*Execution Version*

## AMENDMENT NO. 2 TO SECOND LIEN TERM LOAN AGREEMENT

AMENDMENT NO. 2 (this "**Amendment**"), dated as of April 29, 2022, to the Second Lien Term Loan Agreement, dated as of February 26, 2019 (as amended by that certain Amendment No. 1 to Second Lien Term Loan Agreement, dated as of July 31, 2020, that certain Refinancing Agreement (Second Lien), dated as of March 30, 2021 and as further amended, modified, refinanced and/or restated from time to time prior to the date hereof, the "**Existing Credit Agreement**"; and the Existing Credit Agreement, as amended by this Amendment, the "**Credit Agreement**"), among FIRST BRANDS GROUP INTERMEDIATE, LLC (f/k/a Trico Group Holdings, LLC), a Delaware limited liability company ("**Holdings**"), FIRST BRANDS GROUP, LLC (f/k/a Trico Group, LLC), a Delaware limited liability company (the "**Borrower**"), the Lenders (as defined in the Existing Credit Agreement) party hereto, and JEFFERIES FINANCE LLC, as Administrative Agent and Collateral Agent (in such capacities, the "**Agent**"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in the Credit Agreement.

## RECITALS:

WHEREAS, Section 1.12 of the Existing Credit Agreement permits the Borrower and the Administrative Agent to amend the Existing Credit Agreement to replace LIBOR with a Benchmark Replacement, and implement any Benchmark Replacement Conforming Changes, under such circumstances and on such terms as are set forth in Section 1.12 of the Existing Credit Agreement;

WHEREAS, an Early Opt-In Election has occurred, and the Borrower and the Administrative Agent have agreed to replace the Eurodollar Rate applicable to Eurodollar Rate Loans with Term SOFR as the Benchmark Replacement therefor, and implement certain Benchmark Replacement Conforming Changes, in each case, as further set forth herein;

WHEREAS, Section 1.12 of the Existing Credit Agreement provides that amendments implemented pursuant thereto (the "**Benchmark Replacement Amendments**") shall become effective on the fifth (5th) Business Day (as defined in the Credit Agreement) after the Administrative Agent shall have posted the Benchmark Replacement Amendments to all Lenders and the Borrower, so long as the Administrative Agent shall not have received, by such time, written notice of objection to Benchmark Replacement Amendments from Lenders comprising the Required Lenders; and

WHEREAS, the Benchmark Replacement Amendments to be effected by this Amendment, which are set forth on Annex I hereto were posted to the Lenders on April 22, 2022, and the Administrative Agent has not, since such date, received written notice from Lenders comprising the Required Lenders that such Lenders do not accept the Benchmark Replacement Amendments.

NOW THEREFORE, in consideration of the premises and the agreements, provisions and covenants contained herein, the parties hereto hereby agree as follows:

**SECTION 1**   *Amendment to Credit Agreement.* On the Amendment No. 2 Effective Date, the Existing Credit Agreement shall be amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: double-underlined text) as set forth in the pages of the Credit Agreement attached as Annex I hereto in order to effect the foregoing.

**SECTION 2**   *Effectiveness of Amendment.* This Amendment shall become effective as of the first date (the "**Amendment No. 2 Effective Date**") on which each of the following conditions shall have been satisfied:

CONFIDENTIAL     FBG_CH1_00097876

**DEBTORS' EXHIBIT NO. 67**
**Page 1 of 180**

(a)      the Agent shall have executed this Amendment, and the Agent shall have received counterparts of this Amendment duly executed by the Borrower and the Guarantors;

(b)      the Borrower shall pay any accrued and unpaid interest on the Existing Term Loans pursuant to Section 2.08 of the Credit Agreement; and

(c)      the Agent has not received, by 5:00 p.m. on April 29, 2022, written notice of objection to the Benchmark Replacement Amendments from Lenders comprising the Required Lenders (it being acknowledged by the parties hereto that such written notice of objection to the Benchmark Replacement Amendments from Lenders comprising the Required Lenders has not been received by such time).

**SECTION 3**   *Representations and Warranties.* To induce the Agent to enter into this Amendment, the Borrower and each Guarantor party hereto represents and warrants to the Agent and the Lenders that:

(a)      each of the representations and warranties of the Borrower and each Loan Party set forth in Article V of the Credit Agreement and in each other Loan Document are true and correct in all material respects (except to the extent that such representations and warranties (i) specifically refer to an earlier date, in which case they are true and correct in all material respects on and as of such earlier date, and (ii) are qualified as to "materiality", "Material Adverse Effect" or similar language, in which case they shall be true and correct in all respects as so qualified) on and as of the Amendment No. 2 Effective Date (both before and after giving effect to this Amendment and the transactions contemplated hereby);

(b)      no Default or Event of Default shall have occurred and be continuing or shall occur as a result of the transactions contemplated by this Amendment;

(c)      the execution and delivery of this Amendment by the Borrower and each Guarantor and the performance of this Amendment and the Loan Documents to which such Person is party are within such Person's corporate or other powers, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01 of the Credit Agreement), or require any payment to be made under (x) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject (in each case in this clause (ii), except, in each case, to the extent such conflict, breach, contravention or creation of a Lien could not reasonably be expected to have a Material Adverse Effect), or (iii) violate any applicable Law (except to the extent that such violation could not reasonably be expected to have a Material Adverse Effect); and

(d)      this Amendment has been duly executed and delivered by the Borrower and each Guarantor party hereto and constitutes the legal, valid and binding obligation of the Borrower and each Guarantor party hereto and is enforceable against the Borrower and each Guarantor party hereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

**SECTION 4**   *Credit Agreement Governs.* Except as expressly set forth herein, this Amendment shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of any Lender or the Agent under the Credit Agreement or any other Loan Document, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other Loan Document, all of which are ratified and

2

1314599.01A-NYCSR01A - MSW

CONFIDENTIAL

FBG_CH1_00097877

affirmed in all respects and shall continue in full force and effect. Nothing herein shall be deemed to entitle any Loan Party to a future consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other Loan Document in similar or different circumstances.

**SECTION 5**   *Ratification and Reaffirmation of Liability.*

(a)      As of the date hereof, each Loan Party hereby (i) ratifies and reaffirms all of its payment and performance obligations, contingent or otherwise, under each of the Loan Documents to which it is a party, (ii) ratifies and reaffirms each grant of a lien on, or security interest in, its property made pursuant to the Loan Documents (including, without limitation, the grant of security made by such Loan Party pursuant to the Security Agreement and Pledge Agreement) and confirms that such liens and security interests continue to secure the Secured Obligations under the Loan Documents, subject to the terms thereof (including obligations in respect of the Existing Term Loans) and (iii) in the case of each Guarantor, ratifies and reaffirms its guaranty of the Obligations (including, in any event, all obligations in respect of the Existing Term Loans) pursuant to the Guaranty. Without limiting the foregoing, this Amendment shall not extinguish the obligations for the payment of money outstanding under the Existing Credit Agreement or discharge or release the Lien or priority of any Collateral Document or any other security therefor. Nothing herein contained shall be construed as a substitution or novation of the obligations outstanding under the Existing Credit Agreement or instruments securing the same, which shall remain in full force and effect, except to any extent modified hereby or by instruments executed concurrently herewith. Nothing implied in this Amendment or in any other document contemplated hereby shall be construed as a release or other discharge of any of the Loan Parties under any Loan Document from any of its obligations and liabilities as a borrower, guarantor or pledgor under any of the Loan Documents

(b)      As security for the payment or performance, as the case may be, in full of the Secured Obligations (as defined in the Credit Agreement), each Loan Party hereby grants to the Collateral Agent (and its successors and permitted assigns), for the benefit of the Secured Parties (and their respective successors and permitted assigns), a security interest in all of its right, title and interest in (x) the Collateral (as such term is defined in that certain Security Agreement, dated as of February 26, 2019 (as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, the "Security Agreement"), among the Grantors (as defined therein) and the Collateral Agent) and (y) the Securities Collateral (as such term is defined in that certain Pledge Agreement, dated as of February 26, 2019 (as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, the "Pledge Agreement"), among the Pledgors (as defined therein) and the Collateral Agent).

**SECTION 6**   *Counterparts.* This Amendment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Delivery of an executed counterpart of a signature page to this Amendment by facsimile or electronic (i.e., "pdf" or "tif") transmission shall be effective as delivery of a manually executed counterpart of this Amendment. Any signature to this Amendment may be delivered by facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. Each of the parties hereto represents and warrants to the other parties that it has the corporate capacity and authority to execute this Amendment through electronic means and there are no restrictions for doing so in that party's constitutive documents. The foregoing also applies to any amendment, extension or renewal of this Amendment.

3

1314599.01A-NYCSR01A - MSW

CONFIDENTIAL

FBG_CH1_00097878

**SECTION 7**    *Miscellaneous.*

(a)    *Loan Document.* This Amendment shall constitute a "Loan Document" for all purposes of the Credit Agreement and the other Loan Documents. The provisions of this Amendment are deemed incorporated into the Credit Agreement as if fully set forth therein.

(b)    *Entire Agreement.* This Amendment, the Credit Agreement, the other Loan Documents delivered in connection herewith and the other Loan Documents, in each case as amended, restated, amended and restated, supplemented or otherwise modified from time to time on or prior to the date hereof, constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof and supersede all other prior agreements and understandings, both written and verbal, among the parties or any of them with respect to the subject matter hereof.

(c)    *Severability; Governing Law; Waiver of Right to Trial by Jury; PATRIOT ACT.* The following provisions of the Credit Agreement are hereby incorporated by reference as if set forth fully herein, mutatis mutandis: Section 11.14 (*Severability*); Section 11.15 (*Governing Law*); Section 11.16 (*Waiver of Right to Trial by Jury*); and Section 11.17 (*PATRIOT ACT*).

*[Remainder of page intentionally left blank]*

4

1314599.01A-NYCSR01A - MSW

CONFIDENTIAL

FBG_CH1_00097879

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the date first above written.

FIRST BRANDS GROUP, LLC, as Borrower

By: _____

Name:   Shekhar Kumar

Title:    Corporate Finance Manager

FIRST BRANDS GROUP INTERMEDIATE, LLC,
CARTER FUEL SYSTEMS, LLC,
STRONGARM, LLC,
KTRI HOLDINGS, INC.,
HEATHERTON HOLDINGS, LLC,
CARTER FUEL EXPORT, INC.,
PREMIER MARKETING GROUP, LLC,
AVM EXPORT, INC.,
TRICO PRODUCTS CORPORATION,
KTRI OFFSHORE HOLDINGS, LLC,
TRICO HOLDING CORPORATION,
TRICO TECHNOLOGIES CORPORATION,
ASC INDUSTRIES, INC.,
SPECIALTY PUMPS GROUP, INC.,
each as a Guarantor

By: _____

Name:   Shekhar Kumar

Title:    Corporate Finance Manager

*[Signature Page – Amendment No. 2 to Second Lien Term Loan Agreement]*

CONFIDENTIAL

FBG_CH1_00097880

AIRTEX INDUSTRIES, LLC,
AIRTEX PRODUCTS, LP,
CHAMPION LABORATORIES, INC.,
FUEL FILTER TECHNOLOGIES, INC.,
UCI ACQUISITION HOLDINGS (NO. 4) LLC,
UCI INTERNATIONAL HOLDINGS, INC.,
UCI INTERNATIONAL HOLDINGS PARENT, INC.,
UCI INTERNATIONAL, LLC,
UCI PENNSYLVANIA, INC.,
UCI-AIRTEX HOLDINGS, INC.,
UNITED COMPONENTS, LLC,
UNIVERSAL AUTO FILTER LLC,
each as a Guarantor

By:_____
Name:    Shekhar Kumar
Title:     Corporate Finance Manager


BPI ACQUISITION COMPANY, LLC,
BPI HOLDINGS INTERNATIONAL, LLC,
BRAKE PARTS HOLDINGS, INC.,
BRAKE PARTS INC LLC,
BRAKE PARTS INC INDIA LLC,
BPI EC, LLC,
BRAKE PARTS INC CHINA LLC,
each as a Guarantor

By:_____
Name:    Shekhar Kumar
Title:     Corporate Finance Manager

APC PARENT, LLC,
APC INTERMEDIATE HOLDINGS, LLC,
CWD INTERMEDIATE HOLDINGS I, LLC,
CWD HOLDING, LLC,
CWD INTERMEDIATE HOLDINGS II, LLC,
CWD, LLC,
QUALIS ENTERPRISES, LLC,
QUALIS AUTOMOTIVE, L.L.C.,
each as a Guarantor

By:_____
Name:    Shekhar Kumar
Title:     Corporate Finance Manager


*[Signature Page – Amendment No. 2 to Second Lien Term Loan Agreement]*

CONFIDENTIAL

FBG_CH1_00097881

**DEBTORS' EXHIBIT NO. 67**
**Page 6 of 180**

AUTOLITE OPERATIONS,
FRAM GROUP IP, LLC,
GRAM GROUP OPERATIONS, LLC,
FRAMAUTO HOLDINGS, LLC,
each as a Guarantor

By:_____

Name:    Shekhar Kumar
Title:     Corporate Finance Manager

*[Signature Page – Amendment No. 2 to Second Lien Term Loan Agreement]*

**DEBTORS' EXHIBIT NO. 67**
**Page 7 of 180**

JEFFERIES FINANCE LLC, as Administrative Agent

By: _____

    Name: Paul Chisholm
    Title: Managing Director

*[Signature Page – Amendment No. 2 to Second Lien Term Loan Agreement]*

CONFIDENTIAL

FBG_CH1_00097883

**ANNEX I**
[See attached]

1314599.01A-NYCSR01A - MSW

CONFIDENTIAL

FBG_CH1_00097884

SECOND LIEN TERM LOAN AGREEMENT

Dated as of February 26, 2019, as amended by
Amendment No. 1, dated as of July 31, 2020, ~~and~~
Refinancing Agreement (Second Lien), dated as of March 30, 2021

~~among, and~~
<u>Amendment No. 2, dated as of April 29, 2022</u>

<u>among</u>

FIRST BRANDS GROUP, LLC
(f/k/a Trico Group, LLC),
as Borrower,

FIRST BRANDS GROUP INTERMEDIATE, LLC
(f/k/a Trico Group Holdings, LLC),
as Parent,

THE LENDERS PARTY HERETO

and

JEFFERIES FINANCE LLC,
as Administrative Agent and Collateral Agent

———————————————————————

JEFFERIES FINANCE LLC,
as Sole Lead Arranger

———————————————————————

CONFIDENTIAL

FBG_CH1_00097885

TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS AND ACCOUNTING TERMS** 1

Section 1.01    Defined Terms 1
Section 1.02    Other Interpretive Provisions 5354
Section 1.03    Accounting Terms 5455
Section 1.04    Rounding 5456
Section 1.05    References to Agreements, Laws, Etc. 5556
Section 1.06    Times of Day 5556
Section 1.07    Timing of Payment or Performance 5556
Section 1.08    Currency Equivalents Generally 5556
Section 1.09    Cashless Rollovers 5556
Section 1.10    Certain Calculations and Tests 5557
Section 1.11    Divisions 5657
Section 1.12    Interest Rates; LIBOR Replacement 5658

**ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS** 5758

Section 2.01    The Loans 5758
Section 2.02    Borrowings, Conversions and Continuations of Loans 5758
Section 2.03    [Reserved] 5960
Section 2.04    [Reserved] 5960
Section 2.05    Prepayments 5960
Section 2.06    Termination or Reduction of Commitments 6465
Section 2.07    Repayment of Loans 6465
Section 2.08    Interest 6465
Section 2.09    Fees 6566
Section 2.10    Computation of Interest and Fees 6566
Section 2.11    Evidence of Indebtedness 6566
Section 2.12    Payments Generally 6667
Section 2.13    Sharing of Payments 68
Section 2.14    Defaulting Lenders 6869
Section 2.15    [Reserved] 6970
Section 2.16    Incremental Term Loans 6970
Section 2.17    Specified Term Refinancing Debt 7172
Section 2.18    Extension of Loans 7374
Section 2.19    Benchmark Replacement Setting 76

**ARTICLE III TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY** 7577

Section 3.01    Taxes 7577
Section 3.02    Illegality 7981
Section 3.03    Inability to Determine Rates 7982
Section 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar RateSOFR Loans 8082
Section 3.05    Funding Losses 8183
Section 3.06    Matters Applicable to All Requests for Compensation 8183
Section 3.07    Replacement of Lenders under Certain Circumstances 8284
Section 3.08    Survival 8386

**ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS** 8386

Section 4.01    Conditions of Initial Credit Extension 8386
Section 4.02    Conditions to All Credit Extensions 8689

i

CONFIDENTIAL

FBG_CH1_00097886

**TABLE OF CONTENTS** (Cont.)

Page

**ARTICLE V REPRESENTATIONS AND WARRANTIES** .......................................... 8789

Section 5.01　Existence, Qualification and Power; Compliance with Laws ............... 8789
Section 5.02　Authorization; No Contravention ................................................ 8790
Section 5.03　Governmental Authorization; Other Consents ............................... 8790
Section 5.04　Binding Effect ...................................................................... 8890
Section 5.05　No Material Adverse Effect ...................................................... 8890
Section 5.06　Litigation; FCPA .................................................................. 8890
Section 5.07　Ownership of Property; Liens; Insurance ...................................... 8891
Section 5.08　Creation and Perfection of Security Interests ................................ 8891
Section 5.09　Environmental Compliance ...................................................... 8991
Section 5.10　Taxes ................................................................................ 8992
Section 5.11　Compliance with ERISA .......................................................... 9092
Section 5.12　Labor Matters ...................................................................... 9092
Section 5.13　Subsidiaries; Equity Interests .................................................. 9093
Section 5.14　Margin Regulations; Investment Company Act; PATRIOT Act ............ 9093
Section 5.15　Disclosure; Financial Statements .............................................. 9193
Section 5.16　Intellectual Property .............................................................. 9194
Section 5.17　Solvency ............................................................................ 9294
Section 5.18　AML Laws; Anti-Corruption Laws and Sanctions ........................... 9294
Section 5.19　Status as Senior Indebtedness .................................................. 9295

**ARTICLE VI AFFIRMATIVE COVENANTS** .......................................................... 9295

Section 6.01　Financial Statements .............................................................. 9295
Section 6.02　Certificates; Reports; Other Information ...................................... 9396
Section 6.03　Notice Requirements; Other Information ...................................... 9497
Section 6.04　Environmental Matters ............................................................ 9597
Section 6.05　Maintenance of Existence ........................................................ 9598
Section 6.06　Maintenance of Properties ........................................................ 9598
Section 6.07　Maintenance of Insurance ........................................................ 9698
Section 6.08　Compliance with Laws ............................................................ 9699
Section 6.09　Books and Records ................................................................ 9699
Section 6.10　Inspection Rights .................................................................. 9699
Section 6.11　Covenant to Guarantee Obligations and Give Security ..................... 9799
Section 6.12　Further Assurances ................................................................ 99102
Section 6.13　Taxes ................................................................................ 99102
Section 6.14　Ratings .............................................................................. 100102
Section 6.15　Use of Proceeds .................................................................... 100102
Section 6.16　Lien Enhancements ................................................................ 100102

**ARTICLE VII NEGATIVE COVENANTS** .............................................................. 100103

Section 7.01　Liens ................................................................................ 100103
Section 7.02　Investments ........................................................................ 105107
Section 7.03　Indebtedness ........................................................................ 107110
Section 7.04　Fundamental Changes ............................................................ 112115
Section 7.05　Dispositions ........................................................................ 114116
Section 7.06　Restricted Payments .............................................................. 117119
Section 7.07　Change in Nature of Business .................................................. 119122
Section 7.08　Transactions with Affiliates .................................................... 119122
Section 7.09　Prepayments and Modifications of Certain Indebtedness ................. 120123
Section 7.10　Negative Pledge .................................................................... 121124

ii

## TABLE OF CONTENTS (Cont.)

Page

Section 7.11     Amendments to Organization Documents ........... ~~123~~125
Section 7.12     Fiscal Year ........... ~~123~~125
Section 7.13     Sanctions; Anti-Corruption Laws ........... ~~123~~125
Section 7.14     Anti-Layering ........... ~~123~~126

**ARTICLE VIII PARENT COVENANT** ........... ~~123~~126

**ARTICLE IX EVENTS OF DEFAULT AND REMEDIES** ........... ~~124~~127

Section 9.01     Events of Default ........... ~~124~~127
Section 9.02     Remedies Upon Event of Default ........... ~~127~~129
Section 9.03     Application of Funds ........... ~~127~~129

**ARTICLE X ADMINISTRATIVE AGENT AND OTHER AGENTS** ........... ~~128~~130

Section 10.01     Appointment and Authorization of Agents ........... ~~128~~130
Section 10.02     Delegation of Duties ........... ~~130~~133
Section 10.03     Liability of Agents ........... ~~131~~133
Section 10.04     Reliance by Agents ........... ~~131~~134
Section 10.05     Notice of Default ........... ~~131~~134
Section 10.06     Credit Decision; Disclosure of Information by Agents ........... ~~132~~134
Section 10.07     Indemnification of Agents ........... ~~132~~135
Section 10.08     Agents in their Individual Capacities ........... ~~133~~135
Section 10.09     Successor Agents ........... ~~133~~135
Section 10.10     Administrative Agent May File Proofs of Claim; Credit Bidding ........... ~~134~~136
Section 10.11     Other Agents; Arrangers and Managers ........... ~~135~~137
Section 10.12     Certain ERISA Matters ........... ~~135~~138

**ARTICLE XI MISCELLANEOUS** ........... ~~137~~139

Section 11.01     Amendments, Etc. ........... ~~137~~139
Section 11.02     Notices and Other Communications; Facsimile and Electronic Copies ........... ~~140~~142
Section 11.03     No Waiver; Cumulative Remedies ........... ~~144~~146
Section 11.04     Costs and Expenses ........... ~~144~~146
Section 11.05     Indemnification ........... ~~144~~147
Section 11.06     Payments Set Aside ........... ~~145~~148
Section 11.07     Successors and Assigns ........... ~~146~~148
Section 11.08     Confidentiality ........... ~~152~~154
Section 11.09     Setoff ........... ~~153~~156
Section 11.10     Release of Collateral and Guarantee ........... ~~154~~156
Section 11.11     Counterparts ........... ~~154~~157
Section 11.12     Integration ........... ~~155~~157
Section 11.13     Survival of Representations and Warranties ........... ~~155~~157
Section 11.14     Severability ........... ~~155~~158
Section 11.15     GOVERNING LAW ........... ~~155~~158
Section 11.16     WAIVER OF RIGHT TO TRIAL BY JURY ........... ~~156~~158
Section 11.17     Binding Effect ........... ~~156~~158
Section 11.18     [Reserved] ........... ~~156~~159
Section 11.19     PATRIOT Act ........... ~~156~~159
Section 11.20     Interest Rate Limitation ........... ~~156~~159
Section 11.21     ABL Intercreditor Agreement ........... ~~157~~159
Section 11.22     First Lien/Second Lien Intercreditor Agreement ........... ~~157~~159
Section 11.23     No Fiduciary Duty ........... ~~157~~160

CONFIDENTIAL

FBG_CH1_00097888

**TABLE OF CONTENTS** (Cont.)

**Page**

Section 11.24    Acknowledgement and Consent to Bail-In of Affected Financial
Institutions ............................................................................................ ~~158~~160

Section 11.25    Acknowledgment Regarding Any Supported QFCs ............................ ~~158~~161

iv

CONFIDENTIAL

FBG_CH1_00097889

SCHEDULES

Schedule 1.01(a)        -        Specified Customers
Schedule 1.01(b)        -        Subsidiary Guarantors
Schedule 2.01           -        Commitments
Schedule 5.07(b)        -        Owned Real Property
Schedule 5.13           -        Subsidiaries and Other Equity Investments
Schedule 6.11           -        Foreign Law Security Principles
Schedule 7.01(b)        -        Existing Liens
Schedule 7.02(e)        -        Investments
Schedule 7.03(e)        -        Permitted Non-Recourse Factoring Transactions
Schedule 7.03(v)        -        Indebtedness

EXHIBITS

Exhibit A        -        Form of Committed Loan Notice
Exhibit B        -        Form of Prepayment Notice
Exhibit C        -        Form of Note
Exhibit D        -        Form of Compliance Certificate
Exhibit E        -        Form of Assignment and Assumption
Exhibit F        -        Form of Guarantee
Exhibit G-1      -        Form of Pledge Agreement
Exhibit G-2      -        Form of Security Agreement
Exhibit H-1      -        Form of Intellectual Property Security Agreement
Exhibit H-2      -        Form of Intellectual Property Security Agreement Supplement
Exhibit I        -        Form of ABL Intercreditor Agreement
Exhibit J-1      -        Form of U.S. Tax Compliance Certificate (For Foreign Lenders that
                          are not Partnerships for U.S. Federal Income Tax Purposes)
Exhibit J-2      -        Form of U.S. Tax Compliance Certificate (For Foreign Participants
                          that are not Partnerships for U.S. Federal Income Tax Purposes)
Exhibit J-3      -        Form of U.S. Tax Compliance Certificate (For Foreign Participants
                          that are Partnerships for U.S. Federal Income Tax Purposes)
Exhibit J-4      -        Form of U.S. Tax Compliance Certificate (For Foreign Lenders that
                          are Partnerships for U.S. Federal Income Tax Purposes)
Exhibit K        -        Form of Solvency Certificate
Exhibit L        -        Form of First Lien/Second Lien Intercreditor Agreement

i

## SECOND LIEN TERM LOAN AGREEMENT

This SECOND LIEN TERM LOAN AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement") is entered into as of February 26, 2019, among FIRST BRANDS GROUP, LLC (formerly known as Trico Group, LLC), a Delaware limited liability company (the "Borrower"), FIRST BRANDS GROUP INTERMEDIATE, LLC (formerly known as Trico Group Holdings, LLC), a Delaware limited liability company ("Parent"), THE LENDERS FROM TIME TO TIME PARTY HERETO, and JEFFERIES FINANCE LLC ("Jefferies"), as administrative agent (together with its permitted successors in such capacity, the "Administrative Agent"), and as collateral agent (together with its permitted successors in such capacity, the "Collateral Agent").

## PRELIMINARY STATEMENTS

WHEREAS, capitalized terms used in these recitals shall have the respective meanings set forth for such terms in Section 1.01 hereof;

WHEREAS, the Lenders have agreed to extend to the Borrower $100,000,000 aggregate principal amount of Initial Term Loans on the Closing Date, for purposes of consummating the Transactions, including satisfying the Borrower's obligations under the Fram Purchase Agreement and for other permitted purposes as set forth in Section 6.15 hereof;

WHEREAS, the Guarantors have agreed to guarantee the obligations of the Borrower hereunder; and

WHEREAS, the Borrower and the Guarantors have agreed to secure their respective Obligations by granting to the Collateral Agent, for the benefit of the Secured Parties, a second priority Lien (subject to the terms of the ABL Intercreditor Agreement and the First Lien/Second Lien Intercreditor Agreement and Liens on the ABL Priority Collateral in favor of the ABL Agent and Liens on the Collateral in favor of the First Lien Collateral Agent) on substantially all of their respective assets, subject to the terms and conditions set forth in the Collateral Documents.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01   Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"2019 Specified Acquisitions" means the Fram Acquisition, the Airtex Acquisition and the Anco Acquisition.

"2020 Specified Acquisitions" means the BPI Acquisition and the UCI Acquisition.

"2021 Existing Term Loans" means the Term Loans outstanding under this Agreement immediately prior to the occurrence of the 2021 Refinancing Agreement Effective Date.

1

FBG_CH1_00097891

"2021 Refinancing Agreement" means the Refinancing Agreement (Second Lien), dated as of the 2021 Refinancing Agreement Effective Date, by and among the Borrower, the Guarantors, the Administrative Agent, the Collateral Agent, Jefferies, as the Fronting Bank (as defined therein), and the Lenders Party thereto.

"2021 Refinancing Agreement Effective Date" means the "Agreement Effective Date" as defined in Section 4 of the 2021 Refinancing Agreement, which date is March 30, 2021.

"2021 Refinancing Agreement Transactions" means, collectively, (a) the execution and delivery of the 2021 Refinancing Agreement and performance of the transactions contemplated thereunder on or about the 2021 Refinancing Agreement Effective Date, including without limitation, the refinancing in full of the 2021 Existing Term Loans with the 2021 Term Loans and the refinancing in full of the loans outstanding under the First Lien Facility, in each case, on the 2021 Refinancing Agreement Effective Date and the payment of all closing payments, fees and expenses to be paid and owing in connection with any of the foregoing.

"2021 Term Commitments" has the meaning assigned to such term in the 2021 Refinancing Agreement.

"2021 Term Lender" means a Lender with a 2021 Term Commitment or an outstanding 2021 Term Loan.

"2021 Term Loans" means the Term Loans made pursuant to Section 2.01(ii) on the 2021 Refinancing Agreement Effective Date.

"ABL Agent" means Bank of America, N.A.  as administrative agent and collateral agent (as successor to Goldman Sachs Bank USA) for the lenders from time to time party to the ABL Credit Agreement

"ABL Credit Agreement" means the ABL Credit Agreement, dated as of February 2, 2018 (as amended by that certain First Amendment to ABL Credit Agreement dated as of June 1, 2018, that certain Second Amendment to ABL Credit Agreement dated as of January 8, 2019, that certain Third Amendment to ABL Credit Agreement dated as of January 29, 2019, that certain Consent to ABL Credit Agreement dated as of February 26, 2019, that certain Fourth Amendment to ABL Credit Agreement dated as of April 18, 2019, that certain Fifth Amendment to ABL Credit Agreement, dated as of July 31, 2020, and as the same may be amended, amended and restated, supplemented or otherwise modified from time to time not in violation of the ABL Intercreditor Agreement), among, *inter alios*, Parent, the Borrower, the other borrowers from time to time party thereto, Bank of America, N.A., as administrative agent and collateral agent (as successor to Goldman Sachs Bank USA), and the lenders from time to time party thereto.

"ABL Facility" means the credit facility governed by the ABL Credit Agreement.

"ABL Incremental Commitment Increase" means any "Incremental ABL Commitment Increase" as defined in the ABL Credit Agreement.

"ABL Intercreditor Agreement" means the Amended and Restated ABL Intercreditor Agreement, dated as of the Closing Date (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms), among the Collateral Agent, the ABL Agent, the First Lien Collateral Agent and the Loan Parties, substantially in the form of Exhibit I.

2

FBG_CH1_00097892

"ABL Loan Documents" means the "Loan Documents" as defined in the ABL Credit Agreement.

"ABL Loans" means the loans extended to the "Borrowers" (as defined in the ABL Credit Agreement) pursuant to the ABL Credit Agreement (including pursuant to any ABL Incremental Commitment Increase).

"ABL Obligations" means the "Obligations" as defined in the ABL Credit Agreement.

"ABL Priority Collateral" has the meaning specified in the ABL Intercreditor Agreement.

"Accounts" has the meaning specified in Article 9 of the UCC.

"Acquisition" means the purchase or other acquisition of all or substantially all of the property and assets or business of any Person or of assets constituting a business unit, a line of business or division of such Person, or of a majority of the Equity Interests in a Person.

"Additional Amount Basket" means, at any date of determination, an amount equal to the sum, without duplication and, in the case of clauses (v) through (vii) below, to the extent not otherwise reflected in the Retained Excess Cash Flow Amount, of

> (i)     [reserved]

> (ii)     the Retained Excess Cash Flow Amount, plus

> (iii)     the cash proceeds of Qualified Equity Interests of Parent (other than Specified Equity Contributions (as defined in the ABL Credit Agreement) made pursuant to the ABL Credit Agreement) that are contributed to the Borrower as common equity after the Closing Date, plus

> (iv)     the cash proceeds of capital contributions to Parent and/or any of its Restricted Subsidiaries (other than contributions from Parent and/or any of its Restricted Subsidiaries, Specified Equity Contributions (as defined in the ABL Credit Agreement) made pursuant to the ABL Credit Agreement) that are contributed to the Borrower as common equity after the Closing Date, plus

> (v)     returns, net profits, distributions and cash principal payments on loans received in cash on Investments made using this Additional Amount Basket (up to the amount of the original Investment), plus

> (vi)     the net cash proceeds received by the Borrower or any other Restricted Subsidiary during the period from and including the day immediately following the Closing Date through and including such time in connection with the Disposition to any Person (other than Parent or any of its Restricted Subsidiaries) of any Investment made using this Additional Amount Basket (up to the amount of the original Investment), plus

> (vii)     [reserved], plus

> (viii)     the aggregate principal amount of any Indebtedness or Disqualified Equity Interests, in each case, of Parent or any of its Restricted Subsidiaries issued after the Closing Date (other than Indebtedness or such Disqualified Equity Interests issued to Parent or any of its Restricted Subsidiaries), which has been converted into or exchanged for Qualified Equity Interests of the Borrower, any other Restricted Subsidiary or any Parent Company, in

3

CONFIDENTIAL

FBG_CH1_00097893

**DEBTORS' EXHIBIT NO. 67**
**Page 18 of 180**

each case, during the period from and including the day immediately following the Closing Date through and including such time (other than Specified Equity Contributions (as defined in the ABL Credit Agreement) made pursuant to the ABL Credit Agreement), plus

(ix)     to the extent not otherwise applied to prepay Indebtedness secured by the Collateral on a pari passu or junior lien basis to the Obligations in accordance with the terms of the definitive documentation governing such Indebtedness, the amount of any Declined Proceeds, minus

(x)     any amounts expended pursuant to Section 7.02(m)(ii), Section 7.06(e) and Section 7.09(a)(vi) hereof.

"Adjusted Term SOFR" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Administrative Agent" means Jefferies, in its capacity as administrative agent under the Loan Documents, or any successor administrative agent appointed in accordance with Section 10.09.

"Administrative Agent's Office" means, the Administrative Agent's address and, as appropriate, account as set forth in Section 11.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, controls, is Controlled by or is under common Control with the Person specified.  For purposes of this Agreement and the other Loan Documents, Jefferies LLC and its Affiliates shall be deemed to be Affiliates of Jefferies Finance LLC and its Affiliates.

"Affiliated Lender" means, at any time, any Affiliate of any Permitted Holder or the Parent (other than any natural person), the Borrower and each other Subsidiary of Parent.

"Agent-Related Persons" mean the Agents and the Lead Arranger, together with their respective Affiliates, and the officers, directors, employees, agents and attorneys-in-fact of such Persons and Affiliates.

"Agents" means, collectively, the Administrative Agent and the Collateral Agent.

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" has the meaning specified in the introductory paragraph hereto.

"Airtex Acquired Assets" means the Shares and the Acquired Assets (each as defined in the Airtex PSA).

"Airtex Acquisition" means the Borrower's acquisition, directly or indirectly, of the Airtex Acquired Assets pursuant to the Airtex PSA.

4

FBG_CH1_00097894

**DEBTORS' EXHIBIT NO. 67**
**Page 19 of 180**

"Airtex PSA" means that certain Stock and Asset Purchase Agreement, dated as of January 14, 2019, by and among Trico Group, LLC, Carter Fuel Systems, LLC, Specialty Pump Groups, Inc., UCI Acquisition Holdings (No. 4) LLC and UCI-Airtex Holdings, Inc.

"All-In Yield" means, as to any Indebtedness, the yield thereof, whether in the form of interest rate margin, original issue discount (with original issue discount being equated to interest rate margin based on an assumed four (4)-year life to maturity or, if the relevant Indebtedness has a maturity of less than four (4) years, then based on the actual maturity for such Indebtedness), upfront fees, an interest rate floor, or otherwise, in each case, incurred or payable to all lenders of such Indebtedness; provided that (a) All-In Yield shall not include customary arrangement, administration, structuring and underwriting fees and commissions and any amendment fees and, in each case, similar fees in respect of the applicable Indebtedness, in each case, that are not generally paid to all lenders providing such Indebtedness and (b) if such Indebtedness includes an interest rate floor, such interest rate floor shall be equated to applicable interest rate margin for purposes of determining the difference between the All-In Yield of two items of Indebtedness.

"Alternate Currencies" means Euros and such additional currencies as may be agreed by the Administrative Agent.

"Amendment No. 1 Effective Date" means July 31, 2020.

"Amendment No. 2 Effective Date" means April 29, 2022.

"AML Laws" means all Laws of any jurisdiction applicable to any Lender, the Borrower, the Borrower's Subsidiaries or any Guarantor from time to time concerning or relating to terrorism financing or money laundering, including, without limitation, Executive Order No. 13224, the PATRIOT Act, the Bank Secrecy Act, the Money Laundering Control Act of 1986 (i.e., 18 U.S.C. §§ 1956 and 1957) and all Laws comprising or implementing these Laws.

"Anco Acquisition" means the Borrower's acquisition, directly or indirectly, of all of the issued and outstanding equity interests of Federal-Mogul SA, a limited liability company (société anonyme) organized under the laws of Belgium, Federal-Mogul Motorparts Ploiesti Srl, a Romanian limited liability company organized under the laws of Romania, Federal-Mogul Sistemas de Limpadores de Para-Brisas Ltda., a limited liability company organized under the laws of Brazil, Subensambles Internacionales, S. de R.L. de C.V., a limited liability company organized under the laws of Mexico and Federal-Mogul Distribucion de Mexico, S. de R.L. de C.V., a limited liability company organized under the laws of Mexico.

"Anti-Corruption Laws" means all Laws of any jurisdiction applicable to the Borrower, the Borrower's Subsidiaries or any Guarantor from time to time concerning or relating to bribery or corruption, including, without limitation, the FCPA.

"Applicable Lending Office" means for any Lender, such Lender's office, branch or affiliate designated for ~~Eurodollar Rate~~SOFR Loans or Base Rate Loans, as applicable, as notified to the Administrative Agent and the Borrower or as otherwise specified in the Assignment and Assumption pursuant to which such Lender became a party hereto, any of which offices may, subject to Section 3.01(e) and Section 3.02, be changed by such Lender upon 10 days' prior written notice to the Administrative Agent and the Borrower.

"Applicable Rate" means (a) ~~prior to the 2021 Refinancing Agreement~~on and after the Amendment No. 2 Effective Date, a percentage per annum equal to, in respect of Term Loans that are

5

FBG_CH1_00097895

(i) ~~Eurodollar Rate Loans, 9.00% and (ii) Base Rate Loans, 8.00% and (b) on and after the 2021 Refinancing Agreement Effective Date, a percentage per annum equal to, in respect of Term Loans that are (i) Eurodollar~~SOFR Rate Loans, 8.50%, (ii) Base Rate Loans, 7.50% and (~~iii~~b) Specified Term Refinancing Debt Loans, Incremental Term Loans or Extended Term Loans, in each case, as set forth in the applicable Extension Amendment, Incremental Amendment, Joinder Agreement or Refinancing Amendment.

"Applicable Term Loan Premium" has the meaning specified in Section 2.05(a)(iii).

"Appropriate Lender" means, at any time, with respect to Loans of any Class, the Lenders of such Class.

"Approved Fund" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or Affiliate of an entity that administers or manages a Lender.

"Assignment and Assumption" means an Assignment and Assumption substantially in the form of Exhibit E.

"Attorney Costs" means and includes all reasonable and documented or invoiced out-of-pocket fees, expenses and disbursements of any law firm or other external legal counsel.

"Attributable Indebtedness" means, at any date, in respect of any Capital Lease of any Person, the capitalized amount thereof that appears on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"Audited Financial Statements" has the meaning specified in Section 4.01(g).

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.19(d).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable to the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy" as now or hereafter in effect, or any successor statute.

6

CONFIDENTIAL

FBG_CH1_00097896

"Bankruptcy Plan" has the meaning specified in Section 11.07(i)(ii).

"Base Rate" means a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the greatest of (i) the Prime Rate, (ii) ½ of 1.00% per annum above the Federal Funds Rate; (iii) the Eurodollar RateAdjusted Term SOFR for a one-month tenor in effect on such day for an Interest Period of one (1) month plus 1.00%; and (iv) 2.00%. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Rate or Adjusted Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Rate or Adjusted Term SOFR, respectively.

"Base Rate Loan" means a Loan that bears interest at a rate based on the Base Rate.

"Base Rate Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.19(a).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date: (a) the sum of (i) Daily Simple SOFR and (ii) the Benchmark Replacement Adjustment and (b) the sum of: (ai) the alternate benchmark rate (which may include Term SOFR) that has been selected by the Administrative Agent and the Borrower giving due consideration to (iA) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (iiB) any evolving or then-prevailing market convention for determining a benchmark rate of interest as a replacement to the Eurodollar Base Rate for U.S. dollar-denominated then-current Benchmark for Dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment; provided that, if.

If the Benchmark Replacement as so determined pursuant to clause (a) or (b) above would be less than 1.00%the Floor, the Benchmark Replacement will be deemed to be 1.00%the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the Eurodollar Base Ratethen-current Benchmark with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (ia) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the Eurodollar Base Ratesuch Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (iib) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the Eurodollar Base Ratesuch Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominatedDollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment.

"Benchmark Replacement Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of

7

FBG_CH1_00097897

"Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period," or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest and other, timing of a Committed Loan Notice or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 3.05 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such Benchmark Replacement andrate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of the Benchmark Replacementany such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Replacement Date" means the earlier to occur of the following events with respect to the Eurodollar Base Ratethen-current Benchmark:

(a)       in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (ai) the date of the public statement or publication of information referenced therein and (bii) the date on which the administrator of LIBORsuch Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide LIBORall Available Tenors of such Benchmark (or such component thereof); or

(b)       in the case of clause (c) of the definition of "Benchmark Transition Event," the first date of the publicon which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication of information referenced thereinin such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof)

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the Eurodollar Base Ratethen-current Benchmark:

(a)       a public statement or publication of information by or on behalf of the administrator of LIBORsuch Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide LIBORall Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely,; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBORany Available Tenor of such Benchmark (or such component thereof);

(b)       a public statement or publication of information by the regulatory supervisor for the administrator of LIBOR, the U.S.such Benchmark (or the published component used in the calculation thereof), the Federal Reserve SystemBoard, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for LIBORsuch Benchmark (or such component), a resolution authority with jurisdiction over the administrator for LIBORsuch Benchmark

8

CONFIDENTIAL

FBG_CH1_00097898

(or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for ~~LIBOR~~such Benchmark (or such component), which states that the administrator of ~~LIBOR~~such Benchmark (or such component) has ceased or will cease to provide ~~LIBOR~~all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely~~,~~; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide ~~LIBOR~~any Available Tenor of such Benchmark (or such component thereof); or

(c)  a public statement or publication of information by the regulatory supervisor for the administrator of ~~LIBOR announcing that LIBOR is no longer~~such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

~~"Benchmark Transition Start Date" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Administrative Agent or the Required Lenders, as applicable, by notice to the Borrower, the Administrative Agent (in the case of such notice by the Required Lenders) and the Lenders.~~

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means, ~~if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Eurodollar Base Rate and solely to the extent that the Eurodollar Base Rate has not been replaced with a Benchmark Replacement,~~ the period (~~x~~if any) (a) beginning at the time that ~~such~~a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced ~~LIBOR~~the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with ~~the~~ Section ~~titled "Effect of Benchmark Transition Event"~~2.19 and (~~y~~b) ending at the time that a Benchmark Replacement has replaced the ~~Eurodollar Base Rate~~then-current Benchmark for all purposes hereunder ~~pursuant to~~and under any Loan Document in accordance with Section ~~1.1~~2.19.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (pursuant to ERISA Section 3(42)) the assets of any such "employee benefit plan" or "plan".

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Borrower" has the meaning specified in the introductory paragraph of this Agreement.

9

FBG_CH1_00097899

"Borrowing" means a Term Borrowing, an Incremental Term Borrowing, and/or a Specified Term Refinancing Debt Borrowing, as the context may require.

"BPI Acquisition" means the Borrower's acquisition, directly or indirectly, of all of the issued and outstanding equity interests of BPI Acquisition Company, Inc., a Delaware corporation, and each of its direct and indirect subsidiaries each of which is set forth on Schedule 1.2(f) of that certain Securities Purchase Agreement, dated as of July 31, 2020, by and among BPI Acquisition Company, Inc., a Delaware corporation, the sellers listed on the signature pages thereto, including Torque BPI LLC, a Delaware limited liability company, Brake Parts Holdings, Inc., a Delaware corporation, Torque Capital Group, LLC and the supporting parties identified on the signature pages thereto.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required to close under the Laws of, or are in fact closed in, the province or state where the Administrative Agent's Office is located and in the State of New York; provided that if such day relates to any interest rate settings as to a Eurodollar Rate Loan, any fundings, disbursements, settlements and payments in respect of any such Eurodollar Rate Loan, or any other dealings in Dollars to be carried out pursuant to this Agreement in respect of any such Eurodollar Rate Loan, Business Day also means any such day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank market..

"Capital Expenditures" means, with respect to the Borrower and the other Restricted Subsidiaries for any period, the aggregate amount, without duplication, of (x) all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Leases) that would, in accordance with GAAP, be included as additions to property, plant and equipment and (y) other capital expenditures of such Person for such period (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Leases) that are reported in the Borrower's consolidated statement of cash flows for such period; provided, that Capital Expenditures shall not include (i) any expenditures for replacements and substitutions for fixed assets, capital assets or equipment to the extent made with (A) Net Cash Proceeds invested pursuant to Section 2.05(b)(ii)(B) or Section 2.05(b)(ii)(B) of the First Lien Credit Agreement or (B) proceeds from any Disposition for aggregate consideration of less than $2,500,000 with respect to any transaction or series of related transactions and less than $6,250,000 in the aggregate during any Fiscal Year, (ii) expenditures financed with the proceeds of cash capital contributions or the net cash proceeds from the sale or issuance of Equity Interests (other than Disqualified Equity Interests) received or made by Parent (or any other Parent Company) and contributed to the Borrower, (iii) expenditures that are accounted for as capital expenditures of such Person and that actually are paid for by a third party and for which none of the Loan Parties and their Subsidiaries have provided or are required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other person (whether before, during or after such period), (iv) the purchase price of equipment purchased during such period to the extent the consideration therefor consists of any combination of (A) used or surplus equipment traded in at the time of such purchase and (B) the proceeds of a concurrent sale of used or surplus equipment, in each case, in the ordinary course of business or (v) investments in respect of a Permitted Acquisition solely to the extent amounts paid in connection with such Permitted Acquisition would be treated as a capital expenditure in accordance with GAAP.

"Capital Lease" means, in respect of any Person, any lease of or other arrangement conveying the right to use, property (whether real, personal or mixed) by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person; provided that all leases of any Person that are or would have been characterized as operating leases in accordance with GAAP as in effect immediately prior to the First Lien Credit Agreement Original Closing Date shall continue to be accounted for as operating leases (and not as Capital Leases)

10

FBG_CH1_00097900

for purposes of this Agreement regardless of any change in GAAP following the date that would otherwise require such leases to be recharacterized as Capital Leases.

"Capital Lease Obligation" means, with respect to any Person, at any time of determination, all obligations of such Person as lessee under Capital Leases, in each case, taken at the amount thereof accounted for as liabilities in accordance with GAAP.

"Cash Equivalents" means any of the following, to the extent owned by Parent or any of its Restricted Subsidiaries, having a maturity of not greater than 365 days from the date of acquisition thereof:    (a) Dollars, (b) [reserved], (c) [reserved], (d) readily marketable direct obligations of the Government of the United States or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of the Government of the United States, (e) insured certificates of deposit, time deposits, money market deposits, bankers' acceptances and ~~Eurodollar~~SOFR time deposits (or similar instruments), in each case with any commercial bank having capital and surplus of not less than $500,000,000 and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such person, (f) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (e) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities, (g) securities with maturities of 365 days or less from the date of acquisition that are issued or fully guaranteed by any state, district or territory of the United States, by any political subdivision or taxing authority of any such state, district or territory or by any foreign government, the securities of which state, district or territory, taxing authority or foreign government (as the case may be) are rated at least A-1 by S&P or P-1 by Moody's (or, if at any time neither S&P nor Moody's rates such obligations, an equivalent rating from another nationally recognized statistical rating agency), (h) commercial paper maturing no more than one year from the date of creation thereof and having a rating of at least A-1 by S&P or P-1 by Moody's, (i) securities with maturities of six (6) months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (e) of this definition, (j) money market mutual or similar funds that invest substantially all of their assets in one or more type of securities satisfying the requirements of clauses (d) through (i) of this definition and (k) Investments, classified in accordance with GAAP as Current Assets of the Borrower or any of the other Restricted Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions having capital of at least $1,000,000,000, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (d) and (e) of this definition.

"Cash Interest Payment Date" means, (a) as to any Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of the Credit Facility under which such Loan was made; provided that if any Interest Period for a ~~Eurodollar Rate~~SOFR Loan exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be Cash Interest Payment Dates; and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date of the Credit Facility under which such Loan was made.

"Casualty Event" means any casualty, loss, damage, destruction or any condemnation or other taking by a Governmental Authority pursuant to the power of eminent domain or other similar loss with respect to real or personal property or improvements of the Borrower and the other Restricted Subsidiaries resulting in receipt by the Borrower or any other Restricted Subsidiary of payments or

11

                                                                 FBG_CH1_00097901

DEBTORS' EXHIBIT NO. 67
Page 26 of 180

proceeds (including cash and Cash Equivalents) under any casualty insurance policy or proceeds of a condemnation award in respect of any such property.

"CFC" means a "controlled foreign corporation" as defined in Section 957(a) of the Code.

"CFC Domestic Person" means any Domestic Subsidiary substantially all the assets of which consist of equity and/or debt of one or more CFCs and cash or cash equivalents.

"Change in Law" means (a) the adoption of any law, treaty, order, policy, rule or regulation after the date of this Agreement, (b) any change in any law, treaty, order, policy, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any guideline, request or directive issued or made after the date hereof by any central bank or other Governmental Authority (whether or not having the force of law) (in each case, regardless of whether the same had been proposed as of the date of this Agreement); provided that notwithstanding anything herein the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means the earliest to occur of:

(a)     the Parent ceasing to own directly 100% of the Equity Interests of the Borrower (or, if applicable, any Successor Borrower);

(b)     at any time prior to the consummation of a Qualifying IPO, the Permitted Holders ceasing to own or control, directly or indirectly, at least 50.1% of the then outstanding voting stock of Parent in the aggregate;

(c)     at any time upon or after the consummation of a Qualifying IPO, and for any reason whatsoever, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person and its Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders shall be the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act), directly or indirectly, of more than the lesser of (i) 35% of the then outstanding voting stock of Parent in the aggregate and (ii) the aggregate amount of outstanding voting stock of Parent held, directly or indirectly, by the Permitted Holders; or

(d)     a "Change of Control" under (and as defined in) the First Lien Credit Agreement or the ABL Credit Agreement (or any equivalent occurrence under any Refinancing Indebtedness in respect thereof).

"Class" (a) when used with respect to Lenders, refers to whether such Lenders are Term Lenders, Incremental Term Lenders, or Specified Term Refinancing Debt Lenders, (b) when used with respect to Commitments, refers to whether such Commitments are Term Commitments, Incremental Term Loan Commitments, or Specified Term Refinancing Debt Commitments and (c) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are Term Loans, Incremental Term Loans, or Specified Term Refinancing Debt Loans.

12

FBG_CH1_00097902

"Closing Date" means February 26, 2019, being the date on which all the conditions precedent in Section 4.01 were satisfied or waived in accordance with Section 11.01 and the initial Credit Extension was made.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Collateral" means all the "Collateral" as defined in any Collateral Document and shall include the Term Priority Collateral, the ABL Priority Collateral, and the Mortgaged Properties, if any.

"Collateral Agent" means Jefferies, in its capacity as collateral agent under the Loan Documents, or any successor collateral agent appointed in accordance with Section 10.09.

"Collateral Documents" means, collectively, the Security Agreement, the Intellectual Property Security Agreement, the Mortgages, the Pledge Agreement and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties to secure the Secured Obligations, in each case, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Commitment" means a Term Commitment, an Incremental Term Loan Commitment, a Specified Term Refinancing Debt Commitment or an Extended Term Loan Commitment, as the context may require.

"Committed Loan Notice" means a notice of (i) a Term Borrowing, (ii) an Incremental Term Borrowing, or (iii) a Specified Term Refinancing Debt Borrowing, pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. §§ 1 et seq.).

"Communications" has the meaning specified in Section 11.02(e).

"Company Competitor" means any competitor of the Borrower and/or any of its Subsidiaries.

"Company Customer" means any customer of the Borrower and/or any of its Subsidiaries.

"Company Model" means the financial model delivered to the Lead Arranger under the First Lien Credit Agreement prior to the First Lien Credit Agreement Original Closing Date.

"Compensation Period" has the meaning specified in Section 2.12(c)(ii).

"Compliance Certificate" means a certificate substantially in the form of Exhibit D.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Adjusted EBITDA" means, with respect to any Person on a consolidated basis for any period, the sum of:

> (a)     Consolidated Net Income for such period; plus

> (b)     without duplication and to the extent deducted in determining Consolidated Net Income for such period, the sum of:

13

CONFIDENTIAL

FBG_CH1_00097903

(i)        Consolidated Interest Expense for such period;

(ii)       federal, state and foreign income tax expense for such period and other taxes based on profits, revenue or capital, including, without limitation, franchise, property, premium and similar taxes based on income, profits, revenue or capital, ACA fees and taxes, and foreign withholding taxes paid or accrued during such period (including in respect of repatriated funds), including, in each case with respect to this clause (ii), penalties and interest related to such taxes or arising from any tax examinations (in each case, net of tax refunds received in such period);

(iii)      all amounts attributable to depreciation and amortization expenses or charges for such period;

(iv)      the aggregate amount of all non-cash charges reducing Consolidated Net Income for such period; provided that any cash payments made with respect to any non-cash expenses or charges added back in calculating Consolidated Adjusted EBITDA for any earlier period pursuant to this clause (iv) shall be subtracted in calculating Consolidated Adjusted EBITDA for the period in which such cash payment is made until the entire amount previously added back with respect to such expense or charge has been deducted;

(v)       Transaction Expenses to the extent incurred during such period;

(vi)      non-recurring cash costs and expenses for such period in connection with any Investment (other than an Investment in the Borrower or any of its Subsidiaries existing at the time of such Investment), Permitted Acquisition, Disposition, factoring or other Indebtedness or the issuance of Equity Interests or Indebtedness or the refinancing, modification or amendment thereof and the prepayment of Indebtedness (in each case, solely to the extent permitted hereunder);

(vii)     management fees expensed during such period to the extent permitted under Section 7.06(j);

(viii)    expenses related to contributions to any Pension Plan;

(ix)      any realized or unrealized losses attributable to hedging activities or other derivative instruments pursuant to Accounting Standards Codification 815;

(x)       currency conversion translation losses;

(xi)      any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any Disposition of assets permitted under this Agreement, to the extent (x) actually reimbursed or (y) with respect to which such Person has not received notification from the applicable carrier that it does not intend to indemnify or reimburse such expenses, charges or losses; provided that such amount is in fact indemnified or reimbursed within one hundred eighty (180) days of the initial claim made under the relevant indemnification provisions;

(xii)     any expenses, charges or losses with respect to liability or casualty events or business interruption that are covered by insurance, to the extent (x) actually reimbursed or (y) with respect to which such Person has not received notification from the insurer such amount will not be reimbursed by the insurer; provided that (i) such amount is in

14

FBG_CH1_00097904

**DEBTORS' EXHIBIT NO. 67**
**Page 29 of 180**

fact reimbursed within one hundred eighty (180) days of the initial claim and (ii) upon request of the Administrative Agent, the Borrower shall provide reasonable documentation supporting such expenses, charges or losses for distribution to the Lenders;

(xiii)    (A) the amount of cost savings that have resulted from actions that have been implemented prior to the end of the relevant period, which, on a Pro Forma Basis, are realized or expected to be realized (net of the amount of actual amounts realized) within the first 12 months following the event giving rise thereto as though such cost savings had been realized on the first day of the relevant period, so long as (1) such cost savings are reasonably identifiable and quantifiable and factually supportable, in each case as determined by the Chief Financial Officer in good faith and (2) no cost savings shall be added pursuant to this clause (A) to the extent duplicative of (x) any cost savings that have been included in the determination of Deemed EBITDA (as defined below) or (y) any expenses or charges relating to such cost savings that are included in clause (B) below, and (B) start-up costs, launch costs and any expenses, charges or losses related to pre-production activity; provided that the aggregate amount that may be added back to Consolidated Adjusted EBITDA pursuant to this clause (b)(xiii) in any Test Period shall not exceed 25.0% of Consolidated Adjusted EBITDA (calculated prior to giving effect to any adjustment in this clause (b)(xiii));

(xiv)    without duplication of amounts added back to Consolidated Adjusted EBITDA pursuant to clause (b)(i) above or otherwise, the "interest" or financing charge component of Permitted Non-Recourse Factoring Transactions for such period;

(xv)    without duplication of any amounts added back pursuant to clause (xiii), non-recurring or unusual charges (including any non-recurring operating expenses directly attributable to the implementation of cost savings initiatives and business optimization costs) or losses, restructuring charges, severance costs and relocation costs and synergies, as determined by the Chief Financial Officer in good faith;

(xvi)    adjustments identified in the Company Model (including any cost savings identified therein);

(xvii)    expenses, charges, losses or deductions associated with the Equity Interests in an entity held by such Person attributable to the non-controlling interests or minority interests of third parties;

(xviii)    any aggregate net loss on the Disposition of property and charges related to any asset write-off or write-down (in each case, other than the sale of accounts receivable and inventory in the ordinary course of business); minus

(c)    without duplication and to the extent included in Consolidated Net Income for such period, the sum of:

(i)    the aggregate amount of all non-cash items of income for such period, other than the accrual of revenue or recording of receivables in the ordinary course of business,

(ii)    any realized or unrealized gains attributable to hedging activities or other derivative instruments pursuant to Accounting Standards Codification 815,

(iii)    currency conversion translation gains; and

15

FBG_CH1_00097905

(iv)      any aggregate net gains on the Disposition of property.

Notwithstanding the foregoing, Consolidated Adjusted EBITDA (a) for the fiscal quarter ended March 31, 2020 shall be deemed to be $127,000,000, (b) for the fiscal quarter ended June 30, 2020 shall be deemed to be $102,000,000, (c) for the fiscal quarter ended September 30, 2020 shall be deemed to be $176,000,000 and (d) for the fiscal quarter ended December 31, 2020 shall be deemed to be $178,000,000 (the "Deemed EBITDA").

"Consolidated First Lien Debt" means, with respect to the Borrower and the other Restricted Subsidiaries at any time and as determined on a consolidated basis and without duplication, the aggregate principal amount of Consolidated Total Debt outstanding on such date that is secured by a "first priority" Lien on any property of the Borrower or the other Restricted Subsidiaries that is senior to the Lien securing the Obligations, including the First Lien Loans and the ABL Loans.

"Consolidated Interest Expense" means, with respect to any Person for any Test Period, the sum of (i) consolidated total interest expense of such Person and its Subsidiaries for such period, whether paid or accrued and whether or not capitalized (including, without limitation (and without duplication), amortization of debt issuance costs and original issue discount, premiums paid to obtain payment, financial assurance or similar bonds, interest capitalized during construction, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments under Capital Leases (regardless of whether accounted for as interest expense under GAAP), all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances and net obligations under any Swap Contracts constituting interest rate swaps, collars, caps or other arrangements requiring payments contingent upon interest rates of such Person and its Subsidiaries, any fees and/or expenses paid to the Administrative Agent in connection with its services hereunder, any other bank, administrative agency (or trustee) and financing fees and costs of surety bonds in connection with Indebtedness) plus (ii) all cash dividends paid or payable on preferred stock during such period other than to such Person or a Loan Party plus or less, as applicable, (iii) to the extent they would otherwise be included in interest expense under GAAP, unrealized gains and losses arising from derivative financial instruments issued by such Person for the benefit of such Person or its Subsidiaries, in each case determined on a consolidated basis for such period.

For purposes of this definition, interest on a Capital Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capital Lease Obligation in accordance with GAAP.

"Consolidated Net Income" means, for any period, the consolidated net income (or loss) of the Borrower and the other Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Restricted Subsidiary of the Borrower or is merged into or consolidated with the Loan Parties or any of their respective Restricted Subsidiaries, (b) the income (or deficit) of any Person (other than a Restricted Subsidiary of the Borrower) in which any other Person (other than the Loan Parties or any of their Restricted Subsidiaries) has a joint ownership interest, except to the extent that any such income is actually received by a Loan Party or such Restricted Subsidiary during such period in the form of dividends or similar distributions, (c) the undistributed earnings of any Restricted Subsidiary of the Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of its charter or any agreement (other than under any Loan Document), instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Subsidiary, (d) any after-tax gains or losses attributable to (i) disposed, abandoned, divested and/or discontinued assets, properties or operations (other than, at the option of the Borrower, assets, properties or operations pending the disposal, abandonment, divestiture and/or termination thereof), (ii)

16

CONFIDENTIAL

FBG_CH1_00097906

the disposal, abandonment, divestiture and/or discontinuation of assets, properties or operations or (iii) asset Dispositions or returned surplus assets of any Pension Plan, (e) the income (or loss) attributable to the early extinguishment of Indebtedness, and (f) (to the extent not included in clauses (a) through (e) above) any net extraordinary gains or net extraordinary losses.

"Consolidated Total Assets" means, as of any date, the assets and properties of the Borrower and the other Restricted Subsidiaries as of such date, determined on a consolidated basis in accordance with GAAP as set forth on the most recent consolidated balance sheet of the Borrower delivered pursuant to Section 6.01.

"Consolidated Total Debt" means, with respect to the Borrower and the other Restricted Subsidiaries at any time and as determined on a consolidated basis and without duplication, an amount equal to the sum of Indebtedness of the type set forth in clauses (a), (b), (e), (f)(i) (but only to the extent that any letter of credit, bankers' acceptance or similar instrument has been drawn and not reimbursed), (h) (without duplication and only to the extent of Guarantee Obligations of Indebtedness of the type set forth in clauses (a), (b), (e), (f)(i) (but only to the extent that any letter of credit, bankers' acceptance or similar instrument has been drawn and not reimbursed), and (k) of the definition thereof), and (k) of the definition thereof; provided that "Consolidated Total Debt" shall be calculated (x) net of Unrestricted Cash and (y) excluding any obligation, liability or indebtedness of Parent or any of its Restricted Subsidiaries if, upon or prior to the maturity thereof, there shall have been irrevocably deposited with the proper Person in trust or escrow the necessary funds (or evidences of indebtedness) for the payment, redemption or satisfaction of such obligation, liability or indebtedness, and thereafter such funds and evidences of such obligation, liability or indebtedness or other security so deposited are not included in any computation of Unrestricted Cash.

"Consolidated Working Capital" means, as at any date of determination, the excess or deficiency of Current Assets over Current Liabilities.

"Consolidated Working Capital Adjustment" means, for any period on a consolidated basis, the amount (which may be a negative number) by which Consolidated Working Capital as of the beginning of such period exceeds (or is less than) Consolidated Working Capital as of the end of such period. In calculating the Consolidated Working Capital Adjustment there shall be excluded the effect of reclassification during such period of current assets to long term assets and current liabilities to long term liabilities and the effect of any Permitted Acquisition during such period; provided that there shall be included with respect to any Permitted Acquisition during such period an amount (which may be a negative number) by which the Consolidated Working Capital acquired in such Permitted Acquisition as at the time of such acquisition exceeds (or is less than) Consolidated Working Capital at the end of such period.

"Contract Consideration" has the meaning specified in the definition of "Excess Cash Flow".

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Covered Entity" means any of the following: (a) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (b) a "covered bank" as that term is defined

17

in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Parties" has the meaning assigned to such term in Section 11.02(f).

"Credit Extension" means a Borrowing.

"Credit Facilities" means the Term Loan Facility, any Incremental Term Facility or any Specified Term Refinancing Debt Facility, as the context may require.

"Current Assets" means, at any date, all assets of the Borrower and the other Restricted Subsidiaries which under GAAP would be classified as current assets (excluding any (i) cash or Cash Equivalents (including cash and Cash Equivalents held on deposit for third parties by the Borrower or any of the other Restricted Subsidiaries), (ii) deferred bank fees and derivative financial instruments related to Indebtedness, and (iii) the current portion of current and deferred income taxes and taxes based on profit or capital).

"Current Liabilities" means, at any date, all liabilities of the Borrower and the other Restricted Subsidiaries which under GAAP would be classified as current liabilities, other than (i) current maturities of long term debt, (ii) outstanding ABL Loans (including, without limitation, Swing Line Loans (as defined in the ABL Credit Agreement)) and L/C Exposure (as defined in the ABL Credit Agreement), (iii) accruals of Consolidated Interest Expense (excluding Consolidated Interest Expense that is due and unpaid), (iv) obligations in respect of derivative financial instruments related to Indebtedness, (v) accruals of current and deferred income taxes and taxes based on profit or capital, (vi) liabilities in respect of unpaid earnouts, (vii) the accruals relating to restructuring reserves, (viii) liabilities in respect of funds of third parties on deposit with the Borrower or any of the other Restricted Subsidiaries, (ix) [reserved] and (x) the current portion of any other long term liability for borrowed money.

"Debtor Relief Laws" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, fraudulent transfer, reorganization, or similar debtor relief Laws of the United States or any similar foreign, federal or state law for the relief of debtors from time to time in effect and affecting the rights of creditors generally.

"Declined Proceeds" has the meaning specified in Section 2.05(b)(vii).

"Deemed EBITDA" has the meaning specified in the definition of "Consolidated Adjusted EBITDA".

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

18

CONFIDENTIAL

FBG_CH1_00097908

"Default Rate" means an interest rate equal to (a) the Base Rate plus (b) the Applicable Rate applicable to Base Rate Loans plus (c) 2.00% per annum; provided that with respect to a ~~Eurodollar RateSOFR~~ Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan plus 2.00% per annum, in each case, to the fullest extent permitted by applicable Laws.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender that (i) has failed to fund any portion of the Term Loans required to be funded by it hereunder within three (3) Business Days of the date required to be funded by it hereunder (provided that any such Lender shall be a Defaulting Lender under this clause (i) solely (x) with respect to each Credit Facility with respect to which it has failed to fund and (y) during the occurrence and continuation of such failure to fund, until any such funding shortfall shall have been funded in full by such Lender), (ii) has notified the Borrower and the Administrative Agent in writing that it does not intend to comply with its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or generally under other existing agreements under which it has an obligation to extend credit (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent to funding cannot be satisfied), (iii) failed, within three (3) Business Days after request by the Administrative Agent, to provide written confirmation that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (iii) upon receipt by the Administrative Agent and the Borrower of such requested confirmation, (iv) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three (3) Business Days of the date when due, (v) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding or its parent company has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding (which shall not include any Undisclosed Administration) or (vi) has become subject to a Bail-In Action; provided that (x) as of any date of determination, the determination of whether any Lender is a Defaulting Lender hereunder shall not take into account, and shall not otherwise impair, any amounts funded by such Lender which have been assigned by such Lender to an SPC pursuant to Section 11.07(g) and (y) a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such governmental authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Designated Non-Cash Consideration" means the fair market value (as determined in good faith by the Borrower) of non-cash consideration received by the Borrower or any other Restricted Subsidiary in connection with a Disposition pursuant to Section 7.05 that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer of the Borrower, setting forth the basis of such valuation, less the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Non-Cash Consideration.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition of any asset or property by a Person (including any sale of Equity Interests, but excluding any issuance by a Person of its own Equity Interests), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

19

FBG_CH1_00097909

"Disqualified Equity Interests" means, with respect to any Person, any Equity Interest of such Person which, by its terms, or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable, or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a Change of Control, Qualifying IPO or asset sale so long as any rights of the holders thereof upon the occurrence of a Change of Control, Qualifying IPO or asset sale event shall be subject to the occurrence of the Termination Date), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety one (91) days after the Latest Maturity Date; provided that, (i) if such Equity Interests are issued pursuant to a plan for the benefit of employees of Parent or any of its Restricted Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by Parent or any of its Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations, (ii) no Equity Interest held by any future, present or former Representative (or its Affiliates or any Immediate Family Member who is a successor-in-interest to the relevant Representative) of the Borrower (or any Parent Company or Subsidiary thereof) shall be considered a Disqualified Equity Interest because such Equity Interest is redeemable or subject to repurchase pursuant to any management equity subscription agreement, stock option, stock appreciation right or other stock award agreement, stock ownership plan, put agreement, stockholder agreement or similar agreement that may be in effect from time to time and (iii) any Equity Interests that would not constitute Disqualified Equity Interests but for provisions thereof that give the holders thereof (or the holders of any security into which such Equity Interests are convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of any Change of Control, Qualifying IPO or any asset sale occurring prior to ninety one (91) days after the Latest Maturity Date shall not constitute Disqualified Equity Interests if such Equity Interests provide that the issuer thereof will not redeem any such Equity Interests pursuant to such provisions prior to the Termination Date.

"Disqualified Institution" means (i) those Persons who have been identified to the Lead Arranger in writing prior to the 2021 Refinancing Agreement Effective Date, (ii) Company Competitors and Company Customers who have been identified to the Lead Arranger in writing on or prior to March 29, 2021, and (iii) Affiliates of the Persons identified in clauses (i) and (ii) above that are identifiable as Affiliates thereof solely on the basis of such Person's name; provided, that the Borrower may supplement the list of Disqualified Institutions that are Company Competitors and Affiliates thereof in writing to the Administrative Agent (it being understood that (A) any such supplement shall not apply retroactively to disqualify a Person that has previously acquired an assignment or participation interest in a Loan and (B) with effect from the date of the Administrative Agent's receipt of a notice from the Borrower designating a Person as no longer being a "Disqualified Institution", references herein and in the other Loan Documents to a "Disqualified Institution" shall not include references to such Person) and provided, further, that Disqualified Institutions shall not include any Person which is a bona fide debt fund, investment vehicle, regulated bank entity or unregulated lending entity (other than any Person separately identified as a Disqualified Institution pursuant to clause (i) or (ii) above) that is engaged in making, purchasing, holding or otherwise investing in commercial loans or similar extensions of credit in the ordinary course of business so long as any Person identified in clauses (i) through (iii) above does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of such entity.

20

CONFIDENTIAL

FBG_CH1_00097910

**DEBTORS' EXHIBIT NO. 67**
**Page 35 of 180**

"Disregarded Domestic Person" means any direct or indirect Domestic Subsidiary that is treated as disregarded for U.S. tax purposes and substantially all the assets of which consist of equity of one or more Foreign Subsidiaries and cash or cash equivalents.

"Dollar Equivalent Amount" means, on any date of determination, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in an Alternate Currency, the equivalent amount thereof in Dollars as determined by the Administrative Agent, at such time on the basis of the Spot Rate (determined as of the date of determination or such other date determined by the Administrative Agent) for the purchase of Dollars with such applicable Alternate Currency, as the case may be.

"Dollars" means lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia.

~~"Early Opt-in Election" means the occurrence of:~~

~~(a)   (i) a determination by the Administrative Agent or (ii) a notification by the Required Lenders to the Administrative Agent (with a copy to the Borrower) that the Required Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 1.12 are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace LIBOR, and~~

~~(b)   (i) the election by the Administrative Agent or (ii) the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Administrative Agent of written notice of such election to the Borrower and the Lenders or by the Required Lenders of written notice of such election to the Administrative Agent.~~

"ECF Payment" has the meaning specified in Section 2.05(b)(i).

"ECF Percentage" means 50%, provided, however, (i) if the Total Leverage Ratio at the end of the applicable Excess Cash Flow Period is less than or equal to 3.00:1.00 and greater than 2.50:1.00, the ECF Percentage shall mean 25% and (ii) if the Total Leverage Ratio at the end of the applicable Excess Cash Flow Period is less than or equal to 2.50:1.00, the ECF Percentage shall mean 0%.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means (a) a Lender, (b) an Approved Fund, (c) any commercial bank, insurance company, mutual fund, finance company, financial institution, any fund that invests in loans or

21

any other "accredited investor" (as defined in Regulation D of the Securities Act) and (d) any Affiliate of a Lender.  Notwithstanding anything to the contrary herein, (i) (x) a Disqualified Institution or (y) any natural person shall, in each case, not be an "Eligible Assignee" and (ii) except as permitted under Section 11.07(i), neither Parent nor any of its Affiliates may be an "Eligible Assignee".

"Environmental Action" means any action, suit, demand, demand letter, claim, written notice of non-compliance or violation, written request for information, notice of liability or potential liability, notice of governmental investigation, proceeding, consent order, consent decree or consent agreement relating in any way to any Environmental Law, any Environmental Permit, Hazardous Material or Environmental Liability including, without limitation, (a) by any Person with respect to enforcement (including citizen-suit enforcement pursuant to such provisions of Environmental Laws), Responses or damages, or (b) by any Person for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"Environmental Laws" means any and all Laws, decrees or other governmental restrictions of legal effect relating to the protection of the environment, to the Release of any Hazardous Materials into the environment or to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of, or exposure to, Hazardous Materials.

"Environmental Liability" means any and all legal obligations or liabilities (including obligations to perform Response activities) related to Environmental Laws, Environmental Permits or Hazardous Materials.

"Environmental Permit" means any permit, approval, identification number, license or other Governmental Authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities (other than Indebtedness) convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or non-voting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any Person that is under common control with the Borrower or any of the other Restricted Subsidiaries and is treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations at any facility of the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate as described in Section 4062(e) of ERISA, in each case, resulting in liability pursuant to Section 4063 of ERISA; (c) a complete or partial withdrawal by the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate from a Multiemployer Plan resulting in the imposition of Withdrawal Liability on the Borrower or any of the other Restricted

22

FBG_CH1_00097912

Subsidiaries, notification of the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate concerning the imposition of Withdrawal Liability or notification that a Multiemployer Plan is "insolvent" within the meaning of Section 4245 of ERISA; (d) the filing of a notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA, the treatment of a Pension Plan amendment as a termination under Section 4041(c) of ERISA, the commencement of proceedings by the PBGC to terminate a Pension Plan or the receipt by the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate of notice of the treatment of a Multiemployer Plan amendment as a termination under Section 4041A of ERISA or of notice of the commencement of proceedings by the PBGC to terminate a Multiemployer Plan; (e) the occurrence of an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates, with respect to the termination of any Pension Plan; (g) the conditions for imposition of a Lien under Section 303(k) of ERISA shall have been met with respect to any Pension Plan; (h) with respect to any Pension Plan, the failure to meet the minimum funding standard of Section 412 of the Code or the failure to make any required contribution in accordance with Section 515 of ERISA; (i) receipt from the Internal Revenue Service of notice of the failure of any Plan to qualify under Section 401(a) of the Code that is intended to be so qualified, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code; (j) the occurrence of a non-exempt prohibited transaction under Sections 406 or 407 of ERISA for which the Borrower or any of the other Restricted Subsidiaries or any ERISA Affiliate may be directly or indirectly liable, (k) the determination that any Multiemployer Plan is considered a plan in "endangered", "critical", or "critical and declining" status within the meaning of Section 432 of the Code or Section 305 of ERISA or (l) a Foreign Plan Event.

"Erroneous Payment" has the meaning specified in Section 10.01(d)(i).

"Erroneous Payment Notice" has the meaning specified in Section 10.01(d)(ii).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

~~"Eurocurrency Reserve Requirements" means for any day as applied to a Eurodollar Rate Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the FRB or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the FRB) maintained by a member bank of the Federal Reserve System.~~

~~"Eurodollar Base Rate" means, for any Interest Period, the highest of:~~

~~(a)      in respect of the Term Loans only, 1.00% per annum,~~

~~(b)      the rate per annum (which in any event, with respect to Term Loans denominated in Dollars, shall not be less than 1.00%) equal to the rate determined by the Administrative Agent to be the offered rate that appears on the page of the Reuters Screen (or any successor thereto) that displays an average London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) (such page currently being page number LIBOR01) for deposits in Dollars (for delivery on the first day of such Interest Period) with a term~~

23

FBG_CH1_00097913

~~equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period, or~~

~~(c) if the rates referenced in the preceding clause (b) are not available, the rate per annum (which in any event, with respect to Term Loans denominated in Dollars, shall not be less than 1.00%) determined by the Administrative Agent to be the offered rate on such other page or other service which displays an average London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) Interest Settlement Rate for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period.~~

~~"Eurodollar Rate" means with respect to each Interest Period pertaining to a Eurodollar Rate Loan, a rate per annum equal to (x) the Eurodollar Base Rate as of such date divided by (y) (1.00 minus Eurocurrency Reserve Requirements as of such date).~~

~~"Eurodollar Rate Loan" means a Loan (other than a Base Rate Loan) that bears interest at a rate based on the Eurodollar Rate.~~

"Event of Default" has the meaning specified in Section 9.01.

"Excess Cash Flow" means, with respect to the Borrower and the other Restricted Subsidiaries for any Excess Cash Flow Period, an amount (if positive) equal to (without duplication):

(a) the sum, without duplication, of the amounts for such period of (i) Consolidated Net Income, plus, (ii) to the extent reducing Consolidated Net Income, the sum, without duplication, of amounts for non-cash charges reducing Consolidated Net Income, including for depreciation and amortization (excluding any such non-cash charge to the extent that it represents an accrual or reserve for potential cash charge in any future period or amortization of a prepaid cash gain that was paid in a prior period), plus (iii) the Consolidated Working Capital Adjustment (which may be negative), minus

(b) the sum of, without duplication, (i) the amounts for such period of cash payments (except to the extent financed with long term Indebtedness) actually made of (1) scheduled repayments and required prepayments (to the extent permitted under this Agreement) of Indebtedness for borrowed money (excluding (w) mandatory or voluntary prepayments of the First Lien Facility, (x) prepayments of loans under the ABL Credit Agreement, (y) mandatory prepayments (other than scheduled amortization) or voluntary prepayments of the Term Loans and (z) repayments and prepayments (to the extent permitted under this Agreement) of Capital Lease Obligations (excluding any interest expense portion thereof)), (2) consolidated Capital Expenditures made in accordance with this Agreement and (3) without duplication of amounts deducted from Excess Cash Flow in prior periods, the aggregate consideration paid in cash in respect of Permitted Acquisitions made during such period in accordance with Section 7.02(h), plus (ii) the amount of Taxes actually paid in cash in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period, plus (iii) to the extent not deducted when determining Consolidated Net Income, management fees paid in cash for such period permitted under Section 7.06(j), plus (iv) Restricted Payments made during such period pursuant to Sections 7.06(c), plus (v) other non-cash gains increasing Consolidated Net Income for such period (excluding any such non-cash gain to the extent it represents the reversal of an accrual or reserve for potential cash gain in any prior period), plus (vi) without duplication of amounts deducted from Excess Cash Flow in prior periods, and at the option of the Borrower, the aggregate consideration required to be paid in cash by the Borrower or any of its Subsidiaries pursuant to binding contracts (the "Contract Consideration") entered into during such period relating to Permitted

24

Acquisitions permitted under Section 7.06(j) to be consummated following such period but on or prior to the date that is 120 days following the end of such period (the "Outside Date"), to the extent such payments will actually be made with internally generated cash; provided that to the extent the aggregate amount of internally generated cash actually utilized to finance such Permitted Acquisition prior to the Outside Date is less than the Contract Consideration, the amount of the resulting shortfall shall be added to the calculation of Excess Cash Flow in the first full period immediately following the Outside Date, plus (vii) Transaction Expenses paid during such period.

"Excess Cash Flow Period" means each Fiscal Year of the Borrower commencing with the Fiscal Year ending December 31, 2021.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Asset" has the meaning specified in the Security Agreement.

"Excluded Subsidiary" means (a) any Subsidiary of Parent that is not a Wholly-owned Subsidiary; provided that no Person that is or becomes a Loan Party shall subsequently constitute an Excluded Subsidiary pursuant to this clause (a), (b) any Immaterial Subsidiary, (c) any Subsidiary of Parent that is prohibited by law, regulation or Contractual Obligation (in the case of a Contractual Obligation, not entered into in contemplation of the Transactions) from providing the Guarantee or that would require a governmental (including regulatory) consent, approval, license or authorization in order to provide such Guarantee or where the provision of such Guarantee would result in material adverse tax consequences as mutually determined by the Borrower and the Administrative Agent, (d) any Foreign Subsidiary, CFC Domestic Person or Disregarded Domestic Person, (e) any Domestic Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary, CFC Domestic Person or a Disregarded Domestic Person, (f) any not-for-profit Subsidiaries, captive insurance Subsidiaries, any broker-dealer subsidiary and special purpose entities used for permitted financings and (g) any Subsidiary to the extent that the Administrative Agent and the Borrower reasonably agree that the burden or cost of providing a Guarantee with respect to such Subsidiary shall be excessive in view of the benefits afforded thereby; provided that the term "Excluded Subsidiary" shall not include (i) the Borrower or any Subsidiary that is an obligor (including pursuant to a Guarantee) under any First Lien Facility, ABL Facility, any Subordinated Indebtedness or any Refinancing Indebtedness in respect of any of the foregoing or under any Material Indebtedness of a Loan Party, other than such Subsidiaries which constitute "Excluded Subsidiaries" pursuant to clause (d) or (e) above which are not obligors with respect to any obligations of U.S. Persons or (ii) any Subsidiary of Parent that owns any Equity Interests of a Loan Party, other than such Subsidiaries which constitute "Excluded Subsidiaries" pursuant to clause (c), (d) or (e) above.

"Excluded Taxes" means, (a) with respect to each Agent and each Lender, Taxes imposed on or measured by net income (however denominated), net profits (including any branch profits taxes), franchise Taxes and backup withholding Taxes, in each case, (i) imposed as a result of such Agent or Lender being organized under the laws of, being a resident of, or having its principal office or Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) any withholding Tax that is imposed by the United States on amounts payable to a Lender under the law in effect at the time (i) such Lender becomes a party to this Agreement other than pursuant to an assignment made under Section 3.07 or (ii) such Lender changes its lending office; provided that clause (b) shall not apply to the extent that the indemnity payments or additional amounts any Lender would be entitled to receive (without regard to clause (b)) do not exceed the indemnity payment or additional amounts that the Person making the assignment or transfer to such Lender or the Lender changing its lending office would have been entitled to receive in the absence of such assignment or transfer, other than an assignment made pursuant to Section 3.07(b) or in the absence

25

FBG_CH1_00097915

**DEBTORS' EXHIBIT NO. 67**
**Page 40 of 180**

of such change of lending office, (c) any Tax that is attributable to a Lender's or Agent's failure to comply with Section 3.01(f), and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Extended Loans" means Extended Term Loans.

"Extended Term Loan" means a Term Loan that has been extended pursuant to an Extension.

"Extended Term Loan Commitment" means a commitment of any Lender, established pursuant to Section 2.18, to make Extended Term Loans to the Borrower.

"Extension" as defined in Section 2.18(a).

"Extension Amendment" means an amendment to this Agreement (which may, at the option of the Administrative Agent and the Borrower, be in the form of an amendment and restatement of this Agreement) among the Borrower, the applicable extending Lenders, and the Administrative Agent.

"Extension Offer" as defined in Section 2.18(a).

"FATCA" means Sections 1471 through 1474 of the Code, as of the date hereof (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code, and any legislation, regulation or guidance giving effect to such intergovernmental agreements.

"FCPA" shall mean the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"Federal Reserve Bank of New York's Website" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"Fee Letter" means the Fee Letter dated as of July 31, 2020 among the Administrative Agent and the Borrower.

"First Lien Administrative Agent" means Jefferies in its capacity as administrative agent under the First Lien Credit Agreement (as successor to Credit Suisse), or any successor administrative agent under the First Lien Credit Agreement.

"First Lien Collateral Agent" means Jefferies in its capacity as collateral agent under the First Lien Credit Agreement (as successor to Credit Suisse), or any successor collateral agent under the First Lien Credit Agreement.

26

CONFIDENTIAL

"First Lien Credit Agreement" means that certain First Lien Term Loan Agreement, dated as of February 2, 2018, among Parent, the Borrower, the lenders party thereto, the First Lien Administrative Agent and the First Lien Collateral Agent, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, in each case, as and to the extent permitted by this Agreement, the ABL Intercreditor Agreement and the First Lien/Second Lien Intercreditor Agreement.

"First Lien Credit Agreement Original Closing Date" means February 2, 2018.

"First Lien Facility" means the term credit facility under the First Lien Credit Agreement or any permitted Refinancing Indebtedness thereof.

"First Lien Facility Documentation" means the First Lien Credit Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith.

"First Lien Lenders" means the lenders form time to time party to the First Lien Credit Agreement.

"First Lien Leverage Ratio" means, with respect to any Test Period, the ratio of (a) Consolidated First Lien Debt as of the last day of such Test Period to (b) Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries for such Test Period.

"First Lien Loans" means the "Loans" under and as defined in the First Lien Credit Agreement as in effect on the 2021 Refinancing Agreement Effective Date.

"First Lien/Second Lien Intercreditor Agreement" means the Term Intercreditor Agreement, dated as of the 2021 Refinancing Agreement Effective Date, among Parent, the Borrower, the Administrative Agent, the Collateral Agent, the First Lien Administrative Agent and the First Lien Collateral Agent, substantially in the form of Exhibit L hereto, as amended, amended and restated, supplemented or otherwise modified from time to time in accordance therewith and herewith.

"Fiscal Year" means the fiscal year of the Borrower and the other Restricted Subsidiaries ending on December 31 of each calendar year.

"Floor" means 1.00%

"Foreign Lender" means a Lender that is not a U.S. Person.

"Foreign Plan" means any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Loan Party or any of their respective Subsidiaries with respect to employees employed outside the United States.

"Foreign Plan Event" means, with respect to any Foreign Plan, (a) the existence of unfunded liabilities materially in excess of the amount permitted under any applicable law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure in any material respect to make the required contributions or payments, under any applicable law, on or before the due date for such contributions or payments, (c) the receipt of a notice from a Governmental Authority relating to the intention to terminate any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (d) the incurrence of liability by any Loan Party or any of their respective Subsidiaries under applicable law on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any participating employer therein, or (e) the occurrence of any

27

FBG_CH1_00097917

material transaction that is prohibited under any applicable law and that would reasonably be expected to result in the incurrence of any material liability by any Loan Party or any of their respective Subsidiaries, or the imposition on any Loan Party or any of their respective Subsidiaries of any material fine, excise tax or penalty resulting from any noncompliance with any applicable law.

"Foreign Subsidiary" means any direct or indirect Subsidiary organized under the laws of any jurisdiction other than the United States, any state thereof or the District of Columbia.

"Fram Acquisition" means the Borrower's acquisition of all the outstanding shares of capital stock of Autolife Operations LLC, a Delaware limited liability company, Fram Group Operations LLC, a Delaware limited liability company, FRAM Group IP LLC, a Delaware limited liability company and Autoparts Holdings (Luxembourg) S.à r.l, a company organized under the laws of Luxembourg.

"Fram Purchase Agreement" means that certain Sale and Purchase Agreement, dated as of December 3, 2018, among FRAM Group Holdings Limited, FRAM Group Holdings Inc., Trico Group, LLC and Rank Group Limited, as amended, amended and restated, supplemented or otherwise modified from time to time, including pursuant to the letter agreements entered into on December 21, 2018 and January 29, 2019 by the original parties party to the Fram Purchase Agreement.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"GAAP" means generally accepted accounting principles in the United States, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP, the methodologies thereunder or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith and it is agreed that such amendment to effectuate such changes shall not require the payment of any amendment or similar fee to the Administrative Agent or the Lenders.  Without limiting the generality of the foregoing, the Borrower shall neither be deemed to be in compliance with any covenant hereunder nor out of compliance with any covenant hereunder if such state of compliance or noncompliance, as the case may be, would not exist but for the occurrence of a change in accounting principles after the date hereof.

"Governmental Authority" means any nation or government, any provincial, state, local, municipal or other political subdivision thereof, any central bank or supra-national authority and any entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Governmental Authorization" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

CONFIDENTIAL                                                                       FBG_CH1_00097918

"Granting Lender" has the meaning specified in Section 11.07(g).

"Guarantee" means the Guaranty executed by the Loan Parties substantially in the form of Exhibit F.

"Guarantee Obligations" means, with respect to any Person, any obligation or arrangement of such Person to guarantee or intended to guarantee any Indebtedness or other payment obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of non-performance by any other party or parties to an agreement or (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof.  The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guarantee Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Guarantors" means Parent and the Subsidiary Guarantors.

"Guaranty" means the Guarantee, as supplemented by each Guaranty Supplement delivered pursuant to Section 6.11.

"Guaranty Supplement" has the meaning specified in Section 6.11(a)(i).

"Hazardous Materials" means any material, substance or waste that is regulated, classified, or otherwise defined under or pursuant to any Environmental Law as "hazardous", "toxic", a "pollutant", a "contaminant", a "deleterious substance", "radioactive" or words of similar meaning or effect, including petroleum and its by-products, asbestos, polychlorinated biphenyls, urea formaldehyde insulation and chlorofluorocarbons and all other regulated ozone-depleting substances.

"Immaterial Subsidiary" means any direct or indirect Restricted Subsidiary (other than the Borrower) designated as such in writing by the Borrower to the Administrative Agent from time to time; provided that (i) no Immaterial Subsidiary shall have revenues for any fiscal quarter or total assets as of the last day of any fiscal quarter for which financial statements have been furnished in an amount that is equal to or greater than 2.5% of the consolidated total revenues or Consolidated Total Assets, as the case may be, for, or as of the last day of, such fiscal quarter, as the case may be, and (ii) Immaterial Subsidiaries, taken together, shall not have total revenues or total assets as of the last day of any fiscal quarter in an amount that is equal to or greater than 5.0% of the consolidated revenues or Consolidated Total Assets, as applicable, for, or as of the last day of, such fiscal quarter, as the case may be.

"Immediate Family Member" means, with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse,

29

FBG_CH1_00097919

**DEBTORS' EXHIBIT NO. 67**
**Page 44 of 180**

domestic partner, former domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including adoptive relationships), any trust, corporation, limited liability company, partnership or other bona fide estate-planning vehicle the only stockholders, members, partners or beneficiaries of which are any of the foregoing individuals or a charity, such individual's estate (or an executor or administrator acting on its behalf), heirs or legatees or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"Increased Amount Date" has the meaning specified in Section 2.16(a).

"Incremental Amendment" has the meaning specified in Section 2.16(d).

"Incremental Cap" means:

(a)     (i) the greater of (x) $435.0 million and (y) 75.0% of Consolidated Adjusted EBITDA, *less* (ii) the amount of "Incremental Term Loans" or "Incremental Equivalent Debt" (each as defined in the First Lien Credit Agreement or any equivalent term under any documentation governing any First Lien Facility), in each case incurred under clause (a) of the definition of "Incremental Cap" (as defined in the First Lien Credit Agreement (or equivalent provision under any other documentation governing any First Lien Facility)), *plus*

(b)     [reserved], *plus*

(c)     (i) the amount of any optional prepayment of any Loan in accordance with Section 2.05(a), and (ii) the amount of any reduction in the outstanding amount of any Term Loans (other than any Incremental Term Loans incurred pursuant to clause (d) below) and/or Specified Term Refinancing Debt Loans resulting from any assignment of Term Loans to Parent or any of its Restricted Subsidiaries made in accordance with Section 11.07(i) of this Agreement (including in connection with any Dutch auction) based upon the actual amount of cash paid in connection with the relevant assignment (it being understood that the amount of the relevant reduction in the outstanding amount of any Term Loans, Incremental Term Loans and/or Specified Term Refinancing Debt Loans shall not exceed the actual purchase price of any such Term Loans, Incremental Term Loans and/or Specified Term Refinancing Debt Loans below par), so long as, in the case of clauses (i) and (ii), such prepayment or reduction was not funded with the proceeds of any long-term Indebtedness and, in each case, only to the extent such prepayment or reduction occurs on or prior to the date of any Incremental Term Facility and/or Incremental Equivalent Debt incurred or issued in reliance on clauses (c)(i) and (c)(ii) of this definition and *less* the aggregate principal amount of all Incremental Term Facilities and Incremental Equivalent Debt incurred or issued in reliance on clauses (c)(i) and (c)(ii) of this definition (the amount calculated pursuant to clauses (a), (b) and (c) of this definition, collectively, "Shared Fixed Incremental Amount"), *plus*

(d)     an unlimited amount (such maximum aggregate principal amount under this clause (d), the "Incurrence-Based Incremental Amount") at any time so long as after giving effect to the incurrence of any such Incremental Term Facility or Incremental Equivalent Debt and the use of proceeds thereof,

(i)     in the case of an Incremental Term Facility or Incremental Equivalent Debt that is secured on a senior lien basis to the Obligations, the First Lien Leverage Ratio on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Incremental

30

CONFIDENTIAL

FBG_CH1_00097920

Term Facility or Incremental Equivalent Debt made pursuant to the foregoing <u>clauses (a)</u>, <u>(b)</u> and <u>(c)</u> of this definition) shall not exceed 3.55:1.00;

(ii)    in the case of an Incremental Term Facility or Incremental Equivalent Debt that is secured on a pari passu basis with the Obligations, the Total Secured Leverage Ratio on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Incremental Term Facility or Incremental Equivalent Debt made pursuant to the foregoing <u>clauses (a)</u>, <u>(b)</u> and <u>(c)</u> of this definition) shall not exceed 3.55:1.00;

(iii)    in the case of an Incremental Term Facility or Incremental Equivalent Debt that is secured on a junior lien basis to the Obligations, the Total Secured Leverage Ratio on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Incremental Term Facility or Incremental Equivalent Debt made pursuant to the foregoing <u>clauses (a)</u>, <u>(b)</u> and <u>(c)</u> of this definition) shall not exceed 3.55:1.00; and

(iv)    in the case of an Incremental Term Facility or Incremental Equivalent Debt that is unsecured, the Total Leverage Ratio on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Incremental Term Facility or Incremental Equivalent Debt made pursuant to the foregoing <u>clauses (a)</u>, <u>(b)</u> and <u>(c)</u> of this definition) shall not exceed 3.55:1.00.

Compliance with the First Lien Leverage Ratio, Total Secured Leverage Ratio and Total Leverage Ratio tests described in <u>clause (d)</u> above shall be calculated at the time of incurrence of the relevant Incremental Term Facility or Incremental Equivalent Debt on a Pro Forma Basis after giving effect thereto (and as if fully drawn) and the application of the proceeds thereof (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to <u>Section 6.01(a)</u> or <u>(b)</u>, as applicable); it being understood that if the proceeds of the relevant Incremental Term Facility or Incremental Equivalent Debt will be applied to finance a Limited Condition Acquisition and the Borrower has made an LCA Election, compliance with the First Lien Leverage Ratio, Total Secured Leverage Ratio and Total Leverage Ratio tests prescribed above shall be determined as of the LCA Test Date in respect of such Limited Condition Acquisition (and determined on the basis of the financial statements for the then-most recently ended Test Period on or prior to such date for which financial statements have been (or are required to have been) delivered pursuant to <u>Section 6.01(a)</u> or <u>(b)</u>, as applicable).

Incremental Term Loans may be incurred under both the Shared Fixed Incremental Amount and the Incurrence-Based Incremental Amount, and proceeds from any such incurrence may be utilized in a single transaction by first calculating the incurrence under the Incurrence-Based Incremental Amount and then calculating the incurrence under Shared Fixed Incremental Amount (if any) and, the First Lien Leverage Ratio, Total Secured Leverage Ratio or Total Leverage Ratio, as applicable, shall be permitted to exceed the maximum First Lien Leverage Ratio, Total Secured Leverage Ratio or Total Leverage Ratio tests set forth in <u>clause (d)</u> above to the extent of such amounts incurred in reliance on the Shared Fixed Incremental Amount at substantially the same time.  Unless the Borrower otherwise elects in writing to the Administrative Agent, the Borrower shall be deemed to have used amounts, if any, that are available under the Incurrence-Based Incremental Amount prior to the utilization of amounts under the Shared Fixed Incremental Amount.

Notwithstanding anything in this definition to the contrary, Foreign Subsidiaries of the Borrower organized in a Permitted Foreign Jurisdiction shall be permitted to incur Incremental Facilities in Alternate Currencies (such Incremental Facilities in Alternate Currencies in an aggregate amount not to exceed the Dollar Equivalent Amount of $400,000,000) or in Dollars, subject to the guarantee and

31

FBG_CH1_00097921

**DEBTORS' EXHIBIT NO. 67**
**Page 46 of 180**

security principles and collateral sharing arrangements with respect to the assets of such Foreign Subsidiaries set forth in Schedule 6.11.

"Incremental Equivalent Debt" means Indebtedness of any Loan Party in the form of secured or unsecured bonds, notes or other instruments issued or incurred in lieu of loans under the Incremental Term Facilities otherwise permitted to be incurred under Section 2.16(a); provided that the aggregate amount thereof shall (x) not exceed the Incremental Cap and (y) be subject to the Required Additional Debt Terms.

"Incremental Term Borrowing" means a borrowing consisting of Incremental Term Loans of the same Type and, in the case of ~~Eurodollar Rate~~SOFR Loans, having the same Interest Period made pursuant to the applicable Incremental Term Facility.

"Incremental Term Facility" has the meaning specified in Section 2.16(a).

"Incremental Term Lender" has the meaning specified in Section 2.16(c).

"Incremental Term Loan Commitments" has the meaning specified in Section 2.16(a).

"Incremental Term Loans" has the meaning specified in Section 2.16(a).

"Incurrence-Based Incremental Amount" has the meaning set forth in the definition of "Incremental Cap".

"Indebtedness" of any Person means, as to any Person at a particular time, without duplication, all of the following:

      (a)     all obligations of such Person for borrowed money;

      (b)     all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, but excluding all obligations of such Person to reimburse any Person in respect of amounts paid or payable under a performance, payment, stay, customs, appeal or surety bond, performance and completion guaranty or similar instrument;

      (c)     all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person;

      (d)     all obligations, other than intercompany items, of such person to pay the deferred purchase price of property (other than trade accounts payable and accrued expenses arising in the ordinary course of business);

      (e)     the Attributable Indebtedness of such Person in respect of Capital Lease Obligations;

      (f)     without duplication, (i) all obligations, contingent or otherwise, of such Person to reimburse any bank or other Person in respect of amounts paid or payable under a letter of credit, bankers' acceptance or similar instrument, and (ii) all non-contingent obligations (and, for purposes of Indebtedness permitted under Section 7.03, all contingent obligations) of such Person to reimburse any Person in respect of amounts paid or payable under a performance, payment, stay, customs, appeal or surety bond, performance and completion guaranty or similar instrument;

32

CONFIDENTIAL

FBG_CH1_00097922

(g)     all obligations of others secured by (or for which the holder of such obligations has an existing right, contingent or otherwise, to be secured by) a Lien on any property or asset of such Person, whether or not such obligation is assumed by such Person, provided that the aggregate amount of such obligations does not exceed the lesser of (i) the aggregate unpaid amount of the relevant obligation and (ii) the fair market value of the assets by which the obligations are secured;

(h)     all guarantees by such Person of other obligations of third parties treated as Indebtedness pursuant to clauses (a)-(g) above or (i)-(l) below;

(i)     all Disqualified Equity Interests of such Person;

(j)     all net obligations arising under or in connection with Swap Contracts to which such Person is party;

(k)     all purchase money obligations of such Person; and

(l)     the Indebtedness of any third person (including any partnership in which such Person is a general partner and any unincorporated joint venture in which such Person is a joint venturer) to the extent such Person would be liable therefor under applicable law or any agreement or instrument by virtue of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person shall not be liable therefor and only to the extent the relevant Indebtedness is of the type that would be included in the calculation of Consolidated Total Debt;

provided that (A) to the extent not constituting Indebtedness for borrowed money, Indebtedness shall not include (i) deferred compensation arrangements, (ii) earn-out obligations and purchase price adjustments unless and until the same are required by GAAP to be reflected on the balance sheet of such Person or (iii) non-compete or consulting obligations incurred in connection with permitted Acquisitions or permitted Dispositions and (B) notwithstanding anything herein to the contrary, the term "Indebtedness" shall not include, and shall be calculated without giving effect to, the effects of Accounting Standards Codification Topic 815 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose hereunder as a result of accounting for any embedded derivatives created by the terms of such Indebtedness and any such amounts that would have constituted Indebtedness hereunder but for the application of clause (B) of this proviso shall not be deemed an incurrence of Indebtedness hereunder.

"Indemnified Liabilities" has the meaning specified in Section 11.05.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 11.05.

"Information" has the meaning specified in Section 11.08(l).

"Initial Term Loans" means the Term Loans made pursuant to Section 2.01(i) on the Closing Date.

"Intellectual Property" has the meaning specified in Section 5.16.

33

FBG_CH1_00097923

"Intellectual Property Security Agreement" means, collectively, any Intellectual Property Security Agreement executed by one or more Loan Parties substantially in the form of Exhibit H-1, as any such agreement may be supplemented by any Intellectual Property Security Agreement Supplement executed and delivered pursuant to Section 6.11.

"Intellectual Property Security Agreement Supplement" means a supplement to any Intellectual Property Security Agreement substantially in the form of Exhibit H-2.

"Interest Payment Date" means, (a) as to any Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of the Credit Facility under which such Loan was made; provided that if any Interest Period for a SOFR Loan exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date of the Credit Facility under which such Loan was made.

"Interest Period" means, as to each ~~Eurodollar Rate~~SOFR Loan, the period commencing on the date such ~~Eurodollar Rate~~SOFR Loan is disbursed or converted to or continued as a ~~Eurodollar Rate~~SOFR Loan as applicable, and ending on the date one (1), ~~two (2),~~ three (3) or six (6) months (~~or, if agreed to by all affected Lenders, twelve (12) months) and such other shorter interest period as may be permitted by the Lenders and the Administrative Agent~~in each case subject to the availability thereof), in each case as set forth by the Borrower in its Committed Loan Notice; provided that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; ~~and~~

(c)     no Interest Period shall extend beyond the Maturity Date of the Credit Facility under which such Loan was made~~.~~; and

(d)     no tenor that has been removed from this definition pursuant to Section 2.19(d) shall be available for specification in such Committed Loan Notice.

"Investment" in any Person means any loan or advance to such Person, any purchase or other acquisition of any voting Equity Interests or other Equity Interests or Indebtedness or the assets comprising a division or business unit or all or substantially all of the business of such Person (including any partnership or joint venture), or any capital contribution to such Person.

"Jefferies" has the meaning set forth in the introductory paragraph hereto.

"Joinder Agreement" has the meaning specified in Section 2.16(b)(vii).

"Latest Maturity Date" means, as of any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any Loan.

"Laws" means, collectively, all international, foreign, federal, state, provincial and local laws, statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents or

34

**DEBTORS' EXHIBIT NO. 67**
**Page 49 of 180**

authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"LCA Election" has the meaning specified in Section 1.10.

"LCA Test Date" has the meaning specified in Section 1.10.

"Lead Arranger" means, as of the 2021 Refinancing Agreement Effective Date, Jefferies.

"Lender" means any Term Lender, Incremental Term Lender or Specified Term Refinancing Debt Lender that may be a party to this Agreement from time to time on and after the 2021 Refinancing Agreement Effective Date and, in the case of each such Lender, including their respective successors and assigns as permitted hereunder (each of which is referred to herein as a "Lender").

"Lien" means any assignment, mortgage, charge, pledge, lien, encumbrance, title retention agreement (including Capital Leases but excluding operating leases) or any other security interest or interest in the nature of security whatsoever, in each case howsoever created or arising, whether fixed or floating, legal or equitable, perfected or not.

"Limited Condition Acquisition" means an Acquisition or Investment that the Borrower or one or more of the other Restricted Subsidiaries is contractually committed to consummate and whose consummation is not conditioned on the availability of, or on obtaining, third-party financing.

"Loan" means an extension of credit by a Lender to the Borrower in the form of a Term Loan.

"Loan Documents" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents, (iv) Joinder Agreements, (v) Extension Amendments, (vi) Refinancing Amendments, (vii) the ABL Intercreditor Agreement, (viii) the First Lien/Second Lien Intercreditor Agreement, (ix) the Guaranty and (x) all other certificates, instruments and documents delivered from time to time on and after the 2021 Refinancing Agreement Effective Date by or on behalf of the Borrower or any of the other Restricted Subsidiaries in connection herewith or therewith which have been designated as "Loan Documents".

"Loan Parties" means, collectively, Parent, the Borrower and each Subsidiary Guarantor.

"Management Agreement" means the Management Services Agreement between the Borrower and Larchmont, LLC, dated as of February 2, 2018 (as amended or otherwise modified from time to time in a manner not materially adverse to the Lenders).

"Master Agreement" has the meaning specified in the definition of "Swap Contract".

"Material Adverse Effect" means any event or circumstance which has a material adverse effect on (i) the business, properties, assets, financial condition or results of operations, in each case, of the Borrower and the other Restricted Subsidiaries, taken as a whole, (ii) the rights and remedies of any Agent or the Lenders under any Loan Document or (iii) the ability of the Borrower and the Guarantors (taken as a whole) to perform any of their obligations under the Loan Documents.

"Material Indebtedness" means any Indebtedness incurred or assumed by a Loan Party with an aggregate outstanding principal amount or committed amount in excess of $18,750,000.

35

FBG_CH1_00097925

"Material Owned Property" means any real property located in the United States and owned by any Loan Party with a fair market value in excess of $6,250,000 at the time of acquisition (such value to be reasonably estimated by the Borrower in good faith).

"Maturity Date" means, with respect to (a) the Term Loan Facility, March 30, 2028, and (b) any other Class of Loans, the maturity dates specified therefor in the applicable Joinder Agreement, Extension Amendment, Incremental Amendment or Refinancing Amendment.

"Moody's" means Moody's Investors Service, Inc. and its successors.

"Mortgage" means collectively, the deeds of trust, trust deeds, deeds to secure debt and mortgages creating and evidencing a Lien on a Mortgaged Property made by the Loan Parties in favor or for the benefit of the Administrative Agent on behalf of the Secured Parties in form and substance reasonably satisfactory to the Administrative Agent, executed and delivered pursuant to Section 6.11.

"Mortgage Policies" has the meaning specified in paragraph (c) of the definition of "Mortgage Requirement".

"Mortgage Requirement" means the Administrative Agent shall have received the Mortgages with respect to each Material Owned Property required to be delivered pursuant to Section 6.11 within the time period prescribed therein (the "Mortgaged Properties"), together with:

        (a)     a completed Life of Loan Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto) and if any improvements on any Mortgaged Property are located in an area designated as a "special flood hazard area," evidence of such flood insurance as may be required under Section 6.07;

        (b)     evidence that counterparts of the Mortgages with respect to the Mortgaged Properties have been duly executed, acknowledged and delivered and are in form suitable for filing or recording in all filing or recording offices as the Administrative Agent reasonably deems necessary to create a valid second and subsisting Lien on the property described therein in favor of the Collateral Agent for the benefit of the Secured Parties (subject only to Liens of the nature referred to in Section 5.07(b)) along with evidence reasonably satisfactory to the Administrative Agent that all filing and recording taxes and fees payable with respect to the Mortgages have been paid or received by the issuer of the Mortgage Policies;

        (c)     (i) fully paid American Land Title Association Lender's Extended Coverage (or other reasonably satisfactory coverage if such coverage is not available in the applicable jurisdiction) title insurance policies (the "Mortgage Policies") in form and substance reasonably satisfactory to the Administrative Agent, together with such endorsements (other than endorsements relating to creditors' rights) that are reasonably required by the Administrative Agent and which lenders typically receive in the jurisdiction where the Mortgaged Property is located, in an amount reasonably acceptable to the Administrative Agent (but in any event not to exceed the fair market value of the property as reasonably determined by the Borrower in good faith), issued by title insurers reasonably acceptable to the Administrative Agent and insuring the Mortgages to be valid second (or where applicable in accordance with this Agreement, a third) and subsisting Liens on the real property described therein, in a customary form in the jurisdiction where the Mortgaged Property is located free and clear of all Liens (provided that if a survey is not available, such Mortgage Policies may include the standard survey exception and the

36

FBG_CH1_00097926

**DEBTORS' EXHIBIT NO. 67**
**Page 51 of 180**

Administrative Agent shall not require any endorsement that will require delivery of a survey), except Permitted Liens;

(d)     customary opinions of local counsel for the relevant Loan Party (A) in the state in which the relevant Mortgaged Property is located, including, without limitation, with respect to the enforceability of the Mortgages and any related fixture filings in form and substance reasonably satisfactory to the Administrative Agent and (B) in the state in which the relevant Loan Party is organized or formed, with respect to the valid existence, corporate power and authority of such Loan Party in the granting of the Mortgages, in form and substance reasonably satisfactory to the Administrative Agent;

(e)     such other actions that, in each case, the Administrative Agent may reasonably deem necessary in order to create valid and subsisting Liens on the property described in the Mortgages shall have been delivered or taken, in each case to the extent the same can be obtained or taken with the use of commercially reasonable efforts; it being understood that if the Administrative Agent so agrees, the relevant Loan Party may provide such existing surveys, abstracts, appraisals, legal opinions and/or other documents as may suffice to satisfy the requirements described in clauses (a) through (d) above; and

(f)     reasonably satisfactory evidence of any additional insurance required to be maintained pursuant to Section 6.07.

"Mortgaged Properties" has the meaning specified in the definition of "Mortgage Requirement".

"Multiemployer Plan" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates is making or has an obligation to make contributions or with respect to which the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates has any liability.

"Net Cash Proceeds" means:

(a)     with respect to the Disposition of any asset or any Casualty Event the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such Disposition or Casualty Event (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty Event, any insurance proceeds or condemnation awards in respect of such Casualty Event actually received by or paid to or for the account of the Borrower or any of the other Restricted Subsidiaries) less (ii) the sum of (A) the principal amount of and interest and fees, premiums and other amounts payable in respect of any Indebtedness that is secured by the asset subject to such Disposition or Casualty Event and that is repaid in connection therewith (other than Indebtedness under any Credit Facility, Indebtedness under any ABL Facility, Indebtedness under the First Lien Facility Documentation or any Indebtedness that is secured by a Lien that is pari passu or junior to the Lien securing the First Lien Loans), (B) the reasonable and documented out-of-pocket expenses actually incurred and paid by the Borrower or any of the other Restricted Subsidiaries in connection with such Disposition or Casualty Event (including, reasonable attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant, and other customary fees) to third parties (other than the Loan Parties), (C) taxes paid or reasonably estimated to be payable (including pursuant to any tax sharing arrangements) as a result of any gain recognized in connection therewith by such Person or any of the direct or indirect stockholders thereof and attributable to such Disposition or Casualty Event, (D) any reserve actually maintained in respect of (x) the sale price of such

37

FBG_CH1_00097927

**DEBTORS' EXHIBIT NO. 67**
**Page 52 of 180**

asset or assets established in accordance with GAAP, and (y) any liabilities associated with such asset or assets and retained by the Borrower or any of the other Restricted Subsidiaries after such sale or other Disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to any indemnification obligations and/or purchase price adjustments associated with such transaction and (E) the amount of any cash escrow from the sale price for any relevant Disposition (until released from escrow); it being understood that "Net Cash Proceeds" shall include (1) any cash or Cash Equivalents received upon the Disposition of any non-cash consideration received by such Person in any such Disposition, and (2) upon the reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in clause (D) above, the amount of such reserve; and

(b)      with respect to the incurrence or issuance of any Indebtedness by the Borrower or any of the other Restricted Subsidiaries not permitted under Section 7.03 (other than Refinancing Facilities of the Term Loan Facilities or Specified Term Refinancing Debt), the excess, if any, of (i) the sum of the cash received in connection with such incurrence or issuance less (ii) the investment banking fees, underwriting discounts, commissions, costs and other reasonable and documented out-of-pocket expenses and other customary expenses and any taxes incurred by such Loan Party in connection with such incurrence or issuance to third parties (other than the Loan Parties).

"Non-Consenting Lender" has the meaning specified in Section 3.07(c).

"Non-Loan Party Subsidiary" means any Subsidiary of the Borrower that is not a Loan Party.

"Note" means a promissory note of the Borrower payable to any Lender or its assigns, in substantially the form of Exhibit C hereto, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Loans made by such Lender (which form may be amended, modified or supplemented by the Administrative Agent and the Borrower for any necessary or desirable changes to evidence Indebtedness of the Borrower under any Incremental Term Facility denominated in Alternate Currencies without any further action or consent of any other party hereto).

"Obligations" means (a) for purposes of this Agreement, all advances to, and debts, liabilities and obligations of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed or allowable claims in such proceeding and interest accruing at the Default Rate in accordance with Section 2.08(b) or (b) solely for purposes of the Guarantee and the Collateral Documents, (x) the obligations specified in the foregoing clause (a) and the other Secured Obligations, in each case, as amended, amended and restated, supplemented, modified, extended, renewed, refinanced or replaced from time to time.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include the obligation (including Guarantee Obligations) to pay principal, interest (including interest accruing at the Default Rate in accordance with Section 2.08(b)), charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document, whether direct or indirect (including those acquired by assumption), absolute, contingent, due or to become due, now existing or hereafter arising.

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury, or any successor thereto.

CONFIDENTIAL                                                                FBG_CH1_00097928

"Organization Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws; (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, declaration, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Original Lead Arrangers" means, collectively, as of the Closing Date, Credit Suisse Loan Funding LLC and FTI Capital Advisors, LLC.

"Other Applicable Indebtedness" has the meaning specified in Section 2.05(b)(ii)(D).

"Other Connection Taxes" means, with respect to any Agent or Lender, as the case may be, Taxes imposed as a result of a present or former connection between such Lender or Agent and the jurisdiction imposing such Tax (other than connections arising from such Lender or Agent having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" has the meaning specified in Section 3.01(b).

"Outstanding Amount" means with respect to the Loans, the outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date.

"Parent" has the meaning specified in the introductory paragraph of this Agreement.

"Parent Company" means Parent and any other Person of which the Borrower is an indirect Wholly-owned Subsidiary.

"Participant" has the meaning specified in Section 11.07(e).

"Participant Register" has the meaning specified in Section 11.07(e).

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as the same may be amended, supplemented, modified, replaced or otherwise in effect from time to time.

"PBGC" means the Pension Benefit Guaranty Corporation (or any successor thereof).

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA) other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates or to which the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates contributes or has an obligation to contribute or with respect to which the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates has any liability.

CONFIDENTIAL

FBG_CH1_00097929

"Permitted Acquisition" means the 2019 Specified Acquisitions, the 2020 Specified Acquisitions and any other Acquisition by the Borrower or any of the other Restricted Subsidiaries; provided that:

(a)     both prior to and after giving effect to such Acquisition on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to consummation thereof which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable), no Event of Default exists or would result from the consummation of such Acquisition (provided that, solely in connection with a Permitted Acquisition that is a Limited Condition Acquisition for which the Borrower has made an LCA Election, (i) no Event of Default shall exist or would result from the consummation of such Acquisition as of the LCA Test Date for such Limited Condition Acquisition, both prior to and after giving effect to such Acquisition on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to consummation thereof which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) and (ii) no Event of Default pursuant to Section 9.01(a), (f) or (g) shall exist and be continuing as of the date of consummation of the Limited Condition Acquisition);

(b)     upon the consummation of such Acquisition, the Borrower and the other Restricted Subsidiaries are in compliance with Section 7.07; and

(c)     the total consideration paid by Loan Parties for (i) the Equity Interests of any Person that does not become a Guarantor and (ii) in the case of an asset Acquisition, assets that are not acquired by the Borrower or any Guarantor, shall not exceed, when taken together with the total consideration for all such Persons and assets so acquired after the 2021 Refinancing Agreement Effective Date and investments pursuant to Sections 7.02(c)(iv), the greater of $187,500,000 and 31.0% of Consolidated Adjusted EBITDA of the Borrower and its Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable).

"Permitted Foreign Jurisdictions" means Netherlands, Luxembourg and such additional jurisdictions as may be agreed by the Administrative Agent.

"Permitted Holder" means each of Patrick James, and any family members of Patrick James (including his spouse, lineal descendants, spouses of such descendants, the lineal descendants of any such spouse and the spouses of any such spouse's lineal descendants), and trusts for estate planning purposes where any of the foregoing persons or a spouse of any such person is a beneficiary or trustee of any such trust or trusts, including a voting trust or any other business entity, regardless of form, organized solely for the benefit of one or more of the foregoing persons.  For purposes of this paragraph, the relationship of any person that is derived by or through legal adoption prior to age 18 shall be considered a natural one. A minor for whom an Equity Interest is held pursuant to a Uniform Transfers to Minors Act or similar law shall be considered a holder of an Equity Interest.

"Permitted Inventory Financing" means the financing, including pursuant to a sale, sale-leaseback, factoring, early-pay or similar arrangement, of inventory that does not constitute Eligible Inventory (as defined in the ABL Credit Agreement).

"Permitted Liens" means each of the Liens permitted pursuant to Section 7.01.

"Permitted Non-Recourse Factoring Transactions" means non-recourse factoring (or factoring where recourse is limited to customary warranties and indemnities) and early-pay arrangements listed on Schedule 7.03(e) (in each case, as in effect on the 2021 Refinancing Agreement Effective Date or as the

40

CONFIDENTIAL

FBG_CH1_00097930

same may be amended, extended, supplemented or otherwise modified in accordance with this definition) or between the Borrower or any Subsidiary thereof (each such Person, a "Selling Trico Party") and any of (a) a third party commercial bank or an Affiliate thereof, or (b) any other Person which customarily acts as a factor under factoring or early pay arrangements in the ordinary course of its business (each such counterparty, a "Factor"), pursuant to which such Selling Trico Party sells Accounts, together with Related Assets, to such Factor; provided that (i) either (A) if the transaction does not involve an implied interest or similar financing component, the maximum discount for Accounts sold thereunder shall not exceed 5.00% of the face value thereof or (B) the implied interest or similar financing component of such Permitted Non-Recourse Factoring Transaction shall not exceed the Eurodollar RateAdjusted Term SOFR (or the equivalent term used in the documentation governing such Permitted Non-Recourse Factoring Transaction for the applicable period, in each case without giving effect to any floor) plus 5.00%, (ii) for Permitted Non-Recourse Factoring Transactions existing as of the Closing Date, the Borrower shall have delivered the documentation governing such transaction to the Administrative Agent prior to the Closing Date, and (B) for any Permitted Non-Recourse Factoring Transaction consummated after the Closing Date, the Borrower shall have delivered the documentation governing such transaction to the Administrative Agent at least two (2) Business Days prior to the consummation thereof, (iii) the risk of credit loss with respect to the Accounts subject thereto is transferred to the Factor thereunder, (iv) to the extent collection accounts are established in connection with such Permitted Non-Recourse Factoring Transaction for the purposes of the collection of Accounts subject to such Permitted Non-Recourse Factoring Transaction, the Loan Parties shall not permit the proceeds of ABL Priority Collateral (which does not include proceeds of the Accounts subject to such Permitted Non-Recourse Factoring Transaction) to be deposited or maintained in such collection accounts, (v) other than as set forth in clause (vi) below in the case of each Selling Trico Party to such Permitted Non-Recourse Factoring Transaction, neither Parent nor any of its Subsidiaries shall provide any credit support of any kind other than customary performance undertakings and (vi) other than customary performance undertakings and indemnities, the obligations thereunder shall not involve any recourse to Parent or any of its Subsidiaries other than to each Selling Trico Party party to such Permitted Non-Recourse Factoring Transaction, and such recourse to such Selling Trico Party shall be limited solely to a breach of a customary asset related representation thereunder and disputes.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Periodic Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) sponsored, maintained or contributed to by any Loan Party or any of the other Restricted Subsidiaries or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate, other than a Multiemployer Plan.

"Platform" has the meaning specified in Section 11.02(e).

"Pledge Agreement" means the Pledge Agreement executed by the Loan Parties substantially in the form of Exhibit G-1, as supplemented by each Security Agreement Supplement executed and delivered pursuant to Section 6.11.

"Prepayment Notice" means a notice of prepayment in respect of any voluntary or mandatory prepayment in substantially the form of Exhibit B.

41

DEBTORS' EXHIBIT NO. 67
Page 56 of 180

"Prime Rate" means, for any day, the prime rate published in the Wall Street Journal for such day; provided that if the Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" means the prime lending rate as set forth on the Bloomberg page PRIMBB Index (or successor page) for such day (or such other service as determined by the Administrative Agent from time to time for purposes of providing quotations of prime lending interest rates); each change in the Prime Rate shall be effective on the date such change is effective. The prime rate is not necessarily the lowest rate charged by any financial institution to its customers.

"Pro Forma Basis" means, with respect to any determination of the First Lien Leverage Ratio, Total Leverage Ratio, Total Secured Leverage Ratio, the Consolidated Adjusted EBITDA or Consolidated Total Assets (including component definitions thereof), that each Specified Transaction shall be deemed to have occurred as of the first day of the applicable Test Period (or, in the case of Consolidated Total Assets, as of the last day of such Test Period) with respect to any test or covenant for which such calculation is being made and that:

(a)    (i)    in the case of any Disposition of all or substantially all of the Equity Interests of any Subsidiary of Parent (other than the Borrower) or any division and/or product line of the Borrower and/or any Restricted Subsidiary, income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction, shall be excluded as of the first day of such Test Period with respect to any test or covenant for which the relevant determination is being made, and

(ii)    in the case of any Permitted Acquisition and/or Investment described in the definition of the term "Specified Transaction", income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction shall be included as of the first day of such Test Period with respect to any test or covenant for which the relevant determination is being made,

(b)    any retirement or repayment of Indebtedness (other than normal fluctuations in revolving Indebtedness incurred for working capital purposes) shall be deemed to have occurred as of the first day of such Test Period with respect to any test or covenant for which the relevant determination is being made,

(c)    any Indebtedness incurred or assumed by the Borrower or any of the other Restricted Subsidiaries in connection therewith shall be deemed to have occurred as of the first day of such Test Period with respect to any test or covenant for which the relevant determination is being made; provided that, (x) if such Indebtedness has a floating or formula rate, such Indebtedness shall have an implied rate of interest for the applicable Test Period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Indebtedness at the relevant date of determination (taking into account any interest hedging arrangements applicable to such Indebtedness), (y) interest on any obligation with respect to any Capital Lease shall be deemed to accrue at an interest rate reasonably determined by a Responsible Officer of the Borrower to be the rate of interest implicit in such obligation in accordance with GAAP and (z) interest on any Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a Eurocurrency interbank offered rate or other rate shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen by the Borrower, and

(d)    the acquisition of any assets included in calculating Consolidated Total Assets, whether pursuant to any Specified Transaction or any Person becoming a Restricted Subsidiary or merging, amalgamating or consolidating with or into the Borrower or any of the other Restricted Subsidiaries, or the Disposition of any assets included in calculating Consolidated Total Assets described

42

FBG_CH1_00097932

in the definition of "Specified Transaction" shall be deemed to have occurred as of the last day of such Test Period with respect to any test or covenant for which such calculation is being made.

In the case of any calculation of the First Lien Leverage Ratio, Total Secured Leverage Ratio, Total Leverage Ratio or Consolidated Total Assets for any event described above that occurs prior to the date on which financial statements have been (or are required to be) delivered for the fiscal quarter ending March 31, 2021, any such calculation required to be made on a "Pro Forma Basis" shall use (I) prior to the date on which the financial statements for the fiscal quarter ending March 31, 2021 have been (or are required to have been) delivered pursuant to Section 6.01(b), the financial statements of the Borrower and the other Restricted Subsidiaries for the Fiscal Year ending December 31, 2020 delivered to the Lead Arranger prior to the 2021 Refinancing Agreement Effective Date) and (II) on and after such date referred to in the foregoing clause (I), the financial statements of the Borrower and the other Restricted Subsidiaries delivered pursuant to Section 6.01. Notwithstanding the foregoing, the Borrower shall not be required to (but may) make any determination on a Pro Forma Basis if the Specified Transaction does not involve consideration in excess of $2,000,000.

"Pro Rata Share" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments of such Lender under the respective applicable Credit Facility or Credit Facilities at such time and the denominator of which is the amount of the Aggregate Commitments under the applicable Credit Facility or Credit Facilities at such time; provided that if any Commitment for a Credit Facility has been terminated, then the Pro Rata Share of each Lender as it pertains to such Credit Facility shall be determined based on the outstanding principal amount of the Loans under such Credit Facility held by such Lender divided by the aggregate principal amount of all Outstanding Amounts under such Credit Facility.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Lender" has the meaning specified in Section 11.02(h).

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"Qualified Equity Interests" means any Equity Interests that are not Disqualified Equity Interests.

"Qualifying IPO" means the issuance by Parent or any other Parent Company or any successor thereof of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering) or in a firm commitment underwritten offering (or series of related offerings of securities to the public pursuant to a final prospectus) made pursuant to the Securities Act.

"Ratio Debt Basket" means, at any date of determination, subject to the Required Additional Debt Terms, an unlimited amount at any time so long as after giving effect to the incurrence of any such Indebtedness and the use of proceeds thereof,

(a)    in the case of Indebtedness that is secured on a senior lien basis to the Obligations, the First Lien Leverage Ratio on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Indebtedness made pursuant to any other clause of Section 7.03 other than 7.03(a) or (m) in respect of the Incurrence-Based Incremental Amount or 7.03(r) in respect of the

43

DEBTORS' EXHIBIT NO. 67
Page 58 of 180

Incurrence-Based Incremental Amount (as defined in the First Lien Credit Agreement) or 7.03(s)) shall not exceed 3.55:1.00;

(b)      in the case of Indebtedness that is secured on a pari passu basis with the Obligations, the Total Secured Leverage Ratio on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Indebtedness made pursuant any other clause of Section 7.03 other than 7.03(a) or (m) in respect of the Incurrence-Based Incremental Amount or 7.03(r) in respect of the Incurrence-Based Incremental Amount (as defined in the First Lien Credit Agreement) or 7.03(s)) shall not exceed 3.55:1.00;

(c)      in the case of Indebtedness that is secured by the Collateral on a junior lien basis to the Obligations, the Total Secured Leverage Ratio on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Indebtedness made pursuant any other clause of Section 7.03 other than 7.03(a) or (m) in respect of the Incurrence-Based Incremental Amount or 7.03(r) in respect of the Incurrence-Based Incremental Amount (as defined in the First Lien Credit Agreement) or 7.03(s)) shall not exceed 3.55:1.00; and

(d)      in the case of Indebtedness that is unsecured, the Total Leverage Ratio on a Pro Forma Basis (but without giving effect to any simultaneous incurrence of any Indebtedness made pursuant any other clause of Section 7.03 other than 7.03(a) or (m) in respect of the Incurrence-Based Incremental Amount or 7.03(r) in respect of the Incurrence-Based Incremental Amount (as defined in the First Lien Credit Agreement) or 7.03(s)) shall not exceed 3.55:1.00.

Compliance with the First Lien Leverage Ratio, Total Secured Leverage Ratio and Total Leverage Ratio tests described above shall be calculated at the time of incurrence of the relevant Indebtedness on a Pro Forma Basis after giving effect thereto and the application of the proceeds thereof (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable); it being understood that if the proceeds of the relevant Indebtedness will be applied to finance a Limited Condition Acquisition and the Borrower has made an LCA Election, compliance with the First Lien Leverage Ratio, Total Secured Leverage Ratio and Total Leverage Ratio tests described above shall be determined as of the LCA Test Date in respect of such Limited Condition Acquisition (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable).

"Refinancing Amendment" means an amendment to this Agreement, in form and substance reasonably satisfactory to the Administrative Agent, among the Borrower, the Administrative Agent and the lender or lenders providing the relevant Specified Term Refinancing Debt, including, without limitation, the 2021 Refinancing Agreement.

"Refinancing Facility" means one or more series of notes or loans, which may be pari passu or junior in right of payment with the Indebtedness then existing under the Credit Facilities and/or may be secured by a Lien on all or part of the Collateral that is pari passu or junior to the Lien on such Collateral securing the Credit Facilities or be unsecured, in each case issued in respect of a refinancing of a portion of the outstanding Indebtedness of the Borrower under the Credit Facilities; provided that:

(a)      if such Refinancing Facility shall be secured by a security interest in the Collateral, then such Refinancing Facility shall be issued subject to the ABL Intercreditor Agreement or customary intercreditor arrangements that are reasonably satisfactory to the Administrative Agent and the Borrower and, if such security interest is pari passu to the Liens securing the Obligations, the First

44

DEBTORS' EXHIBIT NO. 67
Page 59 of 180

Lien/Second Lien Intercreditor Agreement or customary intercreditor arrangements that are reasonably satisfactory to the Administrative Agent and the Borrower and if such security is junior to the Liens securing the Obligations, other customary intercreditor arrangements that are reasonably satisfactory to the Administrative Agent and, in each case, the Borrower,

(b)    such Refinancing Facility shall not have a scheduled final maturity earlier than the Maturity Date of the Indebtedness being refinanced; provided that any such Indebtedness that is unsecured or is secured on a junior lien basis to the Term Loan Facility shall have a scheduled final maturity at least ninety one (91) days following the Latest Maturity Date,

(c)    the Weighted Average Life to Maturity of such Refinancing Facility shall be equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being refinanced, provided that any Indebtedness that is unsecured or is secured on a junior lien basis to the Term Loan Facility shall have no scheduled amortization or scheduled payments of principal prior to ninety one (91) days following the Latest Maturity Date,

(d)    the covenants, events of default, and other terms of such Refinancing Facility (other than interest rate, payment premiums and redemptions or as otherwise provided in the other clauses of this definition) shall be as agreed between the Borrower and the lenders providing such Refinancing Facility; provided, that the other terms of any Refinancing Facility that are not substantially identical to the corresponding terms in the then-existing Term Loan Facility shall (x) reflect current market terms at the time such Refinancing Facility is incurred for such types of Indebtedness (as reasonably determined by the Borrower in good faith) or (y) be not materially more favorable (taken as a whole) to the lenders providing such Indebtedness than such terms in the Loans being refinanced thereby (as reasonably determined by the Borrower in good faith) (except for any materially more favorable terms that are (i) reasonably acceptable to the Administrative Agent, (ii) added for the benefit of the Loans not being refinanced thereby or (iii) applicable only after the Latest Maturity Date of the remaining outstanding Loans);

(e)    except to the extent otherwise permitted hereunder, the aggregate principal amount of such Refinancing Facility shall not exceed the aggregate principal amount of Indebtedness being refinanced therewith, plus interest, premiums, fees and reasonable expenses;

(f)    (i) if any such Refinancing Facility is guaranteed, it shall not be guaranteed by any Person other than the Guarantors and (ii) if any Refinancing Facility is secured, it shall not be secured by any assets other than the Collateral;

(g)    any Refinancing Facility that replaces and/or refinances the Term Loan Facility or any Incremental Term Facility and that is pari passu with such Term Loan Facility or Incremental Term Facility in right of payment and pari passu with the Lien on the Collateral securing such Term Loan Facility or Incremental Term Facility shall share ratably in any mandatory prepayment of such Term Loan Facility or Incremental Term Facility unless the Borrower and the lenders in respect of such Refinancing Facility elect lesser payments; and

(h)    any Refinancing Facility that replaces and/or refinances Indebtedness that is unsecured or secured by a Lien on all or a part of the Collateral that is junior to the Lien on such Collateral securing the Term Loan Facility shall be unsecured or secured by a Lien on all or part of the Collateral that is junior to the Lien on such Collateral securing the Term Loan Facility.

"Refinancing Indebtedness" has the meaning specified in Section 7.03(y).

45

"Refunding Equity Interests" has the meaning specified in Section 7.06(k).

"Register" has the meaning specified in Section 11.07(d).

"Related Assets" means, (i) with respect to any Accounts sold pursuant to a Permitted Non-Recourse Factoring Transaction, all collateral securing such Accounts, all contracts and contract rights, guarantees or other obligations in respect of such Accounts, all records with respect to such Accounts and any other assets customarily transferred together with Accounts in connection with a non-recourse accounts receivable factoring arrangement and which are sold, conveyed, assigned or otherwise transferred by the Borrower or any other Restricted Subsidiary thereof party to such Permitted Non-Recourse Factoring Transaction to the factor thereunder and (ii) with respect to any inventory sold pursuant to a Permitted Inventory Financing, all collateral securing such inventory, all contracts and contract rights, guarantees or other obligations in respect of such inventory, all records with respect to such inventory and any other assets customarily transferred together with inventory in connection with a comparable inventory financing arrangement and which are sold, conveyed, assigned or otherwise transferred by the Borrower or any other Restricted Subsidiary thereof party to such Permitted Inventory Financing to the counterparty thereto.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, leaching or migration of any Hazardous Material in or into the environment, including indoor air.

"Relevant Governmental Body" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"Reportable Event" means with respect to any Pension Plan or Multiemployer Plan any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the thirty (30) day notice period is waived under PBGC Reg. Section 4043.

"Representatives" mean, with respect to any Person, the employees, directors, members of management, officers, managers, consultants, partners or independent contractors of such Person.

"Repricing Transaction" means (i) any prepayment or repayment of any 2021 Term Loan with the proceeds of, or any conversion of any 2021 Term Loans into, any new or replacement tranche of secured term loans with an All-In Yield less than the All-In Yield applicable to such 2021 Term Loans (as such comparative rates are determined by the Administrative Agent in consultation with the Borrower), and (ii) any amendment to the 2021 Term Loans that, directly or indirectly, reduces the All-In Yield applicable to such 2021 Term Loans (including any mandatory assignment of any 2021 Term Loan by a Lender that refuses to consent to such amendment) other than in connection with the exchange of 2021 Term Loans for (or the conversion of 2021 Term Loans into) 2021 Term Loans pursuant to Section 2.01(ii).

"Request for Credit Extension" means, with respect to a Borrowing, conversion or continuation of Term Loans, Incremental Term Loans or Specified Term Refinancing Debt Loans, the delivery of a Committed Loan Notice.

"Required Additional Debt Terms" means, with respect to any Indebtedness:

(a)     no Default or Event of Default shall exist and be continuing or would result from the incurrence of such Indebtedness, provided that, solely in connection with Indebtedness incurred to

46

DEBTORS' EXHIBIT NO. 67
Page 61 of 180

finance a Limited Condition Acquisition for which the Borrower has made an LCA Election, (i) no Event of Default shall exist and be continuing as of the LCA Test Date for such Limited Condition Acquisition and (ii) no Event of Default pursuant to Section 9.01(a), (f) or (g) shall exist and be continuing as of the date of consummation of the Limited Condition Acquisition,

(b)      such Indebtedness shall not (except in the case of customary bridge loans, so long as the long-term debt into which any such customary bridge facility is to be converted or exchanged satisfies such clause and any such conversion or exchange is subject only to customary conditions) have a scheduled final maturity earlier than the Latest Maturity Date; provided that any such Indebtedness that is unsecured or is secured on a junior lien basis to the Term Loan Facility shall have a scheduled final maturity at least ninety one (91) days following the Latest Maturity Date,

(c)      the Weighted Average Life to Maturity applicable to such Indebtedness shall (except in the case of customary bridge loans, so long as the long-term debt into which any such customary bridge facility is to be converted or exchanged satisfies such clause and any such conversion or exchange is subject only to customary conditions), be equal to or greater than the Weighted Average Life to Maturity of the existing Term Loan Facility, provided that any Indebtedness that is unsecured or is secured on a junior lien basis to the Term Loan Facility shall have no scheduled amortization or scheduled payments of principal prior to ninety one (91) days following the Latest Maturity Date,

(d)      any such Indebtedness that is pari passu in right of payment with the Term Loans on the Closing Date and which is secured by a Lien that is pari passu with the Lien securing the Obligations on the Closing Date and is in the form of loans shall be subject to the requirements set forth in Section 2.16(b)(xi) hereof,

(e)      if such Indebtedness is secured, the obligations in respect thereof shall not be secured by a Lien on any asset other than Collateral,

(f)      such Indebtedness shall not be subject to any Guarantee by any Person other than a Guarantor,

(g)      such Indebtedness may rank pari passu or junior in right of payment to the Term Loans and may be secured on a senior, pari passu or junior lien basis with the Liens securing the Obligations or may be unsecured, and (w) if senior in right of security or junior in right of payment and/or security or unsecured, shall be established pursuant to separate documentation than the Loan Documents for the Term Loans that are secured by the Collateral on a second priority basis, (x) if secured, shall be subject to the ABL Intercreditor Agreement and/or other customary intercreditor arrangements reasonably satisfactory to the Administrative Agent and, in each case, the Borrower, (y) if secured on a pari passu or senior basis to the Liens securing the Obligations, shall be subject to the First Lien/Second Lien Intercreditor Agreement and/or other customary intercreditor arrangements reasonably satisfactory to the Administrative Agent and the Borrower and (z) if secured on a junior basis to the Liens securing the Obligations, shall be subject to other customary intercreditor arrangements reasonably satisfactory to the Administrative Agent and the Borrower;

(h)      (i) such Indebtedness which is secured on a pari passu basis with the Obligations may provide for the ability to participate on a pro rata basis or less than pro rata basis (but not on a greater than pro rata basis other than in the case of prepayment with permitted Refinancing Indebtedness) in any mandatory prepayments of the Term Loans and (ii) such Indebtedness which is secured on a senior lien basis to the Obligations may provide for the ability to participate on a greater than pro rata basis, a pro rata basis or a less than pro rata basis in any mandatory prepayments of the Term Loans; and

47

FBG_CH1_00097937

(i)      except as otherwise required by this definition, all other terms of such Indebtedness will be as agreed between the Borrower and the lenders providing such Indebtedness; provided, that the other terms of such Indebtedness (other than terms related to pricing, fees and maturity) that are not substantially identical to the corresponding terms in the then existing Term Loan Facility shall not be materially more favorable (taken as a whole) to the lenders providing such Indebtedness than such terms in the then-existing Term Loan Facility (as reasonably determined by the Borrower in good faith) (except for any materially more favorable terms that are (i) reasonably acceptable to the Administrative Agent, (ii) added for the benefit of the Term Loan Facility or (iii) applicable only after the Latest Maturity Date).

"Required Lenders" means, as of any date of determination, Lenders having more than 50% of the Total Facility Exposure; provided that any unused Term Commitment (if any) and the portion of the Total Outstandings held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Resolution Authority" means an EEA Resolution Authority or, with respect tony UK Financial Institution, a UK Resolution Authority.

"Response" shall mean any investigations, assessments, studies, cleanup, response, remedial, removal, or corrective actions related to Environmental Laws, Environmental Permits, Environmental Actions or Hazardous Materials.

"Responsible Officer" means the chief executive officer, president, chief financial officer, or treasurer, any assistant treasurer, executive vice president, senior vice president or, in each case, any other similar officer or a Person performing similar functions of a Loan Party (and, as to any document delivered on the Closing Date, to the extent acceptable to the Administrative Agent in its sole discretion or required by the terms of this Agreement, any secretary or assistant secretary of a Loan Party).  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Amount" has the meaning specified in Section 2.05(b)(vi).

"Restricted Debt" has the meaning specified in Section 7.09(a).

"Restricted Debt Payment" has the meaning specified in Section 7.09(a).

"Restricted Payment" means, with respect to any Person, any dividend or other distribution (whether in cash, securities (other than dividends consisting of Qualified Equity Interests issued by such Person) or other property) with respect to any capital stock or other Equity Interest of such Person, or any payment (whether in cash, securities (other than Qualified Equity Interests) or other property), including any sinking fund or similar deposit, on account of the purchase, retraction, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest of such Person, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof).

"Restricted Subsidiary" means any Subsidiary of Parent.

"Restricting Information" has the meaning assigned to such term in Section 11.02(i).

48

**DEBTORS' EXHIBIT NO. 67**
**Page 63 of 180**

"Retained Excess Cash Flow Amount" means, at any date of determination, an amount, not less than zero, determined on a cumulative basis equal to the amount of Excess Cash Flow for all Excess Cash Flow Periods ending after the Closing Date that is not (and, in the case of any Excess Cash Flow Period where the respective required date of prepayment has not yet occurred pursuant to Section 2.05(b)(i), will not on such date of required prepayment be) required to be applied in accordance with Section 2.05(b)(i) (other than as a result of clause (B) thereof).

"S&P" means S&P Global Ratings Inc., and its successors.

"Sale Leaseback Transaction" means any arrangement with any Person providing for the leasing by either of the Borrower or any of the other Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Borrower or such Restricted Subsidiary to such Person in contemplation of such leasing.

"Sanctioned Country" means, at any time, a country or territory that is the subject or target of any Sanctions broadly restricting or prohibiting dealings with or in such country or territory (including, as of the date hereof, the Crimea region of Ukraine, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means any Person: (i) listed in any Sanctions-related list of designated Persons maintained by any Sanctions Authority, (ii)  located, organized or resident in, or any governmental entity or governmental instrumentality of, a Sanctioned Country, (iii) owned or controlled by, or acting for the benefit or on behalf of, directly or indirectly, any Person described in clauses (i) or (ii) hereof or (iv) otherwise the subject or target of any Sanctions.

"Sanctions" means the economic, financial or other sanctions laws, regulations or embargoes administered and enforced from time to time by any Sanctions Authority.

"Sanctions Authority" means (a) the United Nations Security Council, (b) the European Union and each of its member states, (c) the United States of America (including, without limitation, OFAC and the U.S. Department of State), (d)  the United Kingdom (including, without limitation, Her Majesty's Treasury) or (e) any other relevant national or supra-national sanctions authority with jurisdiction over the Borrower.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Obligations" means all Obligations of each Loan Party now or hereafter existing under the Loan Documents.

"Secured Parties" means, collectively, the Administrative Agent, the Collateral Agent and the Lenders.

"Securities Act" means the Securities Act of 1933, as amended.

"Security Agreement" means the Security Agreement executed by the Loan Parties substantially in the form of Exhibit G-2, as supplemented by each Security Agreement Supplement executed and delivered pursuant to Section 6.11.

"Security Agreement Supplement" has the meaning specified in Section 6.11(a)(ii).

49

CONFIDENTIAL

"Shared Fixed Incremental Amount" has the meaning specified in the definition of "Incremental Cap."

"SOFR" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"SOFR Borrowing" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"SOFR Loan" means a Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (iii) of the definition of "Base Rate".

"Sold Entity or Business" means for any period any Person or any property or assets constituting a line of business or a division of a Person or all or substantially all of the assets of a Person sold, transferred or otherwise disposed of, closed or classified as discontinued operations (in each case, other than as a result of such Person, property, business or asset being held for sale, transfer or other disposition) by the Borrower or any of the other Restricted Subsidiaries.

"Solvency Certificate" means the Solvency Certificate executed by certain Loan Parties substantially in the form of Exhibit K.

"Solvent" means, with respect to any Person on any date of determination, that on such date (a) the Fair Value of the assets of such Person and its Subsidiaries taken as a whole exceeds the Liabilities of such Person and its Subsidiaries taken as a whole, (b) the Present Fair Salable Value of the assets of such Person and its Subsidiaries taken as a whole exceeds the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, (c) such Person and its Subsidiaries taken as a whole do not have Unreasonably Small Capital and (d) such Person and its Subsidiaries taken as a whole will be able to pay their Liabilities as they mature. For purposes of this definition: (i) "Fair Value" means the amount at which the assets (both tangible and intangible), in their entirety, of such Person and its Subsidiaries taken as a whole would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act; (ii) "Present Fair Salable Value" means the amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of such Person and its Subsidiaries taken as a whole are sold with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated; (iii) "Liabilities" means the recorded liabilities (including contingent liabilities that would be recorded in accordance with GAAP) of such Person and its Subsidiaries taken as a whole, as of any date, determined in accordance with GAAP consistently applied; (iv) "will be able to pay their Liabilities as they mature" shall mean such Person and its Subsidiaries taken as a whole will have sufficient assets and cash flow to pay their Liabilities as those liabilities mature or (in the case of contingent Liabilities) otherwise become payable, in light of business conducted or anticipated to be conducted by such Person and its Subsidiaries and (v) "do not have Unreasonably Small Capital" means such Person and its Subsidiaries taken as a whole is a going concern and has sufficient capital to reasonably ensure that it will continue to be a going concern (it being understood that "unreasonably small capital" depends on the nature of the particular business or business conducted or to be conducted, based on the needs and anticipated needs for the capital of the business conducted or anticipated to be conducted by such Person and its Subsidiaries).

"SPC" has the meaning specified in Section 11.07(g).

50

CONFIDENTIAL

"Specified Customers" means original equipment manufacturers, automotive aftermarket customers, automotive dealerships and those Persons listed on Schedule 1.01(a).

"Specified Term Refinancing Debt" has the meaning specified in Section 2.17(a).

"Specified Term Refinancing Debt Borrowing" means a borrowing consisting of Specified Term Refinancing Debt Loans of the same Type and, in the case of ~~Eurodollar Rate~~SOFR Loans, having the same Interest Period made pursuant to the applicable Specified Term Refinancing Debt Facility.

"Specified Term Refinancing Debt Commitment" has the meaning specified in Section 2.17(a).

"Specified Term Refinancing Debt Facility" means a new term loan facility under this Agreement or one or more series of notes or loans, in each case, pursuant to Section 2.17.

"Specified Term Refinancing Debt Lenders" means lenders under any Specified Term Refinancing Debt Facility.

"Specified Term Refinancing Debt Loans" has the meaning specified in Section 2.17(a).

"Specified Transaction" means the Transactions, any Permitted Acquisition or similar Investment, any Disposition of a Sold Entity or Business, any incurrence or repayment of Indebtedness, any Incremental Term Facility or any other transaction, event or action that by the terms of this Agreement requires pro forma compliance with a test or covenant hereunder or requires such test or covenant to be calculated on a Pro Forma Basis.

"Spot Rate" means, on any date of determination, the exchange rate, as determined by the Administrative Agent, that is applicable to conversion of one currency into another currency, which is (a) the exchange rate reported by Bloomberg (or other commercially available source designated by the Administrative Agent) as of the end of the preceding business day in the financial market for the first currency; or (b) if such report is unavailable for any reason, the spot rate for the purchase of the first currency with the second currency as in effect during the preceding business day in the Administrative Agent's (or one of its Affiliate's) principal foreign exchange trading office for the first currency.

"Subordinated Indebtedness" means any Indebtedness created, incurred or assumed by Parent or any of its Restricted Subsidiaries or in respect of which Parent or any of its Restricted Subsidiaries is liable, which is contractually subordinated in right of payment to the Obligations.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" of a Person shall refer to a Subsidiary or Subsidiaries of Parent.

"Subsidiary Guarantors" means (i) on the 2021 Refinancing Agreement Effective Date, each Subsidiary listed on Schedule 1.01(b) hereto and (ii) thereafter, each Subsidiary that executes a Guaranty Supplement, in each case, until such time as the relevant Subsidiary is released from its obligations under the Guaranty in accordance with the terms and provisions hereof.

"Successor Borrower" has the meaning specified in Section 7.04(a).

51

FBG_CH1_00097941

"Swap Contract" means (a) any and all interest rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Tax Distributions" for any period in which each of the Borrower and Parent is a partnership or disregarded entity for U.S. federal income tax purposes, the Borrower and its Subsidiaries may pay dividends or make distributions to Parent and Parent may distribute such amounts to the partners or members to whom the income earned by the Borrower and its Subsidiaries is allocable for such purposes (either directly or indirectly through intermediary entities, as the case may be) in an aggregate amount not greater than the amount necessary for such partners or members, as the case may be, to pay their state and United States federal income tax liabilities, in each case, solely in respect of income earned by the Borrower and its Subsidiaries that is allocable to them (but not any other Affiliate of the Borrower) but not to exceed in any taxable year the state and United States income tax liabilities of such partners or members actually owed by such partners or members for such taxable year (calculated as taxable income, on a quarterly basis, multiplied by the highest combined federal, state and local tax rates taking into account the deductibility of state and local income taxes for federal income tax purposes, but without taking into account any potential effects of Sections 67 and 68 of the Code and reduced by any amounts required to be withheld by Borrower or Parent with respect to such partners or members under Section 1446 of the Code).

"Taxes" means any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, stamp taxes, withholdings (including backup withholding) or similar charges imposed by any Governmental Authority, including interest, additions to tax or penalties applicable thereto.

"Term Borrowing" means a borrowing consisting of Term Loans of the same Type and, in the case of ~~Eurodollar Rate~~SOFR Loans, having the same Interest Period made by each of the Term Lenders pursuant to Section 2.01.

"Term Commitment" means, as to each Term Lender, its obligation to make a Term Loan to the Borrower pursuant to Sections 2.01, 2.16, 2.17 or 2.18 in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 hereto under the caption "Term Commitment" or in the Assignment and Assumption pursuant to which such Term Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Term Lender" means, at any time, any Lender that has a Term Commitment or a Term Loan at such time.

52

"Term Loan" means a Loan made pursuant to Section 2.01, an Incremental Term Loan, a Specified Term Refinancing Debt Loan and an Extended Term Loan.  The aggregate principal amount of Term Loans on the 2021 Refinancing Agreement Effective Date is $540,000,000.

"Term Loan Facility" means the Term Loans in an aggregate amount equal to the amount of each Lender's Term Commitment.

"Term Priority Collateral" has the meaning specified in the ABL Intercreditor Agreement.

"Term SOFR" means,

(a)    for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)    for any calculation with respect to an Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "Base Rate Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate SOFR Determination Day.

"Term SOFR Adjustment" means, for any calculation with respect to a Base Rate Loan or a SOFR Loan, a percentage per annum as set forth below for the applicable type of such Loan and (if applicable) Interest Period therefor:

Base Rate Loans:

| 0.11448% |
| --- |

SOFR Loans:

| Interest Period | Percentage |
| --- | --- |
| Less than or equal to one month | 0.11448% |
| Greater than one month and less than or equal to three months | 0.26161% |
| Greater than three months and less than or equal to six months | 0.42826% |

53

CONFIDENTIAL

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate" means  the forward-looking term rate based on SOFR ~~that has been selected or recommended by the Relevant Governmental Body~~.

"Termination Date" means the date upon which all Commitments have terminated and the Loans, together with all interest, fees and other Obligations (other than contingent indemnification Obligations for which no demand shall have been made), have been paid in full in cash.

"Test Period" means, at any date of determination, the most recently completed four (4) consecutive fiscal quarters of the applicable Person ending on or prior to such date for which financial statements are required to have been delivered pursuant to Section 6.01(a) or (b), as applicable.

"Total Facility Exposure" means the sum of (a) Total Outstandings and (b) aggregate unused Commitments (if any).

"Total Leverage Ratio" means, with respect to any Test Period, the ratio of (a) Consolidated Total Debt as of the last day of such Test Period to (b) Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries for such Test Period.

"Total Outstandings" means the aggregate Outstanding Amount of all Loans.

"Total Secured Leverage Ratio" means, with respect to any Test Period, the ratio of (a) Consolidated Total Debt as of the last day of such Test Period that is secured by the assets of the Borrower and the other Restricted Subsidiaries to (b) Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries for such Test Period.

"Transaction Expenses" means any fees or expenses incurred or paid by the Borrower (or any Parent Company) or any of the other Restricted Subsidiaries in connection with any of the following (but calculated without duplication of any amounts): (i) the Transactions, (ii) the internal restructuring commencing on or prior to the Closing Date (including amendments, modifications and the repayment of obligations under any contracts, leases or indebtedness in connection therewith) in an amount not to exceed $6,250,000, (iii) this Agreement and the other Loan Documents and the transactions contemplated to occur hereunder and thereunder, as applicable, (iv) the 2019 Specified Acquisitions and (v) the 2020 Specified Acquisitions.

"Transactions" means, collectively, (a) the funding of the Term Loans on the Closing Date, (b) the repayment of the Indebtedness outstanding under the Existing Credit Agreements (as defined in the First Lien Credit Agreement), (c) the incurrence of the loans and effectiveness of the commitments pursuant to and under the ABL Credit Agreement and the First Lien Credit Agreement, (d) the 2021 Refinancing Agreement Transactions, (e) the consummation of any other transactions in connection with the foregoing, including payment of deferred purchase price in connection therewith, and (f) the payment of the fees and expenses incurred in connection with any of the foregoing.

"Treasury Equity Interests" has the meaning specified in Section 7.06(k).

"Type" means, with respect to a Loan, its character as a Base Rate Loan or a ~~Eurodollar Rate~~SOFR Loan.

54

CONFIDENTIAL

FBG_CH1_00097944

"UCI Acquisition" means the acquisition by UCI International Holdings Parent, Inc., a wholly-owned Subsidiary of the Borrower, of all of the outstanding equity interests of UCI International Holdings, Inc., via merger of its wholly-owned subsidiary with and into UCI International Holdings, Inc.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"Unaudited Financial Statements" has the meaning specified in Section 4.01(g).

"Undisclosed Administration" means, in relation to a Lender or its parent company, the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator under or based on the law in the country where such person is subject to home jurisdiction supervision if applicable law requires that such appointment is not to be publicly disclosed.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any security interest in any item or items of Collateral.

"United States" means the United States of America.

"Unrestricted Cash" means all non-restricted cash and Cash Equivalents of the Loan Parties in deposit or securities accounts in which the Collateral Agent has "control" pursuant to and within the meaning of Section 9-104 and/or 9-106 of the UCC pursuant to the terms and conditions set forth in the Security Agreement or any other Collateral Document.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(f)(ii)(B)(3).

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years calculated to the

55

FBG_CH1_00097945

nearest one-twelfth that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Wholly-owned" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) directors' qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly-owned Subsidiaries of such Person.

"Withdrawal Liability" means the liability to a Multiemployer Plan as the result of a "complete" or "partial" withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA by the Borrower or any other Restricted Subsidiary or the ERISA Affiliates of the Borrower.

"Write-Down and Conversion Powers" means (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or a part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related or ancillary to any of those powers.

Section 1.02    Other Interpretive Provisions. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    (i)    The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)    Article, Section, paragraph, clause, subclause, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(iii)    The term "including" is by way of example and not limitation.

(iv)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(d)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

56

CONFIDENTIAL

FBG_CH1_00097946

(e)     Whenever the context may require, any pronoun shall include the corresponding masculine, feminine or neuter forms.

(f)     For purposes of determining compliance with Section 7.01 or 7.03, in the event that a Lien or an item of Indebtedness meets the criteria of more than one of the categories in their respective sections or the defined terms used therein, the Borrower may, in its sole discretion, classify and reclassify or later divide, classify or reclassify such Lien or item of Indebtedness (or any portion thereof, as applicable), and will be permitted to include the amount and type of such Lien or item of Indebtedness in one or more of the clauses contained in Section 7.01 or 7.03, as applicable; provided that all Indebtedness outstanding under the Loan Documents, the ABL Loan Documents and the First Lien Facility Documentation will be deemed to have been incurred in reliance only on the exception in clauses (a), (b) and (r), as applicable, of Section 7.03.

(g)     For purposes of determining the permissibility of any action, change, transaction or event that by the terms of the Loan Documents requires a calculation of any financial ratio or test (including the First Lien Leverage Ratio, the Total Secured Leverage Ratio, the Total Leverage Ratio and the amount of Consolidated Adjusted EBITDA and/or Consolidated Total Assets), such financial ratio or test shall be calculated at the time such action is taken, such change is made, such transaction is consummated or such event occurs, as the case may be, and no Default or Event of Default shall be deemed to have occurred solely as a result of a change in such financial ratio or test occurring after the time such action is taken, such change is made, such transaction is consummated or such event occurs, as the case may be.

(h)     The determination of whether any Indebtedness that is permitted hereunder matures or requires certain payments prior to the Latest Maturity Date shall be made at the time of the incurrence of the relevant Indebtedness.

Section 1.03    Accounting Terms. (ii)  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing audited financial statements, except as otherwise specifically prescribed herein.

(b)     Notwithstanding anything to the contrary herein, financial ratios and tests (including the First Lien Leverage Ratio, the Total Leverage Ratio, the Total Secured Leverage Ratio and the amount of Consolidated Adjusted EBITDA or Consolidated Total Assets) contained in this Agreement that are calculated with respect to any Test Period during which any Specified Transaction occurs shall be calculated with respect to such Test Period and such Specified Transaction on a Pro Forma Basis. Further, if since the beginning of any such Test Period and on or prior to the date of any required calculation of any financial ratio or test (x) any Specified Transaction has occurred or (y) any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of the other Restricted Subsidiaries since the beginning of such Test Period has consummated any Specified Transaction, then, in each case, any applicable financial ratio or test shall be calculated on a Pro Forma Basis for such Test Period as if such Specified Transaction had occurred at the beginning of the applicable Test Period.

(c)     Where reference is made to a Person "and its Subsidiaries on a consolidated basis" or similar language, such consolidation shall not include any subsidiaries other than Subsidiaries.

Section 1.04    Rounding. Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component

57

DEBTORS' EXHIBIT NO. 67
Page 72 of 180

by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05    References to Agreements, Laws, Etc.  Unless otherwise expressly provided herein, (a) references to documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, amendments and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendments and restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.07    Timing of Payment or Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day (unless such immediately succeeding Business Day is in the next calendar month, in which case the date of such payment or performance shall be the immediately preceding Business Day) and, in the case of any payment that accrues interest, interest thereon shall be payable for the period of such extension.

Section 1.08    Currency Equivalents Generally.

(a)    For purposes of determining compliance under Sections 7.01, 7.02, 7.03, 7.05 and 7.06, any amount in a currency other than Dollars will be converted to Dollars in a manner consistent with that used in calculating net income in the Borrower's annual financial statements delivered pursuant to Section 6.01(a) at the time of determination; provided that no Event of Default shall be deemed to have occurred thereafter solely as a result of such changes in rates of exchange thereafter.

(b)    Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with the Borrower's consent to appropriately reflect a change in currency of any country and any relevant market convention or practice relating to such change in currency.

(c)    Notwithstanding anything to the contrary herein, for purposes of any determination of Consolidated Total Debt, amounts in currencies other than Dollars shall be translated into Dollars at the currency exchange rates used in preparing the financial statements pursuant to Sections 6.01(a) or (b), as applicable.

Section 1.09    Cashless Rollovers.  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, to the extent that any Lender extends the maturity date of, or replaces, renews or refinances, any of its then-existing Loans with Incremental Term Loans and/or Specified Term Refinancing Debt Loans or loans incurred under a new credit facility, in each case, to the extent such extension, replacement, renewal or refinancing is effected by means of a "cashless roll" by such Lender, such extension, replacement, renewal or refinancing shall be deemed to comply with any requirement hereunder or any other Loan Document that such payment be made "in Dollars", "in immediately available funds", "in cash" or any other similar requirement.

58

FBG_CH1_00097948

Section 1.10    Certain Calculations and Tests.  (a)  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, for purposes of (a) determining compliance with any provision of this Agreement which requires calculation of the First Lien Leverage Ratio, Total Leverage Ratio or Total Secured Leverage Ratio, (b) determining compliance with any provision of this Agreement which requires as a condition that no Default or Event of Default has occurred, is continuing or would result from the incurrence of any Indebtedness (including Incremental Term Facilities) or Liens or the making of any Acquisitions or Investments, in each case, in connection with the consummation of a Limited Condition Acquisition or (c) testing availability under baskets set forth in this Agreement (including (i) any baskets based on a percentage of Consolidated Adjusted EBITDA and (ii) the incurrence of any Incremental Term Facility), in each case in connection with a Limited Condition Acquisition, the date of determination of such ratio or of whether any Default or Event of Default has occurred, is continuing or would result therefrom or other applicable covenant shall, at the irrevocable option of the Borrower (an "LCA Election"), be deemed to be the date the definitive agreements for such Limited Condition Acquisition are entered into (the "LCA Test Date") and if, after such ratios and other provisions are measured on a Pro Forma Basis after giving effect to such Limited Condition Acquisition and any incurrence of Indebtedness (and the use of proceeds thereof) or Liens or the making of any Acquisitions or Investments, in each case, to be consummated in connection therewith, as if they occurred at the beginning of the Test Period being used to calculate such financial ratio ending prior to the LCA Test Date, the Borrower could have taken such action on the relevant LCA Test Date in compliance with such ratios and provisions, such provisions shall be deemed to have been complied with. If any of such ratios are exceeded as a result of fluctuations in such ratio (including due to fluctuations in Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries or the target of such Limited Condition Acquisition) at or prior to the consummation of the relevant Limited Condition Acquisition, such ratios and other provisions will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether such Limited Condition Acquisition (and any incurrence of any Indebtedness (including Incremental Term Facilities) or Liens or the making of any Acquisitions or Investments, in each case in connection therewith) is permitted hereunder.  If the Borrower makes an LCA Election, then in connection with any calculation of any ratio, test or basket availability with respect to any Specified Transaction following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Acquisition is consummated or the date that the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, for purposes of determining whether such subsequent Specified Transaction is permitted under the Loan Document, any such ratio, test or basket shall be required to be satisfied on a Pro Forma Basis assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have been consummated.

(b) The calculation of any ratio hereunder shall be made without regard to the netting of any cash proceeds of Indebtedness incurred by the Borrower or any of its Restricted Subsidiaries in connection with such transaction (but without limiting the pro forma effect of any prepayment of Indebtedness with such cash proceeds).

Section 1.11    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.12    Interest Rates; LIBOR Replacement.  Interest Rates.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the

59

FBG_CH1_00097949

continuation of, administration of, submission of, calculation of or any other matter related to Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the defini-tion thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, succes-sor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Bench-mark Replacement Conforming Changes.  The Administrative Agent and its affiliates or other relat-ed entities may engage in transactions that affect the calculation of Base Rate, the Term SOFR Ref-erence Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (in-cluding any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a man-ner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agree-ment, and shall have no liability to the Borrower, any Lender or any other person or entity for dam-ages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

~

(a) ~~Notwithstanding anything to the contrary herein or in any other Loan Document, and without limiting the provisions of Section 3.03, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent and the Borrower may amend this Agreement to replace LIBOR with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders of each Class. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders of each Class have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment. No replacement of LIBOR with a Benchmark Replacement pursuant to this Section 1.12 will occur prior to the applicable Benchmark Transition Start Date.~~

(b) ~~In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.~~

(c) ~~The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or Lenders pursuant to this Section 1.12, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their~~

60

~~sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 1.12.~~

~~(d)      Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Eurodollar Rate Loan of, conversion to or continuation of Eurodollar Rate Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of the Base Rate based upon the Eurodollar Base Rate will not be used in any determination of the Base Rate.~~

## ARTICLE II

## THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01      The Loans.  (i) Subject to the terms and conditions set forth herein, each Term Lender severally made to the Borrower, on the Closing Date, a single loan in a principal amount equal to such Term Lender's Term Commitment as in effect at such time and (ii) subject to the terms and conditions set forth herein and the 2021 Refinancing Agreement, the 2021 Term Lender agrees to make to the Borrower on the 2021 Refinancing Agreement Effective Date, 2021 Term Loans not in excess of its 2021 Term Commitment (and subject to reduction in the event of any exchanges or cashless settlements pursuant to the 2021 Refinancing Agreement).  Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.  Term Loans may be Base Rate Loans or ~~Eurodollar Rate~~SOFR Loans, as further provided herein.

Section 2.02      Borrowings, Conversions and Continuations of Loans.

(a)      Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of ~~Eurodollar Rate~~SOFR Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent of such Borrowing, conversion or continuation of ~~Eurodollar Rate~~SOFR Loans, which may be given by telephone.  Each such notice must be received by the Administrative Agent not later than (i) 1:00 p.m. three (3) U.S. Government Securities Business Days prior to the requested date of any Borrowing or continuation or conversion of ~~Eurodollar Rate~~SOFR Loans (or any conversion of Base Rate Loans to ~~Eurodollar Rate~~SOFR Loans) and (ii) 11:00 a.m. on the requested date of any Borrowing of Base Rate Loans or any continuation or conversion of ~~Eurodollar Rate~~SOFR Loans to Base Rate Loans.  Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower.  Each Borrowing of, conversion to or continuation of ~~Eurodollar Rate~~SOFR Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.  Except with respect to the initial Credit Extension, each Borrowing of, continuation of or conversion to Base Rate Loans, shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.  Each Committed Loan Notice shall specify, as applicable, (i) whether the Borrower is requesting a Term Borrowing, an Incremental Term Borrowing, a Specified Term Refinancing Debt Borrowing or a conversion or continuation of Term Loans, Incremental Term Loans or Specified Term Refinancing Debt Loans from one Type to the other, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day or a U.S. Government Securities Business Day, as applicable), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted and (v) in the case of ~~Eurodollar Rate~~SOFR Loans, the duration of the Interest Period with respect thereto.  If the Borrower fails to specify a Type of Loan in a Committed Loan Notice with respect to Loans or fails to give a timely request for conversion or continuation pursuant to a

61

Committed Loan Notice, then the applicable Loans shall be made as, continued as or converted to, as applicable, a Base Rate Loan. Any such automatic conversion to a Base Rate Loan shall be effective as of the last day of the Interest Period then in effect with respect to the applicable ~~Eurodollar Rate~~SOFR Loans. If the Borrower requests a Borrowing of, conversion to, or continuation of ~~Eurodollar Rate~~SOFR Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month. The Borrower and the Lenders acknowledge and agree that any conversion or continuation of an existing Loan shall be deemed to be a continuation of that Loan with a converted interest rate methodology and not a new Loan.

(b)     Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Appropriate Lender of the amount of its Pro Rata Share of the applicable Class of Loans (or of the details of the relevant conversion or continuation), and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Appropriate Lender of the details of any automatic conversion described in Section 2.02(a). In the case of each Borrowing after the 2021 Refinancing Agreement Effective Date, each Appropriate Lender shall make (or cause its Applicable Lending Office to make) the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than (i) 1:00 p.m., in the case of ~~Eurodollar Rate~~SOFR Loans, and (ii) 2:00 p.m., in the case of Base Rate Loans, in each case on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction (or waiver) of the applicable conditions set forth in Section 4.02, the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (A) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (B) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)     Except as otherwise provided herein, a ~~Eurodollar Rate~~SOFR Loan may be continued or converted only on the last day of an Interest Period for such ~~Eurodollar Rate~~SOFR Loan unless the Borrower pays the amount due, if any, under Section 3.05 in connection therewith. During the existence of an Event of Default, upon notice to the Administrative Agent, the Required Lenders may require that no Loans may be converted to or continued as ~~Eurodollar Rate~~SOFR Loans.

(d)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for ~~Eurodollar Rate~~SOFR Loans upon determination of such interest rate (in any event, no less than one Business Day before the effective date of such interest rate). The determination of the ~~Eurodollar~~Adjusted Term SOFR Rate by the Administrative Agent shall be conclusive in the absence of manifest error.

(e)     Anything in clauses (a) to (d) above to the contrary notwithstanding, after giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than fifteen (15) Interest Periods in effect at any time for all Borrowings unless otherwise agreed between the Borrower and the Administrative Agent.

(f)     The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

Section 2.03____[Reserved].

Section 2.04____[Reserved].

62

Section 2.05    Prepayments.

(a)    Optional Prepayments. (i)  The Borrower may, upon delivery of a Prepayment Notice to the Administrative Agent, at any time or from time to time voluntarily prepay Term Loans, Incremental Term Loans and Specified Term Refinancing Debt Loans, in whole or in part without premium or penalty (except as set forth in Section 2.05(a)(iii) below); provided that (1) such notice must be received by the Administrative Agent not later than (A) 1:00 p.m. three (3) U.S. Government Securities Business Days prior to any date of prepayment of ~~Eurodollar Rate~~SOFR Loans and (B) 11:00 a.m. on any date of prepayment of Base Rate Loans (or, in each case, such later date to which the Administrative Agent may agree); (2) any prepayment of ~~Eurodollar Rate~~SOFR Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof; (3) any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and, subject to the limitations in the final sentence of this Section 2.05(a)(i), the Class(es) and Type(s) of Loans to be prepaid.  The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a ~~Eurodollar Rate~~SOFR Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05. Each prepayment of any Loans pursuant to this Section 2.05(a) shall be applied (x) with respect to the Applicable Term Loan Premium, ratably among 2021 Term Loans, (y) ratably among the Loans within any such Class and (z) to the remaining installments thereof as directed by the Borrower (it being understood and agreed that if the Borrower does not so direct at the time of such prepayment, such prepayment shall be applied against the scheduled repayments of Term Loans under Section 2.07 in direct order of maturity) and shall be paid to the Appropriate Lenders in accordance with their respective Pro Rata Shares.

(ii)    Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.05(a) if such prepayment would have resulted from a refinancing, replacement or prepayment of all or a portion of one or more of the Credit Facilities, which refinancing, replacement or prepayment shall not be consummated or shall otherwise be delayed.

(iii)    If the Borrower (A) consummates any Repricing Transaction (including any assignment pursuant to Section 3.07 in connection with any Repricing Transaction), (B) makes any voluntary prepayment of the Term Loans or (C) makes any mandatory prepayment of the 2021 Term Loans pursuant to Section 2.05(b)(ii) or Section 2.05(b)(iii), in each case, prior to the relevant anniversary of the 2021 Refinancing Agreement Effective Date set forth below, the Borrower shall pay to the Administrative Agent, for the ratable account of each 2021 Term Lender, a premium equal to the corresponding percentage set forth below on the aggregate principal amount of the 2021 Term Loans so prepaid or refinanced (the "Applicable Term Loan Premium").  In addition, with respect to any Non-Consenting Lender that is replaced pursuant to Section 3.07 in connection with a Repricing Transaction prior to the relevant anniversary of the 2021 Refinancing Agreement Effective Date set forth below, the Borrower shall pay to the Administrative Agent, for the ratable account of each such Non-Consenting Lender, a premium equal to the corresponding percentage set forth below on the aggregate principal amount of such Non-Consenting Lender's 2021 Term Loans that are assigned to one or more Persons pursuant to such section.

Anniversary  of  the  2021  Refinancing

63

FBG_CH1_00097953

| Agreement Effective Date | Percentage |
|---|---|
| First | 3.00% |
| Second | 1.00% |
| At all times thereafter | 0.00% |

(b)        Mandatory Prepayments.  (ii)  No later than five (5) Business Days after the date on which financial statements are required to be delivered pursuant to Section 6.01(a) (commencing with the Fiscal Year ending December 31, 2021), the Borrower shall cause to be prepaid (each such payment, an "ECF Payment") an aggregate principal amount of Term Loans and, if applicable, Incremental Term Loans and Specified Term Refinancing Debt Loans equal to (A) the ECF Percentage of Excess Cash Flow, if any, for the Excess Cash Flow Period covered by the financial statements required to be delivered pursuant to Section 6.01(a) minus (B) the sum of (1) all voluntary prepayments of Term Loans, Incremental Term Loans or Specified Term Refinancing Debt Loans and the amount of any reduction in the outstanding amount of any Term Loans, Incremental Term Loans and/or Specified Term Refinancing Debt Loans resulting from any assignment to Parent or its Restricted Subsidiaries made in accordance with Section 11.07(i) of this Agreement (including in connection with any Dutch auction) based upon the actual amount of cash paid in connection with the relevant assignment (it being understood that the amount of the relevant reduction in the outstanding amount of any Term Loans, Incremental Term Loans and/or Specified Term Refinancing Debt Loans shall not exceed the actual purchase price of any such Term Loans, Incremental Term Loans and/or Specified Term Refinancing Debt Loans below par), in each case during such Excess Cash Flow Period or, at the option of the Borrower, on or prior to the date such ECF Payment is required to be made (without duplication in any succeeding period), (2) without duplication of the preceding clause (1), all voluntary prepayments of First Lien Loans (and, in the case of Revolving Loans (as defined in the First Lien Credit Agreement), to the extent accompanied by a permanent reduction in such revolving commitment) and, to the extent secured on a pari passu basis with the Liens securing the First Lien Loans and the amount of any reduction in the outstanding amount of any First Lien Loans resulting from any assignment to Parent or its Restricted Subsidiaries made in accordance with Section 11.07(i) of the First Lien Credit Agreement (including in connection with any Dutch auction) based upon the actual amount of cash paid in connection with the relevant assignment (it being understood that the amount of the relevant reduction in the outstanding amount of any First Lien Loans shall not exceed the actual purchase price of any such Loans below par), in each case during such Excess Cash Flow Period or, at the option of the Borrower, on or prior to the date such ECF Payment is required to be made (without duplication in any succeeding period) and (3) all voluntary prepayments of ABL Loans during such Excess Cash Flow Period or, at the option of the Borrower, on or prior to the date such ECF Payment is required to be made (without duplication in any succeeding period) to the extent the Commitments (as defined in the ABL Credit Agreement) are permanently reduced by the amount of such payments, in each case of the foregoing subclauses (1)-(3), except to the extent financed with long-term Indebtedness; provided that no prepayment under this Section 2.05(b)(i) shall be required to the extent that Excess Cash Flow is less than or equal to $6,250,000.

(ii)        (A)        Subject to Section 2.05(b)(ii)(B), if (x) the Borrower or any of the other Restricted Subsidiaries Disposes of any property pursuant to Section 7.05(h), (k), (n), (o) or (t) outside the ordinary course of business or (y) any Casualty Event occurs, the Borrower shall make a prepayment, in accordance with Section 2.05(b)(ii)(C), of an aggregate principal amount of Term Loans and, if applicable, Incremental Term Loans and Specified Term Refinancing Debt Loans equal to 100% of all such Net Cash Proceeds realized or received in excess of $12,500,000 in any single transaction or series of related transactions (but only the amount in excess of such amount); provided that no such prepayment shall be required pursuant

64

FBG_CH1_00097954

to this Section 2.05(b)(ii)(A) with respect to such portion of such Net Cash Proceeds that the Borrower has, on or prior to the date specified in Section 2.05(b)(ii)(C) below, given written notice to the Administrative Agent of its intent to reinvest in accordance with Section 2.05(b)(ii)(B).

(B)    With respect to any Net Cash Proceeds realized or received with respect to any Disposition or any Casualty Event which are required to be applied to prepay the Term Loans under clause (A) above, at the option of the Borrower, the Borrower and/or any other Restricted Subsidiary may reinvest or commit to reinvest all or any portion of such Net Cash Proceeds in assets useful for its business within three hundred sixty five (365) days following receipt of such Net Cash Proceeds (and, in the case of any commitment to reinvest, so reinvest within one hundred eighty (180) days after the end of such three hundred sixty five (365) day period); provided that if any such Net Cash Proceeds are not so reinvested by the deadline specified above, an amount equal to 100% of any such Net Cash Proceeds shall be applied, in accordance with Section 2.05(b)(ii)(C), to the prepayment of the Term Loans as set forth in this Section 2.05.

(C)    On each occasion that the Borrower must make a prepayment of the Term Loans pursuant to this Section 2.05(b)(ii), the Borrower shall, as promptly as reasonably practicable, but in any event within five (5) Business Days after the date of realization or receipt of such Net Cash Proceeds (or, in the case of prepayments required pursuant to Section 2.05(b)(ii)(B), as promptly as reasonably practicable, but in any event within five (5) Business Days after the deadline specified therein), make a prepayment, in accordance with Section 2.05(b)(v) below, of the principal amount of Term Loans in an amount equal to 100% of such Net Cash Proceeds realized or received and required to be prepaid.

(D)    Notwithstanding the foregoing, if at any time a prepayment obligation arises under this Section 2.05(b)(ii), the Borrower or any other Restricted Subsidiary is required to offer to repay or repurchase any other Indebtedness that is secured on a pari passu basis with the Obligations pursuant to the terms of the documentation governing such Indebtedness with the Net Cash Proceeds giving rise to the prepayment obligation under this Section 2.05(b)(ii) (such Indebtedness required to be offered to be so repaid or repurchased, the "Other Applicable Indebtedness"), then the relevant Person may apply such Net Cash Proceeds on a pro rata basis to the prepayment of the Term Loans and, if applicable, the Incremental Term Loans and Specified Term Refinancing Debt Loans and to the repurchase or repayment of the relevant Other Applicable Indebtedness (determined on the basis of the aggregate outstanding principal amount of the Term Loans, applicable Incremental Term Loans, applicable Specified Term Refinancing Debt Loans and such Other Applicable Indebtedness (or accreted amount, if such Other Applicable Indebtedness is issued with original issue discount) at such time; provided that the portion of such Net Cash Proceeds allocated to the relevant Other Applicable Indebtedness shall not exceed the amount that is required to be allocated to such Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such Net Cash Proceeds shall be allocated to the Term Loans, applicable Incremental Term Loans and applicable Specified Term Refinancing

65

FBG_CH1_00097955

Debt Loans in accordance with the terms hereof), and the amount of the prepayment of the Term Loans, applicable Incremental Term Loans and applicable Specified Term Refinancing Debt Loans that would have otherwise been required pursuant to this Section 2.05(b)(ii) shall be reduced accordingly; provided, further, that to the extent the holders of the relevant Other Applicable Indebtedness decline to have such Indebtedness prepaid or repurchased, the declined amount shall promptly be applied to prepay the Term Loans, applicable Incremental Term Loans and applicable Specified Term Refinancing Debt Loans in accordance with the terms hereof.

(iii)     If the Parent or any of its Restricted Subsidiaries incurs or issues any Indebtedness (including Disqualified Equity Interests) either (A) not permitted to be incurred or issued pursuant to Section 7.03 or, with respect to Parent, Article VIII or (B) constituting Refinancing Facilities of the Term Loan Facilities or Specified Term Refinancing Debt, the Borrower shall cause to be prepaid an aggregate principal amount of Term Loans equal to 100% of all Net Cash Proceeds received therefrom as promptly as reasonably practicable, but in any event, on or prior to the date which is five (5) Business Days after the receipt of such Net Cash Proceeds.

(iv)     Each prepayment of Term Loans pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) shall be applied ratably to the Term Loans; provided, that the Borrower, at its option, may apply prepayments in excess of a ratable amount to Term Loans with an earlier maturity date.  For the purpose of Section 2.05(b), references to "Term Loans" or "Term Loan Facility" shall also be deemed to be a reference to the Incremental Term Loans and the Specified Term Refinancing Debt Loans (unless a Joinder Agreement or Refinancing Amendment, as applicable, expressly provides otherwise).

(v)     The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to clauses (i), (ii) and (iii) of this Section 2.05(b) at least three (3) Business Days (or such shorter period as the Administrative Agent may agree in its sole discretion) prior to the date of such prepayment pursuant to a Prepayment Notice.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment.  The Administrative Agent will promptly notify each Appropriate Lender of the contents of the Borrower's Prepayment Notice and of such Appropriate Lender's Pro Rata Share of the prepayment.

(vi)     Notwithstanding anything in this Section 2.05 to the contrary, (A) the Borrower shall not be required to prepay any amount that would otherwise be required to be paid pursuant to Section 2.05(b)(i) or (ii)  above to the extent that the relevant Excess Cash Flow is generated by any Foreign Subsidiary or the relevant Net Cash Proceeds are received by any Foreign Subsidiary, as the case may be, for so long as the repatriation to the Borrower of any such amount would be prohibited under any requirement of local law as reasonably determined by the Borrower in good faith (the Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all actions reasonably required by applicable requirements of law to permit such repatriation); it being understood that once the repatriation of the relevant affected Excess Cash Flow or Net Cash Proceeds, as the case may be, is permitted under the applicable requirement of law, the relevant Foreign Subsidiary will promptly repatriate the relevant Excess Cash Flow or Net Cash Proceeds, as the case may be, and the repatriated Excess Cash Flow or Net Cash Proceeds, as the case may be, will be promptly applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Term Loans pursuant to this Section 2.05 to the extent required herein (without regard to this clause (vi)) and (B) if the

66

FBG_CH1_00097956

Borrower reasonably determines in good faith that the repatriation to the Borrower of any amounts required to mandatorily prepay the Term Loans pursuant to Section 2.05(b)(i) or (ii) above would result in material and adverse tax consequences (such amount, a "Restricted Amount"), as reasonably determined by the Borrower in good faith, the amount the Borrower shall be required to mandatorily prepay pursuant to such applicable provision of Section 2.05 above shall be reduced by the Restricted Amount until such time as it may repatriate to the Borrower the Restricted Amount without incurring such material and adverse tax liability; provided that to the extent that the repatriation of any Excess Cash Flow or Net Cash Proceeds from the relevant Foreign Subsidiary would no longer have an adverse tax consequence, an amount equal to such Excess Cash Flow or Net Cash Proceeds, as applicable, not previously applied pursuant to preceding clause (B), shall be promptly applied to the repayment of the Term Loans pursuant to this Section 2.05 as otherwise required above (without regard to this clause (vi)).

(vii)    Any Lender may elect not to accept any mandatory prepayments required to be made pursuant to this Section 2.05(b); provided that in the case of a mandatory prepayment required to be made pursuant to Section 2.05(b)(iii), a Lender may only decline such prepayments solely to the extent they do not represent Refinancing Facilities of the Term Loan Facilities or Specified Term Refinancing Debt.  Any prepayment amount that is not applied to the First Lien Loans pursuant to Section 2.05(b) of the First Lien Credit Agreement and is so declined by a Lender hereunder may be retained by the Borrower (such declined payment, the "Declined Proceeds") subject to prepayment requirements, if any, of any other Indebtedness secured by a lien on the Collateral that is pari passu with or junior to the Liens securing the Obligations, and will increase the Additional Amount Basket.

(viii)    Notwithstanding the foregoing, (i) any requirement to prepay or repay the Term Loans pursuant to clause (b)(ii) of this Section 2.05 with respect to ABL Priority Collateral shall be subject to the terms of the ABL Intercreditor Agreement and (ii) there shall be no requirement to prepay or repay the Term Loans pursuant to clauses (b)(i), (ii) or (iii)(A) of this Section 2.05 until the Maximum First Priority Obligations Payment Date (as defined in the First Lien/Second Lien Intercreditor Agreement) has occurred except with amounts that are required to prepay or repay the First Lien Credit Agreement pursuant to Section 2.05(b)(i), (ii) or (iii)(A) thereof that have been declined by the First Lien Lenders.

(c)    Interest, Funding Losses.  All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a ~~Eurodollar Rate~~SOFR Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such ~~Eurodollar Rate~~SOFR Loan pursuant to Section 3.05.  If any payment of ~~Eurodollar Rate~~SOFR Loans otherwise required to be prepaid under Section 2.05(b) would be made on a day other than the last day of the applicable Interest Period therefor, the Borrower may direct the Administrative Agent to (and if so directed, the Administrative Agent shall) deposit such payment in a deposit account pledged as Collateral until the last day of the applicable Interest Period at which time the Administrative Agent shall apply the amount of such payment to the prepayment of such Borrowings; provided, however, that such Loans shall continue to bear interest as set forth in Section 2.08 until the last day of the applicable Interest Period thereunder.

Section 2.06    Termination or Reduction of Commitments.

(a)    Optional.  The Borrower may, upon written notice in accordance with Section 11.02 to the Administrative Agent, terminate the unused Commitments of any Class, or from time to time permanently reduce the unused Commitments of any Class; provided that (i) any such notice

67

DEBTORS' EXHIBIT NO. 67
Page 82 of 180

shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction, and (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $100,000 in excess thereof.  Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice to terminate or reduce unused Commitments of any Class under this Section 2.06(a) if such termination or reduction would have resulted from a refinancing, replacement or prepayment of all or a portion of one or more of the Credit Facilities, which refinancing, replacement or prepayment shall not be consummated or shall otherwise be delayed.

(b)  Mandatory.  Upon the making of each Term Lender's Term Loans pursuant to Section 2.01, the Term Commitment of such Term Lender shall be automatically and permanently reduced to $0.  Upon the making by any Incremental Term Lender of any Incremental Term Loans pursuant to Section 2.16, the Incremental Term Loan Commitment of such Incremental Term Lender with respect to such Incremental Term Loan shall be automatically and permanently reduced to $0.  Upon the making by any Specified Term Refinancing Debt Lender of any Specified Term Refinancing Debt Loan pursuant to Section 2.17, the Specified Term Refinancing Debt Commitment of such Specified Term Refinancing Debt Lender with respect to such Specified Term Refinancing Debt Loan shall be automatically and permanently reduced to $0.  The Extended Term Loan Commitments shall terminate as provided in the related Extension Amendment.

Section 2.07    Repayment of Loans.  The Borrower shall repay to the Administrative Agent (for the ratable account of the Term Lenders on the Maturity Date), the aggregate principal amount of all Term Loans outstanding on such date.  Subject to the terms of the First Lien/Second Lien Intercreditor Agreement, the principal amounts of Incremental Term Loans, Extended Term Loans and Specified Term Refinancing Debt Loans, in each case, shall be repaid in installments, if any, as set forth in the applicable Extension Amendment, Joinder Agreement or Refinancing Amendment.

Section 2.08    Interest.

(a)  Subject to the provisions of Section 2.08(c), (i) each ~~Eurodollar Rate~~SOFR Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the ~~Eurodollar~~Adjusted Term SOFR Rate for such Interest Period, as the case may be, plus the Applicable Rate; and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.  All interest hereunder on any Loan shall be computed on a daily basis based upon the outstanding principal amount of such Loan as of the applicable date of determination.

(b)  [Reserved].

(c)  Commencing upon the occurrence and during the continuance of any Event of Default under Section 9.01(a) (with respect to any failure to make any payment of principal, interest or fees that is required under the terms of this Agreement), 9.01(f) or 9.01(g), the Borrower shall pay interest on the relevant overdue amounts at a fluctuating interest rate per annum equal to the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest to the fullest extent permitted by applicable Laws) shall be due and payable upon demand.

(d)  In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The

68

**DEBTORS' EXHIBIT NO. 67**
**Page 83 of 180**

Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Benchmark Replacement Conforming Changes in connection with the use or administration of Term SOFR.

(d̶e̶)    Interest on each Loan payable pursuant to Section 2.08(a) shall be due and payable in cash in arrears on each Cash Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after any judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.09    Fees.    The Borrower shall pay to the Agents such fees as shall have been separately agreed upon in the Fee Letter at the times so specified.

Section 2.10    Computation of Interest and Fees.  All computations of interest for Base Rate Loans shall be made on the basis of a year of three hundred and sixty-five (365) days or three hundred and sixty-six (366) days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a three hundred and sixty (360) day year and actual days elapsed. Interest shall accrue on each Loan for the day on which such Loan is made, and shall not accrue on such Loan, or any portion thereof, for the day on which such Loan or such portion is paid; provided that any such Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one (1) day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11    Evidence of Indebtedness.

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, in each case in the ordinary course of business.  Without limitation of Section 11.07(d), the accounts or records maintained by each Lender shall be prima facie evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.  It is understood and agreed that any Lender (and/or its applicable assign) in possession of a Note shall be required to return such Note to the Borrower in accordance with Section 11.07(b) and upon the occurrence of the Termination Date (or as promptly as practicable thereafter).

(b)    Entries made in good faith by each Lender in its account or accounts pursuant to Section 2.11(a) shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to such Lender under this Agreement and the other Loan Documents, absent manifest error; provided that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents; provided, further, that if such accounts are inconsistent with the Register, the Register

69

CONFIDENTIAL

shall prevail, absent manifest error.  The Register shall be available for inspection by the Borrower and each Lender (but only as to its own holdings), at any reasonable time and from time to time upon reasonable prior notice.

Section 2.12   Payments Generally.

(a)     All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office and in immediately available funds not later than 3:00 p.m. (or at such later time as the Administrative Agent may agree) on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Applicable Lending Office.  All payments received by the Administrative Agent after 3:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)     [Reserved].

(c)     Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto.  If and to the extent that such payment was not in fact made to the Administrative Agent in immediately available funds, then:

(i)     if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in immediately available funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in immediately available funds at the Federal Funds Rate; and

(ii)     if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in immediately available funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "Compensation Period") at a rate per annum equal to the Federal Funds Rate.  When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing.  If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, then in the event the Administrative Agent has funded a Loan in advance of receipt of funds from a Defaulting Lender or otherwise made a payment to the Borrower on behalf of such Defaulting Lender, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing.  Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any

CONFIDENTIAL

FBG_CH1_00097960

rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by a Lender hereunder.

A notice by the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent manifest error.

(d)     If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this ARTICLE II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in ARTICLE IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)     The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan or to fund any such participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and neither the Administrative Agent nor any Lender shall be responsible for the failure of any other Lender to make its Loan or purchase its participation.

(f)     Without limiting the obligations of any Lender to make Loans hereunder, nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular manner.

(g)     Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 9.03. If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the Outstanding Amount of all Loans outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

Section 2.13     Sharing of Payments. If, other than as expressly provided elsewhere herein (including, without limitation, in Section 2.16, Section 2.17 and Section 11.07), any Lender shall obtain on account of the Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, pro rata with each of them; provided that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 11.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without

71

FBG_CH1_00097961

**DEBTORS' EXHIBIT NO. 67**
**Page 86 of 180**

further interest thereon. The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 11.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation. The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.14    Defaulting Lenders. Notwithstanding any other provision in this Agreement to the contrary, if at any time a Lender becomes a Defaulting Lender, then the following provisions shall apply so long as any Lender is a Defaulting Lender: Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of any Defaulting Lender (whether voluntary or mandatory, at maturity or otherwise, and including any amounts made available to the Administrative Agent by such Defaulting Lender pursuant to Section 11.09), shall be applied at such time or times as may be determined by the Administrative Agent and, where relevant, the Borrower as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, so long as no Default or Event of Default exists, as the Borrower may request, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement; third, if so determined by the Administrative Agent or the Borrower, to be held in a deposit account and released in order to satisfy obligations of such Defaulting Lender to fund Loans under this Agreement; fourth, to the payment of any amounts owing to the non-Defaulting Lenders as a result of any judgment of a court of competent jurisdiction obtained by any non-Defaulting Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loan in respect of which such Defaulting Lender has not fully funded its appropriate share and (y) such Loan was made or created, as applicable, at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Loans of such Defaulting Lender. Any payments, prepayments or other amounts paid or payable to any Defaulting Lender that are applied (or held) to pay amounts owed by any Defaulting Lender pursuant to this Section 2.14 shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

Section 2.15    [Reserved].

Section 2.16    Incremental Term Loans.

(a)    On or before the Maturity Date of the Term Loan Facility, the Borrower may by written notice to the Administrative Agent elect to request the establishment of incremental or additional term loan facilities (each, an "Incremental Term Facility", the commitments thereunder, the "Incremental Term Loan Commitments" and the loans thereunder, the "Incremental Term Loans"). Subject to the terms and conditions set forth in this Section 2.16, the Incremental Term Facilities shall be, in the case of any Incremental Term Facility, funded on the relevant Increased Amount Date (as defined below); provided that the aggregate amount of all Incremental Term Facilities shall not exceed the Incremental

72

FBG_CH1_00097962

Cap. Each such notice shall specify the date (each, an "Increased Amount Date") on which the Borrower proposes that the Incremental Term Loan Commitments shall be effective; provided that any Lender offered or approached to provide all or a portion of any Incremental Term Loan Commitments may elect or decline, in its sole discretion, to provide such Incremental Term Loan Commitments.

(b)     Such Incremental Term Loan Commitments shall become effective as of the Increased Amount Date; provided that

(i)     no Default or Event of Default shall exist and be continuing or would result from the incurrence of such Incremental Term Facility; provided that, solely in connection with Incremental Term Facilities incurred to finance a Limited Condition Acquisition for which the Borrower has made an LCA Election, (i) no Default or Event of Default shall exist and be continuing as of the LCA Test Date for such Limited Condition Acquisition and (ii) no Event of Default pursuant to Section 9.01(a), (f) or (g) shall exist and be continuing as of the date of consummation of the Limited Condition Acquisition;

(ii)     the representations and warranties in ARTICLE V shall be true and correct in all material respects (except for those representations and warranties that are conditioned by materiality, which shall be true and correct in all respect) on and as of the date of incurrence of such Indebtedness to the same extent as though made on and as of that date, except to the extent such representations or warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, solely in connection with Incremental Term Facilities incurred to finance a Limited Condition Acquisition for which the Borrower has made an LCA Election, the representations and warranties shall be made as of the LCA Test Date for such Limited Condition Acquisition and such Limited Condition Acquisition may be subject to customary "SunGard" conditionality;

(iii)     such Incremental Term Facility shall not be (x) secured by any Lien on any assets other than the Collateral or (y) guaranteed by any person other than the Guarantors under the then outstanding Credit Facilities;

(iv)     such Incremental Term Facility shall not (except in the case of customary bridge loans, so long as the long-term Indebtedness into which any such customary bridge facility is to be converted or exchanged satisfies such clause and any such conversion or exchange is subject only to customary conditions) have a scheduled final maturity date earlier than the Latest Maturity Date; provided that any such Indebtedness that is unsecured or is secured on a junior lien basis to the Term Loan Facility shall have a scheduled final maturity at least ninety one (91) days following the Latest Maturity Date,

(v)     the Weighted Average Life to Maturity applicable to such Incremental Term Facility shall (except in the case of customary bridge loans, so long as the long-term Indebtedness into which any such customary bridge facility is to be converted or exchanged satisfies such clause and any such conversion or exchange is subject only to customary conditions) be equal to or greater than the Weighted Average Life to Maturity of the existing Term Loan Facility, provided that any Incremental Term Loans that are unsecured or secured on a junior lien basis to the Obligations or subordinated in right in right of payment to the Obligations shall have no scheduled amortization or scheduled payments of principal prior to ninety one (91) days following the Latest Maturity Date of the Term Loans,

73

DEBTORS' EXHIBIT NO. 67
Page 88 of 180

(vi)      except as otherwise required by this Section, all other terms of such Incremental Term Facility will be as agreed between the Borrower and the lenders providing such Incremental Term Facility; provided, that the other terms of any Incremental Term Facility (other than terms related to pricing, fees and maturity) that are not substantially identical to the corresponding terms in the then existing Term Loan Facility shall not be materially more favorable (taken as a whole) to the lenders providing such Incremental Term Facility than such terms in the then existing Term Loan Facility (as reasonably determined by the Borrower in good faith) (except for any materially more favorable terms that are (i) reasonably acceptable to the Administrative Agent, (ii) added for the benefit of the Term Loan Facility or (iii) applicable only after the Latest Maturity Date);

(vii)     such Incremental Term Loans or Incremental Term Loan Commitments shall be effected pursuant to one or more joinder agreements executed and delivered by the Borrower, and one or more Incremental Term Lenders (and acknowledged by the Administrative Agent) and setting forth the terms applicable to such Incremental Term Loans and Incremental Term Loan Commitments (each, a "Joinder Agreement");

(viii)    the Incremental Term Loans shall rank pari passu or junior in right of payment to the Term Loans and may be secured on a senior, pari passu or junior lien basis with the Liens securing the Obligations or may be unsecured, and (w) if senior in right of security or junior in right of payment and/or security or unsecured, shall be established pursuant to separate documentation than the Loan Documents for the Term Loans that are secured by the Collateral on a first priority basis, (x) if secured, shall be subject to the ABL Intercreditor Agreement and/or other customary intercreditor arrangements reasonably satisfactory the Administrative Agent and the Borrower, (y) if secured on a senior or pari passu basis to the Liens securing the Obligations, shall be subject to the First Lien/Second Lien Intercreditor Agreement and/or other customary intercreditor arrangements reasonably satisfactory to the Administrative Agent and the Borrower and (z) if secured on a junior basis to the Liens securing the Obligations, shall be subject to customary intercreditor arrangements reasonably satisfactory to the Administrative Agent and the Borrower;

(ix)      the Borrower shall deliver or cause to be delivered any customary legal opinions or other customary documents reasonably requested by the Administrative Agent in connection with any such Incremental Term Facility, including any supplements or amendments to the Collateral Documents providing for such Incremental Term Loans secured thereby and, if applicable, a Committed Loan Notice;

(x)       (i) an Incremental Term Facility which is secured on a pari passu basis with the Obligations may provide for the ability to participate on a pro rata basis or less than pro rata basis (but not on a greater than pro rata basis other than in the case of prepayment with permitted Refinancing Indebtedness) in any mandatory prepayments of the Term Loans and (ii) an Incremental Term Facility which is secured on a senior basis with the Obligations may provide for the ability to participate on a greater than pro rata basis, a pro rata basis, or a less than pro rata basis in any mandatory prepayments of the Term Loans; and

(xi)      if prior to the first year anniversary of the 2021 Refinancing Agreement Effective Date, the All-In Yield applicable to any Incremental Term Loans under such Incremental Term Facility that ranks pari passu in right of payment and with respect to security with the 2021 Term Loans shall be more than 0.50% higher than the corresponding All-In Yield of the 2021 Term Loans, then the All-In Yield applicable to the 2021 Term Loans shall be increased to a level that is not less than 0.50% below such Incremental Term Facility; provided

74

that (i) any amendments to the Applicable Rate of the 2021 Term Loans that became effective subsequent to the 2021 Refinancing Agreement Effective Date but prior to the time of the addition of such Incremental Term Facility shall be included and (ii) for purposes of this clause (xi), All-In Yield shall be calculated exclusive of any non-cash interest payable in respect of the 2021 Term Loans or Incremental Term Loans.

(c)     On any Increased Amount Date on which any Incremental Term Loan Commitment becomes effective, subject to the foregoing terms and conditions, each lender with any such Incremental Term Loan Commitment (each, an "Incremental Term Lender"), to the extent not already a Lender, shall become a Lender hereunder with respect to such Incremental Term Loan Commitment; provided that any financial institution that becomes an Incremental Term Lender that is not already a Lender hereunder shall be satisfactory to the Borrower and, to the extent the consent of the Administrative Agent would be required under Section 11.07 for an assignment of Term Loans to such financial institution, the Administrative Agent.

(d)     The Lenders hereby irrevocably authorize the Administrative Agent to enter into such amendments to this Agreement (each, an "Incremental Amendment") and the other Loan Documents with the Borrower as may be necessary in order to establish new tranches or sub-tranches in respect of Loans or Commitments increased or extended pursuant to this Section 2.16, and each Joinder Agreement may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent to effect the provisions of this Section 2.16.

(e)     The proceeds of any Incremental Term Facility may be used for working capital and other general corporate purposes, including the financing of Permitted Acquisitions and other Investments and any other use not prohibited by this Agreement.

(f)     This Section 2.16 shall supersede any provision of Section 2.13 and/or Section 11.01 to the contrary.

Section 2.17    Specified Term Refinancing Debt.

(a)     The Borrower may, from time to time, add one or more new term loan facilities to the Credit Facilities or incur one or more additional series of notes or loans (such term loan facilities, notes or loans, "Specified Term Refinancing Debt", the commitments thereunder, "Specified Term Refinancing Debt Commitments" and the notes or loans thereunder, "Specified Term Refinancing Debt Loans") with the consent of the lenders providing such Specified Term Refinancing Debt, to refinance or replace all or any portion of the Term Loans, then outstanding under this Agreement (which for purposes of this Section 2.17 will be deemed to include any then outstanding Incremental Term Loans, and any previously incurred Specified Term Refinancing Debt Loans); provided that:

(i)     any such Specified Term Refinancing Debt will rank pari passu or junior in right of payment and/or of security with the other Loans and Commitments hereunder (or may be unsecured) and any Specified Term Refinancing Debt that is pari passu or junior with respect to security shall be subject to the ABL Intercreditor Agreement and, if junior, shall be subject to the First Lien/Second Lien Intercreditor Agreement or other customary intercreditor arrangements reasonably acceptable to the Administrative Agent and the Borrower;

(ii)     (A) no Specified Term Refinancing Debt that is secured on a pari passu basis to the Obligations shall mature prior to the Latest Maturity Date of the Term Loans being refinanced or replaced or have a shorter Weighted Average Life to Maturity than the Term Loans

75

FBG_CH1_00097965

being refinanced or replaced and (B) Specified Term Refinancing Debt that is junior in security or unsecured or subordinated in right in right of payment to the Obligations shall not mature prior to the date that is ninety one (91) days following the Latest Maturity Date of the Term Loans being refinanced or replaced hereunder and shall have no scheduled amortization or scheduled payments of principal prior to the date that is ninety one (91) days following the Latest Maturity Date of the Term Loans being refinanced or replaced hereunder;

(iii)    such Specified Term Refinancing Debt shall have pricing (including interest, fees and premiums), optional prepayment and redemption terms as may be agreed to by the Borrower and the lenders party thereto; provided that no Specified Term Refinancing Debt shall be voluntarily or mandatorily prepaid prior to repayment in full of the then existing Credit Facilities, unless accompanied by at least a ratable payment of the then existing Credit Facilities (or, if junior in right of payment or as to security, on a junior basis with respect to the then existing Credit Facilities);

(iv)    if any such Specified Term Refinancing Debt is secured, it shall not be secured by any assets other than the Collateral;

(v)    if any such Specified Term Refinancing Debt is guaranteed, it shall not be guaranteed by any Person other than the Guarantors;

(vi)    Specified Term Refinancing Debt that is secured on a pari passu basis to the Obligations may provide for the ability to participate on a pro rata basis or less than pro rata basis (but not on a greater than pro rata basis other than in the case of prepayment with permitted Refinancing Indebtedness) in any mandatory prepayments of the Term Loans;

(vii)    the other terms and conditions (excluding those referenced in clauses (i) through (vi) above) of such Specified Term Refinancing Debt that are not substantially identical to the corresponding terms applicable to the then-existing Term Loans shall either (x) reflect market terms at the time of incurrence of such Specified Term Refinancing Debt (as reasonably determined by the Borrower) or (y) not be materially more favorable (taken as a whole) to the lenders providing such Specified Term Refinancing Debt (except for materially more favorable terms (i) reasonably satisfactory to the Administrative Agent, (ii) added for the benefit of the Term Loan Facility (to the extent not refinanced), or (iii) applicable only to periods after the Latest Maturity Date existing at the time of such refinancing or replacement);

(viii)    the aggregate principal amount of any Specified Term Refinancing Debt shall not exceed the aggregate principal amount of indebtedness and commitments being refinanced or replaced therewith, plus interest, premiums, fees and expenses;

(ix)    the proceeds of such Specified Term Refinancing Debt shall be applied, substantially concurrently with the incurrence thereof, to the prepayment of outstanding Loans being so refinanced, in each case pursuant to Section 2.05(b); and

(x)    no Lender shall be obligated to provide all or any portion of any such Specified Term Refinancing Debt and the determination to provide such Specified Term Refinancing Debt shall be within the sole and absolute discretion of such Lender.

(b)    The Borrower shall make any request for Specified Term Refinancing Debt pursuant to a written notice to the Administrative Agent specifying in reasonable detail the proposed terms thereof.  To achieve the full amount of a requested issuance of Specified Term Refinancing Debt,

76

FBG_CH1_00097966

**DEBTORS' EXHIBIT NO. 67**
**Page 91 of 180**

and subject to the approval of the Administrative Agent to the extent the consent of the Administrative Agent would be required under Section 11.07 for an assignment of Term Loans to such financial institution, the Borrower may invite additional Eligible Assignees to become Lenders in respect of such Specified Term Refinancing Debt pursuant to a joinder agreement in form and substance satisfactory to the Administrative Agent. Any Affiliated Lender that becomes a Lender in respect of any Specified Term Refinancing Debt and the Term Loans, if any, comprising all or a part of such Specified Term Refinancing Debt, provided by such Affiliated Lender shall be subject to the limitations on assignments to Affiliated Lenders set forth in Section 11.07(i).

(c)     Each class of Specified Term Refinancing Debt incurred under this Section 2.17 shall be in an aggregate principal amount that is (x) not less than $5,000,000 (or such lesser amount as the Administrative Agent may agree) and (y) an integral multiple of $1,000,000 (or such lesser amount as the Administrative Agent may agree) in excess thereof.

(d)     The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Refinancing Amendment. Each of the parties hereto hereby agrees that, upon the effectiveness of any Refinancing Amendment, this Agreement shall be deemed amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Specified Term Refinancing Debt incurred pursuant thereto (including the addition of such Specified Term Refinancing Debt as separate "Credit Facilities" hereunder and treated in a manner consistent with (or less favorable than) the Credit Facilities being refinanced, including, without limitation, for purposes of prepayments and voting). Any Refinancing Amendment may, without the consent of any Person other than the Administrative Agent, the Borrower and the Lenders providing such Specified Term Refinancing Debt, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.17 (including the establishment of new tranches or subtranches of debt hereunder).

(e)     This Section 2.17 shall supersede any provision of Section 2.13 and/or Section 11.01 to the contrary.

Section 2.18     Extension of Loans.

(a)     The Borrower may, by written notice to the Administrative Agent from time to time, request an extension (each, an "Extension") of the maturity date and/or the weighted average life to maturity of any Class of Loans and Commitments to the extended maturity date and/or weighted average life to maturity specified in such notice. Such notice shall (i) set forth the amount of the applicable Class of Term Loans to which the Extension will apply (which shall be in a minimum amount of $10,000,000 and minimum increments of $1,000,000 above such amount), (ii) set forth the date on which such Extension is requested to become effective (which shall be not less than ten Business Days nor more than sixty days after the date of such Extension notice (or such longer or shorter periods as the Administrative Agent shall agree in its sole discretion)) and (iii) identify the relevant Class of Term Loans to which such Extension relates. Each Lender of the applicable Class shall be offered (an "Extension Offer") an opportunity to participate in such Extension on a pro rata basis and on the same terms and conditions as each other Lender of such Class pursuant to procedures established by, or reasonably acceptable to, the Administrative Agent and the Borrower. If the aggregate principal amount of Term Loans in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Term Loans subject to the Extension Offer as set forth in the Extension notice, then the Term Loans of Lenders of the applicable Class shall be extended ratably up to such maximum amount based on the respective principal amounts with respect to which such Lenders have accepted such Extension Offer. If the aggregate principal amount of Term Loans in respect of which Lenders shall have

77

FBG_CH1_00097967

accepted the relevant Extension Offer is less than the maximum aggregate principal amount of Term Loans subject to the Extension Offer as set forth in the Extension notice, then the Term Loans of Lenders of the applicable Class shall be extended up to the amounts to which the Lenders accepting such Extension Offer shall have committed.

(b)     The following shall be conditions precedent to the effectiveness of any Extension:

(i)     no Default or Event of Default shall have occurred and be continuing immediately prior to and immediately after giving effect to such Extension,

(ii)     the representations and warranties set forth in ARTICLE V and in each other Loan Document shall be deemed to be made and shall be true and correct in all material respects on and as of the effective date of such Extension provided that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date,

(iii)     the terms of such Extended Term Loans shall comply with Section 2.18(c); and

(iv)     no Lender shall be obligated to provide all or any portion of any such Extension and the determination to provide such Extension shall be within the sole and absolute discretion of such Lender.

(c)     The terms of each Extension shall be determined by the Borrower and the applicable extending Lenders and set forth in an Extension Amendment; provided:

(i)     the final maturity date of any Extended Term Loan shall be no earlier than the Latest Maturity Date for the Term Loan Facility;

(ii)     the average weighted life to maturity of the Extended Term Loans shall be no shorter than the remaining average weighted life to maturity of the existing Term Loans;

(iii)     the Extended Term Loans will rank pari passu in right of payment and with respect to security with the existing Term Loans and the borrower and guarantors of the Extended Term Loans shall be the same as the Borrower and Guarantors with respect to the existing Term Loans;

(iv)     the interest rate margin, rate floors, fees, original issue discount and premium applicable to any Extended Term Loans shall be determined by the Borrower and the applicable extending Lenders;

(v)     the Extended Term Loans may participate on a pro rata or less than pro rata (but not greater than pro rata) basis in voluntary or mandatory prepayments with the other Term Loans; and

(vi)     the terms of the Extended Term Loans shall be substantially identical to the terms set forth in this Agreement (except as set forth in clauses (i) through (v) above), except for such terms as apply only after the Latest Maturity Date of the Loans which are not extended.

(d)     In connection with any Extension, the Borrower, the Administrative Agent and each applicable extending Lender shall execute and deliver to the Administrative Agent an Extension

78

FBG_CH1_00097968

Amendment and such other documentation as the Administrative Agent shall reasonably specify to evidence the Extension. The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Extension. Any Extension Amendment may, without the consent of any other Lender, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to implement the terms of any such Extension, including any amendments necessary to establish Extended Term Loans as a new Class or tranche of Term Loans and such other technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new Class or tranche (including to preserve the pro rata treatment of the extended and non-extended Classes or tranches), in each case on terms consistent with this section.

Section 2.19    Benchmark Replacement Setting.

(a)    Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(b)    Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.19(d) and (y) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.19, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.19.

79

FBG_CH1_00097969

(d)    Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)    Benchmark Unavailability Period.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Base Rate.

# ARTICLE III

## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01    Taxes.

(a)    Except as required by applicable Laws, any and all payments by a Loan Party to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any and all Taxes.

If a Loan Party, or its applicable agent, shall be required by any Law to deduct (under applicable Laws, as determined in the good faith discretion of the applicable withholding agent) any Taxes from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) with respect to Indemnified Taxes, the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings on account of Indemnified Taxes that are applicable to additional sums payable under this Section 3.01), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable Loan Party (or withholding agent if applicable) shall make such deductions or withholdings, (iii) the applicable Loan Party (or withholding agent if applicable) shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Laws, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), the Borrower shall furnish to the Administrative Agent for its account or for the account of any other Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof, or in the event that the same is

80

not available using commercially reasonable business efforts, such other written proof of payment thereof that is reasonably satisfactory to the Administrative Agent.

(b) In addition, the Borrower agrees to pay any and all present or future stamp, fee, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.07(a)) (all such non-excluded taxes, charges, duties, debits and levies described in this Section 3.01(b) being hereinafter referred to as "Other Taxes").

(c) The Borrower agrees to indemnify each Agent and each Lender for (i) the full amount of Indemnified Taxes (including any Indemnified Taxes imposed or asserted by any Governmental Authority on amounts payable and paid under this Section 3.01) payable or paid by such Agent and such Lender under any Loan Document or otherwise arising in connection with any Loan and (ii) any reasonable expenses arising therefrom or with respect thereto, in each case whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error. Payment under this Section 3.01(c) shall be made in accordance with Section 3.06 hereof. The Borrower shall not be required to indemnify any Lender or Agent under this Section 3.01(c) with respect to any Taxes that have been compensated for by the payment of any additional amounts pursuant to Section 3.01(a) or (b).

(d) If any Lender or Agent determines, in its reasonable discretion exercised in good faith, that it has received a refund in respect of any Taxes as to which indemnification or additional amounts have been paid to it pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this Section 3.01), it shall remit such refund as soon as practicable after it is determined that such refund pertains to Indemnified Taxes (but only to the extent of indemnity payments made, or additional amounts paid, under this Section 3.01 with respect to the Indemnified Taxes giving rise to such refund) to the Borrower, net of all reasonable out-of-pocket expenses of the relevant Lender or Agent, as the case may be and without interest (other than any interest paid by the relevant Governmental Authority); provided that the Borrower, upon the request of the Lender or Agent, as the case may be, agrees promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such party in the event such party is required to repay such refund to the relevant Governmental Authority. Such Lender or Agent, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (provided that such Lender or Agent may delete any information therein that such Lender or Agent deems confidential). Notwithstanding anything to the contrary in this paragraph (d), in no event will any Lender or Agent be required to pay any amount to the Borrower pursuant to this paragraph (d) the payment of which would place such Lender or Agent in a less favorable net after-Tax position than such Lender or Agent would have been in if the Taxes subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Taxes had never been paid. Subject to Section 3.01(e) below, nothing herein contained shall oblige any Lender or Agent to make available its tax returns or disclose any information relating to its tax affairs or any computations in respect thereof (or any other information relating to its Taxes that it deems confidential) or require any Lender or Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

81

(e)    Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a), 3.01(b) or 3.01(c) with respect to such Lender it will, if requested by the Borrower, use commercially reasonable efforts (subject to legal and regulatory restrictions) to designate another Applicable Lending Office for any Loan affected by such event; provided that (i) such designation would eliminate or reduce amounts payable pursuant to Section 3.01(a), 3.01(b) or 3.01(c), as the case may be, and (ii) such efforts are made on terms that, in the judgment of such Lender, cause such Lender and its Applicable Lending Office(s) to suffer no economic, legal or regulatory disadvantage; and provided further that nothing in this Section 3.01(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.01(a) or 3.01(c).  The Borrower agrees to pay all reasonable out-of-pocket expenses incurred by any Lender or Agent in connection with any such designation in accordance with Section 11.04 hereof.

(f)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(f) (ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing,

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, Internal Revenue Service Form W-8BEN or W-8BEN-E, as

82

FBG_CH1_00097972

**DEBTORS' EXHIBIT NO. 67**
**Page 97 of 180**

applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed copies of Internal Revenue Service Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit J-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable; or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of Internal Revenue Service Form W-8IMY, accompanied by Internal Revenue Service Form W-8ECI, Internal Revenue Service Form W-8BEN or W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-2 or Exhibit J-3, Internal Revenue Service Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and

83

CONFIDENTIAL

withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for any Taxes imposed on or with respect to any payment made by the Borrower under any Loan Document attributable to such Lender (but only to the extent that the Borrower, Parent or any Subsidiary Guarantor has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Borrower, Parent or any Subsidiary Guarantor to do so).  Each Lender shall severally indemnify the Administrative Agent within 10 days after demand therefor, for (i) any taxes, including interest, additions to tax or penalties applicable thereto, attributable to such Lender's failure to comply with the provisions of Section 11.07(e) relating to the maintenance of a Participant Register and (ii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes, taxes or Excluded Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (g).

Section 3.02     Illegality.  If any Lender reasonably determines that any Law has made it unlawful, or that any Governmental Authority ~~that is a court, statutory board or commission~~ has asserted that it is unlawful, for any Lender or its Applicable Lending Office to make, maintain or fund ~~Eurodollar Rate Loans~~Loans whose interest is determined by reference to SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or to determine or charge interest ~~rates~~ based upon SOFR, the ~~Eurodollar~~Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, then, on notice thereof by such Lender to the Borrower (through the Administrative Agent~~, in respect of Eurodollar Rate Loans~~), (~~A~~a) any obligation of ~~such Lender to make or~~the Lenders to make SOFR Loans, and any right of the Borrower to continue ~~Eurodollar Rate~~SOFR Loans or to convert Base Rate Loans to ~~Eurodollar Rate Loans shall be suspended until such~~SOFR Loans, shall be suspended, and (b) the interest rate on which Base Rate Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "Base Rate", in each case until each affected Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist~~, (B) upon~~.  Upon receipt of such notice, the Borrower shall, if necessary to avoid such illegality, upon demand from ~~such~~any Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all ~~Eurodollar Rate~~SOFR Loans ~~of such Lender~~ to Base Rate Loans~~, either~~ (the interest rate on which Base Rate Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "Base Rate"), on the last day of the Interest Period therefor, if ~~such Lender~~all affected Lenders may lawfully continue to maintain such ~~Eurodollar Rate~~SOFR Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such ~~Eurodollar Rate Loans, (C) upon any such~~SOFR Loans to such day, in each case until the Administrative Agent is advised in writing by each affected Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted ~~and all amounts due, if any, in connection with such prepayment or conversion under Section 3.05.  Each Lender agrees to~~

84

                                                      FBG_CH1_00097974

designate a different Applicable Lending Office if such designation will avoid the need for any such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender., together with any additional amounts required pursuant to Section 3.05.

Section 3.03   Inability to Determine Rates.   Subject to Section 2.19, if, on or prior to the first day of any Interest Period for any SOFR Loan:

(g)   the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof, or

. If (h) the Required Lenders determine that for any reason adequate and reasonable means do not exist for determining the Eurodollar Rate in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Adjusted Term SOFR for any requested Interest Period with respect to a proposed Eurodollar Rate Loan, or that the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate SOFR Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount and the Interest Period of such Eurodollar Rate Loan, such Lenders shall provide a notice to making and maintaining such Loan,

the Administrative Agent to such effect, and, upon receipt of such notices, the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter,

the Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make or maintain Eurodollar SOFR Loans, and any right of the Borrower to continue SOFR Loans or to convert Base Rate Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, (i) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans in the amount specified therein. and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into Base Rate Loans at the end of the applicable Interest Period.  Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 3.05. Subject to Section 2.19, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on Base Rate Loans shall be determined by the Administrative Agent without reference to clause (c) of the definition of "Base Rate" until the Administrative Agent revokes such determination.

Section 3.04   Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate SOFR Loans

(a g)   If any Lender reasonably determines that as a result of any Change in Law that (x) imposes, modifies or deems applicable any reserve (including pursuant to regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, special, supplemental or other marginal reserve requirement) with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D), special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Eurodollar Rate) or (y) imposes on any Lender or the London interbank market any other condition affecting this Agreement or Eurodollar

85

FBG_CH1_00097975

~~Rate~~SOFR Loans made by any Lender and with which such Lender is required to comply, in each case, after the date hereof, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Loan (other than a Base Rate Loan), or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04 any such increased costs or reduction in amount resulting from Indemnified Taxes, Connection Income Taxes or Excluded Taxes), then, in accordance with Section 3.06 hereof, the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.  At any time when any ~~Eurodollar Rate~~SOFR Loan is affected by the circumstances described in this Section 3.04(a), the Borrower may either (i) if the affected ~~Eurodollar Rate~~SOFR Loan is then being made pursuant to a Borrowing, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower receives any such demand from such Lender or (ii) if the affected ~~Eurodollar Rate~~SOFR Loan is then outstanding, upon at least three (3) Business Days' notice to the Administrative Agent, require the affected Lender to convert such ~~Eurodollar Rate~~SOFR Loan into a Base Rate Loan, subject to the requirements of Section 3.05 to the extent applicable.

(~~b~~h)     If any Lender determines that any Change in Law regarding liquidity or capital requirements with which such Lender (or its Applicable Lending Office) is required to comply, in each case after the date hereof, would have the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender to a level below that which such Lender or the corporation controlling such Lender could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of any corporation controlling such Lender with respect to capital adequacy) as a consequence of such Lender's obligations hereunder, in accordance with Section 3.06 below, the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction.

(~~c~~i)     Subject to Section 3.06(b), failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation.

(~~d~~j)     If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Borrower, use commercially reasonable efforts to designate another Applicable Lending Office for any Loan affected by such event; provided that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its Applicable Lending Office(s) to suffer no material economic, legal or regulatory disadvantage; and provided further that nothing in this Section 3.04(d) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.04(a), (b) or (c).

Section 3.05    Funding Losses.  In accordance with Section 3.06 hereof, the Borrower shall compensate any Lender for and hold any Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any ~~Eurodollar Rate~~SOFR Loan on a day other than the last day of the Interest Period for such Loan; or

(b)     any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay or borrow, continue or convert any Loan (other than a Base Rate Loan) on the date or in the amount notified by the Borrower;

86

DEBTORS' EXHIBIT NO. 67
Page 101 of 180

including any loss or expense (excluding loss of anticipated profits) arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

~~For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurodollar Rate Loan made by it at the Eurodollar Rate for such Loan by a matching deposit or other borrowing in the London interbank Eurodollar market or the European interbank market, respectively, for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.~~

Section 3.06     Matters Applicable to All Requests for Compensation.

(a)     Any Agent or Lender claiming compensation under this ARTICLE III shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder, which shall be conclusive absent manifest error (it being understood and agreed that such Agent or such Lender may use any reasonable averaging and attribution methods), and the basis therefor. The Borrower shall pay the relevant amounts to the relevant Agent or Lender within 30 days following receipt of the certificate described in the immediately preceding sentence. With respect to any Lender's claim for compensation under Section 3.01, Section 3.02, Section 3.03 or Section 3.04, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; provided that if the circumstance giving rise to such claim is retroactive, then such one hundred and eighty (180)-day period referred to above shall be extended to include the period of retroactive effect thereof. If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue ~~Eurodollar Rate~~SOFR Loans from one Interest Period to another, or to convert Base Rate Loans into ~~Eurodollar Rate~~SOFR Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(b) shall be applicable); provided that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(b)     If the obligation of any Lender to make or continue any ~~Eurodollar Rate~~SOFR Loan from one Interest Period to another, or to convert Base Rate Loans into ~~Eurodollar Rate~~SOFR Loans shall be suspended pursuant to Section 3.06(a) hereof (but excluding Section 3.03), such Lender's ~~Eurodollar Rate~~SOFR Loans shall be automatically converted into Base Rate Loans on the last day(s) of the then current Interest Period(s) for such ~~Eurodollar Rate~~SOFR Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.01, Section 3.02 or Section 3.04 hereof that gave rise to such conversion no longer exist:

(i)     to the extent that such Lender's ~~Eurodollar Rate~~SOFR Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's ~~Eurodollar Rate~~SOFR Loans shall be applied instead to its Base Rate Loans; and

(ii)     all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as ~~Eurodollar Rate~~SOFR Loans shall be made or continued instead as Base Rate Loans, and all Base Rate Loans of such Lender that would otherwise be converted into ~~Eurodollar Rate~~SOFR Loans shall remain as Base Rate Loans.

(c)     If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.01, Section 3.02 or Section 3.04 hereof that gave rise

87

FBG_CH1_00097977

**DEBTORS' EXHIBIT NO. 67**
**Page 102 of 180**

to the conversion of such Lender's ~~Eurodollar Rate~~SOFR Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when ~~Eurodollar Rate~~SOFR Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted to ~~Eurodollar Rate~~SOFR Loans, on the first day(s) of the next succeeding Interest Period(s) for such outstanding ~~Eurodollar Rate~~SOFR Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding ~~Eurodollar Rate~~SOFR Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Commitments.

Section 3.07   Replacement of Lenders under Certain Circumstances.

(a)   If at any time (i) any Lender requests reimbursement for amounts owing pursuant to Section 3.04 or requires a Loan Party to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 as a result of any condition described in such Sections or any Lender ceases to make ~~Eurodollar Rate~~SOFR Loans as a result of any condition described in Section 3.02 or Section 3.04, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, in its sole discretion and at its sole expense and effort, on prior written notice to the Administrative Agent and such Lender, (A) terminate the Commitments of such Lender and prepay such Lender's outstanding Loans in full at par or (B) replace any such Lender by requiring such Lender to (and such Lender shall be obligated to) assign pursuant to Section 11.07(b) (with any assignment fee to be paid by the Borrower in such instance) all of its rights and obligations under this Agreement (or, with respect to clause (iii) above, all of its rights and obligations with respect to the Class of Loans or Commitments that is the subject of the related consent, waiver or amendment) to one or more Eligible Assignees; provided that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; and provided further that (A) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments, (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to the applicable departure, waiver or amendment of the Loan Documents and (C) no such assignment shall be made if it conflicts with applicable Laws. A Lender shall not be required to make any such assignment if, prior thereto, as a result of a waiver by the Required Lenders or otherwise, the circumstances entitling the Borrower to require such assignment cease to apply.

(b)   Any Lender being replaced pursuant to Section 3.07(a) above shall execute and deliver an Assignment and Assumption with respect to such Lender's Commitment and outstanding Loans. Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's Commitment and outstanding Loans, (B) all obligations of the Borrower owing to the assigning Lender together with accrued interest thereon to the date of payment of such principal amount and all other amounts payable to such Lender under this Agreement shall be paid in full to such assigning Lender concurrently with such Assignment and Assumption and (C) upon such payment and, if so requested by the assignee Lender, the Borrower shall deliver to the assignee Lender a Note or Notes (or replacement Note or Notes, as the case may be) executed by the Borrower, the assignee Lender shall become a Lender hereunder with respect to the interests assigned, in addition to any other interest it may otherwise hold as a Lender under this Agreement, and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned interest, except with respect to provisions under this Agreement which survive the Termination Date, which shall survive as to such assigning Lender. In connection with any such replacement, if any such Lender being replaced does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within two Business Days of the date on which

88

DEBTORS' EXHIBIT NO. 67
Page 103 of 180

the assignee Lender executes and delivers such Assignment and Assumption to such Lender being replaced, then such Lender being replaced shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Lender being replaced.

(c)     In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of all affected Lenders in accordance with the terms of Section 11.01 or all the Lenders with respect to a certain Class of the Loans and (iii) the Required Lenders or the Lenders holding a majority in outstanding principal amount of the Loans held by the relevant group of affected Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "Non-Consenting Lender". Each Lender hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Lender's attorney-in-fact with full authority in the place and stead of such Lender and in the name of such Lender, from time to time in the Administrative Agent's discretion, with prior notice to such Lender, to take any action and to execute any instrument that the Administrative Agent may deem reasonably necessary to carry out this provisions of this Section 3.07.

Section 3.08   Survival.   All of the Borrower's obligations under this ARTICLE III shall survive the Termination Date.

## ARTICLE IV

## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01   Conditions of Initial Credit Extension.   The obligation of each Lender on the Closing Date to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent except as otherwise agreed between the Borrower and the Administrative Agent:

(a)     Loan Documents.   The Administrative Agent shall have received of the following Loan Documents (together with the schedules and exhibits thereto, if any), each of which shall be originals or electronic copies (followed promptly by originals) unless otherwise specified, each executed by a Responsible Officer of the signing Loan Party (where execution is applicable), each dated the Closing Date (unless otherwise specified) (or, in the case of certificates of governmental officials, a recent date before the Closing Date):

(i)      this Agreement;

(ii)     the Collateral Documents;

(iii)    each Note requested by a Lender, if any;

(iv)     the Guaranty;

(v)      the ABL Intercreditor Agreement; and

(vi)     the First Lien/Second Lien Intercreditor Agreement.

(b)     Secretary's Certificate and Attachments.   The Administrative Agent shall have received a copy of an originally executed certificate from the secretary or assistant secretary (or another

CONFIDENTIAL

FBG_CH1_00097979

officer authorized to provide such certificate) of each Loan Party, together with all applicable attachments, certifying as to the following:

(i)        Organizational Documents.  Attached thereto is a copy of each Organization Document of such Loan Party originally executed and delivered by each party thereto and, to the extent applicable, certified as of a recent date by the appropriate governmental official.

(ii)        Signature and Incumbency.  Set forth therein are the signature and incumbency of the officers or other authorized representatives of such Loan Party executing the Loan Documents to which it is a party.

(iii)        Resolutions.  Attached thereto are copies of resolutions of the board of directors, board of managers or functional equivalent of such Loan Party approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party, or by which it or its assets may be bound as of the Closing Date and approving the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date, certified as of the Closing Date as being in full force and effect without modification or amendment.

(iv)        Good Standing Certificates.  Attached thereto is a good standing certificate from the applicable Governmental Authority of such Loan Party's jurisdiction of incorporation, organization or formation, each dated a recent date prior to the Closing Date.

(c)        Committed Loan Notice; Letter of Direction; Flow of Funds Memorandum.  The Administrative Agent shall have received a fully executed and delivered Committed Loan Notice, no later than (i) 11:00 a.m. on the Closing Date (in the case of Base Rate Loans) or (ii) 1:00 p.m. three (3) Business Days in advance of the Closing Date (in the case of ~~Eurodollar Rate~~SOFR Loans) (or, in each case such shorter period as may be agreed to by the Administrative Agent), together with a customary direction letter attaching a flow of funds memorandum with respect to the Transactions and any of the other transactions contemplated by the Loan Documents to occur as of the Closing Date.

(d)        Closing Date Certificate and Attachments.  The following shall have occurred (or shall occur concurrently with the making of the Loans on the Closing Date), and the Administrative Agent shall have received an originally executed Closing Date certificate, together with all applicable attachments, certifying as to the following:

(i)        Representations and Warranties.  Confirming satisfaction of the condition set forth in Section 4.02(a).

(ii)        No Default or Event of Default. Confirming satisfaction of the condition set forth in Section 4.02(b).

(iii)        Material Adverse Effect.  Since December 31, 2017, no event, effect, occurrence, fact, condition, change or development shall have occurred that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

CONFIDENTIAL                                                                                  FBG_CH1_00097980

(iv)     ABL Loan Documents.  The Administrative Agent shall have received a copy of the ABL Loan Agreement, together with any amendments thereto that have been entered into on or prior to the Closing Date.

(v)     First Lien Loan Documents.  The Administrative Agent shall have received a copy of the First Lien Agreement Amendment No. 3, duly executed by the parties thereto.

(e)     [Reserved].

(f)     Collateral.  The Collateral Agent shall have received:

(i)     Lien Searches.  The results of a recent search, by a Person reasonably satisfactory to the Administrative Agent, of all effective UCC financing statements (or equivalent filings) made with respect to any personal or mixed property of any Loan Party in the appropriate jurisdictions, together with copies of all such filings disclosed by such search.

(ii)     [Reserved].

(iii)     UCC Financing Statements.  Copies of proper financing statements, filed or duly prepared for filing under the UCC in all United States jurisdictions that the Administrative Agent may deem reasonably necessary in order to perfect and protect the Liens created under the Collateral Documents on assets of Parent, the Borrower and each Subsidiary Guarantor that is party to the Collateral Documents, covering the Collateral described therein.

(iv)     Securities.  Certificates, if any, representing the pledged equity accompanied by undated stock or membership interest powers executed in blank and instruments evidencing the pledged debt, as required pursuant to the Pledge Agreement, indorsed in blank (or confirmation in lieu thereof reasonably satisfactory to the Administrative Agent or its counsel that such certificates, powers and instruments have been sent for prompt delivery to the Collateral Agent or its counsel or to the First Lien Collateral Agent or its counsel to the extent such delivery is made in accordance with the First Lien/Second Lien Intercreditor Agreement).

(v)     Perfection Certificate.  A completed perfection certificate, executed and delivered by a Responsible Officer of each Loan Party, together with all attachments contemplated thereby.

(g)     Financial Statements.  The Administrative Agent and the Original Lead Arrangers shall have received (i) an audited consolidated balance sheet and related statements of income and cash flows of the Borrower and its Subsidiaries as of and for each of the Fiscal Year ended December 31, 2017 (the "Audited Financial Statements") and (ii) unaudited consolidated balance sheets and related statements of income and cash flows of the Borrower and its Subsidiaries for the Fiscal Quarters ended March 31, 2018, June 30, 2018 and September 30, 2018 (the "Unaudited Financial Statements"); provided that the financial statements described in this clause (g) shall have been prepared in accordance with GAAP consistently applied.

(h)     Opinions of Counsel to Loan Parties.  The Administrative Agent and its counsel shall have received an opinion of Paul Hastings LLP, special counsel to the Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent and the Lenders, dated as of the Closing Date.

91

CONFIDENTIAL

FBG_CH1_00097981

(i)     [Reserved].

(j)     Fees.  The Borrower shall have paid (or shall cause to be paid from the proceeds of funding on the Closing Date) to the Original Lead Arrangers, the Administrative Agent, the Collateral Agent, the Lenders and third party service providers such fees payable to each such Person on the Closing Date to the extent due and invoiced at least two (2) Business Days prior to the Closing Date.

(k)     Solvency.  The Administrative Agent shall have received a copy of the executed Solvency Certificate.

(l)     "Know-Your-Customer", Etc.  The Administrative Agent shall have received not less than three (3) Business Days prior to the Closing Date (or such shorter period as the Administrative Agent may agree) all such documentation and other information required by regulatory authorities under any "know-your-customer" Laws or AML Laws in order to allow the Lenders to comply therewith.

Each Lender and each Agent, by delivering its signature page to this Agreement and, if applicable, funding a Loan on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document, agreement, instrument, certificate or opinion required to be approved by such Lender or such Agent, as the case may be, on the Closing Date.

Section 4.02     Conditions to All Credit Extensions.  The obligation of each Lender to honor any Request for Credit Extension (other than (x) a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of ~~Eurodollar Rate~~SOFR Loans, or (y) to the extent agreed by the lenders providing the same, in connection with any Indebtedness incurred under Section 2.17 hereof) is subject to the following conditions precedent:

(a)     the representations and warranties of the Borrower and each other Loan Party contained in ARTICLE V or any other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension (immediately before and after giving effect to such Credit Extension); provided that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates;

(b)     no Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds therefrom; and

(c)     the Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

Each Request for Credit Extension (other than (x) a Committed Loan Notice requesting only a conversion or continuation of Loans to the other Type or a continuation of ~~Eurodollar Rate~~SOFR Loans, or (y) to the extent agreed by the lenders providing the same, in connection with any Indebtedness incurred under Section 2.17 hereof) submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in Section 4.02(a) and Section 4.02(b) have been satisfied on and as of the date of the applicable Credit Extension; provided that, notwithstanding anything in this Section 4.02 to the contrary, any Request for Credit Extension in connection with any Indebtedness incurred under Section 2.16 may be subject to the more limited conditions set forth in paragraphs (b)(i) and (ii) thereof.

92

CONFIDENTIAL

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Each of Parent and the Borrower represents and warrants to the Agents and the Lenders on the Closing Date, the 2021 Refinancing Agreement Effective Date and on the date of each Credit Extension that:

Section 5.01    Existence, Qualification and Power; Compliance with Laws.    Each of the Borrower, the Guarantors and each of the other Restricted Subsidiaries (a) is duly incorporated, organized or formed, and validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction) (solely in the case of any such Person other than the Borrower, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect), (b) has all requisite power and authority to (i) own or lease its assets and carry on its business (except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect) and (ii) to the extent such Person is a Loan Party, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification (except where such failure could not reasonably be expected to have a Material Adverse Effect), (d) is in compliance with all Laws, orders, writs, injunctions and orders (except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect) and (e) has all requisite governmental licenses, authorizations, consents and approvals, if any, to operate its business as currently conducted (except where the failure to have such licenses, authorizations, consents and approvals could not reasonably be expected to have a Material Adverse Effect).

Section 5.02    Authorization; No Contravention.    The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, (a) are within such Loan Party's corporate or other organizational powers, (b) have been duly authorized by all necessary corporate or other organizational action, and (c) do not and will not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (x) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (y) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject (in each case in this clause (ii), except to the extent such conflict, breach, contravention or creation of a Lien could not reasonably be expected to have a Material Adverse Effect), or (iii) violate any applicable Law (except to the extent such violation could not reasonably be expected to have a Material Adverse Effect).

Section 5.03    Governmental Authorization; Other Consents.    Except to the extent that any such failure could not reasonably be expected to result in a Material Adverse Effect, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement, any other Loan Document, any ABL Loan Document or any First Lien Facility Documentation or for the consummation of the Transactions, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the

93

CONFIDENTIAL

FBG_CH1_00097983

Secured Parties and (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect.

Section 5.04   Binding Effect.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

Section 5.05   No Material Adverse Effect.  Since December 31, 2019, no event, effect, occurrence, fact, condition, change or development has occurred that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.06   Litigation; FCPA.  There is no action, suit, investigation, litigation, proceeding or disputes affecting the Parent or any of its Restricted Subsidiaries or any of their properties, pending or threatened in writing before any Governmental Authority or arbitrator that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.07   Ownership of Property; Liens; Insurance.

(a)    Each Loan Party is the legal and beneficial owner of the Collateral pledged by it free and clear of any Lien, except for the Liens and security interest created or permitted under the Loan Documents including, any Liens permitted under Section 7.01.

(b)    The Borrower and each of the other Restricted Subsidiaries has (i) good and legal (or to the extent such real property is located in Texas, indefeasible) title in fee simple to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real property), or (iii) easements or other limited property interests in, all real property used in the ordinary conduct of its business, free and clear of all Liens except for defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by Section 7.01 and except where the failure to have such title or other interest could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Set forth as Schedule 5.07(b) hereto is a complete and accurate list of all real property owned in fee by the Borrower or any of the other Restricted Subsidiaries as of the 2021 Refinancing Agreement Effective Date, showing the street address (if applicable), county, state and any other relevant jurisdiction and record owner.

(c)    The Borrower and each of the other Restricted Subsidiaries maintains the insurance required by Section 6.07.

Section 5.08   Creation and Perfection of Security Interests.

(a)    The Collateral Documents are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a valid, enforceable and, upon the making of the filings and the taking of the actions required under the terms of the Loan Documents, perfected security interest in the Collateral, securing the payment of the Secured Obligations, and having priority over all other Liens on the Collateral except Liens permitted under Section 7.01.

(b)    When the Intellectual Property Security Agreements are properly filed in the United States Patent and Trademark Office and the United States Copyright Office, as applicable, to the extent such filings may perfect such interests, the Liens created by the Security Agreement shall

94

FBG_CH1_00097984

constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder in Patents and Trademarks (each as defined in the Security Agreement) registered or applied for with the United States Patent and Trademark Office and Copyrights (as defined in the Security Agreement) registered or applied for with the United States Copyright Office, as the case may be, in each case subject to no Liens other than Liens permitted under Section 7.01 (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect the Collateral Agent's Lien on registered Patents, Trademarks and Copyrights acquired by the grantors thereof after the Closing Date).

Section 5.09    Environmental Compliance.    Except as could not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect:

(a)    The operations and properties of the Parent, the Borrower and each of their respective Subsidiaries comply in all respects with all, and have not violated any, applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with all applicable Environmental Permits. The Parent, the Borrower and each of their respective Subsidiaries have no reasonable basis to believe that any such Environmental Permits will be revoked or adversely modified, or will not be timely renewed and complied with, in the ordinary course of business;

(b)    (i) There are no Environmental Liabilities of the Parent, the Borrower or any of their respective Subsidiaries, and (ii) there are no facts, circumstances or conditions arising out of or relating to the Parent, the Borrower or any of their respective Subsidiaries, their respective operations or their respective currently or formerly owned, leased or operated facilities that would be reasonably likely to give rise to Environmental Liabilities or Environmental Actions against the Parent, the Borrower or any of their respective Subsidiaries or be reasonably likely to require a net increase in the Parent's, Borrower's or their respective Subsidiaries' costs to maintain compliance with applicable Environmental Laws;

(c)    Neither the Parent, the Borrower nor any of their respective Subsidiaries has received any written notice of, nor have they been subject to, any Environmental Action, nor is any Environmental Action pending or, to the knowledge of the Parent or the Borrower, threatened as to the Parent, the Borrower or any of their respective Subsidiaries; and

(d)    There has been no release at, on, to, from or in any property or facility currently or formerly owned, leased, or operated by the Parent, the Borrower or any of their respective Subsidiaries.

Section 5.10    Taxes.  The Parent, the Borrower and each of their Restricted Subsidiaries have (a) timely filed all tax returns and reports required to be filed (taking into account extensions of time to file), and (b) timely paid all Taxes, shown on such returns and all other amounts of federal, provincial, state, municipal, foreign and other Taxes imposed upon them or their properties, income or assets otherwise due and payable, in each case except (i) with respect to amounts which are being contested in good faith by appropriate proceedings and for which adequate reserves have been provided in accordance with GAAP, if applicable, or (ii) where the failure to file or pay could not reasonably be expected to have a Material Adverse Effect. No material written claim has been asserted with respect to any Taxes, except (a) Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are being maintained in accordance with GAAP or (b) as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.11    Compliance with ERISA.

95

(a)     Each Plan is in material compliance with the applicable provisions of ERISA, the Code and other federal or state Laws; and

(b)     (i) no ERISA Event has occurred prior to the date on which this representation is made that, when taken together with all other such ERISA Events, would reasonably be expected to have a Material Adverse Effect and (ii) none of the Borrower or any of the other Restricted Subsidiaries or ERISA Affiliates has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, except as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.12     Labor Matters.  There are no strikes pending or threatened against the Borrower or any of the other Restricted Subsidiaries that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.  Except as could not reasonably be expected to have a Material Adverse Effect, (i) the hours worked and payments made to employees of the Borrower or any of the other Restricted Subsidiaries have not been in violation in any respect of the Fair Labor Standards Act or any other applicable law dealing with such matters and (ii) all payments due from the Borrower or any of the other Restricted Subsidiaries or for which any claim may be made against the Borrower or any of the other Restricted Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Borrower or such Restricted Subsidiary to the extent required by GAAP.

Section 5.13     Subsidiaries; Equity Interests.  As of the 2021 Refinancing Agreement Effective Date, none of Parent or any of its Restricted Subsidiaries has any Subsidiaries other than those specifically disclosed on Schedule 5.13, and all of the outstanding Equity Interests in each such Person and each such Subsidiary have been validly issued, and, if applicable, are fully paid and non-assessable and are owned by the Parent or a Restricted Subsidiary (as applicable) free and clear of all Liens except those permitted under Section 7.01.  As of the 2021 Refinancing Agreement Effective Date, Schedule 5.13 (a) sets forth the name and jurisdiction of organization of each Subsidiary of Parent and each of their respective Subsidiaries and (b) sets forth the ownership interest of Parent and its Subsidiaries in each of their respective Subsidiaries, including the percentage of such ownership.

Section 5.14     Margin Regulations; Investment Company Act; PATRIOT Act.

(a)     None of Parent or any of its Restricted Subsidiaries is engaged nor will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U issued by the FRB.

(b)     None of Parent or any of its Restricted Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

(c)     None of Parent or any of its Restricted Subsidiaries is in violation in any material respect of any laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing, effective September 23, 2001 and the PATRIOT Act and the use of proceeds of the Loans will not violate the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.

Section 5.15     Disclosure; Financial Statementsi)          .

96

(a)      As of the 2021 Refinancing Agreement Effective Date, (i) no report, financial statement, certificate or other written information furnished by or on behalf of Parent or any of its Restricted Subsidiaries to any Lead Arranger, Agent or Lender (other than projections and other forward looking information and information of a general economic or general industry nature) in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when furnished, and when taken as a whole (including all supplements thereto), contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not materially misleading in light of the circumstances under which such statements were made (after giving effect to all supplements and updates thereto from time to time) and (ii) the projected financial information delivered by or on behalf of the Borrower or any of the other Restricted Subsidiaries to any Lead Arranger, Agent or Lender prior to the Amendment No. 1 Effective Date was prepared in good faith based upon assumptions believed by the preparer thereof to be reasonable at the time such projected financial information were so delivered, it being understood that such financial projections are as to future events and are not to be viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrower and the other Restricted Subsidiaries, that no assurance can be given that any particular financial projection or the financial projections taken as a whole will be realized and that actual results during the period or periods covered by any such financial projections may differ significantly from the projected results and such differences may be material.

(b)      The Audited Financial Statements and the Unaudited Financial Statements were prepared in conformity with GAAP (except as may be indicated in the notes thereto) and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of the Unaudited Financial Statements, to changes resulting from audit and normal year-end adjustments.

(c)      As of the 2021 Refinancing Agreement Effective Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 5.16      Intellectual Property.  Each Loan Party and each of the Restricted Subsidiaries owns or has a valid and enforceable right to use, any and all intellectual property and similar proprietary rights throughout the world, including any and all trademarks (including the associated goodwill), service marks (including the associated goodwill), trade names, domain names, copyrights, patents, licenses, know-how (including trade secrets and other patented and/or unpatentable proprietary or confidential information, systems or procedures), software, design rights, technology and all registrations and applications for registration of any of the foregoing and all goodwill associated with any of the foregoing (collectively, "Intellectual Property") that are used or held for use in, or otherwise necessary for, the operation of their respective business as currently conducted and, to the knowledge of Parent and the Borrower, the use of such Intellectual Property by such Loan Party or Restricted Subsidiary does not infringe, misappropriate or otherwise violate, and has not infringed, misappropriated or otherwise violated, any Intellectual Property held by any other Person, except, in each case, for such infringement, misappropriation or other violations, which either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. To the knowledge of the Parent and the Borrower, the respective business of any Loan Party or any of its Subsidiaries as currently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property held by any Person except for such infringement, misappropriation or other violations, which either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any Intellectual Property is filed and presently pending or, to the knowledge of the Parent or the Borrower,

97

CONFIDENTIAL

FBG_CH1_00097987

presently threatened in writing against any Loan Party or any of its Subsidiaries, which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 5.17    Solvency.  As of the 2021 Refinancing Agreement Effective Date, after giving effect to the Transactions, Parent and its Restricted Subsidiaries are, on a consolidated basis, Solvent.

Section 5.18    AML Laws; Anti-Corruption Laws and Sanctions.

(a)    None of the Borrower, any Guarantor, any Subsidiary or any of their respective directors, officers or, to the Borrower's knowledge, employees, agents or Affiliates is: (i) a Sanctioned Person, (ii) has engaged in the past five (5) years or intends to engage in the future in any dealings or transactions with, involving or for the benefit of, any Sanctioned Person, (iii) has taken or will take any action that would constitute or give rise to a violation of any AML Laws, Anti-Corruption Laws, or Sanctions or (iv) will directly or indirectly use any part of any proceeds of the Loans or lend, contribute, or otherwise make available such proceeds (A) in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage in violation of the FCPA or in any other manner that would constitute or give rise to a violation of any Anti-Corruption Law or (B) to fund or facilitate any activities or business of, with or involving any Sanctioned Person or in any other manner that would constitute or give rise to a violation of Sanctions by any Person, including any Lender.

(b)    The Borrower, its Subsidiaries and their respective directors, officers and employees and, to the knowledge of the Borrower, the agents of the Borrower and its Subsidiaries, are in compliance with applicable Anti-Corruption Laws, AML Laws, and Sanctions in all material respects.

Section 5.19    Status as Senior Indebtedness.  The Obligations constitute (i) "Second Lien Obligations" under and as defined in the ABL Intercreditor Agreement, (ii) "Second Priority Obligations" under and as defined in the First Lien/Second Lien Intercreditor Agreement and (iii) "senior indebtedness" under and as defined in any documentation governing any Subordinated Indebtedness.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

On and after the 2021 Refinancing Agreement Effective Date until the Termination Date, each of Parent and the Borrower shall, and shall cause each other Restricted Subsidiary to:

Section 6.01    Financial Statements.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    As soon as available, but in any event within ninety (90) days after the end of each Fiscal Year of the Borrower (commencing with the Fiscal Year ending December 31, 2020), a consolidated balance sheet of the Borrower and the other Restricted Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Year, prepared in accordance with GAAP and audited and accompanied by a (A) report and opinion of BDO or any independent registered public accounting firm of nationally recognized standing (including, but not limited to, any of the "big 4" national firms) (or another

98

FBG_CH1_00097988

accounting firm reasonably satisfactory to the Administrative Agent), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit, (other than with regard to the occurrence of the Maturity Date in respect of any Credit Facility, the First Lien Facility or the ABL Facility in the 12 month period following the date of the relevant auditor's report) and (B) (i) a comparison against the figures for the previous Fiscal Year and (ii) commencing after the delivery of the first forecast under Section 6.01(b) below, a comparison of actual figures against the forecast for such Fiscal Year, all in reasonable detail.

(b)      As soon as available, but in any event, within, forty-five (45) days after the end of each of the first three (3) fiscal quarters of each Fiscal Year of the Borrower, a consolidated balance sheet of the Borrower and the other Restricted Subsidiaries as at the end of such fiscal quarter, and the related (A) consolidated statements of income or operations for such fiscal quarter and for the portion of the Fiscal Year then ended and (B) consolidated statements of cash flows for the portion of the Fiscal Year then ended and, in the case of each of clauses (A) and (B) setting forth in each case (x) in comparative form the figures for the corresponding fiscal quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year and (y) "segment"-level information with respect to revenues and gross margins.

(c)      Annual Forecasts and Budget; "Flash Reports".  As soon as available and in any event within (x) ninety (90) days after the end of each Fiscal Year, an annual budget prepared by management of Parent, consisting of condensed income statements on an annual basis for the Fiscal Year following the most recently ended Fiscal Year and showing financial projections for each fiscal quarter in the Fiscal Year covered thereby and (y) forty-five (45) days after the end of each Fiscal Year, "flash reports" relating to revenue, Consolidated Adjusted EBITDA and liquidity of the Borrower and the other Restricted Subsidiaries with respect to the fourth fiscal quarter of such Fiscal Year.

(d)      Telephonic Meetings.  The Borrower shall, following the delivery of the financial statements referred to in Section 6.01(a) and (b), as applicable, at such date and time as reasonably agreed by the Borrower and the Administrative Agent, schedule one telephonic conference call per applicable period specified in Section 6.01(a) and Section 6.01(b) (but in no event more frequently than once per fiscal quarter) with directors and officers of the Borrower reasonably requested by the Administrative Agent to attend (which may include the chief executive officer, the chief financial officer and the president of the Borrower) to discuss the contents of the relevant reports.

Section 6.02    Certificates; Reports; Other Information.  Deliver to the Administrative Agent for further distribution to each Lender:

(a)      upon delivery of the financial statements referred to in Section 6.01(a) and (b) a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower which Compliance Certificate shall, among other things, set forth in reasonable detail satisfactory to the Administrative Agent, calculations of Consolidated Adjusted EBITDA, Total Leverage Ratio and Total Secured Leverage Ratio and, together with each Compliance Certificate delivered in connection with the financial statements referred to in Section 6.01(a) and (b), a customary management discussion and analysis with respect to the financial statements accompanying such Compliance Certificate;

(b)      promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which any Loan Party files with the SEC or with any successor Governmental Authority (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any

99

DEBTORS' EXHIBIT NO. 67
Page 114 of 180

registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(c)      prompt written notice of any change (i) in any Loan Party's legal name, (ii) in any Loan Party's type of organization, (iii) in any Loan Party's jurisdiction of organization and (iv) to the extent such information is necessary to enable the Administrative Agent to perfect or maintain the perfection and priority of its security interest in the Collateral of the relevant Loan Party, in any Loan Party's organizational identification number; and

(d)      promptly, such additional information regarding the business, legal, financial or corporate affairs of any Loan Party or any Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01 or Section 6.02 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents or other information, or provides a link thereto at the website address listed in Section 11.02, (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent) or (iii) on which such documents are available on the website of the SEC at http:/www.sec.gov; provided that the Borrower shall notify (which notice may be delivered by facsimile or electronic mail as provided in Section 11.02) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.   Each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

Section 6.03    Notice Requirements; Other Information.  Promptly after a Responsible Officer obtains knowledge thereof, notify the Administrative Agent of each of the following events or circumstances:

(a)      the occurrence of any Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(b)      to the extent permissible by applicable requirements of Law, the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority (i) against any Loan Party, that would reasonably be expected to result in a Material Adverse Effect and (ii) with respect to any Loan Document, in each case, together with the details thereof and any action taken or proposed to be taken with respect thereto;

(c)      the occurrence of any ERISA Event or ERISA Events that has had or could reasonably be expected to have a Material Adverse Effect;

(d)      the occurrence of any other matter that has resulted or would reasonably be expected to result in a Material Adverse Effect;

(e)      damage to, or condemnation of, a material portion of the Collateral, which notice shall specify the nature of such condition, event or change and what action, if any, Parent or the Borrower has taken, is taking or proposes to take with respect thereto; and

100

CONFIDENTIAL

FBG_CH1_00097990

(f)     any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

Section 6.04    Environmental Matters.   Except to the extent that failure to take the actions described in this Section 6.04 could not reasonably be expected to have a Material Adverse Effect:

(a)     comply and cause each of the Subsidiaries to comply, and take commercially reasonable efforts to cause all of their lessees to comply, with all applicable Environmental Laws and Environmental Permits, which compliance includes obtaining and renewing, and causing each of the Restricted Subsidiaries to obtain and renew, all Environmental Permits necessary for their operations and properties;

(b)     conduct, cause each of the Subsidiaries to conduct, and take commercially reasonable efforts to cause any other Persons occupying or leasing their facilities or properties to conduct, any Response required by Environmental Law related to their facilities or properties, or at any location which the Parent, the Borrower or any of their respective Subsidiaries conduct operations or business by contract or otherwise; provided, however, that neither the Parent, the Borrower nor any of their respective Subsidiaries shall be required to undertake any such Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances; and

(c)     promptly, and in any event within ten (10) Business Days of, either (i) receipt by the Parent, the Borrower or any of their respective Subsidiaries of any notice of an Environmental Action related to such Persons, or (ii) the occurrence of any Release that would reasonably be likely to result in the Parent, the Borrower or any of their respective Subsidiaries incurring Environmental Liability or being required to conduct a Response, provide written notice of such receipt or Release to the Administrative Agent, along with a description of actions proposed to be taken by the Parent, the Borrower or any of their respective Subsidiaries to address the Environmental Action or Release.

Section 6.05    Maintenance of Existence.   (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all commercially reasonable action to maintain all rights, privileges (including its good standing), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except, in each case, (i) other than with respect to any Person (other than the Borrower), to the extent the board of directors (or equivalent governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower and the other Restricted Subsidiaries and to the extent that the loss thereof shall not be disadvantageous to the Borrower, any of the other Restricted Subsidiaries or the Lenders in any material respect, (ii) pursuant to a transaction permitted by Section 7.04 or Section 7.05 or (iii) with respect to any such Person (other than the Borrower), except to the extent that such failure could not reasonably be expected to have a Material Adverse Effect.

Section 6.06    Maintenance of Properties.   Maintain, preserve and protect all of its material tangible and intangible properties and equipment that are used or useful in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, and make all commercially reasonable and appropriate repairs, renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof, in each case except where failure to do so could not reasonably be expected to have a Material Adverse Effect individually or in the aggregate.

101

CONFIDENTIAL

FBG_CH1_00097991

Section 6.07    Maintenance of Insurance.    Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the other Restricted Subsidiaries) as are customarily carried by Persons engaged in similar businesses and owning or leasing similar properties in the same general areas in which the Borrower or such Restricted Subsidiary operates. Each policy of property or general liability insurance shall (i) name the Collateral Agent, on behalf of the Secured Parties (or the First Lien Collateral Agent, if done so in accordance with the First Lien/Second Lien Intercreditor Agreement), as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty insurance policy (excluding any business interruption or personal injury insurance policy), contain a loss payable clause or endorsement that names the Collateral Agent, on behalf of the Secured Parties (or the First Lien Collateral Agent, if done so in accordance with the First Lien/Second Lien Intercreditor Agreement), as the loss payee thereunder and, provide for prior written notice to the Collateral Agent of any modification or cancellation of such policy or the failure to pay any premiums thereunder. In addition to the foregoing, if any improvements located upon any Mortgaged Property are located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 (or any amendment or successor act thereto), then the applicable Loan Party shall maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount sufficient to comply with all applicable rules and regulations promulgated pursuant to such Act.

Section 6.08    Compliance with Laws.    Comply with the requirements of all applicable Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business or property, except if the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

Section 6.09    Books and Records.    Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and permit the preparation of financial statements in conformity in all material respects with GAAP shall be made of all material financial transactions and matters involving the assets and business of the Borrower or any of the other Restricted Subsidiaries, as the case may be.

Section 6.10    Inspection Rights.    Permit representatives and independent contractors, in each case designated by the Administrative Agent or any applicable Lender, to visit and inspect any properties of the Borrower and the other Restricted Subsidiaries and in connection with such visit, to discuss their respective affairs, finances and accounts with their respective directors, officers, and independent public accountants, in each case, at such reasonable times during normal business hours and as often as may be reasonably requested, upon reasonable advance notice to the Borrower; provided, however, that excluding any such visits and inspections during the continuance of an Event of Default, (i) such visits and inspections shall be coordinated through and by the Administrative Agent and (ii) the Administrative Agent and Lenders, taken as a whole, shall not exercise such rights more than one (1) time during any calendar year (it being understood that such annual visit or inspection shall be at the Borrower's expense); provided further that when an Event of Default is continuing, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Lenders shall give the Borrower a reasonable opportunity to participate in any discussions with the Borrower's independent public accountants. None of the Borrower nor any of the other Restricted Subsidiaries shall be required to disclose to the Administrative Agent or any Lender (or any authorized representative or independent contractor of any

102

FBG_CH1_00097992

**DEBTORS' EXHIBIT NO. 67**
**Page 117 of 180**

of them) any information (w) that is prohibited by Law to be disclosed, (x) that is subject to attorney-client or similar privilege or constitutes attorney work product, (y) the disclosure of which would cause a breach of a binding non-disclosure or similar agreement with a third party to the extent such agreement is not made in contemplation of the avoidance of this Section 6.10 or (z) that constitutes non-financial trade secrets or non-financial proprietary information of the Borrower or its Subsidiaries and/or any of their respective customers and/or suppliers; provided that, in the event the Borrower or any Restricted Subsidiary thereof withholds information from the Administrative Agent or the Lenders in reliance on this sentence, the Borrower shall provide (to the extent possible without violation of such Law, attorney-client or similar privilege, attorney work product privilege or non-disclosure or similar agreement) to provide notice to the Administrative Agent or such applicable Lender that such information is being withheld and shall use commercially reasonable efforts to communicate the applicable information in a way that would not violate the applicable Law or non-disclosure or similar agreement or risk waiver of such attorney-client or similar privilege or attorney work product privilege.

Section 6.11    Covenant to Guarantee Obligations and Give Security.

(a)    Upon (x) the formation or Acquisition by any Loan Party of any new direct or indirect Wholly-owned Domestic Subsidiary which is not an Excluded Subsidiary, including pursuant to a Permitted Acquisition or (y) any Excluded Subsidiary ceasing to constitute an Excluded Subsidiary, then the Borrower shall, within sixty (60) days of the date of such formation, Acquisition or cessation (or such later date as may be agreed by the Administrative Agent):

(i)    cause such Domestic Subsidiary to duly execute and deliver to the Administrative Agent a supplement to the Guarantee in substantially the form attached as Exhibit A thereto (a "Guaranty Supplement"),

(ii)    cause such Domestic Subsidiary to (i) duly execute and deliver to the Administrative Agent (A) a supplement (w) to the Security Agreement in substantially the form attached as Annex I to the Security Agreement (a "Security Agreement Supplement"), (x) to the Pledge Agreement, (y) to the ABL Intercreditor Agreement in substantially the form attached as Exhibit C to the ABL Intercreditor Agreement and (z) to the First Lien/Second Lien Intercreditor Agreement substantially in the form of Exhibit C to the First Lien/Second Lien Intercreditor Agreement and (B) if such Domestic Subsidiary owns registrations of or applications for U.S. Patents, Trademarks and/or Copyrights (each as defined in the Security Agreement) that constitute Collateral, an Intellectual Property Security Agreement, and (ii) deliver completed Uniform Commercial Code financing statements in appropriate form for filing in such jurisdictions as the Administrative Agent may reasonably request; it being understood and agreed that with respect to any Collateral owned by any Restricted Subsidiary that becomes a Loan Party in accordance with this Section 6.11, for purposes of the requirements set forth in the Pledge Agreement and the Security Agreement, such Collateral shall be deemed to have been acquired by such Restricted Subsidiary on the first day of the time period within which such Restricted Subsidiary is required to become a Loan Party under this Section 6.11,

(iii)    cause such Domestic Subsidiary to deliver to the Administrative Agent, upon the reasonable request of the Administrative Agent in its sole discretion, a signed copy of a favorable opinion in customary form, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent as to the matters contained in clauses (i) and (ii) above and such other matters as the Administrative Agent may reasonably request,

103

FBG_CH1_00097993

(iv)     cause such Domestic Subsidiary to deliver to the Administrative Agent the secretary's certificates and attachments which would have been required to be delivered to the Administrative Agent pursuant to Section 4.01(b) if such Domestic Subsidiary had been a Guarantor on the Closing Date, and

(v)     cause such Domestic Subsidiary (and the parent of each such Domestic Subsidiary that is a Loan Party) to deliver any and all certificates representing Equity Interests (to the extent certificated) and promissory notes that are required to be pledged pursuant to the Collateral Documents, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank.

(b)     After the 2021 Refinancing Agreement Effective Date, promptly within ninety (90) days (or such later date as may be agreed by the Administrative Agent) after the acquisition of any Material Owned Property by any Loan Party, satisfy the Mortgage Requirement; it being understood and agreed that, with respect to any Material Owned Property owned by any Domestic Subsidiary at the time such Domestic Subsidiary is required to become a Loan Party under this Section 6.11, such Material Owned Property shall be deemed to have been acquired by such Domestic Subsidiary on the first day of the time period within which such Domestic Subsidiary is required to become a Loan Party under this Section 6.11.

(c)     Notwithstanding anything to the contrary herein or in any other Loan Document:

(i)     the Loan Documents shall not require the creation or perfection of pledges of or security interests in, or the delivery of particular documents with respect to, particular assets if and for so long as the Administrative Agent and the Borrower determine in their reasonable discretion that the burden or cost of creating or perfecting such pledges or security interests in such assets or obtaining title insurance in respect of such assets shall excessive in view of the benefit of the security afforded thereby;

(ii)     notwithstanding anything to the contrary contained herein or in any other Loan Document, after the 2021 Refinancing Agreement Effective Date, the Borrower shall not be required to pledge any Equity Interests other than that of (i) any Wholly-owned Domestic Subsidiary (other than any Excluded Subsidiary) and (ii) up to 65% of the issued and outstanding voting stock of a first-tier Wholly-owned Foreign Subsidiary (other than any direct or indirect Subsidiary of an Excluded Subsidiary); provided, however, that notwithstanding anything to the contrary contained in this clause (ii), any Foreign Subsidiary that becomes a Loan Party pursuant to Section 2.16 or Section 7.03(m) or is required to become a Loan Party in connection with the incurrence of any Indebtedness permitted under Section 7.03(o) shall be required to perfect security interests in, and take other actions with respect to, any of its assets constituting Collateral outside of the United States in accordance with the guarantee and security principles and collateral sharing arrangements that are to be set forth Schedule 6.11;

(iii)     notwithstanding anything to the contrary contained herein or in any other Loan Document, the Loan Parties shall not be required to (a) grant a security interest in any asset or perfect a security interest in any asset to the extent (and for the duration) that the relevant assets constitute Excluded Assets, (b) other than to the extent required pursuant to any ABL Loan Document, seek any landlord waiver, estoppel, warehouseman waiver or other collateral access or similar letter or agreement, (c) perfect a security interest in vehicles and any other assets subject to a certificate of title and letter of credit rights to the extent not perfected by the filing of a UCC-1 financing statement, (d) no action shall be required in order to create or perfect a security interest in any asset located outside of the United States (including with respect to

104

**DEBTORS' EXHIBIT NO. 67**
**Page 119 of 180**

intellectual property and equity interests, and delivery of any stock certificates of any Foreign Subsidiaries, other than the stock certificates of Foreign Subsidiaries required to be pledged hereunder that are (i) held by the Collateral Agent prior to the 2021 Refinancing Agreement Effective Date and (ii) representing the Equity Interests of any material first-tier Wholly-owned Foreign Subsidiary (other than any direct or indirect Subsidiary of an Excluded Subsidiary) acquired or formed after the 2021 Refinancing Agreement Effective Date); it being understood and agreed that no foreign law pledge and/or security agreements shall be required and (e) except with respect to any Mortgages over any Material Owned Property, no Loan Party shall be required to perfect a security interest in any Collateral other than perfection by (i) filing of a UCC financing statement (except with respect to any Chattel Paper with a value equal to or greater $2,500,000), (ii) filings in U.S. government offices with respect to registered intellectual property (and applications related thereto) or (iii) delivery to the Collateral Agent of certificated equity interests and notes and other evidence of indebtedness, in each case, accompanied by transfer powers or indorsements, as applicable, executed in blank and to the extent otherwise required to be pledged hereunder (provided, that notes and other evidence of immaterial indebtedness that are immaterial (as reasonably determined by the Borrower) shall not be required to be delivered); provided, however, that notwithstanding anything to the contrary contained in this clause (iii), any Foreign Subsidiary that becomes a Loan Party pursuant to Section 2.16 or Section 7.03(m) or is required to become a Loan Party in connection with the incurrence of any Indebtedness permitted pursuant to Section 7.03(o) shall be required to perfect security interests in, and take other actions with respect to, any of its assets constituting Collateral outside of the United States in accordance with the guarantee and security principles and collateral sharing arrangements that are to be set forth Schedule 6.11; and

(iv)     the Administrative Agent may grant extensions of time for the perfection of security interests in or the obtaining of title insurance and surveys with respect to particular assets (including extensions beyond the time as set forth therein for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in its discretion, that perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

Section 6.12     Further Assurances.  Promptly upon request by the Administrative Agent, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, Mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as the Administrative Agent or Collateral Agent, may reasonably require from time to time in order to (x) to the fullest extent permitted by applicable Law, subject any Loan Party's properties, assets, rights or interests that constitute Collateral to the Liens now or hereafter intended to be covered by any of the Collateral Documents and (y) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder (subject to Liens permitted by Section 7.01) and cause each of its Restricted Subsidiaries to do so, but in each case, subject to the limitations set forth herein and in the other Loan Documents.

Section 6.13     Taxes.  Pay and discharge, and will cause each of the Restricted Subsidiaries to pay and discharge, all Taxes, imposed upon it or upon its income or profits, or upon any properties belonging to it, in each case on a timely basis, which, if unpaid when due and payable, may reasonably be expected to become a tax Lien upon any properties of Parent or any of its Restricted Subsidiaries not otherwise permitted under this Agreement; provided that none of Parent or any of its Restricted Subsidiaries shall be required to pay any such Tax, with respect to amounts which are being contested in

105

FBG_CH1_00097995

good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP.

Section 6.14    Ratings.  Use commercially reasonable efforts to maintain at all times (a) public corporate family ratings with respect to the Borrower from Moody's and public corporate credit ratings with respect to the Borrower from S&P and (b) public facility ratings with respect to the Credit Facilities from each of S&P and Moody's (but, in each case, not any specific ratings).

Section 6.15    Use of Proceeds.  The Borrower is requesting the making of the Term Loans on the Closing Date to satisfy, in part, the Borrower's obligations under the Fram Purchase Agreement and pay other Transaction Expenses.  The proceeds of the 2021 Term Loans shall be applied by the Borrower on the 2021 Refinancing Agreement Effective Date to consummate the 2021 Refinancing Agreement Transactions.  Following the 2021 Refinancing Agreement Effective Date, the proceeds of the Term Loans may be applied by the Borrower to other permitted transactions, to finance the working capital needs of Parent and its Subsidiaries and for general corporate purposes.  The proceeds of the Incremental Term Loans shall be applied by the Borrower for use as agreed by the Borrower and the lenders providing such Incremental Term Loans to the extent not otherwise prohibited under the Loan Documents.

Section 6.16    Lien Enhancements.  If any holder of the ABL Loans or the First Lien Loans or any agent thereof receives any guaranty from any Person (other than the Borrower to the extent its guarantee is limited to the cash management and hedging obligations of the Parent and its Subsidiaries and such obligations are permitted to be secured under the ABL Credit Agreement or First Lien Credit Agreement, in each case as in effect on the date hereof, as applicable), or is granted additional collateral to secure such ABL Loans or First Lien Loans after the Closing Date, the Loan Parties shall cause the same to be granted to the Collateral Agent for the benefit of the Secured Parties, to the extent required by the ABL Intercreditor Agreement or the First Lien/Second Lien Intercreditor Agreement.

## ARTICLE VII

## NEGATIVE COVENANTS

(i) Until the Termination Date, in the case of each provision of this ARTICLE VII, the Borrower shall not, nor shall it permit any of the other Restricted Subsidiaries to, directly or indirectly:

Section 7.01    Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens pursuant to any Loan Document;

(b)    Liens existing on the 2021 Refinancing Agreement Effective Date and listed on Schedule 7.01(b);

(c)    Liens for Taxes (i) not yet due and payable or (ii) which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)    statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, suppliers, construction contractors or other like Liens arising in the ordinary course of business which secure amounts (i) which are not yet overdue, (ii) which are overdue and which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate

106

CONFIDENTIAL

reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP or (iii) the failure to make payment of which could not reasonably be expected to have a Material Adverse Effect;

(e)     (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation (including obligations in respect of letters of credit or bank guarantees in respect thereof), (ii) pledges and deposits in the ordinary course of business securing (A) liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to the Borrower or any of the other Restricted Subsidiaries or (B) leases or licenses of property otherwise permitted by this Agreement (and, in each case, obligations in respect of letters of credit or bank guarantees in respect thereof) and (iii) pledges and deposits securing any settlement of litigation;

(f)     Liens to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business (and, in each case, obligations in respect of indemnities, letters of credit or bank guarantees in respect thereof);

(g)     easements, rights-of-way, covenants, conditions, restrictions, encroachments, and other survey defects, protrusions and other similar encumbrances and minor title defects, or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions and declarations affecting real property or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness, and which do not in any case or in the aggregate materially and adversely interfere with the ordinary conduct of business of the applicable Person on the affected real property;

(h)     Liens securing Indebtedness permitted under Section 7.03(c); provided that (i) such Liens attach concurrently with or within one hundred and eighty (180) days after the acquisition, construction, repair, replacement or improvement (as applicable) of the property subject to such Liens, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds and the products thereof and customary security deposits and (iii) the Indebtedness secured thereby does not exceed the cost of the property being acquired on the date of acquisition plus the amount of any related interest, premiums, fees and/or expenses and/or other customary amounts; it being understood and agreed that individual financings by any lender may be cross-collateralized to other financings provided by such lender or its affiliates;

(i)     Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary, in each case after the Closing Date and pursuant to an Acquisition permitted hereby; provided that (i) such Lien was not created in contemplation of such acquisition or such Person becoming a Subsidiary, (ii) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder), and (iii) the Indebtedness secured thereby is permitted under Section 7.03;

(j)     (i) Liens securing obligations of the type described in Section 7.03(i) and (ii) bankers' Liens and similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower and/or any other Restricted Subsidiary granted in

107

CONFIDENTIAL

the ordinary course of business in favor of the bank or banks with which such accounts are maintained and securing amounts owing to such bank or banks in respect of cash management and/or operating account arrangements, including those involving pooled and netting arrangements;

(k)    Liens arising from precautionary Uniform Commercial Code financing statement filings;

(l)    Liens securing Indebtedness incurred in reliance on Section 7.03(n), subject to the Required Additional Debt Terms;

(m)    the modification, replacement, renewal or extension of any Lien permitted by clause (b)   or (h) of this Section 7.01; provided that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property encumbered by such Lien or financed by Indebtedness permitted under Section 7.03, (B) additions and accessions thereto and (C) proceeds and products thereof; and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens, if such obligations are Indebtedness, is permitted pursuant to Section 7.03;

(n)    (i) leases, non-exclusive licenses, subleases or non-exclusive sublicenses granted to other Persons in the ordinary course of business which do not (x) interfere in any material respect with the business of the Borrower or any of the other Restricted Subsidiaries (taken as a whole) or (y) secure any Indebtedness and (ii) the rights reserved or vested in any Person by the terms of any lease, license, franchise, grant or permit held by the Borrower or any of their respective Restricted Subsidiaries or by a statutory provision to terminate any such lease, license, franchise, grant or permit or to require periodic payments as a condition to the continuance thereof;

(o)    Liens securing Indebtedness permitted to be assumed or incurred, as applicable, pursuant to Section 7.03(m) and (s) so long as the applicable conditions described in the definition of "Incremental Equivalent Debt" or Section 7.03(s), as the case may be, have been satisfied;

(p)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(q)    Liens on (i) incurred premiums, dividends and rebates which may become payable under insurance policies and loss payments which reduce the incurred premiums on such insurance policies, (ii) on insurance policies and the proceeds thereof securing the financing of premiums with respect thereto and (iii) rights which may arise under State insurance guarantee funds relating to any such insurance policy, in each case securing Indebtedness permitted to be incurred pursuant to Section 7.03;

(r)    subject to the First Lien/Second Lien Intercreditor Agreement, Liens on the Collateral securing Indebtedness permitted under Section 7.03(r);

(s)    Liens securing judgments and awards for the payment of money not constituting an Event of Default under Section 9.01(h);

(t)    Liens securing any Specified Term Refinancing Debt or Refinancing Facility permitted hereunder;

108

CONFIDENTIAL

FBG_CH1_00097998

(u)    Liens not otherwise permitted by this Section 7.01 so long as the aggregate outstanding principal amount of the obligations secured thereby (together with the then outstanding principal amount of obligations secured by all other Liens incurred pursuant to this clause (u)) does not exceed the greater of (x) $187,500,000 and (y) 31.0% of Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) in the aggregate at any time; provided that any such Liens securing Indebtedness for borrowed money on assets constituting Collateral shall be secured on a junior basis to the Liens securing the Credit Facilities on the Closing Date and shall be subject to an intercreditor agreement reasonably acceptable to the Administrative Agent;

(v)    Liens consisting of any (i) interest or title of a lessor or sub-lessor (or such lessor or sub-lessor's mortgagee or lender) under any lease of real estate permitted hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject, (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii) or (v) deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any other Restricted Subsidiary in the ordinary course of business of the Borrower or such Restricted Subsidiary to secure the performance of the Borrower's or such Restricted Subsidiary's obligations under the terms of the lease for such premises;

(w)    Liens solely on any cash earnest money deposits made by the Borrower and/or any of the other Restricted Subsidiaries in connection with any letter of intent or purchase agreement with respect to any Investment permitted hereunder;

(x)    Liens securing Indebtedness permitted pursuant to Section 7.03(y); provided that (i) no such Lien extends to any asset not covered by the Lien securing the Indebtedness that is refinanced other than (A) after acquired property that is affixed or incorporated into the property encumbered by such Lien or financed by Indebtedness permitted under Section 7.03, (B) additions and accessions thereto and (C) proceeds and products thereof and (ii) if the Indebtedness being refinanced was subject to intercreditor arrangements, then any Refinancing Indebtedness in respect thereof shall be subject to intercreditor arrangements not materially less favorable, taken as a whole, than the intercreditor arrangements governing the Indebtedness that is refinanced or the intercreditor arrangements governing the relevant Refinancing Indebtedness shall be otherwise reasonably acceptable to the Administrative Agent;

(y)    Liens arising out of Sale Leaseback Transactions permitted pursuant to Section 7.05(n);

(z)    Subject to the terms of the ABL Intercreditor Agreement, Liens securing the ABL Loans and other ABL Obligations;

(aa)    Liens disclosed in any Mortgage Policy delivered pursuant to the terms hereof with respect to any Material Owned Property and any replacement, extension or renewal of any such Lien; provided that no such replacement, extension or renewal Lien shall cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal (and additions thereto, improvements thereon and the proceeds thereof);

109

CONFIDENTIAL

FBG_CH1_00097999

(bb)     Liens on securities that are the subject of repurchase agreements constituting Investments permitted under Section 7.02 arising out of the relevant repurchase transaction;

(cc)     Liens securing obligations in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments permitted under Section 7.03;

(dd)     Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the ordinary course of business and permitted by this Agreement or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction);

(ee)     Liens (i) in favor of any Loan Party and/or (ii) granted by any non-Loan Party in favor of any Restricted Subsidiary that is not a Loan Party, in the case of each of clauses (i) and (ii), securing intercompany Indebtedness permitted under Section 7.03;

(ff)     Liens on specific items of inventory or other goods and the proceeds thereof securing the relevant Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(gg)     Liens securing obligations under Swap Contracts in connection with any derivative transaction of the type permitted under Section 7.03(d);

(hh)     (i) Liens on Equity Interests of joint ventures securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Wholly- owned Subsidiaries;

(ii)     Liens on cash or Cash Equivalents arising in connection with the defeasance, discharge or redemption of Indebtedness;

(jj)     Liens that are customary rights of setoff (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions in the ordinary course of business and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any other Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business, (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any other Restricted Subsidiary in the ordinary course of business or (iv) relating to credit card processing arrangements entered into in the ordinary course of business;

(kk)     Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the Uniform Commercial Code in effect in the relevant jurisdiction covering only the items being collected upon;

(ll)     Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.02 to be applied against the purchase price for such Investment or (ii) consisting of an agreement to dispose of any property in a Disposition permitted under Section 7.04, in each case, solely to the extent such Investment or Disposition, as applicable, would have been permitted on the date of the creation of such Lien;

(mm)     Liens arising as a result of any Permitted Non-Recourse Factoring Transaction; provided that such Liens encumber solely the Accounts and the Related Assets sold in connection with such Permitted Non-Recourse Factoring Transaction; and

110

CONFIDENTIAL

FBG_CH1_00098000

(nn)     Liens arising as a result of any Permitted Inventory Financing; provided that such Liens encumber solely the inventory and the Related Assets sold in connection with such Permitted Inventory Financing.

Section 7.02____ Investments.  Make any Investments (directly or indirectly), except:

(a)     Investments by the Borrower or any of the other Restricted Subsidiaries in cash or Cash Equivalents at the time of the relevant Investment;

(b)     loans and advances to Representatives in the ordinary course of the business of Parent or any of its Restricted Subsidiaries (i) in an aggregate principal amount, together with the then-outstanding principal amount of all other loans and advances made pursuant to this clause (b)(i), not to exceed the greater of $37,500,000 and 6.0% of Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable), or (ii) in connection with the relevant Person's purchase of Equity Interests of Parent or any other Parent Company so long as the proceeds of such loans and/or advances are substantially contemporaneously contributed to the Borrower as consideration for the purchase of such Equity Interests;

(c)     Investments (i) by any Loan Party in any other Loan Party, (ii) by any Restricted Subsidiary that is not a Loan Party in any Loan Party, (iii) by any Restricted Subsidiary that is not a Loan Party in any other Restricted Subsidiary that is also not a Loan Party and (iv) by any Loan Party in any Restricted Subsidiary that is not a Loan Party in an aggregate outstanding amount, together with all Investments pursuant to this clause (c)(iv), and the total consideration for all Permitted Acquisitions pursuant to clause (c)(A) of the definition thereof, not to exceed the greater of $187,500,000 and 31.0% of Consolidated Adjusted EBITDA of the Borrower and its Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable);

(d)     Investments consisting of (or resulting from) Liens, Indebtedness, fundamental changes, Dispositions, Restricted Payments and/or Restricted Debt Payments permitted or not restricted under Section 7.01 (other than Section 7.01(bb)), Section 7.03 (other than Section 7.03(l) and (u)), Section 7.04 (other than Sections 7.04(a)(ii)(B), (c) and (d)), Section 7.05 (other than Section 7.05(d) and (e)), Section 7.06 (other than Section 7.06(a) and (c)(ix)) and Section 7.09 respectively;

(e)     Investments existing on the 2021 Refinancing Agreement Effective Date and listed on Schedule 7.02(e) or consisting of any modification, replacement, renewal, reinvestment or extension of any Investment existing on the 2021 Refinancing Agreement Effective Date; provided that the amount of any Investment permitted pursuant to this Section 7.02(e) shall not be increased from the amount of such Investment on the 2021 Refinancing Agreement Effective Date except pursuant to the terms of such Investment as of the 2021 Refinancing Agreement Effective Date or as otherwise permitted by this Section 7.02;

(f)     Investments in Swap Contracts permitted under Section 7.03;

(g)     promissory notes and other non-cash consideration (including, without limitation, net exercise and net withholding of equity and equity-based awards) received in connection with Dispositions permitted by Section 7.05;

111

(h)     Permitted Acquisitions;

(i)     loans and advances of payroll payments or other compensation to present or former Representatives of any Parent Company (to the extent such payments or other compensation relate to services actually provided to such Parent Company (but excluding the portion of any such amount, if any, attributable to the ownership or operations of any Subsidiary of any Parent Company other than the Borrower and/or its Subsidiaries)), the Borrower and/or any Subsidiary, in each case in the ordinary course of business;

(j)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business;

(k)     Investments (i) received (A) in satisfaction or partial satisfaction thereof from financially troubled suppliers and/or account debtors to the extent reasonably necessary in order to prevent or limit loss, (B) in connection with the bankruptcy or reorganization of any Person, (C) upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment and (D) as a result of the settlement, compromise, resolution of litigation, arbitration or other disputes, (ii) in the form of advances made to distributors, suppliers, licensors and licensees in the ordinary course of business or to the extent necessary to maintain the ordinary course of supplies to the Borrower and/or any Restricted Subsidiary, (iii) made in the ordinary course of business consisting of endorsements for collection or deposit and (iv) consisting of customary trade arrangements with customers in the ordinary course of business;

(l)     Investments consisting of the acquisition and/or retention by the Borrower of obligations of one or more current or former Representatives of the Borrower or any of the other Restricted Subsidiaries or any Parent Company in connection with any such Representative's acquisition of Equity Interests of the Borrower or any Parent Company, so long as no cash is paid by the Borrower or any of the other Restricted Subsidiaries to such officers or employees in connection with the acquisition of any such obligations; and

(m)     other Investments in an amount not to exceed, together with all Investments made pursuant to this clause (m), (i) the greater of (x) $187,500,000 and (y) 31.0% of Consolidated Adjusted EBITDA of the Borrower and its Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable), plus (ii) the portion of the Additional Amount Basket on the relevant date of determination that the Borrower elects to apply pursuant to this Section 7.02(m) so long as no Event of Default exists on such date or would result therefrom; provided that any such Investments made pursuant to this clause (m)(ii) funded using the Additional Amount Basket may only be made if at the time of the making of any such Investment, the Total Leverage Ratio, on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) after giving effect to such Restricted Payment, does not exceed 3.50:1.00;

(n)     Investments to the extent that payment therefor is made solely with Qualified Equity Interests of any Parent Company, in each case, to the extent not resulting in a Change of Control;

(o)     (i) Investments of any Restricted Subsidiary acquired after the Closing Date, or of any Person acquired by, or merged into or consolidated or amalgamated with, the Borrower or any other Restricted Subsidiary after the Closing Date, in each case as part of an Investment otherwise permitted by this Section 7.02 to the extent that such Investments were not made in contemplation of or

112

CONFIDENTIAL

in connection with the relevant Acquisition, merger, amalgamation or consolidation and were in existence on the date of the relevant Acquisition, merger, amalgamation or consolidation and (ii) any modification, replacement, renewal or extension of any Investment permitted under clause (i) of this Section 7.02(o) so long as no such modification, replacement, renewal or extension thereof increases the amount of such Investment except as otherwise permitted by this Section 7.02;

(p)     (i) Guarantee Obligations in respect of leases (other than Capital Leases) or of other obligations not constituting Indebtedness, in each case, in the ordinary course of business and (ii) Guarantee Obligations constituting Indebtedness to the extent permitted by Section 7.03;

(q)     Investments in any Parent Company in amounts and for purposes for which Restricted Payments to such Parent Company are permitted under Section 7.06; provided that any Investment made as provided above in lieu of any such Restricted Payment shall reduce availability under the applicable provision of Section 7.06;

(r)     Investments consisting of advances made to Trico Componentes, S.A. de C.V. in the ordinary course of business for payroll and other ordinary course expenses not to exceed $3,750,000 in any Fiscal Year, when taken together with the principal amount of all other Investments made pursuant to this clause (r) in such Fiscal Year;

(s)     Investments received in connection with the Disposition of assets permitted by Section 7.05;

(t)     Investments in the Borrower, any Subsidiary and/or any joint venture in connection with intercompany cash management arrangements and related activities consistent with past practice and in the ordinary course of business;

(u)     Investments consisting of the grant of non-exclusive licenses or sublicenses of Intellectual Property pursuant to joint marketing arrangements with other Persons in the ordinary course of business;

(v)     Investments in an unlimited amount so long as, (i) on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) after giving effect to such Investments, the Total Leverage Ratio shall not exceed 2.75:1.00 and (ii) no Event of Default shall have occurred or be continuing; and

(w)     the Transactions and Investments made to effect the Transactions.

Notwithstanding the foregoing, in no event shall any Loan Party make any Investment of any Intellectual Property in (or otherwise Dispose any Intellectual Property to) any Subsidiary of Parent that is not a Loan Party, except for any Investment or Disposition of any Intellectual Property that, in the reasonable business judgment of the Borrower, (x) is immaterial to, or no longer used in or necessary for, the conduct of the business of any Loan Party or (y) is required by any applicable Law to be owned by a non-Loan Party in order for such non-Loan Party to engage in the business conducted by it on the Closing Date (or any business substantially related, similar, ancillary or complementary thereto or a reasonable extension thereof).

Section 7.03     Indebtedness. Create, incur, assume or suffer to exist any Indebtedness, except the following, without duplication:

113

(a)     Indebtedness of the Borrower and the other Loan Parties under (i) the Loan Documents, (ii) any Incremental Term Facilities, (iii) any Specified Term Refinancing Debt and/or (iv) Refinancing Facilities;

(b)     Indebtedness of the Borrower or any Subsidiary Guarantor incurred in respect of any ABL Facility in an aggregate principal amount that does not exceed the "ABL Priority Cap" (as defined in the ABL Intercreditor Agreement); provided that such Indebtedness is secured only by Liens permitted under Section 7.01(z);

(c)     Indebtedness with respect to Capital Lease Obligations and purchase money Indebtedness not to exceed, together with the principal amount of all other Indebtedness then outstanding pursuant to this clause (c), the greater of (x) $150,000,000 and (y) 25.0% of Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable);

(d)     Indebtedness in respect of Swap Contracts designed to hedge against interest rates, foreign exchange rates or commodities pricing risks and not entered into for speculative purposes;

(e)     Indebtedness (but not for borrowed money) in respect of Permitted Non-Recourse Factoring Transactions (i) with respect to Accounts owing from Persons that are not Specified Customers, in an aggregate outstanding amount not to exceed $62,500,000 and (ii) with respect to Accounts owing from Persons that are Specified Customers;

(f)     Indebtedness incurred by any Loan Party or any Restricted Subsidiary of any Loan Party in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits, salary, wages or other compensation or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; provided that any reimbursement obligations in respect thereof are reimbursed within 30 Business Days following the incurrence thereof;

(g)     (A) contingent liabilities in respect of any indemnification, adjustment of purchase price, earn-out, non-compete, consulting, deferred compensation and similar obligations of one or more of the Borrower or the other Restricted Subsidiaries incurred in the ordinary course of business or in connection with Acquisitions and Dispositions permitted hereby and (B) letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments issued in support of such liabilities;

(h)     reimbursement, indemnification or similar obligations (including any arising by right of subrogation) of one or more of the Borrower or the other Restricted Subsidiaries in respect of performance, payment, surety, customs, stay, return of money or appeal bonds, performance and completion guaranties or similar instruments, in each case incurred in the ordinary course of business, for the benefit of one or more of the Borrower or the other Restricted Subsidiaries;

(i)     Indebtedness in the ordinary course of business (i) arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds and/or (ii) in respect of commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and

114

FBG_CH1_00098004

interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with cash management and deposit accounts, including supplier finance or similar programs;

(j)     Indebtedness owed to any Person incurred to finance the premiums with respect to any insurance policy of any Parent Company, or Parent or its Restricted Subsidiaries in the ordinary course of business;

(k)     Indebtedness (but not for borrowed money) in respect of Permitted Inventory Financing in an aggregate outstanding amount not to exceed $125,000,000;

(l)     Indebtedness of (i) any Loan Party to any other Loan Party, (ii) any Non-Loan Party Subsidiary to any Non-Loan Party Subsidiary, (iii) any Loan Party to any Non-Loan Party Subsidiary; provided that any such Indebtedness pursuant to this clause (l)(iii) shall be unsecured and expressly subordinated in right of payment to the Obligations and the ABL Obligations, in each case, on terms reasonably satisfactory to the Administrative Agent or (iv) any Non-Loan Party Subsidiary to any Loan Party; provided that any such Indebtedness pursuant to this clause (l)(iv) shall (x) not exceed the amount of Investments otherwise permitted under Section 7.02 and (y) be evidenced by a promissory note in form and substance reasonably satisfactory to the Administrative Agent which shall have been pledged to the extent required by the Security Agreement;

(m)     Incremental Equivalent Debt;

(n)     additional Indebtedness of any Loan Party in an amount not to exceed the aggregate principal amount of the Ratio Debt Basket at such time, subject to the Required Additional Debt Terms;

(o)     Indebtedness incurred by Restricted Subsidiaries that are not Loan Parties in an aggregate outstanding principal amount not to exceed, together with the principal amount of all other Indebtedness then outstanding pursuant to this clause (o), the greater of (i) $187,500,000 and (ii) 31.0% of Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries computed on a Pro Forma Basis determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable;

(p)     additional Indebtedness in an aggregate outstanding principal amount not to exceed, together with the principal amount of all other Indebtedness then outstanding pursuant to this clause (p), the greater of (i) $187,500,000 and (ii) 31.0% of Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable);

(q)     Indebtedness consisting of promissory notes issued by the Borrower and the other Restricted Subsidiaries to current or former Representatives of any Parent Company or Parent or any of its Subsidiaries (or any Immediate Family Member who is a successor-in-interest to the relevant Representative) to finance the purchase or redemption of Equity Interests permitted by Section 7.06;

(r)     Indebtedness incurred pursuant to the First Lien Credit Agreement in an amount not to exceed the "Maximum First Priority Obligations Amount" (as defined in the First Lien/Second Lien Intercreditor Agreement);

115

CONFIDENTIAL

FBG_CH1_00098005

**DEBTORS' EXHIBIT NO. 67**
**Page 130 of 180**

(s)     Indebtedness of any Loan Party incurred to finance, or assumed in connection with, any Acquisition permitted hereunder after the Closing Date that is secured by a Lien on the Collateral that is senior, pari passu or junior to the Lien securing the Credit Facilities on the Closing Date or is unsecured; provided that after giving effect to such Acquisition as of the last day of the most recently ended Test Period for which financial statements have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable, prior to the date of incurrence thereof, the Borrower could incur $1.00 of additional senior, pari passu, junior or unsecured Indebtedness (as applicable) permitted by clause (n) of this Section (it being understood that if the proceeds of the relevant Indebtedness will be applied to finance a Limited Condition Acquisition and the Borrower has made an LCA Election, availability under clause (n) of this Section shall be determined as of the LCA Test Date in respect of such Limited Condition Acquisition (and determined on the basis of the financial statements for then-most recently ended Test Period on or prior to such LCA Test Date for which financial statements have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable)), and provided further, that (i) other than with respect to any Indebtedness assumed by any Loan Party in connection with such Acquisition, the Required Additional Debt Terms shall have been satisfied and (ii) with respect to any assumed Indebtedness, (x) such Indebtedness (A) was not incurred in contemplation of such Acquisition, (B) is secured only by the assets acquired in the applicable Acquisition (including any acquired Equity Interests) and products and proceeds thereof, accessions or additions thereto and improvements thereon and (C) the only obligors with respect to any such assumed Indebtedness shall be those Persons who were obligors of such Indebtedness prior to such Acquisition and (y) both immediately prior and after giving effect to the incurrence of such Indebtedness, no Event of Default shall exist or result therefrom (it being understood that if the proceeds of the relevant Indebtedness will be applied to finance a Limited Condition Acquisition and the Borrower has made an LCA Election, (i) no Event of Default shall exist or would result therefrom as of the LCA Test Date for such Limited Condition Acquisition and (ii) no Event of Default pursuant to Section 9.01(a), (f) or (g) shall exist and be continuing as of the date of consummation of the Limited Condition Acquisition).

(t)     Indebtedness of the Borrower and/or any other Restricted Subsidiary (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts or other similar obligations incurred in the ordinary course of business and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(u)     Guarantee Obligations by the Borrower and/or any other Restricted Subsidiary of Indebtedness or other payment obligations of the Borrower and/or any other Restricted Subsidiary with respect to Indebtedness otherwise permitted to be incurred pursuant to this Section 7.03 or other payment obligations not prohibited by this Agreement; provided that in the case of any Guarantee Obligation by any Loan Party of the payment obligations of any non-Loan Party, the related Investment is permitted under Section 7.02 (other than Section 7.02(d));

(v)     Indebtedness of the Borrower and/or any other Restricted Subsidiary existing, or pursuant to commitments existing, on the 2021 Refinancing Agreement Effective Date and described on Schedule 7.03(v);

(w)     [reserved];

(x)     Indebtedness of the Borrower and/or any other Restricted Subsidiary consisting of (i) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and/or (ii) liabilities in respect of customer deposits and advance payments received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business;

116

CONFIDENTIAL

(y)      the Borrower and the other Restricted Subsidiaries may become and remain liable for any Indebtedness refinancing, refunding or replacing any Indebtedness permitted under clauses (a)(iv), (b), (c), (d), (e), (m), (n), (p), (r), (s), (v) and (z) of this Section 7.03 ("Refinancing Indebtedness") and any subsequent Refinancing Indebtedness in respect thereof; provided that

(i)      the principal amount of such Indebtedness does not exceed the principal amount of the Indebtedness being refinanced, refunded or replaced, except by (A) an amount equal to unpaid accrued interest and premiums (including tender premiums) thereon plus underwriting discounts, other reasonable and customary fees, commissions and expenses (including upfront fees, original issue discount or initial yield payments) incurred in connection with the relevant refinancing, refunding or replacement, (B) an amount equal to any existing commitments unutilized thereunder and (C) additional amounts permitted to be incurred pursuant to this Section 7.03 (provided that (1) such additional Indebtedness satisfies the other applicable requirements of this Section 7.03 (with additional amounts incurred in reliance on this clause (C) constituting a utilization of the relevant basket or exception pursuant to which such additional amount is permitted) and (2) if such additional Indebtedness is secured, the Lien securing such Indebtedness satisfies the applicable requirements of Section 7.01);

(ii)      other than in the case of Refinancing Indebtedness with respect to clauses (c) and (z) of this Section 7.03, (A) such Indebtedness has a final scheduled maturity on or later than (and, in the case of revolving Indebtedness, does not require mandatory commitment reductions, if any, prior to) the final maturity of the Indebtedness being refinanced, refunded or replaced and (B) other than with respect to revolving Indebtedness, a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being refinanced, refunded or replaced;

(iii)      the covenants, events of default, and other terms of such Indebtedness (other than interest rate, payment premiums and redemptions or as otherwise provided in the other clauses of this clause (y)) shall be not materially more favorable (taken as a whole) to the lenders providing such Indebtedness than those applicable to the Indebtedness being refinanced, refunded or replaced (other than any covenants or any other provisions applicable only to periods after the Latest Maturity Date);

(iv)      in the case of Refinancing Indebtedness with respect to Indebtedness permitted or originally incurred under clauses (a)(iv), (b), (c), (e), (m), (n), (o), (p), (r) and (z) of this Section 7.03, the incurrence thereof shall be deemed to be incurred in reliance on the relevant clause noted above and not under this clause (y);

(v)      (A) to the extent secured, such Indebtedness (i) is secured only by Permitted Liens at the time of such refinancing, refunding or replacement (it being understood that secured Indebtedness may be refinanced with unsecured Indebtedness) and (ii) is not secured by any Lien which extends to any asset not covered by the Lien securing the Indebtedness that is refinanced, refunded or replaced, (B) if the Indebtedness being refinanced, refunded or replaced was originally contractually subordinated to the Obligations in right of payment (or the Liens securing such Indebtedness were originally contractually subordinated to the Liens on the Collateral securing the Secured Obligations), such Indebtedness is contractually subordinated to the Obligations in right of payment or the Liens securing such Indebtedness are subordinated to the Liens on the Collateral securing the Secured Obligations, as applicable, and shall otherwise be on terms not materially less favorable (as reasonably determined by the Borrower), taken as a whole and (C) if the Indebtedness being refinanced, refunded or replaced was originally unsecured, such Indebtedness shall be unsecured or contractually subordinated to the Liens on

117

CONFIDENTIAL

FBG_CH1_00098007

**DEBTORS' EXHIBIT NO. 67**
**Page 132 of 180**

the Collateral securing the Secured Obligations pursuant to an intercreditor agreement containing terms (taken as a whole) that are at least as favorable to the Secured Parties as the terms for the secured parties under the First Lien Facilities Documentation contained in the First Lien/Second Lien Intercreditor Agreement;

(vi)     such Indebtedness is incurred by the obligor or obligors in respect of the Indebtedness being refinanced, refunded or replaced, except to the extent otherwise permitted pursuant to Section 7.03;

(vii)     at the time such Indebtedness is incurred, no Default or Event of Default shall have occurred and be continuing;

(viii)     any Refinancing Indebtedness that replaces and/or refinances Indebtedness that is pari passu with the Term Loan Facility in right of payment and pari passu with the Lien on the Collateral securing the Term Loan Facility shall share ratably (but not on a greater than pro rata basis) in any mandatory prepayment of the Term Loan Facility unless the Borrower and the lenders in respect of such Refinancing Indebtedness elect lesser payments; and

(ix)     any Refinancing Indebtedness that replaces and/or refinances any Indebtedness that is secured on a junior basis to the Liens securing the Obligations, to the extent secured, shall be secured on a junior Lien basis to the Liens securing the Term Loan Facility and shall be secured by assets pursuant to one or more security agreements that is subject to the ABL Intercreditor Agreement and another intercreditor agreement containing terms (taken as a whole) that are at least as favorable to the Secured Parties as those contained in the junior lien intercreditor agreement in effect prior to the incurrence of such Refinancing Indebtedness.

(z)     Indebtedness of the Borrower and/or any other Restricted Subsidiary incurred in connection with Sale Leaseback Transactions permitted pursuant to Section 7.05(n)(ii);

(aa)     [reserved];

(bb)     Indebtedness of the Borrower and/or any other Restricted Subsidiary supported by any Letter of Credit (as defined in the ABL Credit Agreement) the face amount of which is at least equal to the principal (or equivalent) amount of such Indebtedness;

(cc)     without duplication of any other Indebtedness, all premiums (if any), interest (including post-petition interest and payment in kind interest), accretion or amortization of original issue discount, fees, expenses and charges with respect to Indebtedness of the Borrower and/or any other Restricted Subsidiary hereunder.

Section 7.04     Fundamental Changes.  Merge, dissolve, liquidate, consolidate or amalgamate with or into another Person, except that:

(a)     any Restricted Subsidiary may merge, dissolve, liquidate, consolidate or amalgamate with (i) the Borrower; provided that (A) the Borrower shall be the continuing or surviving Person or (B) if the Person formed by or surviving any such merger, consolidation or amalgamation is not the Borrower (any such Person, the "Successor Borrower"), (1) the Successor Borrower shall be an entity organized or existing under the law of the United States, any state thereof or the District of Columbia, (2) the Successor Borrower shall expressly assume the Obligations of the Borrower in a manner and pursuant to documentation reasonably satisfactory to the Administrative Agent, (3) no Default or Event of Default shall be continuing at the time of such merger, consolidation or amalgamation or shall result

118

CONFIDENTIAL

therefrom, (4) the Loan Parties shall execute and deliver such amendments, supplements and other modifications to the Collateral Documents other instruments and agreements in connection therewith as the Administrative Agent may reasonably request in order to perfect and protect the liens and security interests in the Collateral of the Successor Borrower, including a confirmation that its Guaranty shall apply to the Successor Borrower's Obligations under the Loan Documents, (5) if requested by the Administrative Agent, the Borrower shall be required to deliver a favorable opinion of counsel on such corporate and collateral matters as may be reasonably requested by the Administrative Agent, including that such merger or consolidation and such supplement to this Agreement, the Guaranty or any Collateral Document preserves the enforceability of this Agreement, the Guaranty and the Collateral Documents and the perfection of the Liens under the Collateral Documents and (6) the Administrative Agent shall have received at least 10 Business Days' (or such shorter period as the Administrative Agent may reasonably agree) prior written notice of the proposed merger, consolidation or amalgamation and, at least three (3) Business Days prior to the consummation of the relevant transaction, the Administrative Agent shall have received all information any Lender or any Agent may reasonably request to satisfy its "know your customer" and other similar requirements with respect to the proposed Successor Borrower; it being understood and agreed that if the foregoing conditions under clauses (1) through (6) are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement and the other Loan Documents, or (ii) any one or more other Restricted Subsidiaries; provided that when any Restricted Subsidiary that is a Loan Party is merging with another Restricted Subsidiary, (A) a Loan Party shall be the continuing or surviving Person or the continuing or surviving Person shall expressly assume the Guarantee Obligations of the relevant Loan Party in a manner reasonably satisfactory to the Administrative Agent or (B) the relevant transaction shall be treated as an Investment and comply with Section 7.02;

(b)      any Restricted Subsidiary that is not a Loan Party may merge, consolidate or amalgamate with or dissolve or liquidate into any other Restricted Subsidiary that is not a Loan Party;

(c)      any Restricted Subsidiary may dissolve or liquidate; provided that if in connection with any such dissolution or liquidation, the dissolving entity transfers its assets to another Person and the transferor in such a transaction is a Loan Party, then (i) the transferee must be or become a Loan Party or (ii) to the extent constituting an Investment, such Investment must be a permitted Investment in each applicable Restricted Subsidiary in accordance with Section 7.02 (other than Section 7.02(d));

(d)      the Borrower may merge, amalgamate or consolidate with or dissolve or liquidate into any other Person; provided that (A) the Borrower shall be the continuing or surviving Person or (B) if the Person formed by or surviving any such merger, consolidation or amalgamation is a Successor Borrower, (1) the Successor Borrower shall be an entity organized or existing under the law of the United States, any state thereof or the District of Columbia, (2) the Successor Borrower shall expressly assume the Obligations of the Borrower in a manner and pursuant to documentation reasonably satisfactory to the Administrative Agent, (3) no Default or Event of Default shall be continuing at the time of such merger, consolidation or amalgamation or shall result therefrom, (4) the Loan Parties shall execute and deliver such amendments, supplements and other modifications to the Collateral Documents other instruments and agreements in connection therewith as the Administrative Agent may reasonably request in order to perfect and protect the liens and security interests in the Collateral of the Successor Borrower, including a confirmation that its Guaranty shall apply to the Successor Borrower's Obligations under the Loan Documents, (5) if requested by the Administrative Agent, the Borrower shall be required to deliver a favorable opinion of counsel on such corporate and collateral matters as may be reasonably requested by the Administrative Agent, including that such merger or consolidation and such supplement to this Agreement, the Guaranty or any Collateral Document preserves the enforceability of this Agreement, the Guaranty and the Collateral Documents and the perfection of the Liens under the

119

FBG_CH1_00098009

**DEBTORS' EXHIBIT NO. 67**
**Page 134 of 180**

Collateral Documents and (6) the Administrative Agent shall have received at least 10 Business Days' (or such shorter period as the Administrative Agent may reasonably agree) prior written notice of the proposed merger, consolidation or amalgamation and, at least three (3) Business Days prior to the consummation of the relevant transaction, the Administrative Agent shall have received all information any Lender or any Agent may reasonably request to satisfy its "know your customer" and other similar requirements with respect to the proposed Successor Borrower; it being understood and agreed that if the foregoing conditions under clauses (1) through (6) are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement and the other Loan Documents;

(e)       so long as no Default or Event of Default exists or would result therefrom, a merger, dissolution, liquidation or consolidation, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05 (other than Section 7.05(e)), may be effected; and

(f)       mergers, dissolutions, liquidations and/or consolidations, the purpose of which is to effect the Transactions.

Notwithstanding the foregoing, nothing in this Section 7.04 shall permit the sale of all or substantially all of the assets (whether owned as of the Closing Date or thereafter acquired) of Parent, the Borrower and their Restricted Subsidiaries (taken as a whole).

Section 7.05     Dispositions.  Make any Disposition (directly or indirectly), except:

(a)       (i) Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, (ii) Dispositions of property no longer used or useful in the conduct of the business of the Borrower and the other Restricted Subsidiaries and (iii) Dispositions of property that is economically impracticable to maintain;

(b)       Dispositions of inventory, immaterial assets and immaterial Intellectual Property, in the ordinary course of business (including allowing any registrations or any applications for registration of any immaterial Intellectual Property to lapse or be abandoned in the ordinary course of business) and non-exclusive licensing of Intellectual Property in the ordinary course of business;

(c)       Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)       Dispositions of property to the Borrower or any of the other Restricted Subsidiaries; provided that if the transferor of such property is a Loan Party (i) the transferee thereof must be a Loan Party or (ii) if the relevant transaction constitutes an Investment, it is permitted under Section 7.02 and the transferee must pay fair market value (as reasonably determined by such Person);

(e)       Dispositions consisting of (or resulting from) Liens, Investments, fundamental changes, Restricted Payments and Restricted Debt Payments permitted (or not restricted) by Section 7.01 (other than Section 7.01(y)), Section 7.02 (other than Section 7.02(d)), Section 7.04 (other than Section 7.04(e)), Section 7.06 (other than Section 7.06(a)) and Section 7.09, respectively;

(f)       Dispositions of cash and Cash Equivalents;

(g)       Dispositions in connection with the unwinding of any Swap Contract pursuant to its terms;

120

FBG_CH1_00098010

(h)     Dispositions of assets; <u>provided</u> that

(i)     the purchase price paid to the Borrower or other Restricted Subsidiary for such asset shall be no less than the fair market value of such asset at the time of such sale,

(ii)     with respect to any Disposition having a fair market value in excess of $12,500,000, not less than 75% of the consideration for such disposition shall be paid in cash or Cash Equivalents; <u>provided</u> that for purposes of such 75% cash consideration requirement:

(A)     the amount of any Indebtedness or other liabilities (other than Indebtedness or other liabilities that are subordinated to the Obligations or that are owed to the Borrower or any other Restricted Subsidiary) of the Borrower or any other Restricted Subsidiary (as shown on such Person's most recent balance sheet or statement of financial position (or in the notes thereto)) that are assumed by the transferee of any such assets and for which the Borrower and/or the applicable other Restricted Subsidiary have been validly released by all relevant creditors in writing,

(B)     any securities received by the Borrower or any other Restricted Subsidiary from such transferee that are converted by such Person into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within one hundred and eighty (180) days following the closing of the applicable Disposition, and

(C)     any Designated Non-Cash Consideration received in respect of such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this <u>clause (h)</u> that is at that time outstanding, not in excess of the greater of (x) $75,000,000 and (y) 27.5% of Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to <u>Section 6.01(a)</u> or <u>(b)</u>, as applicable) shall be deemed to be cash,

(iii)     no Default or Event of Default has occurred and is continuing at the time of the execution of the definitive agreement with respect to such Disposition or would result therefrom, and

(iv)     such Disposition is subject to the provisions of <u>Section 2.05(b)(ii)</u>;

(i)     Dispositions of accounts receivable in connection with the collection or compromise thereof in the ordinary course of business (including sales to factors or other third parties);

(j)     leases, subleases, non-exclusive licenses or non-exclusive sublicenses of property in the ordinary course of business and which do not materially interfere with the business of the Borrower or any of the other Restricted Subsidiaries;

(k)     transfers of property subject to foreclosure, eminent domain, casualty or condemnation proceedings (including in lieu thereof) or any similar proceedings;

121

FBG_CH1_00098011

(l)     any surrender, waiver, settlement, compromise, modification or release of contractual rights in the ordinary course of business, or the settlement, release or surrender of tort or other claims of any kind;

(m)     Dispositions of (i) Accounts and Related Assets pursuant to any Permitted Non-Recourse Factoring Transaction and (ii) inventory and Related Assets pursuant to any Permitted Inventory Financing;

(n)     Sale Leaseback Transactions so long as (i) any resulting Capital Lease is permitted under Section 7.03 or (ii) in an aggregate amount not to exceed, together with the aggregate amount of all Sale Leaseback Transactions entered into pursuant to this clause (n)(ii), the greater of (x) $112,500,000 and (y) 19.0% of Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable);

(o)     Dispositions not otherwise permitted by this Section 7.05 in an aggregate amount not to exceed $31,250,000 in any Fiscal Year;

(p)     Dispositions made pursuant to deferred compensation arrangements in the ordinary course of business;

(q)     Dispositions of Equity Interests made in connection with the exercise or settlement of equity-based awards outstanding as of the Closing Date or hereafter granted under the terms of any equity or equity-based compensation plans, programs, agreements or arrangements of any Parent Company or Parent or any of its Restricted Subsidiaries;

(r)     Dispositions of Investments in joint ventures to the extent required by, or made pursuant to, buy/sell arrangements between joint venture or similar parties set forth in the relevant joint venture arrangements and/or similar binding arrangements;

(s)     (i) Dispositions and/or terminations of leases, subleases, licenses or sublicenses (including the provision of software under any open source license), which (A) do not materially interfere with the business of the Borrower and the other Restricted Subsidiaries or (B) relate to closed facilities or the discontinuation of any product line and (ii) expirations of options agreements in respect of real or personal property;

(t)     Dispositions of non-core assets acquired in connection with any Acquisition permitted hereunder, within ninety (90) days of the date of such Acquisition, are designated in writing to the Administrative Agent by the Borrower as being held for sale and not for the continued operation of the Borrower or any of the other Restricted Subsidiaries or any of their respective businesses; provided that no Default or Event of Default exists on the date on which the definitive agreement governing the relevant Disposition is executed; and

(u)     exchanges or swaps, including transactions covered by Section 1031 of the Code (or any comparable provision of any foreign jurisdiction), of property or assets so long as any such exchange or swap is made for fair value (as reasonably determined by the Borrower) for like property or assets; provided that upon the consummation of any such exchange or swap by any Loan Party, to the extent the property received does not constitute an Excluded Asset, the Administrative Agent has a perfected Lien with the same priority as the Lien held on the property so exchanged or swapped.

122

FBG_CH1_00098012

To the extent that any Collateral is disposed of as expressly permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and the Administrative Agent shall be authorized to take (and shall take) any actions deemed appropriate in order to effect the foregoing.

Notwithstanding the foregoing, (i) nothing in this Section 7.05 shall permit the sale of all or substantially all of the assets (whether owned as of the Closing Date or thereafter acquired) of Parent, the Borrower and their Restricted Subsidiaries (taken as a whole) and (ii) in no event shall any Loan Party Dispose of any Intellectual Property to any Subsidiary of Parent that is not a Loan Party, except for any Disposition of any Intellectual Property that, in the reasonable business judgment of the Borrower, (x) is immaterial to, or no longer used in or necessary for, the conduct of the business of any Loan Party or (y) is required by any applicable Law to be owned by a non-Loan Party in order for such non-Loan Party to engage in the business conducted by it on the Closing Date (or any business substantially related, similar, ancillary or complementary thereto or a reasonable extension thereof).

Section 7.06    Restricted Payments.   Make, directly or indirectly, any Restricted Payment, except:

(a)    to the extent constituting Restricted Payments, the Borrower and each of the other Restricted Subsidiaries may enter into and consummate transactions permitted or not restricted by any provision of Section 7.02 (other than Section 7.02(d) and (q)), Section 7.04, Section 7.05 (other than Section 7.05(e)) and/or Section 7.08 (other than Section 7.08(b) and (c));

(b)    any Restricted Subsidiary other than the Borrower may make Restricted Payments to the direct holders of its Equity Interests on a pro rata basis;

(c)    the payment of dividends or the payment of other distributions by Parent or any of its Restricted Subsidiaries to any Parent Company not to exceed amounts required for Parent or any other Parent Company to pay, in each case without duplication:

(i)    franchise taxes and other fees, taxes and expenses required to maintain their corporate existence;

(ii)    Tax Distributions; provided that upon the request of the Administrative Agent, the Borrower shall provide reasonable documentation supporting the basis of such Tax Distribution for distribution to the Lenders;

(iii)    (A) expenses relating to any Qualifying IPO, debt offering or Acquisition (whether or not successful) and (B) after the consummation of a Qualifying IPO, listing fees and other costs and expenses attributable to being a publicly traded company which are reasonable and customary;

(iv)    general corporate operating, overhead, administrative and legal costs and expenses incurred in the ordinary course of business;

(v)    reasonable   and   customary   indemnification   claims   made   by Representatives;

(vi)    audit, accounting and reporting expenses;

(vii)    insurance premiums;

123

CONFIDENTIAL

FBG_CH1_00098013

(viii)    customary salary, bonus, severance and other benefits payable to current or former Representatives of any Parent Company consistent with past practice; and

(ix)    consideration for any Investment permitted under Section 7.02 (other than Section 7.02(d)); provided that (A) any Restricted Payment under this clause (c)(ix) shall be made substantially concurrently with the consummation of the relevant Investment and (B) the relevant Parent Company shall, promptly following the consummation of such Investment, cause (x) all property acquired to be contributed to the Borrower or one or more of the other Restricted Subsidiaries or (y) the merger, consolidation or amalgamation of the Person formed or acquired into the Borrower or one or more of the other Restricted Subsidiaries, in either case, in order to consummate such Investment in compliance with the applicable requirements of Section 7.02 as if undertaken as a direct Investment by the Borrower or such other Restricted Subsidiary;

provided that any amount giving rise to a Restricted Payment made in reliance on Section 7.06(c)(i) through (viii) above shall be attributable to the relevant Parent Company's ownership of Parent and/or its Subsidiaries (and/or any of them);

(d)    (i) cash payments in lieu of issuing fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Equity Interests of the Borrower or any Parent Company, (ii) payments made or expected to be made in respect of withholding or similar taxes payable by any future, present or former Representatives of any Parent Company, Parent or any of its Restricted Subsidiaries (or any Immediate Family Member who is a successor-in-interest to the relevant Representative) and/or (iii) repurchases of Equity Interests in consideration of the payments described in clause (ii) above, including demand repurchases in connection with the exercise of stock options;

(e)    Restricted Payments in an amount not to exceed the Additional Amount Basket then in effect so long as no Event of Default is then continuing or would result therefrom; provided that such Restricted Payments pursuant to this clause (e) may only be made if at the time of the declaration of any such Restricted Payment funded with all or any portion of the Additional Amount Basket, the Total Leverage Ratio, on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) after giving effect to such Restricted Payment, does not exceed 3.25:1.00;

(f)    payments (including under any promissory note) to Parent for the purpose of (or for distribution by Parent to any other Parent Company to permit) the repurchase, redemption, retirement or other acquisition of Qualified Equity Interests held by current or former Representatives of such Person (including any Parent Company) or any of its Subsidiaries (or any Immediate Family Member who is a successor-in-interest to the relevant Representative); provided (i) that the aggregate cash consideration paid for all such redemptions and payments shall not exceed, in any Fiscal Year, (x) $18,750,000, plus (y) the net cash proceeds of any "key man" life insurance policies contributed to the Borrower, with any unused amounts in any Fiscal Year being carried over to the next two (2) succeeding (but no other) Fiscal Years and (ii) no Default or Event of Default is then continuing;

(g)    repurchases of Equity Interests deemed to occur upon exercise of stock options, warrants or other securities if such Equity Interests represent a portion of the exercise price or tax withholding obligation of such options, warrants or other securities;

(h)    the declaration and payment of dividends on the Person's Equity Interests (or a Restricted Payment to any Parent Company to fund a payment of dividends on such entity's Equity

124


**DEBTORS' EXHIBIT NO. 67**

Interests), following the first Qualifying IPO of such common stock after the Closing Date, of up to 6% per annum of the net cash proceeds received by (or, in the case of a Restricted Payment to a Parent Company, contributed to the capital of) the Borrower in or from any such Qualifying IPO; provided no Default or Event of Default is then continuing;

(i)     Restricted Payments the proceeds of which are applied to effect the Transactions;

(j)     Restricted Payments to Parent for the purpose of (or for distribution by Parent to any other Parent Company to permit) paying management fees in cash under the Management Agreement in an aggregate amount not to exceed $6,250,000 in any Fiscal Year; provided that no Default or Event of Default is then continuing;

(k)     Restricted Payments to (i) redeem, repurchase, retire or otherwise acquire any (A) Equity Interests ("Treasury Equity Interests") of the Borrower and/or any other Restricted Subsidiary or (B) Equity Interests of any Parent Company, in the case of each of clauses (A) and (B), in exchange for, or out of the proceeds of the substantially concurrent sale (other than to the Borrower and/or any other Restricted Subsidiary) of, Qualified Equity Interests of the Borrower or any Parent Company to the extent any such proceeds are contributed to the capital of the Borrower and/or any other Restricted Subsidiary in respect of Qualified Equity Interests ("Refunding Equity Interests") and (ii) declare and pay dividends on any Treasury Equity Interests out of the proceeds of the substantially concurrent sale (other than to the Borrower or any other Restricted Subsidiary) of any Refunding Equity Interests;

(l)     additional Restricted Payments in an aggregate amount not to exceed, together with all Restricted Payment made pursuant to this clause (l), the greater of (i) $112,500,000 and (ii) 19.0% of Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries on a Pro Forma Basis (and determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable); and

(m)     Restricted Payments in an unlimited amount so long as (i) on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) after giving effect to such Restricted Payments, the Total Leverage Ratio shall not exceed 2.25:1.00 and (ii) no Event of Default shall have occurred or be continuing.

Section 7.07    Change in Nature of Business.  Engage, directly or indirectly, in any line of business other than (i) those lines of business conducted by the Borrower and the Restricted Subsidiaries on the date hereof or (ii) any business substantially related, similar, ancillary or complementary thereto or a reasonable extension thereof or as otherwise consented to by the Administrative Agent.

Section 7.08    Transactions with Affiliates.  Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than:

(a)     transactions on terms, taken as a whole, substantially as favorable (or more favorable) to the Borrower or such Restricted Subsidiary as would be obtainable by the Borrower or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

125

(b)    loans and other transactions by and among Parent and/or one or more of its Restricted Subsidiaries to the extent expressly permitted or not restricted under this ARTICLE VII;

(c)    (i) Restricted Payments expressly permitted under Section 7.06 (other than Section 7.06(a)) and (ii) Investments expressly permitted by Section 7.02(b), (i), (l), (o), (q) and (s);

(d)    the Transactions;

(e)    issuances of Equity Interests (other than Disqualified Equity Interests);

(f)    (i) expense reimbursement and employment, severance and compensation arrangements entered into by Parent or any of its Restricted Subsidiaries with their respective Representatives in the ordinary course of business, (ii) transactions pursuant to any employee compensation, benefit plan, equity-based incentive plan or arrangement, any health, disability or similar insurance plan which covers current or former Representatives or any employment or consulting contract or arrangement and (iii) the payment of reasonable out-of-pocket costs and expenses related to registration rights and customary indemnities provided to shareholders under any shareholder agreement;

(g)    the payment of reasonable and customary fees to, and indemnities provided on behalf of, Representatives of the Borrower, any direct or indirect parent companies of Parent or any of its Restricted Subsidiaries (including any Parent Company) in the ordinary course of business;

(h)    [reserved];

(i)    Guarantees to the extent expressly permitted by Section 7.02 or Section 7.03;

(j)    transactions with customers, clients, suppliers, joint ventures, purchasers or sellers of goods or services or providers of employees or other labor entered into in the ordinary course of business, which are (i) fair from a financial perspective (taken as a whole) to the Borrower and/or the other applicable Restricted Subsidiary in the good faith determination of the board of directors (or similar governing body) of the Borrower or the senior management thereof or (ii) on terms at least as favorable as might reasonably be obtained in a comparable arm's-length transaction with a Person other than an Affiliate; and

(k)    any transaction in respect of which the Borrower delivers to the Administrative Agent a letter addressed to the board of directors (or equivalent governing body) of the Borrower from an accounting, appraisal or investment banking firm of nationally recognized standing stating that such transaction is on terms that are no less favorable to the Borrower or the other applicable Restricted Subsidiary than might be obtained at the time in a comparable arm's length transaction from a Person who is not an Affiliate.

Section 7.09    Prepayments and Modifications of Certain Indebtedness.

(a)    Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner or make any cash payment, in each case, of any Subordinated Indebtedness or any Indebtedness secured on a junior lien basis to the Liens securing the Obligations (which shall not include the ABL Loans) (any such debt, "Restricted Debt"), or in violation of any subordination terms of any such Subordinated Indebtedness (any such payment, a "Restricted Debt Payment"), other than:

(i)    regularly scheduled interest payments and payments of fees, expenses and indemnification obligations in respect of Restricted Debt, in each case when due and in

126

amounts not to exceed the amounts required to be paid with respect thereto under the documents governing such Restricted Debt as in effect on the Closing Date,

(ii)     refinancings, replacements or exchanges of such Indebtedness for Refinancing Indebtedness permitted by Section 7.03(y),

(iii)     payments with, or conversions to, Equity Interests (other than Disqualified Equity Interests),

(iv)     payments made such that a loan will not be classified, at the issue date or thereafter, as an applicable high yield discount obligation for purposes of Code Section 163(i),

(v)     other Restricted Debt Payments in an unlimited amount so long as (i) on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) after giving effect to such Restricted Debt Payments, the Total Leverage Ratio shall not exceed 2.25:1.00 and (ii) no Event of Default shall have occurred or be continuing,

(vi)     Restricted Debt Payments in an amount not to exceed the Additional Amount Basket then in effect so long as no Event of Default is then continuing or would result therefrom; provided that such Restricted Debt Payments pursuant to this clause (vi) may only be made if at the time of the declaration of any such Restricted Debt Payment funded with all or any portion of the Additional Amount Basket, the Total Leverage Ratio, on a Pro Forma Basis (determined on the basis of the financial statements for the most recently ended Test Period at or prior to such time which have been (or are required to have been) delivered pursuant to Section 6.01(a) or (b), as applicable) after giving effect to such Restricted Debt Payment, does not exceed 3.25:1.00,

(vii)     the Transactions, including the payment of Transaction Expenses; and

(viii)     mandatory prepayments of any junior secured Indebtedness made with Declined Proceeds (it being understood that any Declined Proceeds applied to make Restricted Debt Payments in reliance on this Section 7.09(a) shall not increase the amount available under clause (a)(ix) of the definition of "Additional Amount Basket" to the extent so applied).

(b)     Amend or otherwise modify the terms of the documentation governing any Restricted Debt in a manner materially adverse to the Lenders; provided that the foregoing limitation shall not otherwise prohibit debt refinancing or replacing or an exchange of Restricted Debt.

Section 7.10     Negative Pledge.   Enter into or suffer to exist, incur or permit any of the Restricted Subsidiaries to enter into or suffer to exist any agreement or other arrangement that prohibits:

(a)     the ability of Parent, the Borrower or any of the other Loan Parties to create, incur or permit to exist any Lien upon any of its property or assets to secure the Obligations;

(b)     the ability of any Restricted Subsidiary to make any Restricted Payments with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any of the other Loan Parties; or

CONFIDENTIAL

FBG_CH1_00098017

(c)   the ability of any Restricted Subsidiary to make loans or cash advances to the Borrower or any of the other Loan Parties;

provided, that the foregoing shall not apply to:

(i)   any restriction or encumbrance with respect to any asset of and/or Equity Interest in any Restricted Subsidiary imposed pursuant to an agreement which has been entered into for the sale or disposition of such assets or all or a portion of the Equity Interests or assets of such Restricted Subsidiary, so long as such sale or disposition is permitted under this Agreement;

(ii)   Contractual Obligations binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Restricted Subsidiary;

(iii)   customary provisions in joint venture agreements and other similar agreements applicable to joint ventures expressly permitted hereunder and applicable solely to the assets of and Equity Interests of and in such joint venture entered into in the ordinary course of business;

(iv)   restrictions imposed by any agreement relating to secured Indebtedness expressly permitted by this Agreement if such restrictions or conditions apply only to the Person obligated under such Indebtedness and its Subsidiaries or the property or assets intended to secure such Indebtedness;

(v)   any negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to the property financed by or the subject of or securing such Indebtedness or expressly permits Liens for the benefit of the Secured Parties with respect to the Credit Facilities established hereunder and the Obligations under the Loan Documents on a senior basis and without a requirement that such holders of such Indebtedness be secured by such Liens equally and ratably;

(vi)   restrictions on cash, other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(vii)   customary non-assignment provisions with respect to leases or licensing agreements or other agreements entered into by the Borrower or any of the other Restricted Subsidiaries, in each case entered into in the ordinary course of business;

(viii)   restrictions imposed by any agreement relating to Indebtedness permitted by Section 2.16, 2.17, and 7.03(a), (b), (m), (n), (o), (p), (r), (s) and (x) (with respect to the foregoing types of Indebtedness) if such restrictions or conditions apply only to the Person obligated under such Indebtedness and its Subsidiaries;

(ix)   restrictions set forth in any Loan Document, any Swap Contract and/or any agreement relating to any Cash Management Obligations (as defined in the First Lien Credit Agreement as in effect on the 2021 Refinancing Agreement Effective Date);

(x)   [reserved];

128

FBG_CH1_00098018

(xi)      restrictions arising under or as a result of applicable law, rule, regulation or order or the terms of any license, authorization, concession or permit; and

(xii)      other restrictions or encumbrances imposed by any amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing of the contracts, instruments or obligations referred to in the foregoing clauses of this Section 7.10; provided that no such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing is, in the good faith judgment of the Borrower, more restrictive with respect to such encumbrances and other restrictions, taken as a whole, than those in effect prior to the relevant amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

Section 7.11    Amendments to Organization Documents.    Without the consent of the Administrative Agent, amend, or permit any of the Restricted Subsidiaries that are Loan Parties to amend, its certificate of incorporation or bylaws or other Organization Documents in any manner materially adverse to the interests of the Lenders (as reasonably determined by the Borrower in good faith).

Section 7.12    Fiscal Year.  Make any change in the Fiscal Year of the Parent or any of its Restricted Subsidiaries; provided, that, Parent or the Borrower may, upon written notice to the Administrative Agent, change their Fiscal Year to another date, in which case the Borrower and the Administrative Agent will, and are hereby authorized to, make any adjustments to this Agreement that are necessary to reflect such change in Fiscal Year.

Section 7.13    Sanctions; Anti-Corruption Laws.  Use any part of any proceeds of the Loans or lend, contribute or other make available such proceeds: (i) in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage in violation of the FCPA or in any other manner that would constitute or give rise to a violation of any Anti-Corruption Law; or (ii) to fund or facilitate any activities or business of, with or involving any Sanctioned Person or in any other manner that would constitute or give rise to a violation of Sanctions by any Person, including any Lender.

Section 7.14    Anti-Layering.  Create, incur, assume, guarantee, suffer to exist or otherwise become liable for any Indebtedness (or any Refinancing Indebtedness thereof) that is secured by Liens upon any of its property, assets or revenues, whether now owned or hereafter acquired, which Liens is subordinated or junior in priority to any first priority lien securing any of the Borrower's or such other Restricted Subsidiary's obligations under any other Indebtedness, including any first priority Lien securing the First Lien Credit Agreement or any Refinancing Indebtedness thereof, and senior in priority to any Lien securing the Obligations.

**ARTICLE VIII**

**PARENT COVENANT**

Until the Termination Date, Parent shall not engage in any business or activity other than:

129

FBG_CH1_00098019

(a)      the ownership of all outstanding Equity Interests in the Borrower and, indirectly, its Subsidiaries and joint ventures; provided that Parent shall not own directly any Equity Interests other than those of Borrower,

(b)      maintaining its corporate existence,

(c)      participating in tax, accounting and other administrative activities of the consolidated group of companies, including the Loan Parties, including (i) filing tax reports and paying Taxes, including interest, additions to tax or penalties applicable thereto, and other customary obligations in the ordinary course (and contesting any Taxes), (ii) preparing reports to Governmental Authorities and to its shareholders and (iii) holding director and shareholder meetings, preparing organizational records and other organizational activities required to maintain its separate organizational structure or to comply with applicable requirements of law,

(d)      (i) the performance of obligations under the Loan Documents, the ABL Loan Documents, the First Lien Facility Documentation, the documents governing Incremental Term Loans, Extended Term Loans, Specified Term Refinancing Debt and Refinancing Facilities and Guarantees of Indebtedness permitted under Section 7.03 and/or obligations that do not constitute Indebtedness (including, guaranties of any lease obligations of any Loan Party or Subsidiary) and (ii) the creation of (A) Liens to secure Guarantees permitted under this clause (d) so long as the underlying Indebtedness is permitted to be secured on the same basis under Section 7.01 and (B) Liens of the types permitted under Section 7.01 (other than to secure debt for borrowed money),

(e)      the Transactions,

(f)      issuing its own Equity Interests (including, the making of any dividend or distribution on account of, or any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value of, any shares of any class of Equity Interests),

(g)      holding, distributing and/or lending (A) cash, Cash Equivalents and other assets received in connection with permitted distributions or dividends received from, or permitted Investments or permitted Dispositions made by, any of its Subsidiaries or permitted contributions to the capital of, or proceeds from the issuance of Equity Interests of, Parent pending the application thereof and (B) the proceeds of Indebtedness permitted by Section 7.03,

(h)      making payments of the type permitted under Section 7.06 and the performance of its obligations under any document, agreement and/or Investment contemplated by the Transactions or otherwise not prohibited under this Agreement,

(i)      complying with applicable requirements of law, and

(j)      activities incidental to the businesses or activities described in the foregoing clauses (a) through (i).

## ARTICLE IX

## EVENTS OF DEFAULT AND REMEDIES

Section 9.01      Events of Default.  Any of the following events referred to in any of clauses (a) through (m) inclusive of this Section 9.01 shall constitute an "Event of Default":

130

CONFIDENTIAL

FBG_CH1_00098020

(a)     Non-Payment.  Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)     Specific Covenants.  (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.03(a), Section 6.05(a) (with respect to the existence of the Parent and the Borrower), Section 6.15, ARTICLE VII or VIII, as applicable, or (ii) Parent fails to perform or observe any term, covenant or agreement contained in ARTICLE VIII; or

(c)     Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 9.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after the earlier of (i) Borrower's knowledge of such default and (ii) receipt by the Borrower of written notice thereof by the Administrative Agent; or

(d)     Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any certificate required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be incorrect or misleading (after giving effect to any qualification therein) in all respects when made or deemed made or

(e)     Cross-Default.   (i) Parent, the Borrower or any of the other Restricted Subsidiaries (A) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount in excess of $112,500,000, or (B) fails to observe or perform any other agreement or condition relating to any Indebtedness with an aggregate outstanding principal amount in excess of $112,500,000 (other than, with respect to Indebtedness consisting of obligations under Swap Contracts, termination events or equivalent events pursuant to the terms of the relevant Swap Contract which are not the result of any default thereunder by any Loan Party or any Restricted Subsidiary), in each case beyond the grace period, if any, provided therefor, the effect of which failure is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise) or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that clause (B) of this paragraph (e) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property securing such Indebtedness if such sale or transfer is permitted hereunder.

(f)     Insolvency Proceedings, Etc.  Parent, the Borrower or any of the other Restricted Subsidiaries (other than any Immaterial Subsidiary) institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes a general assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, interim receiver, receiver and manager, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor

131

DEBTORS' EXHIBIT NO. 67
Page 146 of 180

Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days; or

(g)     Inability to Pay Debts; Attachment.  (i) Parent, the Borrower or any of the other Restricted Subsidiaries (other than any Immaterial Subsidiary) becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process in respect of a claim in excess of $112,500,000 is issued or levied against all or any material part of the property of the Loan Parties, taken as a whole, and is not released, vacated, stayed or fully bonded within sixty (60) days after its issue or levy; or

(h)     Judgments.  There is entered against Parent, the Borrower or any of the other Restricted Subsidiaries a final judgment or order for the payment of money in an aggregate amount in excess of $112,500,000 (to the extent not effectively covered by insurance) and such judgment or order shall not have been paid, satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(i)     ERISA.  (i) an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect or (ii) Parent, the Borrower, any of the other Restricted Subsidiaries or ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect; or

(j)     Invalidity of Loan Documents.  Any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or the occurrence of the Termination Date, ceases to be in full force and effect (other than in accordance with its terms); or any Loan Party contests in writing in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of the occurrence of the Termination Date or as a result of the release of any Loan Party therefrom in accordance with its terms or the terms hereof), purports to revoke or rescind any Loan Document or asserts in writing that any Guarantee, Collateral Document or subordination provision in respect of any Indebtedness in excess (in the aggregate) of $112,500,000 is invalid or unenforceable; or

(k)     Change of Control.  There occurs any Change of Control; or

(l)     Liens.  Any Lien on Collateral created under any Collateral Document ceases to be perfected with the priority required by the Collateral Documents, the First Lien/Second Lien Intercreditor Agreement and the ABL Intercreditor Agreement with respect to a material portion of the Collateral (other than by reason of (i) any affirmative action of the Agents, the failure of the applicable Agent to maintain possession of any Collateral actually delivered to it or the failure of the applicable Agent to file any Uniform Commercial Code financing statement, (ii) a release of Collateral in accordance with the terms of any Loan Document or (iii) the occurrence of the Termination Date or the termination of any Collateral Document in accordance with the terms thereof); or

(m)     Indebtedness.  The Obligations shall cease to constitute third priority Indebtedness under the ABL Intercreditor Agreement with respect to the ABL Priority Collateral and second priority Indebtedness under the First Lien/Second Lien Intercreditor Agreement or, in any case, such intercreditor provisions shall be invalidated or otherwise cease to be legal, valid and binding obligations of the parties thereto, enforceable in accordance with their terms (other than by reason of (i) any affirmative action of the Agents, the failure of the applicable Agent to maintain possession of any

132

FBG_CH1_00098022

Collateral actually delivered to it or the failure of the applicable Agent to file any Uniform Commercial Code financing statement, (ii) a release of Collateral in accordance with the terms of any Loan Document or (iii) the occurrence of the Termination Date or the termination of any Collateral Document in accordance with the terms thereof).

Section 9.02    Remedies Upon Event of Default.    If any Event of Default occurs and is continuing, the Administrative Agent may and, at the request of the Required Lenders, shall take any or all of the following actions:

(a)    declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligations shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, which amount shall include the Applicable Term Loan Premium in effect on the date of such acceleration, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(c)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

provided that upon the occurrence of an Event of Default under Section 9.01(f), the obligation of each Lender to make Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable without further act of any Agent or any Lender.

Section 9.03    Application of Funds.    If the circumstances described in Section 2.12(g) have occurred, or after the exercise of remedies provided for in Section 9.02 (or after the Loans have automatically become immediately due and payable), including in any bankruptcy or insolvency proceeding, any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including any Attorney Costs payable under Section 11.04 and amounts payable under ARTICLE III) payable to each Agent in its capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including any Attorney Costs payable under Section 11.04 and amounts payable under ARTICLE III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest (including, but not limited to, post-petition interest), ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of Loans, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

Fifth, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective

133

CONFIDENTIAL

FBG_CH1_00098023

aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

Last, the balance, if any, after all of the Obligations have been paid in full in cash, to the Borrower or as otherwise required by Law.

## ARTICLE X

## ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 10.01   Appointment and Authorization of Agents.

(a)   Each Lender hereby irrevocably appoints and designates Jefferies to act on its behalf as the Administrative Agent and the Collateral Agent hereunder and under the other Loan Documents, and authorizes the Administrative Agent and the Collateral Agent to take such actions on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to each such Agent by the terms of this Agreement or any other Loan Document, together with such actions or powers as are reasonably incidental thereto.  The provisions of this ARTICLE X are solely for the benefit of the Agents and the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions.  Notwithstanding any provision to the contrary contained in this Agreement or in any other Loan Document, no Agent shall have any duties or responsibilities, except those expressly set forth herein, nor shall any Agent have or be deemed to have any fiduciary relationship with any Lender or Participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

Notwithstanding any provision contained in this Agreement providing for any action in an Agent's reasonable discretion or approval of any action or matter in an Agent's reasonable satisfaction, such Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Law.  No Agent shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, any other Loan Party or any of their respective Affiliates that is communicated to or obtained by the Person serving as such Agent or any other Agent-Related Person in any capacity.

No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any

134

CONFIDENTIAL

FBG_CH1_00098024

Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in ARTICLE IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

(b)     Jefferies shall also act as the Collateral Agent under the Loan Documents, and each of the Lenders (in its capacities as a Lender) hereby irrevocably appoints and authorizes Jefferies to act as the agent of (and to hold any security interest, charge or other Lien created by the Collateral Documents for and on behalf of or on trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Collateral Agent (and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to Section 10.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Collateral Agent), shall be entitled to the benefits of all provisions of this ARTICLE X (including Section 10.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

(c)     Each Lender and each other Secured Party (by acceptance of the benefits of the Collateral Documents) hereby acknowledges that it has received a copy of the ABL Intercreditor Agreement and the First Lien/Second Lien Intercreditor Agreement, agrees that it will be bound by and will take no actions contrary to the provisions of the ABL Intercreditor Agreement or the First Lien/Second Lien Intercreditor Agreement to the extent then in effect, and authorizes and instructs the Collateral Agent to enter into the ABL Intercreditor Agreement and the First Lien/Second Lien Intercreditor Agreement as Collateral Agent and on behalf of such Lender or Secured Party.

(d)

(i)     Each Lender hereby agrees that (i) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from or on behalf of the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.  A notice of the Administrative Agent to any Lender under this Section 10.01(d) shall be conclusive, absent manifest error.

135

CONFIDENTIAL

(ii)     Without limiting the immediately preceding clause (a), each Lender hereby further agrees that if it receives an Erroneous Payment from or on behalf of the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Erroneous Payment (an "Erroneous Payment Notice"), (y) that was not preceded or accompanied by an Erroneous Payment Notice, or (z) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), in each case, an error has been made (and that it is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment) with respect to such Erroneous Payment, and to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.  Each Lender agrees that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(iii)     Each Lender hereby agrees that, to the extent it fails to return any Erroneous Payment to the Administrative Agent pursuant to, and within the time periods required by, clauses (i) or (ii) above, the Administrative Agent (or its Affiliates) is authorized at any time and from time to time thereafter, to the fullest extent permitted by law, to set off and apply any and all deposits of such Lender (general or special, time or demand, provisional or final) at any time held by or on behalf of the Administrative Agent (or its Affiliate, including by branches and agencies of the Administrative Agent, wherever located) for the account of such Lender against any such amounts.

(iv)     The Borrower and each other Loan Party hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party.

(v)     Each party's obligations under this Section 10.01(d) shall survive the resignation or replacement of the Administrative Agent, the termination of the Commitments or the repayment, satisfaction or discharge of all (or any portion thereof) under any Loan Document.

Section 10.02   Delegation of Duties.  Each Agent may execute any and all of its duties and exercise its rights and powers under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all of its

136

CONFIDENTIAL

duties and exercise its rights and powers by or through their respective Affiliates and Representatives as shall be deemed necessary by such Agent or sub-agent, and shall be entitled to advice of counsel, both internal and external, and other consultants or experts concerning all matters pertaining to such duties. The exculpatory provisions of this ARTICLE X shall apply to any such sub-agent and to the Affiliates and Representatives of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Term Loan Facility as well as activities as Administrative Agent and Collateral Agent.  No Agent shall be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such agent, sub-agent or attorney-in-fact.

Section 10.03  Liability of Agents.  No Agent-Related Person shall (a) be liable to any Lender for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct, as determined by the final and nonappealable judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), (b) be responsible in any manner to any Lender or Participant for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, the existence, value or collectability of the Collateral, any failure to monitor or maintain any part of the Collateral, or the perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder or (c) be responsible for or have any duty to ascertain or inquire into the satisfaction of any condition set forth in ARTICLE IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.  No Agent-Related Person shall be under any obligation to any Lender or Participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.

Section 10.04  Reliance by Agents.

(a)  Each Agent shall be entitled to rely, shall be fully protected in relying and shall not incur any liability for relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, made or otherwise authenticated by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by such Agent.  Each Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

137

FBG_CH1_00098027

(b)     For purposes of determining compliance with the conditions specified in Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 10.05   Notice of Default.  No Agent shall be deemed to have knowledge or notice of the occurrence of any Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless such Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default and stating that such notice is a "notice of default".  Each Agent will promptly notify the Lenders of its receipt of any such notice.  Each Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with ARTICLE IX; provided that unless and until an Agent has received any such direction, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

Section 10.06   Credit Decision; Disclosure of Information by Agents.     Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession.  Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and the Restricted Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

Section 10.07   Indemnification of Agents.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities to the extent incurred by it; provided that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities to the extent resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final non-appealable judgment of a court of competent jurisdiction; provided that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 10.07.  In the case of any investigation, litigation or

138

FBG_CH1_00098028

proceeding giving rise to any Indemnified Liabilities, this Section 10.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse each Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrower; provided that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, if any. The undertakings in this Section 10.07 shall survive the Termination Date.

Section 10.08   Agents in their Individual Capacities. Each Agent and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though such Agent were not an Agent hereunder and without notice to or consent of the Lenders. The Lenders acknowledge that, pursuant to such activities, each Agent or its Affiliates may receive information regarding any Loan Party or any Affiliate of a Loan Party (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them. With respect to its Loans, each Agent shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not an Agent, and the terms "Lender" and "Lenders" include each such Agent in its individual capacity.

Section 10.09   Successor Agents. Each Agent may resign as an Agent upon thirty (30) days' notice to the Lenders and the Borrower. If an Agent resigns under this Agreement or any other Loan Document, the Required Lenders shall appoint a commercial bank or trust company with offices in the United States having combined capital and surplus in excess of $1,000,000,000 as successor agent for the Lenders, which appointment of a successor agent shall require the consent of the Borrower at all times other than during the existence of an Event of Default (which consent of the Borrower shall not be unreasonably withheld or delayed). If no successor agent is appointed prior to the effective date of the resignation of such Agent, such Agent may appoint, after consulting with the Lenders and, if no Event of Default has occurred and is continuing, procuring the consent of the Borrower (which consent of the Borrower shall not be unreasonably withheld or delayed), a successor agent satisfying the requirements set forth above from among the Lenders; provided that (i) nothing in this Section 10.09 shall require a Lender that has a legal, regulatory or other contractual restriction on its ability to assume the role of such Agent or any of the obligations thereof to assume such role or obligations and (ii) such appointment shall not be a condition to the effectiveness of such Agent's resignation. If an Agent becomes a Defaulting Lender or is or becomes an Affiliate of a Defaulting Lender, the Required Lenders or the Borrower may at their option appoint a successor agent satisfying the requirements set forth above to replace such Agent, and such successor agent shall be appointed from among the Lenders. Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Agent and the term "Agent" shall mean such successor agent, as the case may be, and the retiring Agent's appointment, powers and duties as the Agent shall be terminated. After the retiring Agent's resignation hereunder as an Agent, the provisions of this ARTICLE X and Section 11.04 and Section 11.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement. If no successor agent has accepted appointment by the date which is thirty (30) days following the retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of such Agent hereunder until such time, if any, as the Required Lenders appoint a

139

FBG_CH1_00098029

successor agent as provided for above. Lenders assuming the role of an Agent as specified in the immediately preceding sentence shall assume the rights and obligations of such Agent (including the indemnification provisions set forth in Section 10.07) as if each such Lender were such Agent; provided that nothing in this Section 10.09 shall require a Lender that has a legal, regulatory or other contractual restriction on its ability to assume the role of an Agent or any of the obligations thereof to assume such role or obligations. Upon the acceptance of any appointment as the Collateral Agent hereunder by a successor and, upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may reasonably request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents, the successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Collateral Agent, and the retiring Collateral Agent shall be discharged from its duties and obligations under the Loan Documents. Notwithstanding anything to the contrary herein, no Disqualified Institution (nor any Affiliate of any Disqualified Institution) may be appointed as a successor Agent.

Section 10.10   Administrative Agent May File Proofs of Claim; Credit Bidding. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 2.04(e) and (f), Section 2.09 and Section 11.04 or otherwise hereunder) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c)      any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due to the Administrative Agent under Section 2.09 and Section 11.04 or otherwise hereunder.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or

140

FBG_CH1_00098030

otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Section 363, 1123 or 1129 thereof, or any Debtor Relief Laws in any other jurisdictions to which a Loan Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable laws.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt interests of the acquisition vehicle or vehicles that are used to consummate such purchase).  In connection with any such bid, (I) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (II) to adopt documents providing that the governance of the acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 11.01, and (III) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

Section 10.11   Other Agents; Arrangers and Managers.  None of the Lenders or other Persons identified on the facing page or signature pages of this Agreement as a "syndication agent", Lead Arranger "lead arranger" or "sole bookrunner" shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than, to the extent such Person is a Lender, those applicable to all Lenders in such capacity.  Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any Lender, or any trust or agency relationship with any Loan Party.  Each Lender acknowledges that it has not relied, and will not rely, on any of the other Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking any action hereunder.

Section 10.12   Certain ERISA Matters.

(a)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of each Agent-Related Person, and not to or for the benefit of the Borrower and or any other Loan Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions

141

CONFIDENTIAL

FBG_CH1_00098031

involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of each Agent-Related Person, and not to or for the benefit of the Borrower or any other Loan Party, that:

(i)    no Agent-Related Person is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is independent (within the meaning of 29 C.F.R. § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 C.F.R. § 2510.3-21(c)(1)(i)(A)-(E),

(iii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

142

FBG_CH1_00098032

(v)      no fee or other compensation is being paid directly to any Agent-Related Person for investment advice (as opposed to other services) in connection with the Loans, the Commitments or this Agreement.

(c)      The Agents and each Lead Arranger hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

## ARTICLE XI

## MISCELLANEOUS

Section 11.01   Amendments, Etc.  No amendment or waiver of any provision of this Agreement or any other Loan Document, nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders, or by the Administrative Agent with the consent of the Required Lenders, and the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that:

(a)      no amendment, waiver or consent shall, unless in writing and signed by all of the Lenders, do any of the following at any time:

(i)      change the number of Lenders or reduce the percentage of (x) the Commitments or (y) the aggregate unpaid principal amount of Loans that, in each case, shall be required for the Lenders (or any of them) to take any action hereunder;

(ii)      except as otherwise permitted herein or in any other Loan Document, release Parent or any Subsidiary Guarantor (or otherwise limit Parent or such Subsidiary Guarantor's liability with respect to the Obligations owing to the Agents and the Lenders under the Guaranty) if such release or limitation is in respect of all or substantially all of the value of the Guaranty;

(iii)      except as otherwise permitted herein or in any other Loan Document, release all or substantially all of the Collateral in any transaction or series of related transactions;

(iv)      amend, modify, terminate or waive any provision of the definition of "Required Lenders", "Pro Rata Share", Sections 2.12, 2.13 or 9.03 or any other term or condition of this Agreement or any other Loan Document that would deprive a Lender of its Pro Rata Share of any payments to which it is entitled; provided, additional extensions of credit pursuant hereto

143

CONFIDENTIAL

may be included in the determination of "Required Lenders" or "Pro Rata Share" on substantially the same basis as the Term Commitments and the Term Loans are included on the Closing Date;

(v)     amend, modify, terminate or waive any term of condition of Section 11.01;

(vi)     consent to the assignment or transfer by any Loan Party of any of its rights and obligations under any Loan Document; or

(vii)     (A) subordinate the priority of payment of the Obligations to the payment of other Indebtedness or (B) subordinate the Liens granted in favor of the Collateral Agent on the Collateral to Liens securing other Indebtedness (except, in the case of clause (B), for (x) the Liens on the ABL Priority Collateral as provided for in the ABL Intercreditor Agreement, (y) any Liens permitted under Section 7.01 or (z) any debtor-in-possession financing); provided that a Lender's consent shall not be required pursuant to this clause (vii) to the extent such Lender is offered a reasonable, bona fide opportunity to participate on a pro rata basis in any such Indebtedness (including being allocated its ratable portion of any fees payable in connection therewith);

(b)     no amendment, waiver or consent shall, unless in writing and signed by each Lender specified below for such amendment, waiver or consent, but without the consent of the Required Lenders or any other Lender:

(i)     increase the Commitments of a Lender without the consent of such Lender (it being understood that waivers or modifications of any condition precedent pursuant to Section 4.01 and 4.02 (other than with respect to Credit Extensions on the Closing Date), any Default or Event of Default pursuant to Section 9.01, any representation or warranty set forth in ARTICLE V, any covenant set forth in ARTICLE VI, ARTICLE VII and/or ARTICLE VIII, any mandatory prepayment required pursuant to Section 2.05(b) and/or any mandatory Commitment reduction pursuant to Section 2.06(a) shall not constitute an increase of the Commitments of any Lender for the purpose of this clause (i));

(ii)     waive or reduce the principal of, or stated rate of interest on, or stated premium payable on, the Loans owed to a Lender or any fees or other amounts stated to be payable hereunder or under the other Loan Documents to such Lender without the consent of such Lender (it being understood that any change in the definition of any ratio used in the calculation of such rate of interest or fees (or the component definitions thereof) shall not constitute a reduction in any rate of interest of fees and it being further understood that a waiver or modification of any Default or Event of Default, any mandatory prepayment requirement and/or any mandatory Commitment reduction shall not constitute a reduction or forgiveness of principal for the purpose of this clause (ii)); provided if the Required Lenders agree to waive any relevant Event of Default and such waiver is effective in accordance with this Section 11.01, then only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the Default Rate in connection with such waived Event of Default;

(iii)     postpone any date scheduled for any payment of principal of, or interest on, the Loans pursuant to Section 2.05(b)(iii), Section 2.07 or Section 2.08, any date scheduled for payment or for any date fixed for any payment of fees hereunder in each case payable to a Lender without the consent of such Lender (other than, in each case, an extension for administrative reasons agreed by the Administrative Agent) (it being further understood that a waiver or modification of any Default or Event of Default, any mandatory prepayment

144

FBG_CH1_00098034

requirement and/or any mandatory Commitment reduction shall not constitute an extension of the maturity date for purposes of this clause (iii));

(iv)    alter the required application of any repayments or prepayments as between Classes of Loans pursuant to Section 2.13 or Section 9.03 without the consent of Lenders holding more than 50% of the Total Facility Exposure of all Lenders of each Class of Loans which is being allocated a lesser repayment or prepayment as a result thereof; provided, Required Lenders may waive, in whole or in part, any prepayment so long as the application, as between Classes, of any portion of such prepayment which is still required to be made is not altered; or

(v)    extend the expiry date of Lender's Commitment (it being understood that a waiver of any condition precedent or the waiver of any Default, Event of Default, representation, warranty, covenant mandatory prepayment or mandatory Commitment reduction shall not constitute an extension of a Commitment of any Lender);

provided further that (A) no amendment, waiver or consent shall, unless in writing and signed by an Agent or Lead Arranger, as applicable, in addition to the Lenders required above to take such action, affect the rights or duties of such Agent or Lead Arranger, as applicable, under this Agreement or the other Loan Documents (it being understood that only the consent of the Required Lenders (and no other Person other than (as applicable) the Borrower) is necessary to effectuate any forbearance agreement in respect of any Default or Event of Default), (B) any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) may only be effected by an agreement or agreements in writing entered into by the Borrower and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this Section if such Class of Lenders were the only Class of Lenders hereunder at the time, (C) the scheduled maturity dates of part or all of any Term Loans or Commitments of any Lender may be extended solely with the consent of such Lender, (D) the scheduled amortization payment of any Term Loan of any Lender may be reduced solely with the consent of such Lender, (E) any tranche of Term Loans may be refinanced with a replacement tranche of Term Loans, or modified with a lower rate of interest with the consent of each Lender holding the Term Loans subject thereto and (F) any mandatory prepayment required pursuant to Section 2.05(b) may be waived with the consent of the Required Lenders.

Notwithstanding anything to the contrary contained in this Section 11.01, (a) any guarantees, collateral security documents and related documents executed by Restricted Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent acting on the advice of counsel and may be, together with this Agreement, amended, supplemented and waived with the consent of the Administrative Agent acting on the advice of counsel at the request of the Borrower without the need to obtain the input or consent of any other Lender if such amendment, supplement or waiver is delivered in order to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents and/or comply with relevant requirements of law or the advice of local counsel and (b) any intercreditor agreement entered into with respect to this Agreement may be amended, supplemented and/or waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender to give effect thereto and/or to carry out the purposes thereof and/or to reflect amendments, supplements, waivers and/or other modifications with respect to the treatment of any Equity Interests or Indebtedness to address the methodology (or any change therein) applied by any ratings agency in providing a rating of Parent or any other Parent Company, the Borrower and/or any other Restricted Subsidiary so long as such amendment, supplement, waiver or modification is not materially adverse to

145

CONFIDENTIAL

FBG_CH1_00098035

the Lenders; it being understood that any amendment, supplement or waiver effecting a change to permit any transaction permitted under Sections 7.02, 7.06 and 7.09 hereof is not materially adverse to the Lenders.

Notwithstanding the foregoing, the Administrative Agent and the Borrower may amend, modify or supplement this Agreement or any other Loan Document to cure any ambiguity, error, omission, defect or inconsistency or any necessary or desirable technical change without any further action or consent of any other party to any Loan Document, so long as such amendment, modification or supplement does not materially and adversely affect the rights of any Lender.

Notwithstanding the foregoing, in addition to any credit extensions and related Refinancing Amendments effectuated without the consent of Lenders in accordance with Section 2.16 or Section 2.17, as applicable, this Agreement (including this Section 11.01 and Section 2.13) may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the accrued interest and fees in respect thereof and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and other definitions related to such new credit facilities; provided that, for the purpose of clarity, (x) no such facility shall rank senior in right of payment or security to the original Credit Facilities and (y) no Incremental Term Facility shall rank senior in right of payment or security to the original Credit Facilities.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the lenders providing the relevant Incremental Term Facility and/or the relevant Specified Term Refinancing Debt (but without the consent of any other Lender) to effectuate the provisions of Section 2.16 and/or Section 2.17.

Section 11.02   Notices and Other Communications; Facsimile and Electronic Copies.

(a)      General.   Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile or other electronic transmission) (and, as to service of process, only in writing and in accordance with applicable law) and, to the extent set forth in Section 11.02(e), in an electronic medium and delivered as set forth in Section 11.02(e).   All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)      if to the Borrower, to the address, facsimile number, electronic mail address or telephone number specified for such Person below or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties from time to time;

FIRST BRANDS GROUP, LLC
127 Public Square, Suite 5110
Cleveland, Ohio 44114
Facsimile:  (216) 274-9027
Attention:  Patrick James, Chairman
Email:  patrick.james@trico-group.com

146

With a copy (which shall not constitute notice) to:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention: Michael Baker
Telephone:  (212) 318-6855

(ii)     if to the Administrative Agent or the Collateral Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person below or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties from time to time;

Jefferies Finance LLC
520 Madison Avenue
New York, NY 10022
Attention: Account Officer – Trico Group
Facsimile No.: (212) 284-3444
Email Address: JFIN.Admin@jefferies.com

With a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001
Attention: Tracey Chenoweth
Telephone: (212) 735-3624

(iii)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a written notice to the Borrower and the Administrative Agent.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid (properly addressed); (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 11.02(b)) upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), when delivered; provided that notices and other communications to the Borrower and Administrative Agent pursuant to ARTICLE II shall not be effective until actually received by such Person during the Person's normal business hours.  In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(b)     Effectiveness of Facsimile Documents and Signatures.  Loan Documents may be transmitted and/or signed by facsimile or electronic transmission of a .pdf copy; provided that, if requested, original copies are delivered promptly thereafter (it being understood that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or electronic transmission).

147

FBG_CH1_00098037

(c)     Reliance by Agents and Lenders.  The Agents and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify each Agent and each Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Agent or Lender on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct as determined in a final and nonappealable judgment by a court of competent jurisdiction.  All telephonic notices to the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

(d)     Notice to other Loan Parties.  The Borrower agrees that notices to be given to any other Loan Party under this Agreement or any other Loan Document may be given to the Borrower in accordance with the provisions of this Section 11.02 with the same effect as if given to such other Loan Party in accordance with the terms hereunder or thereunder.

(e)     The Borrower hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials (all such communications being referred to herein collectively as the "Communications"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to an electronic mail address specified by the Administrative Agent to the Borrower.  The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders or actual or prospective assignees or participants by posting the Communications on Debt Domain, SyndTrak, IntraLinks or another relevant website or other information platform (the "Platform").

(f)     THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT-RELATED PERSONS DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT-RELATED PERSONS IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL ANY PARTY HERETO OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "COVERED PARTIES") HAVE ANY LIABILITY TO ANY OTHER PARTY HERETO OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT (I) TO THE EXTENT THE LIABILITY OF ANY COVERED PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH COVERED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OR A MATERIAL BREACH OF THIS AGREEMENT OR (II) IN THE CASE OF A CLAIM BY ANY THIRD PARTY AGAINST ANY INDEMNITEE, TO THE EXTENT SUCH DAMAGES WOULD OTHERWISE BE SUBJECT TO INDEMNIFICATION PURSUANT TO THE TERMS OF SECTION 11.05.

148

CONFIDENTIAL

FBG_CH1_00098038

(g)     The Administrative Agent agrees that the receipt in accordance with this Section 11.02 of the Communications by the Administrative Agent at its e-mail address set forth in this Section 11.02 shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees (i) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address.  Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

(h)     Each Loan Party hereby acknowledges that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to any Loan Party or its securities) (each, a "Public Lender").  Each Loan Party hereby agrees that (i) Communications that are to be made available on the Platform to Public Lenders who notify the Borrower and the Administrative Agent of such Lender's status as a Public Lender shall be clearly and conspicuously marked by such Loan Party as "PUBLIC," which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Communications "PUBLIC," each Loan Party shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Communications as either publicly available information or not material information for purposes of United States federal, state and other applicable securities laws (although it may contain sensitive business information and remains subject to the confidentiality undertakings of Section 11.08) with respect to such Loan Party or its securities for purposes of United States Federal and state securities laws, (iii) all Communications marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information," and (iv) the Administrative Agent shall be required to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information".

(i)     EACH LENDER ACKNOWLEDGES THAT UNITED STATES FEDERAL AND STATE SECURITIES LAWS PROHIBIT ANY PERSON WITH MATERIAL, NON-PUBLIC INFORMATION ABOUT ANY PERSON FROM PURCHASING OR SELLING SECURITIES OF SUCH PERSON OR, SUBJECT TO CERTAIN LIMITED EXCEPTIONS, FROM COMMUNICATING SUCH INFORMATION TO ANY OTHER PERSON.  EACH LENDER AGREES TO COMPLY WITH APPLICABLE LAW AND ITS RESPECTIVE CONTRACTUAL OBLIGATIONS WITH RESPECT TO CONFIDENTIAL AND MATERIAL NON-PUBLIC INFORMATION.  Each Lender that is not a Public Lender confirms to the Administrative Agent that such Lender has adopted and will maintain internal policies and procedures reasonably designed to permit such Lender to take delivery of Restricting Information (as defined below) and maintain its compliance with applicable law and its respective Contractual Obligations with respect to confidential and material non-public information.  A Public Lender may elect not to receive Communications and Information that contains material non-public information with respect to the Loan Parties or their securities (such Communications and Information, collectively, "Restricting Information"), in which case it will identify itself to the Administrative Agent as a Public Lender.  Such Public Lender shall not take delivery of Restricting Information and shall not participate in conversations or other interactions with the Agent-Related Persons, any Lender or any Loan Party concerning the Credit Facilities in which Restricting Information may be discussed.  No Agent-Related Person, however, shall by making any Communications and Information (including Restricting Information) available to a Lender (including any Public Lender), by participating in any conversations or other interactions with a Lender (including any Public Lender) or otherwise, be responsible or liable in any way for any decision a Lender (including any Public Lender) may make to limit or to not limit its access to the Communications and Information.  In particular, no

149

FBG_CH1_00098039

Agent-Related Person shall have, and the Administrative Agent, on behalf of all Agent-Related Persons, hereby disclaims, any duty to ascertain or inquire as to whether or not a Lender (including any Public Lender) has elected to receive Restricting Information, such Lender's policies or procedures regarding the safeguarding of material non-public information or such Lender's compliance with applicable laws related thereto.  Each Public Lender acknowledges that circumstances may arise that require it to refer to Communications and Information that might contain Restricting Information.  Accordingly, each Public Lender agrees that it will nominate at least one designee to receive Communications and Information (including Restricting Information) on its behalf and identify such designee (including such designee's contact information).  Each Public Lender agrees to notify the Administrative Agent in writing from time to time of such Public Lender's designee's address to which notice of the availability of Restricting Information may be sent.  Each Public Lender confirms to the Administrative Agent and the Lenders that are not Public Lenders that such Public Lender understands and agrees that the Administrative Agent and such other Lenders may have access to Restricting Information that is not available to such Public Lender and that such Public Lender has elected to make its decision to enter into this Agreement and to take or not take action under or based upon this Agreement, any other Loan Document or related agreement knowing that, so long as such Person remains a Public Lender, it does not and will not be provided access to such Restricting Information.  Nothing in this Section 11.02(i) shall modify or limit a Lender's (including any Public Lender) obligations under Section 11.08 with regard to Communications and Information and the maintenance of the confidentiality of or other treatment of Communications or Information.  Each Public Lender hereby waives any claim or cause of action it may have or acquire against Parent and/or any of its Restricted Subsidiaries by virtue of its election to not receive any Restricting Information.

Section 11.03  No Waiver; Cumulative Remedies.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Section 11.04  Costs and Expenses.  The Borrower agrees (a) to pay or reimburse the Lead Arranger and each Agent in its capacity as such for all reasonable and documented out of pocket costs and expenses incurred before (to the extent not reimbursed on the Closing Date), on or after the Closing Date in connection with the preparation, syndication, execution, delivery and administration of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof requested by the Borrower or negotiated in consultation with the Borrower (in each case, whether or not the transactions contemplated thereby are consummated), but limited, in the case of Attorney Costs, to the Attorney Costs of Skadden, Arps, Slate, Meagher & Flom LLP, counsel for the Agents, taken as a whole, and, to the extent reasonably necessary, one local counsel in any relevant jurisdiction, and (b) to pay or reimburse the Lead Arranger, each Agent and each Lender for all reasonable and documented out of pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all costs and expenses incurred in connection with any workout or restructuring in respect of the Loans, all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law), but limited, in the case of Attorney Costs, to the reasonable and documented costs and expenses of one counsel to the Administrative Agent and the Lenders, taken as a whole and, to the extent reasonably necessary, one local counsel to such Persons taken as a whole in any relevant jurisdiction (and, in the event of any actual or perceived conflict of interest, one additional counsel to each group of affected persons similarly situated, taken as a whole).  The foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto,

150

FBG_CH1_00098040

and other reasonable and documented out of pocket expenses (other than Attorney Costs) incurred by the Administrative Agent.  The agreements in this Section 11.04 shall survive the Termination Date.  All amounts due under this Section 11.04 shall be paid within thirty (30) Business Days of receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail.  If the Borrower fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.

This Section 11.04 shall not apply to Taxes arising with respect to payments to the Lenders under the Loan Documents, which shall be governed exclusively by Section 3.01.

Section 11.05  Indemnification.   The Borrower shall indemnify and hold harmless each Agent-Related Person, the Lead Arranger, each Lender and their respective Affiliates, and their respective directors, officers, employees, partners, counsel, agents, trustees, investment advisors and attorneys in fact (collectively the "Indemnitees") from and against any and all liabilities, obligations, losses, Taxes, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (but limited, in the case of Attorney Costs, to the reasonable and documented out-of-pocket fees and expenses of one counsel to all the Indemnitees, taken as a whole, and to the extent reasonably necessary, the reasonable and documented out-of-pocket fees and expenses of one local counsel to such Persons in any relevant jurisdiction (and, in the event of any actual or perceived conflict of interest, the reasonable and documented out-of-pocket fees and expenses of one additional counsel to the affected Indemnitees)) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) any Commitment or Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged Release or presence of Hazardous Materials in violation of or giving rise to obligations under Environmental Laws on, at, under, to or migrating from any property or facility currently or formerly owned, leased or operated by the Parent, the Borrower, or any of their respective Subsidiaries (or at which the Parent, the Borrower or any of their respective Subsidiaries has arranged for or caused any Release or disposal of Hazardous Materials), or any Environmental Action or Environmental Liability related to the Parent, the Borrower or any of their respective Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (all the foregoing, collectively, the "Indemnified Liabilities"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee and whether brought by an Indemnitee, a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto and whether or not any of the transactions contemplated hereby are consummated; provided that such indemnity shall not, as to any Indemnitees, be available to the extent that (x) such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from the gross negligence or willful misconduct of this Agreement or any of the other Loan Documents by, such Indemnitee or of any controlled Affiliate, director, officer, employee, counsel, agent or attorney in fact of such Indemnitee as determined by a final non-appealable judgment of a court of competent jurisdiction or (y) if such indemnity relates to any dispute solely among the Indemnitees that does not involve an act or omission of Borrower or any of its Affiliates (other than indemnity for claims against the Agents or the Lead Arranger in their respective capacities as such), and the Borrower shall be entitled to a refund and a return of any and all amounts paid to any Indemnitee for fees and expenses to the extent such Indemnitee is not entitled to payment of such amounts in accordance with the terms hereof.  No Indemnitee nor any

151

FBG_CH1_00098041

Loan Party nor any of their respective officers, directors, employees, agents, advisors or representatives shall have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document (other than in respect of any such damages incurred or paid by an Indemnitee to a third party unaffiliated with such Indemnitee).  All amounts due under this Section 11.05 shall be paid within thirty (30) days after written demand therefor, which demand shall set forth in reasonable detail the amount and nature of reimbursement claimed.  The agreements in this Section 11.05 shall survive the resignation of any Agent, the replacement of any Lender and the Termination Date.

Section 11.06   Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate.

Section 11.07   Successors and Assigns.

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby and, except as otherwise provided herein (including without limitation as permitted under Section 7.04), none of Parent, the Borrower or any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under the other Loan Documents without the prior written consent of each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the requirements of Section 11.07(b), (ii) by way of participation in accordance with the provisions of Section 11.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 11.07(f) or (iv) to an SPC in accordance with the provisions of Section 11.07(g) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 11.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      (i)      Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent in each case not to be unreasonably withheld or delayed) of:

(A)      the Borrower; provided that no consent of the Borrower shall be required for an assignment to (1) a Lender, an Affiliate of a Lender, a Lead Arranger or an Approved Fund relating thereto, (2) if an Event of Default pursuant to Section 9.01(a), (f) or (g) has occurred and is continuing, any Eligible Assignee or (3) any Eligible Assignee that occurs at any time prior to the date that the Administrative Agent shall notify the Borrower that the primary syndication of the Loans has been completed; and

152

CONFIDENTIAL

FBG_CH1_00098042

(B)     the Administrative Agent; provided, that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund relating thereto.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless the Borrower and the Administrative Agent otherwise consent; provided that (1) no such consent of the Borrower to such lesser amount shall be required if any Event of Default of the type described in Section 9.01(a), (f) or (g) has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(B)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption and any applicable tax forms required by Section 3.01(f), if applicable; and

(C)     the relevant Eligible Assignee, if it is not then a Lender, shall deliver to the Administrative Agent any documentation required by Section 3.01(f).

This paragraph (b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Credit Facilities on a non-pro rata basis.

Notwithstanding anything in this Section 11.07 to the contrary, if the Borrower has not given the Administrative Agent written notice of its objection to an assignment of Term Loans within ten (10) Business Days after receipt of written notice of such assignment, the Borrower shall be deemed to have consented to such assignment.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 11.07(d) and receipt by the Administrative Agent from the parties to each assignment of a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent; provided, that all Affiliates of the Administrative Agent shall be exempt from paying such processing and recordation fee in connection with Term Loan assignments), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be party to this Agreement as a Lender with respect to the interest assigned and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement in addition to any rights and obligations otherwise held by such assignee as a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 (or any other increased costs protection provision), 11.04 and 11.05 and shall continue to be subject to the provisions of Section 11.08). Upon request, and the surrender by the

153

CONFIDENTIAL

FBG_CH1_00098043

assigning Lender of its Note (if any), the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.

(c)     The Administrative Agent may provide the list of Disqualified Institutions to any potential Lender and shall provide the list of Disqualified Institutions upon the request of any Lender, in each case subject to the provisions in Section 11.08.  If any assignment or participation under this Section 11.07 is made to any Disqualified Institution without the Borrower's prior written consent, then the Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) terminate any Commitment of such Disqualified Institution and repay all obligations of the Borrower owing to such Disqualified Institution, (B) in the case of any outstanding Loans held by such Disqualified Institution, purchase such Loans by paying the lesser of (x) par and (y) the amount that such Disqualified Institution paid to acquire such Loans, in the cases of clauses (x) and (y), plus accrued interest thereon, accrued fees and all other amounts payable to it hereunder and/or (C) require such Disqualified Institution to assign, without recourse (in accordance with and subject to the restrictions contained in this Section 11.07), all of its interests, rights and obligations under this Agreement to one or more Eligible Assignees; provided that (I) in the case of clause (A), the applicable Disqualified Institution has received payment of an amount equal to the lesser of (1) par and (2) the amount that such Disqualified Institution paid for the applicable Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the Borrower, (II) in the case of clauses (A) and (B), the Borrower shall be liable to the relevant Disqualified Institution under Section 3.05 if any ~~Eurodollar Rate~~SOFR Loan owing to such Disqualified Institution is repaid or purchased other than on the last day of the Interest Period relating thereto and (III) in the case of clause (C), the relevant assignment shall otherwise comply with this Section 11.07 (except that no registration and processing fee required under this Section 11.07 shall be required with any assignment pursuant to this paragraph). Nothing in this Section 11.07(c) shall be deemed to prejudice any right or remedy that the Borrower may otherwise have at law or equity.  Each Lender acknowledges and agrees that Parent and its Subsidiaries will suffer irreparable harm if such Lender breaches any obligation under this Section 11.07 insofar as such obligation relates to any assignment, participation or pledge to any Disqualified Institution without the Borrower's prior written consent.  Additionally, each Lender agrees that the Borrower may seek to obtain specific performance or other equitable or injunctive relief to enforce this Section 11.07(c) against such Lender with respect to such breach without posting a bond or presenting evidence of irreparable harm.  The Parent, the Borrower and each Lender agree that (i) the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Institution and (ii) the Administrative Agent shall not have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Institution.

(d)     The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, any Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice (but no Lender shall be entitled to view any information in the Register except such information contained therein with respect to the Class and amount of Obligations owing to such Lender).  No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (d).  The Register is intended to cause the Loan or any other Loan Document to be in registered form within the meaning of Sections 5f.103-1(c) and 1.871-14(c) of the United State Treasury

154

CONFIDENTIAL

FBG_CH1_00098044

Regulations, Proposed Treasury Regulations Section 1.163-5(b) (or any amended or successor version) and Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(e)      Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than any Disqualified Institution or any natural person) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 11.01(a), or Section 11.01(b) that directly affects any participation of such Participant and with respect to which the participating Lender would have been entitled to vote.  The Borrower agrees that each Participant shall be entitled to the benefits of Section 3.01 (subject to the requirements of Section 3.01, including Section 3.01(e) and Section 3.01(f) (it being understood that the documentation required under Section 3.01(f) shall be delivered to the participating Lender)), 3.04 and 3.05 (through the applicable Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 11.07(b); provided that such Participant agrees to be subject to the provisions of Sections 3.01(e), 3.04(d) and 3.07 as if it were an assignee under Section 11.07(b).  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 11.09 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.13 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  The Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register. The Participant Register is intended to cause the Loan or any other Loan Document to be in registered form within the meaning of Sections 5f.103-1(c) and 1.871-14(c) of the United State Treasury Regulations, Proposed Treasury Regulations Section 1.163-5(b) (or any amended or successor version) and Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

Notwithstanding anything to the contrary contained in this Agreement, a Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after such Participant acquired the applicable participation.

155

CONFIDENTIAL

FBG_CH1_00098045

(f)        Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or central bank having jurisdiction over such Lender; provided that no pledge may be made to a Disqualified Institution and; provided further that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)        Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (other than a Disqualified Institution) identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.04 or 3.05), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and such liability shall remain with the Granting Lender, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee Obligation or credit or liquidity enhancement to such SPC.

(h)        Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it in favor of any Person (other than a Disqualified Institution) and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee (other than a Disqualified Institution) for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 11.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(i)        Notwithstanding any consent requirements otherwise set forth in this Section 11.07, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender on a non-pro rata basis through (x) Dutch auctions open to all Lenders on a pro rata basis or (y) open market purchases, subject to the following limitations:

(i)        in connection with an assignment to an Affiliated Lender, (A) such Person shall have identified itself in writing as an Affiliated Lender to the assigning Term Lender and the Administrative Agent prior to the execution of such assignment and (B) such Person

156

DEBTORS' EXHIBIT NO. 67
Page 171 of 180

shall be deemed to have represented and warranted to the assigning Term Lender and the Administrative Agent that the requirements set forth in this clause (i) and clause (iii) below, shall have been satisfied upon consummation of the applicable assignment;

(ii)     (A) for purposes of any consent to any amendment, waiver or modification of, or any action under, and for the purpose of any direction to the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) under, this Agreement or any other Loan Document, each Affiliated Lender will be deemed to have consented in the same proportion as the Term Lenders that are not Affiliated Lenders consented to such matter, unless such matter requires the consent of all or all affected Lenders and adversely affects such Affiliated Lender more than other Term Lenders in any material respect, (B) for purposes of voting on any plan of reorganization or plan of liquidation pursuant to any Debtor Relief Laws (a "Bankruptcy Plan"), each Affiliate hereby agrees (x) not to vote on such Bankruptcy Plan, (y) if such Affiliate does vote on such Bankruptcy Plan notwithstanding the restriction in the foregoing clause (x), such vote will be deemed not to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such Bankruptcy Plan in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws) and (z) not to contest any request by any party for a determination by a U.S. Bankruptcy Court (or other applicable court of competent jurisdiction) effectuating the foregoing clause (y), in each case under this clause (iii)(B) unless such Bankruptcy Plan adversely affects such Affiliate more than other Term Lenders in any material respect, and (C) each Affiliate of Parent hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Affiliate's attorney-in-fact, with full authority in the place and stead of such Affiliate and in the name of such Affiliate (solely in respect of Term Loans therein and not in respect of any other claim or status such Affiliate may otherwise have), from time to time in the Administrative Agent's discretion to take any action and to execute any instrument that the Administrative Agent may deem reasonably necessary or appropriate to carry out the provisions of this clause (ii), including to ensure that any vote of such Affiliate on any Bankruptcy Plan is withdrawn or otherwise not counted;

(iii)     the aggregate principal amount of Term Loans held at any one time by Affiliated Lenders shall not exceed 10% of the aggregate principal amount of all Term Loans (including any Incremental Term Loans and any Specified Term Refinancing Debt Loans) outstanding at such time under this Agreement, after giving effect to any substantially simultaneous cancellations thereof;

(iv)     Affiliated Lenders in their respective capacities as such will not be entitled to receive information provided solely to Lenders by the Administrative Agent (except to the extent such information or materials have been made available to any Loan Party or constitute administrative notices in respect of such Affiliated Lender's Term Loans) or any Lender and will not be permitted to attend or participate in meetings or conference calls attended solely by the Lenders and the Administrative Agent;

(v)     in the case of any Dutch auction or open market purchases conducted by Parent or any of its Subsidiaries, no Default or Event of Default shall have occurred and be continuing at the time of acceptance of bids for the Dutch auction or consummation of such open market purchase, as the case may be;

157

CONFIDENTIAL

FBG_CH1_00098047

(vi)     no Affiliated Lender will be entitled to bring actions against the Administrative Agent, in its role as such, or receive advice of counsel or other advisors to the Administrative Agent or any other Lenders or challenge the attorney client privilege of their respective counsel;

(vii)     [reserved];

(viii)     any Term Loans acquired by Parent or any of its Subsidiaries shall be promptly cancelled to the extent permitted by applicable law and the full par value of the aggregate principal amount of such Term Loans shall be applied to Term Loan Facility pursuant to Section 2.07; and

(ix)     the proceeds of the ABL Loans shall not be used to acquire such Term Loans.

It is understood and agreed that no Affiliated Lender shall be required to make a representation that, as of the date of any open market purchase or assignment of Loans hereunder or at any other time, it is not in possession of material nonpublic information within the meaning of the United States federal securities laws within respect to Parent and its Subsidiaries or any of their respective securities.

Notwithstanding the foregoing, (a) any Affiliated Lender (other than Parent or any of its Subsidiaries) shall be permitted (but not required) to contribute any such Term Loans assigned to it to Parent or any of its Subsidiaries for purposes of cancellation of such debt and the aggregate principal amount of such Term Loans shall be reduced in accordance with Section 11.07(i)(v) which contribution may be made (including, with the Borrower's consent, to the Borrower, whether through Parent or otherwise), in exchange for Qualified Equity Interests of Parent, or the Borrower or Subordinated Indebtedness of the Borrower to the extent such Subordinated Indebtedness is permitted to be incurred (including, if applicable, as a permitted Refinancing Facility) pursuant to Section 7.03 at such time, (b) each Affiliated Lender shall have the right to vote on any amendment, modification, waiver or consent that would require the vote of all Lenders or the vote of all Lenders directly and adversely affected thereby and (c) no amendment, modification, waiver or consent shall affect any Affiliated Lender (in its capacity as a Lender) in a manner that is disproportionate to the effect on any Lender of the same Class or that would deprive such Affiliated Lender of its Pro Rata Share of any payments to which it is entitled.

Section 11.08   Confidentiality.  Each of the Agents, the Lead Arranger and the Lenders agrees to maintain the confidentiality of the Information and to not use or disclose such information, except that Information may be disclosed:

(a)     to its Affiliates and its and its Affiliates' Representatives, partners, trustees, investment advisors and agents, including accountants and independent auditors, legal counsel and other experts, agents and advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential) in connection with the transactions contemplated or permitted hereby; provided that the relevant Agent, Lead Arranger or Lender shall be responsible for its controlled Affiliates' and their respective directors', officers', employees' and agents' compliance with the terms of this Section 11.08,

(b)     to the extent requested or required by any Governmental Authority or examiner regulating any Lender (provided that such Lender that discloses any Information or any Loan Document pursuant to this clause (b) shall provide the Borrower with prompt advance written notice of such disclosure (except with respect to any audit or examination conducted by bank accountants or any

158

FBG_CH1_00098048

governmental bank regulatory authority, self-regulatory authority, state insurance commissioners or the National Association of Insurance Commissioners exercising its examination or regulatory authority) to the extent practical and permitted by applicable Law);

(c)    to the extent required by applicable Laws or regulations or by any subpoena or similar legal process (provided, that such Agent, Lead Arranger or such Lender that discloses any Information or any Loan Document pursuant to this clause (c) shall provide the Borrower with prompt written advance notice of such disclosure to the extent practical and permitted by applicable law);

(d)    to any other party to this Agreement;

(e)    subject to a written acknowledgment from the relevant recipient that the Information and/or Loan Document so disclosed is being disseminated on a confidential basis (on substantially the same, or at least as restrictive taken as a whole, as the terms set forth in this Section 11.08 or on such other terms to which the Borrower provides written consent, to any pledgee referred to in Section 11.07(f) or Section 11.07(h)), direct or indirect counterparty to a Swap Contract, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement;

(f)    with the written consent of the Borrower;

(g)    to the extent such Information becomes publicly available other than as a result of a breach of this Section 11.08 by the disclosing party;

(h)    to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from the disclosing Person);

(i)    in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder or in connection with the administration by the Agents of the Term Loan Facility;

(j)    to the extent that such Information (i) is received by such Person from a third party that is not, to such Person's knowledge, after reasonable investigation, subject to confidentiality, fiduciary or other legal obligations owing to the Parent or its Restricted Subsidiaries or Affiliates or (ii) was already in such Person's possession (except to the extent received in a manner that would be restricted by the immediately-preceding subclause (i)) or is independently developed by such Person based exclusively on information the disclosure of which would not be restricted by this Section 11.08;

(k)    for purposes of establishing a "due diligence" defense; or

(l)    to the CUSIP Service Bureau or any similar agency in connection with the application, issuance, publishing and monitoring of CUSIP numbers or other identifiers with respect to the credit facilities hereunder.

In addition, the Agents, the Lead Arranger and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments, and the Credit Extensions.  For the purposes of this Section 11.08, "Information" means all information

159

CONFIDENTIAL

FBG_CH1_00098049

received from any Loan Party or its Affiliates or its Affiliates' directors, officers, employees, trustees, investment advisors or agents, relating to Parent or any of its Restricted Subsidiaries or their business, other than any such information that is publicly available prior to disclosure by any Loan Party other than as a result of a breach of this Section 11.08, including, without limitation, information delivered pursuant to Section 6.01, 6.02 or 6.03 hereof.  Notwithstanding anything to the contrary in this Agreement, this Section 11.08 shall survive the Termination Date for a period of one (1) year.

Section 11.09   Setoff.  In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates is authorized at any time and from time to time, without prior notice to the Borrower or any other Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and the Restricted Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates to or for the credit or the account of the respective Loan Parties and the Restricted Subsidiaries against any and all Obligations owing to such Lender and its Affiliates hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness; provided that such Lender and its Affiliates shall not exercise any right of setoff given this Section 11.09 without obtaining the prior written consent of the Administrative Agent.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set off and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Administrative Agent, each Lender under this Section 11.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent, such Lender may have.

Section 11.10   Release of Collateral and Guarantee.  (i) (i) Upon the sale, lease, transfer or other disposition of any item of Collateral of any Loan Party to any Person that is not a Loan Party (including, without limitation, as a result of the sale, in accordance with the terms of the Loan Documents, of the Loan Party that owns such Collateral) in accordance with the terms of the Loan Documents or, subject to Section 11.01, if otherwise approved, authorized or ratified in writing by the Required Lenders, (ii) upon the Termination Date (and, concurrently therewith, to release all the Loan Parties from their obligations under the Loan Documents (other than those that specifically survive the Termination Date)), (iii) upon release of a Subsidiary Guarantor from its obligations under its Guaranty pursuant to clause (c) below or (iv) upon any asset ceasing to constitute Collateral, the Lenders irrevocably authorize the Agents, and the Agents agree, at the Borrower's expense, to execute and deliver to such Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents in accordance with the terms of the Loan Documents.

(b)      The Lenders irrevocably authorize the Agents, and the Agents agree, at the request of the Borrower, to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01.

(c)      The Lenders irrevocably authorize the Agents, and the Agents agree, to release any Subsidiary Guarantor from its obligations under any Loan Document to which it is a party if such Person ceases to be a Restricted Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder; provided that, in the case of a release of a Subsidiary Guarantor due to such Subsidiary Guarantor becoming an Excluded Subsidiary, no such release shall

160

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 67**
**Page 175 of 180**

occur if such Subsidiary Guarantor became an Excluded Subsidiary as a result of not being a Wholly-owned Subsidiary of the Borrower or a Guarantor in connection with the sale of any Equity Interests of such Subsidiary Guarantor to an Affiliate of Parent (other than any sale or transfer to an Affiliate of Parent for a bona fide business purpose of the Borrower and the other Restricted Subsidiaries (the primary purpose of which is not to evade the Guarantor requirements of the Loan Documents)).

(d)     The Lenders irrevocably authorize the Agents, and the Agents agree, to enter into subordination or intercreditor agreements or arrangements with respect to Indebtedness (or Liens securing such Indebtedness) that is required or permitted to be pari passu with or subordinated to the Obligations or Secured Obligations hereunder.

Section 11.11   Counterparts.  This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by facsimile transmission or electronic transmission of a .pdf copy of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document. Any signature to this Agreement may be delivered by facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. The foregoing also applies to any amendment, extension or renewal of this Agreement.

Section 11.12   Integration.   This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  In the event of any conflict or inconsistency between the provisions of this Agreement and those of any other Loan Document (but excluding the ABL Intercreditor Agreement and the First Lien/Second Lien Intercreditor Agreement), the provisions of this Agreement shall control; provided that (x) in the case of any conflict or inconsistency between the ABL Intercreditor Agreement and any other Loan Document, the terms of the ABL Intercreditor Agreement shall govern and control and (y) in the case of any conflict or inconsistency between the First Lien/Second Lien Intercreditor Agreement and any other Loan Documents, the terms of the First Lien/Second Lien Intercreditor Agreement shall govern and control; provided further that the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan Document shall not be deemed a conflict or inconsistency with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 11.13   Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect until the Termination Date.

Section 11.14   Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby.

161

CONFIDENTIAL

FBG_CH1_00098051

The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 11.15  GOVERNING LAW.

(a)  THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (EXCEPT, WITH RESPECT TO ANY OTHER LOAN DOCUMENT, AS OTHERWISE EXPRESSLY PROVIDED THEREIN).

(b)  ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, PARENT, THE BORROWER, EACH AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS; PROVIDED THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION (AND IN CONNECTION THEREWITH TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW) IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY LOAN DOCUMENT OR AGAINST ANY COLLATERAL OR THE ENFORCEMENT OF ANY JUDGMENT, AND THE PARENT AND THE BORROWER HEREBY SUBMITS TO THE JURISDICTION OF, AND CONSENTS TO VENUE IN, ANY SUCH COURT. PARENT, THE BORROWER, EACH AGENT AND EACH LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.

Section 11.16  WAIVER OF RIGHT TO TRIAL BY JURY.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 11.16 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 11.17  Binding Effect.  This Agreement shall become effective when it shall have been executed by Parent, the Borrower, the Administrative Agent, and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of Parent, the Borrower, each such Agent and each Lender and their respective

162

CONFIDENTIAL

FBG_CH1_00098052

successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted by Section 7.04.

Section 11.18 [Reserved].

Section 11.19 PATRIOT Act. Each Lender and the Administrative Agent hereby notifies the Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender and the Administrative Agent to identify the Borrower in accordance with the PATRIOT Act. The Borrower agrees to provide, and to cause each other Loan Party to provide, such information promptly upon request.

Section 11.20 Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the obligations hereunder.

Section 11.21 ABL Intercreditor Agreement. REFERENCE IS MADE TO THE ABL INTERCREDITOR AGREEMENT. EACH LENDER HEREUNDER (a) AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF THE ABL INTERCREDITOR AGREEMENT AND (b) AUTHORIZES AND INSTRUCTS THE ADMINISTRATIVE AGENT TO ENTER INTO THE ABL INTERCREDITOR AGREEMENT AS "SECOND LIEN COLLATERAL AGENT" AND ON BEHALF OF SUCH LENDER. THE PROVISIONS OF THIS SECTION 11.21 ARE NOT INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF THE ABL INTERCREDITOR AGREEMENT. REFERENCE MUST BE MADE TO THE ABL INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF. EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF THE ABL INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN THE ABL INTERCREDITOR AGREEMENT. THE FOREGOING PROVISIONS ARE INTENDED AS AN INDUCEMENT TO THE LENDERS UNDER ANY ABL FACILITY TO EXTEND CREDIT AND SUCH LENDERS ARE INTENDED THIRD PARTY BENEFICIARIES OF SUCH PROVISIONS AND THE PROVISIONS OF THE ABL INTERCREDITOR AGREEMENT.

Section 11.22 First Lien/Second Lien Intercreditor Agreement. REFERENCE IS MADE TO THE FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT. EACH LENDER HEREUNDER (a) AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF THE FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT AND (b) AUTHORIZES AND INSTRUCTS THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT TO ENTER INTO THE FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT AS "INITIAL SECOND PRIORITY REPRESENTATIVE" AND ON BEHALF OF SUCH LENDER. THE PROVISIONS OF THIS SECTION 11.22 ARE NOT

163

CONFIDENTIAL

FBG_CH1_00098053

INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF THE FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT. REFERENCE MUST BE MADE TO THE FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF. EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF THE FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND NEITHER THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT NOR ANY OF THEIR RESPECTIVE AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN THE FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT. THE FOREGOING PROVISIONS ARE INTENDED AS AN INDUCEMENT TO THE LENDERS UNDER ANY FIRST LIEN FACILITY TO EXTEND CREDIT AND SUCH LENDERS ARE INTENDED THIRD PARTY BENEFICIARIES OF SUCH PROVISIONS AND THE PROVISIONS OF THE FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT.

Section 11.23  No Fiduciary Duty. Each Agent, each Lender and their Affiliates (collectively, the "Lender Affiliated Parties"), may have economic interests that conflict with those of the Loan Parties, and each Loan Party acknowledges and agrees that (a) nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Lender Affiliated Parties and each Loan Party, its stockholders or its Affiliates; (b) the transactions contemplated by the Loan Documents are arm's-length commercial transactions between the Lender Affiliated Parties, on the one hand, and each Loan Party, on the other; (c) in connection therewith and with the process leading to such transaction each of the Lender Affiliated Parties is acting solely as a principal and not the agent or fiduciary of any Loan Party, its management, stockholders, creditors or any other Person; (d) none of the Lender Affiliated Parties has assumed an advisory or fiduciary responsibility in favor of any Loan Party with respect to the transactions contemplated hereby or the process leading thereto (regardless of whether any of the Lender Affiliated Parties or any of their respective Affiliates has advised or is currently advising any Loan Party on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents; (e) each Loan Party has its own legal and financial advisors to the extent it deemed appropriate; (f) each Loan Party is responsible for making its own independent judgment with respect to such transactions and the process leading thereto; and (g) no Loan Party will claim that any of the Lender Affiliated Parties has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to any Loan Party, in connection with such transaction or the process leading thereto.

Section 11.24  Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a

164

CONFIDENTIAL

FBG_CH1_00098054

bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

                    (iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 11.25  Acknowledgment Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Contracts or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States), in the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

[Remainder of Page Intentionally Blank]

165

CONFIDENTIAL

FBG_CH1_00098055

**DEBTORS' EXHIBIT NO. 67**
**Page 180 of 180**