# EXHIBIT 41

*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

## JOINT CHAPTER 11 PLAN OF
## FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS[2]

| | |
|---|---|
| **WEIL, GOTSHAL & MANGES LLP** | **WEIL, GOTSHAL & MANGES LLP** |
| Clifford W. Carlson (24090024) | Matthew S. Barr (admitted *pro hac vice*) |
| 700 Louisiana Street, Suite 3700 | Sunny Singh (admitted *pro hac vice*) |
| Houston, Texas 77002 | Andriana Georgallas (admitted *pro hac vice*) |
| Telephone: (713) 546-5000 | Kevin Bostel (admitted *pro hac vice*) |
| Facsimile: (713) 224-9511 | Jason H. George (admitted *pro hac vice*) |
| | 767 Fifth Avenue |
| | New York, New York 10153 |
| | Telephone: (212) 310-8000 |
| | Facsimile: (212) 310-8007 |

*Attorneys for Debtors and Debtors in Possession*

June 16, 2026
Houston, Texas

---

[1] A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Claims and Noticing Agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] All Definitive Documents, including the Plan and the Disclosure Statement, remain subject to ongoing review, revisions, and further negotiations by the Debtors, the Ad Hoc Group, the Creditors' Committee, and the ABL Secured Parties in all respects.

**<u>Table of Contents</u>**

**Page**

**ARTICLE I.** **Definitions and Interpretation.** ........................................................................1

   1.1    Definitions. ................................................................................................................1
   1.2    General Applicability. ............................................................................................30
   1.3    Interpretation; Application of Definitions; Rules of Construction. ......................30
   1.4    Reference to Monetary Figures. ............................................................................30
   1.5    Consent Rights. ......................................................................................................30
   1.6    Controlling Document. ..........................................................................................31

**ARTICLE II.** **Administrative Expense Claims, DIP A Claims, Professional Fee Claims, Restructuring Expenses, and Priority Tax Claims.** ....................................31

   2.1    Administrative Expense Claims. ............................................................................31
   2.2    DIP A Claims. ........................................................................................................31
   2.3    Professional Fee Claims. ........................................................................................32
   2.4    Restructuring Expenses. ........................................................................................33
   2.5    Priority Tax Claims. ..............................................................................................33

**ARTICLE III.** **Classification of Claims and Interests Against the FBG Debtors.** ..............34

   3.1    Classification in General. ......................................................................................34
   3.2    Summary of Classification of Claims and Interests. .............................................34
   3.3    Special Provision Governing Unimpaired Claims. ...............................................34
   3.4    Elimination of Vacant Classes. .............................................................................35
   3.5    Voting Classes; Presumed Acceptance by Non-Voting Classes. ..........................35
   3.6    Voting; Presumptions; Solicitation. ......................................................................35
   3.7    Cramdown. .............................................................................................................35
   3.8    No Waiver. .............................................................................................................35

**ARTICLE IV.** **Treatment of Claims and Interests Against the FBG Debtors.** ...................35

   4.1    Class 1: Other Priority Claims. .............................................................................35
   4.2    Class 2: Other Secured Claims. ............................................................................36
   4.3    Class 3: Roll-Up Claims. ......................................................................................36
   4.4    Class 4: First Lien Claims. ....................................................................................37
   4.5    Class 5: Second Lien Claims. ................................................................................37
   4.6    Class 6: ABL Claims. ............................................................................................38
   4.7    Class 7: General Unsecured Claims. .....................................................................39
   4.8    Class 8: Subordinated Claims. ..............................................................................39
   4.9    Class 9: Intercompany Claims. .............................................................................39
   4.10  Class 10: FBG Debtor Interests. ...........................................................................39

**ARTICLE V.   Means for Implementation.** ...........................................................................**40**

5.1   Compromise and Settlement of Claims, Interests, and Controversies. .........................40
5.2   Plan Settlement. ...........................................................................................................40
5.3   Implementation. ...........................................................................................................44
5.4   Factored Receivables Account. ....................................................................................45
5.5   Wind Down Accounts. .................................................................................................46
5.6   Corporate Action. .........................................................................................................46
5.7   Wind Down Administrator. ..........................................................................................46
5.8   Governance. ..................................................................................................................48
5.9   Cancellation of Existing Securities, Agreements, and Liens. ......................................48
5.10   Dissolution of FBG Debtors. .......................................................................................48
5.11   Effectuating Documents; Further Transactions. ..........................................................49
5.12   Closing of the Chapter 11 Case. ..................................................................................49

**ARTICLE VI.   Litigation Trust.** .........................................................................................**49**

6.1   Establishment of the Litigation Trust. .........................................................................49
6.2   Funding of and Transfer of Assets into the Litigation Trust. .......................................50
6.3   Initial Litigation Trust Funding Commitments and Litigation Trust Backstop Commitments. ...............................................................................................................53
6.4   Additional Litigation Trust Funding. ...........................................................................54
6.5   Litigation Trust Waterfall. ...........................................................................................56
6.6   Minimum Distribution; No Fractional Distributions. ..................................................60
6.7   Lender Distribution Agent. ..........................................................................................60
6.8   Administration of the Litigation Trust. ........................................................................60
6.9   Litigation Trust Oversight Committee. ........................................................................60
6.10   Litigation Trustee. ........................................................................................................61
6.11   Preference Settlement. ..................................................................................................63
6.12   Fees and Expenses of the Litigation Trust. ..................................................................66
6.13   Indemnification. ...........................................................................................................66
6.14   Dissolution of the Litigation Trust. .............................................................................66
6.15   Records. ........................................................................................................................66
6.16   Turnover of Litigation Trust Assets. ............................................................................66
6.17   Assignment of Horizon Alester IP. ..............................................................................67
6.18   Non-Transferability. .....................................................................................................67
6.19   Litigation Trust Tax and Other Matters. ......................................................................67

**ARTICLE VII.   DIP Collateral Trust.** .................................................................................**71**

7.1   Establishment of the DIP Collateral Trust. ..................................................................71
7.2   Transfer of Assets into the DIP Collateral Trust. .........................................................71
7.3   DIP Collateral Trust Funding. ......................................................................................72
7.4   DIP Collateral Trust Waterfall. ....................................................................................73
7.5   DIP Collateral Trustee. .................................................................................................74
7.6   Fees and Expenses of the DIP Collateral Trust. ...........................................................76
7.7   DIP Collateral Trust Oversight Committee. .................................................................76

| | | |
|---|---|---|
| 7.8 | Indemnification. | 76 |
| 7.9 | Minimum Distribution; No Fractional Distributions. | 77 |
| 7.10 | Dissolution of the DIP Collateral Trust. | 77 |
| 7.11 | Records. | 77 |
| 7.12 | Turnover of DIP Collateral Trust Assets. | 78 |
| 7.13 | Non-Transferability. | 78 |
| 7.14 | Maintenance of Lender Registers Post-Confirmation Date. | 78 |
| 7.15 | DIP Collateral Trust Tax and Other Matters. | 79 |

**ARTICLE VIII. ABL Collateral Trust. .................................................................................81**

| | | |
|---|---|---|
| 8.1 | Establishment of the ABL Collateral Trust. | 81 |
| 8.2 | Transfer of Assets into the ABL Collateral Trust. | 82 |
| 8.3 | ABL Collateral Trust Waterfall. | 83 |
| 8.4 | ABL Collateral Trustee. | 83 |
| 8.5 | Fees and Expenses of the ABL Collateral Trust. | 84 |
| 8.6 | Indemnification. | 85 |
| 8.7 | Dissolution of the ABL Collateral Trust. | 85 |
| 8.8 | Records. | 85 |
| 8.9 | Turnover of ABL Collateral Trust Assets. | 85 |
| 8.10 | Non-Transferability. | 85 |
| 8.11 | ABL Collateral Trust Tax and Other Matters. | 85 |

**ARTICLE IX. Distributions. ................................................................................................89**

| | | |
|---|---|---|
| 9.1 | No Postpetition Interest on Claims. | 89 |
| 9.2 | Distribution Record Date. | 89 |
| 9.3 | Date of Distributions. | 90 |
| 9.4 | Reserve on Account of Disputed Claims of the FBG Debtors. | 90 |
| 9.5 | Distributions After Effective Date. | 91 |
| 9.6 | Delivery of Distributions. | 91 |
| 9.7 | Unclaimed Property. | 91 |
| 9.8 | Satisfaction of Claims. | 92 |
| 9.9 | Manner of Payment Under Plan. | 92 |
| 9.10 | Minimum Distribution. | 92 |
| 9.11 | Setoffs and Recoupments. | 92 |
| 9.12 | Withholding and Reporting Requirements. | 92 |
| 9.13 | Disbursing Agent. | 93 |
| 9.14 | Allocation of Distributions Between Principal and Interest. | 94 |

**ARTICLE X. Procedures for Resolving Claims Against the FBG Debtors. ....................94**

| | | |
|---|---|---|
| 10.1 | Allowance of Claims. | 94 |
| 10.2 | Objections to Claims. | 94 |
| 10.3 | Estimation of Claims. | 95 |
| 10.4 | Claim Resolution Procedures Cumulative. | 95 |
| 10.5 | Adjustment to Claims Register Without Objection. | 95 |

10.6 No Distributions Pending Allowance. ...........................................................95

**ARTICLE XI. Executory Contracts and Unexpired Leases. ...............................................96**

11.1 Rejection of Executory Contracts and Unexpired Leases. ...........................................96
11.2 Survival of Indemnification Obligations. ...................................................96
11.3 Rejection Damages Claims. ...............................................................96
11.4 Insurance Policies. ...........................................................................97
11.5 Reservation of Rights. ...........................................................................98

**ARTICLE XII. Conditions Precedent to Occurrence of Effective Date. .............................98**

12.1 Conditions Precedent to Effective Date. ...................................................98
12.2 Waiver of Conditions Precedent. ...........................................................100
12.3 Effect of Failure of a Condition. ...........................................................100
12.4 Effect of Vacatur of Confirmation Order. ...............................................100

**ARTICLE XIII. Effect of Confirmation. ...................................................................100**

13.1 Binding Effect. ...................................................................................100
13.2 Vesting of Assets. ...............................................................................101
13.3 Pre-Confirmation Injunctions and Stays. ...............................................101
13.4 Plan Injunction. ...................................................................................102
13.5 Releases. ...........................................................................................104
13.6 Exculpation. ......................................................................................107
13.7 Waiver of Statutory Limitation on Releases. .........................................108
13.8 Injunction Related to Releases and Exculpation. ....................................108
13.9 Subordinated Claims. ...........................................................................108
13.10 Retention of Causes of Action and Reservation of Rights. .....................108
13.11 Ipso Facto and Similar Provisions Ineffective. ......................................109
13.12 Solicitation of Plan. .............................................................................109

**ARTICLE XIV. Retention of Jurisdiction. ...............................................................109**

14.1 Retention of Jurisdiction. .....................................................................109
14.2 Courts of Competent Jurisdiction. .........................................................111

**ARTICLE XV. Miscellaneous Provisions. ...........................................................112**

15.1 Statutory Fees. ....................................................................................112
15.2 Exemption from Certain Transfer Taxes. ...............................................112
15.3 Dissolution of Creditors' Committee. ....................................................112
15.4 Request for Expedited Determination of Taxes of the FBG Debtors. ........113
15.5 Dates of Actions to Implement Plan. ......................................................113
15.6 Amendments. ......................................................................................113
15.7 Revocation or Withdrawal of Plan. ........................................................113
15.8 Notice of Confirmation Date and Effective Date. ...................................114
15.9 Substantial Consummation. ...................................................................114

iv

15.10  Governing Law. ....................................................................................................114
15.11  Immediate Binding Effect. ...................................................................................114
15.12  Successors and Assigns. .......................................................................................115
15.13  Entire Agreement. .................................................................................................115
15.14  Severability of Plan Provisions. ...........................................................................115
15.15  Additional Documents. .........................................................................................115
15.16  Deemed Acts. ........................................................................................................115
15.17  Computing Time. ..................................................................................................116
15.18  Exhibits to Plan. ...................................................................................................116
15.19  Notices. .................................................................................................................116
15.20  Reservation of Rights............................................................................................118

First Brands Group Holdings, LLC ("**FBGH**"), FBGH's direct and indirect Debtor subsidiaries, and Viceroy Private Capital, LLC (collectively, the "**FBG Debtors**") propose the following joint chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

## ARTICLE I.  DEFINITIONS AND INTERPRETATION.

### 1.1  *Definitions.*

The following terms shall have the respective meanings specified below:

*ABL Agent* has the meaning set forth in the DIP Order.

*ABL Borrowers* has the meaning set forth in the DIP Order.

*ABL Claims* means all Secured Claims (including all accrued and unpaid interest, fees, charges, expenses, and other amounts) arising from (i) the ABL Credit Documents (as defined in the DIP Order) or (ii) the DIP Order or any other applicable order of the Bankruptcy Court, in each case, that are on account of the ABL Obligations and Cash Management Obligations (each as defined in the DIP Order) and including all Secured Claims held by any ABL Secured Party secured by any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

*ABL Collateral Trust* means that certain liquidating trust to be established upon entry of the Confirmation Order in accordance with ARTICLE VIII of the Plan to hold, transfer, sell, monetize, or abandon the ABL Collateral Trust Assets and make distributions to the ABL Collateral Trust Beneficiaries in accordance with the ABL Collateral Trust Agreement and the Plan.

*ABL Collateral Trust Agreement* means the agreement evidencing the terms and provisions governing the ABL Collateral Trust, establishing the terms and conditions of the ABL Collateral Trust, the rights of, and limitations on, the ABL Collateral Trust Interests, and pursuant to which the ABL Collateral Trustee shall manage and administer the ABL Collateral Trust Assets.

*ABL Collateral Trust Assets* means any (i) ABL Priority Collateral for which, on the date the ABL Collateral Trust is established, (x) no bona fide dispute exists as to whether the ABL Secured Parties have a validly perfected first-priority Lien on such collateral, senior in lien priority to the Liens securing the DIP Claims, or (y) if such a bona fide dispute exists, it is subsequently determined by a court of competent jurisdiction pursuant to a Final Order or settlement that the ABL Secured Parties have a validly perfected first-priority Lien on such collateral, senior in lien priority to the Liens securing the DIP Claims, and (ii) rights, title, and interests of the holders of ABL Deficiency Claims in respect of any amounts or proceeds to be realized on account of such ABL Deficiency Claims (which rights, title, and interests are contributed to the ABL Collateral Trust pursuant to Section 4.6(b) of the Plan by holders of ABL Deficiency Claims and are not assets of the FBG Debtors transferred in connection with the foreclosure upon the ABL Collateral Trust Assets of the FBG Debtors). The ABL Collateral Trust Assets include (a) any amounts in the Factored Receivables Account that are determined by a Final Order to be property of an FBG Debtor's Estate, but excluding any amounts in the Factored

Receivables Account that the Bankruptcy Court determines by a Final Order that a Factor has a validly perfected first-priority security interest in such amounts, (b) the ABL Reserved Claims, and (c) all Insurance Rights of the FBG Debtors in respect of ABL Priority Collateral (solely to the extent such rights result from insured assets or property that constituted ABL Priority Collateral prior to the event giving rise to such Insurance Rights). The ABL Collateral Trust Assets will be identified in a schedule annexed to the ABL Collateral Trust Agreement, which schedule shall be prepared in consultation with the ABL Agent. To the extent the ABL Agent disagrees with the scope of the ABL Collateral Trust Assets set forth in the ABL Collateral Trust Agreement schedule, the ABL Agent may seek appropriate relief from the Bankruptcy Court. For the avoidance of doubt, (i) in no event shall any assets that constitute Litigation Trust Assets or DIP Collateral Trust Assets be considered ABL Collateral Trust Assets, and (ii) ABL Collateral Trust Assets shall not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their Estates, any of the Factors, or any of the SPV Lenders, or (b) subject to a validly perfected first-priority Lien asserted by a Factor, the SPV Lenders, or the DIP Secured Parties.

*ABL Collateral Trust Beneficiaries* means the holders of the ABL Collateral Trust Interests.

*ABL Collateral Trust Interests* means the beneficial interests in the ABL Collateral Trust granted to holders of Allowed ABL Claims upon entry of the Confirmation Order, which beneficial interests shall entitle holders to share in distributions in accordance with the ABL Collateral Trust Waterfall.

*ABL Collateral Trust Waterfall* means the method for making distributions to the holders of ABL Collateral Trust Interests in the order of priority set forth in Section 8.3 of the Plan and the ABL Collateral Trust Agreement.

*ABL Collateral Trustee* means the trustee for the ABL Collateral Trust, which, unless otherwise disclosed in the Plan Supplement, shall be the ABL Agent (or its designee).

*ABL Credit Agreement* means that certain *ABL Credit Agreement*, dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Group Intermediate, LLC, (iii) the other borrowers from time to time party thereto, (iv) Bank of America, N.A., as administrative agent and collateral agent, and (v) the lenders from time to time party thereto.

*ABL Deficiency Claims* has the meaning set forth in Section 4.6(b) of the Plan.

*ABL Guarantors* has the meaning set forth in the DIP Order.

*ABL Intercreditor Agreement* has the meaning set forth in the DIP Order.

*ABL Lenders* has the meaning set forth in the DIP Order.

*ABL Loan Parties* means, collectively, the ABL Borrowers and other ABL Guarantors.

***ABL Parties*** means Bank of America, N.A., Truist Bank, U.S. Bank National Association, and the ABL Agent, in their capacities as lenders or providers of financing or liquidity to one or more FBG Debtors prior to the Petition Date.

***ABL Priority Collateral*** has the meaning set forth in the DIP Order.

***ABL Reserved Claims*** means, collectively, the following, each of which shall vest in the ABL Collateral Trust: (i) all claims, Causes of Action, and rights (excluding any Estate Claims or Recovery Action Proceeds) against any customer, Account, Debtor, or other Person arising from, relating to, or in connection with, any prepetition credits, rebates, chargebacks, deductions, or offsets applied or asserted against accounts or other ABL Priority Collateral of any FBG Debtor; and (ii) all claims, Causes of Action, and rights (excluding any Estate Claims or Recovery Action Proceeds) against any SPV Lender, SPV Debtor, or other Person arising from, relating to, or in connection with, any competing or adverse claim to ownership, priority, or possession of any ABL Priority Collateral or the proceeds thereof.

***ABL Secured Parties*** has the meaning set forth in the DIP Order.

***Account*** has the meaning ascribed to such term in the ABL Intercreditor Agreement.

***Ad Hoc Group*** has the meaning set forth in the DIP Order.

***Ad Hoc Group Advisors*** has the meaning set forth in the DIP Order.

***Ad Hoc Group SteerCo*** means the holders of DIP A Claims that comprised the members of the steering committee of the Ad Hoc Group as of the date of the entry of the Agreed Mediation Order.

***Additional Class 1 Litigation Trust Funding*** means, if applicable, up to $37,500,000 in principal amount of funding commitments and/or contributions.

***Additional Class 1 Litigation Trust Interests*** means, if applicable, any Class 1 Litigation Trust Interests issued on account of any Additional Class 1 Litigation Trust Funding.

***Additional Litigation Trust Funding*** means, collectively, Additional Class 1 Litigation Trust Funding and Additional Waterfall Litigation Trust Funding.

***Additional Unencumbered Property*** has the meaning set forth in the DIP Order.

***Additional Waterfall Litigation Trust Funding*** means, if applicable, any additional funding for the Litigation Trust that primes the entire Litigation Trust Waterfall.

***Administrative Expense Claim*** means any Claim for a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under sections 327, 328, 330, 365, and 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving an

3

FBG Debtor's Estate and operating an FBG Debtor's business, other than Professional Fee Claims, Restructuring Expenses, DIP A Claims, Roll-Up Claims, Intercompany Claims, and Priority Tax Claims.

*Administrative Expense Claims Consent Program* means the consent program offered to holders of Administrative Expense Claims against the FBG Debtors pursuant to which such holders may elect to compromise the Allowed amount of their Administrative Expense Claims against the FBG Debtors in exchange for receiving the treatment provided to Settled Administrative Expense Claims under the Plan, including receiving distributions from the Litigation Trust before payment of other Allowed Administrative Expense Claims in accordance with Section 6.5(d)(i) of the Plan; *provided* that the Claims Ombudsman shall not be required to reserve on account of distributions to holders of Claims junior in priority to Administrative Expense Claims (including for distributions to holders of Administrative Expense Claims who do not opt in to the Administrative Expense Claims Consent Program); *provided further* that, in the event the Litigation Trust is unable to make distributions sufficient to satisfy Allowed Administrative Expense Claims in full, payments made to holders of Settled Administrative Expense Claims are not subject to clawback or disgorgement.

*Administrative Expense Claims Consent Program Opt-In Form* means the opt-in form, approved under the Disclosure Statement Order, sent to holders of Administrative Expense Claims against the FBG Debtors pursuant to which such holders may opt in to participating in the Administrative Expense Claims Consent Program.

*Adverse Conduct* means (i) engaged in wrongful, actual, or constructively fraudulent conduct against any Debtor or Affiliate of any Debtor, or otherwise participated, conspired with, or acted in concert with, any Person that engaged in wrongful, actual or constructively fraudulent conduct against any Debtors, creditors, or lenders of the Debtors (or Affiliates of Debtors), (ii) received an avoidable transfer on grounds other than section 547 of the Bankruptcy Code from any of the Debtors, or (iii) received a transfer not in good faith.

*Affiliate* means, with respect to any specified Entity: (i) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified Entity as if such specified Entity were a debtor in a case under the Bankruptcy Code; (ii) any Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Entity; (iii) any Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity; or (iv) any Entity twenty percent (20%) or more of whose outstanding equity securities are directly or indirectly owned, controlled, or held by the specified Entity or by an Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity. As used in the prior sentence, "control" includes (without limitation) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified Entity (whether through the ownership of equity, by contract or otherwise).

*Agreed Market Check* means a third-party solicitation or marketing process conducted by or on behalf of the Litigation Trust to solicit funding, bids, or other expressions of competitive interest, including from multiple unaffiliated and independent market participants, that is: (i) designed and implemented in good faith by the Litigation Trustee in consultation with its

retained professionals; (ii) reasonably tailored to prevailing market conditions, the nature of the Litigation Trust Assets, and the objectives of the Litigation Trust; (iii) inclusive of meaningful outreach to a sufficient number of credit and active market participants to permit an informed comparison of available alternatives; and (iv) documented in writing and performed consistent with the Litigation Trustee's duties.

*Agreed Mediation Order* means the *Agreed Mediation Order Appointing Judge Marvin Isgur as Mediator* (Docket No. 1822).

*AHG Member(s)* means the member(s) of the Litigation Trust Oversight Committee appointed by the Ad Hoc Group SteerCo in accordance with the Litigation Trust Agreement.

*Alester Agreements* means, collectively, (i) that certain *Contribution Agreement*, dated December 30, 2022, by and between TAE Brakes, LLC and Alester Technologies, LLC; (ii) that certain *Contribution Agreement*, dated February 8, 2023, by and between Horizon Global Corporation and Alester Technologies, LLC; (iii) that certain *Intellectual Property License Agreement*, dated as of February 8, 2023, by and between First Brands Group, LLC and Alester Technologies, LLC; (iv) that certain *Contribution Agreement*, dated July 3, 2023, by and between Cardone Industries, Inc. and Alester Technologies, LLC; and (v) that certain *Contribution Agreement*, dated September 29, 2023, by and between Carter Carburetor Holdings, LLC and Alester Technologies, LLC.

*Allowed* means, with respect to any Claim against or Interest in an FBG Debtor, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in the Plan or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder; (ii) any Claim against or Interest in an FBG Debtor as to which the liability of the FBG Debtor and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; (iii) any Claim against or Interest in an FBG Debtor expressly Allowed under the Plan; or (iv) any Claim against an FBG Debtor that is listed in the applicable FBG Debtor's Schedules as liquidated, non-contingent, and undisputed.

*Allowed Lender Claims* means, collectively, the (i) DIP Claims, (ii) First Lien Claims, (iii) Second Lien Claims, and (iv) the Remaining Lender Claims, each of which shall be deemed Allowed under this Plan upon entry of the Confirmation Order.

*Available Cash* means, with respect to each Trust, (i) Cash on hand (including any amounts invested pending distribution) of such Trust, as of the date of determination, realized from the Trust's assets *less* (ii) (a) any fees and costs incurred by the Trust associated with the collection of such proceeds, (b) any amounts reserved in respect of Disputed Claims, and (c) any reserves established in the good faith discretion of the Trustee to pay (w) any obligations or liabilities of the Trust, (x) any costs or expenses of the Trust or the Trustee, (y) any taxes (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity, any taxes of such fund or separate taxable entity), or (z) any amounts needed to maintain the value of any assets of the Trust.

*Avoidance Actions* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the FBG Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code, or (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances.

*Avoidance Proceeds* means any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise.

*Ballot* means each of the ballots distributed to the holders of Impaired Claims entitled to vote on the Plan.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or if the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any local rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Cases.

*Business Day* means any calendar day that is not a Saturday, Sunday, or other calendar day on which banks are authorized or required to be closed in New York, New York.

*Cash* means legal tender of the United States of America.

*Cash Management Order* means the *Final Order (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System and Bank Accounts, (B) Implement Ordinary Course Changes to Cash Management System, and (C) Honor Certain Related Prepetition Obligations, (II) Granting Administrative Expense Priority for Postpetition Intercompany Claims, (III) Extending Time to Comply with Requirements of 11 U.S.C. § 345(b), and (IV) Granting Related Relief* (Docket No. 604).

*Cause of Action* means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively

6

(including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including but not limited to any and all rights of a Debtor, Debtor-in-possession or Trustee to assert rights to extend time under 11 U.S.C. § 108. For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims or Interests; (iii) any claim pursuant to section 362 of the Bankruptcy Code; (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (v) any Estate Claims, Recovery Actions, and Avoidance Actions; and (vi) with respect to each of the Specified Non-Released Parties, all of the aforementioned items that can be or may be asserted against any Specified Non-Released Party.

*Challenge Period* has the meaning set forth in the DIP Order.

*Chapter 11 Case* means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

*Claim* means a "claim," as defined in section 101(5) of the Bankruptcy Code.

*Claims and Noticing Agent* means Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent retained by the Debtors.

*Claims Ombudsman* means a Person selected by the Creditors' Committee, with the consent of the FBG Debtors and Ad Hoc Group SteerCo (not to be unreasonably withheld, conditioned, or delayed), that shall have the qualifications, duties, and responsibilities described in Section 5.2(g) of the Plan, subject to the terms of the Litigation Trust Agreement. The identity of the Claims Ombudsman will be disclosed in the Plan Supplement.

*Claims Register* means the official register of Claims maintained by the Claims and Noticing Agent in the Chapter 11 Cases.

*Class* means any group of Claims or Interests classified under the Plan pursuant to section 1122(a) of the Bankruptcy Code.

*Class 1 DIP Collateral Trust Interests* means the beneficial interests in the DIP Collateral Trust granted to the DIP Collateral Trust Funding Contributors upon entry of the Confirmation Order.

*Class 1 Litigation Trust Interests* means, collectively, the beneficial interests in the Litigation Trust granted to the Litigation Trust Class 1 Funding Contributors on account of the Initial Litigation Trust Funding Commitments upon entry of the Confirmation Order or, if applicable, on account of any Additional Class 1 Litigation Trust Funding.

7

*Class 2 DIP Collateral Trust Interests* means the beneficial interests in the DIP Collateral Trust granted to holders of Allowed DIP A Claims upon entry of the Confirmation Order; *provided* that no Class 2 DIP Collateral Trust Interests shall be granted to a holder of Allowed DIP A Claims that holds less than $1,000 in principal amount of Allowed DIP A Claims.

*Class 2 Litigation Trust Interests* means the beneficial interests in the Litigation Trust granted to holders of Allowed DIP A Claims upon entry of the Confirmation Order; *provided* that no Class 2 Litigation Trust Interests shall be granted to a holder of Allowed DIP A Claims that holds less than $1,000 in principal amount of Allowed DIP A Claims.

*Class 3 Litigation Trust Interests* means, collectively, the (i) Class 3(a) Litigation Trust Interests, (ii) Class 3(b) Litigation Trust Interests, and (iii) Class 3(c) Litigation Trust Interests.

*Class 3(a) Litigation Trust Interests* means the beneficial interests in the Litigation Trust granted to the holders of Allowed Roll-Up Claims upon entry of the Confirmation Order; *provided* that no Class 3(a) Litigation Trust Interest shall be granted to a holder of Allowed Roll-Up Claims that holds less than $1,000 in principal amount of Allowed Roll-Up Claims.

*Class 3(b) Litigation Trust Interests* means the beneficial interests in the Litigation Trust granted to the Claims Ombudsman, as agent to the holders of Allowed General Unsecured Claims and Allowed Subordinated Claims.

*Class 3(c) Litigation Trust Interests* means the beneficial interests in the Litigation Trust granted to the holders of Allowed First Lien Claims and/or Allowed Second Lien Claims upon entry of the Confirmation Order; *provided* that no Class 3(c) Litigation Trust Interest shall be granted to a holder of Allowed First Lien Claims and/or Allowed Second Lien Claims that holds less than $1,000 in principal amount of Allowed First Lien Claims or Allowed Second Lien Claims, respectively.

*Confirmation Date* means the date on which the Bankruptcy Court enters the Confirmation Order and the Definitive Documents are in form and substance acceptable to the Ad Hoc Group SteerCo and the Creditors' Committee.

*Confirmation Hearing* means the hearing held by the Bankruptcy Court regarding approval of the Disclosure Statement and confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

*Confirmation Order* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

*Contracts Procedures Order* means the *Order (I) Approving Procedures to (A) Assume or Assume and Assign or (B) Reject, Unexpired Leases and Executory Contracts, (II) Approving Abandonment of Property in Connection with Rejection of Unexpired Leases, and (III) Granting Related Relief* (Docket No. 1244).

*Court-Approved Additional Waterfall Litigation Funding* means Additional Waterfall Litigation Trust Funding on terms substantially similar to those identified in the Agreed

8

Market Check approved by an order of the Bankruptcy Court. The Bankruptcy Court may approve such Additional Waterfall Litigation Trust Funding upon a finding that the requested funding and/or contribution of additional funds are reasonably necessary to adequately monetize the Litigation Trust Assets or are otherwise in the best interests of Litigation Trust Beneficiaries.

*Credit Bid Claims* means, collectively, the amount of Claims retired pursuant to the (i) Estate Claims Credit Bid and (ii) DIP Collateral Credit Bid.

*Creditors' Committee* means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *United States Trustee's Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 313) filed on October 9, 2025, as reconstituted from time to time.

*D&O Policy* means all directors and officers liability insurance policies (including any runoff policies or tail policies related to or associated with the foregoing) issued or providing coverage at any time to any of the Debtors, any of their Affiliates (including, without limitation, Mayfair Enterprises, LLC), or any of their predecessors or subsidiaries, for current or former directors', managers', officers', and employees' liability and all agreements, documents, or instruments relating thereto.

*D&O Proceeds Appeals* means the appeals of the *Order Regarding Motion for Entry of an Order (I) Authorizing and, to the Extent Necessary, Modifying the Automatic Stay to Allow Use of Proceeds of Directors and Officers Liability Insurance Policies Issued to Non-Debtor Mayfair Enterprises, LLC for Insureds' Defense Costs or, in the Alternative, (II) Confirming that Advancement of Defense Costs and Providing Notice in Accordance with Directors and Officers Liability Insurance Policies Does Not Violate the Automatic Stay* (Docket No. 1231).

*Debtors* means, collectively, the FBG Debtors and the SPV Debtors.

*Defaulting Contributor* means any Litigation Trust Class 1 Funding Contributor that (i) has failed to fund all or any portion of its Litigation Trust Class 1 Funding Contributions within ten (10) Business Days of the date the same were required to be funded hereunder; (ii) has notified the Litigation Trustee in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect; (iii) has, prior to the full funding of its Litigation Trust Class 1 Funding Contributions, failed, within ten (10) Business Days after written request by the Litigation Trustee, to confirm in writing to the Litigation Trustee that it will comply with its prospective funding obligations hereunder (*provided* that such Litigation Trust Class 1 Funding Contributor shall cease to be a Defaulting Contributor pursuant to this clause (iii) upon receipt of such written confirmation by the Litigation Trustee); or (iv) has, or has a direct or indirect parent company that has, prior to the full funding of its Litigation Trust Class 1 Funding Contributions, (a) become the subject of a proceeding under the Bankruptcy Code or any other applicable debtor relief law or (b) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity. Any determination by the Litigation Trustee that a Litigation Trust Class 1 Funding Contributor is a Defaulting Contributor

9

shall be conclusive and binding absent manifest error. The Litigation Trustee may agree in writing in its sole discretion, subject to the satisfaction of any conditions determined by the Litigation Trustee in its sole discretion, that a Defaulting Contributor is no longer a Defaulting Contributor, whereupon such Litigation Trust Class 1 Funding Contributor will, to the extent applicable, purchase at par that portion of outstanding Litigation Trust Class 1 Funding Contributions of the other Litigation Trust Class 1 Funding Contributors or take such other actions as the Litigation Trustee may determine to be necessary to cause the Litigation Trust Class 1 Funding Contributions to be held pro rata by the Litigation Trust Class 1 Funding Contributors in accordance with their applicable Litigation Trust Class 1 Funding Commitments, whereupon such Litigation Trust Class 1 Funding Contributor will cease to be a Defaulting Contributor; *provided* that no adjustments will be made retroactively with respect to fees payable in respect of such Litigation Trust Class 1 Funding Contributor's Litigation Trust Class 1 Funding Commitment while that Litigation Trust Class 1 Funding Contributor was a Defaulting Contributor; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, such cessation of Defaulting Contributor status will not constitute a waiver or release of any claim of any party hereunder arising from that Litigation Trust Class 1 Funding Contributor having been a Defaulting Contributor.

***Definitive Documents*** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to, the Plan, including, but not limited to: (i) the Plan; (ii) the Disclosure Statement; (iii) the motion seeking approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (iv) the Disclosure Statement Order; (v) each of the documents comprising the Plan Supplement; (vi) the Confirmation Order; (vii) the ABL Collateral Trust Agreement; (viii) the DIP Collateral Trust Agreement; (ix) the Litigation Trust Agreement; and (x) the DIP Collateral Credit Bid APA (if applicable).

***DIP A Claims*** means all Claims (including all Secured Obligations (as defined in the DIP Credit Agreement), accrued and unpaid interest (including default interest, as applicable), fees (including any DIP Fees and Expenses, as defined in the DIP Order, as applicable), charges, expenses, indemnities, premiums (including any Extension Premiums and Exit Premiums, each as defined in the DIP Credit Agreement), other amounts, and/or deficiency Claims) arising from (i) the DIP Credit Agreement or any other Loan Document (as defined in the DIP Credit Agreement); or (ii) the DIP Order and/or any other applicable order of the Bankruptcy Court; in each case, that are on account of the New Money DIP Loans.

***DIP Claims*** means, collectively, the DIP A Claims and Roll-Up Claims.

***DIP Collateral*** has the meaning set forth in the DIP Order.

***DIP Collateral Credit Bid*** means a credit bid and equivalent release of the DIP Loan Parties of all or a portion of the Allowed DIP A Claims in consideration of the sale of the DIP Collateral Trust Assets and transfer of such assets to the DIP Collateral Trust.

***DIP Collateral Credit Bid APA*** means, if the parties decide to enter into a separate purchase agreement, a purchase and sale agreement providing for, among other things, the sale of DIP Collateral Trust Assets and transfer of such assets to the DIP Collateral Trust.

*DIP Collateral Credit Bid Transaction* means the sale of the DIP Collateral Trust Assets and transfer of such assets to the DIP Collateral Trust in accordance with Section 5.2(f) of the Plan.

*DIP Collateral Sale Proceeds* means the proceeds from any sale of assets of the FBG Debtors allocated but not yet distributed to holders of DIP A Claims on or before the Confirmation Date.

*DIP Collateral Trust* means that certain liquidating trust to be established in accordance with ARTICLE VII of the Plan to hold, transfer, sell, monetize, or abandon the DIP Collateral Trust Assets and make distributions to the DIP Collateral Trust Beneficiaries in accordance with the DIP Collateral Trust Agreement and the Plan.

*DIP Collateral Trust Additional Payments* means all rights to Additional Payments, in respect of the Letter of Credit and/or otherwise pursuant to and as contemplated by Section 3.03 of the *Asset Purchase Agreement*, dated as of March 25, 2026, as amended, by and among First Brands Group Holdings, LLC, as Seller, and PGI Northstar LLC, as Buyer and Premium Guard Incorporated, as Guarantor.

*DIP Collateral Trust Agreement* means the agreement evidencing the terms and provisions governing the DIP Collateral Trust, establishing the terms and conditions of the DIP Collateral Trust, the rights of, and limitations on, the DIP Collateral Trust Interests, and pursuant to which the DIP Collateral Trustee shall manage and administer the DIP Collateral Trust Assets.

*DIP Collateral Trust Assets* means (i) all DIP Collateral (other than the Litigation Trust Assets) for which, on the date the DIP Collateral Trust is established, (x) no bona fide dispute exists as to whether the DIP Secured Parties, the First Lien Secured Parties, or the Second Lien Term Loan Secured Parties have a validly perfected Lien in such collateral, senior in lien priority to the Liens securing the ABL Claims, or (y) if such a bona fide dispute exists, it is subsequently determined by a court of competent jurisdiction pursuant to a Final Order or settlement that the DIP Secured Parties, the First Lien Secured Parties, or the Second Lien Term Loan Secured Parties have a validly perfected Lien in such collateral, senior in lien priority to the Liens securing the ABL Claims; (ii) all reversionary interests and/or second lien interests of the DIP Secured Parties, the First Lien Secured Parties, or the Second Lien Term Loan Secured Parties in the ABL Priority Collateral; and (iii) all Ultinon Claims and Interests. The DIP Collateral Trust Assets include any DIP Collateral Trust SPV Recoveries and the DIP Collateral Trust Additional Payments. The DIP Collateral Trust Assets will be identified in a schedule annexed to the DIP Collateral Trust Agreement. For the avoidance of doubt, DIP Collateral Trust Assets shall not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their Estates, any of the Factors, or any of the SPV Lenders, or (b) subject to a validly perfected first-priority Lien asserted by a Factor or SPV Lender.

*DIP Collateral Trust Beneficiaries* means the holders of the DIP Collateral Trust Interests.

*DIP Collateral Trust Funding* means, collectively, the Primary DIP Collateral Trust Funding and the Secondary DIP Collateral Trust Funding.

11

*DIP Collateral Trust Funding Contributors* means, collectively, the Primary DIP Collateral Trust Funding Contributors and the Secondary DIP Collateral Trust Funding Contributors.

*DIP Collateral Trust Interests* means the beneficial interests in the DIP Collateral Trust granted to holders of Allowed DIP A Claims upon entry of the Confirmation Order, which beneficial interests shall entitle holders to share in distributions in accordance with the DIP Collateral Trust Waterfall, including the (i) Class 1 DIP Collateral Trust Interests, and (ii) Class 2 DIP Collateral Trust Interests.

*DIP Collateral Trust Oversight Committee* means an unpaid oversight committee created on the Confirmation Date and that consists of three (3) holders of DIP Claims selected by the Ad Hoc Group SteerCo.

*DIP Collateral Trust SPV Recoveries* means any SPV Recovery that arises out of litigation, settlement, or negotiation involving a Lien or ownership dispute over tangible property (including, among others, disputes with Onset Financial, Inc. regarding interests in machinery and equipment) that would otherwise constitute a DIP Collateral Trust Asset.

*DIP Collateral Trust Waterfall* means the method for making distributions to the holders of DIP Collateral Trust Interests in accordance with the priorities set forth in Section 7.4 of the Plan and DIP Collateral Trust Agreement.

*DIP Collateral Trustee* means the trustee for the DIP Collateral Trust. The identity of the initial DIP Collateral Trustee will be disclosed in the Plan Supplement.

*DIP Credit Agreement* means that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement*, dated as of October 2, 2025 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among (i) First Brands Group, LLC, as Borrower and Debtor and Debtor-in-Possession, (ii) First Brands Group Intermediate, LLC, as Parent and a Debtor and Debtor-in-Possession, (iii) the lenders party thereto, (iv) Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent, and (v) OPY Credit Corp., as Trading Agent.

*DIP Documents* has the meaning set forth in the DIP Order.

*DIP Loan Parties* has the meaning set forth in the DIP Order.

*DIP Obligations* has the meaning set forth in the DIP Order.

*DIP Order* means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 608).

*DIP Secured Parties* has the meaning set forth in the DIP Order.

*DIP Term Priority Collateral* has the meaning set forth in the DIP Order.

**Direct Creditor Claims** means any direct (non-derivative) Claims held by a Preference Settlement Electing Creditor (i) against any non-Debtor Person and (ii) that relate to the conduct of the Debtors and/or Affiliates or professionals of the Debtors on or before the Petition Date; *provided* Direct Creditor Claims shall not include any Claims against a Released Party that are released under the Plan. For the avoidance of doubt, Direct Creditor Claims shall not include (a) any Estate Claims, (b) Claims that are duplicative of Estate Claims, or (c) Claims that are plead as direct Claims but in substance are Estate Claims.

**Disbursing Agent** means the Trustees or such Entity or Entities designated by a Trustee to make or facilitate distributions required by the Plan.

**Disclosure Statement** means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time, and which is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rules 3016 and 3018.

**Disclosure Statement Order** means the order entered by the Bankruptcy Court (i) conditionally approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code; and (ii) authorizing solicitation of the Plan.

**Disputed** means, with respect to a Claim against any FBG Debtor, (i) any Claim that is disputed under ARTICLE X of the Plan or as to which any FBG Debtor or any party in interest has interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order, (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of Claim was not timely or properly filed, (iii) any Claim that is listed in the Schedules of an FBG Debtor as unliquidated, contingent or disputed, and as to which no request for payment or proof of Claim has been filed, or (iv) any Claim that is otherwise disputed by the FBG Debtors, the Claims Ombudsman, or any party in interest in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order. To the extent the FBG Debtors, Claims Ombudsman, or any party in interest disputes the amount of an asserted Claim against an FBG Debtor, such Claim shall be deemed Allowed in the amount that is not disputed, if any, and a Disputed Claim as to the balance of such Claim. Any and all Claims asserted by any of the Specified Non-Released Parties are Disputed. For the avoidance of doubt, none of the Allowed Lender Claims shall be Disputed by the FBG Debtors, Claims Ombudsman, or Trustees.

**Disputed Alester IP** means all assets, including intellectual property, covered by the Alester Agreements.

**Disputed Claim Reserve** means any assets of the FBG Debtors, ABL Collateral Trust Assets, or Litigation Trust Assets allocable to, or held on account of, Disputed Claims, including one or more reserve accounts to be funded with Cash and/or proceeds of such assets, as applicable, in accordance with the terms of the Plan.

**Distribution Record Date** means: (i) for all Claims against the FBG Debtors (other than Allowed Lender Claims), the Confirmation Date and (ii) for Allowed Lender Claims, June 22, 2026 (as may be extended by the Ad Hoc Group Advisors).

13

*Effective Date* means the date that is the first Business Day on which all conditions to the effectiveness of the Plan set forth in Section 12.1 of the Plan have been satisfied or waived in accordance with Section 12.2 of the Plan.

*Employee Lease Accounts* means any bank account of the FBG Debtors that is established in connection with an employee lease arrangement entered into in connection with a sale transaction and funded by the sale transaction purchaser with certain amounts to cover costs and expenses associated with employees incurred during the applicable employee lease period.

*Employee Liability Account* has the meaning set forth in the OEM Order.

*Entity* has the meaning set forth in section 101(15) of the Bankruptcy Code.

*Estate(s)* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

*Estate Claims* means any and all claims and/or remedies that are held or controlled by, or which were or could have been asserted by, the FBG Debtors or their Estates against any Entity or Affiliate or Representative of any Entity (including each other through intercompany claims, intercompany interests, and/or other intercompany obligations), seeking relief or recovery arising from harm to any FBG Debtor, any FBG Debtor's Estate, or the FBG Debtors' creditors taken as a whole, based on any legal theory including, without limitation, such claims and/or remedies under federal or state law, statutory or common law, in equity or otherwise, arising out of or in any way related to (i) the FBG Debtors; (ii) the Chapter 11 Cases; (iii) the Estates; and/or (iv) the ownership, management, operation, status, tenure, conduct, omission, action or inaction at any time of a stockholder, affiliate, owner, partner, member, manager, director, officer, employee, servant, agent, representative, attorney, creditor, successor, assign or other relationship with an FBG Debtor and/or any of its predecessors, in each case, including, without limitation, such claims and/or remedies that are actions, causes of action, lawsuits, suits, claims, counterclaims, cross-claims, liabilities, interests, judgments, obligations, rights, demands, debts, damages, losses, grievances, promises, remedies, liens, attachments, garnishments, prejudgment and post-judgment interest, costs and expenses (including attorneys' fees and costs incurred or to be incurred), including unknown Claims to the maximum extent allowed under the law, whether pled or unpled, fixed or contingent, choate or inchoate, matured or unmatured, foreseen or unforeseen, accrued or unaccrued, past, present or future, for fraudulent transfer, fraudulent conveyance, preference, turnover, breach of fiduciary duty, negligence, gross negligence, mismanagement, civil conspiracy, RICO, aiding and abetting, unjust enrichment, constructive trust, equitable subordination, equitable disallowance, agency, joint venture, alter ego, corporate veil piercing, successor liability, and all other such claims and/or remedies, Recovery Actions, Recovery Action Proceeds, Avoidance Actions, and Avoidance Proceeds, including, for the avoidance of doubt, (a) any Disputed Alester IP recovered from an Avoidance Action or Recovery Action of an FBG Debtor, (b) all 506(c), 552(b), and other surcharge rights, claims, and/or causes of action that the FBG Debtors have and/or are entitled to assert against any Person, and (c) any and all initial and subsequent transfers related to the items within this definition; *provided* that Estate Claims shall also include any Claim that is duplicative of an Estate Claim, any Claim related to (i) – (iv) above that is a general claim with no particularized injury arising from it, or any other Claim that is in substance an Estate Claim.  For the avoidance of doubt, any claims and/or remedies of the FBG

Debtors or their Estates against any SPV Lender, including any Aequum Lender (as defined in Docket No. 215), or its Affiliates, whether asserted by or assertable by the FBG Debtors, their Estates, or the Creditors' Committee, shall also be Estate Claims.

*Estate Claims Credit Bid* means a credit bid and equivalent release of the DIP Loan Parties of all or a portion of the Allowed DIP A Claims in consideration of the sale of the Litigation Trust Assets and transfer of such assets to the Litigation Trust.

*Estate Claims Credit Bid Transaction* means the sale of the Litigation Trust Assets and transfer of such assets to the Litigation Trust in accordance with Section 5.2(e) of the Plan.

*Evolution Adequate Protection Stipulation* means the *Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* (Docket No. 609).

*Examiner* means Martin De Luca, in his capacity as examiner, appointed pursuant to the *Order Approving the Appointment of Examiner* (Docket No. 1260).

*Examiner Account* means the segregated bank account established by the Debtors to hold amounts that are exclusively available for the payment of fees and expenses of the Examiner and his professionals.

*Exculpated Parties* means each of the following in their capacity as such: (i) the FBG Debtors; (ii) Neal Goldman, William Transier, and Benjamin Duster, in their capacities as members of one or more of the Special Committees; (iii) Neal Goldman and William Transier, in their capacities as the Independent Managers of the FBG Debtors; and (iv) the Creditors' Committee and each of its members in their official capacity.

*Factor* means any Person that purchased, or intended or agreed to purchase, accounts receivable at a discount from one or more FBG Debtors, and as identified in an exhibit to the Litigation Trust Agreement.

*Factored Receivables Account* has the meaning set forth in the Cash Management Order.

*FBG Debtor Interests* means an Interest in an FBG Debtor.

*FBG Debtors* has the meaning set forth in the introductory paragraph of the Plan.

*Final Order* means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for

15

*certiorari*, or move for a new trial, reargument, or rehearing shall have expired. However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

**Final Return Threshold** has the meaning set forth in the <u>Section 6.5</u> of the Plan.

**First Lien Claims** means, collectively, the First Lien Term Loan Claims and the Side-Car Term Loan Claims.

**First Lien Secured Parties** has the meaning set forth in the DIP Order, and shall include, for the avoidance of doubt, the Sidecar Term Loan Secured Parties.

**First Lien Term Loan Agreement** means that certain *First Lien Term Loan Agreement*, dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Intermediate, LLC, (iii) Jefferies Finance LLC (later replaced by Wilmington Savings Fund Society, FSB), as administrative agent and collateral agent, and (iv) the lenders and letter of credit issuers from time to time party thereto.

**First Lien Term Loan Claims** means all Claims (including all accrued and unpaid interest, fees, charges, expenses, other amounts, and/or deficiency Claims) arising from (i) the First Lien Term Loan Agreement; or (ii) the DIP Order and/or any other applicable order of the Bankruptcy Court that relate to the First Lien Term Loan Agreement.

**First Lien Term Loan Collateral** has the meaning set forth in the DIP Order.

**General Unsecured Claim** means any Claim (other than an Intercompany Claim or a Subordinated Claim) that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court. For the avoidance of doubt, the Roll-Up Claims, First Lien Claims, and Second Lien Claims shall not be General Unsecured Claims.

**Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code.

**Health Escrow Account** means any escrow account established to hold funds to be used to pay run-out health claims of employees or former employees (and their covered dependents and beneficiaries) of the FBG Debtors.

**Horizon Alester Agreement** means that certain *Contribution Agreement*, dated February 8, 2023, by and between Horizon Global Corporation and Alester Technologies, LLC.

**Horizon Alester IP** means all assets, including intellectual property, covered by the Horizon Alester Agreement.

16

*Impaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

*Indemnification Obligations* means an FBG Debtor's indemnification obligations in place prior to the Confirmation Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, or otherwise, for the directors, managers, officers, and employees of the FBG Debtors, and the attorneys, accountants, investment bankers, and Professionals that are retained by the FBG Debtors.

*Independent Manager Policies* means the primary and excess D&O Policies issued to Mayfair Enterprises, LLC, as named insured, that have a policy period of September 26, 2025 to September 26, 2026 and are numbered: (i) XDO000165-0925 (issued by Convex North American Insurance Services, Inc.), (ii) AMB06760 (issued by Ambridge Partners LLC), (iii) EQ5EX00296-251 (issued by Everest National Insurance Company), (iv) 100625436251 (issued by Starr Indemnity & Liability Company), (v) 833891932 (issued by Continental Casualty Company), (vi) CRDO-0000058-00 (issued by Celerity Risk), (vii) B1976DO00007206 (issued by Lloyds Syndicate BEAT 4242), and (viii) ELU206779-25 (issued by XL Specialty Insurance Company).

*Independent Managers* means Neal Goldman and William Transier, in their capacities as members of the governing bodies of any Debtor.

*Initial Litigation Trust Funding Commitments* means commitments on the Confirmation Date to fund Cash contributions to the Litigation Trust pursuant to the terms of the Litigation Trust Agreement and/or any Litigation Trust Funding Agreement, in a principal amount of $50,000,000; *provided* that no holder of Allowed DIP A Claims may provide Initial Litigation Trust Funding Commitments unless such holder holds at least $1,000 in principal amount of Allowed DIP A Claims.

*Insurance Company* means all Persons that issued, or that have any actual, potential, demonstrated, or alleged liabilities, duties, or obligations under, or with respect to, any Insurance Policy, and any third party administrator, parent, subsidiary, affiliate, successor, predecessor, or assign of any of the foregoing, solely in their capacity as such with respect to an Insurance Policy.

*Insurance Policies* means any insurance policies, insurance contracts, binders, certificates, or reinsurance policies, whether currently known or unknown, issued to or that provides or may provide coverage (whether as the primary or additional insured or otherwise) at any time to any of the Debtors, any of their Affiliates (including, without limitation, Mayfair Enterprises, LLC), or any of their predecessors or subsidiaries, or under which any of the foregoing, or any of their current or former directors, managers, officers, or employees, have sought or may seek such coverage, including, but not limited, to any such policies for directors' and officers' liability, general liability, workers' compensation, any excess or umbrella policies, and all agreements, documents, or instruments relating thereto.

17

***Insurance Rights*** means any and all rights, titles, privileges, interests, claims, demands, or entitlements of the FBG Debtors to any proceeds, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under, or attributable to, any and all Insurance Policies now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including: (i) any Insurance Company's failure to provide coverage or otherwise pay under an Insurance Policy; (ii) the refusal of any Insurance Company to compromise and settle any claim or provide defense to any claim; (iii) the interpretation or enforcement of the terms of any Insurance Policy with respect to any Claim; (iv) any conduct by any Insurance Company constituting "bad faith" conduct or that could otherwise give rise to extra-contractual damages, or other wrongful conduct under applicable law; or (v) any right to receive proceeds with respect to any Insurance Policy or a coverage action.

***Intercompany Claim*** means any Claim held by an FBG Debtor against another FBG Debtor arising before the Petition Date. For the avoidance of doubt, any Claim held by an SPV Debtor or a non-Debtor Affiliate against an FBG Debtor shall not be an Intercompany Claim but shall be a General Unsecured Claim, Subordinated Claim, or Administrative Expense Claim, as determined by the Bankruptcy Court.

***Interest*** means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in an FBG Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such FBG Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "*stock*" or a similar security, including any Claim against an FBG Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

***Interim Compensation Procedures Order*** means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (Docket No. 699), as may be amended, modified, or supplemented from time to time.

***International Emergency Economic Powers Act*** means sections 1701–1708 of title 50 to the United States Code, as may have been amended from time to time.

***Inventory*** has the meaning ascribed to such term in the ABL Intercreditor Agreement.

***IRS*** means the United States Internal Revenue Service.

***James Complaint*** means the adversary proceedings against Patrick James et al. (Adv. Pro. Case No. 25-03803).

***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

***Litigation Trust*** means that certain liquidating trust to be established upon entry of the Confirmation Order in accordance with ARTICLE VI of the Plan to hold the Litigation Trust

Assets and make distributions to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement.

***Litigation Trust Agreement*** means the agreement evidencing the terms and provisions governing the Litigation Trust, establishing, among other things, the terms and conditions of the Litigation Trust, the rights of, and limitations on, the Litigation Trust Interests, and pursuant to which the Litigation Trustee shall manage and administer the Litigation Trust Assets.

***Litigation Trust Assets*** means (i) the Litigation Trust Cash Funding; (ii) all Estate Claims, including, for the avoidance of doubt, all 506(c), 552(b), and other surcharge rights, claims, and/or causes of action that the FBG Debtors have and/or are entitled to assert against any Person; (iii) all rights, privileges, and defenses of the FBG Debtors relating to the Estate Claims; (iv) the FBG Debtors' and Creditors' Committees rights, privileges, and defenses in respect of the D&O Proceeds Appeals; (v) all Insurance Rights of the FBG Debtors with respect to Insurance Policies that provide or may provide coverage for the Estate Claims, including for the avoidance of doubt, the rights to the proceeds of the D&O Policies; (vi) all Direct Creditor Claims of Preference Settlement Electing Creditors (which claims are thus contributed to the Litigation Trust by Preference Settlement Electing Creditors and are not assets of the FBG Debtors transferred in connection with the Estate Claims Credit Bid Transaction); (vii) all books, records, and investigative and/or discovery findings of the FBG Debtors, including to the extent such records are owned or controlled by advisors to the FBG Debtors, any independent director or manager of the FBG Debtors, the Examiner and the advisors thereto (subject to a mutual agreement on cooperation/transfer), and the advisors to the Creditors' Committee; *provided* that (a) the FBG Debtors' Professionals, (b) any independent director or manager of the FBG Debtors, (c) the Examiner and the advisors thereto (subject to a mutual agreement on cooperation/transfer), and (d) the Creditors' Committee's Professionals shall not be required to turnover all work product and communications but each such professional, in its sole discretion, may compile (in a digest or other appropriate format) its material findings, information, and records and provide the Litigation Trust with such compilation and/or enter into common interest or other agreements sufficient to facilitate the turnover of work product or communications; (viii) all Litigation Trust SPV Recoveries; and (ix) all assets or other interests in property made payable to or otherwise acquired by any of the FBG Debtors (or their Estates) as a result of any government enforcement action, including as a result of any forfeiture proceeding, order of restitution, or governmental settlement agreement. The Litigation Trust Assets will be identified in a schedule annexed to the Litigation Trust Agreement. For the avoidance of doubt, Litigation Trust Assets shall not include any assets that are determined by Final Order to be property of the SPV Debtors or their Estates, any of the Factors, or any of the SPV Lenders.

***Litigation Trust Backstop Commitments*** means the commitments, on a pro rata basis, provided by the Litigation Trust Backstop Parties to provide the Initial Litigation Trust Funding Commitments on the Confirmation Date that are not subscribed to by other holders of Allowed DIP A Claims.

***Litigation Trust Backstop Parties*** means, collectively, the holders of DIP A Claims that are members of the Ad Hoc Group SteerCo and sign a backstop commitment letter on or before the Confirmation Date.

*Litigation Trust Beneficiaries* means the holders of the Litigation Trust Interests.

*Litigation Trust Cash Funding* means $25,000,000 in Cash from the FBG Debtors' balance sheet that will be provided to the Litigation Trust upon the establishment of the Litigation Trust.

*Litigation Trust Class 1 Funding Commitments* means, collectively, the Initial Litigation Trust Funding Commitments provided on the Confirmation Date and, if applicable, any additional commitments to provide Additional Class 1 Litigation Trust Funding.

*Litigation Trust Class 1 Funding Contributions* means the funding under the Litigation Trust Class 1 Funding Commitments approved upon entry of the Confirmation Order.

*Litigation Trust Class 1 Funding Contributors* means (i) holders of Allowed DIP A Claims that, on or before the Confirmation Date, commit to provide the Initial Litigation Trust Funding Commitments, and (ii) if applicable, following the Confirmation Date, holders of Class 1 Litigation Trust Interests that commit to provide the Additional Class 1 Litigation Trust Funding.

*Litigation Trust Funding Agreements* means any agreement (which may be included in the Litigation Trust Agreement) pursuant to which a Litigation Trust Class 1 Funding Contributor contributes or commits to contribute Cash or other property to the Litigation Trust in exchange for Class 1 Litigation Trust Interests.

*Litigation Trust Interests* means the beneficial interests in the Litigation Trust granted upon entry of the Confirmation Order as provided herein, which beneficial interests shall entitle holders to share in distributions in accordance with the Litigation Trust Waterfall, including the (i) Class 1 Litigation Trust Interests, (ii) Class 2 Litigation Trust Interests, and (iii) Class 3 Litigation Trust Interests.

*Litigation Trust Oversight Committee* has the meaning set forth in the Litigation Trust Agreement and initially shall be comprised of four (4) members established on the Confirmation Date.

*Litigation Trust SPV Recoveries* means any SPV Recovery that is not a DIP Collateral Trust SPV Recovery.

*Litigation Trust Waterfall* means the method for making distributions to the holders of Litigation Trust Interests in accordance with the priorities set forth in Section 6.5 of the Plan and the Litigation Trust Agreement.

*Litigation Trustee* means Gerard Uzzi of Uzzi & Lall, in his capacity as the trustee for the Litigation Trust.

*Major Decision* shall have the meaning set forth in the Litigation Trust Agreement. Any decision of the Litigation Trust that qualifies as a Major Decision (i) before the Final Return Threshold is satisfied, shall require the affirmative vote of at least two AHG Members and a majority of the members of the Litigation Trust Oversight Committee; and (ii) after the Final

20

Return Threshold is satisfied, shall require the affirmative vote of a majority of the members of the Litigation Trust Oversight Committee.

*New Money DIP Loans* has the meaning set forth in the DIP Order.

*OEM Order* means the *Order (I) Approving Funding Arrangement With Certain OEM Customers; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (Docket No. 1848).

*Onset Complaint* means the adversary proceedings against Onset Financial, Inc. et al. (Adv. Pro. Case No. 26-03005).

*Other Priority Claim* means any Claim entitled to priority of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

*Other Secured Claim* means any Secured Claim, other than an Administrative Expense Claim, a DIP Claim, a First Lien Claim, a Second Lien Claim, an ABL Claim, or a Priority Tax Claim.

*Parent Guarantors* has the meaning set forth in the DIP Order.

*Person* means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

*Petition Date* means, with respect to an FBG Debtor, the date on which such FBG Debtor commenced its Chapter 11 Case.

*Plan* means this joint chapter 11 plan, including all exhibits, annexes, supplements, and schedules hereto (including the Plan Supplement), as may be amended, supplemented, or modified from time to time in accordance with the Bankruptcy Code and the terms of the Plan.

*Plan Settlement* has the meaning set forth in Section 5.2(a) of the Plan.

*Plan Supplement* means a supplemental appendix to the Plan, containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended, modified, or supplemented from time to time in accordance with the terms the Plan, the Bankruptcy Code, and the Bankruptcy Rules, which may include: (i) the Schedule of Retained Causes of Action; (ii) the disclosure of the identity of the Wind Down Administrator; (iii) the disclosure of the identity of the Claims Ombudsman; (iv) the Litigation Trust Agreement, any separate Litigation Trust Funding Agreement(s), and the form of any backstop commitment letter with the Litigation Trust Backstop Parties; (v) a non-exhaustive schedule of Specified Non-Released Parties; and (vi) any other agreement, instrument, schedule, exhibit, or document designated by the FBG Debtors (with the consent of the Ad Hoc Group SteerCo and the Creditors' Committee (such consent not to be unreasonably withheld, conditioned, or delayed)) as a Plan Supplement document. Through the Confirmation Date, the FBG Debtors

shall have the right to amend any schedules, exhibits, or amendments to any of the documents contained in, and exhibits to, the Plan Supplement.

**Preference Actions** means all Causes of Action arising under section 547 of the Bankruptcy Code.

**Preference Settlement** has the meaning set forth in Section 6.11 of the Plan.

**Preference Settlement Electing Creditor** means any Trade Creditor, Supply Chain Financer, or Factor who (i) timely elects on the Preference Settlement Opt-In Form to (a) participate in, and receive the benefits of, the Preference Settlement, (b) grant the releases contained in Section 13.5(b) of the Plan, and (c) contribute all of its Direct Creditor Claims to the Litigation Trust; *provided* that any such creditor that is later determined to be ineligible for the Preference Settlement in accordance with Section 6.11 hereof shall not be a Releasing Party.

**Preference Settlement Opt-In Form** means the form, approved under the Disclosure Statement Order, sent to Trade Creditors, Supply Chain Financers, and Factors, pursuant to which such Persons may opt in to (i) participating in, and receiving the benefits of, the Preference Settlement; (ii) granting the releases contained in Section 13.5(b) of the Plan; and (iii) contributing all of their Direct Creditor Claims to the Litigation Trust.

**Prepetition Collateral** has the meaning set forth in the DIP Order.

**Prepetition Secured Parties** has the meaning set forth in the DIP Order, and shall include, for the avoidance of doubt, the Sidecar Term Loan Secured Parties.

**Primary DIP Collateral Trust Funding** means the use of DIP Collateral Sale Proceeds by Primary DIP Collateral Trust Funding Contributors to fund Cash for the DIP Collateral Trust pursuant to the terms of this Plan, the DIP Collateral Trust Agreement, and the Confirmation Order, in an amount up to $20,000,000.

**Primary DIP Collateral Trust Funding Contributors** means the members of the Ad Hoc Group SteerCo that agree to withhold their pro rata share of DIP Collateral Sale Proceeds and direct such amounts to fund the DIP Collateral Trust pursuant to the terms of the DIP Collateral Trust Agreement, this Plan, and the Confirmation Order.

**Priority Tax Claim** means any Claim held by a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**Pro Rata Share** means (i) that proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class; and (ii) that proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in multiple Classes, as applicable.

**Professional** means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 363, or 503(b) of

the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court and the Examiner and advisers thereto.

**Professional Fee Claim** means a Claim for fees and expenses incurred by a Professional on or after the Petition Date through the Effective Date.

**Professional Fees Escrow Account** has the meaning set forth in the DIP Order.

**Proof of Claim** means a proof of Claim filed against any FBG Debtor in the Chapter 11 Cases.

**Recovery Actions** has the meaning set forth in the DIP Order.

**Recovery Action Proceeds** has the meaning set forth in the DIP Order.

**Reinstate, Reinstated, or Reinstatement** means, with respect to Claims and Interests, the treatment provided for in section 1124(2) of the Bankruptcy Code.

**Released Parties** means collectively, and in each case solely in their capacities as such, (i) the FBG Debtors and their Estates; (ii) Neal Goldman, William Transier, and Benjamin Duster, in their capacities as members of one or more of the Special Committees; (iii) Neal Goldman and William Transier, in their capacities as the Independent Managers of one or more of the FBG Debtors; (iv) the Specified Executives; (v) the Professionals; (vi) the Creditors' Committee and each of its members; (vii) the Ad Hoc Group and members thereof, including the Ad Hoc Group SteerCo; (viii) the DIP Secured Parties; (ix) the Prepetition Secured Parties; (x) the ABL Parties; (xi) the Litigation Trust Backstop Parties; (xii) the Litigation Trust Class 1 Funding Contributors and the DIP Collateral Trust Funding Contributors; and (xiii) solely with respect to each of the foregoing Persons in clauses (vii) – (xii), their Affiliates and Representatives; *provided* that, notwithstanding anything in the Plan to the contrary, and for the avoidance of doubt, no Specified Non-Released Party shall be a Released Party and no Estate Claims shall be released against any Specified Non-Released Party; *provided further* that any Person that is given the opportunity to grant the releases set forth in the Plan and does not grant such releases shall not be a Released Party.

**Releasing Parties** means, collectively: (i) the holders of all Claims that vote to accept the Plan and opt in to granting the releases set forth in the Plan; (ii) the holders of all Claims that are presumed to accept the Plan and opt in to granting the releases set forth in the Plan; (iii) the holders of all Claims that vote to reject the Plan, but opt in to granting the releases set forth in the Plan; (iv) the holders of all Claims whose vote to accept or reject the Plan is solicited but that do not vote either to accept or reject the Plan, but opt in to granting the releases set forth in the Plan; (v) the Persons that receive the Preference Settlement Opt-In Form and opt in to granting the releases set forth in the Plan; and (vi) the holders of DIP A Claims that are given notice of the ability to opt in to granting the releases set forth in the Plan and opt in to granting such releases. For the avoidance of doubt, none of the Debtors (including SPV Debtors) shall be Releasing Parties.

**Remaining DIP A Claims** means the Allowed DIP A Claims against the FBG Debtors not included in the Estate Claims Credit Bid or the DIP Collateral Credit Bid. For the

23

avoidance of doubt, the Remaining DIP A Claims shall continue to accrue interest (including default interest, as applicable), fees, charges, expenses, indemnities, premiums (including any Extension Premiums and Exit Premiums, each as defined in the DIP Credit Agreement), other amounts, and/or deficiency Claims, in accordance with the DIP Order following the Confirmation Date.

*Remaining First Lien Claims* has the meaning set forth in Section 4.4(b) of the Plan.

*Remaining Lender Claims* means, collectively, (i) the Remaining DIP A Claims, (ii) the Remaining Roll-Up Claims, (iii) the Remaining First Lien Claims, and (iv) the Remaining Second Lien Claims.

*Remaining Roll-Up Claims* has the meaning set forth in Section 4.3(b) of the Plan. For the avoidance of doubt, the Remaining Roll-Up Claims shall continue to accrue interest (including default interest, as applicable), fees, charges, and expenses, indemnities, premiums, other amounts, and/or deficiency Claims, in accordance with the DIP Order following the Confirmation Date.

*Remaining Second Lien Claims* has the meaning set forth in Section 4.5(b) of the Plan.

*Representative* means, with respect to any Entity, such Entity's outside attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

*Restructuring Expenses* means the reasonable, documented, and due and owing fees and out-of-pocket expenses of the advisors to the (i) Ad Hoc Group, (ii) the DIP Secured Parties, (iii) the First Lien Secured Parties, and (iv) the Second Lien Term Loan Secured Parties, accrued since the inception of their respective engagements and continuing through the implementation of the restructuring transactions and in accordance with their respective engagement letters or fee letters with the FBG Debtors and/or any applicable order of the Bankruptcy Court.

*Roll-Up Claims* means all Claims (including all Secured Obligations (as defined in the DIP Credit Agreement), accrued and unpaid interest (including default interest, as applicable), fees (including any DIP Fees and Expenses, as defined in the DIP Order, as applicable), charges, expenses, other amounts, and/or deficiency Claims) arising from (i) the DIP Credit Agreement or any other Loan Document (as defined in the DIP Credit Agreement); or (ii) the DIP Order and/or any other applicable order of the Bankruptcy Court, in each case, that are on account of the Roll-Up Obligations.

*Roll-Up Obligations* has the meaning set forth in the DIP Order.

24

***Sacred Right*** shall have the meaning set forth in the Litigation Trust Agreement. Any decision of the Litigation Trust that qualifies as a Sacred Right (i) before the Final Return Threshold is satisfied, shall require the affirmative vote of at least two AHG Members and the UCC Member; and (ii) after the Final Return Threshold is satisfied, shall require the affirmative vote of the AHG Member and at least one UCC Member.

***Schedule of Retained Causes of Action*** means a schedule to be filed as part of the Plan Supplement of Causes of Action to be retained by the FBG Debtors and transferred to the Litigation Trust.

***Schedules*** means the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

***Second Lien Claims*** means all Claims (including all accrued and unpaid interest, fees, charges, expenses, other amounts, and/or deficiency Claims) arising from (i) the Second Lien Term Loan Agreement; or (ii) the DIP Order and/or any other applicable order of the Bankruptcy Court that relate to the Second Lien Term Loan Agreement.

***Second Lien Term Loan Agreement*** means that certain *Second Lien Term Loan Agreement*, dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Intermediate, LLC, (iii) Jefferies Finance LLC (later replaced by Wilmington Savings Fund Society, FSB), as administrative agent and collateral agent, and (iv) the lenders from time to time party thereto.

***Second Lien Term Loan Collateral*** has the meaning set forth in the DIP Order.

***Second Lien Term Loan Secured Parties*** has the meaning set forth in the DIP Order.

***Second Return Threshold*** has the meaning set forth in the Section 6.5 of the Plan.

***Secondary DIP Collateral Trust Funding*** means, if needed, the use of DIP Collateral Sale Proceeds by Secondary DIP Collateral Trust Funding Contributors to fund any shortfall in Cash for the DIP Collateral Trust that is not funded by the Primary DIP Collateral Trust Funding on the Confirmation Date, pursuant to the terms of this Plan, the DIP Collateral Trust Agreement, and the Confirmation Order.

***Secondary DIP Collateral Trust Funding Contributors*** means the holders of DIP A Claims on the Confirmation Date that are not Primary DIP Collateral Trust Funding Contributors.

***Secured Claim*** means a Claim (i) secured by a Lien on any Debtor's interest in property to the extent of the value of such interest as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the FBG Debtors or the Claims Ombudsman, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (ii) secured by the

amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

*Securities Act* means the Securities Act of 1933, as amended.

*Security* has the meaning set forth in section 101(49) of the Bankruptcy Code.

*Segregated Accounts* has the meaning set forth in the Evolution Adequate Protection Stipulation.

*Settled Administrative Expense Claims* means Administrative Expense Claims held by holders of Administrative Expense Claims who receive the Administrative Expense Claims Consent Program Opt-In Form and affirmatively elect to participate in the Administrative Expense Claims Consent Program on or before the deadline set forth in the Administrative Expense Claims Consent Program Opt-In Form, and therefore, are deemed to have an Allowed Administrative Expense Claim in an amount equal to fifty percent (50%) of the reconciled amount set forth in the Administrative Expense Claims Consent Program Opt-In Form or otherwise agreed to by the FBG Debtors or Claims Ombudsman and the holder of such Administrative Expense Claim. Pursuant to Section 6.5(d)(i) of the Plan, Allowed Settled Administrative Expense Claims shall receive distributions from the Litigation Trust before payment of other Allowed Administrative Expense Claims.

*Side-Car Term Loan Agreement* means that certain *First Lien Term Loan Agreement*, dated as of June 16, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among (i) First Brands Group, LLC, (ii) First Brands Intermediate, LLC, (iii) GLAS USA LLC, as administrative agent and collateral agent, and (iv) the lenders from time to time party thereto.

*Side-Car Term Loan Claims* means all Claims (including all accrued and unpaid interest, fees, charges, expenses, other amounts, and/or deficiency Claims) arising from (i) the Side-Car Term Loan Agreement; or (ii) the DIP Order and/or any other applicable order of the Bankruptcy Court that relate to the Side-Car Term Loan Agreement.

*Sidecar Term Loan Collateral* has the meaning set forth in the DIP Order.

*Sidecar Term Loan Secured Parties* has the meaning set forth in the DIP Order.

*Special Committees* means, collectively, the special committees of the boards of managers of (i) First Brands Group Holdings, LLC, First Brands Group Intermediate, LLC, and First Brands Group, LLC, each comprised of Neal Goldman and William Transier; and (ii) Viceroy, comprised of Benjamin Duster, Neal Goldman, and William Transier.

*Specified Executives* means, collectively, (i) Charles M. Moore, as Interim Chief Executive Officer and/or Chief Restructuring Officer of the Debtors; (ii) Daniel Jerneycic and Gaurav Malhotra, as Chief Restructuring Officers of the Debtors; and (iii) Paul Kosturos, as Chief Financial Officer of the Debtors.

***Specified Non-Released Parties*** means (i) any Person (or Affiliate of any Person) against which any action has been commenced on behalf of a Debtor or its Estate in this Bankruptcy Court or any court of competent jurisdiction prior to the Confirmation Hearing, including, for the avoidance of doubt, any defendants named or to be named by the Debtors in the James Complaint or named by the Debtors in the Onset Complaint; (ii) any Person (or Affiliate of any Person) identified as a defendant or a potential defendant of a Cause of Action in the Plan Supplement; (iii) any Person (or Affiliate of any Person) that is charged with a crime (whether before or after the Confirmation Date) based on conduct related to the Debtors; (iv) any Person (or Affiliate of any Person) that meets the definition of Adverse Conduct, as determined by a Final Order of the Bankruptcy Court; and (v) any subsequent transferee of any of the foregoing with respect to any assets of or transfers by the Debtors or their Affiliates or Representatives. Notwithstanding the foregoing or anything else in the Plan to the contrary (including anything in the definition of Released Party), and for the avoidance of doubt, neither the FBG Debtors and their Estates, nor any member of the Ad Hoc Group, Ad Hoc Group Advisors, Creditors' Committee and each of its members, Special Committee member, Independent Manager, Specified Executive, Professional, Prepetition Secured Party, nor DIP Secured Party, with respect to each of the foregoing, solely in their capacities as such, shall be construed to be or deemed to be a Specified Non-Released Party.

***SPV Debtors*** means the direct and indirect Debtor subsidiaries of Viceroy other than the FBG Debtors. For the avoidance of doubt, Viceroy is not an SPV Debtor.

***SPV Independent Manager*** means Benjamin Duster, in his capacity as independent manager of Viceroy.

***SPV Lender*** means (i) any lender or financing party (including any litigation financing party) (including, for the avoidance of doubt, Onset Financial, Inc.) that provided and/or asserts that it provided financing to an SPV Debtor and/or its agents, and (ii) any subsequent transferee, Affiliate, and/or Representative of the foregoing.

***SPV Recoveries*** means any recoveries or proceeds on account of any Lien asserted by the DIP Secured Parties in any assets owned by an SPV Debtor pursuant to the DIP Order, any adequate protection stipulation entered by the Bankruptcy Court, or any other order of the Bankruptcy Court.

***SPV-ABL Wind Down Account*** has the meaning set forth in the Wind Down Order.

***SPV-DIP Wind Down Account*** has the meaning set forth in the Wind Down Order.

***Statutory Fees*** means all fees and charges assessed against the FBG Debtors' Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

***Subordinated Claims*** means a Claim that is determined by a Final Order to be subordinated under section 510(c) of the Bankruptcy Code.

***Supply Chain Financer*** means any financial institution, fund, or other Person (other than any ABL Lender in its capacity as such) that (i) provided (or asserts that it provided) financing or liquidity to suppliers or vendors of one or more FBG Debtors or reimbursed any FBG

Debtor Affiliate for providing such financing or liquidity in connection with such suppliers' or vendors' accounts receivable arising from the supply of goods or services to such FBG Debtors, whether through supply chain financing programs, reverse factoring arrangements, receivables purchase facilities, or similar arrangements; or (ii) remitted payments (or asserts that it remitted payments) on behalf of one or more FBG Debtors relating to accounts payable arising from the supply of goods or services to such FBG Debtors, and as identified in an exhibit to the Litigation Trust Agreement.

*Term Claimholders* has the meaning set forth in the ABL Intercreditor Agreement.

*Term Collateral Agents* has the meaning set forth in the ABL Intercreditor Agreement.

*Trade Creditor* means any Person (including any Person that was paid through a payment intermediary but excluding any such payment intermediary) that, as of the Petition Date, holds a General Unsecured Claim against an FBG Debtor arising from the ordinary course of the FBG Debtor's business for goods sold, services rendered, or other trade obligations incurred prior to the Petition Date, excluding any Person whose claim arises from a (secured or unsecured) loan, financing arrangement, bond, note, or other financial indebtedness. For the avoidance of doubt, a Trade Creditor shall not include any Entity that qualifies as a Factor or Supply Chain Financer.

*Trademarks* means all trademarks, service marks, trade names, corporate names, trade dress, logos and other similar indica of source or origin, including all applications, registrations, extensions and renewals of the foregoing and all goodwill associated with the foregoing.

*Treasury Regulations* means the regulations of the United States Treasury.

*Trust Agreements* means, collectively, the ABL Collateral Trust Agreement, the DIP Collateral Trust Agreement, and the Litigation Trust Agreement.

*Trust Beneficiaries* means, collectively, the ABL Collateral Trust Beneficiaries, the DIP Collateral Trust Beneficiaries, and the Litigation Trust Beneficiaries.

*Trust Documents* means, collectively, (i) the Litigation Trust Agreement, (ii) the DIP Collateral Trust Agreement, and (iii) the ABL Collateral Trust Agreement.

*Trustees* means, collectively, the ABL Collateral Trustee, the DIP Collateral Trustee, and the Litigation Trustee.

*Trusts* means, collectively, the ABL Collateral Trust, the DIP Collateral Trust, and the Litigation Trust.

*UCC Member(s)* means the member(s) of the Litigation Trust Oversight Committee appointed by the Creditors' Committee in accordance with the Litigation Trust Agreement.

***Ultinon Claims and Interests*** means Debtor KTRI Holdings, Inc.'s (i) claims in respect of the loans (including sub-participation interests) made available to Liberty I B.V. and its direct and indirect subsidiaries under: (a) the senior facilities agreement originally dated July 20, 2024, as amended on October 27, 2025, November 17, 2025 and November 25, 2025 (as amended and/or amended and restated from time to time) between, amongst others Liberty II B.V. as the company, KTRI Holdings, Inc., and Deva Capital Investment Company S.L.U. as lenders and Banco Santander, S.A. as agent and security agent, and (b) the funded participation agreement dated November 26, 2025 (as amended and/or amended and restated from time to time) between Deva Capital Investment Company S.L.U. as grantor and KTRI Holdings, Inc. as participant; and (ii) Liens in respect of such claims.

***U.S. Bank Obligations*** has the meaning set forth in the DIP Order.

***U.S. Trustee*** means the United States Trustee for Region 7.

***Unimpaired*** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

***Viceroy*** means Viceroy Private Capital, LLC.

***Wind Down*** means the process to sell, abandon, wind down, dissolve, liquidate, or distribute the assets owned by the FBG Debtors following the Confirmation Date, if any, pursuant to a process to be agreed upon by the ABL Agent, the Ad Hoc Group SteerCo, and the Creditors' Committee.

***Wind Down Administrator*** means the administrator appointed by the FBG Debtors, the Ad Hoc Group SteerCo, and the Creditors' Committee whose duties will include, among other things, effectuating the Wind Down in accordance with the Plan.

***Wind Down Budget*** means a budget approved by the ABL Lenders, the Ad Hoc Group, SteerCo, and the Creditors' Committee, setting forth the estimate of costs and expenses necessary to effectuate the Wind Down through the date the Wind Down is completed.

***Wind Down Order*** means *Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* (Docket No. 2454).

***Wind Down Reserve*** means a deposit account or other Cash reserve held by the Wind Down Administrator to be funded in accordance with the Wind Down Budget, which shall be available and used only to satisfy costs and expenses of the Wind Down; *provided* that any funds remaining in the Wind Down Reserve on the date the Wind Down is completed (as determined in the Wind Down Administrator's sole discretion) shall be turned over to the DIP Collateral Trust. Absent the consent of the Ad Hoc Group SteerCo, the Wind Down Reserve shall not include any DIP Term Priority Collateral, First Lien Term Loan Collateral, Sidecar Term Loan Collateral, or Second Lien Term Loan Collateral.

29

**1.2** _**General Applicability.**_

The provisions of the Plan (including, for the avoidance of doubt, the provisions of Articles II-IV) only apply to Claims against and Interests in the FBG Debtors and not to any Claims against or Interests in the SPV Debtors.

**1.3** _**Interpretation; Application of Definitions; Rules of Construction.**_

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in or exhibit to the Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (v) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

**1.4** _**Reference to Monetary Figures.**_

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

**1.5** _**Consent Rights.**_

Notwithstanding anything herein to the contrary, any and all consent, approval, and consultation rights of the Ad Hoc Group SteerCo, the DIP Secured Parties, the ABL Agent, or the Creditors' Committee set forth herein or in the DIP Order, including with respect to the form and substance of the Plan, the Plan Supplement, and all other Definitive Documents (including any amendments, restatements, supplements, or other modifications to such documents and any consents, waivers, or other deviations under or from any such documents), shall be incorporated herein by this reference (including the applicable definitions in ARTICLE I hereof) and fully

enforceable as if stated in full herein. For the avoidance of doubt, the Debtors may accept and rely on emails from counsel for any required consents or approvals.

### 1.6 *Controlling Document.*

In the event of an inconsistency between the Plan and the Plan Supplement or any other exhibit, schedule, or annex to the Plan, the terms of the relevant document in the Plan Supplement or such exhibit, schedule, or annex, shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control. The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each. If there is any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

### ARTICLE II.    ADMINISTRATIVE EXPENSE CLAIMS, DIP A CLAIMS, PROFESSIONAL FEE CLAIMS, RESTRUCTURING EXPENSES, AND PRIORITY TAX CLAIMS.

### 2.1 *Administrative Expense Claims.*

**(a)** Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, on the later of (i) the Effective Date, and (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, each such holder of an Allowed Administrative Expense Claim shall receive, in full and final satisfaction, settlement, and release of such Administrative Expense Claim, (i) Cash payable by the Litigation Trust and/or the DIP Collateral Trust in accordance with the Litigation Trust Waterfall and the DIP Collateral Trust Waterfall, as applicable, in an amount equal to such Allowed Administrative Expense Claim; or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

### 2.2 *DIP A Claims.*

**(a)** **Allowance**. On the Confirmation Date, the DIP A Claims shall be deemed Allowed against the FBG Debtors. The Allowed amount of the DIP A Claims against the FBG Debtors as of the Confirmation Date shall be set forth in the notice of entry of the Confirmation Order filed in accordance with Section 15.8(a) of the Plan.

**(b)** **Treatment**. Except to the extent that a holder of an Allowed DIP A Claim agrees to less favorable treatment of such Claim, on the Confirmation Date, each such holder shall receive, in full and final satisfaction, settlement, and release of such Allowed DIP A Claim (other than the Remaining DIP A Claim), (i) on account of the Estate Claims Credit Bid, its Pro Rata Share of the Class 2 Litigation Trust Interests; (ii) on account of the DIP Collateral Credit Bid, its Pro Rata Share of the Class 2 DIP Collateral Trust Interests; (iii) if applicable, on account of any Initial Litigation Trust Funding Commitments, its pro rata share of the Class 1 Litigation Trust

Interests in accordance with the Litigation Trust Agreement; and (iv) if applicable, on account of any DIP Collateral Trust Funding, its pro rata share of the Class 1 DIP Collateral Trust Interests in accordance with the DIP Collateral Trust Agreement. The Remaining DIP A Claims shall not be discharged or released on the Confirmation Date, shall remain enforceable against the DIP Loan Parties, Parent Guarantors, and/or the SPV Debtors, as applicable, and shall continue to accrue interest, fees, and expenses in accordance with the DIP Order; *provided* that, for the avoidance of doubt, any such accruals following the Confirmation Date shall not increase the amounts distributable to holders of Class 2 Litigation Trust Interests in accordance with the Litigation Trust Waterfall set forth in <u>Section 6.5</u> of the Plan.

### 2.3 *Professional Fee Claims*.

(a) All Professionals seeking approval by the Bankruptcy Court of Professional Fee Claims shall file, on or before the date that is ninety (90) calendar days after the Confirmation Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Confirmation Date. Objections to any Professional Fee Claims must be filed and served no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Professional Fee Claim).

(b) Allowed Professional Fee Claims shall be paid in full in Cash in such amounts as are allowed by the Bankruptcy Court (i) upon such terms as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the FBG Debtors, out of the Professional Fees Escrow Account; or (ii) on the date upon which an order relating to any such allowed Professional Fee Claim is entered. The Plan Settlement is conditioned upon the FBG Debtors', Ad Hoc Group SteerCo's, and Creditors' Committee's agreement to a budget for amounts payable by the FBG Debtors from the date of entry of the order approving the Disclosure Statement on a conditional basis to the Confirmation Date (the "**Agreed Budget**"). Pursuant to the Plan Settlement, no allowed Professional Fees of Professionals may be paid from the Litigation Trust Cash Funding, the Litigation Trust, or the DIP Collateral Trust. All Professionals waive their right to any Post-Carve Out Amount (as defined in the DIP Order); *provided*, for the avoidance of doubt, this provision shall not act as a waiver of any condition precedent set forth in <u>Section 12.1</u> of the Plan.

(c) Any Professional Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court, including the Interim Compensation Procedures Order, may be paid at the times and in the amounts authorized pursuant to such orders.

(d) Five (5) Business Days before the Confirmation Date, holders of Professional Fee Claims shall provide a reasonable estimate of unpaid Professional Fee Claims incurred in rendering services to the Debtors and the Creditors' Committee, and the Debtors shall fund such estimated amounts into the Professional Fees Escrow Account for the benefit of the holders of the Professional Fee Claims; *provided* that, notwithstanding the foregoing, the Debtors may not fund any amounts into the Professional Fees Escrow Account that would cause the FBG Debtors to have in the aggregate less than $25,000,000 in Cash on their balance sheet on the Confirmation Date without the consent of the Ad Hoc Group SteerCo. If a holder of a Professional Fee Claim does not provide an estimate, the Debtors shall estimate the unpaid and unbilled

32

reasonable and necessary fees and out-of-pocket expenses of such holder of a Professional Fee Claim.  When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in such Professional Fees Escrow Account shall be released from such escrow and revert to, and ownership thereof shall vest in, the DIP Collateral Trust without any further action or order of the Bankruptcy Court.

**(e)** Pursuant to the terms of the Wind Down Budget, the Wind Down Administrator is authorized to pay compensation for services rendered to the FBG Debtors or reimbursement of expenses incurred on behalf of the FBG Debtors after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.4 *Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Confirmation Date, shall be paid in full in Cash on the Confirmation Date or as soon as reasonably practicable thereafter (to the extent not previously paid) in accordance with, and subject to, as applicable, the Plan and any other fee arrangements, without any requirement to file a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval; *provided* that the foregoing shall be subject to the  FBG Debtors' receipt of an invoice in summary form (but without the need for itemized time detail and may be redacted) from the applicable Entity entitled to such Restructuring Expenses.  All Restructuring Expenses to be paid on the Confirmation Date shall be estimated prior to and as of the Confirmation Date, and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Confirmation Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.

### 2.5 *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, and release of such Allowed Priority Tax Claim, at the option of the Claims Ombudsman, either: (i) Cash payable by the Litigation Trust in accordance with the Litigation Trust Waterfall in an amount equal to such Allowed Priority Tax Claim on the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; and (b) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; (ii) equal annual Cash payments payable by the Litigation Trust in accordance with the Litigation Trust Waterfall in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date (*provided* that the Claims Ombudsman reserves the right to prepay all or a portion of any Allowed Priority Tax Claim at any time under this option without penalty or premium); or (iii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

**ARTICLE III.     CLASSIFICATION OF CLAIMS AND INTERESTS AGAINST THE FBG DEBTORS.**

### 3.1     *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 3.2     *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the FBG Debtors and specifies which Classes are (i) Impaired and Unimpaired under the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP A Claims, Professional Fee Claims, and Priority Tax Claims have not been classified.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 3 | Roll-Up Claims | Impaired | Yes |
| 4 | First Lien Claims | Impaired | Yes |
| 5 | Second Lien Claims | Impaired | Yes |
| 6 | ABL Claims | Impaired | Yes |
| 7 | General Unsecured Claims | Impaired | Yes |
| 8 | Subordinated Claims | Impaired | Yes |
| 9 | Intercompany Claims | Impaired | No (Presumed to Accept) |
| 10 | FBG Debtor Interests | Impaired | No (Deemed to Reject) |

### 3.3     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the FBG Debtors, the ABL Collateral Trust, the DIP Collateral Trust, and the Litigation Trust, as applicable, in respect of any Unimpaired Claims against the FBG Debtors, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims against the FBG Debtors.

34

### 3.4 *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Claim against or Interest in the FBG Debtors that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.5 *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contained Claims eligible to vote and no holder of such Claims votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

### 3.6 *Voting; Presumptions; Solicitation.*

**(a) Acceptance by Certain Impaired Classes**. Only holders of Claims in Classes 3, 4, 5, 6, 7, and 8 are entitled to vote to accept or reject the Plan.

**(b) Presumed Acceptance by Unimpaired Classes.** Holders of Claims in Classes 1, 2, and 9 are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

**(c) Deemed Rejection by Certain Impaired Classes.** Holders of Interests in Class 10 are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### 3.7 *Cramdown.*

If any Class entitled to vote on the Plan does not vote to accept the Plan, the FBG Debtors may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.8 *No Waiver.*

Nothing contained in the Plan shall be construed to waive a FBG Debtor's or other Person's right to object on any basis to any Claim against the FBG Debtors.

## ARTICLE IV. TREATMENT OF CLAIMS AND INTERESTS AGAINST THE FBG DEBTORS.

### 4.1 *Class 1:  Other Priority Claims.*

**(a) Treatment**: Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the later of (i) the Effective Date, and (ii) the first

Business Day after the date that is forty-five (45) calendar days after the date such Other Priority Claim becomes an Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, and release of such Allowed Other Priority Claim: (i) Cash distributions from the Litigation Trust in an amount equal to such Allowed Other Priority Claim payable by the Litigation Trust in accordance with the Litigation Trust Waterfall; or (ii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

**(b)    Impairment and Voting**: Class 1 is Unimpaired, and holders of Other Priority Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

### 4.2    *Class 2: Other Secured Claims.*

**(a)    Treatment:** Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, settlement, and release of such Allowed Other Secured Claim, at the option of the Claims Ombudsman:

(i)    payment in full in Cash in an amount equal to such Claim, payable on the later of (x) the Effective Date, and (y) the first Business Day after forty-five (45) days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim;

(ii)    transfer of the collateral securing such Other Secured Claim or the proceeds thereof in satisfaction of the Allowed amount of such Secured Claim; or

(iii)    such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

**(b)    Impairment and Voting:** Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Secured Claims.

### 4.3    *Class 3:  Roll-Up Claims.*

**(a)    Allowance.** On the Confirmation Date, the Roll-Up Claims shall be deemed Allowed against the FBG Debtors. Solely for purposes of the Litigation Trust Waterfall, the Allowed amount of the Roll-Up Claims shall be $3,300,000,000.

**(b)    Treatment**: Except to the extent that a holder of an Allowed Roll-Up Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, and release of such Allowed Roll-Up Claim (other than the Remaining Roll-Up Claims), on the Confirmation Date, each such holder shall receive, on account of its Allowed Roll-Up Claim, its

36

Pro Rata Share of the Class 3(a) Litigation Trust Interests.  The Roll-Up Claims in excess of the aggregate amount of distributions that are anticipated to be made to holders of Allowed Roll-Up Claims under the Litigation Trust Waterfall, as determined in accordance with Section 6.19(d)(ii) of the Plan (the "**Remaining Roll-Up Claims**"), shall not be discharged or released on the Confirmation Date, shall remain enforceable against the DIP Loan Parties, Parent Guarantors, and/or the SPV Debtors, as applicable, and shall continue to accrue interest, fees, and expenses in accordance with the DIP Order; *provided* that, for the avoidance of doubt, any such accruals following the Confirmation Date shall not increase the amounts distributable to holders of Class 3(a) Litigation Trust Interests in accordance with the Litigation Trust Waterfall set forth in Section 6.5 of the Plan.

(c)      **Impairment and Voting:**  Class 3 is Impaired, and, thus, holders of Roll-Up Claims against the FBG Debtors are entitled to vote to accept or reject the Plan.

### 4.4      *Class 4:  First Lien Claims.*

(a)      **Allowance**.  On the Confirmation Date, the First Lien Claims shall be deemed Allowed against the FBG Debtors.  The Allowed amount of the First Lien Claims against the FBG Debtors as of the Confirmation Date shall be set forth in the notice of entry of the Confirmation Order filed in accordance with Section 15.8(a) of the Plan.

(b)      **Treatment:**  Except to the extent that a holder of an Allowed First Lien Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, and release of such Allowed First Lien Claim (other than Remaining First Lien Claims), on the Confirmation Date, each such holder shall receive, on account of its Allowed First Lien Claim, its Pro Rata Share of the Class 3(c) Litigation Trust Interests.  The First Lien Claims in excess of the aggregate amount of distributions that are anticipated to be made to holders of Allowed First Lien Claims under the Litigation Trust Waterfall, as determined in accordance with Section 6.19(d)(ii) of the Plan (the "**Remaining First Lien Claims**"), shall remain outstanding until the Effective Date, at which point such Remaining First Lien Claims shall be deemed to be released.

(c)      **Impairment and Voting:**  Class 4 is Impaired, and, thus, holders of First Lien Claims against the FBG Debtors are entitled to vote to accept or reject the Plan.

### 4.5      *Class 5:  Second Lien Claims.*

(a)      **Allowance**.  On the Confirmation Date, the Second Lien Claims shall be deemed Allowed against the FBG Debtors.  The Allowed amount of the Second Lien Claims against the FBG Debtors as of the Confirmation Date shall be set forth in the notice of entry of the Confirmation Order filed in accordance with Section 15.8(a) of the Plan.

(b)      **Treatment:**  Except to the extent that a holder of an Allowed Second Lien Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, and release of such Allowed Second Lien Claim (other than Remaining Second Lien Claims), on the Confirmation Date, each such holder shall receive, on account of its Allowed Second Lien Claim, its Pro Rata Share of the Class 3(c) Litigation Trust Interests.  The Second Lien Claims in excess of the aggregate amount of distributions that are anticipated to be made to holders of Allowed Second Lien Claims under the Litigation Trust Waterfall, as determined in accordance

with Section 6.19(d)(ii) of the Plan (the "**Remaining Second Lien Claims**"), shall remain outstanding until the Effective Date, at which point such Remaining Second Lien Claims shall be deemed to be released.

(c)   **Impairment and Voting:**  Class 5 is Impaired, and, thus, holders of Second Lien Claims against the FBG Debtors are entitled to vote to accept or reject the Plan.

### 4.6   *Class 6:  ABL Claims.*

(a)   **Allowance**.  On the Confirmation Date, the ABL Claims shall be deemed Allowed against the FBG Debtors in the full amount then outstanding under the ABL Credit Agreement and the DIP Order, other than with respect to the U.S. Bank Obligations.  Upon a determination by the Bankruptcy Court, or mutual agreement of the applicable parties, that the U.S. Bank Obligations are Allowed Secured Claims, such U.S. Bank Obligations shall be treated as ABL Claims against the FBG Debtors in accordance with the Plan.  Notwithstanding anything to the contrary herein, if the U.S. Bank Obligations are determined by the Bankruptcy Court not to be Allowed Secured Claims, then any provision herein regarding contributions to the ABL Collateral Trust shall be deemed inapplicable to the U.S. Bank Obligations.  The Allowed amount of the ABL Claims shall be set forth in the notice of entry of the Confirmation Order filed in accordance with Section 15.8(a) of the Plan.

(b)   **Treatment**:  On the Confirmation Date, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code, the ABL Agent, by and on behalf of the ABL Secured Parties, shall be deemed to have foreclosed upon the ABL Collateral Trust Assets of the FBG Debtors and transferred all such assets to the ABL Collateral Trust.  Except to the extent that a holder of an Allowed ABL Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, and release of such Allowed ABL Claim, on the Confirmation Date, each such holder shall receive, on account of its Allowed ABL Claim, its Pro Rata Share of the ABL Collateral Trust Interests.  The ABL Claims against the ABL Loan Parties in excess of the fair market value of the ABL Collateral Trust Assets, as determined in accordance with Section 8.11(d)(ii) of the Plan (the "**ABL Deficiency Claims**"), shall remain outstanding and enforceable against such ABL Loan Parties; *provided* that such ABL Deficiency Claims shall not be secured by the ABL Collateral Trust Assets, which assets shall be held free and clear of ABL Deficiency Claims by the ABL Collateral Trust; *provided further* that, on the Confirmation Date and immediately following the foreclosure upon the ABL Collateral Trust Assets, the holders of the ABL Deficiency Claims shall be deemed to have contributed all of their rights, title, and interests in respect of any amounts or proceeds to be realized on account of the ABL Deficiency Claims to the ABL Collateral Trust to be distributed in accordance with the waterfall set forth in Section 8.3 of the Plan.

(c)   To the extent the ABL Secured Parties hold Allowed ABL Claims against the FBG Debtors that are oversecured (i.e., the value of the ABL Priority Collateral exceeds the Allowed amount of the ABL Claims), as determined by the Bankruptcy Court, the holders of such Allowed ABL Claims shall be entitled to receive postpetition interest on such Claims at the applicable contractual rate under the ABL Credit Agreement to the extent permitted by section 506(b) of the Bankruptcy Code, which interest shall be paid from the ABL Collateral Trust Assets

prior to any turnover of excess proceeds to the DIP Collateral Trust pursuant to Section 7.12 of the Plan.

**(d)** **Impairment and Voting**: Class 6 is Impaired, and, thus, holders of ABL Claims are entitled to vote to accept or reject the Plan.

### 4.7 *Class 7: General Unsecured Claims.*

**(a)** **Treatment**: Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final settlement, and release of such Allowed General Unsecured Claim, on the Confirmation Date, each such holder shall receive its Pro Rata Share of the Class 3(b) Litigation Trust Interests.

**(b)** **Impairment and Voting:** Class 7 is Impaired, and, thus, holders of General Unsecured Claims against the FBG Debtors are entitled to vote to accept or reject the Plan.

### 4.8 *Class 8: Subordinated Claims.*

**(a)** **Treatment**: All Subordinated Claims, if any, shall be cancelled, released, and extinguished, and shall be of no further force or effect, and holders of Allowed Subordinated Claims shall receive their Pro Rata Share of the Class 3(b) Litigation Trust Interests.

**(b)** **Impairment and Voting**: Class 8 is Impaired, and, thus, holders of Subordinated Claims against the FBG Debtors are entitled to vote to accept or reject the Plan.

### 4.9 *Class 9: Intercompany Claims.*

**(a)** **Treatment**: On or prior to the Effective Date or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, reinstated, or released to the extent reasonably determined to be appropriate by the Wind Down Administrator; *provided* that no distributions will be made on account of Intercompany Claims.

**(b)** **Impairment and Voting:** Class 9 is Impaired. Holders of Intercompany Claims are either plan proponents or controlled by plan proponents and therefore are conclusively presumed to accept the Plan. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Intercompany Claims.

### 4.10 *Class 10: FBG Debtor Interests.*

**(a)** **Treatment**: On the date that an FBG Debtor's Chapter 11 Case is closed (which in the case of FBGH and Viceroy, shall not occur until all distributions under the Plan with respect to the FBG Debtors have been made), and without the need for any further corporate or limited liability company action or approval of any members, board of managers, managers, management, or Interest holders of such FBG Debtor, all FBG Debtor Interests in such FBG Debtor shall be cancelled, and holders of FBG Debtor Interests in such FBG Debtor shall not receive any distributions on account of such FBG Debtor Interests unless and until any Allowed Claims for which such FBG Debtor has a continuing obligation to pay following the Confirmation

Date are satisfied in full, in which case each holder of an FBG Debtor Interest in such FBG Debtor shall receive its Pro Rata Share of any residual distributable value of such FBG Debtor. The continuing rights of holders of Debtor Interests in FBGH and Viceroy shall be nontransferable and non-assignable except by will, intestate, succession, or (subject to the prior written consent of the Wind Down Administrator, which is not to be unreasonably withheld) operation of law.

(b) **Impairment and Voting:** Class 10 is Impaired. Holders of FBG Debtors Interest are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of FBG Debtor Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to FBG Debtor Interests.

## ARTICLE V. MEANS FOR IMPLEMENTATION.

### 5.1 *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, and the releases contained in the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, equitable, and subordination rights that a holder of a Claim or Interest may have with respect to any Claim against or Interest in an FBG Debtor and any distribution to be made on account of such Claim or Interest. The Plan shall be deemed a motion to approve the compromises and settlements contained in the Plan, including the Plan Settlement. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, including the Plan Settlement, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the FBG Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of the Plan.

### 5.2 *Plan Settlement.*

(a) **Overview**. Pursuant to sections 105(a), 361, 363, 364, 1123(b)(3)(A), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan effect a compromise and settlement among the FBG Debtors, the Ad Hoc Group, and the Creditors' Committee (the "**Plan Settlement**"). The compromises and settlements included in the Plan Settlement are each (i) integrated with and dependent on all other compromises and settlements contemplated in connection with the Plan and (ii) necessary and integral to the Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlement under sections 105(a), 361, 363, 364, 1123(b)(3)(A), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Plan Settlement is fair, equitable, reasonable and in the best interests of the FBG Debtors' Estates. The terms of the Plan Settlement are reflected below.

(b) **Enforcement of Remedies**. The DIP Secured Parties have superpriority liens on (i) all prepetition and postpetition property of the FBG Debtors, including the DIP Loan

Parties and Parent Guarantors, and all proceeds thereof, including all Estate Claims (excluding Avoidance Actions but including Avoidance Proceeds), (ii) all Additional Unencumbered Property, and (iii) all Prepetition Collateral (other than ABL Priority Collateral, on which the liens of the DIP Secured Parties, the First Lien Secured Parties, and the Second Lien Term Loan Secured Parties are junior to those of the ABL Secured Parties). The DIP Secured Parties have alleged that various events of default have occurred and are continuing under the DIP Documents. The DIP Loan Parties and Parent Guarantors do not have sufficient funds to indefeasibly pay the DIP Obligations in full in Cash. The Plan Settlement incorporates a consensual arrangement to (i) permit the DIP Secured Parties to accelerate the DIP Obligations and enforce remedies against the FBG Debtors but without the costs, expenses, and risks of attendant litigation relating thereto and (ii) provide recoveries to junior creditors of the FBG Debtors which allows such creditors to participate in recovery prior to the satisfaction in full of the DIP A Claims and Roll-Up Claims.

(c) **Expiration of Challenge Rights**. The Challenge Period shall be deemed to expire against the Creditors' Committee and all other parties in interest (unless already expired pursuant to the terms of the DIP Order) upon the (i) establishment of the Litigation Trust, (ii) consummation of the Estate Claims Credit Bid Transaction, and (iii) funding of the Litigation Trust Cash Funding to the Litigation Trust.

(d) **Cash Funding and Agreed Budget**. On the Confirmation Date, the Litigation Trust shall receive the Litigation Trust Cash Funding. No Allowed Professional Fees of Professionals may be paid from the Litigation Trust Cash Funding.

(e) **Estate Claims Credit Bid Transaction**. The FBG Debtors are conducting a marketing and sale process for the Estate Claims. Pursuant to the Plan Settlement, on the Confirmation Date or soon thereafter as reasonably practicable, unless the FBG Debtors determine the Estate Claims Credit Bid Transaction is not the highest or best offer (with the consent of the Creditors' Committee (not to be unreasonably withheld, conditioned, or delayed)), the FBG Debtors shall sell, assign, convey, transfer, and deliver, or cause to be sold, assigned, conveyed, transferred, and delivered, the Litigation Trust Assets, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code, to the DIP Secured Parties and such assets shall then transfer to the Litigation Trust free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise). The aggregate consideration to be paid by the DIP Secured Parties for such Litigation Trust Assets shall be the Estate Claims Credit Bid as the same may be increased at any auction. The Plan shall serve as a motion by the FBG Debtors seeking entry of a Bankruptcy Court order, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code, approving the Estate Claims Credit Bid Transaction, including the Bankruptcy Court's findings that (i) the Estate Claims Credit Bid Transaction is (a) in exchange for good and valuable consideration, (b) in the best interests of the FBG Debtors and their Estates, (c) fair, equitable, reasonable, and free and clear, and (d) effected after due notice and opportunity for hearing; and (ii) the relevant parties are afforded the protections of section 363(m) of the Bankruptcy Code.

(f) **DIP Collateral Credit Bid Transaction**. Pursuant to the Plan Settlement, on the Confirmation Date or as soon thereafter as reasonably practicable, the FBG Debtors shall sell, assign, convey, transfer, and deliver, or cause to be sold, assigned conveyed, transferred, and delivered, the DIP Collateral Trust Assets, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code and the DIP Collateral Credit Bid APA (if applicable), to

the DIP Secured Parties and such assets shall then transfer to the DIP Collateral Trust free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise). The aggregate consideration to be paid by the DIP Secured Parties for the DIP Collateral Trust Assets shall be the DIP Collateral Credit Bid. The Plan shall serve as a motion by the FBG Debtors seeking entry of a Bankruptcy Court order, pursuant to sections 105, 363(b) and (f), and 1123(a)(5)(D) of the Bankruptcy Code, approving the DIP Collateral Credit Bid Transaction, including the Bankruptcy Court's findings that (i) the DIP Collateral Credit Bid Transaction is (a) in exchange for good and valuable consideration, (b) in the best interests of the FBG Debtors and their Estates, (c) fair, equitable, reasonable, and free and clear, and (d) effected after due notice and opportunity for hearing, and (ii) the relevant parties are afforded the protections of section 363(m) of the Bankruptcy Code.

(g)     **Claims Ombudsman**. The Claims Ombudsman shall be appointed on the Confirmation Date (or as soon thereafter as reasonably practicable) and shall serve as the holder of record of the Class 3(b) Litigation Trust Interests (and, in such capacity shall provide the Litigation Trustee with a properly completed IRS Form W-9). The Claims Ombudsman shall be responsible for reconciling all Disputed Claims (including Disputed Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and General Unsecured Claims) against the FBG Debtors and making distributions to holders of Class 3(b) Litigation Trust Interests in accordance with the Plan, including all federal, state, and local income tax reporting obligations associated therewith. As permitted or required by applicable law, the Claims Ombudsman may treat any Litigation Trust Assets allocable to, or held on account of, any Class 3(b) Litigation Trust Interests as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity. *See* Section 6.19(d) of the Plan. The Claims Ombudsman shall only withhold distributions where necessary and shall otherwise be required to make minimum and/or interim distributions expeditiously. All costs of the Claims Ombudsman to reconcile Disputed Claims (including Disputed Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims) and make distributions to holders of Class 3(b) Litigation Trust Interests shall be paid from the distributions otherwise distributable to holders of Class 3 Litigation Trust Interests and shall not be otherwise chargeable against the Litigation Trust. The Litigation Trust shall advance funds to the Claims Ombudsman to fund the claims reconciliation process, subject to an agreed budget. The Litigation Trustee and Claims Ombudsman shall negotiate such agreed budget in good faith. The Claims Ombudsman shall have a fiduciary duty to all holders of Litigation Trust Interests to maximize value in connection with the reconciliation of Disputed Claims (including Disputed Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and General Unsecured Claims). The Litigation Trust Agreement shall provide that certain settlements of Disputed Claims shall require approval by the Litigation Trust Oversight Committee.

(h)     **Survival of Claims**. The Remaining Lender Claims and ABL Deficiency Claims against the Estates of the FBG Debtors are preserved and may continue to be asserted against the Estates of the applicable FBG Debtors and shall not be reduced by the amount of any Trust distributions made on or after the Confirmation Date. For the avoidance of doubt, no Allowed Claims shall be reduced by any Trust distributions on or after the Confirmation Date. The Remaining First Lien Claims and Remaining Second Lien Claims shall be deemed to be released against the FBG Debtors on the Effective Date. Any property recovered on account of the Remaining Lender Claims (other than any Litigation Trust SPV Recoveries) shall be deemed to be contributed to the DIP Collateral Trust and shall constitute DIP Collateral Trust Assets.

      **(i)**      **DIP Order and Intercreditor Agreement Preservation.** Nothing in the Plan, the Confirmation Order, or any Definitive Document shall modify, amend, waive, reject, or impair the rights of the DIP Secured Parties or the Prepetition Secured Parties under the Intercreditor Agreements (as defined in the DIP Order) and the DIP Order, except to the extent expressly agreed to in writing by the ABL Agent and the DIP Agent. Subject to the terms of the Plan, Confirmation, and DIP Order, the Intercreditor Agreements and the DIP Order shall remain in full force and effect following the Confirmation Date and shall not be rejected, modified, supplemented, or otherwise altered by the Plan, the Confirmation Order, or any Definitive Document without the prior written consent of the ABL Agent and the DIP Agent. The DIP Collateral Trust (and any trustee or fiduciary thereof) shall be deemed a successor to the Term Collateral Agents and the Term Claimholders for purposes of the Intercreditor Agreements and shall be bound by all restrictions and obligations applicable to the Term Claimholders thereunder.

      **(j)**      **Bona Fide Disputes Among the Trusts.**

      (i)      If there is a dispute as to whether an asset is a Litigation Trust Asset, DIP Collateral Trust Asset, or ABL Collateral Trust Asset, such dispute shall be resolved either by the mutual consent of the DIP Secured Parties, the ABL Secured Parties, and/or the Litigation Trust or by the Bankruptcy Court and, upon entry of a Final Order or mutual agreement, such asset, as applicable, shall automatically vest in the Litigation Trust, DIP Collateral Trust, or ABL Collateral Trust, as applicable. Until such bona fide dispute is resolved, the DIP Secured Parties and the ABL Secured Parties may determine that the FBG Debtors shall hold such asset in trust pending an adjudication or settlement, or the DIP Secured Parties and ABL Secured Parties may determine to have the asset remain in the estates of the FBG Debtors. This section shall only apply to assets to which there is a dispute between the ABL Secured Parties and DIP Secured Parties.

      (ii)      For the avoidance of doubt, a dispute exists with respect to whether any amounts (excluding the agreed $3,000,000 tariff refunds currently in the FBG Debtors' possession, which constitute ABL Priority Collateral) recovered by the Debtors that were unlawfully collected under the International Emergency Economic Powers Act are Litigation Trust Assets, DIP Collateral Trust Assets, or ABL Collateral Trust Assets. Until the Litigation Trustee, the DIP Secured Parties, and ABL Secured Parties resolve such dispute, all amounts recovered under the International Emergency Economic Powers Act shall be placed in a segregated escrow account maintained by the FBG Debtors and shall only vest to the Litigation Trust, DIP Collateral Trust, or ABL Collateral Trust pursuant to a Final Order or consensual agreement of the parties. For the avoidance of doubt, the $3,000,000 tariff refunds currently in the FBG Debtors' possession is not subject to dispute and constitute ABL Priority Collateral.

**(k)**     Solely for purposes of distributions under the Plan: (i) each Claim filed or to be filed against any FBG Debtor shall be deemed filed as a single Claim against, and a single obligation of, the FBG Debtors; (ii) any Claims on account of a guarantee provided by an FBG Debtor of the obligations of another FBG Debtor shall be treated as eliminated so that any Claim against any FBG Debtor and any Claim based upon a guarantee thereof by any other FBG Debtor shall be treated as one Claim against a single consolidated Estate; and (iii) any joint or joint and several liability of any of the FBG Debtors shall be one obligation of the FBG Debtors and any Claims based upon such joint or joint and several liability shall be treated as one Claim against a single consolidated Estate.

**5.3**     *Implementation.*

(i)     On the Confirmation Date or as soon as reasonably practicable thereafter, the FBG Debtors shall consummate the (i) Estate Claims Credit Bid Transaction and (ii) DIP Collateral Credit Bid Transaction.

(ii)     On the Confirmation Date or as soon as reasonably practicable thereafter, the Litigation Trust shall be established and administered pursuant to the Litigation Trust Agreement and the Plan.  Upon the establishment of the Litigation Trust, the Litigation Trust Assets shall transfer to the Litigation Trust automatically and without further action of the Bankruptcy Court; *provided* that the FBG Debtors, the Litigation Trust, the Litigation Trustee, and any other necessary party shall execute (or be deemed to have executed) all documentation necessary to effectuate such transfer.

(iii)     On the Confirmation Date or as soon as reasonably practicable thereafter, the DIP Collateral Trust shall be established and administered pursuant to the DIP Collateral Trust Agreement and the Plan.  Upon the establishment of the DIP Collateral Trust, the DIP Collateral Trust Assets shall transfer to the DIP Collateral Trust automatically and without further action of the Bankruptcy Court; *provided* that the FBG Debtors, the DIP Collateral Trust, the DIP Collateral Trustee, and any other necessary party shall execute (or be deemed to have executed) all documentation necessary to effectuate such transfer.

(iv)     On the Confirmation Date or as soon as reasonably practicable thereafter, the ABL Collateral Trust shall be established and administered pursuant to the ABL Collateral Trust Agreement and the Plan.  Upon the establishment of the ABL Collateral Trust, the ABL Secured Parties shall be deemed to have foreclosed on the ABL Collateral Trust Assets and transferred such ABL Collateral Trust Assets to the ABL Collateral Trust automatically and without further action of the Bankruptcy Court; *provided* that the FBG Debtors, the ABL Collateral Trust, the ABL Collateral Trustee, and any other

44

necessary party shall execute (or be deemed to have executed) all documentation necessary to effectuate such transfer.

(v)      On the Confirmation Date or as soon as reasonably practicable thereafter, the Wind Down Reserve shall be established and funded in accordance with the Wind Down Budget.

(vi)      On the Confirmation Date or as soon as reasonably practicable thereafter, the FBG Debtors shall transfer the (a) Professional Fees Escrow Account, (b) the Factored Receivables Account, (c) the Examiner Account, (d) the Employee Liability Account, (e) any Employee Lease Accounts, and (f) the Segregated Accounts to the Wind Down Administrator.

(vii)      Following the Confirmation Date, the Wind Down Administrator shall administer the Factored Receivables Account in accordance with the Cash Management Order and the Plan.

(viii)      Following the Confirmation Date, the Wind Down Administrator shall administer the Employee Liability Account in accordance with the OEM Order.

(ix)      Following the Confirmation Date, the Wind Down Administrator shall administer any Employee Lease Accounts in accordance with any applicable order of the Bankruptcy Court, purchase agreement, and/or employee lease agreement.

(x)      Following the Confirmation Date, any funds remaining in the Health Escrow Account that are required to be returned to the FBG Debtors shall be remitted to the Wind Down Administrator to satisfy costs and expenses of the Wind Down in accordance with the Wind Down Budget until transferred by the Wind Down Administrator to the DIP Collateral Trust.

### 5.4     *Factored Receivables Account.*

Following the Confirmation Date, the Factored Receivables Account shall be transferred to the Wind Down Administrator, and the Wind Down Administrator shall assume the obligations for administering the Factored Receivables Account. The Wind Down Administrator shall administer the Factored Receivables Account in accordance with the Cash Management Order, including providing the reporting set forth in paragraph 7 of the Cash Management Order. The Confirmation Order shall provide that (i) the FBG Debtors shall continue to direct, to the extent received by the FBG Debtors, and segregate all prepetition collections into the Factored Receivables Account and (ii) the FBG Debtors and the Wind Down Administrator shall not disburse any such segregated funds from the Factored Receivables Account pending further order of the Bankruptcy Court after notice to the ABL Agent and all other affected parties and all such parties being provided an opportunity to be heard; *provided*, for the avoidance of doubt, that the FBG Debtors and the Wind Down Administrator shall not be required to segregate any funds

received on account of any postpetition sale and related invoice. The Confirmation Order shall further provide that the Wind Down Administrator shall be authorized to administer the Factored Receivables Account and prosecute the FBG Debtors' interests in the funds on deposit in the Factored Receivables Account; *provided* that the Wind Down Administrator shall do so at the ABL Collateral Trust's sole cost and expense (paid in advance); *provided further* that the ABL Agent shall have the right to direct the Wind Down Administrator with respect to the prosecution of the FBG Debtors' interests in the Factored Receivables Account and the ABL Agent's prior written consent shall be required for any settlement, compromise, or other disposition of such interests.

**5.5** ***Wind Down Accounts.***

As soon as reasonably practicable following the Confirmation Date, (i) the SPV-ABL Wind Down Account shall be transferred to the ABL Collateral Trust and the ABL Collateral Trust shall assume the obligations for administering such account; and (ii) the SPV-DIP Wind Down Account shall be transferred to the DIP Collateral Trust, and the DIP Collateral Trustee shall assume the obligations for administering such account. The ABL Collateral Trustee and the DIP Collateral Trustee shall administer the SPV-ABL Wind Down Account and the SPV-DIP Wind Down Account, respectively, in accordance with the Wind Down Order.

**5.6** ***Corporate Action.***

**(a)** Following the Confirmation Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan or the Confirmation Order (including any action to be undertaken by the FBG Debtors, the Wind Down Administrator, the Trustees, or the Trusts) shall be deemed authorized, approved, and, to the extent taken prior to the Confirmation Date, ratified without any requirement for further action by holders of Claims or Interests, the FBG Debtors, or any other Entity or Person. All matters provided for in the Plan involving the organizational structure of the FBG Debtors, and any other action required by the FBG Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the FBG Debtors or their Estates.

**(b)** The authorizations and approvals contemplated by this Section 5.6 shall be effective notwithstanding any requirements under non-bankruptcy law.

**(c)** The Confirmation Order shall and shall be deemed, pursuant to sections 363, 1123, and 1142 of the Bankruptcy Code, to authorize and direct parties, as applicable, among other things, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**5.7** ***Wind Down Administrator.***

**(a)** **Wind Down**. After the Confirmation Date, pursuant to the Plan, the Wind Down Administrator shall effectuate the Wind Down without any further approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, subject to the Wind Down Budget. The Wind Down (as determined for federal income tax purposes) shall occur in an expeditious but orderly manner following the Confirmation Date.

(b) **Authority of the Wind Down Administrator**. The Wind Down Administrator shall have the authority and right on behalf of the FBG Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i) coordinate with the Trustees with respect to the transfer and turnover of information;

(ii) administer the FBG Debtors' tax obligations, including (a) filing tax returns and paying tax obligations, (b) requesting, if necessary, an expedited determination of any unpaid tax liability of the FBG Debtors or their Estates under Bankruptcy Code section 505(b) for all taxable periods of the FBG Debtors ending after the Petition Date through the liquidation of the FBG Debtors as determined under applicable tax laws, and (c) representing the interest and account of the FBG Debtors or their Estates before any taxing authority in all matters including, without limitation, any action, suit, or proceeding or audit;

(iii) (a) administer the Factored Receivables Account and prosecute the FBG Debtors' interests in the Factored Receivables Account in accordance with the Cash Management Order and the Plan, (b) administer the Professional Fees Escrow Account in accordance with the DIP Order and facilitate distributions from such account to satisfy allowed Professional Fee Claims, (c) administer the Examiner Account and facilitate distributions from such account to satisfy the allowed fee and expenses of the Examiner and his professionals, (d) administer the Employee Liability Account in accordance with the OEM Order, (e) administer any Employee Lease Accounts in accordance with any applicable order of the Bankruptcy Court, purchase agreement, and/or employee lease agreement, and (f) administer the Segregated Accounts in accordance with the Evolution Adequate Protection Stipulation;

(iv) pay statutory fees in accordance with <u>Section 15.1</u> of the Plan;

(v) close the Chapter 11 Case of the FBG Debtors; and

(vi) perform other duties and functions that are consistent with the Plan or as the Wind Down Administrator reasonably deems to be necessary and proper to carry out the provisions of the Plan.

(c) **Indemnification**. The FBG Debtors shall indemnify and hold harmless the Wind Down Administrator, solely in its capacity as such, for any losses incurred in such capacity, except to the extent such losses were the result of the Wind Down Administrator's bad faith, gross negligence, willful misconduct, fraud, or criminal conduct.

**5.8** *Governance.*

**(a)** On the Confirmation Date, the authority, power and incumbency of the persons then acting as directors, managers, members, officers, and other authorized persons of the FBG Debtors shall be terminated and such persons shall be deemed to have resigned. On the Confirmation Date, the Wind Down Administrator shall serve as the initial director or manager, as applicable, and sole officer of each FBG Debtor after the Confirmation Date until such time as such FBG Debtor goes out of existence, by dissolution or otherwise.

**(b)** The Wind Down Administrator, on behalf of the FBG Debtors, may appoint one or more directors or managers of any FBG Debtor to serve after the Confirmation Date. The Wind Down Administrator, on behalf of the FBG Debtors, may elect such additional directors(s), manager(s), and/or officer(s) of the FBG Debtors as the Wind Down Administrator deems necessary to implement the Plan and the actions contemplated herein. The Wind Down Administrator, on behalf of the FBG Debtors, shall, after the Confirmation Date, have the power to act by written consent to remove any manager or officer of the FBG Debtors at any time with or without cause.

**(c)** As of the Confirmation Date, the governing documents of the FBG Debtors may be amended (and shall be deemed amended) to the extent necessary to carry out the provisions of the Plan.

**5.9** *Cancellation of Existing Securities, Agreements, and Liens.*

Subject to Section 4.8 of the Plan, and except for the purpose of evidencing a right to a distribution pursuant to the Plan, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or holders of FBG Debtor Interests, all notes, instruments, other securities, and other evidence of debt issued by the FBG Debtors, and any rights of any holder in respect thereof, shall be deemed cancelled and of no force or effect and the obligations of the FBG Debtors thereunder shall be deemed fully satisfied, settled, and released; *provided* that the foregoing shall not apply to the DIP Documents, Remaining DIP A Claims, Remaining Roll-Up Claims, First Lien Term Loan Liens, Sidecar Term Loan Liens, and Second Lien Term Loan Liens (each, as defined in the DIP Order).

**5.10** *Dissolution of FBG Debtors.*

On and after the Confirmation Date, the Wind Down Administrator may complete the winding up of the FBG Debtors without the necessity for any other or further actions to be taken by or on behalf of the FBG Debtors or its members, managers, directors, management, or holders of FBG Debtor Interests or any payments to be made in connection therewith, other than the filing of a certificate of dissolution or cancellation with the appropriate governmental authorities, and any such certificate of dissolution or cancellation may be filed by the Wind Down Administrator without need for any authorization, signature or other act of any Person, including without limitation any holder of any Claim or Interest. Any such transactions may be effective without any further action by the members, managers, directors, management, or Interest holders of the FBG Debtors.

**5.11** *Effectuating Documents; Further Transactions.*

**(a)** On and after the Confirmation Date, the Wind Down Administrator is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the FBG Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**(b)** On and after the Confirmation Date, the Trustees are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**(c)** Before, on, or after the Confirmation Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the Interest holders, directors, managers, or members of the FBG Debtors shall be deemed to have been so approved and shall be in effect before, on, or after the Confirmation Date (as appropriate) pursuant to applicable law and without any requirement of further action by the Interest holders, directors, managers, or members of the FBG Debtors, or the need for any approvals, authorizations, actions or consents.

**5.12** *Closing of the Chapter 11 Case.*

After the Confirmation Date, the Wind Down Administrator shall be authorized, but not directed, to submit a motion for orders that close and issue final decree for any of the FBG Debtors' Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules, subject to the consent of the Litigation Trustee and the Claims Ombudsman (not to be unreasonably withheld, conditioned, or delayed). Furthermore, the Claims and Noticing Agent shall be authorized to destroy all paper/hardcopy records related to the FBG Debtors' Chapter 11 Cases two (2) years after the Effective Date has occurred.

**ARTICLE VI.     LITIGATION TRUST.**

**6.1** *Establishment of the Litigation Trust.*

**(a)** On the Confirmation Date, or as soon thereafter as reasonably practicable, the Litigation Trust shall be established in accordance with the Litigation Trust Agreement for the purpose of being vested with and liquidating the Litigation Trust Assets and making distributions to the Litigation Trust Beneficiaries in accordance with the terms of the Litigation Trust Agreement and the Plan. For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the Litigation Trust's primary purpose is liquidating the Litigation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Litigation Trust's liquidating purpose and reasonably necessary to conserve and protect the Litigation Trust Assets and provide for the orderly liquidation thereof.

**(b)** Upon the establishment of the Litigation Trust, each holder of Litigation Trust Interests shall be deemed to be a party to the Litigation Trust Agreement without the need for execution by such holder. The Litigation Trust Agreement shall be binding on all Entities receiving, and all holders of, Litigation Trust Interests (and their respective successors), whether such Litigation Trust Interests are received or are to be received on or after the Confirmation Date and regardless of whether such Entity executes or delivers a signature page to the Litigation Trust Agreement.

### 6.2 *Funding of and Transfer of Assets into the Litigation Trust.*

**(a)** Following the Confirmation Date and the consummation of the Estate Claims Credit Bid Transaction, the FBG Debtors, the DIP Secured Parties, and, with respect to Direct Creditor Claims, each Preference Settlement Electing Creditor, shall be deemed to have, without any further action, automatically and irrevocably transferred, assigned, and delivered, and (except as provided for U.S. federal, state, and local income tax purposes) automatically vested in the Litigation Trust its remaining interests in the Litigation Trust Assets, and all such assets shall be deemed to have vested in the Litigation Trust (without recourse and free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on the Confirmation Date, to be administered by the Litigation Trustee, in accordance with the Plan and the Litigation Trust Agreement; *provided* that with respect to any Insurance Rights transferred to the Litigation Trust, such transfer shall not impair the rights of any other Person in the relevant Insurance Policies. The Litigation Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the Litigation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Litigation Trust. The act of transferring the Litigation Trust Assets, as authorized by the Plan and the Confirmation Order, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights (including, for the avoidance of doubt, any extensions available to a trustee or debtor-in-possession under 11 U.S.C. § 108) may be asserted by the Litigation Trust, in any judicial, arbitration, or administrative proceeding, during or after the pendency of these Chapter 11 Cases, as if the asset or right asserted in such judicial, arbitration, or administrative proceeding were an action or other asset still held by the applicable Debtor or Debtor-in-possession. Upon the transfer of the Litigation Trust Assets to the Litigation Trust, the FBG Debtors' Estates or their successors shall have no interest in or with respect to the Litigation Trust Assets or the Litigation Trust. Upon delivery of the Litigation Trust Assets to the Litigation Trust, the FBG Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Litigation Trust Assets or the Litigation Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Litigation Trust Assets to the Litigation Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. The Litigation Trustee shall agree to accept and hold the Litigation Trust Assets in the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, subject to the terms of the Litigation Trust Agreement.

**(b)** All Causes of Action, claims, rights, and interests purchased, transferred, assigned, or otherwise conveyed to the Litigation Trust from each FBG Debtor's Estate or Preference Settlement Electing Creditor, as applicable, shall remain separate and distinct from the

Causes of Action, claims, rights, and interests transferred from the Estates of any other FBG Debtor or Preference Settlement Electing Creditor, as applicable. The Litigation Trust shall hold, administer, and prosecute such Causes of Action on behalf of each contributing FBG Debtor's Estate or Preference Settlement Electing Creditor, as applicable, as though such Causes of Action continued to be held by such FBG Debtor's Estate or Preference Settlement Electing Creditor, as applicable, independently. The consolidation of Causes of Action within the Litigation Trust shall not entitle any defendant, counterparty, or other party against whom a Cause of Action is asserted by the Litigation Trust to assert, as a defense, setoff, recoupment, counterclaim, or reduction of any kind, any claim, defense, or right arising from or relating to such party's dealings, transactions, or relationships with any FBG Debtor or Preference Settlement Electing Creditor, as applicable, other than the specific FBG Debtor or Preference Settlement Electing Creditor, as applicable, who or whose Estate originally held the Cause of Action being prosecuted. For the avoidance of doubt, the consolidation of Causes of Action within the Litigation Trust for administrative convenience shall not operate to merge, consolidate, or otherwise combine the separate and distinct claims of the respective FBG Debtor Estates or Preference Settlement Electing Creditors, as applicable, nor shall such consolidation permit any party to assert cross-FBG Debtor and/or cross-Preference Settlement Electing Creditor defenses, as applicable, or to reduce its liability on a Cause of Action held by one FBG Debtor's Estate or a Preference Settlement Electing Creditor, as applicable, by reference to any claim, credit, or defense arising from such party's relationship with a different FBG Debtor or Preference Settlement Electing Creditor, as applicable.

(c) Notwithstanding anything to the contrary in this Plan, nothing in this Plan shall in any way impair, prevent, affect, or prejudice any defendant, counterparty, or other party against whom a Cause of Action is asserted by the Litigation Trust from asserting, in response to any such Cause of Action, any defense or legal argument, including any defense of recoupment, setoff, or offset, arising from or relating to such defendant or party's dealings, transactions, or relationships with any FBG Debtor (including the ability to assert such defenses or legal arguments regardless of whether such FBG Debtor is the FBG Debtor whose estate may have held the Cause of Action being asserted). Nothing in this Plan shall modify any defense, response, or argument relating to any Cause of Action based on the doctrine of substantive consolidation, veil piercing, alter ego or any similar doctrine, including any defense, including any defense of recoupment, setoff, or offset, response, or argument that subsequent new value or other value provided to one debtor or related entity should be treated as value provided to another FBG Debtor or to the FBG Debtors in the aggregate; *provided, however, that* nothing in the Plan shall in any way impair, prevent, or affect the FBG Debtors' or the Litigation Trustee's right to contest any such defense or legal argument raised by any party.

(d) All attorney-client privileges, work product protections, joint client privilege, mediation privilege, common interest or joint defense privilege or protection and all other privileges, immunities or protections from disclosure (the "**Privileges**") held by (1) any one or more of the FBG Debtors or (2) any prepetition or postpetition committee or subcommittee of the board of managers or equivalent governing body of any of the FBG Debtors and their predecessors (together the "**Privilege Transfer Parties**") related in any way to the Litigation Trust Assets or the purpose of the Litigation Trust (the "**Transferred Privileges**"), along with all information, documents, and other materials covered by any of the Transferred Privileges (the "**Transferred Privileged Information**"), shall be deemed transferred and assigned to, and vested in, the Litigation Trust and its authorized representatives. The Transferred Privileged

51

Information shall include documents and information of all manner, whether oral, written or digital, and whether or not previously disclosed or discussed. For the avoidance of doubt, the Transferred Privileges shall include any right or obligation to preserve or enforce or waive a privilege that arises from any joint defense, common interest or similar agreement involving any of the Privilege Transfer Parties.

(e)  The foregoing transfer and assignment shall vest the Transferred Privileges concerning the Transferred Privileged Information in the Litigation Trust, in trust, and consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the benefit of the Litigation Trust and the Litigation Trust Beneficiaries; *provided*, however, that to the extent that any such Transferred Privileges or Transferred Privileged Information relates to both the Litigation Trust Assets on one hand and any matter in which the FBG Debtors (or the ABL Collateral Trust or DIP Collateral Trust) have an interest on the other, such Transferred Privileges and Transferred Privileged Information shall vest jointly in the FBG Debtors (or the ABL Collateral Trust or DIP Collateral Trust), as applicable, (or their designee) and the Litigation Trust. As relates to any Transferred Privileges or Transferred Privileged Information held jointly with the FBG Debtors (or the ABL Collateral Trust or DIP Collateral Trust) (or their designee), (i) with respect to litigations or proceedings concerning matters in which an FBG Debtor (or the ABL Collateral Trust or DIP Collateral Trust) has an interest as a potential defendant, the applicable FBG Debtor (or the ABL Collateral Trust or DIP Collateral Trust) shall maintain the Transferred Privileges and keep the Transferred Privileged Information confidential, and may only waive any Transferred Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written consent from the Litigation Trust, and (ii) with respect to litigations or proceedings concerning the Litigation Trust Assets where an FBG Debtor (or the ABL Collateral Trust or DIP Collateral Trust) has an interest as a potential defendant, the Litigation Trust shall maintain the Transferred Privileges and keep the Transferred Privileged Information confidential, and may only waive any Transferred Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written consent from the applicable FBG Debtor (or the ABL Collateral Trustee or DIP Collateral Trustee). The Trusts and FBG Debtors have agreed that they do not intend to provide a general waiver of all Transferred Privileges and that each such party will take commercially reasonable steps to avoid a general waiver of the Transferred Privileges.

(f)  Pursuant to, *inter alia*, Federal Rule of Evidence 502(d), no Privileges shall be waived by the transfer and assignment of the Transferred Privileges or the production of any Transferred Privileged Information to the Litigation Trust or any of its respective employees, professionals or representatives, or by disclosure of such Transferred Privileged Information between the Privilege Transfer Parties, on the one hand, and the Litigation Trust, on the other hand, or any of their respective employees, professionals or representatives.

(g)  Pursuant to, *inter alia,* Federal Rule of Evidence 502(c), if a Privilege Transfer Party, the Litigation Trust, any of their respective employees, professionals or representatives or any other person inadvertently produces or discloses Transferred Privileged Information to any third party, such disclosure shall not be deemed to destroy any of the Transferred Privileges, or be deemed a waiver of any confidentiality protections afforded to such Transferred Privileged Information. In such circumstances, the disclosing party shall promptly upon discovery of the disclosure notify the Litigation Trust of the disclosure and shall demand that

all recipients of the inadvertently disclosed Transferred Privileged Information return or confirm the destruction of such materials. Notwithstanding anything herein to the contrary, the Litigation Trustee has no obligation to waive privilege over any communications, information, or other similar materials when fulfilling its duties to meet and confer with any party in interest.

**(h)** On the Confirmation Date, the Litigation Trustee shall be substituted as the party in interest for the Creditors' Committee without the need for any court order or Final Order with respect to any (i) motion filed by the Creditors' Committee seeking standing to assert any cause of action on behalf of the FBG Debtors not released or waived under the Plan; and (ii) complaint filed by the Creditors' Committee on behalf of the FBG Debtors against any party in interest pursuant to a grant of standing by the Bankruptcy Court. The Litigation Trustee shall inherit all "challenge" rights possessed by the Creditors' Committee not otherwise waived in the Plan on the same terms and with the same deadlines as possessed by the Creditors' Committee on the Confirmation Date, and to the extent the Creditors' Committee is not bound by any stipulation of the FBG Debtors pending resolution of such "challenge," the Litigation Trustee shall not be bound by such stipulation. For the avoidance of doubt, nothing in this paragraph modifies or affects the expiration of the Challenge Deadline (as defined in the DIP Order) as set forth in the Plan.

**6.3** *Initial Litigation Trust Funding Commitments and Litigation Trust Backstop Commitments.*

**(a)** On the Confirmation Date, the Litigation Trust Class 1 Funding Contributors will provide the Initial Litigation Trust Funding Commitments to the Litigation Trust pursuant to the Litigation Trust Agreement and/or any Litigation Trust Funding Agreement, which commitments and contributions shall be available to pay litigation costs of the Litigation Trust, costs of administration of the Litigation Trust, and costs of monetizing the Litigation Trust Assets. Additionally, the Litigation Trust Backstop Parties shall provide a backstop commitment on the Confirmation Date to ensure adequate capitalization of the Litigation Trust notwithstanding the rate of participation from holders of DIP A Claims to participate in the Initial Litigation Trust Funding Commitments. The Litigation Trust Class 1 Funding Commitments and Litigation Trust Backstop Commitments are necessary and incidental to the liquidating purpose of the Litigation Trust. The Litigation Trust Backstop Commitments are bargained-for and integral part of the restructuring transactions contemplated under the Plan.

**(b)** The terms of the Initial Litigation Trust Funding Commitments and Litigation Trust Backstop Commitments shall be set forth in the Litigation Trust Agreement and/or in any Litigation Trust Funding Agreement. Upon execution of the Litigation Trust Agreement or any Litigation Trust Funding Agreement, the Initial Litigation Trust Funding Commitments and the Litigation Trust Backstop Commitments shall constitute legal, valid, and binding obligations of the parties thereto and be enforceable in accordance with their respective terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, usury, or subordination under applicable law, the Plan or the Confirmation Order, and the Litigation Trust shall be authorized to incur or enforce the obligations under the Litigation Trust Agreement or in any Litigation Trust Funding Agreement with respect to the Initial Litigation Trust Funding Commitments and the Litigation Trust Backstop Commitments and use the proceeds of such Initial Litigation Trust Funding Commitments and Litigation Trust

53

Backstop Commitments, in each case, in accordance with the terms of the Plan, the Confirmation Order, the Litigation Trust Agreement, and any Litigation Trust Funding Agreement without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The terms and conditions of the Litigation Trust Agreement and any Litigation Trust Funding Agreement, in each case, shall bind the Litigation Trust and each other Entity that enters into such agreement.

(c)     Entry of the Confirmation Order shall constitute approval of the Initial Litigation Trust Funding Commitments and Litigation Trust Backstop Commitments. Subject only to the provision of the Initial Litigation Trust Funding Commitments and Litigation Trust Backstop Commitments, the terms and conditions of the Initial Litigation Trust Funding Commitments and Litigation Trust Backstop Commitments are satisfied and earned as of the entry of the Confirmation Order. The Initial Litigation Trust Funding Commitments and Litigation Trust Backstop Commitments are bargained-for and integral parts of the restructuring transactions contemplated under the Plan.

(d)     *Oversubscription*. To the extent that any Litigation Trust Class 1 Funding Contributor fails to fund, declines to fund, or is otherwise unable to fund all or any portion of its pro rata share of the Initial Litigation Trust Funding Commitments (the "**Unfunded Amount**"), the Litigation Trust Backstop Parties, pursuant to the terms of any backstop commitment letter, shall subscribe for and fund such Unfunded Amount, on a pro rata basis based on their respective commitments (or as otherwise agreed among such participating parties). Each applicable Litigation Trust Backstop Party shall be entitled to receive Class 1 Litigation Trust Interests in respect of any Unfunded Amount actually funded by such party.

(e)     *Commitment Period*. Five (5) years.

(f)     *Minimum Funding*. Available in one or more draws, equal to the lesser of (i) $10 million and (ii) the undrawn commitment amount.

(g)     *Consequences of Breach of Funding Commitments*. If any Litigation Trust Class 1 Funding Contributor elects to provide an Initial Litigation Trust Funding Commitment but fails to actually fund all or a portion of such Initial Litigation Trust Funding Commitment when requested by the Litigation Trustee at any point during the Commitment Period, the Litigation Trustee shall be entitled to seek enforcement of any applicable commitment agreement, the Plan, the Litigation Trust Agreement, or the Litigation Trust Funding Agreement against such Litigation Trust Class 1 Funding Contributor or take other actions as allowed under applicable Law.

**6.4     *Additional Litigation Trust Funding*.**

(a)     The Litigation Trust may obtain Additional Litigation Trust Funding on the following terms and conditions:

(i)     the Litigation Trust may obtain all or a portion of the Additional Class 1 Litigation Trust Funding as Additional Class 1 Litigation Trust Interests if such commitments are (a) on the same terms as the Initial Litigation Trust Funding Commitments (including Section 6.5(b)(i)–(iv)), and

(b) approved by the Litigation Trust Oversight Committee as a Major Decision; and

(ii)     if the Litigation Trust has already obtained all Additional Class 1 Litigation Trust Funding, the Litigation Trust (unless a determination has been made pursuant to Section 6.4(c) below) may obtain Additional Waterfall Litigation Trust Funding if such Additional Waterfall Litigation Trust Funding is (a) approved by a unanimous vote of the Litigation Trust Oversight Committee, including the UCC Member(s), or (b) approved by the Bankruptcy Court pursuant to the Court-Approved Additional Waterfall Litigation Funding.

**(b)**     All Additional Litigation Trust Funding obtained by the Litigation Trust shall be subject to the following conditions:

(i)     the Litigation Trustee shall conduct an Agreed Market Check;

(ii)     at the time of seeking such funding, the Litigation Trust has, or the Litigation Trustee reasonably expects, that the Litigation Trust will have in the near term, less than $7,500,000 (on a pro forma basis); and

(iii)     if the Additional Litigation Trust Funding is provided by an insider (including an existing holder of Class 1 Litigation Trust Interests), then the Additional Litigation Trust Funding must be on economic terms no more expensive for the Litigation Trust than Section 6.5(b)(i)–(iii) hereof.

**(c)**     Notwithstanding anything to the contrary herein, the Litigation Trustee may, in its sole discretion, decide not to obtain or cause the funding of the Additional Class 1 Litigation Trust Funding if it determines that such actions may result in the Litigation Trust or Litigation Trust Interests being or having been subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the Trust Indenture Act, or the Investment Company Act.

**(d)**     *Preemptive Rights for Additional Litigation Trust Funding*.  Any additional funding of the Litigation Trust (including any Additional Litigation Trust Funding) shall be offered *first* to holders of Class 1 Litigation Trust Interests on a pro rata basis pursuant to the terms of the Litigation Trust Agreement and in accordance with applicable Law.  Each holder of a Class 1 Litigation Trust Interest shall be deemed to have declined such offer if it has not committed to provide such additional funding within ten (10) business days of a request therefor.

**(e)**     *Additional Class 1 Litigation Trust Interests*.  For the avoidance of doubt, any Additional Class 1 Litigation Trust Interests issued by the Litigation Trust shall participate pro rata in the Class 1 Litigation Trust Waterfall solely with respect to distributions made after closing of such Additional Class 1 Litigation Trust Funding and providers of Additional Class 1 Litigation Trust Funding shall be entitled to distributions the Class 1 Litigation Trust Waterfall only with respect to their own undrawn or backstopped commitments. Any person providing such Additional Class 1 Litigation Trust Funding shall be a "**Funding Party**," and any contributions and/or

55

commitments in connection therewith shall be "**Committed Funding,**" "**Commitment Amounts**," and/or "**Contributions**," each as defined in the Litigation Trust Agreement.

**(f)** The Litigation Trust Class 1 Funding Contributors may decline to fund a requested Litigation Trust Class 1 Funding Contribution in the reasonable discretion of the Required Litigation Trust Funding Contributors (as defined in the Litigation Trust Agreement) if they determine based on a written valuation or status report from the Litigation Trustee that the remaining liquidation value of the Litigation Trust Assets would be insufficient to repay the outstanding Class 1 Litigation Trust Interests; *provided* that, if a Litigation Trust Class 1 Funding Contributor declines to fund a requested Litigation Trust Class 1 Funding Contribution, the Litigation Trust shall be prohibited from obtaining any future Additional Litigation Waterfall Trust Funding from such holder of Class 1 Litigation Trust Interests or its Affiliates.

**(g)** *Priming Effect of Additional Waterfall Litigation Trust Funding*. If the Litigation Trustee receives any Additional Waterfall Litigation Trust Funding, such amounts may be structurally and contractually senior to the Litigation Trust Waterfall. For the avoidance of doubt, providers of Additional Waterfall Litigation Trust Funding shall not receive any Class 1 Litigation Interests or any Additional Class 1 Litigation Trust Interests on account of any Additional Waterfall Litigation Trust Funding.

### 6.5 *Litigation Trust Waterfall.*

**(a)** **Litigation Trust Waterfall**. Except as may be altered by the provisions of Additional Waterfall Litigation Trust Funding, proceeds from the monetization of the Litigation Trust Assets, net of fees, costs, or other expenses pursuant to the terms of the Litigation Trust Agreement, shall be distributed to Litigation Trust Beneficiaries as follows:

> (i) *First*, to holders of Class 1 Litigation Trust Interests (or, if applicable, Additional Class 1 Litigation Trust Interests), which shall receive the amounts to which they are entitled pursuant to Section 6.5(b)(i), (ii), and (iii) of the Plan in respect of principal and investment return from the Litigation Trust Class 1 Funding Commitments, the Litigation Trust Class 1 Funding Contributions, and any Additional Class 1 Litigation Trust Funding (the "**First Return Threshold**");

> (ii) *Second*, following satisfaction of the First Return Threshold until aggregate distributions from the Litigation Trust (including distributions pursuant to Section 6.5(b) below) equal $350,000,000 (the "**Second Return Threshold**"):

>> (1) 15% to the holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable), and

>> (2) 85% to holders of Class 2 Litigation Trust Interests;

56

(iii) *Third*, following the satisfaction of the Second Return Threshold until aggregate distributions to holders of Class 2 Litigation Trust Interests from the Litigation Trust equal to the amount of the Allowed DIP A Claims as of the Confirmation Date (excluding, for the avoidance of doubt, any reduction for the Credit Bid Claims) (the "**Final Return Threshold**"):

    (1)    10% to holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable),

    (2)    74% to holders of Class 2 Litigation Trust Interests, and

    (3)    16% to the holders of Class 3 Litigation Trust Interests (subject to payment of Allowed Settled Administrative Expense Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims in full, set forth in accordance with Section 6.5(d) below); and

(iv) *Fourth*, following the satisfaction of the Final Return Threshold: (1) 10% to the holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable), and (2) 90% to the holders of Class 3 Litigation Trust Interests (subject to payment of Allowed Settled Administrative Expense Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims in full, set forth in accordance with Section 6.5(d) below).

(b)    **Class 1 Litigation Trust Interests Distributions**. Distributions to the holders of Class 1 Litigation Trust Interests (and Additional Class 1 Litigation Trust Interests, if applicable) pursuant to the Litigation Trust Waterfall shall be paid as follows:

(i) *First*, to the Litigation Trust Class 1 Funding Contributors, pro rata in accordance with their respective Litigation Trust Class 1 Funding Contributions, until each Litigation Trust Class 1 Funding Contributor has received an amount equal to the greater of (a) an internal rate of return on such Litigation Trust Class 1 Funding Contributions equal to 20.0% and (b) a multiple on invested capital on such Litigation Trust Class 1 Funding Contributions of 1.75x, with such returns being measured from the date of each Litigation Trust Class 1 Funding Contribution;

(ii) *Second*, to the Litigation Trust Class 1 Funding Contributors, in an amount accrued on the daily undrawn amounts of their respective Litigation Trust Class 1 Funding Commitments, at the rate of 5.0% *per annum*; *provided* that no Litigation Trust Class 1 Funding Contributor shall be entitled to receive any such distribution in

57

respect of undrawn Litigation Trust Class 1 Funding Commitments for any period during which such Litigation Trust Class 1 Funding Contributor is a Defaulting Contributor;

(iii) *Third*, to the Litigation Trust Backstop Parties until each such Litigation Trust Backstop Party has received an amount equal to 5.0% of the amount of such Litigation Trust Backstop Party's Litigation Trust Class 1 Funding Commitment (whether drawn or undrawn) backstopped by such Litigation Trust Backstop Party; *provided* that (1) no Litigation Trust Backstop Party shall be entitled to receive any such distribution for any period during which such Litigation Trust Backstop Party is a Defaulting Contributor and (2) if a Litigation Trust Backstop Party becomes a Defaulting Contributor, such Litigation Trust Backstop Party's Litigation Trust Backstop Commitments and fees in respect thereof may be terminated or reallocated in Litigation Trustee's reasonable discretion; and

(iv) *Fourth*, to the Litigation Trust Class 1 Funding Contributors, pro rata in accordance with the amounts of their respective Litigation Trust Class 1 Funding Commitments (whether drawn or undrawn, and whether or not the Commitment Period (as defined in the Litigation Trust Agreement) has lapsed), for all Litigation Trust Class 1 Funding Contributors, for the life of the Litigation Trust; *provided* that no Litigation Trust Class 1 Funding Contributor shall be entitled to receive any such distribution for any period during which such Litigation Trust Class 1 Funding Contributor is a Defaulting Contributor.

Any payment of principal, interest, fees or other amounts received by the Litigation Trustee for the account of a Defaulting Contributor or received by the Litigation Trustee from a Defaulting Contributor shall be applied at such time or times as may be determined by the Litigation Trustee as follows: *first*, to the payment of any amounts owing by such Defaulting Contributor to the Litigation Trustee hereunder; *second*, to the funding of any Litigation Trust Class 1 Funding Contribution in respect of which such Defaulting Contributor has failed to fund its portion thereof, as determined by the Litigation Trustee; *third*, to the payment of any amounts owing as a result of any judgment of a court of competent jurisdiction against such Defaulting Contributor as a result of such Defaulting Contributor's failure to fund; and *fourth*, to such Defaulting Contributor or as otherwise directed by a court of competent jurisdiction. Any payments, prepayments or other amounts paid or payable to a Defaulting Contributor that are applied (or held) to pay amounts owed by such Defaulting Contributor shall be deemed paid to and redirected by such Defaulting Contributor.

(c) **Class 2 Litigation Trust Interests Distributions**. Distributions to the holders of Class 2 Litigation Trust Interests pursuant to the Litigation Trust Waterfall shall be paid pro rata based on the Class 2 Litigation Trust Interests held by such holders.

**(d)** **Class 3 Litigation Trust Interests Distributions**. Distributions to the holders of Class 3 Litigation Trust Interests (and holders of Settled Administrative Expense Claims, Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims) pursuant to the Litigation Trust Waterfall shall be paid as follows:

(i) *First*, to the holders of Settled Administrative Expense Claims, pro rata based on the aggregate amount of Allowed Settled Administrative Expense Claims, until each such holder has received distributions equal to the amount of its Allowed Settled Administrative Expense Claim;

(ii) *Second*, to the holders of Allowed Administrative Expense Claims (other than Settled Administrative Expense Claims), pro rata based on the aggregate amount of Allowed Administrative Expense Claims (other than Settled Administrative Expense Claims) held by such holders, until each such holder has received distributions equal to the amount of its Allowed Administrative Expense Claim;

(iii) *Third*, to holders of Allowed Other Priority Claims, pro rata based on the aggregate amount of Allowed Other Priority Claims held by such holders, until each such holder has received distributions equal to the amount of its Allowed Other Priority Claim;

(iv) *Fourth*, to holders of Priority Tax Claims, pro rata based on the aggregate amount of Allowed Priority Tax Claims held by such holders, until each such holder has received distributions equal to the amount of its Allowed Priority Tax Claim;

(v) *Fifth*, to holders of Allowed Roll-Up Claims, Allowed First Lien Claims, Allowed Second Lien Claims, and Allowed General Unsecured Claims, pro rata based on the aggregate amount of $3,300,000,000 of Allowed Roll-Up Claims, Allowed First Lien Claims as of the Confirmation Date, Allowed Second Lien Claims as of the Confirmation Date, and Allowed General Unsecured Claims held by such holders, until each holder has received distributions equal to the amount of its respective $3,300,000,000 of Allowed Roll-Up Claims, Allowed First Lien Claims, Allowed Second Lien Claims, and Allowed General Unsecured Claims, as applicable; and

(vi) *Sixth*, to holders of Allowed Subordinated Claims, pro rata based on the amount of Allowed Subordinated Claims held by such holders, until each such holder has received distributions equal to the amount of its Allowed Subordinated Claim.

Following aggregate distributions equal to the amount of all Allowed Subordinated Claims, any residual value shall be paid as directed by the Litigation Trust Oversight Committee,

59

subject to Bankruptcy Court approval; *provided* that no such residual value shall be distributable to or for the benefit of the FBG Debtors.

**6.6** *Minimum Distribution; No Fractional Distributions.*

**(a)** Notwithstanding anything herein or the Litigation Trust Agreement to the contrary, no fractional interests of Litigation Trust Interests shall be issued, and no Cash shall be distributed in lieu of such fractional amounts. If any issuance or distribution on account of an Allowed Claim would otherwise result in the issuance of a number of interests of Litigation Trust Interests that is not a whole number, the actual distribution of shares of Litigation Trust Interests shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized interests of Litigation Trust Interests shall be adjusted as necessary to account for the foregoing rounding.

**(b)** Notwithstanding anything herein or the Litigation Trust Agreement to the contrary, including the Litigation Trust Waterfall and Class 1 Litigation Trust Waterfall, no Litigation Trust Interests shall be issued to a holder of an Allowed Lender Claim if the entitlement to Litigation Trust Interests is for less than $1,000.00 in principal amount of such Allowed Lender Claim, and no Cash or other distribution shall be made as a result of such adjustment. The Litigation Trustee shall have no obligation to make a distribution under the Litigation Trust Agreement (including pursuant to the Litigation Trust Waterfall and the Class 1 Litigation Trust Waterfall) to the holder of Class 1 Litigation Trust Interests, Class 2 Litigation Trust Interests, Class 3(a) Litigation Trust Interests, or Class 3(c) Litigation Trust Interests that is either (i) less than $500.00 in Cash or (ii) that does not exceed any transaction costs associated with such distribution. For the avoidance of doubt, this Section 6.6(b) shall not apply to Class 3(b) Litigation Trust Interests.

**6.7** *Lender Distribution Agent.*

Distributions owed to holders of Class 1, Class 2, Class 3(a), and Class 3(c) Litigation Trust Interests shall be made by one or more distribution agents to be selected by the Ad Hoc Group SteerCo (the "**Lender Distribution Agent**"). The Litigation Trust shall pay all reasonable costs of such Lender Distribution Agent. Such costs shall be subject to a budget to be agreed by the Litigation Trustee and the Lender Distribution Agent.

**6.8** *Administration of the Litigation Trust.*

The Litigation Trust shall be administered by the Litigation Trust Oversight Committee and the Litigation Trustee in accordance with the Litigation Trust Agreement and the Plan. In the event of any inconsistency between the Plan and the Litigation Trust Agreement, the Litigation Trust Agreement shall control.

**6.9** *Litigation Trust Oversight Committee.*

**(a)** On the Confirmation Date, the Litigation Trust Oversight Committee shall be appointed in accordance with the terms of the Litigation Trust Agreement. The initial Litigation Trust Committee shall be comprised of four members, including three AHG Members and one

60

UCC Member. Following the satisfaction of the Final Return Threshold, the Litigation Trust Oversight Committee shall be comprised of three members, including one AHG Member and two UCC Members. The duties and obligations of the members of the Litigation Trust Oversight Committee shall be set forth in the Litigation Trust Agreement.

**(b)** The Litigation Trust Agreement shall provide that the UCC Member (i) must be a Preference Settlement Electing Creditor; and (ii) shall be entitled to compensation of $125,000 per year, paid by the Litigation Trust. If the initial UCC Member (the "**Initial UCC Member**") does not timely opt in to being a Preference Settlement Electing Creditor (as such deadline may be extended pursuant to Section 6.11(b) of the Plan), then the Litigation Trustee may remove the Initial UCC Member in its sole discretion. In the event the Initial UCC Member is removed, the replacement UCC Member shall be selected by the prior members of the Creditors' Committee from the pool of eligible candidates, as set forth in the Litigation Trust Agreement, which selection process shall be coordinated by the Claims Ombudsman. If the prior members of the Creditors' Committee do not select the replacement UCC Member from the pool of eligible candidates within seven (7) days of the removal of the Initial UCC Member, then the prior Creditors' Committee members may select either the Claims Ombudsman or an independent person who was not a Professional retained by the Creditors' Committee that otherwise satisfies the criteria for serving as the Claims Ombudsman, as set forth in the Litigation Trust Agreement, as the replacement UCC Member. The Claims Ombudsman shall inform the Litigation Trustee of the ultimate selection of the UCC Member.

### 6.10 *Litigation Trustee.*

**(a) Appointment of Litigation Trustee.** Upon the establishment of the Litigation Trust, the Litigation Trustee shall be appointed. The powers, rights and responsibilities of the Litigation Trustee shall be as specified in the Litigation Trust Agreement and shall include the authority and responsibility to fulfill the items identified in this Section 6.10 of the Plan. Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement.

**(b) Functions of the Litigation Trustee.** On and after the date the Litigation Trust is established, the Litigation Trustee shall carry out the functions set forth in this Section 6.10 and may take such actions, under the supervision or with the approval of the Litigation Trust Oversight Committee, without supervision or approval by the Bankruptcy Court (including without the need to seek Bankruptcy Court approval pursuant to section 363 of the Bankruptcy Code and/or Bankruptcy Rule 9019 with respect to any Litigation Trust Assets) and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Litigation Trust Agreement. Such functions shall include any and all powers and authority to:

(i) perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Litigation Trust;

(ii)     take any actions necessary to (A) resolve all matters related to the Litigation Trust Assets and (B) vest such assets in the Litigation Trust;

(iii)     open and maintain bank accounts on behalf of or in the name of the Litigation Trust;

(iv)     maintain the books and records and accounts of the Litigation Trust and obtain any necessary insurance;

(v)     coordinate with the Wind Down Administrator, the Claims Ombudsman, and the other Trustees;

(vi)     accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the Litigation Trust Assets in accordance with the Litigation Trust Agreement;

(vii)     conduct investigations of the Litigation Trust Assets, including of any Estate Claims and Direct Creditor Claims of Preference Settlement Electing Creditors, pursuant to Bankruptcy Rule 2004;

(viii)     pursue, prosecute, settle, abandon, or otherwise resolve the Litigation Trust Assets (including with respect to any Estate Claims and Direct Creditor Claims of Preference Settlement Electing Creditors and including through the commencement, participation, defense, or continuation of legal proceedings, including judicial, arbitration or administrative proceedings, in any domestic or foreign jurisdiction) in accordance with the Litigation Trust Agreement;

(ix)     protect and enforce the rights of the Litigation Trust in and to the Litigation Trust Assets by utilizing any foreign judicial proceedings and any applicable foreign bankruptcy, insolvency, moratorium, or similar law;

(x)     administer the Litigation Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Litigation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, audit or examination;

(xi)     calculate and make distributions to Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement and the Plan;

(xii)     invest Cash, as available, and any income earned thereon;

(xiii) retain, compensate and employ professionals to represent the Litigation Trust or the Litigation Trustee, as applicable;

(xiv) dissolve the Litigation Trust in accordance with the terms of the Litigation Trust Agreement; and

(xv) take any other actions not inconsistent with the provisions hereof and the Litigation Trust Agreement that the Litigation Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

**6.11** *Preference Settlement.*

**(a)** Section 6.11 hereof shall be defined as the "**Preference Settlement**." The Preference Settlement applies only to Trade Creditors, Supply Chain Financers, and Factors who:

(i) do not meet the definition of Adverse Conduct, as determined by a Final Order;

(ii) are not Specified Non-Released Parties; and

(iii) are Preference Settlement Electing Creditors.

**(b) Preference Settlement Opt-In Deadline**. Trade Creditors, Supply Chain Financers, and Factors shall have until forty-five (45) days following the Confirmation Date to opt in to the Preference Settlement; *provided* that if a Preference Action is brought against a Trade Creditor that did not timely opt in to the Preference Settlement, such Trade Creditor shall have an additional thirty (30) days following service of the Preference Action to opt in to the Preference Settlement. The Litigation Trustee shall be authorized to extend the UCC Member's deadline to opt in to the Preference Settlement in its sole discretion. Any demand or summons related to a Preference Action against a Trade Creditor that is not a Preference Settlement Electing Creditor shall reiterate in clear and conspicuous language the extended deadline to participate in the Preference Settlement.

**(c) Implementation of the Preference Settlement**.

(i) With respect to a Preference Settlement Electing Creditor that is not expressly named in the schedule of Specified Non-Released Parties in the Plan Supplement, the Preference Settlement shall be inapplicable to such creditor only if the Litigation Trustee either alleges and/or pleads facts alleging Adverse Conduct as (a) an element of the Preference Action or (b) (x) a cause of action in a complaint or (y) in a pleading or other filing, and in the case of both (x) and (y), in a complaint, pleading, or other filing, as applicable, that is filed prior to or substantially contemporaneously with the filing of a Preference Action. If a Preference Settlement Electing Creditor obtains a verdict in their favor on all such alleged Adverse Conduct in a Final Order, or such allegations of Adverse Conduct

are withdrawn or counts related to such Adverse Conduct are dismissed with prejudice or on a voluntary basis by the Litigation Trustee, or dismissed without prejudice but the Litigation Trustee makes a final determination not to refile, then such Preference Settlement Electing Creditor shall retain the benefits of the Preference Settlement (assuming all other conditions of the Preference Settlement are met).

     (ii)    For the avoidance of doubt, nothing herein shall require the Litigation Trustee to obtain a finding, determination, or Final Order related to Adverse Conduct prior to initiating a Preference Action.

**(d)** **Preference Actions Against Trade Creditors**. No Preference Actions shall be brought against Trade Creditors who meet the criteria set forth in Section 6.11(a) of the Plan.

**(e)** **Preference Actions Against Supply Chain Financers and Factors**. Preference Actions against Supply Chain Financers and Factors who meet the criteria set forth in Section 6.11(a) of the Plan shall be brought only after the Litigation Trustee conducts reasonable due diligence and makes a good faith attempt to meet and confer with the putative defendant, which meet and confer shall include providing such putative defendant with the Litigation Trustee's analysis with respect to such putative defendant's defenses under section 547(c)(4) of the Bankruptcy Code (the "**New Value Defense**") and providing such putative defendant with an opportunity to identify additional new value (as defined in section 547 of the Bankruptcy Code) which was not included in the Litigation Trustee's analysis. Prior to commencing a Preference Action, the Litigation Trustee must consider the information timely provided by such putative defendant and any other affirmative defenses timely articulated by such putative defendant and provide a report to the Litigation Trust Oversight Committee setting forth the basis for litigating the Preference Action.

     (i)    If the Litigation Trustee, in his reasonable discretion, prosecutes a Preference Action against a Supply Chain Financer or Factor, and the Litigation Trustee agrees that in such prosecution new value includes any subsequent payment made by a Supply Chain Financer or Factor at the request of the FBG Debtors as part of the factoring or supply chain financing agreement (*i.e.*, it shall include payments to legitimate vendors of the FBG Debtors and payments made at the direction of the FBG Debtors on non-legitimate or "cover invoices"), without regard to which FBG Debtor entity such payment by a Supply Chain Financer or Factor was made on behalf of, as long as it was made on behalf of a Debtor (the "**Modified New Value Elements**"), then the prosecution shall not be considered a Sacred Right but instead a Major Decision. For the avoidance of doubt, all other elements of any Preference Action and affirmative defenses thereto, including any other component of a New Value Defense, shall apply in accordance with applicable law, including that such new value must still have been provided by the Supply

Chain Financer or Factor subsequent to the applicable alleged preferential payment by the Debtor.

(ii)     In connection with any prosecution by the Litigation Trustee that utilizes the Modified New Value Elements, to the extent that any payment made by a Supply Chain Financer or Factor was received by a non-Debtor and the Supply Chain Financer or Factor has the right to recover such payment from that non-Debtor, such right must be assigned to the Litigation Trust for prosecution by the Litigation Trust in order for such payment to qualify as new value and for the creditor to receive the benefit of a prosecution utilizing Modified New Value Elements (and that such assignment may be conditional upon the payment being considered new value).

(iii)     If the Litigation Trustee, in his reasonable discretion, seeks to prosecute a Preference Action against a Supply Chain Financer or Factor, and the Litigation Trustee determines, in his reasonable discretion, to seek to prosecute such Preference Action without utilizing all of the Modified New Value Elements, then proceeding with the Preference Action shall be considered a Sacred Right instead of a Major Decision; *provided* that, the only modifications to the Modified New Value Elements that the Litigation Trustee is permitted to make under this subparagraph is to assert that (a) the alleged new value was provided on behalf of a non-Debtor entity (*e.g.*, a payment on an invoice owed by a non-Debtor); or (b) the alleged new value provided was not received directly or indirectly by a Debtor or by Bowery Finance II,  and therefore, in both cases, does not qualify as new value.

(iv)     For the avoidance of doubt, if a Supply Chain Financer or Factor (i) meets the definition of Adverse Conduct or (ii) did not transact with the Debtors in good faith, then none of the provisions of this Section 6.11(e) shall apply to such Person.  Nothing in this Section 6.11(e) shall shift the burden of proof under applicable law with respect to Preference Actions.

(f)     **Litigation Trust's Authority to Commence Preference Actions**.  The Litigation Trust's authority to commence Preference Actions against Supply Chain Financers and Factors who meet the criteria set forth in Section 6.11(a) of the Plan shall exist only if the process in Section 6.11(e) above is undertaken by the Litigation Trustee in good faith.  Good faith shall be conclusively established if the Preference Action is authorized by a majority of the Litigation Trust Oversight Committee, including the affirmative vote of one UCC Member; *provided* that the absence of any such authorization shall not establish a lack of good faith.

**6.12**     *Fees and Expenses of the Litigation Trust.*

Following the establishment of the Litigation Trust, expenses of the Litigation Trust shall be paid in the ordinary course of business, in accordance with the Litigation Trust Agreement. Subject to the terms of the Litigation Trust Agreement, and without any further notice to any party or action, order or approval of the Bankruptcy Court, the Litigation Trustee, on behalf of the Litigation Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional for services rendered or expenses incurred. Subject to the terms of the Litigation Trust Agreement, the Litigation Trust may retain professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties necessary or desirable to assist in the investigation, prosecution and/or settlement of the Litigation Trust Assets, including any Estate Claims).

**6.13**     *Indemnification.*

The Litigation Trust shall indemnify and hold harmless the Litigation Trustee and the members of the Litigation Trust Oversight Committee, in their capacities as such, for any losses incurred in such capacities, except to the extent such losses were the result of such party's fraud, bad faith, gross negligence, willful misconduct, or criminal misconduct.

**6.14**     *Dissolution of the Litigation Trust.*

In no event shall the Litigation Trust be dissolved later than five (5) years from the date the Litigation Trust is established unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Litigation Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Trust Assets.

**6.15**     *Records.*

The Litigation Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the FBG Debtors necessary, as reasonably determined by the Litigation Trustee, for the disposition of the Litigation Trust Assets.

**6.16**     *Turnover of Litigation Trust Assets.*

If the DIP Collateral Trust or the ABL Collateral Trust receives, or otherwise obtains possession or ownership of, Litigation Trust Assets, such Litigation Trust Assets shall be assigned, turned over, or otherwise transferred to (or held in trust for the benefit of) the Litigation Trust.

66

**6.17** *Assignment of Horizon Alester IP.*

To the extent (i) all or a portion of the Horizon Alester IP is sold (the "**Purchased Horizon Alester IP**") and (ii) the resolution, final judgment or settlement of the James Complaint results in the avoidance of purported transfers of such Purchased Horizon Alester IP and recovery of such Purchased Horizon Alester IP by the Litigation Trust (as assignee of the applicable FBG Debtors and their Estates), the Litigation Trustee, on behalf of the Litigation Trust, shall, in accordance with any applicable purchase agreements, execute a supplemental assignment agreement assigning, conveying, transferring, and delivering the Purchased Horizon Alester IP to the applicable purchaser.

**6.18** *Non-Transferability.*

The Litigation Trust Interests shall not be certificated, and shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.

**6.19** *Litigation Trust Tax and Other Matters.*

**(a)** **Tax Treatment.** The Litigation Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701- 4(d) that is a "grantor trust" for U.S. federal income tax purposes (except to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-1 et seq. or other separate taxable entity). Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), all parties (including, without limitation, the Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of the Litigation Trust Assets of the FBG Debtors to the Litigation Trust as (i) the transfer of such assets by the FBG Debtors directly to the holders of Allowed Claims entitled to receive Litigation Trust Interests in satisfaction of their Claims, other than to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity, followed by (ii) the transfer of such assets by such holders to the Litigation Trust in exchange for the beneficial interests in the Litigation Trust. Accordingly, absent definitive guidance to the contrary, the Litigation Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of Litigation Trust Assets (other than to the extent any such assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity).

**(b)** **Liquidation Purpose of the Litigation Trust; No Successor in Interest.** The Litigation Trust shall be established for the primary purpose of liquidating and distributing the Litigation Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust. Accordingly, the Litigation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Litigation Trust Assets, make timely distributions to the Litigation Trust Beneficiaries, as applicable, and not unduly prolong their duration. The Litigation Trust shall distribute at least annually to the Litigation Trust Beneficiaries any Available Cash. The Litigation

Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan, the DIP Order, any other Final Order, or the Litigation Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Litigation Trustee expressly for such purpose. Notwithstanding anything in the Plan or Litigation Trust Agreement to the contrary, the Litigation Trustee shall always act consistently with, and not contrary to, the purpose of the Litigation Trust as set forth in the Plan.

(c) **Cash Investments.** The right and power of the Litigation Trustee to invest the Litigation Trust Assets, the proceeds thereof, or any income earned by the Litigation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements. The Litigation Trustee may expend the Cash of the Litigation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Litigation Trust Assets during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Litigation Trust) and (iii) to satisfy other respective liabilities incurred by the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement (including, without limitation, the payment of any taxes).

(d) **Tax Reporting and Tax Payments.**

(i) The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 6.19(d). The Litigation Trustee also shall annually send to each holder of a Litigation Trust Interest, a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii) As soon as practicable following the establishment of the Litigation Trust, the Litigation Trustee shall make a good faith determination of the fair market value of the Litigation Trust Assets (on an asset-by-asset basis) as of the date the Litigation Trust is established, taking into account (among other things) the anticipated recoveries on the respective Litigation Trust Assets based on probability of success, timing of such recoveries and estimated litigation costs and expenses; it being understood that the aggregate fair market value of the Litigation Trust Assets may be equal to the amount of the Estate Claims Credit Bid. The Litigation Trustee shall provide all parties with such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes. In furtherance of the treatment of the Roll-Up Claims,

68

First Lien Claims, and Second Lien Claims under ARTICLE IV of the Plan, the Litigation Trustee shall also determine as of the date the Litigation Trust is established (based on the information taken into account in determining the fair market value of the Litigation Trust Assets) the aggregate amount of distributions that are anticipated to be made to holders of Allowed Roll-Up Claims, Allowed First Lien Claims, and Allowed Second Lien Claims under the Litigation Trust Waterfall over the term of the Trust. The Litigation Trustee shall provide all relevant parties with the aggregate amount so determined.

(iii) Allocations of Litigation Trust taxable income among Litigation Trust Beneficiaries (other than taxable income allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) under the Litigation Trust Agreement if, immediately prior to such deemed distribution, the Litigation Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of Litigation Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the United States Internal Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv) The Litigation Trust shall be responsible for payment, out of Litigation Trust Assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets. More particularly, any taxes imposed on any Disputed Claim Reserve established within the Litigation Trust or its assets will be paid out of the assets of such Disputed Claim Reserve (including any Litigation Trust Assets allocable to, or held on account of, Disputed Claims), and netted against any subsequent distributions in respect of the allowance or disallowance of such Claims. In the event, and to the extent, any Cash in such Disputed Claim Reserve is insufficient to pay the portion of any

69

taxes attributable to taxable income arising from assets of such Disputed Claim Reserve (including any income that may arise upon an actual or constructive distribution of the assets of the reserve in respect of the resolution of Disputed Claims), assets of such Disputed Claim Reserve (including those otherwise distributable) may be sold to pay such taxes.

(v)  The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity in relation to the Litigation Trust, taxes of such fund or other separate taxable entity), under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Litigation Trust (or any such disputed ownership fund or other separate taxable entity) for all taxable periods through the dissolution of the Litigation Trust. Similarly, the Claims Ombudsman may request expedited determinations of taxes under section 505(b) of the Bankruptcy Code in respect of any assets allocable to, or held on account of Disputed Claims that it has treated as a disputed ownership fund or other separate taxable entity.

(vi)  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee or the Claims Ombudsman in respect of Class 3(b) Litigation Trust Interests, so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Litigation Trustee), the Litigation Trustee or the Claims Ombudsman (as applicable) may elect to treat any Litigation Trust Assets allocable to, or held on account of, any Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity, and shall report consistently therewith for state and local income tax purposes. If a "disputed ownership fund" election is made (or all or any portion of the Litigation Trust Assets allocable to, or held on account of, Disputed Claims is otherwise treated as a separate taxable entity), all parties (including the Litigation Trustee, the Claims Ombudsman, and Litigation Trust Beneficiaries) shall report for U.S. federal, state and local income taxes consistently with the foregoing.

(vii)  The treatment provided in this Section 6.19, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

**ARTICLE VII.**       **DIP COLLATERAL TRUST.**

**7.1**       *Establishment of the DIP Collateral Trust.*

On the Confirmation Date, or as soon thereafter as is reasonably practicable, the DIP Collateral Trust shall be established in accordance with the DIP Collateral Trust Agreement for the purpose of being vested with and liquidating the DIP Collateral Trust Assets, and making distributions to the DIP Collateral Trust Beneficiaries in accordance with the terms of the DIP Collateral Trust Agreement and the Plan.  For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the DIP Collateral Trust's primary purpose is liquidating the DIP Collateral Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the DIP Collateral Trust's liquidating purpose and reasonably necessary to conserve and protect the DIP Collateral Trust Assets and provide for the orderly liquidation thereof.

**7.2**       *Transfer of Assets into the DIP Collateral Trust.*

**(a)**       Following the Confirmation Date and consummation of the DIP Collateral Credit Bid Transaction, the FBG Debtors shall be deemed to have, without any further action, automatically and irrevocably transferred, assigned, and delivered, and (except as provided for U.S. federal, state, and local income tax purposes) automatically vested in the DIP Collateral Trust its remaining interests in the DIP Collateral Trust Assets, and all such assets shall be deemed to have vested in the DIP Collateral Trust (without recourse and free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on the Confirmation Date, to be administered by the DIP Collateral Trustee, in accordance with the Plan and the DIP Collateral Trust Agreement.  The DIP Collateral Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the DIP Collateral Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the DIP Collateral Trust.  The act of transferring the DIP Collateral Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the DIP Collateral Trust as if the asset or right was still held by the applicable Debtor.  Upon the transfer of the DIP Collateral Trust Assets to the DIP Collateral Trust, the Debtors shall have no interest in or with respect to the DIP Collateral Trust Assets or the DIP Collateral Trust.  Upon delivery of the DIP Collateral Trust Assets to the DIP Collateral Trust, the FBG Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the DIP Collateral Trust Assets or the DIP Collateral Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the DIP Collateral Trust Assets to the DIP Collateral Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.  In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the DIP Collateral Trust shall vest in the DIP Collateral Trust and its representatives, and the FBG Debtors and the DIP Collateral Trustee are directed to take all necessary actions to effectuate the transfer of such privileges.  The DIP Collateral Trustee shall agree to accept and hold the DIP Collateral

71

Trust Assets in the DIP Collateral Trust for the benefit of the DIP Collateral Trust Beneficiaries, subject to the terms of the Plan and the DIP Collateral Trust Agreement.

(b) Notwithstanding anything in this Plan to the contrary, on, prior to, or following the Confirmation Date, the DIP Collateral Trustee (in consultation with the Ad Hoc Group) may cause one or more domestic corporations to be formed, each of which shall be wholly owned by the DIP Collateral Trust and classified as a C corporation for U.S. federal income tax purposes (each, a "**U.S. Holding Corporation**" and, together, the "**U.S. Holding Corporations**"). The DIP Collateral Trustee shall designate, in consultation with the Ad Hoc Group, the DIP Collateral Trust Assets that constitute "U.S. real property interests" within the meaning of Section 897(c) of the United States Internal Revenue Code of 1986, as amended from time to time, or are otherwise appropriate to be held through such corporate structure, that shall be held through each U.S. Holding Corporation (such designated assets, the "**Designated Assets**").

(c) In addition to the U.S. Holding Corporations, the DIP Collateral Trustee (in consultation with the Ad Hoc Group) shall have the authority to form, organize, and capitalize one or more other entities (each, an "**Other Holding Entity**") to hold any DIP Collateral Trust Assets the DIP Collateral Trustee determines, in consultation with the Ad Hoc Group, are appropriate to be held through such structure, on such terms (including with respect to the legal form, jurisdiction of organization, and U.S. and non-U.S. tax classification of any such Other Holding Entity) as the DIP Collateral Trustee determines in consultation with the Ad Hoc Group. Any DIP Collateral Trust Assets to be held through an Other Holding Entity shall vest in the DIP Collateral Trust in accordance with the otherwise applicable provisions of this Plan and shall thereafter be contributed by the DIP Collateral Trust to the applicable Other Holding Entity, or otherwise transferred to the Other Holding Entity on terms determined by the DIP Collateral Trustee in consultation with the Ad Hoc Group.

(d) The transfers described in this Section 7.2 shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax pursuant to Section 1146(a) of the Bankruptcy Code.

### 7.3 *DIP Collateral Trust Funding.*

(a) The DIP Collateral Trust Funding Contributors will provide the DIP Collateral Trust Funding to the DIP Collateral Trust pursuant to this Plan, the DIP Collateral Trust Agreement, and the Confirmation Order, which commitments and contributions shall be available to pay costs of the DIP Collateral Trust, costs of administration of the DIP Collateral Trust, and costs of monetizing the DIP Collateral Trust Assets. The DIP Collateral Trust Funding is necessary and incidental to the liquidating purpose of the DIP Collateral Trust. The DIP Collateral Trust Funding is a bargained-for and integral part of the restructuring transactions contemplated under the Plan.

(b) The terms of the DIP Collateral Trust Funding shall be set forth in this Plan, the DIP Collateral Trust Agreement, and the Confirmation Order. Upon execution of the DIP Collateral Trust Agreement, the DIP Collateral Trust Funding shall constitute legal, valid, and binding obligations of the parties thereto and be enforceable in accordance with their respective terms and such obligations shall not be enjoined or subject to discharge, impairment, release,

avoidance, usury, recharacterization, or subordination under applicable law, the Plan, or the Confirmation Order, and the DIP Collateral Trust shall be authorized to incur or enforce the obligations thereunder with respect to the DIP Collateral Trust Funding set forth therein and use the proceeds of such DIP Collateral Trust Funding in accordance with the terms of the Plan, the Confirmation Order, and the DIP Collateral Trust Agreement without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The terms and conditions of the DIP Collateral Trust Agreement shall bind the DIP Collateral Trust and each other Entity that enters into such agreement.

**(c)** Entry of the Confirmation Order shall constitute approval of the DIP Collateral Trust Funding. Subject only to the provision of the DIP Collateral Trust Funding, the terms and conditions of the DIP Collateral Trust Funding are satisfied and earned as of the entry of the Confirmation Order. The DIP Collateral Trust Funding is a bargained-for and integral part of the restructuring transactions contemplated under the Plan. On and as of the Effective Date, each holder of DIP Collateral Trust Interests shall be deemed to be a party to the DIP Collateral Trust Agreement without the need for execution by such holder. The DIP Collateral Trust Agreement shall be binding on all Entities receiving, and all holders of, DIP Collateral Trust Interests (and their respective successors), whether such DIP Collateral Trust Interests is received or to be received on or after the Confirmation Date and regardless of whether such Entity executes or delivers a signature page to the DIP Collateral Trust Agreement.

### 7.4 *DIP Collateral Trust Waterfall.*

**(a)** Proceeds of the DIP Collateral Trust Assets, net of expenses, shall be distributed to DIP Collateral Trust Beneficiaries as follows:

(i) *First*, to the Primary DIP Collateral Trust Funding Contributors, pro rata in accordance with their respective Primary DIP Collateral Trust Funding, until each Primary DIP Collateral Trust Funding Contributor has received an amount equal to the greater of (a) an internal rate of return on such Primary DIP Collateral Trust Funding equal to 20.0% and (b) a multiple on invested capital on such Primary DIP Collateral Trust Funding of 1.75x, with such returns being measured from the date of the Primary DIP Collateral Trust Funding;

(ii) *Second*, to the Secondary DIP Collateral Trust Funding Contributors, pro rata in accordance with their respective Secondary DIP Collateral Trust Funding, until each Secondary DIP Collateral Trust Funding Contributor has received an amount equal to the greater of (a) an internal rate of return on such Secondary DIP Collateral Trust Funding equal to 20.0% and (b) a multiple on invested capital on such Secondary DIP Collateral Trust Funding of 1.75x, with such returns being measured from the date of the Secondary DIP Collateral Trust Funding;

73

(iii)   *Third*, to the holders of Class 2 DIP Collateral Trust Interests until such holders receive aggregate distributions equal to the amount of the Allowed DIP A Claims as of the Confirmation Date (excluding, for the avoidance of doubt, any reduction for the Credit Bid Claims); and

(iv)   *Fourth*, to the extent that at any time (a) aggregate distributions to holders of Class 2 DIP Collateral Trust Interests and Class 2 Litigation Trust Interests equal the amount of the Allowed DIP A Claims as of the Confirmation Date (excluding, for the avoidance of doubt, any reduction for the Credit Bid Claims) and (b) all Allowed Administrative Expense Claims (including Allowed Settled Administrative Expense Claims) have not been repaid in full from the proceeds of the Litigation Trust Assets, to holders of Allowed Administrative Expense Claims until such Allowed Claims are paid in full.

Following aggregate distributions equal to the amount of Allowed DIP A Claims as of the Confirmation Date, any residual value shall be paid as directed by the DIP Collateral Trust Oversight Committee, subject to Bankruptcy Court approval; *provided* that no such residual value shall be distributable to or for the benefit of the FBG Debtors.

Distributions to each class of DIP Collateral Trust Interests shall be made pro rata. Notwithstanding the foregoing, upon each distribution, the DIP Collateral Trustee shall have no obligation to make a distribution that would be in an amount that is either (i) less than $500 in Cash or (ii) less than the cost for the DIP Collateral Trustee to make the distribution.

**7.5    *DIP Collateral Trustee.***

(a)    **Appointment of DIP Collateral Trustee.**  Upon the establishment of the DIP Collateral Trust, the DIP Collateral Trustee shall be appointed as trustee of the DIP Collateral Trust.  The powers, rights and responsibilities of the DIP Collateral Trustee shall be as specified in the DIP Collateral Trust Agreement and Plan and shall include, among other rights and duties, the authority and responsibility to fulfill the items identified in this Section 7.5 of the Plan.

(b)    **Functions of the DIP Collateral Trustee.**  Following the establishment of the DIP Collateral Trust, the DIP Collateral Trustee and/or the DIP Collateral Trust, as applicable, shall carry out the functions set forth in this Section 7.5 and may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Confirmation Order or the DIP Collateral Trust Agreement.  Such functions shall include any and all powers and authority to:

(i)   perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the DIP Collateral Trust;

74

(ii) take any actions necessary to (A) resolve all matters related to the DIP Collateral Trust Assets and (B) vest such assets in the DIP Collateral Trust;

(iii) open and maintain bank accounts on behalf of or in the name of the DIP Collateral Trust;

(iv) maintain the books and records and accounts of the DIP Collateral Trust and obtain any necessary insurance;

(v) administer the SPV-DIP Wind Down Account in accordance with the Wind Down Order;

(vi) coordinate with the Wind Down Administrator and the other Trustees;

(vii) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the DIP Collateral Trust Assets in accordance with the DIP Collateral Trust Agreement;

(viii) administer the DIP Collateral Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the DIP Collateral Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(ix) calculate and make distributions to the DIP Collateral Trust Beneficiaries in accordance with the DIP Collateral Trust Agreement and the Plan;

(x) invest Cash, as available, and any income earned thereon;

(xi) retain, compensate and employ professionals to represent the DIP Collateral Trust or the DIP Collateral Trustee, as applicable;

(xii) form, organize, capitalize, recapitalize, dissolve, and liquidate any U.S. Holding Corporation, Other Holding Entity, or other wholly-owned subsidiary of the DIP Collateral Trust;

(xiii) hold and exercise all rights of equity ownership in any U.S. Holding Corporation, Other Holding Entity, or other wholly-owned subsidiary of the DIP Collateral Trust, including the appointment and removal of officers and directors, and cause any such subsidiary to engage in transactions consistent with the purposes of the DIP Collateral Trust, including the acquisition, holding, monetization, sale, exchange, and other disposition of assets;

75

(xiv)     maintain, control, administer, and oversee the voting and economic rights of any DIP Claims, First Lien Claims, and Second Lien Claims (subject to the terms and conditions of this Plan and the applicable oversight from the DIP Collateral Trust Oversight Committee);

(xv)      dissolve the DIP Collateral Trust in accordance with the terms of the DIP Collateral Trust Agreement; and

(xvi)     take any other actions not inconsistent with the provisions hereof that the DIP Collateral Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

### 7.6     *Fees and Expenses of the DIP Collateral Trust.*

Following the establishment of the DIP Collateral Trust, expenses of the DIP Collateral Trust shall be paid in the ordinary course of business, in accordance with the Plan and the DIP Collateral Trust Agreement.  Subject to the terms of the DIP Collateral Trust Agreement and without any further notice to any party or action, order or approval of the Bankruptcy Court, the DIP Collateral Trustee, on behalf of the DIP Collateral Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional for services rendered or expenses incurred.  Subject to the terms of the DIP Collateral Trust Agreement, the DIP Collateral Trust may retain professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties necessary or desirable to assist in monetizing the DIP Collateral Trust Assets).  Distributions owed to holders of DIP Collateral Trust Interests to be made by the DIP Collateral Trust shall be made by one or more distribution agents to be selected by the Ad Hoc Group SteerCo. Costs associated with such distribution agents shall be paid by the DIP Collateral Trust.

### 7.7     *DIP Collateral Trust Oversight Committee.*

On the Confirmation Date, the DIP Collateral Trust Oversight Committee shall be appointed in accordance with the terms of the DIP Collateral Trust Agreement.  The duties and obligations of the members of the DIP Collateral Trust Oversight Committee shall be set forth in the DIP Collateral Trust Agreement.  With respect to any DIP Claims, First Lien Claims, and Second Lien Claims not contributed into the DIP Collateral Trust, the Plan, the DIP Collateral Trust Agreement, and the Confirmation Order shall provide that Required Lenders (as defined in the DIP Order) under the DIP Order, Required Lenders (as defined in the Side-Car Term Loan Agreement) under the Side-Car Term Loan Agreement, Required Lenders (as defined in the First Lien Term Loan Agreement), and Required Lenders (as defined in the Second Lien Term Loan Agreement) under the Second Lien Term Loan Agreement, shall delegate all voting and economic rights with respect thereto to the DIP Collateral Trust Oversight Committee and the DIP Collateral Trust, respectively.

### 7.8     *Indemnification.*

The DIP Collateral Trust shall indemnify and hold harmless the DIP Collateral Trustee and the DIP Collateral Trust Oversight Committee, in their capacities as such, for any

76

losses incurred in such capacity, except to the extent such losses were the result of such party's fraud, bad faith, gross negligence, willful misconduct, or criminal misconduct.

**7.9** _**Minimum Distribution; No Fractional Distributions.**_

**(a)** Notwithstanding anything herein or the DIP Collateral Trust Agreement to the contrary, no fractional interests of DIP Collateral Trust Interests shall be issued, and no Cash shall be distributed in lieu of such fractional amounts. If any issuance or distribution on account of an Allowed Claim would otherwise result in the issuance of a number of interests of DIP Collateral Trust Interests that is not a whole number, the actual distribution of shares of DIP Collateral Trust Interests shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized interests of DIP Collateral Trust Interests shall be adjusted as necessary to account for the foregoing rounding.

**(b)** Notwithstanding anything herein or the DIP Collateral Trust Agreement to the contrary, including the DIP Collateral Trust Waterfall, no DIP Collateral Trust Interests shall be issued to a holder of an Allowed Claim if the entitlement to DIP Collateral Trust Interests is for less than $1,000.00 in principal amount of such Allowed Claim and no Cash or other distribution shall be made as a result of such adjustment. The DIP Collateral Trustee shall have no obligation to make a distribution under the DIP Collateral Trust Agreement (including pursuant to the DIP Collateral Trust Waterfall) that is either (i) less than $500.00 in Cash or (ii) that does not exceed any transaction costs associated with such distribution.

**7.10** _**Dissolution of the DIP Collateral Trust.**_

In no event shall the DIP Collateral Trust be dissolved later than five (5) years from the date the DIP Collateral Trust is established unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the DIP Collateral Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the DIP Collateral Trust Assets.

**7.11** _**Records.**_

The DIP Collateral Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the FBG Debtors necessary, as reasonably determined by the DIP Collateral Trustee, for the disposition of DIP Collateral Trust Assets, subject to the payment of any fees, costs, or expenses of providing such documents, business records, and other information.

**7.12** ***Turnover of DIP Collateral Trust Assets.***

If the Litigation Trust or the ABL Collateral Trust receives, or otherwise obtains possession or ownership of, DIP Collateral Trust Assets, such DIP Collateral Trust Assets shall be assigned, turned over, or otherwise transferred to (or held in trust for the benefit of) the DIP Collateral Trust.

**7.13** ***Non-Transferability.***

The DIP Collateral Trust Interests shall not be certificated, and shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.

**7.14** ***Maintenance of Lender Registers Post-Confirmation Date.***

**(a)** Maintenance of the lender registers for holders of any Allowed Lender Claims shall vest to the DIP Agent upon the Confirmation Date. Costs associated with the maintenance of the lender registers post-Confirmation Date shall be paid by the DIP Collateral Trust.

**(b)** If any advisors or professionals are hired, requested, and/or directed by the DIP Collateral Trust Oversight Committee to litigate or otherwise take actions in furtherance of the preservation of DIP Collateral Trust Assets and/or any Allowed Lender Claims, such advisors and/or professionals shall be directed, paid and funded by the DIP Collateral Trust.

**(c)** Upon the Confirmation Date, the lender registers maintained by the applicable agents under the DIP Credit Agreement, First Lien Term Loan Agreement, and Second Lien Term Loan Agreement shall be and remain frozen and will not be transferable other than to facilitate:

(i) transfers among Affiliates;

(ii) transfers required in connection with the termination, wind-down, or expiration of a collateralized loan obligation vehicle, collateralized debt obligation, or similar structured finance vehicle that holds such claims (including transfers to a liquidating trust, warehouse facility, or other entity established in connection with such wind-down);

(iii) transfers required in connection with a replacement of, or succession to, the investment manager or collateral manager of any collateralized loan obligation vehicle, collateralized debt obligation, or similar structured finance vehicle that holds such claims, including transfers to a new vehicle managed by a successor manager; and

(iv) transfers required by applicable law or by the organizational or governing documents of the holder in effect as of the Confirmation Date.

**7.15** *DIP Collateral Trust Tax and Other Matters.*

**(a)** **Tax Treatment.** The DIP Collateral Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701- 4(d) that is a "grantor trust" for U.S. federal income tax purposes. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the DIP Collateral Trustee), all parties (including, without limitation, the Debtors, the DIP Collateral Trustee, and the DIP Collateral Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of the DIP Collateral Trust Assets of the FBG Debtors to the DIP Collateral Trust as (i) the transfer of such assets by the FBG Debtors directly to the holders of Allowed Claims entitled to receive DIP Collateral Trust Interests in satisfaction of their Claims, followed by (ii) the transfer of such assets by such holders to the DIP Collateral Trust in exchange for the beneficial interests in the DIP Collateral Trust. Accordingly, absent definitive guidance to the contrary, the DIP Collateral Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of DIP Collateral Trust Assets.

**(b)** **Liquidation Purpose of the DIP Collateral Trust; No Successor in Interest.** The DIP Collateral Trust shall be established for the primary purpose of liquidating and distributing the DIP Collateral Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the DIP Collateral Trust. Accordingly, the DIP Collateral Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the DIP Collateral Trust Assets, make timely distributions to the DIP Collateral Trust Beneficiaries, as applicable, and not unduly prolong their duration. The DIP Collateral Trustee shall distribute at least annually to the DIP Collateral Trust Beneficiaries any Available Cash. The DIP Collateral Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan, the DIP Order, any other Final Order, or the DIP Collateral Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the DIP Collateral Trustee expressly for such purpose. Notwithstanding anything in the Plan or DIP Collateral Trust Agreement to the contrary, the DIP Collateral Trustee shall always act consistently with, and not contrary to, the purpose of the DIP Collateral Trust as set forth in the Plan.

**(c)** **Cash Investments.** The right and power of the DIP Collateral Trustee to invest the DIP Collateral Trust Assets, the proceeds thereof, or any income earned by the DIP Collateral Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements. The DIP Collateral Trustee may expend the Cash of the DIP Collateral Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the DIP Collateral Trust Assets during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the DIP Collateral Trust) and (iii) to satisfy other respective liabilities incurred by the DIP Collateral Trust in accordance with the Plan and the DIP Collateral Trust Agreement (including, without limitation, the payment of any taxes).

**(d)**     **Tax Reporting and Tax Payments.**

(i)     The DIP Collateral Trustee shall file tax returns for the DIP Collateral Trust treating the DIP Collateral Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 7.15(d). The DIP Collateral Trustee also shall annually send to each holder of a DIP Collateral Trust Interest, a separate statement regarding the receipts and expenditures of the DIP Collateral Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii)     As soon as practicable following the establishment of the DIP Collateral Trust, the DIP Collateral Trustee shall make a good faith determination of the fair market value of the DIP Collateral Trust Assets (on an asset-by-asset basis) as of the date the DIP Collateral Trust is established, taking into account (among other things) the anticipated recoveries on the respective DIP Collateral Trust Assets based on probability of success, timing of such recoveries and estimated litigation costs and expenses; it being understood that the aggregate fair market value of the DIP Collateral Trust Assets may be equal to the amount of the DIP Collateral Credit Bid. The DIP Collateral Trustee shall provide all parties with such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii)     Allocations of DIP Collateral Trust taxable income among DIP Collateral Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the DIP Collateral Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of DIP Collateral Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the DIP Collateral Trust. Similarly, taxable loss of the DIP Collateral Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining DIP Collateral Trust Assets. The tax book value of DIP Collateral Trust Assets for purpose of this paragraph shall equal their fair market value on the date DIP Collateral Trust Assets are transferred to the DIP Collateral Trust,

adjusted in accordance with tax accounting principles prescribed by the United States Internal Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv) The DIP Collateral Trust shall be responsible for payment, out of DIP Collateral Trust Assets, of any taxes imposed on the DIP Collateral Trust or the DIP Collateral Trust Assets.

(v) The DIP Collateral Trustee may request an expedited determination of taxes of the DIP Collateral Trust under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the DIP Collateral Trust for all taxable periods through the dissolution of the DIP Collateral Trust.

(vi) The treatment provided in this Section 7.15, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

**(e)** **Assignment of DIP Collateral Trust Assets.** To the extent any DIP Collateral Trust SPV Recoveries, DIP Collateral Trust Additional Payments, or other DIP Collateral Trust Asset can be validly assigned under applicable law (including applicable provisions of the Internal Revenue Code, Treasury Regulations, and U.S. Customs regulations), the FBG Debtors and their successors shall, at the direction of the DIP Collateral Trustee and at the DIP Collateral Trust's sole cost and expense (paid in advance), take all commercially reasonable actions to assign assets to the DIP Collateral Trust, including the execution of any assignment forms, powers of attorney, or other instruments required by any applicable governmental authority. To the extent any such assets cannot be validly assigned under applicable law, the FBG Debtors and their successors shall, to the extent applicable, liquidate such assets at the direction and sole cost and expense of the DIP Collateral Trust (paid in advance), and any proceeds received shall be held in trust for the DIP Collateral Trust and promptly remitted to the DIP Collateral Trust.

**(f)** **DIP Credit Bidding Rights**. The DIP Collateral Trustee, on behalf of the DIP Collateral Trust, shall have the right, pursuant to section 363(k) of the Bankruptcy Code, to credit bid up to the full amount of the Remaining DIP A Claims in any sale of DIP Collateral, whether such sale is effectuated through sections 363, 1123, or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. No provision of the Plan, the Confirmation Order, or any Definitive Document shall be construed to limit, restrict, or otherwise impair the DIP Collateral Trustee's right to credit bid the Remaining DIP A Claims for any DIP Collateral.

## ARTICLE VIII. ABL COLLATERAL TRUST.

### 8.1 *Establishment of the ABL Collateral Trust.*

On the Confirmation Date, or as soon thereafter as is reasonably practicable, the

ABL Collateral Trust shall be established in accordance with the ABL Collateral Trust Agreement for the purpose of being vested with and liquidating the ABL Collateral Trust Assets and making distributions to holders of Allowed Claims in accordance with the terms of the ABL Collateral Trust Agreement and the Plan. For the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the ABL Collateral Trust's primary purpose is liquidating the ABL Collateral Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the ABL Collateral Trust's liquidating purpose and reasonably necessary to conserve and protect the ABL Collateral Trust Assets and provide for the orderly liquidation thereof.

### 8.2     *Transfer of Assets into the ABL Collateral Trust.*

On the Confirmation Date, or as soon thereafter as reasonably practicable, and in connection with the foreclosure of the ABL Collateral Trust Assets by the ABL Collateral Trust, the FBG Debtors shall be deemed to have, without any further action, automatically and irrevocably transferred, assigned, and delivered, and (except as provided for U.S. federal, state, and local income tax purposes) automatically vested in the ABL Collateral Trust its remaining interests in the ABL Collateral Trust Assets, and all such assets shall be deemed to have vested in the ABL Collateral Trust (without recourse and free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on the Confirmation Date, to be administered by the ABL Collateral Trustee, in accordance with the Plan and the ABL Collateral Trust Agreement. The ABL Collateral Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the ABL Collateral Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the ABL Collateral Trust. The act of transferring the ABL Collateral Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the ABL Collateral Trust as if the asset or right was still held by the applicable Debtor. Upon the transfer of the ABL Collateral Trust Assets to the ABL Collateral Trust, the Debtors shall have no interest in or with respect to the ABL Collateral Trust Assets or the ABL Collateral Trust. Upon delivery of the ABL Collateral Trust Assets to the ABL Collateral Trust, the FBG Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the ABL Collateral Trust Assets or the ABL Collateral Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the ABL Collateral Trust Assets to the ABL Collateral Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the ABL Collateral Trust shall vest in the ABL Collateral Trust and its representatives, and the FBG Debtors and the ABL Collateral Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The ABL Collateral Trustee shall agree to accept and hold the ABL Collateral Trust Assets, including, for the avoidance of doubt, any amounts or proceeds realized on account of any ABL Deficiency Claims, in the ABL Collateral Trust for the benefit of the ABL Collateral Trust Beneficiaries, subject to the terms of the Plan and the ABL Collateral Trust Agreement.

**8.3** *ABL Collateral Trust Waterfall.*

Proceeds of the ABL Collateral Trust Assets, net of expenses, shall be distributed to ABL Collateral Trust Beneficiaries as follows: one-hundred percent (100%) of such proceeds shall be distributed to the ABL Collateral Trust Beneficiaries in accordance with the waterfall under the ABL Credit Agreement until aggregate distributions equal the Allowed amount of the ABL Claims; *provided* that any proceeds of the ABL Collateral Trust Assets in excess of the Allowed amount of the ABL Claims shall be deemed to be DIP Collateral Trust Assets and shall be turned over to the DIP Collateral Trust and distributed in accordance with the Plan. Distributions to holders of ABL Collateral Trust Interests shall be paid in accordance with the ABL Credit Agreement.

**8.4** *ABL Collateral Trustee.*

**(a)** **Appointment of ABL Collateral Trustee.** Upon the establishment of the ABL Collateral Trust, the ABL Collateral Trustee shall be appointed as the trustee of the ABL Collateral Trust. The initial ABL Collateral Trustee shall be selected and appointed by the ABL Agent, and the ABL Agent shall have the sole right to remove and replace the ABL Collateral Trustee. The powers, rights and responsibilities of the ABL Collateral Trustee shall be as specified in the ABL Collateral Trust Agreement and Plan and shall include the authority and responsibility to fulfill the items identified in this Section 8.4 of the Plan. Other rights and duties of the ABL Collateral Trustee and the ABL Collateral Trust Beneficiaries shall be as set forth in the ABL Collateral Trust Agreement.

**(b)** **Functions of the ABL Collateral Trustee.** Following the establishment of the ABL Collateral Trust, the ABL Collateral Trustee and/or the ABL Collateral Trust, as applicable, shall carry out the functions set forth in this Section 8.4 and may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Confirmation Order or the ABL Collateral Trust Agreement. Such functions shall include any and all powers and authority to:

(i) perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the ABL Collateral Trust;

(ii) take any actions necessary to (A) resolve all matters related to the ABL Collateral Trust Assets and (B) vest such assets in the ABL Collateral Trust;

(iii) open and maintain bank accounts on behalf of or in the name of the ABL Collateral Trust;

(iv) maintain the books and records and accounts of the ABL Collateral Trust and obtain any necessary insurance;

(v) coordinate with the Wind Down Administrator, the Claims Ombudsman, and the other Trustees;

83

(vi)	accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the ABL Collateral Trust Assets in accordance with the ABL Collateral Trust Agreement;

(vii)	administer the ABL Collateral Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the ABL Collateral Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(viii)	calculate and make distributions to the ABL Collateral Trust Beneficiaries in accordance with the ABL Collateral Trust Agreement and the Plan;

(ix)	invest Cash, as available, and any income earned thereon;

(x)	retain, compensate and employ professionals to represent the ABL Collateral Trust or the ABL Collateral Trustee, as applicable;

(xi)	provide funding for the administration of the Factored Receivables Account and prosecution of the FBG Debtors' interests in the Factored Receivables Account in accordance with the Plan;

(xii)	dissolve the ABL Collateral Trust in accordance with the terms of the ABL Collateral Trust Agreement; and

(xiii)	take any other actions not inconsistent with the provisions hereof that the ABL Collateral Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

## 8.5	*Fees and Expenses of the ABL Collateral Trust.*

Following the establishment of the ABL Collateral Trust, expenses of the ABL Collateral Trust shall be paid in the ordinary course of business, in accordance with the Plan and the ABL Collateral Trust Agreement. Subject to the terms of the ABL Collateral Trust Agreement and without any further notice to any party or action, order or approval of the Bankruptcy Court, the ABL Collateral Trustee, on behalf of the ABL Collateral Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional for services rendered or expenses incurred. Subject to the terms of the ABL Collateral Trust Agreement, the ABL Collateral Trust may retain professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties necessary or desirable to assist in monetizing the ABL Collateral Trust Assets).

**8.6** *Indemnification.*

The ABL Collateral Trust shall indemnify and hold harmless the ABL Collateral Trustee and the ABL Agent, in their capacities as such, for any losses incurred in such capacity, except to the extent such losses were the result of such party's fraud, bad faith, gross negligence, willful misconduct, or criminal misconduct.

**8.7** *Dissolution of the ABL Collateral Trust.*

In no event shall the ABL Collateral Trust be dissolved later than five (5) years from the date the ABL Collateral Trust is established unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the ABL Collateral Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the ABL Collateral Trust Assets.

**8.8** *Records.*

The ABL Collateral Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the FBG Debtors necessary, as reasonably determined by the ABL Collateral Trustee, for the disposition of ABL Collateral Trust Assets, subject to the payment of any fees, costs, or expenses of providing such documents, business records, and other information.

**8.9** *Turnover of ABL Collateral Trust Assets.*

If the DIP Collateral Trust or the Litigation Trust receives, or otherwise obtains possession or ownership of, ABL Collateral Trust Assets, such ABL Collateral Trust Assets shall be assigned, turned over, or otherwise transferred to (or held in trust for the benefit of) the ABL Collateral Trust.

**8.10** *Non-Transferability.*

The ABL Collateral Trust Interests shall not be certificated, and shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.

**8.11** *ABL Collateral Trust Tax and Other Matters.*

**(a)** **Tax Treatment.** The ABL Collateral Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701- 4(d) that is a "grantor trust" for U.S. federal income tax purposes (except to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-1 et seq. or other separate taxable entity). Subject to definitive guidance from the IRS or a court of competent

jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the ABL Collateral Trustee), all parties (including, without limitation, the Debtors, the ABL Collateral Trustee, and the ABL Collateral Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of the ABL Collateral Trust Assets of the FBG Debtors to the ABL Collateral Trust as (i) the transfer of such assets by the FBG Debtors directly to the holders of Allowed Claims entitled to receive ABL Collateral Trust Interests in satisfaction of their Claims, and, by reason of the DIP Collateral Trust's beneficial interest in any excess proceeds from the sale of ABL Collateral Trust Assets, to the holders of Allowed Claims entitled to receive DIP Collateral Trust Interests, other than to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity, followed by (ii) the transfer of such assets by such holders of ABL Collateral Trust Interests to the ABL Collateral Trust (in the case of holders of DIP Collateral Trust Interests, indirectly by first transferring such assets to the DIP Collateral Trust) in exchange for the beneficial interests in the ABL Collateral Trust. Accordingly, absent definitive guidance to the contrary, the ABL Collateral Trust Beneficiaries (including for purposes of this Section 8.11, holders of Allowed Claims entitled to receive DIP Collateral Trust Interests in respect of the DIP Collateral Trust's beneficial interest in the ABL Collateral Trust) shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of ABL Collateral Trust Assets (other than to the extent any such assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity).

(b)     **Liquidation Purpose of the ABL Collateral Trust; No Successor in Interest.**  The ABL Collateral Trust shall be established for the primary purpose of liquidating and distributing the ABL Collateral Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the ABL Collateral Trust.  Accordingly, the ABL Collateral Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the ABL Collateral Trust Assets, make timely distributions to the ABL Collateral Trust Beneficiaries, as applicable, and not unduly prolong their duration.  The ABL Collateral Trustee shall distribute at least annually to the ABL Collateral Trust Beneficiaries any Available Cash.  The ABL Collateral Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or the ABL Collateral Trust Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the ABL Collateral Trustee expressly for such purpose. Notwithstanding anything in the Plan or ABL Collateral Trust Agreement to the contrary, the ABL Collateral Trustee shall always act consistently with, and not contrary to, the purpose of the ABL Collateral Trust as set forth in the Plan.

(c)     **Cash Investments.**  The right and power of the ABL Collateral Trustee to invest the ABL Collateral Trust Assets, the proceeds thereof, or any income earned by the ABL Collateral Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements.  The ABL Collateral Trustee may expend the Cash of the ABL Collateral Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the ABL Collateral Trust Assets during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on

the ABL Collateral Trust) and (iii) to satisfy other respective liabilities incurred by the ABL Collateral Trust in accordance with the Plan and the ABL Collateral Trust Agreement (including, without limitation, the payment of any taxes).

### (d) Tax Reporting and Tax Payments.

(i) The ABL Collateral Trustee shall file tax returns for the ABL Collateral Trust treating the ABL Collateral Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 8.11(d). The ABL Collateral Trustee also shall annually send to each holder of an ABL Collateral Trust Interest, a separate statement regarding the receipts and expenditures of the ABL Collateral Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii) As soon as practicable following the establishment of the ABL Collateral Trust, the ABL Collateral Trustee shall make a good faith determination of the fair market value of the ABL Collateral Trust Assets as of the date the ABL Collateral Trust is established. The ABL Collateral Trustee shall provide all parties with such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii) Allocations of ABL Collateral Trust taxable income among ABL Collateral Trust Beneficiaries (other than taxable income allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the ABL Collateral Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of ABL Collateral Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the ABL Collateral Trust. Similarly, taxable loss of the ABL Collateral Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining ABL Collateral Trust Assets. The tax book value of ABL Collateral Trust Assets for purpose of this paragraph shall equal their fair market value on the date ABL Collateral Trust Assets are transferred to the

ABL Collateral Trust, adjusted in accordance with tax accounting principles prescribed by the United States Internal Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)     The ABL Collateral Trust shall be responsible for payment, out of ABL Collateral Trust Assets, of any taxes imposed on the ABL Collateral Trust or the ABL Collateral Trust Assets.  More particularly, any taxes imposed on any Disputed Claim Reserve established within the ABL Collateral Trust or its assets will be paid out of the assets of such Disputed Claim Reserve (including any ABL Collateral Trust Assets allocable to, or held on account of, Disputed Claims), and netted against any subsequent distributions in respect of the allowance or disallowance of such Claims.  In the event, and to the extent, any Cash in such Disputed Claim Reserve is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of such Disputed Claim Reserve (including any income that may arise upon an actual or constructive distribution of the assets of the reserve in respect of the resolution of Disputed Claims), assets of such Disputed Claim Reserve (including those otherwise distributable) may be sold to pay such taxes.

(v)      The ABL Collateral Trustee may request an expedited determination of taxes of the ABL Collateral Trust (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity in relation to the ABL Collateral Trust, taxes of such fund or other separate taxable entity), under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the ABL Collateral Trust (or any such disputed ownership fund or other separate taxable entity) for all taxable periods through the dissolution of the ABL Collateral Trust.

(vi)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the ABL Collateral Trustee of a private letter ruling if the ABL Collateral Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such ABL Collateral Trustee), the ABL Collateral Trustee may elect to treat any ABL Collateral Trust Assets allocable to, or held on account of, any Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity, and shall report consistently therewith for state and local income tax purposes.  If a "disputed ownership fund" election is made (or all or any portion of the ABL Collateral Trust Assets allocable to, or held on account of,

88

Disputed Claims is otherwise treated as a separate taxable entity), all parties (including the ABL Collateral Trustee and ABL Collateral Trust Beneficiaries) shall report for U.S. federal, state and local income taxes consistently with the foregoing.

(vii)     The treatment provided in this Section 8.11, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

**(e)      Assignment of ABL Collateral Trust Assets.**  To the extent any ABL Collateral Trust Asset can be validly assigned under applicable law (including applicable provisions of the Internal Revenue Code, Treasury Regulations, and U.S. Customs regulations), the FBG Debtors and their successors shall, at the direction of the ABL Agent and at the ABL Collateral Trust's sole cost and expense (paid in advance), take all commercially reasonable actions to assign such assets to the ABL Collateral Trust, including the execution of any assignment forms, powers of attorney, or other instruments required by the applicable governmental authority.  To the extent any such assets cannot be validly assigned under applicable law, the FBG Debtors and their successors shall, to the extent applicable, liquidate such assets at the direction and sole cost and expense of the ABL Collateral Trust (paid in advance), and any proceeds received shall be held in trust for the ABL Collateral Trust and promptly remitted to the ABL Collateral Trust.

**(f)      ABL Credit Bidding Rights.**  Following the foreclosure of the ABL Collateral Trust Assets by the ABL Collateral Trust, the ABL Agent, for itself and on behalf of the ABL Secured Parties, shall have the right, pursuant to section 363(k) of the Bankruptcy Code, to credit bid up to the full amount of the ABL Deficiency Claim (as determined in accordance with Sections 4.6(b) and 8.11(d)(ii) of the Plan) in any sale of any ABL Priority Collateral by the FBG Debtors that has not been foreclosed upon, whether such sale is effectuated through sections 363, 1123, or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.  No provision of the Plan, the Confirmation Order, or any Definitive Document shall be construed to limit, restrict, or otherwise impair the ABL Agent's right to credit bid the ABL Deficiency Claim for ABL Priority Collateral that has not been foreclosed upon.

## ARTICLE IX.      DISTRIBUTIONS.

### 9.1     *No Postpetition Interest on Claims.*

Unless otherwise provided in the Plan, the Confirmation Order, the DIP Order, the Trust Agreements, as applicable, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

### 9.2     *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various lists of holders of Claims or Interests in each Class, as maintained by the FBG Debtors, the DIP Agent, or the Prepetition Agents (as defined in the DIP Order), shall be deemed closed, and there shall be no

further changes in the record holders of any Claims or Interests after the Distribution Record Date, other than as provided in the solicitation procedures and Disclosure Statement Order. Neither the FBG Debtors, the Claims Ombudsman, nor the Trustees shall have any obligation to recognize any transfer of a Claim (i) occurring after the close of business on the Distribution Record Date, or (ii) that does not comply with Bankruptcy Rule 3001(e) or otherwise does not comply with the Bankruptcy Code or Bankruptcy Rules.

### 9.3     *Date of Distributions.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 9.4     *Reserve on Account of Disputed Claims of the FBG Debtors.*

(a)     From and after the Confirmation Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Bankruptcy Court in an amount constituting the Allowed amount, or Allowed or disallowed by Final Order, the Claims Ombudsman or the applicable Trustee shall retain, for the benefit of each holder of a Disputed Claim against the FBG Debtors, an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim against the FBG Debtors if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in a filed Proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim has been estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code as constituting and representing the maximum amount in which such Claim may ultimately become an Allowed Claim, or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Claims Ombudsman. Property held in the Disputed Claim Reserve (including, with respect to Cash, any earnings that have accrued on such Cash, net of any expenses, including any taxes, relating thereto) shall be retained by the Claims Ombudsman or the applicable Trustee for the benefit of holders of Disputed Claims against the FBG Debtors pending determination of their entitlement thereto under the terms of the Plan. Any Cash shall be either (x) held by the Claims Ombudsman or the applicable Trustee in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States government and guaranteed by the United States government, and having (in either case) a maturity of not more than 30 days. No payments or distributions shall be made with respect to all or any portion of any Disputed Claim against the FBG Debtors pending the entire resolution thereof by Final Order or settlement.

(b)     Subject to the other provisions of the Plan regarding timing of distributions, after a Disputed Claim becomes an Allowed Claim, the Claims Ombudsman or the applicable Trustee shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan and any earnings related to the portion of the Disputed Claim Reserve allocable to such Allowed Claim (net of any expenses, including any taxes, relating thereto). The balance of any property previously retained but not distributed to a Disputed Claim holder shall be included in future distributions to holders of Claims in the applicable Class. Each holder of a Disputed Claim that ultimately becomes an Allowed Claim shall be paid (i) first from the Disputed Claim Reserve and (ii) if the amount available for distribution pursuant to the foregoing clause (i)

is insufficient to remit distributions required to be made to such holder pursuant to this sentence, such holder shall receive the amount of such insufficiency on the next subsequent Distribution Date(s) from the FBG Debtors' assets or the applicable Trust's assets.

(c)     The Claims Ombudsman and the Trustees shall not be required to make any distributions from the Disputed Claim Reserve as a result of any Disputed Claims that are disallowed until all Disputed Claims either become Allowed Claims or are disallowed.

(d)     Unless otherwise ordered by the Bankruptcy Court, the Disputed Claim Reserves shall not be used for operating expenses, costs, or any purpose other than as set forth in this Section 9.4.

**9.5     *Distributions After Effective Date.***

Distributions made after the Confirmation Date to holders of Disputed Claims that are not Allowed Claims as of the Confirmation Date but which later become Allowed Claims shall be deemed to have been made on the Confirmation Date.

**9.6     *Delivery of Distributions.***

(a)     Subject to Bankruptcy Rule 9010, the Claims Ombudsman and the Trustees, as applicable, shall make all distributions to any holder of an Allowed Claim or its authorized designee or transferee as and when required by the Plan at (a) the address of such holder on the books and records of the FBG Debtors or its agents, (b) at the address in any written notice of address change delivered to the Claims Ombudsman or the Trustees, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001, or (c) the address of the designee of such holder to the extent practicable.  Subject to Section 9.7 of the Plan, in the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Claims Ombudsman or Trustees, as applicable, have been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable, such distribution shall be made to such holder without interest.

(b)     The FBG Debtors shall use commercially reasonable efforts to provide the Claims Ombudsman and the Trustees with the amounts of Claims against the FBG Debtors and the identities and addresses of holders of Claims against the FBG Debtors, in each case, as set forth in the FBG Debtors' books and records.

**9.7     *Unclaimed Property.***

(a)     Six (6) months from the later of:  (i) the Confirmation Date and (ii) the date that is ten (10) Business Days after the date a Claim against or Interest in the FBG Debtors is first Allowed, all distributions payable on account of such Claim or Interest that are unclaimed pursuant to Section 9.7(b) shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the applicable Trust, and all claims of any other Entity (including the holder of a Claim in the same Class) to such distribution shall be forever barred.  The Claims Ombudsman and the Trustees, as applicable, shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the FBG Debtors' books and records and the Bankruptcy Court's filings.

**(b)** A distribution made pursuant to the Plan shall be deemed unclaimed if a holder has not (i) accepted a particular distribution or, in the case of distribution made by check, by ninety (90) calendar days after issuance, negotiated such check, (ii) given notice to the Claims Ombudsman or applicable Trustee of an intent to accept a particular distribution, (iii) responded to a request by the Claims Ombudsman, Trustee, or a Disbursing Agent for information necessary to facilitate a particular distribution, or (iv) taken any other action necessary to facilitate such distribution.

### 9.8 *Satisfaction of Claims.*

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and exchange for such Allowed Claims.

### 9.9 *Manner of Payment Under Plan.*

Except as otherwise specifically provided herein, at the option of the Claims Ombudsman, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Claims Ombudsman. Any wire transfer fees incurred by the Claims Ombudsman in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient holder's distribution.

### 9.10 *Minimum Distribution.*

The Claims Ombudsman shall have no obligation to make a distribution under the Plan that is less than $500.00 in Cash.

### 9.11 *Setoffs and Recoupments.*

Except as otherwise provided in the Plan or the DIP Order, including in all respects Sections 13.5(a), 13.5(b), 13.6, and 13.7, the Claims Ombudsman may, pursuant to applicable non-bankruptcy law, set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the FBG Debtors or its successors may hold against the holder of such Allowed Claim; *provided* that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the FBG Debtors, their Estates, or the Claims Ombudsman of any claims, rights, or Causes of Action that the FBG Debtors may possess against the holder of such Claim.

### 9.12 *Withholding and Reporting Requirements.*

**(a)** **Withholding Rights**. In connection with the Plan, any Entity issuing any instrument or making any distribution or payment in connection therewith shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of

the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any Entity issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations. Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

(b)     **Forms**.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon reasonable request, deliver to the applicable withholding agent or such other Entity or Estate designated by the FBG Debtors, the Claims Ombudsman, a Trustee, or Disbursing Agent, an appropriate IRS Form W-9 or (if the payee is a foreign person) IRS Form W-8 and/or any other forms or documents, as applicable, requested by the FBG Debtors, the Claims Ombudsman, a Trustee, Disbursing Agent, or the applicable withholding agent to reduce or eliminate any required federal, state, or local withholding.  If such request is made and the party entitled to receive such property as an issuance or distribution fails to comply with any such request within ninety (90) days after the request is made, the amount of such issuance or distribution shall irrevocably revert to the FBG Debtors or the applicable Trust and any Claim in respect of such distribution under the Plan shall be forever barred from assertion against the FBG Debtors, the FBG Debtors' Estates, the Trusts, and their respective property.

(c)     The FBG Debtors shall cooperate in good faith with the Claims Ombudsman and the Trustees to comply with the withholding and reporting requirements outlined in this Section 9.12 of the Plan.

### 9.13    *Disbursing Agent*.

(a)     Subject to Section 6.7 of the Plan and the terms of the Litigation Trust Agreement, the Claims Ombudsman and the Trustees shall have the authority to enter into agreements with one or more Disbursing Agents to facilitate the distributions required under the Plan, the Confirmation Order, and the Trust Agreements.  The Claims Ombudsman and the Trustees may pay to the Disbursing Agent all reasonable and documented fees and expenses of the Disbursing Agent without the need for other approvals, authorizations, actions or consents.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

(b)     From and after the Confirmation Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Persons, including, without limitation, holders of Claims against the FBG Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions

to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent. No holder of a Claim or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or the Trust Documents or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

(c) The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(d) Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Confirmation Date shall be paid in Cash by the Claims Ombudsman or the applicable Trust in the ordinary course of business.

### 9.14 *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in the Plan, the DIP Order, or as otherwise required by law (as determined by the Claims Ombudsman or the Trustees, as applicable), distributions with respect to an Allowed Claim shall be allocated first to the principal amount of such Allowed Claim (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of such Allowed Claim, to any portion of such Allowed Claim for accrued but unpaid interest (including original issuance discount).

### ARTICLE X. PROCEDURES FOR RESOLVING CLAIMS AGAINST THE FBG DEBTORS.

### 10.1 *Allowance of Claims.*

Except as expressly provided in the Plan or in any order entered in the FBG Debtors' Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim against the FBG Debtors shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Court has entered a Final Order in the FBG Debtors' Chapter 11 Cases allowing such Claim.

### 10.2 *Objections to Claims.*

As of the Confirmation Date, the Claims Ombudsman shall be entitled to object to Claims against the FBG Debtors. Any objections to Claims against the FBG Debtors shall be served and filed (i) on or before one hundred and eighty (180) days following the later of (a) the Effective Date and (b) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as ordered by the Bankruptcy Court; *provided* that the Claims Ombudsman may extend the Claim Objection Deadline for an additional one hundred and eighty (180) days in its sole discretion upon

94

the filing of a notice with the Bankruptcy Court, with further extensions thereafter permitted after notice and a hearing.

### 10.3 *Estimation of Claims.*

The Claims Ombudsman may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the FBG Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Claims Ombudsman may pursue supplementary proceedings to object to the allowance of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim is estimated.

### 10.4 *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### 10.5 *Adjustment to Claims Register Without Objection.*

Any Claim against or Interest in the FBG Debtors that (a) is a duplicate, (b) has been paid or satisfied, or (c) has been amended or superseded, may be adjusted or expunged on the Claims Register by the Claims Ombudsman upon agreement between the parties in interest without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 10.6 *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim against the FBG Debtors is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim. Notwithstanding anything herein to the contrary, if any portion of a Claim against the FBG Debtors is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

95

**ARTICLE XI.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

### 11.1      *Rejection of Executory Contracts and Unexpired Leases.*

**(a)**      As of and subject to the occurrence of the Confirmation Date, all executory contracts and unexpired leases to which any of the FBG Debtors are a party shall be deemed rejected by the FBG Debtors  except for an executory contract or unexpired lease that: (i)  was previously assumed or rejected by the FBG Debtors pursuant to a Final Order of the Bankruptcy Court or assumed and assigned pursuant to a Final Order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a separate assumption or rejection motion or request filed by the FBG Debtors on or before the Effective Date; (iv) is a contract, lease, or other agreement or document entered into in connection with the Plan; (v) is a contract, lease, or other agreement or document transferred to the FBG Debtors in connection with the Estate Claims Credit Bid Transaction or DIP Collateral Credit Bid Transaction and subsequently transferred to the DIP Collateral Trust or Litigation Trust on or before the Confirmation Date.  For the avoidance of doubt, the FBG Debtors may seek to assume, assume and assign, or reject an executory contract or unexpired lease at any time prior to the Confirmation Date, including pursuant to the Contracts Procedure Order or otherwise in accordance with applicable bankruptcy law; *provided* that the FBG Debtors shall not assume and assign any executory contract or unexpired lease to the DIP Collateral Trust or Litigation Trust without the consent of the Ad Hoc Group SteerCo (such consent not to be unreasonably withheld, conditioned, or delayed).

**(b)**      Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections provided for in the Plan pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

### 11.2      *Survival of Indemnification Obligations.*

Any and all obligations of the FBG Debtors to indemnify, defend, reimburse, or limit the liability of current and former officers, directors, members, managers, agents, or employees against any Claims or Causes of Action as provided in the FBG Debtors' corporate charters, bylaws, other organizational documents, other agreements, or applicable law shall survive confirmation of the Plan, and shall be assumed by the applicable FBG Debtors solely to the extent necessary to recover and have access to insurance proceeds.  Any indemnification claims against the FBG Debtors arising under the foregoing documents shall be treated as General Unsecured Claims against the FBG Debtors to the extent Allowed and not subordinated.  Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable FBG Debtor effective as of the Confirmation Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, solely for the purposes described in the first sentence of this Section 11.2.

### 11.3      *Rejection Damages Claims.*

**(a)**      Unless an earlier date is otherwise provided for by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the FBG Debtors' executory

96

contracts or unexpired leases pursuant to the Plan, must be filed with Bankruptcy Court and served on the Claims and Noticing Agent no later than twenty-one (21) days after the Confirmation Date.

(b)     Any Claims against the FBG Debtors arising from the rejection of an executory contract or unexpired lease for which proofs of Claim were not timely filed as set forth in the paragraph above shall not (i) be treated as a creditor of the FBG Debtors with respect to such Claim, or (ii) participate in any distribution in the FBG Debtors' Chapter 11 Cases on account of such Claim, and any Claims against the FBG Debtors arising from the rejection of an executory contract or unexpired lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the FBG Debtors, their Estates, or the property for any of the foregoing without the need for any objection by the FBG Debtors or Claims Ombudsman or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim against the FBG Debtors arising out of the rejection of such contract or lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims against the FBG Debtors arising from the rejection of the FBG Debtors' prepetition executory contracts or unexpired leases shall be classified as General Unsecured Claims.

### 11.4    *Insurance Policies.*

(a)     Each of the FBG Debtors' Insurance Policies and any agreements, documents, or instruments related thereto, as of the Confirmation Date, shall be deemed to be and treated as executory contracts and shall be assumed by the FBG Debtors and shall continue in full force and effect thereafter in accordance with their respective terms.

(b)     Nothing in the Plan shall alter, supplement, change, decrease, or modify the terms (including the conditions, limitations, and/or exclusions) of the FBG Debtors' Insurance Policies; *provided* that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including the conditions, limitations, and/or exclusions) of the Insurance Policies, and thus the rights or obligations thereof, are subject to the Bankruptcy Code and applicable law.

(c)     All officers, managers, directors, agents, or employees who served in such capacity at any time before the Confirmation Date shall be entitled to the full benefits of the D&O Policies in effect as of, or purchased on or before, the Confirmation Date for the full term of such D&O Policies regardless of whether such officers, managers, directors, agents, and/or employees remain in such positions as of the Confirmation Date, in each case, to the extent set forth in such D&O Policies.

(d)     On the Confirmation Date, all rights and obligations of the FBG Debtors, if any, under the D&O Policies shall transfer to the Litigation Trust in accordance with the Plan and the Litigation Trust shall assume the FBG Debtors' obligations for administering such policies. For the avoidance of doubt, the transfer of the Insurance Rights of the FBG Debtors' and their Estates to recover proceeds from D&O Policies to the Litigation Trust shall not hinder the ability of any beneficiaries or insureds of such D&O Policies to submit claims and otherwise pursue and obtain coverage under the D&O Policies.

**(e)** On the Confirmation Date, the Wind Down Administrator shall assume the FBG Debtors' obligations, if any, for administering the Independent Manager Policies, subject to the Wind Down Budget.

### 11.5 *Reservation of Rights.*

**(a)** Neither the exclusion nor the inclusion by the FBG Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the FBG Debtors or any other party that any such contract or lease is or is not an executory contract or unexpired lease or that the FBG Debtors, their Estates, or their Affiliates has any liability thereunder.

**(b)** Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the FBG Debtors, the Estates, the Claims Ombudsman, the Trustees, or the Trusts under any executory or non-executory contract or unexpired or expired lease.

**(c)** Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the FBG Debtors, the Estates, the Claims Ombudsman, the Trustees, or the Trusts under any executory or non-executory contract or unexpired or expired lease.

## ARTICLE XII.    CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.

### 12.1 *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied on or before the Effective Date:

**(a)** the Disclosure Statement Order shall have been entered;

**(b)** the closings of the Estate Claims Credit Bid Transaction and DIP Collateral Credit Bid Transaction each shall have occurred;

**(c)** the Litigation Trust shall have been established and the Litigation Trust Assets shall have been transferred to the Litigation Trust;

**(d)** the Litigation Trust Interests shall have been issued in a form and manner satisfactory to the Ad Hoc Group SteerCo and the Creditors' Committee;

**(e)** the DIP Collateral Trust shall have been established and the DIP Collateral Trust Assets shall have been transferred to the DIP Collateral Trust;

**(f)** the DIP Collateral Trust Interests shall have been issued in a form and manner satisfactory to the Ad Hoc Group SteerCo;

98

(g)      the ABL Collateral Trust shall have been established and the ABL Collateral Trust Assets shall have been transferred to the ABL Collateral Trust;

(h)      the Plan Supplement and all of the schedules, documents, supplements, and exhibits thereto shall have been filed in form and substance reasonably acceptable to the FBG Debtors, the Ad Hoc Group SteerCo, and the Creditors' Committee (such consent not to be unreasonably withheld, conditioned, or delayed);

(i)      the Confirmation Order shall have been entered by the Bankruptcy Court and shall not be subject to any stay or injunction;

(j)      all actions, documents, certificates, and agreements necessary or appropriate to implement the Plan shall have been effected or executed or deemed executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws;

(k)      all authorizations, consents, regulatory approvals, rulings or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received;

(l)      the Professional Fees Escrow Account shall have been fully funded as provided for in the Plan;

(m)      all actions, documents, certificates, and agreements necessary to implement the Plan, including the Plan Settlement, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental authorities in accordance with applicable laws;

(n)      the Restructuring Expenses and all other fees, expenses, and other amounts due and payable to the Ad Hoc Group Advisors pursuant to the DIP Order and the Plan shall have been paid in full;

(o)      the Litigation Trust and/or the DIP Collateral Trust shall have sufficient Cash on hand to (i) satisfy (x) all Allowed Administrative Expense Claims against the FBG Debtors (unless an applicable holder consents to different treatment) in accordance with section 1129(a)(9)(A) of the Bankruptcy Code and (y) all Allowed Priority Tax Claims and Allowed Other Priority Claims against the FBG Debtors (unless an applicable holder consents to different treatment) that are required to be paid on the Effective Date under the terms of the Plan (the "**Effective Date Priority Claims**"), and (ii) reserve for all Disputed Administrative Expense Claims and Disputed Effective Date Priority Claims actually asserted in a timely filed proof of claim; *provided* that no amounts shall be required to be reserved for any Disputed Administrative Expense Claims and Disputed Effective Date Priority Claims that have been disallowed by order of the Bankruptcy Court (whether or not subject to appeal); and

(p)      the Definitive Documents shall have been filed and/or executed, as applicable, in form and substance acceptable to the Debtors, the Ad Hoc Group SteerCo, and the Creditors' Committee.

**12.2** *Waiver of Conditions Precedent.*

**(a)** Each of the conditions precedent to the occurrence of the Effective Date of the Plan set forth in this ARTICLE XII (other than the condition precedent set forth in Section 12.1(o)) may be waived, in whole or in part, by the FBG Debtors, with the consent of the Ad Hoc Group SteerCo and the Creditors' Committee or the Claims Ombudsman, as applicable (not to be unreasonably withheld, conditioned, or delayed), without leave of or order of the Bankruptcy Court.

**(b)** Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

**(c)** The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

**12.3** *Effect of Failure of a Condition.*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the FBG Debtors, (ii) prejudice in any manner the rights of any Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the FBG Debtors or any other Entity; *provided* that the foregoing shall not alter the protections afforded to any Person under sections 363(m) or 364(e) of the Bankruptcy Code to the extent applicable to any transactions consummated in connection with the Plan following entry of the Confirmation Order.

**12.4** *Effect of Vacatur of Confirmation Order.*

If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the FBG Debtors and all holders of Claims and Interests in the FBG Debtors shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all of the FBG Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the FBG Debtors or any other Entity or to prejudice in any manner the rights of the FBG Debtors or any other Entity in any further proceedings involving the FBG Debtors or otherwise; *provided* that the foregoing shall not alter the protections afforded to any Person under sections 363(m) or 364(e) of the Bankruptcy Code to the extent applicable to any transactions consummated in connection with the Plan following entry of the Confirmation Order.

**ARTICLE XIII.     EFFECT OF CONFIRMATION.**

**13.1** *Binding Effect.*

As of the Confirmation Date, the Plan shall bind (i) the FBG Debtors; (ii) the Wind Down Administrator; (iii) the Claims Ombudsman; (iv) the Litigation Trustee and the Litigation

Trust; (v) the DIP Collateral Trustee and the DIP Collateral Trust; (vi) the ABL Collateral Trustee and the ABL Collateral Trust; (vii) any successor to the FBG Debtors; (viii) the Litigation Trust Class 1 Funding Contributors and the DIP Collateral Trust Funding Contributors; (ix) all holders of Claims against and Interests in the FBG Debtors and their respective successors and assigns, regardless of whether any such holders were, as applicable, (a) Impaired or Unimpaired under the Plan, (b) presumed to accept or deemed to reject the Plan, (c) failed to vote to accept or reject the Plan, (d) voted to reject the Plan, and/or (e) received any distribution under the Plan; (x) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan; (xi) all Trade Creditors, Supply Chain Financers, and Factors; (xii) all Preference Settlement Electing Creditors; (xiii) each Entity acquiring property under the Plan and the Confirmation Order; (xiv) any and all non-Debtor parties to executory contracts and unexpired leases with the FBG Debtors; (xv) all Insurance Companies; and (xvi) all beneficiaries of the Trusts.

### 13.2 *Vesting of Assets.*

Except as otherwise provided in the Plan (including in all respects Sections 13.5(a), 13.5(b), 13.6, and 13.7), the Plan Supplement, and/or the Confirmation Order, on and after Confirmation Date, pursuant to sections 363 and 1141(b) and (c) of the Bankruptcy Code, the Litigation Trust Assets, the DIP Collateral Trust Assets, and the ABL Collateral Trust Assets shall vest in the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust, respectively, free and clear of all Claims, Liens, encumbrances, charges, constructive trusts, and other interests to the extent permitted under applicable law. Subject to the terms of the Plan, the Litigation Trust Agreement, the DIP Collateral Trust Agreement, and the ABL Collateral Trust Agreement, on and after the Confirmation Date, the Wind Down Administrator, the Claims Ombudsman, the Litigation Trustee, the DIP Collateral Trustee, and/or the ABL Collateral Trustee, as applicable, may use, acquire, and dispose of property and prosecute, compromise, or settle applicable Claims (including Administrative Expense Claims) and Interests against the FBG Debtors, without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan and/or the Confirmation Order. Without limiting the foregoing, the FBG Debtors and/or Wind Down Administrator may pay the charges that it incurs on behalf of the FBG Debtors' Estates after the Confirmation Date for Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 13.3 *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the FBG Debtors' Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay. For the avoidance of doubt, no injunction or stay shall interfere with the administration of the Litigation Trust or the prosecution of claims owned by such Litigation Trust.

101

### 13.4 *Plan Injunction.*

(a) Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former Affiliates, Representatives, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan or the occurrence of the Effective Date, including, for the avoidance of doubt, exercising control, or attempting to exercise control, over the Litigation Trust Assets, including the Estate Claims.

(b) Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released pursuant to the Plan, including under Section 13.5(a) or Section 13.5(b) of the Plan, or (ii) subject to exculpation pursuant to Section 13.6 of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the FBG Debtors, the FBG Debtors' Estates, the Wind Down Administrator, the Claims Ombudsman, the Litigation Trust, the Litigation Trust Assets, the DIP Collateral Trust, the DIP Collateral Trust Assets, the ABL Collateral Trust, the ABL Collateral Trust Assets, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section 13.6 of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action: (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the FBG Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the FBG Debtors as of the Confirmation Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to

the Plan, including pursuant to <u>Section 13.5(a)</u> or <u>Section 13.5(b)</u> of the Plan; and (G) exercising control, or attempting to exercise control, over the Litigation Trust Assets, including the Estate Claims; *provided* that such Persons that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, the Debtors or their Estates shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(c)     Subject in all respects to <u>Section 14.1</u> of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Exculpated Party that arose or arises from, in whole or in part: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Wind Down Administrator; the Claims Ombudsman; the Litigation Trust; the Litigation Trustee; the DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Exculpated Party. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been exculpated and, only to the extent legally permissible and as provided for in <u>Section 14.1</u> of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(d)     As of the Effective Date, all Persons other than the Litigation Trust are permanently enjoined from commencing, conducting, or continuing, directly or indirectly, any litigation or prosecution of an Estate Claim (including in any proceeding in a judicial, arbitral, administrative, or other forum). If any Person other than the Litigation Trust commences, conducts, or continues litigation or prosecution of an Estate Claim without a

prior determination by the Bankruptcy Court that the claim or cause of action is not an Estate Claim, the Litigation Trust shall be entitled to make an emergency application to the Bankruptcy Court for a determination that such claim or Cause of Action is an Estate Claim and that this injunction has been violated. Upon such determination, damages may be awarded in the amount of attorneys' fees and other litigation costs and expenses incurred by the Litigation Trust.  For the avoidance of doubt, no Person other than the Litigation Trust (including a defendant in such action) is entitled to enforce this <u>Section 13.4(d)</u>.

(e) The injunctions in this <u>Section 13.4</u> shall extend to any successors of the FBG Debtors, the Wind Down Administrator, the Claims Ombudsman, the Litigation Trust and the Litigation Trustee, the DIP Collateral Trust and the DIP Collateral Trustee, and the ABL Collateral Trust and the ABL Collateral Trustee and each of their respective property and interests in property.

(f) FOR THE AVOIDANCE OF DOUBT NONE OF THE SPECIFIED NON-RELEASED PARTIES SHALL BE RELEASED PARTIES UNDER THE PLAN. THE RELEASING PARTIES ARE HEREBY PRESERVING AND TRANSFERRING, VESTING, AND/OR SELLING TO THE LITIGATION TRUST AND NOT RELEASING ANY SUCH CLAIMS AND CAUSES OF ACTION (INCLUDING ANY ESTATE CLAIMS) WHICH CAN AND MAY BE BROUGHT BY THE LITIGATION TRUST.

13.5 *Releases.*

(a) Releases by the FBG Debtors and their Estates.  Except as otherwise expressly set forth below in this <u>Section 13.5</u>, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and Effective Date, as applicable, the FBG Debtors, their Estates, and successors and assigns, including the Wind Down Administrator, the Claims Ombudsman, the Litigation Trust, the Litigation Trustee, the DIP Collateral Trust, the DIP Collateral Trustee, the ABL Collateral Trust, and the ABL Collateral Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the FBG Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the FBG Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their

104

Estates; the Wind Down Administrator; the Claims Ombudsman; the Litigation Trust; the Litigation Trustee; the DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order (including the formation of the Litigation Trust, DIP Collateral Trust, and the ABL Collateral Trust and the issuance of the Litigation Trust Interests, DIP Collateral Trust Interests, and ABL Collateral Trust Interests); the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or Effective Date, as applicable. Notwithstanding anything to the contrary in the foregoing, the releases contained in this Section 13.5(a) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted gross negligence, willful misconduct, or actual fraud committed by such Released Party; *provided* that the foregoing exception for Claims and Causes of Action arising from an act or omission that constitutes gross negligence or willful misconduct shall not preserve or retain any Claim or Cause of Action for breach of fiduciary duty against a Released Party, (b) any post-Effective Date obligations of any Person under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (c) prior to the Effective Date, any post-Confirmation Date obligations of any Person under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) any Intercompany Claims against the FBG Debtors, which, for the avoidance of doubt, shall be treated in accordance with Section 4.8 of the Plan, or (e) any Claims in respect of the U.S. Bank Obligations; *provided* that, for the avoidance of doubt, the releases granted under this Section 13.5(a) are binding on successors to the FBG Debtors.

(b)     Third-Party Releases. Notwithstanding anything contained in the Plan to the contrary, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, Interests, obligations, rights, suits, damages, Causes of

Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the FBG Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Wind Down Administrator; the Claims Ombudsman; the Litigation Trust; the Litigation Trustee; the DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the FBG Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the FBG Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the FBG Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the FBG Debtors; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order (including the formation of the Litigation Trust, DIP Collateral Trust, and the ABL Collateral Trust and the issuance of the Litigation Trust Interests, DIP Collateral Trust Interests, and ABL Collateral Trust Interests); the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in this Section 13.5(b) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted gross negligence, willful misconduct, or actual fraud committed by such Released Party, or (b) any post-Effective Date obligations of any Person under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order. Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released under the Plan.

(c) FOR THE AVOIDANCE OF DOUBT NONE OF THE SPECIFIED NON-RELEASED PARTIES SHALL BE RELEASED PARTIES UNDER THE PLAN. THE RELEASING PARTIES ARE HEREBY PRESERVING AND TRANSFERRING,

**VESTING, AND/OR SELLING TO THE LITIGATION TRUST AND NOT RELEASING ANY SUCH CLAIMS AND CAUSES OF ACTION (INCLUDING ANY ESTATE CLAIMS) WHICH CAN AND MAY BE BROUGHT BY THE LITIGATION TRUST.**

**(d)     NOTWITHSTANDING ANYTHING IN THE PLAN TO THE CONTRARY, ANY CLAIM OF AN FBG DEBTOR AGAINST (I) AN SPV DEBTOR OR (II) AN AFFILIATE OR SUBSIDIARY OF AN FBG DEBTOR, SHALL NOT BE RELEASED UNDER THE PLAN.**

### 13.6     *Exculpation.*

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Wind Down Administrator; the Claims Ombudsman; the Litigation Trust; the Litigation Trustee; the DIP Collateral Trust; the DIP Collateral Trustee; the ABL Collateral Trust; the ABL Collateral Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Order; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order (including the formation of the Litigation Trust, DIP Collateral Trust, and the ABL Collateral Trust and the issuance of the Litigation Trust Interests, DIP Collateral Trust Interests, and ABL Collateral Trust Interests); the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and, in each instance, solely to the extent that such Cause of Action took place from the Petition Date through the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in this Section 13.6 shall not release or exculpate (a) any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted gross negligence, willful misconduct, or actual fraud committed by such Exculpated Party, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**13.7** *Waiver of Statutory Limitation on Releases.*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER ARTICLE XIII OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN SECTION 13.5 OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

**13.8** *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person (including any Affiliate of any Person), whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

**13.9** *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims against and Interests in the FBG Debtors and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims against and Interests in the FBG Debtors in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the FBG Debtors and the Claims Ombudsman reserve the right, to reclassify any Allowed Claim against or Interest in the FBG Debtors in accordance with any contractual, legal, or equitable subordination relating thereto.

**13.10** *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in the Plan in connection with the Preference Settlement and Sections 13.5(a), 13.5(b), 13.6, and 13.7, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes

of Action, rights of setoff or recoupment, or other legal or equitable defenses that the FBG Debtors had immediately prior to the Effective Date on behalf of their Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. Except as otherwise provided in the Plan in connection with the Preference Settlement and Sections 13.5(a), 13.5(b), 13.6, and 13.7, the FBG Debtors shall have, retain, reserve, or shall have transferred, sold, and/or vested to the Trusts which Trusts shall be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the FBG Debtors' and the Trusts' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 13.11 *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to an FBG Debtor shall be void and of no further force or effect with respect to any FBG Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the FBG Debtor as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of an FBG Debtor, (ii) the commencement of the Chapter 11 Cases, or (iii) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation.

### 13.12 *Solicitation of Plan.*

As of the Confirmation Date: (a) the FBG Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (b) the FBG Debtors and each of its respective managers, directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation in such solicitation, and therefore are not, and on account thereof shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.

## ARTICLE XIV. RETENTION OF JURISDICTION.

### 14.1 *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to sections 1334 and 157 of title 28 of the United States Code, over all matters arising in, arising under, or related to the FBG Debtors' Chapter 11 Cases for, among other things, the following purposes:

(a) to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(b)     to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(c)     to ensure that distributions to holders of Allowed Claims against and Interests in the FBG Debtors are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)     to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or any counterclaim related thereto;

(e)     to hear and determine settlements and disputes with respect to any (i) Litigation Trust Asset, including any Estate Claims, (ii) DIP Collateral Trust Asset, and (iii) ABL Collateral Trust Asset;

(f)     to hear and determine any disputes with respect to the Factored Receivables Account and the funds deposited therein;

(g)     to hear and determine disputes among the Trusts regarding the ownership of assets;

(h)     to hear and determine any disputes with respect to the SPV-ABL Wind Down Account and SPV-DIP Wind Down Account and the funds deposited therein;

(i)     to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date, including any such motions, adversary proceeding, application, contested matter or other litigated matter brought by the FBG Debtors, the Wind Down Administrator, the Claims Ombudsman, the Litigation Trustee, the DIP Collateral Trustee, or the ABL Collateral Trustee;

(j)     to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(k)     to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(l)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release, or other agreements or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order (in each case, to the extent Bankruptcy Court approval is necessary), or to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, the Confirmation Order, or any order of the Bankruptcy Court, in such a manner as may be necessary to carry out the purposes and effects thereof;

(m)     to hear and determine all Professional Fee Claims;

**(n)** to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

**(o)** to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

**(p)** to hear and determine all disputes involving the existence, nature, scope or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan;

**(q)** to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, the Plan Supplement, and the Confirmation Order;

**(r)** to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

**(s)** to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

**(t)** to hear and determine any other matters related to the FBG Debtors' Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

**(u)** to resolve any disputes concerning whether a Person had sufficient notice of the FBG Debtors' Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the FBG Debtors' Chapter 11 Cases, or any bar date or established in the FBG Debtors' Chapter 11 Cases, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purposes;

**(v)** to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE XIII of the Plan, including the releases, discharge, exculpations, and injunctions issued thereunder;

**(w)** to enforce all orders previously entered by the Bankruptcy Court;

**(x)** to recover all assets of the Litigation Trust, DIP Collateral Trust, the ABL Collateral Trust, the FBG Debtors and property of the FBG Debtors' Estates, wherever located; and

**(y)** to enter a final decree closing the FBG Debtors' Chapter 11 Cases.

**14.2** ***Courts of Competent Jurisdiction.***

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such

111

abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XV.        MISCELLANEOUS PROVISIONS.

### 15.1    *Statutory Fees.*

All Statutory Fees for the FBG Debtors due and payable prior to the Effective Date shall be paid by the FBG Debtors (or the Wind Down Administrator on behalf of the FBG Debtors) in full on the Effective Date.  On and after the Confirmation Date, the FBG Debtors (or the Wind Down Administrator on behalf of the FBG Debtors) shall pay any and all Statutory Fees for the FBG Debtors when due and payable and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  After the Confirmation Date, the FBG Debtors shall remain obligated to file post-confirmation quarterly reports and to pay Statutory Fees to the U.S. Trustee until the earliest of that particular FBG Debtor's' case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a Proof of Claim or any other request for payment of Statutory Fees.

### 15.2    *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the FBG Debtors; or (b) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Confirmation Order), including with respect to any transfers to or by the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, document recording tax, intangibles or similar tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 15.3    *Dissolution of Creditors' Committee.*

On the Confirmation Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided* that the Creditors' Committee shall continue to exist for the sole purpose of prosecuting any final fee applications of the Professionals of the Creditors' Committee.  The FBG Debtors, the Wind Down Administrator, the Claims Ombudsman, the

112

Trusts, and the Trustees shall not be responsible for paying the fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Confirmation Date.

### 15.4 *Request for Expedited Determination of Taxes of the FBG Debtors.*

The FBG Debtors and the Wind Down Administrator shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the FBG Debtors filed, or to be filed, for any and all taxable periods ending after the Petition Date.

### 15.5 *Dates of Actions to Implement Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 15.6 *Amendments.*

(a) **Plan Modifications**. The Plan may be amended, supplemented, or otherwise modified by the FBG Debtors (with the consent of the Ad Hoc Group SteerCo, the Creditors' Committee (or the Claims Ombudsman), and the ABL Agent, not to be unreasonably withheld, conditioned or delayed) in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the Litigation Trust, the DIP Collateral Trust, the ABL Collateral Trust, the treatment of holders of Allowed Claims against the FBG Debtors pursuant to the Plan or the rights or responsibilities of the UCC Member, the FBG Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan and any holder of a Claim against or Interest in the FBG Debtors that has accepted the Plan shall be deemed to have accepted the Plan as amended, supplemented, or otherwise modified.

(b) **Certain Technical Amendments**. Prior to the Effective Date, the FBG Debtors (with the consent of the Ad Hoc Group SteerCo, the Creditors' Committee (or the Claims Ombudsman), and the ABL Agent, not to be unreasonably withheld, conditioned or delayed) may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, as long as such technical adjustments and modifications do not adversely affect in a material way the Litigation Trust, the DIP Collateral Trust, the ABL Collateral Trust, or the treatment of the holders of Claims or Interests against the FBG Debtors under the Plan.

### 15.7 *Revocation or Withdrawal of Plan.*

The FBG Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Plan has been revoked or withdrawn prior to the Effective Date, then (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan

(including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claim by or against, or any Interest in, the FBG Debtors or any other Person, (b) prejudice in any manner the rights of the FBG Debtors or any other Person, including the holders of Claims, or (c) constitute an admission, acknowledgement, offering, or undertaking of any sort by the FBG Debtors or any other Person; *provided* that the foregoing shall not alter the protections afforded to any Person under sections 363(m) or 364(e) of the Bankruptcy Code to the extent applicable to any transactions consummated in connection with the Plan following entry of the Confirmation Order.

### 15.8 *Notice of Confirmation Date and Effective Date.*

**(a)** As soon as reasonably practicable, the FBG Debtors shall file a notice of entry of the Confirmation Order with the Bankruptcy Court.

**(b)** As soon as reasonably practicable, the FBG Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 15.9 *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 15.10 *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that the Plan or the Confirmation Order provides otherwise, the rights, duties, and obligations arising under the Plan and the Confirmation Order shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 15.11 *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Confirmation Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the FBG Debtors, the Wind Down Administrator, the Claims Ombudsman, the Litigation Trustee, the DIP Collateral Trustee, the ABL Collateral Trustee, the holders of Claims or Interests against the FBG Debtors (regardless of whether the holders of such Claims or Interests are deemed to have accepted or rejected the Plan), the Preference Settlement Electing Creditors, the Released Parties, the Releasing Parties, the Exculpated Parties, and each of their respective successors and assigns.

**15.12** *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

**15.13** *Entire Agreement.*

On the Confirmation Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

**15.14** *Severability of Plan Provisions.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the FBG Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan, and (c) non-severable and mutually dependent.

**15.15** *Additional Documents.*

On or before the Confirmation Date, the FBG Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The FBG Debtors, the Wind Down Administrator, the Claims Ombudsman, the Litigation Trustee, the DIP Collateral Trustee, the ABL Collateral Trustee, holders of Claims receiving distributions pursuant to the Plan, and other applicable parties in interest shall prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**15.16** *Deemed Acts.*

Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

**15.17** *Computing Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**15.18** *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

**15.19** *Notices.*

All notices, requests, and demands hereunder to be effective shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

(1) If to the FBG Debtors, to:

**First Brands Group, LLC**
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attn: Charles M. Moore, Chief Executive Officer
Email: cmoore@alvarezandmarsal.com

with a copy (which will not constitute notice) to:

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, New York 10153
Attn:    Matthew S. Barr
            Sunny Singh
            Andriana Georgallas
            Kevin Bostel
            Jason H. George
Email:  matt.barr@weil.com
            sunny.singh@weil.com
            andriana.georgallas@weil.com
            kevin.bostel@weil.com
            jason.george@weil.com

-and-

700 Louisiana Street, Suite 3700
Houston, Texas 77002
Attn:    Clifford W. Carlson
Email:  clifford.carlson@weil.com

(2) If to the Ad Hoc Group and/or the Ad Hoc Group SteerCo to:

**Gibson, Dunn & Crutcher LLP**
200 Park Avenue
New York, New York 10166
Attn:    Scott J. Greenberg
            AnnElyse Scarlett Gains
            Christina M. Brown
Email:  sgreenberg@gibsondunn.com
            agains@gibsondunn.com
            christina.brown@gibsondunn.com

(3) If to the Creditors' Committee, to:

**Brown Rudnick LLP**
7 Times Square
New York, New York 10036
Attn:    Robert J. Stark
            Bennett S. Silverberg
            Kenneth J. Aulet
Email:  rstark@brownrudnick.com
            bsilverberg@brownrudnick.com
            kaulet@brownrudnick.com

117

(4) If to the ABL Secured Parties, to:

**Winston Taylor LLP**
300 N. LaSalle Drive
Suite 440
Chicago, IL 60654
Attn:   Daniel J. McGuire
            Jason Bennett
Email:  dan.mcguire@winstontaylor.com
            jason.bennett@winstontaylor.com

After the Effective Date, the Wind Down Administrator has authority to send a notice to Persons providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Persons must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  Notwithstanding the foregoing, the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the Effective Date, the Wind Down Administrator is authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to those Persons that have filed such renewed requests.

### 15.20   *Reservation of Rights.*

Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision of the Plan, or the taking of any action by the FBG Debtors with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the FBG Debtors or any other Persons with respect to any Claims or Interests prior to the Confirmation Date.

*[Remainder of Page Intentionally Left Blank]*

118

Dated: June 16, 2026
Oakland County, MI


By: */s/ Charles M. Moore*
Name: Charles M. Moore
Title: Chief Executive Officer

*On behalf of First Brands Group, LLC and certain affiliated Debtors*

[*Signature Page to Joint Chapter 11 Plan*]