# EXHIBIT 47

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| **In re:** | § | **Chapter 11** |
|  | § |  |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
|  | § |  |
|  | § | **(Jointly Administered)** |
| **Debtors.[1]** | § |  |

## DECLARATION OF CHARLES M. MOORE IN SUPPORT
## OF CONFIRMATION OF FBG DEBTORS' CHAPTER 11 PLAN

I, Charles M. Moore, hereby declare under penalty of perjury pursuant to § 1746 of title 28 of the United States Code, that the following is true and correct to the best of my knowledge, information, and belief:

1. I submit this declaration (the "**Declaration**") in support of confirmation of the *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors*, dated June 16, 2026 (Docket No. 3019) (including any exhibits, schedules, or supplements thereto and as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "**Plan**"), including the agreements and other documents set forth in that certain *Notice of Filing of (I) Plan Supplement and (II) Liquidation Analysis* (Docket No. 3046) (as may be further amended, supplemented, or otherwise modified from time to time in accordance with the Plan, the "**Plan Supplement**"), and final approval of the *Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (Docket No. 3020)

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

(as may be amended, supplemented, or otherwise modified from time to time, the "**Disclosure Statement**").[2]

2.       This Declaration is based on my personal knowledge, education, experience, and review of documents and other information relevant to my testimony.  If called to testify, I could and would testify competently to the matters set forth in my Declaration.  My compensation is not contingent upon or influenced by the substance of my testimony or the outcome of the Plan or Disclosure Statement.  I am authorized to submit this Declaration on behalf of the FBG Debtors.[3]

## I.       QUALIFICATIONS AND PROFESSIONAL BACKGROUND

3.       I am a Managing Director at Alvarez & Marsal North America LLC ("**A&M**").  On September 5, 2025, A&M was retained by the Company to, among other things, assist with liquidity management and forecasting, identify cost-reduction opportunities, and undertake contingency preparations for a potential chapter 11 filing.  In September 2025 (as applicable, the "**Petition Date**"), First Brands Group, LLC ("**FBG**") and its affiliated debtors (collectively, the "**Debtors**," and together with the FBG Debtors' non-debtor affiliates, "**First Brands**" or the "**Company**") each commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

4.       On September 24, 2025, I was appointed as Chief Restructuring Officer of First Brands Group, LLC and its Debtor affiliates.  On October 13, 2025, I was appointed as Interim Chief Executive Officer of each of (i) First Brands Group, LLC, (ii) First Brands Group

---

[2]     Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to such terms in the Plan, Disclosure Statement, DIP Order, and the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* (Docket No. 22), as applicable.

[3]     "**FBG Debtors**" means, collectively, First Brands Group Holdings, LLC ("**FBGH**"), FBGH's direct and indirect Debtor subsidiaries, and Viceroy Private Capital, LLC.

Intermediate, LLC, (iii) First Brands Group Holdings, LLC, and (iv) Viceroy Private Capital, LLC, and certain other members of the A&M team were appointed as Co-Chief Restructuring Officers of such entities. Additionally, on November 3, 2025, another member of the A&M team was appointed as Chief Financial Officer of such entities. From the outset of A&M's retention, we have worked in coordination with the Debtors' other advisors on numerous activities to support the Debtors' restructuring efforts. As a result of A&M's work with the Debtors, their affiliates, and the Debtors' other advisors, I have become familiar with the Company's day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases, as described in my declaration filed with the Court on September 29, 2025 (Docket No. 22).

5. I have over thirty years of experience providing turnaround consulting and advisory services to organizations in a variety of industries. I received my bachelor's degree and MBA from Michigan State University. I am a Certified Public Accountant, a Certified Turnaround Professional, and am certified in Financial Forensics. These certifications, together with my past advisory engagements, provide me with substantial experience and training in analyzing financial statements, including preparing, auditing, and evaluating financial statements in accordance with generally accepted accounting principles. In particular, through my Financial Forensics certification, training, and over thirty years of professional experience, I have significant expertise in identifying financial statement misstatements and in determining and quantifying the adjustments necessary to correct misstated financial statements so that they may be accurately analyzed. Prior to joining A&M, I was a Senior Managing Director at Conway MacKenzie, Inc., served as Chief Financial Officer for Horizon Technology Group (an automotive supplier), and began my career in the Management Solutions & Services group at Deloitte & Touche LLP.

6.      I have substantial experience serving either in senior management positions or as a restructuring advisor in large organizations and in assisting companies with stabilizing their financial condition, analyzing their operations, and developing a business plan to accomplish restructuring objectives.  I am recognized for my work in the automotive industry and have advised more than seventy-five (75) companies in the industry across all parts segments.  I regularly advise Tier I and Tier II automotive suppliers, as well as secured lenders and equity investors, on matters such as liquidity management, cost reductions, mergers and acquisitions, negotiations with customers and unions, and strategic planning.  I have served as Chief Restructuring Officer for, among others, Accuride Corporation, FirstEnergy Solutions, The Budd Company, Cynergy Data, Inc., and National Real Estate Information Services, Inc.

## II.     BACKGROUND

7.      In these chapter 11 cases, I have been personally involved in assisting the Debtors in various aspects of their restructuring efforts.  Between my roles advising the Company as Managing Director at A&M and serving as the Company's Interim Chief Executive Officer, I have become very familiar with the Debtors' assets and liabilities, books and records, and various business lines.

8.      I have reviewed and am generally familiar with the terms and provisions of the Disclosure Statement and the Plan, including the agreements and other documents set forth in the Plan Supplement, and the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code.

## III.    DEVELOPMENT OF PLAN

9.      After securing $1.1 billion of new money DIP financing, the Debtors, with the assistance of Lazard, launched a marketing process in January 2026 to sell all or substantially all of their assets.  However, due to ongoing liquidity challenges and an inability to raise new

4

financing, it became clear that consummating a whole-company sale of the Debtors' businesses was no longer feasible. Accordingly, in late January 2026, the Debtors announced they would wind down certain of their unprofitable business units in chapter 11 while pursuing going-concern sales of other businesses and certain targeted asset sales with the support of their original equipment manufacturer customers (the "**OEMs**"), the Ad Hoc Group, the Creditors' Committee, and the ABL Secured Parties. Focused on identifying a path to an orderly wind down and maximizing recoveries for all constituents, the Debtors engaged in initial discussions with the OEMs, the Ad Hoc Group, the Creditors' Committee, and the ABL Secured Parties.

10. On January 29, 2026, the Debtors initiated a consensual mediation process overseen by the Honorable Judge Marvin Isgur to address, among other things, a resolution of the chapter 11 cases. Following extensive mediation, the Debtors, Ad Hoc Group, and the Creditors' Committee reached a settlement in principle regarding the terms of the orderly wind down of the Debtors' estates through a chapter 11 plan and the transactions contemplated thereunder. As discussed in more detail below, the Plan Settlement forms the foundation of the Plan. Following months of extensive negotiations with the Ad Hoc Group and Creditors' Committee, and after multiple hearings before the Court, the Debtors filed the Plan. The ABL Secured Parties subsequently agreed to support the Plan.

11. I believe the Plan provides for the orderly wind down of the FBG Debtors' estates and distributions to creditors in the most efficient, value maximizing, and expeditious manner possible. Specifically, the Plan provides for a structure to (i) monetize all of the FBG Debtors' remaining assets and (ii) allocate recoveries on Estate Claims among creditors in accordance with a waterfall agreed to among the FBG Debtors, Ad Hoc Group, and the Creditors' Committee. Among other things, the Plan contemplates a series of transactions that provide for

5

the transfer of the FBG Debtors' assets to various trusts to be monetized for the benefit of the FBG Debtors' creditors based on their rights and remedies with respect to such assets.

## IV.    SETTLEMENTS EMBODIED IN PLAN

12.    There are two settlements—the Plan Settlement and the Preference Settlement—embodied in the Plan, along with an Administrative Expense Claims Consent Program (collectively, the "**Settlements**"). As set forth in more detail below, the Settlements are fair and reasonable and in the best interests of the estates.

### A.    <u>Plan Settlement</u>

13.    The Plan incorporates the Plan Settlement by and among the FBG Debtors, the Ad Hoc Group, and the Creditors' Committee. The compromises and settlements included in the Plan Settlement are each (i) integrated with and dependent on all other compromises and settlements contemplated in connection with the Plan and (ii) necessary and integral to the Plan. The Plan Settlement includes, but is not limited to, the following terms:

a)    <u>Enforcement of Remedies</u>: The Plan Settlement incorporates a consensual arrangement to permit the DIP Secured Parties to accelerate the DIP Obligations and enforce remedies against the FBG Debtors but without the costs, expenses, and risks of attendant litigation relating thereto.

b)    <u>Estate Claims Credit Bid Transaction</u>: On the Confirmation Date or as soon thereafter as reasonably practicable, the FBG Debtors will sell the Litigation Trust Assets and such assets will transfer to and vest in the Litigation Trust free and clear of all liens, claims, encumbrances and interests.

c)    <u>Litigation Trust Waterfall</u>: A waterfall that allows junior creditors of the FBG Debtors to participate in recoveries from the DIP Secured Parties' purchased assets (i.e., the Estate Claims), prior to the satisfaction in full of the DIP A Claims and Roll-Up Claims.

d) <u>Committed Funding</u>:  The Litigation Trust will be funded with at least $75 million to monetize the Litigation Trust Assets for the benefit of creditors, which is comprised of (i) $25 million of cash from the FBG Debtors' balance sheet (from accounts holding the DIP Lenders' cash collateral), and (ii) $50 million of new committed funding provided and backstopped by certain holders of DIP A Claims.

e) <u>Minority Governance Rights</u>:  The Litigation Trust will be governed by an oversight committee, which will be initially comprised of four (4) members, including three (3) members appointed by certain members of the Ad Hoc Group and one (1) member appointed by the Creditors' Committee (the "**UCC Member**").  Certain sacred right decisions will require the affirmative vote of the UCC Member, as set forth in the Litigation Trust Agreement.

f) <u>Expiration of Challenge Rights</u>: The deadline to assert a Challenge to the Debtors' Stipulations or the Prepetition Secured Debt and Prepetition Liens will be deemed to expire against the Creditors' Committee and all other parties in interest upon the (i) establishment of the Litigation Trust, (ii) consummation of the Estate Claims Credit Bid Transaction, and (iii) funding of the Litigation Trust Cash Funding to the Litigation Trust.

g) <u>Claims Ombudsman</u>:  A Claims Ombudsman will be appointed on the Confirmation Date (or as soon thereafter as reasonably practicable), to serve as the holder of record of the Class 3(b) Litigation Trust Interests, and will be responsible for reconciling all Administrative Expense, Priority Tax, Other Priority, and General Unsecured Claims.

h) <u>Survival of Claims</u>:  The Remaining Lender Claims and ABL Deficiency Claims against the Estates of the FBG Debtors are preserved and may continue to be asserted against the Estates of the applicable FBG Debtors.

i) <u>Consolidation for Distribution Purposes</u>: For administrative ease and to avoid significant costs and time associated with reconciling all of the FBG Debtors' intercompany claims, each Class of Claims and Interests shall be treated as against a single consolidated Estate,

solely for the purpose of making distributions in accordance with the Plan.

j)   Agreed Budget:  The DIP Secured Parties' consent to the continued use of cash collateral pursuant to an agreed budget and a reduction of the minimum liquidity covenant under the DIP Documents from $50 million to $25 million.

k)   DIP Collateral Credit Bid Transaction: On the Confirmation Date or as soon thereafter as reasonably practicable, the FBG Debtors will sell the DIP Collateral Trust Assets and such assets will transfer to and vest in the DIP Collateral Trust free and clear of all liens, claims, encumbrances and interests.  The DIP Collateral Trust will be responsible for liquidating the DIP Collateral Trust Assets and making distributions to the DIP Collateral Trust Beneficiaries.

l)   ABL Priority Collateral Foreclosure: On the Confirmation Date or as soon thereafter as reasonably practicable, the ABL Secured Parties will be deemed to have foreclosed on the ABL Collateral Trust Assets, consisting of the ABL Priority Collateral, and such assets will transfer to and vest in the ABL Collateral Trust free and clear of all liens, claims, encumbrances and interests.  The ABL Collateral Trust will be responsible for liquidating the ABL Collateral Trust Assets and making distributions to the ABL Collateral Trust Beneficiaries.

14.   Additionally, as announced on the record at a hearing before the Court on June 12, 2026, the Debtors, the ABL Parties, the Ad Hoc Group, and the Creditors' Committee reached an agreement on the FBG Debtors' budget through the proposed confirmation hearing (the "**Confirmation Budget**"), which agreement was incorporated into the Plan Settlement.  The Confirmation Budget provides the FBG Debtors with the requisite consent to utilize cash collateral to fund the chapter 11 cases through confirmation.  The funding sources for the Confirmation Budget include OEM funding, $15 million of the ABL Secured Parties' cash collateral, and freed cash reserves.

15. With respect to consolidation for distribution purposes only, I believe that calculating recoveries for creditors on a deconsolidated basis would be unduly time consuming and costly. In the ordinary course operations of the FBG Debtors' various business lines, the FBG Debtors engaged in intercompany transactions with each other and with non-Debtor subsidiaries and affiliates. It would be impracticable and unduly burdensome to validate the accuracy of the FBG Debtors' intercompany balances due to voluminous transactions that occurred. Further, to calculate recoveries for creditors at each FBG Debtor, individual transactions would have to be analyzed in the context of the specific business operating through each entity. The time and expense this process would take would harm creditors by consuming valuable resources and reducing value that would otherwise be distributable to creditors.

16. I understand this limited form of consolidation was agreed to with the Creditors' Committee and the Ad Hoc Group as a necessary component of the Plan Settlement. Additionally, each of the FBG Debtors is jointly and severally liable under the DIP Facility and certain Prepetition Secured Debt, and subject to liens in excess of $6.6 billion (plus accrued and unpaid interest) in the aggregate (which exceeds the value of the underlying assets secured thereby). The lenders under these debt facilities have liens on the FBG Debtors' assets that are senior in right and priority to the claims of general unsecured creditors (whether the FBG Debtors' estates are consolidated for distribution purposes or not). Further, pursuant to the Plan, the DIP Secured Parties are permitting junior creditors to share in recoveries before the DIP A Claims are repaid in full in cash. Thus, I believe the exercise of separating the assets and liabilities of the FBG Debtors for purposes of distributions under the Plan is particularly unwarranted here. Accordingly, consolidation for distribution purposes only is necessary and appropriate under the circumstances.

9

17.     The Plan Settlement is an essential component of the FBG Debtors' Plan to ensure a timely wind down of the FBG Debtors' estates and to maximize recoveries for creditors, including administrative, priority, and general unsecured creditors.

18.     Absent entry into the Plan Settlement, the FBG Debtors would not be able to confirm a chapter 11 plan and would be forced to convert their cases to chapter 7. I believe this outcome would result in no recoveries for junior creditors compared to those under the Plan. Thus, to maximize recoveries for creditors, the FBG Debtors require time and money, and the support of key stakeholders, as contemplated under the Plan Settlement.

19.     The Plan Settlement allows the FBG Debtors to avoid the substantial litigation costs and risk associated with the DIP Secured Parties seeking relief from the automatic stay to exercise remedies against their collateral and terminating the FBG Debtors' consensual use of cash collateral. Litigating these issues would deplete the FBG Debtors' remaining resources, and would leave insufficient funds to pursue an alternative transaction to maximize value for the estates. There is a significant risk that the DIP Secured Parties would be granted relief from the automatic stay and could foreclose on all DIP Collateral, including the FBG Debtors' litigation assets, which would allow the DIP Secured Parties to keep 100% of all litigation recoveries until their DIP A Claims are paid in full in cash (with interest). I do not believe taking these risks is warranted, especially after weighing the harm it would cause to all creditors against the benefits provided under the Plan.

20.     The Plan Settlement is the product of hard-fought negotiations between the FBG Debtors, the Ad Hoc Group, and the Creditors' Committee, each of which was represented by independent, sophisticated counsel. The Parties exchanged numerous proposals and counter-proposals over months as part of extensive mediation overseen by Judge Isgur and subsequent

discussions, which ultimately led to the terms of both the Plan Settlement and the Plan. The FBG Debtors' efforts to negotiate and enter the Plan Settlement were at all times overseen and approved by the independent Special Committee.

21. The Plan Settlement affords the FBG Debtors' estates with numerous benefits, including, reducing the minimum liquidity covenant under the DIP Documents from $50 million to $25 million, consenting to the continued use of cash collateral pursuant to an agreed budget, providing $75 million of funding to the Litigation Trust, and allowing holders of Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims to receive distributions from the proceeds of the assets that will be transferred to the Litigation Trust before DIP A Claims are paid in full in cash with interest.

22. I believe that the Plan Settlement serves the paramount interests of creditors because, if approved, it will allow for the Estate Claims to be monetized and for junior creditors to receive recoveries. Additionally, I believe the Plan Settlement is required to avoid the value-destructive scenario of a chapter 7 liquidation. Without the approval of the Plan Settlement, the FBG Debtors will be unable to secure the funding needed to monetize their remaining assets and confirm a chapter 11 plan, and junior creditors likely will receive no recoveries.

23. In light of the foregoing, I believe that the Plan Settlement is fair, reasonable, and in the best interest of the FBG Debtors and their estates.

**B.** **Preference Settlement**

24. Trade Creditors, Supply Chain Financers, and Factors will be afforded the opportunity to participate in the Preference Settlement subject to the terms and procedures set forth in the Plan. The Preference Settlement, including the terms thereof applicable to Trade Creditors, Supply Chain Financers, and Factors, was critical to reaching an agreement with the Creditors' Committee and the Ad Hoc Group on the terms of the broader Plan Settlement. I believe that the

Creditors' Committee would not have agreed to support the Plan without the Preference Settlement.

25. In connection with the Preference Settlement, eligible Trade Creditors that elect to participate will be released from Preference Actions under the Plan and eligible Supply Chain Financers and Factors that elect to participate will receive the benefit of certain procedures with respect to Preference Actions asserted against them. In consideration for becoming a Preference Settlement Electing Creditor, such creditors must (1) grant the third-party releases under the Plan and (2) voluntarily contribute all of their direct (non-derivative) Claims against non-Debtor parties (other than a Released Party) that relate to First Brands' prepetition operations to the Litigation Trust.

26. In addition to achieving the benefits of the Plan Settlement generally, I believe the Preference Settlement affords the FBG Debtors' estates with significant additional benefits, such as (i) a global settlement with the Creditors' Committee, and (ii) the contribution of all Direct Creditor Claims held by the applicable Preference Settlement Electing Creditor, which outweigh the releases and related concessions being granted by the FBG Debtors in connection therewith. Further, I understand that the Preference Settlement only applies to Trade Creditors, Factors, and Supply Chain Financers who (i) do not meet the definition of Adverse Conduct (which includes, among other things, wrongful, actual, or constructively fraudulent conduct against any Debtor or affiliate of any Debtor), (ii) are not included on the list of Specified Non-Released Parties, and (iii) affirmatively opt-in to participate in the Preference Settlement.

27. In making these determinations with respect to Trade Creditors, my team and I evaluated and considered, among other things, the aggregate transfers to Trade Creditors during the preference period, potential defenses to Preference Actions that may be available to

Trade Creditors, and potential value received by the FBG Debtors' estates from the transfer of direct claims held by such creditors.

28.     The FBG Debtors evaluated a similar set of factors to determine the procedures for Supply Chain Financers and Factors under the Preference Settlement.  In light of, among other things, the aggregate amount of transfers to Supply Chain Financers and Factors during the preference period and the merits of Preference Actions that may exist against such creditors (and available defenses thereto), the FBG Debtors, the Creditors' Committee, and the Ad Hoc Group determined that Supply Chain Financers and Factors should be subject to a separate and independent process with respect to any Preference Actions that may be asserted against them. This process does not provide for the automatic release of Preference Actions against such creditors but will allow such creditors to, among other things, meet and confer with the Litigation Trustee and receive the benefit of the Modified New Value Elements in response to a Preference Action asserted against them.  The terms of the Preference Settlement applicable to the Supply Chain Financers and Factors will ensure that material and potentially valuable Preference Actions will not be released without due consideration and a commensurate benefit for the FBG Debtors and their estates.

29.     The terms of the Preference Settlement with respect to Supply Chain Financers and Factors were a key focus of the FBG Debtors, the Creditors' Committee, and the Ad Hoc Group in their negotiations regarding the broader Plan Settlement.  Specifically, each party wanted to ensure that the Preference Settlement was structured in a manner that would not allow potential "bad actors" to benefit from the Modified New Value Elements, but would allow creditors of the FBG Debtors that acted in good faith, including those that made substantial payments at the direction of the FBG Debtors, to participate in the Preference Settlement and

benefit from the Modified New Value Elements. The terms of the Preference Settlement, as set forth in the Plan, reflect the agreement struck by the Plan Settlement parties in light of these considerations. Absent an agreement between these parties on the terms of the Preference Settlement, the FBG Debtors likely would not have reached an agreement on the broader Plan Settlement.

30. Further, I believe the benefits of the Preference Settlement with respect to Supply Chain Financers and Factors outweigh the concessions being granted by the FBG Debtors pursuant thereto. As previously noted, a Supply Chain Financer or Factor that determines to opt-in to the Preference Settlement will grant the releases contained in Section 13.5(b) of the Plan and contribute its Direct Creditor Claims to the Litigation Trust. In exchange, such Supply Chain Financer or Factor will receive the benefit of the process and procedures provided for such creditors under the Preference Settlement, including the opportunity to meet and confer with the Litigation Trustee and the Modified New Value Elements, but will not receive an automatic release of any Preference Actions that may exist against them. I, therefore, believe that the Preference Settlement with respect to the Supply Chain Financers and Factors represents a fair and equitable compromise.

31. In light of the foregoing, I believe the Preference Settlement represents a sound exercise of the FBG Debtors' business judgment and is fair, reasonable, and in the best interest of the FBG Debtors and their estates.

### C. Administrative Expense Claims Consent Program

32. In light of the amount of secured, administrative, and priority claims asserted against the FBG Debtors' estates, as well as the forecasted timeline for the FBG Debtors to monetize and collect on their remaining assets (including significant litigation claims), I anticipate that there will be an extended executory period between the Confirmation Date of the

Plan and the Effective Date of the Plan. Accordingly, to accelerate cash payments to consenting holders of Allowed Administrative Expense Claims, the Plan provides the Administrative Expense Claims Consent Program, by which holders of Administrative Expense Claims have the opportunity to voluntarily participate in a settlement of their Administrative Expense Claim at a reduced amount in exchange for receiving an earlier recovery under the Litigation Trust Waterfall.

33.     If a holder of an Allowed Administrative Expense Claim chooses to participate in the Administrative Expense Claims Consent Program, they will receive a Settled Administrative Expense Claim in the amount equal to 50% of the Reconciled Amount identified in the Consent Program Opt-In Form and will receive the distributions accorded under the Litigation Trust Waterfall to holders of Settled Administrative Expense Claims.

34.     As an incentive to participate in the Administrative Expense Claims Consent Program, I understand that Settled Administrative Expense Claims will be satisfied in full before any other Allowed Administrative Expense Claims. However, regardless of the degree of holders' participation in the Administrative Expense Claims Consent Program, I understand that the Plan provides for the payment in full of all Allowed Administrative Expense Claims on or before the Effective Date.

35.     The Administrative Expense Claims Consent Program affords the FBG Debtors' estates with the significant benefit of consensually reducing the total aggregate outstanding Administrative Expense Claims that must be paid in full in cash before the occurrence of the Effective Date. I believe that the Administrative Expense Claims Consent Program serves the interests of creditors because, if approved, it will accelerate the occurrence of the Effective Date and distributions to junior creditors, and allow consenting Administrative Expense Claim holders faster recoveries in exchange for accepting a reduced Administrative Expense Claim

amount. Moreover, any holder of an Administrative Expense Claim who prefers to retain the entire amount of their Administrative Expense Claim may do so by simply not opting into the program. In light of the foregoing, I believe the Administrative Expense Claims Consent Program is fair, reasonable, and in the best interest of the FBG Debtors and their estates.

## V.     SALES EMBODIED IN PLAN

36.     The Plan Settlement provides for (i) the sale of Litigation Trust Assets, including Estate Claims, to the DIP Secured Parties (with such assets being contributed to the Litigation Trust) and (ii) the sale of DIP Collateral to the DIP Secured Parties (with such assets being contributed to the DIP Collateral Trust). The Estate Claims Credit Bid was subject to higher and better bids resulting from an extensive marketing process. As discussed below, no higher or better bids have materialized to date.

### A.     Estate Claims Credit Bid

37.     The Debtors are conducting a marketing and sale process for the Litigation Trust Assets, including the Estate Claims, to solicit potential higher or better bids for all Litigation Trust Assets. I believe the Estate Claims Marketing Process permits an informed comparison of the alternatives available to the Debtors' estates and afforded any potentially interested party a full and fair opportunity to submit offers for the Litigation Trust Assets.

38.     The Estate Claims Marketing Process is a supplement to the broader Sale Process (as defined below) that the Debtors initiated in January 2026, which included a sale of certain of the Debtors' businesses as going concerns. The Debtors launched the Estate Claims Marketing Process on May 4, 2026. In connection therewith, the Debtors, through their professionals, identified twenty-six (26) financial and strategic parties as potentially interested in acquiring the Estate Claims, including parties active in the litigation finance and claims acquisition markets. On May 4, 2026, members of A&M conducted initial outreach to each of these twenty-

16

six (26) potential bidders and provided them with summary marketing materials (the "**Initial Marketing Materials**") describing the opportunity. The Initial Marketing Materials included, among other things: (i) a summary of the Estate Claims to be sold, including the claims asserted in the pending adversary proceedings against Patrick James and related parties and against Onset Financial Inc. ("**Onset**") and related parties, as well as avoidance actions, recovery actions, and other estate claims and causes of action; (ii) a high level summary of the potential transfers at issue, including more than $700 million in alleged transfers to Patrick James and related entities and more than $2 billion in alleged fraudulent transfers in connection with purported sale-leaseback transactions with Onset; (iii) the current status of the ongoing litigation; (iv) an overview of these chapter 11 cases; and (v) the proposed procedures, bid requirements, and timeline for a sale of the Estate Claims.

39. As part of this outreach, the Debtors offered each contacted party access to a virtual data room containing diligence materials relevant to the Estate Claims, subject to the execution of a non-disclosure agreement. The Debtors also offered to schedule meetings with the Debtors' litigation counsel and members of the A&M investigation team to provide interested parties with a summary of the Estate Claims and a potential sale transaction, and to respond to diligence inquiries.

40. In addition to this targeted outreach, the Debtors publicly disclosed the Estate Claims Marketing Process in the Disclosure Statement. The Disclosure Statement describes the Estate Claims Marketing Process in detail, annexes the Marketing Materials as <u>Exhibit E</u> thereto, sets forth the requirements for a Qualified Bid, discloses the extension of the original May 22, 2026 bid deadline, and provides the contact information for the A&M professionals administering the process, inviting any party interested in submitting a bid to contact them directly.

The Disclosure Statement thus put all potentially interested parties—including parties beyond the twenty-six (26) contacted directly—on notice that the Debtors were actively marketing the Estate Claims and remained open to engaging with any bidder.

41. Following the Court's conditional approval of the Disclosure Statement, on June 12, 2026, A&M reached out again to each of the twenty-six (26) potential bidders to (i) update them on the outcome of the hearings on the Disclosure Statement, including the Court's conditional approval of the Disclosure Statement, (ii) inform them that the Estate Claims Marketing Process was being extended, and (iii) invite them to engage in further discussions with the Debtors and their advisors regarding a potential transaction involving the Estate Claims.

42. Notwithstanding these efforts, to date, only two (2) of the twenty-six (26) contacted parties have executed a non-disclosure agreement, and one of those parties declined to pursue the opportunity shortly after executing the non-disclosure agreement and receiving initial diligence information. The Debtors have offered to further extend the Estate Claims Marketing Process for the two remaining parties in an effort to solicit an alternative offer, but no alternative bid has been submitted to date. The Debtors have received no proposals from any third-party to purchase the Estate Claims, and no party has indicated a willingness to provide cash consideration for the Estate Claims or to provide litigation financing on terms alternative to, or more favorable than, the financing contemplated by the Plan.

43. Based on the foregoing, and as of the date of this Declaration, there is no indication that any third party is presently willing to acquire the Estate Claims in an amount sufficient to satisfy the DIP A Claims and provide equal or greater value to the FBG Debtors' other constituents as compared to the treatment proposed under the Plan.

44. I believe that the Estate Claims Marketing Process was reasonable and appropriate under the circumstances and that the Estate Claims Credit Bid represents the highest or otherwise best offer for the Litigation Trust Assets.

### B. DIP Collateral Credit Bid

45. Beginning on January 5, 2026, the Debtors and their advisors conducted a marketing and sale process for all or a portion of the Debtors' assets (the "**Sale Process**"). I understand that, in total, over 400 potentially interested parties were contacted on behalf of the Debtors to determine their interest in a potential sale transaction involving one or more of the Debtors' business units. As a result of that outreach, I understand that over 200 potential buyers executed confidentiality agreements and received access to a virtual data room with technical, commercial, and financial information regarding each of the Debtors' business units.

46. On January 8, 2026, the Debtors filed the Bidding Procedures Motion (Docket No. 1253), seeking court approval of an expedited timeline and auction procedures for the proposed Sale Process and the Initial Notice. The Initial Notice was served on all potential bidders for the Debtors' assets, all known parties that had expressed interest in purchasing any of the Debtors' assets within the last twelve months, all parties listed on the Debtors' creditor matrix, and various other notice parties, as well as through publication. On January 16, 2026, the Debtors published a notice of the Sale Process in *The New York Times*.

47. Shortly after filing the Bidding Procedures Motion, the Debtors' already-strained liquidity position deteriorated further and the Debtors were unable to obtain additional funding or waivers to access additional liquidity from their lenders. As a result, in late January, the Debtors began taking steps to wind down certain of their North America business operations. At that point, consummating a sale transaction under the timeline and procedures contemplated by the Bidding Procedures Motion was no longer feasible and the Debtors needed

19

to move as quickly as possible to consummate going-concern sales before it became too late to do so.

48.     In the months that followed, the Debtors, with support and funding from certain of their OEM customers, executed several going concern and other sale transactions involving their various business lines, including Walbro, TMD, and Horizon.

49.     The Debtors have not received any viable bids for the DIP Collateral Trust Assets.  Thus, the DIP Collateral Credit Bid represents the highest or otherwise best available bid for a sale of the DIP Collateral Trust Assets.  The DIP Collateral Credit Bid will maximize the value of the FBG Debtors' estates for the benefit of all stakeholders and further marketing, including by auction, is unlikely to yield a higher or otherwise better result; rather, any incremental value achieved by such additional marketing would likely be offset, if not exceeded, by the costs of doing so.

50.     The DIP Collateral Trust Assets are subject to undisputed DIP Liens in the amount of approximately $4.9 billion and liens securing the First Lien Claims and the Second Lien Claims (the "**Prepetition Term Loan Liens**") in the amount of approximately $2.6 billion (collectively, approximately $7.5 billion).[4]  Based on my review of the Debtors' books and records and the results of the postpetition sale and marketing process conducted by the Debtors, I believe that the amount of the DIP Liens and the Prepetition Term Loan Liens in the aggregate significantly exceeds the value of the DIP Collateral Trust Assets.  Moreover, I understand that, under the DIP Collateral Trust Waterfall, if aggregate distributions from the DIP Collateral Trust and the

---

[4]     I understand that the Challenge Period for the Prepetition Term Loan Liens has expired with respect to all parties in interest other than the Creditors' Committee.  I further understand that, pursuant to the Plan Settlement, the Challenge Period with respect to the Creditors' Committee will expire upon the (i) establishment of the Litigation Trust, (ii) consummation of the Estate Claims Credit Bid Transaction, and (iii) funding of the Litigation Trust Cash Funding to the Litigation Trust.

Litigation Trust exceed the amount of DIP A Claims as of the Confirmation Date, any additional amounts realized from the sale of the DIP Collateral Trust Assets will be distributed to holders of Administrative Expense Claims until such claims are paid in full.  Plan § 7.4(a)(iv).

51.    Accordingly, I believe that the proposed DIP Collateral Credit Bid Transaction represents a sound exercise of the Debtors' business judgment and is fair, reasonable, and in the best interests of the FBG Debtors' estates and all creditor constituencies.

**C.      Negotiations Were in Good Faith**

52.    I believe that the Estate Claims Credit Bid Transaction and DIP Collateral Credit Bid Transaction (together, the "**Credit Bid Transactions**") were proposed and negotiated by and among the FBG Debtors and the DIP Secured Parties without collusion or fraud, in good faith, and at arm's-length.  Each of the DIP Secured Parties is represented by qualified counsel and I believe that the DIP Secured Parties have not engaged in any conduct that would indicate or constitute a lack of good faith.  I have no reason to believe that the purchase price or the terms of the proposed transactions were controlled by any agreement among potential bidders or other parties and I do not believe that the successful bidders engaged in any collusion with any other bidder or party in connection with the Credit Bid Transactions.  It is my understanding that neither the DIP Secured Parties, nor any of their affiliates, members, partners, officers, directors, managers, principals, or shareholders are "insiders" of the Debtors and there exists no common identity of directors, managers, controlling shareholders, or members between the Debtors and the DIP Secured Parties.  I also understand that the protections afforded by section 363(m) of the Bankruptcy Code are integral to the Credit Bid Transactions and the DIP Secured Parties would not consummate the Credit Bid Transactions without such protections.

21

## VI.    LITIGATION TRUST

### A.    <u>Litigation Trust Funding</u>

53.     The Litigation Trust will initially be funded with $75 million, comprised of $25 million from the FBG Debtors' balance sheet and $50 million of committed funding provided and backstopped by the Litigation Trust Class 1 Funding Contributors, which are certain of the DIP Secured Parties.  In exchange for providing the Litigation Trust Class 1 Funding Contributions, each contributor will be entitled to receive distributions from the Litigation Trust in accordance with the Litigation Trust Waterfall, including distributions in an amount equal to the greater of (i) an internal rate of return on such Litigation Trust Class 1 Funding Contributions equal to 20.0% and (ii) a multiple on invested capital on such Litigation Trust Class 1 Funding Contributions of 1.75x.  In addition, following aggregate distributions from the Litigation Trust equal to $90 million, the contributors are entitled to receive 15% of all distributions from the Litigation Trust, and following aggregate distributions from the Litigation Trust equal to $350 million, the contributors are entitled to receive 10% of all distributions by the Litigation Trust.  The Litigation Trust Backstop Parties will receive an amount equal to 5.0% of the amount of the funding commitment (whether drawn or undrawn) backstopped by such Litigation Trust Backstop Party, which amount is included for purposes of the $90 million distribution threshold under the Litigation Trust Waterfall.

54.     I believe the Litigation Trust Funding provided by Litigation Trust Funding Contributors is the best litigation financing available to the FBG Debtors and their successors. Indeed, the Litigation Trust Funding represents the only viable source of financing for the Litigation Trust because the DIP Secured Parties have liens on Avoidance Proceeds and other Estate Claims, are purchasing the Litigation Trust Assets outright through the Estate Claims Credit Bid Transaction, and would not consent to be primed by, or subordinate their recoveries to,

alternative litigation funders.  No other litigation financers have come forward with an alternative financing proposal.  Moreover, the Litigation Funding is a critical aspect of the Plan Settlement and absent an agreement on the terms of the Litigation Funding, the FBG Debtors likely would not have reached an agreement on the Plan Settlement.  Specifically, since funding is needed to monetize the Estate Claims and provide recoveries to the FBG Debtors' creditors, certain DIP Secured Parties were willing to provide such funding but only if the terms provided a sufficient market return, taking into account their attendant risks and the amount of their outstanding DIP Claims.  Further, I believe the terms are reasonable, market-based, and actionable.

### B.      Litigation Trust Waterfall

55.      As mentioned above, proceeds from the monetization of the Litigation Trust Assets will be distributed in accordance with an agreed waterfall.  Specifically, the Plan allows junior creditors of the FBG Debtors (including administrative creditors, priority unsecured creditors, and general unsecured creditors) to receive distributions of proceeds of DIP Collateral, including Estate Claims before the DIP A Claims and Roll-Up Claims are paid in full in cash (with interest).

56.      Under the Litigation Trust Waterfall, after aggregate distributions of $350 million of proceeds from the Litigation Trust to holders of Class 1 and Class 2 Litigation Trust Interests, 16% of aggregate distributions from the Litigation Trust are paid in the following order until the holders of each of these claims are paid in full: *first*, to holders of Administrative Expense Claims who agree to participate in the Administrative Expense Claims Consent Program; *second*, to holders of other Administrative Expense Claims; *third*, to holders of Other Priority Claims; and *fourth*, to holders of Priority Tax Claims.  When the Allowed DIP A Claims have been paid in full, the share of proceeds to be distributed from the Litigation Trust to these beneficiaries will increase from 16% to 90%.  When the Allowed Administrative Expense Claims,

Other Priority Claims, and Priority Tax Claims have been paid in full, holders of Roll-Up Claims, First Lien Claims, Second Lien Claims, and General Unsecured Claims are entitled to share, on a pro rata basis, in 90% of all distributions by the Litigation Trust.

57. I believe the Litigation Trust Waterfall provides a significant benefit to administrative and priority creditors, who will be able to realize some recoveries before DIP A Claims are paid in full in cash (with interest).

## VII. THE FACTS UNCOVERED SINCE THE FILING OF THESE CHAPTER 11 CASES

### A. Overall Findings

58. Since our retention in this case, I, along with my team at A&M, in coordination with the FBG Debtors' other professionals and advisors, have uncovered significant facts about the true nature of the activities of prior management and the FBG Debtors' prepetition business based on an extensive, and months-long, factual review and analysis of the FBG Debtors' books and records, financial data, electronic records, and prepetition transactions and events. I have also become very familiar with the FBG Debtors' business over the last ten months.

59. As further described herein, there is substantial evidence that, in the years preceding the chapter 11 filings, the FBG Debtors' operating business was not profitable or an otherwise self-sustaining enterprise. Instead, the FBG Debtors' operating business did not generate sufficient cash to satisfy their obligations, including their indebtedness to the Term Loan Lenders and ABL Secured Parties. A&M's analysis indicates that, rather than being transparent with existing lenders and other stakeholders, the FBG Debtors' former officers—including Patrick James (founder and CEO), Edward James (Executive Vice President), Andy Brumbergs (SVP of Finance), and Stephen Graham (CFO)—engaged in a financial scheme (the "**Scheme**"), described herein, that began as early as 2018 and continued through the Petition Date. The main elements

of the Scheme were: (a) fabricating financial statements to misrepresent the FBG Debtors' dire financial condition; (b) fabricating accounts receivable to obtain cash from third party factoring parties; (c) fabricating supplier and vendor payables to obtain cash from supply chain financing ("**SCF**") parties (the "**SCF Lenders**"); and (d) causing inadequately capitalized special purpose vehicles (each, an "**SPV Entity**" and collectively, "**SPV Entities**") to enter into inventory and equipment financing facilities to obtain cash where: (i) the assets of such SPV Entities were of insufficient value to perform under the financing documents (e.g., to purchase inventory for fair value and sell it for a far greater amount required to replace the inventory and service the debt); (ii) existing lender collateral was purportedly double pledged or sold without notice or compensation to those lenders; and (iii) the resulting billions of dollars of debt was concealed from FBG's existing lenders  and other stakeholders.

60.     Round after round of transactions undertaken in furtherance of the Scheme occurred so the FBG Debtors could funnel cash received in the most recent financing round to the parties owed money from an earlier round, and so forth.  And of course, key insiders also received significant transfers as part of the Scheme.  All told, I estimate the aggregate amount of the transfers made by the FBG Debtors in furtherance of the Scheme during the four years prior to the Petition Date (the "**Full Period**") exceeds approximately $25.4 billion.

61.     The following chart summarizes the transfers we have determined were made in furtherance of the Scheme:[5]

---

[5]     The "Full Period" generally refers to the four-year period from September 28, 2021 through September 28, 2025, where data is available for that entire period.  All amounts shown in the 90-Day, 1-Year, and Full Period columns are based on the dates covered by the available data for each relationship.  Where data was not available for the full four-year period, the chart reflects the available period only. In addition, certain relationships did not exist throughout the full four-year period—for example, the Evolution relationship began in 2023.

|  | 90 Day | 1 Year | Full Period |
|---|---|---|---|
| **AR Factoring (ARF) Programs** |  |  |  |
| Leucadia | $ 737,623,204 |  | $ 9,400,235,200 |
| Katsumi | 321,413,837 |  | 5,685,073,511 |
| Evolution | 46,245,339 |  | 277,676,325 |
| **Total Payments to ARF Programs** | **$ 1,105,282,380** |  | **$ 15,362,985,036** |
| **Supply Chain Finance (SCF) Programs** |  |  |  |
| Raistone Financing Parties | 188,234,558 |  | 1,939,805,707 |
| PrimeRevenue Financing Parties | 162,743,463 |  | 1,418,480,533 |
| LiquidX Financing Parties | 76,981,691 |  | 979,552,136 |
| YieldStreet Financing Parties | - |  | 222,218,046 |
| Orbian Financing Parties | 39,997,124 |  | 114,017,780 |
| Interface Financing Parties | - |  | 380,708 |
| **Total Payments to SCF Programs** | **$ 467,956,836** |  | **$ 4,674,454,910** |
| **SPV Lenders** |  |  |  |
| Onset | 46,143,097 | 987,417,170 | 2,331,851,090 |
| CarVal | 7,450,173 |  | 92,816,984 |
| Aequum | 6,447,677 |  | 29,085,602 |
| Evolution | - |  | 73,477,450 |
| **Total Payments to SPV Lenders** | **$ 60,040,946** | **$ 987,417,170** | **$ 2,527,231,125** |
| **Insiders** |  |  |  |
| Patrick James | 65,056,679 | 514,700,466 | 965,659,044 |
| Insiders (Ed James, Andy Brumbergs, etc.) | 4,153,621 | 23,083,434 | 23,083,434 |
| **Total Payments to Insiders** | **$ 69,210,300** | **$ 537,783,900** | **$ 988,742,478** |
| **Other** |  |  |  |
| Acquisitions Payments | - |  | 1,646,000,000 |
| Helios | 3,920,000 |  | 79,931,026 |
| BDO Fees (minimum) | 260,177 |  | 4,268,797 |
| Trade Payables | 196,957,131 |  | 196,957,131 |
| **Total Other** | **$ 201,137,308** |  | **$ 1,927,156,954** |
| **TOTAL PAYMENTS** | **$ 1,903,627,770** | **$ 1,525,201,070** | **$ 25,480,570,503** |

62.     I am aware that certain recipients of these transfers were aware of unusual or extraordinary activities or information that I consider to be red flags: Katsumi Servicing, LLC ("**Katsumi**"), Leucadia Asset Management ("**Leucadia**" or "**LAM**"), and PrimeRevenue, Inc. ("**PrimeRevenue**"), and/or each of their affiliates, obtained documented examples of falsified invoices or otherwise discovered material irregularities related to the Scheme.   With such information, these parties could have conducted further diligence concerning, among other things, FBG's financial statements, which depicted a company operating at a very high level of

26

profitability inconsistent with its own business model and with the broader auto supplier industry (e.g., gross margins of 36.2% and operating income margins of approximately 19–20% for fiscal year 2023). These margins, if genuine, would have placed the FBG Debtors among the most profitable auto parts suppliers in the world.

63. And, FBG's reported financial performance appeared inconsistent with the publicly available financial information of certain acquired businesses. For example, immediately prior to its acquisition by FBG in January 2023, Horizon Global publicly disclosed negative trailing adjusted EBITDA margins, projected adjusted EBITDA margins of approximately negative 2.5% for 2022, and projected adjusted EBITDA margins of only approximately 5% through 2025. Despite acquiring Horizon and numerous other businesses, FBG continued to report consolidated gross margins exceeding 36% and operating income margins approaching 20%. The addition of these lower-margin business lines should have diluted FBG's average reported margins in subsequent years, but the reported figures show no such decline. This raised questions about how FBG could acquire new business lines operating at a fraction of FBG's reported margins, and somehow generated immediate improvements in profitability such that the acquisitions had no dilutive effect, especially when such margins were inconsistent with any historical results of those acquired entities.

64. Also, the financial statements from 2022 up until the Petition Date did not reflect the reality that the automotive industry continued to face uncertainty associated with global supply chains, elevated interest rates, inflationary pressures, and the potential impact of existing and evolving U.S. trade policies, including tariffs affecting imported automotive components.

65. Finally, publicly available information (or the lack thereof) about FBG's controlling owner, Patrick James, showed almost no information about him personally, very

27

limited relevant corporate experience, and prior lawsuits alleging that Patrick James had inflated receivables at other companies he controlled.

66. With specific information in hand concerning false invoices and the other red flags described above, these parties could have required additional information, such as a quality of earnings report, which First Brands could not have provided (as was the case in the summer of 2025 when the Scheme began to unravel), or otherwise questioned the accuracy of First Brands' financial statements and representations, and acted accordingly. For example, an April 2024 internal Apollo presentation titled "First Brands Overview" identified each of the following as "key issue[s]": (a) "Very simply: the cash flow of the business has never matched the Company's claims about its margins nor its ability to drive cost savings in the business;" (b) "It's not uncommon for management teams/sponsors to exaggerate run-rate impacts, synergies, etc., but in the case of First Brands, *it is not just pro forma numbers that don't make sense*" (emphasis added); (c) "The Company's income statement paints a picture of a company with 20% operating margins, which is difficult to believe for this business, especially when First Brands has been acquiring sub 5 and 10% EBITDA margin businesses;" and (d) the "Company is 100% controlled by CEO Patrick James . . . The CEO has controlled dozens of entities over the years, many of which have ended up in litigation or liquidation (or both). Simple Google searches reveal almost nothing about him." *See e.g.,* Apr. 2024 *First Brands Overview*, Apollo Global Management, Inc. The presentation goes on to provide an internal direction to "*[d]iscuss implications and possibilities of shorting a loan when on the DQ list.*" *Id.* (emphasis added).

67. In addition to the red flags discussed above, specific red flags should have been evident to SPV Lenders considering information readily available to them including, for example, (a) the fact that the SPV Entities could not satisfy their obligations under the SPV

28

Facilities based on the economics of the deals as written; (b) the initial purchase agreements through which the SPV Entities purportedly acquired inventory often contained no set purchase price and no schedule of assets; (c) the SPV Entities generally tracked inventory only by generic, continuously turning SKU numbers rather than unique identifiers that would permit specific items to be traced—a fact that should have made it obvious that the separateness of the SPV Entities was not being maintained; (d) the borrowing base certificates were generally facially deficient and internally inconsistent; and (e) in some cases, the purported "borrowing base" generally exceeded the loans extended to the SPV Entities, without an explanation of how an undercapitalized SPV Entity could properly acquire assets in excess of its funding amount. Because the Debtors have not yet obtained emails and internal communications from all or substantially all of the counterparties to the transfers, I believe additional information about what they knew or should have known about the Scheme will come to light.

68.     Given the transfers these specific parties received, I would expect that many of them will have received proportionally more on account of their claims against the FBG Debtors than other unsecured creditors will receive, such as suppliers and other trade creditors.

69.     These and other facts regarding the Scheme are presented in the following sections of this Declaration.

**B.     False Financials Concealing First Brands' Financial Condition**

70.     During the course of our work, my team at A&M uncovered pervasive manipulation and doctoring of the FBG Debtors' financial records. In effect, our investigation uncovered the existence of two sets of books: one reflecting legitimate underlying transactions, and another reflecting adjusted amounts manipulated for lender-facing reporting. The adjustments decreased expenses and improved reported margins. Based on the allocution of Andy Brumbergs (Brumbergs Plea at 27-28), I understand that, beginning at least as early as 2018, Patrick James

and Edward James, among others, caused the FBG Debtors to provide lenders with a version of financial statements that did not reflect the Company's true financial position.

71. The evidence we have uncovered shows that FBG Debtors' former management manipulated the Company's financial records according to a top-down process. They dictated false manual adjustments to the Company's financials, including, for example, directing that the Company "reduce factoring by 3. Reduce interest by 6. Reduce non–cash by 14. Increase restructuring 14," without any apparent business justification for these manual adjustments. Andy Brumbergs implemented corresponding accounting changes, including by having Debtors' accounting personnel make entries in local general ledger systems and directly in HFM, the Debtors' consolidation system, which enabled "instant" adjustments to financial results. Specifically, at the close of each reporting period, Andy Brumbergs prepared documents setting target financial outcomes for the Company known as "Results Bridges," which we understand were based on his discussions with Patrick James. The accounting department would then translate these "Results Bridges" into "Adjustments Bridges," which instructed site level accounting personnel to make specific unsupported manual journal entries needed to hit those targets, again with no apparent business justification. This process generated more than 38,000 posting lines of unsupported "Special" manual journal entries between January 2024 and September 2025 alone, touching nearly every line of the Debtors' balance sheet and income statement.

72. These "Special" manual entries included entries that improperly reclassified operating expenses as capitalized assets, entries that inflated reported sales, and entries reclassifying expenses "below the line" to inflate reported EBITDA. A&M determined that these adjustments rarely corresponded to the FBG Debtors' actual financial condition and were otherwise untethered to business realities.

73.     The A&M team also determined that the Debtors' former management improperly commingled the funds of the FBG Debtors and certain affiliates in order to conceal their financial misconduct.  In January 2022, the Debtors' former management began using a Wells Fargo bank account belonging to Bowery Finance II, LLC ("**Bowery**") to disguise the true sources and uses of cash apparently to keep transactions in furtherance of the Scheme and related liabilities off the Debtors' balance sheet.  Bowery is a non-Debtor entity incorporated in Delaware, on whose incorporation filing Patrick James is listed as President and Chief Executive Officer and Edward James as Executive Vice President.  Several Bowery accounts were originally opened at Wells Fargo to run a self-administered accounts receivable factoring program funded by Wells Fargo and Viceroy Private Capital, LLC, but by the end of 2022, the Debtors had begun routing proceeds generated from the Scheme through the main Bowery account ending 4822 (the "**Bowery Account**") as well.  In total, the A&M team found that approximately $12 billion flowed through the Bowery Account as part of the Scheme between January 2022 and October 2025.

74.     Funds flowed into the Bowery account from multiple sources, including SCF and SPV Lenders (each as defined below), and were then distributed out to FBG (typically via certain of the Debtors' operating entities), to Patrick James and his affiliated entities, and to SPV Entities to pay SPV Lenders.  The large majority of amounts initially transferred to the Debtors' operating entities were calculated pursuant to a formula-driven, percentage-based allocation schedule that accounting personnel referred to internally as the "Bowery Splits."  The A&M team found no discernible business basis for the percentages assigned to each site under the Bowery Splits.  Accounting personnel at the individual operating sites were provided journal entries by FBG corporate accounting personnel instructing them how to record the incoming Bowery transfers on the operating sites' books.  The site accountants were generally led to believe

31

the cash represented ordinary accounts receivable collections or were otherwise not informed of the transfers' true origin. The transfers were then generally washed through intercompany accounts or eliminated from the books entirely using top-side adjusting entries, effectively erasing any liability and record of the cash's original source. My team's analysis indicates that new money obtained through the Scheme, and washed through the Bowery Account, was regularly used in circular fashion to pay factors, SCF Lenders, and SPV Lenders, which, in turn, encouraged future rounds of borrowing to support the Scheme.

75. Our work also uncovered substantial evidence that the Debtors' operating businesses were losing money, could not pay all their obligations when due, and had liabilities far in excess of their assets for years preceding the Petition Date. For one thing, the FBG Debtors' true earnings were a fraction of what was reported. My team and I analyzed the impact of the 38,000 unsupported manual adjustments on the Company's reported profitability. We estimate that reversing these unsupported manual journal entries made by former leadership would, on its own, reduce the Debtors' reported EBITDA for FY2024 by approximately $925 million (from the reported $1.05 billion to approximately $125 million) and would reduce EBITDA for the nine months ended September 2025 by a further approximately $852 million. My team then made additional adjustments to correct other identified misstatements in First Brands' financial statements, including entries that were for adjustments to revenue and accounts receivable for credits, rebates, discounts, short payments, uncollectable amounts, and other items; adjustments to inventory and cost of goods sold for capitalized variances and inventory reserves; and adjustments to rent expense. With these corrections, the cumulative decrease to the FBG Debtors' FY2024 EBITDA is approximately $1.348 billion, resulting in EBITDA of approximately negative $294 million, rather than the $1.05 billion reported by former leadership. For the nine months

32

ended September 2025, the adjusted EBITDA is approximately negative $825 million, rather than the approximately $418 million from the Company's internal financial statements. This analysis confirms that the FBG Debtors' stated profitability prior to the Petition Date was illusory. Their reported EBITDA (in excess of $1 billion) rested on unsupported manual adjustments and misstated financial statements. In fact, the FBG Debtors had negative EBITDA and negative cash flow, and could not have serviced their debt absent prior management's ongoing Scheme.

76.     While my team has not had the time to conduct a similar forensic analysis of adjustments for 2022 and 2023, the evidence suggests that the results would be comparable. That includes the fact that Andy Brumbergs confirmed under oath that the Scheme dates back to at least 2018, and my team has confirmed the existence of similar unsupported manual adjustments made to financial statements in 2022 and 2023.

77.     My team and I also determined that the FBG Debtors' liabilities exceeded their assets well before the Petition Date. Since at least 2022, the FBG Debtors' reported liabilities have exceeded their reported assets ($5.153 billion in liabilities against $5.099 billion in assets in FY 2022; $6.801 billion against $6.605 billion in FY 2023). The FBG Debtors' assets were exceeded by their liabilities even before accounting for the substantial understatement of liabilities and the manipulated financial statements related to the Scheme. That condition persisted through the Petition Date: of the approximately $11.5 billion in liabilities outstanding as of the Petition Date, my team and I determined that approximately $5.5 billion was unrecorded or under-recorded, including the accounts receivable factoring liabilities, off-balance-sheet SPV liabilities, and unsecured SCF liabilities described herein.

78.     There is also evidence that prior management overstated asset values before the Petition Date. For example, my team analyzed the FBG Debtors' adjustments for aged and

obsolete inventory and found numerous instances in which clearly obsolete, worthless inventory remained on the books well past the point at which it should have been written off. This indicates that, in addition to underreporting liabilities, prior management overreported assets on the FBG Debtors' historical financial statements. Accordingly, the evidence supports the conclusion that the FBG Debtors' actual assets fell short of their liabilities by an even wider margin for years prior to the Petition Date.

79. With the Special Committee and outside advisors in place, former management was terminated. The guilty pleas of certain of the Debtors' most senior finance executives soon followed. Stephen Graham admitted under oath that as CFO he agreed with others to "inflate and report the financial performance of First Brands on financial statements that were issued to First Brands' lenders," knowing those statements contained false and misleading information, and that he personally presented the false and inflated statements in lender presentations to obtain financing on better terms. (Graham Plea at 24-25). Andy Brumbergs likewise admitted that, from approximately 2018 through 2025, he agreed with others to provide misleading financial statements to lenders that "included accounting adjustments that misstated First Brands' financial condition and results," and misrepresented the existence of inventory and equipment pledged or sold as collateral. (Brumbergs Plea at 27-28). Patrick James and Edward James were indicted on January 29, 2026 in the Southern District of New York on charges related to the Scheme, including operating a continuing financial crimes enterprise, conspiracy to commit wire fraud and bank fraud, conspiracy to commit money laundering, and numerous substantive counts of wire fraud and bank fraud.

C. **False and Misleading Activity Relating to FBG's Factoring and Supply Chain Practices**

1. **Accounts Receivable Factoring**

80. Prior to the Petition Date, the FBG Debtors utilized factoring arrangements to bridge the cash shortages created by their own extended customer payment terms, which in some cases permitted customers up to a year to pay outstanding invoices. First Brands historically entered into two primary types of factoring arrangements, including arrangements with (i) customers and their financial institution partners and (ii) unaffiliated third parties. In both arrangements, the Company would transfer a receivable to either a customer partner or third-party factor in exchange for a near-term discounted payment on a customer invoice with lengthy payment terms. Under customer factoring arrangements, the customer would pay the factor directly when the receivable came due. However, under third-party factoring arrangements, the third-party factor would purchase invoices from the Debtors and the Debtors were then required to turn over the payment, once received from the customer, to the third-party factor. Our investigation found that the Debtors' prepetition third-party factoring practices, specifically, were substantially based on fraudulent invoices. For example, Andy Brumbergs has admitted under oath that, between approximately 2020 and 2025, he and others knowingly submitted falsified invoice information to factoring companies and investors in order to secure "a higher financing or higher proceeds" than the true receivables would have justified. (Brumbergs Plea at 28-29).

81. To determine the extent and scope of the factoring Scheme, my team and I compared values of the factored invoices (from available nomination files or from information provided by the factors) to FBG's internal database of actual invoices owed by customers to identify the percentage of inflated invoices submitted to each factor. We applied this percentage to the total payments made to each third-party factor for the period prior to the Petition Date to

35

estimate the total value of prepetition transfers to each third-party factor on account of falsified accounts receivable in furtherance of the Scheme.

82. Through this forensic reconciliation of nomination files against the Debtors' system-generated invoices, we estimate that the vast majority of amounts transferred from and paid to factoring parties was on account of falsified invoices. The following chart summarizes how we estimated the fraudulent amount.

| AR Factoring (ARF) Programs | Amount Factored | Customer Invoice Amount | Fraudulent Amount |
|---|---|---|---|
| Leucadia | $ 1,624,819,272 | $ 632,436,313 | 61% |
| Katsumi | 5,430,868,697 | 1,011,080,194 | 81% |
| Evolution | 75,617,499 | - | 100% |

83. A&M's work identified several different methods applied by former management to manipulate invoices utilized in the factoring Scheme, including: (i) invoices submitted at inflated values that bore no relation to the underlying customer order; (ii) invoices submitted for customer orders that did not exist at all; and (iii) receivables that were factored more than once, i.e., pledged simultaneously to two or more competing factors. In some cases, the amount reflected on a factored invoice was ten times or more than the actual invoice amount. By way of example, a package of invoices valued at approximately $2.3 million was sent to Andy Brumbergs, who forwarded that same package to a factoring company at a value of $11.18 million. In another example, on July 19, 2023, the nomination file prepared by an accounting team in Romania was sent to Andy Brumbergs totaling approximately $11.9 million in invoice value to upload. This was the amount of real invoices nominated for factoring. FBG had additional capacity of $31.2 million available above and beyond that $11.9 million. Andy Brumbergs falsified invoices totaling $29.8 million to take advantage of the additional capacity and a total of $41.7 million was factored.

84.     Given the losses experienced by the operating business, and the fact that customers did not actually owe the amounts specified in the false invoices, former management relied upon the Scheme to generate cash to remit funds expected by the factoring parties, without which they could not have continued to engage in factoring still more false invoices.  For example, on August 8, 2025, LAM sent $1,291,986.58 to a Trico Products Corporation, LLC account.  Later that same day, Trico Products Corporation, LLC sent $4,550,509.56 to Katsumi.  Additionally, on August 22, 2025, LAM sent $732,816.56 to a Carter Fuel Systems, LLC account.  On the same day, Carter Fuel Systems sent $536,426.42 to Katsumi.  The evidence shows that the money received from factoring parties in many instances was cycled back to pay other or the same factoring parties in satisfaction of earlier liabilities.

i.     *Evidence Concerning "Red Flags" To Factoring Counterparties*

85.     There is evidence of unusual and concerning information that I consider to be red flags concerning the Scheme that was available to specified factoring counterparties prior to the Petition Date.  My team uncovered that, prior to the Petition Date, certain counterparties received documented examples of falsified invoices and discovered material irregularities related to the Scheme.

86.     For example, on September 22, 2023, Katsumi asked First Brands to provide copies of seven invoices Katsumi had already funded, as part of an audit.  On September 25, 2023, a First Brands accounts receivable analyst based in Romania sent Katsumi the requested invoices without funneling the response through Andy Brumbergs or Edward James.  Katsumi compared these underlying invoices to the amounts it had actually funded, and the discrepancy was unmistakable: not one of the seven sampled invoices matched.  For example, an invoice actually worth $240.35 had been funded by Katsumi as if it were worth $434,997.58, an inflation of more than 180,000%.

37

87. On September 27, 2023, Katsumi requested a call with FBG specifically to discuss the failed audit. The following day, Katsumi escalated the discrepancy directly to two of FBG's senior finance personnel. Katsumi's message to FBG made clear that all seven sampled invoices contained substantial discrepancies in invoice amount. Katsumi told FBG that it would continue requesting samples on future nominations.

88. There is evidence that, within months of this incident, Katsumi sought to market and sell its exposure in First Brands factored invoices. For example, Katsumi attempted to sell a portion of its position to Apollo following this disclosure. However, Apollo declined the opportunity after correctly identifying the numerous red flags discussed herein, even without the benefit of the specific disclosure known to Katsumi.

89. This information was available to Katsumi no later than September 27, 2023. Thereafter, it funded approximately $4.9 billion of additional third-party factoring and was paid more than $4.7 billion. Of that amount, my team estimated that $3.8 billion (81%) was on account of fraudulent or inflated invoices.

90. Jefferies and its affiliates, including LAM, are another example of a party that conducted diligence and uncovered irregularities and concrete examples of the fabricated invoices. Specifically, on January 13, 2023, LAM sent First Brands a series of due diligence questions related to LAM's existing accounts receivable facility, including the aggregate dollar amount of all inventory financing, accounts payable, and accounts receivable securitization facilities in place at First Brands. LAM also requested that First Brands schedule an onsite visit for LAM's annual review, which it noted was "past due," and asked for a call with First Brands' CFO. Rather than simply provide the requested diligence information, Edward James pushed back on the scope of LAM's requests. In a response on January 14, 2023, he wrote that he was "surprised

by the length of the questions" LAM had posed, and reminded LAM that Jefferies had been "rewarded handsomely" for its role in FBG's prior transactions. He added that he would "need to keep any future recommendations in mind" if LAM expressed concerns about providing additional factoring capacity.

91. On January 17, 2023, LAM wrote that without a site visit and a meeting with First Brands' CFO to "gain comfort" with First Brands, there was "no possibility of an increase" in First Brands' factoring capacity. LAM emphasized that it viewed itself as "one of [First Brands'] largest creditors," and that it wanted to "walk[] through [First Brands'] current on balance sheet and off balance sheet credit facilities." Edward James responded strongly, writing that "clearly LAM is not my creditor" given the structure of the LAM facility, and that he would need to "let ownership know" that LAM would not be providing increased factoring capacity as requested. Despite the lack of transparency and pushback against its diligence requests, Jefferies and its LAM affiliate may have prioritized their broader relationship with FBG over completing diligence they had sought.

92. This appears to have remained the case in October 2023. During its independent diligence, a prospective investor in First Brands had identified a material cash flow anomaly: FBG's reported operating cash from receivables remained positive despite significant revenue and accounts receivable growth, a pattern the prospective investor flagged as inconsistent with typical accounting results. But when Jefferies bankers advising that investor sent First Brands' CFO diligence requests seeking historical cash flows associated with factoring activities and a reconciliation of adjusted EBITDA, one Jefferies banker noted that Jefferies already knew First Brands "[did] not want to disclose more than necessary." Notably, the anomaly that the prospective investor identified is evident on the face of the financial statements.

39

93.     This information was available no later than January 17, 2023 to Jefferies and its affiliates.  Thereafter, LAM funded approximately $7.3 billion of additional third-party factoring and was paid more than $6.9 billion.  When my team compared the actual nominated invoices to the amounts transferred by FBG to LAM, they discovered that the actual invoices only accounted for 39% of the transferred value.  Therefore, my team estimates that 61% of transfers from FBG to LAM were on account of fraudulent or inflated invoices, and when applied to the full $6.9 billion paid to LAM, my team estimated that $4.2 billion (61%) was on account of fraudulent or inflated invoices.

94.     The Debtors have not yet had an opportunity to obtain internal documents from various factoring and other counterparties to the Scheme.  Nor have the Debtors had an opportunity to review all of their own emails.  Nonetheless, the information that has come to light suggests red flags were present.

ii.     *Transfers to Factoring Parties*

95.     The following chart summarizes payments to factoring parties (i) in the 90 days preceding the Petition Date ($1.1 billion) and (ii) in the four years preceding the Petition Date ($15.3 billion).  Additionally, my team has calculated the average percentage of fraudulent invoice value by comparing the amounts of factored invoices against the invoice details found in FBG's internal invoice database and estimates that, of the total paid to the factors in the four year period, a total of $10.6 billion was paid for fraudulent invoices.  For LAM and Katsumi parties, using the same methodology, my team estimated transfers made on account of false invoices in furtherance of the Scheme after January and September 2023, respectively (approximately $8 billion).  The following charts summarize our analysis.

| Factor Party | Total Paid - 90 Days | Total Paid - 4 Year | Fraudulent Amount Applied | Estimated Fraudulent Amount | |
|---|---|---|---|---|---|
| | | | | Total Paid | On Notice - Total Paid |
| Leucadia | $ 737,623,204 | $ 9,400,235,200 | 61% | $ 5,734,143,472 | $ 4,211,487,439 |
| Katsumi | 321,413,837 | 5,685,073,511 | 81% | 4,627,649,838 | 3,813,115,283 |
| Evolution | 46,245,339 | 277,676,325 | 100% | 277,676,325 | |
| **Total** | **$ 1,105,282,380** | **$ 15,362,985,036** | | **$ 10,639,469,635** | **$ 8,024,602,722** |

## 2. Supply Chain Financing

96. The Debtors used SCF to facilitate payments to certain vendors and suppliers where the SCF provider pays the vendor, less a discount, and the Debtors repay the SCF provider on the terms and amounts normally owed to the vendor. The Debtors facilitated the SCF program in two ways: through "Direct Factoring," in which participating vendors uploaded invoices directly to an SCF platform's portal, and through a "Third-Party Bill Payer" structure, in which vendors choosing to participate would have their invoices submitted to the SCF program portal and could choose to take money on "Day 1" or wait until their invoice matured, which then provided funds to a third-party bill payer, ITS, NextProcess LP ("**NextProcess**"), or VERCYFi LLC ("**VERCYFi**"), which in turn would pay the vendor. The Debtors used several SCF platforms, including PrimeRevenue, Raistone Purchasing LLC Series XXVII ("**Raistone**"), LiquidX, Inc. ("**LiquidX**"), IFG Network LLC d/b/a The Interface Financial Group ("**Interface**"), YieldStreet Prism Fund Inc. ("**Yieldstreet**"), Orbian Financial Services XXVI LLC ("**Orbian**"), Bank of America NA ("**BAML**"), and/or each of their affiliates, funded by a range of bank and institutional lenders, and the credit lines under these programs generally increased over time. The SCF platforms' respective lenders were owed approximately $1.2 billion at the time of the Petition Date, none of which was recorded on the balance sheet.

97. There is significant evidence, however, that Debtors' former management systematically created, and received payments on account of, billions of dollars of fake invoices, using either Excel schedules of fake supplier invoices or fake "cover" invoices. In general,

41

personnel within the Debtors created fake cover invoices or invoice information that were uploaded to the SCF platforms. As an example, in February 2024, the company created a cover invoice, also sometimes referred to internally as a "Dummy Invoice," which was submitted to Crescendo Asset Management under the Raistone factoring program. This cover invoice was used to support funding for $2.1 million of supposed freight invoices, which in reality never existed. The SCF platform provider would then approve the fake invoices for payment on behalf of one or more financing parties. Based on the dummy invoices, funds were then routed to a third party bill payer, which in turn would route the funds to Bowery, based on the payment instructions provided by First Brands. These transactions were referred to internally as "corporate initiative" or "round trip" payments and were tracked in an internal spreadsheet titled "Approved ROUNDTRIP Master."[6]



---

[6] "**ASC**" means ASC Industries, Inc. "**Champ**" or "**Champion**" means Champion Laboratores, Inc. "**TRICO**" or "**Trico**" means Trico Products Corporation.

98.     A portion of the funds received from SCF Lenders would flow through the Bowery Account and be transferred to operating entities pursuant to the percentages dictated by the Bowery Splits schedule.  My team also determined that amounts received from Bowery relating to the SCF program were recorded on the individual sites' books in various accounts and ultimately adjusted out at the direction of Andy Brumbergs and others.  In connection with this practice, just prior to the Debtors' bankruptcy, Andy Brumbergs instructed individuals in the Debtors' corporate accounting department to add a $1.2 billion SCF liability to the Debtors' books, effectively recording the outstanding SCF liabilities that had been concealed under the Scheme.  This adjustment stands in stark contrast to the SCF liabilities that First Brands had disclosed in prior years, which were approximately $543 million for 2023 and $682 million for 2024.  A&M's analysis has determined that each of these disclosures understated the actual SCF liabilities by hundreds of millions of dollars.

99.     Based on the SCF transaction structure, no payments for legitimate SCF invoices should have passed through the Bowery Account or been part of the roundtripping exercise.  Consistent with this fact, my team and I were unable to match transfers from SCF Lenders through the Bowery Account to any legitimate invoices.  Based on these facts, my team determined that every SCF transfer which passed through the Bowery Account was based on nonexistent invoices.  In other words, the evidence shows that 100% of the transfers to Bowery made pursuant to an SCF program were made on account of fake invoices.

100.     My team further confirmed that funds flowing through the Bowery Account, funded in part by the SCF Lenders, were not used to pay actual vendors.  Rather, funds paid by SCF Lenders on account of fake supply chain invoices were used, along with other funds

generated from the Scheme, to make payments to SCF Lenders, the factoring parties or SPV Lenders to perpetuate the Scheme by obtaining more cash from them.

i.  *Evidence Concerning "Red Flags" to SCF Counterparties*

101.  There is evidence that PrimeRevenue, which gave certain financing parties access to invoices of First Brands' vendors, obtained what appeared to be vendor invoices from First Brands in the ordinary course and then reviewed some of those invoices to determine that they were not created by the vendor at all, but by First Brands itself. This occurred in the summer of 2024, when a PrimeRevenue employee, who had an ongoing relationship with Edward James, told an FBG employee that the purported customer invoice meta data showed that the FBG employee authored the vendor invoice.  I believe that this is a significant red flag.  The First Brands employee was then advised by PrimeRevenue to check the invoices' file properties going forward. The Debtors do not yet have access to internal records or communications with PrimeRevenue's participating banks about this incident.

102.  Additional information such as internal communications has not yet been obtained and reviewed by the Debtors. The following chart, however, summarizes payments to SCF parties (i) in the 90 days preceding the Petition Date ($468 million), (ii) the total amount paid pursuant to fraudulent invoices in the four years preceding the Petition Date ($4.7 billion) and (iii) total amounts paid to PrimeRevenue's participating banks since the date of the incident described above ($575 million).

| Program | Total Paid - 90 Days | Estimated Fraudulent Amount | |
|---|---|---|---|
| | | Total Paid | On Notice - Total Paid |
| Raistone Financing Parties | $ 188,234,558 | $ 1,939,805,707 | |
| PrimeRevenue Financing Parties | 162,743,463 | 1,418,480,533 | 574,730,126 |
| LiquidX Financing Parties | 76,981,691 | 979,552,136 | |
| YieldStreet Financing Parties | - | 222,218,046 | |
| Orbian Financing Parties | 39,997,124 | 114,017,780 | |
| Interface Financing Parties | - | 380,708 | |
| **Total** | $ 467,956,836 | $ 4,674,454,910 | $ 574,730,126 |

#### D.    False and Misleading Activity Relating to SPV Entities

103.    The Debtors' former management established the SPV Entities through which the Debtors incurred more than $2.3 billion in undisclosed financing obligations as of the Petition Date.  The SPV Entities, including the CarVal SPVs,[7] Onset SPVs,[8] Evolution SPVs,[9] and Aequum SPVs,[10] were organized under a holding structure controlled by FBG's officers, and were used to obtain financing from four primary lender groups: Onset (approximately $2.2 billion as of the Petition Date), CarVal[11] (approximately $159 million as of the Petition Date), Evolution[12] (approximately $230 million as of the Petition Date), and Aequum[13] (approximately $87 million as of the Petition Date) (each, an "**SPV Lender**" and collectively, the "**SPV Lenders**").  From January 2022 through the Petition Date, the SPV Lenders advanced approximately $2.73 billion that flowed through the SPV Entities and should have been transferred to the FBG Debtors under the respective credit facilities (the "**SPV Facilities**") and received transfers from the FBG Debtors, through the SPV Entities as intermediaries, of approximately $2.4 billion.

---

[7]    "**CarVal SPVs**" means, collectively, Carnaby Inventory Holdings II, LLC ("**Carnaby Holdings II**"), Carnaby Inventory II, LLC ("**Carnaby II**"), Carnaby Inventory Holdings III, LLC ("**Carnaby Holdings III**"), and Carnaby Inventory III, LLC ("**Carnaby III**").

[8]    "**Onset SPVs**" means, collectively, Carnaby Inventory IV, LLC ("**Carnaby IV**"), Carnaby Inventory Holdings IV, LLC ("**Carnaby Holdings IV**"), Carnaby FA Holdings, LLC ("**Carnaby FA Holdings**") and Carnaby FA, LLC ("**Carnaby FA**").

[9]    "**Evolution SPVs**" means, collectively, Starlight Inventory Holdings I, LLC ("**Starlight Holdings**"), Starlight Inventory I, LLC ("**Starlight**"), Patterson Inventory Holdings, LLC ("**Patterson Holdings**"), and Patterson Inventory, LLC ("**Patterson**").

[10]    "**Aequum SPVs**" means, collectively, Broad Street Financial Holdings, LLC ("**Broad Street Holdings**"), Broad Street Financial, LLC ("**Broad Street**"), Global Assets LLC ("**Global Assets**"), and Global Assets GmbH ("**Global Assets GmbH**").

[11]    "**CarVal**" means the lenders under that certain credit agreement dated as of May 31, 2022, and that certain credit agreement dated as of July 6, 2022.

[12]    "**Evolution**" means Evolution Credit Opportunity Master Fund II-B, L.P., Evolution Credit Partners Trade Finance Master, L.P. (as successor in interest to Evolution Credit Partners Trade Finance L.P.), Evolution Credit Opportunity Master Fund III-B, LP, and certain other Evolution affiliated funds.

[13]    "**Aequum**" means the lenders under the revolving credit facility to Broad Street and Broad Street Financial Holdings, LLC and Aequum Capital Financial II LLC, in its capacity as administrative agent for the lenders.

104. The SPV Facilities were nominally loans (or sale-leaseback transactions) to a special purpose vehicle from an SPV Lender, to be repaid and secured by the SPV Entities' current and future inventory or existing equipment of a value sufficient to generate the cash necessary to maintain a minimum dollar value of collateral and repay the principal plus interest and fees.

105. There is substantial evidence, however, that cash proceeds from the transactions contemplated by the SPV Facilities would not have been and were not sufficient to perform under the SPV Facilities, and that the SPV Entities had effectively no capitalization or other legitimate means to uphold their obligations to the SPV Lenders under the SPV Facilities. Further, based on an extensive analysis conducted over many months by my team, we have determined the following facts to be accurate:

- The SPV Entities were controlled by FBG management. *See infra* ¶¶ 115, 124, 133–135.

- The SPV Entities plainly lacked the capitalization and assets to perform under the SPV loan agreements. *See infra* ¶¶ 109–115, 132.

- The SPV Facilities were made on substantially worse terms and higher interest rates relative to the available credit under the then undrawn ABL Facility, especially the Onset Facilities. *See* ¶¶110, 134–137.

- The inventory or equipment was ABL and term loan collateral before the SPV Facilities were entered into and such lenders contend that their liens were never properly released giving rise to double pledging. *See infra* ¶¶ 119, 123–124.

- The inventory and equipment remained on FBG Debtors' books and records and were functionally utilized by the FBG business (not the SPV Entities). *See infra* ¶¶ 111, 119–121.

- The FBG Debtors bore the risk of default under the loans, including because the FBG Debtors stood to lose access to the equipment and inventory necessary for their business. *See infra* ¶¶ 109–114, 124.

- The FBG Debtors' management actively concealed the existence of the SPV Facilities and debt from the FBG Debtors' ABL Secured Parties and Term Lenders and all other stakeholders, including by failing to disclose their existence in their financial statements as required under the applicable accounting rules. *See infra* ¶¶ 124–127, 138.

- The FBG Debtors received substantially all of the loan proceeds (certain amounts were diverted by Patrick James) and were the actual source of the cash for nearly all payments made to the SPV Lenders, which were not generated by sales of inventory by SPV Entities. *See infra*. ¶¶ 106–107, 116–118, 125–127.

- The inventory that was supposed to provide the means to repay the SPV Entity financings and that ostensibly secured the loans (other than Onset's property, plant and equipment ("**PP&E**") financings) was of insufficient value to generate replacement collateral as required under the transaction documents while also servicing the loans. In other words, even if the SPV Entities owned the inventory (which is disputed), the margins from the sale of the inventory would have been insufficient to both replace the inventory that had been sold and to pay the loans. *See infra* ¶¶ 109–114.

106. In sum, FBG's former management utilized the SPV Facilities to obtain billions of dollars of secret debt they could not repay to generate cash that was utilized to perpetuate the Scheme; funneling funds from one SPV Lender to another, or in certain cases the same lender, and to enrich Patrick James and his affiliates. For example, on August 25, 2023, Onset sent $48 million to Carnaby IV in connection with Lease 12; just one week later, on September 1, 2023, Carnaby IV sent $48,353,350 back to Onset, with the difference funded by Viceroy. On November 27, 2024, Onset sent $158.4 million to Carnaby FA in connection with Lease 8; on the same day, Carnaby FA sent $50.6 million to Carnaby IV, which helped fund its $81.2 million payment to Onset on November 29, 2024. On January 16, 2025, Onset sent $192 million to Carnaby IV in connection with Lease 24; this money was then used to pay multiple lenders, including GLAS Trust ($2,590,456.98 via Carnaby II and III), UMB Bank ($4,534,587.88 via Global Assets), and Aequum ($579,917.23 via Broad Street); on April 17, 2023, Onset sent

Carnaby IV $28,800,000 in connection with Lease 007, and $27,838,350 was sent back to Onset on May 1, 2023; on October 27, 2023, Onset sent Carnaby FA $91,200,000 in connection with Lease 001, and on November 1, 2023, Carnaby FA transferred $57,153,350 to Carnaby IV, which in turn transferred $57,153,350 back to Onset on the same day. Accordingly, funds from the SPV Lenders were recycled to service preexisting creditors, rather than to purchase and sell inventory as part of the SPV structure—a hallmark of a circular, self-sustaining fraudulent financing scheme.



107. My team at A&M also uncovered evidence that Patrick James caused the FBG Debtors to transfer funds to Onset using a variety of intermediaries to mask these transfers. For example, on October 31, 2024, First Brands Group, LLC transferred $25 million from the corporate account to the Patrick James Trust for a purported tax distribution. On October 31, 2024, Patrick James transferred $22,059,394.90 from his Trust account to Carnaby Inventory IV at a time when the account, immediately prior to such transfer, held a balance of just over $1 million.

Those funds were combined with an additional $13.9 million transferred from other SPV Entities and, the following day, were used to fund a $36.9 million payment due to Onset.

108.    The following summarizes additional details and facts related to the SPV financing Scheme.

### 3.    The Inventory or Equipment Supposed to Generate the Cash to Perform Under the SPV Financings Was Inadequate for That Purpose

109.    Based on our review of the SPV structure, my team and I determined that the SPV Entities could not have performed under the SPV Facilities utilizing the inventory or equipment they purportedly purchased as contemplated by the transactions.  The SPV Facilities were nominally structured as inventory and equipment financing arrangements in which an SPV Entity would purportedly "purchase" inventory or PP&E from the FBG Debtors and then deploy those assets in one of two ways: as collateral for a loan, or in a purported sale-leaseback transaction in which the SPV Entity would sell the assets to an SPV Lender and then make purported "lease" payments to the SPV Lender for the continued use of the assets.  The SPV Entity, however, would not have had sufficient assets or liquidity under the economic terms of the SPV Facilities to service their obligations and maintain their borrowing base.  This is because the value of the collateral (typically inventory, but in the case of Onset, also PP&E) purchased from the FBG Debtors by the SPV Entity was insufficient to generate the requisite returns to both maintain the collateral and repay the principal plus interest and fees as required under the SPV Facilities.

110.    An example is the Onset Facilities.  Under the sale-leaseback transactions (the "**Onset Sale-Leaseback Transactions**"), Carnaby Inventory IV would purportedly purchase inventory from the FBG Debtors at fair value using funds advanced by Onset, sell those same assets to Onset, and then lease the assets back from Onset in exchange for monthly payments that were to be generated from the SPV's sales of inventory back to the FBG Debtors (presumably also

49

at the same fair value). These proceeds had to be enough to both purchase a new batch of equally valuable inventory from the FBG Debtors and service the Onset debt. An example illustrates how the proceeds would not be sufficient to do this: the SPV Entity receives funds (e.g., $100 million) from Onset, purchases in this example $100 million in inventory from FBG at fair value, and must then sell $100 million worth of that inventory for a price equal to another $100 million worth of replacement inventory and debt service (at interest rates in the high-double and triple digits—including as high as approximately 200%—in stark contrast to normal asset-based lending arrangements, which in my experience carry interest rates closer to 6% in today's market).

111. The Onset Facilities also featured a sale-lease back of PP&E whereby the SPV Entity (Carnaby FA) would obtain funds from Onset to pay FBG for equipment, assign it to Onset and then lease it back under a schedule that required the SPV Entity to pay Onset the original amount plus significant interest and fees. For its part, the FBG entity was permitted under the transaction documents with Onset to continue to use the equipment for no consideration. Thus, on day 1, the FBG entity had the cash from Onset for the equipment and had use of the equipment for no consideration, while the SPV Entity had the repayment obligation with zero source of income with which to pay Onset's ongoing fees and interest. In other words, the Carnaby FA entity had no means whatsoever to perform any of its obligations to Onset based on the economic structure as written by Onset and Edward James. Instead, the economic burden to pay Onset fell entirely on the FBG Debtors, although their operating business could not sustain it either. *See supra* ¶¶ 59, 75–78.

112. The remaining SPV Facilities saddled the relevant SPV Entity with obligations they could not satisfy for similar reasons. Each such SPV Entity would have had to purchase inventory with the principal amount of the loan from FBG for fair value, but then sell

50

that same inventory back to FBG for much greater value in order for the SPV Entity to generate sufficient cash to both purchase replacement inventory and service the debt. Notably, the SPV Entities were not direct or indirect subsidiaries of the FBG Debtors and instead were affiliated entities outside the FBG corporate structure under the indirect control of FBG's managers, Patrick and Edward James. Accordingly, the transfers between these entities should have been made at arm's length and for fair value. However, the structure of the SPV loans would not allow the SPV Entities to satisfy their obligations through arm's length transactions with the FBG Debtors for fair value.

113. The transaction structure also did not provide any means for the SPV Entities to fulfill applicable obligations to maintain or finish their inventory. As an example, for Carnaby II and III, the SPV Entities were obligated to incur certain costs in converting raw inventory into finished goods. A&M estimates that converting the raw materials into finished goods suitable for sale would have required a significant amount of additional cash. The SPV Entities had no source of funding with which to satisfy these obligations, the payment of which was made exclusively by the FBG Debtors.

114. The SPV Entities also had no customer relationships of their own, meaning they were wholly reliant on selling 100% of the transferred inventory back to the FBG Debtors at a significant margin in order to finance debt service and purchase replacement inventory. However, the FBG entities would only have cause to re-purchase the inventory if it was being sold to third parties. The transaction structure did not account for significant portions of SPV inventory that could have been or became excess or obsolete. For example, through our analysis of the purported CarVal SPV inventory, A&M learned that a significant portion of the inventory was potentially excess and/or obsolete, suggesting that it was materially overvalued on the balance

51

sheet. This inventory was never written down on the SPV Entities' books and records, and there was no means by which this excess and obsolete inventory could have been sold by the SPV Entities to satisfy their obligations to the SPV Lenders.

**4.**      **The SPV Entities Did Not Operate as Independent Entities and the Contemplated Purchases and Sales of Inventory or Equipment Between the SPV Entities and FBG Was Not Followed in Practice**

115. My team also determined that, in the prepetition period, the SPV Entities failed to observe corporate formalities and did not in fact operate as discrete corporate entities. They held no genuine board meetings, adopted no resolutions, had no employees of their own, and were uncapitalized entities whose employees and managers overlapped with the management of Patrick James' other entities, including FBG. What limited functions the SPV Entities performed—producing monthly borrowing base certificates, maintaining rudimentary books and records, and executing follow-on asset purchase agreements—were carried out by FBG employees (or employees of other entities controlled by Patrick James).

116. Instead, the SPV Entities functioned as "way stations" for in-transit cash. In many cases, the SPV Entities immediately transferred incoming lender funds to Bowery, except for approximately $207 million, which was diverted to the Patrick James Trust, discussed below, where the funds were commingled with accounts receivable collections, SCF proceeds, and funds from other Patrick James-affiliated accounts. In substance, the SPV Entities served as financing conduits rather than independent entities. Based on the transactions reviewed, the SPV Entities generally received and paid funds to and from lenders, transferred funds to and from Bowery, other SPV Entities, Viceroy, and indirectly, FBG. Structuring the cash flows in this manner avoided direct transfers between SPV Lenders and FBG and reduced scrutiny from FBG's preexisting creditors by making it more difficult to trace the ultimate source and destination of the funds.

117.    The A&M team also found that the SPV Entities often failed to follow the terms of their relevant deal documents.  In many instances, the purported sellers under the asset purchase agreements never received the stated purchase price.  For example, the SPV Entity Carnaby II received over $47 million from SPV Lender CarVal in June 2022, ostensibly to purchase raw materials from Brake Parts Inc LLC ("**BPI**"), yet there is no record of Carnaby II transferring those funds to BPI.  The majority was instead transferred to First Brands Group, LLC.  In September 2022, Carnaby II received another approximately $3 million under the CarVal Facilities.  Carnaby II transferred those funds to Viceroy, which in turn sent the funds to Bowery as part of a larger transfer, before Bowery finally transferred the funds to First Brands Group, LLC.  Similarly, Carnaby III received over $80 million from CarVal in July 2022, ostensibly to purchase raw materials from Trico, yet there is no record of any direct transfer of those funds to Trico; the majority was promptly transferred to First Brands Group, LLC.  The same pattern held for the Onset advances.  In connection with Onset Lease Schedule 025, which was an $85 million advance for which the FBG Debtor FRAM Group Operations LLC ("**FRAM**") was the designated counterparty, A&M traced $81.6 million into the SPV Entity Carnaby IV, of which $15 million was transferred to the Patrick James Trust and $66.6 million to Bowery, which in turn distributed the funds among the five FBG operating sites in accordance with the allocation percentages in the Bowery Splits file.  FRAM—the entity that was supposed to be selling the inventory and receiving the funds—was never sent any portion of the advance.  In another case, on March 28, 2024, Broad Street, an SPV Entity, received approximately $43.7 million in funding from the SPV Lender Aequum.  That same day, Broad Street sent $900,000 of the funds to Helios (as defined below), and the remaining $42.8 million to Bowery, which then transferred the funds to FBG operating entities in accordance with the Bowery Splits.

118. The SPV Entities' own financial records were also not maintained consistently with the purported deal structure. For example, the general ledgers of Carnaby II and III reflect an initial entry increasing inventory at the purported "purchase date" in mid-2022, but no subsequent increases to inventory for purchases of additional raw materials or manufacturing costs, and no subsequent decreases to inventory for purported sales of finished goods back to BPI or Trico. Instead, inventory was reduced monthly solely to reflect monthly debt service payments to SPV Lender CarVal (funded by various entities controlled by Patrick James, including FBG), not on account of any actual inventory sales or other asset transfers. The general ledgers for Carnaby II and Carnaby III reflect ending inventory balances of $25.1 million and $53.8 million, respectively, as of the Petition Date, with all changes from 2022 reflecting only debt service payments rather than any actual transfers of inventory.

119. Additionally, SPV Entities failed to document the expected ongoing transactions with FBG entities for the ongoing transfer of inventory and/or equipment. In most instances, the SPV only recorded the initial purported sale between the SPV Entities and the FBG Debtors. For example, with respect to the Onset SPVs, although the Onset Sale-Leaseback Transactions contemplated ongoing purchases of replacement inventory and corresponding sale agreements, none of these follow-on agreements were entered into, and the books and records of the FBG Debtors and the Onset SPVs do not reflect any true sales of inventory or PP&E. Moreover, the inventory and PP&E purportedly "sold" to the SPV Entities was generally not removed from the FBG Debtors' balance sheet or borrowing bases. The same collateral that the SPV Entities reported as their own also remained pledged to FBG's preexisting lenders.

120. The SPV Entities also do not appear to have maintained accurate records of their purported property as distinct from that of the FBG Debtors. Using Carnaby II and III as an

54

example, the usable raw materials related to the initial 2022 transactions would have long since turned over in the ordinary course of manufacturing, yet there is no record in Carnaby II and Carnaby III's books and records of replacement inventory being purchased, manufactured, or sold consistent with the transaction structure contemplated by the agreements between Carnaby II and III and FBG. Moreover, BPI's and Trico's own books showed essentially level inventory balances throughout this period, without any evidence of the initial 2022 transactions or any subsequent periodic transactions with Carnaby II or Carnaby III—and none of the inventory purportedly sold to Carnaby II or Carnaby III was ever removed from the books of BPI or Trico.

121. With respect to the Evolution Facilities, a review of the borrowing bases the Evolution SPVs provided to Evolution suggests that those SPVs also failed to maintain accurate records of their own inventory, distinct from the FBG Debtors. My team conducted a SKU-level comparison of the Evolution borrowing base certificates against a third-party audit of the same inventory balances as of May 3, 2025. That comparison revealed only a 1% match between the inventory reported on the Evolution borrowing bases and the actual inventory in the books and records of the physical locations used to prepare the audit—records my team understands to accurately reflect inventory at those locations. By contrast, the borrowing bases provided to the ABL lender (BAML) by the FBG Debtors for the same, arguably double-pledged, inventory showed a 95% match with the inventory files provided for the audit, with over 99% of SKUs matching and quantities reconciling to within a 2% variance. This indicates that the Evolution SPVs submitted borrowing base certificates bearing little if any relation to the inventory actually on the ground.

### 5. Alleged Double Pledging

122. Andy Brumbergs admitted under oath that, between approximately 2020 and 2025, he and others misrepresented the nature and existence of collateral pledged to

off-balance-sheet lenders, including by failing to disclose that the collateral had already been pledged to lenders. (Brumbergs Plea at 29.)

123. A&M's analysis of lender inventory claims by location confirms that multiple locations and business units had inventory purportedly pledged to multiple lenders simultaneously—including overlapping claims among Onset, Evolution, CarVal (with respect to BPI and Trico Mexico), and the ABL Secured Parties. A SKU-level comparison of the Evolution borrowing base at assignment against BAML's borrowing base support for the surrounding months revealed that the Evolution-assigned SKUs were highly correlated with the BAML borrowing base certificates—that is, the same inventory support was used for both lenders—and there is no evidence that the Evolution-assigned SKUs were ever removed from the BAML borrowing base. Similarly, Onset's location-level inventory listings show numerous locations with clear double-pledging with lenders, which becomes even more apparent upon review of the detailed perpetual inventory records.

### 6. Improper Disclosure and Concealment

124. My team also determined that, because the SPV Entities were affiliates under the shared control of Patrick and Edward James, and because the FBG Debtors received the loan proceeds and were practically obligated to repay the SPV debt (or risk losing inventory or equipment essential to its business), the SPV Facilities were required to be disclosed on FBG's financial statements. In light of the extensive financial misstatements, double pledging, and practical obligations incurred by the FBG Debtors in connection with the SPV loans, FBG may have been required to consolidate their financial statements with the SPV Entities in light of the ongoing Scheme. Even if consolidation were not required, however, a detailed disclosure of the SPV loans and FBG's related obligations and pledged collateral would be required. However, these obligations were not disclosed in any of the financial statements since 2022, when SPV

transactions began. For example, FBG's financial statements did not disclose the Onset debt, the relationship with Onset itself, or even the existence of the Onset SPVs. Interviews with FBG's corporate accounting staff uncovered that staff were instructed by Andy Brumbergs not to disclose the existence of the SPV Entities to FBG's auditors. And in July 2025, a senior executive falsely represented to lenders that First Brands had "no off-balance sheet financing" involving "special purpose entities" and that "all related party relationships" were fully disclosed—by which time First Brands had incurred approximately $2 billion in undisclosed off-balance-sheet debt through the SPV Entities.

125. The movement of money was likewise engineered to avoid detection by FBG's lenders. My team's work showed that loan proceeds from the off-balance-sheet lenders were typically routed through Bowery and then split across FBG operating entities using a file called "Bowery Splits" at consistent but arbitrary, pre-determined percentages, so that the funds would appear to be ordinary customer receipts rather than related-party loan proceeds. For example, in a December 2024 financing, approximately $41.5 million advanced under the Aequum Facility was routed through Global Assets, then approximately $41 million was transferred to the Bowery Account, and then this amount was split across five FBG operating entities using the Bowery Splits file. On a daily basis, the cash balance in the FBG operating entities' accounts was swept to FBG corporate.

126. FBG's payments to the SPV Lenders were disguised in a similar manner. FBG employees were prohibited from paying the SPV Entities directly from FBG entities. Instead, as payments to the SPV Lenders came due, FBG financial executives created fake invoices— apparently untethered to any actual goods or services—from CI Supply, LLC ("**CI Supply**"), an entity affiliated with Patrick James, and routed payment through the third-party bill processor

NextProcess to Carnaby I (another SPV belonging to Patrick James), which then forwarded the funds to the SPV Entities that had debt payments due. This served to evade related-party disclosures and obscure the Company's true leverage. In one representative example, a $58,926,662 interest payment traveled from FBG through NextProcess to Carnaby I, then to Carnaby Inventory IV, and finally to Onset—in the identical amount at each step. First Brands' leadership even put the rule in writing: in a February 2025 email, a member of First Brands' leadership confirmed that FBG could route funds to the Onset SPVs via NextProcess or through Bowery, but "[n]ever FBG direct to Car[naby]."

127. In his plea allocution, Andy Brumbergs admitted that, between approximately 2020 and 2025, he and others misrepresented the nature and existence of collateral pledged to off-balance-sheet lenders, and further admitted that, from approximately 2022 to 2025, he agreed to structure cash transfers to conceal the source of proceeds obtained from off-balance-sheet lenders by dividing them into smaller amounts sent to multiple company-owned accounts. (Brumbergs Plea at 30).

### 7. Evidence Concerning "Red Flags" to SPV Lenders

128. There is significant evidence concerning information available to all SPV Lenders prior to the Petition Date which pointed to the existence of financial irregularities related to the SPV Facilities. These red flags would have given rise to many relevant questions, including why would FBG utilize a structure where the collateral would not generate sufficient value to perform under the loans? Why were special purpose entities utilized in the first place? Why were they (and the SPV financing debt) not disclosed in FBG's financials? Was FBG attempting to conceal secured debt from its pre-existing lenders? Why did FBG require so much cash? Why didn't FBG draw down on its existing ABL Credit Agreement? What was the true purpose or intended use for the funds and how would FBG legitimately generate cash to repay them?

129. These red flags should have been evident to SPV Lenders considering information readily available including, for example, as discussed above, the fact that the SPV Entities could not satisfy their obligations under the SPV Facilities based on the economics of the deals as written.

130. Moreover, as discussed above, the control by Patrick James given his prior litigation related to falsified financial data (and mysterious lack of public information about him), should have been troubling, and, for the reasons stated, FBG's financial statements raised additional red flags as well (e.g., unusually high level of reported profitability, a large number of acquisitions of companies with far less profitability, and a disconnect between the profit and loss statement and cash flow statements).

131. The transaction documents themselves also included obvious warning signs, although the specific deficiencies varied by lender. In some cases, the initial purchase agreements through which the SPV Entities purportedly acquired inventory contained no set purchase price and no schedule of assets. For example, the initial transaction whereby the CarVal Lenders funded the purported purchase of inventory on behalf of Carnaby II and Carnaby III from the relevant FBG Debtors included purchase agreements that were executed but contained *no purchase price and no schedule of assets or inventory*. In addition, the initial borrowing base certificates provided to the CarVal Lenders actually predated the applicable Purchase Agreements, raising the question of how Carnaby II and Carnaby III obtained the inventory listed in the aggregate on those borrowing bases in the first place. Similar circumstances exist for Aequum: the Purchase Agreement pursuant to which the Aequum Lenders funded Broad Street's purported initial inventory purchase included a schedule of assets that did not adequately describe the inventory such that any individual piece of inventory could be uniquely identified for subsequent

sale by Broad Street back to the relevant FBG Debtor—and every subsequent purchase agreement provided to Aequum included an inventory schedule containing the same flaw, begging the question of how Broad Street would be able to actually sell or purchase specific inventory items without any identification of them beyond generic descriptions and SKU numbers. There were also consistent discrepancies between the schedules to the purchase agreements Aequum received on a monthly basis and Broad Street's borrowing base certificates: for example, the purchase price set forth in the schedules differed from the value of the in-kind exchange listed on the borrowing base, and in other instances the purchase price set forth in the schedules differed from the inventory purchased with additional advances on the corresponding borrowing base without any evidence that additional advances were actually made. For Evolution, the warning signs existed in the dearth of appropriate transaction documentation itself. Although the Evolution Credit Facilities contemplated a repeating cycle in which the Evolution SPVs would buy inventory from the FBG Debtors, sell inventory back to the FBG Debtors, and purchase replacement inventory to maintain a borrowing base—with each step to be documented using the forms of purchase and sale agreements attached to the credit documents—my team at A&M was able to locate only two executed Master Origin Sale and Exchange Agreements (one each for Patterson and Starlight), two associated sale schedules, and a single executed Destination Sale Agreement (between Starlight and BPI) across all of the Evolution SPVs; no executed Destination Sale Agreement was located for Patterson at all. And as for the agreements that were to be used when the Evolution SPVs purportedly bought replacement inventory from the FBG Debtors, my team was unable to identify even one such purchase agreement—nor any invoices evidencing purchases of replacement inventory by Patterson or Starlight—and the books and records of the FBG Debtors, Patterson,

and Starlight likewise do not reflect any purchases or sales of replacement inventory to or from each other.

132. The SPV Entities' borrowing base certificates were generally facially deficient and internally inconsistent. Inventory was tracked only by generic SKU numbers that could continuously turn over, and there is no evidence that the SPV Lenders ever received confirmation that the FBG Debtors or the SPV Entities recorded inventory using unique identifiers that would enable the tracking of purchases and sales of the specific items the SPV Entities purportedly owned—making it effectively impossible to determine which inventory belonged to which entity, and thus whether the SPV Entities owned any particular item of inventory at all. With respect to CarVal, for example, across the more than seventy borrowing base certificates delivered over a three-year period, not one identified even a single item of inventory as ineligible, and—despite the FBG-Carnaby Agreements purporting to involve continuous purchases and sales of particular pieces of inventory—not one reflected any purchase of inventory into, or sale of inventory out of, the borrowing base, reporting instead only end-of-month gross inventory balances. The certificates also consistently listed obviously incorrect prior-period gross inventory balances that did not match the prior period's certificate. The certificates likewise reflected significant, unexplained month-over-month increases in reported inventory: in April 2024, for example, the reported inventory balance increased to $109 million from $82 million in the prior month—a 33% increase in a single month—without any documentation of corresponding inventory purchases. With respect to Evolution, the borrowing base certificates were simply unreliable and did not reflect actual business activity recorded in the Debtors' business systems: when my team compared the inventory data utilized by the audit firm that conducted a May/June 2025 audit of Evolution's purported net inventory balances (which data was consistent with the

61

Company's perpetual inventory reporting system) against the corresponding borrowing base certificate data provided to Evolution for the same period, we determined that nearly all of the SKU-level quantity and pricing data had been altered from what was reported in the Companies' books and records. In some cases, the purported borrowing base or purchase price also exceeded the funding actually extended to the SPV Entities, without any explanation of how an undercapitalized SPV could properly acquire assets in excess of its funding amount. Patterson and Starlight, for example, purportedly agreed to purchase inventory from the FBG Debtors for stated purchase prices of approximately $180.2 million and $185.8 million, respectively—payable in cash, in kind, or by subordinated note—yet the SPVs held no inventory with which to make an in-kind exchange, no subordinated note was ever located, and First Brands Group received only approximately $119.8 million and $105 million in connection with those purported purchases, materially short of the stated purchase prices. These deficiencies would have been readily apparent had the SPV Lenders actually conducted diligence related to the transfers—indeed, the borrowing base certificates themselves show the unexplained month-over-month increases and inconsistencies described above.

133. The SPV Entities also had no employees of their own, and, although an independent manager was appointed at Carnaby II, Carnaby III, and Broad Street, the remaining managers overlapped with management of Patrick James' other entities, including First Brands Group, LLC, the transaction documents were signed by the same overlapping personnel, and A&M has found no evidence of board meetings, resolutions, or other functions undertaken by the managers. What limited functions the SPV Entities performed—producing monthly borrowing base certificates, maintaining rudimentary books and records, and, in the case of Broad Street, executing follow-on asset purchase agreements to provide to Aequum—were carried out by FBG

employees, as would have been evident to the SPV Lenders, who dealt only with FBG employees and managers to conduct business with the SPV Entities. Nor did the SPV Entities actually and effectively maintain segregated cash accounts: monies flowing from Aequum into Broad Street, for example, were disbursed to a cash pooling account used by several other special purpose entities, where they were swept and distributed to a number of entities (none of which was the supposed seller of inventory under the initial asset purchase agreement), and the SPV Entities received inflows from seemingly random entities for the purpose of making interest payments to their financing counterparties. Likewise, in the case of Evolution, the FBG entities never made direct transfers of cash to Patterson or Starlight (and vice versa); instead, invoices were issued by a different Patrick James-controlled entity to BPI, cash was paid through a payment processor to Patterson or Starlight, and Patterson or Starlight then round-tripped essentially the same funds back to BPI through another James-controlled entity (Bowery), usually on the same date—round-trip transfers that do not correspond to the inventory levels shown on Evolution's borrowing base certificates and that appear to have been undertaken solely to generate bank statement activity for disclosure under the Evolution Credit Facilities.

8. **Additional Red Flags Concerning the Onset Facilities and Issues Concerning Misleading FBG's Existing Lenders**

134. In addition to the general red flags available to all SPV Lenders, Onset had access to still more troubling information. Edward James was an officer of FBG and the Onset SPVs, and the only party representing these entities in discussions with Onset. After the initial SPV Facilities were negotiated and executed between Onset and Edward James in the summer of 2022, Edward James became one of Onset's financing partners in the Onset SPV Facilities. Upon Edward James investing in the SPV Facilities, the interest rates jumped to triple digits (from ~25% in May 2022 to ~200% in December 2022), and they remained higher than the initial rates for over

30 transactions over the next three years. This was at a time when FBG had ABL capacity available at single-digit rates.

135. In each new lease schedule over this time period, Edward James was the sole representative for FBG and the SPV Entities across the table from Onset in deals in which Edward James personally profited from above market terms provided to Onset. Edward James therefore sat on both sides of the Onset Sale-Leaseback Transactions and his interests were in direct conflict to those of FBG and the Onset SPVs, a fact that was known to Onset at the time. As the senior FBG and SPV executive who negotiated and controlled the Onset Sale-Leaseback Transactions, Edward James simultaneously served as the Debtors' representative and as Onset's own funding partner. Edward James policed all communications, instructing Onset to exclude other officers and employees of the Company, and declared that "ALL [such] communications [from Onset] go through me ALONE." Interviews with FBG Debtors' staff after the Petition Date indicated that, when concerns were raised about certain onerous terms, they were specifically instructed that First Brands does not comment on Onset's documents.

136. I understand that neither Onset nor FBG engaged outside counsel to document the transactions; that Onset obtained no true-sale opinion or other opinion of counsel as to the structure; and that Onset conducted limited diligence.

137. The debt-service burden was also unreasonably high: approximately $200 million per month in 2025 for the Onset SPVs alone. And Onset, which held FBG's audited financials, was aware of the on-balance sheet $5–6 billion in funded debt FBG also had to service.

138. I understand Onset admittedly received and reviewed FBG financial statements, and therefore Onset knew or should have known that those statements did not disclose Onset, the SPV Entities, or any of the debt owed to Onset. Onset could have nonetheless attempted

64

to take steps to perfect its ownership or lien interest by disclosing the Onset Facilities via filing of UCC-1 statements against the FBG Debtors that held the inventory and equipment over which it claimed an interest.  There is evidence that Onset discussed filing UCC-1s against FBG in connection with the Carnaby Inventory IV transaction in July 2022, but Edward James instructed Onset not to do so.  I understand that Onset did not file UCC-1s naming the FBG Debtors from at least 2022 to just before the bankruptcy.  Apparently aware of this issue, Onset then attempted to file UCC-1s mere weeks before the filing of these cases against FBG Debtors, including First Brands Group, LLC; Horizon Global Company LLC; Horizon Global Americas, Inc.; Trico Technologies Corporation; Eagle Casting, LLC; Toledo Molding & Die LLC; and Walbro LLC.

### 9. Transfers to SPV Lenders

139.    My team's review identified substantial preferences and transfers made pursuant to the Scheme with respect to each of the four SPV Lenders.  As of the Petition Date, the Company owed more than $2.3 billion in off-balance-sheet financing obligations incurred through the four SPV Facilities: the CarVal Facilities, the Aequum Facility, the Evolution Facilities, and the Onset Facilities.  The following summarizes the Debtors' transfers in furtherance of the Scheme by SPV Lender.

| SPV Facility | Total Paid - 90 Days | Total Paid - 1 Year | Total Paid - 4 Years |
|---|---|---|---|
| Onset | $ 46,143,097 | $ 987,417,170 | $ 2,331,851,090 |
| CarVal | 7,450,173 | | 92,816,984 |
| Aequum | 6,447,677 | | 29,085,602 |
| Evolution | - | | 73,477,450 |
| **Total** | **$ 60,040,946** | **$ 987,417,170** | **$ 2,527,231,125** |

### E. Insider Misconduct

140.    As discussed above, Patrick James and other members of former management caused the FBG Debtors to incur billions of dollars in liabilities in order to conceal the FBG Debtors' actual financial performance and their Scheme.  In addition, Patrick James

diverted some of the proceeds of that financing from the FBG Debtors for his and his family's personal benefit.

141.    My A&M team traced estate funds from First Brands bank accounts to Patrick James, entities under his control, including, among others, the Patrick James Trust, and to third parties which used the funds for the personal benefit of Patrick James and his family.  That tracing identified more than 1,400 separate transfers totaling at least approximately $966 million from 2021 to 2025, with the majority of such transfers by value occurring between 2023 and 2025, and continuing until days before the Petition Date.  Aside from entries in the Company's general ledger, the A&M team found no ordinary-course documentation indicating that the payments constituted legitimate dividends, tax distributions, or payments for services.

142.    The vast majority of the funds, totaling approximately $708 million, including over $229 million in 2025 alone, were transferred to Patrick James or his family trust. For example, on April 5, 2022, Patrick James' Chief of Staff emailed Andy Brumbergs that James "want[ed] a $10M tax distribution paid to him this week"; three days later, First Brands transferred $10 million to the Patrick James Trust.  In January 2024, internal communications reflected that James "wanted to have the distribution funds sent" to two Patrick James Trust accounts in batches of $21 million and $4 million; First Brands distributed $25 million to the Patrick James Trust that same day.  And in October 2024, Brumbergs indicated he had been "instructed to make a $25 million USD distribution" to a Patrick James Trust account, which First Brands paid that same day.

143.    At the time the transfers were made, the transferor entities lacked sufficient surplus, net profits, or distributable capital to lawfully authorize dividends or distributions under applicable law, and the transfers rendered or contributed to the transferor's insolvency.  My team's

tax analysis independently corroborates this conclusion. Under the First Brands Group Holdings, LLC Agreement and the Company's first-lien, second-lien, and ABL credit agreements, First Brands was restricted from making distributions other than permitted tax distributions. Patrick James, through his ownership of Mayfair, Aztec Corporation, and Brake Parts, received $378 million of purported tax distributions from 2019 through 2024—yet under the calculation methodologies prescribed by the Credit Agreements and the FBGH LLC Agreement, the allowable amounts were only approximately $142 million and $169 million, respectively. Accordingly, my team estimates that James received an overpayment of approximately $209 million to $236 million on account of tax distributions alone, a portion of which had been reclassified in the general ledger from restricted equity distributions to tax distributions.

144. Moreover, my team and I confirmed that, to the extent tax distributions may have been permitted in any amount under the Credit Agreements and the FBGH LLC Agreement, such tax distributions are allowed to reimburse members (which all ultimately flowed up to Patrick James) for tax payments on their share of allocated income. Here, where the allocated income was manufactured as part of the Scheme, no tax distributions would be permitted to the extent the Company was actually in a net taxable loss position. This calls into question whether Patrick James was entitled to any tax distribution during these periods, indicating that every tax distribution was an impermissible component of the Scheme.

145. My team also determined that James commingled First Brands' business accounts with personal funds, including through the non-Debtor Bowery described above, and used the Debtors' funds for personal use. From 2018 to 2025, First Brands transferred approximately $38 million to Larchmont, LLC, James' family office. Although these payments were mostly characterized as "management fees," our work shows that Larchmont did not provide

services to First Brands; indeed, when an auditor asked what services Larchmont provided in exchange for the fee, a senior member of the accounting team replied simply: "Patrick James."

146.     There is evidence James directed these transfers to be made.  For example, on April 12, 2021, Andy Brumbergs told a member of the finance team that James "wants the entire Q2 amount paid today," and First Brands transferred $1.25 million to Larchmont that day. First Brands also has paid the salaries, benefits, and compensation of Larchmont's family-office employees (both directly and through Larchmont's vendor, Consociate Group LLC); rent, utilities, and related housing expenses for James' personal New York City townhouse through MRRDISON LLC, together with associated furniture leasing, realtor, moving, and storage expenses; approximately $455,000 to James' private celebrity chef; security and "intelligence" services routed through CTC International Group, Inc.; personal automotive and transportation services paid to Carcorp USA; personal IT services paid to Banshee Computer Consulting Corp.; and financial advisory and wealth-management services paid to Sequoia Financial Group, LLC and its CEO, Thomas A. Haught—who simultaneously served as trustee of the Patrick James Trust.

147.     Payments were also made from First Brands to Battery Park Holdings LLC, an entity 100% owned by James, as purported reimbursement for James' expenses.  The A&M team found that more than $18 million was transferred from First Brands to Battery Park from 2019 to 2025 to pay James' and his family's personal expenses, including approximately $150,000 for a "celebrity" personal trainer and hundreds of thousands of dollars for personal travel, security, and transportation.  Our team found evidence that James orchestrated both the amounts and timing of these transfers—for example, Larchmont employees advised First Brands in July 2022 that "Patrick has asked that we invoice weekly," submitted an invoice for more than $400,000 in October 2022 with the instruction that, "Per Patrick, this should be paid tomorrow," and in March

2025 indicated that James had requested that a $468,000 invoice be "paid this week if possible." Patrick James also directed that his associates submit invoices for reimbursement which commingled personal and business expenses, such as an August 2023 Battery Park invoice seeking over $110,000 in reimbursement for a six-week "Southampton hotel" stay for two individuals who worked for James personally, and at times directed employees to "recode" charges so that Battery Park's expenses would be reimbursed by First Brands.

148.     The A&M team also determined that steps appear to have been taken to conceal these payments: in January 2025, rather than pay a $1.7 million Battery Park invoice directly, Brumbergs arranged for the funds to be routed first to SPV Debtor Patterson Inventory, LLC through a third-party payment processor, and Patterson then transferred the funds to Battery Park.  Even the First Brands employees who processed these invoices did not have full transparency; in March 2024, an employee submitted a $412,000 invoice on behalf of James' family office with no detail as to its contents, stating that Battery Park would no longer provide detailed invoices and that any necessary detail would be provided directly to Brumbergs.

149.     The team further found that intellectual property purportedly was transferred out of the Debtors and into Alester Technologies LLC, a non-Debtor entity under Patrick James' control.  In connection with First Brands' acquisitions of Horizon Global Corporation ("**Horizon**"), Cardone Industries, Inc., and TAE Brakes, LLC, the acquired entities executed agreements purporting to contribute intellectual property portfolios to Alester for no corresponding consideration to First Brands.  First Brands subsidiary Carter Carburetor Holdings, LLC executed a similar agreement.  Alester then purportedly licensed certain of that intellectual property back to First Brands at a 3.5% royalty on net sales, and a total of at least $34 million was transferred from First Brands to Alester through a third-party payment processor on account of

these purported "royalty" obligations. My team confirmed that the Horizon IP purportedly contributed to Alester was never removed from Horizon's books and records; that Alester recorded approximately $20.9 million and approximately $14 million of Horizon "royalty" income on its 2023 and 2024 profit-and-loss statements, respectively; that internal FBG communications confirm the "Boss" (that is, Patrick James) directed FBG to pay Alester's invoices; and that, among other transfers, $7 million of the "royalty" funds Alester received was subsequently transferred to the Patrick James Trust as a purported loan repayment.

150. Significant additional transfers totaling in the millions of dollars were made from First Brands to Albion Realty, LLC, James' real estate holding company, including payments made directly by First Brands subsidiaries Champion and FRAM. Although purportedly lease payments, our team concluded that the value of these transfers far exceeded the reasonable value of any purported lease.

151. Between 2022 and 2025, First Brands also transferred over $1 million, including through ASC, to Pegasus Aviation, LLC, Patrick James' personal aircraft company.

152. My team has also identified additional payments made by the Debtors to other James-affiliated entities and service providers—including SA Eagle Holdings LLC, LJ Aviation, Archive Health LLC (a company associated with James' son-in-law), Hanover Realty LLC, and 705 North Fayette Street LLC—that may warrant further investigation by the Litigation Trustee.

153. As further described below, James also extracted value from the Debtors in connection with acquisitions, including through the FRAM/Autolite and "Winning" company acquisitions identified by the Examiner. James further diverted personnel, operational capacity, and value to non-Debtor entities he owned, including through Global Technologies' 2025

acquisition of Novares and the solicitation of FBG employees, which prompted a cease-and-desist letter from the Debtors' counsel in October 2025.

154.    My team also found that the insider transfers were not limited to funds taken directly from the FBG Debtors' accounts.  Approximately $207 million was diverted from the SPV Entities doing business with Onset to the Patrick James Trust, notwithstanding that those funds were contractually required to flow to the designated FBG sellers under the applicable transaction documents.  Specifically, A&M's tracing identified transfers from Onset-funded SPV Entities to the Patrick James Trust as described above.  *Supra* ¶¶ 116–117.  In the aggregate, A&M's tracing identified approximately $236.5 million redirected from SPV Lender fundings to Patrick James and his affiliated entities.

155.    Payments flowing from Patrick James appear to have been for the purpose of preventing discovery of the Scheme.  Patrick James and his affiliated entities transferred approximately $222.6 million to the SPV Entities—transfers that were timed to debt-service due dates rather than to any inventory transactions, and that enabled the SPV Entities to make interest payments to the SPV Lenders and sustain the Scheme.  My team's tracing identified approximately $592 million in direct and indirect payments from the Patrick James Trust to Debtor entities between September 2022 and the Petition Date, where we believe these inflows were to prevent defaults under SPV and factoring obligations as they came due.  A&M's cash tracing indicates that some of these payments appear to be funded by FBG Debtors, funneling money through Patrick James entities to disguise the existence of the SPV Entities.

156.    I further understand that, in connection with the off-balance-sheet financings, Edward James received millions of dollars in purported commission fees for brokering one of the inventory financings from an entity called Helios.

71

157. My team uncovered evidence that Patrick James caused the FBG Debtors to acquire entities that James already owned or controlled, typically through holding companies, at prices that appear to greatly exceed the value of the underlying assets. In each instance, after the acquisition closed, a senior First Brands executive directed the accounting department to retroactively inflate the recorded value of the acquired assets in an effort to justify the purchase price, notwithstanding that the underlying assets had not changed. My team has identified the following acquisitions of James-affiliated entities as suspect:

- **Eagle Machining, LLC**. Eagle Machining was established under SA Eagle Holdings, LLC, which was in turn owned by Viceroy, an entity indirectly owned by Patrick James. In October 2021, Eagle Machining acquired the fixed assets of ZF Active Safety US for approximately $8.5 million (which had been appraised at approximately $15.4 million). These were the sole assets of Eagle Machining. On November 15, 2024, First Brands purchased Eagle Machining for approximately $65 million—representing an overpayment of at least $49.6 million above the appraised value, and a markup of $56.5 million above the original purchase price. Thereafter, a senior First Brands executive instructed members of the accounting department to retroactively adjust the value of Eagle Machining's assets from approximately $8.9 million to approximately $39.9 million to justify the purchase price, despite no change in the underlying assets.

- **Eagle Castings, LLC**. Eagle Castings, a subsidiary of Bond Street Asset Management (an entity owned by James), acquired the foundry operations of R.H. Sheppard Co. Inc. on April 28, 2023 for approximately $12.5 million. Eagle Castings then sold these assets to SPV Entity Carnaby FA for approximately $100 million on October 27, 2023. These assets were never transferred back to Eagle Castings. Nevertheless, on December 6, 2024, First Brands purchased Eagle Castings for approximately $156 million, representing an overpayment of at least $143.5 million above the original acquisition cost. A senior First Brands executive instructed the accounting department to retroactively adjust the value of Eagle Castings' property and equipment from approximately $17.1 million to approximately $69.9 million, despite no change in the underlying assets.

- **Dalton Corporation**. On November 13, 2023, Ignite Acquisition Sub, LLC, a subsidiary of Patrick James' entity Ignite Acquisition Holdings, acquired the Dalton Corporation from New Dalton Foundry for approximately $45 million. Dalton was later sold to First Brands over the course of two transactions in December 2024 for a total of approximately $267 million, representing an overpayment of at least $222 million above the original acquisition cost. The sale proceeds were distributed to Alester Technologies LLC, an entity indirectly owned by Patrick James. Thereafter, the same senior executive instructed the accounting department to retroactively adjust the value of Dalton's assets to justify the purchase price.

158. In each case, the financial statements provided to lenders failed to disclose that the acquired entities had been purchased from entities under Patrick James' control. Moreover, the funds that First Brands paid in these acquisitions were routed to the Bowery Account and then transferred back to First Brands operating entities, where the receipt of incoming cash was used to remove aged and uncollectible accounts receivable from First Brands' balance sheet and thereby avoid a negative impact on its reported profit and loss. This had the effect of concealing the deterioration of the Company's receivables.

159. My team and I also confirmed that the FBG Debtors maintain two towers of D&O coverage for the February 2025–February 2026 policy year which may be implicated by certain Estate Claims against insiders. Under the Side A DIC tower, approximately $10 million out of $100 million has been exhausted as of June 2026. Under the primary tower, approximately $0 out of $100 million has been exhausted as of the same date. In total, the FBG Debtors have up to $190 million in potentially available D&O insurance coverage to fund recoveries on these claims. Actual coverage available to the FBG Debtors may ultimately be lower depending on the number and size of covered claims made by other insureds under the policies.

160. The following chart summarizes distributions made to insiders in the one year and four years periods preceding the Petition Date.

| Insider | Total Paid - 1 Year | Total Paid - 4 Years |
|---|---|---|
| Patrick James or Related Entity | $ 514,700,466 | $ 965,659,044 |
| Stephen Graham | 6,434,759 | 6,434,759 |
| Ed James | 5,992,634 | 5,992,634 |
| Andy Brumbergs | 2,899,113 | 2,899,113 |
| Other Potential Insiders | 7,756,927 | 7,756,927 |
| Total | $ 537,783,900 | $ 988,742,478 |

73

**F.        Suspect Acquisitions Above Market Price**

161.    My team's work also identified a series of transactions from 2022 to 2025 in which the FBG Debtors acquired business units at purchase prices that may have exceeded the fair market value of the assets acquired.  In general, these transactions appear to have only worsened the Debtors' already deteriorating financial condition, and may have been executed primarily to fuel a false growth and profitability narrative and to provide additional sources of collateral to obtain still more unsustainable debt financing as part of the Scheme.

162.    Between 2022 and 2024, the FBG Debtors acquired at least ten business units for an aggregate purchase price in excess of $1.6 billion.  Of those ten business units, seven proved unsellable in these chapter 11 proceedings and were ultimately liquidated for nominal value, yielding just $35 million to date.  The three business units that were sold as going concerns (Horizon Global, Walbro, and TMD) together yielded going-concern sale proceeds of $195 million, against a combined acquisition cost of more than $641 million.  In short, the Debtors have realized less than $250 million from the sale of businesses purchased for more than $1.6 billion within just the last four years, a decline in value of approximately 85%.  While the intervening bankruptcy and the effects of prior management's business practices have affected underlying asset values to some degree, the recovery of less than fifteen cents on every dollar spent on acquisitions completed within the last four years calls into serious question whether the FBG Debtors received reasonably equivalent value at the time of those acquisitions.  The following chart summarizes the acquisitions made since 2022 and the value realized for those business units:

| Applicable Business | Acquisition Date | Purchase Price | Going-Concern Sale Proceeds | Est. Liquidation Proceeds |
|---|---|---|---|---|
| Pylon | 2022 | $206 | $-- | $-- |
| IBI | 2022 | 42 | -- | -- |
| Horizon Global | 2023 | 410 | 65 | 2 |
| Cardone | 2023 | 136 | -- | 5 |
| Hopkins | 2023 | 337 | -- | 20 |
| Walbro | 2023-2024 | 184 | 50 | 0 |
| Jasper | 2024 | 36 | -- | 10 |
| TMD | 2024 | 47 | 80 | 13 |
| Ultinon | 2024 | 183 | -- | -- |
| Winning | 2024 | 65 | -- | -- |
| **Total** | | **$1,646** | **$195** | **$50** |

## VIII. ADDITIONAL FINDINGS

163. The following details additional areas relevant to the Litigation Trust, including (i) potential preferential transfers, (ii) payments to Helios, and (iii) BDO's audit work.

### A. Potential Preferential Transfers

164. A&M conducted an analysis of the Debtors' books and records to identify transfers made by the Debtors to or for the benefit of certain creditors on account of antecedent debts during the applicable preference periods. As part of that analysis, A&M reviewed, among other things, the Debtors' accounts payable records, disbursements, bank statements, and vendor payment histories to identify transfers made during the preference period, as well as the identity of the transferee and the nature of the underlying obligation. As summarized below, A&M has identified more than $1.7 billion of transfers made during the preference period. Net of potential offsets, A&M estimates that preferences exceed $304 million.

| Type / Counterparty | Total Paid - 90 Days (Outgoing) | Total Receipts - 90 Days (Incoming) | Net Amount Received by Creditor (Outgoing - Incoming) |
|---|---|---|---|
| **AR Factoring (ARF) Programs** | | | |
| Leucadia | $ (737,623,204) | $ 743,716,023 | $ (6,092,819) |
| Katsumi | (321,413,837) | 351,305,464 | (29,891,628) |
| Evolution | (46,245,339) | 34,907,578 | 11,337,761 |
| **Subtotal - ARF Programs:** | $ (1,105,282,380) | $ 1,129,929,065 | $ (24,646,685) |
| **Supply Chain Finance (SCF) Programs** | | | |
| Raistone Financing Parties | (188,234,558) | - | 188,234,558 |
| PrimeRevenue Financing Parties | (162,743,463) | | 162,743,463 |
| LiquidX Financing Parties | (76,981,691) | - | 76,981,691 |
| Orbian Financing Parties | (39,997,124) | - | 39,997,124 |
| Inflows into Bowery | - | 351,958,296 | (351,958,296) |
| **Subtotal - SCF Programs:** | $ (467,956,836) | $ 351,958,296 | $ 115,998,540 |
| **SPV Lenders** | | | |
| CarVal | (7,450,173) | - | 7,450,173 |
| Aequum | (6,447,677) | 2,361,926 | 4,085,750 |
| **Subtotal - SPV Lenders:** | $ (13,897,849) | $ 2,361,926 | 11,535,923 |
| **Other** | | | |
| Helios | (3,920,000) | - | 3,920,000 |
| BDO Fees (minimum) | (260,177) | - | 260,177 |
| Trade Payables | (196,957,131) | - | 196,957,131 |
| **Subtotal - Trade Payables:** | $ (201,137,308) | $ - | $ 201,137,308 |
| **TOTAL:** | $ (1,788,274,373) | $ 1,484,249,287 | $ 304,025,086 |

| Insiders | Total Paid - 1 Year (Outgoing) |
|---|---|
| Patrick James | (514,700,466) |
| Insiders (Ed James, Andy Brumbergs, etc.) | (23,083,434) |
| Onset | (987,417,170) |
| **Total - Insiders:** | $ (1,525,201,070) |

## B.  **Helios Strategic Advisors ("Helios")**

165.    My team found that, during the course of the Scheme described above, Edward James appears to have used Helios to funnel FBG Debtors' funds to himself. Helios purports to be an advisory firm and was purportedly retained to identify and arrange sources of funding for the FBG Debtors in exchange for fees. In that capacity, Helios was responsible for arranging SPV funding arrangements, as well as certain of the arrangements (especially extensions) with certain pre-existing factoring counterparties, including Katsumi. On the transactions it brokered, Helios collected a fee from First Brands, and between June 2022 and August 2025, First Brands sent Helios 45 payments totaling $27.5 million.

166.    Helios was also apparently paid by Katsumi for its role in the factoring extensions, based on agreements between Katsumi and First Brands that set aside a total of approximately $52.4 million for Helios.  For example, a March 28, 2023 agreement between Katsumi and First Brands authorized Katsumi to pay Helios a 1.5% fee for the expansion of the accounts receivable program.  The agreement noted that "[t]he balance of the fees," $6,710,526 of which was earmarked for Helios, "will be paid from the next purchase, which is anticipated to be on March 31, 2023."  On March 31, 2023, Katsumi Servicing, LLC sent First Brands a payment of $37,703,750, with the description: "For First Brands 3-31-23 Funding *Less Helios*."

167.    My team also uncovered an agreement between Helios and Edward James' family office entity Optimus Private Capital ("**Optimus**"), under which Optimus was purportedly entitled to half of any commissions received by Helios.  In addition, my team has uncovered evidence that in late 2023, Edward James, through his entity Optimus, became the sole investor in Helios Credit Opportunity Fund I.  Among other things, the A&M team identified an Excel file maintained by Edward James tracking his personal investments, which reflects his interest in the Helios fund, in the amount of approximately $20.5 million as of February 2025.

C.    **BDO**

168.    In 2021, First Brands' senior leadership transitioned the external audit engagement from Cohen & Company to BDO, because BDO was viewed as having "the most unsophisticated audit process," such that "[w]e can do what we want with these guys." (Examiner's Report).  BDO issued unqualified audit opinions on FBG's financial statements through 2024.  The breadth and duration of the wrongful conduct described above raise significant questions regarding the adequacy of BDO's audit procedures and whether those procedures were designed and performed in accordance with applicable professional auditing standards.  Given the pervasive nature of the alleged misconduct, the extent to which it affected numerous entities,

transactions and reporting periods, and the volume of supporting documentation generated by those activities, it is reasonable to expect that a properly planned and executed audit would have identified indicators of fraud requiring expanded audit procedures and further investigation. BDO received more than $4 million in fees from the FBG Debtors for the audits it conducted.

## IX. BANKRUPTCY CODE REQUIREMENTS FOR CONFIRMATION OF THE PLAN

169. I am aware that the FBG Debtors must demonstrate that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. Below I set out facts with respect to certain of those requirements and the relevant events that have occurred in these chapter 11 cases related to such requirements. Based on my understanding of the requirements of section 1129 of the Bankruptcy Code, I believe that the Plan complies with each of the requirements and should be confirmed.

### A. Section 1129(a)(1): Plan Complies with All Applicable Bankruptcy Code Provisions

#### i. *Section 1122: Classification*

170. The Plan provides for the following ten (10) Classes of Claims and Interests: (i) Class 1 (Other Priority Claims), (ii) Class 2 (Other Secured Claims), (iii) Class 3 (Allowed Roll-Up Claims), (iv) Class 4 (First Lien Claims), (v) Class 5 (Second Lien Claims), (vi) Class 6 (ABL Claims), (vii) Class 7 (General Unsecured Claims), (viii) Class 8 (Subordinated Claims), (ix) Class 9 (Intercompany Claims), and (x) Class 10 (FBG Debtor Interests).

171. The classification structure of the Plan is rational. The Plan provides for the separate classification of Claims and Interests based upon the different legal nature and priority of such Claims and Interests, which classification generally tracks the FBG Debtors' prepetition capital structure and divides the applicable Claims and Interests into Classes based on the

underlying instruments, debts, or circumstances giving rise to such Claims and Interests.  Within a given Class, all Claims and Interests have the same or similar rights against the FBG Debtors.

172.     I believe the FBG Debtors have a reasonable and permissible basis for the differing classification of Claims because each Class of Claims is comprised of Claims arising under different debt obligations and/or different facts and circumstances, which evidence their different natures.

a)     ***Class 1 (Other Priority Claims).***  Class 1 is comprised of any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.  *See* Plan § 1.1.

b)     ***Class 2 (Other Secured Claims).***  Class 2 is comprised of any Secured Claim, other than an Administrative Expense Claim, a DIP Claim, a First Lien Claim, a Second Lien Claim, an ABL Claim, or a Priority Tax Claim.  *Id.*

c)     ***Class 3 (Roll-Up Claims).***  Class 3 is comprised of all Claims arising from (i) the DIP Credit Agreement or any other Loan Document (as defined in the DIP Credit Agreement), or (ii) the DIP Order and/or any other applicable order of the Bankruptcy Court, in each case, that are on account of the Roll-Up Obligations.  *Id.*

d)     ***Class 4 (First Lien Claims).***  Class 4 is comprised of all Claims arising from (i) the First Lien Term Loan Agreement, (ii) the Side-Car Term Loan Agreement, or (iii) the DIP Order and/or any other applicable order of the Bankruptcy Court that relate to the First Lien Term Loan Agreement or the Side-Car Term Loan Agreement.  *Id.*

e)     ***Class 5 (Second Lien Claims).***  Class 5 is comprised of all Claims arising from (i) the Second Lien Term Loan Agreement, or (ii) the DIP Order and/or any other applicable order of the Bankruptcy Court that relate to the Second Lien Term Loan Agreement.  *Id.*

f)     ***Class 6 (ABL Claims).***  Class 6 is comprised of all Claims arising from (i) the ABL Credit Documents (as defined in the DIP Order) or (ii) the DIP Order or any other applicable order of the Bankruptcy

Court, in each case, that are on account of the ABL Obligations and Cash Management Obligations (each as defined in the DIP Order) and including all Secured Claims held by any ABL Secured Party secured by any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. *Id.*

g) ***Class 7 (General Unsecured Claims).*** Class 7 is comprised of Claims (other than an Intercompany Claim or a Subordinate Claim) that are neither secured by collateral nor entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court. *Id.*

h) ***Class 8 (Subordinated Claims).*** Class 8 is comprised of any Claims that are subject to subordination under section 510(b) of the Bankruptcy Code. *Id*.

i) ***Class 9 (Intercompany Claims).*** Class 9 is comprised of any Claims held by an FBG Debtor against another FBG Debtor arising before the Petition Date. *Id.*

173. Finally, I believe the FBG Debtors have a reasonable and permissible basis for the classification of Class 10, which is comprised of any Interests in the FBG Debtors and is the only Class of Interests under the Plan.

ii. ***Section 1123(a)(5): Adequate Means for Implementation***

174. I understand that a chapter 11 plan must provide adequate means for implementation to be confirmed. I believe the Plan provides the requisite means for its implementation through, among other things, (i) the implementation of the Plan Settlement and Estate Claims Credit Bid Transaction and the DIP Collateral Trust Credit Bid Transaction, which transfer the Litigation Trust Assets to the Litigation Trust and DIP Collateral Trust Assets to the DIP Collateral Trust, respectively (Plan § 5.2), (ii) the establishment of the Litigation Trust and the appointment of the Litigation Trustee to pursue and monetize the Litigation Trust Assets, including the Estate Claims (Plan §§ 6.1, 6.10), (iii) the funding of the Litigation Trust with the Litigation Trust Cash Funding and the Litigation Trust Class 1 Funding Contributions (Plan §§

6.3, 6.4), (iv) the establishment of the DIP Collateral Trust and the appointment of the DIP Collateral Trustee to pursue and monetize the DIP Collateral Trust Assets (Plan §§ 7.1, 7.5), (v) the funding of the DIP Collateral Trust with the DIP Collateral Trust Funding (Plan § 7.3), (vi) the foreclosure by the ABL Secured Parties on the ABL Collateral Assets and the transfer of such assets to the ABL Collateral Trust (Plan §§ 4.6(b), 8.2), (vii) the establishment of the ABL Collateral Trust and the appointment of the ABL Collateral Trustee to pursue and monetize the ABL Collateral Trust Assets (Plan §§ 8.1, 8.4), (viii) provisions governing distributions to creditors through the Litigation Trust Waterfall, DIP Collateral Trust Waterfall, and ABL Collateral Trust Waterfall  (Plan §§ 6.5, 7.4, and 8.3), (ix) the appointment of the Wind Down Administrator to direct and control the wind down of the FBG Debtors' estates and the Wind Down Budget, which is reasonable and adequate for effectuating the Wind Down and completing the Wind Down Administrator's duties under the Plan  (Plan § 5.7), (x) the appointment of the Claims Ombudsman to perform a claims reconciliation and make distributions to holders of Class 3(b) Litigation Trust Interests and adequate funding for such Claims Ombudsman (Plan § 5.2(g)), (xi) procedures for resolving Disputed Claims (Plan § 5.2(g), Art. X),   (xii) procedures for rejecting executory contracts and unexpired leases (Plan Art. XI), and (xiii) the FBG Debtor Releases, Third-Party Releases, Exculpation, and the Plan Injunction (Plan §§ 13.4, 13.5, 13.6). The foregoing will allow the FBG Debtors to consummate the transactions contemplated under the Plan in accordance with the terms thereof.

### B. Section 1129(a)(2):  FBG Debtors are Proper Plan Proponents

175.    To my knowledge, each of the FBG Debtors has complied with the applicable provisions of the Bankruptcy Code throughout the chapter 11 cases.

C. **Section 1129(a)(3): Plan is Proposed in Good Faith and Is Not by Any Means Forbidden by Law**

176. The Plan has been proposed in good faith and for the legitimate purpose of winding down and liquidating the estates of each FBG Debtor and distributing any remaining proceeds in accordance with the Plan. The FBG Debtors engaged in extensive, arm's-length negotiations over the Plan with the Ad Hoc Group, the Creditors' Committee, the ABL Secured Parties and various other parties supporting the Plan, each of which is represented by experienced and sophisticated legal and other advisors, and such negotiations were, at certain stages, with the assistance of a mediator, the Honorable Marvin Isgur. I also believe the Plan preserves and maximizes the value of the FBG Debtors' remaining assets. Specifically, confirmation of the Plan provides numerous key benefits for the FBG Debtors' estates, including (i) allowing the estate to maximize recoveries on account of its remaining assets, including the Litigation Trust Assets (including the Estate Claims), DIP Collateral Trust Assets, and the ABL Collateral Trust Assets, (ii) a substantial reduction in costs necessary to administer the estates, (iii) streamlined governance (*i.e.*, the Trustees and Wind Down Administrator), and (iv) $75 million in committed Litigation Funding that will permit the full and unfettered prosecution of Estate Claims. *See* Plan § 6.3.

177. To the best of my knowledge, and based on my observations, the FBG Debtors followed appropriate governance practices throughout the entire Plan negotiation and approval process and, as such, the FBG Debtors have proposed the Plan in good faith.

D. **Section 1129(a)(5): FBG Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders**

178. The FBG Debtors have identified and disclosed the identity and affiliations of the Wind Down Administrator, Alex Calderone of Calderone Advisory Group, LLC, and Claims Ombudsman, Patrick A. Jackson, Esq. of Faegre Drinker Biddle & Reath LLP. *See* Plan Supplement, Ex. 2., Ex.3. The FBG Debtors have also identified and disclosed that Gerard Uzzi

82

of Uzzi & Lall, a division of CBMN Advisors LLC, will serve as Litigation Trustee under the Plan. *See* Plan Supplement, Ex. 4. The Plan Supplement provides the nature of the compensation of the Litigation Trustee. *See* Plan Supplement, Ex. 4-C.

179. I believe the appointments of the Wind Down Administrator, Claims Ombudsman, and Litigation Trustee are consistent with the interests of creditors and other parties in interest in the FBG Debtors' cases. Moreover, I believe the individuals selected to serve as Wind Down Administrator, Claims Ombudsman, and Litigation Trustee are competent, experienced professionals and well-equipped to assist with their respective roles.

### E.        Section 1129(a)(7):  Plan Satisfies Best Interests Test

180. I am familiar with the Liquidation Analysis, the underlying financial and asset data, and the assumptions upon which the Liquidation Analysis is based, which are described in the Liquidation Analysis and notes thereto.

181. I understand section 1129(a)(7) of the Bankruptcy Code requires the Court to determine that a chapter 11 plan provides, with respect to each impaired class of claims or equity interests, that each holder of a claim or an equity interest in such class either (i) has accepted the plan or (ii) will receive under the plan value that is not less than the amount that such holder would receive if the debtors had liquidated under chapter 7 of the Bankruptcy Code (the "**Best Interests Test**").

182. I analyzed whether the Plan satisfies the Best Interests Test. To complete that analysis, the FBG Debtors, with the assistance of A&M and the FBG Debtors' other advisors, calculated the estimated recovery values for each Class of Claims and Interests under the Plan upon disposition of the FBG Debtors' assets pursuant to a hypothetical chapter 7 liquidation, as of July 28, 2026 (the "**Liquidation Date**").

83

183. This analysis assumes that in a hypothetical liquidation under chapter 7, holders of DIP A Claims will seek to foreclose on the Estate Claims, including proceeds of the Estate Claims (i.e., the Avoidance Proceeds), or otherwise purchase such collateral via credit bid or cash. My analysis further assumes that a chapter 7 trustee would either consent to such a foreclosure by the holders of DIP A Claims or otherwise sell such claims to such holders in an amount that is substantially less than the outstanding balance of the DIP A Claims (~$1.35 billion), and holders of DIP A Claims would take outright ownership of the Estate Claims without any obligation to share proceeds with any other creditors. I understand that in a liquidation under chapter 7, a chapter 7 trustee would receive up to a 3% fee on all distributions, including the proceeds of the Estate Claims. With respect to the FBG Debtors' remaining operating assets, my analysis assumes that anticipated proceeds of the liquidation of such remaining operating assets would be the same in chapter 7 as under the Plan, but the proceeds available for distribution to creditors would be further reduced by chapter 7 trustee fees and professionals and other wind down costs.

184. I, along with others at A&M and the FBG Debtors, then estimated the cash distributions that these holders of Claims and Interests would receive in a hypothetical liquidation under chapter 7 of the Bankruptcy Code commencing on the Liquidation Date and compared those distributions against potential recoveries under the Plan.

i. ***Liquidation Analysis***

185. The Liquidation Analysis represents an estimate of recovery values based upon a hypothetical liquidation of the FBG Debtors and was prepared on an entity-by-entity basis under the following assumptions if these chapter 11 cases are converted to chapter 7:

    a) All assets of FBG Debtors (or proceeds thereof) are encumbered by liens.

b) In a chapter 7 liquidation, a chapter 7 trustee would not have access to any unencumbered assets to finance the chapter 7 cases or adequately protect any secured parties' interests.

c) The DIP Secured Parties would foreclose on the Estate Claims, including proceeds thereof, or purchase such collateral and own such claims outright, with no duty to share with junior creditors.

d) Due to an inability to finance the prosecution of the Estate Claims, a chapter 7 trustee would either consent to the DIP Secured Parties' foreclosure or agree to a sale of the Estate Claims to the DIP Secured Parties via credit bid or cash, for an amount substantially less than the amount of outstanding DIP A Claims.

e) Any cash proceeds paid by holders of DIP A Claims are Avoidance Proceeds and therefore are subject to liens of DIP Secured Parties and would be used by the chapter 7 trustee to pay down the DIP A Claims, after subtracting chapter 7 trustee fees.

f) Accordingly, no creditors besides holders of DIP A Claims will receive any recovery on account of the Estate Claims in chapter 7.

g) Any assets subject to ongoing disputes are assumed to be owned by the FBG Debtors and/or subject to the liens of the FBG Debtors' secured creditors in the Liquidation Analysis. But even if that were not the case, it would not alter the conclusions of the Liquidation Analysis.

h) The amount of DIP A Claims would be substantially higher in a chapter 7 liquidation due to the continued accrual of interest.

i) With respect to the FBG Debtors' remaining operating assets, such assets would be liquidated in a chapter 7 for the same value as in a chapter 11, but any creditor recoveries in a chapter 7 on account of such assets would be reduced for costs of a chapter 7 trustee, the chapter 7 trustee's professionals, and other wind down costs.

186. Based on these assumptions and for the reasons set forth in the Liquidation Analysis, in a hypothetical chapter 7 liquidation of the FBG Debtors' assets commencing on or about the Liquidation Date, holders of Allowed Roll-Up, First Lien, Second Lien, Administrative Expense, Priority Tax, General Unsecured, Subordinated Claims, and FBG Debtor Interests would

receive zero recovery on account of their Claims and Interests and therefore are not expected to receive a greater recovery in a chapter 7 liquidation as compared to the Plan where recoveries are possible for all such holders.

187.    I understand that section 1129(a)(7) of the Bankruptcy Code is satisfied with regard to holders of Claims in Classes 1 (Other Priority Claims) and 2 (Other Secured Claims) as they are Unimpaired and thus, will be paid in full in cash under the Plan and can receive no less payment under the Plan than they would receive in a chapter 7 case.  I also understand that section 1129(a)(7) of the Bankruptcy Code is satisfied with regard to holders of Claims in Class 9 (Intercompany Claims), who would not realize any recoveries either under the Plan or in a chapter 7 case, and thus, will receive no less payment under the Plan than they would receive in a chapter 7 case.

188.    The Liquidation Analysis demonstrates that, on both a consolidated basis and a deconsolidated basis, each holder of an Allowed Claim will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the FBG Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Therefore, it is my opinion that the Plan satisfies the "best interests" test.

189.    Moreover, even in a scenario where the DIP Secured Parties do not foreclose on or otherwise acquire outright ownership of all the Estate Claims in a chapter 7, given (among other factors) the lack of available liquidity, I believe that a chapter 7 trustee would negotiate a settlement with the DIP Secured Parties to avoid the risks, length, cost and uncertainties of litigation.  I believe that any such settlement reached in chapter 7 would include terms and conditions that are no better than the settlements and compromises included in the Plan, which

were the result of extensive arm's-length negotiations with various stakeholders and creditors. The compromises and settlements in the Plan resolve highly contentious disputes among the FBG Debtors' creditors on various issues. The litigation of these issues would be time consuming and expensive. A chapter 7 trustee would have to spend time analyzing each of the plan issues resolved by the compromises and settlements included in the Plan. I believe in this alternative scenario, a chapter 7 trustee would determine that the compromises and settlements included in the Plan are the most reasonable means to avoid protracted litigation of the various issues resolved by the Plan.

190. Even in this alternative scenario where a chapter 7 trustee successfully negotiates the same compromises and settlements included in the Plan in a hypothetical chapter 7, the FBG Debtors' creditors would still recover less than they would under the Plan because all recoveries will be materially reduced by the costs described above, including the 3% chapter 7 trustee fees, the chapter 7 trustee's professionals' fees, and other general inefficiencies and wind down costs. Moreover, I understand that conversion to chapter 7 will likely be preceded by funding of the Carve-Out (as defined in the DIP Order) with $25 million of cash from the Debtors' balance sheet, which will have the effect of reducing the amount of funds available for prosecution of the Estate Claims by such amount and would likely require the chapter 7 trustee to seek additional financing. In a scenario where a chapter 7 trustee is forced to obtain additional litigation funding, junior creditors will be pushed further down the waterfall. Accordingly, I believe even under this alternative scenario, each holder of an Allowed Claim will receive or retain on account of such Claim less if the FBG Debtors were liquidated under chapter 7 of the Bankruptcy Code than under the Plan.

191. I believe the Liquidation Analysis is reasonable and incorporates justified assumptions and estimates regarding the FBG Debtors' assets and claims against the FBG Debtors.

87

In light of the foregoing, I believe that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

F.     **Section 1129(a)(11):  Plan is Feasible**

192.     For purposes of determining that the FBG Debtors will be able to satisfy the conditions to effectiveness of the Plan, including payment of Allowed Administrative Expense Claims and Allowed Priority Claims, the FBG Debtors, with the assistance of their financial and legal advisors, analyzed and evaluated the asserted Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims.  Since the beginning of these Chapter 11 Cases, I have overseen the A&M team that has been directly involved with the Debtors' postpetition operations.  This direct management, including regular discussions with the Debtors' operations teams, vendors, employees, and other advisors provides the basis for this team's work in monitoring, analyzing, and evaluating postpetition accounts payable, certain prepetition accounts payable (including 503(b)(9) claims and claims that may be entitled to priority status), and filed claims that may be entitled to administrative priority status to provide the best estimate of all outstanding administrative and priority claims against the FBG Debtors' estates.  I have reviewed the methodology used and the results of that work, and I rely on both to support my testimony set forth herein.

193.     As of June 26, 2026, the FBG Debtors' good faith estimate of the total amount of outstanding administrative expense claims against the FBG Debtors is approximately $222 million.  This estimated total includes (i) $147 million in unpaid administrative expense claims incurred since the Petition Date on account of postpetition goods and services provided to the FBG Debtors in the ordinary course (excluding Professional Fee Claims (which are secured by the amounts escrowed in the Professional Fees Escrow Account), Restructuring Expenses, DIP A Claims, Roll-Up Claims, Intercompany Claims, and Priority Tax Claims) (the "**Postpetition**

**Administrative Expense Claims**"), (ii) approximately $38 million of unpaid claims entitled to priority pursuant to section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claims**") and (iii) an additional 20% cushion of the aggregated estimate of both Postpetition Administrative Expense Claims and 503(b)(9) Claims.

194. Additionally, as of the date hereof, the FBG Debtors' good faith estimate of the total amount of outstanding priority claims against the FBG Debtors is approximately $78 million, including (i) approximately $65 million in Priority Tax Claims, plus (ii) an additional 20% cushion of $13 million on account of any additional amounts that constitute a Priority Tax Claim (together with the Other Priority Claims, the "**Priority Claims**"), including any interest or penalty charges asserted that may be entitled to priority.[14]

> i. ***The FBG Debtors' Methodology for Estimating Administrative Expense and Priority Claims***

195. Since the beginning of these Chapter 11 Cases, the A&M team has been directly involved in the Debtors' postpetition operations, including through vendor communication and management, analysis of relevant tax, employee, and other costs, and providing general assistance to the personnel that run the Debtors' businesses day-to-day. Throughout this process, multiple team members from A&M have been on-site at the FBG Debtors' corporate headquarters and have worked closely with the FBG Debtors' accounts payable group, tax group, and employees on-the-ground at the FBG Debtors' facilities across their business units.

196. Through this hands-on process, my team amassed a detailed understanding of the workings of the FBG Debtors' invoicing process and has obtained the data necessary to estimate the amount and validity of outstanding claims against the FBG Debtors. For purposes of

---

[14] The Debtors currently estimate that there are no outstanding, valid Other Priority Claims and dispute all Other Priority Claims that have been filed as of the date hereof.

determining that the FBG Debtors will be able to satisfy the conditions to effectiveness of the Plan (including the payment of Allowed administrative and priority claims), the FBG Debtors and their advisor teams reviewed this available data in light of my team's detailed understanding of the FBG Debtors' operations to understand which of such outstanding claims may be entitled to priority under the Bankruptcy Code.

### a. Administrative Expense Claim Estimation Process.

197.    The FBG Debtors estimate the total amount of Administrative Expense Claims that will be Allowed is approximately $222 million, as shown below:

| FBG Debtors' Estimate of Administrative Expense Claims | Amount |
|---|---|
| Postpetition Administrative Expense Claims | $147 million |
| 503(b)(9) Claims | $38 million |
| *Plus* 20% Cushion | $37 million |
| **Total Estimated Allowed Administrative Expense Claims**[15] | **$222 million** |

198.    Since A&M's engagement prior to the Petition Date, my team and I have been in frequent contact with the FBG Debtors' accounts payable team as well as the managers of the FBG Debtors' facilities across their business units to review, verify, and coordinate payment of outstanding invoices and charges asserted by vendors and suppliers.  Both prior to and following the Petition Date, the A&M team has frequently reviewed data aggregated from the FBG Debtors' several enterprise resource planning systems, which my team has been able to access and review at any time.  The FBG Debtors' accounts payable team, further, would escalate invoices, typically on an aggregated basis, for A&M's review once they came due by their terms, if product had—to the best of the FBG Debtors' accounts payable team's knowledge based on their communications

---

[15]    For the avoidance of doubt, the Debtors' estimate of outstanding Administrative Expense Claims does not include any Administrative Expense Claim held by a Debtor or affiliate of a Debtor against an FBG Debtor, including, for the avoidance of doubt, any Administrative Expense Claims asserted by Longkou Haimeng Machinery Co., Ltd. ("**LHM**").

with management at the various business units—been received, or if invoices had been shifted to "cash-in-advance" terms and required payment prior to the delivery of any goods.

199. To determine the amount of Administrative Expense Claims outstanding against the FBG Debtors, my team worked directly with the FBG Debtors to create a detailed accounting of the aggregated data of invoices and charges logged throughout these cases, including obligations that accrued in the twenty-day period leading up to the Petition Date as well as following the Petition Date (the "**Aggregated Accounting**"). Based on the invoice-level data aggregated into the Aggregated Accounting, my team prepared the foregoing estimates of (i) Postpetition Administrative Expense Claims and (ii) 503(b)(9) Claims on account of goods actually received by the FBG Debtors in the 20 days leading up to the Petition Date (which I understand may be entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code).

200. The Aggregated Accounting is not a recreation of the FBG Debtors' existing books and records, but instead, was assembled based on invoice-level detail and review of charges potentially entitled to administrative or priority status. This work was performed by the FBG Debtors postpetition, subject to oversight by my team.

### b. Priority Claims Estimation Process.

201. The FBG Debtors estimate the total amount of Priority Claims that ultimately will be Allowed is approximately $78 million, consisting of (i) $65 million in Priority Tax Claims, plus (ii) an additional 20% cushion of $13 million on account of any additional amounts that constitute a Priority Tax Claim:

| FBG Debtors' Estimate of Priority Claims | Amount |
| --- | --- |
| Priority Tax Claims | $65 million |
| *Plus* 20% Cushion | $13 million |
| **Total Estimated Allowed Priority Claims** | **$78 million** |

202. The FBG Debtors, in the ordinary course of operations, tracked outstanding tax liabilities, customs charges, and other operational charges that may constitute Priority Tax Claims or Other Priority Claims. The A&M team, under my supervision, coordinated directly with the FBG Debtors and the FBG Debtors' other advisors tasked with resolving issues related to taxation (among others) to verify the accuracy of the FBG Debtors' estimates of outstanding tax and other charges that may be entitled to priority. In particular, the A&M team coordinated directly with the FBG Debtors' tax, trade, and legal teams (including Weil) to determine valid outstanding Priority Tax Claims that were not duplicative or already paid.

203. Once this review was complete, this data was aggregated into the Aggregated Accounting, which was used in part to estimate the amount of Priority Tax Claims and Other Priority Claims outstanding against the FBG Debtors.

ii. ***The FBG Debtors' Methodology For Evaluating Filed Claims***

204. The A&M team, under my supervision, has reviewed and carefully evaluated all of the asserted claims that have been filed on the docket and the Claims Register (as defined herein) in the FBG Debtors' Chapter 11 Cases, including those claims asserted in the Administrative Motions (as defined herein) (collectively, the "**Filed Claims**"). I have reviewed the methodology used and the results of that work, and I rely on both in my testimony set forth herein.

205. Based on A&M's review, there is approximately $359 million in filed Proofs of Claim asserting Administrative Expense Claims or Priority Claims, which includes $11 million in filed Proofs of Claim asserting a Postpetition Administrative Expense Claim, $103 million in filed Proofs of Claim asserting a 503(b)(9) Claim, and $245 million in filed Proofs of Claim asserting a Priority Claim. In addition, $63 million in Administrative Expense Claims or Priority Claims have been filed via motion on the docket.

206.     Nevertheless, I believe that the total amount of Allowed Administrative Expense Claims and Priority Claims is approximately $222 million and $78 million, respectively, as described herein.  Based on A&M's evaluation of the Filed Claims, I do not believe that the Filed Claims accurately represent the aggregate amount of outstanding Administrative Expense Claims or Priority Claims against the FBG Debtors because, among other things, a significant amount of such claims are duplicative of other Filed Claims, are amended and superseded versions of other Filed Claims, or are otherwise invalid.  I believe that the aggregate amount of valid Administrative Expense Claims or Priority Claims against the FBG Debtors is less than the aggregate amount of the Filed Claims, and the subset of Filed Claims that likely constitute valid claims against the FBG Debtors are already accounted for in the FBG Debtors' estimates of the total Allowed Administrative Expense Claims and Priority Claims based on the Aggregated Accounting.

207.     As part of this process, A&M evaluated the Filed Claims filed against the FBG Debtors and compared them to the Aggregated Accounting.

### a.  *Administrative Expense Claims Evaluation Process.*

208.     To analyze and evaluate the Administrative Expense Claims, A&M created an extract of the Proofs of Claim pulled on July 6, 2026 reflected on the official register (the **"Claims Register"**) of claims (the "**Claims Register Extract**") at such time maintained by Kroll Restructuring Administration LLC, the FBG Debtors' claims, noticing, and solicitation agent.

209.     As reflected on the Claims Register Extract, as of July 6, 2026, there are approximately (i) $11 million in asserted Postpetition Administrative Expense Claims and approximately (ii) $103 million in asserted 503(b)(9) Claims.

210. The A&M team analyzed and evaluated the Claims Register Extract to identify asserted Administrative Expense Claims that are facially deficient and fall within the broad category of claims that the FBG Debtors intend to object to. Based on the results of this initial analysis and evaluation, the FBG Debtors identified a total of approximately (i) $8 million in asserted Postpetition Administrative Expense Claims and (ii) $15 million in asserted 503(b)(9) Claims that are—on an initial review—not facially deficient (but may be subject to an objection or to further reduction by the FBG Debtors at a later date following further analysis).

211. Although the amount of filed 503(b)(9) Claims, in particular, is much higher than the Debtors' estimate of $38 million, the vast majority in dollar amount of such filed claims are duplicative or otherwise facially invalid based on the A&M team's review. For example, three different Proofs of Claim (Claim Nos. 1845, 1846, and 1960) assert the same 503(b)(9) Claim in the amount of over $21 million by non-Debtor affiliate LHM, which the Debtors dispute, and would account for more than $40 million in duplicated filed 503(b)(9) Claims even if it were valid. The FBG Debtors intend to file objections to Administrative Expense Claims in the total aggregate amount of approximately $57 million on account of (i) Filed Claims that are duplicates of, and subsumed within, another Filed Claim or (ii) Filed Claims that have been amended and superseded by subsequently filed claims. The FBG Debtors also anticipate objecting to approximately $34 million in asserted Administrative Expense Claims including to claims asserting administrative priority that do not qualify for that priority.

212. A&M compared all of the remaining Filed Claims (i) to which an objection has not been or is not likely to be filed in the near term and (ii) that assert an Administrative Expense Claim to the Aggregated Accounting. Because the FBG Debtors' estimate of outstanding

Administrative Expense Claims is itself derived from that same Aggregated Accounting, matching a Filed Claim to the Aggregated Accounting shows whether, and to what extent, the amount asserted in that Filed Claim is already captured within the estimate. Based on that comparison, A&M determined that such remaining filed Administrative Expense Claims are already accounted for and included in the FBG Debtors' estimate.

213. My team, with the assistance of legal counsel, has also reviewed the 24 motions filed in the FBG Debtors' Chapter 11 Cases as of July 12, 2026 asserting a (i) Postpetition Administrative Expense Claim (the "**Administrative Motion Claims**") or (ii) a 503(b)(9) Claim (the "**Administrative Motion 503(b)(9) Claims**") against the FBG Debtors' estates (the "**Administrative Motions**").[16] The A&M team compared the Claims asserted in each Administrative Motion against the Aggregated Accounting. To the extent the information contained in the Aggregated Accounting was consistent with an Administrative Expense Claim asserted in a filed Administrative Motion, the FBG Debtors engaged the party that filed the applicable Administrative Motion to stipulate to an amount of an Allowed Administrative Expense Claim.

214. I understand that the FBG Debtors, with the assistance of Weil and A&M, have contacted all claimants that have filed an Administrative Motion and have resolved 10 Administrative Motions through consensual stipulations providing for allowance of a total of $3 million in Administrative Expense Claims against the FBG Debtors. The amount of Administrative Expense Claims Allowed pursuant to stipulations filed by the FBG Debtors is included in the estimate of the total amount of outstanding Administrative Expense Claims against

---

[16] To the extent any of the Administrative Motion Claims were duplicative of other Filed Claims based on the Claims Register Extract, the A&M marked the filed Proofs of Claim in account of such claims as duplicative in their analysis.

the FBG Debtors. I understand that there are 14 pending Administrative Motions asserting a total of $59 million in Administrative Expense Claims against the FBG Debtors, which remain unresolved and for which no stipulation has been filed. The FBG Debtors anticipate entering consensual stipulations for allowance of up to an additional $6 million in Administrative Expense Claims asserted by the unresolved Administrative Motions, which such amount has also been included in the FBG Debtors' estimate of all outstanding Administrative Expense Claims against the FBG Debtors. The FBG Debtors dispute at least $53 million in Administrative Expense Claims asserted in the Administrative Motions and anticipate filing objections disputing such claims.

215.    Based on this analysis, in total, the FBG Debtors estimate that excluding Professional Fee Claims, Restructuring Expenses, DIP A Claims, Roll-Up Claims, Intercompany Claims, and Priority Tax Claims, the total amount of Administrative Expense Claims that ultimately will be Allowed is approximately $222 million.

| Evaluation of Filed Administrative Expense Claims | Amount |
| --- | --- |
| Filed Postpetition Administrative Expense Claims (Based on Claims Register Extract) | $11million |
| Administrative Motion Claims | $59 million |
| Filed 503(b)(9) Claims (Based on Claims Register Extract) | $103 million |
| **Total Filed Administrative Expense Claims** | $173 million |
| *Minus* withdrawn claims | $100,000 |
| *Minus* anticipated objections | $144 million |
| *Minus* pending settlements and stipulations | $6 million |
| **Total Evaluated Filed Administrative Expense Claims** | $23 million |
| *Minus* Claims Included in the Aggregated Accounting | $23 million |
| **Filed Administrative Expense Claims Additive to Aggregated Accounting** | $0 |

### b.    Priority Claims Reconciliation Process.

216.    A&M began with the extract of the Proofs of Claim filed on the Claims Register Extract. As of July 6, 2026, the extract reflected approximately $245 million in asserted Priority Claims, including approximately (i) $210 million in Priority Tax Claims and (ii) $35 million in Other Priority Claims.

217. The A&M team then analyzed and evaluated the Claims Register Extract to identify facially deficient asserted Priority Claims, to which the FBG Debtors intend to object. Based on the results of this initial analysis (which is ongoing), the FBG Debtors identified a total of approximately $74 million in asserted Priority Claims, comprised of approximately (i) $73.7 million in Priority Tax Claims and (ii) $200,000 in Other Priority Claims that are—on an initial review—not facially deficient (but may be subject to an objection or to further reduction by the FBG Debtors at a later date following further analysis).

218. The FBG Debtors intend to file omnibus objections to filed Priority Claims in the total aggregate amount of approximately $50 million on account of (i) Filed Claims that are duplicates of, and subsumed within, another Filed Claim or (ii) Filed Claims have been amended and superseded by subsequently filed claims. The FBG Debtors also anticipate objecting to additional Priority Claims for approximately $121 million in asserted claims in the near term, including with respect to Filed Claims asserting Priority Claims that do not qualify for priority under the requirements of the Bankruptcy Code.

219. A&M compared the remaining Filed Claims (i) to which an objection has not been and is not likely to be filed in the near term and (ii) that assert a Priority Claim to the Aggregated Accounting. Based on that comparison, A&M determined that such remaining filed Priority Claims are already accounted for and included in the FBG Debtors' estimate.

220. Based on this analysis, in total, the FBG Debtors estimate that the total amount of Priority Claims that ultimately will be Allowed is approximately $78 million.

| Evaluation of Filed Priority Claims | Amount |
|---|---|
| Filed Priority Tax Claims (Based on Claims Register Extract) | $210 million |
| Filed Other Priority Claims (Based on Claims Register Extract) | $35 million |
| **Total Filed Priority Claims** | $245 million |
| *Minus* withdrawn claims | $200,000 |
| *Minus* anticipated objections | $171 million |
| **Total Evaluated Filed Priority Claims** | $74 million |

97

| *Minus* Claims Included in the Aggregated Accounting | $74 million |
|---|---|
| **Filed Priority Claims Additive to Aggregated Accounting** | $0 |

221. Based on my supervision and review of the A&M team's work, I believe that A&M's methodology for evaluating the Filed Claims is sound and that its results are reliable.

iii. ***The FBG Debtors Do Not Anticipate Material Additional Claims Will Be Filed***

222. I do not anticipate that there are significant unaccounted for claims against the FBG Debtors' estates that, if asserted, would materially alter the FBG Debtors' estimates of outstanding Administrative Expense Claims or Priority Claims against the FBG Debtors' estates.

223. For Postpetition Administrative Expense Claims, I do not believe additional valid claims are likely to be filed against the FBG Debtors' estates that are not encompassed by the FBG Debtors' claims estimates. First, the FBG Debtors are likely not incurring new significant Postpetition Administrative Expense Claims because their operations have been shut down. The vast majority of Postpetition Administrative Expense Claims have been asserted and/or are held by vendors and suppliers of the FBG Debtors' various business units which are all now nonoperational. Since late January 2026, substantially all of the FBG Debtors' aftermarket operations ceased because the FBG Debtors no longer had any funds to continue any operations not supported by the financing approved in connection with the OEM Funding Order. Following the sales of the FBG Debtors' Walbro, TMD, and Horizon business lines, substantially all of the FBG Debtors' remaining operations funded by the OEM Funding Order were transitioned to new purchasers or began a wind down process.

224. Second, the FBG Debtors have been in frequent contact with their vendors and suppliers throughout these Chapter 11 Cases, the largest of which—who are likely to hold the largest Postpetition Administrative Expense Claims—are sophisticated parties with familiarity with the claims-filing process typical of Chapter 11 Cases. Moreover, many of these vendors and

suppliers have shifted the FBG Debtors' trade terms to "cash in advance" terms, requiring the FBG Debtors to pay in advance for the shipment of any goods and effectively preventing any additional Postpetition Administrative Expense Claims from being incurred.

225. Based on the foregoing, I believe the FBG Debtors' exposure to their vendors and suppliers with respect to additional Postpetition Administrative Expense Claims is minimal.

226. Additionally, I do not believe additional 503(b)(9) Claims that may be asserted against the FBG Debtors' estates are likely to materially affect the FBG Debtors' estimate of outstanding 503(b)(9) Claims. The FBG Debtors will not incur any new 503(b)(9) Claims given the Petition Date was over 9 months ago. In connection with the filing of the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay (A) Critical Vendor Claims, (B) Non-U.S. Vendor Claims, (C) Lien Claims, and (D) 503(b)(9) Claims, (II) Confirming Administrative Expense Priority of Undisputed Outstanding Prepetition Orders, and (III) Granting Related Relief* (Docket No. 13) (the "**Vendor Motion**"), pursuant to which the FBG Debtors sought to pay certain prepetition claims of vendors and suppliers (including 503(b)(9) Claims), the FBG Debtors performed an analysis of outstanding potential 503(b)(9) Claims to determine the amount of relief to be requested in the Vendor Motion. Prior to the winding-down of major components of their businesses, the FBG Debtors maintained frequent contact with vendors and suppliers asserting significant 503(b)(9) Claims based on this analysis, and the FBG Debtors engaged in frequent negotiations with respect to the amounts of such claims to ensure continued shipment of goods to the FBG Debtors' facilities.

227.    In light of these facts, I believe the FBG Debtors' estimate of outstanding 503(b)(9) Claims is accurate and additional material 503(b)(9) Claims are unlikely to be filed or asserted against the FBG Debtors' estates.

### iv.    *FBG Debtors Will Be Able to Satisfy All Allowed Administrative Expense Claims and Priority Claims Under the Plan*

228.    I believe that the FBG Debtors will be able to make all required payments under the Plan. I understand the Plan provides that Allowed Administrative Expense Claims and Other Priority Claims will be paid in full in cash on the Effective Date and that Priority Tax Claims will also be paid in full in cash on the Effective Date or within five (5) years of the Petition Date. I further understand that, under the Plan, these Allowed Claims will be satisfied from the proceeds of the Estate Claims transferred to the Litigation Trust. Based on the Litigation Trust Waterfall set forth by the Plan, in order for the FBG Debtors to satisfy an estimated $222 million in Administrative Expense Claims and an estimated $78 million in Priority Claims in full, the Litigation Trust would need to obtain approximately $1.965 billion[17] in proceeds.

229.    Based on my personal knowledge of the facts and the Kirschner Declaration, I believe the Litigation Trust will generate sufficient distributable value (i.e., more than $2 billion) to satisfy all such administrative and priority claims in full in cash, by the end of 2028.

230.    Therefore, I believe the FBG Debtors will be able to make all required payments under the Plan, that the Plan will be consummated, and that the Effective Date will occur by the end of 2028.

---

[17]    This figure represents the recoverable proceeds required to satisfy all Administrative Expense Claims and Priority Claims, as well as the estimated fees of the advisors to the Litigation Trustee.

### G. Sections 1129(a)(13): FBG Debtors Have Complied with Obligations Under Section 1114

231. Certain of the FBG Debtors maintain certain retiree benefit arrangements (the "**Retiree Benefit Arrangements**"), including those provided under the First Brands Group, LLC Health and Welfare Employee Benefit Plan (the "**Welfare Plan**"), which provide retiree health and life insurance benefits to certain eligible former employees and their spouses and eligible dependents through various sub-plans.

232. The Debtors are in the process of negotiating termination of the Retiree Benefit Arrangements with the applicable unions (which represent union retirees) (the "**Unions**") and the committee of non-union retirees appointed by the U.S. Trustee (which represent non-union retirees) (the "**Non-Union Retiree Committee**"), which I understand is required and governed by section 1114 of the Bankruptcy Code. The Debtors are hopeful that a settlement with these parties providing for the consensual termination of the Retiree Benefit Arrangements, among other terms, will be reached by the proposed confirmation hearing on July 28, 2026. However, to ensure that these discussions do not delay or prevent confirmation of the Plan on the timeline required by the Confirmation Budget, the Debtors intend to file a motion seeking Court approval of termination of the Retiree Benefit Arrangements and other related terms proposed by the Debtors solely to the extent that a consensual agreement is not reached with the Unions and the Non-Union Retiree Committee prior to the confirmation hearing. If necessary, the Debtors will be prepared to satisfy their burden with respect to termination of the Retiree Benefit Arrangements at the confirmation hearing.

### H. Sections 1129(a)(14)–(16) and 1129(e): Inapplicable Provisions

233. The FBG Debtors are not subject to any domestic support obligations, no Debtor is an "individual" as I understand that term to be used in the Bankruptcy Code, the FBG

Debtors are each a moneyed, business, or commercial corporation, and these chapter 11 cases are not "small business cases."

### I.   Section 1129(d):  Principal Purpose of Plan is Not Avoidance of Taxes

234.   The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act.  Rather, the principal purpose of the Plan is to maximize value of the FBG Debtors' estate for all stakeholders and ensure an orderly wind down of the FBG Debtors' estates.

### X.   PLAN RELEASES, EXCULPATION, AND INJUNCTION

### A.   FBG Debtors' Releases

235.   I understand that Section 13.5 of the Plan contains certain releases by the FBG Debtors and their estates (the "**FBG Debtor Releases**") that are (i) integral components of the Plan, (ii) appropriate and necessary under the circumstances, (iii) are being provided in exchange for valuable consideration, and (iv) are in the best interest of the FBG Debtors and their estates.  For these reasons and those set forth below, I believe that the FBG Debtor Releases are reasonable and appropriate.

236.   First, the FBG Debtor Releases are narrowly limited in scope to entities and individuals who provided integral support and contributions to the FBG Debtors' estates during these chapter 11 proceedings.  Notably, with the exception of the DIP Secured Parties, the Prepetition Secured Parties, and the ABL Parties, the FBG Debtor Releases are limited to entities and individuals who became involved with the Company or the FBG Debtors either (i) on or around the Petition Date or (ii) during the pendency of these cases.

237.   With respect to directors, officers, and management, the only such individuals receiving the benefit of the FBG Debtor Releases are (i) Neal Goldman, William Transier, and Benjamin Duster, in their capacities as members of one or more of the Special

Committees or as Independent Managers of one or more the FBG Debtors, as applicable, and (ii) the Specified Executives (i.e., myself and the other members of my team that served as Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer, as applicable, shortly prior to the Petition Date or during the pendency of the chapter 11 cases). No other directors, officers, management or other employees of the FBG Debtors are receiving releases from the FBG Debtors and I understand that certain individuals are expressly carved out from the FBG Debtor Releases under the Plan. *See* Plan § 1.1; Plan Supplement, Ex. 8.

238. With respect to professionals, the only firms and individuals that are receiving the benefit of the FBG Debtor Releases are those that were retained by order of the Bankruptcy Court in connection with the chapter 11 cases pursuant to specific sections of the Bankruptcy Code, excluding any ordinary course professionals retained by the FBG Debtors and the Examiner, as well as the professionals to the DIP Secured Parties and Prepetition Secured Parties. No other professionals or advisors to the FBG Debtors, including those that were involved in the prepetition conduct and affairs of the FBG Debtors, are receiving releases from the FBG Debtors and, similar to former directors, officers, and management, I understand that certain professionals are expressly carved out from the FBG Debtor Releases under the Plan.

239. Each of the directors, officers, management members and professionals that will benefit from the FBG Debtor Releases has played a critical role in these chapter 11 cases. These parties have helped shepherd the FBG Debtors through, among other things, disputes and litigation with various parties asserting interests in the Debtors' assets, liquidity issues and related financing discussions with stakeholders, value-maximizing sale processes, multi-party mediations, and the wind down of several of the Debtors' business lines.

240.    Specifically, since the inception of these chapter 11 cases, the FBG Debtors' directors, officers, management members and professionals have (i) managed intense demands associated with these chapter 11 cases, while maintaining the FBG Debtors' operational duties, (ii) sourced and negotiated critical complex financing facilities and liquidity arrangements with various key stakeholders, including the DIP Secured Parties and the OEMs, to prevent a complete and sudden shutdown of the FBG Debtors' North American businesses, (iii) represented the FBG Debtors in connection with various disputes and litigations with parties asserting interests in the Debtors' assets, including the Third-Party Factors and SPV Lenders, (iv) launched a sale process for all or substantially all of the FBG Debtors' assets, negotiated sale transactions for certain of the Debtors' business units, and sold several of the FBG Debtors' business lines as going concerns which preserved over 2,000 jobs and generated significant proceeds that were used to pay down claims against the FBG Debtors' estates, (v) conducted a prepetition investigation into potential estate claims and causes of action, (vi) commenced an adversary proceeding against the Debtors' founder and former CEO and affiliated parties to recover misappropriated funds, and commenced an adversary proceeding against numerous defendants, including Onset and a former executive of the Debtors, seeking to avoid billions of dollars of preferential and fraudulent transfers, among other claims, (vii) reconciled prepetition accounts receivable and negotiated and developed procedures with factoring counterparties to release unencumbered funds, and (viii) navigated a variety of issues in respect of the Debtors' 'Rest of World' businesses, including assisting with the management and commencement of local insolvency proceedings in various jurisdictions. Importantly, each of these parties was also instrumental in negotiating and reaching an agreement on the Plan Settlement, which is an integral component of the Plan. Without the efforts of these

104

parties, the FBG Debtors would not be seeking confirmation of the Plan and the chapter 11 cases would likely have converted to cases under chapter 7 several months ago.

241. Further, the FBG Debtor Releases contain certain limitations, including, among other limitations and carve-outs, that they shall not be construed as releasing any party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted gross negligence, willful misconduct, or actual fraud committed by such party.

242. Second, the third parties that are receiving the benefit of the FBG Debtor Releases, including (i) the Creditors' Committee, (ii) the Ad Hoc Group, the DIP Secured Parties, the Litigation Trust Backstop Parties, the Litigation Trust Class 1 Funding Contributors, the DIP Collateral Trust Funding Contributors, and the Prepetition Secured Parties (other than the ABL Secured Parties) (collectively, the "**Ad Hoc Group and Related Released Parties**"), and (iii) the ABL Parties have made a number of concessions either as part of the Plan Settlement or otherwise during these chapter 11 cases that warrant their receipt of the FBG Debtor Releases in accordance with the Plan.

> a) Creditors' Committee. The Creditors' Committee engaged in good faith and arm's-length negotiations with the FBG Debtors, the Ad Hoc Group, and other stakeholders regarding a consensual and value-maximizing wind down of the FBG Debtors' estates. These discussions culminated in the Plan, which provides the FBG Debtors and their successors with a path to make distributions to junior creditors (including administrative, priority, and general unsecured creditors). As part of these negotiations, the Creditors' Committee made a number of concessions that were critical to the parties reaching the agreements set forth in the Plan Settlement, including, among other things, allowing the Challenge Period to expire on upon consummation of certain transactions contemplated under the Plan. The Creditors' Committee has agreed to support confirmation of the Plan pursuant to the Plan Settlement and provided the Creditors' Committee Position Letter indicating their support for the Plan which was included in

the Solicitation Packages the FBG Debtors delivered to creditors entitled to vote on the Plan.  The Creditors' Committee has also been actively involved and provided support in other aspects of the Debtors' chapter 11 cases, including in connection with the going concern and other value-maximizing sales the FBG Debtors pursued.

b) <u>Ad Hoc Group and Related Released Parties</u>.  The Ad Hoc Group and Related Released Parties have provided critical support to the FBG Debtors, without which the FBG Debtors likely would have been forced to convert their chapter 11 cases to chapter 7 cases (a result that would have been worse for creditors than the transactions contemplated under the Plan).  At the outset of the chapter 11 cases, the DIP Secured Parties provided the FBG Debtors with $1.1 billion of new money financing under the DIP Facility and agreed to the consensual use of their cash collateral to allow the FBG Debtors to prosecute their chapter 11 cases for the benefit of all stakeholders.  Of critical importance, members of the Ad Hoc Group have also agreed to (i) provide the FBG Debtors with the funding necessary to pursue confirmation of the Plan pursuant to the Confirmation Budget and (ii) provide the Litigation Trust with at least $75 million of critical funding, including (a) $25 million of cash from the FBG Debtors' balance sheet from accounts holding the DIP Lenders' cash collateral and (b) $50 million of new committed funding provided and backstopped by certain holders of DIP A Claims.  Under the Plan Settlement, the Ad Hoc Group agreed to the Litigation Trust Waterfall which will allow junior creditors of the FBG Debtors to participate in recoveries from the Estate Claims, the proceeds of which are collateral of the DIP Secured Parties, prior to the satisfaction in full of the DIP A Claims and Roll-Up Claims.  In addition, the DIP Secured Parties agreed to a number of other concessions that were critical to reaching an agreement on the Plan Settlement, including the minority governance rights granted to the UCC Member and the appointment of the Claims Ombudsman to serve as the holder of record of the Class 3(b) Litigation Trust Interests.  The Ad Hoc Group has also been actively involved and provided support in other aspects of the Debtors' chapter 11 cases, including consenting to the going concern and other value-maximizing sales of DIP Collateral that the Debtors pursued.

c) <u>ABL Parties</u>.  The ABL Parties have made several concessions in these chapter 11 cases that warrant their release under the FBG Debtor Releases.  In particular, the ABL Parties agreed to consensual priming of certain of their liens by the DIP Facility, as set forth under the DIP Order.  In addition,

the ABL Parties agreed to the consensual use of their cash collateral pursuant to the terms of the DIP Order, which allowed the FBG Debtors to prosecute these chapter 11 cases. With respect to the Plan Settlement, similar to the DIP Lenders, the ABL Parties have allowed the FBG Debtors to use up to $15 million of cash collateral pursuant to the Confirmation Budget that will allow the Debtors to pursue confirmation of the Plan. The ABL Parties have also been actively involved and provided support in other aspects of the Debtors' chapter 11 cases, including consenting to various going concern sale transactions pursued by the Debtors that involved ABL collateral.

243. Third, I understand that pursuant to the Court's DIP Order, the FBG Debtors already absolutely, unconditionally and irrevocably released and forever discharged the DIP Secured Parties and the Prepetition Secured Parties from any and all obligations and liabilities to the FBG Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date. Therefore, pursuant to the Plan, the FBG Debtors are only releasing postpetition conduct of these parties. In any event, the FBG Debtors (in addition to the Examiner and the Creditors' Committee, among others) have conducted an extensive investigation that has not identified any potential claims or causes of action again the DIP Secured Parties and the Prepetition Secured Parties. Additionally, absent the support of the DIP Secured Parties and the Prepetition Secured Parties, the FBG Debtors would not have been able to secure the financing and consensual use of collateral necessary to fund these chapter 11 cases and operate the FBG Debtors' business through confirmation.

244. Based on my experience as the Chief Restructuring Officer in various chapter 11 cases, the FBG Debtor Releases are customary in transactions of this kind and are fair and reasonable under the circumstances. Accordingly, I believe that the FBG Debtor Releases are

appropriate, in the best interest of the FBG Debtors and their estates, were made in good faith, and should be approved.

### B. Third-Party Releases

245. I understand that Section 13.5(b) of the Plan contains certain releases by certain non-Debtor third parties, in favor of the Released Parties (the "**Third-Party Releases**").

246. I understand that the Third-Party Releases are entirely consensual because parties need to affirmatively opt in to the Third-Party Releases to grant such releases under the Plan. I also understand that the Third-Party Releases contain limitations and carve-outs, including that the Plan does not release any Released Party for Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted gross negligence, willful misconduct, or actual fraud committed by such Released Party. The Third-Party Releases are the product of extensive good-faith, arm's-length negotiations and were a material inducement for the Released Parties to support the Debtors and the Plan.

247. As noted above, the Released Parties have provided and continue to provide (or will provide) integral support to the Debtors throughout these chapter 11 cases and have made meaningful contributions to these chapter 11 cases. These efforts to date have been focused on, among other things, maximizing value of the Debtors estate and have included, among other things, (i) providing the funding necessary for the FBG Debtors to prosecute the Plan and avoid conversion to chapter 7, (ii) engaging in discussions and agreeing to the compromises contemplated under the Plan Settlement and other Plan provisions, and (iii) resolving disputes among the Debtors' various key stakeholders that allowed the FBG Debtors to sell several of their business lines as going concerns and preserve over 2,000 jobs.

248.     Accordingly, I believe that the Third-Party Releases are appropriate, in the best interest of the FBG Debtors and their estates, were made in good faith, and should be approved.

### C.     Exculpation

249.     I understand that Section 13.6 of the Plan contains an exculpation (the "**Exculpation**") that is (i) an integral component of the Plan, (ii) appropriate and necessary under the circumstances, and (iii) in the best interest of the FBG Debtors and their estates.  For these reasons and those set forth below, I believe that the Exculpation is reasonable and appropriate under the circumstances.

250.     The Exculpated Parties are limited to (i) the FBG Debtors, (ii) Neal Goldman, William Transier, and Benjamin Duster, in their capacities as members of one or more of the Special Committees or the Independent Managers of the FBG Debtors, as applicable, and (iv) the Creditors' Committee and each of its members in their official capacity.  Importantly, the Exculpated Parties (other than the FBG Debtors) include entities and individuals who became involved with the FBG Debtors either (i) on or around the Petition Date or (ii) during the pendency of these cases.

251.     In developing and approving the Exculpation, my team and I, along with the Debtors' other advisors, considered the fact that the Exculpation contained certain limitations, including, among other limitations and carve-outs, that they shall not be construed as exculpating any party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted gross negligence, willful misconduct, or actual fraud committed by such party.  Further, in approving the Exculpation, the Debtors' advisors also considered the work done by the FBG Debtors, the Special Committees, and the members of the Creditors' Committee to shepherd these chapter 11 cases through several complex and time-

109

consuming events, including the wind down of several of the FBG Debtors' business lines, financing and liquidity issues, sale processes, multi-party mediations, and disputes and litigation with various parties asserting interests in the FBG Debtors' assets. Importantly, each of the Exculpated Parties was also instrumental in negotiating and reaching an agreement on the terms of the Plan Settlement, which forms the basis of the Plan and provides the FBG Debtors with a path to make distributions to junior creditors (including administrative, priority, and general unsecured creditors).

252. Based on my experience as the Chief Restructuring Officer in various chapter 11 cases, the Exculpation is customary in transactions of this kind and is fair and reasonable under the circumstances. Accordingly, I believe that the Exculpation is appropriate, in the best interest of the FBG Debtors and their estates, was made in good faith, and should be approved.

**D. Injunction**

253. As I understand is permitted by section 1123(b)(6) of the Bankruptcy Code, the Plan includes an injunction provision in Section 13.4 (the "**Plan Injunction**"). I understand the Plan Injunction will ensure that after the Confirmation Date parties in interest do not take actions inconsistent with the Plan to the detriment of, and in a manner unfair to, other parties in interest. The Plan Injunction is narrowly tailored and is necessary to effectuate the Plan's release and exculpation provisions, and to protect the Released Parties, including the FBG Debtors, from potential litigation from creditors as the provisions of the Plan are implemented after the Confirmation Date. Such litigation would hinder the efforts of the Trustees and Wind Down Administrator to effectively fulfill their responsibilities as contemplated in the Plan and maximize value for creditors. The Plan Injunction is integral to the Plan, is in the best interests of the FBG

Debtors' creditors, and I believe it is an appropriate exercise of the FBG Debtors' business judgment.

### E. Timing for Plan Releases, Exculpation, and Injunction

254. Each of the FBG Debtor Releases, the Exculpation, and the Plan Injunction will become effective in accordance with the Plan on the Confirmation Date in light of, among other things, the anticipated timing for occurrence of the Effective Date. I also understand that the timing for effectiveness of the FBG Debtor Releases on the Confirmation Date and the Third-Party Releases on the Effective Date were a critical components of the Plan Settlement, without which the FBG Debtors, the Ad Hoc Group, and the Creditors' Committee would likely not have reached an agreement on the Plan and the other terms of the Plan Settlement.

## XI. CAUSE EXISTS TO WAIVE ANY STAY OF THE PROPOSED CONFIRMATION ORDER

255. I understand that, in the event that the Plan is confirmed, Bankruptcy Rules 3020(e) and 6004(h) impose a 14-day stay of the effectiveness of the confirmation order unless the Court orders otherwise. I believe that here it is appropriate for the Court to waive the stay and allow the FBG Debtors to commence implementation of the Plan without delay. Each day the FBG Debtors are delayed from implementing the Plan, they incur significant administrative and professional costs—expenses that should be avoided in light of the ongoing wind down and liquidation of the FBG Debtors' estates. I therefore believe that a waiver of the 14-day stay under Bankruptcy Rules 3020(e) and 6004(h) is in the best interest of the Debtors' estates and will not prejudice any party in interest.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge, information, and belief.

Dated: July 14, 2026
Chicago, Illinois


/s/ Charles M. Moore

Charles M. Moore, Managing Director
Alvarez & Marsal North America LLC