*Execution Version*

---

**SECURITIES PURCHASE AGREEMENT**

among

**IGNITE ACQUISITION SUB, LLC**

*as the Buyer*

**NEW DALTON HOLDINGS CORPORATION**

*as the Company,*

**NEW DALTON FOUNDRY, LLC**

*as the Seller*

*and*

**SPEYSIDE EQUITY FUND I, LP**

*as Speyside*

Dated as of November 10, 2023

CONFIDENTIAL

## TABLE OF CONTENTS

Page

ARTICLE I       DEFINITIONS............................................................................................ 1

    Section 1.1        Certain Defined Terms ............................................................... 1

    Section 1.2        Table of Definitions................................................................... 12

ARTICLE II      PURCHASE AND SALE; CLOSING ..................................................... 13

    Section 2.1        Purchase and Sale ...................................................................... 13

    Section 2.2        Purchase Price............................................................................ 13

    Section 2.3        Closing....................................................................................... 14

    Section 2.4        Delivery of Closing Estimates................................................... 14

    Section 2.5        Seller and Company Closing Deliverables................................. 14

    Section 2.6        Buyer Closing Deliverables....................................................... 16

    Section 2.7        Payments at Closing .................................................................. 16

    Section 2.8        Post-Closing Adjustment........................................................... 17

    Section 2.9        Withholding................................................................................ 18

ARTICLE III     REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE
SELLER AND SPEYSIDE ...................................................................... 18

    Section 3.1        Authorization ............................................................................. 18

    Section 3.2        No Violation ............................................................................... 18

    Section 3.3        Consents and Approvals ............................................................ 19

    Section 3.4        Title to Securities....................................................................... 19

    Section 3.5        Litigation ................................................................................... 19

    Section 3.6        No Brokers or Finders ............................................................... 19

    Section 3.7        No Other Representations and Warranties ................................. 19

ARTICLE IV      REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE
ACQUIRED COMPANIES ...................................................................... 19

    Section 4.1        Organization and Qualification; Authorization .......................... 19

    Section 4.2        No Violation ............................................................................... 20

    Section 4.3        Consents and Approvals ............................................................ 21

    Section 4.4        Capitalization ............................................................................. 21

    Section 4.5        Financial Statements; Accounting and Internal Controls ............ 21

    Section 4.6        Absence of Undisclosed Liabilities ........................................... 22

    Section 4.7        Accounts and Notes Receivable; Accounts Payable.................... 22

    Section 4.8        Inventory.................................................................................... 22

    Section 4.9        Absence of Changes or Events ................................................... 22

    Section 4.10       Assets......................................................................................... 22

i

TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| Section 4.11 | Proprietary Rights | 23 |
| Section 4.12 | Contracts | 25 |
| Section 4.13 | Litigation | 27 |
| Section 4.14 | Compliance with Laws | 27 |
| Section 4.15 | Licenses and Permits | 27 |
| Section 4.16 | Health, Safety and Environment | 27 |
| Section 4.17 | Taxes | 28 |
| Section 4.18 | Employee Benefit Plans | 31 |
| Section 4.19 | Employees; Labor Relations | 33 |
| Section 4.20 | Related Party Transactions | 35 |
| Section 4.21 | Real Property | 35 |
| Section 4.22 | Suppliers and Customers | 36 |
| Section 4.23 | Insurance Policies | 36 |
| Section 4.24 | Bank Accounts | 37 |
| Section 4.25 | Trade Names; Business Locations | 37 |
| Section 4.26 | Products | 37 |
| Section 4.27 | [reserved] | 37 |
| Section 4.28 | Anticorruption; Improper Payments | 37 |
| Section 4.29 | International Trade Laws | 38 |
| Section 4.30 | No Brokers or Finders | 38 |
| Section 4.31 | No Other Representations and Warranties | 38 |
| **ARTICLE V** | **REPRESENTATIONS AND WARRANTIES OF THE BUYER** | **38** |
| Section 5.1 | Organization; Authorization | 38 |
| Section 5.2 | No Violation | 38 |
| Section 5.3 | Consents and Approvals | 39 |
| Section 5.4 | Litigation | 39 |
| Section 5.5 | Investment Intent; Experience | 39 |
| Section 5.6 | No Brokers or Finders | 39 |
| Section 5.7 | Non-Reliance | 39 |
| **ARTICLE VI** | **[RESERVED]** | **39** |
| **ARTICLE VII** | **OTHER COVENANTS AND AGREEMENTS** | **39** |
| Section 7.1 | Restrictive Covenants | 39 |
| Section 7.2 | Agreements Regarding Tax Matters | 41 |

ii

CONFIDENTIAL

FBG_CH1_00095669

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| Section 7.3 | [Reserved] | 43 |
| Section 7.4 | Further Assurances | 43 |
| Section 7.5 | Intercompany Arrangements | 44 |
| Section 7.6 | General Release | 44 |
| Section 7.7 | Public Announcements | 44 |
| Section 7.8 | Directors and Officers Indemnification and Insurance | 45 |
| Section 7.9 | Section 280G | 45 |
| Section 7.10 | Documents and Information | 46 |
| Section 7.11 | Motor Castings Spinoff | 46 |
| **ARTICLE VIII** | **[Reserved]** | **46** |
| **ARTICLE IX** | **[RESERVED]** | **46** |
| **ARTICLE X** | | Error! Bookmark not defined. |
| Section 10.1 | Survival | 47 |
| Section 10.2 | Indemnification by the Seller | 47 |
| Section 10.3 | Indemnification by the Buyer | 48 |
| Section 10.4 | Indemnification Procedure | 48 |
| Section 10.5 | Certain Limitations | 50 |
| Section 10.6 | Materiality Qualifiers | 51 |
| Section 10.7 | Indemnification as Sole Remedy | 51 |
| Section 10.8 | Prevailing Party | 51 |
| Section 10.9 | Waiver of Contribution | 51 |
| Section 10.10 | Tax Treatment of Payments | 52 |
| **ARTICLE XI** | **MISCELLANEOUS** | **52** |
| Section 11.1 | Notices | 52 |
| Section 11.2 | Expenses | 52 |
| Section 11.3 | Entire Agreement | 52 |
| Section 11.4 | No Third-Party Beneficiaries | 53 |
| Section 11.5 | Assignments | 53 |
| Section 11.6 | Amendment; Waiver | 53 |
| Section 11.7 | Agreement Controls | 53 |
| Section 11.8 | Severability | 53 |
| Section 11.9 | Governing Law | 53 |
| Section 11.10 | Consent to Jurisdiction; Service of Process; Waiver of Jury Trial | 54 |

CONFIDENTIAL

FBG_CH1_00095670

## TABLE OF CONTENTS

**Page**

Section 11.11      Admissibility into Evidence ............................................................ 54

Section 11.12      Specific Performance ..................................................................... 55

Section 11.13      Other Remedies ............................................................................. 55

Section 11.14      No Recourse Against the Buyer or Seller Affiliates ...................... 55

Section 11.15      Rules of Construction .................................................................... 55

Section 11.16      Counterparts; Deliveries ................................................................ 57

Section 11.17      Waiver of Conflicts ....................................................................... 57

Section 11.18      EXCLUSIVITY OF REPRESENTATIONS AND WARRANTIES ............ 58

Section 11.19      Disclosure Schedules ..................................................................... 58

iv

CONFIDENTIAL

FBG_CH1_00095671

## SECURITIES PURCHASE AGREEMENT

This SECURITIES PURCHASE AGREEMENT (this "**Agreement**"), dated as of November 10, 2023, is among IGNITE ACQUISITION SUB, LLC, a Delaware limited liability company (the "**Buyer**"), NEW DALTON HOLDINGS CORPORATION a Delaware corporation (the "**Company**"), NEW DALTON FOUNDRY, LLC, a Delaware limited liability company (the "**Seller**") and SPEYSIDE EQUITY FUND I, LP, a Delaware limited partnership (the "**Speyside**").

### RECITALS

A.     The Seller owns all outstanding shares of capital stock of the Company (the "**Securities**").

B.     Speyside is the beneficial owner of the membership interests of Seller and will derive substantial benefit from the transactions contemplated herein and is joining into this Agreement to stand behind the representations and warranties regarding the Acquired Companies in Article IV and the identified obligations in Article X.

C.     The Seller desires to sell the Securities to the Buyer, and the Buyer desires to purchase the Securities from the Seller, free and clear of any and all Liens.

### AGREEMENT

In consideration of the foregoing and the mutual representations, warranties, covenants and agreements contained herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.1     Certain Defined Terms**.  For purposes of this Agreement:

"**Accounting Principles**" means the accounting methods, policies, principles, practices, procedures, methodologies and assumptions used in the calculation of the Net Working Capital Target set forth on Exhibit A.

"**Acquired Companies**" means, collectively, the Company and each of its direct and indirect Subsidiaries, including Dalton Corporation, an Indiana corporation, Dalton Corporation, Ashland Manufacturing Facility, an Ohio corporation, Dalton Corporation, Kendallville Manufacturing Facility, an Indiana corporation, Dalton Corporation, Stryker Machining Facility Co., an Ohio corporation and Dalton Corporation, Warsaw Manufacturing Facility, an Indiana corporation, and "**Acquired Company**" means each of such entities individually.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person.  As used herein, the term "control" means (a) the power to vote at least 50% of the voting power of a Person, or (b) the possession, directly or indirectly, of any other power to direct or cause the direction of the management and policies of such a Person, whether through ownership of voting securities, by contract or otherwise.

1

FBG_CH1_00095672

"**Affiliated Group**" means an affiliated group as defined in Section 1504 of the Code (or analogous combined, consolidated or unitary group defined under state, local or foreign income Tax Law).

"**Affordable Care Act**" means the Patient Protection & Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, as amended and as interpreted in applicable administrative guidance and the rules and regulations issued thereunder.

"**Ancillary Agreements**" means the Escrow Agreement, and the Distribution Agreement.

"**Attorney-Client Communication**" means any communication occurring on or prior to the Closing between Law Firm, on the one hand, and the Seller, Speyside, any Acquired Company or any of their respective Affiliates, on the other hand, relating to the transactions contemplated hereby (including the negotiation, preparation, execution and delivery of this Agreement and related agreements, and the consummation of the transactions contemplated hereby), including such communications relating to any representation, warranty or covenant of any party under this Agreement or any related agreement.

"**Balance Sheet Date**" means June 30, 2023.

"**Base Purchase Price**" means $45,000,000.

"**Business**" means the business of owning and operating a gray iron foundry and machining operations related to the same.

"**Business Day**" means a day other than Saturday, Sunday or any other day on which banks in Ohio and/or Indiana are required or authorized to be closed.

"**Buyer Certificate**" means a certificate in form and substance reasonably satisfactory to the Seller, dated as of the Closing Date and duly executed and delivered by the Buyer, certifying as to the accuracy of the representations and warranties set forth in Article V of this Agreement.

"**Buyer Indemnified Parties**" means, the Buyer, the Acquired Companies and the Buyer's other Affiliates and their respective equity holders, officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors and other agents.

"**Calculation Time**" means 11:59 p.m., Eastern time, on the Closing Date.

"**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act.

"**Cash**" means the aggregate amount of all cash and cash equivalents of the Acquired Companies (including marketable securities, short term investments, liquid instruments, petty cash, deposits in transit to the extent there has been a reduction of receivables on account therefor, the amount of any received and uncleared checks, wires or drafts, and reduced by the amount of any issued but uncleared checks, wires or drafts).

"**Castech**" means Castech, Inc., a Wisconsin corporation.

"**Closing Date Cash**" means the Cash other than (a) Cash held outside the U.S. that would be subject to taxation or limitation in the event such Cash is transferred into the U.S. and (b) Cash restricted from use except for a contractually specified purpose or used as collateral for, or otherwise to provide credit support for, any liabilities of any Person under any letter of credit or other Contract, in each case of the Acquired Companies as of the Calculation Time and without giving effect to the transactions contemplated

2

FBG_CH1_00095673

**DEBTORS' EXHIBIT NO. 98**
**Page 7 of 99**

herein and determined in accordance with GAAP using, to the extent in accordance with GAAP, the same accounting methods, principles, policies, practices and procedures, with consistent classifications, judgments and estimation methodology, as were used in the determination of the current assets or current liabilities, as applicable, in the preparation of the Balance Sheet.

"**Closing Date Indebtedness**" means the Indebtedness of the Acquired Companies as of immediately prior to the Closing without giving effect to the transactions contemplated herein.

"**Closing Date Indebtedness Schedule**" means a written schedule, in form and substance reasonably satisfactory to the Buyer, setting forth (a) the name of each holder of Closing Date Indebtedness (other than any Closing Date Indebtedness set forth in clauses (n) and (o) of Indebtedness), (b) the amount due to such holder as set forth in the applicable Payoff Letter and (c) such holder's bank account information as set forth in the applicable Payoff Letter, delivered to the Buyer in accordance with Section 2.5(e).

"**Closing Date Seller Transaction Expenses**" means the Seller Transaction Expenses as of immediately prior to the Closing (but calculated assuming that the Closing has occurred such that the Seller Transaction Expenses triggered by the Closing are included in the Closing Date Seller Transaction Expenses).

"**Closing Date Seller Transaction Expenses Schedule**" means a written schedule, in form and substance reasonably satisfactory to the Buyer, setting forth (a) the name of each Closing Date Seller Transaction Expense payee, (b) the amount due to such payee as set forth in the applicable invoice and (c) such payee's bank account information as set forth in the applicable invoice, delivered to the Buyer in accordance with Section 2.5(g).

"**COBRA**" means Section 4980B of the Code and Part 6 of Title I of ERISA (or any successor provisions thereto) and the rules and regulations promulgated thereunder.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreement**" means any Contract or other agreement or understanding with a labor union or labor organization or other employee representative.

"**Confidential Information**" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, of any Acquired Company, including all information concerning finances, customer information, supplier information, products, services, prices, organizational structure and internal practices, forecasts, sales and other financial results, records and budgets, and business, marketing, development, sales and other commercial strategies, unpatented inventions, ideas, methods and discoveries, trade secrets, know-how, unpublished patent applications and other confidential intellectual property, designs, specifications, documentation, components, source code, object code, schematics, drawings, protocols and processes. Confidential Information shall not include any information that is or becomes generally known to and available for use by the public other than as a result of any acts or omissions of the Seller or any of its Affiliates.

"**Contracts**" means all contracts, agreements, licenses, indentures, notes, bonds, instruments, leases, mortgages, sales orders, purchase orders, arrangements, commitments, obligations and other understandings or undertakings of any nature, in any case whether written or oral, as well as any bids or proposals which if accepted would result in a binding contract, and all amendments, restatements, supplements or other modifications thereto or waivers thereunder.

3

CONFIDENTIAL

FBG_CH1_00095674

"**Dalton 401(k) Plans**" means collectively each of the Dalton Corporation 401(k) Plan and Dalton Corporation Hourly 401(k) Retirement Savings Plan.

"**Employee Pension Benefit Plan**" means an "employee pension benefit plan" (as defined in Section 3(2) of ERISA whether or not subject to ERISA).

"**Employee Welfare Benefit Plan**" means an "employee welfare benefit plan" (as defined in Section 3(1) of ERISA whether or not subject to ERISA).

"**Environmental and Safety Requirements**" means any Law that is related to (a) pollution, contamination, cleanup, preservation, protection, reclamation or remediation of the environment, (b) health or safety, (c) the Release or threatened Release of any Hazardous Material, including investigation, study, assessment, testing, monitoring, containment, removal, remediation, response, cleanup, abatement, prevention, control or regulation of such Release or threatened Release, or (d) the management of any Hazardous Material, including the manufacture, generation, formulation, processing, labeling, use, treatment, handling, storage, disposal, transportation, distribution, re-use, recycling or reclamation of any Hazardous Material; and includes, but is not limited to, the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6091 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Clean Water Act (33 U.S.C. § 7401 et seq.), the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), the Toxic Substance Control Act (15 U.S.C. § 2601 et seq.) and the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.).

"**Equity Securities**" means, if a Person is a corporation, shares of capital stock of such corporation and, if a Person is a form of entity other than a corporation, ownership interests in such form of entity, whether membership interests, partnership interests or otherwise.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations issued thereunder.

"**ERISA Affiliate**" means any Acquired Company, the Seller and any predecessor of any Acquired Company and the Seller and any other Person who constitutes or has constituted all or part of a controlled group or had been or is under common control with, or whose employees were or are treated as employed by any Acquired Company and the Seller and/or any predecessor of an Acquired Company and the Seller, under Section 414 of the Code or Section 3(40)(B)(ii) or 4001(b) of ERISA.

"**Event**" means any event, change, development, effect, condition, circumstance, matter, occurrence or state of facts.

"**Fraud**" means an actual and intentional fraud committed by a Party in making the representations and warranties set forth in Article III, Article IV or Article V of this Agreement, as applicable, with specific intent to deceive and mislead another Party.

"**Fundamental Representations**" means, collectively, the representations and warranties contained in Section Section 3.1 (Authorization), Section Section 3.2 (No Violation), Section Section 3.4 (Title to Securities), Section Section 3.6 (No Brokers or Finders), Section Section 4.1 (Organization and Qualification; Authorization), Section Section 4.4 (Capitalization), Section Section 4.10(a) (Assets), Section Section 4.16(j) (Taxes), Section Section 4.20 (Related Party Transactions), Section Section 4.30 (No Brokers or Finders), Section Section 5.1 (Organization; Authorization), Section Section 5.2 (No Violation) and Section Section 5.66 (No Brokers or Finders).

4

CONFIDENTIAL

FBG_CH1_00095675

"**GAAP**" means U.S. generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants.

"**Governmental Authority**" means any court, tribunal, arbitrator, authority, agency, commission, bureau, board, department, official, body or other instrumentality of the United States, any foreign country, or any domestic or foreign state, province, county, city, other political subdivision or any other similar body or organization exercising governmental or quasi-governmental power or authority.

"**Government Official**" means, collectively, any officer or employee of a Governmental Authority, any Person acting for or on behalf of any Governmental Authority, any political party or official thereof and any candidate for political office.

"**Hazardous Material**" means (a) hazardous substances, as defined by the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (b) hazardous wastes, as defined by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., (c) petroleum, including crude oil or any fraction thereof which is liquid at standard conditions of temperature and pressure, (d) radioactive material, including any source, special nuclear, or by-product material as defined in 42 U.S.C. § 2011 et seq., (e) asbestos that is friable or would reasonably be likely to become friable, (f) polychlorinated biphenyls, (g) microbial matter, biological toxins, mycotoxins, mold or mold spores and (h) other material, substance or waste to which liability or standards of conduct may be imposed, or which requires or may require investigation, under any applicable Law that is related to pollution, contamination, cleanup, preservation, protection, reclamation or remediation of the environment, health, or safety.

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1986, as amended and the rules and regulations issued thereunder.

"**Improper Payment Laws**" means the United States Foreign Corrupt Practices Act of 1977, any legislation implementing the Organisation for Economic Cooperation and Development Convention on Combating Bribery of Foreign Official in International Business Transactions, and any other applicable Law regarding anti-bribery or illegal payments or gratuities.

"**Income Tax Liability**" means, with respect to any jurisdiction, an amount equal to the liability for Income Taxes of the Acquired Companies unpaid as of the Closing Date that are first due after the Closing Date with respect to such jurisdiction computed for each Pre-Closing Tax Period.

"**Income Tax Liability Accrual**" means an amount equal to the sum of (a) an amount (which amount shall not be less than zero for any taxpayer in any jurisdiction for any taxable period or portion thereof) equal to the sum of the Income Tax Liability separately calculated for (i) each jurisdiction in which any Acquired Company filed an Income Tax Return for the last Tax year for which an Income Tax Return was due in such jurisdiction (taking into account any applicable extensions) and (ii) each jurisdiction in which any Acquired Company commenced activities after the end of such Tax year, and (b) an amount equal to the product of (i) 28% and (ii) any amounts not included in taxable income in Pre-Closing Tax Periods by any Acquired Company pursuant to Rev. Proc. 2004-34 or Section 451(c) of the Code. The Income Tax Liability Accrual shall (y) include any Taxes payable by the Acquired Companies with respect to any income included pursuant to Section 965 of the Code and (z) be determined by including in income for Pre-Closing Tax Periods any income includable by the Acquired Companies pursuant to Sections 951 and 951A of the Code with respect to Pre-Closing Tax Periods (determined, in the case of any CFC giving rise to such income whose taxable year includes but does not end on the Closing Date, as if such taxable year ended on the Closing Date without offsetting such income for such taxable year by any loss or other

5

DEBTORS' EXHIBIT NO. 98
Page 10 of 99

Tax attribute from a Pre-Closing Tax Period except to the extent such loss or other Tax attribute is available in taxable periods (or portions thereof) beginning after the Closing Date).

"**Income Tax Return**" means a Tax Return filed or required to be filed in connection with the determination, assessment or collection of any Income Tax of any party or the administration of any laws, regulations or administrative requirements relating to any Income Tax.

"**Income Taxes**" means Taxes (a) imposed on, or with reference to, net income or gross receipts, or (b) imposed on, or with reference to, multiple bases including net income or gross receipts.

"**Indebtedness**" means, with respect to each Acquired Company, (a) all obligations for borrowed money or extensions of credit, (b) all obligations evidenced by bonds, debentures, notes or other similar instruments, commercial paper or debt securities, (c) all obligations under swaps, hedges, caps, collars, options, futures or similar instruments, (d) all obligations for the deferred purchase price of any property or services (other than trade accounts payable, accrued expenses or current liabilities incurred in the ordinary course of business and reflected as accounts payable, accrued expenses or current liabilities in the Net Working Capital as finally determined pursuant to Section 2.8), including earnouts, payments under non-compete agreements and seller notes, (e) all obligations created or arising under any conditional sale or other title retention agreement, (f) all obligations secured by a Lien of record, (g) all obligations under leases which shall have been or should be, in accordance with GAAP, recorded as capital leases (excluding real property leases), (h) all obligations in respect of bankers' acceptances, surety bonds, performance bonds or letters of credit, excluding the Surety Bonds (in all cases, to the extent drawn), (i) all obligations of any Person other than another Acquired Company as described in respect of any item listed in clauses (a) through (h) above which are directly or indirectly guaranteed by such Acquired Company, (j) all interest, principal, prepayment penalties, premiums, fees or expenses due or owing in respect of any item listed in clauses (a) through (i) above, (k) all obligations with respect to any deferred compensation earned by any current or former employee for and all Taxes that are payable by any Acquired Company in connection with or as a result of the payment of such obligations, (l) the Income Tax Liability Accrual, and (m) any "applicable employment taxes" (as defined in Section 2302 of the CARES Act) unpaid as of the Closing Date that would have been due on or before the Closing Date but for Section 2302(a)(1) of the CARES Act. For the avoidance of doubt, Indebtedness shall not include any obligations or liabilities (including the penal sum) of the Surety Bonds.

"**Intellectual Property**" means, collectively, in the United States and all countries or jurisdictions foreign thereto, (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all Patents, (b) all Trademarks, all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all moral rights, copyrights and other rights in any work of authorship, compilation, derivative work or mask work and all applications, registrations, and renewals in connection therewith, (d) all trade secrets and confidential business information (including confidential ideas, research and development, know-how, methods, formulas, compositions, manufacturing and production processes and techniques, technical and other data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (e) Software, (f) all other proprietary and intellectual property rights, (g) all copies and tangible embodiments of any of the foregoing (in whatever form or medium), (h) the exclusive right to display, perform, reproduce, make, use, sell, distribute, import, export and create derivative works or improvements based on any of the foregoing and (i) all income, royalties, damages and payments related to any of the foregoing (including damages and payments for past, present or future infringements, misappropriations or other conflicts with any intellectual property), and the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any intellectual property.

CONFIDENTIAL

FBG_CH1_00095677

"**International Trade Laws**" means any applicable (a) Sanctions, (b) U.S. export control Laws (including the International Traffic in Arms Regulations (22 CFR §§ 120-130, as amended)), the Export Administration Regulations (15 CFR §§ 730-774, as amended) and any regulation, order, or directive promulgated, issued or enforced pursuant to such laws, (c) laws pertaining to imports and customs, including those administered by the Bureau of Customs and Border Protection in the U.S. Department of Homeland Security (and any successor thereof) and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, (d) the anti-boycott laws administered by the U.S. Department of Commerce and the U.S. Department of the Treasury and (e) export, import and customs Laws of other countries in which the Acquired Companies have conducted and/or currently conduct business.

"**Kendallville Bond**" means Surety Bond (bond number: SBP150085_002), dated April 5, 2023, by and between Dalton Corporation and Pennsylvania Insurance Company.

"**Knowledge**" means, when referring to the "knowledge" of the Company or the Seller, or any similar phrase or qualification based on knowledge of the Company or the Seller, (a) the actual knowledge of Jacob Yahne, David Roycraft or Jeffrey Stone and (b) the knowledge that any such person referenced in clause (a) above, as a prudent business person, would have obtained after making reasonable inquiry with respect to the particular matter in question.

"**Law**" means the common law of any state or other jurisdiction, or any provision of any foreign, federal, state or local law, statute, code, rule, regulation, Order, certification standard, accreditation standard, Permit, judgment, regulatory code of practice, statutory guidance, injunction, decree or other decision of any court or other tribunal or Governmental Authority.

"**Liabilities**" means any Indebtedness, liabilities, demands, commitments or obligations of any nature whatsoever, whether accrued or unaccrued, absolute or contingent, direct or indirect, asserted or unasserted, fixed or unfixed, known or unknown, choate or inchoate, perfected or unperfected, liquidated or unliquidated, secured or unsecured, or otherwise, whether due or to become due, whether arising out of any Contract or tort based on negligence or strict liability and whether or not the same would be required by GAAP to be stated in financial statements or disclosed in the notes thereto, and however arising and including all fees, costs and expenses related thereto.

"**Liens**" means all liens, security interests, claims, mortgages, deeds of trust, preemptive rights, leases, charges, options, rights of first refusal, easements, proxies, voting trusts or agreements, transfer restrictions, pledges, assessments, covenants, burdens and other encumbrances of every kind, including restrictions on voting or use.

"**Losses**" means any and all Liabilities, losses, damages, judgments, awards, settlements, royalties, diminution in value, interest, penalties, fines, Taxes, demands, Proceedings, claims, deficiencies, costs and expenses of any kind (including reasonable fees and expenses of attorneys, accountants and other experts paid in connection with the investigation or defense of any of the foregoing or any Proceeding relating to any of the foregoing).

"**Management Services Agreements**" means that certain Management Services Agreement, dated October 18, 2018, by and between Dalton Corporation and Krishnan Venkatesan together with that certain Management Services Agreement, dated October 18, 2018, by and between Dalton Corporation and BC General Partners LLC, and "**Management Services Agreement**" means each such agreement individually.

"**Material Adverse Effect**" means (a) any Event that, individually or in combination with any other Events, has had or would reasonably be expected to have a material adverse effect on the business, condition (financial or otherwise), assets, liabilities or results of operation of the Acquired Companies taken as a

7

FBG_CH1_00095678

whole, whether or not foreseeable and whether or not durationally significant, provided that any effect resulting from any of the following shall not be considered when determining whether a Material Adverse Effect shall have occurred: (i) changes in general economic conditions, or (ii) acts of terrorism, armed hostilities or war, except, with respect to clauses (i) and (ii), to the extent that the Acquired Companies are disproportionately impacted by such Events in comparison to others in the industry in which they operate, (b) any Event that prevents or materially delays, or would be reasonably expected to prevent or materially delay, consummation of the transactions contemplated hereby or the performance by the Company or the Seller of any of their material obligations under this Agreement or any of the Ancillary Agreements, or (c) any Event that materially impairs, or would reasonably be expected to impair, the ability of the Acquired Companies to continue operating the Business after the Closing in substantially the same manner as it was operated immediately prior to the date of this Agreement.

"**Motor Castings**" means Motor Castings Company, a Wisconsin corporation.

"**Motor Castings Companies**" means Motor Castings together with Castech.

"**Multiemployer Plan**" means a "multiemployer plan" within the meaning of Section 3(37) or 4001(a)(3) of ERISA whether or not subject to ERISA.

"**Multiple Employer Plan**" means a "multiple employer plan" within the meaning of ERISA Section 4063 or 4064 or Code Section 413(c) whether or not subject to ERISA

"**Multiple Employer Welfare Arrangement**" means a "multiple employer welfare arrangement" within the meaning of ERISA Section 3(40) whether or not subject to ERISA.

"**Net Working Capital**" means the difference, as of the Calculation Time, between (a) the book value of the current assets of the Acquired Companies on a consolidated basis that comprise the balance sheet line items included in the calculation of Net Working Capital Target set forth on Exhibit A minus (b) the book value of the current liabilities of the Acquired Companies on a consolidated basis that comprise the balance sheet line items included in the calculation of Net Working Capital Target set forth on Exhibit A, in each case, (i) prepared in accordance with the Accounting Principles and without giving effect to the consummation of the transactions contemplated by this Agreement and (ii) excluding any assets or liabilities with respect to Cash, Indebtedness, Seller Transaction Expenses or Income Taxes.

"**Net Working Capital Target**" means $8,721,820, the calculation of which is set forth on Exhibit A.

"**Order**" means any order, judgment, ruling, injunction, award, stipulation, assessment, decree or writ, whether preliminary or final, of any Governmental Authority.

"**Party**" means any party to this Agreement.

"**Patents**" means all letters patent and pending applications for patents of the United States and all countries and jurisdictions foreign thereto and all reissues, reexamined patents, divisions, continuations, continuations-in-part, revisions, and extensions thereof.

"**Permits**" means permits, licenses, registrations, consents, certificates, grants, waivers, qualifications, approvals and all other authorizations by or of Governmental Authorities.

"**Permitted Lien**" means (a) Liens for Taxes not yet due and payable, or for Taxes being contested in good faith by appropriate proceedings as set forth on Schedule Section 1.1(b) and for which appropriate

8

FBG_CH1_00095679

reserves have been accrued for in the Net Working Capital as of the Closing Date, (b) statutory Liens of landlords for amounts not yet due and payable, (c) Liens of carriers, warehousemen, mechanics and materialmen incurred in the ordinary course of business, (d) Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, (e) in the case of the Securities, restrictions arising under applicable securities Laws, but in each such case excluding any Lien with respect to any Employee Benefit Plan, (f) easements, rights of way, zoning ordinances, and other similar encumbrances affecting Real Property, (g) other imperfections of title or Liens, if any, that are not material to the operation of the Acquired Companies (taken as a whole), and (h) the Liens set forth on Schedule 1.1(b).

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated association, corporation, firm or other entity or any Governmental Authority.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period including and ending on the end of the Closing Date.

"**Proceeding**" means any suit, action, cause of action, litigation, hearing, inquiry, examination, demand, proceeding, controversy, complaint, appeal, notice of violation, citation, summons, subpoena, arbitration, mediation, dispute, claim, allegation, investigation or audit of any nature whether civil, criminal, quasi criminal, indictment, administrative, regulatory or otherwise and whether at Law or in equity.

"**Purchase Price Adjustment**" means the amount obtained by subtracting (a) the amount of the Closing Payment as determined pursuant to Section Section 2.7, from (b) the amount that the Closing Payment would have been had it been calculated using the amounts of the Closing Date Cash, the Closing Date Indebtedness, the Closing Date Seller Transaction Expenses and the Net Working Capital as finally determined pursuant to Section Section 2.8.

"**Related Party**" means the Seller, Speyside, each officer or director of Speyside and its Affiliates (in all cases, other than an Acquired Company).

"**Related Party Transaction**" means any Contract or transaction between an Acquired Company, on the one hand, and any Related Party, on the other hand.

"**Release**" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping into the indoor or outdoor environment.

"**Sanctions**" means economic or financial sanctions, requirements or trade embargoes imposed, administered or enforced from time to time by U.S. Governmental Authorities (including the Office of Foreign Assets Control ("**OFAC**"), the U.S. Department of State and the U.S. Department of Commerce), the United Nations Security Council, the European Union, Her Majesty's Treasury or any other relevant Governmental Authority.

"**Seller Certificate**" means a certificate in form and substance reasonably satisfactory to the Buyer, dated as of the Closing Date and duly executed and delivered by the Seller and the Company, certifying (a) as to the accuracy of the representations and warranties set forth in Article III and Article IV of this Agreement, and (b) that attached thereto are (i) true, complete and accurate copies of the organizational documents of each Acquired Company (and the certificate of incorporation or comparable organizational document of each Acquired Company shall also be certified as of a recent date by the Secretary of State or comparable Governmental Authority of its jurisdiction of organization), (ii) a true, complete and accurate copy of resolutions duly adopted by the board of directors (or comparable governing body) of the Seller

9

CONFIDENTIAL

FBG_CH1_00095680

and the Seller's requisite stockholders, which authorize and approve the execution, delivery and performance by the Seller of this Agreement and the Ancillary Agreements to which the Seller is a party and (iii) a true, complete and accurate copy of resolutions duly adopted by the board of directors (or comparable governing body) of the Company of this Agreement and each Ancillary Agreement to which the Company is a party.

"**Seller Indemnified Parties**" means the Seller and the equity holders, officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors and other agents of the Seller.

"**Seller Taxes**" means any Taxes (a) imposed on the Seller for any taxable period, (b) imposed on or with respect to any Acquired Company or its assets or operations for any Pre-Closing Tax Period, (c) imposed in connection with the transactions contemplated by this Agreement (except for any Transfer Taxes that are the responsibility of Buyer), (d) of any Person other than any Acquired Company imposed on any Acquired Company as a result of being a member of any Affiliated Group on or before the Closing Date pursuant to Treasury Regulation Section 1.1502-6 or any similar state, local, or foreign Law, (e) imposed on the Buyer as a transferee or successor of the Seller, (f) imposed on income of the Acquired Companies from Pre-Closing Tax Periods includible by Buyer or any of its Affiliates pursuant to Sections 951, 951A or 965 of the Code (assuming for this purpose that the taxable year of any CFC that includes the Closing Date ends on the end of the Closing Date), or (g) of any Person for which any Acquired Company becomes liable as a transferee or successor, by Contract (including any Tax sharing, Tax indemnity, or Tax allocation agreement or any other agreement to indemnify any other Person for Taxes), pursuant to any law, or otherwise, to the extent such Taxes relate to an event or transaction occurring on or before the Closing Date.

"**Seller Transaction Expenses**" means (a) all of the fees, costs and expenses incurred by the Seller or Acquired Company in connection with the transactions contemplated by this Agreement or any Ancillary Agreement or any transaction or series of transactions similar to such transactions, including all fees, costs and expenses payable to attorneys, financial advisors, accountants, consultants or other advisors, and all obligations under any engagement letter or other agreement or understanding with any investment banker or broker, including Angle Advisors, LLC, and (b) all obligations that are payable in whole or in part as a result of the consummation of the transactions contemplated by this Agreement under any Contract or Employee Benefit Plan in effect on or before the Closing Date, including all change of control, severance, retention, stock appreciation, phantom stock or similar obligations or any other accelerations of or increases in rights or benefits, and all Taxes that are payable in connection with or as a result of the satisfaction of such obligations or in connection with the cash-out of any options.

"**Service Provider**" means each director, officer, employee, manager, independent contractor, consultant, leased employee or other service provider of the Acquired Companies.

"**Software**" means all websites, computer software and firmware (including source code, executable code, data, databases, user interfaces and related documentation).

"**Straddle Period**" means any taxable period that begins on or before and ends after the Closing Date.

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority

10

CONFIDENTIAL

of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association, or other business entity gains or losses, or shall have the right or sufficient voting interests to designate or elect either (i) a majority of the Persons serving as managers or (ii) the sole manager, managing director or general partner of such entity.

"**Surety Bonds**" means collectively, the Kendallville Bond and the Warsaw Bond.

"**Tax**" means (a) any and all multi-national, U.S. federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, entertainment, amusement, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, ad valorem, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, composite, healthcare, escheat or unclaimed property or other tax of any kind whatsoever, including any interest, penalties or additions to Tax, or any penalties resulting from any failure to file or timely file a Tax Return; (b) liability for the payment of any amounts of the type described in clause (a) above of another Person arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto); and (c) liability for the payment of any amounts of the type described in clause (a) above of another Person as a result of any transferee or secondary liability or any liability assumed by Contract, Law, or otherwise.

"**Tax Returns**" means returns, declarations, reports, notices, forms, claims for refund, information returns or other documents (including any related or supporting schedules, statements or information, and including for the avoidance of doubt all Forms 1099, FinCEN Form 114, Form TD F 90-22.1 and any predecessor or successor forms thereto) filed or required to be filed with any Governmental Authority, or maintained by any Person, or required to be maintained by any Person, in connection with the determination, assessment or collection of any Tax of any party or the administration of any Laws, regulations or administrative requirements relating to any Tax.

"**Title IV Plan**" means an employee benefit plan subject to Section 302 or Title IV of ERISA or Code Section 412, 413, or 430.

"**Trademarks**" means, in the United States and all countries and jurisdictions foreign thereto, registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, registered trade names and unregistered trade names, corporate names, fictitious names, registered trade dress and unregistered trade dress, logos, slogans, Internet domain names, rights in telephone numbers, and other indicia of source, origin, endorsement, sponsorship or certification, together with all translations, adaptations, derivations, combinations and renewals thereof.

"**Transaction Tax Deductions**" means the aggregate amount of (a) all bonuses and other payments payable by the Acquired Companies to any director, officer or employee of the Acquired Companies solely in connection with the consummation of the transactions contemplated by this Agreement, including any deferred compensation payments made or to be made by the Acquired Companies in connection with or resulting from the Closing, including the amount of any employment Taxes with respect to such bonuses and payments, (b) all fees, expenses and interest (including amounts treated as interest for federal income Tax purposes) and any breakage fees or accelerated deferred financing fees incurred by the Acquired Companies with respect to the payment of Indebtedness in connection with the Closing, in each case, that would be deductible after taking into account Section 163(j) of the Code, and (c) all fees and expenses of

11

CONFIDENTIAL

FBG_CH1_00095682

the Acquired Companies incurred in connection with the negotiation and execution of this Agreement and the consummation of the transactions contemplated hereby including any investment banking, legal, accounting and other professional fees.

"**Treasury Regulations**" means the Treasury Regulations promulgated under the Code.

"**U.S.**" or "**United States**" means the United States of America.

"**VEBA**" means a "voluntary employees' beneficiary association" within the meaning of Code Section 501(c)(9).

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended and any similar Law.

"**Warsaw Bond**" means Surety Bond (bond number: SBP150085_001), dated March 16, 2023, by and between Dalton Corporation and Pennsylvania Insurance Company.

**Section 1.2** **Table of Definitions**.  The following terms have the meanings set forth in the locations in this Agreement referenced below:

| Term | Location |
|---|---|
| Accountant | Section 2.8(c) |
| Agreement | Preamble |
| AJCA | Section 4.17(r) |
| Arbitration | Section 11.10(a) |
| Assets | Section 4.10(a) |
| Balance Sheet | Section 4.5(a)(ii) |
| Basket Amount | Section 10.5(a) |
| Buyer | Preamble |
| Buyer Closing Deliverables | Section 2.6 |
| Cap | Section 10.5(c) |
| CFC | Section 4.17(p) |
| Closing | Section 2.3 |
| Closing Date | Section 2.3 |
| Closing Payment | Section 2.7(a) |
| Closing Statement | Section 2.8(a) |
| Company | Preamble |
| Company Intellectual Property | Section 4.11(c) |
| Disclosure Schedules | Article IV |
| Employee Benefit Plan | Section 4.18(a) |
| Employee Benefit Plans | Section 4.18(a) |
| Escrow Agent | Section 2.7(c) |
| Escrow Agreement | Section 2.7(c) |
| Escrow Funds | Section 2.7(c) |
| Estimated Closing Date Cash | Section 2.4 |
| Estimated Closing Date Indebtedness | Section 2.4 |
| Estimated Closing Date Seller Transaction Expenses | Section 2.4 |
| Estimated Closing Statement | Section 2.4 |
| Estimated Net Working Capital | Section 2.4 |
| Export Approvals | Section 4.29(a) |
| Final Determination | Section 10.9 |

12

Financial Statements ........................................................................................................Section 4.5(a)
Immaterial Software License ........................................................................................ Section 4.11(b)
Indemnified Party...........................................................................................................Section 10.4(a)
Indemnifying Party ........................................................................................................Section 10.4(a)
Indemnity Escrow Amount..............................................................................................Section 2.7(c)
Indemnity Escrow Funds .................................................................................................Section 2.7(c)
Insurance Policies ............................................................................................................. Section 4.23
Leased Real Property ..................................................................................................... Section 4.21(b)
Material Adverse Effect.......................................................................................................... Section 1.1
Nonqualified Deferred Compensation Plan ................................................................... Section 4.17(r)
Owned Real Property......................................................................................................Section 4.21(a)
Payoff Letters............................................................................................................... Section 2.5(d)
Pre-Closing Tax Period...................................................................................................Section 7.2(a)(i)
Privacy Requirements ................................................................................................... Section 4.11(g)
Protest Deadline ............................................................................................................. Section 2.8(b)
Protest Notice.................................................................................................................. Section 2.8(b)
Purchase Price.......................................................................................................................... Section 2.2
Purchase Price Adjustment Escrow Amount ..................................................................Section 2.7(c)
Purchase Price Adjustment Escrow Funds.....................................................................Section 2.7(c)
Real Property .................................................................................................................. Section 4.21(b)
Real Property Leases.......................................................................................................Section 4.12(e)
Releasees.......................................................................................................................Section 7.6(a)(i)
Releasing Parties.............................................................................................................Section 7.6(a)
Restricted Period............................................................................................................. Section 7.1(b)
Securities.............................................................................................................................. Recitals
Seller and Company Closing Deliverables ........................................................................... Section 2.5
Seller .......................................................................................................................................... Preamble
Straddle Tax Returns.......................................................................................................Section 7.2(a)(ii)
Systems ..................................................................................................................................Section 4.11(f)
Tail Policies ....................................................................................................................... Section 2.5(t)
Third Party Claim ...........................................................................................................Section 10.4(a)
Top Customer..................................................................................................................Section 4.22(b)
Top Supplier.....................................................................................................................Section 4.22(a)
Transfer Taxes ...............................................................................................................Section 7.2(e)

## ARTICLE II
## PURCHASE AND SALE; CLOSING

**Section 2.1    Purchase and Sale**.  On the terms and conditions set forth in this Agreement, at the Closing, the Seller shall sell, assign, transfer, convey and deliver to the Buyer all right, title and interest in the Securities free and clear of all Liens, and the Buyer shall purchase, accept delivery of and acquire from the Seller all right, title and interest in the Securities free and clear of all Liens.

**Section 2.2    Purchase Price**.  The aggregate purchase price to be paid by the Buyer for the Securities (the "**Purchase Price**") shall consist of an amount of cash equal to the sum of the following:

(a)    the Base Purchase Price;

(b)    *plus* the Closing Date Cash;

13

CONFIDENTIAL

FBG_CH1_00095684

(c)      *minus* the Closing Date Indebtedness;

(d)      *plus* the amount, if any, by which the Net Working Capital is greater than the Net Working Capital Target;

(e)      *minus* the amount, if any, by which the Net Working Capital is less than the Net Working Capital Target; and

(f)      *minus* the Closing Date Seller Transaction Expenses.

**Section 2.3**    **Closing**.  The closing of the purchase and sale of the Securities and the other transactions contemplated by this Agreement (the "**Closing**") shall be effected simultaneously with the execution and delivery of this Agreement via electronic mail in either case at 10:00 a.m. Eastern Time on the date hereof, or at such other time and place as the parties hereto may agree in writing.  The date on which the Closing occurs is referred to herein as the "**Closing Date**."

**Section 2.4**    **Delivery of Closing Estimates**.  Before the Closing Date, the Seller shall prepare and deliver to the Buyer a written statement (the "**Estimated Closing Statement**") setting forth good faith estimates of (a) the Net Working Capital (the "**Estimated Net Working Capital**"), (b) the Closing Date Cash (the "**Estimated Closing Date Cash**"), (c) the Closing Date Indebtedness (which shall include all amounts set forth in the Payoff Letters) (the "**Estimated Closing Date Indebtedness**") and (d) the Closing Date Seller Transaction Expenses (which shall include all amounts set forth in invoices from the respective payees) (the "**Estimated Closing Date Seller Transaction Expenses**"), together with a calculation of the Closing Payment, in each case, with reasonable supporting or underlying documentation used in the preparation thereof.  The Company shall make available such personnel as are reasonably necessary to assist the Buyer in its review of such estimates, and the Estimated Closing Statement shall be reasonably acceptable to the Buyer.  The Estimated Closing Statement also shall attach (i) the Payoff Letters in respect of all amounts owed by the Acquired Company under any credit facilities or indebtedness for borrowed money and (ii) invoices from the respective payees representing Closing Date Seller Transaction Expenses.

**Section 2.5**    **Seller and Company Closing Deliverables**.  In addition to the other requirements set forth in this Agreement, at or before the Closing, the Seller and the Company, as applicable, shall deliver or cause to be delivered to the Buyer each of the following documents and instruments (collectively, the "**Seller and Company Closing Deliverables**"):

(a)      original certificates representing the Securities to the extent they are certificated, stock powers or assignments evidencing the conveyance of the Securities duly executed in blank, and any other transfer instruments required to validly transfer title in and to the Securities from the Seller to the Buyer (or to the Buyer's designee or designees, if so elected by the Buyer) in form and substance reasonably satisfactory to the Buyer;

(b)      the Escrow Agreement, duly executed by each Seller and the Escrow Agent;

(c)      the Seller Certificate, duly executed by the Seller and the Company;

(d)      a counterpart of each Ancillary Agreement to which the Seller or the Company is a party, duly executed by the Seller;

(e)      executed payoff letters for the Indebtedness of the Acquired Companies listed on the Closing Date Indebtedness Schedule in form and substance reasonably acceptable to the Buyer, which include a per diem interest amount and an authorization to file all UCC termination statements and releases

14

CONFIDENTIAL

FBG_CH1_00095685

necessary to evidence satisfaction and termination of such Indebtedness and to enable the release of any Liens relating thereto upon payment of such Indebtedness, along with wire transfer instructions and a duly executed IRS Form W-9 or W-8BEN, as applicable, for each holder of such Indebtedness (collectively, the "**Payoff Letters**");

(f)       the Closing Date Indebtedness Schedule;

(g)       the Closing Date Seller Transaction Expenses Schedule;

(h)       an IRS Form W-9 for each of the Seller and the Company, duly executed by the Seller or the Company, respectively;

(i)       [reserved];

(j)       the minute book, stock ledgers and stock records or comparable records of each Acquired Company;

(k)       a certificate of good standing (or applicable equivalent) from the Secretary of State (or other applicable Governmental Authority) of each Acquired Company's jurisdiction of organization and each jurisdiction in which each Acquired Company is qualified to conduct business as a foreign corporation, in each case dated no more than ten days before the Closing Date and certifying as to the good standing (or applicable equivalent) of each Acquired Company in such jurisdiction;

(l)       a certificate duly executed by Seller certifying in accordance with Section 1445 of the Code that Seller is not a "foreign person" as defined in Section 1445(f)(3) of the Code and that Seller is therefore exempt from the withholding requirements of Section 1445 of the Code;

(m)       [reserved];

(n)       [reserved];

(o)       [reserved];

(p)       evidence of termination of all agreements (if any) regarding voting, transfer, phantom equity (including the phantom equity agreements listed on Schedule 4.4) or other arrangements related to the Securities that are in effect prior to the Closing, in each case in form and substance reasonably acceptable to the Buyer;

(q)       evidence that the applicable Acquired Companies have obtained irrevocable "tail" insurance policies (the "**Tail Policies**") with respect to fiduciary and employment practices liability for a period of six years, in each case in form and substance reasonably acceptable to the Buyer;

(r)       evidence of termination of all existing private equity advisory, management or similar agreements, including the Management Services Agreements (in each case in form and substance reasonably acceptable to the Buyer);

(s)       [reserved];

(t)       all other instruments and documents reasonably requested by the Buyer.

15

CONFIDENTIAL

FBG_CH1_00095686

**Section 2.6**     **Buyer Closing Deliverables**.  In addition to the other requirements set forth in this Agreement, at or before the Closing, the Buyer shall deliver or cause to be delivered to the Seller each of the following documents and instruments (collectively, the "**Buyer Closing Deliverables**"):

(a)     the Buyer Certificate, duly executed by the Buyer; and

(b)     a counterpart of each Ancillary Agreement to which the Buyer is a party, duly executed by the Buyer.

**Section 2.7**     **Payments at Closing**.  At the Closing, the Buyer shall:

(a)     pay or cause to be paid to the Seller, by wire transfer of immediately available funds to the account or accounts designated in writing by the Seller not less than two days prior the Closing Date, an amount of cash equal to the sum of the following (the "**Closing Payment**"):

(i)     the Base Purchase Price;

(ii)     *plus* the Estimated Closing Date Cash;

(iii)     *minus* the Estimated Closing Date Indebtedness;

(iv)     *plus* the amount, if any, by which the Estimated Net Working Capital exceeds the Net Working Capital Target;

(v)     *minus* the amount, if any, by which the Estimated Net Working Capital is less than the Net Working Capital Target;

(vi)     *minus* the Estimated Closing Date Seller Transaction Expenses;

(vii)     *minus* the Purchase Price Adjustment Escrow Amount;

(b)     pay or cause to be paid, on behalf and for the account of the Acquired Companies and the Seller, (i) the amounts set forth in the Payoff Letters delivered pursuant to Section 2.5(e), which amounts shall be included in the Estimated Closing Date Indebtedness, by wire transfer of immediately available funds to the accounts of the applicable lenders or other parties as set forth in the Payoff Letters and (ii) the Estimated Closing Date Seller Transaction Expenses by wire transfer of immediately available funds to the applicable recipients thereof as set forth on the Estimated Closing Statement; provided, however that any amounts treated as wages to a current or former employee of any Acquired Company (inclusive of the employer-portion of any taxes related thereto) will be paid to such Acquired Company, which will pay such amounts, less applicable withholding taxes, to the applicable recipient through its respective payroll; and

(c)     deposit or cause to be deposited an amount equal to $500,000 (the "**Purchase Price Adjustment Escrow Amount**," and such funds *plus* all income accrued thereon, the "**Purchase Price Adjustment Escrow Funds**") with KeyBank National Association, as escrow agent (the "**Escrow Agent**").  The Purchase Price Adjustment Escrow Funds (also known as, the "**Escrow Funds**") shall be maintained by the Escrow Agent in one escrow account to be held as segregated funds to secure the Seller's obligations under of this Agreement and shall be administered and payable in accordance with this Agreement and an escrow agreement by and among the Seller, the Buyer and the Escrow Agent dated as of the date hereof (the "**Escrow Agreement**").

16

CONFIDENTIAL

**Section 2.8**     **Post-Closing Adjustment**.

(a)     Closing Statement.  No later than 90 days after the Closing Date, the Buyer or its representatives shall prepare and deliver to the Seller a written statement (the "**Closing Statement**"), setting forth the Buyer's calculation of (i) the Net Working Capital, (ii) the Closing Date Cash, (iii) the Closing Date Indebtedness and (iv) the Closing Date Seller Transaction Expenses, together with a calculation of the resulting Purchase Price Adjustment, if any.  Upon receipt of the Closing Statement, the Seller and its accountants will be given reasonable access upon reasonable notice to the Acquired Companies' relevant books, records, workpapers and personnel during business hours for the purpose of verifying the Net Working Capital, the Closing Date Cash, the Closing Date Indebtedness and the Closing Date Seller Transaction Expenses, together with a calculation of the resulting Purchase Price Adjustment, if any.

(b)     Protest Notice.  Prior to the date which is 45 days after the Seller's receipt of the Closing Statement (the "**Protest Deadline**"), the Seller may deliver written notice to the Buyer (the "**Protest Notice**") setting forth any objections which the Seller may have to the Closing Statement.  The Protest Notice shall specify in reasonable detail any contested amounts and the basis therefor and shall include a schedule setting forth the Seller's determination of the Net Working Capital, the Closing Date Cash, the Closing Date Indebtedness, the Closing Seller Transaction Expenses and the resulting Purchase Price Adjustment, if any.  If a Protest Notice is not delivered prior to the Protest Deadline, the Net Working Capital, the Closing Date Cash, the Closing Date Indebtedness, the Closing Date Seller Transaction Expenses and the resulting Purchase Price Adjustment, if any, as set forth on the Closing Statement shall be final, binding and non-appealable by the Seller.  If a Protest Notice is delivered prior to the Protest Deadline, any such amounts not disputed therein shall be final, binding and non-appealable by the Parties.

(c)     Resolution of the Protest.  The Buyer and the Seller shall confer and attempt to resolve any disagreement with respect to the Closing Statement within 30 days following the Buyer's receipt of the Protest Notice.  If the Buyer and the Seller are unable to resolve any such disagreement within such 30 day period, then any matters that remain in dispute may be referred by either Buyer or Seller to a firm of nationally or regionally recognized independent public accountants mutually agreed to by the Buyer and Seller (the "**Accountant**"), which will be instructed to determine the amounts in dispute within 45 days after such referral.  The determination by the Accountant of the amounts in dispute shall be based solely on presentations by the Buyer and the Seller, and shall not involve the Accountant's independent review.  Any determination by the Accountant shall not be outside the range defined by the respective amounts in the Closing Statement proposed by the Buyer and the Seller's proposed adjustments thereto set forth in the Protest Notice, and absent manifest mathematical error such determination shall be final, binding and non-appealable. Neither Buyer nor Seller shall engage in *ex parte* communications with the Accountant.  Buyer and Seller shall bear that percentage of the fees and expenses of the Accountant equal to the proportion (expressed as a percentage) of the dollar value of the disputed amounts determined in favor of the other Party by the Accountant.

(d)     Purchase Price Adjustment.  Within 10 days of the final determination of the Net Working Capital, the Closing Date Cash, the Closing Date Indebtedness and the Closing Date Seller Transaction Expenses pursuant to this Section Section 2.8:

(i)     If the Purchase Price Adjustment is a negative number, then the Buyer shall deliver written notice to the Escrow Agent and the Seller specifying such amount, and the Escrow Agent shall pay the amount of the Purchase Price Adjustment out of the Purchase Price Adjustment Escrow Funds to the Buyer in accordance with the terms of the Escrow Agreement.  If the Purchase Price Adjustment Escrow Funds are insufficient to cover the entire amount payable to the Buyer pursuant hereto, the Seller and Speyside shall be obligated to pay to the Buyer an amount equal to the deficiency.  In the event the Purchase Price Adjustment Escrow Funds exceed the amount of the Purchase Price Adjustment,

17

FBG_CH1_00095688

then the Escrow Agent, after paying the amount of the Purchase Price Adjustment to the Buyer as provided herein, shall transfer the remaining Purchase Price Adjustment Escrow Funds to Seller, and Buyer shall execute such written instructions necessary for such release; or

(ii)     If the Purchase Price Adjustment is a positive number, then (A) the Buyer shall deliver written notice to the Escrow Agent and the Seller specifying such amount, and the Buyer shall pay or cause the Company to pay to the Seller an amount equal to the amount by which the Purchase Price Adjustment exceeds the amount held in the Purchase Price Adjustment Escrow Fund and (B) the Escrow Agent shall pay all funds in the Purchase Price Adjustment Escrow Fund to the Seller.

Section 2.9     **Withholding**. Notwithstanding anything to the contrary in this Agreement, the Buyer, the Acquired Companies, the Escrow Agent, the Seller, and their designees, will be entitled to deduct and withhold from any amounts payable pursuant to this Agreement any amounts required to be deducted or withheld under applicable Law. To the extent that any such amounts are so deducted or withheld, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made. Upon Closing (and thereafter as required by law or as requested by the Buyer), each person entitled to payment under this Agreement shall provide an IRS Form W-9 or applicable IRS Form W-8. Any payments under this Agreement to employees or other current or former service providers that are treated as compensation or wages for Tax purposes shall be made through the applicable Acquired Company's payroll system.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE SELLER AND SPEYSIDE

The Seller and Speyside hereby represents and warrants to the Buyer as of the date hereof and as of the Closing as follows:

Section 3.1     **Authorization**. Each of Seller and Speyside has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Ancillary Agreements to which the Seller or Speyside is a party, the performance by each of the Seller and Speyside of their respective obligations hereunder and thereunder and the consummation by the Seller of the transactions contemplated hereby and thereby have been duly authorized. This Agreement and the Ancillary Agreements to which each of the Seller or Speyside is a party have been duly executed and delivered by the Seller or Speyside (as applicable) and constitute the legal, valid and binding obligation of the Seller and Speyside, enforceable against each of them in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

Section 3.2     **No Violation**. The execution, delivery and performance by the Seller of this Agreement and the Ancillary Agreements to which the Seller is a party and the consummation of the transactions contemplated hereby and thereby will not:

(a)     violate, contravene or conflict with any provision of the charter documents, bylaws or similar organizational documents of the Seller;

(b)     violate, contravene or conflict with any Law or Order; or

18

CONFIDENTIAL

FBG_CH1_00095689

(c)     contravene, conflict with, result in the violation or breach of any of the terms or conditions of, or constitute (with or without notice or lapse of time or both) a default under or an Event which would, or would reasonably be expected to give rise to, any right of notice, modification, acceleration, payment, withdrawal, suspension, cancellation or termination under, or in any manner release any party thereto from any obligation under, or otherwise affect any rights of the Seller under, any Contract or other instrument or obligation of any kind or nature, in any case whether written or oral, by which the Seller or any of its assets may be bound or affected.

**Section 3.3**    **Consents and Approvals**. No consent, approval, Order or authorization of, or registration, declaration or filing with, or notice to, any Governmental Authority or other Person is required to be made or obtained by the Seller in connection with the authorization, execution, delivery and performance of this Agreement and the Ancillary Agreements, or the consummation of the transactions contemplated hereby and thereby.

**Section 3.4**    **Title to Securities**. The Seller has the sole voting power and sole power of disposition with respect to all of the Securities held by the Seller with no limitations, qualifications or restrictions on such rights and powers. The Securities owned by the Seller will be transferred to the Buyer pursuant to this Agreement free and clear of any Liens. The Seller is not subject to any agreements, arrangements, options, warrants, calls, rights, commitments or other restrictions relating to the sale, transfer, purchase, redemption or voting of its Securities.

**Section 3.5**    **Litigation**. There are no Proceedings pending or, to the Seller's knowledge, threatened against or affecting the Seller or any Acquired Company that seek to restrain or prohibit or to obtain damages or other relief in connection with the transactions contemplated hereby or under any Ancillary Agreement.

**Section 3.6**    **No Brokers or Finders**. Except with respect to Angle Advisors, LLC, whose fees and expenses shall constitute a Seller Transaction Expense, neither the Seller nor any Affiliate thereof has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement.

**Section 3.7**    **No Other Representations and Warranties**. Neither Seller nor Speyside has made, or will be deemed to have made, any representation or warranty in connection with this Agreement or the Ancillary Agreements other than as expressly made by it in this Article III or Article IV herein. Without limiting the generality of the foregoing, except as expressly covered by a representation and warranty contained in Article III or Article IV, neither Seller nor Speyside makes any representation or warranty with respect to any information or documents (financial or otherwise) made available to Buyer or its representatives before or after the date of this Agreement.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE ACQUIRED COMPANIES**

Except as set forth in the Disclosure Schedules attached hereto (collectively, the "**Disclosure Schedules**"), the Seller represents and warrants to the Buyer as of the date hereof and as of the Closing as follows:

**Section 4.1**    **Organization and Qualification; Authorization**.

19

CONFIDENTIAL

FBG_CH1_00095690

(a)        Each Acquired Company is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation, and has all requisite power and authority to own, lease and operate its assets, properties and business and to carry on its business as now being conducted. Each Acquired Company is duly qualified or otherwise authorized as a foreign entity to transact business in each jurisdiction so required, which are all of the jurisdictions in which the nature of such Person's business or assets requires such Person to so qualify. Complete and correct copies of the charter documents, bylaws or similar organizational documents of each Acquired Company and all amendments thereto have been made available to the Buyer. None of the Acquired Companies is in violation of any of the provisions of its charter documents, bylaws or similar organizational documents. The minute books and resolutions of each Acquired Company previously made available to the Buyer contain true, complete and accurate records of all meetings and accurately reflect in all material respects all corporate action of the equity holders and board of directors (including committees thereof) of such Acquired Company, in all cases, with respect to the three year period prior to the Closing Date. The stock certificate books and stock transfer ledgers of each Acquired Company previously made available to the Buyer are true, complete and accurate in all material respects.

(b)        The Company has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Ancillary Agreements to which the Company is party, the performance by the Company of its obligations hereunder and thereunder and the consummation by the Company of the transactions contemplated hereby and thereby have been duly authorized. This Agreement has been, and the Ancillary Agreements to which the Company is party will be, duly executed and delivered by the Company and constitute the legal, valid and binding obligation of the Company, enforceable against it in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

**Section 4.2        No Violation**. Except as set forth on Schedule Section 4.2 of the Disclosure Schedules, the execution, delivery and performance by the Seller and the Company of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby will not:

(a)        violate, contravene or conflict with any provision of the charter documents, bylaws or similar organizational documents of any Acquired Company;

(b)        violate, contravene or conflict with any resolution adopted by any Acquired Company's board of directors or stockholders;

(c)        violate, contravene or conflict with any Law or Order;

(d)        contravene, conflict with, result in the violation or breach of any of the terms or conditions of, or constitute (with or without notice or lapse of time or both) a default under or an event which would, or could reasonably be expected to give rise to, any right of notice, modification, acceleration, payment, suspension, withdrawal, cancellation or termination under, or in any manner release any party thereto from any obligation under, or otherwise affect any rights of any Acquired Company under, any Material Contract or Permit of the Acquired Company; or

(e)        result in the creation or imposition of any Lien upon any Securities or any Assets.

20

CONFIDENTIAL

FBG_CH1_00095691

**Section 4.3**     **Consents and Approvals**.  Except as set forth on <u>Schedule Section 4.3</u> of the Disclosure Schedules, no consent, approval, Order or authorization of, or registration, declaration or filing with, or notice to, any Governmental Authority or other Person is required to be made or obtained by any Acquired Company in connection with the authorization, execution, delivery and performance by the Company of this Agreement or any Ancillary Agreement, or the consummation of the transactions contemplated hereby and thereby.

**Section 4.4**     **Capitalization**.  <u>Schedule Section 4.4</u> of the Disclosure Schedules sets forth the entire authorized Equity Securities of each Acquired Company and a complete and correct list of the issued and outstanding Equity Securities of each Acquired Company, including the name of the record and beneficial owner thereof and the number of Equity Securities held thereby.  All of the outstanding Equity Securities of each Acquired Company have been duly authorized, validly issued and are fully paid and non-assessable.  Except as set forth on <u>Schedule Section 4.4</u> of the Disclosure Schedules, no Acquired Company has any outstanding Equity Securities or other securities directly or indirectly convertible into or exchangeable for its Equity Securities, no Acquired Company has any outstanding agreements, options, warrants or rights to directly or indirectly subscribe for or purchase, or that directly or indirectly require it to issue, transfer or sell, its Equity Securities or any securities directly or indirectly convertible into or exchangeable for its Equity Securities, and there are no agreements containing phantom equity features with respect to any Acquired Company other than as set forth on <u>Schedule Section 4.4</u> of the Disclosure Schedules.  Except as set forth on <u>Schedule Section 4.4</u> of the Disclosure Schedules, no Acquired Company owns or otherwise holds, directly or indirectly, any stock, membership interest, partnership interest, joint venture interest or other equity interest in any Person.  No Acquired Company is subject to any obligation (contingent or otherwise) to redeem, repurchase or otherwise acquire or retire any of its Equity Securities or any warrants, options or other rights to acquire its Equity Securities.   Except as set forth on <u>Schedule Section 4.4</u> of the Disclosure Schedules, there are no voting agreements, voting trusts or other agreements, commitments or understandings with respect to the voting or transfer of Equity Securities or other securities of any Acquired Company.   All of the outstanding Equity Securities of each of the Company's Subsidiaries are owned by the Company or another Subsidiary free and clear of all Liens.  No Acquired Company has violated any applicable federal or state securities Laws in connection with the offer, sale or issuance of any of its Equity Securities or any warrants, options or other rights to acquire its Equity Securities.  No Equity Securities of any Acquired Company are subject to, nor have been issued in violation of, preemptive or similar rights.  There are no accrued but unpaid dividends payable by the Company on any Equity Securities of the Company.

**Section 4.5**     **Financial Statements; Accounting and Internal Controls**.

(a)     Seller has made available to Buyer the following financial statements of the Acquired Companies (collectively, the "**Financial Statements**"):

(i)     the audited consolidated balance sheets of the Acquired Companies as of September 30, 2020, 2021 and 2022 and the related audited income statements, changes in members' equity and cash flows for each of the years then ended; and

(ii)     the unaudited consolidated balance sheet of the Acquired Companies as of the Balance Sheet Date (the "**Balance Sheet**"), and the related unaudited income statements and cash flows for the nine-month period then ended.

(b)     The Financial Statements (including the notes thereto) (i) have been prepared in accordance with GAAP consistently applied throughout the periods covered thereby, except that the interim Financial Statements are subject to normal year-end adjustments and lack footnotes required by GAAP, (ii) present fairly, in all material respects, the assets, liabilities and financial condition of the Acquired

21

FBG_CH1_00095692

**DEBTORS' EXHIBIT NO. 98**
**Page 26 of 99**

Companies as of such dates and the results of operations of Acquired Companies for such periods, and (iii) are consistent with the books and records of the Acquired Companies in all material respects (which books and records are correct and complete in all material respects). Since December 31, 2022, there has been no change in any accounting principles, policies, methods or practices, including any change with respect to reserves (whether for bad debt, contingent liabilities or otherwise) of the Acquired Companies.

Section 4.6    **Absence of Undisclosed Liabilities**.  No Acquired Company has any Liabilities required to be reflected on a balance sheet prepared in accordance with GAAP, except (a) as and to the extent specifically accrued for or reserved against in the Balance Sheet, (b) Liabilities which have arisen after the date of the Balance Sheet in the ordinary course of business consistent with past practice (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement or violation of Law), (c) executory obligations under Contracts (other than Liabilities relating to any breach, or any fact or circumstance that, with notice, lapse of time or both, would result in a breach, thereof by any Acquired Company), (d) Liabilities specifically set forth on Schedule Section 4.6 of the Disclosure Schedules or (e) Liabilities included in the calculation of Net Working Capital or Closing Date Indebtedness.

Section 4.7    **Accounts and Notes Receivable; Accounts Payable**.  All accounts and notes, and other receivables of the Acquired Companies are reflected properly on their books and records, are valid receivables arising from bona fide transactions entered into by an Acquired Company involving the sale of goods or the rendering of services in the ordinary course of business subject to no setoffs or counterclaims. The accounts payable and accruals of the Acquired Companies have arisen in bona fide arm's-length transactions in the ordinary course of business, and each Acquired Company has been paying its accounts payable as and when due.

Section 4.8    **Inventory**.  The inventory of the Acquired Companies is merchantable and fit for the purpose for which it was procured or manufactured, and is not slow-moving, obsolete, damaged, or defective, subject, in all cases, to the reserve for inventory write-down set forth on the Balance Sheet as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Acquired Companies, except, in each case, as would not be material to the Acquired Companies. Except as set forth on Schedule 4.8, all such inventory is owned by the Acquired Companies free and clear of any Liens (other than Permitted Liens), and no inventory is held on a consignment basis.

Section 4.9    **Absence of Changes or Events**.  Except as disclosed in the applicable subsection of Schedule Section 4.9 of the Disclosure Schedules, since September 30, 2022 (the "**Audit Date**"), (a) each of the Acquired Companies has conducted its business only in the ordinary course consistent with past practice, (b) no Event has occurred that, individually or in combination with any other Events, has had or would reasonably be expected to have Material Adverse Effect and (c) no Acquired Company has suffered any loss, damage, destruction or other casualty affecting any of its material properties or assets, whether or not covered by insurance.

Section 4.10    **Assets**.

(a)    The Acquired Companies own, and immediately following the Closing will continue to own, good and marketable title to, or a valid right to use, all of the tangible assets and property used by the Acquired Companies in connection with their businesses (the "**Assets**"), free and clear of any and all Liens (other than Permitted Liens).

(b)    The tangible assets and property to which the Acquired Companies have good and marketable title to, or a valid right to use, are all the assets and property that are necessary to enable the

22

CONFIDENTIAL                                                                                            FBG_CH1_00095693

businesses of the Acquired Companies to be conducted immediately after the Closing in the same manner as the businesses of the Acquired Companies have been conducted since the Audit Date.

(c)     All material items of tangible personal property owned or leased by any Acquired Company are suitable for the purposes for which they are presently being used.  None of the personal or movable tangible property constituting Assets is located other than at the Real Property.

Section 4.11     **Proprietary Rights**.

(a)     Schedule Section 4.11(a) of the Disclosure Schedules contains a true, complete and accurate description and list of all (i) patented or registered Intellectual Property owned or held by or exclusively licensed to any Acquired Company, (ii) pending patent applications and applications for other registrations of Intellectual Property owned or held by or exclusively licensed to any Acquired Company, and (iii) any unregistered Trademark that is owned or held by or exclusively licensed to any Acquired Company and material to the conduct of any Acquired Company's business as presently conducted (indicating for each of (i) and (ii) the Acquired Company that owns or holds such Intellectual Property or an exclusive license thereto, applicable jurisdiction, registration number (if registered), application number, date issued (if issued) and dated filed).

(b)     Schedule Section 4.11(b) of the Disclosure Schedules contains a true, complete and accurate list of all Intellectual Property licensed to any Acquired Company (excluding generally commercially available, off the shelf software programs licensed to such Acquired Company pursuant to a shrink-wrap or "click to accept" agreements with a replacement cost or annual license fee of less than $50,000 (an "**Immaterial Software License**")) and any license or other agreement relating thereto. Schedule Section 4.11(b) of the Disclosure Schedules contains a true, complete and accurate list of all Intellectual Property licensed by any Acquired Company to any Person other than an Acquired Company and any license or other agreement relating thereto.  The consummation of the transactions contemplated by this Agreement and the Ancillary Agreement will not (i) impair any rights of any Acquired Company under, or cause any Acquired Company to be in violation of or default under, any Contract under which it has the right to use or otherwise commercialize or exploit in any way any Intellectual Property of any Person, (ii) give rise to any termination or modification of, or entitle any other party to terminate or modify, any such Contract, or (iii) require the payment of (or increase the amount of) any royalties, fees, or other consideration with respect to the Acquired Company's use or exploitation of any Intellectual Property of any Person.

(c)     Each Acquired Company exclusively owns and/or possesses all right, title and interest in and to, or has the right under a valid and enforceable license set forth on Schedule Section 4.11(b) of the Disclosure Schedules, (or under a valid and enforceable Immaterial Software License) to use and otherwise commercialize or exploit, all Intellectual Property owned or currently licensed by the Acquired Companies, free and clear of all Liens (collectively for all Acquired Companies, the "**Company Intellectual Property**").  To the Knowledge of the Company, none of the Company Intellectual Property owned by or exclusively licensed to or purported to be owned by or exclusively licensed to any Acquired Company is invalid or unenforceable in whole or in part.  No loss or expiration of any of the Company Intellectual Property is pending, reasonably foreseeable or, to the Knowledge of the Company, threatened, except for patents expiring at the end of their statutory term.  The Acquired Companies have taken all action necessary, including recording or filing all documents and paying all fees and Taxes (to the extent applicable) required to protect and maintain in full force and effect the Company Intellectual Property. Without limiting the generality of the foregoing, (i) each Acquired Company has to the extent possible filed all affidavits or other documents regarding its registered Trademarks that are required to render such Trademarks incontestable and (ii) all assignments of any Intellectual Property to any Acquired Company or any predecessor-in-interest thereof have been timely and properly recorded with the U.S. Patent and

23

CONFIDENTIAL

FBG_CH1_00095694

Trademark Office, the U.S. Copyright Office, or other appropriate agency to the extent required. The Seller does not own or hold any Intellectual Property that is used, commercialized or exploited in any way by any Acquired Company.

(d)     Except as set forth on Schedule Section 4.11(d) of the Disclosure Schedules, (i) there have been no claims made or, to the Knowledge of the Company, threatened against any Acquired Company asserting the invalidity, misuse or unenforceability of any Company Intellectual Property or challenging any Acquired Company's ownership of Intellectual Property owned or purported to be owned by such Acquired Company or right to use, commercialize or exploit any other Company Intellectual Property, in either case free and clear of Liens (other than Permitted Liens), and, to the Knowledge of the Company, there is no basis for any such claim, (ii) no Acquired Company has received any notices of, and, to the Knowledge of the Company, there are no facts which indicate a likelihood of, any direct, vicarious, indirect, contributory or other infringement, violation or misappropriation by an Acquired Company of any Intellectual Property (including any cease-and-desist letters or demands or offers to license any Intellectual Property from any other Person), (iii) to the Knowledge of the Company, the conduct of the Acquired Companies' respective businesses as previously conducted has not infringed, misappropriated or violated, and as presently conducted or presently proposed to be conducted does not and will not infringe, misappropriate or violate, any Intellectual Property of any other Person, whether directly, vicariously, indirectly, contributorily or otherwise, and (iv) to the Knowledge of the Company, no Company Intellectual Property has been infringed, misappropriated or violated by any other Person.

(e)     Except as set forth on Schedule Section 4.11(e) of the Disclosure Schedules, to the Knowledge of the Company, no Acquired Company uses or distributes any Software that is owned by an Acquired Company and subject to an "open source", "copyleft" or other similar type of license, including any license that is approved by the Open Source Initiative or that would require the disclosure of (or grant any person the right to receive) any source code or impose limitations on the right of such Acquired Company to require payment of license or other fees in connection with the distribution of such Software.

(f)     The computer systems, including the Software, hardware and networks (collectively, the "**Systems**"), currently used by the Acquired Companies are sufficient for the current needs of the Business of the Acquired Companies, including as to capacity and ability to process current peak volumes in a timely manner. In the past 12 months, there have been no bugs in, or failures, breakdowns, or continued substandard performance of, any Systems that has caused the substantial disruption or interruption in or to the use of such Systems by any Acquired Company or the conduct of their Business.

(g)     To the Knowledge of the Company, each of the Acquired Companies is in compliance with all applicable Laws, rules and regulations, its own published privacy policies, terms of use and other terms or policies, and any third party privacy policies, terms of use or other terms or policies binding on such Acquired Company with respect to data security, required notifications of breaches or suspected breaches of such security, the privacy of Service Provider, users, visitors and customers, or the collection, use, storage, distribution, handling, processing, transfer or disclosure (whether electronically or in any other medium) of any personally identifiable or private information (collectively, the "**Privacy Requirements**"). No claims are currently pending or, to the Company's Knowledge, are threatened against any Acquired Company by any Person alleging a violation of any Privacy Requirements. The execution and delivery of this Agreement and the Ancillary Agreements, the performance by the Seller and the Company of their respective obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby (i) will, to the Knowledge of the Company, comply with all applicable Privacy Requirements, (ii) will, to the Knowledge of the Company, not impair any rights of, or impose any obligations or restrictions on, any Acquired Company with respect to any use, disclosure, commercialization or exploitation of, or otherwise relating to, any personally identifiable or private information or other data or (iii) will, to the Knowledge of the Company, not give rise to any right on the

24

part of any Person to impair any such rights or impose any such obligations or restrictions. No Acquired Company nor, to the Knowledge of the Company, anyone acting on behalf of any Acquired Company, and, to the Knowledge of the Company, no software tool created or used by or on behalf of any Acquired Company, has used false log-on credentials with respect to any third-party website or other false representation or statement to obtain any personally identifiable or private information or other data. No Acquired Company has received a complaint or, to the Knowledge of the Company, been the subject of any Proceeding or investigation regarding its collection, use or disclosure of personally identifiable or private information or other data or its privacy or data security policies, practices or activities. Each Acquired Company has commercially reasonable security measures in place to protect personally identifiable and private information and other data in its possession, custody or control, and, to the Knowledge of the Company, no Acquired Company has experienced any breach of security or unauthorized access by any third party to personally identifiable or private information or other data in the Company's possession, custody or control. For purposes hereof, information in any Acquired Company's possession, custody or control includes information stored for such Acquired Company by any service provider or vendor.

      **Section 4.12**    **Contracts**. Schedule Section 4.12 of the Disclosure Schedules contains a true, complete and accurate list (by reference to the applicable subsection hereof) as of the date of this Agreement of:

      (a)    each Contract that requires an Acquired Company to pay, or entitles an Acquired Company to receive, in the aggregate, $500,000 or more in any 12-month period (excluding purchase orders issued or received by an Acquired Company in the ordinary course of business);

      (b)    each Contract that restricts any Acquired Company or any of its present or future Affiliates from competing with or engaging in any business activity anywhere in the world or soliciting for employment, hiring or employing any Person;

      (c)    each Contract to acquire or dispose (by merger, purchase or sale of assets or stock or otherwise) of material assets, as to which an Acquired Company has continuing material obligations or material rights;

      (d)    each Contract concerning a joint venture, strategic alliance, collaboration or partnership agreements, or the sharing of profits;

      (e)    each Contract whereby any Acquired Company leases, subleases, licenses, or otherwise holds any rights to use or occupy any interest in real property (the "**Real Property Leases**");

      (f)    each Contract with respect to Indebtedness (excluding any Indebtedness to be discharged at Closing);

      (g)    each Contract with any Governmental Authority;

      (h)    each Contract pursuant to which an Acquired Company leases, is licensed or otherwise authorized to use or otherwise commercialize or exploit any Intellectual Property of any other Person or which otherwise affects the ability of an Acquired Company to use, commercialize or otherwise exploit any Company Intellectual Property (including a covenant not to sue) material to its business as currently conducted (excluding Immaterial Software Licenses);

      (i)    [reserved];

25

FBG_CH1_00095696

(j)     each Contract that contains any "most-favored nation" pricing or provisions regarding volume discounts or rebates;

(k)     each Collective Bargaining Agreement;

(l)     each Contract with respect to bonus or other incentive compensation, deferred compensation, equity purchase or award, salary continuation or pension;

(m)     each Contract with any current Service Provider as well as each Contract with any firm or other organization providing commission or sales-based services to an Acquired Company;

(n)     each Contract with any firm or other organization that provided commission or sales-based services to an Acquired Company under which such Acquired Company has any Liability or other obligation;

(o)     each Contract with a Related Party (excluding the Management Services Agreements);

(p)     each Contract material to the Business that is not terminable by an Acquired Company with notice of 90 days or less without penalty (excluding purchase orders issued or received by an Acquired Company in the ordinary course of business); and

(q)     each Contract to which an Acquired Company is a party that grants any Person other than an Acquired Company any rights of first refusal, rights of first negotiation or similar rights with respect to an Acquired Company.

True, complete and accurate copies of the Contracts listed or required to be listed on Schedule Section 4.12 of the Disclosure Schedules (each, a "**Material Contract**"), together with all modifications and amendments thereto, have previously been delivered or made available to the Buyer, or, to the extent any of such Contracts are oral, Schedule Section 4.12 of the Disclosure Schedules contains a description of the material terms thereof. Each such Material Contract is in full force and effect, is valid, binding and enforceable in accordance with its terms (except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies), and is not subject to any claims, charges, set-offs or valid affirmative defenses. Except as set forth on Schedule Section 4.12 of the Disclosure Schedules, no Acquired Company is in material breach or material default, nor, to the Knowledge of the Company, has any event occurred which with the giving of notice or the passage of time or both would constitute a material breach or material default by any Acquired Company of, or which would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by another party under, or in any manner release any party thereto from any obligation under, any such Material Contract and, to the Knowledge of the Company, no other party is in breach or default, and no event has occurred which with the giving of notice or the passage of time or both would constitute a breach or default by any other party, or which would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by any Acquired Company under, or in any manner release any party thereto from any obligation under, any such Material Contract. Since December 31, 2022, no Acquired Company has received any, written or, to the Knowledge of the Company, oral notice or communication regarding any violation or breach of, or default under any such Material Contract. Neither the Seller nor any Acquired Company has been notified in writing, or to the Knowledge of the Company, orally by any counterparty to any such Material Contract that such counterparty is terminating, repudiating or rescinding, or intends to terminate, repudiate or rescind such Material Contract.

26

CONFIDENTIAL

**Section 4.13** **Litigation**. Except as set forth on Schedule Section 4.13(a) of the Disclosure Schedules, there are no, and there has not been in the prior three years, any Proceedings pending or, to the Knowledge of the Company, threatened against any Acquired Company or any of the current or former officers, directors or employees of any Acquired Company related to any Acquired Company or its operations or current or former Service Providers with respect to any Acquired Company. Except as set forth on Schedule Section 4.13(b) of the Disclosure Schedules, there are no Proceedings pending or threatened by any Acquired Company. Schedule Section 4.13(d) of the Disclosure Schedules sets forth any Order to which any Acquired Company is subject.

**Section 4.14** **Compliance with Laws**. Except as set forth on Schedule Section 4.14 of the Disclosure Schedules, each Acquired Company complies in all material respects with all Laws in connection with the conduct, ownership, use, occupancy or operation of its business and the Assets, and no Acquired Company has received during the past three years any written notice or, to the Knowledge of the Company, other notice from any Governmental Authority that any Acquired Company is not in compliance in any material respect with any Law.

**Section 4.15** **Licenses and Permits**. Except as set forth on Schedule Section 4.15 of the Disclosure Schedules, each Acquired Company holds all Permits necessary for the conduct, ownership, use, occupancy or operation of its businesses or the Assets. Each Acquired Company complies, and has in the prior three years complied, in all material respects with all such Permits, and no Acquired Company has received during the past three years any written notice or, to the Knowledge of the Company, other notice from any Governmental Authority that any Acquired Company is not in compliance in any material respect with any such Permit. All such Permits are identified on Schedule Section 4.15 have been provided or made available to the Buyer.

**Section 4.16** **Health, Safety and Environment**. Except to the extent disclosed on Schedule 4.16:

(a) Each Acquired Company is and has been in the past three years in material compliance with all Environmental and Safety Requirements.

(b) Each Acquired Company has obtained, maintains, and materially complies with all Permits required under Environmental and Safety Requirements to operate its business, and no Proceeding is pending, or to the Knowledge of the Company, threatened, to revoke, modify, or terminate any Permit required under Environmental and Safety Requirements.

(c) There are no Hazardous Materials present in, at, under, about or migrating to or from, any (i) Owned Real Property or Leased Real Property, (ii) real property formerly owned, leased, or used by any Acquired Company or any of its predecessors, or (iii) to the Knowledge of the Company, any property to which any Person has, at any time, transported, treated, stored or disposed of Hazardous Material on behalf of any Acquired Company or any of its predecessors, in each instance, that would reasonably be expected to give rise to, result in, or serve as a basis for material Losses to the Acquired Companies under Environmental and Safety Requirements.

(d) No Acquired Company has been subject to, nor has received any notice of, any Proceeding related to the Release of Hazardous Materials or noncompliance with or Liabilities under Environmental and Safety Requirements (other than Liabilities covered by insurance of an Acquired Company).

(e) No Acquired Company has any contractual indemnity obligation to any third party with respect to Environmental and Safety Requirements.

27

CONFIDENTIAL

(f)     No underground storage tanks or related piping are located on, under, or at any Owned Real Property, and no Acquired Company has removed or caused any such tank or piping to be removed, nor, to the Knowledge of the Company, has there been any such removal from any Owned Real Property or any former operating location, in each instance, that would reasonably be expected to give rise to, result in, or serve as a basis for material Losses to any Acquired Company under Environmental and Safety Requirements.

(g)     [reserved].

(h)     The Company has provided the Buyer with true, complete and accurate copies of all material environmental assessment reports, health and safety audits, and reports of investigations with respect to the Acquired Companies, the Owned Real Property, or the Leased Real Property in the Company's possession or control.

(i)     Prior to the Closing Date, the transactions contemplated by this Agreement do not require, under any Environmental and Safety Requirements, the consent of, or filings with, any Governmental Authority with jurisdiction over the Acquired Companies, the Owned Real Property, or Leased Real Property.

(j)     Notwithstanding any other provision of this Agreement to the contrary, the representations and warranties contained in this <u>Section 4.16</u> shall be the sole representations and warranties of Seller with respect to Health, Safety and Environment.

**Section 4.17     <u>Taxes</u>.**

(a)     Each Acquired Company has timely and properly filed all Tax Returns required to be filed by it, taking into account any valid extension of time to file.  All such Tax Returns are accurate and complete in all material respects.  Each Acquired Company has timely and properly paid all Taxes required to be paid by it or with respect to its assets, whether or not shown on such Tax Returns.

(b)     All Tax deficiencies that have been claimed, proposed, or asserted in writing by any Governmental Authority against any Acquired Company have been fully paid or finally settled.

(c)     To the Knowledge of Seller, no Tax audits or administrative or judicial Tax Proceedings are being conducted with respect to any Acquired Company.  No Acquired Company has received from any Governmental Authority any (i) written notice indicating an intent to open an audit or other review with respect to Taxes, or (ii)  written notice of deficiency or proposed adjustment for any material amount of Tax.  No Acquired Company has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that, in either case, remains in effect. No Acquired Company is currently the beneficiary of any extension of time within which to file any Tax Return or pay any Tax.

(d)     No written claim has ever been made by an authority in a jurisdiction where any Acquired Company does not file Tax Returns that such Acquired Company may be subject to taxation by that jurisdiction.

(e)     There are no Liens on any of the assets of the Acquired Companies that arose in connection with any failure (or alleged failure) to pay any Tax.

(f)     Each Acquired Company has timely withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any current or former Service

CONFIDENTIAL

FBG_CH1_00095699

Provider, equity interest holder, or other third party, and all IRS Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed. Each Acquired Company has consistently treated any workers that it treats as independent contractors (and any similarly situated workers) as independent contractors for purposes of Section 530 of the Revenue Act of 1978.

(g)     No Acquired Company is party to any Tax allocation, Tax sharing, or Tax distribution agreement or arrangement (other than any such agreement or arrangement entered into in the ordinary course of business and the primary subject of which is not Taxes).

(h)     Within the prior five years, no Acquired Company (i) has ever been a member of an Affiliated Group filing a consolidated federal income Tax Return or any similar group for federal, state, local or foreign Tax purposes (other than a group the common parent of which was the Company), (ii) has any liability for the Taxes of any Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by any contract, or otherwise, or (iii) has ever been a party to any joint venture, partnership, or other arrangement that is treated as a partnership for Tax purposes.

(i)     No Acquired Company has ever been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(j)     None of the assets of the Acquired Companies are "section 197(f)(9) intangibles" (as defined in Treasury Regulation Section 1.197-2(h)(1)(i)) and assuming for this purpose that the transition period ends on August 10, 1993.

(k)     Each Acquired Company has timely and properly collected all sales, use, value-added, and similar Taxes required to be collected, and has remitted, or will remit on a timely basis, such amounts to the appropriate Governmental Authority. Each Acquired Company has properly requested, received and retained all necessary exemption certificates and other documentation supporting any claimed exemption or waiver of Taxes on sales or similar transaction as to which it would otherwise have been obligated to collect or withhold Taxes.

(l)     [reserved].

(m)     There is no agreement, plan, arrangement or other contract (including this Agreement or the arrangements contemplated thereby) covering any employee or independent contractor or former employee or independent contractor of any of the Acquired Companies that, considered individually or considered collectively with any other such contracts, will, or would reasonably be expected to, give rise directly or indirectly to the payment of any amount that would not be deductible pursuant to Section 280G or Section 162 of the Code as a result of the transactions contemplated by this Agreement. None of the Acquired Companies are a party to any contract, nor do they have any obligation (current or contingent), to compensate any individual for excise taxes paid pursuant to Section 4999 of the Code.

(n)     No Acquired Company has ever participated in any "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code or Treasury Regulation Section 1.6011-4(b).

(o)     No Acquired Company has requested or received a ruling from any Governmental Authority or signed any binding agreement with any Governmental Authority that might impact the amount of Tax due from the Buyer or its Affiliates (including following the Closing, for the avoidance of doubt, the Acquired Companies) after the Closing Date.

29

CONFIDENTIAL

(p)        Neither the Buyer nor any of its Affiliates (including following the Closing, for the avoidance of doubt, the Acquired Companies) will be required to include any item of income in, or exclude any deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting or use of a cash or improper method of accounting elected prior to the Closing Date for a taxable period ending on or prior to the Closing Date with respect to any Acquired Company; (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign Income Tax Law) prior to Closing; (iii) intercompany transactions as described in Treasury Regulation Section 1.1502-13 (or any corresponding or similar provision of state, local or foreign Income Tax Law) or excess loss account described in Treasury Regulation Section 1.1502-19 (or any corresponding or similar provision of state, local or foreign Income Tax Law) attributable to a Pre-Closing Tax Period; (iv) installment sale or open transaction disposition made prior to Closing by any Acquired Company; (v) prepaid amount or deposit received prior to Closing by any Acquired Company; (vi) interest held by any Acquired Company in a "controlled foreign corporation" (as that term is defined in Section 957 of the Code) (a "**CFC**") on or before the Closing Date pursuant to Sections 951, 951A, or 965 of the Code; (vii) "minimum gain chargeback" provision applicable to any Acquired Company with respect to "minimum gain" for any Pre-Closing Tax Period; or (ix) debt instrument held by any Acquired Company on or before the Closing Date that was acquired with "original issue discount" as defined in Section 1273(a) of the Code or is subject to the rules set forth in Section 1276 of the Code. No Acquired Company is required to include any amount in income pursuant to Section 965 of the Code or pay any installment of the "net tax liability" described in Section 965(h)(1) of the Code.

(q)        No Acquired Company has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that purported or intended to be governed in whole or in part by Section 355 or 361 of the Code.

(r)        Each Employee Benefit Plan that is a "non-qualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code (a "**Nonqualified Deferred Compensation Plan**") and any award thereunder, in each case that is subject to Section 409A of the Code has been administered and drafted or amended, in such a manner so that the additional tax described in Section 409A(1)(B) of the Code will not be assessed against any individual participating in any such non-qualified deferred compensation plan with respect to benefits due or accruing thereunder.  No Employee Benefit Plan that would have been a Nonqualified Deferred Compensation Plan subject to Section 409A of the Code but for the effective date provisions that are applicable to Section 409A of the Code, as set forth in Section 885(d) of the American Jobs Creation Act of 2004, as amended (the "**AJCA**"), has been "materially modified" within the meaning of Section 885(d)(2)(B) of the AJCA after October 3, 2004.  Each Employee Benefit Plans has been or will be timely amended, as needed, to comply with Section 409A of the Code.

(s)        [Reserved].

(t)        No Acquired Company has deferred the inclusion of any amounts in taxable income pursuant to IRS Revenue Procedure 2004-34, Treasury Regulations Section 1.451-5, Sections 451(c), 455, 456 or 460 of the Code, or any corresponding or similar provision of Law (irrespective of whether or not such deferral is elective).

(u)        [Reserved].

(v)        [Reserved].

(w)        [Reserved].

30

(x)     Each Acquired Company has been resident in its jurisdiction of incorporation for Tax purposes and has not, at any time, been treated as a resident of or as having a permanent establishment or other fixed place of business in any other jurisdiction.

**Section 4.18     Employee Benefit Plans**.

(a)     Except as set forth on <u>Schedule Section 4.18</u> of the Disclosure Schedules, neither the Acquired Companies nor any ERISA Affiliate is or have in the prior five years maintained, sponsored, adopted, made contributions to or obligated itself to make contributions to or to pay any benefits or grant rights under or with respect to, or has any other Liability with respect to, any Employee Pension Benefit Plan, Employee Welfare Benefit Plan, Multiemployer Plan, Multiple Employer Plan, Multiple Employer Welfare Arrangement, Title IV Plan, pension plan, plan of deferred compensation, medical plan, life insurance plan, long-term disability plan, dental plan, or other plan, program, arrangement or trust, personnel policy (including vacation time, holiday pay, sick leave, other forms of paid time off, bonus programs, moving or other expense reimbursement or payment programs), excess benefit plan, bonus or incentive plan (including stock options, restricted stock, stock bonus and deferred bonus plans), severance agreement, salary reduction agreement, change-if-control agreement, employment agreement, consulting agreement or any other benefit, program or Contract, whether or not written or pursuant to a Collective Bargaining Agreement, (each an "**Employee Benefit Plan**," and collectively, the "**Employee Benefit Plans**"). No Employee Benefit Plan that provides severance benefits is subject to ERISA.

(b)     Neither the Acquired Companies nor any ERISA Affiliate has at any time participated in or made contributions to or has had any other Liability or potential Liability with respect to a plan which is or was (i) a Multiemployer Plan, (ii) a Multiple Employer Plan, (iii) a Multiple Employer Welfare Arrangement (or other plan, program, arrangement or trust providing for or funding the welfare of any of the employees or former employees or beneficiaries thereof of such Acquired Company), (iv) a VEBA, or (v) any Employee Benefit Plan in which stock of the Company, the Acquired Companies or any ERISA Affiliate is or was held as a plan asset.

(c)     Each Employee Benefit Plan that is intended to be "qualified" under Section 401(a) of the Code has received a determination from the IRS that such Employee Benefit Plan is so qualified or is documented using an IRS pre-approved plan document on which the Acquired Company may rely and to the Acquired Companies' Knowledge, there are no facts or circumstances that would reasonably be expected to adversely affect the qualified status of any such Employee Benefit Plan.

(d)     Each Employee Benefit Plan has been and is operated and funded in such a manner as to qualify, where appropriate, for both federal and state purposes, for Income Tax exclusions to its participants, Tax-exempt income for its funding vehicle, and the allowance of deductions and credits with respect to contributions thereto.

(e)     There are no Proceedings pending, or to the Acquired Companies' Knowledge, threatened against, by or with respect to any Employee Benefit Plan, or the assets, sponsor, plan administrator, or fiduciaries thereof (other than routine claims for benefits for which plan administrative review procedures have not been exhausted and for which any Liability is the sole responsibility of an insurance company), and there are no facts to the Acquired Companies' Knowledge which would give rise to any material Liability or Proceeding against any Employee Benefit Plan, plan sponsor, fiduciary or plan administrator or other Person dealing with any Employee Benefit Plan or the assets thereof.

(f)     No Employee Benefit Plan is under audit or investigation by, or is the subject of a Proceeding with respect to, any Governmental Authority, including the IRS, the Department of Labor or the Pension Benefit Guaranty Corporation.

31

**DEBTORS' EXHIBIT NO. 98**
**Page 36 of 99**

(g)     Each of the Employee Benefit Plans and all related trusts, insurance contracts and funds have been maintained, funded and administered in compliance with their terms and the terms of any applicable Collective Bargaining Agreement, and in compliance with the applicable provisions of ERISA, the Code, and any other applicable Law.  With respect to each Employee Benefit Plan, all required payments, premiums, contributions, distributions or reimbursements for all periods ending prior to or as of the date hereof have been timely made or properly accrued and all required payments, premiums, contributions, distributions or reimbursements for all periods between the date hereof and the Closing Date will have been timely made or properly accrued.

(h)     No Acquired Company, the Seller nor any other "disqualified person" (within the meaning of Section 4975 of the Code) nor any "party in interest" (within the meaning of Section 3(14) of ERISA) has engaged in any nonexempt "prohibited transaction" (within the meaning of Section 4975 of the Code or Section 406 of ERISA) with respect to any of the Employee Benefit Plans which would subject any such Employee Benefit Plans, any Acquired Company or any current or former Service Provider of any Acquired Company to any liability or any penalty or tax under ERISA or the Code.  None of the Acquired Companies nor any other Person has engaged in any transaction with respect to any Employee Benefit Plan that would subject the Employee Benefit Plans, the Acquired Companies or any other Person to any Tax or penalty (civil or otherwise) imposed by ERISA, the Code or other applicable Law.

(i)     Each Employee Benefit Plan that is subject to COBRA and/or the requirements of HIPAA, and/or the requirements of the Affordable Care Act has been administered in compliance with such Laws, and none of the Employee Benefit Plans nor the Acquired Companies have any Liability under any such Law.  Except as set forth on Schedule Section 4.18(q) of the Disclosure Schedules, no Employee Benefit Plan provides post-retirement medical or life or other welfare benefits to any current or future retired or terminated employee (or any dependent thereof) of any Acquired Company other than as required pursuant to COBRA, the full cost of which is paid by the participant.  With respect to each Employee Benefit Plan that is an Employee Welfare Benefit Plan, all claims are (i) insured pursuant to a contract of insurance whereby the insurance company bears any risk of loss with respect to such claims, (ii) covered under a contract with a health maintenance organization, pursuant to which the health maintenance organization bears the liability for claims and there are no provisions for retroactive premium adjustments, or (iii) reflected as a liability or accrued for on the Financial Statements.

(j)     No Employee Benefit Plan has been acquired by the Acquired Companies as a result of any merger or acquisition.

(k)     [reserved].

(l)     All required reports with respect to each Employee Benefit Plan have been timely and accurately filed with all Government Authorities, including the IRS, the United States Department of Labor and the Pension Benefit Guaranty Corporation and, as appropriate, provided to participants in the Employee Benefit Plan.

(m)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will (either alone or in conjunction with any event) (i) result in an "excess parachute payment" (within the meaning of Section 280G of the Code or any corresponding provision of state, local or foreign Law) becoming due to any current or former Service Provider, (ii) increase any benefits otherwise payable under any Employee Benefit Plan, (iii) result in any acceleration of the time of funding, payment or vesting of any such benefits, (iv) result in any Liability to the Buyer or any Acquired Company under any Employee Benefit Plan or agreement with any current or former Service Provider, or (v) require any notification or consultation with any union, works council, employee representative or other labor organization.  None of the Acquired Companies has any obligation

32

CONFIDENTIAL     FBG_CH1_00095703

to "gross up" or otherwise compensate any current or former Service Provider or other Person because of the imposition of any tax on a payment to such Person.

(n)     No communication or disclosure has been made that, at the time made, did not accurately reflect the terms and operations of any Employee Benefit Plan.

(o)     Each Acquired Company has, for purposes of each relevant Employee Benefit Plan, correctly classified its current and former Service Providers as common law employees, leased employees, independent contractors or agents of such Acquired Company and no Person has been an active participant in any Employee Benefit Plan subject to ERISA who was not a common law employee of an Acquired Company (or a beneficiary thereof) at the time of participation (other than with respect to continuation coverage mandated by COBRA).

(p)     No Employee Benefit Plan has been the subject of any correction procedure, including the Employee Plan Compliance Resolution System (EPCRS), the Delinquent Filer Voluntary Compliance Program or the Voluntary Fiduciary Correction Program.

(q)     Except as set forth on Schedule Section 4.18(q) of the Disclosure Schedules, there has been no amendment to, written interpretation of or announcement (whether or not written) by the Company or any of the Acquired Companies relating to, or change in employee participation or coverage under, any Employee Benefit Plan, or other fact or circumstance that would increase materially the expense of maintaining such Employee Benefit Plan above the level of the expense incurred in respect thereof for the fiscal year ended prior to the date hereof.

(r)     None of the Employee Benefit Plans are subject to any Laws of a jurisdiction outside the United States and no Acquired Company has any plan or commitment to establish any new Employee Benefit Plan or to modify any Employee Benefit Plan.

(s)     Other than with respect to any Employee Benefit Plan that is a defined benefit pension plan, each Employee Benefit Plan may be terminated without Liability to the Acquired Companies other than ordinary administrative expenses typically associated with such a termination.

(t)     Any notices required by ERISA or the Code or any other applicable Law with respect to the Employee Benefit Plans, including but not limited to any notices required by Section 204(h), Section 606 or Section 4043 of ERISA or Section 4980B of the Code, have been timely provided in the manner required under applicable Law.

**Section 4.19     Employees; Labor Relations.**

(a)     [reserved].

(b)     Except as set forth on Schedule 4.19(b) of the Disclosure Schedules, since the Audit Date, no current salaried employee of any Acquired Company material to the operation of its business has given notice of his or her intent to terminate such employment and no notice of termination has been given to any such salaried employee by any Acquired Company. Subject to the union employees covered by the Collective Bargaining Agreement set forth on Schedule 4.19(c), each current employee of the Acquired Companies is an "at-will" employee who can be terminated at any time for any reason without any monetary or obligations on the part of the Acquired Companies. There will not been any "employment losses" or "layoffs" (as defined in the WARN Act) or similar event during the 90 days prior to the Closing Date that, when aggregated with enough similar other events, would result in any obligation on behalf of any of any of the Acquired Companies under the WARN Act.

33

CONFIDENTIAL

FBG_CH1_00095704

(c)      Except as set forth on Schedule 4.19(c), no Acquired Company is a party to or obligated with respect to any Collective Bargaining Agreement or any employee benefits provided for by any such agreement.  No strike or union organizational activity or other similar occurrence (whether or not resolved) has occurred at any time during the past five years or is pending or threatened against any Acquired Company.  The Acquired Companies are not subject to any charge, demand, petition or representation proceeding seeking to compel, require or demand any of them to bargain with any labor union or labor organization. To the Knowledge of the Company, no labor union has requested or is seeking to represent any Service Provider.  There is no pending or, to the Knowledge of the Company, threatened labor dispute, strike or lockout involving any of the Acquired Companies. There is no pending, or to the Knowledge of the Company, threatened unfair labor practice charge against any of the Acquired Companies before the National Labor Relations Board and, to the Knowledge of the Company, no basis for any such charge exists.  No Acquired Company is or has been a party to or otherwise bound by any Order relating to employees or employment practices, and there are no Governmental Authority conciliation agreements, noncompliance findings or audits pending or in effect with respect to employees or employment practices of any Acquired Company.

(d)      Each current and former employee of the Acquired Companies that has been classified as exempt from overtime requirements was in fact exempt from overtime requirements at all times so classified, in all material respects.  Each current and former Service Provider who has not been classified as an employee of the Acquired Companies was in fact not an employee of the Acquired Companies at all times so classified, except as would not be material.  The Acquired Companies have no material financial obligation to any former Service Provider other than those included in the calculation of Net Working Capital.  The Acquired Companies are not subject to any contractual obligation to rehire any former Service Provider.  The Acquired Companies have complied, in all material respects, with all Laws relating to their current and former non-employee Service Providers.  The Acquired Companies have complied, in all material respects, with all Laws relating to their employees including all applicable Laws respecting employment and employment practices, terms and conditions of employment, and wages and hours, including (i) Title VII of the Civil Rights Act of 1964, as amended, (ii) the Equal Pay Act of 1967, as amended, (iii) the Age Discrimination in Employment Act of 1967, as amended, (iv) the Americans with Disabilities Act, as amended, (v) the Fair Labor Standards Act, as amended, and (vi) Laws relating to employment and employment practices, terms and conditions of employment, wages, hours, collective bargaining and the payment and withholding of Taxes or other sums as required by the appropriate Governmental Authority and has withheld and paid to the appropriate Governmental Authority or is holding for payment not yet due to such Governmental Authority all amounts required to be withheld from current and former employees, and there are no material arrearages or delinquencies in the payment of wages, salaries, commissions, bonuses or other direct compensation, in each such case, and the related rules and regulations adopted by those federal agencies responsible for the administration of such Laws.

(e)      There is material no Liability of, or pending or, to the Knowledge of the Acquired Companies, threatened claims against, or investigations involving, any of the Acquired Companies (including workers' compensation claims and claims or suits for contribution to, or indemnification of, third parties, occupational health and safety, environmental, consumer protection or equal employment matters) for injury, sickness, disease, discrimination, death or termination of employment services of any current or former Service Providers or other employment matter, other than as set forth on Schedule 4.19(e) of the Disclosure Schedules.

(f)      Except for the agreements and Contracts listed on Schedule Section 4.19(f) of the Disclosure Schedules (true, correct and complete copies of which agreements and contracts have been previously delivered to the Buyer or, in the case of oral agreements, descriptions of which are set forth on Schedule Section 4.19(f) of the Disclosure Schedules), there are no other Contracts, agreements or arrangements between any of the Acquired Companies and any current or former Service Provider for

34

FBG_CH1_00095705

which an Acquired Company has financial obligations outstanding. Subject to the Collective Bargaining Agreement set forth on Schedule 4.19(c), the Acquired Companies have no contractual obligation to increase the compensation or benefits presently being paid or provided or hereafter payable or to be provided to current or former Service Providers.

(g)     [reserved].

(h)     Except as set forth on Schedule 4.19(h) of the Disclosure Schedules, the Acquired Companies do not utilize the services of any professional employer organization (PEO), staffing agency, or loan-out agency or any entity that provides temporary or long-term staffing services. Each Person who provides employment-related services to the Acquired Companies is employed by an Acquired Company.

(i)     To the Knowledge of the Company, none of the Service Providers of the Acquired Companies are subject to any non-compete, non-solicitation, non-disclosure, confidentiality, employment, consulting or similar Contracts in conflict with the business and related activities of the Acquired Companies. None of the Acquired Companies has received any written notice alleging that any violation of any such Contracts has occurred.

Section 4.20     **Related Party Transactions**. No Related Party (a) has any direct or indirect interest in any asset used in or otherwise relating to any Acquired Company or their businesses, (b) is indebted to any Acquired Company, (c) has entered into, or has had any direct or indirect financial interest in, any Contract, transaction or business dealing involving any Acquired Company, (d) is a member, manager, director, officer or employee of, or consultant to, or owns, directly or indirectly, any interest in, any vendor, supplier or customer of any Acquired Company, or is in any way associated with or involved in the business of the Acquired Companies (except in his or her official capacity as a director, officer or employee of an Acquired Company, as the case may be), (e) has any interest in or has filed any application with respect to any Intellectual Property, which arises out of or relates to any Acquired Company, or (f) has any claim or right against any Acquired Company (other than rights to receive compensation for, or expense reimbursement in connection with, services performed as an employee or director). Each Acquired Company does not share any facilities or equipment with any Related Party, and each Acquired Company does not purchase or provide assets or services for any business conducted by any Related Party. For the past five years there has not been, and there is not currently, pending, or, to the Knowledge of the Company, threatened, any Proceeding against any current or former Related Party with respect to which an Acquired Company has an indemnification obligation.

Section 4.21     **Real Property**.

(a)     Schedule Section 4.21(a) of the Disclosure Schedules sets forth a complete list, including an address and description, of all real property owned in fee by any Acquired Company (the "**Owned Real Property**"). With respect to Owned Real Property of any Acquired Company: (i) such Acquired Company has fee simple title, free and clear of all Liens except Permitted Liens; (ii) such Acquired Company has not leased, licensed or otherwise granted to any Person the right to use or occupy the Owned Real Property or any portion thereof; and (iii) there are no outstanding options, rights of first offer or rights of first refusal to purchase the Owned Real Property or any portion thereof or interest therein.

(b)     Schedule Section 4.21(b) of the Disclosure Schedules sets forth a complete list, including an address of each leasehold or subleasehold estate or other right to use or occupy any interest in real property held by any Acquired Company (the "**Leased Real Property**" and, together with Owned Real Property, the "**Real Property**") and the Real Property Leases (including all amendments, guaranties and other agreements with respect thereto) relating to each such Leased Real Property. With respect to each Leased Real Property: (i) the relevant Acquired Company's possession and quiet enjoyment under the

35

CONFIDENTIAL

applicable Real Property Lease has not been disturbed; (ii) no Acquired Company has subleased, licensed or otherwise granted any person the right to use or occupy any Leased Real Property or any portion thereof; and (iii) there are no written special, general or other assessments pending against any Acquired Company affecting any Leased Real Property that would be payable by the lessee thereof.

(c)     The Real Property comprises all of the real property that is used in or otherwise related to the businesses of the Acquired Companies. No Acquired Company has received any written notice from any insurance company or board of fire underwriters of any defects or inadequacies that would adversely affect the insurability of any Real Property or requesting the performance of any material work or alteration with respect to any Real Property. There is no pending or, to the Knowledge of the Company, threatened condemnation, expropriation or other governmental taking of any part or interest in any Owned Real Property or, to the Company's Knowledge, Leased Real Property.

Section 4.22     **Suppliers and Customers**.

(a)     Schedule Section 4.22(a) of the Disclosure Schedules contains a true, complete and accurate list of (i) the 5 largest suppliers to the Acquired Companies, taken as a whole, (excluding utilities) by the aggregate dollar value of purchases by the Acquired Companies, taken as a whole, during the 12 month period ended June 30, 2023 (each a "**Top Supplier**") and (ii) with respect to each Top Supplier such aggregate dollar value of purchases. No Top Supplier has terminated or adversely modified in any material respect the amount, frequency or terms of the business such Top Supplier conducts with any Acquired Company. No Acquired Company has received any written notice to terminate or adversely modify in any material respect the amount, frequency or terms of the business such Top Supplier conducts with any Acquired Company. None of the Acquired Companies has any outstanding material dispute with a Top Supplier, and the Company has no Knowledge of any material dissatisfaction on the part of any Top Supplier.

(b)     Schedule Section 4.22(b) of the Disclosure Schedules contains a true, complete and accurate list of (i) the 5 largest customers (consolidating into a single customer all affiliated customers) of the Acquired Companies, taken as a whole, by the aggregate dollar value of sales by the Acquired Companies, taken as a whole, during the 12 month period ended June 30, 2023 (each a "**Top Customer**") and (ii) with respect to each Top Customer, the aggregate dollar value of such sales. No Top Customer has terminated or adversely modified in any material respect the amount, frequency or terms of the business such Top Customer conducts with any Acquired Company. No Acquired Company has received any written notice to terminate or adversely modify in any material respect the amount, frequency or terms of the business such Top Customer conducts with any Acquired Company. None of the Acquired Companies has any outstanding material dispute with a Top Customer, and the Company has no Knowledge of any material dissatisfaction on the part of any Top Customer outside of the ordinary course of business.

Section 4.23     **Insurance Policies**.     Schedule Section 4.23(a) of the Disclosure Schedules contains a true, complete and accurate list of all insurance policies to which any Acquired Company is a party or which provide coverage to or for the benefit of or with respect to any Acquired Company or any Service Provider in his or her capacity as such (the "**Insurance Policies**"), indicating in each case the type of coverage, name of the insured, the insurer, the expiration date of each policy. True, complete and accurate copies of all such Insurance Policies have been provided or made available to the Buyer. Each Insurance Policy is in full force and effect and shall remain in full force and effect in accordance with its terms immediately following the Closing, is provided by a financially solvent carrier and has not been subject to any lapse in coverage. The Acquired Companies are current in all premiums or other payments due under the Insurance Policies and have otherwise complied in all material respects with all of their obligations under each Insurance Policy. The Acquired Companies have given timely notice to the insurer of all material claims that may be insured thereby under any Insurance Policy. Except as set forth on

36

Schedule 4.23(b), no Insurance Policy provides for any retrospective premium adjustment or other experience based liability on the part of any Acquired Company.

**Section 4.24** **Bank Accounts**. Schedule Section 4.24 of the Disclosure Schedules is a true, complete and accurate list of each bank or financial institution in which any Acquired Company has an account, safe deposit box or lockbox, or maintains a banking, custodial, trading or similar relationship, the number of each such account or box, and the names of all persons authorized to draw thereon or to having signatory power or access thereto.

**Section 4.25** **Trade Names; Business Locations**. Schedule Section 4.25 of the Disclosure Schedules sets forth all fictitious or trade names that any Acquired Company has been known as or used and all offices or places of business each Acquired Company has used, in each case, in the past five years. No Acquired Company is the surviving corporation of a merger or consolidation.

**Section 4.26** **Products**. All products manufactured, sold or delivered by any Acquired Company have been in conformity with all applicable warranties, in all material respects, other than product returns or replacements in the ordinary course of business. No Acquired Company has any Liability for replacement or damages in connection with any product manufactured by an Acquired Company, other than product returns, replacements or rework that are not materially inconsistent with those historically incurred by any Acquired Company in the ordinary course of business, that is inconsistent with such Liabilities incurred by the Acquired Companies historically in the ordinary course of business. No Acquired Company received any written notice of any extraordinary product recalls, returns, warranty obligations or service calls relating to any of its products or services (excluding product returns or replacements in the ordinary course of business). No Acquired Company has incurred as of the Closing Date any unsatisfied Liability arising out of any injury to individuals or property as a result of the ownership, possession or use of any products manufactured, sold or delivered by any Acquired Company or with respect to any services rendered by any Acquired Company.

**Section 4.27** [reserved].

**Section 4.28** **Anticorruption; Improper Payments**. None of the Acquired Companies, nor the Seller, nor, to the Knowledge of the Company, any officer, director, agent, manager, employee, or, to the Knowledge of the Company, any other Person authorized to act on behalf of any of the Acquired Companies or the Seller, has, directly or indirectly, taken any act in furtherance of an offer, payment, promise to pay, authorization, or ratification of payment, directly or indirectly, of any money or anything of value (including any gift, sample, rebate, travel, meal and lodging expense, entertainment, service, equipment, debt forgiveness, donation, grant or other thing of value, however characterized) to any Government Official or any Person to secure any improper advantage or to obtain or retain business that would cause any Acquired Company or the Seller to be in violation of Improper Payment Laws. Each Acquired Company complies, and has at all times complied, with all Improper Payment Laws. Without limiting the generality of the foregoing, (a) none of the Acquired Companies nor the Seller has violated or is in violation in any material respect of the U.S. Anti-Kickback Statute (42 U.S.C. Section 1302a-7(b)), the Federal False Claims Act (31 U.S.C. Sections 3729, et seq.) or any related or similar Law and (b) there has been no use or authorization of money or anything of value relating to any unlawful payment or secret or unrecorded fund or any false or fictitious entries made in the books and records of any Acquired Company relating to the same. None of the Acquired Companies, nor the Seller, nor any of their respective Affiliates or Persons acting on their behalf have received any written notice or, to the Knowledge of the Company, other notice from any Person that alleges, nor been involved in any internal investigation involving any allegations relating to potential violation of any Improper Payment Laws, nor have received a request for information from any Governmental Authority regarding Improper Payment Laws. None of the Acquired Companies, nor the Seller nor, to the Knowledge of the Company, any officer, director, manager, employee, attorney,

37

CONFIDENTIAL

accountant, consultant, financial advisor or other agent of either Company or the Seller, has employed or retained, directly or indirectly, a Government Official or a family member of a Government Official, in all cases, with respect to the Business of the Acquired Companies. No Government Official has, directly or indirectly, the right of control over, or any beneficial interest in any Acquired Company.

**Section 4.29** **International Trade Laws**. The Acquired Companies have, at all times as to which the applicable statute of limitations has not yet expired, conducted their transactions in accordance with all applicable International Trade Laws.

**Section 4.30** **No Brokers or Finders**. Except with respect to Angle Advisors, LLC, whose fees and expenses shall constitute a Seller Transaction Expense, none of the Seller, the Acquired Companies or any of their respective Affiliates has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement or any Ancillary Agreement.

**Section 4.31** **No Other Representations and Warranties**. Neither Seller nor Speyside has made, or will be deemed to have made, any representation or warranty in connection with this Agreement or the Ancillary Agreements other than as expressly made by it in this Article III or Article IV herein. Without limiting the generality of the foregoing, except as expressly covered by a representation and warranty contained in Article III or Article IV, neither Seller nor Speyside makes any representation or warranty with respect to any information or documents (financial or otherwise) made available to Buyer or its representatives before or after the date of this Agreement.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Seller as of the date hereof and as of the Closing as follows:

**Section 5.1** **Organization; Authorization**.

(a) The Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite power and authority to own, lease and operate its assets, properties and business and to carry on its business as now being conducted. The Buyer has full right, power, capacity and authority to execute and deliver this Agreement and each of the Ancillary Agreements to be executed and delivered thereby, to consummate the transactions contemplated hereby and thereby and to comply with the terms, conditions and provisions hereof and thereof. The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which the Buyer is a party have been duly and properly authorized by all requisite action in accordance with applicable Law and with the organizational documents of the Buyer. This Agreement and each of the Ancillary Agreements to which the Buyer is a party have been duly executed and delivered by the Buyer and constitute the legal, valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

**Section 5.2** **No Violation**. The execution, delivery and performance by the Buyer of this Agreement and the Ancillary Agreements to which it is a party and the consummation by the Buyer of the transactions contemplated hereby and thereby will not:

CONFIDENTIAL

(a) violate, contravene or conflict with any Law; or

(b) violate, contravene or conflict with any provision of the charter documents, bylaws or similar organizational documents of the Buyer.

**Section 5.3** **Consents and Approvals**. No consent, approval, Order or authorization of, or registration, declaration or filing with, or notice to, any Governmental Authority or other Person is required to be made or obtained by the Buyer in connection with the authorization, execution, delivery and performance by the Buyer of this Agreement and the Ancillary Agreements to which the Buyer is a party, or the consummation by the Buyer of the transactions contemplated hereby and thereby.

**Section 5.4** **Litigation**. There are no Proceedings pending, or to the knowledge of the Buyer, threatened against the Buyer, or any properties or rights of the Buyer, that questions or challenges the validity of this Agreement or the Ancillary Agreements, nor any action taken or to be taken by the Buyer pursuant hereto or thereto or in connection with the transactions contemplated hereby or thereby, and the Buyer does not know of any such Proceeding that may be asserted.

**Section 5.5** **Investment Intent; Experience**. The Buyer is acquiring the Securities for its own account for investment purposes only and not with a view to distribution with the meaning of Section 2(a)(11) of the Securities Act of 1933, as amended. Buyer and its Affiliates have such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its purchase and acquisition of the Securities. Buyer acknowledges that the Securities have not been registered under United States securities laws and agree that the Securities may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without compliance with applicable United States prospectus and registration requirements, except pursuant to an exemption therefrom under applicable United States securities laws.

**Section 5.6** **No Brokers or Finders**. None of the Buyer or any Affiliate thereof has retained any broker or finder, made any statement or representation to any Person that would entitle such Person to, or agreed to pay, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement or any Ancillary Agreement.

**Section 5.7** **Non-Reliance**. Buyer has conducted its own independent investigation, review and analysis of the Acquired Companies and the Business, and acknowledges that it has been provided adequate access to the personnel, properties, premises, books and records and other documents and data of the Acquired Companies and the Business for this purpose. Buyer acknowledges that, in consummating the transactions contemplated hereby, it is not relying upon any express or implied representations or warranties of any nature (or the omission of any such representation or warranty of any nature), whether in writing, orally or otherwise, made by Speyside, the Seller or any other Person, other than the express representations and warranties set forth in Article IV (as modified by the Disclosure Schedules).

**ARTICLE VI**
**[RESERVED]**

**ARTICLE VII**
**OTHER COVENANTS AND AGREEMENTS**

**Section 7.1** **Restrictive Covenants**.

(a) Confidentiality. For a period of five years following the Closing Date, the Seller shall not, and the Seller shall cause its Affiliates not to, use or disclose or convey to any third party, any

39

FBG_CH1_00095710

**DEBTORS' EXHIBIT NO. 98**
**Page 44 of 99**

Confidential Information; provided, however, that the Seller or its Affiliates may furnish such portion (and only such portion) of the Confidential Information as the Seller or such Affiliate reasonably determines it is legally obligated to disclose if: (i) it receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena, civil investigative demand or order issued by a Governmental Authority; and (ii) to the extent not inconsistent with such request, it notifies the Buyer of the existence, terms and circumstances surrounding such request and consults with the Buyer on the advisability of taking steps available under applicable Law to resist or narrow such request.

(b)     [reserved].

(c)     [reserved].

(d)     Non-Solicitation of Employees and Contractors.  The Seller covenants and agrees that during the period beginning on the Closing Date and ending on the three year anniversary of the Closing Date (the "**Restricted Period**"), the Seller and its Affiliates will not, directly or indirectly, solicit, induce, employ or engage, or participate in any manner (as an owner, equity holder, financing source, director, manager, officer, employee, agent, representative, consultant, service provider or otherwise) in any business that solicits, induces, employs or engages, any individual that served as an employee or independent contractor of an Acquired Company, or otherwise seek to influence or alter any such individual's relationship with the Buyer or any Acquired Company; provided that nothing in this Section 7.1(d) will apply to (i) any individual who responds to or hired as a result of general mass solicitations of employment and generalized employee searches by headhunter/search firms (in either case not focused specifically on or directed in any way at employees of any Acquired Company), (ii) any individual whose employment is terminated by Buyer or any Acquired Company, or (iii) Krishnan Venkatesan.

(e)     Non-Disparagement.  Each Party covenants and agrees that such Person and its Affiliates will not, directly or indirectly, make, cause to be made or condone the making of any statement or other communication, written or otherwise, that would constitute disparagement or criticism of, or that would otherwise be considered to be derogatory or detrimental to, or otherwise reflect adversely on, harm the reputation of, or encourage any adverse action against the other Party or any Acquired Company or any of their employees or Affiliates.  Nothing in this Section Section 7.1(e) shall limit a Party's ability to make true and accurate statements or communications in connection with any disclosure such Person reasonably believes is required pursuant to applicable Law or in connection with any Proceeding.

(f)     Acknowledgements; Remedies.  The Seller acknowledges and agrees that (i) the covenants and agreements set forth in this Section Section 7.1 were a material inducement to the Buyer to enter into this Agreement and to perform its obligations hereunder, (ii) the Buyer and its stakeholders would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the Parties if the Seller or any of its Affiliates breached any provisions of this Section Section 7.1, (iii) any breach of any provisions of this Section 7.1 by the Seller or its Affiliates would result in a significant loss of goodwill by the Buyer and the Acquired Companies, (iv) the Purchase Price is sufficient consideration to make the covenants and agreements set forth herein enforceable, (v) [reserved], (vi) the length of time, scope and geographic coverage of the covenants set forth in this Section Section 7.1 is reasonable given the benefits the Seller will directly or indirectly receive hereunder, (vii) the Seller is familiar with all the restrictive covenants contained in this Section Section 7.1 and is fully aware of its obligations hereunder, and (viii) the Seller will not challenge the reasonableness of the time, scope, geographic coverage or other provisions of this Section Section 7.1 in any Proceeding, regardless of who initiates such Proceeding.  The Seller further acknowledges and agrees that irreparable injury will result to the Buyer if the Seller or any of its Affiliates breaches any of the terms of this Section Section 7.1, and that in the event of an actual or threatened breach by the Seller or any of its Affiliates of any of the provisions contained in this Section Section 7.1, the Buyer will have no adequate remedy at Law.  The Seller accordingly agrees that in the event of any actual breach

40

FBG_CH1_00095711

by the Seller or any of its Affiliates of any of the provisions contained in this Section Section 7.1, the Buyer shall be entitled to injunctive and other equitable relief without (A) posting any bond or other security, (B) proving actual damages and (C) showing that monetary damages are an inadequate remedy.  Nothing contained herein shall be construed as prohibiting the Buyer from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of any damages that it is able to prove.  The Seller shall cause its Affiliates to comply with this Section Section 7.1, and shall be liable for any breach by any of its Affiliates of this Section Section 7.1.  In the event of a breach or violation by the Seller or any of its Affiliates of this Section Section 7.1, the Restricted Period with respect to the Seller shall be extended by a period of time equal to the period of time during which such Person violates the terms of this Section Section 7.1.

Section 7.2    **Agreements Regarding Tax Matters**.

(a)    Preparation and Filing of Tax Returns.

(i)    The Seller shall timely prepare or cause to be prepared and file or cause to be filed, at the Seller's expense, all Income Tax Returns of the Acquired Companies for any Pre-Closing Tax Period (other than any Straddle Period) which are first due (taking into account any applicable extensions) after the Closing Date (each, a "**Seller Return**").  All Seller Returns shall be prepared in accordance with applicable Law and such Acquired Company's past practice (provided that such past practice is consistent with applicable Law).  The Seller shall provide each Seller Return to the Buyer for review and comment no later than 30 days before the due date of such Seller Return; provided, however, that if the Seller fails to provide any Seller Return to the Buyer as set forth in this Section Section 7.2(a)(i), the Buyer shall prepare and file such Tax Return at the Seller's expense.  If the Seller and the Buyer are unable to resolve any dispute regarding any Seller Return within 15 days after the Seller submits such Tax Return to the Buyer, the dispute shall be resolved by the Accountant in the same manner as disputes are intended to be resolved pursuant to Section Section 2.8(c).  The Seller shall pay to the Buyer an amount equal to all Seller Taxes shown as due on any Seller Return, to the extent that such Seller Taxes were not included in the final calculation of Net Working Capital or Indebtedness, at least 10 days before the date on which the Buyer or any of the Acquired Companies would be required to pay such Taxes.

(ii)    The Buyer shall timely prepare or cause to be prepared and file or cause to be filed all Tax Returns of the Acquired Companies required to be filed after the Closing Date (taking into account any applicable extensions) with respect to any Pre-Closing Tax Period which are not Seller Returns (each, a "**Buyer Return**").  All Buyer Returns shall be prepared in accordance with applicable Law and such Acquired Company's past practice (provided that such past practice is consistent with applicable Law) provided, further, that, with respect to income Taxes, such Tax Returns will reflect all applicable Transaction Tax Deductions so long as such Transaction Tax Deductions are "more likely than not" deductible (or deductible at a higher confidence level) in the Pre-Closing Period or any pre-Closing portion of a Straddle Period and, for that purpose, the parties agree that (x) payments described in clause (a) of the definition of Transaction Tax Deductions and paid on or within 75 days following the Closing Date and (y) 70% of any success-based investment banking or other fees described in clause (c) of the definition of Transaction Tax Deductions for which the safe-harbor election of Rev. Proc. 2011-29 is made (which election will be made on such Tax Returns to the extent applicable) are "more likely than not" deductible in the Pre-Closing Period or any pre-Closing portion of a Straddle Period and will be reflected on such Tax Returns. Before filing any Tax Return relating to a Pre-Closing Tax Period, (i) Buyer shall provide each Buyer Return that is an Income Tax Return to the Seller for review and comment no later than 30 days before the due date of such Buyer Return (giving effect to any valid extensions thereof), and (ii) Buyer shall incorporate any comments to such Tax Returns as are reasonably requested by Seller. If the Seller and the Buyer are unable to resolve any dispute regarding any Seller Return within 15 days after the Buyer submits such Tax Return to the Seller, the dispute shall be resolved by the Accountant in the same manner as

41

CONFIDENTIAL

disputes are intended to be resolved pursuant to Section 2.8(c). The Seller shall pay to the Buyer an amount equal to all Seller Taxes due with any Buyer Return, to the extent that such Seller Taxes were not included in the final calculation of Net Working Capital or Indebtedness, at least 10 days before the date on which the Buyer or any of the Acquired Companies would be required to pay such Taxes.

(b)     Allocation of Tax Liability.  For all purposes under this Agreement (including the determination of Seller Taxes), in the case of any Tax for a Straddle Period, the portion of such Tax attributable to the Pre-Closing Tax Period shall (i) in the case of any real property, personal property, ad valorem or other similar Tax imposed on a periodic basis, be deemed to be the amount of such Tax for the entire Straddle Period *multiplied by* a fraction the numerator of which is the number of days in the portion of the Straddle Period ending on the end of the Closing Date and the denominator of which is the number of days in the entire Straddle Period, (ii) in the case of any Tax based upon or related to income, sales, payroll, or receipts, be deemed equal to the amount which would be payable if the relevant taxable period ended on the end of the Closing Date, and (iii) in the case of any Tax imposed with respect to an interest in an entity treated as a CFC, partnership, or disregarded entity for purposes of the Code, be determined as if the taxable year of such CFC, partnership, or disregarded entity ended on the end of the Closing Date.

(c)     Cooperation on Tax Matters.  The Buyer, the Acquired Companies, and the Seller shall cooperate fully, as and to the extent reasonably requested by the other Party (and at the requesting Party's expense), in connection with the filing of Tax Returns of the Acquired Companies and any audit, litigation or other Proceeding with respect to Taxes of the Acquired Companies.  Such cooperation shall include the retention for the applicable statute of limitations (including any extension) and (upon the other Party's request and at its expense) the provision of records and information which are reasonably relevant to any such audit, litigation or other Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

(d)     Tax Sharing Agreements.  The Seller shall cause all Tax sharing, Tax indemnification, or Tax distribution agreements to which any Acquired Company, on the one hand, and the Seller or any of its Affiliates (other than an Acquired Company) on the other hand, are parties (excluding this Agreement) to be terminated as of 12:01 a.m. local time on the Closing Date and the Acquired Companies to not be bound thereby or have any Liability thereunder with respect to any taxable period.

(e)     Transfer Taxes, Etc.  All transfer, documentary, sales, use, registration, stamp and other similar Taxes and fees (including any penalties and interest thereon), but excluding for the avoidance of doubt any Income Taxes, incurred in connection with the transactions contemplated by this Agreement (together, "**Transfer Taxes**") shall be paid one-half by the Buyer and one-half by the Seller when due, and the Buyer shall file all necessary Tax Returns and other documentation with respect to such Transfer Taxes. If required by applicable Law, the Buyer shall, and shall cause its Affiliates (if applicable) to, join in the execution of any such Tax Returns and other documentation.

(f)     Tax Controversies.  The Buyer shall give prompt notice to the Seller of the assertion of any claim or commencement of any Proceeding by a Governmental Authority with respect to any Tax liability of any of the Acquired Companies for which the Seller is responsible under this Agreement (each, a "**Tax Claim**"); provided, however, that the failure to give such prompt notice shall not affect the Seller's indemnification obligations under this Agreement except to the extent the Seller is materially prejudiced thereby.  The Seller may, at the Seller's expense, participate in and, upon written notice to the Buyer, assume the defense of a Tax Claim, provided that (i) the Seller provides such written notice within 20 days after receiving notice from the Buyer of such Tax Claim, (ii) the defense of such Tax Claim can be conducted separately from the defense of any Proceeding not subject to this Section 7.2(f), (iii) the Seller shall thereafter consult with the Buyer upon the Buyer's reasonable request for such consultation from time to time with respect to such Proceeding, and (iv) the Seller shall not, without the Buyer's prior written

42

FBG_CH1_00095713

consent, which shall not be unreasonably withheld, conditioned or delayed, agree to any settlement of or appeal any adverse determination with respect to such Tax Claim, if such settlement would adversely affect Buyer's or an Acquired Company's liability for Post-Close Taxes.  If the Seller assumes such defense, the Buyer shall have the right (but not the duty) to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the Seller.  The Buyer shall have the right to control any Tax Claim that is not controlled by the Seller pursuant to this Section 7.2(f); provided, that Buyer shall not settle or compromise any Tax Claim it controls pursuant to this Section 7.2(f) without Seller's written consent, which shall not be unreasonably withheld, conditioned or delayed, if such settlement or compromise would adversely affect Seller's liability for Taxes.

(g)     Retroactive Filings; Voluntary Disclosures. On or after the Closing Date, except as otherwise required by applicable Law, none of Buyer, the Acquired Companies or any of their respective Affiliates shall, without the prior written consent of Seller, which shall not be unreasonably withheld, conditioned or delayed, (i) make, revoke or change any Tax election with respect to the Acquired Companies with retroactive effect to any Pre-Closing Tax Period, (ii) file (except pursuant to this Section 7.2), re-file, amend or otherwise modify any Tax Return for any Pre-Closing Tax Period or (iii) voluntarily approach any Governmental Authority regarding any Tax or Tax Return of any Acquired Company for any Pre-Closing Tax Period.

(h)     Refunds, Abatements and Credits. Any refunds, Tax abatements (including, without limitation, any personal property Tax abatements issued by any state or local taxing authorities and any Income Tax refunds with respect to any amended Income Tax Returns filed prior to Closing with respect to any Pre-Closing Tax Period) or credits in lieu of refunds of Taxes of the Acquired Companies received or applied by the Acquired Companies or its Affiliates after the Closing Date that are attributable to any Pre-Closing Tax Period (including, for avoidance of doubt, any refunds, Tax abatements or credits attributable to prepaid or estimated Taxes paid prior to Closing), plus any interest received after the Closing Date with respect thereto from the applicable Governmental Authority, but less any out-of-pocket costs incurred after Closing by the Acquired Companies, Buyer or any of their respective Affiliates with respect to the receipt of such refunds or credits (including Taxes), shall be paid by Buyer to Seller within thirty (30) days after receipt or application thereof. If the amount of any such Tax refund or credit is subsequently determined by any Governmental Authority to be less than the amount paid by Buyer pursuant to this Section 7.2(h), Seller shall promptly pay to Buyer the amount of any such disallowed Tax refund or credit (including any interest and penalties in respect of such disallowed amount owed to any Governmental Authority).

(i)     Closing of Tax Period. The Parties will, to the extent permitted or required under applicable Law, treat the Closing Date as the last date of the taxable period of the Acquired Companies for all Tax purposes. Buyer will cause the Acquired Companies to join Buyer's "consolidated group" (as defined in Treasury Regulation Section 1.1502-1(h)) effective on the day after the Closing Date. Buyer and its Affiliates and the Acquired Companies (A) will not make an election under Treasury Regulation Section 1.1502-76(b)(2)(ii)(D) to ratably allocate items (or make any similar election to ratably allocate items under any corresponding provision of state, local or foreign Law), (B) will not apply the "next day" rule of Treasury Regulation Section 1.1502-76(b)(1)(ii)(B) with respect to any of the Transaction Tax Deductions and (C) will apply the "next day" rule of Treasury Regulation Section 1.1502-76(b)(1)(ii)(B) with respect to all other items of income, gain, loss, deduction and credit from any transactions occurring on the Closing Date after Closing outside the ordinary course of business.

Section 7.3     [Reserved].

Section 7.4     **Further Assurances**. Each of the Parties agrees that subsequent to the Closing, upon the reasonable request of any other Party from time to time, it shall execute and deliver, or cause to

43

                                                          FBG_CH1_00095714

be executed and delivered, such further instruments and take such other actions as may be necessary or desirable to carry out the transactions contemplated by this Agreement, the Ancillary Agreements and the Motor Castings Spinoff to vest, perfect or confirm ownership by the Buyer of the Securities.

**Section 7.5      Intercompany Arrangements**.      Except as set forth on Schedule 7.5, all intercompany and intracompany accounts or Contracts between any of the Acquired Companies, on the one hand, and the Seller and its Affiliates (other than the Acquired Companies), on the other hand, shall be cancelled without any consideration or further liability to any party and without the need for any further documentation, immediately prior to the Closing.

**Section 7.6      General Release**.

(a)      Effective upon the Closing, the Seller, on the Seller's own behalf and on behalf of the Seller's heirs, successors, trustees, executors, administrators, assigns and any other Person that may claim by, through or under the Seller (collectively, the "**Releasing Parties**"), hereby (i) irrevocably waives, releases, acquits and forever discharges each Acquired Company and each of their respective present and former officers, directors, managers, employees and other agents (collectively, the "**Releasees**") from, any and all Liabilities of any kind or nature whatsoever since the beginning of time and (ii) agrees that no Releasing Party will bring or voluntarily participate in or assist any Proceeding that relates to any matter released pursuant to this Section Section 7.6. Notwithstanding the foregoing, the Releasing Parties do not waive or release any rights based upon, arising out of or relating to rights in favor of the Releasing Parties created pursuant to the terms of this Agreement and the Ancillary Agreements.

(b)      The Releasing Parties understand and agree that the releases provided in Section 7.6(a) above extend to all claims released above whether known or unknown, suspected or unsuspected. As to those matters released herein only, the Releasing Parties waive and relinquish any and all rights they may have under California Civil Code Section 1542, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY"

The Releasing Parties hereto expressly waive and release any rights and benefits which they have or may have under any similar Law or rule of any other jurisdiction pertaining to the matters released herein. It is the intention of the Releasing Parties through this Agreement and with the advice of counsel to fully, finally and forever settle and release the claims set forth above. In furtherance of such intention, the releases herein given shall be and remain in effect as full and complete releases of such matters notwithstanding the discovery of any additional claims or facts relating thereto.

**Section 7.7      Public Announcements**.

(a)      No Party shall issue or cause the publication of any press release or other public announcement containing any financial terms contained in this Agreement or the identity of the counterparties hereto, any Ancillary Agreement or the financial terms of the transactions contemplated hereby or thereby or parties hereto or thereto (whether before or after the Closing) without the prior written consent of the Buyer and the Seller, except as any Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by applicable rules of any stock exchange or quotation system on which such Party or its Affiliates lists or trades securities (in which case the disclosing Party will use its reasonable best efforts to advise the Buyer and the Seller before making such disclosure). It being

CONFIDENTIAL

FBG_CH1_00095715

understood and agreed each Party, without the consent of the other Party, may issue publications or press releases regarding the transactions contemplated hereby that do not contain financial terms of such transaction or disclose the identity of any counterparty hereto.

(b)     No Party shall make publicly available this Agreement or any Ancillary Agreement (or any portion of this Agreement or any Ancillary Agreement) (whether before or after the Closing) without the prior written consent of the Buyer and the Seller, except as any Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by applicable rules of any stock exchange or quotation system on which such Party or its Affiliates lists or trades securities (in which case the disclosing Party will use its reasonable best efforts to advise the Buyer and the Seller before making such disclosure and, upon the request of the Buyer or the Seller, the Parties will work together in good faith to agree and pursue appropriate confidential treatment requests with respect to this Agreement or such Ancillary Agreements).  This <u>Section Section 7.7(b)</u> shall not apply to disclosures by a Party to its investors, officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors, and other agents for the purpose of obtaining advice in connection with the transactions contemplated hereunder, it being understood that such investors, officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors, and other agents will be informed of the confidential nature of this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby and will be directed to treat such information as confidential in accordance with the terms of this Agreement.

### Section 7.8     <u>Directors and Officers Indemnification and Insurance.</u>

(a)     All rights to indemnification, advancement of expenses and exculpation from liability for acts or omissions occurring in connection with or prior to the Closing now existing in favor of each Person who was at any time prior to the Closing, a director, officer, employee or agent of any Acquired Company ("**D&O Indemnified Persons**"), as provided in the organizational documents of any Acquired Company or in any Contract between any Acquired Company and any D&O Indemnified Person, will survive the Closing and will continue in full force and effect in accordance with their respective terms for a period of not less than six (6) years after the Closing Date (or, in the case of any Contract, in accordance with its terms), and will not be amended, repealed or otherwise modified in any manner (unless required by Law) that would adversely affect the rights thereunder of any D&O Indemnified Person with respect to any matters occurring prior to the Closing Date.

(b)     This Section 7.8 shall be for the benefit of, and shall be enforceable by, any D&O Indemnified Person, and in each case, their respective successors, assigns, heirs, executors, administrators and estates, and such Persons shall be express third party beneficiaries of this Agreement for such purposes.

### Section 7.9     <u>Section 280G</u>.  To the extend applicable, the Acquired Companies shall, prior to the Closing, (a) obtain waivers of any "excess parachute payment" within the meaning of Section 280G) from each Person who has a right to any payments and/or benefits as a result of or in connection with the transactions contemplated by this Agreement and any Ancillary Agreement that would be deemed to constitute "excess parachute payments" (within the meaning of Code Section 280G excluding any payments to be made at the direction of the Buyer), and (b) solicit the approval of the stockholders of the Acquired Companies in a manner that complies with Code Section 280(b)(5)(A)(ii) and 280G(b)(5)(B) of all payments and/or benefits (including payments and benefits waived pursuant to the preceding clause) that would, as a result of, or in connection with, the transactions contemplated by this Agreement and any Ancillary Agreement, be deemed to constitute "excess parachute payments."  To the extent required to comply with the provisions of the preceding sentence, the Acquired Companies shall deliver, among other items, to its stockholders a disclosure statement intended to satisfy the stockholder approval requirements of Section 280G(b)(5)(B) of the Code.  The formal waiver, solicitation of approval, and disclosure materials

45

                                                                                   FBG_CH1_00095716

shall be subject to the reasonable prior review of the Buyer, which shall not be unreasonably withheld, conditioned or delayed.

Section 7.10    **Documents and Information**.  After the Closing Date, Buyer shall cause the Acquired Companies to, until the seventh anniversary of the Closing Date, retain all books, records and other documents pertaining to the business of the Acquired Companies and the Motor Castings Companies in existence on the Closing Date and, in connection with (a) the preparation or filing of any Tax Return relating to the Pre-Closing Tax Periods or to verify any Tax refunds or Transaction Tax Deductions, (b) any actual audit or examination or proposed audit or examination related to the foregoing or (c) any suit involving or among the parties or their respective Affiliates, and subject to reasonable confidentiality restrictions and agreements as the Buyer may require, to make the same available for inspection and copying by the Seller or its representatives (at such Seller's cost and expense) during normal business hours of the Acquired Companies, as applicable, upon reasonable request and upon reasonable notice.

Section 7.11    **Motor Castings Spinoff**.  At least two days prior to the Closing Date, the Acquired Companies effectuated the transactions contemplated in that certain Debt Cancellation Letter Agreement ("**Debt Cancellation Agreement**") between the Acquired Companies, on the one hand, and the Motor Castings Companies, on the other hand (the transactions contemplated therein referred to herein as the "**Debt Cancellation and Release**").  At least one day after the Debt Cancellation and Release, but prior to the Closing Date, Seller shall cause the Company to take any and all actions necessary to distribute all right, title and interest in and to the issued and outstanding Equity Securities of Motor Castings to Seller pursuant to that certain Distribution Agreement ("**Distribution Agreement**") by and between Seller and the Company (the transactions contemplated therein referred to herein as the "**Motor Castings Distribution**" and together with the Debt Cancellation and Release, the "**Motor Castings Spinoff**").

Section 7.12    **Dalton 401(k) Plan Corrections**.  Seller shall take any and all reasonable actions (and pay any and all costs and filing fees) necessary to make Voluntary Correction Program submissions to the IRS on behalf of the Acquired Companies to request to retroactively amend the Dalton 401(k) Plans to (a) update the fact that such Dalton 401(k) Plans cover the employees of Dalton Corporation (which has no employees), Dalton Corporation, Stryker Machining Facility Co. and Dalton Corporation, Warsaw Manufacturing Facility, despite the lack of any participation agreements reflecting the adoption of either Dalton 401(k) Plan by any other Acquired Company who has participating employees and (b) amend the Dalton Corporation 401(k) Plan to exclude the union employees of the Acquired Companies for purposes of both employer contributions and pay deferral contributions to such plan (the deficiencies or errors in the Dalton 401(k) Plans with respect to periods prior to Closing as described in this Section 7.12 are the "**Dalton 401(k) Plan Errors**").

Section 7.13    **Deferred Phantom Equity Payment**.  To the extent that, after Closing, Seller is entitled to any payment under Section 7.2(h), the parties agree that Allen Jacob Yahne shall be entitled to 5% of such payment, and Buyer shall offset and holdback from Seller 5% of such payment owing to Seller under Section 7.2(h) (together with an amount equal to the employer portion of Taxes required to be withheld in connection with the same) and Buyer shall cause such amounts to be paid to Allen Jacob Yahne by an Acquired Company, less applicable withholding Taxes, through its respective payroll.

**ARTICLE VIII**
**[RESERVED]**

**ARTICLE IX**
**[RESERVED]**

46

CONFIDENTIAL

## ARTICLE X

**Section 10.1**     <u>Survival</u>.

(a)     The representations, warranties, covenants and agreements contained herein shall survive the Closing.  The indemnification obligations under <u>Section Section 10.2</u> and <u>Section Section 10.3</u> with respect to breaches of representations and warranties contained in this Agreement, the Ancillary Agreements or any schedule, certificate or other document pursuant hereto or thereto shall survive the Closing and continue until the date that is twelve months after the Closing Date, except that:

(i)     such indemnification obligations with respect to breaches of any Fundamental Representation (other than those set forth in clause (ii) below) or breaches of any representation or warranty in the case of Fraud, shall survive the Closing and continue for a period of 20 years; and

(ii)     such indemnification obligations with respect to breaches of any representation or warranty set forth in <u>Section Section 4.16(j)</u> shall survive the Closing and continue until 60 days after the statute of limitations (giving effect to any waiver, mitigation or extension thereof) applicable to the subject matter of such representations and warranties bars all claims with respect to such subject matter.

(b)     The indemnification obligations under <u>Section Section 10.2</u> and <u>Section Section 10.3</u> with respect to breaches of covenants and agreements contained in this Agreement, the Ancillary Agreements or any schedule, certificate or other document pursuant hereto or thereto shall survive the Closing and continue until 60 days after the statute of limitations (giving effect to any waiver, mitigation or extension thereof) applicable to the subject matter of such covenants and agreements bars all claims with respect to such subject matter.

(c)     Notwithstanding anything to the contrary contained herein, if written notice of any claim for indemnification hereunder has been delivered in accordance herewith prior to the expiration of the applicable period set forth above, the indemnification obligations shall continue solely with respect to such claim until the final resolution and satisfaction of such claim in accordance with the provisions of this <u>Article X</u>.

**Section 10.2**     <u>Indemnification by the Seller</u>. From and after the Closing, and subject to the terms of this Agreement, the Seller and Speyside agrees to indemnify, and hold harmless the Buyer Indemnified Parties from and against, and pay or reimburse the Buyer Indemnified Parties for, any and all Losses relating to, imposed upon, suffered or incurred by any Buyer Indemnified Party by reason of, resulting from or arising out of:

(a)     any inaccuracy in or breach of any of the representations or warranties of contained in <u>Article III</u> or <u>Article IV</u> of this Agreement;

(b)     any breach by the Seller of any of its covenants or agreements contained in this Agreement, any Ancillary Agreement or any schedule, certificate or other document delivered pursuant hereto or thereto;

(c)     the amount of any Closing Date Indebtedness that was not taken into account in calculating the Closing Payment made pursuant to <u>Section Section 2.7(a)</u> or the Purchase Price Adjustment, if any, made pursuant to <u>Section Section 2.8</u>;

CONFIDENTIAL

FBG_CH1_00095718

(d)     the amount of any Seller Transaction Expenses charged to the Acquired Companies, the Buyer or any of their Affiliates after Closing that was not taken into account in calculating the Closing Payment made pursuant to Section Section 2.7(a) or the Purchase Price Adjustment, if any, made pursuant to Section Section 2.8;

(e)     any Seller Taxes to the extent that such Seller Taxes were not included in the final calculation of Net Working Capital or Indebtedness;

(f)     the Motor Castings Companies or the Motor Castings Spinoff;

(g)     the Dalton 401(k) Plan Errors; and

(h)     any Proceeding or claim by Stephen Shaffer with respect to any payment or obligation owed or owing to him in connection with or as a result of the consummation of the transactions contemplated by this Agreement.

**Section 10.3     Indemnification by the Buyer**.  From and after the Closing, and subject to the terms of this Agreement, the Buyer agrees to indemnify, and hold harmless the Seller Indemnified Parties from and against, and pay or reimburse the Seller Indemnified Parties for, any and all Losses relating to, imposed upon, suffered or incurred by any Seller Indemnified Party by reason of, resulting from or arising out of:

(a)     any inaccuracy in or breach of any of the representations and warranties of the Buyer contained in Article V of this Agreement; and

(b)     a breach by the Buyer of any of its covenants or agreements contained in this Agreement, any Ancillary Agreements or any schedule, certificate or other document delivered pursuant hereto or thereto.

**Section 10.4     Indemnification Procedure**.

(a)     In the event that any Person entitled to indemnification under this Agreement (an "**Indemnified Party**") receives notice of the assertion of any claim or of the commencement of any Proceeding by any Person who is not a Party or an Affiliate of a Party (a "**Third Party Claim**") against such Indemnified Party, with respect to which a Party is or may be required to provide indemnification under this Agreement (an "**Indemnifying Party**"), the Indemnified Party shall give written notice regarding such Third Party Claim to the Indemnifying Party within 30 days after learning of such Third Party Claim, provided that the failure to so notify an Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Article X except to the extent (and only to the extent) that the Indemnifying Party is materially prejudiced by reason of such failure, and will not relieve such Indemnifying Party from any other obligation that it may have to an Indemnified Party other than under this Article X.

(b)     The Indemnifying Party shall be entitled to participate in the defense of such Third Party Claim at such Indemnifying Party's expense (which expenses shall not be applied against any indemnity limitation herein).   The Indemnifying Party at its option shall be entitled to assume the defense thereof (subject to the limitations set forth below) by (i) delivering written notice to the Indemnified Party of its election to assume the defense of such Third Party Claim within 30 days of receipt of notice from the Indemnified Party, (ii) appointing a reputable counsel reasonably acceptable to the Indemnified Party to be the lead counsel in connection with such defense and (iii) entering into a written agreement with the Indemnified Party that the Indemnifying Party is unconditionally obligated to pay and satisfy any Losses which may arise with respect to such Third Party Claim and provides evidence of its ability to satisfy such

48

FBG_CH1_00095719

obligation, in each case, in form and substance reasonably satisfactory to the Indemnified Party. If the Indemnifying Party does not expressly elect to assume the defense of such Third Party Claim within the time period and otherwise in accordance with the preceding sentence, the Indemnified Party shall have the sole right to assume the defense of and to settle such Third Party Claim.

(c)     If the Indemnifying Party has assumed the defense of a Third Party Claim in accordance with the terms hereof, the Indemnified Party shall be entitled to participate in the defense of such claim and to employ counsel of its choice for such purpose, and the fees and expenses of such separate counsel shall be borne by the Indemnified Party other than any fees and expenses of such separate counsel (i) that are incurred prior to the date the Indemnifying Party assumes control of such defense, (ii) if the Indemnified Party reasonably shall have concluded (upon advice of its counsel) that there may be one or more legal defenses available to such Indemnified Party that are not available to the Indemnifying Party, or (iii) if the Indemnifying Party may have different, conflicting, or adverse legal positions or interests from the Indemnified Party with respect to such Third Party Claim; provided that the Indemnifying Party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be responsible for the fees and expenses of more than one separate counsel (in addition to any local counsel) for the Indemnified Party.

(d)     Notwithstanding anything to the contrary contained herein, the Indemnifying Party shall not be entitled to control the defense of a Third Party Claim (and the Indemnified Party shall be entitled to maintain or assume control of the defense of such Third Party Claim, at the Indemnifying Party's sole expense) if (i) the Third Party Claim relates to or involves any criminal or quasi criminal Proceeding, (ii) the Third Party Claim primarily relief is seeking an injunction or other equitable relief against the Indemnified Party, (iii) the Indemnified Party reasonably believes that the Losses relating to the claim could exceed the maximum amount that such Indemnified Party would then be entitled to recover under this Article X, (iv) the Third Party Claim involves Taxes (which shall be governed exclusively by Section Section 7.2(f)), (v) the Third Party Claim involves a material customer or material supplier of the Indemnified Party, (vi) the Indemnifying Party fails to vigorously defend the Third Party Claim or (vii) there exists or would reasonably be expected to exist a conflict of interest that would make it inappropriate in the judgment of the Indemnified Party for the same counsel to represent both the Indemnified Party and the Indemnifying Party.

(e)     If the Indemnifying Party shall control the defense of any Third Party Claim, the Indemnifying Party shall obtain the prior written consent of the Indemnified Party before entering into any settlement of, consenting to the entry of any judgment with respect to or ceasing to defend such Third Party Claim if (i) pursuant to or as a result of such settlement, consent or cessation, injunctive or other equitable relief will be imposed against the Indemnified Party, or a finding or admission of any violation of Law would be made by any Indemnified Party, or such settlement, consent or cessation could otherwise reasonably be expected to interfere with or adversely affect the business, operations or assets of the Indemnified Party (other than monetary obligations to be paid by the Indemnifying Party), or (ii) such settlement or judgment does not expressly and unconditionally release the Indemnified Party from all Liabilities and obligations with respect to such Third Party Claim.

(f)     The indemnification required hereunder in respect of a Third Party Claim shall be made by prompt payment by the Indemnifying Party of the amount of actual Losses in connection therewith subject to the limitations herein, as and when bills are received by the Indemnifying Party or within 10 days following the Indemnifying Party's receipt of notice that Losses have been incurred.

(g)     Notwithstanding the provisions of Section Section 11.10, each Indemnifying Party hereby consents to the nonexclusive jurisdiction of any court in which a Proceeding in respect of a Third Party Claim is brought against any Indemnified Party for purposes of any claim that an Indemnified Party

49

DEBTORS' EXHIBIT NO. 98
Page 54 of 99

may have under this Agreement with respect to such Proceeding or the matters alleged therein and agrees that process may be served on each Indemnifying Party with respect to such claim anywhere.

(h)     The Indemnifying Party shall not be entitled to require that any Proceeding be made or brought against any other Person before a Proceeding is brought or claim is made against it hereunder by the Indemnified Party.

(i)     In the event any Indemnified Party has a claim against any Indemnifying Party hereunder that does not involve a Third Party Claim being asserted against or sought to be collected from such Indemnified Party, the Indemnified Party shall deliver notice of such claim with reasonable promptness to the Indemnifying Party, provided that the failure to so notify an Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Article X except to the extent (and only to the extent) that the Indemnifying Party is materially prejudiced by reason of such failure, and will not relieve such Indemnifying Party from any other obligation that it may have to an Indemnified Party other than under this Article X.  If the Indemnifying Party does not notify the Indemnified Party within 30 days following its receipt of such notice that the Indemnifying Party disputes its Liability to the Indemnified Party hereunder, such claim specified by the Indemnified Party shall be deemed to be objected to by the Indemnifying Party for purposes of this Article X.

(j)     If the Indemnifying Party agrees that it has an indemnification obligation under this Article X but asserts that it is obligated to pay a lesser amount than that claimed by the Indemnified Party, the Indemnifying Party shall pay such lesser amount promptly to the Indemnified Party, without prejudice to or waiver of the Indemnified Party's claim for the difference.

**Section 10.5     Certain Limitations**.

(a)     Basket for Losses of the Buyer Indemnified Parties.  Neither Seller nor Speyside shall be liable under Section 10.2(a) unless the aggregate Losses incurred by the Buyer Indemnified Parties with respect to all matters for which indemnification is to be provided under Section 10.2(a) exceed $450,000 in the aggregate (the "**Basket Amount**").  If and when such Basket Amount is met, then the Seller will only be liable under Section 10.2(a) for such Losses in excess of the Basket Amount, but not back to dollar one.  In no event shall an Indemnifying Party have liability to the Indemnified Party for any consequential, special, incidental, punitive or exemplary damages, except to the extent any such damages would otherwise be recoverable under applicable Law in an action for breach of contract or any such damages that are recovered against an Indemnified Party in respect of a Third Party Claim.

(b)     Cap on Losses of the Buyer Indemnified Parties.  The aggregate amount required to be paid by the Seller under Section 10.2(a) shall not exceed $4,500,000 in the aggregate (the "**Cap**").

(c)     Indemnification Limitations.

(i)     The amount of any Losses payable under this Article X by the Indemnifying Party will be net of any amounts actually recovered by the Indemnified Party under applicable insurance policies or from any other Person responsible therefor (which shall, for the avoidance of doubt, take into account any retention, deductible or similar feature applicable thereto).  If the Indemnified Party receives any amounts under applicable insurance policies, or from any other Person responsible for any Losses, with respect to a matter for which indemnification is sought hereunder subsequent to an indemnification payment being made by the Indemnifying Party, then such Indemnified Party will reimburse the Indemnifying Party with respect to such payment.

CONFIDENTIAL

(ii)    Each Indemnified Party will use commercially reasonable efforts to mitigate any Losses for which such Indemnified Party seeks indemnification under this Article X.

(iii)    Notwithstanding anything contained herein to the contrary, the amount of any Losses incurred or suffered by an Indemnified Party will be calculated after giving effect to any Tax benefit actually realized by the Indemnified Party (or any of its Affiliates) in the same taxable year with respect to such Losses.

(d)    Exceptions to Basket and Cap.  Notwithstanding anything to the contrary contained herein, (i) the limitations set forth in Sections Section 10.5(a) through Section 10.5(c) shall not apply to Losses by reason of, resulting from or arising out of, any (A) breach of a Fundamental Representation, or (B) claims of Fraud, and (ii) no indemnification payment made by any Indemnifying Party by reason of, resulting from or arising out of, any breach of any Fundamental Representation shall be considered in determining whether the Basket Amount or the Cap has been exceeded.

**Section 10.6    Materiality Qualifiers**.  Notwithstanding anything to the contrary contained herein, for purposes of determining (a) the amount of Losses arising from a breach for which the Buyer Indemnified Parties or the Seller Indemnified Parties are entitled to indemnification under this Agreement and (b) whether the Basket Amount has been exceeded, each such representation and warranty shall be read without giving effect to any qualification that is based on materiality, including the words "material," "Material Adverse Effect," "in any material respect" and other uses of the word "material" or words of similar meaning (and shall be treated as if such words were deleted from such representation or warranty).

**Section 10.7    Indemnification as Sole Remedy**.  Following the Closing, except as set forth in Section Section 2.8, Section Section 7.1, Section Section 7.2 and Section Section 11.12, the Parties acknowledge and agree that from and after Closing their sole and exclusive remedy with respect to any and all claims (other than claims arising from Fraud on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Article X. In furtherance of the foregoing, each party hereby waives, from and after Closing, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this Article X.  Notwithstanding the foregoing or anything else in this Agreement to the contrary, (a) in the case of Fraud, the Buyer Indemnified Parties or the Seller Indemnified Parties, as applicable, shall have all remedies available under this Agreement or otherwise without giving effect to any of the limitations or waivers contained herein and (b) nothing herein shall limit any Party's right to seek and obtain equitable remedies with respect to any covenant or agreement contained in this Agreement or any Ancillary Agreement.

**Section 10.8    Prevailing Party**.  The party prevailing in any Proceeding involving this Agreement or subject matter hereof that results in a judgement or order of a court of competent jurisdiction shall be entitled to an award of all costs, fees and expenses, including attorneys' fees and expenses to be paid by the non-prevailing party against whom enforcement is ordered.

**Section 10.9    Waiver of Contribution**.  The Seller hereby irrevocably waives and releases any right of contribution, subrogation or any similar right against any Buyer Indemnified Party in respect of matters that are or may become the subject of claims for indemnification hereunder and any indemnification payments that the Seller may, at any time, be required to make to any Buyer Indemnified Party pursuant to this Agreement.

51

CONFIDENTIAL

FBG_CH1_00095722

**Section 10.10    Tax Treatment of Payments**.  All indemnification payments made pursuant to this Agreement shall be treated by the Buyer, the Seller and their respective Affiliates, to the extent permitted by Law, as an adjustment to the Purchase Price for Income Tax purposes.

**ARTICLE XI**
**MISCELLANEOUS**

**Section 11.1    Notices**.  All notices and other communications made pursuant to or under this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when transmitted by facsimile or electronic mail if such transmission occurs on a Business Day before 5:00 p.m. Eastern time, or the next succeeding Business Day if such transmission occurs at any other time, (c) one Business Day after deposit with a nationally recognized overnight courier service, or (d) three Business Days after the mailing if sent by registered or certified mail, postage prepaid, return receipt requested.  All notices and other communications under this Agreement shall be delivered to the addresses set forth below, or such other address as such Party may have given to the other Parties by notice pursuant to this Section Section 11.1 (or in the case of counsel, to such other readily ascertainable business address as such counsel may hereafter maintain).

|  |  |
|---|---|
| If to the Seller: | Jeffrey Stone<br>One Towne Square,<br>Suite 1570,<br>Southfield, Michigan 48076<br>Email: Jeffrey.stone@speysideequity.com |
| with a copy to (which<br>shall not constitute notice): | Miller Johnson<br>45 Ottawa Ave. SW<br>Suite 1100<br>Grand Rapids, MI 49503<br>Email; danielsd@millerjohnson.com;<br>Attention: Dustin Daniels |
| If to the Buyer: | Ignite Acquisition Sub, LLC<br>c/o First Brands Group, LLC<br>1540 Broadway, Suite 3710<br>New York, New York 10036<br>E-Mail: shekhar.kumar@firstbrandsgroup.com<br>Attention: Shekhar Kumar |

**Section 11.2    Expenses**.  Except as otherwise provided herein, all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated, provided that, if the Closing occurs, the Seller Transaction Expenses shall be borne and paid as provided in this Agreement.

**Section 11.3    Entire Agreement**.  All references in this Agreement or the Ancillary Agreements to this Agreement shall include all Exhibits and Schedules hereto (including all of the Disclosure Schedules).  This Agreement and the Ancillary Agreements constitute the entire agreement of the Parties relating to the subject matter hereof and thereof and supersede all prior agreements or understandings between the Parties with respect to such subject matter.  Notwithstanding any oral agreement or course of conduct of the Parties or their respective officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors and other agents to the contrary, no Party shall be under any legal obligation

52

CONFIDENTIAL                                                            FBG_CH1_00095723

to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each of the Parties.

Section 11.4   **No Third-Party Beneficiaries**.  This Agreement shall inure exclusively to the benefit of and be binding upon the Parties, any Person entitled to indemnification under Article X with respect to the provisions therein, any D&O Indemnified Persons as contemplated by Section 7.8 and any Releasee with respect to the provisions of Section Section 7.6, and their respective successors, permitted assigns, executors and legal representatives.  Nothing in this Agreement, express or implied, is intended to confer on any Person (other than the Parties or their respective successors and permitted assigns, any Person entitled to indemnification under Article X with respect to the provisions therein, any D&O Indemnified Persons as contemplated by Section 7.8 and any Releasee with respect to the provisions of Section Section 7.6) any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 11.5   **Assignments**.  This Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns, but will not be assignable or delegable by any Party, by operation of Law or otherwise, without the prior written consent of the other Parties; provided, however, that nothing in this Agreement shall or is intended to limit the ability of the Buyer to assign its rights or delegate its responsibilities, liabilities and obligations under this Agreement, in whole or in part, without the consent of the Seller to (a) any Affiliate of the Buyer, (b) any direct or indirect purchaser of all or substantially all of the assets of the Acquired Companies, or (c) any lender to the Buyer and/or any Acquired Company as security for borrowings.  Any attempted assignment in violation of this Section Section 11.5 shall be void *ab initio*.

Section 11.6   **Amendment; Waiver**.  This Agreement shall not be amended, modified or waived in any manner except by an agreement in writing duly executed and delivered by each of the Buyer and the Seller.  No failure or delay of any Party to exercise any right or remedy given to such Party under this Agreement or otherwise available to such Party, or to insist upon strict compliance by any other Party with its or his obligations hereunder, no single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, and no custom or practice of the Parties in variance with the terms hereof, shall constitute a waiver of any Party's right to demand exact compliance with the terms hereof.  Any written waiver shall be limited to those items specifically waived therein and shall not be deemed to waive any future breaches or violations or other non-specified breaches or violations unless, and to the extent, expressly set forth therein.

Section 11.7   **Agreement Controls**.  In the event that a provision of any Ancillary Agreement is inconsistent with, conflicts with or contradicts any term of this Agreement, the terms of this Agreement shall prevail.

Section 11.8   **Severability**.  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired.  If the final judgment of a court of competent jurisdiction or other Governmental Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

Section 11.9   **Governing Law**.  This Agreement shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation, inducement to enter and/or performance of this Agreement (whether related to breach of contract, tortious conduct or otherwise and

53

**DEBTORS' EXHIBIT NO. 98**
**Page 58 of 99**

whether now existing or hereafter arising) shall be governed by, the internal Laws of the State of Delaware, without giving effect to any Law that would cause the Laws of any jurisdiction other than the State of Delaware to be applied. The Seller shall cause the Seller Indemnified Parties, and the Buyer shall cause the Buyer Indemnified Parties, to comply with the foregoing as though such Indemnified Parties were a Party to this Agreement.

**Section 11.10    Consent to Jurisdiction; Service of Process; Waiver of Jury Trial**.

(a)    Each Party agrees that any Proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought exclusively in the Delaware Court of Chancery in New Castle County, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Proceeding, the United States District Court for the District of Delaware, and each of the Parties hereby submits to the exclusive jurisdiction of such courts for itself and with respect to its property, generally and unconditionally, for the purpose of any such Proceeding. A final judgment in any such Proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each Party agrees not to commence any Proceeding arising out of or relating to this Agreement or the transactions contemplated hereby except in the courts described above (other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in Delaware as described above), irrevocably and unconditionally waives any objection to the laying of venue of any Proceeding arising out of or relating to this Agreement or the transactions contemplated hereby in any such court, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such Proceeding brought in any such court has been brought in an inconvenient forum or does not have jurisdiction over any Party.

(b)    Each Party agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth herein shall be effective service of process for any such Proceeding.

(c)    EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, STATUTE OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF. EACH PARTY FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER PROCEEDING IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED OR WARRANTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.10</u>.

**Section 11.11    Admissibility into Evidence**. All offers of compromise or settlement among the Parties or their officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors or other agents in connection with the attempted resolution of any dispute under this Agreement shall be deemed to have been delivered in furtherance of a settlement and shall be exempt from discovery and production and shall not be admissible in evidence (whether as an admission or otherwise) in any Proceeding for the resolution of such dispute.

54

CONFIDENTIAL

FBG_CH1_00095725

**Section 11.12** **Specific Performance**. The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, each of the Parties shall be entitled to enforce specifically the provisions of this Agreement, including obtaining an injunction or injunctions to prevent breaches or threatened breaches of this Agreement, in any court designated to resolve disputes concerning this Agreement (or, if such court lacks subject matter jurisdiction, in any appropriate state or federal court), this being in addition to any other remedy to which such Party is entitled at Law or in equity. Each Party further agrees not to assert and waives (a) any defense in any action for specific performance that a remedy at Law would be adequate and (b) any requirement under any Law to post security or provide indemnity as a prerequisite to obtaining equitable relief.

**Section 11.13** **Other Remedies**. Except to the extent set forth otherwise in this Agreement, all remedies under this Agreement expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or at Law or in equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

**Section 11.14** **No Recourse Against the Buyer or Seller Affiliates**.

(a) Notwithstanding anything in this Agreement or in any other document delivered pursuant to this Agreement to the contrary, the Buyer's obligations under this Agreement may only be enforced against, and any Proceeding for breach of this Agreement by the Buyer, may only be made against the entity that is expressly identified herein as the "Buyer," and no Affiliate of the Buyer shall have any Liability for any breach of this Agreement. Neither the Company nor the Seller shall have any right of recovery in respect hereof against any Affiliate of the Buyer, whether by or through attempted piercing of the corporate or limited liability company veil, including through any Proceeding by or on behalf of the Company or the Seller against any Affiliate of the Buyer seeking the enforcement of any judgment, fine or penalty or by virtue of any applicable Law, or otherwise.

(b) Notwithstanding anything in this Agreement or in any other document delivered pursuant to this Agreement to the contrary, each of the Seller's and Speyside's obligations under this Agreement may only be enforced against, and any Proceeding for breach of this Agreement by either the Seller or Speyside (as applicable), may only be made against the entity that is expressly identified herein as the "Seller" or "Speyside" and no Affiliate of the Buyer shall have any Liability for any breach of this Agreement. Neither the Buyer nor its Affiliates shall have any right of recovery in respect hereof against any Affiliate of the Seller or Speyside, whether by or through attempted piercing of the corporate or limited liability company veil, including through any Proceeding by or on behalf of any Acquired Company or Affiliate of Buyer against any Affiliate of the Seller or Speyside seeking the enforcement of any judgment, fine or penalty or by virtue of any applicable Law, or otherwise.

**Section 11.15** **Rules of Construction**. The following rules of construction shall govern the interpretation of this Agreement:

(a) all references to Articles, Sections, Exhibits or Schedules are to Articles, Sections, Exhibits or Schedules in this Agreement;

(b) each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with GAAP;

(c) unless the context otherwise requires, words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, the feminine or neuter gender shall include the masculine, feminine and neuter;

55

CONFIDENTIAL

FBG_CH1_00095726

(d)     whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "but not limited to";

(e)     the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not simply mean "if";

(f)     references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(g)     when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in beginning the calculation of such period will be excluded (for example, if an action is to be taken within two days after a triggering event and such event occurs on a Tuesday, then the action must be taken on or prior to Thursday); if the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(h)     time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement;

(i)     the subject headings of Articles and Sections of this Agreement are included for purposes of convenience of reference only and shall not affect the construction or interpretation of any of its provisions;

(j)     (i) the terms "hereof", "herein", "hereby", "hereto", and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto, (ii) the term "any" means "any and all", and (iii) the term "or" shall not be exclusive and shall mean "and/or";

(k)     (i) references to "days" means calendar days unless Business Days are expressly specified and (ii) references to "$" mean U.S. dollars;

(l)     the Parties intend that each representation, warranty, covenant and agreement contained herein shall have independent significance, and if any Party has breached any representation, warranty, covenant or agreement contained herein in any respect, the fact that there exists another representation, warranty, covenant or agreement relating to the same or similar subject matter that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, covenant or agreement;

(m)     all uses of "written" contained in Articles III, IV and V shall be deemed to include information transmitted via e-mail;

(n)     for purposes of Article IV, information shall be deemed to have been "made available" to the Buyer if such information was posted to the electronic data room maintained by Angle Advisors, LLC prior to Closing;

(o)     any drafts of this Agreement or any Ancillary Agreement circulated by or among the Parties prior to the final fully executed drafts shall not be used for purposes of interpreting any provision of this Agreement or any Ancillary Agreement, and each of the Parties agrees that no Party, Indemnifying Party or Indemnified Party shall make any claim, assert any defense or otherwise take any position

56

CONFIDENTIAL

inconsistent with the foregoing in connection with any dispute or Proceeding among any of the foregoing or for any other purpose; and

(p)     the Parties have participated jointly in the negotiation and drafting of this Agreement and the Ancillary Agreements; in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Ancillary Agreements shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement or any Ancillary Agreement and the language used in it will be deemed to be the language chosen by the Parties to express their mutual intent.

Section 11.16   **Counterparts; Deliveries**. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement, the Ancillary Agreements and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of electronic transmission of .pdf files or other image files via e-mail, cloud-based transfer or file transfer protocol, or use of a facsimile machine, shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No party to any such agreement or instrument shall raise the use of electronic transmission or a facsimile machine to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of electronic transmission or a facsimile machine as a defense to the formation or enforceability of a contract, and each such party forever waives any such defense.

Section 11.17   **Waiver of Conflicts**.

(a)     Each party to this Agreement acknowledges that (i) the Acquired Companies, Seller, Speyside and/or their respective Affiliates have retained Miller, Johnson, Snell & Cummiskey, P.L.C. (the "**Law Firm**") to act as their counsel in connection with the transactions contemplated by this Agreement (including the negotiation, preparation, execution and delivery of this Agreement, the Ancillary Agreements and related agreements, and the consummation of the transactions contemplated by this Agreement) as well as other past and ongoing matters, (ii) the Law Firm has not acted as counsel for any other Person in connection with the transactions contemplated by this Agreement and (iii) no Person other than the Acquired Companies, Seller, Speyside and/or their respective Affiliates (as applicable) has the status of the Law Firm client for conflict of interest or any other purpose as a result thereof. Buyer hereby (A) waive and will not assert, and will cause each of their respective Affiliates (including, after the Closing, the Acquired Companies) to waive and not assert, any conflict of interest relating to the Law Firm's representation after the Closing of the Seller, Speyside and/or their respective Affiliates (as applicable) in any matter involving the transactions contemplated by this Agreement (including the negotiation, preparation, execution and delivery of this Agreement and related agreements, and the consummation of the transactions contemplated by this Agreement), including in any litigation, arbitration, mediation or other Proceeding, and (B) consents to, and will cause each of their respective Affiliates (including, after the Closing, the Acquired Companies) to consent to, any such representation, even though in each case (x) the interests of the Seller, Speyside and/or their respective Affiliates (as applicable) may be directly adverse to Buyer or its Affiliates, (y) the Law Firm may have represented the Seller, Speyside and/or their respective Affiliates (as applicable) in a substantially related matter or (z) the Law Firm may be handling other ongoing matters for Buyer, the Acquired Companies or any of their respective Affiliates.

(b)     Buyer agrees that, after the Closing, none of Buyer or its Affiliates will have any right to access or control any Attorney-Client Communications, which will be the property of (and be controlled by) the Seller or its Affiliates, as applicable. In addition, Buyer agree that it would be impractical to remove all Attorney-Client Communications from the books and records (including e-mails and other

57

FBG_CH1_00095728

electronic files) of the Acquired Companies. Accordingly, Buyer will not, and will cause each of its respective Affiliates (including, after the Closing, the Acquired Companies) not to, use any Attorney-Client Communication remaining in the books and records of the Acquired Companies after the Closing in a manner that may be adverse to the Seller, Speyside or any of their respective Affiliates.

(c)      Buyer agrees, on behalf of themselves and on behalf of its Affiliates (including, after the Closing, the Acquired Companies), that from and after the Closing (i) the attorney-client privilege, all other evidentiary privileges, and the expectation of client confidence as to all Attorney-Client Communications belong to the Seller, Speyside or their respective Affiliates, as applicable, and will not pass to or be claimed by Buyer or any of its Affiliates and (ii) the Seller, Speyside or their Affiliates, as applicable, will have the exclusive right to control, assert or waive the attorney-client privilege, any other evidentiary privilege, and the expectation of client confidence with respect to such Attorney-Client Communications. Accordingly, Buyer will not, and will cause each of its Affiliates not to, (x) assert any attorney-client privilege, other evidentiary privilege, or expectation of client confidence with respect to any Attorney-Client Communication; or (y) take any action which would reasonably be expected to cause any Attorney-Client Communication to cease being a confidential communication or to otherwise lose protection under the attorney-client privilege or any other evidentiary privilege, including waiving such protection in any dispute.

**Section 11.18    EXCLUSIVITY OF REPRESENTATIONS AND WARRANTIES**. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN ARTICLE III or ARTICLE IV, THE SELLER, SPEYSIDE AND THE ACQUIRED COMPANIES EXPRESSLY DISCLAIM ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO THE CONDITION, VALUE OR QUALITY OF THE ACQUIRED COMPANIES' BUSINESSES OR THEIR ASSETS, AND THE ACQUIRED COMPANIES SPECIFICALLY DISCLAIMS ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THE ACQUIRED COMPANIES' ASSETS, ANY PART THEREOF, THE WORKMANSHIP THEREOF, AND THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT.   THE REPRESENTATIONS AND WARRANTIES MADE BY SELLER IN ARTICLE III or ARTICLE IV ARE IN LIEU OF AND ARE EXCLUSIVE OF ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES. FURTHER, THE SELLER, SPEYSIDE AND/OR THE ACQUIRED COMPANIES HEREBY EXPRESSLY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, LEGAL OR CONTRACTUAL, EXPRESS OR IMPLIED, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO BUYER OR ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA).

**Section 11.19    Disclosure Schedules**.  The Disclosure Schedule contains a series of schedules which, in part, set forth information specifically referred to in Article III or Article IV and, in part, provide exceptions or qualifications to the representations and warranties contained in Article III or Article IV (the latter schedules are not always specifically referred to in Article III or Article IV). Neither the specification of any dollar amount in Article III or Article IV nor the disclosure of a document or information in a schedule comprising part of the Disclosure Schedule is intended, or will be construed or offered in any dispute between the Parties as evidence of, the materiality of such dollar amount, document or information, nor does it establish any standard of materiality upon which to judge the inclusion or omission of any similar documents or information in that schedule or any other schedule comprising the Disclosure Schedule.  The

58

CONFIDENTIAL

information contained in this Agreement and the Disclosure Schedule is disclosed solely for the purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission of any matter whatsoever, including of any violation of Law or breach of any Contract. An exception or qualification set forth in the Disclosure Schedule with respect to a particular representation or warranty will be deemed to be an exception or qualification with respect to all other applicable representations and warranties to the extent the description of the facts regarding the event, item or matter disclosed is adequate so as to make reasonably clear or otherwise make Buyer reasonably aware that such exception or qualification is applicable to such other representations and warranties whether or not such exception or qualification is so numbered or such other representations and warranties expressly refer to a schedule comprising the Disclosure Schedule.

*[The remainder of this page is intentionally left blank.]*

59

CONFIDENTIAL

FBG_CH1_00095730

DocuSign Envelope ID: EAB1900C-C346-4B0F-8956-815ABC6DE990

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**BUYER:**

**IGNITE ACQUISITION SUB, LLC**

By: _____

Name:   Shekhar Kumar

Its:      Managing Director

(Signature Page to Securities Purchase Agreement)

CONFIDENTIAL                                                                          FBG_CH1_00095731

DocuSign Envelope ID: EAB1900C-C346-4B0F-8956-815ABC6DE990

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

COMPANY:

**NEW DALTON HOLDINGS CORPORATION**

By:  _Jeffrey A. Stone_____

Name:  Jeffrey A. Stone

Its:  Chairman

(Signature Page to Securities Purchase Agreement)

CONFIDENTIAL

FBG_CH1_00095732

DocuSign Envelope ID: EAB1900C-C346-4B0F-8956-815ABC6DE990

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**SELLER**

**NEW DALTON FOUNDRY, LLC**

By:     _Jeffrey A. Stone_
Name:  Jeffrey A. Stone
Its:    Manager

(Signature Page to Securities Purchase Agreement)

CONFIDENTIAL                                                                                 FBG_CH1_00095733

DocuSign Envelope ID: EAB1900C-C346-4B0F-8956-815ABC6DE990

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**SPEYSIDE**

**SPEYSIDE EQUITY FUND I, LP**

**By: Speyside I GP LLC, its General Partner**

By: _Jeffrey A. Stone_____

Name:   Jeffrey A. Stone

Its:        Managing Director

(Signature Page to Securities Purchase Agreement)

CONFIDENTIAL

FBG_CH1_00095734

# EXHIBIT A

## NET WORKING CAPITAL TARGET CALCULATION

**Dalton**
*Working Capital Analysis*

| | Acutal | Acutal | Acutal | Acutal | Acutal | Acutal | Acutal | Acutal | Acutal | Acutal | Acutal | Acutal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NWC Actual | $ - | | | | | | | | | | | |
| NWC Target | 8,721,820 | | | | | | | | | | | |
| Over / (Under) Funded | (8,721,820) | | | | | | | 2023 | | | | |
| | **Sep** | **Oct** | **Nov** | **Dec** | **Jan** | **Feb** | **Mar** | **Apr** | **May** | **Jun** | **Jul** | **Aug** |
| **Current Assets** | | | | | | | | | | | | |
| Cash (Non-Restricted + Restricted) $ | 1,121,546 $ | 1,126,093 $ | 2,212,653 $ | 386,286 $ | 1,246,899 $ | 1,586,552 $ | 742,736 $ | 1,316,459 $ | 1,484,954 $ | (857,329) $ | (564,486) $ | (233,229) |
| Investments & Notes Receivables | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Accounts Receivable | 8,946,895 | 9,497,466 | 10,260,609 | 10,975,139 | 10,129,751 | 10,250,830 | 9,225,481 | 9,005,215 | 8,116,584 | 8,062,884 | 7,256,440 | 7,662,114 |
| Net Inventories | 5,364,991 | 5,534,130 | 6,002,756 | 4,440,670 | 5,297,729 | 5,547,719 | 5,666,448 | 5,944,653 | 5,948,569 | 7,060,684 | 5,330,501 | 5,241,423 |
| Net Storeroom Inventory | 4,156,145 | 4,255,845 | 4,008,289 | 4,057,505 | 4,060,858 | 4,134,624 | 4,382,341 | 4,486,067 | 4,774,222 | 4,744,577 | 4,911,924 | 5,003,176 |
| Prepaid Expenses | 1,102,886 | 1,085,724 | 1,250,052 | 1,162,917 | 1,180,153 | 1,200,961 | 1,136,836 | 978,773 | 1,205,963 | 1,043,387 | 901,542 | 853,597 |
| **Total Current Assets (Less Cash)** $ | **19,570,917** $ | **20,373,165** $ | **21,521,706** $ | **20,636,231** $ | **20,668,491** $ | **21,134,134** $ | **20,411,106** $ | **20,414,708** $ | **20,045,338** $ | **20,911,532** $ | **18,400,407** $ | **18,760,310** |
| | | | | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | | | | |
| Short Term Debt $ | (2,373,294) $ | (2,184,077) $ | (4,451,840) $ | (5,671,416) $ | (3,785,935) $ | (1,090,881) $ | (1,810,150) $ | (2,100,312) $ | (2,102,041) $ | (1,340,839) $ | (942,274) $ | (4,644,398) |
| Accounts Payable | (8,918,297) | (9,118,383) | (9,815,978) | (6,226,806) | (7,205,896) | (8,849,967) | (9,083,610) | (9,082,368) | (9,087,330) | (8,243,951) | (7,346,980) | (7,732,056) |
| *Accrued Liabilities* | | | | | | | | | | | | |
| Salaries & Wages | (1,213,584) | (1,418,682) | (1,560,699) | (1,344,455) | (1,528,362) | (1,531,834) | (918,138) | (1,007,262) | (1,269,048) | (1,233,142) | (908,943) | (1,356,205) |
| Group Medical Insurance | (644,960) | (723,767) | (850,754) | (799,464) | (608,597) | (541,123) | (456,858) | (366,181) | (256,104) | (138,121) | (76,997) | (10,930) |
| Taxes (Property & Payroll) | (794,388) | (846,507) | (693,192) | (562,301) | (619,808) | (647,010) | (638,584) | (684,154) | (528,015) | (565,008) | (567,849) | (635,342) |
| Employee Retirement Plans | (109,663) | (75,457) | (95,658) | (119,204) | (83,138) | (102,445) | (127,962) | (73,288) | (91,568) | (111,086) | (71,820) | (90,128) |
| Other Current Liabilities | (492,910) | (493,580) | (493,581) | (493,581) | (769,080) | (493,580) | (786,167) | (786,167) | (786,166) | (986,169) | (605,781) | (590,035) |
| **Total Current Liabilities** $ | **(12,173,802)** $ | **(12,676,376)** $ | **(13,509,862)** $ | **(9,545,811)** $ | **(10,814,881)** $ | **(12,165,959)** $ | **(12,011,319)** $ | **(11,999,420)** $ | **(12,018,231)** $ | **(11,277,477)** $ | **(9,578,370)** $ | **(10,414,696)** |
| | | | | | | | | | | | | |
| **Working Capital** | **7,397,115** | **7,696,789** | **8,011,844** | **11,090,420** | **9,853,610** | **8,968,175** | **8,399,787** | **8,415,288** | **8,027,107** | **9,634,055** | **8,822,037** | **8,345,614** |
| | | | | | | | | | | | | |
| **Rolling 12-Month Avg** | | | | | | | | | | | | **8,721,820** |
| **Account Adjustments** | | | | | | | | | | | | |
| Taxes Receivable - State | 172,473 | 172,473 | 172,473 | 161,493 | 161,493 | 161,493 | 161,493 | 161,493 | 161,493 | 161,493 | 161,493 | 161,493 |
| Taxes Receivable - Federal | 3,372,511 | 3,372,511 | 3,372,511 | 3,372,511 | 3,372,511 | 1,580,183 | 1,580,183 | 1,580,183 | 1,580,183 | 1,580,183 | 1,580,183 | 1,580,183 |
| Net Accounts Receivable | 3,544,983 | 3,544,983 | 3,544,983 | 3,534,003 | 3,534,003 | 1,741,675 | 1,741,675 | 1,741,675 | 1,741,675 | 1,741,675 | 1,741,675 | 1,741,675 |
| | | | | | | | | | | | | |
| Prepaid Debt Issuance Cost | 24,570 | 24,417 | 341,099 | 331,353 | 321,607 | 311,862 | 302,116 | 292,370 | 282,625 | 272,879 | 263,133 | 253,388 |
| Total Prepaid Expenses | 24,570 | 24,417 | 341,099 | 331,353 | 321,607 | 311,862 | 302,116 | 292,370 | 282,625 | 272,879 | 263,133 | 253,388 |

MJ_DMS 36904323v12

CONFIDENTIAL

FBG_CH1_00095735

*Final Copy*

**DISCLOSURE SCHEDULES**

**TO**

**SECURITIES PURCHASE AGREEMENT**

**BY AND AMONG**

**IGNITE ACQUISITION SUB, LLC,**

**NEW DALTON HOLDINGS CORPORATION,**

**NEW DALTON FOUNDRY, LLC,**

**AND**

**SPEYSIDE EQUITY FUND I, LP**

**Dated: November 10, 2023**

1

CONFIDENTIAL

FBG_CH1_00095736

These Disclosure Schedules are provided pursuant to that certain Securities Purchase Agreement ("**Purchase Agreement**") dated November 10, 2023 by and among Ignite Acquisition Sub, LLC (the "**Buyer**"), New Dalton Holdings Corporation (the "**Company**"), New Dalton Foundry, LLC (the "**Seller**"), and Speyside Equity Fund I, LP, a Delaware limited partnership ("**Speyside**").

Unless the context indicates otherwise, capitalized terms used in these Disclosure Schedules shall have the same meaning ascribed to them in the Purchase Agreement. Any headings are for convenience of reference only and shall not have the effect of amending or changing the content or meaning of the information disclosed in any schedule.

Any information disclosed in any schedule relates to: (a) the particular representation or warranty set forth in the corresponding numbered section of the Purchase Agreement, and (b) any other representation or warranty set forth in the Purchase Agreement where it is reasonably apparent on the face of such disclosure that such information relates to such other representation or warranty, such that disclosure in one schedule constitutes disclosure in all relevant schedules. The inclusion of information in these Disclosure Schedules shall not be construed as or constitute an admission or agreement that a violation, breach, right of termination, default, liability, or other obligation of any kind exists with respect to any item, nor shall it be construed as or constitute an admission or agreement that such information is material to Seller. In addition, matters reflected in these Disclosure Schedules are not necessarily limited to matters required by the Purchase Agreement to be reflected in these Disclosure Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.

These Disclosure Schedules may replicate language from certain sections of the Purchase Agreement, which is done for convenience only. In the event of any conflict between such language in these Disclosure Schedules and the language in the Purchase Agreement, the Purchase Agreement shall control.

2

CONFIDENTIAL

FBG_CH1_00095737

**Schedule 1.1(b)**
**Permitted Liens**

| Secured Party | Debtor | State | File Number | Collateral |
|---|---|---|---|---|
| Citibank, N.A. | Dalton Corporation | Indiana | 201600009996032 (initial filing no.)<br><br>202111152859337 (continuation filing no.) | All right, title and interest of Dalton Corporation ("Supplier") in and to all accounts and all other forms of obligations ("Accounts Receivable") owing to supplier by CNH Industrial America LLC and its subsidiaries and affiliates ("Account Debtor"), whether now existing or hereafter created, arising out of supplier's sale and delivery of goods and services to account debtor, to the extent such accounts receivable are purchased by secured party under that certain supplier agreement between secured party and supplier, as such agreement may be amended, supplemented or modified from time to time, and all collections thereon and proceeds thereof. |
| Magid Glove and Safety Mfg. Co. LLC | Dalton Corporation | Indiana | 202308183098794 | All debtor's inventory of goods now or hereafter acquired by debtor and financed by Magid Glove & Safety Mfg. Co. LLC. This consists of work gloves, safety clothing and safety products. |
| JPMorgan Chase Bank, N.A. | Dalton Corporation, Warsaw Manufacturing Facility | Indiana | 201600007453341 (initial filing no.)<br><br>202106152792659 (continuation filing no.) | All accounts receivable which arise out of the sale of goods and services by the debtor (referred to as "Supplier") to Caterpillar, Inc., a Delaware corporation, and/or its subsidiaries or affiliates, (individually or collectively, "Buyer"), which accounts receivable are now or in the future assigned and sold by Supplier to the Investors party to the Receivables Purchase Agreement among Supplier, the Investors party thereto and the Investor Agent party thereto, as amended, modified or supplemented from time to time (each, a "Purchased Receivable"), but only from and after the date such Purchased Receivables are sold by Supplier to Investor, and all Ancillary Rights with respect to such Purchased Receivables.<br><br>"Ancillary Rights" shall mean, with respect to any Purchased Receivable, (a) all contract rights arising from the sale of goods or the rendition of services which gave rise to such Purchased Receivable, (b) all other obligations for the payment of money arising therefrom, (c) all collateral, insurance, supporting obligations, and guaranties therefore, (d) the rights to goods |

3

CONFIDENTIAL

FBG_CH1_00095738

| | | | | and property represented thereby or associated therewith, (e) all rights and remedies against the Buyer and/or third parties obligated thereon or goods associated therewith, and (f) the books and records with respect thereto and the proceeds of any of the |
|---|---|---|---|---|

4

CONFIDENTIAL

FBG_CH1_00095739

**DEBTORS' EXHIBIT NO. 98**
**Page 73 of 99**

**Schedule 1.1(c)**
**Consents**

1.    Upon consummation of the transactions contemplated by the Purchase Agreement, under Section 20 of the Progress Rail Services Corporation Standard Purchase Order Terms and Conditions dated July 7, 2021, Progress Rail Services Corporation ("**Progress Rail**") has the option of terminating any outstanding purchase orders issued by Progress Rail to Dalton Corporation by giving written notice to Dalton Corporation.

2.    General Motors may terminate that certain Purchase Contract, dated August 18, 2023, by and between General Motors LLC and Dalton Corporation (d/b/a Dalton Foundries, Inc.), including any outstanding purchase orders issued by General Motors to Dalton Corporation under such contract, if Dalton Corporation does not obtain General Motors' prior written consent to consummate the transactions contemplated by the Purchase Agreement.

3.    Upon consummation of the transactions contemplated by the Purchase Agreement, under Section 21 of the Linamar Terms and Conditions dated December 8, 2020, Linamar Transportation Inc. ("**Linamar**") has the option of terminating any outstanding purchase orders issued by Linamar to Dalton Corporation, Warsaw Manufacturing Facility ("**Dalton Warsaw**") by giving written notice to Dalton Warsaw.  Within 10 calendar days after Closing Dalton Warsaw is required to provide Linamar notice of Closing.

4.    Loan and Security Agreement by and among CIBC Bank Lender USA, Dalton Corporation, and other parties thereto, dated November 17, 2022, and certain other ancillary documents thereto (collectively "**CIBC Credit Facility**").  The CIBC Credit Facility will be paid off in full and terminated in connection with Closing.

5

**DEBTORS' EXHIBIT NO. 98**
**Page 74 of 99**

**Schedule 4.2**
**No Violation**

(a)     None.

(b)     None.

(c)     None.

(d)

1.      Upon consummation of the transactions contemplated by the Purchase Agreement, under Section 20 of the Progress Rail Services Corporation Standard Purchase Order Terms and Conditions dated July 7, 2021, Progress Rail has the option of terminating any outstanding purchase orders issued by Progress Rail to Dalton Corporation by giving written notice to Dalton Corporation.

2.      General Motors may terminate that certain Purchase Contract, dated August 18, 2023, by and between General Motors LLC and Dalton Corporation (d/b/a Dalton Foundries, Inc.), including any outstanding purchase orders issued by General Motors to Dalton Corporation under such contract, if Dalton Corporation does not obtain General Motors' prior written consent to consummate the transactions contemplated by the Purchase Agreement.

3.      Upon consummation of the transactions contemplated by the Purchase Agreement, under Section 21 of the Linamar Terms and Conditions dated December 8, 2020, Linamar has the option of terminating any outstanding purchase orders issued by Linamar to Dalton Warsaw by giving written notice to Dalton Warsaw.  Within 10 calendar days after Closing Dalton Warsaw is required to provide Linamar notice of Closing.

4.      CIBC Credit Facility, which will be paid off in full and terminated in connection with Closing.

(e)     None.

6

CONFIDENTIAL                                                              FBG_CH1_00095741

**Schedule 4.3**
**Consents; Governmental Authority.**

None.

7

CONFIDENTIAL

FBG_CH1_00095742

## Schedule 4.4
## Capitalization

| Acquired Company | Stock/Unit Holder | Equity Securities |
|---|---|---|
| New Dalton Holdings Corporation | New Dalton Foundry, LLC | 1,000 common shares |
| Dalton Corporation | New Dalton Holdings Corporation | 2,371,342.8776 common shares |
| Dalton Corporation, Kendallville Manufacturing Facility | Dalton Corporation | 100 common shares |
| Dalton Corporation, Warsaw Manufacturing Facility | Dalton Corporation | 100 common shares |
| Dalton Corporation, Stryker Machining Facility Co. | Dalton Corporation | 1,000 common shares |
| Dalton Corporation, Ashland Manufacturing Facility | Dalton Corporation | 100 common shares |

8

CONFIDENTIAL

FBG_CH1_00095743

**Schedule 4.6**
**Absence of Undisclosed Liabilities**

(d)    None.

9

CONFIDENTIAL

FBG_CH1_00095744

**Schedule 4.9**
**Absence of Changes or Events**

(a)     None.

(b)     None.

(c)     None.

10

CONFIDENTIAL                                                        FBG_CH1_00095745

## Schedule 4.11
## Proprietary Rights

(a)

    1.    https://www.daltoncorporation.com/

    2.    DALTON FOUNDRY

    3.    DALTON CORPORATION

(b)    None.

(d)    None.

(e)    None.

11

CONFIDENTIAL

FBG_CH1_00095746

## Schedule 4.12
## Contracts

(a)     CIBC Credit Facility.

(b)     None.

(c)     Motor Castings Spinoff.

(d)     None.

(e)     Schedule 4.21(b) is incorporated herein by reference.

(f)

      1.     Receivables Purchase Agreement, dated September 17, 2016, by and between Dalton Warsaw and JP Morgan Chase Bank, N.A.

      2.     Supplier Agreement, dated July 8, 2016, by and between Dalton Warsaw and Citibank, N.A.

      3.     Consignment (ZIIP) Agreement, dated April 21, 2023, by and between Dalton Warsaw and Magid Glove Safety Manufacturing Company, LLC.

(g)     None.

(h)     Manufacturer's Representative Agreement, dated October 12, 2017, by and between Dalton Corporation and Metal Parts and Equipment Company ("**Metal Parts Representative Agreement**").

(j)     None.

(k)     Agreement between Dalton Warsaw and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial, and Services Workers International Union, AFL-CIO-CLC, and its Local No. 6805 (the "**Union**") dated August 30, 2021.

(l)

      1.     Employee offer letters offered by the Acquired Companies to certain employees of the Acquired Companies in the ordinary course of business include a description of the employee bonus structure.

      2.     Metal Parts Representative Agreement.

(m)    Metal Parts Representative Agreement.

(n)     None.

(o)

      1.     Phantom Equity Incentive Agreement between Allan Jacob Yahne and Seller dated March 15, 2023.

12

CONFIDENTIAL

FBG_CH1_00095747

2. Phantom Equity Incentive Agreement between Dave Roycraft and Seller dated March 9, 2023.

3. Phantom Equity Incentive Agreement between Steve Shaffer and Seller dated March 5, 2018.

4. Phantom Equity Incentive Agreement between Joe Derita and Seller dated March 15, 2023.

(p) None.

(q) None.

13

CONFIDENTIAL

FBG_CH1_00095748

**DEBTORS' EXHIBIT NO. 98**
**Page 82 of 99**

**Schedule 4.13**
**Litigation**

(a)

1.  On September 15, 2023 a Charge of Discrimination was filed by Maggie A. Witham, who was assigned to perform work at Dalton Corporation by Jack Laurie Flooring, Ms. Witham's employer, to the Indiana Civil Rights Commission ("**Charge of Discrimination Filing**"). Ms. Witham alleges she was sexually harassed by an employee of Dalton Corporation on May 17, 2023. Specifically, Ms. Witham alleges the Dalton Corporation employee inappropriately grabbed Ms. Witham while Ms. Witham was keeping herself from falling. Since making the Charge of Discrimination Filing, Ms. Witham was discharged from Jack Laurie Flooring. Ms. Witham alleges she was discharged because of her sexual orientation (collectively, the "**Witham Matter**").

2.  The Acquired Companies have open grievance issues with the Union that are being resolved in the ordinary course of business.

(b)  None.

(c)

1.  Dalton Corporation received a Safety Order and Notification of Penalty from the Indiana Department of Labor on February 7, 2023, alleging Dalton Corporation violated the Indiana Occupational Safety and Health Act ("**February Safety Order**"). Dalton Corporation entered into that certain Agreed Entry with the Commissioner of the Indiana Department of Labor, dated September 20, 2023, settling the citations in the February Safety Order ("**February IOSHA Agreed Entry**"). Dalton Corporation paid all outstanding penalties in relation to the February Safety Order on September 27, 2023 (the "**February Safety Order Payment**" together with the February Safety Order and the February IOSHA Agreed Entry, the "**February IOSHA Matter**").

2.  Dalton Corporation received a Safety Order and Notification of Penalty from the Indiana Department of Labor on June 6, 2023, alleging Dalton Corporation violated the Indiana Occupational Safety and Health Act ("**June Safety Order**"). Dalton Corporation entered into that certain Settlement Agreement with the Commissioner of the Indiana Department of Labor, dated July 5, 2023, settling the citations in the June Safety Order ("**February IOSHA Settlement**" together with the June Safety Order, the "**June IOSHA Matter**").

3.  The Acquired Companies resolve grievance issues with the Union in the ordinary course of business.

14

CONFIDENTIAL

**Schedule 4.14**
**Compliance with Laws**

1.     Witham Matter.

2.     February IOSHA Matter.

3.     June IOSHA Matter.

15

CONFIDENTIAL

FBG_CH1_00095750

## Schedule 4.15
## Licenses and Permits

1.  Major Modification of Solid Waste Land Disposal Facility Permit issued by the Indiana Department of Environmental Management to Dalton Corporation, dated August 19, 2019.

2.  Solid Waste Land Disposal Facility Permit Renewal issued by the Indiana Department of Environmental Management ("**IDEM**") to Dalton Corporation, dated February 19, 2019.

3.  National Pollutant Discharge Elimination System (NPDES) General Permit issued by IDEM to Dalton Warsaw, dated February 13, 2023. Permit No. INRM02929.

4.  National Pollutant Discharge Elimination System (NPDES) General Permit issued by IDEM to Dalton Warsaw, dated February 28, 2019. Permit No. INRM01582.

5.  National Pollutant Discharge Elimination System (NPDES) General Permit issued by IDEM to Dalton Warsaw, as modified, dated May 24, 2022. Permit No. IN0045578.

6.  Industrial Wastewater Discharge Permit issued by the City of Warsaw Wastewater Treatment Utility to Dalton Warsaw, effective December 1, 2019. Permit No. IPP-004.

7.  Part 70 Operating Permit Renewal issued by IDEM to Dalton Warsaw, dated October 16, 2019. Operation Permit No. T085-37897-00003.

16

CONFIDENTIAL

FBG_CH1_00095751

## Schedule 4.16
## Health, Safety and Environment

(a)     None.

(b)     On August 21, 2019, Dalton Corporation received a Major Modification of Solid Waste Land Disposal facility permit issued by IDEM with respect to the Warsaw landfill (SW Program ID 43-06). On September 4, 2019, Dalton Corporation filed with the Office of Environmental Adjudication (OEA) a Petition for Adjudicatory Hearing and Administrative Review and Request for Stay of Certain Contested Provisions (Cause No. 19-S-J-5084). The proceeding is ongoing, and the stay of contested Permit Condition H.1 has been extended to November 13, 2023.

(c)     Dalton Corporation has been subject to a RCRA Corrective Action for the Dalton Warsaw Foundry (1900 E. Jefferson Street, Warsaw, Indiana) and was identified by IDEM as a potential responsible party for the former Warsaw site (501 Pope Street, Warsaw, Indiana). Dalton Corporation's insurance policies are expected to cover any Acquired Company liabilities.

(d)     None.

(e)     Environmental Cost-Sharing Agreement between Jerry L. Fancil and Dalton Corporation, dated March 6, 2014, with respect to 501 Pope Street, Warsaw, Indiana.

17

CONFIDENTIAL

## Schedule 4.17(d)
## Tax Returns

Indiana:

      1.     Dalton Corporation

      2.     Dalton Corporation, Warsaw Manufacturing Facility

      3.     Dalton Corporation, Kendallville Manufacturing Facility

Ohio:

      1.     Dalton Corporation, Ashland Manufacturing Facility

      2.     Dalton Corporation, Stryker Machining Facility Co.

Delaware:     New Dalton Holdings Corporation

18

CONFIDENTIAL

FBG_CH1_00095753

**Schedule 4.18**
**Employee Benefit Plans**

(a)

1.  Medical/prescription drug benefits with Highmark of PA through the Steelworkers Health and Welfare Fund. The plan utilizes the BlueCross BlueShield national network.

2.  Self-funded Health Reimbursement Arrangement benefits administered by WEX.

3.  Wellness Program benefits.

4.  Dental benefits with United Concordia through the Steelworkers Health and Welfare Fund. This coverage is a stand-alone plan that participants may elect without enrolling in medical/prescription drug coverage.

5.  With respect to bargaining unit employees, vision benefits with either The Spectacle Shoppe or Vision Partners Group.  If bargaining unit employees enroll in the medical/prescription drug coverage, they may enroll in the vision coverage.

6.  With respect to non-bargaining unit employees, voluntary vision benefits with Davis Vision through the Steelworkers Health and Welfare Fund.

7.  Group Term Life/Accidental Death & Dismemberment benefits underwritten by the Life Insurance Company of North America.

8.  Supplemental Life Insurance benefits underwritten by New York Life.

9.  Supplemental Accidental Death & Dismemberment benefits underwritten by New York Life.

10.  Employee Assistance Program administered by New York Life.

11.  Life Assistance Program benefits administered by New York Life.

12.  Identity Theft Program benefits.

13.  Self-funded Short-Term Disability benefits.

14.  With respect to bargaining unit employees, Short Term Disability Buy-up benefits.

15.  With respect to bargaining unit employees, Safety and Dress Glass benefits.

16.  With respect to non-bargaining unit employees, Long Term Disability benefits underwritten by the Life Insurance Company of North America.

17.  Tuition Reimbursement benefits.

18.  Dalton Corporation Medical Flexible Spending Account, Dependent Care Flexible Spending Account, and Pre-Taxed Premium Plan.

19.  Medical Flexible Spending Account benefits administered by WEX.

19

CONFIDENTIAL                    FBG_CH1_00095754

20.    With respect to non-bargaining unit employees, Dependent Care Flexible Spending Account.

21.    Health Savings Account benefits.

22.    Will Preparation benefits.

23.    Cigna Health Rewards benefits.

24.    With respect to non-bargaining unit employees, Overtime.

25.    With respect to non-bargaining unit employees, Shift Premium.

26.    Vacations.

27.    11 paid holidays per year. They are: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Day After Thanksgiving, Christmas Week (5 days).

28.    With respect to non-bargaining unit employees, Bereavement Pay.

29.    Jury Duty Pay.

30.    With respect to non-bargaining unit employees, Service Awards.

31.    Dalton Corporation, Warsaw Manufacturing Facility Pension Plan.

32.    Dalton Corporation Hourly 401(k) Retirement Savings Plan.

33.    Dalton Corporation 401(k) Plan.

(b)    The union employees at Dalton Kendallville were previously participants in the Central States Southeast & Southwest Areas Pension Fund to which Dalton was obligated to contribute. When the Kendallville location was closed in 2010, Dalton was assessed withdrawal liability by Central States. Dalton is currently making monthly withdrawal liability payments to Central States in the amount of $3,748.25. These payments are required to continue through April 1, 2030, when the 20 year payment period ends.

(g)

1.    Dalton Corporation adopted the Dalton Corporation Hourly 401(k) Retirement Savings Plan for its union employees effective August 1, 2016 (the "**Hourly Plan**"). The Hourly Plan was amended and restated effective May 1, 2022 to comply with changes in law using the Great-West Trust Company, LLC Non-Standardized Defined Contribution Pre-approved Plan. The Hourly Plan indicates that it covers the eligible employees of Dalton Corporation, but its wholly owned subsidiaries, Dalton Corporation, Stryker Machining Facility Co. and Dalton Corporation, Warsaw Manufacturing Facility never formally adopted the Hourly Plan. All of the Hourly Plan participants are employed by Dalton Corporation, Stryker Machining Facility Co. or Dalton Corporation, Warsaw Manufacturing Facility, rather than Dalton Corporation.

The Company has filed a voluntary correction program submission with the IRS requesting approval of Dalton Corporation, Stryker Machining Facility Co. and Dalton Corporation,

20

Warsaw Manufacturing Facility retroactively adopting the Hourly Plan for their employees effective August 1, 2016. The Company expects the IRS will approve the request sometime in 2024.

2.  Dalton Corporation adopted the Dalton Corporation 401(k) Plan for its non-union employees effective August 1, 2016 (the "**Plan**"). The Plan was amended and restated effective May 1, 2022 to comply with changes in law using the Great-West Trust Company, LLC Non-Standardized Defined Contribution Pre-approved Plan. The Plan indicates that it covers the eligible employees of Dalton Corporation, but its wholly owned subsidiaries, Dalton Corporation, Stryker Machining Facility Co. and Dalton Corporation, Warsaw Manufacturing Facility never formally adopted the Plan. All of the Plan participants are employed by Dalton Corporation, Stryker Machining Facility Co. or Dalton Corporation, Warsaw Manufacturing Facility, rather than Dalton Corporation. In addition, although the Plan excludes union employees for purposes of employer contributions, the union employees are not excluded from making their own pay deferral contributions.

    The Company has filed a voluntary correction program submission with the IRS requesting approval of Dalton Corporation, Stryker Machining Facility Co. and Dalton Corporation, Warsaw Manufacturing Facility retroactively adopting the Plan for their employees effective August 1, 2016. The Company has also requested permission to retroactively amend the Plan to exclude union employees for all purposes as of August 1, 2016, when the Hourly Plan was adopted for the union employees. The Company expects the IRS will approve this request sometime in 2024.

(i)

1.  Group Medical Insurance Premium Payments for President & Vice Presidents After Retirement Policy.

2.  With respect to non-bargaining unit employees, medical/prescription drug benefits for eligible pre-65 retirees with Highmark of PA through the Steelworkers Health and Welfare Fund.

(p)  Schedule 4.18(g) is incorporated herein by reference in its entirety.

(q)  None.

21

FBG_CH1_00095756

**Schedule 4.19**
**Employee; Labor Relations**

(b)     Tom French, a Production Supervisor at Dalton Corporation, will be retiring in February of 2024.

(c)

      1.     Agreement between Dalton Corporation Warsaw Manufacturing Facility and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial, and Services Workers International Union, AFL-CIO-CLC, and its Local No. 6805 dated August 30, 2021.

      2.     The Acquired Companies resolve grievance issues with the Union in the ordinary course of business.

(e)

      1.     Witham Matter.

      2.     The Acquired Companies resolve grievance issues with the Union in the ordinary course of business.

(f)     None.

(h)     None.

22

CONFIDENTIAL

FBG_CH1_00095757

**DEBTORS' EXHIBIT NO. 98**
**Page 91 of 99**

Schedule 4.21
Real Property

(a)

| Owner(s) of Record / Property / Mailing Address | Tax Identification / Parcel Number | Parcel Number | State ID | Property Address | Tax Description | County Name |
|---|---|---|---|---|---|---|
| Dalton Foundry - 1900 East Jefferson Street, Warsaw, Indiana | | | | | | |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-711017-40 | 004-047-400 | 43-11-09-300-671.000-032 | 1014 E Market St, Warsaw, IN | Lot 212 Williams Add. | Kosciusko |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-711013-00 | 004-047-401.A | 43-11-09-300-873.000-032 | Market St, Warsaw, IN | Lot 212 Williams Add. | Kosciusko |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-710036-00 | 004-047-407.A | 43-11-09-300-992.000-032 | 201 S Grant St, Warsaw, IN | Lot 232 Williams Add. | Kosciusko |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-710035-60 | 004-047-407 | 43-11-09-300-993.000-032 | Jefferson St, Warsaw, IN | Lot 231 Williams Add. | Kosciusko |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-710008-10 | 004-047-404 | 43-11-09-300-961.000-031 | W S Jefferson St, Warsaw, IN | LOT 259 WILLIAMS ADD TO WARSAW | Kosciusko |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-720008-20 | 004-047-425 | 43-11-09-300-255.000-032 | E Jefferson St, Warsaw, IN | 3 WILLIAM'S ADD TO WARSAW & PT VAC COLFAX ST | Kosciusko |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-720008-11 | 004-047-443 | 43-11-09-300-600.000-032 | Market St, Warsaw, IN | LOTS 41 & 42 REED-KER ADD TO CITY OF WARSAW | Kosciusko |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-720007-30 | 004-047-440.A | 43-11-09-300-994.000-032 | E Jefferson St, Warsaw, IN | LOTS 25,26,27,28,29, 30,31,32,33,34,35,& 36 LESS 8.8' & PT VAC ALLEY REED-KER ADD | Kosciusko |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-720037-00 | 004-047-440 | 43-11-09-300-396.000-033 | E Jefferson St, Warsaw, IN | LOTS 13 THRU 24 & PT VAC STS & PT VAC ALLEYS REED-KER ADD | Kosciusko |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-720006-60 | 004-047-446 | 43-11-09-300-398.000-032 | E Jefferson St, Warsaw, IN | W PT OL 2 REED-KER ADD & PT VAC COLFAX ST & PT VAC ALLEY | Kosciusko |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-720006-70 | 004-048-670 | 43-11-09-200-690.000-032 | E Jefferson St, Warsaw, IN | OL 1 LESS W 185' & PT OF LOT 1 REED-KER ADD | Kosciusko |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-720006-80 | 004-048-670.A | 43-11-09-200-691.000-032 | 1900 E Jefferson St, Warsaw, IN | W 185' OL 1 REED-KER ADD & PT VAC ALLEY | Kosciusko |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-720006-40 | 004-048-670.B | 43-11-09-200-695.000-033 | Winona Ave, Warsaw, IN | 3 MHPS OL 1 REED-KER ADD & PT VAC ALLEY | Kosciusko |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-720007-30 | 004-048-152 | 43-11-09-300-706.000-032 | 1900 E Jefferson St, Warsaw, IN | LOTS 67 THRU 203 & 132 THRU 144 & S PT LOTS 148,149 MOUNT MEMORIAL ADD TO WINONA PK & PT VAC LINCOLN & JEFFERSON STREETS & PT VAC STATES | Kosciusko |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-710015-40 | 004-048-284 | 43-11-09-200-002.000-033 | Lindberg St, Warsaw, IN | N 30' LOTS 145 THRU 155 & ADJ VAC ST MOUNT MEMORIAL ADD TO WINONA PK PT LOT 1 REED-KER ADD TO CITY OF WARSAW | Kosciusko |
| Dalton Corporation PO Box 5388 Warsaw IN 46581 | 004-720007-30 | 004-048-277 | 43-11-09-200-001.000-032 | Hendricks St, Warsaw, IN | LOTS 151,152,153,154,155,156 & S PT LOTS 145, 146 & 147 MOUNT MEMORIAL ADD | Kosciusko |

23

CONFIDENTIAL

FBG_CH1_00095758

**DEBTORS' EXHIBIT NO. 98**
**Page 92 of 99**

(b)

1.    Lease Agreement between WPF Investments and Dalton Foundry dated February 28, 2022, for the real property located at 211 S. Lincoln Street, Warsaw, IN 46580.

2.    Lease Agreement between WPF Investments and Dalton Foundry dated February 28, 2022, for the real property located at 2020 E. Jefferson Street, Warsaw, IN 46580.

3.    Lease #97—2550 – Warsaw, Indiana, dated August 19, 1942 for the 0.78 acres near Warsaw, Kosciusko County, Indiana, by and between Dalton Corporation and New York Central Lines, LLC.

The following parcels are manufacturing facilities leased by Dalton Corporation on a month-to-month basis with no written terms:

| Real Property Owner | Parcel |
| --- | --- |
| Frauhigher Wade | 004-048-149.A |
| Frauhigher Wade | 004-048-149 |
| Corburn Justin | 004-048-150 |

24

CONFIDENTIAL

## Schedule 4.22
## Suppliers and Customers

(a)

| No. | Supplier Name | 2023 Purchases |
|---|---|---|
| 1. | Nipsco | $3,967,464.00 |
| 2. | Lewis Salvage Corporation | $3,858,575.00 |
| 3. | Louis Padnos Iron & Metal Co. | $3,130,401.00 |
| 4. | Jewell Coke Company LP | $2,409,420.00 |
| 5. | Ask Chemicals LP | $1,723,353.00 |

(b)

| No. | Customer Name | 2023 Revenue |
|---|---|---|
| 1. | Progress Rail | $15,350,349.40 |
| 2. | Mercury | $8,257,946.80 |
| 3. | Dart | $8,103,852.90 |
| 4. | Carlyle | $7,608,774.40 |
| 5. | GM | $7,561,465.30 |

25

CONFIDENTIAL

FBG_CH1_00095760

**Schedule 4.23**
**Insurance Policies**

(a)

| Insurer | Insureds | Policy Type | Policy Number | Expiration Date |
|---|---|---|---|---|
| Pinnacle Point Insurance Company | New Dalton Foundry, LLC | Worker's Compensation | WCP7005232 | 5/2/2024 |
| Travelers Indemnity Company of America | ☐ Dalton Foundry, Inc.<br>☐ New Dalton Foundry, LLC<br>☐ Dalton Corporation<br>☐ Dalton Corporation, Warsaw Manufacturing Facility<br>☐ Dalton Corporation, Stryker Machining Facility<br>☐ Dalton Corporation, Kendallville Manufacturing Facility<br>☐ Dalton Corporation, Ashland Manufacturing Facility | Business Auto | BA-9M836336-23-14-G | 5/2/2024 |
| Travelers Property Casualty Company of America | New Dalton Foundry, LLC | Boiler and Machinery | BME1-8P611509-TIL-23 | 5/2/2024 |
| The Charter Oak Fire Insurance Company | ☐ New Dalton Foundry, LLC<br>☐ Dalton Corporation<br>☐ Dalton Corporation, Warsaw Manufacturing Facility<br>☐ Dalton Corporation, Stryker Machining Facility<br>☐ Dalton Corporation, Kendallville Manufacturing Facility<br>☐ Dalton Corporation, Ashland Manufacturing Facility | Commercial General Liability | Y-660-8G434176-COF-23 | 5/2/2024 |
| Federal Insurance Company | ☐ New Dalton Foundry, LLC<br>☐ Dalton Foundry, Inc. | Executive Risk Package | 8261-8576 | 5/2/2024 |
| Travelers Property Casualty Company of America | New Dalton Foundry, LLC | Commercial Umbrella | CUP-9R746065-23-14 | 5/2/2024 |
| Arch Specialty Insurance Company | Dalton Foundry, Inc. | Cyber Security | C-4MFH-239204-CYBER-2023A | 5/2/2024 |

26

CONFIDENTIAL

FBG_CH1_00095761

| Starr Surplus Lines Insurance Company | ☐ New Dalton Foundry, LLC<br>☐ Dalton Corporation<br>☐ Dalton Corporation, Warsaw Manufacturing Facility<br>☐ Dalton Corporation, Stryker Machining Facility<br>☐ Dalton Corporation, Kendallville Manufacturing Facility<br>☐ Dalton Corporation, Ashland Manufacturing Facility | Environmental Site Liability | 1000067859221 | 10/11/2025 |
|---|---|---|---|---|
| Endurance American Specialty Insurance Company | ☐ New Dalton Foundry, LLC<br>☐ Dalton Corporation<br>☐ Dalton Corporation, Warsaw Manufacturing Facility<br>☐ Dalton Corporation, Stryker Machining Facility<br>☐ Dalton Corporation, Kendallville Manufacturing Facility<br>☐ Dalton Corporation, Ashland Manufacturing Facility | Property | ARL30001668303 | 5/2/2024 |
| Argonaut Insurance Company | New Dalton Foundry, LLC | Worker's Compensation | WC 928988772484 | 5/2/2024 |

(b)     The Acquired Companies' worker's compensation policy provides for experience based liabilities.

27

CONFIDENTIAL

FBG_CH1_00095762

**DEBTORS' EXHIBIT NO. 98**
**Page 96 of 99**

## Schedule 4.24
## Bank Accounts

1.  Dalton Warsaw business checking account with CIBC Bank. Account No. 7721110. Authorized signers are Allan J. Yahne, David Roycraft, and William Michael Clevy.

2.  Dalton Corporation petty cash account with Old National Bank. Account No. 20064051. Authorized signers are Kathy Lursen, Allan J. Yahne, and Beverly D. Floor.

28

CONFIDENTIAL

FBG_CH1_00095763

## Schedule 4.25
## Trade Names; Business Locations

<u>Trade Names:</u>

1.      Dalton Corporation

2.      Dalton Foundry

3.      Stryker Machining

<u>Business Locations:</u>

1.      Dalton Warsaw located at 1900 E Jefferson Street Warsaw, Indiana 46580.

2.      Dalton Corporation, Kendallville Manufacturing Facility located at 8212 N. Angling Road, Kendallville, Indiana 46580.

3.      Dalton Corporation, Stryker Machining Facility Co. located at 310 Ellis Street Stryker, Ohio 43557.

4.      Dalton Corporation, Ashland Manufacturing Facility located at 1681 Orange Rd, Ashland, Ohio 44805.

29

CONFIDENTIAL

FBG_CH1_00095764

**Schedule 7.5**
**Intercompany Agreements**

None.

30

MJ_DMS 36890901v12

CONFIDENTIAL                    FBG_CH1_00095765

**DEBTORS' EXHIBIT NO. 98**
**Page 99 of 99**