| From: | Brumbergs, Andy[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A48ACBF298164D6C912E61805 B50A737-ANDY.BRUMBE] |
|---|---|
| Sent: | Tue 2/18/2025 6:12:10 PM (UTC) |
| To: | Luna, Nelly[Nelly.Luna@tricoproducts.com] |
| Subject: | FW: PPE listing - Eagle Machining Fayette, OH Fixed Asset Run 113021 - with GL classification.xlsx |
| Attachment: | PPE listing - Eagle Machining Fayette, OH Fixed Asset Run 113021 - with GL classification.xlsx |

**From:** Brumbergs, Andy
**Sent:** Monday, February 17, 2025 12:33 PM
**To:** Ruminski, Kevin <kevin.ruminski@firstbrandsgroup.com>
**Subject:** PPE listing - Eagle Machining Fayette, OH Fixed Asset Run 113021 - with GL classification.xlsx

Does this work for the Fayette OBS classification for PPE?

The thought is to show us recording to NBV and then having the summary draft valuation that is fairly close in value to NBV.  With the full report available later on

CONFIDENTIAL

FBG_CH1_00097549

*Execution Version*

---

### SECURITIES PURCHASE AGREEMENT

by and among

**BPI ACQUISTION COMPANY, LLC**

**NEW DALTON HOLDINGS CORPORATION**

**AND**

**DALTON CORPORATION, STRYKER MACHINING FACILITY CO.**

Dated as of December 16, 2024

---

CONFIDENTIAL

FBG_CH1_00097550

**DEBTORS' EXHIBIT NO. 125**
**Page 2 of 41**

## TABLE OF CONTENTS

Page

**ARTICLE I      DEFINITIONS** ................................................................................................. **1**

    Section 1.1      Certain Defined Terms ...................................................................... 1

    Section 1.2      Table of Definitions ......................................................................... 8

**ARTICLE II      PURCHASE AND SALE; CLOSING** ................................................................ **8**

    Section 2.1      Purchase and Sale ............................................................................ 8

    Section 2.2      Purchase Price .................................................................................. 8

    Section 2.3      Closing .............................................................................................. 8

    Section 2.4      Seller Closing Deliverables.............................................................. 9

    Section 2.5      Buyer Closing Deliverables ............................................................. 9

    Section 2.6      Payments at Closing......................................................................... 9

    Section 2.7      Withholding ...................................................................................... 9

**ARTICLE III      REPRESENTATIONS AND WARRANTIES WITH RESPECT
               TO SELLER** ................................................................................... **10**

    Section 3.1      Power and Authorization ................................................................. 10

    Section 3.2      No Violation...................................................................................... 10

    Section 3.3      Consents and Approvals ................................................................... 10

    Section 3.4      Title to Securities ............................................................................. 10

    Section 3.5      Litigation.......................................................................................... 10

**ARTICLE IV      REPRESENTATIONS AND WARRANTIES WITH RESPECT
               TO THE ACQUIRED COMPANIES** ........................................... **11**

    Section 4.1      Organization and Qualification; Authorization ............................... 11

    Section 4.2      No Violation...................................................................................... 11

    Section 4.3      Capitalization ................................................................................... 12

    Section 4.4      Financial Statements; Accounting and Internal Controls ................ 12

    Section 4.5      Absence of Undisclosed Liabilities ................................................. 13

    Section 4.6      No Brokers or Finders...................................................................... 13

    Section 4.7      Absence of Changes or Events ........................................................ 13

    Section 4.8      Assets ............................................................................................... 14

    Section 4.9      Litigation.......................................................................................... 14

    Section 4.10      Real Property ................................................................................... 14

    Section 4.11      Compliance with Laws .................................................................... 15

    Section 4.12      Licenses and Permits....................................................................... 15

i

CONFIDENTIAL

FBG_CH1_00097551

## TABLE OF CONTENTS

Page

Section 4.13    Health, Safety and Environment ............................................... 15

Section 4.14    Taxes .................................................................................... 16

Section 4.15    Products.........................................**Error! Bookmark not defined.**

Section 4.16    Anti-Money Laundering ...........................**Error! Bookmark not defined.**

Section 4.17    Anticorruption; Improper Payments ......................................... 20

Section 4.18    International Trade Laws ........................................................ 21

Section 4.19    Disclosure ............................................................................ 21

**ARTICLE V       REPRESENTATIONS AND WARRANTIES OF BUYER ..................... 21**

Section 5.1    Organization; Authorization ..................................................... 21

Section 5.2    No Violation........................................................................... 22

Section 5.3    Investment Intent ................................................................... 22

Section 5.4    No Brokers or Finders.............................................................. 22

Section 5.5    No Outside Reliance; Acknowledgement by Buyer. ..................... 22

Section 5.6    No Brokers or Finders.............................**Error! Bookmark not defined.**

**ARTICLE VII     OTHER COVENANTS AND AGREEMENTS......................................... 23**

Section 6.1    Agreements Regarding Tax Matters ........................................... 23

Section 6.2    Further Assurances.................................................................. 24

Section 6.3    Intracompany Arrangements..................................................... 24

Section 6.4    Restrictive Covenants. ............................................................ 24

Section 6.5    Section 280G......................................................................... 25

Section 6.6    Directors and Officers..............................**Error! Bookmark not defined.**

Section 6.7    Public Announcements ............................................................ 26

Section 6.8    General Release ..................................................................... 26

**ARTICLE XI      MISCELLANEOUS ..................................................................... 27**

Section 7.1    Non-survival ......................................................................... 27

Section 7.2    Notices ................................................................................. 27

Section 7.3    Expenses .............................................................................. 28

Section 7.4    Entire Agreement ................................................................... 28

Section 7.5    No Third-Party Beneficiaries.................................................... 28

Section 7.6    Assignments.......................................................................... 28

Section 7.7    Amendment; Waiver................................................................ 28

ii

FBG_CH1_00097552

## TABLE OF CONTENTS

Page

Section 7.8    Agreement Controls ........................................................................... 29

Section 7.9    Severability ........................................................................................ 29

Section 7.10   Governing Law ................................................................................... 29

Section 7.11   Consent to Jurisdiction; Service of Process; Waiver of Jury Trial .......... 29

Section 7.12   Specific Performance ......................................................................... 30

Section 7.13   Other Remedies.................................................................................. 30

Section 7.14   No Recourse Against Affiliates ............................................................ 30

Section 7.15   Rules of Construction ........................................................................ 31

Section 7.16   Counterparts; Deliveries ................................................................... 32

Section 7.17   Admissibility into Evidence................................................................ 32

iii

CONFIDENTIAL

FBG_CH1_00097553

**DEBTORS' EXHIBIT NO. 125**
**Page 5 of 41**

## SECURITIES PURCHASE AGREEMENT

This SECURITIES PURCHASE AGREEMENT (this "**Agreement**"), dated as of December 16, 2024, is among BPI Acquisition Company, LLC, a Delaware limited liability company ("**Buyer**"), New Dalton Holdings Corporation, a Delaware corporation ("**Seller**") and Dalton Corporation, Stryker Machining Facility Co., an Ohio corporation (the "**Company**").

## RECITALS

A.     WHEREAS, Seller owns, beneficially and of record, all of the issued and outstanding equity interests in the Company.

B.     WHEREAS, subject to the terms and conditions set forth herein, upon the execution and delivery of this Agreement, Buyer will acquire one hundred percent (100%) of the issued and outstanding Equity Securities of the Company (the "**Securities**") from Seller, in exchange for the payment by Buyer to Seller of an amount equal to the Purchase Price.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements contained herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1   **Certain Defined Terms**.  For purposes of this Agreement:

"**Acquired Companies**" means, collectively, the Company and each of its direct and indirect Subsidiaries, and "**Acquired Company**" means each of such entities individually.

"**Acquired Confidential Information**" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, of any Acquired Company, including all financial information, customer and supplier contact information, prices, internal practices, forecasts, business, marketing, development, sales and other commercial strategies, unpatented inventions, ideas, methods and discoveries, trade secrets, know-how, unpublished patent applications, designs, specifications, documentation, components, source code, object code, schematics, drawings, protocols and processes. Notwithstanding the foregoing, "Acquired Confidential Information" shall not include any information that (a) is Seller Confidential Information, (b) is or becomes generally known to and available for use by the public other than as a result of any acts or omissions of any party hereto or any of its Affiliates; (c) is or was or becomes available to any party hereto on a nonconfidential basis from a source other than another party to this Agreement, provided that such source is not, to the knowledge of such party, bound by a confidentiality agreement with such other party, or is under another contractual, legal or fiduciary obligation to, such other party; or (d) has been or is independently developed by such party or its representatives without the use of Acquired Confidential Information or in violation of the terms of this Agreement.

1

FBG_CH1_00097554

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person.  As used herein, the term "control" means (a) the power to vote at least 10% of the voting power of a Person, or (b) the possession, directly or indirectly, of any other power to direct or cause the direction of the management and policies of such a Person, whether through ownership of voting securities, by contract or otherwise.

"**Affiliated Group**" means an affiliated group as defined in Section 1504 of the Code (or analogous combined, consolidated or unitary group defined under state, local or non-U.S. income Tax Law).

"**Business Day**" means a day other than Saturday, Sunday or any other day on which banks in Ohio are required or authorized to be closed.

"**Buyer Certificate**" means a certificate in form and substance reasonably satisfactory to Seller, dated as of the Closing Date and duly executed and delivered by Buyer, certifying that attached thereto are true, complete and accurate copies of resolutions duly adopted by the board of directors (or comparable governing body) of Buyer and, if applicable, its requisite equityholders, which authorize and approve the

"**Claim**" means, with respect to any Person or Persons, any and all charges, complaints, claims, liens, demands, causes of action, acts, actions, proceedings, contracts, controversies, agreements, promises, representations, counterclaims, obligations, damages, and liabilities, of every kind, or any combination of the same, of any nature and description whatsoever, known or unknown, suspected or unsuspected, contingent or certain, such Person or Persons has had in the past, or now has up to and including immediately prior to the Closing.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contracts**" means all legally binding contracts, agreements, licenses, indentures, notes, bonds, instruments, leases, mortgages, sales orders, purchase orders, arrangements, commitments, obligations and other understandings or undertakings of any nature, in any case whether written or oral, and all amendments, restatements, supplements or other modifications thereto or waivers thereunder.

"**Employee Benefit Plan**" means an "employee pension benefit plan" (as defined in Section 3(2) of ERISA whether or not subject to ERISA) or an "employee welfare benefit plan" (as defined in Section 3(1) of ERISA whether or not subject to ERISA).

"**Environmental and Safety Requirements**" means any Law that is related to (a) pollution, contamination, cleanup, preservation, protection, reclamation or remediation of the environment, (b) health or safety, (c) the Release or threatened Release of any Hazardous Material, including investigation, study, assessment, testing, monitoring, containment, removal, remediation, response, cleanup, abatement, prevention, control or regulation of such Release or threatened Release, or (d) the management of any Hazardous Material, including the manufacture, generation, formulation, processing, labeling, use, treatment, handling, storage, disposal, transportation, distribution, re-use, recycling or reclamation of any Hazardous Material; and includes, but is not limited to, the Comprehensive Environmental Response, Compensation, and

2

FBG_CH1_00097555

Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6091 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Clean Water Act (33 U.S.C. § 7401 et seq.), the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), the Toxic Substance Control Act (15 U.S.C. § 2601 et seq.) and the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.).

"**Equity Securities**" means, if a Person is a corporation, shares of capital stock of such corporation and, if a Person is a form of entity other than a corporation, ownership interests in such form of entity, whether membership interests, partnership interests or otherwise.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations thereunder.

"**Event**" means any event, change, development, effect, condition, circumstance, matter, occurrence or state of facts.

"**Fraud**" means a claim by a party hereto for an intentional misrepresentation or omission of a material fact which is (a) false and known by the party making such misrepresentation or omission to be false, (b) made for the purpose of inducing such party to rely on such misrepresentation or omission and (c) is actually relied upon by such party, in each case, solely with respect to the making by a party of any of the representations and warranties contained in Article III, Article IV, Article V or any certificate delivered pursuant to this Agreement; provided that, for the avoidance of doubt, "Fraud" shall not include any claim based on constructive knowledge, negligent misrepresentation, recklessness or similar theory.

"**GAAP**" means U.S. generally accepted accounting principles.

"**Governmental Authority**" means any court, tribunal, arbitrator, authority, agency, commission, bureau, board, department, official, body or other instrumentality of the United States, any foreign country, or any domestic or foreign state, province, county, city, other political subdivision or any other similar body or organization exercising governmental or quasi-governmental power or authority.

"**Government Official**" means, collectively, any officer or employee of a Governmental Authority, any Person acting for or on behalf of any Governmental Authority, any political party or official thereof and any candidate for political office.

"**Hazardous Material**" means (a) hazardous substances, as defined by the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (b) hazardous wastes, as defined by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., (c) petroleum, including crude oil or any fraction thereof which is liquid at standard conditions of temperature and pressure, (d) radioactive material, including any source, special nuclear, or by-product material as defined in 42 U.S.C. § 2011 et seq., (e) asbestos that is friable or could reasonably be likely to become friable, (f) polychlorinated biphenyls, (g) microbial matter, biological toxins, mycotoxins, mold or mold spores and (h) other material, substance or waste to which liability or standards of conduct may be imposed, or which requires or may require investigation, under any applicable Environmental and Safety Requirements.

CONFIDENTIAL

FBG_CH1_00097556

"**Improper Payment Laws**" means the United States Foreign Corrupt Practices Act of 1977, any legislation implementing the Organisation for Economic Cooperation and Development Convention on Combating Bribery of Foreign Official in International Business Transactions, and any other applicable Law regarding anti-bribery or illegal payments or gratuities.

"**International Trade Laws**" means any applicable (a) Sanctions, (b) U.S. export control Laws (including the International Traffic in Arms Regulations (22 CFR §§ 120-130, as amended), the Export Administration Regulations (15 CFR §§ 730-774, as amended) and any regulation, order, or directive promulgated, issued or enforced pursuant to such laws, (c) laws pertaining to imports and customs, including those administered by the Bureau of Customs and Border Protection in the U.S. Department of Homeland Security (and any successor thereof) and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, (d) the anti-boycott laws administered by the U.S. Department of Commerce and the U.S. Department of the Treasury and (e) export, import and customs Laws of other countries in which the Acquired Companies have conducted and/or currently conduct business.

"**IRS**" means the U.S. Internal Revenue Service.

"**Knowledge**" means, when referring to the "knowledge" of the Company or the Sellers, or any similar phrase or qualification based on knowledge of the Company or any Seller, (a) the actual knowledge of any employee, officer, director and/or manager of any Acquired Company or any Seller and (b) the knowledge that any such person referenced in clause (a) above, as a prudent business person, would have obtained after making due inquiry with respect to the particular matter in question.

"**Law**" means the common law of any state or other jurisdiction, or any provision of any non-U.S., federal, state or local law, statute, code, rule, regulation, Order, certification standard, accreditation standard, Permit, regulatory code of practice, statutory guidance or other decision of any court or other tribunal or Governmental Authority.

"**Liabilities**" means any liabilities, demands, commitments or obligations of any nature whatsoever, whether accrued or unaccrued, absolute or contingent, direct or indirect, asserted or unasserted, fixed or unfixed, known or unknown, choate or inchoate, perfected or unperfected, liquidated or unliquidated, secured or unsecured, or otherwise, whether due or to become due, whether arising out of any Contract or tort based on negligence or strict liability and whether or not the same would be required by GAAP to be stated in financial statements or disclosed in the notes thereto, and however arising and including all fees, costs and expenses related thereto.

"**Liens**" means all liens, security interests, claims, mortgages, deeds of trust, preemptive rights, leases, charges, options, rights of first refusal, easements, proxies, voting trusts or agreements, transfer restrictions, pledges, assessments, covenants, burdens and other encumbrances of every kind, including restrictions on voting or use.

"**Material Adverse Effect**" means (a) any Event that, individually or in combination with any other Events, has had or could reasonably be expected to have a material adverse effect on the business, condition (financial or otherwise), assets, liabilities, results of operation or prospects of the Acquired Companies taken as a whole, whether or not foreseeable and whether or not

4

FBG_CH1_00097557

durationally significant; provided that any effect resulting from any of the following shall not be considered when determining whether a Material Adverse Effect shall have occurred: (i) changes in general economic conditions, or (ii) acts of terrorism, armed hostilities or war, except, with respect to clauses (i) and (ii), to the extent that the Acquired Companies are disproportionately impacted by such Events in comparison to others in the industry in which they operate, (b) any Event that prevents or materially delays, or could be reasonably expected to prevent or materially delay, consummation of the transactions contemplated hereby or the performance by the Company or the Sellers of any of their material obligations under this Agreement or any of the Ancillary Agreements, or (c) any Event that materially impairs, or could reasonably be expected to impair, the ability of the Acquired Companies to continue operating their business after the Closing in substantially the same manner as it was operated immediately prior to the date of this Agreement.

"**Order**" means any order, judgment, ruling, injunction, award, stipulation, assessment, decree or writ, whether preliminary or final, of any Governmental Authority.

"**Party**" means any party to this Agreement.

"**Permits**" means permits, licenses, registrations, consents, certificates, grants, waivers, qualifications, approvals and all other authorizations by or of Governmental Authorities.

"**Permitted Lien**" means (a) Liens for Taxes not yet due and payable, or for Taxes being contested in good faith by appropriate proceedings as set forth on Schedule Section 1.1(a) and for which appropriate reserves have been accrued for as of the Closing Date, (b) statutory Liens of landlords for amounts not yet due and payable, (c) Liens of carriers, warehousemen, mechanics and materialmen incurred in the ordinary course of business for amounts not yet due and payable, (d) Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, and (e) in the case of the Securities, restrictions arising under applicable securities Laws, but in each such case excluding any Lien with respect to any Employee Benefit Plan.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated association, corporation, firm or other entity or any Governmental Authority.

"**Proceeding**" means any suit, action, cause of action, litigation, hearing, inquiry, examination, demand, proceeding, controversy, complaint, appeal, notice of violation, citation, summons, subpoena, arbitration, mediation, dispute, claim, or audit of any nature whether civil, criminal, quasi criminal, indictment, administrative, regulatory or otherwise and whether at Law or in equity, by or before a Governmental Authority.

"**Release**" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping into the indoor or outdoor environment.

"**Sanctions**" means economic or financial sanctions, requirements or trade embargoes imposed, administered or enforced from time to time by U.S. Governmental Authorities (including the Office of Foreign Assets Control ("**OFAC**"), the U.S. Department of State and the U.S.

5

CONFIDENTIAL

Department of Commerce), the United Nations Security Council, the European Union, Her Majesty's Treasury or any other relevant Governmental Authority.

"**Sanctions Target**" means any Person: (a) that is the subject or target of any Sanctions; (b) named in any Sanctions-related list maintained by the U.S. Department of State; the U.S. Department of Commerce, including the Bureau of Industry and Security's Entity List and Denied Persons List; or the U.S. Department of the Treasury, including the OFAC Specially Designated Nationals and Blocked Persons List, the Sectoral Sanctions Identifications List, and the Foreign Sanctions Evaders List; or any similar list maintained by the United Nations Security Council, the European Union, Her Majesty's Treasury or any other relevant Governmental Authority; (c) located, organized or resident in a country, territory or geographical region which is itself the subject or target of any territory-wide Sanctions (including the Crimea region of Ukraine, Cuba, Iran, North Korea, Syria and, prior to January 17, 2017, Sudan); or (d) owned or controlled by any such Person or Persons described in the foregoing clauses (a)-(c).

"**Seller Certificate**" means a certificate in form and substance reasonably satisfactory to Buyer, dated as of the Closing Date and duly executed and delivered by Seller, certifying that attached thereto are (a) true, complete and accurate copies of the organizational documents of each Acquired Company, (b) true, complete and accurate copies of resolutions duly adopted by the board of directors (or comparable governing body) of Seller, which authorize and approve the execution, delivery and performance by Seller of this Agreement and (c) a true, complete and accurate copy of resolutions duly adopted by the manager of the Company, which authorize and approve the execution, delivery and performance by the Company of this Agreement.

"**Seller Confidential Information**" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, of Seller or its Affiliates (other than any Acquired Company), including all financial information, information regarding the corporate structure of Seller and such Affiliates, customer and supplier contact information, prices, internal practices, forecasts, business, marketing, development, sales and other commercial strategies, unpatented inventions, ideas, methods and discoveries, trade secrets, know-how, unpublished patent applications, designs, specifications, documentation, components, source code, object code, schematics, drawings, protocols and processes. Notwithstanding the foregoing, "Seller Confidential Information" shall not include any information that (a) is Acquired Confidential Information, (b) is or becomes generally known to and available for use by the public other than as a result of any acts or omissions of any party hereto or any of its Affiliates; (c) is, was or becomes available to any party hereto on a nonconfidential basis from a source other than another party to this Agreement, provided that such source is not, to the knowledge of such party, bound by a confidentiality agreement with such other party, or is under another contractual, legal or fiduciary obligation to, such other party; or (d) has been or is independently developed by such party or its representatives without the use of Confidential Information or in violation of the terms of this Agreement.

"**Service Provider**" means each director, officer, employee, manager or independent contractor, of any of the Acquired Companies.

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (a) if a corporation, a majority of

6

FBG_CH1_00097559

the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association, or other business entity gains or losses, or shall have the right or sufficient voting interests to designate or elect either (i) a majority of the Persons serving as managers or (ii) the sole manager, managing director or general partner of such entity.

"**Tax**" means (a) any and all U.S. federal, state, local, or non-U.S. income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, entertainment, amusement, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, ad valorem, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, composite, healthcare, or other tax of any kind whatsoever, including any interest, penalties or additions to Tax, any penalties resulting from any failure to file or timely file a Tax Return, or additional amounts in respect of the foregoing; (b) liability for the payment of any amounts of the type described in clause (a) above of another Person arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto); and (c) liability for the payment of any amounts of the type described in clause (a) above of another Person as a result of any transferee or secondary liability or any liability assumed by Contract (other than by reason of any customary provisions in a commercial Contract the primary purpose of which is unrelated to Taxes) or applicable Law.

"**Tax Returns**" means returns, declarations, reports, notices, forms, claims for refund, information returns or other documents (including any related or supporting schedules, statements or information, and including for the avoidance of doubt all Forms 1099, FinCEN Form 114, Form TD F 90-22.1 and any predecessor or successor forms thereto) filed or required to be filed with any Governmental Authority, in connection with the determination, assessment or collection of any Tax of any party or the administration of any Laws, regulations or administrative requirements relating to any Tax.

"**Treasury Regulations**" means the Treasury Regulations promulgated from time to time under the Code (including corresponding provisions and succeeding provisions) as in effect for the relevant taxable period.

"**U.S.**" or "**United States**" means the United States of America.

7

**Section 1.2**     **Table of Definitions**.  The following terms have the meanings set forth in the locations in this Agreement referenced below:

Term........................................................................................................... Location
Agreement................................................................................................... Preamble
AJCA............................................................................................Section 4.14(q)
Assets .............................................................................................Section 4.8(a)
Balance Sheet...................................................................................... Section 4.5
Closing ............................................................................................... Section 2.3
Closing Date........................................................................................ Section 2.3
Closing Payments............................................................................... Section 2.6
Export Approvals .............................................................................Section 4.18(a)
Financial Statements ........................................................................Section 4.4(a)
Leased Real Property .......................................................................Section 4.10(b)
Non-Party Affiliate .......................................................................... Section 7.14
Nonqualified Deferred Compensation Plan ..........................................Section 4.14(q)
Owned Real Property.......................................................................Section 4.10(a)
Purchase Price.................................................................................... Section 2.2
Real Property ..................................................................................Section 4.10(b)
Releasees............................................................................................Section 6.7(a)
Releaseing Parties ..............................................................................Section 6.7(a)
Seller Closing Deliverables................................................................ Section 2.4
Transfer Taxes ...................................................................................Section 6.1(c)

## ARTICLE II
## PURCHASE AND SALE; CLOSING

**Section 2.1**     **Purchase and Sale**.  On the terms and conditions set forth in this Agreement, at the Closing, (a) Seller shall and hereby does sell, assign, transfer, convey and deliver to Buyer all right, title and interest in the Securities, free and clear of all Liens (other than Liens arising in connection with applicable securities Laws) in exchange for payment of the Purchase Price in accordance with this Agreement and (b) and Buyer shall and hereby does purchase, accept delivery of and acquire from Seller all right, title and interest in the Securities, free and clear of all Liens (other than Liens arising in connection with applicable securities Laws) in exchange for payment of the Purchase Price in accordance with this Agreement.

**Section 2.2**     **Purchase Price**.  The aggregate purchase price to be paid by Buyer for the Securities shall consist of an amount of cash equal $75,000,000 (such amount, the "**Purchase Price**").

**Section 2.3**     **Closing**.  The closing of the purchase and sale of the Securities and the other transactions contemplated by this Agreement (the "**Closing**") shall be effected simultaneously with the execution and delivery of this Agreement via electronic mail, in either case, at 11:59 p.m. Eastern Time on the date hereof, or at such other time and place as the parties hereto may agree in writing.  The date on which the Closing occurs is referred to herein as the "**Closing Date**."

8

Section 2.4 **Seller Closing Deliverables**.  In addition to the other requirements set forth in this Agreement, at or before the Closing, Seller shall deliver or cause to be delivered to Buyer each of the following documents and instruments (collectively, the "**Seller Closing Deliverables**"):

(a)     the Seller Certificate, duly executed by Seller; and

(b)     a certificate of good standing, dated no more than ten days before the Closing Date (or such longer period as Buyer may agree to) and certifying as to the good standing of the Company in its state of formation.

Section 2.5 **Buyer Closing Deliverables**.  In addition to the other requirements set forth in this Agreement, at or before the Closing, Buyer shall deliver or cause to be delivered to Seller each of the following documents and instruments (collectively, the "**Buyer Closing Deliverables**"):

(a)     the Buyer Certificate, duly executed by Buyer; and

(b)     a certificate of good standing, dated no more than ten days prior to the Closing Date (or such longer period as Seller may agree to) and certifying to the good standing of Buyer in its applicable state of formation.

Section 2.6 **Payments at Closing**.  At the Closing, Buyer shall pay or cause to be paid by wire transfer of immediately available funds to Seller, an amount equal to the Purchase Price to the Seller's HSBC Bank USA, N.A. account with the account number 398025584 (collectively, the "**Closing Payments**").

Section 2.7 **Withholding**.  Notwithstanding anything to the contrary in this Agreement, Buyer, the Acquired Companies, Seller, and their designees, as applicable, will be entitled to deduct and withhold from any amounts payable pursuant to this Agreement any amounts required to be deducted or withheld under applicable Law.  In the event that any of Buyer, the Acquired Companies, Seller, or any of their designees, as applicable, determines that deduction and withholding is required in connection with amounts payable pursuant to this Agreement (other than payments treated as compensation or wages for Tax purposes), Buyer, the Acquired Companies, Seller, or any of their designees, as applicable, will use reasonable best efforts to provide advance notice to such Person of such determination and the parties shall cooperate in good faith to reduce or eliminate any such deduction and withholding to the extent permitted under applicable Law.  To the extent that any such amounts are so deducted and withheld, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.  Upon Closing (and thereafter as required by applicable Law), each person entitled to payment under this Agreement shall provide an IRS Form W-9 or applicable version of IRS Form W-8, as applicable.  Any payments under this Agreement to employees or other current or former service providers that are treated as compensation or wages for Tax purposes shall be made through the applicable Acquired Company's payroll system.

9

CONFIDENTIAL

FBG_CH1_00097562

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES WITH RESPECT TO SELLER

Except as set forth in the corresponding sections or subsections of the Disclosure Schedules attached hereto (collectively, the "**Disclosure Schedules**"), Seller hereby represents and warrants to Buyer as of the date hereof and as of the Closing as follows:

Section 3.1　　**Power and Authorization**.  Seller has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby have been duly authorized.  This Agreement has been duly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

Section 3.2　　**No Violation**.  The execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby will not:

(a)　　violate, contravene, or conflict with any provision of the charter documents, bylaws or similar organizational documents of such Seller; or

(b)　　violate, contravene or conflict with any applicable Law or Order.

Section 3.3　　**Consents and Approvals**.  consent, approval, Order or authorization of, or registration, declaration or filing with, or notice to, any Governmental Authority or other Person is required to be made or obtained by such Seller in connection with the authorization, execution, delivery and performance of this Agreement and agreements delivered in connection herewith, or the consummation of the transactions contemplated hereby and thereby.

Section 3.4　　**Title to Securities**.  Seller has the sole voting power and sole power of disposition with respect to all of the Securities with no limitations, qualifications or restrictions on such rights and powers.  Upon payment of the Purchase Price in accordance with this Agreement, the Securities owned by Seller will be transferred to Buyer, as applicable, pursuant to this Agreement free and clear of any Liens.  Seller is not subject to any agreements, arrangements, options, warrants, calls, rights, commitments or other restrictions relating to the sale, transfer, purchase, redemption or voting of its Securities.

Section 3.5　　**Litigation**.  There are no Proceedings pending or, to such Seller's knowledge, threatened against or affecting such Seller or any Acquired Company that seek to restrain or prohibit or to obtain damages or other relief in connection with the transactions contemplated hereby or under any agreement delivered in connection herewith.

10

CONFIDENTIAL

FBG_CH1_00097563

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE ACQUIRED COMPANIES

Except as set forth in the corresponding sections or subsections of the Disclosure Schedules, Seller represents and warrants to Buyer as of the date hereof and as of the Closing as follows:

**Section 4.1**      **Organization and Qualification; Authorization**.

(a)      Each Acquired Company is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation, which jurisdiction is listed on Schedule 4.1 of the Disclosure Schedules, and has all requisite power and authority to own, lease and operate its assets, properties and business and to carry on its business as now being conducted. Complete and correct copies of the charter documents, bylaws or similar organizational documents of each Acquired Company and all amendments thereto have been made available to Buyer. None of the Acquired Companies is in violation of any of the provisions of its charter documents, bylaws or similar organizational documents. The minute books and resolutions of each Acquired Company previously made available to Buyer contain true, complete and accurate records of all meetings and accurately reflect in all material respects all corporate action of the equityholders and board of directors (including committees thereof) of such Acquired Company. The stock certificate books and stock transfer ledgers of each Acquired Company previously made available to Buyer are true, complete and accurate in all material respects.

(b)      The Company has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement, the performance by the Company of its obligations hereunder and thereunder and the consummation by the Company of the transactions contemplated hereby have been duly authorized. This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

**Section 4.2**      **No Violation**. Except as set forth on Schedule 4.2 of the Disclosure Schedules, the execution, delivery and performance by Seller and the Acquired Companies of this Agreement, and the consummation of the transactions contemplated hereby and thereby will not:

(a)      violate, contravene or conflict with any provision of the charter documents, bylaws or similar organizational documents of any Acquired Company;

(b)      violate, contravene or conflict with any resolution adopted by any Acquired Company's board of directors (or comparable governing body) or equityholders;

(c)      violate, contravene or conflict with any applicable Law or Order; or

11

(d)      except as set forth on <u>Schedule 4.2</u> of the Disclosure Schedules, result in the creation or imposition of any Lien upon any Securities (other than liens imposed by applicable securities Laws).

**Section 4.3**      <u>**Capitalization**</u>.  <u>Schedule 4.3</u> of the Disclosure Schedules sets forth the entire authorized Equity Securities of each Acquired Company and a complete and correct list of the issued and outstanding Equity Securities of each Acquired Company, including the name of the record and beneficial owner thereof and the number of Equity Securities held thereby.  All of the outstanding Equity Securities of each Acquired Company have been duly authorized, validly issued and are fully paid and non-assessable (as applicable).  Except as set forth on <u>Schedule 4.3</u> of the Disclosure Schedules, no Acquired Company has any outstanding Equity Securities or other securities directly or indirectly convertible into or exchangeable for its Equity Securities, no Acquired Company has any outstanding agreements, options, warrants or rights to directly or indirectly subscribe for or purchase, or that directly or indirectly require it to issue, transfer or sell, its Equity Securities or any securities directly or indirectly convertible into or exchangeable for its Equity Securities, and there are no agreements containing profit participation or phantom equity features with respect to any Acquired Company.  Except for the direct and indirect Subsidiaries of each Acquired Company, no Acquired Company owns or otherwise holds, directly or indirectly, any stock, membership interest, partnership interest, joint venture interest or other equity interest in any Person.  No Acquired Company is subject to any obligation (contingent or otherwise) to redeem, repurchase or otherwise acquire or retire any of its Equity Securities or any warrants, options or other rights to acquire its Equity Securities.  Except as set forth on <u>Schedule 4.3</u> of the Disclosure Schedules, there are no voting agreements, voting trusts or other agreements, commitments or understandings with respect to the voting or transfer of Equity Securities or other securities of any Acquired Company.  All of the outstanding Equity Securities of each of the Subsidiaries of each Acquired Company are owned by an Acquired Company or another Subsidiary of an Acquired Company free and clear of all Liens (other than Liens arising in connection with applicable securities Laws).  No Acquired Company has violated any applicable federal or state securities Laws in connection with the offer, sale or issuance of any of its Equity Securities or any warrants, options or other rights to acquire its Equity Securities.  No Equity Securities of any Acquired Company are subject to, nor have been issued in violation of, preemptive or similar rights.  There are no accrued but unpaid dividends payable by any Acquired Company on any Equity Securities of such Acquired Company.

**Section 4.4**      <u>**Financial Statements; Accounting and Internal Controls**</u>.

(a)      Except for the exceptions set forth on <u>Schedule 4.4(a)</u> of the Disclosure Schedules, the financial statements in respect of the Company (including the notes thereto) delivered to the Buyer prior to the date hereof (the "**Financial Statements**") (i) have been prepared in accordance with GAAP consistently applied throughout the periods covered thereby, except that the interim Financial Statements are subject to normal year-end adjustments (which will not be material individually or in the aggregate) and lack footnotes required by GAAP, (ii) present fairly the assets, liabilities and financial condition of the Company as of such dates and the results of operations of the Company for such periods, and (iii) are consistent with the books and records of the Acquired Companies (which books and records are correct and complete in all material respects).  Since December 31, 2023, there has been no change in any accounting principles,

12

policies, methods or practices, including any change with respect to reserves (whether for bad debt, contingent liabilities or otherwise) of the Company.

(b)     The Company has established and, for the past three years, has maintained in all material respects, a system of internal accounting controls sufficient to reasonably ensure (i) the reliability of financial reporting and the preparation of the financial statements of the Company and (ii) that (A) all transactions are executed in accordance with management's general or specific authorizations; (B) all transactions are recorded when and as necessary to maintain asset accountability and to permit preparation of financial statements in conformity with GAAP applied using the same accounting practices, policies, principles and methodologies, with consistent classifications, judgments and valuation and estimation accrual methodologies, used in the preparation of the Financial Statements; and (C) all accounts, notes and other receivables are recorded accurately, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis.

(c)     The Company has established and maintained and, for the past three years, have maintained in all material respects, disclosure controls sufficient to reasonably ensure that material information relating to the Company (including any deficiencies or weaknesses in the design or operation of the Company's internal controls and any fraud that involves management or other Service Providers of any Acquired Company) is made known to the Company's management by others within the Company.

Section 4.5     **Absence of Undisclosed Liabilities**.  No Acquired Company has any Liabilities, except (a) as and to the extent specifically accrued for or reserved against in the balance sheet of the Company delivered to the Buyer prior to the date hereof (the "**Balance Sheet**"), (b) Liabilities which have arisen after the date of the Balance Sheet in the ordinary course of business consistent with past practice (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement or violation of Law), (c) executory obligations under Contracts (other than Liabilities relating to any breach, or any fact or circumstance that, with notice, lapse of time or both, would result in a breach, thereof by any Acquired Company) and (d) Liabilities specifically set forth on Schedule 4.5 of the Disclosure Schedules.

Section 4.6     **No Brokers or Finders**.  None of Seller, the Acquired Companies or any of their respective Affiliates has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement.

Section 4.7     **Absence of Changes or Events**.  Except as disclosed in the applicable subsection of Schedule 4.7 of the Disclosure Schedules, since December 31, 2023 (a) each of the Acquired Companies has conducted its business only in the ordinary course consistent with past practice, (b) no Event has occurred that, individually or in combination with any other Events, has had or could reasonably be expected to have Material Adverse Effect and (c) no Acquired Company has suffered any loss, damage, destruction or other casualty affecting any of its material properties or assets, whether or not covered by insurance.

CONFIDENTIAL                                                                                                                                              FBG_CH1_00097566

**Section 4.8**        **Assets**.

(a)        The Acquired Companies own, and immediately following the Closing will continue to own, good and marketable title to, or a valid right to use, all of the tangible assets and property used or held in connection with their businesses (the "**Assets**"), free and clear of any and all Liens (other than Permitted Liens).  The tangible assets and property to which the Acquired Companies have good and marketable title to, or a valid right to use, are all the assets and property that are necessary to enable the businesses of the Acquired Companies to be conducted immediately after the Closing in the same manner as the businesses of the Acquired Companies have been conducted since December 31, 2023.

(b)        All material items of tangible personal property owned or leased by any Acquired Company are in good operating condition and repair, ordinary wear and tear excepted, and are suitable for the purposes for which they are presently being used.  None of the personal or movable property constituting Assets is located other than at the Real Property.

**Section 4.9**     **Litigation**.   Except as set forth on Schedule 4.9(a) of the Disclosure Schedules, there are no Proceedings pending or, to the Knowledge of the Company, threatened against any Acquired Company or any of the current or former officers, directors or employees of any Acquired Company related to any Acquired Company or its operations or current or former Service Providers, nor, to the Knowledge of Company, is there any reasonable basis for any such Proceeding.  Except as set forth on Schedule 4.9(b) of the Disclosure Schedules, there are no Proceedings pending or threatened by any Acquired Company.  For any Proceedings identified on Schedule 4.9(a) and 4.9(b) of the Disclosure Schedules that remain pending as of the date hereof, (i) the Company has provided or made available to the Buyer true, complete and accurate copies of all pleadings, correspondence and other material documents relating to each such Proceeding, (ii) no such Proceeding could reasonably be expected to be material to the Acquired Companies, and (iii) the Company will have paid before the Closing, all fees and expenses of counsel and other representatives of the Company incurred on or before the Closing Date in connection with such Proceeding.  Schedule 4.9(c) of the Disclosure Schedules sets forth a complete and correct list and description of all Proceedings made, filed or otherwise initiated in connection with any Acquired Company or any of the current or former Service Providers of any Acquired Company related to any Acquired Company or its assets or operations that has been resolved in the past five years.  Schedule 4.9(d) of the Disclosure Schedules sets forth any Order to which any Acquired Company is subject.

**Section 4.10**     **Real Property**.

(a)        Schedule 4.10(a) of the Disclosure Schedules sets forth a complete list, including an address and description, of all real property owned in fee by any Acquired Company (the "**Owned Real Property**").  With respect to Owned Real Property of any acquired Company: (i) such Acquired Company has good and marketable indefeasible fee simple title, free and clear of all Liens except Permitted Liens; (ii) such Acquired Company has not leased, licensed or otherwise granted to any Person the right to use or occupy the Owned Real Property or any portion thereof; and (iii) there are no outstanding options, rights of first offer or rights of first refusal to purchase the Owned Real Property or any portion thereof or interest therein.

14

FBG_CH1_00097567

(b)      Schedule 4.10(b) of the Disclosure Schedules sets forth a complete list, including an address of each leasehold or subleasehold estate or other right to use or occupy any interest in real property held by any Acquired Company (the "**Leased Real Property**" and, together with Owned Real Property, the "**Real Property**") and the Real Property Leases (including all amendments, guaranties and other agreements with respect thereto) relating to each such Leased Real Property.  With respect to each Leased Real Property:  (i) the relevant Acquired Company's possession and quiet enjoyment under the applicable Real Property Lease has not been disturbed; (ii) no Acquired Company has subleased, licensed or otherwise granted any person the right to use or occupy any Leased Real Property or any portion thereof; and (iii) there are no special, general or other assessments pending against any Acquired Company or affecting any Leased Real Property that would be payable by the lessee thereof.

Section 4.11      **Compliance with Laws**.  Except as set forth on Schedule 4.11 of the Disclosure Schedules, each Acquired Company complies, and has at all times complied, in all material respects with all Laws in connection with the conduct, ownership, use, occupancy or operation of its business and the Assets, and no Acquired Company has received during the past five years, nor is there any basis for, any notice or other communication from any Governmental Authority or any other Person that any Acquired Company is not in compliance in any material respect with any Law.

Section 4.12      **Licenses and Permits**.  Except as set forth on Schedule 4.12 of the Disclosure Schedules, each Acquired Company holds, and has at all times held, and immediately following the Closing will hold, all Permits necessary for the conduct, ownership, use, occupancy or operation of its businesses or the Assets.  Each Acquired Company complies, and has at all times complied, in all material respects with all such Permits, and no Acquired Company has received during the past five years any notice or other communication from any Governmental Authority or any other Person that any Acquired Company is not in compliance in any material respect with any such Permit or of any actual or possible revocation, withdrawal, suspension, cancellation, termination or material modification of any such Permit.  All such Permits are identified on Schedule Section 4.12 of the Disclosure Schedules, including their respective dates of issuance and expiration, and true, complete and accurate copies thereof have been provided or made available to the Buyer.  All such Permits are, and immediately following the Closing will be, valid and in full force and effect on terms identical in all material respects to those under which, immediately before the Closing (and as of the date of this Agreement), the Acquired Companies hold such Permits.

Section 4.13      **Health, Safety and Environment**.

(a)      Each Acquired Company is and has been in compliance with all Environmental and Safety Requirements.

(b)      Each Acquired Company has obtained, maintains, and complies with all Permits required under Environmental and Safety Requirements to operate its business, and no Proceeding is pending, or to the Knowledge of the Company, threatened, to revoke, modify, or terminate any Permit required under Environmental and Safety Requirements.

15

CONFIDENTIAL

FBG_CH1_00097568

(c)     The Company has provided the Buyer with true, complete and accurate copies of all material environmental assessment reports, health and safety audits, and reports of investigations with respect to the Acquired Companies, the Owned Real Property, or the Leased Real Property in the Company's possession or control.

(d)     There are no Hazardous Materials present in, at, under, about or migrating to or from, any (i) Owned Real Property or Leased Real Property, (ii) real property formerly owned, leased, or used by any Acquired Company or any of its predecessors, or (iii) any property to which any Person has, at any time, transported, treated, stored or disposed of Hazardous Material on behalf of any Acquired Company or any of its predecessors that could reasonably be expected to give rise to, result in, or serve as a basis for Losses to the Acquired Companies under Environmental and Safety Requirements.

(e)     No underground storage tanks or related piping are located on, under, or at any Owned Real Property or Leased Real Property, and no Acquired Company has removed or caused any such tank or piping to be removed, nor, to the Knowledge of the Company, has there been any such removal from any Owned Real Property or Leased Real Property or any former operating location that could reasonably be expected to give rise to, result in, or serve as a basis for Losses to any Acquired Company under Environmental and Safety Requirements.

(f)     There are no Hazardous Materials present in, at, under, about or migrating to or from, any (i) Owned Real Property or Leased Real Property, (ii) real property formerly owned, leased, or used by any Acquired Company or any of its predecessors, or (iii) any property to which any Person has, at any time, transported, treated, stored or disposed of Hazardous Material on behalf of any Acquired Company or any of its predecessors that could reasonably be expected to give rise to, result in, or serve as a basis for Losses to the Acquired Companies under Environmental and Safety Requirements.

(g)     To the Knowledge of the Company, no current facts, circumstances, or conditions exist with respect to any Acquired Company, their respective businesses, the Owned Real Property, the Leased Real Property, or any formerly owned, leased, or operated real property that would result, individually or in the aggregate, in any Acquired Company's incurring material Losses or material, unbudgeted capital expenditures to achieve or maintain compliance under Environmental and Safety Requirements, including Permits required under Environmental and Safety Requirements.

(h)     Prior to the Closing Date, the transactions contemplated by this Agreement do not require, under any Environmental and Safety Requirements, the consent of, or filings with, any Governmental Authority with jurisdiction over the Acquired Companies, the Owned Real Property, or Leased Real Property.

**Section 4.14     <u>Taxes</u>**.

(a)     Each Acquired Company has timely and properly filed all Tax Returns required to be filed by it, taking into account any valid extension of time to file.  All such Tax Returns are accurate and complete.  Each Acquired Company has timely and properly paid all

16

CONFIDENTIAL

Taxes required to be paid by it or with respect to its assets, whether or not shown on such Tax Returns.

(b)     All Tax deficiencies that have been claimed, proposed, or asserted by any Governmental Authority against any Acquired Company have been fully paid or finally settled.

(c)     No Tax audits or administrative or judicial Tax Proceedings are being conducted with respect to any Acquired Company.  No Acquired Company has received from any Governmental Authority any (i) written notice indicating an intent to open an audit or other review with respect to Taxes, (ii) written request for information related to Tax matters, or (iii) written notice of deficiency or proposed adjustment for any amount of Tax.  No Acquired Company has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that, in either case, remains in effect. No Acquired Company is currently the beneficiary of any extension of time within which to file any Tax Return or pay any Tax.

(d)     No claim has ever been made by an authority in a jurisdiction where any Acquired Company does not file Tax Returns that such Acquired Company may be subject to taxation by that jurisdiction.   Section 4.14(d) of the Disclosure Schedules sets forth each jurisdiction in which each Acquired Company is required to file Tax Returns or pay Taxes.

(e)     Each Acquired Company has timely withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any current or former Service Provider, equity interest holder, or other third party, and all IRS Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.  Each Acquired Company has consistently treated any workers that it treats as independent contractors (and any similarly situated workers) as independent contractors for purposes of Section 530 of the Revenue Act of 1978.

(f)     No Acquired Company is party to any Tax allocation, Tax sharing, or Tax distribution agreement or arrangement.

(g)     There are no Liens on any of the assets of the Acquired Companies that arose in connection with any failure (or alleged failure) to pay any Tax.

(h)     No Acquired Company has ever been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(i)     None of the assets of the Acquired Companies are "section 197(f)(9) intangibles" (as defined in Treasury Regulation Section 1.197-2(h)(1)(i) and assuming for this purpose that the transition period ends on August 10, 1993.

(j)     Each Acquired Company has timely and properly collected all sales, use, value-added, and similar Taxes required to be collected, and has remitted, or will remit on a timely basis, such amounts to the appropriate Governmental Authority.  Each Acquired Company has properly requested, received and retained all necessary exemption certificates and other

CONFIDENTIAL

FBG_CH1_00097570

documentation supporting any claimed exemption or waiver of Taxes on sales or similar transaction as to which it would otherwise have been obligated to collect or withhold Taxes.

(k)     The aggregate unpaid Taxes of the Acquired Companies (a) did not, as of the Balance Sheet Date, exceed the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Balance Sheet and (b) do not exceed that reserve as adjusted for the passage of time through the end of the Closing Date in accordance with the past custom and practice of the Company in preparing its Financial Statements. The unpaid Income Taxes of the Acquired Companies for all Pre-Closing Tax Periods shall not exceed the Income Tax Liability Accrual.

(l)     No Acquired Company has ever participated in any "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code or Treasury Regulation Section 1.6011-4(b).

(m)     There is no agreement, plan, arrangement or other contract (including this Agreement or the arrangements contemplated thereby) covering any employee or independent contractor or former employee or independent contractor of any of the Acquired Companies that, considered individually or considered collectively with any other such contracts, will, or could reasonably be expected to, give rise directly or indirectly to the payment of any amount that would not be deductible pursuant to Section 280G or Section 162 of the Code as a result of the transactions contemplated by this Agreement.  None of the Acquired Companies is a party to any contract, nor does it have any obligation (current or contingent), to compensate any individual for excise taxes paid pursuant to Section 4999 of the Code.

(n)     No Acquired Company has requested or received a ruling from any Governmental Authority or signed any binding agreement with any Governmental Authority that might impact the amount of Tax due from the Buyer or its Affiliates (including following the Closing, for the avoidance of doubt, the Acquired Companies) after the Closing Date.

(o)     Neither the Buyer nor any of its Affiliates (including following the Closing, for the avoidance of doubt, the Acquired Companies) will be required to include any item of income in, or exclude any deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting or use of a cash or improper method of accounting for a taxable period ending on or prior to the Closing Date with respect to any Acquired Company; (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign Income Tax Law) executed on or prior to the Closing Date; (iii) intercompany transactions as described in Treasury Regulation Section 1.1502-13 (or any corresponding or similar provision of state, local or foreign Income Tax Law) or excess loss account described in Treasury Regulation Section 1.1502-19 (or any corresponding or similar provision of state, local or foreign Income Tax Law); (iv) installment sale or open transaction disposition made on or prior to the Closing Date by any Acquired Company; (v) prepaid amount or deposit received on or prior to the Closing Date by any Acquired Company; (vi) interest held by any Acquired Company in a "controlled foreign corporation" (as that term is defined in Section 957 of the Code) (a "**CFC**") on or before the Closing Date pursuant to Sections 951, 951A, or 965 of the Code; (vii)  "minimum gain chargeback" provision applicable to any Acquired Company with respect to "minimum gain" for periods (or portions of periods)

18

CONFIDENTIAL

FBG_CH1_00097571

ending on or prior to the Closing Date pursuant to Subchapter K of the Code; or (ix) debt instrument held by any Acquired Company on or before the Closing Date that was acquired with "original issue discount" as defined in Section 1273(a) of the Code or is subject to the rules set forth in Section 1276 of the Code. No Acquired Company is required to include any amount in income pursuant to Section 965 of the Code or pay any installment of the "net tax liability" described in Section 965(h)(1) of the Code.

(p)     No Acquired Company has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that purported or intended to be governed in whole or in part by Section 355 or 361 of the Code.

(q)     Each Employee Benefit Plan that is a "non-qualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code (a "**Nonqualified Deferred Compensation Plan**") and any award thereunder, in each case that is subject to Section 409A of the Code has been administered and drafted or amended, in such a manner so that the additional tax described in Section 409A(1)(B) of the Code will not be assessed against any individual participating in any such non-qualified deferred compensation plan with respect to benefits due or accruing thereunder.  No Employee Benefit Plan that would have been a Nonqualified Deferred Compensation Plan subject to Section 409A of the Code but for the effective date provisions that are applicable to Section 409A of the Code, as set forth in Section 885(d) of the American Jobs Creation Act of 2004, as amended (the "**AJCA**"), has been "materially modified" within the meaning of Section 885(d)(2)(B) of the AJCA after October 3, 2004.  Each Employee Benefit Plans has been or will be timely amended, as needed, to comply with Section 409A of the Code.

(r)     No Acquired Company has deferred the inclusion of any amounts in taxable income pursuant to IRS Revenue Procedure 2004-34, Treasury Regulations Section 1.451-5, Sections 451(c), 455, 456 or 460 of the Code, or any corresponding or similar provision of Law (irrespective of whether or not such deferral is elective).

(s)     None of the Acquired Companies has any net operating losses or other tax attributes presently subject to limitation under Sections 382, 383, 384 or the federal consolidated return regulations (or any corresponding or similar provision of state, local or foreign income Tax Law).

(t)     Each Acquired Company has been resident in its jurisdiction of incorporation for Tax purposes and has not, at any time, been treated as a resident of or as having a permanent establishment or other fixed place of business in any other jurisdiction.

(u)     All material transactions or arrangements made by any Acquired Company with any other Person have in all material respects been made on arm's length terms, and the processes by which prices and terms have been arrived at have, in each case, been documented in accordance with all applicable Laws, including Code Section 482 and any equivalent provision under any state, local, or non-U.S. Law.

Section 4.15     **Anti-Money Laundering**. The Acquired Companies have in place, adhere to and maintain (and for the past five years, have had in place, adhered to and maintained) policies and procedures designed to ensure at all times compliance in all material respects with all anti-

19

CONFIDENTIAL                                                                          FBG_CH1_00097572

money laundering Laws and guidelines applicable to the Acquired Companies, and no Proceeding by or before any Governmental Authority against or affecting any Acquired Company, any assets or properties of any Acquired Company with respect to any such Laws or guidelines is pending or, to the Knowledge of the Company, threatened.

Section 4.16    **Products**.  All products manufactured, sold or delivered by any Acquired Company have been in conformity with all applicable warranties, and no Acquired Company has any Liability for replacement thereof or other damages in connection therewith in excess of any warranty reserve established with respect thereto on the Balance Sheet as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Acquired Companies.  No products manufactured, sold or delivered by any Acquired Company are subject to any guaranty, warranty or other indemnity beyond the applicable standard terms and conditions of sale with respect thereto which, in each case, have been made available to the Buyer.  No Acquired Company received any notice of any claims for, and to the Company's Knowledge there is no reasonable basis for, any extraordinary product recalls, returns, warranty obligations or service calls relating to any of its products or services.  No Acquired Company has had or has any Liability arising out of any injury to individuals or property as a result of the ownership, possession or use of any products manufactured, sold or delivered by any Acquired Company or with respect to any services rendered by any Acquired Company.

Section 4.17    **Anticorruption; Improper Payments**.  None of the Acquired Companies, nor any Seller, nor any officer, director, agent, manager, employee, or, to the Knowledge of the Company, any other Person authorized to act on behalf of any of the Acquired Companies or any Seller, has, directly or indirectly, taken any act in furtherance of an offer, payment, promise to pay, authorization, or ratification of payment, directly or indirectly, of any money or anything of value (including any gift, sample, rebate, travel, meal and lodging expense, entertainment, service, equipment, debt forgiveness, donation, grant or other thing of value, however characterized) to any Government Official or any Person to secure any improper advantage or to obtain or retain business that would cause any Acquired Company or Seller to be in violation of Improper Payment Laws.  Each Acquired Company complies, and has at all times complied, with all Improper Payment Laws.  Without limiting the generality of the foregoing, (a) none of the Acquired Companies nor any Seller has violated or is in violation in any material respect of the U.S. Anti-Kickback Statute (42 U.S.C. Section 1302a-7(b)), the Federal False Claims Act (31 U.S.C. Sections 3729, et seq.) or any related or similar Law and (b) there has been no use or authorization of money or anything of value relating to any unlawful payment or secret or unrecorded fund or any false or fictitious entries made in the books and records of any Acquired Company relating to the same.  None of the Acquired Companies, nor any Seller, nor any of their respective Affiliates or Persons acting on their behalf have received any notice or communication from any Person that alleges, nor been involved in any internal investigation involving any allegations relating to potential violation of any Improper Payment Laws or other applicable Law, nor have received a request for information from any Governmental Authority regarding Improper Payment Laws.  None of the Acquired Companies, nor any Seller nor, to the Knowledge of the Company, any officer, director, manager, employee, attorney, accountant, consultant, financial advisor or other agent of either Company or any Seller, has employed or retained, directly or indirectly, a Government Official or a family member of a Government Official.  No Government Official has, directly or indirectly, the right of control over, or any beneficial interest in any Acquired Company.

20

CONFIDENTIAL

FBG_CH1_00097573

Section 4.18    **Disclosure**.  None of the representations and warranties contained in this Article IV, the information contained in the Exhibits and Disclosure Schedules attached hereto and the written statements, documents, certificates or other items prepared and supplied to the Buyer or its Affiliates by or on behalf of the Company or the Sellers in connection with the transaction contemplated hereby, contain any untrue statement of a material fact or omit a material fact necessary to make each statement contained herein or therein, in light of the circumstances in which they were made, not misleading.

Section 4.19    **International Trade Laws**.  The Acquired Companies have, at all times as to which the applicable statute of limitations has not yet expired, conducted their transactions in accordance with all applicable International Trade Laws.  Without limiting the foregoing:

(a)    the Acquired Companies have obtained, and are in compliance with, all export licenses, license exceptions and other consents, notices, waivers, approvals, orders, authorizations, registrations, declarations, classifications and filings with any Governmental Authority required for (i) the export and re-export of products, services, Software and technologies and (ii) releases of technologies and Software to foreign nationals located in the United States and abroad ("**Export Approvals**");

(b)    there are no pending or, to the Knowledge of the Company, threatened claims against any Acquired Company with respect to such Export Approvals;

(c)    to the Knowledge of the Company, there are no actions, conditions or circumstances pertaining to the Acquired Companies' import or export transactions that may give rise to any future claims;

(d)    to the Knowledge of the Company, no Export Approvals with respect to the transactions contemplated hereby are required;

(e)    none of the Acquired Companies, their Affiliates, their respective directors or officers, nor, to the Knowledge of the Company, any employees or agents of the foregoing, is a Sanctions Target;

(f)    no Acquired Company has received written notice to the effect that a Governmental Authority claimed or alleged that any Acquired Company was not in compliance with International Trade Laws; and

(g)    neither the Acquired Companies nor any of their Affiliates has made any voluntary disclosures to, or has been subject to any fines, penalties or sanctions from, any Governmental Authority regarding any past violations of International Trade Laws.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as of the date hereof and as of the Closing as follows:

Section 5.1    **Organization; Authorization**.

21

CONFIDENTIAL

FBG_CH1_00097574

(a)     Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite power and authority to own, lease and operate its assets, properties and business and to carry on its business as now being conducted.  Buyer has full right, power, capacity and authority to execute and deliver this Agreement to be executed and delivered thereby, to consummate the transactions contemplated hereby and thereby and to comply with the terms, conditions and provisions hereof.  The execution, delivery and performance by Buyer of this Agreement have been duly and properly authorized by all requisite action in accordance with applicable Law and with the organizational documents of Buyer.  This Agreement have been duly executed and delivered by Buyer and constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

**Section 5.2**     **No Violation**.  The execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the transactions contemplated hereby will not:

(a)     violate, contravene or conflict with any Law; or

(b)     violate, contravene or conflict with any provision of the charter documents, bylaws or similar organizational documents of Buyer.

**Section 5.3**     **Investment Intent**.  Buyer is acquiring the Securities for its own account for investment purposes only and not with a view to distribution with the meaning of Section 2(a)(11) of the Securities Act of 1933, as amended.

**Section 5.4**     **No Brokers or Finders**.  Neither Buyer nor any of its Affiliates has retained any broker or finder, made any statement or representation to any Person that would entitle such Person to, or agreed to pay, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement.

**Section 5.5**     **No Outside Reliance; Acknowledgement by Buyer**.

(a)     Notwithstanding anything contained in this Article V or any other provision hereof, Buyer acknowledges and agrees that none of the Acquired Companies, Seller or any of their respective Affiliates, nor any of the respective directors, officers, employees, stockholders, partners, members, agents or representatives of the foregoing, has made, or is making, any representation or warranty whatsoever, oral or written, express or implied (and none of Buyer or any of its Affiliates or their respective directors, officers, employees, stockholders, partners, members, agents or representatives has relied on any representation, warranty or statement of any kind by any Acquired Company, Seller or any of their respective Affiliates or any of the respective directors, officers, employees, stockholders, partners, members, agents or representatives of the foregoing), beyond those expressly given in Article III or Article IV including any implied warranty or representation as to condition, merchantability, suitability or fitness for a particular purpose or trade as to any of the assets of the Acquired Companies. Without limiting the generality of the foregoing, it is understood that any cost estimates, financial or other projections or other predictions or other materials (including any such materials contained in any "data room" or

22

CONFIDENTIAL

FBG_CH1_00097575

reviewed by Buyer or any of its Affiliates, or any of their respective directors, officers, employees, stockholders, partners, members, agents or representatives) or management presentations or due diligence discussions that have been or shall hereafter be provided to or engaged in with by Buyer or any of its Affiliates or any of their respective directors, officers, employees, stockholders, partners, members, agents or representatives, are not and will not be deemed to be representations or warranties of the Acquired Companies, Seller or any of their respective Affiliates or any of the respective directors, officers, employees, stockholders, partners, members, agents or representatives of the foregoing, and no representation or warranty is made as to the accuracy or completeness of any of the foregoing, except as may be expressly set forth in Article III or Article IV. Buyer understands and agrees that any inventory, equipment, vehicles, assets, properties and business of the Acquired Companies are furnished "as is", "where is" with all faults and without any other representation or warranty of any nature whatsoever, in each case subject only to the representations and warranties contained in Article III or Article IV.

(b)     BUYER ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES MADE BY THE ACQUIRED COMPANIES AND SELLER IN ARTICLE III AND ARTICLE IV CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE ACQUIRED COMPANIES AND SELLER TO BUYER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY. BUYER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT, ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESSED OR IMPLIED (INCLUDING ANY RELATING TO THE FUTURE OR HISTORICAL FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS OR LIABILITIES OF THE ACQUIRED COMPANIES) ARE SPECIFICALLY AND EXPRESSLY DISCLAIMED BY THE ACQUIRED COMPANIES AND SELLER. FOR THE AVOIDANCE OF DOUBT, AND NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NOTHING IN THIS SECTION 5.5 SHALL PREVENT ANY PARTY HERETO FROM BRINGING A CLAIM FOR FRAUD.

## ARTICLE VI
## OTHER COVENANTS AND AGREEMENTS

**Section 6.1     Agreements Regarding Tax Matters**.

(a)     Cooperation on Tax Matters.  Buyer, the Acquired Companies, and Seller shall cooperate reasonably and in good faith, as and to the extent reasonably requested by any other party (and at the requesting party's expense), in connection with the filing of Tax Returns of the Acquired Companies and any audit, litigation or other Proceeding with respect to Taxes of the Acquired Companies.  Such cooperation shall include the retention and (upon the other party's reasonable request and at its expense) the provision of records and information which are reasonably relevant to any such audit, litigation or other Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Any information obtained under this Section 6.1(a) shall be kept

23

**DEBTORS' EXHIBIT NO. 125**
**Page 28 of 41**

confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund of Tax or in conducting an audit or other Proceeding relating to Tax.

(b)     Tax Sharing Agreements.   Seller shall cause all Tax sharing, Tax indemnification, or Tax distribution agreements to which any Acquired Company, on the one hand, and Seller or any of its Affiliates (other than an Acquired Company) on the other hand, are parties (excluding this Agreement) to be terminated as of 12:01 a.m. local time on the Closing Date and the Acquired Companies to not be bound thereby or have any Liability thereunder with respect to any taxable period.

(c)     Transfer Taxes, Etc.   All transfer, documentary, sales, use, registration, stamp and other similar Taxes and fees (including any penalties and interest thereon) (together, "**Transfer Taxes**") shall be paid by Buyer when due, and Buyer shall file all necessary Tax Returns and other documentation with respect to such Transfer Taxes.  If required by applicable Law, Seller shall, and shall cause their Affiliates (if applicable) to, join in the execution of any such Tax Returns and other documentation.

**Section 6.2     Further Assurances**.  Each of the Parties agrees that subsequent to the Closing, upon the reasonable request of any other Party from time to time, it shall execute and deliver, or cause to be executed and delivered, such further instruments and take such other actions as may be necessary or desirable to carry out the transactions contemplated by this Agreement, or to vest, perfect or confirm ownership by Buyer of the Securities. Without limiting the foregoing, Seller agrees that upon Buyer's request within 12 months following the Closing, Seller shall use commercially reasonable efforts to facilitate the termination of any agreements between any of the Acquired Companies and Seller or any of its Affiliates.

**Section 6.3     Intracompany Arrangements**.  Each of the intracompany accounts or Contracts between any of the Acquired Companies, on the one hand, and Seller or any of its Affiliates (other than an Acquired Company) on the other hand, shall be cancelled without any consideration or further liability to any party and without the need for any further documentation, effective immediately prior to the Closing.

**Section 6.4     Restrictive Covenants**.

(a)     Confidentiality.

(i)     For a period of five years following the Closing Date, Seller shall not, and Seller shall direct its Affiliates not to, use or disclose or convey to any third party, any Acquired Confidential Information; provided, however, that Seller or its Affiliates may furnish such portion (and only such portion) of the Acquired Confidential Information: (i) as may be required by applicable Law, Order or rule (including, without limitation, the rules of securities exchange or any industry or self-regulatory body) (provided that Seller or such Affiliate promptly notifies Buyer of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure (other than in connection with an audit or review by a Governmental Authority in the ordinary course of business or in connection with ordinary course filings)); (ii) to its representatives on a need to know basis, subject to confidentiality obligations substantially similar to, or greater than, those contained herein; (iii) to enforce its rights under this Agreement or

24

FBG_CH1_00097577

otherwise and Buyer or its Affiliates (including the Acquired Companies following Closing); and (iv) to any current or prospective Affiliate, partner, member, stockholder, limited partner, investor or wholly owned Subsidiary of Seller or such Affiliate in the ordinary course of business (provided that Seller or such Affiliate informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information).

(ii)     For a period of five years following the Closing Date, Buyer shall not, and Buyer shall direct its Affiliates (including the Acquired Companies following the Closing) not to, use or disclose or convey to any third party, any Seller Confidential Information; provided, however, that Buyer or its Affiliates may furnish such portion (and only such portion) of such Seller Confidential Information: (i) as may be required by applicable Law, Order or rule (including, without limitation, the rules of securities exchange or any industry or self-regulatory body) (provided that Buyer or such Affiliate promptly notifies Seller of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure (other than in connection with an audit or review by a Governmental Authority in the ordinary course of business or in connection with ordinary course filings)); (ii) to its representatives on a need to know basis, subject to confidentiality obligations substantially similar to, or greater than, those contained herein; (iii) to enforce its rights under this Agreement or otherwise against Seller or its Affiliates; or (iv) to any current or prospective Affiliate, partner, member, stockholder, limited partner, investor or wholly owned Subsidiary of Buyer or such Affiliate in the ordinary course of business (provided that Buyer or such Affiliate informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information).

(b)     Non-Disparagement. Seller and Buyer agree that neither of them nor any of their respective Affiliates shall, at any time hereafter, make any defamatory, derogatory or disparaging statements or communications (whether written or oral) regarding the other Party or any of its Affiliates, including any of their respective products or services, other than truthful statements made (i) in connection with any then pending or threatened Proceeding or as otherwise required by applicable Law; (ii) to enforce this Agreement or any other Contract; or (iii) to Governmental Authorities about possible violations of Law, in each case in good faith.

Section 6.5     Section 280G.  The Acquired Companies shall each, prior to the Closing, (a) use reasonable best efforts to obtain waivers of any "excess parachute payment" (within the meaning of Section 280G) from each Person who has a right to any payments and/or benefits as a result of or in connection with the transactions contemplated by this Agreement that would be deemed to constitute "excess parachute payments" (within the meaning of Code Section 280G excluding any payments to be made at the direction of Buyer), and (b) solicit the approval of the stockholders of each of the Acquired Companies, as applicable, in a manner that complies with Code Sections 280G(b)(5)(A)(ii) and 280G(b)(5)(B) of all payments and/or benefits (including payments and benefits waived pursuant to the preceding clause) that would, as a result of, or in connection with, the transactions contemplated by this Agreement, be deemed to constitute "excess parachute payments."  To the extent required to comply with the provisions of the preceding sentence, the Acquired Companies shall deliver, among other items, to their respective stockholders, as applicable, a disclosure statement intended to satisfy the stockholder approval requirements of Section 280G(b)(5)(B) of the Code.  The form of waiver, solicitation of approval, and disclosure materials shall be subject to the reasonable prior review of Buyer, which shall not to be unreasonably conditioned or delayed.

25

**Section 6.6**     <u>**Public Announcements**</u>.

(a)     No Party shall issue or cause the publication of any press release or other public announcement relating to this Agreement or the transactions contemplated hereby (whether before or after the Closing) without the prior written consent of Buyer and Seller, except as any Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by applicable rules of any stock exchange or quotation system on which such Party or its Affiliates lists or trades securities (in which case the disclosing Party will use its reasonable best efforts to advise Buyer and Seller before making such disclosure); provided that, nothing herein shall prevent (i) the Buyer or its Affiliates from acknowledging that any such entity owns or is affiliated with the Acquired Companies if asked by a third party and (ii) the Seller or its Affiliates from acknowledging that any such entity has no direct or indirect interest in the Acquired Companies if asked by a third party.

(b)     No Party shall make publicly available this Agreement (or any portion of this Agreement) (whether before or after the Closing) without the prior written consent of Buyer and Seller, except as any Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by applicable rules of any stock exchange or quotation system on which such Party or its Affiliates lists or trades securities (in which case the disclosing Party will use its commercially reasonable efforts to advise Buyer and Seller before making such disclosure and, upon the request of Buyer or Seller, the Parties will work together in good faith to agree and pursue appropriate confidential treatment requests with respect to this Agreement, at the sole cost of the party requesting such treatment). This <u>Section 6.6</u> shall not apply to or restrict disclosure by a Party (i) to its officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors, and other agents for the purpose of obtaining advice in connection with the transactions contemplated hereunder, it being understood that such officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors, and other agents will be informed of the confidential nature of this Agreement and the transactions contemplated hereby and will be directed to treat such information as confidential in accordance with the terms of this Agreement, (ii) to its direct or indirect members, holders of Equity Securities or limited partners and their respective Affiliates or (iii) in connection with any private equity fundraising activities by such party or its indirect members, holders of Equity Securities or limited partners or their respective Affiliates.

**Section 6.7**     <u>**General Release**</u>.

(a)     Effective upon the Closing, each Seller, on such Seller's own behalf and on behalf of such Seller's heirs, successors, trustees, executors, administrators, assigns and any other Person that may claim by, through or under such Seller (collectively, the "**Releasing Parties**"), hereby (i) irrevocably waives, releases, acquits and forever discharges each Acquired Company and each of their respective present and former officers, directors, managers, employees and other agents (collectively, the "**Releasees**") from, any and all Liabilities of any kind or nature whatsoever since the beginning of time and (ii) agrees that no Releasing Party will bring or voluntarily participate in or assist any Proceeding that relates to any matter released pursuant to this <u>Section Section 6.3</u>. Notwithstanding the foregoing, the Releasing Parties do not waive or release any rights based upon, arising out of or relating to rights in favor of the Releasing Parties created pursuant to the terms of this Agreement and the Ancillary Agreements.

26

CONFIDENTIAL                                                                                        FBG_CH1_00097579

(b)      The Releasing Parties understand and agree that the releases provided in Section 7.6(a) above extend to all claims released above whether known or unknown, suspected or unsuspected. As to those matters released herein only, the Releasing Parties waive and relinquish any and all rights they may have under California Civil Code Section 1542, which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY"

The Releasing Parties hereto expressly waive and release any rights and benefits which they have or may have under any similar Law or rule of any other jurisdiction pertaining to the matters released herein. It is the intention of the Releasing Parties through this Agreement and with the advice of counsel to fully, finally and forever settle and release the claims set forth above. In furtherance of such intention, the releases herein given shall be and remain in effect as full and complete releases of such matters notwithstanding the discovery of any additional claims or facts relating thereto.

## ARTICLE VII
## MISCELLANEOUS

**Section 7.1**      **Non-survival**. Except as set forth in the following sentence, the representations, warranties, covenants and agreements of Buyer, Seller and the Acquired Companies contained in this Agreement or in any certificate delivered in connection herewith will not survive beyond the Closing, such that no claim for breach of any such representation or warranty may be brought after the Closing with respect thereto against Buyer, the Acquired Companies or Seller, and there will be no Liability in respect thereof. Notwithstanding the foregoing, the parties acknowledge and agree that the preceding sentence shall not apply to any claims arising out of or relating to (a) any breaches of any covenants or agreements set forth in this Agreement that are required, by their terms, to be performed or complied with after the Closing or (b) Fraud. Each of Buyer, Seller and the Acquired Companies acknowledge and agree that neither such party nor any other Person may avoid such limitation on Liability by (x) seeking damages for breach of contract, tort or pursuant to any other theory of liability, all of which are hereby waived or (y) asserting or threatening any claim against any Person that is not a party hereto (or a successor to a party hereto) for breaches of the representations and warranties contained in this Agreement.

**Section 7.2**      **Notices**. All notices and other communications made pursuant to or under this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when transmitted by facsimile or electronic mail if such transmission occurs on a Business Day before 5:00 p.m. Eastern time, or the next succeeding Business Day if such transmission occurs at any other time, (c) one Business Day after deposit with a nationally recognized overnight courier service, or (d) three Business Days after the mailing if sent by registered or certified mail, postage prepaid, return receipt requested.

27

CONFIDENTIAL

Section 7.3    **Expenses**.  Except as otherwise provided herein, all fees and expenses incurred in connection with or related to this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.

Section 7.4    **Entire Agreement**.  All references in this Agreement to this Agreement shall include all Exhibits and Schedules hereto. This Agreement constitutes the entire agreement of the Parties relating to the subject matter hereof and supersedes all prior agreements or understandings between the Parties with respect to such subject matter.  Notwithstanding any oral agreement or course of conduct of the Parties or their respective officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors and other agents to the contrary, no Party shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each of the Parties.

Section 7.5    **No Third-Party Beneficiaries**.  This Agreement shall inure exclusively to the benefit of and be binding upon the Parties and their respective successors, permitted assigns, executors and legal representatives.  Nothing in this Agreement, express or implied, is intended to confer on any Person any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 7.6    **Assignments**.  This Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns, but will not be assignable or delegable by any Party, by operation of Law or otherwise, without the prior written consent of the other Parties; provided, however, that nothing in this Agreement shall or is intended to limit the ability of Buyer to assign its rights or delegate its responsibilities, liabilities and obligations under this Agreement, in whole or in part, without the consent of Seller to (a) any Affiliate of Buyer, (b) any direct or indirect purchaser of all or substantially all of the assets of the Acquired Companies, (c) any lender to Buyer and/or any Acquired Company as security for borrowings, or (d) any Person to the extent any such assignment would not reasonably be expected to have an adverse Tax impact on Seller.  Any attempted assignment in violation of this Section 7.6 shall be void *ab initio*; provided, further, that nothing in this Agreement shall or is intended to limit the ability of Seller to assign its rights or delegate its responsibilities, liabilities and obligations under this Agreement, in whole or in part, without the consent of Buyer to (a) any Affiliate of Seller, or (b) any lender to Seller (or any Affiliate of Seller) as security for borrowings.

Section 7.7    **Amendment; Waiver**.  This Agreement shall not be amended, modified or waived in any manner except by an agreement in writing duly executed and delivered by each of Buyer and Seller.  No failure or delay of any Party to exercise any right or remedy given to such Party under this Agreement or otherwise available to such Party, or to insist upon strict compliance by any other Party with its or his obligations hereunder, no single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, and no custom or practice of the Parties in variance with the terms hereof, shall constitute a waiver of any Party's right to demand exact compliance with the terms hereof.  Any written waiver shall be limited to those items specifically waived therein and shall not be deemed to waive any future breaches or violations or other non-specified breaches or violations unless, and to the extent, expressly set forth therein.

28

CONFIDENTIAL                                                                    FBG_CH1_00097581

**Section 7.8      Agreement Controls**.  In the event that a provision of any agreement delivered in connection with this Agreement is inconsistent with, conflicts with or contradicts any term of this Agreement, the terms of this Agreement shall prevail.

**Section 7.9      Severability**.  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired.  If the final judgment of a court of competent jurisdiction or other Governmental Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

**Section 7.10      Governing Law**.  This Agreement shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation, inducement to enter and/or performance of this Agreement (whether related to breach of contract, tortious conduct or otherwise and whether now existing or hereafter arising) shall be governed by, the internal Laws of the State of New York, without giving effect to any Law that would cause the Laws of any jurisdiction other than the State of New York to be applied.

**Section 7.11      Consent to Jurisdiction; Service of Process; Waiver of Jury Trial**.

(a)      Each Party agrees that any Proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought exclusively in the United States District Court for the Southern District of New York, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Proceeding, the New York State Supreme Court, and each of the Parties hereby submits to the exclusive jurisdiction of such courts for itself and with respect to its property, generally and unconditionally, for the purpose of any such Proceeding.  A final judgment in any such Proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Each Party agrees not to commence any Proceeding arising out of or relating to this Agreement or the transactions contemplated hereby except in the courts described above (other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in New York as described above), irrevocably and unconditionally waives any objection to the laying of venue of any Proceeding arising out of or relating to this Agreement or the transactions contemplated hereby in any such court, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such Proceeding brought in any such court has been brought in an inconvenient forum or does not have jurisdiction over any Party.

(b)      Each Party agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address (or in the case of Seller, Seller's address) set forth herein shall be effective service of process for any such Proceeding.

(c)      EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON

29

CONTRACT, TORT, STATUTE OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.  EACH PARTY FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER PROCEEDING IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED.   EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED OR WARRANTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 7.11</u>.

Section 7.12     <u>**Specific Performance**</u>.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, each of the Parties shall be entitled to enforce specifically the provisions of this Agreement, including obtaining an injunction or injunctions to prevent breaches or threatened breaches of this Agreement, in any court designated to resolve disputes concerning this Agreement (or, if such court lacks subject matter jurisdiction, in any appropriate state or federal court), this being in addition to any other remedy to which such Party is entitled at Law or in equity.  Each Party further agrees not to assert and waives (a) any defense in any action for specific performance that a remedy at Law would be adequate and (b) any requirement under any Law to post security or provide indemnity as a prerequisite to obtaining equitable relief.

Section 7.13     <u>**Other Remedies**</u>.  Except to the extent set forth otherwise in this Agreement, all remedies under this Agreement expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or at Law or in equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

Section 7.14     <u>**No Recourse Against Affiliates**</u>.  Notwithstanding any other provision of this Agreement, except to the extent otherwise agreed in writing, no claim (whether at law or in equity, whether in contract, tort, statute or otherwise) may be asserted by the Acquired Companies, Seller, Buyer, any Affiliate of any of the foregoing (including, with respect to a Buyer, from and after the Closing, any Acquired Company) or any Person claiming by, through or for the benefit of any of them, against any Person who is not party to this Agreement, including any equityholders, partners, members, controlling persons, directors, managers, officers, employees, incorporators, managers, agents, representatives, or Affiliates of Buyer, any Acquired Company, or Seller or the heirs, executors, administrators, successors or assigns of any of the foregoing (or any Affiliate of any of the foregoing) that is not a party to this Agreement (each a "**Non-Party Affiliate**") with respect to matters arising in whole or in part out of, related to, based on, or in connection with the Company, the Acquired Companies, this Agreement or their subject matter or the transactions contemplated hereby or with respect to any actual or alleged inaccuracies, misstatements or

30

FBG_CH1_00097583

omissions with respect to information furnished by or on behalf of the Acquired Companies or any Non-Party Affiliate in any way concerning the Company, the Acquired Companies, this Agreement or its subject matter or the transactions contemplated hereby.

Section 7.15      **Rules of Construction**. The following rules of construction shall govern the interpretation of this Agreement:

(a)      all references to Articles, Sections, Exhibits or Schedules are to Articles, Sections, Exhibits or Schedules in this Agreement;

(b)      each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with GAAP;

(c)      unless the context otherwise requires, words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, the feminine or neuter gender shall include the masculine, feminine and neuter;

(d)      whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "but not limited to";

(e)      the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not simply mean "if";

(f)      references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(g)      when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in beginning the calculation of such period will be excluded (for example, if an action is to be taken within two days after a triggering event and such event occurs on a Tuesday, then the action must be taken on or prior to Thursday); to the extent any such period is measured in Business Days, if the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(h)      time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement;

(i)      the subject headings of Articles and Sections of this Agreement are included for purposes of convenience of reference only and shall not affect the construction or interpretation of any of its provisions;

(j)      (i) the terms "hereof", "herein", "hereby", "hereto", and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto, (ii) the term "any" means "any and all", and (iii) the term "or" shall not be exclusive and shall mean "and/or";

CONFIDENTIAL                                                     FBG_CH1_00097584

(k)     (i) references to "days" means calendar days unless Business Days are expressly specified and (ii) references to "$" mean U.S. dollars;

(l)     the Parties intend that each representation, warranty, covenant and agreement contained herein shall have independent significance, and if any Party has breached any representation, warranty, covenant or agreement contained herein in any respect, the fact that there exists another representation, warranty, covenant or agreement relating to the same or similar subject matter that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, covenant or agreement;

(m)     all uses of "written" contained in Articles III, IV and V shall be deemed to include information transmitted via e-mail, facsimile or other electronic transmission;

(n)     for purposes of Article IV, information shall be deemed to have been "made available" to Buyer only if such information was posted to the electronic data room or emailed to the legal advisors of Buyer or its Affiliates in a manner accessible and reviewable by Buyer at least one day prior to the date of this Agreement;

(o)     any drafts of this Agreement  circulated by or among the Parties prior to the final fully executed drafts shall not be used for purposes of interpreting any provision of this Agreement, and each of the Parties agrees that no Party shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any dispute or Proceeding among any of the foregoing or for any other purpose; and

(p)     the Parties have participated jointly in the negotiation and drafting of this Agreement; in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement and the language used in it will be deemed to be the language chosen by the Parties to express their mutual intent.

Section 7.16     **Counterparts; Deliveries**.   This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of electronic transmission of .pdf files or other image files via e-mail, cloud-based transfer or file transfer protocol, or use of a facsimile machine, shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  No party to any such agreement or instrument shall raise the use of electronic transmission or a facsimile machine to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of electronic transmission or a facsimile machine as a defense to the formation or enforceability of a contract, and each such party forever waives any such defense.

Section 7.17     **Admissibility into Evidence**.   All offers of compromise or settlement among the Parties or their officers, directors, managers, employees, attorneys, accountants,

32

consultants, financial advisors or other agents in connection with the attempted resolution of any dispute under this Agreement shall be deemed to have been delivered in furtherance of a settlement and shall be exempt from discovery and production and shall not be admissible in evidence (whether as an admission or otherwise) in any Proceeding for the resolution of such dispute.

[*The remainder of this page is intentionally left blank.*]

33

CONFIDENTIAL

FBG_CH1_00097586

**DEBTORS' EXHIBIT NO. 125**
**Page 38 of 41**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**BUYER:**

**BPI ACQUISITION COMPANY, LLC**

By:     _____
         Name:  Michael Baker
         Title:    Chief Corporate Strategy Officer

[Signature Page to Securities Purchase Agreement]

CONFIDENTIAL

FBG_CH1_00097587

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**COMPANY:**

**DALTON CORPORATION, STRYKER MACHINING FACILITY CO.**

By: _____
Name:  Jeremy O. Jenkins
Title:    Authorized Signatory

[Signature Page to Securities Purchase Agreement]

CONFIDENTIAL

FBG_CH1_00097588

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**SELLER:**

**NEW DALTON HOLDINGS CORPORATION**

By: _____

Name:  Jeremy O. Jenkins
Title:   Authorized Signatory

[Signature Page to Securities Purchase Agreement]

CONFIDENTIAL

FBG_CH1_00097589