**Exhibit 3**

**Transcript for December 22, 2025 Hearing on Debtors' Motion for Third-Party Factoring Procedures**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS (HOUSTON)

|  |  |  |
|---|---|---|
| IN RE: | . | Case No.  25-90399 |
|  | . | Chapter 11 |
| FIRST BRANDS GROUP, LLC, | . |  |
|  | . | 515 Rusk Street |
|  | . | Houston, TX 77002 |
| Debtor. | . |  |
|  | . | Monday, December 22, 2025 |
| . . . . . . . . . . . . . . . . | . | 9:03 a.m. |

TRANSCRIPT OF ECF 807 MOTION OF DEBTORS FOR ORDER (I)
ESTABLISHING THIRD-PARTY FACTORING PROCEDURES FOR (A) THE
REVIEW AND RECONCILIATION OF THE DEBTORS' RECEIPTS, AND (B) THE
RELEASE OF FUNDS TO THE DEBTORS ESTATES AND THE THIRD-PARTY
FACTORS; (II) AUTHORIZING CUSTOMERS TO REMIT RECEIVABLES
WITHOUT LIABILITY; AND (III) GRANTING RELATED RELIEF
BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

For the Debtor:        Weil Gotshal and Manges
                       By:  CLIFFORD WILLIAM CARLSON, ESQ.
                       700 Louisiana Street, Suite 3700
                       Houston, TX 77002
                       (713) 546-5248

                       Weil Gotshal and Manges
                       By:  SUNNY SINGH, ESQ.
                            KEVIN BOSTEL, ESQ.
                            LOREN FINDLAY, ESQ.
                            JESSICA L. FALK, ESQ.
                       767 5th Avenue
                       New York, NY 10153
                       (212) 310-8000

APPEARANCES CONTINUED.

Audio Operator:        Yesenia Lila, ERO

Transcription Company: Access Transcripts, LLC
                       10110 Youngwood Lane
                       Fishers, IN 46048
                       (855) 873-2223
                       www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):

For the Ad Hoc Group        Gibson Dunn & Crutcher LLP
of Lenders:                 By: ANNELYSE SCARLETT GAINS, ESQ.
                            1700 M St NW
                            Washington, DC 20036
                            (202) 955-8500

For Evolution Credit        Proskauer Rose
Partners:                   By:  VINCENT INDELICATO, ESQ.
                            Eleven Times Square
                            New York, NY 10036
                            (212) 969-3000

                            Elsberg Baker & Maruri PLLC
                            By:  MICHAEL DUKE, ESQ.
                                 DAVID ELSBERG, ESQ.
                                 GARRETT GERBER, ESQ.
                                 ELLA EPSTEIN, ESQ.
                            1290 Avenue of the Americas
                            Suite 4015
                            New York, NY 10104
                            (212) 390-9000

For Onset Financial,        Morrison & Foerster LLP
Inc.:                       By:  BRYAN KOTLIAR, ESQ.
                            250 W 55th Street
                            New York, NY 10019
                            (212) 468-8000

                            Morrison & Foerster LLP
                            By:  BRIAN R. MICHAEL, ESQ.
                            Aon Center
                            707 Wilshire Blvd Suite 6000
                            Los Angeles, CA 90017
                            (213) 892-5200

                            Morrison & Foerster LLP
                            By:  ANTHONY S. FIOTTO, ESQ.
                            200 Clarendon St Floor 20
                            Boston, MA 02116
                            (617) 648-4700

For LKQ Corporation:        Connolly Gallagher LLP
                            By:  CHRISTINA M. THOMPSON, ESQ.
                            1201 North Market Street, 20th Floor
                            Wilmington, DE 19801
                            (302) 884-6592

```
APPEARANCES (Continued):

For BPP Shiraz Park A      Singer & Levick, P.C.
LP:                        By:  WILLIAM DORWARD, ESQ.
                           16200 Addison Rd
                           Addison, TX 75001
                           (972) 380-5533

For Raistone Capital,      Orrick Herrington & Sutcliffe LLP
LLC; Raistone              By:  EMANUEL GRILLO, ESQ.
Purchasing LLC-Series           LAURA METZGER, ESQ.
XXXII, Raistone            51 W 52nd Street
Purchasing LLC-Series      New York, NY 10019
XXVIII:                    (212) 506-5000

For Katsumi Servicing,     Mayer Brown LLP
LLC:                       By:  CHARLES KELLEY, ESQ.
                           700 Louisiana Street
                           Houston, TX 77002
                           (713) 238-3000

                           Mayer Brown LLP
                           By:  SEAN T. SCOTT, ESQ.
                           71 South Wacker Drive
                           Chicago, IL 60606
                           (312) 782-0600

                           Mayer Brown LLP
                           By: RICHARD A. STIEGLITZ, ESQ.
                           1221 6th Avenue
                           New York, NY 10020
                           (212) 506-2500

For Carnaby II and III     Dechert LLP
Secured Parties:           By:  ALLAN BRILLIANT, ESQ.
                           1095 6th Avenue
                           New York, NY 10036
                           (212) 698-3500

                           Porter Hedges LLP
                           By:  MEGAN YOUNG-JOHN, ESQ.
                           1000 Main St, 36th Floor
                           Houston, TX 77002
                           (713) 226-6000

For UMB Bank, N.A.:        Alston & Bird
                           By:  STEPHEN BLANK, ESQ.
                           90 Park Avenue
                           New York, NY 10016
                           (212) 210-9400
```

APPEARANCES (Continued):

For Bank of America:        Winston & Strawn LLP
                            By: DANIEL MCGUIRE, ESQ.
                                GREGORY GARTLAND, ESQ.
                            35 W Wacker Driver
                            Chicago, IL 60601
                            (312) 558-5600

For ING Belgium             Clifford Chance US LLP
S.A./N.V.:                  By:  DOUGLAS DEUTSCH, ESQ.
                                SARAH CAMPBELL, ESQ.
                                ANTHONY CANDIDO, ESQ.
                                KAITLYN BEYER, ESQ.
                            375 9th Avenue
                            New York, NY 10001
                            (212) 878-8000

For ARC CGMARSC001,         Loeb & Loeb LLP
LLC and ARC                 By:  BETHANY D. SIMMONS, ESQ.
CGLGNIN001, LLC:            345 Park Avenue
                            New York, NY 10154
                            (212) 407-4000

For Patrick James:          Quinn Emanuel Urquhart & Sullivan,
                            LLP
                            By:  JAMES C. TECCE, ESQ.
                            295 5th Avenue
                            New York, NY 10016
                            (212) 849-7199

For the Official            Brown Rudnick LLP
Committee of Unsecured      By: MICHAEL WINOGRAD, ESQ.
Creditors:                      JASNOOR HUNDAL, ESQ.
                                BENNETT S. SILVERBERG, ESQ.
                            7 Times Square
                            New York, NY 10036
                            (212) 209-4917

For FCA US LLC:             Dickinson Wright PLLC
                            By:  ASHLEY JERICHO, ESQ.
                            2600 W Big Beaver Rd #300
                            Troy, MI 48084
                            (248) 433-7200

For the Proposed            Boies Schiller Flexner LLP
Counsel to the              By:  ROBERT GORDON, ESQ.
Examiner:                   55 Hudson Yards, 20th Floor
                            New York, NY 10001
                            (212) 446-2372

APPEARANCES (Continued):

| | |
|---|---|
| For Polaris: | Barnes & Thornburg LLP<br>By:  CONNIE A. LAHN, ESQ.<br>225 South 6th Street Suite 2800<br>Minneapolis, MN 55402<br>(612) 367-8706 |
| For the United States<br>Trustee: | Office of the United States Trustee<br>By:  JAYSON RUFF, ESQ.<br>     VIANEY GARZA, ESQ.<br>515 Rusk Street, Ste. 3516<br>Houston, TX 77002<br>(713) 718-4650 |
| For AutoZone Parts,<br>Inc.: | Baker Donelson<br>By:  DANIEL FERRETTI, ESQ.<br>1301 McKinney St<br>Ste 3700<br>Houston, TX 77010<br>(713) 650-9700 |
| For Leucadia Asset<br>Management LLC: | Wachtell, Lipton, Rosen & Katz<br>By:  MICHAEL H. CASSEL, ESQ.<br>51 W 52nd Street<br>New York, NY 10019<br>(212) 403-1000<br><br>Vinson & Elkins<br>By:  PAUL E. HEATH, ESQ.<br>845 Texas Avenue<br>Suite 4700<br>Houston, TX 77002<br>(713) 758-3313 |
| Also Present: | Grace Yeh<br>Matthew Kleissler<br>Sebastian Rayon<br>Adam Johnson<br>Bernadine Odom |

(Proceedings commence at 9:03 a.m.)

THE COURT:  Good morning.  This is Judge Lopez.  Today is December 22nd.  I'm going to call the 9 a.m. case, First Brands.

I'll take appearances in the courtroom.  Anyone wish to make an appearance on the line, please hit "five star," and I will unmute your line.

Mr. Carlson, good morning.

MR. CARLSON:  Good morning, Your Honor.  Cliff Carlson of Weil Gotshal on behalf of the debtors.  Joined with me is Sunny Singh, Kevin Bostel, Jessica Falk, and Loren Findlay.

THE COURT:  Alrighty.  Good morning.

MR. WINOGRAD:  Good morning, Your Honor.  Michael Winograd from Brown Rudnick on behalf of the committee.  And with me is Bennett Silverberg, also from Brown Rudnick on behalf of the committee, Your Honor.  Thank you.

THE COURT:  Good morning.

MR. GRILLO:  Good morning, Your Honor.  Emanuel Grillo, Orrick, Herrington, & Sutcliffe on behalf of the Raistone Partnerships.  A couple of my colleagues are on the phone as well.

THE COURT:  Good morning

MR. CASSEL:  Good morning, Your Honor.  Michael Cassel, Wachtell, Lipton, Rosen & Katz for the Leucadia

parties.

THE COURT:  Good morning.

MR. CASTLE:  And I have Paul Heath with me in the courtroom from Vinson & Elkins.

THE COURT:  Good morning.

MS. GAINS:  Good morning, Your Honor.  AnnElyse Gains of Gibson Dunn on behalf of the Ad Hoc Group of Lenders.

THE COURT:  Good to see you.  Good morning.

MS. YOUNG-JOHN:  Good morning, Your Honor.  Megan Young-John of Porter Hedges on behalf of the Carnaby II and III secured lenders.

THE COURT:  Good morning.

MR. KELLEY:  Good morning, Judge.

THE COURT:  Good morning.

MR. KELLEY:  How are you?

THE COURT:  Well, I'm about to find out --

MR. KELLEY:  Charles -- sorry.  I'm sorry?

THE COURT:  I said, you asked me how I'm doing.  I said, we're going to find out.

MR. KELLEY:  Hope you had a good weekend.  Charles Kelley from Mayer Brown on behalf of Katsumi Servicing.  I'm joined via video and on the calls by two of my colleagues, Sean Scott and Rich Stieglitz, both who are active in working on this matter with me.  Good morning, Your Honor.

THE COURT:  Good morning.  All right.  Let me unmute

a few lines.  Here's a 901 number.

MR. DUKE:  Good morning, Your Honor.  Michael Duke from Elsberg Baker & Maruri.  I'm on with a couple of my colleagues, Garrett Gerber and David Elsberg as well, on behalf of the Evolution party.

THE COURT:  Good morning.  A 917 number.

MR. DUKE:  Good morning.

MR. ELSBERG:  Your Honor, David Elsberg from Elsberg Baker & Maruri.  I just wanted to note that we also have a co-counsel, Vincent Indelicato, from Proskauer.

THE COURT:  I see him there.  Good morning.  A 212 number.

MR. BLANK:  Good morning, Your Honor.  Stephen Blank, from Alston & Bird on behalf of the UMB, as agent -- as UMB, DIP agent.

THE COURT:  Good morning.  And a 312 number.

MR. DUKE:  Good morning, Your Honor.  Dan McGuire on behalf of Bank of America, the ABL agent.

THE COURT:  Okay.  Anyone else wish to make an appearance, please hit "five star," and I will unmute your line.  Here's a 609 number.

MR. GERBER:  Garrett Gerber from Elsberg Baker & Maruri.  My colleagues, Mr. Duke and Mr. Elsberg, have already introduced me --

THE COURT:  Good morning.

MR. GERBER:  -- for Evolution.

THE COURT:  Good morning.  A 347 number.

MR. DEUTSCH:  Good morning, Your Honor.  Doug Deutsch from Clifford Chance on behalf of ING Belgium Bank.

THE COURT:  Okay.  Good morning.  Okay.  For the lines who -- that I have unmuted, I ask that you just monitor yourselves.  Keep yourselves on mute until it's time to address the Court, just so we can all hear each other.

I'll turn things over to the debtors, and you tell me where we are.

Mr. Singh, good morning.

MR. SINGH:  Good morning, Your Honor.  Sunny Singh, Weil Gotshal, on behalf of the debtors.  Your Honor, we have one matter before you today.  It's the debtor's request for approval of procedures related to the release of funds that we've been maintaining in our segregated account.  I refer to these as the trapped funds.

A lot of paper filed, including overnight, Your Honor.  So maybe I'll start with the status of just where we are, what's going forward for today, what's been adjourned.

And I'm pleased to report, Your Honor, that generally speaking, we've got agreement with the factoring counterparties with the exception of Evolution.  But I'll get into that in my opening remarks, and then we can address the Evolution objection.

So, Your Honor, if you'll recall, in connection with our DIP motion and cash collateral motion, the debtors had agreed to segregate prepetition account receivables pending further order of this Court. And that was really, at the time, done to allow us to address the issues that were being raised by our third-party factoring counterparties as to, you know, they may have purchased some of these receivables.

So what we did was we froze all the cash other than post-petition receivables, which, you know, we've been able to use. So the prepetition had been sitting there.

And since that time, the debtors, led by A&M and Weil under the direction of our special committee, we've been working on the reconciliation of those dollars and the receipts and information, as well as investigating generally the debtors' prepetition third-party factoring programs.

And unfortunately, Your Honor, as has been previously reported, and as I think you know, what we've learned is that the prepetition factoring program was largely fabricated and falsified. The vast majority of the factored amounts don't really tie to any of the actual invoices on the company's books and records. But in any case, we've been reviewing that information.

A&M has, led by Mr. Jerneycic, and providing that information to the UCC, in particular the M3 team on behalf of the creditors' committee to help us, you know, take a look at

this information and provide feedback.  We've been providing the information as well to the third-party factors themselves and had a number of meetings and helpful conversations with them to try to sift through the information.

Your Honor, on December 1, we filed our motion for approval of procedures to try to untrap these trapped funds and kind of go through a process.  And on the 12th of December, we supplemented that motion.

That supplement included basically two things.  We asked Your Honor, in that supplement, to release the segregated cash that we had identified in our first reconciliation report.  We sent out that report to the factoring counterparties, as well as the UCC.  That totaled about $109 million that was trapped that we, you know, wanted to kick off the procedures.

And number two, we asked for the Court to consider the approval of the procedures and the release of that 109 million on an emergency basis, requesting this hearing, which Your Honor authorized.

So since the supplement's been filed, we've continued to work with our stakeholders, including the factoring counterparties, to try to limit the issues for today's hearing.  And as I said, you know, very pleased to report that with the exception of Evolution, which I'll talk about a little bit more, you know, we've agreed on a form of order with the other factoring counterparties.  That form of order was uploaded on

the docket yesterday, Your Honor.  I think you should have a copy of that.

Basically, through this resolution, the factoring counterparties, again, with the exception of Evolution, do not oppose the debtor's access to what is about $63 million, subject to the terms and conditions of the order, of course. And I'll explain how I get to that 63.

But basically, the balance of the motion as supplemented, right, so approval of the actual procedures themselves and the difference of the amounts in our first report and the 63 -- or what will be released, if Your Honor grants today's motion, is what is being deferred.

And we -- the debtors, intend to come back at a hearing in January.  I think we have January 9th tentatively scheduled.  It won't be earlier than January 9th, and we're going to work out with the parties when the date will be.  And where we will request the debtor's approval of the procedures, release of the remaining funds in our first reconciliation report, and everybody's rights are reserved.  They can argue whatever they want with respect to that hearing.

Of course, we're going to try to work constructively with all the counterparties to see if we can, again, try to come up with a resolution and see if we can minimize issues that we have to dispute or fight about.

Your Honor, there's -- what we did with that 109,

just to give you a sense of what, you know, some of the terminology you might hear, and that's referred to in the agreed order in some of the papers.  You can kind of split that 109 into four categories.  Category 1, you know, those are invoices that were dated September 12th, 2025 forward.  And that is a period of time when the debtors stopped factoring altogether, third-party factoring, right?  The debtors at that point, the special -- it was shortly before the filing, special committee had been appointed, A&M had been appointed.  And once we learned of the factoring irregularities, we immediately stopped any further factoring.  And so that's about $43 million, Your Honor, that sort of is in that category.

Category 2 is invoices that were dated prior to September 12th, 2025, for customers that were not identified on any of the factoring receivable that were provided by third-party factors.  So they were customers that none of the third-party factors actually purchased receipts for, right?  That's about another $25 million.

And then you get to Category 3 and 4, which are basically funds not in those amounts.  They were factored pre-September 12th, 2025, and did relate to customers that one or more of the factoring counterparties purchased.  So it's that Category 3 and 4 that were sort of kicking for the future hearing.  And really Category 1 and 2, which I think, you know, somewhat low-hanging fruit, Your Honor, in terms of, you know,

clearly this could not have been factoring cash, that I think, you know, pleased to report that the factoring counterparties, again, with the exception of Evolution, have agreed with us. And so that's what we're really going forward with respect to today.

And so the other thing I would note, Your Honor, some of the factoring counterparties had requested additional time to diligence some Walmart-related invoices.  And so we're okay with that.  We're going to -- even though they may have been in Category 1 or 2, we're okay to put that aside.  It's about another $5 million, Your Honor.  And that gets me to roughly $63 million that we're asking to be released today.

What I will mention, Your Honor, is we're going to -- even on the 63, the UCC, we're working with M3 daily.  They had some questions as early as this morning.  We're going to have everybody take another look, make sure that we're comfortable with Category 1 and 2.  And so the amount may go down slightly, but it's not going to go up, obviously.  We're going to ask for Your Honor to enter the order.

But I just -- we want to make sure people are comfortable with what's going out and what's not going out. And so we're happy to do that afterwards, including to address some of the questions that were raised by the M3 team.  Again, trying to do this, Your Honor, as consensual as possible from our perspective.

So that's where we are today.  We're really just going forward with respect to the release of Category 1 and 2.  Evolution is objecting to the release of even that cash.  And that's where we are today.

Your Honor, we filed a reply last night.  Again, I -- or not again, first time, I really do apologize.  It was a late filing.  You know, but Evolution filed their papers Friday evening.  I'm not faulting or picking on them for that.  And we thought, Your Honor, it's a very technical argument.  We thought it'd be better for us to have something written to give you a chance to at least see what we have on paper rather than me try to do it orally.

So, you know, with that, Your Honor, that's where we are today.  I'm prepared to address the Evolution objection.  I think at this point, it might be helpful -- I don't know if other parties intend to say something, or how Your Honor moves forward.  I have evidence we'd like to introduce before the Evolution objection, and I'll have some remarks with respect to Evolution.  And then obviously, they'll want to be heard themselves.

THE COURT:  Okay.  Let me just -- just give me one second.  And so if approved today, just the cash that would be released would become DIP collateral.  And will it be used between now and the next hearing day?

MR. SINGH:  I expect it will be, Your Honor.

THE COURT:  Can you connect the dots between the DIP, the funds that were released in connection with the DIP, and then the need for additional funds --

MR. SINGH:  Sure.

THE COURT:  --now.

MR. SINGH:  Sure, Your Honor.  So basically, if you -- the DIP proceeds that came in, we're allowed to use those.  You know, these additional funds were contemplated to be used as part of the DIP budget.  We haven't accessed them. So both combined were sort of the debtor's operating cash.  And so the DIP sort of -- I have to double-check with Mr. Jerneycic, but I think we're down to our last DIP draw or second DIP draw.  We're getting pretty close.  And so these funds are critical for us to continue to operate basically through the end of January in order to get these, and frankly, the next slug that will be back sometime during January.

And so that's the dots, you know, sort of connecting the dots.  It's -- we're sort of at a point, as reflected in our emergency motion, where we can't sit with these funds sitting to the sideline anymore without them having a negative impact on the debtor's operations.  And so that's why we were okay to narrow it and do it in two pieces because we're not going to spend necessarily, you know, the full 109, should Your Honor have granted that relief between now and the next January, but we can do it in two steps and manage in a way that

works.  And so that's the idea, Your Honor.

Plus, you know, it's important.  You know, there is a narrative with our customers and vendors that they're not seeing our access to cash.  We believe this cash is ours.  And so from an operational perspective, getting access to this cash will reinforce to our counterparties that we actually have the funds we need to operate over the next, you know, few weeks, months, et cetera.

So that's part of the issue, Your Honor.  A big part, I should say.  You know, we need to reinforce the stability of the business here.  And so that's where we're going forward.  And so yeah, that's the way I connect the dots, Your Honor.

THE COURT:  Got it.  Okay.  Thank you.

MR. SINGH:  Okay.  So should I wait to -- should I let other parties?

THE COURT:  Yeah, yeah.

MR. SINGH:  I think they want to be heard before we go to evidence.

THE COURT:  If anyone wishes to address the Court.  And then, yeah, let me -- and just so the -- before we get into the evidence, just let me just hear preliminarily from any other party.  And then Evolution, I'm going to ask that you go last.  So I'm going to just allow everyone that wishes to speak kind of in support or based on the agreement and then let Evolution go last so I can kind of hear their perspective.

18

Thank you.

MR. SINGH:  Sounds good, Your Honor.  Okay.  Thank you.

MR. KELLEY:  Your Honor, I think the factor community is what -- is coming up next.

THE COURT:  Ah, perfect.

MR. KELLEY:  So the next few of us are the factors.

THE COURT:  Perfect.

MR. KELLEY:  Your Honor, again, for the record, Charles Kelly on behalf of Katsumi Servicing.  I always struggle when I hear someone characterize what we think and what we believe, which I heard Mr. Singh do from the podium.  I want to be very clear.  This order is a limited procedural order.  It's not a substantive one.

Our objection is on file.  We stand by every objection that's still within there and we may supplement with additional.  The core of it, as you probably read, was that we insist that these matters should be dealt with by an adversary proceeding.

We all have claims to this money, even those that the estate has been somewhat dismissive about, notwithstanding that those claims have to be resolved in the adversary.  We have served 2004s, so we have made requests for production on the debtor.  To say that the debtor's cooperation in producing materials is -- suffices would be a far stretch.  It's been

inadequate by all stretch.  We put that in our objection.

We find ourselves going into a hearing that should be an adversary where the procedural protections of an adversary of discovery, the ability to produce information is critical.  We've heard the debtors characterize to this Court many times about the what occurred prepetition with prepetition management based on work of Alvarez & Marsal.  We take issue with a lot of it.

And to be clear, the debtors aren't claiming they can prove it from their records.  What they say is we've gone to look and we can't find things.  It's not a question of the debtors being able to affirmatively meet their burden of proof.  It's a question of the debtor saying what they're unable to locate.

That is a problem for us for a number of reasons.  Parties often characterize the purchase of receivables as sort of a singular transaction.  They're anything but that.  They're complicated.  And when you look at how these transactions operate, there are claims these receivable counterparties have to what was characterized, whether correctly or incorrectly, by debtors and their poor records, which this Court has heard significant information about on day one and what we call day two, the final hearings, about the debtor's lack of adequate records.

We have also learned a lot about what has not been

done by the debtor's professionals to reach these conclusions. Those are issues this Court deserves to hear about, and we believe the Court deserves to hear about them in the form of an adversary proceeding.

We are not alone.  You've probably seen multiple objections by the various parties who contend that is the case. Notwithstanding the limited discovery, we did conduct a thorough deposition of Mr. Jerneycic, who we understood might be a witness.  We learned a couple things at that deposition, such as what Mr. Singh referred to, the debtor's dire straits for cash, which they need by January 2nd.  These are issues that caused the parties to try to broker a compromise with the absolute preservation of all of our rights.  We waived nothing.

I heard the Court's question to Mr. Singh talking about whether or not the debtor's DIP liens attach.  Whatever the debtor's -- DIP lender's rights attached to the cash that come out of here, our rights still continue to attach to them. The debtors may take the cash.  They may use it.  They're not required to keep them in this segregated account.

But if the production of discovery from debtors does not improve, we have a 45-day period to file objections to that use of cash.  I imagine there's going to be an onslaught of objections if we don't have adequate information.  That's why one of the key features in this order is we want this Court, and begging the Court's indulgence, I don't want to ever tell

you what to do.  We would like a status conference 30 days roughly from the entry of this so we can discuss a number of things, not the least of which is the status of discovery. That is baked into the order with a blank for Your Honor to put it in there.

There are other components of the order we wish that, you know, greater attention had paid to.  For example, we don't have an agreement if the Court intends to schedule a hearing -- their hearing on this the week of January 2nd through January 9th.  We had to move things around.  A number of us did, and that week is no longer available.  I think the debtors in drafting said the hearing couldn't be scheduled any earlier than January 9th.  The 9th is a Friday.  Just to avoid any misconstruction of that language, it cannot be the 9th if -- in order to continue to have the party's agreement for that. There's been some pretty absolute disclosures of that to the debtors.  I think that may have been a drafting error.

But in any event, that can be dealt with by when the Court sets the hearing the debtors are requesting on their motion.  To be clear, we don't agree the hearing should be set other than they get the right to have the hearing date and set it with Your Honor because we think it should be an adversary proceeding.

We also intend to challenge, as we get adequate discovery, what Mr. Singh called Buckets 1 and 2, unless we can

get adequate information to satisfy ourselves.

At this point in time, A&M's conclusions are largely unchecked, and the parties here have hired substantial and respected financial advisors to try to help us get answers there. Katsumi has hired AlixPartners, Your Honor, in case there's any concern about who we're bringing to bear to look at these issues. I know that, for example, the Leucadia parties have hired BRG. These are parties who are struggling to get the requisite information to be able to validate what the debtors are saying.

This hearing should not have gone forward with these kinds of issues, but we elected before the holidays not to burden Your Honor with robust discovery hearings. We're trying to stretch things out to see if the debtors can improve the tables on what they're producing.

A couple things I'd like to be clear about, too. The procedures that apply to Buckets 1 and 2, the money that's going to go out now, was intended to allow us to continue to assert every claim we have. The order has, with a bunch of lawyers on here you might imagine, very robust protections of other receivable counterparty's rights. It's all embedded in the order.

THE COURT: How do you read the order? What do you construe the order does what -- in terms of protection of rights?

MR. KELLEY:  It does give us certain administrative claims.  It gives us rights against the remaining funds that remain in the account, notwithstanding the monies that are coming out.  In other words, debtors contend not all the monies that remain in the account belong to the receivables counterparties.

Again, while we don't necessarily have the ability to validate that, we hope there is excess funds there.  And to the extent we have rights against Buckets 1 and 2, and would prove that to Your Honor in an adversary proceeding, we would expect the money to come there.  We also have put in language that allows us to go against the administrative claims bucket that's been reserved under the DIP.

So we believe those protections are afforded in there.  But to be honest, Your Honor, this was an effort by the receivables parties not to blow anything up, but to try to accommodate what appeared to be needs of the estate.  We thought given their cash constraints, we didn't want form over substance arguments that, gee, the procedural requirements of an adversary would prevent them from getting much needed cash.

So this was, I will honestly say, an attempt by the receivables counterparties to be constructive, to allow the debtors to live another day.  But at the same point in time, we are not any less focused on our rights in and against that cash.

I read some of the replies that were filed this morning, and I've seen some characterizations of the parties' positions. We have interests in the cash that's going out the door, whether it's ours outright by virtue of a sale or by the backstop liens that these parties have filed to protect the true sale nature of their claims. We still have claims, and we're prepared to vigorously defend those, including we've properly filed UCC-1s as required for sales, which also establish a number of rights we possess. And we're prepared to do that, Your Honor, but what we really want is to try to get the financial advisors to take a look at this and see if there's a lot we can do to avoid burdening the Court.

So I wanted the Court to see a little bit of our intent and our mindset, and that's the purpose of why I stood up to speak today, Your Honor.

THE COURT: Thank you.

MR. KELLEY: Thank you for allowing me the opportunity.

MR. CASSEL: Good morning, again, Your Honor. Michael Cassel, Wachtell Lipton, for the Leucadia parties. Over the weekend, we filed an objection to the factoring procedures motion. That was at Dockets 1740 through 1742.

As Your Honor heard from Mr. Singh, we've worked constructively with the debtors and with the other factoring counterparties to try to narrow the disputes for the purposes

of today's hearing, and which will hopefully narrow the disputes going forward at future hearings.

As we explained in our papers, particularly the declaration of Mr. Dery of BRG, we think that the debtor's method to determine ownership of the receivables is flawed. Their method abounds to just comparing invoice numbers between one and the other, and if those don't match, then the debtor's on the money. We disagree with that.

We also disagree with the buckets the debtors have laid out. We're not so sure it's clear under New York law, which applies to our agreement, that this date range --

THE COURT: Are you referring to the old 1, 2, 3, 4, 5, or are you referring to the current 1, 2, 3, 4?

MR. CASSEL: I'm referring to the buckets Mr. Singh said about the -- Mr. Singh laid out today about the September 12th to the 28th period.

THE COURT: Ah, yep, yep, yeah, yep.

MR. CASSEL: We don't think New York law is so clear to write about that, and that's one of the reasons why we have this Walmart set aside, which is the substantial --

THE COURT: Oh.

MR. CASSEL: -- bulk of our September 12th to 28th receivables. And we also think that, as Mr. Kelley noted, we do think this needs to be an adversary proceeding after real factual development on the connections between the debtor's

records and the real receivables.

At the core of today's resolution is that all of those issues, both the merits issues and the procedural points, are meant to be fully preserved. That was the deal, was that we'd be entitled to be heard on the adversary proceeding issue. We'd be entitled to be heard on these merits points at a future hearing, and we can at least get through today.

Hopefully, we can use the next few weeks to make some progress on the fact development front. As you heard from Mr. Kelley, the debtors at the moment really don't know. They just don't know how they did their fraud. They don't know how they fabricated receivables. They don't know who manipulated the spreadsheets. And hopefully, over the next few weeks, we can make some real progress on that front.

And hopefully, when we do have disputes, Your Honor, we can tee them up in an organized way and with a real record instead of a bunch of I don't knows.

So unless Your Honor has any further questions.

THE COURT: Thank you.

MR. CASSEL: Thanks.

THE COURT: Before I forget, and I don't want to -- this is unrelated, but I did notice that the Office of the United States Trustee identified who they want as the examiner. To the extent parties have any comment on the proposed examiner or wish to say anything, I'd ask that you please file it. I'll

get some notice out by December 30th.  I know that there's a hearing scheduled on the 9th, but if there's some concerns, I'd like to know sooner rather than later about kind of -- and maybe there are, and may -- just I want to make sure that there's due process and that parties have opportunity for notice on that.  But I would certainly appreciate kind of hearing anything around that time just so that we can all kind of have an open discussion about it.

THE COURT:  So please, go ahead.

MR. GRILLO:  Sure.  Thank you, Your Honor.  Again, Emanuel Grillo, and Your Honor just kind of stole my thunder. I was trying to say something different than what everyone else has said to this point, and I was going to talk to the examiner for just a moment because, obviously, based on Mr. Cassel's remarks, you know, that's a component of what it is that gets wrapped up into all of this at the end of the day.

On behalf of Raistone Purchasing as well, we have the same objections.  We worked with the parties over the weekend to effectively strike a balance, really.  That's what's occurred between, I think, you know, last week and this week. And I think everybody, including Raistone, is reserving all of our rights.  You know, the hearing is being pushed out.  So this way, you know, if there are more objections to be filed, including ours, we'll do that.

But the bottom line is I just want to spend one more

minute on understanding sort of the balancing because I think this was the question that Your Honor raised, right?  So this cash there's being distributed out, approximately 63 million or so, give or take.  And, you know, we're not, I think, as my colleagues have said, giving up our rights even to challenge that.  But what we did do is say, okay, well, if you take those funds, we do need potentially an administrative expense claim in the event that the remaining funds are not sufficient.

So if there's a mistake, right, no one's waiving their rights to challenge any part of the 63 million that is being put out.  But if there is a mistake that we all agree on, it could be a $5 mistake, it could be a $5 million mistake, it'll go first to the remaining funds in the segregated account in the first instance, right?  That'll be the first form of relief.

And then as the parties indicated, the second form of relief would be an administrative expense claim.  So I think where we all got comfortable as factors or representing factoring parties in the first instance is because we had some backup.  It wasn't -- even though this money is being turned over, we're not giving up anything with respect to our ability to challenge, you know, whether those funds were ours or not. We're saying, though, we understand you need that money.  We understand that there's a high probability -- a higher probability, I should say, that there -- you know, you'll have

access and rights to those funds. We're not conceding that yet, but we do have something in place to protect the factors if something has to change.

And also, frankly, to protect the estates, right? They get access to the money today. There's still more in the pot, obviously, to pull from. And then also, there's the potential for an administrative expense claim.

So the bottom line is, as everyone has said, we continue to look at these issues. We're probably going to continue to litigate them. Everyone's got the same views about what the right way to litigate these issues are, as well as the substance, right? So we've got legal issues and structural issues that we're all going to have to work out over some period of time. But this is the balance, I think, that's been struck between the factors on the one hand and the estates on the other hand.

I think it's a good deal for the moment in order to be able to get through this, get the debtors some of the money, and then to protect the parties in the event that there was a mistake that was made.

THE COURT: Thank you.

MS. YOUNG-JOHN: Good morning, again, Your Honor. Megan Young-John of Porter Hedges on behalf of the Carnaby II and III secured parties. I rise really today just in defense of the January 9th dates. We do have our motion for relief

from stay and motion to dismiss also scheduled for that day.

It sounds like for Mr. Kelley that that may be an obsolete thing that I'm raising right now.  But to advise the Court, we anticipate that that's going to be a full-day hearing.  We currently have five witnesses scheduled for that date.  So to the extent at all possible, we would request --

THE COURT:  And it's on your motion to lift the stay.

MS. YOUNG-JOHN:  As to the Carnaby debtors.

THE COURT:  And then the motion to dismiss the Carnaby debtors.

MS. YOUNG-JOHN:  The Carnaby debtors.

THE COURT:  Okay.  Okay.  And do the Carnaby debtors claim a right to any cash of which is subject to --

MS. YOUNG-JOHN:  No, we didn't file an objection today.  We don't think that we're implicated by the factoring motion today.  I'm simply --

THE COURT:  Are you implicated by any of the cash?

MS. YOUNG-JOHN:  I'm sorry?

THE COURT:  Is your client affected by any of the allegations?

MS. YOUNG-JOHN:  Regarding the full DIP in cash?

THE COURT:  Mm-hmm.

MS. YOUNG-JOHN:  Yes.  And we've negotiated reservations of rights in all the relevant orders to date.

THE COURT:  So you all want to go forward on a motion

to lift the stay in light of everything that I don't know?

MS. YOUNG-JOHN:  In light of everything that you don't know?

THE COURT:  That none of us know?

MS. YOUNG-JOHN:  I don't have authority to move that date.

THE COURT:  Oh, I'm not asking that.  I'm just making sure.  But essentially, you all are asking to lift the stay to go proceed against something of which none of us know what exactly and who belongs to what.  I get -- I understand you want to dismiss the cases.  I get that part.

MS. YOUNG-JOHN:  Yeah.

THE COURT:  I don't understand the motion to lift stay.  But you can certainly have the right to do it.  I'm just -- and I'm not saying you won't win.  What I am saying is I just need to understand how much clarity you all have that if the stay gets lifted, that it doesn't belong to anyone else other than the Carnaby parties.

MS. YOUNG-JOHN:  Right.  Well, I think that's part of our arguments is that they're -- the Carnaby debtors are special purpose vehicles.  We should be the only collateralized secured party for those debtors.  And so that's part of the basis of the motion to dismiss and kind of as a fallback, the lift stay motion.

THE COURT:  Okay.

MS. YOUNG-JOHN:  But really, I just rise to defend --

THE COURT:  Yeah, but you --

MS. YOUNG-JOHN:  -- kind of defend that date as far as we expect that to go.

THE COURT:  But your point is regardless of what happens here, you all have a full day scheduled on January 9th. So I think you probably need to pick another date is what you're telling me.

MS. YOUNG-JOHN:  That's what I'm hoping.

THE COURT:  You got it.

MS. YOUNG-JOHN:  Thank you, Your Honor.

THE COURT:  Got it.  No, that makes sense.  That makes sense.  Because you all are going forward on your motions and you want to be able to have your full opportunity.  And this seems like it would not -- you can't -- you couldn't get done all in one day.

MS. YOUNG-JOHN:  That's correct.

THE COURT:  Okay.  That makes sense to me.  Thank you.

MS. YOUNG-JOHN:  Thank you.

MS. GAINS:  Your Honor, for the record, AnnElyse Gains of Gibson Dunn on behalf of the Ad Hoc Group of Lenders. I'm not going to reiterate.  We filed a short joinder last night.  It's Docket Number 1055.

I saw you had a question about the DIP collateral.

So I just wanted to raise one point from the DIP lender perspective. We believe that the order, the proposed order that the debtors filed last night, we're supportive of you entering that order. We believe it coexists with the DIP order, but both align. The DIP order is a shared collateral order between ABL priority collateral and Term 1 priority collateral. The receivables at issue today are ABL priority collateral. So the DIP takes liens where it does under the final DIP order, depending on the various adjudication.

So from our perspective, these orders work in tandem and the reservation of rights that the parties have to, you know, the challenge deadline, all of that, we agree that those are preserved. But we fully support the debtors' use of this cash. We came into these cases. We agree that there could be a segregation.

But now we want to make sure that the debtors have the ability to fund these cases through that cash instead of continuing to have them segregated while parties work through all of the legal issues because they do have the corresponding remedies. I think the factoring counterparties talked about that. I won't reiterate. They are protections, but that is why the ad hoc group is supportive of the proposed order. So unless you have any questions for me, I'll --

THE COURT: No, no, that makes perfect sense. Your point is that the DIP liens are what they are and --

MS. GAINS:  Correct.

THE COURT:  -- they're attached to what they attach to.

MS. GAINS:  Correct.

THE COURT:  So you think that these orders just kind of work in tandem?

MS. GAINS:  That's exactly right.

THE COURT:  Yeah, I got it.  Thank you.

MS. GAINS:  Perfect.  Thank you.

MR. WINOGRAD:  Good morning, Your Honor.  Michael Winograd from Brown Rudnick on behalf of the committee.

THE COURT:  Good morning.

MR. WINOGRAD:  Your Honor, I just wanted to point out that the committee supports the relief requested.  There's obviously a need for cash in the short term.  And our professionals, M3, have worked closely with the debtors.  They continue to work with them.  They've gotten the information that they've requested, in particular on cash receipts.

And we agree that the use of Category 1 and 2, as Mr. Singh described, so either cash that was obtained after the factoring stopped or cash that was received before the factoring stopped, but with respect to customers that are not on the factoring lists, we agree that that's appropriate to use that.  We've been working with the debtors to confirm their actual numbers, and we're pretty close on that $63 million.  We

expect to get there on a number by the end of the day.

And M3 is here.  They're available to help, and as I said, they have been working with the debtors and will continue to do so to make sure that we get this right, Your Honor.

THE COURT:  Thank you.

MR. WINOGRAD:  Thank you, Your Honor.

THE COURT:  Anyone on the line wish to be heard?

MR. MCGUIRE:  Yes, Your Honor.  Yeah, this is Dan McGuire with Winston and Strawn on behalf of Bank of America, Your Honor.

THE COURT:  Yes.

MR. MCGUIRE:  Very briefly, Your Honor, just want to say that the ABL agent also supports the release of this cash.  We are the party with the actual first lien on these proceeds, and we recognize and agree that the debtor has a need for this cash to fund these cases.  They've narrowed this down to the cash that is, you know, clearly identified and appropriate at this point to be used, and we fully support the granting of relief here today, Your Honor.  We think it's critical to keep these companies funded and keep them operating in the ordinary course.

THE COURT:  Thank you.  Does anyone else who supports the relief request that wish to be heard?

Okay.  Let me hear from Evolution.

MR. ELSBERG:  Thank you, Your Honor.  This is David

Elsberg from Elsberg, Baker, and Maruri.  And as I mentioned earlier, I'm here with my colleagues Michael Duke and Garrett Gerber, and also we have co-counsel Vincent Indelicato from Proskauer.  If Your Honor permits, Mr. Duke, Mr. Gerber, and I will be dividing up the argument.

And before diving in, I'll just give Your Honor a roadmap of how we plan to divide it up and where we plan to go. Your Honor, Evolution has a $60.5 million claim.  It paid about $60.5 million to eight debtors who sold or purported to sell receivables to Evolution, and I'll refer to those eight debtors as the sellers.

First, Your Honor, I'll briefly demonstrate that Evolution has a lien and security interest in all of the receivables held by the sellers, and I'll refer to that -- those receivables as Evolution's collateral.

THE COURT:  Okay.

MR. ELSBERG:  Then my associate, Garrett Gerber, will demonstrate that Evolution filed UCCs that perfected its security interest in Evolution's collateral.  My colleague, Mike Duke, will then demonstrate that the debtors do not, in fact, have a security interest in Evolution's collateral.  And finally, Mr. Gerber will demonstrate that even if the debtors did have priority, and they don't, their motion should still be denied because while the debtors have asserted that nothing will be left for Evolution after the other creditors are paid,

that's a hotly contested issue that the debtors would need to try to prove at a valuation hearing under Section 507(a).

Your Honor, with that in place, I'd ask --

THE COURT:  Well, let me ask you, what is the ask today, just to outright deny the relief requested?

MR. ELSBERG:  Your Honor, no.  The remedy that we're seeking is adequate assurance.  And what we want is at a minimum $60.5 million of cash collateral should be maintained in the factor receivables account.  And the debtors should be fashioning --

THE COURT:  But they're asking me for 63.  That's what I'm saying.  So I'm trying to figure out what the ask is. In other words, you're asking that the debtor be allowed to use 3 million and then not the 60?  Is that what you're saying?

MR. ELSBERG:  Yes, whatever the remainder, but the 60.5 million should be kept in the factor receivables account, and the debtors should be fashioning adequate protection acceptable to Evolution, which they refuse to do.  And also, Your Honor, I would say that we agree with the --

THE COURT:  And again, I'm still not clear.  In other words, is the adequate protection the withholding of the 60 million?  So essentially, you're asking for denial of the motion.

MR. ELSBERG:  Essentially, yes, Your Honor.

THE COURT:  Okay.  You said no earlier, and you said

no, but just tell them to hold back 60 of the 63 that they want to use.  So -- but how do I then -- just so -- I get the ask, how do I reconcile the Evolution position with everyone else who's saying that they have probably equal right to that cash and no one is -- in other words, what makes your position superior, if at all, to the lien --

MR. ELSBERG:  Yeah, that --

THE COURT:  -- than anyone else's disposition?

MR. ELSBERG:  Yeah, that's what I'd like to explain. I think that we may have different language in our contract, which I'd like to go through with Your Honor.

THE COURT:  Got it.  You want to walk through it. And is your language subject to 552(b), 552 of the bankruptcy code?  I didn't hear any argument on that.  I just -- as the roadmap kicks in, I want to make sure parties at least answer my question.  At least -- I just want to make sure I understand, because it feels like an after-acquired clause and makes me have to start thinking about 552 of the Code.  And I just need to make sure that at least the debtors and other parties start thinking about that provision as we think about it, because I got it.  There's some prepetition kind of receivable collectibles.  And then there are some that I think were collected post-petition.

And if you're asserting a lien on that, then I need to obviously --

MR. ELSBERG:  Yeah.

THE COURT:  -- go to the UCC and then understand how 552 may or may not apply to it.  It's just a thought.  I didn't see anyone talk about it.  But I want to make sure that I understood kind of how the parties were thinking about this in connection with the roadmap.  And that's a debtor question.  And that's an Evolution question as well.

But in other words, if I understand the ask, it's that adequate protection has to be the full amount, the full 60 million, because you think you have a lien on the full 60 million.  And so adequate --

MR. ELSBERG:  Yes.  Yes, Your Honor.

THE COURT:  -- protection would mean that, the full 60 -- so it's --

MR. ELSBERG:  Yes.

THE COURT:  -- essentially an up or down bill for me today.  I can do that.

MR. ELSBERG:  Okay.  And, Your Honor, this is -- these were applied prepetition.  We're not talking about post-petition.

THE COURT:  Everything that's been trapped is prepetition?

MR. ELSBERG:  Yes.  So we only have an interest in prepetition receivables.

THE COURT:  But in other words, is the cash that is

going to be released, is there any post-petition trapped cash?

MR. SINGH: Your Honor, just to clarify, these are cash that relates to prepetition receivables that were received post-petition. So the --

THE COURT: Got it.

MR. SINGH: -- receivable was prepetition. The cash came in post-petition.

THE COURT: Right. But in other words, if the -- okay. Okay.

MR. SINGH: Does that make sense, Your Honor?

THE COURT: Yeah.

MR. SINGH: Post --

THE COURT: Yeah.

MR. SINGH: If we generated a post-petition receivable --

THE COURT: Then 552 may kick in. But --

MR. SINGH: Well, and we're just using that, because clearly we weren't factoring. So they're not -- I believe nobody's raising an issue.

THE COURT: Got it. So this is all kind of --

MR. SINGH: I think it's a --

THE COURT: -- you know, with some prepetition receivables that were received post-petition. And --

MR. SINGH: So it would be a product of --

THE COURT: Got it.

MR. SINGH:  -- the prepetition --

THE COURT:  Got it, got it.

MR. SINGH:  -- proceeds --

THE COURT:  Got it.

MR. SINGH:  -- of the prepetition receivable.

THE COURT:  Got it.  Got it.  Because you stopped factoring.  Well, but you had -- okay.  That clarifies things for me a little bit.

MR. SINGH:  Yeah.

THE COURT:  That's helpful.

MR. SINGH:  Sure.

THE COURT:  I know you're all still doing business post-petition, and I couldn't tell whether Evolution was claiming a lien on some of the post-petition receivables as well, and whether that was some of the cash that was intended --

MR. SINGH:  No, I mean --

THE COURT:  -- subject to the trap kind.

MR. SINGH:  No, my understanding is that they are only claiming a lien on prepetition accounts receivable that have still since been collected post-petition.

THE COURT:  Post-petition that's been trapped.

MR. SINGH:  That's been -- that we've segregated in the account.  Correct.

THE COURT:  Got it.  Okay.

MR. KELLEY:  If it's helpful, Your Honor, some of these receivables have payment terms that run anywhere from 45 days up to 12 months.

THE COURT:  To 12 months, right?

MR. KELLEY:  Yeah.

THE COURT:  Yeah.  Okay.  Got it.  Okay.  No, no, that's helpful.  So we don't have to deal with that.  We can just -- I would say a lot -- okay.

MR. ELSBERG:  And if I may, Your Honor, just to clarify, my understanding is that what the debtors are trying to do is release $63 million today from Bucket 1 and 2, and that means the remaining cash will be 46 million in Buckets 3 and 4.  So what we're asking for really is the denial releasing $14.5 million from Buckets 1 and 2, not the entirety of the amount.

THE COURT:  Got it.  So that the aggregate amount that is still trapped would equal $60 million.

MR. ELSBERG:  Yes.

THE COURT:  Got it.  Oh, got it.  Got it. Got it.  Okay.  Understood.

MR. ELSBERG:  Your Honor, if I may, I'd like my associate to put something up on the screen if that acceptable.

THE COURT:  We're not there yet, because I haven't had the debtors put their intro in.  I just wanted to make sure that I kind of understood what -- I didn't -- I wanted to make

sure I understood what Evolution was asking for today and kind of where things were --

MR. ELSBERG:  Understood.

THE COURT:  -- as we started.  But I'm going to certainly give you a full and fair opportunity to get started with respect to that.

In terms of evidence that would be presented today, before we start, I've got a ten o'clock hearing that I think shouldn't last very long, that I think maybe we can just take -- maybe we could probably -- Mr. Davidson, how long do you think we'll go?

MR. DAVIDSON:  About ten minutes, Your Honor.

THE COURT:  Yeah.  Maybe we could go from kind of -- really kind of start this up around 10:15 with evidence, if that would work for the parties.

But just in terms of just general, in terms of presentation of evidence before the Court, what -- Mr. Singh, how do you intend to proceed?  And then I'll turn to Evolution.

MR. SINGH:  Sure, Your Honor.  We filed our witness and exhibit list.  You know, generally speaking -- why don't I come up here and address Your Honor?  Sorry.

THE COURT:  Got it.  Got it.

MR. SINGH:  You know, we do have Mr. Jerneycic in the courtroom, his declarations, he's got two that relate to today's hearing.  And then we've got a number of exhibits,

which are really the UCC-1s that were filed.  You know, not only -- Evolution has theirs, we've filed for the Court, the ones filed by the ABL and the prepetition term loan lenders.  And then we've got the credit agreements.

I don't know if Evolution is planning to cross Mr. Jerneycic.  If not, I think we can quickly move in all the evidence that we have and they have now before 10, break, and then come back for arguments.  I think we've got about ten minutes.

THE COURT:  Let me hear from --

MR. SINGH:  Just a suggestion, Your Honor.  I'm happy to proceed --

THE COURT:  Yep, yep.

MR. SINGH:  -- however you want, but it depends on whether they intend to cross.  I'm not sure.

THE COURT:  Let me just hear from Evolution in terms of -- and I guess others may have evidence that they wish to submit and all that stuff, but from --

MR. KELLEY:  We just want a little procedural protection, Your Honor.  Given the order that's before the Court, we don't intend to cross-examine, challenge, object to evidence, but we want to make sure that the Court's acceptance of evidence is limited to this issue between these two parties and we have full rights to challenge and attack it --

THE COURT:  No, no.

MR. KELLEY:  -- at whatever adversary or other hearing comes up.

THE COURT:  I think that's right.

MR. KELLEY:  And so I just wanted -- all the receivables counterparts want to make sure that I lodge that.

THE COURT:  I think that's right.  I think that's right.  This is just between these two parties, but the question is do I -- essentially, approving this motion does one thing.  Agreeing with the objection does something completely different.  And I think everybody's rights would have to then figure out.  If I agreed with Evolution, for example, then I think everybody's rights are then preserved and you all will have an opportunity --

MR. KELLEY:  We'll have our day to address whatever impact that has on us --

THE COURT:  Yeah.

MR. KELLEY:  -- is all I care about.

THE COURT:  Yeah.

MR. KELLEY:  And that we're not barred because of the evidence that's introduced.

THE COURT:  I think that's right.

UNIDENTIFIED:  We don't have an objection.

MR. KELLEY:  With your confirmation, Judge, we're comfortable.

THE COURT:  Okay.

MR. KELLEY:  Thank you.

THE COURT:  Thank you.  From Evolution's perspective, how do you intend to proceed today?

MR. ELSBERG:  Your Honor, if the witness testifies consistent with his definition, I doubt that we'll need to do any cross-examination.

THE COURT:  And in terms of presenting your own evidence?

MR. ELSBERG:  In terms of our own evidence, we had put seven exhibits.  We've listed seven exhibits, and I doubt they're going to be controversial.  They're basically the agreements and the UCC that was filed.

THE COURT:  Okay.  Okay.  Do you want to try to just --

MR. SINGH:  Yeah.

THE COURT:  -- get the docs in now?  We can just continue --

MR. SINGH:  Yeah.

THE COURT:  -- to work now?

MR. SINGH:  Yeah.

THE COURT:  If there's no --

MR. SINGH:  Your Honor, so our amended witness and exhibit list is filed at Docket Number 1052.  And Your Honor, on that exhibit list, we have Exhibit Numbers 1 through, I'm going to stop at 28, which is the UCC statements that I

mentioned.

Two of those exhibits, Exhibit Number 2 and Exhibit Number 5, are the declaration of Daniel Jerneycic in support of the motion and the supplemental declaration of Daniel Jerneycic in support of the motion.  Mr. Jerneycic is here in the courtroom.  He's available for live cross.  His testimony would be as submitted in the declaration.

THE COURT:  As submitted in the declaration.

MR. SINGH:  Nothing additional, Your Honor.  And so if okay, I'd like to move in all of those exhibits.  Again, Docket 1052, Exhibit Numbers 1 through 28, which include those two declarations for Your Honor.

THE COURT:  Any objection?  Okay.  They're admitted.

(ECF 1052-1 through ECF 1052-28 admitted into evidence)

MR. SINGH:  Thank you, Your Honor.

THE COURT:  Let me ask Evolution, do you have any -- I think you have a couple of exhibits.  Can you just identify them on the docket?

MR. ELSBERG:  Yes.  So the public versions are Docket 1016.  The sealed versions are at 1017.

THE COURT:  Any objection to the admission of the Evolution?

MR. SINGH:  No objection, Your Honor.

THE COURT:  Okay.  And Mr. Elsberg, okay, they are admitted.

(ECF 1016 and ECF 1017 admitted into evidence)

THE COURT:  Any -- do you intend to present any witnesses or are you just going to rely on kind of the argument based upon the evidence that's submitted?

MR. ELSBERG:  Only the argument based on the evidence submitted, Your Honor.

THE COURT:  Okay.  Is there -- there's someone else. A 347 number, I just unmuted.

MS. EPSTEIN:  Your Honor, Ella Epstein, also from Elsberg Baker & Maruri.  (Indiscernible) my apologies.

THE COURT:  Okay.  No worries.  Thank you.  I'm glad I got your line unmuted.

So when we come back -- let's just come back at 10:15.

MR. SINGH:  Sure.

THE COURT:  Mr. Singh, I'll let you kind of start, present your argument, assuming all the docs are in evidence.

MR. SINGH:  Thank you.

THE COURT:  And then, Mr. Elsberg, just -- can you just confirm for me, based on the declarations, do you intend to cross-examine any witness?

MR. ELSBERG:  No, Your Honor.

THE COURT:  Okay.  So then, I'll turn to Mr. Singh and then I'll turn to you.  Or I guess, I know it's going to be handled in multiple parts.  And is there someone -- I think you

wanted me to give someone presenter roles. Just, can you identify who that person is? Because once Mr. Singh is done, I'll turn to and give that person the presenter role.

MR. ELSBERG: Yes. It's Ella Epstein.

THE COURT: Alrighty. Now, let me see if I can find you.

Ms. Epstein, can you turn your camera on? I'm really -- I'm telling you, I'm notoriously bad at this. Oh, I see you there --

MS. EPSTEIN: Okay. Good morning.

THE COURT: -- Ms. Epstein. Okay. When it's time, can you -- if you can just turn on your camera, I promise I will -- I'll find you and just give you the presenter role at the appropriate time.

All right, folks, why don't we just -- then just take a break? I'll come back on in five minutes and we'll start. You're more than welcome to stay where you are. Thank you.

MR. SINGH: Thank you, Judge.

(Recess taken at 9:54 a.m.)

(Proceedings resumed at 10:23 a.m.)

THE CLERK: All rise.

THE COURT: Please be seated. Okay. Thank you very much. We are back on the record in First Brands. I'll give everyone an opportunity to get back on. I believe I've kept all the lines unmuted. I believe I have. If there's someone

whose line got accidentally muted, can you please just hit "five star."  I will unmute your line.  A 901 number.

MR. DUKE:  Thank you, Your Honor.  It's Michael Duke from Elsberg Baker & Maruri again.

THE COURT:  Perfect.  Okay.  For folks on the line, if you can keep your line on mute, I'm going to focus on the argument in front of me and then I will turn to Evolution.

Good morning.

MR. SINGH:  Good morning again, Your Honor.  Sunny Singh, Weil Gotshal, on behalf of the debtors.  Again, Your Honor, just to address really the Evolution arguments that are raised.

So, Your Honor, just to take a step back, Evolution is asserting that they have factored $60 million total receivables under their factoring agreements with the debtors.  And generally speaking, the form of their factoring agreement is sort of consistent with other factoring agreements.  They sell the receivable -- excuse me, the debtor sells a receivable to Evolution in exchange for a discount, which usually is the sort of calculated return on that and, you know, they're supposed to collect the invoice when it comes in.  The debtor continues to do that work on the collection points.

The receivable agreement, master purchase agreement, I should say, includes what is referred to as a backup lien. These are all consistent.  Generally speaking, it basically

says if for any reason the transaction is not treated as a sale or is somehow recharacterized, then the factor is treated as a lender and is granted a lien against that specifically sold receivable.

And so, Your Honor, I'm going to be very careful, as I was in the brief, to differentiate between sold receivables and unsold receivables with respect to Evolution.  So the sold receivables, the 60 million or so, they get a backup lien with respect to that sold receivable.

Evolution also has another relevant clause in their agreement.  It's referred to as -- it's Section 5(g) of their contract, and that provision basically says -- and this is unique.  This is -- you know, you asked earlier why is Evolution different?  I think this is what they're relying on to say why they're different.  We don't think it works, and I'll go through why.  But this is their argument for why they're unique and different.

That provision says that for any breach of the debtors under this agreement, and that includes generally there's an obligation to repurchase or indemnify for, quote, "bad receivables" that were sold.  Evolution has a breach of contract claim for that, just like other factors would.  But Evolution's contract claim under 5(g) is asserted to be secured by other receivables owned by these account debtors.  So unsold receivables, you get a lien for your breach of contract claim.

So that's the difference between sold receivables versus unsold receivables.

And the other point I would note, Your Honor, Evolution only purchased from eight account debtors.  So if you're just thinking of the numbers prepetition, we had somewhere in the neighborhood of, you know, $400 million of total account receivables.  These eight debtors is about $188 million of total account receivables that were existing on the debtor's books and records, and so it's a limited set of debtors.  It's not all the debtor's account receivables.

THE COURT:  All right.  But within the cash that you intend to -- that you would want to use, how much of the cash is held by these account debtors?

MR. SINGH:  It's roughly $36 million, Your Honor.  So of the 63-ish that we're asking for you to use, these account debtors, it's roughly $36 million of their, quote, "receipts" that are now cash that we would be using.

THE COURT:  Okay.

MR. SINGH:  So Your Honor is going straight to the point.  I am, but it's just a little bit later in my argument as to --

THE COURT:  I'm sorry.

MR. SINGH:  No, no, no, no, it's totally fine.  But I think you're thinking of, okay, if I have to adequately protect them, what am I actually using?  It's $36 million if we get to

that point. But, Your Honor, I don't -- I think you can determine today that they actually don't have an interest based on the pleadings that we filed. And it comes down to a couple of issues.

I mean, first, they didn't perfect their security interest in the unsold receivables, Your Honor. And we go through this in our reply brief, but if you look at the UCC-1s that Evolution did file.

THE COURT: Okay, I've got one.

MR. SINGH: Their language, Your Honor, it's on the -- it's in the paragraph that describes -- Paragraph 4, which is the -- and then they attach a schedule, right, the collateral. And if you look at that, the key language there is, it starts "What is the collateral?" It says, "Any and all present and future receivables transferred or purported to be transferred to the secured party pursuant to the master receivable agreement."

It's that "transferred or purported to be transferred" language that we believe is key. And so in our view, Your Honor, that only covers the sold receivables, right? Those are the only receivables that we actually transferred or purported to transfer. The unsold receivables were never transferred or purported to be transferred to Evolution. Those provide a claim with respect to a breach claim in the event something goes wrong with the ones that we actually sold to

Evolution.

And if you look at even 5(g) of the master purchase agreement, which is this relevant provision, Your Honor, it says that the lien is granted on all of the receivables. And here's the relevant language: "To the extent not sold or purchased pursuant to Section 1."

So itself 5(g) says we're only granting a lien on things that weren't sold or purchased. And then their UCC statement says that I'm only filing a UCC statement with respect to those receivables that were transferred or purported to be transferred. And so, by definition, Your Honor, they simply didn't record in their UCC-1 with respect to these unsold receivables.

Now, Evolution, and you'll hear about it and, you know, in their brief they say, well, it's a receivable. And they basically just stop reading there, right? They read out the words transferred or purported to be transferred, which they themselves put into the UCC-1, and they also read out the words in the contract not sold and purchased pursuant to Section 1 and Section 5(g) of the master purchase agreement, Your Honor. That's incorrect under basic canons of construction of contract interpretation, but also, as we say under UCC-1 law, which the whole point is you're supposed to put parties on notice with respect to what liens and what assets you are asserting an interest in, and we don't think

they've done that.

Your Honor, compare and contrast that with one of the UCC statements that we -- you can look at any one of them. They're the same for the ABL lenders or the term lenders. And in their financing statements, it says in Section 4, "All assets of the debtor, whether now owned or hereafter acquired."

Your Honor, the other point I would make with respect to Evolution's UCC-1, Your Honor -- I'm just finding the relevant section -- they voluntarily -- if you look at Section 7, right --

THE COURT:  7 of?

MR. SINGH:  Of the UCC-1.

THE COURT:  Okay.

MR. SINGH:  Evolution's.

THE COURT:  Yeah.

MR. SINGH:  If you just scroll down, it's on the cover page.  They have voluntarily selected seller/buyer, right, which implies to you and applies -- implies, excuse me, that they are again reinforcing that this UCC-1 relates to those that were sold and purchased, those receipts.  Not everything, because they could have left it blank, Your Honor, and it could have been a debtor/creditor relationship, but it's not.  And again, if you compare and contrast with respect to the other ones, they don't check that box, right?  So this is a voluntary sort of designation by Evolution.

So right there, Your Honor, in our view, we don't think they've properly perfected.  We think you can make that determination under 544 this is clearly an avoidable interest. It doesn't need to be protected, and therefore they have unsecured claims, and they're not entitled to any further relief today or basis to object.

But let's keep going, Your Honor, because I think there are a number of other ways that, you know, the debtors prevail today.  Let's assume for a second that we accept their language, or their argument I should say, that they did properly perfect in these unsold receivables.  Well, then they've got a mountain of prepetition secured debt that's ahead of them, right?  You've got the ABL, you've got the prepetition first lien term loan, the sidecar, and the second lien term loan.  That totals almost $6 billion.

And so Evolution sits behind all of them, and they can only be a secured creditor to the extent -- under 506(a), to the extent all of that debt is, you know, in the money, right?  It's their burden to prove, Judge, by the way, that they are secured, right?  They call us out in their papers to say, well, you don't have any evidence in the valuation.  Well, I'm not the one who needs evidence, Your Honor.  It's their burden to prove that they're secured.  They've put in no evidence on this point into the record today.  They haven't crossed our witness on this issue.  And so they've offered you

no evidence to say, well, hang on a second, I'm secured.

And it's just basic simple facts, Your Honor, 6 billion of prepetition debt ahead of them, right, and we're only looking to release about $63 million.  And the other point I'd note, Your Honor, you can't look to the other assets that the ABLs and the term loans have an interest in to say, well, those guys are going to get paid somewhere else.

There's no marshaling required under the DIP order with respect to, hey, we're not going -- we're going to marshal away from cash or anything like -- you know, or account receivables.  I mean, to the contrary, I think you're going to hear them say, and we have heard them say, no, these are sort of the best receipts and -- excuse me, the best collateral we have, we're going to take from that first.

So, you know, an argument that, well, wait a minute, those guys have so much more collateral, maybe they'll recover from there.  Well, that doesn't matter.  There's no marshaling. They can first look to this cash.  So, Your Honor, I don't think it's a huge leap to say Evolution is unsecured based on the evidence you have in the record.  And you certainly don't have any evidence from Evolution to say that they're secured and therefore entitled to an interest here.

Now, instead where they go in their papers is to say, well, hang on a second, we are senior to the ABLs and to the prepetition creditors because those documents, including the

58

security agreements, sort of carved us out as permitted transactions.  And not only did they carve out in those documents the sold receivables to say, yeah, if you sell a receivable under a permitted factoring agreement, then you can have a lien, somebody can have a senior lien against that collateral, right?  And that's what the ABLs and term loans are saying.

But they never said that with respect to the unsold receivables.  Evolution says, wait, well, this is an excluded asset, right?  The unsold receivable is an excluded asset.  But excluded assets only carve out accounts that are disposed of pursuant to a permitted factoring transaction and any related assets.  This is not disposed of, right?  Remember, these unsold receivables, they were never sold, transferred.  Nothing happened between that -- on that with Evolution.  The sold receivables did, but these unsold are just sort of sitting there, right?  They were not disposed of.  They were not transferred.

And all of these words, Your Honor, transferred, sold, disposed of, they're generally talking about a transfer or a change in ownership interest, a change in -- you know, from the debtor over to somebody else because that's the point of the factoring agreement, and that's the intent of the parties as to what they were talking about when they were saying, okay, this lien I'll give you on a senior basis, but

not any other lien.

Your Honor, they're also not related assets under their agreement, right?  The excluded assets definition says accounts disposed of pursuant to a permitted factoring transaction and any related asset.  Evolution says, well, we may be a related asset.  They're not tying it back to, you know, dispose of pursuant to a permitted factor.  It's saying we may just be an independent related asset.  Well, that's not right, right, because related assets are defined in the prepetition credit documents as contract rights, guarantees, or other obligations in respect of such accounts.  Again, such accounts going back to and referring back to the sold accounts.

Your Honor, every which way you cut it, they end up back at the fact, which is consistent with the intent, which is consistent with how factoring agreements work, is that you're getting a senior lien with respect to accounts that were actually sold.  It's a sale interest.  You're getting a backup lien with respect to those accounts to the extent you need it.  You're not picking up other collateral, other accounts that were never sold and transferred and somehow shoehorning them into your UCC-1 and saying, now all of a sudden I've got a lien.  That's just not how it works, Your Honor.

And finally they say, well, we're substitutions or replacements because under the ABL credit agreement and under the term loan, another way you can be senior to those liens is

say you're a substitution or replacement, but of the excluded asset.  That's the part they keep failing to take into account.  The excluded asset is the sold account.  It's not the unsold accounts, and so there was no substitution of the unsold.

The agreement doesn't say, hey, if you have a sold account, and for some reason it doesn't work, you can then take one of these unsold accounts and plop them in and move them over to the sold.  What it says is if there's a sold account, if for some reason that sale doesn't work, you get a lien for -- against that particular sold account.  Then you come to the other side of the house under 5(g) and it says, look, if there's any breach, if there's a buyback, et cetera, here's the other assets you can look to in order to collect.

Your Honor, one hypothetical, or just an example, I think it gets a little confusing because they're all accounts.  They're receivables, so it's easy to say, well, you know, they're all accounts.  Let's just bundle them together.  If you were to separate them, and we said these are accounts, and on this side of the house, with respect to 5(g), you get a security interest in a real property that was owned by the debtors, we may as well have said that, right?  It could have said that.  And the point is you don't get to substitute the real property over and say, oh, well, that was a sold account.  And if you just take it with that, I appreciate it's an extreme hypothetical, but that's the point.  They were serving two

different points, these pools of collateral, and one of them was actually secured and perfected, and the other one, unfortunately for Evolution, was not.

So, Your Honor, we think you've got enough under the documents to decide this issue today in the debtor's favor and shut this argument down. But if Your Honor was inclined to not rule on the merits on this issue today, then I think our alternative relief is applicable and we still get to walk out of here with the use of this cash, which is we have sought nonconsensual use of, you know, quote, "cash collateral."

I think, Your Honor, a fair construction and sort of the best-case scenario that they can get is they've got a fourth or fifth lien behind $6 million of prepetition debt. And in that situation, because Your Honor can take into account with respect to cash collateral the likelihood of success that they actually have in interest. And so they have two things that we've offered them, Your Honor, as adequate protect -- or one the bankruptcy code provides and one we've offered.

They're getting a lien -- or, excuse me, not a lien, they get a right if, within this 45-day period, let's say we're wrong, including on this Evolution issue, right? They can assert their claim or lien against the remaining cash.

And so you were asking about this question earlier. Let me just give some numbers. As of, I think it's December 11th, there's $117 million of cash in the trapped

account, right?  We've sought to move out 63-.  I think that number will probably come down based on some conversations we've had with the M3 team, but we've sought to move out $63 million.  We're just going to leave it at that number just to avoid confusion.

And so, Your Honor, that means that there is $54 million, if I did my math correctly there, right, that's still sitting in the account that under Paragraph 8 of the agreed order, if we got this all wrong, right, which we don't think we do, but let's just say Evolution was right on every single point, then they could look to $54 million and say I'm going to assert my claim over there.  I think I have that number right.  Maybe it's 64-.  No, no, it's 54-.  Sorry. Right.

They can look there, and as I said earlier, Your Honor, 36 million is the account debtor cash that we're releasing.  So how much of their cash are we actually using? It's 36 million, so they're covered by the 54-, if Your Honor wanted to go down this line of thinking.  I don't think you'd need to, but, you know, I think they're protected.  They also get an administrative expense claim generally against the debtors that they're -- that they had contract relationships with, including, Your Honor, you'll recall from the DIP hearing, there's a $200 million administrative expense reserve that sort of sits ahead of the prepetition debt, not the

post-petition, that applies in certain, you know, sort of downside scenarios.

Now, I'm not conceding today that they get to assert any adequate protection there, but that is available to the extent, you know, somebody stood up and said, well, you know, it's just an admin claim.  Who knows what happens in this case? Well, we really did try to address that issue early on with the UCC.  Again, not conceding that anybody would have a right to those assets, but they certainly could assert their claim, and Your Honor can take that into account.

And then finally, Your Honor, they've got a 507(b) claim under the bankruptcy code, right, if there is a diminution in value.  And I think that would only apply if you satisfied all of the senior debt first.  And then we said, well, we used some more of your cash without your consent and now you've suffered a loss, they get a super priority administrative expense claim under the bankruptcy code, so we think it's proportionate there.

Again, Your Honor, I don't think -- I think we can just say they don't have an interest, or you can conclude based on the record before you that they don't have an interest.  But to the extent Your Honor was inclined to, you know, not address that issue today or give them further relief there or further opportunity to be heard, Your Honor can find that certainly cash collateral use should be permitted here based on the facts

and circumstance and the adequate protection that we're providing.

Your Honor, the final point is the joinder that was filed just right before this hearing by Evolution, you know, essentially joining in the other parties to say this needs to be determined by an adversary proceeding and therefore we can't proceed today.  And when I say this, Your Honor, it's really not the issues that relate to what we're talking about with respect to the other factors that are kept, right?  The other factors, my understanding their general argument is the procedures we've proposed for release of the cash are insufficient and they should be done by an adversary proceeding, and we'll address that issue in the future.

I think the issue that Evolution is raising is saying my interest that I've asserted in this cash being released based on the pleadings before you should be asserted in adversary proceedings.  So it's slightly different, Your Honor, and that's their basis for the objection.  And I think I would say a couple of things.  One, they're joining into objections that are actually not before you today, right?  Those objections have all been deferred and frankly relate to a different issue about the procedures and whether those should go forward in an adversary proceeding or by motion and don't relate to Evolution's asserted interest.

The other point I'd make is, Your Honor, Evolution

had every opportunity to raise this argument and this issue earlier. It's really form over substance at this point in our view, and we think they've waived either directly or implicitly the right to raise this argument. Your Honor, they filed a 25-page objection that raised a number of issues relating to their property interest, right and what they're asserting they have an interest in and why they're different.

They filed that on Friday. We respond. We engage, right? They didn't file an adversary proceeding. They filed an objection. We respond. They actually participate in deposition. Then we respond and we say, well, wait a minute, you don't have an interest, and here's all the reasons why. And then they say, well, wait, hang on a second, the path we chose to address this issue by motion practice, that's actually not the right path, so let's switch over to the adversary path.

It's too late, Your Honor. We engaged in the path that they chose. They could have done it another way. We've responded. They're having their day in court. And so, Your Honor, to say that we need to now go to an adversary proceeding would be unfair and extremely prejudicial to the debtors.

And again, Your Honor, even if you were inclined to address that issue or take them up on their argument that, you know, they have an interest or they need an adversary proceeding, worst case the debtor should still get to use this cash because at best it's cash collateral. You don't need an

adversary proceeding to permit the debtors to use cash collateral. You've got evidence in the record. You've got a proposal from us on adequate protection, and so we should be permitted to use cash collateral, and we don't need to file an adversary proceeding to do that. And that's their best-case scenario.

So again, Your Honor, you know, that's our view of the Evolution objection. We think you should make a determination today that they don't have an interest based on what they filed, including in their UCC-1 or that they're junior and therefore they're unsecured under 506(a). And to the extent Your Honor was not prepared to make those findings today, then, Your Honor, in the alternative, we request that you authorize the use of cash collateral under the terms that I described.

THE COURT: Thank you.

MR. SINGH: Thank you, Your Honor.

THE COURT: Okay. I'll hear from Evolution.

MR. ELSBERG: Thank you, Your Honor. David Elsberg. It sounds as if the debtors are conceding that we do in fact have a lien and security interest in all of the receivables held by the seller. So I'll be very brief on that point and then I'll turn it over to my colleague, Mr. Gerber.

So, Ella, if we can have permission for Ella to put something up on the screen.

THE COURT: Yeah, you got it.

MR. ELSBERG: Thank you, Your Honor. Okay. Ella, if you're able to enlarge it a little bit.

Your Honor, the language that I was referring to earlier that gives us -- if you can scroll down, Ella, to show 5(g).

The language that gives us the security interest in all of the debtor's receivable is the language we're looking at now in Section 5(g). You can see in the blue, the plain language says that we have a lien and security interest in, and then in Item 1, all of the receivables now or hereafter owned or held by such seller. That includes the receivables that are real legitimate receivables that the debtors say were not factored.

And you can see that lien and security interest is to secure the seller's existing and future obligations under the factoring agreement. And of course when they, according to the debtors, sold us fake receivables, they breached all sorts of their obligations under the agreement.

And with that, I'll now hand it over to my colleague, Garrett Gerber, who will address the perfection of this lien security interest by the filing of UCCs. And then my colleague, Mr. Duke, will demonstrate that contrary to the debtor's assertion that they have a security interest in Evolution's collateral, they actually do not. So with that,

68

I'll hand it over to Mr. Gerber.

THE COURT:  Go ahead.  Thank you.  Mr. Gerber.

MR. GERBER:  Thank you, Your Honor.  Garrett Gerber for Evolution, and my colleague, Ms. Epstein, has pulled up a demonstrative on the screen, and I want to go right to the language of the UCC financing statement that Evolution filed and counsel for the debtors discussed.

So as Mr. Elsberg just said, debtors do not dispute that Section 5(g) grants a lien and security interest broadly in what they call the unsold receivables.  As you can see in the yellow highlighted language, debtors also do not dispute that the language "any and all present and future receivables" is broad enough to cover the security interest under Section 5(g), nor could they contest its broad language, which provides notice to third parties that there is a security interest in seller's receivables.  It doesn't limit it to a list of customers or a specific subset.

The only question that counsel for debtors raise with respect to this language is the transfer to -- transfer or purported to be transferred, and in their view limits the description of the collateral to only what they call the sold receivables or purchased receivables under the factoring agreement.

That's not what this collateral description says.  If you look at the plain language of the financing statement, it

doesn't use the word "receivables purchased."  It doesn't use the receivables sold -- the term "receivables sold."  They use the term "receivables transferred," and this is important because transfer covers more than just a purchase of receivables.

So, Ms. Epstein, if you can scroll down a bit.

So I put on the screen here, this is the definition of transfer from the bankruptcy code, and we can see transfer means --

THE COURT:  Why are we using bankruptcy code definitions?

MR. GERBER:  I think it's informative just to show the broad definition of transfer and showing that it can mean to --

THE COURT:  No.  Why aren't we using the dictionary then, or the -- in other words, are you referring -- the definition of transfer has specific meaning, and it's given multiple meanings within that because you're using -- that's what Congress said it means in this statute.  I don't --

MR. GERBER:  Understood, Your Honor.  We -- in the specialized context here, the creation --

THE COURT:  Are you just using it just generally just to describe what the word "transfer" could mean is broad?

MR. GERBER:  Right.

THE COURT:  Understood.

MR. GERBER: Exactly. We're just using it as a way to show that the word "transfer" has a broad meaning, and this is one way of showing that.

And then we can also see that -- and I'll ask Ms. Epstein to put up a section from the UCC comment -- that the UCC itself contemplates that transfer is broader than just a purchase. And this is Section 9-332, and it's Comment 2(a) there on the meaning of transfer. "A transfer of property occurs when the transferee has obtained a property interest in the relevant property." And then the second highlight, "Although the term transferer and transferee are not defined in the UCC, the term transfer is broader in scope than just purchase."

So we can take that down, Ms. Epstein, and put back up the first demonstrative.

So we can see that the UCC also, if we're looking at the broad definition of transfer, draws the distinction between transfer and purchase. And then going back to the plain text of the collateral description that covers all receivable transfers or purported to be transferred under the RPA, that's broad enough. The transfers that are purported to be transferred language covers both of the liens granted under the RPA.

So it's both the sold receivables that counsel for debtors mentioned where a purchase is not considered a true

sale and there's a backup lien.  And then there's also the second way to do it, and that's 5(g) in all of seller's unsold receivables.  So that's exactly what happened here.  There was two grantings of a lien.  There's two grants of a lien under the RPA, and this broad language covers both.

Accordingly, we submit that Evolution has perfected its security interest in those receivable.  And unless there's anything further, I'll pass it to Mr. Duke, who's going to cover the next topic.

THE COURT:  Okay.  Thank you.

MR. DUKE:  Thank you, Your Honor.  Michael Duke.  I wanted to start with the procedural point that Mr. Singh raised earlier.  We do submit that this should be under an adversary proceeding pursuant to Rule 7001(b).  And I think this is absolutely clear.  So if you look at Paragraph --

THE COURT:  Why didn't you argue that when -- in your initial motion?  In other words, if you're joining on a joinder and no one is prosecuting the joinder, why do you get to raise it now?  Why aren't you get --

MR. DUKE:  Sorry, Your Honor.  We're --

THE COURT:  No, I'm asking you -- I get the procedural point.  I'm asking you the procedural point about the procedure, just why do you get to argue it?

MR. DUKE:  Understood.  Your Honor, we put in the objection in advance of the deadline --

THE COURT: Objection of --

MR. DUKE: -- which was today.

THE COURT: No, I got it.

MR. DUKE: The objection that we put in, and then within zero business days, we filed a joinder that says that, you know what, the debt -- the other factors are correct. If you look at the plain language of 7001(b), what it states is a proceeding to determine the validity, priority, or extent of a lien is an adversary proceeding. Again, this is before the deadline to put in an objection to their motion.

THE COURT: No, I got it. It's an emergency motion. They asked for the date, and so you get to come in at the prior time. I think that's the -- I think that's what you're saying, that you still had time to file something else.

MR. DUKE: Correct. And all we're attempting to do is just to say that 7001(b) is the correct process here. I don't think that there's any waiver. This is zero business days after our motion or our objection was filed on Friday.

THE COURT: Uh-huh, yeah.

MR. DUKE: We're moving quickly here. We put it in as quickly as we could. I don't believe that there's any waiver with respect to that, and I believe the rule is abundantly clear. But here, Your Honor, I'm going to turn to the substance here. I'm going to have Ms. Epstein put some language up on the screen.

There's one provision in particular that I think is critical to focus on, and this is from the ABL agreement, the security agreement to the ABL credit agreement, which are all substantively identical across the ABL and the term loans.

But if you go to the excluded assets definition, Ella, if you wouldn't mind, and just highlight at the top excluded assets.

It's a very long provision, and what it does is it specifies assets that are excluded from the collateral pool for the ABL and for the term loans, so this is a long list of excluded assets.  I want to focus on two of them which are down at the bottom.

So, Ella, if you can scroll down and highlight Q and S.  Just give it a second to orient.  All right, great.  Thank you.

So the first provision says any accounts disposed of pursuant to a permitted non-recourse factoring transaction in any related assets in respect thereof.  That is one category of excluded assets.  And then S, what it does is it has what I'll call two different parts to it.  The first part says that an excluded asset is any proceeds, substitutions, or replacements of any of the foregoing.  So that's Part 1.  Part 2 is that the language that follows it states, "But only to the extent such proceeds, substitutions, or replacements would otherwise constitute excluded assets."

74

And I take it from Mr. Singh's presentation and from their reply brief that what they're taking issue with is that second part of S.  What they say is, well, the accounts are not separately excluded assets, the real accounts that we're putting in through 5(g) to substitute for the fake accounts.  And I thought the example he used was (f), the real property example, because I think that's exactly what this provision is doing.

What this provision does is it says, yeah, you can substitute in other assets that are going to be construed as being excluded assets.  But what you can't do is go say, okay, well, I have a lien in accounts.  Now I want to replace it with a liening of a real property, for example.  That liening of the real property would not otherwise be an excluded asset, but an account for an account is an excluded asset.  Both of those accounts are excluded.

But even if you disagree with that, I think that we'd still have the same result here, which is that we have priority.  So if you look at they've raised the argument on the disposed of definition and what that means.

Ella, if you wouldn't mind just scrolling down in this to the disposition definition.

And they cite to this in Paragraph 26 of their reply brief, saying that this is the relevant language for what it means to dispose of something.  So what it states is that

disposition or dispose means, "A sale, transfer, license, lease, or other disposition of any asset or property by a person" -- skip the parenthetical -- "including any sale, assignment, transfer, or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith."

It is absolutely clear that at the very least we were transferred a security interest in accounts receivable.  That's exactly what this is covering.  It says accounts receivable or any rights or claims associated therewith, and we were transferred that.  There's no debate that we have -- that we had accounts that were transferred pursuant to the permitted non-recourse factoring transaction.

Now, we also have a related assets argument.  They focus more on that.  I'll go through it quickly.  And the argument that they've raised is that the 5(g) contract rights do not relate to sold accounts.  You can see this in Paragraph 26 of their reply brief, and that is just straightforwardly incorrect.  The only reason that we have rights under 5(g), that we have a lien under 5(g) is the sale of these fake accounts.  If there are no fake accounts sold, we don't have a lien on those assets.  It's because they breach their reps and warranties with respect to those accounts that we have associated contract rights.

And you can look at the ordinary meaning, as Your

Honor referenced earlier, of related to. So there's a number of cases out of the Fifth Circuit dealing with this. I'm going to focus on the Latiolais v. Huntington Ingalls case. So that's 951 F.3d 286. And what it states clearly is, quote, "The ordinary meaning of the words 'relating to' is a broad one, to stand in some relation, to have bearing or concern, to pertain, refer, to bring into association with or connection with."

There is absolutely no doubt that our contract rights relate to, they have some association with, they pertain to, they have bearing or concern the accounts that were sold to us that were fake. These are related assets, which that defeats -- I didn't hear it from Mr. Singh today, but in their reply brief, they raised 701(mm). I'll just briefly address that. If it were a related asset, they just don't have an argument under that provision. 701(mm) is also -- that's an obligation on the debtors. It's just if we're an excluded asset, you don't have to get there at all.

And then you can also read those provisions together because all we're doing is saying that you substitute in accounts, the fake accounts, you get rid of those, and you substitute in the real accounts.

With that, unless Your Honor has any questions or anything further that you'd like me to address, I'll pass it back over to my colleague, Mr. Gerber.

MR. GERBER:  Thank you.

THE COURT:  Thank you.  No questions.

MR. GERBER:  Your Honor, I'm going to brief -- I apologize, Your Honor.  Thank you.  I'm just going to briefly address the point that counsel for debtor made in the case that if Evolution doesn't have a first priority security interest, and as Mr. Duke just explained, it does.  At a high level, debtors are claiming that once other higher priority claims are satisfied, Evolution is so far behind in the payment waterfall, there won't be any value left.

And our position is simple.  This is a fact question.  It's hotly disputed, and it's something that really can't be decided on this current motion.  So on Friday, I think a few of the counsel here, as mentioned, Mr. Jerneycic of A&M and the Co-Chief Restructuring Officer was disclosed, and a few portions of his testimony I think show precisely why at this stage --

UNIDENTIFIED:  Your Honor, his deposition is not in evidence.  This is absolutely inappropriate.  We object to this discussion.

THE COURT:  Okay.  You've got to stick within the stuff I can see.

UNIDENTIFIED:  He's been available here for cross-examination and they passed.

THE COURT:  What else do you wish to tell me,

Mr. Gerber?

MR. GERBER:  Okay.  I understand.  I believe it is in other factors evidence, but that is correct.  I don't think we put it in.  So if you will allow me to briefly touch on it.  If not, I can move on.

THE COURT:  I don't think you can touch on it.  If you can find me a doc that's in the record, I'm more than happy to let you.  But if not, I think you've got to move on to something else.

MR. GERBER:  Okay.  Understood, Your Honor.  And as we -- so basically the point that we just want to make is the -- there's been a wide-open question of what the assets of the company are.  We at Evolution have not seen a reliable value of what those are.  And that question is especially important here, and we've heard about it.

We've heard about it today where there's allegations of fraud, and no one knows precisely how that occurred or exactly what happened.  And, you know, on this motion, the debtors have admitted that certain receivables are fabricated and inflated, so we think it's just entirely premature to say that there won't be sufficient assets to cover Evolution's secured claim if it is indeed behind other secured creditors.

Lastly, counsel for debtors briefly touched on marshaling, and I'll read the quote from Paragraph 30 of their reply, which says, "The prepetition secured parties may first

seek to recover on their claim from any collateral, including accounts receivable securing that claim."  And the key point here is debtors use the word "may," and that's because, just going back to this, no one knows what assets will be used to pay down debt, the prepetition debt first.

So even if the debtors are right that other secured parties may in theory go to their receivable first, we just can't say that will happen one way or another at this point. So our position is it's just a mere assertion that there won't be enough assets, and we need a valuation hearing to fully determine that under 506 and 30 -- Rule 3012.  Thank you.

And I'll pass it back to Mr. Elsberg, I think, unless there's anything else.

THE COURT:  Mr. Elsberg?  You may have muted yourself, Ms. Elberg.  I apologize.

MR. ELSBERG:  Oh, no.  I'm sorry.  I'm sorry, Your Honor.

THE COURT:  No, no worries.

MR. GERBER:  I have nothing to -- I'm sorry, can you hear me?

THE COURT:  I can hear you just fine now.  Perfect. Thank you.

MR. ELSBERG:  Yes, I'm sorry, Your Honor.  Thank you. I have nothing to add except for one very quick point.  So earlier you were asking about the amount that we're asking to

withhold.  I said 14 million.  I think that's actually incorrect.  The number keeps changing.

So Mr. Singh today said that there's 54 million in the factored receivables account.  That's different from the 36.5 million figure that the debtors put into their reply.  I would just say that in all events, the Court should deny any request to release an amount that would leave less than 60.5 million in the factored receivables account.

THE COURT:  Just why do you think you're entitled to the kind of amounts that would relate to a debtor upon which your client didn't transact with?

MR. ELSBERG:  Because of the language that's in 5(g).

THE COURT:  5(g)?  Got it.

MR. GERBER:  Yes.

THE COURT:  Okay.  Got it.  Got it.

MR. DUKE:  But if I may just very briefly on that point, just that there --

THE COURT:  I just want to understand.  So you're saying that, like, for example, break parts can -- in other words, these debtors could bind other parties and grant receivables in other parties?

MR. DUKE:  Your Honor, sorry.  I just wanted to make sure that we're talking about the same issues.  This is Michael Duke again.  What we were saying that we have an interest in, it's the eight debtors, it's their receivables, but it's with

all of their customer base, so it's the way the factoring --

THE COURT:  Yeah, I got it.  I got it.  That makes sense to me.  So it's not just -- maybe just the receivables.  So you're disagreeing with Mr. Singh and saying this applies to any receivable in which these eight debtors hold.  5(g) gives you the language and you get the lien based on the UCC-1 that you filed which relates to the master agreement, and therefore 5(g) kicks in and you've got a lien on all receivables.

MR. ELSBERG:  Yes, Your Honor.

MR. DUKE:  Correct.  So we're not going after debtor's receivables that are, you know, like debtors that we never entered into or signed on to or a factoring agreement.

THE COURT:  I get it.

MR. DUKE:  (Indiscernible) those debtors, but their customer base.

THE COURT:  Got it.  No, no, it's just broader than the sold/unsold portion.  Got it.

MR. ELSBERG:  Yes, Your Honor.

THE COURT:  Got it.  Folks, thank you very much.  There's a lot that has been filed, and I want to take my time and read this.  I'm going to ask the parties to come back at 2:30 today.  I'm going to -- there's some things I want to look up.  I think I can pro -- I may be able to provide an answer, or some answer to some of this.  I'm going to -- I've got -- I need to take some time and read this for the next couple of

hours.

But I've got a hearing at 2 that my understanding should last 20, 30 minutes, and maybe we can come back at 2:30 or three o'clock, whatever is easier for the parties, and I can just give you some answers to at least either tell you I can answer it or tell you I can't.  But I want to kind of go back and read, take a look at this language carefully, and give it some careful consideration.

MR. SINGH:  Happy to do that, Your Honor.  Would it be -- I wanted to address some of the points they raised, and just because of the way this has been briefed, if I could take five minutes.

THE COURT:  Yeah, I'll give you five minutes and kind of close it out.

MR. SINGH:  I'll be quick, Your Honor.  Just really not to rehash.

THE COURT:  Yeah, no worries.

MR. SINGH:  And I may just go a little bit out of order, Judge, but just to hit some of the key issues that were raised.  Oh, sorry, Your Honor.  One second.

THE COURT:  No worries.

MR. SINGH:  Okay.  Just to hit on a couple of the points that were raised.  You know, first there's, you know, discussion about the definition of transfer.  And for all the reasons Your Honor indicated, I -- the bankruptcy code

definition is not the right definition to use because at the time we're just talking about UCC-1.  So if you look at Webster's definition of transfer, which I'm just going to read from here, it defines transfer, verb or noun, as "Moving something like property, data, or a person from one place, person, or situation to another.  It also means conveying rights or ownership or a device ticket for such movement, like bus transfer.  Key meanings involve conveying ownership, moving physically, or the carrying of learning feelings from one context to another, such as in psychology or education."

That's Webster's definition, Your Honor, and that clearly does not pick up the unsold receivables.  And it makes sense, Your Honor, if you think of it in the context of the UCC and not the bankruptcy code.  You know, they read a comment from the UCC, but the overall purpose of the UCC and the relevant standard is you're supposed to file something that reasonably identifies the collateral so that other parties, such as the ABL lenders here, the term lenders, or new future financing parties, can read it and take away from it what you're asserting an interest in.

And you have to read this in context, Your Honor.  And by the way, the UCC statement is not something that's negotiated.  They chose to file it.  They chose the words that they chose.  And so, you know, they're the draftsmen of -- you know, draftspersons of that document.  That's not something

that gets negotiated. And they refer to a transfer or that were transferred or purported to be transferred. And then pursuant to the master purchase agreement, anybody reasonably looking at that document and saying, oh, this is a factoring receivable agreement would not have picked up based on how factoring receivable agreements and purchase agreements -- excuse me -- work, that there would be this unique provision of 5(g) in there.

And so if they wanted to have that be secured, it should have been called out. And that would have been consistent with the purpose of the UCC, but it wasn't. And so that should be -- work against them in their favor, Your Honor, in terms of contract construction.

Your Honor, the other thing I would just note, the excluded asset and the arguments around disposed of. Evolution's arguments continue to be only focused on the generic definition of disposed of, and they're not looking at how it was used in the context of the agreement. In the particular sections that we're talking about, it all refers back to disposed of pursuant to that actual master purchase agreement. Not just generally disposed of, not a general receivable per the UCC-1, but in the context of the master purchase agreement.

And 5(g) is a unique provision that, interestingly, you don't have the other factors raising that argument because

it doesn't exist in their contracts.  And so this should have been called out and is not what anybody intended.  And at the end of the day, Your Honor is being asked to interpret the meaning on the page -- the words written on the page for the purpose of figuring out the parties' intent.  And so you would have expected, Your Honor, that if they had this unique right, it would have been called out.

Your Honor, on the cash collateral point, again valuation, Your Honor, that's entirely their burden, 100 percent.  There could be no debate that it is their burden to prove that they have an interest in this property that they properly perfected, that they're ahead in time, and if they're last in line to prove that under 506(a), they actually have an interest that they're supposed to be protecting.

So they continue to come back to the debtors have not put in anything.  Well, first, that's not true.  Mr. Jerneycic has put in plenty of testimony to allow Your Honor to rule today.  But on the valuation point, Your Honor, that's their deficiency.  The other point they made is that in our brief, we say, well, you know, notwithstanding the no marshaling language, we may -- or, excuse me, the secured lenders may look to cash.

Your Honor, I think that's inconsistent with how the bankruptcy code itself is set up.  You can use collateral under the code, and there are extra protections and requirements for

the use of cash collateral.  Why is that?  Because everybody uses cash first to satisfy their collateral, Your Honor.  And so the bankruptcy code, its intent, and Your Honor I think can read into that and say, well, of course people are going to look to use cash collateral.  That's what we always fight about.  What's happening with the cash, right?

You've got a liquid asset, and I think Your Honor can take into account, given your experience on the bench, and the whole fact that the bankruptcy code itself calls out use of cash collateral separate and apart from other use of collateral, shows that parties intend to use cash collateral first.

But, Your Honor, again, you don't even have to get to all of these issues for us to be -- to prevail here today.  But I think you've got everything you need, Your Honor, in our view, to overrule this objection and find that they did not have an interest in it.  And even if they did, they're adequately protected.

THE COURT:  Thank you very much.  Let's come back at -- I know I said 2:30.  Let me just give myself a little cushion.  Can we do 2:45 p.m.?

MR. SINGH:  Of course, Your Honor.

THE COURT:  2:45 p.m. Central.  You're more than free to dial in if you wish.  I've got a two o'clock.  I just want to give a little bit of grace to the two o'clock.  Let's come

back at 2:45, and I'll tell you what I can do and let you know where we are.  Thank you very much.

MR. SINGH:  Thank you, Your Honor.

THE CLERK:  All rise.

(Recess taken at 11:16 a.m.)

(Proceedings resumed at 3:00 p.m.)

THE COURT:  Good afternoon, this is Judge Lopez.  I'm going to recall First Brands.  I'm going to turn on my camera and just give a moment for parties to hit on the line.  Let's see if I have some of the Evolution parties, if you can hit "five star," I will unmute your line just so you can hear what I say and ask any questions about kind of what we're doing.

Whatever appearance parties have made, they will continue, just the continuation of the hearing.  I'm just unmuting lines here.  Just ask that you please -- one moment.  Okay.

Mr. Elsberg, can you just give me a thumbs up if you can hear me? All right, perfect.  Thank you.  Okay.  Just give me one second.

Okay.  So I note that on December 1st the debtors filed a motion for an order establishing certain third-party factoring procedures for review and reconciliation of the debtor's receipts, release of funds for the debtor's estates, and the third-party factors.  And the part of the procedures required would have authorized customers to remit receivables

without liability.  There was some additional related relief there.

There was a supplement filed at ECF Number 931 which kind of tweaked a little bit of the -- excuse me -- nine -- I think it was nine.  It was nine.  Where was the supplement?  I think it was 931.  Yeah, it was a supplement at 931 filed on December 12th for the requested relief.  The original procedures contemplated -- initially requested use of about 100 million that the debtors alleged a property interest in.  There were certain proposed procedures which we're not going to take up today, but I just outlined for the purposes of kind of where we are.

The procedures were set -- according to the debtors were intended to facilitate kind of use of cash, but also to kind of provide some comfort to customers who are holding cash and they don't know who to pay because there are multiple parties alleging that they are the proper recipients.  There was a notice in some of these papers about assignments being sent to certain customers under those procedures.  I do know that some of the factors had the right to kind of take a step back.

The reason the debtors were requesting some of those funds is under the -- some of the third-party factoring, the debtors also served as the servicer.  So the money -- debtors would sell the receivable but then the.  The customer would pay

the debtors and the debtors would then remit the payments to the third-party factor. And so there's -- as the debtors have alleged -- indicated, there are some instances that have come out and it played out in connection with the adversary proceeding. And a lot of the evidence, and I don't need to go into it, but there was some cash that the debtors believed was not subject to any factoring because it was after the date in which the debtors stopped factoring. There was some cash that was subject to kind of a factoring agreement, or they were sold under a factoring agreement. But sometimes the invoice, in terms of what was sold, doesn't line up exactly with kind of the invoice that the factor party may hold. And so there was some question about whether there was alignment there.

Sometimes there's allegations that some of these receivables have been sold to multiple parties. And so there were procedures to try to get the money to come in and then kind of let the debtors, under their proposed procedure, sort it out. There were objections to that proposed procedure. The debtors have come forth now and asked essentially for -- kind of to release and be able to use what has been referred to as "trapped cash," money that has come into the estate in which the debtors have been holding in a segregated account related to invoices dated September 12th through September 28th, which it refers to as Category 1, and then funds related to invoices have not -- debtors believe is not associated with any

third-party factors, which they refer to as Category 2.

I do note that the relief requested under Category 1 and 2 is substantially less than what was initially requested. Debtors are seeking to use -- I think -- just want to use months. It's a little bit more than 60 million, 63 million and hold back 46 mil. The debtors have reached agreement in a proposed form of order with many of the factor parties here. Everybody's rights are reserved. And I'm not taking up the validity of anyone's argument today, which was the intent of that agreement, but many of the factor parties have allowed limited use of this cash, subject to the rights that are preserved in the proposed agreed order.

There was one objecting party, Evolution. And again, everybody has certainly expressed concern. So I'm going to talk a little bit about Evolution. But that's not to say that Katsumi and other parties haven't come in and expressed frustration and concern about cash. Evolution sold about 60 million, 60.5 million in factored funds. And according to their papers, the concern is that they're at least being told that potentially all of those funds that were sold -- the receivables that were sold maybe are subject to one or more issues. Maybe it's -- maybe double pledged, maybe it doesn't line up with where it is, but there's a lot of concern about maybe all of the 60.5 million.

They claim they have a lien on all the cash and the

receivables that are held by certain parties that they did business with. And they claim that the master factor agreement, master receivables purchase agreement that they have, gives them rights that are far superior than any other factor party.

So the question then becomes before the Court today whether I think it's true that they're entitled to have a superior lien over everyone else, and if they are, is there adequate protection for it. I think that's kind of really where we are. I don't think any of the cash that is proposed today is something that is subject to a receivable that was sold. Right? This is to any of these parties. So the question is, what do you do with the Evolution claim?

Evolution believes that -- joined in a joinder by many of the parties saying these issues should be resolved in connection with an adversary proceeding. I do agree, if everybody was getting -- all this was getting teed up and I was going to have to decide who has a superior lien between all the factor parties, that very well may trigger an adversary proceeding to determine the extent, in the interest of everyone's rights, to determine who's first, who's second with respect to certain accounts as they come in.

But here, if you really distill what's really being asked, the debtors are asking to use certain trapped cash, and they believe that there's adequate protection and the other

92

parties are being adequately protected.  So that really this comes down to just, since we're not talking about sold accounts, really just the use of cash collateral and whether a party is adequately protected and whether this party is entitled to full, kind of, greater adequate protection than maybe even the other parties have bargained for soon, I don't think today I need to determine whether Evolution's lien is superior to everyone else's.  I don't think that's the purpose of today.

The question is, even if they are, are they adequately protected?  That's really what this comes down to. But I do want to make a couple of points about what I saw for parties to consider.  And I kind of want to focus on Evolution's arguments in terms of where they are today.

Section 5 of the master receivables agreement says that First Brands, quote, Grants a lien on and security interest in, kind of, one, all the receivables now or hereinafter owned or held by essentially First Brand.  So it's the now or here, whoever owned by First Brands.  And they think that that was perfected through the UCC-1 financing statement. And when you look at any one of the UCC-1 financing statement, the collateral description says any and all present or future receivables transferred or purported to be transferred to the secured party, which is Evolution pursuant to the master receivable purchases agreement.

So as I understand, Evolution's argument is that any and all future receivables transferred or purported to be transferred to them under the master receivables agreement, what was transferred to them, they would then look to 5(g), which grants a lien on all receivables now or hereinafter held by the applicable debtor.  So the question is whether that textually works.  I'm not convinced that it does, to be honest.

I think you've got to read words for what they are.  And I think textually, any and all present future receivables transferred are purported to be transferred under the master receivables agreement, you then determine what does it mean to transfer something, what was transferred under the master receivables agreement, if it's transferred or purported to be transferred.  And looking up the definition of the word "purported," it's intended to be transferred, right?

I think the word "transferred" is used multiple times under the master receivables purchase agreement.  But it's different than the use of the word "grant."  The word "grant" is used in 5(g).  The word "transfer" is used multiple times in the Master Receivable Purchase Agreement.  But "transfer" and "grant" are used differently, which means they can't mean the same thing.  And I think textually you've got to give every word the effect that it has under the relevant agreement.  So what is transferred under -- to the secured party under the Master Receivable Purchase Agreement is when you kind of go

through and you look at sections like, you know, 4(g), 5, excuse me, (d), lowercase J, Exhibit D, lowercase 5 of the master receivables are going -- you get a feel for what "transfer" means, and it really refers to what was sold or specifically assigned to them, which is different than grant. And grant is only used to grant a security interest.

So something could have been transferred, but not granted textually under this agreement. That being so -- I don't know -- and certainly one can make arguments differently. I think they have every right to argue that they're entitled to every bit of the cash, the 60 million, although only 36 million, is really at issue today, based upon the amount of cash that debtors want to use. The question is -- let's assume they are today, since we're not making final calls on text. I only note that it's not an open-and-shut case in terms of just using the word "transfer" and the word "grant."

You would have to textually do an analysis and the term "purport to transfer," although it seems like a legal term of art, is not defined in Article 9 under New York law. The courts look at cases that I saw are really kind of applying the plain language meaning of what you purport to transfer, purporting to transfer in the grammatical sense as it's used there. It's only to say it's not an open-and-shut case that Evolution has that they have that they're superior to every other factor party here. I think everybody else is going to

have their day in court and we just need to figure it all out.

And I don't know what the other security agreements say and I don't know if this language is better than the other -- everyone else's language. I don't know. I don't know. We don't need to make the determination as to whether the DIP liens trump or the ABL trump. Real question is whether one is adequately protected and if debtors are purporting to use -- want to use 63 million but then want to leave back, like, 56 million. I've read the proposed terms of the adequate protection package and I think -- the concern I have with the proposed procedure in the order is that it's not like everyone agrees that it's set in stone that the debtors' analysis is sacrosanct and that no one can come -- no one -- that no one will come back and challenge whether Category 1 is really Category 1 or Category 2 is really Category 2. That's been made clear to me. That's not to say that this hasn't been a good-faith effort and folks haven't really tried or that there'll ever be a dispute about it. I just know that it remains a dispute.

That being said, I think I would feel more comfortable have granting interim -- it's not interim, but just granting relief to allow the debtors to use the cash. I think the debtors want to use 63-. I think the debtors' using 60- and three of it just stays back. Gets me a lot more comfortable in kind of where we are and it just means that the

debtor may have to come back sooner than it wants.  But I think it's adequate for protection for anyone, and not -- just not Evolution.  It just gets me more comfortable that if there is a mistake or well-intentioned that there's you know, 59 million as opposed to 56-, it gets me a lot more comfortable when you start thinking about adequate protection and what's really on the other side of that cash and the value of an adequate protection claim, whether there'll be fights about that or debtor cash.

I think the debtor -- I'd feel a lot more comfortable if the debtor were to use 59- and I would authorize the debtors to be able to use 60 million.  But 3- of it doesn't get used and maybe it just stays right where it is and everybody's rights are what they are, but it's just additional adequate protection for whoever it is on the day that we show up.  And it is what it is.  It's not all granted adequate protection for Evolution.  It's for whoever's won, if they're entitled to it at all.  And maybe the answer is no one.

I think also we need to have a status conference to kind of understand where we are sometime next year, which is really soon.  I'd like to set a status conference.  And I know that there are some hearings set maybe for January 9th, and I don't want to take them up on those days.  Those days -- those issues will be those issues, and I agree that Carnaby just needs to have -- that's their day.  Maybe January -- the 19th

is a federal holiday.  Maybe the -- January 20th or the 21st, somewhere around there.  That's --  I don't know, 22nd somewhere around there.  That's roughly -- that's rough justice, 30 days just to kind of see where we are, if the debtor needs to come back.

I've looked at the debtor's DIP budget.  I think what I'm proposing would still work.  I do.  I did study the budget. I do know that it's close, but I feel a lot more comfortable with what I'm being asked to do today, which is really not make the call, allow the use.  Even if the parties agree to it, by just having a little bit extra cushion I think gets me comfortable with where it is.  But it's not, kind of, tied to Evolution.  It's just tied to whoever is entitled to it.  And it may be Evolution.  Maybe Evolution has a greater right to all the cash on the other side, plus this cash, I don't know. But I think there needs to be a day where everyone can lay all their cards on the table.

And if the Court needs to make that decision, then the Court will.  And maybe the DIP liens trump everything. It's just there's a day for it all.  That day is not today, but one is going to use cash and allow it.  I feel more comfortable with that getting there, unless maybe the debtors need to come in sooner than that.  Then maybe we can talk January 13th, if you had to.  But if the parties wanted to kind of take 30 days, and, I don't know, just kind of play around with it and just --

I'm fine either the 13th in the afternoon, subject to what -- if Rosario tells me otherwise, or the 22nd.  I know that the 20th, 21st, those days seem to be open and we could just pick a date.

It could be a status conference.  We could tee certain things up on those days.  But at a minimum, I can get a better understanding as to kind of what February would look like, in light of discussions now in connection with January.  An examiner will be up and running.  There's other issues that we've got to take care of in connection with the adversary that I need to kind of talk about.  Not today, but I think I'd feel a lot more comfortable.  But that's where we are.

So, Mr. Singh, maybe you can kind of tell me what your thoughts are.

MR. SINGH:  Thank you, Your Honor.  Sunny Singh, for the record, Weil Gotshal, on behalf of the debtors.  Thank you, Your Honor, for that.

You know, one update that, as I mentioned earlier, the debtors and the creditors' committee, they -- primarily A&M and M3, were working through the numbers.  And I think sort of somewhat coincidentally, but conveniently with the numbers you described, in Category 2, I think there's additional reductions that M3 and A&M have agreed would be appropriate to make for now, which would reduce the number -- I don't have the exact number, but in the ballpark of $3 million.

So, Your Honor, what we were going to propose is actually language, and we've shown it to the other factoring counterparties in the room, that just says Category 2 is a number it is, you know, parenthetical subject to reductions agreed by the debtors and UCC.  And obviously we would show the other factors, the results.  And we're happy to add in that, you know, total, we're not going to take out more than 60-, consistent with your ruling, Your Honor.  But I think the number would have gotten us to right about that ballpark anyway.  So we're perfectly comfortable with that.

Just on the hearing, Judge, you know, from the debtor's perspective -- and I do want to give it some thought, but we were contemplating -- we had understood you had some time on January 13th.

THE COURT:  I probably do.  If you talk -- I'm sure --

MR. SINGH:  We checked with your --

THE COURT:  Oh.  Well, then the answer is yes.

MR. SINGH:  Yeah.

THE COURT:  In the afternoon, it looks like.

MR. SINGH:  Yeah, in the afternoon.  I mean, we were contemplating going forward with our procedures and the request for the release of the sort of, you know, category, you know, whatever is left.

THE COURT:  I'm fine with that.

MR. SINGH:  Okay.

THE COURT:  I'm fine with -- but, again --

MR. SINGH:  Okay.  And obviously they could all --

THE COURT:  -- subject to all objections.

MR. SINGH:  Sure.

THE COURT:  All procedural objections to take everything up.

MR. SINGH:  Yeah.  And what I'll do, Your Honor, is we will go back -- if we can hold that date.  It seems to work for the motion, obviously subject to everyone's rights.  But we'll go back and think about your comments today and confer with the other parties.  And if the date needs to move, it needs to move.  But right now we'd like to press forward on the 13th.  And, Your Honor, I know that the 9th is a full day for Carnaby, which we understand, but if Your Honor would be willing to carve out a quick status conference at the beginning of that hearing so we can update you on where we are, you know, ahead of the 13th date, that might be -- and people can do it virtually or they're here, just to give you an update of where things stand.

THE COURT:  I don't think Carnaby is going to mind if we took from 9 to 9:30 for a status update and then kind of started with they're hearing.

MR. SINGH:  Yeah.  So if we could proceed with that, I think, Judge, that would make a lot of sense, from our

perspective, and we can have a little bit of a better plan after we've had an opportunity to confer.

THE COURT:  Let's just call it -- but let's just call it a 30 minute because --

MR. SINGH:  Yeah.

THE COURT:  Yeah, I want to be respectful to the folks who came in and so -- but we could have just a general status conference from 9 to 9:30, kind of really targeted.

MR. SINGH:  Yeah.

THE COURT:  Right to the point.

MR. SINGH:  Yeah.  And we'll make sure we confer with the counterparties in advance to try to have, you know, the sort of issues that we need to address with you.  And Your Honor, obviously it's your court.  I'm going to be here in person, but if others wanted to appear virtually for that 30-minute conference, the debtors would have no objection.

THE COURT:  No, if you're just here for the status conference, I've got no issues with appearing virtually.  And I also want to be really clear about -- I mean, Evolution can have really strong arguments to say, look, you missed X, you missed Y.  And I'm open to all of that.  And so this is -- it's just -- the purpose of me kind of just going through that is I think one can look at adequate protection kind of holistically like who -- regardless of whose priority it is, it's still preserving everyone's right as opposed to saying they -- this

party is the clear winner and they're entitled to full adequate protection, full stop. And they trump the ABL, they trump everybody. It's just to kind of just indicate that it's not a clear answer just based upon the words, but there may be very -- they may trump everyone. Maybe someone has better, you know, has better papers.

I just -- what I'm saying is I don't want anyone to read what I did today and say that this means that they have no security interest. It's not that. It's just to say it's a more difficult question. So I think adequate -- let me not make the choice as to who it -- whose money it is. It's just regardless of what it is, whoever's money it is, if it's anyone's, they're adequately protected based upon kind of the 60 million slip.

MR. SINGH: Understood, Your Honor.

THE COURT: That was the purpose of it. And I want to just give Evolution some comfort on that, and anyone else. I don't think anyone ought to kind of quote me as making a final ruling on that. It was just to kind of highlight the complexities of it and that it's not that easy of an answer.

MR. SINGH: Understood, Your Honor, and appreciated. The one thing, you know, our order does propose an objection deadline, and just so we can have, you know, a little more formality and order to whenever we are before you. I think we had proposed January 2nd.

THE COURT:  That's cruel.

MR. SINGH:  Well, they had selected -- I think we're okay, but I'm happy to push it a couple of days if we need to. But if we could just set a deadline so that the debtors know what they're shooting at, that would be much appreciated.  If it's not the 2nd, that's not the end of the world, from my perspective.

THE COURT:  Yeah.  If we're going to do the 13th, I'm going to give parties to the 6th at noon Central.

MR. SINGH:  Thank you.  Okay, so we'll adjust the order.

MR. CASSEL:  Can we hear from other parties on these dates before we start locking things down, please?

THE COURT:  No, no, no.  I'm just saying from the -- if -- but if they want to go forward, I think -- oh, you're saying --

MR. CASSEL:  (Indiscernible)

THE COURT:  Oh.  All right.  Let me -- that's a fair point.  I should.

MR. SINGH:  Sorry, Your Honor, I thought --

THE COURT:  No.

MR. SINGH:  -- we had checked with the other parties.

MR. CASSEL:  You might not have seen emails or emails going around.

MR. SINGH:  Can I let Mr. Cassel speak to their

issues on timing?  We've been --

THE COURT:  No, no, no, go ahead.  I apologize.  I Should have --

MR. CASSEL:  Good afternoon, Your Honor.  Cassel of Wachtell for the Leucadia parties.  The 14th or the 15th works better for us if the Court has availability that day.

THE COURT:  I am gone the 14th through the 16th.  I won't be around in person.  So that's why I was looking at, like, the 13th or the 20th.  That's the thought on my end.  I'm the problem that Wednesday, Thursday, or Friday.

MR. CASSEL:  Fair enough, Your Honor.  The only other point I'll note just substantively is the disputes that'll be coming your way.  It's not quite adequate protection.  The argument that the factors are making is they purchased --

THE COURT:  No, no, no.  I got you.  You're exactly right.

MR. CASSEL:  -- these receivables, so it's not property of the estate, would be the argument.

THE COURT:  With respect to the other --

MR. CASSEL:  With respect to the funds in the factor receivables account, one of the arguments --

THE COURT:  1, 2, 3, or 4, you're still reserving the right to argue this is -- we purchased this, this is our money.

MR. CASSEL:  It's our money, not property of the estate.

THE COURT:  Yep, yep, yep, yep.

THE COURT:  So it's not quite an adequate protection issue so much as it's an owner -- who owns particular property issue.

THE COURT:  I agree.  No, no, no.  I think you're.  I think those arguments are preserved.

MR. CASSEL:  Yep.  I think they're preserved by this order.  I just wanted to clarify.  It's not just how we're thinking about it.

THE COURT:  Well, I was just thinking about for purposes of the matter that I had in front of me.

MR. CASSEL:  Yeah, of course.  Of course.

THE COURT:  Yeah.  Because they were arguing UCC stuff.

MR. CASSEL:  Precisely.

THE COURT:  Yep.

MR. CASSEL:  That's a lien issue.  It's -- their argument, to the extent that exists, it's a lien on property of the estate.  The issues for the other factors are about ownership as opposed to whether they have a lien on it.

THE COURT:  If you purchase a receivable.

MR. CASSEL:  If we purchased it, if we validly purchased it, then we own it.  And so that's sort of the distinction there.

THE COURT:  Yep, yep, yep.

MR. CASSEL:  Thank you, Honor.

THE COURT:  No, no, I got it.  In other words, you're still preserving the argument that within Category 2, it -- there -- you may still want to make the argument that you have found evidence that you purchased a certain receivable that is -- that they've designated as Category 1 or Category 2.

MR. CASSEL:  Correct.  And it's a different argument than the one they're making, which is they have a lien on this stuff.  We -- our position is we own it outright.

THE COURT:  Correct.  Correct.  No, no, no.  I got it.

MR. CASSEL:  Thank you.

THE COURT:  Yep.  Yep.

MR. KELLEY:  Your honor, I appreciate the Court's availability in making -- going through your calendar.  I just want to make sure the concept of status conferences didn't get blended from what I was raised earlier this morning to what the Court's thinking now.  In the order that we submitted to Your Honor to review, there is a 45-day deadline by which the receivables parties must raise an objection as to Category 1 and Category 2, which can have a dispositive effect on our rights.

So the status conference we are focusing on, particularly as it relates there was 30 days out from when the Court enters that order to allow us to bring to your attention

adequacies, inadequacies of discovery, of exchange of information before our rights were cut off. Or else the receivables parties are going to file claims as to all of Buckets 1 and 2. That seems inefficient to me. And so we were hoping a status conference would allow us to address shortcomings in discovery before these were cut off.

THE COURT: Yeah, we're going to have to figure that out because I think if I -- maybe I'm disconnected.

Mr. Singh, you want to go forward on the whole thing?

MR. SINGH: That's correct, Your Honor.

THE COURT: So in other words, they're trying to tee it up.

MR. KELLEY: And we're going to be arguing, obviously, why we think the need for an adversary is critical for that, for the various discovery issues that we've already flagged for the Court. So I get it, if we're going to go forward. I understand that the 13th is problematic for a couple of parties. 14th and 15th work for us, but I understand the Court's unavailable.

THE COURT: Yeah, if it's going to be the -- if the 13th doesn't work, then I'm going to look at -- ask parties to think about the 20th.

MR. KELLEY: That -- which is fine for us. We can make that work on those days. The concern I have, Your Honor, was to accommodate some discovery disputes we had going on

about availability of deposition.  I personally have locked up the 9th.  I had to move an entire mediation.  So doing the status conference on the 9th, it's counter to what we were trying to.

THE COURT:  No, no, there's a trial on the 9th and I'm not moving that.

MR. KELLEY:  I thought I heard you say you were going to do a status conference that day.

THE COURT:  Oh, just a -- one could do from 9 to 9:30, just a general status conference where I just listen, on what's going on and --

MR. KELLEY:  Okay.  And that's related to whatever date for the upcoming hearing, whether it's the 13th or the 20th.  Is that what you were contemplating?

THE COURT:  But if that may move -- yeah, that may move if it's not the --

MR. KELLEY:  And I have a number of people who've been texting me saying given the dates we're looking at, please do not make the deadline on the objection January 2nd for many reasons that I think you can forecast.

THE COURT:  No.

MR. KELLEY:  And we'd like it to slip more than a couple of days.  Happy to have that conversation with the debtors, but I think we need to resolve when the hearing's going to be so the debtors aren't put in a bind.

THE COURT: Now, I had to file Something on December 31st at 8 o' clock at night one night and I vowed to never do that to anyone again. Yeah.

MR. KELLEY: I remember. I'm old enough to remember when we had to do the Dropbox and drive up here and punch it.

THE COURT: You had to punch it so -- Mr. Singh, I think we've got to figure out --

MR. SINGH: Yep. And, Your Honor, again, I ordinarily would be happy to accommodate schedules, but we kind of have got to see if we're going to get this cash or not. It's critical. And so I would respectfully ask Your Honor that we do the hearing on the 13th. I think Your Honor mentioned an objection deadline of was it the 6th at noon? Which is fine from our perspective.

I mean, this motion's been out there now since December 1st. We filed it. Right? And even the supplement was on the 12th with that information. So people -- it's not like they're getting the information after today's hearing. It's already out there. That'll give people roughly 36 days with the information.

And on the 9th, all I wanted to do, Your Honor, was to -- we don't even have to have it, or it can be on the 8th. There's no magic to the 9th, but since people are here, the point was just to give you an update based on our -- you know, we're going to confer with each of the parties after this on

can we narrow the issues for the 13th or exactly what will go forward on the 13th.  To give you an update on that was kind of what I was suggesting.

If the factoring counterparties want to have a further conference before that 45-day period is up, you know, sure.  You know, or we could just take that up on the 13th, kind of where they are with respect to the 45 days and, you know, reconciliation of information.  But I think, Your Honor, the simplest thing, from the debtor's perspective, would be a hearing on all of the motion and the supplement on the 13th with an objection deadline as you proposed.

THE COURT:  What am I teeing up on the 13th, whether we need an adversary proceeding or not?

MR. SINGH:  Well, that's one of the issues.  I think they're going to raise all objections because we want to get that sort of, you know, the remaining Bucket 3 released, and then the procedures themselves.

THE COURT:  Okay.

MR. SINGH:  Right.  So they may have actual, you know, additional objections to the release of Bucket 3, including, you know, their procedural objection of whether or not this needs to proceed through an adversary proceeding.

THE COURT:  And the debtors are still proceeding with the request to allow customers to deposit the money.

MR. SINGH:  Yes, and Your Honor, thank you for

bringing that up because, look, that is another critical piece of this motion that we've deferred.  You know, customers are holding about $150 million at the time we filed a motion because they don't know who to pay.  I mean, one of the reasons, like, we have other issues we're dealing with the customers.  But we really would like to clear this up sooner rather than later so that those receipts can start coming in to the debtors, go through the same process of reconciliation that we're talking about, work with the factors, you know, to the extent they relate to the prepetition receipts.  Right?

But, you know, so we got to get that money released, Judge.  And so the difference between the 13th and 20th or beyond really is significant, from our perspective, because that is another critical portion of the relief that we are seeking.  And so again, Judge, I don't want to ruin anyone's holidays, certainly not in Your Honor's, but it's really that important for the estate.

THE COURT:  No holiday on the 13th.

MR. SINGH:  Well, you know, over the Christmas break, so --

THE COURT:  Let me just hear from other parties about scheduling and timing.

MR. KELLEY:  I'm sorry, Judge, I'm just confused about a couple things.  Charles Kelley for the Katsumis.  Our objection is loaded with our concerns about what's been

produced to date, whether it's Bucket 1, 2, 3 or 4.  Unless there's a dramatic change in the discovery productions that come from the debtors, and it's hard to explain the volume of materials that's at stake here, they dump them all on us tomorrow, we're still killing holidays trying to get people up to speed and it's a tall order to say, but we want to go into something that otherwise we have the benefit of discovery from an adequate protect -- from an adversary proceeding on January 13, so --

THE COURT:  Right.  I'm saying but I suspect you'll then file something and then tell me.

MR. KELLEY:  Well, we were hoping to do that in the status conference, and we'd talk and arrive at something reasonable, but if the Court would like us to file objections or discovery --

THE COURT:  Don't put it on me.  I --

MR. KELLEY:  We are happy to deal with it in whatever way Your Honor prefers.

THE COURT:  Oh, I just think it -- we're going to have to pick a date, and the question is whether the date works or not in light of, kind of --

MR. KELLEY:  I just don't want people to lose sight of the fact that even production of information still has to be processed.  And that's the issue that I wanted to just flag. Sorry, Your Honor.

THE COURT: No, let me hear from any other party online or --

I need to give this some thought a little bit. The concern that I have is that that hearing could go long based upon everything that I'm hearing. And it may just be legal argument if I think there needs to be an adversary or that I don't have authority to do some of the -- it can get really short, but it can also go really long. I need to just think about the dates. Give me -- I just need to -- I need to check with my case manager on some stuff. I'll get back with the parties by the end of the day and give you an answer on this. I need to -- let me just hear from the parties. If we -- I get the debtor's concern about the 20th. Let me hear the concerns about the 13th. Aside from that someone's going to file a motion saying we don't have enough information to go forward on this date, and we've done that. So what other concerns do the parties have and how long does -- how long of a proceeding do we contemplate, if one were to have this hearing? Guess it just depends on what you got.

MR. SINGH: Yeah, I think it would easily take up, you know, that afternoon, Your Honor, if it's going forward, contested, and probably longer, is my understanding.

THE COURT: Here's the -- and unfortunately, I can't move, and I'm traveling on the 14th in the morning. So, like, we would have to finish on the 13th in the afternoon. And

that's what I'm trying to get a sense of, kind of.  I need to just think about it.

Yes, Counsel.

MR. CASSEL:  Judge, just in terms of what would be contested, if we were to go forward on a contested hearing on the 13th, there'd be the adversary proceeding issue.  Do we need to have an adversary proceeding?  There'd be a legal argument over the customer injunctions, as we called them in our pleadings, whether those work under the bankruptcy code and the adversary proceeding rules as well.  And then there are various merits issues that we were going to tee up.  If we're going forward and they're talking about --

THE COURT:  Some various what?  Excuse me.

MR. CASSEL:  Merits issues.

THE COURT:  Oh, got it.

MR. CASSEL:  If we're going forward on releasing receivables, we have arguments to the effect that we should be the rightful owner of some of the receivables that they claim they own.  Their position is if the invoice number doesn't match, then --

THE COURT:  Under the procedure.

MR. CASSEL:  Under their construct, if the invoice number doesn't match, they own the money.  We disagree with that, both just on a straight legal basis, but also we think factually there are things that we could -- like, if we can

demonstrate there are connections between -- maybe the invoice number is wrong, but everything else about the invoice is a dead ringer for ours.

THE COURT:  Right.

MR. CASSEL:  We think we own that in that kind of scenario.  And that's part of the reason why we need factual development is to, like, understand how, if any, there were connections between the fake invoices and the real ones.  So part of the argument is going to be, you can't do this because we don't have the facts yet.  Part of it may also be, as of some of these receivables, we own them because the information we have is enough to say we own them.  So it could be a pretty contested hearing if we -- and that's why we need the discovery, is to see if there's --

THE COURT:  What is the status of discovery on your end?  And I know Mr. Kelley has a position on it, but what is your position on the status of discovery?

MR. CASSEL:  Very incomplete, Your Honor.  They've produced very limited information.

THE COURT:  When did it start, from your perspective?

MR. CASSEL:  Pretty much the second -- well, we filed 2004 requests, you know, very early, you know, November we started informal discovery before that.  When they served this motion on December 1st, we filed discovery, we filed document requests, we filed interrogatories.  We did a 30(b)(6).  The

information at the 30(b)(6) deposition, if you read the transcript, the debtors responded to almost every question about how the fraud was conducted, how the invoices were connected with, I don't know, we have no idea, that's under ongoing investigation. So the discovery is very, very much in its infancy.

THE COURT: Let me give it some thought. The real question in my mind, and I want parties to think about it, is if one had four to five hours on the 13th, do you just tee up the legal issues and see where you are? Because they may be -- I'm not sure that this is the right thing to do. I'm just thinking about a bunch of things in my mind in terms of -- as I got it, there are procedural --

MR. CASSEL: Right. There are fewer issues of law that maybe could be decided, although, again, our position is those have -- some of those would have to be decided within an adversary proceeding. And then there's -- but the question of whether it needs to be an adversary proceeding, I suppose --

THE COURT: That's what I mean, whether you would need an adversary and to what extent. What I think I'm comfortable doing under the procedures, as a matter of law, when we're -- what you all argue -- what they argue in terms of what I have authority to do one way or the other in terms of the customer issue.

MR. CASSEL: Right. And of course, part of that is

our view is they're seeking various forms of injunctive relief, like we have to withdraw notices that we sent prepetition. They say we have to withdraw notices.  They have to -- they say that --

THE COURT:  I understand.

MR. CASSEL:  -- direct customer -- we think that's equitable relief.  We think the rules say that's an adversary proceeding.  So there's sort of two questions there.  One is, does it need to be an adversary proceeding?  And then there's also the substantive question of, okay, even if it were an adversary proceeding, can I do that?  Because our view, under the UCC, is we have direct claims against customers.  Once we become -- we're the assignee of their receivable, we think we have a direct claim.  And so they're saying, pay someone else. We think that's a third-party release.

THE COURT:  No, I got it.

MR. KELLEY:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. SINGH:  Your Honor, as you're thinking through the issue -- sorry.  Sorry, Your Honor.  As you're thinking through the issue, I mean, just one suggestion, from my perspective.  If we could start on the 13th, right, with the debtors' understanding that, you know, we're not going to go beyond whatever time in the afternoon Your Honor is available, I think that alone would be very helpful.  Right?  And it's

sort of on us to get as much done as possible on the 13th, use it as most efficiently, ideally finish on the 13th, but even, you know, clearing out some of the issues that Your Honor's been raising and talking about would be very helpful, because then, you know, what I don't want to have happen, and then the 20th is we're starting, and then it's sort of, you know, but if we can start on the 13th and Your Honor is reserving the 20th, I think that would be fine, from the debtors' perspective.

And we'll work with the parties to make sure we're using all of the Court's time as efficiently as possible, you know, but this will give us something to focus on.  And Your Honor, I'm not standing to respond to the discovery comments.

THE COURT:  Yeah, I got it.

MR. SINGH:  Your Honor will hear about that, you know, later.  That's not really for today.  But I think that way we've got something we're aiming for.  You know, we're focused on when we're going to get cash in.  We can work with the parties on, you know, is there another efficient resolution like we had today or is there not, or should we just get started?

THE COURT:  Thank you.  Let me --

MR. SINGH:  So with that, Your Honor, obviously you're going to think about it, but I wanted to just let you know we would be fine with that.

THE COURT:  Okay.  Let me ask if anyone else wishes

to be heard on timing on any of these issues, either in the court or online.

Mr. Singh, one way or the other -- and just -- and maybe it can get rolled into the actual, kind of, hearing itself, just kind of what -- and maybe the answer is -- maybe I need to answer this question before I can get the answer to the question that I'm looking for is kind of what February and March look like from a cash standpoint.

MR. SINGH: Yes.

THE COURT: But I suspect I need to answer these questions first to then allow you to kind of answer those questions.

MR. SINGH: Yes. And Your Honor, I think, you know, we can give you a better sense of that either at this hearing, the status conference, et cetera.

THE COURT: Today's not the day for it. It's just that --

MR. SINGH: Yeah, today's -- you know, there's a lot going on in the labs, I would say, Judge, and there's a lot of work and conversations that are happening. And so I think we will definitely be able to report back to you in the January time frame so that you have a sense of it going forward.

THE COURT: Okay.

MR. SINGH: Yeah, that makes a lot of sense.

THE COURT: Thank you very much for your time,

everyone.  Thank you.

MR. SINGH:  Thank you, Your Honor.  Your Honor, we'll upload a modified order just with the changes I discussed with you.

THE COURT:  Okay.  Thank you very much.  And happy holidays.  Thank you.

MR. KELLEY:  Happy holidays, Judge.

MR. SINGH:  Thank you, Your Honor.

(Proceedings concluded at 3:46 p.m.)

**C E R T I F I C A T I O N**

I, Ilene Watson, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____

ILENE WATSON, AAERT NO. 447    DATE:  December 24, 2025

ACCESS TRANSCRIPTS, LLC