<u>**Exhibit 4**</u>

**Transcript for December 30, 2025 Status Conference**

                    UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF TEXAS
                         HOUSTON DIVISION

First Brands Group, LLC          )   CASE NO:  25-90399
              Debtors.           )   Houston, Texas
                                 )
                                 )   Monday,
                                 )   December 30, 2025
------------------------------)      2:01 PM to 2:54 PM


                         STATUS CONFERENCE

          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Committee:       MICHAEL WINOGRAD
                         ROBERT J. STARK
                         Brown Rudnick LLP
                         7 Times Square
                         New York, NY 10036


For Leucadia:            MICHAEL H. CASSEL
                         EMIL A. KLEINHAUS
                         Wachtell Lipton Rosen & Katz
                         51 W 52nd Street
                         New York, NY 10019

                         PAUL E. HEATH
                         Vinson & Elkins LLP
                         845 Texas Avenue, Suite 4700
                         Houston, TX 77002

For the Debtors:         SUNNY SINGH
                         Weil Gotshal & Manges LLP
                         700 Louisiana Street, Suite 3700
                         Houston, TX 77002

For Katsumi Servicing:   CHARLES S. KELLEY
                         RICHARD A. STIEGLITZ
                         SEAN T. SCOTT
                         Mayer Brown LLP
                         700 Louisiana Street, Suite 3400
                         Houston, TX 77002-2730


For Evolution:          DAVID ELSBERG
                        MICHAEL DUKE
                        ELLA EPSTEIN
                        Elsberg Baker & Maruri
                        1 Pennsylvania Plaza # 4015
                        New York, NY 10119


For the Ad Hoc Group of Secured Lenders:
                        STEPHEN D. SILVERMAN
                        ANNELYSE SCARLETT GAINS
                        Gibson Dunn
                        200 Park Avenue
                        New York, NY 10166


                        EMANUEL GRILLO
                        Orrick, Herrington & Sutcliffe
                        51 West 52nd Street
                        New York, NY 10019-6142


For ING Bank:           DOUG DEUTSCH
                        Clifford Chance
                        Two Manhattan West, 375 9th Avenue
                        New York, NY 10001


For Bank of America:    DANIEL J. MCGUIRE
                        Winston & Strawn LLP
                        300 N La Salle Drive, Suite 4400
                        Chicago, IL 60654


For the Defendant:      JAMES C. TECCE
                        Quinn Emanuel Urquhart & Sullivan
                        700 Louisiana St., Suite 3900
                        Houston, TX 77002

Court Reporter:              YESENIA LILA

Courtroom Deputy:

Transcribed by:              Veritext Legal Solutions
                             330 Old Country Road, Suite 300
                             Mineola, NY 11501
                             Tel: 800-727-6396


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

HOUSTON, TEXAS; MONDAY, DECEMBER 30, 2025; 2:01 PM

(Call to Order)

THE COURT:  Good afternoon.  This is Judge Lopez.  Today is December 30th.  I'm going to call the 2 p.m. status conference in First Brands.

Mr. Singh, I just want to make sure, can you put a thumbs up if you can hear me?  Okay.  Perfect.

If parties can just hit five-star.  I don't want this to be incredibly long, I just kind of want to talk a little bit about scheduling before we ended the year.  And don't want to forget to wish everyone a happy new year, before I forget to.

The parties in the courtroom, I know there are some parties are here in the courtroom, if you just -- Today is more kind of a listening deal.

Let's see, I'm going to open up the line.  Here's a 917 number.

MR. WINOGRAD:  Good morning, Your Honor.  This is Michael Winograd, on behalf of the Committee.

THE COURT:  Hi.  Good morning.

All righty.  Ah, Counselor.  If you can state your name?

MR. CASSEL:  Good afternoon, Your Honor.  Michael Cassel, Wachtell Lipton Rosen & Katz, for the Leucadia parties.

THE COURT:  All right.

MR. CASSEL:  With me on the line is Emil Kleinhaus from my firm.

THE COURT:  Okay.

MR. CASSEL:  And Paul Heath from Vinson & Elkins is on the line as well.

THE COURT:  Perfect.  Thank you.  Here is a 212 number.  All righty.

MR. SINGH:  (indiscernible) this is Sunny Singh of Weil Gotshal, on behalf of the Debtors.

THE COURT:  All righty.  Good afternoon, Mr. Singh.

MR. KELLEY:  Good afternoon, Judge.  Charles Kelley from Mayer Brown, on behalf of Katsumi Servicing.  I'm joined with two of my colleagues online, Rich Stieglitz and Sean Scott.

THE COURT:  All righty.  Good afternoon.  A 917 number.  Whoever is typing really fast, I'm jealous, whoever that is.

MR. ELSBERG:  Sorry -- sorry, Your Honor.  This is David Elsberg, Elsberg Baker & Maruri, for Evolution.

THE COURT:  Thank you.  Good afternoon.  A 901 number.

MR. DUKE:  Good afternoon, Your Honor.  Michael Duke from Elsberg Baker & Maruri, on behalf of Evolution.

THE COURT:  Good afternoon.  And a 646 number?

MR. SILVERMAN:  Hello, Your Honor.  Stephen Silverman from Gibson Dunn & Crutcher, LLP, on behalf of the Ad Hoc

Group of Secured Lenders.  I'm here with my colleague, AnnElyse Gains, as well.

THE COURT:  Good afternoon.  A 516 number?

MR. GRILLO:  Your Honor, that's me, Emanuel Grillo again, Orrick Herrington & Sutcliffe.  My partner, Laura Metzger, and others from my firm are on to listed as well.

THE COURT:  A 347 number?  A 347 number.  728, 347-728?

MR. DEUTSCH:  I'm sorry, Your Honor.  That's me.

THE COURT:  No worries.

MR. DEUTSCH:  Doug Deutsch from Clifford Chance, on behalf of ING Bank.

THE COURT:  All righty.  Good afternoon.  And another 347 number.  347-47 -- Yes?

MS. EPSTEIN:  Good afternoon.  Ella Epstein from Elsberg Baker & Maruri, on behalf of Evolution.

THE COURT:  All righty.  Good afternoon.  And a 312 number.

MR. McGUIRE:  Good afternoon, Your Honor.  Dan McGuire for Bank of America (indiscernible)

THE COURT:  Okay.  Good afternoon.

So appreciate everyone jumping on.  I wanted to just, I guess, share a few thoughts.  I thought it might be helpful because I know there's a number of issues related that we're going to have to tackle in connection with the factoring motion, in connection with the staging as well, and how that

gets scheduled, and what we can take up, and on what other dates.

And also, what I think I wanted to share with the parties was January 13th, in the afternoon, starting at 1:00, maybe go to 1:00 to 6:00, at least I'll carve those issues out in the afternoon, subject to someone telling me otherwise, if it works or not works.  So I'm happy to end at 5:00, but I can't go past 6:00.  I can hear arguments about kind of what I would call the legal procedural issues, about whether all of this requires an adversary proceeding, and whether the Debtors can proceed in connection with their motions on the scheduling.  And I'm going to be prepared to rule on that issue, and give a definitive answer on that.  So I'm not going to kind of wait step one, step two, and then kind of provide answers one way or the other on those issues.

And I think that, quite frankly, just requires legal argument, and I don't think I'll take evidence on that day.  So I think I can do that hybrid.  I don't think there's a difference between someone arguing virtually versus appearing in front of a microphone.  I know that there are some thoughts about evidence (indiscernible) differently, but this is just legal arguments, and I'm happy for parties to appear on those issues, and we can kind of take them up.  I'll let the Debtor go first on that, and then allow parties

who wish to oppose kind of going forward.

So that's kind of what I wanted to share, and then we can, I guess -- I don't want to pick another date.  I want to kind of rule definitely on the issues that I think I can on that date, and then kind of pick another date.  But it will be shortly thereafter.  It won't be long.  And then we can pick evidence, and pick a date from there.

So I think in terms of thinking about this on a final basis, Mr. Singh and others, I think my thought would be dual track, kind of, you know, kind of if anybody wants to take discovery or anything in the connection with this, we ought to just keep that going.  I don't want to kind of pause on the 13th and then push this out, because then that makes this motion turn into kind of a March motion as opposed to ruling on January.  If it's an adversary proceeding, well, everything stops there.  But I don't want to kind of stop it.

One, two -- I guess one related to the motion, one unrelated to the motion.  And I will say, I'm just going to write this down so I don't forget, I want to share some preliminary considerations as the parties kind of think about how to think about the motion at least from the way I'm reading it, and you all can tell me otherwise.  So I don't want anyone to comment on it, or to clarify things for me, but you all can -- I'm giving you -- it's not

preliminary rulings, but it's just the preliminary observations as to the way I think about the motion -- as I'm thinking about the motion, I should say.

One is, and I'm kind of putting to the side for now, I guess, what would be characterized category 1, which is where the Debtors believe that there's no -- if it was done, kind of the receivables don't relate to anything factored. Right?  And there is just -- that's a completely different kind of bucket for now.  I think in that instance, and I will say this procedurally, if the Debtors have the belief that those funds do not relate to any receivable, any accounts that have been factored, I don't think the Debtors need to start an adversary proceeding to prove what -- if they think.  Right?  That would just make every cash collateral motion at the beginning of a case an adversary proceeding.

So I think if somebody thinks that that money is, and I'm not saying it doesn't, I think then someone else is going to have to start that process to object to use of cash where the Debtor believes that it wants to use funds from receivables on accounts that it believes, according to its books and records, has never been factored.  And that's subject to someone's right, and I just think in terms of who starts it, I don't think the Debtor needs to start an adversary proceeding on those.  Again, parties can talk to

me differently about that.  And I know that there is discovery about category 1, category 2, and all the other categories, so I'll just try to -- I'll try to speak in terms of buckets as opposed to categories, because I think that gets a little confusing for purposes of where we are.

If there is a receivable, let's just say that the agreement provided that the Debtor may have been the original servicer, but that was changed, and the document provides for that.  I know some of the factoring agreements provided that kind of the servicing fee was kind of -- it appears, at least according to the docs, someone's going to have determine this, that the servicing fee that the Debtors would have received, or First Brands would have received, was kind of built into the purchase price.  And if the Debtor is no longer the servicer, and a third-party factor, you know, believes that certain funds are collectible from a customer -- I'm using as an example the invoice says it's invoice 123, and the customer has an invoice 123, and it perfectly aligns, right, there's no gray.  I'm not sure I have jurisdiction to get in the middle of that one way or the other, or to require a party to send the money to the Debtors, even though they're not the servicer, and the customer and the third party factor believe  everything's in alignment, there's no question about it.

Now, that could lead to a situation where perhaps there

are two parties that have invoice 123, based upon what I've heard from the customer.  Maybe this invoice 123 is one customer, but was sold to two factors.  Right?  Absent agreement of the parties, I think it would make sense that parties are going to have to tell me if they're going to want to deal with that outside of the Court or not.  But if you decide to deal with that outside of the Court, the thought that you're going to have an argument, a disagreement, and then get the Debtors involved in whatever litigation you want to have, I think you need to think about that.  You may not -- And maybe it's an issue.

That's just the consideration that I have, kind of getting the Debtors involved in that litigation that you may want to have with two parties and one invoice, or I think if there's an Examiner that's going to get appointed in short order, and that work is going to be done.  So the thought of kind of getting the Debtors involved in some kind of litigation before an Examiner report, I think I can -- I'm not sure what the parties would be intending, but it's a consideration for the parties, if they want to proceed outside of the Court.

But again, this is all -- it's all clean.  That's just the way I'm thinking about this.  I'm not ruling on anything today, it's just the way I'm thinking about considerations. If there is an invoice 123 on the customer side, and -- it's

just it doesn't perfectly align for whatever reason with what the third-party factor has on their end, right, for whatever reasons, and there could be a host of reasons, and I don't want to speculate.  Let's just say they don't align.  Maybe it was a typo.  Maybe there were other reasons.  I don't know.  I think my jurisdiction, I think, grows in that area, because I don't think -- I think if the customer were to ask me to consider holding those funds, I think I could do that.

And so I think legally, there may be an answer under the UCC.  And this is what I'm thinking about.  Maybe there's a legal answer under the UCC that says in these instances, that I think my jurisdiction --

But what I can do, under the Code, to at least have park the money somewhere until that issue gets resolved, is there -- you know.  Maybe everybody can agree that, you know, this really does relate to invoice 123, and then mine says 1234 but we all know it means 123, maybe there's an easy answer under applicable law that can resolve that issue.  But I think my jurisdiction to hold the cash, to require the Debtors to hold that cash until that gets resolved, that the Debtors may have an interest in that cash, and I think May is the answer.  I'm not making definitive rulings, but I think it's a much different question than when the invoices align, and the customer

believes that they can send that right to the third-party factor. And I'm not sure I can get involved in that, but I know that that was one of the stages that was considered as well.

So I think the murkier it gets with the invoices not lining up -- And I'm talking on behalf of third-party factor side and customer side, I think, I think I can do -- I think my jurisdiction grows a little bit more to kind of handle that, because the Debtor may have an interest. It may be proper to the extent, the nature and the extent of it. I don't know. Maybe it turns out they have a lot, maybe it turns out they have none. But I think I get concerned about potential customers holding money, and by no nefarious means at all just dissipating the funds. So we spend a lot of time determining something, and then the money's gone, for whatever reason. They had to use it, some other rights -- And I would feel a lot more comfortable that if it was Debtor money, that it was here. And then, if it turns out not to be Debtor money, that then it goes somewhere.

So preliminary thoughts on kind of -- And I know that there are other categories. I'm just giving the ones that I'm thinking about, and then parties can think about that.

The Debtor's ability to use funds where it's unclear, you know, absent agreement of the parties, I think I would need to have a little bit more law to get comfortable that

the Debtor could use that cash.  Just my -- And I don't want to kind of blindside anyone with these questions.  These are kind of things that I'm thinking about.  You know, maybe the Debtor could -- I know the Debtor wants to use some of the funds, and provide an admin claim on the back end.  But just legally, you know, let's turn out that the Debtor's  wrong on some of this analysis, could I have even done it in the first place?  I just want to feel comfortable that that's even legally permissible.  If a Debtor doesn't own the money, or ownership is in dispute, how do you then resolve that issue?  And that's going to be things that I'm -- I'm not so sure just jump off the page when you just read the motion with the objections.  But I want to make sure that I'm kind of communicating that up front now, than kind of surprising parties with these questions when we were just supposed to take up whether there could be an adversary proceeding or not.

But I do think these issues relate, whether there could be an adversary proceeding, and then who would start that adversary proceeding?  If the Debtor is unsure whether it has an ownership interest in the cash, it may be the Debtor that has to start that adversary proceeding.  Because the Debtor wants to use cash that it doesn't -- unless it has a clear answer for me on law -- absent agreement of the parties, I think parties can think about this, and figure

out where they go, I'm not going to get in the way of agreement between the parties, and process, if the parties agree to a process, I think.  But if there's a real disagreement about uses of invoices, A, B, C, D, and I know that there's discovery going on, so I don't want to kind of get in the middle of all that -- It's just the way I'm thinking about it in terms of what I think I have jurisdiction to do, and the way I'm --

So that's all I really had to say in terms of connection with kind of the factoring motion, and what parties can think about.  But Mr. Singh, you ought to be prepared to put on your case.  It's just these are the kind of the preliminary questions that I know in my mind.  There may be more, but at least I wanted to kind of put those things out there.  And as well as, for the third-party factoring parties as well, anybody else who --

The other thing, and I'm just kind of putting it out there now because I see the parties involved, I've been looking at a number of 2004 requests.  And I think the Committee has the right to request them, but 2004s, the operative language is that the Court may permit them.  And I'm not going to -- I don't want any 2004s right now going forward, and parties responding to them until -- the Examiner has to go first on all of them.  It's without prejudice, asking for it at another time.  And if it's

unrelated to Examiner work, I think 2004s are fair game. But right now, the Examiner's got to get appointed.  The Examiner has to -- we've got to figure it -- I've got to get that going.  And I don't want the Examiner in a position where the Examiner is getting discovery that other parties have essentially produced to the other side, and I think the Examiner's got to take the lead on that, and I don't want -- I don't want to call it duplication of effort at this point. I just want the Examiner to go first.

I understand why the Committee is serving parties, and I think it all makes sense.  And just the statute says May. I'm just telling you which way I'm leaning.  The Committee can try to convince me otherwise.  It's not for today, but I am going to have to set a day where I take up a number of motions to quash.  I know, I'm aware of one.  I've been on the bench for a while, so -- this morning, so there may be more.  I don't want to get in that.  And I'm not saying no, but -- And I don't want to -- I'm not going through every 2004, nor have I, to then determine what relates to work that the Examiner is doing.  But if it's Examiner work, I want the Examiner to take the lead at this time, without prejudice.  Maybe the Committee can get access to some of it.  I don't know.  But that's another conversation for another time.

But I think in the adversary, and if there's other

2004s that relate to work that the Examiner is going to squarely take on, that was an agreed order, and I'm going to uphold it.  And I want the Examiner to go first.  If the Committee wants to convince me otherwise, I promise you I'm going to set a date, and maybe I can be moved otherwise. But I don't want -- I think everything freezes until I hold that hearing in connection with the 2004s that have been -- unless they relate to matters that have nothing to do with what the Examiner is within the square of the scope.  But I've got to get an Examiner on in the next two weeks, so maybe all this is just academic.  Maybe there are additional things that make sense to do so.

But I think for now, over the next 30, 45 days, the parties -- my goal is to get an Examiner up and running, understand kind of what the next 60, 90 days of this case look like, and then tee issues up and take them in the ordinary course.  That's really what I wanted to say.  I would prefer -- I know if I open one door, I'm going to open up 40 of them.  And I think parties would be right, and I don't want anyone -- I just want everybody to think about the things that were on my mind.  I thought it was fair to kind of put it out, and that's really all I had to say.

So that's all I had, folks.  I didn't want this to be long, it's December 30th, for my drafting --

MR. GRILLO:  Your Honor?

THE COURT:  Yeah?

MR. GRILLO:  I just have a clarifying question about an earlier comment, before I lose track of it, for a second. It's Emanuel Grillo again.

With respect to the hearing on the 13th, you said we were going to look at the legal issue about whether or not we need an adversary proceeding.  So the objections for that hearing I think are presently due on the 6th.  Are we limiting the objections and the scope of that hearing to the adversary, or is it for all the objections (indiscernible)

THE COURT:  No.  No, get your objection on.  I think, because the reality is I don't want you filing kind of a two-part, just whatever you were planning on filing by the 6th, that's the motion, get it all on the table.  I'm just telling you what I can -- In terms of the time that I have, hearing it on the 13th, and maybe it answers some questions, and maybe it doesn't.  But in other words, if I agree with the Debtors that this can proceed, your objection will be on file and it will just proceed normal course.  If not, then we'll pick something out, something else.  But I'd like to see ever -- I'd like to see all the objection on file, whatever the procedure is that's currently proposed by the Debtor.

MR. GRILLO:  Fair enough.  And then, just one follow-up question.  When Your Honor says that Your Honor is taking

evidence that day, is the evidence just (indiscernible)

THE COURT:  Not taking evidence.  Not taking evidence that day.  I should have clarified.

MR. GRILLO:  Not taking -- okay.  Understood.  Okay. Thank you.  (indiscernible)

THE COURT:  Yeah.  Yeah, I don't think -- In other words, that's why I think we can do this -- yeah.  I think we can do this hybrid because I don't think we're going to take evidence up, and I think parties can keep their witnesses.  But in other words, this is -- this really just Bankruptcy Code, bankruptcy rules, and we'll take it up from there, but with the considerations that I have.  And so in other words, we're not going to dig into the A&M work, and what parties think about it, and things of that nature, and you know, that's not -- that's not going to be a subject for the 13th.  It's just going to be presuming the Debtor has made procedures, do I, you know, do I have jurisdiction -- you know, kind of what's the legal issues related to the procedures?  And then, parties can then --

But I do want them dual tracking to the extent possible.  If you have any discovery related to -- you know. And I know that's already started, in terms of category 1 kind of, so all that should just continue.

So it's going to be, I think it will be a hybrid hearing, but I see no difference between people arguing in

the front of the microphone legally here, or virtually, but you all get to pick.  But I don't need people -- I think if we had an evidentiary hearing in stage 2, that parties would have to come in person on that.

MR. ELSBERG:  Your Honor, if I could ask a question?

THE COURT:  Yes.  Just state your name for the record.  And just where -- I've just got to find --

MR. ELSBERG:  This is David -- this is David Elsberg (indiscernible)

THE COURT:  Oh, Mr. Ellsberg.  Yes, yes.  Sorry, I had to find the box.  I apologize.

MR. ELSBERG:  No, no.  Thank you, Your Honor.

So I just want to get some clarity.  I'm frankly not sure whether Your Honor has already ruled, I think you have, that money can leave the factored receivables account so that there will be less than $60.5 million available to Evolution.  And whether Your Honor has ruled that Evolution does not have a first priority (indiscernible)

THE COURT:  No, I don't think I've ruled on that issue.  I just said preliminarily.  And I think I was pretty clear on that.  I think -- In other words, that's a related issue, actually, you know?  Kind of -- I don't think I've -- I don't think I've definitively ruled on it.  I ruled on it for purposes of kind of, you know, could the Court even go forward and grant relief like that?  And I think

preliminarily, you know my thoughts.  But I'm going to give you an opportunity to kind of, if we get to the stage to -- I think, you know, you would be able to come in and say, Lopez, you know, look at this one, you know?  Look at these -- look at these.  Maybe there are some additional things out there, maybe some additional case law out there that I just didn't catch.

MR. ELSBERG:  Okay.  And does that -- Again (indiscernible)

THE COURT:  I mean, but you know where I'm preliminarily leaning.  I didn't hide the cards on that one, just to kind of tell you which way it is.

MR. ELSBERG:  Yeah.

THE COURT:  But we'll see.

MR. ELSBERG:  But yeah, so as it stands now, are the Debtors permitted to move money out of the factored receivables account, that would leave less than $60.5 million available to Evolution, or (indiscernible)

THE COURT:  Yeah, my ruling was the ruling, and I don't think it applied to anyone.  I think everyone's getting adequate protection, because I don't think that you're first.

MR. ELSBERG:  Okay.  (indiscernible)

THE COURT:  And I certainly don't think, I don't -- Yeah, go ahead.

MR. ELSBERG:  Yeah, Your Honor, so if Your Honor (indiscernible)

THE COURT:  No, no, in other words, the ruling was the ruling, and I'm not going back on what I did.  Whatever I signed, I signed, and whatever the order -- whatever the Debtors can do, the Debtors can do.  So I don't think you need clarity on that.  I ruled on that.

MR. ELSBERG:  I'm not sure -- I'm not sure -- I thought an order was going to be submitted today.  I didn't realize one had already been (indiscernible)

THE COURT:  Ah.  Well, you'll see it.  It's whatever I ruled, there will be an order that reflects it.  I don't have the numbers in front of me, so I don't want to misspeak.  But whatever I ruled on that day is the ruling, and I'll sign an appropriate order related to that.  And I think, you know, I don't -- yeah.

MR. ELSBERG:  Okay.

THE COURT:  I think I -- You went forward on your lien motion, and I've ruled on it.  You wanted a ruling, and you got it.

MR. ELSBERG:  Okay.  All right.  So I think, just as a preview, that we'll be seeking an expedited appeal, and we'd like --

THE COURT:  You can file it.  I'm not -- I don't need previews.  I just need papers.

MR. ELSBERG:  (indiscernible)

THE COURT:  I just need papers on file, and I'll read it, and I'll consider it in the due course.  I don't know -- So you all can -- you all can have it.  You decided to go forward with the motion, and the Court's ruling.  I'm not taking up -- I'm not -- I'm only talking about the two things that I'm talking about today.  So --

MR. ELSBERG:  Understood.  So --

THE COURT:  Mr. Elsberg, you're trying to get stuff in. So I'm going to stop it now, and just when things get filed, you can file stuff, and then things will be taken up in the ordinary course.  But they -- So what else can we talk about?  What other clarifying questions about what I said today can we take up?

MR. SINGH:  Your Honor, may I be heard on it?  It's Sunny Singh (indiscernible)

THE COURT:  As long as it doesn't open up the door to more of what I did the other day.

MR. SINGH:  No, it won't, Your Honor.  I just want to be -- Just to clarify, we did submit the order.  Your Honor hasn't entered the order from the last hearing.

THE COURT:  Ah.  Where is it?

MR. SINGH:  I think that was (indiscernible)

THE COURT:  That's actually helpful.

MR. SINGH:  Yeah.  So I think we were waiting, Your

Honor.  It's been submitted, and I think, Your Honor, it includes the date for the next hearing is January 13th, and that was our understanding as to -- or at least our guess as to why Your Honor may not have entered it yet.

THE COURT:  No, no --

MR. SINGH:  But it is on the docket.

THE COURT:  It's -- yeah, let me see.  Can you tell me the docket number?  You don't have to tell me now, just before the end of the hearing.

MR. SINGH:  Yes, we can get that to you, absolutely. And Your Honor, it would be, from our perspective, and I can give you more guidance on what we see in January, generally for the case, Your Honor asked me about liquidity last week, I can give you some preview of that, or I can save it.  But I will say, Your Honor, it's essential that that order, allowing the $55-ish -- excuse me, up to $60 million, but I think we landed on $55 with M3, Your Honor, because I think there was some -- as I mentioned to you, there was going to be some post-hearing work on that, and so it's about $55 million would be released as soon as Your Honor enters the order.  (indiscernible)

THE COURT:  And then, so what's left?

MR. SINGH:  So then, what's left is roughly $62, and the Debtors are going to ask that $57 be released.  Because we agreed that about $5 million is money that, you know, in

some form or fashion is factored dollars, and we need to come back and have that be heard.  So for the next hearing (indiscernible)

THE COURT:  So (indiscernible) but isn't it more than $60.5?  I understand what we're talking about here.  I don't want to open up the door any more --

MR. SINGH:

THE COURT:  I don't want to -- I opened up my own door.  I will shut my own door.  I will shut my own door.

MR. SINGH:  Yeah (indiscernible)

THE COURT:  Someone just get me a docket number, I will sign it, and now there is $62 million out there.  And parties can read it, and then digest it, and then file whatever they wish, and I will focus on the hearing in front of me.

Yes?

MR. CASSEL:  Good afternoon, Your Honor.  Michael Cassel, Wachtell Lipton, for the Leucadia parties.  I understand your admonition not to open doors, the true clarifying question.  Your Honor is --

THE COURT:  No, no, I did it.  I did it to myself.

MR. CASSEL:  Your Honor's comment about the Rule 2004 as filed by the Committee --

THE COURT:  The?

MR. CASSEL:  The 2004 (indiscernible)

THE COURT:  Yes, yes.

MR. CASSEL:  The only concern there is the discovery that we are taking in connection with the factoring procedures motion does overlap a lot with what the Examiner is trying to do (indiscernible)

THE COURT:  Yeah, but I think -- that's what I'm saying.  If it relates to -- I was just talking about 2004 exams.  Now, what you're referring to, I think, is in a contested matter.

MR. CASSEL:  Right.  The contested matter that is currently before the Court.

THE COURT:  That is different than a 2004.

MR. CASSEL:  Yes.

THE COURT:  You wouldn't use a 2004 for a contested matter.

MR. CASSEL:  Of course not.  I just want (indiscernible)

THE COURT:  No, no, no, I got it.  It's a clarifying question.  I got it.  That's what I'm saying.  If it's a contested matter, and it relates to that, serve the discovery, and parties will have whatever rights they have with respect to the discovery.  I am only speaking about 2004 exams that I've seen, that I think I want the Examiner to take lead on those type of examinations.  If there's a pending contested matter, you have the right to take

whatever -- and as well as the Committee, take positions -- whatever.

MR. CASSEL:  Right.

THE COURT:  And I'm not saying the Committee is going to -- I'm just saying I want to get a hearing on it, and then, we can then take -- we can have a separate hearing on 2004s.

MR. CASSEL:  Right.

THE COURT:  Because the Committee may not be the only party that's serving them.

MR. CASSEL:  Right.  We're not serving 2004s.

THE COURT:  I'm just saying -- got it.

MR. CASSEL:  I just want to be completely clear, we can still go forward on our discovery with respect to this contested matter, and that's not (indiscernible)

THE COURT:  Yeah, if it relates to the contested matter, it's --

MR. CASSEL:  Yeah.

THE COURT:  Yeah.

MR. CASSEL:  I just wanted that so the record was clear on that point.

THE COURT:  Yep.  Yep.

MR. CASSEL:  Thank you Your Honor.

THE COURT:  Okay.

MR. SINGH:  Your Honor, I have the docket number for

you, if it's helpful.

THE COURT:  Okay.

MR. SINGH:  It's 1082.  It's our proposed order.

MS. EPSTEIN:  Your Honor, if I may be heard briefly, it's about this.  Ella Epstein from Elsberg Baker & Maruri.

I just wanted to flag for Your Honor that EBM, on behalf of Evolution, we did submit first to the Debtors, who rejected our proposed changes, and then before this hearing, to Your Honor's Court Deputy, a revised proposed form of order.  The revision (indiscernible) proposed changes that we think Your Honor should (indiscernible)

THE COURT:  And what's the docket number to that?

MS. EPSTEIN:  There is no docket number (indiscernible)

THE COURT:  If you emailed it directly, if you email proposed changes to an order that's found on the docket, can you please -- I will read them.  If you put them on the docket, I'll read them.  If it's just to my Case Manager, I think everybody gets the chance to read them, and I'll enter an order.

MS. EPSTEIN:  We'll put them on the docket as soon as (indiscernible) Thank you.

THE COURT:  Okay.  Thank you.

MR. SINGH:  And Your Honor, I'm happy to explain why we rejected those changes.  I know you haven't seen them, but --

THE COURT:  I haven't seen them.

MR. SINGH:  Yeah.  I mean, just to give you an example, it includes one very problematic change, which is that there would be -- Your Honor's order is not effective for two weeks from its entry, which as you just heard Mr. Elsberg say, he's planning on appealing, which he's free to do, but you know, they're not entitled to (indiscernible) stay pending (indiscernible)

THE COURT:  Even though there's -- No, I'm just saying -- but that's what I'm saying.  I can't -- I will -- I've ruled on the issue.  The ruling was a ruling, and parties -- right.  But now there's $62 million.  I don't even know -- I mean, maybe he reads it.  Maybe I'll read it.  Maybe you still want to appeal even though there's more than $60.5, which was the basis of your opinion -- of your objection.  Maybe you think -- I don't know.  But I'll rule, and parties will do what they want to do with it.

MR. SINGH:  Yeah.  Understood, Your Honor.  I just wanted to (indiscernible)

THE COURT:  And I'm -- Maybe you do.  I'm just saying, I don't -- You can -- If you file the comments, I will read them, and I'll go back and look at the transcript, and see exactly, exactly how I ruled, and -- It's just going to be consistent with what I ruled on on that day, and what was asked of me on that day.  So --

MS. EPSTEIN:  Your Honor (indiscernible) we have responses to the Debtor's objections to our proposed amendments.  Would it be helpful for us to file a brief letter explaining each of the changes (indiscernible)

THE COURT:  No.  No.  Because it's just me looking at a transcript.

MS. EPSTEIN:  Understood.

MS. SINGH:  I think, Your Honor, from the Debtor's perspective --

THE COURT:  I just -- I just want it on the docket so that everybody can see it, just so there's transparency about the process.  That's really all I'm asking for.  I can go back and look, and -- It will be my order, so I'll just kind of go back, and -- And I assume I know what's going on. But y'all are going to have -- But then -- I don't know.

I think -- and I'm going back to opening the doors here.  Mr. Elsberg said he won more than $60.5 million, and now there's $62 million, from what I'm hearing.  Maybe he doesn't want to appeal anymore.  Maybe he does.  I get out of the appeal business.  That is outside of my -- that goes upstairs, and I stay on the fourth floor.  Whatever parties choose to do, they have the absolute right to do so, and I will read it, and I will enter the order, and the parties have whatever rights they have.  If I do have questions, I promise I won't enter the order without kind of calling a

hearing, if I have questions.  But I'd rather just read it, and if I have -- if I feel comfortable entering the order, I'll enter the order.  If there's some questions that I have, and I've done this in the past, I'll call the parties in and just say, you know, I have questions about this one way or the other.  But I'll just leave it there.

MS. EPSTEIN:  Understood.  Thank you.

MR. ELSBERG:  Your Honor, just one sentence.  My understanding is that the amount that is being capped is $24 million less than the $60.5 million that would cover Evolution's claim.  I just wanted to say that because you mentioned the $60.5, the $60.5 million.

THE COURT:  I'm confused by that, I've got to be honest with you, Mr. Elsberg.  But your rights --

MR. ELSBERG:  Yeah (indiscernible)

THE COURT:  No, but in other words -- I'm confused by that.  Because I'm now -- And then, you know, what ends up happening is I end up opening doors, and then people quote it to the District Court that I said this on the hearing, after the hearing, and so I say nothing.

Let's talk about the motions.

And just to protect all parties, the transcript will be -- the ruling, the order will say what it says.  If I have questions, I want to be very mindful of that, because I don't want to change in an even -- you know, change the

record in any way.  The record is the record, the ruling was the ruling, and I will get an order on file, and allow parties the process to play out.

Yes?

MR. SINGH:  Thank you, Your Honor.  All I would just say is --

THE COURT:  No, no, no, don't do it.  Don't do it.  Just get the -- And I'll just --

MR. SINGH:  Just the timing -- I just need timing, Your Honor.  These funds are critical, so if Your Honor does want a hearing, all I would say is that we can do that as soon as possible.  But I'm not going to --

THE COURT:  I promise you -- No, yeah, it will be -- yeah.  I got it.  Ms. Epstein is going to get it on the docket, and I will read it, and get an -- you know?  I'll make the call today.  I promise you that.

MR. SINGH:  That would be great (indiscernible) Your Honor.

MS. EPSTEIN:  We'll get a --

THE COURT:  One way or the other.

MS. EPSEIN:  We will get a --

MR. SINGH:  Yeah, that's all we would ask.

MR. WINOGRAD:  Your Honor, this is Michael Winograd from Brown Rudnick, for the Committee.  May I just say something clarifying, or ask the Court something about the

hearing on the 2004 motion that you mentioned?

THE COURT:  Yes.

MR. WINOGRAD:  So number one, just if it would be helpful, Your Honor, I'm sorry, if there's somebody in the courtroom -- related to what we were just talking about, if that would be easier for Your Honor (indiscernible)

THE COURT:  No.  No.  That page is turning.  So let's go.

MR. WINOGRAD:  Okay.  So Your Honor, if it would be helpful, yes, there are a number of hearings, and I just -- a number of motions on the file, the James motion and about six others.  I won't go through them.  The James motion and the Crighton motion are both fully briefed, as will be the Onset, and the Onset is scheduled for a hearing on January 7th.

THE COURT:  Ah.

MR. WINOGRAD:  I would suggest, if Your Honor is open to it, that we could have some sort of an omnibus hearing on January 7th.  And giving the Committee -- Honestly, to take you up on your offer to try and persuade you, we think this is very urgent.  As you hear, the Debtor is expressing the same sort of urgency with funds.  There are new facts that we want to inform the Court of that you'll see in the briefing, that I think will be fairly significant.  And I think the case law, I think ultimately, I won't argue now,

Your Honor, but I do ultimately think that the case law will suggest that we should move on in parallel.

THE COURT:  Yep.  Yep, I think that makes sense.  It looks like we have things scheduled at 9:00 and at 10:00 on that day.  It looks like the adversary at 9:00, and then what's at 10:00?  For some reason -- give me a second.  Yeah.  Oh, just -- But I'm trying to figure out what's scheduled in the main case.

MR. WINOGRAD:  I believe there was a notice of update for the Onset motion.

THE COURT:  Oh, ohh -- there is a motion, I think -- I know there's a motion scheduled in the adversary, right, about the insurance proceeds.  I think that's what's going forward at either 9:00 or 10:00.

Hmm.  Oh, the motion to intervene is scheduled at 9:00.  The Onset motion to intervene is scheduled at 9:00.  So why don't we just keep that there, keep Onset motion to intervene at 9:00, and then just maybe regardless of what time we finish, start at 10:00, and then we can add the 2004.  The fully briefed ones, if they're ripe for adjudication, we'll take them up on the 7th.

MR. WINOGRAD:  Great.

THE COURT:  Okay?  But --

MR. WINOGRAD:  And so that, Your Honor, will be after the 9:00 and 10:00 agenda items, it will be after that?

THE COURT:  I suspect so.  Yeah.  I don't know exactly everything that's scheduled on the 10th -- but yes.  The answer would be yes, we would add this to the back end of it.

I know one of the motions, for example, is the motion to allow the D&O proceeds to go, filed by, I think, the -- some of the directors, that's teed up for that day.  But the entire morning is available.  There's a motion to lift stay -- I think I can do it.  If not, we'll definitely do it on the 7th, even if we have to kind of move some stuff around, Mr. Winograd.

MR. WINOGRAD:  All right.  Thank you, Your Honor.

THE COURT:  What I would ask is that by January -- hmm, by January -- If you know by tomorrow, or by no later than January 5th, at noon -- well, no.  I would probably need to know by tomorrow.  If you can just let my Case Manager know exactly which ones we're -- you think, everybody thinks are fully teed up and ready to go, just so no one is surprised that we're taking it up on that day.

MR. WINOGRAD:  Absolutely, Your Honor.  And I think, Your Honor, it most likely will be James, Crighton, and Onset.  Others were an additional -- In addition to that, I think there were another four that have been filed in the last day or so, largely -- I don't know that any raise issues that are not raised in those three motions.

THE COURT:  Okay.  Okay.  Yeah, let's do that, let's take -- There may be someone else who may want to come in, and I'll leave it up to the parties.  But just by tomorrow, y'all let me know.

MR. WINOGRAD:  Yep.

THE COURT:  But those three, we can definitely take out.

MR. WINOGRAD:  Great.

THE COURT:  All right.

Yes?

MR. KELLEY:  I want to make sure, I'm in the Courtroom, and I want to make sure anyone else on the line has an opportunity to speak before I ask some clarifying questions.

THE COURT:  Okay.  Hold on, let me unmute one line.  I think that's the -- Or two lines.  There's a 212 number?

MR. STARK:  Your Honor, it's Robert Stark from Brown Rudnick.  I was just jumping in before Mr. Winograd stole all my thunder, so (indiscernible)

THE COURT:  Ah.  Apologies.

MR. STARK:  No worries.

THE COURT:  No worries.  Okay.  I think there's one more.  Another 212 number?

MR. TECCE:  Good afternoon, Your Honor.  It's James Tecce of Quinn Emanuel.  Can you hear me?

THE COURT:  Just fine, Mr. Tecce.

MR. TECCE:  (indiscernible)

THE COURT:  Mr. Tecce, since I've got you there, are you okay with teeing up -- I think you're already, there's probably going to be some stuff on January 7th.  Are you okay taking up the motion to quash on January 7th?

MR. TECCE:  I am, Your Honor.  I just wanted to make it clear that we were okay.

THE COURT:  Yep.

MR. TECCE:  It's our motion, but I'm quite happy to have Committee Counsel ask for it to be scheduled that day, if that works for you.  We'll be there, and ready to go on the 7th of January.

THE COURT:  Okay.  I didn't want to jam you up.  I just --

MR. TECCE:  (indiscernible)

THE COURT:  Yeah, I know you filed it.

MR. TECCE:  (indiscernible) language.

THE COURT:  Okay.  Perfect.  Thank you.

MR. TECCE:  Yep.  Thank you very much.

THE COURT:  All righty.

I will turn to you, and then I'll turn to Mr. Silverman.

MR. KELLEY:  Thank you, Your Honor.

On the 22nd, I think you learned that the submitted proposed form of order had been negotiated by a number of

the factoring receivables counterparties.

THE COURT:  Yep.

MR. KELLEY:  And you had raised the issue of bucket 1, and I think you heard at that hearing, we believe we may still have some claims into it.

THE COURT:  Correct.

MR. KELLEY:  So in the form of order that you just received a reference to the docket, I just want to draw your attention to on bucket 1, there's a 45-day period out where rights are going to cut off.  And we asked, and the parties agreed and put in there a blank, for the Court to put a status conference roughly 30 days out from when you sign the order on that bucket 1.  I'm just flagging that blank for you, Your Honor --

THE COURT:  No, that's fair game.

MR. KELLEY:  -- so that you will be mindful of that.  And there was a substantive reason we did that.  That was part of the negotiated procedure we put in place.  So that is something you'll have to plug in.  I just wanted to bring that to your attention.

THE COURT:  Okay.  Ms. Epstein, just out of curiosity, is your date -- are your comments -- do your comments go to the date as well?  Or is it just different?

MS. EPSTEIN:  Your Honor, was that question directed at Evolution?

THE COURT: Yeah. Yes, to you, actually. Just in terms of, like, there's a -- it looks like there's a date that has to get plugged in. I just wanted to know, is that something -- does that go to one of your comments, or no?

MS. EPSTEIN: For the record, Ella Epstein for Elsberg Baker & Maruri.

No, that is not one of our comments. We have some comments (indiscernible)

THE COURT: Okay.

MS. EPSTEIN: (indiscernible) adequate protection (indiscernible)

THE COURT: Ah, got it. Okay. Let's see --

MR. KELLEY: And that feeds my second question for clarification. So you may want to hear it now, and -- or --

THE COURT: I don't -- What's the question?

MR. KELLEY: hat was negotiated as part of our agreement to that order, because when we first (indiscernible) this case --

THE COURT: Are you say picking the date?

MR. KELLEY: The procedure to put that date in. Because what we had anticipated, Your Honor, was remember, the first day declaration was when the receivables counterparties first learned of allegations of potential inappropriate conduct. We did submit 2004s, and we've negotiated and reached agreement with the Debtors. They've

been out there -- That's what we've been getting discovery in on.  Because the factoring counterparties, you've heard me say since day one, we believe causes of action related to that are ours, we want to understand what's been going on. Those 2004s are out there.  It was after that that the Examiner issues, and scope and all was discussed.

We're sensitive to the Estate professionals doing multiple tests that look like the same thing the Examiner is doing, but the factoring counterparties have had pending discovery that we're hoping to get in, that will enable us to be in a position on that date that you're going to plug in.  I'm trying to link them together because you raised a question about 2004s.

THE COURT:  I'm just talking about motions to quash. There are motions, there are pending motions to quash.

MR. KELLEY:  Right.  But do you --

THE COURT:  Is someone seeking to quash your 2004?

MR. KELLEY:  Not at all.

THE COURT:  Then I've got no --

MR. KELLEY:  But the 2004 that we served does overlap substantively with some of the scope the Court has put on the Examiner's plate.

THE COURT:  I got it.  But I'm just talking about I've got pending motions to quash.  That's --

MR. KELLEY:  Then I --

THE COURT:  I've got to address those issues, and I just wanted to, more than anything else, put a freeze until I can decide the issues.  And I think --

MR. KELLEY:  Perfectly appropriate.  That's the clarification I was looking for.  It doesn't apply to our 2004, there is no motion to quash (indiscernible)

THE COURT:  It may, if somebody files an objection and moves to quash then.  That's what I'm saying.

MR. KELLEY:  Yeah, they've been on file for a couple of months, so I would be surprised.  But it does matter.

THE COURT:  Okay.

MR. KELLEY:  The point, I was looking for clarification, and I think you've answered that.

THE COURT:  Okay.

MR. KELLEY:  In that case then, the date is the thing that I drew your attention to, that we're looking at.

THE COURT:  Okay.  I will have --

MR. KELLEY:  And we requested roughly 30 days out from when the Court signs it, so we can study whatever discovery (indiscernible)

THE COURT:  Well, it gets tricky.  Right?  Does that mean (indiscernible)

MR. WINOGRAD:  (indiscernible)

THE COURT:  Well, I'm just going to --

MR. SINGH:  (indiscernible) protections (indiscernible)

THE COURT: Well, no, no. What I'm saying is it's probably going to be last week of February, because the first week of March I'm in trial, and that's, like, 30 days. So that --

MR. KELLEY: We understand (indiscernible)

THE COURT: February is that tricky month. No, I got it. I'll plug in a date.

MR. KELLEY: It was intended to give us legroom to be able to try to work through any issues, and if we can't, we know how to tee them up to the Court.

THE COURT: Okay.

MR. KELLEY: But those are the buckets 1 and 2, and we still have others on our buckets 2, 3, and 4 we still have our substantive issues on.

THE COURT: Okay.

MR. KELLEY: But I'm not reopening the door. I just wanted to (indiscernible)

THE COURT: Mr. Silverman?

MR. SILVERMAN: Thank you, Your Honor. Stephen Silverman from Gibson Dunn, on behalf of the Ad Hoc Group of Secured Lenders.

Given the liquidity backdrop kind of driving a lot of these discussions, I was hoping to offer up a bit of an update from the DIP lender standpoint, just as to process and timeline and thoughts on the cases as we move into

January.  If now is not the right time, I'm happy to go at the end.  Whatever you prefer.

THE COURT:  I think you are going to be the last comment, so --

MR. SILVERMAN:  I'll take it.  Thank you very much.

So obviously, these cases are at a bit of a critical inflection point.  The company is under a lot of pressure to preserve what our clients and the Debtors believe to be a pretty significant amount of value.  We've been working around the clock with the Debtors, their advisors, our clients before the holidays, through the holidays, to try to solve for what's a bona fide liquidity crunch.  That's really existential to every aspect of these cases across all stakeholders, in all of these disputes.  We're optimistic and confident that we're going to get there, but before we do, there is an incredible amount of complexity we're sifting through, both at the legal and commercial level, from a process standpoint.  And we feel like there's very little time to thread the needle on an optimal solution for these businesses, and execute on that solution in the right way.

With all the work we've been doing with Weil and the FAs, I think a few things have become pretty abundantly clear.  The first is that we need to move very expeditiously towards an exit from Chapter 11.  The second is that we need

to accomplish that objective in a really cost-effective way. And the third is I think we need to align with the company and other stakeholders in the very near term on a comprehensive path forward that's structured to build consensus across all stakeholders, and eliminate uncertainty.  We're making a lot of progress in formulating a holistic solution that we're hopeful to put in front of the Court in short order, that accounts for all these considerations, and that also recognizes the rights and interests of all the multiple constituencies in these cases. But we do want to make clear this process is not going to survive an extended period of litigation, nor will the DIP lenders continue to fund against that backdrop.  So we're trying to find something that works for everybody.  And just wanted to put on your radar that we'll be back in short order to share some thoughts and ideas with you, and we're hopeful that we can start moving promptly towards an exit. I just wanted to relay those thoughts before the conference concluded.  Thank you.

THE COURT:  No, I very much appreciate it.  And there's a lot of work to be done in the near term, and I appreciate everyone, and all the work of all the professionals involved.  I know this is -- there are a lot of moving pieces here, and a lot of interests that are being affected one way or the other in connection with this case.  And so

part of what you're hearing me do for all the parties is try to at least front load some of the questions that I have up front, to try to keep things as efficient as possible, and to give parties things to think about as we kind of go into a new year.  I'll set a status conference there.  If parties need hearings from me, I appreciate all the work there. Parties have rights.  We'll take them up in due course.

But I appreciate everyone working, and I do agree -- I think, you know, I'll take things one step at a time.  But I appreciate that there's a lot going on, and I'll just kind of -- I'll leave it there, and I wish everyone a happy new year.  Thank you very much.

(Proceedings adjourned at 2:54 PM.)

CERTIFICATION

I, Lindsay Peacock, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Lindsay Peacock

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date: January 2, 2025