## Exhibit 7

**Transcript for July 20, 2026 Hearing on LAM Parties' and Katsumi Servicing's Emergency Motions to Compel Production of Documents**

                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF TEXAS
                          HOUSTON DIVISION

                                    )  CASE NO: 25-90399-cml
                                    )
FIRST BRANDS GROUP LLC,             )  Houston, Texas
                                    )
          Debtor.                   )  Monday, July 20, 2026
                                    )
                                    )  10:02 a.m. to 11:46 a.m.
-----------------------------)
FIRST BRANDS GROUP, LLC et al.)     CASE NO: 25-03803-cml
                                    )  ADVERSARY
              Plaintiffs,     )
                                    )
     Vs.                      )
                                    )
SEALED DEFENDANTS et al.      )
                                    )
                 Defendants.  )
-----------------------------)


                          STATUS CONFERENCE

          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Debtor:              CLIFFORD WILLIAM CARLSON
                         Weil Gotshal and Manges LLP
                         700 Louisiana Street
                         Houston, TX 77002


For Katsumi Servicing:   CHARLES S. KELLEY
                         Mayer Brown LLP
                         700 Louisiana Street, Suite 3400
                         Houston, TX 77002

For Leucadia Asset       PAUL E. HEATH
Management:              Wachtell, Lipton, Rosen & Katz and
                         Vinson & Elkins LLP
                         845 Texas Avenue, Suite 4700
                         Houston, TX 77002

                              EMIL A. KLEINHAUS
                              Wachtell, Lipton, Rosen & Katz and
                              Vinson & Elkins LLP
                              51 West 52nd Street
                              New York, NY 10019

For Evolution Credit         MICHAEL DUKE
Partners:                    Elsberg Baker & Maruri PLLC
                             One Penn Plaza, Suite 4015
                             New York, NY 10119

For Onset Financial &        ERIN DEXTER
Silver Point Capital:        Milbank LLP
                             1101 New York Avenue NW
                             Washington, DC 20005

For Unsecured Creditors      MICHAEL WINOGRAD
Committee:                   Brown Rudnick LLP
                             7 Times Square
                             New York, NY 10036

For Ad Hoc Group of          ANNELYSE SCARLETT GAINS
Lenders:                     Gibson, Dunn & Crutcher LLP
                             1050 Connecticut Avenue, N.W.
                             Washington, DC 20036

Court Reporter:              YESENIA LILA

Courtroom Deputy:            YESENIA LILA

Transcribed by:              Veritext Legal Solutions
                             330 Old Country Road, Suite 300
                             Mineola, NY 11501
                             Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

HOUSTON, TEXAS; MONDAY, JULY 20, 2026; 11:46 AM

(Call to Order)

THE COURT:  Good morning.  This is Judge Lopez. Today is July 20.  I'm going to call First Brands first in the adversary proceeding and then I'm going to call the main Chapter 11 case in connection with a motion to compel and I think some other matters.

First, with respect to the adversary proceeding in 25-03803, Court had granted the Government's motion in this case to have abate -- essentially abate this case until the criminal court had entered.  I had entered an order doing that, but I wanted to hold a status conference on July 31st -- excuse me -- on July 20th because there were a number of hearings that were going to be set before the -- in the criminal docket and in New York and I wanted to make sure that we were kind of proceeding accordingly.

The parties have entered on the docket status reports.  The United States has filed one, and a status report by First Brands and other parties, and including the Defendants in this case.  Based upon the status reports provided and the order said that we were going to have a status conference, so is the status conference.  I think based upon everything that I've heard, I'm going to continue to extend the stay and abate these proceedings, consistent with the prior order.

I know that there's a trial schedule, it sounds like for February of next year.  What I would ask the parties is to provide me another status report and I'll rule on the papers.  Monday, November 23rd, you can provide me another status report.  Thanksgiving is, like, the 26th or 27th, somewhere around that Thursday, so I'm asking for kind of a report on that Monday, just another similar status report and I can rule on the papers.  Sometimes, things change between now and then.  Right now, it sounds like there's a trial scheduled for February, but if something changes between now and I then, I think November would be appropriate.

I've read all the papers and I understand everyone's position.  I very much appreciate it.  Everyone's rights are preserved.  And so, I'll just enter a short order extending everything, and I will, quite frankly, to the conclusion of the trial, but I'm going to hold another status conference -- hold another -- ask the parties for another status report to determine whether dates should be changed in accordance with what happens between now and then.  That way, we're just not waiting until essentially next year to do something if there's something that could be done based on the facts that occurred -- I don't know -- in 60 days from now just in case things changed, and I'd rather not just put a date out there.  So I think a status report,

November 23rd, is what I would ask for.  So I thank all the parties.  That's all I wanted to say on that today.

I'm going to turn to the First Brands matters in the main case and parties are free to log off for the other one.  Thank you.  I'm going to -- wait, let me make a note to myself so I don't forget what I just said.

Okay, Mr. Carlson.

MR. CARLSON:  Good morning, Your Honor.  Cliff Carlson of Weil, Gotshal on behalf of the Debtors.  Joining me in the courtroom is Ted Tsekerides, and then we've got Matt Barr, Sunny Singh, and Christine Calabrese joining virtually.

THE COURT:  Okay.  Good morning.

MR. CARLSON:  Your Honor, we've got two matters.

THE COURT:  Go ahead and just give me the general overview and then I'll take appearances, then we'll see where we go.

MR. CARLSON:  We've got an consensual exclusivity order that we filed on Friday.  We had one objection that was filed by Onset.  We've since resolved that objection by carving out of exclusivity the Carnaby debtors; those are the boxes at which Onset asserts claims at the SPVs.  And so, we filed that at Docket Number 3522.

THE COURT:  Okay, that's what I was trying to figure out.  So 3522, that has the carveout in it already?

MR. CARLSON:  Correct.

THE COURT:  Okay.  I'll get that signed and on the docket.

MR. CARLSON:  Great, thank you.  And the only other matters are the discovery motions filed by Katsumi and the LAM parties, so I'll turn it over to them to put on their motions.

THE COURT:  Okay.  Why don't I just take appearances then for those who will appear in connection for Katsumi and LAM parties.  Good morning.

MR. KELLEY:  Your Honor, good morning.  Charles Kelley from Mayer Brown on behalf of the Katsumi Servicing party.  I'm joined online by a couple of colleagues, Sean Scott and Rich Stieglitz.  I'll let the Leucadia parties introduce themselves.

THE COURT:  All righty.  Thank you.

MR. HEATH:  Good afternoon -- good morning, I should say, Your Honor.  Paul Heath of Vinson & Elkins on behalf of the Leucadia parties, also referred to as the LAM parties.  I'm joined in the virtual courtroom by Emil Kleinhaus and Michael Castle with the Wachtell, Lipton, Rosen & Katz firm.  I believe Mr. Kleinhaus will be handling the argument on the motion to compel and address the Debtor's response.

Thank you, Your Honor.

THE COURT:  Thank you.  Mr. Kleinhaus at 3229, that's the one, right, 3229?

CLERK:  You're right, 3229 (indiscernible).

THE COURT:  No, no, just making sure.  All right, here's a 212 number.

MR. KLEINHAUS:  Good morning, Your Honor.  It's Emil Kleinhaus.  I'm with Mr. Heath, representing the LAM parties and look forward to addressing the Court.  Thank you.

THE COURT:  Thank you.  A 212 number.

MR. DUKE:  Good morning, Your Honor.  Michael Duke from Elsberg, Baker & Maruri on behalf of the Evolution entities.  We filed a joinder, so I'm appearing with respect to that.  Thank you.

THE COURT:  Thank you.  Good morning.  And a 202 number.

MS. DEXTER:  Your Honor, Erin Dexter from Milbank LLP on behalf of Onset.  Good morning.  Like Mr. Duke, Onset also filed a statement in support of the motion to compel and we're here in that capacity this morning.

THE COURT:  Okay, good morning.  And it looks like there's a 917 number.

MR. WINOGRAD:  Good morning, Your Honor.  This is Michael Winograd on behalf of the Committee.

THE COURT:  Good morning, Mr. Winograd.

MR. WINOGRAD:  Good morning, Your Honor.

THE COURT:  All righty.  I have unmuted your line -- one more, an 847 number.

MS. GAINS:  Good morning, Your Honor.  For the record, this is AnnElyse Gains with Gibson Dunn on behalf of the Ad Hoc Group.

THE COURT:  All righty.  Good morning.

MS. GAINS:  Thank you, Your Honor.

THE COURT:  If I have unmuted your line, please just keep it mute unless you're wanting to -- until it's time to address the Court just so we can all hear each other.  Just give me one second.

It looks like LAM filed it first, then Katsumi. Do y'all have a preference as to who goes first?

MR. KELLEY:  We've actually tried to coordinate, Your Honor.  We've tried not to duplicate what we drafted so you wouldn't have to read the same thing twice, and I believe Mr. Kleinhaus will speak first.

THE COURT:  Mr. Kelley, good morning.

MR. KLEINHAUS:  Good morning, Your Honor, and good morning, everybody.  Emil Kleinhaus, Wachtell, Lipton, Rosen & Katz, on behalf of the LAM parties.  The LAM parties, as Your Honor knows, are factor and counterparties of the Debtors that have filed nearly $1 billion of claims arising out the Debtor's fraud and as well as contractual claims.

Your Honor, the LAM parties were not involved in the mediation or the negotiations of the plan and, as we previewed at the disclosure statement hearing, the LAM parties do intend to object to the plan on multiple grounds. The objection deadline happens to be today and we are prepared to file our objection today, unless there's some change to the schedule.

We're here this morning on a motion to compel.  We filed the motion on Wednesday after we weren't able to get to consensual resolution on the issues; that's Docket 3210. The Debtors responded on Friday evening.  We filed a short reply yesterday; that's Docket 3241.  It was filed late on the -- right as the World Cup match was beginning, so it's possible people didn't pay much attention, but it is there on the docket, the reply.

So understanding that a discovery motion of this kind imposes a burden on the Court and there's a lot of statements about the record and the like, we tried to be very clear and specific in our reply about what issues have been resolved and what issues have not been resolved.  And I'm going to try to take the same approach today to go through what we think there's been progress on and what we think is still open for resolution that I know Mr. Kelley has some issues he's raised on behalf of Katsumi.

So why don't I start with the issues that I think

have been resolved, or at least where I think there's been some progress.  First of all, when we filed our motion, the Debtors were taking the position that mediation privilege covered communications up to the present after the mediation ended on March 27th.  They subsequently backed off that position in an email sent soon after we filed our reply, and I think their objection is likewise clear on this, that they're no longer asserting mediation privilege for the period after the mediation ended on March 27th.  So I think -- subject to the Debtors correcting me, I think that issue is off the table.

The second issue where I think there's been some progress is the privilege log.  When we filed our motion on Wednesday, we did not have a clear commitment from the Debtors to provide any kind of privilege log.  In fact, their email of July 9th had said there was no obligation to provide a log.  In the objection filed on Friday evening, the Debtors have committed to provide a categorical privilege log, which is a step forward.

At the same time, they still haven't made clear whether they intend to collect and review the communications from the period or the periods when they say that privilege applies.  We're okay with a categorical privilege log -- we've never insisted on a document-by-document log -- assuming it's sufficiently detailed.  But using a

categorical approach doesn't excuse the Debtors from actually reviewing documents in categories where there could be both privileged and non-privileged documents.  It also doesn't excuse the Debtors from providing enough information to satisfy Rule 26(b)(5)(A).  So it is a step in the right direction that we're getting a log, but there are still open questions on the form of the log that I hope will be addressed by Debtor's counsel.

So those are two areas where I think there have been progress, either resolution or progress with those couple of caveats on the form of the privilege log.

There are other issues that I believe are still open and in dispute and I'm going to address three of them as briefly as possible.  But the first are documents relating to the sale process and, in particular, communications with the ad hoc group regarding the sale of the Debtor's assets.

Now, Your Honor, the plan proponents did not have to structure the plan as a sale.  They could have provided for a contribution of estate assets to a trust.  There are various ways that this plan could have been structured.  But what they've done is they've sought to embed a Section 363 sale in a Chapter 11 plan.  They're purported to conduct a marketing process.  And they're expressly seeking relief under Section 363 of the Bankruptcy Code, including, in

particular, Section 363(m), and that's important because they want the Court to make Section 363(m) findings that would insulate this confirmation order from any appeal.

So, Your Honor, given that the Debtors here are seeking relief under Section 363, including findings that the sale is for value and in good faith, we've taken discovery focused on the sale.  And, in particular, we've tried to figure out what information was provided to third-party bidders, what information was provided to the ad hoc group, which is putting in a credit bid, and did the ad hoc group get more information than other bidders.  The last question is relevant because it goes to whether there was a level playing field among bidders and an adequate process.

Now, Your Honor, we don't yet have a privilege log of any kind, so we don't know exactly what's being withheld.  But based on all the back and forth, the Debtors appear to be taking the position that any and all communications with the ad hoc group about the assets being sold, namely the estate causes of action, are subject to a common interest privilege.  And, respectfully, we don't think that position survives scrutiny.

First of all, whatever factual information was transmitted to the ad hoc group before in connection with their bidding for the assets in a competitive process, that's not privileged if it's factual information.  So, for

example, if the Debtors sent communication to the ad hoc group transmitting historical documents or presented factual information about transactions or historical events, there's no basis to withhold that kind of factual information so we can see what information was provided to bidders.  It should be produced.

And based on the limited discovery we have received, we have every reason to believe the Debtors did share that kind of information with the ad hoc group.  Over the weekend and while we've been trying to review the thousands of documents that were produced on Friday, we came across an email showing that the Debtors made a presentation to the ad hoc group around April 23rd.  We supplemented our exhibit list this morning to add that email.

The emails also shows that the Debtors shared information with the person who may be appointed at the litigation trustee, who, as we can tell, wouldn't be subject to any privilege right now.  So there's clearly a body of information that was shared with the ad hoc group in connection with their credit bid, and we're entitled to know what was shared and how it compares to what other bidders received.

Now, the Debtors may say that beyond whatever factual information has been shared, they also shared information with the ad hoc group on a common interest basis

that was subject to attorney-client privilege at the outset, not factual information.

Now, we're skeptical, Your Honor, that there's a valid privilege claim here as to all those documents for a couple of reasons.  One is that, at least since the first plan was proposed, the ad hoc group is a bidder in an open auction.  So it's hard to see how a bidder and a seller have a common interest when one side wants to pay as little as possible, the other side wants to get as much as possible. The other point, Your Honor, is that the Fifth Circuit in the United States v. Brown case has articulated a rather narrow view of common interest, which really focuses on communications between co-defendants in actual or potential litigation.

But, Your Honor, the right way to approach this is not for the Court to make some kind of common interest decision in the abstract.  What we would ask the Court to do is to direct the Debtors to collect and review the relevant communications, produce anything that's in the nature of factual information that is not privileged at all.  And if they believe they have a valid privilege claim, they need to assert it in a normal way through a privilege log, which can a categorical privilege log, so we and, if necessary, the Court are in a position to actually evaluate and test that privilege.  But this sweeping common interest privilege

assertion on a matter that the Debtors have put at issue by asking for 363(m) findings and the like, we don't think holds up.  So that's the first point we remain open -- we believe remains open.

Unless Your Honor has any questions, I'll turn to what I believe the next point is.

THE COURT:  Okay.  No questions at this time. Thank you.

MR. KLEINHAUS:  Okay.  So the second issue that we've raised in our motion relates to the special committee's investigation.  We know the Debtor's professionals conducted a broad ranging investigation and reached conclusions.  We know that from various A&M declaration and the like.

We asked for documents relating to that investigation and the Debtors asserts privilege, presumable because the investigation has been conducted by or directed by counsel.  Now, Your Honor, that privilege assertion may well have been justified.  We don't take issue with it in some categorical general way.  The problem is that after asserting privilege, the Debtors on July 14th filed an 112- page declaration from Charles Moore that, in our view, selectively discloses the results of that investigation.

What do I mean by selective disclosure? Throughout this declaration, they start paragraphs with

statements like, our investigation uncovered, our investigation found, and this issue comes up in a particularly acute way in the section of the declaration that deals with the estate causes of action that the Debtors are selling and which are the basis for their feasibility position.

Now, Mr. Moore has no personal knowledge of the historical facts -- we don't think he does -- relating to factoring or those causes of action.  He's an A&M professional who was retained for this bankruptcy, so he's not a fact witness in any traditional sense talking about facts he knows about pre-bankruptcy.  But he still has a whole section in his declaration, multiple sections; one of them starts in Paragraph 85 in which he states conclusions about what he believes Katsumi, Leucadia, and others knew or should have known about the Debtor's fraud and where he contends they were presented with red flags and the like.

Now, since Mr. Moore has no personal knowledge of any of this, the only fair description of what he's doing is he's presenting investigation results in a curated way that he and his counsel have decided will benefit their case. Now, if Mr. Moore wants to give this kind of testimony, essentially the special committee did an investigation and concluded X, Y, and Z, that may or may not be okay.  But they can't just present a selective curated version of the

investigation results without producing the broader investigation file, including whatever materials from the investigation either support or don't support what Mr. Moore is saying.  Again, we're hampered because the Debtors have not yet produced a privilege log, so we don't know what's being withheld and can't address this in a concrete way.

But what we would ask the Court to do is to tell the Debtors that if they want to present this testimony from Mr. Moore, this category of testimony, they need to produce the materials from the investigation that relate to the same subject matter.  It's not -- it doesn't work to have someone without firsthand, personal knowledge testify about an investigation and essentially take what could only be described as a portion of a trial brief, put it into his declaration, and claim that that's his testimony, and then not open up discovery to the underlying materials.  It's a sword-shield problem, as we tried to explain in our motion to compel.

So last point, Your Honor, interrogatories, and I'll just be brief on this because we outlined in our motion to compel.  We served a bunch of interrogatories and, given the timeframe here to try to cut some of these discovery issues, we asked for some facts and then we asked for some contentions.  The Debtors really didn't respond to them in a complete or clear way; they deferred the response.

And I don't want to go back over the blow-by-blow, but we did, in our motion to compel, ask for certain particular interrogatories to be responded to, which we think we're entitled as a matter of discovery, and we haven't been able to get responses without seeking court intervention in Interrogatories 5, 6, and 8, in particular. We're not even asking to compel responses to the full interrogatories.

We're asking to compel response to the specific factual question: what information was shared with bidders in general, what information was shared with the ad hoc group, and this is regarding the assets being sold, and is there a difference between those two sets of information. That's a factual question.  It doesn't call for privilege. We're not asking even on this one, give us the information. I talked about that earlier.  It's just answer the factual question, what information was provided and compare that.

We haven't been able to get a straight answer.  We hope the Debtors will give us that answer.  We also --

THE COURT:  Mr. Kleinhaus, just one question.

MR. KLEINHAUS:  Sure.

THE COURT:  I'm taking down a flurry of notes here.  What is your understanding on the special committee as to who is asserting the privilege: is it the Debtors or is it the special committee or is it both?

MR. KLEINHAUS:  I understand it's the Debtors.

THE COURT:  Okay.

MR. KLEINHAUS:  I don't know whether they're separately asserting a special committee privilege.

THE COURT:  Okay.  I apologize, I cut you off.

MR. KLEINHAUS:  No problem, Your Honor.  Thank you.

The other category of interrogatories, we served a small number of really contention interrogatories where we just wanted to be clear as to what the Debtor's positions are.  This is a super-complicated plan, as they objections I think are going to show.  So it's important just to nail down what are the Debtors actually saying about some discreet questions.  And I think there's some room in litigation for contention interrogatories to serve that purpose.

So we did put forward I think three contention interrogatories that we asked -- or at least two, Numbers 10 and 14, about their positions on particular matters.  One of them was, you know, are they still taking the position that distributions from the litigation trust are gifts, as opposed to estate property, or to the litigation trust.  Interrogatory 14 asked, what -- just to be very specific because this is a big point that we're going to raise in our objection.  What do they think -- if the plan does not reach

the effective date, what do they believe stays in force because -- what provisions stay in force and what provisions don't stay in force.  Because our read of the plan is, they basically want everything to go effective on the confirmation date, yet to not call it the effective date. And we want to know is that actually their position or do they have some other position that they're taking; that's a contention interrogatory.

And then the last one is Interrogatory 16, which maybe is not a contention interrogatory, but it's related. We're basically saying you have this list of non-released parties that you say engaged in "adverse" conduct, which is this non-statutory term that they made up.  What's the basis for that?  So we've been trying for several weeks just to get answers to these interrogatories.  But we've called these and not pressed the number then, so we hope the Debtors can move forward and just give the answers that we requested.

And then lastly, Your Honor, just on issues of process and timing, we're not interested in delay for its own sake.  Sometimes when motions to compel of this kind are brought, Debtors say we're seeking delay, our clients don't benefit from delay.  Like, we're spending time and money objecting to this plan, but we do need a fair process.  It's an issue to have all this discovery flying around and

productions with an objection deadline today and depositions starting tomorrow and also, to have an expert report dropped very late in the process, so we need a fair process, but we're not -- the goal here is not to delay for its own sake.

We would suggest that we see where today comes out and the discuss the issue of how to have a cooperative process to get to trial here that doesn't prejudice us because of all these things that are still outstanding. But, again, the point here is not delay; it's to be able to prepare our objection, have a trial, and have a fair process.

So that's what I have for now, Your Honor.  Thank you and I'll turn it over to Mr. Kelley.

THE COURT:  Okay.  Mr. Kelley.

MR. KELLEY:  If you don't mind as to (indiscernible), Your Honor.

THE COURT:  Of course.

MR. KELLEY:  You'll be pleased to know that the vast majority of things I intended to argue were covered so eloquently by Mr. Kleinhaus, so I'm going to just touch on a couple of bases to supplement what he has said.

First off, as to Katsumi, we are a factoring party.  I read the Debtor's objection arguing that this is a litigation tactic on our behalf.  Remember, Your Honor, that the time we vigorously contested the plan and disclosure

statement on June 12th, there was no statement or identification of Katsumi as party.  That surfaced in the plan supplement, which was filed several weeks later, and then it later became the subject of the Moore Declaration filed last Wednesday.

So the parties  here have vigorously opposed this plan.  We were not in the room in negotiating in it.  We are sizeable stakeholders in this case and there is a sound basis for us to have challenged the plan, bristling at the idea that we are doing this in a litigation posture.

Fundamentally, Your Honor, we have sought discovery because this court has been one of the mainstays of ensuring that litigation here ensures due process for all the litigants, and the way information has been cloaked in this process has been problematic.

On June 12th, Your Honor was kind enough to indulge me a lengthy time to examine Mr. Moore from the witness stand on the conditional disclosure statement hearing.  I think it is fair to say that the bulk of that examination was entirely about what, frankly, the plan is entirely about, which is a litigation trust: how do we determine the value, and how do we get to an effective date, and what are the anticipated values.

We've spent a fair amount of time about that, and I believe -- and we can argue this at a later point in time,

it's not particularly germane for the motion to compel.  I believe that the testimony given under oath by Mr. Moore and his inability to opine on any of those issues rendered him an inadequate and incompetent witness for providing opinions on the claims in the litigation trust.

But what has happened, Your Honor, and we have had ample conversations with the Debtor's counsel, who I have tremendous respect for.  The two declarations were filed, one of Mr. Kirschner, who basically states he relies entirely on Mr. Moore's declaration, and Mr. Moore's declaration where Mr. Kleinhaus accurately and correctly notes he hand selected information from the investigation to put into his declaration and it's on that that they intend to provide opinion testimony of Mr. Kleinhaus.

We're a long way from admissibility of Mr. Kleinhaus' opinions.  We have a lot to say about that.  But we are absolutely entitled to prepare our case in opposition to understand which facts were not presented that were part of the investigation.  We're also entitled, and this is -- this is where the focus of the investigation is important.  It's not - first off, no one disputes that facts themselves cannot be subject to privilege.  It's also what you make of those facts.

We are not specifically seeking conclusions of the lawyers themselves on a number of issues, but when they use

a lay witness, a retained lay witness like Mr. Moore, who's currently sitting in the CEO position, temporary CEO position on behalf of the Debtors, to render judgment on what those facts conclude and show and allow, that door has been opened on the offensive use.  You can't selectively use what is otherwise privilege information about what this results or what this allows you to argue and then refrain from the rest of it.

What we are seeking is the totality of information regarding all the claims that are in the trust, that form the basis for his rather lengthy disclosure -- excuse me -- declaration that goes into each of these claims.

I don't think there was any doubt in your mind we were going to be going through a claim valuation process and that was going to a contested issue here because it determines whether this plan can ever reasonably go effective.  I think Your Honor's cautionary instructions at the end of the hearing made it clear, there was something more that was going to be needed and we're trying to get to that.

So, fundamentally, we have a fact witness who is drawing legal conclusions or making conclusory arguments in a declaration to set the foundation for an opinion coming out of Mr. Kirschner.  They don't get to now, at this point in time, say you don't get to see the report from which he's

extracting.

We also know that Mr. Moore had a team that prepared that report.  He's reciting what the team gave him.  So his decision on what to selectively testify about or what the team selectively gave him to write a declaration about is exactly what we should be able to test.  His deposition is coming up this week.  We want the totality of that information so we can understand why the facts were chosen in the way they were, and the reason why those are used as the descriptors of the causes of action which Mr. Kirschner's rendering his opinion.

The mediation privilege, Your Honor.  We've seen the orders that they provided Your Honor to sign, and I watched carefully as Your Honor tried to put a timeline on each aspect of that and I understand why Your Honor was doing it.  But nowhere in those orders does it intend to cloak the entirety of communications between those parties, even on certain subjects such as the negotiation.

But I want to be clear: we're not asking about communications shared with Judge Isgur.  We don't want the communications.  We're not seeking mediation statements.  We believe, and there is indications in the discovery we've received, that there are communications between the parties where they are describing the assets of this estate over which negotiations occurred.  The fact that those assets are

the litigation trust and they're describing them, we're entitled to that.

I'm not interested in what the ad hoc group or the DIP lenders or the Debtors bid and ask was on how they should allocate that.  We now know where they ended up in the plan.  But the res -- or yes, res of the items, the assets that were the subject of what was being negotiated, we get to see the totality of those communications.

Debtors cite EXCO, which is an interesting transcript from 2018, where I'm a little confused from the transcript because the party seeking the information expressly states on Page 7 that what they're seeking is the communications with Judge Jones, who was the mediator.  Judge Isgur spends the next two pages of that transcript saying, well, what if he picks up the phone.

Because this is the same argument.  They're saying it's a four-and-a-half-month window/five-month window.  We have asked, on what days were you in deposition.  I mean, they're using the Federal Court open records.  We should be able to understand what were the days.  Debtors have refused to tell us on which days they actually scheduled the mediation.  The question was put to counsel for the Debtors.  They've declined to specify.  We know there were finite days.  We don't know what they were because that information has not been provided.

But if, for example, parties are communicating in the mediation session itself or if Judge Isgur picks up the phone two days later and says, I'm thinking about where the parties left off, I'd like to go back and forth, and there is what we call the soft edge of mediation where the mediator is continuing that dialogue, we're not particularly focused on that either.

But to create the level playing field over which the parties then could negotiate, we want the descriptions of the assets, the litigation claims, totality.  I'm not limiting myself to any one, I'm not focusing on factoring.  This is about the litigation trust.

I think Your Honor is dependent on us to present the adversarial case before you, so that you can call balls and strikes, and that is the -- that is the focal point of this litigation -- excuse me -- of this plan.  Is that litigation trust, at some point in the future, going to get to where this Court gets comfortable as to what it will or will not approve with respect to the plan.  It is an incredibly complex plan.

THE COURT:  Mr. Kelley, let me ask you a question.

MR. KELLEY:  Yes, Your Honor.

THE COURT:  If the question is -- and if I'm getting this wrong, I want you to tell me where I'm veering wrong.  If the question is what assets are comprised of the

litigation trust as of what time, you mean as of what time -- they time they were negotiated, you know, and kind of what was being discussed or where the Debtors ultimately landed in connection with proposing the plan.  In other words, you know, maybe they were considering A, B, C, and D, but they eventually landed A, B, and C, are you asking what's in the trust right now, what's the A, B, C, or everything that was discussed the entire time?  That's the piece that I'm just trying to put my finger on.

MR. KELLEY:  Thank you for raising the question, so I want to make sure we're addressing that.  I understand in the plan supplement that the retained causes of action are those causes of action where the Debtors are saying we'll be in the trust.

My focus is what was the communication between the parties about whatever it was they were communicating about the claims over which the negotiations occurred.  There were descriptions, factual descriptions, but the factual descriptions are both the facts of the cause of action and, obviously, now based on the declaration of Mr. Moore, what was the characterization of those facts.

So I don't think there is a crisp line of facts only.  There is a packaging and presentation of those facts to describe a cause of action.

THE COURT:  So give me an example of a

communication that would be during the time period of the mediation, just an example, just a broad one, where it falls within what you're looking for.

MR. KELLEY:  I want to have a little fun, but I'll just be very specific to your answer.  Hey, this plan has no operating assets, we're unable to sell the assets, we have no operating business, how are we going to possibly confirm a plan.  Hey, we've identified a bucket of lawsuits that we think may be worth these parties trying to negotiate over how we're going to structure a plan.  I have no idea what you're talking about in these lawsuits; describe them for me, type of communication.

Okay, well, here's a lawsuit.  We know, for example -- and we can pick anything.  I'm going to pick the SPV entities with respect to some of the claims that have been described in there or we can talk about any of the factoring parties or we can talk about Ed or Patrick James.  I don't care.  The point is, we've identified conduct, and let me tell you here what the facts are, and these are the types of claims that we will... Well, what about the facts here?  Why is this... Because these types of facts are the ones that we think formulate the cause of action, because that is exactly what we're going to be fighting about, is the valuation of the pile of claims.

You can't just sit here and say, here are the

documents, conduct your own investigation.  These are parties who have expended a significant amount of the court resources trying to confirm a plan and ask Your Honor to make a decision about the value of the causes of action.

We have a number of things.  Your Honor is familiar with the Fifth Circuit methodology on all of how you valuate a claim: duration of the litigation, costs to be incurred through the course, what are the nature of the claims, what are the types of defenses, what is the likelihood of recovery of those claims should you prevail, what's the percentage outcome on the individual cause of action.  Methodology on litigation valuation is pretty well established.

THE COURT:  If I understand the argument, you're saying the Debtors are going to come in on plan confirmation and argue these claims are worth -- we think at some point these claims could be worth up to X.  And your argument is, I'm entitled to know how you came up with the number.

MR. KELLEY:  I'm entitled to cross examine the person who's going to stand there and say that, and I'm entitled to show that their calculations and computations failed to take into account the reasonable and standard methodology that is to be considered in reaching those values.  I'm entitled to cross examine that witness to see how they arrived at those numbers and the entire foundation

as to how they built those numbers.

THE COURT:  Okay.

MR. KELLEY:  And all of that is going to be built upon the information that was exactly shared by the parties here in those communications.  So, Your Honor, there's two components to the mediation.

THE COURT:  If those are -- I guess I'm trying to distinguish.

MR. KELLEY:  Please.

THE COURT:  How do I draw the line between what's discussed in mediation, if that's exactly what was discussed in the mediation?  How do I draw the line between what you're asking for?  You're saying, in other words, what's the line that one draws.  Is it just go ahead to ask or it was in conversations where the mediator -- I forget who the mediator was - where there was a mediator?  Where do you draw the line where these discussions are -- if the mediator gave homework, if you will, the parties talk to each other, is that -- in other words, where do you draw the line?  If I were to rule, how does one draw that line?

MR. KELLEY:  That's a good question, Your Honor. I've been thinking about it.  Here's the approach I would use.  Obviously, communications during the course of the days of those mediations or any follow-up sessions involving the mediators would be in mediation.  The communications

that occur in between if they're copying Judge Isgur on them, one will see that on the log they're going to generate and we'll know.  And I think if Judge Isgur is copied on it, if I'm Your Honor, I would be looking at that as, I'm not interested in opening the door on communications with the mediator.  So I would not ask the Court to frame a turnover of those items associated with emails, communications directly to, from, or copied to the Honorable Marvin Isgur.

The challenge we have, Your Honor, is I have no privilege log.  So working without that -- and so, the categorical production of the privilege log will allow me to provide greater detail.  But the mere fact that two days later, one of the constituents who participated in the mediation says, I've heard you say all this stuff about this litigation trust, I want to know what's in it.  Does that make it a mediation?  They're trying to uncover the facts of what is in the trust.  And the facts of a lawsuit are not exclusively listed to the underlying facts that can be asserted as the foundation of the lawsuit; it's a description of the lawsuit itself, which, as you know from Mr. Moore's declaration, includes the conclusions people draw those facts.

And so, that is the issue that we've been trying to get here.  So, in my view, Your Honor, things that were in the mediation process -- now, I want to be very clear.

Sorry, I should have started with this.  Rule 26 makes it abundantly clear, the assertion of privilege in the defense of it falls upon the Debtors.  It's not my burden, but I'm trying -- we've tried to accommodate a number of issues in how we've conducted discovery.  To Mr. Tsekerides' credit, he and I have had some great conversations in trying to figure it out and we just figured out where our arguments lie and what we're bringing to the Court.

I think where I would draw it is direct mediation communications as the way I've described them.  Lateral communications may occur in the temporal timeframe that don't involve the mediator.  If they content those are still mediation related, put them on a log and let's talk about them, but I wouldn't think they would.  And if they're describing the asset -- and the asset in this case are the lawsuits -- I think we get those.

And that's what this plan is structured.  I didn't choose the structure of the plan, but I'm entitled as a litigant to be able to challenge it.  And I think we established on June 12th through the examination we did on the disclosure statement, this litigation trust is the lynchpin to it.

I'm also mindful, and I won't repeat the very cogent arguments from Mr. Kleinhaus of the offensive use issue, what they've elected to disclose and what that does.

But the one thing I will -- and I touched the mediation, but I did spend time on the EXCO holding and even Judge Isgur says, "I see there's very little law on this."  But the focus of what they were looking at appeared to be the back and forth negotiations of who asked for what and who didn't, at least that's the way I read the transcript, and that's not what we're asking for here.  And I'm trying to differentiate between the party's point and counterpoint negotiations is not what we're seeking.

We're seeking the content of the descriptions of the assets themselves that are being negotiated, the lawsuits.  That can be -- the party's offer and counteroffer can be redacted; that's not the important part.

THE COURT:  I'm still trying to draw the distinction between, in my mind, the Debtors are going to come in and argue the value of these estate claims in this trust are worth X.  Do you also want discovery on the matters that are not in the trust now, or are you seeking valuations of all matters?  In other words, if the Debtors are only seeking to put in the trust, A, B, C, and D, do you also want every other potential one that was discussed or just the ones that they're going forward on?

MR. KELLEY:  I'm just focusing on the trust, Your Honor.  And all I know right now is what's identified in the plan supplement as the retained cause of action, which we've

been informed will all be put into the trust.  And, plus, the way the plan came out, my understanding was the parties negotiated over the claims in the litigation trust.  The waterfall, how do we figure out who gets what and how does that work.

THE COURT:  The plan supplement identifies retained causes of action.  You're focused on the retained causes of action that are identified in the plan supplement.

MR. KELLEY:  Well, that's all I've got to go on.

THE COURT:  Okay.

MR. KELLEY:  I mean, if there was a list of causes of action that were shared in communications with the -- that will allow me to answer Your Honor's question with mores distinction.

THE COURT:  I understand.

MR. KELLEY:  The other issue, and I would flag for Your Honor's attention as a party who has litigated in the Fifth Circuit for the entirety of my career, the limitations on common interest are well established in this jurisdiction.  I'm even going to just provide Your Honor direction to a completely different cite, which is In re Santa Fe International Corporation, 272 F.3d 705, going back to 2001.  I have a copy of the decision, Your Honor, if you'd like it.

THE COURT:  Nope, I've got it.

MR. KELLEY:  But, fundamentally, Your Honor, and I would address your -- bring your attention in particular to the discussion that occurs at the top of Page 10 on that decision, talking about the breadth of decisions that have addressed common legal interest and what's required: that they're co-defendants in actual litigation or imminent litigation.  And it isn't that they have a desire in the common outcome of the litigation; it is that they have a common interest in dealing with the claims.

Common interest in this Fifth Circuit has always been treated narrowly.  This goes back a long period of time.  And in the objections put in this plan, common interest was used far broader than it's permitted under the applicable law of this jurisdiction.  We have concerns with that.  We believe that the communications that have been linked to that, including communications outside the actual mediation process in the description I gave you, are also being masked by the expansive use of common interest beyond that permitted in this jurisdiction.

The reason I cite this decision to Your Honor is it's the application of this principle in commercial litigation in a mandamus proceeding where the Fifth Circuit addressed it.  Happy to continue to argue that.

And, Your Honor, there's going to be some complex issues in this case with the fact that I think, as Mr.

Kleinhaus very well argued, which is -- and as I read the response of the Debtors in the motion -- to the motion to compel, they acknowledge that far greater information was available to the secured parties who were credit bidding than were put into the data room or made available to other parties.  This sale process is going to be a very robust issue of litigation before Your Honor.

We don't know how you can try to come to court and say we're asking Your Honor to approve a 363(m) finding and we've given incomplete information to one party without us testing all aspects of that.  And that, to me, is the quintessential nature of an offensive use of that information.  Asserting privilege after giving it to one party who's got a credit bid and trying to cloak this plan within a 363 sale process, we believe that opens the door on that.

And my last comment, Your Honor, with your indulgence -- excuse me -- second-to-last comment would be, if you review what Mr. Moore filed in numerous places and we're happy to provide Your Honor citations, if useful, in his declaration, he repeatedly references, as Mr. Kleinhaus states, their investigation and he's pulling information from it.  You cannot use the investigation to try to add an element of -- a heightened element of support for the facts and not provide the investigation itself.

I heard Your Honor's question, is it the special committee or is it the Debtors?  In my view, that issue was waived when Mr. Moore put it up.  He has access to the investigation if the special committee needed to defend it, but Mr. Moore says in his declaration that the entirety of the plan was led by negotiations by the special committee members.  At this point in time, it's very difficult to distinguish between the Debtors and the special committee on this particular issue.

I believe the results of what A&M investigated, the conclusions drawn from it have bee put squarely in play under the offensive use.  And whether you look at Mr. Moore's declaration for purposes of the plan or whether you look at the sale process for purposes of the plan and what was given to one of the parties who is going to credit bid, all of those materials have been put in play.

Lastly on Mr. Kirschner, I share the concern Mr. Kleinhaus states.  Normally, in a discovery issue where parties have masked and hidden certain information, which is articulated factually within the LAM parties brief about Mr. Kleinhaus.  You might imagine, Your Honor, that after the hearing on June 12th, I had conversations with the Debtors about who was going to be providing that testimony, was not given an answer.

We served interrogatories asking for information

on this.  Before the interrogatories were due, I invited a meet and confer because I was concerned about establishing the deadline and finding out if there was a way that we could work with the Debtors to identify.  I was assured the deadline we'd articulated worked.  The responses to all the interrogatories failed to address them.  Instead, they said you're going to get declarations.

We're entitled under interrogatories to get the specific facts.  We've asked for information on particularity tied to those interrogatories themselves, not over 200 pages of declaration where now we have to try to pin down what is the portion of this that the Debtors contend answer the question.  Particularity requires them to identify specifically where in those declarations is that going to be your answer.  We should have received it well before they filed the declarations because the deadline to respond to the discovery was on Friday before those declarations were filed, roughly five days earlier.

THE COURT:  Here's a question for you on one of the ROGs.  I think it was 14.

MR. KELLEY:  Yes, Your Honor.

THE COURT:  No, no, it's a simple question.  You won't need to kind of refer to it.  There are places where it seems like you're looking for -- I understand the mediation argument conceptually, the argument, and I know

the Debtors will respond to it.  You know, there were things that were shared and we think, you know, the Debtors shared this product with someone else, this work product with someone else and so, therefore, we think we're entitled to it because they want to come in.

There are places -- and I think it was Interrogatory 14, where it looks like you're looking for specific work product that the Debtors have created analyzing the claims.  At least the way I read the ROG, one could see the ROG as asking kind of for the Debtors, like, work and analysis for it.  And I got it, the door may be opened if Moore starts...

But just from a ROG standpoint, maybe instead of kind of going over words, just tell me exactly what you're looking for with respect to the Debtor's analysis of claims. Is it solely if they shared it with a third party in connection with the mediation or is it if Moore is going to talk about it, what's he going to talk about and then what doors get opened.

MR. KELLEY:  Thank you, Your Honor.  Keep in mind that at the time we drafted these interrogatories, we didn't even known Kirschner existed.  Well, that's -- we know him as a person, he exists.  We didn't know he was going to play a role here; he hadn't been identified.

I had attempted to explore, given Moore's

testimony, who's going to be the testifier because we're trying to work within what is a very tight timeframe to lay out the depositions.  I was told can't answer that.

THE COURT:  When did the depos --

MR. KELLEY:  So at the time we're drafting this --

THE COURT:  When are the depos scheduled, by the way?

MR. KELLEY:  Pardon me?

THE COURT:  When are the depos scheduled?

MR. KELLEY:  This week.  We start tomorrow with an A&M person, another A&M person on Wednesday, we have Mr. Moore on Thursday.

THE COURT:  Okay, okay, okay.

MR. KELLEY:  And so, when this was drafted, the only thing we had to work with was their only witness they're going to use is Mr. Moore.  This is built entirely on the presumption because of the information we sought to obtain before it was crafted that he was going to be the one testifying.  He can't get on the stand and talk about these lawsuits and the value of them, which is what we thought the scope of his testimony would be, without giving us the information that allows us to know what he's cherry picking and what he's not saying and what he is saying.  So, fundamentally, that's what we were trying to get at with this.

We also were concerned that an individual who is specifically retained as the professional might somehow be ponied up as somehow a lay witness to opine on these.  We don't think that's legally permissible for a number of reasons, but we needn't get there.  So we were trying to understand if he's going to be providing opinion testimony, this is what we want.

Well, things have shaped up since we've got the declaration.  But now -- the whole point is now that we've seen -- and, Your Honor, there's no way I would have expected you to have read 112 pages -- he devotes a significant amount of his declaration walking through various causes of action against a number of constituents in this case and conclusions he points that he concludes are red flags and warrant the lawsuits.

THE COURT:  Okay.

MR. KELLEY:  Those are the issues that have now shown up.  So I'm tempering my argument as to what they should disclose here based upon that declaration and how we've seen this game playing unfold.  And, obviously, we should have known about Mr. Kirschner before we got his declaration.  We should have known about it.  The submission and the motion to retain him was held in abeyance, even though he was retained on June 20th.  They're seeking nunc pro tunc and filed it only after his declaration was

submitted.

There's no doubt that was a litigation tactic that put us a little bit behind the eight ball to scramble to deal with it.  We are still trying to identify the manner in which we want to present a witness on that.  But we're also mindful of the limitations this estate faces, so we're interested in having a dialogue about what the timeline should look like, Your Honor, based on Your Honor's rulings, but we are not seeking delay for delay's sake.  There may be ways to commence the proceeding but allow parties to process.

There is, simply put, if Your Honor agrees with any of our arguments and requires production or if we get the privilege log that we now have a basis to argue we should have gotten more documents, there is no way I can file an exhibit list by this Friday, the required local rule deadline to file that exhibit list on next Tuesday.  So we're going to have to create some situations that allow us to try to litigate fairly, but yet to recognize the constraints we are now litigating under.

Your Honor, you've given me plenty of time.  Thank you very much.

THE COURT:  Thank you.  Let me just see if there's anyone on the line.

MS. DEXTER:  Your Honor, Erin Dexter on behalf of

Onset.  (Indiscernible) a few minutes?

THE COURT:  Yup, absolutely.  I will turn to -- Mr. Duke, do you wish to address the Court?  I'm just trying to find an order just so we can kind of go from there.

MR. DUKE:  I have a very brief point, but then that'll be it.

THE COURT:  Okay.  Ms. Dexter, then I'll turn to Mr. Duke, and then we'll see where we go.  Okay?

MS. DEXTER:  Thank you, Your Honor.  I'll likewise be brief, just one note from me not covered by Mr. Kleinhaus or Mr. Kelley.  They've both described concerns about categorical assertions and privilege the Debtors have made on perhaps questionable grounds and we would agree.

We had one further and specific concern on the Debtor's privilege position, which is that the Debtors are not reviewing documents individually to determine whether they reflect privileged information.  Instead, they had excluded from the review database communications with certain case parties for sweeping periods.

We talked a little bit about this with respect to the estate claims marketing process.  We have the same concerns with respect to communications related to the negotiations of the plan itself among the parties supporting it, namely, the Debtors, the DIP lenders, the ABL lenders, and the UCC.

And, Your Honor, the Debtors confirmed to us that they will produce no communications with these parties after May 20th.  Their position is that any plan negotiate communications during that period with those parties are presumptively privileged, and we think that is an overbroad position.  Again, we don't have a privilege log yet, but we think, at a minimum, a document-by-document review of the communications among those parties during that period is warranted to determine whether a common interest privilege, in fact, exists.

And one of the reasons for our concerns, Your Honor, is that on May 26th, Your Honor denied conditional approval of the disclosure statement for the Premier Marketing plan, the single debtor plan.  So we believe that after May 26th, the parties went back to the drawing board, and we think it's certainly overbroad to say that during that time period where everyone was back to the drawing board for a new plan, that a common interest presumptively covers every single communication.

And, Your Honor, privilege may exist here and there.  We're not saying that it doesn't, but we don't think it's appropriate to bypass the process for careful review to ensure that the parties receive the discovery that Rule 26 entitles them to.  And, Your Honor, as Mr. Kelley said, we understand that everyone's moving fast here, but we don't

think that this particular shortcut is one that's supportable.  And, Your Honor, we raise the -- we share the remaining concerns raised and we join.

I will also note that the Debtors have committed to providing us Bates numbers for the documents underlying the statements made in Mr. Moore's declaration, and we think that information will be absolutely critical for us to determine whether we can test the assertions that Mr. Moore purports to rely on.

So, Your Honor, unless you have any questions for us, I'll cede my time.  Thank you.

THE COURT:  Just one question and it's just getting dates and I'm sure somebody will clarify for me.  I understood I think at the beginning of this that the Debtors had agreed to provide kind of post-March 27, and then you mentioned March 26, and I don't know if my notes have got it wrong.  Are you seeking -- are you saying -- as of which date do you think the Debtors should be producing...

I think on this date -- I'm looking at March 27 and March 26, and I don't know if my notes are wrong or if you think, no, my notes are right, we're asking for even a day -- kind of a day before then as well.

MS. DEXTER:  So, yes, Your Honor.  I mentioned May 26th, which was the date that Your Honor --

THE COURT:  May 26th, yes.  Yes, got it.

MS. DEXTER:  March 27th, I believe, is the date that mediation ended.

THE COURT:  Mediation ended.

MS. DEXTER:  But we understand that the Debtors have produced some communications between March 27th and May 20th.  But they are taking the position that all communications between the Debtors and the parties supporting the plan after May 20th --

THE COURT:  So kind of not a mediation privilege, but some other basis for withholding documents between March and May.

MS. DEXTER:  Yes.  Although between March and May, there are some productions, Your Honor, but after May 20th, there are no communications that have been produced between the Debtors and any other party supporting the plan, no communications between the Debtors and the DIP lenders, ABL lenders.  Or these would be after May 20th, which again, is before Your Honor denied conditional approval of the disclosure statement.

THE COURT:  Got it.  Got it, thank you.  No, no, you're right, March and May.  Thank you.  That's what I needed, thank you.

Mr. Duke.

MR. DUKE:  Thank you, Your Honor, just very briefly.  I join the arguments that have been made today ad

I won't repeat those.  The one thing I wanted to highlight is with respect to Mr. Kleinhaus's statement on the sword and shield issue that we're going to see in this case, or at least I expect we will.  I'm not sure how they're expecting to assert privilege here with respect to the investigation, because the way that they've proposed it is completely unworkable.  Mr. Moore is going to get up on the stand and he's going to say, we reached this conclusion and, obviously, the cross examination of him will entail, well, did you consider this, did you consider that.

As it stands right now, they would assert privilege over those questions.  They wouldn't allow him to answer because they're withholding all that information as privileged.  That's unworkable and that's not how privilege works.  That's the only additional point I wanted to make.

THE COURT:  Got it.  Thank you.  Is anyone who is seeking to compel wish to be heard?  Give me one second, Mr. Tsekerides.

MR. TSEKERIDES:  I've got a lot to say.

THE COURT:  You may begin, Mr. Tsekerides.

MR. TSEKERIDES:  I'm sorry, Your Honor.

THE COURT:  I said you -- you're free to begin.

MR. TSEKERIDES:  Oh, okay.  Thank you.  Ted Tsekerides from Weil Gotshal for the Debtors.

There's a lot to cover.  I want to start with the

mediation privilege, and I want to start even putting Judge Isgur's order aside in the case we cited, which could not be more clear that it's not just the days that we're there in front of him, which on its face would never be workable. But either the result would be no one would do mediation or every time someone had a back and forth, they'd stick him on a cc.

But we'll start with your order.  Your order, the one from February but the statements are basically the same, talks about -- and I'm' reading from -- this is one from February 27th at Docket 2005.  It says, "Any discussions among the parties, including discussions with or in the presence of the mediator," so not limited to those.  "Any discussions among the parties," can't be more clear.  "Any discussions among the parties" and then we go down a little further, "... not be admissible, discoverable, or otherwise used for any purpose in any proceeding outside of the mediation."

That's your order, that's consistent throughout all the orders and that makes sense.  You want to have people in mediation freely discussing whatever they need to discuss, whether it's with the mediator or without the mediator.  You cannot parse -- and you and both counsel, I think you asked the question, well, where's the line.  There is no line.  You cannot parse this.  You can't say, well, on

this day, they weren't with the mediator, so let's produce that.  Frankly, one would say we relied on that order to say we weren't going to have to produce any documents.

But even beyond that, it makes sense not to do that from a mediation perspective because you just can't figure out what was this for the mediation with the mediator, was this something different.  That's why you have it so broad, that's why it makes sense.  And the place to deal with that, if you're uncomfortable with that going forward, is having orders that try to parse this, but respectfully, I would suggest that would make no sense. There's a reason why people go to mediation.

And they will be getting -- and I'll get to some of this in a minute -- the underlying facts that support the claims have been and, to the extent there are any left, will be produced.  What they're not entitled to is what the parties were talking about during those mediation period. And I think we put it in our papers, but just to give you the dates, so the period specifically for the mediation is January 29 through and including March 27.  And we are claiming -- I'm not saying there couldn't be other things during that time.

THE COURT:  Can you give me the dates again?  I was writing it down.

MR. TSEKERIDES:  January 29 through and including

March 27th for the mediation period.  We have produced documents before that period and after that period.  And I think one of the counsel raised the May date.  We are taking the position -- this is not a mediation point, but we are taking the position from May 20th when announced in court that there was a deal struck, and I appreciate there might have been some marginal changes after that.  But our point is May 20 going forward, everything is privileged as it relates to the plan proponents.  So we can discuss that, that's not a mediation point.

THE COURT:  It's a different one.

MR. TSEKERIDES:  But we are taking that position across the board.

I think there are some things that we all need to just get a handle on about what we're doing next week at the confirmation hearing, and I don't want to keep, like, referring to Steward but there are a lot of similarities.  And at the end of the day, you also raised issues there that this feasibility point in the context of a liquidating plan, does that really exist?  All right.  Well, we can think about that later.  But at the end of the day, we are not having a trial on any of these claims at confirmation.  You made that point in Steward.  It's true here too.  Nobody's being bound by any -- you're not making any findings of fact that, you know, there's a claim against Katsumi, that

there's a claim against Onset.

We have two lawsuits out there and the committee has one and it's Aaquum.  You are not making rulings that the facts alleged in those Complaints are true.  What we -- our burden to show up, whatever the feasibility standard might be or whatever we call it, is to show up and say, hey, are these colorable claims, do they have value, and we're going to put people up to talk about the facts that underlie those, and then an expert who has a lot of experience, to give you help to decide.  You could say, I don't agree with anything either of them said.  That's fine.

We're going to put up evidence to show, are they colorable, are they valuable, does something think who's done this for a long time that this could happen within a period of time.  We are not having a mini-trial.  So all this stuff about, oh, we don't know all these facts, a lot of the facts are in their house.  We haven't gotten discovery from Katsumi, from Onset, from the James', from any of these people.

So we are putting forward facts from Mr. Moore.  There's no legal analysis.  He has a view on something, take his deposition, they'll put him on the stand here.  If he says, I got all that from the lawyers, I'm going to have a problem, right?  But what also happened in Steward was witnesses took the stand, gave facts, said they reached

their own conclusions.  We didn't put anything at issue from a privilege perspective and we're not doing that here.

So this whole idea that somehow because we put in a declaration from Mr. Moore, everything's open season?  That's just wrong.  Let him take their deposition, which they will on Thursday.  If he says I got all this from the lawyers, all right, then we're going to have -- we're going to have to deal with that.  But he gave facts that underlie claims that we are saying are colorable and valuable.  That's what's going on with -- I think this was number two on the first statement that was made early on.

THE COURT:  When you said facts will be produced, are you saying that they've already been produced?

MR. TSEKERIDES:  Yeah, so --

THE COURT:  Are they already out there or what did you mean by that statement?

MR. TSEKERIDES:  Yeah.  Well, I'd say two things.  Obviously, Mr. Moore, you know, he has facts that he's alleged in there.  Documents that underlie information that we have.  I mean, there's some that have been public.  Invoices that were doctored.  Okay?  We've produced email from people saying, hey, we need more money on this factoring thing -- I mean, I'm paraphrasing a little bit here.  Like, go goose this invoice.  That stuff is in there.  I mean, these are the facts that we've uncovered.  In any --

THE COURT:  Have they been produced already?

MR. TSEKERIDES:  They have been produced.

THE COURT:  Okay.  No, no, I guess I thought you said a statement of facts underlying the claims will be produced, as if they were still coming.

MR. TSEKERIDES:  No.  I mean, when he's going to testify on the stand, yeah.

THE COURT:  When he testifies.  Okay, thank you.

MR. TSEKERIDES:  Look, again, in any investigation, okay, every case has some investigation, there are facts that people who were not involved in the conduct that took place are uncovering, okay, and they will produce those facts.  Yeah, obviously, he doesn't have personal knowledge of what any of the -- you know, two guys pled guilty, for god sakes.  We don't know what they did, right, but we have underlying materials, some books and records.  I don't know if they're all true.  These are books and records that fraudsters were putting together.

That is the information that Mr. Moore has said in his declaration, we've produced some of these documents, that will say, look, based on my view -- the guy has been around too for a while too, Mr. Moore -- this is what I think.  All right, cross examine the guy.  You can decide, you know what, I don't believe him.  You know what, Kirschner's wrong that they have -- they're going to get at

least $2 billion.  Okay, fine.  But we have not put in, like, my legal analysis, Mr. Berezin's legal analysis, nobody else's legal analysis has been put at issue.  And don't forget, we have two Complaints.

They want to know what our theories are?  Go read the Complaints.  The UCC has a complaint a Aaquum that is very similar to maybe a Complaint that could be brought against somebody else.  Go read the Complaint.  Those are the legal theories.  If we have facts that we're relying on for a Complaint, we've produced those.  I don't have every fact.  The investigation doesn't -- we haven't taken discovery from them; that's going to be for the litigation trustee to do.

But our burden next week is to say if we can prove to you that, look, there's enough here for you to feel comfortable that these claims are colorable and that by the end of 2028, somebody thinks we can get $2 billion.  If you're not convinced, I don't know where we go, but that's what's going to be put on.  We're not having a mini-trial, you know, did Katsumi do this, did Onset do that; that's not for next week.  That's for, like, you know, a year from now when the Onset trial kicks up again, and if somebody sues Katsumi, it'll come up in that case.

So I think that's an important thing to recognize: what are we doing all of this for?  So this is not the

litigation against any of these entities.  It's a very different concept.  In every case you have where there's an investigation, Judge, somebody's doing an investigation and pulling facts and those facts have been produced, those facts will be testified to by Mr. Moore, and Mr. Kirschner will give his opinions based on his very vast experience.

I do want to turn a bit -- and on that last point, I've heard a lot of, oh, we got this late, and I'm not going to -- there were no scheduling orders in this case and that's not on me.  I've been involved in cases where I've asked for people to give me a scheduling order; we don't have one here.  We were not sitting around letting the clock run.  As I put out in our objection, we had to see, well, maybe Mr. Kirschner wasn't going to agree with us.  So the fact that he was retained on the 20th has nothing to do with when we put it in.  We put that declaration in as soon as we could.

And what I did not hear today -- and they've already gone first.  They could try to come up and reply now, but what I did not hear on their affirmative argument is prejudice.  They have a declaration, it's 50 pages or so, and respectfully, it's significant.  But it's not like a damages recreation guide, it's not an accident recreation guide.  You don't need weeks and weeks to read it.  They're all lawyers; they have great teams on both sides here,

right.  It doesn't take that long to read the document. You're going to depose the guy on Friday and he's going to be here next week.  But what I didn't hear is any prejudice, other than well, we'd like to have more time.  Yeah, so would I.  So I think the notion of the timing is a bit overblown and, if they really cared that much, they could have gotten a scheduling order.

Now, the one area where I think there's some further debate is on this communication with bidders.  And, yeah, I hear the point.  This is not like an auction process like we've seen in some other cases.  You have a lender, and we cited some cases in our brief where courts have held you have a common interest with your lender.  And the notion that the common interest in the Circuit is somehow prescribed in some manner.  Maybe, but I'll tell you this, that U.S. v. Brown case that was cited in the papers, that's a criminal case about two defendants.  It's got nothing to do with common interest on the plaintiff's side.  And the cases we cited refer to common interest that a debtor has with a UCC and a lender.

So if I'm talking to these guys about -- and here's where we're claiming privilege.  If I'm talking to them about, hey, look, here's my draft of the Patrick James Complaint.  You remember we had the PI hearing all that. Yeah, they saw those drafts.  We didn't waive privilege when

we gave it to the ad hoc group and the UCC.  Does that fall into the waiver that they're claiming?  How could it?  That makes no sense.  Of course, we were aligned in interest with those guys.  They saw drafts of that, they saw drafts of the Onset Complaint.  They don't get it.  They don't get that that information...

So the fact that they're trying to say, well, these guys were bidders at some point in the future, so -- or because of the way you set up the plan, that's open season now and anything you ever told them about the estate claims.  That doesn't make any sense.  But what we did do, if we have underlying facts to the bidders -- and I'm not going to name names, but there haven't been that many and the few that came around, not all of them even asked to see any documents and the few that have have gone into a data room and we've also given them some additional materials. Those are not privileged.

But if I happen to have a privileged conversation with someone from the ad hoc group and now just because the ad hoc group is credit bidding, they get that discussion that I had?  That one, I will fight to the end, there's no way that that's right; that if I had that conversation, now they get that.  They're entitled to facts.  Frankly, I don't even know if they're entitled to facts.  The bidder should be the one complaining if they think they don't have

information.

But put that aside.  Underlying facts, we are not claiming privilege over, but we're giving them to these guys.  These people have read the Complaints; they're out there.  If they want more information, they'll get more information.  But the only asymmetry -- and this is important, they try to claim that we recognized the ad hoc group has more information, so by definition, there's asymmetry.

Well, it's true they have more information.  I just gave you a couple of examples.  Draft pleadings.  Yeah, I can't -- I can't change that.  That doesn't mean these guys get it because somebody wants to come in and bid on these assets and that's the distinction that we're making there.

On the ROGs, you cited a few and we definitely had the feeling that you're just trying to get behind my legal analysis here, so let's look at the few that were cited.  Number 5, this is on the LAM one, "To the extent you intend to present evidence at the confirmation hearing regarding any estate claims, identify the estate claims with respect to which you intend to present evidence and describe the evidence."  What's that?

I'm supposed to describe in a ROG response my evidence for a claim?  And what we said, and I was on the

meet and confer before we filed -- this is the day before we filed the declarations, and I told him, look, guys, I didn't tell him who it was.  Okay.  We told them the next day, you'll be getting -- I was, frankly, hoping we'd get it that night, but that didn't happen.  You'll be getting declarations that will address these points.  Why am I doing an interrogatory?  That is not an appropriate interrogatory response.  What is your evidence for the claims, that's ridiculous.  And 6 is of the similar vein.

10 and 14.  I mean, 10 is like a page and a half long asking about the plan.  I mean, I'm not going to read it to you, Judge, it's like four paragraphs.  But basically, they took sections of the plan and say basically, what's your view on this.  Okay.  Presumably, they're going to file objections today.  Mr. Carlson and others in restructuring will prepare a response, and they'll have our views about the plan accordingly.  To say like, now, tell me what your views on the plan.  Well, one, I would say read it and, two, you'll get it in our opposition papers.  But to say that we have to go through and give some kind of narrative response, that doesn't make any sense.

Communication with bidders, special committee, ROGs, timing.  And, again, on the timing, I do want to stress we're not having a mini-trial next week.

I do want to talk a little on the privilege log.

Frankly, from Judge Isgur's decision, I don't even know that we would have had to have done one.  And everyone's, like, oh, the privilege log.  Well, you know what?  The privilege log isn't really going to change anything.  So, okay, I'm going to put on the privilege log discussions with ad hoc group about estate claims.  I can tell you right now we're not giving -- unless you order us, which we would object to, a discussion I have with the ad hoc group or if I happen to send the ad hoc group a view of a claim, it'll say that categorically; that's not going to change anything.

Our views and our positions on these issues, the log is not going to change that.  We're talking about concepts here, so you have to decide where do we go.  Our view is mediation privilege, whatever happened in that timeframe, off limits.  Common interest privilege on the estate claims -- now, we're not claiming everything we ever talked about with these guys is privileged, but there are only really two issues here: the plan negotiations and the estate claims.

On the estate claims, we absolutely have a common interest with the ad hoc group and the UCC; and on the plan negotiations where we did not have a common interest or was outside the scope of mediation, we have produced documents.  I think we're substantially complete; if there's anything else, we will produce it.  But after we had a common

interest with them on the plan, like we're going forward with this plan, we are claiming common interest on that and that's not just made up; there are cases that support that approach.

If I could just check my notes real quick, Judge.

THE COURT:  Just one question for you that was in my notes.

MR. TSEKERIDES:  Yup.

THE COURT:  Mr. Kleinhaus had mentioned a question about -- in one of the ROGs, I think it was in the ROG discussion about essentially, matters that would be -- kind of what would occur on the confirmation date versus what happens on the effective date of the plan and whether certain mattes get locked in.

MR. TSEKERIDES:  Yeah, I think that was the one I told you was three paragraphs long.

THE COURT:  Yeah.  That's the -- what about providing the answer to that question?  Is that something that is with you or just conceptually --

MR. TSEKERIDES:  Can you give me a second?

THE COURT:  Yup, absolutely.

MR. TSEKERIDES:  Yes, I'm told on 14, we can give them some information.

THE COURT:  Okay.

MR. TSEKERIDES:  14 is the one that you were just

talking about.

THE COURT:  Okay.

MR. TSEKERIDES:  While I'm flipping through here, do you have any questions for me?

THE COURT:  No, no, no.

MR. TSEKERIDES:  That's it, Your Honor.  Thank you very much.

THE COURT:  Thank you.  Let me just give everyone a brief response.  I'm going to tell you I'll give kind of movants a minute, minute and a half to kind of just touch on any high points.  I can tell you I need to go back and study more Kirschner a little bit.  And now that things have kind of crystallized for me in terms of what the ask is, take a little time to go back and study this.

I don't think -- there's a lot of specific asks, and I think I need to be precise in the ruling, and I don't think it would take me -- I got a first day hearing today. I need to be precise in the ruling on this and I don't want to -- this isn't one of those, you'll give X and not Y and then we can kind of all settle it.  I need to kind of answer the question.

Could the parties -- can I provide the parties an answer to everything by 9:00 a.m. in the morning?  Just dial in, I can just rattle it off.  But I want to be precise about the specific asks, the specific privileges, talk about

mediation privilege, talk about common interest privilege, talk about the specific requests, provide some guidance.  If that doesn't work for parties, I can certainly do it, but I wish I could have -- I thought I could give an answer by 4:00 or 5:00 today, but I don't know what I don't know. I've got a hearing at 2:30, a first day hearing and I don't -- every time I think they'll be short, they're not, so I don't want to jump in there.

But I think I can -- and I don't want to give kind of half answers, if that's okay with the parties.

MR. KLEINHAUS:  Yes, Your Honor, from the LAM parties' standpoint.  We appreciate the Court's focus on this.

THE COURT:  And if I can do it tonight, I'll call you anyway, even if it's just 5:00 or 6:00.  I'll give you a heads up if I can do it tonight just to kind of get it going.  In other words, if I have the 2:30 doesn't go long, I will reach out to parties if I think I'm in a position to kind of rule on everything.  I'll try to do it today, but no later than 9:00 a.m.

MR. KELLEY:  I think those parties would value Your Honor spending the time you need to.  I think, as we've discussed and I don't want to spend (indiscernible), but I think we're going to commence the depositions, but we'll pause and we'll hear the Court's ruling and ask questions,

what have you.  And the impact of the Court's ruling, we'll have to adjust with and deal with on the fly, but we can, at that point in time, maybe talk about what does that mean in terms of...

THE COURT:  Yeah, don't stop the train.

MR. TSEKERIDES:  Yeah, I agree with that.  I think actually for the depositions tomorrow and Wednesday, it's probably less of an issue.

THE COURT:  That's what I thought.  I thought this really had to do with more Kirschner.

MR. TSEKERIDES:  If I was going to give rebuttal, and I'm not trying to back door it, it's our understanding under oath that Mr. Moffitt led the investigation that Mr. Moore is talking about Mr. Moffitt's deposition is Wednesday.  So Wednesday is Moffitt talking about this investigation issue.  And I think what would be reasonable in my mind and I think it's not fair for me to ask the Debtors commit to this on the record, but if the Court issues a ruling that allows us to have more information, we'll just keep the deposition open and deal with it or we'll get the information and we'll figure out a way to slice and dice it.

THE COURT:  Yeah.  I think I just need to give you an answer to some of these things, but I want to be thoughtful about this and then kind of isolate myself to the

ROGs that were mentioned and kind of be more specific than giving general...

Oh, one question, Mr. Tsekerides.  On the -- I had asked a question about -- it sounds like it's the Debtor who's asserting the privilege on the common interest.

MR. TSEKERIDES:  Yeah, it's the special committee. I mean, it's all of us.

THE COURT:  Okay, okay.

MR. TSEKERIDES:  So I'm not making a distinction.

THE COURT:  No, no, got it, got it.  No, no, I was just trying to make sure that my notes since I had it clear in my head, so I didn't kind of just I got the facts right. Okay.

Mr. Kleinhaus, any kind of -- anything?

MR. KLEINHAUS:  Sure.  And I'll try to keep it extremely brief and I want to respond to a few very specific things I heard counsel say.  I think, frankly, some of the positions are even more harder -- or even more pronounced or even extreme than I thought in the sense that I heard counsel say everything with the ad hoc group post-May 20th is privileged.  I don't want to misquote him, but that's what I heard.  That is a real problem, and I don't think there's any way that's right.

I mean, to the extent the Debtors communicated with the ad hoc group which is bidding for their asset, post

a mediation about those assets and even as to factual matters, I don't know how that every single communication could be privileged.  That seems like a line that can't be defended; that's point one.

The second thing I heard counsel say is that Mr. Moore is going to testify based on facts discovered in the investigation, this is what I think, essentially opinion testimony.  If that's what he's going to do, which is take facts as to which he has no personal knowledge and then express opinions, I mean, that seems like exactly what one is entitled to look behind the opinions to see whether there's other information in the investigation that's inconsistent with the opinion.

I mean, opinion testimony is exactly the testimony where one has to disclose everything you considered and where you can't use a shield approach, so I think what Mr. Kleinhaus and Mr. Moore reaffirms the sword and shield problem.  Counsel, I think, stated explicitly, yes, the ad hoc group got a lot more information than other bidders.  We have asked -- and, by the way, on Interrogatory Number 5, I tried to be clear with the Court and we were clear in our motion, we're not asking for the response to Interrogatory Number 5 as drafted because they did provide the declaration the next day.

What we've been very clear on is what we still

want to know on Interrogatories 5, 6, and 8, is factual question, simple answer.  What information did you provide to third-party bidders, what information did you provide to the ad hoc group; what's the difference?  That's it.  And likewise, on Interrogatories 10 and 14.  They may be long because we're quoting the Debtor's own brief, but we're asking for specific answers, not some broad narrative.

And then finally, Your Honor, counsel said multiple times we're not having a mini-trial and I get that point legally.  But here, we have a declaration from Mr. Moore in which he pulled out from the investigatory file a bunch of specific points which, on their face, appear to be curated by counsel; there's no way to read it otherwise.  And he said, here are my problems with Katsumi, here are my problems with Evolution, here are my problems with the LAM parties.  Why is he doing that if we're not having a mini-trial?  And if he's allowed to testify to those things, how are we not allowed to get behind them?

And on the privilege log, finally, the Judge Isgur case that was referenced, he compelled a log with specific detail in that case.  There's no way to read that transcript to say that no log is required, so I respectfully disagree with counsel on that point.

Thank you, Your Honor.

THE COURT:  Thank you.

MR. KELLEY:  My very quick wrap up, Your Honor. What I didn't do for you is, given the way the discovery has evolved over the case, identified what I think are the incomplete both responses to production and interrogatories.

THE COURT:  Okay.

MR. KELLEY:  And for ease of reference, I'll just read them into the record if you don't mind.  The interrogatories that we served -- that Katsumi served on the Debtors that we think the outcome of Your Honor's will impact and we want more fulsome answers are: 2, 4, 6, 7, 10, 11, 13, 18, 21, and 22.

And then Number 6, I think it's incumbent upon them to specifically identify the documents.  You can't just hit us up with this many documents.  In responding to request for production, you're supposed to say here are the documents responsive to these requests.  There's a high volume they've given.  I'm not asking that.  On 6, I want the specific documents.  Because if you're responding to an interrogatory by choosing to refer people to documents, you should direct them to those documents.

On the request for production, the ones that would be impacted by Your Honor's ruling will be 5, 6, 11 --

THE COURT:  All right, hold on a second.

MR. KELLEY:  Oh, I'm sorry.

THE COURT:  No, no.  5, 6, 11?

MR. KELLEY:  Yes, Your Honor.  14 -- excuse me -- 13, 14, 18, 19, 20, 21, and 22.  And, Your Honor, there are excerpts in there where there's these privileges affected things.  We have gotten some materials.  I think Debtors need a more fulsome response.  I'm not going to sit here and parse what they've given us and not.  I don't think it's a productive use of the court's time.  But I want to be focused on where we think that responses will be impacted by Your Honor's ruling.

Last comment, the use of the word facts here.  We're not talking about the underlying facts in the litigation alone.  Yes, we're entitled to those, but the facts are the litigation as an item; that is the fact that should be disclosed, not the party's position and negotiation on it.  And so, facts in that context means something very specific.

And with that, Your Honor, I think enough has been said and I'll reserve the rest.  Thank you.

THE COURT:  Thank you.  Ms. Dexter.

MS. DEXTER:  Thank you, Your Honor, just very briefly.  I agree that I really want to understand whether the privileges that the Debtors are asserting after May 20th apply to all communications between the plan parties and would really appreciate understanding why that common interest presumptively applies, even after conditional

approval of the disclosure statement of a different plan was denied and everyone picked up the pen again.  So I think that's the one point I would highlight is that I think that the blanket assertion of common interests privilege for that period after May 20th if overbroad.

Thank you, Your Honor.

THE COURT:  Thank you.  Mr. Duke.

MR. DUKE:  Thank you, Your Honor.  Mini-trial or not, we're entitled to test the assertions that have been made in the declarations.  And, you know, I take a little bit of issue with saying that this isn't a major (indiscernible) and putting in 110 pages of a (indiscernible) fact declaration, which as Mr. Kleinhaus noted, is just opinion testimony.

But regardless of how you characterize it, we're entitled to test what he considered, what he didn't consider because if they want to put on the strength of these claims in order to try to say, well, we're going to get all this value out of these claims, we're entitled to test on that.

THE COURT:  Thank you.  There's a 312 number here.  I apologize.  A 312 number?

MR. SAZANT:  Hi, Your Honor.

THE COURT:  Yes.

MR. SAZANT:  Jordan Sazant of Proskauer Rose on behalf of Evolution as well.  I'm actually just raising a

separate issue.  I didn't want to interrupt this argument, but I know Your Honor has a busy schedule.  We filed a statement requesting a status conference on our motion to segregate turnover proceeds of AR, and I wanted to just Your Honor if you've had a chance to take a look at that, but I didn't want to interrupt.

THE COURT:  It's a fair point.  We'll reach out today and get you in soon.

MR. SAZANT:  Thank you, Your Honor.  I would just raise that, you know, because the plan seeks to distribute all of the Debtor's assets, including the assets that are subject to this motion --

THE COURT:  What did I rule?  I entered something and I can't remember.  I know I entered an order deferring consideration of it, right; is that what I did?

MR. SAZANT:  That was a separate motion from the Debtors to withdraw $25.7 million.

THE COURT:  Oh, that was my way of saying no one touch the money until I do it, right?  That was my version of it.

MR. SAZANT:  This is a separate issue where we believe the Debtors have collected money that they have not segregated, they have not -- and had not previously informed us was collected.  And so, it's currently at issue and we believe needs to be segregated.

THE COURT:  You're saying there's new money.  Is that what the -- there's kind of new -- not the existing money, not the money that we --

MR. SAZANT:  Not in the factored receivables account; that's my understanding, Your Honor, correct.

THE COURT:  Okay.  I remember -- got it.  So I know Mr. Duke and I and Mr. (indiscernible) had plenty of conversations about money that was there and whether that money should move and then that money came back.

MR. SAZANT:  Correct.

THE COURT:  You're saying this is -- this is different than those funds.

MR. SAZANT:  That's my understanding, Your Honor.

THE COURT:  Got it.  No, no, no, that makes sense.

MR. SAZANT:  And we're not arguing that today, but...

THE COURT:  I hadn't made the -- I hadn't, in my mind, kind of understood that difference, so I got it. We'll get you in.  I thought it all related to kind of the funds that I've always kind of been talking about.  This is different.  I'll talk to my case manager today and we'll get you on.  We'll figure out a date that makes sense.  I will just read the papers.  I just -- I got it.  We just need to kind of pick a date and get it in.

So if I open the door and start talking about it,

it'll be 1:00 if we get around here, so I'm going to -- I won't do it.  Got it.

Anything else before we break for the day?  I promise I'll get to this.  This is -- I want to spend the time to kind of target this and not kind of scatter thoughts about this, so I want to kind of take my time and kind of work through this and talk about it because we have different time periods.  We've got kind of the mediation part; we've got kind of the post-May part; we've got, you know, kind of facts underlying docs, facts.  We've got more declarations, we've got Kirschner.  We've got a bunch of kind of moving pieces.  We've got discussions with kind of within during the mediation timeframe and those -- you know, the question is, but with the post-May period, you know, does that then -- it's a different privilege.  We've got special committee.

I want to kind of just organize everything in my mind and try to be as precise.  I know people may have questions, but at a minimum, I think if I just rule from here, I may elicit more questions than trying to be a little bit more thoughtful about it.  It makes sense for me to cite some law in here than just kind of you get this, you get this, kind of work it from there.

MR. KELLEY:  We appreciate that.  We also know it's a discovery dispute, which are never the funnest for

the Court to address.

THE COURT:  No, no, no.

MR. KELLEY:  We appreciate it.

THE COURT:  I think it comes -- I think, honestly, I think it comes with it.  It's just -- I know everybody starts off by saying courts don't like them.  I don't really care.  It's just another thing I got to decide.  It's just the matters, as long as parties have talked about it before, I'm good.  That seems to be the golden rule.  Have you discussed these issues and tried to narrow the issues before you get here from the time that you -- before you filed and then from the time that you filed.  I think -- I don't think Perez and I care one bit about ruling on these issues. They're important and they keep the trains moving, so appreciate it.

MR. KELLEY:  Your Honor, we didn't file a response.  I just handed the case to your staff.

THE COURT:  No, no, no, I've got it.  I'm familiar with the case, I'm good.

MR. KELLEY:  Your Honor, one question because I very much appreciate that you're going to spend the time on this.  We're asking the Court to do that, so we appreciate that.  We're going to commence the depositions this week.  I don't know how the ruling will come out.  However it comes out, we're going to have whatever conversations.  The

parties do speak pretty regularly with one another.

What are you envisioning next week might look like? Putting the whole motion to compel aside, there's a lot to dispute here and there's a lengthy trial. I think you scheduled to commence on Tuesday, and I got some (indiscernible).

THE COURT: I mean, if somebody wants to -- if it makes sense to have a status conference, y'all let me know in terms of what the presentations look like or not. I'm not telling anyone to do it. If somebody wants to ask me for one, you can. I have carved out a few days, but I know that everything has to finish on the 30th because on the 31st, I won't be here; that, I know.

So we've got three full working days to try to get it all in and maybe it does make sense to just talk logistics, what time we start, what time we end, and who goes -- maybe it makes sense to do that. I'm open to doing that on Friday if it makes sense to do so. Maybe it just makes sense to just take 30 minutes and just in terms of who goes first and what it's going to look like. But maybe parties can talk about that, so we can then have some clarity.

I know I'm not in a position to talk about that because I know that today is the objection deadline. And so, I am -- yeah, it makes no sense for me to even begin to

have that discussion now, but I will certainly get smarter once I know who gets it, but maybe it makes sense for the objections to come in.  You can talk to parties in terms of what goes in and we can then talk logistics.

But I do know those three days, if not, I am out essentially July 31 and then that whole next week is just not good.

MR. KELLEY:  Thank you, Your Honor.  We'll talk.

THE COURT:  Yeah.  I mean, just using that as the guidance in terms of, you know, going.  So if we got to start up early and go late, we'll do what we have to do.  Okay?

MR. KELLEY:  Thank you, Your Honor.

THE COURT:  Which means that opening should probably be targeted, right to the point, and save your best stuff for closings, if you will, the more fulsome based on the record.  But just openings can be a roadmap.  Closings are going to be what I'm really going to focus on after I hear everything and then parties can then tell me why everything is greater or why things should not be confirmed.

Okay.  Thank you very much.

(Proceedings adjourned at 11:46 a.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from

the electronic sound recording of the proceedings in the

above-entitled matter.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  July 22, 2026