**Exhibit 10**

**Transcript for November 10, 2025 Hearing on Temporary Restraining Order, Adv. Proc. No. 25-03803**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

First Brands Group, LLC          )   CASE NO:  25-03803
                   Debtors.      )   Houston, Texas
                                 )
                                 )   Monday,
                                 )   November 10, 2025
------------------------------)

MOTION HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          CLIFFORD W. CARLSON
                          ROBERT B. NILES-WEED
                          NILI MOGHADDAM
                          MATT BARR
                          SUNNY SINGH
                          ROBERT L. BARROWS
                          Weil Gotshal & Manges LLP
                          700 Louisiana Street, Suite 3700
                          Houston, TX 77002


For the Defendant:        CAMERON KELLY
                          JAMES C. TECCE
                          SCOTT HARTMAN
                          Quinn Emanuel Urquhart & Sullivan
                          700 Louisiana St., Suite 3900
                          Houston, TX 77002


                          ERICA WEISGERBER
                          MATT SORENSON
                          Debevoise & Plimpton LLP
                          66 Hudson Blvd E
                          New York, NY 10001

Court Reporter:

Courtroom Deputy:

Transcribed by:          Veritext Legal Solutions
                         330 Old Country Road, Suite 300
                         Mineola, NY 11501
                         Tel: 800-727-6396


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

HOUSTON, TEXAS; MONDAY, NOVEMBER 10, 2025

(Call to Order)

THE COURT:  Okay.  Good afternoon.  This is Judge Lopez.  It is 3:30.  I'm going to call case number 25-03803, what I would call First Brands in the adversary proceeding here, on a preliminary injunction.

Why don't I take appearances in the courtroom, and we'll get started.  Good afternoon.

[00:00:32.690] MR. CARLSON:  Good afternoon, Your Honor.  Cliff Carlson of Weil Gotshal, on behalf of the Debtors.  And joining me in the courtroom is Robert Niles-Weed and Nili Moghaddam.  In addition, Your Honor, virtually we have Matt Barr, Sunny Singh, and Robert Barrows.

THE COURT:  Okay.

MR. CARLSON:  And apologies, they wanted to be here live, but they had some travel issues.

THE COURT:  No worries.  Okay.  Good afternoon.  And the Judge should turn on his camera, too.  Okay.  Good afternoon.

[00:00:59.410] MR. KELLY:  Good afternoon, Your Honor.  Cameron Kelly from Quinn Emanuel.  I'm joined by Jamie Tecce and Scott Hartman, also from Quinn Emanuel.  And then from Debevoise, Erica Weisgerber and Matt Sorenson.  We represent the Defendants today.

THE COURT:  Okay.  Good afternoon.

Let's see, I have -- I want to make sure I have Mr. Moore.

Doe anyone else wish to make an appearance?  Mr. Moore if you could hit five-star on your phone.  I know -- Is it 240?  I just want to make sure I've got you here.  Mr. Moore?

[00:01:35.756] MR. MOORE:  Yes, Your Honor.

THE COURT:  Okay, perfect.  Okay.  Good afternoon.

Let's see --

MR. MOORE:  Good afternoon.

THE COURT:  There are few lines that are unmuted.  I would just ask that you please monitor yourselves, and keep your phone muted while we continue to do this.  There is -- yeah, okay.  We're good.

So parties, how do we wish to proceed?

MS. MOGHADDAM:  Yes, Your Honor.  May I approach?

THE COURT:  Yes.

MS. MOGHADDAM:  Good afternoon, Your Honor.  Nili Moghaddam of Weil Gotshal, on behalf of First Brands Group, LLC, and its Debtor affiliates as Debtors and Debtors-in-Possession in these Chapter 11 cases.

Your Honor, the Debtors filed an adversary proceeding last Monday, bringing eight causes of action against Patrick James, founder and former CEO of First Brands, and against Patrick James Trust, and against seven entities owned or

otherwise controlled by Defendant James.  These causes of action, which allege, among other things, fraudulent transfer and unjust enrichment, center on a years-long fraud perpetrated by Defendant Patrick James, wherein he caused First Brands to fraudulently incur billions of dollars in financing, principally through two ways, Your Honor.  First, a factoring fraud scheme to the tune of at least $2.3 billion involving accounts receivable factoring liabilities based at least in significant part on nonexistent and doctored invoices.  Second, Your Honor, an off-balance sheet SPV financing scheme also to the tune of at least $2.3 billion in debt, involving, at least in part, double-pledging collateral that First Brands itself could not borrow against a second time.

Defendant Patrick James caused First Brands to fraudulently incur these billions of dollars in financing, Your Honor, only to then turn around, take that money, divert it, and take it to his personal accounts, his trust, and his personal businesses.  This fraud in, fraud out, Your Honor, continued for years.  Last Monday, Your Honor, Your Honor granted the Debtor's emergency application for injunctive relief freezing Defendant's assets.  Today, we are before you seeking that same relief on this preliminary injunction motion, Your Honor.

In support of our application, the Debtors have

presented a sworn affidavit from First Brand's interim CEO, Chuck Moore.  As the Court is aware, Mr. Moore is available, and will be testifying today.  He will tell this Court, Your Honor, that at the same time as Defendant Patrick James was causing First Brands to incur billions of dollars of fraudulent financing, he was misappropriating hundreds of millions, if not billions of dollars from First Brands.  And he was doing it, Your Honor, to fund his lifestyle, and that of his family.  Those misappropriations include, and these are just illustrative examples, Your Honor, over $700 million funneled to Defendants from 2018 to 2025 for no consideration, no valid business purpose, and that includes, Your Honor, at least $600 million, the majority, to the Patrick James Trust.

The misappropriations also include, Your Honor, approximately $35 million from 2018 to 2025 to Larchmont LLC, Mr. James' family office, and a Defendant in this case. At least $3 million, this is another example, from 2019 to 2024 paid towards rent for Mr. James' New York City townhouse.  Approximately $500,000 for Mr. James' private celebrity chef just this year alone.  More than $10 million from 2018 -- 2025, rather, Your Honor, from First Brands to a company called Battery Park Holdings, LLC.  And Your Honor will see this in the documents we'll present, that is described as a personal matter, 100% owned by Mr. James.  In

just one invoice from Battery Park Holdings, Your Honor, payments included approximately $150,000 for a celebrity personal trainer.  One invoice, for one entity that was a personal business.

So Your Honor, the Debtors have shown in their papers, and will show in court today that hundreds of millions of First Brands funds were taken by Defendant James, and more broadly, the Debtors have shown and will show today that this theft was part of a rinse-and-repeat cycle wherein Mr. James routinely and regularly got funds to get funds.

The Debtors, as the Court knows, brought eight causes of action, each of which fit these staggering facts, and they have more than met their prima facie burden, Your Honor, on this motion for a preliminary injunction.  And while the Debtors carry this burden, Your Honor, we're aware of that, of course, it is not lost on us that Defendant James has not offered a sworn affidavit in support of his opposition.  It is not lost on us that he has offered only the unsworn representations and protestations of his Counsel in his two oppositions to this motion.  He's offered no facts, none, Your Honor, in opposition to specific allegations we make about line item by line item fraud and misappropriation.  He's offered no documents justifying his actions.  We'll go through the exhibits, and he will not be testifying, Your Honor.  He is not sitting here so that he

can tell his story, and tell this Court he did not misappropriate those funds, he didn't take company money, and there was no factoring fraud, and there was no SPV fraud.

You will not hear any of that from the Defendant Patrick James in this case, or any other Defendant named in this matter.  What you would hear is Mr. Moore, a 30-year veteran of this industry, tell you it just wasn't right.  As they peeled back layers and layers, and they saw the fraud, nothing was right in connection with those two financing schemes and the misappropriations.

So Your Honor, in their papers, and I would submit in this courtroom today, Defendants will nitpick on the margins, resort to distractions, but they will not have an explanation as to why hundreds of millions of dollars, much of them obtained through debt financing, and other financing schemes, purportedly on behalf of First Brands, mind you, were diverted to Mr. James and his family.

Now to be fair, Mr. James apparently, though very much unrepentantly, acknowledges in his papers that transfers were made to his personal accounts, but he defends them, saying that he later reinvested the funds back into First Brands.  But Your Honor, it's no defense to theft to say, I gave it back.  Nor, to be clear, does the evidence in any way suggest that he gave it all back, such that this was, in

fact, all a wash.  And even if it was, and again, Your Honor, it was not, Mr. Moore will testify today that these were not reinvestments back, money taken out, money put back in.  Not at all.  This was actually an effort urgently to perpetuate Mr. James's fraud by maintaining the illusion that First Brands could repay the debts he inappropriately secured in the first place.  Rinse, repeat, in, out.  So Defendant James engaged in a loop of transferring money in to mislead his Lenders, and secured additional funding only to transfer that money right back out.  Again Your Honor, rinse, repeat, fraud in, fraud out until the music stopped and there were not enough chairs left, not for the Creditors, not for the 26,000 employees, and not for the customers in need.

So the Debtors, Your Honor, are before you again at a time when the stakes could not be higher because not on our watch, Your Honor, will more funds from this Estate be dissipated, put further beyond the reach of the Estate, their Creditors and otherwise, and potentially irretrievably lost to the web of entities that Mr. James has created and by which he runs his life.

Thank you, Your Honor.

THE COURT:  Thank you very much.

MR. TECCE:  Judge Lopez, good afternoon.  James Tecce of Quinn Emanuel, on behalf of Defendant, Mr. James.

First of all, thank you, Your Honor, for having the hearing.  I know that you have a very busy schedule, and we had asked for the date to be kept.

Your Honor, a week ago, the Debtors rushed into this Court on an ex parte basis, with no concrete evidence of emergency and no advance notice to Mr. James, and they asked the Court to enter the TRO that is now at ECF 14 in this adversary.  That order knows absolutely no limitation.  It awards indiscriminate relief, applying to entities about whom nothing has been said in the underlying affidavit, Defendant entities and operating businesses that are not alleged to have received transfers by the Debtors, like Peterson, Eitek, and Meteor, and it freezes any and all accounts.  Because the Debtors didn't make any effort to tailor the relief that was requested, the parties were forced last week to negotiate an emergency basis after the fact, an interim stipulation at ECF 28 that provides limited relief through today to make sure that the TRO does not wipe out Peterson, Meteor, and Eitek and those businesses by stopping them from making payroll payments, tax payments, and payments to suppliers and employees.

Audaciously, Your Honor, in the reply that was filed late last night at ECF 43, in paragraph 1, the Debtors begin by saying, "The Court already concluded in awarding the temporary restraining order that the Debtors have carried

their burden to show they are entitled to injunctive relief." We could not disagree with that more, Your Honor. That is why we're here today, to hold them to their burden. And given the breadth of the TRO, Your Honor, and the paucity of the record, under no circumstances can that order continue in any way or form after today's hearing.

This entire process has been rushed. By the Debtor's own admission, it relies on one affidavit from Mr. Moore. In four paragraphs, 15, 27, 32, and 35, he concedes that there's more work to be done here. The Affiant is the only affiant in connection with the application. He does not have personal knowledge of these events. That affidavit is replete with information and belief qualifications. And if you put aside the factual predicate for the extraordinary relief that's being requested, Grupo, in Supreme Court precedent, don't provide a legal basis for the relief that they're requesting. The Debtors cannot obtain an injunction upon the filing of a lawsuit before they obtain a judgment.

That is exactly what the Estates are trying to do here. And the reply makes this clear in paragraphs 7 and 44. In paragraph 7, the reply says, "The Debtors will not oppose any reasonable modifications to the structure of the injunction so long as it continues to prevent dissipation of property of the Estate, and ensures that the Debtors can collect on a judgment in this action." Paragraph 44 says,

"If the Defendants are willing to fund an escrow with the entirety of the proceeds received from First Brands, pending the outcome of this litigation, the Debtors can comfortably know that all those proceeds can be recovered if and when the Debtors secure a judgment."

This preliminary injunction application is an effort by the Estates to get out ahead of other parties, and try and freeze money on a general basis to collect a judgment that they think they will obtain in seeking monetary relief against Mr. James and these entities.  The Supreme Court makes clear that cannot happen, and they don't satisfy any of the exceptions of Grupo, Your Honor.  The claims are not entirely equitable.  The complaint is built around fraudulent transfer claims, claims that seek the payment of cash, not a specific asset.  Gran Financiera's Supreme Court case says that those are legal claims, and in paragraph 20 of the reply, the Debtors concede dash is fungible.  Clearly, they're seeking monetary relief here, Your Honor.

And while they have claims for constructive trust and accounting, they're not pled with specificity, and accounting on its own is not a standalone claim, and it can't create equity.  And even if the claims were predominantly equitable, Your Honor, and this is really the point here, there is still no relief because there's been no showing of tracing to a specific fund or asset.  An

injunction cannot issue if the injunctive relief requests the freezing of assets generally rather than those connected to a particular property or fund that is the ultimate object of the equitable relief sought.

You've heard allegations of massive amounts of money, but you've never heard specifically what the nexus is between the assets that they seek to freeze with the broad TRO, and the equitable relief that they request.  The application does not identify a specific asset once with specificity.  It doesn't identify a specific piece of property, a specific bank account.  It does not contain any evidence of tracing, with precision that is required to get the injunctive relief that they're requesting.  There's no point A to point B.  From the transfer to the account that they want to attach, there is no tracing.  That's required to get an injunction.

And one reason why there can't be any tracing is because there's no particularity in what's alleged.  The dates of the transfers, the amounts, the transferor, the transferee, the starting point, the ending point, it's not been alleged with sufficient particularity to survive a 9(b) claim, which is not the standard, but certainly to not get extraordinary relief of a preliminary injunction on the first day of a lawsuit.

Standard matters, Your Honor.  The Fifth Circuit says

it's extraordinary relief, the Debtor bears the burden. They have not carried their burden. If anything, the reply is replete with more attacks on Mr. James that he didn't participate in discovery. Neither did the Debtors. That he hasn't come here to affirmatively disprove these allegations. That's not his burden. There's a moving target. When there's a trial, there will be a trial. But it's not his obligation on a preliminary injunction to come in and disprove their allegations. And deflecting back to Mr. James does anything but -- The only thing it shows is the Debtor knows it hasn't carried its burden. It has a heavy burden. It has not carried it. And the relief of the injunction, under the circumstances, Your Honor, is grossly disproportionate to seize any and all assets, which is what that TRO does.

Finally, Your Honor, it makes no sense that this is being rushed, because there was no showing of imminent danger in the application. There's no showing of imminent danger on this record. Mr. James is no longer the CEO of the company. The challenges that are being made are historical at this point. In transactions referenced in the complaint in the affidavit, they span a seven-year period of time, from 2018 to 2025. That's in the Moore Affidavit, paragraphs 35, 39, 51, and 54.

And to be clear, Your Honor, we understand the

importance of acting as an Estate fiduciary.  We're not trying to minimize that.  But even the Debtor-in-Possession's powers have limitations.  The Debtor can't, on the first day of a lawsuit, just to make sure that money is put aside for a judgment that it thinks it's going to obtain, which has been very clear that that's what it wants to do, get an injunction in this forum, if they want an expedited trial and a permanent injunction, we can accommodate that, Your Honor.  But we cannot concede what is not authorized legally and not authorized on this record, and has not been shown with particularity or specificity that on day one, they get a broad injunction imposing all the assets.

We respectfully submit, Your Honor, the TRO should expire by its terms, there should be no preliminary injunction, and the case should proceed expeditiously, if that helps, but to a permanent injunction trial.

THE COURT:  Thank you.

MR. TECCE:  Thank you very much.

MS. MOGHADDAM:  Your Honor, may I proceed?

THE COURT:  Yes, please.  Thank you.

MS. MOGHADDAM:  Thank you.

THE COURT:  Are we going to proceed with Mr. Moore at this time?

MS. MOGHADDAM:  Yes, Your Honor.

THE COURT:  Okay.

MS. MOGHADDAM:  With the Court's permission.

THE COURT:  Just as a form of housekeeping, I know, just so we have a clean record, I'm going to -- I'll swear Mr. Moore in.  And Mr. Moore, there is someone who is -- I've given the presenter role to present documents there.  Are we proceeding by showing Mr. Moore just documents on the screen, and he will review them on the screen?

MS. MOGHADDAM:  Your Honor, I think that was our plan.  The team will correct me if I'm wrong.  I think in the first instance, we'll present it to Mr. Moore without publishing to the Court, and then he will identify the document, and then we'll proceed.  In the interest of time, of course, we're happy to publish, and just --

THE COURT:  No, no, no, no.  I just want to make sure, just so Mr. Moore and we're all clear as to kind of what we're doing.  Because I know some of these documents were filed under seal, and that's why I want to just be sensitive to what's going on here.

MS. MOGHADDAM:  Understood.  As to the documents that were filed under seal, Your Honor, we plan to very briefly, once they're published, in other words foundation is laid, to publish, and you know, proceed through the document in a swift manner.  We're happy to keep it unpublished.  I know the parties obviously all have access to the documents.

THE COURT:  You all let me know.  I'm happy to proceed with whatever makes the most sense.

MS. MOGHADDAM:  Okay.

THE COURT:  Okay.

MS. MOGHADDAM:  And Your Honor, I should have noted earlier, we do have copies of binders of the exhibits for the Court, if the Court would prefer to have the binders ready for ease of reference.

THE COURT:  How many do you have?

MS. MOGHADDAM:  We have two, Your Honor.  I'll note --

THE COURT:  Yeah, I can take them.

MS. MOGHADDAM:  Okay.  I will note they're hefty too, but --

THE COURT:  You can hand it to one of them, there.

MS. MOGHADDAM:  Perfect.  Thank you, Your Honor.

THE COURT:  They'll give it to me.  Thank you.

All right.  In the interest --  Mr. Moore, can you raise your right hand?

Do you swear to tell the truth, the whole truth, and nothing but the truth?

MR. MOORE:  I do.

THE COURT:  You can put your hand down.  And you understand the oath that you took is the same that you would take if you were live in the courtroom, on the witness stand?

MR. MOORE:  Yes, Your Honor.

THE COURT:  Okay.  Can you just tell me who, if anyone, is in the room with you?

MR. MOORE:  There's no one in the room with me, Your Honor.

THE COURT:  Okay.  And I would ask that you put any paper or notes that you may have written to the side.  No looking at texts, or any of that, messages -- It's just as if you were on the witness stand.  Do you understand?

MR. MOORE:  I do, Your Honor.  I have nothing in front of me, and no applications open.

THE COURT:  Okay.  Counsel, you may proceed.

MS. MOGHADDAM:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. MOGHADDAM:

Q    Good afternoon, Mr. Moore.

A    Good afternoon.

Q    Let's talk first about your background and your experience.  Are you a managing director with the firm Alvarez & Marsal  North America?

A    Yes, I am.

Q    And we'll just go ahead and call that A&M if that's okay with you, throughout your testimony today.

A    Yes.

Q    What is A&M, Mr. Moore?

A    A&M is a global consulting firm specializing in turnaround and restructuring work.

Q    And how long have you worked there?

A    I've been there over 10 years.

Q    Can you describe your experience as a restructuring advisor?

A    Yes.  I am typically brought in by companies that are experiencing distress, and my role is to assist them in guiding them through that process, and figuring out the best path forward.

Q    And do you have particular expertise in the automotive industry?

A    Yes.  I have over 30 years of experience providing advisory and restructuring expertise or services to the automotive industry.

Q    And in connection with your work in the restructuring space, have you been recognized by various associations for the turnaround work that you've done?

A    Yes.  I have worked on multiple engagements that have received awards, such as Turnaround of the Year and Transaction of the Year.

Q    And am I correct that some of those have to do with companies in the automotive space, the recognition you've received?

A    Yes.

Q    Okay.  So let's now turn to that experience in the automotive industry.  Could you please tell the Court about the types of restructurings you've overseen in that space?

A    Yes.  First of all, within my experience, I served as the CFO of an auto supplier.  And from an advisory standpoint, I work with companies that are involved in both supplying original equipment manufacturers, as well as suppliers to the automotive aftermarket.

Q    And where did you work, Mr. Moore, before you joined A&M?

A    I was a senior managing director at a restructuring firm by the name of Conway MacKenzie, which is now Riveron.

Q    In all, how many years experience do you have providing turnaround consulting, advisory services, and performance improvement to organizations?

A    I have over 31 years total in that category.

Q    Okay.  And in that 30-year career, how many restructurings, approximately, have you overseen?

A    I've worked on a substantial number of restructurings.  I've overseen at least 15 myself.

Q    Okay.  We've covered your background.  Let's talk briefly, and at a high level about First Brands Group.  Was A&M retained at some point to provide restructuring advisory services to First Brands Group, LLC, and certain affiliates?

A    Yes.

Q    When was A&M retained?

A    Our engagement letter is dated September 5th, 2025.

Q    And what were the services that A&M was retained to provide?

A    A&M was to provide me as a chief restructuring officer, and also to assist the company in developing a restructuring strategy to assist it with liquidity management, to identify cost reduction opportunities, and to assist with preparation for a potential Chapter 11 filing.

Q    Okay.  Was A&M also tasked with conducting an investigation in collaboration with the Debtors' advisors of the Debtors' pre-petition operations?

A    Not initially, but that did become part of the mandate of A&M.

Q    Got it.  Okay, we'll come back to that investigation. For now, you mentioned a moment ago that at some point after A&M was retained, you were appointed Chief Restructuring Officer.  What were your responsibilities as CRO?

A    As CRO, and I was appointed on September 24th, 2025 as Chief Restructuring Officer, those activities included approving all disbursements for the company, serving as the chief liaison to creditor constituents, overseeing the communications firm, and working directly with the Special Committee on conducting an investigation.

Q    And at some point, Mr. Moore, were you then appointed

Interim Chief Executive Officer of First Brands?

A    Yes.

Q    Do you know the date you were appointed?

A    That board appointment was October 13th, 2025.

Q    Got it.  Did First Brands -- and I think we all know the answer to this, but did it ultimately file for Chapter 11?

A    It did.

Q    Okay.  Do you recall the date?  Was it September 24th for Global Assets, LLC and 12 of the Debtors, and then September 28th for First Brands Group, LLC, and the remaining Debtors?

A    That's correct.

Q    Okay.  And so September 28th is the petition date in this matter.  Correct?

A    That's correct.

Q    Okay.  And just so we're clear for the record, First Brands Group, LLC and its Debtor affiliates are the Debtors and Debtors-in-Possession in these Chapter 11 cases.  Is that right, Mr. Moore?

A    Yes.

Q    And for ease of reference today, I'm just going to refer to First Brands Group, LLC and its Debtor affiliates as either the Debtors or First Brands, throughout your testimony today.

A    Okay.

Q    Okay.  So let's talk about the business of First Brands.  Can you tell the Court, generally, what First Brands was doing pre-petition?

A    First Brands is a global supplier of component parts to the automotive aftermarket, as well as the original equipment manufacturer segments.

Q    How many employees does it have worldwide?

A    As of the petition date, it was estimated to be approximately 26,000.

Q    And approximately how many of those are based in the United States?

A    Approximately 6,000.

Q    How many Debtor entities are within the First Brands organization?

A    Between the two filing dates that you mentioned, I believe there are approximately 112 Debtor entities.

Q    Okay.  And you mentioned that First Brands is a global supplier.  How many continents does it span?

A    Five continents.

MS. MOGHADDAM:  With the Court's permission, we'll put up Exhibit 51, Debtors Exhibit 51, for the witness, please.  And this one is one that we could also publish at the same time, Your Honor, probably, given that it's not in any way sensitive.

BY MS. MOGHADDAM:

Q    Mr. Moore, do you have before you now what has been marked by the Debtors as Exhibit 51?

A    Yes.

Q    Do you recognize this document?

A    I do.

Q    What is it?

A    This is a legal organizational chart, highlighting the Debtor entities with the red box around them.

Q    Okay.  So fair to say that these are various First Brands writ large entities, and only the red ones are Debtors in this matter, in these proceedings?  Is that correct?

A    Yes.

Q    Okay.  A number of entities, is that correct, Mr. Moore, both Debtor and non-Debtor?

A    That's correct.

Q    Okay.  We can go ahead and take that down.  We might refer to it, and zoom in for reference later.

        You testified that First Brands organization includes over 100 entities.  We just saw that on Exhibit 51, the web of entities.  Can you tell the Court the ownership structure of those 100-plus entities?

A    They eventually roll up to ownership by Mr. Patrick James.

Q    So is Mr. James the sole owner of each and one of those entities?

A    That's my understanding.

Q    Okay.  Let's now turn to the cash and debt position at petition.  What was the Debtor's capital structure as of the petition date of September 28th, 2025?

A    As of the petition date, there was approximately $5.5 billion in first and second lien term debt.  There was an additional approximately $600 million in ABL debt, which also included cash management products from the ABL lenders that are supply chain financing.  Those two together total $6.1 billion in secured debt.  In addition to that, the Debtors had approximately $800 million in unsecured supply chain financing.  And then, there are two other categories that are off balance sheets, both third party accounts receivable factoring, as well as debts with special purpose vehicle entities, which are the ones that filed on September 24th.

Q    Okay.  And I know we'll be coming back to the SPV debt, as well as the factoring debt.  For now, Mr. Moore, what were the approximate reported consolidated sales of the Debtors in 2024?

A    Net sales as reported in 2024 were approximately $5 billion.

Q    And what was the Debtor's cash position as of the

petition date of September 28th, 2025?

A    Approximately $12 million.

Q    So if we take the capital structure there, we take the reported sales figures, and the cash position, based on all that, Mr. Moore, is it correct that First Brands was levered at least two times reported revenue when Mr. James was CEO?

A    Yes.

Q    And given its reported net sales, are you at all surprised that First Brands was able to incur debt at two times reported revenue under those circumstances?

A    Yes.

Q    Why is that?

MR. TECCE:  Objection, Your Honor.  I do object to this kind of questioning because, well, first of all, this is beyond the affidavit that was submitted in connection with the application for inductive relief.  And we didn't have access to this witness for a deposition accommodated in the schedule, and the Debtor has taken the position that basically satisfied their burden already.  So I think if they want to do a direct that centers around this affidavit, the one that we've had for ten days, or seven days rather, that's fine.

But this roaming examination into areas that are far beyond that I respectfully submit is beyond the scope of (indiscernible) we have about 65 exhibits that we've gotten

here produced to us, some of which were produced last night. So we're really going as quickly as we can to accommodate people's schedules but this inquiry into the capital structure and the performance is not part of his affidavit, or --

THE COURT:  I understand.  I'm just taking it more as background, and I'll allow it.  But if it goes too far, I'll stop it.

MR. TECCE:  Appreciate that.  Thank you very much.

THE COURT:  Thank you.

You can continue.

MS. MOGHADDAM:  Thank you, Your Honor.  I will just note that the capital structure, all of what I've just covered was very much, with the exception of the conclusion (indiscernible)

THE COURT:  That's why I'm taking kind of the background portion of what you're -- in his affidavit.  I think --

MS. MOGHADDAM:  Absolutely.  We had all of those figures in the affidavit.  And Your Honor, just to be clear, because I suspect that this objection might resurface again, we absolutely were willing to make Mr. Moore available for a deposition.  We said, let's move this to Wednesday, Thursday of this week, allow Mr. Moore to be deposed.

THE COURT:  Yeah.  Let's keep going.

MS. MOGHADDAM:  We just want to make sure that the Court is aware.

THE COURT:  Yep.  Thank you.

MS. MOGHADDAM:  Thank you, Your Honor.

BY MS. MOGHADDAM:

Q    Okay, Mr. Moore, back to your testimony, and your appointment as CEO.  You testified you were appointed interim CEO of First Brands on October 13th, 2025.  Is that correct?

A    Yes.

Q    And did you replace Patrick James as CEO at that time?

A    Yes.

Q    And was Patrick James also the founder of First Brands?

A    That's my understanding, yes.

Q    And he was a member of the Board of Directors?

A    Prior to his resignation, yes.

Q    Correct.  And I think you testified a moment ago he's the sole shareholder of First Brands?

A    That's my understanding, yes.

Q    And he's always been the sole shareholder?

A    That's my understanding.

Q    And even though he's resigned, he remains, obviously, the sole shareholder.  Correct?

A    Yes.

Q    All right.  When Mr. James resigned, am I correct that

he resigned from any and all positions he held?

A      Yes.

Q      Why did he resign?

A      There was significant pressure for Mr. James to exit the organization.

Q      Would he have been terminated if he had not resigned?

A      I think that is likely, based on the pressure that was being exerted from lenders, and an unwillingness to provide additional financing as long as Mr. James remained in the position.

Q      And the concerns about Mr. James, did they have to do with his management of the company?

MR. TECCE:  Objection, Your Honor.  Calls for a hearsay response from the witness.

MS. MOGHADDAM:  Your Honor, the rules of evidence do not apply in preliminary injunction.  The Fifth Circuit has clearly ruled that.

MR. TECCE:  I would add speculation to the objection.

THE COURT:  It's overruled.  He can answer.

BY MS. MOGHADDAM:

Q      Do you recall the question, Mr. Moore?

A      I do, yes.  Based on conversations that I had directly with advisors to our lenders, it was more focused on the issues and irregularities that had emerged.

Q      Okay.  Thank you for that background.  Why don't we now

turn to the A&M investigation of the pre-petition operations of the Debtor and the Debtor affiliates.  Okay.  You testified that A&M at some point was tasked with conducting an investigation.  When was that commenced, and what was its scope?

A    I believe the Board resolution is as of September 24th, and that resolution had a number of areas that the Special Committee was going to be in charge of investigating, and the Special Committee enlisted Weil Gotshal and A&M to conduct that investigation.

Q    What was the scope of the investigation as conceived at the outset?

A    There is a definition of specified matters.  Some of those that I recall include investigating any transactions or past dealings potential -- to identify potential claims and causes of action that could exist against third parties, including current and former members of the First Brands management team.

Q    Did the scope of the investigation at some point expand?

A    I would say that the scope has remained generally the same.  However, as new information has been learned, periods of time that are covered, as well as the types of transactions looked at certainly have been expanded.

Q    Got it.  And then in terms of the substantive areas

you've been looking at, could you tell the Court some of what has been the focus of you and your team?

A    Two of the areas are identified in my affidavit that relate.  Those two relate to accounts receivable factoring with third parties, as well as various transactions with the special purpose vehicle entities.

Q    I think you stated in your affidavit, but worth asking again, the investigation is ongoing.  Correct?

A    Yes.  The activities related to those two areas are substantially complete.  There are other areas that we are investigating as well that are not included in my affidavit.

Q    Got it.  So as to the factoring arrangements, and as to the SPV debt financings, the investigation by A&M is substantially complete.  Is that correct?

A    Yes.

Q    And as you and your team have conducted this investigation, fair to say that you've gained an understanding of the pre-petition operations of First Brands?

A    Yes.

Q    And as a result, you've learned about its purported assets, finances, products, vendors, customers, employees, and so on?

A    Yes.

        MR. TECCE:  She's leading the witness.

MS. MOGHADDAM:  Your Honor, leading on very basic introductory matters, not least due to the (indiscernible) concerns raised by the other side.

THE COURT:  I understand.

BY MS. MOGHADDAM:

Q    So the answer was yes.  Correct?

A    Yes.

Q    Okay.  And how did you gain that understanding?  What materials did you and your team review?  Did you conduct witness interviews?  Just briefly tell the Court about the nature of the investigation conducted to date.

A    Yes, a significant number of documents were obtained and were reviewed.  Devices were imaged, and the contents were reviewed.  A significant number of interviews were conducted with First Brands employees.  There was document production requests in 2004 requests that were submitted to parties as well.

Q    And was the scope of the documents collected and under review millions of documents?

A    Yes.

Q    You're aware, Mr. Moore, that on Monday, November 3rd, the Debtors filed an adversary complaint and an emergency application for injunctive relief, including an emergency motion for a TRO in this matter.  Correct?

A    Yes.

Q    And you're generally aware of the claims brought, and of course you submitted an affidavit in support.  Is that right?

A    Yes.

Q    And are the factual assertions, and the conclusions drawn, and the opinions rendered in that affidavit based on your investigation, and the investigation of your team at A&M?

A    Yes.

Q    Why did the Debtors feel compelled to bring an emergency application for a TRO against Mr. James, his trust, and a number of his personal entities?

A    As I indicated, the work as it relates to these two areas, AR factoring and transactions with the special purpose vehicle entities, was substantially complete, and we had multiple data sources that all were telling the same story.  But in addition to that, and in particular, there is a very wide ranging enterprise of entities that Mr. James owns and controls, there is a significant amount of cash that moves amongst all of these entities.  And it was our concern, based on these claims and causes of action, that there could be assets that otherwise would be available to the Debtors that may dissipate.

Q    One final question on this.  The Defendants have, as I think you know because you've generally reviewed their

papers, tried to make much of the fact that your investigation is "ongoing, not complete."  Do you have a view on that, Mr. Moore?

A    I do.  As I've indicated, these two areas are substantially complete.  There are other areas in which the investigation is ongoing, and there may be additional items that we may focus on and bring claims related to, but clearly on these two areas that are the subject of my affidavit, that analysis and investigation is largely complete.

Q    Got it.  Thank you for that background.  Why don't we now turn to the allegations made in your affidavit about the fraudulent funding for First Brands.

So you allege in your affidavit that Mr. James improperly secured billions of dollars in financing for First Brands from third parties, and you allege that it was done in principally two ways.  What is the first way in which Mr. James caused First Brands to incur -- or to obtain debt financing in a fraudulent manner?

A    Through the third-party factoring.  It was submitting invoices to third-party factors that were inflated beyond what the original invoice was.  So when I say inflated, I mean that the original invoice with a customer may have been at one amount, but the invoice that was submitted to the factor was a much larger amount.

Q    Did those accounts receivable factoring liabilities also at times include non-existent invoices?

A    Yes, that's another area.

Q    Okay.  So doctored invoices, non-existent invoices. Correct?

MR. TECCE:  Objection, Your Honor.  She continues to lead the witness into this testimony.

THE COURT:  That's okay.

Please continue.

BY MS. MOGHADDAM:

Q    Is that correct, Mr. Moore?

A    Yes, that's correct.

Q    Great.  Tell the Court about -- We'll, actually, strike that please.  As to that first item, the factoring liabilities, what was the approximate dollar amount in accounts receivable factoring liabilities incurred by First Brands?

A    As of the petition date, it is at least $2.3 billion that is owed to third-party factors.  And we understand the third-party factors are asserting a number a little higher than that, so it's at least $2.3 billion.

Q    Got it.  What is the second way in which Mr. James improperly secured financing for First Brands?

A    This relates to transactions with these special purpose vehicle entities, which I'll just call SPV entities, and the

transactions involving the SPV entities and third-party financing providers to these SPVs, where the collateral was pledged to multiple parties at the same time.

Q   So double-pledging of collateral.  Correct?

A   Yes.

Q   And what was the approximate dollar amount in financing transactions involving SPVs that was incurred by First Brands?

A   As of the petition date, this also is at least $2.3 billion.

Q   Okay.  Let's now turn to the factoring fraud you mentioned a moment ago.  Could you tell the Court, very high level, what is a factoring arrangement?

A   Factoring is used quite often -- What a company does that employs factoring is it will take an invoice that it has related to a good or a service that it provided to its customer, and instead of waiting to get paid based on the terms that it has with its customer, it can factor or sell the receivable, or the invoice, to a factor in order to get paid early, with a discount, and then the factor would collect directly from the customer.

Q   How did A&M come to learn that First Brands was entering into these factoring arrangements, and I think you testified on the order of billions of dollars?

A   During our first week working on site at the company,

it became clear that the company had significant customer and third-party factoring facilities.

Q    Okay.  After A&M learned about these liabilities to third-party factors, what, if any, additional investigation did it conduct on that area?

A    Shortly after we were engaged, and specifically on Friday, September 12th, it was the first time that we heard directly from a member of the management team that they had -- they believed that they pledged receivables, the same receivable or invoice to multiple factors.  Over the course of that weekend, I had numerous conversations with three of the members of the management team to try to understand more about that.  And then, over the course of the following few weeks, we learned more and more information on this.

Q    Did A&M obtain the records of third-party factors so that it could complete the picture in connection with its investigation?

A    Yes.  In addition to reviewing company records, we obtained all of the underlying detail from the third-party factors as of the petition date.

Q    And did A&M attempt to reconcile those records?

A    Yes.

Q    As a result of that review, interviews, review of records, both the company's and third-party factors records, did you come to form an opinion about the company's

factoring practices?

A     Yes, based on this analysis --

MR. TECCE:  Objection (indiscernible)

THE COURT:  Excuse me -- Hold on a second.

MR. TECCE:  The witness is a fact witness, not an expert witness.

MS. MOGHADDAM:  Your Honor, I'm asking for the lay, the very lay opinion he has articulated in court today, and in his affidavit in spades, that there was fraud with respect to the factoring liabilities.

THE COURT:  What was the question?

MS. MOGHADDAM:  It was, as a result of the investigation that you did, did you then come to form an opinion?  And of course, that's the very opinion that's in the affidavit.  It's not an expert opinion.

THE COURT:  I'll allow it.

MS. MOGHADDAM:  I will also note he does happen to be an expert in this space.  But I was not asking him for an expert opinion.

THE COURT:  Yeah.  Got it.  But I'm taking that opinion not as an expert opinion.  This is you saw a bunch of information, and you have reached some conclusions about what you saw.  I'll take it at that.

MS. MOGHADDAM:  Thank you, Your Honor.

THE COURT:  Go ahead.  You may proceed, Mr. Moore.

BY MS. MOGHADDAM:

Q    Mr. Moore, what was the opinion that you formed about the company's factoring arrangements?

A    I first came to observe the two, and really the three areas.  One, that invoices that were reflected from the third party were significantly lower in the company's records.  Two, there were invoices from the third party factors that didn't exist in the company's system.  There was no record of a sale.  Three, that these invoices were factored multiple times.  My observations at that point were then presented to members of the management team directly involved in this, and it was through those interviews that the members of the management team admitted directly to me that yes, these were practices that they were employing.

Q    And specifically, did they admit as to the three discrepancies you've identified, the invoice amounts having discrepancies, non-existent invoices, and the same invoice being factored more than once?

A    Yes.

Q    Okay.  Mr. Moore, does the company -- We've talked about third-party factoring.  Are the three discrepancies you just identified limited to the third-party factoring arrangements at the company, as opposed to the customer factoring arrangements?

A    Yes.  They are limited to the third-party factoring

arrangements.  The company also undertakes what we refer to as customer factoring, where with some of its larger customers, they have factoring partners.  We have not observed any issues as it relates to those arrangements.

Q    Okay.  Why don't we turn now to some exhibits that reflect the company's third-party factoring practices, and the issues you've just identified.

MS. MOGHADDAM:  If we could, with the Court's permission, have Exhibit 11 put on the witnesses' screen?

And Your Honor, again in the interest of efficiency, if it's okay, we'll just publish this now?

THE COURT:  Yep.

MS. MOGHADDAM:  Wonderful.

BY MS. MOGHADDAM:

Q    Okay, Mr. Moore, are you able to see that?  Do you need it zoomed in at all?

A    Yeah, could you zoom in, please?

Q    Okay.  Wonderful.  So we have before you what's been marked as Debtor's Exhibit 11.  This you'll see, Mr. Moore, is a December 30th, 2022 Microsoft Teams chat between Andy Brumbergs and Nicolas Cortes.  Who is Andy Brumbergs?

A    Andy Brumbergs was one of the senior individuals in the finance department.  I think his title may have been chief finance officer, which is different than chief financial officer.  I've also seen it as (indiscernible) But he's a

senior finance department individual at First Brands.

Q    Is he no longer with the company?

A    That's correct.

Q    Okay.  And Nicholas Cortes, do you know who he is?

A    I have not interacted with Mr. Cortes.  My understanding is that he resigned well before A&M began its engagement.

Q    Did you have any conversations with Andy Brumbergs before he left the company?

A    Yes, I did.

Q    And did some of those conversations involve the factoring arrangements that are the subject of your testimony here today?

A    Yes.

Q    Okay.  Let me now direct you to this first chat between Mr. Brumbergs and Nicholas Cortes again on December 30th, 2022.  Mr. Cortes writes to Mr. Andy Brumbergs, "I just sent you the MX upload.  We're not uploading anything in Volks, Ford, or Audi.  It might be possible for me to make a dummy invoice if you want to utilize their capacity.  Otherwise, Zone has 8 million of additional capacity.  Please let me know when it is good to go."  Do you see that before you?

A    I do.

Q    Okay.  Let me now direct your attention to the next page in the same series of chats between Mr. Brumbergs and

Nicholas Cortes.

MR. TECCE:  Objection to the witness testifying about this document.  (indiscernible) two years old, he was not copied on the email.  Anything that he (indiscernible) base don hearsay, and/or is speculation (indiscernible)

MS. MOGHADDAM:  Your Honor, firstly, as we noted, the rules of evidence do not apply in a preliminary injunction hearing.  This is the first we're hearing that there are any objections to the exhibits that we exchanged with the other side.  This witness has conducted an investigation.  His team has conducted an investigation.  He's here rather to speak to the findings of that, and this was a key email in support of the finding that there was factoring fraud writ large with dummy invoices at this company.  This is important evidence that this Court should see.

THE COURT:  I'll allow it.

BY MS. MOGHADDAM:

Q    So Mr. Moore, this is the second page in Exhibit 11, the chats between Andy Brumbergs and Nicholas Cortes, and this is Mr. Brumbergs' response to Nicholas's chat about dummy invoices.  Could you read what, if you can see it, and if not, I'm happy to read it, what Mr. Andy Brumbergs' response was to the chat about dummy invoices?

A    His response is, "Okay.  We'll take a look here as well.  Is Jeff lined up to fund today even with holiday?"

Q    Does Mr. Brumbergs in any way express any surprise,
concern about the reference to dummy invoices in his
response?

A    Not at all.

Q    Does that surprise you?

A    Yes.

Q    And why is that?

A    I would think if the notion of creating a dummy invoice
was new or was not happening, that there would be some
reaction to that.

Q    If we could just turn to the first page again of this
exhibit, Exhibit 11, and directing your attention to the
second line, right after the reference to dummy invoice, "if
you want to utilize their capacity."  And then, the next
line also references 8 million of additional capacity.
Could you tell the Court what Mr. Cortes means by capacity
limitation?

MR. TECCE:  Objection, Your Honor (indiscernible)

THE COURT:  I'll give you that one.  I'll give you that
one.  I don't know how he's going to be able to say what
someone meant in an email from 2022 with knowledge of that.
I think he's just speculating at that point.

MR. TECCE:  (indiscernible)

MS. MOGHADDAM:  Your Honor, I'm happy to move on.  I'll
just note that there's been review of the capacity, and how

then that structured the payments (indiscernible)

THE COURT:  I certainly know that.  But I just don't --
I don't think the witness can say what that email meant,
what he meant by that, in that email.

MS. MOGHADDAM:  Okay.

THE COURT:  There may be other evidence that kind of
sheds light on it, but I don't know if he can answer that
question.

MS. MOGHADDAM:  Your Honor, perhaps with the Court's
permission, I'll just make it high level generally about
capacity limitations and factoring?

THE COURT:  I think that's fair.

MS. MOGHADDAM:  Okay.  Thank you, Your Honor.

BY MS. MOGHADDAM:

Q    Mr. Moore, if you can, could you please speak to how --
And we can take this exhibit down.  Thank you very much.

Could you speak generally to the notion of capacity
limitations, and factoring arrangements, if you have that
information?

A    Based on my discussions -- Yes.  Based on my
discussions directly with Mr. Brumbergs, he indicated that
within these facilities, there were typically capacity
limitations by customer, meaning that the factor would
specify the maximum amount of invoices related to a
particular customer that it would factor, and Mr. Brumbergs

indicated that they would go up to the capacity amount regardless of whether there were actual invoices available to reach those limits.

Q   Okay.  Thank you, Mr. Moore.

If we could just put Exhibit 10 up now, please?  And moving to -- I'll just frame this for the witness, another set of Microsoft Teams chats between Andy Brumbergs and Nicolas Cortes on Friday, September 30th, 2022.  And if we could now direct the witness's attention to page 6 of this Exhibit 10.

Okay.  Here, again, same date, 9/30/2022, directing your attention to the box below, "Hey, Andy, we've not had any invoices for the orange highlighted customers in the last couple weeks, so it is unlikely we'll see anything in the upload tomorrow.  In regards to the customers in orange, Sam just told me that we don't have anything in our aging for those customers.  So if you want to add sales for one of those customers, just let me know because we would have to make some dummy invoices for it."  Do you see that before you, sir?

A   I do.

Q   And is that yet another instance of a reference at First Brands, pre-petition, to dummy invoices in connection with factoring arrangements?

A   Yes.

Q    Okay.  In addition to seeing references to dummy invoices, have you also seen references, or evidence rather, of doctored invoices in connection with the factoring arrangements?

A    Yes.

Q    Okay.  Let me now direct your attention to Exhibit 34, which we'll put on the screen before you.

And then this one, if we're able to, if we could just bring it down a smidge?

While we're trying to sort the exhibit, Mr. Moore -- I meant showing the top of it.  Thank you very much.  You probably can make it out.  It's Exhibit 34, and at the top, it says "Brake Parts, Inc."  Is that right?

A    I see that, yes.

Q    Okay.  And I'll direct your attention to the upper-right quadrant, where there's a billing date.  Do you see what that date is?

A    Yes.

Q    It's now been pulled out for you, billing date, May 9th, 2025.  There's a number there, 6328084.  Is it your understanding that that number reflects the invoice number?

A    Yes.

Q    Okay.  And we can take the pull quote down, and just keep it as is, if we could.  Thank you.  And just go ahead and put 34 back up, please.  Wonderful.

Okay. So upper-right quadrant, the date of the invoice, the number of the invoice, and who's the bill to, if you see that on the left in the middle?

A    Yes, this is to General Motors Corp. SPO stands for Service Parts Organization.

Q    Got it. And on the bottom-right, is there a total invoice amount reflected on this Exhibit 34?

A    Yes, $179.84.

Q    Okay. So this is an invoice from Brake Parts, Inc. to General Motors. And by the way, what is Brake Parts, Inc.? Is it a First Brands entity?

A    It is one of the First Brand debtor entities.

Q    Okay. So now we can take that down, and put Exhibit 35 up for the witness. And if we could reduce the size so that we can see the entire thing?

UNIDENTIFIED SPEAKER: I'm having an issue with the (indiscernible) one second.

MS. MOGHADDAM: Okay, perfect. Thank you. So we've got Exhibit 35 before you. This is an email from Vlad Batescu --

MS. MOGHADDAM: Apologies, Your Honor (indiscernible)

THE COURT: No worries.

MS. MOGHADDAM: (indiscernible) Thank you.

BY MS. MOGHADDAM:

Q    Okay. So Exhibit 35 is an email from Vlad Batescu to

Andy Brumbergs, dated May 19th, 2025, and the subject line is, "Batescu, Vlad shared step 2 eligible nomination 5/29/25 with you."  The attachment below reflects an Excel icon, and the title is "Step 2 eligible nomination," same date, 5/29/25.

Mr. Moore, do you have an understanding of what this email and its attachment reflect?

A    Yes.  I do want to just clarify for the record, I think you may have said 5/29/25.  It's 5/19/25.

Q    Thank you for correcting me.  You're absolutely right.  So Exhibit 35 is a May 19th, 2025 email.  Apologies.

A    Yes.  And I am familiar with this exchange.

Q    I'm sorry?

A    I am familiar with this exchange.

Q    Could you tell the Court what this email generally reflects?  What is Mr. Batescu transmitting to Mr. Brumbergs?

A    This is a listing of the invoices that are to be put forward or nominated to a third-party factor for funding.

Q    Okay.  And presumably, the attachment includes some of those invoices that are to be put forward to a third-party factor?

A    Yes.

Q    Okay.  Why don't we now turn to Exhibit 36.  Mr. Moore, do you have an understanding of -- I know there's a lot of

rows, so a spreadsheet in PDF form.  Could you tell the Court, generally, what this relates to?

A    This is the detailed listing of all of those invoices that would be in this nomination packet.

Q    Got it.  So the email we just saw with the attachment of the nomination packet, this reflects the invoices contained therein.  Correct?

A    Yes.

Q    So now let me direct your attention to page eight of this PDF, row 1443, and we'll get that up before you in a moment.

Okay.  So we've pulled that line out for you, Mr. Moore.  On the left, you'll see General Motors Corp.  SPO.  In the middle is the invoice number of 6328084.  Do you recall that being the same invoice as on the Brake Parts, Inc. invoice we saw a moment ago to General Motors?

A    Yes.

Q    And is the bill date the same of May 9th, 2025?

A    Yes.

Q    And to the right of that, is it the same invoice amount of $179.84?

A    Yes.

Q    Okay.  So this invoice, as reflected on this spreadsheet, is the same as the Brake Parts invoice we saw at the beginning of this line of questioning.  Correct?

A    Yes.

Q    Okay.  Now let's turn to Exhibit 37, if we could.
Okay.  Bear with me while we get the date and the rest of
the email down and show it to you.

MS. MOGHADDAM:  Your Honor while we're working on the
technical difficulties, if it's okay I'll just proceed --

THE COURT:  Sure.  Absolutely.

MS. MOGHADDAM:  -- given that the parties all have the
exhibit (indiscernible)

THE COURT:  Absolutely.

BY MS. MOGHADDAM:

Q    So Mr. Moore, Exhibit 37, which will come back in front
of you in a moment, is a May 20th, 2025 email from Rachel
Debrosse at JA Mitsui Capital, and to, again, Andy
Brumbergs.  It is "Ray 20250519 nominations, purchase
request 5/20/25."  And in this email, Ms. Rachel Debrosse
says, "Hello, First Brands team.  I am sending the TAPC
files by DocuSign for esignature by Andy.  All the other
parties on this email would get a copy."  And I'm going to
skip down to the middle, Mr. Moore.  It says, "We're
finalizing our preparations for funding Thursday, 5/22/2025.
Accordingly, please find attached the following documents,
20250522TAPCBP."

And now you have the email before you, and just for
your reference, Mr. Moore, I'm now moving to the second

bullet point in the middle there, "20250522 Brake Parts Trade 5/19/25."  These are the nomination files you submitted, and are all updated to include SOFR rates, updated configuration, and resulting trade economics for the funding wire.

Does that sort of situate you within this document, Mr. Moore, such that you can testify to what it relates?

A    Yes.

Q    And could you tell the Court, generally, what this email is about?

A    One of the third-party factors is an organization by the name of Katsumi, and this is the communication with Katsumi as it relates to the invoices that they would be factoring, and therefore providing funding to First Brands.

Q    Okay.  If we can now turn to the attachments to this email, and I'll direct your attention to page four.  Actually, apologies, Mr. Moore.  Why don't we go, in the interest of time, to page 33, about three-quarters of the way down, and we'll get you there in a moment on the screen.

THE COURT:  Page 33 of 45?

MS. MOGHADDAM:  Yes, Your Honor.

THE COURT:  Okay.

MS. MOGHADDAM:  Thirty-three of 37, actually.  So exhibit --

THE COURT:  Which exhibit are you on?

MS. MOGHADDAM:  Exhibit 37, page 33.

THE COURT:  (indiscernible)

MR. PREIS:  And if we could zoom in on invoice number 6328084 on that page 33 of Exhibit 37?

BY MS. MOGHADDAM:

Q   Okay.  Mr. Moore, you have before you the line from this attachment to the Katsumi email to Mr. Brumbergs at First Brands.  Again, General Motors on the left, again, the invoice number 6328084, and then there's a dollar amount on the right.  What is that dollar amount?

A   $9,271.25.

Q   Is that dollar -- Well, first let me back up.  Am I correct that that invoice number is the same invoice as the Brake Parts, Inc. invoice we saw earlier in this line of questioning?

A   Yes.

Q   And is that dollar amount to the right now significantly higher than the $179.84 reflected on the underlying Brake Parts, Inc. invoice, and in the earlier spreadsheets we saw?

A   Yes, it is significantly higher.

Q   Okay.  Let's look at some other examples like this of inflated invoice values in connection with factoring at First Brands.  If we could turn to Exhibit 36, page 95, row 9527, and we'll do a comparison for the Court up against the

value in page 37, same invoice.

MS. MOGHADDAM:  And bear with us, Your Honor.  It will take just a minute.

THE COURT:  Uh-huh.

MS. MOGHADDAM:  Your Honor, while we're waiting, with the Court's permission, I'll just grab something?

THE COURT:  Absolutely.

MS. MOGHADDAM:  Thank you very much.

May I approach?

THE COURT:  Yes, please.

MS. MOGHADDAM:  (indiscernible)

Your Honor, I'm being told that even though it's showing up on the broader screen, that there might be something going on with the Court system such that I'm not seeing it.

THE COURT:  (indiscernible)

MS. MOGHADDAM:  And if it's a quick fix, you know, perhaps we could do it.  If not --

THE COURT:  Why don't we take a --

MS. MOGHADDAM:  If it's not, I'm happy to --

THE COURT:  You're not seeing it on your screen right there?

MS. MOGHADDAM:  I cannot.  But I'm happy to go stand there, and --

THE COURT:  Yeah, let's -- let's see --

MR. TECCE:  And I can see it fine.

THE COURT:  (indiscernible)

MS. MOGHADDAM:  My screen has gone dark, and --

THE COURT:  Oh, it's always fun after hours, isn't it?

MS. MOGHADDAM:  Pardon?

THE COURT:  No, I said it's always fun after hours.

MS. MOGHADDAM:  Oh.

THE COURT:  Let me see --

MS. MOGHADDAM:  Would the Court like me -- I'm happy to go stand there, and sort of go through some of these --

THE COURT:  No, I don't want to --

Yesenia, do you mind taking a quick look, and see if we can get it on?

Why don't we take a five-minute break?

MS. MOGHADDAM:  Thank you, Your Honor.

THE COURT:  Yep.  How much, just as from a timing standpoint, how much more direct do you think you've got?

MS. MOGHADDAM:  Your Honor, I still need to cover the SPV fraud, and then speak to the three categories of misappropriations.  And of course, given that we understand this is going to be, you know, the subject of an immediate appeal, we just want to make sure we make the record with specific transfers and specific transactions.

THE COURT:  You got it.

MS. MOGHADDAM:  So I think (indiscernible)

THE COURT:  I don't want to slow you down.  I'm just trying to get a sense (indiscernible)

MS. MOGHADDAM:  No, understood.  I can reflect, and perhaps after the five-minute break, give the Court an indication of time.

THE COURT:  Okay.  That would be great.  Thank you.

MS. MOGHADDAM:  Thank you very much.  Thank you, Your Honor.

THE COURT:  Thank you.

THE COURT:  Okay.  We are back on the record in First Brands.

Mr. Moore, we're having some tech issues.  We're going to proceed by examination, continue with the direct examination, but you may just be able to hear the folks and not be able to see them, if that's okay.

UNIDENTIFIED SPEAKER:  Your Honor, I'm told the audio is not working on the (indiscernible)

THE COURT:  They're telling me -- Hold on.

Mr. Moore, can you hear me okay?

MR. MOORE:  I can. Your Honor.

THE COURT:  Okay.  All righty.  I had to hit another button here.

All right.  Let me see -- Ah, wait -- huh?  No?  Oh, my gosh.  So the camera works, but the monitor doesn't?

MS. MOGHADDAM:  (indiscernible) Is it at all possible

that the light might have gone out?

UNIDENTIFIED SPEAKER:  Yeah.

THE COURT:  I have no idea.  Because I can see you on GoToMeeting, but you can't see the screen, which makes no sense.

MS. MOGHADDAM:  Well, Your Honor, perhaps we can do a combination of for these exhibits, where I need to be rather close to see the line item, I'm happy to stand here.

THE COURT:  Yeah.  I want you to do whatever you feel is best.  And I apologize.

MS. MOGHADDAM:  And (indiscernible) I might sit for some of it (indiscernible)

THE COURT:  Absolutely.  No, no, no, don't worry about any of that.  Let's just proceed.

MS. MOGHADDAM:  Fantastic.

So if we could get Exhibit 36, page 95, row 9527 --

THE COURT:  Mr. Moore, can you hear the questioning?

MR. MOORE:  Generally, Your Honor, yes.

Ms. Moghaddam, if you could make sure you speak just a little louder, that would be helpful.

MS. MOGHADDAM:  Sure.  Is this better, Mr. Moore?

MR. MOORE:  It is.  Thank you.

MS. MOGHADDAM:  Sure thing.

BY MS. MOGHADDAM:

Q   Okay.  Exhibit 36, page 95, row 9527.  And do you see

that before you, Mr. Moore?

A    I do.

Q    Okay.  So here we have the General Motors of Canada invoice, with number 6336979, May 15th, 2025, and a dollar value of $13.97.  Is that correct?

A    Yes.

Q    Now let's pull up Exhibit 37, page 30, reflecting the same invoice from the packet that was ultimately sent to the factor.  And here, General Motors, same invoice number, 6336979, and a dollar value of $8,820.50.  Is that roughly a 668 times increase from the originating value of $13.19, to the $8,820 figure you now see before you, Mr. Moore?

A    Yes.  And Ms. Moghaddam, if I could just point out for the Court, the two dates that are shown the first file, the date was May 15th.  That's the invoice date.  The date on this file is the due date, which is 90 days later.  And that was the same way with the previous ones, in case the Court had a question on that.

THE COURT:  Thank you.

BY MS. MOGHADDAM:

Q    Thanks for that clarification, Mr. Moore.  So we're going to just quickly reference the Exhibit 36 line item entry.  So that invoice is now on the left, $13.19.  And on the right is the Exhibit 37 line item entry for that same invoice, $8,820.50.  Okay.  Why don't we proceed to the next

example of invoice doctoring in connection with the factoring liabilities, and for that, we'll go to Exhibit 36, page 81, row 8246, as compared to Exhibit 37, page 28.  And perhaps we can just pull them up at the same time, and compare.

MR. TECCE:  Your Honor, my only objection here is we don't see the underlying exhibit, the underlying invoice. So we saw the invoice in 36 -- or Debtor's 34, rather but this is just kind of -- we don't see it in the original invoice.  I followed the -- So I'm not sure what we're doing here.  We're just pulling up line items out of the ledger, and showing different amounts without showing the actual underlying invoice.

THE COURT:  I'll allow it.

MS. MOGHADDAM:  Thank you, Your Honor.

BY MS. MOGHADDAM:

Q   Okay.  So before you, on the left, Mr. Moore is Exhibit 36, page 81, row 8246, and on the right is Exhibit 37, page 28, and the invoice number referenced on both, as you'll see, is 63376487, and it relates to General Motors of Canada Company.  On the left, what do you see is the invoice dollar amount?

A   $497.92 -- oh, I'm sorry, $492.92.

Q   All right.  And on the right, that same invoice, 6336487, what's the value it now bears in Exhibit 37, as it

was sent to Katsumi?

A    $5,594.44.

Q    Significant increase from one invoice reference to the next?

A    Yes.

Q    Okay.  We can take those down, and put Exhibit 36, page 2 up, please, as compared to Exhibit 37, page 37.  Okay.  On the left, Exhibit 36, what do you see as the invoice Amazon.com, and then invoice number 6337391, and what's the value, Mr. Moore?

A    $78.77.

Q    And moving to the right, Amazon.com, same invoice number of 6337391, is that correct?

A    Yes.

Q    And what's the invoice dollar amount now in the version that was sent to Katsumi by First Brands?

A    $15,883.18.

Q    Okay.  We can take that down, and move to Exhibit 36, page 2, and Exhibit 37, page 37.  Oh, pardon me.  That's the same one I just covered.  So Exhibit 36, page 94, and Exhibit 37, page 26.  Okay.  On the left, Exhibit 36, General Motors of Canada, invoice number 6341045.  And what's the dollar amount on the right there, for that version of this invoice?

A    $15.84.

Q    And then moving to the right, Exhibit 37's version of this as sent to Katsumi, again General Motors of Canada, again the same invoice number of 6341045.  And now, Mr. Moore, what is the dollar amount that was sent for that invoice to Katsumi?

A    $5,094.76.

Q    Okay.  Moving to our next example, Exhibit 36, page 2, and Exhibit 37, page 32.  Okay.  On the left, Mr. Moore, Amazon.com invoice number 6332179.  What's the dollar value reflected in the internal version of that invoice?

A    $160.48.

Q    And moving to the right, Exhibit 37, the version of the reference to the invoice that was sent to Katsumi, again we have Amazon.com, again the invoice number 6332179.  Now, what's the dollar amount for that invoice as sent to Katsumi?

A    $5,377.79.

Q    In all, Mr. Moore, in these examples that we've just shown you, is the amount set forth in the factor's invoiced -- factored invoice rather, sometimes 200 or more times higher than the actual amount of the invoice?

A    Yes.

Q    Okay.  In your review, in your team's review of the records -- and we can take those down -- were there some invoices where the values were increased?

A    Yes.

Q    In the versions sent to Katsumi, I should say.  Okay.  Let's show you one of those examples, Exhibit 36, page 6, row 1266, as compared to Exhibit 37, page 37.  On the left, Mr. Moore, General Motors 6328163 is the invoice number.  What's the dollar amount for that invoice in the company's internal records?

A    $247.26.

Q    Okay.  And then moving to the right, the Exhibit 37 version of this invoice reference they sent to Katsumi, same company, General Motors, same invoice number, 6328163.  What's the dollar amount in the version sent to Katsumi?

A    $41.37.

Q    And so that's an instance where the invoice number was not inflated.  Correct?

A    That's correct.

Q    Were there also some instances in the nomination packet sent to Katsumi or other third-party factors where there was no change reflected in the invoice value?

A    Yes.

Q    Let's turn to Exhibit 36, page 2, row 954, and Exhibit 37, page 41.  Okay.  On the left, customer GM SPO, invoice number 6328440.  What's the dollar amount reflected for the internal reference to the invoice?

A    $11,732.76.

Q    And on the right, the Exhibit 37 version as sent to Katsumi, same company, same invoice number, 6328440, and in fact, in this instance, Mr. Moore, same dollar value reflected for the external version of the invoice sent to Katsumi.  Correct?

A    Yes.

Q    Okay.  So we've now seen examples of invoices that were increased at significant proportions, and we've seen examples of invoices that were decreased, and we've seen at least one example where the invoice stayed the same. Despite that smattering of decreased invoices, unchanged invoices, Mr. Moore, did the factors nevertheless pay more for the invoices than their actual underlying value?

A    Yes.

Q    And just focusing specifically on this Exhibit 37, which reflects the invoices sent to Katsumi as part of the factoring arrangement with the company, what was the total amount the factors paid for the set of invoices reflected in that Exhibit 37?

A    Katsumi, the third-party factor, paid approximately $11.2 million for all of the invoices included in that nomination packet.

Q    So they paid $11.2, approximately $11.2 million.  What was the actual underlying value for that compendium of invoices in the company's internal records?

A     Approximately $2.3 million.

Q     So a difference, a jump from $2.3, once it's sent to Katsumi, $11.2 approximately.  Correct?

A     Yes.  I would just note that the (indiscernible) value in the Katsumi package was approximately $11.8 million. Katsumi funded approximately $11.2, so the comparison would be $11.8 million to approximately $2.3 million.

Q     Okay, thank you for that clarification.  So Mr. Moore, we've now talked about the first of the ways in which you alleged in your affidavit and in your testimony today that First Brands engaged in factoring fraud -- or in fraud rather, in terms of financing, and that was factoring fraud. Let us now turn to the SPV fraud, or the off-balance sheet financing practices at the company.

You alleged in your affidavit that Mr. James engaged in financing transactions involving SPVs, special purpose vehicles, which incurred at least another $2.3 billion in debt by double-pledging collateral that First Brands could not itself borrow against the second time.  Is that correct?

A     Yes.

Q     So just to set the foundation for the Court, First Brands form these SPVs.  Correct?

A     Correct.

Q     And if we look back at Exhibit 51, which you may recall was the organization chart that we put before you earlier

today, and with the Court's permission, we'll focus in on the section that includes some of the special purpose vehicles within the First Brands family, and specifically focusing on the Carnaby entities, bear with us as we navigate this -- okay.  You have it in front of you.  Do you see some of the Carnaby entities, and other special purpose vehicles, Mr. Moore?

A    I do, yes.

Q    And were some of these, which also happen to be Debtor entities, as reflected by the red, involved in the SPV fraud you allege in your affidavit?

A    Yes.

Q    Okay.  So let's talk about those financing structures.  And we can keep -- well, we can take that down, Exhibit 51.  Thank you.

What types of financing structures did First Brands enter into through those SPV off-balance sheet entities?

A    Both loans, as well as sale-leaseback transactions.

Q    And who were the counterparties to those facilities?

A    There were four groupings.  One of those groupings is actually two parties.  But we have Onset, CarVal, Evolution, and Aqueum, and the Aqueum piece also includes UMB.  And if you could just set the stage by talking through the typical steps in the SPV transactions that are the subject of your affidavit, starting with the nominal purchase of inventory?

A    The special purpose vehicle entities, a special purpose vehicle entity, first of all, is supposed to be separate from an organization.  And in this case, the transaction that was being financed is a transfer of inventory or fixed assets from a First Brands entity to one of the special purpose vehicle entities, and then a provider of either a loan or a lease to the SPV entity would fund that purchase of the assets.

Q    And -- Strike that.  So in connection with your review of these financing transactions using SPV entities at First Brands, did you discover any issues or discrepancies?

A    Yes, several.  First, it does not appear that there were transactions to record the purchase of the inventory or fixed assets.  So even after the transfer, the assets still remained on the balance sheet of the First Brands entity.

In addition to that, in many instances, it appears that the cash that was supposed to flow back to First Brands for the asset that was transferred to an SPV never made it back to First Brands.

Q    And then why should it have made it back?  Could you just tie the loop there for us?

A    Yes.  So the First Brands entity purportedly transferred an asset onto or to an SPV entity, and to do -- as part of doing that, it should have received consideration in the form of cash, and that cash didn't come back, raising

questions as to whether or not a sale transaction ever occurred.

Q    Right.  And were there any other issues in connection with the SPV entity financing arrangements that you identified?

A    Yes.  When the SPV received funding, whether that was through a loan transaction or a lease transaction, the funds that came into the SPV not only didn't appear to go to a First Brands entity in many instances, but also there were numerous transfers out of the SPVs to entities owned by Mr. James, or to Mr. James himself.

Q    Okay.  You mentioned double-pledging of collateral.  Did one such example involve the Lender, Evolution?

A    Yes.

Q    And do you recall the amounts lent, and what was ultimately represented in connection that financing?

A    Yes.  There was supposed to be approximately $370 million of inventory that would have been transferred from a First Brands entity to an SPV entity, against which Evolution was lending money.  Evolution lent approximately $240 million.  That $240 million appears to have gone to a First Brand entity.  However, there were never any replenishment transactions that were supposed to have occurred with the inventory.

Q    And so that $370 million First Brands inventory, did it

actually ever get on the SPV's balance sheet?

A    No.

Q    Fair to say that First Brands kept that inventory?

A    Yes, First Brands kept that inventory on its balance sheet, as well as in its borrowing-based certificate with its ADL lenders.

Q    Got it.  You mentioned one of the issues being the cash that was supposed to be transferred to the First Brands Group's subsidiaries under the applicable transaction documents was instead transferred to another entity.  Was that Bowery Finance II?

A    Yes.

Q    And what is Bowery Finance II?

A    Bowery Finance II is an entity owned by Mr. James, but not part of the First Brands Group of entities.

Q    So fair to say it's an entity personally owned by him, unrelated to First Brands?

A    Yes.

Q    Do you have any idea whether it's an operating business?

A    I am not aware of any operations, just a significant amount of cash flowing through it.

Q    Okay.  You beat me to what was going to be my next question, which is has A&M generally traced cash flows through and from Bowery Finance II's account?

A    Yes.  We obtained bank records for Bowery Finance II going back to the beginning of 2022.

Q    And through 2025.  Correct?

A    Yes.

Q    What types of transfers have you generally identified in terms of the recipient of transfers from the Bowery Finance II account?

A    There are numerous entries that received funds from Bowery, as well as transferred funds to Bowery.  It really appears to have been treated as a commingled pot, and in many ways, and I use this word in my affidavit, really is slush funds for all of these transactions.

Q    Why did you refer to Bowery Finance II, and now in your testimony as a slush fund?

A    A slush fund is essentially an account used to either disguise transactions, or to commingle assets outside of the ordinary course.

Q    Okay.  And based on your review of the flow of funds in and out of Bowery Finance II, that is your assessment, that it was a slush fund?

A    Yes.  There did not appear to be any reason that substantial amounts of money were flowing to Bowery instead of to First Brands entities or to the special purpose vehicle entities.

Q    Okay.  Let's put before you now, Mr. Moore, with the

Court's permission, Exhibit 9.  Do you recognize this document, Mr. Moore?

A    I'm just trying to zoom in.

Q    Sure.

A    Yes.

Q    And so could you tell the Court what it generally reflects?

A    This is an extract of account activity reflections (indiscernible)

THE COURT:  Just one moment.  Just one moment, Mr. Moore.

MR. TECCE:  I'd like to know what the document is before he says what it reflects.  I didn't get an answer (indiscernible) Because I think I have an objection to this.  But go ahead.

MS. MOGHADDAM:  I apologize, Your Honor.  When I said what (indiscernible) reflects, I meant what is this document.  So that's what the witness is answering.

THE COURT:  Understood.

MR. TECCE:  That's all.  I just wanted to get that (indiscernible)

THE COURT:  No, understood.  That makes sense.

MS. MOGHADDAM:  Thank you.

BY MS. MOGHADDAM:

Q    Mr. Moore, could you tell the Court what this document

is?

A     This is an extract showing transfers to and from Bowery Finance.

Q     Okay.  And is it in connection with the Wells Fargo account for Bowery Finance II?

A     Yes, that's right.

MR. TECCE:  Objection.  For the record, Your Honor, I have objection to the witness testifying about a Bowery document.  It's not -- He doesn't represent Bowery, he's not an employee of Bowery.  It's not clear who created it, where it came from, what person (indiscernible) Alvarez & Marsal with a connection to Bowery (indiscernible)

THE COURT:  I know we're a little lax today, but if he can provide just a little bit more foundation just for me, too?  Thank you.

MS. MOGHADDAM:  Understood, Your Honor.

BY MS. MOGHADDAM:

Q     Mr. Moore, are you able to speak to the provenance of these records, how A&M came to access to them, and how you are able to identify them on the record here today?

A     Yes.  Bowery II used Wells Fargo as its depository institution.  A&M obtained bank records for Bowery II going back to the beginning of 2022, and this is a page of the information that we received from Wells Fargo, laying out transfers to and from that account within a particular

period of time.

Q   And was that period of time January 3rd, 2022 through September 30th, 2025?

A   Yes.

Q   Okay.  So for that time period, 2022 though 2025, what was the -- Well, let me back up (indiscernible)

MR. TECCE:  Your Honor, just one more question.  How was this document created?  It's not clear to (indiscernible) yeah, I'm sorry.

THE COURT:  I'm sure you can ask the question.  I'll let you continue.

MS. MOGHADDAM:  Happy to, Your Honor.

BY MS. MOGHADDAM:

Q   Mr. Moore, could you specify for Counsel for Defendant Patrick James, how is that these rows on this document, which I think you testified a moment ago you received from Wells Fargo, came to reflect these transactions?  Am I correct that this is a record received directly from Wells Fargo for the Bowery II Finance account, which was Mr. James' personal account?

A   It's directly from Wells Fargo for Bowery II.

Q   Bowery II for the period of September -- I apologize, for the period --

A   For the period of --

Q   -- 2022 to 2025.

A    That would be correct.

MS. MOGHADDAM:  Your Honor, I want to make sure that answers the --

THE COURT:  Yes, it does.  Thank you.

MS. MOGHADDAM:  Thank you, Your Honor.

BY MS. MOGHADDAM:

Q    And so looking again at this Exhibit 9, the Wells Fargo Bank records for Bowery Finance II, could you just tell the Court generally what these records reflect for that time period, 2022 through 2025, in terms of the flow of funds, transfers from this account to Patrick James, Patrick James Trust, and his affiliated entities?

A    Yes.  There were numerous transfers out to Mr. James and other entities, a number of transfers from Bowery to other entities.  All in, there was approximately $12 billion that flowed through this account.

Q    Okay.  I think you testified a moment ago -- Well, strike that.  Did Patrick James and his trust ever transfer funds to Bowery?

A    I believe that he did, yes.

Q    Okay.  And let's take a look now at Exhibit 54, if we could.  Okay.  Are you able to see this document, Mr. Moore?

A    Yes.

Q    A Microsoft Teams chat, dated December 26th, 2024.  Joe DiFranco, Nigel Crighton, both of First Brands.  Correct?

A    Yes.

Q    And in this -- And do you happen to know what department they were in?

A    They are both in the finance department.

Q    Okay.  So in this chat, Joe DiFranco writes, "Not shocking, but the boss is getting worried about cash not landing in BOA on time.  I'll be sweeping often.  Right now -- nothing available to sweep in WF, haha."

Could you tell the Court what the reference to BOA is?

A    That's Bank of America.

Q    And the reference to WF?

A    That's Wells Fargo.

Q    And is that the Wells Fargo account for Bowery Finance II which you were referring to a moment ago?

A    Yes.

Q    Okay.  And that's the same account that you said had $12 billion in flows in and out from 2022 through 2025.  Correct?

A    Yes.

Q    And yet on December 26tj, 2024, "Nothing available to sweep in Wells Fargo, WF, haha."  Is that right?

A    Yes.

Q    Okay.  Let's turn to Exhibit 55, please.  And if we could zoom in on this one?

December 27th, 2024, Andy Brumbergs, Nigel Crighton.

You testified earlier Andy Brumbergs was a VP of Finance within First Brands Group.  Andy writes, "$30 million going into WF this AM from JP.  Please transfer to BAML as soon as you can."  The reference to WF, is that also a reference to Wells Fargo and the Bowery Finance II account?

A    Yes.

Q    And can you tell the Court about the references to JP and BAML?

A    Yes.  This is -- JP refers to an individual, JP English, and then BAML is Bank of America Merrill Lynch, which is the same Bank of America that I referred to previously.

Q    Okay.  And again, Mr. Crighton and Mr. Brumbergs are within the finance org at First Brand Group. or were then, at that time, and so they're being asked to transfer money into Wells Fargo, the Bowery Finance II account, Mr. James' personal account.  Correct?

A    They are indicating that $30 million is going into the Wells Fargo account, and that that money should be transferred to Bank of America as soon as they can.

Q    Okay.  Moving to Exit 58, December 27th, 2024, Microsoft Teams chat.  Again, Andy Brumbergs and Nigel Crighton, and Nigel writes, "I just talked to JP.  They are sending two $15 million chunks.  First one should hit soon, the other in hours."  Correct?

A     Yes.

Q     And could you tell the Court about this exhibit?

A     This follows the previous exchange.  The $30 million that was referred to is going to come in in two $15 million tranches or transfers.

Q     Thank you.  Moving to Exhibit 59, this is a December 27th, 2024 Microsoft Teams chat, again, between Andy Brumbergs and Nigel Crighton, and Nigel writes, "It sounds like JPM and FI each $15 million into Bowery."  Could you tell the Court about this exchange?

A     Yes.  JPM refers to JPMorgan Chase, that depository institution, and FI is Fidelity.  These are the institutions that Mr. James and his trusts use.

Q     Turning now to Exhibit 52 --

THE COURT:  Counsel, did you say 52?

MS. MOGHADDAM:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.

MS. MOGHADDAM:  Sure thing.

BY MS. MOGHADDAM:

Q     And if we could zoom in on this one, please?

THE COURT:  Can we -- Let me just ask if this -- We're broadcasting an account number on this thing.  I just want to --

MS. MOGHADDAM:  Oh.  Can we take that down, please, and just display it to the witness and the Court (indiscernible)

THE COURT:  Yeah, does the witness have a copy of these documents?

MS. MOGHADDAM:  The witness could.  I believe the witness -- He does not have copies before him, Your Honor, but I think we can publish it to just the witness, if that works for the Court?

THE COURT:  Yeah --

MR. TECCE:  I would, because I'm going to ask some questions about this too, so if we could -- If the witness could have access to the document?

THE COURT:  Yeah, no, I have no issues with that, as long as we're good.  I just wanted to make sure that we didn't put (indiscernible)

MS. MOGHADDAM:  (indiscernible)

THE COURT:  No worries.

MS. MOGHADDAM:  (indiscernible) apologies.

Is it possible to just put it before him?  It is not.

I apologize.  I'm being told it's not.  We can --

THE COURT:  Is there a way to email him the doc?

MS. MOGHADDAM:  Yes, we can find a way to email him the doc, and we'll do so immediately.  Thank you, Your Honor.  Apologies.

THE COURT:  No, no worries.

UNIDENTIFIED SPEAKER:  (indiscernible)

MR. MOORE:  What is the exhibit number?  Because I can

pull it up.

MS. MOGHADDAM:  Sure.  It is Exhibit 52.

Mr. Moore, do you have it before you?

MR. MOORE:  I'm bringing it up right now.

MS. MOGHADDAM:  Okay.  Thank you.

MR. MOORE:  Okay.  I have Exhibit 52.

MS. MOGHADDAM:  Fantastic.

BY MS. MOGHADDAM:

Q    So Wells Fargo bank account statement for Bowery II Finance, LLC, and I think you'll see the entity name in the left quadrant, midway down.  Is that correct?

A    Yes.

Q    Okay.  And the date range for this invoice, could you please tell the Court?

A    Yes.  This is for December 1st, 2024 through December 31st, 2024.

Q    Thank you.  And then, directing your attention to page 6 of this document, bottom of the page, the last two entries were December 27th?

A    Yes.

Q    Okay.  Could you please tell the Court what those entries reflect?

A    Those are two deposits received, each for $15 million.

Q    Okay.  And looking at the first of the December 27th entries for $15 million, there is a reference to National

Financial, and then Patrick, James TT.  Do you have a sense of what that is referring to, based on your investigation to date?

A     Yes.  These would be, again, two accounts used by the Patrick James trusts to hold funds.

Q     And then looking at that second December 27th $15 million entry, J.P. Morgan Chase, and the references to a declaration of trust.  Do you have an understanding of what that transfer relates to?

A     That would be another transfer from Mr. James' trust.

Q     Okay.  Now let's turn to Exhibit 56, and this is yet another Microsoft Teams chat, December 27th, the same date as these two entries we looked at a moment ago in Exhibit 52.  Andy Brumbergs writes Joe -- I'm sorry, writes Nigel Crighton, "Can you send Joe Carnaby invoices to return the $30 million on Monday, December 30th?"  Could you tell the Court about this exchange that comes on the same date as the transfers we just looked at?

A     This demonstrates a couple of items.  Invoices were used to move money around the different entities, including the SPVs.  Where we're referencing Carnaby, Carnaby are all of the SPV entities.  And this is asking Nigel to have Joe DiFranco send Carnaby invoices so that the $30 million can be returned.  There were two $15 million transfers on Friday, December 27th, 2024.  The company's year-end is --

for this year was Saturday, December 28th, 2024.  So this is $30 million coming in on the last business day of the fiscal year, and then that $30 million going back out on the first fiscal day of the next fiscal year.

Q    Okay.  Thank you for that.  And we're going to now put before you Exhibit 21 --

Actually, does that also have the account number?  Okay.

Mr. Moore, if you could also find Exhibit 21 in your records, just in case of any account information.  I think there is (indiscernible)

A    I have Exhibit 21.

Q    Great.  Thank you.  And so what does this generally reflect?  I think you testified earlier it reflects Carnaby I inventory SPV records.  So could you please tell the Court?

A    Yes.  So Carnaby Inventory I LLC is one of the SPV entities, and this exhibit is a number of cash transactions that occurred over a period of time.

Q    Okay.  Let me direct you to page 10, towards the bottom of this Exhibit 21, and have you look at a December 30th, 2024 transfer of $15 million.

A    Yes, I'm there.

Q    Okay.  And do you see the recipient on that?

A    Yes, I see both.  The first one is J.P. Morgan Chase

Bank for the Patrick James trusts, and then the other one would be to the Patrick James Trust as well.

Q    All right.  So does one of them specifically say Patrick James Main Trust?

A    Yes.

Q    And the other one says Patrick James trusts.  Correct?

A    That's right.

Q    And the first is the Bank of America, and the second is J.P. Morgan?

A    Or vice versa, yes.  Main Trust is the Bank of America, and then trusts is J.P. Morgan Chase.

Q    Okay.  And we've been looking at transfers on December 30th, 2024.  Based on your review of Petitioner's -- of the Debtor's, rather, pre-petition operations, do you have an understanding of when the company's 2024 fiscal year ends, or ended?

A    Yes.

Q    And when was that?

A    Yes, the fiscal year ended on December 28th, 2024.

Q    Okay.  So just two days shy.  Correct?

A    Yes.  So this would have been in fiscal year 2025, these two transactions.

Q    Okay.  Exhibit 52 -- 53, rather, if you could look at that on your end, Mr. Moore?

A    Yes, I have it.

Q    Great.  And is this a December 27th, 2024 schedule, showing the total of payments due to factoring entities?

A    You said Exhibit 53.  Right?

Q    Yes, and I might have it wrong.

A    This reflects amounts due to the different AR factors. One row, as of the today row, is December 27th, 2024, and then there are a whole series of dates beyond that.

Q    Okay.  Were there payments based on this Exhibit 53 due to factors on December 27th?

A    Yes.

Q    And could you please tell the Court about those payments?

A    It's broken out by factor, but there were approximately $51.6 million due to factors on that day.

Q    Okay.  Was it $1.9 million to Evolution, $19 million to Katsumi, and $39 million to Jefferies?

A    Yes, the net amount to Jefferies was approximately $30 million.

Q    Okay.  And in all, based on what we've seen so far in this series of exhibits, what's the flow of funds that you were observing, Mr. Moore, and could you describe it to the Court?

A    Could you say the question again?

Q    Sure.  Based off the exhibits just seen, the series of exhibits just seen, are you observing the flow of funds

after James Trust transfers of funds into Bowery, the Carnaby I transfers of the same amounts back three days later, could you just generally describe that pattern to the Court?

A   Yes.  We observed that many times, transfers in from Mr. James within the 2024 and 2025 period oftentimes coincided with large payments that were owed either to SPV lenders or to third-party factors.

Q   Okay.  Thank you, Mr. Moore.  Let me direct your attention now to Exhibit 60.  And this we can put on the screen.  This is a July 25th, 2025 Microsoft Teams message, Maks Chernyavskiy to Joe DiFranco, Eric French, Nigel Crighton.  And in it, Maks Chernyavskiy writes, "Keep an eye, $25 million being sent to Bowery."  Is that right?

A   Yes.

Q   And now if we could turn to Exhibit 61, another Microsoft Teams message, July 25th, 2025.  And this is messages exchanged, Nigel Crighton to Joe DiFranco, Eric French, Maks Chernyavskiy, the same folks.  And Nigel writes, "JP just told me he sent $13 million to Bowery."

A   Yes.

Q   And then finally, turning to Exhibit 64, another Microsoft Teams message, July 25th, 2025, same individuals, Maks Chernyavskiy writes to Joe DiFranco, Eric French, Nigel Crighton, "It hit Bowery."  Is that right?

A     Yes.

Q     And then if you could, Mr. Moore, turn to Exhibit 65 in your packet?  This relates to a bank statement.  I apologize, I might have said 64.  I mean 65.

A     You said 65, and I have that exhibit up.

Q     Okay.  Thank you.  And so is this another Wells Fargo account statement for Bowery Finance II, LLC?

A     Yes.

Q     And the date range is in the top, July 1st, 2025 to July 31st, 2025?  Is that correct?

A     Yes.

Q     And let me now direct your attention to page 4 of these Bowery Finance II LLC bank statements.  And going down to the entries towards the bottom for July 25th, if I could direct your attention to three -- any entries, rather, there for $3 million, $9 million, and $13 million.  Could you please describe those to the Court.

A     Those are three incoming transactions that total $25 million, all of them coming from the Patrick James Trust.

Q     And then finally, Exhibit 66, if you could turn to the -- okay.  So Exhibit 66, if you could look in the schedule to July 29th, 2024, what total payments does that show?  And specifically, row 15.

A     Let me make sure that I have it.  This is Exhibit 66?

Q     It's Exhibit 66, July 29th, 2025.  I believe I misspoke

a moment ago.

A    Yes.

Q    And referring to entry -- July 29th, 2025, with value $3.4, really $3.5 million.  Do you see that there?

A    I do.

Q    Okay.  And there should also be an entry for $25 million to Jefferies?

A    I'm not seeing that in -- I think you can put -- Oh, I'm sorry, you have this showing.  Okay, I'm sorry.  I was looking at a different -- at my own file, with the packet of exhibits.

Q    I apologize.

A    Could you restart the question, please?

Q    Sure thing.  So on this Exhibit 66, if I could direct your attention to July 25th, 2025, it's the third entry down in the schedule.  And if we could go, and if you could tell the Court the payment that it reflects for $25 million, it looks like it's to Jefferies, but if you could describe that for the Court?

A    Yes.  There would be a net approximately $20 million due to Jefferies on that day.

Q    Okay.  In all, in the exhibits we've just seen between the Microsoft chat records, the Wells Fargo bank records, the schedules, could you just do a voiceover for the Court of what we've seen in terms of the general flow of funds

here, and what they reflect?

MR. TECCE:  We just object to that question.

BY MS. MOGHADDAM:

A    Yes.  So --

THE COURT:  Can you explain that question (indiscernible)

MR. TECCE:  (indiscernible)

THE COURT:  Yeah -- yeah.

MS. MOGHADDAM:  Your Honor, I'm asking the witness to explain generally what the flow of funds here reflect based on his review of the banking records, the banking schedules, and then the Microsoft Teams chats.

THE COURT:  Okay.  That makes sense to me.  Thank you.

BY MS. MOGHADDAM:

A    So what we've seen is that there was approximately $25 million that was transferred from the Patrick James Trust, from his accounts into Bowery.  And at that same time, there was almost $25 million due to third-party AR factors.

Q    Thank you, Mr. Moore.  Okay.  So we've now talked about the SPV financing facilities, and the issues identified there, and then discussed the total funds.  Can we now, if we could now, with the Court's permission, turn to the misappropriation by Patrick James of Debtor funds.  Your allege in your affidavit that before he resigned from First Brands, Mr. James misappropriated hundreds of millions, if

not billions of dollars from First Brands.  What was the general time period of your review as asserted in your affidavit?

A    From 2018 to 2025.

Q    And based on your investigation, how did Mr. James misappropriate funds from First Brands during that time period?

A    There were transfers out of approximately $700 million to Mr. James during that time period.

Q    And were some of the transfers to the Patrick James Trust?

A    Yes.  The majority of them went to the Patrick James Trust.

Q    And were some of the transfers payments for Mr. James and his family's personal expenses?

A    Yes.

Q    And in fact, going back to the Patrick James Trust, were the majority of the funds transferred to the Trust itself?

A    Yes.

Q    You testified to transfers from First Brands to the Patrick James Trust.  During your review, did you also see some transfers from Patrick James to First Brands, so transfers in the other direction during that same time period, 2018 through 2025?

A    Yes.

Q    Could you tell the Court about those?

A    There was approximately $100 million that was transferred from the Trust into First Brands during that same time period.

Q    In connection with this action, the Debtors sought a comprehensive accounting from Mr. James?

A    Yes.

Q    And while you made that -- Based on your investigation to date, do you believe Mr. James personally directed the distributions from the company to his trust?

A    Yes.

MR. TECCE:  Objection (indiscernible) doesn't have any basis.  Mr. James hasn't been copied on any email, his name hasn't appeared in any of these documents.  What's the basis for that statement?

MS. MOGHADDAM:  I'm about to show the exhibits, copies of which have already been shared.

THE COURT:  Okay.  You can proceed.

MS. MOGHADDAM:  And Defense Counsel (indiscernible)

BY MS. MOGHADDAM:

Q    So why don't we go ahead and put before you, Mr. Moore, Exhibit 19.

THE COURT:  which one is it?

MS. MOGHADDAM:  Exhibit 19.  And if we could zoom in on

that, please?

BY MS. MOGHADDAM:

Q    A June 12th, 2024 email, Mr. Moore, from Andy Brumbergs to (indiscernible) and copied Joe DiFranco, Ray Distributions (indiscernible) "Hi, Laurie.  Spoke with Patrick, and he wanted to have the distribution funds sent to Schwab, $21 million, and Fidelity $4 million, accounts today."  Mr. Moore, I just asked you a moment ago if you believe, based on your investigation to date, Mr. Patrick James, the Defendant in this case, personally directed the transfers out of First Brands.  Does this email support your conclusion that yes, he did, in fact, direct those transfers?

A    Yes.

Q    Thank you.  Moving to Exhibit 28, if we could zoom into the top, please?  That should sat October 31st, 2025, the email at the bottom from Andrew Brumbergs -- no, I'm sorry, the first email on this page, please.  From Andrew, Andy Brumbergs, dated, October 31st, 2024, to Joe DiFranco, coffee -- copying, rather, Kevin Ruminski (indiscernible) $25 million distribution, "Joe, I was just instructed to make $25 million U.S. dollar distribution to the Fidelity account noted.  Please process today.  Thanks."  What's your understanding of this email?  And please tell the Court who are Kevin Ruminski and Joe DiFranco.

A    Joe DiFranco and Kevin Ruminski are both two individuals within the finance department.  Joe is within treasury, Kevin handles accounting for the corporate entity.  And this is an email from Andy Brumbergs, indicating that he has been instructed to make a $25 million distribution to Mr. James' Trust.

Q    Okay.  And if we go to the email at the top of the same page, from Kevin Ruminski to Andy Brumbergs, October 31st, 2024, "Andy, tax distribution and dividend for the QBA account."  Do you see that there?

A    Yes.

Q    Okay.  And is that Mr. Ruminski asking where the distribution Mr. Brumbergs was directed to make was to go?

A    Yes, he was asking specifically how it should be accounted for in QuickBooks, which is QB, whether that is a tax distribution or a dividend.

Q    Okay.

MS. MOGHADDAM:  Your Honor, may I have a moment?

THE COURT:  Absolutely.

MS. MOGHADDAM:  Thank you so much.

Thank you, Your Honor.

BY MS. MOGHADDAM:

Q    Mr. Moore, let's go ahead and put Exhibit 4 before you.  Okay.  If we could zoom in a bit so that the (indiscernible) but reflecting the title at the top, please.  Maybe we can

just go -- okay.  There you go.

So First Brands, LLC general ledger, all dates.  Do you see that document, Exhibit 4, before you?

A    Yes.

Q    Is this a query, a general ledger query from the First Brands Group, LLC general ledger, and it's reflected at the top for all dates?

A    Yes.

Q    And it's an excerpt.  Correct?

A    That's correct.

Q    And what generally does this excerpt reflect?

A    It reflects the activity booked to two accounts over the entire time period.

Q    And what are those two accounts?

A    One is Distributions - Patrick James, and then the other one is Tax Distribution - Federal PJ.

Q    And could you describe to the Court some of those entries under memo description, starting with the first few at the top, and then going down to the February 3rd entry, and the last entry?

A    The top entries refer to equity distributions made to Mr. James during that time period, for a net total of $39 million.

Q    And then going down in the chart to the (indiscernible) entries?

A    And then, the second category are tax distributions, or what were booked to tax distributions.  And if you can scroll down -- I can't see the bottom for the total here.

Q    Sure.  We're working on it.  One minute, please (indiscernible) Do you see that now?

A    I do.

Q    Okay.

A    And these total $339 million.

Q    Okay.  And in terms of some of the key entries, I know you referenced them, but we see an 8/30/2019 entry, equity payments to dividends for $2 million, a 10/18/2019 entry, Patrick James distribution dividend, $1 million, 1/1/2020, Patrick James distribution dividend, $2 million, 10/2/2020, Patrick James distribution dividend, $5 million, and 12/28/2024, payment to trust, $50 million.  Correct?

A    Yes.

Q    Okay.  We can take that down.  And for Exhibits 20, 21, and 23, which will be the next in sequence for us, Mr. Moore, if you could pull those up on your set, as they reflect account numbers.

A    I have 20.

Q    And if we could go to page -- Well, could you first please tell the Court what Exhibit 20 reflects?

A    This is a schedule for Carnaby FA, LLC, which is one of the SPV entities, and it reflects cash transactions over a

period of time.

Q   And is that period October 8th, 2024 to October 17th, 2025?

A   Yes.

Q   And if I could direct your attention to page 3, Excel row 26, which the row may or may not be reflected there for you, but specifically an entry for Carnaby FS, LLC for $17 million.  Let me know when you're there.  And if you could, once you are there, describe it to the Court?

A   Okay, I'm there.  This is a transaction on April 4th, 2025 for $17 million being sent to Patrick James' J.P. Morgan Chase account for his trust.

Q   Okay.  Okay.  Directing attention to the next exhibit then, 21, again on your device.

A   Okay.  I have it.

Q   Great.  And does this also reflect bank transaction records, but this time for Carnaby Inventory I, LLC?

A   Yes.

Q   And is this for October 9th, 2024 to September 17th, 2025?

A   Yes.

Q   And let me direct your attention to page 10, rows 81 and 82, if you could let me know when you're there?

A   I'm there.

Q   What does row 81 reflect, December 30th payment?  If

you could describe that to the Court.

A    Yes, there is a transfer out for $15 million, to the J.P. Morgan Chase account for Patrick James Trust.

Q    And row 82, same page, December 30th entry for $15 million.  Could you tell the Court what that reflects?

A    This is also a transfer on December 30th of 2024 for $15 million to the Bank of America Patrick James Trust account.

Q    Okay.  Let's now turn to Exhibit 23, also on your device, and let me know when you're there.

A    Okay.  I have the exhibit up.

Q    Okay.  Does this reflect bank transaction records for Carnaby Inventory IV, LLC from October 17th, 2024 to September 17th, 2025?

A    It does.

Q    Okay.  Let me direct your attention to page 2, row 14.  Just let me know when you're there.

A    I'm there.

Q    If you could look at the April 17th, 2025 debit, and describe it to the Court?

A    I don't have -- Could you give me the date again?

Q    Sure.  My notes show April 7th, 2025, for $58 million.

A    Yes, I have that.  I thought you said April 17th.  Yes, on April 7th, there is a transfer out of $58 million to the J.P. Morgan Chase account for the Patrick James Trust.

Q    Okay.  Thank you very much.

MS. MOGHADDAM:  Your Honor, may I have just one moment?
I might be able to tighten my questioning a little.

THE COURT:  Okay.

MS. MOGHADDAM:  Thank you.

BY MS. MOGHADDAM:

Q    Okay, Mr. Moore.  On that same Exhibit 23, page 15, row
101, date 10/18/2024, when you get there, please tell the
Court what that transfer reflects.

A    There are -- If this is the very top?  I don't have row
numbers on this.

Q    I'm sorry, yes, it is the entry at the very top, with
the date 10/18/2024 in that column, second to the far-right.

A    This is another transfer of the $21 million to the J.P.
Morgan Chase account for the Patrick James Trust.

Q    Okay.  And going to page 13 of that same exhibit, let
me know when you're there.

A    Yes.

Q    The entry that's third from the top, dated April 11th,
2024, could you please describe that to the Court?

A    Yes.  That's a transfer of just over $22 million to the
J.P. Morgan Chase account for the Patrick James Trust.

Q    Okay.  And then going further back, page 7 of that same
document, the second entry from the bottom?

A    This is a transfer on February 18th, 2025 for $15

million to the J.P. Morgan Chase account for the Patrick James Trust.

Q   Okay.  And then page 5, the second entry from the top, if you could describe that to the Court when you get there?

A   This is a $35 million transfer to the J.P. Morgan Chase bank account for the Patrick James Trust.

Q   Okay.  And then finally, page 4, row 28.  When you're there, if you could describe that entry on March 13th, 2025?

A   And I don't have row numbers.

Q   I'm sorry.  The fifth entry from the top, dated March 13th, 2025.

A   This is a transfer of $35 million to the J.P. Morgan Chase accounts for the Patrick James Trust.

Q   Okay.  Thank you, Mr. Moore.  We can take that down, and I guess go to Exhibit 31 in your record, another set of account statements.

A   Okay.

Q   If we look at the upper-left quadrant, this reflects an HSBC account statement for Carnaby Inventory IV, LLC.  Is that correct?

A   Yes.

Q   And the statement period just below that and to the right is January 1st, 2025 to January 31st, 2025?

A   Yes.

Q   Okay.  And let me direct your attention to the middle

portion of the actual statement entries, January 15th, 2025. Do you see the closing balance on that date?

A    Yes.   The closing balance on January 15th was $22,137.40.

Q    Let me direct your attention to the entry right below for January 16th, 2025.   What does that reflect?

A    This is an incoming deposit for $192 million on January 16th, 2025, from Onset Financial.

Q    And does that entry reflect sale-leaseback inventory?

A    Yes.   That is what Carnaby Inventory IV was used for.

Q    Okay.   And could you remind the Court what Onset Financial is?

A    Onset is one of those providers that I previously mentioned, that provided lease financing through sale-leaseback transactions with inventory and fixed assets to SPV entities.

Q    Okay.   Looking now at the next, the entry right below the Onset deposit of $119 million, what does the next entry, which is a debit, reflect?

A    This is a transfer out of $25 million to the J.P. Morgan Chase account for the Patrick James Trust.

Q    And then immediately below that, is there another entry, and this time to Carnaby Inventory III, LLC?

A    Yes, for $1.9 million.

Q    And is that also a withdrawal, a debit?

A    It is.

Q    And below that, another entry.  Could you describe it to the Court?

A    Yes.  It is a withdrawal of $1.1 million, again the same day, January 16th.  This one is to Carnaby Inventory II, LLC.  And both Carnaby Inventory III, LLC and Carnaby Inventory II, LLC are not Onset entities.  A different SPV lender provided funding to those entities.

Q    Okay.  And then January 17th, 2025, there is another withdrawal.  Could you describe that to the Court?

A    Yes.  There is a withdrawal of $32,517 -- excuse me, $32,517,525.

Q    Okay.  And then finally, if we look on the next page, there is another entry for same day, January 17th, 2025.  Could you describe that to the Court?

A    Yes, just on the last entry, I don't know if I said it in my response, but the $32.5 million went to Bowery.

Q    Okay.

A    And then the next transaction on January 7th -- I'm sorry, let me make sure that I have my pages right here.  So following that on January 21st, there is a transfer of $22,482,475 to Bowery.  And just above that, there is a transfer of $587,248.35 to Battery Park Holdings.

Q    Okay.  Thank you.  And now if we could go to Exhibit 32 also on your personal set, as this is also an account

statement.  Let me know when (indiscernible)

A    Okay.

Q    Okay.  This is another HSBC bank statement, this time for Carnaby Inventory IV, LLC.  Is that correct?

A    Yes.

Q    And the statement period is March 1st, 2025 to March 31st, 2025.  Is that also correct?

A    Yes.

Q    Okay.  And then directing your attention to the description of transactions, the first that we're going to look at has a posted date of 3/7/2025.  Do you see that there?

A    The first transaction is on March 6th, not March 7th.

Q    I apologize, Mr. Moore.  I meant the first -- the transaction with the date 3/7/2025.  Do you see that?

A    I see that, yes.

Q    Okay.  And the closing balance on that date was?

A    The closing balance on the 7th was after the -- I should say the opening balance on the 7th was $28,952.95.

Q    Okay.  And then, could you describe the -- If we could turn to the next page of the statement, March 10th, 2025, transaction with Onset Financial.

A    Yes.  There is an incoming deposit of $115,200,000 from Onset Financial on March 10th.

Q    Does that also reflect a note about a sale-leaseback

inventory?

A    It does.

Q    Okay.  And then going to the next transaction, also on March 10th, for $35.4 million, could you describe that to the Court?

A    Yes.  This is a transfer for $35,439,577.69 out to Bowery.

Q    And below that, another March 10th, 2025 transaction, this time for $7 million.  Could you describe that to the Court?

A    Yes.  This is a transfer for $7,060,422.31 out to Bowery.

Q    Okay.  And then a $35 million transfer out, could you describe on the same day, March 10th, 2025?

A    (indiscernible) million to the J.P. Morgan Chase (indiscernible)

THE COURT:  Just one moment, Mr. Moore.  Just a second, Mr. Moore.

Counsel, let me just -- It may be a decent just break point.  I've got to break to another case, just for a few minutes.  How much more cross -- direct do you think you have?

MS. MOGHADDAM:  Your Honor, I suspect I have 30 more minutes for Mr. Moore.

THE COURT:  Okay.  Okay.  Why don't we break, and then

we need to talk kind of how late we're going to go tonight, just so we're all on the -- But let me, I've got to just -- I'm going to turn to another case for about just -- well, I don't know how long it's going to -- but it shouldn't be -- You're more than welcome to stay here.  If you need to take a break, there's a lovely vending machine, I'm sure, somewhere.

But we'll proceed.  I'll step out, we'll take a break from First Brands, and then we will start in about four minutes with Pine Gate, and we'll see where they are.  Folks, if you're on the line, you're more than welcome to hang out.  But we'll start in about three minutes.  Thank you.  I'm going to turn my camera off, and then come back on.

MS. MOGHADDAM:  Thank you, Your Honor.

(Brief recess.)

(Back on the record.)

THE COURT:  All right, folks.  Are we ready to -- Let me see if Mr. Moore --

MS. MOGHADDAM:  Yes, Your Honor.  Thank you.

THE COURT:  There you are.  Mr. Moore, can you hear me okay?  Just a sound check.

MR. MOORE:  I can, Your Honor.

THE COURT:  Okay.  I'll remind you that you are still under oath, and we're still continuing with your direct

examination.  Okay?

MS. MOGHADDAM:  May I proceed, Your Honor.

THE COURT:  Yeah.  Can we just, before we -- I want you to finish, but maybe we can talk kind of housekeeping, a little housekeeping before we kind of -- I think you've got another 30 -- In terms of cross, I don't want to hold you to it, maybe (indiscernible)

MR. TECCE:  Your Honor, I think my interest is to finish the witness.  It depends on your schedule, okay, how long we can stay.  I'll work to finish -- I think if we're going to end, I'd like to finish the witness.  I -- I mean, we've been going for three-and-a-half hours with this, and I'm willing to focus my cross, so you know, 30 minutes, 40 minutes (indiscernible)

THE COURT:  Yeah, let's try to --

MR. TECCE:  I can try.  I mean, I --

THE COURT:  No, no, I'm not going to -- Yeah, I mean, look, I'm going to give you a full opportunity to do it.

MR. TECCE:  I appreciate -- we appreciate your time.  I really do.

THE COURT:  Let's keep working.  And if anybody needs breaks or anything -- Let's just keep going.  Thank you.

MS. MOGHADDAM:  Thank you, Your Honor.

THE COURT:  Yeah, but we're finishing with Moore today.

MR. TECCE:  Okay.

THE COURT:  Without a doubt.

MR. TECCE:  Thank you very much.

THE COURT:  Okay.

MS. MOGHADDAM:  Thank you, Your Honor.

THE COURT:  I think Moore wants that more than anybody else, but --

MR. MOORE:  You have that right, Your Honor.

THE COURT:  Let's proceed.

BY MS. MOGHADDAM:

Q   Okay.  Mr. Moore, before the break, we were talking about Exhibit 32, March 2025, HSBC account statements, and Carnaby Inventory IV, LLC for the period March 1st, 2025 to March 31st, 2025.  Before the break, we were focused on a series of transactions dated March 10th, 2025 in those records, and I think you testified to March 10th, 2025, $7 million to Bowery Finance.  Let's now look at the March 10th, 2025 transaction to Patrick James Trust.  Could you describe that entry to the Court?

A   Yes.  There is a transfer of $35 million to the a J.P. Morgan Chase account for the Patrick James Trust.

Q   Okay.  And then directing your attention to March 11th, 2025, do you see a transaction to Bowery Finance?

A   I do.  Yes, a transfer out of $20,719,337.69.

Q   And on March 12th, 2025, another transfer to Bowery Finance, do you see that?

A     Yes, for $16,780,662.31.

Q     And then on that same date, what is the ultimate balance in the account after those transfers to -- rather, I'm sorry, on March 12th, 2025, what is the balance in the account after the transfer to Bowery Finance?

A     The ending balance on March 12th is $202,952.95.

Q     And also on March 12th, is there a deposit from Onset Financial?

A     Yes.

Q     And what is that amount?

A     Prior to -- or subsequent to the $202,000 number that I mentioned, there is an additional $57,600,000 that came in from Onset.

Q     And that, too, is labeled sale-leaseback inventory?

A     Yes.

Q     Okay.  And then turning to March 13th, 2025, is there another transfer to the Patrick James Trust?

A     Yes, there is, for $35 million.

Q     Okay.  And then another March 13th transaction, this time to Bowery Finance.  What is the dollar amount of that?

A     Yes, $11,369,445.25.

Q     And then on March 14th, 2025, again to Bowery Finance, what is the dollar amount of that transfer?

A     That's a transfer out of $11,430,554.75.

Q     And then on March 14th, the closing balance, what is

that?

A    The closing balance on March 14th was $2,952.95.

Q    Okay.  Thank you, Mr. Moore.  Let me now direct your attention to yet another HSBC account statement, this time Exhibit 33.  Let me know when you have that before you.

A    I have that.

Q    Okay.  This HSBC statement is for Carnaby Inventory FA, LLC, and it's for the period March 1st, 2025 through March 30th, 2025.  Is that right?

A    I am not sure I have the same exhibit.  For Exhibit 33, I have Carnaby FA, LLC for April 1st, 2025 through April 30th, 2025.

THE COURT:  Yeah.

BY MS. MOGHADDAM:

Q    All right.  Thank you.  So on that statement, going to the entry on 4/3/25, could you describe the closing balance on that date?

A    The closing balance on the 3rd, or the opening balance on the 3rd?

Q    I'm sorry, the -- the closing balance on the 3rd.

A    The closing balance on the 3rd was $4,833.98.

Q    Okay.  And then moving to April 4th, 2025, there is another deposit from Onset Financial.  Could you describe that to the Court?

A    Yes.  There's a deposit on April 4th, 2025, $67,200,000

from Onset Financial.

Q   And this, too, reflects a note about a sale-leaseback. Is that right?

A   Yes.

Q   And then another April 4th, 2025 transfer to Bowery Finance.  Could you tell the Court about the next three entries, each of which is a transfer from this HSBC Carnaby FA account to Bowery Finance, starting with the $17.3 million transfer to Bowery?

A   Yes.  On April 4th, 2025, there are three transfers out to Bowery.  These three amounts are $17,329,695.45, the second one is $16,558,965.35, the third one is $16,111,339.20.

Q   Okay.  And then on April 4th, 2025, a transfer to Patrick James Trust.  Could you tell the Court about that transfer?

A   Yes.  Also on April 4th, 2025, there's a transfer of $17 million to the J.P. Morgan Chase account for the Patrick James Trust.

Q   Thank you, Mr. Moore.

MS. MOGHADDAM:  One  moment, Your Honor.

THE COURT:  Mm-hmm.

BY MS. MOGHADDAM:

Q   Okay, Mr. Moore.  In all, does your investigation reveal over $600 million distributed directly from First

Brands to Defendant Patrick James Trust from 2018 to 2025?

A    Yes.

Q    And in all, does your investigation also reveal $700 million funneled from First Brands to Mr. James and his affiliated entities also from 2018 to 2025?

A    Yes.

Q    Based on your investigations to date, have you seen any evidence that these transfers were made for any benefit or consideration received by First Brands?

A    Not that I have seen.

Q    And based on your investigation to date, have you uncovered any evidence that Mr. James' transfers were made for any legitimate business purpose?

A    Not that I have seen.

Q    Based on your investigation to date, have you uncovered contemporaneous documentation of the purported business purpose of any of these transfers?

A    Not that I have seen.

Q    Based on your investigation to date, do you have an understanding of whether Mr. James' dissipation of First Brands funds for his personal use was directly and proximately connected to his efforts to secure funding for First Brands?

MR. TECCE:  Objection, Your Honor.  I don't understand the question.  It's not -- it's not clear.

THE COURT:  Can you repeat the question?

MS. MOGHADDAM:  Sure.  I'll try to state it perhaps more simply.

THE COURT:  Okay.

MS. MOGHADDAM:  Thank you, Your Honor.

BY MS. MOGHADDAM:

Q    Mr. Moore, based on the review that you've done to date, is there a relationship between the financing obtained from various facilities and the transfers to Mr. James?  And if my question isn't quite precise, I can find another way to formulate it.

A    Yes, as we've gone through with these statements, there appears to be a direct relationship between money coming in from these various SPV financings, and transfers out to Mr. James and his trust.

Q    Okay.  Thank you.  In addition to transfers to the Patrick James Trust, the Defendant in this case, have you seen transfers to other Defendants, including the Larchmont Family Office?

A    Yes.

Q    Okay.  And Larchmont, the name is actually Larchmont LLC, but is it your understanding, based on your investigation, that that is, in fact, the family office for Patrick James?

A    Yes.

Q    And let me direct your attention now to Exhibit 43.
Do you have that before you?

A    Oh, I didn't realize I needed to bring it up on my side.

Q    Oh, I'm sorry.  Yes, Mr. Moore (indiscernible)

A    Okay.  I have 43.

Q    Okay.  So if I could -- or if you could first describe what this exhibit reflects for the Court?

A    This is a schedule showing disbursements to Larchmont over a period of time.

Q    Okay.  And is the period of time specifically 2018 through 2025?

A    Yes.

Q    Okay.  And you testified it reflects payments to Larchmonth.  Does it generally appear to reflect payments in the dollar amounts of $1.25, $625,000, $416,667, and one payment for $50K over that time period of February 16th, 2018 through August 8th, 2025?

A    Generally, yes.  There is a $2.5 million item as well, but yes.

Q    And in total, from 2018 to 2025, was there a total of $35 million paid to Larchmont, the family office of Defendant Patrick James, as is reflected on this First Brands general ledger entry excerpt?

A    Yes, just over $35 million.

MR. TECCE:  Objection to form, and he hasn't --

BY MS. MOGHADDAM:

Q    Okay.  Based on your investigation to date, have you uncovered any evidence that these payments to the Defendant Patrick James' family office, Larchmont, relate in any way to any legitimate business relationship to First Brands?

A    No.

Q    Okay.  Mr. Moore, let's now turn to the entity, Battery Park Holdings, LLC.  Is this another entity unrelated to First Brands, that is owned and controlled by Patrick James?

A    Yes.

Q    Do you have an understanding of how Patrick James used the Battery Park entity in terms of bank transfers and payments?

A    It appears that Battery Park would send invoices for personal expenses to First Brands entities.

Q    Let's take a look.  And we can put this one on the screen, Exhibit 16.  We have a Microsoft Office Teams chat, Kathy Moody to Michael Baker, and Kathy writes, "Battery Park is used for personal/family."  Is that right?

A    Yes.

Q    Does this confirm your testimony a moment ago that the Battery Park Holdings LLC accounts were for family, personal, and unrelated to First Brands?

A    Yes.

Q   By the way, who is Michael Baker?

A   Michael Baker was one of the officers of the business, who resigned September 25th, 2025.

Q   Okay.

A   When I say "of the business," of First Brands.

Q   And Kathy Moody was an administrative assistant at First Brands.  Correct?

A   That is my understanding.

Q   Let me direct your attention now to Exhibit 42.  And if we could look at the top part of the email (indiscernible) a January 19th email from Vandana Sambangi at First Brands Group to Eric French and Nigel Crighton, Re. BP bill-back invoice through December 31st, 2023.  And Ms. Sambangi writes, "Could you please process BP bill-back invoice to FBG through December 31st, 2023?"  What is your understanding of what BP there, in terms of the (indiscernible) invoice FBG is referring to?

A   This relates to Battery Park.

Q   Okay.  And if we go to the email directly above that, from Eric French to Levin Ruminski, dated January 19th, 2024, so that same date, and Mr. French writes, "Want you to approve for this in December, and post in Jan."  Is that right (indiscernible)

A   Yes.

Q   And I think you testified to this earlier, but am I

correct that Eric French and Kevin Ruminski are within the finance organization at First Brands, or at least were when Defendant Patrick James was running the company?

A    Yes, finance and accounting.

Q    Finance and accounting.  And then, just to close the loop on this email, the top-most email, Mr. Ruminski writes Eric French, cc Andy Brumbergs, dated January 19th, 2024, "Accrue in December as it's all December activity."  Correct?

A    Yes.

Q    And now we're going to turn to the attachment to this email chain.  And at the top you see Battery Park Holdings, LLC, and invoice to, bill to First Brands.  So if you could just focus in on that portion of this invoice?

So in the email, just to make sure the testimony came in, Mr. Moore, ignoring the pullout in front of you at this moment, Battery Park Holdings LLC is at the upper-left corner.  Is that correct?

A    Yes.

Q    And does that suggest to you that that's an invoice being issued by that entity?

A    Yes.

Q    And it's being billed to, and again, this is below that, also on the upper-left, First Brands Group, LLC?

A    Yes.

Q     And do you see the date of this invoice to the right of that, January 19th, 2024?

A     Yes.

Q     Okay.  And now I'm going to direct your attention to two entries on this invoice, specifically December 21st, 2023, and December 21st, 2023, right below, two entries for Simon Waterston -- Waterson, rather, the first FBG 100 wellness sessions for $76,043.70 cents, and the second, same amount, but this time, Mr. James 100 wellness sessions.  Do you see those bill-backs from Battery Park Holdings to First Brands Group?

A     Yes.

Q     What is your understanding of these two charges, and why Battery Park Holdings, the personal entity of Mr. James, is billing back what appear to be wellness sessions with a Simon Waterson to First Brands Group?

A     Battery Park was billed these amounts from Mr. Waterson, and then now these are being packed along or billed to First Brands Group.

Q     Okay.  Along those lines, let me now direct your attention to Exhibit 5.  And this one is more -- if you could look at it in your packet, since it is account numbers?

A     Oh, I have -- okay, I have it.

Q     Great.  And maybe you can take the other exhibit off?

Fantastic.

So this document, Exhibit 5, is this a general ledger of entries from First Brands Group, LLC, to three -- Strike that.  Does this reflect excerpts from the general ledger entries for First Brands Group, LLC?

A     Yes.

Q     And if you scroll through, does it appear to reflect payments to an MRR Dison, LLC, maybe Mister -- LLC, Meridith Baer Home, and Meridian Moving and Storage?

A     Yes.

Q     And do some of the entries out of the category column for MRR D-I-S-O-N, LLC reflect "rent and leases"?

A     Yes.

Q     Do you have an understanding of what this entity, MRR D-I-S-O-N, LLC is?

A     I don't know for sure, but it appears to be something related to real estate.

Q     Okay.  Did you become aware at some point that Mr. James was billing back payments to First Brands for his New York City townhouse?

A     Yes.

Q     And does it reflect your -- refresh your recollection, as you look at Exhibit 5, that these rent and leases payments to MRR Dison, LLC are in fact payments to that New York City townhouse, for rent?

A     Yes.

Q     And to your knowledge?

A     I just don't --

Q     Go ahead.

A     I'm sorry.  Just to clarify my previous answer, I just don't know all of the details about this specific entity.  But these are what those payments relate to.

Q     Understood.  Thank you.  And to your knowledge, Mr. Moore, does First Brands have an office in New York City?

A     Not that I am aware of in New York City, no.

Q     Okay.  And the payments to Meridith Baer Home, do you have an understanding of what that might be, that vendor?

A     No, I don't know that entity.

Q     Okay.  And then Meridian Moving and Storage, fair to say that the name speaks for itself?

A     Yes.

Q     Okay.  In addition to categories of payments for rent and leases, do you also see on these general ledger entries categories for prepaid rent, telephone and internet, and so-called miscellaneous expense towards the very end, in the last -- the end of page 5, and page 6 of this general ledger?

A     Yes.

Q     In your capacity as Interim CEO of First Brands, once you took on that role, Mr. Moore, did you have occasion to

come across examples, in addition to the ones we just identified in these documents, of payments by the company of personal expenses for Mr. James and his family?

A    Yes.  There were I believe between 10 and 12 people that were on the corporate payroll, that were related to Larchmont, they were all -- or at least they were performing personal services.  And once they were terminated from First Brands, my understanding is that they moved over to Larchmont.  And there was also a personal chef on the corporate payroll.

Q    Once you uncovered these payments, what, if anything, did you do with respect to them?

A    I terminated all of these employees.

Q    Mr. Moore, before we conclude your direct examination, I want to take you back to your testimony earlier this afternoon around information you uncovered in your investigation, including, as you testified earlier, in conversations with Andy Brumbergs about the use of bogus information with the AR factors to obtain cash, the pledging of the same collateral two or more times across providers of asset-backed financing.  As you discovered, generally, the fact that bogus information was being used for AR factors, and that collateral was being double-pledged, did you have occasion to speak with Andy Brumbergs about it, and specifically after Patrick James resigned from his role as

CEO of the company?

A     Yes.

Q     And I think you testified earlier, Patrick James resigned on or about October 12th, you became interim CEO on or about October 13th.  At some point immediately thereafter, did you have occasion to speak with Andrew Brumbergs about those issues?

A     Yes.

Q     And in that conversation, did Mr. Brumbergs tell you that Patrick and Ed -- and Patrick James and Ed James (indiscernible) were behind all this, and they were the ones pushing to do all of these things?

MR. TECCE:  Your Honor, I object to this question. It's blatant hearsay, it's leading.  It's basically testifying about what somebody else said.

THE COURT:  Yeah, I think you can ask --

MR. TECCE:  And it goes (indiscernible)

THE COURT:  -- go ahead.  I think you can rephrase the question.

MS. MOGHADDAM:  Sure.

BY MS. MOGHADDAM:

Q     You testified earlier that among the sources of information for the findings in your affidavit, and the testimony here before this Court today about the fraud at First Brands under the leadership of Defendant Patrick

James, were interviews with members of management and other employees.  Was Andy Brumbergs, Mr. Moore, one of the individuals with whom you spoke about the pre-petition operations under Patrick James of this company?

A    Yes, both Mr. Brumbergs and Mr. Steve Graham, who was the CFO.

Q    Could you tell this Court, after Mr. James resigned from the company on October 13th, were you able to obtain more information from Andy Brumbergs?  Was he more willing to speak with you then?

A    Yes, both Mr. Brumbergs, as well as Mr. Graham.

Q    Let's start with Mr. Brumbergs.  In your conversations with Mr. Brumbergs after Patrick James was out of the company, what did Mr. Brumbergs tell you about who was behind these schemes?

MR. TECCE:  For the record, Your Honor, objection.  It's hearsay.  They should have called Mr. Brumbergs as a witness if they wanted his testimony.  They did not do it.

THE COURT:  Hold on, hold on.

MS. MOGHADDAM:  Your Honor, may I repeat the question so that (indiscernible)

THE COURT:  Yeah, but just tell me what this goes to.

MS. MOGHADDAM:  This goes to tying the fraudulent (indiscernible) the dummy invoices, the double-pledging directly to Mr. James and his brother, Ed James.  And James,

in particular, Your Honor, was running those (indiscernible)

MR. TECCE:  (indiscernible)

THE COURT:  No, no, I don't want you testifying for him.  I was just trying to figure out which element we're going to in connection with what year?

MS. MOGHADDAM:  It has to do directly with --

THE COURT:  Likelihood of success?  Is that where you're going?  In terms of the preliminary injunction, tell me which --

MS. MOGHADDAM:  It goes to showing that Mr. James directed the dummy invoices, and directed the double-pledging.

THE COURT:  I'll give you a little bit of leeway on it.

MS. MOGHADDAM:  That you, Your Honor.

BY MS. MOGHADDAM:

Q    Mr. Moore --

A    (indiscernible)

Q    Go ahead.

THE COURT:  Hold on.  Hold on.  She's got to ask a question.

MR. MOORE:  (indiscernible)

THE COURT:  She's got to ask another question.

BY MS. MOGHADDAM:

Q    Mr. Moore, going back to your conversations with Andy Brumbergs about the dummy invoices, and the double-pledging

of collateral, who -- did Mr. Brumbergs tell you who was behind it all?

A    The first conversation that I had after moving into the interim CEO role was with Mr. Graham and Mr. Brumbergs, and that was on October 13th.  This was preceded by conversations that I had with Mr. Graham, where Mr. Graham made it very clear that I would not get full information while Patrick was still in place.  Patrick James, that is. And so that first meeting that I had with both gentlemen, Mr. Graham and Mr. Brumbergs, it was the first time that most of this started to come out, meaning what was being done especially as it relates to the factor --

THE COURT:  Just a moment.

BY MS. MOGHADDAM:

A    (indiscernible) that we had (indiscernible)

THE COURT:  Hold on a second.  Just a second.

Mr. Moore, if you wouldn't mind just starting your answer again?

MR. MOORE:  My pleasure.

BY MS. MOGHADDAM:

A    The first meeting that I had after moving into the interim CEO role was with Mr. Graham and Mr. Brumbergs. This is on October 13th.  What preceded that, which is important, is that Mr. Graham had communicated to me I would not get the full story as long as Mr. James was still in

place.  That meeting that I had with Mr. Graham and Mr. Brumbergs on Monday the 13th of October was the first time that we started to get the full picture of what was being done with the AR factoring.  And I found Mr. Brumbergs to be more open than he had been in the past.

That was then followed by a meeting on the 15th, where all of this was made very clear by Mr. Brumbergs in terms of what had been happening, and it was very clear that Mr. Patrick James was aware of all of these items.

Q    Thank you, Mr. Moore.

MS. MOGHADDAM:  No further questions.

THE COURT:  Okay.

Do you need a few minutes, or you're ready?

MR. TECCE:  I do, if I could just collect my thoughts for a few minutes?

THE COURT:  Yep.

MR. TECCE:  And Your Honor, I commit to be very efficient.

THE COURT:  No, no, take as much time as you need.

MR. TECCE:  No, no, but I -- What I want to say is that we're also prepared to close and end this today.  I don't know what your schedule is, but we wanted to finish.  And we spent a lot of time with this witness, and so --

THE COURT:  Let's just see how -- I won't know the answer to that until I know when you're finished.

MR. TECCE:  Okay.  That's extra incentive for me to just (indiscernible)

THE COURT:  That's not to -- No, no, just to be honest with you all, if there's a way I can finish this today, I want to finish it.  But I don't know how long you're going to take, and just to be considerate, I've still got folks working from home.

MR. TECCE:  Understood.

THE COURT:  So I'll give you -- Let's see, it's 7:23. When do you want to come back?

MR. TECCE:  Fifteen minutes?

THE COURT:  Okay.  Mr. Moore, we're going to take a 15-minute break.  So I don't know, add 15 minutes to 7:23. Well, why don't we just start at 7:40?

MR. TECCE:  Thank you, Your Honor, very much.

THE COURT:  Okay.  Thank you.

MS. MOGHADDAM:  Thank you, Your Honor.

(Brief recess.)

(Back on the record.)

THE COURT:  Mr. Moore, why don't you come back on, and we will continue.

Mr. Moore, just doing a sound check.  Can you hear me okay?

MR. MOORE:  I can, Your Honor.

THE COURT:  And I'll remind you that you're still under

oath.  We're going to proceed with cross-examination.

In terms of showing docs, do you need a presenter or any of that stuff?

MR. TECCE:  We have a (indiscernible)

THE COURT:  Hold on.  I've got to get better one day -- You said (indiscernible) oh (indiscernible) there you are.

MR. TECCE:  Thank you very much, yeah.

THE COURT:  And if you could, Counselor, if you could just state your name for the record, just so we can have a good record, and we'll start.

MR. TECCE:  For the record, Your Honor, my name is James Tecce of Quinn Emanuel.

THE COURT:  And can you move the mic just a little closer to you, just to make sure that we can all hear you?

MR. TECCE:  (indiscernible)

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MR. TECCE:

Q    My name is James Tecce.  I'm an attorney at Quinn Emanuel.  I represent Patrick James, and the Defendants.

Mr. Moore, it's a pleasure to meet you, sir.

A    Thank you, Mr. Tecce.

Q    Mr. Moore, is it correct that the Debtors retained A&M on or about September 5th, 2025?

A    That is correct.

Q    A&M is retained by First Brands, LLC and its subsidiaries.  Is that correct?  First Brands Group Holdings, LLC and its subsidiaries.  Is that correct?

A    There are a couple of entities in our engagement letter.  Viceroy is one of those as well, and then subsidiaries.

Q    Right.  So Viceroy and its subsidiaries, do they go, in this case, under the name of the SPV Debtors?

A    There are entities under Viceroy that are the SPV Debtors, yes.

Q    And the FBG Debtors, those are the First Brands Group Holdings, LLC and its subsidiaries.  Correct?

A    Yes.

Q    A&M has been retained by both the FBG Debtors and the SPV Debtors in this case.  Correct?

A    Yes.

Q    And in the aggregate, I think you said earlier, this is a total of about 112 companies?

A    There are about 112 Debtor entities, yes.

Q    How many people at A&M work on this mandate?

A    I don't have a precise number at this point.  At one point, I saw that there are over 100 timekeepers.

Q    How many work for the FBG Debtors?

A    All of A&M is working for the FBG Debtors in some fashion.

Q     All 100, approximately?

A     Yes.

Q     How many work for the SPV Debtors?

A     We are not distinguishing in terms of who or which entity someone works for, but we are keeping track of our time related to different entities now.

Q     Mr. James was the CEO when you were engaged on September 5th.  Correct?

A     Yes.

Q     And you became the interim CEO on October 13th. Correct?

A     Correct.

Q     He, Mr. James ceased as the CEO on October 12th. Correct?

A     Yes.

Q     A Special Committee, Mr. Moore, was in place when you began your engagement.  Is that correct?

A     No, that's not correct.

Q     When was the Special Committee formed?

A     I believe about 10 days later or so, 10 or 12 days later, mid-September 2025.

Q     Does A&M perform advisory services for the Special Committee?

A     Not directly for the Special Committee, but I report to the Special Committee, and so the Special Committee directs

our activities.

Q    Does the Special Committee have its own financial advisory firm?

A    No.

Q    How many on the A&M team perform work in response to requests from the Special Committee?

A    I don't know if I could give a number, because there are different requests all the time from the Special Committee.

Q    Sir, I don't suppose you have a physical copy of your affidavit in front of you, as I had hoped?  But if not, can you access it, ECF 19?

A    This is the affidavit that was submitted last Monday, on the 3rd?

Q    Yes.

A    For this adversary proceeding?

Q    It is.  And I think we can pull it up too, because I'm going to ask you some questions about it.  So we could probably do that if it's easier.

A    Which exhibit is this of yours?

Q    This -- That's a great question.  It's Debtor's 1.  No, it's not.  It's not.  These are ours.  It's Debtor's first exhibit.  Okay.  There it is.

Mr. James, this affidavit was filed on November 3rd, 2025.  Correct?

A     I think you just referred to me as Mr. James.

Q     Oh.  I apologize for that, Mr. Moore.  It's late in the day.

      Mr. Moore.  This affidavit was submitted on November 3rd, 2025.  Correct?

A     Yes.

Q     And if you turn to paragraph 15, which is the top of page 5, at least as of November 3rd, your testimony was that while more work needs to be done, based on information learned to date, the Debtors believe Mr. James improperly secured billions of dollars in financing for First Brands from third parties.  Correct?

A     Yes.

Q     And in paragraph 27, You provide testimony regarding the off-balance sheet financing practices utilizing special purpose vehicles.  Do you see that?

A     Yes.

Q     And in this paragraph, you talk about the Onset facility, and SPV lending, and in the last sentence of this paragraph, you say, and this was your testimony at least as of November 3rd, "The Special Committee and companies' advisors have identified multiple potential issues with the company's off-balance sheet financing arrangements under Mr. James's leadership and direction, each of which is subject to ongoing investigation."  Correct?

A   Yes.  And in paragraph 35, where -- testimonies provided about improper dividends and distributions, the sentence, the paragraph begins, "While the Debtor's investigation remains ongoing, upon information and belief, hundreds of millions of dollars were transferred from First Brands directly to Mr. James or his affiliated entities from 2018 to 2025, with the majority occurring between 2023 and 2025."  Correct?

A   Yes.

Q   In paragraph 25 of your affidavit, Mr. Moore, you talk about the Brake Parts, LLC invoice.  Correct?  Let's go to that paragraph, if we could.  And is it fair to say --

A   Yes, I see that.

Q   You see that?  Okay.  Is it fair to say, sir, that this is the only invoice that you reference in this affidavit, this Brake Parts, Inc. invoice of May 9th?  Correct?

A   Yes.

Q   And you don't indicate in this affidavit that Mr. James prepared that invoice.  Correct?

A   That is correct.

Q   And you don't indicate in this affidavit that he doctored that invoice.  Correct?

A   Correct.

Q   You were asked, on your direct exam, by Counsel to the Debtors about their Debtor's Exhibit 34.  Can we pull that

up?  And this (indiscernible) It takes time.  Okay.  Sorry.
There we go, okay.  Thank you.

This Exhibit 34 is the invoice to which you're referring in paragraph 25 of your affidavit.  Correct?

A    Yes.

Q    And this invoice has a number, 6328084.  Right?

A    Yes.

Q    And it has a date of 9 May 2025.  Right?

A    Yes.

Q    And then, earlier in your testimony, you then spoke about Debtor's Exhibit 35.  So can we pull up Debtor's Exhibit 35?  Debtor's 35 is an email dated May 19th, 2025 from Vlad Batescu to Andy Brumbergs.  Correct?

A    Yes.

Q    And it has an attachment to it which has a list of the receivables that are in this file called "Eligible nomination 5/19/25."  Correct?

A    Yes.

Q    You were then shown Exhibit 37 of the Debtors.  Can we pull that document up?  Do you remember this exhibit?

A    I do.

Q    And attached to this exhibit were schedules, and you spent time going through these schedules, including finding the exhibit that you referenced in paragraph 25 of the affidavit.  Correct?

A    Yes.

Q    And I believe you testified to several examples that were identified by Counsel to the Debtors in this schedule. Correct?

A    Yes.

Q    This schedule is attached to an email from Rachel Debrosse to Andy Brumbergs.  Do you see that on the first page of Debtor's 37?

A    Yes.

Q    And Ms. Debrosse says, "I'm sending the TAP files via DocuSign for esignature by Andy," her first sentence.  Four lines down she says, "Accordingly, please find attached the following documents, 20250522 TAPCBPI," and in the second bullet, she says, "20250522 Brake Parts Trade 51925.  These are the nomination files you submitted, and are all updated to include SOFR rates, updated configuration, and resulting trade economics for the funding wire."  Do you see that?

A    I do.

Q    And so the schedule that you testified about today was the schedule that Ms. Debrosse attached to her email. Correct?

A    Yes.

Q    And if you look at the second page of this email, you see Mr. Brumbergs' May 19th, 2025 email to Ms. Debrosse saying, "Here is today's nomination file."  Do you see that?

A    I do.

Q    So that's Mr. Brumbergs' file, but Ms. Debrosse created her own file, and that's the one you testified to.  Correct?

A    She updated the file that he had sent for the specific areas that she mentioned.

Q    Can we take a look at Exhibit 11, Debtor's 11?  So Debtor's 11 is an email that the Debtor's Counsel asked you about earlier today from Nicholas Cortes to Mr. Brumbergs, and this is the text sent to several people.  You see that in the to line, I think there's at least three or four people in there.  Correct?

A    No.  It's to one person, Andy Brumbergs.

Q    And Nicholas Cortes -- So this is an exchange between the two of them.  Correct?

A    Yes.

Q    And they're talking about so-called dummy invoices. Correct?

A    Yes.

Q    And so Mr. Brumbergs is not concealing this idea of dummy invoices from anybody, is he?

A    Could you repeat that question?

Q    Sure.  He's not concealing the concept of dummy invoices from anybody, if he's sending an email to somebody about it.  Is that correct?

A    Well, this came from Mr. Cortes to Mr. Brumbergs, and

there is a suggestion about creating a dummy invoice.  It's just between the two of them.

Q    But it's in an email between the two of them.  Correct?

A    It's a message.  It's not an -- I think it's a Teams message.

Q    Electronic communication.  Fair?

A    Yes.

Q    In paragraph 29 of your affidavit, can we pull that back up?  In this paragraph, starting second begins, "Upon information and belief -- "  This talks about the concept of double-pledging, I believe you called it, or the idea that inventory, I'll read it, "That was purportedly transferred by First Brands subsidiaries to SPV Debtors, in connection with certain of the off-balance sheet facilities remained on their balance sheet."  Correct?  That's the allegation in this paragraph?

A    If you could scroll up a little bit?

Q    Sure.  Let's make it so we can (indiscernible)

A    At least on my -- Okay, I'm able to see it.

Q    You are able to see it, or you're not able to see it? I'm sorry.

A    I --

Q    Okay.

A    I am able to see it.

Q    Okay.  Thank you.  And in this paragraph 29 though, and

I believe that you testified earlier that the example that you identified of this involved the Evolution facility in paragraph 31.  Correct?  Let's take a look at paragraph --

A    That's one example of it, yes.

Q    Okay.  You don't refer to any other examples in your affidavit.  Correct?

A    I have given examples of the Onset facilities, as well as Evolution, in terms of some of the transactions that were fraudulent.

Q    I'm talking about your affidavit though, not about -- We'll get to exhibits that you looked at earlier today.  But your affidavit refers to the Evolution facility, and that's the only specific transaction that you reference on this issue.  Correct?  In the affidavit.

A    It could be.  I'd have to go back -- I'd have to go back through the affidavit.  But in this paragraph, I specifically am referring to Evolution and Onset.

Q    And in paragraph 30, you say it's your current knowledge and belief that the funds were transferred to -- Well, strike that.  The testimony, though, that you provided today, you did not provide -- you weren't shown any documents relating to these pledges -- Well, strike that.  You weren't shown borrowing base certificates today.  Correct?

A    Borrowing base certificates weren't relevant for some

of these SPVs.

Q    But you weren't shown them today.  Correct?

A    I don't recall seeing one, no.

Q    You weren't shown any financing documents that described collateral, were you?

A    No.

Q    You weren't shown any documents where Mr. James himself made a statement in connection with this.  Correct?

A    Are you still asking me questions about paragraph 30?

Q    No, I didn't get to 30.  I'm talking about 29.  I'm talking about double inventory, the allegation of double-pledging.  There is no statement in your affidavit --

A    Can we go back to 29, please?

Q    Yeah, sure.  Let me ask the question this way.  There is no statement in your affidavit that Mr. James said or did anything specifically in connection with the allegations of collateral being pledged twice.  Correct?

A    Could you scroll to paragraph 29, please?

Q    Sure.

A    So these transactions in paragraph 29, where we talked about, or where I talked about double-pledging of collateral, this is what we're referring to in terms of these transactions.  There was nothing that ever showed that the transactions were recorded.  So I couldn't show something that didn't take place.

Q   So my question is, though, in your affidavit, you do not identify a statement that Mr. James made in connection with the allegations in this paragraph.  Correct?

A   I went through and we showed that he was the recipient of substantial amounts of money that came from these transactions.

Q   Okay.  But you don't have a statement where he directed people -- you don't have a statement made by him with respect to the double-pledging of assets.  Isn't that correct?  You haven't identified a single statement that he made in your testimony today, or in this affidavit, about the double-pledging of assets.  Correct?

A   Mr. James never said that he did, but he never said that he didn't, either.

Q   So the answer to my question is yes, sir.  You have not identified a single statement made by Mr. James in connection with the allegations in paragraph 29 in your testimony today, or in the affidavit.  Yes, or no?

A   My response is he never made a statement either way, either denying it or affirming it.

Q   Talking about paragraph 30, if we could, in paragraph 30, your testimony is that, "Based on the current knowledge and belief, cash from Onset was transferred to a non-Debtor entity controlled by Mr. James, known as Bowery Finance II." Do you see this paragraph 30?

A    Yes.

Q    Then you say, "Upon information and belief, inadequate books or records were maintained for these SPV Debtors, and cash that was supposed to be transferred to the FBG subsidiaries under the applicable transaction documents was transferred to Bowery Finance II instead."  And then your next sentence is, "Upon information and belief, the Bowery Finance II account was used as a slush fund.  In 2022 through 2025, nearly $12 billion flowed through the account, including transfers between Patrick James, his trust, and his affiliated entities, and transfers with FBG and FBG's business units."  And last sentence, "The transfers were apparently made to facilitate repayments due to Onset and the factoring companies."  You see that paragraph?

A    Yes.

Q    And so let's start with the last sentence.  Payments came out of Bowery Finance that were used to facilitate repayments due to Onset.  Correct?

A    Yes.

Q    And Onset is a Creditor of the First Brands --

THE COURT:  Folks, just one minute.

MR. TECCE:  I thought that was the answer to my question.

THE COURT:  Can you ask the question again?

MR. TECCE:  Certainly.

BY MR. TECCE:

Q    Transfers were made from Bowery Finance to facilitate repayments due to Onset.  Is that what you're saying in the last sentence of Paragraph 30 there, sir?

A    Yes.

Q    And a payment to Onset lowers the Debtor's obligations. Correct?

A    It lowers a Debtor's obligation.

Q    Fair.  Fair point.  It lowers the obligor to Onset's obligations.  Correct?

A    Yes.

Q    Bowery was making payments that would lower obligors to Onset's obligations.  Correct?

A    For that particular SPV, correct.

Q    Let's take a look at Debtor's 52, if we could.

     MS. MOGHADDAM:  Oh (indiscernible) Your Honor.

     THE COURT:  Oh.  Can we take it down?

     MR. TECCE:  You've got to take it down.  Sorry.

BY MR. TECCE:

Q    Can you see -- can you see the exhibit, Mr. Moore?

A    Could you give me the number again?

Q    Sure.  It's 52.

A    I have it.

Q    And this is the Bowery Bank account, correct, at Wells?

A    Yes.

Q    And you accessed this by asking Wells for this document?  Is that correct?

A    That's right.

Q    And do you have an understanding as to whether other people at the company could have seen Wells bank statements for Bowery Finance?

Q    Well, the date of this is December 1st, 2024, so at that time.

A    I'm not sure who at -- and when you say "the company," I'm not sure which entity you're referring to.

Q    Anyone affiliated with any of the 112 Debtors of First Brands, do you have an understanding as to whether anyone could have seen an account statement from Wells relating to Bowery Finance?

A    I don't know who would have access to the Wells Fargo bank statement.

Q    But it's not your testimony today that nobody at the company had access to the Wells Fargo bank statements in December 2024, is it?

A    I'm not stating a position either way.

Q    This bank statement -- Let's go to page 6.  Page 6, you testified about the 12/27 transfers of $15 million each with Patrick James Trust earlier today.  Do you see at 12/23 -- So this is money that was deposited into this account by that trust.  Is that correct?  On 12/27.

A    That's correct.

Q    Okay.  And on 12/23, there is a $50 million payment.
Do you see that?

A    I do.

Q    And so on between 12/23 and 12/27, $80 million was
deposited into this bank account by the Patrick James Trust.
Correct?

A    That appears to be the case, yes.

Q    Okay.  And some money left this account to pay
obligations of First Brands.  Correct?

A    When you say, "some money left this account to pay
obligations of First Brands, "what are you referring to?

Q    So if you look on page 7, it says "Debits."  Do you see
that?

A    Yes.

Q    Okay.  And you see these debits, these amounts, Ask
Industries, Brake Parts, Inc., Champion Laboratories.  Those
are First Brands companies whose bills are being paid out of
this account.  Correct?

A    When you say their bills are being paid, I don't know
that we could take that from this.  These appear to be
transfers to those entities.

Q    Okay.  That's fair.  So money is leaving the Bowery
account, and going to First Brands entities.  Correct?

A    Correct.

Q    And that's what all these debits are on this statement.
Correct?  Well, let me withdraw.

A    (indiscernible)

Q    Yeah, that's fair.  That's not -- Let me withdraw that
question.  Let's take a look at Debtor's 64, if we could.
Or 65.  My apologies, you can't pull it up.  It's another
account statement.

A    I have the exhibit.

Q    Okay.  Thank you, sir.  So this is another Wells Fargo
account.  Correct?

A    Yes.

Q    And on page 3 of 14, July 15th, there's a $25 million
Patrick James payment, do you see that, into this account?

A    I see that, yes.  And then on page 4 of 14, on 7/25,
there are a series of payments, $3,000,000, $9,000,000,
$9,000,000, $13,000,000 into the Bowery account.  Correct?

A    I see those, yes.

Q    And then again starting on page 6 of 14, you see
transfers to First Brands companies coming out of the Bowery
account.  Correct?

A    Yes.  There are also transfers in from First Brands
accounts as well, or First Brands entities as well.

Q    And I asked you earlier -- well, I asked a yes or no
question.  These debits reflect payments out of this account
that are transferred to First Brands entities, yes, or no?

A    That is part of it, yes.

Q    And I asked you if this was to pay their bills, and you said you didn't know.  You just said that the funds were transferred to those First Brands entities.  Correct?

A    Yes.

Q    So is it fair to say that you don't know, when money leaves this account, what happens to it?

A    No, that's not fair to say, because I have the account statements of the other accounts, and we can trace the cash.

Q    Let's take a look at Exhibit 4 of the Debtor's.  This is a First Brands Group, LLC general ledger.  Correct?

A    This is an extract from the First Brands Group, LLC.

Q    I think your testimony was earlier today that Mr. James is the sole owner.  Is that correct?

A    That is my understanding, that Mr. James is the indirect owner of First Brands Group, LLC.

Q    Okay.  And in this extract, the first set of transfers total $39 million, correct, before there's a line there?  This is Distributions - Patrick James.  Do you see that?

A    Yes.

Q    And these entries are from 2019 to 2022.  Correct?

A    Yes.

Q    The last one is November 5th, 202

A    Yes.

Q    And the payments, three of them, 2019, 2020 --

10/18/2019 1/01/2020 and 10/02/2020, these are dividends. Correct?  That's what this says.  These are reflected on this chart as dividends.  Correct?

A    That's what it says.

Q    You don't indicate in your affidavit that you've done a solvency analysis for this company.  Correct?

A    Correct.

Q    So you don't have a position one way or the other as to whether this company was insolvent in 2019, 2020 -- or 2020. Is that correct?

A    That is correct.

Q    And is it your testimony that it's an illegitimate business purpose to make a dividend from a solvent company?

A    That is not my testimony.

Q    Everything below the $39 million, this sums up to $339 million.  Correct?

A    Correct.

Q    And this says Tax Distributions Federal, PJ.  Correct?

A    Yes.

Q    And so, these are -- it says deferred tax distribution for most of these, except for two or three dividends from 2021.  Correct?

A    There are other descriptions.  There is this NOV adjustment as well.

Q    Correct.  Okay, so there's the NOV adjustment.  That's

fair.  There's the distribution dividend in two, and the rest are tax distributions.  Correct?

A     The very bottom line just says "Payment to trust."

Q     Payment to trust.  Okay, that's fair.  Sir, do you understand that in a pass-through entity, the taxes are paid by the managing member?  Do you understand how that pass-through entity works?  Let me rephrase the question.  Do you understand how a pass-through entity works with respect to taxation?

A     Yes.

Q     And do you understand that pass-through entities typically pay and reimburse the managing members for taxes?  Do you understand that?

A     I understand that occurs.

Q     And do you think that it's an illegitimate business practice for a pass-through entity to reimburse its managing member for tax distributions?

A     What I would say is that distribution for actual cash taxes paid is fairly common.  We have not come across any information, any supporting information at all related to any of these distributions, that they actually relate to cash taxes paid.

Q     But this ledger says that these monies were deferred tax distributions, correct, for the ones that we identified?

A     It would be very easy to put whatever someone wanted in

the description line.

Q    Your Honor -- or Mr. Moore, your status is improving, actually.  Mr. Moore, do you have any evidence that Mr. James manipulated this document in front of you?

A    I don't have any data that Mr. James, Mr. Patrick James manipulated it.  I don't know how someone who recorded these entries may have been instructed to record them.

Q    But the answer to your question -- my question is no, you don't have any evidence to indicate that Mr. James, Mr. Patrick James manipulated this, particularly in the tax distribution descriptions.  Correct?

A    I do not have any information that Mr. James was booking entries, or manipulating the schedule.

Q    And this pass-through concept, if you had $5 billion of income in a pass-through entity, what do you think the tax liability could be, approximately, on something like that?

A    I think you're referring to net sales of the company, not income.

Q    Well, for a company with net sales of $5 billion, are tax distributions of this amount inconsistent with a company that performs at that level?

A    It all depends on what the various entities rolling up to that final taxpayer may be.

Q    Can we take a look at Exhibit 28?  I just want to clean something up.  Debtor's 28.

Debtor's 28, your testimony earlier was that this reflected a $25 million distribution.  Correct?

A     Yes.

Q     If you look at -- that's the top email, but if you look at the second email --

MS. MOGHADDAM:  Apologies for interrupting.  I think as shown, it does reflect account numbers.  Perhaps they could just scroll up so that --

THE COURT:  Yep.

MR. TECCE:  Good point.  Thank you for catching that.

BY MR. TECCE:

Q     The middle email, though, indicates that this is a tax distribution.  Correct?

A     When you say the middle email, are you referring to the question?

Q     It says, Kevin Ruminski from, to Andy Brumbergs, "Andy, tax distribution or dividend for the QB account?"  Do you see that?

A     Yes, that's a question that he asked.

Q     Right, and then he -- he answers, "Distribution."  He doesn't answer dividend, he answers distribution.  Correct?

A     Well, he says distribution, but I'm not sure if that is a tax distribution or not.  These are LLCs, and LLCs don't issue dividends.  They tend to -- they issue distributions.

Q     But he doesn't respond by saying dividend.  Isn't that

correct, sir?

A    He does not say dividend.  He also does not say tax distribution.

Q    Okay.  Let's take a look at your affidavit, if we could, paragraph 37.  You say in paragraph 37 -- Do you have it in front of you?

A    Yes.

Q    "Upon information and belief, Mr. James personally directed distributions from the company to his trust."  This is that paragraph.  Right?

A    Yes.

Q    And at the end of that, you say, "Again in October 2024, a senior individual at First Brands indicated they had been instructed to make a $25 million USD distribution to a Patrick James Trust account.  First Brands distributed the same day."  You see that?

A    Could you scroll to the next page?

Q    Sure, please.

A    Yes.

Q    Okay.  And so this email is October 31st, 2024.  Is this the email that you're referring to in paragraph 37?

A    Could you please go back to the previous email?

Q    Sure.  Paragraph 28 -- Debtor's 28.

A    Yes, this is the email.

Q    Okay.  And to be clear, you don't indicate one way or

the other whether this is for a tax distribution or otherwise in your affidavit.  Correct?

A    I say exactly what it is, which is a distribution.

Q    Based on Mr. Brumbergs' response to Mr. Ruminski.  Correct?

A    Correct.

Q    In response to an email saying tax distribution or dividend.  Correct?

A    Yes.

Q    Okay.  In paragraph 38, you indicate of your affidavit that there were entries in the company's general ledger about these payments.  Correct?

A    Correct.

Q    This company had audited financial statements, did it not?  It had an auditor preparing financial statements for it.  Correct?  An outside auditor.

A    When you say "this company," are you referring to First Brands?

Q    I am.  First Brands, meaning First Brands and its subsidiaries had audited -- had a third-party auditor auditing its financial statements at this time.  Correct?

A    Yes.

Q    Can we look at Debtor's 53?  You spent time testifying about this exhibit today.  Correct?  And I think you were talking about specifically, Friday, 12/27/2024.  And this is

a payment that sums up to $51,605,000 across -- Do you see that line?  I believe it's line today, I think.  It starts between negative one and positive one.  Do you see that?

A    I see that.

Q    Okay.  And these are payments that were made to these -- Katsumi, that's a factoring company, UBS -- well, not UBS, but Jefferies -- These are lenders to First Brands and/or its affiliates.  Correct?

A    These are not lenders.  These are the third-party factors.

Q    The third-party factors.  But they're Creditors of the company.  Correct?

A    They shouldn't be.  In a normal factoring arrangement, they would have purchased the invoices from the company.

Q    But they're receiving funds from the company, according to this schedule.  Correct?

A    They are supposed to be, yes.

Q    Okay.

A    But that is one of the red flags, in that this is a factoring arrangement, yet the cash was coming into the company.

Q    But to the extent that the company will have an obligation to them, them receiving money reduces the company's obligation.  Correct?

A    I think that there are a few statements in your

question.  To the extent that the company had an obligation to them, and then if the company made a payment to them, that would reduce the obligation, the answer to that would obviously be yes.

Q    In your affidavit, paragraph 47 -- Strike that.  Are you familiar with Archive Health, LLC, that company, sir?

A    I am.

Q    Okay.  And that's the company that's discussed in paragraph 49 of your affidavit?

A    Yes.

Q    And this is the -- Mr. James' son-in-law's wellness company that you were referring to, Archive Health, LLC?

A    Yes.

Q    And sir, do you recall that when the company filed for bankruptcy protection, it filed a series of motions on the first day, seeking relief from the Bankruptcy Court?  Do you recall that?

A    I do.

Q    And do you recall that one of these was a motion -- Can we pull up Defendant's Exhibit A?

And by the way, sir, do you recall that in your -- in an affidavit you filed with the Court, that you testified that you were familiar with the content and substance of each of the first day motions?  Do you remember that?

A    I do remember that.

Q    And you said, "I believe approval of the relief sought in each of the first day motions is critical to the Debtor's ability to implement their Chapter 11 strategy successfully with minimal disruption of their business operations."  That was your testimony.  Is that correct?

A    That's correct.

Q    And one of the first day motions is the one that should be in front of you in a second, which is Defendant's Exhibit A, the emergency motion for the order authorizing them to pay pre-petition wages.  Do you see that?  You will.  There you go.

A    I do.

Q    There you go.  Okay.  And in paragraph 45 of this first day motion, can we take a look at that?  There is a mention of the Archive Health clinics.  Do you see that?

A    I do.

Q    And this motion says that these clinics provide comprehensive primary care, annual physical and screenings, family health, urgent care, prescription refills, nutrition, and lifestyle coaching services.  Do you see that?

A    I do.

Q    And the Debtors pay them $400,000 a month, and this motion asks for permission to continue paying that.  Correct?

A    Yes.

Q     And now it comes to be that in paragraph 49 of your affidavit, it's your testimony that this health clinic is evidence of misconduct by Mr. James or his son-in-law.  Is that correct?

A     That is what I indicate in my affidavit, based on activities that occurred after the petition date, prior to November 3rd.

Q     But did you come to learn that they were not providing comprehensive primary care, annual physical and screenings, family health, urgent care, prescription refills?  Did you come to learn that they were actually not doing that?

A     No.  I came to learn that you could get similar services at a significantly reduced amount compared to what Archive Health was charging.

Q     But they were performing the services though.  Correct?  They are, to your understanding, performing the services as represented in this motion.  Correct?

A     They are performing the services.  But as I indicated, they're performing the services at a price that is significantly higher than what we can get if we contract with another party.

Q     Paragraph 19 of your affidavit, you say that Mr. James continues to have the ability to further deplete the Estate's funds by spending or diverting money under his control.  Right?

A    Yes.

Q    In the time that you overlapped, have you seen or are you aware of Mr. James -- have you witnessed Mr. James transferring money outside of the United States?

A    Mr. James personally?

Q    Yes.

A    I don't have visibility to what Mr. James is spending money on.

Q    You don't have any evidence -- you have no direct knowledge of him transferring money outside of the United States since the time that you started working, September 5th until today.  Correct?

A    We have not been given access to his accounts.

Q    You don't identify a transfer by Mr. James outside of the United States in your affidavit or otherwise from and after the time that you started, September 5th.  Correct?

A    I'm just -- I want to be clear in my response.  I don't identify one because I haven't been able to receive the information.  It's not that there hasn't been a transaction that has happened.

Q    You're not aware of one.  Isn't that correct?

A    I have no information to review to have an answer to that question.

Q    You say in paragraph 60, "Mr. James, a Malaysian national with hundreds of millions of dollars at his

disposal, has been the subject of an ongoing investigation." Have you seen, since September 5th, Mr. James transfer funds to Malaysia?

A    Again, I'll just repeat my previous response.  I don't have visibility to any of Mr. James' accounts.

Q    Paragraph 61, you indicate that, "My counsel has advised me that all the requirements for emergency injunctive relief have been met."  Do you see that?

A    I do.

Q    You don't reach your own decision about whether or not emergency injunctive relief is necessary?  Is that correct?

A    That's a legal conclusion, and I'm not an attorney.

Q    Do you want to remove that sentence from your affidavit?

A    No, I don't.

Q    I asked you if the company has audited financial statements, and they do.  Correct?

A    For which period of time?

Q    From, say -- well, how about 2018 to 2025?  Did the company have an outside auditor during that period?

A    I can't speak to prior to 2020, and there hasn't been anything done in 2025.  But from 2020, or the year ending on or around December 31st, 2020 through on or around December 31st, 2024, BDO provided an audit report for First Brands.

Q    It doesn't say in your affidavit that you've discussed

these issues with BDO.  Correct?

A    I don't include that in my affidavit, but I have had discussions with BDO.

Q    Let's take a look at our Exhibit F, if we could.  Sir, Weil Gotshall & Manges, their counsel to the Debtor.  Correct?

A    Yes.

Q    Okay.  And this is a letter dated October 24th, 2025.  And you see your name on the bottom there in the cc?

A    Can you scroll to the next page?

Q    Sure.

A    Yes.

Q    Okay.  This letter was sent to Ms. Weisgerber, and it discusses a dispute about whether Nova's subsidiaries are direct or indirect subsidiaries of First Brands.  Do you know what the Nova's -- can you tell us what the Novares subsidiaries are?

A    Yes.  So there is an entity that is under Mr. James' entity, called Global Technologies.  Global Technologies is not part of First Brands.  Within Novares that entity that is -- I believe it's a French entity, there are subsidiaries that are based in North America, Canada, the U.S., and Mexico.  In 2025, early 2025, First Brands paid approximately €27 million for the North American subsidiaries of Novares.

Q    Okay.  And in the second bullet down, one of the reasons -- there's a dispute as to who owns Novares, and it's the Debtor's position that the Novares companies are owned by First Brands Group, and that's evidenced by the three bullets there.  The second one, which is that documentation that FBA, FBG paid $27.5 million through Butterworth Capital Management for the sale of the Novares subsidiaries.  You see that?

A    I do.

Q    And so that's money that Butterworth Capital Management advanced for FBG.  Correct?

A    No.  And actually, this goes directly to the whole reason why we are seeking this injunction, is that rather than First Brands -- First Brands paid $27.5 million.  But instead of that going directly to Novares or these assets, €27.5, actually €27.5 million went to a completely different entity that I believe Mr. James owns, called Butterworth Capital Management, and then Butterworth Capital Management ended up funding Novares.  So First Brands, by paying through another completely unrelated entity, those funds were supposed to go to Novares.  This is not that someone advanced funds.  First Brands paid these funds through another Mr. James entity, and the document -- or the transaction never was properly documented in First Brands, about €27.5.

Q     But your position is that First Brands owns Novares.
Correct?

A     No.  My understanding is that the documentation was not
properly recorded.  So First Brands paid this money, but
never got any return for it.  They did not get the ownership
of those entities.

Q     The lead-in is the following -- or highlights of
"evidence demonstrating that the subs, Novares subsidiaries,
are owned by First Brands."  That's what this letter's
position is.  Correct?

A     Clearly, that is the position that we were taking.
However, through discussions with Debevoise, it is clear
that the transaction was not properly reported.  So we paid,
and we conducted ourselves in this way.  However, the actual
closing of the transaction never occurred.

Q     Let's take a look at Debtor's -- or Defendant's G.
These receipts -- Global Technologies, that's the company
that you just mentioned is a Patrick James company.
Correct?

A     Yes.

Q     And First Brands Group LLC, that's First Brands Group
LLC.  Do you see that in the beneficiary line of this
receipt?

A     I do.

Q     And these receipts reflect monies from Global

Technologies into First Brands.  Correct?

A    I do.

Q    Okay.

A    And that's correct.

Q    And if I were to represent to you that the total of these receipts was approximately $40 million, just to save you the math and the flipping of the pages, you would have no reason to disagree with me, would you?

A    I don't have any reason to disagree with that.

Q    Okay.  And so that's $40 million that Global Technologies paid in to First Brands.  Correct?

A    That's correct.  Again, I think this is a classic example of why we are seeking this relief.  This is $40 million from a completely unrelated entity that got moved over to other entities.

        MR. TECCE:  Your Honor, I would move to strike everything after the yes or no to my -- as non-responsive to my question.

        MS. MOGHADDAM:  Objection, Your Honor.  It was absolutely responsive.  There is no way he could have an answer to yes or no as to what these receipts all reflect.

        THE COURT:  I'll sustain.

BY MR. TECCE:

Q    Can we take a look at Debtor's 23?

A    Actually, before we do that, are you familiar with

Peterson American Corporation, Mr. Moore?

A     I am.

Q     And you understand that company is owned by Mr. James.
Correct?

A     Indirectly, yes.

MS. MOGHADDAM:  Your Honor, I believe has account
numbers.

THE COURT:  Does this have account numbers, or is this
--

MR. TECCE:  We can take this down for now, yeah.  This
might have account numbers.  I'm not getting into this just
yet (indiscernible)

BY MR. TECCE:

Q     And Peterson American, they supply Stellantis.  Isn't
that correct?

A     That's my understanding.

Q     And that's Chrysler?

A     Stellantis includes (indiscernible) Chrysler, yes.

Q     Includes Chrysler.  Fair enough.  Thank you.  Did you
know that the TRO that was entered by this Court covered
Peterson initially, before parties carved it out?  Did you
know that, sir?

A     Yes.

Q     And how about Meteor Business?  Are you familiar with
that company?

A    Not very familiar, no.  I know of it.

Q    You understand that that was covered by the TRO, and then later carved out?  Do you understand that much?

A    Yes.  And when you say carved out, you're referring to the stipulation?

Q    That's correct.  My apologies.  That's right.

A    Yes.

Q    And the same question about Eitek, E-I-T-E-K?

A    Same thing.  I don't know much about the company, just generally aware of it.

Q    Let's go to 23, if we could now.

THE COURT:  How much more cross do you have, Counsel?

MR. TECCE:  I'm sorry?

THE COURT:  How much more cross do you have?

MR. TECCE:  Like, I'm going to ask about three minutes worth of questions, and then I'm going to ask to talk to them for a minute, and then --

THE COURT:  You got it.

MR. TECCE:  You got it?  Thank you.

MS. MOGHADDAM:  (indiscernible)

THE COURT:  Understood.

MR. TECCE:  Yeah, understood.  Thank you.

BY MR. TECCE:

Q    You were shown 23 earlier today, and this is the Carnaby inventory IV, LLC register, I guess.  Is that fair?

How would you describe this document, sir?

A    I'm just bringing it up now.

Q    Sure.  Thank you.

A    Yes, so this is a listing of cash transactions for Carnaby Inventory IV, LLC, which is one of the SPVs.

Q    And so I believe on page -- You were shown I guess it was page 7 of 15, a $15 million debit to the Patrick James Trust.  Do you remember that?

A    I see that.

Q    And it says, "foreign remittance debit."  Do you see that?

A    I do.

Q    And that's related to foreign taxes.  Correct?

A    I don't know.

Q    You don't know?  You don't know what a foreign remittance is, sir?

A    This is what it says.  It just says "Foreign remittance debit."  Any -- A remittance is just a payment.

Q    But you don't know whether it was for taxes or not, do you?

A    I don't.

Q    Let's go to page 1 of 15.  Or no, I'm sorry, page 2 of 15 of this exhibit.  Just one second.

Okay, let's go to 43.  Let's go to Debtor's 43.

MR. TECCE:  There's only two exhibits, Your Honor, 43

and that other one, and then (indiscernible)

THE COURT:  Mm-hmm.

MR. TECCE:  Thank you.

BY MR. TECCE:

Q    Is that 43?  I'm looking for (indiscernible)

MS. MOGHADDAM:  Your Honor, there is an ACH number on there, just in case --

THE COURT:  There's a what?

MS. MOGHADDAM:  An ACH number, in case that's (indiscernible)

THE COURT:  Yeah, why don't we just take it down, just to --

MR. TECCE:  Yeah, that's fine.

BY MR. TECCE:

Q    This was the Battery Park Holdings LLC statement, "Please process the bill-back invoice."  Do you remember testifying about this earlier today?

A    Which exhibit is this?

Q    This is 43, Ruminski, Kevin, email at the top.  Do you see that?

A    Yes.

Q    And --

A    This -- yes, about when it should be booked?  Yes, I recall that.

Q    Correct.  Okay.  And then if you go to page 3 of 4 of

this, you see a listing of descriptions, and I think you talked about the wellness sessions.  Do you see the line items, "Cleaning Floor 53," "Cleaning Floor 53?"  Aren't those payments for company-related work?

A    Floor 53 is Floor 53 of the corporate offices at that time.  As you can see in the address, Suite 5110, the company was occupying the 51st floor as well.  I'm not sure who was using floor 53 at that time.  And then, the 9 is an apartment.

Q    So going to Debtor's 23, and I promise this is the last exhibit --

MS. MOGHADDAM:  (indiscernible) Your Honor.

BY MR. TECCE:

Q    When you were shown 23 today, you testified about payments coming out of this to the Patrick James Trust.  Do you remember that?

A    This is the Carnaby Inventory IV, LLC (indiscernible)

Q    That's right.  That's correct, sir, yes.

A    Yes.

Q    Okay.  If you look on page 8 of 15 --

A    Yes.

Q    -- that's a $25 million payment in from the trust.  Correct?

A    Yes,

Q    Okay.  And how about on page 14 to 15, three lines

down.

A     Yes.

Q     That's another $22 million coming in from the trust. Correct?

A     That's correct.

Q     Just one second.

MR. TECCE:  Okay, Your Honor.  I thank you for listening (indiscernible)

THE COURT:  Thank you.  Counsel, do you have any redirect?

MS. MOGHADDAM:  No, Your Honor.

THE COURT:  Okay.  Mr. Moore, I want to thank you for your time.  You are off the virtual witness stand.  Thank you.

MR. MOORE:  Thank you, Your Honor.

THE COURT:  Let me just ask before I close the evidentiary record, are there any additional documents that folks want in at this time?

MS. MOGHADDAM:  Your Honor, could I have a moment to review?

THE COURT:  Yeah, absolutely.

MS. MOGHADDAM:  Thank you.

Your Honor, if I may, we do have some exhibits we did file with the Court, and exchanged copies with the other side, that we did not reference or otherwise admit today.

We would ask that all of those be part of the record as this Court considers how to proceed, and of course (indiscernible) further, given that the parties didn't object (indiscernible) Counsel for Defendants didn't object.

MR. TECCE:  Your Honor, I'm not sure I understand the question.  We know exhibits were offered into evidence for us to lodge an objection to, and either the rules of evidence apply, or they don't.  If they do, the exhibits should have been moved in through a witness.  If they don't apply, I'm not sure how the exhibits are being moved into evidence.

So I'm not sure what your position is.

MS. MOGHADDAM:  Your Honor, I think the Court's question was --

THE COURT:  Basically, what I'm asking is are there any other documents that y'all can agree on that I should look at, other than the stuff that was presented before me, and this witness today?

MS. MOGHADDAM:  And we responded to that question saying we would like everything that we filed with the Court in connection to our motion to be considered, as it would with respect to any other motion or application to the Court.  In other words, the exhibits would be part of what the Court considers even if the witness was not specifically asked about anything today, Your Honor.  That's our request.

THE COURT:  Okay.  I'll take it under consideration.

MS. MOGHADDAM:  Thank you, Your Honor.

THE COURT:  All right, folks.  I want to thank everyone.  I'm going to just take -- think about this for a day.  And I'm going to come back at 9:00 in the morning -- Well, you don't have to come back.  You can just dial in. I'm just going to give you an answer at 9:00 in the morning on Wednesday.  The Courts are closed tomorrow, and my team has been working, and I want to thank them so much for continuing to work.  I just, it will -- I'll come in tomorrow, and I'll review what I need to, and I'll give you an answer on it on Wednesday.  Obviously, the TRO will expire on its own terms tonight, but you'll have an answer on the preliminary injunction on Wednesday, at 9 a.m.  Just dial in, and I'll give you an answer.

MS. MOGHADDAM:  Your Honor, could we just ask that the TRO be carried over to tomorrow?

THE COURT:  No.  I -- no.  I think we started late, we started at 9:00 in the morning, and we were supposed to.  I accommodated everyone, and I gave everyone as much time as they needed, I gave -- We were supposed to have a three-hour hearing.  That's what I was told.  It continued, I gave everyone a full and fair opportunity.  I'm just going to take a little bit of time to think about it.  And banks are closed tomorrow anyway.  I'm not really sure -- And I'll

rule at 9:00 in the morning.

I was asked to extend it because there was an important meeting in the morning, and I accommodated that.  I accommodated a four-hour direct.  I've done everything that I've been asked.  I'm just going to take a day.  It'll expire on its own terms, but I'll come back at 9:00 in the morning, and I'll rule, and I'll give everyone an answer.

I very much appreciate everyone's time here.  You're more than welcome to have a -- just take as much time as you need to, and I'm going to log off and take time, and do all this stuff --

MR. TECCE:  You mean Wednesday, Wednesday morning.  Right?

THE COURT:  Wednesday morning.

MR. TECCE:  Thank you.

THE COURT:  Wednesday, at 9 a.m.

MR. TECCE:  9 a.m. Central time.  And we can virtual (indiscernible)

THE COURT:  Absolutely.  No one needs to -- no one needs to come into the Court.  I'm just going to dial in, and just give everyone the ruling.  I thank everyone for their time.  Thank you.

(Proceedings adjourned.)

CERTIFICATION

I, Lindsay Peacock, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Lindsay Peacock

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date: November 13, 2025