IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| FIRST BRANDS GROUP, LLC, ET AL | § | CASE NO. 25-03803-ADV |
| | § | HOUSTON, TEXAS |
| | § | WEDNESDAY, |
| VERSUS | § | NOVEMBER 12, 2025 |
| | § | |
| SEALED DEFENDANTS, ET AL | § | 9:00 A.M. TO 9:47 A.M. |

**TRANSCRIPT OF ORAL RULING (SECOND AMENDED TRANSCRIPT)**

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER: YESENIA LILA

COURTROOM DEPUTY:              YESENIA LILA

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

CONFIDENTIAL

FBG_CH1_00090052

2

**APPEARANCES (VIA ZOOM):**


FOR THE PLAINTIFF:                    WEIL GOTSHAL AND MANGES
                                      700 Louisiana Street
                                      Suite 3700
                                      Houston, TX 77002
                                      713-546-5248


FOR THE DEFENDANTS:                   QUINN EMANUEL URQUHART &
                                      SULLIVAN
                                      700 Louisiana Street
                                      Suite 3900
                                      Houston, TX 77002
                                      713-221-7000


                                      DEBEVOISE & PLIMPTON, LLP
                                      Erica S. Weisberger, Esq.
                                      66 Hudson Boulevard
                                      New York, NY  10001
                                      212-909-6000


(Please also see Electronic Appearances.)

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

CONFIDENTIAL                                      FBG_CH1_00090053

**HOUSTON, TEXAS; WEDNESDAY, NOVEMBER 12, 2025; 9:00 A.M.**

THE COURT: Okay. Good morning. This is Judge Lopez. Today is Wednesday, November 12th. I'm going to call the 9:00 a.m. -- I'm going to Oral Ruling in 25-03803.

Mr. Teece, I see you there. Can you just give me a thumbs up if you can hear me, or Ms. Weisberger, if you can hear me, can you give me a thumbs up.

Okay. Good. I just want to make sure. They're still -- looking at the numbers -- there's still a few people dialing in. Why don't I just get started in about one minute? I'm just going to read this in.

Parties, if you wish to make an appearance, I just ask that you just login to the Southern District of Texas webpage and you'll find a place to make a appearance. Go to my homepage. You can find a place to make appearance in a complex case, and you'll find this case, so --

There's still some folks logging in. Why don't I just give it a minute and then we'll get started? I'll turn my camera off and turn it back on in a minute.

(Pause in the proceedings.)

THE COURT: Okay. Why don't I get started? The

CONFIDENTIAL

FBG_CH1_00090054

4

numbers are still -- there's still some folks dialing in, but it seems to have stabilized.  I've got about eleven and a half single-spaced pages to read, so if you want to get comfortable.  We'll be here for a moment.

Let me just hear -- folks at Weil, can you hear me okay?  Give me --

(No audible response.)

THE COURT:  Okay.

Folks at Quinn Emanuel, can you hear me okay?

(No audible response.)

THE COURT:  Mr. Teece, can you hear me okay?

(No audible response.)

THE COURT:  Okay.  Great.  All right.  I'm just going to read.

And the transcript, well, the Oral Ruling will be -- is being recording now just so the parties can have it as well.  Okay.

First Brands is a leading supplier of after-market auto parts with operations across the world.  The company employs over 25,000 people around the world.  About 6,000 employees work in the United States.

If you've ever shopped for products at an Advanced Auto Parts, an AutoZone, an O'Reilly's or a NAPA Auto Parts, you've seen First Brand products on your shelves.  And if you bought a windshield wiper blade or an auto lighting

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

CONFIDENTIAL                                                    FBG_CH1_00090055

**DEBTORS' EXHIBIT NO. 172**
**Page 4 of 32**

5

product, you're probably driving with a First Brands product on your car.

First Brands started these Chapter 11 cases in September of 2025. Its organizational chart, cash management system, and capital structure are too complicated to adequately explain here, but what's important to note is that First Brands arrived in bankruptcy with about 14 million in cash, but saddled with liabilities exceeding 10 billion. Billions of dollars were unaccounted for its financial status of the company and the company didn't have good answers either.

Just -- Eric Moore was the Chief Restructuring Officer and is now the current interim CEO.

Folks, give me a second. I'm having an issue. Folks, I'm going to turn my camera off and I'm going to get started in one minute. Hold on.

(Pause in the proceedings from 9:05 a.m. to 9:07 a.m.)

THE COURT: Folks, I'm going to start all over again just to make sure that we have a good clean record of what I said, so here -- we're going to start. You'll have to hear my intro one more time. It'll just be a good reading. Okay.

First Brands is a leading supplier of after-market auto parts. The company employs over 25,000 people around the world. About 6,000 employees work in the United States.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

CONFIDENTIAL

FBG_CH1_00090056

6

If you've ever shopped for auto parts at an Advanced Auto Parts, AutoZone, O'Reilly's or NAPA Auto Parts, you've seen First Brand products on the shelves.  If you bought a windshield wiper blade or an auto lighting product, you're probably driving with a First Brands product on your car.

First Brands started these Chapter 11 cases in September of 2025.  Its organizational chart, cash management system, and capital structure are too complicated to adequately explain now, but what's important to note is that First Brands arrived in bankruptcy with less than 15 million in cash, but saddled with liabilities exceeding 10 billion.  Billions of dollars were unaccounted for.  Its creditors, lenders, factor parties, and SPV counterparties were shocked about the financial status of the company, and the company didn't have good answers.

Eric Moore was the Chief Restructuring Officer and is now the current interim CEO.  Moore and a team of restructuring professionals have been working nonstop to get a handle on the scope of the problems and why they occurred. The group of lenders has injected over a billion in additional financing to keep the businesses alive and running.

This case presents a large, collective problem. There are allegations of fraud and mismanagement, but First Brands appears to have viable businesses, too.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

CONFIDENTIAL

FBG_CH1_00090057

DEBTORS' EXHIBIT NO. 172
Page 6 of 32

7

If there's any good news, it's that bankruptcy law is well suited to handle these types of mega cases.  The automatic stay prohibits creditors from acts against the Debtors and property of the estate.  Parties should be mindful that it will take some time to sort all of this out.

On November 3rd, First Brands started this adversary proceeding against the Defendants.  First Brands alleges in the Complaint that its founder and former CEO, Patrick James, misrepresented the company's financial position to obtain billions in funded debt, which contributed to First Brands becoming insolvent and running out of cash.

First Brands asserts that James engaged in third-party factoring of accounts receivable based on erroneous, fabricated, or repeatedly sold invoices accruing at least 2.3 billion in liabilities.

First Brands also claims that James arranged several off balance sheet financings through special purpose vehicles incurred at least another 2.3 billion in debt, including transactions that purportedly double pledged the same inventory and diverted the proceeds to James affiliated entities.  While these financings were being raised, James allegedly diverted hundreds of millions, if not billions, from the company for personal use and family use through transfers to the Patrick James Trust and other entities he

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

CONFIDENTIAL

FBG_CH1_00090058

**DEBTORS' EXHIBIT NO. 172**
**Page 7 of 32**

8

controls.

The Complaint cites examples of same day movements of sale/lease back proceeds to the Patrick James Trust and other entities including Albion Realty, A-L-B-I-O-N; Alester Technologies, A-E-L -- excuse me -- A-L-E-S-T-E-R; Battery Park Holdings; Bond Street Asset Management; Ignite Acquisitions Holdings; Larchmont, LLC; and Pegasus Aviation, LLC.

First Brands says that these transfers were not ordinary distributions, were not supported by reasonably equivalent value and contributed to the company's eventual insolvency.

In connection with filing the Complaint, First Brands also moved for immediate relief to freeze any and all assets owned or controlled by James and the other Defendants or any other entities under their control before -- quote, "before those monies are irrevocably and irretrievably gone," end quote.

Upon a next party motion filed by First Brands this court entered a one week TRO against James and the other Defendants.  The TRO stated that the Court would consider a request to vacate the TRO on an emergency basis. James objected to the TRO.  The parties then entered into a stipulation amending the TRO through Monday, November 10th.

On November 10th, the Court conducted a hearing on

CONFIDENTIAL

FBG_CH1_00090059

**DEBTORS' EXHIBIT NO. 172**
**Page 8 of 32**

9

an application for a preliminary injunction.  The Defendants object to enter a preliminary injunction.  First Brands believes one is necessary.

First Brands provided the affidavit of Charles Moore and his capacity as interim CEO, which was Debtor Exhibit 1.  Moore also testified at the November 10 hearing and was cross-examined by Defendants' Counsel -- that's Defendants' -- s apostrophe.

Moore and his team have been investigating since he was retained a few months ago.  His affidavit says that the investigation was still ongoing and made allegations in the affidavit based on information and belief about 20 times.  And that's not a critique at all, it's entirely understandable.

First Brands' organizational chart, Debtor Exhibit 40, gives a strong visual about the complexity of these cases.  And the alleged billions missing did not occur in one transaction.  Again, this is going to take time.  I do note that during the hearing, though, Moore sounded more confident in his conviction about his analysis and the finality of some parts of the investigation against James and the other Defendants.

Moore says that James and his affiliated entities have received hundreds of millions of dollars in transfers from First Brands.  Moore says significant funds were

CONFIDENTIAL

FBG_CH1_00090060

**DEBTORS' EXHIBIT NO. 172**
**Page 9 of 32**

distributed directly from First Brands to James and his affiliated entity.

For instance, in January and October of 2024, he received about 25 million in transfers of which the majority appears to have been distributed to the family trust.

On the petition date, First Brands had little cash relative to its size.  No other business purpose was apparent.  There were transfers totaling hundreds of millions to James and they are highly questionable.  Moore testified about numerous bank statements showing transfers to entities owned or controlled by James.  I refer here Debtors' Exhibits 20 through 27 and 33.

He also testified that one of the entities named Battery Park Holdings operated like a slush fund.  That was his words for James where he agreed with a question that on direct examination, whether this was treated like a slush fund.

Upon information and belief, he believes that the other Defendant entities were also recipients of transfers from First Brands between 2018 and 2025.

Moore also testified that James fraudulently transferred the proceeds of debt financings incurred by First Brands at various points.  For example, there were First Brands affiliated a special purpose vehicles who received the proceeds of certain transactions and on the

CONFIDENTIAL

FBG_CH1_00090061

11

same day James allegedly transferred those funds to accounts under his control, leaving the SPV undercapitalized.

There was documents showing that James' entities received over 200 million dollars in transfers.  Moore testified that those funds were used to fund the lavish lifestyle.

James and the other Defendants opposed preliminary injunction.  They believe First Brands is just speculating and they lack hard facts.  They also believe First Brands didn't satisfy their burden for a preliminary injunction.

In the Fifth Circuit, a preliminary injunction is warranted when a Plaintiff demonstrates, one, a substantial likelihood of success on the merits; two, a substantial threat of irreparable injury if the injunction is not issued; three, that the threat and injury, if the injunction is denied outweighs any harm that will result if the injunction is granted; and four, that the grant of an injunction will not disserve the public interest.

I'll give the cite.  80 F.4th 536, 543 it's a (5th Cir. 2023) case.  I would also refer parties to Federal Rule of Civil Procedure 65, which is incorporated into the Bankruptcy Rules and Bankruptcy Rule 7065.

In *Texas v. Seatrain International,* 518 F.2d 175, 180 (5th Cir. 1975), pincite 180.  Fifth Circuit said that none of the prerequisites has a fixed quantitative value

CONFIDENTIAL

FBG_CH1_00090062

12

rather a sliding scale is utilized which takes into the account the intensity of each in a given calculus.

In *Big Tyme*, T-Y-M-E, *v. Edwards*, 985 F.3d 456, 464 (5th Cir. 2021), pincite 464.  And in *Mock v. Garland* 75 F.4th 563, 587 (5th Cir. 2023), pincite 587 case. Fifth Circuit said a preliminary injunction is an extraordinary remedy and the burden of persuasion on all the requirements is on the moving party.  There are other cases in the Fifth Circuit that say that.  These are just the two I am citing.

In *TitleMax of Texas v. City of Dallas*, 142 F.4th 322, 328 (5th Cir. 2025) pincite 328 case, the Fifth Circuit reiterated, and I quote, "Where the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief, but" and I quote, "when a Plaintiff applies for a mandatory preliminary injunction, such relief should not be granted except in rare instances in which the facts in law are clearly in favor of the moving party."

The First Brands Complaint alleges in Count 1, turnover under Section 542 of the Code.

Count 2, actual fraudulent transfer under Section 548 and 544 using the Ohio and Delaware State fraudulent transfer statutes.

Count 3, constructive fraudulent transfer under

CONFIDENTIAL

FBG_CH1_00090063

13

Section 548 and 544 using the Ohio and Delaware State fraudulent transfer statutes.

Count 4, money had and received.

Count 5, unjust enrichment.

Count 6, constructive trust.

Count 7, accounting against James and John Does 1 through 100.

Count 8, illegal dividend under Delaware law against James and John Does 1 through 100.

In *Grupo Mexicano de Desarrollo, S.A. v. AL Bond Fund, Inc*, 527 US 308 (1999) case.  The Supreme Court held that courts may not freeze a Defendant's assets where a Plaintiff claim is purely legal.  To resolve the dispute, in that case, the Court looked -- what the equitable power of the High Court of Chancery of English -- excuse me -- the High Court of Chancery in England was at the time of the adoption of the United States Constitution and the original Judiciary Act of 1789.

In *Grupo*, the Court held that because the remedies sought, which was damages in connection with a breach of contract claim, was historically unavailable from a court of equity.  The District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondent's contract claim for money damages.  The Supreme Court held

CONFIDENTIAL

FBG_CH1_00090064

14

that a District Court did not have the equitable power to issue the type of injunction requested by the movement since 1789.

Grupo suggested, however, that when equitable claims are at issue, rather than solely legal damages claims, the rule barring issuance of a preliminary injunction freezing assets wouldn't apply.  And I'm looking at Pages 324 and 325 for that in Grupo.

In Ruben v. Pringle, known as In Re Focus Media, Inc, 387 F.3d 1077, 1084 (9th Cir. 2004) pincite 1084.  The Ninth Circuit held that Grupo doesn't prohibit a Bankruptcy Court from issuing a freeze order in an adversary proceeding seeking recovery of fraudulent transfers under Section 548 and State law and a turnover action under 542.

I'd note that those same causes of action are alleged in the First Brands Complaint against the Defendants.

The Ninth Circuit focused on certain language in Grupo, but what I want to note here is that the Court -- the Supreme Court in Grupo didn't actually rule on fraudulent transfers as being legal or equitable in Grupo.

The Focus Media Court, the Ninth Circuit, also didn't discuss or analyze the Supreme Court decision in Granfinanciera v. Nordberg, 492 US (1989).  Granfinanciera spelled, G-R-A-N-F-I-N-A-N-C-I-E-R-A.  Focus Media didn't

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

CONFIDENTIAL

FBG_CH1_00090065

15

focus on that decision either, which found that a Section 548 action to recover money was legal and not equitable.

There are also bankruptcy cases using Bankruptcy Codes § 105 to issue freeze orders referenced in the application for a preliminary injunction.  But, when you look at Fifth Circuit case law -- and there's plenty of it, and I would refer parties also to the Supreme Court decision in *Purdue Pharma*.

Use of Section 105 alone has been long not questioned in the Fifth Circuit, absent a connection to another part of the Bankruptcy Code applying a textual analysis.  That 105 is used in furtherance of the Code.

There's a provision in 105 that also says that nothing prevents the Court from acting *sua sponte* in furtherance of Court Orders or rules, but I would note that rules is a little 'r' and doesn't appear to refer to the Federal Rules.  Here, we have an adversary proceeding, and the Federal Rule is 65 is in effect.

So that's what we're applying theoretically one could see 105 connecting to a 542 action in some instances, but again that would be an adversary proceeding again if someone was seeking a preliminary injunction.  I think we ought to just stick with Federal Rule 65 to the extent it has any equitable power under 105, or statutory authority

CONFIDENTIAL

FBG_CH1_00090066

**DEBTORS' EXHIBIT NO. 172**
**Page 15 of 32**

16

under 105 may be the more precise term.  I'm going to apply Federal Rule 65 only.  I'll decline to exercise any equitable authority I may have.

First Brands argues that this Court has the power to freeze the assets of a Defendant accused of a fraudulent transfer or a similar equitable claim including notice -- excuse me -- without notice the Defendant on a temporary amount, which is true, but here we have notice in connection with an application for a preliminary injunction to protect the Debtor's bankruptcy estate from the risk of further diminishment.

They assert a likelihood of success.  The change of the Defendants are actual and constructive fraud, the unjust enrichment, the legal dividend, constructive trust claims, as well as all the other claims.  I'm not going to engage in a historical and legal analysis on the fraudulent transfer claims.

*Granfinanciera* says what it says.  I don't think Section 105 is a workaround, either.  I also think that the alleged fraudulent transfer claims, as alleged in the Complaint, are in the realm of legal rather than equitable relief, what they're seeking is money.  Right?  You want to freeze bank accounts, and you want to freeze assets, but recovery is for -- what you're seeking is money in this case, as I read the Complaint.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

CONFIDENTIAL

FBG_CH1_00090067

17

Recovery is for fraudulent transfers are found in Section 550, so that's not to say all fraudulent transfers actions are legal, there could be some equitable ones there you could seek to recover value of property or property, but here, what First Brands wants is alleged as I read it, is money.  'Cause they want the transfers.  That's legal to me.

The Complaint, however, also includes claims for unjust enrichment and constructive trusts, which are equitable.  There's also a turnover action under Section 542, which seeks return of property to the estate. All right.

So First Brands can satisfy the requirements for a preliminary injunction on equitable grounds, I find that I can issue a freeze order, but based on the Record at the time, I don't think First Brands has satisfied its burden for a preliminary injunction even if I included fraudulent transfers as equitable remedies.

To establish a substantial likelihood of success of the merits, quote, "The Plaintiff must present the *prima facie* case, but need not prove that he is titled to summary judgment."  That's *Daniel's Health v. Vascular Health,* 710 F.3d 579, 582 (5th Cir 2013) pincite 582.

Whereas here there are multiple claims for relief. A court need only determine that one of Plaintiff's claims has a substantial likelihood of success for an injunction to

CONFIDENTIAL                                     FBG_CH1_00090068

18

be issued.  *TGI Fridays v. Great Northwest Restaurants,* 652 F.Supp.2d 763, 767 (N.D. Tex. 2009) pincite 767.

Bankruptcy Code § 548 provides for avoidance of actual and constructive fraudulent transfers.  Section 544 allows a Debtor to step into the shoes of a creditor with a right to bring a fraudulent transfer using State law.

First Brands seeks to use Ohio and Delaware Law, under the Bankruptcy Code and State law generally, actual and constructive and actual fraud claim provides that it transfer or an obligation incurred -- a transfer made or an obligation incurred.  Here we're focusing on transfers made by a Debtor avoidable as to a creditor.

If the transfer was made with actual intent to hinder, delay or defraud a creditor of the Debtor, when considering actual intent, Bankruptcy Courts under 548 and State Court equivalents often consider several, what they call, badges of fraud.  Like whether you look to whether the transfer was to an insider.  The Debtor retained control of post there -- post transfer, the value of a consideration, whether it was reasonably equivalent, whether the Debtor was insolvent before or right after.

For constructive fraud, you'll look to first determine whether a Debtor made a transfer without receiving reasonably equivalent value for the transfer.  And so reasonably equivalent value first and then if there was less

CONFIDENTIAL

FBG_CH1_00090069

**DEBTORS' EXHIBIT NO. 172**
**Page 18 of 32**

19

than reasonably equivalent value you'd determine whether things like whether the Debtor was engaged or about to engage in a transaction for which the remaining assets were reasonably small.  Whether the Debtor intended to incur or believed -- or reasonably believed -- that they would incur debts beyond the ability to pay or the Debtor became insolvent as a result of the transfer.

For unjust enrichment in constructive trust, First Brands relies on Ohio law.  In Ohio, the doctrine of unjust enrichment and I quote, "applies when a benefit is conferred and it would be inequitable to permit the benefitting party to obtain the benefit without compensating the conferring party." *JOP-Orange v. Tuller*, T-U-L-L-E-R, *Square Northpointe* -- Northpointe with an 'e' at the end 246 N.E.3d 586, 596 (Ohio Ct. App. 2024) pincite 596.

A constructive trust is also an equitable remedy that protects against unjust enrichment and is usually invoked when property has been obtained by fraud. *Ferguson v. Owens*, 9 Ohio St. 3d 223, 226 pincite.  It's a (1984) case.  *Ferguson* Court also said a constructive trust may also be imposed where it is against the principles of equity when the property retained by a person when -- excuse me -- under -- let me start that again.

A constructive trust may also be imposed where it is against the principles of equity that the property be

CONFIDENTIAL

FBG_CH1_00090070

**DEBTORS' EXHIBIT NO. 172**
**Page 19 of 32**

20

retained by a person even though the property was acquired without fraud.

In *State Ex Rel City of Marietta v. Groves,* 1985 WL 8297, a (1985) case, a claimant who is attempting to establish a constructive trust must, quote, "Trace the funds to an identifiable product."

In *Estate of Cowling v. Estate of Cowling,* 109 Ohio St.3d 276, 281 (2006), the Ohio Court said that tracing is a process where the claimant, basically, must be able to point to the identifiable property or fund and say this is mine.  If the funds and property are untraceable, meaning the claimant cannot determine where they were deposited or what the Debtor has done with them, the equitable remedy is not available.  It is also said there must be adequate tracing from the time of the wrongful deprivation of the relevant assets to the specific property over which the constructive trust should be placed.

I note that the reasoning of this case, and I, of course, don't need to -- I don't need to confirm anything on how court is done, but I do note that the reasoning is sound because a constructive trust is not a right to recover on a debt.  Instead it creates a right to recover property wrongfully withheld.  I also note that the burden for most of the causes of action alleged in the Complaint is preponderance of the evidence, but for a constructive trust,

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

CONFIDENTIAL

FBG_CH1_00090071

21

*Cowling* says it's clear and convincing evidence.

There are serious allegations in the Complaint. First Brands entered with little cash despite billions of dollars in pre-petition debt, a complex capital structure, logs receivables factoring in an off balance sheet as PV Financing.  To date, I haven't heard a complete answer as to why First Brands landed in bankruptcy with so little operating cash despite incurring multi-billion debt charges and having multi-billion yearly revenue.

The Record before the Court, as presented by Moore, included numerous bank statements I referenced earlier showing that First Brands was transferring funds to James' controlled entities, and the numbers are in the hundreds of millions.  Moore was told that, as he testified, that he was told or informed that James was behind these transfers.  Defendants' counters that the same bank statements show that the James entities also transferred monies back to First Brands or seem to fake the First Brands creditors.  That's true, but the evidence was that it was far more to these entities than back to First Brands.

There's also concerns that were raised that there was no reason why funds were being transferred to James controlled entities in the first place, and -- so there's the case that these entities, which appear to have no business relationship with First Brands, is receiving the

CONFIDENTIAL

FBG_CH1_00090072

**DEBTORS' EXHIBIT NO. 172**
**Page 21 of 32**

22

transfer for less than reasonably equivalent value.

I put to the side one company that appears to be affiliated with a James relative that did business with First Brands that was referenced in the first day motion to pay employee wages.

First Brands shows the transfers are going back to 2019.  Yeah, it's not clear when First Brands becomes insolvent or was left with unreasonably small capital because of the transfer, but I do find that there's a likelihood that success, if this was the case, at least in 2024 or 2025.  Some of these bank accounts, especially with respect to the SPV were rendered with virtually no cash in some months, which gives credence to establishing a likelihood of success of showing an actual intent to hinder delay -- excuse me -- to hinder or defraud creditors.  Many have had no idea such accounting transfers were occurring or money was being transferred in this way.

Again, there's also evidence that First Brands would buy a product for 'X', mark it up massively when selling it to a factor party and really concerning stuff. First Brands says, connecting the dots, that there's fraud here.  Marking up for sale, taking the excess, potentially and sending it to a James controlled entity.

Let me say again, there are numerous troubling instances of what appear to be doctored invoices provided to

CONFIDENTIAL

FBG_CH1_00090073

23

non-Debtor counterparties.

James is alleged to be behind it.  The Record shows that this does not appear to have been done alone if James is behind it.  It doesn't appear to have been done in the dark either, and doesn't appear to be the work of one person.  That's not to let anyone off the hook here.  This was all done while James was CEO.

In James' defense, there's nothing I saw where he's personally directing anyone to do anything.  There are messages from parties indicating he is aware and messages between parties saying James wants funds transferred.  I'm not sure what all that means yet.  There's nothing showing that James, himself, was manipulating invoices, but it's clear First Brands was moving tens of millions of dollars through unaffiliated accounts.

We don't have the full picture and we're just at a preliminary injunction stage.  Discovery has not started. No document production.  No depositions.  But there are red flags everywhere in the cash management system.  There are questionable transfers and people in the company knew about it.

If these fraudulent transfers could be considered equitable, there would be substantial likelihood of success that James or some of the Defendants, like the James Trust and Battery Park, received transfers that are fraudulent

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

CONFIDENTIAL                                        FBG_CH1_00090074

24

transfers.  I want to know here that the list of Defendants and John Doe's is long.  First Brands is pleading broadly.

There's no evidence of likelihood of success beyond -- for me -- James, James Trust, and Battery Park at this stage.  The amount of the potential exposure is also unclear to me at this point, either, but it's a big number.

And again, it appears that many of these transfers were done with the knowledge of other First Brands parties as they appeared on the First Brands general ledger.

I want to be clear, I'm not accusing any other party of doing anything wrong.  That's not my job.  My job today is to rule on a preliminary injunction application and the fact that there are people with knowledge about these transfers is a relevant fact.  Everyone will have their day in court.

I do find a substantial likelihood of success on the merits.  The Complaint pleads a *prima facie* that there were improper transfers made at least respect to certain specific transfers.  The Court also finds that some transfers appear to have happened immediately after an SPV incurred significant debt obligations.  Other transfers were made in the lead up to the bankruptcy filing.  Because all of this likely to have contributed to First Brands' insolvency, there's a likelihood of success on the merits.

I also think that there'd be a substantial

CONFIDENTIAL

FBG_CH1_00090075

25

likelihood of success for unjust enrichment and a turnover action of the Section 542 based on the same set of facts against James, James Trust and Battery Park.  There's a substantial likelihood establishing that one of these funds is holding estate property.  The potential amount of it is unclear to me, though.

I don't think, however, there's a substantial likelihood of success for a constructive trust.  Moore and his team have been working around the clock and Moore's only been in for about two months and it's clear that he has a commanding knowledge to date about everything.  Everything he's been researching.  He knew his stuff.  There's just so much work that he's doing, but, you know, having conducted a tracing of the alleged transferred actions and there's no documents supporting the type of tracing required to impose a constructive trust.

In fact, First Brands alleges there's comingling of funds, and that would be a tough one to have a preliminary injunction issued.

The next problem requires that the movement establish a substantial threat of irreparable injury if the injunction is not issued.  This means a speculative injury is not enough.  And there are cases cited in *Wright & Millers'* leading treatise providing that there must be more than an unfounded fear on the part of the applicant,

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

CONFIDENTIAL

FBG_CH1_00090076

**DEBTORS' EXHIBIT NO. 172**
**Page 25 of 32**

26

and that a preliminary injunction can't be issued to prevent a possible remote future injury.  I agree with those cases because the words are substantial threat of irreparable injury.

Courts in this District have found that where a Defendant, quote, "Defendant intends to dissipate his assets to make a judgment awarding damages uncollectable, such circumstances may give rise to the irreparable harm required for a preliminary injunction."  *Amegy Bank National Association v. Monarch Flight,* 2011, WL 6091807, at *6 (S.D. Tex. Dec. 7, 2011).

This court also takes guidance from *Newbie v. Enron Corp,* 188 F.Supp.2d 684, 707 (S.D. Tex. 2002).  And it says, in cases in which a pre-judgment asset freezing injunction is granted, the courts have been presented with allegations and evidence showing that Defendants' were concealing assets and were transferring them so as to place them out of the reach of post-judgment collection or were dissipating the assets.

First Brands alleges that James' past actions, sophistication and resources create a substantial risk that he will dissipate these assets in an effort to make a judgment awarding damages uncollectable.  And that James has a demonstrated history of transferring and comingling funds between and among personal and business accounts.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

CONFIDENTIAL

FBG_CH1_00090077

DEBTORS' EXHIBIT NO. 172
Page 26 of 32

27

First Brands also notes that he's a Malaysian national with access to multiple personal business entities and trusts, as well as numerous bank accounts.

Last they conclude, I quote, "They have every reason to think that he's likely to dissipate the misappropriated funds especially given the heightened scrutiny of his actions coming from the Debtors' own investigation and a recorded investigation by the United States Attorney for the Southern District of New York and others, and that continuing to allow James and his family to fund their lavish lifestyles using the funds wrongfully taken from the estate creates the possibility that those funds will never be recovered."

Based on the Record and Moore's testimony, I don't think that satisfies the prong force substantial threat of irreparable injury.  Moore didn't provide any convincing testimony on this point either.  And there aren't documents establishing a substantial threat of irreparable harm either.  There's not sufficient evidence or record that James or any other Defendants will or are transferring their own assets to make themselves judgment-proof.  There's no evidence that these assets are in danger of being transferred or are currently being transferred outside of this Court's jurisdiction.

James is also not the CEO anymore.  I'd also note

CONFIDENTIAL

FBG_CH1_00090078

**DEBTORS' EXHIBIT NO. 172**
**Page 27 of 32**

28

that the CFO is gone, and other leadership positions.  Moore is the interim CEO.  There's a new CFO.  There are new two Co-CROs.

So I also don't have evidence -- so to me, the concern that he's going to continue to move assets from the estate at least in the future, using current estate assets, I would note, is speculative and not imminent.  I don't have evidence that there's a substantial threat as to the relative Defendants either.  I don't have specific evidence showing that they're dissipating assets either.  Moore said he didn't have visibility into James' accounts, too.

I won't read too much into the Malaysian national, with business accounts point because that could be the case with an American or an American company with international related entities and an international cash management system, so I have to have a substantial threat of irreparable injury.  I can't just have speculation or a concerned that someone with -- who's sophisticated and with resources could do it based upon the guidance the and the case law and just the plain reading of the little words on the test.

I think First Brands fails this test at this time based upon the Record before me.

And, again, this is a preliminary injunction.  Everything is based upon the Record before me at this time.

CONFIDENTIAL

FBG_CH1_00090079

29

When you go to the balance of harms, I think First Brands -- based upon the lack of substantial threat or irreparable injury, I think the alleged harm to the Defendants is outweighed by the harm of not issuing the injunction.  The potential to the harm to certain Defendants is real, right?  They could be affectively prohibited from operating their businesses in the ordinary course, which includes access to their bank account without any concrete proof that they actually hold estate assets.

And if not granted, we're just kind of where we usually are in large, multi-million/billion dollar fraudulent transfer cases with causes of action related with no injunctive relief, right?

Back to cases like *Tronox* and *Idearc*.  What happens?  To be clear, all of the allegations in the Complaint may or may not be true, and as we sit here today, I just think the harm outweighs not issuing the injunction. There's just not enough evidence that these serious matters detailed in the claims can't be tried without a freezing order.

And I don't have a good sense of the tracing.  It makes me think about cases where the scope of the injunction may have freezing assets would have been limited to like protecting assets that are the subject of dispute.  Direct traceable proceeds of those assets.  This cuts against a

CONFIDENTIAL

FBG_CH1_00090080

DEBTORS' EXHIBIT NO. 172
Page 29 of 32

30

broad injunction freezing Defendants' assets or even limiting one.

Finally, I think policy supports sticking to *Grupo* for legal claims about money. An absence in substantial and not speculative threat of irreparable harm, the public interest is best served by not granting the injunction at this time. Granting one based on an alleged owner transferring funds for his benefit would make this extraordinary relief, which is extraordinary relief, and I want to be clear that's what the Fifth Circuit said. It should only be used in rare circumstances. Could become potentially routine in large and small fraudulent transfer cases including Sub-Chapter 5 cases.

Let's see, we've got a little over 180 people on the line, so I want to be clear about something. Today's only about whether the law supports issuing a preliminary injunction and freezing assets. That's it. It's an extraordinary remedy and based on the Record before me, I don't think the law supports it. That's it. That's all I've done today.

Everyone is going to have their day in court and have the opportunity to present and prosecute or defend themselves. The merits will be decided at the appropriate time after the evidence comes in. I take no position one way or the other -- other than the Record before me and for

CONFIDENTIAL

FBG_CH1_00090081

31

the reasons stated, I'm going to deny the preliminary injunction, and I'll issue a short Order stating that it's denied for the reasons stated on the Record.

You have my Findings of Facts and Conclusions of Law here. I've given you all the pincite -- the cases and the pincites. I won't say I blue-booked them perfectly in the sense of giving you where there one was services or Inc below it, but you got the main case so you can find it and the case number there.

I tried to make this a little bit easier to read, as opposed to kind of, you know, given you mark, you know, *Monarch Flight II, LLC*. I just told you *Amegy National Bank Association v. Monarch*. The case cites will work and the quotes are accurate.

So, I will unmute the line if anyone has any questions for me at this time. If not, I just thank the parties for their time, and I'll issue an Order and let things go where they are.

(No audible response.)

THE COURT: All right, folks. Thank you very much for your time. Have a good day. We're adjourned.

(Proceeding concluded at 9:47 a.m.)

\* \* \* \* \*

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

CONFIDENTIAL

FBG_CH1_00090082

32

I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.

/S/ MARY D. HENRY

CERTIFIED BY THE AMERICAN ASSOCIATION OF

ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

JTT TRANSCRIPT #70219

DATE FILED:  NOVEMBER 14, 2025

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

CONFIDENTIAL

FBG_CH1_00090083

**DEBTORS' EXHIBIT NO. 172**
**Page 32 of 32**