## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re<br><br>FIRST BRANDS GROUP, LLC *et al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 25-90399 (CML)<br><br>(Jointly Administered) |
| FIRST BRANDS GROUP, LLC *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>ONSET FINANCIAL, INC. *et al.*,<br><br>    Defendants. | Adv. Pro. No. 26-03005 (CML)<br><br>**ONSET FINANCIAL, INC.'S ANSWER AND COUNTERCLAIM, CROSS-CLAIM, AND THIRD-PARTY COMPLAINT** |
| ONSET FINANCIAL, INC.,<br><br>    Counterclaim Plaintiff,<br><br>v.<br><br>BRAKE PARTS INC LLC; CARDONE INDUSTRIES, INC.; CARNABY CAPITAL HOLDINGS, LLC; CARNABY CAPITAL, LLC; CARNABY FA HOLDINGS, LLC; CARNABY FA, LLC; CARNABY INVENTORY IV, LLC; CARTER FUEL SYSTEMS, LLC; CHAMPION LABORATORIES, INC.; DALTON CORPORATION; EAGLE CASTING HOLDINGS, LLC; EAGLE CASTING, LLC; FIRST BRANDS GROUP HOLDINGS, LLC; FIRST BRANDS GROUP, LLC; FRAMAUTO HOLDINGS, LLC; FRAM GROUP OPERATIONS LLC; HOPKINS MANUFACTURING CORPORATION; HORIZON GLOBAL | |

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases (the "Chapter 11 Cases") is 127 Public Square, Suite 5300, Cleveland, OH 44114.

FBG_CH1_00090226

AMERICAS INC.; HORIZON GLOBAL COMPANY LLC; TOLEDO MOLDING & DIE, LLC; TRICO PRODUCTS CORPORATION; TRICO TECHNOLOGIES CORPORATION; VICEROY PRIVATE CAPITAL, LLC; and WALBRO LLC,

    Counterclaim Defendants.

---

ONSET FINANCIAL, INC.,

    Cross-Claim Plaintiff,

v.

EDWARD JAMES,

    Cross-Claim Defendant.

---

ONSET FINANCIAL, INC.,

    Third-Party Plaintiff,

v.

AIRTEX PRODUCTS, S.A.; BRAKE PARTS INC INDIA LLC; CARNABY INVENTORY HOLDINGS IV, LLC; DALTON CORPORATION, WARSAW MANUFACTURING FACILITY; EAGLE MACHINING, LLC; FIRST BRANDS GROUP INTERMEDIATE, LLC; JASPER RUBBER PRODUCTS, INC.; STRONGARM, LLC; BPI BRAKE MANUFACTURING JUÁREZ, S.A. DE C.V.; BPI BRAKE SYSTEM (QINGDAO) CO., LTD.; BRAKE PARTS INDIA PRIVATE LIMITED; CARDONE DE MÉXICO, S. DE R.L. DE C.V.; CEQUENT ELECTRICAL PRODUCTS DE MÉXICO, S. DE R.L. DE C.V.; FRAM GROUP OPERATIONS MEXICALI, S.A. DE C.V.; FRAM GROUP OPERATIONS MEXICO CITY, S.A. DE C.V.; HOPKINS MANUFACTURING DE MÉXICO S. DE R.L. DE C.V.; LONGKOU HAIMENG

FBG_CH1_00090227

**DEBTORS' EXHIBIT NO. 175**
**Page 2 of 1907**

MACHINERY CO., LTD.; PETERSON
AMERICAN CORPORATION;
SUBENSAMBLES INTERNACIONALES,
S. DE R.L. DE C.V.; TALLERES
MECANICOS MONTSERRAT, S.A. DE
C.V.; TRICO BELGIUM; TRICO
COMPONENTES, S.A. DE C.V.; TRICO
ITALY S.R.L.; TRICO WIPERS PLOIESTI
S.R.L.; TRIDONEX, S. DE R.L. DE C.V.;
ULTINON MOTION GERMANY GMBH
(F/K/A LUMILEDS GERMANY GMBH);
WALBRO LOS MOCHIS, S. DE R.L. DE
C.V.; WESTFALIA-AUTOMOTIVE
GMBH; WITTER BRASOV
S.R.L.;WILMINGTON SAVINGS FUND
SOCIETY, FSB; BANK OF AMERICA,
N.A.; SAGARD HOLDINGS MANAGER
(US) LLC; GLAS USA LLC; JEFFERIES
FINANCE LLC; AEQUUM CAPITAL
FINANCIAL II LLC; EVOLUTION
CREDIT OPPORTUNITY MASTER FUND
II-B, L.P.; GLAS TRUST COMPANY LLC;
UMB BANK, N.A.; PATRICK JAMES
TRUST; ALBION REALTY, LLC;
ALESTER TECHNOLOGIES LLC;
BATTERY PARK HOLDINGS LLC;
LARCHMONT, LLC; PEGASUS
AVIATION, LLC; BOWERY FINANCE II,
LLC; PATRICK JAMES; MICHAEL
BAKER; PETER ANDREW BRUMBERGS;
STEPHEN GRAHAM; SHEKHAR
KUMAR; ABC CORPORATION(S) 1–100;
and JOHN AND JANE DOE(S) 1–100,

    Third-Party Defendants.

FBG_CH1_00090228

## Table of Contents

PRELIMINARY STATEMENT ........................................................................................... 1

ONSET FINANCIAL, INC.'S ANSWER ........................................................................... 10

ONSET FINANCIAL, INC.'S COUNTERCLAIM, CROSS-CLAIM, AND THIRD-PARTY
COMPLAINT ..................................................................................................................... 59

PARTIES ............................................................................................................................. 59

    A.   Counterclaim, Cross-Claim, and Third-Party Plaintiff ........................................ 59

    B.   Counterclaim Defendants ..................................................................................... 59

    C.   Cross-Claim Defendant ....................................................................................... 61

    D.   Third-Party Defendants ....................................................................................... 61

JURISDICTION AND VENUE .......................................................................................... 69

PERSONAL JURISDICTION ............................................................................................ 70

GENERAL ALLEGATIONS .............................................................................................. 80

    A.   General Overview of Onset and Its Transactions with the Debtors ................... 80

        i.   Onset Is a Market-Leading Provider of Flexible and Creative Capital Solutions ..... 80

        ii.   General Overview of Onset's Transactions with First Brands .................................. 81

        iii.   Trico (Direct) Transactions ........................................................................ 82

        iv.   The Carnaby Transactions .......................................................................... 94

        v.   Information and Reporting in Connection with the Onset Transactions ................. 109

        vi.   Onset Acquired the Onset Property Free and Clear of the Prepetition First Brands
Liens ........................................................................................................ 116

    B.   Defaults Under the Carnaby Lease Documents Beginning in May 2025 and Multiple
Forbearance Agreements ................................................................................... 121

        i.   The First Forbearance Agreement ........................................................... 121

        ii.   The Second Forbearance Agreement ....................................................... 125

        iii.   The Third Forbearance Agreement ......................................................... 128

        iv.   Failed Efforts to Reach a Fourth Forbearance Agreement ...................... 133

        v.   The Notice of Default ............................................................................... 139

    C.   First Brands Collapses into Chapter 11 Bankruptcy and Its Fraud Is Revealed ............. 140

    D.   Additional Allegations Regarding Defendants' Fraud ...................................... 144

CLAIM FOR RELIEF ...................................................................................................... 146

PRAYER FOR RELIEF .................................................................................................... 169

FBG_CH1_00090229

**DEBTORS' EXHIBIT NO. 175**
**Page 4 of 1907**

Onset Financial, Inc. ("Onset") by and through its undersigned counsel, files this Answer and Counterclaim, Cross-Claim, and Third-Party Complaint as follows:

## PRELIMINARY STATEMENT[2]

1. First Brands owes Onset and its funding partners more than $2 billion. In these bankruptcy cases, rife with fraud orchestrated by Patrick and Edward James[3] and their co-conspirators, such a large figure may well be disquieting to other creditors as they jostle to protect their own interests. But First Brands owes Onset and its partners *every dollar* of Onset's $2.16 billion claim, which represents whole dollars funded and not repaid under enforceable, arm's-length transactions bearing justifiable rates of return and reasonable interest. Onset is a *bona fide* titleholder and secured creditor entitled to the protections, rights and powers granted to it by the Bankruptcy Code and all applicable laws. Onset will readily prove its entitlements in this action, notwithstanding Debtors' (and others') efforts to cast doubt over its title and secured interests, and Onset will put to rest the onslaught of false and unsupported allegations Debtors (and others) have tactically levied against Onset for the benefit of more favored parties in interest. That estate fiduciaries have targeted Onset alone among the myriad parties defrauded here is, quite frankly, astonishing, particularly because Onset has suffered the greatest harm of all. The time has come to put to an end this baseless posturing and victim-blaming, and for those truly responsible to be held to account: the James brothers and their co-conspirators at First Brands.

2. Through this Counterclaim, Cross-Claim, and Third-Party Complaint, Onset seeks determinations regarding Onset's interests in property and segregation of and protection for such property. It also seeks damages to compensate Onset for the direct and immense harm done by

---

[2] Capitalized terms used but not otherwise defined in this "Preliminary Statement" have the meanings ascribed to such terms below.

[3] Hereinafter "Patrick" and "Ed," respectively.

FBG_CH1_00090230

**DEBTORS' EXHIBIT NO. 175**
**Page 5 of 1907**

the James brothers and other First Brands insiders who devised and executed a carefully concealed criminal conspiracy targeting Onset, corruptly inducing Onset to provide funds in good faith to First Brands with full knowledge that Onset could not be repaid what it was duly owed.

3.       No one disputes that Onset provided First Brands consistent and reliable funding for years.  During this time, First Brands outwardly appeared to be a dependable and creditworthy partner.  Onset, whose long-established business is providing efficient and streamlined financing from various funding sources, provided real money to First Brands, which held itself out to be—confirmed by seemingly reliable audited financial data, site visits, representations by senior First Brands officers and counsel, and widely-respected industry reporting—a growing operation in need of financing to acquire new businesses and consolidate them under one banner.  Only in late 2025 did Onset first learn (together with virtually the rest of the world) that a pervasive fraud, choreographed by First Brands' owners, officers, and fiduciaries, had been in motion from the very start of Onset's dealings with the company.

4.       These facts have now been laid bare in a criminal indictment[4] made public last month by the U.S. Department of Justice ("DOJ"): Onset was one of the principal victims of a complex fraud scheme perpetrated by Patrick, the founder, sole owner, and since-displaced CEO of First Brands, and his brother, Ed, the company's former Executive Vice President,[5] along with other First Brands insiders.

5.       As described by DOJ, Patrick and Ed perpetrated a "staggering fraud" diverting "billions for First Brands—and millions for themselves—by presenting their lenders with the

------

[4] *United States v. Patrick James and Edward James*, No. 26-cr-00029 (AT) (S.D.N.Y. Jan. 27, 2026) [hereinafter *U.S. v. James*], [Docket No. 2] (the "James Brothers Indictment"), attached hereto as Exhibit 1.
[5] The James Brothers Indictment alleges Ed was Senior Vice President; he held himself out and signed as Executive Vice President in transactions with Onset.

FBG_CH1_00090231

**DEBTORS' EXHIBIT NO. 175**
**Page 6 of 1907**

impression of a successful, growing international business," when in reality theirs was a business "run through fraud, fake documents, and false financials."[6] Simply put, Patrick, together with Ed and other company insiders, concealed First Brands' true financial condition from Onset (and numerous other sophisticated lenders) and misrepresented the manner in which they used those funds in order to repeatedly induce Onset to provide funding that they then stole.

6.      Debtors concede these troubling facts.  Their complaint filed against Patrick says as much and considerably more.[7] Debtors' current CEO has also given sworn testimony that, at a minimum, hundreds of millions of dollars of funds provided by Onset were secretly and intentionally diverted to Patrick's non-Debtor affiliates.[8]

7.      But now, Debtors' Complaint in *this* case conspicuously declines to include the allegations contained in their complaint against Patrick and fails to acknowledge what the James Brothers Indictment so clearly and loudly proclaims: Onset suffered enormous harm at the hands of the James brothers and their co-conspirators.  Before discovering this intentionally disguised scheme, Onset reasonably believed itself to be in business with a successful and rapidly growing company (as did the automotive industry and Wall Street writ large).  And mountains of evidence in Debtors' possession establishes the long and well-documented history of Onset's good faith dealing with First Brands—which consistently (mis)reported to Onset that while it was working with traditional syndicated lending sources to fund its growing business operations, it required

---

[6] *First Brands Executives Charged With Multibillion-Dollar Fraud*, U.S. DEP'T OF JUSTICE (Jan. 29, 2025), https://www.justice.gov/usao-sdny/pr/first-brands-executives-charged-multibillion-dollar-fraud).  This Court can take judicial notice of a Department of Justice press release pursuant to Federal Rule of Evidence 201(b)(2).

[7] *First Brands Grp., LLC et al. v. Patrick James*, No. 25-03803 (CML) (Bankr. S.D. Tex.) (Jan. 19, 2026) [*hereinafter FBG v. James*] [Docket No. 141], ¶ 67 (the "Patrick Amended Complaint"), attached hereto as Exhibit 2.

[8] Debtors' current CEO is Charles Moore, a Managing Director at Alvarez & Marsal North America LLC ("A&M"). On September 5, 2025, Debtors retained A&M to assist with liquidity management and forecasting, identifying cost-reduction opportunities, and contingency preparations for a potential chapter 11 filing.  According to case filings, Mr. Moore has more than 30 years of experience providing turnaround consulting and advisory services across organizations.

FBG_CH1_00090232

**DEBTORS' EXHIBIT NO. 175**
**Page 7 of 1907**

additional financing to help facilitate an aggressive acquisition strategy and support related costs of folding the newly-acquired entities into First Brands' existing operations.

8.      Onset was consistently told by First Brands officers and counsel that Onset's provision of financing, even at higher rates than traditional lending, was crucial for the company's continued growth.  They conveyed to Onset that its ability to efficiently syndicate short-term funding, which First Brands frequently sought within tight timeframes and in increasingly larger dollar amounts, was critically valuable to First Brands.  Over the course of their eight-year business relationship, Onset engaged in several types of transactions with First Brands, beginning with a series of traditional sale-and-leaseback structures that reflected returns consistent with similar transactions in the industry.

9.      After several years of these successful sale-and-leaseback deals between Onset and wholly-owned First Brands subsidiaries, First Brands proposed a new type of transaction to Onset. Led by Ed and two senior officers, who had previously served as First Brands' outside counsel as partners at a premier law firm across from Onset, First Brands approached Onset with a bespoke lending structure.  Designed by these officers, the new structure involved sales of inventory and equipment from First Brands entities to special purpose vehicles (SPVs) newly created by First Brands within the umbrella of Patrick's corporate empire that, ultimately, reported up to him.  This structure was vetted by Onset and documented as being consistent with, and permitted by, First Brands' other debt facilities (as the transaction documents prove and this proceeding will confirm). First Brands conveyed to Onset that its continued provision of funding—with the significant benefits of efficiency and timeliness it carried—was crucial for First Brands.

10.      Drawing on trust built during their prior experience with First Brands, Onset believed what First Brands proposed.  Indeed, at this time, First Brands' audited financial

4

FBG_CH1_00090233

DEBTORS' EXHIBIT NO. 175
Page 8 of 1907

statements showed steady growth.  From 2018 to the middle of 2025—the period of Onset's funding—First Brands' revenues and EBITDA rose from approximately $500 million and $77 million, respectively, to $5 billion and $1.32 billion.  Far from the fictional portrayal offered by some parties in interest of Onset preying on an unstable company—such as Patrick's frivolous comparison of Onset to a "payday" lender—Onset understandably saw what many other sophisticated parties did: a steady, burgeoning, world-class conglomerate that Onset was proud to help support and nurture with consistent, reliable, streamlined funding.  Credit rating agencies similarly recognized First Brands' steady growth and creditworthiness, and noted the synergies and efficiencies achieved by First Brands' seemingly successful acquisition strategy.  First Brands' other lenders, its auditor, the automotive industry, and virtually all of Wall Street ostensibly saw the same corporate stability at First Brands as did Onset.

11.   For nearly a decade, Onset's funding relationship with First Brands operated smoothly, with the swift provision of capital from Onset and its funding partners supported by timely repayments from First Brands.  That is, until April 2025.  Starting then, in a series of events entirely absent from Debtors' Complaint filed against Onset, First Brands repeatedly sought to delay repayments to Onset.  Onset, which had significant financial obligations to its own funding partners, initially agreed to forbear to help a valued client undertaking what credibly appeared to be legitimate corporate strategies: First Brands' efforts to spin off its European business and refinance credit facilities.  During forbearance negotiations, First Brands repeatedly assured Onset that it was financially stable and had the funds to fulfill its obligations, and that Onset's security interests were enforceable and its collateral was secure.  Onset, seeking to assist its long-term client, ultimately entered into three forbearance agreements during Summer 2025.  But after a further request for a fourth forbearance and on the heels of shifting stories from First Brands

FBG_CH1_00090234

DEBTORS' EXHIBIT NO. 175
Page 9 of 1907

leadership and its counsel too—neither of which ever disavowed or corrected any of the oft-repeated and reaffirmed representations upon which Onset reasonably relied in doing business with First Brands—Onset finally noticed a default; these bankruptcy cases followed soon after. It was only after the Petition Date when Debtors and their advisors began disclosing previously concealed information about First Brands' operations and financial condition that Onset learned it had been defrauded and deceived by the James brothers, First Brands, and other insiders.

12.     To be clear: until these post-Petition revelations, Onset was not aware that an intricate fraud targeting them (and other lenders) was at play. Yet, at the behest of other parties in interest, Debtors clamor to have the Court believe otherwise. But the primary accusations they level at Onset—that it provided off-balance sheet funding through an SPV structure, that it had higher rates of return than more traditional lenders, and that Ed participated in certain funding rounds—fail to establish, collectively or otherwise, that Onset actually had knowledge of any wrongdoing whatsoever, let alone participation in a vast criminal conspiracy.

13.     *First*, that Onset provided First Brands funding through an SPV structure is not inherently suspicious. In the United States, off-balance sheet lending (frequently through SPVs, as here) is a *multi-trillion-dollar-a-year market* and is recognized by both Generally Accepted Accounting Principles and Generally Accepted Auditing Standards. It is acknowledged by corporations around the world to be a valuable method of managing liquidity and obtaining working capital. In fact, the very same counsel that prepared and signed the Complaint here on behalf of Debtors have themselves advocated and endorsed the use of SPVs for asset-backed

FBG_CH1_00090235

**DEBTORS' EXHIBIT NO. 175**
**Page 10 of 1907**

corporate funding.[9]  Nor was Onset the only party to provide First Brands this form of funding, though inexplicably it is the only SPV financing party Debtors have now targeted in litigation.

14.     *Second*, the internal rates of return (IRR) of Onset's funding to First Brands, though criticized by Debtors and other parties in these bankruptcy cases, were plainly justified for the short-term private credit Onset efficiently and consistently provided to First Brands, and which First Brands repeatedly sought and urged Onset to provide.  In contrast to interest rates applicable to longer-term, more traditional bank lending, the IRR on Onset's funding was driven by myriad risk factors not present in typical institutional lending—including (a) only indirect, rather than direct, claims against the cash flows and assets of the operating company; (b) the absence of customary stock pledges and full corporate liens other than at the SPV; (c) inventory collateral that is subject to continual sale and replenishment; (d) equipment collateral that would steadily be (or already had) started depreciating both from an actual wear-and-tear use perspective but also from a tax and accounting perspective; (e) the location of a substantial portion of the equipment and inventory collateral at numerous locations across and outside of the United States; (f) enhanced risk around tariffs and import restrictions for collateral outside of the United States; and (g) risks around mobile equipment and inventory, particularly as First Brands regularly consolidated or relocated facilities as part of its acquisition strategy.  Moreover, by purchasing and then leasing back assets, Onset effectively advanced funding at a 100% loan-to-value ratio, rather than the lower ratios at which traditional asset-based lenders provide capital.  Taken together, these risk factors contributed to a substantially higher risk profile and justified a greater cost of capital, shorter pay-off periods, and higher monthly payments.

---

[9] *See, e.g.*, "Weil Structured Finance Talking Points – Inventory Securitization," WEIL GOTSHAL & MANGES LLP (Apr. 2024), https://www.weil.com/-/media/files/pdfs/2024/april/weil-structured-finance-talking-points.pdf (describing use of special purpose vehicles to obtain financing backed by inventory).

FBG_CH1_00090236

**DEBTORS' EXHIBIT NO. 175**
**Page 11 of 1907**

15. *Finally*, Ed's participation alongside Onset and its other third-party funding partners in certain funding rounds cannot and does not establish that Onset or its partners were ever aware of or participated in Ed's fraud. Debtors stretch in their Complaint to conflate Ed and Onset, but there is simply no evidence that Onset and Ed engaged in anything other than an arm's-length relationship. Onset (and its funding partners) believed Ed's willingness to put his own capital at risk through Onset's funding transactions demonstrated his confidence in First Brands' ability to repay Onset and its partners, and it confirmed for Onset Ed's repeated representations that Onset's funding was critical to First Brands' growth and success. But Ed lied, over and over again, as he used, manipulated, and victimized Onset, ultimately defrauding it to a greater extent than First Brands' other creditor-victims.

16. Incredibly, despite being well aware of all of this, Debtors choose to falsely blame Onset. That they do so here in a *separate* adversary proceeding from the case they filed against Patrick explains why: the conflicting narratives Debtors offer in the two proceedings cannot be reconciled. And only the first set of their claims—those against Patrick—align with the allegations in the James Brothers Indictment. Unbowed by reality, Debtors allege that Onset—alone among *all* of First Brands sophisticated counterparties, including commercial banks and hedge funds — somehow knew or should have known about this well-concealed and complex fraud orchestrated by the James brothers and other First Brands insiders over many years. And Debtors ignore that it was Onset that defaulted First Brands and accelerated and demanded over $2 billion in obligations—an act surely inconsistent with a knowing co-conspirator seeking to mask a secret fraud. Debtors' narrative regarding Onset not only defies common sense, it disregards reams of documents and other evidence produced and available to Debtors now that they sit at the helm of

FBG_CH1_00090237

**DEBTORS' EXHIBIT NO. 175**
**Page 12 of 1907**

First Brands.  At *no* time was Onset ever aware that First Brands was engaged in the sprawling fraud scheme described in the James Brothers Indictment and the Debtors' own filings elsewhere.

17.     Tellingly, the Complaint in this action was filed just as Debtors exhausted $1.1 billion in DIP financing and have since breached their agreed and Court-ordered adequate protection obligations to Onset.  This is no coincidence.  The logical and obvious motivation of the Complaint is to try to drive Onset to the settlement table by placing a thumb firmly on the scale in favor of Debtors' other creditors that now claim superior interests—without supporting law, facts, or evidence—in what is rightfully Onset's property and collateral.  Onset brings this Counterclaim, Cross-Claim, and Third-Party Complaint not only to correct the record, which is replete with falsehoods about Onset, but also to obtain a declaratory judgement confirming Onset's prevailing security interests and to seek redress for the massive fraud in which Patrick, Ed, and their criminal cohorts deceived and victimized Onset.

18.     Among other claims, Onset hereby pursues its claims against Patrick, Ed, and the other First Brands' insiders and related entities involved in the Debtors' fraudulent scheme for (a) fraud; (b) breaches of forbearance, lease, and guarantee agreements by Debtors, other debtor-entities, and their guarantors; and (c) the return of money and other assets taken from Onset to unjustly enrich many of the Defendants who have profited, and would seek to continue to profit, at Onset's expense.  Onset also seeks treble damages and its attorneys' fees under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c).

FBG_CH1_00090238

**DEBTORS' EXHIBIT NO. 175**
**Page 13 of 1907**

## ONSET FINANCIAL, INC.'S ANSWER

Onset, by and through its undersigned counsel, hereby answers and asserts affirmative defenses in response to the complaint in this action, dated January 9, 2026 [Docket No. 1] (the "Complaint"), and in so doing denies the allegations set forth in the Complaint except as specifically stated below.

## GENERAL DENIAL

The Complaint contains definitions, section titles, other organizational headings, and footnotes to which no response is required.  To the extent any such definitions, section titles, other organizational headings, or footnotes in the Complaint are construed to contain substantive allegations to which a response is required, they are hereby denied.  To the extent that Onset uses terms defined in the Complaint in this Answer, such use is not an acknowledgment or admission of any characterization that Plaintiffs seek to associate with any such defined term.

## ANSWERS TO SPECIFIC ALLEGATIONS

1.      The allegations in Paragraph 1 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 1, except that, to the extent the allegations concern other parties, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations, and to the extent Paragraph 1 purports to characterize any master lease agreement, asset purchase agreement, lease schedule, or ancillary document associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

2.      Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 2.

FBG_CH1_00090239

**DEBTORS' EXHIBIT NO. 175**
**Page 14 of 1907**

3.      Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 3.

4.      Onset admits that First Brands created and maintained four SPV conduit entities but denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 4.

5.      Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 5.

6.      Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 6.

7.      Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 7.

8.      Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 8.

9.      Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 9.

10.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 10.

11.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 11.

12.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 12.

13.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 13.

FBG_CH1_00090240

DEBTORS' EXHIBIT NO. 175
Page 15 of 1907

14.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 14.

15.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 15.

16.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 16.

17.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 17.

18.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 18.

19.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 19.

20.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 20.

21.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 21.

22.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 22.

23.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 23.

24.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 24.

FBG_CH1_00090241

**DEBTORS' EXHIBIT NO. 175**
**Page 16 of 1907**

25.      Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 25.

26.      Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 26.

27.      Onset admits the allegations in Paragraph 27, except that, to the extent Paragraph 27 and Footnote 2 purport to characterize https://www.onsetfinancial.com/our-vision/about-us, the website speaks for itself, and Onset refers the Court to the website for its contents and denies any characterizations inconsistent therewith.

28.      Onset admits that Edward James is a former executive vice president, board member, and officer of certain of the Debtors, but denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 28.

29.      Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 29.

30.      Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 30.

31.      Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 31.

32.      Onset admits that Justin Nielsen is the founder, sole shareholder, chief executive officer, and director of Onset, and is the chief executive officer and sole manager of Nielsen Investments, and is an American national located in Draper, Utah.

33.      Onset admits the allegations in Paragraph 33.

34.      Onset denies the allegations in Paragraph 34, except admits that Scott Miller is a former president of Onset and denies knowledge or information sufficient to form a belief as to

FBG_CH1_00090242

**DEBTORS' EXHIBIT NO. 175**
**Page 17 of 1907**

the truth or falsity of whether Mr. Miller is an American national who resides in South Jordan, Utah.

35.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 35.

36.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 36.

37.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 37.

38.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 38.

39.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 39.

40.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 40.

41.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 41.

42.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 42.

43.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 43.

44.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 44.

FBG_CH1_00090243

**DEBTORS' EXHIBIT NO. 175**
**Page 18 of 1907**

45.     The allegations in Paragraph 45 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 45.

46.     The allegations in Paragraph 46 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 46.

47.     The allegations in Paragraph 47 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 47.

48.     The allegations in Paragraph 48 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 48.

49.     The allegations in Paragraph 49 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 49.

50.     The allegations in Paragraph 50 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 50.

51.     Onset admits that it was created in, and continues to operate in, the United States, and holds bank accounts located in the United States.  The remaining allegations in Paragraph 51 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 51.

FBG_CH1_00090244

DEBTORS' EXHIBIT NO. 175
Page 19 of 1907

52.     The allegations in Paragraph 52 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 52.

53.     The allegations in Paragraph 53 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 53.

54.     The allegations in Paragraph 54 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 54.

55.     Onset admits that Asilia holds bank accounts located in the United States.  The remaining allegations in Paragraph 55 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 55.

56.     Onset admits that Nielsen is an American national.  The remaining allegations in Paragraph 56 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 56.

57.     Onset admits that Nielsen Investments was created in, and continues to operate in, the United States and holds a bank account located in the United States but denies that Nielsen Investments holds more than one bank account.  The remaining allegations in Paragraph 57 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 57.

FBG_CH1_00090245

**DEBTORS' EXHIBIT NO. 175
Page 20 of 1907**

58.     The allegations in Paragraph 58 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 58.

59.     Onset admits that Joshua Tree holds a bank account located in the United States but denies knowledge or information sufficient to form a belief as to the whether Joshua Tree holds more than one bank account.  The remaining allegations in Paragraph 59 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 59.

60.     The allegations in Paragraph 60 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 60.

61.     Onset admits that JA Gardner holds a bank account located in the United States but denies knowledge or information sufficient to form a belief as to the whether JA Gardner holds more than one bank account.  The remaining allegations in Paragraph 61 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 61.

62.     The allegations in Paragraph 62 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 62.

63.     Onset admits that Holt Investments holds a bank account located in the United States but denies knowledge or information sufficient to form a belief as to the whether Holt

17

FBG_CH1_00090246

DEBTORS' EXHIBIT NO. 175
Page 21 of 1907

Investments holds more than one bank account.  The remaining allegations in Paragraph 63 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 63.

64.     The allegations in Paragraph 64 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 64.

65.     The allegations in Paragraph 65 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 65.

66.     The allegations in Paragraph 66 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 66.

67.     The allegations in Paragraph 67 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 67.

68.     The allegations in Paragraph 68 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 68.

69.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 69, except that, to the extent Paragraph 69 purports to characterize financial documents, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

FBG_CH1_00090247

**DEBTORS' EXHIBIT NO. 175**
**Page 22 of 1907**

70.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of Paragraph 70, except admits that Debtors and the United States Department of Justice have alleged that Debtors' former management engaged in an intentionally fraudulent scheme to mask Debtors' financial condition.  Further answering, Onset denies the allegations in the second sentence of Paragraph 70.

71.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 71.

72.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 72.

73.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 73, except that, to the extent the allegations in Paragraph 73 purport to characterize FBG Debtors' existing debt facilities, the documents speak for themselves, and Onset denies any characterizations inconsistent therewith.

74.     Onset denies the allegations in Paragraph 74 that concern Onset and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 74.

75.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 75.

76.     Onset denies the allegations in Paragraph 76 that concern Onset, except admits that it is owed at least $1.9 billion and that it and its funding partners received payments of over $2.3 billion from the SPV financing transactions.  Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 76.

19

FBG_CH1_00090248

77.     Onset admits that, beginning in May 2018, First Brands and Onset entered into the transactions relating to inventory, furniture, fixtures, manufacturing, and other equipment.  Onset admits that the terms of the Trico Transactions were governed by a single master lease agreement, titled Master Lease Agreement No. OFI1045321, dated May 9, 2018, between Trico, as lessee, and Onset, as lessor (the "Trico MLA").  Onset further admits that the Trico MLA covered a series of independent but related transactions between First Brands and Onset.  Onset also admits that, since the inception of the Trico Transactions in May 2018, Onset and Trico have entered into 48 Trico Lease Schedules.  Onset denies the remaining allegations in Paragraph 77, except that, to the extent Paragraph 77 purports to characterize the Trico Master Lease Agreement, dated May 9, 2018, or any other transaction documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

78.     Onset denies the allegations in Paragraph 78.

79.     Onset denies the allegations in Paragraph 79 that concern Onset, except admits the Debtors and former management deceived creditors, including Onset, customers and employees as to the true financial condition of the operating businesses.

80.     Onset denies the allegations in Paragraph 80.

81.     Onset denies the allegations in Paragraph 81.

82.     Onset denies the allegations in Paragraph 82.

83.     Onset denies the allegations in Paragraph 83.

84.     Onset denies the allegations in Paragraph 84.

85.     Onset denies the allegations in Paragraph 85.

FBG_CH1_00090249

**DEBTORS' EXHIBIT NO. 175**
**Page 24 of 1907**

86.     Onset denies the allegations in Paragraph 86 that concern Onset and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations, except that, to the extent Paragraph 86 purports to characterize Onset's Motion to Intervene [Case No. 25-90399, Docket No. 72], the document speaks for itself, and Onset refers the Court to the document for its contents and denies any characterizations inconsistent therewith.

87.     Onset denies the allegations in Paragraph 87 that concern Onset, except admits that Onset received payments from certain of the Plaintiffs.

88.     Onset denies the allegations in Paragraph 88.

89.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 89.

90.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 90.

91.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of Paragraph 91 and denies the allegations in the second sentence of Paragraph 91.

92.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 92.

93.     Onset denies the allegations in Paragraph 93 that concern Onset and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 93.

94.     Onset denies the allegations in Paragraph 94.

95.     Onset denies the allegations in Paragraph 95 that concern Onset, except that, to the extent Paragraph 95 purports to characterize documents involving what Plaintiffs allege to be

FBG_CH1_00090250

DEBTORS' EXHIBIT NO. 175
Page 25 of 1907

Sale-Leaseback Onset Transactions and Forbearance Agreements, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

96.    Onset denies the allegations in Paragraph 96.

97.    Onset denies the allegations in Paragraph 97 that concern Onset and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 97.   To the extent Paragraph 97 purports to characterize written communications, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

98.    Onset denies the allegations in Paragraph 98 that concern Onset and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 98.   To the extent Paragraph 98 purports to characterize written communications, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

99.    Onset denies the allegations in Paragraph 99.

100.    Onset denies the allegations in Paragraph 100, except that, to the extent Paragraph 100 purports to characterize Onset's Motion to Intervene, the document speaks for itself, and Onset refers the Court to the document for its contents and denies any characterizations inconsistent therewith.

101.    Onset denies the allegations in Paragraph 101, except that, to the extent Paragraph 101 purports to characterize "documentation of the Sale-leaseback Onset Transactions," the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

22

FBG_CH1_00090251

**DEBTORS' EXHIBIT NO. 175**
**Page 26 of 1907**

102.   Onset denies the allegations in Paragraph 102, except that, to the extent Paragraph 102 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

103.   Onset admits that beginning in January of 2022, Onset entered into transactions with the Carnaby Debtors (defined below) relating to inventory, furniture, fixtures, manufacturing, and other equipment.  The terms of the Carnaby Transactions were governed by (a) in the case of Carnaby I, Master Lease Agreement No. OFI1445408, dated January 19, 2022, between Onset and Carnaby I (the "Carnaby I MLA"); (b) in the case of Carnaby Inventory IV, LLC, Master Lease Agreement No. OFI1445416, dated June 28, 2022, between Onset and Carnaby IV (the "Carnaby IV MLA"); and (c) in the case of Carnaby FA, LLC, Master Lease Agreement OFI1545465, dated October 24, 2023, between Onset and Carnaby FA (the "Carnaby FA MLA" and, together with the Carnaby I MLA and Carnaby IV MLA, the "Carnaby MLAs," and, together with the Trico MLA, the "MLAs") covering a series of independent but related transactions between Carnaby I, Carnaby IV, and Carnaby FA (collectively, the "Carnaby Debtors") and Onset.  Onset further admits that, since the inception of the Carnaby Transactions in January 2022, Onset and the Carnaby Debtors have executed 49 Carnaby Lease Schedules.  Onset also admits that, in total, 37 Carnaby Lease Schedules, as well as three lease schedules with Eagle Machining, were fully repaid and closed out prior to the Petition Date, with another 12 still open today.  To the extent Paragraph 103 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

FBG_CH1_00090252

**DEBTORS' EXHIBIT NO. 175**
**Page 27 of 1907**

104.   Onset denies the allegations in Paragraph 104, except that, to the extent the allegations in Paragraph 104 purport to characterize any documents associated with a transaction between Onset and Debtors, including the contents and existence of any UCC-1 financing statements, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

105.   The allegations in Paragraph 105 state legal conclusions or arguments to which no response is required.   To the extent Paragraph 105 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

106.   Onset denies the allegations in Paragraph 106.

107.   Onset denies the allegations in Paragraph 107, except admits that, under each Onset APA, Onset paid a purchase price for the Carnaby Property equal to the amount the Carnaby Debtors were obligated to pay the applicable FBG subsidiary (*i.e.*, the Carnaby Bailee) under the corresponding Carnaby APA.   Onset further admits that, under the Onset APAs, the applicable Carnaby Debtor confirmed that it transferred its title and ownership interest in the Carnaby Property to Onset free and clear of liens and encumbrances of any kind, and to the extent the Carnaby Bailee continued to hold any interest in the Carnaby Property, the Carnaby Bailee transferred and assigned such interest to Onset and disclaimed any ownership interest therein.   To the extent Paragraph 107 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

FBG_CH1_00090253

**DEBTORS' EXHIBIT NO. 175**
**Page 28 of 1907**

108.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 108.  To the extent Paragraph 108 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

109.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 109.  To the extent Paragraph 109 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

110.    Onset denies the allegations in Paragraph 110 that concern Onset and deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 110.  To the extent Paragraph 110 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

111.    Onset denies the allegations in Paragraph 111.  Further answering, the allegations in Paragraph 111 state legal conclusions or arguments to which no response is required.  To the extent Paragraph 111 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

112.    Onset denies the allegations in Paragraph 112, except admits that the Third Forbearance Agreement was entered into, effective as of June 30, 2025, by and between Carnaby

25

FBG_CH1_00090254

DEBTORS' EXHIBIT NO. 175
Page 29 of 1907

Inventory IV, LLC; Carnaby FA, LLC; First Brands Group, LLC; Carnaby Capital Holdings, LLC; Carnaby Capital, LLC; Carnaby Inventory Holdings IV, LLC; First Brands Group Holdings, LLC; Viceroy Private Capital, LLC; Carnaby FA Holdings, LLC; Eagle Casting Holdings, LLC; Eagle Casting, LLC; and Onset.   Further answering, the allegations in Paragraph 112 state legal conclusions or arguments to which no response is required.  To the extent Paragraph 112 purports to characterize any documents associated with a transaction between Onset and Debtors, including the Third Forbearance Agreement, effective June 30, 2025, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

113.   Onset denies the allegations in Paragraph 113 that concern Onset and deny knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 113.  Further answering, the allegations in Paragraph 113 state legal conclusions or arguments to which no response is required.  To the extent Paragraph 113 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

114.   Onset denies the allegations in Paragraph 114 that concern Onset and deny knowledge or information sufficient to form as belief as to the truth or falsity of the remaining allegations in Paragraph 114.  Further answering, the allegations in Paragraph 114 state legal conclusions or arguments to which no response is required.  To the extent Paragraph 114 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

FBG_CH1_00090255

**DEBTORS' EXHIBIT NO. 175**
**Page 30 of 1907**

115.   Onset denies the allegations in Paragraph 115 that concern Onset and denies knowledge or information sufficient to form as belief as to the truth or falsity of the remaining allegations in Paragraph 115.  Further answering, the allegations in Paragraph 115 state legal conclusions or arguments to which no response is required.  To the extent Paragraph 115 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

116.   Onset denies the allegations in Paragraph 116, except that, to the extent Paragraph 116 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

117.   Onset denies the allegations in Paragraph 117.  Further answering, the allegations in Paragraph 117 state legal conclusions or arguments to which no response is required.  To the extent Paragraph 117 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

118.   Onset denies the allegations in Paragraph 118.  Further answering, the allegations in Paragraph 118 state legal conclusions or arguments to which no response is required.  To the extent Paragraph 118 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

119.   Onset denies the allegations in Paragraph 119, except admits that Onset and First Brands entered into a series of transactions that included sale-leaseback transactions structured

27

FBG_CH1_00090256

using the Carnaby Debtors—four SPV conduit entities created and maintained by First Brands—from which Onset purchased automotive manufacturing furniture, fixtures, equipment, inventory, and other assets acquired by the Carnaby Debtors from a First Brands subsidiary and immediately leased those same assets back to the same entity. Onset further admits that, pursuant to the Onset Transactions, from 2018 to 2025, Onset funded (a) in connection with the Trico Transactions, more than approximately $114,500,000 on account of Trico Inventory and more than approximately $524,700,000 on account of Trico Equipment; and (b) in connection with the Carnaby Transactions, more than approximately $1,619,600,000 on account of Carnaby Inventory and more than approximately $711,400,000 on account of Carnaby Equipment. Onset also funded approximately $50,000,000 on account of equipment for Eagle Machining. Further answering, the allegations in Paragraph 119 state legal conclusions or arguments to which no response is required. To the extent Paragraph 119 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

120.   Onset denies the allegations in Paragraph 120, except admits that, in total, 37 Carnaby Lease Schedules, as well as three lease schedules with Eagle Machining, were fully repaid and closed out prior to the Petition Date. To the extent Paragraph 120 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

121.   Onset denies the allegations in Paragraph 121, except admits that, in total, 12 Carnaby Lease Schedules remain unpaid. To the extent Paragraph 121 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for

28

FBG_CH1_00090257

**DEBTORS' EXHIBIT NO. 175**
**Page 32 of 1907**

themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

122.    Onset denies the allegations in Paragraph 122.

123.    Onset denies the allegations in Paragraph 123, except admits that Onset and certain of the Debtors entered into the Forbearance Agreement, effective as of May 1, 2025, the Second Forbearance Agreement, effective as of June 1, 2025, and the Third Forbearance Agreement, effective June 30, 2025, which speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

124.    Onset denies the allegations in Paragraph 124, except that, to the extent Paragraph 124 purports to characterize the Forbearance Agreement, effective as of May 1, 2025, the Second Forbearance Agreement, effective as of June 1, 2025, and the Third Forbearance Agreement, effective June 30, 2025, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

125.    Onset denies the allegations in Paragraph 125, except that, to the extent Paragraph 125 purports to characterize the Forbearance Agreement, effective as of May 1, 2025, the Second Forbearance Agreement, effective as of June 1, 2025, and the Third Forbearance Agreement, effective June 30, 2025, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

126.    Onset denies the allegations in Paragraph 126.

127.    Onset denies the allegations in Paragraph 127.

128.    Onset denies the allegations in Paragraph 128.

129.    Onset denies the allegations in Paragraph 129 to the extent they concern Onset and denies knowledge or information sufficient to form a belief as to the truth or falsity of the

FBG_CH1_00090258

**DEBTORS' EXHIBIT NO. 175**
**Page 33 of 1907**

remaining allegations in Paragraph 129. To the extent Paragraph 129 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

130. Onset denies the allegations in Paragraph 130 to the extent they concern Onset and denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 130. To the extent Paragraph 130 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

131. Onset denies the allegations in Paragraph 131.

132. Onset denies the allegations in Paragraph 132, except that, to the extent Paragraph 132 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

133. Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 133. Further answering, the allegations in Paragraph 133 state legal conclusions or arguments as to which no response is required.

134. Onset denies the allegations in Paragraph 134 to the extent they concern Onset and denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 134. Further answering, the allegations in Paragraph 134 state legal conclusions or arguments to which no response is required. To the extent Paragraph 134 purports to characterize any documents associated with a transaction between Onset and Debtors, the

FBG_CH1_00090259

DEBTORS' EXHIBIT NO. 175
Page 34 of 1907

documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

135.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 135. Further answering, the allegations in Paragraph 135 state legal conclusions or arguments to which no response is required.

136.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 136. Further answering, the allegations in Paragraph 136 state legal conclusions or arguments to which no response is required.

137.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 137. Further answering, the allegations in Paragraph 137 state legal conclusions or arguments to which no response is required.

138.    Onset denies the allegations in Paragraph 138 that concern Onset except admits that, between October 2024 and September 2025, Onset and its funding partners funded over $1.15 billion and received just over $1 billion in payments, and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 138. Further answering, the allegations in Paragraph 138 state legal conclusions or arguments to which no response is required.

139.    Onset denies the allegations in Paragraph 139.

140.    Onset denies the allegations in Paragraph 140.

141.    Onset denies the allegations in Paragraph 141, except admits that Justin Nielsen is the chief executive officer and sole manager of Nielsen Investments and Nielsen Investments invested in certain transactions between Onset and certain Debtors. Onset further admits that Scott Miller is a former president of Onset and that Joshua Tree Holdings invested in certain transactions

31

FBG_CH1_00090260

**DEBTORS' EXHIBIT NO. 175**
**Page 35 of 1907**

between Onset and certain Debtors.  Further answering, the allegations in Paragraph 141 state legal conclusions or arguments to which no response is required.  To the extent Paragraph 141 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

142.    Onset denies the allegations in Paragraph 142, except that, to the extent Paragraph 142 purports to characterize any documents associated with any transactions between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

143.    Onset denies the allegations in Paragraph 143, except admits that it did not provide money toward the purchase of the property per the November 2024 Intercreditor Agreement between Onset Financial, Inc, Asilia Special Opportunity III, LLC, JA Gardner Holdings, LLC, and Optimus Private Capital LLC.  To the extent Paragraph 143 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

144.    Onset denies the allegations in Paragraph 144.

145.    Onset denies the allegations in Paragraph 145 to the extent they concern Onset and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 145.  Further answering, the allegations in Paragraph 145 state legal conclusions or arguments to which no response is required.

146.    Onset denies the allegations in Paragraph 146 to the extent they concern Onset and denies knowledge or information sufficient to form a belief as to the truth or falsity of the

FBG_CH1_00090261

DEBTORS' EXHIBIT NO. 175
Page 36 of 1907

remaining allegations in Paragraph 146.  Further answering, the allegations in Paragraph 146 state legal conclusions or arguments to which no response is required.  To the extent Paragraph 146 purports to characterize Debtors' LLC agreements, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

147.   The allegations in Paragraph 147 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 147.

148.   The allegations in Paragraph 148 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 148.

<u>**COUNT I**</u>

**Actual Fraudulent Transfer**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550(a); Ohio Rev. Code Ann. §§ 1336.04(A)(1);**
**6 Del. Code § 1304(a)(1)**

149.   Onset repeats each of the foregoing responses as if fully set forth herein.

150.   Onset denies allegations in Paragraph 150 to the extent they concern Onset and denies knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 150.  Further answering, the allegations in Paragraph 150 state legal conclusions or arguments to which no response is required.

151.   Onset denies allegations in Paragraph 151 to the extent they concern Onset and denies knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 151.  Further answering, the allegations in Paragraph 151 state legal conclusions or arguments to which no response is required.

FBG_CH1_00090262

**DEBTORS' EXHIBIT NO. 175**
**Page 37 of 1907**

152.    Onset denies allegations in Paragraph 152 to the extent they concern Onset and denies knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 152.  Further answering, the allegations in Paragraph 152 state legal conclusions or arguments to which no response is required.

153.    Onset denies the allegations in Paragraph 153.

154.    Onset denies the allegations in Paragraph 154.

155.    Onset denies the allegations in Paragraph 155.

156.    Onset denies the allegations in Paragraph 156.

157.    Onset denies the allegations in Paragraph 157 to the extent they concern Onset and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 157.

158.    Onset denies the allegations in Paragraph 158.

159.    Onset denies the allegations in Paragraph 159.

160.    Onset denies the allegations in Paragraph 160.

## COUNT II

**Constructive Fraudulent Transfer**
**Pursuant to 11 U.S.C. § 548(a)(1)(B), Ohio Rev. Code Ann. §§ 1336.04(A)(2),**
**6 Del. Code § 1304(a)(2)**

161.    Onset repeats each of the foregoing responses as if fully set forth herein.

162.    Onset denies the allegations in Paragraph 162.

163.    Onset denies the allegations in Paragraph 163.

164.    Onset denies the allegations in Paragraph 164.

165.    Onset denies the allegations in Paragraph 165.

FBG_CH1_00090263

**DEBTORS' EXHIBIT NO. 175**
**Page 38 of 1907**

166.    Onset denies the allegations in Paragraph 166 to the extent they concern Onset and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 166.

167.    Onset denies the allegations in Paragraph 167 to the extent they concern Onset and denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 167.

168.    Onset denies the allegations in Paragraph 168.

169.    Onset denies the allegations in Paragraph 169.

170.    The allegations in Paragraph 170 state legal conclusions or arguments to which no response is required.   To the extent a response is required, Onset denies the allegations in Paragraph 170.

## COUNT III

### Recovery Against Subsequent Transferees
### Pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(A), 550(a)

171.    Onset repeats each of the foregoing responses as if fully set forth herein.

172.    Onset denies the allegations in Paragraph 172.

173.    Onset denies the allegations in Paragraph 173, except admits that, between 2022 and the Petition Date, Optimus, and JCMC received $269 million, based on the $240 million in funds they provided, as a result of his participation in transactions between Onset and Certain Debtors.

174.    Onset denies the allegations in Paragraph 174, except admits that, between 2022 and the Petition Date, Optimus and JCMC received $ 269 million, based on the $241 million funds they provided, as a result of his participation in transactions between Onset and Certain Debtors.

35

FBG_CH1_00090264

**DEBTORS' EXHIBIT NO. 175**
**Page 39 of 1907**

175.    The allegations in Paragraph 175 state legal conclusions or arguments to which no response is required.   To the extent a response is required, Onset denies the allegations in Paragraph 175 to the extent they concern Onset and Onset Investors and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 175.

176.    The allegations in Paragraph 176 state legal conclusions or arguments to which no response is required.   To the extent a response is required, Onset denies the allegations in Paragraph 176 to the extent they concern Onset and Onset Investors and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 176.

177.    Onset denies the allegations in Paragraph 177 to the extent they concern Onset and Onset Investors and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 177.

178.    The allegations in Paragraph 178 state legal conclusions or arguments to which no response is required.   To the extent a response is required, Onset denies the allegations in Paragraph 178 to the extent they concern Onset and Onset Investors and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 178.

## COUNT IV

**Actual Fraudulent Transfer**
**Pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(A), 550(a); Ohio Rev. Code Ann.**
**§ 1336.04(A)(1); 6 Del. Code § 1304(a)(1)**

179.    Onset repeats each of the foregoing responses as if fully set forth herein.

180.    Onset denies the allegations in Paragraph 180, except admits that a Guaranty Agreement was made between Onset Financial, Inc. and Viceroy Private Capital, LLC, effective

36

FBG_CH1_00090265

**DEBTORS' EXHIBIT NO. 175**
**Page 40 of 1907**

June 28, 2022; a Guaranty Agreement was made between Onset Financial, Inc. and First Brands Group Holdings, LLC, effective June 28, 2022; a Guaranty Agreement was made between Onset Financial, Inc. and First Brands Group Holdings, LLC, effective October 24, 2023; a Guaranty Agreement was made between Onset Financial, Inc. and Viceroy Private Capital, LLC, effective October 24, 2023; a Guaranty Agreement was made between Onset Financial, Inc. and Eagle Casting, LLC, effective October 24, 2023; and a Guaranty Agreement was entered between Onset Financial, Inc. and Eagle Casting Holdings, LLC, effective October 24, 2023.

181.    Onset denies the allegations in Paragraph 181.

182.    The allegations in Paragraph 182 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 182, except admits that the Guarantors have obligations as described in their applicable agreements with Onset, which agreements speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

183.    Onset denies the allegations in Paragraph 183.

184.    Onset denies the allegations in Paragraph 184.

185.    Onset denies the allegations in Paragraph 185.

186.    The allegations in Paragraph 186 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 186.

## COUNT V

**Constructive Fraudulent Transfer**
**Pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B); Ohio Rev. Code Ann. §§ 1336.04(A)(2); 6 Del. Code § 1304(a)(2)**

187.    Onset repeats each of the foregoing responses as if fully set forth herein.

FBG_CH1_00090266

**DEBTORS' EXHIBIT NO. 175**
**Page 41 of 1907**

188.   Onset admits that a Guaranty Agreement was made between Onset Financial, Inc. and Viceroy Private Capital, LLC, effective June 28, 2022; a Guaranty Agreement was made between Onset Financial, Inc. and First Brands Group Holdings, LLC, effective June 28, 2022; a Guaranty Agreement was made between Onset Financial, Inc. and First Brands Group Holdings, LLC, effective October 24, 2023; a Guaranty Agreement was made between Onset Financial, Inc. and Viceroy Private Capital, LLC, effective October 24, 2023; a Guaranty Agreement was made between Onset Financial, Inc. and Eagle Casting, LLC, effective October 24, 2023; and a Guaranty Agreement was entered between Onset Financial, Inc. and Eagle Casting Holdings, LLC, effective October 24, 2023.  To the extent Paragraph 188 purports to any of the Guaranty Agreements Onset has identified in its response to Paragraph 188, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

189.   Onset denies the allegations in Paragraph 189.

190.   Onset denies the allegations in Paragraph 190, except admits that the Guarantors incurred guaranty obligations to Onset according to the terms of the Guarantee Agreements, which agreements speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

191.   Onset denies the allegations in Paragraph 191.

192.   Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 192.

193.   Onset denies the allegations in Paragraph 193.

194.   Onset denies the allegations in Paragraph 194.

FBG_CH1_00090267

**DEBTORS' EXHIBIT NO. 175**
**Page 42 of 1907**

195.     The allegations in Paragraph 195 state legal conclusions or arguments to which no response is required.   To the extent a response is required, Onset denies the allegations in Paragraph 195.

## COUNT VI

### Breach of LLC Agreement

196.     Onset repeats each of the foregoing responses as if fully set forth herein.

197.     The allegations in Paragraph 197 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 197.

198.     The allegations in Paragraph 198 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 198.

199.     Onset denies the allegations in Paragraph 199 to the extent they concern Onset and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 199.  Further answering, the allegations in Paragraph 199 contain legal conclusions or arguments as to which no response is required.

200.     The allegations in Paragraph 200 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 200.

201.     The allegations in Paragraph 201 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 201.

FBG_CH1_00090268

DEBTORS' EXHIBIT NO. 175
Page 43 of 1907

## COUNT VII

### Tortious Interference with LLC Agreement

202.    Onset repeats each of the foregoing responses as if fully set forth herein.

203.    The allegations in Paragraph 203 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 203.

204.    Onset denies the allegations in Paragraph 204.

205.    Onset denies the allegations in Paragraph 205.

206.    Onset denies the allegations in Paragraph 206.

207.    Onset denies the allegations in Paragraph 207.

208.    Onset denies the allegations in Paragraph 208.

## COUNT VIII

### Breach of Employment Agreement

209.    Onset repeats each of the foregoing responses as if fully set forth herein.

210.    The allegations in Paragraph 210 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 210.

211.    The allegations in Paragraph 211 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 211.

212.    Onset denies the allegations in Paragraph 212 that concern Onset.  Further answering, the allegations in Paragraph 212 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 212.

FBG_CH1_00090269

DEBTORS' EXHIBIT NO. 175
Page 44 of 1907

213. The allegations in Paragraph 213 state legal conclusions or arguments to which no response is required. To the extent a response is required, Onset denies the allegations in Paragraph 213.

214. Onset denies the allegations in Paragraph 214.

## COUNT IX

### Tortious Interference with Employment Agreement

215. Onset repeats each of the foregoing responses as if fully set forth herein.

216. The allegations in Paragraph 216 state legal conclusions or arguments to which no response is required. To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 216.

217. Onset denies the allegations in Paragraph 217.

218. Onset denies the allegations in Paragraph 218.

219. Onset denies the allegations in Paragraph 219.

220. Onset denies the allegations in Paragraph 220.

## COUNT X

### Breach of Fiduciary Duties under Delaware Law

222. The allegations in Paragraph 222 state legal conclusions or arguments to which no response is required. To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 222.

223. Onset denies the allegations in Paragraph 223 to the extent they concern Onset and denies knowledge or information sufficient to form as belief as to the truth or falsity of the remaining allegations in Paragraph 223. Further answering, the allegations in Paragraph 223 state legal conclusions or arguments to which no response is required.

FBG_CH1_00090270

**DEBTORS' EXHIBIT NO. 175**
**Page 45 of 1907**

224. The allegations in Paragraph 224 state legal conclusions or arguments to which no response is required. To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 224.

225. The allegations in Paragraph 225 state legal conclusions or arguments to which no response is required. To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 225.

## COUNT XI

### Aiding and Abetting Breach of Fiduciary Duties under Delaware Law

226. Onset repeats each of the foregoing responses as if fully set forth herein.

227. The allegations in Paragraph 227 state legal conclusions or arguments to which no response is required. To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 227.

228. The allegations in Paragraph 228 state legal conclusions or arguments to which no response is required. To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 228.

229. The allegations in Paragraph 229 state legal conclusions or arguments to which no response is required. To the extent a response is required, Onset denies the allegations in Paragraph 229.

230. The allegations in Paragraph 230 state legal conclusions or arguments to which no response is required. To the extent a response is required, Onset denies the allegations in Paragraph 230.

231. The allegations in Paragraph 231 state legal conclusions or arguments to which no response is required. To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 231.

FBG_CH1_00090271

**DEBTORS' EXHIBIT NO. 175**
**Page 46 of 1907**

232.    Onset denies the allegations in Paragraph 232.

## COUNT XII

**Recharacterization of the Sale-Leaseback Transactions as Disguised Financing Transactions Pursuant to 11 U.S.C. §§ 105(a); 28 U.S.C. § 2201; Bankruptcy Rule 7001(2)**

233.    Onset repeats each of the foregoing responses as if fully set forth herein.

234.    Onset denies the allegations in Paragraph 234.  Further answering, the allegations in Paragraph 234 state legal conclusions or arguments to which no response is required.

235.    Onset denies the allegations in Paragraph 235.  Further answering, the allegations in Paragraph 235 contain legal conclusions or arguments to which no response is required.  To the extent Paragraph 235 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

236.    Onset denies the allegations in Paragraph 236.  Further answering, the allegations in Paragraph 236 contain legal conclusions or arguments to which no response is required.  To the extent Paragraph 236 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

237.    Onset denies the allegations in Paragraph 237 to the extent they concern Onset and to the extent they allege that the Carnaby Entities lacked adequate means to perform their obligations and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 237.

238.    The allegations in Paragraph 238 state legal conclusions or arguments to which no response is required.  To the extent Paragraph 236 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves,

43

FBG_CH1_00090272

and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

239.    The allegations in Paragraph 239 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 239.  To the extent Paragraph 239 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

240.    Onset denies the allegations in Paragraph 240.

## COUNT XIII

### Avoidance of Unperfected Security Interests in Inventory and PP&E
### Pursuant to 11 U.S.C. §§ 544, 550, 551

241.    Onset repeats each of the foregoing responses as if fully set forth herein.

242.    The allegations in Paragraph 242 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 242.

243.    The allegations in Paragraph 243 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 243.

244.    Onset admits that the chapter 11 petitions were filed on or about September 28, 2025, but denies knowledge or information sufficient to form a belief as to the meaning of "FBG Debtors."

245.    Onset denies the allegations in Paragraph 245.

FBG_CH1_00090273

DEBTORS' EXHIBIT NO. 175
Page 48 of 1907

246.    The allegations in Paragraph 246 state legal conclusions or arguments to which no response is required.   To the extent a response is required, Onset denies the allegations in Paragraph 246.

247.    The allegations in Paragraph 247 state legal conclusions or arguments to which no response is required.   To the extent a response is required, Onset denies the allegations in Paragraph 247.

248.    Onset denies the allegations in Paragraph 248.

249.    The allegations in Paragraph 249 state legal conclusions or arguments to which no response is required.   To the extent a response is required, Onset denies the allegations in Paragraph 249.

## COUNT XIV

### Declaratory Judgment
### Pursuant to 28 U.S.C. § 2201
### *Onset Has No Property Interest in Replacement Inventory*

250.    Onset repeats each of the foregoing responses as if fully set forth herein.

251.    Onset denies the allegations in Paragraph 251, except that, to the extent Paragraph 251 purports to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

252.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 252.   Further answering, the allegations in Paragraph 252 contain legal conclusions or arguments to which no response is required.

253.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 253.   Further answering, the allegations in Paragraph 253 contain legal conclusions or arguments to which no response is required.

45

FBG_CH1_00090274

**DEBTORS' EXHIBIT NO. 175**
**Page 49 of 1907**

254.    Onset denies the allegation in Paragraph 254.

255.    The allegations in Paragraph 255 state legal conclusions or arguments to which no response is required.   To the extent a response is required, Onset denies the allegations in Paragraph 255.

## COUNT XV

### Declaratory Judgment
### Pursuant to 28 U.S.C. § 2201
### *Any Security Interest of Onset is Subordinate to the ABL and Term Loan Lenders' Liens*

256.    Onset repeats each of the foregoing responses as if fully set forth herein.

257.    The allegations in Paragraph 257 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 257.

258.    The allegations in Paragraph 258 state legal conclusions or arguments to which no response is required.   To the extent a response is required, Onset denies the allegations in Paragraph 258.

259.    Onset denies the allegations in Paragraph 259.

260.    Onset denies the allegations in Paragraph 260.

261.    Onset denies the allegations in Paragraph 261.

262.    The allegations in Paragraph 262 state legal conclusions or arguments to which no response is required.   To the extent a response is required, Onset denies the allegations in Paragraph 262.

FBG_CH1_00090275

**DEBTORS' EXHIBIT NO. 175**
**Page 50 of 1907**

## COUNT XVI

### Declaratory Judgment
### Pursuant to 28 U.S.C. § 2201
***The Maquiladoras Entities that Purportedly Assigned Inventory and PP&E to Onset Did Not Have Legal or Equitable Title to Such Property and Accordingly Did Not Transfer Any Legal or Equitable Interest Directly or Indirectly to Onset***

263.    Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 263.

264.    The allegations in Paragraph 264 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 264.

265.    The allegations in Paragraph 265 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 265.

266.    Onset admits the allegations in Paragraph 266.

267.    The allegations in Paragraph 267 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 267.

268.    Onset denies the allegations in Paragraph 268 to the extent they concern Onset and denies knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations.  To the extent the allegations in Paragraph 268 purport to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

47

FBG_CH1_00090276

**DEBTORS' EXHIBIT NO. 175**
**Page 51 of 1907**

269.    The allegations in Paragraph 269 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 269.

## COUNT XVII

### Declaratory Judgment
### Pursuant to 28 U.S.C. § 2201, 11 U.S.C. §§ 502, 506(a)
### *The Value of Onset's Purported Collateral Is Materially Less Than Its Asserted Claims*

270.    Onset repeats each of the foregoing responses as if fully set forth herein.

271.    The allegations in Paragraph 271 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 271.

272.    The allegations in Paragraph 272 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 272.

273.    Onset denies the allegations in Paragraph 273.

## COUNT XVIII

### Preferential Transfer
### Pursuant to 11 U.S.C. §§ 547(b), 550(a)

274.    Onset repeats each of the foregoing responses as if fully set forth herein.

275.    Onset admits that the Third Forbearance Agreement was entered into, effective as of June 30, 2025, by and between Viceroy Private Capital, LLC and Onset, among others.  To the extent the allegations in Paragraph 275 purport to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

48

FBG_CH1_00090277

**DEBTORS' EXHIBIT NO. 175**
**Page 52 of 1907**

276.     Onset denies the allegations in Paragraph 276 except that, to the extent Paragraph 276 purports to characterize the cited UCC financing statement, the document speaks for itself, and Onset refers the Court to the document for its contents and denies any characterizations inconsistent therewith.

277.     Onset admits the allegations in Paragraph 277.

278.     Onset denies the allegations in Paragraph 278, except that, to the extent Paragraph 278 purports to characterize the UCC financing statement cited in Paragraph 278, the document speaks for itself, and Onset refers the Court to the document for its contents and denies any characterizations inconsistent therewith.

279.     Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 279.

280.     The allegations in Paragraph 280 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 280.

281.     The allegations in Paragraph 281 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 281.

282.     The allegations in Paragraph 282 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 282.

## COUNT XIX

**Preferential Transfer**
**Pursuant to 11 U.S.C. §§ 547(b), 550(a)**

283.     Onset repeats each of the foregoing responses as if fully set forth herein.

FBG_CH1_00090278

**DEBTORS' EXHIBIT NO. 175**
**Page 53 of 1907**

284. Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 284.

285. The allegations in Paragraph 285 state legal conclusions or arguments to which no response is required. To the extent a response is required, Onset denies the allegations in Paragraph 285.

286. The allegations in Paragraph 286 state legal conclusions or arguments to which no response is required. To the extent a response is required, Onset denies the allegations in Paragraph 286.

287. The allegations in Paragraph 287 state legal conclusions or arguments to which no response is required. To the extent a response is required, Onset denies the allegations in Paragraph 287.

288. Onset denies the allegations in Paragraph 288.

289. Onset denies the allegations in Paragraph 289.

290. Onset denies the allegations in Paragraph 290.

291. Onset denies the allegations in Paragraph 291.

292. Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 292.

293. The allegations in Paragraph 293 state legal conclusions or arguments to which no response is required. To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 293.

294. Onset denies the allegations in Paragraph 294.

295. The allegations in Paragraph 295 state legal conclusions or arguments to which no response is required. To the extent a response is required, Onset denies the allegations in Paragraph 295.

FBG_CH1_00090279

**DEBTORS' EXHIBIT NO. 175**
**Page 54 of 1907**

296.     The allegations in Paragraph 296 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 296.

## COUNT XX

### Equitable Subordination
### Pursuant to 11 U.S.C. § 510

297.     Onset repeats each of the foregoing responses as if fully set forth herein.

298.     Onset denies the allegations in Paragraph 298.

299.     Onset denies the allegations in Paragraph 299, except that, to the extent the allegations in Paragraph 299 purport to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

300.     Onset denies the allegations in Paragraph 300, except that, to the extent the allegations in Paragraph 300 purport to characterize any documents associated with a transaction between Onset and Debtors, the documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

301.     Onset denies the allegations in Paragraph 301.

302.     The allegations in Paragraph 302 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 302.

## COUNT XXI

### Unjust Enrichment

303.     Onset repeats each of the foregoing responses as if fully set forth herein.

51

FBG_CH1_00090280

**DEBTORS' EXHIBIT NO. 175**
**Page 55 of 1907**

304.    Onset denies the allegations in Paragraph 304, except admits that it received payments from certain Debtors and interests in PP&E and inventory via the Onset Transactions and pursuant to documents associated with the Onset Transactions, which documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

305.    Onset denies the allegations in Paragraph 305, except admits that it received payments from certain Debtors and interests in PP&E and inventory via the Onset Transactions and pursuant to documents associated with the Onset Transactions, which documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

306.    Onset denies the allegations in Paragraph 306.

307.    Onset denies the allegations in Paragraph 307.

308.    Onset denies the allegations in Paragraph 308, except admits that it received payments from certain Debtors and interests in PP&E and inventory via the Onset Transactions and pursuant to documents associated with the Onset Transactions, which documents speak for themselves, and Onset refers the Court to the documents for their contents and denies any characterizations inconsistent therewith.

309.    The allegations in Paragraph 309 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 309.

310.    The allegations in Paragraph 310 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies the allegations in Paragraph 310.

FBG_CH1_00090281

**DEBTORS' EXHIBIT NO. 175**
**Page 56 of 1907**

## COUNT XXII

### Disallowance of Claims
### Pursuant to 11 U.S.C. § 502(d)

311.   Onset repeats each of the foregoing responses as if fully set forth herein.

312.   The allegations in Paragraph 312 state legal conclusions or arguments to which no response is required.  To the extent a response is required, Onset denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations.

313.   The allegations in Paragraph 313 state legal conclusions or arguments to which no response is required.   To the extent a response is required, Onset denies the allegations in Paragraph 313.

314.   The allegations in Paragraph 314 state legal conclusions or arguments to which no response is required.   To the extent a response is required, Onset denies the allegations in Paragraph 314.

315.   The allegations in Paragraph 315 state legal conclusions or arguments to which no response is required.   To the extent a response is required, Onset denies the allegations in Paragraph 315.

316.   The allegations in Paragraph 316 state legal conclusions or arguments to which no response is required.   To the extent a response is required, Onset denies the allegations in Paragraph 316.

### REQUESTED RELIEF

Onset denies any wrongdoing and that Plaintiffs are entitled to any relief.

### AFFIRMATIVE DEFENSES

Without assuming the burden of proof that properly lies with Plaintiffs, Onset sets forth the following affirmative defenses to the Complaint.  Onset reserves the right to amend this Answer

53

FBG_CH1_00090282

**DEBTORS' EXHIBIT NO. 175**
**Page 57 of 1907**

to assert further defenses that become available and apparent through pretrial proceedings in this action. To the extent that any defense asserted herein or to be asserted in the future is mutually exclusive with another defense asserted herein or to be asserted in the future, such defense is asserted in the alternative to the other.

## FIRST DEFENSE

The Complaint, and each of its purported causes of action, in whole or in part, fails to set forth a cause of action upon which relief can be granted.

## SECOND DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because Plaintiffs cannot demonstrate any damages.

## THIRD DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because Plaintiffs' alleged damages were not actually or proximately caused by Onset.

## FOURTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because Plaintiffs' alleged injuries or damages were caused by independent superseding and intervening events or conduct unconnected to Onset and for which Onset cannot be held liable.

## FIFTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, by Plaintiffs' failure to mitigate or attempt to mitigate any damages they might have suffered, and any recovery by Plaintiffs must be barred or reduced by reason thereof.

## SIXTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, by the doctrines of laches, waiver, estoppel, unclean hands, *in pari delicto*, and/or other equitable doctrines.

FBG_CH1_00090283

DEBTORS' EXHIBIT NO. 175
Page 58 of 1907

## SEVENTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because Plaintiffs would be unjustly enriched if they were permitted to obtain recovery in this action.

## EIGHTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, by the acts, wrongs, omissions, and/or negligence of other individuals or entities with respect to which Onset is not liable.

## NINTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because any damage, loss, or injury sustained by Plaintiffs was proximately caused by or contributed to, in whole or in part, market conditions, the conduct of others, and/or Plaintiffs' own conduct, rather than any conduct of Onset.

## TENTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, from any recovery under the doctrines of *res judicata* and/or collateral estoppel.

## ELEVENTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because Onset gave value in good faith in exchange for the alleged transfers without knowledge of any alleged avoidability of such transfers.

## TWELFTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because Plaintiffs received reasonably equivalent value in exchange for the alleged transfers.

FBG_CH1_00090284

**DEBTORS' EXHIBIT NO. 175**
**Page 59 of 1907**

## THIRTEENTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because Onset did not intentionally or improperly interfere with any contract to which the Plaintiffs were a party.

## FOURTEENTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because Onset's conduct was justified and undertaken in good faith.

## FIFTEENTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because Onset did not knowingly participate in, induce or encourage any alleged breach of any contract.

## SIXTEENTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because the transactions were true leases and were not disguised as financing arrangements.

## SEVENTEENTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because the agreements reflect the parties' intent to enter into valid sale-leaseback transactions.

## EIGHTEENTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, by the doctrine of novation and/or because plaintiffs ratified, approved, and accepted the benefits of the transactions.

## NINETEENTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because Plaintiffs seek impermissible equitable relief inconsistent with the Bankruptcy Code.

FBG_CH1_00090285

DEBTORS' EXHIBIT NO. 175
Page 60 of 1907

## TWENTIETH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because Onset holds valid, perfected, and enforceable security interests.

## TWENTY-FIRST DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because any alleged perfection defects were cured or excused under applicable law.

## TWENTY-SECOND DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because Plaintiffs failed to identify specific collateral subject to avoidance.

## TWENTY-THIRD DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because declaratory relief is duplicative of other claims and inappropriate under the circumstances.

## TWENTY-FOURTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because any benefits conferred arose from valid and enforceable contracts.

## TWENTY-FIFTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because Plaintiffs' claims are not subject to disallowance because no avoidable transfer has been established.

## TWENTY-SIXTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because Plaintiffs failed to satisfy the procedural requirements for claim disallowance.

FBG_CH1_00090286

DEBTORS' EXHIBIT NO. 175
Page 61 of 1907

### TWENTY-SEVENTH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, because the conduct complained of is authorized or released by contract.

### TWENTY-EIGHTH DEFENSE

Plaintiffs' claims against Onset are tainted by a conflict of interest.

### TWENTY-NINTH DEFENSE

Plaintiffs' claims are barred by the releases contained in the Forbearance Agreement, effective as of May 1, 2025, the Second Forbearance Agreement, effective as of June 1, 2025, and the Third Forbearance Agreement, effective as of June 30, 2025.

### THIRTIETH DEFENSE

Plaintiffs' claims against Onset are barred, in whole or in part, by applicable statutes of limitation and by the doctrine of laches and any other comparable doctrine that limits or eliminates claims due to the passage of time.

FBG_CH1_00090287

**DEBTORS' EXHIBIT NO. 175**
**Page 62 of 1907**

## ONSET FINANCIAL, INC.'S COUNTERCLAIM, CROSS-CLAIM, AND THIRD-PARTY COMPLAINT

Incorporating the Preliminary Statement set forth above, Onset alleges upon knowledge of its respective acts and upon information and belief as to all other matters, as follows:

### PARTIES

**A.    Counterclaim, Cross-Claim, and Third-Party Plaintiff**

1.    Onset is a Utah corporation and was founded in 2008.  Justin Nielsen is the Chief Executive Officer and sole shareholder.  Onset is a leader in the equipment lease and finance industry.  Onset provided financing to the Debtors, first commencing in 2018, in the form of inventory and equipment lease transactions.

**B.    Counterclaim Defendants**

2.    Defendant Brake Parts Inc LLC[10] is a Debtor in the Chapter 11 Cases and a Trico Bailee, Carnaby IV Bailee, and Carnaby FA Bailee (each as defined below).

3.    Defendant Cardone Industries, Inc. is a Debtor in the Chapter 11 Cases and a Trico Bailee, Carnaby IV Bailee, and Carnaby FA Bailee.

4.    Defendant Carnaby Capital Holdings, LLC is a Debtor in the Chapter 11 Cases and a Carnaby IV Guarantor and Carnaby FA Guarantor (each as defined below).

5.    Defendant Carnaby Capital, LLC is a Debtor in the Chapter 11 Cases and a Carnaby IV Guarantor and Carnaby FA Guarantor.

6.    Defendant Carnaby FA Holdings, LLC is a Debtor in the Chapter 11 Cases and a Carnaby FA Guarantor.

_____

[10] A corporate organizational chart showing each of the Debtors and their direct and indirect non-Debtor affiliates (the "Non-Debtor Affiliates" and together with the Debtors, the "Company" or "First Brands"), as well as their equity holders, is available on the docket for the Chapter 11 Cases at *In re First Brands Group, LLC*, No. 25-90399 (CML) (Bankr. S.D. Tex.) [hereinafter *In re FBG*] [Docket No. 1] at 40, as amended by *FBG v. James*, [Docket No. 41-1].

FBG_CH1_00090288

**DEBTORS' EXHIBIT NO. 175**
**Page 63 of 1907**

7.      Defendant Carnaby FA, LLC ("Carnaby FA") is a Debtor in the Chapter 11 Cases and the lessee under the Carnaby FA MLA (as defined below).

8.      Defendant Carnaby Inventory IV, LLC ("Carnaby IV" and together with Carnaby FA, the "Carnaby Debtors") is a Debtor in the Chapter 11 Cases and the lessee under the Carnaby IV MLA (as defined below).

9.      Defendant Carter Fuel Systems, LLC is a Debtor in the Chapter 11 Cases and a Trico Bailee and Carnaby IV Bailee.

10.     Defendant Champion Laboratories, Inc. is a Debtor in the Chapter 11 Cases and a Trico Bailee and Carnaby IV Bailee.

11.     Defendant Dalton Corporation is a Debtor in the Chapter 11 Cases and a Trico Bailee.

12.     Defendant Eagle Casting Holdings, LLC is a Debtor in the Chapter 11 Cases and a Carnaby FA Guarantor.

13.     Defendant Eagle Casting, LLC is a Debtor in the Chapter 11 Cases and a Carnaby FA Guarantor.

14.     Defendant First Brands Group Holdings, LLC ("FB Holdings") is a Debtor in the Chapter 11 Cases and a Carnaby IV Guarantor and Carnaby FA Guarantor.

15.     Defendant First Brands Group, LLC (f/k/a Trico Group, LLC) ("FBG") is a Debtor in the Chapter 11 Cases and a Trico Guarantor.

16.     Defendant FRAMAuto Holdings, LLC is a Debtor in the Chapter 11 Cases and a Trico Bailee.

17.     Defendant FRAM Group Operations LLC is a Debtor in the Chapter 11 Cases and a Trico Bailee and Carnaby IV Bailee.

FBG_CH1_00090289

**DEBTORS' EXHIBIT NO. 175**
**Page 64 of 1907**

18.     Defendant Hopkins Manufacturing Corporation is a Debtor in the Chapter 11 Cases and a Trico Bailee and Carnaby IV Bailee.

19.     Defendant Horizon Global Americas Inc. is a Debtor in the Chapter 11 Cases and a Trico Bailee, Carnaby IV Bailee, and Carnaby FA Bailee.

20.     Defendant Horizon Global Company LLC is a Debtor in the Chapter 11 Cases and a Trico Bailee.

21.     Defendant Toledo Molding & Die, LLC is a Debtor in the Chapter 11 Cases and a Trico Bailee and Carnaby FA Bailee.

22.     Defendant Trico Products Corporation ("Trico" or "Trico Lessee") is a Debtor in the Chapter 11 Cases and the lessee under the Trico MLA (as defined below).

23.     Defendant Trico Technologies Corporation is a Debtor in the Chapter 11 Cases and a Trico Bailee and Carnaby FA Bailee.

24.     Defendant Viceroy Private Capital, LLC ("Viceroy") is a Debtor in the Chapter 11 Cases and a Carnaby IV Guarantor and Carnaby FA Guarantor.

25.     Defendant Walbro LLC is a Debtor in the Chapter 11 Cases and a Trico Bailee and Carnaby FA Bailee.

### C.     Cross-Claim Defendant

26.     Defendant Edward James is the brother of Patrick and former EVP, board member, and officer of Debtors.  Ed resigned from all positions he held as officer, director, or manager at all First Brands' entities on or about September 25, 2025.  Upon information and belief, Ed resides in the state of Ohio.

### D.     Third-Party Defendants

27.     Defendant Airtex Products, S.A. is a Debtor in the Chapter 11 Cases and a Trico Guarantor (as defined below).

FBG_CH1_00090290

**DEBTORS' EXHIBIT NO. 175**
**Page 65 of 1907**

28.     Defendant BPI Brake Manufacturing Juárez, S.A. de C.V. is a Non-Debtor Affiliate with its principal place of business in Chihuahua, Mexico and a Trico Bailee.

29.     Defendant Brake Parts Inc India LLC is a Debtor in the Chapter 11 Cases and a Trico Guarantor.

30.     BPI Brake System (Qingdao) Co., Ltd. is a Non-Debtor Affiliate with its principal place of business in Wangcheng District, Laixi City, China and a Trico Bailee.

31.     Defendant Brake Parts India Private Limited is a Non-Debtor Affiliate with its principal place of business in Delhi, India and a Trico Guarantor.

32.     Defendant Cardone de México, S. de R.L. de C.V. is a Non-Debtor Affiliate with its principal place of business in Tamaulipas, Mexico and a Carnaby FA Bailee.

33.     Defendant Carnaby Inventory Holdings IV, LLC is a Debtor in the Chapter 11 Cases and a Carnaby IV Guarantor.

34.     Defendant Cequent Electrical Products de México, S. de R.L. de C.V. is a Non-Debtor Affiliate with its principal place of business in Tamaulipas, Mexico and a Trico Bailee.

35.     Defendant Dalton Corporation, Warsaw Manufacturing Facility is a Debtor in the Chapter 11 Cases and a Trico Bailee.

36.     Defendant Eagle Machining, LLC ("Eagle Machining") is a Debtor in the Chapter 11 Cases and a Trico Bailee.

37.     Defendant First Brands Group Intermediate, LLC (f/k/a Trico Group Holdings, LLC) ("FB Intermediate") is a Debtor in the Chapter 11 Cases and a Trico Guarantor.

38.     Defendant Fram Group Operations Mexicali, S.A. de C.V. is a Non-Debtor Affiliate with its principal place of business in Baja California, Mexico and a Trico Bailee.

FBG_CH1_00090291

**DEBTORS' EXHIBIT NO. 175**
**Page 66 of 1907**

39. Defendant FRAM Group Operations Mexico City, S.A. de C.V. is a Non-Debtor Affiliate with its principal place of business in Estado de México, Mexico and a Trico Bailee.

40. Defendant Hopkins Manufacturing de México S. de R.L. de C.V. is a Non-Debtor Affiliate with its principal place of business in Chihuahua, Mexico and a Trico Bailee.

41. Defendant Jasper Rubber Products, Inc. is a Debtor in the Chapter 11 Cases and a Trico Bailee.

42. Defendant Longkou Haimeng Machinery Co., Ltd. is a Non-Debtor Affiliate with its principal place of business in Shandong Province, China and a Trico Bailee.

43. Defendant Peterson American Corporation is a Non-Debtor Affiliate incorporated in Michigan and a Trico Bailee.

44. Defendant Strongarm, LLC is a Debtor in the Chapter 11 Cases and a Trico Bailee.

45. Defendant Subensambles Internacionales, S. de R.L. de C.V. is a Non-Debtor Affiliate with its principal place of business in Chihuahua, Mexico and a Carnaby IV Bailee and Trico Bailee.

46. Defendant Talleres Mecanicos Montserrat, S.A. de C.V. is a Non-Debtor Affiliate with its principal place of business in Tlaxcala, Mexico and a Carnaby IV Bailee and Trico Guarantor.

47. Defendant Trico Belgium is a Non-Debtor Affiliate with its principal place of business in Aubange, Belgium and a Trico Bailee and Trico Guarantor.

48. Defendant Trico Componentes, S.A. de C.V. is a Non-Debtor Affiliate with its principal place of business in Tamaulipas, Mexico and a Carnaby IV Bailee and Trico Bailee.

49. Defendant Trico Italy S.R.l. is a Non-Debtor Affiliate with its principal place of business in Torino, Italy and a Trico Guarantor.

FBG_CH1_00090292

**DEBTORS' EXHIBIT NO. 175**
**Page 67 of 1907**

50.     Defendant Trico Wipers Ploiesti S.R.L. is a Non-Debtor Affiliate with its principal place of business in Prahova, Romania and a Carnaby FA Bailee and Trico Guarantor.

51.     Defendant Tridonex, S. de R.L. de C.V. is a Non-Debtor Affiliate with its principal place of business in Tamaulipas, Mexico and a Trico Bailee.

52.     Defendant Ultinon Motion Germany GmbH (f/k/a Lumileds Germany GmbH) is a Non-Debtor Affiliate with its principal place of business in Aachen, Germany and a Carnaby FA Bailee.

53.     Defendant Walbro Los Mochis, S. de R.L. de C.V. is a Non-Debtor Affiliate with its principal place of business in Sinaloa, Mexico and a Trico Bailee.

54.     Defendant Westfalia-Automotive GmbH is a Non-Debtor Affiliate with its principal place of business in Rheda-Wiedenbruck, Germany and a Carnaby FA Bailee.

55.     Defendant Witter Brasov S.R.L. is a Non-Debtor Affiliate with its principal place of business in Jud. Brașov, Romania and a Carnaby FA Bailee.

56.     Defendant Wilmington Savings Fund Society, FSB, [11] headquartered in Wilmington, Delaware, is the administrative agent, escrow agent, and collateral agent (in such capacity, the "DIP Agent") under that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of October 2, 2025 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), among FBG, FB Intermediate, the DIP Agent, OPY Credit Corp., as trading agent, and the lenders from time to time party thereto, and is named as a Defendant only in its capacity as such.

---

[11] For the avoidance of doubt, each Third-Party Defendant named in Paragraphs 56–63 is named only in the capacity indicated in the following paragraphs, and is included as a Third-Party Defendant solely to the extent that it may be in possession of, may become in possession of, or may be directed to act with respect to, Onset Property (as defined herein).

FBG_CH1_00090293

57.     Defendant Bank of America, N.A., headquartered in Charlotte, North Carolina, is the administrative agent and collateral agent (in such capacity, the "ABL Agent") under that certain ABL Credit Agreement, dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date (as defined below), the "ABL Credit Agreement"), among FBG, FB Intermediate, the other borrowers from time to time party thereto, the ABL Agent, and the lenders from time to time party thereto (collectively, the "ABL Lenders"), and is named as a Defendant only in its capacity as such.

58.     Defendants Sagard Holdings Manager (US) LLC, headquartered in New York, New York, and GLAS USA LLC, organized under the laws of New Jersey, are, together, the administrative agent and collateral agent (in such capacity, the "Sidecar Term Loan Agents") under that certain First Lien Term Loan Agreement, dated as of June 16, 2025 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "Sidecar Term Loan Agreement"), among FBG, FB Intermediate, the Sidecar Term Loan Agents, and the lenders from time to time party thereto (collectively, the "Sidecar Term Loan Lenders"), and is named as a Defendant only in its capacity as such.

59.     Defendant Jefferies Finance LLC ("Jefferies"), organized under the laws of Delaware, is (a) the administrative agent and collateral agent (in such capacity, the "First Lien Term Loan Agent" and, together with the Sidecar Term Loan Agents, the "First Lien Agents") under that certain First Lien Term Loan Agreement, dated as of February 2, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "First Lien Term Loan Agreement" and, together with the Sidecar Term Loan Agreement, the "First Lien Agreements"), among FBG, FB Intermediate, the First Lien Term Loan Agent, and the lenders and letter of credit issuers from time to time party thereto (collectively, the "First Lien

FBG_CH1_00090294

**DEBTORS' EXHIBIT NO. 175**
**Page 69 of 1907**

Term Loan Lenders" and, together with the Sidecar Term Loan Lenders, the "First Lien Lenders"), and (b) the administrative agent and collateral agent (solely in such capacity, the "Second Lien Term Loan Agent" and, together with the First Lien Agents, the "Term Loan Agents" and, collectively with the ABL Agent, the "Prepetition FBG Agents") under that certain Second Lien Term Loan Agreement dated as of February 26, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "Second Lien Term Loan Agreement" and, together with the First Lien Agreements, the "Prepetition Term Loan Agreements"), among FBG, FB Intermediate, the Second Lien Term Loan Agent, and the lenders from time to time party thereto (collectively, with the ABL Lenders, the "Prepetition FBG Lenders"), and is named as a Defendant only in its capacity as such.

60.    Aequum Capital Financial II LLC ("Aequum"), organized under the laws of Delaware, is the administrative agent under that certain Credit Agreement, dated as of March 28, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), among Debtor Broad Street Financial, LLC, Debtor Broad Street Financial Holdings, LLC, FBG (as servicer), Aequum, and the lenders party thereto, and is named as a Defendant only in its capacity as such.

61.    Evolution Credit Opportunity Master Fund II-B, L.P. ("Evolution"), organized under the laws of Delaware, is a lender under (a) that certain Uncommitted Inventory Finance Agreement, dated as of November 9, 2023, among Debtor Patterson Inventory, LLC and Evolution, guaranteed by Debtor Patterson Inventory Holdings, LLC (the "Patterson Facility"); and (b) that certain Uncommitted Inventory Finance Agreement, dated as of March 28, 2024, among Debtor Starlight Inventory I, LLC and Evolution, guaranteed by Starlight Inventory Holdings I, LLC, and is named as a Defendant only in its capacity as such.

66

FBG_CH1_00090295

**DEBTORS' EXHIBIT NO. 175**
**Page 70 of 1907**

62.     GLAS Trust Company LLC ("GLAS Trust"), organized under the laws of New Hampshire, is the administrative agent under (a) that certain Credit Agreement, dated as of May 31, 2022, among Debtor Carnaby Inventory II, LLC, FBG, FB Holdings, Debtor Carnaby Inventory Holdings II, LLC, GLAS Trust, and the lenders party thereto (the "Carnaby II Facility"); and (b) that certain Credit Agreement, dated as of July 6, 2022, among Debtor Carnaby Inventory III, LLC, FBG, FB Holdings, Debtor Carnaby Inventory Holdings III, LLC, GLAS Trust, and the lenders party thereto, and is named as a Defendant only in its capacity as such.

63.     UMB Bank, N.A. ("UMB"), headquartered in Kansas City, Missouri, is the administrative agent under that certain Credit Agreement, dated as of December 2, 2024, among Debtor Global Assets LLC, Debtor Global Assets GmbH, UMB, and the lenders party thereto, and is named as a Defendant only in its capacity as such.

64.     Defendant Patrick James Trust was created on March 10, 2005, with Patrick as Grantor and Thomas A. Haught as Trustee.

65.     Defendant Albion Realty, LLC ("Albion Realty"), incorporated on August 4, 2020, is a Delaware limited liability company under the control of Patrick.

66.     Defendant Alester Technologies LLC ("Alester"), incorporated on May 18, 2020, is a Delaware limited liability company under the control of Patrick.

67.     Defendant Battery Park Holdings LLC ("Battery Park"), incorporated on May 30, 2013, is a Delaware limited liability company under the control of Patrick.

68.     Defendant Larchmont, LLC ("Larchmont"), incorporated on April 17, 2006, is an Ohio limited liability company under the control of Patrick.

69.     Defendant Pegasus Aviation, LLC ("Pegasus Aviation"), incorporated on August 24, 2021, is a Delaware limited liability company under the control of Patrick.

67

FBG_CH1_00090296

**DEBTORS' EXHIBIT NO. 175**
**Page 71 of 1907**

70.     Defendant Bowery Finance II, LLC ("Bowery Finance II"), incorporated on March 4, 2021, is a Delaware limited liability company under the control of Patrick.

71.     Defendant Patrick James is First Brands' founder, ultimate owner, former CEO, and former manager.  Patrick resigned from all positions he held as an officer, director, or manager at all First Brands' entities on or about October 13, 2025.  Upon information and belief, Patrick resides in the state of Ohio.

72.     Defendant Michael Baker ("Baker") is First Brands' former Chief Corporate Strategy Officer.  Baker resigned from all positions he held as an officer, director, or manager at all First Brands' entities on or about September 25, 2025.  Prior to joining First Brands, Baker was a partner at a prominent U.S. law firm, where he chaired the firm's structured finance group.  Upon information and belief, Baker resides in the state of New Jersey.

73.     Defendant Peter Andrew Brumbergs ("Brumbergs") is First Brands' former Vice President of Finance.  On or about October 30, 2025, Brumbergs was terminated from all positions he held as an executive at all First Brands' entities.  And on January 27, 2026, DOJ announced, in connection with the James Brothers Indictment and arrest of Patrick and Ed, that Brumbergs had pleaded guilty to participating in the First Brands fraud scheme, namely, (a) conspiracy to commit wire fraud affecting a financial institution and bank fraud; (b) wire fraud affecting a financial institution; (c) bank fraud; and (d) conspiracy to commit money laundering, and that he is now cooperating with the government's prosecution of Patrick and Ed.[12]  Upon information and belief, Brumbergs resides in the state of Ohio.

---

[12] *United States v. Peter Andrew Brumbergs*, No. 26-cr-00025 (S.D.N.Y.); *First Brands Executives Charged With Multibillion-Dollar Fraud*, U.S. DEP'T OF JUSTICE (Jan. 29, 2025), https://www.justice.gov/usao-sdny/pr/first-brands-executives-charged-multibillion-dollar-fraud.

FBG_CH1_00090297

**DEBTORS' EXHIBIT NO. 175**
**Page 72 of 1907**

74.     Defendant Stephen Graham ("Graham") is First Brands' former Chief Financial Officer.  On or about October 30, 2025, Graham retired from all positions he held as an officer, director, or manager at all First Brands' entities.  Upon information and belief, Graham resides in the state of Ohio.

75.     Shekhar Kumar ("Kumar") is First Brands' current Senior Vice President.  Prior to joining First Brands, Kumar was a partner at the same prominent U.S. law firm as Baker, where he was a member of the firm's structured finance department.  Upon information and belief, Kumar resides in the state of Ohio.

76.     Defendants ABC Corporation(s) 1–100 are business entities or trusts that are in possession of the Onset Property (as defined below).

77.     Defendant John and Jane Doe(s) 1–100 are any persons or entities that are in possession of the Onset Property (as defined below).

## JURISDICTION AND VENUE

78.     This is an adversary proceeding arising under title 11 of the United States Code (the "Bankruptcy Code") in the jointly administered Chapter 11 Cases pending before this Court, the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

79.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

80.     The relief requested is appropriate pursuant to sections 105, 363, and 502 of the Bankruptcy Code and Rules 7001, 7013, and 7014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

81.     Venue in this Court is proper pursuant to 28 U.S.C. § 1409 because it arises under the Bankruptcy Code or arises in, or is related to, Debtors' bankruptcy cases pending before this Court.

FBG_CH1_00090298

**DEBTORS' EXHIBIT NO. 175**
**Page 73 of 1907**

82.     Onset does not consent to the entry of final orders or judgments by this Court with respect to this Complaint to the extent that it is later determined that the Court, absent such consent, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## PERSONAL JURISDICTION

83.     Where a federal statute or rule provides for nationwide service of process, as does Bankruptcy Rule 7004, a federal court has personal jurisdiction over any defendant having minimum contacts with the United States.

84.     Defendants are subject to personal jurisdiction pursuant to Bankruptcy Rule 7004 because Defendants have established minimum contacts with the United States by conducting business within the United States, including, but not limited to, the following:

a.     Defendant BPI Brake Manufacturing Juárez, S.A. de C.V. entered into one or more agreements with Onset for the bailment of property, which bailment was expressly subject to and governed by the terms of the Trico MLA. The Trico MLA is governed by Utah law and BPI Brake Manufacturing Juárez, S.A. de C.V. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, Onset is incorporated and has its principal place of business in the United States.

b.     Defendant BPI Brake System (Qingdao) Co., Ltd. entered into one or more agreements with Onset for the bailment of property, which bailment was expressly subject to and governed by the terms of the Trico MLA. The Trico MLA is governed by Utah law and BPI Brake System (Qingdao) Co., Ltd. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, Onset is incorporated and has its principal

70

FBG_CH1_00090299

**DEBTORS' EXHIBIT NO. 175**
**Page 74 of 1907**

place of business in the United States.

c.     Defendant Brake Parts India Private Limited is party to one or more agreements with Onset pursuant to which it guaranteed Trico's obligations to Onset. The guaranty agreements are governed by Utah law and Brake Parts India Private Limited submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, Onset is incorporated and has its principal place of business in the United States.

d.     Defendant Cardone de México, S. de R.L. de C.V. entered into one or more agreements with Onset for the bailment of property, which bailment was expressly subject to and governed by the terms of the Carnaby FA MLA. The Carnaby FA MLA is governed by Utah law and Cardone de México, S. de R.L. de C.V. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, Onset is incorporated and has its principal place of business in the United States.

e.     Defendant Cequent Electrical Products de México, S. de R.L. de C.V. entered into one or more agreements with Onset for the bailment of property, which bailment was expressly subject to and governed by the terms of the Trico MLA. Pursuant to certain of those bailment agreements, Cequent Electrical Products de México, S. de R.L. de C.V. represented its address as 127 Public Square, Suite 5300, Cleveland, Ohio 44114. The Trico MLA is governed by Utah law and Cequent Electrical Products de México, S. de R.L. de C.V. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, Onset is

71

FBG_CH1_00090300

**DEBTORS' EXHIBIT NO. 175**
**Page 75 of 1907**

incorporated and has its principal place of business in the United States.

f.     Defendant Fram Group Operations Mexicali, S.A. de C.V. entered into one or more agreements with Onset for the bailment of property, which bailment was expressly subject to and governed by the terms of the Trico MLA. The Trico MLA is governed by Utah law and Fram Group Operations Mexicali, S.A. de C.V. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, Onset is incorporated and has its principal place of business in the United States.

g.     Defendant FRAM Group Operations Mexico City, S.A. de C.V. entered into one or more agreements with Onset for the bailment of property, which bailment was expressly subject to and governed by the terms of the Trico MLA. Pursuant to certain of those bailment agreements, FRAM Group Operations Mexico City, S.A. de C.V. represented its address as 127 Public Square, Suite 5300, Cleveland, Ohio 44114. The Trico MLA is governed by Utah law and FRAM Group Operations Mexico City, S.A. de C.V. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, Onset is incorporated and has its principal place of business in the United States.

h.     Defendant Hopkins Manufacturing de México S. de R.L. de C.V. entered into one or more agreements with Onset for the bailment of property, which bailment was expressly subject to and governed by the terms of the Trico MLA. Pursuant to certain of those bailment agreements, Hopkins Manufacturing de México S. de R.L. de C.V. represented its address as 428

72

FBG_CH1_00090301

**DEBTORS' EXHIBIT NO. 175**
**Page 76 of 1907**

Peyton Street, Emporia, Kansas 66801. The Trico MLA is governed by Utah law and Hopkins Manufacturing de México S. de R.L. de C.V. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, Onset is incorporated and has its principal place of business in the United States.

i.    Defendant Longkou Haimeng Machinery Co., Ltd. entered into one or more agreements with Onset for the bailment of property, which bailment was expressly subject to and governed by the terms of the Trico MLA.  The Trico MLA is governed by Utah law and Longkou Haimeng Machinery Co., Ltd. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, Onset is incorporated and has its principal place of business in the United States.

j.    Defendant Peterson American Corporation entered into one or more agreements with Onset for the bailment of property, which bailment was expressly subject to and governed by the terms of the Trico MLA.  The Trico MLA is governed by Utah law and Peterson American Corporation submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, Onset is incorporated and has its principal place of business in the United States.

k.    Defendant Subensambles Internacionales, S. de R.L. de C.V. entered into one or more assignment agreements with Carnaby IV and Onset which incorporated by reference the terms of the Carnaby IV MLA and were performed at least in part in the state of Utah. The Carnaby IV MLA is

73

FBG_CH1_00090302

governed by Utah law and Subensambles Internacionales, S. de R.L. de C.V. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, each of Carnaby IV and Onset are incorporated and have their principal place of business in the United States.

l.    Defendant Talleres Mecanicos Montserrat, S.A. de C.V. entered into one or more assignment agreements with Carnaby IV and Onset which incorporated by reference the terms of the Carnaby IV MLA and were performed at least in part in the state of Utah. The Carnaby IV MLA is governed by Utah law and Talleres Mecanicos Montserrat, S.A. de C.V. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, each of Carnaby IV and Onset are incorporated and have their principal place of business in the United States.

m.    Defendant Trico Belgium is party to one or more agreements with Onset pursuant to which it guaranteed Trico's obligations to Onset. The guaranty agreements are governed by Utah law and Trico Belgium submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, Onset is incorporated and has its principal place of business in the United States.

n.    Defendant Trico Componentes, S.A. de C.V. entered into one or more assignment agreements with Carnaby IV and Onset which incorporated by reference the terms of the Carnaby IV MLA and were performed at least in part in the state of Utah. The Carnaby IV MLA is governed by Utah law and

74

FBG_CH1_00090303

DEBTORS' EXHIBIT NO. 175
Page 78 of 1907

Trico Componentes, S.A. de C.V. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, each of Carnaby IV and Onset are incorporated and have their principal place of business in the United States.

o.   Defendant Trico Italy S.R.L.  is party to one or more agreements with Onset pursuant to which it guaranteed Trico's obligations to Onset. The guaranty agreements are governed by Utah law and Trico Italy S.R.L. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, Onset is incorporated and has its principal place of business in the United States.

p.   Defendant Trico Wipers Ploiesti S.R.L. entered into one or more assignment agreements with Carnaby FA and Onset which incorporated by reference the terms of the Carnaby FA MLA and were performed at least in part in the state of Utah. The Carnaby FA MLA is governed by Utah law and Trico Wipers Ploiesti S.R.L. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, each of Carnaby FA and Onset are incorporated and have their principal place of business in the United States.

q.   Defendant Tridonex, S. de R.L. de C.V. entered into one or more agreements with Onset for the bailment of property, which bailment was expressly subject to and governed by the terms of the Trico MLA. The Trico MLA is governed by Utah law and Tridonex, S. de R.L. de C.V. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection

75

FBG_CH1_00090304

therewith. In addition, Onset is incorporated and has its principal place of business in the United States.

r.      Defendant Ultinon Motion Germany GmbH (f/k/a Lumileds Germany GmbH) entered into one or more assignment agreements with Carnaby FA and Onset which incorporated by reference the terms of the Carnaby FA MLA and were performed at least in part in the state of Utah. The Carnaby FA MLA is governed by Utah law and Ultinon Motion Germany GmbH submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, each of Carnaby FA and Onset are incorporated and have their principal place of business in the United States.

s.      Defendant Walbro Los Mochis, S. de R.L. de C.V. entered into one or more agreements with Onset for the bailment of property, which bailment was expressly subject to and governed by the terms of the Trico MLA. The Trico MLA is governed by Utah law and Walbro Los Mochis, S. de R.L. de C.V. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, Onset is incorporated and has its principal place of business in the United States.

t.      Defendant Westfalia-Automotive GmbH entered into one or more assignment agreements with Carnaby FA and Onset which incorporated by reference the terms of the Carnaby FA MLA and were performed at least in part in the state of Utah. The Carnaby FA MLA is governed by Utah law and Westfalia-Automotive GmbH submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, each

76

FBG_CH1_00090305

DEBTORS' EXHIBIT NO. 175
Page 80 of 1907

of Carnaby FA and Onset are incorporated and have their principal place of business in the United States.

u.　Defendant Witter Brasov S.R.L. entered into one or more assignment agreements with Carnaby FA and Onset which incorporated by reference the terms of the Carnaby FA MLA and were performed at least in part in the state of Utah. The Carnaby FA MLA is governed by Utah law and Witter Brasov S.R.L. submitted to the jurisdiction of the state and federal courts sitting in Utah in connection therewith. In addition, each of Carnaby FA and Onset are incorporated and have their principal place of business in the United States.

v.　Wilmington Savings Fund Society, FSB is organized under the laws of a state within the United States and has its principal place of business in the United States.

w.　Bank of America, N.A. is organized under the laws of a state within the United States and has its principal place of business in the United States.

x.　Sagard Holdings Manager (US) LLC is organized under the laws of a state within the United States and has its principal place of business in the United States.

y.　GLAS USA LLC is organized under the laws of a state within the United States and has its principal place of business in the United States.

z.　Jefferies Finance LLC is organized under the laws of a state within the United States and has its principal place of business in the United States.

aa.　Aequum Capital Financial II LLC is organized under the laws of a state

77

FBG_CH1_00090306

**DEBTORS' EXHIBIT NO. 175**
**Page 81 of 1907**

within the United States and has its principal place of business in the United States.

bb.     Evolution Credit Opportunity Master Fund II-B, L.P. is organized under the laws of a state within the United States and has its principal place of business in the United States.

cc.     GLAS Trust Company LLC is organized under the laws of a state within the United States and has its principal place of business in the United States.

dd.     UMB Bank, N.A. is organized under the laws of a state within the United States and has its principal place of business in the United States.

ee.     Defendant Patrick James Trust was created in, and continues to be located in, the United States.  Defendant Patrick James Trust holds bank accounts located in the United States.

ff.     Defendant Albion Realty was created in, and continues to operate in, the United States.  Defendant Albion Realty is incorporated in Delaware and holds bank accounts located in the United States.

gg.     Defendant Alester was created in, and continues to operate in, the United States.  Defendant Alester is incorporated in Delaware and holds bank accounts located in the United States.

hh.     Defendant Battery Park was created in, and continues to operate in, the United States.  Defendant Battery Park is incorporated in Delaware and holds bank accounts located in the United States.

ii.     Defendant Larchmont was created in, and continues to operate in, the United States.  Defendant Larchmont is incorporated in Ohio and holds bank

FBG_CH1_00090307

DEBTORS' EXHIBIT NO. 175
Page 82 of 1907

accounts located in the United States.

jj.   Defendant Pegasus Aviation was created in, and continues to operate in, the United States.  Defendant Pegasus Aviation is incorporated in Delaware and holds bank accounts located in the United States.

kk.   Defendant Bowery Finance II was created in, and continues to operate in, the United States.  Defendant Bowery Finance II is incorporated in Delaware and holds bank accounts located in the United States.

ll.   Defendant Patrick James owns interests in, and served as an executive of, a United States-based company relevant to the causes of action asserted herein and owns real and personal property in the United States.  Defendant Patrick is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

mm.   Defendant Edward James owns interests in, and served as an executive of, a United States-based company relevant to the causes of action asserted herein and owns real and personal property in the United States.  Defendant Ed is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

nn.   Defendant Michael Baker served as an officer and executive of a United States-based company relevant to the causes of action asserted herein.  Defendant Baker is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

oo.   Defendant Peter Andrew Brumbergs served as an executive of a United States-based company relevant to the causes of action asserted herein.

79

FBG_CH1_00090308

**DEBTORS' EXHIBIT NO. 175**
**Page 83 of 1907**

Defendant Brumbergs is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

pp.    Defendant Stephen Graham served as an officer and executive of a United States-based company relevant to the causes of action asserted herein. Defendant Graham is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

qq.    Defendant Shekar Kumar served as an officer and executive of a United States-based company relevant to the causes of action asserted herein. Defendant Kumar is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

## GENERAL ALLEGATIONS

### A.    General Overview of Onset and Its Transactions with the Debtors

#### i.    Onset Is a Market-Leading Provider of Flexible and Creative Capital Solutions

85.    Founded in 2008 by Justin Nielsen, its CEO and sole shareholder, and headquartered in Utah, Onset is a leader in the equipment leasing and financing industry. Onset has financed billions of dollars in lease agreements with companies that range from small businesses to large-cap companies across various industries including automotive, aircraft, medical equipment, computers, and data processing. Onset's ability to compete with commercial banks and global financial centers is based on, among other things, (a) providing access to non-traditional capital; (b) structuring complex and challenging transactions; (c) providing certainty of capital at close; and (d) conducting a streamlined process.

80

FBG_CH1_00090309

**DEBTORS' EXHIBIT NO. 175**
**Page 84 of 1907**

86.     Onset structures and funds leases for a wide range of industries, offering flexible options such as deferred payments, step payments, and progress funding.  Onset maintains a strong presence in the national commercial finance market and a disciplined underwriting process designed to ensure that each transaction is sound and tailored to its clients' needs.  Onset is recognized for its broad industry reach and award-winning corporate culture.

### ii.     General Overview of Onset's Transactions with First Brands

87.     Since 2018, Onset has provided First Brands with significant liquidity.  Beginning in 2018, Onset and First Brands entered into a series of transactions that included both (a) direct leases of automotive manufacturing furniture, fixtures, equipment, inventory, and other assets newly purchased by Onset (the "Trico Transactions"); and (b) sale-leaseback transactions structured using the Carnaby Debtors—four SPV conduit entities created and maintained by First Brands—from which Onset purchased automotive manufacturing furniture, fixtures, equipment, inventory, and other assets acquired by the Carnaby Debtors from a First Brands subsidiary and immediately leased those same assets back to the same entity (the "Carnaby Transactions" and, together with the Trico Transactions, the "Onset Transactions").[13]

88.     Pursuant to the Onset Transactions, from 2018 to 2025, Onset funded (a) in connection with the Trico Transactions, more than approximately $114,500,000 on account of Trico Inventory and more than approximately $524,700,000 on account of Trico Equipment; and (b) in connection with the Carnaby Transactions, more than approximately $1,619,600,000 on account of Carnaby Inventory and more than approximately $711,400,000 on account of Carnaby

---

[13] The four SPV entities are (i) Carnaby IV, (ii) Carnaby FA, (iii) Carnaby I (as defined below), and (iv) Eagle Machining.  The transactions with Carnaby I and Eagle Machining were opened and closed prior to the Petition Date.

FBG_CH1_00090310

Equipment (each as defined below).  Onset also funded more than approximately $50,000,000 on account of equipment for Eagle Machining.[14]

### iii.        Trico (Direct) Transactions

#### a.        Trico Transactions Overview

89.        Beginning in May 2018, Trico and Onset entered into the Trico Transactions relating to inventory, furniture, fixtures, manufacturing, and other equipment (together with any other assets described in the Trico Lease Schedules (as defined below), as applicable, the "Trico Inventory" and the "Trico Equipment" and, collectively, the "Trico Property").  The terms of the Trico Transactions were governed by a single master lease agreement, titled Master Lease Agreement No. OFI1045321, dated May 9, 2018, between Trico (which became a wholly owned subsidiary of First Brands following a corporate restructuring), as lessee, and Onset, as lessor (the "Trico MLA").  The Trico MLA covered a series of independent but related transactions between First Brands and Onset.[15]

90.        The first of the Trico Transactions—and the business relationship between Onset and First Brands—began when an Onset sales and marketing account executive placed a cold call in the ordinary course to Trico to describe and offer Onset's leasing programs as a potential funding source.  At the time, Trico had many premium-label automotive parts companies in its portfolio; it would later, following a corporate restructuring, become the main operating entity for the overall enterprise.  The First Brands portfolio had an average operating history of approximately 70 years and included companies with well-known brand names like FMP Bendix, Raybestos, Carlson,

---

[14] With respect to the equipment for Eagle Machining, all leases were commenced in December of 2021 and had a 36-month term.

[15] A copy of the Trico MLA is attached hereto as Exhibit 3.  The Trico MLA is governed by Utah law.  (*See* Ex. 3 (Trico MLA, §§ 20(e), 22(f)).)

FBG_CH1_00090311

**DEBTORS' EXHIBIT NO. 175**
**Page 86 of 1907**

Lumileds Phillips, Pylon, Autolite, Carter, Westfalia, FloTool, and FRAM. After several introductory initial discussions between Onset and First Brands about financing options, Ed became involved in the discussions and took the lead in negotiations on behalf of First Brands. Ed introduced himself to Onset as the EVP of First Brands and as the brother of the company's 100% owner, Patrick.

91. During these initial negotiations in early 2018, an Onset senior officer had several conversations with Ed, during which Ed explained First Brands' reasons for being interested in Onset's funding. In a deceptive theme that would be repeated frequently throughout the course of the First Brands dealings with Onset to induce Onset to provide funding, Ed described how Onset's funding would help First Brands accomplish its growth strategy of acquiring companies in the automotive parts sector. Ed explained that First Brands would use traditional syndicated lending sources to directly fund its acquisitions, while Onset's funding would be used to pay for expenses incurred in consolidating and realizing synergies from the newly acquired companies, including working capital for day-to-day operations. According to Ed, this strategy would ultimately create enormous cost savings for First Brands and boost long-term profitability. Each time First Brands added another automotive parts company to its premium portfolio with the aid of financing from Onset, Onset was led by Ed and other First Brands officers to believe that First Brands intended to consolidate, reduce expenses, and boost revenues.

92. Ed's pitch to Onset was as follows: When First Brands acquired a company, efficiencies could be gained by consolidating manufacturing lines and personnel from that newly acquired company. While traditional financing sources would provide the capital to buy the new company, executing on these synergies also cost money; First Brands therefore required additional, shorter-term financing. As Ed explained (and other First Brands officers reiterated), Onset's

83

FBG_CH1_00090312

DEBTORS' EXHIBIT NO. 175
Page 87 of 1907

shorter-term funding would pay the cost of these consolidations. Onset accordingly understood that its funding would enable consolidations and create efficiencies, which would drive long-term profitability. Onset's shorter-term financing would therefore help nurture, support, and propel First Brands' growth and create a healthier, more profitable business.

93.     As discussions about the Trico Transactions advanced, First Brands engaged its in-house and outside counsel to negotiate the transactions' terms with Onset. Specifically, First Brands retained several highly regarded international law firms, including the firm where Baker and Kumar were partners (and where Baker chaired a premier structured finance group). Although Onset initially proposed using its standard lease agreement that it had used with numerous other clients, the Trico Transactions were heavily negotiated between Onset and First Brands, with First Brands' sophisticated outside counsel insisting on changes to Onset's form agreement. Most changes were deeply favorable to First Brands, including, for example, the option for First Brands to prepay the operating leases at the stipulated loss value. Many of these favorable terms that First Brands and its counsel introduced in the early Trico agreements were used—at First Brands' continued insistence—in later Trico and Carnaby agreements. Having worked as counsel for First Brands for years, Baker and Kumar were intimately familiar with the provisions and intricacies of the Trico and Carnaby Lease Documents.

94.     During the course of the negotiations, Onset conducted standard due diligence. This included reviewing First Brands' financial statements that had been audited by highly regarded outside auditors, including BDO.[16] The 2018 audited statements showed approximately $500 million in revenue and nearly $150 million in EBITDA. Onset also reviewed corporate

---

[16] Cohen & Company performed the First Brands audits for 2018 and 2019. BDO came on as First Brands' auditor beginning in 2020, the size and experience of which gave Onset added comfort.

FBG_CH1_00090313

DEBTORS' EXHIBIT NO. 175
Page 88 of 1907

formation documents to confirm First Brands' organizational structure and corporate governance, finding a suite of experienced and well-respected industry leaders at the helm. For example, the Trico MLA was executed by Graham, First Brands' CFO. Graham had been the company's CFO since 2014 and was First Brands' CFO following the corporate restructure. He had nearly 30 years of financial and operational experience, including 20 years of prior experience as CFO of several companies in the automotive parts sector.

### b.   Structure of Trico Transactions

95.   The structure of the Trico Transactions, which spanned the period May 2018 to July 2025, involved several "steps": first, Onset would acquire property either directly from a manufacturer or from Trico; second, Onset would lease the acquired property to Trico; and third, the leased property was delivered to an operating First Brands entity that held the property as a "bailee" on behalf of Trico but disclaimed title to such property. These steps, illustrated in the following diagram, are described in detail below.



2.   **In step one**, Onset acquired the Trico Property as follows:

- Trico sold Trico Inventory and Trico Equipment to Onset pursuant to Sale and Leaseback Agreements (the "Trico SLAs"),[17] which contained a purchase price and referenced a schedule of assets sold, all of which are located at specified premises. Under the Trico SLAs, title and ownership

---

[17] Attached hereto as Exhibit 4 is a true and correct copy of a sample Trico SLA (Trico SLA to Lease Schedule No. 015). Although most SLAs involved the sale of Trico Inventory, in some instances, Onset acquired Trico Equipment from Trico pursuant to SLAs. (*See, e.g., id.*)

FBG_CH1_00090314

**DEBTORS' EXHIBIT NO. 175**
**Page 89 of 1907**

of the subject Trico Property passed from Trico, or affiliated entities, as seller, to Onset, as buyer; or

- Onset acquired Trico Equipment from the manufacturer in accordance with a Master Progress Payment Agreement, dated May 9, 2018 (the "Trico MPPA").[18]   Under the Trico MPPA, upon Onset's payments to the vendor(s) thereunder, title to the subject Trico Equipment vested in Onset, and such Trico Equipment was delivered to Trico (or the applicable Trico Bailee (as defined below)).   Trico then sold and assigned any purchase orders and contracts related to the Trico Equipment to Onset, and all of its right, title and interest in such items.

Onset funded all amounts it paid under the Trico SLAs, Trico MPPAs directly to a bank account designated in the name of Trico or, in the case of most of the Trico Equipment, the applicable manufacturer.

96.     **In step two**, Onset leased the applicable Trico Property to Trico.  To document this transaction, Onset and Trico executed a schedule to the Trico MLA (each, a "Trico Lease Schedule" and, together with the Trico MLA and all other documents executed in connection therewith, the "Trico Lease Documents")[19] that was specific to individual pieces of Trico Property.[20]  Section 1 of each Trico Lease Schedule specified the "Property," typically by category and location, and included "replacements."  (*See, e.g.*, Ex. 7 (Trico Lease Schedule 019, § 1 (ONSET_00034437)).)  For example, in the case of Trico Lease Schedule No. 019, the agreement provided as follows:

> SECTION 1 Property: All inventory as identified by specific part numbers, consisting of raw components, component parts, all after-acquired raw components, work in progress, and finished goods, and as it relates to inventory maintained, kept and/or stored at Framauto Holdings, LLC located in Mexicali, Mexico, and any and all attachments, accessions, additions, enhancements and replacements

_____

[18] A copy of the Trico MPPA is attached hereto as Exhibit 5.

[19] Attached hereto as Exhibit 6 is a true and correct copy of a sample Trico Lease Schedule (Trico Lease Schedule No. 028 (ONSET_00034827)).  The Trico Lease Schedules are governed by Utah law.  (*See* Ex. 3 (Trico MLA, §§ 20(e), 22(f)).)

[20] In one instance, FRAMAuto Holdings, LLC is identified as a co-lessee with Trico.  (*See* Ex. 7 (Trico Lease Schedule No. 019 (ONSET_00034437)).

FBG_CH1_00090315

**DEBTORS' EXHIBIT NO. 175**
**Page 90 of 1907**

> of any of the foregoing, as more fully described in an Exhibit A to the Acceptance and Delivery Certificate (collectively, the "Property")."

(*Id.*) In addition, in connection with the Trico Lease Schedules, Trico executed Acceptance and Delivery Certificates that contained a description of the "Property" subject to the applicable Trico Lease Schedule that was similar to the description set forth in the Trico Lease Schedule (the "Trico Acceptance & Delivery Certificates").[21]

97.     Each Trico Lease Schedule incorporated the terms of the Trico MLA, subject to certain modifications, and imposed additional covenants and repayment obligations. Pursuant to the Trico MLA and related Trico Lease Schedule, First Brands warranted and represented that any Trico Property transferred from Trico to Onset was "free and clear of all liens, security interests, and encumbrances." (*See* Ex. 3 (Trico MLA, § 9(a)).)

98.     The Trico Lease Documents unambiguously provided that Onset retained title to the Trico Property at all times and that Trico had "no right, title or interest therein except as to the use thereof subject to the terms and conditions of the [Trico] Lease [Schedule]" until either (a) its sale of Trico Inventory to third parties in the ordinary course; or (b) in certain instances involving the Trico Equipment, its acquisition by Trico at the expiration of the lease term. (*See* Ex. 3 (Trico MLA, § 9(a)).) In connection with the execution of each Trico Lease Schedule, Trico also granted Onset a "back-up" security interest in the leased Trico Property. (*See id.* § 20(a).) In connection with these transactions, Onset properly filed UCC-1 financing statements with respect to all of the

---

[21] Attached hereto as Exhibit 6 is a true and correct copy of a sample Trico Acceptance & Delivery Certificate (Trico Lease Schedule No. 028 Acceptance and Delivery Certificate (ONSET_00034805)).

FBG_CH1_00090316

**DEBTORS' EXHIBIT NO. 175**
**Page 91 of 1907**

Trico Property against Trico.[22]  (*See, e.g.*, Ex. 8 (Trico Lease Schedule No. 028, UCC-1 Financing Statement).)

99.    The Trico Lease Documents were executed by Ed, Graham, Kumar, and Brian Troyer (then in-house counsel at First Brands, who later left First Brands but continued to represent it as outside counsel).  In these and other instances, Ed acted pursuant to corporate resolutions and certificates of incumbency according to which he was bestowed "sufficient authority to act on behalf of and to bind the Corporation with respect to transactions involving the leasing of equipment or other personal property," which would "constitute a legally binding and enforceable obligation of the Corporation" (the "Corporate Resolutions").  (*See, e.g.*, Ex. 11 (Action of the Board of Directors of Trico Products Corporation; Ex. 12 (Trico Products Corporation Certificate of Incumbency, § 3).)  First Brands ultimately provided Corporate Resolutions that empowered Ed to bind and act on behalf of not only First Brands, but on behalf of the Trico and Carnaby Guarantors (as defined below) as well.

100.    **In step three** of the Trico Transactions, Trico Property was delivered to a First Brands affiliate as "bailee" (the "Trico Bailees"), which was acknowledged in each Lease Schedule.  (*See, e.g.*, Ex. 6 (Trico Lease Schedule No. 028, § 11(i) (ONSET_00034829)).)  The table attached hereto as **Appendix A** identifies each of the Trico Bailees by Trico Lease Schedule.

101.    The Trico Bailees executed Acknowledgement and Waivers (the "Trico A&Ws") in which they disclaimed ownership and subordinated their interests in the assets to those of Onset,

---

[22] According to the Trico Lease Documents, if the value of the property was less than certain amounts, Trico would grant a security interest to Onset in the proceeds of the property and Onset would be authorized to amend its UCC-1 financing statement.  More generally, Onset always filed a UCC-1 against either Trico or the Carnaby Debtors concerning the equipment or inventory that it acquired.  Each of Onset's UCC-1 filings identify the collateral—either the inventory or fixed assets—by sufficient detail—including the location of collateral—as well as all replacement parts, accessions, replacements, and proceeds therefrom.  (*See, e.g.*, Ex. 8 (Trico Lease Schedule No. 028, UCC-1 Financing Statement); Ex. 9 (Carnaby FA Lease Schedule 008, UCC-1 Financing Statement); Ex. 10 (Carnaby IV Lease Schedule No. 027, UCC-1 Financing Statement).)

FBG_CH1_00090317

**DEBTORS' EXHIBIT NO. 175**
**Page 92 of 1907**

as owner, and Trico, as lessee/bailor.[23]  The Trico A&Ws make clear that the Trico Bailees have no interest in the Trico Property and are solely holding such property, in its possession, on behalf of Trico (which is acknowledged to be the seller thereof).  (*See, e.g.,* Ex. 6, ¶ 1 (ONSET_00034802).)

102.  Following the completion of diligence and the execution of all applicable Trico Lease Documents, Onset and Trico executed a Lease Commencement Letter (a "Trico Lease Commencement Letter") identifying the start date of the applicable Trico Lease Schedule and the payment amount due to Onset under the applicable Trico Lease Schedule.[24]  In some instances, Onset and Trico executed a Notice of Assignment (a "Trico NOA").[25]

103.  Prior to the funding of any amounts, Onset required—and in each instance received—a confirmation by email from First Brands officers and representatives, including, without limitation, Ed and Kumar, that all documentation had been truthfully executed.  (*See infra* ¶ 157.)  Only then would Onset initiate the funding.

104.  Once the relevant Trico Transaction closed, Trico sold the leased Trico Inventory in the ordinary course of business.  The proceeds of those sales were to be remitted and used to make the monthly payments owed to Onset as lessor (the "Trico Monthly Lease Payments").  In the Trico Lease Schedules for Trico Inventory, Onset agreed that its lien on any Trico Property, and any right, title, or interest it had in such property, would be automatically released upon the sale or transfer of such property by Trico in the ordinary course of its business.  (*See, e.g.,* Ex. 7

---

[23] Attached hereto as Exhibit 6 is a true and correct copy of a sample Trico A&W (Trico Lease Schedule No. 028, A&W with Strongarm, LLC (ONSET_00034802).)  All Trico Bailees other than Trico Belgium executed a Trico A&W; Trico Belgium instead included a similar waiver provision within its assignment document disclaiming ownership and subordination of its interest in the Trico Property to Onset.

[24] Attached hereto as Exhibit 7 is a true and correct copy of a sample Trico Lease Commencement Letter (Trico Lease Schedule No. 019, Lease Commencement Letter (ONSET_00034433)).

[25] Attached hereto as Exhibit 13 is a true and correct copy of a sample Trico NOA (Trico Lease Schedule No. 028, NOA (ONSET_00034831)).

FBG_CH1_00090318

**DEBTORS' EXHIBIT NO. 175**
**Page 93 of 1907**

(Trico Lease Schedule 019, § 1 (ONSET_00034437)).)   The rates of return on the Trico Transactions were similar to other transactions of this type, including with other Onset clients, for which the rates of return were comparable or, in some instances, higher.

> c.      Status of Trico Transactions

105.    Since the inception of the Trico Transactions in May 2018, Onset and Trico have executed 48 Trico Lease Schedules.   On average, the Trico Lease Schedules have an initial duration of approximately 35 months, with 22 months being the shortest and 54 months being the longest lease schedule.

106.    Pursuant to the Trico Transactions, Onset funded approximately $639,300,000, which includes $463,900,000 to Trico in connection with the Trico SLAs and $175,400,000 to third-party manufacturers pursuant to the Trico MPPA.   Of these amounts, Onset funded approximately $114,500,000 relating to Trico Inventory and approximately $524,800,000 relating to Trico Equipment.

107.    In total, 25 Trico Lease Schedules were fully repaid and closed out prior to the Petition Date, with 23 schedules still open today.  Prior to the Petition Date, Trico timely performed all of its obligations under the Trico Lease Schedules, including payment of all Trico Monthly Lease Payments thereunder.

> d.      Summary and Status of Trico Obligations

108.    The obligations of Trico under the Trico Lease Documents were guaranteed (each, a "Trico Guarantee" and, collectively, the "Trico Guarantees") by certain affiliates of First Brands consisting of Airtex Products, S.A., Brake Parts Inc India LLC, Brake Parts India Private Limited, FB Intermediate, Talleres Mecanicos Montserrat S.A. de C.V., Trico Belgium, Trico Group, LLC, Trico Italy S.R.L., and Trico Wipers Ploiesti S.R.L.  (each, a "Trico Guarantor" and, collectively,

FBG_CH1_00090319

DEBTORS' EXHIBIT NO. 175
Page 94 of 1907

the "Trico Guarantors" and, together with the Trico Lessee, the "Trico Obligors").[26]  Through the Trico Guarantees, the Trico Guarantors irrevocably and unconditionally guaranteed payment and performance of the Trico Lessee's obligations under each Trico Lease Schedule (the "Trico Obligations").  Onset is the beneficiary of each Trico Guaranty, and the terms of each Trico Guaranty are identical in all material respects.

109.   As of the Petition Date, there are approximately $294,300,000 in remaining Trico Obligations under the Trico Lease Schedules, which consist of approximately (a) $9,671,400 on account of transactions relating to Trico Inventory, and (b) $284,600,000 on account of transactions relating to Trico Equipment (in each case, excluding accrued and unpaid interest, fees, and other amounts).  Following receipt of Onset's court-authorized adequate protection payments during the First Brands Chapter 11 Cases, the remaining Trico Obligations under the Trico Lease Schedules are approximately $279,800,000, which consists of approximately $7,500,000 on account of Trico Inventory and approximately $272,300,000 on account of Trico Equipment.

e.      Trico Transactions Period

110.   As Onset and Trico executed additional Trico Lease Schedules, First Brands senior officers regularly provided Onset with First Brands' audited financial statements every year from 2021 through 2025, typically in or around April of each year.  Onset also conducted numerous in-person inspections of First Brands' facilities that contained the equipment and inventory that Onset was leasing to Trico under the Trico Lease Schedules, including, for example, in February 2021, August 2022, July 2024, and during the summer of 2025.  The inspections confirmed, again and again, that the facilities were operational, brimming with equipment and raw materials, and producing finished goods and inventory subject to the Trico Lease Schedules.

_____

[26] Copies of the Trico Guarantees are attached hereto as Exhibits 14 through 22.

91

FBG_CH1_00090320

**DEBTORS' EXHIBIT NO. 175**
**Page 95 of 1907**

111.    During the same period, First Brands reported robust growth that appeared to validate the acquisition-fueled strategy that Patrick and Ed had outlined in 2018 when First Brands' business relationship with Onset first began.   Indeed, Patrick himself reiterated First Brands' purported growth strategy in an in-person meeting he had with Onset leadership and a funding partner on or about September 7, 2018 at First Brands' headquarters in Cleveland.   During that meeting, which Ed facilitated and attended, Patrick outlined the First Brands' strategy of growth through acquisitions, emphasizing that First Brands targeted companies with supply chains originating in Mexico and Europe, but not in Asia, which was vulnerable to geopolitical and other impediments.   This in-person meeting confirmed for Onset that Ed was his brother's trusted lieutenant and spokesperson, as he had consistently held himself out.   During the course of their business dealings, Ed frequently represented to Onset that he was speaking for and on behalf of Patrick, that Patrick was responsible for approving all decisions with respect to the First Brands/Onset relationship, and that Ed had full authority to act on behalf of Patrick and First Brands Group.  (*See, e.g.*, Ex. 11 (Action of the Board of Directors of Trico Products Corporation); Ex. 12 (Trico Products Corporation Certificate of Incumbency, § 3).)  Ed reaffirmed to Onset on many occasions that when Onset was speaking with Ed, Onset was speaking with Patrick—Ed, so he said, had Patrick's unequivocal endorsement.

112.    The financial statements provided to Onset during this period, including those audited by BDO, showed that First Brands' revenue grew from nearly $500 million in 2018 to $2.83 billion in 2022.  Further, First Brands' EBITDA leapt from $144 million to $1 billion during the same period.[27]

---

[27] Ed provided Onset with First Brands' audited financial statements every year from 2021 through 2025.  Ed knew or had reason to expect that Onset would review and rely on the information contained in these audited financial statements.

FBG_CH1_00090321

113.    Equally as important, First Brands' audited financial statements showed that the company's unrestricted cash on its balance sheet—that is, cash not including available lines of credit—also grew, and considerably, from approximately $39 million in 2018 to $712 million in 2022.  This last metric was critical for Onset, since it showed that First Brands was more than safely navigating all of its debt sources, including the funding from Onset.  The steady stream of financial information First Brands provided to Onset, including audited financial statements, confirmed to Onset that the acquisition-growth strategy Ed had pitched to Onset appeared to be working.  Onset believed it was playing an important role in aiding the growth of an American company building a family of long-established and reputable automotive parts brands.

114.    This apparent successful growth, reflected in the audited financial statements, was confirmed by numerous credible public and media reports of First Brands' acquisitions, including of Airtex, Autolite, FRAM, Anco, International Brake Industries, Centric, Raybestos, Luber Finer, PetroClear and Pylon.  What's more, First Brands' audited financial statements showed that, during this period of intense acquisitions, First Brands' EBITDA margins were also growing.  Starting at 16% in 2018—when the Onset relationship began—EBITDA margins increased to 27% in 2022—an increase of nearly 70%.  These figures also indicated to Onset that the expressed purpose of using Onset's funding—to effect consolidations and efficiencies from synergies in order to boost profitability—was working.  Onset accordingly had every reason to believe the announced strategy was succeeding.

115.    The credit markets took note of First Brands' success during the period 2018 to 2022.  Onset watched as both Moody's and S&P upgraded First Brands' credit ratings from B3/B- to B1/B+.  As Moody's reported in March of 2021, "[t]he company has aggressively pursued and achieved cost savings through facility rationalization, procurement efficiencies and headcount

93

FBG_CH1_00090322

**DEBTORS' EXHIBIT NO. 175**
**Page 97 of 1907**

reduction that exceeded original estimates and have driven profit improvements in certain product lines, such as its pumps and filters businesses, despite top line pressures in these segments." Again, credible reports from reputable and widely trusted sources such as the credit agencies—in addition to audited financial reports showing steep increases in First Brands' profitability and cash balances—led Onset to reasonably believe that its frequent sourcing of streamlined short-term funding was a profoundly positive component of First Brands' seeming success, therefore supporting and justifying the rates of return paid to Onset, confirming First Brands' ability to bear these rates, and validating why First Brands returned to Onset again and again seeking additional funding.

### iv.        The Carnaby Transactions

#### a.        Carnaby Transactions Overview

116.    Riding the momentum from the successful Trico Transactions, in 2021, First Brands introduced to Onset a new funding structure involving the Carnaby Debtors. According to First Brands, these new structures would continue to support and sustain First Brands' successful growth strategy as well as its day-to-day operations. During the lifespan of the Carnaby Transactions, Onset financed a total of $2,331,000,000 to First Brands. Although Onset began by funding smaller amounts in the seven-figure range for the initial Carnaby Transactions, as the relationship continued, the later Carnaby Transactions grew in size, with Onset's funding reaching nine figures in those later transactions.

117.    In August 2021, after several years of representing First Brands across from Onset as outside counsel, Baker and Kumar departed their blue-chip law firm and took senior roles inside First Brands, bringing with them not only the prestige from having been partners at such a well-regarded firm, but their considerable legal and financing expertise. Baker became the Chief

94

FBG_CH1_00090323

**DEBTORS' EXHIBIT NO. 175**
**Page 98 of 1907**

Corporate Strategy Officer and Kumar became a SVP with responsibility over M&A.  Kumar is still employed at First Brands.

118.    During calls with Onset senior executives in 2021 and 2022, Baker and Kumar, along with CFO Graham and Ed, introduced the idea of the Carnaby Transactions, telling Onset executives that First Brands wanted to create a new funding structure involving SPVs.  Including during a call on or about June 22, 2022, they explained that these SPVs would acquire equipment and inventory from a First Brands subsidiary and sell it to Onset, which in turn would lease the equipment and inventory back to the SPVs.  Baker and Kumar explained further that the use of SPVs in this manner was common in the automotive parts and other industries, as it enabled companies with significant inventory capital to leverage that capital efficiently (enabling them to effectively utilize 100% of the value of their inventory capital), and that they had created and utilized such structures for clients while in private law practice countless times.  Given the trusted relationship built on several years of successfully consummated business dealings with timely payments and no material issues, together with audited financials and other reliable indicators of First Brands' continued growth, Onset had no reason to doubt the representations and intentions of these lawyers and First Brands officers.

119.    During these discussions, Ed, Baker, Kumar, and Graham repeatedly confirmed for Onset that First Brands' existing credit facility authorized such transactions.  In late 2021 and into the spring of 2022, Baker, Kumar, and Graham, as well as Ed—speaking, as he frequently did, on behalf of Patrick—explained to Onset executives that the credit facility provided that as long as the SPV paid First Brands sufficient value for the equipment and inventory, that property could be sold to the SPV with clean title free and clear of any liens of existing creditors without obtaining the consent or release of senior lenders.  The SPV, in turn, could then sell the property to Onset

FBG_CH1_00090324

**DEBTORS' EXHIBIT NO. 175**
**Page 99 of 1907**

also free and clear of all pre-existing liens. These same First Brands officers also provided to Onset a copy of the provision of the First Brands credit facility reflecting this structure, as well as a copy of the entire credit facility on or about June 22, 2022, and again on July 28, 2022.

120. Ed, Baker, and Kumar described for Onset in detail how these funding arrangements (which became the Carnaby Transactions) would work: Onset would provide funding to the SPV and that funding would be used to purchase the equipment and inventory in a manner that ensured compliance with the existing First Brands credit facility and assured Onset's title to the property free and clear of any liens. Specifically, during a phone call with Onset on or about June 22, 2022, it was represented by Ed, Baker, and Kumar that First Brands had more than sufficient disposition capacity under its credit agreement. Kumar also explained how the ABL liens would be automatically released through an automatic release provision in the credit agreement—an assurance that was repeated several times during the call. Kumar emphasized that First Brands was focused on compliance with the ABL Credit Agreement, and that it had analyzed and was comfortable with the disposition provisions. He also confirmed that the proposed Carnaby Transactions would be true sales, executed at arm's length. Baker likewise confirmed that First Brands' credit agreement was specifically set up so that First Brands would not need ABL lender consent so long as it was meeting the terms of the credit agreement.

121. Throughout their discussions about the use of the new SPV structure proposed by First Brands, these same First Brands officers repeatedly represented that Onset's financing was crucial to the implementation of its growth strategy, and necessary to complement the capital raised through First Brands' traditional financing sources. When Onset asked if First Brands intended to use this SPV structure with any other funding partners, these same First Brands officers said no.

FBG_CH1_00090325

**DEBTORS' EXHIBIT NO. 175
Page 100 of 1907**

Onset, relying on four years of successful financing transactions, assurances and explanations from Baker and Kumar, and the trust that was understandably created during this period, believed them.

> b.    Structure of Carnaby Transactions

122.    Following these discussions, beginning in June 2022, First Brands and Onset entered into the Carnaby Transactions relating to inventory, furniture, fixtures, manufacturing and other equipment (together with any other assets described in the Carnaby Lease Schedules (as defined below), as applicable, the "Carnaby Inventory" and the "Carnaby Equipment" and, collectively, the "Carnaby Property" and, together with the Trico Property, the "Onset Property"). The terms of the Carnaby Transactions were governed by (a) in the case of Carnaby Inventory, Master Lease Agreement No. OFI1445416, dated June 28, 2022, between Onset and Carnaby IV (the "Carnaby IV MLA"); and (b) in the case of Carnaby Equipment, Master Lease Agreement OFI154565, dated October 24, 2023, between Onset and Carnaby FA (the "Carnaby FA MLA" and, together with the Carnaby IV MLA, the "Carnaby MLAs" and, together with the Trico MLA, the "MLAs") covering a series of independent but related transactions between First Brands and Onset.[28]

123.    The structure of the Carnaby Transactions, which spanned the period June 2022 to mid-2025, also involved several "steps": first, a First Brands subsidiary would sell inventory or equipment to a "Carnaby" SPV; second, the Carnaby SPV sold that purchased inventory or equipment to Onset; third, Onset would lease this purchased property back to the Carnaby SPV; and fourth, the leased property was delivered to the same First Brands entity that had originally sold the property, which held the property as a "bailee" on behalf of the Carnaby SPV but

---

[28] Copies of the Carnaby MLAs are attached hereto as Exhibit 23 (Carnaby IV MLA) and Exhibit 24 (Carnaby FA MLA).  The Carnaby MLAs are governed by Utah law.  (*See* Exs. 23 and 24 (Carnaby MLAs, §§ 20(e), 22(f)).)

97

FBG_CH1_00090326

**DEBTORS' EXHIBIT NO. 175**
**Page 101 of 1907**

disclaimed title to such property. These steps, illustrated in the following diagram, are described in detail below:



124.    **In step one**, a First Brands subsidiary (the applicable Carnaby Bailee (as defined below)) sold Carnaby Inventory and Carnaby Equipment to an SPV—Carnaby IV (for Carnaby Inventory) and Carnaby FA (for Carnaby Equipment)—pursuant to a series of asset purchase agreements (each, a "Carnaby APA").[29]

125.    **In step two**, the Carnaby Debtor sold the applicable Carnaby Property to Onset pursuant to an assignment agreement or similar instrument (each, an "Onset Assignment").[30] Under each Onset Assignment, Onset paid a purchase price for the Carnaby Property equal to the amount that the Carnaby Debtors were obligated to pay the applicable FBG subsidiary (*i.e.*, the Carnaby Bailee) under the corresponding Carnaby APA. (*Compare, e.g.*, Ex. 25 (Carnaby IV Lease Schedule No. 027, Onset Assignment, ¶ 2 (ONSET_00032920) (stating the Purchase Price is $160,000,000)) *with* Ex. 25 (Carnaby IV Lease Schedule No. 027, APA ¶ 2 (ONSET_00032928) (same)).)   Under the Onset Assignments, the applicable Carnaby Debtor confirmed that it transferred its title and ownership interest in the Carnaby Property to Onset free and clear of liens

---

[29] Attached hereto as Exhibits 25 and 26 are true and correct copies of sample Carnaby APAs (Carnaby IV Lease Schedule No. 027, APA; Carnaby FA Lease Schedule No. 008, APA). The Carnaby APAs are governed by Delaware law. (*See, e.g.*, Ex. 26 (Carnaby FA Lease Schedule No. 008, APA, ¶ 12 (ONSET_ 00000389)).)

[30] Attached hereto as Exhibit 25 is a true and correct copy of a sample Onset Assignment (Carnaby IV Lease Schedule No. 027, Onset Assignment). The Onset Assignments are governed by Utah law. (*See* Exs. 23 and 24 (Carnaby MLAs, §§ 20(e), 22(f)).)

FBG_CH1_00090327

**DEBTORS' EXHIBIT NO. 175**
**Page 102 of 1907**

and encumbrances of any kind. (*See, e.g.*, Ex. 25 (Carnaby IV Lease Schedule No. 027, Onset Assignment, ¶ 8(i) (ONSET_0032922) (Seller's Representations and Warranties)).) To the extent the Carnaby Bailee continued to hold any interest in the Carnaby Property, the Carnaby Bailee transferred and assigned such interest to Onset and disclaimed any ownership interest therein.

126. **In step three**, Onset leased the applicable Carnaby Property back to the Carnaby Debtors. To document this arrangement, Onset and the applicable Carnaby Debtor executed a schedule to one of the Carnaby MLAs (each, a "Carnaby Lease Schedule" and, together with the Carnaby MLAs, the Carnaby Lease Schedules, and all other documents executed in connection therewith, the "Carnaby Lease Documents" and, collectively with the Trico Lease Documents, the "Lease Documents")[31] that was specific to individual pieces of Carnaby Property. (*See, e.g.*, Ex. 26 (Carnaby Lease Schedule 008).) Like the Trico Lease Schedules, section 1 of each Carnaby Lease Schedule specified the "Property," typically by category and location, and included "replacements." (*See, e.g., id.* § 1 (ONSET_00032910).) With one exception, Onset funded all amounts pursuant to the Carnaby Lease Schedules directly to a bank account in the name of the applicable Carnaby Debtor.[32]

127. In addition, in connection with the Carnaby Lease Schedule, the Carnaby Debtor executed an Acceptance and Delivery Certificate that contained a description of the "Property" subject to the applicable Carnaby Lease Schedule similar to the description set forth in the Carnaby Lease Schedule (the "Carnaby Acceptance & Delivery Certificates" and, together with the Trico

---

[31] Attached hereto as Exhibits 25 and 26 are true and correct copies of sample Carnaby Lease Schedules (Carnaby IV Lease Schedule No. 027; Carnaby FA Lease Schedule No. 008). The Carnaby Lease Schedules are governed by Utah law. (Exs. 23 and 24 (Carnaby MLAs, §§ 20(e), 22(f)).)

[32] In connection with Onset's funding of the first Carnaby Lease Schedule (with Carnaby I, as defined in this footnote), Onset made the initial payment of $9,900,000 to a bank account in the name of First Brands. At the time, Onset was informed that Carnaby Inventory I, LLC ("Carnaby I")—a lessee-counterparty to prior similar financing arrangements with Onset—had not yet established its own bank account. As of the Petition Date, all financing transactions involving Carnaby I had been completed and closed out due to payment in full.

FBG_CH1_00090328

**DEBTORS' EXHIBIT NO. 175**
**Page 103 of 1907**

Acceptance & Delivery Certificates, the "Acceptance & Delivery Certificates") and specified the location of the property on Exhibit A.[33]  (*See, e.g.*, Ex. 25 (Carnaby IV Lease Schedule No. 027, Acceptance & Delivery Certificate, §§ 1–2); *see also id.* at Ex. A.)

128.    Each Carnaby Lease Schedule incorporated the terms of the applicable Carnaby MLA, subject to certain modifications, and imposed additional covenants and repayment obligations.  In the Carnaby MLA and related Carnaby Lease Schedule, the Carnaby Debtor (and Ed, as the Carnaby Debtors' signatory) warranted and represented to Onset that any Carnaby Property transferred from the Carnaby Debtor to Onset was "free and clear of all liens, security interests and encumbrances."  (*See* Exs. 23 and 24 (Carnaby MLAs, § 9(a)).)

129.    The Carnaby Lease Documents unambiguously provided that Onset retained title to the Carnaby Property at all times and the Carnaby Debtors had "no right, title, or interest therein except as to the use thereof subject to the terms and conditions of the [Carnaby] Lease [Schedule]" until either (a) its sale to third parties in the ordinary course; or (b) in certain instances involving Carnaby Equipment, its acquisition by the applicable Carnaby Debtor at the expiration of the lease term.  (*See id.*)  In connection with the execution of each Carnaby Lease Schedule, the applicable Carnaby Debtor also granted Onset a "back-up" security interest in the leased Carnaby Property. (*See id.* § 20(a).)  Onset properly filed UCC-1 financing statements against the Carnaby Debtors with respect to all of the Carnaby Property.[34]  (*See, e.g.*, Ex. 10 (Carnaby IV Lease Schedule No. 027, UCC-1 Financing Statement); Ex. 9 (Carnaby FA Lease Schedule No. 008, UCC-1 Financing Statement).)

---

[33] Attached hereto as Exhibit 25 is a true and correct copy of a sample Carnaby Acceptance & Delivery Certificate (Carnaby IV Lease Schedule No. 027, Acceptance & Delivery Certificate (ONSET_00034805)).

[34] Again, according to the Carnaby Lease Documents, if the value of the property was less than certain amounts, the Carnaby Debtors would grant a security interest to Onset in the proceeds of the property and Onset would be authorized to amend its UCC-1 financing statement.  (*See supra* n.22.)

FBG_CH1_00090329

130.   **In step four** of the Carnaby Transactions, the Carnaby Property was delivered to a Company affiliate as "bailee" (as applicable, the "Carnaby IV Bailees" and "Carnaby FA Bailees" and collectively, the "Carnaby Bailees" and, together with the Trico Bailees, the "Bailees"), as acknowledged in each Lease Schedule.  (*See, e.g.*, Ex. 25 (Carnaby IV Lease Schedule No. 027, §§ 1, 11(t) (ONSET_00032910)).)  The table attached hereto as **Appendix B** identifies each of the Carnaby Bailees by Carnaby Lease Schedule.   In addition, the Carnaby Bailees executed Acknowledgement and Waivers (the "Carnaby A&Ws" and, together with the Trico A&Ws, the "A&Ws") in which they disclaim ownership and subordinate their interests in the assets to those of Onset, as owner, and the Carnaby Debtor, as lessee/bailor.[35]  (*See, e.g.*, Ex. 25 (Carnaby A&W with Hopkins Manufacturing Corporation, ¶ 2).)  The Carnaby A&Ws make clear that the Carnaby Bailees have no interest in the Carnaby Property and are solely holding such property, in their possession, on behalf of the applicable Carnaby Debtor (which is acknowledged to be the seller thereof).  (*See id.* ¶ 1.)

131.   After completing diligence and executing all applicable Carnaby Lease Documents, Onset and the applicable Carnaby Debtor executed a Lease Commencement Letter (the "Carnaby Lease Commencement Letters" and, together with the Trico Lease Commencement Letters, the "Lease Commencement Letters") identifying the start date of the applicable Carnaby Lease Schedule, and Onset funded the payment amount due under the applicable Carnaby Lease Schedule.[36]   In some instances, Onset and Trico also executed a Notice of Assignment (the

---

[35] Attached hereto as Exhibits 25 and 26 are true and correct copies of sample Carnaby A&Ws (Carnaby IV Lease Schedule No. 027, A&W with Hopkins Manufacturing Corporation (ONSET_00032933–42); Carnaby FA Lease Schedule No. 008, A&W with Walbro LLC (ONSET_000000372–79)).

[36] Attached hereto as Exhibit 25 is a true and correct copy of sample a Carnaby Lease Commencement Letter (Carnaby IV Lease Schedule No. 27, Lease Commencement Letter (ONSET_00032926)).

FBG_CH1_00090330

"Carnaby NOAs" and, together with the Trico NOAs, the "NOAs").[37]  Prior to the funding of any amounts, Onset required—and received—a confirmation by email that (a) all documentation had been truthfully executed; and (b) the Carnaby Debtor was not relying on any terms (including representations and warranties) not set forth in the Carnaby Lease Documents.

132.    Following completion of these four steps, the Carnaby Debtor sold the leased Carnaby Inventory in the ordinary course of business.  The proceeds of those sales were to be remitted and used to make the monthly payments owed to Onset as lessor (the "Carnaby Monthly Lease Payments").  In the Carnaby Lease Schedules for Carnaby Inventory, Onset agreed that its lien on any Carnaby Property and any right, title, or interest it had in such property would be automatically released upon the sale or transfer of such property by the Carnaby Debtor in the ordinary course of its business.  (*See, e.g.*, Ex. 25 (Carnaby IV Lease Schedule No. 027, § 1 (ONSET_00032910)).)

133.    Based on myriad representations—including in the Carnaby Lease Documents, the parties' course of conduct, the First Brands-provided inventory reports, and the site inspections (*see infra* ¶ 154)—Onset understood and reasonably believed the Carnaby Debtors to be in possession of and selling the Carnaby Inventory in the ordinary course of business, and in so doing generating proceeds used to make the Carnaby Monthly Lease Payments.

c.    Relevant Terms of the Carnaby Transactions

134.    Ed signed the Carnaby MLAs on behalf of the Carnaby Debtors.  As part of Onset's due diligence, Onset received resolutions signed by Patrick authorizing Ed to enter into these transactions.  (*See, e.g.*, Ex. 11 (Action of the Board of Directors of Trico Products Corporation);

---

[37] Attached hereto as Exhibit 27 is a true and correct copy of sample a Carnaby NOA (Carnaby IV Lease Schedule No. 003, NOA (ONSET_00000061)).

FBG_CH1_00090331

**DEBTORS' EXHIBIT NO. 175**
**Page 106 of 1907**

Ex. 12 (Trico Products Corporation Certificate of Incumbency, § 3).) These resolutions confirmed to Onset what Ed had been assuring Onset executives for months, and what was confirmed during their earlier in-person meeting with Ed and Patrick: Ed was authorized to act on behalf of First Brands and its sole owner Patrick. As with the Trico Transactions, Onset asked for, and received, charter documents for the Carnaby Debtors and organization charts showing where the Carnaby Debtors sat in the First Brands structure. Onset also received charter documents and authorizations from the entities that served as guarantors in connection with the Carnaby Transactions, as described below.

135.    The rates of return involved in the Carnaby Transactions were determined by the "lease factor" negotiated for and applied to each transaction. The lease factor and the rate of return for Onset were heavily negotiated among Onset and First Brands. Each "lease factor" accounted for certain risk factors that distinguished these transactions from other, more traditional funding arrangements. These included, significantly, that funding through an SPV resulted in only indirect, rather than direct, claims against the cash flows and assets of the operating company. Moreover, by purchasing assets and leasing them to First Brands, Onset provided funding at the equivalent of a 100% loan-to-value (LTV) ratio, which is much higher than the ratios at which traditional asset-based lenders (including First Brands' own ABL lenders) provide capital. While Onset's diligence, together with representations from First Brands, confirmed that its dealings with the SPVs would provide Onset clear title and enforceable security interests, Onset believed that a higher return than traditional financing arrangements was appropriate for the bespoke nature of these transactions; First Brands agreed, and confirmed that even at higher return rates, Onset's funding was critical to the company's strategy. In an in-person meeting in 2023 at Onset's offices, Ed and CFO Graham told Onset that its funding had accelerated growth and profitability that could

103

FBG_CH1_00090332

DEBTORS' EXHIBIT NO. 175
Page 107 of 1907

otherwise have taken First Brands years to achieve.  Graham noted that, while Onset's rates of return were robust, they paled in comparison to First Brands' returns created by the accelerated cost-savings and profitability the Onset funding enabled.  In addition, the Onset funding was short-term, while the savings it enabled were potentially perpetual.  Graham declared that, in fact, the Onset funding was far less expensive than equity funding.

136.    Moreover, the returns and payoff periods for the Carnaby Transactions were similar to those for bridge financing arrangements, which Onset (again relying on representations from First Brands officers) believed the Carnaby Transactions functionally to be: as before, First Brands repeatedly represented that these transactions would be used to fund costs appurtenant to the consolidation of newly acquired businesses.  Consistent with the "bridge" nature of these arrangements, the Carnaby Transactions on average carried an initial duration of approximately 17 months, with three months being the shortest lease schedule and 36 months being the longest. These rates of return, which were heavily negotiated between First Brands and Onset, reflected the bridge nature of the agreements, the short duration of the terms, and various other risk factors, including the location and nature of the collateral.

d.    Summary and Status of Carnaby Transactions

137.    Since the inception of the Carnaby Transactions in June 2022, Onset and the Carnaby Debtors, together with Carnaby I, have executed 49 Carnaby Lease Schedules.

138.    Pursuant to the Carnaby Transactions, Onset funded approximately $2,331,000,000, of which $1,619,000,000 relates to Carnaby Inventory funded to Carnaby I and Carnaby IV and $711,400,000 relates to Carnaby Equipment funded to Carnaby I, Carnaby IV, and Carnaby FA.

FBG_CH1_00090333

DEBTORS' EXHIBIT NO. 175
Page 108 of 1907

139.    In total, 37 Carnaby Lease Schedules, as well as three lease schedules with Eagle Machining, were fully repaid and closed out prior to the Petition Date, with another 12 still open today.

e.    Carnaby Transactions Period

140.    During the period of the Carnaby Transactions, which spanned from 2022 to 2025, First Brands appeared to continue the successful growth trajectory it had proclaimed and was widely reported during the period of the earlier Trico Transactions.  Onset continued to receive quarterly financial statements from First Brands as well as First Brands' annual financial statements audited by BDO.  First Brands' 2022 annual revenue of $2.8 billion grew to just shy of $5 billion in 2024, and then to $5.3 billion (on an LTM basis) as of the second quarter of 2025.  Its 2022 EBITDA leapt from $1 billion to $1.83 billion in 2024 (and $1.89 billion as of the second quarter of 2025 on an LTM basis).  Cash also grew from $712 million in 2022 to $925 million in 2024.

141.    During this same period, First Brands continued its acquisition strategy, which Onset believed to be consistent with First Brands' repeated representations that Onset's funding was enabling growth and consolidation.  From 2022 through 2024, First Brands acquired well known and established brands Horizon Global, Cardone, Peterson Spring, Hopkins, FMP, Winning Group, Lumileds, and Jasper.  Once again, the credit markets took notice.  As S&P stated in December of 2023, continuing with its B+ rating of First Brands: "The positive outlook on First Brands reflects its increased scale, steady margins, and stable credit metrics despite its very aggressive acquisition strategy.  First Brands expects to generate nearly $4 billion of revenues in 2023, up more than 40% from the previous year and 2.5 times bigger than its 2020 revenue base.

105

FBG_CH1_00090334

**DEBTORS' EXHIBIT NO. 175**
**Page 109 of 1907**

. . . The company's increased scale has contributed to improved operating leverage and efficiency at its plants as well as greater purchasing power with its vendors."[38]

142.   In May 2025, Moody's also noted that the First Brands strategy—again, with Onset providing short-term capital to effectuate synergies—continued to be successful.  As Moody's reported, First Brands "revenue and profitability growth have been achieved primarily through acquisitions and subsequent cost savings. . .  First Brands has a consistent track record implementing this strategy . . . [and] we favorably view the company's exposure to the stable demand characteristics of the automotive aftermarket."  S&P also reported at about the same time that First Brands' "increased scale has not come at the cost of lower profitability.  First Brands increased revenue primarily by acquiring underperforming brands and launching new products.  It turned around these businesses through cost-reduction initiatives, relocation of manufacturing to lower cost sites, and improved operating leverage and efficiency at its plants."[39]

### f.    Ed James's Role in the Carnaby Transactions

143.   For each Onset Transaction, Onset and First Brands would negotiate the overall transaction economics, including the rate of return and fees on the entire funding amount provided by Onset.  Ed led these negotiations for First Brands with the involvement of Baker, Kumar, Graham, and Brumbergs, as well as other First Brands officers and employees.  The total funding amount provided by Onset usually included funds from several other funding partners.  Payments by Onset to these funding partners were based on transaction economics Onset and the funding partners negotiated on a deal-by-deal basis.

_____

[38] "Research Update: First Brands Group LLC Outlook Revised to Positive on Growing Scale and Sustaining Better Margins, 'B+' Rating Affirmed," S&P GLOBAL (Dec. 20, 2023), https://www.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/3104549.

[39] "Research Update: First Brands Group LLC 'B+' Rating Affirmed on IMPROVED Business Risk; Outlook Revised to Stable from Positive," S&P GLOBAL (May 30, 2025), https://www.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/101626416.

FBG_CH1_00090335

**DEBTORS' EXHIBIT NO. 175**
**Page 110 of 1907**

144.    In September of 2022, Ed began contributing to the Carnaby Transactions with what he represented to Onset to be funds drawn from his own investment vehicles.[40]  Ed's contributions began when Onset was in the midst of funding for a $50 million lease schedule requested by First Brands.  At the time, Onset and its existing funding partners had raised $47 million, but the funding due date was fast approaching.  Upon learning of this potential $3 million shortfall, Ed asked if he could participate to make up the difference and help close the transaction.  Given his senior and trusted status with First Brands—as its EVP, the brother of its owner and CEO Patrick, and with apparent authority to act on behalf of First Brands and Patrick— Ed's offer to participate was understood by Onset to be within the scope of his authority, which Ed also confirmed.

145.    Ed's participation carried significant weight for Onset because it validated Ed's repeated representations regarding the purpose and expected performance of the Carnaby Transactions.  It similarly validated Ed's oft-expressed confidence in the stability and value of the First Brands business.  Because Ed was both the brother of the First Brands' sole equity owner and the second-most senior officer of the company (and therefore familiar with the company's ownership, operations, and the obligations he owed thereto), Onset and its funding partners reasonably and logically viewed Ed's participation as further confirmation that the Carnaby Transactions were bringing real value to First Brands.  What's more, Onset and its funding partners viewed Ed's participation in the funding alongside them as compelling evidence that the Carnaby Transactions, while involving risk, had solid foundations and structures—not to mention, were entirely legitimate and *bona fide*, as represented and recorded in all of the Lease Schedules.  To

---

[40] Ed has never acted on Onset's behalf, and to the extent Onset is awarded recovery in this action, Onset will seek a judicial declaration that Ed should not receive any portion of that recovery.

FBG_CH1_00090336

DEBTORS' EXHIBIT NO. 175
Page 111 of 1907

Onset, there was no apparent reason that Ed was acting without proper authority, or that he would be willing to put his own money at risk if he did not believe in the business and the growth strategy Onset's funding helped facilitate. When Ed requested thereafter to participate in additional Onset fundings, knowing that Ed also had skin in the game only served to further build Onset's confidence in the transactions. Throughout their dealings, all payments by Onset to Ed were based on transaction economics Onset and Ed negotiated on a deal-by-deal basis.

g.    Summary of Outstanding Carnaby Obligations

146.    The obligations of the Carnaby Debtors under the Carnaby Lease Documents were guaranteed (each, a "Carnaby Guaranty" and, collectively, the "Carnaby Guarantees" and, together with the Trico Guarantees, the "Guarantees") by certain Company affiliates consisting of (a) in the case of the Carnaby IV Master Lease Agreement (each, a "Carnaby IV Guaranty" and, together, the "Carnaby IV Guarantees"): Carnaby Capital Holdings, LLC, Carnaby Capital, LLC, Carnaby Inventory Holdings IV, LLC, FB Holdings, and Viceroy (collectively, the "Carnaby IV Guarantors");[41] and (b) in the case of the Carnaby FA Master Lease Agreement (each, a "Carnaby FA Guaranty" and, together, the "Carnaby FA Guarantees"): Carnaby Capital Holdings, LLC, Carnaby Capital, LLC, Carnaby FA Holdings, LLC, Eagle Casting Holdings, LLC, Eagle Casting, LLC, FB Holdings, and Viceroy (collectively, the "Carnaby FA Guarantors" and, together with the Carnaby IV Guarantors, the "Carnaby Guarantors" and, collectively with the Carnaby Debtors, the "Carnaby Obligors").[42] Onset is the beneficiary of each Carnaby Guaranty, and the terms of each Carnaby Guaranty are identical in all material respects.

---

[41] Copies of the Carnaby IV Guarantees are attached hereto as Exhibits 28 through 32.
[42] Copies of the Carnaby FA Guarantees are attached hereto as Exhibits 33 through 39.

FBG_CH1_00090337

DEBTORS' EXHIBIT NO. 175
Page 112 of 1907

147.    As of the Petition Date, there was approximately $1.88 billion in outstanding Carnaby Obligations under the Carnaby Lease Schedules and Forbearance Agreements (as defined below), which consists of approximately (a) $1.35 billion outstanding on account of transactions relating to Carnaby Inventory; and (b) $528 million outstanding on account of transactions relating to Carnaby Equipment (in each case, excluding accrued and unpaid interest, fees, and other amounts).   Without taking into account the Forbearance Agreements (as discussed below), the amounts outstanding as of the Petition Date are approximately $1.09 billion relating to Carnaby Inventory and $429 million relating to Carnaby Equipment.

v.        **Information and Reporting in Connection with the Onset Transactions**

148.    The Lease Schedules required that Trico and the Carnaby Debtors, as applicable, provide Onset, on a quarterly basis, an updated inventory listing in substantially the same form delivered prior to the date of the applicable Lease Schedule showing the inventory levels at the property location and status as of the date of each provided inventory listing.  (*See, e.g.*, Ex. 7 (Trico Lease Schedule No. 019, § 1 (ONSET_00034437)); Ex. 25 (Carnaby IV Lease Schedule No. 027, § 1 (ONSET_00032910)).)  The Carnaby IV Lease Schedules also required Carnaby IV to keep Onset's inventory property at specified levels.  (*See, e.g.*, Ex. 25 (Carnaby IV Lease Schedule No. 027, § 1 ("[I]f at any time during the term of the Lease the Inventory Value is less than thirty percent (30%) of the Inventory Value determined as of the execution of this Schedule, the Lessee grants to the Lessor a security interest in the proceeds of the Property and authorizes Lessor to amend the UCC description to include proceeds.")).)  Accordingly, First Brands, through Brumbergs, regularly provided inventory reports to Onset purporting to set forth the levels of inventory held by the applicable Carnaby IV Bailees.  No inventory report provided by First Brands

FBG_CH1_00090338

**DEBTORS' EXHIBIT NO. 175**
**Page 113 of 1907**

ever indicated a drop in inventory levels of more than 30%.  Rather, the reports purported to show that the inventory levels stayed consistent, dropped only by small percentages, or even increased.

149.    In addition, the MLAs required Trico and the Carnaby Debtors, as applicable, to keep the Onset Property—which included both equipment and inventory—in Trico's and the Carnaby Debtors' "sole possession and control." (*See* Ex. 3 (Trico MLA, § 8(a)); Exs. 23 and 24 (Carnaby MLAs, § 8(a)).  The MLAs also prohibited the removal of the Onset Property from the location stated in the applicable Lease Schedule without the prior written consent of Onset, which consent was not to be unreasonably withheld or provided.  (*See* Ex. 3 (Trico MLA, § 8(a)); Exs. 23 and 24 (Carnaby MLAs, § 8(a)).)

150.    In connection with the Onset Transactions, Onset and its funding partners performed due diligence on the proposed lease schedules, terms, and counterparties, including numerous in-person site visits.  This diligence process, which continued throughout Onset's relationship with First Brands, together with the fact that First Brands never once missed a lease payment until 2025, gave Onset confidence that First Brands was a responsible and creditworthy counterparty.

151.    As would be expected, one of the primary sources of information that Onset relied upon in its diligence was First Brands' financial statements and other financial information.  As noted above, First Brands' financial statements were independently audited, including by BDO and First Brands provided Onset with First Brands' financial statements throughout the period of the Onset Transactions, specifically, from April 2021 through and included April 2025.  Receipt of these financial statements were a prerequisite for Onset to provide funding to the Carnaby Debtors.  Onset expected that the Carnaby Transactions would not be included in the audited financial statements it reviewed because it understood that the Carnaby Debtors were not included

FBG_CH1_00090339

**DEBTORS' EXHIBIT NO. 175**
**Page 114 of 1907**

in the entities consolidated in the First Brands financial statements; again, Onset inquired whether First Brands was utilizing the SPV financing structure with other funding sources and First Brands never told Onset about any other SPV lenders.

152.   Also included among the myriad financial metrics that Onset analyzed were First Brands' credit ratings.  Ed routinely emphasized to Onset any positive changes in First Brands' credit ratings, offering public and confidential information about these analyses, which had been performed by sophisticated third parties such as Fitch and Moody's, including, for example, in March and October 2021; Onset reviewed these reports to verify Ed's claims.  As one example of Onset's regular requests for verifiable information, on April 5, 2021, Onset asked for, and Ed provided, the following: (a) a record of which current schedules will be repaid with the next negotiated transaction; (b) a bank book/lender presentation; (c) a summary of new capital structure and terms for First Brands; (d) the 2020 audit or year-end financials; and (e) 2021 projections. Onset carefully weighed this information in its decision to move forward with additional financing for First Brands.[43]

153.   Not only did Onset perform appropriate diligence on a macro level and assess the company's financial health and projections, it also carefully outlined and received confirmation from First Brands concerning the specific terms, mechanics, and implications of the individual lease schedules.  Ed routinely provided and confirmed this information, including on at least September 7, 2024 and March 6, 2025; other First Brands officers (including Kumar and Brumbergs, who, as noted above, has since pleaded guilty to participating in the fraud scheme

_____

[43] In addition to routine financial information such as consolidated financial statements and lender presentations, Onset also inquired about current events and their anticipated impact on First Brands' business throughout the entire term of the parties' business relationship.  For example, in early 2025, Ed assured Onset that First Brands would not feel the effects of newly instituted tariffs.  That, however, is not what Debtors have since represented in their filings before this Court. (*See, e.g., In re FBG*, [Docket No. 22] at 5–6, 30.)

FBG_CH1_00090340

described in the James Brothers Indictment) were often included in these requests for, and confirmation of, important diligence information.

154.   Still further, Onset leadership and funding partners personally traveled to and toured several First Brands affiliates' facilities where Onset's collateral was held or in use. Senior Onset representatives and funding partners visited numerous such facilities across the globe, including, for example, to Texas and Mexico on or about September 13, 2018; Belgium on or about December 13, 2019; Illinois on or about September 27, 2022; and many others. During these site visits, Onset observed the viability of First Brands' business and the quality and nature of Onset's collateral, much of which was plainly in use and essential to First Brands' daily business operations. In addition to Onset's site visits, Onset hired a reputable third-party vendor to perform routine site inspections and to monitor the quality and status of Onset's inventory and equipment collateral. These reports often included videos of the premises, photographs of inventory and equipment, and other documentation concerning specific equipment by name or serial number. The most recent set of site visits and reports was dated from the summer of 2025. This on-site diligence appeared to confirm the credibility of the quarterly inventory reports that First Brands (*i.e.*, Graham) provided to Onset that supposedly tracked the value of Onset's inventory collateral across the various locations at which it was held.

155.   All of this information, taken together, and particularly when paired with the trust built during years of business dealings as well as on-time payments by First Brands and no issues, reasonably led Onset to believe that First Brands was a reliable client.

156.   Crucially, Onset always understood, based on its own actions and diligence and on repeated representations from First Brands, that Onset's interests in collateral were "free and clear." As set forth above, the MLAs and other supporting agreements contained and incorporated

112

FBG_CH1_00090341

DEBTORS' EXHIBIT NO. 175
Page 116 of 1907

specific representations about First Brands' affiliates' ownership interest in the collateral. Notably, these foundational agreements were not negotiated and executed by Ed alone; they were reviewed closely by other First Brands' officers, representatives, and attorneys and, in many instances, also executed by others, including CFO Graham and Kumar.

157.   With each new financing, Onset prepared an "Initial Documentation" email for First Brands that identified the bespoke terms that had been negotiated for each transaction, and Onset expressly sought, and received in writing, clarification from First Brands regarding those terms.  For example, in connection with Carnaby IV Lease Schedule No. 026, Onset sent an Initial Documentation email to Ed and Kumar on March 5, 2025, asking that they forward the request "to anybody on [First Brands'] side that should be copied on this email."  (Ex. 40 (Mar. 5, 2025 email chain).)  The email sought, and received, written confirmation about the identity of the "users" (or bailees) of Onset's rented equipment and notifications concerning outstanding documentation, inspections and site visits, and UCC searches.  Notably, Onset also sought, and received, written confirmation from First Brands regarding "Title Transfer":

> *Please confirm that Carnaby Inventory IV, LLC currently holds title to the assets that were included under the APA* dated 12/11/2023 by Brake Parts Inc LLC (amongst others) as Seller and Carnaby Inventory IV, LLC as previously provided for in an earlier Onset transaction (Lease Schedule No. 015). . . .
>
> Our understanding is that *Carnaby Inventory IV, LLC will acquire clear title to the inventory from Carter Fuel Systems, LLC prior to the closing of the Lease transaction – please confirm* . . . .
>
> Further, prior to funding, Onset requires that Lessee provide the items listed below evidencing title transfer satisfactory to Lessor for the Property to be leased under this Schedule . . . An Asset Purchase Agreement identifying the inventory set forth on the Exhibit A (3) attached to the LS 026 documentation enclosed herewith – received and in review at this time . . . *Confirmation that such items are currently owned free and clear by Carnaby Inventory IV, LLC* . . . .

113

FBG_CH1_00090342

> Our understanding is that *Carnaby Inventory IV, LLC will acquire clear title to the inventory from Subensambles Internacionales S. de R.L. de C.V. prior to the closing of the Lease transaction – please confirm* . . . .
>
> Further, prior to funding, Onset requires that Lessee provide the items listed below evidencing title transfer satisfactory to Lessor for the Property to be leased under this Schedule . . . An Asset Purchase Agreement identifying the inventory set forth on the Exhibit A (2) attached to the LS 026 documentation enclosed herewith – received and in review at this time . . . . *Confirmation that such items are currently owned free and clear by Carnaby Inventory IV, LLC* . . . .

(*Id.* (emphases added).)   In this instance, all of the requested title transfer information was confirmed in writing by First Brands that same day. (*Id.*) Nearly identical requests for verification and confirmation were sought from, and provided in writing by, First Brands in connection with other lease schedules.  (*See, e.g.*, Ex. 41 (Sept. 7, 2024 email chain).)   Indeed, these frequent written communications from Ed and Kumar confirmed the representations that First Brands had already made in the formal lease documents.

158.    On an equally routine basis, First Brands made other representations and provided assurances to Onset confirming the transactions in "Document Verification Confirmation" emails. Onset sent the Document Verification Confirmation emails to First Brands as a final check of the lease schedule documentation before releasing the wires.  In them, Onset sought confirmation— which First Brands, often through Ed and with Kumar and Graham involved, provided in writing— that the documentation was true and correct and reflected First Brands' "understanding and commitment to the transaction." (*See, e.g.*, Ex. 42 (Apr. 16, 2021 email chain); *see also* Ex. 43 (Apr. 7, 2025 email chain).)   These written representations and assurances from First Brands' officers confirmed that Onset's funds would be used solely as described in the applicable agreements and that Onset held a perfected security interest in the inventory and equipment that

114

FBG_CH1_00090343

**DEBTORS' EXHIBIT NO. 175**
**Page 118 of 1907**

were the subject of the Onset Transactions.[44] Onset conducted lien searches for each transaction and filed its UCC-1 against the lessee prior to funding.  In each instance, Onset ensured that there were no UCC-1s that conflicted with the relevant Carnaby Debtor and that its filings were perfected against the Carnaby Debtors.  Although the Trico lien searches revealed many other creditors, Onset enjoyed a purchase money security interest status and timely filed its UCC-1s against the Trico lessees.

159.    Onset requested information about the use of funds consistently over the course of its eight-year relationship with First Brands, and in each instance, Ed described how that money would be used to fund capital expenditures or acquisitions and business synergies.  (*See supra* ¶¶ 91–92.)  For example, in January 2025, Ed represented that:

> We intend to deploy the funds back into FBG for both organic growth as well as for potential acquisitions. We expect with the upcoming new Administration and have seen an uptick in Sales enquiries from all our major customers that is looking to buy 'Made in USA ' products and are quoting over $100 - 200 million in Sales to avoid any potential impact of the expected tariffs. We also are looking at opportunistic acquisition opportunities plus replenishment of funds used for acquisitions that we did in 2024 with the proceeds .. The mantra is the same that has driven the growth of FBG to becoming a $5 billion business and growing.

(Ex. 44 (Jan. 3, 2025 email chain).)  And the next month, Ed explained to Onset:

> As we look at the funding on the 3/4, question surrounding the Uses will continue to evolve deploying the funds for organic growth as well as for potential acquisitions . As discussed earlier in the year Sales growth due to the major customers orders for Q1 through Q4 based on the "Made in USA buy" will result in an impact of around $150 million in new sales … In junction with organic growth, we

---

[44] First Brands also made countless *ad hoc* representations in writing and orally to Onset about Onset's security interest separate and apart from the regimented Initial Documentation and Document Verification Confirmation emails.  For example, on or about November 16, 2021, Ed, with Baker and Kumar present, represented to Onset that a First Brands entity would be the 100% owners of the assets once the transactions closed.

FBG_CH1_00090344

**DEBTORS' EXHIBIT NO. 175**
**Page 119 of 1907**

> have several new Acquisition opportunities on the radar that we are
> looking .. highly confidential but some summaries attached

(Ex. 45 (Feb. 25, 2025 email chain).)

160.    Similarly, Ed represented to Onset that the funding Onset provided on or about April 7, 2025 was specifically going to be used to fund the acquisition and consolidation within the First Brands family of Novares Group ("Novares")—a company that, according to Ed, generated over €1 billion in revenue and over €200 million in EBITDA.  Instead, to Onset's surprise, Patrick caused Novares to be acquired not under the First Brands umbrella, but apparently by an entity under his own corporate umbrella and diverted Onset's funds to or through that entity, the full details of which Onset learned only after the Petition Date.  When pressed in June 2025 how the Novares acquisition was improving First Brands' financial situation, as Ed had said it would, Ed and Graham were intentionally opaque in responding.  It was only in July that Ed and Graham first suggested the Novares financials were not rolling up into First Brands at all.

### vi.       Onset Acquired the Onset Property Free and Clear of the Prepetition First Brands Liens

161.    That Onset acquired interests in the Onset Property free and clear of any other First Brands creditors' alleged claims is further apparent from the terms of the relevant debt agreements and structure of the Onset Transactions.

162.    First Brands and certain of its Debtor affiliates are obligors (the "FBG Obligors") under (a) an asset-backed revolving credit facility pursuant to the ABL Credit Agreement; and (b) two syndicated credit facilities pursuant to the Prepetition Term Loan Agreements (together with the ABL Credit Agreement, the "Prepetition FBG Debt Agreements").

163.    To secure the FBG Obligors' obligations under the Prepetition FBG Debt Agreements, the FBG Obligors granted the ABL Agent, the First Lien Term Loan Agent, and the Second Lien Term Loan Agent (together, the "Prepetition Term Loan Agents" and, together with

116

FBG_CH1_00090345

**DEBTORS' EXHIBIT NO. 175**
**Page 120 of 1907**

the ABL Agent, the "Prepetition FBG Agents") liens and security interests (in the case of the ABL Credit Agreement, the "ABL Liens" and, in the case of the Prepetition Term Loan Agreements, the "Term Loan Liens" and, together with the ABL Liens, the "Prepetition FBG Liens") on a broad range of the FBG Obligors' assets (in the case of the ABL Credit Agreement, the "ABL Collateral" and, in the case of the Prepetition Term Loan Agreements, the "Term Loan Collateral" and, together with the ABL Collateral, the "Prepetition FBG Collateral").

164.   The Prepetition FBG Debt Agreements provided for the automatic release of the Prepetition FBG Liens on any Prepetition FBG Collateral that is transferred or disposed of in a manner permitted by the terms of the FBG Debt Agreements. (*See* Ex. 46 (ABL Credit Agreement, § 7.05 ("Collateral . . . disposed of as expressly permitted by this Section 7.05 to any Person other than a Loan Party . . . shall be sold free and clear of the Liens created by the Loan Documents.")); Ex. 47 (First Lien Term Loan Agreement, § 7.05 (same)); Ex. 48 (Second Lien Term Loan Agreement, § 7.05 (same)).) The Prepetition FBG Debt Agreements permitted the FBG Obligors to, among other things: (a) transfer or dispose of "inventory" or "immaterial assets" "in the ordinary course of business" (*see* Ex. 47 (First Lien Term Loan Agreement, § 7.05(b)); (b) dispose of assets not included in the then-applicable borrowing base for the Prepetition FBG Debt Agreements (*id.* § 7.05(c)); (c) sell "assets" for "no less than fair market value" provided that, if such assets are worth at least $10 million, at least 75% of the consideration is paid in cash (*id.* § 7.05(h)); (d) engage in a sale, sale-leaseback, factoring early-pay, or similar inventory financing transaction with respect to, among other things, inventory "not located in the U.S., Canada, England, or Wales" or inventory that was otherwise not "Eligible Inventory" (defined in the Prepetition FBG Debt Agreements as a "Permitted Inventory Financing") (*id.*, § 7.05(m)); or (e) enter into a sale-leaseback transaction with a "Borrower" or "Restricted Subsidiary" (defined

117

FBG_CH1_00090346

**DEBTORS' EXHIBIT NO. 175**
**Page 121 of 1907**

in the Prepetition FBG Debt Agreements as a "Sale Leaseback Transaction"), subject to an aggregate dollar limit (*id.*, § 7.05(n)) (each of the foregoing, along with the other dispositions permitted under the terms of the Prepetition FBG Debt Agreements, a "Permitted Disposition"). Thus, to the extent property was transferred to Onset by an FBG Obligor pursuant to a "Permitted Disposition," Onset took title to such property free and clear of the Prepetition FBG Liens.

165.    On information and belief, each of the transfers of Onset Property by the FBG Obligors in connection with the Onset Transactions constituted a Permitted Disposition.  Further, in the Lease Schedules, Trico and the Carnaby Debtors acknowledged that their assets were "encumbered by liens from various credit agreements with senior lenders."  However, in at least once instance, Trico "represent[ed] and warrant[ed]" to Onset that "all conditions necessary" for disposing of those assets "free and clear of any and all liens" arising under the Prepetition FBG Debt Agreements had been satisfied and that the lenders thereunder had been notified of such disposition.  (*See, e.g.*, Ex. 49 (Trico Lease Schedule No. 014R, § 11(g)).)

166.    Upon information and belief, certain of the Carnaby Transactions were executed (with the corresponding property sold by the applicable FBG Obligors to the applicable Carnaby Debtor) prior to the applicable FBG Obligor becoming a guarantor or otherwise bound under the Prepetition FBG Debt Agreements.  In such cases, the Prepetition FBG Liens never attached to the relevant property, such that the transfer of such property to the Carnaby Debtors and then to Onset was necessarily free and clear of the Prepetition FBG Liens.

167.    Thus, and as described in greater detail below, the transfers of Onset Property from the applicable FBG Obligors were free and clear of the Prepetition FBG Liens.[45]  To the extent

---

[45] As noted above, many of the Trico Bailees and the Carnaby Bailees are Non-Debtor Affiliates.  These Non-Debtor Affiliates are not FBG Obligors and have not granted Prepetition FBG Liens to the Prepetition FBG Agents in respect of the Prepetition FBG Debt Agreements.

FBG_CH1_00090347

that Onset, Trico, and/or the Carnaby Debtors did not receive the Onset Property (or the proceeds thereof) free and clear of the Prepetition FBG Liens, then Onset has claims for breaches of the applicable Trico Lease Documents and the Carnaby Lease Documents, as well as the three Forbearance Agreements entered into with First Brands, as described further below.

a.      Onset Acquired Trico Property Pursuant to Trico SLAs Free and Clear

168.    In the case of Onset Transactions where Onset acquired Trico Equipment directly from the equipment manufacturer pursuant to a Trico MPPA, the Trico MPPA clearly provided that all right, title and interest in the Trico Equipment vested in Onset. (Ex. 5 (Trico MPPA).) Onset then leased the Trico Equipment to Trico (later First Brands) pursuant to a Trico Lease Schedule. Pursuant to the Trico Lease Schedule and the Trico MLA, First Brands warranted that Onset owned the Trico Equipment "free and clear of all liens, security interests and encumbrances." (*See* Ex. 3 (Trico MLA § 9(a)).) Further, to the extent the Trico Equipment was held by a Trico Bailee, such Trico Bailee executed a Trico A&W in which the Trico Bailee disclaimed any security interest in the Trico Equipment. (*See, e.g.*, Ex. 6 (Trico Lease Schedule No. 028, A&W with Strongarm, LLC, ¶ 1 (ONSET_00035108)).) Accordingly, in instances where Onset purchased the Trico Equipment directly from the manufacturer, there can be no dispute that Onset owns that Trico Equipment.

169.    In the case of Trico Transactions where Onset acquired the Trico Property from Trico pursuant to the Trico SLAs (rather than directly from the equipment manufacturer), such Trico Property, to the extent it constituted Prepetition FBG Collateral at all, was acquired by Onset free and clear of the Prepetition FBG Liens because the Trico Property was transferred to Onset pursuant to a Permitted Disposition. The disposition of equipment and inventory in connection with equipment and inventory financing transactions was in the ordinary course of business for the Debtors because the Debtors regularly entered into similar financing arrangements and, upon

FBG_CH1_00090348

information and belief, such arrangements are common in the automotive and aftermarket parts industries. In addition, upon information and belief, the Trico Property was transferred in exchange for not less than fair market value and the purchase price for such property was paid at least 75% in cash.

170. The transactions also constituted "Sale Leaseback Transactions" under the Prepetition FBG Debt Agreements because, upon information and belief, they involved the sale to Onset and re-lease of the Trico Property by Borrowers or Restricted Subsidiaries under the Prepetition FBG Debt Agreements, and all other applicable requirements were met. To the extent any Trico Property was not located in the U.S., Canada, England, or Wales, did not otherwise constitute Eligible Inventory, or was not included in the applicable borrowing base at the time of the transfer, then the transfer of such property was also a Permitted Disposition.

171. Accordingly, Onset acquired any Trico Property that constituted Prepetition FBG Collateral from Trico pursuant to the Trico SLAs free and clear of the Prepetition FBG Liens.

    b.  The Carnaby Debtors (and Onset) Acquired Carnaby Property Free and Clear

172. With respect to the Carnaby Transactions, each transfer of Carnaby Property to the Carnaby Debtors and then onto Onset was free and clear of the Prepetition FBG Liens.

173. Under the Carnaby APAs between the applicable Carnaby Debtor and the Carnaby Bailee that is an FBG Obligor, the purchase price paid by the Carnaby Debtors was equal to at least the fair market value of the corresponding Carnaby Property. (See, e.g., Ex. 26 (Carnaby FA Lease Schedule No. 008, APA, § 2 (ONSET_00000386)).) Because transfers for fair market value are Permitted Dispositions, when the Carnaby Debtors acquired the Carnaby Property that constituted Prepetition FBG Collateral from the Carnaby Bailees, they did so free and clear of the Prepetition FBG Liens under the Prepetition FBG Debt Agreements. In turn, when they

FBG_CH1_00090349

DEBTORS' EXHIBIT NO. 175
Page 124 of 1907

subsequently sold that Carnaby Property to Onset, the Carnaby Debtors conveyed it likewise free and clear of such Prepetition FBG Liens.  To the extent any Carnaby Property was not located in the U.S., Canada, England, or Wales, did not otherwise constitute Eligible Inventory, or was not included in the applicable borrowing base at the time of the transfer, then the transfer of such property was also a Permitted Disposition.

174.  With respect to Carnaby Inventory specifically, the FBG Obligors' sale of automotive parts and other inventory to Carnaby IV fell squarely within their ordinary course of business as a global auto parts manufacturer and distributor.  Because "ordinary course of business" dispositions are Permitted Dispositions, Carnaby IV's acquisition of Carnaby Inventory occurred free and clear of the Prepetition FBG Liens.  To the extent any Carnaby Inventory was not located in the U.S., Canada, England, or Wales, did not otherwise constitute Eligible Inventory, or was not included in the applicable borrowing base at the time of the transfer, then the transfer of such property was also a Permitted Disposition.

**B.** **Defaults Under the Carnaby Lease Documents Beginning in May 2025 and Multiple Forbearance Agreements**

**i.** **The First Forbearance Agreement**

175.  From the execution of the MLAs until April 10, 2025, Onset had provided through the Trico and Carnaby Debtors more than $3 billion in financing to the Company, having fulfilled all of its repayment obligations.

176.  As of April 10, 2025, Debtors' remaining obligations to Onset across the 12 outstanding Carnaby Lease Schedules were well in excess of $1 billion, which amount was guaranteed by the Carnaby Guarantors.  At that point, Ed, again speaking on behalf of Patrick and First Brands, informed Onset that First Brands was in the midst of spinning off its European operations from its U.S.-based operations and, at the same time, was seeking financing from

121

FBG_CH1_00090350

DEBTORS' EXHIBIT NO. 175
Page 125 of 1907

European lenders for those European operations. According to Ed, First Brands needed to preserve cash on its balance sheet, which would aid First Brands in securing financing for European operations.

177.    As a result, Ed asked Onset to enter into a forbearance agreement permitting First Brands a brief delay on making the next Carnaby Monthly Lease Payment in the amount of approximately $200 million[46] from May 1, 2025 until May 30, 2025 (the "First Forbearance Payment"). Perhaps so as not to trigger the anticipatory breach provision of Section 18 of the Carnaby MLAs, Ed, on behalf of himself, Patrick, and First Brands, assured Onset that First Brands' financial condition was sound, that it was financially able to make the Carnaby Monthly Lease Payment due May 1, 2025, and that the only reason First Brands was now asking for a brief delay in making payment was to facilitate its European financing efforts. In reviewing the annual audited financials and quarterly internal financials provided by First Brands, Onset observed certain metrics concerning First Brands' financial health, including, for example, cash on the balance sheet, which reasonably led Onset to believe Ed's explanation and representations about the Company's health. These assurances were consistent with the other information (as described above) and representations from First Brands that Onset had reasonably relied upon, both at the time and throughout eight years of business dealings regarding First Brands' strong financial condition and continued stability. Onset also reasonably relied upon the course of dealings with Ed, First Brands, and its senior leadership that built and maintained Onset's trust and confidence as a business partner. Onset also relied on lender presentation materials prepared by First Brands'

---

[46] This figure represented the outstanding rental payments for the month of May aggregated across 12 different Carnaby Lease Schedules: Carnaby IV Lease Schedule Nos. 022, 023, 024, 025, 026, and 027, as well as Carnaby FA Lease Schedule Nos. 003, 004, 005, 007, 008, and 009.

FBG_CH1_00090351

**DEBTORS' EXHIBIT NO. 175**
**Page 126 of 1907**

banker in May 2025, which showed strong financial trends and future trajectories and reflected Wall Street's validation of the Company's financial health.

178.    Based on those assurances and representations and Onset's independent diligence, Onset agreed to enter into a Forbearance Agreement dated May 1, 2025, by and among Onset and the Carnaby Obligors (the "First Forbearance Agreement").   Under the First Forbearance Agreement, among other things, Onset agreed to suspend declaring an Event of Default under the Carnaby Lease Documents provided the Company delay the Carnaby Monthly Lease Payment, plus certain forbearance fees, until no later than May 30, 2025.  Onset's agreement to forbear also provided First Brands the significant benefit of the continued use (*i.e.*, wear and tear) of Onset's equipment—as well as possession of (and ability to sell) Onset's inventory—without further cost to First Brands during the forbearance period.

179.    The First Forbearance Agreement documented the assurances and representations that Ed and First Brands gave to Onset to induce Onset to agree to the forbearance.  Specifically, the Recitals to the First Forbearance Agreement explicitly stated that, "[i]n connection with a refinance project that impacts Lessee, the Guarantors, and First Brands Group, Lessee has requested that Lessee be allowed to make the [May monthly lease payment] due under each Schedule . . . on May 30, 2025." (Ex. 50 (First Forbearance Agreement, Recitals § C).)  Further, in Section 6(a) of the First Forbearance Agreement, entitled "Representations and Warranty," the Carnaby Debtors and the Carnaby Guarantors represented that, "[e]xcept for the unique circumstances related to the refinance involving Lessee[s], Guarantors, and related parties, Lessee is able to timely pay the [May monthly lease payments] together with all other payments due under the Lease and is able to perform in all other respects and in the ordinary course of business under the [Lease Documents]." (*Id.* § 6(a).)  The Carnaby Debtors and Carnaby Guarantors further

123

FBG_CH1_00090352

**DEBTORS' EXHIBIT NO. 175**
**Page 127 of 1907**

represented in Section 6(c) that "[t]he delay in making the [May monthly lease payments] is related to the refinance involving Lessee, Guarantors, and related parties, and is not a result of changing market conditions or a material adverse change in Lessee's financial condition." (*Id.* § 6(c).)

180.    Section 6(b) of the First Forbearance Agreement included a "Representation and Warranty" that, "[e]xcept for not timely paying the [May monthly lease payments]," the Carnaby Debtors are "in full compliance with all other terms and conditions set forth in the [MLAs and the Lease Schedules], including, but not limited to the representation and warranties set forth in the [MLAs], and no other Events of Default exist under the [MLAs]." Likewise, Section 12 of the First Forbearance Agreement, entitled "Affirmation of Guarantees," provided that the "[Carnaby] Guarantors consent to the terms hereof and acknowledge and agree that the [MLAs, the Lease Schedules,] . . . and the Guarantees, and this [First Forbearance] Agreement, are fully enforceable in accordance with their respective terms. [Carnaby] Guarantors acknowledge and consent to all of the agreements, covenants and representations made herein by Lessee." (*Id.* § 12.)

181.    The First Forbearance Agreement also contained a release of claims by the Carnaby Debtors and the Carnaby Guarantors. The Carnaby Debtors and the Carnaby Guarantors agreed to "release, waive, and forever discharge" Onset from:

> any and all claims of any kind, lawsuits, actions, claims for relief, demands, debts, covenants, contracts, obligations, liabilities, damages, setoffs, counterclaims, breaches of contract, or of any relationship, acts, omissions, claims of recoupment, defenses to payment or performance, costs, and expenses of whatever type, kind, description, character or nature, whether know[n] or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated," including those that "may subsequently accrue based on actions that were taken prior to the date of this Agreement."

(*Id.* § 7(a).)

182.    Ed, Baker, and Kumar signed the First Forbearance Agreement on behalf of the Carnaby Debtors.

FBG_CH1_00090353

**DEBTORS' EXHIBIT NO. 175**
**Page 128 of 1907**

### ii.        The Second Forbearance Agreement

183.    In May 2025, as the deadline for the First Forbearance Payment approached, Ed informed Onset that First Brands and the Carnaby Obligors would need to request a second forbearance.  During a call with Onset on or about May 28, Ed, along with Graham and Baker, shared that the ongoing refinancing of First Brands' European operations was progressing but some more time was needed for completion.  As such, due to the continuing need to preserve cash, First Brands and the Carnaby Obligors preferred to suspend the First Forbearance Payment until June 27, 2025, and to suspend the Carnaby monthly lease payments for June 2025, which was also approximately $200 million, until July 1, 2025.  As done in connection with the First Forbearance Agreement, and presumably to again avoid triggering an anticipatory repudiation, Ed and Baker repeatedly assured and represented to Onset that First Brands' financial condition was sound and that the only reason to temporarily suspend the Carnaby monthly lease payments was due to the European refinancing, which was taking longer to complete than first anticipated.

184.    Based on these assurances and representations, as well as the strength of First Brands' audited and quarterly financial statements, lender presentation materials prepared by First Brands' banker, additional public statements, and the many prior assurances and representations (as described above), Onset was willing to enter into a second forbearance agreement with a long-time valued and trusted client, as another accommodation, because of First Brands' apparent needs related to their European spin-off and refinancing efforts.  That being said, because Onset was being asked to not seek payment for an additional period of time which clearly held significant value for First Brands, Onset made clear that the terms of a second forbearance agreement must account for these weighty considerations, to which First Brands agreed.  The Second Forbearance Agreement, dated as of June 1, 2025 (the "Second Forbearance Agreement"), was similar in many respects to the First Forbearance Agreement, only this time "First Brands Group LLC and its

125

FBG_CH1_00090354

DEBTORS' EXHIBIT NO. 175
Page 129 of 1907

affiliates (collectively, 'FBG')" signed as well at Onset's demand. The Carnaby Debtors, the Carnaby Guarantors, and FBG represented that the reason for the forbearance was due *solely* to the European financing. As Section E of the Second Forbearance Agreement provides, First Brands "[wa]s in the process of closing a substantial refinance project that includes a separation of [First Brands'] US-based operations from its European operations," and that "[First Brands] is able to keep more cash on hand if it is not required to send funds to Lessee to allow Lessee to make the [May monthly lease payments] when due. As such, the delay in making the . . . [May monthly lease payments] will allow [First Brands] to retain more cash on hand, which will assist [First Brands] in its efforts to close the refinancing project." (Ex. 51 (Second Forbearance Agreement, Recitals § E).)

185. FBG and the Carnaby Obligors further represented that, "[e]xcept for the unique circumstances related to the refinance involving Lessee, Guarantors, and related parties, Lessee is able to timely pay the [May monthly lease payments] together with all other payments due under the [Lease Documents] and is able to perform in all other respects and in the ordinary course of business under the [Lease Documents]." (*Id.* § 10(a).) They also represented that "[t]he delay in making the [May monthly lease payments] is related to the refinance involving Lessee, Guarantors, and related parties, and is not a result of changing market conditions or a material adverse change in Lessee's financial condition." (*Id.* § 10(c).) Again, this was consistent with what Onset reasonably believed regarding First Brands' financial condition at the time—a belief that was based on the many years of dealings with First Brands, representations First Brands had made, and independent diligence Onset had performed.

126

FBG_CH1_00090355

**DEBTORS' EXHIBIT NO. 175**
**Page 130 of 1907**

186.   In Section 1, First Brands and the Carnaby Obligors also represented as "true, accurate, and complete" a statement describing how the Carnaby Transactions had successfully operated since their inception:

> [The Carnaby Entities] enter[] into arrangements with First Brands Group, LLC and its affiliates (collectively, 'FBG') whereby [the Carnaby Entities] acquire[] inventory and/or equipment from FBG. [The Carnaby Entities] finance[] the acquisition of the inventory and/or equipment with funds provided by Onset.  In exchange for these funds, [the Carnaby Entities] grant[] a collateral interest in the inventory and/or equipment to Onset.  [The Carnaby Entities] sell[] the inventory back to FBG as FBG, in turn, sells the inventory to its third-party customers in the ordinary course of business.  Carnaby uses the proceeds of these sales together with other funds advanced from FBG to pay its obligation to Onset.

(*Id.* at Recitals § D, § 1.)

187.   Also in Section 1, the Carnaby Debtors (*i.e.*, the Carnaby Entities) "represent[ed], warrant[ed], covenant[ed], and agree[d] that: . . . (c) the [MLAs and the Lease Schedules are] fully enforceable in accordance with [their] terms, and (d) [Onset] has fully performed and discharged all obligations and agreements set forth or contemplated by the [MLAs and the Lease Schedules], including without limitation, any obligation to advance funds to [the Carnaby Entities]."

188.   Like the first, the Second Forbearance Agreement also contained a release of claims by the Carnaby Debtors and the Carnaby Guarantors.  This time, however, First Brands also executed the same release.  Through this release, First Brands, the Carnaby Debtors, and the Carnaby Guarantors each and all agreed to "release, waive, and forever discharge" Onset from:

> any and all claims of any kind, lawsuits, actions, claims for relief, demands, debts, covenants, contracts, obligations, liabilities, damages, setoffs, counterclaims, breaches of contract, or of any relationship, acts, omissions, claims of recoupment, defenses to payment or performance, costs, and expenses of whatever type, kind, description, character or nature, whether know[n] or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated," including those that "may subsequently accrue based on actions that were taken prior to the date of this Agreement."

127

FBG_CH1_00090356

**DEBTORS' EXHIBIT NO. 175**
**Page 131 of 1907**

(*Id.* § 11(a).)

3.      The Second Forbearance Agreement was signed on behalf of the Carnaby Debtors by Ed, Baker, and Kumar; it was signed on behalf of First Brands by these same First Brands officers, as well as Graham, its CFO.

### iii.      The Third Forbearance Agreement

189.    As the first payments came due under the Second Forbearance Agreement, Ed unexpectedly informed Onset that First Brands and the Carnaby Obligors would need yet another period of paused payments under the Carnaby MLAs. In June 2025, Ed reported that First Brands had decided to abandon its European financing efforts and spinoff because they had underestimated how First Brands' lack of experience in the European credit markets would undermine its ability to execute on its plans. Instead, Ed and Graham explained that First Brands was pivoting to what they claimed it should have done in the first instance, which was to pursue a global refinancing of its U.S. credit facility. To that end, Ed claimed that First Brands continued to need to maintain substantial cash on its balance sheet to attract lenders. Ed again reiterated assurances and representations to Onset—presumably to avoid triggering an anticipatory repudiation—that First Brands was financially sound and could otherwise make its payment obligations under the Second Forbearance Agreement, and the *only* reason it needed a further forbearance was due to the global refinancing efforts. Ed asked if First Brands could make both the Carnaby monthly lease payments for May and June 2025 on or before August 29, 2025, with additional payments on the full amount of the debt to follow.

190.    Because this development was unexpected, Onset pressed Ed regarding his explanation and the purported reasons for why First Brands required a third forbearance, making clear that as much as Onset wanted to continue to accommodate and be flexible to help a valued client, First Brands was making a significant ask for a third forbearance because of the continued

128

FBG_CH1_00090357

**DEBTORS' EXHIBIT NO. 175**
**Page 132 of 1907**

passage of time since payment had been received and Onset's still-unfulfilled obligations to its own funding partners. To verify First Brands' continued representations, Onset performed inspections to confirm that Onset's equipment and inventory was where the agreements required it to be; Onset also received inventory reports verifying that Onset's inventory property had been replenished. After consulting with its funding partners, Onset expressed its willingness to enter a third forbearance agreement, the terms of which would again reflect the significant concession being made by Onset by not seeking payment and the considerable value this provided to First Brands. Again based on Ed's and other First Brands officers' assurances, Onset and the Carnaby Obligors entered into a Third Forbearance Agreement dated as of June 30, 2025 (the "Third Forbearance Agreement"; together with the First Forbearance Agreement and the Second Forbearance Agreement, the "Forbearance Agreements"), which was similar in its covenants and provisions to the First and Second Forbearance Agreements.

191.    Under the Third Forbearance Agreement, the Carnaby Obligors acknowledged their obligations and commitments to repay Onset approximately $1.88 billion in Carnaby Monthly Lease Payments—which were defined in the agreement as the "Forbearance Payment(s)" and encompassed late fees, forbearance fees, and additional payments identified in the First and Second Forbearance Agreements plus the contractual amounts under the Carnaby Transactions—including a payment of $20 million by July 3, 2025, and an additional $570 million by August 29, 2025. Additional payments would follow throughout the course of 2025 and 2026 until the Carnaby Obligors had repaid Onset back in full. Again, the contracted-for monthly lease payments, customary late fees, and additional forbearance fees applied to the 12 outstanding Carnaby Lease Schedules and, given that they had gone unpaid for several months, were starting to build.

129

FBG_CH1_00090358

**DEBTORS' EXHIBIT NO. 175**
**Page 133 of 1907**

192.    As before, First Brands and the Carnaby Obligors represented as "true, accurate and complete" a statement describing how the Carnaby Transactions had successfully operated since their inception, including that "[the Carnaby Entities] acquire[] inventory and/or equipment from FBG" and "finance[ed] the acquisition of the inventory and/or equipment with funds provided by Onset," which received "a collateral interest in the inventory and/or equipment." (Ex. 52 (Third Forbearance Agreement, § D, § 1).)

193.    Also, First Brands and the Carnaby Debtors acknowledged as "true, accurate and complete" that

> [First Brands] was working on a substantial refinance project that includes a separation of [First Brands'] US-based operations from its European operations. The European separation project failed and . . . . [First Brands] is no longer pursuing the European financing transaction at this time and instead is working on a global refinance of its senior debt, that will include a first and second line of credit, together with a separate junior credit facility.
>
> . . .
>
> [First Brands] has represented to Onset that if [First Brands] is able to keep more cash on hand and is not required to send funds to Lessee[s] to allow Lessee[s] to make the [May monthly lease payments and June monthly lease payments] when due, then [First Brands] is in a better position to close the new proposed refinance projects. Accordingly, the delay in making the [May monthly lease payments and June monthly lease payments] will allow [First Brands] to retain more cash on hand, which will assist [First Brands] in its efforts to close the proposed global refinance and junior financing projects. [First Brands], therefore, directly benefits from the Lessee[s] not making the [May monthly lease payments and June monthly lease payments] until after the global refinance project has closed.

(*Id.* at Recitals § E, § 1.)

194.    The Third Forbearance Agreement additionally provides, under the heading "Representation and Warranty," that the Carnaby Obligors' delay in making the Carnaby monthly lease payments for May and June 2025 is "related to the refinance projects . . . and is not a result

130

FBG_CH1_00090359

**DEBTORS' EXHIBIT NO. 175**
**Page 134 of 1907**

of changing market conditions impacting [First Brands'] core business operations or a material adverse change in Lessee's financial condition." (*Id.* § 10(c).)  As with the First and Second Forbearance Agreements, First Brands and the Carnaby Obligors represented that, "[e]xcept for the unique circumstances related to the various refinance projects involving Lessee, Guarantors, and related parties, Lessee is able to timely pay the Forbearance Payments due under this Agreement." (*Id.* § 10(a).)

195.    So, too, did the Third Forbearance Agreement contain a release of claims by First Brands, the Carnaby Debtors, and the Carnaby Guarantors, according to which they agreed to release, waive, and forever discharge Onset from:

> any and all claims of any kind, lawsuits, actions, claims for relief, demands, debts, covenants, contracts, obligations, liabilities, damages, setoffs, counterclaims, breaches of contract, or of any relationship, acts, omissions, claims of recoupment, defenses to payment or performance, costs, and expenses of whatever type, kind, description, character or nature, whether know[n] or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated," including those that "may subsequently accrue based on actions that were taken prior to the date of this Agreement."

(*Id.* § 11(a).)

196.    Finally, in connection with the Third Forbearance Agreement, on June 30, 2025, the Carnaby Debtors, each as sellers and lessees, entered into an Inventory and Fixed Asset Purchase Agreement with First Brands as buyer (the "First Brands June 2025 APA").  Pursuant to the First Brands June 2025 APA, First Brands agreed to purchase from the Carnaby Debtors certain items of inventory in exchange for a monthly payment of $45 million per month, starting with a payment on September 20, 2025 and continuing until May 2027.  (*See* Ex. 52 (Third Forbearance Agreement, Ex. E, ¶ 1 (ONSET_00036165)).)  First Brands also "recognize[d] its obligation to replenish and keep inventory levels at levels in compliance with the requirements found in the [applicable Carnaby MLA]." (*Id.* ¶ 2.)

131

FBG_CH1_00090360

**DEBTORS' EXHIBIT NO. 175**
**Page 135 of 1907**

197.    The Third Forbearance Agreement was signed on behalf of the Carnaby Debtors by Ed, Baker, and Kumar.  It was also signed on behalf of First Brands by these same First Brands officers, as well as CFO Graham.

198.    Before the Third Forbearance Agreement was executed on June 30, 2025, Onset sought and received regular updates from First Brands officers, including Ed, Graham, Baker, and Kumar, regarding the status of First Brands' efforts to refinance its credit facility, including during phone calls on or about June 20, 26, 27, and 30.  They reported that the refinancing was going to be led by Jefferies and that they expected it to be for $6 billion, likely making it the largest ever U.S. private company credit refinancing.  Consistent with what it was being told, Onset learned through widespread reporting that Jeffries had in fact commenced a $6 billion fundraise that was garnering significant attention and traction.  Ed later reported to Onset that First Brands expected the transaction would be oversubscribed and, as they entered August, that the refinancing was on track to close on time by August 29, 2025.  Onset also independently verified that Jefferies was well on its way to raising at least $6 billion, taking comfort from the market's response and Jefferies' successful efforts.

199.    The update calls with First Brands also provided reassurance.[47]  For example, on a June 27 call with Onset and its funding partners, Ed stated that First Brands was being very careful to preserve cash amounts and that he had confidence in the capital raise with Jefferies.  During the same call, Graham made assurances regarding the likely success of the refinancing.  After the Third Forbearance Agreement was signed, First Brands officers Ed, Graham, Baker, and Kumar

---

[47] During this same time, as the Third Forbearance Agreement was being negotiated, First Brands began discouraging Onset from exercising its rights.  For example, on a June 26 call, Baker told Onset that neither company would want litigation and that actions could be taken in court to slow Onset down and delay repayment should it choose to sue First Brands.

132

FBG_CH1_00090361

DEBTORS' EXHIBIT NO. 175
Page 136 of 1907

had additional calls with Onset and its funding partners on July 1, 14, and 25 and August 1, 6, 13, and 28, during which Ed made repeated assurances, including that: (a) the Jefferies capital raise was receiving positive feedback and proceeding without concern; (b) First Brands did not expect changes to its credit ratings; (c) First Brands' liquidity status as of mid-July had not changed and sat at about $1 billion; and (d) Q2 revenues were expected to be consistent.

### iv.        Failed Efforts to Reach a Fourth Forbearance Agreement

200.    As required by the Third Forbearance Agreement, on July 3, 2025, the Carnaby Obligors made the first payment of $20 million.  But as the August 29, 2025 deadline for the $570 million payment grew closer, First Brands indicated that it would not be in a position to make the payment—in direct contradiction of its many prior assurances and representations.

201.    In August 2025, Onset learned through a public statement by First Brands that a potential secondary financing source had advised First Brands that it required the commission of a quality of earnings report ("Q of E").  A Q of E is a comprehensive financial analysis performed by an independent third party that assesses a company's earnings to determine the sustainability and reliability of its financial performance, going beyond the financial statements to identify underlying risks and normalize earnings.  Ed shared with Onset during the August 6 call that First Brands had not anticipated needing such a report and the unexpected last-minute demand for it would delay First Brands' otherwise successful refinancing efforts.  Because the refinancing was now unable to close on time, the payment owed under the Third Forbearance Agreement could not be paid because First Brands continued to need to reserve cash on its balance sheet until the refinancing closed.  Ed told Onset that he expected, however, that the First Brands capital raise would be able to generate *more* interest by providing the Q of E to prospective investors; he also suggested this would likely lead to better refinancing terms.  For his part, Graham stated during the same call that he had no concerns about the impact of the Q of E on the planned refinancing

133

FBG_CH1_00090362

DEBTORS' EXHIBIT NO. 175
Page 137 of 1907

efforts, particularly given that a recently completed European Q of E had identified $3.9 million in additional EBITDA. Ed also cautioned that, if Onset insisted on payment under the Third Forbearance Agreement and opted to exercise its rights to declare First Brands in default, it would jeopardize First Brands' refinancing efforts and, ultimately, compromise First Brands' ability to pay Onset the total amount owed in the near future.

202. Again demonstrating willingness to work with First Brands and not risk derailing its refinancing efforts, Onset responded that it would consider again accommodating First Brands by entering into a fourth forbearance agreement, but only if First Brands provided Onset with detailed information regarding First Brands' refinancing efforts, including regular updates on the status of the Q of E (which Graham said was being prepared by Deloitte LLP ("Deloitte")), a draft of which must be shared with Onset when complete, and a revised repayment schedule that included a reasonable up-front payment by First Brands to Onset.

203. Onset explained to Ed that the up-front payment was required because, with three prior forbearance agreements, Onset had displayed incredible patience delaying its receipt of nearly $700 million in scheduled repayments in order to accommodate First Brands. What's more, in connection with the three prior forbearances, First Brands and Ed, on behalf of himself and Patrick, had repeatedly assured and represented to Onset that First Brands was financially sound and capable of making repayments but for the temporary need to maintain a strong cash position on its balance sheet. Onset also reminded Ed that Onset was aware from First Brands' financial reporting that, despite whatever challenges the Company was now navigating, it continued to earn hundreds of millions of dollars a month from its worldwide sales. Onset explained to Ed that a reasonable up-front payment with a delayed repayment schedule for the balance, along with the requested financial details, would provide necessary comfort and confirmation to Onset and its

134

FBG_CH1_00090363

own funding partners that First Brands remained committed to and capable of satisfying its obligations to Onset, while allowing First Brands' the additional accommodation it now needed.

204.    Yet First Brands refused.  According to Ed, disclosure of information regarding First Brands' refinancing efforts would jeopardize those efforts.  And as to a repayment schedule, First Brands was unable to make any commitment.  Despite apparently now teetering on the edge of default, Ed implored Onset to stand down and remain on the sidelines and refrain from exercising its rights.  Ed sought to convince Onset that it was in its best interests to wait until the refinancing was completed to receive any payment—even a nominal good-faith payment in exchange for a forbearance.  To further discourage Onset from exercising its rights to recover the funds it was owed, Ed promised that full payment was forthcoming and repeatedly warned Onset— including, for example, on or about June 26, 2025—that doing anything other than agreeing to further forbearance would be disastrous for all parties.  This message was reiterated in August by First Brands, including through a formal letter dated August 8, 2025 and signed by Kumar to Onset's outside counsel, threatening that the Company's refinancing efforts as well as the Carnaby Debtors' ability to satisfy their obligations under the Forbearance Agreements would be "significantly impaired" should Onset declare default or seek to exercise remedies.  (*See* Ex. 53 (Aug. 8, 2025 Letter to Onset).)

205.    These threats were further expanded upon in formal letter that was dated August 20, 2025 and sent to Onset's outside counsel by First Brands' outside counsel (Brian Troyer, who had previously served as First Brands EVP and General Counsel and executed the Trico Lease Documents along with Ed, Graham, and Kumar; now a partner at a well-respected law firm).  (*See* Ex. 54 (Aug. 20, 2025 Letter to Onset).)  In response to Onset's demand for payment from First Brands and the fulfillment of other conditions in exchange for Onset continuing to forbear from

135

FBG_CH1_00090364

exercising its rights, First Brands' outside counsel represented that (a) "Lessees have advised, and as is publicly verifiable," First Brands was "actively pursuing market refinancing of their debt which has been delayed at the request of potential financing sources for a QOE and further diligence;" (b) "As Onset knows, these efforts are in the best interest of the Company and its stakeholders and lenders, including Onset, as we continue to believe a successful refinancing will enable Lessees to make the payments due to Onset"; (c) but that "more time is needed, and it is in everyone's interest to allow the process to be completed"; and (d) if Onset filed a lawsuit, it "would be value-destructive and self-defeating" and "threaten to derail the Company's efforts to secure refinancing and therefore would have material and detrimental consequences for the Company and its value." (*Id.*)

206.    When Onset informed Ed and First Brands' outside counsel that their response was wholly unacceptable, First Brands adopted a different tack.  Ed now claimed, on or about August 21, 2025, that Patrick, despite his great reluctance to do so, would seek to sell a portion of his personal equity in First Brands to repay Onset.  In exchange for this new approach, however, Ed insisted that Onset provide an open-ended forbearance in or about early September 2025.  In other words: First Brands would not make any interim payments until an equity sale was consummated, nor would it provide any transparency into the timing, process, or likelihood of such a sale.  Onset was in essence being asked by Ed and First Brands to remain at a standstill indefinitely, despite Onset's prior accommodations and own continuing obligations to its funding partners.

207.    When Onset declined this commercially unreasonable and untenable proposal, Ed pivoted yet again.  He reported that First Brands, rather than pursuing a spin-off and/or refinancing—as had originally been contemplated *for months* first in Europe and then in the U.S.— or a partial sale of equity in the Company, Patrick and First Brands had engaged Lazard Frères &

136

FBG_CH1_00090365

**DEBTORS' EXHIBIT NO. 175**
**Page 140 of 1907**

Co. LLC ("Lazard") to explore a sale of the entire Company. He further reported that the law firm Weil, Gotshal & Manges LLP ("Weil") had been engaged to advise and represent the Company in connection with its efforts to secure financing or sell the Company and negotiate a resolution with Onset. After these advisors were retained at Patrick's direction, Ed repeatedly assured Onset, in an effort to convince it to not exercise its rights, that the proceeds of such a sale would be applied first to repay Onset in full, ahead of payments to any of First Brands' other lenders and before Patrick received any distribution on account of his equity. First Brands' outside counsel at Weil similarly told Onset's outside counsel that declaring First Brands in default would lead to disastrous consequences for all parties, including years of costly litigation and substantial delay before Onset would receive payment, if ever.

208. Onset was growing alarmed by the shifting narratives offered by First Brands and Ed, and by the Company's continuing lack of transparency and apparent inability to make any payments. Onset was particularly skeptical of First Brands' assertion that it could not make even a nominal up-front repayment, given First Brands' repeated assurances and representations that it was financially sound and capable of satisfying its obligations to Onset, and balance sheets showing hundreds of millions of dollars in monthly sales revenue. First Brands also continued making all of the Trico monthly payments on time and in the ordinary course of business.

209. Onset faced a daunting Hobson's choice: declaring default and being embroiled in costly litigation for years or forbearing further in accommodation of First Brands' purportedly legitimate efforts to refinance or sell equity to maintain its ability to fulfill its obligations. Despite Onset's significant concerns, on the strength of representations made by First Brands' outside counsel at Weil regarding these renewed refinancing and sale efforts—as well as on continued representations from the Company itself (including, for example, supplemental lender presentation

137

FBG_CH1_00090366

DEBTORS' EXHIBIT NO. 175
Page 141 of 1907

materials prepared by First Brands' banker in July 2025) and indicators of the market's confidence in First Brands (notably, that the Company's debt continued to trade at par throughout the summer)—Onset indicated it was willing to consider a fourth forbearance.

210.    On August 26, 2025—three days before First Brands was required to make a $570 million payment under the Third Forbearance Agreement—Onset proposed a fourth forbearance agreement.  Under Onset's proposal, First Brands would have been required to make payment of $20 million to Onset by September 5 and weekly payments of $5 million through October 31, while deferring any additional, more substantial payments until November 2025.  As a condition to a fourth forbearance, Onset required First Brands to provide regular transparency into the ongoing sale process, including: (a) information on the progress of its sales efforts; (b) a draft of the Q of E being prepared by Deloitte once completed; and (c) weekly updates from Lazard as the sale process advanced.  Onset and First Brands scheduled a meeting for August 28, 2025, to discuss the proposal.

211.    The August 28 meeting was attended (virtually) by Onset through its senior officers and outside counsel, and attended by First Brands through Ed, other First Brands officers, and their outside counsel.  At the meeting, Onset had expected to receive a response to Onset's August 26 proposal or, at a minimum, a counterproposal.  First Brands, after all, was on the verge of defaulting on a $570 million payment, which would entitle Onset to accelerate the entire $1.88 billion in Carnaby Obligations.  Onset could also immediately trigger all of its remedies, including seizing or prohibiting First Brands from using or selling vast amounts of inventory and operating equipment that served as collateral for its outstanding fundings, as well as forcing First Brands to sell equity to repay the full the Carnaby Obligations.

FBG_CH1_00090367

DEBTORS' EXHIBIT NO. 175
Page 142 of 1907

212.    But First Brands offered Onset nothing.   First Brands and its outside counsel claimed that First Brands could not make any payment to Onset, while also again strenuously discouraging Onset from taking action to enforce its rights, because doing so they warned would be disastrous for all parties by spoiling First Brands' efforts to secure sufficient funds to pay Onset. According to Ed and First Brands' outside counsel, First Brands was expecting an indication of interest the following week from a substantial buyer; any payment to Onset, even the $20 million payment Onset had requested, would jeopardize the sale process.  Onset inquired how a payment that was less than four percent of the $570 million payment that was due would jeopardize a multibillion-dollar sale process.  After all, First Brands had represented and warranted all along— representations that had not been disavowed or corrected—that it was financially sound, capable of making payments, and continued to earn hundreds of millions of dollars in monthly revenues.

213.    Neither the First Brands' officers nor its outside counsel provided any explanation. Onset asked Ed if First Brands was making any payments to First Brands' other lenders or funders. Ed refused to answer.  The meeting ended without any resolution.  The only thing appearing certain was that First Brands would fail to make the $570 million payment to Onset that was due the next day and that it had failed to offer Onset any credible basis to avoid being declared in default.

> v.        **The Notice of Default**

214.    Despite its confounding meeting with First Brands on August 28, 2025, Onset remained willing to explore the possibility of a fourth forbearance, and the parties' outside counsel met on the morning of August 29 to continue discussions.  As expected, that day passed with First Brands failing to make the $570 million payment required under the Third Forbearance Agreement.  Still, Onset refrained from issuing a notice of default.

215.    In late August and early September 2025, numerous media outlets started to report on First Brands' stalled efforts to refinance and mounting questions regarding the Company's

139

FBG_CH1_00090368

**DEBTORS' EXHIBIT NO. 175**
**Page 143 of 1907**

financial soundness, which raised serious concerns for Onset regarding the truthfulness and accuracy of First Brands' repeated representations and warranties regarding its financial condition and ability to fulfill its obligations to Onset. In early September, First Brands then shared with Onset more distressing news: the bidder First Brands and its counsel had assured Onset just days earlier would make an offer—that would lead to repayment of the Onset debt—had lost interest.

216.    Onset could wait no longer. On September 8, 2025, Onset issued a Notice of Default and Acceleration under the Third Forbearance Agreement (the "Default Notice"), which made the entire $1.88 billion in outstanding Carnaby Obligations immediately due and payable. (Ex. 55 (Notice of Default).)

**C.    First Brands Collapses into Chapter 11 Bankruptcy and Its Fraud Is Revealed**

217.    On September 24 and 28, 2025 (as applicable, the "Petition Date"), the Debtors commenced the Chapter 11 Cases by filing voluntary petitions with this Court.

218.    Through disclosures made early in the bankruptcy case and other announcements in the media around the time of the Petition Date, Onset (together with the financial media and the world) learned a number of shocking details about First Brands. Among other revelations, Onset learned for the first time that there were other off-balance sheet financing arrangements, including with Aequum, UMB, GLAS Trust, and Evolution (collectively, the "SPV Lenders"). Onset was stunned to hear Debtors' advisors in the first days of this bankruptcy proceeding claim that they were unable to identify Onset Property or ascribe a value to such property, despite the consistent and substantial reporting First Brands and its senior executives provided to Onset in the days, months, and years prior to the Petition Date.

219.    Debtors have more recently alleged that Patrick, Ed, Brumbergs, Baker, Graham, and other unnamed insiders at First Brands perpetrated a massive fraud scheme. In their Amended Complaint filed less than one month ago on January 19, 2026, Debtors alleged that these

140

FBG_CH1_00090369

**DEBTORS' EXHIBIT NO. 175**
**Page 144 of 1907**

defendants "concealed First Brands' true financial condition from counterparties, creditors, and lenders by personally directing the alteration of First Brands' financial statements." (Ex. 2 (Patrick Amended Complaint, ¶ 67).)  This "intentional alteration of First Brands' financial statements led to material misstatements of First Brands' financial condition . . . [and] made it difficult, if not impossible, to accurately assess [First Brands'] financial condition and solvency." (*Id.* ¶ 69.) Further, these defendants were also "misappropriating massive sums—totaling hundreds of millions, if not billions, of dollars—from First Brands to fund [Patrick] James' and his family's lavish lifestyle." (*Id.* ¶ 70.)  According to Debtors, misappropriated "funds were transferred from SPV Debtors to a non-Debtor entity controlled by James." (*Id.* ¶ 61.)  As well, "[i]nadequate books and records were maintained for these SPV Debtors, and cash that was supposed to be transferred to First Brands subsidiaries under the applicable transaction documents was transferred to [Patrick's entity] instead." (*Id.*)

220.    Debtors now admit that First Brands "overstated the gross book value of its inventory, which improperly inflated the value of its assets" and "failed to write down significant excess and obsolete inventory at multiple locations." (*Id.* ¶ 107.)  "Determining First Brands' true financial position," Debtors allege, "is complicated further by numerous instances in which [Defendants] made unsupported, manual changes to [First Brands'] financial statements, such as by reclassifying expenses as assets, inflating sales figures, and reclassifying certain expenses 'below the line' in EBITDA calculations." (*Id.* ¶ 108.)

221.    In Debtors' November 3, 2025 original complaint (the "Original Complaint"), filed only against Patrick and entities associated with him, Debtors alleged that *Onset was one of the principal victims* of this massive fraud.  The Original Complaint provides examples of the fraudulent diversion of capital provided Onset—financing that was provided to the Carnaby

141

FBG_CH1_00090370

**DEBTORS' EXHIBIT NO. 175**
**Page 145 of 1907**

Debtors according to the well-documented and confirmed terms of the Carnaby Lease Documents—to accounts held by the Carnaby Debtors, and then to Patrick's personal entities:

> At the start of the day on April 4, 2025, Carnaby FA, an SPV that sits under Viceroy Private Capital, LLC (both siloed SPVs that are not subsidiaries of First Brands Group, LLC) had just $4,833.98 in its accounts. On that same day Carnaby FA received $67.2 million as part of a purported sale-leaseback transaction from Onset, ostensibly collateralized by First Brands' assets. Then, also on April 4, 2025, Carnaby FA—an entity which, that very morning had less than five thousand dollars in its bank account—paid Defendant Patrick James Trust approximately $17 million.

> On January 15, 2025, for example, the bank account for Carnaby Inventory IV LLC ("Carnaby IV")—another SPV sitting under Viceroy Private Capital, LLC—had just $22,137.40 in deposits in its account at the beginning of the day. On that same day, Onset provided approximately $192 million in purported sale-leaseback funding, again ostensibly collateralized by First Brands' assets. The same day, Carnaby IV paid $25 million into an account belonging to Defendant Patrick James Trust.

> Onset provided a purported sale-leaseback in the amount of $115.2 million on March 10, 2025, which was followed the same day by a $35 million transfer from Carnaby IV to Defendant Patrick James Trust. Following additional transfers, Carnaby IV held only $16.9 million in its account by March 11, and on March 12, Onset provided another $57.6 million from a purported sale-leaseback. On March 13, Carnaby IV transferred an additional $35 million to Patrick James Trust. By the beginning of the day on March 17, 2025, Carnaby IV held only a balance of $2,952.95.

(*FBG v. James*, [Docket No. 17] ¶¶ 72–74; *see also FBG v. James*, [Docket No. 19] ¶¶ 41–43 (same).) As a result of this and similar conduct, the Debtors allege that the Defendants siphoned at least approximately $200 million of funding received from Onset by fraudulently diverting it to Patrick and his affiliated entities. (*FBG v. James*, [Docket No. 17] ¶ 75.)

222. The James Brothers Indictment confirms that Onset is a victim. It unequivocally alleges that Patrick and Ed "faked and falsely inflated invoices for accounts receivable and payable; double- and triple-pledged loan collateral; falsified corporate financial statements; and concealed

142

FBG_CH1_00090371

**DEBTORS' EXHIBIT NO. 175**
**Page 146 of 1907**

substantial liabilities from lenders." (Ex. 1 (James Brothers Indictment, ¶ 2).) Further, the period of such fraud is from 2018 through 2025—the exact time period during which Onset provided First Brands financing through the Trico and Carnaby Transactions. In fact, it was same growth acquisition strategy Ed pitched to Onset that coincided with the fraud: "After years of acquisitions and expansion using fraudulently obtained financing, First Brands faced overwhelming liabilities and unsustainable cash requirements." (*Id.* ¶ 3.)

223. The James Brothers Indictment also alleges that Patrick and Ed "made false and misleading representations to the Off-Sheet Lenders," like Onset, "to fraudulently induce them to extend and expand financing." (*Id.* ¶ 25.) They caused inventory to be pledged to off-balance sheet lenders that "purported to be unencumbered but in fact was already subject to liens by, or otherwise pledged to, First Brands' senior lenders and remained on First Brands' balance sheet." (*Id.*) Still further, Patrick and Ed allegedly "submitted falsified inventory schedules and account documentation" to lenders like Onset and "repeatedly caused fake inventory schedules to be provided to satisfy lender diligence and reporting requirements." (*Id.*)

224. Consistent with facts alleged here by Onset, the James Brothers Indictment goes on to assert that inventory financers like Onset advanced funds to entities controlled by Patrick, which, in turn, entered sale-leaseback transactions and ultimately "funnel[led] the cash from the Off-Sheet Lenders to First Brands." (*Id.* ¶ 22.) These financing arrangements "were directed by Patrick," "negotiated by" Ed, and "implemented through a series of deliberate and coordinated acts of fraud designed to conceal debt, mislead lenders, and obscure the true source and use of funds." (*Id.* ¶ 23.) Patrick and Ed utilized "extensive acts of concealment to disguise both the source of proceeds obtained from the Off-Sheet Lenders" and "the repayment of obligations from First Brands to the Off-Sheet Lenders." (*Id.* ¶ 26.) Funds from lenders like Onset were "deliberately

143

FBG_CH1_00090372

DEBTORS' EXHIBIT NO. 175
Page 147 of 1907

routed through a customer collections entity maintained outside the First Brands corporate structure and then were disbursed across First Brands subsidiaries before being swept back into First Brands' operating account"—a system that was specifically "designed" so that "the funds appeared to be ordinary customer receipts from retail subsidiaries rather than loan proceeds from related-party financing arrangements." (*Id.*)

225.    As the James Brother Indictment makes clear, despite Onset's fulsome, repeated, and committed due diligence, the true financial circumstances of First Brands went undetected by Onset (and the automotive industry and Wall Street writ large) specifically because the information provided by First Brands to Onset (and others) was false, fabricated, and intended to deceive.

226.    At the end of the day, both Debtors and DOJ now contend that the audited financial statements, the Company's regular financial reporting, and the credit agency reports, and therefore the endless stream of confirmatory written and oral assurances, representations, and warranties made by Patrick, Ed, and their insider cohorts regarding the *bona fides* of First Brands were false and misleading.  As a result, Patrick, Ed, and their co-conspirators orchestrated the outright criminal theft of Onset's funding provided in good faith to First Brands.

**D.    Additional Allegations Regarding Defendants' Fraud**

227.    Patrick enlisted the assistance of Ed and other First Brands officers to effectuate a large-scale fraud scheme against Onset and First Brands' other lenders and financing partners that allowed First Brands to reap the benefit of billions of dollars in financing, while it also allowed Patrick and Ed to reap hundreds of millions of dollars from their fraud.  In doing so, and as alleged in the Debtors' pleadings and the James Brothers Indictment, Patrick, Ed, and other First Brands officers falsified financial statements and invoices to Onset, double- and triple-pledged Onset's collateral, hid liabilities from Onset, misrepresented deal information to Onset executives, and transferred Onset's funds to Bowery Finance II and other entities controlled by Patrick, which he

144

FBG_CH1_00090373

**DEBTORS' EXHIBIT NO. 175**
**Page 148 of 1907**

used as a slush fund. According to Debtors, from 2022 through 2025, nearly $12 billion flowed through Bowery Finance II, including transfers between Patrick, the Patrick James Trust and his affiliated entities, and transfers with First Brands and its business units. (Ex. 2 (Patrick Amended Complaint, ¶ 61).)

228. Patrick and Ed orchestrated the misconduct, but Baker, Kumar, Graham, and Brumbergs assisted them, either by helping First Brands to acquire financing from Onset through fraudulent means, and/or by ensuring the delivery of those funds to Patrick, the Patrick James Trust, Bowery Finance II, and third parties acting for Patrick's and his family's benefit. Patrick directed and worked closely with Ed, Baker, Kumar, Graham, and Brumbergs to implement the fraudulent financings and improper transfers. Patrick, Ed, Baker, Kumar, Graham, and Brumbergs structured the terms of the Onset Transactions and created and disseminated to Onset false and fraudulent financial information, including the Trico Lease Documents and Carnaby Lease Documents, confirmatory due diligence regarding the Onset Transactions, and representations and warranties contained in the foregoing and in the Forbearance Agreements. In oral communications to Onset, as described herein, Ed served as Patrick's agent and spokesperson, communicating the false and fraudulent statements described herein on his own behalf and on behalf of his brother.

229. Additionally, according to Debtors, Patrick transferred significant portions of the financing provided by Onset and other SPV lenders to numerous entities that he personally controlled. (Ex. 2 (Patrick Amended Complaint, ¶ 61).) Included among these personal entities was Bowery Finance II, which Patrick allegedly used as a "slush fund" and through which nearly $12 billion passed during the period 2022 through 2025 to accounts held by other entities affiliated with Patrick, including the Patrick James Trust. (*Id.*) Other affiliated entities that allegedly received payments from Debtors at Patrick's direction include, for example, Larchmont (Patrick's

145

FBG_CH1_00090374

**DEBTORS' EXHIBIT NO. 175**
**Page 149 of 1907**

family office, which received weekly invoices from First Brands) and Battery Park (Patrick's "personal" business that received more than $18 million from First Brands accounts). (*See, e.g., id.* ¶¶ 86–92, 95.) Still other fraudulent transfers were effected from Debtors' accounts to entities controlled by Patrick, including Albion Realty, Alester, and Pegasus Aviation. (*See, e.g., id.* ¶¶ 97–98.)

230. As Debtors allege, these transfers to Patrick's personal entities "were apparently made in order to meet repayments due to Onset and third-party factors" (*id.* ¶ 61) and to "conceal that the funds [paid by Onset and other SPV creditors] were simply returning to First Brands in what were internally referred to as 'round trips,' 'RT,' or 'corporate initiatives'" (*id.* ¶ 65). Still further, "Upon information and belief, James, Brumbergs, and Graham regularly reviewed the Company's cash position, including the availability of 'round trip' funding. . . . James would determine how such funds were spent, and Brumbergs would direct the Finance department to distribute the funds accordingly." (*Id.*)

## FIRST CLAIM FOR RELIEF

### (Breach of the Forbearance Agreements Against the Carnaby Debtors, the Carnaby Guarantors, and First Brands)

231. Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

232. The Forbearance Agreements are valid and binding agreements to which Onset and Defendants Carnaby Debtors, Carnaby Guarantors, and First Brands are parties.

233. Onset performed all of its obligations under the Forbearance Agreements requisite to filing this Complaint by, among other things, not filing this Complaint until such a time of a Forbearance Termination Event (as defined in the Forbearance Agreements).

146

FBG_CH1_00090375

**DEBTORS' EXHIBIT NO. 175**
**Page 150 of 1907**

234.    Defendants Carnaby Debtors, Carnaby Guarantors, and First Brands defaulted on their obligations under the Forbearance Agreements by failing to pay or cause to be paid the payments set forth in the Forbearance Agreements.  Onset has not been paid any amounts due under the Forbearance Agreements.

235.    Defendants Carnaby Debtors, Carnaby Guarantors, and First Brands also breached the representations and warranties contained in the Forbearance Agreements regarding (a) First Brands' financial soundness and its ability to timely repay Onset; and (b) to the extent that Onset or the Carnaby Debtors, as applicable, are determined not to have ownership or valid first-priority liens on, and security interests in, the Carnaby Property.

236.    Defendants Carnaby Debtors, Carnaby Guarantors, and First Brands further breached the Forbearance Agreements and the releases therein by filing the Complaint against Onset.

237.    As a result of these breaches and defaults, Onset is entitled to exercise all of its remedies under the Forbearance Agreements, including, at a minimum, to recover $1.88 billion plus 18% annual interest and all costs and expenses, including attorneys' fees, of enforcing the Forbearance Agreements.

238.    Further, pursuant to the terms of the Forbearance Agreements, Onset is entitled to immediate possession of the Carnaby Property or, in the alternative, to enjoin any Defendants in possession of Carnaby Property, including Defendants ABC Corporation(s) 1–100 and John and Jane Doe(s) 1–100, from using or selling any of the Carnaby Property.

147

FBG_CH1_00090376

**DEBTORS' EXHIBIT NO. 175**
**Page 151 of 1907**

## SECOND CLAIM FOR RELIEF

**(Breach of the Carnaby Lease Documents Against the Carnaby Debtors and the Carnaby Bailees)**

239.     Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

240.     The Carnaby Lease Documents are valid and binding agreements.

241.     Onset performed all of its obligations under the Carnaby Lease Documents by, among other things, purchasing the Carnaby Property and leasing it to the Carnaby Debtors.

242.     The Carnaby Debtors defaulted on their obligations under the Carnaby Lease Documents by failing to timely pay the Carnaby Monthly Lease Payments.

243.     The Carnaby Bailees breached their obligations under the Carnaby Lease Documents to the extent that, as Debtors have alleged, the Carnaby Bailees did not deliver good title free and clear to the Carnaby Property to the Carnaby Debtors and Onset.

244.     As a result of these defaults, Onset is entitled to exercise all of its remedies under the Carnaby Lease Documents.

245.     Also as a result of these defaults, Onset is owed payment of $1.88 billion, with 18% interest thereon accumulating from that date, as well as costs and fees incurred in collecting these amounts, including attorneys' fees.

## THIRD CLAIM FOR RELIEF

**(Breach of the Carnaby Guarantees Against the Carnaby Guarantors)**

246.     Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

FBG_CH1_00090377

**DEBTORS' EXHIBIT NO. 175**
**Page 152 of 1907**

247.   The Carnaby Guarantors jointly and severally, irrevocably and unconditionally guaranteed payment and performance of all the obligations of the Carnaby Debtors under the Carnaby Lease Documents and Forbearance Agreements.

248.   Each Carnaby Guaranty provides that Onset may proceed against each Carnaby Guarantor "whether or not action is brought against Lessee[s]" and each Carnaby Guarantor "waives any right to require [Onset]: to (a) proceed first or otherwise against Lessee[s]; (b) proceed against or exhaust any security it may hold; or (c) pursue any other remedy in [Onset's] power whatsoever." (*See, e.g.*, Ex. 28 (Carnaby IV Guaranty, Carnaby Capital Holdings, LLC ¶¶ 2, 4); Ex. 33 (Carnaby FA Guaranty, Carnaby Capital Holdings, LLC ¶¶ 2, 4).)

249.   As a result of the defaults under the Carnaby Lease Documents, the Carnaby Guarantors are jointly and severally indebted to Onset for all amounts owed to Onset as described herein relating to the Carnaby Lease Documents.

## FOURTH CLAIM FOR RELIEF

### (Declaratory Judgment Against All Defendants as to Ownership or Priority Security Interest in Carnaby Property)

250.   Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

251.   An actual and justiciable controversy exists between Onset and Defendants concerning ownership of, and rights to, the Carnaby Property.

252.   Onset contends, and is informed and believes that Defendants deny, that Onset is the rightful owner of the Carnaby Property, free and clear of all liens, claims, and encumbrances.

253.   In the alternative, Onset contends, and is informed and believes that Defendants deny, that Onset holds a valid, perfected, first-priority security interest in the Carnaby Property.

FBG_CH1_00090378

**DEBTORS' EXHIBIT NO. 175**
**Page 153 of 1907**

254.     Accordingly, Onset seeks a judicial declaration confirming that Onset (a) is the owner of the Carnaby Property, free and clear of all liens, claims, and encumbrances; or, in the alternative, (b) holds a valid, perfected, first-priority security interest in the Carnaby Property.

## FIFTH CLAIM FOR RELIEF

### (Breach of the Trico Lease Documents Against Trico and the Trico Bailees)

255.     Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

256.     The Trico Lease Documents are valid and binding agreements.

257.     Onset performed all of its obligations under the Trico Lease Documents by, among other things, purchasing the Trico Property and leasing it to the Trico Debtors.

258.     The Trico Debtors defaulted on their obligations under the Trico Lease Documents by failing to timely pay the Trico Monthly Lease Payments.

259.     The Trico Bailees breached their obligations under the Trico Lease Documents to the extent that, as Debtors have alleged, the Trico Bailees did not deliver good title free and clear to the Trico Property to the Trico Debtors and Onset.

260.     As a result of these defaults, Onset is entitled to exercise all of its remedies under the Trico Leases Documents.

261.     Also as a result of these defaults, Onset is owed payment of $279,803,260.13, as well as costs and fees incurred in collecting these amounts, including attorneys' fees.

## SIXTH CLAIM FOR RELIEF

### (Breach of the Trico Guarantees Against the Trico Guarantors)

262.     Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

150

FBG_CH1_00090379

**DEBTORS' EXHIBIT NO. 175**
**Page 154 of 1907**

263.    The Trico Guarantors jointly and severally, irrevocably and unconditionally guaranteed payment and performance of all the obligations of the Trico Debtors under the Trico Lease Documents.

264.    Each Trico Guaranty provides that Onset may proceed against each Trico Guarantor "whether or not action is brought against Lessee[s]" and each Trico Guarantor "waives any right or claim of right to require [Onset]: to (a) proceed first or otherwise against Lessee[s]; (b) proceed against or exhaust any security it may hold; or (c) pursue any other remedy in [Onset's] power whatsoever." (*See, e.g.*, Ex. 20 (Trico Guaranty, Trico Group, LLC, ¶¶ 3, 5).)

265.    As a result of the defaults under the Trico Lease Documents, the Trico Guarantors are jointly and severally indebted to Onset for all amounts owed to Onset as described herein relating to the Trico Lease Documents.

## SEVENTH CLAIM FOR RELIEF

### (Declaratory Judgment Against All Defendants as to Ownership or Priority Security Interest in Trico Property)

266.    Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

267.    An actual and justiciable controversy exists between Onset and Defendants concerning ownership of, and rights to, the Trico Property.

268.    Onset contends, and is informed and believes that Defendants deny, that Onset is the rightful owner of the Trico Property, free and clear of all liens, claims, and encumbrances.

269.    In the alternative, Onset contends, and is informed and believes that Defendants deny, that Onset holds a valid, perfected, first-priority security interest in the Trico Property.

FBG_CH1_00090380

**DEBTORS' EXHIBIT NO. 175**
**Page 155 of 1907**

270.     Accordingly, Onset seeks a judicial declaration confirming that Onset (a) is the owner of the Trico Property, free and clear of all liens, claims, and encumbrances; or, in the alternative, (b) holds a valid, perfected, first-priority security interest in the Trico Property.

## EIGHTH CLAIM FOR RELIEF

### (Replevin of Carnaby Property Against All Defendants)

271.     Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

272.     Pursuant to the terms of the Carnaby Lease Documents, Onset is entitled to immediate possession of the Carnaby Property upon an Event of Default (as defined in the Carnaby Lease Documents).

273.     Also pursuant to the terms and conditions of the Carnaby Lease Documents, Defendants, including Carnaby Debtors, Carnaby Bailees, ABC Corporation(s) 1–100, and John and Jane Doe(s) 1–100, are no longer entitled to use and be in possession of the Carnaby Property and are wrongfully detaining it.

274.     Onset is entitled to an order (a) enjoining the foregoing Defendants from using the Carnaby Property; (b) directing the foregoing Defendants to deliver, or cause to be delivered, the Carnaby Property to a location to be designated by Onset, or such other location as agreed by the parties; (c) directing that the Carnaby Property be immediately and permanently seized and taken from the possession of the foregoing Defendants; and (d) directing that the Carnaby Property be delivered to Onset or its designated agent.

275.     In addition, Onset is entitled to sell the Carnaby Property that it recovers possession of, in accordance with applicable law, and to apply the proceeds of such sale consistent with its rights under the Carnaby Lease Documents.

FBG_CH1_00090381

DEBTORS' EXHIBIT NO. 175
Page 156 of 1907

## NINTH CLAIM FOR RELIEF

### (Replevin of Trico Property Against All Defendants)

276.   Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

277.   Pursuant to the terms of the Trico Lease Documents, Onset is entitled to immediate possession of the Trico Property upon an Event of Default (as defined in the Trico Lease Documents).

278.   Also pursuant to the terms and conditions of the Trico Lease Documents, Defendants, including Trico Debtors, Trico Bailees, ABC Corporation(s) 1–100, and John and Jane Doe(s) 1–100, are no longer entitled to use and be in possession of the Trico Property and are wrongfully detaining it.

279.   Onset is entitled to an order (a) enjoining the foregoing Defendants from using the Trico Property; (b) directing the foregoing Defendants to deliver, or cause to be delivered, the Trico Property to a location to be designated by Onset, or such other location as agreed by the parties; (c) directing that the Trico Property be immediately and permanently seized and taken from the possession of the foregoing Defendants; and (d) directing that the Trico Property be delivered to Onset or its designated agent.

280.   In addition, Onset is entitled to sell the Trico Property that it recovers possession of, in accordance with applicable law, and to apply the proceeds of such sale consistent with its rights under the Trico Lease Documents.

153

FBG_CH1_00090382

**DEBTORS' EXHIBIT NO. 175**
**Page 157 of 1907**

## TENTH CLAIM FOR RELIEF

**(Declaration that First Brands, the Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, Bowery Finance II, Patrick James, Edward James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, and Shekar Kumar Must Trace Their Cash and Other Property to Onset Property and/or Onset Transactions)**

281.   Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

282.   An actual and justiciable controversy exists between Onset and Defendant First Brands, the Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, Bowery Finance II, Patrick James, Edward James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, and Shekar Kumar concerning ownership of the Onset Property and/or Onset Transactions (including proceeds thereof).

283.   By way of example only, Ed represented to Onset that the funding that Onset provided First Brands on or about April 7, 2025 was going to be used to fund the acquisition and consolidation of Novares.  Instead, Patrick caused Novares to be acquired by an entity under his own control and/or corporate umbrella and diverted Onset's funds to or through that entity.

284.   Accordingly, Defendant First Brands, as well as Defendants the Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, Bowery Finance II, Patrick James, Edward James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, and Shekar Kumar, must trace their cash and other property to Onset Property and/or the Onset Transactions.

## ELEVENTH CLAIM FOR RELIEF

**(Segregation of Proceeds of Onset Property Against First Brands)**

285.   Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

154

FBG_CH1_00090383

286.    Title 11, section 363(c)(4) of the United States Code provides that the Debtors "shall segregate and account for any cash collateral in [their] possession, custody, or control."

287.    Section 363(a) defines "cash collateral" broadly as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . whether existing before or after the commencement of a case under this title." 11 U.S.C. § 363(a).

288.    Accordingly, Defendant First Brands shall segregate and account for any cash collateral in their possession, custody, or control to which Onset has an interest.

## TWELFTH CLAIM FOR RELIEF

**(Fraud Against the Carnaby Debtors, First Brands, the Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, Bowery Finance II, Patrick James, Edward James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, Shekar Kumar)**

289.    Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

290.    Onset alleges, as an alternative to the First through Eleventh Claims for Relief (although not exclusive of such Claims) and on the basis of statements made in the Amended Complaint and the James Brothers' Indictment and based upon additional information that has been disclosed after the Petition Date, that Defendants (a) made or caused to be made false statements, including representations and warranties, in the Lease Documents (including without limitation the Lease Schedules identified in **Appendix C**), the Acceptance & Delivery Certificates, the A&Ws, and the NOAs and in Initial Documentation and other confirmatory due diligence presented in connection with the Lease Schedules identified in Appendix C and in meetings and telephone calls concerning the use of Onset's funds and Onset's security interest in the inventory

155

FBG_CH1_00090384

**DEBTORS' EXHIBIT NO. 175**
**Page 159 of 1907**

and the property, plant, and equipment that were the subject of the Onset Transactions in that Defendants falsely represented that all of Onset's funds would be used to obtain and perfect Onset's security interest and to fund corporate consolidations that would lead to growth and increased profitability, including without limitation with respect to the acquisition of Novares, and that Onset's security interest was in fact obtained and perfected; (b) created and disseminated to Onset false and fraudulent financial information, including quarterly and annual financial statements from 2018 through the second quarter of 2025 and monthly and quarterly inventory schedules during the same period by materially overstating revenues, EBITDA, available cash, accounts receivable, gross and net book value of assets, including inventory, and by materially understating expenses, liabilities and obligations, and the existence, location and value of inventory and property, plant, and equipment that were the subject of the Onset Transactions; and (c) made and disseminated to Onset false and fraudulent representations and warranties contained in and during negotiations of the Forbearance Agreements that First Brands was financially stable and able to make payments with respect to the Carnaby Transactions but for plans to obtain additional financing to continue in its purported growth trajectory when in fact it was not financially stable nor able to make payments with respect to the Carnaby Transactions.

291.    Patrick, Ed, Brumbergs, Baker, Graham, and Kumar also made (or caused to be made) knowingly fraudulent statements concerning Onset's security interests, including but not limited to as alleged in Paragraphs 95–104, 119–20, 122–33, and 161–74.  By signing the Trico and Carnaby MLAs, Ed confirmed and represented to Onset that the property was transferred to Onset free and clear of all liens, security interests, and encumbrances.  Ed, Graham, and Kumar signed the Lease Schedules knowing that they had made fraudulent statements and representations concerning Onset's security interests.

FBG_CH1_00090385

**DEBTORS' EXHIBIT NO. 175**
**Page 160 of 1907**

292.    Patrick, Ed, Brumbergs, Baker, Graham, and Kumar also made (or caused to be made) knowingly fraudulent statements to Onset during diligence meetings and correspondence concerning Onset's security interests, including providing knowingly fraudulent assurances to Onset in Initial Documentation and Document Verification emails, including but not limited to as alleged in Paragraphs 148–60.

293.    Patrick, Ed, Brumbergs, Baker, Graham, and Kumar also made (or caused to be made) knowingly fraudulent statements contained in the forbearance agreements, audited financial statements, and additional financial information concerning the health and stability of First Brands, including but not limited to as alleged in Paragraphs 148–60, 176–78, 183–85, and 189–90.

294.    Patrick, Ed, Baker, Graham, and Kumar also made (or caused to be made) knowingly fraudulent assurances to Onset about the financial condition of First Brands in order to induce Onset into executing the Forbearance Agreements about the likelihood of success of a refinance and made repeated assurances about credit ratings, liquidity, and revenue during phone calls with Onset, including but not limited to as alleged in Paragraphs 175–99.

295.    In addition, Ed served as Patrick's agent and mouthpiece when he falsely told Onset that Onset's funds were being used to fund First Brands' acquisitions and growth, that Onset's security interest in the inventory and plant, property and equipment that were the subject of the Onset Transactions was perfected and secured, and that, during the period in which the parties entered into the Forbearance Agreements, First Brands was financially stable and able to timely pay the amounts due and payable under the Carnaby Lease Documents.

296.    Onset relied on the false and fraudulent statements to its detriment and was damaged thereby.

157

FBG_CH1_00090386

## THIRTEENTH CLAIM FOR RELIEF

**(Money Had and Received Against the Carnaby Debtors, First Brands, the Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, Bowery Finance II, Patrick James, Edward James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, Shekar Kumar)**

297.    Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

298.    Defendants received money from Onset without providing valuable consideration.

299.    By receiving funds from Onset accounts for personal gain, Defendants wrongfully had or held money that belongs to Onset in equity and good conscience.

300.    Defendants have been unjustly enriched by retaining funds belonging to Onset .

301.    Inequity and injustice would result if Defendants were permitted to retain the funds.

302.    Accordingly, Onset are entitled to equitable recovery of any benefits Defendants received that rightfully belong to Onset .

## FOURTEENTH CLAIM FOR RELIEF

**(Unjust Enrichment Against the Carnaby Debtors, First Brands, the Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, Bowery Finance II, Patrick James, Edward James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, Shekar Kumar)**

303.    Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

304.    Defendants were enriched and received direct, concrete economic benefits without legal or equitable justification, including, but not limited to, through the diversion and receipt of funds from Onset.

305.    Defendants or some of them have unjustly retained the sums procured through, funded by, or serviced with Onset's assets—sums to which Defendants had no lawful claim and for which Onset received no reciprocal benefit—to the detriment of Onset.

158

FBG_CH1_00090387

**DEBTORS' EXHIBIT NO. 175**
**Page 162 of 1907**

306.    Onset suffered financial losses as a result of these transactions.  Among other losses, Onset did not receive reasonably equivalent value for any of the transfers and the challenged conduct facilitated and perpetuated efforts that siphoned a substantial part of Onset's assets.

307.    There is a direct, proximate, and traceable relationship between Defendants' enrichment and the losses accrued by Onset: the transfers emanated from Onset's account and were made directly to Defendants, other entities or affiliates owned or controlled by or related to Patrick, or third parties for the benefit of Patrick and his family.

308.    Onset conferred a benefit in the form of corporate funds and value, Defendants were aware of and accepted that benefit, and Defendants' continued retention of that benefit would be unjust and inequitable under the circumstances.

309.    Equity and good conscience will not permit Defendants to retain the benefits they wrongfully obtained at Onset's expense.  Legal remedies are inadequate to the extent the relief required is restitutionary and equitable in nature, including the recovery of specific, identifiable funds or assets traceable to Defendants', including Patrick's and Ed's, unjust enrichment.

310.    Accordingly, Onset is entitled to judgment for restitution in the amount of the benefits unjustly obtained, together with disgorgement of all proceeds traceable to the transfers, the imposition of a constructive trust and/or equitable lien over assets and proceeds in Patrick's control, an accounting, and pre- and post-judgment interest at the maximum rate permitted by law, as well as such other and further equitable relief as the Court deems just and proper.

FBG_CH1_00090388

## FIFTEENTH CLAIM FOR RELIEF

**(Constructive Trust Against the Carnaby Debtors, First Brands, the Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, Bowery Finance II, Patrick James, Edward James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, Shekar Kumar)**

311.    Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, Third-Party Complaint as if fully set forth herein.

312.    A constructive trust is a claim for relief as well as an equitable remedy imposed to prevent unjust enrichment where a defendant, through fraud, breach of fiduciary duty, unfair or unconscionable conduct, commission of a wrong, duress, or abuse of confidence, acquires or retains property that which in equity and good conscience belongs to another.

313.    As detailed herein, Defendants engaged in fraudulent, unfair, and unconscionable conduct, including the diversion and misappropriation of Onset's funds, which Onset provided pursuant to the terms of the Trico Lease Documents and the Carnaby Lease Documents.

314.    By virtue of this misconduct, Defendants were directly and materially enriched.

315.    Defendants obtained and continue to retain specific, identifiable property traceable to Onset.

316.    Defendants received and continued to retain the fraudulent transfers by fraud, self-dealing, and wrongful diversion.  Continued possession of such property is inequitable and would unjustly enrich Defendants at the expense of Onset.

317.    Equity therefore deems Defendants constructive trustees of the fraudulent transfers and all traceable proceeds, substitutions, and products for the benefit of Onset.

318.    The constructive trust property is sufficiently specific and traceable: the transfers to Defendants described herein originated from an identified Onset account.  At Defendants'

160

FBG_CH1_00090389

**DEBTORS' EXHIBIT NO. 175**
**Page 164 of 1907**

direction, these funds were directed to Patrick or other entities and accounts he owned or controlled and can be further traced to property acquired therewith.

319.    Legal remedies are inadequate because Onset seeks restitutionary, in-kind relief as to specific funds and assets; equitable relief is necessary to permit tracing, preserve the constructive trust property, and avoid dissipation.   An accounting is warranted to identify all property constituting or derived from the constructive trust property.

320.    Accordingly, Onset seeks entry of judgment: (a) declaring and imposing a constructive trust over the constructive trust property and all proceeds, products, offspring, and substitutions thereof; (b) directing Defendants, as constructive trustees, to convey, transfer, and turn over the constructive trust property to Onset; (c) imposing, in the alternative, an equitable lien to the extent any portion of the constructive trust property cannot be specifically traced; (d) ordering an accounting and tracing of all relevant accounts and assets; and (e) awarding pre- and post-judgment interest and such other equitable relief as the Court deems just and proper.

## SIXTEENTH CLAIM FOR RELIEF

**(Accounting Against the Carnaby Debtors, First Brands, the Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, Bowery Finance II, Patrick James, Edward James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, Shekar Kumar)**

321.    Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

322.    Defendants possess fraudulently obtained funds belonging to Onset that they are obliged to surrender based on their relationship with Onset.

323.    The facts surrounding Defendants' unlawful actions and the accounts mentioned herein are so complex that adequate relief may not be obtained through standard discovery procedures, such as production and interrogatories.

161

FBG_CH1_00090390

**DEBTORS' EXHIBIT NO. 175**
**Page 165 of 1907**

324.    Accordingly, Onset is entitled to an equitable accounting.

## SEVENTEENTH CLAIM FOR RELIEF

**(Conspiracy Against the Carnaby Debtors, First Brands, the Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, Bowery Finance II, Patrick James, Edward James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, Shekar Kumar)**

325.    Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

326.    Patrick, together with Ed, Baker, Brumbergs, Graham, and Kumar formed a malicious combination or combinations through express agreement or common understanding to effectuate the fraud and misconduct that caused Onset to suffer damages.

327.    In furtherance of the conspiracy or conspiracies, Patrick, Ed, Baker, Brumbergs, Graham, and Kumar worked in concert to, among other misconduct, coordinate (a) unsupported, manual financial statement changes and reclassifications that obscured First Brands' true financial condition; (b) Onset Transactions that contained false representations and warranties concerning the use of Onset's funds and Onset's security interest in the inventory and the property, plant and equipment that were the subject of the Onset Transactions; (c) the dissemination of false and fraudulent financial information, including quarterly and annual financial statements; (d) the dissemination of false and fraudulent Trico Lease Documents (including Trico Lease Schedules) and Carnaby Lease Documents (including Carnaby Lease Schedules); (e) the dissemination to Onset of false and fraudulent confirmatory due diligence regarding the Onset Transactions, including but not limited to inventory reports; (f) the dissemination to Onset of false and fraudulent representations and warranties contained in the foregoing and in the Forbearance Agreements; and (g) the diversion and misappropriation of Onset's funding.

FBG_CH1_00090391

**DEBTORS' EXHIBIT NO. 175**
**Page 166 of 1907**

328.     Accordingly, Onset is entitled to money damages, including compensatory and punitive damages, and such other relief as is fair, just, and equitable as a remedy for the conspiracy or conspiracies among Patrick, Ed, Baker, Brumbergs, Graham, and Kumar.

## EIGHTEENETH CLAIM FOR RELIEF

**(Civil RICO (18 U.S.C. § 1962(c)) Against the Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, Bowery Finance II, Patrick James, Edward James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, Shekar Kumar)**

329.     Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

330.     The Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, Bowery Finance II, Patrick, Ed, Baker, Kumar, Brumbergs, and Graham (the "RICO Defendants"), acting under the management and direction of Patrick, are associated in fact.

331.     Each of the RICO Defendants is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

332.     The RICO Defendants constitute an "enterprise" engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962 (the "Enterprise"). The Enterprise exists separate and apart from the pattern of racketeering activity alleged and the RICO Defendants themselves.

333.     From at least 2020 through 2025, the RICO Defendants conducted, participated in, engaged in, conspired to engage in, or aided and abetted the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c). The predicate acts are related, continuous, and not isolated events; they include, but are not limited to, those set forth below, all of which occurred after 1970 and within 10 years of the first act of such racketeering activity and which constitute a pattern of unlawful activity engaged in by the RICO Defendants through the Enterprise:

FBG_CH1_00090392

**DEBTORS' EXHIBIT NO. 175**
**Page 167 of 1907**

a.   *Wire Fraud, 18 U.S.C. § 1343.*  Through the Enterprise, the RICO Defendants knowingly devised a scheme to obtain money and property by means of false and fraudulent pretenses, representations, and promises and transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme.  More specifically, at the direction of Patrick and Ed, the RICO Defendants faked and falsely inflated invoices for accounts receivable and payable, double- and triple-pledged loan collateral, falsified corporate financial statements, and concealed substantial liabilities from First Brands' lenders and financers and used interstate wires to send such documents. The RICO Defendants also submitted false and misleading invoices and information about First Brands' financial position to induce financers to increase the amount of funds advanced and used interstate wires to send such documents.  Fabricated invoices were used by the RICO Defendants to conceal the enormity of First Brands' financing obligations.

b.   *Conspiracy to Commit Money Laundering, 18 U.S.C. § 1956.*  Through the Enterprise, the RICO Defendants knowingly conspired and agreed together to commit money laundering.  Through certain transactions, the RICO Defendants knowingly agreed to disguise the nature, location, source, ownership, and control of proceeds from unlawful activity.  More specifically, at the direction of Patrick and Ed, the RICO Defendants deliberately routed loan proceeds through entities outside of the First Brands corporate structure, including through entities controlled by Patrick, in order to conceal the source and the

164

FBG_CH1_00090393

**DEBTORS' EXHIBIT NO. 175**
**Page 168 of 1907**

repayment obligations relating to those proceeds. In so doing, the funds were disguised as customer receipts. These circuitous transactions were designed to evade related-party-transaction disclosures in First Brands' audited financials, obscure the Company's true leverage, and prevent lenders and auditors from detecting the existence and magnitude of the off-balance sheet debt. Through these obscured transfers and transactions, Patrick personally siphoned millions of dollars of funds provided to First Brands and the Carnaby Debtors by Onset.

334.    The above-described actions were taken with the specific intent and for the purpose of carrying out the RICO Defendants' scheme to defraud and to conduct or participate in the affairs of the Enterprise.

335.    As a direct and proximate result of, and by reason of the RICO Defendants' conduct in violation of 18 U.S.C. § 1962(c), Onset has been injured in its business or property within the meaning of 18 U.S.C. § 1964(c). As a result of these actions, Onset has been injured in its business or property, having suffered, among other things, significant lost profits (both through the Onset Transactions and lost opportunity costs), lost goodwill, and attorneys' fees and costs.

336.    Together with attorneys' fees and costs, Onset is entitled to recover treble the damages it has sustained.

## NINETEENTH CLAIM FOR RELIEF

**(Engaging in Pattern of Corrupt Activity (Ohio R.C. § 2923.32) Against the Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, Bowery Finance II, Patrick James, Edward James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, Shekar Kumar)**

337.    Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

165

FBG_CH1_00090394

**DEBTORS' EXHIBIT NO. 175**
**Page 169 of 1907**

338.    The RICO Defendants constitute, were employed by, or were associated with an "enterprise" within the meaning of Ohio R.C. § 2923.31(C).  The Enterprise exists separate and apart from the pattern of racketeering activity alleged and the RICO Defendants themselves.

339.    From at least 2020 through 2025, the RICO Defendants conducted, participated in, engaged in, conspired to engage in, or aided and abetted the conduct of the affairs of the Enterprise through a pattern of corrupt activity in violation of Ohio R.C. § 2923.32(A)(1).

340.    The pattern of corrupt activity committed by the RICO Defendants referred to in the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint includes, but is not limited to, two or more incidents of corrupt, felonious activities that are related to the affairs of the same enterprise—and are not isolated or so closely related to each other and connected in time and place so as to constitute a single event.

341.    As part of this pattern of corrupt activity, the RICO Defendants and their agents, employees and/or servants conspired to engage in, and engaged in, with each other and with others multiple fraudulent and criminal actions as set forth in detail below, including, but not limited to:

   a.    ***Wire Fraud, 18 U.S.C. § 1343.***  Through the Enterprise, the RICO Defendants knowingly devised a scheme to obtain money and property by means of false and fraudulent pretenses, representations, and promises and transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme.  More specifically, at the direction of Patrick and Ed, the RICO Defendants faked and falsely inflated invoices for accounts receivable and payable, double- and triple-pledged loan collateral, falsified corporate financial statements, and concealed substantial liabilities from First

166

FBG_CH1_00090395

**DEBTORS' EXHIBIT NO. 175**
**Page 170 of 1907**

Brands' lenders and financers and used interstate wires to send such documents. The RICO Defendants also submitted false and misleading invoices and information about First Brands' financial position to induce financers to increase the amount of funds advanced and used interstate wires to send such documents. Fabricated invoices were used by the RICO Defendants to conceal the enormity of First Brands' financing obligations.

b.   ***Conspiracy to Commit Money Laundering, 18 U.S.C. § 1956.*** Through the Enterprise, the RICO Defendants knowingly conspired and agreed together to commit money laundering. Through certain transactions, the RICO Defendants knowingly agreed to disguise the nature, location, source, ownership, and control of proceeds from unlawful activity. More specifically, at the direction of Patrick and Ed, the RICO Defendants deliberately routed loan proceeds through entities outside of the First Brands corporate structure, including through entities controlled by Patrick, in order to conceal the source and the repayment obligations relating to those proceeds. In so doing, the funds were disguised as customer receipts. These circuitous transactions were designed to evade related-party-transaction disclosures in First Brands' audited financials, obscure the Company's true leverage, and prevent lenders and auditors from detecting the existence and magnitude of the off-balance sheet debt. Through these obscured transfers and transactions, Patrick personally siphoned millions of dollars of funds provided to First Brands and the Carnaby Debtors by Onset.

167

FBG_CH1_00090396

**DEBTORS' EXHIBIT NO. 175**
**Page 171 of 1907**

342.   The above-described actions were taken with the specific intent and for the purpose of carrying out the RICO Defendants' scheme to defraud and to conduct or participate in the affairs of the Enterprise.

343.   As a direct and proximate result of, and by reason of the RICO Defendants' conduct, Onset has been injured in its business or property, having suffered, among other things, significant lost profits (both through the Onset Transactions and lost opportunity costs), lost goodwill, and attorneys' fees and costs.

344.   Together with attorneys' fees and costs, Onset is entitled to recover treble the damages it has sustained.

## TWENTIETH CLAIM FOR RELIEF

**(Piercing the Corporate Veil Against the Carnaby Debtors, First Brands, the Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, Bowery Finance II, Patrick James, Edward James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, Shekar Kumar)**

345.   Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

346.   As alleged in the Complaint and the Patrick Amended Complaint, and as the United States has alleged in the James Brothers Indictment, Defendants exercised complete dominion and control over the Carnaby Debtors, Trico, and the Onset Guarantors with respect to the Onset Transactions; that corporate formalities of the Carnaby Debtors, Trico, and the Onset Guarantors were ignored; that the Carnaby Debtors, Trico, and the Onset Guarantors were inadequately capitalized; that First Brands failed to keep adequate books and records; that funds from the Carnaby Debtors, Trico, and the Onset Guarantors were commingled with Defendants' funds or funds of entities under Defendants' control; that the Carnaby Debtors, Trico, and the Onset Guarantors were mere "alter egos" of Defendants and conducted the business of Defendants for

168

FBG_CH1_00090397

**DEBTORS' EXHIBIT NO. 175**
**Page 172 of 1907**

Defendants' own personal benefit; and that Defendants, in doing so, perpetrated a fraud against Onset and others.

347.    Equity and good conscience require that the Court ignore the corporate form of the Carnaby Debtors, Trico, and the Onset Guarantors for purposes of holding the Defendants liable for the liabilities, obligations, acts, and conduct of the Carnaby Debtors, Trico, and the Onset Guarantors.

## TWENTY-FIRST CLAIM FOR RELIEF

**(Punitive Damages Against the Carnaby Debtors, First Brands, the Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, Bowery Finance II, Patrick James, Edward James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, Shekar Kumar)**

348.    Onset realleges and incorporates by reference the preceding paragraphs of this Counterclaim, Cross-Claim, and Third-Party Complaint as if fully set forth herein.

349.    Defendants and their agents and/or servants acted intentionally, wantonly and with actual malice in that their conduct was undertaken in conscious disregard of Onset's rights or duties owed to Onset and with a high probability of causing substantial harm to Onset and Onset was in fact harmed by the conduct.

350.    Onset is, accordingly, entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Onset prays as follows:

A.    That the Court enter judgment awarding Onset $1,880,000,000.00 on account of the Carnaby Transactions, plus contractual interest in the amount of 18% per year from September 8, 2025, the date that Onset issued the Default Notice, and order that the Carnaby Debtors and Carnaby Obligors, as well as First Brands, the Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation,

169

FBG_CH1_00090398

**DEBTORS' EXHIBIT NO. 175**
**Page 173 of 1907**

Bowery Finance II, Patrick James, Edward James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, Shekar Kumar, are jointly and severally liable for such payment;

B.      That the Court enter judgment awarding Onset $279,803,260.13 on account of the Trico Transactions and order that Trico and the Trico Obligors, as well as First Brands, the Patrick James Trust, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, Bowery Finance II, Patrick James, Edward James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, Shekar Kumar, are jointly and severally liable for such payment;

C.      That the Court enter a declaratory judgment confirming (a) that Onset is the owner of the Carnaby Property and the Trico Property, free and clear of all liens, claims, interests, and encumbrances; or, in the alternative; and (b) that Onset holds a valid, perfected, first-priority security interest in, and lien on the Onset Property;

D.      That the Court enjoin any Defendants in possession of Trico Property, including the Trico Bailees, ABC Corporation(s) 1–100, and John and Jane Doe(s) 1–100, from selling, using, encumbering, or transferring the Trico Property and enter an order directing (a) the foregoing Defendants to deliver, or cause to be delivered, the Trico Property to a location to be designated by Onset, or such other location as agreed by the parties; (b) the Trico Property be immediately and permanently seized and taken from the possession of the foregoing Defendants; (c) that the Trico Property be delivered to Onset or its designated agent; and (d) that Onset may sell the Trico Property to recover its judgment in a manner consistent with applicable law;

170

FBG_CH1_00090399

**DEBTORS' EXHIBIT NO. 175**
**Page 174 of 1907**

E.      That the Court enjoin any Defendants in possession of Carnaby Property, including the Carnaby Bailees, ABC Corporation(s) 1–100, and John and Jane Doe(s) 1–100, from selling, using, encumbering, or transferring the Carnaby Property and enter an order directing (a) the foregoing Defendants to deliver, or cause to be delivered, the Carnaby Property to a location to be designated by Onset, or such other location as agreed by the parties; (b) the Carnaby Property be immediately and permanently seized and taken from the possession of the foregoing Defendants; (c) that the Carnaby Property be delivered to Onset or its designated agent; and (d) that Onset may sell the Carnaby Property to recover its judgment in a manner consistent with applicable law;

F.      That the Court enter judgment awarding Onset damages in the amount of no less than $2,159,803,260.13 for the fraud perpetrated by the Defendants and that each of the Defendants to have participated in the fraud be jointly and severally liable;

G.      That the Court enter judgment awarding Onset treble damages and attorneys' fees and costs;

H.      That the Court award punitive damages for Defendants' extreme, outrageous and fraudulent conduct;

I.      That the Court enter judgment awarding Onset the costs and expenses of this action, including attorneys' fees;

J.      That the Court enter judgment awarding pre- and post-judgment interest as permitted by law; and

K.      That the Court enter all further orders that the Court deems just.

[*Remainder of page left blank intentionally*]

171

FBG_CH1_00090400

**DEBTORS' EXHIBIT NO. 175**
**Page 175 of 1907**

Dated: February 19, 2026
     Houston, Texas

MUNSCH HARDT KOPF & HARR, PC

By: /s/ *Deborah M. Perry*
    Deborah M. Perry
    Texas Bar No. 24002755
    500 N. Akard Street
    Dallas, TX 75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    E-mail: dperry@munsch.com

-and-

*with respect to all Defendants except Wilmington Savings Fund Society, FSB; Bank of America, N.A.; Sagard Holdings Manager (US) LLC; GLAS USA LLC; Jefferies Finance LLC; GLAS Trust Company LLC; and UMB Bank, N.A.*

MORRISON & FOERSTER LLP

Carrie H. Cohen (*pro hac vice* forthcoming)
James Newton (*pro hac vice* forthcoming)
Ben Butterfield (*pro hac vice* forthcoming)
Bryan Kotliar (*pro hac vice* forthcoming)
250 West 55th Street
New York, NY 10019
Email: ccohen@mofo.com
Email: jnewton@mofo.com
Email: bbutterfield@mofo.com
Email: bkotliar@mofo.com

Anthony S. Fiotto (*pro hac vice* forthcoming)
Julia C. Koch (*pro hac vice* forthcoming)
200 Clarendon Street
Boston, MA 02116
Email: afiotto@mofo.com
Email: jkoch@mofo.com

Brian R. Michael (*pro hac vice* forthcoming)
707 Wilshire Boulevard
Los Angeles, CA 90017-3543

172

FBG_CH1_00090401

**DEBTORS' EXHIBIT NO. 175**
**Page 176 of 1907**

Email: bmichael@mofo.com

-and-

*with respect to all Defendants except Wilmington Savings Fund Society, FSB; Bank of America, N.A.; Sagard Holdings Manager (US) LLC; GLAS USA LLC; Jefferies Finance LLC; GLAS Trust Company LLC; and UMB Bank, N.A.*

MILBANK LLP

Andrew M. Leblanc (*pro hac vice* forthcoming)
1101 New York Avenue, NW
Washington, D.C. 20005
Telephone: (202) 835-7500
Facsimile: (202) 263-7586
Email: aleblanc@milbank.com

*Attorneys for Onset Financial, Inc.*

173

FBG_CH1_00090402

**DEBTORS' EXHIBIT NO. 175**
**Page 177 of 1907**

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed on this 19th day of February 2026, with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

/s/ *Deborah M. Perry*
Deborah M. Perry

FBG_CH1_00090403

**DEBTORS' EXHIBIT NO. 175**
**Page 178 of 1907**

## Appendix A

### Trico Bailees by Trico Lease Schedule

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| LS 014R | Champion Laboratories, Inc. **Debtor** | Equipment | 200 South 4th Street, Albion, IL 62806 |
| LS 015 | Trico Technologies Corporation **Debtor** | Equipment | 1900 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 015 | Trico Technologies Corporation **Debtor** | Equipment | 1995 Billy Mitchell Boulevard Brownsville, TX 78521 |
| LS 015 | Champion Laboratories, Inc. **Debtor** | Equipment | 200 South 4th Street, Albion, IL 62806 |
| LS 015 | FRAMAuto Holdings, LLC **Debtor** | Equipment | 851 Jackson Street, Greenville, OH 45331 |
| LS 015 | Champion Laboratories, Inc. **Debtor** | Equipment | 301 Industrial Drive, Albion, IL 62806 |
| LS 015 | Brake Parts Inc LLC **Debtor** | Equipment | 2701 Keystone Pacific Parkway, Suite 100, Patterson, CA 95363 |
| LS 015 | Champion Laboratories, Inc. **Debtor** | Equipment | 51180 Celeste Drive, Shelby Township, MI 48315 |
| LS 015 | Brake Parts Inc LLC **Debtor** | Equipment | 1100 Corporate Drive, McHenry, IL 60050 |
| LS 015 | Brake Parts Inc LLC **Debtor** | Equipment | 1380 Corporate Drive, McHenry, IL 60050 |
| LS 015A | Champion Laboratories, Inc. **Debtor** | Equipment | 301 Industrial Drive, Albion, IL 62806 |
| LS 015A | FRAMAuto Holdings, LLC **Debtor** | Equipment | 851 Jackson Street, Greenville, OH 45331 |

i

FBG_CH1_00090404

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| LS 016 | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Michigan 200, Industrial del Norte, Matamoros, Tamaulipas C.P., Mexico 87316 |
| LS 016 | Trico Technologies Corporation **Debtor** | Equipment | 1900 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 016 | Trico Technologies Corporation **Debtor** | Equipment | 1995 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 016 | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | 7151-C-E, Parque Industrial Omega, CP 32320, Cd. Juarez, Chih, Juarez, Mexico 32320 |
| LS 016 | Talleres Mecanicos Montserrat, S.A. de C.V. **Non-Debtor** | Equipment | Reforma Sur 27 5 Panzacola, Papalotla de Xicohtencatl Tlaxcala 90796, Puebla, Mexico |
| LS 016 | Longkou Haimeng Machinery Co., Ltd **Non-Debtor** | Equipment | Hangshan Haimeng Industrial Park, Longkou City |
| LS 016 | Champion Laboratories, Inc. **Debtor** | Equipment | 301 Industrial Drive, Albion, IL 62806 |
| LS 016 | Brake Parts Inc LLC **Debtor** | Equipment | Calle Industrias #6024, Finsa Industrial Parque, Nuevo Laredo, Tamaulipas, Mexico 88275 |
| LS 016 | Fram Group Operations Mexicali, S.A. de C.V. **Non-Debtor** | Equipment | Blvd. Lazaro Cardenas No. 3101 Parque Industrial Progreso Mexicali, Baja California, Mexico 21188 |
| LS 016 | BPI Brake System (Qingdao) Co. **Non-Debtor** | Equipment | Wangcheng District, Laixi City, Shandong, P.R. China |
| LS 016 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Blvd. Independencia # 1451 – Int 4, Parque Industrial Intermex Oriente, Cd. Juarez, MX CP 32599 |
| LS 017 | Trico Belgium **Non-Debtor** | Equipment | Avenue Champion, 1, B-6790-Aubange, Belgium |

FBG_CH1_00090405

**DEBTORS' EXHIBIT NO. 175**
**Page 180 of 1907**

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| LS 018 | Trico Wipers Ploiesti S.R.L. **Non-Debtor** | Inventory | WDP Industrial Park, Aricestii Rahtivani, DN72, T-76 Romania, Prahova 107025 |
| LS 019 | FRAMAuto Holdings, LLC **Debtor** | Inventory | Street Lazaro Cardenas 3101, Parque Industrial Progreso, Mexicali, Mexico 21188 |
| LS 022 | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | 7151-C-E, Parque Industrial Omega, CP 32320, Cd. Juarez, Chih, Juarez, Mexico 32320 |
| LS 022 | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | Av. Hermanos Escobar 7151, Omega, CP 32410, Cd. Juarez, Chihuahua, Mexico |
| LS 022 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Blvd. Independencia # 1451 – Int 4, Parque Industrial Intermex Oriente, Cd. Juarez, Mexico CP 32599 |
| LS 022 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Boulevard Independencia 3068, UPI 2, Parque Industrial American Industries Independencia II, Juarez, Chihuahua, Mexico 32575 |
| LS 022 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Boulevard Independencia No. 198 Int. 2 Local 2, Hacienda de las Torres, Ciudad Juarez, Chihuahua, Mexico 32695 |
| LS 022 | Fram Group Operations Mexicali, S.A. de C.V. **Non-Debtor** | Equipment | Blvd. Lazaro Cardenas No. 3101 Parque Industrial Progreso Mexicali, Baja California, Mexico 21188 |
| LS 022 | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Michigan 200, Industrial del Norte, Matamoros, Tamaulipas C.P., Mexico 87316 |
| LS 022 | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Priv. Palma Mayor Parque Industrial Los Palmares, Matamoros, Tamaulipas, Mexico 87313 |
| LS 023 | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Michigan 200, Industrial del Norte, Matamoros, Tamaulipas C.P., Mexico 87316 |

iii

FBG_CH1_00090406

**DEBTORS' EXHIBIT NO. 175**
**Page 181 of 1907**

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| LS 023 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Blvd. Independencia # 1451 – Int 4, Parque Industrial Intermex Oriente, Cd. Juarez, Mexico CP 32599 |
| LS 023 | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | Av. Hermanos Escobar 7151, Omega, CP 32410, Cd. Juarez, Chihuahua, Mexico |
| LS 024 | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | Av. Hermanos Escobar 7151, Omega, CP 32410, Cd. Juarez, Chihuahua, Mexico |
| LS 024 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Blvd. Independencia # 1451 – Int 4, Parque Industrial Intermex Oriente, Cd. Juarez, Mexico CP 32599 |
| LS 024 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Boulevard Independencia No. 198 Int. 2 Local 2, Hacienda de las Torres, Ciudad Juarez, Chihuahua, Mexico 32695 |
| LS 024 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Enrique Pinocelli 9010, Parque Industrial Aero Juárez Cd. Juarez Chihuahua, Mexico CP 32696 |
| LS 024A | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | Av. Hermanos Escobar 7151, Omega, CP 32410, Cd. Juarez, Chihuahua, Mexico |
| LS 024A | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Blvd. Independencia # 1451 – Int 4, Parque Industrial Intermex Oriente, Cd. Juarez, Mexico CP 32599 |
| LS 024A | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Boulevard Independencia 3068, UPI 2, Parque Industrial American Industries Independencia II, Juarez, Chihuahua, Mexico 32575 |
| LS 024A | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Boulevard Independencia No. 198 Int. 2 Local 2, Hacienda de las Torres, Ciudad Juarez, Chihuahua, Mexico 32695 |
| LS 024A | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Enrique Pinocelli 9010, Parque Industrial Aero Juárez Cd. Juarez Chihuahua, Mexico CP 32696 |

iv

FBG_CH1_00090407

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| LS 024A | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Priv. Palma Mayor Parque Industrial Los Palmares, Matamoros, Tamaulipas, Mexico 87313 |
| LS 025 | Trico Technologies Corporation **Debtor** | Equipment | 1900 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 025 | Trico Technologies Corporation **Debtor** | Equipment | 1995 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 025 | Brake Parts Inc LLC **Debtor** | Equipment | 1600 Industrial Drive, McHenry, IL 60050 |
| LS 025 | Brake Parts Inc LLC **Debtor** | Equipment | 1100 Corporate Drive, McHenry, IL 60050 |
| LS 025 | Brake Parts Inc LLC **Debtor** | Equipment | 1380 Corporate Drive, McHenry, IL 60050 |
| LS 025 | Brake Parts Inc LLC **Debtor** | Equipment | 2701 Keystone Pacific Parkway, Suite 100, Patterson, CA 95363 |
| LS 025 | Cardone Industries, Inc. **Debtor** | Equipment | 5501 Whitaker Avenue, Philadelphia, PA 19124 |
| LS 025 | Carter Fuel Systems, LLC **Debtor** | Equipment | 101 East Industrial Boulevard, Logansport, IN 46947 |
| LS 025 | Champion Laboratories, Inc. **Debtor** | Equipment | 200 South 4th Street, Albion, IL 62806 |
| LS 025 | Champion Laboratories, Inc. **Debtor** | Equipment | 301 Industrial Drive, Albion, IL 62806 |
| LS 025 | FRAMAuto Holdings, LLC **Debtor** | Equipment | 851 Jackson Street, Greenville, OH 45331 |
| LS 025 | Strongarm, LLC **Debtor** | Equipment | 3108 HWY 76 East, Marion, SC 29571 |
| LS 026 | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Priv. Palma Mayor Parque Industrial Los Palmares, Matamoros, Tamaulipas, Mexico 87313 |

v

FBG_CH1_00090408

**DEBTORS' EXHIBIT NO. 175**
**Page 183 of 1907**

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| LS 026 | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | Av. Hermanos Escobar 7151, Omega, CP 32410, Cd. Juarez, Chihuahua, Mexico |
| LS 026 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Boulevard Independencia No. 198 Int. 2 Local 2, Hacienda de las Torres, Ciudad Juarez, Chihuahua, Mexico 32695 |
| LS 026 | Horizon Global Company LLC **Debtor** | Equipment | Avenida Los Nogales, s/n lots 4, 5, and 6, Parque Industrial Villa Florida, Reynosa, Tamaulipas, Mexico |
| LS 027 | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | 7151-C-E, Parque Industrial Omega, CP 32320, Cd. Juarez, Chih, Juarez, MX 32320 |
| LS 027 | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | Av. Hermanos Escobar 7151, Omega, CP 32410, Cd. Juarez, Chihuahua, Mexico |
| LS 027 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Blvd. Independencia # 1451 – Int 4, Parque Industrial Intermex Oriente, Cd. Juarez, Mexico CP 32599 |
| LS 027 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Boulevard Independencia No. 198 Int. 2 Local 2, Hacienda de las Torres, Ciudad Juarez, Chihuahua, Mexico 32695 |
| LS 027 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Enrique Pinocelli 9010, Parque Industrial Aero Juárez Cd. Juarez Chihuahua, Mexico CP 32696 |
| LS 027 | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Michigan 200, Industrial del Norte, Matamoros, Tamaulipas C.P., Mexico 87316 |
| LS 027 | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Priv. Palma Mayor Parque Industrial Los Palmares, Matamoros, Tamaulipas, Mexico 87313 |
| LS 028 | Trico Technologies Corporation | Equipment | 1900 Billy Mitchell Boulevard, Brownsville, TX 78521 |

FBG_CH1_00090409

**DEBTORS' EXHIBIT NO. 175**
**Page 184 of 1907**

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| | **Debtor** | | |
| LS 028 | Trico Technologies Corporation **Debtor** | Equipment | 1995 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 028 | Champion Laboratories, Inc. **Debtor** | Equipment | 200 South 4th Street, Albion, IL 62806 |
| LS 028 | FRAMAuto Holdings, LLC **Debtor** | Equipment | 851 Jackson Street, Greenville, OH 45331 |
| LS 028 | Champion Laboratories, Inc. **Debtor** | Equipment | 301 Industrial Drive, Albion, IL 62806 |
| LS 028 | Brake Parts Inc LLC **Debtor** | Equipment | 2701 Keystone Pacific Parkway, Suite 100, Patterson, CA 95363 |
| LS 028 | Brake Parts In LLC **Debtor** | Equipment | 1100 Corporate Drive, McHenry, IL 60050 |
| LS 028 | Brake Parts Inc LLC **Debtor** | Equipment | 1380 Corporate Drive, McHenry, IL 60050 |
| LS 028 | Strongarm, LLC **Debtor** | Equipment | 3108 HWY 76 East, Marion, SC 29571 |
| LS 029 | Trico Technologies Corporation **Debtor** | Equipment | 1900 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 029 | Trico Technologies Corporation **Debtor** | Equipment | 1995 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 029 | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | 7151-C-E, Parque Industrial Omega, CP 32320, Cd. Juarez, Chih, Juarez, Mexico 32320 |
| LS 029 | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | Av. Hermanos Escobar 7151, Omega, CP 32410, Cd. Juarez, Chihuahua, Mexico |
| LS 029 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Blvd. Independencia # 1451 – Int 4, Parque Industrial Intermex Oriente, Cd. Juarez, Mexico CP 32599 |

FBG_CH1_00090410

**DEBTORS' EXHIBIT NO. 175**
**Page 185 of 1907**

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| LS 029 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Boulevard Independencia No. 198 Int. 2 Local 2, Hacienda de las Torres, Ciudad Juarez, Chihuahua, Mexico 32695 |
| LS 029 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Enrique Pinocelli 9010, Parque Industrial Aero Juárez Cd. Juarez Chihuahua, Mexico CP 32696 |
| LS 029 | Horizon Global Company LLC **Debtor** | Equipment | Avenida Los Nogales, s/n lots 4, 5, and 6, Parque Industrial Villa Florida, Reynosa, Tamaulipas, Mexico |
| LS 029 | Talleres Mecanicos Montserrat, S.A. de C.V. **Non-Debtor** | Equipment | Reforma Sur 27 5 Panzacola, Papalotla de Xicohtencatl Tlaxcala 90796, Puebla, Mexico |
| LS 029 | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Michigan 200, Industrial del Norte, Matamoros, Tamaulipas C.P., Mexico 87316 |
| LS 029 | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Priv. Palma Mayor Parque Industrial Los Palmares, Matamoros, Tamaulipas, Mexico 87313 |
| LS 030 | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Michigan 200, Industrial del Norte, Matamoros, Tamaulipas C.P., Mexico 87316 |
| LS 030 | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Priv. Palma Mayor Parque Industrial Los Palmares, Matamoros, Tamaulipas, Mexico 87313 |
| LS 030 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Blvd. Independencia # 1451 – Int 4, Parque Industrial Intermex Oriente, Cd. Juarez, Mexico CP 32599 |
| LS 030 | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | Av. Hermanos Escobar 7151, Omega, CP 32410, Cd. Juarez, Chihuahua, Mexico |
| LS 030 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Boulevard Independencia No. 198 Int. 2 Local 2, Hacienda de las Torres, Ciudad Juarez, Chihuahua, Mexico 32695 |

FBG_CH1_00090411

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| LS 030 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Enrique Pinocelli 9010, Parque Industrial Aero Juárez Cd. Juarez Chihuahua, Mexico CP 32696 |
| LS 030 | Horizon Global Company LLC **Debtor** | Equipment | Avenida Los Nogales, lots 4, 5, and 6, Parque Industrial Villa Florida, Reynosa, Tamaulipas, Mexico |
| LS 031 | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Michigan 200, Industrial del Norte, Matamoros, Tamaulipas C.P., Mexico 87316 |
| LS 031 | Trico Technologies Corporation **Debtor** | Equipment | 1900 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 031 | Trico Technologies Corporation **Debtor** | Equipment | 1995 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 031 | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | 7151-C-E, Parque Industrial Omega, CP 32320, Cd. Juarez, Chih, Juarez, Mexico 32320 |
| LS 031 | Talleres Mecanicos Montserrat, S.A. de C.V. **Non-Debtor** | Equipment | Reforma Sur 27 5 Panzacola, Papalotla de Xicohtencatl Tlaxcala 90796, Puebla, Mexico |
| LS 031 | Champion Laboratories, Inc. **Debtor** | Equipment | 200 South 4th Street, Albion, IL 62806 |
| LS 031 | FRAMAuto Holdings, LLC **Debtor** | Equipment | 851 Jackson Street, Greenville, OH 45331 |
| LS 031 | Brake Parts Inc LLC **Debtor** | Equipment | 2701 Keystone Pacific Parkway, Suite 100, Patterson, CA 95363 |
| LS 031 | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Priv. Palma Mayor Parque Industrial Los Palmares, Matamoros, Tamaulipas, Mexico 87313 |
| LS 031 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Blvd. Independencia # 1451 – Int 4, Parque Industrial Intermex Oriente, Cd. Juarez, Mexico CP 32599 |

FBG_CH1_00090412

**DEBTORS' EXHIBIT NO. 175**
**Page 187 of 1907**

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| LS 031 | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | Av. Hermanos Escobar 7151, Omega, CP 32410, Cd. Juarez, Chihuahua, Mexico |
| LS 031 | Brake Parts Inc LLC **Debtor** | Equipment | 1100 Corporate Drive, McHenry, IL 60050 |
| LS 031 | Brake Parts Inc LLC **Debtor** | Equipment | 1380 Corporate Drive, McHenry, IL 60050 |
| LS 031 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Boulevard Independencia No. 198 Int. 2 Local 2, Hacienda de las Torres, Ciudad Juarez, Chihuahua, Mexico 32695 |
| LS 031 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Enrique Pinocelli 9010, Parque Industrial Aero Juárez Cd. Juarez Chihuahua, Mexico CP 32696 |
| LS 031 | Horizon Global Company LLC **Debtor** | Equipment | Avenida Los Nogales, s/n lots 4, 5, and 6, Parque Industrial Villa Florida, Reynosa, Tamaulipas, Mexico |
| LS 031 | Brake Parts Inc LLC **Debtor** | Equipment | 1600 Industrial Drive, McHenry, IL 60050 |
| LS 031 | Carter Fuel Systems, LLC **Debtor** | Equipment | 101 East Industrial Boulevard, Logansport, IN 46947 |
| LS 031 | Walbro Los Mochis, S. de R.L. de C.V. **Non-Debtor** | Equipment | Blvd. Macario Gaxiola 2924 Zona Industrial, Los Mochis, Sinaloa Mexico |
| LS 031 | Jasper Rubber Products, Inc. **Debtor** | Equipment | 1010 West 1st Avenue, Jasper, IN 47546 |
| LS 031 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Miguel de la Madrid 1200 Num. Int., Edificio 1, Colonia Lote Bravo, C.P. 32695, Juarez, Mexico |
| LS 031 | Walbro LLC and/or WEM US Co. **Debtors** | Equipment | 6242 Garfield Avenue, Cass City, MA 48726 |
| LS 031 | Hopkins Manufacturing Corporation **Debtor** | Equipment | 428 Peyton Street, Emporia, KS 66801 |

x

FBG_CH1_00090413

**DEBTORS' EXHIBIT NO. 175**
**Page 188 of 1907**

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| LS 031 | Walbro LLC **Debtor** | Equipment | 5141 36th Street, SE, Grand Rapids, MI 49512 |
| LS 031 | Toledo Molding & Die, LLC **Debtor** | Equipment | 1440 North Maule Road, Tiffin, OH 44883 |
| LS 031 | Hopkins Manufacturing Corporation **Debtor** | Equipment | 2400 NW Industrial Parkway, Miami, OK 74354 |
| LS 031 | Dalton Corporation and/or Dalton Corporation, Warsaw **Debtors** | Equipment | 1900 East Jefferson Street, Warsaw, IN 46580 |
| LS 031 | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Building 4, located at Rio Michigan #1114, Centro Industrial Juarez, Ciudad Juarez, Chihuahua, C.P. 32695, Centro Industrial, Juarez #4, Mexico |
| LS 031 | Tridonex, S. de. R.L. de C.V. **Non-Debtor** | Equipment | Avenida Horizonte 16, Parque de La, Ciudad Industrial, Matamoros, TMS 87499, Mexico |
| LS 031 | Eagle Machining, LLC **Debtor** | Equipment | 705 North Fayette Street, Fayette, OH 43521 |
| LS 031 | FRAM Group Operations LLC **Debtor** | Equipment | 1100 Worldwide Boulevard, Hebron, KY 41048 |
| LS 031 | FRAM Group Operations Mexico City, S.A. de C.V. **Non-Debtor** | Equipment | Carr. Cuautitlan- Melchor Ocampo Col. Santo Tomas, Cuautitlan, Edificio LCC-B006, Mexico C.P. 54803 |
| LS 031A | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | Av. Hermanos Escobar 7151, Omega, CP 32410, Cd. Juarez, Chihuahua, Mexico |
| LS 031A | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Blvd. Independencia # 1451 – Int 4, Parque Industrial Intermex Oriente, Cd. Juarez, Mexico CP 32599 |
| LS 031A | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Boulevard Independencia No. 198 Int. 2 Local 2, Hacienda de las |

FBG_CH1_00090414

**DEBTORS' EXHIBIT NO. 175**
**Page 189 of 1907**

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| | | | Torres, Ciudad Juarez, Chihuahua, Mexico 32695 |
| LS 031A | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Enrique Pinocelli 9010, Parque Industrial Aero Juárez Cd. Juarez Chihuahua, Mexico CP 32696 |
| LS 031A | Horizon Global Company LLC **Debtor** | Equipment | Avenida Los Nogales, s/n lots 4, 5, and 6, Parque Industrial Villa Florida, Reynosa, Tamaulipas, Mexico |
| LS 031A | Talleres Mecanicos Montserrat, S.A. de C.V. **Non-Debtor** | Equipment | Reforma Sur 27 5 Panzacola, Papalotla de Xicohtencatl Tlaxcala 90796, Puebla, Mexico |
| LS 031A | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Michigan 200, Industrial del Norte, Matamoros, Tamaulipas C.P., Mexico 87316 |
| LS 031A | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Priv. Palma Mayor Parque Industrial Los Palmares, Matamoros, Tamaulipas, Mexico 87313 |
| LS 031A | Walbro Los Mochis, S. de R.L. de C.V. **Non-Debtor** | Equipment | Blvd. Macario Gaxiola 2924 Zona Industrial, Los Mochis, Sinaloa Mexico |
| LS 031B | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | 7151-C-E, Parque Industrial Omega, CP 32320, Cd. Juarez, Chih, Juarez, Mexico 32320 |
| LS 031B | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | Av. Hermanos Escobar 7151, Omega, CP 32410, Cd. Juarez, Chihuahua, Mexico |
| LS 031B | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Blvd. Independencia # 1451 – Int 4, Parque Industrial Intermex Oriente, Cd. Juarez, Mexico CP 32599 |
| LS 031B | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Boulevard Independencia 3068, UPI 2, Parque Industrial American Industries Independencia II, Juarez, Chihuahua, Mexico 32575 |
| LS 031B | BPI Brake Manufacturing Juárez, S.A. de C.V. | Equipment | Boulevard Independencia No. 198 Int. 2 Local 2, Hacienda de las |

FBG_CH1_00090415

**DEBTORS' EXHIBIT NO. 175**
**Page 190 of 1907**

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
|  | **Non-Debtor** |  | Torres, Ciudad Juarez, Chihuahua, Mexico 32695 |
| LS 031B | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Enrique Pinocelli 9010, Parque Industrial Aero Juárez Cd. Juarez Chihuahua, Mexico CP 32696 |
| LS 031B | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Miguel de la Madrid 1200 Num. Int., Edificio 1, Colonia Lote Bravo, C.P. 32695, Juarez, Mexico |
| LS 031B | Horizon Global Company LLC **Debtor** | Equipment | Avenida Los Nogales, s/n lots 4, 5, and 6, Parque Industrial Villa Florida, Reynosa, Tamaulipas, Mexico |
| LS 031B | Talleres Mecanicos Montserrat, S.A. de C.V. **Non-Debtor** | Equipment | Reforma Sur 27 5 Panzacola, Papalotla de Xicohtencatl Tlaxcala 90796, Puebla, Mexico |
| LS 031B | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Michigan 200, Industrial del Norte, Matamoros, Tamaulipas C.P., Mexico 87316 |
| LS 031B | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Priv. Palma Mayor Parque Industrial Los Palmares, Matamoros, Tamaulipas, Mexico 87313 |
| LS 031B | Walbro Los Mochis, S. de R.L. de C.V. **Non-Debtor** | Equipment | Blvd. Macario Gaxiola 2924 Zona Industrial, Los Mochis, Sinaloa Mexico |
| LS 031B | Champion Laboratories, Inc. **Debtor** | Equipment | 200 South 4th Street, Albion, IL 62806 |
| LS 031C | Brake Parts Inc LLC **Debtor** | Equipment | 1600 Industrial Drive, McHenry, IL 60050 |
| LS 031C | Brake Parts Inc LLC **Debtor** | Equipment | 1100 Corporate Drive, McHenry, IL 60050 |
| LS 031C | Brake Parts Inc LLC **Debtor** | Equipment | 1380 Corporate Drive, McHenry, IL 60050 |
| LS 031C | Champion Laboratories, Inc. **Debtor** | Equipment | 200 South 4th Street, Albion, IL 62806 |

xiii

FBG_CH1_00090416

**DEBTORS' EXHIBIT NO. 175**
**Page 191 of 1907**

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| LS 031C | FRAMAuto Holdings, LLC **Debtor** | Equipment | 851 Jackson Street, Greenville, OH 45331 |
| LS 031C | Horizon Global Americas Inc. **Debtor** | Equipment | 32901 West 193rd Street, Edgerton, KS 66021 |
| LS 031C | Jasper Rubber Products, Inc. **Debtor** | Equipment | 1010 West 1st Avenue, Jasper, IN 47546 |
| LS 031C | Walbro LLC and/or WEM US Co. **Debtors** | Equipment | 6242 Garfield Avenue, Cass City, MI 48726 |
| LS 031C | Walbro LLC **Debtor** | Equipment | 5141 36th Street, SE, Grand Rapids, MI 49512 |
| LS 031D | Trico Technologies Corporation **Debtor** | Equipment | 1900 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 031D | Trico Technologies Corporation **Debtor** | Equipment | 1995 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 031D | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | 7151-C-E, Parque Industrial Omega, CP 32320, Cd. Juarez, Chih, Juarez, Mexico 32320 |
| LS 031D | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Equipment | Av. Hermanos Escobar 7151, Omega, CP 32410, Cd. Juarez, Chihuahua, Mexico |
| LS 031D | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Blvd. Independencia # 1451 – Int 4, Parque Industrial Intermex Oriente, Cd. Juarez, Mexico CP 32599 |
| LS 031D | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Boulevard Independencia 3068, UPI 2, Parque Industrial American Industries Independencia II, Juarez, Chihuahua, Mexico 32575 |
| LS 031D | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Boulevard Independencia No. 198 Int. 2 Local 2, Hacienda de las Torres, Ciudad Juarez, Chihuahua, Mexico 32695 |

FBG_CH1_00090417

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| LS 031D | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Enrique Pinocelli 9010, Parque Industrial Aero Juárez Cd. Juarez Chihuahua, Mexico CP 32696 |
| LS 031D | BPI Brake Manufacturing Juárez, S.A. de C.V. **Non-Debtor** | Equipment | Miguel de la Madrid 1200 Num. Int., Edificio 1, Colonia Lote Bravo, C.P. 32695, Juarez, Mexico |
| LS 031D | Cequent Electrical Products de Mexico, S. de R.L. de C.V. **Non-Debtor** | Equipment | Industrial Drive SN Edificio 11, Parque Industrial Prologis Park, Reynosa, Tamaulipas, 88787 Mexico |
| LS 031D | Champion Laboratories, Inc. **Debtor** | Equipment | 200 South 4th Street, Albion, IL 62806 |
| LS 031D | Champion Laboratories, Inc. **Debtor** | Equipment | 301 Industrial Drive, Albion, IL 62806 |
| LS 031D | FRAMAuto Holdings, LLC **Debtor** | Equipment | 851 Jackson Street, Greenville, OH 45331 |
| LS 031D | Hopkins Manufacturing de Mexico S. de R.L. de C.V. **Non-Debtor** | Equipment | Oliver Cromwell #2810 Parque Industrial Fernandez, C.P. 32649. Ciudad Juarez, Chihuahua Mexico |
| LS 031D | Horizon Global Company LLC **Debtor** | Equipment | Avenida Los Nogales, s/n lots 4, 5, and 6, Parque Industrial Villa Florida, Reynosa, Tamaulipas, Mexico |
| LS 031D | Fram Group Operations Mexicali, S.A. de C.V. **Non-Debtor** | Equipment | Street Lazaro Cardenas 3101, Parque Industrial Progreso, Mexicali, Mexico 21188 |
| LS 031D | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Michigan 200, Industrial del Norte, Matamoros, Tamaulipas C.P., Mexico 87316 |
| LS 031D | Trico Componentes, S.A. de C.V. **Non-Debtor** | Equipment | Priv. Palma Mayor Parque Industrial Los Palmares, Matamoros, Tamaulipas, Mexico 87313 |
| LS 031D | Walbro Los Mochis, S. de R.L. de C.V. **Non-Debtor** | Equipment | Blvd. Macario Gaxiola 2924 Zona Industrial, Los Mochis, Sinaloa Mexico |

xv

FBG_CH1_00090418

**DEBTORS' EXHIBIT NO. 175**
**Page 193 of 1907**

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| LS 031E | Trico Technologies Corporation **Debtor** | Equipment | 1900 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 031E | Trico Technologies Corporation **Debtor** | Equipment | 1995 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 031E | Brake Parts Inc LLC **Debtor** | Equipment | 1600 Industrial Drive, McHenry, IL 60050 |
| LS 031E | Brake Parts Inc LLC **Debtor** | Equipment | 1100 Corporate Drive, McHenry, IL 60050 |
| LS 031E | Brake Parts Inc LLC **Debtor** | Equipment | 1380 Corporate Drive, McHenry, IL 60050 |
| LS 031E | Brake Parts Inc LLC **Debtor** | Equipment | 2701 Keystone Pacific Parkway, Suite 100, Patterson, CA 95363 |
| LS 031E | Carter Fuel Systems, LLC **Debtor** | Equipment | 101 East Industrial Boulevard, Logansport, IN 46947 |
| LS 031E | Champion Laboratories, Inc. **Debtor** | Equipment | 200 South 4th Street, Albion, IL 62806 |
| LS 031E | Dalton Corporation and/or Dalton Corporation, Warsaw **Debtors** | Equipment | 1900 East Jefferson Street, Warsaw, IN 46580 |
| LS 031E | FRAMAuto Holdings, LLC **Debtor** | Equipment | 851 Jackson Street, Greenville, OH 45331 |
| LS 031E | Hopkins Manufacturing Corporation **Debtor** | Equipment | 2400 NW Industrial Parkway, Miami, OK 74354 |
| LS 031E | Hopkins Manufacturing Corporation **Debtor** | Equipment | 30900 West 185th Street, Edgerton, KS 66021 |
| LS 031E | Hopkins Manufacturing Corporation **Debtor** | Equipment | 428 Peyton Street, Emporia, KS 66801 |
| LS 031E | Horizon Global Americas Inc. **Debtor** | Equipment | 32901 West 193rd Street, Edgerton, KS 66021 |

xvi

FBG_CH1_00090419

**DEBTORS' EXHIBIT NO. 175**
**Page 194 of 1907**

| Lease Schedule | Trico Bailee | Property | Address |
|---|---|---|---|
| LS 031E | Jasper Rubber Products, Inc. **Debtor** | Equipment | 1010 West 1st Avenue, Jasper, IN 47546 |
| LS 031E | Peterson American Corporation **Non-Debtor** | Equipment | 600 Old Hull Road, Athens, GA 30601 |
| LS 031E | Strongarm, LLC **Debtor** | Equipment | 3108 HWY 76 East, Marion, SC 29571 |
| LS 031E | Toledo Molding & Die, LLC **Debtor** | Equipment | 515 East Gypsy Lane, Bowling Green, OH 43402 |
| LS 031E | Walbro LLC **Debtor** | Equipment | 6242 Garfield Avenue, Cass City, MI 48726 |

xvii

FBG_CH1_00090420

**DEBTORS' EXHIBIT NO. 175**
**Page 195 of 1907**

## Appendix B

## Carnaby Bailees by Carnaby Lease Schedule

| Lease Schedule | Carnaby Bailee | Property | Address |
|---|---|---|---|
| LS 003 | Horizon Global Americas Inc. **Debtor** | Equipment | 32901 West 193rd Street, Edgerton, KS 66021 |
| LS 004 | Cardone Industries, Inc. **Debtor** | Equipment | 5501 Whitaker Avenue, Philadelphia, PA 19124 |
| LS 004 | Cardone de Mexico, S. de R.L. de C.V. **Non-Debtor** | Equipment | Horizonte 8, Parque Industrial FINSA Oriente, Matamoros, Tamaulipas, 87499, Mexico |
| LS 005 | Trico Wipers Ploiesti S.R.L. **Non-Debtor** | Equipment | WDP Industrial Park, Aricestii Rahtivani, DN72, T-76 Romania, Prahova 107025 |
| LS 005 | Westfalia-Automotive GmbH **Non-Debtor** | Equipment | Am Sandberg 45, D-33378 Rheda-Wiedenbrück, Germany |
| LS 005 | Witter Brasov S.R.L. **Non-Debtor** | Equipment | CTP Park Brasov, Str. Ghimbavului nr. 80D, 507055 Cristian, Brasov, Romania |
| LS 007 | Ultinon Motion Germany GmbH (f/k/a Lumileds Germany GmbH ) **Non-Debtor** | Equipment | Philipsstrasse 8, 52068 Aachen, Germany |
| LS 008 | Walbro LLC **Debtor** | Equipment | 6242 Garfield Avenue, Cass City, MI 48726 |
| LS 008 | Toledo Molding & Die, LLC **Debtor** | Equipment | 515 East Gypsy Lane, Bowling Green, OH 43402 |
| LS 008 | Toledo Molding & Die, LLC **Debtor** | Equipment | 1440 North Maule Road, Tiffin, OH 44883 |
| LS 008 | Toledo Molding & Die, LLC **Debtor** | Equipment | 11 East Park Drive, Fayetteville, TN 37334 |
| LS 008 | Toledo Molding & Die, LLC **Debtor** | Equipment | AV. Amstrad #109 Parque Industrial, Amistad Bajio, Apaseo el Grande, GTL, Celaya, Guanajuato, Mexico |

FBG_CH1_00090421

**DEBTORS' EXHIBIT NO. 175**
**Page 196 of 1907**

| Lease Schedule | Carnaby Bailee | Property | Address |
|---|---|---|---|
| LS 008 | Trico Technologies Corporation **Debtor** | Equipment | 1900 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 008 | Trico Technologies Corporation **Debtor** | Equipment | 1995 Billy Mitchell Boulevard, Brownsville, TX 78521 |
| LS 009 | Brake Parts Inc LLC **Debtor** | Equipment | 705 North Fayette Street, Fayette, OH 43521 |
| LS 022 | Hopkins Manufacturing Corporation **Debtor** | Inventory | 30900 West 185th Street, Edgerton, KS 66021 |
| LS 023 | Champion Laboratories, Inc. **Debtor** | Inventory | 301 Industrial Drive, Albion, IL 62806 |
| LS 023 | Champion Laboratories, Inc. **Debtor** | Inventory | 200 South 4th Street, Albion, IL 62806 |
| LS 023 | Champion Laboratories, Inc. **Debtor** | Inventory | 329 Industrial Drive, Albion, IL 62806 |
| LS 023 | Champion Laboratories, Inc. **Debtor** | Inventory | 549 IL-RT 130, Albion, IL 62806 |
| LS 023 | Cardone Industries, Inc. **Debtor** | Inventory | 5501 Whitaker Avenue, Philadelphia, PA 19124 |
| LS 024 | Talleres Mecanicos Montserrat, S.A. de C.V. **Non-Debtor** | Inventory | Reforma Sur 27 5 Panzacola, Papalotla de Xicohtencatl, Tlaxcala 90796, Puebla, Mexico |
| LS 024 | Trico Componentes, S.A. de C.V. **Non-Debtor** | Inventory | Michigan 200, Industrial del Norte, Matamoros, Tamaulipas C.P., Mexico 87316 |
| LS 025 | FRAM Group Operations LLC **Debtor** | Inventory | 1100 Worldwide Boulevard, Hebron, KY 41048 |
| LS 026 | Brake Parts Inc LLC **Debtor** | Inventory | 1600 Industrial Drive, McHenry, IL 60050 |
| LS 026 | Subensambles Internacionales, S. de R.L. de C.V. **Non-Debtor** | Inventory | Av. Hermanos Escobar 7151, Omega, CP 32410, Cd. Juarez, Chihuahua, Mexico |

xix

FBG_CH1_00090422

**DEBTORS' EXHIBIT NO. 175**
**Page 197 of 1907**

| *Lease Schedule* | *Carnaby Bailee* | *Property* | *Address* |
|---|---|---|---|
| LS 026 | Carter Fuel Systems, LLC<br>**Debtor** | Inventory | 6700 Paredes Line Road, Brownsville, TX 78526 |
| LS 027 | Horizon Global Americas Inc.<br>**Debtor** | Inventory | Avenida Los Nogales, s/n lots 4, 5, and 6, Parque Industrial Villa Florida (Buildings #1 and #2), Reynosa, Tamaulipas, Mexico |
| LS 027 | Horizon Global Americas Inc.<br>**Debtor** | Inventory | Industrial Drive SN Edificio 11, Parque Industrial Prologis Park, Reynosa, Tamaulipas, Mexico 88787 |
| LS 027 | Horizon Global Americas Inc.<br>**Debtor** | Inventory | 32901 West 193rd Street, Edgerton, KS 66021 |
| LS 027 | Hopkins Manufacturing Corporation<br>**Debtor** | Inventory | 30900 West 185th Street, Edgerton, KS 66021 |
| LS 027 | Hopkins Manufacturing Corporation<br>**Debtor** | Inventory | 428 Peyton Street, Emporia, KS 66801 |

xx

FBG_CH1_00090423

**DEBTORS' EXHIBIT NO. 175**
**Page 198 of 1907**

## Appendix C

### Outstanding Lease Schedules

| Lessee | Lease Schedule | Lease Commencement Date |
|---|---|---|
| Trico Products Corporation | 001 | 01/01/20 |
| Trico Products Corporation | 002 | 07/01/20 |
| Trico Products Corporation | 003 | 01/01/20 |
| Trico Products Corporation | 004 | 10/01/18 |
| Trico Products Corporation | 006 | 04/01/19 |
| Trico Products Corporation | 07A | 10/01/19 |
| Trico Products Corporation | 07B | 10/01/19 |
| Trico Products Corporation | 07C | 10/01/19 |
| Trico Products Corporation | 08A | 01/01/20 |
| Trico Products Corporation | 08B | 01/01/20 |
| Trico Products Corporation | 09A | 01/01/20 |
| Trico Products Corporation | 09B | 01/01/20 |
| Trico Products Corporation | 09C | 01/01/20 |
| Trico Products Corporation | 09D | 01/01/20 |
| Trico Products Corporation | 09E | 04/01/20 |
| Trico Products Corporation | 09F | 04/01/20 |
| Trico Products Corporation | 010 | 04/01/20 |
| Trico Products Corporation | 011 | 10/01/20 |
| Trico Products Corporation | 012 | 01/01/21 |
| Trico Products Corporation | 013 | 07/01/21 |
| Trico Products Corporation | 014 | 04/01/21 |
| Trico Products Corporation | 014R | 10/01/23 |
| Trico Products Corporation | 015A | 07/01/22 |
| Trico Products Corporation | 015 | 07/01/24 |
| Trico Products Corporation | 016 | 04/01/24 |
| Trico Products Corporation | 017 | 07/01/21 |
| Trico Products Corporation | 018 | 07/01/21 |
| Trico Products Corporation | 019 | 07/01/21 |
| Trico Products Corporation | 020R | 07/01/21 |
| Trico Products Corporation | 021 | 10/01/21 |
| Trico Products Corporation | 021A | 10/01/21 |

FBG_CH1_00090424

**DEBTORS' EXHIBIT NO. 175**
**Page 199 of 1907**

| Lessee | Lease Schedule | Lease Commencement Date |
|---|---|---|
| Trico Products Corporation | 021B | 10/01/21 |
| Trico Products Corporation | 022 | 07/01/24 |
| Trico Products Corporation | 023 | 01/01/25 |
| Trico Products Corporation | 024A | 10/01/23 |
| Trico Products Corporation | 024 | 07/01/24 |
| Trico Products Corporation | 025 | 04/01/25 |
| Trico Products Corporation | 026 | 04/01/24 |
| Trico Products Corporation | 027 | 04/01/24 |
| Trico Products Corporation | 028 | 01/01/25 |
| Trico Products Corporation | 029 | 04/01/25 |
| Trico Products Corporation | 030 | 10/01/24 |
| Trico Products Corporation | 031 | |
| Trico Products Corporation | 031A | |
| Trico Products Corporation | 031B | |
| Trico Products Corporation | 031C | 04/01/25 |
| Trico Products Corporation | 031D | 04/01/25 |
| Trico Products Corporation | 031E | 07/01/25 |
| Eagle Machining, LLC | 001 | 01/01/22 |
| Eagle Machining, LLC | 01A | 01/01/22 |
| Eagle Machining, LLC | 01B | 01/01/22 |
| Carnaby Inventory I, LLC | 01A | 04/01/22 |
| Carnaby Inventory I, LLC | 01B | 04/01/22 |
| Carnaby Inventory I, LLC | 01C | 04/01/22 |
| Carnaby Inventory I, LLC | 01D | 04/01/22 |
| Carnaby Inventory I, LLC | 01E | 04/01/22 |
| Carnaby Inventory I, LLC | 01F | 04/01/22 |
| Carnaby Inventory I, LLC | 01G | 07/01/22 |
| Carnaby Inventory I, LLC | 01H | 07/01/22 |
| Carnaby Inventory I, LLC | 01I | 07/01/22 |
| Carnaby Inventory I, LLC | 01J | 07/01/22 |
| Carnaby Inventory I, LLC | 01K | 07/01/22 |
| Carnaby Inventory I, LLC | 01L | 07/01/22 |
| Carnaby Inventory I, LLC | 01M | 07/01/22 |
| Carnaby Inventory I, LLC | 01N | 10/01/22 |

FBG_CH1_00090425

**DEBTORS' EXHIBIT NO. 175**
**Page 200 of 1907**

| Lessee | Lease Schedule | Lease Commencement Date |
|---|---|---|
| Carnaby Inventory I, LLC | 01O | 10/01/22 |
| Carnaby Inventory IV, LLC | 001 | 10/01/22 |
| Carnaby Inventory IV, LLC | 002 | 10/01/22 |
| Carnaby Inventory IV, LLC | 003 | 10/01/22 |
| Carnaby Inventory IV, LLC | 004 | 01/01/23 |
| Carnaby Inventory IV, LLC | 005 | 04/01/23 |
| Carnaby Inventory IV, LLC | 006 | 04/01/23 |
| Carnaby Inventory IV, LLC | 007 | 07/01/23 |
| Carnaby Inventory IV, LLC | 008 | 07/01/23 |
| Carnaby Inventory IV, LLC | 009 | 07/01/23 |
| Carnaby Inventory IV, LLC | 010 | 10/01/23 |
| Carnaby Inventory IV, LLC | 011 | 10/01/23 |
| Carnaby Inventory IV, LLC | 012 | 10/01/23 |
| Carnaby Inventory IV, LLC | 014 | 10/01/23 |
| Carnaby Inventory IV, LLC | 015 | 01/01/24 |
| Carnaby Inventory IV, LLC | 016 | 01/01/24 |
| Carnaby Inventory IV, LLC | 017 | 04/01/24 |
| Carnaby Inventory IV, LLC | 018 | 04/01/24 |
| Carnaby Inventory IV, LLC | 020 | 04/01/24 |
| Carnaby Inventory IV, LLC | 021 | 04/01/24 |
| Carnaby Inventory IV, LLC | 022 | 10/01/24 |
| Carnaby Inventory IV, LLC | 023 | 01/01/25 |
| Carnaby Inventory IV, LLC | 024 | 04/01/25 |
| Carnaby Inventory IV, LLC | 025 | 04/01/25 |
| Carnaby Inventory IV, LLC | 026 | 07/01/25 |
| Carnaby Inventory IV, LLC | 027 | 07/01/25 |
| Carnaby FA, LLC | 001 | 01/01/24 |
| Carnaby FA, LLC | 002 | 01/01/24 |
| Carnaby FA, LLC | 003 | 07/01/24 |
| Carnaby FA, LLC | 004 | 07/01/24 |
| Carnaby FA, LLC | 005 | 07/01/24 |
| Carnaby FA, LLC | 006 | 10/01/24 |
| Carnaby FA, LLC | 007 | 01/01/25 |
| Carnaby FA, LLC | 008 | 01/01/25 |

FBG_CH1_00090426

| *Lessee* | *Lease Schedule* | *Lease Commencement Date* |
|----------|------------------|---------------------------|
| Carnaby FA, LLC | 009 | 07/01/25 |

FBG_CH1_00090427

**DEBTORS' EXHIBIT NO. 175**
**Page 202 of 1907**

# Exhibit 1

FBG_CH1_00090428

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br> v. <br><br> PATRICK JAMES and <br> EDWARD JAMES, <br><br> Defendants. | **SEALED INDICTMENT** <br><br> 26 Cr. <br><br><br> 26 CRIM 029 |

## COUNT ONE
### (Continuing Financial Crimes Enterprise)

The Grand Jury charges:

1.    From at least in or about 2018 through in or about 2025, PATRICK JAMES and EDWARD JAMES, the defendants, built and bankrupted First Brands Group, LLC ("First Brands"), fraudulently obtaining billions of dollars from lenders and enriching themselves.

2.    PATRICK JAMES and EDWARD JAMES, the defendants, and their co-conspirators, perpetrated a series of fraudulent schemes against the company's lenders and financing partners. As part of the defendants' schemes, First Brands faked and falsely inflated invoices for accounts receivable and payable; double- and triple-pledged loan collateral; falsified corporate financial statements; and concealed substantial liabilities from lenders. These schemes yielded billions of dollars in financing to First Brands and enabled PATRICK JAMES and EDWARD JAMES to reap millions of dollars in proceeds derived from their fraud.

3.    The defendants' schemes coincided with, and initially may have contributed to, the growth of First Brands, but those schemes also sowed the seeds of First Brands' demise. After years of acquisitions and expansion using fraudulently obtained financing, First Brands faced overwhelming liabilities and unsustainable cash requirements. In 2025, PATRICK JAMES and

FBG_CH1_00090429

Case 26-23005-0009-AT Document Filed in TXSB 01/27/26 Page 3 of 45

EDWARD JAMES, the defendants, led efforts to refinance First Brands' debt or to sell the company, including through last-ditch attempts to deceive lenders and potential acquirers by disseminating false financials. These efforts failed when First Brands was unable to provide the prospective counterparties with the financial diligence they sought. On September 28, 2025, First Brands filed for bankruptcy. At the time of its bankruptcy, First Brands—a company that reported approximately $5 billion in net annual sales worldwide—declared $12 million in cash in its corporate bank accounts and over $9 billion in liabilities. As a consequence of the defendants' fraudulent schemes, First Brands' lenders and creditors now face billions in losses.

### First Brands and Its Financing Arrangements

4.      First Brands operated as an automotive aftermarket parts supplier that developed, marketed, and sold replacement parts such as brakes, filters, wipers, and lights under various brand names. The company sold its products into established retail and wholesale distribution channels that, in turn, sold them to commercial and individual consumers. First Brands' customer base included large automative retailers, wholesale part distributors, and the world's largest commercial retailers.

5.      PATRICK JAMES, the defendant, founded First Brands and served as its Chief Executive Officer. EDWARD JAMES, the defendant, was First Brands' former Senior Vice President and is PATRICK JAMES's brother. The defendants, along with other executives with whom they conspired, formed the senior business leadership team at First Brands.

6.      Since founding the company in 2013, PATRICK JAMES, the defendant, grew First Brands' market share by buying other automotive-parts businesses, including many well-known auto-parts brands. By in or about 2025, following numerous corporate acquisitions, PATRICK JAMES had built First Brands into one of the largest auto-parts businesses in the world.

2

FBG_CH1_00090430

7.      Under the direction of PATRICK JAMES, the defendant, First Brands' business required substantial cash to sustain its operations. First Brands' customers routinely negotiated extended payment terms—at times permitting payment up to a year after delivery—creating a significant gap between First Brands' manufacturing costs and cash receipts. PATRICK JAMES's growth-through-acquisition strategy added further financial pressure. He arranged for First Brands to acquire other businesses with borrowed money, accumulating significant debt and heavy recurring interest and repayment obligations.

8.      To address the cash lag from extended payment terms, First Brands used factoring. Factoring is a financing arrangement in which a business typically sells or assigns its accounts receivable (invoices) to a third party—commonly a bank or specialized finance company—in exchange for near-term cash, typically at a discount. The third party, called a "factor," then collects full payment when invoices become due. First Brands used two forms of receivable factoring: customer-linked factoring and third-party factoring. Under customer-linked factoring, once a customer verified and approved a First Brands invoice, a bank or financing company affiliated with that customer paid First Brands relatively quickly, even though the customer itself would not pay for months. When invoices ultimately came due, the customer then paid the bank or financing company directly, rather than First Brands. By contrast, when First Brands used third-party factoring, First Brands sold its customer invoices to finance companies unaffiliated with any customer. These factors advanced cash shortly after invoicing, but when customer invoices came due, First Brands—rather than the customer—remained responsible for collecting payment and remitting the full invoice amount to the factor. Because third-party factoring involved no relationship with the customer, invoices were generally not subject to customer verification.

3

FBG_CH1_00090431

**DEBTORS' EXHIBIT NO. 175**
**Page 206 of 1907**

9.      First Brands also used third-party financing to pay its suppliers through accounts-payable factoring (also called supply-chain financing). Under these arrangements, financial institutions advanced funds against invoices First Brands owed to its suppliers. In some instances, the financer paid suppliers directly at a discount and First Brands repaid the financer on a later, fixed due date. In other instances, the financer paid First Brands, which then paid the supplier, with repayment due later to the financer. Each of these factoring arrangements had a maximum limit or "capacity" for borrowing. While the arrangements allowed First Brands to delay paying suppliers and improved short-term cash flow, they added another layer of financial obligations that depended on continuing access to cash.

10.      Besides its widespread use of invoice factoring, First Brands relied on asset-based lending to finance its operations and acquisitions. Under these arrangements, the company borrowed billions of dollars from lenders secured by inventory and other physical assets such as manufacturing plants, equipment, and other fixed assets. The amount First Brands could borrow depended on the value of these assets, and the company was required to comply with the terms of its loan agreements, including regularly reporting to its lenders about the assets and their value.

11.      These financing arrangements left First Brands vulnerable to cash-flow disruptions, sensitive to changes in collateral values, and dependent upon continued access to external financing.

### Accounts Receivable Financing Fraud

12.      First Brands factored billions of dollars' worth of customer invoices through arrangements with lenders. At the direction and with the approval of PATRICK JAMES and EDWARD JAMES, the defendants, First Brands systematically obtained invoice-based financing from factors through a series of fraudulent schemes. As part of those schemes, and under the

4

FBG_CH1_00090432

defendants' direction and supervision, First Brands employees routinely submitted fake invoices, fraudulently inflated invoices, and double-pledged invoices for the purpose of selling and pledging them to factoring counterparties as if they represented valid, collectible receivables from customers. In some instances, invoices were generated for transactions that had never occurred, while in others the dollar amounts on invoices were altered to make them appear more valuable. At the defendants' direction, this fraudulent conduct was directed at and affected at least four factoring partners. Through the defendants' fraud schemes, First Brands sold its factoring partners billions of dollars of purported customer receivables that did not exist.

13. PATRICK JAMES, the defendant, and his co-conspirators took steps to ensure that factoring firms did not learn of the company's fraudulent schemes, including by falsely representing that the invoices were bona fide accounts receivable, even where they were fictitious or overstated. Indeed, when First Brands' factoring counterparties raised questions about some of the company's invoices, PATRICK JAMES directed his co-conspirators to take steps to conceal their fraudulent conduct and to ensure that counterparties did not obtain information that might reveal the fraud. For instance, in approximately 2023, one of First Brands' third-party factors ("Factor-1") contacted First Brands seeking information about certain invoices that Factor-1 had purchased. When a lower-level First Brands employee provided the requested invoices to Factor-1, Factor-1's audit partner began questioning EDWARD JAMES, the defendant, and others about what the audit partner described as "huge" discrepancies between the amounts reflected on the First Brands invoices and the information about those same invoices that First Brands had previously provided to Factor-1. After EDWARD JAMES told PATRICK JAMES about the discovery that had been made by Factor-1, PATRICK JAMES directed that future emails from certain third parties, including Factor-1, be restricted to an inner circle of First Brands executives

FBG_CH1_00090433

DEBTORS' EXHIBIT NO. 175
Page 208 of 1907

involved in the fraudulent scheme, so that no low-level employee would inadvertently supply accurate information to an inquiring lender.

14.     The defendants continued their scheme to defraud third-party factors even after Factor-1 had flagged falsified invoices. For example, in April 2025, First Brands sold to Factor-1 a fictitious customer invoice in the amount of $3,239.18. As another example, in June 2025, after invoicing a customer for $8,976.24 in automotive parts, First Brands sold to Factor-1 what purported to be the same customer invoice, but it falsely claimed the invoiced amount to be $17,826.26. Three days later, First Brands sold the same customer invoice to another third-party factor, falsely claiming that the invoice amount was $463,734.92.

15.     In total, third-party factors now hold approximately $2.7 billion of fake accounts receivable.

### Accounts Payable Financing Fraud

16.     First Brands also defrauded its accounts payable factoring partners. At the direction and with the approval of PATRICK JAMES and EDWARD JAMES, the defendants, First Brands submitted false and misleading invoice information and false and misleading information about First Brands' financial position to induce financers to increase the amount of funds advanced. Those false representations were material to the lenders. At First Brands' direction, certain financers sent funds to a third-party bill-processing intermediary based on fabricated invoices manufactured by First Brands. Contrary to the understanding of the financers, those funds were not used by the bill processor to pay First Brands' suppliers. Instead, those funds were routed to First Brands itself. At First Brands, these self-payments were referred to as "round trips" or, euphemistically, as "corporate initiatives." Their purpose was to inject additional cash into First Brands at moments when the company was unable to meet its payment obligations with legitimate

6

FBG_CH1_00090434

cash on hand. Rather than paying suppliers, "round trip" funds went toward paying interest on debt, rent, leases, or other operating costs.

17. The mechanics of these fraudulent schemes were straightforward: To nominate invoices for funding, First Brands used online platforms provided by supply-chain financers. First Brands employees did not upload invoices themselves. Instead, they submitted spreadsheet-style data entries reflecting purported supplier invoice information—such as invoice amounts and dates—that was then transmitted to the financer. To maximize borrowing from the financers, First Brands fabricated the amounts it purportedly owed to suppliers. Those fabricated amounts did not correspond to real invoices or legitimate supplier payables. After submitting the fictitious line item amounts, First Brands directed the financer to transmit the funds to the third-party bill processor, which First Brands instructed to remit the proceeds back to First Brands.

18. PATRICK JAMES and EDWARD JAMES, the defendants, closely monitored and managed these "round trip" transactions as part of First Brands' daily cash-management process. Internal treasury reports circulated to senior executives tracked available borrowing capacity, net cash flow, and the impact of "corporate initiatives." In multiple communications, PATRICK JAMES, EDWARD JAMES, and other senior executives discussed the scale, timing, and necessity of round-trip payments to manage short-term liquidity, including concerns by the Vice President of Finance—shared with PATRICK JAMES and EDWARD JAMES in August 2021—that the volume of round-trip activity was "getting out of control."

19. As financers began requesting support for funding requests, First Brands engaged in further fraud to conceal their earlier deceptions. Around May 2023, for example, when a particular supply-chain financer requested the invoices underlying a particular line-item submission, a First Brands employee fabricated a "cover" invoice purporting to show aggregate

FBG_CH1_00090435

amounts owed to, or billed by, a third-party payment processor. These fabricated invoices were created solely to satisfy financer diligence requests and did not reflect real transactions. On multiple occasions, when different financers sought documentation for funded amounts, First Brands fabricated and submitted false aggregate invoices to conceal the absence of legitimate supplier obligations. When falsified aggregated invoices did not satisfy certain lenders, the defendants considered terminating that factor relationship. EDWARD JAMES, the defendant, for example, expressed concern when one financer requested physical invoices, asking another First Brands employee whether the factor had asked for such invoices in the past and declaring that he wanted to "kill" the relationship after the requested invoices had been collected.

20.     PATRICK JAMES and EDWARD JAMES, the defendants, also concealed from First Brands' lenders the enormity of First Brands' accounts-payable financing obligations. In consolidated financial statements, at the direction of PATRICK JAMES and EDWARD JAMES, the company reported supplier-finance amounts that were a fraction of the actual liabilities incurred through these programs. In reality, the company maintained outstanding supply-chain financing liabilities exceeding $1 billion.

**Fraud on First Brands' Senior Lenders**
*Off-Balance-Sheet Debt*

21.     As part of their schemes to deceive counterparties and lenders, the defendants deliberately concealed massive amounts of debt incurred through inventory-financing arrangements. While this debt was, by design, nominally incurred by entities outside the First Brands corporate structure, it was purportedly secured by First Brands' inventory. Using that inventory, that is, finished goods and work-in-progress or raw materials held for sale, First Brands received billions of dollars in cash infusions. At the direction of PATRICK JAMES, the defendant, this inventory financing arrangement, which was maintained outside the First Brands corporate

8

FBG_CH1_00090436

**DEBTORS' EXHIBIT NO. 175**
**Page 211 of 1907**

balance sheet, was concealed from the company's lenders, who routinely requested and received First Brands' financial statements.

22.    The off-balance-sheet debt principally related to inventory-financing arrangements executed by entities wholly owned and controlled by PATRICK JAMES, the defendant (the "James Entities"). The James Entities were nominally separate from First Brands but, in fact, had no independent business operations. Through the James Entities, PATRICK JAMES entered financing arrangements with at least three inventory financers. These three lenders (the "Off-Sheet Lenders") advanced funds to the James Entities, which purportedly used those funds to purchase inventory from First Brands, which was pledged back to the Off-Sheet Lenders as collateral. In other cases, the James Entities entered sale-leaseback transactions, purportedly purchasing inventory from First Brands, selling it to Off-Sheet Lenders, and then leasing back the inventory to the James Entities—funneling the cash from the Off-Sheet Lenders to First Brands. These financing arrangements through the James Entities, and purportedly secured by First Brands' inventory, were not included on First Brands' financial statements.

23.    The financing arrangements with the Off-Sheet Lenders were directed by PATRICK JAMES, the defendant, negotiated by EDWARD JAMES, the defendant, and implemented through a series of deliberate and coordinated acts of fraud designed to conceal debt, mislead lenders, and obscure the true source and use of funds.

24.    First, the defendants defrauded First Brands' senior lenders by concealing the nature and scale of the off-balance-sheet financing, and, at times, by expressly disavowing that it had such agreements, even as the James Entities incurred billions of dollars in inventory-backed obligations using First Brands' inventory. First Brands repeatedly denied having undisclosed inventory-financing facilities at all. For example, in July 2025, in a response to high-priority lender

9

FBG_CH1_00090437

diligence requests, at the direction of PATRICK JAMES, the defendant, one of First Brands' senior executives falsely represented that First Brands had "no off-balance sheet financing" involving "special purpose entities" and that "all related party relationships" were fully disclosed in the company's financial statements. Those representations were materially false and misleading. By that time, First Brands had incurred approximately $2 billion in undisclosed off-balance-sheet debt through the James Entities.

25.     Second, the defendants made false and misleading representations to the Off-Sheet Lenders to fraudulently induce them to extend and expand financing. The James Entities pledged inventory that PATRICK JAMES and EDWARD JAMES, the defendants, purported to be unencumbered but in fact was already subject to liens by, or otherwise pledged to, First Brands' senior lenders and remained on First Brands' balance sheet. In addition, the defendants submitted falsified inventory schedules and account documentation to the Off-Sheet Lenders. The defendants repeatedly caused fake inventory schedules to be provided to satisfy lender diligence and reporting requirements. At the direction of EDWARD JAMES, bank transfers through various James Entities were structured to mimic the purchase and resale of inventory from First Brands, creating the false appearance of legitimate collateral and transaction activity supporting the loans.

26.     Third, PATRICK JAMES and EDWARD JAMES, the defendants, undertook extensive acts of concealment to disguise both the source of proceeds obtained from the Off-Sheet Lenders and flowing into First Brands and the repayment of obligations from First Brands to the Off-Sheet Lenders. Loan proceeds from the Off-Sheet Lenders were deliberately routed through a customer collections entity maintained outside the First Brands corporate structure and then were disbursed across First Brands subsidiaries before being swept back into First Brands' operating account. The defendants designed this flow of funds specifically so that the funds appeared to be

10

FBG_CH1_00090438

ordinary customer receipts from retail subsidiaries rather than loan proceeds from related-party financing arrangements with the James Entities. For example, the chart below depicts a December 2024 financing from one of the Off-Sheet Lenders, with funds being circuitously transferred from the lender to one of the James Entities, to a First Brands customer collections account, and then transferred and split across five different First Brands operating entities at arbitrary pre-determined percentages, where the funds were disguised as customer receipts.



27.    At the direction of PATRICK JAMES and EDWARD JAMES, the defendants, repayments to the Off-Sheet Lenders were similarly disguised by routing payments first through a third-party bill processor and then through the James Entities, supported by sham invoices falsely representing payables for inventory owed by First Brands. These circuitous transactions were designed to evade related-party-transaction disclosures in the company's audited financials, obscure the company's true leverage, and prevent lenders and auditors from detecting the existence and magnitude of the off-balance sheet debt.

11

FBG_CH1_00090439

DEBTORS' EXHIBIT NO. 175
Page 214 of 1907

28.     By laundering proceeds fraudulently obtained from Off-Sheet Lenders, the defendants were able to both conceal and advance their criminal schemes and personally profit from them. The inventory-financing arrangements functioned as a parallel borrowing structure designed to inject liquidity into the company while evading covenants, borrowing-base limitations, and disclosure requirements imposed by lenders. Additionally, through these transactions, PATRICK JAMES, the defendant, personally siphoned millions of dollars of Off-Sheet Lenders' funds into his personal accounts before the funds reached First Brands' corporate coffers. EDWARD JAMES, the defendant, also sought to personally enrich himself from the financing arrangements. As one example, while executing the financing agreements on behalf of the James Entities, EDWARD JAMES received millions in commission fees for brokering one of the purported inventory financings.

29.     As a result of these purported inventory financing arrangements, the defendants concealed enormous liabilities and thereby misrepresented First Brands' true financial condition, misrepresented the nature and extent of collateral to its inventory financers, and enriched themselves at the expense of lenders and other stakeholders.

### False and Misleading Statements about First Brands' Financial Condition

30.     PATRICK JAMES and EDWARD JAMES, the defendants, also defrauded First Brands' lenders by disseminating materially false and misleading financial information about the company and secretly encumbering assets subject to the lenders' borrowing base and priority liens.

31.     First, beginning at least as early as 2020, PATRICK JAMES and EDWARD JAMES, the defendants, caused First Brands to provide asset-backed lenders with financial statements that did not reflect the company's true financial position. At the direction and with the approval of PATRICK JAMES, First Brands employees made financial statement adjustments

12

FBG_CH1_00090440

DEBTORS' EXHIBIT NO. 175
Page 215 of 1907

untethered to business realities and instead designed to meet financial benchmarks set by PATRICK JAMES. For example, in August 2021, the Chief Financial Officer directed the Vice President for Finance to make fraudulent adjustments to First Brands' financials, at the direction of PATRICK JAMES: "Talked with PJ [PATRICK JAMES]. Want to: reduce factoring by 3. Reduce interest by 6. Reduce non cash by 14. Increase restructuring 14." PATRICK JAMES directed these adjustments to First Brands' financial reporting, which were designed to artificially decrease expenses and improve margins reported to First Brands' lenders. To implement these directives, First Brands employees maintained internal "bridge" files that juxtaposed accurate corporate financials with spurious financial adjustments needed to meet the benchmarks set by PATRICK JAMES. Those bridge files were then used to manually adjust entries in the corporate books of various First Brands' subsidiaries and were reflected in First Brands' financial statements and presentations. PATRICK JAMES caused these manipulated financials to be disseminated to lenders as accurate representations of the company's performance and condition.

32.    Second, PATRICK JAMES, the defendant, reinforced and sustained these falsehoods by misleading First Brands' outside auditors. PATRICK JAMES repeatedly certified that First Brands had no related-party arrangements, despite knowing that First Brands had purportedly sold billions of dollars' worth of inventory to the James Entities—wholly owned and controlled by PATRICK JAMES—and that the James Entities had incurred billions of dollars of liabilities using First Brands' inventory as collateral. These misrepresentations were intended to prevent auditors and lenders from discovering the existence and magnitude of First Brands' debts.

33.    Third, PATRICK JAMES and EDWARD JAMES, the defendants, also caused materially false and misleading information to be provided to the asset-backed lenders regarding the collateral allegedly securing their loans. Under the governing loan agreements, the asset-

13

FBG_CH1_00090441

backed lenders held priority liens on specific First Brands assets, such as inventory. Without the lenders' knowledge or approval, the defendants encumbered those assets, purporting to sell them free and clear to the Off-Sheet Lenders through the James Entities, notwithstanding the lenders' existing security interests.

### The First Brands Frauds Unravel

34. By 2025, First Brands' fraudulent schemes could not forestall acute cash shortages and mounting liabilities at the company. PATRICK JAMES and EDWARD JAMES, the defendants, recognized the company's dire position and attempted to refinance First Brands' debt or sell the company. As that process was underway, the defendants closed ranks, restricting the flow of information outside the company in an effort to prevent the true financial picture at First Brands from being disclosed to creditors, auditors, and potential purchasers. In April and May 2025, at the defendants' direction, employees in their inner circle withheld information from factor partners and auditors. Members of the inner circle expressed concern in an email among themselves that if other employees were permitted to speak to First Brands' counterparties they might "slip and say the wrong thing," such as inadvertently revealing the existence of the James Entities or the off-balance-sheet debt.

35. Even as the frauds unraveled and First Brands' financial issues mounted, PATRICK JAMES, the defendant, continued to enrich himself as the owner of First Brands. Through the series of frauds he directed, PATRICK JAMES caused billions of dollars in gross proceeds to flow into First Brands from counterparties and received at least hundreds of millions of dollars in gross proceeds into his personal accounts.

36. On or about September 28, 2025, First Brands filed for bankruptcy. At that time, the company had over $9 billion in liabilities, stemming from debt obligations recorded on the

FBG_CH1_00090442

DEBTORS' EXHIBIT NO. 175
Page 217 of 1907

company's balance sheet, debt omitted from the company's balance sheet, and factoring liabilities in both accounts receivable and accounts payable.

### Statutory Allegations

37.     From at least in or about 2018 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES, the defendant, knowingly organized, managed, and supervised a continuing financial crimes enterprise, in that the defendant committed violations of Title 18, United States Code, Sections 1343 and 1344, including Counts Three through Eight set forth below, which violations were part of a series of violations of those statutes committed by at least four persons acting in concert, and from which the defendant received $5,000,000 and more in gross receipts from such enterprise during any 24-month period. The series of violations, as defined by Title 18, United States Code, Section 225, includes the violations set forth below in Counts Three through Eight of this Indictment.

(Title 18, United States Code, Sections 225 and 2.)

## COUNT TWO
**(Conspiracy to Commit Wire Fraud Affecting a Financial Institution and Bank Fraud)**

The Grand Jury further charges:

38.     The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

39.     From at least in or about 2018 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, which affected a financial institution, in violation of Title 18, United States Code, Section 1343, and to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

15

FBG_CH1_00090443

**DEBTORS' EXHIBIT NO. 175**
**Page 218 of 1907**

40.     It was a part and object of the conspiracy that PATRICK JAMES and EDWARD JAMES, the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, which affected a financial institution, in violation of Title 18, United States Code, Section 1343, to wit, PATRICK JAMES and EDWARD JAMES, and others, agreed to make and cause to be made false and misleading statements to First Brands' lenders and financers regarding its financial condition and the existence, nature, and value of collateral that First Brands pledged or sold to its lenders and financers.

41.     It was further a part and an object of the conspiracy that PATRICK JAMES and EDWARD JAMES, the defendants, and others known and unknown, knowingly would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, PATRICK JAMES and EDWARD JAMES, and others, agreed to make and cause to be made false and misleading statements to financial institutions regarding its financial condition and the existence, nature, and value of collateral that First Brands pledged to its lenders and financers.

(Title 18, United States Code, Section 1349.)

16

FBG_CH1_00090444

## COUNT THREE
### (Wire Fraud Affecting a Financial Institution)

The Grand Jury further charges:

42.    The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

43.    From at least in or about 2020 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, PATRICK JAMES and EDWARD JAMES, and others, devised a scheme and artifice to defraud and to obtain money from First Brands' factors through fraudulent representations and promises regarding the nature, value, and existence of First Brands' accounts receivable, which affected a financial institution, and caused others to send and receive, emails, telephone calls, videoconferences, and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FOUR
### (Wire Fraud Affecting a Financial Institution)

The Grand Jury further charges:

44.    The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

17

FBG_CH1_00090445

**DEBTORS' EXHIBIT NO. 175**
**Page 220 of 1907**

45.    From at least in or about 2020 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, PATRICK JAMES and EDWARD JAMES, and others, devised a scheme and artifice to defraud and to obtain money from First Brands' supply chain financers through fraudulent representations and promises regarding the nature, value, and existence of First Brands' accounts payable and First Brands' financial condition, which affected a financial institution, and sent and received, and caused others to send and receive, emails, telephone calls, videoconferences, and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FIVE
### (Bank Fraud)

The Grand Jury further charges:

46.    The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

47.    From at least in or about 2020 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, knowingly executed, and attempted to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to

18

FBG_CH1_00090446

obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, PATRICK JAMES and EDWARD JAMES, and others, executed a scheme and artifice to defraud financial institutions that provided supply chain financing to First Brands through fraudulent representations and promises regarding the nature, value, and existence of First Brands' accounts payable and First Brands' financial condition.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT SIX
### (Wire Fraud Affecting a Financial Institution)

The Grand Jury further charges:

48.     The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

49.     From at least in or about 2020 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, PATRICK JAMES and EDWARD JAMES, and others, devised a scheme and artifice to defraud and to obtain money from First Brands' lenders through fraudulent representations and promises regarding First Brands' financial condition, which affected a financial institution, and sent and received, and caused others to send and receive, emails, telephone calls, videoconferences, and

19

FBG_CH1_00090447

other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT SEVEN
### (Bank Fraud)

The Grand Jury further charges:

50.    The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

51.    From at least in or about 2020 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, knowingly executed, and attempted to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, PATRICK JAMES and EDWARD JAMES, and others, executed a scheme and artifice to defraud financial institutions that provided asset-backed financing to First Brands through fraudulent representations and promises regarding First Brands' financial condition.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT EIGHT
### (Wire Fraud Affecting a Financial Institution)

The Grand Jury further charges:

52.    The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

20

FBG_CH1_00090448

**DEBTORS' EXHIBIT NO. 175**
**Page 223 of 1907**

53.     From at least in or about 2020 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, PATRICK JAMES and EDWARD JAMES, and others, devised a scheme and artifice to defraud and to obtain money from First Brands' off-sheet lenders through fraudulent representations and promises regarding First Brands' financial condition and the nature, value, and existence of collateral and property that were the subject of financing agreements, which affected a financial institution, and sent and received, and caused others to send and receive, emails, telephone calls, videoconferences, and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT NINE
### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

54.     The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

55.     From at least in or about 2022 up to and including at least in or about 2025, in the Southern District of New York and elsewhere, PATRICK JAMES and EDWARD JAMES, the defendants, and others known and unknown, willfully and knowingly combined, conspired,

21

FBG_CH1_00090449

confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

56.     It was a part and an object of the conspiracy that PATRICK JAMES and EDWARD JAMES, the defendants, and others known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, PATRICK JAMES and EDWARD JAMES, and others, agreed to disguise the proceeds of fraudulent representations to the Off-Sheet Lenders of First Brands, including through transactions designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity alleged in Count 8, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATIONS

57.     As a result of committing the offenses alleged in Counts One through Eight of this Indictment, PATRICK JAMES and EDWARD JAMES, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Eight, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendants personally obtained.

22

FBG_CH1_00090450

58.    As a result of committing the offense alleged in Count Nine of this Indictment, PATRICK JAMES and EDWARD JAMES, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

23

FBG_CH1_00090451

**DEBTORS' EXHIBIT NO. 175**
**Page 226 of 1907**

Substitute Assets Provision

59.     If any of the above-described forfeitable property, as a result of any act or omission

by the defendants:

> a.     cannot be located upon the exercise of due diligence;
>
> b.     has been transferred or sold to, or deposited with, a third party;
>
> c.     has been placed beyond the jurisdiction of the court;
>
> d.     has been substantially diminished in value; or
>
> e.     has been commingled with other property which cannot be divided

without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code,

Section 853(p), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other

property of the defendant up to the value of the forfeitable property.

(Title 18, United States Code, Sections 981, 982; Title 21, United States Code, Section 853; Title 28, United States Code, Section 2461.)

FORE███████

JAY CLAYTON
United States Attorney

24

FBG_CH1_00090452

**DEBTORS' EXHIBIT NO. 175**
**Page 227 of 1907**

# Exhibit 2

FBG_CH1_00090453

**DEBTORS' EXHIBIT NO. 175**
**Page 228 of 1907**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ------------------------------------------------------------x | : | ----------------------------------------------------- |
| In re | : | Chapter 11 |
| | : | |
| FIRST BRANDS GROUP, LLC, *et al.*,[1] | : | Case No. 25-90399 (CML) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |
| | : | |
| ------------------------------------------------------------x | : | ----------------------------------------------------- |
| | : | |
| FIRST BRANDS GROUP, LLC, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Adv. Pro. No. 25-03803 (CML) |
| | : | |
| v. | : | |
| | : | |
| PATRICK JAMES, THE PATRICK JAMES TRUST, ALBION REALTY, LLC, ALESTER TECHNOLOGIES LLC, BATTERY PARK HOLDINGS LLC, LARCHMONT LLC, PEGASUS AVIATION, LLC, MICHAEL BAKER, PETER ANDREW BRUMBERGS, STEPHEN GRAHAM, JOHN AND JANE DOE(S) 1-100, and ABC CORPORATION(S) 1-100, | : : : : : : : : : : | |
| | : | |
| Defendants. | : | |

AMENDED COMPLAINT

_____

[1]    A complete list of Debtors in these chapter 11 cases may be obtained on the website of Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

FBG_CH1_00090454

First Brands Group, LLC and its debtor affiliates ("**Debtors**", "**First Brands**", or "**Company**") as debtors and debtors in possession in the above-captioned chapter 11 cases, by their attorneys, Weil, Gotshal & Manges LLP, file this adversary proceeding against Patrick James ("**James**"); the Patrick James Trust; Albion Realty, LLC ("**Albion Realty**"), Alester Technologies LLC ("**Alester**"), Battery Park Holdings LLC ("**Battery Park**"), Larchmont LLC ("**Larchmont**"), Pegasus Aviation, LLC ("**Pegasus Aviation**") (the "**Entity Defendants**"); Michael Baker, Peter Andrew Brumbergs, Stephen Graham, John and Jane Doe(s) 1-100, and ABC Corporation(s) 1-100 (together, "**Defendants**").

## NATURE OF THE ACTION

1. This action concerns grievous misconduct by Patrick James, the founder and former Chief Executive Officer of First Brands, who fraudulently secured billions of dollars of financing for First Brands, only to turn around and enrich himself and his family by misappropriating hundreds of millions (if not billions) of dollars from First Brands, which contributed to First Brands' insolvency and occurred while First Brands was insolvent or nearing insolvency.

2. Founded by James in 2013, First Brands—spanning five continents and comprising over 100 entities, all entirely though indirectly owned by James—is a global supplier of aftermarket automotive parts, including brakes, filters, wipers, lights, pumps, and towing solutions. First Brands employs approximately 26,000 individuals worldwide and purported to generate net sales of approximately $5 billion in 2024.

3. James—who resigned from his role as Chief Executive Officer on October 13, 2025—commandeered the enterprise to engage in fraudulent conduct to enrich himself and his family at the expense of First Brands and its creditors. First Brands' investigation thus far shows that James misrepresented First Brands' financial position to secure billions in debt financing and

2

FBG_CH1_00090455

inappropriately used First Brands' funds for his and his family's personal benefit.

4.      Specifically, James, working with others, including First Brands' former Chief Corporate Strategy Officer Michael Baker, former Vice President of Finance Peter Andrew Brumbergs, and former Chief Financial Officer Stephen Graham, deployed at least four discrete strategies to perpetuate this fraud and secure financing from third-party lenders.

5.      *First*, James caused First Brands to incur at least $2.3 billion in accounts receivable factoring liabilities based, at least in significant part, on non-existent or doctored invoices.

6.      *Second*, James engaged in financing transactions involving special purpose vehicles ("**SPVs**"), which incurred another at least $2.3 billion in debt, including by double-pledging collateral that First Brands could not itself borrow against a second time.

7.      *Third*, James engaged in supply chain financing ("**SCF**") arrangements to factor its accounts payable, incurring at least approximately $900 million in unsecured liabilities that were not recorded on First Brands' balance sheet.

8.      *Fourth*, James concealed First Brands' true financial condition from counterparties, creditors, and lenders by directing the alteration of First Brands' financial statements.

9.      James did not act alone in carrying out these activities. Rather, as further alleged below, certain senior executives and directors, including Baker, Brumbergs, and Graham, knowingly participated in, substantially assisted, and/or conspired with James in implementing each of the foregoing plans.

10.      As he secured this financing, James—aided and abetted by the other Defendants, including, Baker, Brumbergs, Graham, Jane and John Does 1-100, and ABC Corporations 1-100— secretly pilfered First Brands' assets to fund his and his family's lavish lifestyle. In short, he lined his pockets at the expense of First Brands and its creditors.

FBG_CH1_00090456

11.     James did not fraudulently transfer First Brands' assets just once. Instead, he orchestrated an elaborate process through which he effectuated hundreds of transfers to himself and entities under his control, or to third parties for his or his family's personal benefit. A chart identifying the transferors, transferees, transfer dates, and transfer amounts of a significant subset of the transfers that occurred from 2018 to 2025 is attached as Exhibit A to this Amended Complaint.[2] The transfers reflected in Exhibit A trace estate funds directly from identified First Brands accounts to James, entities under his control, or third parties for his and his family's personal benefit.

12.     In total, hundreds of millions of dollars were transferred from accounts belonging to First Brands directly to James and entities under his control, or to third parties for James' or his family's personal benefit from 2018 to 2025, with the majority of such transfers by value occurring between 2023 and 2025.

13.     In a rinse and repeat cycle, James caused First Brands to fraudulently incur debt financing only to then divert—routinely and regularly—funds from First Brands for his and his family's personal benefit. These practices contributed to First Brands' insolvency. Aside from entries in the Company's general ledger, the Company's advisors are unaware of any formal documentation indicating that these payments constituted dividends or tax distributions in the ordinary course.

14.     Upon information and belief, James and his family are also believed to have used the misappropriated funds to pay for or otherwise maintain, among other personal expenses, an extensive collection of lavish homes and cars.

_____

[2]     Exhibit A reflects a non-exhaustive set of improper transfers. First Brands reserves the right to present evidence of additional transfers at trial.

FBG_CH1_00090457

15.     The results of James' actions culminated on September 24, 2025 and September 28, 2025 (the "**Petition Date**"), when First Brands Group, LLC and 111 affiliated debtors, including certain First Brands SPV entities (the "**SPV Debtors**"), each filed with the Court a voluntary case under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), commencing the above-captioned chapter 11 cases. As of the commencement of these chapter 11 cases, First Brands—which is comprised of entities reported to have had approximately $5 billion in net annual sales and at least approximately $11.5 billion in total debt obligations and other financing liabilities—held just $12 million in cash in its corporate bank accounts, a staggering dissipation of assets.

16.     James' conduct would have continued unabated if certain lenders had not, in July 2025, started asking questions and demanding a quality of earnings report before they would consider issuing any additional debt financing to First Brands. It soon became clear that the quality of earnings report would not be done in any period of time necessary for a refinancing. With the pipeline of future financing screeched to a halt, First Brands was exposed as undercapitalized and unable to meet its most basic payment obligations—including employee payroll. This led to, among other things, the appointment of an independent special committee and commencement of an investigation that continues to uncover the full extent of James' and others' misconduct.

17.     James' actions contributed to First Brands' insolvency and continued while First Brands was nearing insolvency and insolvent. Indeed, James was instrumental in causing First Brands to incur substantial debt through off-balance sheet financing that First Brands could not pay as those debts came due. And because James used a complicated web of corporate entities under his control to secretly conduct fraudulent transfers, the full extent of his misconduct may not be known at this time.

5

FBG_CH1_00090458

18.     First Brands brings this action to recover significant sums of money—totaling hundreds of millions, if not billions, of dollars—from James, the Patrick James Trust, the Entity Defendants which constitute business entities controlled by James, Michael Baker, Peter Andrew Brumbergs, Stephen Graham, John and Jane Doe(s) 1-100, and ABC Corporation(s) 1-100, for the benefit of the Debtors' estates and their creditors.

## THE PARTIES

### A.  Plaintiffs

19.     Plaintiff First Brands Group, LLC is a Delaware limited liability company with its principal place of business in Cleveland, Ohio.[3] Founded by James in 2013, First Brands—through its subsidiaries and portfolio of brands—operated as a supplier of aftermarket automotive parts, including brakes, filters, wipers, lighting, pumps, and towing products. As alleged below, First Brands' business model relied heavily on serial acquisitions, price increases, and debt-financed liquidity structures (including factoring, SPV, and SCF arrangements).

### B.  Defendants

20.     Defendant Patrick James is First Brands' founder, ultimate owner, former Chief Executive Officer, and former manager. James resigned from all positions he held as an officer, director, or manager at all First Brands' entities on October 13, 2025. Upon information and belief, James resides in the state of Ohio.

21.     Defendant Patrick James Trust was created on March 10, 2005, with Patrick James as Grantor and Thomas A. Haught as Trustee.

22.     Defendant Albion Realty, incorporated on August 4, 2020, is a Delaware limited

---

[3]     Plaintiffs in this action are First Brands Group, LLC and its debtor affiliates. Information about these entities may be obtained on the website of Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.

FBG_CH1_00090459

liability company under the control of Patrick James.

23.     Defendant Alester, incorporated on May 18, 2020, is a Delaware limited liability company under the control of Patrick James.

24.     Defendant Battery Park, incorporated on May 30, 2013, is a Delaware limited liability company under the control of Patrick James.

25.     Defendant Larchmont, incorporated on April 17, 2006, is an Ohio limited liability company under the control of Patrick James.

26.     Defendant Pegasus Aviation, incorporated on August 24, 2021, is a Delaware limited liability company under the control of Patrick James.

27.     Defendant Michael Baker is First Brands' former Chief Corporate Strategy Officer. Baker resigned from all positions he held as an officer, director, or manager at all First Brands' entities on September 25, 2025. Upon information and belief, Baker resides in the state of New Jersey.

28.     Defendant Peter Andrew Brumbergs is First Brands' former Vice President of Finance. On October 30, 2025, Brumbergs was terminated from all positions he held as an executive at all First Brands' entities. Upon information and belief, Brumbergs resides in the state of Ohio.

29.     Defendant Stephen Graham is First Brands' former Chief Financial Officer. On October 30, 2025, Graham retired from all positions he held as an officer, director, or manager at all First Brands' entities. Upon information and belief, Graham resides in the state of Ohio.

30.     Defendants John and Jane Doe(s) 1-100 are persons yet to be identified that, on information and belief, received fraudulent transfers and/or participated or aided and abetted in various frauds committed by Defendants. Debtors may further amend this Complaint to show the

FBG_CH1_00090460

**DEBTORS' EXHIBIT NO. 175**
**Page 235 of 1907**

true names and capacities of John and Jane Doe(s) 1-100 when the same have been ascertained.

31.     Defendants ABC Corporation(s) 1-100 are business entities or trusts yet to be identified that, on information and belief, received fraudulent transfers and/or participated or aided and abetted in various frauds committed by Defendants. Debtors may further amend this Complaint to show the true names and capacities of ABC Corporation(s) 1-100 when the same have been ascertained.

## JURISDICTION AND VENUE

32.     The United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**" or the "**Court**") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

33.     This adversary proceeding is commenced pursuant to Sections 105(a), 502, 542, 544, 548, 550, and 551 of the Bankruptcy Code, Rules 3007, 6009, and 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rule 7008-1 of the Local Rules of the Bankruptcy Court (the "**Local Rules**"), and applicable non-bankruptcy law.

34.     This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (H), and (O), and this Court has jurisdiction to hear and determine this proceeding and to enter a final order and judgment. If this Court or any other court finds any part of this adversary proceeding to be "non-core," this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334 because the relief sought herein relates to Debtors' bankruptcy cases and will have a material impact on the administration of Debtors' estates.

35.     Debtors consent to entry of final orders and judgments by this Court in this adversary proceeding pursuant to Bankruptcy Rule 7008 and Local Rule 7008-1. Debtors also consent to entry of final orders or judgment by this Court if it is determined that this Court cannot

8

FBG_CH1_00090461

enter final orders or judgments consistent with Article III of the United States Constitution absent consent of the parties.

36.     Venue in this Court is proper pursuant to 28 U.S.C. § 1409 because it arises under the Bankruptcy Code or arises in, or is related to, Debtors' bankruptcy cases pending before this Court.

## PERSONAL JURISDICTION

37.     Defendants are subject to personal jurisdiction pursuant to Bankruptcy Rule 7004 because Defendants have established minimum contacts with the United States. Where a federal statute or rule provides for nationwide service of process, as does Bankruptcy Rule 7004, a federal court has personal jurisdiction over any defendant having minimum contacts with the United States.

38.     Each Defendant has established minimum contacts with the United States by conducting business within the United States, including, but not limited to, the following:

a) Defendant Patrick James owns interests in, and served as an executive of, a United States-based company relevant to the causes of action asserted herein; owns real and personal property in the United States; and fraudulently transferred money from a United States-based company into other accounts within the United States, including to accounts belonging to several United States-based companies controlled by him as well as to accounts belonging to Defendant Patrick James Trust, which, as set forth below, was created in and continues to be held in the United States. Defendant James is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

b) Defendant Patrick James Trust was created in, and continues to be located in, the

9

FBG_CH1_00090462

United States. Defendant Patrick James Trust holds bank accounts located in the United States.

c) Defendant Albion Realty was created in, and continues to operate in, the United States. Defendant Albion Realty is incorporated in Delaware and holds bank accounts located in the United States.

d) Defendant Alester was created in, and continues to operate in, the United States. Defendant Alester is incorporated in Delaware and holds bank accounts located in the United States.

e) Defendant Battery Park was created in, and continues to operate in, the United States. Defendant Battery Park is incorporated in Delaware and holds bank accounts located in the United States.

f) Defendant Larchmont was created in, and continues to operate in, the United States. Defendant Larchmont is incorporated in Ohio and holds bank accounts located in the United States.

g) Defendant Pegasus Aviation was created in, and continues to operate in, the United States. Defendant Pegasus Aviation is incorporated in Delaware and holds bank accounts located in the United States.

h) Defendant Michael Baker served as an officer and executive of a United States-based company relevant to the causes of action asserted herein. Defendant Baker is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

i) Defendant Peter Andrew Brumbergs served as an executive of a United States-based company relevant to the causes of action asserted herein. Defendant

10

FBG_CH1_00090463

Brumbergs is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

j)   Defendant Stephen Graham served as an officer and executive of a United States-based company relevant to the causes of action asserted herein. Defendant Graham is also domiciled in at least one state of the United States and is therefore subject to general jurisdiction within the United States.

39.   Accordingly, this Court has personal jurisdiction over Defendants based on their contacts with the United States.

<u>FACTUAL ALLEGATIONS</u>

**I.   DEFENDANTS CAUSED FIRST BRANDS TO FRAUDULENTLY INCUR BILLIONS OF DOLLARS IN FINANCING**

40.   As of the Petition Date, First Brands had approximately $6 billion in aggregate principal of on-balance sheet outstanding funded debt obligations, at least $2.3 billion in factoring liabilities, at least $2.3 billion in aggregate "off-balance sheet" financings incurred through SPVs, and at least approximately $900 million in unsecured SCF liabilities.

41.   Despite reported annual net sales of approximately $5 billion, First Brands' cash position on the Petition Date was dire, and remains so. As of the Petition Date, First Brands had only approximately $12 million in cash in corporate bank accounts.

42.   Since the Petition Date, First Brands has investigated James' conduct, the conduct of his co-conspirators, including Baker, Brumbergs, Graham, Albion Realty, Alester, Battery Park, Larchmont, Pegasus Aviation, and the Patrick James Trust, and potential claims held by First Brands against those individuals and entities.

43.   That investigation has revealed that James, through Baker, Brumbergs, and Graham, improperly secured funding from third parties for First Brands. First Brands brings this

11

FBG_CH1_00090464

action to recover assets that properly belong to the estates based on the results to date of its ongoing investigation.

44.     As described below, James and his co-conspirators' activities included, at a minimum, causing First Brands to fraudulently incur financing by: (a) using erroneous or fabricated invoices in connection with accounts receivable factoring activities; (b) executing off-balance sheet financing transactions through SPVs; (c) incurring liabilities through off-balance sheet SCF arrangements; and (d) altering First Brands' financial statements.

45.     In order to line his own pockets, James induced third-party lenders to lend to First Brands, including on terms First Brands would never be able to repay, by misrepresenting its true financial condition.

**A.  Third-Party Factoring**

46.     Prior to the Petition Date, First Brands used a variety of factoring arrangements to obtain liquidity. Under these arrangements, First Brands would sell accounts receivable generated from the sale of goods in exchange for near-term payment on invoices with extended payment terms.

47.     Before the Petition Date, First Brands entered into factoring arrangements with unaffiliated third parties ("**Third-Party Factoring**") in which it would transfer a receivable to a third-party factor in exchange for a near-term discounted payment on an invoice with lengthy payment terms. The third-party factor would purchase invoices from First Brands, and First Brands was then required to turn over the payment, once received, to the third-party factor.

48.     At least $2.3 billion in debt has accrued with respect to Third-Party Factoring arrangements as of the Petition Date.

49.      To date, First Brands has identified three significant issues or discrepancies with

FBG_CH1_00090465

First Brands' prepetition Third-Party Factoring practices under James' leadership and direction, and the actions of Brumbergs (among others):

a) *First*, in many instances, the amount set forth on a factored invoice did not accurately reflect a customer's order, without any apparent reason for the discrepancy. For example, in some instances, the amount set forth in a factored invoice was ten or more times higher than the actual amount of an invoice.

b) *Second*, in many instances, purported invoices representing customer orders were created and submitted to Third-Party Factoring parties for payment even though First Brands' books and records, in some cases, do not reflect that such customer invoices existed.

c) *Third*, in many instances, the same invoice was factored more than once to different third-party factors. There were also instances of factoring the same receivable to both a customer partner factor and a separate third-party factor.

50.    In other words, in certain instances First Brands sold erroneous or fabricated invoices to the third-party factors or sold duplicate invoices to multiple counterparties.

51.    As an example, on May 9, 2025, Brake Parts Inc LLC sold automotive parts to General Motors Corporation SPO. An invoice for this sale shows a total of $179.84. On May 19, 2025, that invoice, along with thousands of others, was sent to Brumbergs as part of a package of invoices to be nominated to Katsumi Global, LLC, d/b/a JA Mitsui Capital Americas ("**Katsumi**") for factoring. When Brumbergs sent the list to Katsumi later that day, it listed the very same Brake Parts Inc LLC invoice, but this time with a value of $9,271.25, representing an extreme increase from the original May 9, 2025 invoice amount of $179.84. The values of numerous other invoices in the package also had been changed, including some invoices that were listed at net values and

13

FBG_CH1_00090466

purchase prices more than $15,000 higher and $12,000 higher, respectively, than the invoice values listed in the original documents. Ultimately, the factoring company purchased the package of invoices including the modified invoice (along with other invoices) at a cost of approximately $11.18 million, but the actual value of the invoices was only approximately $2.3 million.[4]

52.     In addition, First Brands, at James' direction, fabricated and sold non-existent receivables to third parties, totaling millions of dollars.

**B.  Off-Balance Sheet Financing Practices**

53.     Certain First Brands entities are party to off-balance sheet financing structures, including lease, inventory sale-leaseback, and equipment financing arrangements. These arrangements include the CarVal Facilities (the "**CarVal Facilities**"), Aequum Facilities (the "**Aequum Facilities**"), Evolution Facilities (the "**Evolution Facilities**"), and the Onset Master Lease and transactions related thereto (the "**Onset Facilities**").

54.     Under the CarVal Facilities, lenders provided asset-based revolving credit facilities to certain SPV Debtors. Under these facilities, these SPV Debtors could engage certain First Brands subsidiaries to manufacture inventory on their behalf and could purchase manufactured inventory such as brake parts or raw materials from First Brands and use that inventory as a borrowing base to obtain credit from the lenders.

55.     Under the Aequum Facilities, lenders provided asset-based revolving credit facilities to certain SPV Debtors. Under these facilities, the SPV Debtors could purchase inventory,

---

[4]     First Brands presented evidence of these transactions and other instances of Defendants' misconduct, including over sixty exhibits and several hours of sworn testimony, at the preliminary injunction hearing in this matter. First Brands incorporates by reference all evidence offered at that preliminary injunction hearing. This evidence includes, among other things, bank records reflecting transfers from First Brands accounts to James, entities under his control, or third parties for his and his family's personal benefit.

FBG_CH1_00090467

finished parts, raw materials, or semi-finished products directly from certain other Debtors, and utilize that inventory as a borrowing base to obtain credit from the lenders. These facilities also permitted SPV Debtors to sell the inventory back to the other Debtors.

56. Under the Onset Facilities and the Evolution Facilities, an SPV Debtor could (i) first purchase inventory and/or equipment from certain subsidiaries of First Brands and then (ii) utilize those assets either as (a) collateral to support a loan (in the case of the Evolution Facilities) or (b) in connection with an alleged sale-leaseback transaction (in the case of the Onset Facilities).

57. First Brands' investigation, however, has identified multiple issues with these arrangements.

58. *First*, in the case of the Aequum and CarVal Facilities the agreements entered into by the SPVs did not reflect the commercial reality of their transactions. The SPVs associated with these facilities purported to purchase materials or inventory from specific First Brands entities, but sent funds obtained through the transactions to entities other than the supposed sellers of inventory under their agreements.

59. *Second*, in the case of the Onset Facilities, in many cases, the amounts paid from the off-balance sheet SPV to the First Brands subsidiary for inventory and/or property, plant and equipment ("**PP&E**") were less than the stated sale price specified in the relevant asset purchase agreements.

60. *Third*, it appears that inventory that was purportedly transferred by First Brands subsidiaries to the SPV Debtors in connection with certain of the off-balance sheet facilities, namely the Evolution Facilities and the Onset Facilities, remained on the First Brands subsidiaries' balance sheets, notwithstanding the alleged transfers. Also, the value of such inventory appears to

FBG_CH1_00090468

have remained in the borrowing base for the First Brands credit facilities, including Debtors' ABL Facility. Accordingly, the value of the same inventory was used to support loans to both (i) the First Brands subsidiaries and (ii) the SPV Debtors.

61.     *Fourth*, funds were transferred from SPV Debtors to a non-Debtor entity controlled by James known as "Bowery Finance II." Inadequate books and records were maintained for these SPV Debtors, and cash that was supposed to be transferred to the First Brands subsidiaries under the applicable transaction documents was transferred to Bowery Finance II instead. Upon information and belief, the Bowery Finance II account was used as a slush fund. From 2022 through 2025, nearly $12 billion flowed through the account, including transfers between Patrick James, the Patrick James Trust and his affiliated entities, and transfers with First Brands and First Brands' business units. The transfers were apparently made in order to meet repayments due to Onset and third-party factors.

**C.  Supply-Chain Financing Practices**

62.     First Brands incurred at least approximately $900 million in unsecured SCF liabilities that were not fully recorded as liabilities on First Brands' balance sheet, further obscuring First Brands' true financial condition. These liabilities, together with off-balance sheet SPV and factoring obligations, contributed to approximately $5.5 billion in unrecorded or under-recorded debt.

63.     In the SCF program, First Brands used third-party platforms to factor the Company's accounts payable, thereby extending payment terms for the amounts due to vendors and suppliers. The SCF program principally operated through two methods: (1) direct factoring, and (2) bill payers. In the first method, vendors would upload invoices to an SCF platform and choose whether to immediately receive funds or wait until the invoice matured. In the second

FBG_CH1_00090469

method, First Brands would upload customer invoices to a third-party payment processing entity, often in the form of a "cover" invoice that consolidated multiple vendor invoices, and the payment processing entity would make payment on those invoices using funds sourced through the SCF platforms.

64.     First Brands' investigation has uncovered, however, misconduct by certain Defendants in connection with the SCF program. Senior finance executives acting at the direction of James, through Brumbergs, created false "cover invoices" to submit to processors such as NextProcess LP and VERCYFi LLC—entities used to process payments to third parties on behalf of First Brands—that, either in whole or in part, did not reflect actual accounts payable due to vendors or suppliers. Instead, these invoices used fictitious amounts to ensure that First Brands drew the maximum amount of cash permitted under the SCF platforms' credit limits.

65.     Upon information and belief, rather than directing that the payment processors use such funds to pay First Brands' vendors or suppliers, James, through Brumbergs, directed that such funds be paid to non-Debtor entities including Bowery Finance II, to conceal that the funds were simply returning to First Brands in what were internally referred to as "round trips," "RT," or "corporate initiatives." Upon information and belief, James, Brumbergs, and Graham regularly reviewed the Company's cash position, including the availability of "round trip" funding obtained through the SCF program. James would determine how such funds were spent, and Brumbergs would direct the Finance department to distribute the funds accordingly.

66.     By using SCF financing, James and Brumbergs greatly increased First Brands' liabilities, but James, through Brumbergs, coordinated with senior First Brands executives to conceal the extent of SCF financing. Moreover, Brumbergs and Graham were directly involved in preparing and reviewing financial statements related to SCF disclosures, which failed to disclose

FBG_CH1_00090470

DEBTORS' EXHIBIT NO. 175
Page 245 of 1907

a substantial portion of the liabilities that First Brands had incurred through the SCF program. Notably, immediately prior to the Petition Date, Brumbergs instructed individuals in First Brands' Accounting department to record a $1.2 billion liability related to the SCF program, which had not previously been reflected on First Brands' balance sheet.

### D.  Altered Financial Statements

67.     In addition to the above practices, James, through the actions of Brumbergs and Graham, concealed First Brands' true financial condition from counterparties, creditors, and lenders by personally directing the alteration of First Brands' financial statements.

68.     Specifically, James directed senior First Brands executives, including Brumbergs, to make these alterations. In turn, Brumbergs manually reclassified expenses as assets, inflated sales figures, and placed certain expenses "below the line" for purposes of EBITDA calculations.

69.     The intentional alteration of First Brands' financial statements led to material misstatements of First Brands' financial condition. When considered alongside the off-balance sheet financings, such alterations made it difficult, if not impossible, to accurately assess the Company's financial condition and solvency.

### II.    DEFENDANTS' MISAPPROPRIATION OF FIRST BRANDS' FUNDS FOR JAMES' AND HIS FAMILY'S PERSONAL BENEFIT

70.     At the same time James and his co-conspirators were manipulating First Brands' books and records to bring funds into First Brands, James and his co-conspirators were misappropriating massive sums—totaling hundreds of millions, if not billions, of dollars—from First Brands to fund James' and his family's lavish lifestyle. This misconduct is not new for James, who has been previously accused of engaging in fraudulent and deceptive business practices to

FBG_CH1_00090471

divert corporate proceeds to enrich himself.[5]

71.    First Brands has uncovered that hundreds of millions of dollars were transferred from First Brands directly to James and entities under his control, or to third parties for his personal benefit from 2018 to 2025. The scale of James' transfers increased in recent years, with the majority of such transfers occurring between 2023 and 2025. These transfers continued unabated into 2025 and continued until days before the Petition Date.

72.    In total, Exhibit A reflects **835 transfers totaling at least approximately $830 million** from 2018 to 2025. First Brands' review of the corresponding accounts has not identified consideration constituting reasonable value for the transfers reflected therein. First Brands has likewise not found ordinary-course documentation reflecting that these transfers were made for a legitimate business purpose. First Brands reserves the right to supplement Exhibit A, and to challenge additional transfers, as additional bank records and discovery are obtained.

---

[5]    In 2009, Tristate Capital Bank filed a lawsuit against James and companies under his control for repeatedly misleading a borrower group about the nature and value of collateral, the condition of the businesses, and the disposition of assets and proceeds. *Tristate Capital Bank v. Red Rock Stamping LLC et al.*, No. 09-cv-01455 (N.D. Ohio June 26, 2009). James, and companies under his control, allegedly (1) overstated eligible accounts receivable by concealing substantial offsets owed to major customers; (2) manipulated internal records to hide these offsets (3) transferred collateral inventory to a related entity without consideration; (4) diverted substantial "management" and "consulting" fees despite subordination and distribution restrictions; and (5) withheld collateral and business records after default and execution of a wind-down agreement. The case settled and James agreed to pay $1 million.

In 2011, Fortress Value Recovery Fund filed a similar lawsuit against James and companies under his control. Plaintiff, an unpaid creditor, accused James of creating and using a web of affiliated entities to move money from James' heavily indebted company, Columbus Components Group, LLC ("**CCG**"), to other management entities. *Fortress Value Recovery Fund I LLC v. Columbus Components Group, LLC et al.*, No. 11-cv-200 (N.D. Ohio Jan. 27, 2011). The creditor alleged that tens of thousands of dollars per month were diverted in "management fees," including during periods when CCG was in default and prohibited from making such payments. CCG, at James' direction or with his knowledge, allegedly withheld accurate information to avoid triggering an event of default, thereby allowing continued fee payments to James' affiliated companies. James' company settled this lawsuit for $6 million. *Fortress Value Recovery Fund I LLC v. Columbus Components Group, LLC et al.*, No. 11-cv-200 (N.D. Ohio July 6, 2011).

FBG_CH1_00090472

73.     While James asserts that he "transferred (at least) tens of millions of dollars into First Brands," James has never provided an accounting of these relatively limited transfers. ECF No. 108 ¶ 6. Even if James had transferred money back into First Brands, doing so would not absolve him of liability for his misappropriations. The ultimate result of James' actions was that First Brands was left with just $12 million in cash in its corporate bank accounts as of the Petition Date.

74.     James' misappropriated funds from First Brands involved, at a minimum, improper "dividends" or "distributions" to the Patrick James Trust, and brazen use of First Brands' funds to pay for James' and his family's lifestyle and personal businesses. These transfers occurred between 2018 and 2025, with the majority of transfers by value occurring in the two years prior to the Petition Date. The recipients, ostensible purpose, and total amount of such transfers are described below.

**A. Improper Transfers to Defendant Patrick James Trust**

75.     Based on evidence uncovered to date, the vast majority of the misappropriated funds—**totaling approximately $708 million, with over $229 million in 2025 alone**—were transferred to Defendant Patrick James Trust. First Brands is not aware of any information demonstrating that these transactions were made for any benefit or consideration received by First Brands.

76.     Transfers to Defendant Patrick James Trust comprise payments originating from accounts belonging to First Brands Group, LLC, Brake Parts Inc LLC, and various SPV Debtors—including accounts belonging to Carnaby FA, LLC and Carnaby Inventory IV, LLC.

77.     James personally directed these distributions from the Company to Defendant Patrick James Trust, specifying the amount and destination accounts for each payment.

FBG_CH1_00090473

DEBTORS' EXHIBIT NO. 175
Page 248 of 1907

78.     For example, on April 5, 2022, James' Chief of Staff emailed Brumbergs, writing that James "wants a $10M tax distribution paid to him this week." Brumbergs wrote to members of the First Brands Finance department that he had discussed the payment and timing with James and instructed them to make a transfer at the end of the week. On April 8, 2022, First Brands transferred $10 million to Defendant Patrick James Trust.

79.      Similarly, in January 2024, internal communications among Brumbergs and other senior individuals at First Brands indicated that James "wanted to have the distribution funds sent" to two accounts belonging to Defendant Patrick James Trust, divided into batches of $21 million and $4 million. That day, First Brands distributed $25 million into an account belonging to Defendant Patrick James Trust.

80.     Again, in October 2024, Brumbergs indicated that he had been "instructed to make a $25 million USD distribution" to a Patrick James Trust account. First Brands distributed $25 million into the specified account that same day.

81.     First Brands is unaware of any documentation, aside from entries in the Company's general ledger, indicating that these payments constituted dividends or distributions in the ordinary course. To the extent the transfers were properly considered dividends or distributions, the sum total of the payments far exceeded the consideration provided to First Brands in return.

82.     At the time these transfers were made, the entities from which the transfers were made lacked sufficient surplus, net profits, or distributable capital to lawfully authorize dividends or distributions under applicable law. Transfers to the trust reflected in Exhibit A rendered First Brands and/or the relevant transferor entity insolvent or occurred as they were nearing insolvency and later, further exacerbated their insolvency.

83.     Simply put, upon information and belief, there was no legitimate business reason

21

FBG_CH1_00090474

for James to transfer hundreds of millions of dollars from First Brands to Defendant Patrick James Trust, leaving First Brands insolvent and with just $12 million in the bank as of the Petition Date.

**B.    James Commingled His Personal Accounts with Company Accounts and Diverted First Brands' Funds to Pay for His and His Family's Lavish Lifestyle**

84.    Upon information and belief, James also intentionally commingled First Brands' business accounts with personal funds and used First Brands' funds for his and his family's personal expenses and personal businesses.

85.    Indeed, upon information and belief, certain of the Debtors' cash was frequently commingled with the cash of non-Debtor entities, including Bowery Finance II, controlled by James.

86.    James also caused First Brands to pay numerous third parties that serviced his personal lifestyle and family office—rather than First Brands' business—using First Brands' funds. These payments included salaries, benefits, and compensation for current and former employees of Defendant Larchmont LLC, James' family office, paid both from First Brands Group, LLC and Trico Products Corporation, to the employees directly and through Larchmont's vendor, Consociate Group LLC[6]; security and consulting services paid to CTC International Group, Inc.; interior design and furnishing expenses paid to Meribear Productions, Inc. d/b/a Meridith Baer Home; rent, utilities, and related housing expenses paid through MRRDISON LLC for James' personal New York City residence; automotive and transportation-related services paid to Carcorp USA; financial advisory and wealth-management services paid to Sequoia Financial Group, LLC, as well as direct payments to Thomas A. Haught, trustee of Defendant Patrick James

---

[6]    These employees are identified by a numerical designation in Exhibit A to preserve their anonymity. Exhibit B to this Complaint, filed under seal, identifies these individuals by name. *See* ECF No. 408 ¶14.

FBG_CH1_00090475

DEBTORS' EXHIBIT NO. 175
Page 250 of 1907

Trust and CEO of Sequoia Financial Group, LLC, including for services overlapping with James' family office and Defendant Patrick James Trust; purported IT services paid to Banshee Computer Consulting Corp.; personal moving and logistics services paid to Meridian Moving and Storage, Inc.; and over $400,000 paid to James' private celebrity chef. These payments conferred no benefit on First Brands, were not made in the ordinary course of business, and were made solely to subsidize James' and his family's personal and family-office expenses.

87.     Payments were also made from First Brands to entities controlled by James, named as Defendants in this action. For example, Defendant Battery Park—which is not directly affiliated with First Brands—is 100% owned by James and is described as a "personal" business in James' financial documents. On information and belief, more than $18 million was transferred from First Brands to Battery Park from 2019 to 2025 to pay James and his family's personal expenses, including approximately $150,000 for a personal trainer and hundreds of thousands of dollars for personal travel, security, transportation, and other costs that should have been borne by James and his family personally.

88.     James orchestrated both the amounts and timing of numerous transfers to Defendant Battery Park. For instance, on July 19, 2022, an employee of Defendant Larchmont, James' family office, emailed First Brands to request payment, indicating that "Patrick has asked that we invoice weekly." On October 31, 2022, the same Larchmont employee submitted an invoice to First Brands for more than $400,000, writing: "Per Patrick, this should be paid tomorrow."

89.     Other communications from James' family office indicate that he personally dictated what should be submitted for reimbursement. For example, on December 31, 2022, a Larchmont employee stated that James "had us go back and recode" certain charges so that

23

DEBTORS' EXHIBIT NO. 175
Page 251 of 1907

expenses borne by Defendant Battery Park would be reimbursed by First Brands.

90.     The conduct by which James enriched himself at the expense of First Brands continued well into 2025. For instance, on March 5, 2025, a Larchmont employee sent an email to First Brands, which noted that James had asked that a $468,000 invoice be "paid this week if possible."

91.     Upon information and belief, James also directed employees to submit invoices to First Brands for reimbursement to Defendant Battery Park wherein line items for personal and business expenses were included in the same invoice. For example, in an invoice submitted by Battery Park to First Brands on August 23, 2023, Battery Park sought reimbursement for over $110,000 for a six week "Southampton hotel" stay for two individuals who worked for James personally.

92.     James and others acting at his direction at times sought to conceal the nature of certain payments to Defendant Battery Park. For instance, on January 3, 2025, Battery Park submitted a $1.7 million invoice to First Brands. Instead of paying this invoice directly from First Brands Group, LLC accounts, Brumbergs arranged that funds be transferred first to Patterson Inventory, LLC ("**Patterson**"), an SPV Debtor, through a third-party payment processor. Patterson subsequently transferred those funds to Defendant Battery Park.

93.     In another instance, on March 21, 2024, an employee of Defendant Larchmont sent First Brands a $412,000 invoice with no detail regarding its contents. The employee wrote that Battery Park would no longer provide detailed invoices, and that he had been instructed to provide any necessary detail directly to Brumbergs.

94.     As Exhibit A illustrates, the other Entity Defendants likewise received transfers from First Brands during the relevant period.

FBG_CH1_00090477

95.     From 2018 to 2025, First Brands transferred approximately $38 million to Defendant Larchmont. Although these payments were mostly characterized as "management fees," upon information and belief, Defendant Larchmont provided no services to First Brands and instead provided personal services to James and his family. Indeed, in one case when an auditor asked what services Larchmont provided to First Brands in return for the "management fee," a senior member of the Accounting team replied: "Patrick James."

96.     James often dictated the timing and quantity of payments to Defendant Larchmont. For example, on April 12, 2021, Brumbergs stated to another member of the Finance team that James "wants the entire Q2 amount paid today." That day, First Brands transferred $1.25 million to Larchmont. On July 6, 2021, Brumbergs indicated that he would "check with PJ" regarding the timing and amount of subsequent payments to Larchmont.

97.     Further, a total of at least $34 million was transferred to Defendant Alester through a third-party payment processor, purportedly as part of a licensing agreement under which Alester allowed First Brands to use certain intellectual property. In reality, however, that intellectual property should have belonged to First Brands. Specifically, in connection with acquisitions by First Brands of entities including Horizon Global Corporation ("**Horizon**"), Cardone Industries, Inc., and TAE Brakes, LLC, the acquired entities executed agreements purporting to contribute substantial portions of their intellectual property portfolios to Alester. First Brands subsidiary Carter Carburetor Holdings, LLC also executed a similar agreement, again purporting to contribute intellectual property to Alester. These purported contributions occurred even though no corresponding consideration or payments had been provided to First Brands. James' and Alester's misappropriations thus also included misappropriation of valuable intellectual property belonging to First Brands. Alester thereafter licensed certain of that intellectual property—including

25

FBG_CH1_00090478

**DEBTORS' EXHIBIT NO. 175**
**Page 253 of 1907**

Horizon's intellectual property—back to First Brands at a 3.5% royalty on net sales. Records related to Alester reflect that funds received by Alester from a Horizon subsidiary, Horizon Global Americas Inc., were characterized as "royalty" payments under these agreements. Notably, among other transfers, $7 million of "royalty" funds received were subsequently transferred by Alester to Defendant Patrick James Trust as a purported loan repayment.

98.     Significant additional transfers totaling in the millions of dollars were also made from First Brands to James' real estate holding company, Defendant Albion Realty, over the same period including payments made directly to Albion Realty by First Brands' subsidiaries Champion Laboratories, Inc. and FRAM Group Operations LLC. Although these were purportedly lease payments, upon information and belief, the value of such transfers far exceeded the reasonable value of any purported lease. And between 2022 and 2025, First Brands also transferred over $1 million, including through ASC Industries, Inc., to Pegasus Aviation, James' personal aircraft company.

99.     Money transferred from First Brands to James also occurred in close proximity to his acquisition of various real estate properties and cars. For example, in the two months prior to purchasing a home in Malibu on September 13, 2019, various entities unrelated to First Brands over which James has complete control received disbursements from First Brands amounting to several million dollars. Likewise, in the two months prior to purchasing a home in the Hamptons on August 31, 2021, certain entities controlled by James received over $1 million from First Brands.

100.    On information and belief, James owns at least seven properties. James also owns an extensive car collection, including at least seventeen exotic cars. On information and belief, these purchases were made at least in part using the improperly transferred funds.

FBG_CH1_00090479

DEBTORS' EXHIBIT NO. 175
Page 254 of 1907

101.   The transaction documentation that First Brands has uncovered fails to show that James' transfers were made for any legitimate business purpose. These transfers were not documented or treated by First Brands as ordinary dividends or distributions and contributed to First Brands' insolvency or occurred while First Brands was insolvent or nearing insolvency.

102.   Many of the transfers seem to have been made without any contemporaneous documentation of their purpose.

**C.   The Improper Transfers Contributed to First Brands' Insolvency and Occurred While First Brands Was Insolvent or Nearing Insolvency**

103.   First Brands' inadequate capitalization, lack of sufficient equity, and insolvency did not arise suddenly in the lead-up to the Petition Date. Rather, the Company was nearing insolvency or rendered insolvent well before the Petition Date and, at Defendants' direction, engaged in a series of increasingly complex and intentionally deceptive off-balance sheet arrangements in part designed to conceal First Brands' true financial condition.

104.   Based on information known to date, the Company's actual financial condition demonstrates that it was insolvent or nearing insolvency well before the Petition Date, including while James was the recipient of unlawful distributions and fraudulent transfers. As reflected by the timing and frequency of the transfers identified in Exhibit A, the diversion of funds accelerated as First Brands' unrestricted cash balances declined and its obligations to creditors increased, leaving First Brands with only approximately $12 million in cash in its corporate bank accounts as of the Petition Date.

105.   There were several widespread issues with First Brands' accounting and business practices that plagued First Brands well before the Petition Date and that indicate First Brands was insolvent or nearing insolvency at the time of—or rendered insolvent by—the above-described transfers to Defendants. Chief among these issues was First Brands' systemic and purposeful

FBG_CH1_00090480

DEBTORS' EXHIBIT NO. 175
Page 255 of 1907

failure to accurately and completely report its liabilities. Of the approximately $11.5 billion in debt and liabilities incurred as of the Petition Date, approximately $2.3 billion arose from off-balance sheet financing through SPVs. The Company also had approximately $2.3 billion in aggregate factoring liabilities and $900 million in unsecured SCF liabilities that were not recorded as liabilities on the Company's balance sheets.

106.    The debt resulting from off-balance sheet financing, factoring liabilities, and unsecured SCF liabilities, did not appear overnight. First Brands' practices in incurring these obligations, and its deliberate and repeated failure to record them, long predate the Petition Date. The off-balance sheet financing transactions, factoring arrangements, and SCF obligations should have been recognized as liabilities in the Company's books and records when the debts were actually incurred. But the historical accumulation of this debt—particularly SPV-related obligations—was not transparently recorded on First Brands' books and materially distorted the Company's true financial condition. On information and belief, had these liabilities been properly accounted for, they would have demonstrated that First Brands was insolvent or nearing insolvency at the time of—or rendered insolvent by—the improper transfers.

107.    Moreover, First Brands also overstated the gross book value of its inventory, which improperly inflated the value of its assets. Specifically, the Company failed to write down significant excess and obsolete inventory at multiple locations.

108.    Determining First Brands' true financial position is complicated further by numerous instances in which Brumbergs and others, at James' direction, made unsupported, manual changes to the Company's financial statements, such as by reclassifying expenses as assets, inflating sales figures, and reclassifying certain expenses "below the line" in EBITDA calculations.

FBG_CH1_00090481

DEBTORS' EXHIBIT NO. 175
Page 256 of 1907

**D. First Brands Received Less Than Reasonably Equivalent Value in Exchange for the Improper Transfers**

109.    First Brands did not receive reasonably equivalent value in exchange for any of the transfers identified in Exhibit A.

110.    Indeed, for the vast majority of transfers, First Brands did not receive any consideration at all.

111.    For example, upon information and belief, none of the purported distributions or dividends paid to Defendant Patrick James Trust appear to have been made for any consideration or legitimate business purpose. Although these transfers were sometimes labeled as "dividends" or "distributions," there are no accompanying documents or records specifying what consideration James provided to First Brands or why such payments were appropriate at the times they were made. To the extent James directed that First Brands classify these payments as tax "distributions," he did not provide First Brands with documentation verifying his own tax payments. Moreover, to date, First Brands has not uncovered any legitimate business justification for these transfers. Accordingly, none of the transfers labeled as "distributions" or "dividends" were made for reasonably equivalent value.

112.    Nor were any of the transfers used to fund James and his family's lavish lifestyle made for reasonably equivalent value. Each of these transfers personally benefitted James or his family and did not provide any value to First Brands.

**III.    THE INVOLVEMENT OF BAKER, BRUMBERGS, AND GRAHAM**

113.    The scale of Defendant James' misconduct—involving billions of dollars of financing secured from multiple counterparties, and the transfer of hundreds of millions of dollars over the course of several years—required James to enlist the help of other individuals.

114.    Although James was the ringleader of the process through which the above-

29

FBG_CH1_00090482

**DEBTORS' EXHIBIT NO. 175**
**Page 257 of 1907**

described improper transfers occurred, Baker, Brumbergs, and Graham provided substantial assistance to James, either by helping the Company incur financing through fraudulent means, and/or by ensuring the delivery of funds to James, his family trust, or third parties acting for James' and his family's benefit. In doing so, Baker, Brumbergs, and Graham leveraged their positions and breached their fiduciary duties to assist James at the Company's expense.

115.    James worked closely with Baker, Brumbergs, and Graham to implement the fraudulent financings and improper transfers. Baker, Brumbergs, and Graham were involved in structuring financing facilities, communicating with counterparties, and authorizing or directing improper payments to benefit James. And although James was the ultimate decision-maker, he sometimes delegated authority to Baker, Brumbergs, or Graham, or allowed them some autonomy, in how to accomplish the various misconduct. In doing so, James appears to have been careful to try and conceal his own role in the misconduct. James endeavored to limit communications in writing and instead communicated with Baker, Brumbergs, and Graham, as well as other employees, primarily by telephone.

116.    In addition to enriching James and his family, Baker, Brumbergs, and Graham benefitted from the misconduct themselves through the receipt of generous compensation packages. For example, from 2020 through 2025, Baker received a total of $13.1 million in compensation, Brumbergs received a total of $10.5 million in compensation, and Graham received a total of $27.8 million in compensation from First Brands. Thus, while Baker, Brumbergs, and Graham were contributing to the misconduct described above, they were simultaneously rewarded with high compensation.

### A. Baker

117.    Baker served as First Brands' Chief Corporate Strategy Officer. In that role, he was

30

FBG_CH1_00090483

responsible for evaluating, structuring, and implementing financing initiatives and strategic transactions, including off-balance sheet SPV structures. This position afforded him regular access to and communication with James and senior finance personnel concerning financing strategy, liquidity needs, and certificates submitted to counterparties. Upon information and belief, Baker reviewed, authorized, or directed the preparation and transmission of borrowing base certificates, amendments, and related transaction documents.

118.    Baker exercised responsibility over the design and negotiation of the financing structures at issue and had visibility into the collateral and cash movements those structures required. Contemporaneous emails, call notes, and executed certifications reflect his direct involvement in: (i) coordinating borrowing-base submissions and amendments; (ii) communicating with lenders and financing counterparties regarding collateral; (iii) creating facilities in which the same inventory was presented as collateral to multiple lenders; and (iv) assisting James in structuring transactions between First Brands and entities he controlled, resulting in the transfer of First Brands' funds to those entities.

**B.  Brumbergs**

119.    Brumbergs was a central participant in the fraudulent financing and transfers at issue. As Vice President of Finance, Brumbergs directly controlled the mechanics by which First Brands incurred factoring, SPV, and SCF liabilities, and directed the movement of cash from First Brands to Defendants' accounts.

120.    For example, Brumbergs was directly involved in the First Brands' factoring practices. Not only did he directly supervise First Brands' factoring program, but Brumbergs personally participated in the factoring fraud, including by altering invoice nomination files and submitting fake invoices to multiple third-party factors.

FBG_CH1_00090484

121.   Upon information and belief, Brumbergs was also a key participant in the SPV financing arrangements. Brumbergs personally caused First Brands to transfer cash among SPV entities. As the Vice President of Finance, Brumbergs oversaw and provided instructions regarding the treatment of inventory, including how transactions related to the SPV financings should be executed or recorded.

122.   Brumbergs also played a substantial role in First Brands' SCF arrangements. Specifically, he was aware of the use of false invoices as part of that program; passed instructions to employees regarding the use of SCF funds, including for vendor payments; and supervised the Finance team responsible for the SCF program. In fact, immediately prior to the Petition Date, Brumbergs instructed the Accounting department to record a $1.2 billion liability related to SCF that had not previously been reflected on the Company's balance sheet.

123.   In addition to his involvement in the various financing arrangements, Brumbergs also provided substantial assistance to James in effectuating the transfer of funds to entities under James' control and for James' and his family's benefit. James would provide Brumbergs with detailed instructions regarding the amount and recipient of the transfers. In turn, Brumbergs would direct First Brands' Financing or Accounting departments to transfer funds accordingly.

**C. Graham**

124.   Graham, as Chief Financial Officer and Treasurer, oversaw First Brands' financial reporting, accounting, and treasury practices, and participated in communications with lenders and financing counterparties, affording him visibility across First Brands' business and financial practices and placing him in regular communication with senior leadership and James. In that role, he routinely received and reviewed lender-facing materials, provided financial information in response to lender requests, and participated in communications concerning financing capacity and

32

FBG_CH1_00090485

Case 25-03805   Document 104-2   Filed in TXSB on 02/19/26   Page 34 of 51

availability. Upon information and belief, Graham regularly corresponded with James regarding these issues as well. Graham failed to implement controls or halt financing practices that caused First Brands to incur obligations far beyond its ability to repay. By continuing to manage lender communications and financial disclosures under these circumstances, Graham knowingly—or, at a minimum, recklessly—assisted in concealing the Company's true financial condition and facilitating James' misconduct.

125. Upon information and belief, as CFO, Graham supervised or permitted manual changes to Company financial statements, including reclassifications and adjustments, that masked deteriorating liquidity and mounting covenant pressure, and bore responsibility for the accuracy of First Brands' financial reporting and certifications. Upon information and belief, Graham approved, reviewed, and/or signed financial statements, management representations, and lender certifications for First Brands and its subsidiaries, and coordinated with James and senior finance personnel regarding the presentation of EBITDA, classification of expenses, and timing of liability recognition.

126. Upon information and belief, at times, Graham personally directed transfers of First Brands' funds to James or entities under his control, thereby participating in or facilitating the misappropriations. Upon information and belief, Graham took these actions at the direction of James.

## COUNT I

**Turnover of Estate Property**
**Pursuant to 11 U.S.C. § 542**
**(Against Patrick James, the Patrick James Trust, and the Entity Defendants)**

127. Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

FBG_CH1_00090486

**DEBTORS' EXHIBIT NO. 175**
**Page 261 of 1907**

Case 25-03803   Document 14-2   Filed in TXSB on 02/19/26   Page 34 of 50

128. Under Section 542(a), an entity in possession of Debtors' property or an entity that owes a debt to the debtor shall deliver such property or pay such debt.

129. As of the date of this Amended Complaint, Defendants, and/or other entities and trusts James controls, have possession, custody, or control over property of the estate. Such property and debts belonging to the estate include, without limitation, cash, accounts receivable, intellectual property, and other matured payment obligations due and payable to the creditors, and any proceeds thereof.

130. Under Section 542(a), Defendants shall deliver to Debtors and account for such property or the value of such property.

131. Defendants' refusal to deliver property impedes administration of the estate. Turnover is appropriate because the property is estate property within Section 541 and is necessary to the administration of this case.

132. Debtors seek an order compelling an immediate turnover and a full accounting, with appropriate safeguards for any proven lienholder's interest.

## COUNT II

**Actual Fraudulent Transfer**
**Pursuant to 11 U.S.C. §§ 548(a)(1)(A), 544(b), Ohio Rev. Code Ann. § 1336.04(A)(1),**
**6 Del. Code § 1304(a)(1)**
**(Against Patrick James, the Patrick James Trust, and the Entity Defendants)**

133. Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

134. On information and belief, James secured funding from lenders based on false representations that James knowingly and intentionally made about First Brands' financial position.

135. On information and belief, James caused First Brands to complete payment of

34

FBG_CH1_00090487

**DEBTORS' EXHIBIT NO. 175**
**Page 262 of 1907**

numerous transfers made to benefit James, his family, and/or his personal affiliates.

136.     James directed First Brands to pay Defendants with the actual intent of hindering, delaying, and/or defrauding First Brands' creditors and investors.

137.     Each transfer was made to or for the benefit of James—an insider of First Brands— or to entities under his control.

138.     The transfers were made for less than reasonably equivalent value, inadequate consideration, or no consideration at all.

139.     James commingled First Brands' funds with his personal accounts.

140.     James used First Brands' funds to subsidize his and his family's personal expenditures.

141.     Each relevant payment was made by First Brands at James' direction.

142.     Patrick James and the Entity Defendants were initial transferees, or entities for whose benefit the transfers were made under Section 550(a)(1); and to the extent any Defendant is a subsequent transferee, recovery is sought under Section 550(a)(2).

143.     James did not direct any of the transfers in good faith.

144.     At the time of each of the transfers, First Brands had at least one general unsecured creditor holding an allowable claim who, but for Debtors' bankruptcy filing, would have standing to bring claims to avoid and recover actual fraudulent transfers.

145.     Each of the transfers was made or could only have been discovered within the applicable lookback period.

146.     The payments to James and the Entity Defendants are voidable pursuant to Section 548(a)(1)(A) and may be recovered from Defendants pursuant to Section 550.

147.     Accordingly, Debtors are entitled to a judgment (1) avoiding the fraudulent

FBG_CH1_00090488

**DEBTORS' EXHIBIT NO. 175**
**Page 263 of 1907**

transfers under Section 548(a)(1)(A) and/or Section 544(b), 6 Del. C. § 1307, and Ohio Rev. Code Ann. § 1336.07, and (2) recovering and preserving all such avoided transfers under Sections 550 and 551, 6 Del. C. § 1307, and Ohio Rev. Code Ann. § 1336.07.

## COUNT III

### Constructive Fraudulent Transfer
### Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 544(b), Ohio Rev. Code Ann. § 1336.04(A)(2), 6 Del. Code § 1304(a)(2)
### (Against Patrick James, the Patrick James Trust, and the Entity Defendants)

148.   Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

149.   Debtors seek to avoid the fraudulent transfers made on numerous occasions from First Brands' accounts to James' personal accounts and affiliated entities, including, but not limited to, Defendant Patrick James Trust and the other named Defendants, and to recover and preserve the value thereof.

150.   On information and belief, James caused First Brands to complete numerous transfers to benefit Defendants and/or James' family and personal affiliates.

151.   First Brands did not receive reasonably equivalent value in exchange for the transfers. Hundreds of transfers, totaling at least approximately $830 million from 2018 through 2025, including payments to Battery Park, transfers for James' family payroll expenses, payments for James' New York City townhouse, and purported distributions to Defendant Patrick James Trust, conferred no value whatsoever on First Brands.

152.   Each of the transfers was made or could only have been discovered within the applicable lookback period.

153.   On the date of each relevant transfer, First Brands: (1) was insolvent, nearing insolvency, or became insolvent as a result of such transfer; (2) engaged in a business dealing or a

36

FBG_CH1_00090489

transaction, or was about to engage in a business dealing or a transaction, for which any property remaining with Debtors was unreasonably small in relation to the business or transaction; or (3) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

154.    At the time of each of the fraudulent transfers, First Brands had numerous unsecured creditors holding an allowable claim who, but for Debtors' bankruptcy filing, would have standing to bring claims to avoid and recover constructive fraudulent transfers.

155.    Each of the transfers was made to or for the benefit of James—an insider to First Brands' entities—or to entities under James' control.

156.    Patrick James and the Entity Defendants were initial transferees, or entities for whose benefit the transfers were made under Section 550(a)(1); and to the extent any Defendant is a subsequent transferee, recovery is sought under Section 550(a)(2).

157.    Accordingly, Debtors are entitled to a judgment (1) avoiding the fraudulent transfers under Sections 548(a)(1)(B) and/or 544(b) of the Bankruptcy Code, 6 Del. C. § 1307, and Ohio Rev. Code Ann. § 1336.07, and (2) recovering and preserving all such avoided transfers under Sections 550 and 551 of the Bankruptcy Code, 6 Del. C. § 1307, and Ohio Rev. Code Ann. §1336.07.

## COUNT IV

**Money Had and Received**
**Pursuant to Ohio Law**
**(Against Patrick James, the Patrick James Trust, and the Entity Defendants)**

158.    Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

159.    Defendants received money from First Brands without providing valuable

37

FBG_CH1_00090490

**DEBTORS' EXHIBIT NO. 175**
**Page 265 of 1907**

consideration.

160.    By receiving funds from First Brands' accounts for personal gain, Defendants wrongfully had or held money that belongs to First Brands in equity and good conscience.

161.    Defendants have been unjustly enriched by retaining funds belonging to First Brands.

162.    Inequity and injustice would result if Defendants were permitted to retain the funds.

163.    Accordingly, Debtors are entitled to equitable recovery of any benefits Defendants received that rightfully belong to First Brands.

## COUNT V

### Unjust Enrichment
### Pursuant to Delaware and Ohio Law
### (Against Patrick James, the Patrick James Trust, and the Entity Defendants)

164.    Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

165.    Defendants were enriched and received direct, concrete economic benefits without legal or equitable justification, including, but not limited to, through the diversion and receipt of funds from First Brands.

166.    Defendants have unjustly retained the sums procured through, funded by, or serviced with First Brands' assets—sums to which Defendants had no lawful claim and for which First Brands received no reciprocal benefit—to the detriment of First Brands and its creditors, thereby shifting value from the enterprise to Defendants.

167.    First Brands suffered financial losses as a result of these transactions. Among other losses, First Brands did not receive reasonably equivalent value for any of the transfers; the challenged conduct facilitated and perpetuated efforts that siphoned substantially all of First

38

FBG_CH1_00090491

Brands' assets; and the estates were left burdened with liabilities without corresponding assets or value.

168.    There is a direct, proximate, and traceable relationship between Defendants' enrichment and the losses accrued by First Brands: the transfers emanated from First Brands' accounts and were made directly to Defendants, other entities or affiliates owned or controlled by or related to James, or third parties for the benefit of James and his family.

169.    No legitimate corporate purpose, consideration, or fair value supports these transfers. They were the product of self-dealing and other misconduct, conferred unique personal benefits upon James that were not shared by First Brands or its stakeholders, and were not supported by reasonably equivalent value or fair consideration.

170.    First Brands conferred a benefit in the form of corporate funds and value, Defendants were aware of and accepted that benefit, and Defendants' continued retention of that benefit would be unjust and inequitable under the circumstances.

171.    Equity and good conscience will not permit Defendants to retain the benefits they wrongfully obtained at First Brands' expense. Legal remedies are inadequate to the extent the relief required is restitutionary and equitable in nature, including the recovery of specific, identifiable funds or assets traceable to James' unjust enrichment.

172.    Accordingly, Debtors are entitled to judgment for restitution in the amount of the benefits unjustly obtained, together with disgorgement of all proceeds traceable to the transfers, the imposition of a constructive trust and/or equitable lien over assets and proceeds in James' control, an accounting, and pre- and post-judgment interest at the maximum rate permitted by law, as well as such other and further equitable relief as the Court deems just and proper.

FBG_CH1_00090492

DEBTORS' EXHIBIT NO. 175
Page 267 of 1907

## COUNT VI

**Constructive Trust**
**Pursuant to Delaware and Ohio Law**
**(Against Patrick James, the Patrick James Trust, and the Entity Defendants)**

173.    Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

174.    A constructive trust is a claim for relief as well as an equitable remedy imposed to prevent unjust enrichment where a defendant, through fraud, breach of fiduciary duty, unfair or unconscionable conduct, commission of a wrong, duress, or abuse of confidence, acquires or retains property that which in equity and good conscience belongs to another.

175.    As detailed in this Amended Complaint, Defendants—acting at James' direction and in breach of his fiduciary duties to First Brands—engaged in fraudulent, unfair, and unconscionable conduct, including the diversion and misappropriation of corporate funds.

176.    By virtue of this misconduct, Defendants were directly and materially enriched. Defendants obtained and continue to retain specific, identifiable property traceable to First Brands' entities.

177.    Defendants received and retain the fraudulent transfers by fraud, self-dealing, and wrongful diversion. Continued possession of such property is inequitable and would unjustly enrich Defendants at the expense of Debtors and their creditors.

178.    Equity therefore deems Defendants constructive trustees of the fraudulent transfers and all traceable proceeds, substitutions, and products (collectively, the "**Constructive Trust Property**") for the benefit of Debtors in their chapter 11 cases.

179.    The Constructive Trust Property is sufficiently specific and traceable: the transfers to Defendants identified in Exhibit A and described herein originated from identified First Brands'

40

FBG_CH1_00090493

accounts or First Brands' entities' accounts. At Defendants' direction, these funds were directed to James or other entities and accounts he owned or controlled, and can be further traced to property acquired therewith.

180. Legal remedies are inadequate because Debtors seek restitutionary, in-kind relief as to specific funds and assets; equitable relief is necessary to permit tracing, preserve the Constructive Trust Property, and avoid dissipation. An accounting is warranted to identify all property constituting or derived from the Constructive Trust Property.

181. Accordingly, Debtors seek entry of judgment: (a) declaring and imposing a constructive trust over the Constructive Trust Property and all proceeds, products, offspring, and substitutions thereof; (b) directing James, as constructive trustee, to convey, transfer, and turn over the Constructive Trust Property to First Brands; (c) imposing, in the alternative, an equitable lien to the extent any portion of the Constructive Trust Property cannot be specifically traced; (d) ordering an accounting and tracing of all relevant accounts and assets; and (e) awarding pre- and post-judgment interest and such other equitable relief as the Court deems just and proper.

## COUNT VII

### Accounting
### Pursuant to Delaware and Ohio Law
### (Against Patrick James)

182. Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

183. James possesses fraudulently obtained funds belonging to First Brands that he is obliged to surrender based on his fiduciary relationship to First Brands.

184. The facts surrounding James' unlawful actions and the accounts mentioned herein are so complex that adequate relief may not be obtained through standard discovery procedures,

41

FBG_CH1_00090494

such as production and interrogatories.

185.     Accordingly, Debtors are entitled to an equitable accounting.

## COUNT VIII

### Illegal Dividend and Unlawful Distribution
### Pursuant to 8 Del. C. § 170, 8 Del. C. § 174, and 6 Del. C. § 18-607
### (Against Patrick James and the Patrick James Trust)

186.     Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

187.     While serving as the Manager, President, CEO, and beneficial owner of First Brands, and while serving on the board of directors for numerous First Brands entities, James directed First Brands to approve and complete numerous distributions to himself and the Patrick James Trust, and other entities under his control that constituted illegal dividends and unlawful distributions.

188.     *First*, none of these distributions constituted reasonable compensation for present or past services or reasonable payments made in the ordinary course of business. Rather, as described above, each of these distributions served only to provide James with a windfall to fund his and his family's lavish lifestyle at the expense of First Brands.

189.     *Second*, the distributions rendered First Brands and/or the relevant transferor entity insolvent or occurred while First Brands was insolvent or nearing insolvency. Alternatively, and in addition, First Brands' and/or the relevant transferor entity's liabilities exceeded its assets such that they did not have a capital surplus at the time James directed dividend distributions to himself. First Brands' and/or the relevant transferor entity's net profits also were insufficient to fund James' dividend distributions.

190.     James knew or was aware that none of the distributions constituted reasonable

42

FBG_CH1_00090495

DEBTORS' EXHIBIT NO. 175
Page 270 of 1907

compensation for present or past services. He also knew or was aware that the distributions rendered First Brands insolvent or occurred while First Brands was insolvent or nearing insolvency.

191.    James was aware of his fraudulent conduct and misrepresentations, and he knew his obfuscation would deceive creditors. Accordingly, the distributions were not lawful under the Delaware General Corporate Law and the Delaware LLC Act.

192.    James orchestrated the purported dividends and distributions to himself and entities under his control for his and his family's personal benefit and therefore is liable for the amount of the distributions.

## COUNT IX

### Breach of Fiduciary Duty
### Pursuant to Delaware Law
### (Against Patrick James, Michael Baker, Peter Andrew Brumbergs, and Stephen Graham)

193.    Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

194.    At all relevant times, James, Baker, Brumbergs, and Graham owed fiduciary duties to First Brands. Each was obligated to faithfully conduct business in First Brands' best interests.

195.    James breached his fiduciary duties by consciously and recklessly subordinating First Brands' interests, including to secure fraudulent financing and to divert Company funds for his personal use.

196.    Among other misconduct, James intentionally caused, directed, approved, and/or knowingly permitted the transfer of First Brands' funds from First Brands' accounts for his personal use and benefit, including through the improper transfers described above. James was self-interested in these transfers, which directly and proximately caused damage to First Brands.

43

FBG_CH1_00090496

DEBTORS' EXHIBIT NO. 175
Page 271 of 1907

By orchestrating these transfers, James did not act in good faith to advance First Brands' best interests.

197.    James' conduct was undertaken in bad faith: it was a conscious and intentional disregard of his obligations to First Brands, and was pursued for his own benefit while exposing First Brands to ruinous liabilities. That willful misconduct and bad faith breach the duties of loyalty and good faith.

198.    Among other misconduct, Baker breached his fiduciary duty by helping structure off-balance sheet debt and SPV financing facilities, ultimately causing First Brands to incur debt that it could not repay; and by failing to ensure First Brands implemented any reporting or information systems or controls, or by consciously failing to monitor or oversee First Brands' operations such that he disabled himself from being informed of the risks or problems with First Brands' fraudulent financing.

199.    Among other misconduct, Brumbergs breached his fiduciary duties through his direct involvement in the factoring practices, including double pledging; his active participation in the SPV and supply-chain financing agreements; and through his role in effectuating the improper transfers for James' benefit.

200.    Among other misconduct, Graham breached his fiduciary duty by failing to ensure First Brands implemented any reporting or information systems or controls, or by consciously failing to monitor or oversee First Brands' operations such that he disabled himself from being informed of the risks or problems with First Brands' fraudulent financing. These breaches facilitated and concealed the extensive misappropriations described herein.

201.    By engaging in the above actions and other misconduct, James, Baker, Brumbergs, and Graham each engaged in willful misconduct that was a direct and proximate cause of First

FBG_CH1_00090497

DEBTORS' EXHIBIT NO. 175
Page 272 of 1907

Brands' injuries. Each is therefore liable to Debtors for all resulting damages, disgorgement of ill-gotten gains, and all other appropriate equitable and legal relief.

202.    Any exculpation or fiduciary duty limitations in applicable LLC or corporate governance documents do not extend to the bad faith, willful misconduct, and self-dealing alleged herein.

203.    To the extent any of First Brands' organizational documents exculpate directors for monetary liability for breaches of the duty of care in a manner permitted by applicable law, Debtors seek relief against such defendants only to the maximum extent permitted by applicable law, including for breaches of the duty of loyalty, acts or omissions not in good faith, willful misconduct, knowing violations of law, and equitable remedies not subject to exculpation. Debtors also seek monetary relief against individuals who are not exculpated under such provisions.

204.    Debtors are entitled to damages and equitable relief against James, Baker, Brumbergs, and Graham for their breaches of fiduciary duties, including but not limited to: (a) the avoidance and recovery of each improper transfer; (b) damages sufficient to place Debtors in the same position they would have occupied absent the fiduciary breaches; (c) disgorgement, restitution, fee forfeiture, constructive trust, and other equitable remedies; and (d) any and all other relief the Court deems just and proper.

## COUNT X

### Aiding and Abetting Breach of Fiduciary Duty
### Pursuant to Delaware Law
### (Against Patrick James, Michael Baker, Peter Andrew Brumbergs, and Stephen Graham)

205.    Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

206.    James, Baker, Brumbergs, and Graham each owed fiduciary duties to First Brands.

45

FBG_CH1_00090498

DEBTORS' EXHIBIT NO. 175
Page 273 of 1907

207.    James, Baker, Brumbergs, and Graham breached such duties to First Brands by, among other misconduct, causing the Company to engage in improper financings, orchestrating fraudulent transfers, and misappropriating estate funds.

208.    James, Baker, Brumbergs, and Graham each knew or acted with reckless disregard for the fact that the others were engaging in conduct that constituted breaches of their fiduciary duty.

209.    James, Baker, Brumbergs, and Graham knowingly participated in such breaches by providing substantial assistance to one another including by structuring fraudulent financing arrangements, facilitating the improper factoring practices, coordinating communications and certifications to counterparties, and assisting with the payment of fraudulent transfers.

210.    First Brands suffered damages as a direct and proximate cause of these breaches of fiduciary duties.

211.    Debtors are thus entitled to judgment against James, Baker, Brumbergs, and Graham for aiding and abetting breach of fiduciary duties in an amount to be proven at trial.

## COUNT XI

### Conspiracy
### Pursuant to Ohio Law
### (Against Patrick James, Michael Baker, Peter Andrew Brumbergs, and Stephen Graham)

212.    Debtors repeat, reallege, and incorporate by reference all preceding allegations as if fully set forth herein.

213.     James, together with (at least) Baker, Brumbergs, and Graham, formed a malicious combination or combinations through express agreement or common understanding to effectuate the fraud and misconduct that caused First Brands to suffer damages.

214.    In furtherance of the conspiracy or conspiracies, James, Baker, Brumbergs, and

46

FBG_CH1_00090499

DEBTORS' EXHIBIT NO. 175
Page 274 of 1907

Graham worked in concert to, among other misconduct, coordinate (a) off-balance sheet SPV facilities and related cash flows; (b) third-party factoring and supply-chain financing practices; (c) unsupported, manual financial statement changes and reclassifications that obscured First Brands' true financial condition; and (d) improper transfers to James, his trust, entities under his control, or other third parties for James' benefit. By engaging in this conspiracy or conspiracies, James, Baker, Brumbergs, and Graham caused Debtors to sustain damages in an amount to be determined at trial.

215.   Each conspirator acted outside the scope of legitimate corporate duties and for independent, personal motives aligned with James' self-dealing, thereby exceeding the reach of legitimate corporate activity.

216.   Accordingly, Debtors are entitled to money damages, including compensatory and punitive damages, and such other relief as is fair, just, and equitable as a remedy for the conspiracy or conspiracies among James, Baker, Brumbergs, and Graham.

## RESERVATION OF RIGHTS

217.   During the course of this proceeding, Debtors may learn through discovery or otherwise of additional claims or causes of action that are actionable under the provisions of the Bankruptcy Code or other applicable law. Debtors reserve all rights to amend this Complaint to, among other things: (i) modify or revise Defendants' names; (ii) add additional defendants; and/or (iii) add claims or causes of action, if applicable, that may become known to Debtors at any time during this adversary proceeding, through formal discovery or otherwise, and for such amendments to relate back to the filing of the Complaint.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Debtors respectfully request that this Court

FBG_CH1_00090500

DEBTORS' EXHIBIT NO. 175
Page 275 of 1907

enter judgment against Defendants:

    a) Freezing any and all bank accounts and other property owned or controlled by Defendants or any other entities under their control;

    b) Avoiding and recovering the fraudulent transfers as actual or constructive fraudulent transfers, in an amount to be determined at trial;

    c) Declaring that Defendants were unjustly enriched at the expense of Debtors, and awarding damages in an amount to be determined at trial;

    d) Avoiding and recovering any improper transfer of First Brands' property, including intellectual property, and directing reversion of title to First Brands, together with appropriate injunctive and other equitable relief;

    e) Imposing a constructive trust upon Defendants' accounts with respect to the fraudulent transfers;

    f) Awarding compensatory, consequential, and punitive damages, in amounts to be determined, together with pre- and post-judgment interest, at the maximum rate allowed by law;

    g) Ordering an equitable accounting;

    h) Awarding pre- and post-judgment interest;

    i) Awarding attorneys' fees and costs as permitted by law; and

    j) Granting such other and further relief as this Court deems just and equitable.

FBG_CH1_00090501

**DEBTORS' EXHIBIT NO. 175**
**Page 276 of 1907**

Respectfully submitted on the 19th day of January, 2026.

Houston, Texas

 /s/ Clifford W. Carlson                        
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email:   gabriel.morgan@weil.com
            clifford.carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
David Lender (admitted *pro hac vice*)
Nili T. Moghaddam (admitted *pro hac vice*)
Robert Niles-Weed (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email:   matt.barr@weil.com
            sunny.singh@weil.com
            david.lender@weil.com
            nili.moghaddam@weil.com
            robert.niles-weed@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

FBG_CH1_00090502

**VERIFICATION**

I, Charles Moore, hereby certify and verify under penalty of perjury that:

I am the interim Chief Executive Officer of First Brands Group, LLC, the Debtor in the above-captioned cases. I have read the factual allegations contained in the Verified Amended Complaint and affirm such allegations are true and correct to the best of my knowledge, information, and belief.

Dated: January 19, 2026                    By: First Brands Group, LLC

                                           Signed: /s/ Charles M. Moore

                                           Name: Charles Moore

                                           Title: Interim Chief Executive Officer, First Brands Group, LLC

FBG_CH1_00090503

**DEBTORS' EXHIBIT NO. 175**
**Page 278 of 1907**

# Exhibit 3

FBG_CH1_00090504

# ONSET FINANCIAL, INC.
10813 River Front Parkway, Suite 450
South Jordan, Utah 84095

## MASTER LEASE AGREEMENT NO. OFI1045321

THIS MASTER LEASE AGREEMENT is made on May 9, 2018 between **ONSET FINANCIAL, INC.**, with its principal office located at 10813 S. River Front Parkway, Suite 450, South Jordan, UT 84095 (the "Lessor") and **TRICO PRODUCTS CORPORATION**, a New York corporation with its principal office located at 3255 W Hamlin Road, Rochester Hills, MI 48309 (the "Lessee").

### SECTION 1. LEASE:

Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor the Property described in any Schedule executed and delivered by Lessor and Lessee in connection with this Master Lease Agreement. Each Schedule shall incorporate by reference the terms and conditions of this Master Lease Agreement, and together with the Acceptance and Delivery Certificate and Master Progress Payment Agreement, if applicable, shall constitute a separate Lease.

### SECTION 2. TERM OF LEASE:

The term of any Lease, as to all Property designated on the applicable Schedule, shall commence on the Date of Acceptance for such Property, and shall continue for a Base Period ending that number of months from the Lease Commencement Date as specified in the Schedule. Thereafter, Lessee shall have those options as provided in Section 20n of this Master Lease Agreement.

### SECTION 3. RENT AND PAYMENT:

Lessee shall pay as rent for use of the Property, aggregate rentals equal to the sum of all the Monthly Rentals and other payments due under the Lease for the entire Base Period. The Monthly Rental shall begin on the Date of Acceptance and shall be due and payable by Lessee in advance on the first day of each month throughout the Base Period. If the Date of Acceptance does not fall on the first day of a calendar quarter, then the first rental payment shall be calculated by multiplying the number of days from and including the Date of Acceptance to the Lease Commencement Date by a daily rental equal to one-thirtieth (1/30) of the Monthly Rental, and shall be due and payable on the Date of Acceptance. Lessee shall pay to Lessor, or its assigns, all rentals as due when due, without notice or demand, to Lessor's address set forth above, or as otherwise directed in writing by Lessor, or its assigns. **LESSEE SHALL NOT ABATE, SET OFF OR DEDUCT ANY AMOUNT OR DAMAGES FROM OR REDUCE ANY MONTHLY RENTAL OR OTHER PAYMENT DUE FOR ANY REASON. THIS LEASE IS NON-CANCELABLE FOR THE ENTIRE TERM OF THE BASE PERIOD AND ANY RENEWAL PERIODS.**

If any rental or other payment due under any Lease shall be unpaid ten (10) days after its due date, Lessee will pay on demand, as a late charge, but not as interest, the greater of twenty-five dollars ($25.00) or ten percent (10%) per month on any such unpaid amount but in no event to exceed maximum lawful charges.

### SECTION 4. TAXES AND FEES:

Lessee shall promptly pay to Lessor, and agrees to indemnify and hold Lessor harmless from all taxes, fees, assessments and charges paid, payable or required to be collected by Lessor (together with any penalties, fines or interest thereon), which are levied or based on the Monthly Rental or other payment due under the Lease, or on the delivery, acquisition, possession, use, operation, lease, rental, sale, purchase, control or value of the Property, including without limitation, registration and license fees and assessments, recycling fees, state and local privilege or excise taxes, documentary stamp taxes or assessments, sales and use taxes, personal and other property taxes, and taxes or charges based on gross revenue, but excluding taxes based on Lessor's net income, (collectively "taxes"), whether the same be assessed to Lessor or Lessee. Lessee also agrees to pay to Lessor all servicing and administrative costs associated with processing and paying various fees and taxes. Lessor shall file all required reports and returns with all applicable governmental agencies relating to the taxes concerning the Property.

### SECTION 5. NET LEASE:

This is a fully net, non-cancelable lease contract which may not be terminated for any reason except as otherwise specifically provided herein. Lessee has no right of prepayment unless agreed to in writing by Lessor. Lessor and Lessee agree that any Lease is a "Finance Lease" as defined by the Uniform Commercial Code Article 2A. Except as otherwise expressly set forth in this Master Lease Agreement, Lessee shall be responsible for and shall indemnify Lessor against, all costs, expenses and claims of every nature whatsoever arising out of or in connection with or related to the Lease or the Property.

Lessee acknowledges and agrees that its obligations to pay all Monthly Rentals and other amounts due and owing and perform its obligations hereunder shall be primary, absolute, unconditional, independent and irrevocable and shall not be subject to or affected by (i) any circumstance whatsoever, including, without limitation, any setoff, counterclaim, recoupment, abatement, suspension, reduction, rescission, defense or other right otherwise available to Lessee; (ii) any defect in the title, merchantability, condition, design, operation or fitness for use of, or any damage to, removal, abandonment, requisition, taking condemnation or loss or theft or destruction of, the Property, or any interference, interruption, restriction, curtailment or cessation in or prohibition of the use or possession thereof by the Lessee or any other person for any reason whatsoever; or (iii) failure on the part of the manufacturer or the shipper of the Property to deliver the Property or any part thereof to Lessee. Lessor is not responsible to install, test, repair, service, or maintain any Property.

### SECTION 6. CONDITIONS PRECEDENT:

Lessor's obligations under each Schedule, including its obligation to purchase and lease any Property to be leased thereunder, are conditioned upon Lessor's receipt of, in form or substance satisfactory to Lessor, and Lessor's determination that all of the following are satisfactory: (i) evidence as to due compliance with the insurance provisions hereof; (ii) Uniform Commercial Code financing statements and all other filings and recordings as required by Lessor; (iii) lien searches in the jurisdiction of Lessee's organization and in each jurisdiction in which the Property and/or Lessee's chief executive office are located; (iv) incumbency and signature of the officers of Lessee authorized to execute such documents; (v) resolutions of Lessee's Board of Directors and/or Members duly authorizing the leasing, or sale and leaseback, as the case may be, of the Property hereunder and the execution, delivery and performance of the Lease; (vi) if requested by Lessor, certificates of good standing from the jurisdiction of Lessee's organization, and (vii) if requested by Lessor, a copy of Lessee's organizational documents and evidence of Lessee's organizational number.

### SECTION 7. MAINTENANCE AND REPAIRS; RETURN OF PROPERTY:

a.  During the continuance of each Lease, Lessee shall, at its own expense, enter into and maintain in force a contract with the manufacturer or other qualified maintenance organization reasonably satisfactory to Lessor for maintenance of each item of Property that requires such a contract. Such contract as to each item shall commence upon the earlier of the Certificate date, if applicable, or the Date of Acceptance. Upon request Lessee shall furnish Lessor with a copy of such contract.

b.  During the continuance of each Lease, Lessee shall, at its own cost and expense, and in accordance with all manufacturer maintenance specifications, (i) keep the Property in good repair, condition, operating order and appearance, (ii) make all necessary adjustments repairs and replacements, (iii) not use or permit the Property to be used for any purpose for which, in the opinion of the

\\utsp-vs-wfs01.osf.local\f.nsso Operations\Lessees\Trico\Master\Master Docs\Redlines\MLA - 05.23.18 Executable.rtf
NAI-1503661138v3

Page 1 of 10   Initials

CONFIDENTIAL

ONSET_00034780
FBG_CH1_00090505

manufacturer, the Property is not designed or reasonably suitable, and (iv) furnish all required parts, mechanisms, devices, maintenance and servicing, so as to keep each item of Property and any part in good repair and operating order (ordinary wear and tear excepted) in the same condition and appearance as when delivered to the Lessee. Such parts, mechanisms and devices shall immediately become a part of the Property for all purposes hereunder and title thereto shall vest in Lessor. If the manufacturer does not provide maintenance specifications, Lessee shall perform all maintenance in accordance with industry standards for like property.

c.   Lessee shall immediately notify Lessor in writing of all details concerning any damage or loss to the Property, including without limitation, any damage or loss arising from the alleged or apparent improper manufacture, functioning or operation of the Property.

d.   Lessee shall pay all shipping and delivery charges and other expenses incurred in connection with the Property. Upon default, or at the expiration or earlier termination of any Lease, Lessee shall, at its own expense, assemble, prepare for shipment and promptly return the Property to Lessor at the location within the continental United States designated by Lessor. Upon such return, the Property shall be in the same operating order, repair, condition and appearance as on the Date of Acceptance, except for reasonable wear and tear from proper use thereof, and shall include all engineering changes theretofore prescribed by the manufacturer. Lessee shall provide maintenance certificates or qualification letters and/or arrange for and pay all costs which are necessary for the manufacturer to accept the Property under contract maintenance at its then standard rates ("recertification"). The term of the Lease shall continue upon the same terms and conditions until such recertification has been obtained.

e.   With regard to Software, at the expiration or earlier termination of any Lease, or upon demand by Lessor upon the occurrence of an Event of Default (hereinafter defined) under the Lease, Lessee shall (i) destroy all copies or duplicates of the Software which were not returned to Lessor (ii); delete from its systems all Software then installed; (iii) cease using the Software altogether or; iv) disable the computers, computer systems or other equipment which run and/or operate and or are controlled by the Software. Upon its receipt from Lessee, Lessor shall be responsible to return the Software to the owner/vendor/licensor so that Lessee shall not be in breach of any software license.

SECTION 8.   USE: ALTERATIONS AND ATTACHMENTS:

a.   Lessee shall at all times keep the Property in its sole possession and control. The Property shall not be moved from the location stated in the Schedule without the prior written consent of Lessor, which consent shall not be unreasonably withheld, provided, however, in no event shall the Property be moved to a location outside the United States.

b.   The Property is leased solely for commercial or business purposes.

c.   After Lessee receives and inspects any Property and is satisfied that the Property is acceptable, Lessee shall execute and deliver to Lessor an Acceptance and Delivery Certificate in form provided by Lessor; provided, however, that Lessee's failure to execute and deliver an Acceptance and Delivery Certificate for any Property shall not affect the validity and enforceability of the Lease with respect to the Property. If Lessee has executed and delivered a Master Progress Payment Agreement, Lessor may, in its sole discretion, at any time by written notice to Lessee, declare all prior Certificates executed in connection with the Master Progress Payment Agreement to be and constitute the Acceptance and Delivery Certificate for all purposes under the Lease, and the Date of Acceptance of the Lease shall be the date determined by Lessor in its sole discretion which shall not be earlier than the date of the last Certificate. In addition to the inspection rights of Lessor and its assigns under Section 9(b), if required by Lessor and/or its assigns, Lessee shall permit Lessor or Lessor's agent (or Lessor's assigns or an agent of Lessor's assigns), at any reasonable time during normal business hours, (i) to inspect the Property, and (ii) to inspect the premises where the property is or will be located, and (iii) to visit

Lessee's management at Lessee's headquarters or elsewhere. In addition, Lessee shall, if required by Lessor and/or its assigns, provide Lessor and/or its assigns with an inspection report satisfactory to Lessor and/or its assigns, in its or their sole discretion. Notwithstanding any other provision herein, any of the foregoing inspections shall be performed, and any such report shall be provided, prior to the execution and delivery by Lessee of an Acceptance and Delivery Certificate. Lessee shall pay any and all costs, including travel expenses, incurred by Lessor and/or its assigns in connection with any such inspections, reports and visits.

d.   The Property is and shall remain personal property during the term of the Lease notwithstanding that any portion thereof may in any manner become affixed, attached to or located on real property or any building or improvement thereon. Lessee shall not affix or attach, or permit any of the Property to become affixed or attached to any real property in any manner which would change its nature from that of personal property to real property. Lessee shall not permit the Property to become an accession to other goods or a fixture to or part of any real property. Lessee will obtain and deliver to Lessor a lien waiver in a form satisfactory to Lessor, from all persons not a party hereto who might claim an interest, lien or other claim in the Property.

e.   Lessee shall comply with all applicable laws, regulations, requirements, rules and orders, all manufacturer's instructions and warranty requirements, and with the conditions and requirements of all policies of insurance with respect to the Property and the Lease.

f.   Lessee may not make alterations or attachments to the Property, that will detrimentally affect the Property's end of Base Period residual value without first obtaining the written consent of Lessor which shall not be unreasonably withheld. Any such alterations or attachments shall be made at Lessee's expense and shall not interfere with the normal and satisfactory operation or maintenance of the Property. The manufacturer may incorporate engineering changes or make temporary alterations to the Property upon request of Lessee. Unless Lessor shall otherwise agree in writing, all such alterations and attachments shall be and become the property of Lessor upon their attachment to the Property or, at the option of Lessor, shall be removed by Lessee at the termination of the Lease and the Property restored at Lessee's expense to its original condition, reasonable wear and tear only excepted.

g.   Lessee shall ensure that the Property is installed, used, operated and, at the termination of the Lease, if applicable, removed at Lessee's expense (i) in accordance with any applicable manufacturer's manuals or instructions; (ii) by competent and duly qualified personnel only; and (iii) in accordance with applicable governmental regulations.

h.   In the event the Property includes Software, the following shall apply: (i) Lessee shall possess and use the Software in accordance with the terms and conditions of any license agreement entered into with the owner/vendor/licensor of such Software ("License") (at Lessor's request, Lessee shall provide a complete copy of the License to Lessor) and shall not breach the License; (ii) Lessee agrees that Lessor has an interest in the License and Software due to its payment of the price thereof and is an assignee or third-party beneficiary of the License; (iii) as due consideration for Lessor's payment of the price of the License and Software and for providing the Software to Lessee at a lease rate (as opposed to a debt rate), Lessee agrees that Lessor is leasing (and not financing) the Software to Lessee; (iv) except for the original price paid by Lessor, Lessee shall, at its own expense, pay promptly when due all servicing fees, maintenance fees, update and upgrade costs, modification costs, and all other costs and expenses relating to the License and Software and maintain the License in effect during the term of the Lease; and (v) the Software shall be deemed Property for all purposes under the Lease.

i.   Unless otherwise agreed to in writing by Lessor, the Property shall at all times be used in Lessee's business and shall not at any time be held for sale or lease or otherwise constitute "inventory", as such term is defined in Utah Uniform Commercial Code (as may be amended from time to time).

\\utsj-vs-wfs01.osft.local\it.oasw.Operations\Lessees\Trico\Master\Master Docs\Redlines\MLA - 05.23.18 Executable.rtf
NAI-1503661138v3

Page 2 of 10          Initials

CONFIDENTIAL

ONSET_00034781
FBG_CH1_00090506

j.  With respect to Lessee's use of the property, Lessee shall comply with all present and future federal, state, regional and municipal laws, statutes, ordinances, regulations, rules, judicial and similar requirements of all federal, state, regional and municipal governmental agencies, bodies or officials or other governmental entities with legal authority pertaining to the protection of human or wildlife health and safety or the environment, including, without limitation, any such laws, statutes, ordinances, regulations, rules, judicial and administrative orders and decrees, permits, licenses, approvals, authorizations and similar requirements regulating or relating to Hazardous Materials (defined below) or to the generation, use, storage, release, presence, disposal, transport, or handling of any other substance, oil, oil byproducts, gas element, or material which has the potential to pollute, contaminate or harm any land, subsurface area, water source or watercourse, air or other natural resource, hereinafter referred to as "Environmental Laws".

"Hazardous Materials" is defined as any hazardous or toxic substance, material or waste that are or become regulated under any applicable local, state or federal law, including, but not limited to, those substances, materials, and wastes listed in the United States Department of Transportation Hazardous Materials Table (49 CFR 172.101) or defined by the Environmental Protection Agency ("EPA") as "any material that poses a threat to human health and/or the environment. Typical hazardous substances are toxic, corrosive, ignitable, explosive, or chemically reactive".

SECTION 9.  OWNERSHIP AND INSPECTION:

a.  The Property shall at all times be the property of Lessor or its assigns, and Lessee shall have no right, title or interest therein except as to the use thereof subject to the terms and conditions of the Lease. For purposes of the foregoing, Lessee transfers to Lessor all of Lessee's right, title and interest (including all ownership interest) in and to the Property free and clear of all liens, security interests and encumbrances. Lessor may affix (or require Lessee to affix) tags, decals or plates to the Property indicating Lessor's ownership, and Lessee shall not permit their removal or concealment. Lessee shall not permit the name of any person or entity other than Lessor or its assigns to be placed on the Property as a designation that might be interpreted as a claim of ownership or security interest.

b.  Lessor, its assigns and their agents shall have free access to the Property at all reasonable times during normal business hours for the purpose of inspecting the Property and for any other purpose contemplated in the Lease. Lessee shall pay any and all costs incurred by Lessor in connection with any inspection performed by Lessor and/or its assigns .

c.  **LESSEE SHALL KEEP THE PROPERTY AND LESSEE'S INTEREST UNDER ANY LEASE FREE AND CLEAR OF ALL LIENS AND ENCUMBRANCES, EXCEPT THOSE PERMITTED IN WRITING BY LESSOR OR ITS ASSIGNS.**

SECTION 10.  DISCLAIMER OF WARRANTIES:

a.  WITHOUT WAIVING ANY CLAIM THE LESSEE MAY HAVE AGAINST ANY MANUFACTURER, LESSEE ACKNOWLEDGES AND AGREES THAT i) LESSOR IS NOT A SELLER, SUPPLIER OR THE MANUFACTURER OF THE PROPERTY (AS SUCH TERMS ARE DEFINED OR USED, AS THE CASE MAY BE, IN THE UNIFORM COMMERCIAL CODE) OR DEALER, NOR A SELLER'S OR A DEALER'S AGENT, ii) THE PROPERTY IS OF A SIZE, DESIGN, CAPACITY AND MANUFACTURE SELECTED BY AND ACCEPTABLE TO THE LESSEE, iii) THE LESSEE HAS EXAMINED AND IS SATISFIED THAT EVERY ITEM OF PROPERTY IS SUITABLE FOR ITS PURPOSE, iv) THE LESSEE ACCEPTS THE PROPERTY AND EACH PART THEREOF "AS IS" AND "WHERE IS", V) THE LESSOR HAS NOT MADE AND DOES NOT MAKE, AND HEREBY DISCLAIMS LIABILITY FOR, AND LESSEE HEREBY WAIVES ALL RIGHTS AGAINST LESSOR RELATING TO, ANY AND ALL WARRANTIES, REPRESENTATIONS OR OBLIGATIONS WHATSOEVER, EXPRESS OR IMPLIED, ARISING BY APPLICABLE LAW OR OTHERWISE, RELATING TO THE PROPERTY, OR ANY PART THEREOF, INCLUDING, WITHOUT LIMITATION, ANY AND ALL WARRANTIES, REPRESENTATIONS OR OBLIGATIONS AS TO: (1) THE DESCRIPTION, CONDITION, DESIGN, QUALITY OR PERFORMANCE OF THE PROPERTY OR QUALITY OR CAPACITY OF MATERIALS OR WORKMANSHIP IN THE PROPERTY; (2) ITS MERCHANTABILITY OR FITNESS OR SUITABILITY FOR A PARTICULAR PURPOSE WHETHER OR NOT DISCLOSED TO LESSOR; (3) THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE (4) THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT OR THE LIKE; AND (5) THE ABSENCE OF OBLIGATIONS BASED ON STRICT LIABILITY IN TORT.  It is agreed that all such risks incident to the matters described in this Section 10a, as between the Lessor and the Lessee are to be borne by the Lessee. If the Property or Software is not properly installed, does not function as represented or warranted by original owner/seller/supplier/licensor, or is unsatisfactory for any reason, Lessee shall make any claim on account thereof solely against original owner/seller/supplier/licensor and shall nevertheless pay all sums payable under the Lease, Lessee hereby waiving the right to make any such claims against Lessor. Lessor shall not be liable to Lessee for any loss, damage or expense of any kind or nature caused, directly or indirectly, by the Property or the use, possession or maintenance thereof, or the repair, service or adjustment thereof, or by any delay or failure to provide any such maintenance, repair, service or adjustment, or by any interruption of service or loss of use thereof (including without limitation, Lessee's use of or right to use any Software) or for any loss of business howsoever caused.

b.  NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THE LEASE, LESSOR SHALL NOT, UNDER ANY CIRCUMSTANCES, BE LIABLE TO LESSEE OR ANY THIRD PARTY, FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THE TRANSACTION CONTEMPLATED HEREUNDER, WHETHER IN AN ACTION BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) OR ANY OTHER LEGAL THEORY, INCLUDING WITHOUT LIMITATION, LOSS OF ANTICIPATED PROFITS, OR BENEFITS OF USE OR LOSS OF BUSINESS, EVEN IF LESSOR IS APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING.

IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT EACH AND EVERY PROVISION OF ANY LEASE WHICH PROVIDES FOR A LIMITATION OF LIABILITY, DISCLAIMER OF WARRANTIES OR EXCLUSION OF DAMAGES, IS INTENDED BY THE PARTIES TO BE SEVERABLE FROM ANY OTHER PROVISION AND IS A SEPARABLE AND INDEPENDENT ELEMENT OF RISK ALLOCATION AND IS INTENDED TO BE ENFORCED AS SUCH.

c.  Lessor assigns to Lessee all assignable warranties on the Property, including without limitation any warranties described in Lessor's purchase contract, which assignment shall be effective only (i) during the Base Period and any renewal period thereof; and (ii) so long as no Event of Default exists.

SECTION 11.  ASSIGNMENT BY LESSOR:

Lessor may assign or transfer its rights and interests in the Lease and/or the Property to another party ("**Lessor's Assignee**") either outright or as security for loans (collectively the "**Underwriting**"). Upon notice of any such assignment and instructions from Lessor, Lessee shall pay its Monthly Rental and other payments and perform its other obligations under the Lease to the Lessor's Assignee (or to another party designated by Lessor's Assignee). Upon any such sale or assignment, **LESSEE'S OBLIGATIONS TO LESSOR'S ASSIGNEE UNDER THE ASSIGNED LEASE SHALL BE ABSOLUTE AND UNCONDITIONAL AND LESSEE WILL NOT ASSERT AGAINST LESSOR'S ASSIGNEE ANY CLAIM, DEFENSE, OFFSET OR COUNTERCLAIM WHICH LESSEE MIGHT HAVE AGAINST LESSOR.** Lessee waives and will not assert against any assignee of Lessor any claims, defenses, or set-offs which Lessee could assert against Lessor. Lessor's Assignee shall have all of the rights but none of the obligations of Lessor under the assigned Lease, and after such assignment Lessor shall continue to be responsible for all of Lessor's obligations under the Lease.

\\utspva-wfs01 osf.local\Lease Operations\Lessons\Tricon\Master\Master Docs\Redlines\MLA - 05.23.18 Executable.rtf
NAI-1503661138v3

Page 3 of 10     initials:

CONFIDENTIAL

ONSET_00034782
FBG_CH1_00090507

**DEBTORS' EXHIBIT NO. 175
Page 282 of 1907**

Upon any such assignment, Lessee agrees to promptly execute or otherwise authenticate and deliver to Lessor estoppel certificates, acknowledgements of assignment, records and other documents requested by Lessor which acknowledge the assignment, and affirmation of provisions of the Lease which may be required to effect the Underwriting. Lessee authorizes Lessor's assigns to file UCC-1 financing statements or precautionary filings as Lessor or its assigns deem necessary. Lessor's assigns are authorized to take any reasonable measures necessary to protect their interest in the Property.

Only one executed counterpart of any Schedule shall be marked "Original"; any other executed counterparts shall be marked "Duplicate Original" or "Counterpart". No security interest in any Schedule may be created or perfected through the transfer or possession or control, as applicable, of any counterpart other than the document or record, as applicable, marked "Original".

SECTION 12. ASSIGNMENT BY LESSEE:

LESSEE MAY NOT ASSIGN ANY LEASE OR ANY OF ITS RIGHTS HEREUNDER OR SUBLEASE THE PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR. NO PERMITTED ASSIGNMENT OR SUBLEASE SHALL RELIEVE LESSEE OF ANY OF ITS OBLIGATIONS HEREUNDER.

Lessee grants Lessor a security interest in any existing or future sublease of the Property and the proceeds thereof, whether or not such sublease is prohibited. Subject to the terms of this Lease, this Lease and each Schedule inure to the benefit of, and are binding upon, the successors and assigns of Lessee, and, without limiting the foregoing, shall bind all persons who become bound as a "new debtor" (as defined in the Uniform Commercial Code) to this Lease and any Schedule.

SECTION 13. LESSEE'S REPRESENTATIONS AND WARRANTIES:

Lessee represents and warrants as follows:

a. If Lessee is a corporation, that it is duly organized and validly existing in good standing under the laws of the jurisdiction of its incorporation, that it is duly qualified to do business in each jurisdiction where any Property is, or is to be located, and has full corporate power and authority to hold property under lease and to enter into and perform its obligations under any Lease; that the execution, delivery and performance by Lessee of any Lease has been duly authorized by all necessary corporate action on the part of Lessee, and is not inconsistent with its articles of incorporation or by-laws or other governing instruments;

b. (i) Lessee's state of organization is the state listed in the introductory paragraph of this Lease; (ii) Lessee's principal office is located in the state listed in the introductory paragraph of this Lease; (iii) Lessee is the legal entity or organization indicated in the introductory paragraph of this Lease, which organization is duly organized, validly existing and in good standing under the laws of the state listed in the introductory paragraph of this Lease; and (iv) Lessee's full and exact legal name is the same as listed in the introductory paragraph of this Lease;

c. The execution, delivery and performance by Lessee of any Lease does not violate any law or governmental rule, regulation, or order applicable to Lessee, does not and will not contravene any provision of, constitute a default under, or result in the creation of any lien on or in any property or assets of the Lessee, pursuant to any material indenture, mortgage, contract, or other instrument to which it is bound and, upon execution and delivery of each Lease, will constitute a legal, valid and binding agreement of Lessee, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceeding in equity or in law);

d. If Lessee is a partnership, that it is duly organized by written partnership agreement and validly existing in accordance with the laws of the jurisdiction of its organization, that is duly qualified to do business in each jurisdiction where the Property is, or is to be located, and has full power and authority to hold property under

lease and to enter into and perform its obligations under any Lease; that the execution, delivery and performance by Lessee of any Lease has been duly authorized by all necessary action on the part of the Lessee, and is not inconsistent with its partnership agreement or other governing instruments. Upon request, Lessee will deliver to Lessor certified copies of its partnership agreement and other governing instruments and original certificate of partners and other instruments deemed necessary or desirable by Lessor. To the extent required by applicable law, Lessee has filed and published its fictitious business name certificate;

e. No action, including any permits or consents, in respect of or by any state, federal or other governmental authority or agency is required with respect to the execution, delivery and performance by Lessee of any Lease, and;

f. There are no actions, suits or proceedings pending or, to the knowledge of the Lessee, threatened against or affecting the Lessee in any court or before any governmental commission, board or authority which, if adversely determined, will have a material adverse effect on the ability of the Lessee to perform its obligations under any Lease.

SECTION 14. RISK OF LOSS ON LESSEE:

From the earlier of the date the supplier ships the Property to Lessee or the date Lessor confirms Lessee's purchase order or contract to supplier until the date the Property is returned to Lessor as provided in the Lease, Lessee hereby assumes and shall bear all risk of loss for theft, damage, non-delivery or destruction to the Property or caused by the Property to the environment, persons or other property (hereafter, such loss, damage, non-delivery or destruction to the Property or caused by the Property to the environment, persons or other property shall be referred to as the "Casualty"), howsoever caused. NO SUCH CASUALTY SHALL IMPAIR ANY OBLIGATION OF LESSEE UNDER THIS LEASE, WHICH OBLIGATION, INCLUDING TIMELY RENTAL PAYMENTS, SHALL CONTINUE IN FULL FORCE AND EFFECT.

SECTION 15. LESSEE'S WAIVERS:

To the extent permitted by applicable law, Lessee hereby waives any and all rights and remedies conferred upon a Lessee by §§ 70A-2A-508 through 70A-2A-522 of the Utah Uniform Commercial Code, including but not limited to Lessee's rights to: (i) cancel the Lease; (ii) repudiate the Lease; (iii) reject the Property; (iv) revoke acceptance of the Property; (v) recover damages from Lessor for any breaches of warranty or for any other reason; (vi) claim, grant or permit a security interest in the Property in Lessee's possession or control for any reason; (vii) deduct all or any part of any claimed damages resulting from Lessor's default, if any, under the Lease; (viii) cover by making any purchase or lease of or contract to purchase or lease property in substitution for the Property due from Lessor; (ix) recover any general, special, incidental or consequential damages, for any reason whatsoever; and (x) commence legal action against Lessor for specific performance, replevin, detinue, sequestration, claim and delivery or the like for any Property identified in the Lease. To the extent permitted by applicable law, Lessee also hereby waives any rights now or hereafter conferred by statute or otherwise which may require Lessor to sell, lease or otherwise use any Property in mitigation of Lessor's Damages as set forth in Section 19 hereof or which may otherwise limit or modify any of Lessor's rights or remedies in that section.

SECTION 16. INDEMNIFICATION:

Lessee shall indemnify and hold Lessor harmless from and against any and all claims, (including without limitation negligence, tort and strict liability), damages, judgments, suits and legal proceedings, and any and all costs and expenses in connection therewith (including attorney fees incurred by Lessor either in enforcing this indemnity or in defending against such claims), arising out of or in any manner connected with or resulting from the Lease or the Property, including, without limitation the manufacture, purchase, financing, ownership, rejection, non-delivery, transportation, delivery, possession, use, operation, maintenance, condition, lease, return, storage or disposition thereof; including without limitation (i) claims for injury to or death of persons and for damage to property; (ii) claims relating to latent or other defects in the Property whether or not discoverable by Lessor; (iii) claims relating to patent,

Initials:

\\sfs-vs-wfs01.oaf.local\Lease Operations\Lessees\Trico\Master\Master Docs\Redlines\MLA - 05.23.18 Executable.rtf
NAI-1503661138v3

CONFIDENTIAL

ONSET_00034783
FBG_CH1_00090508

copyright, or trademark infringement; and (iv) claims for wrongful, negligent or improper act or misuse by Lessor, except those claims arising in connection with and while the Property is in the possession of Lessor or its agents; and (v) claims for any damages to persons or property, any costs associated with, or any fines caused by violation of any Environmental Laws. Lessee agrees to give Lessor prompt notice of any such claim or liability. For purposes of this paragraph and any Lease, the term "Lessor" shall include Lessor, its successors and assigns, shareholders, members, owners, partners, directors, officers, representatives and agents, and the provisions of this paragraph shall survive expiration of any Lease with respect to events occurring prior thereto.

Upon request of Lessor, Lessee shall assume the defense of all demands, claims, or actions, suits and all proceedings against Lessor for which indemnity is provided and shall allow Lessor to participate in the defense thereof. Lessor shall be subrogated to all rights of Lessee for any matter which Lessor has assumed obligation hereunder, and may settle any such demand, claim, or action without Lessee's prior consent, and without prejudice to Lessor's right to indemnification hereunder.

SECTION 17. INSURANCE:

Lessee shall obtain and maintain for the entire time the Lease is in effect, at its own expense (as primary insurance for Lessor and Lessee), property damage and liability insurance (including any claims caused from the breach of any Environmental Laws involving the Property) and insurance against loss or damage to the Property including without limitation loss by fire (including so-called extended coverage), theft, collision and such other risks of loss as are customarily insured against on the type of Property leased under any lease and by businesses in which Lessee is engaged, in such amounts, in such form and with such insurers as shall be satisfactory to Lessor; provided, however, that the amount of insurance against loss or damage to the Property shall be equal to or greater than the full replacement value or the Stipulated Loss Value (as defined herein) of such items of Property. Stipulated Loss Value means the product of the Property cost (as designated on the related Schedule) and the applicable percentage factor set forth on the Stipulated Loss Schedule attached to the Schedule ("Stipulated Loss Value"). Each insurance policy will name Lessee as insured and Lessor and its assignees as additional insureds and loss payees thereof, shall contain cross-liability endorsements and shall contain a clause requiring the insurer to give Lessor and its assignees at least thirty (30) days prior written notice of any material alteration in the terms of such policy or of the cancellation thereof. Lessee shall furnish to Lessor a certificate of insurance or other evidence satisfactory to Lessor that such insurance coverage is in effect; provided, however, that Lessor shall be under no duty either to ascertain the existence of or to examine such insurance policy or to advise Lessee in the event such insurance coverage shall not comply with the requirements hereof. All insurance covering loss or damage to the Property shall contain a breach of warranty clause satisfactory to Lessor.

In the event of a Casualty to the Property (or any part thereof) and irrespective of payment from any insurance coverage maintained by Lessee, but applying full credit thereof, Lessee shall, at the option of Lessee, (unless an Event of Default has occurred and shall be continuing, in which case, it shall be at Lessor's option), (i) place the Property in good repair, condition and working order; or (ii) replace the Property (or any part thereof) with like property of equal or greater value, in good repair, condition and working order and transfer clear title to such replacement property to Lessor whereupon such replacement property shall be deemed the Property for all purposes under the Lease; or (iii) pay to Lessor the total rent due and owing at the time of such payment plus an amount calculated by Lessor which is equal to the Stipulated Loss Value (defined in the Stipulated Loss Schedule) specified in the Stipulated Loss Schedule attached to the Schedule.

Lessee shall notify Lessor within ten (10) days of the actual date of the Casualty, and in its notice include its election of either option (i), (ii), or (iii), as set forth above. If Lessee fails to notify Lessor of its election within ten (10) days of the Casualty, Lessor shall make the election (within five (5) days of notice from Lessee of the Casualty) and direct the Lessee to fully perform the repair, replacement or payment which performance shall occur within sixty (60) days of the date of the Casualty. Lessee's failure to notify Lessor within ten (10) days of the Casualty shall constitute a default as set forth in Section 18 herein, and Lessee shall

waive its right to elect option (i), (ii), or (iii) as set forth above. Upon discovery of the Casualty, Lessor shall direct Lessee to repair, replace, or make payment and Lessee shall fully perform with thirty (30) days of such notice.

SECTION 18. DEFAULT:

An "Event of Default" shall occur under any Lease if:

a. Lessee fails to pay any Monthly Rental or other payment required under the Lease when the same becomes due and payable and such failure continues for ten (10) days after its due date;

b. Lessee fails to promptly execute or otherwise authenticate and deliver to Lessor or its assigns any document or record, as applicable, required under the terms of this Master Lease Agreement;

c. Lessee attempts to or does, remove, sell, assign, transfer, encumber, sublet or part with possession of any one or more items of the Property or any interest under any Lease, except as expressly permitted herein, or permits a judgment or other claim to become a lien upon any or all of Lessee's assets or upon the Property;

d. Lessee permits any item of Property to become subject to any levy, seizure, attachment, assignment or execution; or Lessee abandons any item of Property;

e. Lessee fails to immediately (within ten (10) days) notify Lessor of any loss, damage, or destruction to the Property or fails to timely repair, replace, or make payment as required in Sections 7 and 17, herein;

f. Lessee or any guarantor, shall (i) be adjudicated insolvent or bankrupt, or cease, be unable, or admit its inability, to pay its debts as they mature, or make a general assignment for the benefit of creditors or enter into any composition or arrangement with creditors; (ii) apply for or consent to the appointment of a receiver, trustee or liquidator of it or of a substantial part of its property, or authorize such application or consent, or proceedings seeking such appointment shall be instituted against it without such authorization, consent or application and shall continue undismissed for a period of sixty (60) days; (iii) authorize or file a voluntary petition in bankruptcy or apply for or consent to the application of any bankruptcy, reorganization in bankruptcy, arrangement, readjustment of debt, insolvency, dissolution, moratorium or other similar law of any jurisdiction, or authorize such application or consent; or proceedings to such end shall be instituted against it without such authorization, application or consent and such proceeding instituted against it shall continue undismissed for a period of sixty (60) days;

g. Lessee is in default under any Lease or agreement executed with Lessor; or Lessee fails to sign or otherwise authenticate and deliver to Lessor any document or record requested by Lessor in connection with any Lease executed with Lessor; or Lessee fails to protect Lessor's rights and interests in any Lease and the Property; or Lessee fails to provide financial statements to Lessor as provided in Section 20k hereof; or Lessee is in default of other loan or lease from, or guaranty or other financing obligation to any person or entity other than Lessor that exceeds $10,000,000, and in such case applicable grace periods for curing such default or event of default have expired up to thirty (30) days if such applicable grace periods are shorter than that; provided, however, that any waiver or amendment out of existence or other resolution of any default or event of default under such agreement shall waive the existence of such event of default hereunder automatically;

h. Lessee or any guarantor, breaches any of its representations and warranties made under any Lease, or if any such representations or warranties shall be false or misleading in any material respect;

i. Lessee or any guarantor, fails to observe or perform any of its covenants and obligations required to be observed or performed under the Lease and such failure continues uncured for ten (10) days after occurrence thereof, except that the ten (10) day cure

\\ntsp.va-ws01.oa6.local\\t.nai6 Operations\\Lessees\\Trico\\Master\\Master Docs\\Redlines\\MLA - 05.23.18 Executable.rtf
NAI-1503661138v3

Page 5 of 10          Initials

CONFIDENTIAL

ONSET_00034784
FBG_CH1_00090509

DEBTORS' EXHIBIT NO. 175
Page 284 of 1907

period shall not apply and an Event of Default shall occur immediately upon Lessee's failure to maintain insurance;

j. Lessee or any guarantor, shall suffer a material adverse change in its financial condition after the date hereof as determined by Lessor in its sole discretion;

k. There shall occur (i) a substantial change in the ownership or membership of Lessee, any guarantor, any parent of Lessee or any guarantor, or any entity that has a direct or indirect ownership interest in Lessee or any guarantor, or (ii) a substantial change in control of the board of directors, members or manager of Lessee, any guarantor, any parent of Lessee or any guarantor, or any entity that has a direct or indirect ownership interest in Lessee or any guarantor;

l. Lessor in good faith believes that the prospect of payment or performance has become impaired, or if Lessee takes any action, makes any representation, or fails to do anything requested by Lessor, at any time before or after the execution of this Master Lease Agreement, the result of which causes Lessor, in good faith, to believe that the prospect of Lessee's payment or performance under the Lease is impaired, or otherwise causes Lessor to feel insecure in funding or continuing to fund the Lease or any Schedule;

m. Lessee, any guarantor, any parent of Lessee or any guarantor, or any entity that has a direct or indirect ownership interest in Lessee or any guarantor shall have terminated or changed its corporate or other entity existence, consolidated with, merged into, or conveyed or leased substantially all of its assets to any person or entity, unless: (i) such person or entity executes and delivers to Lessor an agreement satisfactory in form and substance to Lessor, in its sole discretion, containing such person's or entity's effective assumption, and its agreement to pay, perform, comply with and otherwise be liable for, in a due and punctual manner, all of Lessee's (or guarantor's) obligations having previously arisen, or then or thereafter arising, under the Lease or guaranty, as the case may be, together with any and all documents, agreements, instruments, certificates, opinions and filings requested by Lessor; (ii) Lessor is satisfied as to the creditworthiness of such person's or entity's conformance to other standard criteria then used by Lessor for such purposes; and (iii) Lessee or any guarantor has provided no less than thirty (30) days prior written notice of such occurrence to Lessor or its assigns;

n. Lessee breaches any License, maintenance or other agreement for Software or fails to pay when due all servicing fees, maintenance fees, update and upgrade costs, modification costs, and all other costs and expenses relating to the License and Software and fails to maintain the License in effect during the term of the Lease.

SECTION 19. REMEDIES:

Upon the occurrence of any Event of Default and at any time thereafter, Lessor may with or without giving notice to Lessee and with or without canceling the Lease, do any one or more of the following

a. enforce this Master Lease Agreement according to its terms;

b. require additional collateral to secure the Lease;

c. upon notice to Lessee, cancel this Master Lease Agreement and any or all Schedules executed pursuant thereto;

d. advance funds on Lessee's behalf to cure the Event of Default, whereupon Lessee shall immediately reimburse Lessor therefore, together with late charges accrued thereon;

e. upon notice to Lessee, refuse to fund any Schedule(s) pursuant to the Lease;

f. declare any Lease or Leases immediately due and payable;

g. refuse to deliver the Property to Lessee;

h. declare immediately due and payable all amounts due or to become due hereunder for the full term of the Lease (including any renewal period or purchase options which Lessee has contracted to pay);

i. in its sole discretion, sell, re-lease or otherwise dispose of any or all of the Property covered under any Schedule, whether or not in Lessor's possession, in a commercially reasonable manner at public or private sale with notice to Lessee (the parties agreeing that ten (10) days' prior written notice shall constitute adequate notice of such sale), and in the event a court of competent jurisdiction or other governing authority shall determine that the Lease is not a "true lease" or is a lease intended as security or that Lessor (or its assigns) does not hold legal title to or is not the owner of the Property, apply the net proceeds of any such disposition, after deducting all costs incurred by Lessor in connection with such default, to the obligations of Lessee hereunder and under such Schedule, or retain any or all of the Property in full or partial satisfaction, as the case may be, with Lessee remaining liable for any deficiency. The sale, re-lease, or other disposition may, at Lessor's sole option, be conducted at Lessee's premises;

j. without notice to Lessee, repossess, disable or demand Lessee to disable the Property wherever found, with or without legal process, and for this purpose Lessor and/or its agents or assigns may enter upon any premises of or under the control or jurisdiction of Lessee or any agent of Lessee, without liability for suit, action or other proceeding by Lessee (any damages occasioned by such repossession or disablement being hereby expressly waived by Lessee) and remove or disable the Property therefrom; Lessee further agrees on demand, to assemble the Property and make it available to Lessor at a place to be designated by Lessor;

k. exercise any other right or remedy which may be available to it under the Uniform Commercial Code or any other applicable law;

l. if Lessee breaches any of its obligations under Section 7e of this Master Lease Agreement with regard to Software, Lessee shall be liable to Lessor for additional damages in an amount equal to the original price paid by Lessor for the Software, and in addition, at Lessor's option, Lessor shall be entitled to injunctive relief;

m. if Lessor determines, in its sole discretion, not to take possession of the Property, Lessor shall continue to be the owner of the Property and may, but is not obligated to, dispose of the Property by sale or otherwise, all of which determinations may be made by Lessor in its sole discretion and for its own account;

n. a cancellation hereunder shall occur only upon notice by Lessor and only as to such items of Property as Lessor specifically elects to cancel and this Lease shall continue in full force and effect as to the remaining items, if any;

o. demand and recover as liquidated damages for loss of a bargain and not as a penalty, and in lieu of any further payments of rent the Stipulated Loss Value of the Property as of the rent payment date immediately preceding the date of default together with all accrued but unpaid late charges, interest, taxes, penalties, and any and all other sums due and owing under the Schedule as of the rent payment date immediately preceding the date of default;

p. With respect to any exercise by Lessor of its right to recover and/or dispose of any Property securing Lessee's obligations under any Schedule, Lessee acknowledges and agrees as follows: (i) Lessor shall have no obligation, subject to the requirements of commercial reasonableness, to clean-up or otherwise prepare the Property for disposition; (ii) Lessor may comply with any applicable State or Federal law requirements in connection with any disposition of the Property, and any actions taken in connection therewith shall not be deemed to have adversely affected the commercial reasonableness of any disposition of such Property; (iii) Lessor may specifically disclaim any warranties of title or the like with respect to the disposition of the Property; (iv) if Lessor purchases any of the Property, Lessor may pay for the same by crediting some or all of Lessee's obligations hereunder or under any Schedule; and (v) no right or remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and shall be in addition to any other remedy referred to above or otherwise available at law or

\\\\tsjvs-wfs01.osfi.local\it nasa.Operations\Lessees\Tribo\Master\Master Docs\Redlines\MLA - 05 23 18 Executable.rtf
NAI-1503661138v3

Page 6 of 10    Initials:

CONFIDENTIAL

ONSET_00034785
FBG_CH1_00090510

DEBTORS' EXHIBIT NO. 175
Page 285 of 1907

in equity, and may be exercised concurrently or separately from time to time;

q.  (i) by notice to Lessee, declare any license agreement with respect to Software terminated, in which event the right and license of Lessee to use the Software shall immediately terminate, and Lessee shall thereupon cease all use of the Software and return all copies thereof to Lessor or original licensor; (ii) have access to and disable, or demand Lessee to disable the Software by any means deemed necessary by Lessor, including but not limited to disabling the computers, computer systems or other equipment which run and/or operate and/or are controlled by the Software, for which purposes Lessee hereby expressly consents to such access and disablement, promises to take no action that would prevent or interfere with Lessor's ability to perform such access and disablement, and waives and releases any and all claims that it has or might otherwise have for any and all losses, damages, expenses, or other detriment that it might suffer as a result of such access and disablement; and (iii) Lessee agrees that the detriment which Lessor will suffer as a result of a breach by Lessee of the obligations contained in the Lease cannot be adequately compensated by monetary damages, and therefore Lessor shall be entitled to injunctive and other equitable relief to enforce the provisions of this Section 19q. LESSEE AGREES THAT LESSOR SHALL HAVE NO DUTY TO MITIGATE LESSOR'S DAMAGES UNDER ANY LEASE BY TAKING LEGAL ACTION TO RECOVER THE SOFTWARE FROM LESSEE OR ANY THIRD PARTY, OR TO DISPOSE OF THE SOFTWARE BY SALE, RE-LEASE OR OTHERWISE.

Lessor may exercise any and all rights and remedies available at law or in equity, including those available under the Uniform Commercial Code. The rights and remedies afforded Lessor hereunder shall not be deemed to be exclusive, but shall be in addition to any rights or remedies provided by law. Lessor's failure promptly to enforce any right or remedy hereunder shall not operate as a waiver of such right or remedy, and Lessor's waiver of any default shall not constitute a waiver of any subsequent or other default. Lessor may accept late payments or partial payments of amounts due under the Lease and may delay enforcing any of Lessor's rights or remedies hereunder without losing or waiving any of Lessor's rights or remedies under the Lease.

In connection with Lessor's exercise of any or all of the above-listed remedies, Lessor shall be entitled to recover all costs and expenses incurred by Lessor in the repossession, recovery, storage, repair, sale, re-lease or other disposition of the Property, or the termination or disabling of Software, including without limitation, reasonable attorney fees and costs incurred in connection therewith or otherwise resulting or arising from Lessee's default, and any indemnity if then determinable, plus interest on all of the above until paid (before and after judgment) at the lesser of the rate of eighteen percent (18%) per annum or the highest rate permitted by law. In the event of involuntary repossession by Lessor through judicial proceedings, or through a sheriff's levy and sale, Lessee hereby waives any requirement that Lessor post a bond.

If Lessor demands payment from Lessee of the Stipulated Loss Value, of the Property, upon full and indefeasible payment thereof to Lessor, together with all related costs, expenses, attorney's fees, interest (i.e., the Lessor's Damages, as defined in Section 22g), then all of Lessor's right, title and interest in and to the subject Property shall, without further action, be deemed to have been conveyed to Lessee on an AS IS, WHERE IS basis, except Lessor shall warrant the absence of any liens created by or through Lessor.

SECTION 20.  ADDITIONAL PROVISIONS:

a.  Security Interest. The parties acknowledge and agree that this is a "true lease" and title to the leased Property (or Lessee's interest in the Property if the Property is Software) is vested in the Lessor. In the event a court of competent jurisdiction or other governing authority shall determine that the Lease is not a "true lease" or is a lease intended as security or that Lessor (or its assigns) does not hold legal title to or is not the owner of the Property, the following shall apply:

i  Effective the execution date of the Lease, Lessee, as debtor, grants a security interest to Lessor, as secured party, in the

Property (or Lessee's interest in the Property if the Property is Software), including but not limited to equipment and other personal property, general intangibles, Software and Lessee's license rights and other rights to use the Software, and accessions thereto, and any refunds, rebates, remittances, and all rights and services related thereto, and proceeds of any of the foregoing, to secure all duties and obligations of Lessee under any Lease or other agreement with Lessor. The Lease shall be deemed to be a security agreement with Lessee having granted to Lessor a security interest in the Property, and the Property shall secure all duties and obligations of Lessee under any Lease or other agreement with Lessor. With regard to any security interest created hereunder in any of the Property, Lessee consents and agrees that Lessor shall have all of the rights, privileges and remedies of a secured party under the Utah Uniform Commercial Code.

ii  Lessee authorizes Lessor to file financing statements and any records describing the Property and to take any and all actions necessary to perfect Lessor's interest in the Property. Lessee agrees to execute any further documents, and to take any further actions, reasonably requested by Lessor to evidence or perfect the security interest granted under this subpart of the Lease, to maintain the first priority of the security interests, or to effectuate the rights granted to Lessor under this subpart of the Lease.

b.  Entire Agreement. Each Schedule shall incorporate the terms and conditions of this Master Lease Agreement and, together with the Acceptance and Delivery Certificate and Master Progress Payment Agreement (and Certificates thereunder), if applicable, Transaction Documents, and any amendments to any of the foregoing documents, shall supersede all prior communications, representations, agreements, and understandings, including but not limited to offer letters, proposal letters, comfort letters, commitment letters and the like, and constitute the entire understanding and agreement between the Lessor and Lessee with regard to the subject matter hereof and thereof, and there is no understanding or agreement, oral or written, which is not set forth herein or therein. In the event of conflict between the provisions of this Master Lease Agreement and any Schedule, the provisions of the Schedule shall govern.

c.  Time Is of the Essence. Time is of the essence with respect to any Lease.

d.  Captions. Captions and section headings are inserted for reference and convenience only and in no way define, limit or describe the scope of this agreement or intent of any provision.

e.  Governing Law. THIS LEASE (AS DEFINED IN SECTION 22 HEREIN) SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF UTAH, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE. THE PARTIES AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE STATE OF UTAH; ANY SUIT OR OTHER PROCEEDING BROUGHT BY EITHER PARTY TO ENFORCE OR CONSTRUE THIS LEASE (AS DEFINED IN SECTION 22 HEREIN), OR TO DETERMINE MATTERS RELATING TO THE PROPERTY OR THE RELATIONSHIP BETWEEN THE PARTIES HERETO SHALL BE BROUGHT ONLY IN THE STATE OR FEDERAL COURTS IN THE STATE OF UTAH. THIS LEASE WAS EXECUTED IN THE STATE OF UTAH (BY THE LESSOR HAVING COUNTERSIGNED IT IN UTAH) AND IS TO BE PERFORMED IN THE STATE OF UTAH (BY REASON OF ONE OR MORE PAYMENTS REQUIRED TO BE MADE TO LESSOR IN UTAH).

f.  Waiver of Trial by Jury. Lessor and Lessee hereby waive the right to trial by jury of any matters arising out of the Lease or Property or the conduct of the relationship between Lessor and Lessee.

g.  Severability. Should any term or provision of this Agreement be declared invalid, illegal, void or unenforceable, all remaining terms and provisions hereof will remain in full force and effect and will in no way be invalidated or affected thereby.

\\otsp-va-wfs01.na6.local\\...na5o Operations\\Lessees\\Trico\\Master\\Master Docs\\Redlines\\MLA - 05.23.13 Executable.rtf
NAI-1503661138v3

Page 7 of 10   Initials

CONFIDENTIAL

ONSET_00034786
FBG_CH1_00090511

h.  Binding Effect; Survivability.  The provisions of each Lease shall inure to the benefit of and shall bind Lessor and Lessee and their respective permitted successors and assigns.  All indemnities of Lessee made or agreed to in the Lease or in any certificates delivered in connection therewith shall survive the expiration, termination or cancellation of the Lease for any reason.

i.  Waiver.  A waiver by either Party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

j.  Limitations.  No paragraph, clause or phrase of this agreement shall limit, infringe, deny, negate, refuse or render void any other paragraph, clause or phrase of this agreement.

k.  Financial Statements.  Lessee shall provide to Lessor a copy of guarantor's annual audited financial statements within one hundred twenty (120) days after guarantor's fiscal year end, and a copy of guarantor's quarterly unaudited financial statements within sixty (60) days after the end of each fiscal quarter.

l.  Acceptance and Delivery Certificate.  If Lessee fails to sign and deliver an Acceptance and Delivery Certificate, then except as otherwise provided in Section 8c hereof, the Date of Acceptance shall be a date determined by Lessor which shall be no sooner than the date Lessee receives substantially all of the Property.

m.  Covenant of Quiet Possession.  Lessor agrees that so long as no Event of Default has occurred and is continuing, Lessee shall be entitled to quietly possess the Property subject to and in accordance with the terms and conditions of this Master Lease Agreement.

n.  Lessee's Options at Maturity of Base Period.  At the end of the Base Period of any Schedule, unless otherwise provided herein, the Schedule shall automatically renew for twelve (12) additional months at the rate specified on the respective Schedule. Provided that Lessee gives written notice to Lessor, by certified mail, received by Lessor at least one hundred twenty (120) days prior to the end of the Base Period of any Schedule, Lessee shall be granted the opportunity to negotiate with Lessor concerning one of the following options: (1) purchase the Property for a price to be determined by Lessor and Lessee, or (2), or terminate the Schedule and return the Property to Lessor at Lessee's expense to a destination within the continental United States specified by Lessor; provided, however, that for option (2) to apply, all accrued but unpaid late charges, interest, taxes, penalties, and any and all other sums due and owing under the Schedule must first be paid in full, the provisions of Sections 8f, 8g and 7d hereof must be specifically complied with, and Lessee must enter into a new Schedule with Lessor to lease Property which replaces the Property listed on the old Schedule. With respect to options (1) and (2), each party shall have the right in its absolute and sole discretion to accept or reject any terms of purchase or of any new Schedule, as applicable.  In the event Lessor and Lessee have not agreed to either option (1) or (2) prior to the maturity of the Base Period, or if Lessee fails to give written notice via certified mail at least one hundred twenty (120) days prior to the maturity of the Base Period of its intent to negotiate, or if an Event of Default has occurred under any Schedule, then options (1) and (2) shall expire and the Schedule shall automatically renew as provided herein.  At the maturity of the initial twelve (12) month renewal period provided above, the Schedule shall continue in effect at the rate specified in the respective Schedule for successive periods of six (6) months, each subject to termination at the maturity of any such successive six-month renewal period by either Lessor or Lessee giving to the other party at least thirty (30) days prior written notice of termination.  **Lessee acknowledges that Lessor has no obligation to enter into any agreement as a result of the initiation of discussions concerning options (1) or (2).    LESSEE ACKNOWLEDGES AND AGREES THAT IT HAS READ AND UNDERSTANDS THE FOREGOING PROVISIONS AND HAS HAD THE OPPORTUNITY TO DISCUSS THEM WITH LESSOR AND/OR ITS COUNSEL, SHOULD IT SO DESIRE.**  In the event of a disagreement between the parties in the interpretation of any provision of this Section 20(n), the parties agree that the ambiguity shall not be interpreted for or against either party upon grounds of authorship.    **This Section 20(n) shall supersede all prior** communications, representations, agreements and understandings, including but not limited to offer letters, proposal letters, comfort letters, commitment letters, emails and the like and constitutes the entire understanding and agreement between Lessor and Lessee with regard to the subject matter of this Section 20(n), and THERE IS NO UNDERSTANDING OR AGREEMENT, ORAL OR WRITTEN, WHICH IS NOT SET FORTH HEREIN; provided, however, that in the event of a conflict between the provisions of this Section 20(n) and any Schedule, the provisions of the Schedule shall govern.

Initials: _____

o.  Notices.  Notices or demands required to be given herein shall be in writing and addressed to the other party at the address herein or such other address provided by written notice hereunder and shall be effective (i) upon the next business day if sent by guaranteed overnight express service; (ii) on the same day if personally delivered; or (iii) three days after mailing if sent by certified or registered U.S. mail, postage prepaid.

p.  Further Assurances; Financing Statements.  Lessee will cooperate with Lessor in protecting Lessor's interests in the Property, the Lease and the amounts due under the Lease, including, without limitation, the execution (or other authentication), and delivery of Uniform Commercial Code statements, records and filings, patent and copyright registration documents with respect to proprietary Software (if applicable), and other documents requested by Lessor. Lessee will promptly execute, or otherwise authenticate, and deliver to Lessor such further documents, instruments, assurances and other records, and take such further action as Lessor may reasonably request in order to carry out the intent and purpose of this Lease and to establish and protect the rights and remedies created or intended to be created in favor of Lessor under this Lease.  Lessee hereby authorizes Lessor to file UCC-1 financing statements, fixture filings, real property waivers, and all other filings and recordings, as may be deemed necessary by Lessor that includes collateral descriptions that are consistent with the Property. Lessee hereby authorizes and/or ratifies the filing of any UCC-1 financing statements by Lessor before or after the execution of this Lease.    Lessee shall pay all costs of filing any financing amendment, continuation and termination statements with respect to the Property and Lease, including without limitation, any intangibles tax, documentary stamp tax or other similar taxes or charges relating thereto and all costs of UCC or other lien searches and of obtaining and filing any full or partial third-party releases deemed necessary or advisable by Lessor.  Lessee will do whatever may be necessary or advisable to have a statement of the interest of Lessor in the Property noted on any certificate of title relating to the Property and will deposit said certificate with Lessor.  Lessee will execute, or otherwise authenticate, and deliver to Lessor such other documents, records and written assurances and take such further action as Lessor may request to more fully carry out the implementation, effectuation, confirmation and perfection of the Lease and any rights of Lessor thereunder.  Lessee grants to Lessor a security interest in all deposits and other property transferred or pledged to Lessor to secure the payment and performance of all of Lessee's obligations under the Lease.  Lessor is authorized to take any measures necessary to protect its interest in the Property.

In the event the Property is in the possession of a third party, Lessee will join with Lessor in notifying the third party of Lessor's interest in the Property and obtaining an acknowledgment from the third party that the third party is holding the Property for the benefit of Lessor.

q.  Lessor's Right to Perform for Lessee.  If Lessee fails to perform or comply with any of its agreements contained herein, Lessor may perform or comply with such agreements and the amount of any payments and expenses of Lessor incurred in connection with such performance or compliance (including attorney fees), together with interest thereon at the lesser of the rate of eighteen percent (18%) per annum, or the highest rate permitted by law shall be deemed additional rent payable by Lessee upon demand.

r.  Counterparts; Chattel Paper.  This Lease may be executed in any number of counterparts and by different parties hereto or thereto on

NAI-1503661138v3

Page 8 of 10            Initials: _____

CONFIDENTIAL

ONSET_00034787
FBG_CH1_00090512

separate counterparts, each of which, when so executed or otherwise authenticated and delivered, shall be an original, but all such counterparts shall together consist of but one and the same instrument; provided, however, that to the extent that this Lease and/or the Schedule(s) would constitute chattel paper, as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction, no security interest herein or therein may be created or perfected through the transfer or possession of this Lease in and of itself without the transfer or possession or control, as applicable, of the original counterpart of such Schedule(s) identified as the document or record (as applicable) marked "Original", and all other counterparts shall be marked "Duplicate Original" or "Counterpart".

s.  Joint and Several Liability.  In the event two or more parties execute this Master Lease Agreement as Lessee, each party shall be jointly and severally liable for all Lessee representations, warranties, and obligations (including without limitation, payment obligations) under this Master Lease Agreement or under any Schedule or other document executed in connection herewith.  Any and all representations, agreements, or actions by one Lessee shall be binding on all other Lessees.

t.  Legal Fees and Other Costs.  Lessee shall reimburse Lessor for all legal fees and additional charges, costs and expenses incurred by Lessor: (i) in review or preparation of this Lease Agreement, any Schedule and any other document or agreement in connection with this Lease Agreement; (ii) in review or preparation of any changes or amendments required by Lessee to Lessor's standard Lease documentation; (iii) in periodic legal reviews of the Lease Agreement, Schedules and other Lease documentation; (iv) in defending or protecting its interest in the Property; (v) in the execution, delivery, administration, amendment and enforcement of the Lease or the collection of any rent or other payments due under the Lease, or the preparation of any amendments or settlement agreements prepared in connection with the Lease; and (vi) in any lawsuit or other legal or arbitration/mediation proceeding to which the Lease gives rise, including without limitation; actions in tort. Lessee shall pay applicable legal fees at the rate of no more than $350.00 per hour. Lessee shall pay a documentation fee calculated at .15% of the total cost of property with a minimum of $750.00 and a maximum of $7,500.00 for each Schedule.

u.  Amendment and Modification.  The Lease may not be amended or modified except by a written amendment executed by a duly authorized representative of each party, but no such amendment or modification needs further consideration to be binding. Notwithstanding the foregoing, Lessee authorizes Lessor to amend any Schedule to identify more accurately the Property (including, without limitation, supplying serial numbers or other identifying data), and such amendment shall be binding on Lessor and Lessee unless Lessee objects thereto in writing within ten (10) days after receiving notice of the amendment from Lessor.

v.  Unauthorized Distribution of Lease Documents Prohibited.  Lessee agrees that it will not, through any of its actions or omissions, cause any document or any portion of any document, associated with any Lease to be delivered, distributed, or otherwise fall into the possession of anyone not employed by Lessee on a full time basis, without the written consent of Lessor, except for Lessee's auditors, attorneys or any individual, company, or entity as required by applicable law.  Lessee further acknowledges that any such unauthorized delivery or distribution could cause Lessor to suffer irreparable economic harm.

w.  Change in Lessee's Name, Address and Jurisdiction.  Lessee shall not change its name, chief executive office address, or jurisdiction of organization from that set forth above, unless it shall have given Lessor or its assigns no less than thirty (30) days prior written notice.

SECTION 21. POWER OF ATTORNEY:

LESSEE HEREBY AUTHORIZES AND APPOINTS LESSOR AND LESSOR'S AGENTS AND ASSIGNS AS LESSEE'S ATTORNEY-IN-FACT TO EXECUTE ACKNOWLEDGEMENT LETTERS AND OTHER DOCUMENTS REQUIRED TO BE EXECUTED BY LESSEE TO

EFFECT ANY UNDERWRITING OR PERFECT ANY SECURITY INTEREST WITH REGARD TO A SCHEDULE.  THE POWER OF ATTORNEY GRANTED HEREIN SHALL BE LIMITED TO THE FOREGOING PURPOSES.

SECTION 22. DEFINITIONS

All capitalized terms not defined herein are defined in the Schedule.

a.  "Acceptance and Delivery Certificate" means, any acceptance and delivery certificate, executed by the Lessee in connection with a Schedule, a Master Progress Payment Agreement, if any, and this Master Lease Agreement whereby the Lessee acknowledges that the items of Property to be leased have been delivered, received, installed, examined and tested and determined by Lessee to be satisfactory.

b.  "Base Period" means, the period of any Lease referred to as such on the related Schedule under this Master Lease Agreement.

c.  "Certificate" means, an Acceptance and Delivery and Approval for Progress Payment Certificate executed by the Lessee in connection with a Schedule, a Master Progress Payment Agreement and this Master Lease Agreement.

d.  "Date of Acceptance" means, except as otherwise provided in Section 8c of this Master Lease Agreement, the date Lessee accepts the Property designated on any Schedule, as set forth in any Acceptance and Delivery Certificate executed by the Lessee in form provided by Lessor.

e.  "Lease Commencement Date" means, as to the Property designated on any Schedule, where the Date of Acceptance for such Schedule falls on the first day of a calendar quarter, that date, and in any other case, the first day of the calendar quarter following the calendar quarter in which such Date of Acceptance falls.

f.  "Lease" means, a Schedule incorporating the terms of this Master Lease Agreement, together with the related Master Progress Payment Agreement, if any, Stipulated Loss Schedule, Acceptance and Delivery Certificate, UCC financing statements and all other supporting documentation related thereto.

g.  "Lessor's Damages" means, the Stipulated Loss Value together with costs, expenses, attorney's fees, interest, and any determinable indemnity owed by Lessee to Lessor.

h.  "Master Progress Payment Agreement" means, an agreement under which (i) Lessee accepts items of Property by signing a Certificate, (ii) Lessor agrees to purchase said items or Property, and (iii) Lessee agrees to pay service charges, all prior to the Date of Acceptance of all Property under the Schedule.

i.  "Monthly Rental" means, the monthly rental, together with sales tax and other amounts, if applicable, referred to as such on the related Schedule under this Master Lease Agreement.

j.  "Property" means, equipment and other property, together with all related software whether embedded therein or otherwise, with all attachments, replacements, parts, substitutions, additions, repairs, accessions and accessories, incorporated therein and/or affixed thereto described in any Lease Schedule to be executed and delivered by Lessor and Lessee in connection with this Master Lease Agreement.

k.  "Schedule" means, any Lease Schedule to be executed and delivered by Lessor and Lessee under this Master Lease Agreement, which Schedule states the terms and other information associated with the Schedule and describes the leased Property.

l.  "Software" means, any computer program and supporting data, including all documentation, later versions, updates, upgrades and modifications, provided and/or described in any Lease Schedule to be executed and delivered by Lessor and Lessee in connection with this Master Lease Agreement.

\\\\usp-ss-wfs01.osfi.local\Lease Operations\Lessees\Tricol\Master\Master Docs\Redlines\MLA - 05.23.18 Executable.rtf
NAI-1503661138v3

Page 9 of 10

Initials:

CONFIDENTIAL

ONSET_00034788
FBG_CH1_00090513

m.   "Stipulated Loss Schedule" means, Schedule of Stipulated Loss Values relating to a specific Schedule under this Master Lease Agreement.

n.   "Transaction Documents" means the Master Lease Agreement, Master Progress Payment Agreement, Lease(s), Schedule(s), Acceptance and Delivery Certificate(s), Certificate(s), sale leaseback agreement(s), bill(s) of sale, guaranty agreement(s) executed on behalf of Lessee in favor of Lessor, and any other document entered into by lessee or any guarantor pursuant to the foregoing, together with any and all amendments, addendums, riders and exhibits thereto.

IN WITNESS WHEREOF, Lessor and Lessee have executed this Master Lease Agreement on the month, day and year first above written.

LESSOR:

ONSET FINANCIAL, INC.

BY: _____
     Cathy Lawrence
TITLE:   Vice President

LESSEE:

TRICO PRODUCTS CORPORATION

BY: _____
TITLE: _____   Stephen Graham

NAI-1503661138v3

Initial

CONFIDENTIAL

ONSET_00034789
FBG_CH1_00090514

# Exhibit 4

FBG_CH1_00090515



## SALE AND LEASEBACK AGREEMENT

This Sale and Leaseback Agreement (the "Agreement") is dated and effective April 7, 2021 by and between **TRICO PRODUCTS CORPORATION**, 172 Public Square, Suite 5110, Cleveland, OH 44114, (the "Seller") and **ONSET FINANCIAL, INC.**, 274 West 12300 South, Draper, Utah 84020 (the "Buyer").

WHEREAS, Seller requests Buyer: (1) to purchase from Seller Property listed on one or more Acceptance and Delivery and Approval for Progress Payment Certificates ("Certificates") (collectively, the "Property") to be paid for by Lessor as provided in that Master Progress Payment Agreement dated May 9, 2018 (the "MPPA") and (2) to lease the Property to Seller under the terms and conditions of Lease Schedule No. 015 dated April 7, 2021 (the "Schedule") to Master Lease Agreement No. OFI1045321 dated and effective as of May 9, 2018  (the "Master Lease") (the Master Lease and Schedule are referred to herein collectively as the "Lease"); and

WHEREAS, Buyer is willing to purchase from and lease the Property to Seller under the terms and conditions of this Agreement, the MPPA Agreement, the Certificates and the Lease;

NOW, THEREFORE, in consideration of the mutual promises herein, Seller and Buyer agree as follows:

1.      **Sale and Leaseback**.  Subject to the terms of the MPPA, Seller agrees to sell and Buyer agrees to purchase the Property described in one or more Certificates signed by Seller under the MPPA.  Each Certificate upon the execution and delivery thereof, shall be incorporated into this Agreement by this reference, and collectively, the Certificates shall comprise the Property.  Upon Seller's later execution and delivery to Buyer of an Acceptance and Delivery Certificate required under the Lease, Buyer shall lease the Property to Seller and Seller shall accept the Property under lease from Buyer under the terms and conditions of the Lease.  In connection with Seller's sale of the Property to Buyer, Seller assigns to Buyer all manufacturer warranties and indemnities with respect to the Property.

2.      **Purchase Price and Payment**.  Buyer and Seller agree that the purchase price of the Property shall not exceed $12,500,000 exclusive of applicable taxes (the "Purchase Price") which shall be payable to Seller pursuant to the terms and conditions of this Agreement, the MPPA, the Master Lease and the Schedule.  The parties agree to later amend this Agreement if the Purchase Price referenced herein decreases to reflect the final Purchase Price of all the Property.

3.      **Title**.  The parties agree that title and ownership of those items of Property specified in any Certificate signed in connection with the MPPA shall pass from Seller to Buyer at the time Seller signs such Certificate.  Seller shall provide insurance coverage for the Property from the date title passes to Buyer in accordance with the terms and conditions of the Master Lease, which terms and conditions are incorporated herein by this reference.

4.      **Buyer's Purchase and Performance**.  Seller agrees that Buyer's obligations hereunder are expressly subject to the following conditions:

> a.      Buyer's receipt of the executed Master Lease, Schedule, Stipulated Loss Schedule, MPPA and Certificates, Bill of Sale for the Property given by Seller in favor of Buyer, UCC searches to be performed against Seller showing no security interests, liens or encumbrances, partial releases of any UCC liens or encumbrances, evidence of Seller's ownership, and any other documentation reasonably required by Buyer, all in form acceptable to Buyer.

1

CONFIDENTIAL

ONSET_00034288
FBG_CH1_00090516

b.        Buyer's receipt of Incumbency Certificates in form acceptable to Buyer evidencing Seller's authority to enter into this sale and leaseback transaction with Buyer.

5.        **Taxes.**  Seller represents and warrants that it is responsible for and it has paid all sales and use, property and other taxes assessed or due in connection with Seller's purchase, use and possession of the Property prior to sale to Buyer hereunder.  Seller agrees to pay to Buyer an amount equal to all taxes paid, payable or required to be collected by Buyer, however designated, which are levied or based on the rental, on the Lease or on the Property or on its purchase for lease hereunder, or on its use, lease, operation, control or value (including, without limitation, state and local privilege or excise taxes based on gross revenue), any penalties or interest in connection therewith or taxes or amounts in lieu thereof paid or payable by Buyer in respect of the foregoing, but excluding taxes based on Buyer's net income.  Buyer shall deliver to Seller on or before the date of each Certificate a duly executed sales tax exemption certificate for the Property, prior to Buyer's payment of the Purchase Price.

6.        **Seller's Representations and Warranties.**  Seller represents and warrants to Buyer that:

a.        Seller is a Corporation, duly organized, validly existing and in good standing under the laws of the state of its organization and in all jurisdictions where such qualification is required for it to conduct its business.

b.        Seller has all requisite power and authority to conduct its business, to own and lease its properties and to enter into and perform all of its obligations under this Agreement.

c.        This Agreement has been duly authorized by Seller, and upon execution and delivery by the parties thereto, shall constitute the valid, legal and binding obligation of Seller enforceable in accordance with its terms.

d.        No event has occurred or is continuing which constitutes an event of default under this Agreement.  There is no action, suit or proceeding pending or threatened against or effecting Seller before or by any court, administrative agency or other governmental authority which brings into question the validity of the transaction contemplated by this Agreement or which might materially impair the ability of Seller to perform its obligations under this Agreement or the transaction contemplated hereby.

e.        Neither the execution and delivery by the Seller of this Agreement, nor the compliance by the Seller with the provisions of any thereof, conflicts with or results in a breach of any of the provisions of the Articles of Incorporation or By-Laws of Seller, or of any applicable law, judgment, order, writ, injunction, decree, rule or regulation of any court, administrative agency or other governmental authority, or of any agreement or other instrument to which the Seller is a party or by which it is bound, or constitutes or will constitute a default under any thereof.

f.        The transaction contemplated by this Agreement complies with all applicable federal and state laws, rules and regulations applicable to Seller.

g.        No consent, approval or authorization of or by any court, administrative agency or other governmental authority is required in connection with the execution, delivery or performance by Seller of, or the consummation by Seller of the transaction contemplated by this Agreement.

h.        Seller is transferring to Buyer good title to the Property, free and clear of all liens and encumbrances of any kind or description and the Property is, and at the time of signing of each Certificate will be, located at Seller's premises identified on the Certificate, in good operating condition and appearance and installed (if applicable) and operating in accordance with all manufacturer specifications.

7.        **Buyer's Representations and Warranties.**  Buyer represents and warrants to Seller that:

2

CONFIDENTIAL

ONSET_00034289
FBG_CH1_00090517

a.      Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Utah and in all jurisdictions where such qualification is required for it to conduct business.

b.      Buyer has all requisite power and authority to conduct its business, to own and lease its properties and to enter into and perform all of its obligations under this Agreement.

c.      This Agreement has been duly authorized by Buyer, and upon the execution and delivery by the parties thereto, shall constitute the valid, legal and binding obligation of Buyer enforceable in accordance with its terms.

8.      **Default and Remedies**.  In the event any of Seller's representations made hereunder should be false or misleading in any material respect, or in the event Seller should breach any of its warranties or obligations under this Agreement, Buyer shall be entitled to exercise all rights and remedies available to it at law or in equity together with all of its rights and remedies under the Lease or the MPPA in Buyer's discretion as if they were set forth in this Agreement, and for purposes hereof all such rights and remedies shall be incorporated herein by this reference.

9.      **Successors**.  Buyer and Seller agree that this Agreement shall inure to the benefit of and shall be binding upon Seller and Buyer, their respective successors and assigns.  Any assignment by Buyer shall not require Seller's prior written approval provided such assignee agrees to observe Buyer's covenant of quiet enjoyment under the Lease Agreement.  Seller shall not assign any interest in this Agreement without Buyer's prior written consent.

10.     **Survival of Covenants**.  Buyer and Seller agree that the warranties, covenants and agreements contained in this Agreement shall survive the passing of title to the Property.

11.     **Miscellaneous**.  Section titles are not intended to, and shall not limit or otherwise affect the interpretation of this Agreement.  If any provision of this Agreement shall be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions hereof shall not be affected or impaired in any way.  Any modifications to this Agreement shall be in writing and shall be signed by both parties and their last known assignees, if any.  Any terms capitalized herein shall have the meaning set forth in the Master Lease, the Schedule, and the MPPA which are incorporated herein by reference.

12.     **Entire Agreement**.  Seller and Buyer agree that this Agreement, the Lease and the MPPA, together with any amendments, supplements or riders thereto, shall constitute the entire agreement between the parties with respect to the Property and shall supersede all proposals, oral or written, all prior negotiations and all other communications.

13.     **Legal and Administrative Expenses**.  Seller shall reimburse Buyer for all charges, costs, expenses and attorney fees incurred by Buyer in connection with this sale/leaseback transaction.

14.     **No Brokers Fee**.  Each party represents it has retained no brokers in this transaction and indemnifies the other party against any brokers' or other fees which might result from the indemnifying party's actions.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their authorized representatives as of the day and year first above written.

[Signature(s) on following page]

3

CONFIDENTIAL

ONSET_00034290
FBG_CH1_00090518

[Sale and Leaseback Agreement Signature Page to Lease Schedule No. 015]

BUYER:                                        SELLER:

**ONSET FINANCIAL, INC.**                     **TRICO PRODUCTS CORPORATION**

BY:  _____                  BY:  _____
         Lindsay Fellmeth
TITLE:   Vice President                        TITLE:   __4.20.2021_____

1

CONFIDENTIAL                                                              ONSET_00034291
                                                                          FBG_CH1_00090519

**DEBTORS' EXHIBIT NO. 175**
**Page 294 of 1907**

# Exhibit 5

FBG_CH1_00090520

**DEBTORS' EXHIBIT NO. 175**
**Page 295 of 1907**

## MASTER PROGRESS PAYMENT AGREEMENT

Reference is made to that Master Lease Agreement No. OFI1045321 dated May 9, 2018 ("Master Lease") between **ONSET FINANCIAL, INC.** ("Lessor") and **TRICO PRODUCTS CORPORATION** ("Lessee"). In connection with the Master Lease, Lessor and Lessee have or intend to enter into one or more Lease Schedules by and between Lessor and Lessee (each Lease Schedule together with the Master Lease is referred to herein collectively as the "Lease" and is incorporated herein and by this reference is made a part of this Agreement) pursuant to which Lessor will lease to Lessee certain items of Property listed on said Lease (the "Property"). All capitalized terms used herein but not defined herein shall have the meanings ascribed to them in the Lease.

With regard to each Lease executed and delivered by Lessee, Lessee may request Lessor to purchase and pay for certain items of Property to be leased thereunder prior to the commencement of such Lease. Provided Lessee (i) completes, executes and delivers to Lessor an Acceptance and Delivery and Approval for Progress Payment Certificate ("Certificate") in form acceptable to Lessor, and such Certificate directs Lessor to make payment and is consistent with all terms and conditions of this Agreement and the Lease, (ii) is not in default of this Agreement or the Lease, and (iii) has paid Lessor a non-refundable disbursement fee of $250.00 for each Certificate that has a total disbursement amount of more than $25,000.00 or, if Lessee delivers to Lessor, simultaneously, a set of Certificates with a total disbursement amount of more than $25,000.00, then for each such set of Certificates (each a "Disbursement Fee"), Lessor agrees to make payments against the purchase price for such items of Property. All such payments made by Lessor shall be referred to herein as "Progress Payment(s)".

Upon Lessor's payment of any Progress Payment hereunder, title to the items of Property paid by such Progress Payment shall vest in Lessor and Lessee hereby sells and assigns its purchase orders and contracts and all of its right, title and interest to such items of Property to Lessor. From the date risk of loss passes from each vendor as to items of Property paid for by Lessor hereunder, Lessee shall bear all risk of loss, and Lessee shall assume and be responsible for all of Lessee's obligations with respect to such items of Property as specified in the Lease.

In consideration of each Progress Payment made by Lessor pursuant to this Agreement, Lessee agrees to pay to Lessor the Disbursement Fee(s) pursuant to one or more Certificates as described above and a daily pro-rata interim "Progress Payment Charge" calculated by multiplying the "Lease Rate Factor" specified in the applicable Lease times the amount of such Progress Payment divided by 30. The daily Progress Payment Charges shall accumulate and be payable monthly in arrears on the last day of each such month. The daily Progress Payment Charges shall begin on the date Lessee authorizes Lessor to disburse the Progress Payment and shall continue until all items of Property specified in the Lease are installed, tested and are finally accepted by Lessee as evidenced by Lessee's execution and delivery of the final "Acceptance and Delivery Certificate" required under the Lease. If any Progress Payment Charge due under this Agreement shall be unpaid ten (10) days after its due date, Lessor shall be entitled to collect late charges from Lessee pursuant to Paragraph 2 of Section 3 of the Master Lease.

Notwithstanding any other provision in this Agreement, Lessee agrees that 1) if any Lease for which Progress Payments have been made is not fully executed and delivered and/or the Property is not accepted under such Lease within ninety (90) days after the first Progress Payment is made for items of Property covered by such Lease, or 2) if Lessee breaches any of its obligations under this Agreement, the Certificate(s), or the Lease, or 3) if there is a material adverse change in the creditworthiness or financial condition of Lessee or any Guarantor of the Lease as determined by Lessor in its sole discretion, or 4) if there is a material adverse change in market conditions which affects Lessor's ability to secure nonrecourse underwriting for the Lease under the same terms, conditions and pricing as when this Agreement was entered into by Lessor and Lessee, then Lessor may, in its sole discretion, do one or more of the following: (i) collect all Progress Payment Charges due under this Agreement, all unpaid Disbursement Fees and all amounts due under the Lease, (ii) cease disbursing Progress Payments, (iii) begin the Lease term for those items of Property paid under any Progress Payment without requiring Lessee to execute an Acceptance and Delivery Certificate, (iv) require Lessee to reimburse Lessor for all Progress Payments made, together with all unpaid daily Progress Payment Charges and other charges due under the Lease, including but not limited to the Stipulated Loss Value as set forth in the Lease, and (v) exercise any rights or remedies under the Lease and at law or in equity. The occurrence of any of the events specified in 1) through 4) above shall constitute an Event of Default under the Lease. Lessee shall reimburse Lessor upon demand for all of its collection and enforcement costs (including legal fees). In the case of (i) above, accrued daily Progress Payment Charges shall be immediately due and payable, and shall continue to accrue, both before and after entry of any judgment, until all Progress Payments and all accrued Progress Payment Charges, are paid in full. In the case of (iii) above, Lessee hereby grants Lessor Power of Attorney to execute said Acceptance and Delivery Certificate on Lessee's behalf. In the case of (iv) above, upon Lessor's receipt of all amounts, charges, and reimbursements required and any unpaid Disbursement Fees, Lessor will convey, without representation or warranty, its rights and interests in such Property to Lessee and reassign to Lessee all purchase orders, invoices and contracts it has received for such Property. Lessor's failure promptly to enforce any right or remedy under this Agreement or the Lease shall not operate as a waiver of such right or remedy, and Lessor's waiver of any default shall not constitute a waiver of any subsequent or other default.

Dated: May 9, 2018

LESSOR:                                              LESSEE:

**ONSET FINANCIAL, INC.**                            **TRICO PRODUCTS CORPORATION**

BY: _____                 BY: _____
      Cathy Lawrence
TITLE:   Vice President                              TITLE: _____

O:\Leases\Trico\Master\Master Docs\Genl\MPPA Executable 05.22.18.rtf              *[SIGNATURE PAGE TO FOLLOW]*

CONFIDENTIAL                                                          ONSET_00034790
                                                                     FBG_CH1_00090521

**DEBTORS' EXHIBIT NO. 175**
**Page 296 of 1907**

LESSOR:                                                  LESSEE:

ONSET FINANCIAL, INC.                                    TRICO PRODUCTS CORPORATION

BY:  _____                           BY:  _____
     Cathy Lawrence                                           Stephen Graham
TITLE:  Vice President                                   TITLE:  Chief Financial Officer, Treasurer and Secretary

*[Signature Pages – Master Progress Payment Agreement ]*

CONFIDENTIAL

ONSET_00034791
FBG_CH1_00090522

**DEBTORS' EXHIBIT NO. 175**
**Page 297 of 1907**

# Exhibit 6

FBG_CH1_00090523

**DEBTORS' EXHIBIT NO. 175**
**Page 298 of 1907**



### LEASE SCHEDULE NO. 028
### TO
### MASTER LEASE AGREEMENT NO. OFI1045321



This Lease Schedule No. 028 dated August 1, 2023 (the "Schedule") between **ONSET FINANCIAL, INC.** (the "Lessor") and **TRICO PRODUCTS CORPORATION** (the "Lessee") incorporates by reference the terms and conditions of Master Lease Agreement No. OFI1045321 dated May 9, 2018 (the "Master Lease"), the Master Progress Payment Agreement dated May 9, 2018 (the "MPPA"), the Exhibit A ("Property") and the Exhibit B ("Stipulated Loss Schedule"), and constitutes a separate lease between Lessor and Lessee and is referred to herein as the "Lease". Lessor shall have the right to replace this Schedule with multiple Schedules and to replace the related Stipulated Loss Schedules with multiple Stipulated Loss Schedules for the purpose of segregating the Property into separate Lease Schedules. All capitalized terms used herein but not defined herein shall have the same meanings ascribed to them in the Master Lease.

SECTION 1     PROPERTY: Manufacturing equipment and other items of Property purchased or paid for by Lessor pursuant to the MPPA, including without limitation all Certificates signed in connection with said MPPA which relate to this Schedule, all of which shall be more fully described in an Exhibit A to the Acceptance and Delivery Certificate, together with any and all attachments, accessions, additions, enhancements and replacements thereto (collectively, the "Property"). Software and soft costs collectively shall not exceed 20% of the Total Property Cost.

The Property subject to this Schedule shall be more fully described on the Exhibit A to the Acceptance and Delivery Certificate which shall be later executed by Lessee in connection with this Schedule. Upon Lessee's execution of the Acceptance and Delivery Certificate, this Section 1 shall be amended automatically to include all such Property.

SECTION 2     PROPERTY LOCATION: Location(s) as set forth on the Exhibit A to the Acceptance and Delivery Certificate.

SECTION 3     BASE PERIOD: Thirty-six (36) months starting on the Lease Commencement Date

SECTION 4     TOTAL PROPERTY COST NOT TO EXCEED: $4,000,000.00

SECTION 5     MONTHLY LEASE RATE FACTOR: 0.02925

SECTION 6     MONTHLY RENTAL: $117,000.00, plus applicable sales/use and property tax

SECTION 7     RENTAL FREQUENCY: Monthly in advance

SECTION 8     THIS SECTION INTENTIONALLY LEFT BLANK

SECTION 9     DATE OF ACCEPTANCE: As specified in the Acceptance and Delivery Certificate

SECTION 10   FLOATING LEASE RATE FACTOR: The Monthly Lease Rate Factor indicated in Section 5, shall increase .00006776 for every five (05) basis point increase in thirty-six (36) month U.S. Treasury Notes as of the Date of Acceptance of the Property (the "Amended Monthly Lease Rate Factor"), at which time the Monthly Rental under this Schedule shall be adjusted by multiplying the Total Property Cost, indicated in Section 4, by the Amended Monthly Lease Rate Factor. The thirty-six (36) month U.S. Treasury Note yield used as the basis for the calculation of the Amended Monthly Lease Rate Factor herein is 4.57%.

CONFIDENTIAL

ONSET_00034827
FBG_CH1_00090524

**DEBTORS' EXHIBIT NO. 175**
**Page 299 of 1907**

ORIGINAL

SECTION 11   ADDITIONAL PROVISIONS:

a.  PAYMENT BY ELECTRONIC TRANSFER:  In the event that a Monthly Rental payment and other monies due under the Lease are not received by Lessor or its assigns within ten (10) days of the due date, Lessee authorizes Lessor or its assigns to electronically transfer payment due under any past due invoice from Lessee's account maintained with its financial institution, and Lessee agrees to execute and deliver a written "Authorization for Electronic Transfer" form to Lessor to affect such transfers. Failure or refusal of Lessee to authorize such transfers or failure of Lessor or its assigns to receive such payments by electronic transfer shall constitute an additional Event of Default under Section 18 of the Master Lease. Upon the occurrence of the Event of Default specified above, Lessor shall be entitled to exercise its rights and remedies under the Lease.

b.  EARLY TERMINATION OPTION:  For purposes of this Schedule only, provided no Event of Default has occurred and is continuing under the Lease, and further provided Lessor has received twelve (12) Base Period Monthly Rental payments and Lessee has provided Lessor thirty (30) days prior written notice, Lessee may elect to early terminate this Schedule and to purchase the Property for an amount equal to the then "Current Stipulated Loss Value" (defined as the Stipulated Loss Value specified in the attached Exhibit B corresponding to the most recent payment made by Lessee), together with all applicable taxes and other amounts due under the Lease, including but not limited to sales and use tax, property tax, late charges, and any and all other sums due.  Lessor's sale of Property to the Lessee pursuant to this clause shall be on an "as-is, where-is" basis, without any representation or warranty by, or recourse to, the Lessor, except as to the absence of liens created by or through Lessor.

c.  INSPECTION:  Pursuant to the terms and conditions of the Master Lease, Lessor requires a third-party inspection of each item of Property.  Upon Lessor's receipt of a satisfactory third-party inspection of the Property evidencing that the Property is delivered, installed and in good working order and condition, Lessor will provide Lessee a final Acceptance and Delivery Certificate, as provided in the Master Lease. Upon receipt of the final Acceptance and Delivery Certificate, and further upon Lessee's inspection, satisfaction and acceptance of the Property (subject to the terms and conditions of the Master Lease), Lessee shall execute and deliver to Lessor the final Acceptance and Delivery Certificate.

d.  WAIVERS:  For purposes of this Lease and to ensure that Lessor shall be granted all right, title and interest in and to the Property, and to further ensure that Lessor shall be indemnified from and against any loss or damage it might incur resulting from liens, claims, security interest or encumbrances existing or of records against the Property Location or the Property, Lessee agrees to provide to Lessor any documentation requested, including but not limited to bills of sale, waivers of interest, lien releases, mechanic's lien releases, mortgagee waivers, and any additional waivers (collectively the "Waivers").  Unless otherwise agreed to in writing by Lessor, Lessee's failure to provide Waivers shall constitute an additional Event of Default under the Lease.

e.  ADDITIONAL REMEDIES ON DEFAULT- INJUNCTIVE RELIEF:  Upon the occurrence of a monetary Event of Default under the Lease, upon demand by Lessor, in addition to the remedies set forth in Section 18 of the Master Lease, Lessee shall thereupon immediately cease the use of any and all Property under each and every Schedule under the Master Lease whether such use is by Lessee or any affiliate of Lessee.  In the enforcement of the remedies described in this Section, Lessor shall be entitled to an injunction restraining Lessee, or any of Lessee's affiliates, from using the Property and any Property under any other Schedules executed in connection with the Master Lease.  Lessee agrees that a violation of such will cause immediate and irreparable damage to Lessor and that the detriment which Lessor will suffer as a result of a breach by Lessee of the obligations contained in the Lease cannot be adequately compensated by monetary damages, and therefore Lessor shall be entitled to injunctive and other equitable relief to enforce the provisions of this Section.

Nothing contained herein shall prohibit Lessor from also pursuing any other remedies available under the Master Lease, the Schedule, or otherwise at law, and no action by Lessor in pursuing any other remedies

\\FIREANS\WINS\LOSFI Loss&Lease Operations\Master &Iease Schedule Documents\Lease Schedule - FF.docx

CONFIDENTIAL

ONSET_00034828
FBG_CH1_00090525

ORIGINAL

shall constitute an election to forego other remedies. Lessee agrees that the foregoing remedies are in addition to all other rights and remedies available to Lessor under the Master Lease, the Schedule, or otherwise available provided by law. In connection with Lessor's exercise of any or all of the above-listed remedies, Lessor shall be entitled to recover all costs and expenses incurred by Lessor in the enforcement of the Lease and/or the exercise of its rights hereunder, including in disabling the Property, including without limitation, reasonable attorney fees and costs incurred by Lessor. In the event of enforcement by Lessor through judicial proceedings, Lessee hereby waives any requirement that Lessor post a bond. Lessor's failure to promptly enforce any right or remedy hereunder shall not operate as a waiver of such right or remedy, and Lessor's waiver of any default shall not constitute a waiver of any subsequent or other default. Lessee further agrees that the rights and remedies available to Lessor under the Lease may be enforced by specific performance, including by injunction.

f.   SELF-MAINTENANCE:  For purposes of this Schedule only, Lessee shall, and at its own expense, either (i) enter into and maintain in force a contract with the manufacturer or other qualified maintenance organization satisfactory to Lessor for maintenance of the Property; or (ii) self-maintain the Property in accordance with the manufacturer's standard maintenance agreement. Such contract or self-maintenance as to the Property shall commence upon the earlier of the Certificate Date, if applicable, or the Date of Acceptance. Upon Lessor's request, Lessee shall furnish Lessor with a copy of such contract or provide to Lessor satisfactory evidence of self-maintenance.

g.   CURRENCY:  Unless otherwise specifically stated, all monies referenced in the Lease and any accompanying documents shall be deemed to be in U.S. Dollars. All payments due to Lessor and/or its assigns, shall be due and payable in U.S. Dollars.

h.   AMENDMENT AUTHORIZATION:  Lessee agrees that upon determination of the conversion rate from any foreign currency to USD, as applicable, which determination shall take place at the time of the respective funding, this Schedule, together with any and all applicable related documents, shall be amended to reflect in USD, the final Total Property Cost, Monthly Rental and Deposit.

i.   BAILEE:  Notwithstanding anything to the contrary contained herein or in the Master Lease, Lessor and Lessee acknowledge and agree that Lessee may deliver possession of the Property to one or more related companies (collectively, the "Bailee"). Inasmuch as the Property may be located at and in use by the Bailee, Lessee agrees, to (i) cooperate with Lessor in protecting Lessor's interests in the Property, (ii) authorize Lessor to take any measures necessary to protect its ownership and/or interest in the Property, and (iii) execute, or cause each Bailee to execute, any further documentation and to take any further actions, reasonably requested by Lessor to evidence ownership or to perfect the security interest granted under the Lease or to effectuate the rights granted to Lessor under the Lease.

j.   MASTER LEASE TERMS AND CONDITIONS:  Unless otherwise specifically modified herein, all terms and conditions of the Master Lease shall continue to be in full force and effect without change.

SECTION 12   REPRESENTATION OF LESSEE:  Lessor and Lessee agree that this Schedule is a "Finance Lease" as defined by the Uniform Commercial Code Article 2A, in that (i) Lessee has selected the Property in its sole discretion, (ii) Lessor has acquired the Property solely for the purpose of leasing such Property under this Schedule, and (iii) Lessee has received a copy of the contract evidencing Lessor's purchase of the Property.

[Signature(s) on following page]

\\GSJ-VS-WPS01 USP1 Email.com Operations Master Library Schedule Document Lease Schedule - DF.docx

CONFIDENTIAL

ONSET_00034829
FBG_CH1_00090526

DEBTORS' EXHIBIT NO. 175
Page 301 of 1907

[Lease Schedule No. 028 Signature Page]

**ORIGINAL**

LESSOR:                                                          LESSEE:

**ONSET FINANCIAL, INC.**                                        **TRICO PRODUCTS CORPORATION**

BY:                                                              BY:

      Lindsay Fellmeth                                       Edward James
TITLE:    Vice President                                         TITLE:    Executive Vice President

Page 4 of 4

\\CTSBN-WTSOL\OFI_Local\Lease Operations\Master Library\Blanket Document Lease Schedule - PLdot

CONFIDENTIAL

ONSET_00034830
FBG_CH1_00090527

**DEBTORS' EXHIBIT NO. 175**
**Page 302 of 1907**

**EXHIBIT B**
**STIPULATED LOSS SCHEDULE**
**DATED DECEMBER 04, 2024**
**TO**
**LEASE SCHEDULE NO. 028**
**DATED AUGUST 01, 2023**
**TO**
**MASTER LEASE AGREEMENT NO. OFI1045321**
**STIPULATED LOSS VALUE TABLE**

ORIGINAL

| AFTER MONTHLY PAYMENT | TOTAL STIPULATED LOSS VALUE | STIPULATED LOSS PERCENTAGE | AFTER MONTHLY PAYMENT | TOTAL STIPULATED LOSS VALUE | STIPULATED LOSS PERCENTAGE |
|---|---|---|---|---|---|
| 0 | $4,797,368 | 120.00% | 19 | $3,232,589 | 80.61% |
| 1 | $4,737,236 | 118.50% | 20 | $3,127,778 | 78.24% |
| 2 | $4,656,772 | 116.48% | 21 | $3,046,280 | 76.20% |
| 3 | $4,575,689 | 114.45% | 22 | $2,948,990 | 73.77% |
| 4 | $4,493,981 | 112.41% | 23 | $2,851,072 | 71.32% |
| 5 | $4,411,644 | 110.35% | 24 | $2,752,522 | 68.85% |
| 6 | $4,363,091 | 109.14% | 25 | $2,653,338 | 66.37% |
| 7 | $4,277,929 | 107.01% | 26 | $2,553,513 | 63.87% |
| 8 | $4,192,146 | 104.86% | 27 | $2,453,045 | 61.36% |
| 9 | $4,105,739 | 102.70% | 28 | $2,351,929 | 58.83% |
| 10 | $4,018,702 | 100.52% | 29 | $2,255,690 | 56.42% |
| 11 | $3,931,032 | 98.33% | 30 | $2,152,362 | 53.84% |
| 12 | $3,842,723 | 96.12% | 31 | $2,048,409 | 51.24% |
| 13 | $3,753,771 | 93.90% | 32 | $1,943,830 | 48.62% |
| 14 | $3,687,033 | 92.23% | 33 | $1,838,620 | 45.99% |
| 15 | $3,595,411 | 89.93% | 34 | $1,732,775 | 43.34% |
| 16 | $3,503,160 | 87.63% | 35 | $1,626,292 | 40.68% |
| 17 | $3,410,275 | 85.30% | 36 | $1,519,167 | 38.00% |
| 18 | $3,316,753 | 82.96% | | and thereafter | |

This Stipulated Loss Schedule replaces and supercedes any and all Stipulated Loss Schedules signed previously in connection with Lease Schedule No. 028

The Stipulated Loss Value for any item of lost, damaged or destroyed Property shall be the Lessor's original cost of such item of Property multiplied by the Stipulated Loss Percentage indicated in the above table which corresponds to the month of the Lease after the Lease Commencement Date in which the last Monthly Rental payment was made. In the event of a total loss or destruction, the Stipulated Loss Value for all lost or damaged Property shall be equal to the percentage or dollar amount, as the case may be, listed under the Total Stipulated Loss Value indicated above which corresponds to the month of the Lease after the Lease Commencement Date in which the last Monthly Rental payment was made. If a partial or total loss occurs at any time prior to the Lease Commencement Date of the Lease, then the Stipulated Loss Value shall be equal to 120% of the total amount funded. In the event the Lease is continued for any reason, then the last percentage or dollar amount, as the case may be, shown above shall control throughout any such continued term.

In the event of default under the Lease, Lessor may, in addition to all other remedies available to it under the Lease, recover the dollar amount listed under the Total Stipulated Loss Value indicated above as of the Monthly Rental payment date immediately preceding the date of the default.

[Signature(s) on following page]

CONFIDENTIAL

ONSET_00034833
FBG_CH1_00090528

ORIGINAL

[STIPULATED LOSS SCHEDULE DATED DECEMBER 04, 2024 TO LEASE SCHEDULE NO. 028 SIGNATURE PAGE]

LESSOR:

ONSET FINANCIAL, INC.

BY: _____
Lindsay Fellmeth
TITLE: Vice President

LESSEE:

TRICO PRODUCTS CORPORATION

BY: _____
Edward James
TITLE: Executive Vice President

CONFIDENTIAL

ONSET_00034834
FBG_CH1_00090529



## AMENDMENT NO. 1
## TO
## LEASE SCHEDULE NO. 028
## TO
## MASTER LEASE AGREEMENT NO. OFI1045321



Reference is made to Lease Schedule No. 028 dated August 1, 2023, including any amendments thereto, (collectively, the "Schedule") between **ONSET FINANCIAL, INC.** (the "Lessor") and **TRICO PRODUCTS CORPORATION** (the "Lessee") to Master Lease Agreement No. OFI1045321 dated May 9, 2018 (the "Master Lease"). The Schedule as it incorporates the terms and conditions of the Master Lease is referred to herein as the "Lease". Pursuant to the Lease, Lessor has agreed to purchase and lease to Lessee property specified in the Lease. All capitalized terms used herein but not defined herein shall have the same meanings ascribed to them in the Lease.

The Schedule, as originally signed, was based on Property with a Total Property Cost Not To Exceed $4,000,000.00. The revised Total Property Cost is $3,997,807.01. Based on the decreased Total Property Cost, the Schedule is hereby amended effective the date hereof by deleting Sections 1, 4, and 6 and replacing them with the following:

SECTION 1    PROPERTY: Manufacturing equipment together with any and all attachments, accessions, additions, enhancements and replacements thereto, all as more fully described on the Exhibit A to the Acceptance and Delivery Certificate.

SECTION 4    TOTAL PROPERTY COST: $3,997,807.01

SECTION 6    MONTHLY RENTAL: $116,935.86, plus applicable sales/use tax and property tax

The Schedule shall be further amended by deleting Section 10 in its entirety.

All other terms and conditions of the Lease shall remain in full force and effect without change.

Dated: December 4, 2024

[Signature(s) on following page]

\\TSI-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Schedule Documents\028 Amendment - PF.docx

CONFIDENTIAL

ONSET_00034825
FBG_CH1_00090530

**DEBTORS' EXHIBIT NO. 175**
**Page 305 of 1907**

[Amendment No. 1 to Lease Schedule No. 028 Signature Page]

*ORIGINAL*

LESSOR:                                          LESSEE:

**ONSET FINANCIAL, INC.**                        **TRICO PRODUCTS CORPORATION**

BY: _____                   BY: _____
    Lindsay Fellmeth                                Edward James
TITLE:   Vice President                       TITLE:   Executive Vice President

Page 2 of 2

\\ITS\AVS-WRS01\USP1\Local\Lease Operations\Master Library\Schedule Documents\028 Amendment - PP.docx

CONFIDENTIAL

ONSET_00034826
FBG_CH1_00090531



## ACKNOWLEDGEMENT AND WAIVER

This Acknowledgement and Waiver is given April 7, 2021 by **BRAKE PARTS INC LLC** ("Bailee") of 4400 Prime Parkway, McHenry, Illinois 60050 to **ONSET FINANCIAL, INC.** ("Onset") of 274 West 12300 South, Draper, Utah 84020 as it relates to the following premises: 2701 Keystone Pacific Parkway, Suite 100, Patterson, California 95363 (the "Premises").

Bailee is a Affiliate of **TRICO PRODUCTS CORPORATION** (the "Lessee"). Bailee acknowledges that pursuant to one or more lease schedules (the "Schedules") which Onset, as Lessor, has or may enter into with Lessee, each of which Schedules incorporate by reference the terms and conditions of that Master Lease Agreement No. OFI1045321 dated May 9, 2018, including any amendments thereto, between Onset and Lessee (the "Master Lease"), Onset has or may lease items of property (all or any part thereof referred to herein as the "Property") to Lessee. Bailee further acknowledges that from time to time Lessee may deliver possession of such Property to Bailee for use in its operations.

As an inducement to Onset to enter into the Schedules, Bailee represents and warrants to Onset as follows:

1.  Bailee's possession, use and control of any Property is, and will always be, subject to all of the terms and conditions of the Schedule and Master Lease and subordinate to all of Onset's and Lessee's rights, interests and remedies under the Schedules.

2.  Bailee disclaims and waives any ownership, leasehold or other interest in the Property.

3.  While in Bailee's possession and control, Bailee will not permit the Property to be removed from the Premises specified in the first paragraph above, and Bailee will maintain and keep the Property in good operating conditions at that location and will permit Onset and its agents to inspect the Property at reasonable times.

4.  Bailee will not permit the Property to become subject to any liens or encumbrances by Bailee or by parties claiming through Bailee. Upon request from Lessor, Bailee agrees to cooperate with and assist Lessor in obtaining any landlord and/or mortgage waivers as Lessor deems necessary to effectuate the purposes set forth herein and in the Lease.

5.  Bailee hereby authorizes Onset to file UCC financing statements and other documents against Bailee evidencing Onset's right and interest in the Property and Schedules.

6.  Bailee acknowledges Onset's right to assign its rights and interests under this instrument to its underwriters and assigns, and any such assignee shall be an intended third-party beneficiary under this instrument.

7.  Bailee acknowledges that, in the event of a default by Lessee in any of its obligations or agreements to Lessor, it is hereby agreed that Lessor may exercise any and all of its available default rights and remedies including, but not limited to, the repossession and sale of the Property. If the Property is in Bailee's possession, Bailee will make the Property available to Lessor on demand.

[Signature(s) on following page]

Page 1 of 2

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Acknowledgment & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00034794
FBG_CH1_00090532

[Acknowledgement and Waiver Signature Page]

**BRAKE PARTS INC LLC**

BY: _____

NAME:     Edward James

TITLE:     Executive Vice President

Page 2 of 2

WPSI-US-WP501.OSFI.Local\Lease Operations\Master Library\Acknowledgment & Waiver A&W - OFI.docx

CONFIDENTIAL

ONSET_00034795
FBG_CH1_00090533

**DEBTORS' EXHIBIT NO. 175**
**Page 308 of 1907**



## ACKNOWLEDGEMENT AND WAIVER

This Acknowledgement and Waiver is given May 9, 2018 by **BRAKE PARTS INC LLC** ("Bailee") of 4400 Prime Parkway, McHenry, IL 60050 to **ONSET FINANCIAL, INC.** ("Onset") of 274 West 12300 South, Draper, Utah 84020 as it relates to the following premises: 1100 Corporate Drive, McHenry, Illinois 60050, 1300 Corporate Drive, McHenry, Illinois 60050, 1380 Corporate Drive, McHenry, Illinois 60050 and 4400 Prime Parkway, McHenry, IL 60050 (the "Premises").

Bailee is a related entity of **TRICO PRODUCTS CORPORATION** (the "Lessee"). Bailee acknowledges that pursuant to one or more lease schedules (the"Schedules") which Onset, as Lessor, has or may enter into with Lessee, each of which Schedules incorporate by reference the terms and conditions of that Master Lease Agreement No. OFI1045321 dated May 9, 2018, including any amendments thereto, between Onset and Lessee (the "Master Lease"), Onset has or may lease items of property (all or any part thereof referred to herein as the "Property") to Lessee. Bailee further acknowledges that from time to time Lessee may deliver possession of such Property to Bailee for use in its operations.

As an inducement to Onset to enter into the Schedules, Bailee represents and warrants to Onset as follows:

1. Bailee's possession, use and control of any Property is, and will always be, subject to all of the terms and conditions of the Schedule and Master Lease and subordinate to all of Onset's and Lessee's rights, interests and remedies under the Schedules.

2. Bailee disclaims and waives any ownership, leasehold or other interest in the Property.

3. While in Bailee's possession and control, Bailee will not permit the Property to be removed from the Premises specified in the first paragraph above, and Bailee will maintain and keep the Property in good operating conditions at that location and will permit Onset and its agents to inspect the Property at reasonable times.

4. Bailee will not permit the Property to become subject to any liens or encumbrances by Bailee or by parties claiming through Bailee. Upon request from Lessor, Bailee agrees to cooperate with and assist Lessor in obtaining any landlord and/or mortgage waivers as Lessor deems necessary to effectuate the purposes set forth herein and in the Lease.

5. Bailee hereby authorizes Onset to file UCC financing statements and other documents against Bailee evidencing Onset's right and interest in the Property and Schedules.

6. Bailee acknowledges Onset's right to assign its rights and interests under this instrument to its underwriters and assigns, and any such assignee shall be an intended third-party beneficiary under this instrument.

7. Bailee acknowledges that, in the event of a default by Lessee in any of its obligations or agreements to Lessor, it is hereby agreed that Lessor may exercise any and all of its available default rights and remedies including, but not limited to, the repossession and sale of the Property. If the Property is in Bailee's possession, Bailee will make the Property available to Lessor on demand.

[Signature(s) on following page]

Page 1 of 2

S:\TSJ-VS-WPS01\OSFI Local\Lease Operations\Master Library\Acknowledgement & Waiver\A&W - OFI.docx

CONFIDENTIAL

ONSET_00035051
FBG_CH1_00090534

[Acknowledgement and Waiver Signature Page]

**BRAKE PARTS INC LLC**

BY: _____

NAME: ____Edward James_____

TITLE: ____Executive Vice President____

Page 2 of 2

\\TSJ-VS-WES03\GSPLLocal\Lease Operations\Master Library\Acknowledgment & Waiver\A&W - OP1.docx

CONFIDENTIAL

ONSET_00035052
FBG_CH1_00090535



## ACKNOWLEDGEMENT AND WAIVER

This Acknowledgement and Waiver is given April 7, 2021 **CHAMPION LABORATORIES, INC.** ("Bailee") of 200 South 4th Street, Albion, Illinois, 62806 to **ONSET FINANCIAL, INC.** ("Onset") of 274 West 12300 South, Draper, Utah 84020 as it relates to the following premises: 200 South 4th Street, Albion, Illinois, 62806 (the "Premises").

Bailee is a related party of **TRICO PRODUCTS CORPORATION** (the "Lessee"). Bailee acknowledges that pursuant to one or more lease schedules (the "Schedules") which Onset, as Lessor, has or may enter into with Lessee, each of which Schedules incorporate by reference the terms and conditions of that Master Lease Agreement No. OFI1045321 dated May 9, 2018, including any amendments thereto, between Onset and Lessee (the "Master Lease"), Onset has or may lease items of property (all or any part thereof referred to herein as the "Property") to Lessee. Bailee further acknowledges that from time to time Lessee may deliver possession of such Property to Bailee for use in its operations.

As an inducement to Onset to enter into the Schedules, Bailee represents and warrants to Onset as follows:

1. Bailee's possession, use and control of any Property is, and will always be, subject to all of the terms and conditions of the Schedule and Master Lease and subordinate to all of Onset's and Lessee's rights, interests and remedies under the Schedules.

2. Bailee disclaims and waives any ownership, leasehold or other interest in the Property.

3. While in Bailee's possession and control, Bailee will not permit the Property to be removed from the Premises specified in the first paragraph above, and Bailee will maintain and keep the Property in good operating conditions at that location and will permit Onset and its agents to inspect the Property at reasonable times.

4. Bailee will not permit the Property to become subject to any liens or encumbrances by Bailee or by parties claiming through Bailee. Upon request from Lessor, Bailee agrees to cooperate with and assist Lessor in obtaining any landlord and/or mortgage waivers as Lessor deems necessary to effectuate the purposes set forth herein and in the Lease.

5. Bailee hereby authorizes Onset to file UCC financing statements and other documents against Bailee evidencing Onset's right and interest in the Property and Schedules.

6. Bailee acknowledges Onset's right to assign its rights and interests under this instrument to its underwriters and assigns, and any such assignee shall be an intended third-party beneficiary under this instrument.

[Signature(s) on following page]

\\UTSI-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Acknowledgment & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00034796
FBG_CH1_00090536

[Acknowledgement and Waiver Signature Page]

**CHAMPION LABORATORIES, INC.**

BY: _____

NAME:  Ed James

TITLE:  EVP

Page 2 of 2

\\UTSJ-VS-WFS01.OSEI.Local\Lease Operations\Master Library\Acknowledgment & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00034797
FBG_CH1_00090537

**DEBTORS' EXHIBIT NO. 175**
**Page 312 of 1907**



## ACKNOWLEDGEMENT AND WAIVER

This Acknowledgement and Waiver is given June 24, 2022 by **CHAMPION LABORATORIES, INC.** ("Bailee") of 301 Industrial Drive, Albion, Illinois 62806 to **ONSET FINANCIAL, INC.** ("Onset") of 274 West 12300 South, Draper, Utah 84020 as it relates to the following premises: 301 Industrial Drive, Albion, Illinois 62806 (the "Premises").

Bailee is a subsidiary of **TRICO PRODUCTS CORPORATION** (the "Lessee"). Bailee acknowledges that pursuant to one or more lease schedules (the "Schedules") which Onset, as Lessor, has or may enter into with Lessee, each of which Schedules incorporate by reference the terms and conditions of that Master Lease Agreement No. OFI1045321 dated May 9, 2018, including any amendments thereto, between Onset and Lessee (the "Master Lease"), Onset has or may lease items of property (all or any part thereof referred to herein as the "Property") to Lessee. Bailee further acknowledges that from time to time Lessee may deliver possession of such Property to Bailee for use in its operations.

As an inducement to Onset to enter into the Schedules, Bailee represents and warrants to Onset as follows:

1.    Bailee's possession, use and control of any Property is, and will always be, subject to all of the terms and conditions of the Schedule and Master Lease and subordinate to all of Onset's and Lessee's rights, interests and remedies under the Schedules.

2.    Bailee disclaims and waives any ownership, leasehold or other interest in the Property.

3.    While in Bailee's possession and control, Bailee will not permit the Property to be removed from the Premises specified in the first paragraph above, and Bailee will maintain and keep the Property in good operating conditions at that location and will permit Onset and its agents to inspect the Property at reasonable times.

4.    Bailee will not permit the Property to become subject to any liens or encumbrances by Bailee or by parties claiming through Bailee. Upon request from Lessor, Bailee agrees to cooperate with and assist Lessor in obtaining any landlord and/or mortgage waivers as Lessor deems necessary to effectuate the purposes set forth herein and in the Lease.

5.    Bailee hereby authorizes Onset to file UCC financing statements and other documents against Bailee evidencing Onset's right and interest in the Property and Schedules.

6.    Bailee acknowledges Onset's right to assign its rights and interests under this instrument to its underwriters and assigns, and any such assignee shall be an intended third-party beneficiary under this instrument.

7.    Bailee acknowledges that, in the event of a default by Lessee in any of its obligations or agreements to Lessor, it is hereby agreed that Lessor may exercise any and all of its available default rights and remedies including, but not limited to, the repossession and sale of the Property. If the Property is in Bailee's possession, Bailee will make the Property available to Lessor on demand.

[Signature(s) on following page]

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Acknowledgment & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00034798
FBG_CH1_00090538

**DEBTORS' EXHIBIT NO. 175**
**Page 313 of 1907**

[Acknowledgement and Waiver Signature Page]

**CHAMPION LABORATORIES, INC.**

BY: _____

NAME:    Edward James

TITLE:    Executive Vice President

Page 2 of 2

\\UTSJ-VS-WFS01.DSF1.Local\Lease Operations\Master Library\Acknowledgements & Waiver A&W - OFI.docx

CONFIDENTIAL

ONSET_00034799
FBG_CH1_00090539

**DEBTORS' EXHIBIT NO. 175**
**Page 314 of 1907**



## ACKNOWLEDGEMENT AND WAIVER

This Acknowledgement and Waiver is given April 7, 2021 by **FRAMAUTO HOLDINGS, LLC** ("Bailee") of 127 Public Square, Cleveland, OH 44114 to **ONSET FINANCIAL, INC.** ("Onset") of 274 West 12300 South, Draper, Utah 84020 as it relates to the following premises: 851 Jackson Street, Greenville, OH 45331 (the "Premises").

Bailee is a related party of **TRICO PRODUCTS CORPORATION** (the "Lessee").   Bailee acknowledges that pursuant to one or more lease schedules (the "Schedules") which Onset, as Lessor, has or may enter into with Lessee, each of which Schedules incorporate by reference the terms and conditions of that Master Lease Agreement No. OFI1045321 dated May 9, 2018, including any amendments thereto, between Onset and Lessee (the "Master Lease"), Onset has or may lease items of property (all or any part thereof referred to herein as the "Property") to Lessee.  Bailee further acknowledges that from time to time Lessee may deliver possession of such Property to Bailee for use in its operations.

As an inducement to Onset to enter into the Schedules, Bailee represents and warrants to Onset as follows:

1.      Bailee's possession, use and control of any Property is, and will always be, subject to all of the terms and conditions of the Schedule and Master Lease and subordinate to all of Onset's and Lessee's rights, interests and remedies under the Schedules.

2.      Bailee disclaims and waives any ownership, leasehold or other interest in the Property.

3.      While in Bailee's possession and control, Bailee will not permit the Property to be removed from the Premises specified in the first paragraph above, and Bailee will maintain and keep the Property in good operating conditions at that location and will permit Onset and its agents to inspect the Property at reasonable times.

4.      Bailee will not permit the Property to become subject to any liens or encumbrances by Bailee or by parties claiming through Bailee.  Upon request from Lessor, Bailee agrees to cooperate with and assist Lessor in obtaining any landlord and/or mortgage waivers as Lessor deems necessary to effectuate the purposes set forth herein and in the Lease.

5.      Bailee hereby authorizes Onset to file UCC financing statements and other documents against Bailee evidencing Onset's right and interest in the Property and Schedules.

6.      Bailee acknowledges Onset's right to assign its rights and interests under this instrument to its underwriters and assigns, and any such assignee shall be an intended third-party beneficiary under this instrument.

[Signature(s) on following page]

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Acknowledgment & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00034800
FBG_CH1_00090540

**DEBTORS' EXHIBIT NO. 175**
**Page 315 of 1907**

[Acknowledgement and Waiver Signature Page]

**FRAMAUTO HOLDINGS, LLC**

BY: _____

NAME: _____Ed James_____

TITLE: EVP_____

Page 2 of 2

\\UTSJ-VS-WFS01.OSEI.Local\Lease Operations\Master Library\Acknowledgement & Waiver\A&W - OEI.dotx

CONFIDENTIAL

ONSET_00034801
FBG_CH1_00090541



## ACKNOWLEDGEMENT AND WAIVER

This Acknowledgement and Waiver is given August 15, 2023 by **STRONGARM, LLC** ("Bailee") of 3108 HWY 76 East, Marion, South Carolina 29571 to **ONSET FINANCIAL, INC.** ("Onset") of 274 West 12300 South, Draper, Utah 84020 as it relates to the following premises: 3108 HWY 76 East, Marion. South Carolina 29571 (the "Premises").

Bailee is an Affiliate of **TRICO PRODUCTS CORPORATION** (the "Lessee"). Bailee acknowledges that pursuant to one or more lease schedules (the "Schedules") which Onset, as Lessor, has or may enter into with Lessee, each of which Schedules incorporate by reference the terms and conditions of that Master Lease Agreement No. OFI1045321 dated May 9, 2018, including any amendments thereto, between Onset and Lessee (the "Master Lease"), Onset has or may lease items of property (all or any part thereof referred to herein as the "Property") to Lessee. Bailee further acknowledges that from time to time Lessee may deliver possession of such Property to Bailee for use in its operations.

As an inducement to Onset to enter into the Schedules, Bailee represents and warrants to Onset as follows:

1.  Bailee's possession, use and control of any Property is, and will always be, subject to all of the terms and conditions of the Schedule and Master Lease and subordinate to all of Onset's and Lessee's rights, interests and remedies under the Schedules.

2.  Bailee disclaims and waives any ownership, leasehold or other interest in the Property.

3.  While in Bailee's possession and control, Bailee will not permit the Property to be removed from the Premises specified in the first paragraph above, and Bailee will maintain and keep the Property in good operating conditions at that location and will permit Onset and its agents to inspect the Property at reasonable times.

4.  Bailee will not permit the Property to become subject to any liens or encumbrances by Bailee or by parties claiming through Bailee. Upon request from Lessor, Bailee agrees to cooperate with and assist Lessor in obtaining any landlord and/or mortgage waivers as Lessor deems necessary to effectuate the purposes set forth herein and in the Lease.

5.  Bailee hereby authorizes Onset to file UCC financing statements and other documents against Bailee evidencing Onset's right and interest in the Property and Schedules.

6.  Bailee acknowledges Onset's right to assign its rights and interests under this instrument to its underwriters and assigns, and any such assignee shall be an intended third-party beneficiary under this instrument.

7.  Bailee acknowledges that, in the event of a default by Lessee in any of its obligations or agreements to Lessor, it is hereby agreed that Lessor may exercise any and all of its available default rights and remedies including, but not limited to, the repossession and sale of the Property. If the Property is in Bailee's possession, Bailee will make the Property available to Lessor on demand.

[Signature(s) on following page]

Page 1 of 2

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Acknowledgment & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00034802
FBG_CH1_00090542

[Acknowledgement and Waiver Signature Page]

**STRONGARM, LLC**

BY: _____

NAME:   Edward James

TITLE:   Executive Vice President

\\UTSJ-VS-WFS01.OSEI.Local7\Lease Operations\Master Library\Acknowledgement & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00034803
FBG_CH1_00090543

**DEBTORS' EXHIBIT NO. 175**
**Page 318 of 1907**

## ACKNOWLEDGEMENT AND WAIVER

This Acknowledgement and Waiver is given May 9, 2018 by **TRICO TECHNOLOGIES CORPORATION** ("Bailee") of 1995 Billy Mitchell Boulevard, Brownsville, TX 78521, to **ONSET FINANCIAL, INC.** ("Onset") of 10813 S. River Front Parkway, Suite 450, South Jordan, UT 84095 as it relates to the following premises: 1995 Billy Mitchell Boulevard, Brownsville, TX (the "Premises").

Bailee is a wholly owned subsidiary of **TRICO PRODUCTS CORPORATION** (the "Lessee"). Bailee acknowledges that pursuant to one or more lease schedules (the "Schedules") which Onset, as Lessor, has or may enter into with Lessee, each of which Schedules incorporate by reference the terms and conditions of that Master Lease Agreement No. OFI1045321 dated May 9, 2018, including any amendments thereto between Onset and Lessee (the "Master Lease"), Onset has or may lease items of property (all or any part hereof herein referred to as the "Property") to Lessee. Bailee further acknowledges that from time to time Lessee may deliver possession of such Property to Bailee for use in its operations.

As an inducement to Onset to enter into the Schedules, Bailee represents and warrants to Onset as follows:

1. Bailee's possession, use and control of any Property is, and will always be, subject and subordinate to all of Onset's and Lessee's rights, interests and remedies under the Schedules.

2. Bailee disclaims and waives any ownership, leasehold or other interest in the Property.

3. While in Bailee's possession and control, Bailee will not permit the Property to be removed from the Premises specified in the first paragraph above, and Bailee will maintain and keep the Property in good operating conditions at that location and will permit Onset and its agents to inspect the Property at reasonable times.

4. Bailee will not permit the Property to become subject to any liens or encumbrances by Bailee or by parties claiming through Bailee. Upon request from Lessor, Bailee agrees to use commercially reasonable efforts to cooperate with and assist Lessor in obtaining any landlord and/or mortgage waivers as Lessor deems necessary to effectuate the purposes set forth herein and in the Lease.

5. Bailee hereby authorizes Onset to file UCC financing statements and other documents against Bailee evidencing Onset's right and interest in the Property and Schedules.

6. Bailee acknowledges Onset's right to assign its rights and interests under this instrument to its underwriters and assigns, and any such assignee shall be an intended third party beneficiary under this instrument.

**TRICO TECHNOLOGIES CORPORATION**

By: _____

Name: _____Stephen Graham_____

Title: _____CFO_____

CONFIDENTIAL

ONSET_00034804
FBG_CH1_00090544



## ACKNOWLEDGEMENT AND WAIVER

This Acknowledgement and Waiver is given February 20, 2024 by **TRICO TECHNOLOGIES CORPORATION** ("Bailee") of 127 Public Square, Suite 5300, Cleveland, Ohio 44114 to **ONSET FINANCIAL, INC.** ("Onset") of 274 West 12300 South, Draper, Utah 84020 as it relates to the following premises: 1900 Billy Mitchell Boulevard, Brownsville, Texas 78521 (the "Premises").

Bailee is an affiliate of **TRICO PRODUCTS CORPORATION** (the "Lessee"). Bailee acknowledges that pursuant to one or more lease schedules (the "Schedules") which Onset, as Lessor, has or may enter into with Lessee, each of which Schedules incorporate by reference the terms and conditions of that Master Lease Agreement No. OFI1045321 dated May 9, 2018, including any amendments thereto, between Onset and Lessee (the "Master Lease"), Onset has or may lease items of property (all or any part thereof referred to herein as the "Property") to Lessee. Bailee further acknowledges that from time to time Lessee may deliver possession of such Property to Bailee for use in its operations.

As an inducement to Onset to enter into the Schedules, Bailee represents and warrants to Onset as follows:

1.  Bailee's possession, use and control of any Property is, and will always be, subject to all of the terms and conditions of the Schedule and Master Lease and subordinate to all of Onset's and Lessee's rights, interests and remedies under the Schedules.

2.  Bailee disclaims and waives any ownership, leasehold or other interest in the Property.

3.  While in Bailee's possession and control, Bailee will not permit the Property to be removed from the Premises specified in the first paragraph above, and Bailee will maintain and keep the Property in good operating conditions at that location and will permit Onset and its agents to inspect the Property at reasonable times.

4.  Bailee will not permit the Property to become subject to any liens or encumbrances by Bailee or by parties claiming through Bailee. Upon request from Lessor, Bailee agrees to cooperate with and assist Lessor in obtaining any landlord and/or mortgage waivers as Lessor deems necessary to effectuate the purposes set forth herein and in the Lease.

5.  Bailee hereby authorizes Onset to file UCC financing statements and other documents against Bailee evidencing Onset's right and interest in the Property and Schedules.

6.  Bailee acknowledges Onset's right to assign its rights and interests under this instrument to its underwriters and assigns, and any such assignee shall be an intended third-party beneficiary under this instrument.

7.  Bailee acknowledges that, in the event of a default by Lessee in any of its obligations or agreements to Lessor, it is hereby agreed that Lessor may exercise any and all of its available default rights and remedies including, but not limited to, the repossession and sale of the Property. If the Property is in Bailee's possession, Bailee will make the Property available to Lessor on demand.

[Signature(s) on following page]

S:\UTSI-VS-WFS01\OSFI Local\Lease Operations Master Library\Acknowledgement & Waiver\A&W - OFI.docx

CONFIDENTIAL

ONSET_00035123
FBG_CH1_00090545

[Acknowledgement and Waiver Signature Page]

**TRICO TECHNOLOGIES CORPORATION**

BY: _____

NAME: Edward James

TITLE: Executive Vice President

Page 2 of 2

CONFIDENTIAL

ONSET_00035124
FBG_CH1_00090546

**DEBTORS' EXHIBIT NO. 175**
**Page 321 of 1907**



## ACCEPTANCE AND DELIVERY CERTIFICATE
## TO
## LEASE SCHEDULE NO. 028

Reference is made to Lease Schedule No. 028 dated August 1, 2023, including any amendments thereto, (collectively, the "Schedule") which incorporates the terms and conditions of Master Lease Agreement No. OFI1045321 dated May 9, 2018 (the "Master Lease") between **ONSET FINANCIAL, INC.** (the "Lessor") and **TRICO PRODUCTS CORPORATION** (the "Lessee"). The Master Lease and Schedule shall be referenced herein collectively as the Lease. All capitalized terms used herein but not defined herein shall have the same meanings ascribed to them in the Master Lease.

SECTION 1    PROPERTY: Manufacturing equipment as more fully described on the attached Exhibit A, which by reference becomes a part hereof, together with any and all attachments, accessions, additions, enhancements and replacements thereto (collectively, the "Property").

SECTION 2    PROPERTY LOCATION:  Location(s) of Lessee as set forth on the attached Exhibit A.

SECTION 3    DATE OF ACCEPTANCE: December 4, 2024

SECTION 4    CONDITION OF THE PROPERTY:  Lessee hereby acknowledges that all items of Property described in Section 1 have been delivered and received, have been properly installed, examined and tested and determined by Lessee to be in good working condition, operating satisfactorily in all respects, and for all of intended uses and purposes, and Lessee hereby unconditionally and irrevocably accepts the Property for all purposes under the Lease.

SECTION 5    DISBURSEMENTS:  By signature below Lessee hereby i) ratifies Lessor's prior payment, if any, for items of Property purchased or paid for by Lessor pursuant to all Certificates signed in connection with the Master Progress Payment Agreement and described on the attached Exhibit A, and ii) authorizes and directs Lessor to pay the purchase price for items of Property, if any, described on the attached Exhibit A which are not paid, all of which are covered under the Lease.

[Signature(s) on following page]

\\UTSA-US-WEB01\OFI Lease\Lease Operations\Master Library\Acceptance and Delivery\Acceptance & Delivery Certificate.doc

CONFIDENTIAL

ONSET_00034805
FBG_CH1_00090547

[Acceptance and Delivery Certificate Signature Page to Lease Schedule No. 028]

LESSEE: **TRICO PRODUCTS CORPORATION**

BY: _____

Edward James

TITLE:   Executive Vice President

Page 2 of 2

ONSET_00034806
FBG_CH1_00090548

**DEBTORS' EXHIBIT NO. 175**
**Page 323 of 1907**

CONFIDENTIAL

ONSET_00034807

EXHIBIT A

Trico Products Corporation
Master Lease No. DFI1048321
Lease Schedule No. 028

$3,997,807.01    $3,997,807.01

| ADDRESS | CITY | ST | ZIP | VENDOR | INVOICE NO. | INVOICE DATE | QTY | DESCRIPTION | IDENTIFICATION # | PC NO. | PER UNIT | UNIT TOTAL | INVOICE TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1900 & 1995 Billy Mitchell Blvd | Brownsville | TX | 78521 | UMD AUTOMATED SYSTEMS, INC. | 7212 7358 7438 7608 7605 | 03/29/2023 06/30/2023 07/26/2023 11/17/2023 12/13/2023 | 2 | RUBBER MIXING INSOURCE - 20" CANTILEVER BATCH OFF | | 1.1 1.2 1.3 1.4 | $467,472.00 | $934,944.00 | |
| | | | | | | | 1 | MECHANICAL SUPPORT | | 3.1 3.2 3.3 3.4 | $10,572.00 | $10,572.00 | |
| | | | | | | | 1 | START-UP PROGRAM SUPPORT | | 3.1 3.2 3.3 3.4 | $17,567.00 | $17,567.00 | $963,083.00 |
| 1900 & 1995 Billy Mitchell Blvd | Brownsville | TX | 78521 | UMD AUTOMATED SYSTEMS, INC. | 7258 7358 7432 7700 7701 | 04/27/2023 06/30/2023 07/26/2023 12/13/2023 12/13/2023 | 2 | RUBBER MIXING INSOURCE - ROTARY CUTTERS | | 2.1 2.2 2.3 2.4 | $101,371.00 | $202,742.00 | |
| | | | | | | | | | | 2.1 2.2 2.3 2.4 | | | $202,742.00 |
| 1900 & 1995 Billy Mitchell Blvd | Brownsville | TX | 78521 | E.S.I. EXTRUSION SERVICES, INC. | D-3273 C3273 M-3273 | 06/2/2023 08/23/2023 10/20/2023 | 2 | ACCUFLY CUTTERS | 2232731 2232732 | 3.1 3.3 3.3 3.1 3.3 3.3 | $71,550.00 | $143,100.00 | $143,100.00 |
| Champion Laboratories, Inc. located at 301 Industrial Drive | Albion | IL | 62806 | BRAD A. ATTEBERRY dba ATTEBERRY MACHINE & TOOL | 5415 5427 5428 | 7/27/2023 10/17/2023 10/17/2023 | 40 | AF3195 BOTTOM MOLD | | 4.1 4.2 | $650.00 | $26,000.00 | |
| | | | | | | | 40 | AF3195 TOP MOLD | | 4.1 4.2 | $550.00 | $22,000.00 | $48,000.00 |
| Brake Parts Inc LLC located at 2791 Keystone Pacific Parkway, Suite 100 | Patterson | CA | 95363 | IMPACT AUTOMATION, INC | 2404 2526 2550 | 06/26/2023 09/16/2023 10/24/2023 | 1 | MECHANICAL EQUIPMENT, INCLUDING BUT NOT LIMITED TO CONVEYOR BELTS, MOTORS, AND FRAMES, PHOTOEYES FOR AUTOMATED SENSORS, ELECTRICAL BOXES AND WIRING FOR THE SYSTEM | | 5.1 5.2 | $76,145.00 | $76,145.00 | |
| | | | | | | | 1 | INSTALLATION | | 5.1 5.2 | $48,037.00 | $48,037.00 | |
| | | | | | | | 1 | PLC/POWER SUPPLY PANELS | | 5.1 5.2 | $17,500.00 | $17,500.00 | |
| | | | | | | | 1 | DEVICES | | 5.1 5.2 | $1,250.00 | $1,250.00 | |
| | | | | | | | 1 | SITE MANAGEMENT PROGRAMMING AND COMMISSIONING | | 5.1 5.2 | $22,375.00 | $22,375.00 | |
| | | | | | | | 1 | FREIGHT | | 5.1 5.2 | $6,000.20 | $6,000.20 | $171,307.20 |
| Stronggate, LLC located at 3109 HWY 76 East | Marion | SC | 29571 | AMERICAN HERMETICS OF GEORGIA, INC. | 16985 | 8/27/2023 | 1 | REMANUFACTURED TRANE COMPRESSOR | | | 6 $10,679.62 | $10,679.62 | |
| | | | | | | | 16 | REFRIGERANT, 25LB CYLINDER | | | 6 $452.00 | $6,912.00 | |
| | | | | | | | 1 | FREIGHT CHARGES | | | 6 $600.00 | $600.00 | $18,191.62 |
| Francisco Holdings, LLC located at 851 Jackson Street | Greenville | OH | 45331 | NORDSON CORPORATION | 1980009145 9361851048 | 8/29/2023 2/28/2024 | 5 | EXTRUDER EX-807 | | 7.1 7.2 | $77,234.05 | $386,170.25 | |

Page 1 of 8

FBG_CH1_00090549

**DEBTORS' EXHIBIT NO. 175**
**Page 324 of 1907**

EXHIBIT A

CONFIDENTIAL

Trico Products Corporation
Master Lease No. OF11045321
Lease Schedule No. 028

$3,997,807.81    $3,997,807.81

| ADDRESS | CITY | ST | ZIP | VENDOR | INVOICE NO. | INVOICE DATE | QTY | DESCRIPTION | IDENTIFICATION # | PC NO. | PER UNIT | UNIT TOTAL | INVOICE TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 5 | BLUE SERIES GUN SINGLE MODULE | SA23J54163, SA23J54164, SA23J54165, SA23J54166, SA23J54167 | 7.1 7.2 | $1,913.16 | $9,565.80 | |
| | | | | | | | 5 | CONN ASSY | | 7.1 7.2 | $34.31 | $171.55 | |
| | | | | | | | 5 | SERVICE KIT, 45DEG HOSE CONN | | 7.1 7.2 | $25.50 | $127.50 | |
| | | | | | | | 10 | O RING, KALREZ, 3/8 TUBE | | 7.1 7.2 | $215.69 | $2,156.90 | |
| | | | | | | | 5 | KIT, INSULAT. FILTER, INLINE, SATURN | | 7.1 7.2 | $131.12 | $655.60 | |
| | | | | | | | 5 | JACKET, GUN, BC, SINGLE, BACK, AOAC | | 7.1 7.2 | $170.72 | $853.60 | |
| | | | | | | | 5 | KIT, MULTI-TOOL, CAP/NOZ/FILTER | | 7.1 7.2 | $100.32 | $501.60 | |
| | | | | | | | 5 | HOSE, BLUE SERIES, 5/16X 8 FT, 240V, AU | NC23L40907, NC23L40912, NC23L40928, NC23L40933, NC23L40934 | 7.1 7.2 | $746.24 | $3,731.20 | |
| | | | | | | | 5 | HOLDER, 5/16 HOSE | | 7.1 7.2 | $46.93 | $234.55 | |
| | | | | | | | 5 | KIT, FRAME MOUNT, REDIFLEX II SYSTEM | | 7.1 7.2 | $28.12 | $190.60 | |
| | | | | | | | 25 | STRAP, VELCRO, W/BUCKLE, 25X3CM | | 7.1 7.2 | $1.50 | $37.50 | |
| | | | | | | | 25 | STRAP, VELCRO, W/BUCKLE, 41X3CM | | 7.1 7.2 | $1.94 | $48.50 | |
| | | | | | | | 5 | KIT, INSULATION | | 7.1 7.2 | $65.52 | $327.60 | |
| | | | | | | | 1 | SHIPPING | | 7.1 7.2 | $2,196.99 | $2,196.99 | $411,828.34 |
| Champion Laboratories, Inc located at 200 S. 4th Street | Albion | IL | 62806 | MORRISON TIMING SCREW COMPANY dba MORRISON CONTAINER HANDLING SOLUTIONS | 105345-ADV1 105345-ADV2 105345 | 09/08/2023 11/13/2023 8/30/2024 | 1 | SERVO METERING DRIVE SYSTEM | | 8.1 8.2 8.3 | $19,960.00 | $19,960.00 | |
| | | | | | | | 1 | PNEUMATIC REJECT STATION | | 8.1 8.2 8.3 | $5,000.00 | $5,000.00 | |
| | | | | | | | 1 | SYSTEM GUARDING | | 8.1 8.2 8.3 | $13,000.00 | $13,000.00 | |
| | | | | | | | 1 | AB NEMA 12 SERVO CONTROLS | | 8.1 8.2 8.3 | $21,930.00 | $21,930.00 | |
| | | | | | | | 1 | CAMERA STAND | | 8.1 8.2 8.3 | $2,400.00 | $2,400.00 | |
| | | | | | | | 1 | PALLET CHARGE | | 8.1 8.2 8.3 | $324.50 | $324.50 | |
| | | | | | | | 1 | SHIPPING | | 8.1 8.2 8.3 | $960.00 | $960.00 | $63,574.50 |
| Champion Laboratories, Inc. located at 200 S. 4th Street | Albion | IL | 62806 | SCOTT SPECIAL TOOLS, INC. | 30610.11 30G1880 | 09/27/2023 09/27/2023 | 1 | SUSPENDED ENG DRIVE UNIT | | 9.1 9.2 | $1,484.00 | $1,484.00 | |
| | | | | | | | 4 | DIRECT END DRIVE UNIT RH | | 9.1 9.2 | $731.00 | $2,924.00 | |
| | | | | | | | 1 | DIRECT END DRIVE UNIT LH | | 9.1 9.2 | $731.00 | $731.00 | |
| | | | | | | | 20 | STANDARD PLAIN CHAIN 5M BOX | | 9.1 9.2 | $386.00 | $7,720.00 | |
| | | | | | | | 3 | STAINLESS STEEL TOP CHAIN 5M BOX | | 9.1 9.2 | $1,351.00 | $4,053.00 | |

Page 2 of 8

ONSET_00034808

FBG_CH1_00090550

EXHIBIT A

Trico Products Corporation
Master Lease No. QFI845321
Lease Schedule No. 028

$3,997,807.01     $3,997,807.81

| ADDRESS | CITY | ST | ZIP | VENDOR | INVOICE NO. | INVOICE DATE | QTY | DESCRIPTION | IDENTIFICATION # | PC NO. | PER UNIT | UNIT TOTAL | INVOICE TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2 | HORIZONTAL PLAIN BEND 15 DEGREE | | 9.1 9.2 | $283.00 | $326.00 | |
| | | | | | | | 2 | HORIZONTAL PLAIN BEND 90 DEGREE | | 9.1 9.2 | $349.00 | $698.00 | |
| | | | | | | | 2 | HORIZONTAL PLAIN BEND 45 DEGREE | | 9.1 9.2 | $283.00 | $568.00 | |
| | | | | | | | 3 | VERTICAL BEND 5 DEGREE | | 9.1 9.2 | $474.00 | $1,392.00 | |
| | | | | | | | 1 | 45 DEGREE WHEEL BEND | | 9.1 9.2 | $372.00 | $372.00 | |
| | | | | | | | 1 | 135 DEGREE WHEEL BEND | | 9.1 9.2 | $427.00 | $427.00 | |
| | | | | | | | 9 | 180 DEGREE WHEEL BEND | | 9.1 9.2 | $450.00 | $4,050.00 | |
| | | | | | | | 10 | HDPE SLIDE RAIL | | 9.1 9.2 | $73.00 | $730.00 | |
| | | | | | | | 2 | ALUMINUM RIVETS 50 PRE PACK | | 9.1 9.2 | $16.00 | $32.00 | |
| | | | | | | | 10 | CONVEYOR BEAM | | 9.1 9.2 | $183.00 | $1,830.00 | |
| | | | | | | | 3 | T-BOLT 80MM LONG 50 PACK | | 9.1 9.2 | $24.00 | $72.00 | |
| | | | | | | | 1 | T-BOLT 55MM 50 PACK | | 9.1 9.2 | $43.00 | $43.00 | |
| | | | | | | | 8 | SUPPORT BEAM 64MM BY 64MM | | 9.1 9.2 | $134.00 | $1,072.00 | |
| | | | | | | | 40 | VERTICAL BEAM SUPPORT BRACKET | | 9.1 9.2 | $9.00 | $360.00 | |
| | | | | | | | 10 | ALPINE BEAM SUPPORT BRACKET | | 9.1 9.2 | $14.00 | $140.00 | |
| | | | | | | | 3 | SUPPORT BEAM 80MM BY 80MM | | 9.1 9.2 | $182.00 | $546.00 | |
| | | | | | | | 1 | 80X80MM SUPPORT BEAM FOOT | | 9.1 9.2 | $453.00 | $459.00 | |
| | | | | | | | 10 | FOOT FOR 64X64MM SUPPORTS | | 9.1 9.2 | $58.00 | $580.00 | |
| | | | | | | | 10 | VERTICAL BEAM SUPPORT BRACKETS | | 9.1 9.2 | $20.00 | $200.00 | |
| | | | | | | | 1 | GUARANTEED SERVICE TRACKING | | 9.1 9.2 | $668.80 | $668.80 | $31,677.80 |
| Champion Laboratories, Inc. located at 301 Industrial Drive | Albion | IL | 62806 | STANDARD MACHINE & FABRICATION, LLC | 1284 | 9/21/2023 | 1 | TOP MOLD PILOT | | 10 | $3,984.90 | $3,984.90 | $3,984.90 |
| Champion Laboratories, Inc. located at 200 S. 4th Street | Albion | IL | 62806 | SKYLINE MANUFACTURING CORPORATION | 6396 6658 6958 | 10/4/2023 10/6/2023 3/29/2024 | 1 | TWO-OUT BACKPLATE DIE - BUILD (1) TWO-OUT PROG DIE WITH CHANGEOVER TOOLING TO PRODUCE THE BACKPLATES | | 11.1 11.3 11.3 | $204,480.08 | $204,480.08 | $204,480.08 |

Page 3 of 8

CONFIDENTIAL

ONSET_00034809

FBG_CH1_00090551

CONFIDENTIAL

ONSET_00034810

EXHIBIT A

Trico Products Corporation
Master Lease No. OFT3845321
Lease Schedule No. 028

$3,992,807.01   $3,997,907.01

| ADDRESS | CITY | ST | ZIP | VENDOR | INVOICE NO. | INVOICE DATE | QTY | DESCRIPTION | IDENTIFICATION # | PC NO. | PER UNIT | UNIT TOTAL | INVOICE TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Champion Laboratories, Inc. located at 200 S. 4th Street | Albion | IL. | 62806 | SKYLINE MANUFACTURING CORPORATION | 7028 | 4/23/2024 | 1 | TWO-OUT BACKPLATE DIE - EXTRUSION DEVELOPMENT | | 11.1 | $8,675.00 | $8,675.00 | $8,675.00 |
| Champion Laboratories, Inc. located at 200 S. 4th Street | Albion | IL. | 62806 | CODI MANUFACTURING, INC. | 12911.01 12911.03 | 3/31/2023 2/20/2024 | 1 | DEPALLETIZER SYSTEM - DPL-250 - SHELL SYSTEM | | 12.1 12.2 | $42,500.00 | $42,500.00 | |
| | | | | | | | 1 | PALLETIZER SYSTEM - PLT-1000 - ELEMENT SYSTEM | | 12.1 12.2 | $149,500.00 | $149,500.00 | |
| | | | | | | | 1 | DEPALL UPGRADE TO PLT1000 | | 12.1 12.2 | $19,500.00 | $19,500.00 | |
| | | | | | | | 1 | DPL-250 S.P SHEET SLIDE RACK COLLECTION - BOTTOM MOUNTED | | 12.1 12.2 | $3,500.00 | $3,500.00 | |
| | | | | | | | 1 | CATWALK - APPROXIMATELY 36" WIDE X 96' LONG | | 12.1 12.2 | $4,250.00 | $4,250.00 | |
| | | | | | | | 1 | DPL-250 SECONDARY HMI - CONTROL THE DEPAL FROM THE PLATFORM | | 12.1 12.2 | $3,250.00 | $3,250.00 | |
| | | | | | | | 2 | ALLEN BRADLEY UPGRADE (PER MACHINE) | | 12.1 12.2 | $4,250.00 | $8,500.00 | |
| | | | | | | | 1 | CONVEYING SHELL SYSTEM | | 12.1 12.2 | $12,500.00 | $12,500.00 | |
| | | | | | | | 1 | CONVEYING WITH INDEXER FOR PALLETIZER | | 12.1 12.2 | $15,500.00 | $15,500.00 | |
| | | | | | | | 1 | CRATING | | 12.1 12.2 | $3,500.00 | $3,500.00 | |
| | | | | | | | 1 | INSTALLATION AND TRAINING (20 DAYS) INCLUDES TRAVEL AND MEALS | | 12.1 12.2 | $27,000.00 | $27,000.00 | $289,500.00 |
| Strongarm, LLC located at 7108 HWY 76 East | Marion | SC | 29571 | BODORLASER INC | PIBW20230831036 | 8/16/2023 | 1 | BODOR LASER Q0 PRO - 3KW | | 13.1 | $150,000.00 | $150,000.00 | $150,000.00 |
| Champion Laboratories, Inc. located at 301 Industrial Drive | Albion | IL. | 62806 | STANDARD MACHINE & FABRICATION, LLC | 1323 1451 1463 | 10/19/2023 12/29/2023 12/29/2023 | 140 | AF4065 BOTTOM MOLD | | 14.1 14.2 | $124.00 | $17,360.00 | |
| | | | | | | | 140 | AF4085 TOP MOLD | | 14.1 14.2 | $109.00 | $15,260.00 | |
| | | | | | | | 280 | AF4065 PACK BAR | | 14.1 14.2 | $18.00 | $5,040.00 | |
| | | | | | | | 280 | AF4065 MOLD PLATE RISER | | 14.1 14.2 | $12.50 | $3,500.00 | |
| | | | | | | | 280 | AF4065 PACK BAR HOLDER | | 14.1 14.2 | $18.85 | $5,278.00 | |
| | | | | | | | 140 | AF4065 FLIP PLATE | | 14.1 14.2 | $46.00 | $6,440.00 | $52,878.00 |
| Champion Laboratories, Inc. located at 200 S. 4th Street | Albion | IL. | 62806 | POWER/MOTION, INC. | 02848 | 10/4/2023 | 1 | IS3801, UNIT ONLY, COLOR, PERFORMANCE, SC | | 15 | $10,842.86 | $10,842.86 | |
| | | | | | | | 1 | 60MM LENS COVER | | 15 | $104.00 | $104.00 | |
| | | | | | | | 1 | EDMUNDS 6MM TECHSPEC 1/1.8" FIXED FOCAL LENGTH LENS | | 15 | $593.67 | $593.67 | |
| | | | | | | | 1 | 5 PIN 10 METER LIGHT CABLE | | 15 | $104.00 | $104.00 | |
| | | | | | | | 1 | POWER AND I/O CABLE, M12-12 | | 15 | $429.00 | $429.00 | |
| | | | | | | | 1 | COGNEX X-CODED M12 ETHERNET CABLE | | 15 | $173.33 | $173.33 | |
| | | | | | | | 1 | SHIPPING | | 15 | $25.40 | $25.40 | $12,272.26 |
| | | | | | | | 2 | IS3801, UNIT ONLY, COLOR, PERFORMANCE, SC | | 15 | $10,842.86 | $21,685.72 | |
| | | | | | | | 2 | 60MM LENS COVER | | 15 | $104.00 | $208.00 | |
| | | | | | | | 2 | POWER AND I/O CABLE, M12-12 | | 15 | $164.67 | $329.34 | |
| | | | | | | | 2 | COGNEX X-CODED M12 ETHERNET CABLE | | 15 | $143.00 | $286.00 | |
| | | | | | | | 2 | LENS, MORITEX, 3MP, 8MM, 2/3" | | 15 | $619.67 | $1,239.34 | |

Page 4 of 8

FBG_CH1_00090552

**DEBTORS' EXHIBIT NO. 175**
**Page 327 of 1907**

CONFIDENTIAL

EXHIBIT A

Trico Products Corporation
Master Lease No. OF31845521
Lease Schedule No. 828

$3,997,807.91      $3,997,807.91

| ADDRESS | CITY | ST | ZIP | VENDOR | INVOICE NO. | INVOICE DATE | QTY | DESCRIPTION | IDENTIFICATION # | PC NO. | PER UNIT | UNIT TOTAL | INVOICE TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 1 | SHIPPING | | 13 | $30.57 | $30.57 | $23,778.97 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | GRAND RIVER MAINTENANCE AND SERVICES, LLC | 1028 1029-2 1029-3 | 11/2/2023 12/19/2023 12/27/2023 | 1 | DEMOLITION SERVICES FOR CONCRETE BASE IN OPERATIONS AREA. CONSTRUCTION CONCRETE CHANNEL 26" W X 108'L X 24" H INCLUDES EQUIPMENT MATERIALS AND LABOR. | | 16.1 16.2 16.3 | $66,980.00 | $66,980.00 | $66,980.00 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | RR MULTISERVICES LLC | 1023 | 9/28/2023 | 1 | LABOR AND LIFTING EQUIPMENT FOR THE RELOCATION OF 5 COILING MACHINES. THE EQUIPMENT WILL BE LOADED AT TRICO WAREHOUSE AND TRANSPORTED TO PRODUCTION AREA. THE MOVE TO INCLUDE EQUIPMENT CLEANING. THE COILERS WILL BE MOVED FROM THE STORAGE WAREHOUSE FOR CLEANING BAND TRANSPORTED TO PRODUCTION AREA THE PRICE INCLUDES COMPLETE RIGGING OF MACHINES LOADING AND UNLOADING INN NEW LOCATION. - SCOPE OF WORK - RIGGING AND LOAD 5 COILING MACHINES BEING MOVED TO PRODUCTION AREA. THE PRESS WILL BE ROLLED FROM THE EXISTING LOCATION AND SET IN NEW PLACE. - RIGG COILERS FROM EXISTING AREA TO STAGING LOCATION - CLEAN COILERS - ROLL PRESS OUT TO LOADING LOCATION - LOAD PRESS ON TRAILER FOR TRANSPORTATION TO PRODUCTION AREA - PRESS SET IN NEW AS PER CUSTOMER LAYOUT | | 17 | $6,700.00 | $6,700.00 | $6,700.00 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | RR MULTISERVICES LLC | 1034 | 11/7/2023 | 1 | LABOR AND LIFTING EQUIPMENT FOR THE RELOCATION OF 8 MACHINES. THE EQUIPMENT WILL BE LOADED AT OFF SITE WAREHOUSE AND TRANSPORTED TO NEW LOCATION OR PRODUCTION AREA. THE PRESS WILL BE ROLLED FROM EXISTING LOCATION AND LOADED ON TRAILER WITH CRANE OR FORKLIFT AS REQUIRED. THE PRESS WILL BE SET IN PLACE AS REQUESTED BY CUSTOMER. THE PRICE INCLUDES COMPLETE RIGGING OF MACHINES LOADING AND UNLOADING INN NEW LOCATION. - SCOPE OF WORK - RIGGING AND LOAD 8 MACHINES BEING MOVED FROM STORAGE WAREHOUSE TO NEW LOCATION. THE PRESS WILL BE ROLLED FROM THE EXISTING LOCATION AND SET IN NEW PLACE. - CLEAN PRESSES FOR MOVE TO NEW LOCATION - ROLL PRESS OUT TO LOADING LOCATION. - LOAD PRESSES ON TRAILER FOR TRANSPORTATION TO PRODUCTION AREA. - PRESS SET IN NEW LOCATION AS PER CUSTOMER LAYOUT. | | 18 | $16,600.00 | $16,600.00 | $16,600.00 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | RR MULTISERVICES LLC | 1040 | 11/14/2023 | 1 | REMOVAL OF TUNNEL OVEN AND PARTS DRYING LINE. THE OVENS WILL BE TAKEN DOWN AND STACKED ON PALLETS FOR MOVING TO WAREHOUSE. THE REMOVE TO INCLUDE ALL LABOR AND LIFTING EQUIPMENT REQUIRED FOR COMPLETE TAKE DOWN OF OVEN AND TRANSPORTED TO NEW WAREHOUSE FOR STORING. THE ASSEMBLY DRYING LINE TAKE DOWN TO INCLUDES SETTING ON PALLETS AND SECURE ALL CONTROLS AND WIRING. THE REMOVAL OF BOTH UNITS TO INCLUDE EXHAUST DUCTS AT ROOF LEVEL. THE EXHAUST DUCT WILL BE COVERED WITH BLANK SHEET METAL PLATE. CLOSED TO KEEP EXISTING OVEN RUNNING. ALL ELECTRICAL CONNECTIONS TO BE TAGGED OUT BY J&A. THE MACHINES TO BE REMOVED IN PIECES OR PALLETS TO OF SITE WAREHOUSE. THE PRICE INCLUDES ALL LIFTING EQUIPMENT AND REQUIRED TOOLS FOR THE COMPLETE MOVE AND DISASSEMBLE OF OVENS. SCOPE OF WORK. REMOVE TUNNEL OVEN AND PARTS DRYING LINE. THE UNITS WILL BE TAKEN DOWN TO SIZE FOR TRANSPORT TO AN OF SITE WAREHOUSE. REMOVE EXHAUST AIR DUCT TO INCLUDE CLOSING OPENING TO RUNNING OVEN. TAG OUT UNITS OF ALL POWER FEEDS TO OVENS AND CONTROLS - REMOVE ALL NATURAL GAS LINES SUPPLING THE OVENS - TAKE DOWN OF ALL VENTING AND EXHAUST DUCT WORK TO OVENS - TAKE DOWN OF OVENS AND REMOVE FROM AREA - OVENS BROKEN DOWN INTO SMALLER SECTIONS FOR TRANSPORT | | 18 | $28,415.62 | $28,415.62 | $28,415.62 |

ONSET_00034811

FBG_CH1_00090553

**DEBTORS' EXHIBIT NO. 175**
**Page 328 of 1907**

EXHIBIT A

Trico Products Corporation
Master Lease No. OFT1045323
Lease Schedule No. 028

$3,997,807.03   $3,997,807.03

| ADDRESS | CITY | ST | ZIP | VENDOR | INVOICE NO. | INVOICE DATE | QTY | DESCRIPTION | IDENTIFICATION # | PC NO. | PER UNIT | UNIT TOTAL | INVOICE TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | RR MULTISERVICES LLC | 1048 | 12/13/2023 | 1 | UNLOADING OF MXI MIXER FROM CONTAINERS AND ASSEMBLE UNIT IN PRODUCTION AREA. THE MIXER WILL BE UNLOADED FROM FOUR CONTAINERS AND MOVED TO, STAGING AREA FOR ASSEMBLY. THE UNLOADING AND ASSEMBLE TO INCLUDE ALL LABOR AND LIFTING EQUIPMENT REQUIRED FOR COMPLETE RIGGING AND SETUP. NOT INCLUDED IN THE PRICE ARE POWER SUPPLY, COMPRESSED AIR AND EXHAUST DUCTS. THE PRICE INCLUDES ALL LIFTING EQUIPMENT AND REQUIRED TOOLS FOR THE COMPLETE ASSEMBLY OF THE MXI-888. MIXER. *SCOPE OF WORK* UNLOAD FOUR CONTAINERS OF MXI MIXER COMPONENTS. SETUP UNIT IN STAGING AREA AND ASSEMBLE. • UNLOAD FOUR CONTAINERS WITH MXI MIXER PARTS. • CONTAINERS UNLOADED ON DOCK WITH CRANE, FORKLIFT AND ROLLERS. • RIGG COMPONENTS TO STAGING AREA. • ASSEMBLE COMPONENTS AS PER PRINTS AND ANCHOR. • REMOVE ALL PACKAGING MATERIALS. ESTIMATED TIME FOR COMPLETION IS TWO WEEKS WITH FULL ACCESS TO THE AREA. | | 19 | $61,200.00 | $61,200.00 | $61,200.00 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | RR MULTISERVICES LLC | 1046 | 12/8/2023 | 1 | UNLOADING OF UMD 14532 COMPONENTS FROM TWO TRAILERS AND SETUP IN STAGING AREA. THE COMPONENTS UNLOADED WITH CRANE AND FORKLIFT. ALL UNITS ARE SET UP ON THE PRODUCTION FLOOR AS PER CUSTOMER LAYOUT. THE UNLOADING AND ASSEMBLE TO INCLUDE ALL LABOR AND LIFTING EQUIPMENT REQUIRED FOR COMPLETE RIGGING AND SETUP. NOT INCLUDED IN THE PRICE ARE POWER SUPPLY, COMPRESSED AIR AND EXHAUST DUCTS. THE PRICE INCLUDES ALL LIFTING EQUIPMENT AND REQUIRES TOOLS FOR THE COMPLETE ASSEMBLY OF UMD 14532 LINE. *SCOPE OF WORK* UNLOAD TWO TRAILERS WITH UMD COMPONENTS. SETUP UNIT IN STAGING AREA AND ASSEMBLE. • UNLOAD TWO TRAILERS WITH UMD 14532 PARTS • UNLOADED ON DOCK WITH CRANE, FORKLIFT AND ROLLERS • RIGG COMPONENTS TO STAGING AREA. • ASSEMBLE COMPONENTS AS PER PRINTS AND ANCHOR. • REMOVE ALL PACKAGING MATERIALS | | 19 | $58,200.00 | $58,200.00 | $58,200.00 |
| Champion Laboratories, Inc. located at 200 S. 4th Street | Albion | IL | 62806 | INFINITY MOLDING & ASSEMBLY, INC. | TO 1855 TO 1903 | 6/10/2022 | 1 | INJECTION MOLD TOOL 98-47596 FRAME | | 20.1 20.2 | $93,200.00 | $93,200.00 | $93,200.00 |
| Champion Laboratories, Inc. located at 200 S. 4th Street | Albion | IL | 62806 | INFINITY MOLDING & ASSEMBLY, INC. | TO 1931 | 12/13/2023 | 1 | INJECTION MOLD TOOL 98-47596 FRAME | | 20.3 | $14,300.00 | $14,300.00 | $14,300.00 |
| Champion Laboratories, Inc. located at 200 S. 4th Street | Albion | IL | 62806 | INFINITY MOLDING & ASSEMBLY, INC. | TO 1911 | 8/29/2023 | 1 | FRAME LAF6271A • 98-47596 | | 20.4 | $1,203.40 | $1,203.40 | $1,203.40 |
| Sturtgants, LLC located at 3108 Marion HWY 76 East | | SC | 29571 | WEISS NORTH AMERICA, INC. | 14337 14358 | 12/19/2023 2/7/2024 | 1 | ROTARY INDEXING TABLE TC 320T | | 21.1 21.2 | $9,390.00 | $9,390.00 | $43,360.00 |
| | | | | | | | 1 | VARIABLE FREQUENCY DRIVE: CONFIGURED PARAMETERS ROCKWELL | | 21.1 21.2 | $940.00 | $940.00 | |
| | | | | | | | 1 | CHASSIS WITH WELDED STYLE BASE FRAME, ALUMINUM BASE PLATE, ALUMINUM DIAL PLATE, MECHANICAL ANVIL BACKUP ASSEMBLY, ALUMINUM SECTIONAL PLATE(S), EXTENSION ARMS(), AND ALUMINUM TIE PLATE | | 21.1 21.2 | $33,030.00 | $33,030.00 | |
| Sturtgants, LLC located at 3108 Marion HWY 76 East | | SC | 29571 | MOTION INDUSTRIES, INC. | EC03 GCN 364022 / SCO | 12/01/2023 / 3/29/2024 | 12 | 16-C TOP LOCK PNEUMATIC LEXAIR 66396 | | 22 | $1,000.00 | $12,000.00 | $21,831.05 |
| | | | | | | | 12 | LEXAIR 16C COLLETS 15MM | | 22 | $160.00 | $1,920.00 | |
| | | | | | | | 12 | LEXAIR 16C COLLETS 18MM | | 22 | $160.00 | $1,920.00 | |
| | | | | | | | 12 | LEXAIR 16C COLLETS 19MM | | 22 | $160.00 | $1,920.00 | |
| | | | | | | | 12 | LEXAIR 16C COLLETS 22MM | | 22 | $160.00 | $1,920.00 | |
| | | | | | | | 12 | LEXAIR 16C COLLETS 24MM | | 22 | $160.00 | $1,920.00 | |
| | | | | | | | 1 | FREIGHT | | 22 | $291.05 | $291.05 | |

Page 6 of 8

FBG_CH1_00090554

**DEBTORS' EXHIBIT NO. 175**
**Page 329 of 1907**

CONFIDENTIAL

ONSET_00034812

EXHIBIT A

Trico Products Corporation
Master Lease No. OP13045321
Lease Schedule No. 028

53,997,897.01    $3,997,897.01

| ADDRESS | CITY | ST | ZIP | VENDOR | INVOICE NO. | INVOICE DATE | QTY | DESCRIPTION | IDENTIFICATION # | PC NO. | PER UNIT | UNIT TOTAL | INVOICE TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | RR MULTISERVICES LLC | 1060 | 1/12/2024 | 1 | LABOR AND LIFTING EQUIPMENT FOR SETTING UP 11 FORMING MACHINE. THE MACHINES TO INCLUDE PARTS WASHING STATIONS AND ROLLER DIE. THE EQUIPMENT WILL BE ROLLED IN PLACE WITH ROLLERS AND LIFTING EQUIPMENT. THE PRESS WILL BE ROLLED FROM EXISTING LOCATION AND SETUP AS PER SUPPLIED PRINT. THE PRESS WILL BE PRICE INCLUDES COMPLETE RIGGING OF MACHINES AND SETUP AS PER PRINT. SCOPE OF WORK. RIGGING AND SETUP 11 MACHINES SECONDARY EQUIPMENT. THE PRESS WILL BE ROLLED FROM THE LOCATION AND SET IN NEW PLACE AS PER SUPPLIED PRINTS. -SET 11 FORMING MACHINES AS PER SUPPLIED PRINTS -SET FORMING MACHINES ON OIL TRAYS -ALL MACHINES SETUP MAS PER CUSTOMER SUPPLIED PRINT -SETUP SECONDARY PROCESS EQUIPMENT AS PER PRINT -INCLUDES WASH STATIONS AND ROLLER DIES -PRESS SET IN NEW LOCATION AS PER | | 23 | $18,500.00 | $18,500.00 | $18,500.00 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | GRAND RIVER MAINTENANCE AND SERVICES, LLC | 1058 | 1/17/2024 | 1 | FABRICATE - SUPPLY 5 GALVANIZED OIL CONTAINMENT TRAYS FOR MACHINES IN OPERATING AREAS 4 GALVANIZED TRAYS 3W X 10L X 3H1 GLVANIZED TRAYS 3W X 10L X 3H | | 24 | $5,850.00 | $5,850.00 | $5,850.00 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | RR MULTISERVICES LLC | 1061 | 2/11/2024 | 1 | SELECTIVE PALLET RACK SYSTEM 14 SECTIONS FLOOR + 3 LEVELS  15 NEW UPRIGHT 16"X42"X3" Cap # 23,800 lbs @ 48" WELDED 84 NEW CROSSBEAM 96"X4" CAP #5,370 LBS PER PR. 84 NEW WIREDECK 42"X46" CAP # 2,500 LBS 1 INSTALLATION OF 14 SECTIONS IN BROWNSVILLE 30 ANCHOR 1/2" X 3" 3/4 1 DRILL BIT 6" | | 25 | $19,781.31 | $19,781.31 | $19,781.31 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | RR MULTISERVICES LLC | 1044 | 12/1/2023 | | RIGGING AND INSTALLATION | | 26 | $57,100.00 | $57,100.00 | $57,100.00 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | RR MULTISERVICES LLC | 1065 | 2/22/2024 | 1 | 2 8' HIGH MEZZANINES 1/4" NON-SLIP PLATE 2"X 2" X 3/16 ANGLE FOR BASE 4" X 4" C11 SQUARE TUBE INCLUDES RAILING THE MEZZANINE IS 14' FEET WIDE. WORK. PAINTING AND MATERIALS ARE INCLUDED. | | 27 | $48,800.00 | $48,800.00 | $48,800.00 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | BALL BROS. MACHINERY LTD. | 24-001 | 1/26/2024 | | 4.5" DAVIS STANDARD COLD FEED RUBBER EXTRUDER MODEL 45IN45H 20:1 L/D 4.5" SCREW VENTED/PLUGGED BARREL ELECTRICALLY HEATED AND LIQUID COOLED POWERED ROLLER FEED BELT DRIVEN BY 150 HP DC MOTOR AND SCR CONTROL FREE-STANDING TEMPERATURE CONTROL PANEL DAVIS CLAM HEAD DAVIS GEAR BOX WITH 17.36/1 GEAR RATIO RATED AT 304 HP | | 28 | $75,000.00 | $75,000.00 | $75,000.00 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | BOWMAN ANALYTICS, INC. | INV/2024/35829 INV/2024/35967 | 1/29/2024 2/5/2024 | 1 | X-RAY SYSTEM - PROGXY. W TUBE  VAR30X, SDD KDPP3, 24MIL MC | | 29.1 29.2 | $31,526.88 | $31,526.88 | |
| | | | | | | | 1 | COMPUTER DESKTOP | | 29.1 29.2 | $2,445.00 | $2,445.00 | |
| | | | | | | | 1 | COMPUTER MONITOR | | 29.1 29.2 | $345.00 | $345.00 | |
| | | | | | | | 1 | NI FOIL 200UIN (5UM) | | 29.1 29.2 | $768.00 | $768.00 | |
| | | | | | | | 1 | NI FOIL 400UIN (10UM) | | 29.1 29.2 | $315.00 | $315.00 | $34,989.88 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | RR MULTISERVICES LLC | 1066 1100 | 1/23/2024 3/7/2024 | | RIGGING AND RELOCATION OF WIPER SLEAVE LINE WHICH INCLUDES COMPLETE TAKEDOWN AND SET UP, LABOR AND LIFTING EQUIPMENT REQUIRED FOR COMPLETE TAKE DOWN OF THE LINE AND TRANSPORT | | 30.1 30.2 | $195,500.00 | $195,500.00 | $195,500.00 |
| Champion Laboratories, Inc. located at 200 S. 4th Street | Albion | IL | 62806 | PRO MACH INC. dba SERPA PACKAGING SOLUTIONS LLC | 49375 | 12/29/2023 | 2 | CHAIN ASSEMBLY BACKUP 9" PITCH LHL | S-01722 | 31 | $18,238.11 | $36,476.22 | |
| | | | | | | | 2 | CHAIN ASSEMBLY PUSHER, 8" PITCH LHL | | 31 | $16,433.97 | $32,867.94 | |
| | | | | | | | 2 | CHAIN ASSEMBLY PUSHER, 9" PITCH LHL | | 31 | $16,433.97 | $32,867.94 | |
| | | | | | | | 2 | 1722 CHAIN TRACK KIT (INCLUDES SET OF 8 TRACKS) | | 31 | $9,282.79 | $18,565.58 | |
| | | | | | | | 1 | SHIPPING AND HANDLING | | 31 | $886.97 | $886.97 | $121,664.65 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | KUNSHAN SUNTECH TOOLING CO., LTD | 24030101 24111101 | 3/1/2024 11/11/2024 | 1 | ASSEM E-FLEX TOOL 28 | | 32.1 32.2 | $22,080.00 | $22,080.00 | |

CONFIDENTIAL

ONSET_00034813

FBG_CH1_00090555

**DEBTORS' EXHIBIT NO. 175**
**Page 330 of 1907**

EXHIBIT A

Trico Products Corporation
Master Lease No. OF11045321
Lease Schedule No. 028

$3,997,807.01    $3,997,807.01

| ADDRESS | CITY | ST | ZIP | VENDOR | INVOICE NO. | INVOICE DATE | QTY | DESCRIPTION | IDENTIFICATION # | PC NO. | PER UNIT | UNIT TOTAL | INVOICE TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | KUNSHAN SUNTECH TOOLING CO., LTD | 24030101 24111101 | 1/1/2024 11/11/2024 | 1 | ASSEM E-FLEX TOOL 26 | | 32.1 32.2 | $22,000.00 | $22,000.00 | |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | KUNSHAN SUNTECH TOOLING CO., LTD | 24036101 24111101 | 3/1/2024 10/11/2024 | 1 | MATERIAL FOR 2 SETS DIE TRYOUT. AND 300PCS SAMPLES EACH DIE | | 32.1 32.2 | $2,000.00 | $2,000.00 | $46,000.00 |
| Brake Parts Inc LLC located at 1100 & 1380 Corporate Drive | McHenry | IL | 60050 | A J.L. ELECTRIC, INC. | 16225 | 4/8/2024 | 1 | PARCEL LINE ELECTRICAL FEED REQUIREMENTS I-1203-24 TOTAL LABOR AND MATERIALS | | 33 | $33,962.00 | $33,962.00 | $33,962.00 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | BINATIONAL INDUSTRIAL SERVICES LLC | BIS-1006 BIS-1011 | 4/10/2024 4/23/2024 | 1 | MATERIALS, TOOLS, ACCESSORIES & EQ TO SUPPLY AIR HANDLING UNIT #2 | | 34.1 34.2 | $47,884.00 | $47,884.00 | |
| | | | | | | | 1 | SERVICES AND LABOR TO INSTALL AIR HANDLING UNIT #2 | | 34.1 34.2 | $11,966.00 | $11,966.00 | $59,850.00 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | ROLER MACHINE SHOP INCORPORATED | 8098 | 4/24/2024 | 6 | FABRICATE STUD BENCH WORK STATION  INCLUDING BUT NOT LIMITED TO THE FOLLOWING: SQUARE TUBING TABLE WITH PLYWOOD, LAMP ON/OFF SWITCH, CONTACTORS, HEAVY DUTY BENCH VISE WITH SWIVEL BASE, FRONT WALL WITH PEGBOARD STEEL, AIR HOSES AND CONNECTORS | | 35 | $2,400.00 | $14,400.00 | $14,400.00 |
| 1900 & 1995 Billy Mitchell Blvd. | Brownsville | TX | 78521 | ROLER MACHINE SHOP INCORPORATED | 8089 8433 | 4/24/2024 12/19/2024 | 1 | FABRICATE EVTB5T001 DIE SET | | 36.1 36.2 | $55,325.00 | $55,325.00 | $55,325.00 |

each line item as may be more fully described on the referenced invoice(s) and related underlying quotes, purchase orders, etc., and all such Property to include any and all attachments, replacements, parts, substitution, additions, repairs, accessions and accessories incorporated therein and/or affixed thereto.

Page 8 of 8

CONFIDENTIAL

ONSET_00034814

FBG_CH1_00090556

# Exhibit 7

FBG_CH1_00090557

**DEBTORS' EXHIBIT NO. 175**
**Page 332 of 1907**

ORIGINAL

 onset financial

## LEASE SCHEDULE NO. 019
## TO
## MASTER LEASE AGREEMENT NO. OFI1045321

This Lease Schedule No. 019 dated April 7, 2021 (the "Schedule") between **ONSET FINANCIAL, INC.** (the "Lessor") and **TRICO PRODUCTS CORPORATION** and **FRAMAUTO HOLDINGS, LLC**, as co-lessees, (collectively, the "Lessee") incorporates by reference the terms and conditions of Master Lease Agreement No. OFI1045321 dated May 9, 2018 (the "Master Lease"), the Exhibit A ("Property") and the Exhibit B ("Stipulated Loss Schedule"), and constitutes a separate lease between Lessor and Lessee and is referred to herein as the "Lease". All capitalized terms used herein but not defined herein shall have the same meanings ascribed to them in the Master Lease.

SECTION 1    PROPERTY: All inventory as identified by specific part numbers, consisting of raw components, component parts, all after-acquired raw components, work in progress, and finished goods, and as it relates to inventory maintained, kept and/or stored at Framauto Holdings, LLC located in Mexicali, Mexico, and any and all attachments, accessions, additions, enhancements and replacements of any of the foregoing, as more fully described in an Exhibit A to the Acceptance and Delivery Certificate (collectively, the "Property"). Notwithstanding anything herein or in the Master Lease to the contrary, Lessor and Lessee acknowledge that the Property is inventory and will be sold, transferred, assigned, conveyed or distributed by Lessee in its ordinary course of business and will be replenished by Lessee also in its ordinary course of business. Lessor acknowledges that, subject to the terms hereof, Lessee is entitled to all proceeds from the sale or transfer of the Property. Lessor agrees that its lien on any Property and any right, title or interest it has in any Property shall be automatically released upon the sale or transfer of such Property by Lessee in the ordinary course of its business. Upon request of Lessee, Lessor shall execute any documents reasonably requested by Lessee to evidence the release of Lessor's lien on the Property. Lessee agrees to provide to Lessor on a quarterly basis an updated inventory listing in substantially the same form delivered by Lessee to Lessor prior to the date hereof showing the inventory levels at the Property Location and status as of the date of each provided inventory listing ("Inventory List").

Notwithstanding the foregoing, if at any time during the term of the Lease the Inventory Value is less than thirty percent (30%) of the Inventory Value determined as of the execution of this Schedule, the Lessee grants to the Lessor a security interest in the proceeds of the Property and authorizes Lessor to amend the UCC description to include proceeds. To determine the Inventory Value, Lessee shall provide to Lessor the current valuation of the inventory that specifically constitutes Property hereunder, which valuation shall be in accordance with GAAP standards ("Inventory Value") and will be evidenced on the Inventory List.

SECTION 2    PROPERTY LOCATION: Location(s) as set forth on the Acceptance and Delivery Certificate

SECTION 3    BASE PERIOD: Forty-two (42) months starting on the Lease Commencement Date

SECTION 4    TOTAL PROPERTY COST: $40,000,000.00 USD

SECTION 5    LEASE RATE FACTOR:      0.02388

SECTION 6    MONTHLY RENTAL: $955,200.00, plus applicable sales/use tax

SECTION 7    RENTAL FREQUENCY: Monthly in advance

SECTION 8    THIS SECTION INTENTIONALLY LEFT BLANK

SECTION 9    DATE OF ACCEPTANCE: As specified in the Acceptance and Delivery Certificate

CONFIDENTIAL

ONSET_00034437
FBG_CH1_00090558

ORIGINAL

SECTION 10   THIS SECTION INTENTIONALLY LEFT BLANK

SECTION 11   ADDITIONAL PROVISIONS:

a.   INCLUSION OF ADDITIONAL LESSEE:  For purposes of this Schedule only, as an additional condition to the Lease, Lessor requires the addition of **FRAMAUTO HOLDINGS, LLC** ("Additional Lessee") as an obligated party to the Lease in the capacity of Lessee.  In accordance with the foregoing, the Lease, including the Master Lease, MPPA, the Schedule and all related documents shall be revised such that the Additional Lessee shall be deemed to be included in the defined term Lessee.  As such, Additional Lessee agrees to be and is jointly and severally obligated as Lessee under the Lease.  Each reference in the Lease to the term "Lessee" or to "you" or to "your" shall be deemed to refer to each Lessee, jointly and severally, including Additional Lessee.  By execution below, Additional Lessee agrees (i) to be bound by all terms and conditions of the Master Lease, the MPPA, the Schedule, and the Lease, and all documents executed in connection with any of the foregoing, (ii) to be jointly and severally obligated as Lessee in the Master Lease, MPPA, the Schedule and the Lease, (iii) that each representation and warranty made by Lessee in the Lease shall be deemed to have been made by Additional Lessee, and (iv) that it has read and understands the terms of the Lease, including the Master Lease and the MPPA and the Schedule.

b.   PAYMENT BY ELECTRONIC TRANSFER:  In the event that a Monthly Rental payment and other monies due under the Lease are not received by Lessor or its assigns within ten (10) business days of the due date, Lessee authorizes Lessor or its assigns to electronically transfer payment due under any past due invoice from Lessee's account maintained with its financial institution, and Lessee agrees to execute and deliver a written "Authorization for Electronic Transfer" form to Lessor to affect such transfers.  Failure or refusal of Lessee to authorize such transfers or failure of Lessor or its assigns to receive such payments by electronic transfer shall constitute an additional Event of Default under the Master Lease.  Upon the occurrence of the Event of Default specified above, Lessor shall be entitled to exercise its rights and remedies under the Lease.

c.   RETURN OPTION:  For purposes of this Schedule only, Section 20(n) of the Master Lease shall be revised by deleting option (2) in its entirety together with any and all terms and references specific to option (2) thereunder.

d.   EARLY TERMINATION OPTION:  For purposes of this Schedule only, provided no Event of Default has occurred and is continuing under the Lease, and further provided Lessor has received twelve (12) Base Period Monthly Rental payments and Lessee has provided Lessor thirty (30) days prior written notice, Lessee may elect to early terminate this Schedule and to purchase the Property for an amount equal to the then "Current Stipulated Loss Value" (defined as the Stipulated Loss Value specified in the attached Exhibit B corresponding to the most recent payment made by Lessee), together with all applicable taxes and other amounts due under the Lease, including but not limited to sales and use tax, property tax, late charges, and any and all other sums due.  Lessor's sale of Property to the Lessee pursuant to this clause shall be on an "as-is, where-is" basis, without any representation or warranty by, or recourse to, the Lessor, except as to the absence of liens created by or through Lessor.

e.   EVENTS OF DEFAULT:  Notwithstanding Section 18(c) of the Master Lease, it shall not be an Event of Default if Lessee sells, transfers, assigns, conveys or distributes any Property in the ordinary course of its business.

f.   WAIVERS:  For purposes of this Lease and to ensure that Lessor shall be granted all right, title and interest in and to the Property, and to further ensure that Lessor shall be indemnified from and against any loss or damage it might incur resulting from liens, claims, security interest or encumbrances existing or of records against the Property, Lessee agrees (i) to provide to Lessor any documentation reasonably requested, including but not limited to bills of sale, waivers of interest, lien releases, mechanic's lien releases, mortgagee waivers, and any additional waivers (collectively the "Waivers"), and (ii) to use its commercially reasonable efforts to cause any third parties reasonably deemed necessary by Lessor to execute such Waivers.  As long

Page 2 of 5

CONFIDENTIAL

ONSET_00034438
FBG_CH1_00090559

ORIGINAL

as the Property leased under this Schedule remains personal property and the Lessee has used commercially reasonable efforts to obtain a third-party Waiver, then Lessee's failure to provide Waivers shall constitute an additional Event of Default under the Lease.

g.  ADDITIONAL REMEDIES ON DEFAULT- INJUNCTIVE RELIEF:  Upon the occurrence of a monetary Event of Default under the Lease, upon demand by Lessor, in addition to the remedies set forth in Section 18 of the Master Lease, Lessee shall thereupon immediately cease the use of any and all Property under each and every Schedule under the Master Lease whether such use is by Lessee or any affiliate of Lessee.  In the enforcement of the remedies described in this Section, Lessor shall be entitled to an injunction restraining Lessee, or any of Lessee's affiliates, from using the Property and any Property under any other Schedules executed in connection with the Master Lease.  Lessee agrees that a violation of such will cause immediate and irreparable damage to Lessor and that the detriment which Lessor will suffer as a result of a breach by Lessee of the obligations contained in the Lease cannot be adequately compensated by monetary damages, and therefore Lessor shall be entitled to injunctive and other equitable relief to enforce the provisions of this Section.

Nothing contained herein shall prohibit Lessor from also pursuing any other remedies available under the Master Lease, the Schedule, or otherwise at law, and no action by Lessor in pursuing any other remedies shall constitute an election to forego other remedies.  Lessee agrees that the foregoing remedies are in addition to all other rights and remedies available to Lessor under the Master Lease, the Schedule, or otherwise available provided by law.  In connection with Lessor's exercise of any or all of the above-listed remedies, Lessor shall be entitled to recover all costs and expenses incurred by Lessor in the enforcement of the Lease and/or the exercise of its rights hereunder, including in disabling the Property, including without limitation, reasonable attorney fees and costs incurred by Lessor.  In the event of enforcement by Lessor through judicial proceedings, Lessee hereby waives any requirement that Lessor post a bond.  Lessor's failure to promptly enforce any right or remedy hereunder shall not operate as a waiver of such right or remedy, and Lessor's waiver of any default shall not constitute a waiver of any subsequent or other default.  Lessee further agrees that the rights and remedies available to Lessor under the Lease may be enforced by specific performance, including by injunction.

h.  MAINTENANCE OF PROPERTY:  For purposes of this Schedule only, Lessee shall, undertake all reasonable and customary actions to preserve and protect the Property and maintain, keep and/or store the Property so that it is ready to assemble, sell or distribute in the ordinary course of business.  By fulfilling these requirements, Lessee shall meet and satisfy the requirements to maintain the Property as found in the Master Lease.

i.  CURRENCY:  Unless otherwise specifically stated, all monies referenced in the Lease and any accompanying documents shall be deemed to be in U.S. Dollars.  All payments due to Lessor and/or its assigns, shall be due and payable in U.S. Dollars.

j.  TAX INDEMNIFICATION:  Notwithstanding anything to the contrary contained in the Lease, Lessee agrees to defend, indemnify, reimburse and hold Lessor harmless against any sales or use tax imposed upon Lessor by any jurisdiction, or other taxing authority, for failure to pay sales, property, or use tax (a) on purchase of the Property, and (b) on any payments required to be made under the Lease or otherwise with respect to the Lease.  Upon any assessment against or final payment by Lessor of sales, property, or use tax as provided herein, Lessee agrees to pay such assessments or reimburse Lessor for its payments of such assessments.  This Indemnity shall survive the termination of the Lease and shall continue to bind Lessee as long as any sales or use tax assessment with respect to the Property or Lease is pending or may be imposed on Lessor.

k.  PROPERTY TAX:  For purposes of this Schedule only, notwithstanding anything to the contrary contained in the Lease, and effective the date hereof and continuing throughout the term of the Schedule, including any renewals thereof, Lessee agrees to file in its name and remit directly to the proper taxing authority, all property taxes due under the Schedule.  Lessee shall maintain records of filing and evidence of payment and shall provide proof of such filing and/or payment to Lessor upon request by Lessor.  Lessee agrees to

Page 3 of 5

CONFIDENTIAL

ONSET_00034439
FBG_CH1_00090560

ORIGINAL

indemnify Lessor for any unpaid property tax, penalties and interest resulting from Lessee's failure to timely file property taxes or its failure to remit payment to the proper taxing authority. Lessee's failure to comply with the requirements set forth in this Section shall constitute an additional Event of Default under the Lease.

l.   FURTHER ASSURANCES: Inasmuch as the Property will be located in Mexico, Lessee agrees as follow: i) Lessee will cooperate with Lessor in protecting Lessor's interests in the Property, ii) Lessor is authorized to take any measures necessary to protect its ownership and/or interest in the Property, and iii) Lessee agrees to execute any further documents, and to take any further actions, reasonably requested by Lessor to evidence ownership or to perfect the security interest granted under the Lease or to effectuate the rights granted to Lessor under the Lease.

m.   QUARTERLY REPORTING: In addition to the financial statement requirements set forth in Section 20(k) of the Master Lease, Lessee shall provide to Lessor on a quarterly basis, a copy of its current updated Lender Presentation, and an updated Inventory List.

n.   MASTER LEASE TERMS AND CONDITIONS: Unless otherwise specifically modified herein, all terms and conditions of the Master Lease shall continue in full force and effect without change.

SECTION 12   REPRESENTATION OF LESSEE: Lessor and Lessee agree that this Schedule is a "Finance Lease" as defined by the Uniform Commercial Code Article 2A, in that (i) Lessee has selected the Property in its sole discretion, (ii) Lessor has acquired the Property solely for the purpose of leasing such Property under this Schedule, and (iii) Lessee has received a copy of the contract evidencing Lessor's purchase of the Property.

[SIGNATURE PAGE TO FOLLOW]

WUTS..]V8-WF:01\GS\FLLocal\Lease Operations\Master Library\Schedule Documents\OFI\ST Lease Schedule - ST.doc

CONFIDENTIAL

ONSET_00034440
FBG_CH1_00090561

**DEBTORS' EXHIBIT NO. 175**
**Page 336 of 1907**

[SIGNATURE PAGE TO LEASE SCHEDULE NO. 019]

LESSOR:                                          LESSEE:

**ONSET FINANCIAL, INC.**                        **TRICO PRODUCTS CORPORATION**

BY: _Cathy Lawrence_                             BY: _____
     Cathy Lawrence
TITLE:   Vice President                          TITLE: _____

                                                 LESSEE:

                                                 **FRAMAUTO HOLDINGS, LLC**

                                                 BY: _____

                                                 TITLE: _____

ORIGINAL

CONFIDENTIAL

ONSET_00034441
FBG_CH1_00090562

**DEBTORS' EXHIBIT NO. 175**
**Page 337 of 1907**

**EXHIBIT B**
**STIPULATED LOSS SCHEDULE**
**DATED APRIL 07, 2021**
**TO**
**LEASE SCHEDULE NO. 019**
**DATED APRIL 07, 2021**
**TO**
**MASTER LEASE AGREEMENT NO. OFI1045321**
**STIPULATED LOSS VALUE TABLE**

**ORIGINAL**

| AFTER MONTHLY PAYMENT | TOTAL STIPULATED LOSS VALUE | STIPULATED LOSS PERCENTAGE | AFTER MONTHLY PAYMENT | TOTAL STIPULATED LOSS VALUE | STIPULATED LOSS PERCENTAGE |
|---|---|---|---|---|---|
| 0 | $50,000,000 | 125.00% | 22 | $35,626,715 | 89.07% |
| 1 | $49,599,932 | 124.00% | 23 | $34,842,119 | 87.11% |
| 2 | $48,944,249 | 122.36% | 24 | $34,053,766 | 85.13% |
| 3 | $48,284,606 | 120.71% | 25 | $33,261,637 | 83.15% |
| 4 | $47,620,980 | 119.05% | 26 | $32,465,716 | 81.16% |
| 5 | $46,953,347 | 117.38% | 27 | $31,665,983 | 79.16% |
| 6 | $46,743,005 | 116.86% | 28 | $30,862,420 | 77.16% |
| 7 | $46,050,593 | 115.13% | 29 | $30,187,168 | 75.47% |
| 8 | $45,354,289 | 113.39% | 30 | $29,363,946 | 73.41% |
| 9 | $44,654,070 | 111.64% | 31 | $28,537,125 | 71.34% |
| 10 | $43,949,915 | 109.87% | 32 | $27,706,689 | 69.27% |
| 11 | $43,241,801 | 108.10% | 33 | $26,872,622 | 67.18% |
| 12 | $42,529,706 | 106.32% | 34 | $26,034,909 | 65.09% |
| 13 | $41,813,607 | 104.53% | 35 | $25,193,533 | 62.98% |
| 14 | $41,430,164 | 103.58% | 36 | $24,348,479 | 60.87% |
| 15 | $40,690,621 | 101.73% | 37 | $23,499,730 | 58.75% |
| 16 | $39,947,229 | 99.87% | 38 | $22,647,271 | 56.62% |
| 17 | $39,199,967 | 98.00% | 39 | $21,817,044 | 54.54% |
| 18 | $38,448,816 | 96.12% | 40 | $20,948,137 | 52.37% |
| 19 | $37,693,754 | 94.23% | 41 | $20,075,794 | 50.19% |
| 20 | $36,934,762 | 92.34% | 42 | $19,200,000 | 48.00% |
| 21 | $36,407,572 | 91.02% | and thereafter | | |

The Stipulated Loss Value for any item of lost, damaged or destroyed Property shall be the Lessor's original cost of such item of Property multiplied by the Stipulated Loss Percentage indicated in the above table which corresponds to the month of the Lease after the Lease Commencement Date in which the last Monthly Rental payment was made. In the event of a total loss or destruction, the Stipulated Loss Value for all lost or damaged Property shall be equal to the percentage or dollar amount, as the case may be, listed under the Total Stipulated Loss Value indicated above which corresponds to the month of the Lease after the Lease Commencement Date in which the last Monthly Rental payment was made. If a partial or total loss occurs at any time prior to the Lease Commencement Date of the Lease, then the Stipulated Loss Value shall be equal to 125% of the total amount funded. In the event the Lease is continued for any reason, then the last percentage or dollar amount, as the case may be, shown above shall control throughout any such continued term.

In the event of default under the Lease, Lessor may, in addition to all other remedies available to it under the Lease, recover the dollar amount listed under the Total Stipulated Loss Value indicated above as of the Monthly Rental payment date immediately preceding the date of the default.

LESSOR:

ONSET FINANCIAL, INC.

BY: _____
Cathy Lawrence
TITLE:   Vice President

LESSEE:

TRICO PRODUCTS CORPORATION

BY: _____

TITLE: _____

CONFIDENTIAL

ONSET_00034442
FBG_CH1_00090563

**EXHIBIT B**
**STIPULATED LOSS SCHEDULE**
**DATED APRIL 07, 2021**
**TO**
**LEASE SCHEDULE NO. 019**
**DATED APRIL 07, 2021**
**TO**
**MASTER LEASE AGREEMENT NO. OFI1045321**
**STIPULATED LOSS VALUE TABLE**

| AFTER MONTHLY PAYMENT | TOTAL STIPULATED LOSS VALUE | STIPULATED LOSS PERCENTAGE | AFTER MONTHLY PAYMENT | TOTAL STIPULATED LOSS VALUE | STIPULATED LOSS PERCENTAGE |
|---|---|---|---|---|---|
| 0 | $50,000,000 | 125.00% | 22 | $35,626,715 | 89.07% |
| 1 | $49,599,932 | 124.00% | 23 | $34,842,119 | 87.11% |
| 2 | $48,944,249 | 122.36% | 24 | $34,053,766 | 85.13% |
| 3 | $48,284,606 | 120.71% | 25 | $33,261,637 | 83.15% |
| 4 | $47,620,980 | 119.05% | 26 | $32,465,716 | 81.16% |
| 5 | $46,953,347 | 117.38% | 27 | $31,665,983 | 79.16% |
| 6 | $46,743,005 | 116.86% | 28 | $30,862,420 | 77.16% |
| 7 | $46,050,593 | 115.13% | 29 | $30,187,168 | 75.47% |
| 8 | $45,354,289 | 113.39% | 30 | $29,363,946 | 73.41% |
| 9 | $44,654,070 | 111.64% | 31 | $28,537,125 | 71.34% |
| 10 | $43,949,915 | 109.87% | 32 | $27,706,689 | 69.27% |
| 11 | $43,241,801 | 108.10% | 33 | $26,872,622 | 67.18% |
| 12 | $42,529,706 | 106.32% | 34 | $26,034,909 | 65.09% |
| 13 | $41,813,607 | 104.53% | 35 | $25,193,533 | 62.98% |
| 14 | $41,430,164 | 103.58% | 36 | $24,348,479 | 60.87% |
| 15 | $40,690,621 | 101.73% | 37 | $23,499,730 | 58.75% |
| 16 | $39,947,229 | 99.87% | 38 | $22,647,271 | 56.62% |
| 17 | $39,199,967 | 98.00% | 39 | $21,817,044 | 54.54% |
| 18 | $38,448,816 | 96.12% | 40 | $20,948,137 | 52.37% |
| 19 | $37,693,754 | 94.23% | 41 | $20,075,794 | 50.19% |
| 20 | $36,934,762 | 92.34% | 42 | $19,200,000 | 48.00% |
| 21 | $36,407,572 | 91.02% | and thereafter | | |

The Stipulated Loss Value for any item of lost, damaged or destroyed Property shall be the Lessor's original cost of such item of Property multiplied by the Stipulated Loss Percentage indicated in the above table which corresponds to the month of the Lease after the Lease Commencement Date in which the last Monthly Rental payment was made. In the event of a total loss or destruction, the Stipulated Loss Value for all lost or damaged Property shall be equal to the percentage or dollar amount, as the case may be, listed under the Total Stipulated Loss Value indicated above which corresponds to the month of the Lease after the Lease Commencement Date in which the last Monthly Rental payment was made. If a partial or total loss occurs at any time prior to the Lease Commencement Date of the Lease, then the Stipulated Loss Value shall be equal to 125% of the total amount funded. In the event the Lease is continued for any reason, then the last percentage or dollar amount, as the case may be, shown above shall control throughout any such continued term.

In the event of default under the Lease, Lessor may, in addition to all other remedies available to it under the Lease, recover the dollar amount listed under the Total Stipulated Loss Value indicated above as of the Monthly Rental payment date immediately preceding the date of the default.

LESSOR:

**ONSET FINANCIAL, INC.**

BY: _____
      Cathy Lawrence
TITLE:  Vice President

LESSEE:

**TRICO PRODUCTS CORPORATION**

BY: _____
TITLE:  EVP

**FRAMAUTO HOLDINGS, LLC**

BY: _____
TITLE:  EVP

CONFIDENTIAL

ONSET_00034443
FBG_CH1_00090564

 onset financial

June 3, 2021


Trico Products Corporation
3255 W Hamlin Road
Rochester Hills, MI 48309


Framauto Holdings, LLC
127 Public Square
Cleveland, OH 44114


Re:    Master Lease Agreement No. OFI1045321 dated May 9, 2018 and Lease Schedule No. 019 dated April 7, 2021 (collectively the "Lease") between **ONSET FINANCIAL, INC.** (the "Lessor") and **TRICO PRODUCTS CORPORATION** and **FRAMAUTO HOLDINGS, LLC.** as co-lessees (collectively, the "Lessee"). <u>All capitalized terms used herein but not defined herein shall have the same meanings ascribed to the in the Lease.</u>

| | |
|---|---|
| Term: | Forty-two (42) Base Period Monthly Rental payments remaining |
| Monthly Rental: | $955,200.00 USD |
| Lease Commencement Date: | July 1, 2021 |

Gentlemen:

Notice is hereby given that the above referenced Lease has been accepted as set forth in that Acceptance and Delivery Certificate executed by Lessee. Now therefore, the Base Period Monthly Rental payments are directed as follows:

All amounts from time to time payable under the Lease to the Lessor shall be paid to the Lessor at 274 West 12300 South, Draper, UT 84020 as follows: Forty-two (42) consecutive Base Period Monthly Rental payments of $955,200.00 due on July 1, 2021 through and including the Base Period Monthly Rental due on December 1, 2024.

Lessee, by signature below, acknowledges and agrees that the Lease is in full force and effect and Lessee is not in default thereunder; Lessee's obligations to make all payments under the Lease and the rights of Lessor in and to such amounts, shall be as set forth in the Lease; the Lessee has received no notice of a prior, transfer, assignment, hypothecation or pledge of the Lease or of the rents reserved thereunder; and the Lessee will not modify or consent to any modification of the terms of the Lease or enter into any sublease of the Property or assignment of the Lease without the prior written consent of the Lessor; the Lessee will not move the Property from its locations specified in the Acceptance and Delivery Certificate without the prior written consent of Lessor; the Lessor shall not have any affirmative obligation under the Lease except to take no action to impair Lessee's quiet enjoyment and use of the Property so long as the Lessee is not in default under the terms of the Lease.


[SIGNATURE PAGE TO FOLLOW]


CONFIDENTIAL

ONSET_00034433
FBG_CH1_00090565

 onset financial

[Signature page to Lease Commencement Letter
as it relates to Lease Schedule No. 019]

Sincerely,

ONSET FINANCIAL, INC.

By: _____

Cathy Lawrence

Title:   Vice President

The foregoing is hereby acknowledged and agreed to by the
undersigned:

LESSEE: TRICO PRODUCTS CORPORATION

By: _____

Title:   EVP

LESSEE: FRAMAUTO HOLDINGS, LLC

By: _____

Title:   EVP

CONFIDENTIAL

ONSET_00034434
FBG_CH1_00090566



## INVENTORY BILL OF SALE

For valuable consideration, the receipt of which is acknowledged, **TRICO PRODUCTS CORPORATION and FRAMAUTO HOLDINGS, LLC** (hereinafter collectively the "Seller"), having its principal place of business at 3255 W. Hamlin Road, Rochester Hills, Michigan 48309 and 127 Public Square, Cleveland, Ohio 44114, respectively, hereby sells, assigns and transfers all of its right, title and interest in and to the Property described herein to:

**ONSET FINANCIAL, INC.** (hereinafter the "Buyer")
274 West 12300 South
Draper, UT 84020

Property: All inventory, whether now in place or hereafter acquired, as identified by specific part numbers, consisting of raw components, component parts, all after-acquired raw components, work in progress, and finished goods, and as it relates to inventory maintained, kept and/or stored at Framauto Holdings, LLC located in Mexicali, Mexico, including all such items as they are replenished in the ordinary course of business, all as more fully described in the attached Exhibit A, as supplemented from time to time, which by this reference is made a part hereof (hereinafter the "Property").

Seller hereby represents and warrants to Buyer that Seller is the absolute owner of said Property, that said Property is free and clear of all liens, charges and encumbrances, and that Seller has full right and power and authority to sell, assign and transfer said Property, and to make this Bill of Sale, and that said sale has been duly authorized by all necessary action of Seller. Seller hereby assigns to Buyer all manufacturer, vendor and licensor representations, warranties and indemnities with respect to the Property.

This Bill of Sale is being delivered in connection with a certain Sale, Assignment and Transfer of Inventory dated April 7, 2021 between Buyer and Seller and all of Seller's representations and warranties contained therein are hereby incorporated herein as if fully set forth herein.

Dated: April 7, 2021

[Signature(s) on following page]

CONFIDENTIAL

ONSET_00034435
FBG_CH1_00090567

**DEBTORS' EXHIBIT NO. 175**
**Page 342 of 1907**

[Inventory Bill of Sale to Lease Schedule No. 019 Signature Page]

SELLER:

**TRICO PRODUCTS CORPORATION**

BY: _____

TITLE: _____

**FRAMAUTO HOLDINGS, LLC**

BY: _____

TITLE: _____

Trico Products Corporation
Master Lease Agreement No. OFI1045321
Lease Schedule No. 019

Page 2 of 2

CONFIDENTIAL

ONSET_00034436
FBG_CH1_00090568

**DEBTORS' EXHIBIT NO. 175**
**Page 343 of 1907**



### SALE, ASSIGNMENT AND TRANSFER OF INVENTORY

This Sale, Assignment and Transfer of Inventory (the "Assignment") is dated and effective April 7, 2021 by and between **TRICO PRODUCTS CORPORATION**, 3255 W. Hamlin Road, Rochester Hills, Michigan 48309 ("Trico Products"), **FRAMAUTO HOLDINGS, LLC**, 127 Public Square, Cleveland, Ohio 44114 ("Framauto") (Trico Products and Framauto are referred to herein individually and collectively as "Seller") and **ONSET FINANCIAL, INC.**, 274 West 12300 South, Draper, Utah 84020 (the "Buyer").

WHEREAS, Seller requests Buyer to purchase from Seller all of Seller's inventory located at the Seller's facility, as described in more detail on the attached Exhibit A, which by this reference is made a part hereof (the "Property"), and to lease the Property to Seller under the terms and conditions of Lease Schedule No. 019 dated April 7, 2021 (the "Schedule") to Master Lease Agreement No. OFI1045321 dated and effective as of May 9, 2018 (the "Master Lease") (the Master Lease and the Schedule are referred to herein collectively as the "Lease"); and

WHEREAS, Buyer is willing to purchase from Seller and lease the Property to Seller under the terms and conditions of this Assignment and the Lease;

NOW, THEREFORE, in consideration of the mutual promises herein, Seller and Buyer agree as follows:

1.      **Sale, Assignment and Transfer of Property.** Seller agrees to sell, assign and transfer to Buyer and Buyer agrees to purchase and acquire title to the Property, as described in more detail on the attached Exhibit A. Concurrent with the sale, Buyer agrees to lease the Property to Seller and Seller agrees to accept and lease the Property from Buyer for all purposes under the Lease pursuant to the terms and conditions of the Lease. In connection with Seller's sale of the Property to Buyer, Seller assigns to Buyer all warranties and indemnities from any supplier of raw components or component parts or otherwise with respect to the Property.

2.      **Purchase Price and Payment.** Buyer and Seller agree that the purchase price of the Property is $40,000,000.00 exclusive of applicable sales taxes (the "Purchase Price") which shall be payable to Seller pursuant to the terms and conditions of this Assignment, and the Lease. Specifically, the Buyer shall deliver the Purchase Price as directed by Seller in more detail in one or more pay proceeds letters executed by Seller in connection with the Lease.

3.      **Title.** The parties agree that title and ownership of the Property shall pass from Seller to Buyer upon payment of the Purchase Price specified herein. Accordingly, contemporaneously herewith, Seller shall execute and deliver an Inventory Bill of Sale in favor of Buyer formally transferring title in the Property to Buyer. Seller will execute and deliver such further documents and do such further acts and things as Buyer may reasonably request in order to fully effect the purposes of this Assignment and properly vest title in the Property with Buyer and protect Buyer's rights in the Property, including, but not limited to, recording or otherwise evidencing transfer of title in the Property to Buyer on any records or with any governmental agencies in the United States or Mexico, if so required. Seller shall provide insurance coverage for the Property from the date title passes to Buyer in accordance with the terms and conditions of the Master Lease, which terms and conditions are incorporated herein by this reference.

Page 1 of 7

CONFIDENTIAL

ONSET_00034444
FBG_CH1_00090569

4.    **Use of Property.**  As set forth in more detail in the Lease, Seller's use of the Property as lessee under the Lease includes the use of the Property by Framauto, particularly Framauto's use of the Property as inventory, which includes, but is not limited to, compilation, preparation of component parts into finished inventory product, and storage, distribution, conveying, transferring, and selling inventory in the ordinary course of Framauto's business.  By their signatures below, Seller and Buyer, hereby acknowledge and consent to Framauto's use of the Property, as set forth herein, provided that such use is in accordance with the terms and conditions of the Lease.  Framauto's use of the Property is further subject to the following representation and warranties that Seller makes hereby in favor and to the benefit of Buyer:

a.    Upon full execution of this Assignment and the Inventory Bill of Sale, Seller disclaims and waives any ownership, leasehold or other interest in the Property.

b.    While in Seller's possession and control, except for storing, distributing, conveying, transferring and selling the Property as inventory in the ordinary course of business, Seller will (i) not permit the Property to be removed from the Property Location, (ii) maintain and keep the Property in good condition and appearance and ready for distribution, transfer and sale in the ordinary course of business, and (iii) permit Buyer and/or its agents to inspect the Property at reasonable times.

c.    Seller will not permit the Property to become subject to any liens or encumbrances by Seller or by parties claiming through Seller.  Upon request from Buyer (as lessor), Seller agrees to cooperate with and assist Buyer (as lessor) in obtaining any landlord and/or mortgage waivers as lessor deems necessary to effectuate the purposes set forth in the Lease.

d.    Seller hereby authorizes Buyer (as lessor) to file UCC financing statements or their equivalents and other documents as needed against Seller, evidencing Buyer's right and interest in the Property.

e.    Buyer and Seller acknowledge that the Property is inventory and will be sold, transferred, assigned, conveyed or distributed by Lessee in its ordinary course of business and will be replenished by Seller also in its ordinary course of business.  Buyer (as lessor) acknowledges that, subject to the terms contained in the Lease, Seller is entitled to all proceeds from the sale or transfer of the Property.  Upon the sale or transfer of any item or portion of the Property in the ordinary course of Seller's business, Buyer agrees to automatically release all claims of title or ownership it has in and to that item or portion of Property sold, together with any related right, title or interest thereto.

5.    **Buyer's Purchase and Performance.**  Seller agrees that Buyer's obligations hereunder are expressly subject to the following conditions:

a.    Buyer's receipt of the executed Master Lease, Schedule, Stipulated Loss Schedule, Acceptance and Delivery Certificate, Inventory Bill of Sale for the Property given by Seller in favor of Buyer, UCC searches to be performed against Seller showing no security interests, liens or other encumbrances, partial releases of any UCC liens or encumbrances, evidence of Seller's ownership, and any other documentation reasonably required by Buyer, all in form acceptable to Buyer.

b.    Buyer's receipt of Incumbency Certificates in form acceptable to Buyer evidencing Seller's authority to enter into this sale and leaseback transaction with Buyer.

CONFIDENTIAL

ONSET_00034445
FBG_CH1_00090570

**DEBTORS' EXHIBIT NO. 175**
**Page 345 of 1907**

6.  **Taxes**.  Seller represents and warrants that it is responsible for and it has paid all sales and use, property and other taxes assessed or due in connection with Seller's purchase, use and possession of the Property prior to the sale to Buyer hereunder.  Seller agrees to pay to Buyer an amount equal to all taxes paid, payable or required to be collected by Buyer, however designated, which are levied or based on the rental, on the Lease or on the Property or on its purchase for lease hereunder, or on its use, lease, possession, operation, control or value (including, without limitation, state and local privilege or excise taxes based on gross revenue), any penalties or interest in connection therewith or taxes or amounts in lieu thereof paid or payable by Buyer in respect of the foregoing, but excluding taxes based on Buyer's net income.  Buyer shall deliver to Seller a duly executed sales tax exemption certificate for the Property, prior to Buyer's payment of the Purchase Price.

7.  **Seller's Representations and Warranties**.  Seller represents and warrants to Buyer that:

a.  Seller, individually and collectively, are either a corporation or recognized business entity, duly organized, validly existing and in good standing under the laws of the state, province or country of its incorporation or organization and in all jurisdictions where such qualification is required for it to conduct its business.

b.  Each Seller, individually and collectively, has all requisite power and authority to conduct its business, to own and lease its properties and to enter into and perform all of its obligations under this Assignment.

c.  This Assignment has been duly authorized by each Seller, individually and collectively, and upon execution and delivery by the parties thereto, shall constitute the valid, legal and binding obligation of each Seller enforceable in accordance with its terms.

d.  No event has occurred or is continuing which constitutes an event of default under this Assignment.  There is no action, suit or proceeding pending or threatened against or effecting either Seller, individually and/or collectively, before or by any court, administrative agency or other governmental authority which brings into question the validity of the transaction contemplated by this Assignment or which might materially impair the ability of either Seller to perform its obligations under this Assignment or the transaction contemplated hereby.

e.  Neither the execution and delivery by either Seller, individually and/or collectively, of this Assignment, nor the compliance by each Seller with the provisions of any thereof, conflicts with or results in a breach of any of the provisions of the Articles of Incorporation, By-Laws or other charter or organizational documents of Seller, or of any applicable law, judgment, order, writ, injunction, decree, rule or regulation of any court, administrative agency or other governmental authority, or of any agreement or other instrument to which each Seller is a party or by which it is bound, or constitutes or will constitute a default under any thereof.

f.  The transaction contemplated by this Assignment complies with all applicable federal, state, municipal or provincial laws, rules and regulations applicable to each Seller, individually and/or collectively.

g.  No consent, approval or authorization of or by any court, administrative agency or other governmental authority is required in connection with the execution, delivery or performance by each Seller, individually and collectively, of, or the consummation by each Seller of the transaction contemplated by this Assignment.



CONFIDENTIAL

ONSET_00034446
FBG_CH1_00090571

**DEBTORS' EXHIBIT NO. 175**
**Page 346 of 1907**

h.        Each Seller, individually and collectively, represents and warrants that it has either direct or indirect claims of title or ownership interest in and to the Property and each Seller is transferring to Buyer all claims of title and/or ownership interest that it has to Buyer and that the transfer of such claims of title and/or ownership interest constitutes and will vest good and marketable title to the Property in Buyer, free and clear of all liens and encumbrances of any kind or description. Each Seller represents and warrants that no other parties, except Seller, individually and collectively, have claims of title and/or ownership interest in and to the Property. Except for Seller's use of the Property as inventory in the ordinary course, which includes, but is not limited to storing, distributing, conveying, transferring and selling inventory in ordinary course, each Seller represents and warrants that the Property is, and at the time of closing will be, located at Seller's premises identified on the Acceptance and Delivery Certificate, in good condition and appearance ready for distribution, transfer and sale in the ordinary course of business.

8.        **Buyer's Representations and Warranties.** Buyer represents and warrants to Seller that:

a.        Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Utah and in all jurisdictions where such qualification is required for it to conduct business.

b.        Buyer has all requisite power and authority to conduct its business, to own and lease its properties and to enter into and perform all of its obligations under this Assignment.

c.        This Assignment has been duly authorized by Buyer, and upon the execution and delivery by the parties thereto, shall constitute the valid, legal and binding obligation of Buyer enforceable in accordance with its terms.

9.        **Default and Remedies.** In the event any of Seller's representations and warranties made hereunder should be false or misleading in any material respect, or in the event Seller should breach any of its warranties or obligations under this Assignment, Buyer shall be entitled to exercise all rights and remedies available to it at law or in equity together with all of its rights and remedies under the Lease as if they were set forth in this Assignment, and for purposes hereof all such rights and remedies shall be incorporated herein by this reference.

10.        **Successors.** Buyer and Seller agree that this Assignment shall inure to the benefit of and shall be binding upon Seller and Buyer, their respective successors and assigns. Any assignment by Buyer shall not require Seller's prior written approval provided such assignee agrees to observe Buyer's covenant of quiet enjoyment under the Lease. Seller shall not assign any interest in this Assignment without Buyer's prior written consent.

11.        **Survival of Covenants.** Buyer and Seller agree that the warranties, covenants and agreements contained in this Assignment shall survive the passing of title to the Property.

12.        **Miscellaneous.** Section titles are not intended to, and shall not limit or otherwise affect the interpretation of this Assignment. If any provision of this Assignment shall be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions hereof shall not be affected or impaired in any way. Any modifications to this Assignment shall be in writing and shall be signed by both parties and their last known assignees, if any. Any terms capitalized herein shall have the meaning set forth in the Master Lease and the Schedule, which are incorporated herein by reference.

CONFIDENTIAL

ONSET_00034447
FBG_CH1_00090572

13.     **Entire Agreement.**  Seller and Buyer agree that this Assignment and the Lease, together with any amendments, supplements or riders thereto, shall constitute the entire agreement between the parties with respect to the Property and shall supersede all proposals, oral or written, all prior negotiations and all other communications.

14.     **Legal and Administrative Expenses.**   Seller shall reimburse Buyer for all charges, costs, expenses and attorney fees incurred by Buyer in connection with this sale/leaseback transaction.

15.     **No Brokers Fee.**  Each party represents it has retained no brokers in this transaction and indemnifies the other party against any brokers' or other fees which might result from the indemnifying party's actions.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be duly executed by their authorized representatives as of the day and year first above written.

[Signature(s) on following page]

CONFIDENTIAL

ONSET_00034448
FBG_CH1_00090573

**DEBTORS' EXHIBIT NO. 175**
**Page 348 of 1907**

[Sale, Assignment and Transfer of Inventory Signature Page No. 019]

BUYER:                                          SELLER:

ONSET FINANCIAL, INC.                           TRICO PRODUCTS CORPORATION

BY: _____                       BY: _____
        Cathy Lawrence
TITLE:   Vice President                         TITLE: _____


                                                and


                                                FRAMAUTO HOLDINGS, LLC

                                                BY: _____

                                                TITLE: _____


Page 6 of 7

CONFIDENTIAL                                    ONSET_00034449
                                               FBG_CH1_00090574

**DEBTORS' EXHIBIT NO. 175**
**Page 349 of 1907**

## EXHIBIT A

All inventory, whether now in place or hereafter acquired, and related items at any given time located at the Seller's facility located at Street Lazaro Cardenas 3101, Parque Industrial Progreso, Mexicali, Mexico 21188, including, but not limited to, raw components, component parts, work in progress, finished goods and all after-acquired raw components, component parts, work in progress, and finished goods, as such items are replenished in the ordinary course of business.

Page 7 of 7

CONFIDENTIAL

ONSET_00034450
FBG_CH1_00090575



## ACKNOWLEDGEMENT AND WAIVER

This Acknowledgement and Waiver is given February 15, 2022 by **FRAM GROUP OPERATIONS MEXICALI, S.A. DE C.V.** ("Bailee") of Blvd. Lazaro Cardenas No. 3101 Parque Industrial Progreso Mexicali, Baja California, 21188 Mexico to **ONSET FINANCIAL, INC.** ("Onset") of 274 West 12300 South, Draper, Utah 84020 as it relates to the following premises: Blvd. Lazaro Cardenas No. 3101 Parque Industrial Progreso Mexicali, Baja California, 21188 Mexico
(the "Premises").

Bailee is a related party of **TRICO PRODUCTS CORPORATION** (the "Lessee"). Bailee acknowledges that pursuant to one or more lease schedules (the "Schedules") which Onset, as Lessor, has or may enter into with Lessee, each of which Schedules incorporate by reference the terms and conditions of that Master Lease Agreement No. OFI1045321 dated May 9, 2018, including any amendments thereto, between Onset and Lessee (the "Master Lease"), Onset has or may lease items of property (all or any part thereof referred to herein as the "Property") to Lessee. Bailee further acknowledges that from time to time Lessee may deliver possession of such Property to Bailee for use in its operations.

As an inducement to Onset to enter into the Schedules, Bailee represents and warrants to Onset as follows:

1. Bailee's possession, use and control of any Property is, and will always be, subject to all of the terms and conditions of the Schedule and Master Lease and subordinate to all of Onset's and Lessee's rights, interests and remedies under the Schedules.

2. Bailee disclaims and waives any ownership, leasehold or other interest in the Property.

3. While in Bailee's possession and control, Bailee will not permit the Property to be removed from the Premises specified in the first paragraph above, and Bailee will maintain and keep the Property in good operating conditions at that location and will permit Onset and its agents to inspect the Property at reasonable times.

4. Bailee will not permit the Property to become subject to any liens or encumbrances by Bailee or by parties claiming through Bailee. Upon request from Lessor, Bailee agrees to cooperate with and assist Lessor in obtaining any landlord and/or mortgage waivers as Lessor deems necessary to effectuate the purposes set forth herein and in the Lease.

5. Bailee hereby authorizes Onset to file UCC financing statements and other documents against Bailee evidencing Onset's right and interest in the Property and Schedules.

6. Bailee acknowledges Onset's right to assign its rights and interests under this instrument to its underwriters and assigns, and any such assignee shall be an intended third-party beneficiary under this instrument.

[Signature(s) on following page]

Page 1 of 2

S:\UTSI-VS-WPS01\OSFI Local\Lease Operations\Master Library\Acknowledgement & Waiver\A&W - OFI.docx

CONFIDENTIAL

ONSET_00035035
FBG_CH1_00090576

**DEBTORS' EXHIBIT NO. 175**
**Page 351 of 1907**

[Acknowledgement and Waiver Signature Page]

**FRAM GROUP OPERATIONS MEXICALI, S.A. DE C.V.**

BY: _____

NAME:   Stephen Edward Graham

TITLE:   Director

Page 2 of 2

\\TSJ-VS-WES03\GSPL\Local\Lease Operations\Master Library\Acknowledgment & Waiver\A&W - OP1.docx

CONFIDENTIAL

ONSET_00035036
FBG_CH1_00090577



## ACCEPTANCE AND DELIVERY CERTIFICATE
## TO
## LEASE SCHEDULE NO. 019

Reference is made to Lease Schedule No. 019 dated April 7, 2021 (the "Schedule") which incorporates the terms and conditions of Master Lease Agreement No. OFI1045321 dated May 9, 2018 (the "Master Lease") between **ONSET FINANCIAL, INC.** (the "Lessor") and **TRICO PRODUCTS CORPORATION** and **FRAMAUTO HOLDINGS, LLC**, as co-lessees (collectively, the "Lessee"). The Master Lease and Schedule shall be referenced herein collectively as the Lease. All capitalized terms used herein but not defined herein shall have the same meanings ascribed to them in the Master Lease.

SECTION 1   PROPERTY: All inventory as identified by specific part numbers, consisting of raw components, component parts, all after-acquired raw components, work in progress, and finished goods, and as it relates to inventory maintained, kept and/or stored at Framauto Holdings, LLC located in Mexicali, Mexico, and any and all attachments, replacements, parts, substitutions, additions, repairs, accessions, and accessories incorporated therein and/or affixed thereto, as more fully described on the attached Exhibit A, which Exhibit A shall automatically be updated and replaced upon Lessor's quarterly receipt of Inventory List.

SECTION 2   PROPERTY LOCATION: Framauto Holdings, LLC located at Street Lazaro Cardenas 3101, Parque Industrial Progreso, Mexicali, Mexico 21188

SECTION 3   DATE OF ACCEPTANCE: April 7, 2021

SECTION 4   CONDITION OF THE PROPERTY: Lessee hereby acknowledges that all items of Property described in Section 1 have been delivered and received, by Lessee and will be maintained, kept and/or stored at the Property Location in Lessee's ordinary course of business. Lessee hereby unconditionally and irrevocably accepts the Property for all purposes under the Lease.

SECTION 5   DISBURSEMENTS: By signature below, Lessee hereby authorizes and directs Lessor to remit proceeds directly to Lessee in the amount of $40,000,000.00 USD for the Property.

[Signatures on following page]

CONFIDENTIAL

ONSET_00034431
FBG_CH1_00090578

[Acceptance and Delivery Certificate to Lease Schedule No. 019 Signature Page]

LESSEE: **TRICO PRODUCTS CORPORATION**       **FRAMAUTO HOLDINGS, LLC**

BY: _____       BY: _____

TITLE: _____    TITLE: _____

Page 2 of 2

ONSET_00034432
FBG_CH1_00090579

**DEBTORS' EXHIBIT NO. 175**
**Page 354 of 1907**

# DOCUMENT PRODUCED NATIVELY

CONFIDENTIAL

ONSET_00035242
FBG_CH1_00090580

**EXHIBIT A**
Trico Products Corporation
Master Lease No. OFI1045321
Lease Schedule No. 019
Equipment Location:
Framauto Holdings, LLC located at Street Lazaro Cardenas 3101, Parque Industrial Progreso, Mexicali, Mexico 21188

| Part # | Description | Quantity | Extended Value (in USD) |
|---|---|---|---|
| 201873 | Shell | 891 | 457.09 |
| 221873 | Shell Assembly | 19,161 | 10,825.97 |
| 222751 | Shell Assembly | 118 | 163.77 |
| 222769 | Shell Assembly | 9,040 | 17,606.58 |
| 222820 | Shell Assembly | 7,146 | 10,246.65 |
| 222940 | Shell Assembly | 313 | 493.41 |
| 222988 | Shell Assembly | 24,316 | 5,035.11 |
| 223121 | Shell Assembly | 1,552 | 2,144.38 |
| 223202 | Shell Assembly | 12,090 | 3,445.65 |
| 223204 | Shell Assembly | 10,320 | 5,732.76 |
| 223207 | Shell Assembly | 360 | 109.80 |
| 223219 | Shell Assembly | 1,860 | 472.44 |
| 223221 | Shell Assembly | 13,950 | 4,645.35 |
| 233055 | Platinum Welded Shel | 422 | 539.66 |
| 233207 | Platinum Welded Shel | 1,452 | 717.94 |
| 233211 | Shell Assembly | 20,586 | 10,755.16 |
| 233219 | Platinum Welded Shel | 3,464 | 1,536.11 |
| 233221 | Platinum Welded Shel | 2,754 | 1,438.82 |
| 400762 | Terminal Stud | 942 | 29.84 |
| 732230 | Material | 6,074 | 3,895.68 |
| 732250 | Material | 547 | 395.91 |
| 940010 | Ground Shield | 50,166 | 42,380.23 |
| 941929 | Ground Shield | 66,538 | 33,599.75 |
| 941930 | Ground Shield | 27,224 | 13,747.33 |
| 941931 | Ground Shield | 104,599 | 51,804.82 |
| 941935 | Ground Shield | 9,204 | 4,558.46 |
| 6800343 | Material | 44 | 228.82 |
| 6800533 | Material | 33,692 | 268,305.22 |
| 6800957 | Material | 2,752 | 9,460.01 |
| 6800960 | Material | 524 | 5,895.00 |
| 6800974 | Material | 111 | 137.04 |
| 6801354 | Material | 874 | 6,598.69 |
| 6801488 | Material | 1,181 | 299.01 |
| 6801825 | Material | 4,654 | 45,521.62 |
| 6801826 | Material | 1,473 | 6,304.46 |
| 6801841 | Material | 545 | 2,318.98 |
| 6801842 | Material | 2,941 | 3,779.17 |
| 6801864 | Material | 5,127 | 816.74 |
| 6801868 | Material | 529 | 782.92 |
| 6801871 | Material | 7,714 | 73,745.84 |
| 6801923 | Material | 514 | 15,677.00 |
| 6801936 | Material | 23,578 | 27,220.57 |
| 6801964 | Material | 245 | 394.52 |
| 6801976 | Material | 9,484 | 99,866.52 |
| 6801977 | Material | 249 | 4,327.63 |
| 6802027 | Material | 1,059 | 1,644.07 |
| 6802028 | Material | 1,348 | 3,066.73 |
| 6802061 | Material | 910 | 5,623.80 |
| 100002302 | Packaging Label | 994 | 54.34 |
| 100007809 | Packaging | 25,597 | 2,892.46 |
| 100009507 | Packaging | 1,507 | 81.07 |
| 100012833 | Packaging | 5,580 | 9,241.10 |
| 100073585 | Packaging Label | 4,799 | 33.93 |
| 100073739 | Packaging Label | 12,400 | 217.00 |
| 102234M | Insulator | 12,963 | 2,229.64 |
| 102268M | Insulator | 7,776 | 1,346.41 |
| 102275M | Insulator | 43,287 | 14,289.90 |
| 102276M | Insulator | 14,818 | 2,498.17 |
| 102281M | Insulator | 4,092 | 731.04 |
| 102283A | Insulator | 136,896 | 13,689.60 |
| 102283M | Insulator | 180,172 | 30,683.29 |
| 102374A | Insulator | 2,325 | 298.28 |
| 102376A | Insulator | 51,693 | 5,598.36 |
| 102430M | Insulator | 1,674 | 264.76 |
| 102447A | Insulator | 31 | 3.10 |
| 102479M | Insulator | 13,482 | 2,329.56 |
| 102491M | Insulator | 11,997 | 2,035.41 |
| 102492M | Insulator | 5,041 | 839.22 |
| 102507A | Insulator | 27,057 | 2,930.27 |

FBG_CH1_00090581

| | | | |
|---|---|---:|---:|
| 102507M | Insulator | 2,604 | 414.32 |
| 102511M | Insulator | 3,743 | 600.54 |
| 102563A | Insulator | 57,338 | 6,209.70 |
| 102570M | Insulator | 6,448 | 1,105.96 |
| 102707M | Insulator | 26,325 | 10,595.55 |
| 102768M | Insulator | 7,944 | 1,321.17 |
| 102789M | Insulator | 14,618 | 2,442.53 |
| 102803A | Insulator | 11,341 | 1,228.23 |
| 102803M | Insulator | 36 | 6.15 |
| 102829M | Insulator | 3,178 | 539.16 |
| 102895M | Insulator | 35,154 | 5,868.97 |
| 102938A | Insulator | 73,098 | 7,309.80 |
| 102938M | Insulator | 13,919 | 2,305.69 |
| 102939A | Insulator | 69,750 | 6,975.00 |
| 102939M | Insulator | 21,700 | 3,476.77 |
| 102942M | Insulator | 29,200 | 4,683.10 |
| 102947A | Insulator | 319 | 34.55 |
| 102947M | Insulator | 122 | 21.19 |
| 102959M | Insulator | 34,410 | 5,425.78 |
| 102991A | Insulator | 319,049 | 34,553.09 |
| 102991F | Insulator | 175,996 | 29,433.55 |
| 103073A | Insulator | 124,000 | 13,429.20 |
| 103078A | Insulator | 1,023 | 110.79 |
| 103095M | Insulator | 17,309 | 2,904.62 |
| 103123A | Insulator | 43,651 | 4,727.40 |
| 103158M | Insulator | 11,369 | 1,891.35 |
| 103161M | Insulator | 28,698 | 4,917.41 |
| 103169M | Insulator | 7,294 | 1,200.38 |
| 103170A | Insulator | 37,200 | 4,028.76 |
| 103170M | Insulator | 186 | 29.73 |
| 103171M | Insulator | 35,154 | 6,023.28 |
| 103172A | Insulator | 496 | 53.72 |
| 103172M | Insulator | 713 | 119.91 |
| 103173M | Insulator | 72,695 | 11,587.58 |
| 103183A | Insulator | 11,780 | 1,275.77 |
| 103184M | Insulator | 56,963 | 9,116.36 |
| 103186A | Insulator | 66,588 | 7,211.55 |
| 103186M | Insulator | 43,589 | 7,474.21 |
| 103191A | Insulator | 9,419 | 1,020.06 |
| 103191M | Insulator | 118 | 19.98 |
| 103193A | Insulator | 15,382 | 1,538.20 |
| 103193M | Insulator | 7,818 | 1,334.84 |
| 103195M | Insulator | 30,380 | 4,819.48 |
| 103197M | Insulator | 19,625 | 3,418.09 |
| 103199M | Insulator | 35,154 | 6,074.26 |
| 103211A | Insulator | 32,979 | 3,571.58 |
| 103211M | Insulator | 218,858 | 37,000.08 |
| 103219M | Insulator | 29,574 | 5,002.14 |
| 103220M | Insulator | 8,711 | 1,471.12 |
| 103255A | Insulator | 2,010 | 217.68 |
| 103255M | Insulator | 1,514 | 238.44 |
| 103256A | Insulator | 15,500 | 1,550.00 |
| 103256M | Insulator | 71,940 | 11,568.66 |
| 103257A | Insulator | 181,548 | 19,661.64 |
| 103257M | Insulator | 4,760 | 761.51 |
| 103258M | Insulator | 8,432 | 1,361.94 |
| 103259M | Insulator | 22,444 | 3,588.58 |
| 103265M | Insulator | 26,908 | 4,256.30 |
| 103266A | Insulator | 15,500 | 1,860.00 |
| 103275M | Insulator | 27,606 | 4,624.83 |
| 103276M | Insulator | 133,796 | 22,547.31 |
| 103282M | Insulator | 16,058 | 2,758.12 |
| 103294A | Insulator | 17,210 | 1,721.00 |
| 103313A | Insulator | 977,070 | 105,816.98 |
| 103313F | Insulator | 555,309 | 92,869.92 |
| 103334M | Insulator | 3,357 | 567.57 |
| 103336M | Insulator | 558 | 91.12 |
| 103338M | Insulator | 15,125 | 2,692.24 |
| 103344M | Insulator | 25,544 | 4,313.87 |
| 103348M | Insulator | 6,386 | 1,160.53 |
| 103353A | Insulator | 35,294 | 3,822.32 |
| 103354A | Insulator | 48,825 | 6,264.26 |
| 103358A | Insulator | 459,674 | 49,782.86 |
| 103359A | Insulator | 215,450 | 23,333.25 |
| 103359M | Insulator | 52,530 | 8,318.12 |
| 103362M | Insulator | 3,472 | 558.60 |
| 103365A | Insulator | 74,687 | 8,088.59 |

FBG_CH1_00090582

**DEBTORS' EXHIBIT NO. 175**
**Page 357 of 1907**

| | | | |
|---|---|---|---|
| 103368A | Insulator | 1,168,610 | 126,560.71 |
| 103368F | Insulator | 14,936 | 2,497.90 |
| 103373A | Insulator | 133,300 | 14,436.39 |
| 103373M | Insulator | 15,905 | 2,518.23 |
| 103374A | Insulator | 10,903 | 1,180.81 |
| 103375M | Insulator | 25,081 | 4,115.79 |
| 103376A | Insulator | 1,163 | 125.98 |
| 103377A | Insulator | 51,228 | 5,547.98 |
| 103377M | Insulator | 651 | 106.69 |
| 103378A | Insulator | 38,285 | 4,146.27 |
| 103386M | Insulator | 9,145 | 1,692.29 |
| 103404M | Insulator | 1,928 | 323.42 |
| 103437M | Insulator | 19,747 | 3,198.63 |
| 103458A | Insulator | 150,350 | 15,035.00 |
| 103458M | Insulator | 32,984 | 5,250.07 |
| 103470M | Insulator | 97,325 | 16,220.18 |
| 103471M | Insulator | 88,598 | 14,765.75 |
| 103481A | Insulator | 115,844 | 12,545.94 |
| 103493M | Insulator | 26,381 | 4,282.99 |
| 103494M | Insulator | 13,625 | 2,237.37 |
| 103495M | Insulator | 14,407 | 2,243.09 |
| 103496M | Insulator | 18,358 | 5,204.13 |
| 103497M | Insulator | 13,733 | 3,997.54 |
| 103499M | Insulator | 7,880 | 1,255.65 |
| 103500M | Insulator | 6,803 | 1,923.55 |
| 103501M | Insulator | 20,342 | 3,193.90 |
| 103502M | Insulator | 13,020 | 2,048.31 |
| 103504A | Insulator | 89,900 | 9,736.17 |
| 103504M | Insulator | 60,760 | 9,627.42 |
| 103512A | Insulator | 98 | 9.80 |
| 103512C | Insulator | 118,108 | 13,381.61 |
| 103513A | Insulator | 9,300 | 1,193.19 |
| 103514M | Insulator | 28,280 | 4,501.33 |
| 103517A | Insulator | 1,411,968 | 152,916.61 |
| 103517F | Insulator | 1,928,798 | 322,572.20 |
| 103518A | Insulator | 8,595 | 930.86 |
| 103518M | Insulator | 10,959 | 1,746.31 |
| 103527A | Insulator | 150,677 | 16,318.39 |
| 103527C | Insulator | 13,175 | 1,492.73 |
| 103532M | Insulator | 18,578 | 2,868.07 |
| 103534A | Insulator | 89,900 | 8,990.00 |
| 103534M | Insulator | 22,987 | 3,631.26 |
| 103535A | Insulator | 15,500 | 1,550.00 |
| 103535M | Insulator | 29,931 | 4,756.04 |
| 103540A | Insulator | 15,345 | 1,534.50 |
| 103540M | Insulator | 57,288 | 9,286.96 |
| 103549A | Insulator | 15,500 | 1,550.00 |
| 103549M | Insulator | 41,915 | 6,621.31 |
| 103555M | Insulator | 9,300 | 1,574.77 |
| 103556M | Insulator | 12,416 | 2,094.58 |
| 103557M | Insulator | 115,258 | 19,414.06 |
| 103558M | Insulator | 253 | 42.92 |
| 103559M | Insulator | 41,731 | 7,051.71 |
| 103560M | Insulator | 63,246 | 10,655.05 |
| 103568F | Insulator | 157,635 | 37,339.00 |
| 103568M | Insulator | 115,429 | 18,560.99 |
| 103570M | Insulator | 2,911 | 464.44 |
| 103576M | Insulator | 25,761 | 4,066.12 |
| 103580A | Insulator | 30,070 | 3,608.40 |
| 103589M | Insulator | 47,461 | 7,627.94 |
| 103590M | Insulator | 30,380 | 4,859.89 |
| 103593A | Insulator | 240 | 570.05 |
| 103593B | Insulator | 37,118 | 17,753.54 |
| 103593M | Insulator | 136 | 103.59 |
| 103594A | Insulator | 5,115 | 12,149.15 |
| 103594B | Insulator | 591 | 282.69 |
| 103595A | Insulator | 1,910 | 4,536.64 |
| 103595B | Insulator | 271 | 129.62 |
| 103596B | Insulator | 3,170 | 1,516.21 |
| 103597B | Insulator | 1,085 | 518.96 |
| 103598B | Insulator | 13,707 | 6,556.06 |
| 103600A | Insulator | 5,735 | 13,621.77 |
| 103600B | Insulator | 10,072 | 4,817.43 |
| 103608A | Insulator | 601,865 | 65,181.98 |
| 103608F | Insulator | 207,150 | 34,643.75 |
| 103621M | Insulator | 10,990 | 1,739.50 |
| 103622M | Insulator | 8,680 | 2,495.50 |

FBG_CH1_00090583

| | | | |
|---|---|---|---|
| 103623M | Insulator | 1,586 | 249.02 |
| 103626M | Insulator | 8,370 | 1,358.87 |
| 103627M | Insulator | 3,348 | 559.86 |
| 103629M | Insulator | 27,266 | 4,410.27 |
| 103630M | Insulator | 1,736 | 268.89 |
| 103631M | Insulator | 5,580 | 937.72 |
| 103632M | Insulator | 19,530 | 3,363.84 |
| 103633M | Insulator | 19,530 | 3,273.62 |
| 103634M | Insulator | 6,665 | 1,117.19 |
| 103640M | Insulator | 2,122 | 356.45 |
| 103642M | Insulator | 11,222 | 1,923.57 |
| 103647M | Insulator | 21,499 | 3,624.95 |
| 103650M | Insulator | 2,826 | 459.43 |
| 103651M | Insulator | 39,060 | 6,428.10 |
| 103652M | Insulator | 47,988 | 8,078.79 |
| 103656M | Insulator | 525 | 88.54 |
| 103657A | Insulator | 4,498 | 487.15 |
| 103659M | Insulator | 138,446 | 21,796.94 |
| 103661A | Insulator | 73,005 | 7,906.44 |
| 103662A | Insulator | 62,000 | 6,714.62 |
| 103663M | Insulator | 8,635 | 1,367.70 |
| 103664M | Insulator | 121,520 | 19,302.24 |
| 103668M | Insulator | 91,140 | 14,716.38 |
| 103680A | Insulator | 361,624 | 39,164.03 |
| 103680F | Insulator | 254,925 | 53,773.90 |
| 103681A | Insulator | 45,198 | 4,519.80 |
| 103681M | Insulator | 718 | 277.20 |
| 103688A | Insulator | 299,347 | 32,419.41 |
| 103688F | Insulator | 541,716 | 95,255.40 |
| 103690B | Insulator | 446,245 | 57,253.23 |
| 103690M | Insulator | 704 | 111.77 |
| 103691A | Insulator | 120,683 | 13,070.00 |
| 103694C | Insulator | 340,954 | 38,630.06 |
| 103694F | Insulator | 667,974 | 140,902.43 |
| 103696A | Insulator | 42,510 | 4,603.79 |
| 103702B | Insulator | 5,504 | 2,632.59 |
| 103703B | Insulator | 725 | 346.76 |
| 103703M | Insulator | 8,085 | 6,163.20 |
| 103704B | Insulator | 1,133 | 203.94 |
| 103704M | Insulator | 3,160 | 2,423.59 |
| 103705B | Insulator | 15,117 | 7,230.48 |
| 103706B | Insulator | 8,641 | 4,133.00 |
| 103712A | Insulator | 80,464 | 13,456.79 |
| 103712M | Insulator | 105 | 16.58 |
| 103713M | Insulator | 59,557 | 9,359.38 |
| 103714M | Insulator | 20,522 | 3,225.04 |
| 103715A | Insulator | 7,065 | 1,128.99 |
| 103715M | Insulator | 33,852 | 5,313.07 |
| 103730A | Insulator | 26,291 | 2,847.31 |
| 103730M | Insulator | 849 | 157.82 |
| 103732A | Insulator | 19,711 | 2,134.73 |
| 103748A | Insulator | 271,278 | 43,350.15 |
| 103748B | Insulator | 14,737 | 1,890.96 |
| 103749M | Insulator | 11,036 | 1,743.25 |
| 103753A | Insulator | 302,718 | 53,229.73 |
| 103753B | Insulator | 13,423 | 1,722.17 |
| 103759A | Insulator | 427,030 | 83,228.19 |
| 103759B | Insulator | 746,144 | 95,730.25 |
| 103759M | Insulator | 536 | 78.32 |
| 103760M | Insulator | 4,345 | 692.12 |
| 103761A | Insulator | 24,800 | 3,181.86 |
| 103762A | Insulator | 9,300 | 1,193.19 |
| 103763A | Insulator | 29,450 | 3,778.44 |
| 103763M | Insulator | 1,821 | 291.61 |
| 103764M | Insulator | 10,292 | 1,641.87 |
| 103765M | Insulator | 23,554 | 3,757.57 |
| 103772A | Insulator | 167,943 | 18,188.20 |
| 103773M | Insulator | 12,016 | 2,192.86 |
| 103775M | Insulator | 22,363 | 4,119.72 |
| 103777M | Insulator | 30,380 | 4,677.61 |
| 103778M | Insulator | 1,008 | 204.17 |
| 103780M | Insulator | 2,984 | 606.92 |
| 103784A | Insulator | 144,576 | 28,177.90 |
| 103784B | Insulator | 4,247 | 587.42 |
| 103785M | Insulator | 14,886 | 5,611.28 |
| 103809A | Insulator | 279,750 | 54,523.29 |
| 103809B | Insulator | 70,423 | 9,739.64 |

FBG_CH1_00090584

| | | | |
|---|---|---|---|
| 103817A | Insulator | 83,509 | 16,275.94 |
| 103817B | Insulator | 63,039 | 11,239.85 |
| 103818A | Insulator | 173,168 | 33,750.52 |
| 103818B | Insulator | 126 | 22.45 |
| 103820M | Insulator | 17,329 | 2,914.56 |
| 103821M | Insulator | 24,304 | 3,817.91 |
| 103823A | Insulator | 9,833 | 1,916.44 |
| 103823B | Insulator | 104,899 | 14,507.60 |
| 103824A | Insulator | 174,845 | 34,077.36 |
| 103824B | Insulator | 3,785 | 523.53 |
| 103834A | Insulator | 15,686 | 1,698.80 |
| 103834M | Insulator | 99,806 | 18,213.59 |
| 103843A | Insulator | 79,868 | 8,649.78 |
| 103844A | Insulator | 56,271 | 7,782.27 |
| 103850A | Insulator | 166 | 21.30 |
| 103850M | Insulator | 160 | 22.91 |
| 103852M | Insulator | 5,650 | 892.47 |
| 103853M | Insulator | 85,878 | 13,863.29 |
| 103854A | Insulator | 23,600 | 2,555.89 |
| 103855A | Insulator | 150,242 | 16,271.24 |
| 103856M | Insulator | 159,862 | 25,491.60 |
| 103858M | Insulator | 101,395 | 18,591.78 |
| 103859A | Insulator | 375,100 | 40,623.33 |
| 103861B | Insulator | 45,147 | 5,792.35 |
| 103862A | Insulator | 1,263 | 519.60 |
| 103862B | Insulator | 52,985 | 6,798.01 |
| 103870M | Insulator | 23,498 | 3,495.10 |
| 103871A | Insulator | 556,622 | 228,994.34 |
| 103871B | Insulator | 307,077 | 39,398.14 |
| 103872A | Insulator | 12,400 | 1,488.00 |
| 103876A | Insulator | 362,974 | 58,003.21 |
| 103877A | Insulator | 975 | 96.49 |
| 103888A | Insulator | 10,137 | 1,216.44 |
| 103890A | Insulator | 7,130 | 926.90 |
| 103891A | Insulator | 1,614 | 209.82 |
| 19347368TP | Packaging | 4,170 | 9,830.07 |
| 19347368UB | Packaging | 12,299 | 655.17 |
| 19347370TP | Packaging | 82,880 | 18,501.31 |
| 19347370UB | Packaging | 206,212 | 11,135.45 |
| 19351268TP | Packaging | 4,452 | 993.83 |
| 19351268UB | Packaging | 27,823 | 1,501.60 |
| 19351279TP | Packaging | 3,424 | 764.34 |
| 19351279UB | Packaging | 17,083 | 921.96 |
| 19375677FP | Packaging | 2,856 | 127.83 |
| 19375677UB | Packaging | 4,915 | 100.66 |
| 212479CP | Shell Assembly | 105,254 | 18,528.91 |
| 212480CP | Shell Assembly | 33,145 | 5,758.94 |
| 212481CP | Shell Assembly | 13,115 | 1,768.30 |
| 212481DZ | Shell Assembly | 5,792 | 791.65 |
| 212484CP | Shell Assembly | 1,056 | 151.20 |
| 212485CP | Shell Assembly | 37,977 | 3,751.74 |
| 212488CR | Shell Assembly | 12,264 | 2,480.14 |
| 212489CR | Shell Assembly | 20,849 | 3,463.23 |
| 212490DS | Shell Assembly | 17,010 | 3,246.53 |
| 212495DI | Shell Assembly | 1,713 | 288.81 |
| 212497CR | Shell Assembly | 3,461 | 634.06 |
| 212498CS | Shell Assembly | 667 | 135.01 |
| 212501CR | Shell Assembly | 9,012 | 1,546.10 |
| 212503CP | Shell Assembly | 93,353 | 16,020.31 |
| 212509EM | Shell Assembly | 23,049 | 4,009.61 |
| 212511CP | Shell Assembly | 17,690 | 3,243.12 |
| 212512CP | Shell Assembly | 6,434 | 1,045.59 |
| 212513CQ | Shell Assembly | 6,332 | 1,155.71 |
| 212513DJ | Shell Assembly | 53,464 | 8,651.01 |
| 212513DM | Shell Assembly | 3,870 | 710.56 |
| 212513DZ | Shell Assembly | 146,058 | 27,105.45 |
| 212514DE | Shell Assembly | 344 | 56.47 |
| 212515DE | Shell Assembly | 3,185 | 522.91 |
| 212518DZ | Shell Assembly | 25,973 | 4,945.01 |
| 212519CQ | Shell Assembly | 5,963 | 1,099.23 |
| 212519DZ | Shell Assembly | 242 | 44.72 |
| 212520CB | Shell Assembly | 1,372 | 186.86 |
| 212520CF | Shell Assembly | 1,006 | 122.25 |
| 212568CR | Shell Assembly | 2,485 | 340.92 |
| 212570EO | Shell Assembly | 322 | 51.27 |
| 212571DZ | Shell Assembly | 22,697 | 4,212.33 |
| 212612DZ | Shell Assembly | 106,693 | 14,792.98 |

FBG_CH1_00090585

| | | | |
|---|---|---:|---:|
| 212613CP | Shell Assembly | 106,979 | 14,676.45 |
| 212614DO | Shell Assembly | 9,777 | 1,780.10 |
| 212616CS | Shell | 803 | 127.46 |
| 212618DE | Shell | 8,531 | 1,375.45 |
| 212619CP | Shell Assembly | 3,563 | 355.06 |
| 212621CB | Shell Assembly | 16,526 | 2,328.85 |
| 212622CR | Shell Assembly | 84,580 | 16,216.52 |
| 212622DB | Shell Assembly | 65,181 | 6,453.57 |
| 212623CB | Shell Assembly | 4,940 | 528.88 |
| 212625CR | Shell Assembly | 2,105 | 423.42 |
| 212626CR | Shell Assembly | 12,639 | 1,256.69 |
| 212629DE | Shell Assembly | 7,136 | 741.64 |
| 212633BN | Shell Assembly | 16,173 | 2,054.13 |
| 212642CR | Shell Assembly | 35,011 | 3,607.54 |
| 212643DG | Shell Assembly | 12,781 | 1,622.42 |
| 212646CS | Shell Assembly | 10,339 | 26,290.22 |
| 212647CO | Shell Assembly | 18,386 | 3,220.49 |
| 212648CN | Shell Assembly | 460 | 1,223.34 |
| 212649CI | Shell Assembly | 14,520 | 28,630.25 |
| 212652DK | Shell Assembly | 212 | 694.71 |
| 212653CQ | Shell Assembly | 640 | 1,178.82 |
| 212654CS | Shell Assembly | 2,252 | 388.56 |
| 212655DZ | Shell Assembly | 2,313 | 415.16 |
| 212657BG | Shell Assembly | 691 | 1,226.15 |
| 212662CR | Shell Assembly | 102 | 17.29 |
| 212665CZ | Shell Assembly | 158 | 33.21 |
| 212666CP | Shell | 6,412 | 1,382.43 |
| 212668CZ | Shell Assembly | 752 | 134.37 |
| 212669DS | Shell Assembly | 10,732 | 1,993.15 |
| 212670CP | Shell Assembly | 26,896 | 4,591.42 |
| 212670DZ | Shell Assembly | 6,595 | 1,128.08 |
| 212672CP | Shell Assembly | 11,222 | 2,467.60 |
| 212673CZ | Shell Assembly | 11,323 | 2,417.81 |
| 212674CB | Shell Assembly | 5,647 | 911.70 |
| 212675BO | Shell Assembly | 9,956 | 1,492.00 |
| 212675CB | Shell Assembly | 6,014 | 631.89 |
| 212676CP | Shell Assembly | 33,651 | 5,345.46 |
| 212676DA | Shell Assembly | 40,746 | 7,119.14 |
| 212676DC | Shell Assembly | 14,472 | 2,732.60 |
| 212679CR | Shell Assembly | 26,215 | 5,672.15 |
| 212680CP | Shell Assembly | 37,851 | 5,738.97 |
| 212681EO | Shell Assembly | 2,054 | 374.39 |
| 212682DS | Shell Assembly | 7,304 | 1,332.90 |
| 212684CR | Shell Assembly | 32,533 | 5,192.26 |
| 212685CQ | Shell Assembly | 21,990 | 3,519.07 |
| 212685DB | Shell Assembly | 9,161 | 1,434.43 |
| 212686EM | Shell Assembly | 6,918 | 1,102.18 |
| 212687CQ | Shell Assembly | 21,960 | 3,509.65 |
| 212689CR | Shell Assembly | 14,198 | 2,694.92 |
| 212689DI | Shell Assembly | 57,286 | 9,154.88 |
| 212689DZ | Shell Assembly | 11,320 | 1,619.89 |
| 212692CP | Shell Assembly | 3,971 | 556.65 |
| 212692EM | Shell Assembly | 11,217 | 2,066.85 |
| 212693BB | Shell Assembly | 5,087 | 971.66 |
| 212694DI | Shell Assembly | 20,327 | 3,469.21 |
| 212695CN | Shell Assembly | 10,030 | 1,729.67 |
| 212700DC | Shell Assembly | 90,487 | 14,686.95 |
| 212702CN | Shell Assembly | 13,232 | 2,832.18 |
| 212709CR | Shell | 2,401 | 419.19 |
| 212714CB | Shell Assembly | 822 | 111.75 |
| 212722CB | Shell Assembly | 7,070 | 1,085.04 |
| 212767BK | Shell Assembly | 2,691 | 1,024.92 |
| 212768BL | Shell Assembly | 1,207 | 219.77 |
| 212840CR | Shell | 1,550 | 290.89 |
| 212841ED | Shell | 1,370 | 230.40 |
| 212843CP | Shell | 12,436 | 1,595.91 |
| 212844CP | Shell | 809 | 102.21 |
| 212845DE | Shell | 800 | 129.09 |
| 212846CR | Shell | 24,845 | 4,290.24 |
| 212846DI | Shell | 801 | 130.95 |
| 212847CP | Shell Assembly | 2,744 | 720.06 |
| 212848CR | Shell | 1,331 | 218.62 |
| 212852DZ | Shell | 2,762 | 376.99 |
| 212937CP | Shell Assembly | 4,656 | 467.60 |
| 212950CQ | Shell | 18,617 | 2,903.14 |
| 212960CQ | Shell | 792 | 115.98 |
| 212965CR | Shell | 1,173 | 189.63 |

FBG_CH1_00090586

| | | | |
|---|---|---|---|
| 212971CP | Shell Assembly | 389 | 65.40 |
| 212979CS | Shell Assembly | 11,949 | 1,577.27 |
| 212980BQ | Shell | 7,908 | 1,464.64 |
| 212990DZ | Shell Assembly | 11,689 | 2,128.81 |
| 212991DZ | Shell Assembly | 1,073 | 224.24 |
| 212996CQ | Shell Assembly | 1,860 | 333.30 |
| 213000CR | Shell Assembly | 10,656 | 1,640.70 |
| 213081DJ | Shell Assembly | 608 | 112.98 |
| 213082CR | Shell Assembly | 20,874 | 3,344.43 |
| 213083DG | Shell Assembly | 95 | 16.73 |
| 213104CP | Shell Assembly | 10,771 | 1,944.59 |
| 213104DO | Shell Assembly | 9,085 | 1,671.63 |
| 213131CS | Shell Assembly | 24,581 | 3,982.62 |
| 213152CR | Shell | 31,722 | 5,010.17 |
| 213162CR | Shell Assembly | 2,314 | 237.72 |
| 213164CQ | Shell Assembly | 34,294 | 5,876.28 |
| 222478CQ | Shell Assembly | 6,792 | 1,681.09 |
| 222517CP | Shell Assembly | 110,889 | 23,134.77 |
| 222560CQ | Shell Assembly | 26,750 | 4,976.03 |
| 222560CQP | Shell Assembly | 20,088 | 3,406.93 |
| 222593DZ | Shell Assembly | 85 | 17.65 |
| 222615DE | Shell Assembly | 935 | 180.66 |
| 222615DEP | Shell Assembly | 14,463 | 2,585.98 |
| 222615DH | Shell Assembly | 3,742 | 728.87 |
| 222616CS | Shell Assembly | 63,393 | 12,348.33 |
| 222617CS | Shell Assembly | 68,693 | 13,317.48 |
| 222618DE | Shell Assembly | 1,184 | 229.19 |
| 222618DEP | Shell Assembly | 113,282 | 18,867.09 |
| 222623CB | Shell Assembly | 60,357 | 8,809.70 |
| 222630CDP | Shell Assembly | 28,252 | 14,973.56 |
| 222632CD | Shell Assembly | 12,247 | 21,846.94 |
| 222633BN | Shell Assembly | 26,756 | 4,245.37 |
| 222633CA | Shell Assembly | 16,410 | 2,541.09 |
| 222633CH | Shell Assembly | 5,749 | 893.23 |
| 222633CK | Shell Assembly | 44,942 | 6,917.47 |
| 222634CH | Shell Assembly | 50 | 8.77 |
| 222634CHP | Shell Assembly | 3,457 | 1,071.67 |
| 222636CZ | Shell Assembly | 13,766 | 34,220.62 |
| 222650BB | Shell Assembly | 67,301 | 12,015.93 |
| 222651BB | Shell Assembly | 40,119 | 6,567.08 |
| 222656CF | Shell Assembly | 6,042 | 1,352.26 |
| 222656CZ | Shell Assembly | 370 | 70.47 |
| 222658BN | Shell Assembly | 477 | 336.47 |
| 222658BNP | Shell Assembly | 20,028 | 10,214.28 |
| 222658CA | Shell Assembly | 5,444 | 1,185.05 |
| 222660CG | Shell Assembly | 15,785 | 3,055.97 |
| 222663CZ | Shell Assembly | 31,758 | 6,502.45 |
| 222693BBP | Shell Assembly | 17,360 | 4,513.60 |
| 222697CZ | Shell Assembly | 29,684 | 5,419.12 |
| 222698BG | Shell Assembly | 7,965 | 1,507.94 |
| 222699BG | Shell Assembly | 16,611 | 3,485.32 |
| 222703BP | Shell Assembly | 7,874 | 1,451.34 |
| 222707EM | Shell Assembly | 16,089 | 5,631.80 |
| 222708CR | Shell Assembly | 10,385 | 3,001.37 |
| 222710CI | Shell Assembly | 6,034 | 1,078.94 |
| 222711CK | Shell Assembly | 1,679 | 351.29 |
| 222712CG | Shell Assembly | 45,196 | 8,028.61 |
| 222713CL | Shell Assembly | 8,744 | 2,020.65 |
| 222714BP | Shell Assembly | 397 | 82.28 |
| 222714CB | Shell Assembly | 9,861 | 2,601.03 |
| 222716BO | Shell Assembly | 9,066 | 1,780.74 |
| 222717BO | Shell Assembly | 4,540 | 820.24 |
| 222719CK | Shell Assembly | 12,634 | 2,402.35 |
| 222721BQ | Shell Assembly | 13,200 | 2,950.33 |
| 222721EE | Shell Assembly | 6,801 | 1,557.50 |
| 222723BO | Shell Assembly | 105,333 | 17,865.54 |
| 222749BB | Shell Assembly | 7,283 | 1,519.39 |
| 222751CXP | Shell Assembly | 26,815 | 34,591.35 |
| 222752BD | Shell Assembly | 8,502 | 2,120.31 |
| 222753BD | Shell Assembly | 4,824 | 1,274.69 |
| 222754CF | Shell Assembly | 8,020 | 2,124.09 |
| 222755CF | Shell Assembly | 18,611 | 4,881.67 |
| 222756CF | Shell Assembly | 30,811 | 8,081.73 |
| 222762CL | Shell Assembly | 7,054 | 1,459.33 |
| 222765BQ | Shell Assembly | 18,521 | 4,151.67 |
| 222766BZ | Shell Assembly | 5,988 | 1,149.39 |
| 222770CO | Shell Assembly | 9,043 | 2,291.32 |

FBG_CH1_00090587

| | | | |
|---|---|---|---|
| 222810BH | Shell Assembly | 7,606 | 2,066.25 |
| 222811BG | Shell Assembly | 1,513 | 3,769.77 |
| 222812BM | Shell Assembly | 26,635 | 5,957.72 |
| 222815BM | Shell Assembly | 7,015 | 1,584.96 |
| 222828BR | Shell Assembly | 321 | 61.59 |
| 222839CP | Shell Assembly | 770 | 33.11 |
| 222845DE | Shell Assembly | 211 | 44.17 |
| 222852DZ | Shell Assembly | 406 | 82.61 |
| 222865DA | Shell Assembly | 20,706 | 6,288.00 |
| 222874CA | Shell Assembly | 23,394 | 4,808.36 |
| 222874CAP | Shell Assembly | 8,835 | 3,799.05 |
| 222875BQ | Shell Assembly | 17,036 | 4,845.89 |
| 222876BQ | Shell Assembly | 1,242 | 369.78 |
| 222877BR | Shell Assembly | 17,642 | 5,788.88 |
| 222878BP | Shell Assembly | 1,437 | 369.57 |
| 222879BP | Shell Assembly | 4,259 | 1,260.71 |
| 222880CM | Shell Assembly | 504 | 135.26 |
| 222881CM | Shell Assembly | 9,416 | 2,681.49 |
| 222882CM | Shell Assembly | 12,848 | 3,429.26 |
| 222883CM | Shell Assembly | 3,822 | 1,305.25 |
| 222884CP | Shell Assembly | 239 | 59.72 |
| 222885EM | Shell Assembly | 18,191 | 4,834.26 |
| 222886DK | Shell Assembly | 512 | 132.19 |
| 222887CS | Shell Assembly | 166 | 42.93 |
| 222888DA | Shell Assembly | 724 | 186.83 |
| 222888DK | Shell Assembly | 184,972 | 47,965.09 |
| 222889DA | Shell Assembly | 197 | 49.58 |
| 222891DF | Shell Assembly | 643 | 168.44 |
| 222892DF | Shell Assembly | 24,496 | 8,329.14 |
| 222892DG | Shell Assembly | 133,956 | 45,565.13 |
| 222893CR | Shell Assembly | 473 | 104.34 |
| 222894CR | Shell Assembly | 271 | 61.52 |
| 222898CR | Shell Assembly | 118 | 30.99 |
| 222898DI | Shell Assembly | 1,011 | 266.91 |
| 222901EP | Shell Assembly | 349 | 92.40 |
| 222902CS | Shell Assembly | 1,085 | 386.12 |
| 222903CS | Shell Assembly | 738 | 195.93 |
| 222904DZ | Shell Assembly | 343 | 94.66 |
| 222912CR | Shell Assembly | 851 | 180.48 |
| 222913CM | Shell Assembly | 10,101 | 2,400.60 |
| 222913CR | Shell Assembly | 15,181 | 2,908.68 |
| 222913DI | Shell Assembly | 656 | 127.18 |
| 222915CM | Shell Assembly | 14,683 | 3,345.97 |
| 222917DK | Shell Assembly | 15,906 | 3,002.89 |
| 222918CR | Shell Assembly | 290 | 54.39 |
| 222919CR | Shell Assembly | 2,861 | 646.36 |
| 222930CR | Shell Assembly | 7,240 | 1,719.50 |
| 222931CP | Shell Assembly | 11,512 | 2,251.64 |
| 222934CS | Shell Assembly | 5,577 | 1,068.60 |
| 222936CQ | Shell Assembly | 45,829 | 10,314.28 |
| 222939CQ | Shell Assembly | 9,178 | 1,720.13 |
| 222940CXP | Shell Assembly | 23,572 | 30,407.88 |
| 222948CR | Shell Assembly | 198 | 40.05 |
| 222949CQ | Shell Assembly | 16,077 | 3,067.19 |
| 222950CQ | Shell Assembly | 909,525 | 174,956.27 |
| 222952CQ | Shell Assembly | 990 | 227.50 |
| 222959CR | Shell Assembly | 905 | 174.35 |
| 222960CQ | Shell Assembly | 15,385 | 2,973.45 |
| 222965CR | Shell Assembly | 587,024 | 115,626.16 |
| 222965CRP | Shell Assembly | 444,503 | 73,476.30 |
| 222981CZ | Shell Assembly | 20,068 | 3,822.36 |
| 222990DZP | Shell Assembly | 11,160 | 11,113.13 |
| 222991DZP | Shell Assembly | 1,049 | 1,055.40 |
| 222998CS | Shell Assembly | 1,571,392 | 302,602.76 |
| 222998CSP | Shell Assembly | 400,317 | 64,411.05 |
| 222999CS | Shell Assembly | 2,186,965 | 424,117.98 |
| 222999CSP | Shell Assembly | 203,315 | 32,772.39 |
| 223011CI | Shell Assembly | 14,916 | 2,840.91 |
| 223012BZ | Shell Assembly | 4,157 | 741.66 |
| 223013BZ | Shell Assembly | 4,373 | 780.83 |
| 223014BA | Shell Assembly | 1,243 | 245.16 |
| 223015BQ | Shell Assembly | 513 | 97.87 |
| 223015BQP | Shell Assembly | 5,503 | 10,661.79 |
| 223016BR | Shell Assembly | 251 | 42.03 |
| 223016BRP | Shell Assembly | 10,754 | 5,985.68 |
| 223017BN | Shell Assembly | 443 | 86.17 |
| 223018BN | Shell Assembly | 986 | 176.29 |

FBG_CH1_00090588

| | | | |
|---|---|---|---|
| 223018BNP | Shell Assembly | 11,101 | 3,219.29 |
| 223019BQ | Shell Assembly | 41,024 | 8,186.74 |
| 223020BA | Shell Assembly | 6,138 | 941.22 |
| 223020BAP | Shell Assembly | 19,530 | 12,307.81 |
| 223021BA | Shell Assembly | 3,283 | 543.60 |
| 223021BAP | Shell Assembly | 1,159 | 1,366.69 |
| 223022BA | Shell Assembly | 763 | 126.34 |
| 223022BAP | Shell Assembly | 25,958 | 30,095.72 |
| 223023BA | Shell Assembly | 31,659 | 5,252.87 |
| 223023BAP | Shell Assembly | 52,080 | 30,132.45 |
| 223024CI | Shell Assembly | 2,348 | 428.72 |
| 223025CK | Shell Assembly | 1,356 | 254.17 |
| 223025CKP | Shell Assembly | 8,370 | 1,566.03 |
| 223026CL | Shell Assembly | 43,910 | 7,769.43 |
| 223026CLP | Shell Assembly | 8,370 | 1,566.03 |
| 223027BZ | Shell Assembly | 198 | 36.18 |
| 223029BA | Shell Assembly | 8,742 | 1,745.52 |
| 223030CZ | Shell Assembly | 78 | 25.37 |
| 223030CZP | Shell Assembly | 19,747 | 23,058.58 |
| 223031CD | Shell Assembly | 3,914 | 682.48 |
| 223032CL | Shell Assembly | 5,690 | 1,168.10 |
| 223033BQ | Shell Assembly | 16,190 | 3,118.68 |
| 223034BQ | Shell Assembly | 22,388 | 4,483.20 |
| 223035CJ | Shell Assembly | 22,743 | 4,826.06 |
| 223036CI | Shell Assembly | 13,736 | 2,682.21 |
| 223037BB | Shell Assembly | 19,186 | 3,796.16 |
| 223038BA | Shell Assembly | 42,534 | 7,984.48 |
| 223038BAP | Shell Assembly | 99,510 | 19,902.00 |
| 223039BB | Shell Assembly | 32,271 | 5,892.00 |
| 223039BBP | Shell Assembly | 49,535 | 9,907.00 |
| 223040BB | Shell Assembly | 3,044 | 582.31 |
| 223041BA | Shell Assembly | 15,556 | 2,862.14 |
| 223042BA | Shell Assembly | 3,078 | 5,842.54 |
| 223043BA | Shell Assembly | 2,120 | 3,007.05 |
| 223044BK | Shell Assembly | 1,043 | 1,499.95 |
| 223044BKP | Shell Assembly | 9,300 | 3,813.00 |
| 223045BN | Shell Assembly | 2,339 | 7,783.91 |
| 223046BN | Shell Assembly | 63,905 | 12,331.11 |
| 223047BN | Shell Assembly | 12,597 | 2,430.72 |
| 223047BNP | Shell Assembly | 7,750 | 4,107.50 |
| 223048CZ | Shell Assembly | 188 | 40.30 |
| 223048CZP | Shell Assembly | 7,905 | 3,636.30 |
| 223049BS | Shell Assembly | 141 | 26.65 |
| 223050BN | Shell Assembly | 9,669 | 20,711.78 |
| 223051BN | Shell Assembly | 4,627 | 9,043.37 |
| 223069DE | Shell Assembly | 2,947 | 570.19 |
| 223069DEP | Shell Assembly | 820 | 140.66 |
| 223070DF | Shell Assembly | 4,622 | 887.87 |
| 223070DFP | Shell Assembly | 6,645 | 1,188.44 |
| 223080CR | Shell Assembly | 71,798 | 13,943.89 |
| 223081DJP | Shell Assembly | 70,680 | 13,224.23 |
| 223083DGP | Shell Assembly | 19,530 | 23,550.25 |
| 223084CM | Shell Assembly | 9,511 | 1,771.24 |
| 223096CR | Shell Assembly | 47,929 | 15,529.00 |
| 223098DE | Shell Assembly | 43,211 | 15,616.46 |
| 223098DG | Shell Assembly | 75,501 | 27,306.45 |
| 223099CP | Shell Assembly | 7,459 | 1,978.87 |
| 223099CR | Shell Assembly | 167 | 44.33 |
| 223104DO | Shell Assembly | 32,649 | 11,958.35 |
| 223106CN | Shell Assembly | 612 | 217.38 |
| 223111DO | Shell Assembly | 374 | 103.82 |
| 223112CB | Shell Assembly | 150 | 28.75 |
| 223113CZ | Shell Assembly | 28,033 | 4,687.12 |
| 223121CXP | Shell Assembly | 101,837 | 123,222.77 |
| 223124DI | Shell Assembly | 606 | 161.64 |
| 223127CA | Shell Assembly | 2,046 | 511.41 |
| 223127CAP | Shell Assembly | 17,115 | 3,340.85 |
| 223128CS | Shell Assembly | 7,332 | 1,447.19 |
| 223128CSP | Shell Assembly | 1,042,716 | 172,673.80 |
| 223145CN | Shell Assembly | 21,466 | 4,218.92 |
| 223151CO_A | Shell Assembly | 89,280 | 13,865.18 |
| 223154CN | Shell Assembly | 47 | 18.99 |
| 223155CM | Shell Assembly | 31 | 12.46 |
| 223155CP | Shell Assembly | 259 | 105.77 |
| 223162CR | Shell Assembly | 11,070 | 1,890.22 |
| 223176CG | Shell Assembly | 18,753 | 4,069.97 |
| 223177CM | Shell Assembly | 2,804 | 922.13 |

FBG_CH1_00090589

| | | | |
|---|---|---:|---:|
| 223177CMP | Shell Assembly | 1,527 | 274.24 |
| 223178DR | Shell Assembly | 462 | 80.25 |
| 223183CR | Shell Assembly | 68,068 | 13,104.40 |
| 223184CH | Shell Assembly | 19,521 | 3,700.59 |
| 223184CR | Shell Assembly | 873,459 | 170,158.56 |
| 223184CRP | Shell Assembly | 132,255 | 24,145.80 |
| 223185N | Shell | 678,912 | 142,571.52 |
| 223190CM | Shell Assembly | 589 | 158.74 |
| 223190CMP | Shell Assembly | 14,880 | 2,672.45 |
| 223191CM | Shell Assembly | 3,660 | 986.37 |
| 223191CMP | Shell Assembly | 62,730 | 11,266.29 |
| 223192CL | Shell Assembly | 346 | 113.73 |
| 223192CLP | Shell Assembly | 34,410 | 6,180.04 |
| 223194CM | Shell Assembly | 601 | 191.33 |
| 223194CMP | Shell Assembly | 51,821 | 9,307.06 |
| 223195DD | Shell Assembly | 2,294 | 454.51 |
| 223196CO | Shell Assembly | 897 | 302.05 |
| 223198CI | Shell Assembly | 1,383 | 273.06 |
| 223198CR | Shell Assembly | 105,921 | 24,858.61 |
| 223199CR | Shell Assembly | 37,877 | 11,485.07 |
| 223200CR | Shell Assembly | 17,349 | 3,194.65 |
| 223201CI | Shell Assembly | 16,258 | 3,084.79 |
| 223206CS | Shell Assembly | 331,779 | 65,479.91 |
| 223206CSP | Shell Assembly | 330,468 | 54,626.35 |
| 223211P | Shell Assembly | 12,062 | 4,016.65 |
| 223213CR | Shell Assembly | 423 | 110.94 |
| 223215CB | Shell Assembly | 135 | 35.94 |
| 223215CBP | Shell Assembly | 179,361 | 32,213.25 |
| 223218DZ | Shell Assembly | 47,909 | 9,305.37 |
| 223222CR | Shell Assembly | 383,365 | 81,204.37 |
| 223224CR | Shell Assembly | 376,140 | 73,305.92 |
| 223224DI | Shell Assembly | 239,548 | 47,241.27 |
| 223225EP | Shell Assembly | 38,697 | 7,744.44 |
| 223226DA | Shell Assembly | 46,204 | 9,034.73 |
| 223227CP | Shell Assembly | 59,253 | 11,681.71 |
| 223227CR | Shell Assembly | 149,727 | 29,550.15 |
| 223228CS | Shell Assembly | 307,729 | 58,687.01 |
| 223228DK | Shell Assembly | 102,895 | 19,818.62 |
| 223229CS | Shell Assembly | 29,512 | 5,661.87 |
| 223230DA | Shell Assembly | 1,948 | 373.68 |
| 223231CR | Shell Assembly | 10,740 | 1,322.09 |
| 223231DA | Shell Assembly | 115,139 | 14,270.34 |
| 223232CR | Shell Assembly | 32,690 | 6,327.80 |
| 223233CO | Shell Assembly | 3,844 | 1,014.40 |
| 223235CO | Shell Assembly | 1,779 | 554.28 |
| 223236CN | Shell Assembly | 1,152 | 372.21 |
| 223237CN | Shell Assembly | 1,079 | 348.61 |
| 223239DZ | Shell Assembly | 3,164 | 648.05 |
| 223241ED | Shell Assembly | 27,018 | 5,456.02 |
| 223242CS | Shell Assembly | 67,698 | 13,372.39 |
| 223244DI | Shell Assembly | 8,299 | 1,654.81 |
| 223248EM | Shell Assembly | 100,045 | 21,804.80 |
| 223255CQ | Shell Assembly | 11,966 | 2,282.87 |
| 223256CQ | Shell Assembly | 99,778 | 19,692.19 |
| 223270EM | Shell Assembly | 15,306 | 2,969.98 |
| 223271CR | Shell Assembly | 9,932 | 1,020.31 |
| 232593DZ | Platinum Welded Shel | 1,314 | 521.76 |
| 232833DF | Platinum Welded Shel | 8,706 | 3,341.37 |
| 232835CR | Platinum Welded Shel | 8,004 | 3,231.37 |
| 232839CP | Platinum Welded Shel | 9,717 | 3,056.09 |
| 232839DZ | Platinum Welded Shel | 83,533 | 29,027.72 |
| 232840CN | Platinum Welded Shel | 4,661 | 1,876.03 |
| 232840CR | Platinum Welded Shel | 374,012 | 150,854.05 |
| 232841ED | Platinum Welded Shel | 142,104 | 56,000.37 |
| 232842CR | Platinum Welded Shel | 10,560 | 3,575.60 |
| 232843CP | Platinum Welded Shel | 44,869 | 16,106.62 |
| 232844CP | Platinum Welded Shel | 14,203 | 5,058.53 |
| 232845DE | Platinum Welded Shel | 1,886 | 722.44 |
| 232846CR | Platinum Welded Shel | 13,485 | 4,738.78 |
| 232846DD | Platinum Welded Shel | 78 | 31.09 |
| 232846DI | Platinum Welded Shel | 309,919 | 109,692.78 |
| 232847CP | Platinum Welded Shel | 102,370 | 39,687.83 |
| 232847CS | Platinum Welded Shel | 1,976 | 746.84 |
| 232847DJ | Platinum Welded Shel | 119,265 | 45,863.36 |
| 232848CN | Platinum Welded Shel | 11,644 | 4,495.17 |
| 232848CR | Platinum Welded Shel | 111,050 | 43,132.77 |
| 232849CP | Platinum Welded Shel | 12,250 | 4,748.10 |

FBG_CH1_00090590

| | | | |
|---|---|---|---|
| 232850CR | Platinum Welded Shel | 21,171 | 8,252.44 |
| 232851CP | Platinum Welded Shel | 1,209 | 478.16 |
| 232852DZ | Platinum Welded Shel | 7,735 | 2,770.76 |
| 232854DZ | Platinum Welded Shel | 177,058 | 63,845.38 |
| 232855DS | Platinum Welded Shel | 760 | 257.14 |
| 232856EO | Platinum Welded Shel | 15,004 | 5,694.47 |
| 232857CR | Platinum Welded Shel | 2,162 | 748.94 |
| 232857DJ | Platinum Welded Shel | 23,318 | 8,026.30 |
| 232857DZ | Platinum Welded Shel | 82,539 | 28,627.85 |
| 232858CS | Platinum Welded Shel | 3,156 | 1,220.19 |
| 232860CP | Platinum Welded Shel | 12,739 | 3,952.76 |
| 232860DZ | Platinum Welded Shel | 105,640 | 37,526.54 |
| 232864CR | Platinum Welded Shel | 9,908 | 4,432.64 |
| 232865DA | Platinum Welded Shel | 1,194 | 588.80 |
| 232866CR | Platinum Welded Shel | 132 | 61.39 |
| 232885EM | Platinum Welded Shel | 17,916 | 8,155.37 |
| 232886CS | Platinum Welded Shel | 705 | 314.77 |
| 232886DK | Platinum Welded Shel | 538 | 240.81 |
| 232887CS | Platinum Welded Shel | 2,451 | 1,098.14 |
| 232888CS | Platinum Welded Shel | 5,082 | 2,242.88 |
| 232888DA | Platinum Welded Shel | 1,668 | 746.43 |
| 232888DK | Platinum Welded Shel | 102,147 | 45,839.48 |
| 232889CR | Platinum Welded Shel | 14,652 | 6,500.80 |
| 232889DA | Platinum Welded Shel | 318 | 140.28 |
| 232891DF | Platinum Welded Shel | 51 | 23.03 |
| 232892DF | Platinum Welded Shel | 90 | 47.65 |
| 232893CR | Platinum Welded Shel | 4,906 | 2,011.66 |
| 232894CR | Platinum Welded Shel | 907 | 377.73 |
| 232895CR | Platinum Welded Shel | 326 | 135.06 |
| 232895DC | Platinum Welded Shel | 5,681 | 2,625.82 |
| 232898DI | Platinum Welded Shel | 29 | 13.16 |
| 232901EP | Platinum Welded Shel | 15,619 | 7,094.30 |
| 232902CS | Platinum Welded Shel | 1,429 | 779.27 |
| 232902DA | Platinum Welded Shel | 4,895 | 2,212.98 |
| 232904DZ | Platinum Welded Shel | 277 | 128.92 |
| 232913CR | Platinum Welded Shel | 7,781 | 2,964.95 |
| 232913DI | Platinum Welded Shel | 8,086 | 3,099.52 |
| 232915CM | Platinum Welded Shel | 7,442 | 3,105.77 |
| 232915CR | Platinum Welded Shel | 13,122 | 5,338.16 |
| 232917DK | Platinum Welded Shel | 10,591 | 4,005.93 |
| 232918CR | Platinum Welded Shel | 5,382 | 2,636.59 |
| 232925CP | Platinum Welded Shel | 339 | 150.51 |
| 232930CR | Platinum Welded Shel | 8,043 | 4,342.01 |
| 232931CP | Platinum Welded Shel | 9,260 | 4,610.92 |
| 232934CS | Platinum Welded Shel | 6,789 | 2,587.01 |
| 232936DZ | Platinum Welded Shel | 43,530 | 16,387.73 |
| 232939CQ | Platinum Welded Shel | 10,064 | 3,792.82 |
| 232979CS | Platinum Welded Shel | 4,449 | 2,207.99 |
| 232990DZ | Platinum Welded Shel | 12,721 | 4,726.73 |
| 232991DZ | Platinum Welded Shel | 12,028 | 4,792.27 |
| 232996CQ | Platinum Welded Shel | 31,383 | 11,569.02 |
| 232998CS | Shell Assembly | 57,161 | 19,761.70 |
| 233000CR | Platinum Welded Shel | 4,007 | 1,828.48 |
| 233002DZ | Platinum Welded Shel | 19,211 | 7,786.98 |
| 233004CS | Platinum Welded Shel | 775 | 386.46 |
| 233069DE | Shell Assembly | 560 | 194.11 |
| 233070DF | Shell Assembly | 31,053 | 11,436.83 |
| 233078CN | Platinum Welded Shel | 95 | 64.30 |
| 233081DJ | Platinum Welded Shel | 130 | 48.78 |
| 233082CR | Platinum Welded Shel | 3,164 | 1,106.36 |
| 233095CR | Platinum Welded Shel | 388 | 174.68 |
| 233098DG | Platinum Welded Shel | 17,510 | 9,650.11 |
| 233099CP | Platinum Welded Shel | 1,352 | 614.82 |
| 233099CR | Platinum Welded Shel | 391 | 177.86 |
| 233107CN | Platinum Welded Shel | 552 | 435.65 |
| 233109CN | Platinum Welded Shel | 1,225 | 626.33 |
| 233130CN | Platinum Welded Shel | 16,032 | 8,029.78 |
| 233131CS | Platinum Welded Shel | 17,518 | 6,546.84 |
| 233131CSP | Shell Assembly | 379,282 | 141,745.51 |
| 233138DE | Platinum Welded Shel | 16,703 | 6,766.05 |
| 233139EP | Platinum Welded Shel | 21,195 | 8,202.70 |
| 233148CL | Platinum Welded Shel | 108,946 | 50,659.89 |
| 233149CO | Platinum Welded Shel | 949 | 503.22 |
| 233150CO | Platinum Welded Shel | 512 | 271.50 |
| 233155CM | Platinum Welded Shel | 99 | 58.55 |
| 233156CS | Platinum Welded Shel | 42,653 | 16,419.30 |
| 233175DE | Platinum Welded Shel | 2,474 | 943.61 |

FBG_CH1_00090591

**DEBTORS' EXHIBIT NO. 175**
**Page 366 of 1907**

| | | | |
|---|---|---:|---:|
| 233177CM | Platinum Welded Shel | 33,356 | 17,288.78 |
| 233178DR | Platinum Welded Shel | 8,477 | 3,078.26 |
| 233186DG | Platinum Welded Shel | 577 | 259.67 |
| 233187EP | Platinum Welded Shel | 13,333 | 5,431.87 |
| 233190CM | Platinum Welded Shel | 12,916 | 5,927.80 |
| 233191CM | Platinum Welded Shel | 82,981 | 38,084.09 |
| 233192CL | Platinum Welded Shel | 70,640 | 36,602.82 |
| 233194CM | Platinum Welded Shel | 7,496 | 3,806.39 |
| 233195DD | Platinum Welded Shel | 24,220 | 9,387.20 |
| 233196CO | Platinum Welded Shel | 96 | 50.51 |
| 233198CR | Platinum Welded Shel | 61,140 | 25,931.92 |
| 233199CR | Platinum Welded Shel | 27,285 | 13,442.50 |
| 233206CS | Platinum Welded Shel | 247,175 | 95,609.87 |
| 233213CR | Platinum Welded Shel | 17,650 | 7,973.02 |
| 233222CR | Platinum Welded Shel | 19,445 | 8,106.26 |
| 233222CRP | Shell Assembly | 3,176 | 1,026.33 |
| 233224CR | Platinum Welded Shel | 63,421 | 25,365.21 |
| 233224CRP | Shell Assembly | 13,268 | 4,287.55 |
| 233224DI | Platinum Welded Shel | 122,523 | 49,287.36 |
| 233225EP | Platinum Welded Shel | 18,769 | 8,286.32 |
| 233226DA | Platinum Welded Shel | 30,059 | 12,041.64 |
| 233227CP | Platinum Welded Shel | 18,833 | 7,574.82 |
| 233227CR | Platinum Welded Shel | 22,734 | 9,148.66 |
| 233228CS | Platinum Welded Shel | 23,633 | 9,353.21 |
| 233228DK | Platinum Welded Shel | 19,453 | 7,735.88 |
| 233229CS | Platinum Welded Shel | 99,394 | 39,450.50 |
| 233230DA | Platinum Welded Shel | 15,688 | 6,226.42 |
| 233231CR | Platinum Welded Shel | 936 | 307.16 |
| 233231DA | Platinum Welded Shel | 12,828 | 4,220.41 |
| 233232CR | Platinum Welded Shel | 1,973 | 786.50 |
| 233233CO | Platinum Welded Shel | 13,091 | 6,614.23 |
| 233233COP | Shell Assembly | 116,893 | 37,202.34 |
| 233234CO | Platinum Welded Shel | 2,885 | 1,457.65 |
| 233234COP | Shell Assembly | 65,698 | 22,689.37 |
| 233235CO | Platinum Welded Shel | 36,524 | 20,195.21 |
| 233235COP | Shell Assembly | 278,420 | 91,527.80 |
| 233236CN | Platinum Welded Shel | 3,966 | 2,238.61 |
| 233236CNP | Shell Assembly | 2,275 | 772.62 |
| 233237CN | Platinum Welded Shel | 4,509 | 2,545.10 |
| 233237CNP | Shell Assembly | 21,987 | 7,399.94 |
| 233238CM | Platinum Welded Shel | 2,531 | 1,428.63 |
| 233238CMP | Shell Assembly | 56,953 | 19,423.82 |
| 233238CP | Platinum Welded Shel | 2,895 | 1,635.01 |
| 233238CPP | Shell Assembly | 74,070 | 25,349.05 |
| 233239DZ | Platinum Welded Shel | 21,105 | 9,416.63 |
| 233239DZP | Shell Assembly | 181,491 | 63,186.10 |
| 233240DO | Platinum Welded Shel | 2,415 | 1,081.48 |
| 233240DOP | Shell Assembly | 18,772 | 6,817.05 |
| 233241ED | Platinum Welded Shel | 6,724 | 2,980.74 |
| 233242CS | Platinum Welded Shel | 117,740 | 47,400.95 |
| 233242CSP | Shell Assembly | 690 | 229.87 |
| 233243DF | Platinum Welded Shel | 9,407 | 4,065.33 |
| 233243DFP | Shell Assembly | 2,331 | 816.56 |
| 233244DI | Platinum Welded Shel | 2,232 | 983.83 |
| 233246CR | Platinum Welded Shel | 1,059 | 427.69 |
| 233246CRP | Shell Assembly | 32,734 | 11,144.33 |
| 233247CRP | Shell Assembly | 7,866 | 2,677.99 |
| 233248EM | Platinum Welded Shel | 615 | 260.14 |
| 233249DG | Platinum Welded Shel | 273 | 117.64 |
| 233249DGP | Shell Assembly | 1,555 | 529.07 |
| 233255CQ | Platinum Welded Shel | 1,466 | 557.41 |
| 233261DR | Shell Assembly | 4,514 | 1,385.73 |
| 233266CR | Shell Assembly | 10,526 | 4,585.61 |
| 242482CB | Shell Assembly | 236 | 27.48 |
| 242482CBP | Shell Assembly | 12,090 | 2,614.46 |
| 242483CR | Shell Assembly | 28,630 | 5,207.79 |
| 242491EA | Shell Assembly | 484 | 91.31 |
| 242491EAP | Shell Assembly | 574,194 | 132,064.62 |
| 242502CP | Shell Assembly | 1,331 | 258.98 |
| 242502CPP | Shell Assembly | 1,593 | 366.39 |
| 242502DZ | Shell Assembly | 29,028 | 6,720.27 |
| 242505DA | Shell Assembly | 26,401 | 7,391.75 |
| 242507CP | Shell Assembly | 563 | 101.50 |
| 242507CPP | Shell Assembly | 29,337 | 12,614.91 |
| 242508CP | Shell Assembly | 1,085 | 187.27 |
| 242508CPP | Shell Assembly | 5 | 2.15 |
| 242833DF | Shell Assembly | 3,173 | 616.67 |

FBG_CH1_00090592

| | | | |
|---|---|---|---|
| 242833DFP | Shell Assembly | 22,940 | 4,292.07 |
| 242835CR | Shell Assembly | 40,838 | 8,750.34 |
| 242839CP | Shell Assembly | 28,508 | 4,600.05 |
| 242839DZ | Shell Assembly | 476,030 | 92,516.45 |
| 242839DZP | Shell Assembly | 1,310,995 | 225,753.30 |
| 242840CR | Shell Assembly | 126,162 | 26,984.78 |
| 242841ED | Shell Assembly | 293,468 | 60,052.42 |
| 242841EDP | Shell Assembly | 238,240 | 42,883.20 |
| 242842CR | Shell Assembly | 749 | 111.68 |
| 242842CRP | Shell Assembly | 157,516 | 29,471.25 |
| 242843CP | Shell Assembly | 3,419 | 579.56 |
| 242843CPP | Shell Assembly | 1,298,092 | 221,714.17 |
| 242844CP | Shell Assembly | 12,766 | 2,128.23 |
| 242844CPP | Shell Assembly | 1,286,351 | 240,496.30 |
| 242845DE | Shell Assembly | 1,428 | 276.48 |
| 242846CR | Shell Assembly | 409,147 | 81,117.66 |
| 242846CRP | Shell Assembly | 940,002 | 155,100.32 |
| 242846DD | Shell Assembly | 22,856 | 5,610.01 |
| 242846DI | Shell Assembly | 509,079 | 102,218.30 |
| 242847CP | Shell Assembly | 51,708 | 10,250.60 |
| 242847DJ | Shell Assembly | 9,156 | 1,786.09 |
| 242847DJP | Shell Assembly | 412,010 | 69,876.87 |
| 242848CN | Shell Assembly | 10,662 | 2,096.15 |
| 242848CR | Shell Assembly | 80,749 | 16,065.79 |
| 242848CRP | Shell Assembly | 376,211 | 65,836.92 |
| 242849CP | Shell Assembly | 2,375 | 470.61 |
| 242849CPP | Shell Assembly | 1,421 | 326.83 |
| 242850CR | Shell Assembly | 4,087 | 818.86 |
| 242850CRP | Shell Assembly | 488,269 | 104,977.84 |
| 242851CP | Shell Assembly | 1,057 | 217.80 |
| 242851CPP | Shell Assembly | 44,082 | 10,138.86 |
| 242852DZ | Shell Assembly | 1,366 | 230.53 |
| 242852DZP | Shell Assembly | 57,376 | 13,196.48 |
| 242853EM | Shell Assembly | 34,120 | 6,768.05 |
| 242854DZ | Shell Assembly | 9,827 | 2,038.62 |
| 242854DZP | Shell Assembly | 474,567 | 91,401.59 |
| 242855DS | Shell Assembly | 894 | 165.57 |
| 242855DSP | Shell Assembly | 642,534 | 138,144.81 |
| 242856EO | Shell Assembly | 237 | 45.05 |
| 242856EOP | Shell Assembly | 58,012 | 14,503.00 |
| 242857CO | Shell Assembly | 78,622 | 15,614.33 |
| 242857CR | Shell Assembly | 14,169 | 2,738.44 |
| 242857DJ | Shell Assembly | 141,362 | 27,008.62 |
| 242857DZ | Shell Assembly | 258,131 | 49,997.57 |
| 242857DZP | Shell Assembly | 958,334 | 162,533.51 |
| 242858CS | Shell Assembly | 126,393 | 24,922.18 |
| 242860CP | Shell Assembly | 269,049 | 32,511.92 |
| 242860CPP | Shell Assembly | 115,399 | 19,571.67 |
| 242860DZ | Shell Assembly | 102,678 | 17,021.94 |
| 242860DZP | Shell Assembly | 397,110 | 67,349.86 |
| 243138DE | Shell Assembly | 28,777 | 6,205.19 |
| 243139EP | Shell Assembly | 163,471 | 32,295.34 |
| 243139EPP | Shell Assembly | 376,960 | 64,083.20 |
| 243148CL | Shell Assembly | 285 | 88.88 |
| 243148CLP | Shell Assembly | 6,154 | 961.87 |
| 243152CR | Shell Assembly | 269,271 | 52,351.66 |
| 243152CRP | Shell Assembly | 44,640 | 11,606.40 |
| 243156CS | Shell Assembly | 22,906 | 4,478.12 |
| 243175DE | Shell Assembly | 550 | 105.58 |
| 243181DA | Shell Assembly | 5,380 | 1,153.42 |
| 243187EP | Shell Assembly | 171,329 | 37,341.14 |
| 243187EPP | Shell Assembly | 438,949 | 79,010.82 |
| 253129CS | Shell Assembly | 16,301 | 11,494.65 |
| 253131CS | Shell Assembly | 14,951 | 5,681.98 |
| 253131CSP | Shell Assembly | 241,383 | 44,479.66 |
| 263222CR | Shell Assembly | 28,506 | 7,517.92 |
| 263224CR | Shell Assembly | 96,658 | 23,855.21 |
| 263224DI | Shell Assembly | 8,923 | 2,222.89 |
| 263225EP | Shell Assembly | 16 | 4.03 |
| 263226DA | Shell Assembly | 32,496 | 8,041.17 |
| 263227CP | Shell Assembly | 31,939 | 7,954.73 |
| 263227CR | Shell Assembly | 26,886 | 6,701.89 |
| 263228CS | Shell Assembly | 71,807 | 17,421.80 |
| 263228DK | Shell Assembly | 8,032 | 1,963.99 |
| 263229CS | Shell Assembly | 32,544 | 7,932.92 |
| 263230DA | Shell Assembly | 16,275 | 3,966.90 |
| 263231DA | Shell Assembly | 38,333 | 6,740.86 |

FBG_CH1_00090593

| | | | |
|---|---|---|---|
| 263232CR | Shell Assembly | 31,776 | 7,800.36 |
| 263233CO | Shell Assembly | 5,425 | 1,713.23 |
| 263234CO | Shell Assembly | 1,082 | 341.70 |
| 263235CO | Shell Assembly | 2,105 | 765.13 |
| 263236CN | Shell Assembly | 3,023 | 1,133.63 |
| 263237CN | Shell Assembly | 1,012 | 379.51 |
| 263238CM | Shell Assembly | 463 | 173.63 |
| 263239DZ | Shell Assembly | 1,795 | 460.82 |
| 263240DO | Shell Assembly | 1,316 | 340.02 |
| 263242CS | Shell Assembly | 133,018 | 33,179.99 |
| 263243DF | Shell Assembly | 290 | 70.39 |
| 263244DI | Shell Assembly | 8,801 | 2,211.78 |
| 263246CR | Shell Assembly | 264 | 56.60 |
| 263248EM | Shell Assembly | 791 | 213.46 |
| 263261DR | Shell Assembly | 56 | 14.05 |
| 272709DI | Shell Assembly | 284 | 85.65 |
| 272878BP | Shell Assembly | 2,486 | 585.28 |
| 272883CM | Shell Assembly | 18,383 | 5,684.58 |
| 272888CS | Shell Assembly | 343 | 141.51 |
| 272905CR | Shell Assembly | 1,015 | 329.31 |
| 273222CRP | Shell Assembly | 44,820 | 7,619.40 |
| 273224CRP | Shell Assembly | 272,600 | 46,342.00 |
| 273224DIP | Shell Assembly | 102,410 | 17,409.70 |
| 273228DKP | Shell Assembly | 480,810 | 81,641.54 |
| 273231CRP | Shell Assembly | 17,670 | 4,447.54 |
| 273233COP | Shell Assembly | 199,401 | 32,923.11 |
| 273234COP | Shell Assembly | 68,925 | 13,248.08 |
| 273235COP | Shell Assembly | 621,347 | 109,102.31 |
| 273236CNP | Shell Assembly | 460 | 85.79 |
| 273237CNP | Shell Assembly | 201,061 | 36,876.59 |
| 273238CMP | Shell Assembly | 96,650 | 18,160.53 |
| 273238CPP | Shell Assembly | 514,803 | 97,338.92 |
| 273239DZP | Shell Assembly | 529,492 | 103,250.94 |
| 273240DOP | Shell Assembly | 149,947 | 31,488.87 |
| 273241EDP | Shell Assembly | 118,420 | 30,789.20 |
| 273242CSP | Shell Assembly | 1,028 | 185.04 |
| 273243DFP | Shell Assembly | 34,419 | 6,786.06 |
| 273245CRP | Shell Assembly | 17,670 | 3,309.59 |
| 273246CRP | Shell Assembly | 1,542 | 288.83 |
| 273247CRP | Shell Assembly | 2,263 | 423.85 |
| 273249DGP | Shell Assembly | 567 | 106.09 |
| 273252CMP | Shell Assembly | 3,294 | 1,778.76 |
| 273253CFP | Shell Assembly | 8,680 | 3,385.20 |
| 273254CRP | Shell Assembly | 33,015 | 15,186.90 |
| 282888CS | Shell Assembly | 104,605 | 13,997.20 |
| 282888DA | Shell Assembly | 31,718 | 3,707.52 |
| 282894CR | Shell Assembly | 109 | 13.75 |
| 283111DO | Shell Assembly | 849 | 301.97 |
| 300103M | Center Electrode | 3,100 | 213.19 |
| 300105M | Center Electrode | 39,744 | 2,894.55 |
| 300106M | Center Electrode | 12,778 | 960.89 |
| 300109M | Center Electrode | 140,249 | 5,187.80 |
| 300515M | Center Electrode | 7,156 | 492.61 |
| 300524M | Center Electrode | 22,077 | 1,464.77 |
| 300525M | Center Electrode | 2,604 | 172.78 |
| 300526M | Center Electrode | 859 | 56.98 |
| 300541M | Center Electrode | 26,610 | 1,950.51 |
| 300547M | Center Electrode | 17,879 | 1,422.99 |
| 300554M | Center Electrode | 36,199 | 2,401.81 |
| 300566M | Center Electrode | 5,496 | 372.01 |
| 300568M | Center Electrode | 8,424 | 558.96 |
| 300570M | Center Electrode | 5,344 | 346.34 |
| 300581M | Center Electrode | 11,504 | 984.50 |
| 300585M | Center Electrode | 30,434 | 2,223.50 |
| 300589M | Center Electrode | 27,889 | 1,882.23 |
| 300591M | Center Electrode | 17,825 | 1,346.86 |
| 300593M | Center Electrode | 2,044 | 157.18 |
| 300598M | Center Electrode | 14,181 | 978.92 |
| 300608M | Center Electrode | 8,372 | 780.53 |
| 300610M | Center Electrode | 6,747 | 509.80 |
| 300614M | Center Electrode | 13,373 | 1,336.63 |
| 300634M | Center Electrode | 26,781 | 2,640.61 |
| 300638M | Center Electrode | 12,867 | 922.05 |
| 300645M | Center Electrode | 12,144 | 985.24 |
| 300646M | Center Electrode | 21,213 | 1,814.34 |
| 300726M | Center Electrode | 14,144 | 1,065.47 |
| 300755M | Center Electrode | 8 | 0.58 |

FBG_CH1_00090594

| | | | |
|---|---|---|---|
| 300756M | Center Electrode | 9,770 | 698.75 |
| 300764M | Center Electrode | 23,726 | 1,574.19 |
| 300765M | Center Electrode | 39,102 | 2,717.19 |
| 300792M | Center Electrode | 2 | 0.18 |
| 300801M | Center Electrode | 48,549 | 4,304.36 |
| 300869M | Center Electrode | 479,745 | 18,796.05 |
| 300876M | Center Electrode | 333,216 | 12,052.39 |
| 300877M | Center Electrode | 134,376 | 4,702.11 |
| 300878M | Center Electrode | 62,591 | 2,155.69 |
| 300879M | Center Electrode | 195,436 | 6,336.25 |
| 300888M | Center Electrode | 828,275 | 29,958.63 |
| 300891M | Center Electrode | 295,974 | 8,568.38 |
| 300900M | Center Electrode | 11,600 | 585.56 |
| 300901M | Center Electrode | 56,251 | 1,859.04 |
| 300905M | Center Electrode | 448,282 | 12,977.72 |
| 300906M | Center Electrode | 59,339 | 2,253.09 |
| 300907M | Center Electrode | 71,147 | 2,451.02 |
| 300908M | Center Electrode | 5,276 | 244.91 |
| 300909M | Center Electrode | 1,056 | 32.49 |
| 300910M | Center Electrode | 35,422 | 1,104.09 |
| 300912M | Center Electrode | 451,365 | 15,048.51 |
| 300913M | Center Electrode | 111,394 | 3,798.54 |
| 300914M | Center Electrode | 5,391 | 187.69 |
| 300916M | Center Electrode | 32,057 | 1,236.11 |
| 300917M | Center Electrode | 48,543 | 1,762.59 |
| 300919M | Center Electrode | 62,422 | 1,843.80 |
| 300925M | Center Electrode | 9,622 | 684.70 |
| 300926M | Center Electrode | 159,605 | 5,410.61 |
| 300929M | Center Electrode | 21,514 | 691.89 |
| 300932M | Center Electrode | 145,744 | 4,707.52 |
| 300940M | Center Electrode | 816,108 | 30,530.60 |
| 300946M | Center Electrode | 130,371 | 4,364.85 |
| 300957M | Center Electrode | 42,065 | 1,745.28 |
| 300961M | Center Electrode | 721,620 | 24,159.83 |
| 300962M | Center Electrode | 258,644 | 8,659.41 |
| 300963M | Center Electrode | 706,462 | 26,365.16 |
| 300964M | Center Electrode | 160,468 | 5,988.66 |
| 300965M | Center Electrode | 8,500 | 317.22 |
| 300966M | Center Electrode | 288,768 | 9,922.18 |
| 300973M | Center Electrode | 237,181 | 9,005.76 |
| 300974M | Center Electrode | 1,212 | 33.49 |
| 300975M | Center Electrode | 302,881 | 10,764.38 |
| 300976M | Center Electrode | 140 | 26.60 |
| 300979M | Center Electrode | 239 | 24.12 |
| 300989M | Center Electrode | 141 | 5.95 |
| 300992M | Center Electrode | 41,979 | 1,354.66 |
| 300997M | Center Electrode | 49,000 | 3,326.62 |
| 300999M | Center Electrode | 66,304 | 4,326.34 |
| 301007M | Center Electrode | 23,424 | 884.72 |
| 301028M | Center Electrode | 78,797 | 3,511.20 |
| 301030M | Center Electrode | 19,360 | 711.28 |
| 301032M | Center Electrode | 52,530 | 2,096.47 |
| 301034M | Center Electrode | 13,547 | 606.90 |
| 301043M | Center Electrode | 61,188 | 2,189.30 |
| 301044M | Electrode | 1,060 | 564.67 |
| 301053M | Center Electrode | 16,912 | 1,321.51 |
| 301058M | Center Electrode | 86,919 | 3,243.81 |
| 301060M | Center Electrode | 282,345 | 12,016.60 |
| 301061M | Center Electrode | 132,364 | 5,962.61 |
| 301075M | Center Electrode | 155 | 5.53 |
| 301076M | Center Electrode | 155 | 5.41 |
| 301077M | Center Electrode | 143,862 | 5,332.96 |
| 301078M | Center Electrode | 45,068 | 1,325.46 |
| 301085M | Center Electrode | 115,841 | 7,736.96 |
| 301086M | Electrode | 1,284,036 | 171,303.29 |
| 301087M | Electrode | 780 | 484.00 |
| 301090M | Electrode | 442,522 | 207,989.77 |
| 301093M | Center Electrode | 1,242 | 41.57 |
| 301094M | Electrode | 2,949,745 | 577,294.67 |
| 301095M | Center Electrode | 155 | 5.47 |
| 301096M | Center Electrode | 50,462 | 1,837.83 |
| 301097M | Electrode | 70,479 | 26,640.36 |
| 301099M | Center Electrode | 15,877 | 642.71 |
| 301100M | Center Electrode | 21,700 | 722.18 |
| 301101M | Center Electrode | 31,090 | 8,078.11 |
| 301116M | Electrode | 2,088,137 | 202,778.91 |
| 301122M | Center Electrode | 169,725 | 7,345.70 |

FBG_CH1_00090595

| | | | |
|---|---|---:|---:|
| 301123M | Center Electrode | 77,739 | 2,709.98 |
| 301126M | Electrode | 431,841 | 246,628.71 |
| 301131M | Center Electrode | 210,408 | 9,925.14 |
| 301132M | Center Electrode | 58,071 | 1,932.52 |
| 301134M | Center Electrode | 201,077 | 7,725.38 |
| 301141M | Center Electrode | 3,075 | 87.69 |
| 301144M | Center Electrode | 9,409 | 313.12 |
| 301146M | Center Electrode | 3,100 | 119.54 |
| 301147M | Center Electrode | 108,004 | 3,688.33 |
| 301148M | Center Electrode | 232,553 | 7,739.36 |
| 301149M | Center Electrode | 9,520 | 321.50 |
| 301151M | Center Electrode | 3,015 | 96.96 |
| 301153M | Center Electrode | 12,524 | 427.07 |
| 301155M | Center Electrode | 487 | 16.78 |
| 301160M | Center Electrode | 29,958 | 986.22 |
| 301161M | Center Electrode | 396,927 | 13,932.14 |
| 301162M | Center Electrode | 109,935 | 4,088.49 |
| 301167M | Center Electrode | 82,767 | 3,078.10 |
| 301171M | Center Electrode | 98,256 | 3,289.61 |
| 301172M | Center Electrode | 49,490 | 1,656.92 |
| 301173M | Center Electrode | 46,674 | 1,584.11 |
| 301174M | Center Electrode | 18,893 | 632.54 |
| 301175M | Center Electrode | 1,455 | 48.72 |
| 301182M | Center Electrode | 13,950 | 521.87 |
| 301183M | Center Electrode | 2,660 | 99.53 |
| 310500MX | Center Electrode | 932 | 494.53 |
| 310501MX | Center Electrode | 19,104 | 10,136.78 |
| 310502MX | Center Electrode | 293 | 155.48 |
| 310503MX | Center Electrode | 7,121 | 4,023.50 |
| 310504MX | Center Electrode | 53,016 | 28,334.40 |
| 310506MX | Center Electrode | 8,728 | 4,665.46 |
| 310507MX | Center Electrode | 23,478 | 12,547.81 |
| 310508MX | Center Electrode | 11,393 | 5,978.72 |
| 310509MX | Center Electrode | 107 | 57.24 |
| 310510MX | Center Electrode | 5,179 | 2,767.92 |
| 310511MX | Center Electrode | 36,020 | 19,274.30 |
| 310513M | Center Electrode | 4,300 | 0.05 |
| 310514M | Center Electrode | 7,820 | 0.08 |
| 310519MX | Center Electrode | 2,443 | 1,382.50 |
| 310520MX | Center Electrode | 5,355 | 3,030.12 |
| 310521MX | Center Electrode | 4,111 | 2,343.10 |
| 310522MX | Center Electrode | 2,967 | 1,698.12 |
| 310524MX | Center Electrode | 5,307 | 2,836.33 |
| 310525MX | Center Electrode | 4,363 | 2,997.95 |
| 310527MX | Center Electrode | 6,930 | 3,737.12 |
| 310529MX | Center Electrode | 21,903 | 11,595.45 |
| 310531MX | Center Electrode | 3,629 | 2,040.89 |
| 310532MX | Center Electrode | 1,474 | 364.27 |
| 310535MX | Center Electrode | 37,109 | 9,063.52 |
| 310536MX | Center Electrode | 48,589 | 11,902.35 |
| 310537MX | Center Electrode | 94,801 | 23,576.99 |
| 310538MX | Center Electrode | 37,488 | 9,046.24 |
| 310539MX | Center Electrode | 229,484 | 55,874.77 |
| 310540MX | Center Electrode | 23,025 | 5,674.52 |
| 310541MX | Center Electrode | 115,776 | 28,052.52 |
| 310542MX | Center Electrode | 22,528 | 5,461.68 |
| 310559MX | Center Electrode | 5,811 | 3,978.79 |
| 310560MX | Center Electrode | 14,204 | 9,674.48 |
| 310562MX | Center Electrode | 1,838 | 1,251.89 |
| 310567MX | Center Electrode | 3,450 | 2,359.98 |
| 310568MX | Center Electrode | 298,573 | 44,346.94 |
| 310569MX | Center Electrode | 15,553 | 2,519.93 |
| 310570MX | Center Electrode | 420,441 | 61,232.70 |
| 310571MX | Center Electrode | 192,485 | 28,172.01 |
| 310572MX | Center Electrode | 138,624 | 20,807.53 |
| 310573MX | Center Electrode | 263,506 | 37,604.89 |
| 310574MX | Center Electrode | 277,882 | 40,259.88 |
| 310575MX | Center Electrode | 293,458 | 43,387.74 |
| 310576MX | Center Electrode | 215,887 | 31,023.14 |
| 310577MX | Center Electrode | 53,039 | 7,629.16 |
| 310579MX | Center Electrode | 19,246 | 2,738.71 |
| 310584MX | Center Electrode | 13,561 | 9,181.35 |
| 310585MX | Center Electrode | 260 | 176.61 |
| 310604MX | Center Electrode | 68,814 | 12,718.92 |
| 310605MX | Center Electrode | 243,184 | 44,420.03 |
| 310606MX | Center Electrode | 199,107 | 35,642.05 |
| 310607MX | Center Electrode | 222,499 | 40,312.61 |

FBG_CH1_00090596

| | | | |
|---|---|---:|---:|
| 310608MX | Center Electrode | 27,185 | 5,006.12 |
| 310610MX | Center Electrode | 18,530 | 9,828.49 |
| 310611MX | Center Electrode | 39,263 | 11,745.92 |
| 310615MX | Center Electrode | 10,712 | 5,630.77 |
| 310617MX | Center Electrode | 11,726 | 6,219.63 |
| 310620MX | Center Electrode | 79,932 | 52,294.71 |
| 310621MX | Center Electrode | 228,785 | 149,252.49 |
| 310622MX | Center Electrode | 4,521 | 1,090.96 |
| 310624MX | Center Electrode | 88,462 | 21,576.79 |
| 310628MX | Center Electrode | 13,719 | 3,350.75 |
| 310629MX | Center Electrode | 10,317 | 1,506.18 |
| 310630MX | Center Electrode | 392,925 | 97,182.12 |
| 310632MX | Center Electrode | 36,882 | 24,204.90 |
| 310635MX | Center Electrode | 104,420 | 68,141.32 |
| 310636MX | Center Electrode | 74,581 | 48,669.31 |
| 310637MX | Center Electrode | 36,836 | 24,055.02 |
| 310638MX | Center Electrode | 47,278 | 30,852.22 |
| 310639MX | Center Electrode | 11,636 | 7,593.30 |
| 310641MX | Center Electrode | 13,223 | 8,237.26 |
| 311066MX | Center Electrode | 67,231 | 20,701.09 |
| 320532MX | Center Electrode | 595 | 183.54 |
| 320535MX | Center Electrode | 388,929 | 118,844.95 |
| 320536MX | Center Electrode | 2,044 | 626.06 |
| 320537MX | Center Electrode | 42,617 | 13,212.56 |
| 320538MX | Center Electrode | 646,669 | 195,707.76 |
| 320539MX | Center Electrode | 146,336 | 44,604.77 |
| 320540MX | Center Electrode | 225,771 | 69,487.76 |
| 320541MX | Center Electrode | 225,088 | 68,343.56 |
| 320542MX | Center Electrode | 78,366 | 23,805.20 |
| 320553MX | Center Electrode | 22,563 | 5,822.36 |
| 320554MX | Center Electrode | 47,853 | 14,462.65 |
| 320611MX | Center Electrode | 28,140 | 10,144.19 |
| 320618MX | Center Electrode | 6,012 | 1,863.91 |
| 320622MX | Center Electrode | 11,566 | 3,500.32 |
| 320624MX | Center Electrode | 789,725 | 241,054.50 |
| 320626MX | Center Electrode | 132,499 | 40,230.84 |
| 320627MX | Center Electrode | 38,290 | 11,671.34 |
| 320628MX | Center Electrode | 24,885 | 7,604.08 |
| 320630MX | Center Electrode | 420,203 | 129,699.85 |
| 321066MX | Center Electrode | 8,790 | 3,245.62 |
| 321182MX | Center Electrode | 8,978 | 2,773.12 |
| 4000263M | Terminal Stud | 77,633 | 1,620.98 |
| 4000281M | Terminal Stud | 41,284 | 926.41 |
| 4000282M | Terminal Stud | 18,581 | 410.63 |
| 4000287M | Terminal Stud | 73,980 | 1,827.31 |
| 4000366M | Terminal Stud | 18,147 | 456.90 |
| 4000372M | Terminal Stud | 133,390 | 2,975.92 |
| 4000451M | Terminal Stud | 13,846 | 327.73 |
| 4000636M | Terminal Stud | 1,163 | 28.16 |
| 4000646M | Terminal Stud | 87,015 | 1,679.39 |
| 4000659M | Terminal Stud | 31,767 | 802.12 |
| 4000674M | Terminal Stud | 1,415 | 35.93 |
| 4000737M | Terminal Stud | 4,163 | 98.32 |
| 4000738M | Terminal Stud | 126,799 | 2,943.01 |
| 4000835M | Terminal Stud | 11,693 | 260.16 |
| 4000836M | Terminal Stud | 27,212 | 675.94 |
| 400201HM | Terminal Stud | 36,344 | 718.88 |
| 400203M | Steel | 719,552 | 8,634.66 |
| 400262M | Terminal Stud | 172,007 | 4,437.78 |
| 400272M | Terminal Stud | 4,286 | 113.48 |
| 400283M | Terminal Stud | 53,148 | 1,007.69 |
| 400292M | Terminal Stud | 30,276 | 669.10 |
| 400312M | Terminal Stud | 55,986 | 1,317.92 |
| 400323M | Terminal Stud | 32,663 | 687.92 |
| 400325M | Terminal Stud | 56,091 | 1,523.96 |
| 400332M | Terminal Stud | 24,967 | 661.39 |
| 400397M | Terminal Stud | 23,213 | 444.99 |
| 400455M | Terminal Stud | 42,022 | 974.48 |
| 400460M | Terminal Stud | 41,521 | 908.90 |
| 400463M | Terminal Stud | 32,305 | 837.66 |
| 400476M | Terminal Stud | 8,542 | 227.38 |
| 400492M | Terminal Stud | 129,000 | 2,638.06 |
| 400503M | Terminal Stud | 85,456 | 2,285.95 |
| 400520M | Terminal Stud | 771 | 18.48 |
| 400528M | Terminal Stud | 127,678 | 2,778.25 |
| 400531M | Terminal Stud | 9,393 | 231.45 |
| 400542M | Terminal Stud | 1,455 | 34.45 |

FBG_CH1_00090597

| | | | |
|---|---|---|---|
| 400563M | Terminal Stud | 109,504 | 2,630.28 |
| 400565M | Terminal Stud | 22,931 | 554.01 |
| 400570M | Terminal Stud | 135,971 | 3,145.00 |
| 400586M | Terminal Stud | 14,325 | 335.32 |
| 400587M | Terminal Stud | 43 | 1.03 |
| 400587MS | Terminal Stud | 17,999 | 452.13 |
| 400588M | Terminal Stud | 22,382 | 531.36 |
| 400590M | Terminal Stud | 191 | 4.61 |
| 400592M | Terminal Stud | 113,260 | 2,642.36 |
| 400593M | Terminal Stud | 25,490 | 532.23 |
| 400597M | Terminal Stud | 39,669 | 868.35 |
| 400598M | Terminal Stud | 668 | 15.61 |
| 400599M | Terminal Stud | 16,776 | 356.99 |
| 400637M | Steel | 53,938 | 647.24 |
| 400639M | Terminal Stud | 43,324 | 863.01 |
| 400642M | Terminal Stud | 31,811 | 686.16 |
| 400648M | Terminal Stud | 109,095 | 2,105.53 |
| 400649M | Terminal Stud | 76,012 | 1,446.51 |
| 400654M | Terminal Stud | 34,114 | 858.92 |
| 400655M | Terminal Stud | 109,427 | 2,515.73 |
| 400656M | Terminal Stud | 57,573 | 1,272.36 |
| 400660M | Terminal Stud | 53,537 | 1,314.93 |
| 400661M | Terminal Stud | 82,787 | 1,529.07 |
| 400665M | Terminal Stud | 81,360 | 1,753.31 |
| 400673M | Terminal Stud | 226,450 | 4,386.34 |
| 400682M | Terminal Stud | 110,678 | 2,460.37 |
| 400685M | Terminal Stud | 144,731 | 3,168.16 |
| 400688M | Terminal Stud | 83,308 | 1,966.91 |
| 400695M | Terminal Stud | 123,572 | 2,250.24 |
| 400697M | Terminal Stud | 8,001 | 205.87 |
| 400706M | Terminal Stud | 166,597 | 3,818.41 |
| 400707M | Terminal Stud | 111,226 | 2,579.33 |
| 400709M | Terminal Stud | 15,590 | 354.05 |
| 400710M | Terminal Stud | 8,979 | 200.32 |
| 400712M | Terminal Stud | 4,391 | 274.17 |
| 400714M | Terminal Stud | 20,768 | 15,821.07 |
| 400726M | Terminal Stud | 89,669 | 1,866.01 |
| 400729M | Terminal Stud | 36,490 | 791.83 |
| 400731M | Terminal Stud | 36,093 | 758.67 |
| 400739M | Terminal Stud | 95,695 | 2,261.27 |
| 400745M | Terminal Stud | 8,809 | 213.97 |
| 400747M | Terminal Stud | 258,143 | 5,513.93 |
| 400754M | Terminal Stud | 5,630 | 145.99 |
| 400755M | Terminal Stud | 767 | 18.90 |
| 400763M | Terminal Stud | 40,977 | 986.72 |
| 400766M | Terminal Stud | 298,722 | 6,213.40 |
| 400768M | Terminal Stud | 90,799 | 2,237.33 |
| 400786M | Terminal Stud | 364 | 8.60 |
| 400786MS | Terminal Stud | 65,086 | 1,603.72 |
| 400793M | Terminal Stud | 59,960 | 967.15 |
| 400797M | Terminal Stud | 46,154 | 1,095.70 |
| 400807M | Terminal Stud | 305 | 6.81 |
| 400807MS | Terminal Stud | 5,414 | 126.74 |
| 400808M | Terminal Stud | 28,670 | 664.86 |
| 400810M | Terminal Stud | 16,115 | 331.97 |
| 400819M | Terminal Stud | 31,109 | 613.47 |
| 400842M | Terminal Stud | 35,692 | 840.18 |
| 4200027L | Terminal Stud | 508,715 | 8,159.78 |
| 4200027M | Terminal Stud | 3,748 | 128.54 |
| 4200076L | Terminal Stud | 996,693 | 15,987.07 |
| 4200076M | Terminal Stud | 634 | 21.95 |
| 420032L | Terminal Stud | 111,011 | 1,780.62 |
| 420032M | Terminal Stud | 6,022 | 164.40 |
| 420035L | Terminal Stud | 1,017,688 | 16,323.73 |
| 420035M | Terminal Stud | 1,316 | 35.29 |
| 4200366L | Terminal Stud | 130,200 | 1,933.47 |
| 420037L | Terminal Stud | 266,600 | 4,276.26 |
| 420041L | Terminal Stud | 390,333 | 6,260.92 |
| 420041M | Terminal Stud | 23,602 | 669.60 |
| 420042L | Terminal Stud | 265,321 | 4,255.72 |
| 420042M | Terminal Stud | 1,299 | 42.88 |
| 420044L | Terminal Stud | 6,780,842 | 108,764.63 |
| 420044M | Terminal Stud | 36 | 1.17 |
| 420049M | Terminal Stud | 212 | 5.73 |
| 420050L | Terminal Stud | 397,715 | 6,379.39 |
| 420050M | Terminal Stud | 223 | 7.51 |
| 420051L | Terminal Stud | 260,400 | 3,866.94 |

FBG_CH1_00090598

| | | | |
|---|---|---:|---:|
| 420054M | Terminal Stud | 27,974 | 869.99 |
| 4200565M | Terminal Stud | 1,451 | 1.46 |
| 420057L | Terminal Stud | 1,171,281 | 18,787.31 |
| 420057M | Terminal Stud | 33 | 1.01 |
| 420058L | Terminal Stud | 207,512 | 3,328.49 |
| 420058M | Terminal Stud | 8,851 | 300.65 |
| 420060L | Terminal Stud | 7,341,048 | 117,750.46 |
| 4200636M | Terminal Stud | 12,166 | 12.17 |
| 4200639M | Terminal Stud | 86,984 | 2,602.56 |
| 420071L | Terminal Stud | 894,108 | 14,341.39 |
| 420071M | Terminal Stud | 3,712 | 120.95 |
| 420072L | Terminal Stud | 34,142 | 547.60 |
| 420072M | Terminal Stud | 2,497 | 77.78 |
| 4200763L | Terminal Stud | 874,941 | 14,034.00 |
| 4200763M | Terminal Stud | 203 | 6.94 |
| 420077L | Terminal Stud | 203,509 | 3,022.13 |
| 4200782M | Terminal Stud | 30,682 | 789.46 |
| 4200785L | Terminal Stud | 4,128 | 66.21 |
| 4200785M | Terminal Stud | 2,155 | 68.31 |
| 4200829M | Terminal Stud | 24,062 | 559.20 |
| 4200830M | Terminal Stud | 46,215 | 1,086.51 |
| 4200831M | Terminal Stud | 41,542 | 1,005.31 |
| 4200832M | Terminal Stud | 21,447 | 524.81 |
| 4200834L | Terminal Stud | 260,400 | 4,176.82 |
| 4200834M | Terminal Stud | 230,885 | 7,676.98 |
| 4200835L | Terminal Stud | 173,137 | 2,777.14 |
| 4200835M | Terminal Stud | 1,579 | 52.56 |
| 4200836M | Terminal Stud | 33 | 1.15 |
| 4200837L | Terminal Stud | 15,810 | 253.60 |
| 420084L | Terminal Stud | 129,915 | 2,083.84 |
| 420084M | Terminal Stud | 28,991 | 949.17 |
| 4200867L | Terminal Stud | 130,200 | 2,088.41 |
| 4200867M | Terminal Stud | 61,543 | 1,312.08 |
| 4200868L | Terminal Stud | 139,500 | 2,071.58 |
| 4200868M | Terminal Stud | 49,608 | 1,239.20 |
| 4200869M | Terminal Stud | 54,850 | 1,271.42 |
| 420086M | Terminal Stud | 25,550 | 687.03 |
| 4200870L | Terminal Stud | 130,200 | 2,088.41 |
| 4200870M | Terminal Stud | 17,655 | 415.95 |
| 4200873M | Terminal Stud | 35,542 | 1,183.91 |
| 4200880L | Terminal Stud | 17,360 | 278.46 |
| 4200880M | Terminal Stud | 6,797 | 228.52 |
| 420088L | Terminal Stud | 2,117,181 | 33,959.39 |
| 420088M | Terminal Stud | 9,267 | 305.20 |
| 420088MS | Terminal Stud | 187,600 | 17,686.93 |
| 420089L | Terminal Stud | 495,822 | 7,952.93 |
| 420089M | Terminal Stud | 139,990 | 4,602.87 |
| 420093L | Terminal Stud | 338,869 | 5,435.40 |
| 420093M | Terminal Stud | 256,689 | 8,370.63 |
| 420094M | Terminal Stud | 28,551 | 1,477.23 |
| 420095M | Terminal Stud | 182,520 | 5,603.37 |
| 420531L | Terminal Stud | 59,210 | 949.73 |
| 420565L | Terminal Stud | 99,262 | 1,592.16 |
| 420565M | Terminal Stud | 126,643 | 4,199.47 |
| 420636L | Terminal Stud | 1,047,778 | 16,806.24 |
| 420636M | Terminal Stud | 5,233 | 179.28 |
| 420642M | Terminal Stud | 246,997 | 7,797.69 |
| 420649M | Terminal Stud | 271,182 | 7,872.41 |
| 420747M | Terminal Stud | 26,362 | 800.35 |
| 420775L | Terminal Stud | 390,600 | 5,800.41 |
| 420775M | Terminal Stud | 86,798 | 2,976.36 |
| 420777L | Terminal Stud | 30,380 | 487.29 |
| 420777M | Terminal Stud | 1,457 | 41.66 |
| 420786L | Terminal Stud | 2,706,587 | 43,413.32 |
| 420786M | Terminal Stud | 99,136 | 3,318.09 |
| 420793M | Terminal Stud | 112,037 | 2,927.53 |
| 420806M | Terminal Stud | 366 | 11.52 |
| 420807L | Terminal Stud | 2,645,621 | 42,435.72 |
| 420807M | Terminal Stud | 9,419 | 313.79 |
| 420807MS | Terminal Stud | 285 | 26.97 |
| 420842L | Terminal Stud | 493,928 | 7,922.60 |
| 420872L | Terminal Stud | 97,354 | 1,561.55 |
| 420872M | Terminal Stud | 124 | 4.03 |
| 420875L | Terminal Stud | 34,060 | 546.32 |
| 420875M | Terminal Stud | 174 | 5.87 |
| 420878M | Terminal Stud | 1,433,874 | 28,116.88 |
| 420890L | Terminal Stud | 17,360 | 299.12 |

FBG_CH1_00090599

| | | | |
|---|---|---|---|
| 420890M | Terminal Stud | 14,502 | 458.56 |
| 420892L | Terminal Stud | 130,200 | 1,933.47 |
| 4M5J12405AAUB | Packaging | 361,169 | 4,272.63 |
| 5000200M | Gasket-Spark Plug | 1,912,855 | 899.05 |
| 500066M | Gasket-Spark Plug | 880,803 | 2,853.80 |
| 500127M | Gasket-Spark Plug | 8,411,878 | 82,436.33 |
| 500128M | Gasket-Spark Plug | 54,417 | 541.46 |
| 500129M | Gasket-Spark Plug | 292,454 | 3,535.77 |
| 500134M | Gasket-Spark Plug | 451,779 | 24,237.95 |
| 500150M | Gasket-Spark Plug | 1,235,369 | 5,979.62 |
| 500151M | Gasket-Spark Plug | 989,283 | 3,422.93 |
| 500155M | Gasket-Spark Plug | 5,727,222 | 14,889.97 |
| 500157M | Gasket-Spark Plug | 4,873,262 | 8,625.89 |
| 500158M | Gasket-Spark Plug | 3,332,531 | 3,732.45 |
| 500159M | Gasket-Spark Plug | 1,604,549 | 5,102.44 |
| 500160M | Gasket-Spark Plug | 180,693 | 699.28 |
| 500164M | Gasket-Spark Plug | 408,472 | 1,584.86 |
| 500167M | Gasket-Spark Plug | 3,547,101 | 11,670.01 |
| 500193M | Gasket-Spark Plug | 7,002,513 | 9,103.26 |
| 500194M | Gasket-Spark Plug | 3,094,312 | 5,817.31 |
| 500218M | Gasket-Spark Plug | 3,024,978 | 38,901.68 |
| 500228M | Gasket-Spark Plug | 3,679,140 | 36,606.87 |
| 500348M | Gasket-Spark Plug | 651 | 1.91 |
| 600532M | Ink | 78 | 2,129.64 |
| 600580M | Ink | 78 | 3,159.00 |
| 600920M | Material | 475 | 579.76 |
| 6800533M | Material | 1,581 | 12,464.45 |
| 6800534M | Material | 881 | 10,439.16 |
| 6800588M | Material | 113 | 830.07 |
| 6800588MX | Material | 310 | 3,030.75 |
| 6800602M | Material | 912 | 8,778.26 |
| 6800607M | Material | 1,385 | 29,834.09 |
| 6800607MX | Material | 605 | 13,965.94 |
| 6800624M | Material | 1,621 | 17,065.60 |
| 6801691M | Material | 2,796 | 40,975.53 |
| 6801884C | Material | 5,163 | 22,393.02 |
| 6801938A | Material | 4,514 | 75,609.51 |
| 800000LM | Packaging Label | 80,600 | 2,901.48 |
| 800000MFLM | Packaging Label | 37,692 | 173.77 |
| 800000SEM | Packaging Label | 29,085 | 727.13 |
| 801226MZM | Packaging | 13,640 | 159.73 |
| 801226TFMCAPM | Packaging | 200,000 | 2,822.01 |
| 801226TM | Packaging | 942,955 | 12,154.68 |
| 801276TM | Packaging | 101,756 | 5,897.36 |
| 801286TFMCAPM | Packaging | 45,355 | 2,372.49 |
| 801286TM | Packaging | 19,077 | 884.98 |
| 801376M | Packaging | 31,140 | 5,511.78 |
| 802M00 | Packaging | 14,395 | 185.55 |
| 802M00ACDR | Packaging | 123,487 | 1,753.52 |
| 804488M | Packaging | 942 | 27.56 |
| 804M00 | Packaging | 54,537 | 1,518.85 |
| 804M00ACDR | Packaging | 40,841 | 1,147.23 |
| 806M00 | Packaging | 47,880 | 3,425.81 |
| 8080018AM | Packaging | 353,119 | 12,359.16 |
| 8080050M | Corrugated | 2,350 | 1,431.15 |
| 8080058M | Corrugated | 12,132 | 1,444.17 |
| 808601M | Packaging | 5 | 1.13 |
| 808602M | Packaging | 5 | 1.13 |
| 8087000SM | Packaging | 9,984 | 624.99 |
| 8087000TM | Packaging | 37,947 | 4,288.00 |
| 8089000M | Packaging Label | 3,348 | 167.39 |
| 8089300M | Packaging Label | 2,370 | 1,412.51 |
| 812000M | Packaging | 1,130 | 14.57 |
| 8120S4M | Packaging | 220,046 | 4,394.30 |
| 812104M | Packaging | 305,304 | 4,454.40 |
| 8121S4M | Packaging | 280,234 | 6,229.61 |
| 812404M | Packaging | 61,623 | 2,960.36 |
| 8124S4M | Packaging | 61,499 | 3,494.98 |
| 8140S4M | Packaging | 53,767 | 1,751.20 |
| 82M835M | Packaging | 2,649 | 98.01 |
| 840000XSM | Packaging | 7,736 | 230.52 |
| 860000M | Corrugated | 1,752 | 933.83 |
| 860048M | Corrugated | 38,864 | 7,423.06 |
| 860209M | Corrugated | 2,831 | 577.53 |
| 860217M | Corrugated | 24,113 | 9,211.16 |
| 860218M | Corrugated | 3,701 | 880.83 |
| 860300M | Corrugated | 800 | 640.81 |

FBG_CH1_00090600

| | | | |
|---|---|---|---|
| 860400M | Corrugated | 23,110 | 7,279.50 |
| 860404M | Corrugated | 1,829 | 674.91 |
| 860484A | Corrugated | 3,686 | 2,241.07 |
| 86048S4M | Corrugated | 14,777 | 4,374.03 |
| 865322M | Packaging | 7,854 | 1,130.98 |
| 865363M | Packaging | 4,224 | 2,969.47 |
| 865365M | Packaging | - | - |
| 865420M | Corrugated | 3,234 | 4,653.73 |
| 865422M | Corrugated | 3,436 | 2,549.53 |
| 865432M | Corrugated | 2,362 | 3,375.29 |
| 865522M | Packaging | 7,374 | 2,971.74 |
| 865532M | Corrugated | 2,656 | 464.79 |
| 869040AM | Packaging | 6,223 | 3,267.07 |
| 86GN48M | Corrugated | 4,922 | 3,410.96 |
| 86S448M | Corrugated | 14,317 | 5,082.55 |
| 870000M | Packaging | 50,051 | 7,504.15 |
| 885101M | Packaging Label | 1,938 | 20.28 |
| 885105M | Packaging Label | 3 | 0.03 |
| 885111M | Packaging Label | 894 | 8.93 |
| 885112M | Packaging Label | 1,550 | 15.50 |
| 885202M | Packaging Label | 1,550 | 18.60 |
| 885500M | Packaging Label | 1,373 | 54.95 |
| 885600M | Packaging Label | 14,016 | 349.01 |
| 885664M | Packaging Label | 18,602 | 279.12 |
| 890800M | Packaging | 9,411 | 6,376.51 |
| 890801M | Packaging | 788 | 933.30 |
| 890804M | Packaging | 789 | 867.89 |
| 890805M | Packaging | 565 | 649.78 |
| 891000EM | Pallets | 34 | 0.34 |
| 891001EM | Pallets | 38 | 513.00 |
| 891039AM | Pallets | 29 | 302.19 |
| 891048EM | Pallets | 193 | 2,026.54 |
| 891049M | Pallets | 162 | 1,814.33 |
| 891050GM | Pallets | 27 | 367.16 |
| 8M0000XS | Packaging | 6,191 | 89.08 |
| 8ML2000C | Packaging Label | 39,981 | 673.28 |
| 8MZ1063M | Packaging | 5,363 | 82.69 |
| 8MZ1148M | Packaging | 3,364 | 51.87 |
| 8MZ1157M | Packaging | 10,585 | 154.97 |
| 8MZ1165M | Packaging | 6,095 | 93.98 |
| 8MZ1175M | Packaging | 4,684 | 71.28 |
| 900000HM | Packaging | 329,888 | 6,587.82 |
| 900000LM | Packaging Label | 304,815 | 11,887.81 |
| 900000MM | Packaging Label | 235,881 | 2,288.00 |
| 900000OM | Packaging Label | 6,960 | 135.73 |
| 900010M | Packaging | 101,471 | 5,476.40 |
| 900210M | Packaging | 52,032 | 20,376.26 |
| 901110MAPIM | Packaging | 14,417 | 764.09 |
| 901227M | Packaging | 1,430,281 | 18,908.39 |
| 901227MXM | Packaging | 699,267 | 9,244.32 |
| 901326M | Packaging | 51,460 | 3,348.50 |
| 901527M | Packaging | 341,381 | 6,817.37 |
| 901FOC000M | Packaging | 416,702 | 5,392.12 |
| 904401M | Packaging | 329,916 | 8,891.20 |
| 904401MXM | Packaging | 150,657 | 3,993.91 |
| 904405MX | Packaging | 4,216 | 155.99 |
| 904405MXMX | Packaging | 4,340 | 160.58 |
| 904417MX | Packaging | 4,534 | 167.77 |
| 904417MXMX | Packaging | 4,340 | 160.58 |
| 904445MX | Packaging | 4,548 | 168.28 |
| 904466MX | Packaging | 567 | 19.10 |
| 904522M | Packaging | 75,068 | 2,777.52 |
| 904558M | Packaging | 28,320 | 1,047.83 |
| 904570M | Packaging | 41,239 | 1,306.45 |
| 904570MXM | Packaging | 63,295 | 2,341.92 |
| 904577MAPIN | Packaging | 4,893 | 313.06 |
| 904588MX | Packaging | 8,148 | 274.58 |
| 904590M | Packaging | 110,667 | 4,094.69 |
| 904591M | Packaging | 86,059 | 3,184.19 |
| 904597M | Packaging | 50,923 | 1,884.17 |
| 904598M | Packaging | 100,628 | 3,723.24 |
| 904607MX | Packaging | 6,771 | 250.54 |
| 904608MX | Packaging | 8,326 | 280.59 |
| 904631MX | Packaging | 60 | 2.03 |
| 904633M | Packaging | 92,983 | 2,945.70 |
| 9046400MX | Packaging | 8,744 | 323.53 |
| 904651M | Packaging | 52,061 | 1,926.26 |

FBG_CH1_00090601

| | | | |
|---|---|---|---|
| 904658MX | Packaging | 7,020 | 259.74 |
| 904666MX | Packaging | 2,764 | 93.15 |
| 904666MXMX | Packaging | 4,340 | 160.58 |
| 904667M | Packaging | 78,192 | 2,893.10 |
| 904667MXMX | Packaging | 4,340 | 160.58 |
| 904669MX | Packaging | 4,139 | 139.47 |
| 904677M | Packaging | 56,208 | 2,079.70 |
| 904678MX | Packaging | 5,267 | 177.49 |
| 904679M | Packaging | 106,795 | 3,951.42 |
| 904680M | Packaging | 28,692 | 908.96 |
| 904680MXM | Packaging | 21,467 | 794.28 |
| 904681M | Packaging | 40,823 | 1,510.42 |
| 904683MX | Packaging | 5,866 | 197.69 |
| 904684M | Packaging | 29,638 | 1,096.60 |
| 904699MX | Packaging | 5,149 | 190.51 |
| 904767MX | Packaging | 2,551 | 85.97 |
| 904767MXMX | Packaging | 4,340 | 160.58 |
| 904780MX | Packaging | 2,554 | 86.07 |
| 91FCA02M | Packaging | 86,800 | 2,117.92 |
| 92X224M | Packaging | 1,134 | 315.28 |
| 92X236M | Packaging | 1,212 | 385.45 |
| 930000XPM | Packaging | 15,565 | 2,369.16 |
| 934000HM | Packaging | 102,430 | 5,199.41 |
| 934000M | Packaging | 383,795 | 10,550.67 |
| 940000F2M | Packaging | 101,413 | 2,690.53 |
| 940000FPM | Packaging | 300,358 | 7,968.56 |
| 940000IRM | Packaging | 13,626 | 517.79 |
| 940000P2M | Packaging | 171,475 | 4,549.26 |
| 940000PM | Packaging | 426,345 | 12,180.59 |
| 940000XPM | Packaging | 40,124 | 2,036.71 |
| 940001IRM | Packaging | 57,905 | 2,583.14 |
| 940103PM | Packaging | 22,736 | 682.07 |
| 940104F2M | Packaging | 51,963 | 1,922.64 |
| 940104PM | Packaging | 124,184 | 3,725.52 |
| 943923FPM | Packaging | 53,885 | 1,993.77 |
| 943924P2M | Packaging | 62,051 | 2,295.90 |
| 943924PM | Packaging | 36,926 | 1,107.78 |
| 945224FPM | Packaging | 31,809 | 1,176.90 |
| 945224P2M | Packaging | 49,607 | 1,835.47 |
| 945224PM | Packaging | 170,135 | 5,104.05 |
| 945245FPM | Packaging | 30,750 | 1,137.74 |
| 945325FPM | Packaging | 87,801 | 3,248.63 |
| 945325PM | Packaging | 59,257 | 1,715.50 |
| 945683FPM | Packaging | 99,648 | 3,686.99 |
| 94FCA02M | Packaging | 26,040 | 1,551.98 |
| 94H000F2M | Packaging | 1,220 | 61.93 |
| 94H000IRM | Packaging | 70,138 | 5,611.04 |
| 94H000P2M | Packaging | 60,906 | 3,091.59 |
| 94H000PM | Packaging | 68,931 | 3,518.90 |
| 94H001IRM | Packaging | 22,356 | 2,052.05 |
| 94H5263PM | Packaging | 42,422 | 2,281.86 |
| 950841M | Packaging | 155 | 39.68 |
| 950860M | Corrugated | 1,520 | 1,162.79 |
| 9FM1014MX | Packaging | 11,084 | 210.58 |
| 9FM1015MX | Packaging | 11,307 | 214.83 |
| 9FM1015MXMX | Packaging | 10,850 | 206.15 |
| 9FM1030MX | Packaging | 11,022 | 209.42 |
| 9FM1030MXMX | Packaging | 10,850 | 206.15 |
| 9FM1172MAPIN | Packaging | 17,307 | 328.83 |
| 9FM1181MAPIM | Packaging | 93,660 | 1,339.34 |
| 9FM2055M | Packaging | 46,283 | 879.38 |
| 9FM2058MX | Packaging | 14,990 | 284.81 |
| 9FM2063MX | Packaging | 1,804 | 31.45 |
| 9FM2065M | Packaging | 370,814 | 7,045.47 |
| 9FM2066MX | Packaging | 22,523 | 392.58 |
| 9FM2079MX | Packaging | 21,709 | 412.45 |
| 9FM2134MX | Packaging | 10,170 | 177.27 |
| 9FM2139M | Packaging | 344,117 | 5,636.64 |
| 9FM2144M | Packaging | 239,261 | 4,545.96 |
| 9FM2147MX | Packaging | 25,758 | 489.40 |
| 9FM2148M | Packaging | 279,388 | 5,308.36 |
| 9FM2150M | Packaging | 138,781 | 2,636.83 |
| 9FM2152M | Packaging | 145,891 | 2,389.70 |
| 9FM2152MXM | Packaging | 249,885 | 4,747.82 |
| 9FM2153M | Packaging | 302,813 | 5,753.44 |
| 9FM2154M | Packaging | 335,223 | 6,369.23 |
| 9FM2155MX | Packaging | 33,164 | 578.03 |

FBG_CH1_00090602

| | | | |
|---|---|---|---|
| 9FM2157M | Packaging | 42,034 | 688.52 |
| 9FM2157MXM | Packaging | 224,986 | 4,274.71 |
| 9FM2158MX | Packaging | 9,319 | 162.43 |
| 9FM2158MXMX | Packaging | 10,850 | 206.15 |
| 9FM2159MX | Packaging | 942 | 16.42 |
| 9FM2159MXMX | Packaging | 10,850 | 206.15 |
| 9FM2160MXMX | Packaging | 10,850 | 206.15 |
| 9FM2161MX | Packaging | 6,725 | 117.20 |
| 9FM2167M | Packaging | 171,047 | 3,249.88 |
| 9FM2168M | Packaging | 175,493 | 3,334.37 |
| 9FM2169MX | Packaging | 13,138 | 249.62 |
| 9FM2174M | Packaging | 43,919 | 834.47 |
| 9FM2175MX | Packaging | 21,052 | 366.93 |
| 9FM2177MX | Packaging | 14,302 | 249.29 |
| 9FM2178M | Packaging | 164,698 | 3,129.26 |
| 9FM2180MX | Packaging | 27,238 | 474.76 |
| 9FM2181M | Packaging | 84,148 | 1,598.81 |
| 9FM6007M | Packaging | 91,779 | 1,911.76 |
| 9FM6008M | Packaging | 512,463 | 10,536.18 |
| 9H0000F2M | Packaging | 29,529 | 589.70 |
| 9H0000IR | Packaging | 227,376 | 6,821.28 |
| 9H0000P2M | Packaging | 295,859 | 5,908.31 |
| 9H0000PM | Packaging | 241,223 | 4,817.21 |
| 9H0001IR | Packaging | 193,426 | 6,872.43 |
| 9H5263PM | Packaging | 244,347 | 5,141.09 |
| 9M0000 | Packaging | 1,419,228 | 18,776.44 |
| 9M0000F2 | Packaging | 653,765 | 8,217.88 |
| 9M0000FP | Packaging | 1,276,427 | 16,044.74 |
| 9M0000IR | Packaging | 757,454 | 13,459.95 |
| 9M0000P | Packaging | 1,572,074 | 21,600.26 |
| 9M0000P2 | Packaging | 639,501 | 8,038.60 |
| 9M0000XP | Packaging | 209,571 | 4,185.13 |
| 9M0001IR | Packaging | 351,535 | 6,176.46 |
| 9M0103P | Packaging | 370,997 | 5,353.47 |
| 9M0104F2 | Packaging | 138,913 | 2,639.36 |
| 9M0104P | Packaging | 560,815 | 8,092.52 |
| 9M3923FP | Packaging | 145,323 | 2,761.15 |
| 9M3924P | Packaging | 112,214 | 1,619.24 |
| 9M3924P2 | Packaging | 179,771 | 3,415.65 |
| 9M5224FP | Packaging | 230,871 | 4,386.55 |
| 9M5224P | Packaging | 406,895 | 5,871.44 |
| 9M5224P2 | Packaging | 302,146 | 5,740.76 |
| 9M5245FP | Packaging | 52,495 | 997.42 |
| 9M5325FP | Packaging | 250,722 | 4,763.73 |
| 9M5325P | Packaging | 27,311 | 518.91 |
| 9M5683FP | Packaging | 293,400 | 5,574.60 |
| 9R1200M | Packaging | 245,109 | 3,117.79 |
| 9R1200MXL | Packaging | 317,518 | 7,058.43 |
| 9R4200M | Packaging | 36,222 | 995.78 |
| 9R4200MXL | Packaging | 69,905 | 3,972.70 |
| 9S4400M | Packaging | 158,446 | 9,004.48 |
| 9S4501M | Packaging | 74,147 | 3,763.71 |
| 9S4607M | Packaging | 31,453 | 1,666.06 |
| 9S4608M | Packaging | 150,461 | 7,866.12 |
| 9S4FOC0000M | Packaging | 100,220 | 2,796.14 |
| A103-04 | AT AM Copper Core | 50 | 19.50 |
| A103-05 | AT AM Copper Core | 36,919 | 20,205.03 |
| A103-05 | AT AM Copper Core | 22,095 | 12,786.30 |
| A104-04 | AT AM Copper Core | 42 | 16.38 |
| A104-05 | AT AM Copper Core | 19,671 | 10,734.08 |
| A104-05 | AT AM Copper Core | 110,025 | 63,474.14 |
| A104BP-02 | AT AM Copper Core | 22 | 12.74 |
| A104BPW | AT AM Copper Core | 47 | 28.62 |
| A105-04 | AT AM Copper Core | 45,310 | 16,945.77 |
| A106-04 | AT AM Copper Core | 105 | 40.94 |
| A106-05 | AT AM Copper Core | 3 | 1.44 |
| A106-05 | AT AM Copper Core | 61,231 | 35,028.22 |
| A1104-02 | AT AM Glow Plug | 409 | 702.64 |
| A1106-02 | AT AM Glow Plug | 149 | 244.60 |
| A1107-02 | AT AM Glow Plug | 465 | 677.15 |
| A1108 | AT AM Glow Plug | 205 | 299.21 |
| A1108-02 | AT AM Glow Plug | 5,916 | 8,816.32 |
| A1108-03 | AT AM Glow Plug | 1,296 | 1,994.33 |
| A1110 | AT AM Glow Plug | 54 | 100.08 |
| A1110-02 | AT AM Glow Plug | 539 | 749.64 |
| A1111-02 | AT AM Glow Plug | 1,352 | 2,322.67 |
| A1113-03 | AT AM Glow Plug | 291 | 709.36 |

FBG_CH1_00090603

| | | | |
|---|---|---:|---:|
| A1114 | AT AM Glow Plug | 19 | 60.68 |
| A1114-02 | AT AM Glow Plug | 372 | 1,020.40 |
| A1116-02 | AT AM Glow Plug | 260 | 446.67 |
| A1117-02 | AT AM Glow Plug | 353 | 968.28 |
| A1118-02 | AT AM Glow Plug | 353 | 929.79 |
| A1119-02 | AT AM Glow Plug | 403 | 1,123.01 |
| A124-04 | AT AM Copper Core | 4,520 | 1,836.91 |
| A144-04 | AT AM Copper Core | 2,902 | 1,131.55 |
| A145-04 | AT AM Copper Core | 10,862 | 4,235.31 |
| A145-05 | AT AM Copper Core | 88 | 49.88 |
| A145-05 | AT AM Copper Core | 4,018 | 2,425.79 |
| A147 | AT AM Copper Core | 167 | 150.58 |
| A147-03 | AT AM Copper Core | 3 | 1.74 |
| A147-03 | AT AM Copper Core | 223 | 136.48 |
| A216-04 | AT AM Small Eng | 4,538 | 1,869.14 |
| A2245 | AT AM Copper Core | 6 | 12.14 |
| A23-04 | AT AM Copper Core | 6,460 | 2,518.88 |
| A23-05 | AT AM Copper Core | 8 | 7.22 |
| A24-04 | AT AM Copper Core | 18,154 | 7,078.60 |
| A24-05 | AT AM Copper Core | 76 | 40.96 |
| A24-05 | AT AM Copper Core | 16,666 | 9,567.95 |
| A25-04 | AT AM Copper Core | 55,682 | 21,711.51 |
| A25-05 | AT AM Copper Core | 129 | 67.66 |
| A25-05 | AT AM Copper Core | 17,112 | 9,555.98 |
| A2526-02 | AT AM Copper Core | 2 | 1.36 |
| A254-04 | AT AM Small Eng | 21,080 | 8,682.58 |
| A2544 | AT AM Copper Core | 143 | 111.37 |
| A2544-03 | AT AM Copper Core | 2 | 1.06 |
| A2544-03 | AT AM Copper Core | 372 | 211.03 |
| A2545 | AT AM Copper Core | 62 | 44.22 |
| A2545-04 | AT AM Copper Core | 6,343 | 2,438.43 |
| A2546-03 | AT AM Copper Core | 1,414 | 817.15 |
| A255-04 | AT AM Small Eng | 24,189 | 9,963.14 |
| A258-03 | AT AM Small Eng | 5 | 13.93 |
| A258-04 | AT AM Small Eng | 149 | 55.73 |
| A25DP2-01 | AT AM Copper Core | 136 | 92.92 |
| A26-04 | AT AM Copper Core | 104,557 | 40,768.85 |
| A26-05 | AT AM Copper Core | 279 | 151.67 |
| A26-05 | AT AM Copper Core | 100,589 | 58,167.88 |
| A2634-04 | AT AM Small Eng | 2,306 | 949.81 |
| A275-04 | AT AM Copper Core | 10,063 | 4,144.82 |
| A2852 | AT AM Small Eng | 372 | 717.35 |
| A2872-03 | AT AM Small Eng | 5 | 9.62 |
| A292-02 | AT AM Copper Core | 3 | 3.56 |
| A295-04 | AT AM Small Eng | 2,306 | 949.81 |
| A2956-03 | AT AM Small Eng | 14 | 19.15 |
| A2974-04 | AT AM Small Eng | 8,556 | 3,524.11 |
| A2976-03 | AT AM Small Eng | 5 | 4.37 |
| A2976-04 | AT AM Small Eng | 236 | 97.20 |
| A2984-04 | AT AM Small Eng | 1,934 | 764.06 |
| A303 | AT AM Copper Core | 174 | 132.90 |
| A303-04 | AT AM Copper Core | 4,414 | 1,818.07 |
| A3076-02 | AT AM Small Eng | 2 | 6.54 |
| A3076-05 | AT AM Small Eng | 310 | 613.80 |
| A373-02 | AT AM Small Eng | 5 | 4.13 |
| A386-04 | AT AM Small Eng | 2,753 | 1,118.90 |
| A3922 | AT AM Copper Core | 68 | 44.28 |
| A3922-04 | AT AM Copper Core | 3,838 | 1,496.51 |
| A3922-05 | AT AM Copper Core | 59 | 35.85 |
| A3922-05 | AT AM Copper Core | 1,488 | 957.18 |
| A3923-05 | AT AM Copper Core | 158 | 97.46 |
| A3923-05 | AT AM Copper Core | 51,968 | 34,469.40 |
| A3924-04 | AT AM Copper Core | 248 | 96.70 |
| A3924-05 | AT AM Copper Core | 507 | 311.89 |
| A3924-05 | AT AM Copper Core | 186,547 | 121,356.50 |
| A3924BP-02 | AT AM Copper Core | 12 | 7.26 |
| A3926-04 | AT AM Copper Core | 16,089 | 6,273.42 |
| A3926-05 | AT AM Copper Core | 7,567 | 4,793.92 |
| A398-02 | AT AM Copper Core | 5 | 4.15 |
| A403-04 | AT AM Copper Core | 1,860 | 725.25 |
| A404-04 | AT AM Copper Core | 3,422 | 1,334.31 |
| A405-03 | AT AM Copper Core | 74 | 51.39 |
| A405-04 | AT AM Copper Core | 2,827 | 1,102.30 |
| A4051-03 | AT AM Small Eng | 3 | 2.57 |
| A4051-03 | AT AM Small Eng | 388 | 352.74 |
| A4054 | AT AM Small Eng | 81 | 54.84 |
| A4054-03 | AT AM Small Eng | 5 | 3.88 |

FBG_CH1_00090604

| | | | |
|---|---|---:|---:|
| A4054-03 | AT AM Small Eng | 744 | 615.02 |
| A4056 | AT AM Small Eng | 1,947 | 2,268.31 |
| A4062-04 | AT AM Small Eng | 2,530 | 986.64 |
| A4063-04 | AT AM Small Eng | 595 | 232.00 |
| A4063S | AT AM Small Eng | 19 | 12.59 |
| A4092-04 | AT AM Small Eng | 3,125 | 1,287.15 |
| A4093-03 | AT AM Small Eng | 8,333 | 7,528.89 |
| A4123-04 | AT AM Small Eng | 5,158 | 2,124.51 |
| A4132-04 | AT AM Small Eng | 37,708 | 15,531.45 |
| A414-02 | AT AM Small Eng | 3 | 2.72 |
| A4162-02 | AT AM Small Eng | 5 | 3.63 |
| A4162-04 | AT AM Small Eng | 2,238 | 921.80 |
| A4163-02 | AT AM Small Eng | 3 | 2.24 |
| A4163-04 | AT AM Small Eng | 9,145 | 4,268.94 |
| A4164-04 | AT AM Small Eng | 13,094 | 5,393.26 |
| A4173-04 | AT AM Small Eng | 893 | 348.20 |
| A4194-04 | AT AM Small Eng | 16,442 | 6,320.78 |
| A425-04 | AT AM Copper Core | 5,878 | 2,421.08 |
| A4263-03 | AT AM Small Eng | 223 | 150.77 |
| A4265-04 | AT AM Small Eng | 5,134 | 2,001.85 |
| A4302-04 | AT AM Small Eng | 3,348 | 1,379.00 |
| A4303-04 | AT AM Small Eng | 422 | 173.82 |
| A4345-02 | AT AM Small Eng | 67 | 48.96 |
| A4345-02 | AT AM Small Eng | 1,116 | 867.49 |
| A45-04 | AT AM Copper Core | 7,366 | 2,993.51 |
| A45-05 | AT AM Copper Core | 147 | 85.89 |
| A45-05 | AT AM Copper Core | 9,002 | 5,597.53 |
| A456 | AT AM Small Eng | 143 | 113.79 |
| A456-03 | AT AM Small Eng | 3 | 2.36 |
| A456-04 | AT AM Small Eng | 789 | 324.98 |
| A458-03 | AT AM Small Eng | 3 | 2.40 |
| A458-04 | AT AM Small Eng | 3,869 | 1,593.59 |
| A46-04 | AT AM Copper Core | 3,581 | 1,455.30 |
| A46-05 | AT AM Copper Core | 115 | 68.92 |
| A46-05 | AT AM Copper Core | 23,957 | 15,277.26 |
| A5125-04 | AT AM Copper Core | 9,164 | 3,724.20 |
| A5143-04 | AT AM Copper Core | 4,985 | 2,053.26 |
| A5143-05 | AT AM Copper Core | 26 | 13.80 |
| A5143-05 | AT AM Copper Core | 893 | 504.71 |
| A5144-04 | AT AM Copper Core | 53,022 | 20,674.33 |
| A5144-05 | AT AM Copper Core | 122 | 64.00 |
| A5144-05 | AT AM Copper Core | 9,672 | 5,402.84 |
| A5145-04 | AT AM Copper Core | 32,959 | 12,326.54 |
| A5164 | AT AM Copper Core | 595 | 273.42 |
| A5184 | AT AM Copper Core | 68 | 37.31 |
| A5184-03 | AT AM Copper Core | 552 | 319.51 |
| A5224-04 | AT AM Copper Core | 40,703 | 16,625.87 |
| A5224-05 | AT AM Copper Core | 377 | 239.82 |
| A5224-05 | AT AM Copper Core | 55,205 | 37,080.64 |
| A5243 | AT AM Copper Core | 149 | 113.06 |
| A5243-04 | AT AM Copper Core | 8,196 | 3,195.78 |
| A5245-04 | AT AM Copper Core | 155 | 60.44 |
| A5245-05 | AT AM Copper Core | 223 | 122.94 |
| A5245-05 | AT AM Copper Core | 11,606 | 6,752.98 |
| A5324-04 | AT AM Copper Core | 18,972 | 8,495.57 |
| A5325-04 | AT AM Copper Core | 52,037 | 24,291.18 |
| A5364-04 | AT AM Copper Core | 18,972 | 8,856.24 |
| A5503-04 | AT AM Copper Core | 6,473 | 2,523.95 |
| A5663-04 | AT AM Copper Core | 24,155 | 9,949.14 |
| A5682-03 | AT AM Small Eng | 40 | 28.09 |
| A5682-03 | AT AM Small Eng | 2,833 | 2,114.38 |
| A5903-04 | AT AM Copper Core | 24,645 | 10,152.32 |
| A5923-03 | AT AM Small Eng | 2,065 | 1,474.49 |
| A5924 | AT AM Small Eng | 6 | 3.78 |
| A5924 | AT AM Small Eng | 1,116 | 759.21 |
| A6003-04 | AT AM Copper Core | 3,348 | 1,562.87 |
| A605-04 | AT AM Copper Core | 87 | 33.92 |
| A605-05 | AT AM Copper Core | 153 | 83.47 |
| A605-05 | AT AM Copper Core | 53,661 | 30,945.44 |
| A606-04 | AT AM Copper Core | 74 | 28.85 |
| A606-05 | AT AM Copper Core | 67 | 35.03 |
| A606-05 | AT AM Copper Core | 13,764 | 7,880.78 |
| A63-04 | AT AM Copper Core | 34,472 | 13,441.32 |
| A63-05 | AT AM Copper Core | 118 | 87.99 |
| A63-05 | AT AM Copper Core | 8,035 | 6,373.89 |
| A64-04 | AT AM Copper Core | 126,013 | 49,134.97 |
| A64-05 | AT AM Copper Core | 180 | 131.88 |

FBG_CH1_00090605

**DEBTORS' EXHIBIT NO. 175**
**Page 380 of 1907**

| | | | |
|---|---|---|---|
| A64-05 | AT AM Copper Core | 149 | 116.10 |
| A646-04 | AT AM Copper Core | 9,562 | 3,728.41 |
| A646-05 | AT AM Copper Core | 37 | 24.27 |
| A646-05 | AT AM Copper Core | 2,976 | 2,074.21 |
| A65-04 | AT AM Copper Core | 22,618 | 8,819.20 |
| A65-05 | AT AM Copper Core | 234 | 151.81 |
| A65-05 | AT AM Copper Core | 17,664 | 12,192.65 |
| A66-04 | AT AM Copper Core | 81,797 | 31,894.27 |
| A66-05 | AT AM Copper Core | 67 | 50.59 |
| A66-05 | AT AM Copper Core | 149 | 119.53 |
| A666 | AT AM Copper Core | 37 | 31.82 |
| A666-04 | AT AM Copper Core | 8,407 | 3,278.06 |
| A666-05 | AT AM Copper Core | 68 | 37.00 |
| A666-05 | AT AM Copper Core | 12,350 | 7,148.73 |
| A685-03 | AT AM Copper Core | 3 | 1.56 |
| A764-04 | AT AM Copper Core | 12,270 | 4,716.94 |
| A765-04 | AT AM Copper Core | 50,400 | 19,375.19 |
| A765-05 | AT AM Copper Core | 85 | 44.51 |
| A765-05 | AT AM Copper Core | 17,580 | 8,537.91 |
| A766 | AT AM Copper Core | 415 | 399.93 |
| A766-04 | AT AM Copper Core | 1,562 | 575.95 |
| A766-05 | AT AM Copper Core | 33 | 15.18 |
| A824-02 | AT AM Copper Core | 3 | 10.29 |
| A847 | AT AM Copper Core | 68 | 52.59 |
| A847-01 | AT AM Copper Core | 149 | 52.36 |
| A847-03 | AT AM Copper Core | 5 | 3.15 |
| A847-03 | AT AM Copper Core | 143 | 96.88 |
| A85-03 | AT AM Copper Core | 5 | 4.02 |
| A85-04 | AT AM Copper Core | 6,175 | 2,556.28 |
| A85-05 | AT AM Copper Core | 28 | 23.85 |
| A86-04 | AT AM Copper Core | 87 | 35.83 |
| A86-05 | AT AM Copper Core | 3 | 2.55 |
| A86-05 | AT AM Copper Core | 880 | 795.92 |
| A985-04 | AT AM Copper Core | 41,974 | 16,366.49 |
| A985-05 | AT AM Copper Core | 157 | 99.87 |
| A985-05 | AT AM Copper Core | 15,333 | 10,431.36 |
| AAI3922 | AT AM Fine Wire | 73 | 110.87 |
| AAI3923 | AT AM Fine Wire | 42 | 62.21 |
| AAI5245 | AT AM Fine Wire | 48 | 68.41 |
| AAI5263 | AT AM Fine Wire | 71 | 104.57 |
| AAI5325 | AT AM Fine Wire | 5 | 6.93 |
| AAI5363 | AT AM IR ULTRA | 6 | 9.38 |
| AAI5363-01 | AT AM IR ULTRA | 48 | 72.40 |
| AAI5363-01 | AT AM IR ULTRA | 4,644 | 7,419.55 |
| AAI5682-01 | AT AM IR ULTRA | 16 | 21.95 |
| AAI5682-01 | AT AM IR ULTRA | 3,112 | 4,531.49 |
| AAI5683-01 | AT AM IR ULTRA | 62 | 83.90 |
| AAI5683-01 | AT AM IR ULTRA | 3,026 | 4,344.61 |
| AAI5684-01 | AT AM IR ULTRA | 45 | 62.22 |
| AAI5684-01 | AT AM IR ULTRA | 2,480 | 3,638.21 |
| AAI5701 | AT AM IR ULTRA | 6 | 9.17 |
| AAI5701-01 | AT AM IR ULTRA | 67 | 91.38 |
| AAI5701-01 | AT AM IR ULTRA | 4,025 | 5,825.35 |
| AAI5702-01 | AT AM IR ULTRA | 37 | 50.35 |
| AAI5702-01 | AT AM IR ULTRA | 1,476 | 2,131.40 |
| AAI5703 | AT AM Fine Wire | 43 | 66.17 |
| AAI5862 | AT AM IR ULTRA | 6,577 | 9,507.38 |
| AAI5863 | AT AM Fine Wire | 51 | 76.92 |
| AAI6043-01 | AT AM IR ULTRA | 59 | 88.75 |
| AAI6043-01 | AT AM IR ULTRA | 2,846 | 4,530.07 |
| AAI6203-01 | AT AM IR ULTRA | 59 | 80.63 |
| AAI6203-01 | AT AM IR ULTRA | 1,848 | 2,679.68 |
| AAP103-05 | AT AM Platinum | 237 | 157.19 |
| AAP103-05 | AT AM Platinum | 32,432 | 22,763.47 |
| AAP104-03 | AT AM Platinum | 76 | 56.59 |
| AAP104-05 | AT AM Platinum | 220 | 148.50 |
| AAP104-05 | AT AM Platinum | 83,695 | 59,768.72 |
| AAP105-02 | AT AM Platinum | 78 | 52.57 |
| AAP105-02 | AT AM Platinum | 90 | 64.16 |
| AAP106-03 | AT AM Platinum | 12,181 | 7,413.22 |
| AAP106-03 | AT AM Platinum | 13,510 | 9,607.05 |
| AAP145 | AT AM Platinum | 310 | 303.56 |
| AAP145-03 | AT AM Platinum | 9 | 5.84 |
| AAP145-03 | AT AM Platinum | 372 | 269.99 |
| AAP23-03 | AT AM Platinum | 25 | 17.80 |
| AAP23-03 | AT AM Platinum | 1,711 | 1,296.78 |
| AAP24-03 | AT AM Platinum | 68 | 42.79 |

FBG_CH1_00090606

| | | | |
|---|---|---|---|
| AAP24-03 | AT AM Platinum | 2,686 | 1,799.69 |
| AAP25-03 | AT AM Platinum | 81 | 52.74 |
| AAP25-03 | AT AM Platinum | 27,621 | 18,765.69 |
| AAP2544 | AT AM Platinum | 2 | 1.97 |
| AAP2545DP2 | AT AM Platinum | 12 | 24.15 |
| AAP25DP2 | AT AM Platinum | 37 | 77.92 |
| AAP26 | AT AM Platinum | 12 | 15.74 |
| AAP26-03 | AT AM Platinum | 105 | 68.30 |
| AAP26-03 | AT AM Platinum | 14,871 | 10,097.52 |
| AAP3922-01 | AT AM Platinum | 14 | 11.20 |
| AAP3922-01 | AT AM Platinum | 3,199 | 2,694.52 |
| AAP3923-03 | AT AM Platinum | 25,837 | 19,628.39 |
| AAP3923-03 | AT AM Platinum | 36,893 | 30,063.02 |
| AAP3924-03 | AT AM Platinum | 256 | 190.90 |
| AAP3924-03 | AT AM Platinum | 33,978 | 26,808.96 |
| AAP45-03 | AT AM Platinum | 54 | 40.56 |
| AAP45-03 | AT AM Platinum | 2,740 | 2,189.63 |
| AAP46-03 | AT AM Platinum | 54 | 40.70 |
| AAP46-03 | AT AM Platinum | 2,610 | 2,093.12 |
| AAP5125-03 | AT AM Platinum | 3 | 2.28 |
| AAP5125-03 | AT AM Platinum | 25 | 20.21 |
| AAP5143-03 | AT AM Platinum | 33 | 22.19 |
| AAP5143-03 | AT AM Platinum | 2,567 | 1,837.21 |
| AAP5144-03 | AT AM Platinum | 17 | 11.13 |
| AAP5144-03 | AT AM Platinum | 6,171 | 4,442.09 |
| AAP5144DP2 | AT AM Platinum | 50 | 97.84 |
| AAP5145 | AT AM Platinum | 43 | 32.54 |
| AAP5145-02 | AT AM Platinum | 39 | 26.41 |
| AAP5145-02 | AT AM Platinum | 1,947 | 1,403.31 |
| AAP5224-03 | AT AM Platinum | 41,757 | 31,178.30 |
| AAP5224-03 | AT AM Platinum | 35,128 | 27,709.99 |
| AAP5243 | AT AM Platinum | 74 | 74.54 |
| AAP5243-03 | AT AM Platinum | 48 | 31.96 |
| AAP5243-03 | AT AM Platinum | 3,348 | 2,357.21 |
| AAP5245-03 | AT AM Platinum | 174 | 115.87 |
| AAP5245-03 | AT AM Platinum | 22,078 | 15,544.34 |
| AAP5263-03 | AT AM Platinum | 366 | 260.33 |
| AAP5263-03 | AT AM Platinum | 15,705 | 11,843.20 |
| AAP5324 | AT AM Platinum | 62 | 45.00 |
| AAP5324 | AT AM Platinum | 21,799 | 16,841.32 |
| AAP5325-02 | AT AM Platinum | 104 | 77.58 |
| AAP5325-02 | AT AM Platinum | 19,160 | 15,205.48 |
| AAP5364-02 | AT AM Platinum | 157 | 109.76 |
| AAP5364-02 | AT AM Platinum | 18,219 | 13,413.13 |
| AAP5405-03 | AT AM Platinum | 93 | 70.39 |
| AAP5405-03 | AT AM Platinum | 3,199 | 2,577.43 |
| AAP5426-03 | AT AM Platinum | 129 | 91.98 |
| AAP5426-03 | AT AM Platinum | 8,227 | 6,205.23 |
| AAP5503-03 | AT AM Platinum | 22 | 17.76 |
| AAP5503-03 | AT AM Platinum | 1,190 | 1,029.55 |
| AAP605-03 | AT AM Platinum | 37 | 27.97 |
| AAP605-05 | AT AM Platinum | 150 | 101.09 |
| AAP605-05 | AT AM Platinum | 11,558 | 8,239.53 |
| AAP605DP2 | AT AM Platinum | 50 | 98.72 |
| AAP606-03 | AT AM Platinum | 26 | 16.88 |
| AAP606-03 | AT AM Platinum | 16,349 | 11,569.45 |
| AAP63-03 | AT AM Platinum | 42 | 34.02 |
| AAP63-03 | AT AM Platinum | 3,091 | 2,663.59 |
| AAP63DP2 | AT AM Platinum | 2,158 | 4,576.59 |
| AAP64-03 | AT AM Platinum | 67 | 54.58 |
| AAP64-03 | AT AM Platinum | 88 | 76.23 |
| AAP646 | AT AM Platinum | 19 | 19.93 |
| AAP646-03 | AT AM Platinum | 105 | 82.49 |
| AAP646-03 | AT AM Platinum | 174 | 145.33 |
| AAP65 | AT AM Platinum | 19 | 20.31 |
| AAP65-03 | AT AM Platinum | 54 | 44.77 |
| AAP65-03 | AT AM Platinum | 1,953 | 1,721.58 |
| AAP66-03 | AT AM Platinum | 56 | 45.84 |
| AAP66-03 | AT AM Platinum | 136 | 118.36 |
| AAP666-03 | AT AM Platinum | 53 | 37.01 |
| AAP666-03 | AT AM Platinum | 223 | 165.65 |
| AAP85-03 | AT AM Platinum | 39 | 31.42 |
| AAP86-02 | AT AM Platinum | 285 | 221.53 |
| AAP86-03 | AT AM Platinum | 70 | 53.60 |
| AAP985-03 | AT AM Platinum | 54 | 39.22 |
| AAP985-03 | AT AM Platinum | 3,643 | 2,826.83 |
| AAPP103-04 | AT AM Db Platinum | 223 | 217.12 |

FBG_CH1_00090607

| | | | |
|---|---|---|---|
| AAPP103-04 | AT AM Db Platinum | 16,219 | 16,714.53 |
| AAPP104-04 | AT AM Db Platinum | 150 | 149.15 |
| AAPP104-04 | AT AM Db Platinum | 20,758 | 22,643.28 |
| AAPP105-01 | AT DB Platinum | 51 | 42.08 |
| AAPP105-01 | AT DB Platinum | 1,662 | 1,514.80 |
| AAPP106-04 | AT DB Platinum | 5 | 3.93 |
| AAPP106-04 | AT DB Platinum | 50 | 44.98 |
| AAPP106-05 | AT DB Platinum | 8 | 6.35 |
| AAPP106-05 | AT DB Platinum | 1,507 | 1,367.42 |
| AAPP24 | AT DB Platinum | 316 | 235.63 |
| AAPP24-03 | AT DB Platinum | 11 | 8.99 |
| AAPP24-03 | AT DB Platinum | 670 | 582.15 |
| AAPP25-03 | AT DB Platinum | 8 | 6.72 |
| AAPP25-03 | AT DB Platinum | 2,778 | 2,439.79 |
| AAPP26 | AT DB Platinum | 471 | 510.67 |
| AAPP26-03 | AT DB Platinum | 4,111 | 3,445.92 |
| AAPP26-03 | AT DB Platinum | 818 | 718.09 |
| AAPP3922-05 | AT DB Platinum | 37 | 41.69 |
| AAPP3922-05 | AT DB Platinum | 298 | 356.70 |
| AAPP3923-03 | AT DB Platinum | 56 | 50.04 |
| AAPP3923-03 | AT DB Platinum | 14,260 | 13,642.33 |
| AAPP3924-03 | AT DB Platinum | 8,238 | 7,126.05 |
| AAPP3924-03 | AT DB Platinum | 21,902 | 20,680.56 |
| AAPP3926-03 | AT DB Platinum | 6 | 5.87 |
| AAPP3926-03 | AT DB Platinum | 750 | 787.16 |
| AAPP45 | AT DB Platinum | 409 | 346.24 |
| AAPP45-03 | AT DB Platinum | 25 | 22.45 |
| AAPP45-03 | AT DB Platinum | 372 | 355.08 |
| AAPP5125-03 | AT DB Platinum | 9 | 8.54 |
| AAPP5125-03 | AT DB Platinum | 301 | 303.22 |
| AAPP5143-01 | AT DB Platinum | 43 | 36.41 |
| AAPP5143-01 | AT DB Platinum | 911 | 820.38 |
| AAPP5144 | AT DB Platinum | 93 | 73.96 |
| AAPP5144-03 | AT DB Platinum | 45 | 36.26 |
| AAPP5144-03 | AT DB Platinum | 4,780 | 4,391.33 |
| AAPP5145 | AT DB Platinum | 558 | 529.58 |
| AAPP5145-01 | AT DB Platinum | 20 | 17.31 |
| AAPP5145-01 | AT DB Platinum | 298 | 274.04 |
| AAPP5224-03 | AT DB Platinum | 122 | 110.57 |
| AAPP5224-03 | AT DB Platinum | 28,844 | 28,740.45 |
| AAPP5243-03 | AT DB Platinum | 43 | 36.70 |
| AAPP5243-03 | AT DB Platinum | 670 | 604.96 |
| AAPP5245 | AT DB Platinum | 62 | 60.35 |
| AAPP5245-03 | AT DB Platinum | 119 | 101.58 |
| AAPP5245-03 | AT DB Platinum | 8,240 | 7,440.05 |
| AAPP5263-03 | AT DB Platinum | 209 | 218.43 |
| AAPP5263-03 | AT DB Platinum | 19,163 | 21,225.90 |
| AAPP5324 | AT AM Db Platinum | 2 | 1.82 |
| AAPP5324 | AT AM Db Platinum | 4,092 | 4,866.42 |
| AAPP5325-03 | AT DB Platinum | 31 | 30.81 |
| AAPP5325-05 | AT DB Platinum | 42 | 37.75 |
| AAPP5325-05 | AT DB Platinum | 33,629 | 33,427.78 |
| AAPP5363 | AT DB Platinum | 45 | 49.05 |
| AAPP5363 | AT DB Platinum | 7,322 | 8,420.23 |
| AAPP5364-02 | AT DB Platinum | 85 | 75.39 |
| AAPP5364-02 | AT DB Platinum | 16,591 | 15,513.77 |
| AAPP5405-01 | AT DB Platinum | 33 | 29.94 |
| AAPP5405-01 | AT DB Platinum | 1,637 | 1,579.55 |
| AAPP5426-02 | AT DB Platinum | 53 | 47.82 |
| AAPP5426-02 | AT DB Platinum | 4,754 | 4,538.37 |
| AAPP5503 | AT DB Platinum | 167 | 191.68 |
| AAPP5503-03 | AT DB Platinum | 36 | 34.37 |
| AAPP5503-03 | AT DB Platinum | 180 | 183.82 |
| AAPP5682-01 | AT DB Platinum | 8 | 9.47 |
| AAPP5682-01 | AT DB Platinum | 670 | 842.80 |
| AAPP5683-01 | AT DB Platinum | 188 | 216.68 |
| AAPP5683-01 | AT DB Platinum | 4,019 | 5,071.99 |
| AAPP5684-01 | AT DB Platinum | 5 | 5.97 |
| AAPP5684-05 | AT DB Platinum | 140 | 157.31 |
| AAPP5701 | AT DB Platinum | 31 | 37.20 |
| AAPP5701 | AT DB Platinum | 2,678 | 3,411.10 |
| AAPP5702 | AT DB Platinum | 79 | 94.80 |
| AAPP5702 | AT DB Platinum | 1,835 | 2,337.62 |
| AAPP5863 | AT AM Platinum | 2 | 1.86 |
| AAPP5863-05 | AT DB Platinum | 47 | 43.71 |
| AAPP5863-05 | AT DB Platinum | 3,422 | 3,355.68 |
| AAPP6043 | AT DB Platinum | 5 | 4.88 |

FBG_CH1_00090608

| | | | |
|---|---|---|---|
| AAPP6043-05 | AT DB Platinum | 6 | 5.91 |
| AAPP6043-05 | AT DB Platinum | 1,407 | 1,466.78 |
| AAPP605-04 | AT AM Db Platinum | 184 | 181.31 |
| AAPP605-04 | AT AM Db Platinum | 14,173 | 15,322.59 |
| AAPP606 | AT DB Platinum | 87 | 73.14 |
| AAPP606-04 | AT DB Platinum | 166 | 165.80 |
| AAPP606-04 | AT DB Platinum | 8,027 | 8,647.05 |
| AAPP6203 | AT DB Platinum | 62 | 78.15 |
| AAPP6203 | AT DB Platinum | 372 | 497.65 |
| AAPP63-03 | AT DB Platinum | 73 | 68.95 |
| AAPP63-03 | AT DB Platinum | 952 | 955.91 |
| AAPP64 | AT DB Platinum | 87 | 70.53 |
| AAPP64-03 | AT DB Platinum | 36 | 34.39 |
| AAPP646 | AT DB Platinum | 99 | 82.41 |
| AAPP646-03 | AT DB Platinum | 57 | 53.21 |
| AAPP646-03 | AT DB Platinum | 818 | 811.32 |
| AAPP65 | AT DB Platinum | 124 | 102.69 |
| AAPP65-03 | AT DB Platinum | 64 | 61.50 |
| AAPP65-03 | AT DB Platinum | 347 | 354.33 |
| AAPP985-03 | AT DB Platinum | 68 | 62.14 |
| AAPP985-03 | AT DB Platinum | 1,116 | 1,087.61 |
| AAR103-02 | AT AM Racing Plugs | 115 | 82.01 |
| AAR12-02 | AT AM Racing Plugs | 20 | 19.77 |
| AAR13-02 | AT AM Racing Plugs | 17 | 16.17 |
| AAR132-02 | AT AM Racing Plugs | 14 | 13.33 |
| AAR132-02 | AT AM Racing Plugs | 614 | 619.14 |
| AAR133-02 | AT AM Racing Plugs | 70 | 63.86 |
| AAR133-02 | AT AM Racing Plugs | 316 | 305.29 |
| AAR134-02 | AT AM Racing Plugs | 11 | 10.23 |
| AAR135-02 | AT AM Racing Plugs | 20 | 18.48 |
| AAR23-02 | AT AM Racing Plugs | 37 | 26.24 |
| AAR24 | AT AM Racing Plugs | 149 | 121.03 |
| AAR24-02 | AT AM Racing Plugs | 68 | 45.44 |
| AAR25-02 | AT AM Racing Plugs | 68 | 44.85 |
| AAR2592 | AT AM Racing Plugs | 74 | 88.17 |
| AAR2592-02 | AT AM Racing Plugs | 54 | 58.97 |
| AAR2593-02 | AT AM Racing Plugs | 73 | 79.60 |
| AAR2594 | AT AM Racing Plugs | 74 | 88.72 |
| AAR2594-02 | AT AM Racing Plugs | 28 | 31.00 |
| AAR32-02 | AT AM Racing Plugs | 36 | 34.47 |
| AAR33-02 | AT AM Racing Plugs | 33 | 26.35 |
| AAR3910-02 | AT AM Racing Plugs | 47 | 37.74 |
| AAR3910-02 | AT AM Racing Plugs | 74 | 63.09 |
| AAR3910X-01 | AT AM Racing Plugs | 73 | 133.68 |
| AAR3911-02 | AT AM Racing Plugs | 62 | 53.71 |
| AAR3923-01 | AT AM Racing Plugs | 298 | 255.99 |
| AAR3923-02 | AT AM Racing Plugs | 64 | 54.56 |
| AAR3924-02 | AT AM Racing Plugs | 155 | 126.46 |
| AAR3924-02 | AT AM Racing Plugs | 149 | 138.85 |
| AAR3931-02 | AT AM Racing Plugs | 47 | 40.00 |
| AAR3932-02 | AT AM Racing Plugs | 57 | 45.48 |
| AAR3932-02 | AT AM Racing Plugs | 298 | 254.33 |
| AAR3932X-01 | AT AM Racing Plugs | 19 | 36.51 |
| AAR3933-02 | AT AM Racing Plugs | 67 | 52.28 |
| AAR3933X-01 | AT AM Racing Plugs | 39 | 81.81 |
| AAR3934-02 | AT AM Racing Plugs | 65 | 52.09 |
| AAR3935-02 | AT AM Racing Plugs | 40 | 33.95 |
| AAR4133-02 | AT AM Racing Plugs | 54 | 106.63 |
| AAR4152-02 | AT AM Racing Plugs | 6 | 11.93 |
| AAR4153-02 | AT AM Racing Plugs | 31 | 120.61 |
| AAR472-02 | AT AM Racing Plugs | 48 | 45.80 |
| AAR473-02 | AT AM Racing Plugs | 43 | 33.89 |
| AAR474-02 | AT AM Racing Plugs | 33 | 26.62 |
| AAR50-02 | AT AM Racing Plugs | 88 | 89.10 |
| AAR51-02 | AT AM Racing Plugs | 19 | 18.51 |
| AAR52-02 | AT AM Racing Plugs | 36 | 36.22 |
| AAR5242 | AT AM Racing Plugs | 25 | 15.53 |
| AAR5262 | AT AM Racing Plugs | 68 | 46.63 |
| AAR53-02 | AT AM Racing Plugs | 42 | 36.96 |
| AAR5324 | AT AM Racing Plugs | 2 | 1.16 |
| AAR5362 | AT AM Racing Plugs | 5 | 3.30 |
| AAR5383-01 | AT AM Racing Plugs | 33 | 28.54 |
| AAR5384 | AT AM Racing Plugs | 45 | 53.78 |
| AAR72-02 | AT AM Racing Plugs | 65 | 192.80 |
| AAR73-02 | AT AM Racing Plugs | 48 | 133.32 |
| AAR764-02 | AT AM Racing Plugs | 19 | 15.01 |
| AAR92-02 | AT AM Racing Plugs | 23 | 19.32 |

FBG_CH1_00090609

| | | | |
|---|---|---:|---:|
| AAR93-02 | AT AM Racing Plugs | 84 | 72.01 |
| AAR94-02 | AT AM Racing Plugs | 47 | 38.38 |
| ADS000 | FR AM Other | 4,073 | 3,738.31 |
| ADS003 | FR AM Other | 223 | 809.70 |
| AHT0-03 | AT AM High Thread | 67 | 99.64 |
| AHT0BPRP-01 | AT OE/OES High Thd | 2,083 | 4,590.71 |
| AHT1-02 | AT AM High Thread | 5 | 11.30 |
| AHT1-03 | AT AM High Thread | 25 | 37.33 |
| AHT1-03 | AT AM High Thread | 81 | 128.30 |
| AHT15-01 | AT AM High Thread | 6 | 14.47 |
| AHT15-03 | AT AM High Thread | 226 | 335.18 |
| AHT15-03 | AT AM High Thread | 1,525 | 2,399.87 |
| AHT1EBP-01 | AT OE/OES High Thd | 2,962 | 5,299.50 |
| AHT2-02 | AT AM High Thread | 2 | 4.52 |
| AHT2-02 | AT AM High Thread | 19 | 45.44 |
| AHT2-03 | AT AM High Thread | 64 | 93.56 |
| AHT2-03 | AT AM High Thread | 40 | 62.05 |
| ALT76-03 | AT AM Copper Core | 6 | 3.72 |
| AW65700 | FR AM Other | 353 | 23,291.24 |
| AXP103-02 | AT AM Fine Wire | 5,098 | 5,421.47 |
| AXP103-02 | AT AM Fine Wire | 2,387 | 2,685.44 |
| AXP103DP2R | AT AM Fine Wire | 5 | 11.50 |
| AXP104-02 | AT AM Fine Wire | 57 | 61.30 |
| AXP104-02 | AT AM Fine Wire | 3,825 | 4,352.45 |
| AXP104DP2R | AT AM Fine Wire | 5 | 11.62 |
| AXP105 | AT AM Fine Wire | 403 | 701.26 |
| AXP105-02 | AT AM Fine Wire | 3,717 | 4,093.86 |
| AXP105-02 | AT AM Fine Wire | 223 | 260.87 |
| AXP106 | AT AM Fine Wire | 37 | 45.50 |
| AXP106-01 | AT AM Fine Wire | 71 | 68.99 |
| AXP106-01 | AT AM Fine Wire | 446 | 487.40 |
| AXP24 | AT AM Fine Wire | 1,215 | 2,120.03 |
| AXP24-02 | AT AM Fine Wire | 23 | 24.36 |
| AXP24-02 | AT AM Fine Wire | 149 | 167.68 |
| AXP25-02 | AT AM Fine Wire | 102 | 99.13 |
| AXP25-02 | AT AM Fine Wire | 831 | 858.56 |
| AXP26 | AT AM Fine Wire | 1,153 | 2,027.40 |
| AXP26-02 | AT AM Fine Wire | 79 | 79.67 |
| AXP26-02 | AT AM Fine Wire | 372 | 398.50 |
| AXP3922-01 | AT AM Fine Wire | 36 | 44.55 |
| AXP3922-01 | AT AM Fine Wire | 2,902 | 3,802.17 |
| AXP3923-02 | AT AM Fine Wire | 8,758 | 9,901.89 |
| AXP3923-02 | AT AM Fine Wire | 12,226 | 14,641.26 |
| AXP3923DP2R | AT AM Fine Wire | 6 | 14.39 |
| AXP3924 | AT AM Fine Wire | 50 | 94.06 |
| AXP3924-02 | AT AM Fine Wire | 181 | 200.04 |
| AXP3924-02 | AT AM Fine Wire | 9,523 | 11,147.61 |
| AXP3924DP2R | AT AM Fine Wire | 3 | 7.07 |
| AXP3926 | AT AM Fine Wire | 291 | 386.60 |
| AXP3926-01 | AT AM Fine Wire | 29 | 43.48 |
| AXP3926-01 | AT AM Fine Wire | 310 | 492.19 |
| AXP5143 | AT AM Fine Wire | 112 | 161.31 |
| AXP5143-01 | AT AM Fine Wire | 68 | 73.15 |
| AXP5143-01 | AT AM Fine Wire | 372 | 425.07 |
| AXP5144 | AT AM Fine Wire | 12 | 20.21 |
| AXP5144-02 | AT AM Fine Wire | 20 | 21.77 |
| AXP5144-02 | AT AM Fine Wire | 696 | 804.48 |
| AXP5145 | AT AM Fine Wire | 1,104 | 1,914.35 |
| AXP5145-02 | AT AM Fine Wire | 5 | 6.22 |
| AXP5145-02 | AT AM Fine Wire | 226 | 298.37 |
| AXP5224-02 | AT AM Fine Wire | 333 | 371.26 |
| AXP5224-02 | AT AM Fine Wire | 10,205 | 12,036.85 |
| AXP5224DP2R | AT AM Fine Wire | 3 | 7.10 |
| AXP5243 | AT AM Fine Wire | 74 | 128.48 |
| AXP5243-01 | AT AM Fine Wire | 16,511 | 22,517.54 |
| AXP5243-02 | AT AM Fine Wire | 31 | 33.06 |
| AXP5243-02 | AT AM Fine Wire | 446 | 502.96 |
| AXP5245-02 | AT AM Fine Wire | 228 | 245.22 |
| AXP5245-02 | AT AM Fine Wire | 6,876 | 7,820.10 |
| AXP5245DP2R | AT AM Fine Wire | 2 | 4.62 |
| AXP5263-02 | AT AM Fine Wire | 37 | 42.78 |
| AXP5263-02 | AT AM Fine Wire | 10,990 | 13,455.55 |
| AXP5263DP2R | AT AM Fine Wire | 3 | 7.02 |
| AXP5324 | AT AM Fine Wire | 8 | 9.31 |
| AXP5324 | AT AM Fine Wire | 1,637 | 2,023.63 |
| AXP5325-02 | AT AM Fine Wire | 56 | 61.23 |
| AXP5325-02 | AT AM Fine Wire | 13,821 | 16,051.80 |

FBG_CH1_00090610

| | | | |
|---|---|---|---|
| AXP5325DP2R | AT AM Fine Wire | 5 | 11.18 |
| AXP5362 | AT AM Fine Wire | 62 | 87.39 |
| AXP5362 | AT AM Fine Wire | 223 | 334.03 |
| AXP5363 | AT AM Fine Wire | 6 | 8.14 |
| AXP5363-02 | AT AM Fine Wire | 276 | 316.93 |
| AXP5363-02 | AT AM Fine Wire | 307 | 373.49 |
| AXP5363DP2R | AT AM Fine Wire | 2 | 4.94 |
| AXP5364 | AT AM Fine Wire | 74 | 136.30 |
| AXP5364-02 | AT AM Fine Wire | 124 | 143.53 |
| AXP5364-02 | AT AM Fine Wire | 7,124 | 8,728.65 |
| AXP5364DP2R | AT AM Fine Wire | 5 | 11.88 |
| AXP5405-02 | AT AM Fine Wire | 71 | 88.10 |
| AXP5405-02 | AT AM Fine Wire | 2,336 | 3,063.28 |
| AXP5426 | AT AM Fine Wire | 130 | 255.65 |
| AXP5426-02 | AT AM Fine Wire | 9 | 10.95 |
| AXP5426-02 | AT AM Fine Wire | 750 | 965.50 |
| AXP5503 | AT AM Fine Wire | 800 | 1,545.61 |
| AXP5503-02 | AT AM Fine Wire | 521 | 646.07 |
| AXP5663 | AT AM Fine Wire | 166 | 234.04 |
| AXP5663 | AT AM Fine Wire | 521 | 779.08 |
| AXP5682 | AT AM Fine Wire | 11 | 16.32 |
| AXP5682-02 | AT AM Fine Wire | 5,994 | 6,088.41 |
| AXP5682-02 | AT AM Fine Wire | 808 | 871.59 |
| AXP5683-02 | AT AM Fine Wire | 122 | 122.68 |
| AXP5683-02 | AT AM Fine Wire | 1,434 | 1,531.39 |
| AXP5683DP2R | AT AM Fine Wire | 3 | 6.57 |
| AXP5684-02 | AT AM Fine Wire | 157 | 161.09 |
| AXP5684-02 | AT AM Fine Wire | 2,957 | 3,221.93 |
| AXP5701-02 | AT AM Fine Wire | 6,169 | 6,214.65 |
| AXP5701-02 | AT AM Fine Wire | 564 | 603.40 |
| AXP5701DP2R | AT AM Fine Wire | 12 | 26.54 |
| AXP5702-02 | AT AM Fine Wire | 113 | 113.50 |
| AXP5702-02 | AT AM Fine Wire | 17,833 | 19,020.91 |
| AXP5702DP2R | AT AM Fine Wire | 9 | 19.85 |
| AXP5703 | AT AM Fine Wire | 25 | 38.05 |
| AXP5703-02 | AT AM Fine Wire | 88 | 88.77 |
| AXP5703-02 | AT AM Fine Wire | 2,530 | 2,710.56 |
| AXP5863-01 | AT AM Fine Wire | 184 | 211.24 |
| AXP5863-01 | AT AM Fine Wire | 3,863 | 4,699.09 |
| AXP5863DP2R | AT AM Fine Wire | 3 | 7.43 |
| AXP6003 | AT AM Fine Wire | 14,082 | 21,356.06 |
| AXP6003 | AT AM Fine Wire | 229 | 316.72 |
| AXP6003-01 | AT AM Fine Wire | 54 | 68.33 |
| AXP6003-01 | AT AM Fine Wire | 1,866 | 2,506.86 |
| AXP6043-02 | AT AM Fine Wire | 118 | 138.39 |
| AXP6043-02 | AT AM Fine Wire | 3,906 | 4,847.07 |
| AXP605-02 | AT AM Fine Wire | 116 | 124.83 |
| AXP605-02 | AT AM Fine Wire | 1,393 | 1,585.49 |
| AXP606-02 | AT AM Fine Wire | 19,403 | 18,870.59 |
| AXP606-02 | AT AM Fine Wire | 2,306 | 2,521.30 |
| AXP606DP2R | AT AM Fine Wire | 5 | 11.00 |
| AXP6083 | AT AM Fine Wire | 88 | 125.47 |
| AXP6203-02 | AT AM Fine Wire | 160 | 161.60 |
| AXP6203-02 | AT AM Fine Wire | 2,666 | 2,859.60 |
| AXP63-02 | AT AM Fine Wire | 33 | 40.83 |
| AXP63-02 | AT AM Fine Wire | 446 | 586.06 |
| AXP64-02 | AT AM Fine Wire | 73 | 99.12 |
| AXP64-02 | AT AM Fine Wire | 744 | 1,072.51 |
| AXP646 | AT AM Fine Wire | 781 | 1,469.39 |
| AXP646-02 | AT AM Fine Wire | 9 | 11.30 |
| AXP646-02 | AT AM Fine Wire | 1,116 | 1,487.23 |
| AXP666 | AT AM Fine Wire | 12 | 14.98 |
| AXP666-01 | AT AM Fine Wire | 36 | 37.49 |
| AXP666-01 | AT AM Fine Wire | 223 | 246.61 |
| AXP985 | AT AM Fine Wire | 6 | 11.20 |
| AXP985-02 | AT AM Fine Wire | 73 | 82.52 |
| AXP985-02 | AT AM Fine Wire | 735 | 884.86 |
| AXS3922-10BP | AT AM SM Eng Prem | 180 | 233.95 |
| AXS3922DP | AT AM SM Eng Prem | 8 | 11.89 |
| AXS3922DP | AT AM SM Eng Prem | 29 | 45.65 |
| AXS3923DP | AT AM SM Eng Prem | 14 | 25.34 |
| AXS3923DP-01 | AT AM SM Eng Prem | 56 | 79.91 |
| AXS3924-01 | AT AM SM Eng Prem | 17 | 20.91 |
| AXS3924DP-01 | AT AM SM Eng Prem | 20 | 28.28 |
| AXS4062-01 | AT AM SM Eng Prem | 16 | 24.14 |
| AXS4063-01 | AT AM SM Eng Prem | 14 | 22.21 |
| AXS4063DP-01 | AT AM SM Eng Prem | 8 | 14.06 |

FBG_CH1_00090611

**DEBTORS' EXHIBIT NO. 175**
**Page 386 of 1907**

| | | | |
|---|---|---|---|
| AXS4063S | AT AM SM Eng Prem | 42 | 65.49 |
| AXS4064-01 | AT AM SM Eng Prem | 16 | 25.79 |
| AXS4064DP-01 | AT AM SM Eng Prem | 22 | 39.52 |
| AXS4092-01 | AT AM SM Eng Prem | 2 | 3.32 |
| AXS4093DP-01 | AT AM SM Eng Prem | 8 | 14.96 |
| AXS4162-01 | AT AM SM Eng Prem | 37 | 58.49 |
| AXS4162DP | AT AM SM Eng Prem | 56 | 105.20 |
| AXS4163-01 | AT AM SM Eng Prem | 60 | 87.11 |
| AXS4163DP-01 | AT AM SM Eng Prem | 20 | 32.72 |
| AXS4163DP-01 | AT AM SM Eng Prem | 124 | 214.84 |
| AXS4164-01 | AT AM SM Eng Prem | 25 | 39.02 |
| AXS4164DP-01 | AT AM SM Eng Prem | 54 | 94.21 |
| AXS4164DP-01 | AT AM SM Eng Prem | 62 | 114.80 |
| AXS4302-01 | AT AM SM Eng Prem | 45 | 70.22 |
| AXS4302DP-01 | AT AM SM Eng Prem | 8 | 13.95 |
| AXS4302DP-01 | AT AM SM Eng Prem | 109 | 201.36 |
| AXS4303-01 | AT AM SM Eng Prem | 5 | 7.73 |
| AXS4303DP-01 | AT AM SM Eng Prem | 9 | 16.48 |
| AXS5224-01 | AT AM SM Eng Prem | 70 | 85.77 |
| AXS5723 | AT AM SM Eng Prem | 2,429 | 3,907.26 |
| AXS5723DP | AT AM SM Eng Prem | 2,596 | 4,674.88 |
| AXS61-01 | AT AM SM Eng Prem | 5 | 8.30 |
| AXS61DP-01 | AT AM SM Eng Prem | 56 | 103.26 |
| AXS61S | AT AM SM Eng Prem | 3 | 4.89 |
| AXS62-01 | AT AM SM Eng Prem | 23 | 32.14 |
| AXS63-01 | AT AM SM Eng Prem | 56 | 75.65 |
| AXS63DP-01 | AT AM SM Eng Prem | 19 | 29.02 |
| AXS65-01 | AT AM SM Eng Prem | 20 | 28.94 |
| AXS65DP-01 | AT AM SM Eng Prem | 19 | 30.99 |
| AXS65DP-01 | AT AM SM Eng Prem | 47 | 64.92 |
| AXS85-01 | AT AM SM Eng Prem | 33 | 42.95 |
| AXS85DP-01 | AT AM SM Eng Prem | 47 | 70.17 |
| AXS985-01 | AT AM SM Eng Prem | 5 | 6.58 |
| AXS985DP | AT AM SM Eng Prem | 3,224 | 5,736.56 |
| AXST254DP-01 | AT AM SM Eng Prem | 16 | 28.50 |
| AXST255DP-01 | AT AM SM Eng Prem | 5 | 8.22 |
| AXST255DP-01 | AT AM SM Eng Prem | 273 | 474.74 |
| AXST258DP-01 | AT AM SM Eng Prem | 53 | 211.33 |
| AXST2954DP-01 | AT AM SM Eng Prem | 26 | 46.43 |
| AXST2956DP-01 | AT AM SM Eng Prem | 45 | 80.53 |
| AXST2974DP-01 | AT AM SM Eng Prem | 42 | 74.25 |
| AXST2974DP-01 | AT AM SM Eng Prem | 620 | 1,160.64 |
| AXST2976DP-01 | AT AM SM Eng Prem | 34 | 59.04 |
| AXST3924DP-01 | AT AM SM Eng Prem | 47 | 68.67 |
| AXST3926DP-01 | AT AM SM Eng Prem | 26 | 40.02 |
| AXST4055DP-01 | AT AM SM Eng Prem | 11 | 18.56 |
| AXST4265DP-01 | AT AM SM Eng Prem | 23 | 36.16 |
| AXST458DP-01 | AT AM SM Eng Prem | 34 | 60.12 |
| BWP1101BR | Water Pumps | 2 | 24.21 |
| BWP1101BW | Water Pumps Private | 8 | 96.84 |
| BWP1103BR | Water Pumps | 3 | 22.56 |
| BWP1103SP | Water Pumps Private | 2 | 15.04 |
| BWP1106BR | Water Pumps | 6 | 209.12 |
| BWP1842BR | Water Pumps | 3 | 32.56 |
| BWP1869BR | Water Pumps | 29 | 196.07 |
| BWP1869SP | Water Pumps Private | 11 | 74.37 |
| BWP1878BR | Water Pumps | 20 | 214.13 |
| BWP1881NP | Water Pumps Private | 48 | 653.17 |
| BWP1884DG | Water Pumps Private | 2 | 22.32 |
| BWP1885BR | Water Pumps | 2 | 13.10 |
| BWP1885SP | Water Pumps Private | 2 | 13.10 |
| BWP1888BR | Water Pumps | 3 | 30.93 |
| BWP1891BR | Water Pumps | 60 | 410.92 |
| BWP1892BR | Water Pumps | 43 | 310.95 |
| BWP1892SP | Water Pumps Private | 5 | 36.16 |
| BWP1901BR | Water Pumps | 3 | 32.84 |
| BWP1902BR | Water Pumps | 5 | 34.23 |
| BWP1902SP | Water Pumps Private | 93 | 636.64 |
| BWP1903DG | Water Pumps Private | 3 | 34.82 |
| BWP1941BR | Water Pumps | 2 | 46.88 |
| BWP1947BR | Water Pumps | 5 | 82.23 |
| BWP1953BR | Water Pumps | 16 | 97.75 |
| BWP1953GP | Water Pumps Private | 2 | 12.22 |
| BWP1968BR | Water Pumps | 25 | 892.66 |
| BWP1968BW | Water Pumps Private | 2 | 71.41 |
| BWP1969BR | Water Pumps | 9 | 326.85 |
| BWP1974BR | Water Pumps | 2 | 24.14 |

FBG_CH1_00090612

| | | | |
|---|---|---|---|
| BWP1974NP | Water Pumps Private | 2 | 24.14 |
| BWP1982SP | Water Pumps Private | 11 | 93.55 |
| BWP2010BR | Water Pumps Private | 23 | 257.22 |
| BWP2026BR | Water Pumps | 2 | 15.70 |
| BWP2056BR | Water Pumps | 3 | 103.18 |
| BWP2056GP | Water Pumps Private | 6 | 206.37 |
| BWP2057BR | Water Pumps | 6 | 89.22 |
| BWP2058BW | Water Pumps Private | 2 | 15.92 |
| BWP2059BR | Water Pumps | 57 | 451.14 |
| BWP2059GP | Water Pumps Private | 6 | 47.49 |
| BWP2066BR | Water Pumps | 2 | 24.86 |
| BWP2083BR | Water Pumps | 2 | 28.64 |
| BWP2090SP | Water Pumps Private | 9 | 148.51 |
| BWP2092BR | Water Pumps | 2 | 28.84 |
| BWP2092DG | Water Pumps Private | 3 | 43.27 |
| BWP2092NP | Water Pumps Private | 23 | 331.70 |
| BWP2094BR | Water Pumps | 9 | 60.13 |
| BWP2095BR | Water Pumps | 8 | 245.85 |
| BWP2095GP | Water Pumps Private | 5 | 153.65 |
| BWP2096NP | Water Pumps Private | 48 | 861.24 |
| BWP2115BR | Water Pumps | 3 | 19.73 |
| BWP2115SP | Water Pumps Private | 2 | 13.16 |
| BWP2119BR | Water Pumps | 25 | 260.22 |
| BWP2121BR | Water Pumps Private | 155 | 1,288.19 |
| BWP2135BR | Water Pumps | 19 | 124.41 |
| BWP2137BR | Water Pumps | 2 | 20.05 |
| BWP2140BR | Water Pumps | 22 | 162.76 |
| BWP2140SP | Water Pumps Private | 8 | 59.19 |
| BWP2141SC | Water Pumps Private | 6 | 58.06 |
| BWP2142BR | Water Pumps | 6 | 42.98 |
| BWP2142BW | Water Pumps Private | 8 | 57.30 |
| BWP2142SP | Water Pumps Private | 6 | 42.98 |
| BWP2143BR | Water Pumps | 5 | 37.58 |
| BWP2146BR | Water Pumps | 37 | 625.97 |
| BWP2147SP | Water Pumps Private | 8 | 273.99 |
| BWP2150BR | Water Pumps | 2 | 28.65 |
| BWP2151BR | Water Pumps | 2 | 23.14 |
| BWP2154BR | Water Pumps | 3 | 33.59 |
| BWP2154BW | Water Pumps Private | 14 | 156.74 |
| BWP2154DG | Water Pumps Private | 3 | 33.59 |
| BWP2155BR | Water Pumps | 12 | 82.97 |
| BWP2155BW | Water Pumps Private | 9 | 62.23 |
| BWP2157BR | Water Pumps | 3 | 39.22 |
| BWP2157BW | Water Pumps Private | 2 | 26.15 |
| BWP2171DG | Water Pumps Private | 3 | 43.74 |
| BWP2195SP | Water Pumps Private | 6 | 63.57 |
| BWP2196SP | Water Pumps Private | 6 | 40.13 |
| BWP2200BR | Water Pumps | 8 | 203.28 |
| BWP2200SP | Water Pumps Private | 12 | 304.93 |
| BWP2218BR | Water Pumps | 2 | 61.93 |
| BWP2222BR | Water Pumps | 25 | 724.25 |
| BWP2223BR | Water Pumps | 16 | 413.75 |
| BWP2224BR | Water Pumps | 40 | 316.54 |
| BWP2233SP | Water Pumps Private | 9 | 413.83 |
| BWP2234BR | Water Pumps | 48 | 1,036.20 |
| BWP2253BR | Water Pumps | 3 | 67.68 |
| BWP2255BR | Water Pumps | 14 | 259.95 |
| BWP2255NP | Water Pumps Private | 50 | 928.40 |
| BWP2256GP | Water Pumps Private | 2 | 15.10 |
| BWP2258BR | Water Pumps | 3 | 155.60 |
| BWP2259BR | Water Pumps | 5 | 29.45 |
| BWP2271BR | Water Pumps Private | 47 | 874.31 |
| BWP2272BR | Water Pumps | 17 | 605.39 |
| BWP2274SP | Water Pumps Private | 2 | 18.72 |
| BWP2280BR | Water Pumps | 23 | 131.04 |
| BWP2281BR | Water Pumps | 20 | 175.35 |
| BWP2340BR | Water Pumps | 5 | 79.16 |
| BWP2340BW | Water Pumps Private | 2 | 31.66 |
| BWP2354BR | Water Pumps | 42 | 713.32 |
| BWP2354SP | Water Pumps Private | 3 | 50.95 |
| BWP2373BR | Water Pumps | 2 | 10.90 |
| BWP2417SP | Water Pumps Private | 2 | 29.94 |
| BWP2418BR | Water Pumps | 40 | 1,862.76 |
| BWP2419BR | Water Pumps | 23 | 1,081.17 |
| BWP2420BR | Water Pumps | 84 | 3,871.26 |
| BWP2421BR | Water Pumps | 5 | 323.17 |
| BWP2422BR | Water Pumps | 9 | 548.30 |

FBG_CH1_00090613

| | | | |
|---|---|---|---|
| BWP2437BR | Water Pumps Private | 33 | 298.18 |
| BWP2440CB | Water Pumps Private | 2 | 107.88 |
| BWP2468BR | Water Pumps | 2 | 43.45 |
| BWP2474BR | Water Pumps | 9 | 543.56 |
| BWP2488BR | Water Pumps | 42 | 496.98 |
| BWP2500BR | Water Pumps Private | 93 | 1,718.35 |
| BWP2518BR | Water Pumps Private | 98 | 2,109.64 |
| BWP2521BR | Water Pumps Private | 23 | 263.08 |
| BWP2556BR | Water Pumps Private | 70 | 787.43 |
| BWP2614BR | Water Pumps Private | 2 | 25.66 |
| BWP2615BR | Water Pumps Private | 243 | 3,828.09 |
| BWP2649BR | Water Pumps Private | 64 | 811.17 |
| BWP2686BR | Water Pumps Private | 65 | 1,823.67 |
| BWP2711BR | Water Pumps Private | 161 | 5,669.80 |
| BWP295SP | Water Pumps Private | 11 | 147.05 |
| BWP345BR | Water Pumps | 6 | 63.51 |
| BWP386BR | Water Pumps | 3 | 32.68 |
| BWP399BR | Water Pumps | 17 | 286.68 |
| BWP4007SP | Water Pumps Private | 6 | 47.69 |
| BWP4015BR | Water Pumps | 20 | 236.66 |
| BWP4027BR | Water Pumps | 3 | 22.10 |
| BWP4027CB | Water Pumps Private | 3 | 22.10 |
| BWP404BR | Water Pumps | 2 | 24.19 |
| BWP413BR | Water Pumps | 3 | 50.56 |
| BWP450SP | Water Pumps Private | 5 | 20.79 |
| BWP459SP | Water Pumps Private | 5 | 112.48 |
| BWP461BR | Water Pumps | 12 | 222.48 |
| BWP479GP | Water Pumps Private | 3 | 25.07 |
| BWP493BR | Water Pumps | 2 | 27.39 |
| BWP505BR | Water Pumps | 6 | 49.18 |
| BWP506BR | Water Pumps | 47 | 288.93 |
| BWP506SP | Water Pumps Private | 37 | 227.45 |
| BWP508BR | Water Pumps | 17 | 142.43 |
| BWP511BR | Water Pumps | 3 | 84.79 |
| BWP547HDABR | Water Pumps | 19 | 257.69 |
| BWP561SP | Water Pumps Private | 9 | 99.20 |
| BWP572BR | Water Pumps | 2 | 27.55 |
| BWP572HDABR | Water Pumps | 16 | 240.24 |
| BWP578SP | Water Pumps Private | 3 | 17.36 |
| BWP584BR | Water Pumps | 9 | 89.36 |
| BWP594SP | Water Pumps Private | 3 | 37.10 |
| BWP599BR | Water Pumps | 5 | 33.21 |
| BWP601DG | Water Pumps Private | 2 | 13.01 |
| BWP602BR | Water Pumps | 25 | 167.87 |
| BWP602DG | Water Pumps Private | 2 | 13.43 |
| BWP605BR | Water Pumps | 3 | 45.40 |
| BWP606BR | Water Pumps | 47 | 415.29 |
| BWP608BR | Water Pumps | 23 | 289.58 |
| BWP608SP | Water Pumps Private | 3 | 37.77 |
| BWP609BR | Water Pumps | 5 | 109.19 |
| BWP621BR | Water Pumps | 2 | 21.76 |
| BWP622BR | Water Pumps | 8 | 110.27 |
| BWP622GP | Water Pumps Private | 8 | 110.27 |
| BWP624BR | Water Pumps | 3 | 18.30 |
| BWP624DG | Water Pumps Private | 6 | 36.59 |
| BWP624GP | Water Pumps Private | 5 | 30.49 |
| BWP635BR | Water Pumps | 2 | 25.81 |
| BWP644BR | Water Pumps | 40 | 520.24 |
| BWP646BR | Water Pumps | 42 | 471.00 |
| BWP647BR | Water Pumps | 2 | 15.56 |
| BWP651BR | Water Pumps | 2 | 30.71 |
| BWP651NP | Water Pumps Private | 37 | 568.13 |
| BWP651SP | Water Pumps Private | 11 | 168.90 |
| BWP654GP | Water Pumps Private | 2 | 30.40 |
| BWP657BR | Water Pumps | 2 | 15.60 |
| BWP659BR | Water Pumps | 14 | 324.76 |
| BWP661DG | Water Pumps Private | 2 | 17.95 |
| BWP662DG | Water Pumps Private | 5 | 41.86 |
| BWP664BR | Water Pumps | 19 | 102.82 |
| BWP672SP | Water Pumps Private | 2 | 43.58 |
| BWP676BR | Water Pumps | 23 | 240.13 |
| BWP694BR | Water Pumps | 3 | 24.86 |
| BWP702BR | Water Pumps | 12 | 94.66 |
| BWP715DG | Water Pumps Private | 8 | 131.57 |
| BWP715SP | Water Pumps Private | 5 | 82.23 |
| BWP722BR | Water Pumps | 34 | 494.22 |
| BWP726BR | Water Pumps | 11 | 104.98 |

FBG_CH1_00090614

| | | | |
|---|---|---|---|
| BWP726CB | Water Pumps Private | 6 | 57.26 |
| BWP726DG | Water Pumps Private | 12 | 114.52 |
| BWP726SP | Water Pumps Private | 64 | 610.77 |
| BWP746BR | Water Pumps Private | 3 | 46.07 |
| BWP746SP | Water Pumps Private | 5 | 76.79 |
| BWP747DG | Water Pumps Private | 2 | 27.55 |
| BWP750DG | Water Pumps Private | 11 | 82.22 |
| BWP750NP | Water Pumps Private | 3 | 22.42 |
| BWP751BR | Water Pumps | 5 | 37.28 |
| BWP754BR | Water Pumps | 6 | 115.16 |
| BWP759BR | Water Pumps | 3 | 20.94 |
| BWP767BR | Water Pumps | 2 | 11.98 |
| BWP768BR | Water Pumps | 5 | 31.31 |
| BWP775BR | Water Pumps | 17 | 116.96 |
| BWP775SP | Water Pumps Private | 53 | 364.64 |
| BWP776BR | Water Pumps | 36 | 419.23 |
| BWP789BR | Water Pumps | 25 | 214.44 |
| BWP789SP | Water Pumps Private | 8 | 68.62 |
| BWP833SP | Water Pumps Private | 6 | 47.80 |
| BWP836SP | Water Pumps Private | 2 | 23.28 |
| BWP837BR | Water Pumps | 29 | 435.09 |
| BWP838BR | Water Pumps | 3 | 32.45 |
| BWP840DG | Water Pumps Private | 3 | 44.47 |
| BWP841BR | Water Pumps | 8 | 97.00 |
| BWP841GP | Water Pumps Private | 12 | 145.50 |
| BWP853NP | Water Pumps Private | 23 | 235.65 |
| BWP861BR | Water Pumps | 31 | 159.16 |
| BWP861SP | Water Pumps Private | 11 | 56.48 |
| BWP875BR | Water Pumps | 47 | 322.27 |
| BWP875SP | Water Pumps Private | 12 | 82.28 |
| BWP883BR | Water Pumps | 2 | 15.45 |
| BWP887BR | Water Pumps | 2 | 10.34 |
| BWP888BR | Water Pumps | 11 | 232.99 |
| BWP891BR | Water Pumps | 36 | 324.65 |
| BWP896BR | Water Pumps | 2 | 12.59 |
| BWP897BR | Water Pumps | 36 | 331.46 |
| BWP898SP | Water Pumps Private | 14 | 79.11 |
| BWP9002BR | Water Pumps | 47 | 1,476.93 |
| BWP9017BR | Water Pumps | 43 | 441.49 |
| BWP9017SP | Water Pumps Private | 11 | 112.94 |
| BWP9018BR | Water Pumps | 29 | 269.80 |
| BWP9020BR | Water Pumps | 64 | 1,098.60 |
| BWP9020GP | Water Pumps Private | 3 | 51.50 |
| BWP9020SP | Water Pumps Private | 3 | 51.50 |
| BWP9022BR | Water Pumps | 26 | 238.63 |
| BWP9024BR | Water Pumps | 62 | 513.59 |
| BWP9024GP | Water Pumps Private | 3 | 24.85 |
| BWP9033BR | Water Pumps | 2 | 19.39 |
| BWP9035BR | Water Pumps | 5 | 42.51 |
| BWP9036BR | Water Pumps | 31 | 296.32 |
| BWP9036BW | Water Pumps Private | 12 | 114.70 |
| BWP9037BR | Water Pumps | 87 | 699.62 |
| BWP9038DG | Water Pumps Private | 2 | 21.50 |
| BWP9038SP | Water Pumps Private | 2 | 21.50 |
| BWP9043BR | Water Pumps | 3 | 30.20 |
| BWP9043SP | Water Pumps Private | 8 | 80.53 |
| BWP9044BR | Water Pumps | 5 | 66.02 |
| BWP9046BR | Water Pumps | 3 | 24.43 |
| BWP9047SP | Water Pumps Private | 2 | 20.05 |
| BWP9048BR | Water Pumps | 17 | 154.91 |
| BWP9051DG | Water Pumps Private | 3 | 32.61 |
| BWP9099BR | Water Pumps | 2 | 27.04 |
| BWP9101BR | Water Pumps | 6 | 69.37 |
| BWP9103BR | Water Pumps | 8 | 101.34 |
| BWP9105BR | Water Pumps | 9 | 161.95 |
| BWP9108BR | Water Pumps | 60 | 439.82 |
| BWP9119BR | Water Pumps | 3 | 30.76 |
| BWP9120BR | Water Pumps | 2 | 14.36 |
| BWP9122BR | Water Pumps | 33 | 250.93 |
| BWP9127BR | Water Pumps | 11 | 124.56 |
| BWP9127BW | Water Pumps Private | 5 | 56.62 |
| BWP9135BR | Water Pumps | 2 | 26.25 |
| BWP9137SP | Water Pumps Private | 2 | 13.27 |
| BWP9139BR | Water Pumps | 8 | 51.70 |
| BWP9139DG | Water Pumps Private | 2 | 12.92 |
| BWP9150SC | Water Pumps Private | 5 | 49.51 |
| BWP9171BR | Water Pumps | 3 | 20.37 |

FBG_CH1_00090615

| | | | |
|---|---|---|---|
| BWP9173BR | Water Pumps | 2 | 17.93 |
| BWP9174BR | Water Pumps | 2 | 33.64 |
| BWP9174DG | Water Pumps Private | 2 | 33.64 |
| BWP9182BR | Water Pumps | 2 | 44.04 |
| BWP9187DG | Water Pumps Private | 3 | 26.07 |
| BWP9187GP | Water Pumps Private | 9 | 78.21 |
| BWP9187SP | Water Pumps Private | 14 | 121.66 |
| BWP9200BR | Water Pumps | 2 | 25.46 |
| BWP9201SP | Water Pumps Private | 8 | 105.46 |
| BWP9210BR | Water Pumps | 8 | 59.61 |
| BWP9210GP | Water Pumps Private | 2 | 14.90 |
| BWP9216BR | Water Pumps | 6 | 53.07 |
| BWP9228BR | Water Pumps | 9 | 121.59 |
| BWP9231BR | Water Pumps | 2 | 12.14 |
| BWP9234BR | Water Pumps | 16 | 172.12 |
| BWP9240BR | Water Pumps | 8 | 114.92 |
| BWP9240GP | Water Pumps Private | 9 | 129.29 |
| BWP9257BR | Water Pumps | 33 | 433.18 |
| BWP9270BR | Water Pumps | 11 | 70.97 |
| BWP9272BR | Water Pumps | 2 | 38.67 |
| BWP9272SC | Water Pumps Private | 3 | 58.00 |
| BWP9275BR | Water Pumps | 23 | 180.99 |
| BWP9276BR | Water Pumps | 2 | 14.37 |
| BWP9303DG | Water Pumps Private | 2 | 57.75 |
| BWP9304BR | Water Pumps | 29 | 275.40 |
| BWP9309BR | Water Pumps | 31 | 385.34 |
| BWP9316BR | Water Pumps | 62 | 498.46 |
| BWP9344SP | Water Pumps Private | 2 | 30.61 |
| BWP9345BR | Water Pumps | 47 | 570.65 |
| BWP9349BR | Water Pumps | 9 | 56.12 |
| BWP9351BR | Water Pumps | 22 | 139.39 |
| BWP9354BR | Water Pumps | 39 | 57.28 |
| BWP9356BR | Water Pumps | 45 | 453.99 |
| BWP9361BR | Water Pumps | 6 | 37.42 |
| BWP9363BR | Water Pumps | 20 | 167.62 |
| BWP9366BR | Water Pumps | 2 | 13.81 |
| BWP9366SP | Water Pumps Private | 9 | 62.15 |
| BWP9367BR | Water Pumps | 2 | 42.41 |
| BWP9376BR | Water Pumps | 16 | 84.97 |
| BWP9376DG | Water Pumps Private | 2 | 10.62 |
| BWP9376GP | Water Pumps Private | 3 | 15.93 |
| BWP9376SP | Water Pumps Private | 11 | 58.42 |
| BWP9377BR | Water Pumps | 2 | 33.51 |
| BWP9377DG | Water Pumps Private | 5 | 83.78 |
| BWP9378SP | Water Pumps Private | 3 | 26.10 |
| BWP9379BR | Water Pumps | 8 | 95.55 |
| BWP9408BR | Water Pumps | 2 | 30.38 |
| BWP9408SP | Water Pumps Private | 11 | 167.08 |
| BWP9412NP | Water Pumps Private | 25 | 211.64 |
| BWP9415SP | Water Pumps Private | 2 | 14.49 |
| BWP9524BR | Water Pumps | 9 | 150.88 |
| BWP9537BR | Water Pumps | 47 | 1,329.37 |
| BWP9551BR | Water Pumps | 3 | 72.33 |
| BWP9552BR | Water Pumps | 5 | 158.05 |
| BWP9556CB | Water Pumps Private | 8 | 167.04 |
| BWP9700BR | Water Pumps | 25 | 544.71 |
| BWP9700SP | Water Pumps Private | 9 | 196.10 |
| BWP9701BR | Water Pumps | 50 | 1,150.84 |
| BWP9701SP | Water Pumps Private | 14 | 322.24 |
| BWPHD6012BR | Water Pumps | 29 | 2,778.84 |
| BWPHD6051CB | Water Pumps Private | 11 | 600.57 |
| BWPHD6053CB | Water Pumps Private | 2 | 80.56 |
| BWPHD6053SP | Water Pumps Private | 2 | 80.56 |
| BWPHD6057BR | Water Pumps | 2 | 82.81 |
| BWPHD6057SP | Water Pumps Private | 2 | 82.81 |
| BWPHD6064BR | Water Pumps | 6 | 287.99 |
| BWPHD6068BR | Water Pumps | 3 | 166.33 |
| BWPHD6068BW | Water Pumps Private | 11 | 609.89 |
| BWPHD6068CB | Water Pumps Private | 11 | 609.89 |
| BWPHD6073BR | Water Pumps | 5 | 290.72 |
| BWPHD6076DG | Water Pumps Private | 2 | 106.42 |
| BWPHD6090BR | Water Pumps | 5 | 119.33 |
| BWPHD6301BR | Water Pumps | 3 | 86.88 |
| BWPHD6307BR | Water Pumps | 3 | 91.72 |
| BWPHD6315BR | Water Pumps | 14 | 188.53 |
| BWPHD6520BR | Water Pumps | 9 | 106.60 |
| BWPHD6542CB | Water Pumps Private | 2 | 261.57 |

FBG_CH1_00090616

| | | | |
|---|---|---|---|
| BWPHD6543BR | Water Pumps | 2 | 259.96 |
| BWPHD6601CB | Water Pumps Private | 2 | 62.74 |
| BWPHD6601SP | Water Pumps Private | 6 | 188.23 |
| BWPHD6602SP | Water Pumps Private | 8 | 292.77 |
| BWPHD6603BR | Water Pumps | 3 | 55.98 |
| BWPHD6700BR | Water Pumps | 3 | 99.09 |
| BWPHD7315BR | Water Pumps | 36 | 1,794.08 |
| BWPMS1001 | Water Pumps | 16 | 7.10 |
| BWPMS1011 | Water Pumps | 775 | 344.31 |
| BWPMS1160 | Water Pumps | 1,020 | 535.46 |
| BWPMS1175 | Water Pumps | 248 | 127.75 |
| BWPMS1308 | Water Pumps | 183 | 92.20 |
| CBX1900 | Pump Parts | 45 | 66.18 |
| CBX1901 | Pump Parts | 1,226 | 711.70 |
| CBX1903 | Pump Parts | 285 | 509.15 |
| CCE1536 | Pump Parts | 474 | 259.56 |
| CFM6 | Pump Parts | 601 | 568.02 |
| CFM7 | Pump Parts | 1,882 | 1,217.62 |
| CFM8BCA | Pump Parts | 42 | 43.21 |
| CWP102BCA | Pump Parts | 15,850 | 2,105.51 |
| CWP102BM | Pump Parts | 2,970 | 645.43 |
| CWP102DG | Pump Parts | 22,808 | 5,048.57 |
| CWP102SP | Pump Parts | 45,514 | 11,241.23 |
| CWP111BCA | Pump Parts | 389 | 84.21 |
| CWP141BCA | Pump Parts | 45 | 6.92 |
| CWP193BCA | Pump Parts | 23,478 | 4,620.47 |
| CWP193BM | Pump Parts | 1,769 | 505.67 |
| CWP193DG | Pump Parts | 15,018 | 4,372.72 |
| CWP193SP | Pump Parts | 41,805 | 13,595.49 |
| CWP288BCA | Pump Parts | 1,300 | 342.02 |
| CWP288BM | Pump Parts | 5,439 | 2,023.05 |
| CWP288DG | Pump Parts | 6,057 | 2,402.86 |
| CWP288SP | Pump Parts | 7,229 | 3,211.67 |
| CWP396BCA | Pump Parts | 47 | 10.08 |
| CWP462BCA | Pump Parts | 1,917 | 688.02 |
| CWP462BM | Pump Parts | 1,535 | 833.13 |
| CWP462DG | Pump Parts | 4,366 | 2,953.03 |
| CWP462SP | Pump Parts | 5,707 | 3,855.17 |
| CWP635BCA | Pump Parts | 1,025 | 411.00 |
| CWP635BM | Pump Parts | 172 | 109.85 |
| CWP635DG | Pump Parts | 15,977 | 9,432.82 |
| CWP635SP | Pump Parts | 22,969 | 17,120.64 |
| CX91587P | Pump Parts | 321 | 161.25 |
| ETBCH | Pump Parts | 232,500 | 2.40 |
| ETBGE | Pump Parts | 310,000 | 2,023.33 |
| ETBM | Pump Parts | 5,647 | 860.03 |
| ETGP1 | Pump Parts | 7,352 | 1,015.89 |
| ETSPD | Pump Parts | 8,596 | 326.86 |
| ETSPG | Pump Parts | 4,712 | 179.17 |
| EWBB14 | Labels | 3,047 | 260.85 |
| EWBB14N | Labels | 752 | 64.38 |
| EWBB16 | Labels | 10,788 | 923.54 |
| EWBB17N | Labels | 1,023 | 87.58 |
| EWBB18 | Labels | 7,144 | 611.58 |
| EWBB18N | Labels | 1,008 | 86.29 |
| EWBB19 | Labels | 6,045 | 517.50 |
| EWBB19N | Labels | 1,370 | 117.28 |
| EWBB20 | Labels | 6,665 | 570.58 |
| EWBB20N | Labels | 1,060 | 90.74 |
| EWBB21 | Labels | 8,370 | 716.54 |
| EWBB21N | Labels | 1,589 | 136.03 |
| EWBB22 | Labels | 7,890 | 675.45 |
| EWBB22N | Labels | 1,397 | 119.59 |
| EWBB24 | Labels | 7,440 | 636.92 |
| EWBB24N | Labels | 978 | 83.72 |
| EWBB26 | Labels | 4,168 | 356.81 |
| EWBB26N | Labels | 1,077 | 92.20 |
| EWBB28 | Labels | 2,790 | 238.85 |
| FBA3631 | FR AM Other Assess | 56 | 47.33 |
| FBA3707A-02 | FR AM Other Assess | 9 | 8.11 |
| FBA3749-01 | FR AM Other Assess | 65 | 38.65 |
| FBA3749-02 | FR AM Other Assess | 28 | 25.22 |
| FBA3803-02 | FR AM Other Assess | 8 | 6.94 |
| FBA6314-01 | FR AM Other Assess | 28 | 19.48 |
| FBA6314-02 | FR AM Other Assess | 561 | 573.92 |
| FBA6592 | FR AM Other Assess | 112 | 117.75 |
| FBA6592-01 | FR AM Other Assess | 307 | 443.79 |

FBG_CH1_00090617

| | | | |
|---|---|---|---|
| FBA6662-02 | FR AM Other Assess | 9 | 4.66 |
| FBA9605 | FR AM H Duty Air | 335 | 5,273.09 |
| FBA9606 | FR AM H Duty Air | 124 | 1,673.33 |
| FC10517 | FR AM H Duty Fuel | 19 | 26.28 |
| FC1106PL | FR AM H Duty Fuel | 9 | 26.08 |
| FC1110PL | FR AM H Duty Fuel | 9 | 14.10 |
| FC1153 | FR AM H Duty Fuel | 9 | 56.90 |
| FC1163PL | FR AM H Duty Fuel | 74 | 333.85 |
| FC1166PL-01 | FR AM H Duty Fuel | 37 | 261.87 |
| FC1169 | FR AM H Duty Fuel | 37 | 253.26 |
| FC1173PL-01 | FR AM H Duty Fuel | 28 | 145.13 |
| FC1174PL | FR AM H Duty Fuel | 160 | 514.61 |
| FC1175PL | FR AM H Duty Fuel | 9 | 45.24 |
| FC11860PL | FR AM H Duty Fuel | 121 | 228.90 |
| FC11860ZP | FR AM H Duty Fuel | 474 | 717.31 |
| FC11861ZP | FR AM H Duty Fuel | 9 | 13.12 |
| FC11864ZP | FR AM H Duty Fuel | 908 | 1,207.39 |
| FC1188PL | FR AM H Duty Fuel | 19 | 307.06 |
| FC1189 | FR AM H Duty Fuel | 47 | 320.05 |
| FC1191A-02 | FR AM H Duty Fuel | 40 | 53.84 |
| FC1191A-M2 | FR AM H Duty Fuel | 1,469 | 2,095.25 |
| FC1191B | FR AM H Duty Fuel | 9 | 16.91 |
| FC11941 | FR AM H Duty Fuel | 84 | 516.33 |
| FC135 | FR AM H Duty Oil | 9 | 24.91 |
| FC137A | FR AM H Duty Oil | 121 | 1,307.06 |
| FC139PL-01 | FR AM H Duty Oil | 28 | 170.33 |
| FC159 | FR AM H Duty Oil | 37 | 255.25 |
| FC1659 | FR AM Other H Duty | 28 | 161.44 |
| FC1660A | FR AM Other H Duty | 47 | 257.05 |
| FC1664 | FR AM Other H Duty | 9 | 58.31 |
| FC1669-01 | FR AM Other H Duty | 12 | 155.99 |
| FC1670 | FR AM Other H Duty | 19 | 115.10 |
| FC1671-01 | FR AM Other H Duty | 34 | 188.14 |
| FC1672 | FR AM Other H Duty | 28 | 163.22 |
| FC1678 | FR AM Other H Duty | 9 | 41.88 |
| FC1679 | FR AM Other H Duty | 9 | 70.48 |
| FC1681 | FR AM Other H Duty | 28 | 140.09 |
| FC1682 | FR AM Other H Duty | 2 | 8.93 |
| FC1697 | FR AM Other H Duty | 65 | 508.71 |
| FC1700 | FR AM Other H Duty | 243 | 1,061.34 |
| FC1702-01 | FR AM Other H Duty | 37 | 248.59 |
| FC1719 | FR AM Other H Duty | 26 | 537.32 |
| FC1720-01 | FR AM Other H Duty | 37 | 218.42 |
| FC1721-M2 | FR AM Other H Duty | 446 | 1,695.55 |
| FC1723A | FR AM Other H Duty | 37 | 298.75 |
| FC1724 | FR AM Other H Duty | 19 | 166.49 |
| FC174E | FR AM H Duty Oil | 28 | 361.47 |
| FC175E-01 | FR AM H Duty Oil | 56 | 797.91 |
| FC252 | FR AM H Duty Oil | 19 | 179.97 |
| FC3 | FR AM H Duty Oil | 16 | 64.26 |
| FC31PL-01 | FR AM H Duty Oil | 37 | 250.45 |
| FC3601 | FR AM H Duty Fuel | 19 | 132.48 |
| FC3954 | FR AM Other H Duty | 9 | 100.37 |
| FC3978 | FR AM Other H Duty | 9 | 39.55 |
| FC3P | FR AM H Duty Oil | 74 | 366.31 |
| FC4 | FR AM H Duty Oil | 65 | 300.42 |
| FC4163-01 | FR AM H Duty Fuel | 214 | 376.27 |
| FC4633 | FR AM Other H Duty | 19 | 108.91 |
| FC4635-01 | FR AM Other H Duty | 6 | 53.72 |
| FC4636 | FR AM Other H Duty | 68 | 439.59 |
| FC4844 | FR AM Other H Duty | 28 | 161.61 |
| FC4P-01 | FR AM H Duty Oil | 74 | 332.61 |
| FC6644 | FR AM Other H Duty | 37 | 473.74 |
| FC6921 | FR AM H Duty Fuel | 186 | 124.46 |
| FC6957 | FR AM Other H Duty | 9 | 295.76 |
| FC6968 | FR AM Other H Duty | 9 | 105.99 |
| FC6989 | FR AM Other H Duty | 47 | 701.19 |
| FC7031 | FR AM Other H Duty | 8 | 73.96 |
| FC7060 | FR AM Other H Duty | 6 | 51.74 |
| FC7066 | FR AM Other H Duty | 9 | 238.95 |
| FC7215 | FR AM Other H Duty | 11 | 218.64 |
| FC7300 | FR AM Other H Duty | 298 | 2,557.62 |
| FC7517 | FR AM H Duty Fuel | 37 | 146.71 |
| FC7518 | FR AM H Duty Fuel | 28 | 219.73 |
| FC7519 | FR AM H Duty Fuel | 9 | 47.75 |
| FC7523 | FR AM H Duty Fuel | 37 | 98.91 |
| FC8201 | FR AM Other H Duty | 2 | 18.68 |

FBG_CH1_00090618

| | | | |
|---|---|---|---|
| FC8246 | FR AM H Duty Fuel | 19 | 77.96 |
| FC8449 | FR AM H Duty Fuel | 19 | 179.94 |
| FC9031 | FR AM H Duty Oil | 37 | 1,123.18 |
| FC9559 | FR AM H Duty Fuel | 9 | 38.86 |
| FC9608 | FR AM H Duty Fuel | 1,184 | 3,622.74 |
| FC9766-M2 | FR AM Passcar Fuel | 735 | 2,466.75 |
| FCA10013-03 | FR AM Panel Air | 3,877 | 6,400.45 |
| FCA10014-03 | FR AM Panel Air | 301 | 654.57 |
| FCA10015-02 | FR AM Panel Air | 842 | 1,948.16 |
| FCA10022-01 | FR AM Panel Air | 126 | 397.75 |
| FCA10064-M2 | FR AM Panel Air | 330 | 581.93 |
| FCA10065-01 | FR AM Round Air | 60 | 346.06 |
| FCA10071-01 | FR AM Panel Air | 76 | 146.76 |
| FCA10081-M2 | FR AM Panel Air | 508 | 902.18 |
| FCA10083-02 | FR AM Panel Air | 19 | 33.30 |
| FCA10083-M3 | FR AM Panel Air | 530 | 928.83 |
| FCA10084-M2 | FR AM Panel Air | 214 | 406.82 |
| FCA10085-03 | FR AM Panel Air | 14 | 21.24 |
| FCA10085-M3 | FR AM Panel Air | 11,988 | 18,189.73 |
| FCA10086-03 | FR AM Panel Air | 126 | 370.47 |
| FCA10088-02 | FR AM Panel Air | 1,941 | 2,569.83 |
| FCA10091-M3 | FR AM Panel Air | 1,054 | 2,596.85 |
| FCA10092-01 | FR AM Panel Air | 107 | 133.29 |
| FCA10093-03 | FR AM Panel Air | 778 | 1,269.67 |
| FCA10094-M3 | FR AM Panel Air | 4,441 | 6,417.26 |
| FCA10096-M3 | FR AM H Duty Air | 2,018 | 3,634.33 |
| FCA101-01 | FR AM Round Air | 74 | 121.14 |
| FCA10110-03 | FR AM Panel Air | 3,641 | 9,926.99 |
| FCA10115-01 | FR AM Panel Air | 477 | 1,804.61 |
| FCA10115-M3 | FR AM Panel Air | 1,637 | 4,212.26 |
| FCA10118-03 | FR AM Panel Air | 3,295 | 4,362.49 |
| FCA10120-01 | FR AM Panel Air | 47 | 232.37 |
| FCA10159-03 | FR AM Panel Air | 98 | 183.83 |
| FCA10161-01 | FR AM Round Air | 56 | 1,683.64 |
| FCA10162-M2 | FR AM Panel Air | 65 | 429.72 |
| FCA10163-02 | FR AM Panel Air | 1,009 | 2,372.41 |
| FCA10165-03 | FR AM Panel Air | 4,602 | 7,885.11 |
| FCA10165-M2 | FR AM Panel Air | 3 | 5.02 |
| FCA10169-03 | FR AM Panel Air | 5,230 | 9,615.24 |
| FCA10170-01 | FR AM Panel Air | 209 | 312.29 |
| FCA10171-01 | FR AM Panel Air | 386 | 650.09 |
| FCA10173-01 | FR AM Panel Air | 563 | 851.76 |
| FCA10190-03 | FR AM Panel Air | 7,344 | 10,287.07 |
| FCA10191-01 | FR AM Panel Air | 884 | 1,550.52 |
| FCA10191-M3 | FR AM Panel Air | 921 | 1,269.22 |
| FCA10192-03 | FR AM Panel Air | 223 | 289.87 |
| FCA10193-02 | FR AM Panel Air | 1,579 | 3,258.41 |
| FCA10228-01 | FR AM Panel Air | 1,034 | 2,069.00 |
| FCA10232-M2 | FR AM Round Air | 936 | 1,330.88 |
| FCA10233-02 | FR AM Panel Air | 307 | 499.14 |
| FCA10234-01 | FR AM Panel Air | 13,025 | 16,527.01 |
| FCA10236 | FR AM Panel Air | 5 | 16.71 |
| FCA10237 | FR AM Panel Air | 884 | 1,780.60 |
| FCA10238-01 | FR AM H Duty Air | 33 | 828.69 |
| FCA10239 | FR AM Round Air | 419 | 3,019.40 |
| FCA10242-03 | FR AM Panel Air | 366 | 504.38 |
| FCA10253-M2 | FR AM Panel Air | 716 | 1,334.26 |
| FCA10254-01 | FR AM Panel Air | 5 | 15.06 |
| FCA10254-M2 | FR AM Panel Air | 1,083 | 2,058.79 |
| FCA10256-M2 | FR AM Panel Air | 770 | 1,973.40 |
| FCA10257-M2 | FR AM Panel Air | 51 | 108.92 |
| FCA10261-01 | FR AM Panel Air | 2 | 9.80 |
| FCA10262-03 | FR AM Panel Air | 5,786 | 11,349.84 |
| FCA10270 | FR AM Round Air | 412 | 12,907.14 |
| FCA10271-01 | FR AM Panel Air | 70 | 142.70 |
| FCA10281 | FR AM H Duty Air | 47 | 2,036.93 |
| FCA10281SY | FR AM H Duty Air | 2 | 23.38 |
| FCA10286-M2 | FR AM Panel Air | 395 | 915.91 |
| FCA10290-M2 | FR AM Panel Air | 569 | 979.54 |
| FCA10293 | FR AM Panel Air | 251 | 612.64 |
| FCA10303 | FR AM Panel Air | 20 | 21.92 |
| FCA10304 | FR AM Panel Air | 149 | 7.33 |
| FCA10305 | FR AM H Duty Air | 471 | 5,646.80 |
| FCA10328-01 | FR AM Panel Air | 47 | 131.64 |
| FCA10330 | FR AM Panel Air | 42 | 146.59 |
| FCA10343-03 | FR AM Panel Air | 856 | 2,087.61 |
| FCA10344-03 | FR AM Panel Air | 3,949 | 9,630.80 |

FBG_CH1_00090619

| | | | |
|---|---|---|---|
| FCA10346-01 | FR AM Panel Air | 684 | 1,338.04 |
| FCA10348 | FR AM Panel Air | 1,153 | 2,954.97 |
| FCA10349 | FR AM Panel Air | 270 | 345.38 |
| FCA10349-01 | FR AM Panel Air | 1,000 | 1,527.17 |
| FCA10355-M2 | FR AM Panel Air | 1,494 | 3,646.57 |
| FCA10359-01 | FR AM Panel Air | 581 | 1,020.49 |
| FCA10389-M2 | FR AM H Duty Air | 169 | 1,461.66 |
| FCA10389SY-M2 | FR AM H Duty Air | 73 | 440.69 |
| FCA10421 | FR AM Round Air | 1,018 | 3,598.15 |
| FCA10432 | FR AM Panel Air | 19 | 55.41 |
| FCA10464-M2 | FR AM Panel Air | 112 | 355.38 |
| FCA10465-01 | FR AM Panel Air | 1,153 | 2,622.52 |
| FCA10465-M3 | FR AM Panel Air | 6,980 | 15,876.12 |
| FCA10466 | FR AM Panel Air | 6 | 24.43 |
| FCA10466-M2 | FR AM Panel Air | 5 | 16.48 |
| FCA10467-03 | FR AM Panel Air | 3,340 | 6,182.29 |
| FCA10468-02 | FR AM Panel Air | 5 | 10.25 |
| FCA10468-03 | FR AM Panel Air | 223 | 415.56 |
| FCA10470-03 | FR AM Panel Air | 121 | 216.47 |
| FCA10488-01 | FR AM Panel Air | 702 | 1,240.96 |
| FCA10490-M2 | FR AM Panel Air | 538 | 955.46 |
| FCA10491 | FR AM Round Air | 40 | 1,524.06 |
| FCA10493 | FR AM Panel Air | 14 | 52.19 |
| FCA10494-01 | FR AM Panel Air | 74 | 183.79 |
| FCA10495-M2 | FR AM Panel Air | 490 | 926.90 |
| FCA10497-M2 | FR AM Panel Air | 3,119 | 9,706.44 |
| FCA10498 | FR AM Panel Air | 107 | 391.75 |
| FCA10500-M2 | FR AM Panel Air | 102 | 298.75 |
| FCA10509-M2 | FR AM Panel Air | 1,609 | 3,791.90 |
| FCA10516 | FR AM Panel Air | 14 | 26.38 |
| FCA10516-01 | FR AM Panel Air | 1,386 | 2,107.79 |
| FCA10522 | FR AM Panel Air | 381 | 954.69 |
| FCA10522-AZ | FR AM Panel Air | 31 | 77.68 |
| FCA10538 | FR AM Panel Air | 95 | 447.83 |
| FCA10538-AZ | FR AM Panel Air | 6 | 28.28 |
| FCA10540 | FR AM Panel Air | 23 | 47.37 |
| FCA10542 | FR AM Panel Air | 16 | 83.94 |
| FCA10542-01 | FR AM Panel Air | 74 | 153.27 |
| FCA10543 | FR AM Panel Air | 14 | 64.35 |
| FCA10564-M2 | FR AM H Duty Air | 171 | 681.30 |
| FCA10573 | FR AM Panel Air | 9 | 110.05 |
| FCA10576 | FR AM Panel Air | 9 | 132.11 |
| FCA10576-AZ | FR AM Panel Air | 3 | 43.49 |
| FCA10578-01 | FR AM Panel Air | 60 | 135.07 |
| FCA10591 | FR AM Panel Air | 47 | 78.88 |
| FCA10604-01 | FR AM Panel Air | 200 | 277.68 |
| FCA10616-01 | FR AM Round Air | 516 | 1,408.74 |
| FCA10626-02 | FR AM Panel Air | 130 | 479.63 |
| FCA10630-M2 | FR AM Panel Air | 51 | 108.92 |
| FCA10633-M2 | FR AM Panel Air | 47 | 78.77 |
| FCA10650-M2 | FR AM Panel Air | 2,702 | 3,919.99 |
| FCA10656 | FR AM Panel Air | 19 | 43.76 |
| FCA10661 | FR AM Panel Air | 2 | 8.77 |
| FCA10662-01 | FR AM Panel Air | 9 | 39.80 |
| FCA10675-M2 | FR AM Panel Air | 105 | 307.54 |
| FCA10676-M2 | FR AM Panel Air | 153 | 457.47 |
| FCA10677-03 | FR AM Panel Air | 1,246 | 2,353.07 |
| FCA10685-M2 | FR AM Panel Air | 33 | 114.78 |
| FCA10690-01 | FR AM Panel Air | 109 | 240.95 |
| FCA10692-01 | FR AM Round Air | 70 | 175.16 |
| FCA10692-AZ | FR AM Round Air | 2 | 5.00 |
| FCA10693-01 | FR AM Panel Air | 116 | 271.72 |
| FCA10694-01 | FR AM Panel Air | 228 | 360.31 |
| FCA10696 | FR AM Panel Air | 547 | 2,354.84 |
| FCA10700 | FR AM Panel Air | 9 | 35.74 |
| FCA10700-AZ | FR AM Panel Air | 8 | 31.77 |
| FCA10714 | FR AM H Duty Air | 31 | 2,031.32 |
| FCA10738 | FR AM H Duty Air | 11 | 1,103.69 |
| FCA10739-M2 | FR AM Panel Air | 1,163 | 1,585.56 |
| FCA10740 | FR AM H Duty Air | 3 | 162.69 |
| FCA10741-01 | FR AM Panel Air | 288 | 580.95 |
| FCA10755-01 | FR AM Panel Air | 2,748 | 5,312.07 |
| FCA10756-M3 | FR AM Panel Air | 251 | 571.33 |
| FCA10767-M2 | FR AM Round Air | 288 | 514.07 |
| FCA10767-M3 | FR AM Round Air | 4,306 | 7,593.36 |
| FCA10781-M2 | FR AM Panel Air | 547 | 1,676.07 |
| FCA10782 | FR AM H Duty Air | 33 | 1,262.92 |

FBG_CH1_00090620

| | | | |
|---|---|---|---|
| FCA10783 | FR AM Panel Air | 23 | 256.29 |
| FCA10784 | FR AM H Duty Air | 26 | 257.75 |
| FCA10785-01 | FR AM Panel Air | 37 | 78.64 |
| FCA10786 | FR AM Panel Air | 14 | 34.59 |
| FCA10787 | FR AM Panel Air | 60 | 1,092.56 |
| FCA10802-01 | FR AM Panel Air | 470 | 1,205.02 |
| FCA10811 | FR AM Panel Air | 1,573 | 3,743.41 |
| FCA10811-AZ | FR AM Panel Air | 26 | 61.87 |
| FCA10822-M2 | FR AM Round Air | 322 | 1,277.16 |
| FCA10834-M2 | FR AM Panel Air | 251 | 658.59 |
| FCA10835-01 | FR AM Panel Air | 465 | 1,323.26 |
| FCA10867-01 | FR AM Panel Air | 51 | 106.26 |
| FCA10881 | FR AM Panel Air | 369 | 990.73 |
| FCA10885-M2 | FR AM Panel Air | 1,731 | 3,052.50 |
| FCA10886 | FR AM Panel Air | 23 | 76.98 |
| FCA10887 | FR AM Panel Air | 47 | 855.84 |
| FCA10888 | FR AM Panel Air | 23 | 51.66 |
| FCA10889 | FR AM Panel Air | 1,837 | 3,476.93 |
| FCA10910-M3 | FR AM Panel Air | 1,569 | 2,766.83 |
| FCA10963 | FR AM Panel Air | 918 | 1,542.41 |
| FCA10989 | FR AM Panel Air | 377 | 557.94 |
| FCA10990 | FR AM Panel Air | 1,243 | 1,727.03 |
| FCA10993 | FR AM Panel Air | 81 | 446.99 |
| FCA10994 | FR AM Panel Air | 28 | 233.39 |
| FCA10995 | FR AM Panel Air | 31 | 220.91 |
| FCA10996 | FR AM Panel Air | 158 | 855.17 |
| FCA10997 | FR AM Panel Air | 3,962 | 5,715.36 |
| FCA10998-01 | FR AM Panel Air | 98 | 304.04 |
| FCA10999-01 | FR AM Panel Air | 84 | 222.31 |
| FCA11001-01 | FR AM Panel Air | 713 | 1,872.61 |
| FCA11002 | FR AM Panel Air | 73 | 323.20 |
| FCA11003 | FR AM Panel Air | 23 | 65.15 |
| FCA11004 | FR AM Round Air | 20 | 341.64 |
| FCA11011 | FR AM Panel Air | 47 | 166.28 |
| FCA11013 | FR AM Panel Air | 23 | 217.68 |
| FCA11013-AZ | FR AM Panel Air | 16 | 151.43 |
| FCA11033 | FR AM Panel Air | 135 | 392.34 |
| FCA11034 | FR AM Panel Air | 130 | 702.22 |
| FCA11041-01 | FR AM Panel Air | 37 | 101.94 |
| FCA11042-03 | FR AM Panel Air | 1,789 | 3,423.28 |
| FCA11048 | FR AM Round Air | 363 | 835.47 |
| FCA11049 | FR AM Panel Air | 82 | 101.35 |
| FCA11049-AZ | FR AM Panel Air | 3 | 5.19 |
| FCA11050 | FR AM Panel Air | 1,302 | 4,066.43 |
| FCA11053 | FR AM Panel Air | 59 | 186.57 |
| FCA11053A-03 | FR AM Panel Air | 74 | 155.68 |
| FCA11054 | FR AM Panel Air | 5 | 36.75 |
| FCA11062 | FR AM Panel Air | 37 | 218.04 |
| FCA11063 | FR AM Panel Air | 33 | 189.81 |
| FCA11071 | FR AM Panel Air | 3 | 5.55 |
| FCA11071-M2 | FR AM Panel Air | 868 | 1,605.30 |
| FCA11072 | FR AM Panel Air | 2,573 | 6,123.20 |
| FCA11077-AZ | FR AM Panel Air | 23 | 103.86 |
| FCA11104 | FR AM Panel Air | 1,955 | 6,179.46 |
| FCA11109 | FR AM Panel Air | 5 | 10.99 |
| FCA11109-M2 | FR AM Panel Air | 625 | 1,133.41 |
| FCA11112 | FR AM Panel Air | 14 | 41.01 |
| FCA11112-AZ | FR AM Panel Air | 6 | 17.57 |
| FCA11113 | FR AM Panel Air | 2,209 | 4,369.05 |
| FCA11114 | FR AM Round Air | 2,892 | 9,272.81 |
| FCA11118-M2 | FR AM Panel Air | 409 | 1,222.90 |
| FCA11121-M2 | FR AM Panel Air | 116 | 247.74 |
| FCA11170-M3 | FR AM Panel Air | 1,544 | 2,641.30 |
| FCA11206 | FR AM Panel Air | 1,029 | 3,405.32 |
| FCA11215 | FR AM Panel Air | 24,726 | 33,746.25 |
| FCA11215-M3 | FR AM Panel Air | 40,715 | 42,467.38 |
| FCA11222 | FR AM Panel Air | 2,395 | 3,465.50 |
| FCA11227 | FR AM Panel Air | 215 | 701.74 |
| FCA11233-01 | FR AM Passcar Fuel | 28 | 75.79 |
| FCA11250-M2 | FR AM Panel Air | 1,046 | 1,726.82 |
| FCA11251 | FR AM Panel Air | 2 | 5.05 |
| FCA11251-01 | FR AM Panel Air | 1,138 | 2,444.51 |
| FCA11256-M2 | FR AM Panel Air | 302 | 589.70 |
| FCA11257-03 | FR AM Panel Air | 1,167 | 5,027.38 |
| FCA11258-03 | FR AM Panel Air | 5,799 | 11,023.95 |
| FCA11259-03 | FR AM Panel Air | 8,142 | 14,459.72 |
| FCA11263 | FR AM Panel Air | 2,062 | 6,196.59 |

FBG_CH1_00090621

| | | | |
|---|---|---|---|
| FCA11263-AZ | FR AM Panel Air | 3 | 5.14 |
| FCA11305-AZ | FR AM Panel Air | 6 | 34.77 |
| FCA114-02 | FR AM Round Air | 42 | 87.97 |
| FCA11413-M2 | FR AM Panel Air | 856 | 1,680.79 |
| FCA11421 | FR AM Panel Air | 28 | 111.81 |
| FCA11422 | FR AM Panel Air | 9 | 32.22 |
| FCA11424 | FR AM Round Air | 65 | 601.81 |
| FCA11426-AZ | FR AM Panel Air | 3 | 3.07 |
| FCA11426-M3 | FR AM Panel Air | 400 | 409.34 |
| FCA11431 | FR AM Panel Air | 349 | 697.48 |
| FCA11438 | FR AM Panel Air | 19 | 283.83 |
| FCA11439 | FR AM Panel Air | 23 | 54.68 |
| FCA11450-M2 | FR AM Panel Air | 93 | 144.27 |
| FCA11456 | FR AM Panel Air | 335 | 459.85 |
| FCA11469-M2 | FR AM Panel Air | 1,114 | 1,783.35 |
| FCA11474-AZ | FR AM Panel Air | 5 | 7.88 |
| FCA11474-M3 | FR AM Panel Air | 3,240 | 5,105.71 |
| FCA11476 | FR AM Panel Air | 763 | 2,376.26 |
| FCA11477 | FR AM Panel Air | 177 | 652.00 |
| FCA11480 | FR AM Panel Air | 563 | 1,239.56 |
| FCA11482 | FR AM Panel Air | 158 | 313.90 |
| FCA11494 | FR AM Panel Air | 363 | 1,430.73 |
| FCA11494-AZ | FR AM Panel Air | 2 | 7.88 |
| FCA11501 | FR AM Panel Air | 1,555 | 2,303.60 |
| FCA11525 | FR AM Panel Air | 23 | 79.25 |
| FCA11654 | FR AM Panel Air | 2,158 | 4,534.22 |
| FCA11674-AZ | FR AM Round Air | 2 | 7.80 |
| FCA11674-M3 | FR AM Round Air | 1,082 | 4,222.04 |
| FCA11712-M2 | FR AM Panel Air | 95 | 208.69 |
| FCA11744 | FR AM Panel Air | 23 | 55.51 |
| FCA11744-AZ | FR AM Panel Air | 39 | 94.13 |
| FCA11814-M2 | FR AM Panel Air | 955 | 1,839.35 |
| FCA11858 | FR AM Panel Air | 3,399 | 10,281.35 |
| FCA11858-M2 | FR AM Panel Air | 37 | 92.29 |
| FCA11876 | FR AM Panel Air | 284 | 838.79 |
| FCA11877 | FR AM Panel Air | 1,823 | 4,502.52 |
| FCA11895 | FR AM Panel Air | 326 | 1,120.34 |
| FCA11895-AZ | FR AM Panel Air | 3 | 10.31 |
| FCA11941 | FR AM Panel Air | 104 | 403.43 |
| FCA11942 | FR AM Panel Air | 74 | 253.73 |
| FCA11942-AZ | FR AM Panel Air | 2 | 6.86 |
| FCA11943 | FR AM Panel Air | 5 | 20.07 |
| FCA11945 | FR AM Panel Air | 677 | 1,708.39 |
| FCA11946 | FR AM Panel Air | 223 | 812.89 |
| FCA11946-AZ | FR AM Panel Air | 3 | 10.94 |
| FCA11948 | FR AM Panel Air | 270 | 753.87 |
| FCA11948-AZ | FR AM Panel Air | 3 | 8.38 |
| FCA11949 | FR AM Panel Air | 1,469 | 3,226.99 |
| FCA11950 | FR AM Round Air | 868 | 5,296.56 |
| FCA11952 | FR AM Panel Air | 2,919 | 5,165.44 |
| FCA11958-01 | FR AM Panel Air | 6 | 15.10 |
| FCA11958-AZ | FR AM Panel Air | 2 | 5.03 |
| FCA11959 | FR AM Panel Air | 1,004 | 2,695.58 |
| FCA11960 | FR AM Panel Air | 6 | 21.29 |
| FCA11960-01 | FR AM Panel Air | 20 | 51.89 |
| FCA12050-M2 | FR AM Panel Air | 11 | 28.86 |
| FCA12051-03 | FR AM Panel Air | 90 | 186.41 |
| FCA12052-AZ | FR AM Panel Air | 2 | 4.64 |
| FCA12052-M2 | FR AM Panel Air | 1,194 | 2,768.60 |
| FCA12055 | FR AM Panel Air | 921 | 3,709.17 |
| FCA12057 | FR AM Panel Air | 51 | 146.27 |
| FCA12057-AZ | FR AM Panel Air | 26 | 74.57 |
| FCA12061 | FR AM Panel Air | 70 | 225.95 |
| FCA12061-AZ | FR AM Panel Air | 8 | 25.82 |
| FCA12062 | FR AM Round Air | 37 | 97.34 |
| FCA12065 | FR AM Panel Air | 48 | 201.05 |
| FCA12066-AZ | FR AM Panel Air | 2 | 4.23 |
| FCA12066-M2 | FR AM Panel Air | 877 | 1,853.64 |
| FCA12073 | FR AM Panel Air | 1,097 | 1,852.18 |
| FCA12075 | FR AM Panel Air | 70 | 126.38 |
| FCA12085 | FR AM Panel Air | 186 | 374.54 |
| FCA12086 | FR AM Panel Air | 930 | 1,721.42 |
| FCA12088 | FR AM Panel Air | 428 | 966.32 |
| FCA12088-AZ | FR AM Panel Air | 2 | 4.52 |
| FCA12089 | FR AM Panel Air | 50 | 114.96 |
| FCA12104 | FR AM Panel Air | 546 | 1,032.83 |
| FCA12112 | FR AM Panel Air | 62 | 264.06 |

FBG_CH1_00090622

| | | | |
|---|---|---|---|
| FCA12166 | FR AM Panel Air | 65 | 211.07 |
| FCA12180-M3 | FR AM Panel Air | 6,068 | 10,989.47 |
| FCA12182 | FR AM Round Air | 93 | 970.40 |
| FCA12182-AZ | FR AM Round Air | 11 | 114.78 |
| FCA12183 | FR AM Round Air | 6 | 60.41 |
| FCA12183-01 | FR AM Round Air | 473 | 4,185.17 |
| FCA122 | FR AM H Duty Air | 5 | 41.32 |
| FCA12258 | FR AM Panel Air | 339 | 1,344.98 |
| FCA12260 | FR AM Panel Air | 1,473 | 3,164.11 |
| FCA12260-AZ | FR AM Panel Air | 36 | 77.33 |
| FCA12290 | FR AM Panel Air | 50 | 131.54 |
| FCA12314 | FR AM Panel Air | 33 | 66.45 |
| FCA12315 | FR AM Panel Air | 19 | 33.03 |
| FCA12369 | FR AM Panel Air | 2,158 | 5,267.27 |
| FCA12376 | FR AM Panel Air | 233 | 848.31 |
| FCA12377 | FR AM Panel Air | 236 | 505.09 |
| FCA12404 | FR AM Panel Air | 9 | 34.19 |
| FCA12413 | FR AM Panel Air | 9 | 25.26 |
| FCA124A | FR AM H Duty Air | 9 | 70.53 |
| FCA12520 | FR AM Panel Air | 684 | 1,300.29 |
| FCA12609 | FR AM Panel Air | 1,772 | 4,649.51 |
| FCA12612 | FR AM Panel Air | 298 | 600.07 |
| FCA12636 | FR AM Panel Air | 1,163 | 4,045.10 |
| FCA12638 | FR AM Panel Air | 298 | 709.18 |
| FCA127-01 | FR AM Round Air | 200 | 1,100.69 |
| FCA133-02 | FR AM Round Air | 51 | 78.66 |
| FCA136-03 | FR AM Round Air | 135 | 766.11 |
| FCA140 | FR AM H Duty Air | 25 | 135.93 |
| FCA146-02 | FR AM Round Air | 191 | 387.45 |
| FCA148-02 | FR AM Round Air | 98 | 124.20 |
| FCA15 | FR AM H Duty Air | 9 | 66.23 |
| FCA1503 | FR AM H Duty Air | 17 | 378.69 |
| FCA1505 | FR AM H Duty Air | 9 | 191.90 |
| FCA151 | FR AM Round Air | 8 | 28.82 |
| FCA151-01 | FR AM Round Air | 42 | 79.24 |
| FCA1519 | FR AM H Duty Air | 8 | 171.39 |
| FCA1531SY | FR AM H Duty Air | 3 | 19.47 |
| FCA1532SY | FR AM H Duty Air | 22 | 266.80 |
| FCA1533SY | FR AM H Duty Air | 12 | 91.28 |
| FCA1537 | FR AM H Duty Air | 3 | 67.76 |
| FCA1543-M2 | FR AM H Duty Air | 23 | 202.98 |
| FCA1543SY | FR AM H Duty Air | 9 | 44.26 |
| FCA1544SY | FR AM H Duty Air | 62 | 284.01 |
| FCA1546 | FR AM H Duty Air | 19 | 323.24 |
| FCA1548 | FR AM H Duty Air | 11 | 136.02 |
| FCA1548-M2 | FR AM H Duty Air | 8 | 100.94 |
| FCA1548SY | FR AM H Duty Air | 5 | 125.39 |
| FCA154-AZ | FR AM Round Air | 11 | 29.12 |
| FCA1550 | FR AM H Duty Air | 14 | 295.40 |
| FCA1551 | FR AM H Duty Air | 11 | 217.57 |
| FCA1553SY | FR AM H Duty Air | 14 | 121.34 |
| FCA1562 | FR AM H Duty Air | 70 | 1,729.50 |
| FCA1565 | FR AM H Duty Air | 12 | 139.42 |
| FCA1569 | FR AM H Duty Air | 9 | 228.56 |
| FCA157 | FR AM H Duty Air | 33 | 257.02 |
| FCA1574 | FR AM H Duty Air | 536 | 3,474.93 |
| FCA1575 | FR AM H Duty Air | 2 | 29.27 |
| FCA1575SY | FR AM H Duty Air | 9 | 147.23 |
| FCA1580ASY | FR AM H Duty Air | 9 | 110.09 |
| FCA1580-M2 | FR AM H Duty Air | 16 | 168.96 |
| FCA1581-M2 | FR AM H Duty Air | 42 | 662.53 |
| FCA1588 | FR AM H Duty Air | 29 | 365.16 |
| FCA1588SY | FR AM H Duty Air | 9 | 68.29 |
| FCA1591 | FR AM H Duty Air | 14 | 329.13 |
| FCA1592 | FR AM H Duty Air | 5 | 104.58 |
| FCA1596ASY | FR AM H Duty Air | 313 | 1,077.97 |
| FCA1596ASY-M2 | FR AM H Duty Air | 126 | 433.94 |
| FCA1596-M2 | FR AM H Duty Air | 181 | 1,636.24 |
| FCA1599 | FR AM H Duty Air | 2 | 27.52 |
| FCA1599ASY | FR AM H Duty Air | 5 | 56.91 |
| FCA1599-M2 | FR AM H Duty Air | 23 | 322.91 |
| FCA160-03 | FR AM Round Air | 3,354 | 4,301.99 |
| FCA161-M2 | FR AM Round Air | 465 | 970.94 |
| FCA169-01 | FR AM Round Air | 17 | 42.53 |
| FCA170PL-M2 | FR AM H Duty Air | 25 | 47.42 |
| FCA176-01 | FR AM Round Air | 11 | 48.39 |
| FCA176-02 | FR AM Round Air | 53 | 112.65 |

FBG_CH1_00090623

| | | | |
|---|---|---|---|
| FCA184-03 | FR AM Round Air | 135 | 157.08 |
| FCA187-M2 | FR AM Round Air | 47 | 70.92 |
| FCA189-02 | FR AM Round Air | 186 | 181.29 |
| FCA189-M2 | FR AM Round Air | 1,269 | 1,236.83 |
| FCA190 | FR AM H Duty Air | 74 | 130.87 |
| FCA192-03 | FR AM Round Air | 214 | 286.59 |
| FCA198 | FR AM H Duty Air | 19 | 61.32 |
| FCA214 | FR AM H Duty Air | 14 | 122.96 |
| FCA216 | FR AM H Duty Air | 20 | 289.33 |
| FCA218 | FR AM H Duty Air | 8 | 89.72 |
| FCA219 | FR AM H Duty Air | 12 | 168.40 |
| FCA223 | FR AM H Duty Air | 9 | 137.08 |
| FCA224 | FR AM H Duty Air | 33 | 408.04 |
| FCA224SY | FR AM H Duty Air | 14 | 291.61 |
| FCA225 | FR AM H Duty Air | 9 | 109.75 |
| FCA226-M2 | FR AM H Duty Air | 23 | 272.57 |
| FCA226SY-01 | FR AM H Duty Air | 16 | 256.71 |
| FCA228 | FR AM H Duty Air | 12 | 122.51 |
| FCA229 | FR AM H Duty Air | 9 | 80.28 |
| FCA230 | FR AM H Duty Air | 50 | 732.83 |
| FCA232 | FR AM H Duty Air | 6 | 73.65 |
| FCA236 | FR AM H Duty Air | 9 | 176.37 |
| FCA237 | FR AM H Duty Air | 79 | 1,296.78 |
| FCA239 | FR AM H Duty Air | 2 | 45.62 |
| FCA2512 | FR AM H Duty Air | 3 | 82.47 |
| FCA2512SY | FR AM H Duty Air | 3 | 59.46 |
| FCA2519 | FR AM H Duty Air | 8 | 206.55 |
| FCA2520 | FR AM H Duty Air | 14 | 199.65 |
| FCA2522 | FR AM H Duty Air | 57 | 953.07 |
| FCA2522SY | FR AM H Duty Air | 20 | 257.16 |
| FCA2523SY | FR AM H Duty Air | 16 | 82.50 |
| FCA2535 | FR AM H Duty Air | 12 | 165.48 |
| FCA2539 | FR AM H Duty Air | 6 | 124.16 |
| FCA253-M2 | FR AM H Duty Air | 203 | 974.59 |
| FCA253SY | FR AM H Duty Air | 29 | 214.66 |
| FCA2541 | FR AM H Duty Air | 2 | 46.52 |
| FCA2541SY | FR AM H Duty Air | 16 | 183.82 |
| FCA2542 | FR AM H Duty Air | 17 | 233.33 |
| FCA2548 | FR AM H Duty Air | 22 | 291.35 |
| FCA2548SY | FR AM H Duty Air | 33 | 250.39 |
| FCA2550 | FR AM H Duty Air | 17 | 350.86 |
| FCA2555SY | FR AM H Duty Air | 22 | 520.03 |
| FCA2557SY | FR AM H Duty Air | 140 | 1,761.38 |
| FCA2565 | FR AM H Duty Air | 26 | 364.84 |
| FCA2565SY | FR AM H Duty Air | 9 | 49.73 |
| FCA2580 | FR AM H Duty Air | 8 | 111.53 |
| FCA2587 | FR AM H Duty Air | 79 | 254.51 |
| FCA2588 | FR AM H Duty Air | 34 | 703.55 |
| FCA258SY | FR AM H Duty Air | 20 | 164.49 |
| FCA2590 | FR AM H Duty Air | 3 | 36.98 |
| FCA2590SY | FR AM H Duty Air | 26 | 606.32 |
| FCA2592 | FR AM H Duty Air | 19 | 235.44 |
| FCA2595 | FR AM H Duty Air | 3 | 78.16 |
| FCA2595SY | FR AM H Duty Air | 17 | 275.83 |
| FCA2598 | FR AM H Duty Air | 31 | 304.05 |
| FCA260 | FR AM H Duty Air | 6 | 177.32 |
| FCA2662-M2 | FR AM Round Air | 14 | 15.21 |
| FCA268 | FR AM H Duty Air | 16 | 325.84 |
| FCA269 | FR AM H Duty Air | 20 | 241.80 |
| FCA270 | FR AM H Duty Air | 11 | 166.90 |
| FCA2709A-01 | FR AM Round Air | 51 | 225.96 |
| FCA2719B-03 | FR AM Round Air | 60 | 105.68 |
| FCA272 | FR AM H Duty Air | 12 | 199.80 |
| FCA2740-03 | FR AM Round Air | 126 | 358.84 |
| FCA279 | FR AM H Duty Air | 39 | 586.90 |
| FCA2800-M2 | FR AM H Duty Air | 47 | 624.79 |
| FCA283 | FR AM H Duty Air | 53 | 1,155.69 |
| FCA283C | FR AM H Duty Air | 1,000 | 10,532.11 |
| FCA288-01 | FR AM H Duty Air | 67 | 2,213.39 |
| FCA29 | FR AM H Duty Air | 14 | 112.83 |
| FCA303 | FR AM Round Air | 5 | 6.64 |
| FCA303-02 | FR AM Round Air | 9 | 16.49 |
| FCA305-02 | FR AM Round Air | 158 | 264.61 |
| FCA307 | FR AM H Duty Air | 11 | 230.84 |
| FCA308 | FR AM H Duty Air | 17 | 437.80 |
| FCA310 | FR AM H Duty Air | 17 | 521.56 |
| FCA311 | FR AM H Duty Air | 11 | 556.07 |

FBG_CH1_00090624

| | | | |
|---|---|---:|---:|
| FCA312 | FR AM H Duty Air | 6 | 317.82 |
| FCA313 | FR AM H Duty Air | 39 | 2,739.74 |
| FCA314 | FR AM H Duty Air | 17 | 1,590.69 |
| FCA3159-01 | FR AM Round Air | 9 | 39.80 |
| FCA317 | FR AM H Duty Air | 3 | 29.43 |
| FCA320 | FR AM H Duty Air | 6 | 150.91 |
| FCA3203-M2 | FR AM H Duty Air | 135 | 466.20 |
| FCA323 | FR AM H Duty Air | 2 | 52.80 |
| FCA3245 | FR AM Round Air | 158 | 296.41 |
| FCA324A-04 | FR AM Round Air | 112 | 218.51 |
| FCA325-AZ | FR AM Round Air | 2 | 8.87 |
| FCA326-03 | FR AM Panel Air | 1,744 | 2,780.08 |
| FCA327-03 | FR AM Round Air | 19 | 38.77 |
| FCA3273 | FR AM H Duty Air | 180 | 2,993.95 |
| FCA3273SY | FR AM H Duty Air | 29 | 302.50 |
| FCA3280A | FR AM H Duty Air | 2 | 16.84 |
| FCA3281 | FR AM H Duty Air | 3 | 35.77 |
| FCA3290A | FR AM Round Air | 206 | 5,523.41 |
| FCA3291SY | FR AM H Duty Air | 228 | 2,331.76 |
| FCA3300-02 | FR AM Round Air | 330 | 522.80 |
| FCA3324 | FR AM H Duty Air | 9 | 101.93 |
| FCA3325 | FR AM H Duty Air | 19 | 363.44 |
| FCA3371-01 | FR AM Round Air | 47 | 149.72 |
| FCA3371-AZ | FR AM Round Air | 5 | 18.16 |
| FCA3373-02 | FR AM Panel Air | 2,437 | 2,672.58 |
| FCA3399-02 | FR AM Panel Air | 93 | 147.61 |
| FCA340A-02 | FR AM Round Air | 9 | 19.13 |
| FCA342-01 | FR AM Round Air | 8 | 39.12 |
| FCA3424-01 | FR AM Round Air | 3 | 9.31 |
| FCA3425-02 | FR AM Round Air | 88 | 170.80 |
| FCA342-AZ | FR AM Round Air | 16 | 34.53 |
| FCA3441M-M2 | FR AM Round Air | 953 | 682.21 |
| FCA346 | FR AM H Duty Air | 28 | 214.28 |
| FCA347 | FR AM Round Air | 84 | 129.11 |
| FCA347-01 | FR AM Round Air | 5 | 21.03 |
| FCA3490-01 | FR AM Round Air | 14 | 36.78 |
| FCA3492-03 | FR AM Round Air | 93 | 202.74 |
| FCA3497-02 | FR AM Round Air | 42 | 85.62 |
| FCA3501-02 | FR AM Round Air | 79 | 356.72 |
| FCA351-03 | FR AM Round Air | 279 | 424.43 |
| FCA3517A | FR AM H Duty Air | 14 | 212.04 |
| FCA3517-M2 | FR AM H Duty Air | 12 | 174.04 |
| FCA3518 | FR AM H Duty Air | 26 | 441.37 |
| FCA352-03 | FR AM Round Air | 195 | 327.73 |
| FCA3523-01 | FR AM Round Air | 60 | 217.70 |
| FCA3523-02 | FR AM Round Air | 39 | 108.95 |
| FCA3536-01 | FR AM Round Air | 14 | 46.39 |
| FCA3537 | FR AM Round Air | 70 | 117.96 |
| FCA353-M2 | FR AM Round Air | 2,669 | 2,645.99 |
| FCA3544-02 | FR AM Panel Air | 186 | 649.19 |
| FCA3544-AZ | FR AM Panel Air | 2 | 7.97 |
| FCA3549-03 | FR AM Round Air | 153 | 264.37 |
| FCA3552-AZ | FR AM Round Air | 3 | 9.80 |
| FCA3559-02 | FR AM Panel Air | 451 | 412.94 |
| FCA3565 | FR AM Round Air | 70 | 217.21 |
| FCA3565-AZ | FR AM Round Air | 2 | 6.21 |
| FCA3566-01 | FR AM Round Air | 70 | 360.26 |
| FCA3588-03 | FR AM Round Air | 2,409 | 3,114.78 |
| FCA3597 | FR AM Round Air | 37 | 81.15 |
| FCA3602 | FR AM Round Air | 9 | 23.64 |
| FCA3602-01 | FR AM Round Air | 33 | 107.71 |
| FCA3603-M2 | FR AM H Duty Air | 112 | 1,143.19 |
| FCA362 | FR AM H Duty Air | 3 | 43.09 |
| FCA3622 | FR AM Round Air | 5 | 5.33 |
| FCA3622-02 | FR AM Round Air | 29 | 159.46 |
| FCA3647-M2 | FR AM Round Air | 439 | 536.51 |
| FCA3648-01 | FR AM Round Air | 23 | 79.79 |
| FCA3649 | FR AM Round Air | 9 | 15.18 |
| FCA3649-01 | FR AM Round Air | 9 | 24.06 |
| FCA3660-03 | FR AM Panel Air | 4,971 | 6,349.12 |
| FCA3681-03 | FR AM Round Air | 157 | 354.47 |
| FCA3686-M2 | FR AM H Duty Air | 181 | 785.97 |
| FCA3688-02 | FR AM Round Air | 23 | 59.87 |
| FCA371 | FR AM H Duty Air | 8 | 88.28 |
| FCA3717-02 | FR AM Panel Air | 586 | 601.42 |
| FCA372-02 | FR AM H Duty Air | 51 | 139.71 |
| FCA3725-01 | FR AM Round Air | 51 | 291.37 |

FBG_CH1_00090625

| | | | |
|---|---|---|---|
| FCA376-01 | FR AM Round Air | 47 | 295.40 |
| FCA3770 | FR AM H Duty Air | 16 | 917.60 |
| FCA3782SY | FR AM H Duty Air | 20 | 215.20 |
| FCA3785-01 | FR AM Round Air | 3 | 16.96 |
| FCA3814-03 | FR AM Round Air | 140 | 293.22 |
| FCA3818 | FR AM H Duty Air | 12 | 334.95 |
| FCA381-M2 | FR AM Round Air | 372 | 448.77 |
| FCA3824 | FR AM H Duty Air | 14 | 349.95 |
| FCA3864-M2 | FR AM H Duty Air | 20 | 320.73 |
| FCA3873-02 | FR AM Panel Air | 57 | 319.76 |
| FCA3901 | FR AM Panel Air | 2 | 2.49 |
| FCA3901-03 | FR AM Panel Air | 3,486 | 5,857.11 |
| FCA3902-03 | FR AM Round Air | 93 | 138.05 |
| FCA3903-02 | FR AM Panel Air | 84 | 95.34 |
| FCA3913 | FR AM H Duty Air | 5 | 84.21 |
| FCA3915-02 | FR AM Panel Air | 9 | 10.02 |
| FCA3916-03 | FR AM Panel Air | 19 | 18.46 |
| FCA3916-M3 | FR AM Panel Air | 6,910 | 6,714.45 |
| FCA3924-M2 | FR AM Round Air | 363 | 460.06 |
| FCA3930-AZ | FR AM Round Air | 3 | 17.29 |
| FCA3989 | FR AM H Duty Air | 8 | 93.70 |
| FCA3990-M2 | FR AM H Duty Air | 54 | 749.97 |
| FCA3997 | FR AM Panel Air | 5 | 10.43 |
| FCA3997-02 | FR AM Panel Air | 395 | 931.11 |
| FCA3998-03 | FR AM Round Air | 36 | 139.65 |
| FCA4202SY | FR AM H Duty Air | 14 | 73.97 |
| FCA4223 | FR AM H Duty Air | 9 | 224.85 |
| FCA4235 | FR AM Round Air | 144 | 1,007.65 |
| FCA4282 | FR AM Round Air | 5 | 10.07 |
| FCA4303-M2 | FR AM Panel Air | 191 | 277.88 |
| FCA4304 | FR AM H Duty Air | 33 | 281.20 |
| FCA4309-M2 | FR AM Panel Air | 7,789 | 11,335.61 |
| FCA4311 | FR AM Round Air | 9 | 47.47 |
| FCA4318 | FR AM Round Air | 9 | 32.07 |
| FCA4325-02 | FR AM Round Air | 79 | 207.83 |
| FCA4327 | FR AM H Duty Air | 12 | 203.30 |
| FCA4335 | FR AM Round Air | 28 | 216.01 |
| FCA4365-02 | FR AM Panel Air | 37 | 56.23 |
| FCA4381-01 | FR AM Panel Air | 14 | 28.02 |
| FCA4540 | FR AM Panel Air | 48 | 179.95 |
| FCA4540-01 | FR AM Panel Air | 36 | 202.19 |
| FCA4540-AZ | FR AM Panel Air | 2 | 7.50 |
| FCA4568-01 | FR AM Panel Air | 65 | 274.94 |
| FCA4568-02 | FR AM Panel Air | 51 | 74.69 |
| FCA4576-02 | FR AM Panel Air | 288 | 393.21 |
| FCA4778 | FR AM Panel Air | 5 | 14.18 |
| FCA4778-03 | FR AM Panel Air | 130 | 246.68 |
| FCA4828-02 | FR AM Round Air | 60 | 135.34 |
| FCA4830-02 | FR AM Panel Air | 60 | 116.31 |
| FCA4831-01 | FR AM Round Air | 82 | 372.09 |
| FCA4924 | FR AM Panel Air | 47 | 2.31 |
| FCA4938-01 | FR AM Round Air | 51 | 206.74 |
| FCA4939-03 | FR AM Round Air | 60 | 105.06 |
| FCA4940-02 | FR AM Round Air | 14 | 24.40 |
| FCA4958-01 | FR AM Round Air | 9 | 26.77 |
| FCA4958-02 | FR AM Round Air | 9 | 28.07 |
| FCA4964-01 | FR AM Round Air | 51 | 193.38 |
| FCA502 | FR AM H Duty Air | 33 | 114.17 |
| FCA5021 | FR AM H Duty Air | 16 | 232.63 |
| FCA5021SY | FR AM H Duty Air | 11 | 115.53 |
| FCA502SY | FR AM H Duty Air | 36 | 739.60 |
| FCA5030 | FR AM H Duty Air | 6 | 103.31 |
| FCA5034 | FR AM H Duty Air | 26 | 80.28 |
| FCA5036 | FR AM H Duty Air | 9 | 214.79 |
| FCA5042 | FR AM H Duty Air | 48 | 1,071.74 |
| FCA5056-03 | FR AM Panel Air | 880 | 1,471.63 |
| FCA5057-02 | FR AM Panel Air | 65 | 90.63 |
| FCA5058-03 | FR AM Panel Air | 4,218 | 5,227.57 |
| FCA5067 | FR AM H Duty Air | 9 | 114.78 |
| FCA5070 | FR AM H Duty Air | 9 | 103.55 |
| FCA507-M2 | FR AM H Duty Air | 19 | 253.34 |
| FCA507SY-M2 | FR AM H Duty Air | 19 | 140.08 |
| FCA508SY | FR AM H Duty Air | 19 | 163.99 |
| FCA5125-01 | FR AM Panel Air | 93 | 234.08 |
| FCA5189 | FR AM H Duty Air | 6 | 92.00 |
| FCA5189SY | FR AM H Duty Air | 2 | 14.46 |
| FCA5229 | FR AM Round Air | 118 | 331.22 |

FBG_CH1_00090626

| | | | |
|---|---|---|---|
| FCA523 | FR AM H Duty Air | 39 | 275.71 |
| FCA523SY | FR AM H Duty Air | 78 | 413.99 |
| FCA534A | FR AM H Duty Air | 6 | 90.60 |
| FCA535 | FR AM H Duty Air | 5 | 74.97 |
| FCA5350-02 | FR AM Panel Air | 209 | 248.02 |
| FCA536 | FR AM H Duty Air | 12 | 202.93 |
| FCA536SY | FR AM H Duty Air | 11 | 183.93 |
| FCA5377-M2 | FR AM Round Air | 454 | 745.38 |
| FCA542 | FR AM H Duty Air | 2 | 28.67 |
| FCA546 | FR AM H Duty Air | 5 | 85.05 |
| FCA5466-03 | FR AM Panel Air | 1,775 | 3,107.90 |
| FCA546SY | FR AM H Duty Air | 175 | 1,124.58 |
| FCA549 | FR AM H Duty Air | 6 | 74.18 |
| FCA5496 | FR AM Panel Air | 9 | 7.51 |
| FCA5496-M2 | FR AM Panel Air | 8,361 | 8,453.47 |
| FCA550 | FR AM H Duty Air | 5 | 85.26 |
| FCA5513-M2 | FR AM Round Air | 2,939 | 4,294.59 |
| FCA552 | FR AM H Duty Air | 3 | 66.57 |
| FCA5522-01 | FR AM Panel Air | 65 | 185.03 |
| FCA5595-03 | FR AM Panel Air | 1,065 | 1,864.74 |
| FCA562 | FR AM H Duty Air | 9 | 164.57 |
| FCA5626PU | FR AM H Duty Air | 3 | 36.98 |
| FCA5626SYPU | FR AM Round Air | 1,167 | 7,875.90 |
| FCA5627 | FR AM Round Air | 157 | 321.89 |
| FCA562ASY | FR AM H Duty Air | 6 | 77.16 |
| FCA563 | FR AM H Duty Air | 2 | 28.11 |
| FCA563SY | FR AM H Duty Air | 22 | 289.14 |
| FCA568 | FR AM Round Air | 3 | 4.74 |
| FCA568-02 | FR AM Round Air | 47 | 121.10 |
| FCA573SY | FR AM H Duty Air | 17 | 327.20 |
| FCA5777-AZ | FR AM H Duty Air | 3 | 20.59 |
| FCA5777-M2 | FR AM H Duty Air | 188 | 860.39 |
| FCA5837 | FR AM Round Air | 16 | 61.12 |
| FCA5876-M2 | FR AM Panel Air | 126 | 638.15 |
| FCA5898 | FR AM Panel Air | 491 | 2,058.85 |
| FCA5898-AZ | FR AM Panel Air | 8 | 41.96 |
| FCA592 | FR AM H Duty Air | 3 | 51.27 |
| FCA592-M2 | FR AM H Duty Air | 48 | 837.06 |
| FCA595-M2 | FR AM H Duty Air | 28 | 561.71 |
| FCA596-01 | FR AM H Duty Air | 19 | 697.50 |
| FCA5970 | FR AM Round Air | 5 | 7.92 |
| FCA5970-M2 | FR AM Round Air | 42 | 66.54 |
| FCA598-M2 | FR AM H Duty Air | 28 | 351.03 |
| FCA598SY | FR AM H Duty Air | 3 | 68.76 |
| FCA6304-02 | FR AM Panel Air | 70 | 143.82 |
| FCA6305-02 | FR AM Round Air | 51 | 236.59 |
| FCA6306-01 | FR AM Round Air | 51 | 237.73 |
| FCA6308-01 | FR AM Round Air | 19 | 112.58 |
| FCA6319 | FR AM H Duty Air | 9 | 170.77 |
| FCA6325 | FR AM H Duty Air | 11 | 190.08 |
| FCA6326-M2 | FR AM H Duty Air | 47 | 648.89 |
| FCA6328 | FR AM H Duty Air | 16 | 372.24 |
| FCA6333-03 | FR AM Panel Air | 45 | 88.81 |
| FCA6362-02 | FR AM Round Air | 73 | 352.52 |
| FCA6366-03 | FR AM Panel Air | 1,311 | 1,907.95 |
| FCA6367-01 | FR AM Round Air | 823 | 2,653.45 |
| FCA6369-02 | FR AM Round Air | 37 | 87.30 |
| FCA6370-01 | FR AM Round Air | 19 | 100.91 |
| FCA6376-03 | FR AM Round Air | 284 | 515.02 |
| FCA6377-M2 | FR AM Round Air | 507 | 1,082.80 |
| FCA6381 | FR AM Panel Air | 5 | 13.77 |
| FCA6381-01 | FR AM Panel Air | 23 | 113.50 |
| FCA6389 | FR AM Round Air | 62 | 290.98 |
| FCA6395-03 | FR AM Panel Air | 1,130 | 2,303.60 |
| FCA6478 | FR AM Round Air | 8 | 13.31 |
| FCA6479-03 | FR AM Panel Air | 628 | 1,037.85 |
| FCA6481 | FR AM H Duty Air | 19 | 390.50 |
| FCA6491-01 | FR AM Round Air | 20 | 153.24 |
| FCA6511 | FR AM H Duty Air | 12 | 246.66 |
| FCA6512-01 | FR AM H Duty Air | 74 | 2,566.11 |
| FCA6525 | FR AM H Duty Air | 19 | 70.75 |
| FCA6541-02 | FR AM Panel Air | 74 | 98.99 |
| FCA6543 | FR AM Round Air | 5 | 20.07 |
| FCA6545-02 | FR AM Panel Air | 149 | 233.41 |
| FCA6555-02 | FR AM Panel Air | 288 | 349.71 |
| FCA6558 | FR AM Panel Air | 9 | 22.96 |
| FCA6558-02 | FR AM Panel Air | 163 | 269.54 |

FBG_CH1_00090627

| | | | |
|---|---|---|---|
| FCA6576-02 | FR AM Panel Air | 693 | 760.33 |
| FCA6584 | FR AM Panel Air | 23 | 63.33 |
| FCA6604SY | FR AM H Duty Air | 20 | 134.17 |
| FCA6605 | FR AM H Duty Air | 102 | 302.54 |
| FCA6619-02 | FR AM Round Air | 98 | 243.89 |
| FCA6619IM-M2 | FR AM Round Air | 432 | 1,080.57 |
| FCA6622 | FR AM H Duty Air | 5 | 222.15 |
| FCA6623 | FR AM H Duty Air | 19 | 1,127.41 |
| FCA6625-02 | FR AM Panel Air | 172 | 162.99 |
| FCA6626-03 | FR AM Panel Air | 74 | 85.05 |
| FCA6629-01 | FR AM H Duty Air | 34 | 596.43 |
| FCA6631 | FR AM H Duty Air | 11 | 156.18 |
| FCA6633 | FR AM H Duty Air | 19 | 185.52 |
| FCA6645 | FR AM H Duty Air | 2 | 24.77 |
| FCA6645-M2 | FR AM H Duty Air | 9 | 118.64 |
| FCA6671 | FR AM H Duty Air | 5 | 87.49 |
| FCA6684 | FR AM H Duty Air | 71 | 1,338.49 |
| FCA6690-03 | FR AM Panel Air | 5,100 | 9,248.66 |
| FCA6690-04 | FR AM Panel Air | 87 | 185.61 |
| FCA6696-01 | FR AM H Duty Air | 43 | 1,044.84 |
| FCA6807-03 | FR AM Panel Air | 628 | 1,178.13 |
| FCA6815 | FR AM H Duty Air | 8 | 109.72 |
| FCA6817 | FR AM H Duty Air | 9 | 138.11 |
| FCA6818 | FR AM H Duty Air | 37 | 683.37 |
| FCA6821-01 | FR AM Round Air | 2 | 7.06 |
| FCA6821-02 | FR AM Round Air | 28 | 61.94 |
| FCA6828-03 | FR AM Panel Air | 153 | 296.96 |
| FCA6849-01 | FR AM Panel Air | 23 | 84.35 |
| FCA6850-02 | FR AM Round Air | 2,339 | 6,622.79 |
| FCA6853 | FR AM H Duty Air | 17 | 392.12 |
| FCA6855 | FR AM H Duty Air | 22 | 744.79 |
| FCA6856 | FR AM H Duty Air | 53 | 649.64 |
| FCA6858 | FR AM H Duty Air | 78 | 1,294.82 |
| FCA6867-02 | FR AM Panel Air | 479 | 766.06 |
| FCA6900-M2 | FR AM Panel Air | 11,878 | 17,561.15 |
| FCA6918 | FR AM H Duty Air | 3 | 64.99 |
| FCA6926 | FR AM H Duty Air | 20 | 418.83 |
| FCA6929SY | FR AM H Duty Air | 19 | 374.72 |
| FCA6937 | FR AM Panel Air | 3 | 11.87 |
| FCA6937-01 | FR AM Panel Air | 51 | 103.80 |
| FCA6938 | FR AM Round Air | 14 | 99.72 |
| FCA70 | FR AM H Duty Air | 428 | 1,185.99 |
| FCA7007-02 | FR AM Panel Air | 112 | 356.58 |
| FCA7017-02 | FR AM Panel Air | 609 | 697.83 |
| FCA7088 | FR AM H Duty Air | 6 | 69.77 |
| FCA7094-03 | FR AM Panel Air | 567 | 1,028.23 |
| FCA7096-02 | FR AM Round Air | 37 | 124.03 |
| FCA7111 | FR AM H Duty Air | 2 | 27.32 |
| FCA7111SY | FR AM H Duty Air | 19 | 187.65 |
| FCA7113 | FR AM H Duty Air | 5 | 166.07 |
| FCA7139-M2 | FR AM H Duty Air | 6 | 54.68 |
| FCA7139SY | FR AM H Duty Air | 153 | 826.15 |
| FCA7140 | FR AM H Duty Air | 5 | 64.89 |
| FCA7140-01 | FR AM H Duty Air | 67 | 1,506.98 |
| FCA7140SY-M2 | FR AM H Duty Air | 141 | 843.49 |
| FCA7142-02 | FR AM Panel Air | 693 | 1,126.72 |
| FCA7167-03 | FR AM Panel Air | 577 | 981.42 |
| FCA7174-03 | FR AM Panel Air | 857 | 1,446.96 |
| FCA7178 | FR AM H Duty Air | 47 | 640.88 |
| FCA7199 | FR AM H Duty Air | 22 | 369.99 |
| FCA7203 | FR AM H Duty Air | 11 | 190.14 |
| FCA7203SY | FR AM H Duty Air | 3 | 46.26 |
| FCA7218 | FR AM H Duty Air | 6 | 96.21 |
| FCA7224-02 | FR AM Panel Air | 47 | 103.98 |
| FCA7229 | FR AM H Duty Air | 45 | 2,276.79 |
| FCA7240 | FR AM H Duty Air | 17 | 365.43 |
| FCA7284 | FR AM Panel Air | 23 | 86.96 |
| FCA7284-01 | FR AM Panel Air | 23 | 77.75 |
| FCA73 | FR AM H Duty Air | 56 | 275.43 |
| FCA7337 | FR AM Panel Air | 19 | 96.25 |
| FCA7344-03 | FR AM Panel Air | 1,699 | 3,399.80 |
| FCA7351-01 | FR AM Panel Air | 6 | 13.19 |
| FCA7351-03 | FR AM Panel Air | 2,062 | 3,997.25 |
| FCA7365-03 | FR AM Panel Air | 918 | 867.18 |
| FCA7368-02 | FR AM Panel Air | 23 | 60.51 |
| FCA7369-01 | FR AM Panel Air | 20 | 68.01 |
| FCA7403-02 | FR AM Panel Air | 23 | 37.26 |

FBG_CH1_00090628

| | | | |
|---|---|---|---|
| FCA7414-02 | FR AM Panel Air | 102 | 200.74 |
| FCA7417-03 | FR AM Panel Air | 777 | 1,700.59 |
| FCA7420-03 | FR AM Panel Air | 916 | 1,947.54 |
| FCA7421-01 | FR AM Panel Air | 11 | 14.23 |
| FCA7421-03 | FR AM Panel Air | 3,488 | 4,561.38 |
| FCA7421-M3 | FR AM Panel Air | 13,332 | 17,434.74 |
| FCA7422 | FR AM H Duty Air | 12 | 215.75 |
| FCA7426-M2 | FR AM Panel Air | 144 | 183.57 |
| FCA7430 | FR AM Round Air | 8 | 86.41 |
| FCA7431-01 | FR AM Panel Air | 2 | 7.31 |
| FCA7431-02 | FR AM Panel Air | 1,125 | 2,030.79 |
| FCA7432 | FR AM Panel Air | 5 | 6.53 |
| FCA7432-03 | FR AM Panel Air | 1,070 | 1,695.14 |
| FCA7438-02 | FR AM Round Air | 200 | 580.17 |
| FCA7440-02 | FR AM Panel Air | 2,697 | 4,384.16 |
| FCA7444 | FR AM H Duty Air | 39 | 596.07 |
| FCA7447 | FR AM H Duty Air | 36 | 747.79 |
| FCA7448 | FR AM H Duty Air | 6 | 121.05 |
| FCA7448SY | FR AM H Duty Air | 9 | 117.52 |
| FCA7458 | FR AM H Duty Air | 102 | 2,351.62 |
| FCA7458SY | FR AM H Duty Air | 6 | 171.88 |
| FCA7459 | FR AM H Duty Air | 19 | 295.07 |
| FCA7465 | FR AM H Duty Air | 5 | 95.94 |
| FCA7466-01 | FR AM H Duty Air | 48 | 1,321.74 |
| FCA7470SY | FR AM H Duty Air | 14 | 148.64 |
| FCA7476 | FR AM H Duty Air | 25 | 495.04 |
| FCA7476SY | FR AM H Duty Air | 48 | 428.11 |
| FCA7478 | FR AM H Duty Air | 6 | 94.50 |
| FCA7478SY | FR AM H Duty Air | 8 | 71.02 |
| FCA7480 | FR AM H Duty Air | 29 | 404.98 |
| FCA7480-01 | FR AM H Duty Air | 42 | 1,233.60 |
| FCA7480SY-01 | FR AM H Duty Air | 39 | 527.19 |
| FCA7482-01 | FR AM H Duty Air | 37 | 777.19 |
| FCA7482SY | FR AM H Duty Air | 9 | 127.24 |
| FCA7484-01 | FR AM H Duty Air | 40 | 882.56 |
| FCA7484SY | FR AM H Duty Air | 121 | 488.43 |
| FCA7486-01 | FR AM H Duty Air | 29 | 562.16 |
| FCA7486SY | FR AM H Duty Air | 53 | 208.63 |
| FCA7487 | FR AM H Duty Air | 36 | 391.70 |
| FCA7487SY | FR AM H Duty Air | 40 | 464.46 |
| FCA7490SY | FR AM H Duty Air | 3 | 157.33 |
| FCA7491 | FR AM H Duty Air | 5 | 56.71 |
| FCA7597-03 | FR AM Panel Air | 2,674 | 3,723.17 |
| FCA7597-M3 | FR AM Panel Air | 9,928 | 13,823.35 |
| FCA7598-03 | FR AM Panel Air | 84 | 144.32 |
| FCA7600-01 | FR AM Round Air | 60 | 304.79 |
| FCA7605-M2 | FR AM Panel Air | 161 | 293.98 |
| FCA7608-01 | FR AM Panel Air | 102 | 392.03 |
| FCA7614-02 | FR AM Panel Air | 544 | 751.29 |
| FCA7617-01 | FR AM Panel Air | 167 | 541.78 |
| FCA7620-02 | FR AM Panel Air | 107 | 150.77 |
| FCA7626-01 | FR AM Panel Air | 1,079 | 1,981.73 |
| FCA7628-02 | FR AM Panel Air | 474 | 638.29 |
| FCA7640-03 | FR AM Panel Air | 312 | 570.42 |
| FCA7648 | FR AM H Duty Air | 28 | 160.55 |
| FCA7651-02 | FR AM Panel Air | 200 | 273.26 |
| FCA7666 | FR AM Panel Air | 14 | 33.66 |
| FCA7666-01 | FR AM Panel Air | 51 | 123.10 |
| FCA7669 | FR AM Panel Air | 33 | 85.21 |
| FCA7670 | FR AM H Duty Air | 8 | 283.99 |
| FCA7670SY | FR AM H Duty Air | 5 | 67.83 |
| FCA7680 | FR AM H Duty Air | 36 | 569.75 |
| FCA7688 | FR AM H Duty Air | 115 | 1,210.30 |
| FCA7691 | FR AM H Duty Air | 2 | 27.08 |
| FCA7692 | FR AM H Duty Air | 8 | 103.16 |
| FCA76-M2 | FR AM H Duty Air | 307 | 249.98 |
| FCA7703 | FR AM H Duty Air | 5 | 51.41 |
| FCA7710 | FR AM H Duty Air | 26 | 295.31 |
| FCA7710SY | FR AM H Duty Air | 33 | 268.22 |
| FCA7726-01 | FR AM H Duty Air | 17 | 30.41 |
| FCA7730-01 | FR AM Round Air | 412 | 912.57 |
| FCA7737-02 | FR AM Panel Air | 163 | 242.59 |
| FCA7738-02 | FR AM Panel Air | 335 | 423.75 |
| FCA7755-01 | FR AM Panel Air | 74 | 215.17 |
| FCA7764-01 | FR AM Panel Air | 33 | 46.92 |
| FCA7764-03 | FR AM Panel Air | 112 | 193.14 |
| FCA7774-01 | FR AM Round Air | 195 | 369.94 |

FBG_CH1_00090629

| Part | Description | Qty | Value |
|---|---|---|---|
| FCA7775-01 | FR AM Panel Air | 56 | 117.90 |
| FCA77-M2 | FR AM H Duty Air | 112 | 111.09 |
| FCA8010-01 | FR AM Panel Air | 107 | 184.89 |
| FCA8013 | FR AM Panel Air | 14 | 44.92 |
| FCA8014-01 | FR AM Panel Air | 28 | 60.66 |
| FCA8029 | FR AM H Duty Air | 12 | 276.37 |
| FCA8029SY | FR AM H Duty Air | 12 | 160.06 |
| FCA8037-01 | FR AM Round Air | 507 | 2,084.85 |
| FCA8038-03 | FR AM Panel Air | 1,429 | 4,427.22 |
| FCA8039-03 | FR AM Round Air | 7,032 | 15,243.63 |
| FCA8040-03 | FR AM Panel Air | 414 | 418.58 |
| FCA8052-01 | FR AM Panel Air | 51 | 126.15 |
| FCA8060-M2 | FR AM Round Air | 107 | 324.87 |
| FCA8067-02 | FR AM Panel Air | 902 | 1,974.17 |
| FCA8068 | FR AM Round Air | 56 | 265.69 |
| FCA8069 | FR AM Panel Air | 65 | 205.13 |
| FCA8069-02 | FR AM Panel Air | 711 | 2,028.80 |
| FCA8071-01 | FR AM Panel Air | 74 | 247.68 |
| FCA8080-02 | FR AM Panel Air | 217 | 378.69 |
| FCA8093 | FR AM Panel Air | 12 | 42.06 |
| FCA8095-01 | FR AM Panel Air | 102 | 324.38 |
| FCA8099 | FR AM Panel Air | 84 | 269.54 |
| FCA8121-M2 | FR AM Panel Air | 823 | 1,657.17 |
| FCA8127-02 | FR AM Panel Air | 56 | 98.55 |
| FCA8129 | FR AM H Duty Air | 87 | 2,636.39 |
| FCA8130 | FR AM H Duty Air | 3 | 144.34 |
| FCA8131 | FR AM H Duty Air | 6 | 441.49 |
| FCA8133-M2 | FR AM Panel Air | 260 | 439.41 |
| FCA8141-01 | FR AM Round Air | 434 | 712.76 |
| FCA8142-01 | FR AM Round Air | 823 | 1,822.93 |
| FCA8162-M2 | FR AM Panel Air | 93 | 198.62 |
| FCA8169 | FR AM Round Air | 9 | 61.61 |
| FCA8177 | FR AM Panel Air | 14 | 86.44 |
| FCA8180-01 | FR AM H Duty Air | 14 | 420.54 |
| FCA8188-01 | FR AM Panel Air | 23 | 89.85 |
| FCA8193-01 | FR AM H Duty Air | 22 | 259.75 |
| FCA8193SY | FR AM H Duty Air | 34 | 153.40 |
| FCA8205-03 | FR AM Panel Air | 172 | 376.92 |
| FCA8208 | FR AM Panel Air | 3 | 6.15 |
| FCA8208-M2 | FR AM Panel Air | 1,338 | 2,292.54 |
| FCA8209-01 | FR AM Round Air | 37 | 134.49 |
| FCA8220-01 | FR AM Panel Air | 70 | 230.78 |
| FCA8221-03 | FR AM Panel Air | 1,566 | 3,158.94 |
| FCA8226 | FR AM H Duty Air | 9 | 101.84 |
| FCA8229 | FR AM H Duty Air | 96 | 498.21 |
| FCA8229-AZ | FR AM H Duty Air | 3 | 19.18 |
| FCA8231-01 | FR AM H Duty Air | 8 | 306.73 |
| FCA8243-03 | FR AM Panel Air | 4,759 | 7,066.43 |
| FCA8243-M3 | FR AM Panel Air | 16,517 | 24,525.37 |
| FCA8244 | FR AM H Duty Air | 6 | 62.10 |
| FCA8245 | FR AM H Duty Air | 54 | 422.62 |
| FCA8248 | FR AM H Duty Air | 16 | 292.02 |
| FCA8262 | FR AM H Duty Air | 2 | 33.46 |
| FCA8269-01 | FR AM Panel Air | 47 | 73.58 |
| FCA8295-02 | FR AM Panel Air | 90 | 266.08 |
| FCA8304 | FR AM H Duty Air | 22 | 262.34 |
| FCA8331 | FR AM Round Air | 1,026 | 12,831.72 |
| FCA8455SY | FR AM H Duty Air | 26 | 290.33 |
| FCA8466 | FR AM H Duty Air | 48 | 568.32 |
| FCA8466-01 | FR AM H Duty Air | 43 | 582.42 |
| FCA8475-03 | FR AM Panel Air | 716 | 1,567.08 |
| FCA8492 | FR AM H Duty Air | 5 | 92.44 |
| FCA8511SY | FR AM H Duty Air | 62 | 1,046.92 |
| FCA8547-03 | FR AM Panel Air | 219 | 453.59 |
| FCA8548-03 | FR AM Panel Air | 56 | 141.25 |
| FCA8575 | FR AM H Duty Air | 9 | 168.17 |
| FCA8594 | FR AM H Duty Air | 3 | 45.03 |
| FCA8596SY | FR AM H Duty Air | 54 | 198.33 |
| FCA8598 | FR AM H Duty Air | 8 | 128.00 |
| FCA8601-01 | FR AM Round Air | 42 | 128.36 |
| FCA8602-01 | FR AM Panel Air | 2 | 5.63 |
| FCA8602-03 | FR AM Panel Air | 5,803 | 11,197.61 |
| FCA8606-03 | FR AM Panel Air | 116 | 196.84 |
| FCA8609-M3 | FR AM H Duty Air | 2,553 | 3,813.45 |
| FCA8612-01 | FR AM Panel Air | 9 | 17.39 |
| FCA8613-01 | FR AM Round Air | 19 | 34.30 |
| FCA8621 | FR AM H Duty Air | 135 | 2,038.02 |

FBG_CH1_00090630

| FCA8621SY | FR AM H Duty Air | 9 | 54.73 |
| FCA8651-M2 | FR AM Panel Air | 47 | 87.64 |
| FCA8659 | FR AM H Duty Air | 6 | 71.99 |
| FCA8660SY | FR AM H Duty Air | 19 | 184.40 |
| FCA8674 | FR AM Round Air | 1,004 | 1,648.37 |
| FCA8674-M2 | FR AM Round Air | 167 | 274.18 |
| FCA8713-01 | FR AM Panel Air | 51 | 170.15 |
| FCA8715-02 | FR AM Panel Air | 33 | 102.94 |
| FCA8720 | FR AM Panel Air | 2 | 6.93 |
| FCA8720-01 | FR AM Panel Air | 60 | 174.13 |
| FCA8729 | FR AM Panel Air | 23 | 69.87 |
| FCA8730 | FR AM Panel Air | 23 | 74.62 |
| FCA8731 | FR AM Panel Air | 5 | 13.98 |
| FCA8731-01 | FR AM Panel Air | 56 | 171.65 |
| FCA8736-M2 | FR AM Round Air | 2 | 3.37 |
| FCA8736-M3 | FR AM Round Air | 921 | 1,551.52 |
| FCA8737-M2 | FR AM H Duty Air | 908 | 4,896.23 |
| FCA8737SY | FR AM H Duty Air | 758 | 2,308.10 |
| FCA8747-M2 | FR AM Panel Air | 654 | 1,302.84 |
| FCA8754-03 | FR AM Panel Air | 591 | 1,053.47 |
| FCA8755A | FR AM Panel Air | 3 | 11.79 |
| FCA8755A-03 | FR AM Panel Air | 5,093 | 13,734.05 |
| FCA8756-02 | FR AM Panel Air | 5,389 | 14,399.69 |
| FCA8760-M2 | FR AM Panel Air | 1,920 | 4,217.72 |
| FCA8766-03 | FR AM Panel Air | 270 | 536.41 |
| FCA8767-02 | FR AM Panel Air | 9 | 25.81 |
| FCA8768-01 | FR AM Panel Air | 896 | 1,542.47 |
| FCA8768-M3 | FR AM Panel Air | 1,721 | 2,429.27 |
| FCA8782-M2 | FR AM Panel Air | 1,567 | 2,289.76 |
| FCA8789 | FR AM Round Air | 251 | 897.52 |
| FCA8797-M3 | FR AM Round Air | 502 | 866.41 |
| FCA8805-01 | FR AM Round Air | 2,342 | 4,167.74 |
| FCA8817-M2 | FR AM Panel Air | 4,748 | 9,855.65 |
| FCA8891 | FR AM H Duty Air | 5 | 92.38 |
| FCA8911-03 | FR AM Panel Air | 1,409 | 2,449.44 |
| FCA8918-03 | FR AM Panel Air | 1,632 | 3,612.72 |
| FCA8922-M2 | FR AM Panel Air | 1,200 | 2,251.20 |
| FCA8925-M2 | FR AM Panel Air | 42 | 90.16 |
| FCA8925-M3 | FR AM Panel Air | 394 | 845.76 |
| FCA8932 | FR AM H Duty Air | 16 | 207.72 |
| FCA8956-02 | FR AM H Duty Air | 958 | 1,315.03 |
| FCA8958-02 | FR AM Panel Air | 174 | 310.33 |
| FCA8960-01 | FR AM H Duty Air | 60 | 123.28 |
| FCA8963 | FR AM Panel Air | 23 | 38.41 |
| FCA8969-03 | FR AM Panel Air | 3,971 | 6,216.78 |
| FCA8970-01 | FR AM Panel Air | 614 | 1,008.07 |
| FCA8970-M3 | FR AM Panel Air | 1,423 | 1,685.18 |
| FCA8997-01 | FR AM Panel Air | 6,236 | 10,201.47 |
| FCA9007-M3 | FR AM Panel Air | 665 | 966.82 |
| FCA9053-01 | FR AM Round Air | 2,914 | 4,824.36 |
| FCA9054-03 | FR AM Panel Air | 6,398 | 10,771.83 |
| FCA9055 | FR AM Panel Air | 70 | 217.21 |
| FCA9055-01 | FR AM Panel Air | 502 | 927.61 |
| FCA9073-01 | FR AM Panel Air | 205 | 410.20 |
| FCA9113-03 | FR AM Panel Air | 228 | 465.19 |
| FCA9115-M2 | FR AM Panel Air | 598 | 860.08 |
| FCA9240 | FR AM H Duty Air | 26 | 295.26 |
| FCA9242 | FR AM H Duty Air | 3 | 50.70 |
| FCA9244-01 | FR AM H Duty Air | 25 | 477.73 |
| FCA9244SY-01 | FR AM H Duty Air | 220 | 1,468.85 |
| FCA9245-01 | FR AM H Duty Air | 25 | 517.18 |
| FCA9246 | FR AM H Duty Air | 205 | 620.59 |
| FCA9246SY | FR AM H Duty Air | 8 | 68.34 |
| FCA9247 | FR AM H Duty Air | 3 | 23.51 |
| FCA9248-01 | FR AM H Duty Air | 298 | 961.65 |
| FCA9248SY | FR AM H Duty Air | 64 | 250.58 |
| FCA9269-01 | FR AM Round Air | 102 | 395.65 |
| FCA9269SY-01 | FR AM H Duty Air | 37 | 220.27 |
| FCA9277-02 | FR AM Panel Air | 127 | 275.54 |
| FCA9284-M3 | FR AM H Duty Air | 23 | 42.00 |
| FCA9286-M2 | FR AM H Duty Air | 167 | 317.47 |
| FCA9287 | FR AM H Duty Air | 5 | 42.19 |
| FCA9288-01 | FR AM H Duty Air | 419 | 737.39 |
| FCA9315 | FR AM Panel Air | 229 | 850.52 |
| FCA9316 | FR AM Round Air | 3 | 8.24 |
| FCA9316-M2 | FR AM Round Air | 6 | 22.05 |
| FCA9316-M3 | FR AM Round Air | 2,567 | 6,228.28 |

FBG_CH1_00090631

| | | | |
|---|---|---|---|
| FCA9332-03 | FR AM Panel Air | 1,014 | 1,602.93 |
| FCA9345-03 | FR AM Round Air | 763 | 2,016.63 |
| FCA9346-01 | FR AM H Duty Air | 84 | 1,315.31 |
| FCA9346-M2 | FR AM H Duty Air | 3 | 46.98 |
| FCA9346SY | FR AM H Duty Air | 85 | 810.53 |
| FCA9359-M2 | FR AM Panel Air | 143 | 305.40 |
| FCA9360-03 | FR AM Panel Air | 4,317 | 5,723.06 |
| FCA9361-03 | FR AM Panel Air | 5 | 10.68 |
| FCA9367-M2 | FR AM Panel Air | 1,460 | 3,195.45 |
| FCA9379-01 | FR AM Panel Air | 9 | 33.89 |
| FCA9392-03 | FR AM Panel Air | 172 | 198.19 |
| FCA9400-03 | FR AM Panel Air | 19 | 44.21 |
| FCA9401-M3 | FR AM Panel Air | 11,374 | 28,976.13 |
| FCA9402-02 | FR AM Panel Air | 623 | 1,285.62 |
| FCA9409-01 | FR AM Panel Air | 163 | 288.14 |
| FCA9410-M2 | FR AM Panel Air | 3,687 | 6,766.24 |
| FCA9410-M3 | FR AM Panel Air | 10,690 | 19,617.86 |
| FCA9429 | FR AM H Duty Air | 2 | 11.88 |
| FCA9429-01 | FR AM H Duty Air | 19 | 43.80 |
| FCA9431 | FR AM Panel Air | 37 | 95.84 |
| FCA9435-M2 | FR AM Panel Air | 1,311 | 2,328.26 |
| FCA9441-M2 | FR AM Panel Air | 660 | 1,081.33 |
| FCA9459-02 | FR AM Panel Air | 65 | 126.00 |
| FCA9471-01 | FR AM Panel Air | 298 | 375.92 |
| FCA9481-03 | FR AM Panel Air | 1,034 | 1,952.71 |
| FCA9482-03 | FR AM Panel Air | 4,139 | 5,280.02 |
| FCA9492-03 | FR AM Panel Air | 5,896 | 9,438.61 |
| FCA9493 | FR AM Round Air | 3 | 8.12 |
| FCA9493-03 | FR AM Panel Air | 2,193 | 4,829.41 |
| FCA9493-M3 | FR AM Panel Air | 781 | 1,427.50 |
| FCA9497 | FR AM Panel Air | 19 | 71.38 |
| FCA9501-01 | FR AM Panel Air | 56 | 122.61 |
| FCA9511-M2 | FR AM Panel Air | 440 | 642.95 |
| FCA9513-01 | FR AM Panel Air | 144 | 260.22 |
| FCA9516-01 | FR AM Panel Air | 118 | 3,722.07 |
| FCA9519-M2 | FR AM Panel Air | 1,442 | 2,280.22 |
| FCA9525-03 | FR AM Panel Air | 183 | 337.31 |
| FCA9550-01 | FR AM H Duty Air | 56 | 102.01 |
| FCA9550SY | FR AM H Duty Air | 17 | 126.74 |
| FCA9555-M2 | FR AM Panel Air | 488 | 1,578.23 |
| FCA9563-03 | FR AM Panel Air | 1,297 | 1,855.66 |
| FCA9564-03 | FR AM Panel Air | 14 | 28.89 |
| FCA9564-M2 | FR AM Panel Air | 1,995 | 3,333.31 |
| FCA9589-03 | FR AM Panel Air | 566 | 1,049.28 |
| FCA9590-M2 | FR AM Round Air | 2,869 | 4,192.30 |
| FCA9600-03 | FR AM Panel Air | 1,415 | 2,866.90 |
| FCA9601-M2 | FR AM Round Air | 130 | 357.41 |
| FCA9609-M2 | FR AM Round Air | 1,158 | 2,261.28 |
| FCA9610 | FR AM Round Air | 5 | 8.62 |
| FCA9610-M2 | FR AM Round Air | 4,380 | 7,548.83 |
| FCA9629 | FR AM Panel Air | 226 | 287.21 |
| FCA9634 | FR AM Panel Air | 20 | 734.97 |
| FCA9636-01 | FR AM Panel Air | 88 | 284.32 |
| FCA9639 | FR AM H Duty Air | 28 | 380.20 |
| FCA9639SY | FR AM H Duty Air | 36 | 239.79 |
| FCA9646-M3 | FR AM Panel Air | 284 | 653.55 |
| FCA9652 | FR AM Round Air | 112 | 330.62 |
| FCA9662-03 | FR AM Panel Air | 270 | 757.19 |
| FCA9663 | FR AM H Duty Air | 81 | 801.96 |
| FCA9669-M2 | FR AM Panel Air | 2,950 | 5,644.86 |
| FCA9676 | FR AM Round Air | 93 | 4,203.54 |
| FCA9681-03 | FR AM Panel Air | 2,120 | 4,507.40 |
| FCA9683-01 | FR AM Panel Air | 195 | 534.19 |
| FCA9687-03 | FR AM Panel Air | 2,813 | 5,311.78 |
| FCA9689-M2 | FR AM Panel Air | 488 | 1,667.56 |
| FCA9708-01 | FR AM Panel Air | 56 | 111.73 |
| FCA9711 | FR AM Panel Air | 2 | 6.27 |
| FCA9711-01 | FR AM Panel Air | 74 | 173.99 |
| FCA9711-M3 | FR AM Panel Air | 2,241 | 4,289.01 |
| FCA9721-M2 | FR AM H Duty Air | 23 | 271.97 |
| FCA9721SY | FR AM H Duty Air | 33 | 150.85 |
| FCA9730-M2 | FR AM Round Air | 587 | 1,445.18 |
| FCA9762-03 | FR AM Panel Air | 262 | 403.08 |
| FCA9778 | FR AM Round Air | 2 | 4.77 |
| FCA9778-02 | FR AM Round Air | 882 | 2,176.23 |
| FCA9798-M2 | FR AM Panel Air | 401 | 954.30 |
| FCA9800 | FR AM Round Air | 2 | 6.11 |

FBG_CH1_00090632

| | | | |
|---|---|---|---|
| FCA9800-M2 | FR AM Round Air | 5 | 19.22 |
| FCA9806-M2 | FR AM Panel Air | 246 | 464.57 |
| FCA9833-M2 | FR AM Panel Air | 995 | 3,103.19 |
| FCA9838-03 | FR AM Panel Air | 532 | 703.11 |
| FCA9838-M3 | FR AM Panel Air | 3,139 | 3,888.77 |
| FCA9856 | FR AM H Duty Air | 132 | 1,200.81 |
| FCA9874 | FR AM H Duty Air | 113 | 570.36 |
| FCA9874SY | FR AM H Duty Air | 19 | 106.51 |
| FCA9887 | FR AM H Duty Air | 90 | 926.87 |
| FCA9888-M2 | FR AM H Duty Air | 1,958 | 7,390.71 |
| FCA9894 | FR AM Panel Air | 236 | 781.01 |
| FCA9895-03 | FR AM Panel Air | 465 | 665.29 |
| FCA9898-03 | FR AM Panel Air | 6,288 | 12,582.68 |
| FCA9900 | FR AM Panel Air | 177 | 6,077.00 |
| FCA9901-01 | FR AM H Duty Air | 19 | 574.56 |
| FCA9902-03 | FR AM Panel Air | 5 | 9.25 |
| FCA9902-M2 | FR AM Panel Air | 3,780 | 6,315.75 |
| FCA9912-02 | FR AM Panel Air | 65 | 260.22 |
| FCA9916 | FR AM Round Air | 11 | 47.92 |
| FCA9916-M3 | FR AM Round Air | 1,784 | 8,143.83 |
| FCA9944-03 | FR AM Panel Air | 735 | 1,075.46 |
| FCA9948-01 | FR AM Panel Air | 758 | 1,097.18 |
| FCA9951 | FR AM Round Air | 132 | 483.28 |
| FCA9953-02 | FR AM Panel Air | 84 | 215.92 |
| FCA9956-M2 | FR AM Round Air | 3,706 | 7,187.65 |
| FCA9957-M2 | FR AM Round Air | 181 | 190.48 |
| FCA9959-M2 | FR AM Panel Air | 98 | 205.74 |
| FCA9959-M3 | FR AM Panel Air | 539 | 1,024.64 |
| FCA9966-01 | FR AM H Duty Air | 47 | 1,603.94 |
| FCA9966SY | FR AM H Duty Air | 8 | 65.61 |
| FCA9969 | FR AM Panel Air | 5 | 17.00 |
| FCA9969-02 | FR AM Panel Air | 20 | 31.22 |
| FCA9969-03 | FR AM Panel Air | 3,776 | 5,005.85 |
| FCA9997-03 | FR AM Panel Air | 767 | 1,170.30 |
| FCAK1531 | FR AM H Duty Air | 54 | 512.29 |
| FCAK1532-M2 | FR AM H Duty Air | 82 | 778.26 |
| FCAK2523 | FR AM H Duty Air | 22 | 241.20 |
| FCAK253-M2 | FR AM H Duty Air | 749 | 4,018.95 |
| FCAK256 | FR AM H Duty Air | 43 | 210.05 |
| FCAK257 | FR AM H Duty Air | 6 | 99.51 |
| FCAK258-01 | FR AM H Duty Air | 47 | 188.67 |
| FCAK259-01 | FR AM H Duty Air | 5 | 155.26 |
| FCAK503 | FR AM H Duty Air | 3 | 44.40 |
| FCAK5052S | FR AM H Duty Air | 17 | 94.75 |
| FCAK530 | FR AM H Duty Air | 138 | 778.81 |
| FCAK546 | FR AM H Duty Air | 8 | 117.23 |
| FCAK553 | FR AM H Duty Air | 20 | 267.72 |
| FCAK556 | FR AM H Duty Air | 50 | 366.42 |
| FCAK558 | FR AM H Duty Air | 3 | 47.11 |
| FCAK559 | FR AM H Duty Air | 9 | 153.72 |
| FCAK565A-01 | FR AM H Duty Air | 67 | 961.62 |
| FCAK6604 | FR AM H Duty Air | 74 | 885.21 |
| FCAK6910 | FR AM H Duty Air | 14 | 141.84 |
| FCAK7107 | FR AM H Duty Air | 25 | 365.60 |
| FCAK7493 | FR AM H Duty Air | 6 | 110.21 |
| FCAK7673 | FR AM H Duty Air | 6 | 64.06 |
| FCAK7687 | FR AM H Duty Air | 5 | 99.50 |
| FCAK8192 | FR AM H Duty Air | 20 | 249.38 |
| FCAK8321 | FR AM H Duty Air | 23 | 463.57 |
| FCAK8429 | FR AM H Duty Air | 5 | 41.81 |
| FCC1133PL-02 | FR AM Other H Duty | 161 | 313.68 |
| FCC21 | FR AM Other H Duty | 37 | 1,512.51 |
| FCF10103-02 | FR AM Fresh Brz Air | 34 | 164.64 |
| FCF10132 | FR AM Fresh Brz Air | 6 | 11.02 |
| FCF10132-01 | FR AM Fresh Brz Air | 1,513 | 2,869.21 |
| FCF10133-01 | FR AM Fresh Brz Air | 5,465 | 9,445.36 |
| FCF10134-03 | FR AM Fresh Brz Air | 4,374 | 14,219.36 |
| FCF10135-01 | FR AM Fresh Brz Air | 2,895 | 8,721.44 |
| FCF10136-01 | FR AM Fresh Brz Air | 445 | 1,789.25 |
| FCF10137-01 | FR AM Fresh Brz Air | 133 | 359.75 |
| FCF10138-03 | FR AM Fresh Brz Air | 53 | 118.79 |
| FCF10139-03 | FR AM Fresh Brz Air | 295 | 684.96 |
| FCF10140-01 | FR AM Fresh Brz Air | 10,056 | 23,535.64 |
| FCF10141 | FR AM Fresh Brz Air | 322 | 849.96 |
| FCF10157-01 | FR AM Fresh Brz Air | 115 | 228.67 |
| FCF10208 | FR AM Fresh Brz Air | 74 | 431.32 |
| FCF10218 | FR AM Fresh Brz Air | 62 | 331.08 |

FBG_CH1_00090633

| | | | |
|---|---|---|---|
| FCF10218-01 | FR AM Fresh Brz Air | 90 | 311.14 |
| FCF10245 | FR AM Fresh Brz Air | 81 | 463.43 |
| FCF10259 | FR AM Fresh Brz Air | 42 | 146.89 |
| FCF10285-01 | FR AM Fresh Brz Air | 22,035 | 48,133.83 |
| FCF10285-02 | FR AM Fresh Brz Air | 2 | 4.37 |
| FCF10285-03 | FR AM Fresh Brz Air | 6,203 | 14,441.85 |
| FCF10285-M2 | FR AM Fresh Brz Air | 1,454 | 3,176.16 |
| FCF10329-01 | FR AM Fresh Brz Air | 90 | 300.39 |
| FCF10360-01 | FR AM Fresh Brz Air | 50 | 139.42 |
| FCF10361-01 | FR AM Fresh Brz Air | 2,706 | 6,170.89 |
| FCF10362 | FR AM Fresh Brz Air | 28 | 110.38 |
| FCF10362-01 | FR AM Fresh Brz Air | 37 | 110.68 |
| FCF10363-02 | FR AM Fresh Brz Air | 68 | 204.23 |
| FCF10364-01 | FR AM Fresh Brz Air | 81 | 229.73 |
| FCF10368-01 | FR AM Fresh Brz Air | 84 | 240.25 |
| FCF10369 | FR AM Fresh Brz Air | 93 | 484.81 |
| FCF10370-03 | FR AM Fresh Brz Air | 124 | 252.35 |
| FCF10371 | FR AM Fresh Brz Air | 43 | 128.99 |
| FCF10372-01 | FR AM Fresh Brz Air | 62 | 146.97 |
| FCF10373-01 | FR AM Fresh Brz Air | 9,452 | 34,374.19 |
| FCF10373-02 | FR AM Fresh Brz Air | 34 | 123.63 |
| FCF10374-01 | FR AM Fresh Brz Air | 24,068 | 42,464.24 |
| FCF10374-03 | FR AM Fresh Brz Air | 1,008 | 1,963.86 |
| FCF10375-02 | FR AM Fresh Brz Air | 205 | 576.53 |
| FCF10376 | FR AM Fresh Brz Air | 36 | 104.18 |
| FCF10377-01 | FR AM Fresh Brz Air | 57 | 139.89 |
| FCF10381-01 | FR AM Fresh Brz Air | 1,153 | 3,132.48 |
| FCF10382 | FR AM Fresh Brz Air | 85 | 266.68 |
| FCF10383 | FR AM Fresh Brz Air | 12 | 71.80 |
| FCF10388-01 | FR AM Fresh Brz Air | 143 | 422.65 |
| FCF10435-02 | FR AM Fresh Brz Air | 31 | 96.44 |
| FCF10436 | FR AM Fresh Brz Air | 37 | 268.12 |
| FCF10545-01 | FR AM Fresh Brz Air | 2,930 | 5,802.54 |
| FCF10546-02 | FR AM Fresh Brz Air | 459 | 1,093.55 |
| FCF10547-03 | FR AM Fresh Brz Air | 180 | 881.16 |
| FCF10548-01 | FR AM Fresh Brz Air | 99 | 232.32 |
| FCF10549-02 | FR AM Fresh Brz Air | 93 | 230.46 |
| FCF10550-01 | FR AM Fresh Brz Air | 3,494 | 6,751.73 |
| FCF10553-01 | FR AM Fresh Brz Air | 1,026 | 2,807.68 |
| FCF10554 | FR AM Fresh Brz Air | 67 | 332.25 |
| FCF10555 | FR AM Fresh Brz Air | 28 | 134.70 |
| FCF10557 | FR AM Fresh Brz Air | 174 | 772.55 |
| FCF10558 | FR AM Fresh Brz Air | 6 | 26.59 |
| FCF10559-01 | FR AM Fresh Brz Air | 56 | 176.88 |
| FCF10560 | FR AM Fresh Brz Air | 84 | 326.26 |
| FCF10561 | FR AM Fresh Brz Air | 50 | 211.94 |
| FCF10562 | FR AM Fresh Brz Air | 29 | 95.90 |
| FCF10563 | FR AM Fresh Brz Air | 43 | 220.06 |
| FCF10612 | FR AM Fresh Brz Air | 152 | 570.24 |
| FCF10709-01 | FR AM Fresh Brz Air | 1,739 | 3,130.81 |
| FCF10719-01 | FR AM Fresh Brz Air | 1,516 | 3,402.57 |
| FCF10727-01 | FR AM Fresh Brz Air | 56 | 206.30 |
| FCF10728-01 | FR AM Fresh Brz Air | 736 | 1,651.91 |
| FCF10728-02 | FR AM Fresh Brz Air | 166 | 395.49 |
| FCF10728-M2 | FR AM Fresh Brz Air | 169 | 379.31 |
| FCF10729-01 | FR AM Fresh Brz Air | 12,595 | 38,850.56 |
| FCF10730-01 | FR AM Fresh Brz Air | 40 | 83.84 |
| FCF10731-01 | FR AM Fresh Brz Air | 105 | 242.64 |
| FCF10732 | FR AM Fresh Brz Air | 71 | 184.22 |
| FCF10733-02 | FR AM Fresh Brz Air | 62 | 175.10 |
| FCF10734 | FR AM Fresh Brz Air | 65 | 393.92 |
| FCF10735-01 | FR AM Fresh Brz Air | 171 | 489.08 |
| FCF10743-01 | FR AM Fresh Brz Air | 620 | 1,906.62 |
| FCF10743-M2 | FR AM Fresh Brz Air | 329 | 967.44 |
| FCF10744 | FR AM Fresh Brz Air | 56 | 186.96 |
| FCF10745-01 | FR AM Fresh Brz Air | 101 | 300.93 |
| FCF10746-01 | FR AM Fresh Brz Air | 87 | 311.16 |
| FCF10747-02 | FR AM Fresh Brz Air | 99 | 237.05 |
| FCF10775 | FR AM Fresh Brz Air | 2 | 8.92 |
| FCF10775-01 | FR AM Fresh Brz Air | 6,598 | 19,718.67 |
| FCF10776 | FR AM Fresh Brz Air | 50 | 95.44 |
| FCF10828-02 | FR AM Fresh Brz Air | 23 | 88.85 |
| FCF10828-AZ | FR AM Fresh Brz Air | 2 | 8.60 |
| FCF10830 | FR AM Fresh Brz Air | 34 | 264.38 |
| FCF10896 | FR AM Fresh Brz Air | 5 | 17.95 |
| FCF10896-02 | FR AM Fresh Brz Air | 186 | 545.30 |
| FCF10900 | FR AM Fresh Brz Air | 23 | 67.04 |

FBG_CH1_00090634

| | | | |
|---|---|---|---|
| FCF10916 | FR AM Fresh Brz Air | 82 | 477.95 |
| FCF10934 | FR AM Fresh Brz Air | 37 | 417.02 |
| FCF10935 | FR AM Fresh Brz Air | 71 | 709.90 |
| FCF10935-AZ | FR AM Fresh Brz Air | 2 | 20.00 |
| FCF10936 | FR AM Fresh Brz Air | 47 | 386.87 |
| FCF10937 | FR AM Fresh Brz Air | 51 | 464.35 |
| FCF11171 | FR AM Fresh Brz Air | 74 | 555.83 |
| FCF11172-02 | FR AM Fresh Brz Air | 67 | 199.63 |
| FCF11173-02 | FR AM Fresh Brz Air | 818 | 2,032.30 |
| FCF11174-02 | FR AM Fresh Brz Air | 205 | 417.42 |
| FCF11175-01 | FR AM Fresh Brz Air | 43 | 101.93 |
| FCF11176-01 | FR AM Fresh Brz Air | 2,238 | 4,190.36 |
| FCF11177-01 | FR AM Fresh Brz Air | 5,515 | 10,789.44 |
| FCF11177-02 | FR AM Fresh Brz Air | 412 | 874.25 |
| FCF11179-01 | FR AM Fresh Brz Air | 96 | 344.49 |
| FCF11180 | FR AM Fresh Brz Air | 118 | 715.11 |
| FCF11181 | FR AM Fresh Brz Air | 67 | 290.38 |
| FCF11181-01 | FR AM Fresh Brz Air | 3 | 9.02 |
| FCF11182-01 | FR AM Fresh Brz Air | 3,607 | 8,052.39 |
| FCF11183-01 | FR AM Fresh Brz Air | 933 | 2,709.96 |
| FCF11184 | FR AM Fresh Brz Air | 3 | 6.83 |
| FCF11220 | FR AM Fresh Brz Air | 29 | 212.60 |
| FCF11436 | FR AM Fresh Brz Air | 62 | 361.95 |
| FCF11472 | FR AM Fresh Brz Air | 2 | 6.98 |
| FCF11472-02 | FR AM Fresh Brz Air | 36 | 135.63 |
| FCF11483 | FR AM Fresh Brz Air | 59 | 261.80 |
| FCF11639 | FR AM Fresh Brz Air | 6 | 23.40 |
| FCF11639-AZ | FR AM Fresh Brz Air | 2 | 7.80 |
| FCF11663-01 | FR AM Fresh Brz Air | 3,075 | 5,757.53 |
| FCF11663-03 | FR AM Fresh Brz Air | 3 | 6.14 |
| FCF11664-02 | FR AM Fresh Brz Air | 17 | 40.32 |
| FCF11666 | FR AM Fresh Brz Air | 6 | 18.00 |
| FCF11667 | FR AM Fresh Brz Air | 93 | 467.09 |
| FCF11668-01 | FR AM Fresh Brz Air | 499 | 1,403.26 |
| FCF11668-03 | FR AM Fresh Brz Air | 3 | 8.68 |
| FCF11669 | FR AM Fresh Brz Air | 422 | 1,475.91 |
| FCF11670 | FR AM Fresh Brz Air | 628 | 1,577.87 |
| FCF11671-01 | FR AM Fresh Brz Air | 772 | 1,723.44 |
| FCF11672 | FR AM Fresh Brz Air | 239 | 1,230.73 |
| FCF11766 | FR AM Fresh Brz Air | 84 | 230.88 |
| FCF11775-03 | FR AM Fresh Brz Air | 229 | 766.83 |
| FCF11776-02 | FR AM Fresh Brz Air | 9 | 26.82 |
| FCF11776-03 | FR AM Fresh Brz Air | 338 | 1,007.07 |
| FCF11777-02 | FR AM Fresh Brz Air | 87 | 155.33 |
| FCF11809-01 | FR AM Fresh Brz Air | 2,595 | 8,845.49 |
| FCF11809-03 | FR AM Fresh Brz Air | 394 | 1,353.56 |
| FCF11810 | FR AM Fresh Brz Air | 47 | 110.62 |
| FCF11811-03 | FR AM Fresh Brz Air | 288 | 586.11 |
| FCF11819-01 | FR AM Fresh Brz Air | 2,279 | 4,786.83 |
| FCF11819-02 | FR AM Fresh Brz Air | 16 | 36.04 |
| FCF11819-03 | FR AM Fresh Brz Air | 146 | 328.82 |
| FCF11854-03 | FR AM Fresh Brz Air | 195 | 576.77 |
| FCF11902-01 | FR AM Fresh Brz Air | 96 | 297.50 |
| FCF11919 | FR AM Fresh Brz Air | 74 | 365.39 |
| FCF11920-02 | FR AM Fresh Brz Air | 22 | 65.53 |
| FCF11920-03 | FR AM Fresh Brz Air | 208 | 633.29 |
| FCF11920-AZ | FR AM Fresh Brz Air | 2 | 6.09 |
| FCF11922 | FR AM Fresh Brz Air | 54 | 252.34 |
| FCF11923 | FR AM Fresh Brz Air | 68 | 715.55 |
| FCF11924 | FR AM Fresh Brz Air | 47 | 165.38 |
| FCF11925 | FR AM Fresh Brz Air | 71 | 305.28 |
| FCF11966-03 | FR AM Fresh Brz Air | 288 | 1,354.96 |
| FCF12000 | FR AM Fresh Brz Air | 115 | 447.27 |
| FCF12001 | FR AM Fresh Brz Air | 9 | 108.97 |
| FCF12002 | FR AM Fresh Brz Air | 74 | 147.53 |
| FCF12150 | FR AM Fresh Brz Air | 90 | 314.77 |
| FCF12157-03 | FR AM Fresh Brz Air | 223 | 772.84 |
| FCF12160 | FR AM Fresh Brz Air | 68 | 178.77 |
| FCF12224 | FR AM Fresh Brz Air | 1,135 | 3,269.43 |
| FCF12237 | FR AM Fresh Brz Air | 6,346 | 17,518.38 |
| FCF12312 | FR AM Fresh Brz Air | 3,085 | 9,775.19 |
| FCF12460 | FR AM Fresh Brz Air | 16,300 | 54,387.41 |
| FCF5816A | FR AM Fresh Brz Air | 17 | 36.37 |
| FCF5972A | FR AM Fresh Brz Air | 36 | 138.11 |
| FCF8045A | FR AM Fresh Brz Air | 3 | 8.74 |
| FCF8046 | FR AM Panel Air | 56 | 322.32 |
| FCF8109A | FR AM Fresh Brz Air | 87 | 182.66 |

FBG_CH1_00090635

| | | | |
|---|---|---|---|
| FCF8109A-01 | FR AM Fresh Brz Air | 11 | 28.83 |
| FCF8110A | FR AM Fresh Brz Air | 65 | 163.31 |
| FCF8249A-AZ | FR AM Fresh Brz Air | 2 | 6.66 |
| FCF8327A | FR AM Fresh Brz Air | 65 | 288.60 |
| FCF8391A | FR AM Fresh Brz Air | 62 | 206.34 |
| FCF8392A-02 | FR AM Fresh Brz Air | 130 | 441.66 |
| FCF8603A-01 | FR AM Fresh Brz Air | 1,023 | 3,646.68 |
| FCF8603A-02 | FR AM Fresh Brz Air | 3 | 10.73 |
| FCF8631A | FR AM Fresh Brz Air | 96 | 380.49 |
| FCF8644A-01 | FR AM Fresh Brz Air | 4,852 | 11,763.54 |
| FCF8714A | FR AM Fresh Brz Air | 34 | 106.67 |
| FCF8717A | FR AM Fresh Brz Air | 90 | 407.22 |
| FCF8718A-01 | FR AM Fresh Brz Air | 56 | 170.20 |
| FCF8726A-02 | FR AM Fresh Brz Air | 253 | 702.46 |
| FCF8762 | FR AM Panel Air | 16 | 75.07 |
| FCF8769A | FR AM Fresh Brz Air | 3 | 8.49 |
| FCF8770A | FR AM Fresh Brz Air | 34 | 180.84 |
| FCF8791A-01 | FR AM Fresh Brz Air | 1,597 | 5,884.49 |
| FCF8804A-02 | FR AM Fresh Brz Air | 9 | 26.82 |
| FCF8804A-03 | FR AM Fresh Brz Air | 186 | 554.19 |
| FCF8813 | FR AM Panel Air | 48 | 343.63 |
| FCF8813A | FR AM Fresh Brz Air | 12 | 58.74 |
| FCF8813A-01 | FR AM Fresh Brz Air | 74 | 246.99 |
| FCF8838 | FR AM Fresh Brz Air | 8,113 | 23,954.25 |
| FCF8921A-01 | FR AM Fresh Brz Air | 3,098 | 6,692.99 |
| FCF9118A | FR AM Fresh Brz Air | 90 | 263.30 |
| FCF9118A-01 | FR AM Fresh Brz Air | 25 | 73.00 |
| FCF9119A | FR AM Fresh Brz Air | 47 | 116.10 |
| FCF9336 | FR AM Fresh Brz Air | 19 | 76.06 |
| FCF9465A | FR AM Fresh Brz Air | 40 | 152.60 |
| FCF9594A | FR AM Fresh Brz Air | 84 | 380.07 |
| FCF9597A-01 | FR AM Fresh Brz Air | 1,020 | 2,815.75 |
| FCF9612-M2 | FR AM Panel Air | 25 | 293.07 |
| FCF9613-M2 | FR AM Panel Air | 57 | 365.99 |
| FCF9614 | FR AM Panel Air | 20 | 209.43 |
| FCF9615 | FR AM Panel Air | 29 | 157.56 |
| FCF9785 | FR AM Fresh Brz Air | 87 | 752.98 |
| FCF9846A | FR AM Fresh Brz Air | 56 | 146.04 |
| FCF9846A-01 | FR AM Fresh Brz Air | 3 | 6.22 |
| FCF9846A-03 | FR AM Fresh Brz Air | 422 | 1,100.51 |
| FCF9905-01 | FR AM Fresh Brz Air | 84 | 249.28 |
| FCG11-01 | FR AM Passcar Fuel | 195 | 96.67 |
| FCG20-03 | FR AM Passcar Fuel | 248 | 172.29 |
| FCG3389-M2 | FR AM Passcar Fuel | 288 | 169.19 |
| FCG3790 | FR AM Passcar Fuel | 124 | 435.22 |
| FCG5 | FR AM Passcar Fuel | 9 | 16.34 |
| FCG8 | FR AM Passcar Fuel | 19 | 18.66 |
| FCH10054 | FR AM Extra Gd Oil | 315 | 403.65 |
| FCH10066-07 | Extra Gd Cartridges | 3,729 | 5,378.27 |
| FCH10075 | FR AM Extra Gd Oil | 2 | 2.19 |
| FCH10075-07 | Extra Gd Cartridges | 1,834 | 2,192.53 |
| FCH10158-07 | Extra Gd Cartridges | 403 | 496.06 |
| FCH10160-07 | Extra Gd Cartridges | 394 | 726.50 |
| FCH10246-09 | Extra Gd Cartridges | 8 | 5.85 |
| FCH10246-10 | Extra Gd Cartridges | 12,315 | 14,419.71 |
| FCH10295-11 | Extra Gd Cartridges | 2,902 | 2,894.76 |
| FCH10323-07 | Extra Gd Cartridges | 47 | 53.32 |
| FCH10358-10 | Extra Gd Cartridges | 12,780 | 8,004.63 |
| FCH10415-07 | Extra Gd Cartridges | 195 | 313.40 |
| FCH10515-10 | Extra Gd Cartridges | 112 | 121.70 |
| FCH10530-07 | Extra Gd Cartridges | 105 | 202.73 |
| FCH10632 | Extra Gd Cartridges | 9 | 20.75 |
| FCH10636-08 | Extra Gd Cartridges | 37 | 73.14 |
| FCH10682 | Extra Gd Cartridges | 9 | 76.38 |
| FCH106PL | Extra Gd Cartridges | 26 | 106.19 |
| FCH10759-10 | Extra Gd Cartridges | 3,483 | 4,363.08 |
| FCH10855-09 | Extra Gd Cartridges | 595 | 962.99 |
| FCH10955-10 | Extra Gd Cartridges | 7,682 | 7,484.62 |
| FCH10992-01 | Extra Gd Cartridges | 62 | 284.59 |
| FCH11007-10 | Extra Gd Cartridges | 158 | 492.40 |
| FCH11008 | Extra Gd Cartridges | 124 | 822.06 |
| FCH11018 | Extra Gd Cartridges | 19 | 47.62 |
| FCH11018-AZ | FR AM Extra Gd Oil | 23 | 57.64 |
| FCH11038 | Extra Gd Cartridges | 50 | 106.85 |
| FCH11051-07 | Extra Gd Cartridges | 43 | 265.91 |
| FCH11060 | Extra Gd Cartridges | 65 | 153.36 |
| FCH11242 | Extra Gd Cartridges | 71 | 170.23 |

FBG_CH1_00090636

**DEBTORS' EXHIBIT NO. 175**
**Page 411 of 1907**

| | | | |
|---|---|---|---|
| FCH11246 | Extra Gd Cartridges | 304 | 659.55 |
| FCH11277 | Extra Gd Cartridges | 140 | 273.35 |
| FCH11473 | FR AM Extra Gd Oil | 93 | 171.72 |
| FCH11490-10 | Extra Gd Cartridges | 29 | 51.97 |
| FCH11665-10 | Extra Gd Cartridges | 13,068 | 14,702.72 |
| FCH11675 | Extra Gd Cartridges | 149 | 227.84 |
| FCH11784-M2 | Extra Gd Cartridges | 6,529 | 8,764.84 |
| FCH11790 | Extra Gd Cartridges | 409 | 661.96 |
| FCH11791 | Extra Gd Cartridges | 166 | 369.58 |
| FCH11792 | Extra Gd Cartridges | 31 | 66.04 |
| FCH11794-10 | Extra Gd Cartridges | 91 | 147.05 |
| FCH11816-01 | Extra Gd Cartridges | 84 | 136.86 |
| FCH11885-01 | Extra Gd Cartridges | 344 | 677.21 |
| FCH11955-10 | Extra Gd Cartridges | 485 | 400.63 |
| FCH12056 | FR AM Extra Gd Oil | 37 | 53.06 |
| FCH12059 | FR AM Extra Gd Oil | 74 | 181.43 |
| FCH14PL | FR AM H Duty Oil | 28 | 189.90 |
| FCH155PL | FR AM Other H Duty | 37 | 173.10 |
| FCH191APL-01 | FR AM H Duty Oil | 37 | 172.21 |
| FCH192PL | FR AM Extra Gd Oil | 22 | 92.26 |
| FCH200PL-07 | Extra Gd Cartridges | 20 | 82.05 |
| FCH200PL-09 | Extra Gd Cartridges | 43 | 121.01 |
| FCH211A-01 | FR AM H Duty Oil | 19 | 177.57 |
| FCH236APL | Extra Gd Cartridges | 9 | 61.23 |
| FCH238APL | FR AM H Duty Oil | 28 | 152.24 |
| FCH2877 | FR AM H Duty Oil | 9 | 35.17 |
| FCH2927 | FR AM Extra Gd Oil | 17 | 47.60 |
| FCH2962 | FR AM H Duty Oil | 57 | 387.48 |
| FCH2965A-01 | Extra Gd Cartridges | 19 | 45.14 |
| FCH2971 | FR AM H Duty Oil | 34 | 278.66 |
| FCH2989 | FR AM Extra Gd Oil | 149 | 640.51 |
| FCH330PL | FR AM H Duty Oil | 39 | 239.60 |
| FCH331PL | FR AM H Duty Oil | 19 | 48.61 |
| FCH333PL-01 | FR AM H Duty Oil | 28 | 136.70 |
| FCH335PL | FR AM H Duty Oil | 12 | 30.63 |
| FCH335PL-01 | FR AM H Duty Oil | 56 | 238.66 |
| FCH3505 | FR AM H Duty Oil | 19 | 92.76 |
| FCH3970-09 | FR AM Extra Gd Oil | 90 | 153.73 |
| FCH4536-07 | Extra Gd Cartridges | 74 | 229.63 |
| FCH4536-AZ | FR AM Extra Gd Oil | 9 | 25.54 |
| FCH4797 | Extra Gd Cartridges | 9 | 18.21 |
| FCH5320-09 | Extra Gd Cartridges | 74 | 115.75 |
| FCH56 | FR AM H Duty Oil | 56 | 840.61 |
| FCH56P | FR AM H Duty Oil | 3 | 57.80 |
| FCH5957-M2 | FR AM H Duty Air | 163 | 312.20 |
| FCH6000-02 | Extra Gd Cartridges | 149 | 157.65 |
| FCH6001-02 | Extra Gd Cartridges | 105 | 111.10 |
| FCH6002-02 | Extra Gd Cartridges | 735 | 849.48 |
| FCH6003-02 | Extra Gd Cartridges | 642 | 630.49 |
| FCH6004-02 | Extra Gd Cartridges | 130 | 140.10 |
| FCH6005-02 | Extra Gd Cartridges | 198 | 228.11 |
| FCH6006 | FR AM Extra Gd Oil | 19 | 33.84 |
| FCH6006-02 | Extra Gd Cartridges | 9 | 9.42 |
| FCH6008-02 | Extra Gd Cartridges | 9 | 9.13 |
| FCH6009-01 | Extra Gd Cartridges | 9 | 12.77 |
| FCH6009-03 | Extra Gd Cartridges | 37 | 39.24 |
| FCH6012-03 | Extra Gd Cartridges | 146 | 152.89 |
| FCH6014-01 | FR AM Extra Gd Oil | 84 | 169.71 |
| FCH6060 | FR AM Extra Gd Oil | 6 | 20.82 |
| FCH6060-02 | Extra Gd Cartridges | 28 | 200.75 |
| FCH6062 | FR AM Extra Gd Oil | 8 | 27.77 |
| FCH6062-01 | FR AM Extra Gd Oil | 47 | 118.46 |
| FCH6066-02 | Extra Gd Cartridges | 9 | 6.79 |
| FCH6069-01 | FR AM Extra Gd Oil | 149 | 249.29 |
| FCH6070-02 | Extra Gd Cartridges | 112 | 95.40 |
| FCH6096-01 | Extra Gd Cartridges | 214 | 154.38 |
| FCH6105 | Extra Gd Cartridges | 37 | 40.94 |
| FCH6351-AZ | FR AM Extra Gd Oil | 28 | 80.88 |
| FCH6483 | FR AM Other H Duty | 19 | 59.16 |
| FCH6527 | FR AM H Duty Oil | 28 | 176.86 |
| FCH6531 | Extra Gd Cartridges | 65 | 111.06 |
| FCH6847-07 | Extra Gd Cartridges | 37 | 125.66 |
| FCH6848-08 | Extra Gd Cartridges | 363 | 481.12 |
| FCH7073-07 | Extra Gd Cartridges | 112 | 315.94 |
| FCH7329-09 | Extra Gd Cartridges | 102 | 156.23 |
| FCH7732 | Extra Gd Cartridges | 102 | 622.89 |
| FCH801BPL | FR AM H Duty Oil | 9 | 17.20 |

FBG_CH1_00090637

| | | | |
|---|---|---|---|
| FCH8081-10 | Extra Gd Cartridges | 3,925 | 4,552.57 |
| FCH8087-M2 | Extra Gd Cartridges | 846 | 1,393.83 |
| FCH814PL | Extra Gd Cartridges | 37 | 238.63 |
| FCH8157 | FR AM Extra Gd Oil | 47 | 149.65 |
| FCH8158-10 | Extra Gd Cartridges | 673 | 1,094.85 |
| FCH8213-07 | Extra Gd Cartridges | 277 | 720.73 |
| FCH8278-09 | Extra Gd Cartridges | 93 | 123.26 |
| FCH836PL | Extra Gd Cartridges | 81 | 176.33 |
| FCH837PL-AZ | FR AM H Duty Oil | 5 | 28.54 |
| FCH8481 | FR AM Extra Gd Oil | 9 | 11.46 |
| FCH8481-10 | Extra Gd Cartridges | 4,222 | 5,288.81 |
| FCH8530-08 | Extra Gd Cartridges | 642 | 739.40 |
| FCH8623-07 | Extra Gd Cartridges | 19 | 59.28 |
| FCH8712-10 | Extra Gd Cartridges | 3,013 | 3,844.22 |
| FCH8751 | FR AM H Duty Oil | 14 | 20.08 |
| FCH8765-10 | Extra Gd Cartridges | 6,240 | 5,645.43 |
| FCH8776-M2 | FR AM Passcar Fuel | 316 | 404.93 |
| FCH8806-M2 | Extra Gd Cartridges | 1,144 | 1,256.53 |
| FCH8871-07 | Extra Gd Cartridges | 62 | 147.30 |
| FCH9018-10 | Tough Gd Cartridges | 31,285 | 26,652.92 |
| FCH9024-10 | Extra Gd Cartridges | 48 | 83.30 |
| FCH9260-M2 | Extra Gd Cartridges | 181 | 437.97 |
| FCH9301-AZ | FR AM H Duty Oil | 57 | 80.00 |
| FCH9301-M2 | FR AM H Duty Oil | 1,784 | 2,503.79 |
| FCH9443-M3 | FR AM Extra Gd Oil | 595 | 977.46 |
| FCH9447-07 | Extra Gd Cartridges | 237 | 597.02 |
| FCH9461-09 | Extra Gd Cartridges | 1,460 | 2,472.42 |
| FCH9549-09 | Extra Gd Cartridges | 65 | 99.52 |
| FCH9558 | FR AM H Duty Oil | 112 | 886.53 |
| FCH9584-08 | Extra Gd Cartridges | 11,030 | 13,791.49 |
| FCH962PL | Extra Gd Cartridges | 140 | 296.34 |
| FCH9641-09 | Extra Gd Cartridges | 5,258 | 6,139.45 |
| FCH9690-07 | Extra Gd Cartridges | 112 | 223.54 |
| FCH9706 | Extra Gd Cartridges | 11,941 | 18,216.08 |
| FCH9713-01 | Extra Gd Cartridges | 3,553 | 3,585.35 |
| FCH9911-09 | Extra Gd Cartridges | 11,842 | 17,979.32 |
| FCH9918-07 | Extra Gd Cartridges | 409 | 816.32 |
| FCH9954 | Extra Gd Cartridges | 9 | 10.39 |
| FCH9954-01 | Extra Gd Cartridges | 195 | 222.47 |
| FCH9955-07 | Extra Gd Cartridges | 93 | 150.28 |
| FCH9972-10 | Extra Gd Cartridges | 13,122 | 10,349.64 |
| FCH9994 | FR AM Extra Gd Oil | 19 | 53.83 |
| FCH9994-07 | Extra Gd Cartridges | 28 | 36.91 |
| FCH9999-09 | Extra Gd Cartridges | 884 | 1,466.90 |
| FCPH3950 | FR AM Extra Gd Oil | 19 | 24.14 |
| FCS11037-01 | FR AM Passcar Fuel | 37 | 342.55 |
| FCS1133PL | FR AM Other H Duty | 19 | 41.01 |
| FCS11947-01 | FR AM Passcar Fuel | 9 | 109.44 |
| FCS3504 | FR AM Other H Duty | 84 | 499.82 |
| FCS3558 | FR AM Other H Duty | 112 | 410.40 |
| FCS5043 | FR AM Other H Duty | 37 | 94.79 |
| FCS7715A-01 | FR AM Other | 316 | 1,929.01 |
| FCS7772B | FR AM Other H Duty | 56 | 339.71 |
| FCS8629A-02 | FR AM Other | 419 | 2,062.78 |
| FCS8744A-01 | FR AM Other H Duty | 28 | 128.52 |
| FCS8941-01 | FR AM Other | 121 | 493.89 |
| FCS9667A-01 | FR AM Other H Duty | 197 | 1,335.64 |
| FCS9864-01 | FR AM Other | 56 | 364.85 |
| FCS9970-M2 | FR AM H Duty Oil | 158 | 1,102.61 |
| FFCS10726 | FR AM H Duty Fuel | 130 | 4,726.35 |
| FFT1020A | FR AM Other | 5 | 13.06 |
| FFT1021A | FR AM Other | 65 | 230.93 |
| FFT1028A | FR AM Other | 9 | 14.31 |
| FFT1037A | FR AM Other | 56 | 122.61 |
| FFT1047A | FR AM Other | 42 | 204.62 |
| FFT1048A | FR AM Other Assess | 9 | 19.52 |
| FFT1051B | FR AM Other | 65 | 652.95 |
| FFT1055A | FR AM Other | 9 | 25.54 |
| FFT1058A | FR AM Other | 9 | 28.35 |
| FFT1061-01 | FR AM Other Assess | 5 | 14.46 |
| FFT1065A | FR AM Other | 112 | 322.69 |
| FFT1072A | FR AM Other | 74 | 289.65 |
| FFT1073B | FR AM Other | 28 | 128.40 |
| FFT1077-02 | FR AM Other | 130 | 472.22 |
| FFT1083A | FR AM Other | 9 | 27.61 |
| FFT1092 | FR AM Other | 14 | 41.51 |
| FFT1099A | FR AM Other | 19 | 37.21 |

FBG_CH1_00090638

| | | | |
|---|---|---|---|
| FFT1102A | FR AM Other | 74 | 398.76 |
| FFT1115B | FR AM Other | 9 | 54.75 |
| FFT1121 | FR AM Other Assess | 33 | 99.60 |
| FFT1121A | FR AM Other | 28 | 65.93 |
| FFT1122A | FR AM Other | 140 | 688.58 |
| FFT1123-02 | FR AM Other | 19 | 86.09 |
| FFT1124-02 | FR AM Other | 19 | 96.99 |
| FFT1129A-02 | FR AM Other | 74 | 353.09 |
| FFT1130A | FR AM Other | 9 | 71.85 |
| FFT1131A | FR AM Other | 28 | 223.52 |
| FFT1133A | FR AM Other | 19 | 61.81 |
| FFT1134-02 | FR AM Other | 74 | 312.81 |
| FFT1138-02 | FR AM Other | 45 | 283.08 |
| FFT1143A | FR AM Other | 9 | 33.35 |
| FFT1144A | FR AM Other | 98 | 359.30 |
| FFT1145-02 | FR AM Other | 9 | 71.66 |
| FFT1153-01 | FR AM Other Assess | 9 | 49.18 |
| FFT1153-02 | FR AM Other | 47 | 275.20 |
| FFT1166-02 | FR AM Other | 19 | 170.83 |
| FFT1169A | FR AM Other | 16 | 61.03 |
| FFT1170-02 | FR AM Other | 47 | 231.84 |
| FFT1181-02 | FR AM Other | 37 | 224.68 |
| FFT1194 | FR AM Other Assess | 14 | 108.23 |
| FFT1203A | FR AM Other | 47 | 308.94 |
| FFT1206A | FR AM Other | 28 | 191.45 |
| FFT1210-01 | FR AM Other | 19 | 117.03 |
| FFT1216A | FR AM Other | 9 | 104.87 |
| FFT1217B | FR AM Other | 56 | 369.75 |
| FFT1219 | FR AM Other Assess | 5 | 17.16 |
| FFT1219-01 | FR AM Other | 74 | 337.38 |
| FFT1220 | FR AM Other Assess | 5 | 26.74 |
| FFT1220-01 | FR AM Other | 130 | 710.40 |
| FFT1223A | FR AM Other | 19 | 250.56 |
| FFT1224-01 | FR AM Other | 19 | 109.49 |
| FFT1225-01 | FR AM Other | 9 | 58.27 |
| FFV163-01 | FR AM Other | 17 | 15.70 |
| FFV178-01 | FR AM Other | 574 | 510.62 |
| FFV179-02 | FR AM Other Assess | 87 | 54.18 |
| FFV181-02 | FR AM Other Assess | 25 | 19.86 |
| FFV184-01 | FR AM Other | 112 | 102.36 |
| FFV191-01 | FR AM Other | 174 | 157.00 |
| FFV198-01 | FR AM Other | 217 | 205.11 |
| FFV202-01 | FR AM Other | 62 | 59.03 |
| FFV231-30 | FR AM Other | 178 | 165.30 |
| FFV237 | FR AM Other Assess | 31 | 11.49 |
| FFV242-02 | FR AM Other Assess | 130 | 133.99 |
| FFV243-01 | FR AM Other | 60 | 25.10 |
| FFV246-01 | FR AM Other | 57 | 55.74 |
| FFV258-02 | FR AM Other | 9 | 7.82 |
| FFV266 | FR AM Other Assess | 16 | 19.47 |
| FFV266-01 | FR AM Other | 171 | 248.41 |
| FFV267 | FR AM Other Assess | 9 | 3.53 |
| FFV267-02 | FR AM Other Assess | 121 | 79.23 |
| FFV279-01 | FR AM Other | 747 | 610.65 |
| FFV281-02 | FR AM Other | 9 | 7.63 |
| FFV285-02 | FR AM Other | 130 | 133.63 |
| FFV289-01 | FR AM Other | 31 | 27.77 |
| FFV292-01 | FR AM Other | 90 | 87.06 |
| FFV294 | FR AM Other | 9 | 3.53 |
| FFV294-01 | FR AM Other | 90 | 83.23 |
| FFV295-01 | FR AM Other | 200 | 173.68 |
| FFV299 | FR AM Other | 2 | 0.68 |
| FFV299-01 | FR AM Other | 217 | 186.15 |
| FFV301-01 | FR AM Other | 31 | 28.89 |
| FFV307 | FR AM Other Assess | 9 | 11.02 |
| FFV309 | FR AM Other Assess | 28 | 15.00 |
| FFV309-01 | FR AM Other | 31 | 26.59 |
| FFV309-02 | FR AM Other Assess | 149 | 126.36 |
| FFV311 | FR AM Other | 16 | 18.84 |
| FFV311-02 | FR AM Other | 56 | 80.39 |
| FFV314-01 | FR AM Other | 96 | 86.10 |
| FFV324-01 | FR AM Other | 93 | 79.96 |
| FFV330-01 | FR AM Other Assess | 16 | 7.10 |
| FFV330-02 | FR AM Other Assess | 205 | 127.67 |
| FFV332-02 | FR AM Other Assess | 65 | 60.14 |
| FFV333-02 | FR AM Other Assess | 251 | 419.99 |
| FFV340-01 | FR AM Other | 543 | 439.34 |

FBG_CH1_00090639

**DEBTORS' EXHIBIT NO. 175**
**Page 414 of 1907**

| | | | |
|---|---|---|---|
| FFV345 | FR AM Other Assess | 2 | 1.54 |
| FFV345-01 | FR AM Other | 40 | 71.59 |
| FFV346 | FR AM Other Assess | 2 | 0.75 |
| FFV346-02 | FR AM Other Assess | 91 | 87.70 |
| FFV348-01 | FR AM Other | 93 | 84.80 |
| FFV350 | FR AM Other Assess | 9 | 4.61 |
| FFV350-02 | FR AM Other Assess | 102 | 79.76 |
| FFV352-01 | FR AM Other | 248 | 428.10 |
| FFV353-01 | FR AM Other | 138 | 135.59 |
| FFV366 | FR AM Other Assess | 3 | 5.61 |
| FFV366-01 | FR AM Other | 140 | 321.73 |
| FFV366-02 | FR AM Other Assess | 9 | 20.68 |
| FFV370 | FR AM Other Assess | 62 | 102.43 |
| FFV373-01 | FR AM Other | 31 | 38.41 |
| FFV375 | FR AM Other | 28 | 12.57 |
| FFV375-01 | FR AM Other | 158 | 138.48 |
| FFV376-01 | FR AM Other | 198 | 157.27 |
| FFV379 | FR AM Other Assess | 9 | 4.89 |
| FFV379-01 | FR AM Other | 87 | 82.92 |
| FFV380-01 | FR AM Other | 31 | 36.11 |
| FFV384-01 | FR AM Other | 91 | 101.19 |
| FFV385-01 | FR AM Other | 138 | 122.76 |
| FFV388 | FR AM Other Assess | 16 | 17.54 |
| FFV391-01 | FR AM Other | 40 | 35.58 |
| FFV395-01 | FR AM Other | 31 | 30.35 |
| FFV397-01 | FR AM Other | 62 | 59.23 |
| FFV398-01 | FR AM Other | 62 | 53.60 |
| FFV400-01 | FR AM Other | 82 | 78.16 |
| FFV401 | FR AM Other | 140 | 229.46 |
| FFV437-02 | FR AM Other | 112 | 208.52 |
| FFV438-02 | FR AM Other | 9 | 5.95 |
| FG10068-M2 | FR AM Passcar Fuel | 47 | 761.61 |
| FG10095-M2 | FR AM Passcar Fuel | 288 | 887.30 |
| FG10147 | FR AM Passcar Fuel | 9,959 | 72,924.15 |
| FG10166-M3 | FR AM Passcar Fuel | 10,058 | 14,202.30 |
| FG10174 | FR AM Passcar Fuel | 12 | 42.00 |
| FG10174-M3 | FR AM Passcar Fuel | 580 | 2,029.77 |
| FG102 | FR AM Other | 705 | 2,595.38 |
| FG10243-M3 | FR AM Passcar Fuel | 7,797 | 49,480.63 |
| FG10624 | FR AM Passcar Fuel | 56 | 118.36 |
| FG10698-M2 | FR AM Passcar Fuel | 177 | 422.36 |
| FG10806 | FR AM Passcar Fuel | 74 | 384.10 |
| FG10902-M2 | FR AM Passcar Fuel | 326 | 1,563.18 |
| FG12451 | FR AM Passcar Fuel | 2,215 | 4,595.44 |
| FG12637 | FR AM Passcar Fuel | 1,311 | 3,345.36 |
| FG12-M2 | FR AM Passcar Fuel | 1,299 | 696.63 |
| FG15-M3 | FR AM Passcar Fuel | 149 | 125.36 |
| FG1-M2 | FR AM Passcar Fuel | 860 | 480.66 |
| FG20012-M3 | FR AM Passcar Fuel | 16,548 | 16,853.15 |
| FG20014 | FR AM Passcar Fuel | 62 | 370.29 |
| FG22A-M3 | FR AM Passcar Fuel | 228 | 201.13 |
| FG2-M2 | FR AM Passcar Fuel | 4,365 | 2,611.46 |
| FG3-03 | FR AM Passcar Fuel | 74 | 99.54 |
| FG3359 | FR AM Passcar Fuel | 20 | 9.94 |
| FG3359-M2 | FR AM Passcar Fuel | 1,184 | 588.35 |
| FG3428A-02 | FR AM Passcar Fuel | 14 | 26.02 |
| FG3499A-M2 | FR AM Passcar Fuel | 175 | 93.85 |
| FG3499-M3 | FR AM Passcar Fuel | 488 | 810.32 |
| FG3515 | FR AM Passcar Fuel | 56 | 26.45 |
| FG3583 | FR AM Passcar Fuel | 205 | 291.97 |
| FG3587 | FR AM Passcar Fuel | 84 | 62.12 |
| FG3606 | FR AM Passcar Fuel | 138 | 164.39 |
| FG3641-M2 | FR AM Passcar Fuel | 277 | 536.41 |
| FG3692 | FR AM Passcar Fuel | 9 | 21.36 |
| FG3704 | FR AM Passcar Fuel | 9 | 9.39 |
| FG3704-01 | FR AM Passcar Fuel | 40 | 41.93 |
| FG3727-M2 | FR AM Passcar Fuel | 2 | 2.52 |
| FG3727-M3 | FR AM Passcar Fuel | 31,866 | 40,167.23 |
| FG3728-M3 | FR AM Passcar Fuel | 195 | 322.84 |
| FG3736 | FR AM Passcar Fuel | 16 | 97.11 |
| FG3737-M2 | FR AM Passcar Fuel | 84 | 312.81 |
| FG3741-AZ | FR AM Passcar Fuel | 8 | 15.33 |
| FG3744 | FR AM Passcar Fuel | 93 | 404.28 |
| FG3747-M3 | FR AM Passcar Fuel | 56 | 188.74 |
| FG3769 | FR AM Passcar Fuel | 65 | 98.44 |
| FG3802 | Finished Goods | 11 | 0.54 |
| FG3802A-M3 | FR AM Passcar Fuel | 14,982 | 16,179.66 |

FBG_CH1_00090640

| | | | |
|---|---|---|---|
| FG3829-M3 | FR AM Passcar Fuel | 2,359 | 2,844.70 |
| FG3840 | FR AM Passcar Fuel | 9 | 19.57 |
| FG3842-M2 | FR AM Passcar Fuel | 28 | 21.23 |
| FG3850-M3 | FR AM Passcar Fuel | 25,998 | 27,782.09 |
| FG3870 | FR AM Passcar Fuel | 195 | 462.75 |
| FG3870-01 | FR AM Passcar Fuel | 9 | 20.49 |
| FG3875 | FR AM Passcar Fuel | 93 | 93.83 |
| FG3893 | FR AM Passcar Fuel | 12 | 27.03 |
| FG3895 | FR AM Passcar Fuel | 37 | 109.72 |
| FG3941 | FR AM Passcar Fuel | 12 | 32.76 |
| FG3969 | FR AM Passcar Fuel | 9 | 30.62 |
| FG3972 | FR AM Passcar Fuel | 28 | 100.68 |
| FG4164-M2 | FR AM Passcar Fuel | 586 | 259.19 |
| FG4166 | FR AM Passcar Fuel | 93 | 95.09 |
| FG4167 | FR AM Passcar Fuel | 37 | 388.04 |
| FG4167-AZ | FR AM Passcar Fuel | 8 | 83.90 |
| FG4191 | FR AM Passcar Fuel | 121 | 71.04 |
| FG4715-M3 | FR AM Passcar Fuel | 251 | 133.37 |
| FG4773 | FR AM Passcar Fuel | 9 | 9.63 |
| FG4774 | FR AM Passcar Fuel | 11 | 5.89 |
| FG4774-M2 | FR AM Passcar Fuel | 93 | 49.23 |
| FG4775-M2 | FR AM Passcar Fuel | 121 | 96.08 |
| FG4776-01 | FR AM Passcar Fuel | 9 | 9.76 |
| FG4777-M3 | FR AM Passcar Fuel | 10,890 | 9,569.18 |
| FG4926 | FR AM Passcar Fuel | 19 | 65.60 |
| FG4927 | FR AM Passcar Fuel | 9 | 31.15 |
| FG5188 | FR AM Passcar Fuel | 107 | 126.23 |
| FG5237-01 | FR AM Passcar Fuel | 11 | 12.98 |
| FG5237-M3 | FR AM Passcar Fuel | 15,404 | 20,811.30 |
| FG5603-M2 | FR AM Passcar Fuel | 1,023 | 2,524.63 |
| FG5738A-M3 | FR AM Passcar Fuel | 3,581 | 5,292.60 |
| FG5738-M2 | FR AM Passcar Fuel | 205 | 302.98 |
| FG5857-M3 | FR AM Passcar Fuel | 9,232 | 12,023.06 |
| FG5870-M3 | FR AM Passcar Fuel | 20,237 | 23,388.07 |
| FG5982-M2 | FR AM Passcar Fuel | 205 | 525.39 |
| FG5-M2 | FR AM Passcar Fuel | 558 | 351.96 |
| FG6343 | FR AM Passcar Fuel | 28 | 103.77 |
| FG6344-M2 | FR AM Passcar Fuel | 299 | 317.90 |
| FG6348-03 | FR AM Passcar Fuel | 9 | 36.62 |
| FG6431 | FR AM Passcar Fuel | 19 | 27.66 |
| FG6435 | FR AM Passcar Fuel | 112 | 378.46 |
| FG6436 | FR AM Passcar Fuel | 28 | 27.87 |
| FG6437 | FR AM Passcar Fuel | 19 | 62.58 |
| FG6440 | FR AM Passcar Fuel | 9 | 33.95 |
| FG6442 | FR AM Passcar Fuel | 102 | 340.27 |
| FG6457 | FR AM Passcar Fuel | 12 | 29.93 |
| FG6458 | FR AM Passcar Fuel | 9 | 10.20 |
| FG6459 | FR AM Passcar Fuel | 9 | 12.45 |
| FG6459-01 | FR AM Passcar Fuel | 37 | 50.68 |
| FG6462-M2 | FR AM Passcar Fuel | 110 | 319.25 |
| FG6469-M2 | FR AM Passcar Fuel | 667 | 2,112.39 |
| FG6473 | FR AM Passcar Fuel | 9 | 31.15 |
| FG6475 | FR AM Passcar Fuel | 19 | 64.13 |
| FG6476 | FR AM Passcar Fuel | 19 | 70.12 |
| FG6495 | FR AM Passcar Fuel | 56 | 193.83 |
| FG6507-M3 | FR AM Passcar Fuel | 161 | 445.73 |
| FG6534-M2 | FR AM Passcar Fuel | 84 | 173.45 |
| FG6536 | FR AM Passcar Fuel | 9 | 29.65 |
| FG6553 | FR AM Passcar Fuel | 19 | 82.39 |
| FG6563 | FR AM Passcar Fuel | 112 | 224.88 |
| FG6566-M4 | FR AM Passcar Fuel | 267 | 472.39 |
| FG6567-M2 | FR AM Passcar Fuel | 112 | 238.16 |
| FG6572 | FR AM Passcar Fuel | 146 | 792.39 |
| FG6574 | FR AM Passcar Fuel | 84 | 297.52 |
| FG6612-01 | FR AM Passcar Fuel | 47 | 119.06 |
| FG6613-01 | FR AM Passcar Fuel | 6 | 29.26 |
| FG6674-M2 | FR AM Passcar Fuel | 84 | 259.13 |
| FG6678-M3 | FR AM Passcar Fuel | 763 | 2,353.73 |
| FG6679 | FR AM Passcar Fuel | 28 | 93.70 |
| FG6691 | FR AM Passcar Fuel | 37 | 206.35 |
| FG6692 | FR AM Passcar Fuel | 28 | 96.11 |
| FG6826-M3 | FR AM Passcar Fuel | 102 | 416.13 |
| FG6827-M2 | FR AM Passcar Fuel | 84 | 220.40 |
| FG6842 | FR AM Passcar Fuel | 19 | 87.53 |
| FG6895 | FR AM Passcar Fuel | 47 | 189.64 |
| FG6896 | FR AM Passcar Fuel | 65 | 333.86 |
| FG7072-M2 | FR AM Passcar Fuel | 56 | 135.72 |

FBG_CH1_00090641

| | | | |
|---|---|---|---|
| FG7092-M3 | FR AM Passcar Fuel | 791 | 1,048.43 |
| FG7143-M3 | FR AM Passcar Fuel | 679 | 611.01 |
| FG7144 | FR AM Passcar Fuel | 65 | 47.50 |
| FG7146-M2 | FR AM Passcar Fuel | 121 | 248.31 |
| FG7148 | FR AM Passcar Fuel | 12 | 44.44 |
| FG7150 | FR AM Passcar Fuel | 19 | 64.13 |
| FG7182 | FR AM Passcar Fuel | 26 | 95.17 |
| FG7194 | FR AM Passcar Fuel | 84 | 382.95 |
| FG7196-M3 | FR AM Passcar Fuel | 313 | 1,089.68 |
| FG7248-M2 | FR AM Passcar Fuel | 68 | 138.78 |
| FG7295 | FR AM Passcar Fuel | 9 | 22.95 |
| FG7295-M2 | FR AM Passcar Fuel | 28 | 71.40 |
| FG7296 | FR AM Passcar Fuel | 39 | 206.30 |
| FG7315-02 | FR AM Passcar Fuel | 316 | 724.47 |
| FG7315-M2 | FR AM Passcar Fuel | 9 | 9.45 |
| FG7315-M3 | FR AM Passcar Fuel | 9,263 | 9,730.04 |
| FG7333-M3 | FR AM Passcar Fuel | 2,334 | 2,507.95 |
| FG7367 | FR AM Passcar Fuel | 74 | 333.44 |
| FG7367-M2 | FR AM Passcar Fuel | 84 | 295.50 |
| FG7393-M2 | FR AM Passcar Fuel | 884 | 1,186.72 |
| FG7397 | FR AM Passcar Fuel | 19 | 86.60 |
| FG7398-M2 | FR AM Passcar Fuel | 363 | 1,605.58 |
| FG7399-M3 | FR AM Passcar Fuel | 698 | 1,480.12 |
| FG7404-M3 | FR AM Passcar Fuel | 1,972 | 2,381.90 |
| FG7416 | FR AM Passcar Fuel | 188 | 398.20 |
| FG7418 | FR AM Passcar Fuel | 37 | 128.46 |
| FG7428-M3 | FR AM Passcar Fuel | 200 | 461.00 |
| FG7599-M3 | FR AM Passcar Fuel | 1,442 | 5,015.91 |
| FG7609-03 | FR AM Passcar Fuel | 19 | 169.67 |
| FG7610-03 | FR AM Passcar Fuel | 54 | 482.21 |
| FG7612-M2 | FR AM Passcar Fuel | 837 | 2,267.69 |
| FG7616 | FR AM Passcar Fuel | 9 | 38.70 |
| FG7629-M2 | FR AM Passcar Fuel | 279 | 680.99 |
| FG7729-M3 | FR AM Passcar Fuel | 279 | 544.79 |
| FG7731 | FR AM Passcar Fuel | 9 | 36.42 |
| FG7731-M2 | FR AM Passcar Fuel | 37 | 106.37 |
| FG7736 | FR AM Passcar Fuel | 19 | 97.08 |
| FG7740-M2 | FR AM Passcar Fuel | 632 | 1,317.47 |
| FG7745 | FR AM Passcar Fuel | 19 | 294.91 |
| FG7759-AZ | FR AM Passcar Fuel | 5 | 18.00 |
| FG7760-M2 | FR AM Passcar Fuel | 335 | 1,341.14 |
| FG7767-M3 | FR AM Passcar Fuel | 56 | 133.49 |
| FG7769 | FR AM Passcar Fuel | 19 | 85.91 |
| FG7770-M3 | FR AM Passcar Fuel | 19 | 71.81 |
| FG7771 | FR AM Passcar Fuel | 19 | 68.54 |
| FG8008 | FR AM Passcar Fuel | 9 | 49.67 |
| FG8015 | FR AM Passcar Fuel | 9 | 38.26 |
| FG8016 | FR AM Passcar Fuel | 47 | 247.12 |
| FG8018-M3 | FR AM Passcar Fuel | 30,402 | 36,661.53 |
| FG8078-M3 | FR AM Passcar Fuel | 93 | 529.44 |
| FG8122 | FR AM Passcar Fuel | 19 | 86.34 |
| FG8123-M2 | FR AM Passcar Fuel | 140 | 488.29 |
| FG8160 | FR AM Passcar Fuel | 37 | 185.92 |
| FG8164-M2 | FR AM Passcar Fuel | 419 | 927.46 |
| FG8207-M2 | FR AM Passcar Fuel | 130 | 362.91 |
| FG8211 | FR AM Passcar Fuel | 19 | 86.62 |
| FG8216 | FR AM Passcar Fuel | 56 | 168.60 |
| FG8219-02 | FR AM Passcar Fuel | 2 | 3.29 |
| FG8219-M3 | FR AM Passcar Fuel | 4,883 | 6,443.33 |
| FG8279-M2 | FR AM Passcar Fuel | 9 | 30.99 |
| FG8414-01 | FR AM Passcar Fuel | 242 | 2,109.74 |
| FG8415-01 | FR AM Passcar Fuel | 112 | 988.27 |
| FG8532-M2 | FR AM Passcar Fuel | 65 | 223.86 |
| FG8711-01 | FR AM Passcar Fuel | 102 | 453.09 |
| FG8758 | FR AM Passcar Fuel | 11 | 17.18 |
| FG8758-M2 | FR AM Passcar Fuel | 245 | 367.65 |
| FG8861A | FR AM Passcar Fuel | 2 | 11.72 |
| FG8861A-M3 | FR AM Passcar Fuel | 330 | 1,265.60 |
| FG89 | FR AM Passcar Fuel | 37 | 49.01 |
| FG9041-M2 | FR AM Passcar Fuel | 270 | 1,252.28 |
| FG9272-M1 | FR AM Passcar Fuel | 2,406 | 14,725.88 |
| FG9279-M3 | FR AM H Duty Fuel | 651 | 1,681.53 |
| FG9291 | FR AM Passcar Fuel | 5,380 | 8,338.54 |
| FG9343-M2 | FR AM Passcar Fuel | 4,873 | 17,841.12 |
| FG9344-M2 | FR AM Passcar Fuel | 772 | 2,355.38 |
| FG9370-M1 | FR AM Passcar Fuel | 31 | 403.48 |
| FG9370-M2 | FR AM Passcar Fuel | 381 | 3,875.01 |

FBG_CH1_00090642

| | | | |
|---|---|---|---|
| FG9604-M2 | FR AM Passcar Fuel | 481 | 3,012.11 |
| FG9607 | FR AM Passcar Fuel | 2 | 4.78 |
| FG9607-M2 | FR AM Passcar Fuel | 93 | 222.28 |
| FG9611-M3 | FR AM Passcar Fuel | 307 | 1,084.04 |
| FG9729-M2 | FR AM Passcar Fuel | 605 | 858.45 |
| FG9791-M2 | FR AM Passcar Fuel | 298 | 1,127.41 |
| FG9795-M2 | FR AM Passcar Fuel | 214 | 521.60 |
| FG9796-M2 | FR AM Passcar Fuel | 316 | 827.27 |
| FG9960-M3 | FR AM Passcar Fuel | 4,799 | 7,945.13 |
| FG9961-M2 | FR AM Passcar Fuel | 332 | 835.83 |
| FHM2 | FR AM Hi Mileage Oil | 26 | 57.82 |
| FHM2870A | FR AM Hi Mileage Oil | 149 | 311.88 |
| FHM3387A | FR AM Hi Mileage Oil | 121 | 214.32 |
| FHM3600 | FR AM Hi Mileage Oil | 84 | 169.37 |
| FHM3675 | FR AM Hi Mileage Oil | 19 | 35.58 |
| FHM3980 | FR AM Hi Mileage Oil | 921 | 1,758.81 |
| FHM4967 | FR AM Hi Mileage Oil | 9 | 22.33 |
| FHM5 | FR AM Hi Mileage Oil | 419 | 982.18 |
| FHM8A | FR AM Hi Mileage Oil | 19 | 43.89 |
| FHP1-03 | FR AM Racing Oil | 140 | 410.74 |
| FHP3 | FR AM Racing Oil | 26 | 94.48 |
| FHPH11000FP | FR AM H Perf Oil | 56 | 650.02 |
| FHPH3690FP | FR AM H Perf Oil | 19 | 126.61 |
| FHPH49AFP | FR AM H Perf Oil | 9 | 77.64 |
| FHPH6349AFP-02 | FR AM H Perf Oil | 130 | 2,586.10 |
| FHPH9617FP | FR AM H Perf Oil | 47 | 428.56 |
| FHPK1 | FR AM Other | 37 | 630.86 |
| FK10489A | FR AM H Duty Fuel | 9 | 371.34 |
| FK10826 | FR AM Passcar Fuel | 25 | 631.98 |
| FK3926M | FR AM Other H Duty | 9 | 309.42 |
| FP10715-01 | FR AM H Duty Fuel | 74 | 495.62 |
| FP1101A-01 | FR AM H Duty Fuel | 56 | 185.28 |
| FP1103A-01 | FR AM H Duty Fuel | 102 | 470.57 |
| FP1104-01 | FR AM H Duty Fuel | 74 | 264.43 |
| FP1105-01 | FR AM H Duty Fuel | 47 | 294.38 |
| FP1106 | FR AM H Duty Fuel | 186 | 697.75 |
| FP1107 | FR AM H Duty Fuel | 19 | 142.45 |
| FP1107-01 | FR AM H Duty Fuel | 37 | 218.85 |
| FP1108-01 | FR AM H Duty Fuel | 37 | 202.35 |
| FP1109-01 | FR AM H Duty Fuel | 28 | 133.56 |
| FP1110 | FR AM H Duty Fuel | 9 | 37.73 |
| FP1112 | FR AM H Duty Fuel | 19 | 112.55 |
| FP1118 | FR AM H Duty Fuel | 8 | 56.44 |
| FP1118-01 | FR AM H Duty Fuel | 37 | 182.30 |
| FP1119 | FR AM H Duty Fuel | 16 | 59.65 |
| FP1120 | FR AM H Duty Fuel | 54 | 206.72 |
| FP1121-01 | FR AM H Duty Air | 9 | 58.47 |
| FP1127-01 | FR AM H Duty Fuel | 19 | 90.03 |
| FP1129A | FR AM H Duty Fuel | 93 | 620.49 |
| FP1131-01 | FR AM H Duty Fuel | 47 | 191.84 |
| FP1145A | FR AM H Duty Fuel | 47 | 291.18 |
| FP1146G-01 | FR AM H Duty Fuel | 65 | 262.56 |
| FP1147G-01 | FR AM H Duty Fuel | 65 | 239.84 |
| FP1653A-01 | FR AM Other H Duty | 74 | 228.38 |
| FP1654A-01 | FR AM Other H Duty | 74 | 228.38 |
| FP1656 | FR AM Other H Duty | 47 | 268.78 |
| FP3317-01 | FR AM H Duty Oil | 19 | 91.24 |
| FP3318-01 | FR AM H Duty Oil | 19 | 92.24 |
| FP3319-01 | FR AM H Duty Fuel | 28 | 161.44 |
| FP3340 | FR AM H Duty Fuel | 37 | 162.75 |
| FP3375 | FR AM H Duty Fuel | 19 | 80.66 |
| FP3376-01 | FR AM H Duty Fuel | 37 | 238.80 |
| FP3380-01 | FR AM H Duty Fuel | 93 | 806.06 |
| FP3380-02 | FR AM H Duty Fuel | 37 | 216.30 |
| FP3398 | FR AM Other H Duty | 19 | 75.09 |
| FP3401-01 | FR AM H Duty Fuel | 56 | 261.20 |
| FP3404 | FR AM H Duty Oil | 9 | 32.56 |
| FP3415 | FR AM Other H Duty | 88 | 747.81 |
| FP3430A-01 | FR AM H Duty Fuel | 65 | 502.80 |
| FP3431 | FR AM H Duty Fuel | 9 | 45.65 |
| FP3500 | FR AM Passcar Fuel | 19 | 129.87 |
| FP3528A-01 | FR AM H Duty Fuel | 206 | 622.68 |
| FP3555A | FR AM H Duty Oil | 37 | 309.16 |
| FP3555PL-02 | FR AM H Duty Oil | 130 | 923.52 |
| FP3594-02 | FR AM H Duty Fuel | 40 | 177.25 |
| FP3595-02 | FR AM H Duty Fuel | 51 | 196.29 |
| FP3613 | FR AM H Duty Oil | 9 | 52.13 |

FBG_CH1_00090643

| | | | |
|---|---|---|---|
| FP3627-01 | FR AM H Duty Fuel | 74 | 133.34 |
| FP3710-01 | FR AM H Duty Fuel | 9 | 49.90 |
| FP3710-02 | FR AM H Duty Fuel | 9 | 67.90 |
| FP3710-AZ | FR AM H Duty Fuel | 19 | 143.35 |
| FP3726-M2 | FR AM Passcar Fuel | 84 | 232.26 |
| FP3755 | FR AM Other H Duty | 161 | 971.05 |
| FP3760 | FR AM Other H Duty | 9 | 38.32 |
| FP3767-01 | FR AM H Duty Fuel | 9 | 75.43 |
| FP3767-M2 | FR AM H Duty Fuel | 102 | 319.17 |
| FP3768A | FR AM H Duty Fuel | 37 | 253.91 |
| FP3780 | FR AM Other H Duty | 9 | 64.24 |
| FP3804 | FR AM H Duty Fuel | 353 | 2,121.24 |
| FP3805-01 | FR AM H Duty Fuel | 37 | 339.50 |
| FP3815A | FR AM H Duty Fuel | 270 | 2,796.12 |
| FP3828 | FR AM H Duty Oil | 28 | 240.91 |
| FP3951 | FR AM Other H Duty | 56 | 432.93 |
| FP3952 | FR AM Other H Duty | 56 | 278.74 |
| FP3961 | FR AM Other H Duty | 9 | 104.37 |
| FP4102A-02 | FR AM H Duty Fuel | 130 | 312.53 |
| FP4173 | FR AM Passcar Fuel | 68 | 78.84 |
| FP5158 | FR AM Other H Duty | 56 | 690.32 |
| FP5694 | FR AM H Duty Fuel | 56 | 248.14 |
| FP6321 | FR AM H Duty Fuel | 9 | 51.51 |
| FP6444 | FR AM Passcar Fuel | 9 | 13.38 |
| FP6445 | FR AM Passcar Fuel | 19 | 77.87 |
| FP6446 | FR AM Passcar Fuel | 19 | 17.80 |
| FP6503-01 | FR AM H Duty Fuel | 205 | 375.00 |
| FP6697 | FR AM H Duty Oil | 37 | 211.76 |
| FP6871 | FR AM Other H Duty | 39 | 786.92 |
| FP6881 | FR AM Other H Duty | 74 | 1,335.72 |
| FP6882 | FR AM Other H Duty | 19 | 413.60 |
| FP6883 | FR AM Other H Duty | 239 | 3,669.30 |
| FP6888 | FR AM Other H Duty | 3 | 52.18 |
| FP6892 | FR AM Other H Duty | 23 | 474.12 |
| FP6893 | FR AM Other H Duty | 3 | 71.24 |
| FP6904-02 | FR AM H Duty Fuel | 47 | 186.86 |
| FP7026 | FR AM Other H Duty | 74 | 1,309.87 |
| FP7040 | FR AM Other H Duty | 19 | 173.65 |
| FP7041 | FR AM Other H Duty | 19 | 428.99 |
| FP7075 | FR AM H Duty Fuel | 9 | 35.69 |
| FP7077 | FR AM Other H Duty | 31 | 925.94 |
| FP7084 | FR AM Other H Duty | 9 | 339.44 |
| FP7253 | FR AM Other H Duty | 19 | 376.07 |
| FP7254 | FR AM Other H Duty | 3 | 88.24 |
| FP7363 | FR AM H Duty Fuel | 56 | 269.50 |
| FP7514 | FR AM H Duty Fuel | 84 | 404.76 |
| FP7531 | FR AM Other H Duty | 9 | 58.14 |
| FP7536 | FR AM Other H Duty | 3 | 181.83 |
| FP7565 | FR AM Other H Duty | 19 | 561.79 |
| FP7566 | FR AM Other H Duty | 28 | 353.46 |
| FP7572 | FR AM H Duty Fuel | 65 | 196.48 |
| FP7742 | FR AM H Duty Fuel | 19 | 76.86 |
| FP8021 | FR AM H Duty Fuel | 34 | 840.04 |
| FP8022 | FR AM H Duty Fuel | 47 | 960.15 |
| FP8024 | FR AM H Duty Fuel | 9 | 273.36 |
| FP8043 | FR AM H Duty Fuel | 74 | 569.74 |
| FP8044-01 | FR AM Other H Duty | 102 | 180.91 |
| FP8049 | FR AM H Duty Fuel | 19 | 148.00 |
| FP8050 | FR AM H Duty Fuel | 9 | 69.51 |
| FP8191 | FR AM H Duty Fuel | 84 | 498.54 |
| FP8224 | FR AM Other H Duty | 19 | 208.40 |
| FP8264-01 | FR AM H Duty Fuel | 9 | 48.65 |
| FP8264-02 | FR AM H Duty Fuel | 65 | 193.44 |
| FP8265 | FR AM H Duty Fuel | 19 | 86.81 |
| FP8307 | FR AM Other H Duty | 3 | 73.46 |
| FP8317 | FR AM H Duty Fuel | 37 | 307.99 |
| FP8334-01 | FR AM H Duty Fuel | 65 | 322.16 |
| FP8335-01 | FR AM H Duty Fuel | 130 | 874.81 |
| FP8336 | FR AM H Duty Fuel | 47 | 356.38 |
| FP8430 | FR AM H Duty Fuel | 9 | 113.61 |
| FP8451 | FR AM H Duty Fuel | 8 | 35.45 |
| FP8480 | FR AM H Duty Fuel | 74 | 411.76 |
| FP8552 | FR AM Other H Duty | 37 | 366.54 |
| FP8595 | FR AM Other H Duty | 19 | 711.10 |
| FP8604 | FR AM Other H Duty | 19 | 332.81 |
| FP8707 | FR AM Other H Duty | 19 | 148.18 |
| FP9454 | FR AM H Duty Fuel | 26 | 198.37 |

FBG_CH1_00090644

| | | | |
|---|---|---|---|
| FP9458 | FR AM H Duty Fuel | 19 | 104.63 |
| FP9626 | FR AM H Duty Fuel | 19 | 115.43 |
| FP9644 | FR AM H Duty Fuel | 28 | 278.14 |
| FPA10436 | FR AM Fresh Brz Air | 155 | 1,162.18 |
| FPA1508 | FR AM H Duty Air | 11 | 457.83 |
| FPA2 | FR AM H Duty Air | 33 | 1,644.09 |
| FPA2571 | FR AM H Duty Air | 26 | 890.04 |
| FPA5001 | FR AM H Duty Air | 12 | 234.42 |
| FPA5006 | FR AM H Duty Air | 3 | 52.64 |
| FPA5013 | FR AM H Duty Air | 3 | 36.66 |
| FPA5038 | FR AM H Duty Air | 6 | 60.87 |
| FPB50-01 | FR AM H Duty Oil | 82 | 339.04 |
| FPH10060-10P | FR AM Extra Gd Oil | 17 | 22.91 |
| FPH10060-12 | FR AM Extra Gd Oil | 76,060 | 102,435.22 |
| FPH10220 | FR AM H Duty Oil | 53 | 467.33 |
| FPH10575 | FR AM Extra Gd Oil | 6 | 6.70 |
| FPH10575-12 | FR AM Extra Gd Oil | 8,993 | 12,978.54 |
| FPH10600-10 | FR AM Extra Gd Oil | 1,962 | 4,788.87 |
| FPH10757 | FR AM Extra Gd Oil | 28 | 58.09 |
| FPH10757-M2 | FR AM Extra Gd Oil | 22,181 | 46,018.72 |
| FPH10792 | FR AM Other H Duty | 9 | 39.88 |
| FPH10890-11 | FR AM Extra Gd Oil | 112 | 385.83 |
| FPH10959 | FR AM Other H Duty | 74 | 329.48 |
| FPH11-07 | FR AM Extra Gd Oil | 392 | 684.99 |
| FPH11462 | FR AM Extra Gd Oil | 12,186 | 17,888.86 |
| FPH12060-12 | FR AM Extra Gd Oil | 1,693 | 2,292.40 |
| FPH16-10P | FR AM Extra Gd Oil | 16 | 27.80 |
| FPH16-12 | FR AM Extra Gd Oil | 61,409 | 106,628.42 |
| FPH16FP-02 | FR AM Extra Gd Oil | 632 | 951.54 |
| FPH20A-02 | FR AM H Duty Oil | 223 | 605.67 |
| FPH21 | FR AM H Duty Oil | 140 | 440.29 |
| FPH2-10P | FR AM Extra Gd Oil | 11 | 19.18 |
| FPH2-12 | FR AM Extra Gd Oil | 44,212 | 77,038.32 |
| FPH25-10 | FR AM Extra Gd Oil | 729 | 1,169.29 |
| FPH2815-01 | FR AM Extra Gd Oil | 56 | 264.75 |
| FPH2815-AZ | FR AM Extra Gd Oil | 9 | 30.70 |
| FPH2821A-01 | FR AM H Duty Oil | 28 | 100.94 |
| FPH2825-07 | FR AM Extra Gd Oil | 5,811 | 7,914.13 |
| FPH2836 | FR AM Extra Gd Oil | 1,172 | 5,263.56 |
| FPH2842-10 | FR AM Extra Gd Oil | 74 | 286.37 |
| FPH2844 | FR AM Extra Gd Oil | 37 | 57.36 |
| FPH2849A-07 | FR AM Extra Gd Oil | 1,302 | 1,917.62 |
| FPH2865A | FR AM Extra Gd Oil | 47 | 278.95 |
| FPH2870A-12 | FR AM Extra Gd Oil | 69,522 | 101,778.97 |
| FPH2870B | FR AM Extra Gd Oil | 155 | 306.44 |
| FPH2883 | FR AM H Duty Oil | 28 | 247.87 |
| FPH2895 | FR AM H Duty Oil | 19 | 46.20 |
| FPH2921-01 | FR AM Extra Gd Oil | 9 | 30.99 |
| FPH2931-01 | FR AM Extra Gd Oil | 12 | 46.29 |
| FPH2931-10 | FR AM Extra Gd Oil | 37 | 138.88 |
| FPH2951-10P | FR AM Extra Gd Oil | 2,027 | 2,788.70 |
| FPH2953A | FR AM H Duty Oil | 9 | 39.96 |
| FPH2960 | FR AM H Duty Oil | 14 | 75.32 |
| FPH2977A | FR AM Extra Gd Oil | 9 | 30.05 |
| FPH2FP | FR AM Extra Gd Oil | 74 | 79.48 |
| FPH2FP-02 | FR AM Extra Gd Oil | 400 | 614.97 |
| FPH30-12 | FR AM Extra Gd Oil | 11,197 | 17,903.28 |
| FPH30FP-01 | FR AM Extra Gd Oil | 84 | 98.79 |
| FPH3306A-01 | FR AM H Duty Oil | 74 | 303.61 |
| FPH3335-01 | FR AM H Duty Oil | 140 | 1,259.39 |
| FPH3387A-12 | FR AM Extra Gd Oil | 101,751 | 125,513.64 |
| FPH3387AFP-02 | FR AM Extra Gd Oil | 893 | 883.28 |
| FPH3403 | FR AM H Duty Oil | 37 | 135.59 |
| FPH3426 | FR AM H Duty Oil | 9 | 62.32 |
| FPH3429 | FR AM Extra Gd Oil | 177 | 124.80 |
| FPH3506-09 | FR AM Extra Gd Oil | 3 | 3.66 |
| FPH3506-12 | FR AM Extra Gd Oil | 26,889 | 33,034.17 |
| FPH3506FP | FR AM Extra Gd Oil | 9 | 8.56 |
| FPH3506FP-01 | FR AM Extra Gd Oil | 130 | 128.21 |
| FPH3508-M2 | FR AM Extra Gd Oil | 298 | 585.29 |
| FPH3512 | FR AM Extra Gd Oil | 19 | 45.95 |
| FPH3519A-01 | FR AM H Duty Air | 102 | 274.44 |
| FPH3531-07 | FR AM Extra Gd Oil | 140 | 248.92 |
| FPH3534 | FR AM H Duty Oil | 9 | 66.03 |
| FPH3534-01 | FR AM H Duty Oil | 74 | 374.93 |
| FPH3545-01 | FR AM H Duty Oil | 65 | 303.86 |
| FPH3567-01 | FR AM Other H Duty | 37 | 271.55 |

FBG_CH1_00090645

| | | | |
|---|---|---|---|
| FPH3569-10 | FR AM Extra Gd Oil | 1,107 | 2,823.57 |
| FPH3589-01 | FR AM H Duty Oil | 37 | 187.46 |
| FPH3593A | FR AM Extra Gd Oil | 11 | 10.55 |
| FPH3593A-10P | FR AM Extra Gd Oil | 6 | 8.25 |
| FPH3593A-12 | FR AM Extra Gd Oil | 44,741 | 61,469.70 |
| FPH3593AFP-01 | FR AM Extra Gd Oil | 167 | 121.77 |
| FPH3600-10P | FR AM Extra Gd Oil | 3 | 4.38 |
| FPH3600-12 | FR AM Extra Gd Oil | 83,812 | 122,334.46 |
| FPH3600FP-02 | FR AM Extra Gd Oil | 698 | 814.40 |
| FPH3612-01 | FR AM H Duty Oil | 140 | 1,035.51 |
| FPH3614-10P | FR AM Extra Gd Oil | 17 | 22.80 |
| FPH3614-12 | FR AM Extra Gd Oil | 159,878 | 214,270.61 |
| FPH3614FP-01 | FR AM Extra Gd Oil | 31 | 21.97 |
| FPH3614FP-02 | FR AM Extra Gd Oil | 716 | 741.76 |
| FPH3616 | FR AM H Duty Oil | 102 | 529.30 |
| FPH3639-10 | FR AM Extra Gd Oil | 37 | 90.84 |
| FPH3639-AZ | FR AM Extra Gd Oil | 19 | 51.90 |
| FPH3675-07 | FR AM Extra Gd Oil | 11,924 | 15,759.84 |
| FPH3675FP-01 | FR AM Extra Gd Oil | 84 | 89.94 |
| FPH3682-10P | FR AM Extra Gd Oil | 2 | 2.65 |
| FPH3682-12 | FR AM Extra Gd Oil | 111,774 | 147,952.01 |
| FPH3689 | FR AM H Duty Oil | 28 | 141.66 |
| FPH3690-02 | FR AM H Duty Oil | 74 | 363.48 |
| FPH36A-02 | FR AM H Duty Oil | 93 | 217.75 |
| FPH3757-01 | FR AM H Duty Oil | 56 | 429.62 |
| FPH3766-10 | FR AM Passcar Fuel | 539 | 2,216.97 |
| FPH3773 | FR AM H Duty Oil | 93 | 848.00 |
| FPH3776-01 | FR AM H Duty Oil | 65 | 303.57 |
| FPH3786-11 | Extra Gd Cartridges | 952 | 4,084.80 |
| FPH3816-AZ | FR AM Extra Gd Oil | 19 | 87.60 |
| FPH3900-01 | FR AM H Duty Oil | 212 | 551.55 |
| FPH3950 | FR AM Extra Gd Oil | 47 | 56.37 |
| FPH3950-07 | FR AM Extra Gd Oil | 1,389 | 2,464.78 |
| FPH3976A-11 | Extra Gd Cartridges | 493 | 1,387.42 |
| FPH3980-12 | FR AM Extra Gd Oil | 13,246 | 17,921.21 |
| FPH3985-07 | FR AM Extra Gd Oil | 1,285 | 2,244.11 |
| FPH4 | FR AM Extra Gd Oil | 45 | 494.87 |
| FPH43-07 | FR AM Extra Gd Oil | 18,749 | 32,480.45 |
| FPH4386-12 | FR AM Extra Gd Oil | 21,840 | 27,407.66 |
| FPH4386FP | FR AM Extra Gd Oil | 251 | 273.42 |
| FPH44 | FR AM H Duty Oil | 9 | 43.06 |
| FPH44-01 | FR AM H Duty Oil | 19 | 128.26 |
| FPH4558 | FR AM Extra Gd Oil | 736 | 1,517.99 |
| FPH46-12 | FR AM Extra Gd Oil | 264 | 352.69 |
| FPH4681-07 | FR AM Extra Gd Oil | 93 | 154.69 |
| FPH47 | FR AM Other H Duty | 3 | 15.89 |
| FPH47-01 | FR AM Other H Duty | 65 | 477.04 |
| FPH4704 | FR AM H Duty Oil | 9 | 33.34 |
| FPH4722 | FR AM Extra Gd Oil | 19 | 35.28 |
| FPH4731 | FR AM H Duty Oil | 28 | 1,249.03 |
| FPH4967-12 | FR AM Extra Gd Oil | 24,081 | 29,268.71 |
| FPH49A-01 | FR AM H Duty Oil | 93 | 745.00 |
| FPH5046 | FR AM H Duty Oil | 37 | 173.59 |
| FPH5-12 | FR AM Extra Gd Oil | 13,873 | 24,872.26 |
| FPH52 | FR AM H Duty Oil | 9 | 70.77 |
| FPH5343-12 | FR AM Extra Gd Oil | 623 | 906.09 |
| FPH5548 | FR AM Extra Gd Oil | 28,212 | 63,351.39 |
| FPH5566 | FR AM Extra Gd Oil | 130 | 216.44 |
| FPH5618-07 | FR AM Extra Gd Oil | 279 | 569.97 |
| FPH5796 | FR AM Extra Gd Oil | 20,885 | 37,467.64 |
| FPH6010A-02 | FR AM Extra Gd Oil | 112 | 147.42 |
| FPH6016 | FR AM Extra Gd Oil | 9 | 7.85 |
| FPH6017A | FR AM Extra Gd Oil | 2 | 1.93 |
| FPH6017A-02 | FR AM Extra Gd Oil | 936 | 1,030.30 |
| FPH6018 | FR AM Extra Gd Oil | 5 | 5.27 |
| FPH6018-02 | FR AM Extra Gd Oil | 3,591 | 4,162.17 |
| FPH6019-01 | FR AM Extra Gd Oil | 214 | 528.92 |
| FPH6022-02 | FR AM Extra Gd Oil | 884 | 1,171.43 |
| FPH6063 | FR AM Extra Gd Oil | 167 | 348.60 |
| FPH6063-01 | FR AM Extra Gd Oil | 121 | 342.05 |
| FPH6065B-05 | FR AM Extra Gd Oil | 135 | 407.75 |
| FPH6068-01 | FR AM Extra Gd Oil | 9 | 38.23 |
| FPH6068-02 | FR AM Extra Gd Oil | 74 | 223.51 |
| FPH6349A-02 | FR AM H Duty Oil | 28 | 208.34 |
| FPH6355-10 | FR AM Extra Gd Oil | 3,501 | 12,604.29 |
| FPH6357 | FR AM Extra Gd Oil | 19 | 35.76 |
| FPH6606 | FR AM H Duty Oil | 9 | 27.04 |

FBG_CH1_00090646

| | | | |
|---|---|---|---|
| FPH6607-12 | FR AM Extra Gd Oil | 22,646 | 26,092.08 |
| FPH6607FP | FR AM Extra Gd Oil | 9 | 12.56 |
| FPH6607FP-01 | FR AM Extra Gd Oil | 2,920 | 2,851.27 |
| FPH6644 | FR AM H Duty Oil | 19 | 130.27 |
| FPH6657 | FR AM H Duty Oil | 37 | 91.52 |
| FPH6923 | FR AM H Duty Oil | 9 | 46.70 |
| FPH6941 | FR AM Extra Gd Oil | 17 | 54.70 |
| FPH7136 | FR AM H Duty Oil | 74 | 555.81 |
| FPH7136-01 | FR AM H Duty Oil | 121 | 732.43 |
| FPH7138-01 | FR AM H Duty Oil | 47 | 478.04 |
| FPH7202 | FR AM H Duty Oil | 140 | 497.31 |
| FPH7309 | FR AM H Duty Oil | 37 | 166.51 |
| FPH7317-12 | FR AM Extra Gd Oil | 51,784 | 64,518.02 |
| FPH7317FP | FR AM Extra Gd Oil | 9 | 13.07 |
| FPH7317FP-01 | FR AM Extra Gd Oil | 986 | 1,067.04 |
| FPH7325 | FR AM Extra Gd Oil | 37 | 121.51 |
| FPH7328-07 | FR AM Extra Gd Oil | 186 | 319.87 |
| FPH7405A-01 | FR AM H Duty Oil | 223 | 2,202.04 |
| FPH7496 | FR AM H Duty Oil | 6 | 54.52 |
| FPH7650-01 | FR AM H Duty Oil | 84 | 299.24 |
| FPH7-AZ | FR AM H Duty Oil | 9 | 33.45 |
| FPH8172-10 | FR AM H Duty Oil | 28 | 52.69 |
| FPH8212-10 | FR AM Extra Gd Oil | 147 | 330.88 |
| FPH8316-10P | FR AM Extra Gd Oil | 2,455 | 4,331.34 |
| FPH8316FP | FR AM Extra Gd Oil | 9 | 12.19 |
| FPH8476 | FR AM H Duty Oil | 1,733 | 10,003.78 |
| FPH8531 | FR AM H Duty Oil | 9 | 111.35 |
| FPH8691A-01 | FR AM H Duty Oil | 33 | 537.30 |
| FPH8830-01 | FR AM Extra Gd Oil | 93 | 334.30 |
| FPH8842-01 | FR AM H Duty Oil | 37 | 243.11 |
| FPH8873-10P | FR AM Extra Gd Oil | 409 | 706.43 |
| FPH8942-02 | FR AM H Duty Oil | 102 | 273.84 |
| FPH8942-AZ | FR AM H Duty Oil | 3 | 8.05 |
| FPH8994-10 | FR AM Extra Gd Oil | 2,623 | 6,434.26 |
| FPH8A-10P | FR AM Extra Gd Oil | 3 | 5.51 |
| FPH8A-12 | FR AM Extra Gd Oil | 6,355 | 11,662.12 |
| FPH8AFP-02 | FR AM Extra Gd Oil | 195 | 307.53 |
| FPH9010-07 | FR AM Extra Gd Oil | 508 | 1,021.75 |
| FPH9100-12 | FR AM Extra Gd Oil | 856 | 1,623.20 |
| FPH9342 | FR AM H Duty Oil | 19 | 66.27 |
| FPH9566 | FR AM Extra Gd Oil | 56 | 185.07 |
| FPH9602 | FR AM Extra Gd Oil | 9 | 10.11 |
| FPH9648 | FR AM Extra Gd Oil | 3,230 | 6,188.80 |
| FPH966B-07 | FR AM Extra Gd Oil | 626 | 715.31 |
| FPH9688-07 | FR AM Extra Gd Oil | 60 | 64.24 |
| FPH9688-12 | FR AM Extra Gd Oil | 15,605 | 21,391.96 |
| FPH9715-07 | FR AM Extra Gd Oil | 56 | 61.69 |
| FPH9837-12 | FR AM Extra Gd Oil | 22,227 | 27,394.99 |
| FPH9897-12 | FR AM Extra Gd Oil | 335 | 453.35 |
| FPH9971A-01 | FR AM H Duty Oil | 130 | 2,510.37 |
| FPR3304-M2 | FR AM Other H Duty | 149 | 377.17 |
| FPR3383-01 | FR AM Other H Duty | 9 | 25.19 |
| FPR3414 | FR AM Other H Duty | 22 | 106.65 |
| FPR3433 | FR AM Other H Duty | 65 | 670.48 |
| FPR3753 | FR AM Other H Duty | 28 | 217.95 |
| FPR3907 | FR AM Other H Duty | 37 | 270.37 |
| FPR3908 | FR AM Other H Duty | 56 | 210.53 |
| FPR3909 | FR AM Other H Duty | 19 | 106.64 |
| FPR393 | FR AM Other H Duty | 19 | 90.93 |
| FPR7308 | FR AM Other H Duty | 19 | 82.02 |
| FPR8591 | FR AM Other H Duty | 19 | 99.89 |
| FPR8693 | FR AM Other H Duty | 37 | 818.95 |
| FPR8694 | FR AM Other H Duty | 28 | 362.06 |
| FPS10264 | FR AM H Duty Fuel | 37 | 548.74 |
| FPS10265 | FR AM Passcar Fuel | 3 | 12.59 |
| FPS10265-M2 | FR AM Passcar Fuel | 129 | 541.57 |
| FPS10451-M3 | FR AM H Duty Fuel | 214 | 703.01 |
| FPS10716-01 | FR AM H Duty Fuel | 47 | 483.29 |
| FPS10964 | FR AM H Duty Fuel | 9 | 222.40 |
| FPS10980 | FR AM H Duty Fuel | 16 | 214.70 |
| FPS3607A | FR AM H Duty Fuel | 19 | 151.72 |
| FPS3712-02 | FR AM H Duty Fuel | 112 | 513.36 |
| FPS3808-01 | FR AM H Duty Fuel | 65 | 293.54 |
| FPS4836 | FR AM H Duty Fuel | 28 | 151.26 |
| FPS4886 | FR AM H Duty Fuel | 5 | 20.33 |
| FPS4886-M3 | FR AM H Duty Fuel | 130 | 401.39 |
| FPS4922-M2 | FR AM H Duty Fuel | 99 | 298.63 |

FBG_CH1_00090647

| | | | |
|---|---|---|---|
| FPS5896-01 | FR AM Passcar Fuel | 198 | 636.25 |
| FPS6554A | FR AM Passcar Fuel | 74 | 730.76 |
| FPS6628 | FR AM Passcar Fuel | 73 | 468.82 |
| FPS6829 | FR AM H Duty Fuel | 56 | 410.05 |
| FPS6830 | FR AM H Duty Fuel | 84 | 551.92 |
| FPS6831 | FR AM H Duty Fuel | 9 | 52.61 |
| FPS7171-01 | FR AM H Duty Fuel | 177 | 1,429.14 |
| FPS7358 | FR AM Passcar Fuel | 93 | 618.93 |
| FPS7407A | FR AM H Duty Fuel | 172 | 1,234.83 |
| FPS7569A | FR AM H Duty Fuel | 56 | 427.68 |
| FPS7713 | FR AM H Duty Fuel | 43 | 507.45 |
| FPS7714 | FR AM H Duty Fuel | 19 | 221.94 |
| FPS7716 | FR AM H Duty Fuel | 37 | 439.25 |
| FPS7749 | FR AM Passcar Fuel | 56 | 527.82 |
| FPS8047 | FR AM H Duty Fuel | 28 | 227.73 |
| FPS8132 | FR AM H Duty Fuel | 93 | 1,028.65 |
| FPS8186 | FR AM H Duty Fuel | 37 | 401.64 |
| FPS8187 | FR AM H Duty Fuel | 28 | 285.76 |
| FPS8239 | FR AM H Duty Fuel | 65 | 500.44 |
| FPS8322 | FR AM H Duty Fuel | 28 | 171.22 |
| FPS8450 | FR AM H Duty Fuel | 19 | 219.61 |
| FPS8486 | FR AM H Duty Fuel | 56 | 546.80 |
| FPS8687 | FR AM H Duty Fuel | 19 | 226.37 |
| FPS8688 | FR AM H Duty Fuel | 19 | 345.65 |
| FPS9000 | FR AM H Duty Fuel | 23 | 178.30 |
| FPS9025 | FR AM H Duty Fuel | 274 | 3,725.23 |
| FPS9026 | FR AM H Duty Fuel | 112 | 5.51 |
| FPS9027 | FR AM H Duty Fuel | 569 | 5,072.13 |
| FPS9050 | FR AM H Duty Fuel | 28 | 176.14 |
| FPS9059B-02 | FR AM H Duty Fuel | 214 | 1,998.11 |
| FPS9794 | FR AM H Duty Fuel | 56 | 701.78 |
| FSP3443 | FR AM Other | 93 | 390.02 |
| FTG10060-12 | FR AM Tough Gd Oil | 205 | 285.30 |
| FTG10246 | Tough Gd Cartridges | 149 | 133.02 |
| FTG10575-12 | FR AM Tough Gd Oil | 353 | 537.79 |
| FTG11665-09 | Tough Gd Cartridges | 74 | 73.98 |
| FTG16-12 | FR AM Tough Gd Oil | 623 | 1,133.18 |
| FTG2-12 | FR AM Tough Gd Oil | 753 | 1,377.40 |
| FTG2870A-12 | FR AM Tough Gd Oil | 1,014 | 1,607.30 |
| FTG2951-03 | FR AM Tough Gd Oil | 84 | 81.91 |
| FTG30-03 | FR AM Tough Gd Oil | 130 | 171.11 |
| FTG3387A-12 | FR AM Tough Gd Oil | 1,339 | 1,719.08 |
| FTG3593A-12 | FR AM Tough Gd Oil | 65 | 92.57 |
| FTG3600-12 | FR AM Tough Gd Oil | 521 | 823.58 |
| FTG3614-12 | FR AM Tough Gd Oil | 1,144 | 1,590.76 |
| FTG3675-07 | FR AM Tough Gd Oil | 65 | 90.79 |
| FTG3682-09 | FR AM Tough Gd Oil | 195 | 275.47 |
| FTG3682-12 | FR AM Tough Gd Oil | 242 | 320.73 |
| FTG3950 | FR AM Tough Gd Oil | 167 | 147.85 |
| FTG3980-12 | FR AM Tough Gd Oil | 186 | 274.18 |
| FTG3985-02 | FR AM Tough Gd Oil | 19 | 28.35 |
| FTG4386-09 | FR AM Tough Gd Oil | 1,339 | 1,752.18 |
| FTG5-12 | FR AM Tough Gd Oil | 242 | 458.29 |
| FTG6607-12 | FR AM Tough Gd Oil | 1,876 | 2,252.82 |
| FTG7317-12 | FR AM Tough Gd Oil | 2,697 | 3,559.60 |
| FTG8081-10 | FR AM Tough Gd Oil | 37 | 43.01 |
| FTG8A-12 | FR AM Tough Gd Oil | 88 | 170.37 |
| FTG9018 | Tough Gd Cartridges | 19 | 19.32 |
| FTG9549-07 | Tough Gd Cartridges | 28 | 144.77 |
| FTG9911-09 | Tough Gd Cartridges | 763 | 1,274.39 |
| FW401 | FR AM Other | 223 | 1,163.87 |
| FW502 | FR AM Other | 191 | 545.63 |
| FXG10060-12 | FR AM Extend Gd Oil | 20,844 | 56,944.51 |
| FXG10075-10 | FR Ultra Cartridges | 381 | 1,397.35 |
| FXG10246 | FR Ultra Cartridges | 242 | 750.43 |
| FXG10358-09 | FR Ultra Cartridges | 260 | 895.21 |
| FXG10415 | FR Ultra Cartridges | 26 | 131.84 |
| FXG10575-12 | FR AM Extend Gd Oil | 1,610 | 4,781.09 |
| FXG10600-09 | FR AM Extend Gd Oil | 84 | 389.67 |
| FXG11665-09 | FR Ultra Cartridges | 149 | 724.38 |
| FXG12060-12 | FR Ultra Cartridges | 735 | 2,008.67 |
| FXG16 | FR AM Extend Gd Oil | 16 | 47.80 |
| FXG16-12 | FR AM Extend Gd Oil | 1,237 | 4,205.59 |
| FXG2-12 | FR AM Extend Gd Oil | 4,807 | 16,615.52 |
| FXG2870A-12 | FR AM Extend Gd Oil | 6,163 | 18,655.56 |
| FXG2951 | FR AM Extend Gd Oil | 65 | 127.61 |
| FXG3387A-12 | FR AM Extend Gd Oil | 9,097 | 23,871.41 |

FBG_CH1_00090648

| | | | |
|---|---|---:|---:|
| FXG3506-12 | FR AM Extend Gd Oil | 1,082 | 2,828.03 |
| FXG3593A-12 | FR AM Extend Gd Oil | 896 | 2,473.40 |
| FXG3600-12 | FR AM Extend Gd Oil | 1,874 | 5,664.51 |
| FXG3614-12 | FR AM Extend Gd Oil | 34,677 | 94,695.01 |
| FXG3675-09 | FR AM Extend Gd Oil | 388 | 1,104.66 |
| FXG3682-09 | FR AM Extend Gd Oil | 553 | 1,598.97 |
| FXG3786-09 | FR AM Extend Gd Oil | 25 | 275.46 |
| FXG3976A-10 | FR AM Extend Gd Oil | 136 | 699.23 |
| FXG3980-12 | FR AM Extend Gd Oil | 344 | 1,003.11 |
| FXG3985S-01 | FR AM Extend Gd Oil | 39 | 107.60 |
| FXG4386-12 | FR AM Extend Gd Oil | 711 | 1,814.45 |
| FXG4967-07 | FR AM Extend Gd Oil | 12 | 27.62 |
| FXG4967-12 | FR AM Extend Gd Oil | 2,968 | 7,385.12 |
| FXG5-12 | FR AM Extend Gd Oil | 312 | 1,180.48 |
| FXG6607-12 | FR AM Extend Gd Oil | 4,590 | 11,248.92 |
| FXG7317-12 | FR AM Extend Gd Oil | 20,572 | 52,498.84 |
| FXG8481-09 | FR Ultra Cartridges | 591 | 2,609.01 |
| FXG8712-09 | FR Ultra Cartridges | 214 | 1,038.44 |
| FXG8765-09 | FR Ultra Cartridges | 22 | 139.05 |
| FXG8A-07 | FR AM Extend Gd Oil | 2 | 7.83 |
| FXG8A-12 | FR AM Extend Gd Oil | 395 | 1,501.55 |
| FXG9018-09 | FR Ultra Cartridges | 1,889 | 7,425.41 |
| FXG9100-07 | FR AM Extend Gd Oil | 708 | 2,832.11 |
| FXG9641-09 | FR Ultra Cartridges | 494 | 2,068.28 |
| FXG9688-12 | FR AM Extend Gd Oil | 1,730 | 4,891.16 |
| FXG9837-12 | FR AM Extend Gd Oil | 719 | 2,047.03 |
| FXG9911-09 | FR Ultra Cartridges | 2,604 | 12,386.74 |
| FXG9972-09 | FR Ultra Cartridges | 1,274 | 4,851.62 |
| FXG9999-09 | FR Ultra Cartridges | 121 | 534.31 |
| IBXSP01 | Pump Parts | 585,407 | 30,094.95 |
| MAF10W30N2 | FR AM Other Assess | 2,046 | 2,627.31 |
| MAF10W30N5 | FR AM Other Assess | 756 | 4,716.35 |
| MAF10W30N7 | FR AM Other Assess | 8 | 2,019.82 |
| MAF15W40N2 | FR AM Other Assess | 242 | 326.24 |
| MAF15W40N5 | FR AM Other Assess | 639 | 4,096.48 |
| MAF15W40N7 | FR AM Other Assess | 22 | 5,505.89 |
| MAF20W50L2 | FR AM Other Assess | 1,322 | 1,613.05 |
| MAF20W50L5 | FR AM Other Assess | 2,232 | 13,441.28 |
| MAF20W50L7 | FR AM Other Assess | 11 | 2,592.40 |
| MAF20W50N2 | FR AM Other Assess | 39 | 56.22 |
| MAF20W50N5 | FR AM Other Assess | 4,675 | 30,430.33 |
| MAF25W50L5 | FR AM Other Assess | 12 | 73.21 |
| MAF25W60L5 | FR AM Other Assess | 335 | 2,245.74 |
| MAF5W30N2 | FR AM Other Assess | 74 | 105.95 |
| MAF5W30N5 | FR AM Other Assess | 1,674 | 11,612.87 |
| MAF5W30N7 | FR AM Other Assess | 2 | 558.80 |
| MBF20W50J2 | FR AM Other Assess | 2,350 | 3,052.37 |
| MBF20W50J7 | FR AM Other Assess | 9 | 2,560.11 |
| MEF80W90G52 | FR AM Other Assess | 2,120 | 3,139.55 |
| MFFTCW32 | FR AM Other Assess | 3,069 | 7,280.09 |
| MIFTCW29 | FR AM Other Assess | 3,701 | 2,938.92 |
| MISA0001 | MISCELLANEOUS | 1,172 | 0.06 |
| MISA0002 | MISCELLANEOUS | 265 | 0.01 |
| MISA0004 | MISCELLANEOUS | 17 | 0.00 |
| MISA0005 | MISCELLANEOUS | 23 | 0.00 |
| MISA0006 | MISCELLANEOUS | 491 | 0.02 |
| MISA0007 | MISCELLANEOUS | 124 | 0.01 |
| MISA0008 | MISCELLANEOUS | 315 | 0.02 |
| MISA0009 | MISCELLANEOUS | 90 | 0.00 |
| MISF0001 | MISCELLANEOUS | 186 | 0.01 |
| MISF0002 | MISCELLANEOUS | 330 | 0.02 |
| MISF0003 | MISCELLANEOUS | 357 | 0.02 |
| MISF0004 | MISCELLANEOUS | 109 | 0.01 |
| MISF0005 | MISCELLANEOUS | 50 | 0.00 |
| MISF0008 | MISCELLANEOUS | 256 | 0.01 |
| MISF0010 | MISCELLANEOUS | 127 | 0.01 |
| MISF0011 | MISCELLANEOUS | 172 | 0.01 |
| MISF0012 | MISCELLANEOUS | 87 | 0.00 |
| MISF0014 | MISCELLANEOUS | 45 | 0.00 |
| MTFDX3H2 | FR AM Other Assess | 1,352 | 1,813.29 |
| MTFDX3H2-02 | FR AM Other Assess | 19 | 25.48 |
| P037BM | Water Pumps | 23 | 400.28 |
| P03L121011CLAR | Water Pumps Private | 16 | 120.84 |
| P07K121011BLAR | Water Pumps Private | 8 | 72.88 |
| P096BM | Water Pumps | 16 | 243.03 |
| P103 | Water Pumps Private | 8 | 215.98 |
| P10311BM | Water Pumps | 2 | 151.56 |

FBG_CH1_00090649

| | | | |
|---|---|---|---|
| P103BM | Water Pumps | 54 | 1,464.01 |
| P105BM | Water Pumps | 3 | 51.38 |
| P105P4 | Water Pumps Private | 99 | 2,947.67 |
| P105P4BM | Water Pumps | 78 | 2,331.32 |
| P106 | Water Pumps Private | 36 | 454.03 |
| P106BM | Water Pumps | 31 | 388.73 |
| P106PA | Water Pumps Private | 2 | 49.06 |
| P106PABM | Water Pumps | 19 | 468.28 |
| P106PV | Water Pumps Private | 26 | 663.74 |
| P106PVBM | Water Pumps | 19 | 487.21 |
| P108BM | Water Pumps | 3 | 85.11 |
| P110 | Water Pumps Private | 11 | 420.43 |
| P1101BM | Water Pumps | 2 | 12.35 |
| P1103BM | Water Pumps | 40 | 331.42 |
| P1106BM | Water Pumps | 25 | 1,062.69 |
| P110BM | Water Pumps | 29 | 1,111.71 |
| P115 | Water Pumps Private | 9 | 76.47 |
| P115BM | Water Pumps | 16 | 135.46 |
| P1201E5LAR | Water Pumps Private | 19 | 113.60 |
| P1219 | Water Pumps Private | 39 | 405.41 |
| P1219BM | Water Pumps | 16 | 165.69 |
| P141 | Water Pumps Private | 124 | 1,008.34 |
| P141BM | Water Pumps | 70 | 566.47 |
| P1447BM | Water Pumps | 87 | 494.36 |
| P1448BM | Water Pumps | 102 | 589.23 |
| P157BM | Water Pumps | 161 | 1,349.78 |
| P1610029415LAR | Water Pumps Private | 8 | 65.96 |
| P1619 | Water Pumps Private | 1,355 | 8,322.48 |
| P1619BM | Water Pumps | 422 | 2,579.42 |
| P1633 | Water Pumps Private | 233 | 1,475.09 |
| P1633BM | Water Pumps | 217 | 1,367.36 |
| P1641BM | Water Pumps | 160 | 1,106.43 |
| P1642BM | Water Pumps | 155 | 929.53 |
| P1661 | Water Pumps Private | 31 | 210.24 |
| P1661BM | Water Pumps | 9 | 60.77 |
| P1680 | Water Pumps Private | 42 | 258.85 |
| P1700 | Water Pumps Private | 102 | 724.92 |
| P1700BM | Water Pumps | 212 | 1,500.41 |
| P1793BM | Water Pumps | 19 | 146.83 |
| P1800 | Water Pumps Private | 6 | 70.07 |
| P1800BM | Water Pumps | 6 | 69.28 |
| P1831 | Water Pumps Private | 9 | 79.96 |
| P1831BM | Water Pumps | 12 | 102.71 |
| P1838 | Water Pumps Private | 37 | 250.54 |
| P1842 | Water Pumps Private | 8 | 54.21 |
| P1842BM | Water Pumps | 8 | 53.89 |
| P1856 | Water Pumps Private | 23 | 236.04 |
| P1856BM | Water Pumps | 11 | 112.46 |
| P1857BM | Water Pumps | 11 | 171.96 |
| P1863BM | Water Pumps | 40 | 288.86 |
| P1874BM | Water Pumps | 19 | 129.44 |
| P1878 | Water Pumps Private | 8 | 55.51 |
| P1878BM | Water Pumps | 12 | 82.91 |
| P1883 | Water Pumps Private | 31 | 292.36 |
| P1884 | Water Pumps Private | 47 | 320.23 |
| P1884BM | Water Pumps | 17 | 115.32 |
| P1887BM | Water Pumps | 16 | 76.74 |
| P1891BM | Water Pumps | 12 | 75.49 |
| P1892 | Water Pumps Private | 16 | 117.74 |
| P1892BM | Water Pumps | 9 | 65.96 |
| P1901BM | Water Pumps | 47 | 296.16 |
| P1903 | Water Pumps Private | 31 | 233.65 |
| P1903BM | Water Pumps | 8 | 60.06 |
| P1909 | Water Pumps Private | 19 | 488.93 |
| P1975BM | Water Pumps | 6 | 72.52 |
| P1981BM | Water Pumps | 2 | 39.77 |
| P1982BM | Water Pumps | 53 | 372.88 |
| P1983BM | Water Pumps | 19 | 224.30 |
| P1985 | Water Pumps Private | 31 | 281.93 |
| P200BM | Water Pumps | 8 | 209.61 |
| P2010BM | Water Pumps | 8 | 59.77 |
| P2015 | Water Pumps Private | 17 | 0.00 |
| P2022 | Water Pumps Private | 56 | 401.79 |
| P2022BM | Water Pumps | 5 | 35.68 |
| P2030BM | Water Pumps | 3 | 18.56 |
| P2040ABM | Water Pumps | 62 | 378.66 |
| P2040BM | Water Pumps | 29 | 177.12 |

FBG_CH1_00090650

| | | | |
|---|---|---|---|
| P2042 | Water Pumps Private | 8 | 66.93 |
| P2042BM | Water Pumps | 25 | 208.40 |
| P2047BM | Water Pumps | 16 | 118.11 |
| P2057 | Water Pumps Private | 59 | 523.10 |
| P2057BM | Water Pumps | 29 | 255.02 |
| P2058BM | Water Pumps | 23 | 165.80 |
| P2059 | Water Pumps Private | 6 | 44.43 |
| P2061BM | Water Pumps | 16 | 105.43 |
| P2064 | Water Pumps Private | 16 | 236.39 |
| P2064BM | Water Pumps | 26 | 387.11 |
| P2067 | Water Pumps Private | 76 | 711.16 |
| P2067BM | Water Pumps | 81 | 755.54 |
| P2083 | Water Pumps Private | 5 | 88.01 |
| P2083BM | Water Pumps | 8 | 139.97 |
| P2085 | Water Pumps Private | 6 | 41.56 |
| P2090BM | Water Pumps | 39 | 674.38 |
| P2093DGBM | Water Pumps | 8 | 696.89 |
| P2093FG | Water Pumps Private | 26 | 2,180.09 |
| P2094BM | Water Pumps | 6 | 52.35 |
| P2095 | Water Pumps Private | 2 | 72.26 |
| P2095BM | Water Pumps | 5 | 179.97 |
| P2096 | Water Pumps Private | 22 | 251.85 |
| P2096BM | Water Pumps | 16 | 182.01 |
| P2097 | Water Pumps Private | 31 | 285.28 |
| P2097BM | Water Pumps | 56 | 513.15 |
| P2099BM | Water Pumps | 11 | 1,015.91 |
| P2100BM | Water Pumps | 23 | 1,293.15 |
| P2101 | Water Pumps Private | 33 | 235.04 |
| P2101BM | Water Pumps | 14 | 99.16 |
| P2117 | Water Pumps Private | 39 | 411.54 |
| P2117BM | Water Pumps | 14 | 147.18 |
| P2118 | Water Pumps Private | 40 | 318.27 |
| P2118BM | Water Pumps | 81 | 642.09 |
| P2120 | Water Pumps Private | 543 | 3,534.49 |
| P2120BM | Water Pumps | 313 | 2,028.09 |
| P2126 | Water Pumps Private | 17 | 135.12 |
| P2127 | Water Pumps Private | 16 | 367.17 |
| P2127BM | Water Pumps | 14 | 320.72 |
| P2137 | Water Pumps Private | 6 | 75.17 |
| P2137BM | Water Pumps | 8 | 99.65 |
| P2139BM | Water Pumps | 26 | 467.13 |
| P2142BM | Water Pumps | 3 | 19.09 |
| P2143BM | Water Pumps | 16 | 147.76 |
| P2147 | Water Pumps Private | 8 | 172.05 |
| P2147BM | Water Pumps | 12 | 257.60 |
| P214BM | Water Pumps | 5 | 43.45 |
| P215 | Water Pumps Private | 47 | 468.85 |
| P2155 | Water Pumps Private | 16 | 111.36 |
| P2155BM | Water Pumps | 65 | 450.49 |
| P215BM | Water Pumps | 47 | 467.00 |
| P2171 | Water Pumps Private | 5 | 65.94 |
| P2171BM | Water Pumps | 36 | 472.20 |
| P219 | Water Pumps Private | 12 | 88.79 |
| P2190 | Water Pumps Private | 3,618 | 18,937.59 |
| P2190BM | Water Pumps | 577 | 2,997.46 |
| P2192BM | Water Pumps | 5 | 107.38 |
| P2195BM | Water Pumps | 2 | 10.34 |
| P2196 | Water Pumps Private | 22 | 159.23 |
| P2196BM | Water Pumps | 3 | 21.60 |
| P2197BM | Water Pumps | 74 | 382.46 |
| P2198 | Water Pumps Private | 15,268 | 75,038.95 |
| P2198BM | Water Pumps | 640 | 3,126.48 |
| P219BM | Water Pumps | 16 | 117.75 |
| P2218BM | Water Pumps | 5 | 35.69 |
| P222 | Water Pumps Private | 48 | 1,277.04 |
| P222BM | Water Pumps | 64 | 1,695.88 |
| P2233BM | Water Pumps | 8 | 233.67 |
| P2234BM | Water Pumps | 6 | 99.78 |
| P2253 | Water Pumps Private | 37 | 999.89 |
| P2253BM | Water Pumps | 31 | 841.29 |
| P2254BM | Water Pumps | 8 | 779.12 |
| P2258BM | Water Pumps | 2 | 15.42 |
| P2259 | Water Pumps Private | 6,991 | 37,451.79 |
| P2259BM | Water Pumps | 499 | 2,673.21 |
| P226BM | Water Pumps | 9 | 69.93 |
| P2274 | Water Pumps Private | 16 | 178.30 |
| P2274BM | Water Pumps | 31 | 343.21 |

FBG_CH1_00090651

| | | | |
|---|---|---|---|
| P2276 | Water Pumps Private | 28 | 347.09 |
| P2276BM | Water Pumps | 20 | 246.48 |
| P2278 | Water Pumps Private | 23 | 197.72 |
| P2278BM | Water Pumps | 8 | 68.54 |
| P228 | Water Pumps Private | 146 | 7,910.40 |
| P2280 | Water Pumps Private | 20 | 150.77 |
| P2280BM | Water Pumps | 9 | 67.49 |
| P2281BM | Water Pumps | 16 | 221.47 |
| P228BM | Water Pumps | 164 | 8,910.63 |
| P2303 | Water Pumps Private | 29 | 250.05 |
| P2322 | Water Pumps Private | 8 | 86.58 |
| P2322BM | Water Pumps | 9 | 97.05 |
| P2328 | Water Pumps Private | 16 | 92.90 |
| P2333 | Water Pumps Private | 31 | 227.30 |
| P2333BM | Water Pumps | 14 | 102.10 |
| P2338BM | Water Pumps | 6 | 41.72 |
| P2340 | Water Pumps Private | 23 | 234.59 |
| P2340BM | Water Pumps | 11 | 111.76 |
| P2342 | Water Pumps Private | 8 | 85.31 |
| P2346BM | Water Pumps | 64 | 520.31 |
| P2347 | Water Pumps Private | 3,937 | 22,075.11 |
| P2347BM | Water Pumps | 784 | 4,372.70 |
| P2349 | Water Pumps Private | 16 | 145.74 |
| P2350 | Water Pumps Private | 22 | 283.54 |
| P2350BM | Water Pumps | 16 | 205.06 |
| P2354 | Water Pumps Private | 28 | 496.42 |
| P2354BM | Water Pumps | 12 | 213.30 |
| P2364BM | Water Pumps | 908 | 7,142.80 |
| P237 | Water Pumps Private | 102 | 749.79 |
| P2370BM | Water Pumps | 22 | 217.97 |
| P2373BM | Water Pumps | 42 | 245.71 |
| P2376BM | Water Pumps | 2 | 15.75 |
| P2379 | Water Pumps Private | 9 | 66.39 |
| P2379BM | Water Pumps | 6 | 44.08 |
| P237BM | Water Pumps | 33 | 241.60 |
| P2397 | Water Pumps Private | 11 | 87.69 |
| P2397BM | Water Pumps | 11 | 87.36 |
| P2403 | Water Pumps Private | 42 | 251.56 |
| P2404BM | Water Pumps | 31 | 255.91 |
| P2407BM | Water Pumps | 51 | 585.38 |
| P2408 | Water Pumps Private | 70 | 1,760.55 |
| P2408BM | Water Pumps | 17 | 429.50 |
| P2411 | Water Pumps Private | 16 | 192.64 |
| P2411BM | Water Pumps | 25 | 299.20 |
| P2416BM | Water Pumps | 19 | 199.99 |
| P2417 | Water Pumps Private | 42 | 457.67 |
| P2418BM | Water Pumps | 9 | 372.36 |
| P2419BM | Water Pumps | 14 | 219.27 |
| P241BM | Water Pumps | 8 | 479.88 |
| P2420 | Water Pumps Private | 91 | 3,740.22 |
| P2420BM | Water Pumps | 22 | 905.99 |
| P2422 | Water Pumps Private | 372 | 2,066.33 |
| P2422BM | Water Pumps | 250 | 1,398.38 |
| P2438 | Water Pumps Private | 12 | 225.93 |
| P2438BM | Water Pumps | 6 | 113.65 |
| P2439BM | Water Pumps | 70 | 2,598.47 |
| P2440 | Water Pumps Private | 2 | 129.16 |
| P2440BM | Water Pumps | 84 | 5,434.19 |
| P2452 | Water Pumps Private | 37 | 359.65 |
| P2452BM | Water Pumps | 2 | 19.38 |
| P2453 | Water Pumps Private | 16 | 94.36 |
| P2453BM | Water Pumps | 20 | 117.36 |
| P2459BM | Water Pumps | 3 | 20.41 |
| P246 | Water Pumps Private | 64 | 1,425.06 |
| P2464 | Water Pumps Private | 37 | 332.75 |
| P2466 | Water Pumps Private | 33 | 365.64 |
| P2466BM | Water Pumps | 9 | 99.07 |
| P2468BM | Water Pumps | 16 | 144.04 |
| P2471 | Water Pumps Private | 9 | 81.69 |
| P2471BM | Water Pumps | 16 | 144.08 |
| P247BM | Water Pumps | 88 | 4,793.14 |
| P2481BM | Water Pumps | 16 | 93.10 |
| P2482BM | Water Pumps | 74 | 458.53 |
| P2483 | Water Pumps Private | 16 | 120.84 |
| P2494BM | Water Pumps | 8 | 61.78 |
| P2502BM | Water Pumps | 16 | 183.92 |
| P2518BM | Water Pumps | 3 | 72.44 |

FBG_CH1_00090652

| | | | |
|---|---|---|---|
| P2521BM | Water Pumps | 31 | 399.79 |
| P2548BM | Water Pumps | 70 | 867.71 |
| P255 | Water Pumps Private | 124 | 949.86 |
| P255BM | Water Pumps | 9 | 68.67 |
| P2649BM | Water Pumps | 5 | 47.69 |
| P2674BM | Water Pumps | 16 | 222.51 |
| P2707 | Water Pumps Private | 16 | 193.02 |
| P2711BM | Water Pumps | 9 | 385.64 |
| P3132676TN | Water Pumps Private | 8 | 165.57 |
| P364125 | Water Pumps Private | 19 | 501.72 |
| P366 | Water Pumps Private | 62 | 1,784.37 |
| P366BM | Water Pumps | 109 | 3,149.49 |
| P366L | Water Pumps Private | 39 | 1,110.80 |
| P366LBM | Water Pumps | 50 | 1,429.81 |
| P3717 | Water Pumps Private | 16 | 169.90 |
| P3717BM | Water Pumps | 119 | 1,255.06 |
| P3801784OES | Water Pumps Private | 8 | 447.81 |
| P390 | Water Pumps Private | 39 | 1,032.40 |
| P390BM | Water Pumps | 12 | 316.07 |
| P397 | Water Pumps Private | 47 | 6,356.97 |
| P4013 | Water Pumps Private | 19 | 113.40 |
| P4015 | Water Pumps Private | 47 | 337.22 |
| P4015BM | Water Pumps | 11 | 78.49 |
| P4099BM | Water Pumps | 3 | 26.39 |
| P4114 | Water Pumps Private | 47 | 1,135.64 |
| P4114BM | Water Pumps | 28 | 679.75 |
| P4119BM | Water Pumps | 3 | 33.05 |
| P4125 | Water Pumps Private | 26 | 392.96 |
| P4125BM | Water Pumps | 16 | 240.66 |
| P4128BM | Water Pumps | 3 | 25.15 |
| P4131EO11 | Water Pumps Private | 8 | 364.75 |
| P451 | Water Pumps Private | 606 | 7,546.98 |
| P451BM | Water Pumps | 12 | 149.09 |
| P453 | Water Pumps Private | 9 | 178.46 |
| P453BM | Water Pumps | 16 | 316.64 |
| P464 | Water Pumps Private | 48 | 1,172.62 |
| P471 | Water Pumps Private | 8 | 166.42 |
| P476DNBM | Water Pumps | 42 | 1,002.10 |
| P476INBM | Water Pumps | 2 | 48.98 |
| P4919814 | Water Pumps Private | 2 | 85.34 |
| P497 | Water Pumps Private | 101 | 1,137.29 |
| P497BM | Water Pumps | 20 | 222.55 |
| P5090 | Water Pumps Private | 147 | 3,496.91 |
| P5090BM | Water Pumps | 19 | 454.15 |
| P5097 | Water Pumps Private | 245 | 2,279.52 |
| P5097BM | Water Pumps | 59 | 546.62 |
| P531BM | Water Pumps | 39 | 451.22 |
| P532 | Water Pumps Private | 3 | 51.14 |
| P532BM | Water Pumps | 16 | 271.05 |
| P5380791000GR | Water Pumps Private | 8 | 114.52 |
| P5380792000GR | Water Pumps Private | 388 | 1,811.11 |
| P5380793000GR | Water Pumps Private | 16 | 116.98 |
| P5380794000GR | Water Pumps Private | 45 | 326.61 |
| P5380798000GR | Water Pumps Private | 8 | 59.87 |
| P5380822000GR | Water Pumps Private | 67 | 916.75 |
| P5380831000GR | Water Pumps Private | 64 | 722.96 |
| P5380832000GR | Water Pumps Private | 64 | 863.68 |
| P5380835000GR | Water Pumps Private | 56 | 823.25 |
| P5380839000GR | Water Pumps Private | 8 | 182.44 |
| P5380841000GR | Water Pumps Private | 16 | 124.91 |
| P5380845000GR | Water Pumps Private | 23 | 250.67 |
| P546 | Water Pumps Private | 2,666 | 15,284.08 |
| P546BM | Water Pumps | 312 | 1,779.43 |
| P547 | Water Pumps Private | 6 | 39.84 |
| P547BM | Water Pumps | 16 | 105.61 |
| P548BM | Water Pumps | 22 | 354.89 |
| P549 | Water Pumps Private | 25 | 368.11 |
| P549BM | Water Pumps | 17 | 248.50 |
| P551BM | Water Pumps | 40 | 617.04 |
| P580 | Water Pumps Private | 34 | 672.72 |
| P595 | Water Pumps Private | 16 | 203.64 |
| P595BM | Water Pumps | 16 | 201.52 |
| P6057BM | Water Pumps | 6 | 277.83 |
| P608 | Water Pumps Private | 70 | 1,728.36 |
| P608BM | Water Pumps | 6 | 147.50 |
| P612 | Water Pumps Private | 9 | 111.80 |
| P612BM | Water Pumps | 16 | 198.13 |

FBG_CH1_00090653

| | | | |
|---|---|---|---|
| P630BM | Water Pumps | 8 | 80.18 |
| P631 | Water Pumps Private | 23 | 266.20 |
| P634 | Water Pumps Private | 47 | 728.05 |
| P634BM | Water Pumps | 42 | 647.56 |
| P638ABM | Water Pumps | 3 | 60.46 |
| P639BM | Water Pumps | 11 | 107.49 |
| P64020 | Water Pumps Private | 16 | 442.78 |
| P64021 | Water Pumps Private | 31 | 1,183.66 |
| P644 | Water Pumps Private | 2 | 39.48 |
| P644BM | Water Pumps | 22 | 436.76 |
| P65210BGR | Water Pumps Private | 59 | 373.71 |
| P65214BGR | Water Pumps Private | 78 | 488.45 |
| P65216BGR | Water Pumps Private | 169 | 927.13 |
| P65320A1BGR | Water Pumps Private | 310 | 1,827.47 |
| P65320BGR | Water Pumps Private | 310 | 2,126.63 |
| P65361A1BGR | Water Pumps Private | 543 | 4,153.52 |
| P65412BGR | Water Pumps Private | 28 | 167.12 |
| P6542BM | Water Pumps | 43 | 3,775.15 |
| P65430BGR | Water Pumps | 143 | 702.00 |
| P6543BM | Water Pumps | 2 | 246.29 |
| P65468A1BGR | Water Pumps Private | 1,860 | 9,560.08 |
| P65486BGR | Water Pumps Private | 8 | 56.83 |
| P65510A1BGR | Water Pumps Private | 465 | 3,082.64 |
| P657 | Water Pumps Private | 62 | 882.91 |
| P657BM | Water Pumps | 17 | 240.27 |
| P658BM | Water Pumps | 8 | 92.51 |
| P659 | Water Pumps Private | 47 | 872.96 |
| P65920BGR | Water Pumps Private | 31 | 185.35 |
| P665BM | Water Pumps | 51 | 817.83 |
| P66804BGR | Water Pumps Private | 47 | 251.93 |
| P66813BGR | Water Pumps Private | 16 | 119.92 |
| P66825BGR | Water Pumps Private | 20 | 154.20 |
| P66925BGR | Water Pumps Private | 122 | 1,005.85 |
| P67319BGR | Water Pumps Private | 65 | 443.18 |
| P677 | Water Pumps Private | 11 | 188.22 |
| P677BM | Water Pumps | 9 | 155.03 |
| P680BM | Water Pumps | 2 | 30.68 |
| P685BM | Water Pumps | 2 | 24.09 |
| P68602BGR | Water Pumps Private | 16 | 89.45 |
| P68610BGR | Water Pumps Private | 67 | 1,284.73 |
| P68621BGR | Water Pumps Private | 50 | 265.38 |
| P68624BGR | Water Pumps Private | 181 | 1,860.62 |
| P689BM | Water Pumps | 14 | 245.37 |
| P69004BGR | Water Pumps Private | 1,550 | 9,430.01 |
| P69005BGR | Water Pumps Private | 56 | 333.65 |
| P7164BM | Water Pumps | 17 | 176.24 |
| P7165 | Water Pumps Private | 6 | 46.66 |
| P7165BM | Water Pumps | 109 | 843.31 |
| P725BM | Water Pumps | 107 | 4,855.60 |
| P726 | Water Pumps Private | 14 | 548.85 |
| P726BM | Water Pumps | 25 | 982.94 |
| P727 | Water Pumps Private | 65 | 2,823.85 |
| P727BM | Water Pumps | 96 | 4,185.24 |
| P728BM | Water Pumps | 9 | 424.46 |
| P729 | Water Pumps Private | 6 | 406.63 |
| P729BM | Water Pumps | 12 | 814.63 |
| P730 | Water Pumps Private | 8 | 483.20 |
| P730BM | Water Pumps | 40 | 2,420.57 |
| P7315 | Water Pumps Private | 53 | 2,875.72 |
| P737BM | Water Pumps | 20 | 907.59 |
| P739 | Water Pumps Private | 39 | 1,660.40 |
| P739BM | Water Pumps | 6 | 255.01 |
| P800BM | Water Pumps | 2 | 16.48 |
| P803 | Water Pumps Private | 5 | 90.67 |
| P803BM | Water Pumps | 6 | 108.16 |
| P804A | Water Pumps Private | 6 | 124.83 |
| P804ABM | Water Pumps | 16 | 333.62 |
| P809 | Water Pumps Private | 43 | 686.38 |
| P814 | Water Pumps Private | 116 | 1,520.86 |
| P814BM | Water Pumps | 60 | 780.25 |
| P816BM | Water Pumps | 8 | 153.01 |
| P819 | Water Pumps Private | 26 | 423.73 |
| P819BM | Water Pumps | 5 | 81.29 |
| P826BM | Water Pumps | 2 | 14.76 |
| P830 | Water Pumps Private | 5 | 77.78 |
| P830BM | Water Pumps | 2 | 30.90 |
| P831 | Water Pumps Private | 116 | 931.90 |

FBG_CH1_00090654

| | | | |
|---|---|---|---|
| P831BM | Water Pumps | 47 | 375.73 |
| P832 | Water Pumps Private | 31 | 411.25 |
| P832BM | Water Pumps | 12 | 157.60 |
| P835 | Water Pumps Private | 19 | 201.04 |
| P842 | Water Pumps Private | 23 | 232.42 |
| P842BM | Water Pumps | 9 | 90.30 |
| P846 | Water Pumps Private | 31 | 351.08 |
| P846BM | Water Pumps | 22 | 247.56 |
| P850 | Water Pumps Private | 34 | 238.59 |
| P850BM | Water Pumps | 16 | 111.65 |
| P857 | Water Pumps Private | 23 | 267.16 |
| P859 | Water Pumps Private | 9 | 248.53 |
| P859BM | Water Pumps | 8 | 220.61 |
| P860BM | Water Pumps | 53 | 738.35 |
| P861BM | Water Pumps | 53 | 895.42 |
| P862 | Water Pumps Private | 81 | 1,382.25 |
| P862BM | Water Pumps | 11 | 186.54 |
| P863 | Water Pumps Private | 62 | 433.78 |
| P863BM | Water Pumps | 40 | 278.29 |
| P864BM | Water Pumps | 65 | 377.53 |
| P866 | Water Pumps Private | 14 | 167.44 |
| P869BM | Water Pumps | 11 | 165.84 |
| P870 | Water Pumps Private | 16 | 239.62 |
| P877 | Water Pumps Private | 59 | 867.11 |
| P877BM | Water Pumps | 37 | 548.01 |
| P878 | Water Pumps Private | 530 | 6,205.64 |
| P878BM | Water Pumps | 104 | 1,210.19 |
| P883 | Water Pumps Private | 62 | 736.78 |
| P883BM | Water Pumps | 54 | 637.81 |
| P884BM | Water Pumps | 40 | 618.12 |
| P886 | Water Pumps Private | 42 | 332.98 |
| P886BM | Water Pumps | 60 | 471.35 |
| P887 | Water Pumps Private | 17 | 193.64 |
| P887BM | Water Pumps | 6 | 67.91 |
| P888 | Water Pumps Private | 45 | 443.87 |
| P888BM | Water Pumps | 14 | 137.08 |
| P889 | Water Pumps Private | 8 | 128.80 |
| P889BM | Water Pumps | 9 | 143.94 |
| P890 | Water Pumps Private | 68 | 1,055.09 |
| P891 | Water Pumps Private | 109 | 1,143.95 |
| P891BM | Water Pumps | 16 | 166.76 |
| P892BM | Water Pumps | 9 | 181.39 |
| P896 | Water Pumps Private | 31 | 277.45 |
| P896BM | Water Pumps | 8 | 71.02 |
| P897 | Water Pumps Private | 47 | 274.38 |
| P897BM | Water Pumps | 109 | 633.09 |
| P898 | Water Pumps Private | 228 | 2,070.49 |
| P898BM | Water Pumps | 79 | 711.69 |
| P902 | Water Pumps Private | 8 | 147.06 |
| P902BM | Water Pumps | 6 | 109.66 |
| P90543277LAR | Water Pumps Private | 8 | 45.99 |
| P905BM | Water Pumps | 5 | 51.36 |
| P9062BM | Water Pumps | 26 | 1,056.85 |
| P9099 | Water Pumps Private | 8 | 114.13 |
| P9099BM | Water Pumps | 8 | 113.28 |
| P9107 | Water Pumps Private | 14 | 83.93 |
| P9107BM | Water Pumps | 28 | 167.03 |
| P912BM | Water Pumps | 126 | 1,143.58 |
| P9137 | Water Pumps Private | 8 | 66.96 |
| P9139 | Water Pumps Private | 36 | 294.57 |
| P9139BM | Water Pumps | 57 | 464.17 |
| P913BM | Water Pumps | 20 | 273.45 |
| P914 | Water Pumps Private | 14 | 126.59 |
| P914BM | Water Pumps | 29 | 261.07 |
| P9150BM | Water Pumps | 95 | 879.65 |
| P917 | Water Pumps Private | 26 | 246.02 |
| P9171 | Water Pumps Private | 8 | 69.73 |
| P9171BM | Water Pumps | 16 | 138.98 |
| P9173BM | Water Pumps | 16 | 135.39 |
| P9174 | Water Pumps Private | 9 | 82.45 |
| P9174BM | Water Pumps | 16 | 145.42 |
| P9176 | Water Pumps Private | 60 | 493.25 |
| P917BM | Water Pumps | 6 | 56.34 |
| P9187BM | Water Pumps | 22 | 134.59 |
| P9204 | Water Pumps Private | 19 | 220.84 |
| P9231 | Water Pumps Private | 132 | 1,250.72 |
| P9243BM | Water Pumps | 20 | 275.53 |

FBG_CH1_00090655

| | | | |
|---|---|---|---|
| P925 | Water Pumps Private | 17 | 400.24 |
| P926 | Water Pumps Private | 2 | 20.82 |
| P927 | Water Pumps Private | 663 | 7,309.60 |
| P9276 | Water Pumps Private | 295 | 2,498.59 |
| P9276BM | Water Pumps | 31 | 261.64 |
| P927BM | Water Pumps | 87 | 949.89 |
| P9301 | Water Pumps Private | 12 | 145.68 |
| P9303BM | Water Pumps | 16 | 473.17 |
| P9304 | Water Pumps Private | 22 | 189.69 |
| P9304BM | Water Pumps | 23 | 197.41 |
| P9305 | Water Pumps Private | 26 | 333.01 |
| P9309 | Water Pumps Private | 17 | 256.86 |
| P9309BM | Water Pumps | 14 | 210.98 |
| P9313 | Water Pumps Private | 33 | 293.34 |
| P9313BM | Water Pumps | 26 | 230.09 |
| P9314 | Water Pumps Private | 132 | 1,204.38 |
| P9314BM | Water Pumps | 109 | 990.23 |
| P9316 | Water Pumps Private | 26 | 182.06 |
| P932 | Water Pumps Private | 1,248 | 10,687.26 |
| P932BM | Water Pumps | 40 | 339.65 |
| P93385844LA | Water Pumps Private | 8 | 47.16 |
| P9338BM | Water Pumps | 25 | 373.83 |
| P934 | Water Pumps Private | 16 | 143.78 |
| P9341 | Water Pumps Private | 2 | 22.10 |
| P9341BM | Water Pumps | 8 | 87.33 |
| P9342BM | Water Pumps | 47 | 443.48 |
| P9345 | Water Pumps Private | 6 | 57.48 |
| P935 | Water Pumps Private | 16 | 674.62 |
| P9351BM | Water Pumps | 9 | 63.25 |
| P9352BM | Water Pumps | 5 | 66.80 |
| P9356 | Water Pumps Private | 59 | 715.08 |
| P9358BM | Water Pumps | 16 | 367.33 |
| P935BM | Water Pumps | 5 | 210.63 |
| P935C1BM | Water Pumps | 188 | 1,769.39 |
| P9361 | Water Pumps Private | 14 | 117.56 |
| P9361BM | Water Pumps | 90 | 753.08 |
| P9363 | Water Pumps Private | 39 | 411.32 |
| P9363BM | Water Pumps | 59 | 617.99 |
| P9366 | Water Pumps Private | 3 | 23.89 |
| P937 | Water Pumps Private | 6 | 53.28 |
| P9374 | Water Pumps Private | 43 | 514.76 |
| P9374BM | Water Pumps | 9 | 107.39 |
| P9377 | Water Pumps Private | 54 | 1,152.27 |
| P9377BM | Water Pumps | 25 | 536.32 |
| P9379BM | Water Pumps | 14 | 151.44 |
| P937BM | Water Pumps | 16 | 141.60 |
| P938 | Water Pumps Private | 29 | 440.73 |
| P9385 | Water Pumps Private | 33 | 339.82 |
| P9385BM | Water Pumps | 31 | 318.30 |
| P938BM | Water Pumps | 9 | 136.13 |
| P9390 | Water Pumps Private | 53 | 404.37 |
| P941 | Water Pumps Private | 19 | 302.24 |
| P9410 | Water Pumps Private | 93 | 1,454.87 |
| P9410BM | Water Pumps | 79 | 1,225.37 |
| P9413 | Water Pumps Private | 3 | 29.50 |
| P9414 | Water Pumps Private | 16 | 114.77 |
| P9414BM | Water Pumps | 39 | 278.59 |
| P9415 | Water Pumps Private | 6 | 89.78 |
| P9415BM | Water Pumps | 12 | 179.09 |
| P9416 | Water Pumps Private | 310 | 2,461.24 |
| P9416BM | Water Pumps | 31 | 243.88 |
| P941BM | Water Pumps | 14 | 220.84 |
| P9422 | Water Pumps Private | 48 | 470.13 |
| P9422BM | Water Pumps | 62 | 605.41 |
| P9427BM | Water Pumps | 48 | 386.54 |
| P943 | Water Pumps Private | 16 | 497.14 |
| P943BM | Water Pumps | 8 | 249.48 |
| P944 | Water Pumps Private | 19 | 305.89 |
| P944BM | Water Pumps | 16 | 255.46 |
| P945BM | Water Pumps | 17 | 203.17 |
| P948 | Water Pumps Private | 59 | 690.84 |
| P949 | Water Pumps Private | 54 | 464.88 |
| P950 | Water Pumps Private | 39 | 291.09 |
| P950BM | Water Pumps | 5 | 37.17 |
| P951BM | Water Pumps | 54 | 1,069.94 |
| P956 | Water Pumps Private | 12 | 79.09 |
| P956BM | Water Pumps | 14 | 91.86 |

FBG_CH1_00090656

| | | | |
|---|---|---|---|
| P958 | Water Pumps Private | 8 | 75.10 |
| P958BM | Water Pumps | 59 | 551.58 |
| P960BM | Water Pumps | 29 | 412.54 |
| P962BM | Water Pumps | 14 | 203.40 |
| P964 | Water Pumps Private | 53 | 584.35 |
| P964BM | Water Pumps | 67 | 736.07 |
| P965BM | Water Pumps | 11 | 203.15 |
| P96666219LAR | Water Pumps Private | 16 | 95.33 |
| P966BM | Water Pumps | 9 | 94.43 |
| P96872702LAR | Water Pumps Private | 31 | 188.60 |
| P968BM | Water Pumps | 68 | 1,042.74 |
| P9700 | Water Pumps Private | 6 | 89.93 |
| P9700BM | Water Pumps | 3 | 44.56 |
| P9701 | Water Pumps Private | 11 | 161.66 |
| P9701BM | Water Pumps | 5 | 72.95 |
| P979 | Water Pumps Private | 471 | 7,529.89 |
| P979BM | Water Pumps | 155 | 2,461.45 |
| P980 | Water Pumps Private | 16 | 130.16 |
| P982BM | Water Pumps | 12 | 122.57 |
| P984 | Water Pumps Private | 51 | 582.67 |
| P984BM | Water Pumps | 57 | 643.65 |
| P992 | Water Pumps Private | 512 | 4,940.97 |
| P992BM | Water Pumps | 81 | 778.49 |
| P993 | Water Pumps Private | 62 | 916.71 |
| P993BM | Water Pumps | 33 | 483.54 |
| P994BM | Water Pumps | 54 | 403.67 |
| P996 | Water Pumps Private | 1,256 | 9,591.26 |
| P996BM | Water Pumps | 222 | 1,686.53 |
| P998BM | Water Pumps | 8 | 64.13 |
| P999BM | Water Pumps | 19 | 183.81 |
| PB105FN | Water Pumps Private | 8 | 128.22 |
| PB106N | Water Pumps Private | 8 | 97.34 |
| PB1106N | Water Pumps Private | 37 | 1,546.88 |
| PB1700 | Water Pumps Private | 8 | 54.88 |
| PB1857 | Water Pumps Private | 31 | 467.80 |
| PB1983N | Water Pumps Private | 93 | 1,063.31 |
| PB204 | Water Pumps Private | 20 | 142.45 |
| PB2042 | Water Pumps Private | 8 | 64.95 |
| PB2061 | Water Pumps Private | 3 | 18.91 |
| PB2067 | Water Pumps Private | 8 | 72.88 |
| PB2096 | Water Pumps Private | 8 | 88.03 |
| PB2171 | Water Pumps Private | 8 | 101.96 |
| PB2197N | Water Pumps Private | 102 | 505.00 |
| PB2198N | Water Pumps Private | 673 | 3,141.43 |
| PB2259 | Water Pumps Private | 186 | 956.01 |
| PB2276 | Water Pumps Private | 8 | 95.62 |
| PB2333 | Water Pumps Private | 8 | 56.06 |
| PB2340 | Water Pumps Private | 8 | 78.99 |
| PB2347N | Water Pumps Private | 155 | 830.82 |
| PB2364N | Water Pumps Private | 78 | 596.64 |
| PB2367N | Water Pumps Private | 16 | 94.32 |
| PB2466 | Water Pumps Private | 8 | 85.09 |
| PB2468 | Water Pumps Private | 23 | 200.48 |
| PB2541 | Water Pumps Private | 8 | 97.65 |
| PB349N | Water Pumps Private | 172 | 844.36 |
| PB350AN | Water Pumps Private | 31 | 1,381.98 |
| PB366N | Water Pumps Private | 50 | 1,389.85 |
| PB390N | Water Pumps Private | 153 | 3,946.82 |
| PB406N | Water Pumps Private | 68 | 2,694.11 |
| PB4126N | Water Pumps Private | 918 | 5,748.70 |
| PB476DN | Water Pumps Private | 183 | 4,165.46 |
| PB476IN | Water Pumps Private | 25 | 584.79 |
| PB534 | Water Pumps Private | 984 | 10,115.18 |
| PB547 | Water Pumps Private | 8 | 50.52 |
| PB582N | Water Pumps Private | 102 | 541.38 |
| PB608 | Water Pumps Private | 8 | 191.56 |
| PB680N | Water Pumps Private | 2 | 29.40 |
| PB832 | Water Pumps Private | 16 | 201.45 |
| PB850 | Water Pumps Private | 8 | 53.54 |
| PB862 | Water Pumps Private | 8 | 130.56 |
| PB877N | Water Pumps Private | 59 | 835.23 |
| PB889 | Water Pumps Private | 8 | 122.84 |
| PB898N | Water Pumps Private | 23 | 198.65 |
| PB902 | Water Pumps Private | 16 | 282.20 |
| PB912N | Water Pumps Private | 172 | 1,511.91 |
| PB9173 | Water Pumps Private | 5 | 41.22 |
| PB924N | Water Pumps Private | 31 | 1,651.88 |

FBG_CH1_00090657

| | | | |
|---|---|---|---|
| PB9270 | Water Pumps Private | 64 | 361.65 |
| PB932N | Water Pumps Private | 19 | 154.27 |
| PB9416 | Water Pumps Private | 248 | 1,858.81 |
| PB945 | Water Pumps Private | 8 | 90.37 |
| PB959N | Water Pumps Private | 164 | 1,038.78 |
| PB960 | Water Pumps Private | 8 | 109.46 |
| PB992 | Water Pumps Private | 42 | 409.72 |
| PB994 | Water Pumps Private | 215 | 1,560.48 |
| PB996N | Water Pumps Private | 8 | 58.49 |
| PDP1447 | Water Pumps Private | 5 | 28.43 |
| PDP1619 | Water Pumps Private | 53 | 324.17 |
| PDP1633 | Water Pumps Private | 12 | 75.66 |
| PDP1641 | Water Pumps Private | 53 | 366.79 |
| PDP1646 | Water Pumps Private | 5 | 30.90 |
| PDP1700 | Water Pumps Private | 23 | 162.87 |
| PDP1857 | Water Pumps Private | 2 | 31.53 |
| PDP1903 | Water Pumps Private | 12 | 90.14 |
| PDP1982 | Water Pumps Private | 17 | 119.67 |
| PDP2040A | Water Pumps Private | 81 | 495.14 |
| PDP2067 | Water Pumps Private | 26 | 242.63 |
| PDP2120 | Water Pumps Private | 14 | 90.77 |
| PDP2149 | Water Pumps Private | 12 | 89.26 |
| PDP2190 | Water Pumps Private | 16 | 83.20 |
| PDP2197 | Water Pumps Private | 25 | 129.31 |
| PDP2198 | Water Pumps Private | 3 | 14.67 |
| PDP2218 | Water Pumps Private | 11 | 78.79 |
| PDP2259 | Water Pumps Private | 23 | 123.31 |
| PDP2347 | Water Pumps Private | 124 | 692.10 |
| PDP2364 | Water Pumps Private | 9 | 70.83 |
| PDP2422 | Water Pumps Private | 8 | 44.79 |
| PDP2452 | Water Pumps Private | 51 | 494.43 |
| PDP2453 | Water Pumps Private | 42 | 246.63 |
| PDP2468 | Water Pumps Private | 16 | 144.13 |
| PDP255 | Water Pumps Private | 34 | 259.58 |
| PDP4099 | Water Pumps Private | 5 | 43.22 |
| PDP531 | Water Pumps Private | 17 | 198.96 |
| PDP546 | Water Pumps Private | 56 | 319.61 |
| PDP551 | Water Pumps Private | 19 | 292.18 |
| PDP630 | Water Pumps Private | 34 | 341.60 |
| PDP634 | Water Pumps Private | 29 | 447.84 |
| PDP657 | Water Pumps Private | 8 | 112.68 |
| PDP665 | Water Pumps Private | 8 | 127.90 |
| PDP7165 | Water Pumps Private | 8 | 61.94 |
| PDP812 | Water Pumps Private | 2 | 25.70 |
| PDP831 | Water Pumps Private | 31 | 247.99 |
| PDP832 | Water Pumps Private | 45 | 597.01 |
| PDP860 | Water Pumps Private | 5 | 69.68 |
| PDP861 | Water Pumps Private | 8 | 134.77 |
| PDP863 | Water Pumps Private | 5 | 34.81 |
| PDP877 | Water Pumps Private | 53 | 776.91 |
| PDP878 | Water Pumps Private | 3 | 34.98 |
| PDP884 | Water Pumps Private | 25 | 389.67 |
| PDP889 | Water Pumps Private | 5 | 79.73 |
| PDP897 | Water Pumps Private | 31 | 180.18 |
| PDP898 | Water Pumps Private | 16 | 144.54 |
| PDP913 | Water Pumps Private | 14 | 191.76 |
| PDP9174 | Water Pumps Private | 5 | 45.57 |
| PDP927 | Water Pumps Private | 48 | 521.76 |
| PDP932 | Water Pumps Private | 6 | 51.10 |
| PDP9377 | Water Pumps Private | 5 | 106.50 |
| PDP9409 | Water Pumps Private | 16 | 551.67 |
| PDP951 | Water Pumps Private | 14 | 276.72 |
| PDP962 | Water Pumps Private | 50 | 724.00 |
| PDP964 | Water Pumps Private | 8 | 87.93 |
| PDP965 | Water Pumps Private | 8 | 147.36 |
| PDP968 | Water Pumps Private | 23 | 351.58 |
| PDP979 | Water Pumps Private | 47 | 744.11 |
| PDP982 | Water Pumps Private | 33 | 341.47 |
| PDP994 | Water Pumps Private | 40 | 299.18 |
| PDP996 | Water Pumps Private | 31 | 235.67 |
| PDP998 | Water Pumps Private | 42 | 336.92 |
| PF65Z8501BALAR | Water Pumps Private | 8 | 74.60 |
| PG1268227 | Water Pumps Private | 82 | 2,408.42 |
| PG1615719 | Water Pumps Private | 16 | 1,475.25 |
| PG23532543 | Water Pumps Private | 2 | 244.20 |
| PG3801784 | Water Pumps Private | 56 | 2,532.72 |
| PG3803138 | Water Pumps Private | 45 | 2,115.46 |

FBG_CH1_00090658

| | | | |
|---|---|---|---|
| PG3806180 | Water Pumps Private | 53 | 854.14 |
| PG7W7019 | Water Pumps Private | 26 | 2,164.96 |
| PGAR61788 | Water Pumps Private | 31 | 818.86 |
| PGP1106 | Water Pumps Private | 6 | 254.96 |
| PGP1448 | Water Pumps Private | 17 | 99.12 |
| PGP1619 | Water Pumps Private | 163 | 1,005.07 |
| PGP1642 | Water Pumps Private | 31 | 187.57 |
| PGP1700 | Water Pumps Private | 12 | 85.57 |
| PGP1887 | Water Pumps Private | 8 | 38.80 |
| PGP1901 | Water Pumps Private | 11 | 69.90 |
| PGP1903 | Water Pumps Private | 8 | 60.49 |
| PGP1981 | Water Pumps Private | 3 | 59.61 |
| PGP2022 | Water Pumps Private | 16 | 114.95 |
| PGP2042 | Water Pumps Private | 16 | 134.24 |
| PGP2059 | Water Pumps Private | 5 | 37.08 |
| PGP2094 | Water Pumps Private | 16 | 140.40 |
| PGP2097 | Water Pumps Private | 6 | 55.67 |
| PGP2190 | Water Pumps Private | 105 | 550.62 |
| PGP2195 | Water Pumps Private | 3 | 15.67 |
| PGP2197 | Water Pumps Private | 33 | 172.33 |
| PGP2198 | Water Pumps Private | 2 | 9.88 |
| PGP2218 | Water Pumps Private | 16 | 114.67 |
| PGP2259 | Water Pumps Private | 73 | 394.99 |
| PGP226 | Water Pumps Private | 8 | 62.59 |
| PGP2276 | Water Pumps Private | 25 | 308.83 |
| PGP2280 | Water Pumps Private | 25 | 188.70 |
| PGP2328 | Water Pumps Private | 6 | 34.98 |
| PGP2340 | Water Pumps Private | 23 | 234.81 |
| PGP2342 | Water Pumps Private | 8 | 85.39 |
| PGP2346 | Water Pumps Private | 6 | 49.10 |
| PGP2347 | Water Pumps Private | 146 | 822.14 |
| PGP2364 | Water Pumps Private | 240 | 1,900.85 |
| PGP237 | Water Pumps Private | 11 | 81.83 |
| PGP2379 | Water Pumps Private | 8 | 59.21 |
| PGP2408 | Water Pumps Private | 14 | 353.51 |
| PGP2411 | Water Pumps Private | 23 | 275.94 |
| PGP2422 | Water Pumps Private | 40 | 225.71 |
| PGP2438 | Water Pumps Private | 14 | 264.99 |
| PGP2452 | Water Pumps Private | 31 | 302.08 |
| PGP2471 | Water Pumps Private | 20 | 180.68 |
| PGP2548 | Water Pumps Private | 8 | 98.80 |
| PGP4015 | Water Pumps Private | 9 | 64.66 |
| PGP4119 | Water Pumps Private | 6 | 66.39 |
| PGP451 | Water Pumps Private | 16 | 199.64 |
| PGP497 | Water Pumps Private | 43 | 476.52 |
| PGP5097 | Water Pumps Private | 34 | 316.67 |
| PGP540 | Water Pumps Private | 29 | 216.23 |
| PGP546 | Water Pumps Private | 95 | 546.92 |
| PGP547 | Water Pumps Private | 16 | 106.39 |
| PGP548 | Water Pumps Private | 17 | 272.54 |
| PGP624 | Water Pumps Private | 34 | 253.51 |
| PGP657 | Water Pumps Private | 26 | 364.89 |
| PGP665 | Water Pumps Private | 104 | 1,657.38 |
| PGP685 | Water Pumps Private | 16 | 193.22 |
| PGP7164 | Water Pumps Private | 26 | 270.31 |
| PGP7165 | Water Pumps Private | 67 | 521.66 |
| PGP814 | Water Pumps Private | 25 | 322.62 |
| PGP831 | Water Pumps Private | 9 | 72.39 |
| PGP860 | Water Pumps Private | 22 | 307.67 |
| PGP861 | Water Pumps Private | 36 | 604.63 |
| PGP863 | Water Pumps Private | 16 | 112.10 |
| PGP864 | Water Pumps Private | 90 | 527.57 |
| PGP877 | Water Pumps Private | 37 | 547.49 |
| PGP878 | Water Pumps Private | 34 | 396.63 |
| PGP883 | Water Pumps Private | 6 | 71.04 |
| PGP884 | Water Pumps Private | 25 | 385.19 |
| PGP886 | Water Pumps Private | 33 | 260.21 |
| PGP889 | Water Pumps Private | 22 | 349.67 |
| PGP898 | Water Pumps Private | 74 | 668.82 |
| PGP909 | Water Pumps Private | 17 | 224.40 |
| PGP9099 | Water Pumps Private | 51 | 717.08 |
| PGP9107 | Water Pumps Private | 26 | 156.50 |
| PGP913 | Water Pumps Private | 12 | 164.42 |
| PGP9139 | Water Pumps Private | 12 | 99.10 |
| PGP917 | Water Pumps Private | 40 | 376.78 |
| PGP9173 | Water Pumps Private | 3 | 25.55 |
| PGP9187 | Water Pumps Private | 8 | 49.37 |

FBG_CH1_00090659

**DEBTORS' EXHIBIT NO. 175**
**Page 434 of 1907**

| | | | |
|---|---|---|---|
| PGP927 | Water Pumps Private | 143 | 1,547.09 |
| PGP9309 | Water Pumps Private | 16 | 241.90 |
| PGP9313 | Water Pumps Private | 9 | 80.09 |
| PGP932 | Water Pumps Private | 29 | 247.09 |
| PGP9338 | Water Pumps Private | 22 | 326.78 |
| PGP9361 | Water Pumps Private | 47 | 395.80 |
| PGP9375 | Water Pumps Private | 29 | 628.89 |
| PGP9409 | Water Pumps Private | 6 | 207.70 |
| PGP941 | Water Pumps Private | 37 | 581.97 |
| PGP9412 | Water Pumps Private | 17 | 137.81 |
| PGP9415 | Water Pumps Private | 12 | 179.68 |
| PGP942 | Water Pumps Private | 5 | 52.29 |
| PGP945 | Water Pumps Private | 5 | 59.68 |
| PGP951 | Water Pumps Private | 43 | 847.71 |
| PGP958 | Water Pumps Private | 47 | 441.70 |
| PGP960 | Water Pumps Private | 14 | 198.52 |
| PGP962 | Water Pumps Private | 8 | 115.43 |
| PGP964 | Water Pumps Private | 20 | 220.71 |
| PGP965 | Water Pumps Private | 3 | 55.11 |
| PGP968 | Water Pumps Private | 67 | 1,020.74 |
| PGP979 | Water Pumps Private | 54 | 852.16 |
| PGP984 | Water Pumps Private | 14 | 157.45 |
| PGP992 | Water Pumps Private | 113 | 1,091.59 |
| PGP993 | Water Pumps Private | 57 | 832.61 |
| PGP994 | Water Pumps Private | 14 | 105.41 |
| PGP996 | Water Pumps Private | 113 | 864.01 |
| PGP998 | Water Pumps Private | 14 | 112.92 |
| PGP999 | Water Pumps Private | 9 | 87.51 |
| PGU5MW0111 | Water Pumps Private | 16 | 262.86 |
| PHLM6852000001 | Water Pumps Private | 6 | 170.66 |
| PK470 | Water Pumps Private | 186 | 931.32 |
| PM2S6G8591AALAR | Water Pumps Private | 31 | 170.07 |
| PQRP103 | Water Pumps Private | 47 | 1,267.07 |
| PQRP105 | Water Pumps Private | 14 | 230.00 |
| PQRP110 | Water Pumps Private | 31 | 1,183.66 |
| PQRP141 | Water Pumps Private | 8 | 64.03 |
| PQRP2100 | Water Pumps Private | 9 | 504.64 |
| PQRP215 | Water Pumps Private | 8 | 78.78 |
| PQRP222 | Water Pumps Private | 54 | 1,418.07 |
| PQRP234 | Water Pumps Private | 3 | 35.64 |
| PQRP2440 | Water Pumps Private | 17 | 1,099.54 |
| PQRP366 | Water Pumps Private | 17 | 490.97 |
| PQRP366L | Water Pumps Private | 62 | 1,763.53 |
| PQRP3717 | Water Pumps Private | 19 | 198.32 |
| PQRP390 | Water Pumps Private | 16 | 427.86 |
| PQRP726 | Water Pumps Private | 6 | 234.99 |
| PQRP727 | Water Pumps Private | 5 | 217.22 |
| PQRP729 | Water Pumps Private | 20 | 1,354.68 |
| PQRP730 | Water Pumps Private | 11 | 665.50 |
| PQRP739 | Water Pumps Private | 8 | 339.15 |
| PTMMP912 | Water Pumps Private | 25 | 224.67 |
| PTMTP247 | Water Pumps Private | 352 | 19,118.93 |
| PTMTP390 | Water Pumps Private | 8 | 209.24 |
| PTMTP727 | Water Pumps Private | 8 | 347.55 |
| PTMTP9042 | Water Pumps Private | 57 | 2,289.49 |
| PUS1044BM | Water Pumps | 16 | 198.13 |
| PUS1053BM | Water Pumps | 12 | 185.11 |
| PUS1121BM | Water Pumps | 6 | 96.22 |
| PUS2023BM | Water Pumps | 16 | 200.64 |
| PUS2128BM | Water Pumps | 11 | 116.01 |
| PUS3403BM | Water Pumps | 14 | 115.34 |
| PUS3412BM | Water Pumps | 152 | 1,194.08 |
| PUS4038BM | Water Pumps | 9 | 152.62 |
| PUS4044BM | Water Pumps | 25 | 422.37 |
| PUS4048BM | Water Pumps | 3 | 44.43 |
| PUS4049BM | Water Pumps | 8 | 70.80 |
| PUS4050BM | Water Pumps Private | 6 | 95.96 |
| PUS4053BM | Water Pumps | 20 | 208.45 |
| PUS4054BM | Water Pumps | 8 | 93.09 |
| PUS4069BM | Water Pumps | 17 | 232.43 |
| PUS4070BM | Water Pumps | 14 | 126.04 |
| PUS4078BM | Water Pumps | 3 | 24.10 |
| PUS4090BM | Water Pumps | 8 | 116.23 |
| PUS4093BM | Water Pumps | 14 | 153.81 |
| PUS4094BM | Water Pumps | 122 | 1,377.65 |
| PUS4101BM | Water Pumps | 11 | 161.18 |
| PUS4103BM | Water Pumps | 6 | 84.96 |

FBG_CH1_00090660

| PUS4105BM | Water Pumps | 8 | 127.04 |
|---|---|---|---|
| PUS4107BM | Water Pumps | 9 | 95.30 |
| PUS4108BM | Water Pumps | 16 | 295.49 |
| PUS4114BM | Water Pumps | 2 | 48.55 |
| PUS4119BM | Water Pumps Private | 6 | 66.10 |
| PUS4126BM | Water Pumps | 112 | 725.71 |
| PUS4129BM | Water Pumps | 2 | 26.72 |
| PUS5006BM | Water Pumps | 8 | 104.03 |
| PUS5030BM | Water Pumps | 5 | 60.23 |
| PUS5032BM | Water Pumps | 19 | 264.69 |
| PUS5033BM | Water Pumps | 2 | 11.62 |
| PUS5035BM | Water Pumps | 11 | 169.98 |
| PUS5040BM | Water Pumps | 8 | 94.49 |
| PUS5050BM | Water Pumps | 8 | 75.12 |
| PUS5057BM | Water Pumps | 274 | 2,155.43 |
| PUS5058BM | Water Pumps | 14 | 117.41 |
| PUS5068BM | Water Pumps | 5 | 211.39 |
| PUS5072BM | Water Pumps | 11 | 72.18 |
| PUS5077BM | Water Pumps | 57 | 874.06 |
| PUS5079BM | Water Pumps | 5 | 29.83 |
| PUS6020BM | Water Pumps | 104 | 685.32 |
| PUS6022BM | Water Pumps | 8 | 66.28 |
| PUS6023BM | Water Pumps | 3 | 35.42 |
| PUS6037BM | Water Pumps | 2 | 39.77 |
| PUS6046BM | Water Pumps | 96 | 604.91 |
| PUS6047BM | Water Pumps | 8 | 119.11 |
| PUS6050BM | Water Pumps | 23 | 214.54 |
| PUS6149BM | Water Pumps | 16 | 149.05 |
| PUS6184BM | Water Pumps | 220 | 1,557.03 |
| PUS6186BM | Water Pumps | 14 | 217.15 |
| PUS6198BM | Water Pumps | 11 | 95.59 |
| PUS61BM | Water Pumps | 12 | 180.84 |
| PUS6217BM | Water Pumps | 11 | 115.64 |
| PUS6221BM | Water Pumps | 3 | 19.09 |
| PUS6232BM | Water Pumps | 8 | 110.73 |
| PUS6233BM | Water Pumps | 2 | 14.40 |
| PUS6244BM | Water Pumps | 11 | 81.77 |
| PUS6250BM | Water Pumps | 93 | 908.12 |
| PUS6341BM | Water Pumps | 43 | 1,166.95 |
| PUS6350BM | Water Pumps Private | 5 | 37.49 |
| PUS64BM | Water Pumps | 8 | 277.05 |
| PUS6662BM | Water Pumps | 31 | 343.21 |
| PUS67BM | Water Pumps | 26 | 388.03 |
| PUS7100BM | Water Pumps | 6 | 69.42 |
| PUS7121BM | Water Pumps | 3 | 23.27 |
| PUS7123HBM | Water Pumps | 16 | 129.48 |
| PUS7127BM | Water Pumps | 14 | 126.12 |
| PUS7136BM | Water Pumps | 36 | 305.68 |
| PUS7141BM | Water Pumps | 5 | 37.17 |
| PUS7145NBM | Water Pumps | 6 | 54.46 |
| PUS7150BM | Water Pumps | 33 | 250.70 |
| PUS7156BM | Water Pumps | 47 | 262.90 |
| PUS7163BM | Water Pumps | 109 | 1,190.10 |
| PUS7164BM | Water Pumps | 31 | 321.38 |
| PUS7165BM | Water Pumps | 65 | 502.89 |
| PUS8925BM | Water Pumps | 2 | 12.60 |
| PUS8927BM | Water Pumps | 226 | 1,562.83 |
| PUS8931BM | Water Pumps | 5 | 28.52 |
| PUS8932BM | Water Pumps | 172 | 1,439.22 |
| PUS8933BM | Water Pumps | 9 | 53.97 |
| PUS8934BM | Water Pumps | 2 | 14.42 |
| PUS8937BM | Water Pumps | 11 | 68.16 |
| PUS8938BM | Water Pumps | 211 | 1,289.71 |
| PUS8940BM | Water Pumps | 19 | 407.60 |
| PUS8949BM | Water Pumps | 71 | 380.36 |
| PUS8960BM | Water Pumps | 3 | 31.07 |
| PUS896BM | Water Pumps | 5 | 55.64 |
| PUS8981BM | Water Pumps | 43 | 1,086.39 |
| PUS9065BM | Water Pumps | 26 | 135.07 |
| PUS9104BM | Water Pumps | 11 | 126.45 |
| PUS9111BM | Water Pumps | 12 | 129.41 |
| PUS9130BM | Water Pumps | 2 | 11.55 |
| PUS9133BM | Water Pumps | 20 | 212.49 |
| PUS9145BM | Water Pumps | 5 | 64.08 |
| PUS9179BM | Water Pumps | 3 | 18.32 |
| PUS9201BM | Water Pumps | 25 | 182.32 |
| PUS9206BM | Water Pumps | 78 | 435.04 |

FBG_CH1_00090661

| | | | |
|---|---|---|---|
| PUS9207BM | Water Pumps | 2 | 12.06 |
| PUS9213BM | Water Pumps | 5 | 36.73 |
| PUS9214BM | Water Pumps | 14 | 68.39 |
| PUS9255BM | Water Pumps | 19 | 261.89 |
| PUS9257BM | Water Pumps | 8 | 151.54 |
| PUS9261BM | Water Pumps | 5 | 49.54 |
| PUS9262BM | Water Pumps | 16 | 127.08 |
| PUS9270BM | Water Pumps | 37 | 217.12 |
| PUS9272BM | Water Pumps | 12 | 99.06 |
| PUS9284BM | Water Pumps | 20 | 103.37 |
| PUS9293BM | Water Pumps | 34 | 314.82 |
| PUS9306BM | Water Pumps | 14 | 126.04 |
| PUS9309BM | Water Pumps Private | 5 | 48.45 |
| PUS932BM | Water Pumps | 5 | 73.09 |
| PUS9333BM | Water Pumps | 8 | 88.06 |
| PUS9342BM | Water Pumps Private | 17 | 160.41 |
| PUS9349BM | Water Pumps | 11 | 97.35 |
| PUS9364BM | Water Pumps | 26 | 211.72 |
| PUS9379BM | Water Pumps | 11 | 151.54 |
| PUS9385BM | Water Pumps | 8 | 82.14 |
| PUS9389BM | Water Pumps | 5 | 45.44 |
| PUS9399BM | Water Pumps | 20 | 171.66 |
| PUS9402BM | Water Pumps | 9 | 73.63 |
| PUS9406BM | Water Pumps | 9 | 55.06 |
| PUS9414BM | Water Pumps | 19 | 135.72 |
| PUS9416BM | Water Pumps | 5 | 39.34 |
| PUS9426BM | Water Pumps | 8 | 67.52 |
| PUS9427BM | Water Pumps | 16 | 128.85 |
| PUS9434BM | Water Pumps | 47 | 426.98 |
| PUS9449BM | Water Pumps | 16 | 134.14 |
| PUS9461BM | Water Pumps | 9 | 79.65 |
| PUS9468BM | Water Pumps | 2 | 14.06 |
| PUS9470BM | Water Pumps | 19 | 199.02 |
| PUS953BM | Water Pumps | 6 | 97.70 |
| PVP6852000001 | Water Pumps Private | 59 | 1,678.20 |
| PVP6852000101 | Water Pumps Private | 47 | 1,350.88 |
| SAF0W20N2 | FR AM Other Assess | 465 | 877.37 |
| SAF0W20N5 | FR AM Other Assess | 949 | 9,393.26 |
| SAF10W30N2 | FR AM Other Assess | 202 | 338.90 |
| SAF10W30N5 | FR AM Other Assess | 43 | 357.75 |
| SAF10W30N7 | FR AM Other Assess | 8 | 2,615.49 |
| SAF5W30N2 | FR AM Other Assess | 854 | 1,512.61 |
| SAF5W30N5 | FR AM Other Assess | 17 | 149.46 |
| SAF5W40N2 | FR AM Other Assess | 11,104 | 26,778.87 |
| SAF5W40N5 | FR AM Other Assess | 899 | 10,966.54 |
| SAF5W50N2 | FR AM Other Assess | 1,116 | 2,092.51 |
| SAF5W50N5 | FR AM Other Assess | 457 | 4,278.78 |
| SCFCVT2 | FR AM Other Assess | 395 | 1,132.61 |
| SCFCVT2-M1 | FR AM Other Assess | 4,774 | 13,688.86 |
| SETTLEMENT AT | AT AM Copper Core | 1,676 | 82.46 |
| SETTLEMENT FR | FR AM Extra Gd Oil | 155 | 0.01 |
| STFMERV2 | FR AM Other Assess | 911 | 3,202.92 |
| W3111 | WP AM WIPERS ANCO | 14,880 | 6,673.14 |
| W3112 | WP AM WIPERS ANCO | 8,680 | 3,892.67 |
| W3113 | WP AM WIPERS ANCO | 8,680 | 3,892.67 |
| W3114 | WP AM WIPERS ANCO | 15,190 | 6,812.17 |
| W3115 | WP AM WIPERS ANCO | 14,880 | 6,673.15 |
| W3116 | WP AM WIPERS ANCO | 102,300 | 45,877.87 |
| W3117 | WP AM WIPERS ANCO | 26,970 | 13,405.12 |
| W3118 | WP AM WIPERS ANCO | 391,995 | 194,836.47 |
| W3119 | WP AM WIPERS ANCO | 82,925 | 46,181.65 |
| W3120 | WP AM WIPERS ANCO | 192,815 | 107,380.34 |
| W3121 | WP AM WIPERS ANCO | 39,990 | 23,671.17 |
| W3122 | WP AM WIPERS ANCO | 129,430 | 76,613.15 |
| W3124 | WP AM WIPERS ANCO | 32,710 | 20,544.35 |
| W3126 | WP AM WIPERS ANCO | 10,695 | 10,051.74 |
| W3128 | WP AM WIPERS ANCO | 19,384 | 20,539.19 |
| W9712 | WP AM WIPERS ANCO | 1,333 | 1,464.12 |
| W9713 | WP AM WIPERS ANCO | 2,697 | 3,030.30 |
| W9714 | WP AM WIPERS ANCO | 8,045 | 9,363.77 |
| W9715 | WP AM WIPERS ANCO | 1,721 | 2,062.13 |
| W9716 | WP AM WIPERS ANCO | 8,300 | 10,171.23 |
| W9717 | WP AM WIPERS ANCO | 6,107 | 8,118.25 |
| W9718 | WP AM WIPERS ANCO | 45,519 | 60,969.10 |
| W9719 | WP AM WIPERS ANCO | 12,834 | 17,772.63 |
| W9720 | WP AM WIPERS ANCO | 9,605 | 13,523.90 |
| W9721 | WP AM WIPERS ANCO | 6,118 | 9,780.43 |

FBG_CH1_00090662

**DEBTORS' EXHIBIT NO. 175**
**Page 437 of 1907**

| | | | |
|---|---|---:|---:|
| W9722 | WP AM WIPERS ANCO | 13,516 | 21,566.20 |
| W9724 | WP AM WIPERS ANCO | 6,634 | 11,153.99 |
| W9726 | WP AM WIPERS ANCO | 2,954 | 6,727.50 |
| W9728 | WP AM WIPERS ANCO | 1,821 | 4,250.03 |
| WA14M | WP AM WIPERS ANCO | 3,869 | 4,928.57 |
| WA16M | WP AM WIPERS ANCO | 7,649 | 10,337.81 |
| WA17M | WP AM WIPERS ANCO | 3,171 | 4,436.00 |
| WA18M | WP AM WIPERS ANCO | 15,308 | 22,788.93 |
| WA19M | WP AM WIPERS ANCO | 8,195 | 12,340.36 |
| WA20M | WP AM WIPERS ANCO | 6,688 | 10,098.04 |
| WA21M | WP AM WIPERS ANCO | 7,077 | 11,277.82 |
| WA22M | WP AM WIPERS ANCO | 13,167 | 20,942.94 |
| WA24M | WP AM WIPERS ANCO | 6,448 | 10,795.73 |
| WA26M | WP AM WIPERS ANCO | 4,617 | 8,605.59 |
| WA28M | WP AM WIPERS ANCO | 2,209 | 4,478.28 |
| WAN41477 | WP AM WIPERS ANCO | 189 | 1,553.60 |
| WAN4364 | WP AM WIPERS ANCO | 90 | 567.34 |
| WAN4523 | WP AM WIPERS ANCO | 119 | 1,080.21 |
| WAN4527 | WP AM WIPERS ANCO | 667 | 6,639.91 |
| WAN5113 | WP AM WIPERS ANCO | 680 | 2,043.83 |
| WAN5114 | WP AM WIPERS ANCO | 3,385 | 10,276.48 |
| WAN5115 | WP AM WIPERS ANCO | 631 | 1,934.74 |
| WAN5116 | WP AM WIPERS ANCO | 2,641 | 8,177.60 |
| WAN5214 | WP AM WIPERS ANCO | 1,076 | 4,666.59 |
| WAN5216 | WP AM WIPERS ANCO | 1,919 | 8,709.77 |
| WAN5218 | WP AM WIPERS ANCO | 5,665 | 27,997.23 |
| WAN5704 | WP AM WIPERS ANCO | 50 | 239.54 |
| WAN5709 | WP AM WIPERS ANCO | 922 | 5,812.06 |
| WAN5710 | WP AM WIPERS ANCO | 682 | 4,471.12 |
| WAN5718 | WP AM WIPERS ANCO | 465 | 2,931.24 |
| WAN5724 | WP AM WIPERS ANCO | 3 | 10.89 |
| WANMFA5118 | WP AM WIPERS ANCO | 411 | 1,305.78 |
| WB11 | WP AM WIPER CHAMPION | 4,650 | 2,059.09 |
| WB12 | WP AM WIPER CHAMPION | 1,550 | 686.36 |
| WB13 | WP AM WIPER CHAMPION | 2,790 | 1,235.46 |
| WB14 | WP AM WIPER CHAMPION | 12,710 | 5,628.19 |
| WB15 | WP AM WIPER CHAMPION | 3,720 | 1,647.27 |
| WB16 | WP AM WIPER CHAMPION | 22,320 | 9,883.65 |
| WB17 | WP AM WIPER CHAMPION | 6,200 | 3,046.62 |
| WB18 | WP AM WIPER CHAMPION | 120,900 | 59,409.05 |
| WB19 | WP AM WIPER CHAMPION | 31,000 | 17,089.08 |
| WB20 | WP AM WIPER CHAMPION | 24,180 | 13,329.48 |
| WB21 | WP AM WIPER CHAMPION | 23,560 | 13,812.74 |
| WB22 | WP AM WIPER CHAMPION | 31,000 | 18,174.65 |
| WB24 | WP AM WIPER CHAMPION | 12,400 | 7,718.10 |
| WB26 | WP AM WIPER CHAMPION | 6,200 | 5,792.08 |
| WB28 | WP AM WIPER CHAMPION | 4,650 | 4,900.85 |
| WBB18N | WP AM WIPER CHAMPION | 155 | 362.08 |
| WBB28 | WP AM WIPER CHAMPION | 85 | 264.70 |
| WC14UB | WP AM WIPERS ANCO | 682 | 881.16 |
| WC15OE | WP AM WIPERS ANCO | 915 | 1,267.10 |
| WC15UB | WP AM WIPERS ANCO | 969 | 1,276.40 |
| WC16UB | WP AM WIPERS ANCO | 1,496 | 2,138.06 |
| WC17OE | WP AM WIPERS ANCO | 1,496 | 2,187.86 |
| WC17UB | WP AM WIPERS ANCO | 1,077 | 1,515.37 |
| WC18OE | WP AM WIPERS ANCO | 2,068 | 3,235.05 |
| WC18UB | WP AM WIPERS ANCO | 2,558 | 3,828.72 |
| WC19OE | WP AM WIPERS ANCO | 1,395 | 2,073.91 |
| WC19UB | WP AM WIPERS ANCO | 2,441 | 3,464.02 |
| WC20OE | WP AM WIPERS ANCO | 1,077 | 1,759.75 |
| WC20UB | WP AM WIPERS ANCO | 2,091 | 3,298.45 |
| WC21OE | WP AM WIPERS ANCO | 1,569 | 2,674.41 |
| WC21UB | WP AM WIPERS ANCO | 2,190 | 3,551.81 |
| WC22OE | WP AM WIPERS ANCO | 2,209 | 3,705.18 |
| WC22UB | WP AM WIPERS ANCO | 3,650 | 5,879.18 |
| WC24OE | WP AM WIPERS ANCO | 1,364 | 2,448.80 |
| WC24UB | WP AM WIPERS ANCO | 2,602 | 4,527.05 |
| WC26OE | WP AM WIPERS ANCO | 961 | 1,822.22 |
| WC26UB | WP AM WIPERS ANCO | 1,665 | 3,044.61 |
| WC28OE | WP AM WIPERS ANCO | 899 | 1,848.83 |
| WC28UB | WP AM WIPERS ANCO | 442 | 884.02 |
| WCHC11 | WP AM WIPER CHAMPION | 23 | 41.02 |
| WCHC14 | WP AM WIPER CHAMPION | 995 | 1,750.88 |
| WCHC15 | WP AM WIPER CHAMPION | 23 | 37.44 |
| WCHC17 | WP AM WIPER CHAMPION | 39 | 61.16 |
| WCHC18N | WP AM WIPER CHAMPION | 4,526 | 10,185.29 |
| WCHC19 | WP AM WIPER CHAMPION | 23 | 34.14 |

FBG_CH1_00090663

| | | | |
|---|---|---|---|
| WCHC20 | WP AM WIPER CHAMPION | 54 | 81.45 |
| WCHC21 | WP AM WIPER CHAMPION | 5 | 7.72 |
| WCHC24N | WP AM WIPER CHAMPION | 1,970 | 5,093.55 |
| WCHC26 | WP AM WIPER CHAMPION | 17 | 39.07 |
| WCHC26N | WP AM WIPER CHAMPION | 240 | 663.64 |
| WCHC28 | WP AM WIPER CHAMPION | 183 | 431.55 |
| WCHCO14 | WP AM WIPER CHAMPION | 1,741 | 4,313.99 |
| WCHCO16 | WP AM WIPER CHAMPION | 51 | 80.76 |
| WCHCO17 | WP AM WIPER CHAMPION | 23 | 54.69 |
| WCHCO18 | WP AM WIPER CHAMPION | 78 | 134.53 |
| WCHCO19 | WP AM WIPER CHAMPION | 1,132 | 3,048.87 |
| WCHCO20 | WP AM WIPER CHAMPION | 4,659 | 8,411.33 |
| WCHCO21 | WP AM WIPER CHAMPION | 566 | 1,598.93 |
| WCHCO22 | WP AM WIPER CHAMPION | 5 | 14.24 |
| WCHCO24 | WP AM WIPER CHAMPION | 36 | 106.01 |
| WCHCO26 | WP AM WIPER CHAMPION | 257 | 750.63 |
| WCHCO28 | WP AM WIPER CHAMPION | 1,158 | 3,507.02 |
| WCHR10B | WP AM WIPER CHAMPION | 2,472 | 7,165.99 |
| WCHR10W | WP AM WIPER CHAMPION | 2,899 | 6,705.07 |
| WCHR11A | WP AM WIPER CHAMPION | 961 | 1,742.31 |
| WCHR12A | WP AM WIPER CHAMPION | 1,054 | 2,036.94 |
| WCHR12B | WP AM WIPER CHAMPION | 930 | 1,807.36 |
| WCHR12E | WP AM WIPER CHAMPION | 891 | 1,605.76 |
| WCHR12V | WP AM WIPER CHAMPION | 2,527 | 4,692.15 |
| WCHR12X | WP AM WIPER CHAMPION | 2,378 | 6,247.67 |
| WCHR14A | WP AM WIPER CHAMPION | 1,187 | 2,371.06 |
| WCHR14B | WP AM WIPER CHAMPION | 1,046 | 2,089.41 |
| WCHR14C | WP AM WIPER CHAMPION | 1,108 | 2,369.71 |
| WCHR14D | WP AM WIPER CHAMPION | 2,201 | 4,205.95 |
| WCHR16A | WP AM WIPER CHAMPION | 2,525 | 6,689.79 |
| WCHR16B | WP AM WIPER CHAMPION | 2,427 | 6,482.68 |
| WCHR16E | WP AM WIPER CHAMPION | 2,525 | 6,497.23 |
| WCHR8A | WP AM WIPER CHAMPION | 2,573 | 6,201.72 |
| WCHW12 | WP AM WIPER CHAMPION | 620 | 274.55 |
| WCHW13 | WP AM WIPER CHAMPION | 54 | 24.58 |
| WCHW14 | WP AM WIPER CHAMPION | 2 | 0.89 |
| WCHW16 | WP AM WIPER CHAMPION | 52,153 | 26,162.00 |
| WCHW17 | WP AM WIPER CHAMPION | 3,877 | 1,905.12 |
| WCHW18 | WP AM WIPER CHAMPION | 327 | 160.68 |
| WCHW18P | WP AM WIPER CHAMPION | 155 | 142.15 |
| WCHW19 | WP AM WIPER CHAMPION | 62 | 38.72 |
| WCHW19/21 | WP AM WIPER CHAMPION | 388 | 418.83 |
| WCHW20 | WP AM WIPER CHAMPION | 157 | 86.55 |
| WCHW21 | WP AM WIPER CHAMPION | 163 | 95.56 |
| WCHW22 | WP AM WIPER CHAMPION | 160 | 93.80 |
| WCHW26 | WP AM WIPER CHAMPION | 2 | 1.87 |
| WCHW28 | WP AM WIPER CHAMPION | 1,694 | 1,785.39 |
| WP1000 | Pump Parts | 56 | 829.78 |
| WP1101 | Pump Parts | 5 | 29.79 |
| WP1103 | Pump Parts | 219 | 1,766.90 |
| WP1107 | Pump Parts | 6 | 57.59 |
| WP144 | Pump Parts | 78 | 1,030.59 |
| WP1793 | Pump Parts | 2 | 14.37 |
| WP1800 | Pump Parts | 5 | 55.02 |
| WP1803 | Pump Parts | 16 | 118.99 |
| WP1825 | Pump Parts | 67 | 400.59 |
| WP1838 | Pump Parts | 20 | 130.49 |
| WP1842 | Pump Parts | 57 | 367.71 |
| WP1863 | Pump Parts | 31 | 212.34 |
| WP1869 | Pump Parts | 138 | 901.82 |
| WP1874 | Pump Parts | 14 | 90.17 |
| WP1878 | Pump Parts | 184 | 1,231.38 |
| WP1883 | Pump Parts | 48 | 431.36 |
| WP1884 | Pump Parts | 236 | 1,549.67 |
| WP1887 | Pump Parts | 93 | 425.85 |
| WP1888 | Pump Parts | 9 | 53.24 |
| WP1891 | Pump Parts | 3 | 18.22 |
| WP1892 | Pump Parts | 34 | 241.80 |
| WP1903 | Pump Parts | 2 | 14.58 |
| WP1909 | Pump Parts | 74 | 1,849.09 |
| WP1928 | Pump Parts | 147 | 1,729.91 |
| WP1941 | Pump Parts | 23 | 597.13 |
| WP1943 | Pump Parts | 791 | 20,404.79 |
| WP1947 | Pump Parts | 17 | 340.97 |
| WP1953 | Pump Parts | 8,339 | 45,747.57 |
| WP1955 | Pump Parts | 112 | 2,185.68 |
| WP1956 | Pump Parts | 81 | 1,444.08 |

FBG_CH1_00090664

| | | | |
|---|---|---|---|
| WP1968 | Pump Parts | 995 | 38,942.09 |
| WP1969 | Pump Parts | 1,640 | 64,975.65 |
| WP1974 | Pump Parts | 3 | 21.97 |
| WP1975 | Pump Parts | 3 | 35.40 |
| WP1981 | Pump Parts | 5 | 96.15 |
| WP1983 | Pump Parts | 31 | 354.44 |
| WP1985 | Pump Parts | 43 | 377.07 |
| WP2010 | Pump Parts | 118 | 847.86 |
| WP2022 | Pump Parts | 29 | 198.64 |
| WP2040 | Pump Parts | 78 | 555.54 |
| WP2045 | Pump Parts | 287 | 1,902.62 |
| WP2055 | Pump Parts | 23 | 193.70 |
| WP2056 | Pump Parts | 9 | 67.97 |
| WP2057 | Pump Parts | 163 | 1,372.76 |
| WP2059 | Pump Parts | 9 | 63.72 |
| WP2064 | Pump Parts | 45 | 640.54 |
| WP2067 | Pump Parts | 155 | 1,412.11 |
| WP2077 | Pump Parts | 133 | 1,561.20 |
| WP2083 | Pump Parts | 8 | 134.86 |
| WP2090 | Pump Parts | 16 | 264.01 |
| WP2094 | Pump Parts | 9 | 75.96 |
| WP2096 | Pump Parts | 116 | 1,276.40 |
| WP2097 | Pump Parts | 57 | 506.02 |
| WP2099 | Pump Parts | 468 | 42,708.81 |
| WP2100 | Pump Parts | 3 | 165.38 |
| WP2115 | Pump Parts | 43 | 354.72 |
| WP2117 | Pump Parts | 25 | 255.68 |
| WP2118 | Pump Parts | 78 | 601.36 |
| WP2119 | Pump Parts | 79 | 795.52 |
| WP2124 | Pump Parts | 5 | 58.74 |
| WP2135 | Pump Parts | 1,108 | 6,531.73 |
| WP2139 | Pump Parts | 121 | 2,108.30 |
| WP2140 | Pump Parts | 8 | 67.78 |
| WP2141 | Pump Parts | 326 | 2,544.94 |
| WP2143 | Pump Parts | 29 | 259.52 |
| WP2147 | Pump Parts | 16 | 530.35 |
| WP2148 | Pump Parts | 91 | 1,219.64 |
| WP2149 | Pump Parts | 22 | 158.77 |
| WP2151 | Pump Parts | 11 | 106.15 |
| WP2155 | Pump Parts | 3,794 | 25,470.04 |
| WP2157 | Pump Parts | 104 | 842.18 |
| WP2159 | Pump Parts | 122 | 816.46 |
| WP2171 | Pump Parts | 79 | 1,006.83 |
| WP2190 | Pump Parts | 51 | 360.76 |
| WP2192 | Pump Parts | 25 | 520.54 |
| WP2194 | Pump Parts | 31 | 213.31 |
| WP2195 | Pump Parts | 71 | 607.72 |
| WP2196 | Pump Parts | 28 | 193.55 |
| WP2197 | Pump Parts | 56 | 556.49 |
| WP2198 | Pump Parts | 129 | 1,946.63 |
| WP2200 | Pump Parts | 9 | 228.69 |
| WP2202 | Pump Parts | 312 | 14,923.54 |
| WP2218 | Pump Parts | 79 | 3,369.82 |
| WP2221 | Pump Parts | 1,700 | 10,681.40 |
| WP2223 | Pump Parts | 73 | 1,887.75 |
| WP2233 | Pump Parts | 67 | 1,883.48 |
| WP2234 | Pump Parts | 8 | 128.70 |
| WP2238 | Pump Parts | 3 | 22.88 |
| WP2249 | Pump Parts | 16 | 152.76 |
| WP2253 | Pump Parts | 729 | 19,273.61 |
| WP2254 | Pump Parts | 31 | 2,985.09 |
| WP2255 | Pump Parts | 126 | 934.06 |
| WP2256 | Pump Parts | 237 | 1,789.92 |
| WP2258 | Pump Parts | 518 | 27,576.09 |
| WP2259 | Pump Parts | 12,048 | 61,924.63 |
| WP2272 | Pump Parts | 164 | 2,941.66 |
| WP2274 | Pump Parts | 12 | 128.39 |
| WP2276 | Pump Parts | 48 | 573.69 |
| WP2278 | Pump Parts | 73 | 609.52 |
| WP2280 | Pump Parts | 2 | 14.43 |
| WP2281 | Pump Parts | 20 | 271.12 |
| WP2340 | Pump Parts | 47 | 552.16 |
| WP2354 | Pump Parts | 17 | 288.73 |
| WP2373 | Pump Parts | 16 | 90.12 |
| WP2375 | Pump Parts | 140 | 994.54 |
| WP2407 | Pump Parts | 16 | 179.08 |
| WP2408 | Pump Parts | 98 | 2,411.82 |

FBG_CH1_00090665

**DEBTORS' EXHIBIT NO. 175**
**Page 440 of 1907**

| | | | |
|---|---|---|---|
| WP2417 | Pump Parts | 124 | 1,856.06 |
| WP2418 | Pump Parts | 9 | 369.78 |
| WP2419 | Pump Parts | 20 | 305.81 |
| WP2421 | Pump Parts | 6 | 353.33 |
| WP2422 | Pump Parts | 16 | 831.60 |
| WP2437 | Pump Parts | 47 | 305.66 |
| WP2438 | Pump Parts | 74 | 1,631.99 |
| WP2439 | Pump Parts | 14 | 504.33 |
| WP2440 | Pump Parts | 20 | 1,271.91 |
| WP2450 | Pump Parts | 8 | 52.45 |
| WP2451 | Pump Parts | 1,296 | 15,819.99 |
| WP2453 | Pump Parts | 56 | 1,092.22 |
| WP2474 | Pump Parts | 450 | 23,978.86 |
| WP2500 | Pump Parts | 5 | 106.58 |
| WP2521 | Pump Parts | 8 | 101.43 |
| WP2537 | Pump Parts | 48 | 2,655.79 |
| WP2548 | Pump Parts | 2 | 23.71 |
| WP2592 | Pump Parts | 93 | 13,179.44 |
| WP2614 | Pump Parts | 73 | 936.69 |
| WP2625 | Pump Parts | 1,039 | 12,581.83 |
| WP2639 | Pump Parts | 1,163 | 11,955.24 |
| WP2649 | Pump Parts | 8 | 74.01 |
| WP2650 | Pump Parts | 6 | 158.76 |
| WP2674 | Pump Parts | 346 | 4,623.93 |
| WP2711 | Pump Parts | 5 | 211.05 |
| WP278 | Pump Parts | 74 | 1,330.82 |
| WP2780 | Pump Parts | 1,395 | 17,531.19 |
| WP2847 | Pump Parts | 1,194 | 68,306.11 |
| WP295 | Pump Parts | 40 | 652.09 |
| WP345 | Pump Parts | 265 | 2,804.95 |
| WP386 | Pump Parts | 5 | 48.25 |
| WP399 | Pump Parts | 25 | 349.48 |
| WP4007 | Pump Parts | 8 | 44.81 |
| WP4013 | Pump Parts | 11 | 62.08 |
| WP4015 | Pump Parts | 107 | 732.91 |
| WP4027 | Pump Parts | 440 | 2,676.91 |
| WP4030 | Pump Parts | 42 | 250.24 |
| WP404 | Pump Parts | 16 | 193.55 |
| WP413 | Pump Parts | 277 | 4,291.54 |
| WP450 | Pump Parts | 43 | 518.25 |
| WP458 | Pump Parts | 68 | 1,628.29 |
| WP459 | Pump Parts | 245 | 3,951.24 |
| WP461 | Pump Parts | 70 | 1,410.62 |
| WP478 | Pump Parts | 184 | 2,005.33 |
| WP482 | Pump Parts | 2 | 35.53 |
| WP485 | Pump Parts | 53 | 797.44 |
| WP487 | Pump Parts | 17 | 190.27 |
| WP490 | Pump Parts | 109 | 1,470.96 |
| WP493 | Pump Parts | 113 | 1,062.22 |
| WP494 | Pump Parts | 2 | 24.90 |
| WP505 | Pump Parts | 56 | 401.20 |
| WP506 | Pump Parts | 155 | 902.35 |
| WP508 | Pump Parts | 31 | 251.68 |
| WP510 | Pump Parts | 8 | 150.04 |
| WP511 | Pump Parts | 25 | 565.57 |
| WP520 | Pump Parts | 121 | 1,863.06 |
| WP529 | Pump Parts | 56 | 380.64 |
| WP546 | Pump Parts | 518 | 5,711.99 |
| WP547 | Pump Parts | 45 | 665.43 |
| WP547HDA | Pump Parts | 2 | 29.40 |
| WP561 | Pump Parts | 22 | 242.50 |
| WP562 | Pump Parts | 2 | 12.97 |
| WP566 | Pump Parts | 33 | 372.59 |
| WP571 | Pump Parts | 12 | 208.66 |
| WP572HDA | Pump Parts | 45 | 902.71 |
| WP577 | Pump Parts | 29 | 614.24 |
| WP578 | Pump Parts | 23 | 177.13 |
| WP583 | Pump Parts | 105 | 1,040.11 |
| WP584 | Pump Parts | 31 | 238.56 |
| WP587 | Pump Parts | 16 | 106.24 |
| WP594 | Pump Parts | 51 | 630.64 |
| WP596 | Pump Parts | 5 | 79.86 |
| WP598 | Pump Parts | 67 | 1,207.90 |
| WP599 | Pump Parts | 2 | 14.01 |
| WP602 | Pump Parts | 161 | 1,555.44 |
| WP604 | Pump Parts | 501 | 5,643.51 |
| WP605 | Pump Parts | 85 | 1,258.94 |

FBG_CH1_00090666

| WP608 | Pump Parts | 166 | 2,090.03 |
|---|---|---|---|
| WP609 | Pump Parts | 34 | 905.48 |
| WP610 | Pump Parts | 82 | 632.09 |
| WP621 | Pump Parts | 40 | 435.24 |
| WP622 | Pump Parts | 25 | 291.87 |
| WP624 | Pump Parts | 25 | 342.85 |
| WP625 | Pump Parts | 171 | 956.04 |
| WP634 | Pump Parts | 254 | 2,905.57 |
| WP635 | Pump Parts | 11 | 164.01 |
| WP636 | Pump Parts | 26 | 377.83 |
| WP637 | Pump Parts | 9 | 64.20 |
| WP642 | Pump Parts | 73 | 594.31 |
| WP645 | Pump Parts | 8 | 130.55 |
| WP646 | Pump Parts | 14 | 157.00 |
| WP647 | Pump Parts | 62 | 413.62 |
| WP651 | Pump Parts | 25 | 383.87 |
| WP652 | Pump Parts | 206 | 2,070.45 |
| WP656 | Pump Parts | 37 | 523.79 |
| WP657 | Pump Parts | 59 | 959.11 |
| WP659 | Pump Parts | 36 | 1,018.39 |
| WP661 | Pump Parts | 87 | 588.62 |
| WP664 | Pump Parts | 710 | 3,485.43 |
| WP667 | Pump Parts | 16 | 193.17 |
| WP676 | Pump Parts | 175 | 1,171.15 |
| WP695 | Pump Parts | 5 | 54.28 |
| WP702 | Pump Parts | 48 | 503.90 |
| WP711 | Pump Parts | 181 | 2,530.23 |
| WP715 | Pump Parts | 3 | 39.27 |
| WP719 | Pump Parts | 3 | 19.98 |
| WP722 | Pump Parts | 14 | 131.87 |
| WP723 | Pump Parts | 78 | 853.84 |
| WP724 | Pump Parts | 233 | 1,743.73 |
| WP726 | Pump Parts | 6 | 52.74 |
| WP732 | Pump Parts | 56 | 313.09 |
| WP746 | Pump Parts | 96 | 1,693.21 |
| WP747 | Pump Parts | 47 | 595.06 |
| WP750 | Pump Parts | 388 | 3,351.09 |
| WP751 | Pump Parts | 36 | 306.21 |
| WP754 | Pump Parts | 54 | 1,231.10 |
| WP756 | Pump Parts | 6 | 33.36 |
| WP759 | Pump Parts | 50 | 395.63 |
| WP763 | Pump Parts | 6 | 69.91 |
| WP766 | Pump Parts | 53 | 439.75 |
| WP767 | Pump Parts | 43 | 424.59 |
| WP768 | Pump Parts | 74 | 765.07 |
| WP775 | Pump Parts | 879 | 4,711.53 |
| WP776 | Pump Parts | 64 | 448.44 |
| WP786 | Pump Parts | 59 | 511.19 |
| WP787 | Pump Parts | 51 | 634.65 |
| WP825 | Pump Parts | 29 | 234.93 |
| WP833 | Pump Parts | 23 | 266.54 |
| WP834 | Pump Parts | 68 | 853.20 |
| WP836 | Pump Parts | 17 | 169.76 |
| WP837 | Pump Parts | 118 | 1,569.47 |
| WP838 | Pump Parts | 124 | 1,080.87 |
| WP843 | Pump Parts | 43 | 1,518.96 |
| WP844 | Pump Parts | 74 | 552.67 |
| WP849 | Pump Parts | 17 | 149.08 |
| WP853 | Pump Parts | 295 | 2,395.17 |
| WP856 | Pump Parts | 14 | 157.71 |
| WP861 | Pump Parts | 219 | 1,561.40 |
| WP862 | Pump Parts | 9,026 | 42,131.58 |
| WP875 | Pump Parts | 22 | 168.48 |
| WP878 | Pump Parts | 53 | 715.39 |
| WP882 | Pump Parts | 34 | 327.15 |
| WP883 | Pump Parts | 29 | 224.02 |
| WP887 | Pump Parts | 11 | 54.46 |
| WP890 | Pump Parts | 8 | 66.27 |
| WP891 | Pump Parts | 60 | 541.09 |
| WP893 | Pump Parts | 43 | 663.22 |
| WP896 | Pump Parts | 141 | 1,123.68 |
| WP897 | Pump Parts | 40 | 312.59 |
| WP898 | Pump Parts | 271 | 1,531.37 |
| WP899 | Pump Parts | 3 | 21.65 |
| WP9017 | Pump Parts | 180 | 1,631.32 |
| WP9018 | Pump Parts | 20 | 126.88 |
| WP9020 | Pump Parts | 606 | 8,905.60 |

FBG_CH1_00090667

| WP9022 | Pump Parts | 26 | 201.00 |
|---|---|---|---|
| WP9023 | Pump Parts | 50 | 394.40 |
| WP9024 | Pump Parts | 7,311 | 53,451.75 |
| WP9033 | Pump Parts | 34 | 517.88 |
| WP9035 | Pump Parts | 3 | 19.00 |
| WP9036 | Pump Parts | 82 | 1,209.76 |
| WP9038 | Pump Parts | 135 | 1,451.17 |
| WP9039 | Pump Parts | 144 | 2,744.18 |
| WP9043 | Pump Parts | 243 | 2,600.17 |
| WP9047 | Pump Parts | 512 | 7,224.36 |
| WP9048 | Pump Parts | 25 | 289.90 |
| WP9078 | Pump Parts | 37 | 279.44 |
| WP9097 | Pump Parts | 87 | 811.28 |
| WP9098 | Pump Parts | 25 | 241.78 |
| WP9099 | Pump Parts | 158 | 2,136.35 |
| WP9100 | Pump Parts | 9 | 137.18 |
| WP9103 | Pump Parts | 31 | 291.03 |
| WP9105 | Pump Parts | 2 | 20.41 |
| WP9107 | Pump Parts | 277 | 1,592.25 |
| WP9108 | Pump Parts | 1,229 | 6,523.11 |
| WP9119 | Pump Parts | 65 | 691.32 |
| WP9122 | Pump Parts | 78 | 738.92 |
| WP9125 | Pump Parts | 136 | 4,091.95 |
| WP9127 | Pump Parts | 8 | 81.73 |
| WP9128 | Pump Parts | 5 | 118.11 |
| WP9135 | Pump Parts | 146 | 2,089.93 |
| WP9137 | Pump Parts | 82 | 659.63 |
| WP9139 | Pump Parts | 57 | 447.87 |
| WP9150 | Pump Parts | 31 | 270.22 |
| WP9154 | Pump Parts | 143 | 902.99 |
| WP9164 | Pump Parts | 34 | 571.34 |
| WP9167 | Pump Parts | 5 | 89.06 |
| WP9171 | Pump Parts | 54 | 457.32 |
| WP9173 | Pump Parts | 19 | 156.65 |
| WP9174 | Pump Parts | 2 | 17.43 |
| WP9176 | Pump Parts | 47 | 371.09 |
| WP9182 | Pump Parts | 16 | 271.11 |
| WP9187 | Pump Parts | 50 | 295.02 |
| WP9189 | Pump Parts | 5 | 240.20 |
| WP9202 | Pump Parts | 3 | 21.56 |
| WP9204 | Pump Parts | 45 | 503.06 |
| WP9207 | Pump Parts | 12 | 75.52 |
| WP9210 | Pump Parts | 67 | 499.21 |
| WP9216 | Pump Parts | 2,342 | 14,666.07 |
| WP9228 | Pump Parts | 312 | 3,063.25 |
| WP9231 | Pump Parts | 163 | 1,491.44 |
| WP9237 | Pump Parts | 3 | 34.94 |
| WP9240 | Pump Parts | 781 | 8,028.41 |
| WP9243 | Pump Parts | 29 | 381.00 |
| WP9249 | Pump Parts | 5 | 29.96 |
| WP9270 | Pump Parts | 122 | 728.16 |
| WP9272 | Pump Parts | 130 | 2,964.69 |
| WP9273 | Pump Parts | 84 | 1,232.23 |
| WP9276 | Pump Parts | 651 | 5,353.05 |
| WP9277 | Pump Parts | 8 | 81.65 |
| WP9301 | Pump Parts | 60 | 701.74 |
| WP9304 | Pump Parts | 11 | 91.27 |
| WP9309 | Pump Parts | 25 | 369.60 |
| WP9313 | Pump Parts | 78 | 667.97 |
| WP9314 | Pump Parts | 388 | 3,413.96 |
| WP9316 | Pump Parts | 70 | 472.86 |
| WP9322 | Pump Parts | 144 | 997.34 |
| WP9325 | Pump Parts | 79 | 794.00 |
| WP9336 | Pump Parts | 3 | 50.44 |
| WP9341 | Pump Parts | 47 | 487.58 |
| WP9345 | Pump Parts | 16 | 141.37 |
| WP9349 | Pump Parts | 67 | 502.18 |
| WP9350 | Pump Parts | 109 | 854.08 |
| WP9351 | Pump Parts | 2 | 13.62 |
| WP9352 | Pump Parts | 73 | 935.70 |
| WP9358 | Pump Parts | 64 | 1,428.44 |
| WP9360 | Pump Parts | 70 | 2,835.14 |
| WP9361 | Pump Parts | 543 | 4,425.59 |
| WP9363 | Pump Parts | 597 | 6,031.19 |
| WP9371 | Pump Parts | 8 | 69.06 |
| WP9374 | Pump Parts | 16 | 138.12 |
| WP9376 | Pump Parts | 998 | 7,633.90 |

FBG_CH1_00090668

| | | | |
|---|---|---|---|
| WP9377 | Pump Parts | 109 | 2,266.98 |
| WP9379 | Pump Parts | 3 | 31.59 |
| WP9408 | Pump Parts | 3 | 54.86 |
| WP9409 | Pump Parts | 188 | 6,379.14 |
| WP9412 | Pump Parts | 2 | 15.67 |
| WP9413 | Pump Parts | 37 | 347.36 |
| WP9415 | Pump Parts | 84 | 1,229.64 |
| WP9524 | Pump Parts | 54 | 905.30 |
| WP9535 | Pump Parts | 11 | 497.58 |
| WP9537 | Pump Parts | 609 | 16,928.39 |
| WP9551 | Pump Parts | 211 | 4,968.80 |
| WP9552 | Pump Parts | 34 | 834.54 |
| WP9556 | Pump Parts | 205 | 3,285.71 |
| WP9558 | Pump Parts | 281 | 10,463.74 |
| WP9700 | Pump Parts | 26 | 372.11 |
| WP9701 | Pump Parts | 23 | 320.87 |
| WPHD3000 | Pump Parts | 85 | 864.85 |
| WPHD6000 | Pump Parts | 188 | 5,412.77 |
| WPHD6006 | Pump Parts | 246 | 20,385.18 |
| WPHD6012 | Pump Parts | 45 | 3,870.60 |
| WPHD6052 | Pump Parts | 439 | 19,570.68 |
| WPHD6053 | Pump Parts | 23 | 968.99 |
| WPHD6057 | Pump Parts | 67 | 3,048.90 |
| WPHD6062 | Pump Parts | 136 | 6,020.71 |
| WPHD6064 | Pump Parts | 268 | 10,322.94 |
| WPHD6068 | Pump Parts | 118 | 7,881.07 |
| WPHD6069 | Pump Parts | 5 | 231.82 |
| WPHD6073 | Pump Parts | 1,211 | 51,827.07 |
| WPHD6076 | Pump Parts | 14 | 831.83 |
| WPHD6121 | Pump Parts | 14 | 2,723.44 |
| WPHD6301 | Pump Parts | 14 | 318.67 |
| WPHD6303 | Pump Parts | 74 | 2,512.54 |
| WPHD6315 | Pump Parts | 76 | 693.56 |
| WPHD6500 | Pump Parts | 339 | 3,822.25 |
| WPHD6543 | Pump Parts | 5 | 607.60 |
| WPHD6603 | Pump Parts | 194 | 2,360.54 |
| WPHD6700 | Pump Parts | 85 | 2,362.75 |
| WUR10 | WP AM WIPERS ANCO | 2,099 | 3,021.03 |
| WUR101 | WP AM WIPERS ANCO | 2,100 | 2,679.35 |
| WUR11 | WP AM WIPERS ANCO | 2,013 | 3,366.26 |
| WUR12 | WP AM WIPERS ANCO | 2,179 | 2,668.06 |
| WUR121 | WP AM WIPERS ANCO | 2,091 | 3,226.74 |
| WUR122 | WP AM WIPERS ANCO | 2,116 | 3,408.31 |
| WUR13 | WP AM WIPERS ANCO | 1,635 | 2,504.92 |
| WUR131 | WP AM WIPERS ANCO | 2,116 | 3,054.04 |
| WUR14 | WP AM WIPERS ANCO | 2,193 | 3,477.04 |
| WUR15 | WP AM WIPERS ANCO | 2,238 | 3,640.94 |
| WUR16 | WP AM WIPERS ANCO | 2,029 | 3,182.23 |
| WUR8 | WP AM WIPERS ANCO | 2,215 | 3,007.03 |
| WXM989991079 | WP AM WIPERS ANCO | 4,493 | 788.51 |
| WXM989991080 | WP AM WIPERS ANCO | 4,493 | 874.61 |
| X19347368ACDR | AT OE/OES Fine Wire | 645 | 983.24 |
| X19347370ACDR | AT OE/OES Fine Wire | 8 | 10.86 |
| X19351268ACDR | AT OE/OES Fine Wire | 4,538 | 5,219.15 |
| X19351279ACDR | AT OE/OES Fine Wire | 220 | 241.30 |
| X19375668ACDR | AT OE/OES Fine Wire | 1,297 | 1,584.00 |
| X19375669ACDR | AT OE/OES Fine Wire | 1,710 | 2,077.94 |
| X19375670ACDR | AT OE/OES Fine Wire | 1,468 | 1,740.81 |
| X19375671ACDR | AT OE/OES Fine Wire | 268 | 309.76 |
| X19375676ACDR | AT OE/OES Fine Wire | 589 | 731.10 |
| X19375677ACDR | AT OE/OES Fine Wire | 8,486 | 10,356.58 |
| X41-601ACD-04 | AT OE/OES Copper | 251,174 | 91,367.04 |
| X41-602ACD-04 | AT OE/OES Copper | 129,307 | 47,057.40 |
| X41-606ACD-01 | AT OE/OES Copper | 28,928 | 16,488.96 |
| X41-606ACD-04 | AT OE/OES Copper | 44,640 | 16,237.35 |
| X41-627ACD-04 | AT OE/OES Copper | 22,022 | 8,008.74 |
| X41-629ACD-01 | AT OE/OES Copper | 60 | 35.55 |
| X41-629ACD-04 | AT OE/OES Copper | 104,458 | 40,128.58 |
| X41-630ACD-01 | AT OE/OES Copper | 124 | 73.05 |
| X41-630ACD-04 | AT OE/OES Copper | 6,101 | 2,343.27 |
| X41-631ACD-04 | AT OE/OES Copper | 19,493 | 7,090.78 |
| X41-800ACDAU | AT OE/OES Platinum | 355 | 348.32 |
| X41-801ACDAU | AT OE/OES Platinum | 2,959 | 3,124.85 |
| X41-802ACDAU | AT OE/OES Platinum | 3,315 | 3,985.89 |
| X41-804ACDAU | AT OE/OES Platinum | 2,999 | 3,457.90 |
| X41-805ACDAU | AT OE/OES Platinum | 12,871 | 12,901.24 |
| X41-806ACDAU | AT OE/OES Platinum | 5,258 | 5,412.69 |

FBG_CH1_00090669

| | | | |
|---|---|---|---|
| X41-810ACDAU | AT OE/OES Platinum | 2,633 | 2,944.36 |
| X41-814ACDAU | AT OE/OES Platinum | 1,755 | 1,684.64 |
| X41-825ACD-01 | AT OE/OES Platinum | 476 | 504.92 |
| X41-834ACD-01 | AT OE/OES Fine Wire | 74,237 | 76,387.66 |
| X41-834ACDAU | AT OE/OES Fine Wire | 1,513 | 1,574.09 |
| X41-835ACD-01 | AT OE/OES Fine Wire | 34 | 50.63 |
| X41-835ACDAU | AT OE/OES Fine Wire | 1,169 | 1,756.94 |
| X41-837ACD-01 | AT OE/OES Fine Wire | 5,349 | 7,936.79 |
| X41-942ACDAU | AT OE/OES Platinum | 7,177 | 7,211.44 |
| X41-950GMX | AT OE/OES Fine Wire | 1,953 | 2,921.04 |
| X41-963ACDAU | AT OE/OES Fine Wire | 1,155 | 1,666.33 |
| X41-964ACDAU | AT OE/OES Fine Wire | 4,393 | 6,824.39 |
| X41-966ACDAU | AT OE/OES Fine Wire | 1,490 | 2,079.60 |
| X41-967ACDAU | AT OE/OES Fine Wire | 5,084 | 6,846.12 |
| X41-968ACDAU | AT OE/OES Fine Wire | 1,187 | 1,768.32 |
| X41-969ACDAU | AT OE/OES Platinum | 3,683 | 4,057.38 |
| X41-970ACDAU | AT OE/OES Platinum | 2,558 | 2,918.57 |
| X41-971ACDAU | AT OE/OES Platinum | 4,359 | 4,432.15 |
| X41-972ACDAU | AT OE/OES Platinum | 2,550 | 2,604.19 |
| X41-973ACDAU | AT OE/OES Platinum | 5,202 | 5,412.06 |
| X41-976ACDAU | AT OE/OES Platinum | 1,586 | 1,691.00 |
| X41-977ACDAU | AT OE/OES Platinum | 859 | 913.52 |
| X41-982ACDAU | AT OE/OES Platinum | 1,752 | 2,043.22 |
| X41-990ACD | AT OE/OES Db Plat | 932 | 841.58 |
| X4M5J12405AAFCE | AT OE/OES Copper | 154,127 | 89,740.44 |
| X4M5J12405AAFCEK | AT OE/OES Copper | 25,152 | 14,649.29 |
| X5682P | AT AM Small Eng | 4,991 | 4,090.25 |
| X5684P | AT AM Small Eng | 175 | 128.12 |
| X5923P | AT AM Small Eng | 27,060 | 17,921.57 |
| X5924P | AT AM Small Eng | 222 | 162.54 |
| XAE42CAFMX | AT OE/OES Copper | 74 | 30.63 |
| XAE42CFMX-03 | AT OE/OES Copper | 6,693 | 5,333.58 |
| XAGFS22CM1FCE | AT OE/OES Copper | 16,001 | 9,124.09 |
| XAGFS22CM1FCEK | AT OE/OES Copper | 8,603 | 4,615.86 |
| XAGPS071CFCE | AT OE/OES Copper | 2,506 | 1,551.77 |
| XAGPS12P1FCE-01 | AT OE/OES Db Plat | 5,578 | 4,636.99 |
| XAGPS22CFCE | AT OE/OES Copper | 3,655 | 2,060.61 |
| XAGPS22P1FCE-01 | AT OE/OES Db Plat | 2,068 | 1,759.21 |
| XAGPS22PP1FCE-01 | AT OE/OES Platinum | 6,415 | 6,923.19 |
| XAGPS32C1FCE | AT OE/OES Copper | 5,304 | 3,424.37 |
| XAGS12CFCE | AT OE/OES Copper | 4,926 | 3,107.32 |
| XAGS22CAFCS-02 | AT OE/OES Copper | 3,497 | 1,154.99 |
| XAGS22CFCE | AT OE/OES Copper | 5,732 | 3,653.01 |
| XAGS32CAFCS-02 | AT OE/OES Copper | 24,775 | 8,182.69 |
| XAGS42CAFCS-02 | AT OE/OES Copper | 6,547 | 2,565.81 |
| XAGS42CFMX-01 | AT OE/OES Copper | 78 | 52.15 |
| XAGS52CAFCS | AT OE/OES Copper | 627,787 | 246,033.25 |
| XAGS52CAFCS-02 | AT OE/OES Copper | 16,740 | 6,343.13 |
| XAGS52CAFCS-02 | AT OE/OES Copper | 2,678 | 1,049.52 |
| XAGS52CFMX-01 | AT OE/OES Copper | 12 | 7.40 |
| XAGSF12FM1FCS-04 | AT OE/OES Fine Wire | 267 | 312.19 |
| XAGSF12FM1FCSX | AT OE/OES Fine Wire | 8,666 | 10,291.49 |
| XAGSF12FMFCS-04 | AT OE/OES Fine Wire | 68 | 55.54 |
| XAGSF22CAFCSX | AT OE/OES Copper | 7,628 | 4,318.45 |
| XAGSF22CFMX-01 | AT OE/OES Copper | 34 | 20.45 |
| XAGSF22F1FCS-04 | AT OE/OES Fine Wire | 146,880 | 120,268.29 |
| XAGSF22F1FMC-01 | AT OE/OES Fine Wire | 31,002 | 32,449.18 |
| XAGSF22F1MFCE-01 | AT OE/OES Fine Wire | 4,126 | 3,311.45 |
| XAGSF22F1MFCS-04 | AT OE/OES Fine Wire | 122 | 95.65 |
| XAGSF22F1MFCSX | AT OE/OES Fine Wire | 1,829 | 1,466.33 |
| XAGSF22F1MMAZ-01 | AT OE/OES Fine Wire | 5,555 | 4,515.10 |
| XAGSF22FM1FC-01 | AT OE/OES Fine Wire | 9,226 | 7,510.79 |
| XAGSF22FM1FCS-04 | AT OE/OES Fine Wire | 55,786 | 45,678.69 |
| XAGSF22FM1FMX-04 | AT OE/OES Copper | 1,786 | 1,443.22 |
| XAGSF22FMFCS-04 | AT OE/OES Fine Wire | 36,490 | 30,075.42 |
| XAGSF22FMFMX-03 | AT OE/OES Fine Wire | 67 | 54.66 |
| XAGSF22FPAP | AT OE/OES Fine Wire | 6,136 | 6,356.83 |
| XAGSF22FSMFCE-02 | AT OE/OES Fine Wire | 4,121 | 3,314.03 |
| XAGSF22FSMFCS-04 | AT OE/OES Fine Wire | 138 | 111.95 |
| XAGSF22FSMFCSX | AT OE/OES Fine Wire | 2,407 | 1,995.16 |
| XAGSF22NFCS-03 | AT OE/OES Copper | 10,997 | 6,375.84 |
| XAGSF22NFMC | AT OE/OES Copper | 44,919 | 34,009.53 |
| XAGSF22WMFCS-03 | AT OE/OES Db Plat | 208,639 | 139,637.94 |
| XAGSF22WMFMX-04 | AT OE/OES Db Plat | 28,511 | 19,710.52 |
| XAGSF24CFMX-03 | AT OE/OES Copper | 9,230 | 4,678.32 |
| XAGSF24FMFCS-04 | AT OE/OES Fine Wire | 45 | 37.38 |
| XAGSF24FMFCSX | AT OE/OES Fine Wire | 4,239 | 3,554.95 |

FBG_CH1_00090670

| | | | |
|---|---|---|---|
| XAGSF24NFCS-03 | AT OE/OES Copper | 133,340 | 76,083.83 |
| XAGSF24NFMX-03 | AT OE/OES Copper | 3,098 | 1,719.17 |
| XAGSF32CAFCS-02 | AT OE/OES Copper | 18,898 | 7,160.83 |
| XAGSF32CAFCS-02 | AT OE/OES Copper | 78,492 | 30,761.45 |
| XAGSF32CFCS-01 | AT OE/OES Copper | 352 | 203.59 |
| XAGSF32CFMX-01 | AT OE/OES Copper | 129 | 75.49 |
| XAGSF32FECAFCS-02 | AT OE/OES Db Plat | 22 | 21.21 |
| XAGSF32FECAFCSX | AT OE/OES Db Plat | 2,483 | 2,438.21 |
| XAGSF32FMFCE-01 | AT OE/OES Fine Wire | 7,680 | 6,252.59 |
| XAGSF32FMFCS-04 | AT OE/OES Fine Wire | 216,138 | 173,749.01 |
| XAGSF32FMFMX-04 | AT OE/OES Db Plat | 34 | 27.94 |
| XAGSF32FMMAZ-01 | AT OE/OES Fine Wire | 7,341 | 6,051.12 |
| XAGSF32FSMFCS-04 | AT OE/OES Fine Wire | 949 | 779.84 |
| XAGSF2NFCS-03 | AT OE/OES Copper | 130 | 74.27 |
| XAGSF32PMFCS-04 | AT OE/OES Db Plat | 500,940 | 348,338.72 |
| XAGSF32PMFMX-04 | AT OE/OES Db Plat | 82,472 | 57,674.32 |
| XAGSF32WM1FCS-03 | AT OE/OES Db Plat | 28,128 | 19,616.46 |
| XAGSF32WM1MAZ-01 | AT OE/OES Db Plat | 4,204 | 2,942.26 |
| XAGSF32WMFCS-03 | AT OE/OES Db Plat | 70,353 | 49,647.40 |
| XAGSF32WMFMX-04 | AT OE/OES Db Plat | 70 | 48.81 |
| XAGSF32YRAFCS-02 | AT OE/OES Db Plat | 18,578 | 18,068.41 |
| XAGSF34CAFCS-02 | AT OE/OES Copper | 1,562 | 591.87 |
| XAGSF34CFCS-01 | AT OE/OES Copper | 226 | 130.91 |
| XAGSF34CFMX-01 | AT OE/OES Copper | 31 | 17.93 |
| XAGSF34FMFCS-04 | AT OE/OES Fine Wire | 9,503 | 7,916.29 |
| XAGSF34FMFMX-04 | AT OE/OES Fine Wire | 132 | 108.85 |
| XAGSF34FPFCS-04 | AT OE/OES Fine Wire | 37 | 35.34 |
| XAGSF34FPFCSX | AT OE/OES Fine Wire | 47 | 45.83 |
| XAGSF34NFCS-03 | AT OE/OES Copper | 22 | 12.45 |
| XAGSF34NFCSX | AT OE/OES Copper | 5 | 2.93 |
| XAGSF42C-6AFCSX | AT OE/OES Copper | 7,620 | 4,303.94 |
| XAGSF42C-6FCS-01 | AT OE/OES Copper | 40 | 23.98 |
| XAGSF42C-6FMX-02 | AT OE/OES Copper | 6 | 3.53 |
| XAGSF42F1MFCS-03 | AT OE/OES Fine Wire | 1,933 | 2,331.57 |
| XAGSF42FMFCS-04 | AT OE/OES Fine Wire | 66,249 | 55,009.19 |
| XAGSF42FMFMX-04 | AT OE/OES Fine Wire | 144 | 118.36 |
| XAGSF43CFCS-01 | AT OE/OES Copper | 21,463 | 12,368.26 |
| XAGSF43CFMX-02 | AT OE/OES Copper | 1,913 | 1,114.44 |
| XAGSF44FMFCS-04 | AT OE/OES Fine Wire | 14 | 11.54 |
| XAGSF44FMFCSX | AT OE/OES Fine Wire | 10,920 | 9,199.45 |
| XAGSF52CAFCS-02 | AT OE/OES Copper | 12,722 | 4,820.61 |
| XAGSF52CAFCS-02 | AT OE/OES Copper | 105,648 | 41,404.04 |
| XAGSF52CFCS-01 | AT OE/OES Copper | 51 | 25.82 |
| XAGSF52CFMX-01 | AT OE/OES Copper | 26 | 13.34 |
| XAGSP32CAFCS-02 | AT OE/OES Copper | 21,874 | 8,288.50 |
| XAGSP32CAFCS-02 | AT OE/OES Copper | 38,837 | 15,220.44 |
| XAGSP32CFMX-01 | AT OE/OES Copper | 82 | 47.61 |
| XAGSP32FMFCS-04 | AT OE/OES Fine Wire | 126 | 106.46 |
| XAGSP32FMFCSX | AT OE/OES Fine Wire | 8,120 | 7,005.36 |
| XAGSP32FMFMX-04 | AT OE/OES Fine Wire | 150 | 126.71 |
| XAGSP32FP4AP | AT OE/OES Fine Wire | 4,404 | 4,654.77 |
| XAGSP32FPFCS-04 | AT OE/OES Fine Wire | 93 | 93.48 |
| XAGSP32FPFCSX | AT OE/OES Fine Wire | 237 | 243.03 |
| XAGSP32FSMFCS-04 | AT OE/OES Fine Wire | 39 | 33.17 |
| XAGSP32FSMFCSX | AT OE/OES Fine Wire | 973 | 847.05 |
| XAGSP33CAFCSX | AT OE/OES Copper | 20,460 | 7,751.89 |
| XAGSP33CAFCSX | AT OE/OES Copper | 2,009 | 787.25 |
| XAGSP33CAFCSX-01 | AT OE/OES Copper | 7,271 | 4,347.04 |
| XAGSP33CFCS-01 | AT OE/OES Copper | 56 | 30.38 |
| XAGSP33CFMX | AT OE/OES Copper | 4,061 | 2,230.02 |
| XAGSP52CAFCS-02 | AT OE/OES Copper | 5,431 | 1,793.75 |
| XAGSP52CAFCS-02 | AT OE/OES Copper | 4,985 | 1,953.65 |
| XAGSP52CFCS-01 | AT OE/OES Copper | 78 | 46.18 |
| XAGSP52CFMX-01 | AT OE/OES Copper | 11,512 | 6,892.82 |
| XAGSP54CAFCS-02 | AT OE/OES Copper | 1,637 | 641.55 |
| XAGSP54CFCS-01 | AT OE/OES Copper | 19 | 10.69 |
| XAL7CAFCS-02 | AT OE/OES Copper | 11,830 | 4,723.37 |
| XAL7CFCS-01 | AT OE/OES Copper | 189 | 118.61 |
| XAS52CFMX-02 | AT OE/OES Copper | 8,590 | 5,296.60 |
| XASF32C-6FCS | AT OE/OES Copper | 2,678 | 1,236.89 |
| XASF32CAFCS-02 | AT OE/OES Copper | 63,612 | 24,103.83 |
| XASF32CAFCS-02 | AT OE/OES Copper | 223 | 87.39 |
| XASF32CFCS-01 | AT OE/OES Copper | 1,291 | 715.20 |
| XASF32CFMX-01 | AT OE/OES Copper | 22,320 | 12,514.61 |
| XASF32PFCS-04 | AT OE/OES Db Plat | 30,163 | 19,732.35 |
| XASF32PFMX-03 | AT OE/OES Db Plat | 14,896 | 9,749.13 |
| XASF42CAFCS-02 | AT OE/OES Copper | 205,716 | 77,949.90 |

FBG_CH1_00090671

| | | | |
|---|---|---|---|
| XASF42CAFCS-02 | AT OE/OES Copper | 893 | 349.97 |
| XASF42CFCS-01 | AT OE/OES Copper | 372 | 169.94 |
| XASF42CFMX-01 | AT OE/OES Copper | 17,458 | 7,748.56 |
| XASF42PFCS-04 | AT OE/OES Db Plat | 52,423 | 35,874.64 |
| XASF42PFMX-04 | AT OE/OES Db Plat | 132 | 89.22 |
| XASF44PFCS-04 | AT OE/OES Db Plat | 60 | 42.89 |
| XASF4CFCS | AT OE/OES Copper | 2,666 | 2,077.96 |
| XASF52CAFCS-02 | AT OE/OES Copper | 9,077 | 3,439.46 |
| XASF52CAFCS-02 | AT OE/OES Copper | 138,012 | 54,087.68 |
| XASF52CFCS-01 | AT OE/OES Copper | 17 | 8.31 |
| XASF52CFMX-01 | AT OE/OES Copper | 23 | 10.96 |
| XAWSF42CAFCS-02 | AT OE/OES Copper | 8,556 | 3,242.04 |
| XAWSF42CAFCS-02 | AT OE/OES Copper | 46,574 | 18,252.61 |
| XAWSF42CFCE | AT OE/OES Copper | 4,075 | 1,883.68 |
| XAWSF42CFCS | AT OE/OES Copper | 122 | 52.61 |
| XAWSF42CFMX-01 | AT OE/OES Copper | 43 | 19.18 |
| XAWSF42PPFCS | AT OE/OES Platinum | 82 | 77.88 |
| XAWSF44CAFCS-02 | AT OE/OES Copper | 15,996 | 6,386.71 |
| XAWSF44CAFCS-02 | AT OE/OES Copper | 372 | 153.96 |
| XAWSF44CFCS-01 | AT OE/OES Copper | 36 | 18.75 |
| XAWSF44CFMX-01 | AT OE/OES Copper | 4,194 | 2,212.13 |
| XAWSF52CFMX-01 | AT OE/OES Copper | 3,198 | 1,709.68 |
| XAWSF54CFCS-02 | AT OE/OES Copper | 4,360 | 2,376.94 |
| XAWSFA12CFCS-02 | AT OE/OES Copper | 8,032 | 4,487.64 |
| XAWSFA32CFCS-01 | AT OE/OES Copper | 2,502 | 1,437.38 |
| XAYFS092FE1FCE-01 | AT OE/OES Fine Wire | 14,006 | 19,896.92 |
| XAYFS092FE1FCS-04 | AT OE/OES Fine Wire | 36 | 51.70 |
| XAYFS092FE1FCSX | AT OE/OES Fine Wire | 4,442 | 6,456.85 |
| XAYFS22CAFMX | AT OE/OES Copper | 13,318 | 6,097.08 |
| XAYFS22CFMX-02 | AT OE/OES Copper | 14 | 8.07 |
| XAYFS22FMFCS-04 | AT OE/OES Copper | 217,584 | 185,100.87 |
| XAYFS22FMFMX-04 | AT OE/OES Fine Wire | 46,080 | 39,382.74 |
| XAYFS22FMMAZ-01 | AT OE/OES Fine Wire | 13,125 | 11,022.24 |
| XAYFS22FMMMC-01 | AT OE/OES Fine Wire | 1,158 | 1,030.42 |
| XAYFS22FPAP | AT OE/OES Fine Wire | 2,764 | 2,952.19 |
| XAYFS22PPFCE-01 | AT OE/OES Platinum | 2,271 | 2,582.15 |
| XAZFS22CFCS-01 | AT OE/OES Copper | 893 | 508.81 |
| XAZFS22CFCS-03 | AT OE/OES Copper | 14,892 | 8,426.19 |
| XAZFS22FEFCS-04 | AT OE/OES Fine Wire | 33 | 34.81 |
| XAZFS22FEFCSX | AT OE/OES Fine Wire | 1,765 | 1,896.82 |
| XAZFS22FEFMX-04 | AT OE/OES Fine Wire | 12,253 | 12,830.73 |
| XAZFS32FEFCE-01 | AT OE/OES Fine Wire | 5,535 | 5,632.20 |
| XAZFS32FEFCS-04 | AT OE/OES Fine Wire | 99 | 101.52 |
| XAZFS32FEFCSX | AT OE/OES Fine Wire | 15,533 | 16,203.86 |
| XAZFS32FEFMX-04 | AT OE/OES Fine Wire | 121 | 124.07 |
| XAZFS32FEMAZ-01 | AT OE/OES Fine Wire | 20,052 | 20,607.63 |
| XBF22FCS-03 | AT OE/OES Copper | 15,920 | 10,967.44 |
| XBFS32C1FCE | AT OE/OES Copper | 2,682 | 1,548.17 |
| XBSF3AFCS | AT OE/OES Copper | 22 | 9.16 |
| XBSF3AFCSX | AT OE/OES Copper | 4,538 | 1,889.16 |
| XBSF3FCS-03 | AT OE/OES Copper | 25 | 15.11 |
| XBSF42CAFCS-02 | AT OE/OES Copper | 14,062 | 5,273.67 |
| XBSF42CAFCS-02 | AT OE/OES Copper | 14,434 | 5,973.84 |
| XBSF42CFCS-01 | AT OE/OES Copper | 133 | 83.64 |
| XBSF42CFMX-01 | AT OE/OES Copper | 171 | 108.51 |
| XBSF42PFCS-02 | AT OE/OES Copper | 2,759 | 2,087.08 |
| XBSF44CAFCS-02 | AT OE/OES Copper | 22,320 | 8,911.69 |
| XBSF44CAFCS-02 | AT OE/OES Copper | 78,343 | 32,424.05 |
| XBSF44CFMX-01 | AT OE/OES Copper | 138 | 88.29 |
| XBSF44PFCS-04 | AT OE/OES Db Plat | 73 | 56.96 |
| XBSF44PFMX-04 | AT OE/OES Db Plat | 56 | 43.70 |
| XBSF82CAFCS-02 | AT OE/OES Copper | 69,415 | 27,715.32 |
| XBSF82CAFCS-02 | AT OE/OES Copper | 78,418 | 32,472.49 |
| XBSF82CFCS-01 | AT OE/OES Copper | 118 | 73.77 |
| XBSF82CFMX-01 | AT OE/OES Copper | 78,800 | 49,786.63 |
| XC45LACD-01 | AT OE/OES Copper | 68 | 40.43 |
| XC45LACD-04 | AT OE/OES Copper | 15,475 | 5,942.72 |
| XC85SACD-01 | AT OE/OES Copper | 124 | 474.97 |
| XC87ACD-01 | AT OE/OES Copper | 113 | 77.61 |
| XC87ACD-04 | AT OE/OES Copper | 26,933 | 10,342.81 |
| XC88LACD-01 | AT OE/OES Copper | 60 | 145.46 |
| XC88LACD-04 | AT OE/OES Copper | 3,125 | 1,243.06 |
| XCGSF22NA1FCS-02 | AT OE/OES Fine Wire | 46,888 | 26,246.97 |
| XCR42TSACD-04 | AT OE/OES Copper | 4,166 | 1,701.81 |
| XCR43TSACD-01 | AT OE/OES Copper | 44,375 | 25,915.44 |
| XCR43TSACD-04 | AT OE/OES Copper | 1,054,694 | 383,644.94 |
| XCR44TSACD-01 | AT OE/OES Copper | 37 | 22.00 |

FBG_CH1_00090672

| | | | |
|---|---|---:|---:|
| XCR44TSACD-04 | AT OE/OES Copper | 8,928 | 3,057.31 |
| XCR45TSACD-01 | AT OE/OES Copper | 2,688 | 1,669.09 |
| XCR45TSACD-04 | AT OE/OES Copper | 30,058 | 10,934.79 |
| XCS45DPACD | AT OE/OES Copper | 1,003 | 2,349.16 |
| XCYFS12F4AP | AT OE/OES Fine Wire | 3,649 | 3,169.89 |
| XCYFS12F-5AFCS-02 | AT OE/OES Copper | 36,484 | 34,912.99 |
| XCYFS12FFMC | AT OE/OES Db Plat | 121,635 | 124,253.79 |
| XCYFS12FP4AP | AT OE/OES Fine Wire | 6,786 | 7,569.65 |
| XCYFS12FPFCS-03 | AT OE/OES Fine Wire | 203,275 | 221,256.71 |
| XCYFS12NAP | AT OE/OES Fine Wire | 22,398 | 14,771.94 |
| XCYFS12NAPIN | AT OE/OES Fine Wire | 16,204 | 10,785.05 |
| XCYFS12NPGFMC | AT OE/OES Db Plat | 122,453 | 115,280.92 |
| XF11FCS-02 | AT OE/OES Copper | 251 | 712.03 |
| XFR5LSACD-01 | AT OE/OES Copper | 70 | 45.38 |
| XFR5LSACD-04 | AT OE/OES Copper | 1,934 | 703.76 |
| XLM46ACD-04 | AT OE/OES Copper | 5,208 | 2,003.58 |
| XLM46DPACD | AT OE/OES Copper | 1,459 | 1,451.74 |
| XLM49ACD-04 | AT OE/OES Copper | 2,232 | 911.82 |
| XM-12405-3V0ABPFMC | AT OE/OES High Thd | 8,801 | 13,598.24 |
| XM8ACD-01 | AT OE/OES Copper | 81 | 186.99 |
| XMR41TACD-04 | AT OE/OES Copper | 893 | 336.50 |
| XMR43LTSACD-04 | AT OE/OES Copper | 103,714 | 39,415.47 |
| XMR43LTSGMX | AT OE/OES Copper | 8,136 | 5,182.80 |
| XMR43TACD-04 | AT OE/OES Copper | 286,886 | 109,002.33 |
| XPZH0FBPFMC | AT OE/OES High Thd | 37 | 83.37 |
| XPZH14FFCS-01 | AT OE/OES High Thd | 1,406 | 3,181.42 |
| XPZH1F-3FMX-01 | AT OE/OES High Thd | 11 | 24.81 |
| XPZH1FFCS-01 | AT OE/OES High Thd | 10,469 | 23,693.65 |
| XPZH2F-3FMX-01 | AT OE/OES High Thd | 124 | 280.57 |
| XPZK14FFCS-02 | AT OE/OES High Thd | 194 | 287.15 |
| XPZK1F-3FMX | AT OE/OES High Thd | 133 | 198.19 |
| XPZK1F-3FMX-02 | AT OE/OES High Thd | 71 | 105.71 |
| XPZK1FFCS-02 | AT OE/OES High Thd | 487 | 725.77 |
| XPZK2F-3FMX-02 | AT OE/OES High Thd | 2,427 | 3,613.49 |
| XQSP-1 | AT OE/OES Db Plat | 1,122 | 1,313.78 |
| XQSP-10 | AT OE/OES Db Plat | 1,314 | 1,357.28 |
| XQSP-2 | AT OE/OES Db Plat | 2,599 | 3,015.41 |
| XQSP-3 | AT OE/OES Db Plat | 3,057 | 3,392.20 |
| XQSP-4 | AT OE/OES Db Plat | 794 | 850.62 |
| XQSP-5 | AT OE/OES Db Plat | 467 | 534.23 |
| XQSP-6 | AT OE/OES Db Plat | 3,236 | 3,521.03 |
| XQSP-7 | AT OE/OES Db Plat | 2,038 | 2,232.50 |
| XQSP-8 | AT OE/OES Db Plat | 6,105 | 6,754.14 |
| XQSP-9 | AT OE/OES Db Plat | 797 | 879.30 |
| XR121XLSACD-01 | AT OE/OES Copper | 2,230 | 1,703.03 |
| XR42LTS6ACD-01 | AT OE/OES Copper | 4,018 | 2,438.69 |
| XR42LTS6ACD-04 | AT OE/OES Copper | 21,874 | 8,935.53 |
| XR42LTSACD-01 | AT OE/OES Copper | 2,350 | 1,424.17 |
| XR42LTSACD-04 | AT OE/OES Copper | 49,402 | 17,967.02 |
| XR42TACD-01 | AT OE/OES Copper | 50 | 27.42 |
| XR42TACD-04 | AT OE/OES Copper | 1,190 | 406.72 |
| XR42TSACD-01 | AT OE/OES Copper | 4,652 | 2,876.33 |
| XR42TSACD-04 | AT OE/OES Copper | 19,046 | 6,926.63 |
| XR42XLSACD-04 | AT OE/OES Copper | 19,642 | 7,145.37 |
| XR43ACD-04 | AT OE/OES Copper | 26,784 | 10,287.20 |
| XR43FSACD-01 | AT OE/OES Copper | 74 | 44.00 |
| XR43FSACD-04 | AT OE/OES Copper | 5,357 | 2,060.89 |
| XR43SACD-04 | AT OE/OES Copper | 54,907 | 21,089.24 |
| XR43TS6ACD-04 | AT OE/OES Copper | 149,544 | 54,399.62 |
| XR43TSACD-01 | AT OE/OES Copper | 35,690 | 21,899.02 |
| XR43TSACD-04 | AT OE/OES Copper | 77,078 | 28,043.29 |
| XR43XLACD-01 | AT OE/OES Copper | 51 | 36.74 |
| XR43XLACD-04 | AT OE/OES Copper | 3,869 | 1,407.04 |
| XR43XLSACD-04 | AT OE/OES Copper | 38,837 | 14,126.57 |
| XR44FACD-01 | AT OE/OES Copper | 68 | 50.86 |
| XR44FACD-04 | AT OE/OES Copper | 1,786 | 686.09 |
| XR44LTS6ACD-01 | AT OE/OES Copper | 17,109 | 10,451.03 |
| XR44LTS6ACD-04 | AT OE/OES Copper | 97,910 | 35,623.58 |
| XR44LTSM6ACD-04 | AT OE/OES Copper | 30,802 | 11,204.85 |
| XR44LTSMACD-04 | AT OE/OES Copper | 16,814 | 6,117.25 |
| XR44TACD-01 | AT OE/OES Copper | 15,140 | 8,397.71 |
| XR44TACD-04 | AT OE/OES Copper | 60,264 | 21,920.43 |
| XR44TSACD-01 | AT OE/OES Copper | 10,498 | 5,539.79 |
| XR44TSACD-04 | AT OE/OES Copper | 68,597 | 24,949.42 |
| XR44TSXACD-01 | AT OE/OES Copper | 76 | 39.89 |
| XR44TXACD-01 | AT OE/OES Copper | 99 | 53.15 |
| XR44TXACD-04 | AT OE/OES Copper | 3,125 | 1,136.47 |

FBG_CH1_00090673

| | | | |
|---|---|---|---|
| XR44XLACD-04 | AT OE/OES Copper | 12,350 | 4,492.81 |
| XR44XLSACD-04 | AT OE/OES Copper | 74,102 | 26,952.39 |
| XR45ACD-04 | AT OE/OES Copper | 84,518 | 32,471.82 |
| XR45LTS6ACD-01 | AT OE/OES Copper | 28,613 | 17,294.56 |
| XR45LTS6ACD-04 | AT OE/OES Copper | 24,701 | 8,984.99 |
| XR45SACD-04 | AT OE/OES Copper | 190,018 | 72,982.12 |
| XR45TSACD-04 | AT OE/OES Copper | 499,819 | 181,779.17 |
| XR45TSXACD-04 | AT OE/OES Copper | 370,512 | 134,984.93 |
| XR45XLS6ACD-01 | AT OE/OES Copper | 152 | 93.37 |
| XR45XLS6ACD-04 | AT OE/OES Copper | 17,856 | 6,493.69 |
| XR45XLSACD-01 | AT OE/OES Copper | 104 | 63.87 |
| XR45XLSACD-04 | AT OE/OES Copper | 6,994 | 2,543.51 |
| XR46SZACD-01 | AT OE/OES Copper | 129 | 80.34 |
| XR46SZACD-04 | AT OE/OES Copper | 69,192 | 26,571.11 |
| XR83TACD-01 | AT OE/OES Copper | 5 | 3.17 |
| XR83TACD-04 | AT OE/OES Copper | 744 | 303.94 |
| XR83TSACD-04 | AT OE/OES Copper | 446 | 171.34 |
| XR85TSACD-01 | AT OE/OES Copper | 129 | 79.44 |
| XR85TSACD-04 | AT OE/OES Copper | 5,059 | 1,944.29 |
| XTT10AFCSX | AT OE/OES Copper | 7,750 | 14,246.05 |
| XTT10FCS-02 | AT OE/OES Copper | 304 | 970.71 |
| XWC255W-04 | AT OE/OES Copper | 1,042 | 386.89 |
| XWC2984W-04 | AT OE/OES Copper | 1,637 | 607.81 |
| XWC2986W-04 | AT OE/OES Copper | 670 | 248.77 |
| XWC468W-04 | AT OE/OES Copper | 2,381 | 884.07 |
| XWC5924W-04 | AT OE/OES Copper | 2,158 | 758.54 |
| XWC65W-04 | AT OE/OES Copper | 2,232 | 784.55 |

FBG_CH1_00090674

# Exhibit 8

FBG_CH1_00090675

**DEBTORS' EXHIBIT NO. 175**
**Page 450 of 1907**

**0810809**        **2023 Aug 07 PM07:20**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
CSC 800-858-5294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CSC
801 Adlai Stevenson Dr
Springfield, IL 62703, USA
NYfilings@cscinfo.com
(Fax)800-345-6059

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | Trico Products Corporation | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS 127 Public Square, Suite 5300 | CITY Cleveland | STATE OH | POSTAL CODE 44114 | COUNTRY USA |
|---|---|---|---|---|

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Corporation | 1f. JURISDICTION OF ORGANIZATION NY | 1g. ORGANIZATIONAL ID #, if any None | X NONE |
|---|---|---|---|---|---|

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | Corporation Service Company, as Representative | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS P.O. Box 2576 uccsprep@cscinfo.com | CITY Springfield | STATE IL | POSTAL CODE 62708 | COUNTRY USA |
|---|---|---|---|---|

4. This FINANCING STATEMENT covers the following collateral:
**Manufacturing equipment and all other Property purchased or paid for by Lessor and leased to Debtor as Lessee under Lease Schedule No. 28 to Master Lease Agreement No. ending in -5321 together with any and all attachments, replacements, parts, substitutions, additions, enhancements, repairs, accessions and accessories thereto, and insurance, lease, sublease and other proceeds thereof.**

**THIS IS A "TRUE LEASE". THIS FILING IS FOR PRECAUTIONARY AND INFORMATIONAL PURPOSES ONLY. THE PARTIES DO NOT BELIEVE THIS LEASE IS SUBJECT TO UCC9. THIS PROPERTY IS OWNED BY LESSOR AND LEASED TO LESSEE. LESSEE HAS NO RIGHT TO SELL OR PLEDGE THE PROPERTY.**

5. ALTERNATIVE DESIGNATION [if applicable]: X LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable]   7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional]   ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA -5321-28 [262109050]

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

## Filing Number-202308076104676

FBG_CH1_00090676

**DEBTORS' EXHIBIT NO. 175**
**Page 451 of 1907**

# Exhibit 9

FBG_CH1_00090677

**DEBTORS' EXHIBIT NO. 175**
**Page 452 of 1907**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC 800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
FILINGDEPT@CSCINFO.COM

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

    801 ADLAI STEVENSON DR [298314182]

    SPRINGFIELD, IL 62703

    US

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 01:15 PM 11/26/2024**
**U.C.C. Initial Filing No: 2024 8267336**

**Service Request No:  20244324444**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| CARNABY FA, LLC | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3010 LBJ FREEWAY, SUITE 1200 | DALLAS | TX | 75234 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY). Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|
| P.O. BOX 2576 | UCCSPREP@CSCINFO.COM | SPRINGFIELD | IL | 62708 | US |

4. COLLATERAL: This financing statement covers the following collateral:
All furniture, fixtures, manufacturing and other equipment identified by specific asset and/or tag numbers, and located at: (i) Walbro LLC's facility located at 6242 Garfield Avenue, Cass City, Michigan 48726, (ii) Toledo Molding & Die, LLC's facilities located at 515 East Gypsy Lane, Bowling Green, Ohio 43402, 1440 North Maule Road, Tiffin, Ohio 44883, and 11 East Park Drive, Fayetteville, Tennessee 37334, and AV. Amstrad #109 Parque Industrial, Amistad Bajio, Apaseo el Grande, GTL, Celaya, Guanajuato, Mexico, and certain furniture, fixtures, manufacturing and other equipment identified by specific asset and/or tag numbers, and located at: (iii) Trico Technologies Corporation's facilities located at 1900 Billy Mitchell Boulevard, Brownsville, Texas 78521 and 1995 Billy Mitchell Boulevard, Brownsville, Texas 78521, and (iv) any other future location(s), and all other Property purchased or paid for by Lessor and leased to Debtor as Lessee under Lease Schedule No. 8 to Master Lease Agreement No. ending in -5465 together with any and all attachments, replacements, parts, substitutions, additions, enhancements, repairs, accessions and accessories thereto, and insurance, lease, sublease and other proceeds thereof.   THIS IS A "TRUE LEASE". THIS FILING IS FOR PRECAUTIONARY AND INFORMATIONAL PURPOSES ONLY.   THE PARTIES DO NOT BELIEVE THIS LEASE IS SUBJECT TO UCC9.   THIS PROPERTY IS OWNED BY LESSOR AND LEASED TO LESSEE.   LESSEE HAS NO RIGHT TO SELL OR PLEDGE THE PROPERTY.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☑ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
5465-8

International Association of Commercial Administrator

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

CONFIDENTIAL

ONSET_00000693
FBG_CH1_00090678

# Exhibit 10

FBG_CH1_00090679



## LEASE SCHEDULE NO. 027
## TO
## MASTER LEASE AGREEMENT NO. OFI1445416

This Lease Schedule No. 027 dated April 7, 2025 (the "Schedule") between **ONSET FINANCIAL, INC.** (the "Lessor") and **CARNABY INVENTORY IV, LLC** (the "Lessee") incorporates by reference the terms and conditions of Master Lease Agreement No. OFI1445416 dated June 28, 2022 (the "Master Lease"), the Exhibit A ("Property") and the Exhibit B ("Stipulated Loss Schedule"), and constitutes a separate lease between Lessor and Lessee and is referred to herein as the "Lease". Lessor shall have the right to replace this Schedule with multiple Schedules for the purpose of segregating the Property into separate Lease Schedules. All capitalized terms used herein but not defined herein shall have the same meanings ascribed to them in the Master Lease.

SECTION 1      PROPERTY: All inventory, whether now in place or hereafter acquired, including all such items as they are replenished in the ordinary course of business, as identified by specific part numbers and/or by specific material numbers, consisting of raw components, work in progress, component parts, all after-acquired raw components and all finished goods, maintained, kept and/or stored at (i) Horizon Global Americas Inc.'s facility located at Avenida Los Nogales, s/n lotes 4, 5 y 6 (lots 4, 5 and 6) Parque Industrial Villa Florida (Buildings #1 and #2), Reynosa, Tamaulipas, Mexico, (ii) Horizon Global Americas Inc.'s facility located at Industrial Drive Edificio 11, Prologis Park, S/N, Reynosa Tamaulipas, 88787 Mexico, (iii) Horizon Global Americas Inc.'s facility located at 32901 West 193rd Street, Edgerton, Kansas 66021, (iv) Hopkins Manufacturing Corporation's facility located at 30900 West 185th Street, Edgerton, Kansas 66021, (v) Hopkins Manufacturing Corporation's facility located at 428 Peyton Street, Emporia, Kansas 66801, and (vi) any other future location(s), and other items of Property as more fully described on the attached Exhibit A to the Acceptance and Delivery Certificate, together with any and all attachments, accessions, additions, enhancements and replacements thereto. Notwithstanding anything herein or in the Master Lease to the contrary, Lessor and Lessee acknowledge that the Property is inventory and will be sold, transferred, assigned, conveyed or distributed by Lessee in its ordinary course of business and will be replenished by Lessee also in its ordinary course of business. Lessor acknowledges that, subject to the terms hereof, Lessee is entitled to all proceeds from the sale or transfer of the Property. Lessor agrees that its lien on any Property and any right, title or interest it has in any Property shall be automatically released upon the sale or transfer of such Property by Lessee in the ordinary course of its business. Upon request of Lessee, Lessor shall execute any documents reasonably requested by Lessee to evidence the release of Lessor's lien on the Property. Lessee agrees to provide to Lessor on a quarterly basis, or at such time as otherwise requested by Lessor, an updated inventory listing in substantially the same form delivered by Lessee to Lessor prior to the date hereof showing the inventory levels at the Property Location and status as of the date of each provided inventory listing ("Inventory List"). Lessee agrees that upon Lessor's request, it will increase the inventory balance to a level and amount equal to or greater than the then current Stipulated Loss Value as set forth in the Stipulated Loss Schedule.

Notwithstanding the foregoing, if at any time during the term of the Lease the Inventory Value is less than thirty percent (30%) of the Inventory Value determined as of the execution of this Schedule, the Lessee grants to the Lessor a security interest in the proceeds of the Property and authorizes Lessor to amend the UCC description to include proceeds. To determine the Inventory Value, Lessee shall provide to Lessor the current valuation of the inventory that specifically constitutes Property hereunder, which valuation shall be in accordance with GAAP standards ("Inventory Value") and will be evidenced on the Inventory List. Lessee's failure to comply with the terms set forth in this Section shall constitute an additional Event of Default under the Lease.

SECTION 2      PROPERTY LOCATION: Location(s) as set forth on the Exhibit A to the Acceptance and Delivery Certificate

SECTION 3      BASE PERIOD: Six (6) months starting on the Lease Commencement Date

SECTION 4      TOTAL PROPERTY COST: $160,000,000.00

SECTION 5      MONTHLY LEASE RATE FACTOR: 0.24167

SECTION 6      MONTHLY RENTAL:      $38,667,200.00, plus applicable sales/use and property tax

SECTION 7      RENTAL FREQUENCY: Monthly in advance

SECTION 8      THIS SECTION INTENTIONALLY LEFT BLANK

\\UTSJ-V3-WFS01.OSFI.Local\Lease Operations\Master Library\Schedule Documents\Lease Schedule - ST.dotx

CONFIDENTIAL

ONSET_00032910
FBG_CH1_00090680

DEBTORS' EXHIBIT NO. 175
Page 455 of 1907

SECTION 9     DATE OF ACCEPTANCE: As specified in the Acceptance and Delivery Certificate

SECTION 10    THIS SECTION INTENTIONALLY LEFT BLANK

SECTION 11    ADDITIONAL PROVISIONS:

    a.   PAYMENT BY ELECTRONIC TRANSFER: In the event that a Monthly Rental payment and other monies due under the Lease are not received by Lessor or its assigns within ten (10) days of the due date, Lessee authorizes Lessor or its assigns to electronically transfer payment due under any past due invoice from Lessee's account maintained with its financial institution, and Lessee agrees to execute and deliver a written "Authorization for Electronic Transfer" form to Lessor to affect such transfers. Failure or refusal of Lessee to authorize such transfers or failure of Lessor or its assigns to receive such payments by electronic transfer shall constitute an additional Event of Default under Section 18 of the Master Lease. Upon the occurrence of the Event of Default specified above, Lessor shall be entitled to exercise its rights and remedies under the Lease.

    b.   LATE FEES: For purposes of this Schedule, the second paragraph of Section 3 of the Master Lease shall be deleted and replaced with the following: "If any rental or other payment due under the Lease shall be unpaid five (5) days after its due date, Lessee will pay on demand, as a late charge, but not as interest, $50,000 per day commencing on the 6th day after its due date through and including the 10th day after its due date. If any rental or other payment due under the Lease shall be unpaid ten (10) days after its due date, and in addition to the amounts set forth above, Lessee will pay on demand, as an additional late charge, but not as interest, ten percent (10%) per month on any such unpaid amount but in no event to exceed maximum lawful charges."

    c.   ADDITIONAL EVENT OF DEFAULT – CROSS DEFAULT: In addition to the Events of Default set forth in the Master Lease, the following shall constitute an additional Event of Default under the Lease: Breach by any of Lessee's affiliates of any agreements that such affiliates may have in place with Lessor, now or hereafter in effect during the term of this Schedule, including but not limited to Master Lease Agreement No. OFI1045321 by and between TRICO PRODUCTS CORPORATION and Lessor, and any and all Lease Schedules thereunder, Master Lease Agreement No. OFI1345400 by and between EAGLE MACHINING, LLC and Lessor, and any and all Lease Schedules thereunder, Master Lease Agreement No. OFI1445408 by and between CARNABY INVENTORY I, LLC and Lessor, and any and all Lease Schedules thereunder, and Master Lease Agreement No. OFI1545465 by and between CARNABY FA, LLC and Lessor, and any and all Lease Schedules thereunder. Upon the occurrence of an Event of Default under the Lease, including without limitation, the additional Event of Default specified herein, Lessor shall be entitled to exercise any of its rights or remedies under the Lease.

    d.   PURCHASE OPTION: For purposes of this Schedule only, and provided no Event of Default has occurred and is continuing under the Lease, at the end of the Base Period, the following amendment shall apply: Option (1) of Section 20(n) of the Master Lease shall be revised to state "purchase the Property for a price equal to $101.00. Lessor's sale of Property to the Lessee pursuant to this clause shall be on an "as-is, where-is" basis, without any representation or warranty by, or recourse to, the Lessor, except as to the absence of liens created by or through Lessor." All other terms and conditions of the Master Lease shall continue in full force and effect without change.

    e.   RENT AND PAYMENT: For purposes of this Schedule only, in the third sentence of Section 3 of the Master Lease, the phrase "by a daily rental equal to one-thirtieth (1/30) of the Monthly Rental" shall be deleted and replaced with "by a daily rental equal to the Total Cost of Property multiplied by 0.150000 then divided by 30".

    f.   CROSS COLLATERALIZATION: As part of the consideration of Lessor entering into this Schedule, and as additional security against Lessee's obligations under the Lease, Lessee agrees to the cross-collateralization of Property as follows:

CARNABY FA, LLC and Lessor have entered into Master Lease Agreement No. OFI1545465 and have or intend to enter into Lease Schedule No. 009 ("Carnaby FA 009") and CARNABY INVENTORY IV, LLC and Lessor have entered into Master Lease Agreement No. OFI1445416 and have or intend to enter into Lease Schedule No. 027 ("Carnaby Inventory IV 027") (Carnaby FA 009 and Carnaby Inventory IV 027 shall be referred to herein as the "Current Schedules"). Lessor and Lessee hereby agree that the Current Schedules, the Master Lease Agreements (as they relate to the Current Schedules), and the Property leased under the Current Schedules shall be cross-collateralized for all purposes under the Current Schedules and that such Property shall serve to secure the payment and performance of CARNABY INVENTORY IV, LLC and CARNABY FA, LLC on all obligations owed by CARNABY INVENTORY IV, LLC and CARNABY FA, LLC to Lessor under the Current Schedules.

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Schedule Documents\Lease Schedule - ST.dotx

CONFIDENTIAL

ONSET_00032911
FBG_CH1_00090681

DEBTORS' EXHIBIT NO. 175
Page 456 of 1907

In addition to the foregoing cross-collateralization, Lessee further agrees to the cross-collateralization of Property as follows:

CARNABY FA, LLC and Lessor have entered into Master Lease Agreement No. OFI1545465 and various Lease Schedules thereunder (all Lease Schedules entered into by and between Carnaby FA, LLC and Lessor, including Carnaby FA 009, shall be referred to herein collectively as the "Carnaby FA Schedules") and CARNABY INVENTORY IV, LLC and Lessor have entered into Master Lease Agreement No. OFI1445416 and various Lease Schedules thereunder (all Lease Schedules entered into by and between Carnaby Inventory IV, LLC and Lessor, including Carnaby Inventory IV 027, shall be referred to herein collectively as the "Carnaby Inventory IV Schedules") (collectively, the Carnaby FA Schedules and the Carnaby Inventory IV Schedules may be referred to herein as the "Schedules" and individually as a "Schedule"). Lessor and Lessee hereby agree that the Schedules, the Master Lease Agreements (as they relate to each Schedule), and the Property leased under each Schedule shall be cross-collateralized for all purposes under each Schedule and that such Property shall serve to secure the payment and performance of CARNABY INVENTORY IV, LLC and CARNABY FA, LLC on all obligations owed by CARNABY INVENTORY IV, LLC and CARNABY FA, LLC to Lessor under the Schedules. In consideration of the foregoing, in the event either CARNABY FA, LLC or CARNABY INVENTORY IV, LLC elects to exercise its Early Termination Option included in any Schedule, then Lessor shall have the right in Lessor's sole and absolute discretion, to require that Lessee pay off in full all remaining obligations on some or all Carnaby FA Schedules and Carnaby Inventory IV Schedules, as such Schedules shall be determined by Lessor.

g.  EARLY TERMINATION OPTION:  For purposes of this Schedule only, provided no Event of Default has occurred and is continuing under the Lease, and further provided Lessee has provided Lessor thirty (30) days prior written notice, Lessee may elect to early terminate this Schedule and to purchase the Property for an amount equal to the aggregate of the remaining obligations due and owing to Lessor including (i) any and all payments due, owing and expected prior to the Lease Commencement Date (to include Progress Payment Charges, Interim Rent, Transaction Fee, and other such charges), and (ii) Base Period Monthly Rental payments, together with a prepayment penalty of five percent (5%) of such amount, together with all applicable taxes and other amounts due under the Lease, including but not limited to sales and use tax, property tax, late charges, and any and all other sums due. Lessor's sale of Property to the Lessee pursuant to this clause shall be on an "as-is, where-is" basis, without any representation or warranty by, or recourse to, the Lessor, except as to the absence of liens created by or through Lessor.

h.  RETURN OPTION:  For purposes of this Schedule only, Section 20(n) of the Master Lease shall be revised by deleting option (2) in its entirety together with any and all terms and references specific to option (2) thereunder.

i.  EVENTS OF DEFAULT:  Notwithstanding Section 18(c) of the Master Lease, it shall not be an Event of Default if Lessee sells, transfers, assigns, conveys or distributes any Property in the ordinary course of its business.

j.  INSPECTION:  Pursuant to the terms and conditions of the Master Lease, Lessor requires a third-party inspection of each item of Property. Upon Lessor's receipt of a satisfactory third-party inspection of the Property evidencing that the Property is delivered, installed and in good working order and condition, Lessor will provide Lessee a final Acceptance and Delivery Certificate, as provided in the Master Lease. Upon receipt of the final Acceptance and Delivery Certificate, and further upon Lessee's inspection, satisfaction and acceptance of the Property (subject to the terms and conditions of the Master Lease), Lessee shall execute and deliver to Lessor the final Acceptance and Delivery Certificate.

k.  WAIVERS:  For purposes of this Lease and to ensure that Lessor shall be granted all right, title and interest in and to the Property, and to further ensure that Lessor shall be indemnified from and against any loss or damage it might incur resulting from liens, claims, security interest or encumbrances existing or of records against the Property Location or the Property, Lessee agrees (i) to provide to Lessor any documentation reasonably requested, including but not limited to bills of sale, waivers of interest, lien releases, mechanic's lien releases, mortgagee waivers, and any additional waivers (collectively the "Waivers"), and (ii) to use its commercially reasonable efforts to cause any third parties reasonably deemed necessary by Lessor to execute such Waivers. As long as the Property leased under this Schedule remains personal property and the Lessee has used commercially reasonable efforts to obtain a third-party Waiver, Lessee's failure to provide Waivers shall not constitute an additional Event of Default under the Lease.

l.  ADDITIONAL REMEDIES ON DEFAULT- INJUNCTIVE RELIEF:  Upon the occurrence of a monetary Event of Default under the Lease, upon demand by Lessor, in addition to the remedies set forth in Section 19 of the Master Lease, Lessee shall thereupon immediately cease the use of any and all Property under each and every Schedule under the Master Lease whether such use is by Lessee or any affiliate of Lessee. In the enforcement of the remedies described in this Section, Lessor shall be entitled to an injunction restraining Lessee, or any of Lessee's affiliates, from using the

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Schedule Documents\Lease Schedule - ST.docx

CONFIDENTIAL

ONSET_00032912
FBG_CH1_00090682

DEBTORS' EXHIBIT NO. 175
Page 457 of 1907

Property and any Property under any other Schedules executed in connection with the Master Lease. Lessee agrees that a violation of such will cause immediate and irreparable damage to Lessor and that the detriment which Lessor will suffer as a result of a breach by Lessee of the obligations contained in the Lease cannot be adequately compensated by monetary damages, and therefore Lessor shall be entitled to injunctive and other equitable relief to enforce the provisions of this Section.

Nothing contained herein shall prohibit Lessor from also pursuing any other remedies available under the Master Lease, the Schedule, or otherwise at law, and no action by Lessor in pursuing any other remedies shall constitute an election to forego other remedies. Lessee agrees that the foregoing remedies are in addition to all other rights and remedies available to Lessor under the Master Lease, the Schedule, or otherwise available provided by law. In connection with Lessor's exercise of any or all of the above-listed remedies, Lessor shall be entitled to recover all costs and expenses incurred by Lessor in the enforcement of the Lease and/or the exercise of its rights hereunder, including in disabling the Property, including without limitation, reasonable attorney fees and costs incurred by Lessor. In the event of enforcement by Lessor through judicial proceedings, Lessee hereby waives any requirement that Lessor post a bond. Lessor's failure to promptly enforce any right or remedy hereunder shall not operate as a waiver of such right or remedy, and Lessor's waiver of any default shall not constitute a waiver of any subsequent or other default. Lessee further agrees that the rights and remedies available to Lessor under the Lease may be enforced by specific performance, including by injunction.

m.  MAINTENANCE OF PROPERTY:  For purposes of this Schedule only, Lessee shall, undertake all reasonable and customary actions to preserve and protect the Property and maintain, keep and/or store the Property so that it is ready to assemble, sell or distribute in the ordinary course of business. By fulfilling these requirements, Lessee shall meet and satisfy the requirements to maintain the Property as found in the Master Lease.

n.  TRANSACTION FEE: For and in consideration of Lessor entering into this Lease, Lessee shall pay to Lessor a non-refundable transaction fee equal to $6,400,000.00 (the "Transaction Fee") which shall be paid concurrently with Lessee's execution and delivery of this Schedule. Lessee agrees that the Transaction Fee is paid in consideration of Lessor's work in underwriting, due diligence and originating the Lease. The Transaction Fee is in addition to, and shall not be applied to, any other amounts due or owed by Lessee under or in connection with the Lease, whether denominated rents, charges, fees, or expenses, including without limitation, any inspection fees, documentation fees, out of pocket expenses chargeable to Lessee, or any other fee or charge provided for in the Lease.

o.  CURRENCY:  Unless otherwise specifically stated, all monies referenced in the Lease and any accompanying documents shall be deemed to be in U.S. Dollars. All payments due to Lessor and/or its assigns, shall be due and payable in U.S. Dollars.

p.  FURTHER ASSURANCES:  Lessee agrees as follow: i) Lessee will cooperate with Lessor in protecting Lessor's interests in the Property, ii) Lessor is authorized to take any measures necessary to protect its ownership and/or interest in the Property, and iii) Lessee agrees to execute any further documents, and to take any further actions, reasonably requested by Lessor to evidence ownership or to perfect the security interest granted under the Lease or to effectuate the rights granted to Lessor under the Lease.

q.  TAX INDEMNIFICATION:  Notwithstanding anything to the contrary contained in the Lease, Lessee agrees to defend, indemnify, reimburse and hold Lessor harmless against any and all taxes imposed upon Lessor by any State, jurisdiction or taxing authority, for failure to pay any such taxes due or incurred based on (a) the Property, and (b) any payments required to be made under the Lease or otherwise with respect to the Lease. Upon any assessment against or final payment by Lessor of any taxes as provided herein, Lessee agrees to pay such assessments or reimburse Lessor for its payments of such assessments. This Indemnity shall survive the termination of the Lease and shall continue to bind Lessee as long as any tax assessments with respect to the Property or Lease is pending or may be imposed on Lessor.

r.  PROPERTY TAX:  For purposes of this Schedule only, notwithstanding anything to the contrary contained in the Lease, and effective the date hereof and continuing throughout the term of the Schedule, including any renewals thereof, Lessee agrees to file in its name and remit directly to the proper taxing authority, all property taxes due under the Schedule. Lessee shall maintain records of filing and evidence of payment and shall provide proof of such filing and/or payment to Lessor upon request by Lessor. Lessee agrees to indemnify Lessor for any unpaid property tax, penalties and interest resulting from Lessee's failure to timely file property taxes or its failure to remit payment to the proper taxing authority. Lessee's failure to comply with the requirements set forth in this Section shall constitute an additional Event of Default under the Lease.

\\UTSJ-VS-WF301.OSFI.Local\Lease Operations\Master Library\Schedule Documents\Lease Schedule - ST.dotx

CONFIDENTIAL

ONSET_00032913
FBG_CH1_00090683

s.   ASSIGNMENT: Notwithstanding anything to the contrary herein, Lessor and Lessee acknowledge and agree that all or a portion of this Lease may be structured as an Assignment, whereby Lessor may take an Assignment of all or a portion of the Property from Lessee for purposes of leasing the Property back to Lessee, in accordance with the terms and conditions set forth in an Assignment and Transfer of Inventory, which may be executed in connection with this Lease.

t.   BAILEE: Notwithstanding anything to the contrary contained herein or in the Master Lease, Lessor and Lessee acknowledge and agree that Lessee may deliver possession of the Property to one or more related companies (collectively, the "Bailee"). Inasmuch as the Property may be located at and in use by the Bailee, Lessee agrees, to (i) cooperate with Lessor in protecting Lessor's interests in the Property, (ii) authorize Lessor to take any measures necessary to protect its ownership and/or interest in the Property, and (iii) execute, or cause each Bailee to execute, any further documentation and to take any further actions, reasonably requested by Lessor to evidence ownership or to perfect the security interest granted under the Lease or to effectuate the rights granted to Lessor under the Lease.

u.   ADDITIONAL CONDITIONS PRECEDENT AND REPRESENTATIONS OF LESSEE: For purposes of this Schedule, and as an inducement for Lessor entering into this Schedule, Lessee agrees that under no circumstances, including, but not limited to problems with (i) supply chain disruption, (ii) labor shortages, (iii) rising interest rates, (iv) global pandemic, (v) inflation, and/or (vi) geopolitical turmoil, will the Lessee request any kind of payment reduction or offsets to the payments set forth in this Schedule. Lessee represents and warrants that it has the financial ability to make the payments due under this Schedule regardless of any kind of problems or change in circumstances, including but not limited to those listed above. Lessee acknowledges that Lessor is under no obligation to reduce or modify the payments due under this Schedule, and instead recognizes that Lessee is obligated to timely make all payments due under the Schedule. Specifically, Lessee hereby reaffirms that all of Lessee's payment and other obligations shall be without notice or demand, are absolute, unconditional and not subject to abatement, reduction or setoff for any reason, including any of the circumstances listed above and any other circumstances, unforeseen or not, and Lessee will not request or receive any abatement, reduction, setoff, deferment, modification, or other accommodation relating thereto.

v.   MASTER LEASE TERMS AND CONDITIONS: Unless otherwise specifically modified herein, all terms and conditions of the Master Lease shall continue to be in full force and effect without change.

SECTION 12   REPRESENTATION OF LESSEE: Lessor and Lessee agree that this Schedule is a "Finance Lease" as defined by the Uniform Commercial Code Article 2A, in that (i) Lessee has selected the Property in its sole discretion, (ii) Lessor has acquired the Property solely for the purpose of leasing such Property under this Schedule, and (iii) Lessee has received a copy of the contract evidencing Lessor's purchase of the Property.

[Signature(s) on following page]

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Schedule Documents\Lease Schedule - ST.dotx

CONFIDENTIAL

ONSET_00032914
FBG_CH1_00090684

**DEBTORS' EXHIBIT NO. 175**
**Page 459 of 1907**

[Lease Schedule No. 027 Signature Page]

LESSOR:                                          LESSEE:

**ONSET FINANCIAL, INC.**                         **CARNABY INVENTORY IV, LLC**

BY:  _____                 BY:  _____
      Kristina Allen                                      Edward James
TITLE:   Executive Vice President                TITLE:   Executive Vice President

Page 6 of 6

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Schedule Documents\Lease Schedule - ST.dotx

CONFIDENTIAL

ONSET_00032915
FBG_CH1_00090685

**DEBTORS' EXHIBIT NO. 175**
**Page 460 of 1907**

**EXHIBIT B**
**STIPULATED LOSS SCHEDULE**
**DATED APRIL 07, 2025**
**TO**
**LEASE SCHEDULE NO. 027**
**DATED APRIL 07, 2025**
**TO**
**MASTER LEASE AGREEMENT NO. OFI1445416**
**STIPULATED LOSS VALUE TABLE**

| AFTER MONTHLY PAYMENT | TOTAL STIPULATED LOSS VALUE | STIPULATED LOSS PERCENTAGE |
|---|---|---|
| 0 | $216,000,000 | 135.00% |
| 1 | $194,155,066 | 121.35% |
| 2 | $170,472,862 | 106.55% |
| 3 | $144,962,853 | 90.60% |
| 4 | $117,483,967 | 73.43% |
| 5 | $87,884,245 | 54.93% |
| 6 | $56,000,000 | 35.00% |
| and thereafter | | |

The Stipulated Loss Value for any item of lost, damaged or destroyed Property shall be the Lessor's original cost of such item of Property multiplied by the Stipulated Loss Percentage indicated in the above table which corresponds to the month of the Lease after the Lease Commencement Date in which the last Monthly Rental payment was made. In the event of a total loss or destruction, the Stipulated Loss Value for all lost or damaged Property shall be equal to the percentage or dollar amount, as the case may be, listed under the Total Stipulated Loss Value indicated above which corresponds to the month of the Lease after the Lease Commencement Date in which the last Monthly Rental payment was made. If a partial or total loss occurs at any time prior to the Lease Commencement Date of the Lease, then the Stipulated Loss Value shall be equal to 135% of the total amount funded. In the event the Lease is continued for any reason, then the last percentage or dollar amount, as the case may be, shown above shall control throughout any such continued term.

In the event of default under the Lease, Lessor may, in addition to all other remedies available to it under the Lease, recover the dollar amount listed under the Total Stipulated Loss Value indicated above as of the Monthly Rental payment date immediately preceding the date of the default.

[Signature(s) on following page]

CONFIDENTIAL

ONSET_00032916
FBG_CH1_00090686

[STIPULATED LOSS SCHEDULE DATED APRIL 07, 2025 TO LEASE SCHEDULE NO. 027 SIGNATURE PAGE]

LESSOR:                                              LESSEE:

**ONSET FINANCIAL, INC.**                            **CARNABY INVENTORY IV, LLC**

BY: _____                       BY: _____
        Kristina Allen                                      Edward James
TITLE: Executive Vice President                     TITLE:  Executive Vice President

CONFIDENTIAL                                        ONSET_00032917
                                                     FBG_CH1_00090687



## ACCEPTANCE AND DELIVERY CERTIFICATE
## TO
## LEASE SCHEDULE NO. 027

Reference is made to Lease Schedule No. 027 dated April 7, 2025 (the "Schedule") which incorporates the terms and conditions of Master Lease Agreement No. OFI1445416 dated June 28, 2022 (the "Master Lease") between **ONSET FINANCIAL, INC.** (the "Lessor") and **CARNABY INVENTORY IV, LLC** (the "Lessee"). The Master Lease and Schedule shall be referenced herein collectively as the Lease. All capitalized terms used herein but not defined herein shall have the same meanings ascribed to them in the Master Lease.

SECTION 1      PROPERTY: All inventory, whether now in place or hereafter acquired, including all such items as they are replenished in the ordinary course of business, as identified by specific part numbers and/or by specific material numbers, consisting of raw components, work in progress, component parts, all after-acquired raw components and all finished goods, maintained, kept and/or stored at (i) Horizon Global Americas Inc.'s facility located at Avenida Los Nogales, s/n lotes 4, 5 y 6 (lots 4, 5 and 6) Parque Industrial Villa Florida (Buildings #1 and #2), Reynosa, Tamaulipas, Mexico, (ii) Horizon Global Americas Inc.'s facility located at Industrial Drive Edificio 11, Prologis Park, S/N, Reynosa Tamaulipas, 88787 Mexico, (iii) Horizon Global Americas Inc.'s facility located at 32901 West 193rd Street, Edgerton, Kansas 66021, (iv) Hopkins Manufacturing Corporation's facility located at 30900 West 185th Street, Edgerton, Kansas 66021, (v) Hopkins Manufacturing Corporation's facility located at 428 Peyton Street, Emporia, Kansas 66801, and (vi) any other future location(s), and other items of Property all as more fully described on the attached Exhibit A, which by reference becomes a part hereof, together with any and all attachments, accessions, additions, enhancements and replacements thereto (collectively, the "Property").

SECTION 2      PROPERTY LOCATION:  Location(s) as set forth on the attached Exhibit A.

SECTION 3      DATE OF ACCEPTANCE: April 7, 2025

SECTION 4      CONDITION OF THE PROPERTY:  Lessee hereby acknowledges that all items of Property described in Section 1 have been delivered and received by Lessee and will be maintained, kept and/or stored at the Property Location in Lessee's ordinary course of business. Lessee hereby unconditionally and irrevocably accepts the Property for all purposes under the Lease.

SECTION 5      DISBURSEMENTS:  By signature below Lessee hereby authorizes and directs Lessor to remit proceeds directly to Lessee in the amount of $160,000,000.00 USD for the Property.

[Signature(s) on following page]

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Acceptance and Delivery\Acceptance & Delivery Certificate.dotx

CONFIDENTIAL

ONSET_00032918
FBG_CH1_00090688

**DEBTORS' EXHIBIT NO. 175**
**Page 463 of 1907**

[Acceptance and Delivery Certificate Signature Page to Lease Schedule No. 027]

LESSEE:  **CARNABY INVENTORY IV, LLC**

BY: _____
     Edward James
TITLE:   Executive Vice President

Page 2 of 2

CONFIDENTIAL

ONSET_00032919
FBG_CH1_00090689

**DEBTORS' EXHIBIT NO. 175**
**Page 464 of 1907**



## ASSIGNMENT AND TRANSFER OF INVENTORY

This Assignment and Transfer of Inventory (the "Assignment") is dated and effective April 7, 2025, by and between **CARNABY INVENTORY IV, LLC**, 3010 LBJ Freeway, Suite 1200, Dallas, Texas 75234 ("Carnaby" or the "Seller"), **HORIZON GLOBAL AMERICAS INC.**, 127 Public Square, Suite 5300, Cleveland, Ohio 44114 ("Horizon Americas"), and **HOPKINS MANUFACTURING CORPORATION**, 127 Public Square, Suite 5300, Cleveland, Ohio 44114 ("Hopkins") (Horizon Americas and Hopkins are individually and collectively referred to hereinafter as "User"), and **ONSET FINANCIAL, INC.**, 274 West 12300 South, Draper, Utah 84020 (the "Buyer").

WHEREAS, Seller requests Buyer to purchase from Seller Seller's inventory located at each facility as described in more detail on the attached Exhibit A, which by this reference is made a part hereof (the "Property"), and to lease the Property to Seller under the terms and conditions of Lease Schedule No. 027 dated April 7, 2025 (the "Schedule") to Master Lease Agreement No. OFI1445416 dated and effective as of June 28, 2022 (the "Master Lease") (the Master Lease and the Schedule are referred to herein collectively as the "Lease"); and

WHEREAS, Buyer is willing to purchase from Seller and lease the Property to Seller under the terms and conditions of this Assignment and the Lease;

NOW, THEREFORE, in consideration of the mutual promises herein, Seller and Buyer agree as follows:

1.     **Assignment and Transfer of Property**.  Seller agrees to sell, assign and transfer to Buyer and Buyer agrees to purchase and acquire title to the Property, as described in more detail on the attached Exhibit A.  Additionally, Seller also hereby grants a security interest in the Property to Buyer and authorizes Buyer to file any and all UCC-1 financing statements necessary to perfect Buyer's interest in the Property.  Concurrent with the assignment, Buyer agrees to lease the Property to Seller and Seller agrees to accept and lease the Property from Buyer for all purposes under the Lease pursuant to the terms and conditions of the Lease.  As set forth in more detail below and subject to the terms and conditions set forth in Section 4, Lessee intends to allow User to use the Property during the term of the Lease.  Buyer consents to User's use of the Property during the term of the Lease, subject to the Lease and the terms and conditions set forth in Section 4, below. In connection with Seller's sale of the Property to Buyer, Seller assigns to Buyer all warranties and indemnities from any supplier of raw components or component parts or otherwise with respect to the Property.

2.     **Purchase Price and Payment**.  Buyer and Seller agree that the purchase price of the Property is $160,000,000.00 exclusive of applicable sales taxes (the "Purchase Price") which shall be payable to Seller pursuant to the terms and conditions of this Assignment, and the Lease.  Specifically, the Buyer shall deliver the Purchase Price as directed by Seller in more detail in one or more pay proceeds letters executed by Seller in connection with the Lease.

3.     **Title**.  The parties agree that title and ownership of the Property shall pass from Seller to Buyer upon payment of the Purchase Price specified herein.  Seller will execute and deliver such further documents and do such further acts and things as Buyer may reasonably request in order to fully effect the purposes of this Agreement and properly vest title in the Property with Buyer and protect Buyer's rights in the Property, including, but not limited to, recording or otherwise evidencing transfer of title in the Property to Buyer on any records or with any governmental agencies in the United States and/or Mexico, if so required.  Seller shall provide insurance coverage for the Property from the date title passes to Buyer in accordance with the terms and conditions of the Master Lease, which terms and conditions are incorporated herein by this reference.

4.     **Use of Property**.  Seller's use of the Property as lessee under the Lease includes allowing the Property to be held, possessed, maintained, controlled, and stored by User.  In the ordinary course of its business, the Seller will sell the Property.  When the Property is sold by Seller in the ordinary course, it shall be released from the terms of the Lease, as discussed in more detail below.  By their signatures below, Seller and Buyer, hereby acknowledge and consent to each User's use of the Property, while it is subject to the terms of the Lease.  Each User's use of the Property is further subject to the following representation and warranties that both Seller and each User make hereby in favor and to the benefit of Buyer:

a.     Each User's possession, use, custody, and control of any Property is, and will always be, subject to all of the terms and conditions of the Lease and subordinate to all of Buyer's (as lessor) and Seller's (as lessee) rights, interest and remedies under the Lease.

CONFIDENTIAL

ONSET_00032920
FBG_CH1_00090690

**DEBTORS' EXHIBIT NO. 175**
**Page 465 of 1907**

b. Upon full execution of this Assignment, each User disclaims and waives any ownership, leasehold or other interest in the Property.

c. While in User's possession and control, except for storing, distributing, conveying, and transferring the Property as inventory in the ordinary course of business, User will (i) not permit the Property to be removed from the respective User's facility, (ii) maintain and keep the Property in good condition and appearance and ready for distribution, transfer and sale in the ordinary course of business, and (iii) permit Buyer and/or its agents to inspect the Property at reasonable times.

d. User will not permit the Property to become subject to any liens or encumbrances by User or by parties claiming through User.  Upon request from Buyer (as lessor), User agrees to cooperate with and assist Buyer (as lessor) in obtaining any landlord and/or mortgage waivers as lessor deems necessary to effectuate the purposes set forth in the Lease.

e. Buyer and Seller acknowledge that the Property is inventory and will be sold, transferred, assigned, conveyed or distributed by Lessee in its ordinary course of business and will be replenished by Seller also in its ordinary course of business.  Buyer (as lessor) acknowledges that, subject to the terms contained in the Lease, Seller is entitled to all proceeds from the sale or transfer of the Property.  Upon the sale or transfer of any item or portion of the Property in the ordinary course of Seller's business, Buyer agrees to automatically release all claims of title or ownership it has in and to that item or portion of Property sold, together with any related right, title or interest thereto, provided that such item or portion of Property is replenished with equivalent value Property, or sold for cash to each User at a price greater than originally paid to the respective User for such Property, and such cash proceeds are used by Seller solely to remit the Monthly Rental Lease payments due under the Lease.

5. **User's Disclaimer of Property**.  The parties acknowledge that Horizon Americas and Hopkins each recently transferred any and all rights, title and interest it had to the Property to Seller.

a. Horizon Americas confirms that it transferred its rights, title and interest in the Property to Seller free and clear of liens, encumbrances or security interests of any kind.  To the extent Horizon Americas continues to hold any interest in the Property, it hereby transfers and assigns such interest to Buyer and disclaims any ownership interest therein.

b. Hopkins confirms that it transferred its rights, title and interest in the Property to Seller free and clear of liens, encumbrances or security interests of any kind.  To the extent Hopkins continues to hold any interest in the Property, it hereby transfers and assigns such interest to Buyer and disclaims any ownership interest therein.

6. **Buyer's Purchase and Performance**.  Seller agrees that Buyer's obligations hereunder are expressly subject to the following conditions:

a. Buyer's receipt of the executed Master Lease, Schedule, Stipulated Loss Schedule, Acceptance and Delivery Certificate for the Property given by Seller in favor of Buyer, UCC searches to be performed against Seller showing no security interests, liens or other encumbrances, partial releases of any UCC liens or encumbrances, evidence of Seller's ownership, and any other documentation reasonably required by Buyer, all in form acceptable to Buyer.

b. Buyer's receipt of Resolutions in form acceptable to Buyer evidencing Seller's authority to enter into this sale and leaseback transaction with Buyer.

7. **Taxes**.  Seller represents and warrants that it is responsible for and it has paid all sales and use, property and other taxes assessed or due in connection with Seller's purchase, use and possession of the Property prior to the sale to Buyer hereunder.  Seller agrees to pay to Buyer an amount equal to all taxes paid, payable or required to be collected by Buyer, however designated, which are levied or based on the rental, on the Lease or on the Property or on its purchase for lease hereunder, or on its use, lease, possession, operation, control or value (including, without limitation, state and local privilege or excise taxes based on gross revenue), any penalties or interest in connection therewith or taxes or amounts in lieu thereof paid or payable by Buyer in respect of the foregoing, but excluding taxes based on Buyer's net income.  Buyer shall deliver to Seller a duly executed sales tax exemption certificate for the Property, prior to Buyer's payment of the Purchase Price.

CONFIDENTIAL

ONSET_00032921
FBG_CH1_00090691

**DEBTORS' EXHIBIT NO. 175**
**Page 466 of 1907**

8. **Seller's Representations and Warranties**. Seller represents and warrants to Buyer that:

a. Each User is a subsidiary, affiliate or related entity of Seller and that the ultimate management control and ownership of User is held by Seller.

b. Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the state, province or country of its incorporation or organization and in all jurisdictions where such qualification is required for it to conduct its business.

c. Seller has all requisite power and authority to conduct its business, to own and lease its properties and to enter into and perform all of its obligations under this Assignment.

d. This Assignment has been duly authorized by Seller, and upon execution and delivery by the parties thereto, shall constitute the valid, legal and binding obligation of Seller enforceable in accordance with its terms.

e. No event has occurred or is continuing which constitutes an event of default under this Assignment. There is no action, suit or proceeding pending or threatened against or effecting Seller, before or by any court, administrative agency or other governmental authority which brings into question the validity of the transaction contemplated by this Assignment or which might materially impair the ability of Seller to perform its obligations under this Assignment or the transaction contemplated hereby.

f. Neither the execution and delivery by Seller of this Assignment, nor the compliance by Seller with the provisions of any thereof, conflicts with or results in a breach of any of the provisions of the Articles of Incorporation, By-Laws or other charter or organizational documents of Seller, or of any applicable law, judgment, order, writ, injunction, decree, rule or regulation of any court, administrative agency or other governmental authority, or of any agreement or other instrument to which Seller is a party or by which it is bound, or constitutes or will constitute a default under any thereof.

g. The transaction contemplated by this Assignment complies with all applicable federal, state, municipal or provincial laws, rules and regulations applicable to Seller.

h. No consent, approval or authorization of or by any court, administrative agency or other governmental authority is required in connection with the execution, delivery, performance or consummation by Seller of the transaction contemplated by this Assignment.

i. Seller represents and warrants that it has either direct or indirect claims of title or ownership interest in and to the Property and Seller is transferring to Buyer all claims of title and/or ownership interest that it has to Buyer and that the transfer of such claims of title and/or ownership interest constitutes and will vest good and marketable title to the Property in Buyer, free and clear of all liens and encumbrances of any kind or description. Seller represents and warrants that no other parties, except Seller have claims of title and/or ownership interest in and to the Property. Except for the allowed use by User of the Property as inventory in the ordinary course, which includes, but is not limited to storing, distributing, conveying, transferring and selling inventory in ordinary course, Seller represents and warrants that the Property is, and at the time of closing will be, located at the premises identified on the Acceptance and Delivery Certificate, in good condition and appearance ready for distribution, transfer and sale in the ordinary course of business.

9. **Buyer's Representations and Warranties**. Buyer represents and warrants to Seller that:

a. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Utah and in all jurisdictions where such qualification is required for it to conduct business.

b. Buyer has all requisite power and authority to conduct its business, to own and lease its properties and to enter into and perform all of its obligations under this Assignment.

c. This Assignment has been duly authorized by Buyer, and upon the execution and delivery by the parties thereto, shall constitute the valid, legal and binding obligation of Buyer enforceable in accordance with its terms.

CONFIDENTIAL

ONSET_00032922
FBG_CH1_00090692

**DEBTORS' EXHIBIT NO. 175**
**Page 467 of 1907**

10.     **Default and Remedies**.  In the event any of Seller's representations and warranties made hereunder should be false or misleading in any material respect, or in the event Seller should breach any of its warranties or obligations under this Assignment, Buyer shall be entitled to exercise all rights and remedies available to it at law or in equity together with all of its rights and remedies under the Lease as if they were set forth in this Assignment, and for purposes hereof all such rights and remedies shall be incorporated herein by this reference.

11.     **Successors**.  Buyer and Seller agree that this Assignment shall inure to the benefit of and shall be binding upon Seller and Buyer, their respective successors and assigns.  Any assignment by Buyer shall not require Seller's prior written approval provided such assignee agrees to observe Buyer's covenant of quiet enjoyment under the Lease.  Seller shall not assign any interest in this Assignment without Buyer's prior written consent.

12.     **Survival of Covenants**.  Buyer and Seller agree that the warranties, covenants and agreements contained in this Assignment shall survive the passing of title to the Property.

13.     **Miscellaneous**.  Section titles are not intended to, and shall not limit or otherwise affect the interpretation of this Assignment.  If any provision of this Assignment shall be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions hereof shall not be affected or impaired in any way.  Any modifications to this Assignment shall be in writing and shall be signed by both parties and their last known assignees, if any.  Any terms capitalized herein shall have the meaning set forth in the Master Lease and the Schedule, which are incorporated herein by reference.

14.     **Entire Agreement**.  Seller and Buyer agree that this Assignment and the Lease, together with any amendments, supplements or riders thereto, shall constitute the entire agreement between the parties with respect to the Property and shall supersede all proposals, oral or written, all prior negotiations and all other communications.

15.     **Legal and Administrative Expenses**.  Seller shall reimburse Buyer for all charges, costs, expenses and attorney fees incurred by Buyer in connection with this sale/leaseback transaction.

16.     **No Brokers Fee**.  Each party represents it has retained no brokers in this transaction and indemnifies the other party against any brokers' or other fees which might result from the indemnifying party's actions.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be duly executed by their authorized representatives as of the day and year first above written.

[Signature(s) on following page]

CONFIDENTIAL

ONSET_00032923
FBG_CH1_00090693

**DEBTORS' EXHIBIT NO. 175**
**Page 468 of 1907**

[Assignment and Transfer of Inventory Signature Page - Lease Schedule No. 027]

BUYER:                                          SELLER:

**ONSET FINANCIAL, INC.**                       **CARNABY INVENTORY IV, LLC**

BY: _____            BY: _____
       Kristina Allen                               Edward James
TITLE:    Executive Vice President        TITLE:    Executive Vice President

                                        and

                                        **HORIZON GLOBAL AMERICAS INC.**

                                        BY: _____

                                        TITLE:    Executive Vice President

                                        and

                                        **HOPKINS MANUFACTURING CORPORATION**

                                        BY: _____

                                        TITLE:    Executive Vice President

CONFIDENTIAL

ONSET_00032924
FBG_CH1_00090694

**DEBTORS' EXHIBIT NO. 175**
**Page 469 of 1907**

## EXHIBIT A

All inventory, whether now in place or hereafter acquired, including all such items as they are replenished in the ordinary course of business, as identified by specific part numbers and/or by specific material numbers, consisting of raw components, work in progress, component parts, all after-acquired raw components and all finished goods, maintained, kept and/or stored at (i) Horizon Global Americas Inc.'s facility located at Avenida Los Nogales, s/n lotes 4, 5 y 6 (lots 4, 5 and 6) Parque Industrial Villa Florida (Buildings #1 and #2), Reynosa, Tamaulipas, Mexico, (ii) Horizon Global Americas Inc.'s facility located at Industrial Drive Edificio 11, Prologis Park, S/N, Reynosa Tamaulipas, 88787 Mexico, (iii) Horizon Global Americas Inc.'s facility located at 32901 West 193rd Street, Edgerton, Kansas 66021, (iv) Hopkins Manufacturing Corporation's facility located at 30900 West 185th Street, Edgerton, Kansas 66021, (v) Hopkins Manufacturing Corporation's facility located at 428 Peyton Street, Emporia, Kansas 66801, and (vi) any other future location(s).

CONFIDENTIAL

ONSET_00032925
FBG_CH1_00090695



April 7, 2025

Edward James
Executive Vice President
Carnaby Inventory IV, LLC
3010 LBJ Freeway, Suite 1200
Dallas, Texas 75234

Re:     Lease Schedule No. 027 dated April 7, 2025 (the "Schedule") to Master Lease Agreement
        No. OFI1445416 dated June 28, 2022 (the "Master Lease") (the Schedule and Master Lease
        are referred to herein collectively, the "Lease") each by between **ONSET FINANCIAL,
        INC.** (the "Lessor") and **CARNABY INVENTORY IV, LLC** (the "Lessee"). <u>All defined
        terms used herein but not defined herein shall have the same meaning ascribed to them in
        the Lease</u>.

Base Period:                Six (6) Base Period Monthly Rental payments remaining

Monthly Rental:             $38,667,200.00

Lease Commencement Date:    July 1, 2025

Dear Mr. James:

Notice is hereby given that the above referenced Lease has been accepted on April 7, 2025 as more
fully described in that Acceptance and Delivery Certificate executed by Lessee.  Now therefore,
the Base Period Monthly Rental payments are directed as follows:

All amounts from time to time payable under the Lease to the Lessor shall be paid to the Lessor at
274 West 12300 South, Draper, Utah 84020 as follows:  Six (6) Base Period Monthly Rental
payments of $38,667,200.00 commencing on July 1, 2025 through and including the Base Period
Monthly Rental payment due on December 1, 2025.

Lessee, by signature below, acknowledges and agrees that the Lease is in full force and effect and
Lessee is not in default thereunder; Lessee's obligations to make all payments under the Lease and
the rights of Lessor in and to such amounts, shall be as set forth in the Lease; the Lessee has received
no notice of a prior, transfer, assignment, hypothecation or pledge of the Lease or of the rents
reserved thereunder; and the Lessee will not modify or consent to any modification of the terms of
the Lease or enter into any sublease of the Property or assignment of the Lease without the prior
written consent of the Lessor; the Lessee will not move the Property from its locations specified in
the Acceptance and Delivery Certificate without the prior written consent of  Lessor; the Lessor
shall not have any affirmative obligation under the Lease except to take no action to impair Lessee's
quiet enjoyment and use of the Property so long as the Lessee is not in default under the terms of
the Lease.

[Signature(s) on following page]

CONFIDENTIAL

ONSET_00032926
FBG_CH1_00090696

DEBTORS' EXHIBIT NO. 175
Page 471 of 1907

[Lease Commencement Letter 027 Signature Page]

Sincerely,

**ONSET FINANCIAL, INC.**

BY: _Kristina Allen_ _____

   Kristina Allen

TITLE:   Executive Vice President

Acknowledged by:

LESSEE: **CARNABY INVENTORY IV, LLC**

By: _Edward James_ _____

   Edward James

Title:   Executive Vice President

Date: March 27, 2025 _____

\\JTSI-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Schedule Documents\Lease Commencement Letter - Internal.dotx

CONFIDENTIAL

ONSET_00032927
FBG_CH1_00090697

**DEBTORS' EXHIBIT NO. 175**
**Page 472 of 1907**

*Execution Version*

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "***Agreement***") is made and entered into as of March 26, 2025, by and between HOPKINS MANUFACTURING CORP. and HORIZON GLOBAL AMERICAS INC. (collectively, the "***Sellers***" and each, a "***Seller***"), on the one hand, and CARNABY INVENTORY IV, LLC (the "***Buyer***"), on the other hand. The Sellers and the Buyer are each a "***Party***" and collectively, the "***Parties***."

## RECITALS

WHEREAS, the Sellers desire to sell, assign and transfer, and the Buyer desires to purchase, all of the assets set forth on **Schedule A** to this Agreement, which consist of certain inventory of the Sellers (the "***Acquired Assets***"), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties to this Agreement, intending to be legally bound, hereby agree as follows:

1.  **Sale and Purchase of Assets**. At the Closing, the Buyer shall purchase from the Sellers, and the Sellers shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Sellers and their respective affiliates in and to all of the Acquired Assets.

2.  **Purchase Price**. The aggregate purchase price for the Acquired Assets will be One Hundred Sixty Million United States Dollars ($160,000,000) (the "***Purchase Price***"), which amount will be paid in full on the Closing Date.

3.  **Closing**. The purchase and sale of the Acquired Assets (the "***Closing***") shall occur on March 26, 2025 (the "***Closing Date***").

4.  **Seller's Representations and Warranties**. Each Seller represents and warrants to the Buyer, as of the date of this Agreement and as of the Closing, each of the following.

    (a)  **Organization, Existence, Good Standing**. Such Seller is duly incorporated, organized, or formed, and is existing and in good standing under the laws of its jurisdiction of incorporation, organization, or formation.

    (b)  **Power and Authority**. Such Seller has full power and authority to enter into and perform this Agreement. The execution, delivery and performance of this Agreement by Seller have been duly and validly approved by Seller's board of directors or equivalent governing body. No other proceedings are necessary on the part of Seller to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein. Seller has the necessary power and authority to own and operate the Acquired Assets.

    (c)  **Enforceability**. This Agreement has been duly authorized, executed and delivered by Seller and constitutes a legal, valid and binding obligation of Seller, enforceable against such Seller in accordance with its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

CONFIDENTIAL

ONSET_00032928
FBG_CH1_00090698

(d)     Governmental Consents and Conflicts.  No consent, authorization, order or approval of, or filing or registration with, any Governmental Authority is required for or in connection with the consummation by such Seller of the transactions contemplated by this Agreement.

(e)     Other Consents and Conflicts.  Neither the execution nor delivery of this Agreement by such Seller, nor the consummation by such Seller of the transactions contemplated in this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any claim upon any of the Acquired Assets, under (i) such Seller's corporate governing or other organizational documents, or (ii) any contract that is material to the operation of the business of such Seller.

(f)     Title to Assets.  Such Seller has good title to the Acquired Assets, in each case free and clear of any Liens.

(g)     Transfer Taxes.  Each Seller hereby represents and warrants with respect to the Acquired Assets that the sale, transfer, assignment and conveyance of the Acquired Assets by such Seller pursuant to this Agreement is not subject to and will not result in any tax, fee or governmental charge payable by the Buyer or such Seller to any federal, state or local government ("Transfer Taxes").  In the event that any Seller receives notice of any Transfer Taxes arising out of the transfer of such Assets, such Seller shall give notice thereof to the Buyer, and the Sellers shall pay any such Transfer Taxes.

(h)     Condition and Sufficiency of Acquired Assets.  The Acquired Assets are in good condition for use in the business as used by the applicable Seller as of the date hereof, ordinary wear and tear excepted.

(i)     Right of Others to Purchase Assets.  No Seller has entered into any other contracts for the sale of any of the Acquired Assets, nor are there any rights of first refusal or options to purchase any of the Acquired Assets or any other rights of others that might prevent the consummation of this Agreement.

5.     **Buyer's Representations and Warranties**.  The Buyer represents and warrants to the Sellers, as of the date of this Agreement and as of the Closing, each of the following.

(a)     **Organization, Existence, Good Standing**.  The Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all the requisite power and authority to enter into this Agreement and to purchase the Acquired Assets.

(b)     **Enforceability**.  This Agreement constitutes the Buyer's legal, valid and binding obligation and is enforceable according to its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(c)     **Power and Authority**.  The Buyer's execution and delivery of this Agreement, and the consummation of the transactions it contemplates, will not (i) violate, breach or be a default under any contract, agreement or commitment, (ii) violate any order, injunction, rule,

2

CONFIDENTIAL

ONSET_00032929
FBG_CH1_00090699

**DEBTORS' EXHIBIT NO. 175**
**Page 474 of 1907**

regulation or ordinance of any court, administrative agency or governmental body, or (iii) violate or breach the Buyer's organizational or governing documents.

6.    Further Assurances.  From and after the Closing, at the request of the Buyer, the Sellers will execute and deliver, or cause to be executed and delivered, to the Buyer such instruments and other documents as the Buyer may request in order to implement the purchase and sale of the Acquired Assets, including, without limitation, bills of sale, transfer or assignment agreements, the filing of certificates of title and similar instruments, and any filings relating to the payment of Transfer Taxes.  The Sellers and the Buyer shall cooperate and use their respective reasonable best efforts to comply with their respective obligations under this Agreement.

7.    Expenses.  Except as otherwise provided in this Agreement with respect to Transfer Taxes, each Party will bear its own expenses incurred or to be incurred in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby.

8.    No Assignment.  The rights and obligations of the Sellers under this Agreement may not be assigned without the prior written consent of the Buyer, except that any Seller may, without the consent of Buyers, assign any or all of its rights and obligations to any of its affiliates, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of such Seller hereunder or the failure of such Seller to perform any of its covenants hereunder, and provided that no such assignment shall relieve any Seller of any of its liabilities or obligations hereunder.  The rights and obligations of the Buyer under this Agreement may not be assigned without prior written consent of the Sellers, except that the Buyer may, without the consent of the Sellers, assign any or all of its rights and obligations under this Agreement to (a) any affiliate of the Buyer, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of the Buyer hereunder or the failure of the Buyer to perform any of its covenants hereunder, and provided that no such assignment shall relieve the Buyer of any of its liabilities or obligations hereunder; or (b) any lenders of the Buyer or any affiliate of the Buyer as collateral security.

9.    Headings.  The headings contained in this Agreement are included for purposes of convenience only, and do not affect the meaning or interpretation of this Agreement.

10.   Severability.  If any provision of this Agreement or the application of any provision of this Agreement to any Party or circumstance is, to any extent, adjudged invalid or unenforceable, then the application of the remainder of such provision to such Party or circumstance, the application of such provision to other Parties or circumstances, and the application of the remainder of this Agreement will not be affected thereby. Upon such determination that any term or other provision is invalid or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

11.   Notices.  All notices and other communications required or permitted under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) one day after deposit with an overnight delivery service (prepaid, return receipt requested), (c) three days after being mailed if sent by registered or certified mail (postage prepaid, return receipt requested), (d) upon receipt of electronic evidence of successful electronic mail transmission or (e) upon electronic confirmation of successful facsimile

3

CONFIDENTIAL

ONSET_00032930
FBG_CH1_00090700

DEBTORS' EXHIBIT NO. 175
Page 475 of 1907

transmission, in each case, to the appropriate Party at the address or facsimile number specified below:

    (a)    If to any Seller:
First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention: Edward James, Executive Vice President
Email: ed.james@firstbrandsgroup.com

    (b)    If to the Buyer:
Carnaby Inventory IV, LLC
19111 Dallas Pkwy, Suite 170
Dallas, Texas 75287
Attention: Shekhar Kumar, Managing Director
Email: shekhar.kumar@viceroyprivatecapital.co

12.    **Governing Law**.  This Agreement will be governed by and construed and enforced in accordance with the laws of the State of Delaware without regard to principles of conflicts of law.

13.    **Waiver of Jury Trial**.  EACH OF THE PARTIES IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED UPON, ARISING OUT OF OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

14.    **Counterparts**.  This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission (including documents in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Agreement.

**[Signatures Pages Follow]**

4

CONFIDENTIAL

ONSET_00032931
FBG_CH1_00090701

IN WITNESS WHEREOF, the Parties have duly executed this Agreement or have caused this Asset Agreement to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY IV, LLC**

By: _____

Name: Shekhar Kumar

Title: Managing Director

SELLERS:

**HOPKINS MANUFACTURING CORP.**

By: _____

Name: Edward James

Title: Executive Vice President

**HORIZON GLOBAL AMERICAS INC.**

By: _____

Name: Edward James

Title: Executive Vice President

[Signature Page to Asset Purchase Agreement]

CONFIDENTIAL

ONSET_00032932
FBG_CH1_00090702

**DEBTORS' EXHIBIT NO. 175**
**Page 477 of 1907**



## ACKNOWLEDGEMENT AND WAIVER

This Acknowledgement and Waiver is given April 7, 2025 by **HOPKINS MANUFACTURING CORPORATION** ("Bailee") of 127 Public Square, Suite 5300, Cleveland, Ohio 44114 to **ONSET FINANCIAL, INC.** ("Onset") of 274 West 12300 South, Draper, Utah 84020 as it relates to the following premises: 428 Peyton Street, Emporia, Kansas 66801 (the "Premises").

Bailee is an affiliate of **CARNABY INVENTORY IV, LLC** (the "Lessee"). Bailee acknowledges that pursuant to one or more lease schedules (the "Schedules") which Onset, as Lessor, has or may enter into with Lessee, each of which Schedules incorporate by reference the terms and conditions of that Master Lease Agreement No. OFI1445416 dated June 28, 2022, including any amendments thereto, between Onset and Lessee (the "Master Lease"), Onset has or may lease items of property (all or any part thereof referred to herein as the "Property") to Lessee. Bailee further acknowledges that from time to time Lessee may deliver possession and custody of such Property to Bailee.

As an inducement to Onset to enter into the Schedules, Bailee represents and warrants to Onset as follows:

1.  Bailee's possession, use, custody, and control of any Property is, and will always be, subject to all of the terms and conditions of the Schedule and Master Lease and subordinate to all of Onset's and Lessee's rights, interests and remedies under the Schedules.

2.  Bailee disclaims and waives any ownership, leasehold or other interest in the Property.

3.  While in Bailee's possession and custody, except for storing, distributing, conveying, and transferring the Property as inventory in the ordinary course of business, Bailee will (i) not permit the Property to be removed from the Premises specified in the first paragraph above, (ii) maintain and keep the Property in good condition and appearance and ready for distribution, transfer and sale in the ordinary course of business, and (iii) permit Onset and/or its agents to inspect the Property at reasonable times.

4.  Bailee will not permit the Property to become subject to any liens or encumbrances by Bailee or by parties claiming through Bailee. Upon request from Lessor, Bailee agrees to cooperate with and assist Lessor in obtaining any landlord and/or mortgage waivers as Lessor deems necessary to effectuate the purposes set forth herein and in the Lease.

5.  Bailee acknowledges Onset's right to assign its rights and interests under this instrument to its underwriters and assigns, and any such assignee shall be an intended third-party beneficiary under this instrument.

6.  Bailee acknowledges that, in the event of a default by Lessee in any of its obligations or agreements to Lessor, it is hereby agreed that Lessor may exercise any and all of its available default rights and remedies including, but not limited to, the repossession and sale of the Property. If the Property is in Bailee's possession at the time an event of default by Lessee occurs, then Bailee will make the Property available to Lessor on demand.

[Signature(s) on following page]

Page 1 of 2

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Acknowledgment & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00032933
FBG_CH1_00090703

[Acknowledgement and Waiver – Carnaby Inventory IV, LLC - Signature Page]

**HOPKINS MANUFACTURING CORPORATION**

BY: _____

NAME: Edward James

TITLE: Executive Vice President

\\IJTSJ-VS-WFS01 OSFI.Local\Lease Operations\Master Library\Acknowledgement & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00032934
FBG_CH1_00090704

**DEBTORS' EXHIBIT NO. 175**
**Page 479 of 1907**



## ACKNOWLEDGEMENT AND WAIVER

This Acknowledgement and Waiver is given February 12, 2024 by **HOPKINS MANUFACTURING CORPORATION** ("Bailee") of 127 Public Square, Suite 5300, Cleveland, Ohio 44114 to **ONSET FINANCIAL, INC.** ("Onset") of 274 West 12300 South, Draper, Utah 84020 as it relates to the following premises: 30900 West 185th Street, Edgerton, Kansas 66021 (the "Premises").

Bailee is an affiliate of **CARNABY INVENTORY IV, LLC** (the "Lessee"). Bailee acknowledges that pursuant to one or more lease schedules (the "Schedules") which Onset, as Lessor, has or may enter into with Lessee, each of which Schedules incorporate by reference the terms and conditions of that Master Lease Agreement No. OFI1445416 dated June 28, 2022, including any amendments thereto, between Onset and Lessee (the "Master Lease"), Onset has or may lease items of property (all or any part thereof referred to herein as the "Property") to Lessee. Bailee further acknowledges that from time to time Lessee may deliver possession and custody of such Property to Bailee.

As an inducement to Onset to enter into the Schedules, Bailee represents and warrants to Onset as follows:

1.  Bailee's possession, use, custody, and control of any Property is, and will always be, subject to all of the terms and conditions of the Schedule and Master Lease and subordinate to all of Onset's and Lessee's rights, interests and remedies under the Schedules.

2.  Bailee disclaims and waives any ownership, leasehold or other interest in the Property.

3.  While in Bailee's possession and custody, except for storing, distributing, conveying, and transferring the Property as inventory in the ordinary course of business, Bailee will (i) not permit the Property to be removed from the Premises specified in the first paragraph above, (ii) maintain and keep the Property in good condition and appearance and ready for distribution, transfer and sale in the ordinary course of business, and (iii) permit Onset and/or its agents to inspect the Property at reasonable times.

4.  Bailee will not permit the Property to become subject to any liens or encumbrances by Bailee or by parties claiming through Bailee. Upon request from Lessor, Bailee agrees to cooperate with and assist Lessor in obtaining any landlord and/or mortgage waivers as Lessor deems necessary to effectuate the purposes set forth herein and in the Lease.

5.  Bailee acknowledges Onset's right to assign its rights and interests under this instrument to its underwriters and assigns, and any such assignee shall be an intended third-party beneficiary under this instrument.

6.  Bailee acknowledges that, in the event of a default by Lessee in any of its obligations or agreements to Lessor, it is hereby agreed that Lessor may exercise any and all of its available default rights and remedies including, but not limited to, the repossession and sale of the Property. If the Property is in Bailee's possession at the time an event of default by Lessee occurs, then Bailee will make the Property available to Lessor on demand.

[Signature(s) on following page]

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Acknowledgment & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00032935
FBG_CH1_00090705

[Acknowledgement and Waiver – Carnaby Inventory IV, LLC - Signature Page]

**HOPKINS MANUFACTURING CORPORATION**

BY: _____

NAME:   Edward James

TITLE:   Executive Vice President

Page 2 of 2

\\JTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Acknowledgement & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00032936
FBG_CH1_00090706

**DEBTORS' EXHIBIT NO. 175**
**Page 481 of 1907**



## ACKNOWLEDGEMENT AND WAIVER

This Acknowledgement and Waiver is given February 12, 2024 by **HORIZON GLOBAL AMERICAS INC.** ("Bailee") of 127 Public Square, Suite 5300, Cleveland, Ohio 44114 to **ONSET FINANCIAL, INC.** ("Onset") of 274 West 12300 South, Draper, Utah 84020 as it relates to the following premises: 32901 West 193rd Street, Edgerton, Kansas 66021 (the "Premises").

Bailee is an affiliate of **CARNABY INVENTORY IV, LLC** (the "Lessee"). Bailee acknowledges that pursuant to one or more lease schedules (the "Schedules") which Onset, as Lessor, has or may enter into with Lessee, each of which Schedules incorporate by reference the terms and conditions of that Master Lease Agreement No. OFI1445416 dated June 28, 2022, including any amendments thereto, between Onset and Lessee (the "Master Lease"), Onset has or may lease items of property (all or any part thereof referred to herein as the "Property") to Lessee. Bailee further acknowledges that from time to time Lessee may deliver possession and custody of such Property to Bailee.

As an inducement to Onset to enter into the Schedules, Bailee represents and warrants to Onset as follows:

1.  Bailee's possession, use, custody, and control of any Property is, and will always be, subject to all of the terms and conditions of the Schedule and Master Lease and subordinate to all of Onset's and Lessee's rights, interests and remedies under the Schedules.

2.  Bailee disclaims and waives any ownership, leasehold or other interest in the Property.

3.  While in Bailee's possession and custody, except for storing, distributing, conveying, and transferring the Property as inventory in the ordinary course of business, Bailee will (i) not permit the Property to be removed from the Premises specified in the first paragraph above, (ii) maintain and keep the Property in good condition and appearance and ready for distribution, transfer and sale in the ordinary course of business, and (iii) permit Onset and/or its agents to inspect the Property at reasonable times.

4.  Bailee will not permit the Property to become subject to any liens or encumbrances by Bailee or by parties claiming through Bailee. Upon request from Lessor, Bailee agrees to cooperate with and assist Lessor in obtaining any landlord and/or mortgage waivers as Lessor deems necessary to effectuate the purposes set forth herein and in the Lease.

5.  Bailee acknowledges Onset's right to assign its rights and interests under this instrument to its underwriters and assigns, and any such assignee shall be an intended third-party beneficiary under this instrument.

6.  Bailee acknowledges that, in the event of a default by Lessee in any of its obligations or agreements to Lessor, it is hereby agreed that Lessor may exercise any and all of its available default rights and remedies including, but not limited to, the repossession and sale of the Property. If the Property is in Bailee's possession at the time an event of default by Lessee occurs, then Bailee will make the Property available to Lessor on demand.

[Signature(s) on following page]

Page 1 of 2

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Acknowledgment & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00032937
FBG_CH1_00090707

[Acknowledgement and Waiver – Carnaby Inventory IV, LLC - Signature Page]

**HORIZON GLOBAL AMERICAS INC.**

BY:  _____

NAME:  Edward James

TITLE:  Executive Vice President

Page 2 of 2

\\IITSJ-VS-WFS01\OSFI.Local\Lease Operations\Master Library\Acknowledgement & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00032938
FBG_CH1_00090708

**DEBTORS' EXHIBIT NO. 175**
**Page 483 of 1907**



## ACKNOWLEDGEMENT AND WAIVER

This Acknowledgement and Waiver is given April 7, 2025 by **HORIZON GLOBAL AMERICAS INC.** ("Bailee") of 127 Public Square, Suite 5300, Cleveland, Ohio 44114 to **ONSET FINANCIAL, INC.** ("Onset") of 274 West 12300 South, Draper, Utah 84020 as it relates to the following premises: Industrial Drive Edificio 11, Prologis Park, S/N, Reynosa Tamaulipas, 88787 Mexico (the "Premises").

Bailee is an affiliate of **CARNABY INVENTORY IV, LLC** (the "Lessee"). Bailee acknowledges that pursuant to one or more lease schedules (the "Schedules") which Onset, as Lessor, has or may enter into with Lessee, each of which Schedules incorporate by reference the terms and conditions of that Master Lease Agreement No. OFI1445416 dated June 28, 2022, including any amendments thereto, between Onset and Lessee (the "Master Lease"), Onset has or may lease items of property (all or any part thereof referred to herein as the "Property") to Lessee. Bailee further acknowledges that from time to time Lessee may deliver possession and custody of such Property to Bailee.

As an inducement to Onset to enter into the Schedules, Bailee represents and warrants to Onset as follows:

1.  Bailee's possession, use, custody, and control of any Property is, and will always be, subject to all of the terms and conditions of the Schedule and Master Lease and subordinate to all of Onset's and Lessee's rights, interests and remedies under the Schedules.

2.  Bailee disclaims and waives any ownership, leasehold or other interest in the Property.

3.  While in Bailee's possession and custody, except for storing, distributing, conveying, and transferring the Property as inventory in the ordinary course of business, Bailee will (i) not permit the Property to be removed from the Premises specified in the first paragraph above, (ii) maintain and keep the Property in good condition and appearance and ready for distribution, transfer and sale in the ordinary course of business, and (iii) permit Onset and/or its agents to inspect the Property at reasonable times.

4.  Bailee will not permit the Property to become subject to any liens or encumbrances by Bailee or by parties claiming through Bailee. Upon request from Lessor, Bailee agrees to cooperate with and assist Lessor in obtaining any landlord and/or mortgage waivers as Lessor deems necessary to effectuate the purposes set forth herein and in the Lease.

5.  Bailee acknowledges Onset's right to assign its rights and interests under this instrument to its underwriters and assigns, and any such assignee shall be an intended third-party beneficiary under this instrument.

6.  Bailee acknowledges that, in the event of a default by Lessee in any of its obligations or agreements to Lessor, it is hereby agreed that Lessor may exercise any and all of its available default rights and remedies including, but not limited to, the repossession and sale of the Property. If the Property is in Bailee's possession at the time an event of default by Lessee occurs, then Bailee will make the Property available to Lessor on demand.

[Signature(s) on following page]

Page 1 of 2

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Acknowledgment & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00032939
FBG_CH1_00090709

[Acknowledgement and Waiver – Carnaby Inventory IV, LLC - Signature Page]

**HORIZON GLOBAL AMERICAS INC.**

BY: _____

NAME: Edward James

TITLE: Executive Vice President

Page 2 of 2

\\IITSJ-VS-WFS01 OSFI Local\Lease Operations\Master Library\Acknowledgement & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00032940
FBG_CH1_00090710



## ACKNOWLEDGEMENT AND WAIVER

This Acknowledgement and Waiver is given April 7, 2025 by **HORIZON GLOBAL AMERICAS INC.** ("Bailee") of 127 Public Square, Suite 5300, Cleveland, Ohio 44114 to **ONSET FINANCIAL, INC.** ("Onset") of 274 West 12300 South, Draper, Utah 84020 as it relates to the following premises: Avenida Los Nogales, s/n lotes 4, 5 y 6 (lots 4, 5 and 6) Parque Industrial Villa Florida (Buildings #1 and #2), Reynosa, Tamaulipas, Mexico (the "Premises").

Bailee is an affiliate of **CARNABY INVENTORY IV, LLC** (the "Lessee"). Bailee acknowledges that pursuant to one or more lease schedules (the "Schedules") which Onset, as Lessor, has or may enter into with Lessee, each of which Schedules incorporate by reference the terms and conditions of that Master Lease Agreement No. OFI1445416 dated June 28, 2022, including any amendments thereto, between Onset and Lessee (the "Master Lease"), Onset has or may lease items of property (all or any part thereof referred to herein as the "Property") to Lessee. Bailee further acknowledges that from time to time Lessee may deliver possession and custody of such Property to Bailee.

As an inducement to Onset to enter into the Schedules, Bailee represents and warrants to Onset as follows:

1.      Bailee's possession, use, custody, and control of any Property is, and will always be, subject to all of the terms and conditions of the Schedule and Master Lease and subordinate to all of Onset's and Lessee's rights, interests and remedies under the Schedules.

2.      Bailee disclaims and waives any ownership, leasehold or other interest in the Property.

3.      While in Bailee's possession and custody, except for storing, distributing, conveying, and transferring the Property as inventory in the ordinary course of business, Bailee will (i) not permit the Property to be removed from the Premises specified in the first paragraph above, (ii) maintain and keep the Property in good condition and appearance and ready for distribution, transfer and sale in the ordinary course of business, and (iii) permit Onset and/or its agents to inspect the Property at reasonable times.

4.      Bailee will not permit the Property to become subject to any liens or encumbrances by Bailee or by parties claiming through Bailee. Upon request from Lessor, Bailee agrees to cooperate with and assist Lessor in obtaining any landlord and/or mortgage waivers as Lessor deems necessary to effectuate the purposes set forth herein and in the Lease.

5.      Bailee acknowledges Onset's right to assign its rights and interests under this instrument to its underwriters and assigns, and any such assignee shall be an intended third-party beneficiary under this instrument.

6.      Bailee acknowledges that, in the event of a default by Lessee in any of its obligations or agreements to Lessor, it is hereby agreed that Lessor may exercise any and all of its available default rights and remedies including, but not limited to, the repossession and sale of the Property. If the Property is in Bailee's possession at the time an event of default by Lessee occurs, then Bailee will make the Property available to Lessor on demand.

[Signature(s) on following page]

Page 1 of 2

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Acknowledgment & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00032941
FBG_CH1_00090711

[Acknowledgement and Waiver – Carnaby Inventory IV, LLC - Signature Page]

**HORIZON GLOBAL AMERICAS INC.**

BY: _Edward James_ _____

NAME: Edward James _____

TITLE: Executive Vice President _____

\\IJTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Acknowledgement & Waiver\A&W - OFI.dotx

CONFIDENTIAL

ONSET_00032942
FBG_CH1_00090712

LANDLORD WAIVER

This Agreement between the undersigned and ONSET FINANCIAL, INC., 274 West 12300 South, Draper, Utah 84020, ("OFI") is entered into in connection with a lease or other financing transaction between OFI and its customer CARNABY INVENTORY IV, LLC and any other related and/or affiliated entities that enter into a lease with OFI (collectively, the "Lessee") and relates to the following "Premises": 30900 West 185th Street, Edgerton, Kansas 66021, which Premises are being occupied by HOPKINS MANUFACTURING CORPORATION, an affiliate of Lessee, pursuant to that certain Industrial Lease, dated February 18, 2018 (as amended from time to time, the "Lease"). The legal real estate description of the Premises is more fully described in the attached Exhibit A hereto and the "Leased Property" as detailed in the attached Exhibit B hereto.

The undersigned holds an interest in the Premises as owner and landlord and hereby agrees that: (a) OFI is the owner of the Leased Property; (b) the Leased Property may be located at the Premises and, shall at all times remain personal property and no item of the Leased Property is, or shall become, a fixture or part of the Premises notwithstanding that any of the Leased Property may become affixed or attached to the Premises; (c) OFI, or any person acting on behalf of OFI as its designated agent ("Agent"), may enter upon the Premises during the term of the Lease and remove the Leased Property in the exercise of its lessor's or other rights; (d) the undersigned will not assert any claim or lien against, or rights or interest in, the Leased Property; (e) this Agreement shall be binding on the successors and assigns of the undersigned and OFI, and shall benefit and be enforceable by OFI, the undersigned, and their successors and assigns; (f) this Agreement is not inconsistent with any agreement, contract or covenant with respect to the Premises to which undersigned is a party; and (g) the undersigned agrees that it has not and shall not, through its own actions, create, grant or cause a lien to be recorded against or otherwise encumber the Leased Property, and the undersigned shall indemnify and hold OFI harmless if it allows the Leased Property to be so encumbered.

OFI agrees to repair, at its sole cost and expense, any actual damage to the Premises directly caused by OFI's, or its agents', entry upon the Premises and/or removal of Leased Property from the Premises. Further, OFI hereby indemnifies, defends, and holds the undersigned, its members, partners, employees, and agents, harmless from and against any and all liability actually incurred by any of the foregoing related to or in connection with any physical harm to Premises (or any the undersigned's personal property located on or at the Premises) or personal injuries or death to persons related to or in connection with (i) OFI's, or its agents', entry on to the Premises, or (ii) the removal of the Leased Property from the Premises by OFI or its agents.

Dated: March __15__ , 2024

[Signature(s) on following page]

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Waivers\Landlord Waiver.dotx

CONFIDENTIAL

ONSET_00032943
FBG_CH1_00090713

[Owner/Mortgagee Waiver Signature Page – Carnaby Inventory IV, LLC]


IPVIII 185 STREET LLC                    ONSET FINANCIAL, INC.


BY:   *HOWARD HUANG*                      BY:   ~~signature~~
      ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾                 ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

NAME:   HOWARD  HUANG                      TITLE:   Lindsay Fellmeth
        ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾                   Vice President

TITLE:   Vice President
         ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Waivers\Landlord Waiver.dotx

CONFIDENTIAL

ONSET_00032944
FBG_CH1_00090714

**DEBTORS' EXHIBIT NO. 175**
**Page 489 of 1907**

EXHIBIT A

RE:  CARNABY INVENTORY IV, LLC

Physical Address:  30900 West 185th Street, Edgerton, Kansas 66021

Legal Real Estate Description:

A tract of land in the West One-Half of the Northwest Quarter of Section 35, Township 14 South, Range 22 East, Johnson County, Kansas being more particularly described as follows:

Commencing at the Northwest corner of Northwest Quarter of said Section 35; thence North 88°32'07" East, along the North line of said Northwest Quarter, a distance of 50.00 feet to the Easterly right-of-way line of Waverly Road, as now established; thence South 01°56'27" East, along said Easterly right-of-way line, a distance of 22.00 feet to the Southerly right-of-way line of 183rd Street, as now established and the Point of Beginning; thence North 88°32'07" East, along the Southerly right-of-way line of said 183rd Street, a distance of 1168.78 feet to the Westerly right-of-way line of Montrose Road, as now established; thence South 02°07'50" East, along said Westerly right-of-way line, a distance of 1437.02 feet; thence South 01°18'33" West, continuing along said Westerly right-of-way line, a distance of 101.39 feet; thence South 43°00'32" West, continuing along said Westerly right-of-way line, a distance of 58.61 feet to the Northerly right-of-way line of 187th Street, as now established; thence South 84°46'45" West, along said Northerly right-of-way line of 187th Street, a distance of 103.39 feet; thence South 88°06'09" West, continuing along said Northerly right-of-way line, a distance of 410.31 feet to a point of curvature; thence Westerly and Northwesterly, continuing along said Northerly right-of-way line and along a curve to the right having a radius of 460.00 feet and a central angle of 26°25'31", an arc distance of 212.16 feet to a point of tangency; thence North 65°28'21" West, continuing along said Northerly right-of-way line, a distance of 139.11 feet to a point of curvature; thence Northwesterly, continuing along said Northerly right-of-way line and along a curve to the left having a radius of 540.00 feet and a central angle of 14°11'55", an arc distance of 133.82 feet; thence North 72°21'51" West, continuing along said Northerly right-of-way line, a distance of 146.13 feet to the Easterly right-of-way line of said Waverly Road; thence North 12°14'45" West, along the Easterly right-of-way line of said Waverly Road, a distance of 111.80 feet; thence North 01°56'27" West, continuing along said Easterly right-of-way line, a distance of 1281.58 feet to the Point of Beginning, except any part used or dedicated for streets, roads or public rights of way.

COUNTY:     Johnson
PARCEL ID:   0461373502002001000

Owner of Record:

IPVIII 185 Street LLC
3315 N Oak Trwy
Kansas City, MO 66116

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Waivers\Landlord Waiver.dotx

CONFIDENTIAL

ONSET_00032945
FBG_CH1_00090715

EXHIBIT B

RE:  CARNABY INVENTORY IV, LLC

Leased Property: All inventory, whether now in place or hereafter acquired, as identified by specific part numbers and/or by specific material numbers, consisting of raw components, work in progress, component parts, all after-acquired raw components and finished goods, maintained, kept and/or stored at Hopkins Manufacturing Corporation located at 30900 West 185th Street, Edgerton, Kansas 66021, or any other future location(s) and all other tangible personal property purchased or paid for by OFI pursuant to one or more Lease Schedules under Master Lease Agreement No. OFI1445416 dated June 28, 2022 , including any amendments thereto, between OFI and Carnaby Inventory IV, LLC together with any and all attachments, replacements, parts, substitutions, additions, repairs, accessions and accessories incorporated therein and/or affixed thereto.

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Waivers\Landlord Waiver.dotx

CONFIDENTIAL

ONSET_00032946
FBG_CH1_00090716

LANDLORD WAIVER

This Agreement between the undersigned and ONSET FINANCIAL, INC., 274 West 12300 South, Draper, Utah 84020, ("OFI") is entered into in connection with a lease or other financing transaction between OFI and its customer CARNABY INVENTORY IV, LLC and any other related and/or affiliated entities that enter into a lease with OFI (collectively, the "Lessee") and relates to the following "Premises": 32901 West 193rd Street, Edgerton, Kansas 66021, which Premises are being occupied by HORIZON GLOBAL AMERICAS INC., an affiliate of Lessee, pursuant to that certain Industrial Lease, dated February 18, 2018 (as amended from time to time, the "Lease"). The legal real estate description of the Premises is more fully described in the attached Exhibit A hereto and the "Leased Property" as detailed in the attached Exhibit B hereto.

The undersigned holds an interest in the Premises as owner and landlord and hereby agrees that: (a) OFI is the owner of the Leased Property; (b) the Leased Property may be located at the Premises and, shall at all times remain personal property and no item of the Leased Property is, or shall become, a fixture or part of the Premises notwithstanding that any of the Leased Property may become affixed or attached to the Premises; (c) OFI, or any person acting on behalf of OFI as its designated agent ("Agent"), may enter upon the Premises during the term of the Lease and remove the Leased Property in the exercise of its lessor's or other rights; (d) the undersigned will not assert any claim or lien against, or rights or interest in, the Leased Property; (e) this Agreement shall be binding on the successors and assigns of the undersigned and OFI, and shall benefit and be enforceable by OFI, the undersigned, and their successors and assigns; (f) this Agreement is not inconsistent with any agreement, contract or covenant with respect to the Premises to which undersigned is a party; and (g) the undersigned agrees that it has not and shall not, through its own actions, create, grant or cause a lien to be recorded against or otherwise encumber the Leased Property, and the undersigned shall indemnify and hold OFI harmless if it allows the Leased Property to be so encumbered.

OFI agrees to repair, at its sole cost and expense, any actual damage to the Premises directly caused by OFI's, or its agents', entry upon the Premises and/or removal of Leased Property from the Premises. Further, OFI hereby indemnifies, defends, and holds the undersigned, its members, partners, employees, and agents, harmless from and against any and all liability actually incurred by any of the foregoing related to or in connection with any physical harm to Premises (or any the undersigned's personal property located on or at the Premises) or personal injuries or death to persons related to or in connection with (i) OFI's, or its agents', entry on to the Premises, or (ii) the removal of the Leased Property from the Premises by OFI or its agents.

Dated: March **15**, 2024

[Signature(s) on following page]

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Waivers\Landlord Waiver.dotx

CONFIDENTIAL

ONSET_00032947
FBG_CH1_00090717

DEBTORS' EXHIBIT NO. 175
Page 492 of 1907

[Owner/Mortgagee Waiver Signature Page – Carnaby Inventory IV, LLC]

IPXXII 193 STREET LLC

BY: _HOWARD HUANG_____

NAME: HOWARD HUANG_____

TITLE: Vice President_____

ONSET FINANCIAL, INC.

BY: _____

Lindsay Fellmeth
TITLE:   Vice President

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Waivers\Landlord Waiver.dotx

CONFIDENTIAL

ONSET_00032948
FBG_CH1_00090718

**DEBTORS' EXHIBIT NO. 175**
**Page 493 of 1907**

EXHIBIT A

RE: CARNABY INVENTORY IV, LLC

Physical Address: 32901 West 193rd Street, Edgerton, Kansas 66021

Legal Real Estate Description:

**Legal Description**

Real property in the City of Edgerton, County of Johnson, State of Kansas, described as follows:

A TRACT OF LAND IN THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 4, TOWNSHIP 15 SOUTH, RANGE 22 EAST, IN THE CITY OF EDGERTON, JOHNSON COUNTY, KANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION 4; THENCE SOUTH 88°27'13" WEST, ALONG THE SOUTH LINE OF SAID NORTHEAST QUARTER, A DISTANCE OF 20.00 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 88°27'13" WEST, ALONG SAID SOUTH LINE, A DISTANCE OF 1002.02 FEET TO THE EASTERLY RIGHT-OF-WAY LINE OF ESSEX STREET, AS NOW ESTABLISHED; THENCE NORTH 01°50'21" WEST, ALONG SAID EASTERLY RIGHT-OF-WAY LINE, A DISTANCE OF 635.13 FEET TO A POINT OF CURVATURE; THENCE NORTHERLY AND NORTHWESTERLY, CONTINUING ALONG THE EASTERLY RIGHT-OF-WAY LINE OF SAID ESSEX STREET AND ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 1244.75 FEET AND A CENTRAL ANGLE OF 23°59'39", AN ARC DISTANCE OF 521.27 FEET TO A POINT OF REVERSE CURVATURE; THENCE NORTHWESTERLY, NORTHERLY AND NORTHEASTERLY, CONTINUING ALONG SAID EASTERLY RIGHT-OF-WAY LINE OF ESSEX STREET AND ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 60.00 FEET AND A CENTRAL ANGLE OF 86°15'53", AN ARC DISTANCE OF 90.34 FEET TO THE SOUTHERLY RIGHT-OF-WAY LINE OF 193RD STREET, AS NOW ESTABLISHED AND A POINT OF TANGENCY; THENCE NORTH 60°25'53" EAST, ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE OF 193RD STREET, A DISTANCE OF 31.46 FEET TO A POINT OF CURVATURE; THENCE NORTHEASTERLY AND EASTERLY, CONTINUING ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE OF 193RD STREET AND ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 575.00 FEET AND A CENTRAL ANGLE OF 28°05'56", AN ARC DISTANCE OF 281.99 FEET TO A POINT OF TANGENCY; THENCE NORTH 88°31'47" EAST, CONTINUING ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE OF 193RD STREET, A DISTANCE OF 776.08 FEET TO THE WESTERLY RIGHT-OF-WAY LINE OF HOMESTEAD LANE, AS NOW ESTABLISHED; THENCE SOUTH 02°10'12" EAST, ALONG SAID WESTERLY RIGHT-OF-WAY LINE OF HOMESTEAD LANE, A DISTANCE OF 1299.62 FEET TO THE POINT OF BEGINNING.

EXCEPT ANY PART USED OR DEDICATED FOR STREETS, ROADS OR PUBLIC RIGHTS OF WAY.

COUNTY:      Johnson
PARCEL ID:   0462020401003001000

Owner of Record:

IPXXII 193 Street LLC
3315 N Oak Trwy
Kansas City, MO 64116

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Waivers\Landlord Waiver.dotx

CONFIDENTIAL

ONSET_00032949
FBG_CH1_00090719

**DEBTORS' EXHIBIT NO. 175**
**Page 494 of 1907**

EXHIBIT B

RE:  CARNABY INVENTORY IV, LLC

Leased Property:  All inventory, whether now in place or hereafter acquired, as identified by specific part numbers and/or by specific material numbers, consisting of raw components, work in progress, component parts, all after-acquired raw components and finished goods, maintained, kept and/or stored at Horizon Global Americas Inc. facility located at 32901 West 193rd Street, Edgerton, KS 66021, or any other future location(s), and all other tangible personal property purchased or paid for by OFI pursuant to one or more Lease Schedules under Master Lease Agreement No. OFI1445416 dated June 28, 2022 , including any amendments thereto, between OFI and Carnaby Inventory IV, LLC together with any and all attachments, replacements, parts, substitutions, additions, repairs, accessions and accessories incorporated therein and/or affixed thereto.

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Waivers\Landlord Waiver.dotx

CONFIDENTIAL

ONSET_00032950
FBG_CH1_00090720

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC 800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
FILINGDEPT@CSCINFO.COM

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

801 ADLAI STEVENSON DR [308107137]

SPRINGFIELD, IL 62703

US

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 05:40 PM 03/27/2025**
**U.C.C. Initial Filing No: 2025 2176391**

**Service Request No:  20251272395**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| CARNABY INVENTORY IV, LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3010 LBJ FREEWAY, SUITE 1200 | DALLAS | TX | 75234 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| P.O. BOX 2576          UCCSPREP@CSCINFO.COM | SPRINGFIELD | IL | 62708 | US |

4. COLLATERAL: This financing statement covers the following collateral

All inventory, whether now in place or hereafter acquired, including all such items as they are replenished in the ordinary course of business, as identified by specific part numbers and/or by specific material numbers, consisting of raw components, work in progress, component parts, all after-acquired raw components and all finished goods, maintained, kept and/or stored at (i) Horizon Global Americas Inc.'s facility located at Avenida Los Nogales, s/n lotes 4, 5 y 6 (lots 4, 5 and 6) Parque Industrial Villa Florida (Buildings #1 and #2), Reynosa, Tamaulipas, Mexico, (ii) Horizon Global Americas Inc.'s facility located at Industrial Drive Edificio 11, Prologis Park, S/N, Reynosa Tamaulipas, 88787 Mexico, (iii) Horizon Global Americas Inc.'s facility located at 32901 West 193rd Street, Edgerton, Kansas 66021, (iv) Hopkins Manufacturing Corporation's facility located at 30900 West 185th Street, Edgerton, Kansas 66021, (v) Hopkins Manufacturing Corporation's facility located at 428 Peyton Street, Emporia, Kansas 66801, and (vi) any other future location(s) and all other Property purchased or paid for by Lessor and leased to Debtor as Lessee under Lease Schedule No. 27 to Master Lease Agreement No. ending in -5416 together with any and all attachments, replacements, parts, substitutions, additions, enhancements, repairs, accessions and accessories thereto, and insurance, lease, sublease and other proceeds thereof.  THIS IS A "TRUE LEASE". THIS FILING IS FOR PRECAUTIONARY AND INFORMATIONAL PURPOSES

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☑ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

International Association of Commercial Administrators

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

CONFIDENTIAL

ONSET_00032951
FBG_CH1_00090721

**DEBTORS' EXHIBIT NO. 175**
**Page 496 of 1907**

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**10. DEBTOR'S NAME** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**
ONLY.  THE PARTIES DO NOT BELIEVE THIS LEASE IS SUBJECT TO UCC9.  THIS PROPERTY IS OWNED BY LESSOR AND LEASED TO LESSEE.  LESSEE HAS NO RIGHT TO SELL OR PLEDGE THE PROPERTY.

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest)

**16.** Description of real estate:

**17. MISCELLANEOUS:**

International Association of Commercial Administrator

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

CONFIDENTIAL

ONSET_00032952
FBG_CH1_00090722

# Exhibit 11-
# Filed Under Seal

FBG_CH1_00090723

# Exhibit 12

FBG_CH1_00090724

**DEBTORS' EXHIBIT NO. 175**
**Page 499 of 1907**

## CERTIFICATE OF INCUMBENCY

The undersigned, who is the Chief Financial Officer, Treasurer and Secretary of **TRICO PRODUCTS CORPORATION**, a corporation duly organized, qualified to do business in all states where it is now conducting business, and existing in good standing under the laws of the state of its incorporation (hereinafter "Corporation"), hereby certifies to **ONSET FINANCIAL, INC.** as follows:

1. That he is the duly elected, qualified and acting Secretary or other duly authorized officer of the Corporation.

2. That pursuant to the Corporation's By-Laws, as amended, the following named persons were designated and appointed to the offices indicated below, and that said persons does/do continue to hold such offices at this time, and the signatures set forth opposite the names are genuine signatures.

| NAME | TITLE | SIGNATURE |
|---|---|---|
| Stephen Graham | Chief Financial Officer, Treasurer | |
| Brian Troyer | General Counsel/Secretary | |
| Edward James | Executive Vice President | |

3. That pursuant to the Corporation's By-Laws, as amended, and certain resolutions adopted by the Corporation's Board of Directors, the persons designated to serve in the above-entitled capacity was/were given sufficient authority to act on behalf of and to bind the Corporation with respect to transactions involving the leasing of equipment and other personal property, including without limitation the sale and lease back of such equipment or other personal property, and that the execution by said persons of documents related to such transactions, including without limitation Master Lease Agreements, Schedules, Acceptance and Delivery Certificates and Master Progress Payment Agreements thereto (as applicable), constitute a legally binding and enforceable obligation of the Corporation.

4. The authority granted herein shall be deemed retroactive and any and all acts authorized thereunder performed prior to the date thereof or thereafter conferred upon any other person or persons, it being understood and agreed that the authority therein conferred shall continue in full force and effect until written notice from an authorized person revoking said authorization shall have been actually received.

5. That this Certificate shall be in full force and effect until withdrawn in writing by the Secretary or other duly authorized officer of the Corporation.

6. That pursuant to the Corporation's By-Laws, as amended, the undersigned has the power and authority to execute this certificate on behalf of the Corporation and that he has so executed this certificate on this day of _____ October, 2019.

TRICO PRODUCTS CORPORATION

Brian Troyer
General Counsel / Secretary

FBG_CH1_00090725

**DEBTORS' EXHIBIT NO. 175**
**Page 500 of 1907**

# Exhibit 13

FBG_CH1_00090726

 onset financial

December 4, 2024

Edward James
Executive Vice President
Trico Products Corporation
127 Public Square, Suite 5300
Cleveland, Ohio 44114

Re:     Lease Schedule No. 028 dated August 1, 2023, as amended by Amendment No. 1 dated December 4, 2024, (collectively, the "Schedule"), to Master Lease Agreement No. OFI1045321 dated May 9, 2018 (the "Master Lease"), between **ONSET FINANCIAL, INC.** (the "Lessor") and **TRICO PRODUCTS CORPORATION** (the "Lessee"), hereinafter referred to as the "Lease".

           Term: Thirty-six (36) Base Period Monthly Rental payments remaining
                     Thirty-five (35) Base Period Monthly Rental payments assigned

           Monthly Rental: $116,935.86

Dear Mr. James:

Notice is hereby given that effective August 17, 2023, the Lessor has assigned the Lease and sold the underlying property (the "Property") to **PLANTERS BANK** (the "Successor Lessor").

Lessee is hereby directed and by signature below agrees, to pay directly to the Successor Lessor at the address set forth below, all amounts required to be paid by the Lessee under the Lease including, but not limited to, all lease payments, casualty, loss or termination payments, accelerated payments upon default, attorney's fees and expenses of collection and enforcement of the Lease.

All amounts from time to time payable under the Lease to the Lessor shall be paid as follows:  Thirty-Six (36) consecutive Base Period Monthly Rental payments of $116,935.86 commencing on January 1, 2025 consisting of (1) Base Period Monthly Rental payment due to Lessor on January 1, 2025 followed by Thirty-Five (35) consecutive Base Period Monthly Rental payments due to the Successor Lessor at its office at 201 Northwest Railroad, Suite 110, Hammond, LA 70401 beginning on February 1, 2025 through and including the payment due on December 1, 2027.

Lessee, by signature below, acknowledges notice of the foregoing sale and assignment, and agrees that: the Lease is in full force and effect and Lessee is not in default thereunder; Lessee's obligations to make all payments under the Lease and the rights of Successor Lessor in and to such amounts, shall be as set forth in the Lease; the Lessee has received no notice of a prior transfer, assignment, hypothecation or pledge of the Lease or of the rents reserved thereunder; and the Lessee will not modify or consent to any modification of the terms of the Lease or enter into any sublease of the Property or assignment of the Lease without the prior written consent of the Successor Lessor; the Successor Lessor shall not have any affirmative obligation under the Lease except to take no action to impair Lessee's quiet enjoyment and use of the Property so long as the Lessee is not in default under the terms of the Lease.

Sincerely,

**ONSET FINANCIAL, INC.**

BY:     _____
           Lindsay Fellmeth
TITLE:  Vice President

[Signature(s) on following page]

Page 1 of 2

\\UTSB-VS-WP300\OSFI\Lease\Lease Operations\Master Library\Underwriters\Planters Bank\Notice of Assignment\OFI.docx

CONFIDENTIAL

ONSET_00034831
FBG_CH1_00090727

[Notice of Assignment Signature Page]

The foregoing is hereby acknowledged and agreed to by the undersigned:

**TRICO PRODUCTS CORPORATION**

BY: _____

TITLE: Executive Vice President

DATE: December 20, 2024

Page 2 of 2

\\UTS\-VS-WEB01\DSP3.Local\L.case Operations\Master Library\Underwriters\Planters Bank\Notice of Assignment\OPI.doc\

CONFIDENTIAL

ONSET_00034832
FBG_CH1_00090728

**DEBTORS' EXHIBIT NO. 175**
**Page 503 of 1907**

# Exhibit 14

FBG_CH1_00090729

**DEBTORS' EXHIBIT NO. 175**
**Page 504 of 1907**



## GUARANTY AGREEMENT

This Guaranty Agreement (the "Guaranty") is made and effective July 21, 2020.

BETWEEN:   **ONSET FINANCIAL, INC.** (the "Lessor"), a corporation organized and existing under the laws of the   state of Utah, with its head office located at: 274 West 12300 South, Draper, Utah 84020

AND:   **AIRTEX PRODUCTS, S.A.** (the "Guarantor"), a company organized and existing under the laws of the jurisdiction of its organization, with its head office located at: Calle Osca, 2, Polingono Campus, Nave 5, 50197 Zaragoza, Spain.

## RECITALS

WHEREAS, This Guaranty is a continuing guaranty given by the Guarantor to Lessor; and

WHEREAS, Lessor, **TRICO PRODUCTS CORPORATION**, and one or more co-Lessees (collectively, the "Lessee") have entered or intend to enter into one or more Lease Schedules (the "Schedule" or "Schedules") which incorporate the terms and conditions of Master Lease Agreement No. OFI1045321 dated May 9, 2018, including all amendments or addendums now or hereafter executed in connection therewith (collectively, the "Master Lease"). Each of the Schedules constitutes a separate lease between Lessor and Lessee and shall be referred to herein as the "Lease" or the "Leases"; and

WHEREAS, Lessor will not enter into any Leases with the Lessee unless, Guarantor unconditionally guarantees pursuant hereto the payment and performance of all of Lessee's obligations under each Lease, whether entered into on, or before, or after the date of this Guaranty; and

WHEREAS, Guarantor for their own interests, wish to induce Lessor to enter into the Leases; and

WHEREAS, Guarantor will receive reasonably equivalent value for this Guaranty; and

WHEREAS, Guarantor is willing to unconditionally guarantee the performance of all of Lessee's obligations under each Lease pursuant hereto.

NOW, THEREFORE, in consideration of the foregoing, the parties agree as follows:

### 1.   THE GUARANTY

Guarantor hereby irrevocably, unconditionally guarantees, without offset or deduction, jointly and severally, the full, complete and prompt payment and proper performance by Lessee of all obligations now or hereafter due to Lessor from Lessee, including pursuant to the Leases, including without limitation the payment of rents and all amounts required or provided for under the Leases resulting from Lessee's breach or non-performance thereof. Guarantor agrees that this is an irrevocable, continuing guaranty and that Guarantor shall perform its obligations hereunder notwithstanding any amendment, waiver, renewal, continuation, compromise, acceleration or other modification of any of the terms or Lessee's obligations under the Leases. This Guaranty shall apply to each Schedule that Lessee executes in connection with any Master Lease, and Lessor shall not be required to notify Guarantor of Lessee's execution of each such Schedule before, at the time of, or after it is executed and delivered.

### 2.   JOINT AND SEVERAL OBLIGATIONS

Guarantor's obligations hereunder are separate and independent of Lessee's obligations under any Lease. If an Event of Default shall occur and be continuing under any Lease, Lessor may pursue its remedies against Lessee and a separate action or actions may be brought and prosecuted against Guarantor whether or not action is brought against Lessee or whether or   not Lessee be joined in any such action or actions.

### 3.   REPRESENTATIONS AND WARRANTIES

Guarantor hereby represents and warrants that this Guaranty is a binding obligation of the Guarantor and is enforceable against Guarantor in accordance with its terms, and that the execution, delivery and performance of this Guaranty will not result in a breach of any agreement to which Guarantor is a party.

### 4.   WAIVERS

The Guarantor waives any right to require Lessor: to (a) proceed first or otherwise against Lessee; (b) proceed against or exhaust

Page 1 of 3

CONFIDENTIAL

ONSET_00034756
FBG_CH1_00090730

**DEBTORS' EXHIBIT NO. 175**
**Page 505 of 1907**

any security it may hold; or (c) pursue any other remedy in Lessor's power whatsoever. Guarantor waives all presentments, demands for performance, notices of default, notices of protest, notices of dishonor and notices of acceptances of this Guaranty. Guarantor also waives any defense or disability available to Lessee, which might save or release it from liability including, without limitation, defect in or unenforceability of the Lease. No delay on the part of Lessor in exercising any rights under this Guaranty or failure to exercise the same shall operate as a waiver of such rights. No modification or waiver of the provisions of this Guaranty shall be effective unless in writing signed by Lessor, and no such waiver shall be applicable and effective except in the specific instance for which it is given. Guarantor waives and agrees not to exercise any rights which may be acquired by way of subrogation under this Guaranty, or any of the Leases, resulting from Guarantor's performance by any payment made hereunder or otherwise, including without limitation, the right to take or receive from Lessee, directly or indirectly, in cash or other assets or by setoff or in any other manner, payment or security on account of such subrogation rights. Guarantor assumes all responsibility for keeping informed of Lessee's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment or nonperformance of the obligations and the nature, scope, and extent of the risks that Guarantor assumes and incurs under this Guaranty and agrees that Lessor shall have no duty to advise Guarantor of information known to it regarding those circumstances or risks.

5.   MODIFICATIONS
Without causing a release of Guarantor from its obligations hereunder, and in accordance with the provisions of the Master Lease, Lessor, without notifying Guarantor, is authorized to (a) renew, extend, accelerate or otherwise change the payment schedule or other terms of any Lease; (b) accept partial payments from the Lessee; (c) take and apply any security (if applicable) and exercise any remedy against the Lessee; (d) amend, substitute, waive, subordinate or release any property or additional security or any obligations covered under any Lease; (e) settle, release, compound, compromise, collect or otherwise liquidate the obligations covered under any Lease; and (f) release Lessee from any obligations under any Lease.

6.   ASSIGNMENT
Guarantor agrees that Lessor may assign without notice all or a part of its rights hereunder and Guarantor agrees, in such case, that any such assignee shall have the rights of Lessor hereunder and further agrees to perform any such assigned obligations for the benefit of any such assignee.

7.   GOVERNING LAW
This Guaranty and the rights and obligations of Lessor and of Guarantor hereunder shall be governed by and construed in accordance with the laws of the State of Utah and shall be binding upon Guarantor, its successors and assigns and shall inure to the benefit of and be enforceable by Lessor, its successors and assigns, including any successor assignees. Guarantor submits itself to the exclusive jurisdiction of the state

or federal courts situated in Salt Lake County, State of Utah in connection with any or other proceeding brought by any party to enforce or construe this Guaranty or any matters related to or arising out of this Guaranty. This Guaranty was executed in the State of Utah by virtue of Lessor having countersigned it in the State of Utah. Guarantor agrees to immediately reimburse Lessor for all costs and expenses, including reasonable attorneys' fees, incurred by Lessor in connection with the enforcement of this Guaranty or any dispute, lawsuit or other legal or arbitration/mediation proceeding to which this Guaranty gives rise, including without limitation, actions in tort, whether incurred at the trial or appellate level, before or after judgement, and including any of the foregoing incurred in connection with any bankruptcy or insolvency proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Guarantor or any other person or entity) relating to the Lessee or any other person or entity.

8.   PROCESS AGENT
Guarantor hereby irrevocably appoints First Brands Group, LLC ("Process Agent") with an office on the date hereof at 127 Public Square, Suite 5110, Cleveland, Ohio 44114, as its agent to receive on behalf of the Guarantor service of copies of the summons and complaint and any other process which may be served in any such action or proceeding. Guarantor further agrees that, until all obligations owing under the Leases have been paid in full, it will maintain Process Agent as its duly appointed agent for the service of such process or summons   in Ohio (State where Process Agent is located). Such service may be made by mailing or delivering a copy of such process to Guarantor in care of the Process Agent at the Process Agent's above address.

Guarantor shall pay all fees, charges, costs, and expenses necessary to retain, in good standing, Process Agent as its agent for the purposes described in this Section. In the event Guarantor fails to pay any fee, charge, cost, or expense necessary to retain, in good standing, Process Agent as Guarantor's agent for the purposes described in this Section, Lessor is hereby authorized to pay to Process Agent such fees, charges, costs, or expenses, and Guarantor shall immediately reimburse Lessor for all such amounts paid to Process Agent.

9.   WAIVER OF TRIAL BY JURY
LESSOR AND GUARANTOR HEREBY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THE LEASE, THE PROPERTY, THIS GUARANTY, OR THE CONDUCT OF THE RELATIONSHIP BETWEEN LESSOR AND GUARANTOR.

10.  INVALIDITY
If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty shall be construed as though it did not contain that provision, and the rights and liabilities of the parties to this Guaranty shall be construed and enforced accordingly.

[Signatures on following page]

ACTIVE/WFSH/HDH/Lead Lessor Operations Master Library Guaranty (Annually Aggregated - Corporate).doc

CONFIDENTIAL

ONSET_00034757
FBG_CH1_00090731

[AIRTEX PRODUCTS, S.A. Guaranty Agreement Signature Page]

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered to Lessor as of the month, day and year first above written.

LESSOR:                                   GUARANTOR:

**ONSET FINANCIAL, INC.**                 **AIRTEX PRODUCTS, S.A.**

BY:                                       BY:

_Cathy Lawrence_
Cathy Lawrence
TITLE:   Vice President                   TITLE:   Managing Director

CONFIDENTIAL

ONSET_00034758
FBG_CH1_00090732

DEBTORS' EXHIBIT NO. 175
Page 507 of 1907

# Exhibit 15

FBG_CH1_00090733

**DEBTORS' EXHIBIT NO. 175**
**Page 508 of 1907**



## GUARANTY AGREEMENT

This Guaranty Agreement (the "Guaranty") is made and effective July 14, 2021.

BETWEEN:   **ONSET FINANCIAL, INC.** (the "Lessor"), a corporation organized and existing under the laws of the state of Utah, with its head office located at: 274 West 12300 South, Draper, Utah 84020

AND:   **BRAKE PARTS INC INDIA LLC** (the "Guarantor"), a limited liability company organized and existing under the laws of the state of Delaware, with its head office located at: 4400 Prime Parkway, McHenry, Illinois, 60050.

### RECITALS

WHEREAS, This Guaranty is a continuing guaranty given by the Guarantor to Lessor; and

WHEREAS, Lessor and **TRICO PRODUCTS CORPORATION**, and one or more co-Lessees (collectively, the "Lessee") have entered or intend to enter into one or more Lease Schedules (the "Schedule" or "Schedules") which incorporate the terms and conditions of Master Lease Agreement No. OFI1045321 dated May 9, 2018, including all amendments or addendums now or hereafter executed in connection therewith (collectively, the "Master Lease"). Each of the Schedules constitutes a separate lease between Lessor and Lessee and shall be referred to herein as the "Lease" or the "Leases"; and

WHEREAS, Lessor will not enter into any Leases with the Lessee unless, Guarantor unconditionally guarantees pursuant hereto the payment and performance of all of Lessee's obligations under each Lease, whether entered into on, or before, or after the date of this Guaranty; and

WHEREAS, Guarantor for their own interests, wish to induce Lessor to enter into the Leases; and

WHEREAS, Guarantor will receive reasonably equivalent value for this Guaranty; and

WHEREAS, Guarantor is willing to unconditionally guarantee the performance of all of Lessee's obligations under each Lease pursuant hereto.

NOW, THEREFORE, in consideration of the foregoing, the parties agree as follows:

### 1.   THE GUARANTY
Guarantor hereby irrevocably, unconditionally guarantees, without offset or deduction, jointly and severally, the full, complete and prompt payment and proper performance by Lessee of all obligations now or hereafter due to Lessor from Lessee, including pursuant to the Leases, including without limitation the payment of rents and all amounts required or provided for under the Leases resulting from Lessee's breach or non-performance thereof. Guarantor agrees that this is an irrevocable, continuing guaranty and that Guarantor shall perform its obligations hereunder notwithstanding any amendment, waiver, renewal, continuation, compromise, acceleration or other modification of any of the terms or Lessee's obligations under the Leases. This Guaranty shall apply to each Schedule that Lessee executes in connection with any Master Lease, and Lessor shall not be required to notify Guarantor of Lessee's execution of each such Schedule before, at the time of, or after it is executed and delivered.

### 2.   JOINT AND SEVERAL OBLIGATIONS
Guarantor's obligations hereunder are separate and independent of Lessee's obligations under any Lease. If an Event of Default shall occur and be continuing under any Lease, Lessor may pursue its remedies against Lessee and a separate action or actions may be brought and prosecuted against Guarantor whether or not action is brought against Lessee or whether or not Lessee be joined in any such action or actions.

### 3.   REPRESENTATIONS AND WARRANTIES
Guarantor hereby represents and warrants that this Guaranty is a binding obligation of the Guarantor and is enforceable against Guarantor in accordance with its terms, and that the execution, delivery and performance of this Guaranty will not result in a breach of any agreement to which Guarantor is a party.

### 4.   WAIVERS
The Guarantor waives any right to require Lessor: to (a) proceed first or otherwise against Lessee; (b) proceed against or exhaust any security it may hold; or (c) pursue any other remedy in

Page 1 of 3

CONFIDENTIAL

ONSET_00034759
FBG_CH1_00090734

Lessor's power whatsoever. Guarantor waives all presentments, demands for performance, notices of default, notices of protest, notices of dishonor and notices of acceptances of this Guaranty. Guarantor also waives any defense or disability available to Lessee, which might save or release it from liability including, without limitation, defect in or unenforceability of the Lease. No delay on the part of Lessor in exercising any rights under this Guaranty or failure to exercise the same shall operate as a waiver of such rights. No modification or waiver of the provisions of this Guaranty shall be effective unless in writing signed by Lessor, and no such waiver shall be applicable and effective except in the specific instance for which it is given. Guarantor waives and agrees not to exercise any rights which may be acquired by way of subrogation under this Guaranty, or any of the Leases, resulting from Guarantor's performance by any payment made hereunder or otherwise, including without limitation, the right to take or receive from Lessee, directly or indirectly, in cash or other assets or by setoff or in any other manner, payment or security on account of such subrogation rights. Guarantor assumes all responsibility for keeping informed of Lessee's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment or nonperformance of the obligations and the nature, scope, and extent of the risks that Guarantor assumes and incurs under this Guaranty and agrees that Lessor shall have no duty to advise Guarantor of information known to it regarding those circumstances or risks.

## 5.   MODIFICATIONS

Without causing a release of Guarantor from its obligations hereunder, and in accordance with the provisions of the Master Lease, Lessor, without notifying Guarantor, is authorized to (a) renew, extend, accelerate or otherwise change the payment schedule or other terms of any Lease; (b) accept partial payments from the Lessee; (c) take and apply any security (if applicable) and exercise any remedy against the Lessee; (d) amend, substitute, waive, subordinate or release any property or additional security or any obligations covered under any Lease; (e) settle, release, compound, compromise, collect or otherwise liquidate the obligations covered under any Lease; and (f) release Lessee from any obligations under any Lease.

## 6.   ASSIGNMENT

Guarantor agrees that Lessor may assign without notice all or a part of its rights hereunder and Guarantor agrees, in such case,

that any such assignee shall have the rights of Lessor hereunder and further agrees to perform any such assigned obligations for the benefit of any such assignee.

## 7.   GOVERNING LAW

This Guaranty and the rights and obligations of Lessor and of Guarantor hereunder shall be governed by and construed in accordance with the laws of the State of Utah and shall be binding upon Guarantor, its successors and assigns and shall inure to the benefit of and be enforceable by Lessor, its successors and assigns, including any successor assignees. Guarantor submits itself to the exclusive jurisdiction of the state or federal courts situated in Salt Lake County, State of Utah in connection with any or other proceeding brought by any party to enforce or construe this Guaranty or any matters related to or arising out of this Guaranty. This Guaranty was executed in the State of Utah by virtue of Lessor having countersigned it in the State of Utah. Guarantor agrees to immediately reimburse Lessor for all costs and expenses, including reasonable attorneys' fees, incurred by Lessor in connection with the enforcement of this Guaranty or any dispute, lawsuit or other legal or arbitration/mediation proceeding to which this Guaranty gives rise, including without limitation, actions in tort, whether incurred at the trial or appellate level, before or after judgement, and including any of the foregoing incurred in connection with any bankruptcy or insolvency proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Guarantor or any other person or entity) relating to the Lessee or any other person or entity.

## 8.   WAIVER OF TRIAL BY JURY

LESSOR AND GUARANTOR HEREBY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THE LEASE, THE PROPERTY, THIS GUARANTY, OR THE CONDUCT OF THE RELATIONSHIP BETWEEN LESSOR AND GUARANTOR.

## 9.   INVALIDITY

If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty shall be construed as though it did not contain that provision, and the rights and liabilities of the parties to this Guaranty shall be construed and enforced accordingly.

[Signatures on following page]

CONFIDENTIAL

ONSET_00034760
FBG_CH1_00090735

**DEBTORS' EXHIBIT NO. 175**
**Page 510 of 1907**

[**BRAKE PARTS INC INDIA LLC** Guaranty Agreement Signature Page]

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered to Lessor as of the month, day and year first above written.

LESSOR:

**ONSET FINANCIAL, INC.**

BY:   _Kristina Allen_

Kristina Allen

TITLE:   Executive Vice President

GUARANTOR:

**BRAKE PARTS INC INDIA LLC**

BY:   _____

TITLE:   _____

Page 3 of 3

CONFIDENTIAL

ONSET_00034761

FBG_CH1_00090736

# Exhibit 16

FBG_CH1_00090737



**GUARANTY AGREEMENT**

This Guaranty Agreement (the "Guaranty") is made and effective July 14, 2021.

BETWEEN:  **ONSET FINANCIAL, INC.** (the "Lessor"), a corporation organized and existing under the laws of the state of Utah, with its head office located at: 274 West 12300 South, Draper, Utah 84020

AND:  **BRAKE PARTS INDIA PRIVATE LIMITED** (the "Guarantor"), a limited liability company organized and existing under the laws of its jurisdiction, with its head office located at: Village Rewli P.O. Murthal, Sonepat, Haryana, 131027 India

RECITALS

WHEREAS, This Guaranty is a continuing guaranty given by the Guarantor to Lessor; and

WHEREAS, Lessor and **TRICO PRODUCTS CORPORATION**, and one or more co-Lessees (collectively, the "Lessee") have entered or intend to enter into one or more Lease Schedules (the "Schedule" or "Schedules") which incorporate the terms and conditions of Master Lease Agreement No. OFI1045321 dated May 9, 2018, including all amendments or addendums now or hereafter executed in connection therewith (collectively, the "Master Lease"). Each of the Schedules constitutes a separate lease between Lessor and Lessee and shall be referred to herein as the "Lease" or the "Leases"; and

WHEREAS, Lessor will not enter into any Leases with the Lessee unless, Guarantor unconditionally guarantees pursuant hereto the payment and performance of all of Lessee's obligations under each Lease, whether entered into on, or before, or after the date of this Guaranty; and

WHEREAS, Guarantor for their own interests, wish to induce Lessor to enter into the Leases; and

WHEREAS, Guarantor will receive reasonably equivalent value for this Guaranty; and

WHEREAS, Guarantor is willing to unconditionally guarantee the performance of all of Lessee's obligations under each Lease pursuant hereto.

NOW, THEREFORE, in consideration of the foregoing, the parties agree as follows:

1.  THE GUARANTY
Guarantor hereby irrevocably, unconditionally guarantees, without offset or deduction, jointly and severally, the full, complete and prompt payment and proper performance by Lessee of all obligations now or hereafter due to Lessor from Lessee, including pursuant to the Leases, including without limitation the payment of rents and all amounts required or provided for under the Leases resulting from Lessee's breach or non-performance thereof. Guarantor agrees that this is an irrevocable, continuing guaranty and that Guarantor shall perform its obligations hereunder notwithstanding any amendment, waiver, renewal, continuation, compromise, acceleration or other modification of any of the terms or Lessee's obligations under the Leases. This Guaranty shall apply to each Schedule that Lessee executes in connection with any Master Lease, and Lessor shall not be required to notify Guarantor of Lessee's execution of each such Schedule before, at the time of, or after it is executed and delivered.

2.  JOINT AND SEVERAL OBLIGATIONS
Guarantor's obligations hereunder are separate and independent of Lessee's obligations under any Lease. If an Event of Default shall occur and be continuing under any Lease, Lessor may pursue its remedies against Lessee and a separate action or actions may be brought and prosecuted against Guarantor whether or not action is brought against Lessee or whether or not Lessee be joined in any such action or actions.

3.  REPRESENTATIONS AND WARRANTIES
Guarantor hereby represents and warrants that this Guaranty is a binding obligation of the Guarantor and is enforceable against Guarantor in accordance with its terms, and that the execution, delivery and performance of this Guaranty will not result in a breach of any agreement to which Guarantor is a party.

O:\TRS-VS-WIN01\ONSET\Lease\Lease Operations\Master Library\Onsetdoc\Guaranty Agreement - Corporate.docx

CONFIDENTIAL

ONSET_00034762
FBG_CH1_00090738

## 4. WAIVERS

The Guarantor waives any right to require Lessor: to (a) proceed first or otherwise against Lessee; (b) proceed against or exhaust any security it may hold; or (c) pursue any other remedy in Lessor's power whatsoever. Guarantor waives all presentments, demands for performance, notices of default, notices of protest, notices of dishonor and notices of acceptances of this Guaranty. Guarantor also waives any defense or disability available to Lessee, which might save or release it from liability including, without limitation, defect in or unenforceability of the Lease. No delay on the part of Lessor in exercising any rights under this Guaranty or failure to exercise the same shall operate as a waiver of such rights. No modification or waiver of the provisions of this Guaranty shall be effective unless in writing signed by Lessor, and no such waiver shall be applicable and effective except in the specific instance for which it is given. Guarantor waives and agrees not to exercise any rights which may be acquired by way of subrogation under this Guaranty, or any of the Leases, resulting from Guarantor's performance by any payment made hereunder or otherwise, including without limitation, the right to take or receive from Lessee, directly or indirectly, in cash or other assets or by setoff or in any other manner, payment or security on account of such subrogation rights. Guarantor assumes all responsibility for keeping informed of Lessee's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment or nonperformance of the obligations and the nature, scope, and extent of the risks that Guarantor assumes and incurs under this Guaranty and agrees that Lessor shall have no duty to advise Guarantor of information known to it regarding those circumstances or risks.

## 5. MODIFICATIONS

Without causing a release of Guarantor from its obligations hereunder, and in accordance with the provisions of the Master Lease, Lessor, without notifying Guarantor, is authorized to (a) renew, extend, accelerate or otherwise change the payment schedule or other terms of any Lease; (b) accept partial payments from the Lessee; (c) take and apply any security (if applicable) and exercise any remedy against the Lessee; (d) amend, substitute, waive, subordinate or release any property or additional security or any obligations covered under any Lease; (e) settle, release, compound, compromise, collect or otherwise liquidate the obligations covered under any Lease; and (f) release Lessee from any obligations under any Lease.

## 6. ASSIGNMENT

Guarantor agrees that Lessor may assign without notice all or a part of its rights hereunder and Guarantor agrees, in such case, that any such assignee shall have the rights of Lessor hereunder and further agrees to perform any such assigned obligations for the benefit of any such assignee.

## 7. GOVERNING LAW

This Guaranty and the rights and obligations of Lessor and of Guarantor hereunder shall be governed by and construed in accordance with the laws of the State of Utah and shall be binding upon Guarantor, its successors and assigns and shall inure to the benefit of and be enforceable by Lessor, its successors and assigns, including any successor assignees.

Guarantor submits itself to the exclusive jurisdiction of the state or federal courts situated in Salt Lake County, State of Utah in connection with any or other proceeding brought by any party to enforce or construe this Guaranty or any matters related to or arising out of this Guaranty. This Guaranty was executed in the State of Utah by virtue of Lessor having countersigned it in the State of Utah. Guarantor agrees to immediately reimburse Lessor for all costs and expenses, including reasonable attorneys' fees, incurred by Lessor in connection with the enforcement of this Guaranty or any dispute, lawsuit or other legal or arbitration/mediation proceeding to which this Guaranty gives rise, including without limitation, actions in tort, whether incurred at the trial or appellate level, before or after judgement, and including any of the foregoing incurred in connection with any bankruptcy or insolvency proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Guarantor or any other person or entity) relating to the Lessee or any other person or entity.

## 8. PROCESS AGENT

Guarantor hereby irrevocably appoints **BRAKE PARTS INC INDIA LLC** ("Process Agent") with an office on the date hereof at **4400 Prime Parkway, McHenry, Illinois, 60050**, as its agent to receive on behalf of the Guarantor service of copies of the summons and complaint and any other process which may be served in any such action or proceeding. Guarantor further agrees that, until all obligations owing under the Leases have been paid in full, it will maintain Process Agent as its duly appointed agent for the service of such process or summons in Illinois (State where Process Agent is located). Such service may be made by mailing or delivering a copy of such process to Guarantor in care of the Process Agent at the Process Agent's above address.

Guarantor shall pay all fees, charges, costs, and expenses necessary to retain, in good standing, Process Agent as its agent for the purposes described in this Section. In the event Guarantor fails to pay any fee, charge, cost, or expense necessary to retain, in good standing, Process Agent as Guarantor's agent for the purposes described in this Section, Lessor is hereby authorized to pay to Process Agent such fees, charges, costs, or expenses, and Guarantor shall immediately reimburse Lessor for all such amounts paid to Process Agent.

## 9. WAIVER OF TRIAL BY JURY

LESSOR AND GUARANTOR HEREBY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THE LEASE, THE PROPERTY, THIS GUARANTY, OR THE CONDUCT OF THE RELATIONSHIP BETWEEN LESSOR AND GUARANTOR.

## 10. INVALIDITY

If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty shall be construed as though it did not contain that provision, and the rights and liabilities of the parties to this Guaranty shall be construed and enforced accordingly.

[Signatures on following page]

S:\TRI-VS-WEST\CONT\Lease\Lease Operations\Master Library\Guaranty\Guaranty Agreement - Corporate.doc

CONFIDENTIAL

ONSET_00034763
FBG_CH1_00090739

**DEBTORS' EXHIBIT NO. 175**
**Page 514 of 1907**

[BRAKE PARTS INDIA PRIVATE LIMITED Guaranty Agreement Signature Page]

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered to Lessor as of the month, day and year first above written.

LESSOR:                                              GUARANTOR:

ONSET FINANCIAL, INC.                                BRAKE PARTS INDIA PRIVATE LIMITED

BY: _____                          BY: _____
       Kristina Allen
TITLE:   Executive Vice President                    TITLE: _____

Page 3 of 3

CONFIDENTIAL

ONSET_00034764
FBG_CH1_00090740

DEBTORS' EXHIBIT NO. 175
Page 515 of 1907

# Exhibit 17

FBG_CH1_00090741

**DEBTORS' EXHIBIT NO. 175**
**Page 516 of 1907**



## GUARANTY AGREEMENT

This Guaranty Agreement (the "Guaranty") is made and effective July 21, 2020.

BETWEEN:    **ONSET FINANCIAL, INC.** (the "Lessor"), a corporation organized and existing under the laws of the state of Utah, with its head office located at: 274 West 12300 South, Draper, Utah 84020

AND:    **FIRST BRANDS GROUP INTERMEDIATE, LLC** (the "Guarantor"), a limited liability company organized and existing under the laws of the state of Delaware, with its head office located at: 127 Public Square, Suite 5110, Cleveland, Ohio 44114

### RECITALS

WHEREAS, This Guaranty is a continuing guaranty given by the Guarantor to Lessor; and

WHEREAS, Lessor and **TRICO PRODUCTS CORPORATION**, and one or more co-Lessees (collectively, the "Lessee") have entered or intend to enter into one or more Lease Schedules (the "Schedule" or "Schedules") which incorporate the terms and conditions of Master Lease Agreement No. OFI1045321 dated May 9, 2018, including all amendments or addendums now or hereafter executed in connection therewith (collectively, the "Master Lease"). Each of the Schedules constitutes a separate lease between Lessor and Lessee and shall be referred to herein as the "Lease" or the "Leases"; and

WHEREAS, Lessor will not enter into any Leases with the Lessee unless, Guarantor unconditionally guarantees pursuant hereto the payment and performance of all of Lessee's obligations under each Lease, whether entered into on, or before, or after the date of this Guaranty; and

WHEREAS, Guarantor for their own interests, wish to induce Lessor to enter into the Leases; and

WHEREAS, Guarantor will receive reasonably equivalent value for this Guaranty; and

WHEREAS, Guarantor is willing to unconditionally guarantee the performance of all of Lessee's obligations under each Lease pursuant hereto.

NOW, THEREFORE, in consideration of the foregoing, the parties agree as follows:

### 1. THE GUARANTY

Guarantor hereby irrevocably, unconditionally guarantees, without offset or deduction, jointly and severally, the full, complete and prompt payment and proper performance by Lessee of all obligations now or hereafter due to Lessor from Lessee, including pursuant to the Leases, including without limitation the payment of rents and all amounts required or provided for under the Leases resulting from Lessee's breach or non-performance thereof. Guarantor agrees that this is an irrevocable, continuing guaranty and that Guarantor shall perform its obligations hereunder notwithstanding any amendment, waiver, renewal, continuation, compromise, acceleration or other modification of any of the terms or Lessee's obligations under the Leases. This Guaranty shall apply to each Schedule that Lessee executes in connection with any Master Lease, and Lessor shall not be required to notify Guarantor of Lessee's execution of each such Schedule before, at the time of, or after it is executed and delivered.

### 2. JOINT AND SEVERAL OBLIGATIONS

Guarantor's obligations hereunder are separate and independent of Lessee's obligations under any Lease. If an Event of Default shall occur and be continuing under any Lease, Lessor may pursue its remedies against Lessee and a separate action or actions may be brought and prosecuted against Guarantor whether or not action is brought against Lessee or whether or not Lessee be joined in any such action or actions.

### 3. REPRESENTATIONS AND WARRANTIES

Guarantor hereby represents and warrants that this Guaranty is a binding obligation of the Guarantor and is enforceable against Guarantor in accordance with its terms, and that the execution, delivery and performance of this Guaranty will not result in a breach of any agreement to which Guarantor is a party.

### 4. WAIVERS

The Guarantor waives any right to require Lessor: to (a) proceed first or otherwise against Lessee; (b) proceed against or exhaust

Page 1 of 3

CONFIDENTIAL

ONSET_00034765
FBG_CH1_00090742

any security it may hold; or (e) pursue any other remedy in Lessor's power whatsoever. Guarantor waives all presentments, demands for performance, notices of default, notices of protest, notices of dishonor and notices of acceptances of this Guaranty. Guarantor also waives any defense or disability available to Lessee, which might save or release it from liability including, without limitation, defect in or unenforceability of the Lease. No delay on the part of Lessor in exercising any rights under this Guaranty or failure to exercise the same shall operate as a waiver of such rights. No modification or waiver of the provisions of this Guaranty shall be effective unless in writing signed by Lessor, and no such waiver shall be applicable and effective except in the specific instance for which it is given. Guarantor waives and agrees not to exercise any rights which may be acquired by way of subrogation under this Guaranty, or any of the Leases, resulting from Guarantor's performance by any payment made hereunder or otherwise, including without limitation, the right to take or receive from Lessee, directly or indirectly, in cash or other assets or by setoff or in any other manner, payment or security on account of such subrogation rights. Guarantor assumes all responsibility for keeping informed of Lessee's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment or nonperformance of the obligations and the nature, scope, and extent of the risks that Guarantor assumes and incurs under this Guaranty and agrees that Lessor shall have no duty to advise Guarantor of information known to it regarding those circumstances or risks.

### 5. MODIFICATIONS

Without causing a release of Guarantor from its obligations hereunder, and in accordance with the provisions of the Master Lease, Lessor, without notifying Guarantor, is authorized to (a) renew, extend, accelerate or otherwise change the payment schedule or other terms of any Lease; (b) accept partial payments from the Lessee; (c) take and apply any security (if applicable) and exercise any remedy against the Lessee; (d) amend, substitute, waive, subordinate or release any property or additional security or any obligations covered under any Lease; (e) settle, release, compound, compromise, collect or otherwise liquidate the obligations covered under any Lease; and (f) release Lessee from any obligations under any Lease.

### 6. ASSIGNMENT

Guarantor agrees that Lessor may assign without notice all or a part of its rights hereunder and Guarantor agrees, in such case, that any such assignee shall have the rights of Lessor hereunder and further agrees to perform any such assigned obligations for the benefit of any such assignee.

### 7. GOVERNING LAW

This Guaranty and the rights and obligations of Lessor and of Guarantor hereunder shall be governed by and construed in accordance with the laws of the State of Utah and shall be binding upon Guarantor, its successors and assigns and shall inure to the benefit of and be enforceable by Lessor, its successors and assigns, including any successor assignees. Guarantor submits itself to the exclusive jurisdiction of the state or federal courts situated in Salt Lake County, State of Utah in connection with any or other proceeding brought by any party to enforce or construe this Guaranty or any matters related to or arising out of this Guaranty. This Guaranty was executed in the State of Utah by virtue of Lessor having countersigned it in the State of Utah. Guarantor agrees to immediately reimburse Lessor for all costs and expenses, including reasonable attorneys' fees, incurred by Lessor in connection with the enforcement of this Guaranty or any dispute, lawsuit or other legal or arbitration/mediation proceeding to which this Guaranty gives rise, including without limitation, actions in tort, whether incurred at the trial or appellate level, before or after judgement, and including any of the foregoing incurred in connection with any bankruptcy or insolvency proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Guarantor or any other person or entity) relating to the Lessee or any other person or entity.

### 8. WAIVER OF TRIAL BY JURY

LESSOR AND GUARANTOR HEREBY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THE LEASE, THE PROPERTY, THIS GUARANTY, OR THE CONDUCT OF THE RELATIONSHIP BETWEEN LESSOR AND GUARANTOR.

### 9. INVALIDITY

If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty shall be construed as though it did not contain that provision, and the rights and liabilities of the parties to this Guaranty shall be construed and enforced accordingly.

[Signatures on following page]

CONFIDENTIAL

ONSET_00034766
FBG_CH1_00090743

**DEBTORS' EXHIBIT NO. 175**
**Page 518 of 1907**

[FIRST BRANDS GROUP INTERMEDIATE, LLC Guaranty Agreement Signature Page]

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered to Lessor as of the month, day and year first above written.

LESSOR:                                         GUARANTOR:

ONSET FINANCIAL, INC.                           FIRST BRANDS GROUP INTERMEDIATE, LLC

BY:                                             BY:

_Cathy Lawrence_                                _[signature]_

TITLE:   Cathy Lawrence                         TITLE:   Executive Vice President
         Vice President

Page 3 of 3

CONFIDENTIAL

ONSET_00034767
FBG_CH1_00090744

# Exhibit 18

FBG_CH1_00090745



## GUARANTY AGREEMENT

This Guaranty Agreement (the "Guaranty") is made and effective February 19, 2020.

BETWEEN:    **ONSET FINANCIAL, INC.** (the "Lessor"), a corporation organized and existing under the laws of the state of Utah, with its head office located at: 274 West 12300 South, Draper, Utah 84020

AND:    **TALLERES MECANICOS MONTSERRAT SA DE CV** (the "Guarantor"), a company organized and existing under the laws of the jurisdiction of its organization, with its head office located at: REFORMA SUR 27 5 PANZACOLA, PAPALOTLA DE XICOHTENCATL TLAXCALA 90796.

### RECITALS

WHEREAS, This Guaranty is a continuing guaranty given by the Guarantor to Lessor; and

WHEREAS, Lessor and **TRICO PRODUCTS CORPORATION** (the "Lessee") have entered or intend to enter into one or more Lease Schedules (the "Schedule" or "Schedules") which incorporate the terms and conditions of Master Lease Agreement No. OFI1045321 dated May 9, 2018, including all amendments or addendums now or hereafter executed in connection therewith (collectively, the "Master Lease"). Each of the Schedules constitutes a separate lease between Lessor and Lessee and shall be referred to herein as the "Lease" or the "Leases"; and

WHEREAS, Lessor will not enter into any Leases with the Lessee unless, Guarantor unconditionally guarantees pursuant hereto the payment and performance of all of Lessee's obligations under each Lease; and

WHEREAS, Guarantor for their own interests, wish to induce Lessor to enter into the Leases; and

WHEREAS, Guarantor will receive reasonably equivalent value for this Guaranty; and

WHEREAS, Guarantor is willing to unconditionally guarantee the performance of all of Lessee's obligations under each Lease pursuant hereto.

NOW, THEREFORE, in consideration of the foregoing, the parties agree as follows:

### 1. THE GUARANTY

Guarantor hereby irrevocably, unconditionally guarantees, without offset or deduction, jointly and severally, the full, complete and prompt payment and proper performance by Lessee of all obligations now or hereafter due to Lessor from Lessee, including pursuant to the Leases, including without limitation the payment of rents and all amounts required or provided for under the Leases resulting from Lessee's breach or non-performance thereof. Guarantor agrees that this is an irrevocable, continuing guaranty and that Guarantor shall perform its obligations hereunder notwithstanding any amendment, waiver, renewal, continuation, compromise, acceleration or other modification of any of the terms or Lessee's obligations under the Leases. This Guaranty shall apply to each Schedule that Lessee executes in connection with any Master Lease, and Lessor shall not be required to notify Guarantor of Lessee's execution of each such Schedule before, at the time of, or after it is executed and delivered.

### 2. JOINT AND SEVERAL OBLIGATIONS

Guarantor's obligations hereunder are separate and independent of Lessee's obligations under any Lease. If an Event of Default shall occur and be continuing under any Lease, Lessor may pursue its remedies against Lessee and a separate action or actions may be brought and prosecuted against Guarantor whether or not action is brought against Lessee or whether or not Lessee be joined in any such action or actions.

### 3. REPRESENTATIONS AND WARRANTIES

Guarantor hereby represents and warrants that this Guaranty is a binding obligation of the Guarantor and is enforceable against Guarantor in accordance with its terms, and that the execution, delivery and performance of this Guaranty will not result in a breach of any agreement to which Guarantor is a party.

### 4. WAIVERS

The Guarantor waives any right to require Lessor: to (a) proceed first or otherwise against Lessee; (b) proceed against or exhaust any security it may hold; or (c) pursue any other remedy in Lessor's power whatsoever. Guarantor waives all presentments, demands for performance, notices of default, notices of protest, notices of dishonor and notices of acceptances of this Guaranty. Guarantor also waives any defense or disability available to Lessee, which might save or release it from liability including,

Page 1 of 3

CONFIDENTIAL

ONSET_00034768
FBG_CH1_00090746

**DEBTORS' EXHIBIT NO. 175**
**Page 521 of 1907**

without limitation, defect in or unenforceability of the Lease. No delay on the part of Lessor in exercising any rights under this Guaranty or failure to exercise the same shall operate as a waiver of such rights. No modification or waiver of the provisions of this Guaranty shall be effective unless in writing signed by Lessor, and no such waiver shall be applicable and effective except in the specific instance for which it is given. Guarantor waives and agrees not to exercise any rights which may be acquired by way of subrogation under this Guaranty, or any of the Leases, resulting from Guarantor's performance by any payment made hereunder or otherwise, including without limitation, the right to take or receive from Lessee, directly or indirectly, in cash or other assets or by setoff or in any other manner, payment or security on account of such subrogation rights. Guarantor assumes all responsibility for keeping informed of Lessee's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment or nonperformance of the obligations and the nature, scope, and extent of the risks that Guarantor assumes and incurs under this Guaranty and agrees that Lessor shall have no duty to advise Guarantor of information known to it regarding those circumstances or risks.

5.   MODIFICATIONS
Without causing a release of Guarantor from its obligations hereunder, and in accordance with the provisions of the Master Lease, Lessor, without notifying Guarantor, is authorized to (a) renew, extend, accelerate or otherwise change the payment schedule or other terms of any Lease; (b) accept partial payments from the Lessee; (c) take and apply any security (if applicable) and exercise any remedy against the Lessee; (d) amend, substitute, waive, subordinate or release any property or additional security or any obligations covered under any Lease; (e) settle, release, compound, compromise, collect or otherwise liquidate the obligations covered under any Lease; and (f) release Lessee from any obligations under any Lease.

6.   ASSIGNMENT
Guarantor agrees that Lessor may assign without notice all or a part of its rights hereunder and Guarantor agrees, in such case, that any such assignee shall have the rights of Lessor hereunder and further agrees to perform any such assigned obligations for the benefit of any such assignee.

7.   GOVERNING LAW
This Guaranty and the rights and obligations of Lessor and of Guarantor hereunder shall be governed by and construed in accordance with the laws of the State of Utah and shall be binding upon Guarantor, its successors and assigns and shall inure to the benefit of and be enforceable by Lessor, its successors and assigns, including any successor assignees. Guarantor submits itself to the exclusive jurisdiction of the state or federal courts situated in Salt Lake County, State of Utah in connection with any or other proceeding brought by any party to enforce or construe

this Guaranty or any matters related to or arising out of this Guaranty. This Guaranty was executed in the State of Utah by virtue of Lessor having countersigned it in the State of Utah. Guarantor agrees to immediately reimburse Lessor for all costs and expenses, including reasonable attorneys' fees, incurred by Lessor in connection with the enforcement of this Guaranty or any dispute, lawsuit or other legal or arbitration/mediation proceeding to which this Guaranty gives rise, including without limitation, actions in tort, whether incurred at the trial or appellate level, before or after judgement, and including any of the foregoing incurred in connection with any bankruptcy or insolvency proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Guarantor or any other person or entity) relating to the Lessee or any other person or entity.

8.   PROCESS AGENT
Guarantor hereby irrevocably appoints Trico Group, LLC ("Process Agent") with an office on the date hereof at 127 Public Square, Suite 5110, Cleveland, Ohio 44114, as its agent to receive on behalf of the Guarantor service of copies of the summons and complaint and any other process which may be served in any such action or proceeding. Guarantor further agrees that, until all obligations owing under the Leases have been paid in full, it will maintain Process Agent as its duly appointed agent for the service of such process or summons in Ohio (State where Process Agent is located). Such service may be made by mailing or delivering a copy of such process to Guarantor in care of the Process Agent at the Process Agent's above address.

Guarantor shall pay all fees, charges, costs, and expenses necessary to retain, in good standing, Process Agent as its agent for the purposes described in this Section. In the event Guarantor fails to pay any fee, charge, cost, or expense necessary to retain, in good standing, Process Agent as Guarantor's agent for the purposes described in this Section, Lessor is hereby authorized to pay to Process Agent such fees, charges, costs, or expenses, and Guarantor shall immediately reimburse Lessor for all such amounts paid to Process Agent.

9.   WAIVER OF TRIAL BY JURY
LESSOR AND GUARANTOR HEREBY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THE LEASE, THE PROPERTY, THIS GUARANTY, OR THE CONDUCT OF THE RELATIONSHIP BETWEEN LESSOR AND GUARANTOR.

10.  INVALIDITY
If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty shall be construed as though it did not contain that provision, and the rights and liabilities of the parties to this Guaranty shall be construed and enforced accordingly.

[Signatures on following page]

RTSI-PS-WF501-OSPI LocalLease Operations Master Library Guaranty/Guaranty Agreement - Corporate.docx

CONFIDENTIAL

ONSET_00034769
FBG_CH1_00090747

**DEBTORS' EXHIBIT NO. 175**
**Page 522 of 1907**

[TALLERES MECANICOS MONTSERRAT SA DE CV Guaranty Agreement Signature Page]

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered to Lessor as of the month, day and year first above written.

LESSOR:                                                          GUARANTOR:

**ONSET FINANCIAL, INC.**                                         **TALLERES MECANICOS MONTSERRAT SA DE CV.**

BY:        _Cathy Lawrence_                                       BY:        _____
           Cathy Lawrence
TITLE:     Vice President                                         TITLE:     _Director_____

Page 3 of 3

CONFIDENTIAL

ONSET_00034770
FBG_CH1_00090748

**DEBTORS' EXHIBIT NO. 175**
**Page 523 of 1907**

# Exhibit 19

FBG_CH1_00090749

**DEBTORS' EXHIBIT NO. 175**
**Page 524 of 1907**



## GUARANTY AGREEMENT

This Guaranty Agreement (the "Guaranty") is made and effective November 14, 2019.

BETWEEN:    **ONSET FINANCIAL, INC.** (the "Lessor"), a corporation organized and existing under the laws of the state of Utah, with its head office located at: 274 West 12300 South, Draper, Utah 84020

AND:    **TRICO BELGIUM** (the "Guarantor"), a company organized and existing under the laws of the jurisdiction of its organization, with its head office located at: Avenue Champion, 1, B-6790-Aubange, Belgium.

### RECITALS

WHEREAS, This Guaranty is a continuing guaranty given by the Guarantor to Lessor; and

WHEREAS, Lessor and **TRICO PRODUCTS CORPORATION** (the "Lessee") have entered or intend to enter into one or more Lease Schedules (the "Schedule" or "Schedules") which incorporate the terms and conditions of Master Lease Agreement No. OFI1045321 dated May 9, 2018, including all amendments or addendums now or hereafter executed in connection therewith (collectively, the "Master Lease"). Each of the Schedules constitutes a separate lease between Lessor and Lessee and shall be referred to herein as the "Lease" or the "Leases"; and

WHEREAS, Lessor will not enter into any Leases with the Lessee unless, Guarantor unconditionally guarantees pursuant hereto the payment and performance of all of Lessee's obligations under each Lease; and

WHEREAS, Guarantor for their own interests, wish to induce Lessor to enter into the Leases; and

WHEREAS, Guarantor will receive reasonably equivalent value for this Guaranty; and

WHEREAS, Guarantor is willing to unconditionally guarantee the performance of all of Lessee's obligations under each Lease pursuant hereto.

NOW, THEREFORE, in consideration of the foregoing, the parties agree as follows:

### 1. THE GUARANTY
Guarantor hereby irrevocably, unconditionally guarantees, without offset or deduction, jointly and severally, the full, complete and prompt payment and proper performance by Lessee of all obligations now or hereafter due to Lessor from Lessee, including pursuant to the Leases, including without limitation the payment of rents and all amounts required or provided for under the Leases resulting from Lessee's breach or non-performance thereof. Guarantor agrees that this is an irrevocable, continuing guaranty and that Guarantor shall perform its obligations hereunder notwithstanding any amendment, waiver, renewal, continuation, compromise, acceleration or other modification of any of the terms or Lessee's obligations under the Leases. This Guaranty shall apply to each Schedule that Lessee executes in connection with any Master Lease, and Lessor shall not be required to notify Guarantor of Lessee's execution of each such Schedule before, at the time of, or after it is executed and delivered.

### 2. JOINT AND SEVERAL OBLIGATIONS
Guarantor's obligations hereunder are separate and independent of Lessee's obligations under any Lease. If an Event of Default shall occur and be continuing under any Lease, Lessor may pursue its remedies against Lessee and a separate action or actions may be brought and prosecuted against Guarantor whether or not action is brought against Lessee or whether or not Lessee be joined in any such action or actions.

### 3. REPRESENTATIONS AND WARRANTIES
Guarantor hereby represents and warrants that this Guaranty is a binding obligation of the Guarantor and is enforceable against Guarantor in accordance with its terms, and that the execution, delivery and performance of this Guaranty will not result in a breach of any agreement to which Guarantor is a party.

### 4. WAIVERS
The Guarantor waives any right to require Lessor: to (a) proceed first or otherwise against Lessee; (b) proceed against or exhaust any security it may hold; or (c) pursue any other remedy in Lessor's power whatsoever. Guarantor waives all presentments, demands for performance, notices of default, notices of protest, notices of dishonor and notices of acceptances of this Guaranty. Guarantor also waives any defense or disability available to Lessee, which might save or release it from liability including,

\TSI-V1-NFSR1\SFI\Local\Lease Operations\Master Library\Guaranty-Suretn\ Agreement - Corporate.docx

Page 1 of 3

CONFIDENTIAL

ONSET_00034771
FBG_CH1_00090750

without limitation, defect in or unenforceability of the Lease. No delay on the part of Lessor in exercising any rights under this Guaranty or failure to exercise the same shall operate as a waiver of such rights. No modification or waiver of the provisions of this Guaranty shall be effective unless in writing signed by Lessor, and no such waiver shall be applicable and effective except in the specific instance for which it is given. Guarantor waives and agrees not to exercise any rights which may be acquired by way of subrogation under this Guaranty, or any of the Leases, resulting from Guarantor's performance by any payment made hereunder or otherwise, including without limitation, the right to take or receive from Lessee, directly or indirectly, in cash or other assets or by setoff or in any other manner, payment or security on account of such subrogation rights. Guarantor assumes all responsibility for keeping informed of Lessee's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment or nonperformance of the obligations and the nature, scope, and extent of the risks that Guarantor assumes and incurs under this Guaranty and agrees that Lessor shall have no duty to advise Guarantor of information known to it regarding those circumstances or risks.

5.   MODIFICATIONS
Without causing a release of Guarantor from its obligations hereunder, and in accordance with the provisions of the Master Lease, Lessor, without notifying Guarantor, is authorized to (a) renew, extend, accelerate or otherwise change the payment schedule or other terms of any Lease; (b) accept partial payments from the Lessee; (c) take and apply any security (if applicable) and exercise any remedy against the Lessee; (d) amend, substitute, waive, subordinate or release any property or additional security or any obligations covered under any Lease; (e) settle, release, compound, compromise, collect or otherwise liquidate the obligations covered under any Lease; and (f) release Lessee from any obligations under any Lease.

6.   ASSIGNMENT
Guarantor agrees that Lessor may assign without notice all or a part of its rights hereunder and Guarantor agrees, in such case, that any such assignee shall have the rights of Lessor hereunder and further agrees to perform any such assigned obligations for the benefit of any such assignee.

7.   GOVERNING LAW
This Guaranty and the rights and obligations of Lessor and of Guarantor hereunder shall be governed by and construed in accordance with the laws of the State of Utah and shall be binding upon Guarantor, its successors and assigns and shall inure to the benefit of and be enforceable by Lessor, its successors and assigns, including any successor assignees. Guarantor submits itself to the exclusive jurisdiction of the state or federal courts situated in Salt Lake County, State of Utah in connection with any or other proceeding brought by any party to enforce or construe this Guaranty or any matters related to or

arising out of this Guaranty. This Guaranty was executed in the State of Utah by virtue of Lessor having countersigned it in the State of Utah. Guarantor agrees to immediately reimburse Lessor for all costs and expenses, including reasonable attorneys' fees, incurred by Lessor in connection with the enforcement of this Guaranty or any dispute, lawsuit or other legal or arbitration/mediation proceeding to which this Guaranty gives rise, including without limitation, actions in tort, whether incurred at the trial or appellate level, before or after judgement, and including any of the foregoing incurred in connection with any bankruptcy or insolvency proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Guarantor or any other person or entity) relating to the Lessee or any other person or entity.

8.   PROCESS AGENT
Guarantor hereby irrevocably appoints Trico Group, LLC ("Process Agent") with an office on the date hereof at 127 Public Square, Suite 5110, Cleveland, Ohio 44114, as its agent to receive on behalf of the Guarantor service of copies of the summons and complaint and any other process which may be served in any such action or proceeding. Guarantor further agrees that, until all obligations owing under the Leases have been paid in full, it will maintain Process Agent as its duly appointed agent for the service of such process or summons in Ohio (State where Process Agent is located). Such service may be made by mailing or delivering a copy of such process to Guarantor in care of the Process Agent at the Process Agent's above address.

Guarantor shall pay all fees, charges, costs, and expenses necessary to retain, in good standing, Process Agent as its agent for the purposes described in this Section. In the event Guarantor fails to pay any fee, charge, cost, or expense necessary to retain, in good standing, Process Agent as Guarantor's agent for the purposes described in this Section, Lessor is hereby authorized to pay to Process Agent such fees, charges, costs, or expenses, and Guarantor shall immediately reimburse Lessor for all such amounts paid to Process Agent.

9.   WAIVER OF TRIAL BY JURY
LESSOR AND GUARANTOR HEREBY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THE LEASE, THE PROPERTY, THIS GUARANTY, OR THE CONDUCT OF THE RELATIONSHIP BETWEEN LESSOR AND GUARANTOR.

10.   INVALIDITY
If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty shall be construed as though it did not contain that provision, and the rights and liabilities of the parties to this Guaranty shall be construed and enforced accordingly.

[Signatures on following page]

\\TRI-NS-WFS01\OFS Local Lease Operations\Master Library\Guaranty Guaranty Agreement - Corporate.docx

CONFIDENTIAL

ONSET_00034772
FBG_CH1_00090751

[TRICO BELGIUM Guaranty Agreement Signature Page]

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered to Lessor as of the month, day and year first above written.

LESSOR:                                          GUARANTOR:

**ONSET FINANCIAL, INC.**                        **TRICO BELGIUM**

BY:  _____                     BY:  _____
         Cathy Lawrence
TITLE:   Vice President                           TITLE:   CFo

CONFIDENTIAL

ONSET_00034773
FBG_CH1_00090752

**DEBTORS' EXHIBIT NO. 175**
**Page 527 of 1907**

# Exhibit 20

FBG_CH1_00090753

**DEBTORS' EXHIBIT NO. 175**
**Page 528 of 1907**

## CONTINUING AND UNCONDITIONAL GUARANTY

This Continuing and Unconditional Guaranty (this "Guaranty") is made and effective May 9, 2018

BETWEEN:      **ONSET FINANCIAL, INC.** (the "Lessor"), a corporation organized and existing under the laws of the state of Utah, with its head office located at: 10813 S. River Front Parkway, Suite 450, South Jordan, Utah 84095.

AND:      **TRICO GROUP, LLC** (the "Guarantor"), a limited liability company organized and existing under the laws of the state of Delaware, with its head office located at: 127 Public Square, Suite 5110, Cleveland, Ohio 44114

RECITALS

THIS GUARANTY IS AN ABSOLUTE, UNCONDITIONAL AND CONTINUING GUARANTY GIVEN BY GUARANTOR TO LESSOR. THIS IS ALSO A GENERAL GUARANTY WHICH IS ENFORCEABLE BY THE LESSOR, ITS SUCCESSORS AND ASSIGNS

WHEREAS, Lessor and **TRICO PRODUCTS CORPORATION** (the "Lessee") have entered or intend to enter into one or more Lease Schedules (the "Schedule" or "Schedules") which incorporate the terms and conditions of Master Lease Agreement No. OFI1045321 dated May 9, 2018, including all amendments or addendums now or hereafter executed in connection therewith (collectively, the "Master Lease"). Each of the Schedules constitutes a separate lease between Lessor and Lessee and shall be referred to herein as the "Lease" or the "Leases".

WHEREAS, Lessor will not enter into any Leases with the Lessee unless Guarantor absolutely and unconditionally guarantees pursuant hereto the payment and performance of all of Lessee's obligations under each Lease.

WHEREAS, Guarantor for its or their own interests, wish to induce Lessor to enter into the Leases; and

WHEREAS, Guarantor will receive reasonably equivalent value for this Guaranty; and

WHEREAS, Guarantor is therefore willing to absolutely and unconditionally guarantee the payment and performance of all of Lessee's obligations under each Lease pursuant hereto.

NOW, THEREFORE, in consideration of the foregoing, the undersigned jointly and severally agrees as follows:

1.      THE GUARANTY

Guarantor hereby irrevocably, absolutely and unconditionally guarantees, without offset or deduction, jointly and severally, the full, complete and prompt payment by Lessee of all monies now or hereafter due Lessor and the proper performance by Lessee of all obligations now or hereafter owed by Lessee pursuant to the Leases, including without limitation the payment to Lessor or to its order, on demand, of all rents and all amounts required or provided for under the Leases. Guarantor agrees that this is an irrevocable, continuing and unconditional guaranty and that Guarantor shall perform its obligations and make payments hereunder notwithstanding any amendment, waiver, renewal, continuation, compromise, acceleration, extension or other modification of any of the terms of, or of any of Lessee's obligations under, any of the Leases. This Guaranty shall apply to each Schedule Lessee executes in connection with the Master Lease, whether any such Schedule is entered into prior to or simultaneously with this Guaranty or at any time hereafter, and Lessor shall not be required to notify Guarantor of Lessee's execution of each such Schedule before, at the time of, or after it is executed and delivered. This Guaranty is a guaranty of payment and not a guaranty of collection. Guarantor agrees that upon the occurrence of an Event of Default (as defined in the Master Lease) with respect to any of Lessee's obligations, Lessor may, at its option, proceed directly and at once against Guarantor to collect and recover the full amount of the liability hereunder, or any portion of such liability.

2.      CONSIDERATION

Guarantor agrees and understands that the Master Lease and each Schedule were agreed to by Lessor and credit was extended by Lessor to Lessee in reliance upon this Guaranty, and that Guarantor will notify Lessor in writing in the event of any material change in Guarantor's financial statements. Guarantor acknowledges that the extension of credit by Lessor to Lessee and the execution of this Guaranty has or will result in a receipt by Guarantor of reasonably equivalent value.

CONFIDENTIAL

ONSET_00034750
FBG_CH1_00090754

**DEBTORS' EXHIBIT NO. 175**
**Page 529 of 1907**

3.      JOINT AND SEVERAL OBLIGATIONS

Guarantor's obligations hereunder are separate and independent of Lessee's obligations under any Lease.  If an Event of Default shall occur and be continuing under any Lease, Lessor may pursue its remedies against Lessee and a separate action or actions may be brought and prosecuted against Guarantor whether or not action is brought against Lessee or other guarantor or whether or not Lessee or any other guarantor be joined in any such action or actions.

4.      REPRESENTATIONS AND WARRANTIES

Guarantor hereby represents and warrants that this Guaranty is a binding obligation of Guarantor and is enforceable against Guarantor in accordance with its terms, and that the execution, delivery and performance of this Guaranty has been approved by all necessary corporate or other entity action and does not violate or conflict with Guarantor's articles of incorporation, bylaws, articles of organization, operating agreement, resolutions or other governing instruments, as applicable, and will not result in a breach of any agreement to which Guarantor is a party. Guarantor further represents and warrants to Lessor that (a) no representations or agreements of any kind have been made to Guarantor that would limit or qualify the terms of this Guaranty; (b) this Guaranty is executed at Lessee's request and not at the request of Lessor; and (c) Lessor has made no representation to Guarantor as to the credit worthiness of Lessee. Where Lessee is a corporation, partnership, limited liability company, or a trustee, it is not necessary for Lessor to inquire into the powers of Lessee or the officers, directors, partners, managers, members or agents acting or purporting to act in its behalf, and any of Lessee's obligations made or created under any of the Leases in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

5.      WAIVERS

Guarantor waives any right or claim of right to require Lessor: to (a) proceed first or otherwise against Lessee; (b) proceed against or exhaust any security it may hold; or (c) pursue any other remedy in Lessor's power whatsoever. Guarantor further waives all presentments, demands for performance, notices of default, notices of protest, notices of dishonor, notices of acceptances of this Guaranty, notices of any modifications described in Section 6 of this Guaranty, and notices of the sale, exchange, compromise, or other disposition of any or all of the leased Property (as defined in the Leases). Guarantor also waives any suretyship or other defense or disability or defense available to Lessee, which might save or release it from liability including, without limitation, defect in or unenforceability of any Lease. No delay on the part of Lessor in exercising any rights under this Guaranty or failure to exercise the same shall operate as a waiver of such rights. No modification or waiver of the provisions of this Guaranty shall be effective unless in writing signed by Lessor, and no such waiver shall be applicable and effective except in the specific instance for which it is given. Guarantor waives and agrees not to exercise any rights which may be acquired by way of subrogation under this Guaranty, or any of the Leases, resulting from Guarantor's performance by any payment made hereunder or otherwise, including without limitation, the right to take or receive from Lessee, directly or indirectly, in cash or other assets or by setoff or in any other manner, payment or security on account of such subrogation rights. Guarantor assumes all responsibility for keeping informed of Lessee's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment or nonperformance of the obligations and the nature, scope, and extent of the risks that Guarantor assumes and incurs under this Guaranty, and agrees that Lessor shall have no duty to advise Guarantor of information known to it regarding those circumstances or risks. Guarantor also expressly waives to the extent permitted by law any right or claim of right to participate in any security now or hereafter held by Lessor and to make any defense arising by reason of any statute or rule of law limiting the amount of any deficiency judgment that may be entered against Lessee after foreclosure or other disposition of any real or personal property that secures Lessee's obligations.

6.      MODIFICATIONS

Without causing a release of Guarantor from its obligations hereunder, and in accordance with the provisions of the Master Lease, Lessor, without notifying Guarantor, is authorized by Guarantor to (a) renew, extend, accelerate or otherwise change the payment schedule or other terms of any Lease; (b) accept partial payments from the Lessee; (c) take and apply any security (if applicable) and exercise any remedy against the Lessee; (d) amend, substitute, waive, subordinate or release any property or additional security or any obligations covered under any Lease; (e) settle, release, compound, compromise, collect or otherwise liquidate the obligations covered under any Lease; and (f) release Lessee from any obligations under any Lease.

7.      VOIDABLE TRANSFERS

If any of the payments of money or transfers of property made to Lessor by Lessee or Guarantor in payment of Lessee's obligations under any of the Leases or otherwise should for any reason be declared to be fraudulent, preferential or voidable within the meaning of any state or federal law relating to fraudulent conveyances or preferential transfers, or otherwise become voidable or recoverable under the Bankruptcy Code or any other federal or state law, in whole or in part, for any reason (hereinafter, "Voidable Transfers") and Lessor is required to repay or restore any such Voidable Transfers, or any portion thereof, then, as to any such Voidable Transfer or the amount repaid or restored (including all

L:\Lessees\Trico\Master\Master Docs\Prep\Guaranty-Corporation New 10.1.13.rtf

Page 2 of 3

CONFIDENTIAL

ONSET_00034751
FBG_CH1_00090755

costs, expenses and attorneys' fees of Lessor related thereto), the liability of Guarantor and all security interests and liens, if any, granted specifically as security for this Guaranty, shall automatically be revived, reinstated and restored as though such Voidable Transfer had never been made to Lessor.  Nothing herein is an admission by any party that any such Voidable Transfer has occurred and all parties believe that no such Voidable Transfer exists.

8.      ASSIGNMENT

Guarantor agrees that Lessor may assign without notice all or a part of its rights hereunder and Guarantor agrees, in such case, that any such assignee shall have the rights of Lessor hereunder and further agrees to perform any such assigned obligations for the benefit of any such assignee.

10.     GOVERNING LAW

This Guaranty and the rights and obligations of Lessor and of Guarantor hereunder shall be governed by and construed in accordance with the laws of the State of Utah and shall be binding upon Guarantor, its successors and assigns and shall inure to the benefit of and be enforceable by Lessor, its successors and assigns, including any successor assignees.  Guarantor submits itself to such jurisdiction and agrees that it shall immediately, upon demand, reimburse Lessor for all costs and expenses, **including reasonable attorneys' fees a**nd expenses, incurred by Lessor in the enforcement of this Guaranty. If Guarantor is not a resident of the State of Utah, Guarantor hereby consents to the personal and subject matter jurisdiction of the state and federal courts of the State of Utah to enforce this Guaranty.

11.     WAIVER OF TRIAL BY JURY

Lessor and Guarantor hereby waive the right to trial by jury of any matters arising out of the Lease or Property or the conduct of the relationship between Lessor and Guarantor.

12.     INVALIDITY

If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty shall be construed as though it did not contain that provision, and the rights and liabilities of the parties to this Guaranty shall be construed and enforced accordingly.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered to Lessor as of the month, day and year first above written.

LESSOR:                                             GUARANTOR:

**ONSET FINANCIAL, INC.**                            **TRICO GROUP, LLC**

BY: _____          BY: _____
        Cathy Lawrence
TITLE:  Vice President                       TITLE: _____

*[SIGNATURE PAGE TO FOLLOW]*

CONFIDENTIAL

ONSET_00034752
FBG_CH1_00090756

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered to Lessor as of the month, day and year first above written.

LESSOR:

ONSET FINANCIAL, INC.

BY: _____

Cathy Lawrence

TITLE:   Vice President

GUARANTOR:

TRICO GROUP, LLC

BY: _____

Stephen Graham

TITLE:   Chief Financial Officer, Treasurer and Secretary

*[Signature Pages – Guaranty]*

CONFIDENTIAL

ONSET_00034753
FBG_CH1_00090757

**DEBTORS' EXHIBIT NO. 175**
**Page 532 of 1907**



## AMENDMENT NO. 1
## TO
## CONTINUING AND UNCONDITIONAL GUARANTY

**ONSET FINANCIAL, INC.** (the "Lessor") and **FIRST BRANDS GROUP, LLC** fka **TRICO GROUP, LLC** (the "Guarantor") executed and delivered a Continuing and Unconditional Guaranty dated May 9, 2018 (the "Guaranty") wherein the Guarantor unconditionally guarantees the performance of all of the obligations of **TRICO PRODUCTS CORPORATION** ("Lessee") under one or more Lease Schedules (the "Schedule" or "Schedules") which incorporate the terms and conditions of Master Lease Agreement No. OFI1045321 dated May 9, 2018 (the "Master Lease") between Lessor and Lessee.

Guarantor has advised Lessor that effective July 14, 2020, Articles of Amendment were filed with the Delaware Secretary of State wherein Guarantor changed its name from **TRICO GROUP, LLC** to **FIRST BRANDS GROUP, LLC.** By signature below, the Guarantor hereby acknowledges and agrees that effective July 14, 2020, the Guaranty shall be amended by changing its name, wherever it appears in the Guaranty and/or Schedule(s), from **TRICO GROUP, LLC** to **FIRST BRANDS GROUP, LLC.**

Guarantor also acknowledges and agrees that the Guaranty shall further guaranty the performance and obligations of any and all co-Lessees that are included on any one or more Schedules executed in connection with the Master Lease.

All other terms and conditions of the Guaranty shall remain in full force and effect without change.

Dated: July 21, 2020

[Signature(s) on following page]

UTSH-VS-WFS01 OS\FLs\od.Lease Operations\Master Library\Document\Guaranty Agreement - Amendment - Lessee Name Change.doc

CONFIDENTIAL

ONSET_00034754
FBG_CH1_00090758

**DEBTORS' EXHIBIT NO. 175**
**Page 533 of 1907**

[Amendment No. 1 to CONTINUING AND UNCONDITIONAL GUARANTY Signature Page]

LESSOR:                                    GUARANTOR

**ONSET FINANCIAL, INC.**                   **FIRST BRANDS GROUP, LLC**

BY: _Cathy Lawrence_                        BY: _____
    Cathy Lawrence
TITLE:  Vice President                      TITLE:  Executive Vice President

Page 2 of 2

CONFIDENTIAL                                    ONSET_00034755
                                                FBG_CH1_00090759

# Exhibit 21

FBG_CH1_00090760

**DEBTORS' EXHIBIT NO. 175**
**Page 535 of 1907**



## GUARANTY AGREEMENT

This Guaranty Agreement (the "Guaranty") is made and effective November 14, 2019.

BETWEEN:     **ONSET FINANCIAL, INC.** (the "Lessor"), a corporation organized and existing under the laws of the state of Utah, with its head office located at: 274 West 12300 South, Draper, Utah 84020

AND:     **TRICO ITALY S.R.L** (the "Guarantor"), a company organized and existing under the laws of the jurisdiction of its organization, with its head office located at: Via Venaria, 12, 10040, Druento (TO), Italy.

### RECITALS

WHEREAS, This Guaranty is a continuing guaranty given by the Guarantor to Lessor; and

WHEREAS, Lessor and **TRICO PRODUCTS CORPORATION** (the "Lessee") have entered or intend to enter into one or more Lease Schedules (the "Schedule" or "Schedules") which incorporate the terms and conditions of Master Lease Agreement No. OFI1045321 dated May 9, 2018, including all amendments or addendums now or hereafter executed in connection therewith (collectively, the "Master Lease"). Each of the Schedules constitutes a separate lease between Lessor and Lessee and shall be referred to herein as the "Lease" or the "Leases"; and

WHEREAS, Lessor will not enter into any Leases with the Lessee unless, Guarantor unconditionally guarantees pursuant hereto the payment and performance of all of Lessee's obligations under each Lease; and

WHEREAS, Guarantor for their own interests, wish to induce Lessor to enter into the Leases; and

WHEREAS, Guarantor will receive reasonably equivalent value for this Guaranty; and

WHEREAS, Guarantor is willing to unconditionally guarantee the performance of all of Lessee's obligations under each Lease pursuant hereto.

NOW, THEREFORE, in consideration of the foregoing, the parties agree as follows:

### 1.   THE GUARANTY

Guarantor hereby irrevocably, unconditionally guarantees, without offset or deduction, jointly and severally, the full, complete and prompt payment and proper performance by Lessee of all obligations now or hereafter due to Lessor from Lessee, including pursuant to the Leases, including without limitation the payment of rents and all amounts required or provided for under the Leases resulting from Lessee's breach or non-performance thereof. Guarantor agrees that this is an irrevocable, continuing guaranty and that Guarantor shall perform its obligations hereunder notwithstanding any amendment, waiver, renewal, continuation, compromise, acceleration or other modification of any of the terms or Lessee's obligations under the Leases. This Guaranty shall apply to each Schedule that Lessee executes in connection with any Master Lease, and Lessor shall not be required to notify Guarantor of Lessee's execution of each such Schedule before, at the time of, or after it is executed and delivered.

### 2.   JOINT AND SEVERAL OBLIGATIONS

Guarantor's obligations hereunder are separate and independent of Lessee's obligations under any Lease. If an Event of Default shall occur and be continuing under any Lease, Lessor may pursue its remedies against Lessee and a separate action or actions may be brought and prosecuted against Guarantor whether or not action is brought against Lessee or whether or not Lessee be joined in any such action or actions.

### 3.   REPRESENTATIONS AND WARRANTIES

Guarantor hereby represents and warrants that this Guaranty is a binding obligation of the Guarantor and is enforceable against Guarantor in accordance with its terms, and that the execution, delivery and performance of this Guaranty will not result in a breach of any agreement to which Guarantor is a party.

### 4.   WAIVERS

The Guarantor waives any right to require Lessor: to (a) proceed first or otherwise against Lessee; (b) proceed against or exhaust any security it may hold; or (c) pursue any other remedy in Lessor's power whatsoever. Guarantor waives all presentments, demands for performance, notices of default, notices of protest, notices of dishonor and notices of acceptances of this Guaranty. Guarantor also waives any defense or disability available to Lessee, which might save or release it from liability including, without limitation, defect in or unenforceability of the Lease. No delay on the part of Lessor in exercising any rights under

Page 1 of 3

CONFIDENTIAL

ONSET_00034774
FBG_CH1_00090761

this Guaranty or failure to exercise the same shall operate as a waiver of such rights. No modification or waiver of the provisions of this Guaranty shall be effective unless in writing signed by Lessor, and no such waiver shall be applicable and effective except in the specific instance for which it is given. Guarantor waives and agrees not to exercise any rights which may be acquired by way of subrogation under this Guaranty, or any of the Leases, resulting from Guarantor's performance by any payment made hereunder or otherwise, including without limitation, the right to take or receive from Lessee, directly or indirectly, in cash or other assets or by setoff or in any other manner, payment or security on account of such subrogation rights. Guarantor assumes all responsibility for keeping informed of Lessee's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment or nonperformance of the obligations and the nature, scope, and extent of the risks that Guarantor assumes and incurs under this Guaranty and agrees that Lessor shall have no duty to advise Guarantor of information known to it regarding those circumstances or risks.

5. MODIFICATIONS
Without causing a release of Guarantor from its obligations hereunder, and in accordance with the provisions of the Master Lease, Lessor, without notifying Guarantor, is authorized to (a) renew, extend, accelerate or otherwise change the payment schedule or other terms of any Lease; (b) accept partial payments from the Lessee; (c) take and apply any security (if applicable) and exercise any remedy against the Lessee; (d) amend, substitute, waive, subordinate or release any property or additional security or any obligations covered under any Lease; (e) settle, release, compound, compromise, collect or otherwise liquidate the obligations covered under any Lease; and (f) release Lessee from any obligations under any Lease.

6. ASSIGNMENT
Guarantor agrees that Lessor may assign without notice all or a part of its rights hereunder and Guarantor agrees, in such case, that any such assignee shall have the rights of Lessor hereunder and further agrees to perform any such assigned obligations for the benefit of any such assignee.

7. GOVERNING LAW
This Guaranty and the rights and obligations of Lessor and of Guarantor hereunder shall be governed by and construed in accordance with the laws of the State of Utah and shall be binding upon Guarantor, its successors and assigns and shall inure to the benefit of and be enforceable by Lessor, its successors and assigns, including any successor assignees. Guarantor submits itself to the exclusive jurisdiction of the state or federal courts situated in Salt Lake County, State of Utah in connection with any or other proceeding brought by any party to enforce or construe this Guaranty or any matters related to or arising out of this Guaranty. This Guaranty was executed in the State of Utah by virtue of Lessor having countersigned it in the State of Utah. Guarantor agrees to immediately reimburse Lessor for all costs and expenses, including reasonable attorneys' fees, incurred by Lessor in connection with the enforcement of this Guaranty or any dispute, lawsuit or other legal or arbitration/mediation proceeding to which this Guaranty gives rise, including without limitation, actions in tort, whether incurred at the trial or appellate level, before or after judgement, and including any of the foregoing incurred in connection with any bankruptcy or insolvency proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Guarantor or any other person or entity) relating to the Lessee or any other person or entity.

8. PROCESS AGENT
Guarantor hereby irrevocably appoints Trico Group, LLC ("Process Agent") with an office on the date hereof at 127 Public Square, Suite 5110, Cleveland, Ohio 44114, as its agent to receive on behalf of the Guarantor service of copies of the summons and complaint and any other process which may be served in any such action or proceeding. Guarantor further agrees that, until all obligations owing under the Leases have been paid in full, it will maintain Process Agent as its duly appointed agent for the service of such process or summons in Ohio (State where Process Agent is located). Such service may be made by mailing or delivering a copy of such process to Guarantor in care of the Process Agent at the Process Agent's above address.

Guarantor shall pay all fees, charges, costs, and expenses necessary to retain, in good standing, Process Agent as its agent for the purposes described in this Section. In the event Guarantor fails to pay any fee, charge, cost, or expense necessary to retain, in good standing, Process Agent as Guarantor's agent for the purposes described in this Section, Lessor is hereby authorized to pay to Process Agent such fees, charges, costs, or expenses, and Guarantor shall immediately reimburse Lessor for all such amounts paid to Process Agent.

9. WAIVER OF TRIAL BY JURY
LESSOR AND GUARANTOR HEREBY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THE LEASE, THE PROPERTY, THIS GUARANTY, OR THE CONDUCT OF THE RELATIONSHIP BETWEEN LESSOR AND GUARANTOR.

10. INVALIDITY
If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty shall be construed as though it did not contain that provision, and the rights and liabilities of the parties to this Guaranty shall be construed and enforced accordingly.

[Signatures on following page]

CONFIDENTIAL

ONSET_00034775
FBG_CH1_00090762

[TRICO ITALY S.R.L Guaranty Agreement Signature Page]

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered to Lessor as of the month, day and year first above written.

LESSOR:                                                      GUARANTOR:

**ONSET FINANCIAL, INC.**                                    **TRICO ITALY S.R.L**

BY: _Cathy Lawrence_                                         BY: _____
     Cathy Lawrence
TITLE:   Vice President                                      TITLE:   CFo

Page 3 of 3

\\UT.SJ-VS-WFS01.ONET.local\Lease Operations\Master Library\Guaranty\Guaranty Agreement – Corporate.doc

CONFIDENTIAL

ONSET_00034776
FBG_CH1_00090763

# Exhibit 22

FBG_CH1_00090764

**DEBTORS' EXHIBIT NO. 175**
**Page 539 of 1907**



## GUARANTY AGREEMENT

This Guaranty Agreement (the "Guaranty") is made and effective December 16, 2019.

BETWEEN:   **ONSET FINANCIAL, INC.** (the "Lessor"), a corporation organized and existing under the laws of the state of Utah, with its head office located at:  274 West 12300 South, Draper, Utah 84020

AND:   **TRICO WIPERS PLOIESTI S.R.L.** (the "Guarantor"), a company organized and existing under the laws of the jurisdiction of its organization, with its head office located at: WDP Industrial Park, Aricestii Rahtivani, DN72, T-76 Romania, Prahova 107025.

## RECITALS

WHEREAS, This Guaranty is a continuing guaranty given by the Guarantor to Lessor; and

WHEREAS, Lessor and **TRICO PRODUCTS CORPORATION** (the "Lessee") have entered or intend to enter into one or more Lease Schedules (the "Schedule" or "Schedules") which incorporate the terms and conditions of Master Lease Agreement No. OFI1045321 dated May 9, 2018, including all amendments or addendums now or hereafter executed in connection therewith (collectively, the "Master Lease"). Each of the Schedules constitutes a separate lease between Lessor and Lessee and shall be referred to herein as the "Lease" or the "Leases"; and

WHEREAS, Lessor will not enter into any Leases with the Lessee unless, Guarantor unconditionally guarantees pursuant hereto the payment and performance of all of Lessee's obligations under each Lease; and

WHEREAS, Guarantor for their own interests, wish to induce Lessor to enter into the Leases; and

WHEREAS, Guarantor will receive reasonably equivalent value for this Guaranty; and

WHEREAS, Guarantor is willing to unconditionally guarantee the performance of all of Lessee's obligations under each Lease pursuant hereto.

NOW, THEREFORE, in consideration of the foregoing, the parties agree as follows:

### 1.   THE GUARANTY
Guarantor hereby irrevocably, unconditionally guarantees, without offset or deduction, jointly and severally, the full, complete and prompt payment and proper performance by Lessee of all obligations now or hereafter due to Lessor from Lessee, including pursuant to the Leases, including without limitation the payment of rents and all amounts required or provided for under the Leases resulting from Lessee's breach or non-performance thereof. Guarantor agrees that this is an irrevocable, continuing guaranty and that Guarantor shall perform its obligations hereunder notwithstanding any amendment, waiver, renewal, continuation, compromise, acceleration or other modification of any of the terms or Lessee's obligations under the Leases. This Guaranty shall apply to each Schedule that Lessee executes in connection with any Master Lease, and Lessor shall not be required to notify Guarantor of Lessee's execution of each such Schedule before, at the time of, or after it is executed and delivered.

### 2.   JOINT AND SEVERAL OBLIGATIONS
Guarantor's obligations hereunder are separate and independent of Lessee's obligations under any Lease. If an Event of Default

shall occur and be continuing under any Lease, Lessor may pursue its remedies against Lessee and a separate action or actions may be brought and prosecuted against Guarantor whether or not action is brought against Lessee or whether or not Lessee be joined in any such action or actions.

### 3.   REPRESENTATIONS AND WARRANTIES
Guarantor hereby represents and warrants that this Guaranty is a binding obligation of the Guarantor and is enforceable against Guarantor in accordance with its terms, and that the execution, delivery and performance of this Guaranty will not result in a breach of any agreement to which Guarantor is a party.

### 4.   WAIVERS
The Guarantor waives any right to require Lessor: to (a) proceed first or otherwise against Lessee; (b) proceed against or exhaust any security it may hold; or (c) pursue any other remedy in Lessor's power whatsoever. Guarantor waives all presentments, demands for performance, notices of default, notices of protest, notices of dishonor and notices of acceptances of this Guaranty. Guarantor also waives any defense or disability available to Lessee, which might save or release it from liability including,

\\UTSI-V5-WF801.OSFI.Local\Lease Operations\Master Library\Guaranty\Guaranty Agreement - Corporate.dotx

Page 1 of 3

CONFIDENTIAL

ONSET_00034777
FBG_CH1_00090765

without limitation, defect in or unenforceability of the Lease. No delay on the part of Lessor in exercising any rights under this Guaranty or failure to exercise the same shall operate as a waiver of such rights. No modification or waiver of the provisions of this Guaranty shall be effective unless in writing signed by Lessor, and no such waiver shall be applicable and effective except in the specific instance for which it is given. Guarantor waives and agrees not to exercise any rights which may be acquired by way of subrogation under this Guaranty, or any of the Leases, resulting from Guarantor's performance by any payment made hereunder or otherwise, including without limitation, the right to take or receive from Lessee, directly or indirectly, in cash or other assets or by setoff or in any other manner, payment or security on account of such subrogation rights. Guarantor assumes all responsibility for keeping informed of Lessee's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment or nonperformance of the obligations and the nature, scope, and extent of the risks that Guarantor assumes and incurs under this Guaranty and agrees that Lessor shall have no duty to advise Guarantor of information known to it regarding those circumstances or risks.

5.   MODIFICATIONS

Without causing a release of Guarantor from its obligations hereunder, and in accordance with the provisions of the Master Lease, Lessor, without notifying Guarantor, is authorized to (a) renew, extend, accelerate or otherwise change the payment schedule or other terms of any Lease; (b) accept partial payments from the Lessee; (c) take and apply any security (if applicable) and exercise any remedy against the Lessee; (d) amend, substitute, waive, subordinate or release any property or additional security or any obligations covered under any Lease; (e) settle, release, compound, compromise, collect or otherwise liquidate the obligations covered under any Lease; and (f) release Lessee from any obligations under any Lease.

6.   ASSIGNMENT

Guarantor agrees that Lessor may assign without notice all or a part of its rights hereunder and Guarantor agrees, in such case, that any such assignee shall have the rights of Lessor hereunder and further agrees to perform any such assigned obligations for the benefit of any such assignee.

7.   GOVERNING LAW

This Guaranty and the rights and obligations of Lessor and of Guarantor hereunder shall be governed by and construed in accordance with the laws of the State of Utah and shall be binding upon Guarantor, its successors and assigns and shall inure to the benefit of and be enforceable by Lessor, its successors and assigns, including any successor assignees. Guarantor submits itself to the exclusive jurisdiction of the state or federal courts situated in Salt Lake County, State of Utah in connection with any or other proceeding brought by any party to enforce or construe

this Guaranty or any matters related to or arising out of this Guaranty. This Guaranty was executed in the State of Utah by virtue of Lessor having countersigned it in the State of Utah. Guarantor agrees to immediately reimburse Lessor for all costs and expenses, including reasonable attorneys' fees, incurred by Lessor in connection with the enforcement of this Guaranty or any dispute, lawsuit or other legal or arbitration/mediation proceeding to which this Guaranty gives rise, including without limitation, actions in tort, whether incurred at the trial or appellate level, before or after judgement, and including any of the foregoing incurred in connection with any bankruptcy or insolvency proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Guarantor or any other person or entity) relating to the Lessee or any other person or entity.

8.   PROCESS AGENT

Guarantor hereby irrevocably appoints Trico Group, LLC ("Process Agent") with an office on the date hereof at 127 Public Square, Suite 5110, Cleveland, Ohio 44114, as its agent to receive on behalf of the Guarantor service of copies of the summons and complaint and any other process which may be served in any such action or proceeding. Guarantor further agrees that, until all obligations owing under the Leases have been paid in full, it will maintain Process Agent as its duly appointed agent for the service of such process or summons in Ohio (State where Process Agent is located). Such service may be made by mailing or delivering a copy of such process to Guarantor in care of the Process Agent at the Process Agent's above address.

Guarantor shall pay all fees, charges, costs, and expenses necessary to retain, in good standing, Process Agent as its agent for the purposes described in this Section. In the event Guarantor fails to pay any fee, charge, cost, or expense necessary to retain, in good standing, Process Agent as Guarantor's agent for the purposes described in this Section, Lessor is hereby authorized to pay to Process Agent such fees, charges, costs, or expenses, and Guarantor shall immediately reimburse Lessor for all such amounts paid to Process Agent.

9.   WAIVER OF TRIAL BY JURY

LESSOR AND GUARANTOR HEREBY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY MATTERS ARISING OUT OF THE LEASE, THE PROPERTY, THIS GUARANTY, OR THE CONDUCT OF THE RELATIONSHIP BETWEEN LESSOR AND GUARANTOR.

10.   INVALIDITY

If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty shall be construed as though it did not contain that provision, and the rights and liabilities of the parties to this Guaranty shall be construed and enforced accordingly.

[Signatures on following page]

CONFIDENTIAL

ONSET_00034778
FBG_CH1_00090766

[TRICO WIPERS PLOIESTI S.R.L. Guaranty Agreement Signature Page]

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered to Lessor as of the month, day and year first above written.

LESSOR:                                              GUARANTOR:

ONSET FINANCIAL, INC.                                TRICO WIPERS PLOIESTI S.R.L.

BY: _____                          BY: _____
      Cathy Lawrence
TITLE:   Vice President                              TITLE:   EVP Maintenance

CONFIDENTIAL

ONSET_00034779
FBG_CH1_00090767

**DEBTORS' EXHIBIT NO. 175**
**Page 542 of 1907**

# Exhibit 23

FBG_CH1_00090768

**DEBTORS' EXHIBIT NO. 175**
**Page 543 of 1907**

# ONSET FINANCIAL, INC.
274 West 12300 South
Draper, Utah 84020

## MASTER LEASE AGREEMENT NO. OFI1445416

THIS MASTER LEASE AGREEMENT is made on June 28, 2022 between **ONSET FINANCIAL, INC.**, with its principal office located at 274 West 12300 South, Draper, UT 84020 (the "Lessor") and **CARNABY INVENTORY IV, LLC**, a Delaware limited liability company with its principal office located at 19111 Dallas Parkway, Suite 170, Dallas, Texas 75287 (the "Lessee").

### SECTION 1. LEASE:

Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor the Property described in any Schedule executed and delivered by Lessor and Lessee in connection with this Master Lease Agreement. Each Schedule shall incorporate by reference the terms and conditions of this Master Lease Agreement, and together with the Acceptance and Delivery Certificate and Master Progress Payment Agreement, if applicable, shall constitute a separate Lease.

### SECTION 2. TERM OF LEASE:

The term of any Lease, as to all Property designated on the applicable Schedule, shall commence on the Date of Acceptance for such Property, and shall continue for a Base Period ending that number of months from the Lease Commencement Date as specified in the Schedule. Thereafter, Lessee shall have those options as provided in Section 20n of this Master Lease Agreement.

### SECTION 3. RENT AND PAYMENT:

Lessee shall pay as rent for use of the Property, aggregate rentals equal to the sum of all the Monthly Rentals and other payments due under the Lease for the entire Base Period. The Monthly Rental shall begin on the Date of Acceptance and shall be due and payable by Lessee in advance on the first day of each month throughout the Base Period. If the Date of Acceptance does not fall on the first day of a calendar quarter, then the first rental payment shall be calculated by multiplying the number of days from and including the Date of Acceptance to the Lease Commencement Date by a daily rental equal to one-thirtieth (1/30) of the Monthly Rental, and shall be due and payable on the Date of Acceptance. Lessee shall pay to Lessor, or its assigns, all rentals as due when due, without notice or demand, to Lessor's address set forth above, or as otherwise directed in writing by Lessor, or its assigns. **LESSEE SHALL NOT ABATE, SET OFF OR DEDUCT ANY AMOUNT OR DAMAGES FROM OR REDUCE ANY MONTHLY RENTAL OR OTHER PAYMENT DUE FOR ANY REASON. THIS LEASE IS NON-CANCELABLE FOR THE ENTIRE TERM OF THE BASE PERIOD AND ANY RENEWAL PERIODS.**

If any rental or other payment due under any Lease shall be unpaid ten (10) days after its due date, Lessee will pay on demand, as a late charge, but not as interest, the greater of twenty-five dollars ($25.00) or ten percent (10%) per month on any such unpaid amount but in no event to exceed maximum lawful charges.

### SECTION 4. TAXES AND FEES:

Lessee shall promptly pay to Lessor, and agrees to indemnify and hold Lessor harmless from all taxes, fees, assessments and charges paid, payable or required to be collected by Lessor (together with any penalties, fines or interest thereon), which are levied or based on the Monthly Rental or other payment due under the Lease, or on the delivery, acquisition, possession, use, operation, lease, rental, sale, purchase, control or value of the Property, including without limitation, registration and license fees and assessments, recycling fees, state and local privilege or excise taxes, documentary stamp taxes or assessments, sales and use taxes, personal and other property taxes, and taxes or charges based on gross revenue, but excluding taxes based on Lessor's net income, (collectively "taxes"), whether the same be assessed to Lessor or Lessee. Lessee also agrees to pay to Lessor all servicing and administrative costs associated with processing and paying various fees and taxes. Lessor shall file all required reports and returns with all applicable governmental agencies relating to the taxes concerning the Property.

### SECTION 5. NET LEASE:

This is a fully net, non-cancelable lease contract which may not be terminated for any reason except as otherwise specifically provided herein. Lessee has no right of prepayment unless agreed to in writing by Lessor. Lessor and Lessee agree that any Lease is a "Finance Lease" as defined by the Uniform Commercial Code Article 2A. Except as otherwise expressly set forth in this Master Lease Agreement, Lessee shall be responsible for and shall indemnify Lessor against, all costs, expenses and claims of every nature whatsoever arising out of or in connection with or related to the Lease or the Property.

Lessee acknowledges and agrees that its obligations to pay all Monthly Rentals and other amounts due and owing and perform its obligations hereunder shall be primary, absolute, unconditional, independent and irrevocable and shall not be subject to or affected by (i) any circumstance whatsoever, including, without limitation, any setoff, counterclaim, recoupment, abatement, suspension, reduction, rescission, defense or other right otherwise available to Lessee; (ii) any defect in the title, merchantability, condition, design, operation or fitness for use of, or any damage to, removal, abandonment, requisition, taking condemnation or loss or theft or destruction of, the Property, or any interference, interruption, restriction, curtailment or cessation in or prohibition of the use or possession thereof by the Lessee or any other person for any reason whatsoever; or (iii) failure on the part of the manufacturer or the shipper of the Property to deliver the Property or any part thereof to Lessee. Lessor is not responsible to install, test, repair, service, or maintain any Property.

### SECTION 6. CONDITIONS PRECEDENT:

Lessor's obligations under each Schedule, including its obligation to purchase and lease any Property to be leased thereunder, are conditioned upon Lessor's receipt of, in form or substance satisfactory to Lessor, and Lessor's determination that all of the following are satisfactory: (i) evidence as to due compliance with the insurance provisions hereof, (ii) Uniform Commercial Code financing statements and all other filings and recordings as required by Lessor; (iii) lien searches in the jurisdiction of Lessee's organization and in each jurisdiction in which the Property and/or Lessee's chief executive office are located; (iv) incumbency and signature of the officers of Lessee authorized to execute such documents, (v) resolutions of Lessee's Board of Directors and/or Members duly authorizing the leasing, or sale and leaseback, as the case may be, of the Property hereunder and the execution, delivery and performance of the Lease; (vi) if requested by Lessor, certificates of good standing from the jurisdiction of Lessee's organization, and (vii) if requested by Lessor, a copy of Lessee's organizational documents and evidence of Lessee's organizational number.

### SECTION 7. MAINTENANCE AND REPAIRS; RETURN OF PROPERTY:

a. During the continuance of each Lease, Lessee shall, at its own expense, enter into and maintain in force a contract with the manufacturer or other qualified maintenance organization reasonably satisfactory to Lessor for maintenance of each item of Property that requires such a contract. Such contract as to each item shall commence upon the earlier of the Certificate date, if applicable, or the Date of Acceptance. Upon request Lessee shall furnish Lessor with a copy of such contract.

b. During the continuance of each Lease, Lessee shall, at its own cost and expense, and in accordance with all manufacturer maintenance specifications, (i) keep the Property in good repair, condition, operating order and appearance, (ii) make all necessary adjustments repairs and replacements, (iii) not use or permit the Property to be used for any purpose for which, in the opinion of the manufacturer, the Property is not designed or reasonably suitable, and (iv) furnish all required parts, mechanisms, devices, maintenance and servicing, so as to keep each item of Property and any part in good repair and operating order (ordinary wear and tear excepted) in the same condition and appearance as when delivered to the Lessee. Such parts, mechanisms and devices shall immediately become a part of the Property for all purposes hereunder and title thereto shall vest in Lessor. If the manufacturer does not provide maintenance

Initials. _____

Page 1 of 9

NAI-1503661138v3

CONFIDENTIAL

ONSET_00032968
FBG_CH1_00090769

specifications. Lessee shall perform all maintenance in accordance with industry standards for like property.

c. Lessee shall immediately notify Lessor in writing of all details concerning any damage or loss to the Property, including without limitation, any damage or loss arising from the alleged or apparent improper manufacture, functioning or operation of the Property.

d. Lessee shall pay all shipping and delivery charges and other expenses incurred in connection with the Property. Upon default, or at the expiration or earlier termination of any Lease, Lessee shall, at its own expense, assemble, prepare for shipment and promptly return the Property to Lessor at the location within the continental United States designated by Lessor. Upon such return, the Property shall be in the same operating order, repair, condition and appearance as on the Date of Acceptance, except for reasonable wear and tear from proper use thereof, and shall include all engineering changes theretofore prescribed by the manufacturer. Lessee shall provide maintenance certificates or qualification letters and/or arrange for and pay all costs which are necessary for the manufacturer to accept the Property under contract maintenance at its then standard rates ("recertification"). The term of the Lease shall continue upon the same terms and conditions until such recertification has been obtained.

e. With regard to Software, at the expiration or earlier termination of any Lease, or upon demand by Lessor upon the occurrence of an Event of Default (hereinafter defined) under the Lease, Lessee shall (i) destroy all copies or duplicates of the Software which were not returned to Lessor (ii); delete from its systems all Software then installed; (iii) cease using the Software altogether or; iv) disable the computers, computer systems or other equipment which run and/or operate and or are controlled by the Software. Upon its receipt from Lessee, Lessor shall be responsible to return the Software to the owner/vendor/licensor so that Lessee shall not be in breach of any software license.

SECTION 8.   USE; ALTERATIONS AND ATTACHMENTS:

a. Lessee shall at all times keep the Property in its sole possession and control. The Property shall not be moved from the location stated in the Schedule without the prior written consent of Lessor, which consent shall not be unreasonably withheld, provided, however, in no event shall the Property be moved to a location outside the United States.

b. The Property is leased solely for commercial or business purposes.

c. After Lessee receives and inspects any Property and is satisfied that the Property is acceptable, Lessee shall execute and deliver to Lessor an Acceptance and Delivery Certificate in form provided by Lessor; provided, however, that Lessee's failure to execute and deliver an Acceptance and Delivery Certificate for any Property shall not affect the validity and enforceability of the Lease with respect to the Property. If Lessee has executed and delivered a Master Progress Payment Agreement, Lessor may, in its sole discretion, at any time by written notice to Lessee, declare all prior Certificates executed in connection with the Master Progress Payment Agreement to be and constitute the Acceptance and Delivery Certificate for all purposes under the Lease, and the Date of Acceptance of the Lease shall be the date determined by Lessor in its sole discretion which shall not be earlier than the date of the last Certificate. In addition to the inspection rights of Lessor and its assigns under Section 9(b), if required by Lessor and/or its assigns, Lessee shall permit Lessor or Lessor's agent (or Lessor's assigns or an agent of Lessor's assigns), at any reasonable time during normal business hours, (i) to inspect the Property, and (ii) to inspect the premises where the property is or will be located, and (iii) to visit Lessee's management at Lessee's headquarters or elsewhere. In addition, Lessee shall, if required by Lessor and/or its assigns, provide Lessor and/or its assigns with an inspection report satisfactory to Lessor and/or its assigns, in its or their sole discretion. Notwithstanding any other provision herein, any of the foregoing inspections shall be performed, and any such report shall be provided, prior to the execution and delivery by Lessee of an Acceptance and Delivery Certificate. Lessee shall pay any and all costs, including travel expenses, incurred by Lessor and/or its assigns in connection with any such inspections, reports and visits.

d. The Property is and shall remain personal property during the term of the Lease notwithstanding that any portion thereof may in any manner become affixed, attached to or located on real property or any building or improvement thereon. Lessee shall not affix or attach, or permit any of the Property to become affixed or attached to any real property in any manner which would change its nature from that of personal property to real property. Lessee shall not permit the Property to become an accession to other goods or a fixture to or part of any real property. Lessee will obtain and deliver to Lessor a lien waiver in a form satisfactory to Lessor, from all persons not a party hereto who might claim an interest, lien or other claim in the Property.

e. Lessee shall comply with all applicable laws, regulations, requirements, rules and orders, all manufacturer's instructions and warranty requirements, and with the conditions and requirements of all policies of insurance with respect to the Property and the Lease.

f. Lessee may not make alterations or attachments to the Property, that will detrimentally affect the Property's end of Base Period residual value without first obtaining the written consent of Lessor which shall not be unreasonably withheld. Any such alterations or attachments shall be made at Lessee's expense and shall not interfere with the normal and satisfactory operation or maintenance of the Property. The manufacturer may incorporate engineering changes or make temporary alterations to the Property upon request of Lessee. Unless Lessor shall otherwise agree in writing, all such alterations and attachments shall be and become the property of Lessor upon their attachment to the Property or, at the option of Lessor, shall be removed by Lessee at the termination of the Lease and the Property restored at Lessee's expense to its original condition, reasonable wear and tear only excepted.

g. Lessee shall ensure that the Property is installed, used, operated and, at the termination of the Lease, if applicable, removed at Lessee's expense (i) in accordance with any applicable manufacturer's manuals or instructions; (ii) by competent and duly qualified personnel only; and (iii) in accordance with applicable governmental regulations.

h. In the event the Property includes Software, the following shall apply: (i) Lessee shall possess and use the Software in accordance with the terms and conditions of any license agreement entered into with the owner/vendor/licensor of such Software ("License") (at Lessor's request, Lessee shall provide a complete copy of the License to Lessor) and shall not breach the License; (ii) Lessee agrees that Lessor has an interest in the License and Software due to its payment of the price thereof and is an assignee or third-party beneficiary of the License; (iii) as due consideration for Lessor's payment of the price of the License and Software and for providing the Software to Lessee at a lease rate (as opposed to a debt rate), Lessee agrees that Lessor is leasing (and not financing) the Software to Lessee; (iv) except for the original price paid by Lessor, Lessee shall, at its own expense, pay promptly when due all servicing fees, maintenance fees, update and upgrade costs, modification costs, and all other costs and expenses relating to the License and Software and maintain the License in effect during the term of the Lease; and (v) the Software shall be deemed Property for all purposes under the Lease.

i. Unless otherwise agreed to in writing by Lessor, the Property shall at all times be used in Lessee's business and shall not at any time be held for sale or lease or otherwise constitute "inventory", as such term is defined in Utah Uniform Commercial Code (as may be amended from time to time).

j. With respect to Lessee's use of the property, Lessee shall comply with all present and future federal, state, regional and municipal laws, statutes, ordinances, regulations, rules, judicial and similar requirements of all federal, state, regional and municipal governmental agencies, bodies or officials or other governmental entities with legal authority pertaining to the protection of human or wildlife health and safety or the environment, including, without limitation, any such laws, statutes, ordinances, regulations, rules, judicial and administrative orders and decrees, permits, licenses, approvals, authorizations and similar requirements regulating or relating to Hazardous Materials (defined below) or to the generation, use, storage, release, presence, disposal, transport, or handling of any other substance, oil, oil byproducts, gas element, or material which has the potential to pollute, contaminate or harm any land, subsurface area, water source or watercourse, air or other natural resource, hereinafter referred to as "Environmental Laws".

 

CONFIDENTIAL

ONSET_00032969
FBG_CH1_00090770

DEBTORS' EXHIBIT NO. 175
Page 545 of 1907

"Hazardous Materials" is defined as any hazardous or toxic substance, material or waste that are or become regulated under any applicable local, state or federal law, including, but not limited to, those substances, materials, and wastes listed in the United States Department of Transportation Hazardous Materials Table (49 CFR 172.101) or defined by the Environmental Protection Agency ("EPA") as "any material that poses a threat to human health and/or the environment. Typical hazardous substances are toxic, corrosive, ignitable, explosive, or chemically reactive".

SECTION 9.   OWNERSHIP AND INSPECTION:

a.   The Property shall at all times be the property of Lessor or its assigns, and Lessee shall have no right, title or interest therein except as to the use thereof subject to the terms and conditions of the Lease. For purposes of the foregoing, Lessee transfers to Lessor all of Lessee's right, title and interest (including all ownership interest) in and to the Property free and clear of all liens, security interests and encumbrances. Lessor may affix (or require Lessee to affix) tags, decals or plates to the Property indicating Lessor's ownership, and Lessee shall not permit their removal or concealment. Lessee shall not permit the name of any person or entity other than Lessor or its assigns to be placed on the Property as a designation that might be interpreted as a claim of ownership or security interest.

b.   Lessor, its assigns and their agents shall have free access to the Property at all reasonable times during normal business hours for the purpose of inspecting the Property and for any other purpose contemplated in the Lease. Lessee shall pay any and all costs incurred by Lessor in connection with any inspection performed by Lessor and/or its assigns   .

c.   **LESSEE SHALL KEEP THE PROPERTY AND LESSEE'S INTEREST UNDER ANY LEASE FREE AND CLEAR OF ALL LIENS AND ENCUMBRANCES, EXCEPT THOSE PERMITTED IN WRITING BY LESSOR OR ITS ASSIGNS.**

SECTION 10.   DISCLAIMER OF WARRANTIES:

a.   WITHOUT WAIVING ANY CLAIM THE LESSEE MAY HAVE AGAINST ANY MANUFACTURER, LESSEE ACKNOWLEDGES AND AGREES THAT i) LESSOR IS NOT A SELLER, SUPPLIER OR THE MANUFACTURER OF THE PROPERTY (AS SUCH TERMS ARE DEFINED OR USED, AS THE CASE MAY BE, IN THE UNIFORM COMMERCIAL CODE) OR DEALER, NOR A SELLER'S OR A DEALER'S AGENT, ii) THE PROPERTY IS OF A SIZE, DESIGN, CAPACITY AND MANUFACTURE SELECTED BY AND ACCEPTABLE TO THE LESSEE, iii) THE LESSEE HAS EXAMINED AND IS SATISFIED THAT EVERY ITEM OF PROPERTY IS SUITABLE FOR ITS PURPOSE, iv) THE LESSEE ACCEPTS THE PROPERTY AND EACH PART THEREOF "AS IS" AND "WHERE IS", V) THE LESSOR HAS NOT MADE AND DOES NOT MAKE, AND HEREBY DISCLAIMS LIABILITY FOR, AND LESSEE HEREBY WAIVES ALL RIGHTS AGAINST LESSOR RELATING TO, ANY AND ALL WARRANTIES, REPRESENTATIONS OR OBLIGATIONS WHATSOEVER, EXPRESS OR IMPLIED, ARISING BY APPLICABLE LAW OR OTHERWISE, RELATING TO THE PROPERTY, OR ANY PART THEREOF, INCLUDING, WITHOUT LIMITATION, ANY AND ALL WARRANTIES, REPRESENTATIONS OR OBLIGATIONS AS TO: (1) THE DESCRIPTION, CONDITION, DESIGN, QUALITY OR PERFORMANCE OF THE PROPERTY OR QUALITY OR CAPACITY OF MATERIALS OR WORKMANSHIP IN THE PROPERTY; (2) ITS MERCHANTABILITY OR FITNESS OR SUITABILITY FOR A PARTICULAR PURPOSE WHETHER OR NOT DISCLOSED TO LESSOR; (3) THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE (4) THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT OR THE LIKE; AND (5) THE ABSENCE OF OBLIGATIONS BASED ON STRICT LIABILITY IN TORT. It is agreed that all such risks incident to the matters described in this Section 10a, as between the Lessor and the Lessee are to be borne by the Lessee. If the Property or Software is not properly installed, does not function as represented or warranted by original owner/seller/supplier/licensor, or is unsatisfactory for any reason, Lessee shall make any claim on account thereof solely against original owner/seller/supplier/licensor and shall nevertheless pay all sums payable

under the Lease. Lessee hereby waiving the right to make any such claims against Lessor. Lessor shall not be liable to Lessee for any loss, damage or expense of any kind or nature caused, directly or indirectly, by the Property or the use, possession or maintenance thereof, or the repair, service or adjustment thereof, or by any delay or failure to provide any such maintenance, repair, service or adjustment, or by any interruption of service or loss of use thereof (including without limitation, Lessee's use of or right to use any Software) or for any loss of business howsoever caused.

b.   NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THE LEASE, LESSOR SHALL NOT, UNDER ANY CIRCUMSTANCES, BE LIABLE TO LESSEE OR ANY THIRD PARTY, FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THE TRANSACTION CONTEMPLATED HEREUNDER, WHETHER IN AN ACTION BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) OR ANY OTHER LEGAL THEORY, INCLUDING WITHOUT LIMITATION, LOSS OF ANTICIPATED PROFITS, OR BENEFITS OF USE OR LOSS OF BUSINESS, EVEN IF LESSOR IS APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING.

IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT EACH AND EVERY PROVISION OF ANY LEASE WHICH PROVIDES FOR A LIMITATION OF LIABILITY, DISCLAIMER OF WARRANTIES OR EXCLUSION OF DAMAGES, IS INTENDED BY THE PARTIES TO BE SEVERABLE FROM ANY OTHER PROVISION AND IS A SEPARABLE AND INDEPENDENT ELEMENT OF RISK ALLOCATION AND IS INTENDED TO BE ENFORCED AS SUCH.

c.   Lessor assigns to Lessee all assignable warranties on the Property, including without limitation any warranties described in Lessor's purchase contract, which assignment shall be effective only (i) during the Base Period and any renewal period thereof; and (ii) so long as no Event of Default exists.

SECTION 11.   ASSIGNMENT BY LESSOR:

Lessor may assign or transfer its rights and interests in the Lease and/or the Property to another party ("**Lessor's Assignee**") either outright or as security for loans (collectively the "**Underwriting**"). Upon notice of any such assignment and instructions from Lessor, Lessee shall pay its Monthly Rental and other payments and perform its other obligations under the Lease to the Lessor's Assignee (or to another party designated by Lessor's Assignee). Upon any such sale or assignment, **LESSEE'S OBLIGATIONS TO LESSOR'S ASSIGNEE UNDER THE ASSIGNED LEASE SHALL BE ABSOLUTE AND UNCONDITIONAL AND LESSEE WILL NOT ASSERT AGAINST LESSOR'S ASSIGNEE ANY CLAIM, DEFENSE, OFFSET OR COUNTERCLAIM WHICH LESSEE MIGHT HAVE AGAINST LESSOR.** Lessee waives and will not assert against any assignee of Lessor any claims, defenses, or set-offs which Lessee could assert against Lessor. Lessor's Assignee shall have all of the rights but none of the obligations of Lessor under the assigned Lease, and after such assignment Lessor shall continue to be responsible for all of Lessor's obligations under the Lease.

Upon any such assignment, Lessee agrees to promptly execute or otherwise authenticate and deliver to Lessor estoppel certificates, acknowledgements of assignment, records and other documents requested by Lessor which acknowledge the assignment, and affirmation of provisions of the Lease which may be required to effect the Underwriting. Lessee authorizes Lessor's assigns to file UCC-1 financing statements or precautionary filings as Lessor or its assigns deem necessary. Lessor's assigns are authorized to take any reasonable measures necessary to protect their interest in the Property.

Only one executed counterpart of any Schedule shall be marked "Original"; any other executed counterparts shall be marked "Duplicate Original" or "Counterpart". No security interest in any Schedule may be created or perfected through the transfer or possession or control, as applicable, of any counterpart other than the document or record, as applicable, marked "Original".

SECTION 12.   ASSIGNMENT BY LESSEE:

**LESSEE MAY NOT ASSIGN ANY LEASE OR ANY OF ITS RIGHTS HEREUNDER OR SUBLEASE THE PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR. NO PERMITTED**

CONFIDENTIAL

ONSET_00032970
FBG_CH1_00090771

**DEBTORS' EXHIBIT NO. 175**
**Page 546 of 1907**

**ASSIGNMENT OR SUBLEASE SHALL RELIEVE LESSEE OF ANY OF ITS OBLIGATIONS HEREUNDER.**

Lessee grants Lessor a security interest in any existing or future sublease of the Property and the proceeds thereof, whether or not such sublease is prohibited. Subject to the terms of this Lease, this Lease and each Schedule inure to the benefit of, and are binding upon, the successors and assigns of Lessee, and, without limiting the foregoing, shall bind all persons who become bound as a "new debtor" (as defined in the Uniform Commercial Code) to this Lease and any Schedule.

SECTION 13.   LESSEE'S REPRESENTATIONS AND WARRANTIES:

Lessee represents and warrants as follows:

a. If Lessee is a corporation, that it is duly organized and validly existing in good standing under the laws of the jurisdiction of its incorporation, that it is duly qualified to do business in each jurisdiction where any Property is, or is to be located, and has full corporate power and authority to hold property under lease and to enter into and perform its obligations under any Lease; that the execution, delivery and performance by Lessee of any Lease has been duly authorized by all necessary corporate action on the part of Lessee, and is not inconsistent with its articles of incorporation or by-laws or other governing instruments;

b. (i) Lessee's state of organization is the state listed in the introductory paragraph of this Lease; (ii) Lessee's principal office is located in the state listed in the introductory paragraph of this Lease; (iii) Lessee is the legal entity or organization indicated in the introductory paragraph of this Lease, which organization is duly organized, validly existing and in good standing under the laws of the state listed in the introductory paragraph of this Lease; and (iv) Lessee's full and exact legal name is the same as listed in the introductory paragraph of this Lease;

c. The execution, delivery and performance by Lessee of any Lease does not violate any law or governmental rule, regulation, or order applicable to Lessee, does not and will not contravene any provision of, constitute a default under, or result in the creation of any lien on or in any property or assets of the Lessee, pursuant to any material indenture, mortgage, contract, or other instrument to which it is bound and, upon execution and delivery of each Lease, will constitute a legal, valid and binding agreement of Lessee, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceeding in equity or in law);

d. If Lessee is a partnership, that it is duly organized by written partnership agreement and validly existing in accordance with the laws of the jurisdiction of its organization, that it is duly qualified to do business in each jurisdiction where the Property is, or is to be located, and has full power and authority to hold property under lease and to enter into and perform its obligations under any Lease; that the execution, delivery and performance by Lessee of any Lease has been duly authorized by all necessary action on the part of the Lessee, and is not inconsistent with its partnership agreement or other governing instruments. Upon request, Lessee will deliver to Lessor certified copies of its partnership agreement and other governing instruments and original certificate of partners and other instruments deemed necessary or desirable by Lessor. To the extent required by applicable law, Lessee has filed and published its fictitious business name certificate;

e. No action, including any permits or consents, in respect of or by any state, federal or other governmental authority or agency is required with respect to the execution, delivery and performance by Lessee of any Lease; and;

f. There are no actions, suits or proceedings pending or, to the knowledge of the Lessee, threatened against or affecting the Lessee in any court or before any governmental commission, board or authority which, if adversely determined, will have a material adverse effect on the ability of the Lessee to perform its obligations under any Lease.

SECTION 14.   RISK OF LOSS ON LESSEE:

From the earlier of the date the supplier ships the Property to Lessee or the date Lessor confirms Lessee's purchase order or contract to supplier until the date the Property is returned to Lessor as provided in the Lease, Lessee hereby assumes and shall bear all risk of loss for theft, damage, non-delivery or destruction to the Property or caused by the Property to the environment, persons or other property (hereafter, such loss, damage, non-delivery or destruction to the Property or caused by the Property to the environment, persons or other property shall be referred to as the "Casualty"), howsoever caused.   NO SUCH CASUALTY SHALL IMPAIR ANY OBLIGATION OF LESSEE UNDER THIS LEASE, WHICH OBLIGATION, INCLUDING TIMELY RENTAL PAYMENTS, SHALL CONTINUE IN FULL FORCE AND EFFECT.

SECTION 15.   LESSEE'S WAIVERS:

To the extent permitted by applicable law, Lessee hereby waives any and all rights and remedies conferred upon a Lessee by §§ 70A-2A-508 through 70A-2A-522 of the Utah Uniform Commercial Code, including but not limited to Lessee's rights to: (i) cancel the Lease; (ii) repudiate the Lease; (iii) reject the Property; (iv) revoke acceptance of the Property; (v) recover damages from Lessor for any breaches of warranty or for any other reason; (vi) claim, grant or permit a security interest in the Property in Lessee's possession or control for any reason; (vii) deduct all or any part of any claimed damages resulting from Lessor's default, if any, under the Lease; (viii) cover by making any purchase or lease of or contract to purchase or lease property in substitution for the Property due from Lessor; (ix) recover any general, special, incidental or consequential damages, for any reason whatsoever; and (x) commence legal action against Lessor for specific performance, replevin, detinue, sequestration, claim and delivery or the like for any Property identified in the Lease.   To the extent permitted by applicable law, Lessee also hereby waives any rights now or hereafter conferred by statute or otherwise which may require Lessor to sell, lease or otherwise use any Property in mitigation of Lessor's Damages as set forth in Section 19 hereof or which may otherwise limit or modify any of Lessor's rights or remedies in that section.

SECTION 16.   INDEMNIFICATION:

Lessee shall indemnify and hold Lessor harmless from and against any and all claims, (including without limitation negligence, tort and strict liability), damages, judgments, suits and legal proceedings, and any and all costs and expenses in connection therewith (including attorney fees incurred by Lessor either in enforcing this indemnity or in defending against such claims), arising out of or in any manner connected with or resulting from the Lease or the Property, including, without limitation the manufacture, purchase, financing, ownership, rejection, non-delivery, transportation, delivery, possession, use, operation, maintenance, condition, lease, return, storage or disposition thereof; including without limitation (i) claims for injury to or death of persons and for damage to property; (ii) claims relating to latent or other defects in the Property whether or not discoverable by Lessor; (iii) claims relating to patent, copyright, or trademark infringement; and (iv) claims for wrongful, negligent or improper act or misuse by Lessor, except those claims arising in connection with and while the Property is in the possession of Lessor or its agents; and (v) claims for any damages to persons or property, any costs associated with, or any fines caused by violation of any Environmental Laws.   Lessee agrees to give Lessor prompt notice of any such claim or liability.   For purposes of this paragraph and any Lease, the term "Lessor" shall include Lessor, its successors and assigns, shareholders, members, owners, partners, directors, officers, representatives and agents, and the provisions of this paragraph shall survive expiration of any Lease with respect to events occurring prior thereto.

Upon request of Lessor, Lessee shall assume the defense of all demands, claims, or actions, suits and all proceedings against Lessor for which indemnity is provided and shall allow Lessor to participate in the defense thereof.   Lessor shall be subrogated to all rights of Lessee for any matter which Lessor has assumed obligation hereunder, and may settle any such demand, claim, or action without Lessee's prior consent, and without prejudice to Lessor's right to indemnification hereunder.

SECTION 17.   INSURANCE:

Lessee shall obtain and maintain for the entire time the Lease is in effect, at its own expense (as primary insurance for Lessor and Lessee), property damage and liability insurance (including any claims caused from the breach of any Environmental Laws involving the Property) and insurance against loss or

Initials

CONFIDENTIAL

ONSET_00032971
FBG_CH1_00090772

**DEBTORS' EXHIBIT NO. 175**
**Page 547 of 1907**

damage to the Property including without limitation loss by fire (including so-called extended coverage), theft, collision and such other risks of loss as are customarily insured against on the type of Property leased under any lease and by businesses in which Lessee is engaged, in such amounts, in such form and with such insurers as shall be satisfactory to Lessor; provided, however, that the amount of insurance against loss or damage to the Property shall be equal to or greater than the full replacement value or the Stipulated Loss Value (as defined herein) of such items of Property. Stipulated Loss Value means the product of the Property cost (as designated on the related Schedule) and the applicable percentage factor set forth on the Stipulated Loss Schedule attached to the Schedule ("Stipulated Loss Value"). Each insurance policy will name Lessee as insured and Lessor and its assignees as additional insureds and loss payees thereof, shall contain cross-liability endorsements and shall contain a clause requiring the insurer to give Lessor and its assignees at least thirty (30) days prior written notice of any material alteration in the terms of such policy or of the cancellation thereof. Lessee shall furnish to Lessor a certificate of insurance or other evidence satisfactory to Lessor that such insurance coverage is in effect; provided, however, that Lessor shall be under no duty either to ascertain the existence of or to examine such insurance policy or to advise Lessee in the event such insurance coverage shall not comply with the requirements hereof. All insurance covering loss or damage to the Property shall contain a breach of warranty clause satisfactory to Lessor.

In the event of a Casualty to the Property (or any part thereof) and irrespective of payment from any insurance coverage maintained by Lessee, but applying full credit thereof, Lessee shall, at the option of Lessee, (unless an Event of Default has occurred and shall be continuing, in which case, it shall be at Lessor's option), (i) place the Property in good repair, condition and working order; or (ii) replace the Property (or any part thereof) with like property of equal or greater value, in good repair, condition and working order and transfer clear title to such replacement property to Lessor whereupon such replacement property shall be deemed the Property for all purposes under the Lease; or (iii) pay to Lessor the total rent due and owing at the time of such payment plus an amount calculated by Lessor which is equal to the Stipulated Loss Value (defined in the Stipulated Loss Schedule) specified in the Stipulated Loss Schedule attached to the Schedule.

Lessee shall notify Lessor within ten (10) days of the actual date of the Casualty, and in its notice include its election of either option (i), (ii), or (iii), as set forth above. If Lessee fails to notify Lessor of its election within ten (10) days of the Casualty, Lessor shall make the election (within five (5) days of notice from Lessee of the Casualty) and direct the Lessee to fully perform the repair, replacement or payment which performance shall occur within sixty (60) days of the date of the Casualty. Lessee's failure to notify Lessor within ten (10) days of the Casualty shall constitute a default as set forth in Section 18 herein, and Lessee shall waive its right to elect option (i), (ii), or (iii) as set forth above. Upon discovery of the Casualty, Lessor shall direct Lessee to repair, replace, or make payment and Lessee shall fully perform with thirty (30) days of such notice.

SECTION 18.   DEFAULT.

An "Event of Default" shall occur under any Lease if:

a.   Lessee fails to pay any Monthly Rental or other payment required under the Lease when the same becomes due and payable and such failure continues for ten (10) days after its due date;

b.   Lessee fails to promptly execute or otherwise authenticate and deliver to Lessor or its assigns any document or record, as applicable, required under the terms of this Master Lease Agreement;

c.   Lessee attempts to or does, remove, sell, assign, transfer, encumber, sublet or part with possession of any one or more items of the Property or any interest under any Lease, except as expressly permitted herein, or permits a judgment or other claim to become a lien upon any or all of Lessee's assets or upon the Property;

d.   Lessee permits any item of Property to become subject to any levy, seizure, attachment, assignment or execution, or Lessee abandons any item of Property;

e.   Lessee fails to immediately (within ten (10) days) notify Lessor of any loss, damage, or destruction to the Property or fails to timely repair, replace, or make payment as required in Sections 7 and 17, herein;

f.   Lessee or any guarantor, shall (i) be adjudicated insolvent or bankrupt, or cease, be unable, or admit its inability, to pay its debts as they mature, or make a general assignment for the benefit of creditors or enter into any composition or arrangement with creditors; (ii) apply for or consent to the appointment of a receiver, trustee or liquidator of it or of a substantial part of its property, or authorize such application or consent, or proceedings seeking such appointment shall be instituted against it without such authorization, consent or application and shall continue undismissed for a period of sixty (60) days; (iii) authorize or file a voluntary petition in bankruptcy or apply for or consent to the application of any bankruptcy, reorganization in bankruptcy, arrangement, readjustment of debt, insolvency, dissolution, moratorium or other similar law of any jurisdiction, or authorize such application or consent; or proceedings to such end shall be instituted against it without such authorization, application or consent and such proceeding instituted against it shall continue undismissed for a period of sixty (60) days;

g.   Lessee is in default under any Lease or agreement executed with Lessor; or Lessee fails to sign or otherwise authenticate and deliver to Lessor any document or record requested by Lessor in connection with any Lease executed with Lessor; or Lessee fails to protect Lessor's rights and interests in any Lease and the Property; or Lessee fails to provide financial statements to Lessor as provided in Section 20k hereof; or Lessee is in default of other loan or lease from, or guaranty or other financing obligation to any person or entity other than Lessor that exceeds $10,000,000, and in such case applicable grace periods for curing such default or event of default have expired up to thirty (30) days if such applicable grace periods are shorter than that; provided, however, that any waiver or amendment out of existence or other resolution of any default or event of default under such agreement shall waive the existence of such event of default hereunder automatically;

h.   Lessee or any guarantor, breaches any of its representations and warranties made under any Lease, or if any such representations or warranties shall be false or misleading in any material respect;

i.   Lessee or any guarantor, fails to observe or perform any of its covenants and obligations required to be observed or performed under the Lease and such failure continues uncured for ten (10) days after occurrence thereof, except that the ten (10) day cure period shall not apply and an Event of Default shall occur immediately upon Lessee's failure to maintain insurance;

j.   Lessee or any guarantor, shall suffer a material adverse change in its financial condition after the date hereof as determined by Lessor in its sole discretion;

k.   There shall occur (i) a substantial change in the ownership or membership of Lessee, any guarantor, any parent of Lessee or any guarantor, or any entity that has a direct or indirect ownership interest in Lessee or any guarantor, or (ii) a substantial change in control of the board of directors, members or manager of Lessee, any guarantor, any parent of Lessee or any guarantor, or any entity that has a direct or indirect ownership interest in Lessee or any guarantor.

l.   Lessor in good faith believes that the prospect of payment or performance has become impaired, or if Lessee takes any action, makes any representation, or fails to do anything requested by Lessor, at any time before or after the execution of this Master Lease Agreement, the result of which causes Lessor, in good faith, to believe that the prospect of Lessee's payment or performance under the Lease is impaired, or otherwise causes Lessor to feel insecure in funding or continuing to fund the Lease or any Schedule;

m.   Lessee, any guarantor, any parent of Lessee or any guarantor, or any entity that has a direct or indirect ownership interest in Lessee or any guarantor shall have terminated or changed its corporate or other entity existence, consolidated with, merged into, or conveyed or leased substantially all of its assets to any person or entity, unless: (i) such person or entity executes and delivers to Lessor an agreement satisfactory in form and substance to Lessor, in its sole discretion, containing such person's or entity's effective assumption, and its agreement to pay, perform, comply with and otherwise be liable for, in a due and punctual manner, all of Lessee's (or guarantor's) obligations having previously arisen, or then or thereafter arising, under

CONFIDENTIAL

ONSET_00032972
FBG_CH1_00090773

the Lease or guaranty, as the case may be, together with any and all documents, agreements, instruments, certificates, opinions and filings requested by Lessor; (ii) Lessor is satisfied as to the creditworthiness of such person's or entity's conformance to other standard criteria then used by Lessor for such purposes; and (iii) Lessee or any guarantor has provided no less than thirty (30) days prior written notice of such occurrence to Lessor or its assigns;

n.   Lessee breaches any License, maintenance or other agreement for Software or fails to pay when due all servicing fees, maintenance fees, update and upgrade costs, modification costs, and all other costs and expenses relating to the License and Software and fails to maintain the License in effect during the term of the Lease.

SECTION 19.   REMEDIES:

Upon the occurrence of any Event of Default and at any time thereafter, Lessor may with or without giving notice to Lessee and with or without canceling the Lease, do any one or more of the following

a.   enforce this Master Lease Agreement according to its terms;

b.   require additional collateral to secure the Lease;

c.   upon notice to Lessee, cancel this Master Lease Agreement and any or all Schedules executed pursuant thereto;

d.   advance funds on Lessee's behalf to cure the Event of Default, whereupon Lessee shall immediately reimburse Lessor therefore, together with late charges accrued thereon;

e.   upon notice to Lessee, refuse to fund any Schedule(s) pursuant to the Lease.

f.   declare any Lease or Leases immediately due and payable;

g.   refuse to deliver the Property to Lessee;

h.   declare immediately due and payable all amounts due or to become due hereunder for the full term of the Lease (including any renewal period or purchase options which Lessee has contracted to pay);

i.   in its sole discretion, sell, re-lease or otherwise dispose of any or all of the Property covered under any Schedule, whether or not in Lessor's possession, in a commercially reasonable manner at public or private sale with notice to Lessee (the parties agreeing that ten (10) days' prior written notice shall constitute adequate notice of such sale), and in the event a court of competent jurisdiction or other governing authority shall determine that the Lease is not a "true lease" or is a lease intended as security or that Lessor (or its assigns) does not hold legal title to or is not the owner of the Property, apply the net proceeds of any such disposition, after deducting all costs incurred by Lessor in connection with such default, to the obligations of Lessee hereunder and under such Schedule, or retain any or all of the Property in full or partial satisfaction, as the case may be, with Lessee remaining liable for any deficiency. The sale, re-lease, or other disposition may, at Lessor's sole option, be conducted at Lessee's premises;

j.   without notice to Lessee, repossess, disable or demand Lessee to disable the Property wherever found, with or without legal process, and for this purpose Lessor and/or its agents or assigns may enter upon any premises of or under the control or jurisdiction of Lessee or any agent of Lessee, without liability for suit, action or other proceeding by Lessee (any damages occasioned by such repossession or disablement being hereby expressly waived by Lessee) and remove or disable the Property therefrom; Lessee further agrees on demand, to assemble the Property and make it available to Lessor at a place to be designated by Lessor;

k.   exercise any other right or remedy which may be available to it under the Uniform Commercial Code or any other applicable law;

l.   if Lessee breaches any of its obligations under Section 7e of this Master Lease Agreement with regard to Software, Lessee shall be liable to Lessor for additional damages in an amount equal to the original price paid by

Lessor for the Software, and in addition, at Lessor's option, Lessor shall be entitled to injunctive relief;

m.   if Lessor determines, in its sole discretion, not to take possession of the Property, Lessor shall continue to be the owner of the Property and may, but is not obligated to, dispose of the Property by sale or otherwise, all of which determinations may be made by Lessor in its sole discretion and for its own account;

n.   a cancellation hereunder shall occur only upon notice by Lessor and only as to such items of Property as Lessor specifically elects to cancel and this Lease shall continue in full force and effect as to the remaining items, if any;

o.   demand and recover as liquidated damages for loss of a bargain and not as a penalty, and in lieu of any further payments of rent the Stipulated Loss Value of the Property as of the rent payment date immediately preceding the date of default together with all accrued but unpaid late charges, interest, taxes, penalties, and any and all other sums due and owing under the Schedule as of the rent payment date immediately preceding the date of default;

p.   With respect to any exercise by Lessor of its right to recover and/or dispose of any Property securing Lessee's obligations under any Schedule, Lessee acknowledges and agrees as follows: (i) Lessor shall have no obligation, subject to the requirements of commercial reasonableness, to clean-up or otherwise prepare the Property for disposition; (ii) Lessor may comply with any applicable State or Federal law requirements in connection with any disposition of the Property, and any actions taken in connection therewith shall not be deemed to have adversely affected the commercial reasonableness of any disposition of such Property; (iii) Lessor may specifically disclaim any warranties of title or the like with respect to the disposition of the Property; (iv) if Lessor purchases any of the Property, Lessor may pay for the same by crediting some or all of Lessee's obligations hereunder or under any Schedule; and (v) no right or remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and shall be in addition to any other remedy referred to above or otherwise available at law or in equity, and may be exercised concurrently or separately from time to time;

q.   (i) by notice to Lessee, declare any license agreement with respect to Software terminated, in which event the right and license of Lessee to use the Software shall immediately terminate, and Lessee shall thereupon cease all use of the Software and return all copies thereof to Lessor or original licensor; (ii) have access to and disable, or demand Lessee to disable the Software by any means deemed necessary by Lessor, including but not limited to disabling the computers, computer systems or other equipment which run and/or operate and/or are controlled by the Software, for which purposes Lessee hereby expressly consents to such access and disablement, promises to take no action that would prevent or interfere with Lessor's ability to perform such access and disablement, and waives and releases any and all claims that it has or might otherwise have for any and all losses, damages, expenses, or other detriment that it might suffer as a result of such access and disablement; and (iii) Lessee agrees that the detriment which Lessor will suffer as a result of a breach by Lessee of the obligations contained in the Lease cannot be adequately compensated by monetary damages, and therefore Lessor shall be entitled to injunctive and other equitable relief to enforce the provisions of this Section 19q. LESSEE AGREES THAT LESSOR SHALL HAVE NO DUTY TO MITIGATE LESSOR'S DAMAGES UNDER ANY LEASE BY TAKING LEGAL ACTION TO RECOVER THE SOFTWARE FROM LESSEE OR ANY THIRD PARTY, OR TO DISPOSE OF THE SOFTWARE BY SALE, RE-LEASE OR OTHERWISE.

Lessor may exercise any and all rights and remedies available at law or in equity, including those available under the Uniform Commercial Code. The rights and remedies afforded Lessor hereunder shall not be deemed to be exclusive, but shall be in addition to any rights or remedies provided by law. Lessor's failure promptly to enforce any right or remedy hereunder shall not operate as a waiver of such right or remedy, and Lessor's waiver of any default shall not constitute a waiver of any subsequent or other default. Lessor may accept late payments or partial payments of amounts due under the Lease and may delay enforcing any of Lessor's rights or remedies hereunder without losing or waiving any of Lessor's rights or remedies under the Lease.

Initials: _____

CONFIDENTIAL

ONSET_00032973
FBG_CH1_00090774

DEBTORS' EXHIBIT NO. 175
Page 549 of 1907

In connection with Lessor's exercise of any or all of the above-listed remedies, Lessor shall be entitled to recover all costs and expenses incurred by Lessor in the repossession, recovery, storage, repair, sale, re-lease or other disposition of the Property, or the termination or disabling of Software, including without limitation, reasonable attorney fees and costs incurred in connection therewith or otherwise resulting or arising from Lessee's default, and any indemnity if then determinable, plus interest on all of the above until paid (before and after judgment) at the lesser of the rate of eighteen percent (18%) per annum or the highest rate permitted by law. In the event of involuntary repossession by Lessor through judicial proceedings, or through a sheriff's levy and sale, Lessee hereby waives any requirement that Lessor post a bond.

If Lessor demands payment from Lessee of the Stipulated Loss Value, of the Property, upon full and indefeasible payment thereof to Lessor, together with all related costs, expenses, interest (i.e., the Lessor's Damages, as defined in Section 22g), then all of Lessor's right, title and interest in and to the subject Property shall, without further action, be deemed to have been conveyed to Lessee on an AS IS, WHERE IS basis, except Lessor shall warrant the absence of any liens created by or through Lessor.

SECTION 20.   ADDITIONAL PROVISIONS:

a.   Security Interest. The parties acknowledge and agree that this is a "true lease" and title to the leased Property (or Lessee's interest in the Property if the Property is Software) is vested in the Lessor. In the event a court of competent jurisdiction or other governing authority shall determine that the Lease is not a "true lease" or is a lease intended as security or that Lessor (or its assigns) does not hold legal title to or is not the owner of the Property, the following shall apply:

   i  Effective the execution date of the Lease, Lessee, as debtor, grants a security interest to Lessor, as secured party, in the Property (or Lessee's interest in the Property if the Property is Software), including but not limited to equipment and other personal property, general intangibles, Software and Lessee's license rights and other rights to use the Software, and accessions thereto, and any refunds, rebates, remittances, and all rights and services related thereto, and proceeds of any of the foregoing, to secure all duties and obligations of Lessee under any Lease or other agreement with Lessor. The Lease shall be deemed to be a security agreement with Lessee having granted to Lessor a security interest in the Property, and the Property shall secure all duties and obligations of Lessee under any Lease or other agreement with Lessor. With regard to any security interest created hereunder in any of the Property, Lessee consents and agrees that Lessor shall have all of the rights, privileges and remedies of a secured party under the Utah Uniform Commercial Code.

   ii  Lessee authorizes Lessor to file financing statements and any records describing the Property and to take any and all actions necessary to perfect Lessor's interest in the Property. Lessee agrees to execute any further documents, and to take any further actions, reasonably requested by Lessor to evidence or perfect the security interest granted under this subpart of the Lease, to maintain the first priority of the security interests, or to effectuate the rights granted to Lessor under this subpart of the Lease.

b.   Entire Agreement. Each Schedule shall incorporate the terms and conditions of this Master Lease Agreement and, together with the Acceptance and Delivery Certificate and Master Progress Payment Agreement (and Certificates thereunder), if applicable, Transaction Documents, and any amendments to any of the foregoing documents, shall supersede all prior communications, representations, agreements, and understandings, including but not limited to offer letters, proposal letters, comfort letters, commitment letters and the like, and constitute the entire understanding and agreement between the Lessor and Lessee with regard to the subject matter hereof and thereof, and there is no understanding or agreement, oral or written, which is not set forth herein or therein. In the event of conflict between the provisions of this Master Lease Agreement and any Schedule, the provisions of the Schedule shall govern.

c.   Time Is of the Essence. Time is of the essence with respect to any Lease.

d.   Captions. Captions and section headings are inserted for reference and convenience only and in no way define, limit or describe the scope of this agreement or intent of any provision.

e.   Governing Law. THIS LEASE (AS DEFINED IN SECTION 22 HEREIN) SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF UTAH, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE. THE PARTIES AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE STATE OF UTAH; ANY SUIT OR OTHER PROCEEDING BROUGHT BY EITHER PARTY TO ENFORCE OR CONSTRUE THIS LEASE (AS DEFINED IN SECTION 22 HEREIN), OR TO DETERMINE MATTERS RELATING TO THE PROPERTY OR THE RELATIONSHIP BETWEEN THE PARTIES HERETO SHALL BE BROUGHT ONLY IN THE STATE OR FEDERAL COURTS IN THE STATE OF UTAH. THIS LEASE WAS EXECUTED IN THE STATE OF UTAH (BY THE LESSOR HAVING COUNTERSIGNED IT IN UTAH) AND IS TO BE PERFORMED IN THE STATE OF UTAH (BY REASON OF ONE OR MORE PAYMENTS REQUIRED TO BE MADE TO LESSOR IN UTAH).

f.   Waiver of Trial by Jury. Lessor and Lessee hereby waive the right to trial by jury of any matters arising out of the Lease or Property or the conduct of the relationship between Lessor and Lessee.

g.   Severability. Should any term or provision of this Agreement be declared invalid, illegal, void or unenforceable, all remaining terms and provisions hereof will remain in full force and effect and will in no way be invalidated or affected thereby.

h.   Binding Effect; Survivability. The provisions of each Lease shall inure to the benefit of and shall bind Lessor and Lessee and their respective permitted successors and assigns. All indemnities of Lessee made or agreed to in the Lease or in any certificates delivered in connection therewith shall survive the expiration, termination or cancellation of the Lease for any reason.

i.   Waiver. A waiver by either Party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

j.   Limitations. No paragraph, clause or phrase of this agreement shall limit, infringe, deny, negate, refuse or render void any other paragraph, clause or phrase of this agreement.

k.   Financial Statements. Lessee shall provide to Lessor a copy of guarantor's annual audited financial statements within one hundred twenty (120) days after guarantor's fiscal year end, and a copy of guarantor's quarterly unaudited financial statements within sixty (60) days after the end of each fiscal quarter.

l.   Acceptance and Delivery Certificate. If Lessee fails to sign and deliver an Acceptance and Delivery Certificate, then except as otherwise provided in Section 8c hereof, the Date of Acceptance shall be a date determined by Lessor which shall be no sooner than the date Lessee receives substantially all of the Property.

m.   Covenant of Quiet Possession. Lessor agrees that so long as no Event of Default has occurred and is continuing, Lessee shall be entitled to quietly possess the Property subject to and in accordance with the terms and conditions of this Master Lease Agreement.

n.   Lessee's Options at Maturity of Base Period. At the end of the Base Period of any Schedule, unless otherwise provided herein, the Schedule shall automatically renew for twelve (12) additional months at the rate specified on the respective Schedule. Provided that Lessee gives written notice to Lessor, by certified mail, received by Lessor at least one hundred twenty (120) days prior to the end of the Base Period of any Schedule, Lessee shall be granted the opportunity to negotiate with Lessor concerning one of the following options: (1) purchase the Property for a price to be determined by Lessor and Lessee, or (2), or terminate the Schedule and return the Property to Lessor at Lessee's expense to a destination within the continental United States specified by Lessor; provided, however, that for option (2) to apply, all accrued but unpaid late charges, interest, taxes, penalties, and any and all other sums due and owing under the Schedule must first be paid in full, the provisions of Sections 8f, 8g and 7d hereof must be specifically complied with, and

Initials: _____

CONFIDENTIAL

ONSET_00032974
FBG_CH1_00090775

Lessee must enter into a new Schedule with Lessor to lease Property which replaces the Property listed on the old Schedule. With respect to options (1) and (2), each party shall have the right in its absolute and sole discretion to accept or reject any terms of purchase or of any new Schedule, as applicable. In the event Lessor and Lessee have not agreed to either option (1) or (2) prior to the maturity of the Base Period, or if Lessee fails to give written notice via certified mail at least one hundred twenty (120) days prior to the maturity of the Base Period of its intent to negotiate, or if an Event of Default has occurred under any Schedule, then options (1) and (2) shall expire and the Schedule shall automatically renew as provided herein. At the maturity of the initial twelve (12) month renewal period provided above, the Schedule shall continue in effect at the rate specified in the respective Schedule for successive periods of six (6) months, each subject to termination at the maturity of any such successive six-month renewal period by either Lessor or Lessee giving to the other party at least thirty (30) days prior written notice of termination. **Lessee acknowledges that Lessor has no obligation to enter into any agreement as a result of the initiation of discussions concerning options (1) or (2). LESSEE ACKNOWLEDGES AND AGREES THAT IT HAS READ AND UNDERSTANDS THE FOREGOING PROVISIONS AND HAS HAD THE OPPORTUNITY TO DISCUSS THEM WITH LESSOR AND/OR ITS COUNSEL, SHOULD IT SO DESIRE.** In the event of a disagreement between the parties in the interpretation of any provision of this Section 20(n), the parties agree that the ambiguity shall not be interpreted for or against either party upon grounds of authorship. **This Section 20(n) shall supersede all prior communications, representations, agreements and understandings, including but not limited to offer letters, proposal letters, comfort letters, commitment letters, emails and the like and constitutes the entire understanding and agreement between Lessor and Lessee with regard to the subject matter of this Section 20(n), and THERE IS NO UNDERSTANDING OR AGREEMENT, ORAL OR WRITTEN, WHICH IS NOT SET FORTH HEREIN; provided, however, that in the event of a conflict between the provisions of this Section 20(n) and any Schedule, the provisions of the Schedule shall govern.** Initials: ___

o. Notices. Notices or demands required to be given herein shall be in writing and addressed to the other party at the address herein or such other address provided by written notice hereunder and shall be effective (i) upon the next business day if sent by guaranteed overnight express service; (ii) on the same day if personally delivered; or (iii) three days after mailing if sent by certified or registered U.S. mail, postage prepaid.

p. Further Assurances; Financing Statements. Lessee will cooperate with Lessor in protecting Lessor's interests in the Property, the Lease and the amounts due under the Lease, including, without limitation, the execution (or other authentication), and delivery of Uniform Commercial Code statements, records and filings, patent and copyright registration documents with respect to proprietary Software (if applicable), and other documents requested by Lessor. Lessee will promptly execute, or otherwise authenticate, and deliver to Lessor such further documents, instruments, assurances and other records, and take such further action as Lessor may reasonably request in order to carry out the intent and purpose of this Lease and to establish and protect the rights and remedies created or intended to be created in favor of Lessor under this Lease. Lessee hereby authorizes Lessor to file UCC-1 financing statements, fixture filings, real property waivers, and all other filings and recordings, as may be deemed necessary by Lessor that includes collateral descriptions that are consistent with the Property. Lessee hereby authorizes and/or ratifies the filing of any UCC-1 financing statements by Lessor before or after the execution of this Lease. Lessee shall pay all costs of filing any financing amendment, continuation and termination statements with respect to the Property and Lease, including without limitation, any intangibles tax, documentary stamp tax or other similar taxes or charges relating thereto and all costs of UCC or other lien searches and of obtaining and filing any full or partial third-party releases deemed necessary or advisable by Lessor. Lessee will do whatever may be necessary or advisable to have a statement of the interest of Lessor in the Property noted on any certificate of title relating to the Property and will deposit said certificate with Lessor. Lessee will execute, or otherwise authenticate, and deliver to Lessor such other documents, records and written assurances and take such further action as Lessor may request to more fully carry out the implementation, effectuation, confirmation and perfection of the Lease and any rights of Lessor thereunder. Lessee grants to Lessor a security interest in all

deposits and other property transferred or pledged to Lessor to secure the payment and performance of all of Lessee's obligations under the Lease. Lessor is authorized to take any measures necessary to protect its interest in the Property.

In the event the Property is in the possession of a third party, Lessee will join with Lessor in notifying the third party of Lessor's interest in the Property and obtaining an acknowledgment from the third party that the third party is holding the Property for the benefit of Lessor.

q. Lessor's Right to Perform for Lessee. If Lessee fails to perform or comply with any of its agreements contained herein, Lessor may perform or comply with such agreements and the amount of any payments and expenses of Lessor incurred in connection with such performance or compliance (including attorney fees), together with interest thereon at the lesser of the rate of eighteen percent (18%) per annum, or the highest rate permitted by law shall be deemed additional rent payable by Lessee upon demand.

r. Counterparts; Chattel Paper. This Lease may be executed in any number of counterparts and by different parties hereto or thereto on separate counterparts, each of which, when so executed or otherwise authenticated and delivered, shall be an original, but all such counterparts shall together consist of but one and the same instrument; provided, however, that to the extent that this Lease and/or the Schedule(s) would constitute chattel paper, as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction, no security interest herein or therein may be created or perfected through the transfer or possession of this Lease in and of itself without the transfer or possession or control, as applicable, of the original counterpart of such Schedule(s) identified as the document or record (as applicable) marked "Original", and all other counterparts shall be marked "Duplicate Original" or "Counterpart".

s. Joint and Several Liability. In the event two or more parties execute this Master Lease Agreement as Lessee, each party shall be jointly and severally liable for all Lessee representations, warranties, and obligations (including without limitation, payment obligations) under this Master Lease Agreement or under any Schedule or other document executed in connection herewith. Any and all representations, agreements, or actions by one Lessee shall be binding on all other Lessees.

t. Legal Fees and Other Costs. Lessee shall reimburse Lessor for all legal fees and additional charges, costs and expenses incurred by Lessor: (i) in review or preparation of this Lease Agreement, any Schedule and any other document or agreement in connection with this Lease Agreement; (ii) in review or preparation of any changes or amendments required by Lessee to Lessor's standard Lease documentation; (iii) in periodic legal reviews of the Lease Agreement, Schedules and other Lease documentation; (iv) in defending or protecting its interest in the Property; (v) in the execution, delivery, administration, amendment and enforcement of the Lease or the collection of any rent or other payments due under the Lease, or the preparation of any amendments or settlement agreements prepared in connection with the Lease; and (vi) in any lawsuit or other legal or arbitration/mediation proceeding to which the Lease gives rise, including without limitation; actions in tort. Lessee shall pay applicable legal fees at the rate of no more than $350.00 per hour. Lessee shall pay a documentation fee calculated at .15% of the total cost of property with a minimum of $750.00 and a maximum of $7,500.00 for each Schedule.

u. Amendment and Modification. The Lease may not be amended or modified except by a written amendment executed by a duly authorized representative of each party, but no such amendment or modification needs further consideration to be binding. Notwithstanding the foregoing, Lessee authorizes Lessor to amend any Schedule to identify more accurately the Property (including, without limitation, supplying serial numbers or other identifying data), and such amendment shall be binding on Lessor and Lessee unless Lessee objects thereto in writing within ten (10) days after receiving notice of the amendment from Lessor.

v. Unauthorized Distribution of Lease Documents Prohibited. Lessee agrees that it will not, through any of its actions or omissions, cause any document or any portion of any document, associated with any Lease to be delivered, distributed, or otherwise fall into the possession of anyone not employed by Lessee on a full time basis, without the written consent of Lessor, except for Lessee's auditors, attorneys or any individual, company,

Initials:

CONFIDENTIAL

ONSET_00032975
FBG_CH1_00090776

**DEBTORS' EXHIBIT NO. 175**
**Page 551 of 1907**

or entity as required by applicable law. Lessee further acknowledges that any such unauthorized delivery or distribution could cause Lessor to suffer irreparable economic harm.

w.   **Change in Lessee's Name, Address and Jurisdiction.** Lessee shall not change its name, chief executive office address, or jurisdiction of organization from that set forth above, unless it shall have given Lessor or its assigns no less than thirty (30) days prior written notice.

SECTION 21.   POWER OF ATTORNEY:

LESSEE HEREBY AUTHORIZES AND APPOINTS LESSOR AND LESSOR'S AGENTS AND ASSIGNS AS LESSEE'S ATTORNEY-IN-FACT TO EXECUTE ACKNOWLEDGEMENT LETTERS AND OTHER DOCUMENTS REQUIRED TO BE EXECUTED BY LESSEE TO EFFECT ANY UNDERWRITING OR PERFECT ANY SECURITY INTEREST WITH REGARD TO A SCHEDULE. THE POWER OF ATTORNEY GRANTED HEREIN SHALL BE LIMITED TO THE FOREGOING PURPOSES.

SECTION 22.   DEFINITIONS

All capitalized terms not defined herein are defined in the Schedule.

a.   "Acceptance and Delivery Certificate" means, any acceptance and delivery certificate, executed by the Lessee in connection with a Schedule, a Master Progress Payment Agreement, if any, and this Master Lease Agreement whereby the Lessee acknowledges that the items of Property to be leased have been delivered, received, installed, examined and tested and determined by Lessee to be satisfactory.

b.   "Base Period" means, the period of any Lease referred to as such on the related Schedule under this Master Lease Agreement.

c.   "Certificate" means, an Acceptance and Delivery and Approval for Progress Payment Certificate executed by the Lessee in connection with a Schedule, a Master Progress Payment Agreement and this Master Lease Agreement.

d.   "Date of Acceptance" means, except as otherwise provided in Section 8c of this Master Lease Agreement, the date Lessee accepts the Property designated on any Schedule, as set forth in any Acceptance and Delivery Certificate executed by the Lessee in form provided by Lessor.

e.   "Lease Commencement Date" means, as to the Property designated on any Schedule, where the Date of Acceptance for such Schedule falls on the first day of a calendar quarter, that date, and in any other case, the first day of the calendar quarter following the calendar quarter in which such Date of Acceptance falls.

f.   "Lease" means, a Schedule incorporating the terms of this Master Lease Agreement, together with the related Master Progress Payment Agreement, if any, Stipulated Loss Schedule, Acceptance and Delivery Certificate, UCC financing statements and all other supporting documentation related thereto.

g.   "Lessor's Damages" means, the Stipulated Loss Value together with costs, expenses, attorney's fees, interest, and any determinable indemnity owed by Lessee to Lessor.

h.   "Master Progress Payment Agreement" means, an agreement under which (i) Lessee accepts items of Property by signing a Certificate, (ii) Lessor agrees to purchase said items or Property, and (iii) Lessee agrees to pay service charges, all prior to the Date of Acceptance of all Property under the Schedule.

i.   "Monthly Rental" means, the monthly rental, together with sales tax and other amounts, if applicable, referred to as such on the related Schedule under this Master Lease Agreement.

j.   "Property" means, equipment and other property, together with all related software whether embedded therein or otherwise, with all attachments, replacements, parts, substitutions, additions, repairs, accessions and accessories, incorporated therein and/or affixed thereto described in any Lease Schedule to be executed and delivered by Lessor and Lessee in connection with this Master Lease Agreement.

k.   "Schedule" means, any Lease Schedule to be executed and delivered by Lessor and Lessee under this Master Lease Agreement, which Schedule states the terms and other information associated with the Schedule and describes the leased Property.

l.   "Software" means, any computer program and supporting data, including all documentation, later versions, updates, upgrades and modifications, provided and/or described in any Lease Schedule to be executed and delivered by Lessor and Lessee in connection with this Master Lease Agreement.

m.   "Stipulated Loss Schedule" means, Schedule of Stipulated Loss Values relating to a specific Schedule under this Master Lease Agreement.

n.   "Transaction Documents" means the Master Lease Agreement, Master Progress Payment Agreement, Lease(s), Schedule(s), Acceptance and Delivery Certificate(s), Certificate(s), sale leaseback agreement(s), bill(s) of sale, guaranty agreement(s) executed on behalf of Lessee in favor of Lessor, and any other document entered into by lessee or any guarantor pursuant to the foregoing, together with any and all amendments, addendums, riders and exhibits thereto.

IN WITNESS WHEREOF, Lessor and Lessee have executed this Master Lease Agreement on the month, day and year first above written.

LESSOR:                                                          LESSEE:

**ONSET FINANCIAL, INC.**                        **CARNABY INVENTORY IV, LLC**

BY:   _Kristina Allen_                              BY:   _Edward James_
      Kristina Allen                                       Edward James
TITLE:   Executive Vice President              TITLE:   Executive Vice President

Initials: _____

CONFIDENTIAL

ONSET_00032976
FBG_CH1_00090777

DEBTORS' EXHIBIT NO. 175
Page 552 of 1907

# Exhibit 24

FBG_CH1_00090778

## ONSET FINANCIAL, INC.
274 West 12300 South
Draper, Utah 84020

### MASTER LEASE AGREEMENT NO. OFI1545465

THIS MASTER LEASE AGREEMENT is made on October 24, 2023 between **ONSET FINANCIAL, INC.**, with its principal office located at 274 West 12300 South, Draper, UT 84020 (the "Lessor") and **CARNABY FA, LLC**, a Delaware limited liability company with its principal office located at 3010 LBJ Freeway, Suite 1200, Dallas, Texas 75234 (the "Lessee").

### SECTION 1.   LEASE:

Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor the Property described in any Schedule executed and delivered by Lessor and Lessee in connection with this Master Lease Agreement. Each Schedule shall incorporate by reference the terms and conditions of this Master Lease Agreement, and together with the Acceptance and Delivery Certificate and Master Progress Payment Agreement, if applicable, shall constitute a separate Lease.

### SECTION 2.   TERM OF LEASE:

The term of any Lease, as to all Property designated on the applicable Schedule, shall commence on the Date of Acceptance for such Property, and shall continue for a Base Period ending that number of months from the Lease Commencement Date as specified in the Schedule. Thereafter, Lessee shall have those options as provided in Section 20n of this Master Lease Agreement.

### SECTION 3.   RENT AND PAYMENT:

Lessee shall pay as rent for use of the Property, aggregate rentals equal to the sum of all the Monthly Rentals and other payments due under the Lease for the entire Base Period. The Monthly Rental shall begin on the Date of Acceptance and shall be due and payable by Lessee in advance on the first day of each month throughout the Base Period. If the Date of Acceptance does not fall on the first day of a calendar quarter, then the first rental payment shall be calculated by multiplying the number of days from and including the Date of Acceptance to the Lease Commencement Date by a daily rental equal to one-thirtieth (1/30) of the Monthly Rental, and shall be due and payable on the Date of Acceptance. Lessee shall pay to Lessor, or its assigns, all rentals as due when due, without notice or demand, to Lessor's address set forth above, or as otherwise directed in writing by Lessor, or its assigns. **LESSEE SHALL NOT ABATE, SET OFF OR DEDUCT ANY AMOUNT OR DAMAGES FROM OR REDUCE ANY MONTHLY RENTAL OR OTHER PAYMENT DUE FOR ANY REASON. THIS LEASE IS NON-CANCELABLE FOR THE ENTIRE TERM OF THE BASE PERIOD AND ANY RENEWAL PERIODS.**

If any rental or other payment due under any Lease shall be unpaid ten (10) days after its due date, Lessee will pay on demand, as a late charge, but not as interest, the greater of twenty-five dollars ($25.00) or ten percent (10%) per month on any such unpaid amount but in no event to exceed maximum lawful charges.

### SECTION 4.   TAXES AND FEES:

Lessee shall promptly pay to Lessor, and agrees to indemnify and hold Lessor harmless from all taxes, fees, assessments and charges paid, payable or required to be collected by Lessor (together with any penalties, fines or interest thereon), which are levied or based on the Monthly Rental or other payment due under the Lease, or on the delivery, acquisition, possession, use, operation, lease, rental, sale, purchase, control or value of the Property, including without limitation, registration and license fees and assessments, recycling fees, state and local privilege or excise taxes, documentary stamp taxes or assessments, sales and use taxes, personal and other property taxes, and taxes or charges based on gross revenue, but excluding taxes based on Lessor's net income, (collectively "taxes"), whether the same be assessed to Lessor or Lessee. Lessee also agrees to pay to Lessor all servicing and administrative costs associated with processing and paying various fees and taxes. Lessor shall file all required reports and returns with all applicable governmental agencies relating to the taxes concerning the Property.

### SECTION 5.   NET LEASE:

This is a fully net, non-cancelable lease contract which may not be terminated for any reason except as otherwise specifically provided herein. Lessee has no right of prepayment unless agreed to in writing by Lessor. Lessor and Lessee agree that any Lease is a "Finance Lease" as defined by the Uniform Commercial Code Article 2A. Except as otherwise expressly set forth in this Master Lease Agreement, Lessee shall be responsible for and shall indemnify Lessor against, all costs, expenses and claims of every nature whatsoever arising out of or in connection with or related to the Lease or the Property.

Lessee acknowledges and agrees that its obligations to pay all Monthly Rentals and other amounts due and owing and perform its obligations hereunder shall be primary, absolute, unconditional, independent and irrevocable and shall not be subject to or affected by (i) any circumstance whatsoever, including, without limitation, any setoff, counterclaim, recoupment, abatement, suspension, reduction, rescission, defense or other right otherwise available to Lessee, (ii) any defect in the title, merchantability, condition, design, operation or fitness for use of, or any damage to, removal, abandonment, requisition, taking condemnation or loss or theft or destruction of, the Property, or any interference, interruption, restriction, curtailment or cessation in or prohibition of the use or possession thereof by the Lessee or any other person for any reason whatsoever, or (iii) failure on the part of the manufacturer or the shipper of the Property to deliver the Property or any part thereof to Lessee. Lessor is not responsible to install, test, repair, service, or maintain any Property.

### SECTION 6.   CONDITIONS PRECEDENT:

Lessor's obligations under each Schedule, including its obligation to purchase and lease any Property to be leased thereunder, are conditioned upon Lessor's receipt of, in form or substance satisfactory to Lessor, and Lessor's determination that all of the following are satisfactory: (i) evidence as to due compliance with the insurance provisions hereof; (ii) Uniform Commercial Code financing statements and all other filings and recordings as required by Lessor; (iii) lien searches in the jurisdiction of Lessee's organization and in each jurisdiction in which the Property and/or Lessee's chief executive office are located; (iv) incumbency and signature of the officers of Lessee authorized to execute such documents; (v) resolutions of Lessee's Board of Directors and/or Members duly authorizing the leasing, or sale and leaseback, as the case may be, of the Property hereunder and the execution, delivery and performance of the Lease; (vi) if requested by Lessor, certificates of good standing from the jurisdiction of Lessee's organization, and (vii) if requested by Lessor, a copy of Lessee's organizational documents and evidence of Lessee's organizational number.

### SECTION 7.   MAINTENANCE AND REPAIRS; RETURN OF PROPERTY:

a.   During the continuance of each Lease, Lessee shall, at its own expense, enter into and maintain in force a contract with the manufacturer or other qualified maintenance organization reasonably satisfactory to Lessor for maintenance of each item of Property that requires such a contract. Such contract as to each item shall commence upon the earlier of the Certificate date, if applicable, or the Date of Acceptance. Upon request Lessee shall furnish Lessor with a copy of such contract.

b.   During the continuance of each Lease, Lessee shall, at its own cost and expense, and in accordance with all manufacturer maintenance specifications, (i) keep the Property in good repair, condition, operating order and appearance, (ii) make all necessary adjustments repairs and replacements, (iii) not use or permit the Property to be used for any purpose for which, in the opinion of the manufacturer, the Property is not designed or reasonably suitable, and (iv) furnish all required parts, mechanisms, devices, maintenance and servicing, so as to keep each item of Property and any part in good repair and operating order (ordinary wear and tear excepted) in the same condition and appearance as when delivered to the Lessee. Such parts, mechanisms and devices shall immediately become a part of the Property for all purposes hereunder and title thereto shall vest in Lessor. If the manufacturer does not provide maintenance

 

CONFIDENTIAL

ONSET_00000766
FBG_CH1_00090779

specifications. Lessee shall perform all maintenance in accordance with industry standards for like property.

c. Lessee shall immediately notify Lessor in writing of all details concerning any damage or loss to the Property, including without limitation, any damage or loss arising from the alleged or apparent improper manufacture, functioning or operation of the Property.

d. Lessee shall pay all shipping and delivery charges and other expenses incurred in connection with the Property. Upon default, or at the expiration or earlier termination of any Lease, Lessee shall, at its own expense, assemble, prepare for shipment and promptly return the Property to Lessor at the location within the continental United States designated by Lessor. Upon such return, the Property shall be in the same operating order, repair, condition and appearance as on the Date of Acceptance, except for reasonable wear and tear from proper use thereof, and shall include all engineering changes theretofore prescribed by the manufacturer. Lessee shall provide maintenance certificates or qualification letters and/or arrange for and pay all costs which are necessary for the manufacturer to accept the Property under contract maintenance at its then standard rates ("recertification"). The term of the Lease shall continue upon the same terms and conditions until such recertification has been obtained.

e. With regard to Software, at the expiration or earlier termination of any Lease, or upon demand by Lessor upon the occurrence of an Event of Default (hereinafter defined) under the Lease, Lessee shall (i) destroy all copies or duplicates of the Software which were not returned to Lessor (ii) delete from its systems all Software then installed; (iii) cease using the Software altogether or; iv) disable the computers, computer systems or other equipment which run and/or operate and or are controlled by the Software. Upon its receipt from Lessee, Lessor shall be responsible to return the Software to the owner/vendor/licensor so that Lessee shall not be in breach of any software license.

SECTION 8.   USE; ALTERATIONS AND ATTACHMENTS:

a. Lessee shall at all times keep the Property in its sole possession and control. The Property shall not be moved from the location stated in the Schedule without the prior written consent of Lessor, which consent shall not be unreasonably withheld, provided, however, in no event shall the Property be moved to a location outside the United States.

b. The Property is leased solely for commercial or business purposes.

c. After Lessee receives and inspects any Property and is satisfied that the Property is acceptable, Lessee shall execute and deliver to Lessor an Acceptance and Delivery Certificate in form provided by Lessor; provided, however, that Lessee's failure to execute and deliver an Acceptance and Delivery Certificate for any Property shall not affect the validity and enforceability of the Lease with respect to the Property. If Lessee has executed and delivered a Master Progress Payment Agreement, Lessor may, in its sole discretion, at any time by written notice to Lessee, declare all prior Certificates executed in connection with the Master Progress Payment Agreement to be and constitute the Acceptance and Delivery Certificate for all purposes under the Lease, and the Date of Acceptance of the Lease shall be the date determined by Lessor in its sole discretion which shall not be earlier than the date of the last Certificate. In addition to the inspection rights of Lessor and its assigns under Section 9(b), if required by Lessor and/or its assigns, Lessee shall permit Lessor or Lessor's agent (or Lessor's assigns or an agent of Lessor's assigns), at any reasonable time during normal business hours, (i) to inspect the Property, and (ii) to inspect the premises where the property is or will be located, and (iii) to visit Lessee's management at Lessee's headquarters or elsewhere. In addition, Lessee shall, if required by Lessor and/or its assigns, provide Lessor and/or its assigns with an inspection report satisfactory to Lessor and/or its assigns, in its or their sole discretion. Notwithstanding any other provision herein, any of the foregoing inspections shall be performed, and any such report shall be provided, prior to the execution and delivery by Lessee of an Acceptance and Delivery Certificate. Lessee shall pay any and all costs, including travel expenses, incurred by Lessor and/or its assigns in connection with any such inspections, reports and visits.

d. The Property is and shall remain personal property during the term of the Lease notwithstanding that any portion thereof may in any manner become affixed, attached to or located on real property or any building or improvement thereon. Lessee shall not affix or attach, or permit any of the Property to become affixed or attached to any real property in any manner which would change its nature from that of personal property to real property. Lessee shall not permit the Property to become an accession to other goods or a fixture to or part of any real property. Lessee will obtain and deliver to Lessor a lien waiver in a form satisfactory to Lessor, from all persons not a party hereto who might claim an interest, lien or other claim in the Property.

e. Lessee shall comply with all applicable laws, regulations, requirements, rules and orders, all manufacturer's instructions and warranty requirements, and with the conditions and requirements of all policies of insurance with respect to the Property and the Lease.

f. Lessee may not make alterations or attachments to the Property, that will detrimentally affect the Property's end of Base Period residual value without first obtaining the written consent of Lessor which shall not be unreasonably withheld. Any such alterations or attachments shall be made at Lessee's expense and shall not interfere with the normal and satisfactory operation or maintenance of the Property. The manufacturer may incorporate engineering changes or make temporary alterations to the Property upon request of Lessee. Unless Lessor shall otherwise agree in writing, all such alterations and attachments shall be and become the property of Lessor upon their attachment to the Property or, at the option of Lessor, shall be removed by Lessee at the termination of the Lease and the Property restored at Lessee's expense to its original condition, reasonable wear and tear only excepted.

g. Lessee shall ensure that the Property is installed, used, operated and, at the termination of the Lease, if applicable, removed at Lessee's expense (i) in accordance with any applicable manufacturer's manuals or instructions; (ii) by competent and duly qualified personnel only; and (iii) in accordance with applicable governmental regulations.

h. In the event the Property includes Software, the following shall apply: (i) Lessee shall possess and use the Software in accordance with the terms and conditions of any license agreement entered into with the owner/vendor/licensor of such Software ("License") (at Lessor's request, Lessee shall provide a complete copy of the License to Lessor) and shall not breach the License; (ii) Lessee agrees that Lessor has an interest in the License and Software due to its payment of the price thereof and is an assignee or third-party beneficiary of the License; (iii) as due consideration for Lessor's payment of the price of the License and Software and for providing the Software to Lessee at a lease rate (as opposed to a debt rate), Lessee agrees that Lessor is leasing (and not financing) the Software to Lessee; (iv) except for the original price paid by Lessor, Lessee shall, at its own expense, pay promptly when due all servicing fees, maintenance fees, update and upgrade costs, modification costs, and all other costs and expenses relating to the License and Software and maintain the License in effect during the term of the Lease; and (v) the Software shall be deemed Property for all purposes under the Lease.

i. Unless otherwise agreed to in writing by Lessor, the Property shall at all times be used in Lessee's business and shall not at any time be held for sale or lease or otherwise constitute "inventory", as such term is defined in Utah Uniform Commercial Code (as may be amended from time to time).

j. With respect to Lessee's use of the property, Lessee shall comply with all present and future federal, state, regional and municipal laws, statutes, ordinances, regulations, rules, judicial and similar requirements of all federal, state, regional and municipal governmental agencies, bodies or officials or other governmental entities with legal authority pertaining to the protection of human or wildlife health and safety or the environment, including, without limitation, any such laws, statutes, ordinances, regulations, rules, judicial and administrative orders and decrees, permits, licenses, approvals, authorizations and similar requirements regulating or relating to Hazardous Materials (defined below) or to the generation, use, storage, release, presence, disposal, transport, or handling of any other substance, oil, oil byproducts, gas element, or material which has the potential to pollute, contaminate or harm any land, subsurface area, water source or watercourse, air or other natural resource, hereinafter referred to as "Environmental Laws".

Page 2 of 9    Initials:

CONFIDENTIAL

ONSET_00000767
FBG_CH1_00090780

"Hazardous Materials" is defined as any hazardous or toxic substance, material or waste that are or become regulated under any applicable local, state or federal law, including, but not limited to, those substances, materials, and wastes listed in the United States Department of Transportation Hazardous Materials Table (49 CFR 172.101) or defined by the Environmental Protection Agency ("EPA") as "any material that poses a threat to human health and/or the environment. Typical hazardous substances are toxic, corrosive, ignitable, explosive, or chemically reactive".

## SECTION 9.   OWNERSHIP AND INSPECTION:

a. The Property shall at all times be the property of Lessor or its assigns, and Lessee shall have no right, title or interest therein except as to the use thereof subject to the terms and conditions of the Lease. For purposes of the foregoing, Lessee transfers to Lessor all of Lessee's right, title and interest (including all ownership interest) in and to the Property free and clear of all liens, security interests and encumbrances. Lessor may affix (or require Lessee to affix) tags, decals or plates to the Property indicating Lessor's ownership, and Lessee shall not permit their removal or concealment. Lessee shall not permit the name of any person or entity other than Lessor or its assigns to be placed on the Property as a designation that might be interpreted as a claim of ownership or security interest.

b. Lessor, its assigns and their agents shall have free access to the Property at all reasonable times during normal business hours for the purpose of inspecting the Property and for any other purpose contemplated in the Lease. Lessee shall pay any and all costs incurred by Lessor in connection with any inspection performed by Lessor and/or its assigns .

c. **LESSEE SHALL KEEP THE PROPERTY AND LESSEE'S INTEREST UNDER ANY LEASE FREE AND CLEAR OF ALL LIENS AND ENCUMBRANCES, EXCEPT THOSE PERMITTED IN WRITING BY LESSOR OR ITS ASSIGNS.**

## SECTION 10.   DISCLAIMER OF WARRANTIES:

a. WITHOUT WAIVING ANY CLAIM THE LESSEE MAY HAVE AGAINST ANY MANUFACTURER, LESSEE ACKNOWLEDGES AND AGREES THAT i) LESSOR IS NOT A SELLER, SUPPLIER OR THE MANUFACTURER OF THE PROPERTY (AS SUCH TERMS ARE DEFINED OR USED, AS THE CASE MAY BE, IN THE UNIFORM COMMERCIAL CODE) OR DEALER, NOR A SELLER'S OR A DEALER'S AGENT, ii) THE PROPERTY IS OF A SIZE, DESIGN, CAPACITY AND MANUFACTURE SELECTED BY AND ACCEPTABLE TO THE LESSEE, iii) THE LESSEE HAS EXAMINED AND IS SATISFIED THAT EVERY ITEM OF PROPERTY IS SUITABLE FOR ITS PURPOSE, iv) THE LESSEE ACCEPTS THE PROPERTY AND EACH PART THEREOF "AS IS" AND "WHERE IS", v) THE LESSOR HAS NOT MADE AND DOES NOT MAKE, AND HEREBY DISCLAIMS LIABILITY FOR, AND LESSEE HEREBY WAIVES ALL RIGHTS AGAINST LESSOR RELATING TO, ANY AND ALL WARRANTIES, REPRESENTATIONS OR OBLIGATIONS WHATSOEVER, EXPRESS OR IMPLIED, ARISING BY APPLICABLE LAW OR OTHERWISE, RELATING TO THE PROPERTY, OR ANY PART THEREOF, INCLUDING, WITHOUT LIMITATION, ANY AND ALL WARRANTIES, REPRESENTATIONS OR OBLIGATIONS AS TO: (1) THE DESCRIPTION, CONDITION, DESIGN, QUALITY OR PERFORMANCE OF THE PROPERTY OR QUALITY OR CAPACITY OF MATERIALS OR WORKMANSHIP IN THE PROPERTY; (2) ITS MERCHANTABILITY OR FITNESS OR SUITABILITY FOR A PARTICULAR PURPOSE WHETHER OR NOT DISCLOSED TO LESSOR; (3) THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE (4) THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT OR THE LIKE; AND (5) THE ABSENCE OF OBLIGATIONS BASED ON STRICT LIABILITY IN TORT. It is agreed that all such risks incident to the matters described in this Section 10a, as between the Lessor and the Lessee are to be borne by the Lessee. If the Property or Software is not properly installed, does not function as represented or warranted by original owner/seller/supplier/licensor, or is unsatisfactory for any reason, Lessee shall make any claim on account thereof solely against original owner/seller/supplier/licensor and shall nevertheless pay all sums payable

under the Lease, Lessee hereby waiving the right to make any such claims against Lessor. Lessor shall not be liable to Lessee for any loss, damage or expense of any kind or nature caused, directly or indirectly, by the Property or the use, possession or maintenance thereof, or the repair, service or adjustment thereof, or by any delay or failure to provide any such maintenance, repair, service or adjustment, or by any interruption of service or loss of use thereof (including without limitation, Lessee's use of or right to use any Software) or for any loss of business howsoever caused.

b. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THE LEASE, LESSOR SHALL NOT, UNDER ANY CIRCUMSTANCES, BE LIABLE TO LESSEE OR ANY THIRD PARTY, FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THE TRANSACTION CONTEMPLATED HEREUNDER, WHETHER IN AN ACTION BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) OR ANY OTHER LEGAL THEORY, INCLUDING WITHOUT LIMITATION, LOSS OF ANTICIPATED PROFITS, OR BENEFITS OF USE OR LOSS OF BUSINESS, EVEN IF LESSOR IS APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING.

IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT EACH AND EVERY PROVISION OF ANY LEASE WHICH PROVIDES FOR A LIMITATION OF LIABILITY, DISCLAIMER OF WARRANTIES OR EXCLUSION OF DAMAGES, IS INTENDED BY THE PARTIES TO BE SEVERABLE FROM ANY OTHER PROVISION AND IS A SEPARABLE AND INDEPENDENT ELEMENT OF RISK ALLOCATION AND IS INTENDED TO BE ENFORCED AS SUCH.

c. Lessor assigns to Lessee all assignable warranties on the Property, including without limitation any warranties described in Lessor's purchase contract, which assignment shall be effective only (i) during the Base Period and any renewal period thereof, and (ii) so long as no Event of Default exists.

## SECTION 11.   ASSIGNMENT BY LESSOR:

Lessor may assign or transfer its rights and interests in the Lease and/or the Property to another party ("**Lessor's Assignee**") either outright or as security for loans (collectively the "**Underwriting**"). Upon notice of any such assignment and instructions from Lessor, Lessee shall pay its Monthly Rental and other payments and perform its other obligations under the Lease to the Lessor's Assignee (or to another party designated by Lessor's Assignee). Upon any such sale or assignment, **LESSEE'S OBLIGATIONS TO LESSOR'S ASSIGNEE UNDER THE ASSIGNED LEASE SHALL BE ABSOLUTE AND UNCONDITIONAL AND LESSEE WILL NOT ASSERT AGAINST LESSOR'S ASSIGNEE ANY CLAIM, DEFENSE, OFFSET OR COUNTERCLAIM WHICH LESSEE MIGHT HAVE AGAINST LESSOR.** Lessee waives and will not assert against any assignee of Lessor any claims, defenses, or set-offs which Lessee could assert against Lessor. Lessor's Assignee shall have all of the rights but none of the obligations of Lessor under the assigned Lease, and after such assignment Lessor shall continue to be responsible for all of Lessor's obligations under the Lease.

Upon any such assignment, Lessee agrees to promptly execute or otherwise authenticate and deliver to Lessor estoppel certificates, acknowledgements of assignment, records and other documents requested by Lessor which acknowledge the assignment, and affirmation of provisions of the Lease which may be required to effect the Underwriting. Lessee authorizes Lessor's assigns to file UCC-1 financing statements or precautionary filings as Lessor or its assigns deem necessary. Lessor's assigns are authorized to take any reasonable measures necessary to protect their interest in the Property.

Only one executed counterpart of any Schedule shall be marked "Original"; any other executed counterparts shall be marked "Duplicate Original" or "Counterpart". No security interest in any Schedule may be created or perfected through the transfer or possession or control, as applicable, of any counterpart other than the document or record, as applicable, marked "Original".

## SECTION 12.   ASSIGNMENT BY LESSEE:

**LESSEE MAY NOT ASSIGN ANY LEASE OR ANY OF ITS RIGHTS HEREUNDER OR SUBLEASE THE PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR. NO PERMITTED**

CONFIDENTIAL

ONSET_00000768
FBG_CH1_00090781

DEBTORS' EXHIBIT NO. 175
Page 556 of 1907

ASSIGNMENT OR SUBLEASE SHALL RELIEVE LESSEE OF ANY OF ITS OBLIGATIONS HEREUNDER.

Lessee grants Lessor a security interest in any existing or future sublease of the Property and the proceeds thereof, whether or not such sublease is prohibited. Subject to the terms of this Lease, this Lease and each Schedule inure to the benefit of, and are binding upon, the successors and assigns of Lessee, and, without limiting the foregoing, shall bind all persons who become bound as a "new debtor" (as defined in the Uniform Commercial Code) to this Lease and any Schedule.

SECTION 13.   LESSEE'S REPRESENTATIONS AND WARRANTIES:

Lessee represents and warrants as follows:

a.   If Lessee is a corporation, that it is duly organized and validly existing in good standing under the laws of the jurisdiction of its incorporation, that it is duly qualified to do business in each jurisdiction where any Property is, or is to be located, and has full corporate power and authority to hold property under lease and to enter into and perform its obligations under any Lease; that the execution, delivery and performance by Lessee of any Lease has been duly authorized by all necessary corporate action on the part of Lessee, and is not inconsistent with its articles of incorporation or by-laws or other governing instruments;

b.   (i)  Lessee's state of organization is the state listed in the introductory paragraph of this Lease; (ii) Lessee's principal office is located in the state listed in the introductory paragraph of this Lease; (iii) Lessee is the legal entity or organization indicated in the introductory paragraph of this Lease, which organization is duly organized, validly existing and in good standing under the laws of the state listed in the introductory paragraph of this Lease; and (iv) Lessee's full and exact legal name is the same as listed in the introductory paragraph of this Lease;

c.   The execution, delivery and performance by Lessee of any Lease does not violate any law or governmental rule, regulation, or order applicable to Lessee, does not and will not contravene any provision of, constitute a default under, or result in the creation of any lien on or in any property or assets of the Lessee, pursuant to any material indenture, mortgage, contract, or other instrument to which it is bound and, upon execution and delivery of each Lease, will constitute a legal, valid and binding agreement of Lessee, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceeding in equity or in law);

d.   If Lessee is a partnership, that it is duly organized by written partnership agreement and validly existing in accordance with the laws of the jurisdiction of its organization, that it is duly qualified to do business in each jurisdiction where the Property is, or is to be located, and has full power and authority to hold property under lease and to enter into and perform its obligations under any Lease; that the execution, delivery and performance by Lessee of any Lease has been duly authorized by all necessary action on the part of the Lessee, and is not inconsistent with its partnership agreement or other governing instruments.  Upon request, Lessee will deliver to Lessor certified copies of its partnership agreement and other governing instruments and original certificate of partners and other instruments deemed necessary or desirable by Lessor.  To the extent required by applicable law, Lessee has filed and published its fictitious business name certificate;

e.   No action, including any permits or consents, in respect of or by any state, federal or other governmental authority or agency is required with respect to the execution, delivery and performance by Lessee of any Lease, and;

f.   There are no actions, suits or proceedings pending or, to the knowledge of the Lessee, threatened against or affecting the Lessee in any court or before any governmental commission, board or authority which, if adversely determined, will have a material adverse effect on the ability of the Lessee to perform its obligations under any Lease.

SECTION 14.   RISK OF LOSS ON LESSEE:

From the earlier of the date the supplier ships the Property to Lessee or the date Lessor confirms Lessee's purchase order or contract to supplier until the date the Property is returned to Lessor as provided in the Lease, Lessee hereby assumes and shall bear all risk of loss for theft, damage, non-delivery or destruction to the Property or caused by the Property to the environment, persons or other property (hereafter, such loss, damage, non-delivery or destruction to the Property or caused by the Property to the environment, persons or other property shall be referred to as the "Casualty"), howsoever caused.  NO SUCH CASUALTY SHALL IMPAIR ANY OBLIGATION OF LESSEE UNDER THIS LEASE, WHICH OBLIGATION, INCLUDING TIMELY RENTAL PAYMENTS, SHALL CONTINUE IN FULL FORCE AND EFFECT.

SECTION 15.   LESSEE'S WAIVERS:

To the extent permitted by applicable law, Lessee hereby waives any and all rights and remedies conferred upon a Lessee by §§ 70A-2A-508 through 70A-2A-522 of the Utah Uniform Commercial Code, including but not limited to Lessee's rights to: (i) cancel the Lease; (ii) repudiate the Lease; (iii) reject the Property; (iv) revoke acceptance of the Property; (v) recover damages from Lessor for any breaches of warranty or for any other reason; (vi) claim, grant or permit a security interest in the Property in Lessee's possession or control for any reason; (vii) deduct all or any part of any claimed damages resulting from Lessor's default, if any, under the Lease; (viii) cover by making any purchase or lease of or contract to purchase or lease property in substitution for the Property due from Lessor; (ix) recover any general, special, incidental or consequential damages, for any reason whatsoever; and (x) commence legal action against Lessor for specific performance, replevin, detinue, sequestration, claim and delivery or the like for any Property identified in the Lease.  To the extent permitted by applicable law, Lessee also hereby waives any rights now or hereafter conferred by statute or otherwise which may require Lessor to sell, lease or otherwise use any Property in mitigation of Lessor's Damages as set forth in Section 19 hereof or which may otherwise limit or modify any of Lessor's rights or remedies in that section.

SECTION 16.   INDEMNIFICATION:

Lessee shall indemnify and hold Lessor harmless from and against any and all claims, (including without limitation negligence, tort and strict liability), damages, judgments, suits and legal proceedings, and any and all costs and expenses in connection therewith (including attorney fees incurred by Lessor either in enforcing this indemnity or in defending against such claims), arising out of or in any manner connected with or resulting from the Lease or the Property, including, without limitation the manufacture, purchase, financing, ownership, rejection, non-delivery, transportation, delivery, possession, use, operation, maintenance, condition, lease, return, storage or disposition thereof; including without limitation (i) claims for injury to or death of persons and for damage to property; (ii) claims relating to latent or other defects in the Property whether or not discoverable by Lessor; (iii) claims relating to patent, copyright, or trademark infringement; and (iv) claims for wrongful, negligent or improper act or misuse by Lessor, except those claims arising in connection with and while the Property is in the possession of Lessor or its agents; and (v) claims for any damages to persons or property, any costs associated with, or any fines caused by violation of any Environmental Laws.  Lessee agrees to give Lessor prompt notice of any such claim or liability.  For purposes of this paragraph and any Lease, the term "Lessor" shall include Lessor, its successors and assigns, shareholders, members, owners, partners, directors, officers, representatives and agents, and the provisions of this paragraph shall survive expiration of any Lease with respect to events occurring prior thereto.

Upon request of Lessor, Lessee shall assume the defense of all demands, claims, or actions, suits and all proceedings against Lessor for which indemnity is provided and shall allow Lessor to participate in the defense thereof.  Lessor shall be subrogated to all rights of Lessee for any matter which Lessor has assumed obligation hereunder, and may settle any such demand, claim, or action without Lessee's prior consent, and without prejudice to Lessor's right to indemnification hereunder.

SECTION 17.   INSURANCE:

Lessee shall obtain and maintain for the entire time the Lease is in effect, at its own expense (as primary insurance for Lessor and Lessee), property damage and liability insurance (including any claims caused from the breach of any Environmental Laws involving the Property) and insurance against loss or



Page 4 of 9        Initials:

CONFIDENTIAL

ONSET_00000769
FBG_CH1_00090782

damage to the Property including without limitation loss by fire (including so-called extended coverage), theft, collision and such other risks of loss as are customarily insured against on the type of Property leased under any lease and by businesses in which Lessee is engaged, in such amounts, in such form and with such insurers as shall be satisfactory to Lessor; provided, however, that the amount of insurance against loss or damage to the Property shall be equal to or greater than the full replacement value or the Stipulated Loss Value (as defined herein) of such items of Property. Stipulated Loss Value means the product of the Property cost (as designated on the related Schedule) and the applicable percentage factor set forth on the Stipulated Loss Schedule attached to the Schedule ("Stipulated Loss Value"). Each insurance policy will name Lessee as insured and Lessor and its assignees as additional insureds and loss payees thereof, shall contain cross-liability endorsements and shall contain a clause requiring the insurer to give Lessor and its assignees at least thirty (30) days prior written notice of any material alteration in the terms of such policy or of the cancellation thereof. Lessee shall furnish to Lessor a certificate of insurance or other evidence satisfactory to Lessor that such insurance coverage is in effect; provided, however, that Lessor shall be under no duty either to ascertain the existence of or to examine such insurance policy or to advise Lessee in the event such insurance coverage shall not comply with the requirements hereof. All insurance covering loss or damage to the Property shall contain a breach of warranty clause satisfactory to Lessor.

In the event of a Casualty to the Property (or any part thereof) and irrespective of payment from any insurance coverage maintained by Lessee, but applying full credit thereof, Lessee shall, at the option of Lessee, (unless an Event of Default has occurred and shall be continuing, in which case, it shall be at Lessor's option), (i) place the Property in good repair, condition and working order; or (ii) replace the Property (or any part thereof) with like property of equal or greater value, in good repair, condition and working order and transfer clear title to such replacement property to Lessor whereupon such replacement property shall be deemed the Property for all purposes under the Lease; or (iii) pay to Lessor the total rent due and owing at the time of such payment plus an amount calculated by Lessor which is equal to the Stipulated Loss Value (defined in the Stipulated Loss Schedule) specified in the Stipulated Loss Schedule attached to the Schedule.

Lessee shall notify Lessor within ten (10) days of the actual date of the Casualty, and in its notice include its election of either option (i), (ii), or (iii), as set forth above. If Lessee fails to notify Lessor of its election within ten (10) days of the Casualty, Lessor shall make the election (within five (5) days of notice from Lessee of the Casualty) and direct the Lessee to fully perform the repair, replacement or payment which performance shall occur within sixty (60) days of the date of the Casualty. Lessee's failure to notify Lessor within ten (10) days of the Casualty shall constitute a default as set forth in Section 18 herein, and Lessee shall waive its right to elect option (i), (ii), or (iii) as set forth above. Upon discovery of the Casualty, Lessor shall direct Lessee to repair, replace, or make payment and Lessee shall fully perform with thirty (30) days of such notice.

SECTION 18.   DEFAULT.

An "Event of Default" shall occur under any Lease if:

a.   Lessee fails to pay any Monthly Rental or other payment required under the Lease when the same becomes due and payable and such failure continues for ten (10) days after its due date;

b.   Lessee fails to promptly execute or otherwise authenticate and deliver to Lessor or its assigns any document or record, as applicable, required under the terms of this Master Lease Agreement;

c.   Lessee attempts to or does, remove, sell, assign, transfer, encumber, sublet or part with possession of any one or more items of the Property or any interest under any Lease, except as expressly permitted herein, or permits a judgment or other claim to become a lien upon any or all of Lessee's assets or upon the Property;

d.   Lessee permits any item of Property to become subject to any levy, seizure, attachment, assignment or execution; or Lessee abandons any item of Property;

e.   Lessee fails to immediately (within ten (10) days) notify Lessor of any loss, damage, or destruction to the Property or fails to timely repair, replace, or make payment as required in Sections 7 and 17, herein;

f.   Lessee or any guarantor, shall (i) be adjudicated insolvent or bankrupt, or cease, be unable, or admit its inability, to pay its debts as they mature, or make a general assignment for the benefit of creditors or enter into any composition or arrangement with creditors; (ii) apply for or consent to the appointment of a receiver, trustee or liquidator of it or of a substantial part of its property, or authorize such application or consent, or proceedings seeking such appointment shall be instituted against it without such authorization, consent or application and shall continue undismissed for a period of sixty (60) days; (iii) authorize or file a voluntary petition in bankruptcy or apply for or consent to the application of any bankruptcy, reorganization in bankruptcy, arrangement, readjustment of debt, insolvency, dissolution, moratorium or other similar law of any jurisdiction, or authorize such application or consent; or proceedings to such end shall be instituted against it without such authorization, application or consent and such proceeding instituted against it shall continue undismissed for a period of sixty (60) days;

g.   Lessee is in default under any Lease or agreement executed with Lessor; or Lessee fails to sign or otherwise authenticate and deliver to Lessor any document or record requested by Lessor in connection with any Lease executed with Lessor; or Lessee fails to protect Lessor's rights and interests in any Lease and the Property; or Lessee fails to provide financial statements to Lessor as provided in Section 20k hereof; or Lessee is in default of other loan or lease from, or guaranty or other financing obligation to any person or entity other than Lessor that exceeds $10,000,000, and in such case applicable grace periods for curing such default or event of default have expired up to thirty (30) days if such applicable grace periods are shorter than that; provided, however, that any waiver or amendment out of existence or other resolution of any default or event of default under such agreement shall waive the existence of such event of default hereunder automatically;

h.   Lessee or any guarantor, breaches any of its representations and warranties made under any Lease, or if any such representations or warranties shall be false or misleading in any material respect;

i.   Lessee or any guarantor, fails to observe or perform any of its covenants and obligations required to be observed or performed under the Lease and such failure continues uncured for ten (10) days after occurrence thereof, except that the ten (10) day cure period shall not apply and an Event of Default shall occur immediately upon Lessee's failure to maintain insurance;

j.   Lessee or any guarantor, shall suffer a material adverse change in its financial condition after the date hereof as determined by Lessor in its sole discretion;

k.   There shall occur (i) a substantial change in the ownership or membership of Lessee, any guarantor, any parent of Lessee or any guarantor, or any entity that has a direct or indirect ownership interest in Lessee or any guarantor, or (ii) a substantial change in control of the board of directors, members or manager of Lessee, any guarantor, any parent of Lessee or any guarantor, or any entity that has a direct or indirect ownership interest in Lessee or any guarantor;

l.   Lessor in good faith believes that the prospect of payment or performance has become impaired, or if Lessee takes any action, makes any representation, or fails to do anything requested by Lessor, at any time before or after the execution of this Master Lease Agreement, the result of which causes Lessor, in good faith, to believe that the prospect of Lessee's payment or performance under the Lease is impaired, or otherwise causes Lessor to feel insecure in funding or continuing to fund the Lease or any Schedule;

m.   Lessee, any guarantor, any parent of Lessee or any guarantor, or any entity that has a direct or indirect ownership interest in Lessee or any guarantor shall have terminated or changed its corporate or other entity existence, consolidated with, merged into, or conveyed or leased substantially all of its assets to any person or entity, unless: (i) such person or entity executes and delivers to Lessor an agreement satisfactory in form and substance to Lessor, in its sole discretion, containing such person's or entity's effective assumption, and its agreement to pay, perform, comply with and otherwise be liable for, in a due and punctual manner, all of Lessee's (or guarantor's) obligations having previously arisen, or then or thereafter arising, under

Page 5 of 9           Initials:

CONFIDENTIAL

ONSET_00000770
FBG_CH1_00090783

DEBTORS' EXHIBIT NO. 175
Page 558 of 1907

the Lease or guaranty, as the case may be, together with any and all documents, agreements, instruments, certificates, opinions and filings requested by Lessor; (ii) Lessor is satisfied as to the creditworthiness of such person's or entity's conformance to other standard criteria then used by Lessor for such approval; and (iii) Lessee or any guarantor has provided no less than thirty (30) days prior written notice of such occurrence to Lessor or its assigns:

n.   Lessee breaches any License, maintenance or other agreement for Software or fails to pay when due all servicing fees, maintenance fees, update and upgrade costs, modification costs, and all other costs and expenses relating to the License and Software and fails to maintain the License in effect during the term of the Lease.

SECTION 19.   REMEDIES:

Upon the occurrence of any Event of Default and at any time thereafter, Lessor may with or without giving notice to Lessee and with or without canceling the Lease, do any one or more of the following

a.   enforce this Master Lease Agreement according to its terms;

b.   require additional collateral to secure the Lease;

c.   upon notice to Lessee, cancel this Master Lease Agreement and any or all Schedules executed pursuant thereto;

d.   advance funds on Lessee's behalf to cure the Event of Default, whereupon Lessee shall immediately reimburse Lessor therefore, together with late charges accrued thereon;

e.   upon notice to Lessee, refuse to fund any Schedule(s) pursuant to the Lease;

f.   declare any Lease or Leases immediately due and payable;

g.   refuse to deliver the Property to Lessee;

h.   declare immediately due and payable all amounts due or to become due hereunder for the full term of the Lease (including any renewal period or purchase options which Lessee has contracted to pay);

i.   in its sole discretion, sell, re-lease or otherwise dispose of any or all of the Property covered under any Schedule, whether or not in Lessor's possession, in a commercially reasonable manner at public or private sale with notice to Lessee (the parties agreeing that ten (10) days' prior written notice shall constitute adequate notice of such sale), and in the event a court of competent jurisdiction or other governing authority shall determine that the Lease is not a "true lease" or is a lease intended as security or that Lessor (or its assigns) does not hold legal title to or is not the owner of the Property, apply the net proceeds of any such disposition, after deducting all costs incurred by Lessor in connection with such default, to the obligations of Lessee hereunder and under such Schedule, or retain any or all of the Property in full or partial satisfaction, as the case may be, with Lessee remaining liable for any deficiency. The sale, re-lease, or other disposition may, at Lessor's sole option, be conducted at Lessee's premises;

j.   without notice to Lessee, repossess, disable or demand Lessee to disable the Property wherever found, with or without legal process, and for this purpose Lessor and/or its agents or assigns may enter upon any premises of or under the control or jurisdiction of Lessee or any agent of Lessee, without liability for suit, action or other proceeding by Lessee (any damages occasioned by such repossession or disablement being hereby expressly waived by Lessee) and remove or disable the Property therefrom; Lessee further agrees on demand, to assemble the Property and make it available to Lessor at a place to be designated by Lessor;

k.   exercise any other right or remedy which may be available to it under the Uniform Commercial Code or any other applicable law;

l.   if Lessee breaches any of its obligations under Section 7c of this Master Lease Agreement with regard to Software, Lessee shall be liable to Lessor for additional damages in an amount equal to the original price paid by

Lessor for the Software, and in addition, at Lessor's option, Lessor shall be entitled to injunctive relief;

m.   if Lessor determines, in its sole discretion, not to take possession of the Property, Lessor shall continue to be the owner of the Property and may, but is not obligated to, dispose of the Property by sale or otherwise, all of which determinations may be made by Lessor in its sole discretion and for its own account;

n.   a cancellation hereunder shall occur only upon notice by Lessor and only as to such items of Property as Lessor specifically elects to cancel and this Lease shall continue in full force and effect as to the remaining items, if any;

o.   demand and recover as liquidated damages for loss of a bargain and not as a penalty, and in lieu of any further payments of rent the Stipulated Loss Value of the Property as of the rent payment date immediately preceding the date of default together with all accrued but unpaid late charges, interest, taxes, penalties, and any and all other sums due and owing under the Schedule as of the rent payment date immediately preceding the date of default;

p.   With respect to any exercise by Lessor of its right to recover and/or dispose of any Property securing Lessee's obligations under any Schedule, Lessee acknowledges and agrees as follows: (i) Lessor shall have no obligation, subject to the requirements of commercial reasonableness, to clean-up or otherwise prepare the Property for disposition; (ii) Lessor may comply with any applicable State or Federal law requirements in connection with any disposition of the Property, and any actions taken in connection therewith shall not be deemed to have adversely affected the commercial reasonableness of any disposition of such Property; (iii) Lessor may specifically disclaim any warranties of title or the like with respect to the disposition of the Property; (iv) if Lessor purchases any of the Property, Lessor may pay for the same by crediting some or all of Lessee's obligations hereunder or under any Schedule; and (v) no right or remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and shall be in addition to any other remedy referred to above or otherwise available at law or in equity, and may be exercised concurrently or separately from time to time;

q.   (i) by notice to Lessee, declare any license agreement with respect to Software terminated, in which event the right and license of Lessee to use the Software shall immediately terminate, and Lessee shall thereupon cease all use of the Software and return all copies thereof to Lessor or original licensor; (ii) have access to and disable, or demand Lessee to disable the Software by any means deemed necessary by Lessor, including but not limited to disabling the computers, computer systems or other equipment which run and/or operate and/or are controlled by the Software, for which purposes Lessee hereby expressly consents to such access and disablement, promises to take no action that would prevent or interfere with Lessor's ability to perform such access and disablement, and waives and releases any and all claims that it has or might otherwise have for any and all losses, damages, expenses, or other detriment that it might suffer as a result of such access and disablement; and (iii) Lessee agrees that the detriment which Lessor will suffer as a result of a breach by Lessee of the obligations contained in the Lease cannot be adequately compensated by monetary damages, and therefore Lessor shall be entitled to injunctive and other equitable relief to enforce the provisions of this Section 19q. LESSEE AGREES THAT LESSOR SHALL HAVE NO DUTY TO MITIGATE LESSOR'S DAMAGES UNDER ANY LEASE BY TAKING LEGAL ACTION TO RECOVER THE SOFTWARE FROM LESSEE OR ANY THIRD PARTY, OR TO DISPOSE OF THE SOFTWARE BY SALE, RE-LEASE OR OTHERWISE.

Lessor may exercise any and all rights and remedies available at law or in equity, including those available under the Uniform Commercial Code. The rights and remedies afforded Lessor hereunder shall not be deemed to be exclusive, but shall be in addition to any rights or remedies provided by law. Lessor's failure promptly to enforce any right or remedy hereunder shall not operate as a waiver of such right or remedy, and Lessor's waiver of any default shall not constitute a waiver of any subsequent or other default. Lessor may accept late payments or partial payments of amounts due under the Lease and may delay enforcing any of Lessor's rights or remedies hereunder without losing or waiving any of Lessor's rights or remedies under the Lease.



Page 6 of 9          Initials: ...............

CONFIDENTIAL

ONSET_00000771
FBG_CH1_00090784

In connection with Lessor's exercise of any or all of the above-listed remedies, Lessor shall be entitled to recover all costs and expenses incurred by Lessor in the repossession, recovery, storage, repair, sale, re-lease or other disposition of the Property, or the termination or disabling of Software, including without limitation, reasonable attorney fees and costs incurred in connection therewith or otherwise resulting or arising from Lessee's default, and any indemnity if then determinable, plus interest on all of the above until paid (before and after judgment) at the lesser of the rate of eighteen percent (18%) per annum or the highest rate permitted by law. In the event of involuntary repossession by Lessor through judicial proceedings, or through a sheriff's levy and sale, Lessee hereby waives any requirement that Lessor post a bond.

If Lessor demands payment from Lessee of the Stipulated Loss Value, of the Property, upon full and indefeasible payment thereof to Lessor, together with all related costs, expenses, attorney's fees, interest (i.e., the Lessor's Damages, as defined in Section 22g), then all of Lessor's right, title and interest in and to the subject Property shall, without further action, be deemed to have been conveyed to Lessee on an AS IS, WHERE IS basis, except Lessor shall warrant the absence of any liens created by or through Lessor.

SECTION 20.   ADDITIONAL PROVISIONS:

a.   Security Interest. The parties acknowledge and agree that this is a "true lease" and title to the leased Property (or Lessee's interest in the Property if the Property is Software) is vested in the Lessor. In the event a court of competent jurisdiction or other governing authority shall determine that the Lease is not a "true lease" or is a lease intended as security or that Lessor (or its assigns) does not hold legal title to or is not the owner of the Property, the following shall apply:

   i.   Effective the execution date of the Lease, Lessee, as debtor, grants a security interest to Lessor, as secured party, in the Property (or Lessee's interest in the Property if the Property is Software), including but not limited to equipment and other personal property, general intangibles, Software and Lessee's license rights and other rights to use the Software, and accessions thereto, and any refunds, rebates, remittances, and all rights and services related thereto, and proceeds of any of the foregoing, to secure all duties and obligations of Lessee under any Lease or other agreement with Lessor. The Lease shall be deemed to be a security agreement with Lessee having granted to Lessor a security interest in the Property, and the Property shall secure all duties and obligations of Lessee under any Lease or other agreement with Lessor. With regard to any security interest created hereunder in any of the Property, Lessee consents and agrees that Lessor shall have all of the rights, privileges and remedies of a secured party under the Utah Uniform Commercial Code.

   ii.   Lessee authorizes Lessor to file financing statements and any records describing the Property and to take any and all actions necessary to perfect Lessor's interest in the Property. Lessee agrees to execute any further documents, and to take any further actions, reasonably requested by Lessor to evidence or perfect the security interest granted under this subpart of the Lease, to maintain the first priority of the security interests, or to effectuate the rights granted to Lessor under this subpart of the Lease.

b.   Entire Agreement. Each Schedule shall incorporate the terms and conditions of this Master Lease Agreement and, together with the Acceptance and Delivery Certificate and Master Progress Payment Agreement (and Certificates thereunder), if applicable, Transaction Documents, and any amendments to any of the foregoing documents, shall supersede all prior communications, representations, agreements, and understandings, including but not limited to offer letters, proposal letters, comfort letters, commitment letters and the like, and constitute the entire understanding and agreement between the Lessor and Lessee with regard to the subject matter hereof and thereof, and there is no understanding or agreement, oral or written, which is not set forth herein or therein. In the event of conflict between the provisions of this Master Lease Agreement and any Schedule, the provisions of the Schedule shall govern.

c.   Time Is of the Essence. Time is of the essence with respect to any Lease.

d.   Captions. Captions and section headings are inserted for reference and convenience only and in no way define, limit or describe the scope of this agreement or intent of any provision.

e.   Governing Law. THIS LEASE (AS DEFINED IN SECTION 22 HEREIN) SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF UTAH, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE. THE PARTIES AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE STATE OF UTAH; ANY SUIT OR OTHER PROCEEDING BROUGHT BY EITHER PARTY TO ENFORCE OR CONSTRUE THIS LEASE (AS DEFINED IN SECTION 22 HEREIN), OR TO DETERMINE MATTERS RELATING TO THE PROPERTY OR THE RELATIONSHIP BETWEEN THE PARTIES HERETO SHALL BE BROUGHT ONLY IN THE STATE OR FEDERAL COURTS IN THE STATE OF UTAH. THIS LEASE WAS EXECUTED IN THE STATE OF UTAH (BY THE LESSOR HAVING COUNTERSIGNED IT IN UTAH) AND IS TO BE PERFORMED IN THE STATE OF UTAH (BY REASON OF ONE OR MORE PAYMENTS REQUIRED TO BE MADE TO LESSOR IN UTAH).

f.   Waiver of Trial by Jury. Lessor and Lessee hereby waive the right to trial by jury of any matters arising out of the Lease or Property or the conduct of the relationship between Lessor and Lessee.

g.   Severability. Should any term or provision of this Agreement be declared invalid, illegal, void or unenforceable, all remaining terms and provisions hereof will remain in full force and effect and will in no way be invalidated or affected thereby.

h.   Binding Effect; Survivability. The provisions of each Lease shall inure to the benefit of and shall bind Lessor and Lessee and their respective permitted successors and assigns. All indemnities of Lessee made or agreed to in the Lease or in any certificates delivered in connection therewith shall survive the expiration, termination or cancellation of the Lease for any reason.

i.   Waiver. A waiver by either Party of any term or condition of this agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or any subsequent breach thereof.

j.   Limitations. No paragraph, clause or phrase of this agreement shall limit, infringe, deny, negate, refuse or render void any other paragraph, clause or phrase of this agreement.

k.   Financial Statements. Lessee shall provide to Lessor a copy of guarantor's annual audited financial statements within one hundred twenty (120) days after guarantor's fiscal year end, and a copy of guarantor's quarterly unaudited financial statements within sixty (60) days after the end of each fiscal quarter.

l.   Acceptance and Delivery Certificate. If Lessee fails to sign and deliver an Acceptance and Delivery Certificate, then except as otherwise provided in Section 8c hereof, the Date of Acceptance shall be a date determined by Lessor which shall be no sooner than the date Lessee receives substantially all of the Property.

m.   Covenant of Quiet Possession. Lessor agrees that so long as no Event of Default has occurred and is continuing, Lessee shall be entitled to quietly possess the Property subject to and in accordance with the terms and conditions of this Master Lease Agreement.

n.   Lessee's Options at Maturity of Base Period. At the end of the Base Period of any Schedule, unless otherwise provided herein, the Schedule shall automatically renew for twelve (12) additional months at the rate specified on the respective Schedule. Provided that Lessee gives written notice to Lessor, by certified mail, received by Lessor at least one hundred twenty (120) days prior to the end of the Base Period of any Schedule, Lessee shall be granted the opportunity to negotiate with Lessor concerning one of the following options: (1) purchase the Property for a price to be determined by Lessor and Lessee, or (2), or terminate the Schedule and return the Property to Lessor at Lessee's expense to a destination within the continental United States specified by Lessor; provided, however, that for option (2) to apply, all accrued but unpaid late charges, interest, taxes, penalties, and any and all other sums due and owing under the Schedule must first be paid in full, the provisions of Sections 8f, 8g and 7d hereof must be specifically complied with, and

 

CONFIDENTIAL

ONSET_00000772
FBG_CH1_00090785

Lessee must enter into a new Schedule with Lessor to lease Property which replaces the Property listed on the old Schedule. With respect to options (1) and (2), each party shall have the right in its absolute and sole discretion to accept or reject any terms of purchase or of any new Schedule, as applicable. In the event Lessor and Lessee have not agreed to either option (1) or (2) prior to the maturity of the Base Period, or if Lessee fails to give written notice via certified mail at least one hundred twenty (120) days prior to the maturity of the Base Period of its intent to negotiate, or if an Event of Default has occurred under any Schedule, then options (1) and (2) shall expire and the Schedule shall automatically renew as provided herein. At the maturity of the initial twelve (12) month renewal period provided above, the Schedule shall continue in effect at the rate specified in the respective Schedule for successive periods of six (6) months, each subject to termination at the maturity of any such successive six-month renewal period by either Lessor or Lessee giving to the other party at least thirty (30) days prior written notice of termination. **Lessee acknowledges that Lessor has no obligation to enter into any agreement as a result of the initiation of discussions concerning options (1) or (2). LESSEE ACKNOWLEDGES AND AGREES THAT IT HAS READ AND UNDERSTANDS THE FOREGOING PROVISIONS AND HAS HAD THE OPPORTUNITY TO DISCUSS THEM WITH LESSOR AND/OR ITS COUNSEL, SHOULD IT SO DESIRE.** In the event of a disagreement between the parties in the interpretation of any provision of this Section 20(n), the parties agree that the ambiguity shall not be interpreted for or against either party upon grounds of authorship. **This Section 20(n) shall supersede all prior communications, representations, agreements and understandings, including but not limited to offer letters, proposal letters, comfort letters, commitment letters, emails and the like and constitutes the entire understanding and agreement between Lessor and Lessee with regard to the subject matter of this Section 20(n), and THERE IS NO UNDERSTANDING OR AGREEMENT, ORAL OR WRITTEN, WHICH IS NOT SET FORTH HEREIN; provided, however, that in the event of a conflict between the provisions of this Section 20(n) and any Schedule, the provisions of the Schedule shall govern.**

Initials: *EJ*

o.  Notices. Notices or demands required to be given herein shall be in writing and addressed to the other party at the address herein or such other address provided by written notice hereunder and shall be effective (i) upon the next business day if sent by guaranteed overnight express service; (ii) on the same day if personally delivered; or (iii) three days after mailing if sent by certified or registered U.S. mail, postage prepaid.

p.  Further Assurances; Financing Statements. Lessee will cooperate with Lessor in protecting Lessor's interests in the Property, the Lease and the amounts due under the Lease, including, without limitation, the execution (or other authentication), and delivery of Uniform Commercial Code statements, records and filings, patent and copyright registration documents with respect to proprietary Software (if applicable), and other documents requested by Lessor. Lessee will promptly execute, or otherwise authenticate, and deliver to Lessor such further documents, instruments, assurances and other records, and take such further action as Lessor may reasonably request in order to carry out the intent and purpose of this Lease and to establish and protect the rights and remedies created or intended to be created in favor of Lessor under this Lease. Lessee hereby authorizes Lessor to file UCC-1 financing statements, fixture filings, real property waivers, and all other filings and recordings, as may be deemed necessary by Lessor that includes collateral descriptions that are consistent with the Property. Lessee hereby authorizes and/or ratifies the filing of any UCC-1 financing statements by Lessor before or after the execution of this Lease. Lessee shall pay all costs of filing any financing amendment, continuation and termination statements with respect to the Property and Lease, including without limitation, any intangibles tax, documentary stamp tax or other similar taxes or charges relating thereto and all costs of UCC or other lien searches and of obtaining and filing any full or partial third-party releases deemed necessary or advisable by Lessor. Lessee will do whatever may be necessary or advisable to have a statement of the interest of Lessor in the Property noted on any certificate of title relating to the Property and will deposit said certificate with Lessor. Lessee will execute, or otherwise authenticate, and deliver to Lessor such other documents, records and written assurances and take such further action as Lessor may request to more fully carry out the implementation, effectuation, confirmation and perfection of the Lease and any rights of Lessor thereunder. Lessee grants to Lessor a security interest in all

deposits and other property transferred or pledged to Lessor to secure the payment and performance of all of Lessee's obligations under the Lease. Lessor is authorized to take any measures necessary to protect its interest in the Property.

In the event the Property is in the possession of a third party, Lessee will join with Lessor in notifying the third party of Lessor's interest in the Property and obtaining an acknowledgment from the third party that the third party is holding the Property for the benefit of Lessor.

q.  Lessor's Right to Perform for Lessee. If Lessee fails to perform or comply with any of its agreements contained herein, Lessor may perform or comply with such agreements and the amount of any payments and expenses of Lessor incurred in connection with such performance or compliance (including attorney fees), together with interest thereon at the lesser of the rate of eighteen percent (18%) per annum, or the highest rate permitted by law shall be deemed additional rent payable by Lessee upon demand.

r.  Counterparts; Chattel Paper. This Lease may be executed in any number of counterparts by different parties hereto or thereto on separate counterparts, each of which, when so executed or otherwise authenticated and delivered, shall be an original, but all such counterparts shall together consist of but one and the same instrument; provided, however, that to the extent that this Lease and/or the Schedule(s) would constitute chattel paper, as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction, no security interest herein or therein may be created or perfected through the transfer or possession of this Lease in and of itself without the transfer or possession or control, as applicable, of the original counterpart of such Schedule(s) identified as the document or record (as applicable) marked "Original", and all other counterparts shall be marked "Duplicate Original" or "Counterpart".

s.  Joint and Several Liability. In the event two or more parties execute this Master Lease Agreement as Lessee, each party shall be jointly and severally liable for all Lessee representations, warranties, and obligations (including without limitation, payment obligations) under this Master Lease Agreement or under any Schedule or other document executed in connection herewith. Any and all representations, agreements, or actions by one Lessee shall be binding on all other Lessees.

t.  Legal Fees and Other Costs. Lessee shall reimburse Lessor for all legal fees and additional charges, costs and expenses incurred by Lessor: (i) in review or preparation of this Lease Agreement, any Schedule and any other document or agreement in connection with this Lease Agreement; (ii) in review or preparation of any changes or amendments required by Lessee to Lessor's standard Lease documentation; (iii) in periodic legal reviews of the Lease Agreement, Schedules and other Lease documentation; (iv) in defending or protecting its interest in the Property; (v) in the execution, delivery, administration, amendment and enforcement of the Lease or the collection of any rent or other payments due under the Lease, or the preparation of any amendments or settlement agreements prepared in connection with the Lease; and (vi) in any lawsuit or other legal or arbitration/mediation proceeding to which the Lease gives rise, including without limitation; actions in tort. Lessee shall pay applicable legal fees at the rate of no more than $350.00 per hour. Lessee shall pay a documentation fee calculated at .15% of the total cost of property with a minimum of $750.00 and a maximum of $7,500.00 for each Schedule.

u.  Amendment and Modification. The Lease may not be amended or modified except by a written amendment executed by a duly authorized representative of each party, but no such amendment or modification needs further consideration to be binding. Notwithstanding the foregoing, Lessee authorizes Lessor to amend any Schedule to identify more accurately the Property (including, without limitation, supplying serial numbers or other identifying data), and such amendment shall be binding on Lessor and Lessee unless Lessee objects thereto in writing within ten (10) days after receiving notice of the amendment from Lessor.

v.  Unauthorized Distribution of Lease Documents Prohibited. Lessee agrees that it will not, through any of its actions or omissions, cause any document or any portion of any document, associated with any Lease to be delivered, distributed, or otherwise fall into the possession of anyone not employed by Lessee on a full time basis, without the written consent of Lessor, except for Lessee's auditors, attorneys or any individual, company,

CONFIDENTIAL

ONSET_00000773
FBG_CH1_00090786

**DEBTORS' EXHIBIT NO. 175**
**Page 561 of 1907**

Lessee must enter into a new Schedule with Lessor to lease Property which replaces the Property listed on the old Schedule. With respect to options (1) and (2), each party shall have the right in its absolute and sole discretion to accept or reject any terms of purchase or of any new Schedule, as applicable. In the event Lessor and Lessee have not agreed to either option (1) or (2) prior to the maturity of the Base Period, or if Lessee fails to give written notice via certified mail at least one hundred twenty (120) days prior to the maturity of the Base Period of its intent to negotiate, or if an Event of Default has occurred under any Schedule, then options (1) and (2) shall expire and the Schedule shall automatically renew as provided herein. At the maturity of the initial twelve (12) month renewal period provided above, the Schedule shall continue in effect at the rate specified in the respective Schedule for successive periods of six (6) months, each subject to termination at the maturity of any such successive six-month renewal period by either Lessor or Lessee giving to the other party at least thirty (30) days prior written notice of termination. **Lessee acknowledges that Lessor has no obligation to enter into any agreement as a result of the initiation of discussions concerning options (1) or (2). LESSEE ACKNOWLEDGES AND AGREES THAT IT HAS READ AND UNDERSTANDS THE FOREGOING PROVISIONS AND HAS HAD THE OPPORTUNITY TO DISCUSS THEM WITH LESSOR AND/OR ITS COUNSEL, SHOULD IT SO DESIRE.** In the event of a disagreement between the parties in the interpretation of any provision of this Section 20(n), the parties agree that the ambiguity shall not be interpreted for or against either party upon grounds of authorship. **This Section 20(n) shall supersede all prior communications, representations, agreements and understandings, including but not limited to offer letters, proposal letters, comfort letters, commitment letters, emails and the like and constitutes the entire understanding and agreement between Lessor and Lessee with regard to the subject matter of this Section 20(n), and THERE IS NO UNDERSTANDING OR AGREEMENT, ORAL OR WRITTEN, WHICH IS NOT SET FORTH HEREIN; provided, however, that in the event of a conflict between the provisions of this Section 20(n) and any Schedule, the provisions of the Schedule shall govern.**

Initials: _____

o.  Notices. Notices or demands required to be given herein shall be in writing and addressed to the other party at the address herein or such other address provided by written notice hereunder and shall be effective (i) upon the next business day if sent by guaranteed overnight express service; (ii) on the same day if personally delivered; or (iii) three days after mailing if sent by certified or registered U.S. mail, postage prepaid.

p.  Further Assurances; Financing Statements. Lessee will cooperate with Lessor in protecting Lessor's interests in the Property, the Lease and the amounts due under the Lease, including, without limitation, the execution (or other authentication), and delivery of Uniform Commercial Code statements, records and filings, patent and copyright registration documents with respect to proprietary Software (if applicable), and other documents requested by Lessor. Lessee will promptly execute, or otherwise authenticate, and deliver to Lessor such further documents, instruments, assurances and other records, and take such further action as Lessor may reasonably request in order to carry out the intent and purpose of this Lease and to establish and protect the rights and remedies created or intended to be created in favor of Lessor under this Lease. Lessee hereby authorizes Lessor to file UCC-1 financing statements, fixture filings, real property waivers, and all other filings and recordings, as may be deemed necessary by Lessor that includes collateral descriptions that are consistent with the Property. Lessee hereby authorizes and/or ratifies the filing of any UCC-1 financing statements by Lessor before or after the execution of this Lease. Lessee shall pay all costs of filing any financing amendment, continuation and termination statements with respect to the Property and Lease, including without limitation, any intangibles tax, documentary stamp tax or other similar taxes or charges relating thereto and all costs of UCC or other lien searches and of obtaining and filing any full or partial third-party releases deemed necessary or advisable by Lessor. Lessee will do whatever may be necessary or advisable to have a statement of the interest of Lessor in the Property noted on any certificate of title relating to the Property and will deposit said certificate with Lessor. Lessee will execute, or otherwise authenticate, and deliver to Lessor such other documents, records and written assurances and take such further action as Lessor may request to more fully carry out the implementation, effectuation, confirmation and perfection of the Lease and any rights of Lessor thereunder. Lessee grants to Lessor a security interest in all

deposits and other property transferred or pledged to Lessor to secure the payment and performance of all of Lessee's obligations under the Lease. Lessor is authorized to take any measures necessary to protect its interest in the Property.

In the event the Property is in the possession of a third party, Lessee will join with Lessor in notifying the third party of Lessor's interest in the Property and obtaining an acknowledgment from the third party that the third party is holding the Property for the benefit of Lessor.

q.  Lessor's Right to Perform for Lessee. If Lessee fails to perform or comply with any of its agreements contained herein, Lessor may perform or comply with such agreements and the amount of any payments and expenses of Lessor incurred in connection with such performance or compliance (including attorney fees), together with interest thereon at the lesser of the rate of eighteen percent (18%) per annum, or the highest rate permitted by law shall be deemed additional rent payable by Lessee upon demand.

r.  Counterparts; Chattel Paper. This Lease may be executed in any number of counterparts and by different parties hereto or thereto on separate counterparts, each of which, when so executed or otherwise authenticated and delivered, shall be an original, but all such counterparts shall together consist of but one and the same instrument; provided, however, that to the extent that this Lease and/or the Schedule(s) would constitute chattel paper, as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction, no security interest herein or therein may be created or perfected through the transfer or possession of this Lease in and of itself without the transfer or possession or control, as applicable, of the original counterpart of such Schedule(s) identified as the document or record (as applicable) marked "Original", and all other counterparts shall be marked "Duplicate Original" or "Counterpart".

s.  Joint and Several Liability. In the event two or more parties execute this Master Lease Agreement as Lessee, each party shall be jointly and severally liable for all Lessee representations, warranties, and obligations (including without limitation, payment obligations) under this Master Lease Agreement or under any Schedule or other document executed in connection herewith. Any and all representations, agreements, or actions by one Lessee shall be binding on all other Lessees.

t.  Legal Fees and Other Costs. Lessee shall reimburse Lessor for all legal fees and additional charges, costs and expenses incurred by Lessor: (i) in review or preparation of this Lease Agreement, any Schedule and any other document or agreement in connection with this Lease Agreement; (ii) in review or preparation of any changes or amendments required by Lessee to Lessor's standard Lease documentation; (iii) in periodic legal reviews of the Lease Agreement, Schedules and other Lease documentation; (iv) in defending or protecting its interest in the Property; (v) in the execution, delivery, administration, amendment and enforcement of the Lease or the collection of any rent or other payments due under the Lease, or the preparation of any amendments or settlement agreements prepared in connection with the Lease; and (vi) in any lawsuit or other legal or arbitration/mediation proceeding to which the Lease gives rise, including without limitation, actions in tort. Lessee shall pay applicable legal fees at the rate of no more than $350.00 per hour. Lessee shall pay a documentation fee calculated at .15% of the total cost of property with a minimum of $750.00 and a maximum of $7,500.00 for each Schedule.

u.  Amendment and Modification. The Lease may not be amended or modified except by a written amendment executed by a duly authorized representative of each party, but no such amendment or modification needs further consideration to be binding. Notwithstanding the foregoing, Lessee authorizes Lessor to amend any Schedule to identify more accurately the Property (including, without limitation, supplying serial numbers or other identifying data), and such amendment shall be binding on Lessor and Lessee unless Lessee objects thereto in writing within ten (10) days after receiving notice of the amendment from Lessor.

v.  Unauthorized Distribution of Lease Documents Prohibited. Lessee agrees that it will not, through any of its actions or omissions, cause any document or any portion of any document, associated with any Lease to be delivered, distributed, or otherwise fall into the possession of anyone not employed by Lessee on a full time basis, without the written consent of Lessor, except for Lessee's auditors, attorneys or any individual, company,

Page 8 of 9          Initials:

CONFIDENTIAL

ONSET_00000774
FBG_CH1_00090787

or entity as required by applicable law. Lessee further acknowledges that any such unauthorized delivery or distribution could cause Lessor to suffer irreparable economic harm.

w. <u>Change in Lessee's Name, Address and Jurisdiction.</u> Lessee shall not change its name, chief executive office address, or jurisdiction of organization from that set forth above, unless it shall have given Lessor or its assigns no less than thirty (30) days prior written notice.

SECTION 21.   POWER OF ATTORNEY.

LESSEE HEREBY AUTHORIZES AND APPOINTS LESSOR AND LESSOR'S AGENTS AND ASSIGNS AS LESSEE'S ATTORNEY-IN-FACT TO EXECUTE ACKNOWLEDGEMENT LETTERS AND OTHER DOCUMENTS REQUIRED TO BE EXECUTED BY LESSEE TO EFFECT ANY UNDERWRITING OR PERFECT ANY SECURITY INTEREST WITH REGARD TO A SCHEDULE. THE POWER OF ATTORNEY GRANTED HEREIN SHALL BE LIMITED TO THE FOREGOING PURPOSES.

SECTION 22.   DEFINITIONS

All capitalized terms not defined herein are defined in the Schedule.

a. "Acceptance and Delivery Certificate" means, any acceptance and delivery certificate, executed by the Lessee in connection with a Schedule, a Master Progress Payment Agreement, if any, and this Master Lease Agreement whereby the Lessee acknowledges that the items of Property to be leased have been delivered, received, installed, examined and tested and determined by Lessee to be satisfactory.

b. "Base Period" means, the period of any Lease referred to as such on the related Schedule under this Master Lease Agreement.

c. "Certificate" means, an Acceptance and Delivery and Approval for Progress Payment Certificate executed by the Lessee in connection with a Schedule, a Master Progress Payment Agreement and this Master Lease Agreement.

d. "Date of Acceptance" means, except as otherwise provided in Section 8c of this Master Lease Agreement, the date Lessee accepts the Property designated on any Schedule, as set forth in any Acceptance and Delivery Certificate executed by the Lessee in form provided by Lessor.

e. "Lease Commencement Date" means, as to the Property designated on any Schedule, where the Date of Acceptance for such Schedule falls on the first day of a calendar quarter, that date, and in any other case, the first day of the calendar quarter following the calendar quarter in which such Date of Acceptance falls.

f. "Lease" means, a Schedule incorporating the terms of this Master Lease Agreement, together with the related Master Progress Payment Agreement, if any, Stipulated Loss Schedule, Acceptance and Delivery Certificate, UCC financing statements and all other supporting documentation related thereto.

g. "Lessor's Damages" means, the Stipulated Loss Value together with costs, expenses, attorney's fees, interest, and any determinable indemnity owed by Lessee to Lessor.

h. "Master Progress Payment Agreement" means, an agreement under which (i) Lessee accepts items of Property by signing a Certificate, (ii) Lessor agrees to purchase said items of Property, and (iii) Lessee agrees to pay service charges, all prior to the Date of Acceptance of all Property under the Schedule.

i. "Monthly Rental" means, the monthly rental, together with sales tax and other amounts, if applicable, referred to as such on the related Schedule under this Master Lease Agreement.

j. "Property" means, equipment and other property, together with all related software whether embedded therein or otherwise, with all attachments, replacements, parts, substitutions, additions, repairs, accessions and accessories, incorporated therein and/or affixed thereto described in any Lease Schedule to be executed and delivered by Lessor and Lessee in connection with this Master Lease Agreement.

k. "Schedule" means, any Lease Schedule to be executed and delivered by Lessor and Lessee under this Master Lease Agreement, which Schedule states the terms and other information associated with the Schedule and describes the leased Property.

l. "Software" means, any computer program and supporting data, including all documentation, later versions, updates, upgrades and modifications, provided and/or described in any Lease Schedule to be executed and delivered by Lessor and Lessee in connection with this Master Lease Agreement.

m. "Stipulated Loss Schedule" means, Schedule of Stipulated Loss Values relating to a specific Schedule under this Master Lease Agreement.

n. "Transaction Documents" means, the Master Lease Agreement, Master Progress Payment Agreement, Lease(s), Schedule(s), Acceptance and Delivery Certificate(s), Certificate(s), sale leaseback agreement(s), bill(s) of sale, guaranty agreement(s) executed on behalf of Lessee in favor of Lessor, and any other document entered into by lessee or any guarantor pursuant to the foregoing, together with any and all amendments, addendums, riders and exhibits thereto.

IN WITNESS WHEREOF, Lessor and Lessee have executed this Master Lease Agreement on the month, day and year first above written.

LESSOR:

ONSET FINANCIAL, INC.

BY: _____
Kristine Allen
TITLE:   Executive Vice President

LESSEE:

CARNABY FA, LLC

BY: _____
Edward James
TITLE:   Executive Vice President

CONFIDENTIAL

ONSET_00000775
FBG_CH1_00090788

**DEBTORS' EXHIBIT NO. 175**
**Page 563 of 1907**

# Exhibit 25- Part 1

FBG_CH1_00090789



## LEASE SCHEDULE NO. 027
## TO
## MASTER LEASE AGREEMENT NO. OFI1445416

This Lease Schedule No. 027 dated April 7, 2025 (the "Schedule") between **ONSET FINANCIAL, INC.** (the "Lessor") and **CARNABY INVENTORY IV, LLC** (the "Lessee") incorporates by reference the terms and conditions of Master Lease Agreement No. OFI1445416 dated June 28, 2022 (the "Master Lease"), the Exhibit A ("Property") and the Exhibit B ("Stipulated Loss Schedule"), and constitutes a separate lease between Lessor and Lessee and is referred to herein as the "Lease". Lessor shall have the right to replace this Schedule with multiple Schedules for the purpose of segregating the Property into separate Lease Schedules. All capitalized terms used herein but not defined herein shall have the same meanings ascribed to them in the Master Lease.

SECTION 1      PROPERTY: All inventory, whether now in place or hereafter acquired, including all such items as they are replenished in the ordinary course of business, as identified by specific part numbers and/or by specific material numbers, consisting of raw components, work in progress, component parts, all after-acquired raw components and all finished goods, maintained, kept and/or stored at (i) Horizon Global Americas Inc.'s facility located at Avenida Los Nogales, s/n lotes 4, 5 y 6 (lots 4, 5 and 6) Parque Industrial Villa Florida (Buildings #1 and #2), Reynosa, Tamaulipas, Mexico, (ii) Horizon Global Americas Inc.'s facility located at Industrial Drive Edificio 11, Prologis Park, S/N, Reynosa Tamaulipas, 88787 Mexico, (iii) Horizon Global Americas Inc.'s facility located at 32901 West 193rd Street, Edgerton, Kansas 66021, (iv) Hopkins Manufacturing Corporation's facility located at 30900 West 185th Street, Edgerton, Kansas 66021, (v) Hopkins Manufacturing Corporation's facility located at 428 Peyton Street, Emporia, Kansas 66801, and (vi) any other future location(s), and other items of Property as more fully described on the attached Exhibit A to the Acceptance and Delivery Certificate, together with any and all attachments, accessions, additions, enhancements and replacements thereto. Notwithstanding anything herein or in the Master Lease to the contrary, Lessor and Lessee acknowledge that the Property is inventory and will be sold, transferred, assigned, conveyed or distributed by Lessee in its ordinary course of business and will be replenished by Lessee also in its ordinary course of business. Lessor acknowledges that, subject to the terms hereof, Lessee is entitled to all proceeds from the sale or transfer of the Property. Lessor agrees that its lien on any Property and any right, title or interest it has in any Property shall be automatically released upon the sale or transfer of such Property by Lessee in the ordinary course of its business. Upon request of Lessee, Lessor shall execute any documents reasonably requested by Lessee to evidence the release of Lessor's lien on the Property. Lessee agrees to provide to Lessor on a quarterly basis, or at such time as otherwise requested by Lessor, an updated inventory listing in substantially the same form delivered by Lessee to Lessor prior to the date hereof showing the inventory levels at the Property Location and status as of the date of each provided inventory listing ("Inventory List"). Lessee agrees that upon Lessor's request, it will increase the inventory balance to a level and amount equal to or greater than the then current Stipulated Loss Value as set forth in the Stipulated Loss Schedule.

Notwithstanding the foregoing, if at any time during the term of the Lease the Inventory Value is less than thirty percent (30%) of the Inventory Value determined as of the execution of this Schedule, the Lessee grants to the Lessor a security interest in the proceeds of the Property and authorizes Lessor to amend the UCC description to include proceeds. To determine the Inventory Value, Lessee shall provide to Lessor the current valuation of the inventory that specifically constitutes Property hereunder, which valuation shall be in accordance with GAAP standards ("Inventory Value") and will be evidenced on the Inventory List. Lessee's failure to comply with the terms set forth in this Section shall constitute an additional Event of Default under the Lease.

SECTION 2      PROPERTY LOCATION: Location(s) as set forth on the Exhibit A to the Acceptance and Delivery Certificate

SECTION 3      BASE PERIOD: Six (6) months starting on the Lease Commencement Date

SECTION 4      TOTAL PROPERTY COST: $160,000,000.00

SECTION 5      MONTHLY LEASE RATE FACTOR: 0.24167

SECTION 6      MONTHLY RENTAL:      $38,667,200.00, plus applicable sales/use and property tax

SECTION 7      RENTAL FREQUENCY: Monthly in advance

SECTION 8      THIS SECTION INTENTIONALLY LEFT BLANK

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Schedule Documents\Lease Schedule - ST.dotx

CONFIDENTIAL

ONSET_00032910
FBG_CH1_00090790

SECTION 9     DATE OF ACCEPTANCE: As specified in the Acceptance and Delivery Certificate

SECTION 10    THIS SECTION INTENTIONALLY LEFT BLANK

SECTION 11    ADDITIONAL PROVISIONS:

a. PAYMENT BY ELECTRONIC TRANSFER: In the event that a Monthly Rental payment and other monies due under the Lease are not received by Lessor or its assigns within ten (10) days of the due date, Lessee authorizes Lessor or its assigns to electronically transfer payment due under any past due invoice from Lessee's account maintained with its financial institution, and Lessee agrees to execute and deliver a written "Authorization for Electronic Transfer" form to Lessor to affect such transfers. Failure or refusal of Lessee to authorize such transfers or failure of Lessor or its assigns to receive such payments by electronic transfer shall constitute an additional Event of Default under Section 18 of the Master Lease. Upon the occurrence of the Event of Default specified above, Lessor shall be entitled to exercise its rights and remedies under the Lease.

b. LATE FEES: For purposes of this Schedule, the second paragraph of Section 3 of the Master Lease shall be deleted and replaced with the following: "If any rental or other payment due under the Lease shall be unpaid five (5) days after its due date, Lessee will pay on demand, as a late charge, but not as interest, $50,000 per day commencing on the 6th day after its due date through and including the 10th day after its due date. If any rental or other payment due under the Lease shall be unpaid ten (10) days after its due date, and in addition to the amounts set forth above, Lessee will pay on demand, as an additional late charge, but not as interest, ten percent (10%) per month on any such unpaid amount but in no event to exceed maximum lawful charges."

c. ADDITIONAL EVENT OF DEFAULT – CROSS DEFAULT: In addition to the Events of Default set forth in the Master Lease, the following shall constitute an additional Event of Default under the Lease: Breach by any of Lessee's affiliates of any agreements that such affiliates may have in place with Lessor, now or hereafter in effect during the term of this Schedule, including but not limited to Master Lease Agreement No. OFI1045321 by and between TRICO PRODUCTS CORPORATION and Lessor, and any and all Lease Schedules thereunder, Master Lease Agreement No. OFI1345400 by and between EAGLE MACHINING, LLC and Lessor, and any and all Lease Schedules thereunder, Master Lease Agreement No. OFI1445408 by and between CARNABY INVENTORY I, LLC and Lessor, and any and all Lease Schedules thereunder, and Master Lease Agreement No. OFI1545465 by and between CARNABY FA, LLC and Lessor, and any and all Lease Schedules thereunder. Upon the occurrence of an Event of Default under the Lease, including without limitation, the additional Event of Default specified herein, Lessor shall be entitled to exercise any of its rights or remedies under the Lease.

d. PURCHASE OPTION: For purposes of this Schedule only, and provided no Event of Default has occurred and is continuing under the Lease, at the end of the Base Period, the following amendment shall apply: Option (1) of Section 20(n) of the Master Lease shall be revised to state "purchase the Property for a price equal to $101.00. Lessor's sale of Property to the Lessee pursuant to this clause shall be on an "as-is, where-is" basis, without any representation or warranty by, or recourse to, the Lessor, except as to the absence of liens created by or through Lessor." All other terms and conditions of the Master Lease shall continue in full force and effect without change.

e. RENT AND PAYMENT: For purposes of this Schedule only, in the third sentence of Section 3 of the Master Lease, the phrase "by a daily rental equal to one-thirtieth (1/30) of the Monthly Rental" shall be deleted and replaced with "by a daily rental equal to the Total Cost of Property multiplied by 0.150000 then divided by 30".

f. CROSS COLLATERALIZATION: As part of the consideration of Lessor entering into this Schedule, and as additional security against Lessee's obligations under the Lease, Lessee agrees to the cross-collateralization of Property as follows:

CARNABY FA, LLC and Lessor have entered into Master Lease Agreement No. OFI1545465 and have or intend to enter into Lease Schedule No. 009 ("Carnaby FA 009") and CARNABY INVENTORY IV, LLC and Lessor have entered into Master Lease Agreement No. OFI1445416 and have or intend to enter into Lease Schedule No. 027 ("Carnaby Inventory IV 027") (Carnaby FA 009 and Carnaby Inventory IV 027 shall be referred to herein as the "Current Schedules"). Lessor and Lessee hereby agree that the Current Schedules, the Master Lease Agreements (as they relate to the Current Schedules), and the Property leased under the Current Schedules shall be cross-collateralized for all purposes under the Current Schedules and that such Property shall serve to secure the payment and performance of CARNABY INVENTORY IV, LLC and CARNABY FA, LLC on all obligations owed by CARNABY INVENTORY IV, LLC and CARNABY FA, LLC to Lessor under the Current Schedules.

3UTSJ-VS-WF901.O9FI.Local\Lease Operations\Master Library\Schedule Documents\Lease Schedule - ST.dotx

CONFIDENTIAL

ONSET_00032911
FBG_CH1_00090791

DEBTORS' EXHIBIT NO. 175
Page 566 of 1907

In addition to the foregoing cross-collateralization, Lessee further agrees to the cross-collateralization of Property as follows:

CARNABY FA, LLC and Lessor have entered into Master Lease Agreement No. OFI1545465 and various Lease Schedules thereunder (all Lease Schedules entered into by and between Carnaby FA, LLC and Lessor, including Carnaby FA 009, shall be referred to herein collectively as the "Carnaby FA Schedules") and CARNABY INVENTORY IV, LLC and Lessor have entered into Master Lease Agreement No. OFI1445416 and various Lease Schedules thereunder (all Lease Schedules entered into by and between Carnaby Inventory IV, LLC and Lessor, including Carnaby Inventory IV 027, shall be referred to herein collectively as the "Carnaby Inventory IV Schedules") (collectively, the Carnaby FA Schedules and the Carnaby Inventory IV Schedules may be referred to herein as the "Schedules" and individually as a "Schedule"). Lessor and Lessee hereby agree that the Schedules, the Master Lease Agreements (as they relate to each Schedule), and the Property leased under each Schedule shall be cross-collateralized for all purposes under each Schedule and that such Property shall serve to secure the payment and performance of CARNABY INVENTORY IV, LLC and CARNABY FA, LLC on all obligations owed by CARNABY INVENTORY IV, LLC and CARNABY FA, LLC to Lessor under the Schedules. In consideration of the foregoing, in the event either CARNABY FA, LLC or CARNABY INVENTORY IV, LLC elects to exercise its Early Termination Option included in any Schedule, then Lessor shall have the right in Lessor's sole and absolute discretion, to require that Lessee pay off in full all remaining obligations on some or all Carnaby FA Schedules and Carnaby Inventory IV Schedules, as such Schedules shall be determined by Lessor.

g.   EARLY TERMINATION OPTION: For purposes of this Schedule only, provided no Event of Default has occurred and is continuing under the Lease, and further provided Lessee has provided Lessor thirty (30) days prior written notice, Lessee may elect to early terminate this Schedule and to purchase the Property for an amount equal to the aggregate of the remaining obligations due and owing to Lessor including (i) any and all payments due, owing and expected prior to the Lease Commencement Date (to include Progress Payment Charges, Interim Rent, Transaction Fee, and other such charges), and (ii) Base Period Monthly Rental payments, together with a prepayment penalty of five percent (5%) of such amount, together with all applicable taxes and other amounts due under the Lease, including but not limited to sales and use tax, property tax, late charges, and any and all other sums due. Lessor's sale of Property to the Lessee pursuant to this clause shall be on an "as-is, where-is" basis, without any representation or warranty by, or recourse to, the Lessor, except as to the absence of liens created by or through Lessor.

h.   RETURN OPTION: For purposes of this Schedule only, Section 20(n) of the Master Lease shall be revised by deleting option (2) in its entirety together with any and all terms and references specific to option (2) thereunder.

i.   EVENTS OF DEFAULT: Notwithstanding Section 18(c) of the Master Lease, it shall not be an Event of Default if Lessee sells, transfers, assigns, conveys or distributes any Property in the ordinary course of its business.

j.   INSPECTION: Pursuant to the terms and conditions of the Master Lease, Lessor requires a third-party inspection of each item of Property. Upon Lessor's receipt of a satisfactory third-party inspection of the Property evidencing that the Property is delivered, installed and in good working order and condition, Lessor will provide Lessee a final Acceptance and Delivery Certificate, as provided in the Master Lease. Upon receipt of the final Acceptance and Delivery Certificate, and further upon Lessee's inspection, satisfaction and acceptance of the Property (subject to the terms and conditions of the Master Lease), Lessee shall execute and deliver to Lessor the final Acceptance and Delivery Certificate.

k.   WAIVERS: For purposes of this Lease and to ensure that Lessor shall be granted all right, title and interest in and to the Property, and to further ensure that Lessor shall be indemnified from and against any loss or damage it might incur resulting from liens, claims, security interest or encumbrances existing or of records against the Property Location or the Property, Lessee agrees (i) to provide to Lessor any documentation reasonably requested, including but not limited to bills of sale, waivers of interest, lien releases, mechanic's lien releases, mortgagee waivers, and any additional waivers (collectively the "Waivers"), and (ii) to use its commercially reasonable efforts to cause any third parties reasonably deemed necessary by Lessor to execute such Waivers. As long as the Property leased under this Schedule remains personal property and the Lessee has used commercially reasonable efforts to obtain a third-party Waiver, Lessee's failure to provide Waivers shall not constitute an additional Event of Default under the Lease.

l.   ADDITIONAL REMEDIES ON DEFAULT- INJUNCTIVE RELIEF: Upon the occurrence of a monetary Event of Default under the Lease, upon demand by Lessor, in addition to the remedies set forth in Section 19 of the Master Lease, Lessee shall thereupon immediately cease the use of any and all Property under each and every Schedule under the Master Lease whether such use is by Lessee or any affiliate of Lessee. In the enforcement of the remedies described in this Section, Lessor shall be entitled to an injunction restraining Lessee, or any of Lessee's affiliates, from using the

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Schedule Documents\Lease Schedule - ST.dotx

CONFIDENTIAL

ONSET_00032912
FBG_CH1_00090792

**DEBTORS' EXHIBIT NO. 175**
**Page 567 of 1907**

Property and any Property under any other Schedules executed in connection with the Master Lease. Lessee agrees that a violation of such will cause immediate and irreparable damage to Lessor and that the detriment which Lessor will suffer as a result of a breach by Lessee of the obligations contained in the Lease cannot be adequately compensated by monetary damages, and therefore Lessor shall be entitled to injunctive and other equitable relief to enforce the provisions of this Section.

Nothing contained herein shall prohibit Lessor from also pursuing any other remedies available under the Master Lease, the Schedule, or otherwise at law, and no action by Lessor in pursuing any other remedies shall constitute an election to forego other remedies. Lessee agrees that the foregoing remedies are in addition to all other rights and remedies available to Lessor under the Master Lease, the Schedule, or otherwise available provided by law. In connection with Lessor's exercise of any or all of the above-listed remedies, Lessor shall be entitled to recover all costs and expenses incurred by Lessor in the enforcement of the Lease and/or the exercise of its rights hereunder, including in disabling the Property, including without limitation, reasonable attorney fees and costs incurred by Lessor. In the event of enforcement by Lessor through judicial proceedings, Lessee hereby waives any requirement that Lessor post a bond. Lessor's failure to promptly enforce any right or remedy hereunder shall not operate as a waiver of such right or remedy, and Lessor's waiver of any default shall not constitute a waiver of any subsequent or other default. Lessee further agrees that the rights and remedies available to Lessor under the Lease may be enforced by specific performance, including by injunction.

m. MAINTENANCE OF PROPERTY: For purposes of this Schedule only, Lessee shall, undertake all reasonable and customary actions to preserve and protect the Property and maintain, keep and/or store the Property so that it is ready to assemble, sell or distribute in the ordinary course of business. By fulfilling these requirements, Lessee shall meet and satisfy the requirements to maintain the Property as found in the Master Lease.

n. TRANSACTION FEE: For and in consideration of Lessor entering into this Lease, Lessee shall pay to Lessor a non-refundable transaction fee equal to $6,400,000.00 (the "Transaction Fee") which shall be paid concurrently with Lessee's execution and delivery of this Schedule. Lessee agrees that the Transaction Fee is paid in consideration of Lessor's work in underwriting, due diligence and originating the Lease. The Transaction Fee is in addition to, and shall not be applied to, any other amounts due or owed by Lessee under or in connection with the Lease, whether denominated rents, charges, fees, or expenses, including without limitation, any inspection fees, documentation fees, out of pocket expenses chargeable to Lessee, or any other fee or charge provided for in the Lease.

o. CURRENCY: Unless otherwise specifically stated, all monies referenced in the Lease and any accompanying documents shall be deemed to be in U.S. Dollars. All payments due to Lessor and/or its assigns, shall be due and payable in U.S. Dollars.

p. FURTHER ASSURANCES: Lessee agrees as follow: i) Lessee will cooperate with Lessor in protecting Lessor's interests in the Property, ii) Lessor is authorized to take any measures necessary to protect its ownership and/or interest in the Property, and iii) Lessee agrees to execute any further documents, and to take any further actions, reasonably requested by Lessor to evidence ownership or to perfect the security interest granted under the Lease or to effectuate the rights granted to Lessor under the Lease.

q. TAX INDEMNIFICATION: Notwithstanding anything to the contrary contained in the Lease, Lessee agrees to defend, indemnify, reimburse and hold Lessor harmless against any and all taxes imposed upon Lessor by any State, jurisdiction or taxing authority, for failure to pay any such taxes due or incurred based on (a) the Property, and (b) any payments required to be made under the Lease or otherwise with respect to the Lease. Upon any assessment against or final payment by Lessor of any taxes as provided herein, Lessee agrees to pay such assessments or reimburse Lessor for its payments of such assessments. This Indemnity shall survive the termination of the Lease and shall continue to bind Lessee as long as any tax assessments with respect to the Property or Lease is pending or may be imposed on Lessor.

r. PROPERTY TAX: For purposes of this Schedule only, notwithstanding anything to the contrary contained in the Lease, and effective the date hereof and continuing throughout the term of the Schedule, including any renewals thereof, Lessee agrees to file in its name and remit directly to the proper taxing authority, all property taxes due under the Schedule. Lessee shall maintain records of filing and evidence of payment and shall provide proof of such filing and/or payment to Lessor upon request by Lessor. Lessee agrees to indemnify Lessor for any unpaid property tax, penalties and interest resulting from Lessee's failure to timely file property taxes or its failure to remit payment to the proper taxing authority. Lessee's failure to comply with the requirements set forth in this Section shall constitute an additional Event of Default under the Lease.

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Schedule Documents\Lease Schedule - ST.docx

CONFIDENTIAL

ONSET_00032913
FBG_CH1_00090793

**DEBTORS' EXHIBIT NO. 175**
**Page 568 of 1907**

s.   ASSIGNMENT: Notwithstanding anything to the contrary herein, Lessor and Lessee acknowledge and agree that all or a portion of this Lease may be structured as an Assignment, whereby Lessor may take an Assignment of all or a portion of the Property from Lessee for purposes of leasing the Property back to Lessee, in accordance with the terms and conditions set forth in an Assignment and Transfer of Inventory, which may be executed in connection with this Lease.

t.   BAILEE: Notwithstanding anything to the contrary contained herein or in the Master Lease, Lessor and Lessee acknowledge and agree that Lessee may deliver possession of the Property to one or more related companies (collectively, the "Bailee"). Inasmuch as the Property may be located at and in use by the Bailee, Lessee agrees, to (i) cooperate with Lessor in protecting Lessor's interests in the Property, (ii) authorize Lessor to take any measures necessary to protect its ownership and/or interest in the Property, and (iii) execute, or cause each Bailee to execute, any further documentation and to take any further actions, reasonably requested by Lessor to evidence ownership or to perfect the security interest granted under the Lease or to effectuate the rights granted to Lessor under the Lease.

u.   ADDITIONAL CONDITIONS PRECEDENT AND REPRESENTATIONS OF LESSEE: For purposes of this Schedule, and as an inducement for Lessor entering into this Schedule, Lessee agrees that under no circumstances, including, but not limited to problems with (i) supply chain disruption, (ii) labor shortages, (iii) rising interest rates, (iv) global pandemic, (v) inflation, and/or (vi) geopolitical turmoil, will the Lessee request any kind of payment reduction or offsets to the payments set forth in this Schedule. Lessee represents and warrants that it has the financial ability to make the payments due under this Schedule regardless of any kind of problems or change in circumstances, including but not limited to those listed above. Lessee acknowledges that Lessor is under no obligation to reduce or modify the payments due under this Schedule, and instead recognizes that Lessee is obligated to timely make all payments due under the Schedule. Specifically, Lessee hereby reaffirms that all of Lessee's payment and other obligations shall be without notice or demand, are absolute, unconditional and not subject to abatement, reduction or setoff for any reason, including any of the circumstances listed above and any other circumstances, unforeseen or not, and Lessee will not request or receive any abatement, reduction, setoff, deferment, modification, or other accommodation relating thereto.

v.   MASTER LEASE TERMS AND CONDITIONS: Unless otherwise specifically modified herein, all terms and conditions of the Master Lease shall continue to be in full force and effect without change.

SECTION 12    REPRESENTATION OF LESSEE: Lessor and Lessee agree that this Schedule is a "Finance Lease" as defined by the Uniform Commercial Code Article 2A, in that (i) Lessee has selected the Property in its sole discretion, (ii) Lessor has acquired the Property solely for the purpose of leasing such Property under this Schedule, and (iii) Lessee has received a copy of the contract evidencing Lessor's purchase of the Property.

[Signature(s) on following page]

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Schedule Documents\Lease Schedule - ST.dotx

CONFIDENTIAL

ONSET_00032914
FBG_CH1_00090794

[Lease Schedule No. 027 Signature Page]

LESSOR:                                          LESSEE:

**ONSET FINANCIAL, INC.**                        **CARNABY INVENTORY IV, LLC**

BY: _____                    BY: _____
        Kristina Allen                                   Edward James
TITLE:    Executive Vice President               TITLE:    Executive Vice President

Page 6 of 6

\\UTSJ-VS-WFS01.OSFI.Local\Lease Operations\Master Library\Schedule Documents\Lease Schedule - ST.dotx

CONFIDENTIAL

ONSET_00032915
FBG_CH1_00090795

**DEBTORS' EXHIBIT NO. 175**
**Page 570 of 1907**

**EXHIBIT B**
**STIPULATED LOSS SCHEDULE**
**DATED APRIL 07, 2025**
**TO**
**LEASE SCHEDULE NO. 027**
**DATED APRIL 07, 2025**
**TO**
**MASTER LEASE AGREEMENT NO. OFI1445416**
**STIPULATED LOSS VALUE TABLE**

| AFTER MONTHLY PAYMENT | TOTAL STIPULATED LOSS VALUE | STIPULATED LOSS PERCENTAGE |
|---|---|---|
| 0 | $216,000,000 | 135.00% |
| 1 | $194,155,066 | 121.35% |
| 2 | $170,472,862 | 106.55% |
| 3 | $144,962,853 | 90.60% |
| 4 | $117,483,967 | 73.43% |
| 5 | $87,884,245 | 54.93% |
| 6 | $56,000,000 | 35.00% |
| and thereafter | | |

The Stipulated Loss Value for any item of lost, damaged or destroyed Property shall be the Lessor's original cost of such item of Property multiplied by the Stipulated Loss Percentage indicated in the above table which corresponds to the month of the Lease after the Lease Commencement Date in which the last Monthly Rental payment was made. In the event of a total loss or destruction, the Stipulated Loss Value for all lost or damaged Property shall be equal to the percentage or dollar amount, as the case may be, listed under the Total Stipulated Loss Value indicated above which corresponds to the month of the Lease after the Lease Commencement Date in which the last Monthly Rental payment was made. If a partial or total loss occurs at any time prior to the Lease Commencement Date of the Lease, then the Stipulated Loss Value shall be equal to 135% of the total amount funded. In the event the Lease is continued for any reason, then the last percentage or dollar amount, as the case may be, shown above shall control throughout any such continued term.

In the event of default under the Lease, Lessor may, in addition to all other remedies available to it under the Lease, recover the dollar amount listed under the Total Stipulated Loss Value indicated above as of the Monthly Rental payment date immediately preceding the date of the default.

[Signature(s) on following page]

CONFIDENTIAL

ONSET_00032916
FBG_CH1_00090796

**DEBTORS' EXHIBIT NO. 175**
**Page 571 of 1907**

[STIPULATED LOSS SCHEDULE DATED APRIL 07, 2025 TO LEASE SCHEDULE NO. 027 SIGNATURE PAGE]

LESSOR:                                              LESSEE:

**ONSET FINANCIAL, INC.**                            **CARNABY INVENTORY IV, LLC**

BY: _____                        BY: _____
        Kristina Allen                                      Edward James
TITLE: Executive Vice President                      TITLE:  Executive Vice President

CONFIDENTIAL

ONSET_00032917
FBG_CH1_00090797