**PUBLIC VERSION OF DOCKET NO. 2685**
**FILED UNDER SEAL ON 5/15/2026**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>FIRST BRANDS GROUP, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-90399 (CML)<br><br>(Jointly Administered) |

## MOTION OF THE OFFICIAL COMMITTEE
## OF UNSECURED CREDITORS FOR (I) LEAVE,
## STANDING, AND AUTHORITY TO COMMENCE AND PROSECUTE
## CERTAIN CLAIMS AND CAUSES OF ACTION ON BEHALF OF THE
## DEBTORS' ESTATES AND (II) EXCLUSIVE SETTLEMENT AUTHORITY

> **IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

FBG_CH1_00093291

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT AND RELIEF REQUESTED ....................................................1

JURISDICTION AND AUTHORITY ....................................................................................3

BANKRUPTCY PROCEEDINGS AND CHALLENGE DEADLINE .........................................4

THE DEFENDANTS..........................................................................................................5

STATEMENT OF FACTS ..................................................................................................5

BASIS FOR RELIEF .........................................................................................................6

I.  The Legal Standard for Derivative Standing. ........................................................6

II.  The Committee Satisfies the Requirements
For Derivative Standing Concerning Each of
The Claims Asserted in the Proposed Complaint. ..................................................7

    A.  Each of the Claims Asserted in the Proposed Complaint are Colorable.................8

        i.  The Intentional Fraud Claims are Colorable...............................................10

        ii.  The Constructive Fraud Claims are Colorable...........................................16

        iii.  Aequum was on Inquiry Notice;
The Good Faith Defense is Not Available..................................................19

        iv.  The Disallowance Claims are Colorable....................................................21

        v.  The Equitable Subordination Claims are Colorable. ..................................22

    B.  The Debtors Have Unjustifiably Refused
To Bring the Claims Alleged in the Proposed Complaint. ...................................24

CONCLUSION.................................................................................................................26

FBG_CH1_00093292

**DEBTORS' EXHIBIT NO. 183**
**Page 2 of 90**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.),*
169 B.R. 832 (Bankr. S.D.N.Y. 1994) ..................................................................24

*In re ABC Utils. Servs.,*
No. 89-41420-BJH-7, 2001 Bankr. LEXIS 2240 (Bankr. N.D. Tex. Oct. 9,
2001) .......................................................................................................................9

*Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns
Corp.*),
330 B.R. 364 (Bankr. S.D.N.Y. 2005) ................................................................8, 9

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns
Corp.),*
365 B.R. 24 (Bankr. S.D.N.Y. 2007) ...................................................................22

*In re Am. Hous. Found.,*
785 F.3d 143 (5th Cir. 2015) ...............................................................................20

*ASARCO, LLC v. Montana Res., LLC,*
514 B.R. 168 (S.D. Tex. 2013) ............................................................................19

*Benjamin v. Diamond (In re Mobile Steel Co.),*
563 F.2d 692 (5th Cir. 1977) .................................................................22, 23, 24

*Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Grp., Inc.),*
66 F.3d 1436 (6th Cir. 1995) ...............................................................................25

*Carr v. Loeser (In re Int'l Auction & Appraisal Servs., LLC),*
No. 11-00813 (MDF), 2014 Bankr. LEXIS 5294 (Bankr. M.D. Pa. Aug. 27,
2014) .....................................................................................................................13

*In re Centaur, LLC,*
No. 10-10799 (KJC), 2010 WL 4624910 (Bankr. D. Del. Nov. 5, 2010) .................9

*Charys Liquidating Tr. v. McMahan Sec. Co., L.P. (In re Charys Holding Co.),*
443 B.R. 628 (Bankr. D. Del. 2010) .....................................................................18

*In re Chesapeake,*
No. 20-33233, ECF No. 2906 (Bankr. S.D. Tex. Jan. 13, 2021) .................................9

*Citibank, N.A. v. Brigade Cap. Mgmt., L.P.,*
49 F.4th 42 (2d Cir. 2022) ...................................................................................20

FBG_CH1_00093293

**DEBTORS' EXHIBIT NO. 183
Page 3 of 90**

Case 25-90399   Document 2881   Filed in TXSB on 06/02/26   Page 4 of 90

*Claridge Assocs., LLC v. Schepis (In re Pursuit Cap. Mgmt., LLC)*,
    595 B.R. 631 (Bankr. D. Del. 2018) ....................................................................9

*Commodity Futures Trading Comm'n v. Alexandre*,
    No. 22-cv-3822 (VEC), 2025 WL 252435 (S.D.N.Y. Jan. 21, 2025) ......................15

*Brickley ex rel. CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification
    Beams Sys., LLC*,
    566 B.R. 815 (W.D. Tex. 2017).........................................................................19

*Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics
    Corp. v. Chinery*,
    330 F.3d 548 (3d Cir. 2003).............................................................................7

*In re Diamond Fin. Co., Inc.*,
    658 B.R. 748 (Bankr. E.D.N.Y. 2024)................................................................15

*In re Distributed Energy Systems, Corp.*,
    Case No. 08-11101 (KG) (Bankr. D. Del. Jul. 30, 2008) ...................................8, 9

*In re Dreier LLP*,
    No. 08-15051 (SMB), 2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014) .................15

*In re Enron Corp.*,
    319 B.R. 128 (Bankr. S.D. Tex. 2004) ..............................................................7

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*,
    379 B.R. 425 (S.D.N.Y. 2007)..........................................................................24

*In re EPD Inv. Co., LLC*,
    114 F.4th 1148 (9th Cir. 2024) .........................................................................15

*EPLG I, LLC v. Citibank, N.A. (In re Qimonda Richmond, LLC)*,
    467 B.R. 318 (Bankr. D. Del. 2012) .................................................................18

*Fabricators, Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*,
    109 B.R. 186 (Bankr. S.D. Miss. 1987), *opinion aff'd*, 126 B.R. 239 (S.D.
    Miss. 1989), *judgment aff'd*, 926 F.2d 1458 (5th Cir. 1991)...............................23

*Finn v. All. Bank*,
    860 N.W.2d 638 (Minn. 2015)..........................................................................14

*Fundex Cap. Corp. v. Balaber-Strauss (In re Tampa Chain Co.)*,
    53 B.R. 772 (Bankr. S.D.N.Y. 1985).................................................................22

*Matter of Galaz*,
    850 F.3d 800 (5th Cir. 2017) ...........................................................................12

FBG_CH1_00093294

**DEBTORS' EXHIBIT NO. 183**
**Page 4 of 90**

*In re Guyana Dev. Corp.*,
　168 B.R. 892 (Bankr. S.D. Tex. 1994) ......................................................................6

*Hill v. Zaid (In re Zaid)*,
　No. 11-34701-H3-7, 2013 WL 321579 (Bankr. S.D. Tex. Jan. 28, 2013) ..............................18

*Horwitt v. Sarroff*,
　No. 3:17-cv-1902, 2020 WL 5504471 (D. Conn. Sep. 11, 2020)..........................................21

*In re Houston Drywall, Inc.*,
　No. 05-95161-H4-7, 2008 WL 2754526 (Bankr. S.D. Tex. July 10, 2008) ...........................11

*In re iPCS, Inc.*,
　297 B.R. 283 (Bankr. N.D. Ga. 2003) ..............................................................7, 8, 9

*Janvey v. Alguire*,
　647 F.3d 585 (5th Cir. 2011) .......................................................................15, 19

*Janvey v. GMAG, L.L.C.*,
　977 F.3d 422 (5th Cir. 2020) ............................................................................20

*Matter of Joyanna Holitogs, Inc.*,
　21 B.R. 323 (Bankr. S.D.N.Y. 1982).....................................................................7

*In re Louisiana World Exposition, Inc.*,
　832 F.2d 1391,1397 (5th Cir. 1987) ....................................................................6

*Louisiana World Exposition, Inc. v. Fed. Ins. Co. (In re Louisiana World
　Exposition, Inc.)*,
　832 F.2d 1391 (5th Cir. 1987) ..............................................................7, 8, 24, 25

*Louisiana World Exposition v. Fed. Ins. Co.*,
　858 F.2d 233 (5th Cir. 1988) ...........................................................................24

*Metal Bldg. Components, LP v. Raley*,
　No. 03-05-00823-CV, 2007 WL 74316 (Tex. App. Jan. 10, 2007).........................................11

*In re Octagon Roofing*,
　156 B.R. 214 (Bankr. N.D. Ill. 1993) ................................................................21

*Off. Comm. of Unsecured Creditors v. Hudson United Bank (In re Am.'s Hobby
　Ctr., Inc.)*,
　223 B.R. 275 (Bankr. S.D.N.Y. 1998)..................................................................8, 9

*Poth v. Small, Craig, & Werkenthin, L.L.P.*,
　967 S.W.2d 511 (Tex. App. 1998, pet. denied) ........................................................11

FBG_CH1_00093295

**DEBTORS' EXHIBIT NO. 183**
**Page 5 of 90**

*In re Reagor-Dykes Motors, LP,*
    No. 18-50214-RLJ-11, 2020 WL 4939180 (Bankr. N.D. Tex. Aug. 24, 2020) ......................19

*Reed v. Cooper (In re Cooper),*
    405 B.R. 801 (Bankr. N.D. Tex. 2009)...................................................................................24

*S.E.C. v. Res. Dev. Int'l, LLC,*
    487 F.3d 295 (5th Cir. 2007) .................................................................................................15

*In re Ritz,*
    567 B.R. 715 (Bankr. S.D. Tex. 2017) ............................................................................12, 13

*In re: Roman Catholic Diocese of Harrisburg,*
    640 B.R. 59 (Bankr. M.D. Pa. 2022) .....................................................................................19

*Scholes v. Lehmann,*
    56 F.3d 750 (7th Cir. 1995) ...................................................................................................20

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff),*
    528 F. Supp. 3d 219 (S.D.N.Y. 2021) *aff'd sub nom. Picard v. JABA Assocs.*
    *LP,* 49 F.4th 170 (2d Cir. 2022)...........................................................................................15

*In re Sentinel Mgmt. Grp., Inc.,*
    809 F.3d 958 (7th Cir. 2016) .................................................................................................20

*In re Soza,*
    542 F.3d 1060 (5th Cir. 2008) ...............................................................................................13

*Stanley v. U.S. Bank Nat'l Ass'n (In re TransTexas Gas Corp.),*
    597 F.3d 298 (5th Cir. 2010) .................................................................................................18

*In re Tegeler,*
    586 B.R. 598 (Bankr. S.D. Tex. 2018) ..................................................................................12

*Think3 Litig. Tr. v. Zuccarello (In re Think3, Inc.),*
    529 B.R. 147 (Bankr. W.D. Tex. 2015)..................................................................................18

*Unsecured Creditors Comm. v. Noyes (In re STN Enters.),*
    779 F.2d 901 (2d Cir. 1985)....................................................................................................7

*Wilson v. Huffman (In re Missionary Baptist Found. of Am., Inc.),*
    712 F.2d 206 (5th Cir. 1983) .................................................................................................22

*Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring, Inc.),*
    714 F.3d 860 (5th Cir. 2013) ...................................................................................................7

**Statutes**

11 U.S.C. § 105(a) ........................................................................................................................1, 3

FBG_CH1_00093296

DEBTORS' EXHIBIT NO. 183
Page 6 of 90

11 U.S.C. § 502(d) ...................................................................................................................21

11 U.S.C. § 510(c) ...................................................................................................................22

11 U.S.C. § 544 .................................................................................................................. *passim*

11 U.S.C. § 548 .................................................................................................................. *passim*

11 U.S.C. § 550(b) ...................................................................................................................20

11 U.S.C. § 1103 .......................................................................................................................6

11 U.S.C. § 704(a)(1) ...............................................................................................................24

11 U.S.C. § 1103 ............................................................................................................1, 3, 6, 7

11 U.S.C. § 1107(a) ...................................................................................................................3

11 U.S.C. § 1109(b) ...............................................................................................................1, 7

28 U.S.C. § 157(b) .....................................................................................................................3

28 U.S.C. § 1334 ........................................................................................................................3

28 U.S.C. § 1408 ........................................................................................................................3

28 U.S.C. § 1409 ........................................................................................................................3

Tex. Bus. & Com. Code Ann. § 24.005(a)(2) ...........................................................................17

Tex. Bus. & Com. Code Ann. § 24.006 .....................................................................................17

Tex. Bus. & Com. Code Ann. §24.009(a) ..................................................................................20

Texas Uniform Fraudulent Transfer Act Section 24.005(a)(1) ....................................................10

FBG_CH1_00093297

**DEBTORS' EXHIBIT NO. 183**
**Page 7 of 90**

The Official Committee of Unsecured Creditors (the "Committee") of First Brands Group, LLC and its affiliated debtors (collectively, the "Debtors") files this motion (the "Motion") seeking entry of an order substantially in the form attached hereto as **Exhibit A** (the "Order"), pursuant to sections 105(a), 1103(c), and 1109(b) of title 11 of the United States Code (the "Bankruptcy Code"), granting the Committee standing to prosecute claims and causes of action belonging to the Debtors' estates (the "Claims") against the defendants (the "Defendants") identified in the *Complaint of the Official Committee of Unsecured Creditors*, attached hereto as **Exhibit B** (the "Proposed Complaint").[2]  In support of the Motion, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT AND RELIEF REQUESTED

1.      For years, First Brands appeared to be an exemplary business – the kind of company lauded as a shining business school case study.  But it is not.

2.      For years, the Company reported growing sales, engaged in significant M&A activity seemingly supported by synergistic opportunities, otherwise seemed healthy and profitable.  Considerable investment poured in, including from many top Wall Street firms.  But, as often happens with Ponzi schemes, the music abruptly stopped, and First Brands crashed into bankruptcy shortly thereafter.

3.      Certain of the Debtors' former management weaponized the Company for (enormous) personal gain.  The Debtors' prepetition conduct, while not novel, was brazen and multi-faceted.  Collateral was routinely pledged twice (or more).  Invoices used to secure operational financing were fabricated or entirely made up.  A series of off-balance sheet special

---

[2]    The Committee reserves its right to revise the Proposed Complaint or to amend it after filing.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Proposed Complaint.

FBG_CH1_00093298

**DEBTORS' EXHIBIT NO. 183**
**Page 8 of 90**

purpose vehicles were created to attract additional investment to perpetuate the fraud away from visibility of unwitting creditors. All told, billions of dollars of value were siphoned away from this Company to management and certain co-participants. Creditors are now left to sift through the wreckage and recover what they can to fill the enormous loss.

4. The Committee requests standing to bring the Claims asserted in the Proposed Complaint against one of the Debtors' special purpose vehicle lenders, Aequum. Like other SPV Debtors, Broad Street was used in furtherance of the Ponzi scheme orchestrated by former management. Facially, the FBG Debtors were to transfer assets to Broad Street, which was to then borrow against those assets before selling them back to FBG. None of this ultimately took place. Instead, Aequum extended tens of millions in credit against assets that did not in fact transfer and received considerable out of market returns. Meanwhile, former management was able to increase the slush fund from which it continued the fraud and siphoned additional value away from the Company.

5. For its part, Aequum is not merely another innocent victim – it was either a culpable participant or at least knew or should have known about the Debtors' fraud. Aequum was introduced to the Debtors through Helios – a firm that acted as a middleman arranger of these kinds of financings with the Debtors. For its assistance, Helios was handsomely rewarded – garnering outsized brokerage and other fees, which it willingly split with Ed James. Between the origin and the out of market returns, Aequum should have been sufficiently suspicious to investigate. And indeed, it appears that antennas were raised. Prior to extending credit, Aequum asked for an appraisal, as part of its diligence. When such request was summarily denied by Ed

2

FBG_CH1_00093299

DEBTORS' EXHIBIT NO. 183
Page 9 of 90

James, Aequum was undeterred, and declined to inquire further before loaning nearly $44 million[3] into the Company.

6.      Aequum's conduct gives rise to colorable intentional and constructive fraudulent transfer claims, as well as for disallowance and equitable subordination. Relatedly, and while not dispositive concerning the request for standing in this Motion, the Committee submits that to the extent that Aequum determines to raise a good faith affirmative defense, such defense should be denied upon a finding that Aequum was on inquiry notice of the fraud and failed to take appropriate action. The jurisprudence does not permit such willful blindness, and, among other things, permits a finding that a good faith defense is unavailable.

## JURISDICTION AND AUTHORITY

7.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution.[4] Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory predicates for the relief requested herein are sections 105(a), 1103(c), 1107(a), 1109(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[3]  Certain affiliates of Aequum lent an additional approximately $44 million to other SPV Debtors, which are not the subject of the instant Challenge, but as to which the Committee reserves all rights.

[4]  The Committee hereby confirms its consent to entry of a final order by this Court in connection with this Motion if it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the Constitution.

FBG_CH1_00093300

## BANKRUPTCY PROCEEDINGS AND CHALLENGE DEADLINE

9.      On September 24 and 28, 2025, the Debtors filed voluntary petitions for relief under the Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of Texas (the "Court"). Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

10.     The Chapter 11 cases are being jointly administered for procedural purposes pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1 upon the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 9].

11.     On October 9, 2025, the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed the Committee in these Chapter 11 cases. *See* Docket No. 313.

12.     On October 13, 2025, the Committee selected Brown Rudnick LLP and Cole Schotz P.C. to serve as its co-counsel in these cases.

13.     On November 9, 2025, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 608] (the "Final DIP Order"). As set forth in the Final DIP Order, the Challenge Deadline is automatically extended if the Committee files a motion with a copy of a proposed complaint seeking standing to make a challenge on or before the Challenge Deadline.

14.     On December 19, 2025, the Debtors and Aequum entered into the *Stipulation and Agreed Order Regarding Adequate Protection of the Aequum Secured Parties* [Docket No. 1018], which established a deadline of March 4, 2026 for the Debtors and any other party in interest to challenge the validity, amount, extent, perfection, and priority of Aequum's purported liens. Such

4

FBG_CH1_00093301

deadline was subsequently extended to April 1, 2026 by order of this Court [Docket No. 2045]. On March 23, 2026, the Committee submitted a request to further extend such deadline through and including thirty (30) days after the date that Aequum produces all documents to the Committee requested in a contemporaneously filed request for Rule 2004 discovery [Docket No. 2213]. On April 1, 2026, pursuant to a stipulation and agreement between Aequum and the Committee, the deadline was extended to May 15, 2026, by order of this Court [Docket No. 2276].

15.     On November 19, 2025, the Bankruptcy Court entered its *Order Directing Appointment of an Examiner* [Docket No. 726]. On December 16, 2025, Martin De Luca was appointed as examiner [Docket No. 961].

## THE DEFENDANTS

16.     The Proposed Complaint brings Claims against: (i) Aequum Capital Financial II, LLC (together with its affiliates, "Aequum"); and (ii) John Does 1-10, who are investors in or backers of the Aequum Facility.

## STATEMENT OF FACTS

17.     The factual background underlying each of the Proposed Claims is set forth in the Proposed Complaint attached hereto as **Exhibit B** and is incorporated herein by reference. The Court is respectfully referred to the Proposed Complaint for a recitation of the operative facts that give rise to the Claims sought to be asserted herein.

FBG_CH1_00093302

DEBTORS' EXHIBIT NO. 183
Page 12 of 90

## BASIS FOR RELIEF

**I.      The Legal Standard for Derivative Standing.**

18.      It is well-settled in the Fifth Circuit that courts may allow a creditors' committee to pursue causes of action on behalf of the estate.[5] Although the Bankruptcy Code does not expressly authorize a creditors' committee the standing to initiate an adversary proceeding and/or to pursue other causes of action typically brought by the trustee or the debtor-in-possession, the Bankruptcy Code (i) establishes creditors' committees for the express purpose of protecting the rights of their constituents and similarly situated creditors,[6] (ii) authorizes creditors' committees to "perform such other services as are in the interest of those represented,"[7] and (iii) permits a creditors' committee to "raise and [] appear and be heard on any issue in a case under this chapter."[8] Taken together, the foregoing contemplates that a creditors' committee may move for standing to bring claims and causes of action on behalf and in the interests of unsecured creditors. Indeed, a creditors' committee's general right to be heard and its mandate to protect its constituencies' interests would ring hollow unless it is also permitted to act on behalf of the estate if a debtor-in-possession or a trustee that is explicitly granted the right to act for the estate unjustifiably fails to

---

[5]      *See e.g., In re Louisiana World Exposition, Inc.*, 832 F.2d 1391,1397 (5th Cir. 1987) (discussing how "[a] number of bankruptcy courts have held that in some circumstances, a creditors' committee has standing under 11 U.S.C. §§ 1103(c)(5) and/or 1109(b) to file suit on behalf of debtors-in-possession…or the trustee."); *In re Guyana Dev. Corp.*, 168 B.R. 892, 909 (Bankr. S.D. Tex. 1994) (Bankruptcy Code implies right to act in lieu of debtor-in-possession upon court order).

[6]      *See* 11 U.S.C. § 1103.

[7]      11 U.S.C. § 1103(c)(5).

[8]      11 U.S.C. § 1109(b).

FBG_CH1_00093303

Case 25-90399   Document 2881   Filed in TXSB on 06/02/26   Page 14 of 90

act.[9] In recognition thereof, courts in the Fifth Circuit have granted creditors' committees standing in connection with pursuing claims and causes of action by operation of their equitable powers.[10] And the Fifth Circuit is not alone in this practice – this grant of authority to creditors' committees is widely followed in other jurisdictions as well.[11]

## II.       The Committee Satisfies the Requirements For Derivative Standing Concerning Each of The Claims Asserted in the Proposed Complaint.

19.     In the Fifth Circuit, an official committee seeking derivative standing to pursue an action without the consent of the debtor must satisfy the following three-part test to bring the claim or action: (1) demonstrate that a colorable claim exists; (2) demonstrate that the debtor-in-possession unjustifiably refuses to pursue the colorable claim; and (3) obtain bankruptcy court permission to initiate the action on behalf of the debtor's estate.[12] The Fifth Circuit states that the

---

[9] *See Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568-69 (3d Cir. 2003) (holding that sections 1103(c)(5) and 1109(b) of the Bankruptcy Code implicitly authorize a court to grant a creditors' committee derivative standing to prosecute an avoidance action when the trustee or debtor-in-possession cannot or will not do so, or when the debtor-in-possession is unlikely to act); *Matter of Joyanna Holitogs, Inc.*, 21 B.R. 323, 326 (Bankr. S.D.N.Y. 1982) (holding that the general right to be heard would be empty unless those who have such a right are also given the right to act when the debtors refuse to do so); *see also In re iPCS, Inc.*, 297 B.R. 283, 290 (Bankr. N.D. Ga. 2003) ("[I]f a debtor has a cognizable claim, but refuses to pursue that claim, an important objective of the Code [the recovery and collection of estate property] would be impeded if the bankruptcy court has no power to authorize another party to proceed on behalf of the estate in the debtor's stead.").

[10] *See In re Enron Corp.*, 319 B.R. 128, 131 (Bankr. S.D. Tex. 2004) (quoting *Cybergenics*, 330 F.3d at 553 ("We believe that Sections 1109(b), 1103(c)(5) . . . of the Bankruptcy Code evince Congress's approval of derivative avoidance actions by creditors' committees, and that bankruptcy courts' equitable powers enable them to authorize such suits as a remedy in cases where a debtor-in-possession unreasonably refuses to pursue an avoidance claim.")).

[11] *See Cybergenics*, 330 F.3d 548 (3d Cir. 2003); *Unsecured Creditors Comm. v. Noyes (In re STN Enters.*), 779 F.2d 901, 904 (2d Cir. 1985) (concurring with those bankruptcy courts that have held that sections 1103(c)(5) and 1109(b) of the Bankruptcy Code imply a qualified right for creditors' committees to initiate litigation with the approval of the bankruptcy court).

[12] *In re Louisiana World Exposition, Inc.*, 832 F.2d at 1397; *Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring, Inc.)*, 714 F.3d 860, 863-64 (5th Cir. 2013); *In re Enron Corp.*, 319 B.R. at 131.

FBG_CH1_00093304

**DEBTORS' EXHIBIT NO. 183
Page 14 of 90**

elements are "relevant considerations, though not necessarily a formalistic checklist."[13] The Committee satisfies each of the elements of this test and should be granted derivative standing to further pursue the claims and causes of action set forth in the Proposed Complaint.

### A.   Each of the Claims Asserted in the Proposed Complaint are Colorable.

20.     Asserting a "colorable claim" is a relatively low threshold to satisfy, requiring the court to find that the claim is "not without merit."[14] In determining if a claim is "colorable," this Court need not conduct a mini-trial, but "may weigh the 'probability of success and financial recovery,' as well as the anticipated costs of litigation as part of a cost/benefit analysis conducted to determine whether the pursuit of the colorable claims are likely to benefit the estate."[15]   Indeed, in granting standing to the committee in *In re Chesapeake Energy Corp.*, Judge Jones remarked that the standard for a 'colorable' claim was akin to a claim that was not sanctionable under the Rules of Professional Conduct: "Colorability is a really low standard.  It doesn't take a lot to get over the colorability standard.  And I do find that the claims asserted by the Committee meet that….[T]here are plenty of lawyers who would put their name pursuant to Rule 11 on a complaint that sets forth those claims, and if that's not exactly the colorability argument or standard, it's

---

[13]   *In re Louisiana World Exposition, Inc.*, 832 F.2d at 1397.

[14]   *In re Distributed Energy Sys., Corp.*, No. 08-11101 (KG), ECF No. 315, at 44:15-18 (Bankr. D. Del. July 30, 2008) (transcript) ("[T]he colorable claim issue, of course, is plausibility. . . I don't even have to find that it has merit; I just have to find that it's not without merit."); *see also Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005) ("Caselaw construing requirements for 'colorable' claims has made it clear that the required showing is a relatively easy one to make."); *Off. Comm. of Unsecured Creditors v. Hudson United Bank (In re Am.'s Hobby Ctr., Inc.)*, 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1998) (observing that only if the claim is "facially defective" should standing be denied).

[15]   *iPCS*, 297 B.R. at 291 (citations omitted).

FBG_CH1_00093305

**DEBTORS' EXHIBIT NO. 183**
**Page 15 of 90**

awfully close."[16]   Further, the standing motion stage of proceedings does not exist to protect defendants and exists only to ensure that the proposed litigation "will not be a hopeless fling."[17]

21.     In *In re ABC Utils. Servs.*, the bankruptcy court in the Northern District of Texas ruled that for a claim to be "colorable" it must merely "raise serious issues for determination" even if those claims ultimately will not survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6).[18] Courts in other circuits employ similar standards.[19]

22.     Courts in other circuits have held that any claim that will satisfy Fed. R. Civ. P. 12(b)(6), or a motion to dismiss, is a colorable claim.[20]

23.     As set forth herein and in the Proposed Complaint, the facts determined by the Committee strongly support the Claims asserted against the Defendants, and such Claims are potentially worth up to $11.7 million.  These Claims, therefore, are plainly valuable to the estate, and easily pass the low "colorability" threshold.

---

[16]   *See In re Chesapeake*, No. 20-33233, ECF No. 2906, at 325:5-11 (Bankr. S.D. Tex. Jan. 13, 2021) (transcript).

[17]   *In re Adelphia Commc'ns Corp.*, 330 B.R. at 386.

[18]   No. 89-41420-BJH-7, 2001 Bankr. LEXIS 2240, at *27 (Bankr. N.D. Tex. Oct. 9, 2001) (finding claims were colorable despite a finding that it would have found them not colorable under a Rule 12(b)(6) standard, but denying standing because the refusal to bring the claims at issue was justified due to two previous court decisions dismissing those claims).

[19]   *See, e.g., In re Distributed Energy Sys., Corp.*, No. 08-11101 (KG), ECF No. 315, at 44:15-18 (Bankr. D. Del. Jul. 30, 2008) (transcript) (noting that the colorability standard is less than a Rule 12(b)(6) standard and requires only plausibility and that the claims be not "without merit"); *In re Adelphia Commc'ns Corp.*, 330 B.R. at 381 (granting committee standing despite holding that some claims would likely be dismissed under Rule 12(b)(6)).

[20]   *See, e.g., Claridge Assocs., LLC v. Schepis (In re Pursuit Cap. Mgmt., LLC)*, 595 B.R. 631, 665 (Bankr. D. Del. 2018) ("A claim is colorable if it would survive a motion to dismiss."); *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010) (in determining if a claim is colorable, a court should undertake a Rule 12(b)(6) analysis); *In re Am.'s Hobby Ctr., Inc.*, 223 B.R. at 282-88 (holding a colorability analysis is "much the same" as a 12(b)(6) analysis and observing that only if the claim is "facially defective" should standing be denied); *In re iPCS, Inc.*, 297 B.R. at 291-92 (holding that a colorable claim is one that will survive a motion to dismiss for failure to state a claim).

FBG_CH1_00093306

DEBTORS' EXHIBIT NO. 183
Page 16 of 90

i.       **The Intentional Fraud Claims are Colorable.**

24.     The Proposed Complaint alleges intentional fraudulent transfer claims under Bankruptcy Code Sections 544, 548(a)(1)(A), and 550 and applicable state fraudulent transfer law against the Defendants.  Bankruptcy Code Section 548 provides that a transfer made, or obligation incurred by a debtor, is fraudulent if the debtor made the transfer or incurred the obligation with the actual intent to hinder, delay, or defraud any creditor.[21]  Section 544 of the Bankruptcy Code empowers the estate to assert state-law fraudulent transfer claims under applicable law to avoid transfers or liens.[22]  Section 24.005(a)(1) of the Texas Uniform Fraudulent Transfer Act ("TUFTA") similarly allows for the avoidance of transfers made with the "actual intent to hinder, delay, or defraud any creditor of the debtor[.]"[23]  As discussed below, actual intent to hinder, delay, and defraud creditors may be established in several different ways, each of which are present here and support intentional fraud claims against the Defendants.

25.     **Direct Evidence – Fraudulent Intent of Directors/Officers.**     A debtor's fraudulent intent may be established through the intent of its directors or officers acting on the debtor's behalf.  Given that a corporation can act only through its agents, courts routinely impute the knowledge and intent of corporate officers and directors to the debtor entity when analyzing

---

[21]    *See* 11 U.S.C. § 548(a)(1)(A).

[22]    *See* 11 U.S.C. § 544(b).

[23]    *See* Tex. Bus. & Com. Code Ann. § 24.005(a)(1).

FBG_CH1_00093307

purported fraudulent transfers.[24] The actions of the Debtors' former management provide ample, direct evidence to establish intentional fraud.

26.     As discussed in greater detail below, the Debtors are a classic Ponzi scheme. Former management weaponized the Debtors to carry out large-scale fraud under the guise of a legitimate, profitable business. The fraud orchestrated by management was multi-faceted, and included accounts receivable manipulation and fabrication, as well as double (or more) pledging of collateral. Management also used certain financial engineering, including the establishment of a large and complex web of off-balance sheet special purpose vehicles whereby collateral was to be transferred from the FBG Debtors to these SPV Debtors to secure additional financing, ultimately further enriching former management. Broad Street is one such example.

27.     Broad Street was created and designed to obfuscate transactions from the view and scrutiny of third parties, including auditors and lenders. In theory, Broad Street was to purchase certain inventory from FBG entities, use that inventory to secure financing, and ultimately sell the inventory back to the FBG entities. But such transactions did not occur as represented. There are, for instance, no accounting entries evidencing the sale of inventory from Broad Street back to FBG entities. Rather, inventory amounts recorded in the general ledgers consistently exceeded reported inventory on the Company's books and records. Additionally, bank statements and ledger data

---

[24]  *See, e.g., In re Houston Drywall, Inc.*, No. 05-95161-H4-7, 2008 WL 2754526, at *30 (Bankr. S.D. Tex. July 10, 2008) ("Because [officer] was a limited partner and also president of [debtor], the Court examines [officer's] intent as representative of the partnership's intent. Additionally, [officer] was manager of [debtor's] general partner—Classic Holdings—and had authority to act on behalf of Classic Holdings. Thus, this Court focuses on [officer's] intent with respect to these transfers and the effect thereof on the creditors of [debtor's] estate.") (internal citations omitted); *Metal Bldg. Components, LP v. Raley*, No. 03-05-00823-CV, 2007 WL 74316, at *12 (Tex. App. Jan. 10, 2007) (holding that the fraudulent intent of a director and officer may be imputed to the corporation); *Poth v. Small, Craig, & Werkenthin, L.L.P.*, 967 S.W.2d 511, 515 (Tex. App. 1998, pet. denied) ("[K]nowledge held by corporate officers or directors may be imputed to corporation itself.").

FBG_CH1_00093308

show that Broad Street relied on transfers from other SPV Debtors and non-debtor affiliates to meet facility obligations.

28.     The evidence shows that the Broad Street Facility did not bear any resemblance to the formal financing arrangements as contemplated, and instead served as a general slush fund whereby funds were transferred to Broad Street on an as needed basis to meet payment obligations akin to plugging holes on the Titanic.   Through Broad Street, Aequum received gross payments of approximately $11.7 million, and non-debtor affiliate of Patrick James, Bowery Finance II, LLC, received $42.9 million.

29.     **Badges of Fraud.**  In addition to direct evidence, courts routinely consider certain "badges of fraud" to determining whether a transfer was made with actual intent to hinder, delay, or defraud creditors.[25]

30.     Under the TUFTA, badges of fraud include whether: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was concealed; (4) before the transfer was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[26]

---

[25] *Matter of Galaz*, 850 F.3d 800, 804 (5th Cir. 2017) (citing *Walker v. Anderson*, 232 S.W.3d 899, 914 (Tex. Ct. App. 2007) (holding that direct proof of fraudulent intent is often unavailable thus courts consider circumstantial evidence).

[26] *See In re Tegeler*, 586 B.R. 598, 673-74 (Bankr. S.D. Tex. 2018) (citing Tex. Bus. & Com. Code § 24.005(b)); *In re Ritz*, 567 B.R. 715, 740 (Bankr. S.D. Tex. 2017).

12

FBG_CH1_00093309

**DEBTORS' EXHIBIT NO. 183**
**Page 19 of 90**

31.     The Fifth Circuit has identified similar badges of fraud, including: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.[27]  Notably, such evidence of fraud is non-exhaustive,[28] and the Fifth Circuit has cautioned that "[n]ot all, or even a majority of the 'badges of fraud' must exist to find actual fraud."[29]  Further, the foregoing list of factors is non-exhaustive, and courts have considered additional suspicious facts, including the lack of a debtor's credibility, or whether a debtor misrepresented their financial statements.[30]

32.     The transfers to Aequum present many of the recognized badges of fraud.  *First*, the transfers to Aequum, as all other transfers involving the SPV Debtors, were made with the paramount goal of concealment.  The SPV Debtors were, in general, created as "off-balance sheet" entities for the purpose of hiding activity from parties otherwise charged with evaluating the operations and credit worthiness of the Debtors.  And, the Debtors followed through on execution. With respect to the Broad Street Facility, management was able to siphon tens of millions of dollars

---

[27]  *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008).

[28]  *See In re Ritz*, 567 B.R. at 752; *see also Carr v. Loeser (In re Int'l Auction & Appraisal Servs., LLC)*, No. 11-00813 (MDF), 2014 Bankr. LEXIS 5294, at *18 (Bankr. M.D. Pa. Aug. 27, 2014) (internal citation omitted) (the "presence of several 'badges of fraud' gives rise to a presumption of fraudulent intent, which shifts the burden to the transferee to demonstrate some legitimate purpose for the transfers.").

[29]  *In re Soza*, 542 F.3d at 1067.

[30]  *See In re Ritz*, 567 B.R. at 752.

FBG_CH1_00093310

**DEBTORS' EXHIBIT NO. 183**
**Page 20 of 90**

from the Company, including almost $43 million to Bowery Finance II, LLC, a non-debtor entity controlled by Patrick James.

33.     *Second*, the Debtors were insolvent, and the value that the Debtors received was not reasonably equivalent.  It is axiomatic that as part of a Ponzi scheme, the company is persistently bled dry until there are insufficient assets to keep going.  This concept is recognized by courts, which have found that not only is fraudulent intent established as a matter of law upon a finding of a Ponzi scheme, but so too are both insolvency and reasonably equivalent value under constructive fraud claims.[31]

34.     *Third*, the general chronology of events and transactions is indicative of fraud.  As with all Ponzi schemes, the nature of the fraud is such that new funding must be attracted and raised to keep the machinery going.  So too, here, was the Aequum financing, along with the other SPV debt, a necessary infusion of liquidity to continue feeding the scheme.  The Debtors entered into the Broad Street Facility in March 2024,.  At this time, the Debtors were at least four years into operating the scheme, and searching for new sources of liquidity.  Through Helios, the Debtors were connected with Aequum, who, together with its affiliates, provided almost $44 million of liquidity to Broad Street (despite Ed James' categorical rejection of a requested appraisal).

35.     These badges of fraud strongly support a finding that the transfers made to Aequum were made with actual intent to hinder, delay and defraud creditors.

36.     **Ponzi Presumption.**  Separately, it is well established under Texas law that a finding that the debtor operated as a Ponzi scheme establishes the requisite fraudulent intent behind

---

[31]     *See e.g.*, *Finn v. All. Bank*, 860 N.W.2d 638, 645-46 (Minn. 2015) (finding upon establishment of Ponzi Scheme presumption that 1) "the mere existence of a Ponzi scheme would prove as a matter of law that the debtor was insolvent at the time of a disputed transfer, regardless of the transfer's timing and the actual operations of the debtor" and 2) "a court would be required to presume that any transfer from a Ponzi scheme was not for reasonably equivalent value, which would both establish the second requirement of a constructive-fraud claim and negate the statutory defense to an actual-fraud claim.") (internal citations and quotations omitted).

FBG_CH1_00093311

a transfer as a matter of law.[32]   The Fifth Circuit has defined a Ponzi scheme as a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments."[33] In addition, the Fifth Circuit has adopted from the Second Circuit the following general description of a classic Ponzi scheme:

> A [P]onzi scheme is a scheme whereby a corporation operates and continues to operate at a loss. The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors. The effect of such a scheme is to put the corporation farther and farther into debt by incurring more and more liability and to give the corporation the false appearance of profitability in order to obtain new investors.[34]

37.    The Debtors' prepetition activities fall squarely within the definition and general description of a Ponzi scheme as adopted by the Fifth Circuit.  For many years – indeed, there is evidence of fraud from at least early 2020 – First Brands gave off the appearance of an enormously profitable enterprise, attracting investment from numerous institutional investors.  The Company obtained funding, including from factoring, supply chain financing, and M&A activity, to perpetuate outsized returns and distributions, and prop up the perceived value of its assets, which

---

[32]   *S.E.C. v. Res. Dev. Int'l, LLC,* 487 F.3d 295, 301 (5th Cir. 2007) (citing *Warfield v. Byron,* 436 F.3d 551, 558-59 (5th Cir. 2006) (holding that Ponzi schemes, which as a matter of law are insolvent from inception, establish fraudulent intent behind transfers made).

[33]   *Janvey v. Alguire,* 647 F.3d 585, 597 (5th Cir. 2011) (quoting BLACK'S LAW DICTIONARY 1198 (8th ed. 2004)). Other jurisdictions have considered the following factors in determining a Ponzi scheme: to determine whether a fraudulent scheme is a Ponzi scheme, (1) the absence of any legitimate business connected to the investment program; (2) the unrealistic promises of low risk and high returns; (3) commingling investor money; (4) the use of agents and brokers paid high commissions to perpetuate the scheme; (5) misuse of investor funds; (6) the payment of excessively large fees to the perpetrator; and (7) the use of false financial statements. *In re EPD Inv. Co., LLC,* 114 F.4th 1148, 1159 (9th Cir. 2024); *In re Dreier LLP,* No. 08-15051 (SMB), 2014 WL 47774, at *9 (Bankr. S.D.N.Y. Jan. 3, 2014); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff),* 528 F. Supp. 3d 219, 237–38 (S.D.N.Y. 2021) *aff'd sub nom. Picard v. JABA Assocs. LP,* 49 F.4th 170 (2d Cir. 2022)); *In re Diamond Fin. Co., Inc.,* 658 B.R. 748, 767 (Bankr. E.D.N.Y. 2024); *Commodity Futures Trading Comm'n v. Alexandre,* No. 22-cv-3822 (VEC), 2025 WL 252435, at *4 (S.D.N.Y. Jan. 21, 2025).

[34]   *Janvey v. Alguire,* 647 F.3d at 597 (quoting *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1088 n.3 (2d Cir. 1995).

FBG_CH1_00093312

**DEBTORS' EXHIBIT NO. 183**
**Page 22 of 90**

it in turn used to attract more investment. All the while, the enterprise was worth a fraction of what First Brands represented to the market, while continuing to decline further into debt. These cases have been the unfortunate forum for this realization to materialize, as evidenced by the significant decline in the trading price of the DIP as the scale of the fraud continued to be uncovered, and the perceived value of the business assets continued to decline. As the size and scope of the fraud has been unearthed in these cases, funding rapidly dried up, and the Debtors are now on weekly life-support from certain OEMs.

38. For its part, the federal government shares the same view. As expressed by Executive Special Agent in Charge of the IRS-CI Washington, D.C. Field Office Kareem Carter, "[t]he defendants operated First Brands as a 'Ponzi' scheme in which new loan proceeds were used to pay back old lenders and to fund their extravagant lifestyle."[35]

39. A finding that the Debtors were a Ponzi scheme, which the Committee alleges is supported and entirely appropriate here, establishes as a matter of law the requisite fraudulent intent to avoid and recover every transfer made in furtherance of such scheme.

### ii.     The Constructive Fraud Claims are Colorable.

40. The Proposed Complaint also asserts colorable constructive fraud claims under Bankruptcy Code Section 548 and equivalent state law through Section 544. Section 548 provides that transfers and incurrence of obligations are avoidable as constructively fraudulent where a debtor did not receive reasonably equivalent value at the time of the transfer or incurrence, and the debtor (i) had debts greater than the value of its property (at a fair valuation), (ii) had unreasonably

---

[35]   Matt Ott, *Former First Brands CEO Patrick James and His Brother Are Indicted for Bilking Billions from Banks*, Associated Press (Jan. 29, 2026), https://apnews.com/article/first-brands-indictment-fraud-patrick-james-7762ad05a881f335c5f6a5059fc1cc1c.

16

FBG_CH1_00093313

DEBTORS' EXHIBIT NO. 183
Page 23 of 90

small capital, or (iii) intended to incur, or reasonably should have known that it would incur, debts that it could not pay as they matured.[36] Such transfers and obligations are avoided in their entirety if the debtor did not receive reasonably equivalent value.

41.     Section 544 of the Bankruptcy Code empowers the estate to assert state-law fraudulent transfer claims under applicable law to avoid transfers or liens.[37] Section 24.005(a)(2) of the TUFTA similarly allows for the avoidance of transfers made where (1) the debtor did not receive reasonably equivalent value in exchange for the transfer or obligation; and (2) either "(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."[38] Section 24.006(a) also provides for the avoidance of a transfer if the debtor made the transfer or incurred the obligation without receiving reasonably equivalent value and such transfer or obligation was made when the debtor was insolvent, or the debtor became insolvent as a result of such transfer or obligation.[39] The transfers made to the Defendants satisfy each of the constructive fraud elements under the Bankruptcy Code and applicable state law.

42.     **Reasonably Equivalent Value.**  In determining reasonably equivalent value, courts in this circuit compare the economic value transferred by the debtor to that received by the

---

[36]   *See* 11 U.S.C. § 548(a)(1)(B).

[37]   *See* 11 U.S.C. § 544(b).

[38]   *See* Tex. Bus. & Com. Code Ann. § 24.005(a)(2).

[39]   *See* Tex. Bus. & Com. Code Ann. § 24.006.

17

FBG_CH1_00093314

**DEBTORS' EXHIBIT NO. 183**
**Page 24 of 90**

debtor.[40] The economic value given and received by the debtor is considered "from the standpoint of creditors."[41] This analysis is "fact-intensive, as the court bases its determination upon subsidiary fact findings regarding the value of the property transferred and the value received in exchange."[42] Because reasonably equivalent value is a fact-intensive inquiry that often requires expert testimony as well, it is a subject that must be explored in discovery, and is best resolved at trial where a fact finder can make findings, based on fact and expert evidence.[43]

43. Although a determination of whether the Debtors received reasonably equivalent value in respect of the transfers should follow a more fulsome evidentiary record, the evidence known to date strongly supports a finding that the transfers lacked reasonably equivalent value. Aequum's credit agreement with Broad Street had a cost of capital of approximately 9.5% – far above standard market rates and far above the SOFR + 1.25-1.75% available to the Debtors under the ABL.

44. **Insolvency.** Insolvency under Bankruptcy Code Section 548(a)(1)(B) may be established by satisfying any of three tests: by establishing that the debtor (i) was insolvent or became insolvent as a result of the transfer; (ii) had or would be left with unreasonably small capital; or (iii) intended to incur, or believed it would incur, debts beyond its ability to pay as such

---

[40] *See, e.g., Think3 Litig. Tr. v. Zuccarello (In re Think3, Inc.)*, 529 B.R. 147, 200 (Bankr. W.D. Tex. 2015) (citing *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1127 (5th Cir. 1993)).

[41] *Stanley v. U.S. Bank Nat'l Ass'n (In re TransTexas Gas Corp.)*, 597 F.3d 298, 306 (5th Cir. 2010) (citing *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000)).

[42] *Hill v. Zaid (In re Zaid)*, No. 11-34701-H3-7, 2013 WL 321579, at *4 (Bankr. S.D. Tex. Jan. 28, 2013).

[43] *See EPLG I, LLC v. Citibank, N.A. (In re Qimonda Richmond, LLC)*, 467 B.R. 318, 327 (Bankr. D. Del. 2012) ("[T]he issue of 'reasonably equivalent value' requires a factual determination that cannot be made on a motion to dismiss."); *Charys Liquidating Tr. v. McMahan Sec. Co., L.P. (In re Charys Holding Co.)*, 443 B.R. 628, 638 (Bankr. D. Del. 2010) ("[R]easonably equivalent value is a fact intensive determination that typically requires testing through the discovery process.").

FBG_CH1_00093315

**DEBTORS' EXHIBIT NO. 183**
**Page 25 of 90**

debts matured.[44]   Additionally, the Ponzi scheme presumption also applies to constructive fraud claims, and presumes as a matter of law that such scheme is insolvent as a matter of law from inception, such that insolvency is satisfied as to each transfer in furtherance of the scheme.[45]

45.     The Debtors clearly satisfy each of the three conventional tests of insolvency.  The Committee submits that a company that is required to conduct fraud to pay its bills is insolvent. Moreover, as a classic Ponzi scheme, not only are the Debtors presumed insolvent at all times, but were also at all times left with unreasonably small capital and unable to meet debt obligations as they matured, as evidenced by satisfaction of obligations by entities throughout the organization structure, as well as outside of the organization (including by entities separately owned by Patrick James).

### iii.     Aequum was on Inquiry Notice; The Good Faith Defense is Not Available.

46.     Although the potential availability of affirmative defenses does not bear on the colorability of a claim,[46] no such defense, including Bankruptcy Code Section 548(c)'s "good faith" defense, is available in any event.  Generally, a party that received a fraudulent transfer "for value" may set off the value against the fraudulent transfer if they prove they took the transfer in

---

[44]   *See* 11 U.S.C. § 548(a)(1)(B)(ii).

[45]   *See Janvey v. Alguire*, 647 F.3d at 597.

[46]   *In re: Roman Catholic Diocese of Harrisburg*, 640 B.R. 59, 70 (Bankr. M.D. Pa. 2022) ("Under Federal Rule of Civil Procedure 8, a complaint need not anticipate or overcome affirmative defenses; thus, a complaint does not fail to state a claim simply because it omits facts that would do so.") (quoting *Robinson v. Johnson*, 313 F.3d 128, 134–35 (3d Cir. 2002)); *see also Brickley ex rel. CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*, 566 B.R. 815 (W.D. Tex. 2017) (finding affirmative defenses must be asserted in a defendant's answer and cannot serve as a basis for a motion to dismiss except for limited circumstances where defense appears on the face of the complaint); *ASARCO, LLC v. Montana Res., LLC*, 514 B.R. 168, 197 n.15 (S.D. Tex. 2013) ("*Res judicata* is an affirmative defense generally not resolvable on a motion to dismiss.") (citing *Wang v. Prudential Ins. Co. of Am.*, 439 F. App'x. 359, 363 (5th Cir. 2011)); *In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2020 WL 4939180, at *4 (Bankr. N.D. Tex. Aug. 24, 2020) (affirmative defense "is not appropriately considered on a motion to dismiss.").

FBG_CH1_00093316

DEBTORS' EXHIBIT NO. 183
Page 26 of 90

"good faith."[47]  This defense applies also to subsequent transferees, but is expanded such that a subsequent transferee's taking in good faith and for value is a complete defense.[48]

47.     However, the good faith defense is not available, including for subsequent transferees, where such transferee was on "inquiry notice" that the transfer may be fraudulent.[49]

48.     Once on notice of potential fraud, the would-be transferee has a duty to investigate.[50]  The threshold to trigger an obligation to investigate is whether a reasonably prudent person would have been sufficiently suspicious to inquire.[51]  Outsized returns, alone, may be sufficient to trigger a duty to inquire.[52]

49.     Here, a reasonable person in Aequum's shoes would have been aware of a number of red flags sufficient to raise suspicion and trigger an obligation to investigate.  First, Aequum's out of market returns were, alone, too good to be true.  Second, Aequum was identified and engaged by Helios as a source of financing for FBG.  The terms of the transaction for the Debtors

---

[47] *See* 11 U.S.C. § 548(c) ("a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred . . ."); Section 24.009(a) of the Texas Business and Commerce Code (similar).

[48] *See* 11 U.S.C. § 550(b).

[49] *See In re Am. Hous. Found.*, 785 F.3d 143, 164 (5th Cir. 2015) (quoting *Horton v. O'Cheskey* (*In re Am. Hous. Found.*), 544 F. App'x. 516, 520 (5th Cir. 2013)) (a transferee does not receive a transfer in good faith when (1) the transferee was 'on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer,' and (2) if put on inquiry notice, the transferee failed to engage in a 'diligent investigation.').

[50] *See Janvey v. GMAG, L.L.C.*, 977 F.3d 422, 426 (5th Cir. 2020) (quoting *Janvey v. GMAG, L.L.C.*, 592 S.W.3d 125, 133 (Tex. 2019)) ("[a] transferee on inquiry notice of fraud cannot shield itself from TUFTA's clawback provision without diligently investigating its initial suspicions [of fraud]—irrespective of whether a hypothetical investigation would reveal fraudulent conduct.").

[51] *See In re Sentinel Mgmt. Grp., Inc.*, 809 F.3d 958, 962 (7th Cir. 2016) ("[A]ll that is required to trigger [inquiry notice] is information that would cause a reasonable person to be suspicious enough to investigate.").

[52] *See Citibank, N.A. v. Brigade Cap. Mgmt., L.P.*, 49 F.4th 42, 68-69 (2d Cir. 2022) (finding inquiry notice where benefit was implausibly favorable); *see also Scholes v. Lehmann*, 56 F.3d 750, 760 (7th Cir. 1995) ("Only a very foolish, very naive, very greedy, or very Machiavellian investor would jump at a chance to obtain a return on his passive investment of 10 to 20 percent a month (the Machiavellian being the one who plans to get out early, pocketing his winnings, before the Ponzi scheme collapses).").

FBG_CH1_00093317

were approved by Edward James, and Helios was paid substantial brokerage fees for arranging the Broad Street Facility, as for other transactions, and likely paid kickbacks to Edward on these deals, as with others.    Third, Aequum asked for an appraisal as a condition of the contemplated transaction, and was denied.  Courts have found such requests for, and subsequent denials of, diligence to trigger inquiry notice.[53]  Aequum's failure to investigate and decision to move forward with financing puts it on inquiry notice and eliminates a good faith defense, if ultimately raised.

### iv.    The Disallowance Claims are Colorable.

50.    The Proposed Complaint also asserts a colorable claim to disallow Aequum's claims against the Debtors pursuant to Bankruptcy Code Section 502(d).  Section 502(d) provides that "the court shall disallow any claim of any entity . . . that is a transferee of a transfer avoidable under section[s 544, 547, and 548] of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section [550] of this title."[54]

51.    The Committee asserts colorable claims against Aequum to recover interests in property or transfers under Bankruptcy Code Sections 544 and 548.  Thus, unless and until the estate recovers the amounts sought to be avoided under such sections, Section 502(d) requires that Aequum's claims be disallowed.[55]

---

[53] *See, e.g., Horwitt v. Sarroff*, No. 3:17-cv-1902, 2020 WL 5504471, at *21 (D. Conn. Sep. 11, 2020) (defendants' requests to investment manager for additional diligence regarding investments may, if denied, constitute inquiry notice).

[54] 11 U.S.C. § 502(d).

[55] *See In re Octagon Roofing*, 156 B.R. 214, 219 (Bankr. N.D. Ill. 1993) ("[A] claim may be disallowed not only if the claimant has a § 550 judgment pending against it, but also if that claimant was granted a security interest that is voidable under § 544 or one of the other avoidance actions, even if a judgment pursuant to § 550 has not been entered.").

FBG_CH1_00093318

v.        **The Equitable Subordination Claims are Colorable.**

52.      The Proposed Complaint also asserts a colorable claim to equitably subordinate Aequum's claims against the Debtors pursuant to Bankruptcy Code Section 510(c).  Section 510(c) permits a court to equitably subordinate an otherwise allowable claim where: (i) the claimant has engaged in inequitable conduct, (ii) the misconduct injured other creditors or conferred an unfair advantage, and (iii) the equitable subordination is not inconsistent with the Bankruptcy Code.[56] The application of § 510(c) to a creditor's claim requires a fact intensive analysis.[57]  Each of the *Mobile Steel* elements are satisfied to warrant subordination of Aequum's claims.

53.      Courts have generally recognized three categories of inequitable conduct that may give rise to equitable subordination: "(1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego."[58]  Other courts have allowed equitable subordination when the claimant is unjustly enriched "through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct."[59]  Any inequitable conduct directed at the debtor or its creditors may be sufficient to warrant subordination of the creditor's claim, regardless of whether that inequitable conduct was related to the acquisition or assertion of that claim.[60]

---

[56]   *See Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977).

[57]   *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 29 (Bankr. S.D.N.Y. 2007).

[58]   *Wilson v. Huffman (In re Missionary Baptist Found. of Am., Inc.)*, 712 F.2d 206, 212 (5th Cir. 1983).

[59]   *Fundex Cap. Corp. v. Balaber-Strauss (In re Tampa Chain Co.)*, 53 B.R. 772, 779 (Bankr. S.D.N.Y. 1985) (quoting *In re Harvest Milling Co.*, 221 F. Supp. 836, 838 (D. Or. 1963)).

[60]   *See In re Mobile Steel Co.*, 563 F.2d at 700.

FBG_CH1_00093319

54.     The Debtors operated a massive Ponzi scheme.  As a result of former management's fraud, creditors suffered tremendous losses, and the Debtors have long been insolvent and undercapitalized.  What's more, Aequum, among others, should have been sufficiently suspicious and taken appropriate steps to investigate.  Aequum was privy to glaring red flags, including the Debtors' denial of commonplace appraisal requests.  These red flags would have caused a reasonably prudent person to further investigate prior to extending credit.  But Aequum turned a blind eye and sought to enrich itself through financing that was out of market and too good to be true.  Aequum's conduct further facilitated management's fraud and, in turn, caused additional harm to creditors.

55.     The second prong of the *Mobile Steel* test requires that the inequitable conduct must have actually caused injury to the other creditors or resulted in an unfair advantage to the claimant. An unfair advantage can exist where the inequitable conduct results in the granting of a lien, the validation of which would yield little or no distribution to the general unsecured creditors and, therefore, results in injury to those creditors or unfair advantage to the claimant.[61]

56.     Again, Aequum's conduct both caused direct injury to other creditors and conferred an unfair advantage onto itself.  Aequum ignored readily apparent red flags in pursuit of outsized returns for itself.  In so doing, management was able to siphon tens of millions from the Debtors, resulting in further harm to the Company and to creditors.

57.     The third element of the *Mobile Steel* test serves as "a reminder to the bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is

---

[61]  *Fabricators, Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 109 B.R. 186, 195 (Bankr. S.D. Miss. 1987), *opinion aff'd*, 126 B.R. 239 (S.D. Miss. 1989), *judgment aff'd*, 926 F.2d. 1458 (5th Cir. 1991).

FBG_CH1_00093320

inequitable."[62]   *Mobile Steel* was decided under the Bankruptcy Act and, now that equitable subordination is expressly recognized under the Bankruptcy Code, it has been suggested that this third element is virtually moot.[63]

> **B.      The Debtors Have Unjustifiably Refused
> To Bring the Claims Alleged in the Proposed Complaint.**

58.      The rationale underlying a creditors' committee's standing to bring estate causes of action "comes into play when a debtor-in-possession has a conflict of interest in pursuing an action."[64] Under § 704(a)(1) of the Bankruptcy Code, a debtor in possession has an obligation to pursue estate causes of action if doing so would maximize the value of the estate.[65]   When a colorable cause of action exists but the debtor unjustifiably "is unable or unwilling to fulfill its obligation" it is appropriate for a creditors' committee to be granted standing to pursue such claims.[66]

59.      Where, as here, claims are colorable and the cost-benefit analysis proves that prosecuting the claims will maximize the value of the estate, failure to bring those claims is unjustified.[67]   In other words, where bringing an action is in the best interests of the estate but the debtor has a personal disability preventing it (but not a Committee) from doing so, failure to bring

---

[62]   *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, 379 B.R. 425, 434 (S.D.N.Y. 2007) (quoting *United States v. Noland*, 517 U.S. 535, 539 (1996)).

[63]   *See 80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 841 (Bankr. S.D.N.Y. 1994) ("[S]ince the Bankruptcy Code, unlike its predecessors, expressly authorizes the remedy of equitable subordination, the third prong of the *Mobile Steel* test is likely to be moot.").

[64]   *Reed v. Cooper (In re Cooper)*, 405 B.R. 801, 809 (Bankr. N.D. Tex. 2009).

[65]   *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 246 (5th Cir. 1988).

[66]   *Id.* at 252; *see also In re Cooper*, 405 B.R. at 810.

[67]   *See Louisiana World Exposition, Inc.*, 858 F.2d at 252 (where pursuing an action "would maximize the value of the estate, the debtor-in-possession is obligated to do so," and where the debtor in possession is unable to do so, a committee may assert that cause of action if authorized to do so by the Bankruptcy Court).

FBG_CH1_00093321

that claim is "unjustified" under the Bankruptcy Code.[68]   In such a situation, the Committee is particularly (and perhaps, uniquely) situated to bring such Claims.

60.   The Debtors' Special Committee is purportedly comprised of "independent" directors, but such members were originally appointed by the very same prepetition management that engaged in the rampant fraud giving rise to the Claims asserted in the Proposed Complaint. The Committee does not seek to cast aspersions or opine as to the reason for the Debtors' failure to bring these Claims.  But the fact remains – these Claims are colorable and valuable to the estate and remain unasserted by the Debtors.  The Committee respectfully submits that it is perfectly positioned to bring these Claims on behalf of the estates in these cases, and has satisfied the standard set forth in *Louisiana World* for derivative standing to do so.

---

[68]   *See, e.g., Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Grp., Inc.)*, 66 F.3d 1436, 1441 (6th Cir. 1995) (holding that debtor's failure to bring a value-maximizing claim is "unjustified" for the purposes of committee standing even if the motive of the debtor in failing to bring that claim is justified (such as a conflict of interest or lack of funds)) (citing *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391 (5th Cir. 1987) (debtor-in-possession's failure to bring a colorable avoidance action that is likely to benefit the estate is sufficient to meet the "unjustified inaction" factor or requirement)).

FBG_CH1_00093322

## CONCLUSION

61.     For the foregoing reasons, the Committee respectfully requests that the Court enter an order (i) granting the Committee derivative standing to commence and prosecute the Claims alleged forth in the Proposed Complaint on behalf of the Debtors' estates; and (ii) granting the Committee exclusive authority to settle such claims on behalf of the Debtors' estates.

Dated: May 15, 2026
       Dallas, Texas

Respectfully submitted,


/s/ Ian R. Phillips
Ian R. Phillips, Esq.
Texas Bar No. 24091239
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Justin R. Alberto, Esq. (admitted *pro hac vice*)
**COLE SCHOTZ P.C.**
901 Main Street, Suite 4120
Dallas, TX 75202
Tel:     (469) 557-9390
Fax:     (469) 533-1587
iphillips@coleschotz.com
svanaalten@coleschotz.com
jalberto@coleschotz.com

*-and-*

Robert J. Stark, Esq. (admitted *pro hac vice*)
Jeffrey L. Jonas, Esq. (admitted *pro hac vice*)
Michael S. Winograd, Esq. (admitted *pro hac vice*)
Bennett S. Silverberg, Esq. (admitted *pro hac vice*)
Kenneth J. Aulet, Esq. (admitted *pro hac vice*)
Andrew M. Carty, Esq. (admitted *pro hac vice*)
Hayden A. Miller, Esq. (admitted *pro hac vice*)
Elizabeth C. Castano, Esq. (admitted *pro hac vice*)
**BROWN RUDNICK LLP**
Seven Times Square
New York, NY 10036
Tel:     (212) 209-4800
Fax:     (212) 209-4801
rstark@brownrudnick.com
jjonas@brownrudnick.com
mwinograd@brownrudnick.com
bsilverberg@brownrudnick.com

26

FBG_CH1_00093323

kaulet@brownrudnick.com
acarty@brownrudnick.com
hmiller@brownrudnick.com
ecastano@brownrudnick.com

Sharon I. Dwoskin, Esq. (admitted *pro hac vice*)
Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
Matthew A. Sawyer, Esq. (admitted *pro hac vice*)
**BROWN RUDNICK LLP**
One Financial Center
Boston, MA 02111
Tel:     (617) 856-8200
Fax:     (617) 856-8201
sdwoskin@brownrudnick.com
taxelrod@brownrudnick.com
msawyer@brownrudnick.com

*Co-Counsel to the Official Committee of Unsecured
Creditors*

27

FBG_CH1_00093324

**Exhibit A**
**(Proposed Order)**

FBG_CH1_00093325

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>FIRST BRANDS GROUP, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-90399 (CML)<br><br>(Jointly Administered) |

**ORDER GRANTING THE MOTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS FOR (I) LEAVE,
STANDING, AND AUTHORITY TO COMMENCE AND PROSECUTE
CERTAIN CLAIMS AND CAUSES OF ACTION ON BEHALF OF THE
DEBTORS' ESTATES AND (II) EXCLUSIVE SETTLEMENT AUTHORITY**

Upon the Motion (the "Motion")[2] of the Official Committee of Unsecured Creditors (the "Committee") of First Brands Group, LLC and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, pursuant to sections 105(a), 1103(c), and 1109(b) of the Bankruptcy Code, seeking entry of an order (this "Order"), granting the Committee leave, standing, and authority to commence and prosecute certain Claims and causes of action identified in the Proposed Complaint on behalf of the Debtors' estates and exclusive settlement authority with respect to such Claims and causes of action set forth in the Proposed Complaint, all as more fully set forth in the Motion; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b); and the Court having found that this

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]   Capitalized terms used but not defined in this Order shall have the meanings ascribed to them in the Motion.

FBG_CH1_00093326

proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that Committee's notice of the Motion was appropriate under the circumstances and no other or further notice need be provided and the Court having reviewed and considered the Motion; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections, if any, to the Motion or the relief requested therein that have not been withdrawn, waived or settled, including all reservations of rights, are overruled.

3.      The Committee shall be, and hereby is, granted standing on behalf of the Debtors' estates to commence and prosecute to conclusion the Claims and causes of action set forth in the Proposed Complaint, with the full rights and privileges of, and in the stead of, the Debtors.

4.      To the extent necessary, the right to prosecute and settle the Claims and causes of action is hereby assigned to the Committee.

5.      The Committee shall have the exclusive right and authority to negotiate and enter into settlements on behalf of the Debtors' estates with respect to the Claims and causes of action.

6.      The Court shall retain jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.


Dated: _____                    _____
Houston, Texas                                                   HONORABLE CHRISTOPER M. LOPEZ
                                                                           UNITED STATES BANKRUPTCY JUDGE

FBG_CH1_00093327

**DEBTORS' EXHIBIT NO. 183**
**Page 37 of 90**

**Exhibit B**
**(Proposed Complaint)**

FBG_CH1_00093328

Case 25-90399   Document 2881   Filed in TXSB on 06/02/26   Page 39 of 90

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FIRST BRANDS GROUP, LLC, *et al.*,[1] | § | Case No. 25-90399 (CML) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| THE OFFICIAL COMMITTEE OF | § | |
| UNSECURED CREDITORS OF FIRST | § | |
| BRANDS GROUP, LLC, *et al.*, in its individual | § | Adversary No. 26-_____(CML) |
| capacity and on behalf of the bankruptcy estates of | § | |
| the Debtors, | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | |
| AEQUUM CAPITAL FINANCIAL II, LLC, | § | |
| JOHN DOES 1-10, | § | |
| | § | |
| Defendants. | § | |

**[PROPOSED] COMPLAINT OF THE**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

---

[1]   A complete list of Debtors in these chapter 11 cases may be obtained on the website of Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

FBG_CH1_00093329

Plaintiff, the Official Committee of Unsecured Creditors (the "Committee" or "Plaintiff"), duly appointed in the Chapter 11 cases (the "Chapter 11 Cases") of First Brands Group, LLC and certain of its debtor affiliates (collectively, "First Brands," the "FBG Debtors," or the "Company"), respectfully submits this complaint (the "Complaint") in its own capacity and brings this action on behalf of the Debtors' estate against Defendants Aequum Capital Financial II, LLC ("Aequum"), and John Does 1-10 (the "Aequum Investors") (collectively, the "Defendants").

**PRELIMINARY STATEMENT**

1. First Brands was a fraudulent enterprise; one that often seemed to serve primarily as a conduit to funnel its own and others' money to founder Patrick James and his brother and First Brands executive Edward James. Together with co-conspirators, most notably Onset Financial Inc. ("Onset"), they looted *billions* from the Company. That fraud has had severe consequences: First Brands, which employs tens of thousands of people world-wide, filed for bankruptcy, and despite appearing to have stolen billions through fraud and other means, as of filing had essentially no money and needed a rescue loan to avoid an immediate liquidation. Its financial records, manipulated for years, have made resuscitating First Brands' business difficult, as has the fact the business has been starved for cash for years.

2. First Brands' fraud was multi-faceted, and evolved over time. The Company double- and triple-pledged collateral to its creditors; inflated (and invented) accounts receivable that it sold to factoring parties; created off-balance sheet "special purpose vehicles" to attract capital investments (including Aequum's) that it could hide from its existing lenders; and approved the incurrence of extraordinarily expensive debt (and the payment of fees) to Onset, in which Edward James himself was a backer (and thus on both sides of the deal). The Company was incurring debt from all varieties of creditors (including trade vendors and factoring parties)

2

FBG_CH1_00093330

**DEBTORS' EXHIBIT NO. 183**
**Page 40 of 90**

to feed its debt to Onset and the voracity of the James brothers.  It was, in other words, a Ponzi scheme orchestrated to hinder, delay, and defraud First Brands' creditors.

3.     A fraud this big does not merely have perpetrators and victims; it also has enablers. Some knew, or at least suspected, that something was wrong with First Brands' financial practices, but chose to look the other way.  Aequum is one such enabler.

4.     Aequum should have known upon reasonable inquiry (if it did not in fact know) that First Brands' financing arrangements were fraudulent.  For one, the Broad Street Facility reflected two different realities: the way it was supposed to work, in accordance with the applicable contracts, and the way it actually worked in practice.  Aequum extended tens of millions in credit against assets that were never in fact transferred to the entity that was established to be the borrower of that credit, and yet Aequum received substantial returns in exchange.

5.     Indeed, it appears that Aequum suspected something was amiss from the beginning. Aequum requested a "desktop" appraisal after providing an initial tranche of funding.  Edward James – who had helped initiate First Brands' relationship with Aequum -- decided, on behalf of First Brands, to deny that request.  Despite the denial of this customary request – one contemplated in the transaction documents – Aequum did not insist.  It simply moved forward and provided financing as if everything was normal.

6.     Based on the information collected by the Committee, Aequum received roughly $12.2 million from the Company, nearly $11.7 million of which was collected pre-petition, and the remaining amount which was collected only a few days post-petition. First Brands' fraudulent business practices and transactions, enabled by Aequum's conduct, give rise to claims for intentional and constructive fraudulent transfer, avoidable post-petition transfer, and for disallowance and equitable subordination of Aequum's claims.  Moreover, Aequum's willful

3

FBG_CH1_00093331

DEBTORS' EXHIBIT NO. 183
Page 41 of 90

blindness makes a "good faith" defense unavailable.  Aequum and the Aequum Investors must therefore return what they received from First Brands, for the benefit of all creditors of the First Brands estates.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334 because this is a civil proceeding arising in or related to the Debtors' Chapter 11 Cases (under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")).  The matters set forth herein are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

8.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      Pursuant to Local Bankruptcy Rule 7008-1, the Committee consents to the entry of final orders or a judgment by the Bankruptcy Court in this adversary proceeding.

## PROCEDURAL BACKGROUND

10.     On September 24 and 28, 2025, the Debtors filed voluntary petitions for relief under the Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of Texas (the "Court").  Since the petition date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

11.     The Chapter 11 Cases are being jointly administered for procedural purposes pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1 upon the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 9].

12.     On October 9, 2025, the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed the Committee in these Chapter 11 Cases. *See* Docket No. 313.

13.     On October 13, 2025, the Committee selected Brown Rudnick LLP and Cole Schotz P.C. to serve as its co-counsel in these cases.

FBG_CH1_00093332

## PARTIES

14.     The Committee, Plaintiff in this adversary proceeding, was appointed by the U.S. Trustee on October 9, 2025.  Plaintiff asserts claims both derivatively, on behalf of the FBG Debtors, including First Brands Group, LLC, a corporation organized under the law of Delaware, with its principal place of business in Cleveland, Ohio, and directly on behalf of its constituent members.  Unless the context otherwise requires, when used herein, "FBG" and the "Company" shall mean and refer to First Brands Group, LLC and defined affiliated Debtors in the above-captioned bankruptcy cases.

### A.  Defendants.

15.     Defendant Aequum is an Illinois corporation with its principal place of business in Chicago, Illinois.

16.     Defendants John Does 1-10 are persons or legal entities, whose names and addresses are unknown, who, upon information and belief, invested alongside Aequum in financial transactions with First Brands, are lenders under the Broad Street Credit Agreement, and / or provided Aequum with financial backing for the same.

### B.  Relevant Third Parties.

17.     Eric Weisheit is an individual who resides in Chicago, Illinois.  He is a current partner and former director of defendant Aequum.

18.     Broad Street Financial, LLC ("Broad Street Financial") is a debtor in the Chapter 11 Cases and a Delaware limited liability company with its principal place of business in Cleveland, Ohio.

19.     Broad Street Financial Holdings, LLC ("Broad Street Holdings" and, together with Broad Street Financial, "Broad Street") is a debtor in the Chapter 11 Cases and a Delaware limited

5

FBG_CH1_00093333

liability company with its principal place of business in Cleveland, Ohio.  Broad Street Holdings owns 100% of the outstanding membership interests in Broad Street.

20.     Global Assets GmbH is a debtor in the Chapter 11 Cases and a German limited liability company with its principal place of business in Frankfurt, Germany.

21.     Global Assets LLC is a debtor in the Chapter 11 Cases and a Delaware limited liability company with its principal place of business in Cleveland, Ohio (Global Assets LLC and Global Assets GmbH, collectively ("Global Assets").

22.     Edward James was Senior Executive Vice President and director of First Brands, upon information and belief, from 2020 to 2025, and was the founding member of JCMC Investments Group LLC ("JCMC").  Upon information and belief, Mr. James is an individual resident who, upon information and belief, resides in Cleveland, Ohio.

23.     Optimus Private Capital LLC ("Optimus") is a Delaware limited liability company with its principal place of business in Gold River, California.

24.     JCMC is a Delaware limited liability company.

25.     Helios Strategic Advisors ("Helios") is a New York limited liability with its principal place of business in New York, New York.

26.     Helios Credit Opportunity Fund I ("Helios Fund") is a New York limited liability company with its principal place of business in New York, New York.

27.     Tol Ho is an individual who resides in New York, New York.  He is a principal of Helios.

**FACTUAL ALLEGATIONS**

28.     Except where stated to be made on actual knowledge, allegations made herein are made upon information and belief based on the discovery record made available to date, the investigation of counsel, matters of public record and inferences drawn from such sources.

FBG_CH1_00093334

A. **The Legitimate Business Of First Brands.**

29.     First Brands' fraud is pervasive and, based on the Debtors' and the Committee's investigation to date, that fraud permeates the financial records of its legitimate businesses.  The extent of the tampering with the financial records is currently unknown, and the Committee does not yet know how far the rot spread in the operating business of First Brands.  However, certain information is available that is at least generally reliable.

30.     First Brands, as of the date of its bankruptcy, was perceived as a leading global supplier of aftermarket automotive parts, including brakes, filters, wipers, lights, pumps, and towing solutions.

31.     The company was founded in 2013 by Patrick James under the name Crowne Industrial Group.  From its inception, First Brands pursued an aggressive growth strategy focused on acquiring expensive strategic companies without integrating them.   In other words, it repeatedly purchased other independent businesses in the automotive space, generally funded by taking out debt.  In the last fifteen years, it purchased at least fifteen separate companies or groups of assets.

32.     In theory, First Brands would maintain the brand identity of acquired companies, but use its size and existing supply chains to lower costs and realize synergies – such that First Brands could profit from the acquisition.  Generally, these were successful businesses, with strong brands that should have been able to generate a consistent profit even without extracting cost savings; however, the fraudulent state of First Brands' financial statements makes it unclear how profitable any particular business line was after its acquisition at this time.

33.     First Brands developed a broad presence across key aftermarket channels, including major automotive retailers such as Advance Auto Parts, AutoZone, O'Reilly Auto Parts, and NAPA Auto Parts, as well as vehicle dealerships, mass merchants, warehouse distributors, e-

7

FBG_CH1_00093335

commerce platforms, and direct sales to original equipment manufacturers ("OEMs").  Over time, First Brands evolved into a global enterprise headquartered in Cleveland, Ohio, operating a manufacturing and distribution network spanning five continents.

34.    The company had grown to encompass more than 100 entities worldwide, all indirectly owned by Patrick James, and employed approximately 26,000 individuals, including about 6,000 in the United States.  Many of those employees have already lost their jobs, and many more are at significant risk doing so.

*Organizational Structure*

35.    The First Brands enterprise is comprised of four parent entities: (i) First Brands Group Holdings, LLC ("FBG Holdings"); (ii) First Brands Group Intermediate, LLC; (iii) First Brands Group, LLC (collectively, with their subsidiaries, the "FBG Debtors"); and (iv) Viceroy Private Capital, LLC ("Viceroy", and together with its Debtor subsidiaries, the "SPV Debtors"). It should be noted, however, that prior to 2025 the existence of the Viceroy entities and the SPV Debtors as key parts of the First Brands enterprise was a carefully guarded secret.  The FBG Debtors (91 in total) are 100% subsidiaries of FBG Holdings.  The SPV Debtors consist of 20 Debtors that are 100% subsidiaries of Viceroy and were created between May 2022 and December 2024 to facilitate various purported lease, inventory, and equipment financing arrangements discussed further below in Sections **Error! Reference source not found.** and D.

36.    The chart below provides a high-level overview of the First Brands organizational structure.

FBG_CH1_00093336

DEBTORS' EXHIBIT NO. 183
Page 46 of 90



37.     There are also certain non-Debtor entities – formally unrelated to First Brands – that are key parts of the First Brands fraud.  Cash flows that originate at, end at, or should have ended at First Brands often passed through such entities – which included Bowery Finance II ("Bowery"), the Patrick James Trust, and a number of other entities (the "Patrick James Entities"). Each of the Patrick James Entities was wholly owned by Patrick James and, formally, not part of the First Brands enterprise.  Certain entities, such as Bowery, an off-balance sheet non-Debtor entity controlled by Patrick James, appear to have been used to conceal the source or destination of funds.  Others, such as the Patrick James Trust, appear instead to have simply been a way for Patrick James to funnel money out of First Brands – however, in certain cases, money would flow back in as well.

*Funded Debt Obligations and History*

38.     On the petition date, the Debtors had approximately $6.1 billion in principal amount of funded debt obligations.  This was its "public debt" – the debt it had never attempted to conceal

9

FBG_CH1_00093337

from the market.  It was composed of an ABL facility (the "ABL Facility" or "ABL"), first lien term loans (collectively, the "First Lien Term Loan"), and second lien term loans (collectively, the "Second Lien Term Loan").

39.     The ABL Facility was composed of a revolver with a capacity of $250 million and an interest rate of SOFR[2]+1.25-1.75% as of the petition date (the "ABL Revolver"), certain letters of credit, and (allegedly) certain supply chain financing and cash management facilities.  In total, the principal obligations were approximately $596 million as of the petition date.  Notably, however, the ABL Revolver was historically not drawn (at least, for long periods of time) until shortly before the petition date.

40.     The term loans (the "Term Loans") were comprised of a first lien letter of credit facility, first lien term loans denominated in US Dollars and in Euros, a "Side Car" term loan, and second lien term loans.  In total, the Term Loans had a principal amount of approximately $5.54 billion.  The interest rate ranged from SOFR+4.00% – SOFR+10.00%.

41.     The ABL and the Term Loans were secured by assets of the FBG Debtors; the ABL generally had a first lien over cash or cash-like collateral, while the Term Loans generally had priority over assets, such as inventory, operating assets, and the like.  The exact contours of the collateral securing the ABL and the Term Loans are disputed, but generally the ABL and Term Loan lenders sought to obtain security interests in substantially all assets of the First Brand Debtors.  Their respective security interests (and the security interests between the various tranches of the Term Loans) were governed by an intercreditor agreement.

---

[2]    In the relevant time periods, the Secured Overnight Financing Rate ("SOFR") ranged from approximately 0.015% to 5.4%.  SOFR averaged 2.68% over the period from January 2019 to September 2025, reflecting short-term interest rate conditions over a multi-year horizon.

FBG_CH1_00093338

**DEBTORS' EXHIBIT NO. 183**
**Page 48 of 90**

42.     The ABL and the first lien components of the Term Loans were entered into in 2018, with the second lien component following in 2019.

43.     To this point, First Brands had acquired various entities with debt that needed to be refinanced.  This debt consolidation process was pursued with the intention of retaining additional funding sources to make additional acquisitions.  First Brands entered the ABL and Term Loans with the intention of acquiring more business entities financed by this new debt and expanding its ability to draw on new credit facilities in the future.

44.     First Brands Group, LLC (then known as Trico Group, LLC), as borrower, executed both the ABL Credit Agreement and the First Lien Security Agreement dated February 2, 2018.  Pursuant to the ABL Facility and the First Lien Term Loan, the parties entered an inter-creditor agreement dated February 2, 2018, establishing lien priorities, remedies and application of proceeds.  The initial ABL Credit Agreement was for an aggregate commitment of $80 million, but additional amendments were made to finance First Brands' serial acquisitions, ballooning the ABL aggregate commitment to approximately $250 million.  The First Lien Security Agreement was for an approximate aggregate principal amount of approximately $3.9 billion.

45.     By the time First Brands entered its Second Lien Term Loan, First Brands had entered three amendments of the ABL and First Lien Term Loan, respectively.

46.     First Brands Group, LLC (then known as Trico Group, LLC), as borrower, then entered and executed the Second Lien Security Agreement dated February 26, 2019.  The Second Lien Security Agreement was for an approximate aggregate principal amount of $540 million.

47.     These three credit facilities were used to finance First Brands's various acquisitions.  As these acquisitions continued, First Brands would enter amendments of the ABL,

11

FBG_CH1_00093339

First Lien Term Loan, and Second Lien Term Loan, borrowing more and more to facilitate these acquisitions.

48.     For example, in 2019 and 2020, First Brands acquired various entities, such as Fram Group LLC, Champion Laboratories, Inc., and others.  In that timeframe, First Brands executed three additional ABL amendments as well as three additional amendments to the First Lien Term Loan, and the first amendment to the Second Lien Term Loan.  All told, First Brands entered into six amendments to the three credit facilities in 2020.  These amendments were made primarily to provide additional borrowing flexibility in terms and borrowing base to facilitate First Brands Group's continued acquisitions.

49.     However, these amendments did not provide First Brands sufficient financial stability in the face of its fraudulent activity.  On March 30, 2021, First Brands entered into refinancing agreements on both the First Lien Term Loan and the Second Lien Term Loan.  Pursuant to the refinancing arrangement, the purported secured lenders of the ABL Facility, First Lien Term Loan, and the Second Lien Term Loan entered into an intercreditor agreement delineating the lien priorities, remedies, and application of proceeds.  First Brands understood that the numerous amendments, and now the refinancing agreements were likely testing its lenders' patience.  It began to contemplate alternative financing.

50.     In late 2022, and throughout 2023, First Brands went on another serial acquisition spree, purchasing entities such as Horizon, Cardone Industries, Inc ("Cardone"), and others.  First Brands continued to seek amendments to the credit facilities at this point, but only sought one amendment to the ABL, and three amendments to the First Lien Term Loan in 2023.

51.     On April 29, 2022, First Brands entered and executed its second amendment to the Second Lien Term Agreement.  Pursuant to the amended credit agreement, First Brands would

12

FBG_CH1_00093340

use the proceeds to fund its obligations under the Fram Group purchase agreement, dating back to February 26, 2019, and to pay other transaction expenses. The credit agreement also provides that following the 2021 refinancing agreement, First Brands Group was permitted to apply the proceeds of the Term Loans to other permitted transactions.

52. The refinancing efforts and additional amendments years later to service acquisition debt are indicative of the collapse of the proverbial house of cards. First Brands's inability to fund its acquisitions were present as early as 2019 and predates even those acquisitions. It is clear that First Brands was insolvent at this point and continued to borrow into the future to pay off yesterday's loans.

53. Although First Brands continued to tap the ABL and Term Loan facilities for financing, it had since set up its off-balance sheet lending facilities. This enabled First Brands to continue to pursue additional acquisitions, and provided it with greater access to liquidity and capital, without the scrutiny of the ABL and Term Loan lenders.

*Off Balance Sheet Debt – the SPV Debtors and SPV Debt*

54. On the petition date, the Debtors disclosed four general tranches of debt owed by the SPV Debtors that had been "off-balance sheet" debt of the FBG Debtors and appear to have been a carefully guarded secret prior to 2025. These debts (the "SPV Loans") were (purportedly) obligations of the SPV Debtors, secured by assets (purportedly) transferred to those SPV Debtors from the FBG Debtors free and clear of any liens. How the SPV Loans were *supposed* to operate appears to bear little resemblance to how they *actually* operated in nearly every major respect. These facilities – and how they actually operated, vs. how they were supposed to operate, are further described below. In certain cases, the SPV Loans purported to have guarantees from the FBG Debtors.

FBG_CH1_00093341

55.    As of the petition date, the SPV Loans consisted of:

a.  $1,880 million purportedly owed to Onset, through Carnaby FA, LLC and Carnaby Inventory IV, LLC (the "Onset Facility");

b.  $230 million purportedly owed to Evolution Credit Partners ("Evolution"), through Starlight Inventory I, LLC ("Starlight") and Patterson Inventory, LLC (the "Evolution Facility");

c.  $159 million purportedly owed to GLAS Trust Company LLC, as agent under the relevant credit agreements and certain lenders party thereto, through Carnaby Inventory II, LLC and Carnaby Inventory III, LLC (the "CarVal Facility")

d.  $44.8 million purportedly owed to Aequum through Broad Street, and $34.3 million purportedly owed to UMB Bank N.A. through Global Assets LLC, for an aggregate of approximately $79 million (collectively, the "Aequum Facility").

*The Factoring Debt*

56.    First Brands also engaged in "factoring" – selling receivables due in the future to a third party at a discount, for cash today.  It engaged in at least two significant types of factoring. It appears that both were rife with fraud.

57.    First Brands engaged in "supply chain factoring" when it had *its suppliers* sell invoices owed *by First Brands* to third parties.  Those third parties (the "Supply Chain Factors") were, thus, taking the credit risk of First Brands (and knew they were doing so).  The Supply Chain Factors believed, however, that the underlying debt owed by First Brands to its suppliers was legitimate, and that its suppliers (not First Brands) were "paying" for the factoring.  In neither case does it appear that the Supply Chain Factors were correct—the Committee believes it has uncovered fraud perpetrated by First Brands in this program.  However, the Supply Chain Factors were at least clear they were taking unsecured risk on First Brands.  On the petition date, First Brands owed at least approximately $812.4 million in supply chain financing obligations.

FBG_CH1_00093342

58.     First Brands also engaged in "Third Party Factoring" where it sold receivables from its customers (e.g., Walmart, or AutoZone) to a third party at a discount (the "Third-Party Factors") for immediate payment.

59.     In an ordinary factoring transaction, a company with accounts receivable from a customer sells the rights to payment to a third party (*i.e.*, the factoring parties).  The key to this financing being functional is that there are real receipts that the factor is buying; generally, the customer is directed to pay the Third-Party Factor directly.  However, in the case of First Brands, the accounts receivable were, at least in significant part, non-existent, significantly overstated, or double-sold.  It was common practice for First Brands to issue "dummy purchase orders" or false invoices to misrepresent the available accounts receivable to the factoring parties.

60.     As a result, First Brands turned the Third Party Factors into suppliers of unsecured credit, and it "paid" the fictitious invoices out of its own funds (often, generated from selling new fake invoices or from other illegitimate funding sources) since there was no real customer invoice that would be paid.  Ultimately, there was approximately $3 billion of invoices "sold" to Third-Party Factors that remained owed to the Third-Party Factors as of the petition date, and approximately $2.3 billion of associated factoring liabilities outstanding; to the extent that the underlying invoice is fictitious (and there appears to be only approximately less than $500 million worth of legitimate invoices that were sold), those Third-Party Factors are unsecured creditors of First Brands.  Because of the scale of factoring fraud, all the numbers in this paragraph are current estimates, subject to change as reconciliation is completed.

61.     The Third-Party Factoring fraud is discussed in greater detail in **Section E.i**, below.

B. **First Brands' Collapse Into Bankruptcy.**

62.     In July 2025, First Brands engaged in an effort to refinance its existing debt (the "Global Refinancing"), as the First Lien Term Loan would mature in 2027 and the ABL and

FBG_CH1_00093343

Second Lien Term Loan would mature in 2028. First Brands approached Jefferies to launch refinancing efforts seeking approximately $6.2 billion of funded debt.  First Brands sought $6.2 billion composed of the following credit facilities:

- 5-year $3,450 million First Lien Term Loan;

- 5-year $500 million Fixed-Rate First Lien Term Loan;

- 5-year €650 million ($761 million equivalent) First Lien Term Loan; and

- 5.5-year $1,500 million Second Lien Term Loan[3]

63.     In July 2025, Jefferies sent a lender presentation to over one hundred market participants pursuant to the Global Refinancing process.  The materials sent out by Jefferies disclosed the existence of the SPV Loans – an unpleasant surprise to the ABL and Term Loan lenders.  Additionally, however, there were significant concerns in the marketplace regarding First Brands' financials and business.  First Brands had long claimed margins that significantly exceeded those of other similar companies; yet it had persistent problems paying its suppliers and supplying enough goods to its customers.  Some third parties had dug into First Brands' business and factoring practices and determined that all was not right and had made substantial bets against First Brands' debt.

64.     In August 2025, Jefferies provided First Brands with a status update on the Global Refinancing process.  They warned First Brands that, although the market was impressed by its expansion, refinancing was met with broad resistance due to the lack of diligence provided, and question marks surrounding the business.

---

[3]     As part of the July 2025 refinancing efforts, the proposed refinancing also included a 5-year $500 million ABL Revolving Credit Facility that was anticipated to not be drawn down.

FBG_CH1_00093344

65.     At this point, Jefferies told First Brands that approximately $3.33 billion of the $6.2 billion had been filled.  Jefferies was not optimistic that the approximate $3 billion remaining could be filled without a quality of earnings report and a full run down of diligence items. Jefferies recommended pausing the Global Refinancing process until these diligence items were addressed.

66.     First Brands was unable to fulfill the quality of earnings report requested, nor answer many of the diligence questions requested by the different groups of potential lenders.

67.     Given tepid demand for its refinancing and as advised by Jefferies, First Brands halted its efforts to refinance its debt in August of 2025.

68.     Following the failure of the Global Refinancing, although First Brands had claimed over $900 million in the bank during that process, First Brands fell into bankruptcy in September 2025 with almost no cash, following a counterparty sweeping certain remaining cash.

69.     At the "first day" hearing the Debtors' professionals, including a newly appointed independent CRO, essentially admitted that they were administering the estate of a fraud of unknown proportions, based on (at least) the fraud perpetrated with respect to the Third-Party Factoring.

70.     The Chapter 11 filings raised an unavoidable question: given the company had stolen *at least* $2 billion from its factoring counterparties, and was so cash strapped it would shortly miss payroll without an emergency DIP loan, what exactly happened?

71.     The Debtors, through their newly appointed professionals, quickly moved to separate the company from its historic and fraudulent management, including owner and CEO Patrick James.  The Debtors quickly discovered that Patrick James had extracted hundreds of

FBG_CH1_00093345

DEBTORS' EXHIBIT NO. 183
Page 55 of 90

millions of dollars from the Debtors, and moved to recover those funds, all as described in Section E.iv below. But that alone does not explain the deep hole First Brands is in.

### C. Aequum's Role Within First Brands' Fraudulent Framework.

72. Aequum helped enable the First Brands fraud. Aequum – which purportedly supplied approximately $44 million under the Broad Street Facility (defined below) – received approximately $11.7 million in fraudulent transfers and roughly $570,000 in an unauthorized post-petition transfer from Debtor Broad Street; proceeds that were shuffled from other SPV Borrowers and non-Debtor affiliates to meet Aequum obligations. Aequum is still purportedly owed $45 million on its loan to Broad Street.

73. First Brands' relationship with Aequum began in 2023. Aequum was introduced to Edward James through one of Helios' managing partners, Tol Ho, on or about October 23, 2023, as a potential source of inventory financing. Helios, through Tol Ho, negotiated with Aequum on behalf of Edward James and FBG. Helios charged FBG a 2% broker fee and 1% arranger fee with the approval of Edward James.

74. Pursuant to these negotiations, Aequum facilitated development of an asset-based financing facility with FBG's affiliate, Broad Street. Aequum's Executive Director, Eric Weisheit, is believed to have led the negotiations and/or execution of this facility, as well as other facilities which make up the broader Aequum Facility.

75. On March 28, 2024, Aequum and Broad Street executed a credit agreement whereby Aequum would provide Broad Street with an asset-based revolving credit facility in an aggregate principal amount of $45 million (the "Broad Street Facility", and the underlying credit agreement, the "Broad Street Credit Agreement"). Under the Broad Street Credit Agreement and its ancillary documents, Broad Street provided Aequum with a purported lien on all of its assets.

76. Broad Street Financial Holdings, LLC and Viceroy guaranteed payment and

18

FBG_CH1_00093346

performance of Broad Street's obligations under the Broad Street Credit Agreement.

77.     Evolution established a lending facility with Starlight facilitated by Helios on the same day.  Pursuant to the anticipated closing of these two financing arrangements, Tol Ho sent an invoice to Edward James and Andy Brumbergs for "broker fees" of $2.9 million.  These fees are likely the 2% broker fee for the $45 million funded by Aequum for the Broad Street transaction, and the 1.3% arranger fee for the $150 million funded by Evolution for the Starlight transaction.

78.     Helios played a critical role in the execution of the Broad Street Credit Agreement, and the overarching Aequum Facility.  The costs of capital of the Broad Street Facility was substantial, SOFR+9.5% (despite the fact that, for some or all of the period in which the Broad Street Facility, and the broader Aequum Facility for that matter, was outstanding, the much less expensive ABL remained undrawn).  In turn, Helios received approximately $593,000 in arranger fees between May 2024 and August 2025 on the Aequum Facility.

79.     Aequum, after paying Helios for the arrangement, entered into the Broad Street Credit Agreement.  Aequum must have quickly recognized something was amiss, requesting a "desktop" appraisal following its provision of an initial tranche of funding to FBG.  In response to this request, Edward James told Tol Ho via email, "We told them we are not doing anymore calls or inquiries on this" appraisal.  Tol Ho responded, "I see.  I'm having dinner with Aequum next week.  Will tell them to stand down."  The appraisal was never done.

80.     After this exchange, Aequum moved forward with the transaction, despite the fact that its request for an appraisal, a condition contemplated by the transaction, was denied.

81.     Aequum was right to be suspicious. The Broad Street Facility was structured to provide off-balance sheet asset-based financing, with Broad Street intended to purchase inventory

19

FBG_CH1_00093347

DEBTORS' EXHIBIT NO. 183
Page 57 of 90

from FBG entities, use that inventory to secure financing, and ultimately sell the inventory back to FBG. This structure was documented in the Broad Street Credit Agreement; but this was *not* how the transactions played out in practice.

82. For example, after Broad Street received the initial $43.8 million in proceeds (net cash) from the Broad Street Facility, there were no QuickBooks entries showing inventory being sold back to FBG entities, and inventory amounts in the general ledgers consistently exceeded reported inventory on the borrowing base certificates ("BBCs").

83. This is a stark departure from appropriate underwriting practices. Combined with the other circumstances surrounding the transactions, Aequum exhibited at minimum a willful blindness to First Brands' and the James brothers' fraud after reasonable suspicion.

84. Importantly, Broad Street funneled almost the entirety of the loan proceeds from the Broad Street Facility to Bowery for the benefit of Patrick James. Under the Broad Street Facility, Aequum distributed approximately $44 million in net cash proceeds to Broad Street, and on the same day Broad Street transferred roughly $43 million to Bowery (as detailed below). Almost assuredly, all $11.7 million in pre-petition payments Aequum received from Broad Street came from sources not originally contemplated by Broad Street Credit Agreement.

**D. The Disputed Transfers Of Cash To Aequum.**

85. The Committee seeks to avoid *all* transfers to or for the benefit of Aequum. To the extent those transfers were then distributed to further transferees, such as the Aequum Investors, the Committee seeks to claw those transfers back as well, and will amend when further transferees are identified. As set forth below, prior to the petition date, Aequum received approximately $11.7 million from First Brands (the "Aequum Transfers"), *plus* any purported property interest or lien entitlement that Aequum asserts it obtained over any First Brands property, including assets initially transferred to an SPV Debtor. In addition, post-petition Aequum received an

FBG_CH1_00093348

unauthorized roughly $570,000 transfer from Broad Street, originating from the same fraudulent scheme underlying the pre-petition transfers.

86.   Broad Street was meant to acquire inventory from FBG Debtors, which inventory would serve as security for the Broad Street Facility.  But that is not how the transaction operated in practice, as noted above.  Upon information and belief, despite acquiring title to the inventory, Broad Street never came into physical possession of the inventory; the FBG Debtors continued to retain possession of the inventory, the inventory remained on the FBG Debtors' balance sheets, and the inventory was double pledged to support loans to other Debtors.  Aequum should have known the transfers were fraudulent and would have discovered this through reasonable diligence (the same likely applies the Aequum Investors).  But Aequum chose to ignore the red flags, benefiting to the tune of over $12 million.

87.   From inception in 2024 and through the petition date, First Brands and Broad Street paid roughly $11.7 million of interest, principal repayments, professional fees, and transaction costs to Aequum.

88.   A majority of the total payments made to Aequum were on account of interest expense.  The credit agreement had a high cost of capital, SOFR + 9.5%, which evidence will demonstrate was well above standard market rates; such terms were approved by Edward James and negotiated by Edward James and Tol Ho in concert.  Broad Street's interest expense totaled approximately $6.1 million in 2024 and $3.8[4] million through August 2025.  With no income of its own to report from inception in 2024 through August 2025, Broad Street's balance sheets reflect that it relied on funds received from FBG Debtors, other SPV Borrowers, and non-Debtor affiliates to fund their loan obligations.

---

[4]   This figure was sourced from the Company's books and records.

FBG_CH1_00093349

89. The majority of payments to Aequum – approximately $7.3 million of $11.7 million in pre-petition transfers – were funded, directly or indirectly, by First Brands. Two First Brands entities directly funded roughly $1.8 million of payments and funded an additional $5.5 million through payment processors like NextProcess LP, ITS Traffic Systems Inc. and VERCYFi.

90. Non-First Brands entities including Onset and the Patrick James Trust funded roughly $2.7 million of Aequum's payments through the petition date.

91. Additional discovery is necessary to determine the source of funding for the remaining approximately $1.7 million of pre-petition payments made for the benefit of Aequum.

92. Lastly, on September 30, 2026, six days after filing for relief under Chapter 11, Broad Street transferred an additional roughly $570,000 to Aequum on account of its debts. This post-petition transfer of estate property was not authorized by the Court or by the Bankruptcy Code.

## E. First Brands Operated As A Fraudulent Ponzi Scheme.

93. The Committee's review of thousands of documents, tracing of available bank accounts, and other available information have demonstrated that First Brands operated as a Ponzi scheme. For years, the continuing survival of the Company was contingent upon receiving financing that was not supported by the Company's actual business. Instead, the Company used false and misleading financial statements, fabricated invoices, and other falsified records to create the illusion of a healthy business and thereby obtain additional financing.

94. As described further below, First Brands obtained funds from sources like factoring parties by misrepresenting accounts receivable. It also obtained liquidity through expensive "sale leasebacks" that benefited insiders at the expense of the Company. These debts were unsustainable and required First Brands to increasingly exaggerate its accounts receivable to obtain more financing.

FBG_CH1_00093350

95.     This scheme was required to generate new cash to pay off existing investors to maintain the fraud, and to allow Aequum and the James brothers to continue to funnel immense amounts of money out of First Brands.  Due to the fraud conducted by First Brands, the "Ponzi scheme presumption" applies, and thus all transfers made in furtherance of the scheme – including those sought to be recovered through this Complaint – were made with actual intent to hinder, delay, or defraud creditors.

### i.    First Brands Obtains Cash From Factoring Parties By Utilizing Fraudulent Invoices.

96.     Although First Brands operated a large automotive parts business, its financing program was not tied to legitimate operating needs or sustainable cash flow.  Instead, the Company required constant new borrowing to meet its preexisting obligations.  As of the petition date, First Brands had approximately $6.1 billion in on-balance sheet funded debt, approximately $2.3 billion in "off-balance sheet" financings through special purpose vehicles, approximately $812 million in unsecured supply chain financing, and at least $2.3 billion in factoring liabilities.  Again, because of the scale of the fraud these numbers are current estimates.

97.     It did not have the business to support this massive debt.  Cash used to make each maturity payment would just come from the next cycle of financing, and the Company couldn't make Wednesday's maturity payment without receiving Tuesday's receipts from the next funding cycle.

98.     The lack of a legitimate business to support the new loans was detected by some discerning parties.  For instance, one consultant detected numerous red flags when it conducted due diligence on First Brands in 2022 on behalf of a private capital firm that was considering extending a $200 million bridging loan to the company.  First Brands refused to permit them access to storage sites to confirm the presence of collateral underpinning the underlying loan.  The

FBG_CH1_00093351

firm also noticed that First Brands was chronically behind on payments due to its suppliers, which had shut down many of its open credit facilities in favor of cash on delivery, cash in advance, or letters of credit, and that the money it owed them had shot up. Investment banks including Soros Fund Management and Apollo Global Management studied lawsuits against Patrick James alleging fraud and the falsification of invoices, and decided to short First Brands.

99.     First Brands came to rely upon, among other things, exotic forms of financing to stay afloat. One such example was accounts receivable factoring. Accounts receivable factoring – normally not particularly exotic – involves a company selling their right to the payment to a third party company in exchange for near term discounted payment on the "factored" invoices. As is relevant here, there are two forms of such factoring. *First*, a factoring arrangement can be entered directly between a company's customer and a financial institution (*i.e.*, "Customer Factoring"). In this scenario, the customer directly pays the financial institution when the invoice is due. *Second*, the factoring transaction can be between the company itself and a financing party (as defined earlier, "Third-Party Factoring"). Under Third-Party Factoring arrangements, First Brands was expected to collect payments due from customers and then remit them to the Third-Party Factor. What made this relatively normal financing process exotic was the fraud First Brands conducted to turn it from an asset sale into hidden unsecured financing.

100.     As of the petition date, unpaid Third-Party Factoring balances were approximately $2.3 billion. As it turned out, the vast majority of the $2.3 billion was based upon fraudulent invoices submitted by First Brands. First Brands employed several tactics to misrepresent its accounts receivable to factoring parties and thereby obtain billions of dollars of financing. $1.4 billion of purported customer invoices submitted for factoring did not exist in First Brands Group's books and records. Another $1.1 billion of purported accounts receivable were

24

FBG_CH1_00093352

overstated, *i.e.*, the actual invoices were significantly smaller than what had been sold to the factoring parties. For instance, a Brake Parts Inc. invoice with a true value of approximately $179.84 was submitted in a factoring package at $9,271.25.

101.   Even where the invoice was accurate and did exist, it was still the product of fraud. First Brands would often double or triple-factor the same accounts receivable: *e.g.*, it would pledge a receivable to both a Customer Factoring partner and a Third-Party Factoring partner under separate deals.

102.   In some instances, First Brands utilized these fraudulent strategies together. For example, First Brands would submit inflated invoices (bearing the same invoice number) to multiple parties at different amounts.

103.   Further, First Brands' personnel created "cover" or "dummy" invoices—documents prepared outside the Company's standard invoicing systems and not tied to contemporaneous shipments or services—for the express purpose of drawing down unused supply chain financing capacity after vendors had already been paid in cash. The stated internal purpose was to make up for cash disbursements that could not be factored and to "level set" working capital by converting those outflows into short term financing proceeds.

104.   The process operated on a weekly cadence: personnel selected a United States operating site and a target dollar amount designed to utilize remaining weekly capacity; prepared short, consolidated "cover invoices" or "dummy invoices"; uploaded those invoices to the financing bill payers; received advances at the sites; and then moved the money through centralized cash management before being redistributed to sites or obligations.

105.   Internally, this activity was managed as a capacity utilization exercise across multiple bill payers, with instructions from First Brands executives, including Patrick James and

FBG_CH1_00093353

Peter ("Andy") Brumbergs, First Brands' former Vice President of Finance, to use as much available capacity as internal payment guidelines allowed.  Only U.S. entities were used, and personnel allocated vendors and amounts across programs to fit each financier's parameters before uploading the cover invoices and drawing the cash.

106.   Company records, which tracked this activity beginning in 2023, reflected approximately six billion dollars in cumulative proceeds over time, with roughly $812 million outstanding to supply chain financing programs as of the petition date.

107.   The practice was directed and overseen by senior management, including Patrick James acting through Brumbergs, and operated alongside efforts by other senior executives to increase available capacity from financiers.  The individuals responsible for executing the program were well compensated for bringing cash in the door, including substantial base pay with additional bonuses and deferred compensation.

> **ii.    First Brands Group Continues Its Fraud Through Fraudulent Off-Balance Sheet Financing, While Benefitting Insiders And Aequum.**

108.   Part of the Debtors' fraud was conducted through an off-balance sheet SPV financing scheme.  The SPV Debtors are party to off-balance sheet financing structures, including inventory, sale-leaseback, and equipment financing arrangements.  As of the petition date, the Company owed more than $2.3 billion in off-balance sheet financing obligations.  The off-balance sheet financing arrangements include the CarVal Facility, Aequum Facility, Evolution Facility, and the Onset Facility and sale-leaseback transactions thereunder.

109.   Over a timespan of approximately two and a half years, from May 31, 2022 through December 2, 2024, First Brands established eight different SPV entities starting with the Carval Facility and ending with the Aequum Facility.  Each SPV facility included two SPV Debtors: (i) Carnaby Inventory II, LLC and Carnaby Inventory III, LLC under the Carval Facility;

26

FBG_CH1_00093354

(ii) Patterson Inventory, LLC and Starlight under the Evolution Facility; (iii) Broad Street and Global Assets under the Aequum Facility; and (iv) Carnaby Inventory IV, LLC and Carnaby FA, LLC under the Onset Facility.  The SPVs were subsidiaries of Debtor Viceroy, which is organized under the laws of the state of Delaware.

110.   The SPV facilities generally involve an arrangement whereby an SPV Debtor (i) first purchases inventory and/or equipment from certain subsidiaries of First Brands and then (ii) utilizes those assets as collateral to support a loan.  The independent special committee established by the Debtors and the Debtors' professionals "ha[s] identified multiple potential issues with the Company's off-balance sheet financing arrangements . . . ."  Some of the issues uncovered include "the amounts paid from the off-balance sheet SPV to the FBG subsidiary for inventory and/or [PP&E] was less than the stated sale price specified in the relevant asset purchase agreements."

111.   Additionally, "it appears that inventory that was purportedly transferred by First Brands subsidiaries to the SPV Debtors in connection with certain of the off-balance sheet facilities…remained on the First Brands subsidiaries' balance sheets, notwithstanding the alleged transfers."  The investigation has revealed that "the value of such inventory appears to have remained in the borrowing base for the First Brands credit facilities, including the Debtors' ABL Facility."  For example, Evolution "lent approximately $240 million to a SPV Debtor, against what First Brands represented was $370 million of First Brands' inventory on the SPVs balance sheet. First Brands, however, kept that inventory for itself, without paying the SPV, and by the end of September 2025, few if any assets remained in the SPV[.]"

112.   There are accusations that the SPV Debtors facilitated a massive fraud.  In their adversary complaint, the Debtors described this fraud as "an off-balance sheet SPV financing

FBG_CH1_00093355

scheme [ ] to the tune of at least $2.3 billion in debt, involving, at least in part, double-pledging collateral that First Brands itself could not borrow against a second time." Investigative efforts have revealed that inventory was double-pledged as the same inventory that was used as collateral for loans to both (i) subsidiaries of First Brands and (ii) the SPV Debtors.

113.   The are clear indications that the SPV Debtors had issues that needed further scrutiny. The SPV facilities all required extremely high cost of capital for the SPV and charged very high interest rates. The Committee's investigation has revealed that the cost of capital for the SPV facilities dwarfed the cost of capital for the ABL Facility. For example, the ABL's cost of capital is only SOFR+1.25-1.75%, while the Broad Street Facility's cost of capital is SOFR+9.5%.

114.   Furthermore, the SPV financing structure misused lender funds by transferring cash to Patrick James' slush funds, including into Bowery, an off-balance sheet entity in the SPV silo, controlled by Patrick James. The Debtors' investigation has revealed that the SPV Debtors did not maintain adequate books and records, and cash that was supposed to be transferred to First Brands was transferred to Bowery instead. "From 2022 through 2025, nearly $12 billion flowed through [Bowery], including transfers between Patrick James, his Trust and his affiliated entities, and transfers with FBG and FBG business units."

### iii.   First Brands Commingled Funds From Investors To Meet Various Obligations.

115.   In order to keep an insolvent company alive, First Brands regularly commingled accounts and misrepresented its financial position. In the fashion of a classic Ponzi scheme, First Brands commingled loan proceeds into accounts controlled by Patrick James, which were used to pay other creditors.

116.   One of the larger commingled accounts existed at Bowery. Among the cash received from the Onset SPVs, $1,206,317,303 was commingled in the bank accounts of Bowery.

28

FBG_CH1_00093356

In practice, the Onset funds would then be used to pay various obligations assumed by separate entities. For instance, on November 4, 2024, Bowery discussed sending $2,000,000 to another Debtor, Eagle Casting, LLC., in order to enable Eagle Casting to pay obligations owed in April. In addition, cash outflows from the borrowers under the broader Aequum Facility were received primarily by Bowery, to the tune of approximately $83.9 million.

117. Taking from one creditor to pay another was happening as far back as 2022, as there were discussions about having Viceroy or "SA Eagle"[5] pay Onset. These discussions included how money from Onset was immediately sent to Viceroy and SA Eagle to such an extent that First Brands would become cash poor and need to fund AP payments from money given back by Viceroy.

118. The funding obtained from Aequum, Onset and others was sent to non-Debtor affiliates, other SPV borrowers, and Patrick James. For example, as money came in from Onset, it was sent to entities such as Bowery, Viceroy, and Patrick James. When payments to Onset became due, FBG was expected to support the payment. As Nigel Crighton explained in March 2022 while trying to do "hard core clean up on the viceroy side . . . [t]hese entities have just been tossing cash between each other like crazy with zero accounting [since] 2021 haha the legal entity chart never stops!" Financing proceeds were frequently cycled through SPVs and immediately transferred to insider-controlled accounts, rather than being retained for corporate operations. These transfers often occurred on the same day the SPVs received financing.

119. Between 2022 and 2025, approximately $12 billion moved through Bowery, including transfers between Patrick James, the Patrick James Trust, affiliated entities, First

---

[5] It is unclear from these discussions whether "SA Eagle" referred to Debtors Eagle Casting, LLC, Eagle Casting Holdings, LLC, or Eagle Machining, LLC.

FBG_CH1_00093357

Brands, and First Brands Group business units.  Transfers were made to meet repayments due to Onset and factoring companies.

120.   Evolution Credit Opportunity Master Fund IIB also lent approximately $240 million to an SPV Debtor against inventory represented as worth approximately $370 million on the SPV balance sheet.  First Brands retained that inventory without paying the SPV, leaving few if any assets in the SPV by September 2025.

121.   Inventory purportedly transferred to SPV Debtors remained on First Brands subsidiaries' balance sheets and borrowing bases, resulting in the same inventory supporting loans to both First Brands entities and SPV Debtors.

122.   First Brands also altered its internal records to obscure its activity.  As First Brands was approaching bankruptcy, Brumbergs approached a senior individual in the First Brands accounting department and instructed him to record a journal entry in the corporate books for two large intercompany adjustments related to supply-chain financing liabilities, one of which was a $1.2 billion entry for supply chain financing liability.  Brumbergs provided only a snippet of numbers, but no supporting documentation or back-up for this entry.

123.   Internally, First Brands employees joked about the ever-changing methods for handling accounts to present the most advantageous picture of the Company's financial situation, with Nigel Crighton telling Eric French in February 2023 that he was "creating a million new accounts ... this is something new treating the Onset debt as leases now lol," and French responding with a gif of a monkey juggling, writing "that's us just juggling financials around every month."

124.   First Brands maintained a separate, management-controlled "bridge" reporting process under which senior finance personnel derived lender facing financial figures from the

FBG_CH1_00093358

DEBTORS' EXHIBIT NO. 183
Page 68 of 90

company's Hyperion Financial Management ("HFM") consolidation and then applied off system adjustments before transmission to banks, rather than providing the unadjusted HFM outputs themselves.

125.   Senior leadership, including Patrick James acting through Brumbergs, reviewed the bridged, line-item model and directed "special" entries outside the ordinary close, which were then booked by the HFM team.   The bank facing financials were prepared and controlled exclusively by the senior finance lead, with those numbers kept "under lock and key."

126.   As a consequence, quarterly reports furnished to lenders differed materially from the year-end financial statements, which later incorporated or "fixed" items that had been omitted or adjusted in the intra quarter bridge.   For example, a multi-million dollar debt extinguishment loss was removed from interim reporting and only recognized in the final annual statements, rendering the lender facing financials false or misleading relative to the system consolidated results.

### iv.   First Brands Diverts Corporate Funds To Patrick James, Related Entities, And Other Insiders.

127.   From 2018 through the petition date, Patrick James caused hundreds of millions of dollars to be transferred from First Brands to himself, the Patrick James Trust, and affiliated entities, with the pace and magnitude of transfers increasing as borrowing accelerated.   More than $600 million was distributed directly from First Brands' bank accounts to the Patrick James Trust, and more than $700 million in total was transferred to James and his affiliates overall. These transfers occurred without contemporaneous documentation establishing a legitimate corporate purpose.

128.   Throughout this period, Patrick James would provide detailed instructions to senior individuals at First Brands for payments of specific amounts (often in the millions) to specific

FBG_CH1_00093359

destination accounts.  These accounts generally belonged to, among others, the Patrick James Trust as well as various other entities personally owned and controlled by James and unrelated to First Brands.

129.   The transfers often occurred around the same time as many of Patrick James' acquisitions of high-end real estate properties and luxury items such as exotic cars.  James would also direct submission of invoices to First Brands for reimbursement of both personal and business expenses for individuals and entities unrelated to First Brands, on top of intentional commingling of personal and business accounts as well as Debtor and non-Debtor cash.  Additionally, James himself and his family were among the individuals benefitting from such misappropriation of funds, as further discussed below.

130.   First Brands, upon receipt, would pay for each of these orders, sometimes within the day.  Overall, under Patrick James' personal direction, more than $600 million was distributed directly from First Brands' bank accounts to the Patrick James Trust, and more than $700 million in total was ultimately transferred to James and his affiliates.

131.   These funds have not been returned to First Brands.  First Brands also did not document or treat these funds as ordinary dividends.

132.   As such, following these transfers, First Brands remained with only approximately $12 million in its bank accounts by the petition date and no legitimate business reason to show for it.  Each of these transfers occurred without contemporaneous documentation or any other form of sufficient accounting establishing a legitimate corporate purpose.

133.   The size and frequency of payments to Patrick James and the Patrick James Trust were grossly disproportionate to any plausible compensation or return on equity, particularly given First Brands' mounting debt and deteriorating liquidity.  Nigel Crighton observed that First

32

FBG_CH1_00093360

Brands' cash flow situation was insufficient to cover its obligations in July 2022, telling Kevin Ruminski that "even after for the week is shaky because we pay onset 1.5m cash every month and barely have that on hand."

134.   In multiple instances, SPV Debtors that began the day with nominal cash balances transferred tens of millions of dollars to the Patrick James Trust on the same day they received financing, reflecting contemporaneous extraction of value.

- On March 28, 2024 Aequum funded $45 million to Broad Street, which after bank fees, was approximately $43.8 million, and paid approximately $42.9 million to Bowery the same day for the purported purchase of inventory.

- On January 15, 2025, Carnaby IV began the day with a balance of $22,137.40, received approximately $192 million from Onset, and paid $25 million to the Patrick James Trust the same day.

- On March 10, 2025, Onset funded $115.2 million, and Carnaby IV made a $35 million transfer to the Patrick James Trust. On March 12, 2025, Onset funded $57.6 million, and Carnaby IV made another $35 million transfer to the Patrick James Trust. By March 17, 2025, Carnaby IV held a balance of $2,952.95.

- In January 2024, internal communications reflect instructions from Patrick James to send $25 million in distributions to Patrick James Trust accounts split into $21 million and $4 million, and First Brands Group made those distributions the same day.

- In October 2024, internal communications reflect instructions to make a $25 million distribution to a Patrick James Trust account, and First Brands Group made that distribution that day.

135.   Corporate funds were also used to pay James' personal and family expenses, including payroll for a family office, rent for a New York townhouse, payments to a private celebrity chef, and transfers to personal real estate and holding entities, none of which provided value to First Brands.

136.   In 2025, First Brands paid more than $2 million for "family office" payroll associated with Patrick James. The "family office" consisted of individuals who worked directly

33

FBG_CH1_00093361

for James, not FBG, including his personal chef, security team, and others.  Those individuals were on the FBG executive payroll.

137.   Transaction documentation recovered by the Debtors do not show that these payments and transfers served legitimate corporate purposes, and many were made without contemporaneous documentation.

### v.    First Brands Develops A Culture Of Secrecy To Advance Its Fraudulent Enterprise.

138.   First Brands was able to maintain its scheme and deceive some of the most sophisticated parties in the country about its true financial condition for years through deliberate concealment and a culture of secrecy.  The misconduct extended beyond falsified balance sheets and financial statements to the day-to-day operations of the Company, where information was tightly controlled and access to accurate data was systematically restricted.

139.   The warning signs were there in terms of the manner of operating the business. Employees described First Brands as a dictatorship in which Patrick James made all key decisions, including which invoices to pay.  As one employee observed, you didn't tell James "no"; you just did it.

140.   Patrick James and other key executives also maintained tight control on communications with key third parties.  For example, after a lower-level employee sent an actual invoice requested by a factoring entity, the email domains for Katsumi Global and Jefferies, two of the primary entities that First Brands used for factoring, were blocked for most employees apart from Patrick James and Andy Brumbergs.  Another high-ranking individual in the accounting department reported that he never interacted with any external auditors.

141.   The C-Suite, where executives including Patrick James worked, was physically locked and inaccessible to most employees.  Indeed, Patrick James was so secretive, many

34

FBG_CH1_00093362

employees of First Brands had never seen a photo of him.  In order to maintain secrecy and control, workers were siloed, and there was no openness or transparency within the company.

142.  James also communicated with employees using an ephemeral messaging application, leaving no permanent record of directives or decisions.

**F.   The Aequum Transactions Were The Product Of Actual Or Constructive Fraud.**

143.  The Aequum transactions were executed to provide the James brothers with additional liquidity to perpetuate their fraud.  The James brothers represented that the off-balance sheet financing provided by Aequum was meant to enable Broad Street to purchase inventory directly from FBG.  Broad Street was then supposed to use the inventory as a borrowing base, to obtain further financing from Aequum, ultimately selling the inventory back to FBG.  Instead, the FBG Debtors continued to retain possession of the inventory, the inventory remained on the FBG Debtors' balance sheets, and the inventory was double-pledged to support other loans.  The off-balance sheet financing provided by Aequum was sent to Bowery, which, as explained above, was a Patrick James dominated entity used on numerous occasions to fund personal endeavors.

144.  The Aequum Transfers were fraudulent, and subject to avoidance by the FBG Debtors.  The transfers of cash and assets to, and purported granting of liens in favor of, Aequum by the FBG Debtors were entered into at Edward James' direction to enrich himself and Patrick James as part of a fraudulent scheme.

**i.   Direct Evidence Of Actual Fraudulent Intent.**

145.  This is the rare case where there can be no dispute that the Debtors possessed fraudulent intent in connection with the Aequum Transfers.  In particular, Edward James possessed actual intent to defraud creditors through the Broad Street Facility.  As set forth above in Section C, Edward James helped create the Aequum lending relationship for First Brands.  In essence, Edward James purposely structured the off-balance sheet Broad Street Facility to divert

35

FBG_CH1_00093363

estate value away from the Debtors as part of a greater effort to hinder and defraud creditors, which was deliberately hidden from those creditors. As an executive, Edward James' intent to defraud is imputed to the Company.

### ii.    The Aequum Transfers From The FBG Debtors Bear The Badges Of Fraud.

146.   *First*, First Brands was insolvent at all relevant times (as discussed further in Section H below). Evidence reflects that First Brands was engaged in factoring fraud and falsifying accounting records to support that fraud since 2019, culminating in the Company's collapse in 2025. Because First Brands operated as a Ponzi scheme, relying on constant infusions of new cash through fraudulent means to satisfy existing obligations, it is legally deemed insolvent from the inception of the scheme.

147.   *Second*, the Broad Street Facility was a part of a series of transactions that, when viewed in combination, reveal a pattern of fraudulent intent. As detailed in Section B, between May 2022 and December 2024, the Debtors entered into four tranches of "off-balance sheet" debt with CarVal, Evolution, Onset, and Aequum Facility lenders. The Broad Street Facility (part of the Aequum Facility), established in March 2024, was the penultimate link added to the chain. As of the petition date, the Debtors purportedly owed roughly $2.3 billion of debt to SPV lenders on account of these loans.

148.   *Third*, although the Broad Street Facility transaction documents reflect that the FBG Debtors transferred title to Broad Street and granted liens to Aequum, the FBG Debtors retained possession and control of the assets; the assets never moved. Despite the purported transfers, the inventory remained on the FBG Debtors' balance sheets, and the assets' values were accounted for in the borrowing base for the FBG Debtors' funded debt facilities. This allowed that same inventory to be used to support loans to other Debtors.

36

FBG_CH1_00093364

149. *Fourth*, the Debtors concealed the Aequum Transfers from auditors and other creditors. The ABL Lenders and Term Loan Lenders were never told that their collateral was being used to purportedly secure the Broad Street Facility: there were, for example, no intercreditor agreements to establish relative rights and priorities in the collateral. Moreover, the Debtors engaged in manipulative practices to ensure no one found out about the SPV structures. For example, beginning in 2023 the Debtors, at the direction of Patrick James, "reclass[ified] the Onset debt and interest to capital lease and lease expense." The complex accounting procedures designed to conceal Onset transfers caused administrative problems for the Debtors' accounting team, members of which complained that they had to "setup like 50 different schedules" and create "a million new accounts," and "just juggl[e] financials around every month[.]" We believe the evidence will show similar procedures related to the Broad Street Facility.

150. Overall, the evidence will show that the Debtors improperly failed to disclose assets and cash transfers related to the Broad Street Facility in their financial records and statements.

151. *Fifth*, the value of the consideration received by the Debtors was not reasonably equivalent to the value of the assets transferred in the Aequum Transfers. The Debtors did not receive reasonably equivalent value for the Aequum Transfers because the Aequum Transfers of approximately $12 million were interest payments made on approximately $44 million of funded loans, sufficiently all of the proceeds of which were transferred by Broad Street to affiliates of the James brothers; so the Debtors effectively made $12 million on payments in return for no benefit at all. Further, the evidence will show that the cost of capital was above market, likely due to Edward James' involvement in procuring the Broad Street Facility on favorable terms for Aequum.

FBG_CH1_00093365

152.   *Sixth*, the Broad Street transaction occurred shortly before or after the Debtors incurred a substantial debt; specifically, near or around the time that First Brands Group entered into credit agreements with ABL and Term lenders.  Broad Street entered the off-balance sheet financing arrangement with Aequum on March 28, 2024.  Only 16 days prior, First Brands assumed substantial debts by entering into the Fourteenth Amendment of its First Lien Term Loan.

## G.  Aequum Did Not Receive The Transfers In Good Faith.

153.   There are sufficient indicators that Aequum (and any Aequum Investors) knew or should have known upon reasonable inquiry that the Broad Street Facility consisted of fraudulent, or at least voidable, transfers, including (i) the Broad Street Facility did not adhere to the legal structure contemplated by the Broad Street transaction documents; (ii) Aequum departed from appropriate underwriting practices when there was growing internal suspicion and proceeded funding the Broad Street Facility after they were denied contracted-for appraisals on multiple occasions; and (iii) high cost of capital to the Broad Street asset-based credit agreement.

154.   Aequum knew the Broad Street Facility did not operate as legally mandated by the relevant contracts.  For instance, the Broad Street Facility was structured to provide off-balance sheet asset-based financing to the Broad Street.  In theory, Broad Street was required to purchase inventory from FBG entities, use that inventory to secure financing, and ultimately sell that same inventory back to FBG.  This intended structure was memorialized in the Broad Street Credit Agreement; however, it was evident to Aequum that Broad Street did not adhere to this structure.

155.   Broad Street veered off the intended contractual structure almost immediately. After the initial transaction, there were no QuickBooks entries that demonstrated inventory being sold back to FBG entities.  More importantly, the general ledgers consistently exceeded reported inventory on the BBCs, a datapoint that would confound even the least sophisticated lenders.

FBG_CH1_00093366

156.    Once Aequum grew suspicious, within two months of the Broad Street transaction, it requested a "desktop" appraisal after providing the initial tranche of funding.  Edward James told Aequum that he would not do any more calls or inquiries related to this matter.  When Tol Ho inquired respecting the appraisal requests on Aequum's behalf, Edward James told him the same.

157.    Aequum was rebuffed repeatedly on an agreed contractual term, one it felt the need to ask for on multiple occasions, and decided to turn a blind eye when a routine appraisal request was flatly rebuffed.  Aequum knew at least that *something* was amiss from almost the inception of the Aequum Facility.

158.    Further, the interest and rates of return commanded by these asset-based lending facilities should also have raised flags.  The evidence will show that they were above market, and it is likely no reasonable explanation for that premium exists.  For example, the average cost of capital on the Broad Street Facility was SOFR+9.5%.

159.    Given these factors, taken together, Aequum at least knew *something* was not right.

**H. First Brands Was Insolvent At All Relevant Times.**

160.    At all relevant times, First Brands was insolvent.  Although the financial records of First Brands are entirely unreliable, and thus a standard solvency analysis cannot be completed until those records are rebuilt, the Committee has every expectation that the accurate financials will reveal that the Company was insolvent by all three common tests of solvency.

161.    Specifically, evidence uncovered by the Committee reflects forms of factoring fraud going back at least to 2019.  The Committee submits that a company that is required to conduct fraud to pay its bills is insolvent.  Further, as a Ponzi scheme insolvent by law since its inception, First Brands was insolvent at all relevant times that it operated as a Ponzi scheme.

FBG_CH1_00093367

162.   As these practices continued, First Brands' liabilities exceeded its limited cash reserves and the company was acutely vulnerable to any interruption in its ability to obtain new financing.

163.   That vulnerability materialized in 2025.  As First Brands faced a liquidity crunch purportedly driven by tariffs and capital expenditures, it pursued a global refinancing.  In July 2025, lenders required a quality of earnings report as a condition to extending additional financing, which First Brands did not have and could not complete within the timeframe required to support refinancing.

164.   When the refinancing process collapsed, First Brands was exposed as undercapitalized and unable to meet its most basic obligations, including employee payroll.  This led to the appointment of an independent special committee and the commencement of an investigation into Patrick James's conduct and the company's financing practices.  By September 2025, the damage was irreversible.  On September 24 and September 28, 2025, First Brands Group, LLC and 111 affiliated debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

FBG_CH1_00093368

## COUNT I
## INTENTIONAL FRAUDULENT TRANSFER
(Pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A), and 550 and
Applicable State Fraudulent Transfer Law)
**(Against Aequum)**

165.   The Committee restates and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

166.   The FBG Debtors consummated the Aequum Transfers at the direction of insiders Patrick James and Edward James, which transferred substantial value from the FBG Debtors to Aequum.  In exchange for the Aequum Transfers, the FBG Debtors received less than reasonably equivalent value, as most (if not all) of the loan proceeds from Aequum were diverted from the FBG Debtors and instead inured to the benefit of Patrick James, his family, and related entities.

167.   The FBG Debtors made the Aequum Transfers with the knowledge of the natural consequence and effect such transfer would have on their creditors, and with the intent to hinder, delay, or defraud their creditors.

168.   Aequum was not a good faith transferee, and therefore is not entitled to offset rights, the return of consideration provided, or liens under applicable law.

169.   At all relevant times relevant hereto, there were actual creditors of the FBG Debtors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

170.   The Aequum Transfers should be avoided and recovered pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A) and 550(a) and under applicable state fraudulent transfer law.

## COUNT II
## CONSTRUCTIVE FRAUDULENT TRANSFER
(Pursuant to 11 U.S.C. §§ 544, 548(a)(1)(B) and 550 and
Applicable State Fraudulent Transfer Law)
**(Against Aequum)**

171.   The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

41

FBG_CH1_00093369

**DEBTORS' EXHIBIT NO. 183**
**Page 79 of 90**

172.   The FBG Debtors consummated the Aequum Transfers at the direction of insiders Patrick James and Edward James, which transferred substantial value from the FBG Debtors to Aequum.  In exchange for the Aequum Transfers, the FBG Debtors did not receive reasonably equivalent value, as most (if not all) of the loan proceeds from Aequum were diverted from the FBG Debtors and instead inured to the benefit of Patrick James, his family, and related entities.

173.   At the time of the Aequum Transfers, the FBG Debtors: (i) were insolvent or became insolvent as a result thereof; (ii) were engaged in business or a transaction, or were about to engage in business or a transaction for which any property remaining with the FBG Debtors was with unreasonably small capital; and/or (iii) intended to incur, or believed or reasonably should have believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

174.   Aequum was not a good faith transferee, and therefore is not entitled to offset rights, the return of consideration provided, or liens under applicable law.

175.   At all relevant times relevant hereto, there were actual creditors of the FBG Debtors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

176.   The Aequum Transfers should be avoided and recovered pursuant to 11 U.S.C. §§ 544, 548(a)(1)(B) and 550(a) and under applicable state fraudulent transfer law.

## COUNT III
## DISALLOWANCE OF AEQUUM CLAIMS
(Pursuant to 11 U.S.C. § 502(d) and (j))
**(Against Aequum)**

177.   The Committee repeats and realleges each of the preceding paragraphs as if fully set forth herein.

178.   Aequum has not paid the amounts for which it is liable pursuant to the above-cited provisions of the Bankruptcy Code.

42

FBG_CH1_00093370

**DEBTORS' EXHIBIT NO. 183**
**Page 80 of 90**

179. In accordance with 11 U.S.C. § 502(d) of the Bankruptcy Code, the Aequum claims asserted against the FBG Debtors should be disallowed unless, and until, Aequum pays to the FBG Debtors the full amount of the avoidable transfers asserted herein.

180. Pursuant to 11 U.S.C. § 502(j), any and all claims held by Aequum that have been or may be allowed must be reconsidered and disallowed until such time as the payments and security interests sought herein to be avoided and recovered and the damages sought herein are paid in setoff, as applicable.

**COUNT IV**
**EQUITABLE SUBORDINATION**
(Pursuant to 11 U.S.C. § 510)
**(Against Aequum)**

181. The Committee restates and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

182. The conduct of Aequum in connection with the Aequum Transfers, as alleged above, constitutes inequitable conduct. Such conduct provided Aequum with excess value to which it was not entitled to the detriment of the FBG Debtors' estates and their creditors, including by in bad faith enabling intentional and constructive fraudulent transfers as described above.

183. Because of Aequum's conduct, the FBG Debtors wasted valuable corporate assets, and are now unable to satisfy obligations to general creditors, thereby harming the FBG Debtors' general unsecured creditors.

184. Allowing Aequum to receive payment on its claims in connection with any claims which it purports to assert prior to or with the general unsecured creditors would be unfair and inequitable.

43

FBG_CH1_00093371

185. Equitable subordination of Aequum's claims is consistent with the Bankruptcy Code.

186. Because of the transactions and actions described herein, Aequum's claims should be equitably subordinated to all general unsecured claims pursuant to section 11 U.S.C. § 510.

## COUNT V
### AVOIDANCE AND RECOVERY OF POST-PETITION TRANSFER
(Pursuant to 11 U.S.C. §§ 549 and 550)
**(Against Aequum)**

187. The Committee repeats and realleges each of the preceding paragraphs as if fully set forth herein.

188. Section 549(a) of the Bankruptcy Code authorizes a party acting on behalf of the estate to avoid (a) a transfer of any interest in the debtor's property, (b) made after the petition date, (c) that was not authorized under the Bankruptcy Code or by the bankruptcy court.

189. On September 30, 2026, six days after Broad Street filed its petition for relief under chapter 11, Debtor Broad Street transferred approximately $570,000 to and for the benefit of Aequum. This transfer of estate property is not authorized under the Bankruptcy Code and was not authorized by the Court.

190. Pursuant to 11 U.S.C. §§ 549(a) and 550(a), this post-petition transfer should be avoided and recovered.

## COUNT VI
### INTENTIONAL FRAUDULENT TRANSFER
(Pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A), and 550 and Applicable State Fraudulent Transfer Law)
**(Against the Aequum Investors and the John Doe Defendants)**

191. The Committee repeats and realleges each of the preceding paragraphs as if fully set forth herein.

44

FBG_CH1_00093372

192. The Aequum Investors diverted funds away from the estate of the First Brands Debtors by participating in the fraud through their financial support of Aequum. The Aequum Investors funded, invested in, or otherwise financially backed numerous Aequum purchases. In turn, Aequum transferred its proceeds to the Aequum Investors, allowing the Aequum Investors to enjoy monetary benefits while the FBG Debtors received less than reasonably equivalent value.

193. The FBG Debtors acted with the knowledge of the natural consequence and effect such transactions would have on the FBG Debtors' creditors, and with the intent to hinder, delay, or defraud their creditors.

194. The Aequum Investors were not good faith transferees, and therefore are not entitled to offset rights, the return of consideration provided, or liens under applicable law.

195. Upon information and belief, Aequum also subsequently transferred all or part of its proceeds to the John Doe Defendants, some of whom were funding partners of Aequum and immediate or mediate transferees within the meaning of 11 U.S.C. §§ 550(a)(2).

196. At all relevant times relevant hereto, there were actual creditors of the FBG Debtors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

197. The Aequum Investors' financial backing of Aequum's transactions should be avoided and recovered pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A) and 550(a) and under applicable state fraudulent transfer law.

## COUNT VII
### CONSTRUCTIVE FRAUDULENT TRANSFER
(Pursuant to 11 U.S.C. §§ 544, 548(a)(1)(B) and 550 and Applicable State Fraudulent Transfer Law)
### (Against the Aequum Investors and the John Doe Defendants)

198. The Committee repeats and realleges each of the preceding paragraphs as if fully set forth herein.

45

FBG_CH1_00093373

DEBTORS' EXHIBIT NO. 183
Page 83 of 90

199. The Aequum Investors diverted funds away from the estate of the FBG Debtors by participating in Aequum's fraud through their financial support of Aequum. The Aequum Investors funded, invested in, or otherwise financially backed numerous of Aequum's purchases and leases. In turn, Aequum transferred its proceeds to the Aequum Investors, allowing the Aequum Investors to enjoy monetary benefits while the FBG Debtors received less than reasonably equivalent value.

200. At the time of the Aequum Investors' financing support of Aequum, the FBG Debtors (i) were insolvent or became insolvent as a result thereof; (ii) were engaged in business or a transaction, or were about to engage in business or a transaction for which any property remaining with the FBG Debtors was with unreasonably small capital; and/or (iii) intended to incur, or believed or reasonably should have believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

201. Upon information and belief, Aequum also subsequently transferred all or part of its proceeds to the John Doe Defendants, some of whom were funding partners of Aequum and immediate or mediate transferees within the meaning of 11 U.S.C. §§ 550(a)(2).

202. At all relevant times relevant hereto, there were actual creditors of the FBG Debtors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

203. The Aequum Investors' financial backing of Aequum's transactions should be avoided and recovered pursuant to 11 U.S.C. §§ 544, 548(a)(1)(B) and 550(a) and under applicable state fraudulent transfer law.

## **ATTORNEYS FEES AND COSTS**

204. To the extent allowable by applicable law, the Committee requests that the Court award reasonable attorney's fees and costs.

FBG_CH1_00093374

## RESERVATION OF RIGHTS

205. The Committee demands a jury trial on all issues so triable.

206. The Committee reserves the right to bring additional claims, including, without limitation, additional claims that the Committee discerns from its ongoing investigation of defendants' and First Brands Group's pre-petition activities and conduct.

207. The Committee reserves the right to bring the claims asserted herein, and any additional claims in any appropriate forum, including, without limitation, any state or U.S. District Court, notwithstanding the caption for this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, the Committee requests that the Court grant the following relief:

a. On Count I:

    a. entering a judgment against Aequum, finding that the Aequum Transfers constitute fraudulent transfers pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law;

    b. pursuant to 11 U.S.C. §§ 544 and 548 and applicable state fraudulent transfer law, avoiding the Aequum Transfers;

    c. pursuant to 11 U.S.C. § 550 and under applicable state fraudulent transfer law, entering a judgment against Aequum, in the amount of the avoided transfers;

    d. preserving such avoided transfers and/or liens for the benefit of the estate pursuant to 11 U.S.C. § 551; and

    e. finding that Aequum is not a good faith transferee and is not entitled to any offset rights pursuant to 11 U.S.C. § 548(c) and applicable non-bankruptcy law.

b. On Count II:

    a. entering a judgment against Aequum, finding that the Aequum Transfers constitute fraudulent transfers pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law;

    b. pursuant to 11 U.S.C. §§ 544 and 548 and applicable state fraudulent transfer law, avoiding the Aequum Transfers;

FBG_CH1_00093375

DEBTORS' EXHIBIT NO. 183
Page 85 of 90

    c. pursuant to 11 U.S.C. § 550 and under applicable state fraudulent transfer law, entering a judgment against Aequum in the amount of the avoided transfers; and

    d. preserving such avoided transfers and/or liens for the benefit of the estate pursuant to 11 U.S.C. § 551.

c. On Count III:

    a. entering a judgment against Aequum, finding that its claims should be disallowed pursuant to 11 U.S.C. §§ 502(d) and (j) until Aequum pays to the FBG Debtors the full amount of the avoidable transfers asserted herein.

d. On Count IV:

    a. entering a judgment against Aequum, finding that Aequum's claims should be equitably subordinated to all general unsecured claims pursuant to section 11 U.S.C. § 510.

e. On Count V:

    a. entering a judgment against Aequum, finding that the post-petition transfer is avoidable under 11 U.S.C. § 549(a);

    b. pursuant to 11 U.S.C. § 549(a), avoiding the post-petition transfer; and

    c. pursuant to 11 U.S.C. § 550, entering a judgment against Aequum, in the amount of the avoided transfer.

f. On Count VI:

    a. entering a judgment against the Aequum Investors and the John Doe Defendants, finding that their financial backing of Aequum's transactions constitutes fraudulent transfer pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law;

    b. pursuant to 11 U.S.C. §§ 544 and 548 and applicable state fraudulent transfer law, avoiding the Aequum Investors' financial backing of Aequum's transactions;

    c. pursuant to 11 U.S.C. § 550 and under applicable state fraudulent transfer law, entering a judgment against the Aequum Investors in the amount of the avoided transfers;

    d. preserving such avoided transfers and/or liens for the benefit of the estate pursuant to 11 U.S.C. § 551; and

    e. finding that the Aequum Investors are not good faith transferees and are not entitled to any offset rights pursuant to 11 U.S.C. § 548(c) and applicable non-bankruptcy law.

FBG_CH1_00093376

DEBTORS' EXHIBIT NO. 183
Page 86 of 90

g.  On Count VII:

    a.  entering a judgment against the Aequum Investors and the John Doe Defendants, finding that their financial backing of Aequum's transactions constitutes fraudulent transfer pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law;

    b.  pursuant to 11 U.S.C. §§ 544 and 548 and applicable state fraudulent transfer law, avoiding the Aequum Investors' financial backing of Aequum's transactions;

    c.  pursuant to 11 U.S.C. § 550 and under applicable state fraudulent transfer law, entering a judgment against the Aequum Investors in the amount of the avoided transfers;

    d.  preserving such avoided transfers and/or liens for the benefit of the estate pursuant to 11 U.S.C. § 551; and

h.  Such other and further relief as the Court deems just and proper.

49

FBG_CH1_00093377

Dated: _____, 2026

Respectfully submitted,

*/s/ DRAFT*
_____
Ian R. Phillips, Esq.
Texas Bar No. 24091239
Seth Van Aalten, Esq.
Justin R. Alberto, Esq.
**COLE SCHOTZ P.C.**
901 Main Street, Suite 4120
Dallas, TX 75202
Tel:    (469) 557-9390
Fax:    (469) 533-1587
iphillips@coleschotz.com
svanaalten@coleschotz.com
jalberto@coleschotz.com

*-and-*

Robert J. Stark
Jeffrey L. Jonas
Michael S. Winograd
Bennett S. Silverberg
Kenneth J. Aulet
Andrew M. Carty
Hayden A. Miller
Elizabeth C. Castano
**BROWN RUDNICK LLP**
Seven Times Square
New York, NY 10036
Tel:    (212) 209-4800
Fax:    (212) 209-4801
rstark@brownrudnick.com
jjonas@brownrudnick.com
mwinograd@brownrudnick.com
bsilveberg@brownrudnick.com
kaulet@brownrudnick.com
acarty@brownrudnick.com
hmiller@brownrudnick.com
ecastano@brownrudnick.com

Sharon I. Dwoskin
Tristan G. Axelrod
Matthew A. Sawyer
**BROWN RUDNICK LLP**
One Financial Center

50

FBG_CH1_00093378

Boston, MA 02111
Tel:    (617) 856-8200
Fax:   (617) 856-8201
sdwoskin@brownrudnick.com
taxelrod@brownrudnick.com
msawyer@brownrudnick.com

Steven A. Tyrell
**BROWN RUDNICK LLP**
1900 N Street NW, 4th Floor
Washington, D.C. 20036
Tel:    (202) 536-1700
Fax:   (202) 536-1701
sytrrell@brownrudnick.com

*Co-Counsel to the Official Committee of Unsecured Creditors*

51

FBG_CH1_00093379

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 2nd day of June, 2026, a true and correct copy of the foregoing has been served by electronic transmission to all registered CM/ECF users appearing in these cases.

*/s/ Ian R. Phillips*
Ian R. Phillips, Esq. (TX Bar No. 24091239)

FBG_CH1_00093380

**DEBTORS' EXHIBIT NO. 183**
**Page 90 of 90**