IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

-----------------------------------x

In re:

FIRST BRANDS GROUP, LLC, et al.,

Debtors,

Chapter 11 Case No. 25-90399 (CML)

(Jointly Administered)

-----------------------------------x

July 22, 2026

9:36 a.m.


        VIDEOTAPED DEPOSITION of MICHAEL B. MALLOY,

held at the law offices of Weil Gotshal & Manges,

LLP, 767 Fifth Avenue, New York, New York, before

Judith Thaten, a Certified Livenote Reporter and

Notary Public of the State of New York.

Page 1

A P P E A R A N C E S

ON BEHALF OF DEBTORS
            WEIL GOTSHAL & MANGES, LLP
            767 Fifth Avenue
            New York, New York 10153
            BY:   CHRISTINE CALABRESE, ESQ.
                  christine.calabrese@weil.com

ON BEHALF OF KATSUMI SERVICING
            MAYER BROWN LLP
            700 Louisiana Street, Suite 3400
            Houston, Texas 77002
            BY:   CHARLES S. KELLEY, ESQ.
                  ckelly@mayerbrown.com
                  GARY JOHNSON, ESQ.
                  gjohnson@mayerbrown.com
                  RICHARD STIEGLITZ, ESQ.
                  rstieglitz@mayerbrown.com
                  KYLE TUMSUDEN, ESQ. (via Zoom)
                  ktumsuden@mayerbrown.com
                  LAUREN BLANCHARD, ESQ. (via Zoom)
                  lblanchard@mayerbrown.com

ON BEHALF OF ING BELGIUM
            CLIFFORD CHANCE LLP
            Two Manhattan West
            New York, New York 10001
            BY:   JARED QUINN, ESQ. (via Zoom)
                  jared.quinn@cliffordchance.com

ON BEHALF OF LAM PARTIES
            WACHTELL LIPTON ROSEN & KATZ
            51 West 52nd Street
            New York, New York 10019
            BY:   ANGELA HERRING, ESQ.
                  akherring@wlrk.com
                  MICHAEL CASSEL, ESQ.
                  mhcassel@wlrk.com
                  THEODORE FURCHTGOTT, ESQ. (via
                  Zoom)
                  TRFurchtgott@wlrk.com

Veritext Legal Solutions
346-293-7000

A P P E A R A N C E S (cont'd)

ON BEHALF OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS
          BROWN RUDNICK
          Seven Times Square
          New York, New York 10036
          BY:   BRYAN GARCIA, ESQ. (via Zoom)
                BGarcia@brownrudnick.com
                MATT JANG, ESQ. (via Zoom)
                mjang@brownrudnick.com
                MICHAEL WINOGRAD, ESQ. (via Zoom)
                mwinograd@brownrudnick.com

ON BEHALF OF THE AD HOC GROUP OF CREDITORS AND
LENDERS
          GIBSON DUNN
          Seven Times Square
          New York, New York 10036
          BY:   ROBERT MARSTERS, ESQ.
                rmarsters@gibsondunn.com
                ANNELYSE GAINS, ESQ. (via Zoom)
                agains@gibsondunn.com
                JOSH LEOPOLD, ESQ. (via Zoom)
                jleopold@gibsondunn.com

ON BEHALF OF EVOLUTION
          ELSBERG BAKER & MARURI
          350 Fifth Avenue
          New York, New York 10018
          BY:   MICHAEL DUKE, ESQ.
                mduke@elsberglaw.com
                ANDREW PARKS, ESQ.
                aparks@elsberglaw.com
                VICTORIA KLEVAN, ESQ. (via Zoom)
                vklevan@elsberglaw.com

Page 3

A P P E A R A N C E S (cont'd)

ON BEHALF OF ONSET

    MILBANK LLP

    55 Hudson Yards

    New York, New York 10001

    BY:   ERIN DEXTER, ESQ.

        edexter@milbank.com

        HANNAH BLAZEK, ESQ.

        hblazek@milbank.com

        ELLIOT O'BRIEN, ESQ.

        eobrien@milbank.com

        ALLIE CHESKY, ESQ. (via Zoom)

        achesky@milbank.com

– and –

ON BEHALF OF ONSET

    MORRISON & FOERSTER LLP

    250 West 55th Street

    New York, New York 10019

    BY:  BRIAN MICHAEL, ESQ. (via Zoom)

        bmichael@mofo.com

        ILAYNA GUEVREKIAN, ESQ. (via Zoom)

        iguevrekian@mofo.com

        CAMERON LAKIN, ESQ. (via Zoom)

        clakin@mofo.com

        CHRISTINA PORTUALLO, Law Clerk (via Zoom)

        cportuallo@mofo.com

ON BEHALF OF CARNABY SECURED LENDERS

    DECHERT LLP

    1095 Avenue of the Americas

    New York, New York 10036

    BY:   GARY MENNITT, ESQ.

        gary.mennitt@dechert.com

        ERIC HILMO, ESQ. (via Zoom)

        eric.hilmo@dechert.com

ON BEHALF OF AEQUUM

    BLANK ROME LLP

    444 West Lake Street, Suite 1650

    Chicago, Illinois 60606

    BY:  MATT KASLOW, ESQ.  (via Zoom)

        matt.kaslow@blankrome.com

Veritext Legal Solutions
346-293-7000

A P P E A R A N C E S (cont'd)


ALSO PRESENT:


                MARCELO RIVERA, Legal Video Specialist
                Veritext Legal Solutions
                BENJAMIN WERTZ, M3 Partners (via Zoom)
                BRIAN GRIFFITH, M3 Partners (via Zoom)
                MARK WULFE, Bracewell (via Zoom)
                VIANEY GARZA, ESQ. (via Zoom)
                SPENCER LLOYD, ESQ. (via Zoom)
                EMILY MORGAN, ESQ. (via Zoom)
                MATTHEW SORENSEN, ESQ. (via Zoom)
                SAM HIMMELFARB (via Zoom)

Page 5

MALLOY

need to spend some additional time in the next couple of months, different activities.

Q    And you might remember that in your last deposition in February, you consistently told me, as you just did, that you went pencils down in January of 2026.

That is still true, right?

A    Yeah.

Q    What was your investigation team doing around the beginning of June 2026?

A    I can't specifically say.

Q    Were they doing anything around the beginning of June 2026?

MS. CALABRESE:  Object to the form.

A    I don't know.

Q    Was your investigation team, as you testified about in your February deposition, working on the First Brands case around the beginning of June 2026?

MS. CALABRESE:  Object to

Page 14

MALLOY

form.

A    I don't know if they were.

Q    You weren't involved doing an investigation of -- around June of 2026; is that right?

A    I was not.

Q    When was the last time you were involved doing an investigation in the First Brands case?  Month.

A    I would say investigation activities would have been January of 2026.

Q    All right.  And you're drawing a distinction between investigation activities and other activities that you did on the First Brands case, right?

A    From January of 2026, January 5th through today, I spent a limited amount of time.  Some of that time was the deposition we had, sometimes spent prepping for it.  So I had a few calls here and there.

But that was the extent of my

Page 15

MALLOY

involvement since then.

Q So post-deposition that you gave in this case, February 11th, 2026, what have you personally done on the First Brands cases since then?

MS. CALABRESE: Object to form.

MR. JOHNSON: What's the objection?

MS. CALABRESE: Vague. What has he personally done on the First Brands case since then?

MR. JOHNSON: That's a great question.

Q What have you done on the First Brands case since February 11th, 2026?

A I had a conversation with a few folks. I know Paul, who is the acting CFO, asked me to participate in a call with him regarding ERP systems. And I reviewed a draft, not the final version but a draft of Chuck's declaration.

Page 16

MALLOY

I know I had a few other calls in that period of time.  I am not recalling specifically what they were for, but they were just people checking with me on what my thoughts were.

Q    Calls with Weil or someone else?

A    Calls with A&M team members.

Q    Chuck Moore or someone else?

A    I remember having a conversation with -- I don't remember when, but it -- March or April with Chris Moffatt.  I don't remember at the moment what the topic was.

Q    After your deposition in February, ballpark, how many hours have you spent on the First Brands cases?

MS. CALABRESE:  If you know.

Q    Ballpark.

A    Repeat that question again.

Q    After your February deposition, ballpark, how many hours have you spent on the First Brands cases?

Page 17

MALLOY

A    Less than 40.

Q    In your prior deposition, you remember that you described for me your investigation team that worked with you on First Brands, right?

A    Correct.

Q    And below you kind of in the hierarchal was Kerri Palen; is that right?

A    That's right.

Q    Who was third in charge below Kerri Palen?

A    I would say there were two of our staff members, Ryan Scott and Evan Pakela.

(Clarification by the reporter.)

A    P-A-K-E-L-A.

Q    Since your deposition in February, what, generally speaking, was Kerri Palen and Ryan Scott's role in continuing to work on the First Brands cases?

MS. CALABRESE:   Object to

Page 18

MALLOY

form.

Q     Is that right?

MS. CALABRESE:

Mischaracterizes testimony.

A     I did not say that.

Q     After January 5th, 2026, when you testified that you went pencils down, did the investigation that your team was conducting continue in any respect?

A     It did.

Q     And in what respects?

A     So I mentioned earlier when we were going pencils down, we prepared a budget.  There were certain activities, and Chuck realized that we would have certain roles.  For instance, the DOJ would have questions. We would respond or help provide information.

We had the examiner asking questions and information.  So we needed to be responsive to them and their advisors.  And I believe Kerri

Page 22

MALLOY

was working with folks from Weil with some of the litigation-type support roles.

Those were the types of activities.   So it was more support, not active investigation, is how I would classify it.

Q    So after January 5th, 2026, your team's role in the First Brands case was more in the litigation support realm than in the active investigation realm; is that right?

MS. CALABRESE:   Object to form.

A    I would just add to that that I know in preparing some of the information in Chuck's declaration, there was some additional work done to put -- you know, kind of pull numbers and information together, some of which are in tables and in the declaration, so...

Q    When was that done?

A    In the last month.

Page 23

MALLOY

A    There were a lot of groups, A&M groups, working on First Brands.

Q    But the group within A&M that was working on the special committee investigation was your investigation team, correct?

MS. CALABRESE:   Object to form.

A    We were the ones reporting to the special committee.

Q    How often did you report to the special committee?

A    From that October 14th date through, say, January 5th or towards the end of December, some weeks it was biweekly, and then there were points that it was weekly.

There were a lot of things going on, hearings and stuff, that would change schedules.   But we tried to keep to a certain regimen.

Q    So as it relates to what your team did, the special committee's investigation ran from October 14th,

Page 39

MALLOY

2025, to January 5th, 2026; is that right?

MS. CALABRESE:  Object to form.

A      With limited activities post-January 5th, 2026, not all of which I was a part of.

Q      The active investigation that the special committee did through your team occurred between October 14th, 2025, and January 5th, 2026; is that right?

MS. CALABRESE:  Object to form.

A      There could have been -- I have no idea if other meetings were the special committee have happened.  I have not met with the special committee since, say, that January 5th.

Not that I met with them on January 5th, but I have not had discussions with the special committee members since that date.

Q      As the special committee

Page 40

MALLOY

investigation refers to your team, you yourself have not done anything actively investigating the First Brands cases post-January 5th, right?

A    I myself --

MS. CALABRESE:   Object to form.

(Clarification by the reporter.)

A    I myself have not.

Q    And, to your knowledge, the other things that your team members did after January 5th were all, generally speaking, litigation support-type activities, right?

MS. CALABRESE:   Object to form.

A    To the best of my knowledge, I would say most of them were.

Q    Going back to the biweekly or weekly meetings that you had with the special committee, were there slide decks or presentations prepared for the special committee?

Page 41

MALLOY

did your team create any sort of slide decks or presentations to be presented to the special committee?

A       We did create a brief slide deck to the special committee, I recall, for one meeting.

Q       When was that?

A       I don't recall.

Q       Was it toward the December, January time frame or earlier?

A       It would have been in November, early December.

Q       Generally speaking, what findings did you report to the special committee in that slide deck?

A       Similar findings that you see in the summary of findings document.

Q       The summary of findings of document that you referred to earlier was produced in April --

A       Yes.

Q       -- of 2026, correct?

A       Correct.

Q       And so the bulk of the

Page 43

MALLOY

a budget of activities that we felt we would need to be involved with post that date.  And, you know, we obviously looked to, you know, assess a minimum role, but what was going to be needed. And we did have certain activities, as I went through earlier.

Q    On January 5th, 2026, the investigation that you were conducting was not complete, correct?

A    It was incomplete at that point.

Q    On the budget that you identified, tell me what the line items were, the categories of work were on that budget?

A    I may not remember all of them, but we knew at that point, we were going to need to spend some time responding to questions and requests for information by the DOJ that was working together with a team from Weil.

We knew that there would be requests coming from the examiner, and

Page 57

MALLOY

their -- they had a financial advisor, and they -- technology person.  We got a lot of requests from them, so we knew we would have some of that.  So we budgeted some time.

And we knew that we were going to be asked to help assist with some of the litigation ▇▇▇▇▇▇ ▇▇ roles.  To the best of my knowledge, the budget we prepared encompassed those things.

There may be one or two other things, but I can't recall ▇▇▇ they would have been.

Q    What was the approximate total of that budget that you proposed, in dollars?

A    My recollection is that it was somewhere approximately around $200,000.

Q    So for approximately $200,000, what your team was proposing in a budget for work after January 5th was answering questions from DOJ,

Page 58

MALLOY

working with Weil, answering questioning from the examiner and litigation support-type roles.

Do I have that right?

MS. CALABRESE:  Object to form.

A     To the best of my knowledge, those were the more significant budget items.

Q     There was nothing contemplated in terms of traveling to interview fact witnesses, right?

A     Correct.

Q     There was no large document review contemplated by your team to be undertaken after January 5th, right?

A     Correct.

Q     After January 5th, 2026, other than responding to questions that came in from the examiner, Weil, DOJ, did Charles Moore task you with investigating anything else?

MS. CALABRESE:  Object to form.

Page 59

MALLOY

A    Chuck did not task me in doing any additional investigation work.

Q    Did Mr. Moore task your team with doing additional investigative work after January 5th, 2026?

A    I am not aware of it, but I don't know for certain.

Q    Did you continue to lead the investigation team after January 5th?

A    I was available for questions.  But, no, I was not leading it after January 5th.

Q    Who led the investigation team after January 5th?

A    Kerri Palen, who assisted me.  Very competent individual.  She had more of that leadership role.

Q    And the main tasks that Ms. Palen was working on were related to litigation support-type activities; is that right?

MS. CALABRESE:  To the extent you know.

Page 60

MALLOY

A     I think I stated earlier, the litigation support roles, I know she assisted with certain items around Chuck's declaration.  There was a Patrick James amended complaint, an Onset complaint, if I am correct in my frame of mind time-wise.  And the other things where I would put in my litigation support-type bucket.

Q     After January 5th, 2026, your team was not conducting new fact investigation, correct?

MS. CALABRESE:  Object to form.

A     Not that I'm aware of.

MR. JOHNSON:  Take a break.

VIDEOGRAPHER:  Stand by.

The time is 10:41 a.m.  We are off the record.

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER:  The time is 10:59 a.m.  We are back on the record.

Page 61

MALLOY

declaration, I think, has certain information that shows the cash-tracing activities for the factors.

Q   For the information that went into Mr. Moore's declaration, who from the A&M investigation team led that effort?

A   Kerri Palen led that effort.

Q   Who worked with Ms. Palen on that effort?

A   Evan Pakela.

Q   A few minutes ago you said that one of your team's work streams, pre-January 5th, was business intelligence reports on six individuals, right?

A   Correct.

Q   Who were the six individuals?

A   Patrick James, Ed James, Andy Brumbergs, Steve Graham, Scott Wallace, and Shekhar Kumar.

Q   Michael Baker was not included?

A   We did not, ultimately, do a

Page 73

MALLOY

gather them?

A    We did those reports to understand relationships in businesses. You know, it's what I would put in the insider-type analysis, insider individual analysis.

So the reports, you know, look at the individual's backgrounds and previous filings or court cases and assets, whole host of other areas.

Q    Are there written reports created by that individual or his team for these six individuals?

A    Each individual has a separate report.

Q    At your prior deposition, we spent a lot of time talking about the information that your team collected.

Do you generally remember that?

A    Generally, I remember that.

Q    And that included, broadly speaking, interviewing people at First Brands, right?

Page 75

MALLOY

A    Correct.

Q    And it included traveling outside of the United States to interview people, including in Romania?

A    That was the only outside of the United States location.

Q    And that --

A    That we traveled to.

Q    You met with or interviewed other people via Zoom or remotely?

A    Correct.

Q    And your team also collected a lot of documents as part of that investigation, right?

A    Correct.

Q    Your team never interviewed Patrick James, correct?

A    Our team never conducted an interview of Patrick.  I said earlier I'm aware that Andy had conversations with Patrick.  I wouldn't call them an interview.

Q    Andy Brumbergs had conversations with Patrick?

Page 76

MALLOY

A    Our team, we had access to the files.    So what we were getting access to, the servers, databases, the Microsoft 365, Teams, Outlook, we were able to access those information.

Devices that were imaged and not ultimately put into production, correct, we would not have looked at those.  But we had other mechanisms to look at documents if we needed to.

Q    What other mechanisms did you use to review the documents that were put into the KLD Relativity platform?

A    So we had access into the servers that had the Microsoft Office365, and each individual had their own Outlook email folder in that, like overall folder; a Teams folder, a SharePoint folder, and an OneDrive folder.  And we were able to get access in to those if we needed it.

Q    What volume of documents did your team review preceding January 5th?

A    What volume?  I don't know.

Page 84

MALLOY

Q    Your team at A&M did not do a linear review or chronological review of all the documents available in the Relativity database, correct?

MS. CALABRESE:   Object to form.

A    So we were not the first line in reviewing documents.   That was coordinated through counsel.   We had access in to the Relativity, and we would do strategic searches for certain things.

Q    So the answer to my question is that your team did not review all of the documents in the Relativity database, correct?

A    Correct.

Q    And what you testified previously is that you, for example, would do searches in that database, right?

A    I did a few.

MS. CALABRESE:   Object to form.

Page 85

MALLOY

Q    When was that prepared?

A    We started preparing that in December, just prior to Christmas. Ultimately, that's what we reviewed with the examiner on January 5th, if I have that date correct.

Q    And you testified previously that that PowerPoint deck had some similarities to a similar PowerPoint deck that you presented to DOJ, right?

A    Correct.  We did do a presentation to the DOJ.  And Chuck -- the information, different points in time.  So we -- obviously, whatever was known or we saw at that point in time was presented.

The DOJ meeting was beginning of December, I'm going to say December 7th.  But I may have the date wrong, but it was in that area.

Q    Other than the DOJ presentation, the examiner presentation, and the April 2026 summary of findings, are there any

Page 91

MALLOY

other written reports that your team prepared?

MS. CALABRESE:   Object to form to the extent you know.

A       I am not aware of any other reports that they prepared.   I do know that they did assist with certain of the other filings, like Chuck's declaration.   But that wasn't a report that they prepared.   They just reviewed and contributed.

Q     Since you are not aware, who would be the right person to ask the question to -- of whether your team prepared any other written reports?

MS. CALABRESE:   Object to form.

A     Kerri Palen.

Q     Aside from the April 2026 summary findings, was your team's investigative findings provided to Charles Moore in any other written form?

A     I am not aware.   I don't

Page 92

MALLOY

know.

Q    Before February 12th, did you provide any written findings to Charles Moore relating to your investigation?

A    Not that I'm aware of.

Q    So anything that Charles Moore knew about your investigation pre-February 12th would have been as a result of oral conversations; is that right?

MS. CALABRESE:  Objection. Object to form.

A    Oral conversations or reviewing -- I may not be using the right words -- complaints, declarations, you know, things of that nature that occurred.

Q    What complaints or declarations did your team prepare for Charles Moore?

A    We did not prepare any.

Q    So what written documents did your team provide to Charles Moore

Page 93

MALLOY

pre-February 12th?

A        He would have seen the examiner report.   And I don't believe he ever saw the DOJ report.

Q       Anything else that your team provided to Charles Moore pre-February 12th in writing regarding your team's findings?

A       To the best of my knowledge, it was oral.

Q       If you provided examiner report to Charles Moore?

A       I believe the report was disseminated through Weil.

Q       The April 2026 summary of findings that we've been talking about, did you have a role in preparing that document?

A       No.

Q       Who prepared it?

A       Kerri, my staff that assisted Ryan Scott who I mentioned earlier, and Evan Pakela.

Q       Other than Kerri Palen,

Page 94

MALLOY

was the primary author of the summary of findings report, right?

A    I do not.

Q    Do you know if the summary of findings report was presented to the special committee of First Brands?

A    I do not know.

Q    Did Kerri Palen work with the special committee after February 12th, 2026?

A    I do not know.

Q    Did anyone on your team report to the special committee after February of 2026?

A    I do not know.

Q    You did not, though, right?

A    I did not.

Q    Has your team made any reports or presentations on your team's investigation to any of the DIP lenders in the First Brands bankruptcy?

MS. CALABRESE:   Object to form.

A    Please repeat the question

Page 101

MALLOY

bidders?

A    I have no knowledge.

Q    You had no involvement in the marketing of estate claims to potential bidders at all, correct?

A    Correct.

Q    Have you been told anything -- this is a yes or no -- also about the marketing of estate claims to potential bidders?

A    No.

Q    Did you have any involvement in what claims were to be included within the estate claims?

A    No.

Q    To your knowledge, did your team have any involvement in what claims were to be included within the estate claims?

A    I have no knowledge of that.

Q    Did your team have any involvement in the valuation of estate claims?

A    Not that I know of.

Page 139

MALLOY

Q       Did your team have any involvement in analyzing the viability, the likelihood of success, of any of the estate claims?

A       Not to my knowledge.

Q       At your deposition in February, you testified that your team had not performed a forensic audit?

Do you remember that?

A       I recall that question.

Q       Since your February deposition, has your team at A&M performed a forensic audit?

A       We have not.  When I reviewed my deposition, I saw that and I started thinking about that.  I don't think there is a true "forensic audit" definition.  If you googled it, you get a definition, but the SEC doesn't have a definition of it.

The AICPA only has one standard around "forensic services," and it's not "audit," forensic "audit." So I am not aware of a technical

Page 140

MALLOY

investigation team done any analysis of what factoring proceeds were misappropriated or stolen by First Brands insiders, including, for example, Patrick James and Ed James?

MS. CALABRESE:  Object to form.

A    So there was an insider analysis done with Patrick and Ed.  And in the Patrick bucket there were other companies that he owned.  There was amounts paid to a son-in-law who had a medical practice at the offices that Chuck went out and got an independent quote on that was like, they're paying twice what a market rate would be.

So there was an analysis done by the cash-tracing group of our team around insiders.  And so that was Patrick James and affiliated-type individuals, entities.  And then Ed. It was another one that they did too.

Q    Is there an insider analysis for each one of the First Brands'

Page 217

MALLOY

insiders?

A    Meaning the C-suite?

Q    Yes.

A    What do you mean the "insiders"?

Q    You testified that there was insider analysis done.

A    For Patrick James and Ed James.

Q    For anyone else?

A    We looked at other people. We looked at Andy Brumbergs.  We looked at Stephen Graham.  We did not see, you know, insider transactions that we were aware of related to them, that I recall.

Q    For the insider analysis specific to Patrick James, is that reflected in a spreadsheet?

A    There is a spreadsheet.  It was done under privilege.

Q    How would you describe the document such that someone could find it?

Page 218