**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | |

**FBG DEBTORS' MEMORANDUM OF LAW IN
SUPPORT OF (I) FINAL APPROVAL OF THE DISCLOSURE
STATEMENT AND (II) CONFIRMATION OF JOINT CHAPTER 11 PLAN**

**WEIL, GOTSHAL & MANGES LLP**
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
Andriana Georgallas (admitted *pro hac vice*)
Kevin Bostel (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors and Debtors in Possession*

July 27, 2026
Houston, Texas

---

[1]   A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Claims and Noticing Agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

    I.     Chapter 11 Cases..............................................................................................2

    II.    Declarations in Support of Confirmation..........................................................3

    III.   Plan Summary and Estate Claims Marketing Process ......................................4

    IV.   Plan Solicitation...............................................................................................6

    V.    Plan Supplement ..............................................................................................8

    VI.   Tabulation .......................................................................................................9

ARGUMENT.......................................................................................................................10

    I.     Disclosure Statement Should be Approved on a Final Basis...............................10

         A.    Parties in Interest Received Sufficient Notice of Combined
              Hearing and Combined Objection Deadline .............................................10

         B.    Disclosure Statement Contains Adequate Information and
              Should be Approved .................................................................................12

         C.    Solicitation of Votes Complied with Bankruptcy Code,
              Bankruptcy Rules, and Disclosure Statement Order.................................16

    II.    Settlement, Release, Exculpation, and Injunction Provisions Are
         Appropriate and Should Be Approved................................................................17

         A.    Settlements Are Reasonable and Satisfy Bankruptcy Rule 9019 ..............17

         B.    The Plan Settlement Satisfies Bankruptcy Rule 9019 ..............................20

         C.    Plan Releases Are Appropriate and Should Be Approved........................23

         D.    Exculpation Provision Is Appropriate, Consistent with Fifth
              Circuit Precedent, and Should Be Approved ...........................................32

          E.    Injunction Provisions Are Appropriate and Should Be
              Approved.................................................................................................36

    III.   Plan Satisfies Bankruptcy Code's Requirements and Should Be
         Confirmed ........................................................................................................38

         A.    Section 1129(a)(1) of the Bankruptcy Code: Plan Complies
              with Applicable Provisions of Bankruptcy Code......................................38

          B.    Section 1129(a)(2):  FBG Debtors Have Complied with
              Bankruptcy Code .....................................................................................45

          C.    Section 1129(a)(3):  Plan Has Been Proposed in Good Faith
              and Not by Any Means Forbidden by Law................................................49

D.      Section 1129(a)(4):  Plan Provides that Professional Fees and Expenses are Subject to Court Approval .......................................................52

E.      Section 1129(a)(5):  FBG Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders ....................................................................................................................53

F.      Section 1129(a)(6):  Plan Does Not Contain Any Rate Changes ..............54

G.      Section 1129(a)(7):  Plan Satisfies Best Interests Test .............................54

H.      Section 1129(a)(8):  Plan Has Been Accepted by Impaired Voting Class .............................................................................................................57

I.      Section 1129(a)(9):  Plan Provides for Payment in Full of All Allowed Priority Claims ............................................................................................59

J.      Section 1129(a)(10):  At Least One Class of Impaired Claims Has Accepted Plan at Every FBG Debtor.................................................60

K.      Section 1129(a)(11):  Plan is Feasible .......................................................60

L.      Section 1129(a)(12):  All Statutory Fees Have Been or Will be Paid ...............................................................................................................62

M.      Section 1129(a)(13): FBG Debtors Have Complied with Section 1114.................................................................................................................62

N.      Sections 1129(a)(14)–(16) and 1129(e):  Inapplicable Provisions................................................................................................................64

O.      Plan Satisfies "Cram Down" Requirements under Bankruptcy Code Section 1129(b) for Non-Accepting Classes ...................................65

P.      Section 1129(c):  Plan is Only Plan on File...............................................67

Q.      Section 1129(d):  Principal Purpose of Plan is Not Avoidance of Taxes.................................................................................................................67

RESERVATION OF RIGHTS .................................................................................................67

CONCLUSION..........................................................................................................................67

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 47th and Belleview Partners*,
  95 B.R. 117 (Bankr. W.D. Mo. 1988)........................................................................60

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007), *appeal dismissed*, 371 B.R. 660
  (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008) ..............................................57

*In re Alpha Natural Res., Inc.*,
  552 B.R. 314 (Bankr. E.D. Va. 2016).......................................................................62

*Applewood Chair Co. v. Three Rivers Plan. & Dev. Dist. (In re Applewood Chair
  Co.)*,
  203 F.3d 914 (5th Cir. 2000) ...................................................................................30

*In re Applied Safety, Inc.*,
  200 B.R. 576 (Bankr. E.D. Pa. 1996) .......................................................................61

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006).....................................................................................65

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)..................................................................................................54

*Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber
  Co.)*,
  584 F.3d 229 (5th Cir. 2009) ...................................................................................33

*Baron v. Sherman (In re Ondova Ltd. Co.)*,
  914 F.3d 990 (5th Cir. 2019) ...................................................................................34

*Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*,
  783 F.3d 266 (5th Cir. 2015) ...................................................................................13

*In re Bella Logistics LLC*,
  583 B.R. 674 (Bankr. W.D. Tex. 2018).....................................................................56

*In re Bigler LP*,
  442 B.R. 537 (Bankr. S.D. Tex. 2010) ......................................................18, 25, 29

*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
  764 F.2d 406 (5th Cir. 1985) ...................................................................................49

*In re Chapel Gate Apartments, Ltd.*,
   64 B.R. 569 (Bankr. N.D. Tex. 1986)................................................................52

*Comput. Task Grp., Inc. v. Brotby (In re Brotby)*,
   303 B.R. 177 (B.A.P. 9th Cir. 2003).................................................................61

*In re Couture Hotel Corp.*,
   536 B.R. 712 (Bankr. N.D. Tex. 2015)..............................................................49

*In re Cypresswood Land Partners, I*,
   409 B.R. 396 (Bankr. S.D. Tex. 2009) ..............................................................38

*In re Derosa-Grund*,
   567 B.R. 773 (Bankr. S.D. Tex. 2017) ..........................................................25, 26

*Dodson v. Huff (In re Smyth)*,
   207 F.3d 758 (5th Cir. 2000) ...........................................................................34

*In re Drexel Burnham Lambert Grp.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992)...............................................................66

*In re Eagle Bus Mfg., Inc.*,
   134 B.R. 584 (Bankr. S.D. Tex. 1991), *aff'd*, 158 B.R. 421 (S.D. Tex. 1993) ........................39

*Epstein v. Container Store Grp., Inc. (In re Container Store Grp., Inc.)*,
   676 B.R. 356 (S.D. Tex. 2026) .........................................................................36

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans
   Ltd. P'ship)*,
   116 F.3d 790 (5th Cir. 1997) ...........................................................................61

*FOM P.R. S.E. v. Dr. Barnes Eyecenter Inc.*,
   255 F. App'x 909 (5th Cir. 2007) .....................................................................30

*In re Gen. Homes Corp.*,
   134 B.R. 853 (Bankr. S.D. Tex. 1991) ..............................................................25

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe
   Enters., Ltd., II)*,
   994 F.2d 1160 (5th Cir. 1993) .........................................................................38

*In re Heritage Org., L.L.C.*,
   375 B.R. 230 (Bankr. N.D. Tex. 2007)...........................................................25, 39

*Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt, L.P. (In re
   Highland Cap. Mgmt., L.P.)*,
   132 F.4th 353 (5th Cir. 2025), *cert. denied sub nom. Highland Cap. Mgmt. v.
   Nexpoint Advisors*, No. 25-119, 2026 WL 1855094 (U.S. June 29, 2026)............................37

*Hilal v. Williams (In re Hilal)*,
    534 F.3d 498 (5th Cir. 2008) ..................................................................................34

*Hinojosa Eng'g, Inc. v. Lopez (In re Treyson Dev., Inc.)*,
    No. 14-70256 (EVR), 2016 WL 1604347 (Bankr. S.D. Tex. Apr. 19, 2016) ........................30

*In re Idearc Inc.*,
    423 B.R. 138 (Bankr. N.D. Tex. 2009), *subsequently aff'd*, 662 F.3d 315 (5th
    Cir. 2011) ................................................................................................19, 39

*In re Ionosphere Clubs, Inc.*,
    134 B.R. 515 (Bankr. S.D.N.Y. 1991)..........................................................................63

*In re J T Thorpe Co.*,
    308 B.R. 782 (Bankr. S.D. Tex. 2003) ....................................................................38, 45

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
    *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ........................65

*In re Keisler*,
    No. 08-34321 (RS), 2009 WL 1851413 (Bankr. E.D. Tenn. June 29, 2009) ........................13

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
    150 F.3d 503 (5th Cir. 1998) ..............................................................................45, 52

*In re MCorp Fin., Inc.*,
    160 B.R. 941 (S.D. Tex. 1993) ................................................................................57

*In re Mirant Corp.*,
    348 B.R. 725 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3
    Claimholders v. New Mirant Entities*, No. 06-CV-744 (JHM), 2006 WL
    3780884 (N.D. Tex. Dec. 26, 2006) ..........................................................................25

*In re Moody Nat'l SHS Hous. H, LLC*,
    No. 10-30172 (MI), 2010 WL 5116872 (Bankr. S.D. Tex. June 30, 2010) ......................29, 46

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap.
    Mgmt., L.P.)*,
    48 F.4th 419 (5th Cir. 2022), *pet. for cert. denied*, No. 22-631 (U.S. July 2,
    2024) ..............................................................................................33, 34, 37

*Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun
    Elec. Power Coop., Inc.)*,
    119 F.3d 349 (5th Cir. 1997) ..............................................................................14, 18

*Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin., Inc.)*,
    801 F.3d 530 (5th Cir. 2015) ................................................................................18

3

*Otto v. Tex. Tamale Co. (In re Tex. Tamale Co.)*,
219 B.R. 732 (Bankr. S.D. Tex. 1998) ................................................................11

*Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners)*,
521 B.R. 134 (Bankr. N.D. Tex. 2014)................................................................13

*In re Peach State Ambulance, Inc.*,
No. 16-12121 (WHD), 2017 WL 2222236 (Bankr. N.D. Ga. May 19, 2017).........................56

*In re Pero Bros. Farms, Inc.*,
90 B.R. 562 (Bankr. S.D. Fla. 1988)................................................................60

*Phx. Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*,
995 F.2d 1274 (5th Cir. 1991) ................................................................39

*In re Pisces Energy, LLC*,
No. 09-36591 (KKB), 2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009)...................39, 57

*Republic Supply Co. v. Shoaf*,
815 F.2d 1046 (5th Cir. 1987) ................................................................29, 30

*Rivercity v. Herpel (In re Jackson Brewing Co.)*,
624 F.2d 599 (5th Cir. 1980) ................................................................25

*Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.-Irving)*,
939 F.2d 289 (5th Cir. 1991) ................................................................49, 54

*In re Roqumore*,
393 B.R. 474 (Bankr. S.D. Tex. 2008) ................................................................19, 26

*In re Sabine Oil & Gas Corp.*,
555 B.R. 180 (Bankr. S.D.N.Y. 2016)................................................................38

*In re SAI Holdings Ltd.*,
No. 06-33227 (MAW), 2007 Bankr. LEXIS 1051 (Bankr. N.D. Ohio
March 26, 2007)................................................................62

*In re Sandridge Energy, Inc.*,
No. 16-32488 (DRJ), 2016 Bankr. LEXIS 4622 (Bankr. S.D. Tex. Sept. 20, 2016) ................................................................31

*In re Sentry Op. Co. of Tex.*,
264 B.R. 850 (Bankr. S.D. Tex. 2001) ................................................................39

*Sequa Corp. v. Christopher (In re Christopher)*,
28 F.3d 512 (5th Cir. 1994) ................................................................11

*In re Simbaki, Ltd*,
No. 13-36878 (MI), 2015 WL 1593888 (Bankr. S.D. Tex. Apr. 3, 2015)..............................56

*In re Star Ambulance Serv. LLC*,
540 B.R. 251 (Bankr. N.D. Tex. 2015)...................................................................................45

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
844 F.2d 1142 (5th Cir. 1988) ...................................................................................13, 14, 54

*The Cadle Co. v. Mims (In re Moore)*,
608 F.3d 253 (5th Cir. 2010) ..................................................................................................26

*W. Real Estate Equities, L.L.C. v. Village at Camp Bowie I, L.P. (In re Vill. at Camp Bowie I, L.P.)*,
710 F.3d 239 (5th Cir. 2013) ..................................................................................................49

*Walters v. Hunt (In re Hunt)*,
146 B.R. 178 (Bankr. N.D. Tex. 1992).....................................................................................11

*Williams v. Placid Oil Co. (In re Placid Oil Co.)*,
753 F.3d 151 (5th Cir. 2014) ..................................................................................................11

*In re Wool Growers Cent. Storage Co.*,
371 B.R. 768 (Bankr. N.D. Tex. 2007).....................................................................................29

*In re Wyly*,
No. 14-35043 (BJH), 2019 Bankr. LEXIS 1912 (Bankr. N.D. Tex. June 22, 2019) ......................................................................................................................................31

**Statutes**

11 U.S.C. § 109(a) ............................................................................................................................46

11 U.S.C. § 109(d) ............................................................................................................................46

11 U.S.C. § 348(d) ............................................................................................................................56

11 U.S.C. § 507.................................................................................................................................62

11 U.S.C. § 507(a) ......................................................................................................................41, 56

11 U.S.C. § 510(c) ............................................................................................................................41

11 U.S.C. § 511.................................................................................................................................59

11 U.S.C. § 524(e) ............................................................................................................................36

11 U.S.C. § 553.................................................................................................................................41

11 U.S.C. § 1103(c) ........................................................................................................33, 36

11 U.S.C. § 1107(a) ........................................................................................................35, 36

11 U.S.C. § 1114.........................................................................................................62, 63, 64

11 U.S.C. § 1122.............................................................................................................38, 45

11 U.S.C. § 1122(a) ........................................................................................................38, 39

11 U.S.C. § 1123.............................................................................................................38, 45

11 U.S.C. § 1123(a) ........................................................................................................42, 43

11 U.S.C. § 1123(b) ..........................................................................................25, 29, 44, 45

11 U.S.C. § 1125............................................................................................................ passim

11 U.S.C. § 1125(a) ........................................................................................................13, 15

11 U.S.C. § 1125(b) ........................................................................................................12, 46

11 U.S.C. § 1125(d) .............................................................................................................13

11 U.S.C. § 1125(e) ........................................................................................................16, 17

11 U.S.C. § 1126.......................................................................................................12, 45, 47

11 U.S.C. § 1126(c) ........................................................................................................48, 57, 58

11 U.S.C. § 1126(d) .............................................................................................................48

11 U.S.C. § 1126(f)..............................................................................................................47

11 U.S.C. § 1126(g) ........................................................................................................47, 58

11 U.S.C. § 1127.............................................................................................................46, 47

11 U.S.C. § 1129............................................................................................................ passim

11 U.S.C. § 1129(a) ........................................................................................................ passim

11 U.S.C. § 1129(b) ..........................................................................................49, 58, 65, 66

11 U.S.C. § 1129(c) .............................................................................................................67

11 U.S.C. § 1129(d) .............................................................................................................67

**Other Authorities**

Fed. R. Bankr. P. 2002 .................................................................................................10

Fed. R. Bankr. P. 3017(a) ....................................................................................10, 12, 16

Fed. R. Bankr. P. 3017(d) ...........................................................................................16

Fed. R. Bankr. P. 3018(c) ........................................................................................12, 16

Fed. R. Bankr. P. 3019 .................................................................................................47

Fed. R. Bankr. P. 3020(b)(1).........................................................................................10

Fed. R. Bankr. P. 9006(c)(1) .........................................................................................11

Fed. R. Bankr. P. 9006(c)(2)..........................................................................................11

Fed. R. Bankr. P. 9009 .................................................................................................16

Fed. R. Bankr. P. 9019 ....................................................................................17, 18, 20

H.R. Rep. No. 95-595 (1977)........................................................................................38

S. Rep. No. 95-989 (1978) ...........................................................................................38

First Brands Group, LLC ("**FBG**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully submit this memorandum of law in support of (i) final approval of the Disclosure Statement,[2] and (ii) confirmation of the Plan,[3] and respectfully represent as follows:[4]

## INTRODUCTION

1. Approximately 10 months since the commencement of these immensely complex chapter 11 cases, the FBG Debtors are seeking confirmation of a chapter 11 plan to wind down their Estates with support of the Creditors' Committee and their key financial stakeholders, including the Ad Hoc Group of prepetition and postpetition secured lenders and the ABL Lenders.  Confirmation and consummation of the Plan are in the best interests of the FBG Debtors' stakeholders and far better than the only alternative—a chapter 7 liquidation.

2. The FBG Debtors file this brief in support of final approval of the Disclosure Statement and confirmation of the Plan, in particular to address the various confirmation requirements under section 1129 of the Bankruptcy Code.  The FBG Debtors have filed contemporaneously herewith the *FBG Debtors' Omnibus Reply to Objections to (I) Final Approval of the Disclosure Statement and (II) Confirmation of Joint Chapter 11 Plan* (the "**Reply Brief**")[5] addressing the specific objections to the Plan.  As set forth herein and in the Reply Brief, the Plan satisfies all requirements of section 1129 of the Bankruptcy Code.  The Court, therefore,

---

[2]   The FBG Debtors' *Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (Docket No. 3020), dated June 17, 2026 (as amended, supplemented, or otherwise modified from time to time, the "**Disclosure Statement**").

[3]   The FBG Debtors' *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (Docket No. 3019), dated June 16, 2026 (as amended, supplemented, or otherwise modified from time to time, the "**Plan**").

[4]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or Disclosure Statement, as applicable.

[5]   The FBG Debtors reserve the right to amend, modify, or supplement the arguments in this memorandum and the right to raise additional arguments not raised in this memorandum in the Reply Brief.

should overrule any remaining objections to the Plan, confirm the Plan, and approve the Disclosure Statement on a final basis.

## BACKGROUND

### I.     Chapter 11 Cases

3.     In September 2025, First Brands Group, LLC and its affiliated Debtors each commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee has been appointed in these chapter 11 cases.

4.     On October 9, 2025, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**") (Docket No. 313).

5.     On December 16, 2025, Martin De Luca (the "**Examiner**") was appointed as the examiner in these chapter 11 cases pursuant to the Court's *Order Directing Appointment of an Examiner* (Docket No. 726).

6.     On April 9, 2026, the chapter 11 cases of Patterson Inventory, LLC, Patterson Inventory Holdings, LLC, Starlight Inventory I, LLC, and Starlight Inventory Holdings I, LLC (collectively, the "**Evolution SPV Debtors**") were converted to cases under chapter 7 of the Bankruptcy Code pursuant to the Court's *Order (I) Converting Chapter 11 Cases of Evolution SPV Debtors to Cases Under Chapter 7; and (II) Granting Related Relief* (Docket No. 2396).  The U.S. Trustee has since appointed Ronald Sommers to act as chapter 7 trustee on behalf of the Evolution SPV Debtors' chapter 7 estates.  *See Affidavit of Ronald J. Sommers* (Docket Nos. 2503–06).

7.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

8.     The pertinent facts relating to the commencement of these chapter 11 cases and the key events during the cases are set forth more fully in the Disclosure Statement.

## II.     Declarations in Support of Confirmation

9.     In support of Confirmation, the Debtors respectfully refer the Court to the following declarations and affidavits (collectively, the "**Confirmation Declarations**"):

- *Declaration of Charles M. Moore in Support of Confirmation of FBG Debtors' Chapter 11 Plan* (Docket No. 3188) (the "**Moore Declaration**"), filed on July 14, 2026, which addresses the satisfaction of the elements under section 1129 of the Bankruptcy Code;

- *Declaration of Marc S. Kirschner* (Docket No. 3190) (the "**Kirschner Declaration**"), filed on July 14, 2026, which provides comprehensive analyses with respect to the Estate Claims that will be transferred to the Litigation Trust in accordance with the terms of the Plan;

- *Declaration of Alex Orchowski of Kroll Restructuring Administration LLC Regarding the (I) Solicitation of Votes and Tabulation of Ballots Cast on the Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors and (II) Solicitation and Collection of Third-Party Release Opt-In Elections Made Through Ballots, Third Party-Release Opt-In Forms, and Preference Settlement Opt-In Forms* (Docket No. 3351) (the "**Solicitation Declaration**"), filed on July 24, 2026; and

- *Affidavit of Service of Solicitation Materials* (Docket No. 3347), and the *Affidavit of Supplemental Service of Solicitation Materials* (Docket No. 3346), each filed on July 23, 2026 (collectively, the "**Solicitation Certificates**").

10.     The Confirmation Declarations and any testimony and other declarations that may be adduced or submitted at, or in connection with, the Combined Hearing are herein incorporated in full.

3

### III.     Plan Summary and Estate Claims Marketing Process

11.     The Plan maximizes the value for all stakeholders and provides the best—if not only—opportunity for junior creditors, including administrative, priority, and general unsecured creditors, to receive any recovery on account of their claims.  The Plan contemplates an orderly wind down of the FBG Debtors' estates and the distribution of value through three liquidating trusts—the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust—to holders of Allowed Claims in accordance with the waterfalls set forth in the Plan.  As further described in the Disclosure Statement, the nature of the assets to be transferred to the Trusts under the Plan and the beneficiaries of such Trusts corresponds to the rights of the Debtors' creditors in such assets in accordance with DIP Documents and other agreements.  Importantly, any disputed asset will not be transferred to any of the Trusts until the dispute is resolved either consensually or by the Bankruptcy Court.

12.     The Plan also incorporates a Plan Settlement, which includes the Preference Settlement and Administrative Expense Claims Consent Program.  Every aspect of the Plan Settlement was extensively negotiated among the Debtors, the Ad Hoc Group, and the Creditors' Committee, including during mediation overseen by the Honorable Marvin Isgur.  Together with the Trusts, these are the pillars of the Plan through which the FBG Debtors intend to monetize their remaining assets and make distributions to creditors.  Further details with respect to the Plan are discussed at length in the Disclosure Statement.

13.     Importantly, since conditional approval of the Disclosure Statement, the Debtors have concluded their marketing and sale process for the Estate Claims to solicit potential higher or better bids for such claims.  The Estate Claims Marketing Process was launched on May 4, 2026, and included direct outreach to twenty-six (26) potential financial and strategic partners that may be interested in acquiring (and have the means and experience to acquire) the Estate

Claims.  In addition, the Estate Claims Marketing Process has been public and is widely known due to the extensive coverage of these chapter 11 cases in the press.

14.     As described in the Moore Declaration, the marketing materials provided to each potential bidder included (i) a summary of the Estate Claims to be sold, including the claims asserted in the pending adversary proceedings against Patrick James and related parties and against Onset Financial Inc. ("**Onset**") and related parties, as well as avoidance actions, recovery actions, and other estate claims and causes of action, (ii) a high-level summary of the potential transfers at issue, (iii) the current status of the ongoing litigation, (iv) an overview of these chapter 11 cases, and (v) the proposed procedures, bid requirements, and timeline for a sale of the Estate Claims. Moore Decl. ¶ 38.  Each of the parties that were contacted was also offered (i) access to a virtual data room containing diligence materials relevant to the Estate Claims, subject to the execution of a confidentiality agreement, and (ii) meetings with the Debtors' litigation counsel and members of the A&M investigation team to provide parties with an opportunity to further diligence the Estate Claims.  Moore Decl. ¶ 39.

15.     Only two (2) parties executed a non-disclosure agreement, and one of the two parties declined shortly thereafter. Moore Decl. ¶¶ 40–42.  The Debtors have received no proposals from any third party to purchase the Estate Claims.  Further, no party has indicated a willingness to provide litigation financing on terms alternative to, or more favorable than, the financing contemplated by the Plan.  Accordingly, the Estate Claims Credit Bid represents the highest or otherwise best offer for the Litigation Trust Assets.

## IV.    Plan Solicitation

16.    On June 12, 2026, the Court entered the Disclosure Statement Order,[6] which, among other things:

(i)      conditionally approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code;

(ii)     established June 15, 2026 as the record date for determining which holders of Claims were entitled to vote on the Plan (the "**Voting Record Date**");

(iii)    scheduled the combined hearing to consider final approval of the Disclosure Statement and confirmation of the Plan for July 28, 2026 at 9:00 a.m. (Central Time) (the "**Combined Hearing**");

(iv)     established July 20, 2026 at 5:00 p.m. (Central Time) as the deadline to (a) vote to accept or reject the Plan (the "**Voting Deadline**"), (b) opt-in to the Third-Party Releases (the "**Release Opt-In Deadline**"), and (c) object to final approval of the Disclosure Statement and confirmation of the Plan (the "**Combined Objection Deadline**");

(v)      approved the proposed procedures for (a) soliciting, receiving, and tabulating votes to accept or reject the Plan, (b) voting to accept or reject the Plan, and (c) filing objections to the Plan (the "**Solicitation and Voting Procedures**");

(vi)     approved the form of ballots with voting instructions (the "**Ballots**") and certain other notices;

(vii)    approved the form to opt in to the Preference Settlement and to grant the Third-Party Releases (the "**Preference Settlement Opt-In Form**");

(viii)   approved the form to opt-in to the Administrative Expense Claims Consent Program (the "**Consent Program Opt-In Form**");

---

[6]    *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan, (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing, (III) Establishing Solicitation and Voting Procedures, (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-In Procedures, (V) Establishing Preference Settlement Notice and Opt-In Procedures, (VI) Establishing Notice and Objection Procedures for Confirmation of Plan, and (VII) Granting Related Relief* (Docket No. 2990) (the "**Disclosure Statement Order**").

(ix)     approved the form to opt in of Third-Party Releases (the "**Release Opt-In Form**");

(x)      approved the form and manner of notice of the Combined Hearing (the "**Combined Hearing Notice**"); and

(xi)     established June 22, 2026 as the deadline to file the Plan Supplement.

17.     As set forth in the Solicitation and Voting Procedures, the holders of Claims in Class 3 (Roll-Up Claims), Class 4 (First Lien Claims), Class 5 (Second Lien Claims), Class 6 (ABL Claims), Class 7 (General Unsecured Claims), and Class 8 (Subordinated Claims) were entitled to vote to accept or reject the Plan (each a "**Voting Class**," and collectively, the "**Voting Classes**").

18.     On June 15, 2026, the Debtors filed the Combined Hearing Notice[7] to give parties in interest notice of the Combined Hearing and, through Kroll Restructuring Administration LLC ("**Kroll**"), the Debtors' solicitation agent, caused the Combined Hearing Notice to be served in accordance with the Solicitation and Voting Procedures.  *See* Solicitation Certificates. Commencing on June 18, 2026, the FBG Debtors began solicitation of votes on the Plan in accordance with the Disclosure Statement Order by causing Kroll to distribute the Plan, the Disclosure Statement (with all exhibits, including the Plan), the Solicitation and Voting Procedures, a statement from the Creditors' Committee (to holders of Claims in Class 7), and the applicable Ballot (collectively, the "**Solicitation Package**") to each creditor entitled to vote on the Plan. *See* Solicitation Certificates.  The Combined Hearing Notice was also published in the *New York Times* on June 20, 2026.  *See* Certificate of Publication (Docket No. 3087).

---

[7]     *Notice of (I) Conditional Approval of Disclosure Statement, (II) Approval of (A) Solicitation and Voting Procedures, (B) Administrative Expense Claims Consent Program Opt-In Procedures, and (C) Preference Settlement Opt-In Procedures, (III) Combined Hearing to Consider Final Approval of Disclosure Statement and Confirmation of Plan, and (IV) Establishing Notice and Objection Procedures for Final Approval of Disclosure Statement and Confirmation of Plan* (Docket No. 3004).

19.     Kroll served holders of Claims and Interests in the Non-Voting Classes and holders of DIP A Claims with: (i) the Combined Hearing Notice, (ii) the Release Opt-In Form, and (iii) notice informing them of their non-voting status (collectively, the "**Non-Voting Packages**"), which contained the full text of the release, exculpation, and injunction provisions set forth in Sections 13.4, 13.5, and 13.6 of the Plan in accordance with Rule 40 of the *Procedures for Complex Cases in the Southern District of Texas* (the "**Complex Case Rules**") and consistent with the Disclosure Statement Order.  *See* Solicitation Certificates; *see generally* Solicitation Decl.  The materials included in the Solicitation Packages and Non-Voting Packages were also made available at no cost on the Debtors' restructuring website maintained by Kroll at https://restructuring.ra.kroll.com/FirstBrands (the "**Case Website**").

## V.     Plan Supplement

20.     On June 23, 2026, the Debtors filed the *Notice of Filing of (I) Plan Supplement and (II) Liquidation Analysis* (Docket No. 3046) (the "**Plan Supplement**").  The Plan Supplement included the following draft documents and information: (i) the Schedule of Retained Causes of Action, (ii) the disclosures required under section 1129(a)(5) of the Bankruptcy Code concerning the Wind Down Administrator, (iii) the disclosures required under section 1129(a)(5) concerning the Claims Ombudsman, (iv) the Litigation Trust Agreement, including the List of Litigation Trust Assets, (v) the Litigation Trust Backstop Agreement, (vi) the DIP Collateral Trust Agreement, including the List of DIP Collateral Trust Assets, (vii) the ABL Collateral Trust Agreement, including the List of ABL Collateral Trust Assets, and (viii) the Schedule of Specified Non-Released Parties.  The FBG Debtors also filed the Plan Supplement Notice[8] on June 23, 2026,

---

[8]     *Notice of (I) Filing of Plan Supplement and Liquidation Analysis, (II) Combined Objection Deadline for Final Approval of Disclosure Statement and Plan, and (III) Related Deadlines* (Docket No. 3049) (the "**Plan Supplement Notice**").

and Kroll caused the Plan Supplement Notice to be served in accordance with the Solicitation and Voting Procedures.  The Plan Supplement was also uploaded to the Solicitation Tab on the Case Website, which was accessible via a QR code provided in the Combined Hearing Notice.

## VI.   Tabulation

21.   After the Voting Deadline, and following a complete review by Kroll of all Ballots received, Kroll tabulated all timely and properly completed Ballots cast by holders entitled to vote in the Voting Classes, including on account of Proofs of Claim filed after the Voting Record Date and Voting Stipulations (as defined in the Solicitation Declaration) entered after the Voting Record Date (the "**Comprehensive Final Tabulation**").[9]  *See* Solicitation Decl. ¶¶ 5–19.  The Comprehensive Final Tabulation attached as Exhibit A to the Solicitation Declaration describes in detail the voting results for each FBG Debtor.  There are eighty-one (81) FBG Debtors that have four (4) impaired accepting classes, nine (9) FBG Debtors that have five (5) impaired accepting classes, and two (2) FBG Debtors that have one (1) impaired accepting class.  *See* Solicitation Decl. Ex. A.  As reflected in the chart below, out of the 854 holders of Class 7 General Unsecured Claims who voted on the Plan, 680 (79%) in number voted to accept the Plan.  Notably, and for hypothetical illustrative purposes only, if the Class 7 Ballots submitted by litigation targets Katsumi, LAM Parties, and Evolution were removed from tabulation, Class 7 General Unsecured Claims would be an accepting class at eighty-seven (87) FBG Debtors and a rejecting class at only five (5) FBG Debtors.  *See* Solicitation Decl. Ex. A.

---

[9]   Attached as Exhibit B to the Solicitation Declaration is Kroll's tabulation of all timely and properly completed Ballots cast by holders entitled to vote as of the Voting Record Date, including those entitled to vote under the Voting Stipulations.

| Aggregate Voting Results | | | | | |
| --- | --- | --- | --- | --- | --- |
| | Accept | | Reject | | |
| **Class** | **Amount (% of Amount Voted)** | **Number (% of Number Voted)** | **Amount (% of Amount Voted)** | **Number (% of Number Voted)** | **Result** |
| Class 3 (Roll-Up Claims) | $2,984,482,259.21 (100%) | 756 (100%) | $0.00 (0%) | 0 (0%) | Accept |
| Class 4 (First Lien Claims) | $1,494,377,255.85 (100%) | 833 (100%) | $0.00 (0%) | 0 (0%) | Accept |
| Class 5 (Second Lien) | $346,748,570.75 (100%) | 66 (100%) | $0.00 (0%) | 0 (0%) | Accept |
| Class 6 (ABL Claims) | $543,343,922.14 (100%) | 3 (100%) | $0.00 (0%) | 0 (0%) | Accept |
| Class 7 (General Unsecured Claims) | $12,879,417,346.91 (18.86%) | 680 (79.63%) | $55,395,431,215.86 (81.14%) | 174 (20.37%) | Reject |

## **ARGUMENT**

### I.     **Disclosure Statement Should be Approved on a Final Basis**

22.     For the reasons set forth below, the Disclosure Statement satisfies the applicable requirements of section 1125 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules and should be approved on a final basis as containing adequate information.

### A.     *Parties in Interest Received Sufficient Notice of Combined Hearing and Combined Objection Deadline*

23.     Bankruptcy Rule 3017(a) authorizes the Court to fix a time for filing objections to the adequacy of a disclosure statement, and Bankruptcy Rule 3020(b)(1) authorizes the Court to fix a time for filing objections to confirmation of a chapter 11 plan.  Bankruptcy Rules 2002(b), 2002(d), and 3017(a) generally provide that parties in interest should receive not less than 28 days' notice by mail of the time fixed for filing objections to approval of a disclosure statement

and confirmation of a plan.  However, Bankruptcy Rule 9006(c)(1) provides that the Court for cause shown may in its discretion order the time periods reduced, unless Bankruptcy Rule 9006(c)(2) (which is not applicable here) prohibits such reduction.

24.     Further, the Fifth Circuit has adopted the general rule that "[d]ue process requires that notice be 'reasonably calculated, under all the circumstances, to inform interested parties of the pendency' of a proceeding." *Williams v. Placid Oil Co. (In re Placid Oil Co.)*, 753 F.3d 151, 154 (5th Cir. 2014) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).  When evaluating the sufficiency of notice, courts in this Circuit consider whether "(1) the notice apprised the claimant of the pendency of the action, and (2) [whether] it was sufficiently timely to permit the claimant to present his objections." *Sequa Corp. v. Christopher (In re Christopher)*, 28 F.3d 512, 518 (5th Cir. 1994); *Otto v. Tex. Tamale Co. (In re Tex. Tamale Co.)*, 219 B.R. 732, 739–40 (Bankr. S.D. Tex. 1998).  Indeed, "[w]hether a particular method of notice is reasonably calculated to reach interested parties depends upon the particular circumstances of each case." *Walters v. Hunt (In re Hunt)*, 146 B.R. 178, 182 (Bankr. N.D. Tex. 1992).

25.     On June 6, 2026, the FBG Debtors filed the Disclosure Statement Motion[10] seeking the relief requested in the Disclosure Statement Order, including to establish the Combined Objection Deadline and set the Combined Hearing.  The FBG Debtors submitted to the Court that the Combined Hearing was appropriate because the proposed confirmation timeline would

---

[10]  *Emergency Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan, (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing, (III) Establishing Solicitation and Voting Procedures, (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-In Procedures, (V) Establishing Preference Settlement Notice and Opt-In Procedures, (VI) Establishing Notice and Objection Procedures for Confirmation of Plan, and (VII) Granting Related Relief* (Docket No. 2914) (the "**Disclosure Statement Motion**").

11

preserve and maximize value for all stakeholders.  *See* Disclosure Statement Mot. ¶ 115.  On June 15, 2026, the Debtors filed the Combined Hearing Notice to give parties in interest notice of the Combined Hearing and, through Kroll, caused the Combined Hearing Notice to be served in accordance with the Solicitation and Voting Procedures.  On June 18, 2026, the FBG Debtors commenced service of the Solicitation Packages.

26.     Accordingly, the FBG Debtors submit that all parties in interest had sufficient notice of the Combined Objection Deadline and the Combined Hearing, and no party has been prejudiced by this schedule.

**B.     *Disclosure Statement Contains Adequate Information and Should be Approved***

27.     As set forth in the Solicitation Certificates and in accordance with section 1126 of the Bankruptcy Code, the FBG Debtors solicited acceptances of the Plan from holders of the Voting Classes.  To approve a solicitation of votes to accept or reject a plan, the Court must determine that such solicitation complied with sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

28.     On June 12, 2026, the Court entered the Disclosure Statement Order, conditionally approving the Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code.  In accordance with section 1125(b), the FBG Debtors did not solicit votes on the Plan until after the Disclosure Statement Order was entered.

29.     Under section 1125 of the Bankruptcy Code, a plan proponent must provide voting creditors with "adequate information" regarding a debtor's proposed plan.[11]  A debtor's disclosure statement must provide sufficient information to permit an informed judgment by creditors entitled to vote on the plan.  *See, e.g.*, *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 271 (5th Cir. 2015) ("The proponent of a reorganization plan . . . must provide a court-approved disclosure statement that contains 'adequate information' about the assets, liabilities, and financial affairs of the debtor sufficient to enable creditors to make an 'informed judgment' about the plan.") (citation omitted); *Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners)*, 521 B.R. 134, 176 (Bankr. N.D. Tex. 2014) ("Section 1125 of the Bankruptcy Code entitles creditors to 'adequate information' so they can make an informed decision on whether to accept or reject a chapter 11 plan.").  The essential requirement of a disclosure statement is that it "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."  *In re Keisler*, No. 08-34321 (RS), 2009 WL 1851413, at *4 (Bankr. E.D. Tenn. June 29, 2009) (quoting *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991)).

30.     Whether a disclosure statement contains adequate information "is not governed by any otherwise applicable nonbankruptcy law, rule, or regulation." 11 U.S.C. § 1125(d).  Instead, bankruptcy courts have broad discretion to determine the adequacy of the information contained in a disclosure statement.  *See, e.g.*, *Tex. Extrusion Corp. v. Lockheed*

---

[11]  "Adequate information" is defined in section 1125(a)(1) of the Bankruptcy Code as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.]"  11 U.S.C. § 1125(a)(1).

*Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) (noting that the determination of what is adequate information is "largely within the discretion of the bankruptcy court").

31.     Congress granted bankruptcy courts wide discretion in determining the adequacy of a disclosure statement, taking into account the various facts and circumstances that accompany chapter 11 cases.  *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 408–09 (1977); *see also Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 518 (5th Cir. 1997) ("[W]ith respect to a particular disclosure statement, '[b]oth the kind and form of information are left essentially to the judicial discretion of the court'" (quoting S. Rep. No. 95-989, at 121 (1978))).  Accordingly, the determination of whether a disclosure statement contains adequate information is made on a case-by-case basis, focusing on the unique facts and circumstances of each case.  *See Tex. Extrusion*, 844 F.2d at 1157 ("The determination of what is adequate information is subjective and made on a case by case basis.").

32.     Whether a disclosure statement contains adequate information is intended by Congress to be a flexible, fact-specific inquiry left within the discretion of the Court:

> Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis.  Courts will take a practical approach as to what is necessary under the circumstances of each case, such as the cost of preparation of the statements, the need for relative speed in solicitation and confirmation, and, of course, the need for investor protection.  There will be a balancing of interests in each case.

H.R. Rep. 95-595, at 409 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6365.  *See also Tex. Extrusion*, 844 F.2d at 1157.

33.     The Disclosure Statement is extensive and comprehensive.  The Disclosure Statement provides various types of information, including, but not limited to, the following:

14

(i) an introduction providing background and an overview of the Plan and Plan Settlement (Section I.A);

(ii) a summary of the Administrative Expense Claims Consent Program, including Frequently Asked Questions (Section I.D);

(iii) a summary of the Preference Settlement, including Frequently Asked Questions (Section I.E);

(iv) an estimate of the projected timing of the Effective Date (Section I.D.7);

(v) an illustrative analysis of recoveries under the Litigation Trust Waterfall (Exhibit G);

(vi) a summary of Plan classification and treatment of Claims and Interests (Section I.F);

(vii) an overview of the Debtors' operations (Section II);

(viii) a description of the Debtors' capital structure (Section II.D);

(ix) significant events leading to the commencement of the Debtors' chapter 11 cases (Section III);

(x) events during the chapter 11 cases (Section IV);

(xi) certain risk factors affecting the FBG Debtors to be considered (Section V);

(xii) certain U.S. federal income tax consequences of the Plan (Section VI); and

(xiii) requirements for confirmation of the Plan (Section VII.C).

34. In addition to providing the above information, the Disclosure Statement provides an analysis of the alternatives to confirmation and consummation of the Plan (Section VIII) and begins with the FBG Debtors' recommendation that the holders of Claims in Classes 3, 4, 5, 6, 7, and 8 vote to accept the Plan.

35. For the reasons set forth above, the Disclosure Statement, which was conditionally approved pursuant to the Disclosure Statement Order, satisfies the requirements of section 1125(a) of the Bankruptcy Code and should be approved on a final basis.

C.      *Solicitation of Votes Complied with Bankruptcy Code, Bankruptcy Rules, and Disclosure Statement Order*

36.      As approved in the Disclosure Statement Order, the Solicitation Packages and Solicitation and Voting Procedures comply with the Bankruptcy Code and Bankruptcy Rules. *See* Disclosure Statement Order ¶¶ 4, 7–8.

37.      Bankruptcy Rule 3017(d) sets forth the materials that must be provided to holders of claims and equity interests for the purpose of soliciting their votes and providing adequate notice of the hearing on confirmation of a plan. Bankruptcy Rule 3018(c) provides for the necessary form of acceptances and rejections of a plan.

38.      In accordance with these rules and the Disclosure Statement Order, only holders of Claims in the Voting Classes were sent Ballots. The applicable Ballot, Combined Hearing Notice, the Creditors' Committee Position Letter for holders of Claims in Class 7, and postage-prepaid return envelope were provided in paper format. The Plan, Disclosure Statement, and Disclosure Statement Order—without attachments other than the Solicitation and Voting Procedures—were provided electronically through the QR code included in the Combined Hearing Notice and were also available on the Case Website and paper copies or a USB flash drive were available upon request at no cost. The Ballots conformed to Official Form No. 314, as modified to address the facts of these cases and to be appropriate for the Voting Classes. These modifications included bold and capitalized language disclosing the Third-Party Releases and the procedures for opting in to such releases. The Ballots were approved by the Court in the Disclosure Statement Order. Accordingly, the FBG Debtors have satisfied Bankruptcy Rules 3017(d), 3018(c), and 9009.

39.      Pursuant to section 1125(e) of the Bankruptcy Code, "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions

16

of this title . . . is not liable" on account of such solicitation for violation of any applicable law,

rule, or regulation governing solicitation of acceptance or rejection of a plan.  11 U.S.C. § 1125(e).

40.  As described above, the FBG Debtors engaged in arm's-length, good faith

negotiations with their key stakeholders and other parties in interest, and all parties, including

Kroll, took appropriate actions in connection with the solicitation of the Plan.  Therefore, the FBG

Debtors submit that the Court should grant these parties the protections provided under section

1125(e) of the Bankruptcy Code.

## II.  Settlement, Release, Exculpation, and Injunction Provisions Are Appropriate and Should Be Approved

### A.  *Settlements Are Reasonable and Satisfy Bankruptcy Rule 9019*

41.  The Plan embodies a good-faith compromise of Claims, Interests, and

controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or

Interest may have with respect to any such Allowed Claim or Allowed Interest or any distribution

to be made on account thereof.

42.  Approval of the Plan Settlement will maximize recoveries to creditors.  *See*

Moore Decl. ¶¶ 12–31.  The Plan Settlement allows the FBG Debtors to avoid the substantial

litigation costs and risk associated with, among other disputes, the DIP Secured Parties seeking

relief from the automatic stay to exercise remedies against their collateral and terminating the FBG

Debtors' consensual use of cash collateral.  Litigating these issues would deplete the FBG Debtors'

remaining resources, and would leave insufficient funds to pursue an alternative transaction to

maximize value for the estates.  There is a significant risk that the DIP Secured Parties would be

granted relief from the automatic stay and foreclose on or otherwise acquire all DIP Collateral,

including the FBG Debtors' litigation assets, which would allow the DIP Secured Parties to keep

100% of all litigation recoveries.  Any such litigation would present challenges for the FBG

Debtors, the outcome of which would be uncertain and potentially detrimental to the FBG Debtors' estates and other creditors.

43. In the Fifth Circuit, "[t]he standard for evaluating the validity of a settlement contained in a Chapter 11 plan is the same as the standard for evaluating a settlement between a debtor and another party outside the context of [a] plan . . . . Stated differently, settlement provisions in a Chapter 11 plan must satisfy the standards used to evaluate compromises under [Bankruptcy] Rule 9019." *In re Bigler LP*, 442 B.R. 537, 543 n.6 (Bankr. S.D. Tex. 2010) (citing *In re MCorp Fin., Inc.*, 160 B.R. 941, 951 (S.D. Tex. 1993)). Accordingly, approval should be given "if the settlement is 'fair and equitable and in the best interest of the estate.'" *Cajun Elec. Power*, 119 F.3d at 355 (quoting *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995) (additional citations omitted)).

44. To determine whether a settlement is fair and equitable, courts "apply [a] three-part test . . . with a focus on comparing 'the terms of the compromise with the likely rewards of litigation.'" *Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015) (quoting *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980)). Specifically, a bankruptcy court evaluates (i) "the probability of success in [] litigat[ing] [the claim subject to settlement], with due consideration for the uncertainty in fact and law," (ii) "the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay," and (iii) "all other factors bearing on the wisdom of the compromise," including (a) "the best interests of the creditors, with proper deference to their reasonable views," and (b) "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id.* (first citing *Jackson Brewing*, 624 F.2d at 602; then quoting *Cajun Elec.*

18

*Power*, 119 F.3d at 356; and then quoting *Foster Mortg.*, 68 F.3d at 917–18) (internal quotation marks omitted).

45.     Although the debtor bears the burden of establishing that a settlement is fair and equitable based on the balance of the above factors, "the [debtor's] burden is not high." *See In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008).  The court need only determine that the settlement does not "fall beneath the lowest point in the range of reasonableness." *See In re Idearc Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009), *subsequently aff'd*, 662 F.3d 315 (5th Cir. 2011) (internal quotation and citation omitted); *Roqumore*, 393 B.R. at 480 ("The Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'") (citations omitted).

46.     As set forth in greater detail in the Moore Declaration, the Plan Settlement, including the Preference Settlement, among other things, provides for a clear path to execution of the Plan and the efficient wind down of the FBG Debtors' estates, and saves the FBG Debtors' resources from costly litigation on a number of complicated issues.

47.     As discussed more fully below, the Plan Settlement is fair and equitable and achieves the best resolution of the issues at hand.  The Plan Settlement is the result of good-faith, arm's-length negotiations and embodies a number of compromises made by the FBG Debtors and their key stakeholders, including the DIP Secured Parties and the Creditors' Committee.  The parties exchanged numerous proposals and counterproposals over months as part of an extensive mediation overseen by Judge Isgur and subsequent discussions, which ultimately led to the terms of both the Plan Settlement and the Plan.  The FBG Debtors, DIP Secured Parties, and the Creditors' Committee are all represented by experienced and competent counsel who vigorously

negotiated the Plan Settlement and such parties unanimously agree that approval of the Plan

Settlement is a significantly better outcome than the alternatives.

> **B.**     ***The Plan Settlement Satisfies Bankruptcy Rule 9019***

48.     The Plan Settlement, including the Preference Settlement and resolution of

substantive consolidation, brings consensus among the FBG Debtors, DIP Secured Parties, ABL

Lenders, and Creditors' Committee with respect to a value maximizing chapter 11 plan, and

includes valuable benefits to the FBG Debtors' estates, including:

- The creation of a Litigation Trust, a DIP Collateral Trust, and an ABL Collateral Trust, each with funding and governance to enable the monetization of assets and distribution of proceeds in accordance with the applicable waterfalls;

- $75 million in initial committed funding for the Litigation Trust to prosecute and monetize the Estate Claims, with an option to obtain additional funding;

- The above-described Litigation Trust Waterfall which allows junior creditors to receive recoveries alongside DIP A Claims far in advance of the DIP A Claims being paid in full;

- A cap on the DIP A Claims for the purposes of the Litigation Trust Waterfall at the amount outstanding as of the Confirmation Date (estimated at $1.3 billion);

- The subordination of $3.5 billion of Roll-Up Claims that will share in recoveries under the Litigation Trust Waterfall on a pari passu basis with unsecured creditors;

- A Litigation Oversight Committee, with minority representation appointed by the Creditors' Committee that will have veto power over certain Sacred Rights;

- An opportunity for qualifying Trade Creditors, Factors, and Supply Chain Financers to opt in to a Preference Settlement and receive either a release of, or a modified new value defense against, preference actions the Litigation Trustee could pursue; and

- An Administrative Expense Claims Consent Program, which accelerates recoveries for consenting holders of Administrative

Expense Claims to receive distributions earlier in exchange for reducing the Allowed amount of their claims.

49. The Plan Settlement also provides that each Class of Claims and Interests shall be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors, for the purpose of making distributions in accordance with the Plan. *See* Plan § 5.2(k). This limited consolidation is a key term of the Plan Settlement, and was integral in resolving disputes among the Ad Hoc Group and Creditors' Committee, including convincing the DIP Secured Parties to share recoveries with junior creditors.[12]

50. Additionally, as part of the Plan Settlement, the Preference Settlement affords Trade Creditors, Supply Chain Financers, and Factors the opportunity to participate in a settlement subject to the terms and procedures set forth in the Plan. The terms of the Preference Settlement provide that eligible Trade Creditors that elect to participate will be released from Preference Actions under the Plan and eligible Supply Chain Financers and Factors that elect to participate will receive the benefit of certain procedures with respect to Preference Actions asserted against them. In consideration for becoming a Preference Settlement Electing Creditor, such creditors must (1) grant the third-party releases under the Plan and (2) voluntarily contribute all of their direct (non-derivative) Claims against non-Debtor parties (other than a Released Party) that relate to FBG's prepetition operations to the Litigation Trust.

51. In determining the terms of the Preference Settlement with respect to Trade Creditors, the FBG Debtors considered, among other things, the aggregate transfers to Trade Creditors during the preference period, potential defenses to Preference Actions that may be

---

[12]   Additional information and support of the Plan Settlement, including substantive consolidation for distribution purposes only, is set forth in paragraphs 174 to 191 of the Reply Brief.

21

available to Trade Creditors, and potential value received by the FBG Debtors' estates from the transfer of direct claims held by such creditors.[13]

52.     The FBG Debtors evaluated a similar set of factors to determine the procedures for Supply Chain Financers and Factors under the Preference Settlement.  In light of, among other things, the aggregate amount of transfers to Supply Chain Financers and Factors during the preference period and the merits of Preference Actions that may exist against such creditors (and available defenses thereto), the FBG Debtors, the Creditors' Committee, and the Ad Hoc Group determined that Supply Chain Financers and Factors should be subject to a separate and independent process with respect to any Preference Actions that may be asserted against them. This process does not provide for the automatic release of Preference Actions against such creditors but will allow such creditors to, among other things, meet and confer with the Litigation Trustee and receive the benefit of the Modified New Value Elements in response to a Preference Action asserted against them.  The terms of the Preference Settlement applicable to the Supply Chain Financers and Factors will ensure that material and potentially valuable Preference Actions will not be released without due consideration and a commensurate benefit for the FBG Debtors and their estates.

53.     Agreement on the terms of the Preference Settlement enabled the FBG Debtors to garner additional support for the Plan from the Creditors' Committee and its members and resolved issues with the Plan raised by the Creditors' Committee.  The terms of the Preference Settlement were a key focus of the FBG Debtors, the Creditors' Committee, and the Ad Hoc Group in their negotiations regarding the broader Plan Settlement.  Specifically, each party wanted to ensure that the Preference Settlement was structured in a manner that would not allow potential

---

[13]    Moore Decl. ¶ 28.

"bad actors" to benefit from the Modified New Value Elements, but would allow creditors of the FBG Debtors that acted in good faith, including those that made substantial payments at the direction of the FBG Debtors, to participate in the Preference Settlement and benefit from the Modified New Value Elements. *See* Moore Decl. ¶ 29. The terms of the Preference Settlement, as set forth in the Plan, reflect the heavily negotiated agreement struck by the Plan Settlement parties in light of these considerations.

54. The Preference Settlement maximizes value for the FBG Debtors and their estates. It allows the FBG Debtors to avoid litigation with respect to certain Preference Actions that would be costly to the FBG Debtors' estates to litigate, while the result of such litigation would be uncertain. The benefits of the Preference Settlement with respect to Trade Creditors, Supply Chain Financers, and Factors (*i.e.*, granting releases under the Plan and contributing Direct Creditor Claims to the Litigation Trust) outweigh the concessions being granted by the FBG Debtors pursuant thereto. Thus, the Preference Settlement represents a fair and equitable compromise.

55. Absent entry into the Plan Settlement (including the Preference Settlement), the FBG Debtors would not be able to confirm a chapter 11 plan and would be forced to convert their cases to chapter 7. The Plan Settlement affords the FBG Debtors' estates with numerous benefits, as outlined above. Accordingly, the Plan Settlement is fair, reasonable, and in the best interests of the Estates, and should therefore be approved by the Court.

### C. *Plan Releases Are Appropriate and Should Be Approved*

56. The Plan provides for the release of certain Claims and Causes of Action by (i) the FBG Debtors and their estates as set forth in Section 13.5(a) of the Plan (the "**FBG Debtor Releases**") and (ii) certain non-Debtor third parties as set forth in Section 13.5(b) of the Plan

(the "**Third-Party Releases**"), in favor of the Released Parties.[14]  The FBG Debtor Releases and Third-Party Releases are integral components of the Plan, were negotiated as part of the Plan Settlement, are appropriate and necessary under the circumstances, are consistent with the Bankruptcy Code, and comply with applicable case law and precedent in the Fifth Circuit, and, for the reasons set forth below, should be approved.

(i)      **FBG Debtor Releases**

57.      The Plan provides for a narrow scope of releases by the FBG Debtors and their Estates of the Released Parties which include, among others, (i) Neal Goldman, William Transier, and Benjamin Duster, in their capacities as members of one or more of the Special Committees or as Independent Managers of one or more of the FBG Debtors, (ii) Specified Executives, which consist exclusively of four executives employed by A&M,  (iii) the Creditors' Committee and each of its members, (iv) the DIP Secured Parties, (v) the Prepetition Secured Parties, and (vi) professionals retained by order of the Bankruptcy Court in connection with the chapter 11 cases, excluding any ordinary course professionals retained by the FBG Debtors and the Examiner.

58.      No other party is being released by the FBG Debtors or their estates.  For the avoidance of doubt, the FBG Debtor Releases expressly carve-out from the releases claims

---

[14]    "**Released Parties**" means collectively, and in each case solely in their capacities as such, (i) the FBG Debtors and their Estates; (ii) Neal Goldman, William Transier, and Benjamin Duster, in their capacities as members of one or more of the Special Committees; (iii) Neal Goldman and William Transier, in their capacities as the Independent Managers of one or more of the FBG Debtors; (iv) the Specified Executives; (v) the Professionals; (vi) the Creditors' Committee and each of its members; (vii) the Ad Hoc Group and members thereof, including the Ad Hoc Group SteerCo; (viii) the DIP Secured Parties; (ix) the Prepetition Secured Parties; (x) the ABL Parties; (xi) the Litigation Trust Backstop Parties; (xii) the Litigation Trust Class 1 Funding Contributors and the DIP Collateral Trust Funding Contributors; and (xiii) solely with respect to each of the foregoing Persons in clauses (vii) – (xii), their Affiliates and Representatives; *provided* that, notwithstanding anything in the Plan to the contrary, and for the avoidance of doubt, no Specified Non-Released Party shall be a Released Party and no Estate Claims shall be released against any Specified Non-Released Party; *provided further* that any Person that is given the opportunity to grant the releases set forth in the Plan and does not grant such releases shall not be a Released Party solely with respect to the third-party release set forth in Section 13.5(b) of the Plan.

24

against certain "Specified Non-Released Parties" who have been identified to make clear that these individuals and parties are not being released notwithstanding anything else in the Plan.

59.     Under section 1123(b)(3)(A) of the Bankruptcy Code, a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A).  Accordingly, a debtor may release causes of action as consideration for concessions made by its stakeholders pursuant to a chapter 11 plan.  *See, e.g.*, *Bigler*, 442 B.R. at 547 (finding that plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the [d]ebtors and the [e]state are releasing claims that are property of the [e]state in consideration for funding of the Plan . . . ."); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 308 (Bankr. N.D. Tex. 2007) ("[T]he plain language of § 1123(b)(3) provides for the inclusion in a plan of a settlement of claims belonging to the debtor or to the estate . . . .") (emphasis omitted); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("To the extent that . . . the plan purports to release any causes of action against the [creditor] which the [d]ebtor could assert, such provision is authorized by § 1123(b)(3)(A) . . . .").  In considering the appropriateness of a release of claims by a debtor, courts consider whether the release is (i) "fair and equitable" and (ii) "in the best interest of the estate."  *See Jackson Brewing*, 624 F.2d at 602 (citing *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see Bigler*, 442 B.R. at 543 n.6; *see In re Derosa-Grund*, 567 B.R. 773, 784–85 (Bankr. S.D. Tex. 2017); *see also In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3 Claimholders v. New Mirant Entities*, No. 06-CV-744 (JHM), 2006 WL 3780884 (N.D. Tex. Dec. 26, 2006); *Heritage*, 375 B.R. at 259.

60.     Courts generally determine whether a release is "fair and equitable" and "in the best interests of the estate" by reference to the following so-called "*Foster Mortgage*" factors:

25

- the probability of success in the litigation, with due consideration for the uncertainty in fact and law;

- the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection;

- the paramount interest of the creditors and a proper deference to their respective views;

- the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and

- all other factors bearing on the wisdom of the compromise.

*The Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (citing *Foster Mortg.*, 68 F.3d at 917–18); *see also Derosa-Grund*, 567 B.R. at 784–85; *Roqumore*, 393 B.R. at 479–80.

61. The FBG Debtor Releases meet the foregoing standard, are in the best interests of the FBG Debtors' estates, and should be approved for the following reasons. *First*, the FBG Debtors do not believe there exists any valuable, colorable, or material claims against the Released Parties that are likely to provide a net benefit to the FBG Debtors' estates. As detailed in the Moore Declaration, the FBG Debtor Releases are narrowly tailored and preserve Estate Claims. *See* Moore Decl. ¶ 243.

62. *Second*, pursuant to the Court's DIP Order, the FBG Debtors already absolutely, unconditionally and irrevocably released and forever discharged the DIP Secured Parties and the Prepetition Secured Parties from any and all obligations and liabilities to the FBG Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date. Therefore, pursuant to the Plan, the FBG Debtors are only releasing postpetition conduct of these parties.

26

63.     *Third*, the FBG Debtor Releases are narrowly limited in scope to entities and individuals who provided integral support and contributions to the FBG Debtors' estates during these chapter 11 proceedings.  Notably, with the exception of the DIP Secured Parties and the Prepetition Secured Parties, the FBG Debtor Releases are limited to estate fiduciaries who became involved with the Company or the FBG Debtors either (i) on or around the Petition Date or (ii) during the pendency of these cases.  In particular, the FBG Debtors' estate fiduciaries receiving releases have shepherded the FBG Debtors through, among other things, disputes and litigation with various parties asserting interests in the Debtors' assets, liquidity issues and related financing discussions with stakeholders, value-maximizing sale processes, multi-party mediations, and the wind down of several of the Debtors' business lines.  Additionally, absent the support of the DIP Secured Parties and the Prepetition Secured Parties, the FBG Debtors would not have been able to secure the financing and consensual use of collateral necessary to fund these chapter 11 cases and operate the FBG Debtors' business through confirmation.

64.     *Fourth*, the third parties that are receiving the benefit of the FBG Debtor Releases are limited to (i) the Creditors' Committee, (ii) the Ad Hoc Group, and the DIP Secured Parties in their various capacities, including as Litigation Trust Backstop Parties, Litigation Trust Class 1 Funding Contributors, DIP Collateral Trust Funding Contributors, and the Prepetition Secured Parties, (iii) the ABL Parties, (iv) the Specified Executives, (v)  Neal Goldman, William Transier, and Benjamin Duster, in their capacities as members of one or more of the Special Committees, (vi) Neal Goldman and William Transier, in their capacities as the Independent Managers of one or more of the FBG Debtors, and (vii) the Professionals.  These parties have made a number of concessions either as part of the Plan Settlement or otherwise during these

27

chapter 11 cases that warrant their receipt of the FBG Debtor Releases in accordance with the Plan. *See* Moore Decl. ¶ 242.

65.     *Fifth*, the FBG Debtor Releases were a material inducement for certain Released Parties to support the Plan and Plan Settlement, and reflect a reasonable balance of the risk and expense of litigation, on the one hand, against the benefits received from resolving these disputes and issues, on the other hand.  The Plan Settlement, including the FBG Debtor Releases, reflects an integrated compromise, which averts the need for costly and protracted litigation that would otherwise pose a substantial impediment to confirming the Plan.

66.     *Sixth*, the FBG Debtor Releases also expressly contain certain limitations, including, among other limitations and carve-outs, that they shall not be construed as releasing any party (i) from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted gross negligence, willful misconduct, or actual fraud committed by such party, and (ii) that is a Specified Non-Released Party.  Thus, the FBG Debtor Releases are appropriately tailored to preserve valuable estate causes of action.

67.     Accordingly, the *Foster Mortgage* factors are satisfied because the FBG Debtor Releases, among other things, (i) are narrowly tailored and only include entities and individuals who provided integral support and contributions to the FBG Debtors' estates during these chapter 11 proceedings, (ii) are not believed to release any valuable, colorable, or material claims, (iii) were the result of arm's-length bargaining and hard fought negotiations; and (iv) are supported by the DIP Secured Parties and the Creditors' Committee.

68.     Accordingly, the FBG Debtor Releases are fair, equitable, and in the best interest of the estates, are consistent with prevailing Fifth Circuit law, and should be approved by the Court.

(ii)     **Third-Party Releases**

69.     In addition to the FBG Debtor Releases, Section 13.5(b) of the Plan provides for certain fully consensual Third-Party Releases.  Parties that desire to grant the Third-Party Releases are required to "opt in" in accordance with the procedures set forth in the Disclosure Statement and on the Release Opt-In Form; parties who do not "opt-in" in accordance with these procedures will not be deemed to grant the Third-Party Releases.

70.     Section 1123(b)(6) of the Bankruptcy Code provides that a chapter 11 plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1123(b)(6).  Under Fifth Circuit law, a plan may include releases of third parties if such releases are provided by parties that consented to such releases and received consideration in exchange therefore.  *See Bigler*, 442 B.R. at 549; *see Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) (acknowledging that Bankruptcy Code does not prohibit a non-debtor release "when it has been accepted and confirmed as an integral part of a plan of reorganization.");  *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007) ("Most courts allow consensual nondebtor releases to be included in a plan." (citation omitted)).  If these requirements are satisfied, a release should be approved when it is "an essential means of implementing [a] [p]lan pursuant to Section 1123(a)(5) of the Bankruptcy Code[.]"  *In re Moody Nat'l SHS Hous. H, LLC*, No. 10-30172 (MI), 2010 WL 5116872, at *5 (Bankr. S.D. Tex. June 30, 2010) (approving consensual nondebtor release).

71.     Employing that standard, Fifth Circuit courts routinely allow third-party releases in chapter 11 plans when the third-party releases are (i) consensual, (ii) specific in language, (iii) integral to the plan, (iv) a condition of a settlement, and (v) given for consideration, so long as such releases do not otherwise violate provisions of the Bankruptcy Code.  *See, e.g.*, *Wool Growers*, 371 B.R. at 776 ("Consensual nondebtor releases that are specific in language,

29

integral to the plan, a condition of the settlement, and given for consideration do not violate section 524(e).") (citations omitted); *see also FOM P.R. S.E. v. Dr. Barnes Eyecenter Inc.*, 255 F. App'x 909, 912 (5th Cir. 2007) (enforcing a non-debtor release where "the release of claims was an integral part of the bankruptcy order [and] was not simply boilerplate language that was inserted into the [reorganization plan], but rather a necessary part of the [reorganization plan] itself."); *Applewood Chair Co. v. Three Rivers Plan. & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 920 (5th Cir. 2000) (declining to uphold a general release that did not contain a specific discharge of indebtedness of a third party); *Shoaf*, 815 F.2d at 1050 (upholding a third-party release that was specifically provided for in confirmed plan); *Hinojosa Eng'g, Inc. v. Lopez (In re Treyson Dev., Inc.)*, No. 14-70256 (EVR), 2016 WL 1604347, at *15–17 (Bankr. S.D. Tex. Apr. 19, 2016) (noting that "[t]he Fifth Circuit require[s] that the language in the plan must be specific as to the parties involved and the claim(s) released in order to be sufficient.") (citation omitted).

72.     In determining whether a third-party release is consensual, courts in the Fifth Circuit have focused on two things—notice and an opportunity to object—*i.e.*, whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look over it, [and] the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given." Conf. Hr'g Tr. 47, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. April 21, 2016) (Docket No. 730) (approving third-party releases as consensual, over objection, in light of sufficient notice and opportunity to object); *see also* Conf. Hr'g Tr. 91:15–92:5, *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025) (Docket No. 251) (analyzing the facts and circumstances surrounding opt-out third-party releases before determining such releases were appropriate); *In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017) (Docket No. 1250) (approving third-party

30

releases as consensual over objections from parties in interest, including U.S. Trustee); *In re Ameriforge Grp., Inc.*, No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) (Docket No. 142) (confirming chapter 11 plan over objection because certain impaired creditors were deemed to have consented to third-party release provisions unless they opted out); *In re Sandridge Energy, Inc.*, No. 16-32488 (DRJ), 2016 Bankr. LEXIS 4622, at *47 (Bankr. S.D. Tex. Sept. 20, 2016) (finding a plan's third-party releases to be consensual where creditors were provided notice and the opportunity to opt-in); *In re Wyly*, No. 14-35043 (BJH), 2019 Bankr. LEXIS 1912, at *17 (Bankr. N.D. Tex. June 22, 2019) (same).

73.     Here, the Third-Party Releases satisfy the Fifth Circuit's standard for approval of third-party releases under the Bankruptcy Code and the Complex Case Rules and should be approved.

74.     *First*, the Third-Party Releases are fully consensual and adequate notice was provided.  In compliance with the Disclosure Statement Order, parties in interest were provided extensive notice of these chapter 11 cases, the Plan, the proposed Third-Party Releases, and the Combined Objection Deadline.  The Notice of Non-Voting Status, the Ballots, and Release Opt-In Form expressly included, in bold font, the terms of the Third-Party Releases, as set forth in Section 13.5(b) in the Plan.  *See* Disclosure Statement Order, Exs. 3–10.  The Notice of Non-Voting Status, the Ballots, and Release Opt-In Form advised careful review and consideration of the terms of the Third-Party Releases.  *Id*.  The language of the Third-Party Releases was also emphasized using bold font in the Plan and was included in the Disclosure Statement.  *See* Plan, § 13.5(b); Disclosure Statement, Ex. B.

75.     *Second*, the Third-Party Releases are sufficiently specific to put the Releasing Parties on notice of the claims being released.  The Third-Party Releases contain express

limitations and carve-outs, including that the Plan does not release any Released Party for Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted gross negligence, willful misconduct, or actual fraud committed by such Released Party. Further, the Third-Party Releases describe the nature and type of claims being released. Plan § 13.5(b).

76. *Third*, the Third-Party Releases are an integral part of the Plan. Indeed, the Third-Party Releases were a material inducement for the Released Parties to support the FBG Debtors and the Plan. *See* Moore Decl. ¶ 246. The Creditors' Committee reviewed the Third-Party Releases as part of its oversight of these chapter 11 cases and supports the inclusion of the Third-Party Releases in the Plan, which supports that the Third-Party Releases benefit the FBG Debtors' stakeholders and are appropriate. In connection with the Third-Party Releases, the FBG Debtors and the Creditors' Committee had extensive discussions regarding each class of parties to be included in the definition of Released Parties, discussed the findings of the FBG Debtors' investigation, and reviewed the forms of Ballots and other solicitation materials relating to the Third-Party Releases.

77. As discussed in more detail below, the Court should approve the Third-Party Releases in the Plan. They comply with the Bankruptcy Code, the Complex Case Rules, and controlling Fifth Circuit standards and are appropriate and justified under the circumstances.

**D.    *Exculpation Provision Is Appropriate, Consistent with Fifth Circuit Precedent, and Should Be Approved***

78. The Plan provides for the exculpation of certain parties as set forth in Section 13.6 of the Plan (the "**Exculpation Provision**"). The Exculpation Provision protects the

Exculpated Parties[15] from, among other things, Causes of Action arising out of or relating to the FBG Debtors' wind down, these chapter 11 cases, and the negotiations and agreements made in connection therewith.  *See* Plan § 13.6.  Unlike the Third-Party Releases, the Exculpation Provision does not affect the liability of third parties *per se*, but rather sets a standard of care in hypothetical future litigation against an exculpated party for acts arising out of these chapter 11 cases, with a carve out for actual fraud, willful misconduct, and gross negligence.  As such, the Exculpation Provision prevents future collateral attacks against a limited set of estate fiduciaries that have exercised their fiduciary duties to maximize value for the Debtors and the Estates.

79.     Courts in this circuit permit exculpation of debtors for actions short of gross negligence committed during the course of bankruptcy and, although more carefully scrutinized, permit exculpation of non-debtor parties where a separate statutory basis for exculpation exists. *See NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 437 (5th Cir. 2022), *pet. for cert. denied*, No. 22-631 (U.S. July 2, 2024) ("***Highland I***") ("[Section] 524(e) does not permit absolve[ing] the [non-debtor] from any negligent conduct that occurred during the course of the bankruptcy absent another source of authority.") (alteration in original) (citation modified).  In this vein, section 1103(c) of the Bankruptcy Code is widely recognized as a separate statutory basis for exculpation for creditors' committees.  *See Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 253 (5th Cir. 2009) (approving the exculpation of a creditors' committee and its members because section

---

[15] "**Exculpated Parties**" means each of the following in their capacity as such: (i) the FBG Debtors; (ii) Neal Goldman, William Transier, and Benjamin Duster, in their capacities as members of one or more of the Special Committees; (iii) Neal Goldman and William Transier, in their capacities as the Independent Managers of the FBG Debtors; and (iv) the Creditors' Committee and each of its members in their official capacity; *provided* that, for the avoidance of doubt, the Persons in the foregoing clauses (ii) and (iii) shall only receive exculpation under Section 13.6 of the Plan in their capacities as officers, directors, or managers of one or more FBG Debtors, and not in their capacities as officers, directors, or managers of any SPV Debtor.

1103(c) of the Bankruptcy Code implies "qualified immunity for [committee members'] actions within the scope of their duties.").

80.     In *Highland I*, the Fifth Circuit expressly adopted and applied precedent providing qualified immunity to bankruptcy trustees[16] to exculpate certain non-debtors acting within the scope of duties of a trustee. *Highland I*, 48 F.4th at 436–37. Based on the facts and circumstances before it, the Fifth Circuit determined in *Highland I* that (i) each of the three independent directors appointed as fiduciaries was properly exculpated by the Plan, and (ii) certain other non-debtor parties that were not acting in such a capacity could not be exculpated. *Id*. at 437. Citing section 1107(a) of the Bankruptcy Code, the court reasoned that "[l]ike a debtor-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee" and were therefore entitled to exculpation. *Id*. The Fifth Circuit summarized its holdings broadly, noting "[i]n sum, our precedent and § 524(e) require any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties." *Id.*

81.     Following *Highland I*, the Court has consistently approved plan exculpation provisions that applied to independent directors. *See, e.g.*, *In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) (Docket No. 1483) (approving plan containing exculpation that applied to independent managers); *In re DocuData Sols., L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834) (approving plan containing

---

[16]   *See, e.g.*, *Baron v. Sherman (In re Ondova Ltd. Co.)*, 914 F.3d 990, 993 (5th Cir. 2019) ("We thus hold that bankruptcy trustees in the Fifth Circuit are entitled to qualified immunity for personal harms caused by actions that, while not pursuant to a court order, fall within the scope of their official duties."); *Hilal v. Williams (In re Hilal)*, 534 F.3d 498, 501 (5th Cir. 2008) ("In this circuit, trustees cannot be subjected to personal liability for damages to the bankruptcy estate unless they are found to have acted with gross negligence.") (citation omitted); *Dodson v. Huff (In re Smyth)*, 207 F.3d 758, 762 (5th Cir. 2000) ("[W]e conclude that trustees should not be subjected to personal liability unless they are found to have acted with gross negligence.") (citation omitted).

exculpation provision that applied to disinterested director); *In re Wellpath Holdings, Inc.*, No. 24-90533 (ARP) (Bankr. S.D. Tex. May 1, 2025) (Docket No. 2596) (approving plan containing exculpation provision that applied to independent directors); *In re DRF Logistics, LLC*, No. 24-90447 (CML) (Bankr. S.D. Tex. Nov. 25, 2024) (Docket No. 530) (same); *In re Everstream Solutions, LLC*, No. 25-90144 (CML) (Bankr. S.D. Tex. Nov. 19, 2025) (Docket No. 594) (same).

82.     Here, the Exculpated Parties include the members of the Special Committees and Independent Managers of the FBG Debtors, each of whom has acted on the FBG Debtors' behalf throughout these chapter 11 cases in a fiduciary capacity, with effectively the same rights, duties and powers as a bankruptcy trustee pursuant to section 1107(a) of the Bankruptcy Code.  Indeed, the Exculpated Parties have been instrumental throughout these chapter 11 cases, including by investigating all claims and causes of action of the estates arising from, among other things, the fraud perpetrated by the Debtors' prepetition management team, winding down several of the FBG Debtors' business lines, addressing financing and liquidity issues, participating in multi-party mediations and litigation with various parties asserting interests in the FBG Debtors' assets, and, most importantly, negotiating and reaching an agreement on the terms of the Plan Settlement, which forms the basis of the Plan.  *See* Moore Decl. ¶ 251.

83.     The rationale for granting exculpation to the directors acting for the *Highland Capital* debtors applies equally to the members of the Special Committees and Independent Managers of the FBG Debtors.  Each of the members of the Special Committees and Independent Managers of the FBG Debtors should be exculpated under the Plan because they (i) performed the duties of a debtor in possession under section 1107(a) of the Bankruptcy Code and (ii) acted within the scope of their duties as an estate fiduciary during these chapter 11 cases.  *See* Moore Decl. ¶ 251.

35

84.     The Exculpation Provision will provide such parties with appropriate protections supported by express sources of authority within the Bankruptcy Code, including sections 524(e), 1103(c), and 1107(a) of the Bankruptcy Code.  Furthermore, the Exculpation Provision represents a critical component of the overall settlement embodied by the Plan, is narrowly tailored to protect the Exculpated Parties from inappropriate litigation based on these Chapter 11 Cases and the Plan, and does not release any claim based on any act or omission that constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

85.     Accordingly, the Exculpation Provision is appropriate and conforms to Fifth Circuit precedent and should therefore be approved.

### E.     *Injunction Provisions Are Appropriate and Should Be Approved*

86.     The Plan also provides for the injunction of certain actions as set forth in Section 13.4 of the Plan (the "**Injunction Provisions**").  The Injunction Provisions are appropriate because they comply with the Bankruptcy Code and are necessary to implement and enforce the Plan.  In accordance with the District Court's ruling in *Epstein v. Container Store Grp., Inc. (In re Container Store Grp., Inc.)*, 676 B.R. 356 (S.D. Tex. 2026) and consistent with the Court's ruling in *Pine Gate*, the Gatekeeper Provision (as defined below) in the Injunction Provisions applies only to claims against the Exculpated Parties.

87.     As is common in chapter 11 plans in large chapter 11 cases, the Injunction Provisions permanently enjoin any party in interest from commencing or continuing in any manner any claim that was released or exculpated under the Plan.  The Injunction Provisions also include a "gatekeeper" provision to implement the Plan's exculpation provisions, which provides that, before any claim or Cause of Action is brought against an Exculpated Party, the Court must (i) determine, after notice and a hearing, that such claim or Cause of Action is colorable and has not been exculpated under the Plan and (ii) specifically authorize such person or entity to bring

36

such claim or Cause of Action (the "**Gatekeeper Provision**").  As discussed in more detail below, the Gatekeeper Provision is consistent with the ones authorized by the Fifth Circuit in *Highland I* and in *Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt, L.P. (In re Highland Cap. Mgmt., L.P.)*, 132 F.4th 353 (5th Cir. 2025), *cert. denied sub nom. Highland Cap. Mgmt. v. Nexpoint Advisors*, No. 25-119, 2026 WL 1855094 (U.S. June 29, 2026) ("**Highland II**") and, more recently, by the Court in other cases.  *See, e.g., In re Nine Energy Service, Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. Mar. 4, 2026) (Docket No. 189); *In re PosiGen, PBC*, No. 25-90787 (CML) (Bankr. S.D. Tex. Feb. 24, 2026) (Docket No. 613); *In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) (Docket No. 1483).

88.    In *Highland I*, the Fifth Circuit approved a gatekeeper provision related to claims that were being exculpated under the plan,[17] and in *Highland II*, the Fifth Circuit clarified that the scope of a gatekeeper provision may not extend beyond claims subject to the plan's injunction (there, the exculpated claims).[18]  Thus, because the Gatekeeper Provision is narrowly tailored to apply only to claims or Causes of Action against Exculpated Parties, it is consistent with Fifth Circuit precedent set forth in *Highland I* and *Highland II*.

89.    The Injunction Provisions, including the Gatekeeper Provision, are an integral component of the Plan, appropriate and necessary under the circumstances, consistent with the Bankruptcy Code, narrowly tailored, and compliant with applicable case law and precedent in the Fifth Circuit and, for the reasons set forth above, should be approved.

---

[17]    *See Highland I*, 48 F.4th at 439 ("In sum, the Plan violates § 524(e) but only insofar as it exculpates and enjoins certain non-debtors . . . We otherwise affirm the inclusion of the injunction and the gatekeeper provisions in the Plan.").

[18]    *See Highland II*, 132 F.4th at 362 ("The clear weight of Supreme Court and Fifth Circuit precedent dictates our holding: that a proper reading of *Highland I* requires that the definition of 'Protected Parties' used in the Plan's Gatekeeper Clause be narrowed coextensively with the definition of 'Exculpated Parties' used in the Exculpation Provision.").

### III.     Plan Satisfies Bankruptcy Code's Requirements and Should Be Confirmed

90.     To achieve confirmation of the Plan, the FBG Debtors must demonstrate that the Plan satisfies section 1129 of the Bankruptcy Code by a preponderance of the evidence. *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("[P]reponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003). The Plan satisfies all applicable requirements of section 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, and applicable nonbankruptcy law.

#### A.     *Section 1129(a)(1) of the Bankruptcy Code: Plan Complies with Applicable Provisions of Bankruptcy Code*

91.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and contents of a plan, respectively. *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310 (Bankr. S.D.N.Y. 2016) ("In order to determine whether a plan complies with section 1129(a)(1) of the Code, a court must ensure that the requirements of sections 1122 and 1123 are met.").

#### 1.     Section 1122:  Plan's Classification Structure is Proper

92.     Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). A plan proponent is afforded

38

"significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar." *In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009), *aff'd sub nom. In re Idearc, Inc.*, 662 F.3d 315 (5th Cir. 2011); *see also In re Pisces Energy, LLC*, No. 09-36591 (KKB), 2009 WL 7227880, at *8 (Bankr. S.D. Tex. Dec. 21, 2009) ("The Bankruptcy Code only prohibits the identical classification of dissimilar claims and does not require the same classification for claims sharing some attributes."); *Phx. Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278 (5th Cir. 1991) ("'[S]ubstantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class."); *In re Sentry Op. Co. of Tex.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (noting that "[section] 1122 is permissive of any classification scheme that is not proscribed, and that substantially similar claims may be separately classified.") (emphasis omitted); *In re Heritage Org., L.L.C.,* 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) (the "general rule" remains that "the division of creditors into classes under a plan of arrangement be according to the nature of the creditors' respective claims."); *In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991) ("A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the choices made and all claims within a particular class are substantially similar."), *aff'd*, 158 B.R. 421 (S.D. Tex. 1993).

93. Here, the Plan provides for the following ten (10) Classes of Claims and Interests: (i) Class 1 (Other Priority Claims), (ii) Class 2 (Other Secured Claims), (iii) Class 3 (Roll-Up Claims), (iv) Class 4 (First Lien Claims), (v) Class 5 (Second Lien Claims), (vi) Class 6 (ABL Claims), (vii) Class 7 (General Unsecured Claims), (viii) Class 8 (Subordinated Claims), (ix) Class 9 (Intercompany Claims), and (x) Class 10 (FBG Debtor Interests). *See* Plan, Art. III.

39

94.     The classification structure of the Plan is rational and complies with the Bankruptcy Code.  Within a given Class, all Claims and Interests have the same or similar rights against the FBG Debtors.  *See* Plan §§ 4.1–4.12.  Moreover, the classification generally tracks the FBG Debtors' prepetition capital structure.  *See* Moore Decl. ¶ 171.  The Roll-Up Claims, First Lien Claims, Second Lien Claims, and ABL Claims are separately classified from General Unsecured Claims because they are secured Claims with distinct lien, collateral, and priority rights. *See* DIP Order ¶¶ G(xiv)–(xv), G(xviii), 11; Plan §§ 1.1, 5.2(b).  Therefore, the classifications reflect the Claims' existing legal and economic rights, rather than any effort to manipulate voting. Nor could the separate classifications have been used to manipulate voting because, even if the relevant Claims were combined into a single class, that class would still have accepted the Plan. *See* Solicitation Decl. Ex. A.

95.     The differing legal rights, remedies, priorities, and other characteristics of the five (5) secured Classes of Claims are summarized below:

i.      ***Class 2 (Other Secured Claims)***. Class 2 is comprised of any Secured Claim, other than an Administrative Expense Claim, a DIP Claim, a First Lien Claim, a Second Lien Claim, an ABL Claim, or a Priority Tax Claim. *See* Plan § 1.1.

ii.     ***Class 3 (Roll-Up Claims)***. Class 3 is comprised of all Claims arising from (i) the DIP Credit Agreement or any other Loan Document (as defined in the DIP Credit Agreement), or (ii) the DIP Order and/or any other applicable order of the Bankruptcy Court, in each case, that are on account of the Roll-Up Obligations. *Id.*

iii.    ***Class 4 (First Lien Claims)***. Class 4 is comprised of all Claims arising from (i) the First Lien Term Loan Agreement, (ii) the SideCar Term Loan Agreement, or (iii) the DIP Order and/or any other applicable order of the Bankruptcy Court that relate to the First Lien Term Loan Agreement or the Side-Car Term Loan Agreement. *Id.*

iv.     ***Class 5 (Second Lien Claims)***. Class 5 is comprised of all Claims arising from (i) the Second Lien Term Loan Agreement, or (ii) the

DIP Order and/or any other applicable order of the Bankruptcy Court that relate to the Second Lien Term Loan Agreement. *Id.*

v.   ***Class 6 (ABL Claims)***. Class 6 is comprised of all Claims arising from (i) the ABL Credit Documents (as defined in the DIP Order) or (ii) the DIP Order or any other applicable order of the Bankruptcy Court, in each case, that are on account of the ABL Obligations and Cash Management Obligations (each as defined in the DIP Order) and including all Secured Claims held by any ABL Secured Party secured by any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. *Id.*

96.   Similarly, the FBG Debtors have a reasonable and permissible basis for the differing classification of each of the four (4) Classes of unsecured Claims:

i.   ***Class 1 (Other Priority Claims)***. Class 1 is comprised of any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code. *See* Plan § 1.1.

ii.   ***Class 7 (General Unsecured Claims)***. Class 7 is comprised of Claims (other than an Intercompany Claim or a Subordinate Claim) that are neither secured by collateral nor entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court. *Id.*

iii.   ***Class 8 (Subordinated Claims)***. Class 8 is comprised of any Claims that are subject to subordination under section 510(c) of the Bankruptcy Code. *Id.*

iv.   ***Class 9 (Intercompany Claims)***. Class 9 is comprised of any Claims held by an FBG Debtor against another FBG Debtor arising before the Petition Date. *Id.*

97.   As shown above, each Class containing unsecured Claims is comprised of Claims arising under different facts and circumstances which evidence their different natures. *See* Moore Decl. ¶ 171.  The FBG Debtors further have a reasonable and permissible basis for the classification of Class 10, which is comprised of any Interests in the FBG Debtors and is the only Class of Interests under the Plan.  Moore Decl. ¶ 173.

41

98.     Nevertheless, certain parties have objected to confirmation of the Plan, arguing that the Plan cannot be confirmed on the basis that the Plan separately classifies Roll-Up, First Lien, Second Lien, ABL,  and General Unsecured Claims.[19]  As set forth in the Reply Brief, the classification of these Claims is rational and reflects the nature and differing legal rights of the Claims.  More importantly, the classification was not designed to gerrymander an impaired accepting Class because, even if the relevant Claims had been combined into a single Class, that Class still would have accepted the Plan.[20]  Accordingly, these objections should be overruled.

2.     **Section 1123(a): Plan's Content is Appropriate**

99.     Section 1123(a) of the Bankruptcy Code sets forth seven requirements that a plan must satisfy.  *See* 11 U.S.C. § 1123(a).  The Plan satisfies each such applicable requirement:

- Section 1123(a)(1).  Article III of the Plan designates Classes of Claims and Interests as required by section 1123(a)(1).  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP A Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article III of the Plan.

- Section 1123(a)(2).  Article III of the Plan specifies whether each Class of Claims or Interests is Impaired or Unimpaired under the Plan as required by section 1123(a)(2).

- Section 1123(a)(3).  Article IV of the Plan specifies the treatment of any Class of Claims or Interests that is Impaired as required by section 1123(a)(3).

- Section 1123(a)(4).  Article IV of the Plan provides that, except as otherwise agreed to by a holder of a particular Claim or Interest, each Claim or Interest of a particular class is provided the same treatment, as required by section 1123(a)(4).

- Section 1123(a)(5).  The Plan provides adequate means for its implementation through, among other things, (i) the sale of the Estate Claims and transfer of

---

[19]   *See* Katsumi Obj. ¶¶ 46–55; LAM Obj. ¶¶ 100–06.

[20]   Even if this argument had merit (it does not), as established, Class 3 Roll-Up Claims indisputably have different legal rights than the Claims in Classes 4, 5, 6, and 7—and Class 3 voted to accept the Plan at every FBG Debtor, independently providing the impaired accepting class required for confirmation and further demonstrating that the Plan's classification scheme was not designed to manufacture acceptance.  Solicitation Decl., Ex. A.

42

such claims to the Litigation Trust pursuant to the Estate Claims Credit Bid Transaction (Plan § 5.2(e)), (ii) the establishment of the Litigation Trust and the appointment of the Litigation Trustee to pursue and monetize the Litigation Trust Assets, including the Estate Claims (Plan §§ 6.1, 6.10), (iii) the funding of the Litigation Trust with the Litigation Trust Cash Funding and the Litigation Trust Class 1 Funding Contributions (Plan §§ 6.3, 6.4), (iv) the sale of the DIP Collateral Trust Assets and transfer of such assets to the DIP Collateral Trust pursuant to the DIP Collateral Credit Bid Transaction; (v) the establishment of the DIP Collateral Trust and the appointment of the DIP Collateral Trustee to pursue and monetize the DIP Collateral Trust Assets (Plan §§ 7.1, 7.5), (vi) the funding of the DIP Collateral Trust with the DIP Collateral Trust Funding (Plan § 7.3), (vii) the foreclosure by the ABL Secured Parties upon the ABL Collateral Assets and the transfer of such assets to the ABL Collateral Trust (Plan §§ 4.6(b), 8.2), (viii) the establishment of the ABL Collateral Trust and the appointment of the ABL Collateral Trustee to pursue and monetize the ABL Collateral Trust Assets (Plan §§ 8.1, 8.4), (ix) provisions governing distributions of proceeds from the monetization of the Litigation Trust Assets, DIP Collateral Trust Assets, and ABL Collateral Trust Assets to creditors through the Litigation Trust Waterfall, DIP Collateral Trust Waterfall, and ABL Collateral Trust Waterfall, respectively (Plan §§ 6.5, 7.4, and 8.3), (x) the appointment of the Wind Down Administrator to direct and control the wind down of the FBG Debtors' estates and the Wind Down Budget (Plan § 5.7), (xi) the appointment of the Claims Ombudsman to, among other things, reconcile Disputed Claims (Plan § 5.2(g)), (xii) procedures for resolving Disputed Claims (Plan § 5.2(g), Art. X), (xiii) procedures for rejecting executory contracts and unexpired leases (Plan Art. XI), and (xiv) the FBG Debtor Releases, Third-Party Releases, Exculpation, and the Injunction Provisions (Plan §§ 13.4, 13.5, 13.6).

- <u>Section 1123(a)(7)</u>. Section 5.7 of the Plan provides that the Wind Down Administrator will have the authority and right on behalf of the FBG Debtors to carry out and implement all provisions of the Plan. Section 6.10(a) of the Plan provides that upon the establishment of the Litigation Trust, the Litigation Trustee shall be appointed. The Plan Supplement provides that Gerard Uzzi will serve as the Litigation Trustee. Section 7.5(a) of the Plan provides that upon the establishment of the DIP Collateral Trust, the DIP Collateral Trustee shall be appointed. The Plan Supplement provides that Tom A. Howley will serve as the DIP Collateral Trustee. Section 8.4(a) of the Plan provides that upon the establishment of the ABL Collateral Trust, the ABL Collateral Trustee shall be appointed by the ABL Agent in accordance with the terms of the ABL Collateral Trust Agreement.

100.   Accordingly, the Plan satisfies section 1123(a) of the Bankruptcy Code.

43

3.      *Section 1123(b):  Plan's Content is Permitted*

101.    Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a plan.  Here, the relevant provisions of the Plan are permissible under section 1123(b),[21] as set forth in more detail below.

- Section 1123(b)(1).  Pursuant to Article III of the Plan, Classes 1 (Other Priority Claims) and 2 (Other Secured Claims) are Unimpaired under the Plan, and Classes 3 (Roll-Up Claims), 4 (First Lien Claims), 5 (Second Lien Claims), 6 (ABL Claims), 7 (General Unsecured Claims), 8 (Subordinated Claims), 9 (Intercompany Claims), and 10 (FBG Debtor Interests) are Impaired under the Plan.

- Section 1123(b)(2).  The Plan provides for the rejection of the executory contracts and unexpired leases of the FBG Debtors as of the Confirmation Date, unless and except as otherwise provided in section 11.1(a) of the Plan.

- Section 1123(b)(3)(A). The provisions of the Plan represent a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, equitable, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. Additionally, as discussed in more detail herein, the FBG Debtor Releases, the Third-Party Releases, Exculpation Provision, and Injunction Provisions are permitted pursuant to sections 105, 1103, 1107, 1123(b)(3)(A), 1123(b)(6), 1125(e), and/or 1141 of the Bankruptcy Code.

- Section 1123(b)(3)(B).  The Plan preserves and retains certain rights, claims, and Causes of Action of the Estates to be pursued by the Trusts, as applicable, on behalf of the FBG Debtors.  *See* Plan § 13.10.

- Section 1123(b)(5).  Article IV of the Plan modifies the rights of holders of Roll-Up Claims (Class 3), First Lien Claims (Class 4), Second Lien Claims (Class 5), ABL Claims (Class 6), General Unsecured Claims (Class 7), Subordinated Claims (Class 8), Intercompany Claims (Class 9), and FBG Debtor Interests (Class 10), and leaves Unimpaired the rights of holders of Other Priority Claims (Class 1) and Other Secured Claims (Class 2).

- Section 1123(b)(6).  There are no provisions in the Plan that are inconsistent with the Bankruptcy Code.  In accordance with section 1123(b)(6) of the Bankruptcy Code, Article XIII of the Plan includes certain release, exculpation, and injunction provisions that are essential to the Plan and are

---

[21]   Section 1123(b)(4), which authorizes the sale of substantially all of a debtor's property pursuant to a plan, is inapplicable here.

consistent with the provisions of the Bankruptcy Code and Fifth Circuit precedent. *See id.*, at §§ 13.4–13.8.

102.    Accordingly, each of the foregoing permissive provisions are consistent with section 1123(b) of the Bankruptcy Code.  In addition, as discussed in more detail herein, the FBG Debtor Releases, Third-Party Releases, Exculpation Provision, and Injunction Provisions are permitted pursuant to sections 105, 1103, 1107, 1123(b)(3)(A), 1123(b)(6), 1125(e), and 1141 of the Bankruptcy Code and applicable law.  *See supra* § II.C–E.

103.    For the foregoing reasons, the Plan complies fully with sections 1122 and 1123 of the Bankruptcy Code, and, therefore, satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

**B.      *Section 1129(a)(2):  FBG Debtors Have Complied with Bankruptcy Code***

104.    Under section 1129(a)(2) of the Bankruptcy Code, "[t]he proponent of the plan [must] compl[y] with the applicable provisions of this title."  11 U.S.C. § 1129(a)(2).  The "applicable provisions" of the Bankruptcy Code have been interpreted to include, principally, sections 1125 and 1126 of the Bankruptcy Code.  *See, e.g.*, *Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 512 n.3 (5th Cir. 1998) (noting that section 1129(a)(2) includes requirement of compliance with section 1125); *In re Star Ambulance Serv. LLC*, 540 B.R. 251, 262 (Bankr. N.D. Tex. 2015) ("Courts interpret this language to require that the plan proponent comply with the disclosure and solicitation requirements set forth in Bankruptcy Code §§ 1125 and 1126.").  Often, courts have also considered whether the debtor "is a proper debtor under [s]ection 109 of the Bankruptcy Code and a proper proponent of [a plan] under [s]ection 1121(a) of the Bankruptcy Code." *In re J T Thorpe Co.*, 308 B.R. 782, 786 (Bankr. S.D. Tex. 2003) (holding that debtor's compliance with sections 109, 1125, and 1126 satisfied

45

requirements of section 1129(a)(2)); *see also In re Moody Nat'l SHS Houston H, LLC*, No. 10–30172 (MI), 2010 WL 5116872, at *4 (Bankr. S.D. Tex. June 23, 2010) (same).

### 1. FBG Debtors Are Proper Debtors and Plan Proponents

105. Under section 109(a) of the Bankruptcy Code, "a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor . . . ." 11 U.S.C. § 109(a). Further, "a person that may be a debtor under chapter 7 of [the Bankruptcy Code, with exceptions not applicable here] . . . may be a debtor under chapter 11 . . . ." 11 U.S.C. § 109(d). As stated on their petitions, each FBG Debtor has a domicile, a place of business, and/or property in the United States and is eligible for relief under chapter 7 of the Bankruptcy Code. Therefore, each FBG Debtor is a proper chapter 11 debtor.

### 2. FBG Debtors Have Complied with Sections 1125 and 1127

106. Under section 1125(b) of the Bankruptcy Code:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b).

107. On June 12, 2026, the Bankruptcy Court entered the Disclosure Statement Order (Docket No. 2990), which conditionally approved the Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code and approved the Solicitation Package. As detailed in the Solicitation Declaration, the FBG Debtors solicited votes from holders of Claims in the Voting Classes. In accordance with section 1125(b), the FBG Debtors did not solicit votes on the Plan until after the Disclosure Statement Order was entered.

108. In addition, the FBG Debtors may make certain additional immaterial changes to the Plan prior to or during the Combined Hearing pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. In accordance with Bankruptcy Rule 3019, these modifications will not require additional disclosure under section 1125 of the Bankruptcy Code or the re-solicitation of votes under section 1126 of the Bankruptcy Code. Further, these modifications to the Plan will be consistent with section 1129 of the Bankruptcy Code.

109. Based on the foregoing, the FBG Debtors have satisfied the requirements of sections 1125 and 1127 of the Bankruptcy Code.

### 3. FBG Debtors Have Complied with Section 1126

110. Section 1126 of the Bankruptcy Code sets forth the procedures for soliciting votes on a chapter 11 plan and determining acceptance thereof. Pursuant to section 1126 of the Bankruptcy Code, only holders of Allowed Claims or Interests that are Impaired and will receive or retain property under the Plan on account of such Claims or Interests may vote to accept or reject the Plan. *See* 11 U.S.C. § 1126.

111. As provided in the Solicitation Declaration, the FBG Debtors solicited acceptances of the Plan from the Voting Classes, which included the holders of Class 3 (Roll-Up Claims), Class 4 (First Lien Claims), Class 5 (Second Lien Claims), Class 6 (ABL Claims), Class 7 (General Unsecured Claims), and Class 8 (Subordinated Claims). In accordance with sections 1126(f) and 1126(g) of the Bankruptcy Code, the FBG Debtors did not solicit acceptances of the Plan from holders of Claims and Interests in, as applicable, Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), and Class 10 (FBG Debtor Interests) because holders of such Claims and Interests are either (i) Unimpaired and conclusively presumed to have accepted the Plan or (ii) are Impaired such that they will not receive any recovery under the Plan and, therefore, are deemed to reject the Plan. The FBG Debtors also did not solicit acceptances of the Plan from

47

holders of Claims in Class 9 (Intercompany Claims) because holders of such Claims are either plan proponents or controlled by plan proponents and therefore are presumed to accept the Plan.

112.    Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of claims entitled to vote to accept or reject the plan:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

113.    Similarly, section 1126(d) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of interests entitled to vote to accept or reject the plan:

> A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(d).

114.    As set forth in the Solicitation Declaration, with respect to each of the FBG Debtors, the Plan has been accepted by at least two-thirds in amount and more than one-half in number of Claims in Class 3 (Roll-Up Claims), Class 4 (First Lien Claims), Class 5 (Second Lien Claims), and Class 6 (ABL Claims).  *See* Solicitation Decl., Ex. A.  Accordingly, as a result, there are at least four impaired accepting Classes at 90 of the FBG Debtors.  *See* Solicitation Decl., Ex. A.  Although the holders in Class 7 (General Unsecured Claims) voted to *accept* the Plan at only 9 of 92 FBG Debtor entities, 680 (79%) in number voted to accept the Plan.  Further, and for

48

hypothetical purposes only, if litigation targets Katsumi, LAM Parties, and Evolution were removed from tabulation, Class 7 would be an accepting class at eighty-seven (87) FBG Debtors and rejecting class at only five (5) FBG Debtors.  Furthermore, as discussed herein, the FBG Debtors have satisfied the "cram down" requirements under section 1129(b) of the Bankruptcy Code and may obtain confirmation of the Plan notwithstanding the rejection of the Plan by the holders of Class 7 at certain of the FBG Debtors.  *Infra* § III.O.

115.  Based on the foregoing, the FBG Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

C.  ***Section 1129(a)(3):  Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law***

116.  Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Good faith is determined through consideration of whether the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success."  *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985).  The plan must also achieve a result consistent with the Bankruptcy Code.  *See Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.-Irving)*, 939 F.2d 289, 292 (5th Cir. 1991).  The good faith standard is "viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start."  *In re Sun Country Dev.*, 764 F.2d at 408; *W. Real Estate Equities, L.L.C. v. Village at Camp Bowie I, L.P. (In re Vill. at Camp Bowie I, L.P.)*, 710 F.3d 239, 247 (5th Cir. 2013) ("Good faith should be evaluated 'in light of the totality of the circumstances' . . . mindful of the purposes underlying the Bankruptcy Code.") (citing *In re Cajun Elec. Power*, 150 F.3d at 519); *In re Couture Hotel Corp.*, 536 B.R. 712, 735 (Bankr. N.D. Tex. 2015) (finding that plan

49

that is "the result of arm's length discussions and negotiations among the Debtor [and other relevant parties and stakeholders] . . . clearly promotes the objectives and purposes of the Bankruptcy Code and is being proposed in good faith.").

117.    Here, the Plan has been proposed in good faith and for the legitimate purpose of winding down and liquidating the FBG Debtors' Estates and distributing any remaining proceeds in accordance with the Plan. The Plan is the product of months of extensive, good-faith, arm's-length negotiations among the FBG Debtors, the Ad Hoc Group, the ABL Secured Parties, and the Creditors' Committee, each of which is represented by experienced and sophisticated legal and other advisors. On January 29, 2026, the FBG Debtors initiated a consensual mediation process overseen by the Honorable Marvin Isgur to facilitate a global resolution of the chapter 11 cases. *See* Moore Decl. ¶ 10. Following the extensive mediation process, during which the parties exchanged numerous proposals, held multiple mediation sessions, and engaged in direct discussions, the FBG Debtors, the Ad Hoc Group, and the Creditors' Committee reached a settlement in principle regarding the terms of the orderly wind down of the FBG Debtors' estates through a chapter 11 plan and the transactions contemplated thereunder. *Id.*   Negotiations continued after the initial mediation, including multiple hearings before the Court, ultimately resulting in the filing of the Plan, which the ABL Secured Parties subsequently agreed to support. *Id.*   Throughout this process, the FBG Debtors' efforts to negotiate and enter the Plan Settlement were at all times overseen and approved by the independent Special Committee.   *Id.* ¶ 20. Additionally, the FBG Debtors engaged extensively with Benjamin Duster, in his capacity as Independent Manager and as the Conflicts Manager of the SPV Entities, on numerous issues related to the treatment of the SPV Entities, but despite good-faith efforts, the parties were ultimately unable to reach consensus on those issues. This extensive negotiation process

50

demonstrates that the Plan is the product of genuine arm's-length bargaining rather than any improper purpose. *See id.* The Plan preserves and maximizes the value of the FBG Debtors' remaining assets for the Estates through a series of transactions transferring the FBG Debtors' assets to be monetized for the benefit of creditors. *See id.* ¶ 11.

118. The Plan further provides for satisfaction of the FBG Debtors' secured debt, administrative expense claims, and priority claims, and the potential for meaningful recoveries to general unsecured creditors. Confirmation of the Plan provides numerous key benefits for the FBG Debtors' Estates, including (i) allowing the estate to maximize the value of its remaining assets, including the Litigation Trust Assets (including the Estate Claims), DIP Collateral Trust Assets, and the ABL Collateral Trust Assets, (ii) $75 million in committed Litigation Funding that will permit the full and unfettered prosecution of Estate Claims, (iii) a Litigation Trust Waterfall that allows junior creditors, including administrative and priority creditors, to receive recoveries from proceeds of DIP Collateral well in advance of the repayment of the DIP A Claims and Roll-Up Claims, (iv) a substantial reduction in costs necessary to administer the estates, and (v) streamlined governance by means of the Wind Down Administrator. This Court has previously found a chapter 11 plan providing for the satisfaction of administrative and priority claims with the proceeds of litigation assets collected over time following the confirmation date to have been proposed in good faith. *See* Confirmation Order ¶ qq, *In re Steward Health Care Sys. LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. Jul. 25, 2025) (Docket No. 5774) ("The Debtors have proposed the Plan and all documents necessary to effectuate the Plan . . . in good faith and not by any means forbidden by applicable law.").

119. Further, the Plan is in full compliance with the Bankruptcy Code and applicable nonbankruptcy law, and it is not "forbidden by law." 11 U.S.C. § 1129(a)(3).

Accordingly, the FBG Debtors have proposed the Plan in good faith in compliance with section 1129(a)(3) of the Bankruptcy Code.

**D.** ***Section 1129(a)(4): Plan Provides that Professional Fees and Expenses are Subject to Court Approval***

120.   Section 1129(a)(4) requires that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."   11 U.S.C. § 1129(a)(4).   Section 1129(a)(4) has been construed to require that all payments of professional fees made from estate assets be subject to review and approval as to their reasonableness by the court.   *See In re Cajun Elec. Power*, 150 F.3d at 513–14; *see also In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting "there must be a provision [in the plan] for review by the Court of any professional compensation.").   This is a "relatively open-ended standard" involving a case-by-case inquiry and, under appropriate circumstances, does not necessarily require that a bankruptcy court review the amount charged.   *See In re Cajun Elec. Power*, 150 F.3d at 517 (finding with respect to routine legal fees and expenses that have been approved, "the court will ordinarily have little reason to inquire further with respect to the amount charged.").

121.   All payments for professional services provided to the Debtors during these cases that require Court approval will continue to be subject to such requirement through confirmation in accordance with section 1129(a)(4) of the Bankruptcy Code.   Specifically, Section 2.3 of the Plan provides that all fees of retained professionals accrued through confirmation must be approved by the Court pursuant to fee applications and according to the order approving procedures for the submission and approval of fee applications by professionals retained by the Debtors and Creditors' Committee in these chapter 11 cases pursuant to the Interim

52

Compensation Procedures Order (Docket No. 699) or another applicable order of the Court. Further, Section 14.1 of the Plan provides that the Court shall retain jurisdiction to "hear and determine all Professional Fee Claims." Plan, § 14.1(m). Accordingly, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

E.  **Section 1129(a)(5): FBG Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders**

122.  Section 1129(a)(5) of the Bankruptcy Code requires the plan proponent disclose the identity and affiliations of the proposed officers and directors of the debtors post-confirmation, that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy, and, to the extent that there are any insiders that will be retained or employed by the debtors post-confirmation, that there be disclosure of the identity and nature of any compensation of any such insiders. 11 U.S.C. § 1129(a)(5).

123.  The FBG Debtors have satisfied these requirements. The FBG Debtors have identified and disclosed the identity and affiliations of the Claims Ombudsman, Patrick A. Jackson, Esq. of Faegre Drinker Biddle & Reath LLP. *See* Plan Supplement, Ex. 3. The previously disclosed Wind Down Administrator has withdrawn and other candidates are currently being considered. The FBG Debtors have also identified and disclosed that Gerard Uzzi of Uzzi & Lall, a division of CBMN Advisors LLC, will serve as Litigation Trustee under the Plan. *See* Plan Supplement, Ex. 4. The Plan Supplement further provides the nature of the compensation of the Litigation Trustee. *See* Plan Supplement, Ex. 4-C. Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

F.      *Section 1129(a)(6):  Plan Does Not Contain Any Rate Changes*

124.    Section 1129(a)(6) of the Bankruptcy Code requires applicable government approval of "any rate change provided for in the plan."  *See* 11 U.S.C. § 1129(a)(6).  The Plan does not provide for rate changes by the FBG Debtors.  Accordingly, section 1129(a)(6) does not apply to the Plan.

G.      *Section 1129(a)(7):  Plan Satisfies Best Interests Test*

125.    Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired claim or interest has either accepted the plan or will receive or retain property having, as of the effective date of the plan, a present value of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time—commonly referred to as the "best interests" test.  *See* 11 U.S.C. § 1129(a)(7).  The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's plan.  *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1159 n.23 (5th Cir. 1988) (noting that a bankruptcy court is required to determine whether impaired claims would receive no less under a reorganization than through a liquidation).  A party's speculation that it would fare better in a hypothetical chapter 7 liquidation is insufficient to challenge a plan proponent's liquidation analysis.  *Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.-Irving)*, 939 F.2d 289, 292 (5th Cir. 1991).

126.    Here, the relative recoveries of holders of Claims or Interests under the Plan and in a hypothetical chapter 7 liquidation are set forth in Exhibit 9 to the Plan Supplement

54

(the "**Liquidation Analysis**").  As described in the Moore Declaration, the best interests test is satisfied as to every single holder of a Claim against or Interest in the FBG Debtors.  *See* Plan Supplement, Ex. 9; *see also* Moore Decl. ¶¶ 180–191.

127.   Specifically, the FBG Debtors determined that (i) section 1129(a)(7) of the Bankruptcy Code does not apply to the holders of Claims in Classes 1 (Other Priority Claims) and 2 (Other Secured Claims) as they are Unimpaired and, therefore, are deemed to have accepted the Plan, (ii) the best interests test is satisfied with respect to the holders of Claims and Interests in Class 3 (Roll-Up Claims), Class 4 (First Lien Claims), Class 5 (Second Lien Claims), Class 6 (ABL Claims), Class 7 (General Unsecured Claims), Class 8 (Subordinated Claims), and Class 10 (FBG Debtor Interests) because such holders are expected to receive a higher recovery under the Plan than if the cases are converted to chapter 7, and (iii) the best interests test is satisfied with respect to holders of Claims in Class 9 (Intercompany Claims) because there would be no recovery available to such holders in either a chapter 7 or under the Plan.  *See* Moore Decl. ¶¶ 185–187.

128.   Moreover, 100% of the holders of Claims in Classes 3 (Roll-Up Claims), 4 (First Lien Claims), 5 (Second Lien Claims), and 6 (ABL Claims) that have submitted a Ballot have voted to accept the Plan, satisfying the best interests test for those Classes.  *See* Solicitation Decl., Ex. A.  The Liquidation Analysis demonstrates that each holder of an Allowed Claim will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the FBG Debtors were liquidated under chapter 7 of the Bankruptcy Code.  *See* Moore Decl. ¶¶ 180–191.

129.   If these cases are converted to chapter 7, the FBG Debtors' estates lose the many negotiated benefits under the terms of the Plan Settlement, including (i) the Litigation Trust Waterfall, which provides recoveries for junior creditors before the repayment in full of at least

55

$2.5 billion of DIP A and DIP B Claims, (ii) capping the accrual of interest on the DIP A Claims, which would otherwise continue to accrue interest (at the default rate which adds an additional 2% per annum on top of the existing rate) until they are repaid in full, (iii) committed and backstopped funding for the Litigation Trust to immediately pursue the monetization of Estate Claims, and (iv) minority governance rights to ensure representation of unsecured creditors on the committee overseeing the Litigation Trust.

130.   Additionally, in a chapter 7 liquidation, the FBG Debtors' creditors would recover less than they would under the Plan because any liquidation proceeds in a chapter 7 would be reduced by certain costs, including fees for the chapter 7 trustee (a 3% fee on gross proceeds), the chapter 7 trustee's professionals, and general inefficiencies caused by suddenly transferring the estate to a new party without access to liquidity or institutional knowledge of the FBG Debtors, Special Committee members, and existing professionals.  *See* Moore Decl. ¶ 190.  Such costs of the chapter 7 trustee and the chapter 7 trustee's professionals are payable prior to any distributions that will be made to the FBG Debtors' creditors.[22]

131.   The Liquidation Analysis provides a fair and reasonable assessment of the effects that a conversion of the FBG Debtors' chapter 11 cases to cases under chapter 7 would have on the proceeds available for distribution to holders of Claims and Interests.  *See* Moore Decl.

---

[22]   *See* 11 U.S.C. § 507(a)(1)(c); *see also* 11 U.S.C. § 348(d) ("A claim against the estate or the debtor that arises after the order for relief but before conversion in a case that is converted under section 1112 . . . of this title, other than a claim specified in section 503(b) of this title, shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition."); *In re Simbaki, Ltd*, No. 13-36878 (MI), 2015 WL 1593888, at *4 (Bankr. S.D. Tex. Apr. 3, 2015) ("Section 348(d) provides that post-petition, pre-conversion claims lose their priority over post-petition, post-conversion claims."); *In re Bella Logistics LLC*, 583 B.R. 674, 682 (Bankr. W.D. Tex. 2018) ("Further, because this case has been converted to chapter 7, CIT's allowance, like all pre-conversion administrative expenses allowed under § 503(b), is subordinated to post-conversion administrative expenses allowed under § 503(b)."); *In re Peach State Ambulance, Inc.*, No. 16-12121 (WHD), 2017 WL 2222236, at *4 (Bankr. N.D. Ga. May 19, 2017) ("However, in a case converted to Chapter 7 from some other chapter, administrative expenses incurred after the conversion have priority over administrative expenses incurred prior to the conversion.").

¶¶ 180–191.   Furthermore, the assumptions and methodology used to prepare the Liquidation Analysis, including assuming that the chapter 7 trustee would have to either consent to the DIP Secured Parties' foreclosure or agree to a sale of the Estate Claims to the DIP Secured Parties via credit bid or cash for an amount substantially less than the amount of outstanding DIP A Claims, are reasonable, justified, and consistent with Mr. Moore's experience as a restructuring advisor and reflect a standard and well-recognized approach.   Moreover, the assumptions concerning additional costs in a chapter 7 case[23] and a discount sale of Estate Claims[24] are consistent with the precedent of this Court and many other courts.   *See* Moore Decl. ¶¶ 183–185.

132.   Accordingly, the FBG Debtors' assumptions and estimates used in the Liquidation Analysis are reasonable, justified, and appropriate.   Because each holder of a Claim in an impaired Class will receive a distribution under the Plan greater than or equal to what such holder would receive in a hypothetical chapter 7 liquidation, the Plan complies with section 1129(a)(7) of the Bankruptcy Code.   *See* Moore Decl. ¶¶ 180–191.

**H.    *Section 1129(a)(8):  Plan Has Been Accepted by Impaired Voting Class***

133.   Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accept the plan.   11 U.S.C. § 1129(a)(8).   Section 1126(c) of the

---

[23]   *See Pisces Energy*, 2009 WL 7227880, at *12 & n.7 (holding that plan satisfied best interests test because "a chapter 7 liquidation would increase the administrative costs of the Bankruptcy Cases"); *accord In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252–58 (Bankr. S.D.N.Y. 2007) (considering, among other things, costs of regulatory compliance, administrative costs of one or more chapter 7 trustees and their professionals; a trustee's lack of familiarity with debtors' business; potential for delays in claim and interest holders' receipt of distributions; and likelihood that chapter 7 trustees would adopt settlements embodied in plan), *appeal dismissed*, 371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008).

[24]   *See In re MCorp Fin., Inc.*, 160 B.R. 941, 961 (S.D. Tex. 1993) (confirming chapter 11 plan and holding that the lower prices on the sale of estate assets in a chapter 7 case were reasonable); *see also, e.g., In re Exco Res., Inc., et al.*, No. 18-30155 (MI) (Docket No. 1831 at Exhibit D) (assuming estimated recovery range of between 45% and 50% due to the accelerated timeframe of a proposed sale); *In re Core Sci., Inc.*, No. 23-90341 (CML) (S.D. Tex. Jan. 14, 2024) (Docket No. 1718) (assuming between approximately $314.2 million and $573.8 million of net liquidation proceeds available for distribution in a chapter 7 compared to approximately $1.06 billion of total distributable value under the chapter 11 plan (a 68.8% to 43% reduction in distributable value)).

57

Bankruptcy Code provides that a plan is accepted by an impaired class of claims if the accepting class members hold at least two-thirds in amount and more than one-half in number of the claims voted in their respective class.  11 U.S.C. § 1126(c).

134.   As set forth above, Class 3 (Roll-Up Claims) voted to accept the Plan at each FBG Debtor entity.  Class 4 (First Lien Claims), Class 5 (Second Lien Claims), and Class 6 (ABL Claims) voted to accept the Plan at the FBG Debtor entities at which such Classes held Claims.  At the 83 FBG Debtor entities for which Class 7 (General Unsecured Claims) voted to reject the Plan, either (i) Class 3 (Roll-Up Claims) voted to accept the Plan, (ii) Class 4 (First Lien Claims) voted to accept the Plan, (iii) Class 5 (Second Lien Claims) voted to accept the Plan, (iv) Class 6 (ABL Claims) voted to accept the Plan, or (v) each of Classes 3, 4, 5, and 6 voted to accept the Plan.  Holders of Claims or Interests, as applicable, in Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) are Unimpaired and, therefore, are conclusively presumed to accept the Plan.  Holders of Class 10 (FBG Debtor Interests) are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Claims in Class 9 (Intercompany Claims) are either plan proponents or are controlled by Plan proponents and, therefore, are conclusively presumed to accept the Plan.  Class 8 (Subordinated Claims) did not have at least one Allowed Claim or Interest against the FBG Debtors and, therefore, will be eliminated pursuant to Section 3.4 of the Plan upon commencement of the Combined Hearing and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code.

135.   As discussed more fully below, the FBG Debtors have satisfied the "cram down" requirements under section 1129(b) of the Bankruptcy Code and may obtain confirmation of the Plan notwithstanding the rejection by Class 7 (General Unsecured Claims) at certain FBG Debtors.

I.    *Section 1129(a)(9): Plan Provides for Payment in Full of All Allowed Priority Claims*

136.    Consistent with section 1129(a)(9) of the Bankruptcy Code, the Plan provides that, unless a holder agrees to different treatment, (i) Allowed Administrative Expense Claims and (ii) Allowed Priority Tax Claims, will be paid in full in Cash on the Effective Date or the first Business Day after the date that is forty-five (45) calendar days after allowance (Plan §§ 2.1, 2.5) or in the case of Allowed Priority Tax Claims, deferred Cash payments over a period not exceeding five years from the Petition Date, together with interest at the rate required by section 511 of the Bankruptcy Code (Plan § 2.5). The Plan further requires the Litigation Trust and/or the DIP Collateral Trust to maintain sufficient Cash to pay (i) all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims, and (ii) to establish reserves for all Disputed Administrative Expense Claims and Disputed Effective Date Priority Claims actually asserted in a timely filed proof of claim. Plan § 12.1(o).

137.    The Plan complies with section 1129(a)(9) of the Bankruptcy Code because the Effective Date will not occur until the conditions precedent contained in section 12.1 of the Plan are satisfied. Accordingly, the Plan complies with section 1129(a)(9) of the Bankruptcy Code. Nevertheless, certain parties have objected to confirmation of the Plan, arguing that the Plan cannot be confirmed because the Debtors project that the Effective Date will occur by the end of 2028. As set forth below and in the Reply Brief, an executory period between confirmation and effectiveness is commonplace, and the period of time between the Confirmation Date and the anticipated Effective Date is appropriate in these circumstances and does not render the Plan unconfirmable. Accordingly, and as discussed in more detail in the Reply Brief, the objections raised by these parties under section 1129(a)(9) should be overruled.

**J.**      *Section 1129(a)(10):  At Least One Class of Impaired Claims Has Accepted Plan at Every FBG Debtor*

138.      Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  Here, there is an impaired accepting Class at each of the FBG Debtor entities, with at least four impaired accepting Classes at 90 FBG Debtors, and the remaining two FBG Debtors[25] with one impaired accepting Class.  *See* Solicitation Decl. Ex. A.  Thus, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

**K.**      *Section 1129(a)(11):  Plan is Feasible*

139.      Section 1129(a)(11) requires the Bankruptcy Court to determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, ***unless such liquidation or reorganization is proposed in the plan***.

140.      11 U.S.C. § 1129(a)(11) (emphasis added).  In the context of a liquidating plan, some courts have interpreted this section to mean that a plan that provides for liquidation automatically satisfies section 1129(a)(11).  *See In re 47th and Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988) (finding a liquidating plan feasible because "feasibility, under the literal wording of § 1129(a)(11) of the Bankruptcy Code, is unnecessary to be shown").  As the FBG Debtors have put forth a plan of liquidation, section 1129(a)(11)'s "feasibility test has no application."  *In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988).

141.      To the extent applicable to liquidating plans, the feasibility test generally requires the Court to determine whether the Plan can be implemented and has a reasonable likelihood of success.  To be clear, feasibility does not require guaranteed success; the FBG

---

[25]      These two FBG Debtors have only two voting classes.

Debtors are not required to show that success of the Plan is "inevitable." *See Comput. Task Grp., Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003); *In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996) ("[I]t is not necessary for plan success to be guaranteed, nor is the feasibility requirement generally viewed as rigorous."). The determination of whether a liquidation plan is feasible requires a showing that the plan has a "reasonable assurance of commercial viability." *See Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th Cir. 1997) ("In determining whether a debtor's Chapter 11 plan of reorganization is feasible. . . .'the [bankruptcy] court need not require a guarantee of success. . . [o]nly a reasonable assurance of commercial viability is required.'") (quoting *In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1165–66 (5th Cir. 1993)).

142.    As demonstrated in the Moore Declaration and Kirschner Declaration and discussed in the Reply Brief, the FBG Debtors have demonstrated the Plan has a reasonable assurance of viability, have put forth a reasonable and realistic plan of liquidation, and therefore, section 1129(a)(11) "is satisfied on its own terms." Hr'g Tr. 30:11–22, *In re Steward Health Care Sys., LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. July 16, 2025) (Docket No. 5724).

143.    Multiple parties, without supporting evidence, have asserted the Plan violates section 1129(a)(11) because the FBG Debtors' methodology in the Plan for repaying administrative and priority claims is impermissible, too speculative or, as alleged by the U.S. Trustee, is not guaranteed. However, these parties either misstate the governing legal standard for section 1129(a)(11) or ignore the substantial evidence in support of feasibility. As discussed in more detail in the Reply Brief, the objections raised by these parties under section 1129(a)(11) should be overruled.

61

L.       *Section 1129(a)(12):  All Statutory Fees Have Been or Will be Paid*

144.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan."  11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses.  *Id.* § 507(a)(2).  In accordance with these provisions, Section 15.1 of the Plan provides that all Statutory Fees for the FBG Debtors due and payable prior to the Effective Date shall be paid by the FBG Debtors (or the Wind Down Administrator on behalf of the FBG Debtors) in full on the Effective Date.  The Plan therefore complies with section 1129(a)(12) of the Bankruptcy Code.

M.       *Section 1129(a)(13): FBG Debtors Have Complied with Section 1114*

145.     Section 1129(a)(13) of the Bankruptcy Code requires a proposed plan to provide for the continuation of all "retiree benefits" at the level established by a consensual agreement with an authorized representative of retirees or as modified by court order, in each case as provided in section 1114 of the Bankruptcy Code, or at any time prior to the confirmation of the plan.

146.     Section 1114 of the Bankruptcy Code provides procedures through which a debtor may modify or terminate a retiree benefits plan.  Courts have uniformly held that a debtor may terminate retiree benefits in a chapter 11 liquidation context. *See, e.g., In re Alpha Natural Res., Inc.*, 552 B.R. 314, 326 (Bankr. E.D. Va. 2016) ("Likewise, courts have also granted relief under § 1114 when a debtor proposes to liquidate its assets.") (citations omitted); *In re SAI Holdings Ltd.*, No. 06-33227 (MAW), 2007 Bankr. LEXIS 1051, at *14 (Bankr. N.D. Ohio March 26, 2007) ("Section 1114 itself does not distinguish between a liquidating plan and one in which the debtor seeks to rehabilitate its business—the plain language of the statute requires any debtor-

62

in-possession or trustee to comply with its provisions before being entitled to modify or terminate retiree benefits.") (citations omitted); *In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 524 (Bankr. S.D.N.Y. 1991) (holding that section 1114 of the Bankruptcy Code applies in liquidating chapter 11 cases).

147. On June 23, 2026, representatives of the United Automobile, Aerospace and Agricultural Implement Workers of America ("**UAW**") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy Allied Industrial and Service Workers International Union on behalf of Local Union No. 4863 ("**USW**" and, together with UAW, the "**Unions**") confirmed to the FBG Debtors that they would serve as authorized representative for the unionized retirees they represent in connection with section 1114 discussions with the FBG Debtors. On June 25, 2026, the Court entered the *Order (I) Authorizing and Directing the United States Trustee to Appoint a Committee of Retired Employees and (II) Granting Related Relief* (Docket No. 3060) authorizing the U.S. Trustee to appoint an official committee of retired employees (the "**Non-Union Retiree Committee**") to serve as the authorized representative to represent the interest of certain non-union retired employees of the FBG Debtors. On July 9, 2026 the U.S. Trustee appointed the Non-Union Retiree Committee (Docket No. 3148).

148. The FBG Debtors are following and complying with the procedures in section 1114 of the Bankruptcy Code for resolution of the retiree benefits issues. In accordance with section 1114 of the Bankruptcy Code, on June 25 and July 11, 2026, the FBG Debtors sent a letter to the Unions and the Non-Union Retiree Committee, respectively, proposing, among other things, to terminate the Retiree Benefit Arrangement in accordance with the requirements of section 1114 of the Bankruptcy Code (the "**Proposal**"). Subsequently, on July 14, 2026, the FBG Debtors filed the *Emergency Motion of Debtors for Order (I) Authorizing Debtors to Modify*

*Retiree Benefits and (II) Granting Related Relief* (Docket No. 3194) (the "**1114 Motion**"), requesting authority to terminate the FBG Debtors' retiree benefit plans in accordance with the terms of the Proposal on or before the Combined Hearing. However, the FBG Debtors remain in negotiations and have exchanged counterproposals with each of the Unions and the Retiree Committee.

149. The FBG Debtors are hopeful that a settlement with these parties providing for the consensual termination of the FBG Debtors' retiree benefit arrangements, among other terms, will be reached prior to the Combined Hearing. However, to the extent that no consensual agreement is reached, the FBG Debtors will prosecute the 1114 Motion at the Combined Hearing and will be prepared to satisfy their burden with respect to termination of the retiree benefit motions thereunder. The FBG Debtors will comply with any obligations arising from such ruling with respect to termination of retiree benefits, and as required by section 1129(a)(13) of the Bankruptcy Code. Therefore, the Plan will satisfy the requirement of section 1129(a)(13) of the Bankruptcy Code.

150. The FBG Debtors' 1114 Motion will be heard at the Combined Hearing. The FBG Debtors will comply with any obligations arising from such ruling with respect to modification or termination of retiree benefits, and as required by section 1129(a)(13) of the Bankruptcy Code. Therefore, the Plan will satisfy the requirement of section 1129(a)(13) of the Bankruptcy Code.

N.    *Sections 1129(a)(14)–(16) and 1129(e):  Inapplicable Provisions*

151. Section 1129(a)(14), 1129(a)(15) and 1129(a)(16) of the Bankruptcy Code are inapplicable to the Plan.

O.   ***Plan Satisfies "Cram Down" Requirements under Bankruptcy Code Section 1129(b) for Non-Accepting Classes***

152.   Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims or interests. Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

153.   The only Classes to which cramdown is relevant are the Classes that have been deemed to reject the Plan or that have voted to reject the Plan: Class 7 for 83 of the FBG Debtors and Class 10 (FBG Debtor Interests).

### 1.   **Plan Does Not Discriminate Unfairly**

154.   Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly-situated classes are treated differently without a reasonable basis for the disparate treatment. *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (noting that the "hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination.") (citing *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004)). As between two classes of claims or two classes of interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment. *See, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub*

*nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Drexel Burnham Lambert Grp.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

155.    The Plan does not discriminate unfairly with respect to any Class of Claims. Specifically, the Plan does not discriminate unfairly because Class 3 (Roll-Up Claims), Class 4 (First Lien Claims), Class 5 (Second Lien Claims), and Class 7 (General Unsecured Claims) participate in the same tier of the Litigation Trust Waterfall, as Class 3 Litigation Trust Interests, and share all distributions at that tier pro rata based solely on the Allowed amount of their respective Claims until each Claim is paid in full.  Thus, the Plan does not enhance the recoveries of any Class of Claims at the expense of another Class of Claims.

156.    Therefore, there is no unfair discrimination in the Plan in accordance with section 1129(b) of the Bankruptcy Code.

### 2.    Plan Is Fair and Equitable

157.    To be "fair and equitable" as to holders of unsecured claims, section 1129(b)(2)(B) of the Bankruptcy Code requires a plan to provide that a holder of a claim or interest that is junior to the claims of the nonaccepting class will not receive or retain any property under the plan.  *See* 11 U.S.C. § 1129(b)(2)(B).  Here, the "fair and equitable" rule is satisfied because distributions under the Plan are made in the order of priority prescribed by the Bankruptcy Code.  With respect to each Class that has voted or is deemed to reject the Plan—83 of the FBG Debtor Entities for Class 7 (General Unsecured Claims) and Class 10 (FBG Debtor Interests)—no holder of a junior Claim or Interest at that Debtor will receive or retain property under the Plan unless and until all senior claims are satisfied in full in accordance with the Bankruptcy Code.  *See id*.

66

**P.     *Section 1129(c):  Plan is Only Plan on File***

158.    The Plan is the only plan currently on file in these cases and, accordingly, section 1129(c) of the Bankruptcy Code does not apply.

**Q.     *Section 1129(d):  Principal Purpose of Plan is Not Avoidance of Taxes***

159.    The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no party has objected on any such grounds.  The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

## RESERVATION OF RIGHTS

160.    The FBG Debtors reserve all of their rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this memorandum (including with respect to the Reply Brief), to seek discovery, or to introduce evidence and to raise additional arguments at any hearing to consider confirmation of the Plan.

## CONCLUSION

161.    The Disclosure Statement satisfies all of the applicable requirements of the Bankruptcy Code and the Bankruptcy Rules and should be approved on a final basis.  In addition, the Plan satisfies all of the applicable requirements of section 1129 of the Bankruptcy Code and should be confirmed.  The Debtors respectfully request that the Court approve the Disclosure Statement on a final basis, confirm the Plan, and grant such other further relief as is just and appropriate.

Dated: July 27, 2026
     Houston, Texas

    */s/ Clifford W. Carlson*

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:  gabriel.morgan@weil.com
     clifford.carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
Andriana Georgallas (admitted *pro hac vice*)
Kevin Bostel (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   matt.barr@weil.com
     sunny.singh@weil.com
     andriana.georgallas@weil.com
     kevin.bostel@weil.com
     jason.george@weil.com

*Attorneys for Debtors and Debtors in Possession*

68

**<u>Certificate of Service</u>**

I hereby certify that on July 27, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

_/s/ Clifford W. Carlson_
Clifford W. Carlson