**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.[1]** | § | |

**FBG DEBTORS' OMNIBUS REPLY TO**
**OBJECTIONS TO (I) FINAL APPROVAL OF THE DISCLOSURE**
**STATEMENT AND (II) CONFIRMATION OF JOINT CHAPTER 11 PLAN**

**WEIL, GOTSHAL & MANGES LLP**
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted pro hac vice)
Sunny Singh (admitted pro hac vice)
Andriana Georgallas (admitted pro hac vice)
Kevin Bostel (admitted pro hac vice)
Jason H. George (admitted pro hac vice)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors and Debtors in Possession*

July 27, 2026

Houston, Texas

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|

PRELIMINARY STATEMENT ...........................................................................................................1

REPLY .....................................................................................................................................................10

    I.    Objections to the Plan Under Sections 1129(a)(9) and (11) Should be Overruled ...........................................................................................................10

        A.    The Bankruptcy Code Does Not Prohibit Delaying the Effective Date .............................................................................................................................12

        B.    The Objectors' Feasibility Concerns Should Be Rejected........................23

        C.    The Plan's Anticipated Effective Date Is Not Unfairly Prejudicial ............................................................................................................63

    II.    Objections to the Estate Claims Credit Bid Transaction Should be Overruled ...........................................................................................................66

    III.    Objections to the Preference Settlement Should be Overruled..............................77

    IV.    Objections to Consolidation for Distribution Purposes Should be Overruled ...........................................................................................................86

    V.    SPV-Related Objections Should be Overruled.........................................................93

    VI.    Objections Regarding the Administrative Expense Claims Basket and Administrative Expense Claims Consent Program Should be Overruled ...................................................................................................................100

    VII.    Onset's Objection to the Litigation Trust Funding Should be Overruled............108

    VIII.    Objections to the Third-Party Releases Should be Overruled .............................112

    IX.    Objections to the Exculpation Provision Should be Overruled ...........................114

    X.    Objections to the Injunction Provisions Should be Overruled.............................116

    XI.    Objections Alleging Improper Classification Should be Overruled ....................118

RESERVATION OF RIGHTS .............................................................................................................124

CONCLUSION......................................................................................................................................124

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 47th and Belleview Partners*,
  95 B.R. 117 (Bankr. W.D. Mo. 1988)........................................................................24

*Acequia, Inc. v. Clinton (In re Acequia, Inc.)*,
  34 F.3d 800 (9th Cir. 1994) .....................................................................................49

*Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re
  Peabody Energy Corp.)*,
  933 F.3d 918 (8th Cir. 2019) ..................................................................................108

*Ad Hoc Grp. of Senior Secured Noteholders v. Del. Tr. Co. (In re Sanchez Energy
  Corp.)*,
  139 F.4th 411 (5th Cir. 2024), *cert. denied sub nom. Delaware Tr. Co. v. Ad
  Hoc Grp. of Senior Secured Noteholders*, 146 S. Ct. 840 (2025)............................50

*In re Adelphia Commc'ns. Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007).....................................................................80

*In re Age Refin., Inc.*,
  801 F.3d 530 (5th Cir. 2015) ...................................................................................87

*In re Am. Cap. Equip.*,
  405 B.R. 415 (Bankr. W.D. Pa. 2009) .....................................................................17

*In re Anderson Grain Corp.*,
  222 B.R. 528 (Bankr. N.D. Tex. 1998)...................................................................109

*In re Applied Safety, Inc.*,
  200 B.R. 576 (Bankr. E.D. Pa. 1996) ......................................................................24

*Avion Funding, L.L.C. v. GFS Indus., L.L.C. (In re GFS Indus., L.L.C.)*,
  99 F.4th 223 (5th Cir. 2024) ....................................................................................22

*In re Bake-Line Grp., LLC*,
  359 B.R. 566 (Bankr. D. Del. 2007) ........................................................................52

*Bakst v. Sawran (In re Sawran)*,
  359 B.R. 348 (Bankr. S.D. Fla. 2007) .....................................................................50

*Bank of Am. v. Veluchamy*,
  535 B.R. 783 (N.D. Ill. 2015) *aff'd sub nom. In re Veluchamy*, 879 F.3d 808
  (7th Cir. 2018)..........................................................................................................49

i

*Begier v. I.R.S.*,
    496 U.S. 53 (1990)..............................................................................................52

*In re Bigler LP*,
    442 B.R. 537 (Bankr. S.D. Tex. 2010) ............................................................83, 113

*Boston Post Road Ltd. P'ship v. FDIC (In re Boston Post Road Ltd. P'ship)*,
    21 F.3d 477 (2d Cir. 1994)..............................................................................123

*In re Brotby*,
    303 B.R. 177 (B.A.P. 9th Cir. 2003)..................................................................24

*Cadle Co. v. Mims (In re Moore)*,
    608 F.3d 253 (5th Cir. 2010) ............................................................................84

*In re Cajun Elec. Power Co-op., Inc.*,
    230 B.R. 715 (Bankr. M.D. La. 1999) ................................................................53

*In re Cash Cloud, Inc.*,
    No. 23-10423 (MKN), 2023 Bankr. LEXIS 2561 (Bankr. D. Nev. Aug. 24,
    2023) ............................................................................................25, 57, 65, 66

*In re Celsius Network LLC*,
    649 B.R. 87 (Bankr. S.D.N.Y. 2023)................................................................101

*In re Cent. Eur. Indus. Dev. Co. LLC*,
    288 B.R. 572 (Bankr. N.D. Cal. 2003) .............................................................4, 63

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,
    280 F.3d 648 (6th Cir. 2002) ..........................................................................119

*Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.)*,
    No. H-18-3250 (LHR), 2019 U.S. Dist. LEXIS 21199 (S.D. Tex. Feb. 8,
    2019) ........................................................................................................113

*ConvergeOne Holdings, Inc. v. Ad Hoc Group of Excluded Lenders*,
    No. 4:24-cv-02001 (ASH), 2025 WL 4700341 (S.D. Tex. Sept. 25, 2025) ..................... *passim*

*In re Cybridge Corp.*,
    312 B.R. 262 (D.N.J. 2004) ..............................................................................50

*In re Cypresswood Land Partners I*,
    409 B.R. 396 (Bankr. S.D. Tex 2009) ............................................................23, 119

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017)..................................................................................106, 107

*Decker v. Tramiel (In re JTS Corp.)*,
   617 F.3d 1102 (9th Cir. 2010) ...................................................................................50

*In re Derosa-Grund*,
   567 B.R. 773 (Bankr. S.D. Tex. 2017) .................................................................83, 84

*Donell v. Kowell*,
   533 F.3d 762 (9th Cir. 2008) ....................................................................................48

*Ellis v. Westinghouse Elec. Co., LLC*,
   11 F.4th 221 (3rd Cir. 2021) .....................................................................................14

*In re EPD Inv. Co.*,
   114 F.4th 1148 (9th Cir. 2024) ..................................................................................47

*Epstein v. Container Store Grp., Inc. (In re Container Store Grp., Inc.)*,
   676 B.R. 356 (S.D. Tex. 2026) ................................................................................113

*Faulkner v. Ford Motor Credit Co. (In re Reagor-Dykes Motors, LP)*,
   No. 18-50214 (RLJ), 2022 WL 2046144 (Bankr. N.D. Tex. June 3, 2022) .....................46, 47

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans
   Ltd. P'ship)*,
   116 F.3d 790 (5th Cir. 1997) ...........................................................................11, 24, 57

*First State Operating Co. v. Holbrook (In re Lotspeich)*,
   328 B.R. 209 (B.A.P. 10th Cir. 2005) ..........................................................................76

*Gandy v. Gandy (In re Gandy)*,
   299 F.3d 489 (5th Cir. 2002) ....................................................................................86

*GBL Holding Co. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp.,
   Ltd.)*,
   331 B.R. 251 (N.D. Tex. 2005)....................................................................................84

*Gold Star Constr., Inc. v. Cavu/Rock Props. Project I, L.L.C. (In re Cavu/Rock
   Props. Project I, L.L.C.)*,
   637 F. App'x 123 (5th Cir. 2016) ................................................................................62

*In re Good*,
   428 B.R. 235 (Bankr. E.D. Tex. 2010) ..........................................................................13

*Harrington v. Purdue Pharma L.P.*,
   603 U.S. 204 (2024)................................................................................................112

*In re Heritage Highgate, Inc.*,
   679 F.3d 132 (3d Cir. 2012)...................................................................................61, 62

*In re Heritage Org, L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007)................................................................24, 83, 118, 119

*Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P.*
*(In re Highland II Cap. Mgmt., L.P.)*,
132 F.4th 353 (5th Cir. 2025) .................................................................................116, 117

*In re Idearc Inc.*,
423 B.R. 138 (Bankr. N.D. Tex. 2009)............................................................... *passim*

*In re ie Corp.*, No. 10-11061 (PJW), 2010 Bankr. LEXIS 5867 (Bankr. D. Del. Oct.
27, 2010) ...............................................................................................................24

*In re IFS Fin. Corp.*,
No. 02-39553 (MI), 2009 WL 2986928 (Bankr. S.D. Tex. Sept. 9, 2009), *aff'd*
*sub nom. IFS Fin. Corp. v. Garcia Suarez*, 2010 WL 11652027 (S.D. Tex.
Sept. 11, 2010), *aff'd sub nom. In re IFS Fin. Corp.*, 803 F.3d 195 (5th Cir.
2015) ....................................................................................................................46

*In re Indianapolis Downs, LLC*,
486 B.R. 286 (Bankr. D. Del. 2013) .....................................................................15

*Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*,
111 F.3d 269 (2d Cir. 1997)..................................................................................76

*In re Kossoff PLLC*,
673 B.R. 253 (Bankr. S.D.N.Y. 2025)..................................................................51

*In re Las Torres Dev., L.L.C.*,
413 B.R. 687 (Bankr. S.D. Tex. 2009) .................................................................86

*In re LATAM Airlines Grp. S.A.*,
No. 20-11254 (JLG), 2022 WL 790414 (Bankr. S.D.N.Y. Mar. 15, 2022),
*aff'd*, 643 B.R. 756 (S.D.N.Y. 2022) ...................................................................111

*Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev.*
*Co.)*,
779 F.2d 1068 (5th Cir. 1986) ..............................................................................17

*In re Maple Mortg., Inc.*,
81 F.3d 592 (5th Cir. 1996) ..............................................................................51, 52

*In re Mirant Corp.*,
348 B.R. 725 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3*
*Claimholders v. New Mirant Entities*, No. 06-cv-744 (JHM), 2006 WL
3780884 (N.D. Tex. Dec. 26, 2006) ......................................................................83

*In re Moody Nat'l SHS Hous. H, LLC*,
    No. 10-30172 (MI), 2010 WL 5116872 (Bankr. S.D. Tex. June 30, 2010) ..........................113

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*,
    48 F.4th 419 (5th Cir. 2022) ....................................................................114, 115, 116, 117

*In re Northbelt, LLC*,
    630 B.R. 228 (Bankr. S.D. Tex. 2020) ...................................................................................25

*In re Owens Corning*,
    419 F.3d 195 (3d Cir. 2005)......................................................................................87, 91

*In re Pac. Drilling S.A.*,
    No. 17-13193 (MEW), 2018 WL 11435661 (Bankr. S.D.N.Y. Oct. 1, 2018).......................111

*In re Pearl Res.*,
    622 B.R. 236 (Bankr. S.D. Tex. 2020) .................................................................................120

*Pergament v. Torac Realty (In re Diamond Fin. Co.)*,
    658 B.R. 748 (Bankr. E.D.N.Y. 2024)...................................................................................47

*In re Pero Bros. Farms, Inc.*,
    90 B.R. 562 (Bankr. S.D. Fla. 1988)......................................................................................24

*In re Premiere Network Servs., Inc.*,
    333 B.R. 130 (Bankr. N.D. Tex. 2005)..................................................................................119

*In re Premiere Network Servs., Inc.*,
    No. 04-33402 (HDH), 2005 Bankr. Lexis 2298 (Bankr. N.D. Tex. July 1, 2005) .............................................................................................................................................65

*In re Quigley Co., Inc.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007)..................................................................................108

*In re QVC Grp. Inc.*,
    No. 26-90447 (ARP), 2026 WL 2058528 (Bankr. S.D. Tex. July 15, 2026) .................. *passim*

*Republic Supply Co. v. Shoaf*,
    815 F.2d 1046 (5th Cir. 1987) ............................................................................................113

*Rivercity v. Herpel (In re Jackson Brewing Co.)*,
    624 F.2d 599 (5th Cir. 1980) ................................................................................................83

*In re Robertshaw US Holding Corp.*,
    662 B.R. 300 (Bankr. S.D. Tex. 2024) ................................................................................118

*In re Rolling Green Country Club*,
26 B.R. 729 (Bankr. D. Minn. 1982) ....................................................................................16

*In re Roqumore*,
393 B.R. 474 (Bankr. S.D. Tex. 2008) ...........................................................................84, 87

*In re Sabine Oil & Gas Corp.*,
555 B.R. 180 (Bankr. S.D.N.Y. 2016)................................................................................120

*In re Sanchez Energy Corp.*,
No. 19-34508 (MI), 2022 WL 2912076 (Bankr. S.D. Tex. July 22, 2022) ..........................101

*In re Schepps Food Stores*,
1994 Bankr. LEXIS 1368 (Bankr. S.D. Tex. July 11, 1994)................................................109

*Scholes v. Lehmann*,
56 F.3d 750 (7th Cir. 1995) ...............................................................................................48

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
528 F. Supp. 3d 219 (S.D.N.Y. 2021)..................................................................................47

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Sec. Inv'r Prot. Corp.)*,
568 B.R. 481 (Bankr. S.D.N.Y. 2017)..................................................................................49

*In re Sentry Operating Co. of Tex., Inc.*,
264 B.R. 850 (Bankr. S.D. Tex. 2001) ...............................................................................123

*In re Serta Simmons Bedding, L.L.C.*,
125 F.4th 555 (5th Cir. 2024) ....................................................................................... *passim*

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004)..........................................................................................................13

*In re Southmark*,
49 F.3d 1111 (5th Cir.1995) ..............................................................................................51

*In re SPC Seller*,
No. 09-12647 (BLS), 2010 Bankr. LEXIS 5321 (Bankr. D. Del. Dec. 8, 2010)....................24

*SR Constr. V. Hall Palm Springs, L.L.C. (In re Palm Springs II, L.L.C.)*,
65 F.4th 752 (5th Cir. 2023) ..............................................................................................76

*In re SS&S Specialties, LLC*,
No. 21-50124-KKS, 2024 WL 3884169 (Bankr. N.D. Fla. Aug. 15, 2024)...........................54

*In re Straightline Invs., Inc.*,
525 F.3d 870 (9th Cir. 2008) ..............................................................................................49

vi

*In re Teligent, Inc.*,
282 B.R. 765 (Bankr. S.D.N.Y. 2002)....................................................................106

*In re Tex. Extrusion Corp.*,
844 F.2d 1142 (5th Cir. 1988) ...............................................................................68

*TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*,
764 F.3d 512 (5th Cir. 2014) ...........................................................................75, 76

*Travelers Ins. Co. v. Bryson Props., XVIII (In re Bryson Props., XVIII)*,
961 F.2d 496 (4th Cir. 1992) ................................................................................123

*In re Trico Marine Servs., Inc.*,
450 B.R. 474 (Bankr. D. Del. 2011) .....................................................................101

*In re Twin Peaks Fin. Servs., Inc.*,
516 B.R. 651 (Bankr. D. Utah 2014) ......................................................................47

*U.S. Abatement Corp. v. Mobil Expl. & Producing U.S., Inc. (In re U.S. Abatement Corp.)*,
39 F.3d 556 (5th Cir. 1994) ...................................................................................84

*United States v. AWECO, Inc. (In re AWECO, Inc.)*,
725 F.2d 293 (5th Cir. 1984), *cert. denied*, 469 U.S. 880 (1984)...........................84

*In re Vescor Dev. 3, LLC*,
No. 06-12094 (MKN), 2007 Bankr. LEXIS 5125 (Bankr. D. Nev. Jan. 19,
2007) ...................................................................................................................14

*Wells Fargo Bank of Tex., N.A. v. Sommers (In re AMCO Ins.)*,
444 F.3d 690 (5th Cir. 2006) .................................................................................86

*Whitlock v. Lowe (In re DeBerry)*,
945 F.3d 943 (5th Cir. 2019) .................................................................................50

*Williams v. Fed. Deposit Ins. Corp. (In re Positive Health Mgmt., Inc.)*,
769 F.3d 899 (5th Cir. 2014) .................................................................................48

*In re Wonder Corp. of Am.*,
70 B.R. 1018 (Bankr. D. Conn. 1987) ................................................................4, 63

*In re Wool Growers Cent. Storage Co.*,
371 B.R. 768 (Bankr. N.D. Tex. 2007)................................................................113

**Statutes**

11 U.S.C. § 363................................................................................................ *passim*

11 U.S.C. § 502 ................................................................................................96, 98

11 U.S.C. § 506 ......................................................................................................62

11 U.S.C. § 547 ........................................................................................79, 80, 84

11 U.S.C. § 1101 ....................................................................................................22

11 U.S.C. § 1122 ...........................................................................................*passim*

11 U.S.C. § 1123 ...........................................................................................*passim*

11 U.S.C. § 1129 ...........................................................................................*passim*

11 U.S.C. § 1141 ................................................................................5, 14, 20, 70

11 U.S.C. § 1142 ....................................................................................................68

18 U.S.C. § 981 ......................................................................................................51

18 U.S.C. § 982 ......................................................................................................51

## Other Authorities

Fed. R. Bankr. P. 3020 ...........................................................................................19

Fed. R. Bankr. P. 7001 ...........................................................................................91

Fed. R. Bankr. P. 9014 ...........................................................................................91

Fed. R. Bankr. P. 9019 ...........................................................................4, 8, 78, 87

First Brands Group, LLC ("**FBG**") and certain of its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**FBG Debtors**"), respectfully submit this omnibus reply to objections to (i) final approval of the Disclosure Statement,[2] and (ii) confirmation of the Plan,[3] and represent as follows:

**PRELIMINARY STATEMENT**

1.      The FBG Debtors stand before this Court because Patrick James and his confederates perpetrated one of the largest corporate frauds in history, selling billions of dollars of fake receivables, pledging the same collateral to multiple lenders, and doctoring FBG's books until the enterprise collapsed.  Patrick James has been federally indicted, FBG's former CFO and Vice President of Finance have pleaded guilty, and an independent Examiner has corroborated the Debtors' findings.  What remains of First Brands is no longer a salvageable operating business but instead a set of litigation assets: claims against the architects of the fraud and the counterparties who sustained it.  The Plan now before the Court is the product of months of hard-fought negotiation and mediation before Judge Isgur, and it achieves one of the primary objectives the Estates now have: it funds a Litigation Trust with $75 million to pursue approximately $25 billion in identified claims and, in time, to return recoveries to creditors, including junior creditors who would otherwise receive nothing.  The Plan enjoys widespread support from the Debtors, the Creditors' Committee, the DIP lenders, and each class of prepetition secured lenders.  Most of the objections come from parties the Litigation Trust intends to sue (or who are already defendants).

---

[2]   The FBG Debtors' *Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (Docket No. 3020), dated June 17, 2026, (as amended, supplemented, or otherwise modified from time to time, the "**Disclosure Statement**").

[3]   The FBG Debtors' *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors*, dated June 16, 2026 (Docket No. 3019) (as amended, supplemented, or otherwise modified from time to time, the "**Plan**"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, Disclosure Statement, or the *FBG Debtors' Memorandum of Law in Support of (I) Final Approval of the Disclosure Statement and (II) Confirmation of Joint Chapter 11 Plan* filed contemporaneously herewith.

The Court should overrule the objections, confirm the Plan, and bring these chapter 11 cases to a value-maximizing conclusion.

2.      The cornerstone of the Plan is the Litigation Trust, which will pursue valuable Estate Claims and causes of action with assertable claim amounts totaling approximately $25 billion.  Despite there being more than $1.3 billion of new money DIP loans (the "**DIP A Claims**") outstanding and $3.5 billion in DIP Roll-Up Claims, the Plan allows junior creditors, including administrative, priority and unsecured creditors, to begin sharing in recoveries from the Litigation Trust well before the DIP A Claims are repaid in full.

3.      As the Court recognized at a recent hearing, the DIP Secured Parties are making significant concessions in support of the Plan.[4]  They include:

- providing $75 million of Litigation Trust Funding to the Litigation Trust ($25 million of cash on the balance sheet and $50 million of new money litigation financing);

- capping the DIP A Claims for the purposes of the Litigation Trust Waterfall at the amount outstanding as of the Confirmation Date (estimated at $1.3 billion) and foregoing the ability to collect potentially hundreds of millions of dollars of additional distributions from the Litigation Trust;

- subordinating their $3.5 billion of Roll-Up Claims by agreeing to share in recoveries under the Litigation Trust Waterfall on a pari passu basis with unsecured creditors;

- permitting minority representation on the Litigation Trust Oversight Committee, including a Creditors' Committee appointee who will have veto rights over certain decisions of the Litigation Trust (i.e., Sacred Rights);

- waiving or limiting the Litigation Trust's pursuit of preference claims that would otherwise be available to pay down the DIP Facility;

- foregoing the remedies upon the DIP Facility maturing on June 29, 2026, and other defaults and not being repaid in full;

- agreeing to a reduction of the minimum liquidity covenant under the DIP Facility from $50 million to $25 million; and

---

[4]     *See* Hr'g Tr. 231:11–16, *In re First Brands Group, LLC,* No. 25-90399 (Bankr. S.D. Tex. June 12, 2026).

2

- consenting to the continued use of cash collateral through the confirmation process.

4. Absent this Plan and the Plan Settlement, the FBG Debtors have no ability to monetize their Estate Claims for the benefit of their estates. The only alternative is conversion to chapter 7. As reflected in the FBG Debtors' liquidation analysis, chapter 7 would result in the DIP Secured Parties foreclosing on or otherwise acquiring outright ownership of all of the Estate Claims without any obligation to share in any recoveries with junior creditors. Tellingly, no party has seriously challenged the FBG Debtors' liquidation analysis or argued that the Plan does not satisfy the best interests test.

5. Despite the numerous benefits afforded to creditors under the Plan, a group of litigation defendants or potential targets, consisting of SPV lenders, factors, and supply chain financers whose prepetition actions likely allowed the fraud to persist, have mobilized in opposition to the Plan. To be clear, none of these parties—who at best, hold general unsecured claims—raise issues with the treatment of their claims under the Plan. They cannot credibly dispute that the Plan is the best path to maximize value of the estates and obtain recoveries for creditors; and, to the extent they hold allowed claims, they have a path to participating in those recoveries. Nor do they dispute that junior creditors, including themselves, will be substantially worse off in chapter 7. Instead, these objectors' primary motivations in opposition to the Plan is their claims that the Plan may prejudice their rights as *defendants* (not as creditors of the FBG Debtors). None of these objections withstand scrutiny.

6. *First*, the objectors challenge the Plan's delayed effective structure and argue that achieving the effective date is infeasible. But the objectors cannot overcome the text of the Bankruptcy Code and the existence of confirmed chapter 11 plans with similar structures. As Collier on Bankruptcy makes clear, "the terms of each confirmed plan will set the effective

3

date." 7 Collier on Bankruptcy ¶ 1129.05[e] (16th ed. 2026). The objectors' effort to argue that the Plan's effective date is "illusory" and the Court should treat confirmation as the real effective date would rewrite both the Plan and the Code and flout settled precedent and practice.

7. All that is required under the case law is that: (1) the effective date should occur "no later than is reasonably necessary to accomplish a legitimate purpose,"[5] and (2) the delay does not create any "real danger to [to creditors] of changed facts or prejudice."[6] Here, both standards are easily met—the effective date is only delayed until there are sufficient litigation proceeds to fund plan distributions to repay administrative and priority creditors and the delay does not prejudice creditors, rather it protects them from a value-destructive chapter 7 where junior creditors will receive no recovery.

8. Nor is the Effective Date "illusory" because certain transactions occur on the Confirmation Date. The Plan embodies several sales and settlements that are necessary to implement the Plan and may be independently authorized under applicable sections of the Bankruptcy Code and Bankruptcy Rules, including section 363 and Bankruptcy Rule 9019. Consummating these transactions upon confirmation is integral to the Plan and necessary to lock in the remarkable benefits achieved in negotiations with the Ad Hoc Group, including (most notably) the Litigation Trust Waterfall that provides distributions to junior creditors well in advance of the repayment in full of the DIP A Claims and funding for the Litigation Trust. In order for the estate to lock in the benefits of the bargain, these transactions must occur upon confirmation.

---

[5] *In re Wonder Corp. of Am.*, 70 B.R. 1018, 1021 (Bankr. D. Conn. 1987).

[6] *In re Cent. Eur. Indus. Dev. Co. LLC*, 288 B.R. 572, 577 n.7 (Bankr. N.D. Cal. 2003).

4

9.      In addition, the Effective Date of the Plan has significant import.  Among other things, upon the Effective Date, the FBG Debtors will emerge from chapter 11 and the Bankruptcy Court's jurisdiction will narrow, cash distributions to unsecured creditors may commence (as well as the implementation of substantive consolidation for distribution purposes for these creditors), and numerous other provisions of the Plan will become effective, including the Plan's third-party releases (Section 13.5(b)), injunction (Section 13.4(b)), the release of the remaining First Lien Claims and Second Lien Claims (Section 5.2(h)), and the cancellation of security documents (Section 5.9).  Moreover, upon the Effective Date, the FBG Debtors will no longer be able to seek to withdraw or revoke the Plan (Section 15.7) and the Plan will be deemed to be substantially consummated (Section 15.9).

10.     The objectors' feasibility concerns are likewise meritless.  This objection fails at the threshold, because section 1129(a)(11) expressly addresses liquidating plans and provides that confirmation may be followed by liquidation where, as here, "such liquidation . . . is proposed in the plan."  And the objection also fails on the merits, because the evidence shows that the plan has more than a "reasonable hope of success" (as the U.S. Trustee described the standard).[7] The FBG Debtors hold valuable claims and causes of action in the aggregate amount of approximately $25 billion, and the FBG Debtors need to collect only a small fraction (8%) of the total amount for the Plan to become effective.  The strength of the Estate Claims is supported by fact and expert evidence reflecting (i) months of investigative work by the Debtors and their advisors, (ii) indictments against, and guilty pleas of, former management, and (iii) findings by an independent Examiner.  The objectors—some of whom will soon have to *defend* against Estate

---

[7]    *See* U.S. Trustee Obj. ¶ 22 (Docket No. 3271) (quoting *In re Sun County Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

Claims—offer little to refute the FBG Debtors' evidence and instead try to use confirmation to attack the case against them. To be clear, the Court is not required to hold a mini-trial on any claim—much less every claim—to confirm the Plan. All that the Bankruptcy Code requires, and what the FBG Debtors will show, is that the Plan has a reasonable probability of becoming effective.

11. *Second*, the objectors argue the Estate Claims Marketing Process was inadequate and that the DIP Secured Parties are not good faith purchasers entitled to the protections of section 363(m). Neither argument is supported by evidence. As Mr. Moore will testify, the Debtors, the Ad Hoc Group and the Creditors' Committee engaged in several months of extensive negotiation and mediation regarding a case resolution. Those hard-fought negotiations ultimately resulted in a global deal with the Ad Hoc Group and Creditors' Committee, including substantial concessions from the DIP Lenders.

12. The FBG Debtors also ran a robust marketing process for the Estate Claims over multiple months, with the DIP Secured Parties and other interested bidders having access to the same information regarding the Litigation Trust Assets. The evidence will show that the Debtors ran an extensive and fair process that resulted in a transaction that maximizes the value for the Debtors' estates. Section 363(m) protections are appropriate for this transaction. The DIP Secured Parties are offering multiple substantial forms of valuable consideration in exchange for the Litigation Trust Assets. They are good faith purchasers entitled to the protections of Section 363(m).

13. *Third*, the Preference Settlement does not violate section 1123(a)(4) of the Bankruptcy Code. In fact, this Court's recent decision in *In re QVC Group* directly addresses this issue, where it held that debtor releases in a plan do not constitute "treatment" of claims, and

6

therefore, fall outside section 1123(a)(4)'s requirement that a plan provide "the same treatment for each claim . . . of a particular class." 11 U.S.C. § 1123(a)(4). The objectors argue the Plan provides disparate treatment among certain holders of General Unsecured Claims under the Plan, namely trade creditors, factors, and supply chain financers, because trade creditors can obtain a full preference release under the Preference Settlement whereas factors and supply chain financing parties can only obtain the benefits of a modified "new value" defense. But, as this Court held in *QVC*, treatment is "focused on the payment of value" and there is no value paid when providing a release.[8] This Court found that releases are distinct from the indemnity provision disapproved of by the Fifth Circuit in *Serta* because "indemnity creates an affirmative right to payment in the event of litigation" whereas a release—like those granted under the Preference Settlement—"does not create any such affirmative right to payment."[9]

14.     ***Fourth***, certain objectors argue that substantive consolidation for distribution purposes only is not warranted. Others argue that limited substantive consolidation does not go far enough and the Plan must provide for full substantive consolidation. This objection is a thinly-veiled attempt by defendants seeking to use substantive consolidation to gain additional defenses to claims that may be asserted against them by the Litigation Trust. But, substantive consolidation under a chapter 11 plan is the exception, not the rule. The resolution of this issue was central aspect of the global settlement that was ultimately reached between the Debtors, Ad Hoc Group, and Creditors' Committee. As part of the global settlement, the parties agreed that the Plan would provide for limited consolidation for distribution purposes only, while fully preserving parties' rights—including defendants to claims brought by the Litigation Trust—to

---

[8]     *In re QVC Grp. Inc.*, No. 26-90447 (ARP), 2026 WL 2058528, at *38(Bankr. S.D. Tex. July 15, 2026).

[9]     *Id.*

argue for or against substantive consolidation in future litigation.  The evidence will establish that the limited consolidation provided for distributions under the Plan easily satisfies the "lowest range of reasonableness" standard under Bankruptcy Rule 9019, particularly given the following considerations: (i) the Debtors' capital structure and fact that the DIP Lenders hold DIP liens against all of the FBG Debtors, (ii) segregating the various FBG Debtors' assets and liabilities would be time consuming and costly with no material benefits to creditors, (iii) the challenges with attempting to ascertain which Debtor entity (or entities) owned each of the Estate Claims, and (iv) the significant costs savings by avoiding a "full" substantive consolidation fight at confirmation.  Critically, the Plan preserves the objectors' rights to assert defenses based "on the doctrine of substantive consolidation, veil piercing, alter ego or any similar doctrine."[10]  These objections should be overruled.

15.     *Fifth*, the Administrative Expense Claims Consent Program does not violate section 1123(a)(4).  As mandated by the Bankruptcy Code, Administrative Expense Claims are not classified under the Plan.  Therefore, section 1123(a)(4) is inapplicable.  Moreover, offering to pay certain administrative creditors ahead of others is permitted because, among other reasons, the Plan provides (and the evidence will show) that each Administrative Expense Claim will be paid in full (i.e., will receive the same treatment) whether or not they participate in the Administrative Expense Claims Consent Program.  Accordingly, objections to the Administrative Expense Claims Consent Program should be overruled.

16.     *Sixth*, the release, exculpation, and injunction provisions under the Plan comply with Fifth Circuit law.  The debtor and third-party releases are narrowly tailored.  They are limited to parties that were engaged shortly before or after the commencement of the

---

[10]   Plan § 6.2(c).

8

bankruptcy cases or parties (i.e., the Prepetition Secured Parties) that already received Debtor releases under the DIP Order. No party involved in the Debtors' prepetition management is getting a release and the release provisions contain standard carveouts for gross negligence, willful misconduct, and fraud. Moreover, the third-party releases are fully consensual and creditors are required to "opt in" to become a Releasing Party. Furthermore, the exculpation is limited to the FBG Debtors, the Special Committee members, the Independent Managers, and the Creditors' Committee and its members in compliance with the Fifth Circuit's ruling in *Highland Capital I*.

17.     ***Last***, certain objectors argue the Plan improperly classifies Roll-Up Claims, First Lien Claims, Second Lien Claims, and ABL Claims (collectively, the "**Impaired Accepting Classes**") separately from General Unsecured Claims in an attempt to gerrymander an impaired accepting class. As an initial matter, if the objectors got their way and had all of these classes consolidated into a single class, the voting results reveal that such consolidated class would have voted to accept the Plan.[11] Therefore, even if there were any merit to this objection (there is not), the voting results would render it moot. In any event, the claims in each of the Impaired Accepting Classes arise under different credit agreements, with different security rights in the FBG Debtors' assets, and therefore, possess distinct legal rights as compared to General Unsecured Claims. Neither section 1122 nor the case law cited by the objectors supports the objectors' position and there are an abundance of cases that have rejected their arguments. Accordingly, this objection should be overruled.

---

[11]     *See* Orchowski Decl., Ex. A.

9

18. For these reasons, as set forth more fully below, the objections to confirmation of the Plan should be overruled and the Plan should be confirmed.[12]

## REPLY

### I. Objections to the Plan Under Sections 1129(a)(9) and (11) Should be Overruled

19. Certain objectors take issue with the Plan's delayed Effective Date. They contend that the Plan's structure (A) violates section 1129(a)(9)'s requirement that administrative expense claims must be paid in full "on the effective date of the plan"; (B) renders the plan not feasible, in violation of section 1129(a)(11); and (C) is prejudicial to creditors.[13]

20. None of these arguments has merit and the objectors ignore that this Court and others have confirmed similar plan structures.

21. As for the objectors' legal argument that the delayed Effective Date violates the Bankruptcy Code, the objectors get it backwards. This Court has already recognized that a postponed effective date is not "inconsistent with the Code," but is instead expressly contemplated by the Code, and is particularly appropriate where "the extra time [is] necessary, and will [] benefit the estate and creditors." Hr'g Tr. 32:5–6, 12–13, *In re Steward Health Care Sys., LLC,* No. 24-90213 (CML) (Bankr. S.D. Tex. July 16, 2025) (Docket No. 5724). Here, the Plan does exactly what the Code contemplates: it "otherwise provides" for an effective date after confirmation,

---

[12] The FBG Debtors have worked constructively with various parties that filed objections or reached out with informal comments to narrow issues and, where possible, reach consensual resolutions. A chart summarizing these objections, the FBG Debtors' responses, and the resolutions will be filed separately with the Court (the "**Response Chart**"). Certain parties also object to final approval of the Disclosure Statement arguing that the Disclosure Statement fails to provide "adequate information" as required under section 1125 (each, a "**Disclosure Objection**"). The FBG Debtors reply to each Disclosure Objection in the Response Chart. The FBG Debtors will respond to the late-filed joint supplement objection filed by Katsumi and the LAM Parties. The FBG Debtors reserve all rights to supplement this brief, including but not limited to, responding to such supplemental objection.

[13] LAM Parties Obj. ¶¶ 28–30, 39–41, 52–54 (Docket No. 3262); Katsumi Obj. ¶¶ 9–11 (Docket No. 3271); Onset Obj. ¶¶ 28–31, 42–44, 48–49 (Docket No. 3277); Carnaby Obj. ¶¶ 31–33, 42–44 (Docket No. 3274); Evolution Obj. ¶¶ 32–34 (Docket No. 3265); U.S. Trustee Obj. ¶ 20–21; TQL Obj. ¶¶ 22–23, 26–28 (Docket No. 3275).

section 1141(b), and it does so to benefit creditors and ensure that administrative creditors will be paid in full "on the effective date." The objectors' atextual and self-serving challenge to this structure risks unsettling well-established practice and precedent—including from this Court—approving of plans with effective dates that do not immediately follow confirmation.

22.     As for the objectors' concerns about feasibility, the objectors are wrong several times over. As a threshold legal matter, section 1129(a)(11)'s feasibility requirement does not apply if "[a] liquidation or [further] reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). That is the case here, making the objectors' feasibility concerns entirely misplaced. Even if a feasibility requirement applies, it is satisfied. The Estate Claims are supported by a robust evidentiary record, including guilty pleas of former insiders, months of investigative work by the Debtors and their advisors, findings by a Court-appointed independent Examiner, and lay and expert testimony to be presented at the Confirmation Hearing. This record more than satisfies the FBG Debtors' burden to provide "reasonable assurance" that the Litigation Trust is likely to recover approximately $2 billion (or about 8%) of the approximately $25 billion in prepetition transfers that the Debtors' investigation identified as related to prior management's scheme to misappropriate funds (the "**Scheme**"). *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th Cir. 1997) (quoting *In re Briscoe Enter., Ltd., II*, 994 F.2d 1160, 1165–66 (5th Cir. 1993)).

23.     Finally, as for prejudice to creditors, the objectors again have things backwards. The evidence shows that the Plan is the *only* viable path to provide recoveries to junior creditors, including administrative, priority, and general unsecured creditors. The Liquidation Analysis shows that, without a plan, the cases will convert to chapter 7 and these creditors will receive no recovery, which no objector challenges. In fact, the Plan contains enhanced protections

for junior creditors compared to the analogous plan confirmed in *Steward* because here, administrative and priority creditors will begin to share in distributions from the Litigation Trust well in advance of the repayment in full of the DIP A Claims (estimated at over $1.3 billion).

24.     Simply put, the Plan is consistent with the Bankruptcy Code and decisions by this Court and others confirming similarly structured plans; it is feasible (to the extent a feasibility requirement even applies); and far from unfairly prejudicing creditors, it is in their best interests.  This Court should not allow the objectors—who are primary targets of the Litigation Trust and thus have every incentive to fight the Plan—to invoke provisions of the Bankruptcy Code designed to *protect* other creditors in an effort to make those creditors worse off.

25.     The objections should be overruled.

### A.     *The Bankruptcy Code Does Not Prohibit Delaying the Effective Date*

26.     Certain of the objectors mount a frontal legal attack on the Plan's structure. Some objectors[14] argue that the Bankruptcy Code requires payment in full of administrative expense claims and priority claims by the date the confirmation order is entered, not the Plan's effective date. For their part, the LAM Parties, argue that the Plan's delayed effective date is "impermissible or at least highly suspect,"[15] because the Plan is *per se* unfeasible and indicates a lack of good faith.

27.     These extreme arguments should be rejected.  They find no support in the Bankruptcy Code and instead run headlong into precedent.  The objectors' arguments invite significant disruption if adopted and should accordingly be rejected.

---

[14]   *See* LAM Parties Obj. ¶¶ 51–56; Evolution Obj. ¶¶ 26–33; Katsumi Obj. ¶¶ 22–24; Carnaby Obj. ¶¶ 66–71; Onset Obj. ¶¶ 29–33.

[15]   LAM Parties Obj. I.A.

### 1.    The Code's Text and Settled Practice Allow a Delayed Effective Date

28.    The Court can begin—and end—with the text of the Bankruptcy Code. Far from *prohibiting* a delayed effective date, the Bankruptcy Code *expressly contemplates* it.  For starters, Congress would have had no need to include the term "effective date" (a term that appears a dozen times in section 1129 alone) in the Code at all if it referred only to the date of the confirmation order.  *See generally Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." (citation omitted)).  Thus the Code requires only that administrative claimants be paid in full by the "effective date," not upon confirmation.  11 U.S.C. § 1129(a)(9).  And, in describing the effect of confirmation, the Code is clear that confirmation takes effect "except as otherwise provided in the plan," section 1141, expressly authorizing a plan to modify the timing of confirmation's effect.  If the Code required administrative claims to be paid upon confirmation—as certain objectors suggest—or prohibited a plan from providing for a delayed effective date, the Code would have said so.  It does not.

29.    This Court has accordingly recognized that "[t]here's nothing in the Code that says when the effective date must occur; it just says you have to occur by the effective date" when confirming a similarly structured plan in *Steward*.  Hr'g Tr. 31:14–16, *In re Steward Health Care System, LLC,* No. 24-90213 (CML) (Bankr. S.D. Tex. July 16, 2025) (Docket No. 5724); *see also, e.g.*, *In re Good*, 428 B.R. 235, 244 (Bankr. E.D. Tex. 2010) ("[T]he Code does not define the 'effective date of the plan.'").  And other courts have likewise recognized that "Section 1129(a)(9) does not require that confirmation of the plan be immediately followed by the effective date of the plan." Hr'g Tr. 177:22–24, *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 7, 2019) (Docket No. 5396).  Or, as the field's leading treatise has put it in no

13

uncertain terms: "The Code does not define 'effective date.' Rather, the terms of each confirmed plan will set the effective date." 7 Collier on Bankruptcy ¶ 1129.05[e] (16th 2026).

30.     Courts have accordingly recognized that "there can be a delay of months or longer in cases where, for example, the debtor must wait for regulators to approve the plan or investors to finalize financing." *Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 227 (3rd Cir. 2021). Courts have approved plans with proposed effective dates that follow confirmation by several months or even years.[16] Indeed, courts have held that the exact timing of the effective date need not be prescribed by the plan. For example, in *W.R. Grace*, the court approved a plan with an unspecified effective date that ultimately took the debtors three years to achieve due to appeals regarding the permissibility of the plan's non-debtor channeling injunction, the success of which was a condition precedent to the plan's effectiveness.[17] And in *Sears*, the court approved a plan with an unspecified effective date that was contingent on the debtors' monetizing litigation assets to fund distributions to administrative and priority creditors.[18]

31.     Courts confirm plans with effective dates extended for a variety of reasons, including when additional time is needed to secure regulatory approval of transactions,

---

[16]  *See, e.g.*, *In re Steward Health Care Sys., LLC*, No. 24-90213 (Bankr. S.D. Tex. July 25, 2025) (Docket No. 5774) (confirming plan where, as of the date of the confirmation hearing, effective date was estimated to be approximately eighteen months from confirmation date); *In re Sears*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 31, 2022) (Docket Nos. 5370, 10693) (plan confirmed contingent on funding remaining administrative and priority claims through litigation recoveries went effective over three years after confirmation); Hr'g Tr. 32:14–17, *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 12, 2013) (Docket No. 10205) (approving chapter 11 plan that could only become effective upon resolution of regulatory issues, which would take an unknown amount of time, where delay was contemplated by the plan and "failure of the effective date and the withdrawal of the confirmation order will leave creditors no worse off than if the confirmation order never had been entered"); *In re Vescor Dev. 3, LLC*, No. 06-12094 (MKN), 2007 Bankr. LEXIS 5125, at *11 (Bankr. D. Nev. Jan. 19, 2007) (reviewing cases that "suggest[] permissible plan effective dates range from the date of the plan confirmation hearing to even 'months or years' thereafter").

[17]  *In re W.R. Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del. Jan. 31, 2011) (Docket No. 26155).

[18]  The *Sears* plan has been a success, with all administrative and priority claims satisfied in full and general unsecured creditors have begun to receive recoveries. *See In re Sears Holdings Corp.*, No. 18-23538 (SHL) (Bankr. S.D.N.Y. May 19, 2026) (Docket No. 11037).

consummate parallel foreign restructuring proceedings, complete necessary financings, or otherwise.[19]  These include cases where, as here, an extended executory period is required to monetize estate assets to satisfy plan payments, including administrative expense and priority claims:

---

[19]  *In re W.R. Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del. Jan. 31, 2011) (Docket Nos. 26155, 31732) (Approximately 3 year executory period for numerous contingencies, including approval of non-debtor asbestos channeling injunctions that were appealed); *In re Ambac Fin. Grp., Inc.*, No. 10-15973 (SCC) (Bankr. S.D.N.Y. Mar. 14, 2012) (Docket Nos. 938, 1308) (Approximately 14 month executory period to allow for negotiation of settlement agreements with IRS and other certain interested parties to be consummated); *In re Lightsquared Inc.*, No. 12-12080 (SCC) (Bankr. S.D.N.Y. Mar. 27, 2015) (Docket Nos. 2276, 2433) (Approximately 8 month executory period for review and approval of merger by FCC); *In re LBI Media, Inc.*, No. 18-12655 (CSS) (Bankr. D. Del. Apr. 17, 2019) (Docket No. 839) (Approximately 5 month executory period for review and approval of merger by FCC); *In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. Jan. 22, 2019) (Docket Nos. 2525, 3298) (Approximately 3 month executory period for review and approval of merger by FCC); *In re Caesars Entm't Operating Co.*, No. 15-01145 (ABG) (Bankr. N.D. Ill. Jan. 17, 2017) (Docket Nos. 6334, 7482) (Approximately 9 month executory period for review and approval of proposed transaction by state regulators); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013) (same); *In re Talen Energy Corp.*, No. 22-90339 (MI) (Bankr. S.D. Tex. May 17, 2023) (Docket No. 2060) (Approximately 5 months to obtain regulatory approval of transaction and license transfer approval); *In re FirstEnergy Sols. Corp.* No. 18-50757 (AMK) (Bankr. N.D. Ohio October 16, 2019) (Docket Nos. 3278, 3773) (Approximately 4 months to obtain regulatory approval of transaction and license transfer approval); *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (Bankr. S.D.N.Y June 18, 2022) (Docket Nos. 5754, 7008) (Approximately 4 month executory period to obtain necessary financing and corporate approvals, receive approval of liquidation proceeding in Cayman Islands, and obtain regulatory approvals); *In re N.Y. Racing Ass'n, Inc.*, No. 06-12618 (JMP) (Bankr. S.D.N.Y. Apr. 28, 2008) (Docket Nos. 1008, 1091) (Approximately 4 month executory period to obtain necessary financing and corporate approvals, receive approval of liquidation proceeding in Cayman Islands, and obtain regulatory approvals); *In re SunEdison, Inc.*, No. 16-10992 (SMB) (Bankr. S.D.N.Y. July 28, 2017) (Docket No. 3735) (Approximately 4 months to allow for negotiation of settlement agreements and NYS Legislature to pass legislation renewing franchise); *In re SunEdison, Inc.*, No. 16-10992 (SMB) (Bankr. S.D.N.Y. Jul. 28, 2017) (Docket No. 3735) (Approximately 3 months to sell or dispose of some or all of debtor's equity interests in certain non-debtor entities to a third-party purchaser); *In re Seadrill Ltd.*, No. 21-30427 (DRJ) (Bankr. S.D. Tex. Feb. 22, 2022) (Docket No. 1399) (Approximately 4 months to equitize secured bank debt across multiple silos, arrange new financing, and complete post-emergency securities listing; *In re Weatherford Int'l PLC*, No. 19-33694 (DRJ) (Bankr. S.D. Tex. Dec. 13, 2019) (Docket No. 483) (Approximately 3 months to complete parallel scheme of arrangement proceedings in Ireland and Bermuda)).

| Case | Approximate Executory Period[20] | Effective Date Contingency |
|---|---|---|
| *In re Steward Health Care Sys., LLC*, No. 24-90213 (Bankr. S.D. Tex. July 16, 2025) | 2 years[21] | Pursuit of significant litigation claims to fund administrative and priority claimants. |
| *In re Sears*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 31, 2022) (Docket Nos. 5370, 10693) | 3 years | Pursuit of significant litigation claims to fund administrative and priority claimants. |
| *In re Cash Cloud, Inc.*, No. 23-10423 (MKN) (Bankr. D. Nev. Aug. 17, 2023) (Docket No. 1126) | 6 to 9 months | Pursuit of litigation claims to fund administrative and priority claimants. |
| *In re PRM Family Holding Co., LLC*, No. 13-09026 (BKM) (Bankr. D. Ariz. Apr. 13, 2015) (Docket Nos. 1406, 1573) | 14 months[22] | Over 14 months (but up to 18) to fund administrative and priority claimants primarily through pursuit of avoidance actions and other causes of action. |
| *In re Rolling Green Country Club*, 26 B.R. 729 (Bankr. D. Minn. 1982) | Unspecified | Effective date would occur when "proceeds of liquidation in the hands of the trustee become sufficient to effect the required payments." |
| *In re Schwab Industries, Inc.*, No. 10-60702 (RK) (Bankr. N.D. Ohio Dec. 15, 2010) (Docket No. 698) | Up to 180 days | Liquidation of assets and pursuit of causes of action to pay administrative and priority claims. |

32.     The Plan here thus does exactly what the Code allows and this Court and many others have approved.  It guarantees that all administrative and priority claims will be paid on the effective date.  And it provides which aspects of the plan will and will not become effective upon the Court's entry of the confirmation order and sets a target effective date.

---

[20]   Unless otherwise noted, executory period is measured from actual date of entry of the confirmation order until the actual effective date of the plan.

[21]   *Steward*'s executory period is the estimate provided to the court during confirmation.

[22]   Court permitted up to 18 months.

### 2. The Objectors' Arguments Would Rewrite the Code and Upend Settled Precedent and Practice

33. The objectors can avoid this straightforward and long-settled conclusion only by rewriting the Plan and the Code, and relying on inapposite caselaw.

34. In an effort to argue for a *per se* bar on chapter 11 plans with delayed effective dates, LAM cites several cases that say nothing of the sort.[23] The Third Circuit's decision in *In re Am. Cap. Equip., LLC*, was a decision about feasibility rooted in the facts of that case; it did not make a blanket holding that plans relying on claims with delayed effective dates can never be approved. The Third Circuit affirmed a finding that a plan funded solely by a "surcharge" on an optional asbestos claims-resolution process was "not reasonably likely" to succeed, where most claims had already been dismissed or proven "overwhelmingly unsuccessful." 688 F.3d 145, 156 (3d Cir. 2012) (quoting *In re Am. Cap. Equip.*, 405 B.R. 415, 422 (Bankr. W.D. Pa. 2009)).

35. LAM's citation of *Little Creek* is even farther afield since that case has nothing to do with the effective date of a plan or the confirmation requirements. Instead, the Fifth Circuit in *Little Creek* reversed dismissal of a single-asset real estate chapter 11 case involving a parcel of land that was underwater as a "bad faith" filing because the Bankruptcy Court relied on insufficient evidence to support a "bad faith" finding. *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.),* 779 F.2d 1068, 1072 (5th Cir. 1986). That is a thin reed in support of LAM's argument that a plan with a delayed effective date is impermissible. According to LAM's logic, a liquidating plan could never be confirmed because there is no operating business, an argument repeatedly denied by courts around the country. *See Claar Cellars LLC*, 623 B.R. 578, 601 (Bankr. E.D. Wa. 2021) (holding no "categorical restriction on

---

[23] LAM Parties Obj. ¶¶ 30–32.

liquidating plans" exists).  Indeed, the Code expressly contemplates liquidating chapter 11 plans. *See* 11 U.S.C. § 1129(a)(11) ("[C]onfirmation of the plan is not likely to be followed by the liquidation . . . of the debtor . . . ***unless such liquidation . . . is proposed in the plan***[.]" (emphasis added).

36.     Other objectors mount a bank-shot attack on the Plan by suggesting that the effective date provided in the Plan is somehow "illusory" and not an "effective date" under the Code at all, and that instead, all administrative claims become due upon confirmation, which is the "real" effective date, because it is the date where certain of confirmation's consequences begin to take effect.[24]

37.     These objectors find no support in the Bankruptcy Code for their invention of "real" and "illusory" effective dates—terms that appear nowhere in the Code's text. That is because the Code makes clear that it is the text of the plan, and not an aggrieved creditor's intuition, that sets the plan's effective date.  *See* 7 Collier on Bankruptcy ¶ 1129.05[e] (16th 2026) ("[T]he terms of each confirmed plan will set the effective date.").  As a result, the objectors' argument suffers from a number of critical flaws.

38.     *First*, the objectors conflate the entry of the *confirmation order* with the effective date of *the Plan*.  The objectors cite to multiple dictionary definitions of "effective date," "effective," and "effect" to suggest that the effective date is when the terms of the confirmation order become "binding" or "enforceable."

39.     It is correct that a confirmation order can first become binding on parties for the purposes of res judicata following entry and expiration of the 14-day stay under Bankruptcy

---

[24]    *See* LAM Parties Obj. ¶¶ 51–56; Evolution Obj. ¶¶ 26–33; Katsumi Obj. ¶¶ 22–24; Carnaby Obj. ¶¶ 66–71; Onset Obj. ¶¶ 29–33.

Rule 3020(e) and any other applicable stay.  But, that is true of every court order.  If Congress wanted the effective date of a plan to equate to when the confirmation order becomes binding, it could have said so.  Instead, the Bankruptcy Code expressly contemplates a separate effective date for a chapter 11 plan that is distinct from the entry of the confirmation order.

40.     The objectors' reliance on Section 15.11 of the Plan, which provides that the Plan is "binding" and "immediately effective" is similarly unavailing.  This is standard language, paralleling section 1141 of the Code, referring to the legally binding nature of a confirmed Plan.  It says nothing to hasten the Plan's effective date.  Were it otherwise, then the effective date of every single chapter 11 would be the day of the entry of the confirmation order, which the Bankruptcy Code, precedent, and longstanding practice confirm is not the case.

41.     As this Court recognized, "[t]here's nothing in the Code that says when the effective date must occur," because Congress "allowed for flexibility" rather than imposing a "hard and fast rule."  Hr'g Tr. 31:14–15, 17, *In re Steward Health Care Sys. LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. July 16, 2025) (Docket No. 5724); *see also id*. 40:4–6  ("You can have an effective date that's far out when there's a need to do it.  The Code doesn't say when you have to have one, but there's flexibility within the Code."); *see also* Hr'g Tr. 177:22–24, *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 3, 2019) ("Section 1129(a)(9) does not require that confirmation of the plan be immediately followed by the effective date of the plan.").  Moreover, this argument conflicts with the myriad of chapter 11 plans that have been confirmed with delayed effective dates, as described above.

42.     *Second*, the Plan involves multiple settlements and sales, which can occur irrespective of the confirmation process, and the consummation of those sales are what the objectors use as the foundation of their objection.  The Carnaby Secured Lenders' argument that

the *Steward* Plan is different because the proposed transactions were approved prior to the confirmation process elevates form over substance.  Indeed, parties opposing the *Steward* Plan argued that the pre-confirmation settlement in that case should only have been approved as part of the plan process.[25]  The FBG Debtors ran a thorough sale process and will establish at confirmation that all requirements of section 363 have been satisfied.  Accordingly, there is nothing improper about the sales and related settlements closing following entry of the Confirmation Order approving those sale transactions.  That distinction is consistent with *W.R. Grace*, where the confirmation order made certain settlement agreements "in full force and effect" upon confirmation, even though the related payments and transfers remained conditioned on the plan's delayed effective date.[26]  The Effective Date of the Plan remains of significance to the FBG Debtors, not just because it is the date that the FBG Debtors emerge from chapter 11 and the Bankruptcy Court's jurisdiction narrows.  On the Effective Date, cash distributions will begin to be made to holders of claims in Classes 3–5, general unsecured claims in Class 7, and numerous provisions of the Plan become effective, including the Plan's third-party releases (Section 13.5(b)), injunction (Section 13.4(b)), the release of the First Lien Claims and Second Lien Claims (Section 5.2(h)), and the cancelation of security documents (Section 5.9).  Moreover, upon the Effective Date, the FBG Debtors will no longer be able to seek to withdraw or revoke the Plan (section 15.7) and the Plan will be deemed to be substantially consummated (section 15.9).

---

[25]   *See* Commonwealth of Massachusetts' Objection to Confirmation of the Debtors' Joint Chapter 11 Plan of Liquidation, *In re Steward Health Care System LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. May 19, 2025) (Docket No. 4921) ¶¶ 15–25.

[26]   *In re W.R. Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del. Jan. 31, 2011) (Docket No. 26155).

43.     *Third*, certain objectors[27] fault the FBG Debtors for commencing distributions before the Effective Date, but paying down the Administrative Expense Claims and the DIP A Claims as recoveries are generated is appropriate and salutary, considering the DIP Facility has matured and the Debtors are required to adequately protect them in light of the numerous defaults that exist under the DIP Facility and for continued use of their collateral. Moreover, hundreds of millions of dollars of administrative expense claims have been paid during the chapter 11 cases.   There is no basis to prohibit the Debtors from continuing to pay administrative expense claims following the Confirmation Date in accordance with the Administrative Expense Claims Consent Program.

44.     *Fourth*, the objectors argue that the Plan will be "substantially consummated" on the Confirmation Date and will therefore also become effective since it is illogical that a Plan will not be effective if it has been substantially consummated.[28]  At the outset the FBG Debtors dispute that the Plan will be substantially consummated within the meaning of section 1102(2) on the Confirmation Date.  Regardless, the objectors do not cite to a single case that has ever found that the definition of "substantial consummation" has any bearing, relation to, or effect on the meaning of "effective date" in section 1129(a)(9)(A).  This is because the words "effective date" do not appear in the definition of "substantial consummation."  *See* 11 U.S.C. § 1101(2).  The concept of a plan's effective date is completely distinct from "substantial consummation," which serves different purposes under the Bankruptcy Code.  Indeed, Congress did not use the term "substantial consummation" in section 1129(a)(9)(A) as it did in section 1127(b) (prohibiting post-confirmation modification of a plan after substantial consummation),

---

[27]    LAM Parties Obj. ¶ 53; Carnaby Obj. ¶ 68; Onset Obj. ¶ 32; Evolution Obj. ¶ 14; Katsumi Obj. ¶ 22.

[28]    *See* LAM Parties Obj. ¶ 54; Carnaby Obj. ¶¶ 69–71.

section 1112(b)(4)(M) (identifying the inability to effectuate substantial consummation of a confirmed plan as cause for conversion or dismissal), and section 1183(c) of subchapter V (terminating the trustee's service upon substantial consummation of a consensually confirmed plan and requiring the debtor to file notice thereof). To insert the definition of substantial consummation in section 1129(a)(9)(A), or assume "effective date" is somehow an unwritten condition precedent to achieving "substantial consummation" would be to deny the most fundamental canon of statutory construction that: "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Avion Funding, L.L.C. v. GFS Indus., L.L.C.* (*In re GFS Indus., L.L.C.*), 99 F.4th 223 (5th Cir. 2024) (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)).

45. Certain transactions in the Plan are expressly designed to occur on the Confirmation Date, and there is nothing impermissible about that. In fact, providing for certain transactions to occur on the Confirmation Date—including (among others) establishing the Litigation Trust and transferring the Estate Claims to such trust, execution of the Litigation Trust Agreement, and funding the Litigation Trust—allows the estate to realize the substantial benefits that the Debtors bargained for, including the Litigation Trust Waterfall and minority governance rights. The Litigation Trust must be funded and operative immediately if it is to generate recoveries within a reasonable timeframe, and afford junior creditors with the significant benefits provided in the Litigation Trust Waterfall. Indeed, as the court recognized in *In re AMR Corp.*, the best path forward is entering the confirmation order to make certain provisions operate, and further delay invites greater risk to the Plan's success to the detriment of creditors. *See* Hr'g Tr. 29:21, 30:21–32:1, *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 12, 2013)

22

(Docket No. 10205) (observing that withholding confirmation to await a contingency to play out would instead "invite further preconfirmation proceedings . . . [that] could divert the debtor's focus away from the defense of the plan" itself).  Absent entry of the Confirmation Order, the FBG Debtors do not have funding to prosecute and monetize the Estate Claims, and delay would only further extend the timeline on which recoveries can begin to be realized.

46.     At bottom, the objectors can offer no good reason for the Court to rewrite the terms of the Code and the Plan, and depart from settled precedent and practice, by rejecting the Plan's delayed effective date structure.

B.     ***The Objectors' Feasibility Concerns Should Be Rejected***

1.     **There is no separate feasibility requirement for a liquidating plan.**

47.     The Court should reject the objectors' feasibility arguments at the threshold because there is no "feasibility" test for a liquidating plan.  The FBG Debtors need only demonstrate that they have proposed a "realistic" liquidating plan.  The FBG Debtors easily meet this standard.

48.     Section 1129(a)(11), the source of the feasibility requirement, requires the Bankruptcy Court to determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, ***unless such liquidation or reorganization is proposed in the plan***.

11 U.S.C. § 1129(a)(11) (emphasis added).

49.     In light of this provision, Courts have thus held that any plan that provides for liquidation automatically satisfies section 1129(a)(11).  *See In re Cypresswood Land Partners I*, 409 B.R. 396, 432 (Bankr. S.D. Tex 2009) ("Some courts interpret [1129(a)(11)] to mean that a

23

plan that provides for liquidation automatically satisfies section 1129(a)(11)”); *In re Heritage Org, L.L.C.*, 375 B.R. 230, 311 (Bankr. N.D. Tex. 2007) (same); *In re 47th and Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988) (“[F]easibility, under the literal wording of § 1129(a)(11) of the Bankruptcy Code, is unnecessary to be shown when ‘liquidation . . . . is proposed in the plan.’”); *In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) (same); *see also In re SPC Seller*, No. 09-12647 (BLS), 2010 Bankr. LEXIS 5321, at *22 (Bankr. D. Del. Dec. 8, 2010) (finding that “[b]ecause the [p]lan is a plan of liquidation, pursuant to 1129(a)(11), the [p]lan is feasible”); *In re ie Corp.*, No. 10-11061 (PJW), 2010 Bankr. LEXIS 5867, at *17 (Bankr. D. Del. Oct. 27, 2010) (same).

50.     This Court followed a similar approach in confirming the *Steward* chapter 11 plan, holding that where the liquidating plan is a “realistic liquidation,” section “1129(a)(11) is satisfied on its own terms.”  Hr’g Tr. 30:20–25, *In re Steward Health Care Sys., LLC,* No. 24-90213(CML), (Bankr. S.D. Tex. July 16, 2025).

51.     The Court should hold the same here.

**2.      To the extent a feasibility requirement applies, it is satisfied.**

52.     Even if a feasibility requirement applies, the FBG Debtors are not required to show that success of the Plan is “inevitable” or “guaranteed,” as suggested by the U.S. Trustee. *See In re Brotby*, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003); *In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996) (“[I]t is not necessary for plan success to be guaranteed, nor is the feasibility requirement generally viewed as rigorous.”).

53.     The determination of whether a plan is feasible requires only a showing that the plan has a “reasonable assurance of commercial viability.” *See In re T-H New Orleans L.P.*, 116 F.3d 790 (5th Cir. 1997) (“In determining whether a debtor’s Chapter 11 plan of reorganization

is feasible. . . .'the [bankruptcy] court need not require a guarantee of success. . . [o]nly a reasonable assurance of commercial viability is required.'") (quoting *In re Briscoe Enter., Ltd., II*, 994 F.2d 1160, 1165–66 (5th Cir. 1993)). "The court need not require a guarantee of success.  Essentially, Debtor must be able to show that it can accomplish what it proposes to do, in the time period allowed, and on the terms set forth in the plan." *In re Northbelt, LLC*, 630 B.R. 228, 279 (Bankr. S.D. Tex. 2020); *see also In re Cash Cloud, Inc.*, No. 23-10423 (MKN), 2023 Bankr. LEXIS 2561, at *13 (Bankr. D. Nev. Aug. 24, 2023) ("Is certainty [of success in collecting all assets pursued] required? No. Is there a sufficient showing of certainty that the claims of the estate will be pursued? Yes.").

54.     Here, the liquidation provided for in the Plan is realistic and commercially viable.

55.     The Plan provides for the FBG Debtors' remaining assets to be transferred to one of three liquidating Trusts.  Those Trusts will liquidate the FBG Debtors' assets and make distributions to creditors in accordance with agreed waterfalls.[29]  The Trusts will be adequately funded—the Litigation Trust will receive $75 million of funding to prosecute estate claims and causes of action, the DIP Collateral Trust will receive up to $20 million of funding, and the ABL Collateral Trust will be funded with cash collateral as well as proceeds from the ongoing liquidation of the ABL Priority Collateral.[30]  Each Trust also has a governance structure, including the appointment of trustees, to oversee the liquidation of the Trust's respective assets.[31]

---

[29]   Plan Arts. 6–8.

[30]   *Id*. § 6.3.

[31]   *Id*. Arts. 6–8.

56.    In addition to the Trusts, the Plan provides for the appointment of a Wind Down Administrator to serve as the FBG Debtors' sole officer and director following confirmation of the Plan and to oversee the dissolution of the FBG Debtors.[32]  The cost of the Wind Down will be paid pursuant to an agreed budget, which includes committed funding by the Trusts.[33] Furthermore, the Plan provides for the appointment of a Claims Ombudsman to conduct the claims resolution process, which costs will be funded from advances made by the Litigation Trust.[34] Accordingly, the Plan provides for an orderly liquidation of the FBG Debtors that is realistic and commercially viable.

57.    The objectors argue the Plan may not be implemented because certain contingencies to the occurrence of the Effective Date—namely, that all administrative expense and priority claims be paid in full—may not occur.  These objections are misplaced because a debtor does not need to establish that the success of the plan is inevitable.  Instead, a debtor must show that implementation of the proposed plan is realistic and commercially viable.  That standard is satisfied here.  The Plan provides that Allowed Administrative Expense Claims and Priority Claims[35] will be satisfied from distributions by the Litigation Trust.  As set forth below, the evidence at the confirmation hearing will establish that it is realistic that the Litigation Trust will generate sufficient proceeds to satisfy all Allowed Administrative Expense Claims and Priority Claims.

---

[32]   *Id*. § 5.7.

[33]   *Id*. § 5.7(a).

[34]   *Id*. § 5.2(g).

[35]   "**Priority Claims**" means Other Priority Claims and Priority Tax Claims.

58.     Moreover, the evidence will establish that it is reasonably probable that the FBG Debtors will achieve the Effective Date.  Specifically, the evidence and testimony of Mr. Moore and Mr. Kirschner will show that the FBG Debtors' projected recoveries on account of the Estate Claims are reasonable in light of the facts and legal issues applicable to each claim, the results of the investigations conducted to date, the collectability of potential judgments, the realistic timing of recoveries, in addition to the funding available to the Litigation Trustee.[36]

59.     The Estate Claims comprise a diverse collection of $25 billion in aggregate transfers made by the FBG Debtors in furtherance of the Scheme during the four years prior to the Petition Date to multiple categories of potential defendants arising from the massive fraud perpetrated by the Debtors' prepetition management.  To satisfy Allowed Administrative Expense and Priority Claims in full under the Litigation Trust Waterfall and achieve the Effective Date, the FBG Debtors need only recover $2 billion on account of the Estate Claims, representing merely *8% of the total transfers*.[37]

60.     The evidence will support that the Debtors operated a Ponzi scheme prepetition whereby money from new fraudulent transactions was used to pay earlier obligations, creating a cycle that depended on obtaining ever more fraudulent financing.  As such, the Litigation Trustee will likely be able to invoke the "Ponzi Scheme Presumption," which permits a court to presume that the FBG Debtors were insolvent and made the challenged transfers with actual fraudulent intent.[38]  But even without the Ponzi Scheme Presumption, the declarations of Mr. Moore and Mr. Kirschner demonstrate that there were numerous "red flags" supporting a

---

[36]    *See* Kirschner Decl. ¶¶ 143–47.

[37]    *Id.* ¶ 143.

[38]    *Id.* ¶¶ 25, 33–39.

reasonable conclusion that several potential defendants knew or should have known about the Debtors' fraudulent scheme that the Litigation Trustee could use to otherwise establish colorable constructive and actual fraudulent transfer claims against numerous defendants including:

> **Onset,** which knew or should have known that its sale-leaseback transactions were not legitimate because the SPVs lacked independent operations and a viable source of repayment, while Edward James controlled the transactions, restricted communications, and personally participated on both sides of the arrangements.[39]

> **Katsumi**, which discovered that all seven invoices sampled in a September 2023 audit contained substantial discrepancies— including one invoice inflated by more than 180,000%—but continued to fund billions of dollars of additional factoring transactions.[40]

> **LAM/Jefferies**, which encountered resistance to ordinary diligence, identified unusual cash-flow and financial-reporting issues, yet continued to participate in billions of dollars of additional factoring transactions.[41]

> **PrimeRevenue**, which learned that purported vendor invoices had been created by an FBG employee, not purported vendors, and advised FBG personnel to check the invoices' file properties going forward.[42]

> 61.    These were not isolated transactional anomalies.  The red flags identified

above were compounded by obvious problems with FBG's reported financial performance, including the mismatch between its claimed margins and its actual cash flows.[43]  Given those red flags, reasonable further inquiry, including requesting a quality-of-earnings analysis or otherwise testing the reliability of FBG's reported results, would have revealed still more substantial

---

[39]    *See* Moore Decl. ¶¶ 109–11, 134–38; Kirschner Decl. ¶¶ 62–66, 71–72, 85.

[40]    *See* Moore Decl. ¶¶ 85–89; Kirschner Decl. ¶¶ 41–44.

[41]    *See* Moore Decl. ¶¶ 90–93; Kirschner Decl. ¶¶ 54.

[42]    *See* Moore Decl. ¶¶ 101–02; Kirschner Decl. ¶¶ 50–55.

[43]    Moore Decl. ¶¶ 62–65, 75–78; *see also* Kirschner Decl. ¶¶ 43, 46–47.

concerns.[44]   Indeed, Apollo, a prospective financing or investment counterparty, while evaluating FBG using information available to financing parties, identified significant inconsistencies between FBG's reported margins, cash flows, and acquisition history and raised the possibility of shorting the Company's debt.[45]   These facts reinforce that the warning signs cut across multiple categories of potential defendants and provide further support for the reasonableness of the asserted Estate Claims.

62.     Obtaining recoveries on account of 8% of the aggregate transfers against these and other potential defendants is a conservative assumption grounded in substantial investigative work conducted not only by the advisors to the Debtors, but by the Examiner as well.[46]   The Litigation Trust will be well positioned and adequately funded to obtain sufficient recoveries to satisfy all outstanding Administrative Expense Claims and Priority Claims by the end of 2028.  The wealth of evidentiary support that underlie the Estate Claims establishes that the Effective Date is reasonably likely to occur.   The objections regarding feasibility of the Plan, therefore, should be overruled.

### (i)     Estimated Recoveries Are Reasonable

63.     Numerous objectors—many of which are primary targets of the Litigation Trust—challenge the FBG Debtors' estimated recoveries vis-à-vis each of the Estate Claims.[47]  As described below, the FBG Debtors did not perform a valuation analysis with respect to the Estate Claims individually and are not required to establish that they will succeed on obtaining a judgment

---

[44]   Moore Decl. ¶ 66.

[45]   *Id.*  (citing *First Brands Overview* (Apr. 2024), Apollo Global Management, Inc.); Kirschner Decl. ¶ 43 & n.34.

[46]   Kirschner Decl. ¶ 29.

[47]   PrimeRevenue Obj. ¶¶ 10–11, 14, 24–30 (Docket No. 3249); LAM Parties Obj. ¶¶ 41–49, 68, 98; Evolution Obj. ¶¶ 23(b), 40–43; Katsumi Obj. ¶¶ 20, 30–33 & n.5; Orbian Obj. ¶¶ 7–20 (Docket No. 3272); Carnaby Obj. ¶¶ 83–98, 102–108; Patrick James Obj. ¶¶ 12, 18–23, 27, 29, 35, 38, 41–42; Onset Obj. ¶¶ 38–41, 76.

on every Estate Claim to confirm the Plan. Instead, Mr. Kirschner's conclusion that the Estate Claims are reasonably likely to generate at least $2 billion in proceeds by the end of 2028 is based on the results of A&M's months'-long investigation into the Debtors' prepetition operations and transactions[48] and a measured review of these facts and their legal implications.[49]

64.     The results of the Debtors' investigation have revealed substantial evidence that the prepetition FBG Debtors' business was not a self-sustaining business.[50] Instead, the FBG Debtors' former officers—including Patrick James (founder and CEO), Edward James (Executive Vice President), Andy Brumbergs (SVP of Finance), and Stephen Graham (CFO)—were engaged in the Scheme beginning as early as 2018[51] and in furtherance of which approximately $25 billion dollars were transferred.[52]

65.     Critically, the FBG Debtors are not alone in reaching these conclusions. The substantial evidentiary basis for the Estate Claims is strongly reinforced by the federal indictments of Patrick and Edward James for alleged fraud arising from the same conduct and the guilty pleas of former FBG finance executives Andy Brumbergs and Stephen Graham to fraud-related offenses connected to the Scheme, as well as the findings of the Examiner Report. The criminal proceedings and Examiner Report further demonstrate that the Estate Claims are neither frivolous nor attenuated and instead arise from extraordinary fraud and deceit that present a meaningful opportunity for substantial creditor recoveries. Transfers made on account of the Scheme are summarized in the table below. This Brief addresses each in turn.

---

[48]   Moore Decl. ¶ 58.

[49]   *See* Kirschner Decl. ¶ 18.

[50]   Moore Decl. ¶ 59.

[51]   *Id.*

[52]   *Id.* ¶ 61.

| | 90 Day | 1 Year | Full Period |
|---|---|---|---|
| **AR Factoring (ARF) Programs** | | | |
| Leucadia | $ 737,623,204 | | $ 9,400,235,200 |
| Katsumi | 321,413,837 | | 5,685,073,511 |
| **Total Payments to ARF Programs** | **$ 1,059,037,041** | | **$ 15,085,308,711** |
| **Supply Chain Finance (SCF) Programs** | | | |
| Raistone Financing Parties | 188,234,558 | | 1,939,805,707 |
| PrimeRevenue Financing Parties | 162,743,463 | | 1,418,480,533 |
| LiquidX Financing Parties | 76,981,691 | | 979,552,136 |
| YieldStreet Financing Parties | - | | 222,218,046 |
| Orbian Financing Parties | 39,997,124 | | 114,017,780 |
| Interface Financing Parties | - | | 380,708 |
| **Total Payments to SCF Programs** | **$ 467,956,836** | | **$ 4,674,454,910** |
| **Onset** | | | |
| Onset | 46,143,097 | 987,417,170 | 2,331,851,090 |
| **Total Payments to Onset** | **$ 46,143,097** | **$ 987,417,170** | **$ 2,331,851,090** |
| **Insiders** | | | |
| Patrick James | 65,056,679 | 514,700,466 | 965,659,044 |
| Insiders (Ed James, Andy Brumbergs, etc.) | 4,153,621 | 23,083,434 | 23,083,434 |
| **Total Payments to Insiders** | **$ 69,210,300** | **$ 537,783,900** | **$ 988,742,478** |
| **Other** | | | |
| Acquisitions Payments | - | | 1,646,000,000 |
| Helios | 3,920,000 | | 79,931,026 |
| BDO Fees (minimum) | 260,177 | | 4,268,797 |
| Trade Payables | 196,957,131 | | 196,957,131 |
| **Total Other** | **$ 201,137,308** | | **$ 1,927,156,954** |
| **TOTAL PAYMENTS** | **$ 1,843,484,582** | **$ 1,525,201,070** | **$ 25,007,514,143** |

66.     **Insider Claims**.  The facts contained in the James Complaint and Moore Declaration establish colorable and recoverable claims of approximately $1.0 billion arising out of the misappropriation of FBG Debtor funds to enrich Patrick James and his family, the falsification of invoices for the purpose of obtaining company financing, and the entry into several fraudulent transactions involving the SPV Debtors.[53]

---

[53]     Kirschner Decl. ¶¶ 89–90.

67.     ***First***, there is substantial evidence to support claims that Patrick James fraudulently transferred hundreds of millions of dollars of funds belonging to the FBG Debtors before the start of the chapter 11 cases.[54]  In total, approximately $708 million (including over $229 million in 2025 alone) was transferred to Patrick James or his family trust, including multiple instances where over $20 million at a time was distributed to the Patrick James Trust within days of a mere email request made by Patrick James' chief of staff.[55]  These transfers were not ordinary course payments, but payments used to fund the lavish personal lifestyle of Patrick James at the company's expense.[56]  Moreover, among a variety of other things, (i) approximately $38 million was transferred between 2018 and 2025 to Larchmont, LLC, James' family office, disguised as "management fees,"[57] (ii) between 2019 and 2025, $18 million was transferred from First Brands to the entity "Battery Park" to pay Patrick James' and his family's personal expenses,[58] and (iii) $455,000 was transferred to Patrick James' private chef, in addition to other payments made for Patrick James' personal benefit including rent and interior design expenses.[59]

68.     Mr. Kirschner will testify that these facts give rise to colorable claims for (i) actual fraudulent transfer, (ii) constructive fraudulent transfer, and (iii) turnover of estate property, money had and received, unjust enrichment, constructive trust, illegal dividend and unlawful distributions.[60]  The Debtors' investigation has uncovered numerous "badges of fraud"

---

[54]   *Id.* ¶ 90.

[55]   Moore Decl. ¶ 142.

[56]   *See* Kirschner Decl. ¶ 109.

[57]   *See* Moore Decl. ¶ 145.

[58]   *Id.* ¶ 147.

[59]   *Id.* ¶ 146.

[60]   Kirschner Decl. ¶¶ 101–11.

that are apparent in these facts, which are indicative of actual fraudulent transfers,[61] and that FBG received no—or in rare instances, little—value for the transfers to entities under Patrick James' control, indicative of constructive fraudulent transfer.[62]  Moreover, the Debtors' investigation has uncovered no legitimate corporate purpose for the transfers made to Patrick James and the Patrick James Trust,[63] and there is a good faith basis to believe that FBG was insolvent or nearing insolvency when these distributions were made and had no surplus from which to lawfully make them.[64]  Accordingly, the FBG Debtors hold cognizable claims to recover improperly transferred funds from former insiders.[65]

69.    ***Second***, the FBG Debtors have established sufficient facts to assert colorable claims for breach of fiduciary duty against Patrick James and other former officers of the FBG Debtors.  The FBG Debtors have provided substantial evidence that former officers of the FBG Debtors manipulated the FBG Debtors prepetition financial records,[66] intermingled funds to disguise the true sources and uses of cash apparently to keep transactions in furtherance of the Scheme and related liabilities off the FBG Debtors' balance sheet,[67] and falsified invoices to secure fraudulent financing and enable Patrick James' self-dealing.[68]

---

[61]    *Id.* ¶ 101.

[62]    *Id.* ¶ 104.

[63]    *Id.* ¶ 109.

[64]    *Id*. ¶ 110; Moore Decl. ¶ 143.

[65]    Kirschner Decl. ¶ 111.

[66]    Moore Decl. ¶ 71.

[67]    Moore Decl. ¶ 73.

[68]    Kirschner Decl. ¶ 113.

70.     The FBG Debtors' former SVP of Finance has *admitted* under oath that he misrepresented the existence of inventory, provided misleading financial statements to lenders,[69] and that "he and others knowingly submitted falsified invoice information to factoring companies and investors" in order to secure fraudulent financing.[70]   That fact has been corroborated by the results of the investigation, which revealed that Andy Brumbergs personally manipulated invoice nomination files, including in one instance altering a package of invoices valued at approximately $2.3 million to reflect approximately $11.2 million before submission to the factoring company.[71] The FBG Debtors' former CFO, Stephen Graham, has likewise admitted under oath that he conspired with others to "inflate and report the financial performance of First Brands on financial statements that were issued to First Brands' lenders," knowing those statements contained false and misleading information, and that he personally presented the false and inflated statements in lender presentations to obtain financing on better terms.[72]

71.     The FBG Debtors' expert, Mr. Kirschner, who has extensive experience as a litigation trustee and has been involved in some of the most complex corporate bankruptcies in history, including cases involving fraud, has opined this conduct is indicative of a fraudulent enterprise in which the FBG Debtors' former executives misappropriated funds to "consciously and recklessly subordinate[] FBG's interests to secure fraudulent financing and divert company funds for Patrick James' personal use."[73]   Even if the underlying corporate formation documentation contains purported waivers of fiduciary duties, FBG's organizational documents

---

[69]   Brumbergs Plea at 27–28; Moore Decl. ¶ 79.

[70]   Moore Decl. ¶ 80; Brumbergs Plea at 28–29.

[71]   Moore Decl. ¶ 83.

[72]   Graham Plea at 24–25; Moore Decl. ¶ 79.

[73]   Kirschner Decl. ¶ 113.

do not extend exculpation to actions undertaken in bad faith or willful misconduct.[74] Moreover, Mr. Kirschner opines that facts give rise to claims that the FBG Debtors' former officers acted in concert to effectuate the Scheme and conspired to inflate assets and damage the prepetition FBG Debtors by diverting funds directly to Patrick James and his family,[75] a cause of action that allows the FBG Debtors to seek recoveries beyond compensatory damages.[76]

72. The record for these claims, in many cases, has already been established. Andy Brumbergs and Stephen Graham have already pleaded guilty, and the civil suits against them and other insiders require a lower burden of proof than their criminal counterparts.[77] Accordingly, the FBG Debtors hold exceedingly strong claims against the former directors and officers who committed the prepetition fraud. Furthermore, the Litigation Trust has multiple avenues to collect on these claims, including through the James's significant assets, D&O insurance proceeds,[78] and funds obtained by the federal government via forfeiture, which could be available for the benefit of the estate.[79]

73. **Third-Party Factor and Supply Chain Financing Claims**. The facts set forth in the Moore Declaration establish that the FBG Debtors hold significant and valuable claims against third-party factoring and SCF counterparties related to transfers in excess of $20 billion to the third-party factoring and SCF counterparties on account of fraudulent invoices.[80]

---

[74]  *Id.* ¶ 118.

[75]  *See* Kirschner Decl. ¶¶ 119–20.

[76]  *See id.* ¶ 121.

[77]  *See id.* ¶ 123.

[78]  *Id.* ¶ 145; *see* Moore Decl. ¶ 159.

[79]  *See* Kirschner Decl. ¶ 124.

[80]  Kirschner Decl. ¶ 31.

74. Of the collective $20.1 billion of transfers made to third-party factoring and SCF counterparties, more than $15.4 billion is attributable to claims against third-party factoring counterparties.[81] The Debtors identified three primary methods applied by former management to manipulate invoices used in the factoring Scheme, including: (i) invoices submitted at inflated values that bore no relation to the underlying customer order; (ii) invoices submitted for customer orders that did not exist at all; and (iii) receivables that were factored more than once, i.e., pledged simultaneously to two or more competing factors.[82]

75. The linchpin of this operation—the fabrication of customer invoices—has been ***admitted and acknowledged under oath*** by the Debtors' most senior finance executive, Andy Brumbergs. Andy Brumbergs also has admitted that the fabrication of these invoices was done with the intent to secure "a higher financing or higher proceeds" than the true customer receivables would have justified.[83] The Debtors' investigation confirmed this practice. For example, as explained in the Moore Declaration, a package of invoices valued at approximately $2.3 million was sent to Andy Brumbergs, who forwarded that same package to a factoring company at a value of approximately $11.2 million.[84] *See supra* ¶ 46.

76. The Scheme also involved an arrangement whereby the FBG Debtors' former management used SCF to issue payment to vendors and suppliers less a discount, after which the FBG Debtors would repay the SCF provider on the terms and amounts normally owed to the vendor.[85] As with third-party factoring, the Debtors' advisors found that former

---

[81]   *Id.*

[82]   Moore Decl. ¶ 83.

[83]   *Id.*

[84]   *Id.*

[85]   *See Id.* ¶ 96.

management systematically created and received payments on account of fake invoices.[86] Management would use either Excel schedules of fake supplier invoices or fake "cover invoices" that were uploaded to the SCF platforms.[87]  For example, in February 2024, the company created a cover invoice, also sometimes referred to internally as a "Dummy Invoice," which was submitted to Crescendo Asset Management to support funding for $2.1 million of supposed freight invoices, which in reality never existed.[88]  These facts support more than $4.7 billion of Estate Claims.[89]

77.     The similar characteristics of third-party factoring and SCF extend beyond fake or fabricated invoices.  In addition, the Debtors' advisors' investigation revealed instances where money received by FBG on account of third-party factoring and SCF was, in many instances, cycled back to pay other or the same factoring or SCF parties and other lenders, including SPV Lenders, to perpetuate the Scheme.[90]  These facts are classic indicia of the existence of a Ponzi scheme whereby money contributed by subsequent investors or customers is used to pay original investors at substantial rates, which further helps to perpetuate a fraudulent enterprise.[91]  The Litigation Trustee would undoubtedly further investigate these claims, including to establish whether such transfers were routine and systematic.  Accordingly, as Mr. Kirschner has opined, there is a reasonable likelihood that the Litigation Trustee could invoke the "Ponzi Scheme Presumption," which, under Fifth Circuit law, permits courts in fraudulent-transfer actions

---

[86]   *Id.* ¶ 97.

[87]   *Id.*

[88]   *Id.*

[89]   Kirschner Decl. ¶ 31.

[90]   Moore Decl. ¶¶ 84, 100.

[91]   Kirschner Decl. ¶¶ 25, 37, 38–39.

37

to presume the transferor's insolvency and intent to hinder, delay, or defraud creditors.[92]   If the Ponzi Scheme Presumption were to apply, the Litigation Trustee would only need to prove that a transferee received the subject transfers, even if they did not knowingly participate in the scheme.[93]

78.     Additionally, however, Mr. Kirschner opined that the factual record contains substantial evidence that certain factoring and SCF counterparties were confronted with red flags indicating they knew or should have known about the Scheme.[94]   These facts not only strengthen the FBG Debtors' actual and constructive fraudulent transfer claims but also highlight that third-party factoring and SCF counterparties were, at a minimum, highly incentivized to ignore blatant red flags to reap significant economic benefits at the expense of the FBG Debtors and their creditors.

79.     For example, the evidence shows that Katsumi discovered, through its own audit, that receivables it had purchased did not match the underlying invoices, including one invoice inflated from $240.35 to $434,997.58, after which Katsumi continued transacting with FBG for more than two years.[95]   As for LAM/Jefferies, despite FBG's recognized resistance to routine diligence, efforts to limit disclosure, and a prospective investor's identification of an anomalous cash-flow pattern, LAM continued participating in FBG's factoring program.[96] Finally, the evidence demonstrates that PrimeRevenue discovered that purported vendor invoices were authored by FBG employees rather than the vendors themselves through document metadata

---

[92]   *Id.* ¶ 25.

[93]   *Id.*

[94]   *Id.* ¶¶ 41–49, 54–55.

[95]   *Id.* ¶¶ 41–44.

[96]   *Id.* ¶¶ 46–48.

and such discovery merely led to PrimeRevenue instructing FBG personnel to check the documents' file properties going forward.[97]

80.     Based on these facts, Mr. Kirschner opined that Katsumi, LAM/Jefferies, and PrimeRevenue knew or should have known of FBG's fraud which provides the basis for colorable fraudulent transfer claims and would defeat any assertion of the good faith transferee defense regardless of the application of the Ponzi Scheme Presumption.[98]  Further, there is basis to conclude that the FBG Debtors were insolvent when the identified transfers to the Factors and SCF were made.  Supra ¶¶ 60–61.  Applying the Bankruptcy Code's definition of insolvency, Mr. Kirschner opined that the facts supported a reasonable basis for insolvency because of unreported liabilities in excess of $5 billion and guilty pleas from executives admitting that the fraudulent conduct dated back to as early as 2018.[99]  Moreover, A&M's forensic analysis showed that, since at least 2022, the FBG Debtors' liabilities exceeded their assets, their corrected financial results reflected negative EBITDA and negative cash flow, and they could not satisfy their obligations as they came due.[100]

81.     **Onset Claims.**  The evidence set forth in the Moore Declaration and the Kirschner Declaration establish that the FBG Debtors hold significant and valuable claims against certain lenders to SPV entities, principally, Onset related to transfers in excess of $2.3 billion.[101]  The SPV Facilities formed an integral component of the broader Scheme by generating new financing that was recycled to satisfy earlier obligations and sustain the circular financing

---

[97]     *Id.* ¶ 54.

[98]     *Id.* ¶¶ 43, 46–48, 54.

[99]     *Id.* ¶ 131.

[100]    Moore Decl. ¶¶ 75–78.

[101]    *Id.*

structure, while simultaneously concealing billions of dollars of off-balance-sheet debt and the FBG Debtors' true leverage from their preexisting lenders and other stakeholders.

82.   As set forth in the Moore Declaration, the SPV Facilities were nominally structured as inventory and equipment financings or sale-leaseback transactions under which an SPV Debtor would purportedly acquire inventory or equipment from an FBG Debtor using funds advanced by an SPV Lender and rely on that collateral to generate sufficient cash to replenish the collateral and repay principal, interest, and fees.[102]   In reality, the Debtors' investigation revealed that the SPV Entities, including the SPV Debtors, were undercapitalized shells that generally had no employees, failed to observe corporate formalities, and lacked independent operations capable of generating sufficient revenue to satisfy their obligations under the SPV Facilities.[103]   The investigation uncovered that it was the FBG Debtors, specifically, that received substantially all of the loan proceeds from SPV Lenders and were the actual source of nearly all payments made to the SPV Lenders—*not* the SPV Debtors.[104]   Instead, the SPV Debtors functioned principally as conduits through which cash was commingled, disguised, and rerouted.[105]   Moreover, the inventory and equipment purportedly transferred to the SPV Entities remained in the possession and control of the FBG Debtors, remained on their books and borrowing bases, and in many instances was simultaneously pledged to the FBG Debtors' existing lenders.[106]

83.   The Onset Facility, the largest of the SPV Facilities, is an especially blatant example of the structural deficiencies underlying the SPV financing Scheme.  The Onset Facility

---

[102]   Moore Decl. ¶¶ 104, 109–14.

[103]   *Id.* ¶¶ 105, 109–16.

[104]   *Id.* ¶ 105.

[105]   *Id.* ¶¶ 116, 125–27.

[106]   *Id.* ¶¶ 105, 119–24.

purported to require the Onset SPVs to purchase inventory or equipment from an FBG Debtor, sell that property to Onset, and then lease it back from Onset in exchange for substantial monthly payments.[107]  Yet, the Debtors' investigation revealed the FBG Debtors retained possession, use, and control of the property, while the Onset SPVs received no corresponding source of income with which to replace the inventory and service obligations carrying effective interest rates that reached approximately 200%.[108]

84.     Unsurprisingly, the actual flow of funds confirms that Onset advances were used to service existing obligations rather than to finance legitimate purchases of inventory or equipment.[109]  On November 27, 2024, for example, Onset advanced approximately $158.4 million to Carnaby FA, which transferred approximately $50.6 million to Carnaby IV that same day, thereby helping Carnaby IV fund an approximately $81.2 million payment back to Onset two days later.[110]  Therefore, as with third-party factoring and SCF, the SPV Facilities depended upon the circular use of new financing proceeds to satisfy earlier obligations.[111]  Mr. Kirschner therefore opined that the Litigation Trustee would likely succeed in invoking the Ponzi Scheme Presumption in connection with actual fraudulent transfer claims related to the SPV Facilities.[112]

85.     Mr. Kirschner has opined that, even without the Ponzi Scheme Presumption, the FBG Debtors hold significant and cognizable actual fraudulent transfer claims in

---

[107]   *Id.* ¶¶ 109–11.

[108]   *Id.* ¶¶ 109–11, 134.

[109]   *Id.* ¶¶ 106–07, 117.

[110]   *Id.* ¶ 106.

[111]   Kirschner Decl. ¶¶ 59,70, 73–75.

[112]   *Id.* ¶¶ 73–76.

addition to constructive fraudulent transfer claims against Onset.[113]  With respect to actual fraudulent transfer, the evidence supports numerous badges of fraud, including the use of inadequately capitalized and non-independent SPV Entities, the concealment of billions of dollars in debt, the commingling and disguising of cash flows, the double pledging of collateral, and the FBG Debtors' practical obligation to service debts that the SPV Entities could not repay.[114]  With respect to constructive fraudulent transfer, the evidence supports the conclusion that the FBG Debtors were insolvent when the relevant transfers were made and did not receive reasonably equivalent value in light of the SPV Facilities' above-market financing terms, the SPV Entities' inability to satisfy their obligations, and the absence of any commercially viable means by which the transactions could operate as written.[115]

86.    Onset is by far the most substantial potential source of recovery within this category of Estate Claims, having received more than $2.3 billion of transfers identified as potentially recoverable from the SPV Lenders and also illustrates the most egregious example, as it was continuously confronted with red flags that it willingly ignored so it could continue to profit from the Scheme by, among other things, imposing effective interest rates approaching 200% under a structure that the Carnaby Entities' operations could not support.[116]  Additionally, various other red flags indicate Onset was or should have been aware of the nature of these transactions, including that (i) Edward James, the principal negotiator for the Carnaby Entities (that was personally profiting from the transactions), required all communications concerning the facility to

---

[113]  *Id.* ¶¶ 77–84.

[114]  *Id.* ¶¶ 78–82.

[115]  *Id.* ¶¶ 83–84.

[116]  *Id.* ¶¶ 31, 86.

proceed through him "ALONE" and restricted Onset's ability to inspect its purported collateral; (ii) Onset reviewed FBG's financial statements, which omitted the Onset transactions and the related SPV Entities; and (iii) Onset refrained from filing UCC-1 financing statements against the FBG Debtors at Edward James's request until shortly before FBG's bankruptcy filing.[117]  Each of these facts independently undermines any good faith transferee defense Onset might assert; taken together, they render such a defense unlikely to succeed.

87.     **Suspect Acquisition Claims**.  The evidence in the Moore Declaration and the Kirschner Declaration further establish that the FBG Debtors likely may have colorable claims related to more than $1.6 billion in transfers arising from a series of acquisitions between 2022 and 2025 in which the FBG Debtors appear to have paid purchase prices far exceeding the fair market value of the acquired assets.[118]  The evidence is particularly stark with respect to three acquisitions involving entities owned or controlled by Patrick James.  Patrick James-controlled entities acquired Eagle Machining, Eagle Castings, and Dalton Corporation for aggregate purchase prices of approximately $66 million, and the FBG Debtors later acquired those entities for approximately $488 million, a disparity of approximately $422 million.[119]  Following the acquisitions, a senior First Brands executive directed accounting personnel to retroactively increase the recorded value of the acquired assets, even though the underlying assets had not changed.[120]  These facts strongly support the conclusion that the FBG Debtors did not receive reasonably equivalent value in exchange for the amounts transferred.[121]

---

[117]   *Id.* ¶¶ 85–86.

[118]   *Id.* ¶¶ 31, 126–31.

[119]   *Id.* ¶ 128.

[120]   Moore Decl. ¶ 157.

[121]   Kirschner Decl. ¶ 128.

88.     Mr. Kirschner accordingly has opined that the Litigation Trustee would likely be able to establish constructive fraudulent transfer claims arising from the Suspect Acquisitions.[122]   The substantial disparities between the prices paid by the Patrick James-controlled entities and the amounts later paid by the FBG Debtors support the conclusion that the FBG Debtors received less than reasonably equivalent value, and, the evidence discussed above provides a good-faith basis to conclude that the FBG Debtors were insolvent when the relevant transfers were made.[123]   *Supra* ¶ 60–61.   Together, these facts provide a substantial basis for recovery on claims related to these $1.6 billion in transfers.

89.     **Other Claims**.   In addition to the claims described above, Mr. Kirschner has opined that the FBG Debtors hold valuable Other Claims, including fraudulent-transfer claims against Helios Strategic Advisors LLC ("**Helios**"), and Preference Claims involving transfers together totaling approximately $280 million.[124]

90.     The evidence supports significant actual and constructive fraudulent-transfer claims against Helios.   Helios purportedly served as a broker responsible for arranging SPV financing and factoring transactions and received approximately $27.5 million in fees from the FBG Debtors between 2022 and 2025.[125]   The Debtors' investigation, however, uncovered evidence that Helios was used to funnel kickback payments to Edward James, including an agreement under which an entity controlled by Edward James was entitled to one-half of Helios's commissions and an internal record reflecting Edward James's approximately $20.5

---

[122]   *Id.* ¶¶ 126–31.

[123]   *Id.* ¶¶ 127–31.

[124]   *Id.* ¶¶ 132–36.

[125]   Moore Decl. ¶ 165.

million financial interest in a Helios investment fund.[126]  These facts support the conclusion that Helios served as a conduit for the diversion of estate assets to Edward James and that the transfers were made with actual intent to hinder, delay, or defraud creditors. [127]  The apparent kickback arrangement further supports the conclusion that the fees paid to Helios exceeded the reasonably equivalent value of any legitimate brokerage services rendered, because those services appear to have functioned principally as a conduit for the fraudulent diversion of funds from the FBG Debtors and as one of several channels through which company assets were misappropriated, thereby giving rise to constructive fraudulent-transfer claims. [128]

91.     FBG Debtors also hold Preference Claims against creditors and counterparties that received transfers during the applicable preference periods. [129]  A&M identified more than $1.7 billion in gross transfers made during those periods and estimated that potential preferences exceed approximately $304 million after accounting for potential offsets.[130]  Mr. Kirschner, in his declaration, opined that although defenses may exist to the Preference Claims, which have the potential to reduce the ultimate recoveries, the Litigation Trustee is still likely to recover on account of the Preference Claims.[131]

92.     ***Defenses.***  The litigation target objectors identify defenses and arguments that they contend will defeat the Estate Claims.  The existence of such defenses is unsurprising; litigation claims are inherently subject to factual and legal disputes.  But the FBG Debtors are not

---

[126]   *Id.* ¶ 167.

[127]   Kirschner Decl. ¶ 135.

[128]   *Id.* ¶ 136.

[129]   *Id.* ¶ 137–39.

[130]   Moore Decl. ¶ 164.

[131]   Kirschner Decl. ¶¶ 140–41.

required at confirmation to prove that they will prevail on every Estate Claim and recover the full

$25 billion of potential claims. Nor is this a valuation exercise of the Estate Claims. The relevant

question is whether there is a reasonable probability that the Litigation Trust will recover

approximately $2 billion in light of the substantial evidentiary record, the range of claims and

defendants, and the Litigation Trust's available funding and avenues of recovery. The record

amply supports that conclusion. The defenses raised by the Objectors do not negate that likelihood

or overcome the substantial evidentiary support for the Estate Claims.

93. Some objectors, including the Carnaby Secured Lenders, the LAM Parties,

Katsumi, and Evolution contend that the Ponzi Scheme Presumption is inapplicable to the Estate

Claims because, they argue, the FBG Debtors did not operate a "pure" Ponzi scheme since the

Scheme also had elements of a "legitimate" operating business. These arguments are belied by

the inapplicable cases relied upon in the objections, such as *Reagor-Dykes Motors, LP* where the

court found that a car dealership which engaged "in extensive fraudulent activity" did not operate

as a Ponzi Scheme due to its large "legitimate business." *Faulkner v. Ford Motor Credit Co. (In

re Reagor-Dykes Motors, LP),* No. 18-50214 (RLJ), 2022 WL 2046144, at *4 (Bankr. N.D. Tex.

June 3, 2022). While the fraudulent activity at issue in *Reagor*, such as double pledging of

collateral, does resemble the fraudulent activity underlying the Scheme, there were no allegations

that the dealership in *Reagor* used investor funds to issue returns to other investors, which the court

described as a "*sine qua non* of a Ponzi scheme." *Id.* (citation omitted); *see also In re IFS Fin.

Corp.*, No. 02-39553 (MI), 2009 WL 2986928 (Bankr. S.D. Tex. Sept. 9, 2009) ("Ponzi schemes

are generally defined as schemes in which fictitious profits are paid to investors from the principal

sums deposited subsequent investors.") (citation omitted), *aff'd sub nom. IFS Fin. Corp. v. Garcia*

*Suarez*, 2010 WL 11652027 (S.D. Tex. Sept. 11, 2010), *aff'd sub nom. In re IFS Fin. Corp.*, 803 F.3d 195 (5th Cir. 2015), and *aff'd,* 669 F.3d 255 (5th Cir. 2012).

94.     In contrast, and as Mr. Moore and Mr. Kirschner make clear in their declarations, principal investments made into the Scheme were routinely used to pay out other investors, with FBG's former management relying upon the regular funneling of money from one lender to stay afloat and entice further investment.[132]  Further, courts routinely find that the presence of a legitimate business will not defeat a finding of the Ponzi Scheme Presumption. *See e.g.*, *Pergament v. Torac Realty (In re Diamond Fin. Co.)*, 658 B.R. 748, 768 (Bankr. E.D.N.Y. 2024); *In re Twin Peaks Fin. Servs., Inc.*, 516 B.R. 651, 655 (Bankr. D. Utah 2014); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 528 F. Supp. 3d 219, 240 (S.D.N.Y. 2021); *In re EPD Inv. Co.*, 114 F.4th 1148, 1163 (9th Cir. 2024).

95.     Moreover, the Ponzi Scheme Presumption is not a necessary requirement for the Litigation Trustee to recover on the Estate Claims.  Instead, as noted above, Mr. Kirschner opines that a Litigation Trustee would still have colorable claims for fraudulent transfer, even without the presumption, by instead proving the "badges of fraud."[133]  *See In re Reagor-Dykes Motors, LP*, 2022 WL 2046144, at *9 (finding a trustee's claims for fraudulent transfer should proceed despite ruling against the trustee on the Ponzi Scheme Presumption).  The pervasive use of fabricated and grossly inflated invoices, on account of which billions of dollars were transferred, provides compelling evidence of a persistent course of intentional fraud supporting the applicable badges of fraud.[134]

---

[132]   *See e.g.*, Moore Decl. ¶¶ 60, 106; Kirschner Decl. ¶¶ 37–39, 59.

[133]   Kirschner Decl. ¶¶ 40, 77–78.

[134]   Kirschner Decl. ¶¶ 35–40.

96.     The objectors also allege that even if the Ponzi Scheme Presumption applies, the Litigation Trustee cannot recover transfers from parties that are "net losers" that provided more value to the FBG Debtors than they received in return.  Critically, however, even the case law on which some of these objectors rely confirms that "net loser" status alone does not immunize a transferee from avoidance.[135]  The "net loser" concept provides a defense ***only to the extent a transferee establishes that it gave value in good faith***—and as set forth in the Kirschner Declaration and described in paragraphs 60–61 above, the factual record provides substantial basis to conclude that these counterparties will not be able to establish good faith.[136]  *See Williams v. Fed. Deposit Ins. Corp. (In re Positive Health Mgmt., Inc.)*, 769 F.3d 899, 901, 905–06 (5th Cir. 2014) (explaining that an "*innocent recipient*" has a defense to "retain what it received from the debtor . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer") (citation omitted) (emphasis added); *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) ("[I]f fraudulent intent is proved, then, as we shall see, the defendant, unless he had no knowledge of the transferor's fraudulent intent, must return the entire payment that he received rather than just the amount by which it exceeded the consideration that he gave in exchange for the payment."); *see also Donell v. Kowell*, 533 F.3d 762, 771 (9th Cir. 2008) (citing to *Scholes* and affirming that a trustee can recover all payments, "*including* amounts which could be considered 'return of principal,'" where the good faith defense is unsuccessful).  Accordingly, the objectors' asserted "net loser" status does not defeat the Estate Claims where the record reflects that they continued funding despite glaring red flags that provide substantial grounds to conclude they cannot establish good faith.

---

[135]   LAM Parties Obj. n.14; Carnaby Obj. ¶ 95.

[136]   Kirschner Decl. ¶¶ 41–49, 54–55, 85.

97.     The LAM Parties also argue that the FBG Debtors have not shown that they are likely to recover $2 billion (or anything from the LAM Parties), in part, because the "single satisfaction" rule of section 550(d) would bar the Litigation Trustee from obtaining any recovery from the LAM Parties on account of fraudulent transfers, because, the LAM Parties allege, the transferred value from the aggregate factoring transactions was returned to the FBG Debtors prepetition.[137]   Missing from LAM Parties' selective analysis is the abundance of opinions that prevent the application of the single satisfaction rule, based on, among other things, the good faith requirements of section 548(c).  *See Bank of Am. v. Veluchamy*, 535 B.R. 783, 797–98 (N.D. Ill. 2015) (holding that denying a setoff to a bad-faith transferee does not create a prohibited double recovery under section 550(d) because a transferee may receive a credit under section 548(c) only if the transferee gave value and acted in good faith) *aff'd sub nom. In re Veluchamy*, 879 F.3d 808 (7th Cir. 2018); *In re Straightline Invs., Inc.*, 525 F.3d 870, 884 (9th Cir. 2008) (holding that the Bankruptcy Code does not allow a transferee to set off the amount he paid for fraudulently transferred property against the value of the property); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Sec. Inv'r Prot. Corp.)*, 568 B.R. 481, 484 (Bankr. S.D.N.Y. 2017) (holding that in a situation where a trustee sues multiple defendants to recover the value of avoided fraudulent transfers, even if a trustee recovered the entire amount from one party, section 550(d) does not foreclose the trustee from recovering the full amount from another liable party); *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 810 (9th Cir. 1994) (holding that a magistrate judge erred by "capping" recovery under section 544(b) at the amount of unsecured claims against the bankruptcy estate because pursuant to section 550, the trustee may recover, *for the benefit of*

---

[137]   *See* LAM Parties Obj ¶¶ 45–46.

49

*the estate,* the property transferred); *cf. Decker v. Tramiel (In re JTS Corp.)*, 617 F.3d 1102, 1115 (9th Cir. 2010) (holding that good-faith-transferee exception applied and thus, the court allowed for a reduction in the trustee's recovery under section 544(b) and section 550); *Bakst v. Sawran (In re Sawran)*, 359 B.R. 348, 350 (Bankr. S.D. Fla. 2007) (permitting the application of the single satisfaction rule expressly because the transferees were "innocent of wrongdoing and deserve protection under [the] circumstances.").

98.     And beyond this irrefutable support, the cases cited in the objections are inapposite.  For example, the LAM Parties cite extensively to *In re DeBerry* for the contention that the single satisfaction rule prevents recovery.  Yet, there a debtor fraudulently transferred $275,000 into the joint bank account of a family member.  The family member thereafter authorized the transfers of $235,000 *back* to the debtor.  *Whitlock v. Lowe (In re DeBerry)*, 945 F.3d 943, 945 (5th Cir. 2019) (holding that the trustee could not recover from the family member the money already returned to the debtor).  This clear-cut return of funds in no way resembles the lending facilities operated by the SCF and third-party factoring counterparties, whereunder the counterparties continuously invested into a fraudulent enterprise.  *In re Sanchez Energy Corp.*, where the debtor received lien releases under its confirmed plan and then sought to receive the value of these same liens as preference claims, and *In re Cybridge Corp.*, which concerned the *post*-petition lending of funds from a creditor unaware of the bankruptcy filing, are similarly inapplicable. *See Ad Hoc Grp. of Senior Secured Noteholders v. Del. Tr. Co. (In re Sanchez Energy Corp.)*, 139 F.4th 411, 419–21 (5th Cir. 2024), *cert. denied sub nom. Delaware Tr. Co. v. Ad Hoc Grp. of Senior Secured Noteholders*, 146 S. Ct. 840 (2025); *In re Cybridge Corp.*, 312 B.R. 262, 270 (D.N.J. 2004).  Therefore, the LAM Parties have not established that the "single satisfaction" rule will overcome the Estate Claims.

99.     The LAM Parties also argue that the transferred funds would not be recoverable by the Litigation Trustee because, to the extent those funds were obtained through fraud or theft-by-fraud, the FBG Debtors allegedly held only bare legal title while the fraud victims—or, alternatively, the United States through its forfeiture rights—held the superior equitable interest.[138]  In doing so, the LAM Parties misplace the burden of establishing that the debtor held equitable title in the property at the time of the transfers.  The Fifth Circuit cases cited by the LAM Parties clearly place the burden of establishing that the debtor held only legal title to the subject property on the claimant asserting an equitable interest in such property, not the debtor.  *In re Maple Mortg., Inc.*, 81 F.3d 592, 596 (5th Cir. 1996) ("[W]hen property that otherwise would be considered part of a debtor's estate is alleged to be held in trust for another, '[t]he burden of establishing the existence of the constructive trust rests on the claimant.') (citing *In re Southmark*, 49 F.3d 1111, 1118 (5th Cir.1995)).  And, such burden requires the claimant to trace the property to which it asserts an equitable title.  *In re Kossoff PLLC*, 673 B.R. 253 (Bankr. S.D.N.Y. 2025) ("In a bankruptcy case involving commingled funds, to overcome the presumption that commingled funds are estate property, the transferee bears the burden of tracing the alleged trust property specifically and directly back to the illegal transfers giving rise to the trust."); *see also In re Southmark*, 49 F.3d at 1118 n.31 (5th Cir.1995).  That the property be traceable is also required for the property to be subject to forfeiture under the very statute LAM cites.[139]  Here, that burden cannot be met because, as the Moore Declaration establishes, former management deliberately commingled proceeds, washed them through intercompany accounts, and used top-side entries to

---

[138]   LAM Parties Obj. ¶¶ 47–49.

[139]   LAM Parties Obj. ¶ 49 ("Under federal law, property is subject to forfeiture if it is derived from proceeds traceable to a violation of wire fraud, bank fraud, or conspiracy to commit wire or bank fraud statutes, or if it was involved in a money laundering offense." 18 U.S.C. §§ 981(a)(1), 982(a)(1)).

erase the source and related liabilities.[140]  This fact is also what separates this case from the cases cited by the LAM Parties where a claimant was successful in establishing an equitable interest over the subject property because such property was readily traceable.[141]  Therefore, the LAM Parties' argument concerning whether the FBG Debtors did, or did not, possess both legal and equitable title to the transferred funds does not have any bearing on showing the likelihood of the Litigation Trustee's success on the Estate Claims.

### (ii) Estimated Amount of Allowed Administrative Expense and Priority Claims Is Reasonable

100.  Certain objectors have challenged the Debtors' estimate of Allowed Administrative Expense and Priority Claims and thus the $1.965 billion threshold of recoveries needed to achieve the Plan's Effective Date under the Litigation Trust Waterfall.[142]  These parties assert that the projected amount of Allowed Administrative Expense Claims and Priority Claims is unsupportable, arguing that the FBG Debtors' estimates exclude contingent or disputed administrative claims to which objections have not yet been filed[143] and that the universe of claims may be materially higher than the FBG Debtors' estimates.  These objections improperly assume that because the outstanding amount of administrative expense claims *could* materially exceed the FBG Debtors' estimates, the FBG Debtors cannot confirm the Plan.  There is no basis in the Bankruptcy Code or otherwise for that position.

---

[140]  Moore Decl. ¶¶ 73–74.

[141]  *See, e.g.*, *In re Bake-Line Grp., LLC*, 359 B.R. 566, 568 (Bankr. D. Del. 2007) (subject property was a single check deposited by a chapter 7 debtor prepetition); *Begier v. I.R.S.*, 496 U.S. 53, 54 (1990) (subject property was held in a segregated account and collected by an employer pursuant to the Federal Insurance Contributions Act which specifies such funds were "held in trust for the United States"); *In re Maple Mortg., Inc.*, 81 F.3d at 596 (subject property was kept in a segregated account for which detailed records were maintained).

[142]  *See* Carnaby Obj. ¶ 44–45; Onset Obj. ¶ 36; Garza WARN Plaintiffs' Obj. ¶ 15 (Docket No. 3273).

[143]  *See* Carnaby Obj. ¶ 44–45; Onset Obj. ¶ 36.

101.     As mentioned herein, the FBG Debtors' burden is not to provide a guarantee—only a reasonable probability—that the Plan can be performed.  *In re Idearc Inc.*, 423 B.R. 138, 167 (Bankr. N.D. Tex. 2009) ("The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required.").  The FBG Debtors will meet that burden.  The FBG Debtors' projections of allowed administrative claims are not speculative, but are reasonable, based on a good-faith and methodological review of aggregated invoice and other data performed by the A&M team, and are the best available assessment of outstanding Administrative Expense Claims and Priority Claims that are likely to be Allowed.[144]  To ensure none of the claims filed on the docket were additive to the FBG Debtors' estimate, the A&M team then compared and matched the filed Administrative Expense Claims to which an objection has not been or is not currently anticipated to their estimate.[145]

102.     Tellingly, no party has raised any objection to the estimation methodology used by Mr. Moore to estimate the amount of Allowed Administrative Expense and Priority Claims.  Instead, the objections speculate that because "the universe of potentially assertable Administrative Expense Claims remains open and unknown," the FBG Debtors are unable to satisfy the feasibility requirement.[146]  However, "just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility."  *In re Cajun Elec. Power Co-op., Inc.*, 230 B.R. 715, 745 (Bankr. M.D. La. 1999).  The evidence and methodology set forth in the Moore Declaration is sufficient to establish the reasonableness of the Debtors' estimates.  There is, further, no other requirement in the Bankruptcy Code for the FBG Debtors to

---

[144]   Moore Decl. ¶¶ 198–99.

[145]   *Id.* ¶ 212.

[146]   Carnaby Obj. ¶ 45.

set a bar date to identify a "closed universe" of outstanding Administrative Expense Claims prior to seeking confirmation of a plan. *See In re SS&S Specialties, LLC*, No. 21-50124-KKS, 2024 WL 3884169, at *7 (Bankr. N.D. Fla. Aug. 15, 2024) (stating "[n]o bar date for administrative claims is required in a Chapter 11 case" at all).

103.    The objections also falsely allege that the FBG Debtors' estimate "does not account for future Administrative Expense Claims that will undoubtedly be filed."[147]   That is simply incorrect: the Debtors' estimates account for over $162 million in unfiled Administrative Expense Claims.   The Debtors have estimated that there are $185 million in outstanding Administrative Expense Claims plus a 20% "cushion" of $37 million.[148]   That estimate is inclusive of the approximately $23 million in filed claims that the Debtors do not believe are facially deficient[149] *plus* $162 million of potential claims that have not been filed.  On top of that, the Debtors' cushion of $37 million will likely account for contingent claims that are outstanding against the FBG Debtors' estates, to the extent such claims are Allowed.[150]   That cushion will only increase if the holders of Administrative Expense Claims opt-in to the Administrative Expense Claims Consent Program.  The FBG Debtors' projections are therefore reasonable for establishing that the Plan is feasible.

---

[147]   Carnaby Obj. ¶ 45; Onset Obj. ¶ 36.

[148]   Moore Decl. ¶ 197.

[149]   *Id.* ¶ 215.

[150]   For example, the Garza WARN Plaintiffs' Objection alleges that the Garza WARN Plaintiffs (as defined therein) are entitled to administrative expense claims or priority claims in an unspecified amount described only as "many millions of dollars" on account of certain WARN Act claims brought against the FBG Debtors, which the Debtors dispute.  Garza WARN Plaintiffs' Obj. ¶ 15.  Even if any portion of this claim was Allowed, the Garza WARN Plaintiffs have made no showing that their claims threaten to exceed the 20% contingency buffer factored into the Debtors' estimates.

104.   Moreover, the FBG Debtors are confident they will prevail in objecting to the quanta of claims described in the Moore Declaration.  The FBG Debtors have already identified approximately $57 million in Administrative Expense Claims[151] and approximately $50 million in Priority Claims[152] that are duplicative or have been amended and superseded and therefore can be disallowed on clear-cut legal and procedural grounds.  For example, three different Proofs of Claim (Claim Nos. 1845, 1846, and 1960) filed by Longkou Haimeng Machinery Co. Ltd. ("**LHM**") assert the same 503(b)(9) Claim in the amount of over $21 million, which the FBG Debtors dispute, and would account for more than $40 million in duplicated filed 503(b)(9) Claims even if the underlying debt was valid.[153]  FBG Debtors anticipate objecting to approximately $34 million in filed Administrative Expense Claims[154] and approximately $121 million in filed Priority Claims on substantive grounds,[155] and are confident they will prevail with respect to such claims, and even if some of these objections are unsuccessful, such unsuccessful objections would need to exceed the 20% cushion on Allowed Administrative Expense Claims and Priority Claims[156] to have any effect on the Debtors' aggregate estimate.

105.   Finally, and perhaps most importantly, the objections fail to address the bigger picture of the FBG Debtors' outstanding administrative and priority claims in context of the Plan and the recoverability of the Estate Claims.

---

[151]   Moore Decl. ¶ 211.

[152]   *Id.* ¶ 218.

[153]   *Id.* ¶ 211.

[154]   *Id.* ¶ 211.

[155]   *Id.* ¶ 218.

[156]   *Id.* ¶¶ 193–94.

106.   For example, two of the objections raise that $53 million in postpetition disputed Administrative Expense Claims have been asserted by non-Debtor subsidiary LHM and therefore excluded from the FBG Debtors' estimate.[157]   The Debtors believe that there are a number of valid defenses to this claim that warrant excluding it from their estimate.  However, even if the entirety of the LHM asserted Administrative Expense Claim (including the 503(b)(9) Claim asserted by LHM in the amount of approximately $21 million) was Allowed in full, the entire 20% cushion of Administrative Expense Claims was subsumed by unaccounted for claims other than LHM's claims, and not a single creditor participated in the Administrative Expense Claims Consent Program, the Litigation Trust would only need to recover an additional 0.33% in litigation proceeds of the total assertable Estate Claims by the end of 2028 for the Effective Date to occur, which is consistent with the Debtors' and Mr. Kirschner's estimate of what is reasonably probable.[158]   In light of the substantial amount of evidence the FBG Debtors have set forth in support of the strength of the Estate Claims, the FBG Debtors, have carried their burden to establish that achieving the Effective Date is realistic.

107.   Accordingly, the Debtors' estimations of the total outstanding Allowed Administrative Expense Claims and Priority Claims is reasonable and supported by evidence.

### (iii)   FBG Debtors Will Be Able to Satisfy All Allowed Administrative Expense and Priority Claims under the Plan

108.   The FBG Debtors have carried their burden to provide reasonable assurances of the Plan's success.

---

[157]   Carnaby Obj. ¶ 44, Onset Obj. ¶ 36.

[158]   *See* Kirschner Decl. ¶ 143.

56

109.    As described herein, a liquidating plan must be supported only by a "reasonable assurance of commercial viability" to satisfy the requirements of section 1129(a)(11), to the extent such section is even applicable to liquidating plans. *See In re T-H New Orleans L.P.*, 116 F.3d at 801; *supra* ¶ 53.

110.    To meet this standard, a chapter 11 debtor "must present proof" sufficient to establish a "reasonable probability that the plan provisions can be performed." *In re Idearc Inc.*, 423 B.R. 138, 167 (Bankr. N.D. Tex. 2009).  In the context of a plan that will become effective following an executory period to monetize litigation assets and satisfy administrative expense claims, courts have required debtors to provide evidence showing that it is reasonably probable they will complete the required distributions.  *See* Hr'g Tr. 39:9–12, *In re Steward Health Care Sys. LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. July 16, 2025) (finding plan was feasible notwithstanding over $100 million in administrative expense claims where the debtors had provided sufficient evidence of "potentially over $2 billion of claims"); Hr'g Tr. 179:1–4, *In re Sears Holding Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 7, 2019) (Docket No. 5396) (confirming liquidating plan where it was "reasonable to project substantial recoveries in a relatively brief period on the Debtors' preference claims and/or settlements of administrative expenses"); *see also In re Cash Cloud, Inc.*, No. 23-10423 (MKN), 2023 Bankr. LEXIS 2561, at *11–13 (Bankr. D. Nev. Aug. 24, 2023) (confirming plan over objection that "effective date [would] not occur until after payment of substantial administrative claims anticipated" because there was, among other things, "a sufficient showing of certainty that the claims of the estate [would] be pursued").

111.    As set forth in Mr. Moore's declaration, pursuant to the Litigation Trust Waterfall, the Litigation Trust must generate proceeds of approximately $1.965 billion on account

57

of the Estate Claims and other Litigation Trust Assets to satisfy the estimated $222 million in Administrative Expense Claims and an estimated $78 million in Priority Claims in full.[159]  As set forth above, the FBG Debtors have established that it is reasonably probable that $2 billion of recoveries on account of the Estate Claims will be received by the end of 2028.[160]  The Moore Declaration and Kirschner Declaration describe months of investigative work and legal analysis of the Estate Claims.  That evidence is not mere speculation, but the results of hands-on forensic analyses of many prepetition transactions,[161] tracing analyses displaying approximately $708 million in transfers directly to Patrick James or his family trust,[162] and admissions by the FBG Debtors' former officers under oath to egregious examples of corporate malfeasance,[163] among other things.

112.     Certain objectors argue that the FBG Debtors have not shown that the Estate Claims can be collected, pointing to asset-dissipation risks, limited insurance, as well as other issues they predict may arise to limit collectability.[164]  However, Mr. Kirschner's conclusions take into account that there is collectability risk, and the FBG Debtors have identified sufficient assets: the James Brothers likely retain substantial assets including on account of transactions giving rise to the Estate Claims,[165] significant D&O proceeds remain that may be available to satisfy insider

---

[159]   Moore Decl. ¶ 228.

[160]   Kirschner Decl. ¶ 143.

[161]   Moore Decl. ¶ 82.

[162]   *Id.* ¶ 142.

[163]   *Id.* ¶ 79.

[164]   Evolution Obj. ¶¶ 23(d), 44; U.S. Trustee Obj. ¶¶ 8, 20, 24, 36, 40; Carnaby Obj. ¶¶ 51, 56–57, 99; Onset Obj. ¶¶ 38, 40–41, 43; LAM Parties Obj. ¶ 50.

[165]   Kirschner Decl. ¶ 145.

claims against the James brothers,[166] many other of the FBG Debtors' defendants may be significantly well capitalized,[167] and the Litigation Trust may be able to work together with the government in overlapping civil and criminal litigation to ensure collectability of recovery and, potentially, gain access to forfeited assets.[168]

113.    Further, the primary objectors to the Plan are litigation targets and none have argued or presented evidence to suggest they cannot satisfy a significant judgment.  Indeed, these defendants, including Factors and Supply Chain Financers, engaged in transactions with the FBG Debtors worth multi-billions of dollars.  And, Onset, against whom the FBG Debtors have asserted claims in excess of $2.3 billion, touts on its website that it has funded over $8 billion of finance transactions since 2008. The FBG Debtors have, thus, provided sufficient evidence of the collectability of the Estate Claims in excess of what is required to provide assurances of the Plan's success.  Despite the various objectors' assertions, the FBG Debtors need not establish that every Estate Claim will be recovered in full according to every contingency.  The FBG Debtors have assessed the available avenues of recovery and established a realistic basis to conclude that the Estate Claims will generate sufficient proceeds to carry out the Plan.  Nothing more is required.

114.    Examples of cases with similar plan structures support this conclusion. *See, e.g.*, *In re Steward Health Care System LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. June 18, 2026) (Docket No. 6614) (indicating the *Steward* litigation trust, as of the date thereof, had recovered approximately $60 million in the first 10 months following confirmation); *In re Sears Holdings Corp.*, No. 18-23538 (SHL) (Bankr. S.D.N.Y. May 19, 2026) (Docket No. 11037)

---

[166]    *Id.*

[167]    *Id.*

[168]    *See Id.*

(announcing a $20 million distribution to unsecured creditors following effectiveness of delayed effective date plan).

115. Mr. Kirschner has opined that it is reasonably probable that the FBG Debtors will recover at least $2 billion on account of the Estate Claims by 2028,[169] *representing just 8% of the total potential claim amounts on account of the Estate Claims*, and $1.965 billion is required to satisfy the estimated $222 million in Administrative Expense Claims and an estimated $78 million in Priority Claims in full.[170] The evidence of the Estate Claims that the FBG Debtors have put forth in this case is similar to the evidence provided in *Steward*. *See* Hr'g Tr. 37:4–10, *In re Steward Health Care Sys. LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. July 16, 2025) (finding plan was feasible where debtors had produced evidence of over $2 billion in potential colorable claims, around 13% of which were needed to satisfy outstanding administrative expense claims).

116. Nevertheless, certain of the objections—namely, the LAM Parties' Objection—argue that the value of the Estate Claims cannot support feasibility of the Plan because "market indicators," including the trading price of the DIP A Claims, the results of the marketing process for the Estate Claims, and the purchase price of the Estate Claims Credit Bid Transaction, indicate that the true "value" of the Estate Claims is beneath $2 billion.[171]

117. But these objectors fail to offer evidence showing that their "market indicators" are reliable metrics for projecting recoveries on account of litigation claims. To the contrary, secondary-market trading of the DIP A Claims may reflect illiquidity discounts, duration

---

[169] Kirschner Decl. ¶ 143.

[170] Moore Decl. ¶ 228.

[171] LAM Parties Obj. ¶ 33–37.

risk, the buyer universe's inability to hold litigation exposure, and more. As for the marketing process and the credit bid, the FBG Debtors engaged in a thorough marketing process targeting numerous parties. The natural buyers are the existing DIP lenders holding DIP liens that secure approximately $4.9 billion in DIP obligations ($1.3 billion in DIP A Claims and $3.5 billion in Roll-Up Claims). And any viable third-party bid would have had to be a cash bid that (1) was acceptable to the DIP Lenders (who must consent to any such sale) and (2) provides more value to the Debtors' estates than the Estate Claim Credit Bid Transaction and Plan, which provide for recoveries that are expected to repay administrative expense and priority claims in full and the potential for meaningful recoveries to unsecured creditors. At a minimum, any serious bid likely would have required a cash bid that clears the $1.3 billion of DIP A Claims.

118. More fundamentally, the FBG Debtors have not performed a valuation of the Estate Claims, nor are they obligated to do so. LAM's objection imports irrelevant valuation concepts that are inapplicable to the FBG Debtors' burden at confirmation, which is to simply show that the Plan is commercially viable. For purposes of demonstrating that achieving the Plan's Effective Date is commercially viable, a debtor does not need to establish that the present value of its assets—in this case, the Estate Claims—are sufficient to satisfy obligations under the proposed plan based on a market test. The debtor need only show that the plan has a reasonable probability of success based on reasonable and simple projections of the funds that *will be received* on account of estate assets on the timeline contemplated. *See, e.g.*, *In re Heritage Highgate, Inc.*, 679 F.3d 132, 143 (3d Cir. 2012) (stating that debtor's projections for purposes of feasibility "regarding monies to be realized from the sale of lots over time do not equate to 'value' as of confirmation because they anticipate Debtors spending time and money to realize value at a later date").

119.     For example, in *In re Cavu/Rock Props. Project I, L.L.C*, the Fifth Circuit considered whether a debtor assumed inconsistent positions for purposes of res judicata where the debtor "estimated . . . a total property value range of $8,040,000 to $10,050,000" for purposes of feasibility but in an adversary proceeding with a statutory lienholder, "presented evidence valuing the Property between $2,100,000 and $2,600,000" under section 506 of the Bankruptcy Code. *Gold Star Constr., Inc. v. Cavu/Rock Props. Project I, L.L.C. (In re Cavu/Rock Props. Project I, L.L.C.)*, 637 F. App'x 123, 125–26 (5th Cir. 2016).  The Fifth Circuit held that the debtor had not taken inconsistent positions because the debtors' projections on account of their lots were not, and did not have to be, a valuation.  *See id.* at 126.  Instead, the projections were merely an "estimate of 'monies to be realized from the sale of lots over time' and anticipated continued development." *Id.* (quoting *Heritage Highgate*, 679 F.3d at 142).

120.     The FBG Debtors' estimated litigation recoveries here are no different.  The FBG Debtors' estimate that approximately $2 billion will be obtained on account of the Estate Claims by the end of 2028 is not a valuation of the Estate Claims but an estimate of "monies to be realized over time" by the prosecution of a highly motivated Litigation Trustee funded with a minimum of $75 million.  Whether any of the market indicia referred to in the LAM Parties' objection are an accurate representation of the present value of the Estate Claims is irrelevant because the Debtors have met their burden to produce a "simpl[e] [] set of projections offered in support of the plan's feasibility," *Heritage Highgate*, 679 F.3d at 142, that are both reasonable and grounded in a robust evidentiary record.

121.     Accordingly, the Debtors have provided sufficient evidence of a reasonable probability of the Plan's success and have carried their burden to demonstrate that the Plan is feasible.  All objections to the Plan's feasibility should be overruled.

### C.      *The Plan's Anticipated Effective Date Is Not Unfairly Prejudicial*

122.      Unable to dispute that the Plan is authorized by the Bankruptcy Code and that the Plan is feasible (to the extent such a requirement even applies), the objectors resort to arguing, essentially, that the Plan will unfairly prejudice them and other creditors.

123.      The objectors rely on language from this Court and others that postponing the effective date may not be appropriate where it is not reasonably necessary or risks danger or prejudice to creditors.  *See In re Steward Health Care Sys.*, 32:11–13; *see, e.g.*, *In re Wonder Corp. of Am.*, 70 B.R. 1018, 1021 (Bankr. D. Conn. 1987) (stating that the effective date should occur "no later than is reasonably necessary to accomplish a legitimate purpose.").  But courts have not strictly enforced limits on when the effective date must occur.  Rather, so long as the executory period presents "no real danger [to creditors] of changed facts or prejudice . . . even a delay of 'months or years' [] 'may be permissible.'" *In re Cent. European Inc. Indus. Dev. Co.*, 288 B.R. 572, 577 n. 7 (Bankr. N.D. Cal. 2003) (quoting *In re Loveridge Machine & Tool Co.*, 36 B.R. 159, 166–67 (Bankr. D. Utah 1983)).

124.      *American Airlines* is illustrative.  There, the court found that postponing the effective date would not affect the level of risk of not achieving the effective date.  *See* Hr'g Tr. 29:21, *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 12, 2013) (Docket No. 10205) (finding, where effective date was contingent on regulatory approval of merger, "little practical difference" between entering the confirmation order after the Department of Justice sued to block the merger and hypothetically entering it before such lawsuit was filed).  In fact, the court found that delaying the entry of the confirmation order itself would exacerbate creditor uncertainty, particularly where absent the delayed effective date structure, no confirmable chapter 11 plan would be feasible.  *See id.* 30:21–32:1 (finding that delaying confirmation would "'invite further

63

preconfirmation proceedings . . . [that] could divert the debtor's focus away from the defense of the plan of the merger where it properly belongs."') (quoting creditors' committee's briefing).

125.    Indeed, all of the cases cited above (*see supra* ¶ 32) involving effective dates delayed to allow for litigation of estate claims have ultimately gone effective by meeting the conditions that required the extended executory period after the confirmation date—aside from *Steward*, which remains in its executory period and is on-track to become effective in 2027.[172]

126.    Here, there is no risk of prejudice. The opposite is true: the Plan is the value-maximizing path forward that (i) allows administrative and priority creditors to be repaid from litigation recoveries along-side the DIP Lenders during the executory period and (ii)  protects creditors from a value-destructive conversion to chapter 7.

127.    Confirmation of the Plan with a delayed effective date but approval of other various transactions under the Plan upon entry of the Confirmation Order, including the Estate Claims Credit Bid Transaction and the DIP Collateral Credit Bid Transaction will ensure the benefits provided to the estate under such transactions are obtained, including:

- The creation of a Litigation Trust, a DIP Collateral Trust, and an ABL Collateral Trust, each with funding and governance to enable the monetization of assets and distribution of proceeds in accordance with the applicable waterfalls;

- $75 million in initial committed funding for the Litigation Trust to prosecute and monetize the Estate Claims, with an option to obtain additional funding;

- A Litigation Oversight Committee, with minority representation appointed by the Creditors' Committee that will have veto power over certain Sacred Rights;

---

[172]    *See In re Steward Health Care System LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. June 18, 2026) (Docket No. 6614).

- The Litigation Trust Waterfall which allows junior creditors to receive recoveries alongside DIP A Claims far in advance of the DIP A Claims being paid in full;

- An opportunity for qualifying Trade Creditors, Factors, and Supply Chain Financers to opt in to a Preference Settlement and receive either a release of, or a modified new value defense against, preference actions the FBG Debtors could pursue; and

- An Administrative Claims Consent Program, which accelerates recoveries for consenting holders of Administrative Expense Claims to receive distributions earlier in exchange for reducing the Allowed amount of their claims.

128. Most notably, the Litigation Trust Waterfall provides that junior creditors, including administrative and priority creditors, will begin sharing in recoveries by the Litigation Trust after $350 million of proceeds are distributed to other beneficiaries, well in advance of the repayment of more than $1.3 billion of outstanding DIP A Claims. This is an extraordinary benefit for the estate, particularly for administrative and priority creditors. Outside the Plan, administrative creditors are not entitled to any recovery until the DIP A Claims are repaid in full.

129. The FBG Debtors have made a "sufficient showing of certainty that the claims of the estate will be pursued" following confirmation, and creditors are therefore not prejudiced by the delayed Effective Date. *See In re Cash Cloud, Inc.*, No. 23-10423 (MKN), 2023 Bankr. LEXIS 2561, at *11–13 (Bankr. D. Nev. Aug. 24, 2023) (overruling objection based in part on argument that the debtor's plan could not be confirmed where the effective date was not expected to occur until after the confirmation date when the debtor was expected to have sufficient proceeds to pay administrative expense claims in full). Moreover, given the significant number and diversity of claims, unlike cases such as *Premiere Network Servs., Inc.*, the success of the Plan does not rely on any one claim being successful. *In re Premiere Network Servs., Inc.*, No. 04-33402 (HDH), 2005 Bankr. Lexis 2298 at *18–19 (Bankr. N.D. Tex. July 1, 2005) (finding

proposed plan not feasible where funding of administrative expense claims relied solely on assumption of certain contracts to fund administrative expense claims, where applicable state law was mixed). As stated above, absent confirmation of the Plan, these cases will convert to chapter 7, which would undoubtedly be value destructive for all creditors.

130. Accordingly, creditors in these cases are not being forced to subsidize the FBG Debtors' Plan while creditors "bear the risk" that the assets available for distribution are depleted. Instead, the FBG Debtors' Plan is the only option available to provide recoveries to junior creditors.

131. The Creditors' Committee, who has worked tirelessly with the FBG Debtors to negotiate a value maximizing chapter 11 plan, fully supports the Plan. The support of the Creditors' Committee provides further evidence that the Plan does not place unnecessary risks on creditors and should be given considerable weight. *See In re Cash Cloud, Inc.*, No. 23-10423 (MKN), 2023 Bankr. LEXIS 2561 (Bankr. D. Nev. Aug. 24, 2023) (finding that a Chapter 11 debtor's business judgment to liquidate in Chapter 11, rather than converting to Chapter 7, should be given considerable weight, especially if it is supported by an official committee of unsecured creditors).

## II.    Objections to the Estate Claims Credit Bid Transaction Should be Overruled

132. Certain objectors challenge the Estate Claims Credit Bid Transaction for various reasons, arguing that (i) it is improper to approve section 363 sales in a Plan and that sales may only be consummated pursuant to section 1123(b)(4),[173] (ii) the credit bid transaction violates section 363(k) of the Bankruptcy Code because the DIP Secured Parties' liens only cover proceeds

---

[173]    LAM Objection ¶ 60–62; Katsumi Objection ¶ 43 n.7.

of Avoidance Actions (and not the actions themselves),[174] and (iii) the Estate Claims Marketing Process was not a full and fair process and, therefore, does not satisfy section 363(b) of the Bankruptcy Code, and that the DIP Secured Parties are not good faith purchasers under section 363(m).[175]  Each of these objections lacks merit.

### (i)    Section 363 *is* Applicable to Plan Sales

133.    The LAM parties suggest that chapter 11 plans cannot provide for sales under section 363 of the Bankruptcy Code because section 1123(b)(4) provides the exclusive means to effectuate sales under a plan.  The LAM Parties are wrong.  The Third Circuit recently addressed this exact question in *In re Boy Scouts of Am.*, and upheld the validity of 363 sales as part of plan confirmation.  137 F.4th 126 (3d Cir. 2025), *cert. denied.*  In that mass tort bankruptcy case, the debtors applied section 363 as part of their confirmed reorganization plan to effect a sale of liability insurance policies in order to fund a settlement trust.  The court confirmed that section 363(m) applied because the confirmation order unambiguously authorized the sale of the settling insurers' policies pursuant to section 363.  In overruling arguments that section 363(b) and (m) could only apply to a sale "outside a plan of reorganization," the Third Circuit affirmed that a sale can be consummated as part of a section 363 transaction even when it is incorporated into a confirmed plan under section 1129, the two provisions are not mutually exclusive.  *Id*. at 153.  The Confirmation Order in *Boy Scouts* authorized the sale pursuant to section 363, and the court applied section 363(m)'s good faith purchaser protections accordingly.  In reaching this conclusion, the Third Circuit relied, in part, on similar precedent in the Fifth Circuit.  *Id*. (*citing In re Fieldwood Energy LLC*, 93 F.4th 817, 825 (5th Cir. 2024) (applying section 363(m) to credit bid sale

---

[174]   UST Objection ¶¶ 2, 4, 21(a)(i), 23; Katsumi Objection ¶¶ 39–43; Onset Objection ¶ 61.

[175]   LAM Objection ¶¶ 57–63; Katsumi Objection ¶¶ 39–43.

authorized by confirmation order)).  Bankruptcy Courts in this jurisdiction have also regularly approved 363 sales as part of plan confirmation.[176]

134.   Rather than cite a single holding to the contrary, the LAM Parties and Katsumi rely on an "observation" the Fifth Circuit made in a 1988 case that there is an "implication" that "[section 363] concern[s] the trustee's authority during the administration of the estate."[177]  However, as both objectors concede, the court in *Tex. Extrusion Corp.* was clear that it was not deciding whether section 363 is applicable to plan sales.[178]  And since then, the Fifth Circuit and lower courts in this jurisdiction have affirmed numerous orders approving section 363 sales (including upholding section 363(m) and (n) protections) as part of a chapter 11 plan. *See supra* ¶ 133 n.181.

135.   In fact, LAM's blanket contention that section 363 is a "non-facially applicable provision" is contradicted by the plain text of section 1129 which expressly contemplates that section 363 of will apply to plan sales.  *See* § 1129(b)(2)(A)(ii) (requiring that "With respect to a class of secured claims, the plan provides . . . for the sale, ***subject to***

---

[176]  *See, e.g.*, *In re Rockall Energy Holdings, LLC*, Case No. 22-90000 (Bankr. S.D. Tex. June 2, 2022) (Docket No. 629) (confirmation order approving chapter 11 plan pursuant to which sale of assets conducted and purchaser of assets was found to be "a Purchaser in good faith of the Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code"); *In re Westmoreland Coal Company*, Case No. 18-35672 (Bankr. S.D. Tex. Mar. 2, 2019) (Docket No. 1561) (approving sale of assets free and clear under confirmation order pursuant to section 363(f) and ordering that "[t]he Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is therefore entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code"); *In re Cobalt Int'l Energy, Inc.*, Case No. 17-36709 (Bankr. S.D. Tex. Apr. 5, 2018) (Docket No. 784) (confirmation order approving sale transaction free and clear pursuant to sections 1123(a)(5)(D), 1123(b)(4), and 1129(b)(2)(A)(ii) and stating that "each Purchaser shall be entitled to the protections set forth in section 363 of the Bankruptcy Code").

[177]  LAM Objection ¶ 61 (quoting *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1165 (5th Cir. 1988)); Katsumi Objection ¶ 43 n.7 (same).

[178]  *Tex. Extrusion Corp.*, 844 F.2d at 1165 ("***We, however, decline at this time to rule on the propriety of the application of 11 U.S.C. § 363 to the sale of property pursuant to a plan of reorganization.***  Such a sale is clearly envisioned in a Chapter 11 reorganization. *See* 11 U.S.C. §§ 1123, 1141, 1142.  It is not necessary for us to decide whether the sale can be carried out pursuant to the authority in 11 U.S.C. § 363, thus invoking the shield of 11 U.S.C. § 363(m)" (emphasis added)).

*section 363(k) of this title*, of any property that is subject to the liens securing such claims, free and clear of such liens . . . .") (emphasis added); section 363(k) (itself applying to "a sale under [§363(b)]"). And for good reason. If section 363 of the Bankruptcy Code was not applicable to sales pursuant to a chapter 11 plan, then no secured lender could ever credit bid its secured claims pursuant to section 363(k) in connection with a plan sale. Section 1123(a)(5)(D) merely provides that "a sale of all or any part of the property of the estate" represents but one example of how a plan *may* provide an "adequate means for the plan's implementation." It does not supplant or otherwise exclude the specific sale provisions of section 363.

136. Sales effectuated under section 363 in conjunction with plan confirmation are clearly permitted in this Circuit, and others, and are consistent with the plain text of the Bankruptcy Code. Accordingly, the Court should overrule such objections and approve the sale pursuant to section 363 of the Bankruptcy Code.

### (ii) The Estate Claims Credit Bid Transaction Complies with Section 363(k) of the Bankruptcy Code

137. Certain objectors continue to make much of the fact that the DIP Lenders' liens only extend to the proceeds of Avoidance Actions (and not the actions themselves) and therefore contend that the transaction violates section 363(k). This objection should be overruled.

138. Under the Estate Claims Credit Bid Transaction, among other forms of consideration, the DIP Secured Parties have agreed to credit bid $75 million of their DIP A Claims. As set forth in the Disclosure Statement[179] and numerous other filings, the DIP Secured Parties are also providing numerous other forms of consideration in exchange for the Estate Claims,

---

[179] *See* Disclosure Statement, pp 2 (defining "Estate Claims Credit Bid" as "a sale to the DIP Secured Parties via credit bid *and other consideration* of all Estate Claims and certain other assets of the FBG Debtors as set forth in the Plan[.]" (emphasis added).

including: (i) agreeing to the Litigation Trust Waterfall, which allows junior creditors to share in recoveries before the DIP A Claims are repaid in full; (ii) agreeing to fund the Litigation Trust with not less than $75 million (comprised of $25 million in otherwise restricted cash from the FBG Debtors' balance sheet and $50 million of new committed funding backstopped by certain holders of DIP A Claims); (iii) capping the DIP A Claims for purposes of the Litigation Trust Waterfall at the allowed amount outstanding as of the Confirmation Date; (iv) a reduction of the minimum liquidity covenant under the DIP Documents from $50 million to $25 million; (v) the DIP Secured Parties' consent to the continued use of cash collateral pursuant to an agreed budget; and (vi) minority governance rights with respect to the Litigation Trust for the UCC Member. The Debtors would not approve the Estate Claims Credit Bid Transaction without these benefits provided by the DIP Secured Parties, which together with the credit bid amount, warrants the sale of all Estate Claims. The package of consideration being provided by the DIP Secured Parties under the Estate Claims Credit Bid Transaction is significant and forms the basis of the Plan and the recoveries that are being provided to junior creditors thereunder.

139.     Further, under the Litigation Trust Waterfall, the DIP Secured Parties are sharing recoveries with junior creditors prior to repayment of the DIP A Claims and have agreed to subordinate their Roll-Up Claims to recover alongside general unsecured creditors. Thus, the DIP Secured Parties' incentives are aligned with junior creditors to maximize value beyond simply recovering on the DIP A Claims. This alignment strikes a key balance to ensure the Estate Claims are vigorously pursued and will help enhance recoveries for junior creditors.

140.     Even if the credit bid amount was the only form of consideration being provided by the DIP Secured Parties (it is not), the objectors elevate form over substance and ignore the economic and practical realities of the DIP Secured Parties' collateral package. Because

70

the DIP Secured Parties' liens apply to the proceeds of Avoidance Actions, any cash bid for the Estate Claims would simply round trip back to the DIP Secured Parties in satisfaction of their secured claims in equal amount.[180]  Such a circular transaction would, in effect, be identical to a credit bid, and have the same economic effect on the Debtors' estates.  As a result, the only parties who stand to benefit from an all-cash alternative bid are the DIP Secured Parties themselves, who would be entitled to 100% of any such proceeds up to their $1.35 billion DIP A Claim.

141.    Accordingly, the objections on the basis that the Estate Claims Credit Bid Transaction violates section 363(k) of the Bankruptcy Code should be overruled.

### (iii)    The Estate Claims Marketing Process Was a Full and Fair Process

142.    Certain objectors also argue that the Estate Claim Credit Bid Transaction cannot be approved under section 363(b) of the Bankruptcy Code on the basis that the Debtors' marketing process was inadequate, and that the DIP Secured Parties are not good faith purchasers under section 363(m).[181]  These objections lack merit.

143.    The declarations of Mr. Moore and Mr. Kirschner and other evidence to be presented at confirmation will provide overwhelming support that the Estate Claims Credit Bid Transaction is a sound exercise of the Debtors' business judgment and represents the highest and best offer for the Litigation Trust Assets.

144.    As Mr. Moore will testify, as of January 2026, the Debtors had run out of liquidity and were facing an upcoming DIP maturity in June 2026.  The Debtors, the Ad Hoc Group

---

[180]   Several defaults and Events of Defaults currently exist under the DIP Credit Agreement, which would permit the DIP Secured Parties to exercise remedies against the FBG Debtors and their assets in accordance with the DIP Order and DIP Credit Agreement.  These remedies would include, among other things, foreclosing on cash and other assets of the FBG Debtors that constitute DIP Collateral.

[181]   LAM Objection ¶¶ 57–63; Katsumi Objection ¶ 43; Onset Objection ¶¶ 7–8, 60; First-Citizens Objection ¶ 3(c).

and the Creditors' Committee subsequently engaged in several months of extensive negotiations regarding a case resolution, a substantial portion of which was under the supervision of the mediator.  Those hard-fought negotiations ultimately resulted in a global deal with the Ad Hoc Group, Creditors Committee and ABL Lenders that provided for, among other transactions, the Estate Claims Credit Bid Transaction and Litigation Trust Waterfall that provided substantial concessions from the DIP Lenders, including allowing junior creditors that are substantially out of the money to realize recoveries from the DIP Lenders' collateral (i.e., Estate Claims and/or proceeds thereof).

145.    To ensure that the sale of the Litigation Trust Assets as part of Estate Claims Credit Bid Transaction maximizes value for the Debtors' estates, in early May 2026, the FBG Debtors ran a marketing process for their Estate Claims over multiple months.  Through their professionals at A&M, the Debtors identified twenty-six (26) financial and strategic parties, including parties active in the litigation finance and claims acquisition markets, as potentially interested in acquiring the Estate Claims, and that same day A&M contacted each of them with Initial Marketing Materials describing the opportunity, including:  (i) a summary of the Estate Claims to be sold; (ii) a high-level summary of the potential transfers at issue, including more than $700 million in alleged transfers to Patrick James and related entities and more than $2 billion in alleged fraudulent transfers connected to the purported sale-leaseback transactions with Onset; (iii) the status of the ongoing litigation; (iv) an overview of these chapter 11 cases; and (v) the procedures, bid requirements, and timeline governing a sale of the Estate Claims.[182]  A&M offered every contacted party access to a virtual data room upon execution of a non-disclosure agreement,

---

[182] *See* Moore Decl. ¶¶ 38–39; Marketing Materials, Disclosure Statement Ex. E at 3–9.

together with meetings with the Debtors' litigation counsel and the A&M investigation team to address diligence questions.

146.     In addition to the Debtors' direct outreach, the Disclosure Statement itself describes the Estate Claims Marketing Process in detail, annexes the Marketing Materials as Exhibit E, sets forth the requirements for a Qualified Bid, discloses the extension of the original bid deadline, and provides contact information for the A&M professionals administering the process, thus placing every party in interest on notice that the Estate Claims remained available to any credible bidder.[183]   Despite this broad disclosure, no party, other than the twenty-six (26) identified potential bidders, ever contacted A&M regarding a potential bid.

147.     The sale process continued against the backdrop of a contested confirmation timeline, including the Debtors' successful defense of the Conversion Motion and objections to conditional approval of the Disclosure Statement.  The same day the Court conditionally approved the Disclosure Statement, June 12, 2026, A&M again contacted all twenty-six (26) potential bidders to update them on that approval, confirm the sale process was moving forward, extend the process further, and invite continued engagement.  Following this second round of engagement, three (3) of the twenty-six (26) contacted parties executed non-disclosure agreements in July 2026.[184]  One withdrew shortly after receiving initial virtual data room access, without requesting further diligence or accepting the Debtors' offer to meet regarding Estate Claims or additional diligence.[185]  The remaining two potential bidders were granted access to the declarations of Mr. Moore and Mr. Kirschner, hundreds of source materials supporting those declarations, met with

---

[183] *See* Moore Decl. ¶ 40; Disclosure Statement § I.G.

[184]     *See Id*. ¶¶ 41–42.  While the Moore Decl. references only two bidders executing NDAs, a third executed an NDA in the interim period.

[185]     *Id*. ¶ 42.

the Debtors' representatives, and were provided with the structure of the DIP Secured Parties' Credit Bid, including the $75 million Credit Bid amount and description of additional consideration.  Over the course of multiple meetings with the potential bidders and extensive communication, no request for additional information was left unfulfilled.

148.    The Debtors also extended the deadline an additional time, through July 20, 2026, to accommodate potential bids, with the option to extend further if a bidder were willing to provide an alternative bid structure.  However, each remaining potential bidder declined to propose an alternative bid structure for consideration.

149.    The evidence will show that (i) the Estate Claims Credit Bid Transaction was the culmination of months of extensive, hard-fought negotiations between the Debtors, the DIP Secured Parties, and the Creditors' Committee and (ii) the Debtors' alternative marketing process was full and fair and confirmed that there were no third party bidders that offered to provide a competing third-party bid.  The fact that there were no third party bids was not a surprising result given the DIP Lenders' DIP liens on the Estate Claims (or proceeds thereof) and the substantial benefits that the Estate Claims Credit Bid Transaction provide to the estate.

150.    Certain objectors also claim that the process was unfair or inadequate based on alleged "informational asymmetries" between the DIP Secured Parties and other potential bidders.  However, the evidence will show that interested third party bidders had access to the same information provided to the DIP Secured Parties in connection with the Estate Claims Credit Bid Transaction in all material respects.  The fact that the DIP Secured Parties, in their capacity as DIP lenders (not as a bidder), had access to certain information about the Debtors and Estate Claims earlier on in the cases (before the marketing process was commenced or even contemplated) does not undermine the efficacy of the Debtors' marketing process.  Indeed, these

74

dynamics exist in virtually every case where a secured creditor credit bids on a debtor's assets. That does not render the process unfair, nor does it deprive a successful credit bidder of the findings and protections of section 363(m) of the Bankruptcy Code.

151.     The evidence presented at confirmation will show that the DIP Secured Parties constitute good faith purchasers under section 363(m) of the Bankruptcy Code.  There is no evidence that the Estate Claims Credit Bid involved "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 521 (5th Cir. 2014).  To the contrary, the substantial evidence regarding the Estate Claims Credit Bid Transaction and negotiations in connection therewith leaves no doubt that the DIP Secured Parties are good faith purchasers.  As discussed herein, the Estate Claims Credit Bid Transaction is the product of a months-long negotiation between the FBG Debtors, the DIP Secured Parties, and the Creditors' Committee.  These negotiations ultimately resulted in the DIP Secured Parties and the FBG Debtors reaching an agreement on the Estate Claims Credit Bid.  There is no evidence that the DIP Secured Parties improperly colluded or otherwise interfered with the Estate Claims Marketing Process or otherwise engaged in any form of bad faith.

152.     The objectors' attempt to discredit the Estate Claims Credit Bid's use of section 363(m) protections rests on a blatant misreading of their own cited authority.  The Objectors claim there must be a "third-party purchaser" to obtain section 363(m) protections and that the DIP Secured Parties do not qualify.[186]  But neither *TMT*—the case they cite—nor section 363(m) provide that a "third-party purchaser" cannot be a secured lender submitting a

---

[186]   LAM Objection ¶ 62; Katsumi Objection ¶ 43.

credit bid. *TMT Procurement Corp.*, 764 F.3d at 521. Such an interpretation of section 363(m) would chill credit bidding by secured lenders. Courts addressing this question have clearly held that, even when the purchaser is a secured lender exercising its right to credit bid under section 363(k), such purchasers may qualify as good faith purchasers entitled to section 363(m) protections. *See, e.g.*, *SR Constr. V. Hall Palm Springs, L.L.C. (In re Palm Springs II, L.L.C.)*, 65 F.4th 752 (5th Cir. 2023) (affirming approval of credit bid and holding that purchaser was good faith purchaser entitled to section 363(m) protections); *In re Robertshaw US Holding Corp.*, Case No. 24-90052 (CML) (Bankr. S.D. Tex. June 21, 2024) (Docket No. 681) (approving credit bid and holding that purchaser was good faith purchaser entitled to section 363(m) protections).

153. LAM also argues that a good-faith purchaser under the Fifth Circuit's *TMT Procurement* standard must pay at least 75% of appraised value, citing *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149 (3d Cir. 1986); *Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997); and *First State Operating Co. v. Holbrook (In re Lotspeich)*, 328 B.R. 209, 218 (B.A.P. 10th Cir. 2005), and contends that even valuing the DIP A Claims at full face value, the credit bid is less than 60% of the required threshold.[187] This argument fails on both the law and the facts.

154. First, none of the cases cited by LAM held that a good faith purchaser is only one that credit bids 75% or more of the appraised value of assets, and the Fifth Circuit has never adopted such a rigid requirement. LAM's proposed 75% test has never been adopted in the Fifth Circuit. In any event, even if this rigid test was applicable (it is not), the Estate Claims Credit Bid Transaction would easily meet this standard when applied holistically, taking into account all

---

[187]   LAM Objection ¶ 37 & n.8.

of the consideration provided by the DIP Secured Parties.  Based on the circumstances of these chapter 11 cases, the extraordinary value being provided by the DIP Secured Parties to the Debtors' estate is more than adequate to support a good faith finding pursuant to section 363(m). Accordingly, the Estate Claims Credit Bid Transaction satisfies section 363(m) of the Bankruptcy Code and the objections arguing otherwise should be overruled.

### III.   Objections to the Preference Settlement Should be Overruled

155.    The LAM Parties,[188] Katsumi,[189] and Citizens Bank[190] object to the Preference Settlement, arguing the Plan violates section 1123(a)(4) of the Bankruptcy Code by: (i) offering the Preference Settlement in different forms to certain unsecured creditors (Trade Creditors, Supply Chain Financers, and Factors), and (ii) requiring, among other things, that Preference Settlement Participants not meet the definition of "Adverse Conduct"[191] or otherwise be a Specified Non-Released Party.

156.    The Preference Settlement objections should be overruled for a number of reasons, including that, unlike in *Serta* and *ConvergeOne*, the Preference Settlement does not provide for any "treatment" of any claims or interests against the Debtors.  It is a settlement involving the release or modification, as applicable, of the Debtors' preference claims against Trade Creditors, Supply Chain Financers, and Factors.  It is that treatment, and the distribution of estate assets (*i.e.*, the issuance of Class 3(b) Litigation Trust Interests), that is subject to the

---

[188]   LAM Parties Obj. ¶¶ 64–76.

[189]   Katsumi Obj. ¶¶ 25–38.

[190]   Citizens Bank Obj. ¶¶ 18–32 (Docket No. 3319).

[191]   ***Adverse Conduct*** means (i) engaged in wrongful, actual, or constructively fraudulent conduct against any Debtor or Affiliate of any Debtor, or otherwise participated, conspired with, or acted in concert with, any Person that engaged in wrongful, actual or constructively fraudulent conduct against any Debtors, creditors, or lenders of the Debtors (or Affiliates of Debtors), (ii) received an avoidable transfer on grounds other than section 547 of the Bankruptcy Code from any of the Debtors, or (iii) received a transfer not in good faith.  Plan § 1.1.

strictures of section 1123(a)(4), not the Debtors' settlement of their claims against the Preference

Settlement Parties.  Therefore, as this Court recently held in *QVC*, section 1123(a)(4) does not

prohibit the Preference Settlement.

157.    The Preference Settlement is a permissible exercise of the Debtors' business

judgment, consistent with Federal Rule 9019 and section 1123(b)(3)(A) of the Bankruptcy Code,

to settle and resolve potential estate claims arising under section 547 of the Bankruptcy Code with

Trade Creditors, Supply Chain Financers, and Factors.

158.    Under the terms of the Preference Settlement, parties eligible to participate,

at their option, provided that they: (i) timely opt in following confirmation of the Plan; (ii) agree

to irrevocably contribute their Direct Creditor Claims[192] to the Litigation Trust; (iii) grant releases

under Section 13.5(b) of the Plan (*i.e.*, the Third-Party Release); (iv) do not meet the definition of

Adverse Conduct, as determined by a Final Order, and (v) are not Specified Non-Released

Parties.[193]  In exchange, the Preference Settlement would provide participating Trade Creditors a

waiver of Preference Actions against them, while participating Supply Chain Financers and

Factors would receive the benefit of a modified new value defense.[194]

**(iv)     Preference Settlement is Not a Treatment of Claims**

159.    Section 1123(a)(4) of the Bankruptcy Code requires that a chapter 11 plan

"provide[s] the same ***treatment for each claim*** or interest of a particular class," unless a member

---

[192]  ***Direct Creditor Claims*** means any direct (non-derivative) Claims held by a Preference Settlement Electing Creditor (i) against any non-Debtor Person and (ii) that relate to the conduct of the Debtors and/or Affiliates or professionals of the Debtors on or before the Petition Date; *provided* Direct Creditor Claims shall not include any Claims against a Released Party that are released under the Plan. For the avoidance of doubt, Direct Creditor Claims shall not include (a) any Estate Claims, (b) Claims that are duplicative of Estate Claims, or (c) Claims that are plead as direct Claims but in substance are Estate Claims.  *See* Plan § 1.1.

[193]  Plan § 6.11(a)–(b).

[194]  *Id.* § 6.11(d)–(e).

of a class agrees to have their claim or interest treated less favorably.  11 U.S.C. § 1123(a)(4) (emphasis added).    The Fifth Circuit recently supplied the governing framework for section 1123(a)(4) in *Serta Simmons Bedding*,[195] and then the District Court applied that framework in *ConvergeOne*.[196]

160.    In *Serta*, at issue was that the debtors' plan provided that the Debtors would provide an indemnity to certain lenders in specified classes, which varied significantly in value depending on whether the creditor receiving the indemnity had participated in the debtors' prepetition uptier transaction.[197]  The court held that the grant of the indemnity provisions violated the Bankruptcy Code's requirement that a plan provide equal treatment to creditors within the same class.[198]  The Court separately struck down the indemnity provisions, having characterized them as an impermissible allowance of contingent claims for reimbursement under section 502(e)(1)(B).[199]  In any event, that characterization highlighted that estate value was to be distributed on account of claims.  In *ConvergeOne*, at issue was that the debtors' plan provided a backstop participation to certain members of a class, which ultimately resulted in 31% higher recoveries to the backstop participants through means unavailable to certain members of the same class.[200]

---

[195]  *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555 (5th Cir. 2024).

[196]  *ConvergeOne Holdings, Inc. v. Ad Hoc Group of Excluded Lenders* No. 4:24-cv-02001 (ASH), 2025 WL 4700341 (S.D. Tex. Sept. 25, 2025).

[197]  125 F.4th at 592–93  (indemnity was "potentially worth tens of millions of dollars" more to creditors that participated in the prepetition transaction).

[198]  *Id.* at 591–92.

[199]  *Id.*

[200]  2025 WL 4700341 at *3.

161.     More recently, in *In re QVC Grp.*, this Court held that debtor release provisions in a plan did not constitute treatment of claims against, or interests in, the plan proponent.[201]  In *QVC*, certain creditors raised a section 1123(a)(4) objection to the debtors' plan on the basis that releases granted to members of a specific class would only benefit certain members of the class.[202]  The court contrasted the release provisions to the *Serta* plan's grant of an indemnity to certain creditors, because "[w]hereas an indemnity creates an affirmative right to payment in the event of litigation, a release does not create any such affirmative right to payment (i.e., 'value')."[203]  Treatment under section 1123(a)(4), according to Judge Perez and prior caselaw, is "focused on the ***payment*** of value and the ***tendering*** of consideration in exchange for that value."[204]  *QVC* therefore supports that debtor releases granted to certain members of a class do not offend section 1123(a)(4) because they have no bearing on the plan's treatment of claims or interests.[205]

162.     As in *QVC*, the Preference Settlement differs from the plan provisions struck down in *Serta* and *ConvergeOne* in several important respects.  First, as noted, those cases ultimately concerned equality of ***distributions of estate assets on account of claims*** (in *Serta*, in the form of an indemnity (a contingent claim for reimbursement), and in *ConvergeOne*, in the form of direct recoveries, which were greater for the majority lender group) to intra-class creditors.  That is, in each case, the debtors granted affirmative rights to payment, giving rise to treatment issues.

---

[201]  *In re QVC Grp. Inc.*, Case No. 26-90447 (ARP), 2026 WL 2058528, at *37 (Bankr. S.D. Tex. July 15, 2026).

[202]  *Id.* at *38.

[203]  *Id.*

[204]  *Id.*

[205]  *Id.*  In *In re Adelphia Commc'ns. Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007), the court held that exculpation and release provisions have no bearing on a plan's treatment of claims or interests.  *Id.* at 250–51 ("[T]he releases do not raise an unfair discrimination issue [and] [t]he exculpation and release provisions have no bearing on the Plan's treatment of claims."); *QVC*, 2026 WL 2058528, at *38.

80

163. Here, on the other hand, all creditors in Class 7 (Trade Creditors, Supply Chain Financers, and Factors, and other general unsecured creditors) are receiving the same distributions of estate assets. Under the Preference Settlement, there is no distribution of estate assets, but rather an offer to *release (or modify) claims held by the Debtors* as part of a settlement with each participating creditor, with no regard for the participating creditors' claims or distributions on account of the same. Equality of value and equality of opportunity mandated by section 1123(a)(4) is with respect to value received in the form of *distributions in satisfaction of the non-debtor's claims*, which is not implicated by the Preference Settlement. The releases granted by the Preference Settlement are akin to the debtor releases in *QVC*, which Judge Perez specifically held did not violate section 1123(a)(4) because, unlike the indemnity provisions in *Serta*, the release provisions did not create an affirmative right to payment.[206]

164. Importantly as well, the Preference Settlement constitutes individual, voluntary settlements between the Debtors and the Preference Settlement Electing Creditors, not individualized treatment within specific classes.[207] The Preference Settlement is purely voluntary and is a two-way settlement of certain FBG Debtor claims rather than a distribution of property. Importantly, the Trade Creditors, Supply Chain Financers, and Factors who elect to participate in the Preference Settlement must irrevocably contribute their Direct Creditor Claims to the Litigation Trust and also grant certain releases under Section 13.5(b) of the Plan.[208]

165. This required exchange of new value—contribution of the creditor's Direct Claims and the grant of releases—is another key difference between the present case and *Serta*

---

[206] 2026 WL 2058528, at *38.

[207] *See* Plan § 6.11.

[208] *See* Plan § 1.1 (definition of Preference Settlement Electing Creditor).

and *ConvergeOne*.  In those cases, the purported consideration offered by the creditors, to either receive disparate value from distributions (*Serta*) or for an exclusive opportunity to receive greater distributions from the estate (*ConvergeOne*), was in each case retrospective and provided prepetition.[209]   Here, on the other hand, the participating creditors must offer additional consideration following the Confirmation Date to receive the release of claims or modified new value defense.  The release of claims under the Preference Settlement would only be granted to an eligible creditor once they provide their Direct Creditor Claims and releases within the time period provided in the Plan.

> **(v)    Contribution of Direct Creditor Claims Pursuant to Preference Settlement Is Entirely Voluntary**

166.    Orbian Corporation and Orbian Financial Services XXVI LLC (collectively, "**Orbian**") and First-Citizens Bank & Trust Company ("**First-Citizens**") object to the Preference Settlement, in part, because the Plan requires Preference Settlement Electing Creditors to irrevocably contribute their Direct Creditor Claims to the Litigation Trust in order to receive the benefits of the Preference Settlement.[210]  But contribution of Direct Creditor Claims to the Litigation Trust is entirely voluntary and up to the individual discretion of each creditor, after weighing the risks.  The Preference Settlement Opt-In Form distributed to all creditors eligible to

---

[209]  In *Serta*, the plan's indemnity provisions "mirrored the terms of the [prepetition] 2020 Uptier indemnity . . . on the exact same terms." 125 F.4th at 591.  The debtors framed the provisions as being integral to the plan settlement, despite merely providing for the survival of an existing prepetition indemnity.  *Id.* at 570.  In *ConvergeOne*, the plan's backstopping opportunity similarly provided a benefit to certain creditors for consideration received prepetition, without affording minority lenders the opportunity to receive these benefits on account of postpetition consideration.  2025 WL 4700341 at *10.  The court noted that, "at the time the bankruptcy petition was filed, the train had already left the station, and the Minority Lenders were never permitted to board." *Id.* at *8.

[210]  *See Objection of Orbian Corporation and Orbian Financial Services XXVI LLC to Joint Chapter 11 Plan of First Brands Group LLC and Certain Affiliated Debtors and to Related Disclosure Statement* (Docket No. 3272) ¶ 10; *Joinder and Objection of First-Citizens Bank & Trust Company to Confirmation of the Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated* Debtors (Docket No. 3319) ¶¶ 1–3, 29; Plan § 1.1.

participate in the Preference Settlement explicitly stated: "You are not required to participate in the Preference Settlement. Participation in the Preference Settlement, which requires the contribution of your Direct Creditor Claims to the Litigation Trust, is optional."[211] The Debtors further disclosed a list of Specified Non-Released Parties to put those parties on notice of the Debtors' belief that they may have committed Adverse Conduct. Creditors, including Orbian and First Citizens, therefore had ample notice and information to make an informed decision about contributing their Direct Claims and participating in the Preference Settlement.

### (vi) Preference Settlement is Otherwise Fair, Reasonable, and in the Best Interests of the Estates

167.     The standard for evaluating a settlement, including a debtor release, is well-established. In considering the appropriateness of a release of claims by a debtor, courts consider whether the release is (i) "fair and equitable" and (ii) "in the best interest of the estate."[212] Courts generally determine whether a release is "fair and equitable" and "in the best interests of the estate" by reference to the following so-called "*Foster Mortgage*" factors:

- the probability of success of litigation, with due consideration for the uncertainty in fact and law;

- the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection;

---

[211]   Preference Settlement Opt-In Form, attached as Exhibit 12 to the *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan, (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing, (III) Establishing Solicitation and Voting Procedures, (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-In Procedures, (V) Establishing Preference Settlement Notice and Opt-In Procedures, (VI) Establishing Notice and Objection Procedures for Confirmation of Plan, and (VII) Granting Related Relief* (Docket No. 2990).

[212]   *See Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citing *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see In re Bigler LP*, 442 B.R. 537, 543 n.6; see *In re Derosa-Grund*, 567 B.R. 773, 784–85 (Bankr. S.D. Tex. 2017); *see also In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3 Claimholders v. New Mirant Entities*, No. 06-cv-744 (JHM), 2006 WL 3780884 (N.D. Tex. Dec. 26, 2006); Heritage Org., 375 B.R. at 259.

- the paramount interest of the creditors and a proper deference to their respective views;

- the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and

- all other factors bearing on the wisdom of the compromise.[213]

Further, "[g]reat judicial deference is given to the [debtor's] exercise of business judgement."[214] Thus, approval of a settlement agreement is a matter within the sound discretion of the bankruptcy court.[215]

168.    The proposed difference in settlement offer made as between Trade Creditors, Supply Chain Financers and Factors, accounts for, among other factors, aggregate transfers to creditors in each category, the potential defenses available, and potential value to the FBG Debtors' estates.[216]  The proposed settlements reflect this balance by ensuring that material and potentially valuable Preference Actions are not being released without due consideration and commensurate benefit for the FBG Debtors and their estates.

169.    The Adverse Conduct provisions are also a permissible exercise of the Debtors' discretion.  The Adverse Conduct provisions of the Preference Settlement are reasonable and necessary in the context of the unique complexities of the Debtors' chapter 11 cases.  As explained in greater detail in the Moore Declaration, the prepetition fraud committed by the Debtors' former management was so extensive that certain counterparties, including those

---

[213]   *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (citing *Conn. Gen. Life Ins. Co. v. United Companies Fin Corp. (In re Foster Mortg. Corp.)*, 68 F.3d at 917–18); *see also Derosa-Grund*, 567 B.R. at 784–85; *Roqumore*, 393 B.R. at 479–80.

[214]   *GBL Holding Co. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (N.D. Tex. 2005) (citation omitted).

[215]   *See United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984), *cert. denied*, 469 U.S. 880  (1984).

[216]   Moore Decl. ¶¶ 27–28.

otherwise eligible to elect into the Preference Settlement, should have been on notice of the fraud at the time they transacted with the Debtors.[217]   Accordingly, the Adverse Conduct standard is necessary and appropriate to ensure that the Debtors' ability to assert claims against these parties is not diminished by the Preference Settlement.

170.    Finally, the Preference Settlement, including the terms thereof applicable to Trade Creditors, Supply Chain Financers, and Factors, was critical to reaching an agreement with the Creditors' Committee and the Ad Hoc Group on the terms of the broader Plan Settlement.  The Creditors' Committee would not have agreed to support the Plan without the Preference Settlement.[218]  The Preference Settlement is therefore a critical component to the Plan, and its entry was a valid exercise of the FBG Debtors' business judgement, particularly in that context.

171.    The Debtors are permitted to exercise their business judgment through the Plan, as they can outside of a plan.  Following extensive negotiations with the Ad Hoc Group and the Creditors' Committee, the Debtors have determined in their business judgment, given the well-documented circumstances of these chapter 11 cases, that it is in the best interests of their estates and of their stakeholders to implement the Preference Settlement.

172.    Accordingly, all objections to the Preference Settlement should be overruled.

---

[217]   *See generally* Moore Decl. ¶¶ 80–102 (explaining that several "red flags" indicating the fraudulent scheme orchestrated by the Debtors' former management would have been apparent to third-party factors and supply chain financers at the time they transacted with the Debtors).

[218]   *Id.* ¶ 24 ("I believe that the Creditors' Committee would not have agreed to support the Plan without the Preference Settlement.").

## IV.    Objections to Consolidation for Distribution Purposes Should be Overruled

173.    Certain parties object to the Plan's consolidation of the FBG Debtors for distributions under the Plan. Some argue that the Plan must provide for *full* substantive consolidation,[219] while others argue for *no* consolidation at all.[220]    Following extensive negotiations with the Ad Hoc Group and the Creditors' Committee, the settlement parties agreed that the Plan would provide limited consolidation for distribution purposes only. This partial consolidation is a key term of the Plan Settlement, and was integral in resolving several interrelated disputes among the Ad Hoc Group and Creditors' Committee. The Plan Settlement preserves the benefits of substantive consolidation by avoiding the cost of untangling the Debtors' affairs, without prejudicing parties by expressly preserving their defenses to argue substantive consolidation in subsequent litigation.

174.    As an initial matter, nothing in the Bankruptcy Code prohibits consolidation for distribution purposes only or requires the FBG Debtors to seek substantive consolidation. To the contrary, full substantive consolidation is an equitable remedy reserved for extraordinary circumstances. *See Gandy v. Gandy (In re Gandy)*, 299 F.3d 489, 499 (5th Cir. 2002) ("[S]ubstantive consolidation is an extreme and unusual remedy . . . ."); *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 692–93 (Bankr. S.D. Tex. 2009) (distinguishing full substantive consolidation, an extreme remedy affecting claimants' substantive rights, from administrative consolidation, which serves mere procedural convenience and cost efficiencies); *Wells Fargo Bank of Tex., N.A. v. Sommers (In re AMCO Ins.)*, 444 F.3d 690, 696 n.5 (5th Cir. 2006) ("[B]ecause substantive consolidation is extreme . . . and imprecise, this 'rough justice' remedy

---

[219]    *See* LAM Parties Obj ¶¶ 77–99; Katsumi Obj ¶¶ 56–62.

[220]    *See* Patrick James Obj. ¶ 41; Aequum Obj. ¶¶ 29–31 (Docket No. 3263).

should be rare and, in any event, one of last resort . . . .") (quoting *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005)).

175. On the facts, partial consolidation is appropriate and justified here under Bankruptcy Rule 9019 and section 1123(a)(5)(C) of the Bankruptcy Code.[221]

176. As discussed in the 1129 Brief, in the Fifth Circuit, the debtor's burden for establishing that a settlement is fair and equitable "is not high." *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008). The court need only determine that the settlement does not "fall beneath the lowest point in the range of reasonableness." *In re Idearc Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009), *aff'd*, 662 F.3d 315 (5th Cir. 2011) (citation omitted); *Roqumore*, 393 B.R. at 480 ("The Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'") (citations omitted). In analyzing whether a proposed settlement is fair and equitable, courts in the Fifth Circuit consider three factors: (1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise, including the best interests of the creditors, with proper deference to their reasonable views and the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion. *In re Age Refin., Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). The proposed consolidation set forth in the Plan, which was a key term of the Plan Settlement, meets this standard.

---

[221] The Plan Settlement resolves, among other things, intercompany claims and consolidation issues, and therefore, the proposed consolidation under the Plan should be evaluated under the standard for approving settlements under Bankruptcy Rule 9019. *See In re The Great Atl. & Pac. Tea Co., Inc.*, No. 10-24549 (RDD), Hr'g Tr. 43:7-21 (Bankr. S.D.N.Y. Feb. 27, 2012) (Docket No. 3505) ("As I noted in my original ruling, there are cases that treat a partial substantive consolidation as a settlement and I think do so appropriately . . . .").

177.    *First*, substantive consolidation of the FBG Debtors' estates is a heavily contested issue that involves complicated, fact-intensive questions.  While some facts appear to support substantive consolidation, other facts may not.  Further, while the Examiner concluded there are colorable claims for substantive consolidation of the FBG and SPV Debtors based on asset entanglement, his analysis was limited to substantive consolidation of the FBG and SPV Debtors and he stopped short of saying such a claim would succeed, only that it "may be appropriate."[222]  The Examiner drew no conclusions as to whether the FBG Debtors' estates should be substantively consolidated.[223]

178.    On the other hand, there are certain facts that may weigh against substantive consolidation of the FBG Debtors.  For example, the FBG Debtors have historically maintained separate business lines across specific entities.  This structure is evidenced by the numerous going concern sale transactions that the FBG Debtors consummated during the chapter 11 cases, which effectively carved out specific business lines from the FBG Debtors' operations.

179.    Accordingly, a settlement to obviate the risks and costs of litigation of such complex issues is reasonable and appropriate.

180.    *Second*, the Plan Settlement allows the FBG Debtors to forego complex, time-consuming, and expensive litigation around substantive consolidation.  The substantial costs and delays associated with litigation of substantive consolidation could significantly and negatively impact the FBG Debtors' Estates.

181.    *Third*, the proposed limited consolidation of the FBG Debtors' estates is in the best interest of creditors as a whole.  The limited consolidation is an integral part of the Plan

---

[222]    *Report of E. Martin De Luca, Examiner*, Section VI.D.5. (Docket No. 2538-2).

[223]    *Id.*

Settlement, pursuant to which the DIP Secured Parties have agreed to share recoveries with junior creditors. The proposed consolidation is essential because the Plan Settlement and specifically the sharing of recoveries through the Litigation Trust Waterfall, would simply not work on an entity by entity basis.

182.   In addition to sharing recoveries with junior creditors, as part of the Plan Settlement, the Roll-Up Claims will effectively be rolled down and treated *pari passu* with unsecured creditors. This is fair consideration in exchange for the myriad of other benefits afforded unsecured creditors under the Plan Settlement, including the concessions by the DIP Secured Parties with respect to the Litigation Trust Waterfall.

183.   LAM alleges that "the Plan substantively consolidates in a way that affects the LAM Parties" and that absent substantive consolidation, "LAM TFG would be entitled to recover from each obligor." LAM ignores that, absent the Plan Settlement, they would not receive any recovery on account of their claims, since the DIP Secured Parties have liens on all of the FBG Debtors' assets (or the proceeds thereof), and absent the Plan could seek to foreclose upon, and end up owning, all of the collateral. The limited consolidation agreed to as part of the Plan Settlement, therefore, does not prejudice the LAM Parties; it helps them.

184.   Moreover, absent limited consolidation, the FBG Debtors would be required to undertake the work to segregate the various FBG Debtors' assets and liabilities for purposes of claim reconciliation and distribution. As stated in the Moore Declaration,[224] in the ordinary course operations of the FBG Debtors' various business lines, the FBG Debtors engaged in intercompany transactions with each other and with non-Debtor subsidiaries and affiliates. The

---

[224]   *See* Moore Decl. ¶¶ 15–16.

FBG Debtors determined it would be impracticable and unduly burdensome to validate the accuracy of the intercompany balances due to voluminous transactions that occurred.[225]  Further, to calculate recoveries for creditors at each FBG Debtor, individual transactions would have to be analyzed in the context of the specific business operating through each entity.[226]  The time and expense of this process would harm creditors by consuming valuable resources and reducing value that would otherwise be distributable to creditors.  These concerns are magnified here, where the source of recovery for the Litigation Trust is the pursuit of Estate Claims that would be difficult, if not impossible, to attribute to specific Debtor entities.

185.    Katsumi and the LAM Parties argue the Plan should provide for substantive consolidation for all purposes and that the evidentiary record supports such a finding.  Notably, neither of these parties hide their motivations for why they prefer full substantive consolidation.[227] Katsumi and the LAM Parties are aware that the Litigation Trust will likely bring claims against them and they believe that full substantive consolidation will afford them with a number of legal defenses that they otherwise would not be entitled to, including (among others) aggregating transfers for purposes of asserting the "new value" defense to preference claims, potential setoff and recoupment defenses, alter ego and veil piercing, and various other arguments/defenses.  The objectors' transparent desire to get a windfall by obtaining legal defenses for actions that may be raised against them in the future does not warrant the extraordinary remedy of full substantive consolidation under the FBG Debtors' Plan.

---

[225]    *Id*.

[226]    *Id*.

[227]    *See* LAM Parties Obj ¶ 94; Katsumi Obj ¶ 61.

186.   Importantly, the Plan fully reserves the rights of parties (including the LAM Parties and Katsumi) to raise substantive consolidation and other related arguments as defenses to claims brought against them.  Indeed, shortly before the June 12, 2026 hearing on the Disclosure Statement, the FBG Debtors and the LAM Parties specifically negotiated language to ensure that such rights would be fully preserved.[228]

187.   The true motive of the objectors is, therefore, clear.  These parties seek a full consolidation of the FBG Debtors' estates not to enhance the recoveries they (and other junior creditors) would receive under the Plan, but to improve their defenses in future litigation with the FBG Debtors or their successors.  That is no basis for full substantive consolidation.[229]

188.   Although the objectors cite to the Third Circuit's opinion in *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005),[230] that decision cuts against them.  While cited by several objectors as support for their position that the cases *should* be substantively consolidated in full, the court in *Owens Corning* did not affirm the substantive consolidation at issue and found that no form of consolidation was appropriate under the circumstances of that case.  *Id.* at 216.  The facts of that case are also distinguishable on several grounds.  In *Owens Corning*, the debtors themselves sought substantive consolidation, not plan objectors.  *Id.* at 199.  Further, unlike in *Owens Corning*,

---

[228]   *See* Plan § 6.2(c) ("Nothing in this Plan shall modify any defense, response, or argument relating to any Cause of Action based on the doctrine of substantive consolidation, veil piercing, alter ego or any similar doctrine, including any defense, including any defense of recoupment, setoff, or offset, response, or argument that subsequent new value or other value provided to one debtor or related entity should be treated as value provided to another FBG Debtor or to the FBG Debtors in the aggregate.").

[229]   Additionally, the objectors seeking full substantive consolidation have not properly sought such relief, which must be done by motion or adversary proceeding.  *See* Fed. R. Bankr. P. 7001; Fed. R. Bankr. P. 9014.  Substantive consolidation is not required to confirm a plan and a plan objection is not the proper forum for requesting the extraordinary remedy of a full substantive consolidation.  The timing for requesting this relief is also telling.  After not raising this issue for nine months while actively participating in these cases, they now request substantive consolidation on the eve of confirmation.  This underscores their intent to derail confirmation at any cost.

where the debtors' largest creditor was disproportionately and adversely affected by the proposed consolidation, *id.* at 215–16, the consolidation under the FBG Debtors' Plan applies equally to all of the FBG Debtors' creditors (and stands to benefit all of them).  Additionally, the court in *Owens Corning* noted that there must be more than a "[m]ere benefit to the administration of the case," *id*. at 211, and here, that requirement is met because more than just administration is at stake: the fate of the Plan and Plan Settlement requires consolidation for distribution purposes.  As discussed above, the proposed consolidation is essential because the Plan Settlement and specifically the sharing of recoveries through the Litigation Trust Waterfall, would simply not work on an entity by entity basis.  Lastly, contrary to what the objectors suggest, the FBG Debtors use the limited consolidation under the Plan "defensively to remedy the identifiable harms caused by entangled affairs" and not "offensively" to attack creditors.  *Id.* at 215–16.

189.    The objectors also argue that the Preference Settlement, which provides participating Supply Chain Financers and Factors with the opportunity to benefit from the Modified New Value Elements, is another way in which the FBG Debtors are tactically using consolidation to their advantage without fully substantively consolidating their estates.[231] However, the Preference Settlement is precisely that—a settlement between the FBG Debtors and the applicable Preference Settlement Electing Creditor with respect to Preference Actions that may exist against such creditor.  The Preference Settlement is consensual and requires creditors that wish to participate to affirmatively opt-in.  Those creditors that do not believe the Preference Settlement benefits them are under no obligation to participate.  But the terms of the Preference

---

[231]    *See* LAM Parties Obj ¶ 98; Katsumi Obj ¶ 61.

Settlement, which provide tangible benefits for those creditors that do wish to participate, by no means support or require a full substantive consolidation of the FBG Debtors estates.

190.     This limited form of consolidation for distribution, which is common in large and complex chapter 11 cases in this and other jurisdictions, is an essential component of the Plan Settlement, which serves to maximize recoveries for junior creditors.  The resolution of this issue through the Plan Settlement is fair and equitable, and certainly falls above the lowest point in the range of reasonableness.  The objections on this issue should, therefore, be overruled.

## V.     SPV-Related Objections Should be Overruled

191.     The SPV Lenders, including Aequum, Onset, Evolution, UMB, the Carnaby Secured Lenders, and Ronald Sommers (the "**Chapter 7 Trustee**"), in his capacity as chapter 7 trustee to certain SPV Debtors, each object to the Plan for various reasons related to the SPV Debtors and their interests, including that (i) the Plan's exculpation provisions are unnecessarily broad,[232] (ii) the Plan improperly blocks the SPV Debtors, their estates, and their creditors from pursuing claims sharing a common nucleus of fact with FBG Debtor claims,[233] (iii) the Plan fails to adequately protect the SPV Debtors' rights,[234] (iv) the Plan improperly includes Viceroy as a Plan proponent,[235] (v) the Plan improperly apportions the proceeds of common claims,[236] and (vi) the Plan impermissibly allows the Litigation Trustee to assert privilege to stifle discovery efforts.[237]  These objections share a common flaw.  The Plan disposes only of the FBG Debtors'

---

[232]   *See* Aequum Obj. ¶¶ 12–16; Carnaby Obj ¶¶ 109–13; Chapter 7 Trustee Obj. ¶ 40 (Docket No. 3278).

[233]   *See* Aequum Obj. ¶¶ 17–24; Chapter 7 Trustee Obj. ¶¶ 27–28.

[234]   See Aequum Obj. ¶¶ 25–32; Carnaby Obj ¶¶ 104–06; Onset Obj. ¶¶ 54–59; Chapter 7 Trustee Obj. ¶¶ 29–37.

[235]   *See* Aequum Obj. ¶ 32.

[236]   *See* Aequum Obj. ¶ 32; *see also* Onset Obj. ¶¶ 56.

[237]   *See* Aequum Obj. ¶ 52; Carnaby Obj ¶¶ 105–06.

property; rights, claims, and defenses belonging to the SPV Debtors are expressly preserved. The SPV Lenders' real complaint is that the Plan declines to adjudicate their disputes prematurely, which is a virtue, not a defect. For the reasons set forth below, each of these objections should be overruled.

### (i)   Exculpatory Provisions Are Not Overly Broad and Are Consistent With Routinely Approved Provisions

192.   The SPV Lenders and Chapter 7 Trustee assert that the Plan improperly shields the Exculpated Parties (including the FBG Debtors, Special Committee members, Independent Managers, and the Committee) from claims of the non-Plan SPV Debtors and their stakeholders. As is clear from the definition of "Exculpated Parties,"[238] the Plan's exculpatory provisions are limited to the FBG Debtors, the FBG Debtors' independent directors, and the Creditors' Committee and each of its members in its official capacity. To remove any confusion, the Debtors have made clarifying changes to the "Exculpated Parties" definition in an amended plan filed contemporaneously herewith, which make clear that exculpations for the FBG Debtors' independent directors would be limited to their capacities acting on behalf of the FBG Debtors (and not on behalf of the SPV Debtors).[239]

---

[238]   ***Exculpated Parties*** means each of the following in their capacity as such: (i) the FBG Debtors; (ii) Neal Goldman, William Transier, and Benjamin Duster, in their capacities as members of one or more of the Special Committees; (iii) Neal Goldman and William Transier, in their capacities as the Independent Managers of the FBG Debtors; and (iv) the Creditors' Committee and each of its members in their official capacity; *provided* that, for the avoidance of doubt, the Persons in the foregoing clauses (ii) and (iii) shall only receive exculpation under Section 13.6 of the Plan in their capacities as officers, directors, or managers of one or more FBG Debtors, and not in their capacities as officers, directors, or managers of any SPV Debtor. Plan § 1.1.

[239]   The FBG Debtors have modified the Plan to provide that the independent manager Exculpated Parties "shall only receive exculpation under Section 13.6 of the Plan in their capacities as officers, directors, or managers of one or more FBG Debtors, and not in their capacities as officers, directors, or managers of any SPV Debtor." Plan § 1.1.

94

193.     Moreover, the Plan's exculpatory, gatekeeper, and injunction provisions are appropriate and consistent with similar provisions routinely approved by this Court for all of the reasons set forth in section II of the brief.

**(ii)     "Estate Claims" Definition Does Not Improperly Block SPV Debtors From Pursuing Their Own Claims**

194.     The definition of Estate Claims in the Plan is expressly limited to claims and causes of action belonging to the FBG Debtors.[240]  By definition, Estate Claims are the property of the FBG Debtors, and as the plan proponents, the FBG Debtors are well within their rights to dispose of their own property under the Plan.  The definition clearly does not include the claims of the SPV Debtors or creditors of the SPV Debtors.  Those claims that are ultimately determined to belong to the SPV Debtors are fully preserved.  That the claims of the FBG Debtors

---

[240]  ***Estate Claims*** means any and all claims and/or remedies that are held or controlled by, or which were or could have been asserted by, ***the FBG Debtors or their Estates*** against any Entity or Affiliate or Representative of any Entity (including each other through intercompany claims, intercompany interests, and/or other intercompany obligations), seeking relief or recovery arising from harm to any ***FBG Debtor, any FBG Debtor's Estate, or the FBG Debtors' creditors*** taken as a whole, based on any legal theory including, without limitation, such claims and/or remedies under federal or state law, statutory or common law, in equity or otherwise, arising out of or in any way related to ***(i) the FBG Debtors; (ii) the Chapter 11 Cases; (iii) the Estates;*** and/or (iv) the ownership, management, operation, status, tenure, conduct, omission, action or inaction at any time of a stockholder, affiliate, owner, partner, member, manager, director, officer, employee, servant, agent, representative, attorney, creditor, successor, assign or other relationship with an FBG Debtor and/or any of its predecessors, in each case, including, without limitation, such claims and/or remedies that are actions, causes of action, lawsuits, suits, claims, counterclaims, cross-claims, liabilities, interests, judgments, obligations, rights, demands, debts, damages, losses, grievances, promises, remedies, liens, attachments, garnishments, prejudgment and post-judgment interest, costs and expenses (including attorneys' fees and costs incurred or to be incurred), including unknown Claims to the maximum extent allowed under the law, whether pled or unpled, fixed or contingent, choate or inchoate, matured or unmatured, foreseen or unforeseen, accrued or unaccrued, past, present or future, for fraudulent transfer, fraudulent conveyance, preference, turnover, breach of fiduciary duty, negligence, gross negligence, mismanagement, civil conspiracy, RICO, aiding and abetting, unjust enrichment, constructive trust, equitable subordination, equitable disallowance, agency, joint venture, alter ego, corporate veil piercing, successor liability, and all other such claims and/or remedies, Recovery Actions, Recovery Action Proceeds, Avoidance Actions, and Avoidance Proceeds, including, for the avoidance of doubt, (a)  any Disputed Alester IP recovered from an Avoidance Action or Recovery Action of an FBG Debtor, (b) all 506(c), 552(b), and other surcharge rights, claims, and/or causes of action ***that the FBG Debtors have and/or are entitled to assert*** against any Person, and (c) any and all initial and subsequent transfers related to the items within this definition.  For the avoidance of doubt, any claims and/or ***remedies of the FBG Debtors or their Estates*** against any SPV Lender, including any Aequum Lender (as defined in Docket No. 215), or its Affiliates, whether asserted by or assertable by the FBG Debtors, their Estates, or the Creditors' Committee, shall also be Estate Claims.  Plan § 1,1 (emphasis added).

95

and SPV Debtors may share certain underlying facts or even targets, that does not expand or narrow the scope of claims that may be dealt with in the Plan.  In any event, in response to certain objections, the Debtors have amended the Estate Claims definition by deleting language that certain objecting parties took issue with.[241]

### (iii) Plan Does Not Fail to Appropriately Safeguard Rights of SPV Debtors

195.    The SPV Lenders and Chapter 7 Trustee argue that the Plan does not appropriately preserve certain rights of the SPV Debtors related to: (i) setoff claims and defenses, (ii) substantive consolidation defenses, (iii) D&O Policies, (iv) recoveries from government enforcement actions, (v) access to the FBG Debtors' books and records, and (vi) the ability to file claims under section 502(h) of the Bankruptcy Code.

196.    However, as explained below, nothing in the Plan purports to harm or subsume any of the SPV Debtors' rights and in numerous sections of the Plan the SPV Debtors' rights are expressly excluded from the Plan and fully preserved.

197.    ***Setoff Rights.***  Aequum asserts that the Plan fails to adequately preserve the SPV Debtors' defenses, setoff, and related rights against related parties other than the Litigation Trust.  The Plan appropriately preserves setoff rights against the Litigation Trust.  All the FBG Debtors' Estate Claims are being transferred to the Litigation Trust, so there is no other party that would assert estate claims that would stand to be offset post-Confirmation aside from the Litigation Trust.  Moreover, Section 6.2(c) of the Plan expressly protects creditors' rights to assert setoff or

---

[241]    *See* Plan § 1.1 (amending Estate Claims to remove the following proviso: "*provided* that Estate Claims shall also include any Claim that is duplicative of an Estate Claim, any Claim related to (i) – (iv) above that is a general claim with no particularized injury arising from it, or any other Claim that is in substance an Estate Claim.")

other defenses against the FBG Debtors and their assigns in addition to the Litigation Trustee.[242]

Section 6.2(c) adequately preserves the rights of the SPV Debtors to bring defenses and setoff

claims.

198.    ***Substantive Consolidation.***  The Plan adequately preserves defenses based

on substantive consolidation, veil piercing, or alter ego.  This is sufficiently addressed by Section

6.2(c) of the Plan, which expressly provides:

> Nothing in this Plan shall modify any defense, response, or argument relating to
> any Cause of Action based on the doctrine of substantive consolidation, veil
> piercing, alter ego or any similar doctrine, including any defense, including any
> defense of recoupment, setoff, or offset, response, or argument that subsequent new
> value or other value provided to one debtor or related entity should be treated as
> value provided to another FBG Debtor or to the FBG Debtors in the aggregate[.][243]

The Plan's protection of substantive consolidation defenses is not even limited to the FBG

Debtors—the Plan clearly protects and preserves all defenses and arguments related to substantive

consolidation.    Aequum claims that the plan's substantive consolidation protections are

insufficient, but it has failed to show why the Plan is deficient in this regard.

199.    ***Other Rights of SPV Debtors***.  The Plan preserves the other rights of the

SPV Debtors by limiting the transfer of D&O Insurance Rights, government-enforcement

recoveries, and books and records to those belonging to the FBG Debtors, while expressly

excluding property of the SPV Debtors and providing that insurance transfers do not impair other

---

[242]    The Plan now specifies that "nothing in this Plan shall in any way impair, prevent, affect, or prejudice any
defendant, counterparty, or other party against whom a Cause of Action is asserted by the Litigation Trust ***or the
FBG Debtors (including their Estates, successors, and assigns)*** from asserting, in response to any such Cause
of Action, any defense or legal argument, including any defense of recoupment, setoff, or offset, arising from or
relating to such defendant or party's dealings, transactions, or relationships with any FBG Debtor."  Plan § 6.2(c)
(added language emphasized).

[243]    Plan § 6.2(c).

Persons' rights.[244]   Section 1.2 of the Plan further provides that the Plan does not apply to Claims against the SPV Debtors, leaving any section 502(h) claims against them unaffected.

200.   In addition to their unfounded claims that the Plan does not preserve the rights of the SPV Debtors, the SPV Lenders also go a step further to argue that the Plan should also provide a post-Effective-Date governance structure for the SPV Debtors involving independent fiduciaries.   But the FBG Debtors, not the SPV Debtors, are the Plan proponents. There are no grounds to compel the Debtors to establish a governance structure for the SPV Debtors.

### (iv)   Viceroy Is a Proper Plan Proponent.

201.   Aequum asserts that Viceroy should be excluded as a Plan proponent because "its primary purpose is to serve as the indirect parent of, and holding company for, the SPV Debtors."[245]   This argument fails for at least two reasons.   First, Viceroy is appropriately included as a Plan proponent because it is an obligor under the DIP Credit Agreement (which obligations will mature absent the Plan and related settlements), which was already approved by the Court.[246]   Second, while it is true that Viceroy acts as the holding company for the SPV Debtors, Viceroy also owns a controlling 66% interest in First Brands Group Holdings, LLC, meaning that it holds an indirect interest in each of the FBG Debtors as well.   There is no reason to exclude Viceroy as a Plan Debtor, which holds an interest in each of the FBG Debtor Plan proponents, on the basis that it also holds an interest in certain non-Plan proponents.

---

[244]   Plan §§ 1.1, 6.2(a), 6.15, 7.11, 8.8, 11.4(c)–(d).

[245]   Aequum Obj. ¶ 32.

[246]   *See Senior Secured Superpriority Debtor-in-Possession Credit Agreement* (Docket No. 289-1) Section IV(a)(iv) (listing Viceroy as a guarantor).

(v)      **Plan Does Not Improperly Apportion Proceeds From Common Claims**

202.     Certain SPV Lenders argue that under the Plan, the proceeds from common claims (such as against Patrick and Edward James) must be apportioned to the SPV Debtors and their stakeholders. But the Plan has no bearing on the ultimate allocation of proceeds of common claims, if any exist, including any which might have been asserted in the Patrick James and Onset Adversary Proceedings. All rights of the FBG Debtors and the SPV Debtors on allocation issues are fully preserved, and any such allocation issues will be decided at a later date.

(vi)     **SPV Lenders' Privilege Arguments Are Unripe and Misplaced**

203.     The SPV Lenders claim that privilege assertions by the Litigation Trustee cannot be used to prevent discovery by defendants or subsequent transferees. This issue is neither ripe for consideration nor relevant to confirmation. Nothing in the Plan expands or contracts any privilege. If the Litigation Trustee asserts privilege over any of the information after the establishment of the Litigation Trust, those issues will be addressed at that point by the appropriate court on a developed record.

(vii)    **Carnaby Secured Lenders' Administrative Expense Motion Should Be Denied**

204.     The Court should give no credence to the *Application of GLAS Trust Company LLC, as Administrative Agent, for Allowance and Payment of Administrative Expense Claim* (Docket No. 3345) (the "**Carnaby Administrative Expense Motion**"). The FBG Debtors dispute the Carnaby Administrative Expense Motion in its entirety. While the FBG Debtors will respond to the Carnaby Administrative Expense Motion fully in due course, several points suffice. First, the Carnaby Secured Lenders brought the Carnaby Administrative Expense Motion as a litigation tactic—the Carnaby Secured Lenders have sat their alleged administrative expense claim

99

information for months and decided only to file its motion on the eve of the FBG Debtors' confirmation.  Furthermore, the Court should deny the allowance of these claims as an administrative expense because, although FBG Debtor First Brands Group Holdings, LLC is a guarantor under the Carnaby Facilities, these guarantees are unsecured and will be treated accordingly under the Litigation Trust Waterfall.  The Carnaby Secured Lenders only otherwise have recourse against the CarVal SPVs (as defined in the Moore Declaration).  Finally, to the extent the Carnaby Secured Lenders hold allowable administrative expenses against the FBG Debtors, these claims should be offset by significant surcharge claims held by the FBG Debtors against the Carnaby Secured Lenders for preserving and maintaining their purported collateral for months.

## VI.  Objections Regarding the Administrative Expense Claims Basket and Administrative Expense Claims Consent Program Should be Overruled

### A.  Objections to the Administrative Expense Claims Basket Program Should be Overruled

205.  TQL's objection takes issue with the Administrative Expense Claims Basket.  Specifically, TQL argues that (i)  the Plan fails to describe why distributions of proceeds under various trusts do not trigger the Administrative Expense Claims Basket,[247] (ii) the Plan impermissibly pays prepetition lenders that should be subordinate to administrative claimants pursuant to the DIP Order,[248] and (iii) the FBG Debtors "engineered" the Plan to ensure that the Administrative Expense Claims Basket is not triggered.[249]

---

[247]  TQL Obj. ¶ 30.

[248]  TQL Obj. ¶ 41.

[249]  TQL Obj. ¶ 32.

206.   TQL, however, selectively quotes from the DIP Order and omits crucial details that are fatal to its objection.  The DIP Order provides that prior to the payment of the Roll-Up Obligations, but following *indefeasible payment in full in cash* of the New Money DIP Loans (and the related DIP Obligations, including DIP Fees and Expenses but excluding any DIP Obligations related to the Roll-Up Obligations), certain unpaid and undisputed administrative expense claims of the DIP Loan Parties up to an aggregate amount of $200 million will be paid.[250] The DIP Order also provides that, as long as the New Money DIP Loans are indefeasibly paid in full in cash, the remaining DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Claims shall be subject and subordinate to the payment of the Specified Administrative Expense Claims from the Administrative Expense Claims Basket.[251]

207.   The Administrative Expense Claims Basket is not triggered by the Plan because, under the plain and unambiguous language of the DIP Order, claims that qualify under the Administrative Expense Claims Basket are only payable "following the indefeasible payment *in full in cash* of the New Money DIP Loans."  Under the Plan and Plan Settlement, the New Money DIP Loans are neither "repaid in full" nor "in cash," as required to trigger the Administrative Expense Claims Basket pursuant to the DIP Order,[252] because holders of New

---

[250]   *See* DIP Order ¶ 8(b).

[251]   *Id.*

[252]   "When construing an agreed or negotiated form of order . . . the Court approaches the task as an exercise of contract interpretation rather than the routine enforcement of a prior court order." *In re Trico Marine Servs., Inc.*, 450 B.R. 474, 482 (Bankr. D. Del. 2011); see also *In re Sanchez Energy Corp.*, No. 19-34508 (MI), 2022 WL 2912076, at *5 (Bankr. S.D. Tex. July 22, 2022) ("Contract terms should be given their plain, ordinary meaning.") (citation modified); *In re Celsius Network LLC*, 649 B.R. 87, 98 (Bankr. S.D.N.Y. 2023) ("When a contract's terms are unambiguous, courts apply them as written.").

Money DIP Loans will receive beneficial interests in the Litigation Trust and DIP Collateral Trust, not cash, in exchange for certain of their DIP A Claims.[253]

208.    Moreover, any subordination of prepetition lenders' claims to administrative creditors is only to the extent the Administrative Expense Claims Basket is triggered.  Under the plain and unambiguous language of the DIP Order, the subordination is applicable "as long as the New Money DIP Loans . . . are indefeasibly paid in full in cash."[254] Thus, TQL's arguments regarding subordination are a red herring, because they ignore the clear terms of the DIP Order.

209.    In any event, the premise of TQL's objection is fundamentally flawed because under the Plan's Litigation Trust Waterfall, the Administrative Expense Claims Basket is honored and improved upon by paying *all* Administrative Expense Claims (i.e., not capped at $200 million) in full before the Roll-Up Claims.[255]  And rather than waiting for the $1.3 billion of New Money DIP Claims to be paid in full, after recovering $350 million of litigation proceeds, administrative expense creditors will start recovering 16% of the distributable proceeds from the Litigation Trust.   As a result, under the Litigation Trust Waterfall, holders of Allowed

---

[253]   TQL also argues that the best interests test of § 1129(a)(7) is not satisfied because the Liquidation Analysis does not show creditor recoveries  if the Administrative Expense Claims Basket was honored in a chapter 7 liquidation. *See* TQL Obj. ¶ 40.  However, the Liquidation Analysis is accurate and correctly assumes that the Administrative Expense Claims Basket would not be triggered in a chapter 7 liquidation because if the FBG Debtors' cases convert, the DIP Secured Parties would likely take outright ownership of the Estate Claims, through either a foreclosure or purchase of collateral, and even assuming a scenario where that does not  happen, given (among many factors) the lack of available liquidity or financing options, a chapter 7 trustee would have no other option but to negotiate a settlement with the DIP Secured Parties, on at best, substantially similar terms as the Plan Settlement.  *See* Moore Decl. ¶ 185.  The Administrative Expense Claims Basket, therefore, would not be triggered in any alternative scenario.

[254]   *See* DIP Order ¶ 8(b).

[255]   Onset raises a similar issue in its objection, arguing that there is an "unfairness" because the "DIP Lenders seek to replace" the Administrative Expense Claims Basket with the Litigation Trust Waterfall, *see* Onset Obj. ¶ 66, which is fundamentally flawed for the same reasons addressed herein.

Administrative Expense Claims are projected to be repaid in full on or around *the same time* as the New Money DIP Claims.

210.    The Plan provides a far superior treatment for administrative creditors than the original DIP Order contemplated, under which those creditors would receive only a capped payment after the New Money DIP Loans are paid in full in cash (which loans would continue accruing interest absent the Plan Settlement).  Moreover, the Plan allows administrative creditors to participate in the Administrative Expense Claims Consent Program, which accelerates recoveries to settling administrative creditors.

211.    The DIP Lenders' agreement to take *per se* impairment on the repayment of new, postpetition capital—particularly where the magnitude of such capital exceeds one billion dollars—is a significant concession for the benefit of administrative creditors and others.

212.    Accordingly, TQL's objections regarding the Administrative Expense Claims Basket should be overruled.

**B.    Objections to the Administrative Expense Claims Consent Program Should be Overruled**

213.    Certain parties[256] also argue that the Plan—through the Administrative Expense Claims Consent Program, which proposes to make distributions to holders who elect to settle their administrative claims at a discount (Settled Administrative Expense Claims) before holders of Administrative Expense Claims that do not elect to participate—creates disparate treatment between the holders of Administrative Expense Claims and the holders of Settled Administrative Expense Claims in violation of section 1123(a)(4) and section 1129(a)(9)(A) of the Bankruptcy Code.

---

[256]   *See* Carnaby Obj. ¶¶ 100–01; U.S. Trustee Obj. ¶¶ 26–27; TQL Obj. ¶¶ 23–29.

214.     Section 1123(a)(4) applies only to the treatment of claims within "*a particular class*," and does not apply where "the holder of a particular claim . . . *agrees* to a less favorable treatment."  11 U.S.C. § 1123(a)(4) (emphasis added). Section 1129(a)(9)(A) similarly requires payments in full of allowed administrative expense claims on the effective date "*[e]xcept* to the extent that the holder of a particular claim has agreed to a different treatment of such claim." 11 U.S.C. § 1129(a)(9) (emphasis added).  These textual limitations doom the objections to the Administrative Expense Claims Consent Program.

215.     *First*, any alleged disparate treatment among Administrative Expense Claims cannot violate section 1123(a)(4) because the Administrative Expense Claims are not in a class.     Section 1123(a)(1) expressly excludes administrative and priority claims from classification, and therefore, consistent with the Bankruptcy Code, Administrative Expense Claims are not classified under the Plan.  *See* 11 U.S.C. § 1123(a)(1) (A plan must designate classes of claims "other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of" the Bankruptcy Code); 7 Collier on Bankruptcy ¶ 1123.01 (16th ed. 2026) (stating "[s]ection 1123(a)(1) requires a chapter 11 plan to designate classes of interests and classes of claims *other than* priority claims under section 507(a)(2) (administrative expenses)").  As such, courts routinely

104

confirm settlements and chapter 11 plans which contain similar administrative expense claim consent programs.[257]

216.    *Second*, the Administrative Expense Claims Consent Program is, true to its name, *consensual* in nature, meaning that it is exempt from the requirements of sections 1123(a)(4) and 1129(a)(9)(A).  The Program applies only to parties that affirmatively agree to participate and return the Consent Program Opt-In Form to the FBG Debtors.[258]  Any holder of an Administrative Expense Claim who prefers to retain the entire amount of their Administrative Expense Claim may do so by simply not opting-in to the program.  This is sufficient under applicable law to demonstrate that those that return a completed Consent Program Opt-In Form will have consented

---

[257]    *See In re Steward Health Care Sys. LLC*, No. 24–90213 (CML) (Bankr. S.D. Tex. July 25, 2025) (Docket No. 5774) (confirming a plan that provided for payment of certain settled administrative claims from a recovery pool before other non-settled administrative claims); *In re Pier 1 Imps.*, Inc. No. 20- 30805 (KRH) (Bankr. E.D. Va. July 30, 2020) (Docket No. 967) (confirming a plan that included an administrative consent opt-out program); *In re S. Foods Grps.*, LLC, No. 19- 36313 (DRJ) (Bankr. S.D. Tex. July 21, 2020) (Docket No. 2724) (approving opt-in administrative claims consent program where administrative claimants would receive accelerated cash distributions in exchange for reducing the amount of their claims to a cash recovery in the aggregate amount of 80% of such claims); *In re Gemstone Sols. Grp., Inc.*, No. 19-30258 (KLP) (Bankr. E.D. Va. June 5, 2020) (Docket No. 1636) (confirming chapter 11 plan and finding that the administrative claim settlements thereunder were "integral to" the Plan); *In re Sears Holding Corp.*, No. 18- 23538 (RDD) (Oct. 15, 2019) (Docket No. 5370) (confirming plan with administrative consent opt-out program); *In re Toys "R" US, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Aug 8, 2018) (Docket No. 4083) (approving settlement agreement prior to plan confirmation which, among other things, contained administrative expense opt-out program).

[258]    *See* Disclosure Statement Order ¶¶ 6, 28.

to alternative treatment of their claims in accordance with the requirements of the Bankruptcy Code. [259]

217.    *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017), confirms as much. The Carnaby Secured Lenders cite *Jevic* to argue that the Administrative Expense Claims Consent Program violates the "substantive restrictions" of the Bankruptcy Code's priority scheme by "treat[ing] two claims of the same priority differently."[260]  But they ignore *Jevic*'s clear recognition that differential treatment is permitted with consent: "A distribution scheme ordered in connection with the dismissal of a Chapter 11 case cannot, *without the consent of the affected parties*, deviate from the basic priority rules."  580 U.S. at 454–55 (emphasis added).

218.    *Jevic* is, in any event, inapposite.  *Jevic* addressed a proposed structured dismissal—not a consent program to be implemented pursuant to a chapter 11 plan that was voted on and approved by creditors—that would have paid general unsecured creditors prior to priority

---

[259]  Indeed, while the Administrative Expense Claims Consent Program requires an affirmative opt-in to consent to alternative treatment, numerous courts have found even implied consent to be sufficient in similar contexts. *See, e.g., In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Aug. 8, 2018) (Docket No. 4083) (approving opt-out procedures where administrative claim holders were given the opportunity to affirmatively opt-out of the administrative claims settlement and forego treatment thereunder); *In re Pier 1 Imps., Inc.*, No. 20-30805 (KRH) (Bankr. E.D. Va. June 24, 2020) (Docket No. 804) (authorizing the debtors to mail a consent form notice to all known holders of administrative claims providing that parties who did not follow the procedures set forth thereon would be deemed to consent to less than full payment of their claims); *In re Gemstone Sols. Grp., Inc.*, No. 19-30258 (KLP) (Bankr. E.D. Va. March 13, 2020) (Docket No. 1426) (approving disclosure statement and election form providing that failure to return the election form would be deemed as consent to partial payment of allowed administrative claims in accordance with the administrative claim settlement terms contemplated in the debtors' chapter 11 plan); *In re Barneys N. Y., Inc.*, No. 19-36300 (CMG) (Bankr. S.D.N.Y. Dec. 19, 2019) (Docket No. 612) (approving disclosure statement and solicitation procedures where holders of administrative, priority tax, and other priority claims that did not object to the debtors' chapter 11 plan would be deemed to consent to receiving a smaller distribution than the full amount of the allowed administrative claims); *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2019) (Docket No. 5370) (confirming chapter 11 plan where holders of administrative expense claims who did not opt out of the administrative expense claims consent program would be deemed to have had their claims satisfied in full once they received payment in cash equal to 80% of the applicable allowed administrative claims); *see also In re Teligent, Inc.*, 282 B.R. 765, 771–73 (Bankr. S.D.N.Y. 2002) (confirming chapter 11 plan where administrative claimants that did not respond to solicitation to accept partial payment on their claims would be deemed, by their silence, to have consented to such treatment).

[260]  Carnaby Obj. ¶ 100.

wage claimants in violation of the Bankruptcy Code's priority rules. *Id.* at 459. By contrast, the Administrative Expense Claims Consent Program complies with the safeguards of the Bankruptcy Code because it does not result in a lower-priority class of creditors receiving distributions ahead of a higher priority class creditors without their consent. Instead, the program simply allows administrative creditors the same rights to obtain several benefits for settling their claims.

219.   The transaction in *Jevic* "closely resemble[d] proposed transactions that lower courts have refused to allow" because of its class-skipping and other features that "circumvent[ed] the Code's procedural safeguards." *See* 580 U.S. at 468. By contrast, several courts—including this Court—have upheld administrative expense claim consent programs like the one here. *See supra* ¶ 215 n. 262. In *Sears*, for example, the court rejected objections arguing that the debtors' distributions to settling administrative creditors ahead of non-settling ones before the effective date created unequal treatment in violation of section 1123(a)(4). The *Sears* court found that since all administrative creditors had an equal right and opportunity to participate in the settlement, non-settling administrative creditors were not truly junior to settling administrative creditors, and as a result, there was no issue of disparate treatment.[261] The *Sears* court further held that administrative creditors are only entitled to receive payment in full on the effective date of the plan and that any administrative creditor can settle with the debtors for payment prior to the effective date, which does not violate the rights of other, non-settling administrative creditors.[262] As in *Sears*, there is no disparate treatment here: all holders of Administrative Expense Claims

---

[261]   *See* Oct. 3, 2019 Hr'g Tr. at 33933:2–33:9, *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. 2019) (Docket No. 5395) ("Well, but again, if they can opt in also, affirmatively opt in, then they're not behind them, right? . . . So, to me, they have that right, too. It's not like the people who have settled are looking to get an exclusive right. Anyone can opt in. So, to me, that's not a disparate treatment issue.").

[262]   *See* Oct. 3, 2019 Hr'g Tr. at 39:14–39:1939:19, *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. 2019) (Docket No. 5395) ("It is entitled to get paid it on the effective date. . . If it wants to take at a discount and get paid before the effective date, some portion, it can negotiate with the debtor to do that.").

will have an equal and fair opportunity to choose whether to participate in the Administrative Expense Claims Consent Program.[263]

220.    Accordingly, objections that the Administrative Expense Claims Consent Program provides for disparate treatment inconsistent with the Bankruptcy Code should be overruled.

## VII.    Onset's Objection to the Litigation Trust Funding Should be Overruled

221.    Onset objects on the basis that the terms of the Litigation Trust Funding are unreasonable and, therefore, do not comply with section 1129(a)(4).[264]  In particular, Onset argues that the Litigation Trust Funding (a) was negotiated behind "closed doors" and not sufficiently marketed and (b) provides unreasonable and outsized returns to the DIP Secured Parties providing such financing.  Onset's objection should be overruled for several reasons.[265]

222.    Onset's objection takes section 1129(a)(4) of the Bankruptcy Code out of context.[266]  On its face, section 1129(a)(4) applies only to "payment[s] made or to be made by the [plan] proponent, by the debtor, or by a person issuing securities or acquiring property under the plan"; it should not apply to the Litigation Trust Funding that will be incurred by the Litigation Trust (not the FBG Debtors).[267]  Indeed, courts that have considered the application of section

---

[263]   In similar contexts, many courts have found that when all members of a class receive an opportunity to participate in a program for alternative treatment, but certain creditors elect not to participate, that alone is insufficient to constitute unequal treatment in violation of § 1123(a)(4).  *See Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.),* 933 F.3d 918, 925–27 (8th Cir. 2019) (holding that the right of qualifying creditors to participate in a private placement whereby all qualifying creditors could purchase preferred stock in reorganized debtors did not constitute unequal treatment in violation of § 1123(a)(4)); *In re Quigley Co., Inc.,* 377 B.R. 110, 119 (Bankr. S.D.N.Y. 2007) (declining to hold as a matter of law that the non-settling claimants received unequal treatment in violation of § 1123(a)(4)).

[264]   *See* Onset Obj. ¶¶ 45–53.

[265]   *See id.*

[266]   *See* Onset Obj. ¶ 45.

[267]   11 U.S.C. § 1129(a)(4).

1129(a)(4) have typically done so in the context of the payment of legal fees and expenses by the *debtors* or *reorganized debtors* and not a third party.[268]

223.    Moreover, the purpose of section 1129(a)(4) is to "eliminate the practice of fixing reorganization fees and expenses by private arrangement, thereby decreasing the effective amount of recovery of the creditors," which is not the case here.[269]  Instead, the Litigation Trust Funding being provided by the DIP Secured Parties effectively only primes themselves and does not decrease the amount of funds that would otherwise be distributable to junior creditors.

224.    Under any scenario, the DIP Secured Parties hold undisputed, first-priority security interests in all of the Estate Claims (or proceeds in the case of the Avoidance Actions), for no less than $2.5 billion (with respect to Avoidance Actions) and $5 billion with respect to all other Estate Claims.  Thus, amounts paid to the funding contributors prior to sharing proceeds with junior creditors under the Litigation Funding Waterfall are being paid out of DIP Collateral.  The DIP Secured Parties' decision to provide the Litigation Trust Funding is, therefore, effectively a decision to prime themselves in an effort to allow the Plan to be confirmed.

225.    In any event, as the evidence will show, the Litigation Trust Funding represents the best and only financing available to monetize the Estate Claims.  Neither Onset nor any other party has made a proposal for alternative financing.  And, as explained above, the FBG

---

[268]   *In re Anderson Grain Corp.*, 222 B.R. 528 (Bankr. N.D. Tex. 1998) (applying section 1129(a)(4) and assessing the reasonableness of legal fees and expenses of a secured creditor that were proposed to be paid *by the reorganized debtors*); *In re Schepps Food Stores*, 1994 Bankr. LEXIS 1368, at *6–7 (Bankr. S.D. Tex. July 11, 1994) (declining to "expand the [section 1129(a)(4)] to include payments *by any creditor* who receives a distribution from the estate" and noting that "[n]othing in the legislative history of the Code indicates a Congressional intent to monitor and determine the reasonableness of attorney's fees for [creditors]") (emphasis added); *In re Idearc Inc.*, 423 B.R. 138, 163–4 (Bankr. N.D. Tex. 2009), *subsequently aff'd*, 662 F.3d 315 (5th Cir. 2011) (noting that section 1129(a)(4) of the Bankruptcy Code requires that "all payments of professional fees *made from estate assets* be subject to review and approval by the Bankruptcy Court as to their reasonableness") (emphasis added).

[269]   *Anderson Grain Corp.*, 222 B.R. at 533.

Debtors extensively negotiated the terms of the Litigation Trust Funding as part of the Plan Settlement.  The Litigation Trust Funding terms were part and parcel of the Litigation Trust Waterfall and the benefits and concessions provided thereunder.  Further, the Ad Hoc Group would not have agreed to the other terms and conditions of the Plan Settlement (including concessions under the Litigation Trust Waterfall) absent the agreement reached on the Litigation Trust Funding.  The Plan provides significant benefits to creditors, and absent the Plan (including the Litigation Trust Funding), the FBG Debtors would be forced to convert their chapter 11 cases to cases under chapter 7, which will result in no recoveries for junior creditors.  In light of the substantial benefits provided by the DIP Secured Parties under the Plan, the Litigation Trust Funding and its terms are appropriate and reasonable under the circumstances.

226.    Onset spends a portion of its objection highlighting the economic terms of the Litigation Trust Funding and the anticipated returns of the DIP Secured Parties providing such financing.[270]  But even putting aside Onset's erroneous calculation of anticipated returns,[271] the terms of the Litigation Trust Funding are commensurate with and reasonable in light of the concessions being made by the DIP Secured Parties under the Plan, including their agreement to allow junior creditors to share in recoveries before they are paid in full.  With no viable alternative to the Litigation Trust Funding, the terms thereof are required for the FBG Debtors to confirm the Plan and unlock all the benefits it provides for the estate.

---

[270]  *See id.*

[271]  In concluding that "[b]y the time the Litigation Trust has generated sufficient proceeds to fund recoveries for Administrative and Priority Claims—estimated at $1.965 billion—the funding contributors will have received approximately $286 million, or 5.7x their initial $50 million investment[,]" Onset Obj. ¶ 5 (emphasis in original), Onset appears to have included the $50 million of initial funding from the funding contributors in calculating the rate of return (as opposed to treating such amount as simply a return of their initial investment).

227.    Onset cites three cases in its objection to the Litigation Trust Funding—

*Pac. Drilling S.A.*, *LATAM Airlines Grp. S.A.*, and *ConvergeOne Holdings*.[272]  As an initial matter,

in each of these cases the courts were considering the terms of a backstop commitment in

connection with a rights offering, a separate and distinct structure from litigation funding.  Setting

that key distinction aside, though, each of these cases is either distinguishable or does not support

Onset's position.

     i.    In *Pacific Drilling S.A.*, there were no objections to the backstop commitment terms, meaning that the court's commentary questioning the necessity of the backstop is dicta.[273]  In any event, the Litigation Trust Funding *is* a critical element of the Plan Settlement and Plan, absent which the FBG Debtors would not have the stakeholder support or funding necessary to pursue any chapter 11 plan.

    ii.    While Onset cites to *LATAM Airlines Grp. S.A.* in its objection, noting that the court in that case evaluated backstop arrangements by looking at "the economics of the entire package,"[274] *LATAM Airlines Grp. S.A.* actually supports approval, not rejection, of the Litigation Trust Funding.  Based on, among other things, the proposed financing being required for the debtors to confirm a chapter 11 plan, the support for such financing from the debtors' key stakeholders, and the lack of any alternative financing sources, the court approved the debtors' proposed exit financing package.[275]  Here, the FBG Debtors face a very similar set of circumstances: the Litigation Trust Funding is required for the FBG Debtors to satisfy the requirements for confirmation and implement the terms of the Plan, the FBG Debtors' key stakeholders are either providing or support the Litigation Trust Funding, and there is no alternative financing available to the FBG Debtors.

    iii.    Lastly, Onset's reliance on *ConvergeOne* is even more misplaced.  In that case, the court considered whether providing a backstop commitment and equity purchase

---

[272]  *In re Pac. Drilling S.A.*, No. 17-13193 (MEW), 2018 WL 11435661 (Bankr. S.D.N.Y. Oct. 1, 2018); *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 790414 (Bankr. S.D.N.Y. Mar. 15, 2022), *aff'd* sub nom. In re *LATAM* Airlines Grp. S.A., 643 B.R. 756 (S.D.N.Y. 2022); *ConvergeOne Holdings, Inc. v. Ad Hoc Grp. of Excluded Lenders*, No. 4:24-CV-02001 (ASH), 2025 WL 4700341 (S.D. Tex. Sept. 25, 2025).

[273]  *See Pacific Drilling S.A.*, 2018 WL 11435661 at 3–4.

[274]  *See* Onset Obj. ¶ 47.

[275]  *LATAM Airlines Grp. S.A.*, 2022 WL 790414, at *11 ("The record shows that to date, the Backstop Parties (along with the lenders providing the Exit Financing) are the only parties that have proposed any reorganization transaction, plan and exit proposal, that have any realistic prospect of consummation, and which enjoy the creditor and shareholder support necessary to confirm and implement an otherwise confirmable plan of reorganization that complies with applicable foreign law in the United States and the other jurisdictions where the Debtors operate, including Chile.").

opportunity exclusively to a specific subset of lenders under a chapter 11 plan violated the requirements of section 1123(a)(4) of the Bankruptcy Code with respect to equal treatment of similarly-situated creditors.[276]  The case, therefore, has little relevance to the question of whether a litigation financing package provided by a subset of lenders is reasonable or appropriate.

228.    As noted above, the Litigation Trust Funding is a critical aspect of the Plan and Plan Settlement that unlocks the benefits thereunder, including recoveries for administrative, priority, and general unsecured creditors.  The Litigation Trust Funding should, therefore, be approved and Onset's objection thereto should be overruled.

## VIII.   Objections to the Third-Party Releases Should be Overruled

229.    Katsumi—and Katsumi alone—objects to the Plan's Third-Party Releases. In particular, Katsumi argues that the Third-Party Releases under the Plan are overbroad, since certain Released Parties receiving the benefit of the Third-Party Releases are not FBG Debtors. Katsumi asserts that the FBG Debtors have not shown that releases of this scope are essential to the Plan's success.[277]   However, the scope of the Third-Party Releases are typical of large chapter 11 cases and compliant with well-established Fifth Circuit caselaw. And the releases are fully consensual (and in fact are purely "opt in"), thus avoiding any potential problem under *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) ("Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan").  Contrary to what Katsumi suggests, there are no requirements (in this jurisdiction or others) that consensual releases under a chapter 11 plan may be granted only to debtors.

---

[276]   *ConvergeOne Holdings, Inc.*, 2025 WL 4700341.
[277]   *See* Katsumi Obj. ¶ 80.

230.    Under Fifth Circuit law, a plan may grant releases to third parties if the releases are provided with consent in exchange for consideration, and the releases are "an essential means of implementing [a] [p]lan pursuant to Section 1123(a)(5) of the Bankruptcy Code."  *In re Moody Nat'l SHS Hous. H, LLC*, No. 10-30172 (MI), 2010 WL 5116872, at *5 (Bankr. S.D. Tex. June 30, 2010) (approving consensual nondebtor release)*; see Bigler*, 442 B.R. at 549.[278] And it is common practice in this District for a chapter 11 plan to provide creditors an opportunity to consensually release non-Debtor third-parties.  *See, e.g.*, *Epstein v. Container Store Grp., Inc. (In re Container Store Grp., Inc.)*, 676 B.R. 356, 374 (S.D. Tex. 2026) (stating that the court has a "long-established view" that a plan may provide for consensual third-party releases of non-debtors).[279]

231.    The releases in this case are no different.  Contrary to Katsumi's assertions, the narrow scope of the Third-Party Releases, which are fully consensual, are justified and necessary for the success of the Plan.  As described in the Moore Declaration, the Third-Party Releases are an integral part of the Plan, and were a material inducement for parties to enter into the Plan Settlement and provide their support for the FBG Debtors, and the Plan.[280]

---

[278]  *See also Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) (acknowledging that Bankruptcy Code does not prohibit a non-debtor release "when it has been accepted and confirmed as an integral part of a plan of reorganization"); *Cole v. Nabors Corp. Servs., Inc. (In re CJ Holding Co.)*, No. H-18-3250 (LHR), 2019 U.S. Dist. LEXIS 21199, at *5 (S.D. Tex. Feb. 8, 2019) (rejecting argument that the bankruptcy court cannot release claims against non-debtors held by third parties and held that the "Fifth Circuit does not preclude bankruptcy courts from approving a 'consensual non-debtor release'") (citation omitted); *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007) ("Most courts allow consensual nondebtor releases to be included in a plan." (citations omitted)).

[279]  *See, e.g.*, *In re Steward Health Care Sys. LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. July 25, 2025) (Docket No. 5774) (confirming a plan that provides for consensual third-party releases of non-debtors); *Tehum Care Servs., Inc.*, No. 23-90086 (CML) (Bankr. S.D. Tex. Mar. 3, 2025) (Docket No. 2014) (same); *In re Everstream Sols. LLC*, No. 25-90144 (CML) (Bankr. S.D. Tex. Nov. 19, 2025) (Docket No. 594) (same).

[280]  *See* Moore Decl. ¶ 246.

232.     Accordingly, Katsumi's objection to the Plan's Third-Party Releases lacks merit and should be overruled.

## IX.     Objections to the Exculpation Provision Should be Overruled

233.     Certain objectors argue the Plan's Exculpation Provision is impermissibly broad because it exculpates members of the Special Committee and Independent Managers of the FBG Debtors for actions taken during the bankruptcy.[281]   The inclusion of the three members of the Special Committee and Independent Managers as "Exculpated Parties," however, is consistent with Fifth Circuit precedent.[282]

234.     Certain of the objectors allege that under *Highland I*, exculpation provisions must be limited to the debtor and the creditors' committee and its members for conduct within the scope of their duties.[283]   But the court in *Highland I* found that each of the three independent directors appointed as fiduciaries was properly exculpated under the plan.[284]   Citing section 1107(a) of the Bankruptcy Code, the court reasoned that "[l]ike a debtor-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee" and were therefore

---

[281]   *See* U.S. Trustee Obj ¶¶ 47–50; Katsumi Obj ¶¶ 78–82; Carnaby Obj. ¶¶ 110–111; Aequum Obj ¶¶ 12–16; Sommers ¶ 40.

[282]   *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 439 (5th Cir. 2022) ("**Highland I**").

[283]   *See* U.S. Trustee Obj ¶¶ 49–50; Katsumi Obj ¶¶ 79, 81; Carnaby Obj. ¶¶ 110–111.

[284]   *See Highland I*, 48 F.4th at 437–38.

114

entitled to exculpation.[285]   Following *Highland I*, this Court has approved plan exculpation provisions that apply to independent directors or other similar actors.[286]

235.    Certain objectors also argue that the Exculpation Provision should exclude claims of the SPV Debtors, their estates, successors, and assigns, and their creditors, including the SPV Lenders, since the SPV Debtors are not proponents of the Plan.[287]  These objectors argue that the Plan's Exculpation Provision sweeps too broadly because it exculpates the Exculpated Parties for actions related to the SPV Debtors.[288]  Not so.  However, to provide further clarity, the definition of Exculpated Parties in the Plan, has been updated in an amended plan filed contemporaneously herewith, to expressly include Neal Goldman, William Transier, and Benjamin Duster only "in their capacities as officers, directors, or managers of one or more FBG Debtors, and not in their capacities as officers, directors, or managers of any SPV Debtor," which is properly limited to the governance, management, and operation of the plan proponents and is consistent with *Highland I*.

236.    The Exculpated Parties, including the members of the Special Committee and the Independent Managers, have acted on the FBG Debtors' behalf throughout these chapter 11 cases in a fiduciary capacity and participated in the FBG Debtors' chapter 11 cases in good

---

[285]   *Id.* at 437.

[286]   *See, e.g.*, *In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) (Docket No. 1483) (approving plan containing exculpation that applied to independent managers); *In re Steward Health Care Sys. LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. July 25, 2025) (Docket No. 5774) (approving plan containing exculpation provision that applied to disinterested transformation committee members); *In re DocuData Sols., L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834) (approving plan containing exculpation provision that applied to disinterested director); *In re Wellpath Holdings, Inc.*, No. 24-90533 (ARP) (Bankr. S.D. Tex. May 1, 2025) (Docket No. 2596) (approving plan containing exculpation provision that applied to independent directors); *In re DRF Logistics, LLC*, No. 24-90447 (CML) (Bankr. S.D. Tex. Nov. 25, 2024) (Docket No. 530) (same); *In re Everstream Sols., LLC*, No. 25-90144 (CML) (Bankr. S.D. Tex. Nov. 19, 2025) (Docket No. 594) (same).

[287]   *See* Aequum Obj ¶¶ 12–16;  Carnaby Obj ¶¶ 109–113; Sommers ¶ 40.

[288]   Carnaby Obj ¶ 111.

faith.[289]  The Exculpation Provision is narrowly tailored to protect the Exculpated Parties from inappropriate litigation based on these chapter 11 cases and the Plan, and does not release any claim based on any act or omission that constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order.  The rationale under *Highland I* should be applied equally to the Special Committee members and the Independent Managers, who are independent directors that have acted as estate fiduciaries during the pendency of the FBG Debtors' chapter 11 cases.

237.    Accordingly, objections to the Plan's Exculpation Provision lack merit and should be overruled.

## X.    Objections to the Injunction Provisions Should be Overruled

238.    The U.S. Trustee objects to the Plan's Injunction Provisions and related Gatekeeper Provision, arguing that issuance of the injunction would exceed this Court's authority under the Bankruptcy Code and that the Gatekeeper Provision is overly broad, allegedly in violation of the Fifth Circuit's holding in *Highland II*.[290]

239.    The Injunction Provisions and Gatekeeper Provision, however, are consistent with the Bankruptcy Code and applicable Fifth Circuit precedent, including *Highland II*, and decisions by the Court in other recent cases. *See e.g., In re Nine Energy Serv., Inc.*, No. 26-90295 (CML) (Bankr. S.D. Tex. Mar. 4, 2026) (Docket No. 189); *In re PosiGen, PBC*, No. 25-

---

[289]    *See* Moore Decl. ¶ 251.  Although the Highland Capital independent directors were appointed by the bankruptcy court and the Fifth Circuit considered that fact in its *Highland I* decision, *see Highland*, 48 F.4th at 437, courts have since interpreted that *Highland I* does not require independent directors to be court-appointed to be exculpated.  *See In re Instant Brands Acquisition Holdings Inc.*, No. 23-90716 (MI) (Bankr. S.D. Tex. Mar. 3, 2025) (Docket No. 1451) (rejecting the argument that *Highland I* "stands for the proposition that the exculpation of the Highland Capital independent directors was permitted only because the independent directors were appointed post-petition pursuant to a court order authorizing them to act as a trustee") (internal quotation marks and citation omitted).

[290]    *See* U.S. Trustee Obj. ¶¶ 51–56

90787 (CML) (Bankr. S.D. Tex. Feb. 24, 2026) (Docket No. 613); *In re Pine Gate Renewables, LLC*, No. 25-90669 (CML) (Bankr. S.D. Tex. Feb. 19, 2026) (Docket No. 1483).

240.    In *Highland I*, the Fifth Circuit approved a gatekeeper provision related to claims that were being exculpated under the plan,[291] and in *Highland II*, the Fifth Circuit clarified that the scope of a gatekeeper provision may not extend beyond claims subject to the plan's injunction (there, the exculpated claims).[292]  Here, because the Gatekeeper Provision is narrowly tailored to apply only to Claims or Causes of Action against Exculpated Parties, it is consistent with Fifth Circuit precedent set forth in *Highland I* and *Highland II*.

241.    The U.S. Trustee also asserts that the Gatekeeper Provision would require parties to seek Court permission to sue the Claims Ombudsman, Wind Down Co, and the Plan Administrator.[293]  But the U.S. Trustee misreads the Gatekeeper Provision, which is applicable only to Claims and Causes of Action against *Exculpated Parties*, not the Claims Ombudsman, a "Wind Down Co", or a "Plan Administrator."[294]

---

[291]    *See Highland I*, 48 F.4th at 439 ("In sum, the Plan violates § 524(e) but only insofar as it exculpates and enjoins certain non-debtors. . . . We otherwise affirm the inclusion of the injunction and the gatekeeper provisions in the Plan.").

[292]    *See Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland II Cap. Mgmt., L.P.)*, 132 F.4th 353, 362 (5th Cir. 2025) ("***Highland II***") ("The clear weight of Supreme Court and Fifth Circuit precedent dictates our holding: that a proper reading of *Highland I* requires that the definition of 'Protected Parties' used in the Plan's Gatekeeper Clause be narrowed coextensively with the definition of 'Exculpated Parties' used in the Exculpation Provision.").

[293]    *See* U.S. Trustee Obj. ¶¶ 51–56.

[294]    *See* Plan § 1.1 ("Exculpated Parties means each of the following in their capacity as such: (i) the FBG Debtors; (ii) Neal Goldman, William Transier, and Benjamin Duster, in their capacities as members of one or more of the Special Committees; (iii) Neal Goldman and William Transier, in their capacities as the Independent Managers of the FBG Debtors; and (iv) the Creditors' Committee and each of its members in their official capacity; *provided* that, for the avoidance of doubt, the Persons in the foregoing clauses (ii) and (iii) shall only receive exculpation under Section 13.6 of the Plan in their capacities as officers, directors, or managers of one or more FBG Debtors, and not in their capacities as officers, directors, or managers of any SPV Debtor.")

242. Accordingly, objections with respect to the Plan's Injunction Provisions and Gatekeeper Provision are without merit and should be overruled.

## XI. Objections Alleging Improper Classification Should be Overruled

243. Katsumi and the LAM Parties allege that the Plan's classification scheme impermissibly gerrymanders certain voting classes in violation of section 1122 of the Bankruptcy Code. Specifically, Katsumi argues that the Roll-Up, First Lien, Second Lien, and ABL Claims (collectively, the "**Impaired Accepting Classes**"), should not be classified separately from General Unsecured Claims.[295] The LAM Parties argue that the Impaired Accepting Classes, excluding Roll-Up Claims, should not be classified separately from General Unsecured Claims.[296] As an initial matter, the purported prejudice asserted by the LAM Parties and Katsumi is manufactured and illusory because, even if all of the Claims—from the Impaired Accepting Classes and the Class 7 General Unsecured Claims—were combined into a single class as these objectors argue is the proper classification, that class would be an impaired accepting class at *all* 92 FBG Debtors. Therefore, in addition to this objection being void of any merit, the voting results would render it wholly moot.

244. Nevertheless, plan proponents have "significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar." *In re Idearc,* 423 B.R. at 160; *see In re Robertshaw US Holding Corp.*, 662 B.R. 300, 318–19 (Bankr. S.D. Tex. 2024) (finding that "substantially similar claims may be separately classified for 'good business reasons,'" under section 1122) (citation omitted); *see also In re Heritage Org., L.L.C.*,

---

[295]   *See* Katsumi Obj. ¶¶ 46–55.

[296]   *See* LAM Parties Obj. ¶¶ 100–06.

375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) (recognizing "the Fifth Circuit has continued to recognize the existence of valid business justifications for separate classification of claims of equal rank and priority"); *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 661 (6th Cir. 2002) ("Section 1122(a) does not demand that all similar claims be in the same class. To the contrary, the bankruptcy court has substantial discretion to place similar claims in different classes.") (internal citations omitted).

245. Here, the Plan's separate classification of each of the Impaired Accepting Classes is supported by more than a reasonable basis. The Claims in each Impaired Accepting Class possess distinct legal rights.

246. Separate classification of the Impaired Accepting Classes from General Unsecured Claims (Class 7) is clearly rational and justified, as the Claims of the Impaired Accepting Classes are secured claims, each with legal rights arising under distinct legal documents, and therefore not "substantially similar" to the General Unsecured Claims. Classes of claims are not substantially similar where parties have "different legal rights against the estate that justify their separate classification." *In re Heritage Org.,* 375 B.R. at 301. It is well established that secured claims have different legal rights than unsecured claims and must be classified separately from unsecured claims. *See In re Premiere Network Servs., Inc.*, 333 B.R. 130, 134–35 (Bankr. N.D. Tex. 2005) (to the extent the claim at issue was secured, "its rights are legally different from the unsecured creditors, and section 1122(a) does not allow classification of SBC together with the unsecured creditors"); *In re Cypresswood Land Partners I*, 409 B.R. 396, 434 (Bankr. S.D.

119

Tex 2009) ("secured creditors can, and usually must, be classified separately.") (internal quotation marks and citation omitted).

247.    Moreover, as established in the Moore Declaration, the separate classification of the Impaired Accepting Classes tracks the "FBG Debtors' prepetition capital structure and divides the applicable Claims and Interests into Classes based on the underlying instruments, debts, or circumstances giving rise to such Claims and Interests,"[297] which courts have held to be among the valid "business, factual, and legal reasons" to justify separate classification under a chapter 11 plan.  *See In re Pearl Res.*, 622 B.R. 236, 259 (Bankr. S.D. Tex. 2020) (finding separate classification appropriate where the plan grouped claims according to their differing legal status and lien rights); *see also In re Sabine Oil & Gas Corp.,* 555 B.R. 180, 311 (Bankr. S.D.N.Y. 2016) (holding that separate classification satisfied section 1122 where "[g]enerally speaking, the classification scheme follows the Debtors' capital structure," including by classifying "secured debt . . . separately from unsecured debt," and where the classes otherwise reflected differences in legal priority and the factual or legal nature of the claims); *In re Idearc*, 423 B.R. at 160 (approving a classification scheme based on "the respective legal rights of each holder").

248.    Therefore, as in any chapter 11 plan, the pre-petition secured claims of the Impaired Accepting Classes are properly separately classified because they hold rights distinct from those of General Unsecured Claims.  The Roll-Up Claims, First Lien Claims, Second Lien Claims, and ABL Claims are secured claims, each supported by liens on applicable collateral with differing priorities under the relevant intercreditor arrangements.[298]  The transactions contemplated

---

[297]    Moore Decl. ¶ 171.

[298]    *See* DIP Order ¶¶ G(xiv)–(xv), G(xviii), 11; Plan §§ 1.1, 5.2(b).

by the Plan that would transfer the relevant collateral—including the transfers of the DIP Collateral Trust Assets and ABL Collateral Trust Assets to their respective trusts—have not yet been consummated.[299]   Those transactions will not occur unless and until the Plan is confirmed.[300] Accordingly, holders of Roll-Up, First Lien, Second Lien, and ABL Claims remain entitled to vote their secured Claims as they exist today.

249.   The ABL Claims also are appropriately classified separately because they receive treatment under the Plan that is materially different from the treatment afforded to the other Impaired Accepting Classes and General Unsecured Claims.   Specifically, holders of Allowed ABL Claims are entitled to receive their pro rata share of the ABL Collateral Trust Interests, on account of their interests in the ABL Priority Collateral that comprises the ABL Collateral Trust Assets, which will be transferred to a separate trust established exclusively for their benefit.[301] This distinct recovery reflects the ABL Claims' separate collateral package, lien rights, and priority under the applicable financing and intercreditor arrangements and provides an independent factual and legal basis for their separate classification.

250.   Notably, LAM and Katsumi do not cite a single case to support the proposition that deficiency claims and other unsecured claims must be classified together, much less a case supporting the proposition that a DIP roll-up claim granted pursuant to a binding order must be classified with the claims of general unsecured creditors.   Instead, they rely principally on *Greystone III*, a materially different case involving separate classification of unsecured claims

---

[299]   *See* Plan §§ 7.2(a), 8.2.

[300]   *See* Plan §§ 7.2(a), 8.2, 12.1(b), (e), (g), 15.9.

[301]   Plan §§ 5.2(b), 8.2.

designed to manipulate voting.  *See Phoenix Mut. LifeGreystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1279 (5th Cir. 1991).

251.   In *Greystone III,* the Fifth Circuit held that a secured creditor's unsecured deficiency claim was incorrectly separately classified from general unsecured creditors under section 1122 because such separate classification constituted impermissible gerrymandering that disenfranchised a class of claims.  *Id.* at 1279.  *Greystone III* is distinguishable for a number of reasons.  First, in *Greystone III*, "none of the Debtor's witnesses offered any reason" for the separate classification, and the asserted business justification was unsupported by "evidence in the record."  *Id.* at 1281.  Here, by contrast, the FBG Debtors have offered multiple independent justifications for the separate classification, including through the sworn declaration of the FBG Debtors' CEO.  Second, *Greystone III* addressed an unsecured deficiency claim arising under section 1111(b) after the bankruptcy court valued the creditor's collateral and bifurcated its debt into a secured claim equal to the collateral's value and an unsecured deficiency claim for the balance.  *Id.* at 1276.  Here, no such valuation or bifurcation has occurred: the Claims in the Impaired Accepting Classes are presently secured by existing liens and retain their distinct collateral, priority, and intercreditor rights.[302]  These distinctions alone defeat Katsumi's and the LAM Parties' reliance on *Greystone III*.

252.   Katsumi's separate reliance on *Greystone III*'s discussion of treatment fares no better.  Katsumi emphasizes that, in *Greystone III*, the Fifth Circuit considered the identical treatment afforded to the separately classified unsecured claims in concluding that the

---

[302] Even Katsumi's Objection confirms this distinction: "any deficiency claims of those Secured Parties trace back to what was once a secured financing arrangement does not alter the legal character of the resulting deficiency claim—***which, once bifurcated under Section 506(a)***—stands on the same unsecured footing and carries the same priority and rights as the Class 7 General Unsecured Claims."  Katsumi Obj. ¶ 47 (emphasis added).  Here, such valuation and bifurcation has not occurred.

classification was improper, to argue that the Roll-Up Claims, First Lien Claims, Second Lien Claims, and General Unsecured Claims likewise must be classified together because they "share pro rata in the very same distribution tier."[303]  Yet, *Greystone III* does not hold that claims may be separately classified ***only if*** they receive different treatment under a plan.  *See id.* 1280–81.  More importantly, Katsumi's argument misses the central concern animating *Greystone III*: evidence of actual vote gerrymandering and disenfranchisement is required, which does not exist here.

253.    That distinction also separates the Plan's classification scheme from the cases cited by Katsumi and the LAM Parties, which, like *Greystone III*, found section 1122 to be violated where the separate classification supplied the impaired accepting class necessary for cramdown.  *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 860–62 (Bankr. S.D. Tex. 2001) (finding that the classification scheme materially served the "proscribed purpose of gerrymandering" and supplied the only non-insider impaired accepting class); *Boston Post Road Ltd. P'ship v. FDIC (In re Boston Post Road Ltd. P'ship)*, 21 F.3d 477, 481–83 (2d Cir. 1994) (holding that similar unsecured claims were separately classified "solely to create an impaired assenting class"); *Travelers Ins. Co. v. Bryson Props., XVIII (In re Bryson Props., XVIII)*, 961 F.2d 496, 501–02 (4th Cir. 1992) (concluding that the classification was "clearly for the purpose of manipulating voting").  Here, separately classifying the Impaired Accepting Classes from the General Unsecured Claims could not have served the impermissible purpose of manufacturing an impaired accepting class because, even if those Claims were combined, the resulting class would still accept the Plan.  In fact, if the FBG Debtors classified the Impaired Accepting Classes with Class 7 (General Unsecured Claims) as these objectors suggest, the result would be acceptance by

---

[303]   Katsumi Obj. ¶ 52.

an impaired class as every single FBG Debtor plan proponent. *See* Orchowski Declaration, Exhibit A. These circumstances are a far cry from the deliberate, and outcome-determinative, gerrymandering found in cases holding that section 1122 was violated.

254. Accordingly, the LAM Parties and Katsumi's improper classification objections should be overruled.

## RESERVATION OF RIGHTS

255. The FBG Debtors reserve all of their rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this reply, to seek discovery, or to introduce evidence and to raise additional arguments at any hearing to consider confirmation of the Plan.

## CONCLUSION

256. The Disclosure Statement satisfies all of the applicable requirements of the Bankruptcy Code and the Bankruptcy Rules and should be approved. In addition, the Plan satisfies all of the applicable requirements of section 1129 of the Bankruptcy Code and should be confirmed. The FBG Debtors respectfully request that the Court approve the Disclosure Statement on a final basis, confirm the Plan, overrule the outstanding objections, and grant such other and further relief as is just and appropriate.

Dated:  July 27, 2026
        Houston, Texas

    */s/  Clifford W. Carlson*

**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   gabriel.morgan@weil.com
     clifford.carlson@weil.com


-and-

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted pro hac vice)
Sunny Singh (admitted pro hac vice)
Andriana Georgallas (admitted pro hac vice)
Kevin Bostel (admitted pro hac vice)
Jason H. George (admitted pro hac vice)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email:   matt.barr@weil.com
       sunny.singh@weil.com
       andriana.georgallas@weil.com
       kevin.bostel@weil.com
       jason.george@weil.com


*Attorneys for Debtors*
*and Debtors in Possession*

**Certificate of Service**

I hereby certify that on July 27, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


_/s/  Clifford W. Carlson_
Clifford W. Carlson