**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FIRST BRANDS GROUP, LLC, *et al.*, | § | Case No. 25-90399 (CML) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |

**ORDER (A) AUTHORIZING AND APPROVING SALE TRANSACTION FOR
CERTAIN OF DEBTORS' EQUITY INTERESTS AND RELATED ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND
(B) GRANTING RELATED RELIEF**

Upon the Motion[2] of First Brands Group, LLC and its affiliated debtors in the

above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the

"**Debtors**"), seeking entry of an order (this "**Sale Order**") pursuant to sections 105 and 363 of the

Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9008, and section N of the Procedures

for Complex Cases in the Southern District of Texas (the "**Complex Case Procedures**") (i)

authorizing and approving the entry into and performance under the terms and conditions of that

certain *Purchase Agreement*, dated as of July 15, 2026 (together with all other agreements,

documents, and instruments, deliverable thereunder or attached thereto or referenced therein, and

as may be amended, supplemented, or otherwise modified from time to time in accordance with

the terms thereof, the "**Purchase Agreement**", a true and correct copy of which is attached hereto

as **Exhibit 1**), by and among First Brands Group Holdings, LLC, Carter Carburetor Holdings,

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] As used herein, "**Motion**" means the *Emergency Motion for Order (A) Approving Sale Transaction for Certain of the Debtors' Equity Interests and Related Assets, and (B) Granting Related Relief* (Docket No. [●]). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

305565989v6_404528-00001

LLC, and WEM US Co. (collectively, the "**Sellers**") and Husqvarna Business Support AB (the "**Buyer**"), (ii) authorizing and approving the sale of the Transferred Interests (as defined in the Purchase Agreement) pursuant to the Purchase Agreement (such sale, the "**Sale Transaction**"), free and clear of all liens, claims, encumbrances and interests (collectively, the "**Claims and Interests**" or "**Claims or Interests**", as applicable), except for liabilities expressly assumed by the Buyer or included as permitted encumbrances pursuant to the Purchase Agreement, and (iii) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction and authority to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing to consider the relief requested in the Motion (the "**Sale Hearing**"); and upon the Haughey Declaration,[3] the Walker Declaration,[4] the First Day Declaration,[5] any other declaration filed in support of the Sale Transaction and the record of the Sale Hearing; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Motion

---

[3]   The "**Haughey Declaration**" means the *Declaration of Nicholas Haughey in Support of Emergency Motion for Order (A) Approving Sale Transaction for Certain of the Debtors' Equity Interests and Related Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, and (b) Granting Related Relief* (Docket No. [●]).

[4]   The "**Walker Declaration**" means the *Declaration of Nate Walker in Support of Emergency Motion for Order (A) Approving Sale Transaction for Certain of the Debtors' Equity Interests and Related Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, and (b) Granting Related Relief* (Docket No. [●]).

[5]   The "**First Day Declaration**" means the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* (Docket No. 22).

2

establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY IS FOUND AND DETERMINED THAT:[6]**

A.      **Findings and Conclusions**. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. The Court's findings shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Sale Hearing. This Sale Order shall constitute the Court's findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

B.      **Jurisdiction and Venue**. This Court has jurisdiction over the Motion, the Sale Transaction, and over the property of the Debtors and their respective bankruptcy estates, including the Transferred Interests, pursuant to 28 U.S.C. § 1334(b). The Court has authority to hear and determine the Motion, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and other legal predicates for the relief sought in the Motion and granted herein are sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9008.

---

[6]   All findings of fact and conclusions of law announced by the Court at the Sale Hearing are hereby incorporated herein to the extent not inconsistent herewith.

305565989v6_404528-00001

C.      **Final Order**. This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rule 6004(h), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and, sufficient cause having been shown, waives any such stay, and expressly directs entry of judgment as set forth herein. The provisions of Bankruptcy Rules 6004(h) and 6006(d) are hereby waived, and this Sale Order shall be effective and enforceable immediately upon entry. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Purchase Agreement and the other Transaction Agreements (as defined in the Purchase Agreement). In the absence of a stay pending appeal, the Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale contemplated by the Purchase Agreement at any time after entry of this Sale Order, subject to the provisions of the Purchase Agreement, and shall not be subject to any applicable stay, including any stay provided by Bankruptcy Rule 6004(h) or 6006(d).

D.      **Notice and Opportunity to Object**. As evidenced by the affidavits of service on file with the Court, pursuant to the notice of the Sale Hearing (the "**Notice of Sale Hearing**"), substantially in the form attached to the Motion as **Exhibit B**, due, proper, timely, adequate, and sufficient notice and a reasonable opportunity to object or be heard with respect to the Motion, the Sale Hearing, the Sale Transaction, the Purchase Agreement, and this Sale Order has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules to all known interested parties, including to (i) the Office of the United States Trustee for the Southern District of Texas, (ii) the holders of the 30 largest unsecured claims against the Debtors

4

on a consolidated basis, (iii) the Internal Revenue Service, (iv) the United States Attorney's Office for the Southern District of Texas, (v) Gibson, Dunn & Crutcher LLP, as counsel to the Ad Hoc Group (as defined in the DIP Order[7]), (vi) Brown Rudnick LLP, as counsel to the Creditors' Committee, (vii) Norton Rose Fulbright US LLP and Winston & Strawn, LLP, each as counsel to Bank of America, N.A., (viii) Morrison & Foerster LLP and Milbank LLP, as co-counsel to Onset and Silver Point Capital, L.P. (Onset, Silver Point Capital, L.P., and any Silver Point Managed Funds[8] collectively, the "**Onset Parties**"), (ix) Herbert Smith Freehills Kramer LLP, as counsel to Jefferies Finance LLC, (x) ArentFox Schiff LLP, as counsel to Wilmington Savings Fund Society, FSB, (xi) all persons that have, to the best of the Debtors' management and advisors' knowledge, expressed written interest in consummating a Sale Transaction with respect to the Transferred Interests in whole or in part during the past 12 months, (xii) all entities known by the Debtors to have asserted any Claims or Interests (for whom identifying information and addresses are available to the Debtors), (xiii) counsel to the Buyer, and (xiv) any party that has requested notice pursuant to Bankruptcy Rule 2002. *See Certificate[s] of Service* (Docket No[s]. [●]). In addition to the Sale Notice Parties, the Debtors served the Notice of Sale Hearing upon all federal, state, and local regulatory or taxing authorities or recording offices reasonably known to have an interest in the relief granted herein (the "**Regulatory Authorities**"). *Id*. In connection with the Bidding Procedures Motion, the Debtors also served the Initial Notice upon the Sale Notice Parties and the Regulatory Authorities on January 13, 2026 and caused the Initial Notice to be published in the national edition of *The New York Times* on January 26, 2026. *See Affidavit of Service* (Docket Nos.

---

[7]   The "**DIP Order**" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 608).

[8]   "**Silver Point Managed Funds**" means each affiliate of Silver Point Capital, L.P. and each fund or account for which Silver Point Capital, L.P. or its affiliates serves as investment advisor, sub-advisor, or manager.

305565989v6_404528-00001

1781); *Certificate of Publication* (Docket No. 1645). The Debtors have shown cause for the Court to shorten the time for notice of proposal to sell property of the estate in accordance with Bankruptcy Rule 2002(a)(2). Accordingly, except as otherwise set forth herein, no other or further notice of the foregoing is necessary or required. The disclosures made by the Debtors concerning the Motion, the Notice of Sale Hearing, the Sale Hearing, the Sale Transaction, the Purchase Agreement, and this Sale Order, were complete and adequate.

E.    **Marketing Process**. As demonstrated by the Motion, the Haughey Declaration, the Walker Declaration, and the evidence at the Sale Hearing, the Debtors and their advisors engaged in a robust marketing and sale process for the Transferred Interests (the "**Sale Process**"). The Sale Process (i) was an open and substantively and procedurally fair process to all parties in interest, (ii) was non-collusive, duly noticed, and provided a fair and reasonable opportunity for any entity to make an offer to purchase the Transferred Interests, and (iii) obtained the highest or otherwise best value for the Transferred Interests for the Debtors and their estates, and there was no other transaction available or presented that would have yielded a higher economic or otherwise better result for the Transferred Interests. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective bidders have been afforded a reasonable and fair opportunity to bid for the Transferred Interests or file an objection to the Sale Transaction. The Sale Process was adequate and appropriate under the circumstances and reasonably calculated to maximize the value of the Transferred Interests for the benefit of the Debtors' stakeholders.

F.    **Corporate Authority**. The Debtors (i) have full corporate or other organizational power and authority to execute and deliver the Purchase Agreement and all other documents contemplated thereby, (ii) have all necessary power and authority to consummate the Sale Transaction, and (iii) have taken all necessary action to authorize and approve the Purchase

305565989v6_404528-00001

Agreement and to consummate the Sale Transaction. No consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Debtors to consummate the Sale Transaction.

G. **Business Justification**. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of and entry into the Purchase Agreement and the other agreements, documents, and instruments deliverable thereunder, pursuant to section 363(b) of the Bankruptcy Code.

H. **Highest or Otherwise Best Offer**. The Debtors determined, in a valid and sound exercise of their business judgment and after a robust marketing process, that the transactions contemplated by the Purchase Agreement represent the highest or otherwise best bid for the Transferred Interests. The Debtors afforded a fair and reasonable opportunity for any entity or person to make a higher or otherwise better offer for the Transferred Interests. The consideration to be provided by the Buyer pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Transferred Interests, and (iii) constitutes reasonably equivalent value and fair consideration for the Transferred Interests. No other person, entity, or group of entities has offered to purchase the Transferred Interests for greater economic value or on better terms to the Debtors than the Buyer has. The Debtors' determination that the Purchase Agreement constitutes the highest or otherwise best offer for the Transferred Interests was a valid, sound, and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties. In light of the Sale Process and discussions with potential bidders in connection therewith, it is unlikely that a further marketing or auction process would yield a higher or better offer for the Transferred Interests. The terms and conditions set forth in the Purchase Agreement are fair and reasonable under the circumstances. The Purchase Agreement was not entered into by the Buyer

7

305565989v6_404528-00001

or the Debtors for the purpose of, nor does it have the effect of, hindering, delaying, or defrauding any creditor of the Debtors under any applicable federal, state, or other laws.

I.      **Good Faith Purchaser**. The Purchase Agreement and the Sale Transaction were proposed, negotiated, and entered into by and among the Debtors and the Buyer without collusion or fraud, in good faith, and at arm's length. The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and otherwise has proceeded in good faith in all respects in connection with this proceeding, and is therefore entitled to the full protection of section 363(m) of the Bankruptcy Code with respect to the terms of the Purchase Agreement, the Transaction Agreements, the Closing (as defined in the Purchase Agreement), the Sale Transaction, and this Sale Order. The protections afforded by section 363(m) of the Bankruptcy Code are integral to the Sale Transaction and the Buyer would not consummate the Sale Transaction without such protections. The Buyer is entitled to all of the protections afforded to a good faith purchaser under section 363(m) of the Bankruptcy Code as a matter of law, and any reversal or modification on appeal of this Sale Order or the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the sale of the Transferred Interests to the Buyer, unless such authorization and such sale were duly stayed pending such appeal. For the avoidance of doubt, the good faith of the Buyer has been established by competent evidence presented at the Sale Hearing. There has been no showing that the Debtors or the Buyer, nor any of their respective affiliates, officers, directors, managers, members, partners, principals, or shareholders (or equivalent) or any of their respective advisors, representatives, attorneys, successors, or assigns have engaged in any action or inaction that would cause or permit the Purchase Agreement or the Sale Transaction to be avoided or any costs or damages to be imposed under section 363(n) of the Bankruptcy Code. Buyer has not violated or implicated section 363(n) of the Bankruptcy Code by any action or

inaction. Neither the Buyer, nor any of its affiliates, members, partners, officers, directors, managers, principals, or shareholders is an "insider" of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code. No common identity of directors, managers, controlling shareholders, or members exists between the Debtors and the Buyer.

J.      **Validity of the Transfer**. As of the Closing Date (as defined in the Purchase Agreement), the transfer of the Transferred Interests to the Buyer will be a legal, valid, and effective transfer of such Transferred Interests, and will vest Buyer with all right, title, and interest of the Debtors in and to the Transferred Interests, free and clear of all Claims and Interests. For the avoidance of doubt, and notwithstanding anything in the Purchase Agreement to the contrary, the transfer of the Transferred Interests does not include, and the Buyer shall not be deemed to acquire, any right, title or interest to assets or property (including any intellectual property) which have been previously assigned, sold or disposed of (including, without limitation, pursuant to any of the Prior Sale Agreements (as defined in the Purchase Agreement)) or in which the Debtors do not have any right, title, or interest. The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), and 363(f), and all of the applicable requirements of such sections have been satisfied in respect of the Sale Transaction.

K.      **Legal, Valid, and Binding Transfer**. The Purchase Agreement is a valid and binding contract between the Debtors and the Buyer and shall be enforceable pursuant to its terms. The Purchase Agreement, this Sale Order, the Sale Transaction, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed in these chapter 11 cases and shall not be subject to rejection or avoidance by the foregoing parties or any other person.

9

L.     The Purchase Agreement and this Sale Order shall be enforceable against any bankruptcy trustee, liquidating trustee, or other estate representative appointed in these chapter 11 cases or any successor case, and against any debtor in any successor chapter 7 case. The Sale Transaction and the protections afforded to the Buyer under this Sale Order shall not be affected by any conversion of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, the dismissal of these chapter 11 cases, or the appointment of any subsequent trustee or fiduciary.

M.     **Free and Clear**. The Buyer would not have entered into the Purchase Agreement and would not consummate the Sale Transaction if the transfer of the Transferred Interests to the Buyer was not free and clear of all Claims and Interests (other than those expressly assumed by the Buyer or permitted to survive under the Purchase Agreement) as provided for herein, including, for the avoidance of doubt, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, or if the Buyer would, or in the future could, be liable for any such Claims and Interests. The Debtors may sell the Transferred Interests free and clear of any and all interests, including all Claims and Interests against the Debtors, their bankruptcy estates, or any of the Transferred Interests (other than those expressly assumed by the Buyer or permitted to survive under the Purchase Agreement), because, in each case, one or more of the standards set forth in sections 363(f)(1) through (f)(5) of the Bankruptcy Code have been satisfied. As to any party asserting a Claim or Interest in or to any of the Transferred Interests, if the requirements of section 363(f)(1) of the Bankruptcy Code have not been satisfied with respect to that party, then one or more of the requirements set forth in sections 363(f)(2), (3), (4), or (5) have been satisfied. The Claims or Interests that are attached to the Transferred Interests to be transferred on the Closing Date: (i) are subject to release or discharge under applicable non-bankruptcy law, (ii) are held by an entity that has consented to the Sale Transaction or is deemed to have consented, (iii) are held by an entity that could be compelled

305565989v6_404528-00001

in a legal or equitable proceeding to accept money satisfaction of such Claims or Interests, (iv) constitutes Claims or Interests against some or all of the Transferred Interests and the price at which such property is to be sold under the Purchase Agreement is greater than the aggregate value of all Claims and Interests on such property, (v) is the subject of a bona fide dispute, or (vi) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code. Those holders of Claims and Interests against the Debtors, their bankruptcy estates, or any of the Transferred Interests (other than those expressly assumed by the Buyer or permitted to survive under the Purchase Agreement) that did not object, or who withdrew their objections, to the Motion or the Sale Transaction are deemed to have consented to the Sale Transaction and the relief provided for herein pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims and Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code. Except to the extent expressly set forth in the Purchase Agreement, this Sale Order is and shall be effective on the Closing Date as a determination that all Claims and Interests of any kind or nature whatsoever existing as to the Transferred Interests prior to the Closing Date have been unconditionally released, discharged, and terminated, in each case to the fullest extent permitted by law, and that the conveyances described herein have been effected; provided that such Claims and Interests of the DIP Secured Parties (as defined in the DIP Order) shall attach to the proceeds of the Sale Transaction in the order of their priority, with the same validity, force, perfection, and effect which they now have against the Transferred Interests. Except to the extent expressly set forth in the Purchase Agreement, the Buyer shall not be responsible for any Claims and Interests, including any derivative, successor, transferee, or vicarious liability as a result of the transactions authorized herein, including liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' businesses prior

11

to the Closing Date or by reason of the transactions contemplated by this Sale Order. Except to the extent expressly set forth in the Purchase Agreement, upon the Closing Date, all persons having Claims or Interests of any kind or nature whatsoever against the Debtors or against the Transferred Interests arising prior to the Closing Date shall be forever barred, estopped, and permanently enjoined from pursuing or asserting such Claims or Interests against the Buyer or any of its respective assets, property, affiliates, successors, assigns, or the Transferred Interests.

N.    **Not a Sub Rosa Plan**. The Purchase Agreement and Sale Transaction do not constitute an impermissible *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The Purchase Agreement and the Sale Transaction neither impermissibly restructure the rights of the Debtors' creditors nor impermissibly dictate a liquidating plan for the Debtors.

O.    **No Successor, Derivative or Similar Liability**. The Buyer (i) is not, and shall not be, considered a successor in interest to the Debtors, (ii) has not, *de facto* or otherwise, merged or consolidated with or into the Debtors, (iii) is not a continuation or substantial continuation of the Debtors or any enterprise of the Debtors, and (iv) is not holding itself out to the public as a continuation of the Debtors. There is no continuity or common identity between the Buyer, any of its affiliates and any of the Debtors. The sale and transfer of the Transferred Interests to the Buyer, and the Buyer's occupation and use of the Transferred Interests, will not subject the Buyer to any liability (including any successor liability) with respect to the operation of any of the Debtors' businesses before Closing or by reason of such transfer. Buyer shall have no obligations with respect to any liabilities of the Debtors or the Debtors' estates arising out of or related to the Transferred Interests, except as expressly provided in the Purchase Agreement. The Sale Transaction contemplated under the Purchase Agreement does not amount to a consolidation,

merger or *de facto* merger of the Buyer and the Debtors and/or the Debtors' estates. The Buyer would not have acquired the Transferred Interests if it were liable for claims based upon "successor liability" theories. For the avoidance of doubt, successor liability claims, including those arising under any federal, state, or local law or legal theory (including but not limited to ERISA, CERCLA, environmental laws, tax laws, labor and employment laws, products liability, pension and multiemployer withdrawal liability, and any other successor, transferee, or vicarious liability claims) constitute "interests" in the Transferred Interests within the meaning of section 363(f) of the Bankruptcy Code and are extinguished by the free and clear sale to the Buyer.

P.      **No Fraudulent Transfer**. The total consideration provided by the Buyer pursuant to the Purchase Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable law, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law. The Purchase Agreement was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Buyer has entered into the Purchase Agreement or is consummating the Sale Transaction with any fraudulent or otherwise improper purpose.

Q.      **Prompt Consummation**. The Sale Transaction must be approved and consummated promptly in order to maximize value for the Debtors' estates. Time is of the essence in consummating the Sale Transaction. The Debtors have demonstrated compelling circumstances and good and sufficient cause for the immediate approval and consummation of the transactions contemplated by the Purchase Agreement. Accordingly, there is sufficient cause to waive the stay

305565989v6_404528-00001

contemplated by Bankruptcy Rule 6004(h) with regard to the transactions contemplated by this Sale Order.

R.      **Legal and Factual Bases**. The legal and factual bases set forth in the Motion and herein establish just cause for the relief granted herein.

S.      **Necessity of Sale Order**. The Buyer would not consummate the transactions without all of the relief provided for in this Sale Order.

**THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      Any objections, responses or reservations of rights filed or asserted in regards to the Sale Transaction and the relief granted herein, to the extent not resolved as set forth herein, settled, or waived as announced to the Court on the record at the Sale Hearing, are hereby overruled on the merits in their entirety.

**Approval of the Purchase Agreement and the Transaction Agreements**

3.      The Purchase Agreement with the Buyer, including all of its terms and conditions, all ancillary documents and all transactions contemplated therein, including the Transaction Agreements, are hereby approved in all respects.

4.      Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors and their respective officers, employees, and agents are authorized and empowered to (i) execute, deliver, perform under, consummate, and implement the Purchase Agreement and the Sale Transaction together with all additional documents contemplated thereby and as may be reasonably necessary or desirable to implement the Purchase Agreement and the Sale Transaction, (ii) take any and all actions as they deem necessary, appropriate, or advisable for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer or reducing to possession

14

305565989v6_404528-00001

the Transferred Interests, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement and the Sale Transaction, including any and all actions reasonably requested by the Buyer that are consistent with the Purchase Agreement and the Sale Transaction, and (iii) pay, without further order of this Court, whether before, at, or after the Closing Date, any expenses or costs that are required or reasonably contemplated to be paid by the Debtors to consummate the transactions contemplated by the Purchase Agreement or perform their obligations under the Purchase Agreement, as agreed pursuant to the terms of the DIP Order.

**Transfer of the Transferred Interests Free and Clear**

5.    Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing (as defined in the Purchase Agreement) of the Sale Transaction: (i) the transfer of the Transferred Interests to the Buyer pursuant to the Purchase Agreement shall constitute a legal, valid, and effective transfer of the Transferred Interests and shall vest the Buyer with all right, title, and interest in and to the Transferred Interests (provided that, for the avoidance of doubt, and notwithstanding anything in the Purchase Agreement to the contrary, the transfer of the Transferred Interests does not include, and the Buyer shall not be deemed to acquire, any right, title or interest to assets or property (including any intellectual property) which have been previously assigned, sold or disposed of (including, without limitation, pursuant to any of the Prior Sale Agreements) or in which the Debtors do not have any right, title, or interest); and (ii) the Transferred Interests shall be transferred to the Buyer free and clear of any and all interests, including all Claims and Interests, other than those expressly assumed by the Buyer or permitted to survive under the Purchase Agreement, with any such Claims and Interests of which the Transferred Interests are sold free and clear, and with the Claims and Interests of the DIP Secured

305565989v6_404528-00001

Parties to attach to the proceeds of the Sale Transaction, in the order of their priority, with the same validity, force, extent, perfection, and effect they had against the Transferred Interests prior to the entry of this Sale Order, subject to any rights, claims, and defenses the Debtors and their estates may possess with respect thereto; and all persons are forever prohibited and enjoined from commencing or continuing, in any manner, any action or other proceeding, whether in law or equity, against the Buyer with respect to any such Claims and Interests. Accordingly, except as expressly provided herein or in the Purchase Agreement, the Buyer shall not have any liability as a result of the transactions authorized herein, including liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' businesses prior to the Closing Date or by reason of the transactions contemplated by this Sale Order.

6.     On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a legal, valid, binding, and effective, full and complete general assignment, conveyance, and transfer of the Debtors' interests in the Transferred Interests or a bill of sale transferring good and marketable title in the Transferred Interests. For the avoidance of doubt, other than the Transferred Interests and any Liabilities expressly assumed pursuant to the Purchase Agreement, no other Transferred Interests or Liabilities shall be transferred to or be assumed by Buyer.

7.     This Sale Order is and shall be effective as a determination that all Claims and Interests (other than those expressly assumed by the Buyer or permitted to survive under the Purchase Agreement), attributable to any period ending on or before the Closing Date, shall be and are, without further action by any person or entity, unconditionally released, discharged, and terminated to the fullest extent permitted by the Bankruptcy Code with respect to the Transferred

305565989v6_404528-00001

Interests as of the Closing Date, except as may otherwise be set forth in the Purchase Agreement or this Sale Order. The provisions of this Sale Order authorizing the sale and assignment of the Transferred Interests free and clear of all Claims and Interests shall be self-executing, and notwithstanding the failure of the Debtors, the Buyer, or any other party to execute, file, or obtain releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and/or implement the provisions hereof, all Claims and Interests (other than those expressly assumed by the Buyer or permitted to survive under the Purchase Agreement) on or against such Transferred Interests, if any, shall be deemed released, discharged, and terminated.

8.     All persons (and their respective successors and assigns) including all debt security holders, equity security holders, governmental tax and regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants, trade creditors, pension plans, multiemployer pension plans, union benefit funds, and any other creditors or parties in interest who may or do hold Claims or Interests against the Debtors, the Transferred Interests, and/or the Debtors' businesses (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated, or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity, or otherwise), are hereby forever barred, estopped, and permanently enjoined from asserting or pursuing such Claims or Interests against the Buyer, its affiliates, successors, assigns, their property or the Transferred Interests, including taking any of the following actions with respect to any such Claims or Interests: (i) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against the Buyer, its affiliates, successors, or assigns, or their assets (including the Transferred Interests) or properties, (ii) enforcing, attaching, collecting, or

305565989v6_404528-00001

recovering in any manner any judgment, award, decree, or order against the Buyer, its affiliates, successors or assigns, or their assets (including the Transferred Interests) or properties, (iii) creating, perfecting, or enforcing any claim against the Buyer, its affiliates, successors or assigns, or their assets (including the Transferred Interests) or properties, (iv) asserting a claim as a setoff, recoupment, or right of subrogation against any obligation due to the Buyer, its affiliates, or their successors or assigns, (v) exercising any rights or remedies against any Debtor or the Buyer based on an asserted default that occurred on, prior to, or as a result of Closing, or (vi) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order or the agreements or actions contemplated or taken in respect thereof. Following the Closing Date, no holder of any Claims or Interests shall interfere with the Buyer's title to or use and enjoyment of the Transferred Interests based on or related to any such Claims or Interests or based on any action the Debtors may take in these chapter 11 cases.

9.      Except as otherwise provided herein or in the Purchase Agreement, on the Closing Date, the Debtors and the Debtors' creditors are authorized to execute such documents and instruments and to take all other actions as may be reasonably necessary to document and effectuate the release of their Claims and Interests in the Transferred Interests (other than those expressly assumed by the Buyer or permitted to survive under the Purchase Agreement), if any, as such Claims and Interests, may have been recorded or may otherwise exist. If any such creditor fails to execute any such documents or instruments or take any such actions, the Buyer is authorized to execute such documents and instruments and to take such actions on behalf of the creditor so as to document the release of such Claims and Interests.

10.      To the maximum extent permitted under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and

305565989v6_404528-00001

governmental authorization or approval of the Debtors (to the extent of the Debtors' right, title, and interest therein) with respect to the Transferred Interests, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer with respect to the Transferred Interests as of the Closing Date.

11.     No governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any representative thereof may deny, revoke, suspend or refuse to renew any right, license, copyright, patent, trademark, or other permission or similar grant relating to the operation of the Transferred Interests on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction to the extent that any such action by a governmental unit or any representative thereof would violate section 525 of the Bankruptcy Code.

12.     All governmental units (as defined in section 101(27) of the Bankruptcy Code), including all federal, state, and local authorities, agencies, and instrumentalities, are bound by this Sale Order and the free and clear provisions hereof, and are hereby permanently enjoined from taking any action against the Buyer, its affiliates, successors, or assigns, or the Transferred Interests, based on or relating to any Claims or Interests of the Debtors or their estates arising prior to the Closing Date.

## No Successor, Derivative, or Similar Liability

13.     The Buyer its affiliates and their successors and assigns shall not be deemed, as a result of any action taken in connection with the transfer of the Transferred Interests, to (i) be a successor (including a successor employer) to the Debtors or their estates, (ii) have, *de facto* or otherwise, merged or consolidated with or into the Debtors or their estates, or (iii) be an alter ego or mere continuation or substantial continuation of the Debtors or any enterprise of the Debtors,

305565989v6_404528-00001

and the Buyer shall have no liability, whether successor, transferee, derivative, vicarious, or assignee liability of any kind or character, including, but not limited to, under any theory of foreign, federal, state, or local antitrust, environmental, successor, tax, ERISA, assignee, or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, or regulation, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the sale or marketing of product or material produced in operation of the Transferred Interests or the operation of the Transferred Interests prior to the Closing Date or any other obligations or liabilities of the Debtors arising prior to the Closing Date. Without limiting the foregoing, the Buyer shall have no liability for any claims, liabilities, or obligations arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, including any withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), any environmental laws, the Worker Adjustment and Retraining Notification Act ("WARN Act"), or any similar federal, state, or local labor, employment, environmental, or pension laws. Except as otherwise provided herein or in the Purchase Agreement, the transfer of the Transferred Interests to the Buyer pursuant to the Purchase Agreement shall not result in the Buyer, its affiliates or their successors or assigns, or the Transferred Interests, having any liability or responsibility for, or being required to satisfy in any manner, whether in law or in equity, whether by payment, setoff, recoupment, right of subrogation, or otherwise, directly or indirectly, any Claims and Interests against the Debtors or against any insider of the Debtors, including any derivative, successor, transferee, or vicarious liability as a result of the transactions authorized

20

305565989v6_404528-00001

herein, including liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of Debtors' businesses prior to the Closing Date or by reason of the transactions contemplated by this Sale Order.

14. The Buyer, its affiliates, successors, and assigns are and shall remain protected from any action by any person or entity seeking to recover any claim against or from the Buyer based on any assertion that the Buyer is a successor to the Debtors or their estates, or otherwise has successor, transferee, derivative, or vicarious liability for claims against or liabilities of the Debtors or their estates, including any claims, liabilities, or obligations of the Debtors that arose or relate to any period prior to the Closing Date, whether such claims, liabilities, or obligations are known or unknown, contingent or liquidated, and regardless of when such claims, liabilities, or obligations arise or are asserted.

### Good Faith; Arm's-Length Sale

15. The consideration provided by the Buyer under the Purchase Agreement constitutes reasonably equivalent value, fair consideration and fair value for the Transferred Interests under the Purchase Agreement and may not be avoided under any fraudulent conveyance or similar law or theory, or section 363(n) of the Bankruptcy Code. None of the Debtors, the Buyer, or any of their respective affiliates, officers, directors, managers, members, partners, principals, or shareholders (or equivalent) or any of their respective advisors, representatives, attorneys, successors, or assigns have engaged in any conduct that would cause or permit the Purchase Agreement or the consummation of the transactions contemplated therein to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

16. The Purchase Agreement and the Sale Transaction are undertaken by the Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy

Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Purchase Agreement and the Sale Transaction shall not affect the validity of the sale of the Transferred Interests to the Buyer, unless this Sale Order is duly stayed pending such appeal. The Buyer is a good faith Buyer of the Transferred Interests and is entitled to, and hereby granted, all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

17.     The Court finds that the Buyer has acted in good faith and without collusion in all respects in connection with this proceeding and the Sale Transaction. The good faith finding set forth herein is made following the submission of competent evidence at the Sale Hearing demonstrating, among other things, that (i) the Purchase Agreement was negotiated at arm's length between the Buyer and the Debtors, (ii) the Buyer is not an "insider" of any of the Debtors as defined in section 101(31) of the Bankruptcy Code, (iii) the Buyer had no prior relationship with the Debtors, and (iv) there has been no collusion between the Buyer and any other bidder or party in interest. The Buyer's good faith entitles it to the full protections of section 363(m) of the Bankruptcy Code.

## Notice of Sale Transaction

18.     The Notice of Sale Hearing is approved, and no other or further notice of the Sale Hearing, the Sale Objection Deadline, or the Sale Transaction shall be required. The Notice of Sale Hearing contains the type of information required under Bankruptcy Rule 2002 and complies in all respects with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Local Rules.

305565989v6_404528-00001

**United States**

19.     Notwithstanding any provision to the contrary in this Sale Order, the Purchase Agreement, or any other document related to the Sale Transaction, nothing shall:

i.     release, nullify, preclude or enjoin the enforcement of any police or regulatory power of, or any liability owed to, the United States that any entity would be subject to as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the date of entry of this Sale Order;

ii.     affect the setoff or recoupment rights of the United States;

iii.     confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code);

iv.     authorize the assumption, assignment, sale or other transfer of any federal (a) grants, (b) grant funds, (c) contracts, (d) agreements, (e) awards, (f) task orders, (g) property, (h) intellectual property, (i) patents, (j) leases, (k) certifications, (l) applications, (m) registrations, (n) billing numbers, (o) national provider identifiers, (p) provider transaction access numbers, (q) licenses, (r) permits, (s) covenants, (t) inventory, (u) guarantees, (v) indemnifications, (w) data, (x) records, or (y) any other interests belonging to the United States (collectively, "**Federal Interests**") (and excluding, for the avoidance of doubt, the Transferred Interests) without compliance by the Debtors and the Buyer with all terms of the Federal Interests and with all applicable non-bankruptcy law;

v.     be interpreted to set cure amounts or to require the United States to novate, approve or otherwise consent to the sale, assumption, assignment or other transfer of any Federal Interests;

vi.     waive, alter or otherwise limit the United States' property rights except for Claims and Interests related to the Transferred Interests; or

vii.     expand the scope of 11 U.S.C.§ 525.

20.     In the event of an inconsistency or conflict between any provision of the Purchase Agreement and any provision of this Sale Order, as to the United States, the provisions of this Sale Order and federal law shall govern.

**Related Relief**

21.     All persons and entities that are in possession of some or all of the Transferred Interests as of or after the Closing Date are hereby directed to surrender possession of

305565989v6_404528-00001

such Transferred Interests to the Buyer as of the Closing Date or at such time thereafter as the Buyer may request. All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Transferred Interests to the Buyer or to adversely affect or interfere with the Buyer's title to, possession, use, and enjoyment of the Transferred Interests following the Closing Date. The Debtors agree to exercise commercially reasonable efforts to assist the Buyer in assuring that all persons and entities that are presently, or on the Closing Date may be, in possession of some or all of the Transferred Interests in which the Debtors hold an interest will surrender possession of the Transferred Interests either to (i) the Debtors before the Closing Date or (ii) the Buyer on or after the Closing Date.

22.     This Sale Order is and shall be binding upon and shall authorize and govern the acts of all entities including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of fees, registrars of deeds, registrar of patents, trademarks, or other intellectual property administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Buyer is the assignee and owner of the Transferred Interests free and clear of all Claims and Interests (other than those expressly assumed by the Buyer or permitted to survive under the Purchase Agreement) (all such entities, collectively, the "**Recording Officers**"). All Recording Officers are authorized to strike recorded Claims and Interests against the Transferred Interests recorded prior to the date of this Sale Order unless the Purchase Agreement expressly provides that the Buyer is acquiring the Transferred Interests subject to such Claims or Interests. A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any Claims or Interests of

24

305565989v6_404528-00001

record, and this Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department, or office. If any person or entity which has filed statements or other documents or agreements evidencing Claims and Interests in, all or any portion of the Transferred Interests shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens, and any other documents necessary for the purpose of documenting the release of all Claims or Interests which the person or entity has or may assert with respect to all or any portion of the Transferred Interests, the Debtors are hereby authorized, and the Buyer is hereby authorized, on behalf of the Debtors and each of the Debtors' creditors, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Transferred Interests, or to take such other appropriate action, including seeking relief in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction and releases of all such Claims and Interests with respect to the Transferred Interests. For the avoidance of doubt, upon consummation of the Sale Transaction, the Buyer is authorized to file termination statements, lien terminations, or other amendments in any required jurisdiction to remove and record, notice filings or financing statements recorded to attach, perfect, or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code and the related provisions of the Bankruptcy Code.

23.     Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other person and entity who may be required by operation of law, the duties of its office or contract, to accept,

25

305565989v6_404528-00001

file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Transferred Interests, is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction contemplated by the Purchase Agreement and approved by this Sale Order.

24.     Upon the Closing Date and notwithstanding anything to the contrary in the DIP Order, the Buyer shall deposit (a) the Debtor Closing Proceeds (as defined in the Purchase Agreement) into the DIP Escrow Account (as defined in the Purchase Agreement) (for distribution to the DIP Secured Parties) and (b) the remaining portion of the Base Purchase Price into the Professional Fee Escrow Account. The DIP Agent shall thereafter distribute the Debtor Closing Proceeds to the DIP Secured Parties.

25.     Proceeds from the Sale Transaction paid to the DIP Secured Parties shall reduce the outstanding DIP Obligations (as defined in the DIP Order) (including any DIP Fees and Expenses (as defined in the DIP Order)).

26.     Following the Closing Date, no holder of any Claims or Interests with respect to the Transferred Interests (other than those expressly assumed by the Buyer or permitted to survive under the Purchase Agreement) or other party in interest may interfere with the Buyer's or its affiliates', or their successors' or assigns', use and enjoyment of the Transferred Interests based on or related to such liens, claims, encumbrances, or other interests, or any actions that the Debtors may take in these chapter 11 cases, and no party may take any action to prevent, interfere with, or otherwise enjoin consummation of the Sale Transaction.

27.     The Debtors are directed to cooperate with the Buyer and provide such assistance as may be reasonably requested by the Buyer in connection with the consummation of the Sale Transaction and the transfer of the Transferred Interests, including executing any

305565989v6_404528-00001

documents, instruments, or agreements that may be necessary or appropriate to effectuate the transfer of the Transferred Interests to the Buyer free and clear of all Claims and Interests (other than those expressly assumed by the Buyer or permitted to survive under the Purchase Agreement), in each case subject to the terms and conditions of the Purchase Agreement. Such cooperation obligation shall survive the Closing Date and shall be binding upon any trustee appointed in these chapter 11 cases, any successor to the Debtors, or any liquidating trust or other successor entity, in each case subject to the terms and conditions of the Purchase Agreement.

28.     No "bulk sales," "bulk transfer," or similar laws (including those relating to taxes) of any state or other jurisdiction shall apply in any way to the transactions authorized herein, including the Purchase Agreement and the Sale Transaction.

29.     This Sale Order shall not be modified by any chapter 11 plan of any of the Debtors confirmed in these chapter 11 cases.

30.     No subsequent order of this Court, including any order dismissing any of the chapter 11 cases, converting any of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, confirming any chapter 11 plan, or approving any settlement or compromise, shall modify, amend, or affect the provisions of this Sale Order, including the findings and protections afforded to the Buyer hereunder, without the prior written consent of the Buyer.

31.     This Sale Order shall be binding in all respects upon, and the terms and provisions of the Purchase Agreement and this Sale Order shall inure to the benefit of the Debtors, their estates, all creditors, all holders of equity interests in the Debtors, the Creditors' Committee, any holders of Claims or Interests against or on all or any portion of the Transferred Interests, all counterparties to any executory contract or unexpired lease of the Debtors, the Buyer and its affiliates, successors, and assigns, and any subsequently appointed estate representative or other

fiduciary in these chapter 11 cases, and shall be binding upon and enforceable against all of the foregoing parties and their respective successors and assigns. The Purchase Agreement, the Sale Transaction, and this Sale Order shall be enforceable against and binding upon, and shall not be subject to rejection or avoidance by, any chapter 7 or chapter 11 trustee appointed in these chapter 11 cases, any liquidating trustee, any plan administrator, or any other fiduciary or successor appointed in these chapter 11 cases or in any successor case. Further, nothing contained in any chapter 11 plan confirmed in these chapter 11 cases or any order confirming any chapter 11 plan or any other order entered in these chapter 11 cases shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Sale Order, and to the extent of any such conflict, the terms of the Purchase Agreement or this Sale Order, as applicable, shall govern.

32.     Without further notice or approval of this Court, the Purchase Agreement and any related agreements, documents, or other instruments contemplated thereby (other than this Sale Order), including the provisions of each of the foregoing, may be waived, modified, amended, supplemented, or consented to by the Debtors and the Buyer in a writing signed by such parties without further order of the Court; provided that any such waiver, modification, amendment, supplement, or consent does not have a material adverse effect on the Debtors or the Debtors' estates. Prior to the Closing Date, the Debtors shall provide at least one business day's advance written notice to the Ad Hoc Group (unless such notice period is waived by the Ad Hoc Group) of all amendments, supplements, modifications, or waivers of the Purchase Agreement and any related agreements, documents or instruments contemplated thereby that materially and adversely affect the Ad Hoc Group. For the avoidance of doubt, all other modifications, amendments, supplements, or consents that have a material adverse effect on the Debtors or the Debtors' estates shall be filed on the docket and parties-in-interest shall have five (5) days to object to any such

305565989v6_404528-00001

amendment and (a) absent any such objection, such waiver, modification, amendment, supplement, or consent shall be binding and (b) any such objection shall be heard by the Court on an expedited basis.

33.     To the extent of any inconsistency between the provisions of this Sale Order, the Purchase Agreement, and the Transaction Agreements, the provisions contained in this Sale Order shall govern. In the event of any inconsistency between the provisions of the Purchase Agreement and the Transaction Agreements, the provisions contained in the Purchase Agreement shall govern.

34.     Other than to the extent expressly modified herein, the DIP Order remains in full force and effect and nothing herein shall be deemed to modify, impair, waive, or otherwise affect any of the rights, remedies, protections, obligations, or priorities of the DIP Lenders, the DIP Agent, or any other party under the DIP Order or the DIP Documents, all of which are expressly preserved.

35.     Neither the Buyer nor the Debtors shall have an obligation to close the Sale Transaction until all conditions precedent in the Purchase Agreement to each of their respective obligations to close the Sale Transaction have been met, satisfied, or waived in accordance with the terms of the Purchase Agreement.

36.     This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding the provisions of Bankruptcy Rule 6004(h) or any other applicable provision of the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, or Complex Case Procedures that may stay the effectiveness of this Sale Order, this Sale Order shall be effective and enforceable immediately and shall not be stayed, and the Seller Parties and the Buyer are authorized to close the Sale Transaction immediately upon entry of this Sale Order.

37.     The Debtors shall not take any action, or refrain from taking any action, that would interfere with or impede the consummation of the Sale Transaction or the transfer of the Transferred Interests to the Buyer. The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to (i) permit the Buyer to take any actions necessary to effectuate the Sale Transaction and, from and after the Closing and (ii) following consummation of the Sale Transaction, preserve the Transferred Interests.

38.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Sale Order.

39.     The failure to specify or include any particular provisions of the Purchase Agreement or the Transaction Agreements in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Purchase Agreement, the Transaction Agreements, and the Sale Transaction be authorized and approved in their entirety.

40.     This Court shall retain exclusive jurisdiction and power to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order, the Sale Transaction, and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder, and each of the agreements executed in connection therewith and the transactions contemplated thereby.

41.     This Court shall retain exclusive jurisdiction to (i) enforce the terms of this Sale Order and the Purchase Agreement, (ii) hear and determine any disputes arising out of or relating to the Sale Transaction, the Purchase Agreement, or this Sale Order, (iii) protect the Buyer and its affiliates, successors, and assigns from any claims or liabilities extinguished by this Sale Order, (iv) enter any orders necessary to enforce the provisions of this Sale Order preventing any interference with the Buyer's title to, or use and enjoyment of, the Transferred Interests, (v)

305565989v6_404528-00001

interpret, implement, and enforce the provisions of this Sale Order regarding the transfer of the Transferred Interests free and clear of all Claims and Interests, (vi) adjudicate any claims or causes of action against any person or entity that takes any action inconsistent with this Sale Order, and (vii) enter such further orders as may be necessary or appropriate to implement and effectuate the provisions of this Sale Order.

Signed: July 27, 2026

_____
Christopher Lopez
United States Bankruptcy Judge

305565989v6_404528-00001

# EXHIBIT 1

Purchase Agreement

305565989v6_404528-00001

**Execution Version**

**PURCHASE AGREEMENT**

**dated as of July 15, 2026**

**by and among**

**First Brands Group Holdings, LLC,**

**WEM US Co.,**

**and Carter Carburetor Holdings, LLC, as Sellers**

**and**

**Husqvarna Business Support AB, as Buyer**

4908-2340-2905
6000857526.1
305547980v15

**HIGHLY CONFIDENTIAL**

**Table of Contents**

**Page**

ARTICLE I DEFINITIONS ................................................................................................. 4

    Section 1.01.    Certain Defined Terms................................................................. 4

ARTICLE II PURCHASE AND SALE; CLOSING................................................................. 14

    Section 2.01.    Purchase and Sale of the Transferred Interests ..................................... 14
    Section 2.02.    Closing ..................................................................................... 15
    Section 2.03.    Certain Closing Deliverables ....................................................... 15

ARTICLE III PURCHASE PRICE ....................................................................................... 16

    Section 3.01.    Purchase Price............................................................................ 16
    Section 3.02.    Withholding ............................................................................... 16

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS ........................... 17

    Section 4.01.    Formation and Qualification....................................................... 17
    Section 4.02.    Capital Structure of the Transferred Entities ............................... 17
    Section 4.03.    Formation and Authority of Sellers; Enforceability ..................... 18
    Section 4.04.    No Other Representations or Warranties ..................................... 18

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ................................ 18

    Section 5.01.    Formation and Authority of Buyer; Enforceability ...................... 18
    Section 5.02.    Absence of Restraints; Compliance with Laws and Actions ................. 19
    Section 5.03.    Brokers ..................................................................................... 19
    Section 5.04.    Investigation.............................................................................. 19
    Section 5.05.    Securities Matters....................................................................... 20
    Section 5.06.    Financial Ability ........................................................................ 20

ARTICLE VI ADDITIONAL AGREEMENTS....................................................................... 20

    Section 6.01.    Conduct Before the Closing....................................................... 20
    Section 6.02.    Access to Information................................................................. 21
    Section 6.03.    Confidentiality .......................................................................... 22
    Section 6.04.    Regulatory Approvals and Notices ............................................. 22
    Section 6.05.    Third Party Consents.................................................................. 23
    Section 6.06.    Intercompany Obligations........................................................... 23
    Section 6.07.    Cooperation............................................................................... 24
    Section 6.08.    Guarantees; Other Obligations................................................... 24
    Section 6.09.    Minority Shareholder Interests ................................................... 24
    Section 6.10.    Prohibited Cash Transaction Exceptions. ................................... 25

ARTICLE VII POST-CLOSING COVENANTS ................................................................... 25

    Section 7.01.    Access ....................................................................................... 25

4908-2340-2905
6000857526.1
305547980v15

Section 7.02.  Preservation of Books and Records ...................................................... 26
Section 7.03.  Further Assurances.............................................................................. 26

ARTICLE VIII BANKRUPTCY PROVISIONS ................................................................ 27

Section 8.01.  Bankruptcy Court Filings..................................................................... 27
Section 8.02.  Not a Back-up Bidder .......................................................................... 27
Section 8.03.  Alternative Transactions ...................................................................... 27

ARTICLE IX TAX MATTERS........................................................................................... 28

Section 9.01.  Transfer Taxes ..................................................................................... 28
Section 9.02.  Tax Cooperation................................................................................... 28
Section 9.03.  Post-Closing Actions ........................................................................... 29
Section 9.04.  Survival ............................................................................................... 29
Section 9.05.  Adjustment to Purchase Price .............................................................. 29
Section 9.06.  Interim Closing of the Books............................................................... 29
Section 9.07.  Agreements regarding 336 and 338 ..................................................... 29
Section 9.08.  Tax Refunds......................................................................................... 29

ARTICLE X CONDITIONS TO CLOSING....................................................................... 30

Section 10.01.  Conditions to Obligations of Buyer and Sellers ................................... 30
Section 10.02.  Frustration of Closing Conditions........................................................ 31
Section 10.03.  Waiver of Closing Conditions ............................................................. 31

ARTICLE XI TERMINATION............................................................................................ 31

Section 11.01.  Termination......................................................................................... 31
Section 11.02.  Notice of Termination......................................................................... 31
Section 11.03.  Effect of Termination.......................................................................... 31

ARTICLE XII MISCELLANEOUS..................................................................................... 32

Section 12.01.  Rules of Construction .......................................................................... 32
Section 12.02.  Expenses ............................................................................................. 34
Section 12.03.  Notices ................................................................................................ 34
Section 12.04.  Survival ............................................................................................... 35
Section 12.05.  Limitation on Liability......................................................................... 35
Section 12.06.  Public Announcements ........................................................................ 35
Section 12.07.  Severability ......................................................................................... 35
Section 12.08.  Assignment .......................................................................................... 36
Section 12.09.  No Third-Party Beneficiaries............................................................... 36
Section 12.10.  Entire Agreement ................................................................................ 36
Section 12.11.  Amendments ........................................................................................ 36
Section 12.12.  Waiver................................................................................................. 36
Section 12.13.  Governing Law .................................................................................... 36
Section 12.14.  Dispute Resolution; Consent to Jurisdiction........................................ 37
Section 12.15.  Waiver of Jury Trial............................................................................. 37
Section 12.16.  Admissibility into Evidence................................................................. 38

305547980v15

**HIGHLY CONFIDENTIAL**

Section 12.17.    Remedies; Specific Performance ........................................................... 38
Section 12.18.    Non-Recourse ................................................................................... 38
Section 12.19.    Releases............................................................................................ 39
Section 12.20.    Interest.............................................................................................. 40
Section 12.21.    Schedules and Exhibits .................................................................... 40
Section 12.22.    Provision Respecting Legal Representation ....................................... 40
Section 12.23.    Privilege ........................................................................................... 40
Section 12.24.    Counterparts...................................................................................... 41

**Exhibits**

Exhibit A    Form of Stock Power (Walbro Japan)
Exhibit B    Form of Instruction Letter (Walbro Japan)
Exhibit C    Form of Resignation Letter (Shekhar Kumar)
Exhibit D    Form of Share Transfer Document (Walbro FST)
Exhibit E    Form of Assignment and Assumption Agreement
Exhibit F    Interim Operations
Exhibit G    Resignation Letter (Baker & Graham)

305547980v15

HIGHLY CONFIDENTIAL

This PURCHASE AGREEMENT, dated as of July 15, 2026 (the "**Agreement Date**"), is made by and among First Brands Group Holdings, LLC, a Delaware limited liability company ("**Principal Seller**"), Carter Carburetor Holdings, LLC, a Delaware limited liability company ("**Carter Carburetor**"), and WEM US Co., a Delaware corporation ("**WEM**") (together with the Principal Seller, each a "**Seller**" and, collectively, "**Sellers**"), and Husqvarna Business Support AB, an entity organized under the laws of  Sweden ("**Buyer**" and, together with Sellers, the "**Parties**").  Capitalized terms used herein shall have the meanings set forth herein, including in Article I.

## RECITALS

On or about September 24, 2025 and September 28, 2025, Principal Seller and certain of its Affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas (such court, the "**Bankruptcy Court**" and such cases, "**Bankruptcy Cases**").

Carter Carburetor is the owner of 100% of the equity of Walbro Co., Ltd., a joint stock company organized under the laws of Japan ("**Walbro Japan**").

WEM, and certain other Persons (such other Persons, the "**Walbro FST Minority Shareholders**") are the owners of 100% of the equity of Walbro Fuel Systems and Technology (Thailand) Co., Ltd. an entity organized under the laws of Thailand ("**Walbro FST**").

Certain Persons (those Persons, the "**Walbro Thailand Minority Shareholders**") each own share(s) of Walbro Thailand (as defined below) (such shares in the aggregate, the "**Walbro Thailand Minority Equity Interests**", and together with all the issued and outstanding equity interest of Walbro Thailand held by Walbro Netherlands, **"Walbro Thailand Equity Interests**").

The applicable Sellers desire to sell to Buyer, and Buyer desires to purchase from the applicable Sellers, the Transferred Interests held by such Seller, all on the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01.  Certain Defined Terms.  In addition to the terms defined elsewhere in this Agreement, as used herein, the following terms shall have the following meanings:

"**Action**" means any claim, Avoidance Action, lawsuit, litigation, arbitration, mediation, audit, investigation (including any informal claims or demands, or formal or informal request for documents, information, or testimony), hearing, proceeding (including any civil,

criminal, administrative, investigative or appellate proceeding) or prosecution of any kind whatsoever, whether arising under federal, state, or local law, whether civil or criminal, whether legal, equitable, common law, statutory, regulatory, or administrative, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, seeking any form of relief whatsoever, in each case, commenced, brought, conducted or heard by or before any Government Authority.

"**Affiliate**" means, with respect to any specified Person, any other Person that, at the time of determination, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with such specified Person; provided, however, that for the purposes of this Agreement, (a) no Seller shall be deemed an Affiliate of Buyer, nor, after the Closing, of any Transferred Entity; (b) neither Patrick James, nor any Person Controlled by, or that is otherwise under common Control with, Patrick James (collectively, a "**James Person**") shall be an Affiliate of Principal Seller or any Subsidiary thereof (including, for the avoidance of doubt, Carter Carburetor or any Transferred Entity) and no Seller, nor any Transferred Entity, shall be an Affiliate of any James Person; and (c) after the Closing, Buyer shall be deemed an Affiliate of the Transferred Entities.

"**Agreement**" means this Purchase Agreement, dated as of the Agreement Date, by and among Sellers and Buyer, including the schedules and Exhibits, and all amendments to such agreement made in accordance with Section 12.11.

"**Applicable Obligee**" means, with respect to any component of the Walbro Intercompany Debt, the Seller or Affiliate of a Seller that is the payee or creditor, as applicable, of such intercompany debt or liability.

"**Avoidance Action**" means any Action of any Seller for avoidance, recovery, subordination or other relief arising under chapter 5 of the Bankruptcy Code or applicable state fraudulent conveyance, fraudulent transfer, or similar Laws.

"**Bankruptcy and Equity Exception**" means the effect on enforceability of (a) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Law relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

"**Business**" means the business carried on by the Transferred Entities prior to the Agreement Date.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which commercial banks in New York City, New York are required or authorized by Law to be closed.

"**Buyer Transaction Agreements**" means this Agreement and each other Transaction Agreement to which Buyer is named as a party on the signature pages thereto.

"**Buyer Transactions**" means the transactions contemplated by the Buyer Transaction Agreements.

5

305547980v15

HIGHLY CONFIDENTIAL

"**Closing Conditions**" means the conditions to the respective obligations of the Parties to consummate the Transactions contemplated by this Agreement, in each case, as set forth in Article X.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement by and between Walbro Japan and Husqvarna AB, dated as of April 1, 2026.

"**Consent**" means any consent, approval or authorization.

"**Contract**" means any written contract, agreement, undertaking, indenture, note, bond, mortgage, lease, sublease, license, sublicense, sales order, or purchase order that is currently in effect.

"**Control**" means, with respect to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise. The terms "Controlled by," "Controlled," "under common Control with" and "Controlling" shall have correlative meanings.

"**Debt**" means, without duplication, all monetary obligations (including accrued interest related thereto) (a) for borrowed money from third party lending sources, (b) evidenced by notes, bonds, debentures, mortgages or similar instruments, but excluding letters of credit, banker's acceptance or similar instrument to the extent not drawn upon, in each case, from third party lending sources, (c) under any leases required to be recorded as capital leases under GAAP. Notwithstanding the foregoing, "Debt" of any Transferred Entities shall not include (i) trade payables, (ii) accrued expenses (including employment-related expenses), or (iii) obligations to reimburse any Person in respect of amounts paid or payable under a performance, payment, stay, customs, appeal, or surety bond, performance and completion guaranty or similar instrument, in each case, calculated in accordance with GAAP and Sellers' and their respective Affiliates' books and records.

"**Debtor Closing Proceeds**" means an amount equal to (a) the Base Purchase Price, minus (b) the aggregate amount (not to exceed $300,000 in the aggregate) of fees and expenses of (i) Lazard Frères & Co. and Alvarez & Marsal North America, LLC, and (ii) counsel to Sellers incurred after March 15, 2026 in connection with the transactions contemplated by this Agreement. For the avoidance of doubt, no other proration, setoff, adjustment, deduction or other reduction shall be applied in calculating the Debtor Closing Proceeds.

"**Debtors**" means debtors in the bankruptcy cases.

"**Debtors Chapter 11 Plan**" means The Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors [Docket No. 3019], as the same may be amended, restated, supplemented, or modified as permitted thereby.

"**DIP Escrow Account**" means the Escrow Account (as defined in the DIP Order).

HIGHLY CONFIDENTIAL

"**DIP Order**" means the Final Order (a) Authorizing the Debtors to (i) Obtain Postpetition Financing, (ii) Use Cash Collateral, and (iii) Grant Liens and Provide Superpriority Administrative Expense Claims; (b) Granting Adequate Protection to Prepetition Secured Parties; (c) Modifying the Automatic Stay; and (d) Granting Related Relief (Docket No. 597).

"**Effective Time**" means 12:01 a.m. EDT in New York, NY, on the Closing Date.

"**Exhibits**" means the exhibits to this Agreement (as may be amended from time to time in accordance herewith) which form a part of this Agreement.

"**Foreign Counsel Retainer Amount**" means the amount of funds (converted, as necessary, into U.S. Dollars based on most recently available foreign currency exchange rate) held on deposit (in the nature of a retainer or customer deposit) with local legal counsel by or on behalf of any Transferred Entity on that date of this Agreement, in excess of the amount of fees or expenses incurred by such Transferred Entity with such local legal counsel through Closing, which are refunded or returned by such local legal counsel to the applicable Transferred Entity (or any Seller) prior to Closing as provided in Section 6.10.

"**GAAP**" means U.S. generally accepted accounting principles.

"**Government Authority**" means any U.S. federal, state or local or any supra-national or non-U.S. (including Japan, the Netherlands, Italy, Switzerland, Thailand, or the Peoples Republic of China) government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, body or commission, self-regulatory organization or any court, tribunal, or judicial or arbitral body.

"**Identified Defendants**" has the meaning given to such term in the Overdrive Agreement.

"**Immediate or Mediate Transferee**" shall be interpreted in a manner consistent with Bankruptcy Code section 550(a)(2).

"**Intellectual Property**" means, collectively, any and all intellectual property rights and proprietary rights in any jurisdiction, whether registered or unregistered.

"**Intercompany Released Claims**" means any claims between Sellers or their Subsidiaries on the one hand, and the Transferred Entities on the other hand; *provided* that for the avoidance of doubt, the Intercompany Released Claims shall not include any claims or causes of action against the Identified Defendants or any Immediate or Mediate Transferee of any value provided by the Debtors to any Identified Defendant.

"**Interest Rate**" means the rate designated from time to time in Section 6621(a)(2) of the Code, compounded on a daily basis.

"**Law**" means any U.S. federal, state, local or non-U.S. (including Japan, the Netherlands, Italy, Switzerland, Thailand, or the Peoples Republic of China) statute, law, ordinance, regulation, rule, code, treaty, Order, or other requirement or rule of law (including common law) promulgated by a Government Authority.

7

305547980v15

HIGHLY CONFIDENTIAL

"**Liabilities**" means any liability, Debt, guarantee, claim (including as defined in the Bankruptcy Code), demand, expense, commitment or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, known or unknown, fixed or otherwise, or due or to become due) of every kind and description, including all fines, penalties, losses, costs, interest, charges, damages, assessments, deficiencies, judgments, awards and expenses related thereto.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, security interest, interest, encumbrance, claim, lien, license, option, right of first refusal or first offer, right-of-way, right of setoff, easement, restriction on transfer, restrictive covenant, servitude, defect in title, encroachment or other survey defect, security interest, purchase agreement, charge or other encumbrance of any kind.

"**Material Adverse Effect**" means any fact, event, change, effect, development, circumstance, or occurrence (each, a "**Change**") that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on (i) the business, operations, properties, assets or condition (financial or otherwise) of the Business or (ii) the ability of Sellers to consummate the Transactions contemplated hereby; *provided*, that, solely with respect to clause (i) above, none of the following, either alone or in combination, will constitute a Material Adverse Effect:  (a) any Change in the United States or foreign economies or securities or financial markets in general (including any decline in the price of securities generally or any market or index); (b) any Change that generally affects any industry in which the Business operates; (c) general business or economic conditions in any of the geographical areas in which any of the Sellers, the Transferred Entities or the Business operates; (d) national or international political or social conditions, including any Change arising in connection with hostilities, acts of war, sabotage or terrorism or military action or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military action, whether commenced before or after the Agreement Date and whether or not pursuant to the declaration of a national emergency or war; (e) the occurrence of any act of God or other calamity or force majeure event (whether or not declared as such), including any strike, labor dispute, civil disturbance, cyberattack, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event or any global health conditions or any action by any Government Authority related to the foregoing; (f) any actions taken by Buyer or its Affiliates or specifically contemplated to be taken or omitted to be taken by any Seller or the Transferred Entities pursuant to this Agreement or any other Transaction Agreement or actions taken or omitted to be taken by any Seller or the Transferred Entities at the request or with the consent of Buyer; (g) any Changes in applicable Laws or GAAP (or other relevant accounting rules); (h) any Change resulting from the filing or pendency of the Bankruptcy Cases, any Action that arises from or is in connection with the Bankruptcy Cases or adjudicated in the Bankruptcy Court and connected to the Debtors, or any reasonably anticipated effects of such filing, pendency or Action (other than the complete cessation of operations of any Seller, the conversion of any Sellers' Chapter 11 cases to Chapter 7 under the Bankruptcy Code, or the dismissal of any of the Sellers' Chapter 11 cases); (i) any Change resulting from the public announcement of the entry into this Agreement, compliance with the terms of this Agreement or the consummation of the Transactions; (j) any Change arising from or relating to the imposition, modification or escalation of tariffs, trade restrictions, customs duties, import or export controls or localization requirements applicable to automotive parts or related raw materials; (k) any Change arising from or relating to disruptions affecting the automotive supply chain generally, including shortages or delays in the

305547980v15

HIGHLY CONFIDENTIAL

availability of raw materials, components, semiconductors, steel, aluminum, resins, logistics or transportation services; (l) any Change arising from or relating to changes in automotive safety, emissions, fuel economy, electrification or autonomous vehicle Laws, regulations or standards of general applicability to automotive suppliers; (m) any loss or reduction of customers or customer relationships or any decline in revenues attributable thereto; or (n) any effects or Changes arising from or related to the breach of this Agreement by Buyer; *provided further*, that the exceptions set forth in clauses (a) through (e) of this definition shall not be regarded as exceptions solely to the extent that any such described Change has a disproportionately adverse impact on the Business or Sellers, as compared to other companies similarly situated in the industries in which the Business or the Sellers operate.

"**Onset**" means Onset Financial, Inc., together with its Affiliates.

"**Order**" means any order, writ, judgment, injunction, ruling, decree or award entered by or with any Government Authority.

"**Overdrive Agreement**" means that certain Asset Purchase Agreement dated as of March 9, 2026 by and among the Principal Seller, certain of its Affiliates and Overdrive Capital LLC.

"**Permits**" means all permits, identification numbers, licenses, authorizations, clearances, closures, decisions, registrations, concessions, grants, franchises, certificates, waivers and filings issued or required by any Government Authority under applicable Law for the operation of the Business.

"**Permitted Liens**" means the following Liens (which shall not include any Liens of or asserted by Onset):  (a) Liens for Taxes, assessments or other governmental charges or levies that are not yet due or payable or that are being contested in good faith by appropriate proceedings or that may thereafter be paid without penalty; (b) statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen, workmen, repairmen and other Liens arising or incurred in the ordinary course of business; (c) Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other types of social security; (d) defects or imperfections of title, exceptions, easements, licenses, options to license, covenants, rights-of-way, restrictions and other similar charges, defects or encumbrances not materially interfering with the ordinary course of business; (e) zoning, entitlement, building and other generally applicable land use and environmental restrictions by a Government Authority that are not violated in any material respect by the current use of the applicable Transferred Asset; (f) Liens not created by any Seller or the Transferred Entities that affect the underlying fee, superior lessor, licensor or sublessor interest of any leased real property or real property over which any Seller (with respect to the Business) or the Transferred Entities has easement or other property rights; (g) Liens incurred in the ordinary course of business securing Liabilities that are not material to the Transferred Entities; (h) Liens created by or through, or resulting from any facts or circumstances relating to, Buyer or its Affiliates; (i) Liens arising out of or under this Agreement or the other Transaction Agreements; (j) any set of facts an accurate up-to-date survey would show, which do not and would not reasonably be expected to, individually or in the aggregate, materially impair the current use or occupancy of the applicable Transferred Asset; (k) any non-monetary title matters shown in any title policy or report made available to

9

305547980v15

HIGHLY CONFIDENTIAL

Buyer which do not and would not reasonably be expected to, individually or in the aggregate, materially impair the current use or occupancy of the applicable Transferred Asset; (l) rights, terms or conditions of any leases, subleases, licenses, sublicenses or occupancy agreements (in each case, other than with respect to Intellectual Property) shared with Buyer as of the Agreement Date, including title of a lessor under a capital or operating lease; (m) any other Lien that will be cleared or discharged by the Bankruptcy Court and (n) non-exclusive licenses granted in the ordinary course of business to suppliers, manufacturers, distributors, vendors and customers of the Business with respect to Intellectual Property.

"**Person**" means any natural person, general or limited partnership, corporation, company, trust, limited liability company, limited liability partnership, firm, association, Government Authority, organization or other legal entity.

"**Pre-Closing Period**" means the period beginning on the Agreement Date and ending on the earlier of the Closing Date and the date this Agreement is terminated in accordance with its terms.

"**Pre-Closing Tax Period**" means any Tax period ending on or before the Closing Date and, in the case of any Straddle Period, the portion of such Straddle Period ending on the Closing Date.

"**Prior Sale Agreements**" means (i) the Overdrive Agreement; (ii) that certain Asset Purchase Agreement, dated as of March 25, 2026, by and among Principal Seller, as Seller (as defined therein), PGI NorthStar LLC, as Buyer (as defined therein), and Premium Guard Incorporated, as Guarantor (as defined therein); (iii) that certain Asset Purchase Agreement, dated as of May 30 7, 2026, by and among FBGH, Toledo Molding & Die, LLC (together with FBGH, as Sellers defined therein), TNJ Ohio LLC, as Buyer (defined therein), and solely for purposes of Section 6.12, WMC – KSA Holdings LLC, as Guarantor (as defined therein), (iv) that certain Stock and Asset Purchase Agreement, dated as of May 19, 2026, by and among Principal Seller, the Asset Sellers and Intercompany Sellers party thereto, Horizon Euro Finance LLC, the Equity Sellers and Transferred Entities who thereafter became parties thereto, K2TR Corporation, Ventra Ohio LLC, Horizon SNK, LLC, Horizon ARK, LLC, Horizon Kansas LLC, and Flex-N-Gate, as Guarantor (solely for the purposes set forth therein); (v) that certain Asset Purchase Agreement, dated as of June 12, 2026, by and between Principal Seller and PGI Northstar LLC, and Premium Guard Incorporated, as Guarantor (solely for the purposes set forth therein); and (vi) That certain Settlement and Sale Agreement, dated as of May 19, 2026, by and among Principal Seller, Horizon Global Corporation, and the other Sellers party thereto, Cequent Nederland Holdings B.V., and each of the other Buyers party thereto.

"**Prohibited Cash Transactions**" means any of the following actions by any Transferred Entity: (a) participating in any cash pooling, cash sweep or similar arrangement, (b) making any intercompany loan or advance to any Seller or any of its Affiliates (or any account controlled by them), or (c) making any payment, distribution, dividend or other transfer of cash or cash equivalents to any Seller or any of its Affiliates; provided, however, that (y) a distribution of any Foreign Counsel Retainer Amount as provided in Section 6.10 shall not be a Prohibited Cash Transaction and (z) payments (1) into or out of the bank account(s) of Walbro Switzerland which

305547980v15

HIGHLY CONFIDENTIAL

were funded other than by operations of the Walbro Asia Business and (2) a distribution of cash out of such account as provided in Section 6.10 shall not be a Prohibited Cash Transaction.

"**Related to the Business**" means primarily related to, primarily held for use in, or primarily used in connection with the Business.

"**Released Claims**" means with respect to any party, any and all of such party's rights, commitments, Actions, debts, claims, counterclaims, suits, damages, demands, losses, obligations, costs, expenses, compensation and other Liabilities of every kind and nature whatsoever, whether known or unknown, matured or contingent and whether arising in Law, in equity or otherwise, in each case based upon facts, circumstances or occurrences existing at or prior to the Closing, and solely to the extent arising in connection with the Bankruptcy Cases or the negotiation and documentation of this Agreement and the Transactions.

"**Representative**" of a Person means the directors, officers, employees, advisors, agents, consultants, attorneys, accountants, financial advisors or other representatives of such Person.

"**Required Amount**" shall mean an amount equal to the full amount of the cash required to consummate the Transactions on the terms contemplated by the Transaction Agreements (including, for the avoidance of doubt, the payment of the Base Purchase Price).

"**Sale Order**" shall be an Order or Orders by the Bankruptcy Court, in form and substance acceptable to the Sellers and Buyer, approving and authorizing (i) Sellers' entry into this Agreement and the terms and conditions hereof, including pursuant to Sections 363 and 365 of the Bankruptcy Code, with an express finding that Buyer is a good faith purchaser for purposes of Section 363(m) of the Bankruptcy Code; (ii) the deposit of the Debtor Closing Proceeds into the DIP Escrow Account for further distribution to the Ad Hoc Group (as defined in the Sale Order) and (iii) Sellers to consummate the Transactions.

"**Securities Act**" means the Securities Act of 1933.

"**Seller Transaction Agreements**" means this Agreement and each other Transaction Agreement to which any Seller is a party thereto.

"**Seller Transactions**" means the transactions contemplated by the Seller Transaction Agreements.

"**Straddle Period**" means a taxable period beginning before and ending on or after the Closing Date.

"**Subject Marks**" means, the rights (if any) held by the Sellers as of the date hereof in any trademarks that are primarily related to the Walbro Asia Business and do not constitute either (y) Business Intellectual Property (as such term is defined in the Overdrive Agreement) or (z) Carter Carburetor Trademarks (as such term is defined in the Overdrive Agreement). For the avoidance of doubt, the Subject Marks do not include any assets previously conveyed to any purchaser pursuant to any Prior Sale Agreement (including pursuant to the Overdrive Agreement)

11

HIGHLY CONFIDENTIAL

"**Subsidiary**" of any specified Person means any other Person of which such first Person owns (either directly or through one or more other Subsidiaries) a majority of the outstanding equity securities or securities carrying a majority of the voting power in the election of the board of directors or other governing body of such Person, and with respect to which entity such first Person is not otherwise prohibited contractually or by other legally binding authority from exercising Control.

"**Tax**" or "**Taxes**" means (i) any and all federal, state, provincial, local, foreign and other income, excise, gross receipts, ad valorem, value-added (including VAT), import duties, sales, use, production, employment, social security, unemployment, severance, withholding, franchise, profits, registration, license, lease, service, service use, goods and services, environmental, recording, documentary, filing, permit or authorization, stamp, business and occupation, gains, real or personal property, leasing, transfer, payroll, intangibles or other taxes, together with any interest and any penalties, additions to tax or additional amounts imposed by any Taxing Authority with respect thereto and (ii) any and all liability for the payment of any amounts as a result of any express obligation to indemnify any other Person, or any successor or transferee Liability, in respect of any items described in clause (i) above.

"**Tax Returns**" means all returns and reports (including elections, declarations, disclaimers, notices, disclosures, schedules, estimates, claims (including claims for refunds) and information returns) supplied or required to be supplied to a Taxing Authority relating to Taxes.

"**Taxing Authority**" means any federal, state, local or foreign jurisdiction (including any subdivision and any revenue agency of a jurisdiction) imposing Taxes and the agencies, if any, charged with the collection of such Taxes for such jurisdiction.

"**Transaction Agreements**" means this Agreement, Confidentiality Agreement, and any other agreements, instruments or documents required to be delivered at the Closing pursuant to Section 2.03, in each case including all exhibits and schedules thereto and all amendments thereto made in accordance with the respective terms thereof.

"**Transactions**" means the transactions contemplated by this Agreement and the other Transaction Agreements.

"**Transfer Taxes**" means all sales, use, purchase, excise, gross receipts, ad valorem, direct or indirect real property, conveyance, transfer, intangible, stamp, stock transfer, personal property transfer, business and occupation, value added (including VAT), transaction securities transaction, recording, documentary, filing, Permit or authorization, leasing, license, lease, service, service use, severance, profits, gains, property registration, motor vehicle registration, title recording and other amounts payable in respect of transfer filings, imposed by any Government Authority and similar fees, duties, imposts, levies and other non-income Taxes, together with any interest and any penalties, additions to tax or additional amounts imposed by any Government Authority with respect thereto.

"**Transferred Assets**" means the assets and properties of the Transferred Entities as of the date of this Agreement.

**HIGHLY CONFIDENTIAL**

"**Transferred Books and Records**" means (a) books, records, files and papers, whether in hard copy or computer format, including sales and promotional literature, manuals and data, sales and purchase correspondence, customer lists, lists of suppliers and personnel and employment records, in each case, to the extent Related to the Business, other than any Tax Returns and all records (including all working papers) related thereto, but including any Tax Returns solely related to the Transferred Assets or the Business, and (b) Intellectual Property dockets, prosecution files and invention disclosures, to the extent pertaining to Business.

"**Transferred Entities**" means Walbro Japan, Walbro Netherlands, Walbro Switzerland, Walbro China, Walbro FST, Walbro Italy and Walbro Thailand.

"**Transferred Interests**" means, collectively, the (i) Transferred Intercompany Obligations, (ii) the Transferred Equity and (iii) the Subject Marks. Buyer acknowledges and agrees that (x) there may be no trademarks or any rights to any trademarks conveyed as part of the Subject Marks as any and all such rights may have been transferred to a third party in a Prior Sale Agreement, (y) notwithstanding anything to the contrary in this Agreement, no Seller is making any representation or warranty that it owns any Subject Marks, and (z) neither the execution, delivery, or performance of this Agreement (or the transactions contemplated hereby) is in reliance on the receipt of any Subject Marks and under no circumstances will Buyer be permitted to (and hereby waives), bring any claim, cause of action, or Action against any Person following the Agreement Date as a result of there being no Subject Marks to convey.

"**U.S.**" means the United States of America.

"**Walbro Asia Business**" means, the business, commonly known as the "Walbro Asia" business, as operated, directly or indirectly, by the Transferred Entities immediately prior to the closing at, consisting of the development, design, manufacture, sourcing, marketing, distribution and sale of small engine fuel systems carburetors, fuel pumps, ignition systems, electronic fuel injection, plastics molding and related components across power equipment, powersports, marine and specialty engines, in each case, under the following brand names: Walbro and Carter Carburetor in the jurisdictions of formation of each of the Transferred Entities.

"**Walbro China**" means Walbro (Tianjin) Industries Co., Ltd., an entity organized under the laws of the Peoples Republic of China.

"**Walbro FST Debt**" means (a) the two shareholder loans from WEM (as creditor) to Walbro FST (as debtor) in the approximate amounts (as of April 27, 2026) of $6,905,000 and $3,964,000, respectively, and (b) the intercompany payable owed by Walbro FST (as payor) to WEM (as payee), in the approximate amount (as of April 27, 2026) of $1,150,000.

"**Walbro Intercompany Debt**" means, collectively, the following liabilities, in an aggregate approximate amount (as of April 27, 2026) of $18,553,000: (a) the Walbro FST Debt, (b) the Walbro Thailand Debt, (c) the Walbro Japan Debt, (d) the Walbro Switzerland Debt, and (e) any other intercompany liability owed by any Transferred Entity to any Seller agreed in a writing signed by Buyer and Principal Seller.

"**Walbro Italy**" means Walbro Italy S.r.L., an entity organized under the laws of Italy.

305547980v15

**HIGHLY CONFIDENTIAL**

"**Walbro Japan Debt**" means the intercompany payable owed by Walbro Japan (as payor) to WEM and/or Walbro LLC (as payee), in the approximate amount (as of April 27, 2026) of $686,000.

"**Walbro Netherlands**" means Walbro International Holding BV, an entity organized under the laws of the Netherlands.

"**Walbro Thailand**" means Walbro (Thailand) Co., Ltd., an entity organized under the laws of Thailand.

"**Walbro Thailand Debt**" means the intercompany payable, owed by Walbro Thailand (as payor) to WEM and/or Walbro LLC(as payee), in the approximate amount (as of April 27, 2026) of $388,000.

"**Walbro Switzerland**" means Walbro Suisse Group GmbH, an entity organized under the laws of Switzerland.

"**Walbro Switzerland Debt**" means the loan from Principal Seller (as creditor) to Walbro Switzerland (as debtor) in the approximate amount (as of May 9, 2026) of $5,328,599.30.

"**WEM Japan Payable**" means the intercompany loan, as evidenced by that certain Intercompany Advances Promissory Note dated as of July 1, 2024, owed by Carter Carburetor (as debtor) to Walbro Japan (as creditor), in an amount equal to the aggregate principal amount of the Walbro Intercompany Debt as of the Closing Date.

"**Wind-Up Date**" means with respect to any Seller (that is a Debtor), the date upon which such Seller's corporate or entity existence ceases.

## ARTICLE II

## PURCHASE AND SALE; CLOSING

Section 2.01.   <u>Purchase and Sale of the Transferred Interests</u>.   On the terms and subject to the conditions set forth in this Agreement, at the Closing:

(a)   Carter Carburetor shall sell, convey, assign, transfer and deliver to Buyer or one or more of its Affiliates, and Buyer or one or more of its Affiliates shall purchase, acquire and accept from Carter Carburetor, all of the right, title and interest in and to the issued and outstanding equity interests of Walbro Japan (the "**Walbro Japan Equity Interests**");

(b)   WEM shall sell, convey, assign, transfer and deliver to Buyer or one or more of its Affiliates, and Buyer or one or more of its Affiliates shall purchase, acquire and accept from WEM, all of its right, title and interest in and to (i) the Walbro FST Debt, and (ii) the issued and outstanding equity interests of Walbro FST held by WEM (the "**WEM Walbro FST Equity Interests**" and collectively with the Walbro Japan Equity Interests, the "**Transferred Equity**");

(c) Applicable Obligee shall sell, convey, assign, transfer and deliver to Buyer or one or more of its Affiliates, and Buyer or one or more of its Affiliates shall purchase, acquire and

14

accept from the Applicable Obligee, all of their right, title and interest in and to the Walbro Intercompany Debt (the "**Transferred Intercompany Obligations**"); and

(d)      Buyer shall assume, and agree to pay, perform and discharge when due, the WEM Japan Payable.

Section 2.02.   Closing.  The closing of the sale and purchase of the Transferred Interests (it being agreed that the Subject Marks (if any) are being conveyed by quitclaim) and the assumption of the WEM Japan Payable (the "**Closing**") shall take place by telephone conference and electronic exchange of documents (or if originals are needed, then, the exchange of such original documents) (or, if the Parties agree to hold a physical closing, at the offices of Katten Muchin Rosenman LLP, 50 Rockefeller Plaza, New York, NY 10020-1605), at 9:00 a.m. (New York City time) on the second Business Day following the date upon which all Closing Conditions are satisfied or waived in writing (to the extent permitted by applicable Law) in accordance with Article X (other than those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of those Closing Conditions at such time), or on such other date or at such other time or place as the Parties may agree in writing.  The date on which the Closing occurs is referred to in this Agreement as the "**Closing Date**."  For all purposes under this Agreement and each other Transaction Agreement, (a) except as otherwise expressly provided in this Agreement or such other Transaction Agreements, all matters at the Closing will be considered to take place simultaneously and (b) the Closing shall be deemed effective as of the Effective Time.

Section 2.03.   Certain Closing Deliverables.  At the Closing:

(a)      Sellers shall deliver or cause to be delivered to Buyer the following:

(i)      a stock power (to be signed by Shekhar Kumar), in the form attached hereto, as Exhibit A, to transfer the Walbro Japan Equity Interests from Carter Carburetor to Buyer;

(ii)      an instruction letter substantially in the form attached hereto, as Exhibit B (to be signed by Shekhar Kumar), instructing Walbro Japan to register the transfer of the Walbro Japan Equity Interests from Carter Carburetor to Buyer in the shareholders register of Walbro Japan, duly executed by Carter Carburetor;

(iii)      a resignation letter of Shekhar Kumar substantially in the form attached hereto as Exhibit C;

(iv)      a Share Transfer Document (to be signed by Shekhar Kumar), in the form attached hereto, as Exhibit D to transfer the WEM Walbro FST Equity Interests from WEM to Buyer; and

(v)      a counterpart of the Assignment and Assumption Agreement (to be signed by Shekhar Kumar) substantially in the form attached hereto as Exhibit E (the "**Assignment and Assumption Agreement**").

15

305547980v15

**HIGHLY CONFIDENTIAL**

(b)  Buyer shall deliver or cause to be delivered to Sellers (or, in the case of Section 2.03(b)(i)(A), the escrow agent for the DIP Escrow Account) the following:

(i)  an amount in US Dollars equal to the Debtor Closing Proceeds, by wire transfer of immediately available funds to the DIP Escrow Account, and

(ii)  the remaining portion of the Base Purchase Price, in US Dollars, by wire transfer of immediately available funds to the Professional Fee Escrow Account (as defined in the DIP Order); and

(iii)  a counterpart to the Assignment and Assumption Agreement.

## ARTICLE III

## PURCHASE PRICE

Section 3.01.  Purchase Price. The aggregate consideration to be paid by Buyer for the sale of all of the Transferred Interests (it being agreed that the Subject Marks (if any) are being conveyed by quitclaim) and obligations of Sellers set forth in this Agreement shall be an amount in cash equal to $12,000,000 (the "**Base Purchase Price**") plus the assumption of the WEM Japan Payable. On the Closing Date, Buyer shall pay, by wire transfer of immediately available funds, (x) the Debtor Closing Proceeds to the escrow agent for the DIP Escrow Account for deposit into the DIP Escrow Account, and (y) the remaining portion of the Base Purchase Price to the Professional Fee Escrow Account (as defined in the DIP Order).  Amounts on deposit in the DIP Escrow Account shall be distributed solely as, when and to the Persons provided in, and in the priorities and manner set forth in, the Sale Order and the Settlement Agreement referenced therein, and neither Buyer nor any Debtor shall have any right to direct any disbursement or withdrawal therefrom except to the extent expressly authorized by the Sale Order and/or the DIP Order.  Buyer acknowledges and agrees that all funds deposited into the DIP Escrow Account are not property of Buyer, are not subject to any right of setoff, recoupment or counterclaim by Buyer, and shall remain subject to the liens, claims, priorities and protections set forth in the DIP Order and the Sale Order until disbursed in accordance therewith.

Section 3.02.  Withholding.  Buyer shall be entitled to deduct or withhold from the consideration otherwise payable pursuant to this Agreement such amounts as Buyer is required to deduct and withhold with respect to the making of such payment under the Code, or any provision of state, local or non-U.S. Tax Law; provided, that, in each case, Buyer shall (a) deliver to Sellers notice of intent to so withhold and the reason therefor at least five (5) Business Days prior to Closing, (b) use reasonable best efforts to work together with Sellers to reduce such potential withholding, including through accepting any relevant form establishing an entitlement to reduce withholding, and (c) provide Sellers with an original or certified copy of a receipt evidencing timely payment to the applicable Government Authority.  To the extent that amounts are so deducted or withheld by Buyer, such amounts will be treated for all purposes of this Agreement as having been paid to Sellers.

305547980v15

**HIGHLY CONFIDENTIAL**

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers represent and warrant to Buyer that, as of the Closing Date:

Section 4.01.   Formation and Qualification.

(a)      Each Seller is a corporation, limited liability company or other entity duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization, except where the failure to be so qualified or in good standing would not reasonably be expected to prevent the ability of such Seller to consummate the transactions contemplated hereby, and has the requisite corporate or other appropriate power and authority to execute, deliver and perform its obligations under the Seller Transaction Agreements (including the consummation of the Seller Transactions).

(b)      Each Transferred Entity is a corporation, limited liability company or other entity duly incorporated, formed or organized, validly existing (or is otherwise dormant) and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization, except where the failure to be so qualified or in good standing would not reasonably be expected to have a Material Adverse Effect, and has the requisite corporate or other appropriate power and authority to operate its business as now conducted except where the failure to have such power and authority would not reasonably be expected to have a Material Adverse Effect. Each Transferred Entity is duly qualified as a foreign corporation or other organization to do business, and, to the extent legally applicable, is in good standing, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or in good standing would not reasonably be expected to have a Material Adverse Effect.

Section 4.02.   Capital Structure of the Transferred Entities. Carter Carburetor owns all of the Walbro Japan Equity Interests.  Walbro Japan owns, either directly or indirectly, all of the issued and outstanding equity interest of each Transferred Entity (other than Walbro FST and Walbro Thailand). WEM and the Walbro FST Minority Shareholders, collectively, own all the issued and outstanding equity interest of Walbro FST.  Walbro Netherlands and the Walbro Thailand Minority Shareholders, collectively, own all the issued and outstanding equity interest of Walbro Thailand.  The Sellers own their respective Transferred Interests, free and clear of all Liens, except (i) any Lien arising out of, under or in connection with the Securities Act or any other applicable securities Laws, (ii) any Lien arising out of, under or in connection with this Agreement or any other Transaction Agreement, (iii) any Lien created by or through, or resulting from any facts or circumstances relating to, Buyer or its Affiliates, (iv) any Liens that have been discharged, or will be discharged, on or prior to the Closing, (v) Permitted Liens and (vi) Sellers make no representation or warranty regarding ownership, validity or ability to convey any of the Subject Marks (if any).  Sellers make no representations or warranties regarding the existence or location of any stock certificates or similar instruments evidencing ownership of the Transferred Equity.

305547980v15

HIGHLY CONFIDENTIAL

Section 4.03.    Formation and Authority of Sellers; Enforceability.

(a) The execution, delivery and performance by each Seller of the Seller Transaction Agreements (including the consummation of the Seller Transactions) to which it is a party have been duly authorized by all requisite corporate or organizational action on the part of such Seller. Except for such authorizations as may be required by the Bankruptcy Court, this Agreement has been and upon execution and delivery thereof, the other Seller Transaction Agreements will be, duly executed and delivered by Sellers, and (assuming due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and upon execution and delivery thereof, the other Seller Transaction Agreements will constitute, legal, valid and binding obligations of Sellers party thereto, enforceable against Sellers party thereto in accordance with their respective terms, subject to the Bankruptcy and Equity Exception.

(b) Since April 30, 2026, no Transferred Entity has engaged in any Prohibited Cash Transactions.

Section 4.04.    No Other Representations or Warranties.  Except for the representations and warranties expressly set forth in this Article IV, none of the Sellers or any other Person has made, makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, on behalf of Sellers, the Transferred Entities or any of their respective Affiliates, including any representation or warranty regarding any Seller, the Transferred Entities or any other Person, the Transferred Interests, the Business, any Transaction, any other rights or obligations to be transferred pursuant to the Transaction Agreements or any other matter (collectively, the "**Extracontractual Reps**"), and Sellers hereby disclaim all Extracontractual Reps, whether made by or on behalf of any Seller, the Transferred Entities or any other Person, including any of their respective Representatives.  Each Seller hereby (a) disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Transferred Assets or the Business, and (b) disclaims all Liability and responsibility for all projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) to Buyer or any of Buyer's Affiliates or any Representatives of Buyer or any of Buyer's Affiliates (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any Representative of Sellers or the Transferred Entities, respectively), including omissions therefrom.  Without limiting the foregoing, no Seller makes any representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, to Buyer or any of its Affiliates or any Representatives of Buyer of any of its Affiliates regarding the probable success, profitability or value of the Transferred Entities or the Business.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers that:

Section 5.01.    Formation and Authority of Buyer; Enforceability.  Buyer is a corporation or other entity duly incorporated, formed or organized, validly existing and, to the extent legally

18

305547980v15

HIGHLY CONFIDENTIAL

applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization and has the requisite corporate or other appropriate power and authority to execute, deliver and perform its obligations under the Buyer Transaction Agreements (including the consummation of the Buyer Transactions). The execution, delivery and performance of the Buyer Transaction Agreements by Buyer (including the consummation of the Buyer Transactions) have been duly authorized by all requisite corporate or organizational action on the part of Buyer, and no shareholder or other similar approval is required in connection with Buyer's execution, delivery and performance of the Buyer Transaction Agreements. This Agreement has been, and upon execution and delivery thereof, the other Buyer Transaction Agreements will be, duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and upon execution and delivery thereof, the other Buyer Transaction Agreements will constitute, legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms, subject to the Bankruptcy and Equity Exception.

Section 5.02.    Absence of Restraints; Compliance with Laws and Actions.

(a)    To the knowledge of Buyer, no facts or circumstances exist that would reasonably be expected to impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

(b)    Buyer is not in violation of any Laws or Orders applicable to the conduct of its business or to the Transferred Entities, except for violations the existence of which would not reasonably be expected to impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

(c)    There are no Actions pending or, to the knowledge of Buyer, threatened, that would affect or delay in any material respect Buyer's ability to perform its obligations under the Buyer Transaction Agreements or to consummate the Transactions contemplated by the Buyer Transaction Agreements.

Section 5.03.    Brokers.    No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from Buyer or any of Buyer's Affiliates in connection with the Transactions.

Section 5.04.    Investigation.    Buyer acknowledges and agrees that it (a) has completed such inquiries and investigations as it has deemed appropriate into, and, based thereon, has formed an independent judgment concerning, the Transferred Entities, the Transferred Interests (including the Subject Marks (if any) which may not be available to be conveyed), the Liabilities of the Transferred Entities, the Business and the Transactions, and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements and (b) has been furnished with, or given access to, all such projections, forecasts, estimates, appraisals, statements, promises, advice, data or information about Sellers, the Transferred Entities, the Transferred Interests, the Liabilities of the Transferred Entities, the Business and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements, as it has requested or otherwise requires to enter into this Agreement. Buyer further acknowledges and agrees that (w) the only representations and warranties made by Sellers are the representations and warranties

19

HIGHLY CONFIDENTIAL

expressly set forth in Article IV (the "**Contractual Reps**"), (x) Buyer has not relied upon, and will not rely upon, any other express or implied representations, warranties or other projections, forecasts, estimates, appraisals, statements, promises, advice, data or information made, communicated or furnished by or on behalf of Sellers or any of their Affiliates, any Representatives of Sellers or any of their Affiliates or any other Person, including any projections, forecasts, estimates, appraisals, statements, promises, advice, data or information made, communicated or furnished by or through Sellers' advisors, or management presentations, data rooms (electronic or otherwise) or other due diligence information, and that Buyer will not have any right or remedy arising out of any such representation, warranty or other projections, forecasts, estimates, appraisals, statements, promises, advice, data or information, (y) reliance by Buyer on anything other than the Contractual Reps is unreasonable, and (z) any claims Buyer may have for breach of any representation or warranty shall be based solely on the Contractual Reps, subject to the exclusive remedies set forth herein.  Except for the Contractual Reps, Buyer understands and agrees that (y) the Transferred Interests and the Business are being transferred "**as-is, where-is**" without any other representations or warranties of any nature whatsoever and (z) the Subject Marks (if any) are being conveyed by quitclaim.

Section 5.05.  Securities Matters.  The Transferred Equity is being acquired by Buyer for its own account, and not with a view to, or for the offer or sale in connection with, any public distribution or sale of the Transferred Equity or any interest in them.  Buyer has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of its investment in the Transferred Equity, and Buyer is capable of bearing the economic risks of such investment, including a complete loss of its investment in the Transferred Equity.  Buyer acknowledges that the Transferred Equity has not been registered under the Securities Act, or any state securities Laws, and understands and agrees that it may not sell or dispose of any of the Transferred Equity except pursuant to a registered offering in compliance with, or in a transaction exempt from, the registration requirements of the Securities Act and any other applicable state, foreign or federal securities Laws.

Section 5.06.  Financial Ability.  At Closing, Buyer will have, (a) access to sufficient immediately available funds and the financial ability to pay all Required Amounts and (b) the resources and capabilities (financial and otherwise) to perform its obligations under the Buyer Transaction Agreements.  Buyer has not incurred, and is not contemplating or aware of, any obligation, commitment, restriction or other Liability of any kind, in each case that would impair or adversely affect such resources, funds or capabilities.

## ARTICLE VI

## ADDITIONAL AGREEMENTS

Section 6.01.  Conduct Before the Closing.  Buyer acknowledges that the Transferred Entities are operating the Business in the context of the Bankruptcy Cases and subject to the matters set forth in Section 6.01.  Subject to the foregoing, except (a) as required by applicable Law, by Order of the Bankruptcy Court or to the extent required in connection with the Bankruptcy Cases, (b) as required by the terms of any Transaction Agreement, (c) for matters identified on Exhibit F, or (d) as a result of, or in connection with, the cessation, wind-down (including the sale, abandonment or termination of assets not included in the Transferred Assets) of any business,

HIGHLY CONFIDENTIAL

operations or activities of the Sellers and their Affiliates other than the Transferred Entities and the Business, during the Pre-Closing Period:

(i)    Sellers shall use, and shall cause the Transferred Entities to use, commercially reasonable efforts to (A) operate the Business in the ordinary course of business, and (B) maintain the Transferred Assets in their current condition (subject to ordinary wear and tear), and (C) preserve in all material respects the present business operations, organization and goodwill of the Business;

(ii)    unless Buyer otherwise consents in writing, Sellers will, and will cause their respective Affiliates to, not permit any Transferred Entity to engage in any Prohibited Cash Transactions; and

(iii)    Sellers shall not, and shall cause the Transferred Entities not to, cease, shut down, suspend or discontinue the operations of the Business or any material portion thereof.

Section 6.02.   Access to Information.

(a)    During the Pre-Closing Period, upon reasonable prior written notice to Sellers, Sellers shall, and shall cause each of their respective Affiliates to, (i) afford the Representatives (who are under enforceable confidentiality and non-use agreements) of Buyer reasonable access during normal business hours, to the Business, properties, books and records (including work papers, schedules, memoranda and other documents), Transferred Assets, Transferred Entities and personnel records of the Business, (ii) furnish to the Representatives of Buyer such additional financial and operating data and other information regarding the Business as Buyer or its Representatives may from time to time reasonably request for purposes of consummating the Transactions, (iii) make available to Buyer and its Representatives, during normal business hours, those directors, officers, employees, auditors, accountants, union representatives and other Representatives of Sellers and (iv) cooperate reasonably with Buyer in its investigation of the Business, except, in the case of (i), (ii), (iii) and (iv), as set forth in Section 6.02(b).

(b)    Notwithstanding anything in this Agreement to the contrary,

(i)    (A) in no event shall the Sellers or their respective Affiliates be obligated to provide any (1) access or information in violation of any applicable Law or any privacy policies or notices of the Sellers or their respective Affiliates, or any Order of the Bankruptcy Court, (2) information the disclosure of which could reasonably be expected to jeopardize any applicable legal privilege (including the attorney-client privilege) available to the Sellers or any of their respective Affiliates relating to such information, or (3) information the disclosure of which would cause the Sellers or any of their respective Affiliates to breach a confidentiality obligation to which it is bound with respect to such information (provided, that the applicable Seller or any of its respective Affiliates bound by any such obligation of confidentiality with respect to such information shall use commercially reasonable efforts to obtain a waiver with respect to any such obligation of confidentiality to disclose such information reasonably requested by Buyer) and (B) any access or investigation contemplated by Section 6.02(a) shall not

21

305547980v15

**HIGHLY CONFIDENTIAL**

unreasonably interfere with any of the businesses, personnel or operations of the Sellers or the Business; provided, that to the extent reasonably practicable, the Sellers and their respective Affiliates shall use commercially reasonable efforts to provide access to such information in a redacted form or through alternative means that would permit disclosure to Buyer whilst maintaining compliance with the restrictions set forth in the foregoing clauses (1) through (3);

(ii)     the auditors and accountants of any of the Sellers, the Transferred Entities or any of their respective Affiliates or the Business shall not be obligated to make any work papers available to any Person except in accordance with such auditors' and accountants' normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or accountants;

(iii)     Buyer and its Representatives shall not conduct any sampling or testing of soil, groundwater, air, or other environmental media of any of the Sellers without the prior written consent of the Sellers.

Section 6.03.   Confidentiality.  Buyer acknowledges that the Confidential Information and Transaction Information (each as defined in the Confidentiality Agreement) provided to it in connection with this Agreement, including information provided under Section 6.02, is subject to the Confidentiality Agreement and the terms of the Confidentiality Agreement are incorporated into this Agreement by reference and shall continue in full force and effect (and all obligations thereunder shall be binding upon Buyer, its Representatives (as defined in the Confidentiality Agreement) and any other third party who signed (or signs) a joinder thereto subject to and in accordance with the Confidentiality Agreement as if parties thereto) until the Closing, at which time the obligations under the Confidentiality Agreement shall terminate.  If for any reason the Closing does not occur and this Agreement is terminated, the Confidentiality Agreement shall continue in full force and effect in accordance with its respective terms; provided, that the term of the Confidentiality Agreement as set forth therein shall be amended to refer to one (1) year from the date of termination of this Agreement.  For the avoidance of doubt, the provisions in the Confidentiality Agreement which by their terms survive the termination of the Confidentiality Agreement, shall continue in full force and effect in accordance with their terms (as modified by the previous sentence).

Section 6.04.   Regulatory Approvals and Notices.

(a)     For a period of three (3) months following the Closing, (i) each Party shall, and shall cause its Affiliates to, use commercially reasonable efforts to make all required filings and promptly obtain all Consents, Permits and Orders of all Government Authorities (other than any required approvals or action of the Bankruptcy Court, which are governed exclusively by Article VIII) that may be, or become, necessary for the execution and delivery of, and performance of its obligations pursuant to, the Transaction Agreements (including the consummation of the Transactions) (collectively, the "**Government Approvals**"); and (ii) each Party shall use commercially reasonable efforts to assist the other Party and its Affiliates with the identification of all such Government Approvals and shall reasonably cooperate with the actions contemplated in this Section 6.04(a).

305547980v15

HIGHLY CONFIDENTIAL

(b)      For a period of three (3) months following the Closing, (i) each Party shall promptly inform the other Parties of any material communication (whether oral or written) made to, or received by, such Party (or any of their Affiliates) from any Government Authority regarding any of the Transactions, and promptly provide a copy of any such material written communication, or a written summary of any such oral communication, to the other Parties, (ii) each Party shall promptly notify the other Parties of any substantive oral or written communication it or any of its Representatives receives from any Government Authority relating to the matters that are the subject of this Section 6.04, permit the other Parties and their respective Representatives to review in advance any substantive communication relating to the matters that are the subject of this Section 6.04 proposed to be made by such Party to any Government Authority and consider the other Parties' views in good faith, and provide the other Parties with copies of all substantive correspondence, filings or other communications between them or any of their Representatives, on the one hand, and any Government Authority or members of its staff, on the other hand, relating to the matters that are the subject of this Section 6.04.

(c)      Buyer shall not, and shall not permit any of its Affiliates to, take any action (including acquiring or agreeing to acquire by merging or consolidating with, or by purchasing the assets of or equity in, or by any other manner, any Person or portion thereof, or otherwise acquiring or agreeing to acquire any assets) that would reasonably be expected to have the effect of (i) materially increasing the risk of any Government Authority entering an Order prohibiting the consummation of the Transactions or (ii) otherwise delaying the consummation of the Transactions past the Outside Date.

(d)      Notwithstanding anything in this Agreement to the contrary, no Seller or any of its Affiliates shall be required to compensate any third party, commence or participate in any Action or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to remain primarily, secondarily or contingently liable for any Liability of any Transferred Entity) to any third party to obtain any Government Approvals.

Section 6.05.   Third Party Consents. For a period of three (3) months after the Closing each Party agrees to cooperate and use commercially reasonable efforts to obtain any other consents and approvals from any third party other than a Government Authority that may be required in connection with any Transaction (the "**Third Party Consents**").  Notwithstanding anything in this Agreement to the contrary, no Seller or any of its Affiliates shall be required to compensate any third party, commence or participate in any Action or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to remain primarily, secondarily or contingently liable for any Liability of any Transferred Entity) to any third party to obtain any such Third Party Consent.  For the avoidance of doubt, any cooperation obligation of any Seller under this Section 6.05 shall terminate with respect to such Seller on the Wind-Up Date.  For the avoidance of doubt, no representation, warranty or covenant of any Seller contained in any Transaction Agreement shall be breached or deemed breached, and no condition shall be deemed not satisfied, based on (a) the failure to obtain any Third Party Consents or (b) any Action commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any such Third Party Consents.

Section 6.06.   Intercompany Obligations. Sellers shall take or cause to be taken such action (including cancellation of amounts owed by any Transferred Entity to any Debtor, and vice

23

305547980v15

versa, but excluding making any payments from any Debtor to any Transferred Entity, or vice versa) and make or cause to be made such payments as may be necessary so that, as of the Closing Date, there shall be no intercompany obligations (other than pursuant to the Transaction Agreements) other than the Walbro Intercompany Debt being purchased hereunder and the WEM Japan Payable being assumed hereunder. The Sale Order shall provide that Buyer is acquiring the Transferred Entities and the Transferred Assets free and clear of any intercompany obligations, other than (a) the Walbro Intercompany Debt being purchased hereunder, (b) the WEM Japan Payable being assumed hereunder.

Section 6.07.   <u>Cooperation</u>.

(a)     Prior to or concurrently with the Closing, Sellers shall (i) deliver the Kumar Resignation Letter, and the resignation letters, attached hereto as <u>Exhibit G</u>, to the applicable Transferred Entities; and (ii) instruct Ruengrit Pooprasert to sign and issue the notice of extraordinary general meeting ("**EGM**") of shareholders of Walbro FST and Walbro Thailand and to send the notice of EGM to the shareholders of Walbro FST and Walbro Thailand.

(b)     From the Closing until the date that is three (3) months following the Closing, Sellers shall use commercially reasonable efforts to cause each of Walbro FST and Walbro Thailand, to (i) deliver the original share register book by Ruengrit Pooprasert to Buyer, (ii) apply to register the change of Directors (to be signed by Ruengrit Pooprasert), and (iii) deliver to Buyer the possession of the corporate seal.

(c)     During the Pre-Closing Period, (i) Sellers and Buyer shall, and shall cause their respective Affiliates to, (x) refrain from taking any actions that would reasonably be expected to impair, delay or impede the Closing and (y) without limiting the foregoing, use commercially reasonable efforts to cause all Closing Conditions to be met as promptly as practicable and in any event on or before the Outside Date, and (ii) each Party shall keep the other Party reasonably apprised of the status of the matters relating to the completion of the Transactions, including with respect to the negotiations relating to the satisfaction of the Closing Conditions of the other Party.

For purposes of absolute clarity, the covenant obligations set forth in this <u>Section 6.07</u> shall be deemed satisfied for purposes of <u>Section 10.01</u> and shall not give rise to any liability or obligation of any Seller unless Buyer can prove that the Sellers' acts or omissions during the relevant time period set forth herein were made (or omitted) in bad faith.

Section 6.08.   <u>Guarantees; Other Obligations</u>. At or before the Closing, Sellers shall arrange the termination, extinguishment and/or release of (i) any and all guarantees by any Transferred Entity of any Liability of any Seller or any Affiliate of any Seller, (ii) any Lien on any Transferred Asset or equity of any Transferred Entity arising out of or in connection with any Liability of any Seller or any Affiliate of any Seller.

Section 6.09.   <u>Minority Shareholder Interests</u>. From the Agreement Date until the date that is three (3) months following the Closing, (a) WEM shall use commercially reasonable efforts to cause the Walbro FST Minority Shareholders to sell, convey, assign, transfer and deliver to Buyer or one or more of its Affiliates all of the right, title and interest in and to the issued and outstanding equity of Walbro FST held by the Walbro FST Minority Shareholders (the "**Walbro FST**

24

HIGHLY CONFIDENTIAL

**Minority Equity Interests**"), and (b) Carter Carburetor shall use commercially reasonable efforts to cause the Walbro Thailand Minority Shareholders to sell, convey, assign, transfer and deliver to Walbro Japan or one or more of its Affiliates all right, title and interest in and to the Walbro Thailand Minority Equity Interests. Buyer acknowledges and agrees that such transfers shall be made on an "as-is, where-is" basis without any representation, warranty or indemnity of any kind from Sellers or any of their Affiliates with respect to the Walbro FST Minority Equity Interests, the Walbro Thailand Minority Equity Interests or such transfers, and Buyer shall have no claim against Sellers or any of their Affiliates with respect to the Walbro FST Minority Equity Interests, the Walbro Thailand Minority Equity Interests or such transfers.  For purposes of absolute clarity, the failure of any Walbro FST Minority Shareholder or any Walbro Thailand Minority Shareholder to transfer any of their interest in accordance with this Section 6.09, for any reason or no reason, shall not give rise to any liability or obligation of any Seller nor be deemed to be a failure of any condition to Closing in Article X.

Section 6.10.   Prohibited Cash Transaction Exceptions.

(a)   At any time between the date of this Agreement and the Closing Date, Sellers shall have the right, but not the obligation, to request, or cause any Transferred Entity(ies) to request, from any local counsel retained by any of the Transferred Entities, a return of any retainer or similar amount held by any of them which is in excess of the amount of due to such local counsel from the applicable Transferred Entity.  To the extent any retainer or similar amount is actually returned to and received by the Transferred Entity prior to the Closing Date, an equal amount may be distributed or otherwise paid to any of the Sellers.

(b)   Notwithstanding Section 6.10(a), no alteration shall be made in the relationship between any Transferred Entity and Ruengrit Pooprasert, nor shall any request or demand be made for a return of any retainer or similar amount from him or any firm with which he is associated.

(c)   At any time between the date of this Agreement and the Closing Date, Sellers shall have the right, but not the obligation, to distribute cash proceeds out of any accounts of Walbro Switzerland.

# ARTICLE VII

# POST-CLOSING COVENANTS

Section 7.01.   Access.

(a)   From and after the Closing Date, subject to any limitations imposed by the Bankruptcy Code or the Bankruptcy Court (if applicable), in connection with any reasonable business purpose, including the preparation or amendment of Tax Returns, claims or obligations relating to financial statements, or the determination of any matter relating to the rights or obligations of Sellers or any of their Affiliates under any Transaction Agreement, or as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Cases, upon reasonable prior written notice to Buyer, and except to the extent necessary to (i) ensure compliance with any applicable Law or an Order of the Bankruptcy Court, (ii) preserve any

25

HIGHLY CONFIDENTIAL

applicable privilege (including the attorney-client privilege) or (iii) comply with any contractual confidentiality obligations, Buyer shall, and shall cause its respective Affiliates and each of their respective Representatives to (A) afford each Seller and its Representatives and their respective Affiliates reasonable access, during normal business hours, to the properties, books and records of Buyer and its Affiliates in respect of the Transferred Entities, the Business, and the Transferred Assets, (B) furnish to each Seller and its Representatives and their respective Affiliates such additional financial and other information regarding the Transferred Entities, their Affiliates, the Business, and the Transferred Assets as any Seller or its Representatives may from time to time reasonably request and (C) make available to each Seller and its Representatives and their respective Affiliates those employees of Buyer or its Affiliates whose assistance, expertise, testimony, notes or recollections or presence may be necessary to assist such Seller, its Representatives or their respective Affiliates in connection with its inquiries for any purpose referred to above, including the presence of such Persons for interviews and depositions and as witnesses in hearings or trials for such purposes; provided, however, that such investigation shall not unreasonably interfere with the business or operations of the Business; and provided, further, that the auditors and accountants of Buyer or its Affiliates shall not be obligated to make any work papers available to any Person except in accordance with such auditors' and accountants' normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or accountants.  Notwithstanding anything to the contrary herein, for the longer of (1) any applicable statute of limitations and (2) the period ending on the Wind-Up Date, Sellers shall have continued access to all Transferred Books and Records as is reasonably necessary to administer the Bankruptcy Cases and the Sellers may retain copies of such Transferred Books and Records, as necessary or appropriate in connection with such purpose.

(b)     If so requested by Buyer, on the one hand, or Sellers or any of their Affiliates, on the other hand, Sellers or any of their Affiliates, or Buyer or one of its Affiliates, as the case may be, shall enter into a customary joint defense agreement or common interest agreement with Buyer and its Affiliates, or Sellers and their Affiliates, as applicable, with respect to any information to be provided to any other Party or its Affiliates pursuant to Section 7.01(a).

Section 7.02.   Preservation of Books and Records.  Sellers and their Affiliates shall have the right to retain copies of all books and records of the Business relating to periods ending on or before the Closing Date.  Buyer agrees that it shall preserve and keep all original books and records in respect of the Business in the possession or control of Buyer or its Affiliates for the longer of the period ending on (a) any applicable statute of limitations and (b) the Wind-Up Date.  After such period, before Buyer or any Affiliate shall dispose of any of such books and records, Buyer shall give at least ninety (90) days' prior written notice to Sellers of its intention to dispose of such books and records, and Sellers, and/or any of their respective Affiliates shall be given an opportunity, at their cost and expense, to remove and retain all or any part of such books and records as it or they may elect within ninety (90) days of such notice.

Section 7.03.   Further Assurances.  For a period of three (3) months following the Closing, the Parties shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all reasonable further conveyances, notices, assumptions, releases and acquittances and other documents or instruments, and shall take such reasonable actions as may be necessary or appropriate to make effective the Transactions as may be reasonably requested by the other Party,

305547980v15

HIGHLY CONFIDENTIAL

it being understood that the obligations of each Seller under this Section 7.03 shall terminate with respect to such Seller on the Wind-Up Date; provided, however, that nothing in this Section 7.03 shall require any Party or its Affiliates to pay money to, commence or participate in any Action with respect to, or offer or grant any accommodation (financial or otherwise) to, any third party following the Closing.

## ARTICLE VIII

## BANKRUPTCY PROVISIONS

Section 8.01.   Bankruptcy Court Filings.

(a)      Sellers shall seek entry of the Sale Order by the Bankruptcy Court at a sale hearing scheduled as soon as the Bankruptcy Court is available.  The Sale Order shall expressly authorize the deposit of the Base Purchase Price into the DIP Escrow Account for further distribution to the Ad Hoc Group, the Onset Parties and the ABL Secured Parties in accordance with the Settlement Agreement (each as defined in the Sale Order).

(b)      Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  Buyer shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Transferred Assets hereunder. In the event the entry of the Sale Order shall be appealed, Sellers and Buyer shall use their respective reasonable efforts to defend such appeal.

(c)      Sellers may modify the Sale Order pursuant to discussions with the Office of the United States Trustee assigned to the Bankruptcy Cases, the Bankruptcy Court, any creditor or any other party in interest; provided that any such modifications to the Sale Order shall be acceptable to Buyer.

Section 8.02.   Not a Back-up Bidder.  Sellers and Buyer agree that, notwithstanding anything in any Bankruptcy Court Order to the contrary, Buyer shall not be required to act as a "Back-Up Bidder" absent consent of Buyer.

Section 8.03.   Alternative Transactions.

(a)      Upon entry by the Bankruptcy Court of the Sale Order, Sellers shall not, and shall not permit their Affiliates or any of their respective Representatives, to (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Buyer, its Affiliates and its and their respective Representatives) with respect to an alternative transaction for the Transferred Assets (an "**Alternative Transaction**"), (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any

27

305547980v15

HIGHLY CONFIDENTIAL

Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing.

(b)      From and after the execution of this Agreement, Sellers shall promptly (but in any event within 24 hours) give notice to Buyer if (i) any proposals or offers with respect to an Alternative Transaction are received by Sellers or any of their Affiliates or their respective Representatives or (ii) Sellers or their Affiliates engage in any activity that would be prohibited by Section 8.03(a).  Such notice shall set forth the name of the applicable Person making such proposal or offer, or with whom Sellers and their Affiliates are engaged in such activity with (as applicable), and the material terms and conditions of any proposed Alternative Transaction (as applicable).  Sellers shall thereafter keep Buyer reasonably informed, on a reasonably prompt basis, of the status of any discussions or negotiations with respect thereto.

ARTICLE IX

TAX MATTERS

Section 9.01.  Transfer Taxes.  Notwithstanding anything to the contrary in this Agreement, Buyer shall promptly (and in any event no later than the time prescribed under applicable Law) pay and discharge any Transfer Taxes imposed or arising with respect to the Transactions and shall promptly provide Sellers evidence of such payment.  Buyer shall indemnify, defend and hold harmless Sellers or any of their Affiliates or Representatives from and against any such Transfer Taxes (unless such indemnity is prohibited by (or otherwise invalid under) applicable Law, in which case Buyer shall indemnify, defend and hold harmless Sellers for an amount equal to any such Transfer Taxes).  The party required by Law to file a Tax Return with respect to such Transfer Taxes shall, with the cooperation of the other Parties, timely prepare and file such Tax Return.  If Sellers or any of their Affiliates or Representatives is required to pay any Transfer Tax, Buyer shall within five (5) Business Days of receipt of evidence of filing reimburse Sellers for any Transfer Taxes paid by Sellers or their Affiliates or Representatives in connection with the filing of the applicable Tax Return.  Buyer and Sellers each agree to timely sign and deliver (or to cause their respective Affiliates to timely sign and deliver) such certificates or forms as may be necessary or appropriate and otherwise to cooperate to establish any available exemption from (or otherwise reduce) any Transfer Taxes (it being understood that Sellers and their cooperation obligation hereunder shall cease as of the Wind-Up Date).  No sums payable, or consideration given, by Buyer under this Agreement should be reduced by the amount of any Transfer Tax, and Buyer shall pay any Transfer Tax on those sums or consideration.  All refunds or credits of VAT paid by Buyer under this Section 9.01 shall belong to Buyer.

Section 9.02.  Tax Cooperation.  Without limiting the obligations set forth in Section 6.02 and Section 7.01, the Parties shall furnish or cause to be furnished to each other, upon request, and at the sole cost of the requesting Party, as promptly as practicable, such information and assistance relating to the Transferred Entities, and the Transferred Assets, or the Business as is reasonably necessary for the filing of Tax Returns, the making of any election related to Taxes permitted to be made under this Agreement, and the preparation for, or the prosecution or defense of, any audit, claim, demand, proposed adjustment or deficiency relating to Taxes, and any other matter or proceeding relating to Taxes (it being understood that Sellers and their cooperation obligations hereunder shall cease as of the Wind-Up Date).  Buyer agrees that it shall preserve and keep, or

28

305547980v15

**HIGHLY CONFIDENTIAL**

cause to be preserved and kept, all original books and records in respect of the Business relating to Taxes with respect to taxable years or periods (or portion thereof) ending on or before the Closing Date and in the possession of Buyer or its Affiliates in accordance with Section 7.02.

Section 9.03.   Post-Closing Actions.  With respect to the Transferred Entities, except with Sellers' written consent, neither Buyer nor any Affiliate of Buyer shall (or shall cause or permit the Transferred Entities to), (a) make or change any election, amend, refile or otherwise modify any Tax Return, (b) voluntarily approach a Taxing Authority regarding any Taxes or Tax Returns, enter into any closing agreement, settle any Tax claim or assessment or surrender any right to claim a refund of Taxes, (c) extend or waive any statute of limitations or other period for the assessment or collection of Taxes or (d) otherwise take any action relating to Taxes, in each case with respect to the Pre-Closing Tax Period for the foregoing clauses (a)-(d), that could create a Tax liability for Sellers or otherwise reduce the amounts Sellers would receive under this Agreement.

Section 9.04.   Survival.  Except as otherwise provided herein, the obligations set forth in this Article IX with respect to Taxes shall survive until the third (3rd) anniversary of the Closing Date.

Section 9.05.   Adjustment to Purchase Price.  The Parties agree to treat any payment made pursuant to this Agreement as an adjustment to the Base Purchase Price for all Tax purposes, unless otherwise required by applicable Law.

Section 9.06.   Interim Closing of the Books.  For purposes of determining the amount of any inclusion under Section 951 and Section 951A of the Code attributable to the ownership of the Transferred Equity, the Parties shall treat, and shall cause the Transferred Entities to treat, the taxable year of the Transferred Entities as ending on the day before the Closing Date, provided that all permitted allowances, credits, exemptions and deductions that are computed on the basis of an entire taxable period (including depreciation and amortization deductions) shall be allocated between the portion of the Straddle Period ending on the day before Closing Date and the portion of the Straddle Period beginning on the Closing Date in proportion to the number of days in each such taxable period.

Section 9.07.   Agreements regarding 336 and 338.  No election under Section 336 or Section 338 of the Code (or any comparable applicable provision of state, local or foreign law) shall be made with respect to the transactions contemplated under this Agreement.

Section 9.08.   Tax Refunds.

(a)   All Tax refunds or credits of Taxes of the Transferred Entities attributable to a Pre-Closing Tax Period shall be for the account of the Sellers (or their successors, beneficiaries or assigns).  Buyer and the Transferred Entities shall, and shall cause each of their respective Affiliates, (i) to forward to Sellers (or their successors, beneficiaries or assigns) any such refund of Taxes within thirty (30) days after such refund is received and (ii) to reimburse Sellers (or their successors, beneficiaries or assigns) for any such credit of Taxes within thirty (30) days after the credit is allowed or applied against another Tax liability.  At Principal Sellers' written request, Buyer shall (or shall cause the applicable Transferred Entity to) use commercially reasonable efforts to timely and properly prepare, or cause to be prepared, and file, or cause to be filed, any

HIGHLY CONFIDENTIAL

reasonable claim for refund, amended Tax Return, or other Tax Return required to obtain any such Tax refunds or credits attributable to a Pre-Closing Tax Period of the Transferred Entities (a "**Qualifying Filing**" and such request, a "**Qualified Tax Refund Request**").  Neither Buyer, the Transferred Entities, nor their Affiliates shall intentionally forfeit, fail to collect, or otherwise minimize any Tax refund or credit of Taxes to which Sellers would be entitled.  In the case of any Straddle Period, the amount of Tax refunds or credit of Taxes to which Sellers are entitled shall be determined as if the relevant Tax period ended at the end of the Closing Date.

(b)     The following limitations apply to all of the obligations set forth in Section 9.08(a):

(i)     The obligations in Section 9.08(a) shall terminate two (2) years after the Closing Date; provided, that the obligation to pay to Sellers any amount received or credited with respect to a Qualified Tax Refund Request delivered prior to the Second Anniversary of the Closing Date shall survive indefinitely.

(ii)     There shall be no obligation, pursuant to Section 9.08(a) to (A) pay any tax refunds received if the aggregate of all such tax refunds is less than $50,000 (or foreign currency equivalent) or (B) make any Qualifying Filing with respect to any tax refunds, the aggregate amount of which is reasonably expected to be less than $50,000 (or foreign currency equivalent).  Any tax refunds retained by the Buyer as a result of this Section 9.08(b)(ii) the "**Retained De Minimis Tax Refunds**").

(iii)     Subject to the last sentence of this Section 9.08(b)(iii), Buyer and the Transferred Entities shall be entitled to offset from any amount otherwise due to Sellers under Section 9.08(a) by the amount of any Taxes paid by Buyer or any Transferred Entity after the Closing Date in respect of any Pre-Closing Tax Period.  Buyer or the applicable Transferred Entity shall provide reasonable evidence of the payment of any Taxes that would give rise to an offset under this Section 9.08(b)(iii).  The Parties agree that the offset provided by Section 9.08(b)(iii) shall first apply against any and all Retained De Minimis Tax Refunds.

(iv)     Sellers shall promptly reimburse Buyer or the applicable Transferred Entity for any reasonable and documented expenses incurred in the performance of the obligations in this Section 9.08.

## ARTICLE X

## CONDITIONS TO CLOSING

Section 10.01. Conditions to Obligations of Buyer and Sellers.  The obligations of Buyer and Sellers to consummate the Transactions shall be subject to (i) the Bankruptcy Court's entry of the Sale Order and such Sale Order not being subject to any stay, and (ii) each party's execution and delivery, or causing to be executed and delivered, to the other applicable parties of all of the documents described in Section 2.03 to which it is a party, (iii) all representations and warranties of the other applicable parties contained in this Agreement shall be true and correct as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of

305547980v15

such date), except for breaches or inaccuracies, as the case may be, as to matters that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; provided, however, that for purposes of determining the satisfaction of the condition in this clause (iii), no effect shall be given to any qualifier of "material" or "Material Adverse Effect" in such representations and warranties and (iv) the covenants contained in this Agreement required to be performed or complied with by the other applicable parties at or before the Closing shall have been performed or complied with in all material respects.

Section 10.02. Frustration of Closing Conditions.  Neither Sellers nor Buyer may rely on the failure of any condition set forth in this Article X to be satisfied if such failure was caused by such Party's failure to act in good faith or to use commercially reasonable efforts to cause the Closing Conditions of each such other Party to be satisfied.

Section 10.03. Waiver of Closing Conditions.  Upon the occurrence of the Closing, any condition set forth in this Article X that was not satisfied as of the Closing shall be deemed to have been waived as of and from the Closing.

## ARTICLE XI

## TERMINATION

Section 11.01. Termination.  Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated before the Closing:

(a)      by the mutual written consent of Principal Seller and Buyer;

(b)      by either Principal Seller or Buyer, if the Closing shall not have occurred by July 31, 2026 (the "**Outside Date**"); provided, however, that, if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties or covenants contained in this Agreement by Buyer or Sellers, then the breaching Party may not terminate this Agreement pursuant to this Section 11.01(b);

(c)      by either Principal Seller or Buyer, in the event that any Government Authority of competent jurisdiction shall have issued an Order that permanently enjoins the consummation of the purchase of the Transferred Interests contemplated by this Agreement and such Order shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 11.01(c) shall not be available to Principal Seller or Buyer whose action or failure to fulfill any obligation under this Agreement has been the cause of, or has resulted in, the issuance of such Order or other action;

Section 11.02. Notice of Termination.  If either Buyer or Principal Seller desire to terminate this Agreement pursuant to Section 11.01, such Party shall give written notice of such termination to the other Party.

Section 11.03. Effect of Termination.

(a)      If this Agreement is terminated pursuant to Section 11.01, this Agreement shall thereupon become null and void and of no further force and effect, except for the provisions

305547980v15

**HIGHLY CONFIDENTIAL**

of (i) Section 6.03, (ii) Section 8.02, (iii) this Section 11.03 and (iv) Article XII (each of which shall survive such termination); provided, that nothing in this Section 11.03 shall be deemed to (A) release any Party from any Liability for any (x) knowing and intentional breach of this Agreement prior to the date of termination or (y) willfully and knowingly committed fraud against the non-breaching party with the specific intent to deceive and mislead, as determined by the Bankruptcy Court or (B) impair the right of any Party to compel specific performance by any other Party of its obligations under this Agreement.

(b)      Buyer acknowledges that the agreements contained in this Section 11.03(b) are an integral part of the Transactions, and that without these agreements, Sellers would not have entered into this Agreement.  Buyer agrees that Sellers may seek any other remedies at Law or equity arising from Buyer's breach of this Agreement, pursuant to Section 11.03(a) and Section 12.17.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01. Rules of Construction.  The following rules of construction shall govern the interpretation of this Agreement:

(a)      references to "applicable" Law or Laws with respect to a particular Person, thing or matter means only such Law or Laws as to which the Government Authority that enacted or promulgated such Law or Laws has jurisdiction over such Person, thing or matter as determined under the Laws of the State of Delaware as required to be applied thereunder by the Bankruptcy Court;

(b)      references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(c)      when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in beginning the calculation of such period will be excluded (for example, if an action is to be taken within two (2) days after a triggering event and such event occurs on a Tuesday, then the action must be taken by Thursday); if the applicable provision calculates the period of time using Business Days and the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(d)      whenever the context requires, words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender;

(e)      (i) the provision of a table of contents, the division into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement and (ii) references to the terms "Article," "Section," "subsection," "subclause," "clause," "Schedule" and "Exhibit" are

32

305547980v15

HIGHLY CONFIDENTIAL

references to the Articles, Sections, subsections, subclauses, clauses, Schedules and Exhibits to this Agreement unless otherwise specified;

(f)     all Schedules and Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein;

(g)     any capitalized term used in any Schedule or Exhibit but not otherwise defined therein shall have the meaning as defined in this Agreement;

(h)     where there is any inconsistency between the definitions set out in Section 1.01 and the definitions set out in any other Section or any Schedule or Exhibit, then, for the purposes of construing such Section, Schedule or Exhibit, the definitions set out in such Section, Schedule or Exhibit shall prevail;

(i)     (i) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the schedules and Exhibits thereto, (ii) the terms "thereof," "therein," "thereby," "thereto" and derivative or similar words refer to this Agreement to which the context refers, including the schedules and Exhibits thereto, (iii) the terms "include," "includes," "including" and words of similar import when used in this Agreement mean "including, without limitation" unless otherwise specified, (iv) the term "any" means "any and all" and (v) the term "or" shall not be exclusive and shall mean "and/or";

(j)     (i) references to "days" means calendar days unless Business Days are expressly specified, (ii) references to "written" or "in writing" include in electronic form (including by e-mail transmission or electronic communication by portable document format (.pdf)) and (iii) references to "$" mean U.S. dollars;

(k)     references to any Person includes such Person's successors and permitted assigns;

(l)     whenever this Agreement requires any Seller to take any action, such requirement shall be deemed to involve an undertaking on the part of such Seller to take such action or to cause such Seller to take such action;

(m)     references to any agreement or Contract are to that agreement or Contract as amended, modified or supplemented from time to time in accordance with the terms thereof;

(n)     unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if";

(o)     each Party has participated in the negotiation and drafting of this Agreement, and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any provision in this Agreement; the language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party; and

305547980v15

HIGHLY CONFIDENTIAL

(p)      prior drafts of this Agreement or any ancillary agreements, schedules or exhibits thereto or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement or any ancillary agreements, schedules or exhibits hereto shall not be used as an aid of construction or otherwise constitute evidence of the intent of the Parties; and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of such prior drafts.

Section 12.02. Expenses.  Except as specified in the Transaction Agreements, each Party will pay its own costs and expenses, including legal, consulting, financial advisor, accounting and other fees and expenses, incurred in connection with the Transaction Agreements and the Transactions.

Section 12.03. Notices.  All notices and other communications under or by reason of this Agreement shall be in writing and shall be deemed to have been duly given or made (a) upon receipt when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed or (c) upon delivery by overnight courier service, in each case, to the addresses and attention parties indicated below (or such other address, e-mail address or attention party as the recipient party has specified by prior notice given to the sending party in accordance with this Section 12.03):

| | |
|---|---|
| If to Sellers, to: | First Brands Group Holdings, LLC<br>127 Public Square, Suite 300<br>Cleveland, OH 44114<br>Attention: Charles M. Moore<br>E-mail: cmoore@alvarezandmarsal.com |
| with a copy (which will not constitute notice) to: | Katten Muchin Rosenman LLP<br>50 Rockefeller Plaza<br>New York, NY 10020-1605<br>Attention:  Cindi M. Giglio<br>Email:  cgiglio@katten.com<br><br>and<br><br>Weil, Gotshal & Manges LLP<br>700 Louisiana St<br>Suite 1700<br>Houston, TX 77002<br>Attention:  Clifford W. Carlson<br>Email:  clifford.carlson@weil.com |
| If to Buyer, to: | Husqvarna Business Support AB<br>c/o Husqvarna AB, Box 7454, 103 92 Stockholm, Sweden<br>Attention:  Sophie Elfstadius (Husqvarna Group General Counsel)<br>E-mail: Sophie.Jonsson.Elfstadius@husqvarnagroup.com |

305547980v15

HIGHLY CONFIDENTIAL

|  |  |
|---|---|
| with a copy (which will not constitute notice) to: | Thompson Hine LLP<br>127 Public Square Suite 3900<br>Cleveland, OH  44114<br>Attention:  Sean Gordon and David Watson<br>E-mail:  sean.gordon@thompsonhine.com and<br>            david.watson@thompsonhine.com |

Section 12.04. Survival.  Except (a) as set forth in Section 9.04 and Section 11.03(a) and (b) for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing (which covenants shall survive the Effective Time in accordance with their terms), none of the representations, warranties, or covenants of any Party set forth in this Agreement or any Transaction Agreement shall survive, and each of the same shall terminate and be of no further force or effect as of or following the Effective Time.

Section 12.05. Limitation on Liability.  Notwithstanding anything in this Agreement or in any other Transaction Agreement to the contrary, (a) except in the event of willfully and knowingly committed fraud with the specific intent to deceive and mislead, the maximum aggregate Liability of Sellers under this Agreement shall not exceed $1,200,000 and (b) in no event shall any Party have any Liability under this Agreement (including under this Article XII) for any consequential, special, incidental, indirect or punitive damages, lost profits or similar items (including loss of revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to a breach or alleged breach of this Agreement); provided, that such limitation set forth in clause (b) of this Section 12.05 shall not limit any Party's right to recover contract damages in connection with or resulting from such Party's failure to close the Transactions in breach or violation of this Agreement.

Section 12.06. Public Announcements.  No Party nor any Affiliate or Representative of such Party shall issue or cause the publication of any press release or public announcement or otherwise communicate with any news media in respect of the Transaction Agreements or the Transactions without the prior written consent of the other Parties (which consent shall not be unreasonably withheld, conditioned or delayed), except as is required by applicable Law or by Order of the Bankruptcy Court (in which case the disclosing Party, to the extent practicable under the circumstances and permissible by Law, shall (a) advise the other Parties before making such disclosure and (b) provide each such other Party a reasonable opportunity to review and comment on such release or announcement and consider in good faith any comments with respect thereto).

Section 12.07. Severability.  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired.  If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the Government Authority making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

305547980v15

**HIGHLY CONFIDENTIAL**

Section 12.08. <u>Assignment</u>.  This Agreement will be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties.  No Party may assign (whether by operation of Law or otherwise) this Agreement or any rights, interests or obligations provided by this Agreement without the prior written consent of the other Parties; <u>provided</u>, <u>however</u>, that (a) Buyer may assign this Agreement and any or all rights under this Agreement to any Affiliate and (b) Sellers may assign any of their rights or obligations under this Agreement to any of their Affiliates or to any plan administrator, liquidator, liquidating trust, "winddown" vehicle, examiner, receiver, trustee or similar party appointed on its behalf following that Closing; <u>provided</u>, <u>further</u>, that no such assignment pursuant to the foregoing shall release any other Party from any Liability under this Agreement.  Any attempted assignment in violation of this <u>Section 12.08</u> shall be void *ab initio*.

Section 12.09. <u>No Third-Party Beneficiaries</u>.  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and, except with respect to the Nonparty Affiliates pursuant to <u>Section 12.18</u>, Weil, Gotshal & Manges LLP or Katten Muchin Rosenman LLP pursuant to <u>Section 12.22</u> or as otherwise expressly set forth in this Agreement, nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a Party, including any Affiliates of any Party.

Section 12.10. <u>Entire Agreement</u>.  This Agreement and the other Transaction Agreements (and all Exhibits and Schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior or contemporaneous negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

Section 12.11. <u>Amendments</u>.  This Agreement (including all Exhibits and Schedules hereto) may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by Buyer and Sellers.

Section 12.12. <u>Waiver</u>.  At any time before the Closing, either Sellers or Buyer may, by written instrument duly executed by the waiving Party, (a) extend the time for the performance of any obligation or other acts of the other Party, (b) waive any breaches or inaccuracies in the representations and warranties of the other Party contained in this Agreement or in any document delivered pursuant to this Agreement or (c) waive compliance with any covenant, agreement or condition contained in this Agreement, but such waiver of compliance with any such covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 12.13. <u>Governing Law</u>.  This Agreement, and any Action or claim that may be based upon, arise out of or relate or be incidental to any Transaction, this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "**Transaction Dispute**"), will be exclusively

governed by and construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Delaware to be applied.

Section 12.14. Dispute Resolution; Consent to Jurisdiction.

(a)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.03 (as may be updated from time to time in accordance with Section 12.03); provided, however, that upon the closing of the Bankruptcy Cases, or if the Bankruptcy Court does not have subject matter jurisdiction, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware (or, solely in the event the Court of Chancery of the State of Delaware declines to exercise such jurisdiction, the exclusive jurisdiction of any federal or state court sitting in the City of Wilmington, Delaware) and any appellate court from any thereof, for the resolution of any such Transaction Dispute.  In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally:

(i)    submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts;

(ii)    agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and

(iii)    agrees that the mailing by certified or registered mail, return receipt requested, to the Persons listed in Section 12.03 (as may be updated from time to time in accordance with Section 12.03) of any process required by any such court, will be effective service of process; provided, however, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of Delaware.

(b)    The foregoing consent to jurisdiction will not constitute submission to jurisdiction or general consent to service of process in the State of Delaware for any purpose except with respect to any Transaction Dispute.

Section 12.15. Waiver of Jury Trial.  To the maximum extent permitted by Law, each Party irrevocably and unconditionally waives any right to trial by jury in any forum in respect of any Transaction Dispute and covenants that neither it nor any of its Affiliates or Representatives will assert (whether as plaintiff, defendant or otherwise) any right to such trial by jury.  Each Party certifies and acknowledges that (a) such Party has considered the implications of this waiver, (b) such Party makes this waiver voluntarily and (c) such waiver constitutes a material inducement

37

HIGHLY CONFIDENTIAL

upon which such Party is relying and will rely in entering into this Agreement.  Each Party may file an original counterpart or a copy of this Section 12.15 with any court as written evidence of the consent of each Party to the waiver of its right to trial by jury.

Section 12.16. Admissibility into Evidence.  All offers of compromise or settlement among the Parties or their Representatives in connection with the attempted resolution of any Transaction Dispute (a) shall be deemed to have been delivered in furtherance of a Transaction Dispute settlement, (b) shall be exempt from discovery and production and (c) shall not be admissible into evidence (whether as an admission or otherwise) in any proceeding relating to the resolution of any such Transaction Dispute.

Section 12.17. Remedies; Specific Performance.

(a)     Except to the extent set forth otherwise in this Agreement, all remedies under this Agreement expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by Law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

(b)     Each Party agrees that irreparable damage would occur and the Parties would not have an adequate remedy at law if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, each Party agrees that the other Party will be entitled to injunctive relief from time to time to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions of this Agreement, in each case (i) without the requirement of posting any bond or other indemnity and (ii) in addition to any other remedy to which it may be entitled, at law or in equity.  Furthermore, each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement, and to specifically enforce the terms of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of such Party under this Agreement.  Each Party expressly disclaims that it is owed any duty not expressly set forth in this Agreement, and waives and releases all tort claims and tort Actions that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.

Section 12.18. Non-Recourse.  All claims, obligations, Liabilities or Actions (whether in Contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the Preamble to this Agreement or, if applicable, their successors and assigns ("**Contracting Parties**").  No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other Representative of, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other Representative of any of the foregoing or any of their successors and assigns ("**Nonparty Affiliates**"), shall have any Liability (whether in Contract or in tort, in law or in equity, or granted by statute) for any claims,

305547980v15

HIGHLY CONFIDENTIAL

Action, obligations, or other Liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or their negotiation, execution, performance, or breach; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such claims, Action, obligations and other Liabilities against any such Nonparty Affiliates. It is expressly agreed that the Nonparty Affiliates to whom this Section 12.18 applies shall be third-party beneficiaries of this Section 12.18.

Section 12.19. Releases.

(a)     As of the Closing, Sellers, on behalf of themselves and their Subsidiaries, (i) irrevocably and unconditionally waive, release, and forever discharge (a) the Transferred Entities and (b) Buyer and each of their respective current Representatives, stockholders, members, directors, managers, trustees, principals, predecessors, attorneys, accountants, advisors, representatives, successors, assigns, beneficiaries, heirs or executors (collectively, the "**Buyer Released Parties**") from any and all Released Claims, (ii) irrevocably covenant to refrain from, directly or indirectly, asserting any claims or commencing, instituting or causing to be commenced, any Action of any kind against any Buyer Released Party with respect to the Released Claims, and (iii) represent to the other Parties that Sellers have not assigned or transferred, nor purported to assign or transfer, to any Person all or any part of, or any interest in, any Released Claim (and notwithstanding anything to the contrary in this Agreement, no such assignment or transfer shall be permitted, and any purported assignment or transfer shall be legally ineffective). Sellers also hereby waive the benefits of, and any right that such Person may have under, any statute or common law principle of similar effect in any jurisdiction with respect to any Released Claim. Notwithstanding the foregoing or anything to the contrary in this Agreement, and for the avoidance of doubt, Buyer Released Parties shall not include any of the Identified Defendants or any Immediate or Mediate Transferee of any value provided by the Debtors to any Identified Defendant.

(b)     As of the Closing, Buyer, on behalf of itself and its Subsidiaries (and any assignees in accordance with Section 12.08), (i) irrevocably and unconditionally waives, releases, and forever discharges Sellers and each of their respective current and former advisors, stockholders, members, directors, managers, trustees, principals, parents, Affiliates (other than the Transferred Entities), Subsidiaries, joint ventures, predecessors, attorneys, accountants, advisors, representatives, successors, assigns, beneficiaries, heirs or executors (collectively, the "**Seller Released Parties**") from any and all Released Claims, (ii) irrevocably covenants to refrain from, directly or indirectly, asserting any claims or commencing, instituting or causing to be commenced, any Action of any kind against any Seller Released Party with respect to the Released Claims, and (iii) represents to the other Parties that Buyer has not assigned or transferred, nor purported to assign or transfer, to any Person all or any part of, or any interest in, any Released Claim (and notwithstanding anything to the contrary in this Agreement, no such assignment or transfer shall be permitted, and any purported assignment or transfer shall be legally ineffective). Buyer also hereby waives the benefits of, and any right that such Person may have under, any statute or common law principle of similar effect in any jurisdiction with respect to any Released Claim.

(c)     As of the Closing, (i) Sellers, on behalf of themselves and their Subsidiaries, irrevocably and unconditionally waive, release, and forever discharge the Transferred Entities

39

305547980v15

HIGHLY CONFIDENTIAL

from any and all Intercompany Released Claims and (ii) the Transferred Entities irrevocably and unconditionally waive, release, and forever discharge the Sellers and their Subsidiaries from any and all Intercompany Released Claims.

Section 12.20. <u>Interest</u>.  If any payment required to be made to a Party under this Agreement is made after the date on which such payment is due, interest shall accrue at the Interest Rate on such amount from (but not including) the due date of the payment to (and including) the date such payment is actually made.  All computations of interest pursuant to this Agreement shall be made on the basis of a year of three hundred sixty-five (365) days, in each case for the actual number of days from (but not including) the first day to (and including) the last day occurring in the period for which such interest is payable.

Section 12.21. <u>Schedules and Exhibits</u>.  The schedules and Exhibits attached to this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

Section 12.22. <u>Provision Respecting Legal Representation</u>.  Each Party to this Agreement agrees, on its own behalf and on behalf of its Affiliates and Representatives, that Weil, Gotshal & Manges LLP and Katten Muchin Rosenman LLP may serve as counsel to Sellers, on the one hand, and any Transferred Entities, on the other hand, in connection with the negotiation, preparation, execution and delivery of the Transaction Agreements and the consummation of the Transactions, and that, following consummation of the Transactions, Weil, Gotshal & Manges LLP and/or Katten Muchin Rosenman LLP may serve as counsel to any Seller or any Affiliate or Representative of any Seller, in connection with any litigation, claim or obligation arising out of or relating to the Transactions and the Transaction Agreements notwithstanding such prior representation of the Transferred Entities and each Party consents thereto and waives any conflict of interest arising therefrom, and each Party shall cause its Affiliates and Representatives to consent to waive any conflict of interest arising from such representation.

Section 12.23. <u>Privilege</u>.  Buyer, for itself and its Affiliates, and its and its Affiliates' respective successors and assigns, hereby irrevocably and unconditionally acknowledges and agrees that, other than in the case of potential willfully and knowingly committed fraud with the specific intent to deceive and mislead (such potential claims to be reasonably determined upon the advice of counsel), all attorney-client privileged communications between any Seller and their respective current or former Affiliates or Representatives and their counsel, including Weil, Gotshal & Manges LLP and Katten Muchin Rosenman LLP, made before the consummation of the Closing in connection with the negotiation, preparation, execution, delivery and Closing under any Transaction Agreement, any Transaction Dispute or, before the Closing, any other matter, shall continue after the Closing to be privileged communications with such counsel and neither Buyer nor any of its former or current Affiliates or Representatives nor any Person purporting to act on behalf of or through Buyer or any of its current or former Affiliates or Representatives, shall seek to obtain the same by any process on the grounds that the privilege attaching to such communications belongs to Buyer, the Transferred Entities or the Business or on any other grounds.

305547980v15

**HIGHLY CONFIDENTIAL**

Section 12.24. <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE FOLLOWS]

305547980v15

HIGHLY CONFIDENTIAL

IN WITNESS WHEREOF, Sellers and Buyer have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

**PRINCIPAL SELLER:**

**First Brands Group Holdings, LLC**

By: _____
Name: Shekhar Kumar
Title: Senior Vice President - M&A

**CARTER CARBURETOR:**

**Carter Carburetor Holdings, LLC**

By: _____
Name: Shekhar Kumar
Title: Senior Vice President - M&A

**WEM:**

**WEM US Co.**

By:` _____
Name: Shekhar Kumar
Title: Senior Vice President - M&A

[Signature Page to PA]

4908-2340-2905
6000857526.1
305547980v13

IN WITNESS WHEREOF, Sellers and Buyer have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

BUYER:

Husqvarna Business Support AB

By: _____

Name: Pär Henrik Johansson

Title: Board member / Authorized Signatory

By: _____

Name: Sophie Elisabeth Elfstadius

Title: Deputy Board member / Authorized Signatory

**Exhibit A**
**Form of Stock Power (Walbro Japan)**

(*see* attached)

305547980v15

**Stock Power**

FOR VALUE RECEIVED, the undersigned, Carter Carburetor Holdings, LLC, a Delaware limited liability company ("**Transferor**"), does hereby sell, convey, assign, transfer and deliver unto Husqvarna Business Support AB ("**Transferee**") all of the right, title and interest of Transferor in and to all of the issued and outstanding equity interests of Walbro Co., Ltd., a joint stock company organized under the laws of Japan (the "**Walbro Japan Equity Interests**").

Transferor does hereby irrevocably constitute and appoint any designee of Transferee as its true and lawful attorney-in-fact, with full power of substitution, to transfer the Walbro Japan Equity Interests on the books and records of Walbro Japan, with full power and authority to do all things necessary or appropriate to effect such transfer.

This Stock Power may be executed and delivered (including by electronic transmission) and shall be effective as of the date set forth below.

IN WITNESS WHEREOF, the undersigned has executed this Stock Power as of _____, *2026*.

**CARTER CARBURETOR HOLDINGS, LLC**

By:_____
Name: Shekhar Kumar
Title: Senior Vice President - M&A

305636018v2

**Exhibit B**
**Form of Instruction Letter (Walbro Japan)**

(*see* attached)

## 株主名簿記載事項変更請求書
## Request to Enter Share Transfer into Shareholder Register

2026 年　　　月　　　日
, 2026

ウォルブロー株式会社　御中
To: Walbro Co., Ltd. (the "**Company**")

　Husqvarna Business Support AB（以下、「譲受人」という。）は、Carter Carburetor Holdings, LLC（以下、「譲渡人」という。）から、2026 年　　　月　　　日付で貴社の普通株式 143,006 株（以下、「本件株式」という。）を譲渡により取得しました。したがって、譲渡人及び譲受人は共同して、譲受人を本件株式の株主として貴社の株主名簿に記載することを請求します。

Husqvarna Business Support AB (the "**Transferee**") has acquired 143,006 common shares of the Company (the "**Shares**") by way of transfer from Carter Carburetor Holdings, LLC on　　　　　　　　, 2026.　Accordingly, the Transferee and the Transferor hereby jointly request the entry of the Transferee as the holder of the Shares of the Company into the shareholder register of the Company.

**譲受人 / Transferee:**

Husqvarna Business Support AB
c/o Husqvarna AB, Box 7454, 103 92 Stockholm, Sweden

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Name:　Pär Henrik Johansson
Title: Board member / Authorized Signatory

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Name: Sophie Elisabeth Elfstadius
Title: Deputy Board member / Authorized Signatory

**譲渡人 / Transferor:**

Carter Carburetor Holdings, LLC
127 Public Square, Suite 5300 Cleveland, Ohio, USA

By ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Name:
Title:

305621188v3

**<u>Exhibit C</u>**
**Form of Resignation Letter (Shekhar Kumar)**

(*see* attached)

305547980v15

[Date]

Re: Resignation

Ladies and Gentlemen:

Reference is hereby made to that certain Purchase Agreement, dated as of July 15, 2026 (the "**Purchase Agreement**"), by and among First Brands Group Holdings, LLC, a Delaware limited liability company, Carter Carburetor Holdings, LLC, a Delaware limited liability company, and WEM US Co., a Delaware corporation, and Husqvarna Business Support AB, an entity organized under the laws of Sweden ("**Buyer**").  Capitalized terms used herein, but not otherwise defined herein, shall have the meaning set forth in the Purchase Agreement.

Effective as of, and conditioned upon the Closing, I, Shekhar Kumar, hereby resign from each and every position that I hold with Walbro Co., Ltd., a joint stock company organized under the laws of Japan, Walbro Fuel Systems and Technology (Thailand) Co., Ltd. an entity organized under the laws of Thailand, Walbro (Thailand) Co., Ltd., an entity organized under the laws of Thailand, Walbro Suisse Group GmbH, an entity organized under the laws of Switzerland, Walbro (Tianjin) Industries Co., Ltd., an entity organized under the laws of the Peoples Republic of China, Walbro Italy S.r.L., an entity organized under the laws of Italy, and Walbro International Holding BV, an entity organized under the laws of the Netherlands and their respective subsidiaries (each a "**Company**", and collectively the "**Companies**"), including, without limitation, any and all positions as a director, officer, representative, authorized signatory, and/or any other capacity in which I serve.

This resignation is irrevocable and is given freely and voluntarily. I hereby confirm that I have no claim against any of the Companies, whether for compensation, fees, expenses, loss of office, severance, or otherwise, and to the extent any such claim exists, I hereby irrevocably and unconditionally waive and release it.

I request that each Company take all actions necessary or appropriate to record and give effect to this resignation, including making any required filings with the applicable governmental, corporate, or commercial registries and updating its statutory books and shareholders' and directors' registers accordingly.

If, for any reason, this resignation is not effective as to any position upon delivery, I agree, at the sole cost and expense of the Companies, to execute and deliver such further documents and instruments as may be reasonably necessary or appropriate to give full effect to the intent of this letter.

Sincerely,

Shekhar Kumar

305637561v2

**Exhibit D**
**Form of Share Transfer Document (Walbro FST)**

(*see* attached)

305547980v15

# ตราสารการโอนหุ้น

## SHARE TRANSFER DOCUMENT

วันที่
Date _____

ข้าพเจ้า                                                                    ("ผู้โอน")
We _____ WEM US Co. _____ ("**Transferor**")

อยู่ ณ
of _____ 251 Little Falls Drive, Wilmington, DE 19808, USA _____

เป็นผู้ถือหุ้นในบริษัท                                                        จำกัด
holder of share(s) in _____ Walbro Fuel Systems and Technology (Thailand) Co., Ltd. _____

ตกลงโอนให้แก่                                                             ("ผู้รับโอน")
hereby transfer to _____ Husqvarna Business Support AB _____ ("**Transferee**")

อยู่ ณ
of _____ c/o Husqvarna AB, Hälsingegatan 49, Box 7454, 103 92 Stockholm, Sweden _____

ซึ่งหุ้นเป็นจำนวนทั้งหมด                                                     หุ้น
a total of _____ 19,998 _____ share,

หมายเลข
No. _____ 1-19998 _____,

ซึ่งมีราคาค่าหุ้นหุ้นละ               บาท   ชำระค่าหุ้นแล้ว                  %
par value per share Baht _____ 100 _____ paid up _____ 100 _____ %

โดยตกลงราคาโอนกันทั้งสิ้นเป็นจำนวนเงิน
The total of agreed transfer price is USD _____ 1 _____.

เพื่อเป็นพยานหลักฐาน คู่สัญญาดังลงชื่อข้างล่างนี้จึงลงลายมือชื่อไว้ต่อหน้าพยาน
IN WITNESS WHEREOF each undersigned party sets its signature hereto in the presence of witnesses.

**WEM US Co.**                          **Husqvarna Business Support AB**

ลงชื่อ                        ผู้โอน        ลงชื่อ                        ผู้รับโอน
Signed _____ Transferor   Signed _____ Transferee
     ( Shekhar Kumar )                   ( Pär Henrik Johansson )

ลงชื่อ                        พยาน         ลงชื่อ                        พยาน
Signed _____ Witness      Signed _____ Witness
     (            )                      ( Sophie Elisabeth Elfstadius )

305621185v2

**<u>Exhibit E</u>**
**Form of Assignment and Assumption Agreement**

(*see* attached)

305547980v15

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Assignment and Assumption Agreement (the "**Agreement**"), effective as of [<mark>closing date</mark>] (the "**Effective Date**"), is by and among First Brands Group Holdings, LLC, a Delaware limited liability company ("**Principal Seller**"), Carter Carburetor Holdings, LLC, a Delaware limited liability company ("**Carter Carburetor**"), and WEM US Co., a Delaware corporation ("**WEM**", and together with Principal Seller and Carter Carburetor, individually a "**Seller**" and collectively, the "**Sellers**"), Walbro Co., Ltd., a joint stock company organized under the laws of Japan ("**Walbro Japan**"), Walbro Fuel Systems and Technology (Thailand) Co., Ltd., an entity organized under the laws of Thailand ("**Walbro FST**"), Walbro (Thailand) Co., Ltd., an entity organized under the laws of Thailand ("**Walbro Thailand**"), Walbro Suisse Group GmbH, an entity organized under the laws of Switzerland ("**Walbro Switzerland**", and together with Walbro Japan, Walbro FST and Walbro Thailand, "**Walbro APAC**"),[1] and Husqvarna Business Support AB, an entity organized under the laws of Sweden, or one or more of its Affiliates ("**Husqvarna**"). All capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the Purchase Agreement (as defined herein).

## ARTICLE I

**WHEREAS**, Principal Seller, Carter Carburetor and WEM, as sellers, and Husqvarna, as buyer, have entered into a certain Purchase Agreement, dated as of July 15, 2026 (the "**Purchase Agreement**"), pursuant to which, among other things, (i) Applicable Obligee has agreed to sell, convey, assign, transfer and deliver to Husqvarna, and Husqvarna has agreed to purchase, acquire and accept from Applicable Obligee, all of their right, title and interest in and to the Walbro Intercompany Debt, and (ii) Carter Carburetor has agreed to assign to Husqvarna, and Husqvarna has agreed to assume and to pay, perform and discharge when due, the WEM Japan Payable.

**NOW, THEREFORE**, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Definitions.

(a)     "**Applicable Obligee**" means, with respect to any component of the Walbro Intercompany Debt, any of the Sellers or any affiliate of any of the foregoing that is the payee or creditor, as applicable, of such intercompany debt or liability.

(b)     "**Walbro Intercompany Debt**" means, collectively, the intercompany debts and liabilities owed by any Walbro APAC entity to any Seller, as more particularly described in the Purchase Agreement and also listed in Appendix 1 attached hereto.

(c)     "**WEM Japan Payable**" means the intercompany loan, as evidenced by that certain Intercompany Advances Promissory Note dated as of July 1, 2024, owed by Carter Carburetor (as debtor) to Walbro Japan (as creditor), in an

---

[1]NTD: Additional parties may be added if Husqvarna is to acquire additional intercompany debt involving entities not listed herein in accordance with the Purchase Agreement.

amount equal to the aggregate principal amount of the Walbro Intercompany Debt as of the Effective Date.

2.      Assignment and Assumption.

(a)      Applicable Obligee hereby sells, conveys, assigns, transfers and delivers to Husqvarna, and Husqvarna hereby purchases, acquires and accepts from Applicable Obligee, all of Applicable Obligee's right, title and interest in and to the Walbro Intercompany Debt.

(b)      Carter Carburetor hereby assigns to Husqvarna, and Husqvarna hereby assumes and agrees to pay, perform and discharge when due, the WEM Japan Payable.

3.      Terms of the Purchase Agreement. The terms of the Purchase Agreement are incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded or expanded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4.      Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

5.      Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

2

3

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first above written.

**Principal Seller**

FIRST BRANDS GROUP HOLDINGS, LLC

By_____
Name: Shekhar Kumar
Title: Senior Vice President - M&A

**Carter Carburetor**

CARTER CARBURETOR HOLDINGS, LLC

By_____
Name: Shekhar Kumar
Title: Senior Vice President - M&A

**WEM**

WEM US CO.

By_____
Name: Shekhar Kumar
Title: Senior Vice President - M&A

**Walbro Japan**

WALBRO CO., LTD.

By_____
Name: Shekhar Kumar
Title: Senior Vice President - M&A

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first above written.

**Walbro FST**

WALBRO   FUEL   SYSTEMS   AND TECHNOLOGY   (THAILAND)   CO., LTD.

By_____
Name: Shekhar Kumar
Title: Senior Vice President - M&A

**Walbro Thailand**

WALBRO (THAILAND) CO., LTD.

By_____
Name: Shekhar Kumar
Title: Senior Vice President - M&A

**Walbro Switzerland**

WALBRO SUISSE GROUP GMBH

By_____
Name: Shekhar Kumar
Title: Senior Vice President - M&A

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first above written.

**Husqvarna Business Support AB**

By:_____

Name:  Pär Henrik Johansson

Title: Board member / Authorized Signatory

By:_____

Name: Sophie Elisabeth Elfstadius

Title: Deputy Board member / Authorized Signatory

**Appendix 1**
**Walbro Intercompany Debt**

(a)    (i) the two shareholder loans from WEM (as creditor) to Walbro FST (as debtor) in the approximate amounts (as of April 27, 2026) of $6,905,000 and $3,964,000, respectively, and (ii) the intercompany payable owed by Walbro FST (as payor) to WEM (as payee), in the approximate amount (as of April 27, 2026) of $1,150,000;

(b)    the intercompany payable, owed by Walbro Thailand (as payor) to WEM and/or Walbro LLC (as payee), in the approximate amount (as of April 27, 2026) of $388,000;

(c)    the intercompany payable owed by Walbro Japan (as payor) to WEM and/or Walbro LLC (as payee), in the approximate amount (as of April 27, 2026) of $686,000;

(d)    the loan from Principal Seller (as creditor) to Walbro Switzerland (as debtor) in the approximate amount (as of May 9, 2026) of $5,328,599.30; and

(e)    any other intercompany liability owed by any Transferred Entity to any Seller agreed in a writing signed by Buyer and Principal Seller.

2

**Exhibit F**
**Interim Operations**

(*see* attached)

305547980v15

**Exhibit F**
**Interim Operations**

1. Taking any and all acts or omissions required to comply with the provisions of the Overdrive Agreement.

305547980v15

**Exhibit G**
**Form of Resignation Letter (Baker & Graham)**

(*see* attached)

305547980v15

To:            First Brands Group Holdings, LLC and its Affiliates
                  Patrick James

CC:           Laurie Stein
                  Shekhar Kumar

Please be advised that, effective as of 5:00 PM this 25th day of September, 2025, I hereby resign as a director, officer, and, as applicable, any role having the functional equivalent thereof to which I have been appointed, of First Brands Group Holdings, LLC, its subsidiaries, and of any affiliate thereof, wherever organized or operating, owned in whole or in part, directly or indirectly, by Patrick James (collectively, the "Applicable Entities"), including any role as signatory or authorized person with respect to bank accounts, governmental agencies, third-party accounts or any similar role.

I hereby revoke the application of my signature to any agreement, filing, notice, or any other document, of any Applicable Entity that was made without my express written consent and request that my signature no longer be applied to any document relating to any Applicable Entity.

To the extent reasonably requested and without personal expense, I will cooperate in any formalities relating to the foregoing.

Best regards,

Michael Baker

Execution Version

# RETIREMENT AND RESIGNATION AGREEMENT

This Retirement and Resignation Agreement (this "Agreement") is made by Chapter 11 debtor and debtor in possession First Brands Group Holdings LLC ("First Brands"), Viceroy Private Capital, LLC ("Viceroy") (collectively with their respective direct and indirect subsidiaries, the "Company"), and Stephen Graham ("Executive"). The Company and Executive are referred to herein collectively as the "Parties" and individually as a "Party."

## RECITALS

WHEREAS, Executive currently serves as Chief Financial Officer of First Brands and as an officer of certain of First Brands' and Viceroy's direct and indirect subsidiaries;

WHEREAS, on September 24 and 28, 2025, First Brands, Viceroy, and certain of their direct and indirect subsidiaries initiated proceedings under Chapter 11 of the Federal Bankruptcy Code in the United States Bankruptcy Court in the Southern District of Texas (the "Chapter 11 Proceedings", and the debtors in such Chapter 11 cases, the "Debtors");

WHEREAS, Executive desires to retire and resign from all employment with the Company and all positions Executive holds as an officer, director, manager, member of the board of directors or board of managers, as applicable, or similar governing body (including any committee thereof on which the Executive currently serves), authorized signatory and/or any comparable positions of any Company entity, as well as any ancillary authority with such entities, including as agent or attorney in fact, including with regard to those entities listed on Exhibit 1 to this Agreement;

WHEREAS, the Company desires to accept Executive's retirement and resignation;

WHEREAS, the Parties wish to memorialize the terms of Executive's retirement and resignation, and to accomplish this end, the Parties are willing to enter into this Agreement; and

NOW, THEREFORE, subject to and in consideration of the mutual promises contained herein, including but not limited to Section 3, the Company and Executive agree as follows:

1. Retirement and Resignation.

    (a) The Parties acknowledge and agree that Executive has retired and resigned from employment with the Company, and all obligations of the Company with respect to such employment shall be terminated, effective October 22, 2025 (the "Retirement Date").



1

Execution Version



Execution Version



2.   Retirement and Resignation from Positions.  The Parties acknowledge and agree that, effective as of the Retirement Date, Executive retires and resigns or shall be deemed to have retired and resigned from any and all offices and positions held as an employee, officer, director, manager, member of the board of directors or board of managers, as applicable, or similar governing body (including any committee thereof on which the Executive currently serves), authorized signatory and/or any comparable positions of any Company entity, as well as any related authority, including as agent or attorney in fact, of any of the governing bodies of the entities comprising the Company, whether or not they are debtors in the Chapter 11 Proceedings.  The Parties agree to take reasonable action necessary to effectuate such retirement and resignation and to remove Executive as a signatory, account holder, officer, director, manager, member of the board of directors or board of managers, as applicable, or similar governing body (including any committee thereof on which the Executive currently serves), authorized signatory and/or any comparable positions of any Company entity (including, for the avoidance of doubt, First Brands or Viceroy), including, without limitation, promptly executing and delivering any documents and designating new managers or directors where applicable.  For the avoidance of doubt, the Company agrees that neither it nor any of its affiliates shall ask Executive to sign any documents in connection with such retirements or resignations that impair any rights preserved in this Agreement.  As of the date of this Agreement, Executive hereby gives notice to the Company and each entity listed on Exhibit 1 of such retirement and resignation, and the Parties acknowledge and agree no further writing shall be required to evidence the retirement and resignation of Executive from all such offices and positions.  To the extent Executive does not take reasonable actions necessary to effectuate such retirement and resignation, the Company is authorized to deliver this Agreement to any Company entity from which Executive has been deemed to have retired and resigned, which shall serve as written notice of the retirement and resignation of Executive.  The Parties agree to take reasonable action to cooperate in good faith to effectuate the retirement and resignation contemplated by this Section 2 and to assist with reasonable administrative matters related thereto.

3

Execution Version



Execution Version



Execution Version

*[The remainder of this page is intentionally left blank]*

Execution Version

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by its duly authorized officer, and Executive has executed this Agreement as of the date written below.

Stephen Graham

Date: October 30, 2025

First Brands Holdings, LLC

_____

By:
Name:
Title:
Date:

Viceroy Private Capital, LLC

_____

By:
Name:
Title:
Date:

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by its duly authorized officer, and Executive has executed this Agreement as of the date written below.

Stephen Graham

_____

Date:

First Brands Holdings, LLC

*Charles Moore*
57E1F72D8F63482...

By: _____

Name: Charles M. Moore
Title: Chief Restructuring Officer
Date: October 30, 2025

Viceroy Private Capital, LLC

*Charles Moore*
57E1F72D8F63482...

By: _____

Name: Charles M. Moore
Title: Chief Restructuring Officer
Date: October 30, 2025

7

Execution Version

**Exhibit 1**

1. AH Forgings Proprietary Limited
2. Airtex (Tianjin) Auto Parts, Inc.
3. Airtex Industries, LLC
4. Airtex Products, LP
5. Airtex Products, S.A.
6. Airtex Tianjin Auto Parts Holding Company Limited
7. APC Intermediate Holdings, LLC
8. APC Parent, LLC
9. ASC (Beijing) Consulting (Holdings) Company Limited
10. ASC (Tianjin) Water Pump Co., Ltd.
11. ASC Industries, Inc.
12. ASC International Incorporated
13. ASC Tianjin (Holdings) Company Limited
14. Auto-Electricos de Mexico S.A.P.l. de C.V.
15. Autolite Operations LLC
16. Autoparts Holdings (Luxembourg) I S.a.r.l.
17. Autoparts Holdings (Luxembourg) S.a.r.l.
18. AVM Export, Inc.
19. BPI Acquisition Company, LLC
20. BPI Brake Manufacturing Juarez, S.A. de C.V.
21. BPI Braking Systems (Qingdao) Co., Ltd.
22. BPI Braking Systems Mexico, S.A. de C.V.
23. BPI Distribution Mexico S.A. de C.V.
24. BPI EC, LLC
25. BPI Holdings International, LLC
26. Brake Parts Inc China LLC
27. Brake Parts Inc Hong Kong Limited
28. Brake Parts Inc India LLC
29. Brake Parts Inc Investment Limited
30. Brake Parts Inc LLC
31. Brake Parts India Private Limited
32. C.P. Witter Limited
33. Cardone de Mexico, S de R.L. de C.V.
34. Cardone Industries ULC
35. Cardone Industries, Inc.
36. Carrand Companies, Inc.
37. Carter Carburetor Holdings, LLC
38. Carter Carburetor, LLC
39. Carter Fuel Export, Inc.
40. Carter Fuel Systems, LLC
41. Cequent Electrical Products de Mexico, S. de R. L. de CV
42. Cequent Sales Company de México, S. de R. L. de C.V.
43. Cequent Towing Products of Canada Ltd.
44. Champion Laboratories Trading (Shanghai) Co., Ltd.

8

Execution Version

45. Champion Laboratories, Inc.
46. CoFo - IBEX GmbH
47. CoFo - PWK GmbH
48. CoFo - Rauchle GmbH
49. CoFo Manufacturing a. s.
50. Crysta S.P.A.
51. CWD Holding, LLC
52. CWD Intermediate Holdings I, LLC
53. CWD Intermediate Holdings II, LLC
54. CWD, LLC
55. Dalton Corporation
56. Dalton Corporation Kendallville Manufacturing Facility
57. Dalton Corporation, Ashland Manufacturing Facility
58. Dalton Corporation, Stryker Machining Facility Co.
59. Dalton Corporation, Warsaw Manufacturing Facility
60. Diepersdorf Plastic Manufacturing GmbH
61. Fenves Engineered Technology Private Limited
62. FHG Automotives & Forgings Private Limited
63. Filtros Champion Laboratories, S. de R.L. de C.V.
64. Filtros Champion Sales de Mexico, S. de R.L. de C.V.
65. First Brands Group Holdings, LLC
66. First Brands Group Intermediate, LLC
67. First Brands Group, LLC
68. FMP Automotive (Malaysia) Sdn Bhd.
69. FMP Distribution Co., Ltd.
70. FMP Group (Australia) Pty Limited
71. FMP Group (Thailand) Ltd.
72. FMP Group Australia Holdings PTY LTD
73. FMP Group Holdings 1 (Thailand) Ltd.
74. FMP Group Holdings 2 (Thailand) Ltd
75. FMP Group Pty Limited
76. Fox Acquisition Company Pty. Ltd.
77. FRAM Filtration Operations Mexico, S.A. de C.V.
78. FRAM Group (Canada) Inc.
79. FRAM Group Holdings Mexico, S.A. de C.V.
80. FRAM Group IP LLC
81. FRAM Group Operations LLC
82. FRAM Group Operations Mexicali, S.A. de C.V.
83. FRAM Group Operations Mexico City, S.A. de C.V.
84. FRAM Group Services Mexico S.A., de C.V.
85. FRAM Group Trading (Shanghai) Co., Ltd.
86. FRAMAuto Holdings, LLC
87. FRAMAuto International Holdings, Inc.
88. Fuel Filter Technologies, Inc
89. Global Reman Ventures, LLC
90. Global Technologies S.a.r.L.

9

Execution Version

91. GOC Automotive Malaysia Sdn. Bhd.
92. Heatherton Holdings, LLC
93. Henrichs Beteiligungsgesellschaft GmbH
94. Hopkins Acquisition, Inc.
95. Hopkins Canada, Inc.
96. Hopkins Manufacturing Corporation
97. Hopkins Manufacturing de Mexico S. de R.L. de CV
98. Horizon Euro Finance LLC
99. Horizon Global (Shanghai) Trading Co. Ltd.
100. Horizon Global (South Africa) (PTY) LTD
101. Horizon Global Americas Inc.
102. Horizon Global Company LLC
103. Horizon Global Corporation
104. Horizon Global Digital Limited
105. Horizon Global European Holdings Limited
106. Horizon Global Germany GmbH
107. Horizon Global Hong Kong Holdings Limited
108. Horizon Global Sourcing Operations and Innovation Center India Private
109. Horizon International Holdings LLC
110. HZ Lux Holdings S.a.r.l.
111. HZ Lux S.a.r.l
112. HZN Sourcing Oy
113. IBI Auto Components (Shanghai) Co., Ltd.
114. IBI International Holding Company, Inc.
115. IBI Latin America, S De RI de Cv
116. International Brake Industries, Inc.
117. Jasper Acquisition Corp.
118. Jasper Rubber Products, Inc.
119. Kovil Oy
120. KTRI Holdings, Inc.
121. KTRI Offshore Holdings, LLC
122. Linden Plastic Manufacturing GmbH
123. Linden s.r.o.
124. Longkou Haimeng Machinery Co., Ltd.
125. Longman Enterprises, Inc.
126. Novares Mexico EC Diffucison S de RL de CV
127. Novares Mexico Engine Components S de RL de CV
128. Novares Mexico North Srl de CV
129. Novares Mexico SA de CV
130. NovaStar Brands Group, LLC
131. Patterson Inventory Holdings, LLC
132. Patterson Inventory, LLC
133. PHNX Acquisition Corp.
134. Plastics Germany 1 GmbH
135. Premier Marketing Group, LLC
136. Pylon Automotive Mexico S de RL de CV

10

Execution Version

137. Pylon Manufacturing Corp.
138. Pylon South Bend, Inc.
139. Qualis Automotive, L.L.C.
140. Qualis Enterprises, LLC
141. Qualitor Acquisition Inc.
142. Qualitor Automotive Trading (Shanghai) Co., Ltd
143. Qualitor Automotive, LLC
144. Qualitor Subsidiary H, Inc.
145. Qualitor Subsidiary S, Inc.
146. Qualitor, Inc.
147. Reman Management International LLC
148. RTE Acquisition Holdings, Ltd
149. SDC TX, LLC
150. Smart Choice, LLC
151. SMK Plastic Manufacturing GmbH
152. Société Industrielle des Attelages R.R  S.A.S.
153. Specialty Pumps Group, Inc.
154. Strongarm, LLC
155. Subensambles Internacionales, S. de R.L. de C.V
156. TAE Brakes, LLC
157. TAE China Holdings, Inc.
158. Talleres Mecanicos Montserrat, S.A. de C.V.
159. TMD International Holdings, LLC
160. TMD Mexico, LLC
161. Toledo Molding & Die, LLC
162. Transportation Aftermarket Enterprise, LLC
163. Trico Anco Distribucion de Mexico S. De R.L. de C.V
164. Trico Automotive Systems (Suzhou), Ltd.
165. Trico Belgium S.A.
166. Trico Componentes, S.A. de C.V.
167. Trico Distribuidora S.A. de C.V.
168. Trico Holding Corporation
169. Trico Investments Corporation
170. Trico Italy S.r.l.
171. Trico Limited
172. Trico Products Corporation
173. Trico Products Pty. Ltd.
174. Trico RO S. R. L.
175. Trico Suzhou Investments Limited
176. Trico Technologies Corporation
177. Tridonex USA LLC
178. Tridonex, S de R.L. de C.V.
179. UCI (Beijing) Consulting Company Ltd.
180. UCI Acquisition Holdings (No. 4) LLC
181. UCI International Holdings Parent Inc.
182. UCI International Holdings, Inc.

11

Execution Version

183. UCI International, LLC
184. UCI Pennsylvania, Inc.
185. UCI-Airtex Holdings, Inc.
186. Ultinon Motion (Thailand) Co., Ltd.
187. Ultinon Motion Commercial Canada Inc.
188. Ultinon Motion Commercial France
189. Ultinon Motion de Iberia, S.L.U.
190. Ultinon Motion Delaware, LLC
191. Ultinon Motion Germany GmbH
192. Ultinon Motion Holding BV
193. Ultinon Motion Hong Kong Co. Limited
194. Ultinon Motion India Private Ltd.
195. Ultinon Motion Italy SRL
196. Ultinon Motion Japan GK
197. Ultinon Motion Korea Ltd.
198. ULTINON MOTION MÉXICO, S.A. de C.V.
199. Ultinon Motion Netherlands B.V.
200. Ultinon Motion Poland S.A.
201. Ultinon Motion Taiwan Co. Ltd.
202. Ultinon Motion Technology (Hubei) Co., Ltd.
203. Ultinon Motion US HoldCo, Inc.
204. United Components, LLC
205. Universal Auto Filter LLC
206. Viceroy Private Capital, LLC
207. Viper Acquisition I, Inc.
208. Viper Acquisition, Inc.
209. Walbro (Thailand) Co. Ltd.
210. Walbro (Tianjin) Industries Co. Ltd.
211. Walbro Co., Ltd.
212. Walbro Fuel Systems and Technology (Thailand) Co., Ltd
213. Walbro Italy S.r.L.
214. Walbro LLC
215. Walbro Los Mochis S. de R.I. de C.V.
216. Walbro Midco LLC
217. Walbro Suisse Group GmbH
218. WEM US Co.
219. Westfalia-Automotive Beteiligungsgesellschaft GmbH
220. Westfalia-Automotive Denmark ApS
221. Westfalia-Automotive GmbH
222. Westfalia-Automotive Holding GmbH
223. Westfalia-Automotive Polska Sp.Zo.o
224. Winning Plastics a.s.
225. Witter Brasov SRL

13