<u>**Exhibit 1**</u>

**Transcript for June 12, 2026 Hearing on U.S. Trustee's Motion to Dismiss**

                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF TEXAS
                         HOUSTON DIVISION

                                  )  CASE NO: 25-90399
     FIRST BRANDS GROUP, LLC      )
                                  )  Houston, Texas
                                  )
              Debtor.             )  Friday, June 12, 2026
                                  )
                                  )  10:10 AM to 4:52 PM
     ------------------------------)

                             HEARING

           BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE


     APPEARANCES:

     For the U.S. Trustee:    JAYSON B. RUFF
                              VIANEY GARZA
                              Office of the United States Trustee
                              515 Rusk St., Suite 3516
                              Houston, TX 77002

     For the Debtor:          CLIFFORD CARLSON
                              Weil Gotshal & Manges
                              700 Louisiana Street, Suite 3700
                              Houston, TX 77002

                              SUNNY SINGH
                              ROBERT BEREZIN
                              MATT BARR
                              Weil Gotshal & Manges
                              767 Fifth Avenue
                              New York, NY 10153

     For Katsumi Servicing,   CHARLES KELLEY
     LLC:                     Mayer Brown, LLP
                              700 Louisiana Street, Suite 3400
                              Houston, TX 77002

     For Onset Financial,     ERIN DEXTER
     Inc.:                    Milbank, LLP
                              1101 New York Avenue, NW
                              Washington, DC 20005

For Carnaby II and II        ALLAN BRILLIANT
Secured Lenders:             Dechert, LLP
                             1095 Avenue of the Americas
                             New York, NY 10036

For Martin De Luca:          BENJAMIN WAISBREN
                             Boies Schiller Flexner, LLP
                             1401 New York Avenue, NW
                             Washington, DC 20005

For the Leucadia             MICHAEL CASSEL
Parties:                     Wachtell Lipton Rosen & Katz
                             51 West 52nd Street
                             New York, NY 10019

Court Reporter:              UNKNOWN

Courtroom Deputy:            UNKNOWN

Transcribed by:              Veritext Legal Solutions
                             330 Old Country Road, Suite 300
                             Mineola, NY 11501
                             Tel: 800-727-6396




Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

INDEX

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CHARLES MOORE | | 18/63 | 120 | |
| | | 138/146 | | |

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

| PLAINTIFFS' EXHIBITS | RECEIVED |
|---|---|
| Final DIP Credit Agreement | 120 |

| GOVERNMENT'S EXHIBITS | RECEIVED |
|---|---|

HOUSTON, TEXAS; FRIDAY, JUNE 12, 2026; 10:10 AM

(Call to Order)

THE COURT:  This is Judge Lopez.  Today is Friday, June 12th.  I'm going to call the First Brands case.  I'm going to ask parties to please make an electronic appearance.  Just jump on the Southern District of Texas webpage.  You will find my homepage and a place to make an electronic appearance in this case.  There are a number of parties on the line and in the courtroom.  That's probably the most efficient way.

Good morning, Mr. Ruff.

MR. RUFF:  Good morning, Your Honor.  Jayson Ruff for the U.S. Trustee.  And with me today is Vianey Garza.

THE COURT:  Okay.  Good morning.  No need to make appearances.  I've got it, we're all here.  Let's get started.

MR. RUFF:  So, Your Honor, I'll just brief.  We are here on our motion to convert and/or dismiss the cases today.  In response to that -- and really it's based on the fact that the Debtor's cases are administratively insolvent and have been administratively insolvent for quite some time.  And the Debtors proposed a plan previously at the time of the filing of our motion that didn't really address that, that kind of tried to do in our view and end-run around that.  And didn't even try and pretend to pay those

administrative creditors.  I think we're ready to still go forward today, Your Honor, because Debtors have now filed if my count is correct their fifth revised plan, maybe sixth after this morning.  And while it -- certainly there are some changes.  I would say window dressing changes.  In our view it does not give any assurance that administrative creditors are going to get paid in this case.

THE COURT:  Okay, thank you.  Mr. Ruff, just in terms of housekeeping, how do you intend to proceed today in terms of presentation?

MR. RUFF:  I think we're just going to go right into evidence, Your Honor.  I think Mr. Singh had a few opening remarks that he wanted to make.  We'll go right into evidence and then we're going to call Mr. Moore as our first witness.

THE COURT:  Okay.  And to my understanding it's just one witness.  Is that correct?

MR. RUFF:  Just one witness from us, Your Honor. I don't know of any others that are going to get called.  I think evidence is going to be -- at least to my -- I think we have pretty much an agreement on most if not everything. So hopefully that will be a relatively short -- as far as the documents that we're asking to be admitted and what the Debtors are asking to be admitted and for what purposes.

THE COURT:  Okay.

MR. RUFF:  And then we'll just reserve for closing.  We'll do closing arguments as well.

THE COURT:  Okay.  I just want to hear from the Debtors and then go right into the motions.

MR. KELLEY:  Can I make one statement real quick?

THE COURT:  No.  Let me hear from them first. Just a second.  I've got to hear from the two sides who are actually going to take this up, and then I'll hear from everyone else.  Just so I can keep it straight in my head.

MR. SINGH:  Thank you, Your Honor.  Good morning. Sunny Singh, Weil Gotshal, on behalf of the Debtors.  Your Honor, in the courtroom with me is Mr. Berezin and Mr. Carlson.  Also on the line is Mr. Barr virtually.

Your Honor, agreed with what Mr. Ruff said. Because the motions are so interrelated, their motion to dismiss or convert and our motion to approve the amended DS on a conditional basis, which effectively responds to their motion, we thought we'd put on Mr. Moore.  That evidence would apply to both motions so we don't have to take him off, and he can just testify as to both of those issues and all the evidence would be submitted except obviously Your Honor entering the evidence, but would be proposed to be submitted for both of the motions collectively.

THE COURT:  Okay.

MR. SINGH:  So Your Honor has a full evidentiary

record.  And then we can make closing and sort of address the Court, however, makes the most sense after the evidentiary record.  But this way we don't have to go, you know, with their motion, put Mr. Moore on, and then sort of --

THE COURT:  Just do it all in one --

MR. SINGH:  Do it all at once.  And then I can hear -- I guess I could hear arguments.  Folks can come up and tell me who have filed joinders or what they think about it, both motions at the same time.  And then kind of take them up at that point.  Is there any update before I get started on the -- I did see that there was a new -- something got filed at like 8:30 in the morning that had some redline changes.

MR. SINGH:  Yes.  And I can kind of run you through just current status just so you have it.  That's all I wanted to do, Your Honor.  There's a couple of important updates.  One, Your Honor, as we talked about at the conference on Monday, one open issue with respect to the Debtor's case was the budget and whether that was agreed to by the ABL lenders.

THE COURT:  Right.

MR. SINGH:  I am pleased to report that that is now agreed.  Mr. Carlson in a minute can just tell you the terms of that agreement.  And then obviously Mr. Moore can

be asked questions about that issue if anybody has.  But that is a satisfied condition and we're happy to report that.

Your Honor, with respect to what we filed this morning, an amended plan and DS, they really go to resolutions of certain objections and comments that we received.  The most important, Your Honor, I would say actually is making it clear in the plan that the Debtors and the other parties can't waive the condition to effectiveness that admin creditors and priority creditors be paid in full, consistent with Your Honor's ruling in the Steward Health Care case.

Your Honor, the parties that I believe were resolved -- but then all these parties -- this is just disclosure statement objections that are resolved.  You know, people have filed reservations of rights with respect to plan issues.  So those are open.  But I believe we are now resolved with Leucadia, with CarVal, with Raistone, with LKQ, a customer.  Various admin creditors have fed us comments, Your Honor, who didn't formally file anything.  So we are resolved with them.  Again, this is resolved with respect to the disclosure statement issues for purposes of disclosure, not purposes of plan confirmation.

I believe the only new objections that were filed in between the last hearing and this hearing in terms of

objections is Evolution filed something earlier this morning.  We have one other party, TQL, which is a vendor.  They filed a renewed objection.  So in terms of just what came in since Monday, those are the two.  Obviously other parties, given the nature of the hearing, will want to be heard and have previously stated their objections.

Your Honor, I'm happy to if it's helpful to you to go through the changes that are on the docket, but --

THE COURT:  No, no, no.  Just turning to current status.  Who is still objecting.  Onset, Carnaby, they are still objecting?

MR. SINGH:  Reservations of rights with respect to today.  So we don't -- you'll get confirmation from them.  But those are plan issues in our view.

THE COURT:  Okay.

MR. SINGH:  Your Honor, I'll just let Mr. Carlson just give you the latest since we just settled the issues on the courthouse steps.

THE COURT:  On this issue.  And then I'll hear from anyone who kind of wants to tell me high-level whether they are in or out today.  But let me just --

MR. SINGH:  Sure.  Yeah.  This is on the budget point, just so you have it.  Thanks.

THE COURT:  Okay.

MR. CARLSON:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. CARLSON:  So as Mr. Singh indicated, we have reached an agreement with the ABL lenders and the Ad Hoc Group on a budget.  And it's the same confirmation budget that was filed and attached to Mr. Moore's declaration and contemplates the ABL lenders funding $15 million to get us to confirmation.  And as the case is for most budgets, there are certain conditions and provisions, ten percent variance testing and some conditions subsequent that have been agreed to.  One is that the Debtors will seek release of the $25.7 million of funds that are standing in the factor receivables account that were returned to the account as adequate protection pending a determination on Evolution's lien. Those funds, if returned, would be then used to pay down the ABL lenders.  We believe the release back to the Debtors is consistent with the Court's ruling and prior stipulation. And we are not asking for any of this today, but this is just a condition subsequent to the budget.

THE COURT:  That you ask?

MR. CARLSON:  That we seek payment, yeah.  And obtain this, yes.

THE COURT:  All right.  So everybody's rights are kind of preserved.

MR. CARLSON:  Everybody's rights are preserved. Again, not asking for any of this relief today, but it is a

condition subsequent.

The other one is, you know, we've obviously got a DIP maturity date coming up on June 29th.  We have agreed with the DIP lenders that we will negotiate something with them to extend the maturity date.  And that will likely involve asking for court relief.  And we need to negotiate the terms of that.  But we do need to get an extension of our DIP maturity date, and we'll be back before the Court asking for relief in connection with that extension.

And then finally, Your Honor, we have also agreed to finalize and do everything we can in our power to finalize certain sales of DIP lender collateral.  That's being done as part of the winddown order with Hilco on an expedited timeline.  Again, not seeking any of this relief today, but these are conditions subsequent.  And we think we'll be able to satisfy these conditions.

There's also been an agreement between the DIP lenders and ABL lenders on certain intercreditor disputes involving whose collateral is whose that will be incorporated into the plan.  The parties have agreed that as it relates to tax refunds, that constitutes ABL priority collateral.  As it relates to tariff refunds, there's been $3 million that have been collected to date.  That will be ABL priority collateral set forth in our plan.  And then anything beyond the $3 million that's been collected is --

we are punting on that parties -- that they reserve their rights to either -- they'll agree to that consensually or if the Court will determine it.  And again, these are intercreditor disputes as to whose collateral between those two parties.

THE COURT:  How does that -- it may be related or unrelated, but I thought the United States filed something related to -- in this case related to those tariffs.  Is it related to that or --

MR. CARLSON:  It's related to that.  The U.S. may or may not be seeking to set off certain amounts that are owed.  And we're not trying to resolve --

THE COURT:  You're just resolving a dispute between those two -- or they have agreed to resolution between themselves.

MR. CARLSON:  Correct.  Vis-a-vis each other, who has -- whatever the Debtors get, they get.  But whose collateral is it, right?

THE COURT:  Got it.

MR. CARLSON:  And then the final two terms, there's a provision that provides that 50 percent of any excess amounts in the budget would go under the plan to fund certain things for the benefit of the ABL lenders in connection with our plan if we're in that fortunate position of having excess cash.

And then finally, there would be an amendment to the plan that provides for a waiver of preferences for the ABL lenders.  So those are the conditions.

THE COURT:  Okay.

MR. CARLSON:  And that's it, Your Honor.

THE COURT:  Okay.  Mr. Kelley?

MR. KELLEY:  Thank you, Your Honor.  I know you're eager to commence the hearing, so I'll be very, very brief.  This plan was -- the disclosure statement was filed under an emergency motion.  Within that, it said you could either file objection or show up and object.  I just -- for purposes of understanding where Katsumi Servicing stands, I'm here today asserting an objection against the disclosure statement if the Court is going to take that up substantively.  There was a question in my mind based on the Court's comments at the status conference.

THE COURT:  Got it.

MR. KELLEY:  Also, we filed a position statement on Wednesday along with our witness and exhibit list.

THE COURT:  I did.

MR. KELLEY:  Thank you.  And the purpose of that was to indicate these are issues that as we're processing the plan, which the Debtors have raised as a defense, we will be formulating our views.  I think my line of questions of the witness are going to align more closely with the

Trustee's position on the motion to dismiss or convert.  And so I know the Court likes to take things in order.  I think it's appropriate.  I'm sitting on this side of the room, and my line of questions would go that way.

THE COURT:  Okay.  Thank you.  Michael Cassel, Wachtell, Lipton, Rosen & Katz, for the Leucadia parties.

So Mr. Singh is correct.  We don't have a particular objection to conditional approval today with the exception of one thing that showed up in the redlines this morning that we're going to try and get clarification from the Debtors on during the course of today.  That being said, that's all on the understanding we do have significant merits issues for confirmation.  And we'll make that clear on the record.

THE COURT:  Okay.  Thank you.

MR. CASSEL:  Thank you, Your Honor.

MS. DEXTER:  Your Honor, Erin Dexter from Milbank LLP on behalf of Onset.  Good morning.

THE COURT:  Good morning.

MS. DEXTER:  Mr. Singh is correct.  Onset filed a reservation of rights with respect to the disclosure statement, so we don't need to be heard on that today.  You've heard from us before and our position.  We did however file a limited objection to the U.S. Trustee's motion to convert.

THE COURT:  I did see that.

MS. DEXTER:  So at the appropriate time at closing, I may rise briefly to say a few words.

THE COURT:  Perfect.  Thank you.  Okay.  I will unmute a few lines just for purposes of telling me where you are.  But I think it's important that we just get into the evidence.  A 917 number.

MR. BRILLIANT:  Good morning, Your Honor.  Allan Brilliant on behalf of the Carnaby II and III Secured Lenders.

Mr. Singh is correct.  With the changes they made to the plan, we are not objecting to conditional approval of the disclosure statement.  There are a number of issues, including to some of the things that we've been having discussions on that we still think from a merits perspective are very significant.  And to the extent we can't resolve them, we will be forced to file an objection to the confirmation.  But with respect to today, we are not objecting to the conditional approval of the disclosure statement.

THE COURT:  Thank you.  And 212 number.

Good morning, Your Honor.  Michael Duke, Elsberg Baker & Maruri, on behalf of the Evolution entities.  We filed an objection this morning shortly before this hearing was commenced to the disclosure statement.  We're

maintaining that objection.  Subject to your direction, I will stay out of the merits unless you'd like to hear more on that now.  But otherwise, we'll reserve for later on in this hearing.

THE COURT:  Okay.  Thank you.  And a 917 number.

MR. WAISBREN:  Good morning, Your Honor.  Benjamin Waisbren, Boies Schiller Flexner.  We filed a reservation of rights yesterday that speaks for itself.  I'm appearing in case the Court has any questions for us.

THE COURT:  Thank you very much.

MR. WAISBREN:  Thank you.

THE COURT:  Okay.  For the lines that I have unmuted, I'd ask that you just please keep yourselves on mute and we'll get right into the evidence.  Mr. Ruff?

MR. RUFF:  Your Honor, we filed a witness and exhibit list at Docket 1953.  There's five exhibits there. One of them -- the first being the final DIP order, the second one being a supplemental declaration of Charles Moore in support of the final DIP order, and then the disclosure statement that was -- not the one that was filed this morning, but the one that was filed previously as well as the plan and then Mr. Moore's declaration in support of those.  So we would ask that those be admitted into evidence now.

THE COURT:  Any objection?

MR. KELLEY:  To the declarations, yes, Your Honor. The declarations can be used for cross-examination.  Certain aspects of them are admissions.  But I think that there's a lot of foundational problems, so I'm going to object to the declarations.  But otherwise, I don't have any objections.

THE COURT:  All right.  Decs aren't in.

MR. CASSEL:  No objection.

THE COURT:  All right.  We have one objecting party, so the decs aren't in.  But we'll just take up Mr. Moore --

MR. RUFF:  That's fine.  We've got Mr. Moore here and he's our first witness.  And so we would call him now, Your Honor.

THE COURT:  Okay.  Mr. Moore, why don't you come on up.  Good morning again.

MR. MOORE:  Good morning, Your Honor.

THE COURT:  Can you please raise your right hand? Do you swear to tell the truth, the whole truth, and nothing but the truth?

MR. MOORE:  I do.

THE COURT:  All right.  Let the record reflect the witness has answered in the affirmative.  If you can just get comfortable there and adjust the mic and state your name and spell your last name for the record so we can do a good mic check.

MR. MOORE:  Charles Moore, M-O-O-R-E.

THE COURT:  Okay.  Good morning.  Mr. Ruff, whenever you're ready.

CROSS-EXAMINATION OF CHARLES MOORE

BY MR. RUFF:

Q    All right.  Mr. Moore, good morning.

A    Good morning, Mr. Ruff.

Q    Mr. Moore, can you just remind all of us how long that you've been working as a restructuring professional?

A    Over 30 years.

Q    Over 30 years.  And you've been examined as a witness many times over that period of time, have you not?

A    I have.

Q    Okay.  And so you are familiar with how this should go. And as far as I need to ask a question, you need to answer affirmatively.  Head nods and that sort of thing will not work and not be reflected in the record.  You understand that, correct?

A    I understand.

Q    Very good.  And if I ask any questions that are unclear or anything, please do not hesitate to let me know and I'll be sure to rephrase and/or speak up more clearly.  Okay?

A    Okay.

Q    Very good.  What is your title or position with respect to these Debtors presently?

A    I currently serve as the interim CEO for the Debtors.

Q    Okay.  And prior to that, you were the chief restructuring officer of the Debtors, correct?

A    Yes.

Q    Okay.  And when did that change happen from chief restructuring officer to interim CEO?

A    I believe it was on October 13th of 2025.

Q    Okay.  And so I'm just going to jump right into it. You're familiar with the terms of the disclosure statement and plan that the Debtors are requesting permission for the Court to solicit, correct?

A    I am.

Q    Okay.  And it's your belief that the solicitation of the disclosure statement and plan is necessary and appropriate under the circumstances?

A    It is.

Q    Okay.  And are you familiar with the estate claims credit bid feature of the plan?

A    I am.

Q    Okay.  And can you describe what that is to the Court and everybody in the room here?

A    Sure.  As a general statement, there are various claims and causes of action that the Debtors may have.  And our secured lenders, our DIP lenders are bidding on those assets.  And assuming that they would be successful in that

bid, they would get put into a litigation trust for the benefit of all of the creditors.

Q   Okay.  And would you say that's a key part of the plan structure?

A   There are many key parts, but certainly that is a very important part of our plan.

Q   Very good.  And so what is your understanding of what it means to credit bid for assets?

A   My understanding is a credit bid is something that is available to secured lenders under most conditions.  And so the bid amount may be up to the amount of the secured claim unless, again, there are various provisions that would restrict that ability to make a bid or the amount that could be bid.

Q   And do you believe a credit bid requires a lien on the assets that the bidder is bidding on?

A   That's a legal question that I'm not in the best position to answer.

Q   Yeah.  I'm just asking what your belief is, Mr. Moore. Do you believe in your experience that a party who credit bids on assets actually has a lien on those assets?

A   I think that there are two aspects.  First, as I indicated, if a party is going to make a credit bid, my understanding is they have to be a secured creditor.  And there are two aspects.  There are assets themselves and then

there are also proceeds. And that's where I don't really know from a legal standpoint that distinction. But certainly my understanding is that you need to be a secured creditor in order to make a credit bid.

Q And again, you've been doing this more than 30 years. Do you -- what is your understanding of what it means to be a secured creditor? What exactly does that mean when you're a secured creditor? Secured in what?

A Well, that you have a security interest in collateral that supports your loan.

Q And another way of saying it is that you have a lien on those assets?

A Again, that's where there are assets and there are also proceeds. And that's where I can't distinguish. But yes, collateral supports a loan.

Q But a security interest means you have a lien on something, right?

A Something could be an asset --

Q Could be assets, could be proceeds.

A Yes, that's right.

Q All right. So the estate claims proposed to be bid on by the DIP secured parties here, do those include avoidance actions as a part of the estate claims? Are avoidance actions included in that definition of estate claims?

A They are claims that are expected to be transitioning

to the litigation trust if that bid is successful.

Q    And do you have a belief or is it your belief that the DIP secured parties actually have a lien on the avoidance actions?

A    My understanding is there is a lien in the proceeds.

Q    Okay.  But not on the actions themselves, correct?

A    That's my understanding.

Q    Okay.  And the DIP order specifically excludes avoidance actions from the DIP liens, correct?

A    I believe that's the case.

Q    Okay.  And the avoidance actions would include claims against Patrick James and Edward James, correct?

A    Well, avoidance actions can be a whole host of different items.  And there are many claims that we believe that the Debtors have right now, certainly well beyond just avoidance actions.

Q    Yeah, but my question was claims against Patrick James and Edward James, avoidance actions would include claims against them, would it not?

A    It could.  There may be other claims as well.

Q    Right.  I'm not trying to say that's the exclusive list, but it could include them as well.

A    Yes.

Q    Yes, thank you.  And those are some of the most valuable claims of these estates, correct?

A     I don't know if I would distinguish amongst all of the litigation claims.  I do believe that the litigation claims in total are the most valuable asset of the estates.

Q     And do you recall previously testifying at the beginning of these cases that more than $2 billion could not be accounted for?

A     That is a statement that certainly at that time, the context of that was there was third-party factoring of approximately $2.3 billion.  And there was -- there were not receivables that were backing that third-party factoring at that time.  So the statement was $2.3 billion of cash appeared to have been received by the Debtors, yet there were no receivables that were left for those factors.

Q     Okay.  And you also previously testified that your team was able to identify approximately $700 million of transfers to Patrick James, correct?

A     Yes.

Q     Okay.  And so estate claims also includes potential claims against the lenders in these cases, correct?

A     They may.

Q     They may.  And like I said, potential claims.

A     Yes.  And lenders is a very broad term.  I would consider a whole host of parties as potential lenders.

Q     Sure.  You would agree with me that could be some of the factors, it could be some members of the Ad Hoc Group.

Would you agree with me on that, that it potentially could include those parties?

A    I'm not aware of any claims as it relates to the Ad Hoc Group.

Q    Okay.  Would you disagree with me that the estate itself may potentially have claims against those parties?

A    I'm not aware of any potential claims against those parties, the Ad Hoc Group specifically.  Now, the other parties that you mentioned, yes.

Q    Okay. And let me ask you this.  Have the estate claims been valued?

A    They have not.

Q    Okay.  And so you don't have a high or a low estimate of what the value of the estate claims are?

A    We do have information.  Certainly a population of amounts based on the books and records of the Debtor.  So while we have not valued the claims in the traditional sense, we certainly have a sense as to what the population of transactions is.

Q    When you say population, can you explain that to me?  I don't think I understand what it is that you are saying, actually.

A    Sure.  Happy to.  I'll go through a few different categories.  So if we look at transfers in the 90 days prior to the petition date, there's a little over $2 billion of

transfers.  That is a potential claim as it relates to preferences with external parties.  In addition to that, there are transfers that occurred with what we refer to as factors as well as supply chain finance providers.  And excluding those 90 days, there are about $12 billion of transfers there.  And I can go on with other categories, but these are -- when I refer to the population, this is -- these are the types of transactions I'm referring to.

Q    So the Debtors do have a sense at least of the face value -- potential face value of the claims then.  Is that what I'm hearing?  Am I understanding that correctly?

A    You used the word claims.  I don't know if I would go that far.  But certainly the transactions that have occurred.  Now, there are a few adversary proceedings that we've already filed.  And so certainly with those I would use the word claims.  For some of the other categories, I don't know if I would use the word claims, but certainly transactions that serve as the basis for potential claims.

Q    Okay.  Have Debtors done any sort of valuation on the claims that they have filed already?

A    I don't know if that is the case.

Q    Okay.  And so you've never had any sort of -- you have never performed any analysis, or anybody on your team, or you're not aware that the Debtors have performed any analysis of how much those claims might be worth?

A    As you acknowledged or indicated earlier, certainly we pulled together as part of the investigation various transactions.  And you cited that north of $700 million in transfers.  So we have that type of information.  But from the standpoint of assessing the claims and the probability weighting of that, I'm not aware of that happening.

Q    And I think you said this earlier, but I just want to ask it again.  Would you agree with me that the vast majority of the value for these estates remains -- the remaining value in these estates is in the estate claims?

A    Yes.

Q    Okay.  So allowing the DIP secured parties to credit bid on avoidance actions would actually require the Court to alter the terms of the final DIP order, correct?

A    That may be the case.  That really is a legal question.

Q    Okay.  But if a party has to have a lien on an asset in order to credit bid on it, the DIP order did not give them a lien on the actual avoidance actions.  Is that your understanding?

A    That's generally my understanding.  What the Court would have to do, I can't speak to.

Q    Do you have any sense of how much the estate claims credit bid is anticipated to be?

A    I don't know that offhand.

Q    Okay.  And then let me ask this.  Once those claims,

the estate claims are bid on and then transferred out of the estates to the trust, is there a mechanism in the plan to get them back if the plan fails?

A    First, just to clarify, you're referring specifically to the litigation trust, correct?

Q    Correct.  The estate claims are if we file -- just so we're on the same page -- and you can correct me if I'm wrong.  The estate claims are going to be credit bid on, transferred to the litigation trust, right?  And then they're there.  If the plan fails, is there any way for the estate to get those claims back?

A    The reason why I asked for the clarification, there are multiple trusts that are formed under our plan.  So I wanted to make sure you were specifically referring to the litigation trust.

To the extent that there are activities, the litigation trust is pursuing claims, and the plan eventually doesn't go effective, I don't know exactly what happens in that regard. I do understand under the plan that there are expected to be rolling distributions of proceeds that come into the litigation trust.  So at some point if the plan does not go effective, I don't know exactly what would occur in that instance.

Q    Okay.  So you're not aware of any terms of the plan that would revert the interest in those estate claims back

to the estate?

A   Not offhand.

Q   Okay.  So Debtors estimate administrative claims currently for all of the First Brand debtors to be approximately $222 million.  Is that correct?

A   That's right.

Q   All right.  And $147 million of those were incurred since the petition date.  Is that correct?

A   You're referring specifically to the post-petition accounts payable that's still outstanding.

Q   Yes.

A   That's correct.

Q   Okay.  And $38 million would be the 503(b)(9), or sometimes we call them the 20-day administrative claims?

A   That's correct.  The amounts still outstanding.

Q   And then the other 20 percent of the estimate was just what you think that Debtors have received (indiscernible) just haven't been invoiced for yet.  Is that right?

A   I would characterize that a little bit differently.  The two numbers that you cited add up to $185 million.  And then we've added on a 20 percent cushion just to account for perhaps goods that have been received that have not been invoiced, or just other claims that may come out of the woodwork that we're not aware of right now.  So it's really a 20 percent cushion on top of those numbers.

Q    Okay.  Now, going back to the beginning of these cases, or at least near to the beginning of these cases, the Debtors previously negotiated for I guess what was termed an administrative expense claims basket of $200 million.  Do you recall that?

A    I do.

Q    Okay.  Can you explain to us what the administrative expense claims basket is and what is its purpose?

A    The claims basket of $200 million is provided for in the DIP order whereby after what we refer to as DIP A, which is the new money, which when you take into account fees and accrued interest is between $1.3 billion and $1.4 billion. After that claim is paid in full, then there's $200 million whereby the next proceeds that would come in would go towards paying administrative claims.

Q    All right.  And there was also a trigger feature tied to that administrative claims basket as well too, was there not?

A    I generally recall that, yes.

Q    Yes.  And if that trigger event occurred, at that point their funds would actually be funded and set aside up to the amount of the $200 million claims basket.  Is that correct?

A    I don't remember all of the specifics of the terms.

Q    Okay.  All right.  So what was the intention then of the administrative claims basket?  Was it to give some

assurance to administrative creditors that their claims would be paid in case things went awry in the cases?

A   Well, first you'd have to remember when we filed these cases, there was a lot of uncertainty.  No one really knew what the extent of the fraud that existed in the business as well as just the overall viability of the different business units.  That's a big DIP in terms of new money.  So yes, it was an accommodation by our DIP lenders to -- as part of a negotiation at that time to provide a mechanism for funds to be made available to administrative claimants ahead of the other part of the DIP, which is the rollup portion.

Q   So at least they would get paid prior to the rollup and the prepetition obligations getting paid?

A   At least $200 million worth, yes.

Q   At least 200, that's right.  And you previously testified to that effect in your declaration in support of the DIP order, correct?

A   That's correct.

Q   Yeah.  And the DIP order, the final DIP order actually contains those provisions, correct?

A   That's my understanding.

Q   Yeah.  So what happens to that $200 million of subordination under this plan?

A   We actually have an improved mechanism at this point. Under the plan, the proceeds that come into the litigation

trust begin being shared with the administrative and
priority claimants at approximately $350 million in recovery
versus waiting until the full $1.4 billion in DIP A claims
are paid.

Q    Okay.  But the plan doesn't have any requirement that
somebody funds $200 million of cash right now, right?

A    That's correct.

Q    Okay.  That essentially gets erased by this plan.

A    I would say that this is a much better provision from
the standpoint of starting to share much earlier with
claimants --

          MR. RUFF:  I would object to the response, Your
Honor, as nonresponsive.

          THE COURT:  Sustained.

BY MR. RUFF:

Q    Mr. Moore, I'll just ask the question again.  And
again, as I said at the outset, if I'm not clear, let me
know and -- but my question really is would you agree with
me that the $200 million administrative claim basket, that
funding, that requirement that $200 million be funded upon a
triggering event, that's going to be erased if this plan is
approved, correct?

A    There is no funding in advance for administrative
claimants under the plan.

Q    Okay.  So you do agree with me, yes, that there's no --

the $200 million of funding is not in the plan for administrative claims?

A   Mr. Ruff, the only reason why I'm saying it this way, I don't remember the exact terms around the administrative basket when -- if funding is required to be set aside.  But I am confirming that under this plan, there's no money that is funded in advance for administrative claims.

Q   And that's at the end of these cases, after administrative claims have already provided the goods and services to the Debtors, correct?

A   Yes.  We have a -- the amounts that I went through before are what are outstanding as of this point in time.

Q   So if an administrative creditor provided goods and services in reliance on the administrative claims basket and the assurances that that previously gave, they did that and it's not going to be there under this plan, correct?

A   Well, there are a variety of reasons why an administrative claimant may provide post-petition terms. I'll just highlight.  We paid out about $70 million on prepetition obligations.  So this may have been critical vendors, all of the items under our first-day relief --

            MR. RUFF:  Your Honor, I'm going to object again as nonresponsive.

            THE COURT:  I'll sustain.

BY MR. RUFF:

Q   Mr. Moore, what I'm just asking is simply this.  If a creditor, an administrative creditor said, you know what, this administrative claims basket provides me some assurance, I'm going to go ahead and continue to deal with these Debtors.  If they did that, they're not going to get the benefit of that administrative claims basket under this plan, correct?

A   One, that's a hypothetical.  I don't know if a creditor would have made that decision.

Q   I don't know, either.  So we agree on that.  My question is if they actually did rely on it, it's not going to be there for them, correct?

A   Again, you're asking me to confirm terms of an administrative claims basket.  There is likely something that's better for these claimants under our plan I believe.

Q   Okay.  Well, let me ask you this.  Were administrative claimants negotiated with as a part of the plan terms?

A   We did not engage with specific creditors.  However, the Committee was a very active participant in all of our plan negotiations.

Q   Okay.  But the Committee just represents the general unsecured creditors, correct?

A   I view them to represent all unsecured creditors.

Q   Okay.  But you didn't talk with any of your actual administrative claimants who are holding administrative

claims about the treatment of their administrative claims under the plan, correct?

A    We have thousands of creditors.  So no, that's impractical to engage with all of our unsecured creditors individually as part of coming up with a plan.

Q    Okay.  Did you -- you didn't do it with thousands, but did you do it with any?

A    We did it with the Committee, which obviously has a representative group of unsecured creditors on it.

Q    Okay.  But you don't know if they have a representative group of administrative creditors on it, correct?

A    I'd have to go back and look at the claims that are outstanding for each of the committee members and how those claims are classified.

Q    If Debtors don't move forward with the plan, then the subordination and the administrative claims expense basket remain in place, correct?

A    I'm not sure.

Q    Do they remain in place as we sit here today?

A    My understanding is yes.

Q    Okay.  Are Debtors able to pay their outstanding administrative claims right now?

A    Could you clarify that question a little?

Q    I mean do Debtors have enough funds on hand right now to pay their administrative claims?

A      The Debtors don't have $222 million or $185 million on hand, no.  I would clarify though that this plan, that's the whole purpose, is to provide a mechanism for these claims to be paid.

Q      Okay.  But just to go back to the -- so we're clear, they don't have the money to pay today?

A      No.  As the Debtors, we do not have $222 million.

Q      All right.  Thank you.  So am I correct in understanding that Debtors did not reserve for these administrative claims when they originally received their DIP loan?

A      There was no money set aside for administrative claims, no.

Q      And the original DIP loan was $1.1 billion, correct?

A      That is the only DIP loan that we have.

Q      So why didn't the Debtors account for these administrative claims under that $1.1 billion DIP?

A      We generally have been paying our claims as they come due.  Now, we've gone through multiple rounds of funding from different parties throughout this time period.  We've paid over $1.9 billion in post-petition expenses throughout the Chapter 11 proceedings so far.  So we've been paying all along.  But as we've talked about, there is approximately $145 million, just roughly $145 million of post-petition AP that's still outstanding.  And then we have 503(b)(9), which

those amounts existed as of the petition date.

Q    And then approximately at what point in time did the Debtors run out of funding for those accrued administrative expenses?

A    We've never run out of funding.

Q    Well, you just testified a few moments ago that you don't have the money to pay them today.  So you don't have the funding to pay them today.  At what point of time did the expenses exceed the funding that you have on hand today?

A    I'm distinguishing between two parts.  I'm not aware really of very many Chapter 11 cases that have cash to be able to pay all obligations that are outstanding as of a point in time.  So from that standpoint, you are correct. We don't have that cash on hand.  But we have had cash continue to come in that allows us to pay our obligations on a weekly basis.

Q    Except for the $222 million that is owing.

A    Those amounts are not necessarily owed today.  Those are outstanding amounts.

Q    At the end of January of 2026, Debtors had unfunded administrative liabilities of $200 million plus, correct?

A    I think the amount is around the same, but I don't recall exactly how much was outstanding at the end of January of 2026.

Q    Is $200 million a fair approximation do you believe?

A    I think that's a reasonable estimate.  There's nothing that sticks out that would cause me to think it was significantly higher or lower.

Q    And so those must have been accrued then sometime between the petition date and the end of January of 2026, correct?

A    I think that's a fair statement, yes.

Q    Okay.  Yet back in November when you were giving assurances to this Court and to others that the Debtors did have sufficient liquidity to get through the end of January of 2026 according to the cash forecast, that was actually not correct, right?

A    No, that was correct, and that ended up being the case.  The Debtors had sufficient funding to fund all of the obligations that were coming due through January.  And that's what we actually did.

Q    Well, help me understand that then.  How do you have sufficient funding when at the end of January of 2026 you have approximately we agreed $200 million of unpaid liabilities?

A    I think again, Mr. Ruff, it goes back to the distinction between having cash to pay your obligations as they come due versus having enough cash to pay all of your obligations that are outstanding as of a point in time.  We do not have the latter.  And again, as I've pointed out, I'm

not aware of very many companies in or outside of Chapter 11 that have that ability.

Q    So as the expenses were accruing then, you weren't necessarily reserving for them at the time that they were accrued; you were forecasting for when they might actually be due down the road.  Is that what I'm hearing?

A    We forecast our cash based on when we expect to receive cash receipts as well as when we expect to make cash disbursements.  So yes, it is based on -- we wouldn't take accounts receivable as an example and expect it all to come in the next day just because we have accounts receivable. That money will come in over time.  And similarly, the money will get paid out to vendors over time.

Q    Okay.  So even though you had a cash forecast that went through the end of January, you accrued expenses that went beyond that period then?

A    Meaning that they were payable beyond that period?

Q    Meaning that you had accrued them -- meaning you had incurred them, even though they might have been due maybe a week later or two weeks later or 30 days later, but they were accrued.  So you knew you were going to have to pay them at some point, but you didn't have funding to pay them necessarily.

A    Funding can take more than just the form of cash.  We have accounts receivable and we have inventory.

Q    From any and all sources.  It could be from the DIP lender or it could be from accounts receivable.

A    We typically have had far more accounts receivable and inventory outstanding than administrative claims.

Q    And yet as we stand here today, we are owed north of $220 million, right?  On administrative claims.

A    Yes.  And again, I don't think that that amount -- even though that sounds like a large amount, this company was doing $4 billion in annual revenue.  So the amount is not significantly out of whack, especially compared to receivables and payables -- I'm sorry, receivables and inventory that we had outstanding at any given point in time.

Q    Okay.  And yet now the Debtors are asking the Court and other parties to trust them with some ambiguous promises that they'll be able to pay administrative claims sometime in 2028 maybe.  Is that what the Debtors are asking now?

A    I think there are a couple of things that I want to clarify.  So when you refer to 2028, we have cited that we believe that that is a time period by when litigation proceeds may come in sufficient to pay claims.  So that is an estimate that we've made.

     The key item as we -- and really from my standpoint when I looked at the plan, this is what is the best path.  And so while there is no assurance that there is going to be

sufficient litigation proceeds to come in, we do know that there's significant amounts of transactions that we believe are going to be pursued by the litigation trust.  And then on top of that, it's a far better outcome compared to the alternative scenario.

Q    Are you familiar with the carve out in the DIP order?

A    You are referring to the professional fee carveout?

Q    Just the carveout.

A    Just the carveout itself.  There's a carveout and then I believe there is also a professional fee escrow account.  Are you familiar with each of those?

A    I am.

Q    Okay.  And can you describe your understanding of what the carveout is and what it does?

A    Upon a trigger event, my understanding is that $25 million, which is the carveout, would be funded.  And then that is the only amounts that can cover professional fees from the time of that trigger event forward.

Q    And so why is that there?

A    As a general matter -- again, this is from a non-attorney.  But this is a mechanism in order to provide protection to professionals in order to carry out any remaining activities after a trigger event occurs.

Q    Okay.  And can you also describe to us what the professional fee escrow is?

A     This is an account that was established and that it is funded on a weekly basis based on estimates of professional fees incurred.

Q     Okay.  And that is also a requirement of the DIP order, correct?

A     That's my understanding.

Q     Yeah.  And Debtors have in fact escrowed amounts for professional fees and costs, correct?

A     Yes.

Q     So it was anticipated that there will be funds available to pay for professional fee claims in these cases?

A     Yes.

Q     All right.  And that's going to come from the carveout in the professional fee escrow, correct?

A     Yes.

Q     All right.  How much has been escrowed for professional fees approximately?

A     I don't know the number offhand.

Q     Do you have an approximation?

A     I don't.

Q     Would you be able to let us know if it was over $100 million?

A     When you ask about how much has been escrowed over time, or sitting in the account right now?

Q     How much has been escrowed over time?

A     It would be over $100 million.

Q     Would it be over $200 million?

A     It would be over $200 million.

Q     Okay.  It's a lot of money.

A     Yes.

Q     Yeah.  And that's been going on since the beginning of these cases, correct?

A     Yes.

Q     All right.  Are the professionals' administrative claims of a higher priority than other administrative claims?

A     That's a legal question.

Q     What is your belief?

A     I believe that professional fees typically are viewed as administrative expenses.  And I don't know if there is a distinction that is made between different types of administrative expenses.  But again, that's a legal question that I'm not the best person to --

Q     And you're not -- you're an accountant.  You're not a lawyer, right?

A     That's correct.

Q     That's right.  But steps were taken to ensure that professionals would be paid that weren't taken for other administrative creditors, correct?

A     I'm not sure about that.  Could you provide more --

Q    Well, there's professional fee escrows we talked about and there's a carveout that benefit the professionals, correct?

A    Yes.

Q    There's not a carveout in an escrow that benefits the other administrative creditors, correct?

A    The administrative claims bucket was something specifically that was established for administrative claims holders.

Q    Is there $200 million sitting in that bucket right now, Mr. Moore?

A    No.

Q    Okay.  So let me ask you this.  Would you be supportive of a plan that removes the DIP order's protection for payment of professional fees, including the carveout and the professional fee escrow?

A    Could you ask that again, please?

Q    Yeah.  Would you be supportive of a plan that took away the carveout in the professional fee escrow?

A    The funds that are in escrow are not able to get taken out.  So that's a hypothetical that I don't think could happen.

Q    Okay.  Would you be supportive of a plan that required people to continue working without a professional fee escrow?  Because the plan itself actually has a professional

fee escrow component to it, doesn't it?

A    Which provision are you referring to?

Q    Does the -- let me just ask it more plainly.  Does the plan itself refer to and require as a part of going effective the funding of a professional fee escrow?

A    That is the same professional fee escrow that we've been using.  We expect that to be fully funded.  That is also part of the budget that we've put forward as well as ongoing payment of administrative expenses.

Q    And if the plan didn't require that that be fully funded, would you be supportive of that?

A    That account is already fully funded.  And so there's nothing really in that provision that is a new step that's not already in place.

Q    Okay.  So -- but it is a requirement of the plan, and it's already actually been met, that requirement then is what I'm hearing.  Is that what you're saying?

A    As of today, yes.

Q    Yes.  Okay.  But no requirement to fund other administrative claims unless and until the estate claims have been liquidated and collected, totaling about $1.8 billion, correct?

A    There are a few things with your question.  The first item is that our budget, as has always been the case, continues to contemplate payment of administrative expenses.

So we are not through this what we refer to as the confirmation budget, we're not asking parties to provide goods or services and not get paid.  So that's a very important point to highlight.  We are not asking anyone to provide any goods or services and not get paid.  We provide for that in the confirmation budget.

Q   Okay.  But my point is that's for -- you're talking about administrative expenses as they accrue now and going forward.  What about the $222 million-plus of expenses? There is nothing in this plan that requires that those get funded right now, right?

A   That's correct.  That was the other part of your question about $1.8 billion that I just wanted to clarify if I could.

Q   Mr. Moore, I do mean this question with all sincerity. Would you have continued to work from January of 2026 until now if you thought you weren't being paid?

A   There are many times in this case that I was not sure if we would get paid.  And so the answer to that is yes, and it has happened.  So yes.

Q   Okay.  But you have had the benefit of a professional fee escrow and the carveout out there to help soften the blow so to speak, correct?

A   Yes.

Q   Okay.  And administrative creditors who weren't in the

mediation or the plan discussions and supported Debtors business with the supplying of goods and services, they are not now covered though by any of that.  We already talked about that.  So let me ask you this.  What is the source of funds to pay the administrative claims under the plan?  It's the estate claims, correct, primarily?

A    Yes.  Proceeds that would be coming into the litigation trust.

Q    And as we talked about earlier, the disclosure statement sets an expectation that enough will have been collected that the plan might go effective by the second quarter of 2028, correct?

A    It could go effective even earlier.  That's just the estimate that we put out there.

Q    Yeah.  But -- can I ask you, what's the basis for that timing?

A    Sure.  The first and most important event that we are looking at is the criminal proceedings against Patrick James and Edward James.  Those are currently scheduled to kick off February 9th of 2027.  There's a filing that -- a joint filing by the Federal Government, the DOJ, as well as the James defendants that indicates they expect the entire trial to take place over five to seven weeks.  So that takes us to spring of 2027.  Let's just call it we get to April.  And so to go from that point of April -- because I'm assuming that

the litigation trustee is going to be using the time between now and then to establish cases and be ready to bring claims against parties.  And these claims would actually be brought through this Court.  And I know how quickly this Court can operate.  So that is the foundation for the second half of 2028.

Q    Okay.  And that assumes that it doesn't get further stayed because the criminal matters are still ongoing, right?

A    That's correct.

Q    And so there's no guarantee that that will happen then, correct?

A    There's no guarantee.

Q    All right.  And I mean, you've been in many litigation matters, correct, in your career?

A    Yes.

Q    Okay.  And it's not altogether unusual for matters to stretch on beyond five years sometimes, correct?

A    That's correct.  However, what I would say is that if the criminal proceedings get further delayed, my guess is that the parties are going to be talking about resolution of the stay in order to allow other claims to proceed.

Q    But even then, if it got started in 2027, now we're already a year down the road and the litigation could still stretch on for many years from the time that it actually

gets started in earnest.

A    Well, if the plan gets confirmed, let's just call it at the end of July, and these criminal proceedings are done by the beginning of August, we're talking about eight months or so.  And so from that point through the second half of 2028, that's a pretty significant amount of time to bring these claims during this time period, especially in light of all of the investigation activities that have already occurred.

Q    And so let me ask you this.  What guardrails are proposed under this plan to make sure that it doesn't stretch on for years and years before the plan goes effective?

A    Nothing other than parties' incentives to get cash and get paid.

Q    So the plan itself doesn't have any guardrails in it?

A    Not that I am aware of.

Q    Okay.  And then what happens under this plan if there is a default?  We talked a little bit about this earlier, but I just kind of want to flesh it out a little bit more. If there is a default and the cases need to be converted at a later date, what is your understanding of what happens then?

A    I'm not aware of any potential events of default.  You asked earlier about what happens if the plan never goes effective, and I don't know the answer to that.

Q    Okay.  But the interests that were transferred to the trust, I believe you said you don't think they revert back to the estate, correct?

A    No.  My answer was I don't know what happens in that case.

Q    And are any interests or assets preserved for a Chapter 7 trustee to administer in the event that the plan is not successful?

A    I don't know the answer to that question.

Q    Okay.  Are you aware that the Bankruptcy Code requires that priority claims under a plan be paid within five years from the petition date?

A    That sounds familiar.

Q    Okay.  But there's no certainty that this plan will even go effective within that period of time, correct?

A    No guarantee.

Q    All right.  It's possible that no money might have been collected within five years, correct?  Under the estate claims.

A    That's possible.  Not likely.

Q    I'm just talking about what is possible.  Do we have any information giving certainty that it will go effective within five years or less?

A    No guarantee.

Q    Do we have any -- I didn't ask for a guarantee.  I'm

just asking do we have any information giving certainty that it will go effective within five years or less?

A    When I say no guarantee, you're asking me if we have certainty.  And to that I think that there are a number of natural items that will push parties to try to resolve claims and collect cash, but there is no absolute certainty, there is no guarantee that proceeds will be collected by a certain time.

Q    Thank you.  Now, the disclosure statement does provide some illustrations of potential recoveries, correct?

A    Yes.

Q    All right.  And how the proposed waterfall of distributions might play out depending on what those collections are?

A    Well, it's not how the waterfall may play out, it's how the waterfall will play out.  But there are some variables that may impact the numbers.

Q    Okay.  And it does not provide any details on the assumptions for those illustrations to creditors for them to evaluate though, does it?

A    I actually think that it does.

Q    Okay.  Can you help us explain what some of those are then?

A    Sure.  One of the specific examples that we include in the disclosure statement relates to this administrative

claim consent program where administrative claimants have the ability if they choose to sign up for this program. There would be a discount on the claim of 50 percent. And the example that we include specifically says if we start with $222 million in administrative claims and half of those parties choose to enter the program, so $111 million in administrative claims get changed into $45 million of administrative claims, and based on the starting point I'm sharing based on the litigation proceeds of $350 million, those administrative claimants are paid in full at approximately $650 million in litigation proceeds recovery. So that's a very specific plan that lays out those assumptions that a party could look at.

Q    Well, that sounds more like an illustration to me, Mr. Moore.  I won't argue with you, because I'm not going to get accused of badgering the witness.  But when I say assumptions, I'm thinking more about things like here's the total value of the assets that are available for creditors. Here's the total value of claims that are being asserted against those assets.  There is nothing in that analysis that tells us that, is there?

A    Not specifically.  I know that there is some information as it relates to the adversary proceedings.

Q    Okay.  It doesn't provide any valuations of the estate claims, as we talked about earlier, correct?

A     The litigation claims.

Q     Correct.

A     Correct.

Q     Yes.  And it doesn't even provide any statements of potential value of those claims, does it?

A     Correct.

Q     Yeah.  And it doesn't even provide a range of potential values for those claims either, does it?

A     Correct.

Q     Is there any marketing process that has been done on the estate claims that the DIP secured parties are to be credit bidding on?

A     Yes.

Q     And was there a valuation of estate claims as a part of that process?

A     No.

Q     Why not?

A     Well, that's typically what a buyer would look to do. A buyer would assess what value they would be willing to bid based on the information in a data room.

Q     So how do you know what those claims are worth then?

A     Well, that gets back to the market speaks.  And so when you have a process where you have many parties that have access to information, all the same information, they can make a determination as to what they believe those claims

may be worth.

Q    And how are creditors who are going to -- supposed to evaluate this plan that Debtors have proposed, how are they supposed to do that?

A    Well, from a creditor standpoint -- so those are two different things.  A buyer may look at it one way.

Q    Yeah.  Let's -- I understand you're talking about the buyer.  And that was my question, so thank you very much.  Now I'm sort of turning the page.  How does a creditor do that?

A    From my standpoint, a creditor looks at what are my choices.  My choices are this plan or not a plan.  And that's how a creditor would make that decision.

MR. RUFF:  I'm going to object as nonresponsive, Your Honor.  I'm asking about values of claims.

THE COURT:  Go ahead and ask the question again.

BY MR. RUFF:

Q    Mr. Moore, how does a creditor assess the value of the claims?  In other words, if a creditor is saying there's -- you know, it's real easy when I have $220 million set aside that's for me.  Right?  But if someone says I have this thing, I don't know how much it's worth, but it's set aside for you, how is a creditor supposed to evaluate that?

A    I'm trying to answer the question.  From my standpoint, I think a creditor doesn't necessarily value those claims.

I think the reality is that a creditor looks at what its proposed treatment is under the plan versus an alternative. And they make a decision between those alternatives.

Q    So they don't look at -- let me ask you this.  If you're selling something and you have a purchaser come up to you, don't you usually look for some sort of proof of purchasing power, ability to fund the purchase price?

A    I think you're getting into a hypothetical that I would need more information on.

Q    Okay.  Fair enough.  Let's move on.  Does the plan or the disclosure statement provide any sort of valuation about the DIP collateral trust assets?

A    In the modifications that were filed this morning, there were some additional statements made about some of the categories of assets that get transferred into the DIP trust.

Q    And is there any analysis or value of the ABL collateral trust as well?

A    Similar statements.

Q    Okay.  So if a party were to look at the materials I guess that were filed just this morning -- I apologize, I didn't get a chance to look at them -- those will tell creditors how much assets are going into those trusts and what the values of those are so they can make a determination of the value that the ABL lenders receive, for

example, of the ABL trust assets?

A    There are categories of assets, there are amounts referenced.  An important element to remember under this plan, to the extent that -- I'll use the ABL trust as an example.  If the ABL lenders are paid in full, any additional proceeds from those assets come back to the estate and go towards our other creditors.  So it is not necessarily a mechanism where value is going out that could exceed those claims.  Any proceeds in excess of those claims come back into the estates.

Q    Right.  But I think you are answering my question though.  Those assets potentially if they satisfy above and beyond what the ABL is owed, for example, then those would be assets that would -- the value of those assets would be available for other creditors on the waterfall.

A    That's right.

Q    Okay.  And so is there somewhere that creditors could easily look to, like a balance sheet or something that shows here's the value of the assets, here's the value of the claims, and this is -- we can see how it flows down.  Is there anywhere in the materials that that's provided?

A    Well, certainly we provide our claim estimates.  Someone can look at our disclosure statement and the plan and see the claim amounts.  As it relates to the assets, I can't tell you even as I sit here today what the final

amount is that will be realized.  But we do provide information as it relates to amounts of assets that are going in.  And as an example on the ABL of what was filed this morning, we do reference we don't expect it to exceed more than X.  So that information is in there.

Q    So you at least give the high estimate for those assets.

A    Some indication, yes.

Q    Okay.  But it could potentially be less than, correct?

A    It could be higher or lower.

Q    Or lower.  That's right.  I understand.  We're talking about estimates.  And what I'm asking is -- before I asked did you give a high and a low on the estate claims.  And I believe the answer was no, correct?

A    That's correct.

Q    Right.  And you're telling me at least with respect to what was filed today -- and I'll just take you at your word, I know you're an honest man -- you're saying now we have at least a high estimation of what it is.  We don't necessarily have a range of what the low is, but at least what the high could be.

A    Yes.  I think that's fair to say.  It's an indication of that.

Q    Okay.  And that's both for the DIP collateral trust and the ABL collateral trust, correct?

A     Yes.

Q     Okay.  Now, wouldn't evaluation of the assets and different categories available for creditors be necessary -- wouldn't it be -- let me strike that and start over.  All right.  Wouldn't a valuation of the assets and different categories being available for creditors be a necessary thing for them to evaluate a plan's feasibility?

A     I think it depends on the facts and circumstances of the particular plan.  As we highlight here and as you know well, we have a substantial amount of secured claims.  Many, many billions of dollars.  We are no longer operating as a business right now.  We've sold our last operating businesses.  We're winding down and liquidating the remaining assets.  So I think it's very fair to say that anyone reading this document would be able to understand that outside of the potential proceeds from the estate claims, as you say, there are not going to be assets that get liquidated that are going to generate $10 billion or $12 billion.

Q     So again, if we don't know what the value of the estate claims is, we don't know the high range of it, how is a creditor able, or this Court, to evaluate the feasibility of a plan?

A     Well, first from -- I expect that this is all going to be part of the confirmation process.  But certainly as we

sit here today, we know if we make it very clear how the waterfall will work.  We also talk about the various points, the threshold when different classes start to receive funds. And then I can provide more information around those different transactions.

Q    But what the Debtors are asking the Court today is to allow them to go forward with this plan, right?  To solicit it out.

A    That's right, along with the plan supplement, which is scheduled to be filed by June 22nd.

Q    Now, the Debtor's liquidity situation has not improved in the most recent weeks, has it?

A    I would say the Debtor's liquidity situation is the same that it's been for many months.

Q    For many months.  And it's been tight, correct?

A    Tight is a very good word to use.

Q    Yeah.  In fact, the Debtors have made representations to this Court many times that we need to get this plan done right away because we are at the risk of running out of liquidity.  Is that correct?

A    Yes.

Q    All right.  And so there's really no room for error here, is there?

A    I don't know about that.  The confirmation budget that's attached to my declaration, I have a high degree of

confidence in that.  Given where we are right now, we know the disbursements that are going to be made, the cash receipts that are contemplated in that budget, all of that cash exists already today.  So there aren't really a whole lot of risk factors in that budget.

Q   I guess let me ask this another way.  If this plan isn't successful, if it goes forward and it's unsuccessful, it will all be for naught because there won't be -- you won't be able to fight another day, correct?  That's not a great way -- scratch that I even said -- the Debtors will not have enough liquidity to take another swing at it, correct?

A   That's my understanding.  Unless someone steps up with more cash.

Q   All right.  But nobody is offering to do that as we sit here today, right?

A   Correct.

Q   All right.  Has the litigation trust agreement been drafted yet?

A   I don't know.

Q   Okay.  Do you know when it's going to be filed?

A   I don't know.  I can't recall if that's going to be part of the plan supplement or not.

Q   Okay.

THE COURT:  I can assure you it will.

THE WITNESS:  Thank you, Your Honor.

BY MR. RUFF:

Q    Who is going to control the litigation trust, do you know?

A    The litigation trustee is identified as Jerry Uzzi, U-Z-Z-I.

Q    And there's also going to be a Litigation Trust Oversight Committee, correct?

A    Yes, that's part of the overall negotiation, a very important part of the negotiation that occurred, which is the governance of the litigation trust.

Q    Right.  And the Ad Hoc Group has three of four members on that Litigation Trust Oversight Committee, correct?

A    Yes, and then the -- up until a certain point.  But to start off, yes, three from the Ad Hoc Group and then one from the Committee.

Q    Right.  But there aren't any seats on the Oversight Committee for a representative from the administrative claimants, correct?

A    The Committee.  Again, the Committee represents all unsecured creditors.

Q    Yeah, but they don't specifically represent creditors who are administrative claimants, right?

A    That's not my understanding.  When I deal with the Committee, I believe that they are representing all

unsecured creditors.

Q    Mr. Moore, how much is it going to cost to solicit this plan and disclosure statement?

A    I don't have that number offhand.

Q    But the DIP lenders are agreeing to fund that, right, the ABL lenders?

A    We have a variety of funding sources in the confirmation budget.  And yes.

Q    Okay.  And if the Debtors fail to confirm this plan, all that additional cost will be layered on top of the presently unfunded administrative liabilities, correct?

A    No.  The cash that is being used in the confirmation budget is cash that already exists.  The -- so as an example, as Mr. Carlson indicated, the ABL lenders are providing an additional $15 million in cash.  That cash has already been collected.  It's really allowing us to use cash.  It's not providing additional loans.

Q    Just bear with me one second here.  Thank you, Mr. Moore.  I think I'm almost done here.  And then I'm going to pass you to the next one.

A    Thank you.

Q    Mr. Moore, you had talked earlier about the ability of an administrative claimant to take a discount to try and get paid sooner.

A    Yes.

Q    You had mentioned that.  Is there any information in the plan that tells them if they took that offer, approximately how much faster that they're going to get paid?

A    Yes.

Q    And how much -- can you just tell us, help us understand how much faster if an administrative claimant took that, that they might get paid?  Does that mean that they're going to get paid by a date certain, or is it just faster but we don't know when?

A    It's not a date certain.  Again, as we've highlighted through our back and forth here, there is no guarantee around timing for any creditor.  However, what we do make very clear is the order in which proceeds flow.  So starting at that $350 million mark, once $350 million has come into the litigation trust, then 16 percent of the proceeds after that until DIP A is paid in full will go towards these creditors, administrative and priority.  However, the first dollars go to the parties that sign up for this program.  So they are first dollars out from any of those proceeds that are received in excess of $350 million that are allocated to that group.

Q    Okay.  But 350 is the first threshold before the creditors start to get the flow down on the waterfall, correct?

A    That's right.

Q    And we don't know as you testified earlier if we'll have a single dollar brought in within five years necessarily, correct?

A    Whether we use certainty or guarantee, we've established there's no guarantee.

Q    We just don't know, yes or no?  We don't know, right?

A    We don't know for sure.

Q    Thank you, Mr. Moore.

        MR. RUFF:  I pass the witness, Your Honor.

        MR. KELLEY:  Your Honor, as a courtesy to the witness, may I -- are you okay?  Do you need a break?

        THE WITNESS:  I'm good, Mr. Kelley, thank you.

                CROSS-EXAMINATION OF CHARLES MOORE

BY MR. KELLEY:

Q    I'm going to pick up a little bit where you just left off with my colleague, Mr. Ruff, who has been working on this case alongside a lot of the parties.

        I read your chart attached to your declaration.  And I want to lay out those numbers so I get a crisp record here before the Court.  The first $90 million from the recoveries that come in from the litigation trust is used to return funding to those who provided funding to the trust, correct?

A    When you say chart attached to my declaration, you're referring to the waterfall and not the confirmation budget?

Q  You are correct.  That is the waterfall.  I used the wrong terminology.

A  Yes, that's correct.  The first $90 million goes to the parties that provided funding for the -- the seed funding for the litigation trust.

Q  And so from the litigation trust, the next $90 million plus $1, all the way up to $350 million, goes to pay a portion of the DIP outstanding amounts, correct?

A  DIP A, yes.

Q  There is some confusion in the plan because it talks about subordinating the DIP funding, the DIP A funding, and all DIP funding.  Your chart is the only place where I think there's some clarity.  It's not in the disclosure statement.

MR. BEREZIN:  Objection, Your Honor.  It's not a question.

MR. KELLEY:  It's setting up a question --

THE COURT:  Yeah.  That wasn't the question.

MR. KELLEY:  Right.

THE COURT:  Okay.

BY MR. KELLEY:

Q  But from the $350 million plus $1 recovery range all the way up to $1.8 billion in recoveries, administrative claims will only get 16 percent of those dollars that come in.  Is that correct?

A  There are a few factors that will tie into the final

numbers.  Starting at $350 million, the split -- there are three parties that receive funds.  The litigation funders receive ten percent.  They're at ten percent at all times after that point, after $90 million.  The split between DIP A and the administrative and priority claimant holders is 74/16.  Once DIP A is paid in full, then the administrative and priority claimants are getting the full 90 percent outside of the litigation funders.  The DIP A could be funded or paid from a variety of sources.

So if there are other proceeds that go to pay down DIP A, it could be less than $1.8 billion.  Similarly, if the actual allowed claims, administrative and priority, are less than $222 million, that also could be a lower number.

Q    Your waterfall picks $1.8 billion as the next level by which the administrative claimants could participate.  Is that an accurate statement of the waterfall attached to your declaration?

A    Based on the calculations that we have used, the $222 million assumption on admin and that the DIP claims are not getting -- DIP A claims are not getting repaid from any other source.

Q    Right.  And I'm not going to revisit and I don't want to revisit any of the questions that were asked of you by Mr. Ruff.  But you can't tell, and nor can you forecast whether any such monies are coming in.  So you used a

waterfall number of $1.8 billion.  Is that accurate?

A    I used that as a trigger point or a threshold within the waterfall.

Q    So let me get a clean record here.  The best you can tell us as you sit here today is that the administrative claimants will only participate after $350 million -- and I appreciate your clarification -- of net proceeds come in up until the $1.8 billion net proceeds.  Accurate?

A    I don't know if I used the word net.  That was not my intention.  It's proceeds coming in.

Q    Someone who is going to litigate these claims is going to take their share off the top.  A lawyer who does it on a contingent fee or a lawyer who does it on an hourly fee, they're taking their piece.  So it's got to be net proceeds. Agreed?

A    Not necessarily.

Q    You're not the litigation trustee.  You don't know how he's going to retain or hire counsel.  Is that fair?

A    There is funding that's coming into the litigation trust.  As we highlight, it's $75 million to start.  $25 million of cash from the Debtors, $50 million from the litigation funders.  That is the budget that the litigation trustee will use to pursue claims.  That gets repaid.  And so then beyond that, those additional proceeds that come in go to these other parties.

Q    I appreciate your answer, but could you answer my question?  Which is, you don't know how the litigation trustee intends to use the available cash or which contingency fee arrangements he may elect to use in pursuing claims, do you?

A    What I would say is that how the litigation trustee decides to use the seed funding will be up to the litigation trustee.  However, these threshold points, the $350 million, is $350 million in proceeds.  It is not net proceeds.

Q    So if the trustee decides he has expensive experts he needs to use to pursue high dollar figure claims -- I've heard you waving around numbers here, important, that were high dollar figures, if the Trustee decides he wants to use those dollars for experts and hire lawyers on a contingency fee basis, are those contingency fees that are going to have to go to those lawyers on collection going to be paid out of the DIP A proceeds, or are the DIP A lenders going to be looking solely for net proceeds?

A    The plan specifically provides for how the litigation trustee, to the extent that $75 million is not sufficient, how additional funds can come in.

Q    That's not my question, sir.  So I'm going to object to the responsiveness.  My question is specifically nothing ties the litigation trustee's hands.  If he wants to use contingency fee lawyers, which could be reasonable under the

circumstances, that could delay even further the amount of proceeds before parties get paid.  Would you agree with that statement?

A    I don't agree with that statement.

Q    Is there anything in the plan that limits or prevents the litigation trustee from hiring contingency fee lawyers?

A    I don't know offhand.

Q    Sir, you signed the plan before it was filed.  It's your signature on the bottom of it.

A    That's correct.

Q    You're the CEO, correct?

A    Correct.

Q    The third line of your declaration says you are intimately familiar with the plan, correct?

A    That's correct.

Q    In fact, you put that repeatedly in your declaration. You're holding yourself out as the buck stops here with respect to the plan that's filed, Mr. Moore, correct?

A    That's your description of the buck stops here.  I signed the plan.

Q    Yes.  But you're the commercial head, the titular head of the company who has to approve and support the plan.

A    I'm the CEO of the business.  I signed the plan.

Q    You are an estate fiduciary both as CEO and as a retained professional, correct?

A    If you want to describe me as an estate fiduciary based on those roles, then yes.

Q    This isn't your first rodeo, sir.  You said you've been 30 years in the restructuring space.  You understand that as a debtor-retained professional you are an estate fiduciary, correct?

MR. BEREZIN:  Your Honor, can we get to a question?  This is a little bit badgering at this point.

BY MR. KELLEY:

Q    I'm talking about the plan -- by the way, last week there was a plan before the Court, and that's been scrapped because it was rejected, right?

A    We filed a new plan on June 5th, yes.

Q    And you signed the prior plan and you've signed this plan.

A    Yes.

Q    You signed even the one that was filed about an hour-and-a-half before the hearing today?

A    I did.

Q    With respect to the claims, I'm going to talk about your $222 million administrative claim amount.  How did you arrive at that number?  First off -- let me withdraw that and I'll come back to it.  You are still at A&M, correct?

A    I am a partner at A&M, yes.  Managing director.

Q    Is Mr. Moffatt still working on this case?

A    He is.

Q    In fact, he was the one who was given a lot of reconciliation and accounting responsibilities.  And he reports to you.  Isn't that correct?

A    Yes.

Q    He is an A&M professional.

A    Yes.

Q    And his deposition has been taken in this case.

A    That's my understanding, yes.

Q    You haven't read that deposition?

A    I have not.

Q    When it comes to accounting, tracking cash, receivables, he is the one with the greater knowledge than you.  Is that correct, sir?

A    I don't know about that.  He may be more aware of certain details.  But I also have a lot broader information about the overall business.

Q    He ran the investigation with an A&M team with respect to tracking.  The attempts to track cash prepetition, the attempts to track cash post-petition.  Is that fair?

A    No.  I wouldn't say he ran anything.  He was a part of the team looking at that information.

Q    I stand corrected.  And who is Mr. Malloy?

A    Mr. Mike Malloy?

Q    Yes, sir.

A    He is a partner of mine that was involved in the investigation.

Q    And he too was deposed in this case.

A    That's my understanding.

Q    Okay.  So I want to go through this with you real quick.  Now, going back to administrative claims.  First off, I've read it is your position that with respect to the administrative claims that are outstanding, the bulk of those occurred prior to February 1st, 2026.  Is that accurate?

A    Yeah.  Between 70 to 75 percent of those outstanding amounts existed as of that date.

Q    Say that last part again?  I'm sorry.

A    Of the amounts that tie into this $222 million, 70 to 75 percent of those on the AP side were incurred prior to the end of January.  The 503(b)(9) existed as of the petition date.

Q    So there was a declaration filed in support of this motion at Document 2911 for the record.  And there is an admission from your last sentence of Paragraph 10, "Of the remaining due and payable administrative expense claims that have not been paid, that vast majority of these were incurred before February 1, 2026."  I hear you saying yes, that's true, more than 70 percent, but it doesn't contemplate the reclamation claims or the 503(b)(9) claims.

Is that fair?

A     That's correct.  Just from the standpoint of it may be an obvious statement to some, but I want to clarify, 503(b)(9) existed as of the petition date.

Q     You are the CEO.  You're trying to get this plan on file.  You know that the amount of administrative claims is crucial.  Why did you not seek to have your attorneys file a motion to establish an administrative claim bar date?

A     That's not something that I would normally do.

Q     Is this a normal case?

A     No case is the same.

Q     Is this one by far not normal?  That's an unfair question.  Don't go there.  I'll withdraw it.  But no request for this Court to impose an administrative bar date has been sought by the Debtors, true?

A     Correct.

Q     There is no administrative claim bar date.

A     I believe that the plan requires certain items within 45 days or so, 60 days after plan confirmation.  But there is not an administrative claims bar date motion or a claims bar date that's been set.

Q     I saw in the press, I think we all did, that the government filed a false claims act against this estate.  Do you recall that?

A     Yes.

Q    $246 million being sought by the Government just since 2022.  Is that accurate?

A    I don't recall the amount.

Q    But do you characterize that as a priority claim or an administrative claim?  How do you treat that, sir, in your mind as an experienced restructuring advisor?

A    Neither administrative nor priority.  But obviously I'm not an attorney.  This is in the end a legal determination.

Q    If that is a priority claim or some portion of it is a priority claim, can we agree that that's not included in any of the numbers you've put forward before the Court?

A    That's correct.  When you say any of the numbers that I've --

Q    The Government seeking, excuse me.  I should be more clear.

A    But the number that you're referring to is the $222 million plus the $78 million --

Q    Nothing within the $246 million claim.  A portion of it, half of it, any portion of it you have attempted to include within your $222 million number or any of the reclamation or other priority claim numbers.  Is that fair?

A    It has not been included in the administrative or priority claim numbers that are used in the waterfall or at other places in the plan.

Q    I'm just going to try to shorthand this so I can move

more to the substantive issues.  But my understanding is the $222 million that you're holding up before the Court as current administrative claims is based solely upon the Debtor's receipt of invoices.  Is that accurate?

A    No, that's not accurate.

Q    What's the foundation for it then?

A    We go through a whole process of identifying outstanding amounts that may be owed.  And again, we have two categories here.  We've got the post-petition accounts payable as well as 503(b)(9).  So we have good records on those.  And then on top of that, we've added a 20 percent cushion.

Q    So we'll come back and talk about the 20 percent cushion.  I'm going to skip it for now because I want to ask a couple of other questions in terms of how you gathered your administrative claims.  How many employees were laid off during the course of this case?

A    That's a hard number to determine.

Q    Give me a range.

A    Well, let me just talk through the numbers.  At the time of the filing, there were about 26,000 employees globally.  And if I recall correctly, about 20,000 of those were in North America.  Outside of North America -- so if you assume 6,000 employees or so outside of North America, we've really lost control over those businesses throughout

this Chapter 11 proceeding.  I don't know exactly what the final outcome is with those employees.  So I can't speak to that 6,000.

Of the remaining employees in North America of we'll call it 20,000, we know that 2,500 employees have gone with the recent sale closings.  The other employees, we certainly have a number that are still working in Mexico.  Mexico represented about 15 of the 20,000 in North America.  We still have employees that are working in Mexico right now.  So it's been a substantial number of people that have lost their jobs through this process.  But I can't give you any more precise number than what I just took you through.

Q    And under the relevant applicable laws, whether it's state, Mexican, or other international laws, there are obligations associated with termination, correct?

A    Again, that's a legal question.

Q    Okay.  The estate has been sued for WARN Act claims for laying off employees.  Do you agree?

A    I understand that's the case, yes.

Q    And that will give rise to administrative claims, will it not?

A    It could.

Q    And have you put an number in your $222 million that you believe is a reasonable potential outcomes for the WARN Act claims?

A    First of all, we provided funding for a significant amount of employees.

MR. KELLEY:  Objection to the responsiveness.

BY MR. KELLEY:

Q    My question is very succinct, sir.  Have you included in your $222 million number that you've been using before the Court any amount of money associated with the WARN Act claim for administrative claims?

A    No.

Q    Are you familiar with an -- I looked under the Court's records.  There's not a lot of admin claims that have been filed in this case.  There are some, but not a lot.  Have you checked before you sat down here today?

A    No.

Q    Have you heard of an entity called Longkou Haimeng?

A    Yes.

Q    In fact, it's an affiliate of the debtors, but it's not one of the debtors.  Is that accurate?

A    I don't know how you're using the word affiliate.  It is not a debtor entity.

Q    Fine.  But they provided goods and services to the estate during the course of this bankruptcy, correct?

A    That's my understanding.

Q    And they have a $61 million administrative claim that they've already filed and asserted against the estate,

correct?

A    That's my understanding.

Q    Did you include any of the $61 million in your $22 million number?

A    No.  We believe that -- first of all, there were --

Q    Is the answer yes or no?

A    There are substantial payments and other setoffs.  And so as a result of that, the answer is no, we did not include a claim for that.  We do not believe that they have a valid claim.

Q    What's the status of that entity right now?  Is it in operations?

A    I don't know.

Q    You're not aware of whether it's in a restructuring proceeding in another country?

A    I don't know.

Q    Okay.  That is an entity -- if it is in a restructuring proceeding that has a duty to pursue its claims against the estate, it's got a $61 million claim.  It is asserted and filed, correct?

A    I don't know any of those assumptions that you just made.

MR. KELLEY:  I'd ask the Court to take judicial notice of Document 2569 on the Court's docket, the administrative claim of Longkou Haimeng.

THE COURT:  So noted.

BY MR. KELLEY:

Q    You have no idea whether the Debtors will be successful or unsuccessful in challenging the $61 million claim because the Debtors haven't put together their defense yet, correct?

A    I don't think -- I have no idea.  I think I have a very good idea of our chances of success.

Q    But that's just potential outcome in a litigation dispute.  Right, sir?

A    No, sir.  It's based on actual information that I'm aware of.

Q    Right.  But you're going to have to assert that as an objection.  They're contending $61 million.  You're going to challenge it.  Perhaps this Court will decide which portion of the $61 million it will grant if any.

A    Mr. Kelley, you know obviously a lot of people assert a lot of claims in bankruptcy.  That does not mean that all of these claims are valid.

Q    I don't disagree with you.  But I want this judge to understand there are pending administrative claims.  You may challenge all of them, but the $222 million number that's being waved around in this courtroom by the Debtors doesn't even include the known assertions of administrative claims by other parties.  You've told me Haimeng is not part of the $22 million, correct?

A    I think you just stated two different things.  The
first implied that we have not included anything for any
asserted administrative claims.  That's incorrect.  We have
included those that we believe are valid claims.  And we've
actually been conservative on that.  Because we do believe
for a number of these claims that we will have various
rights of setoff and other items.  On this specific item, we
did not include it.

Q    That's what I'm just trying to establish.  Nothing for
the Haimeng asserted claim appears (indiscernible).

A    That's correct.

Q    Now, are there other admin claims where you have
thought of defenses and you don't think they're valid and
you have not put in the $222 million number?

A    Not specifically that I can think of.

Q    Haimeng didn't only assert an admin claim, they've also
asserted a reclamation claim.  Do you know what the amount
of that claim is?

A    I don't offhand.

Q    Let me just start this way.  This may be faster.  You
put a number in your declaration of reclamation claims of
roughly $38 million.  Does that sound right?

A    Yes.

Q    Is any of those dollars related to Haimeng's
reclamation claim?

A    I don't know.  I don't recall.

Q    But they have filed a $21 million reclamation claim.
Does that sound familiar to you as anything you included in
the $38 million number?

A    I don't know what the detail of that or if there is a
specific amount in the 38.

Q    My concern here, sir, is the plan that the Debtors were
advocating for last week or two weeks ago was turned down.
The Debtors filed a new plan on Friday, a rush to file.
First off, was that plan and disclosure statement in your
view filed as a defense to the trustee's motion?

A    No.

Q    Did you read the Debtor's brief before it was filed
pointing to both the plan and the disclosure statement as a
defense to the trustee's motion?

A    I've read everything that has been filed and before it
was filed.  But this is a mechanism -- we are -- at every
point in this case, we have been trying to maximize value to
the creditors.  And this plan is specifically that next
method.  We believe between this plan and converting the
cases to Chapter 7, this plan is far better for all of our
creditors.  That's why we filed this plan.

Q    We're building a record right now for the trustee's
motion.  Is it your testimony under oath that the Court
should disregard the plan and disclosure statement in

evaluating the trustee's motion?

A    Could you state that question again?

Q    We are litigating right now the Trustee's motion to convert the case or dismiss the case.  Is it your testimony under oath that the judge should disregard the plan and disclosure statement that is on file by the Debtors?

MR. BEREZIN:  Your Honor, we object.  He has no foundation to answer that question.  It's not a factual question.  It's sort of a -- I guess it's a legal question. I don't know how he would answer a question as to whether the Court should or should not do something.  He's a fact witness.

THE COURT:  Mr. Kelley?

MR. KELLEY:  This is the CEO of the company who signed and put forward the plan.  The timing of this plan is putting a lot of parties in serious jeopardy.  And the timing of it was filed -- the brief of the Debtors was filed and it was included as a potential exhibit on the Debtor's witnesses as a defense to the trustee's motion.  If the CEO doesn't know that or can't answer that question, I'll take that on the record.  That's telling.  But if their view is the CEO can't answer that question --

THE COURT:  I thought the trustee filed a motion after --

MR. KELLEY:  The trustee filed a motion weeks ago.

THE COURT:  Yeah, but it was after the global settlement, right?  What's the timing on that?

MR. KELLEY:  I'm going to have to defer to...

MR. BEREZIN:  Just to be clear, we filed -- after the -- I don't know what iteration of the plan --

THE COURT:  It was some iteration of the plan on file.  So I'm not trying to answer the question.  I'm trying to figure out when you say the plan, for the witness to answer --

MR. KELLEY:  Do you want me to clarify the question?

THE COURT:  Yes.  Just which plan we're talking about.  Because as a matter of fact, I think there have been several iterations of it.  And one of them looked different than the other.  So that's what I mean.

BY MR. KELLEY:

Q    The plan was filed by the Debtors on June 5th, a substantially different plan than the first one that went forth on the  Court's conditional disclosure statement hearing.  Would you agree with that?

A    We filed a plan on June 5th.  It certainly had a number of changes to it, most notably the debtor entities that were included as well as improvements in the waterfall.

Q    And I notice a new version was filed this morning.  Do you agree?

A    Well, there are modifications to it.  Very --

Q    It's not called an amended plan.  It is the Debtor's Chapter 11 plan, correct?

A    I don't know why attorneys sometimes say amended or modified.  So I do know that there were documents filed today which I authorized, both the plan and disclosure statement, that have minor updates to what was filed on June 5th.

Q    As the CEO, as a 30-year restructuring professional, is it your view that the Court should take the plan and disclosure statement into consideration in evaluating and addressing the Trustee's motion to dismiss or convert?

A    Yes.

Q    So the plan and the disclosure statement are fair game for this hearing because it's a defense on which you are relying.  Is that fair?

A    I don't know about that.  That's a legal question.  But what I'm saying is that part of what is referenced in the Trustee's motion is no prospects for rehabilitation.  And I think the fact that we have had such robust discussions and negotiations around a plan and we filed another plan on June 5th go directly to that point in the Trustee's motion.  So from a non-attorney, that seems very relevant to me.

Q    Okay.  And the parties are put under a tight timeframe to consider it because you're asking also concurrently today

for conditional approval of the disclosure statement, do you agree?

A    I believe actually the time period is actually very good.  Because it's 28 days from the plan supplement to the objection date.

Q    I am not talking about the time period for the parties to vote.  I'm talking about the time period for creditors in this case to evaluate the papers filed last Friday and then filed again this morning.

A    Mr. Kelley, as we just went through, we've had plans on file for almost two months now.

Q    Has a claims bar date been set?

A    Not that I am aware of.

Q    Have you requested the Court to establish a claims bar date?

A    That wouldn't normally be my role.

Q    You have advisors.  I'm not trying to get into privileged communications.  But at no point have you requested the Court to establish a claims bar date?  You as CEO have not instructed any advisors to file a motion to go ask Judge Lopez to establish a claims bar date.  Fair?

A    I have not instructed anyone to do that.

Q    You're not aware of any such motion having been filed, correct?

A    Not that I'm aware of.

Q    You have an interesting statement in your declaration, Document 2911, Paragraph 9, second sentence.  I'll read the first two together so they're not taken out of context.  I want to be fair to you."  I am aware that certain administrative expenses have accrued during the course of these Chapter 11 cases and remain unpaid."  That's a true statement?

A    Yes.

Q    "This is not surprising given the extraordinary circumstances in which these cases were commenced, including a tangled corporate structure involving over 100 debtors, unreliable books and records inherited from former management, fraud and allegations of embezzlement committed by prior leadership."  The second sentence.  That's your statement under oath, agreed?

A    Yes.

Q    Is it fair to say that the prepetition debtor's books and records are unreliable?

A    Yes.  We have stated that several times.  When we state that, it means that previous financial statements that were issued should not be relied upon.  But there is a distinction.  We're not saying that about all financial information.

Q    I understand that, sir.  We've got lots of testimony as indicated before by Mr. Malloy and Mr. Moffatt.  We can go

through aspects of that, but I want to keep the hearing kind of short.  So I want to stay focused on a couple of key issues.  We understand and do not have a disagreement, do we, that the Debtors have overstated their fixed assets on their financial statements prepetition.  They were overinflated or overvalued and were inaccurate.  Is that a fair statement on the fixed assets?

A     Could you just provide a little bit more detail on that.  That's a very broad statement.

Q     Bricks, mortar, any hard assets owned by the debtors.  I can't list them because there's 112 entities.  But did A&M reach the conclusion those were overstated?

A     I'm just asking you to be more specific on what overstatements you're referring to.

Q     The purported statements of asset value of those particular hard assets.

A     And specifically what overstatements are you referring to?

Q     Well, let me put it this way.  Is it your position that the Debtor's books and records accurately stated the hard, fixed assets?

A     No.  But I need a little bit more detail in order to make sure that I'm responding accurately based on your question.

Q     That answer is good, that they're not accurate.  Are

the Debtor's records accurate as to the amounts of inventory prepetition?  And when I say amounts, let me clarify for you.  Amounts and value of inventory as reported in the financial statements.

A    Again, I would like a little bit more clarity.  There are a whole host of transactions that we have put in pleadings in this case about alleged sales of inventory to special purpose vehicle entities.  That didn't actually happen.  So if you're referring to that as an example, I agree.

Q    Well, are the -- were the financial statements that you looked at prepetition for the Debtors overstating the value of inventory the Debtors actually carry?

A    This gets into how inventory is valued.  And so certainly we have discovered that a lot of this inventory is excess and obsolete, which would suggest that there should have been a reserve against that inventory.  So that is an example where inventory on the balance sheet may have been overvalued.

Q    You're aware Mr. Moffatt has already testified on this issue specifically, correct?

A    I don't know what Mr. Moffatt has testified to.

Q    Let me just try to shortcut this, because there's a number of topics we're going to cover.  If Mr. Moffatt testified that the Debtors' prepetition books and records

seriously overstated their inventory, you are not disputing that. Is that fair?

A     I don't dispute it. I just would like a little bit more detail in your question to make sure that I respond accurately.

Q     We know that they overstated receivables, correct?

A     Could you please provide a little bit more detail on that?

Q     In your view, did the Debtors accurately track receivables and accounts receivable on their balance sheet?

A     There are different aspects of receivables. There is the receivable itself that may appear on a balance sheet and then there are records on receivables that are provided to factors and other parties. We certainly are aware that the receivables were pledged multiple times to parties and records were fabricated. New items were made up. But that does not necessarily mean that the accounts receivable number on the balance sheet is incorrect.

Q     Were you the one responsible for examining the following through and testing the ERP system that is used by these debtors in terms of whether the accounts receivables were properly tracked prepetition? Was that you or someone else?

A     The activity that you're describing, could you please go through that in more detail?

Q    Do you know what the ERP system of the debtors is?

A    The debtors have multiple ERP systems.

Q    And that is where receivables are tracked, correct?

A    When you say that, those?  Because there are multiple ERP systems across the entire enterprise.

Q    Agreed.

A    Generally speaking, that is where all of the financial records are maintained.

Q    Correct.  Who is responsible within the A&M team for testing the validity of those systems?

A    The validity of the ERP systems?  And when you say the validity of the ERP system, what are you referring to specifically?

Q    The outputs.  The information reported.  I don't think it's a tough question, sir.  But are you the one -- it's not a question of a breakdown of the systems, it's what your responsibility specifically is.  Were you the one who tested to determine whether or not those are reliable systems or is that someone else at A&M?

A    Mr. Kelley, it may seem like a very simple question to you.  It's not.  There are so many different tests that can take place around a system.  First, there is segregation of duties.  There are controls.  There are actually -- is the code working correctly with the system?  There's a whole host of things that parties can do on a system to assess

whether the system is operating accurately.  And those activities are not something that Alvarez & Marsal has done.

Q    That's what I understand, sir.  Thank you.  I'm going to shift gears on you and talk about the plan.  I have read it front to back as well as the disclosure statement, and I do not see anywhere in there where the transfer of all of the causes of action from the 112 entities will be tracked on an entity-by-entity basis.  They will be put in a trust and just treated as one pool of claims.  Is that an accurate statement in your view?

A    I think that's accurate.

Q    So all of the causes of action are going to be combined under this plan into one trust?

A    What I would clarify is when, I believe, various claims are pursued, it's going to be relevant to a particular entity.  So while the litigation trust may be pursuing all of these claims, I don't think that there is going to be any loss of tracking as it relates to the nature of the claim.  And which entity this claim would relate to, which debtor entity.

Q    And there's going to be no tracking as to the proceeds from that entity's cause of action how those proceeds are used with respect to that entity.  They're just going to be used in a totality or in an aggregated form, is that correct, under this plan?

A    That is generally correct from the standpoint -- I think you said two things.  One, the tracking of proceeds, I would fully expect that there is going to be tracking related to each claim.  Now, the distribution of those proceeds is done jointly.

Q    And if you never get to the effective date -- and I don't want to repeat the questions Mr. Ruff asked -- what happens to all those claims that have been aggregated in the trust because the plan can't go effective?

A    I don't know the answer, as I indicated to Mr. Ruff.

Q    What happens to the proceeds that have come in for that litigation trust?  Are they going to be clawed back and sent back to the individual entities?

A    As I indicated to Mr. Ruff, there are or there is the expectation of rolling distributions from the proceeds.  But whatever would exist at that time, I don't know offhand as we sit here today what would happen.

Q    I listened very carefully what you said to Mr. Ruff about at what threshold the settling administrative claimants under the example you gave, do you recall that one, that if 50 percent of the administrative claimants settled, that turns into a roughly $56 million number.  Do you recall?

A    Yes.

Q    And you've said they would be paid in full when you get

to something north of $600 million under your waterfall example.

A    It's just about $700 million.

Q    So I'm clear -- I did the math.  What I understand you to be saying is once you pay the funders and the DIP A amounts, that 16 percent that comes in up to that $650 million that is put aside for paying administrative claims will go to all those settling parties, correct?

A    Yes.  So from --

Q    Is that a yes or no, sir?

A    Could you please state the question again?  Because I wasn't clear on the question.

Q    The 16 percent that is allocated for payment of admins up to your example you gave, up to $650 million and change, or whatever the exact number was, that will be used exclusively for paying the settling administrative claimants?

A    Yes.  The 16 percent of proceeds that come in between $350 million and I think it's exactly $697 million, under that specific example would go to those $56 million in claims, settled claims.

Q    You're not a lawyer.  Are you aware of a basis under which certain administrative claims can be preferred over others?

A    This is all part of the settlement.

Q    Right.  But there are other claimants who may, because of valuation or other reasons, want to wait for proceeds to come in.  But they're not going to get their pro rata share of that $50 million.  Your plan proposes taking those who settle and preferring them and paying them before the other admin claimants who are outstanding.

A    It's an exchange of value.  Because they've compromised their claim.  That's the reason why they're getting paid earlier.

Q    Right.  But that punishes the other admin claimants who don't get to participate in the 16 percent.  And they've done nothing wrong other than just value the case differently.

          MR. BEREZIN:  Your Honor, objection.
Argumentative.

          THE COURT:  I will sustain that.

BY MR. KELLEY:

Q    But administrative claimants who don't elect the settlements will get none of the 16 percent at least up, in your example, to the (indiscernible)?

A    They will actually get paid quicker because of the fact that there was compromise of claims.

Q    I appreciate your argument, but the factual question that I put before you, sir, is they will not participate in any of that 16 percent up to your example.  Is that true?

Yes or no?

A    An administrative claimant that does not go into that settlement program won't receive any proceeds until those that have compromised their claims get paid.

MR. KELLEY:  Judge, I have more questions, but it's five after 12:00.  I'm going to follow your lead.

THE COURT:  How much more time do you think you're going to have?

MR. KELLEY:  I'm projecting 45 minutes.

THE COURT:  Okay.  Why don't we just take our break now and come back.  Let's do 1:15.

MR. KELLEY:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.  I'll remind you that you are still under oath and to speak with no one about your testimony.  Thank you.  Everyone is excused.  Thank you.  You are excused.  Thank you.

(Recess.)

THE COURT:  All right.  This is Judge Lopez.  We are back on the record in First Brands.  Let's -- Mr. Moore, come on up.  And I will remind you that you are still under oath.  Okay.

MR. KELLEY:  Thank you, Your Honor.

BY MR. KELLEY:

Q    Mr. Moore, we already covered earlier the lack of reliability on Debtor's books and records per your

declaration and as you've talked about.  Do you -- I'm going to ask you what I recognize and concede was maybe a bit of an unfair question, but I would be interested in your response to it, which is you don't know what you don't know, right, but do you have any ability to have formed a view as to the completeness of the Debtor's prepetition records as to creditors, the entities that may be creditors of this estate?

A     Yes.

Q     Please tell me what you believe you understand.

A     As part of preparing and filing the statement and schedules with the Court, we went through an exhaustive exercise and we have a lot of confidence in the information that appears in the statement of financial affairs and the schedules of assets and liabilities.

Q     I may have not been clear on my question.  I was talking about the Debtor's records if they existed at the petition date.  Not what A&M did since then.  Did the Debtor's records adequately disclose all of the creditors of the estate?  Sort of the company as you inherited it so to speak.

A     When I think about the funded debt, which would include factoring and supply chain financing, those amounts appear to have been understated by at least the supply chain financing.  The other amounts I think were generally known,

but not necessarily recorded.  So as an example, factoring off balance sheet items may not have been on there.

Q    Again, I'll accept responsibility for my question.  But I was talking about identity of creditors.  Did the Debtor's records on the petition date give you sufficient information to know the total pool of creditors of these 112 entities?

A    On the petition date, I think we had a pretty good idea of the various creditors.  But it was going through especially preparing the statement and schedules that we confirmed the identity of creditors.  I don't recall exactly at the petition date how many of those creditors were known to us.  I think from a creditor matrix standpoint, which is something that we prepared at the time of the filing, that gave us a very good understanding of the identity of the various creditors.

Q    Would you agree with me that the completeness of what the Debtor believes it understands about the creditors will be established if a proof of claim bar date is set and parties will submit claims so you can see who thinks they're creditors that maybe you didn't know about?

A    As a general statement, certainly the process of submitting a proof of claim helps with that process.

Q    And I don't want to repeat questions, but I thought I heard you say as you sit here now you do not know the cost of soliciting this plan to the total group of creditors on a

preliminary basis, this disclosure statement, correct?

A    That is what I said.  I personally don't know.  I know that we have provided for that in the budget.  I just don't know what it is offhand.

Q    And parties are still entitled to challenge the disclosure statement even after it goes out.  And if it's inadequate and has to be resolicited, that just doubles that cost, correct?

A    That's what my understanding of conditional approval is.

Q    I would like to confirm for Judge Lopez -- I read this in your declaration.  You put the timeline up in your declaration.  The voting date, the voting record date is June 15th, correct?

A    I believe that's right, yes.

Q    That's Monday.

A    Yes.

Q    So this disclosure statement that's being considered today, that if at the end of the day Judge Lopez allows us to go out, only those creditors that have either filed a claim or appear on the Debtor's schedules as of Monday, again, with no bar date set, are those whose vote will be considered.  Is that accurate?

A    I think that's accurate.

Q    And creditors are hearing about it today.  It's a

complicated plan.  They may not even know that that's a bar date, correct?  Effectively a bar date for voting.

A    I would just go back to the fact that we have multiple filings that have been out there with timelines.  And certainly we filed this last Friday, June 5th.

Q    Right.  But the bar date was previously set in the past on those earlier plans, correct?  Excuse me, that voting effective date was previously set in the past, correct?

A    There were different timelines, yes.

Q    This morning however was something that disturbed me. I saw that the Debtors had filed a plan as of Friday that was willing to accept voting on a consolidated basis.  But this morning at 8:37, the Debtors filed a plan where they specifically removed voting on a consolidated basis.  Were you aware that that occurred and the plan was signed?

A    I recall reading that this morning, yes.

Q    So my client -- and we can talk about what -- I am not asking you whether you agree with my claim.  We filed a proof of claim as to one debtor.  Now voting has to occur on an individual debtor basis based on that change that occurred this morning, correct?

A    I'm not sure exactly how that would work.

Q    So I have to spend all weekend filing 112 other claims against all of these debtors given the fraud the First Brands entities perpetrated on my clients if I believe that

I have an unsecured claim in those estates.  Is that what the procedure I'm left with, spending that money over the weekend?

A    I can't speak to specifically what would be required.

Q    If that is in fact what that means -- and I understand you are not a lawyer and you're not commenting on whether that's true, does that seem equitable to you, that I have to file 112 claims over the weekend, which is costly for my client, just because of this change that occurred Friday morning?

A    I can't really speak to that.

Q    I'm deliberately trying not to cover things that Mr. Ruff covered.  I have an understanding a little bit of your background.  You have valued litigation claims in the past.

A    I have testified as it relates to 9019 settlements.  I myself have not necessarily valued claims.

Q    Have you supervised A&M personnel who have valued claims for your purposes or roles you were playing in cases?

A    I don't know if I would say that I've supervised them.  They have been colleagues of mine, perhaps people within our disputes and investigations practice.  But I don't know that I would say that I supervised them.

Q    Let me approach it this way.  Do you have a general understanding of the types of factors that are taken into account for valuing litigation?

A     A very general understanding.

Q     Strength of the claim would be a factor?

A     Sure.

Q     Strength of defenses?

A     Sure.

Q     Cost of litigation?

A     Yes.

Q     Duration of litigation?

A     Possibly.

Q     Collectability.  Even if you got a judgment, whether you could exercise on and even collect any monies?

A     Possibly.

Q     Well, if you can't collect anything, I think we can agree on what the value of that litigation is, right?

A     It may be a factor.

Q     That exercise to your knowledge has not been performed as of today's date on behalf of the Debtors.  Is that correct?

A     Correct.

Q     Because if it was, you'd make sure it was put in the disclosure statement so people would be able to vote based on that kind of information.

A     I have to defer to the attorneys as to what should and shouldn't be included in a disclosure statement.

Q     Fair enough.  Can you and I agree there is nothing in

the disclosure statement that lays out any sort of risk-adjusted valuation of any of these claims on a collective basis?

A     Yes, I agree.

Q     I heard you this morning use numbers, billions of dollars.  And the one that piqued my interest obviously -- you know I represent a factoring party in this case.

A     I do.

Q     And so you talked about payments that went out in that 90-days, but I didn't hear you reference the hundreds of millions of dollars that came in from those factoring parties in those 90 days.  You were aware that that has occurred.

A     I am.

Q     So using those high line numbers doesn't really tell the full story of what the nature of those disputes may come to look like?

A     Just from the standpoint of the answer that I provided, correct.  I have additional information.

Q     And so no one has considered the various defenses that exist.  And so you don't even know what the value of any such claims, if they are brought, what they would be.

A     That's not correct.  Actually, as part of this I do understand that we are looking at likely a subset of the transfers that occurred in that specific category that I

referred to.

Q    And in fairness to the debtors, I'm not going to ask you to testify to that which may arguably be privileged at this juncture.  But there is no disclosure of that in the disclosure statements, is there?

A    Correct.

Q    So a voting creditor has no idea about the likelihood of recoveries in this case?

A    From the standpoint of how much may eventually be recovered through the estate claims in the litigation trust, I agree with that.

Q    Similarly with what goes with litigation and when you are estimating the value of claims is you project the timeline of that dispute from when it's ultimately filed to the types of defenses, the discovery, the experts and so forth before that claim is ultimately decided and you have appeals, right?

A    That may be the case.

Q    And you were talking some large numbers on these types of issues.  You have not worked out a timeline of what some of these large claims could prove to be, have you?

A    Well, that's where we cited.  The second half of 2028 is a reasonable timeline that we expect that we would be able to receive proceeds from litigation that would be sufficient to pay off these claims and then have the plan go

effective.

Q    Where did you come up with that timeline?  You've already told me you haven't valued the claim.  So who gave you that timeline?

A    Actually, I believe that I responded to a question from Mr. Ruff in terms of some of the factors that go into that. I can repeat that if you would like.

Q    My question was not how, but who?  Who prepared that timeline for you given what you've said about what you've done?

A    That was something specifically that I did in conjunction with counsel for the debtors.

Q    Okay.  And I also heard you say in response to a question from Mr. Ruff, that's a day -- it could be earlier, it could be later.  Does that accurately convey your testimony?

A    And by date, specifically when the plan may go effective, yes.

Q    Correct.  And that means when there are sufficient proceeds coming in to pay all the admins?

A    Yes, admin and priority claims,  Yes.

Q    Right.  And you and I already went through the reliability of the numbers that we've been using thus far and what we know and don't know, so I'm not going to revisit that.

Let me ask you, in the plan I saw no disclosure at all about the Debtors trying to seek a waiver of diminution claims from these lenders.  Were the diminution claims of lenders waived?

A    I don't know.

Q    Do you know what a diminution claim is?

A    Generally.

Q    Is that a superpriority or admin claim depending on who asserts it?

A    I am not sure of what classification that would receive.

Q    Is it fair to say that the $222 million number that's in the disclosure doesn't even take any diminution claims into account from the secured party?

A    Correct.

Q    And there is no waiver of those claims in the plan or that has been reached as of today's date while you're sitting on that witness stand.

A    As part of the overall settlement, I think we have a very good handle on what the claims of our secured creditors are.

Q    That wasn't my question.  Their view on the value of the assets and whether they have a diminution claim has not been -- the possibility that they may file a diminution claim has not been eliminated in this plan.

A      I am not sure.

Q      Are you aware of any waiver of the diminution plan? Going back to my initial question.

A      Not that I recall.

Q      Okay.  And prior -- I understand, as you may expect from the depositions I've done earlier and understanding of (indiscernible) and the investigations associated with prepetition conduct of management.  And I'm not going to go through that.  But I'm going to hit it at a high level in this way.  I understand that a lot of the cash prepetition was aggregated in central accounts and used for the Debtors where and as needed as they went to operations.  Is that consistent with your understanding?

A      Generally, yes.  I don't know if I would say central accounts.  Cash was located in a lot of accounts, but it was moved around and used as needed, yes.

Q      Sort of across entities?

A      Yes.

Q      So if I wanted to go and look at a particular payment that was made prepetition, I probably -- other than grabbing the bank record to see where the wire originated from, I won't know whose cash is in that payment without going through and trying to figure all that trail out.  Is that fair?

A      No, I don't think so.  Every entity -- so every

disbursement has to come from an entity.  So we know the entity that made the disbursement.  We know the account from which that disbursement came.  To the extent that there was cash that was moved from one entity to another by transferring between bank accounts, we have found that that has all been recorded.  So those are two separate things. Both are available.

Q    I questioned your colleague who was leading the fraud investigation -- not Moffatt -- Moyer?

A    Malloy.

Q    Malloy.  Thank you.  Debtors have not been able to piece together the flow of cash that went out the door with respect to the receivables, at least as of February.

A    So that is a full cash tracing exercise.  And there are still open items on that, yes.

Q    I understand that.  And I understand it's a monumental exercise.  But as you sit here now, you can't tell me that money that went out of one account to pay the factors came from that entity; it came from across a variety of entities based upon what you know thus far.

A    It could have.

Q    Is it fair to say as the examiner concluded that prepetition the debtors disregarded the corporate formalities?

A    That certainly is a legal item.  I don't know if I'm in

the best position to say that.

Q    Factually have you seen enough about the debtor's operations prepetition to recognize that they did not strictly adhere to corporate formalities in the way they conducted their business?

A    So we have different types of debtor entities.  On our special purpose vehicle entities, certainly that appears to be the case, from the lay understanding of what certain corporate formalities may be.  As it relates to other debtor entities, I don't know if I'm in the best position to say that.

Q    So I'm just going to summarize what I understood your testimony to be.  As we sit here today, A&M, if I may reference your employer, has not completed the exercise of totally determining the source of cash as it went out the door from particular bank accounts prepetition.

A    Could you be a little bit more specific in that question?

Q    If the corporate formalities were not adhered to and money was moved around prepetition by Mr. James and his brother, Edward James, and the prepetition management as needed to pay obligations as they came due, it's going to require a broad tracing exercise to figure out whose money was used in each of those wires.

Q    There's a lot in what you just said.  And there's not a

yes or no question to that.  So as an example, corporate formalities are not just related to cash movement.  You could not observe corporate formalities, but you could have very good records on cash transfers.  In addition to that, there are questions about whether cash transfers are authorized, if they are eligible or authorized under loan agreements.  There are a number of questions that come into play.

I think that through the investigation, we've uncovered a lot as it relates to cash transfers.  Going back to our exchange just a few minutes ago though, that is not an exercise that has been fully completed.

Q    I respect that.  My point is right now because that's not been completed, A&M is not in a position to identify as to all prepetition transfers whose cash was used, to put it simply.

A    Yeah, that's where I guess I'm -- it's not an all-or-nothing item.  I think we have a significant amount of visibility to a lot of prepetition cash transfers.  But we don't have -- no one is saying that we have visibility to a hundred percent of those.

Q    And the visibility I understand from Mr. Malloy does not yet extend into the payment of receivables.

A    Some of it does, but not -- it has not been completed.

Q    So is it fair to say it's not certain the source of

where those payments came from?

A     It all depends on what payment you're referring to. Some of them, the answer is going to be yes.  Some, the answer will be no.

Q     So from the debtor's perspective, there is nothing in the plan by which the debtors have set up pursuit of those claims by independent debtors.  All those claims are going to be put into a trust and the plaintiff is going to be able to file the claim on whatever name of the debtor it elects to choose, fair?

A     I'm not sure --

Q     The litigation trustee.

A     Yeah, I'm not sure how the litigation trustee will approach that.

Q     And I get that.  But I read the plan as putting the burden on all those preference defendants to only be able to raise defenses as to the entities who wired them the money, notwithstanding the estate may not even know where all those monies came from at this point in time.  Is that fair?

A     Well, every transfer had to have come from an entity to start with.  And so my suspicion is that if there are defenses that any of the parties through whom various litigation claims are brought, they are going to be getting into this, and they'll seek discovery, and a lot of this information will get uncovered as part of that.  But I do

expect because initially if there is a transfer that is viewed to be a fraudulent transfer, that will be from a specific entity.

Q    If A&M is not in a position today to say that they've identified the source of where all those monies came from or how those monies were aggregated before they were wired out to say, for example, the factoring parties, why is it equitable or fair to not have substantive consolidation to allow those counterparties to just identify who made those payments?

A    Substantive consolidation certainly is a legal topic. I'm not in a position to comment on whether this should be substantively consolidated or not.

Q    But A&M got employed I want to say roughly three weeks before the bankruptcy filing, on September 28th, 2025, and have been in this case in that period of time and they have not yet completed that exercise.

A    The first part of your question is correct.  We got engaged approximately three weeks before the filing.  We have not been working on the investigation in the entire time since the petition date.  So we certainly undertook extensive investigation activities.  However, not all of those activities have been completed.  We have not continued on those.  But the books and records have been preserved so that parties can continue those.

Q    In my prior set of questions I was talking about valuation of the litigation.  I don't want to -- you're not in a position to project, forecast, or tell the Court when the potential effective date under this plan may occur, right?

A    Not outside of what we've already included.

Q    But I did hear you clearly, you said in response to value and things like that, you let the market speak to that.  Do you recall that testimony?

A    I want to make sure that we are being clear.  That was as it relates to the marketing process for those litigation claims.  If a different party, a third party would like to acquire those, there is a marketing process for those.  That is different than the litigation -- the valuation of litigation claims.

Q    And valuation of litigation claims also contemplates that the party who is valuing will have access to what is otherwise privileged information of the party that owns that for understanding, investigation in the claims, communications from the clients with respect to those claims, right?

A    Not necessarily.

Q    But it also can exist, right?

A    Well...

Q    You're not saying that there's no privileged

information relevant to value in these claims, are you?

A    I am not saying that.

Q    Okay.  Let's focus on that.  Is that being made available in the marketing process of these claims, privileged information?

A    As I -- no.  As I understand, there is a significant amount of information related to the potential claims that was put in the data room.  I can't speak to whether privilege was waived on any of that.  But I certainly know that there is some privileged information that has not been made available.

Q    The reason I get into it is because the marketing process of claims is inherently flawed because there is not good information.  There is privileged information that is not made available.  You're not aware of any privileged information that's been made available, correct?

A    I'm not aware of privileged information -- I'll state it differently.  There is privileged information that I'm aware has not been made available to any party, including Ad Hoc Group or the DIP lenders.

Q    But when it comes to -- and I'm shifting.  So in fairness, I'm going to pause for a moment just because I'm going to change...

A    Okay.

Q    We talked about when this plan could go effective, we

just don't know whether or if that will be achieved.  Is that fair?

A    Yes.  There is no guarantee about a date by when the plan would go effective.

Q    But whatever it is, when you're going to pay your admin creditors contemplates you're at least going to go pay your DIP -- your DIP Tranche A or Dip A lenders in full before you pay admins, right?

A    Not necessarily.  As we talked about before with the admin claim consent program, they can sign up for that.  And they actually could be paid before the DIP A is paid in full.

Q    Your waterfall contemplates that $350 million the DIP A lenders will have been paid.  And the admins don't share any of the proceeds until after that, and they get 16 percent of the monies that come in after that point in time.  Does that waterfall reflect what the agreement of the parties is, that the DIP A lenders have to be paid first before admins share in proceeds from the litigation trust?

A    Yes.  The waterfall is -- correct.  I thought I understood your question or your statement to be that the DIP A had to be paid in full before the admin creditors got paid in full.  And my response is that is not necessarily the case.

Q    The way the plan is set up, the DIP A will take first

under the waterfall up to the amount of the outstanding amounts of $350 million before the 16 percent share for admins.  Right?

A    Keep in mind that the first 90 of the 350 went to the litigation trust funders.  So from 90 to 350, that would go to DIP A before any admin claim holders.

Q    Has the market spoken to what it thinks the value of the DIP A claims are now?

A    As I understand it, that paper trades.  I don't know what that's trading at right now.

        MR. KELLEY:  May I approach the witness, Your Honor?

        THE COURT:  Of course.

BY MR. KELLEY:

Q    Is that something you regularly monitor?

A    No.

Q    Do you recognize the Bloomberg screenshot for First Brands for debt trading?

A    This certainly looks like a Bloomberg screenshot.  And it says First Brands Group LLC at the top.

Q    And the very first line, you can tell from the loan tranche size is the 1.1 -- when you go over roughly one, two, three, four, five, six, seven, eight, nine, 10, 11 columns, the $1.1 billion tranche, that's -- what does that reflect to you?  Is that the DIP A?

A      That would seem to be the DIP A, yes.

Q      What's the asking price for a sale of a piece of that right now?

A      22.11.

Q      That's 22.11 percent.

A      Yes.

Q      And the bid is 18.89 percent?

A      Yes.

Q      Median price, 20.5 percent.  Does that tell me, someone who is a lawyer, not in the financial space like you are, that the DIP A debt is trading at roughly 20 percent, 20 cents on the dollar?

A      That would be right.  I don't see a date on this.  Oh, here.  I see a June 12th.  This looks like it was run at lunch, as a matter of fact.

Q      So that's current?

A      That's what this would suggest.

Q      And that's the market?

A      Well, this is what the current bid ask is.  The -- whether or not there is liquidity in the market, meaning whether parties are actually interested, these may not reflect recent transaction prices.  Transaction prices are what you would say is the market.

Q      I'm going to hit a couple of questions with you high level, sir.  I'm trying to get through the rest of my

questions.  I heard you earlier today before lunch, you said that -- you gave a long explanation as to the fraud that was done by management with respect to receivables.  You know my client is Katsumi.  You know it has outstanding amounts for which Katsumi Servicing (indiscernible) was roughly $1.7 billion.  You know that, right?

A    I know it's a very large claim.

Q    In response to my questions, Alvarez & Marsal has been unable and through the course of discovery to tell me where that $1.7 billion went.  I suspect -- and I'm not going to make you walk through it -- generally speaking you are not in a position to tell me where that $1.7 billion went.  Is that fair?

A    I can't tell you exactly where that went.

Q    Right.  And I understand that the examiner has been able to trace $700 million coming out of the estate going to Patrick James entities.

MR. BEREZIN:  Your Honor, the relevance of -- is this just discovery on --

MR. KELLEY:  No.  I'll get to it.  Give me a couple of questions.

THE COURT:  Huh?

MR. KELLEY:  Just give me a couple questions.  I'm just going to (indiscernible).

THE COURT:  What is the relevance though?

MR. KELLEY:  I'm just wanting to understand --
I'll just jump to the final question.

BY MR. KELLEY:

Q    Your understanding is Katsumi has an unsecured creditor claim against this estate, correct?

A    Presumably.

Q    I understand you -- I'm not asking you to waive Debtor's objections or challenges, but you understand Katsumi may have an unsecured creditors claim as a result of the fraud perpetrated on it.

A    You have made that very clear throughout the case.

Q    I've tried.

A    Yes.

Q    But you honor me by saying that.  Thank you.  If this is a question for the lawyers, just tell me.  In the plan, you're asking parties who may have a state law defense of offset to file a motion relatively promptly before maybe even claims are filed.  Do you recall that part of the plan?

A    I don't know if I recall that specifically, but I am going to tell you that's a question for the attorneys.

Q    Understood.

MR. KELLEY:  Your Honor, I'm going to pass the witness at this point in time.

THE COURT:  Okay.  Does anyone in the courtroom have any cross for this witness?  Any redirect?

MR. BEREZIN:  Yes, Your Honor.

THE COURT:  Okay.

MR. BEREZIN:  Your Honor, if it is acceptable to the Court, could we start with exhibits in support of the Debtors, both its defense and its motion?  Just because if the witness is needed to authenticate anything, I would want him on the stand.

THE COURT:  I thought we already did that at the beginning.  Is there more evidence?

MR. BEREZIN:  That was -- I believe that was --

THE COURT:  That was in connection with their motion?

MR. BEREZIN:  Yes, exactly.

THE COURT:  Sure.  What do you want to move in?

MR. BEREZIN:  Okay.  So, Your Honor, we have exhibits that were filed --

THE COURT:  They objected to your declaration. You're trying to get the declaration in.  I remember now. All right.

THE WITNESS:  The Debtor didn't object to my declaration.  Mr. Kelley did, but that's fine.

MR. KELLEY:  I don't believe declarations should come in.

THE COURT:  No, no.  It's all good.

MR. KELLEY:  So I'll forewarn -- I haven't had the

opportunity to speak to counsel, but I'm going to object to declarations.

MR. BEREZIN: Yeah. We understand that, that Mr. Moore's is the only declaration on our list here.

So, Your Honor, the Debtors offer exhibit -- the exhibit that is the final DIP credit agreement. It's at -- a spam telemarketer that got through my silence. Pretty impressive.

The final DIP credit agreement, which is at Docket 289-1, the final order authorizing post-petition financing and use of cash collateral at Docket Number 608, the affidavit or service of the disclosure statement at 2702, the joint Chapter 11 plan filed at Docket Number 2907, the confirmation -- I'll skip that. The -- well, the confirmation budget at Exhibit A to the Moore declaration. That's at 2911-1. And then the litigation trust waterfall attached at, which is 2911-2. The disclosure statement for joint Chapter 11 plan at 2912, the notice of filing of that plan at 2913, the emergency motion of Debtors for entry of an order for this hearing, which is at Docket Number 2914. Notice of filing of a revised disclosure statement at 2915, and notice of filing of Chapter 11 plan and disclosure statement, scheduling, and conditional disclosure statement hearing at Docket Number 2933. The affidavit of service of the conditional disclosure statement at Docket Number 2958.

And that's all.

MR. RUFF:  Your Honor, so not objection to the documents themselves, but not -- with the understanding that they're not for the truth of the matter asserted.  Just that the documents state what they state, then that's fine.  Then they can come in and they state what they state on their face, but not for the truth of the matter of anything asserted.  With that understanding, we have no objection.

THE COURT:  Any objection to that?

MR. KELLEY:  I would agree with that, Your Honor.

MR. BEREZIN:  They are actually offered because the fact that they have been provided or they're legally operative, like orders of the Court.  So that's fine.

THE COURT:  Okay.  I will admit them for that purpose.

(Exhibits entered into evidence.)

MR. BEREZIN:  Thank you, Your Honor.  And if it's acceptable, I'll proceed with some questions.

THE COURT:  Okay.

MR. BEREZIN:  Thank you.

REDIRECT EXAMINATION OF CHARLES MOORE

BY MR. BEREZIN:

Q    Mr. Moore, as you're certainly aware now if you weren't before, one of the issues today is whether there's been a substantial loss in these cases.  Is that something you are

familiar with?

A    I am.

Q    Are there facts you consider to be important to the question of a substantial loss that has occurred after the petition date?

A    Yes.

Q    What are those facts?

A    I think it's important to recognize first when these cases filed, there were already significant losses being incurred by these businesses.  So this is not a situation where we had profitable businesses that all of the sudden started to operate at a loss.  In fact, it's been the opposite.  The magnitude of the losses occurring at the petition date was significant in that as we uncovered more and more in the first 60 to 75 days of the cases, we started to get a sense as to just how significant the losses were as well as the pervasiveness of the fraud.

We've taken a number of actions since that time actually to stem these losses.  So by the time we got to around mid-December of 2025, we had prepared multiple business plan scenarios.  It was becoming more clear at that time because of the amount of fraud that we were not going to be able to reorganize the business as a standalone business.

Q    In early January, we pivoted to a sale process for any

and all of the business units.  That sale process combined with also -- so the information that we gathered through that sale process, which is really the interest level by third parties in any of these businesses as well as speaking with all of our customers about the need for businesses to continue on allowed us to make decisions to either shut down businesses as quickly as possible if there were not bids at a level that was acceptable to our secured creditors, or to do whatever we could to bring in money to support businesses where there was interest from third parties and/or a need from customers.  And so through that process, we were actually able to by closing down businesses that were losing money and for which there was no interest or willingness to support, but then on top of that to get funding to support the other businesses through transactions, we were able to significantly improve upon the losses that were existing as of the time of the petition date.

Q    And in terms of the proposed plan, how if at all does that address the issue of losses?

A    There are two aspects, really.  The first is that we have funding to get through a plan confirmation process. That's very important.  So any expenses that we're incurring right now, we have funding to cover those.  But then in my mind, this plan is really the final piece, which is to provide a mechanism for payment of, number one, our admin

and priority claims, but really a structure that provides the most amount possible going to our various creditor constituents.

Q   Let's turn to administrative and priority claims specifically for a moment.  Have you analyzed the amount of administrative expenses and priority claims?

A   Yes.

Q   And what have you done in that regard?

A   There are a variety of inputs that my team and I have used to come up with estimates for both of those categories, including accounts payable registers, claims registers, actual dialogue with individual trade creditors, and the debtors' books and records.

Q   When look at the percentage of the administrative claims, what percentage of those administrative claims incurred during the entire case have been paid?

A   It's over 90 percent.  So we have paid out over $1.9 billion in administrative expenses.  And right now we have approximately $145 million outstanding for post-petition accounts payable.

Q   And what is your current estimate of unpaid priority claims?

A   It's about $65 million.  Similar to the administrative claims, we've added a 20 percent cushion onto that.  And so we're using a number of approximately $78 million.

Q    And so the total estimated amount of unpaid administrative and priority claims is around $300 million at this point?

A    That's correct.

Q    And are the debtors continuing to review administrative and priority expenses?  Go ahead.

A    Yes, we are.  Both from the standpoint of making sure that we identify any others, but also there are a number of defenses that we expect will exist that we are continuing to evaluate as well.

Q    And based on what you have learned to date, what is your expectation about whether there will be a significant increase in unpaid administrative or priority claims?

A    There is nothing that I'm aware of that will cause that number to significantly increase over what our current estimate is.

Q    And what is that expectation based on?

A    That expectation is based on, first of all, the ongoing nature of our accounts payable system, which is a significant part of these items.  The priority claims are largely tax-related.  And while we expect that there will potentially be parties that assert claims with either administrative or priority claim status, we also expect to have a number of defenses on those.

Q    In that regard, Mr. Kelley in his questioning, he

referred to a $246 million false claims act claim.  Do you recall that questioning?

A    From the Federal Government?

Q    That's correct.

A    Yes.

MR. BEREZIN:  And Your Honor, those claims appear on the record at ECF 2059, 2062, and 2063.  We would ask the Court to take judicial notice of those proofs of claim.

THE COURT:  Okay.

MR. BEREZIN:  Thank you, Your Honor.

BY MR. BEREZIN:

Q    Are you aware that those claims were filed as non-priority general unsecured claims, not as administrative expense or priority claims?

A    That's my understanding.

Q    You recall a counsel asked you about the high May claim for $61 million?  Do you recall that?

A    Yes.

Q    Okay.  And are you familiar with that claim?

A    I am.

Q    Okay.  Can you explain how the Debtors have accounted for that claim in their estimate of administrative expenses?

A    That is not included in our estimate of administrative expenses.

Q    And can you explain why?

Page 126

A    There are a number of defenses that exist.  We have made transfers to this entity in excess of that.  And so, we believe through set-off as well as otherwise that we don't expect there's going to be an administrative expense.

Q    I think you've testified earlier.  I just want to make sure it's clear on the record.  Is there a cushion built into your numbers, your estimates of Administrative Expense and Priority Claims?

A    There is.

Q    What fraction, roughly?

A    So, we've used 20 percent on the administrative side. When you add up the accounts payable in 503(b)(9), that's about 185.  And we have $37 million of additional cushion that we've added on top of that.  And then on the priority claim side, we've sized that at about $65 million.  And we've added an additional $13 million onto that.  And so, together we have a pretty significant cushion.

Q    Thank you.  Now, to what extent do the Debtors have or believe that they have a path to pay unpaid Administrative and Priority Claims?

A    Number one, our confirmation budget provides for all of the costs that we're incurring right now to be covered.  And then, the plan itself provides for a waterfall structure whereby these litigation proceeds will flow to parties, but in particular the administrative and priority claim holders.

Q    And you've prepared a written budget reflecting that analysis?

A    Yes.

Q    Okay.  What did you do to ensure that that budget was a reasonable forecast?

A    We have -- when I say we, I'm referring to Alvarez & Marsal, my team under my direction, has been maintaining a weekly cash forecast since the time our engagement started in September of 2025.  We have very good visibility to all of the cash transactions that occur.  The business is no longer operating as an operating business.  There are non-debtor entities that are still operating, but the Debtors no longer have any business operations, meaning any manufacturing or distribution operations.  Our expenses are very well known to us.

And so that's the first item is making sure that we have accounted for all of the anticipated disbursements that we're going to have and all of the expenses that we expect to incur.  And then on top of that, identifying the sources of receipts that will be used to fund these items.

Q    Okay.  Can you identify for the Court where the sources of cash are assumed to come from in the budget?

A    We have three primary sources.  There are a few other smaller ones, but I'll focus on the primary three.  We are still receiving some funding from an OEM Customer.  So, that

is the first part of our receipts, our funding.  Secondly, we are freeing up some cash reserves that the Debtors have right now.  And then lastly, we receive funding from our ABL lenders, both from the standpoint of covering costs.  We refer to them as facility costs where their collateral is housed.

And then on top of that, the ABL lenders will be providing or allowing us to use $15 million in collections on their collateral that have come in.

Q    How confident are you that those sources of cash will actually be available?

A    Highly confident.

Q    What's that based on?

A    We have an agreement with our OEM Customer, and there's really only one week left of that agreement.  That is a sure thing.  It relates to the second bucket, freeing up reserves.  Again, that cash exists.  We've gone through and scrubbed those accounts.  We have a high degree of confidence in the cash that will be made available.  And then as Mr. Carlson and Mr. Singh indicated, at the start of this hearing, we have an agreement with our ABL lender regarding this additional funding.  And that cash already exists.  It's really just a matter of our ABL lenders allowing us to use that cash.

Q    To what extent do you consider the budget you prepared,

and have been testifying about, to be a reasonable forecast?

A    I think it's very reasonable.

Q    Was that budget prepared and filed with your declaration -- withdrawn.

Was the budget you prepared filed with your declaration at ECF-2911?

A    Yes.

Q    And are you familiar with whether that budget is a true and correct copy of the budget that you, in fact, prepared that you've been testifying about today?

A    It is.

Q    Was that budget prepared in a manner typical of the other budgets prepared during these cases?

A    Yes.

Q    Was the budget prepared in the ordinary course of the Debtors' business?

A    Yes.

Q    Was it made at or near the time that you formulated it?

A    Yes.

Q    Was that budget made by someone familiar with the facts and estimates in it?

A    Yes.

MR. BEREZIN:  Your Honor, the Debtors offer the budget that is attached to Mr. Moore's declaration, ECF-2911, into evidence.

THE COURT: Any objection?

Okay, it's admitted.

(ECF-2911 admitted.)

MR. BEREZIN: Thank you, Your Honor.

BY MR. BEREZIN:

Q    A question or two about the disclosure statement schedule, since we're talking about the budget. Are you familiar with whether the Debtors can access cash necessary to push the confirmation hearing or delay the confirmation hearing, beyond late July this year?

A    That is certainly something that I have explored, and at this point there is no additional funding that would allow the Debtors to operate beyond that timeline.

Q    And just explain to the Court where that conclusion -- what that conclusion is based on?

A    Going back to the sources of funding that I referred to, the OEM Funding is going to expire prior to the confirmation timeline, so that will no longer be a source of cash once the current funding runs out. As it relates to freed up cash, we are utilizing that cash in this budget. And then, in terms of any other parties, specifically Secured Lenders, allowing the use of proceeds from their cash collateral, liquidation of their cash collateral, it's been made very clear that there is no more that is available to the Debtors.

Q    Thank you.  Let's turn back now to the path you were describing about the path that the Debtors believe will lead to payment of the unpaid administrative and priority creditors, okay?

A    Yes.

Q    All right.  So, you've been questioned and you've testified about Estate Claims and Causes of Action.  Do you remember that?

A    Yes.

Q    Okay.  So, can you describe the -- you know, based on the records that the Debtors have of transfers made to various parties, what are the general categories of parties who receive the transfers that you understand are going to be likely subject to Litigation Claims and Causes of Action?

A    Sure.  I'll run through -- there are multiple categories, so I'll just run through those and give you some amounts.  The first category, and some of these were addressed earlier, but I would refer to this as the Patrick James and Patrick James entities items.  This is something where there's already an adversary proceeding.  That amount is between $700 million and $800 million.

As it relates to other, I'll call it the onset Edward James adversary proceeding, there's approximately $2.3 billion there.  So, those two together are approximately $3 billion.  And then beyond that, there's about $2.1 billion

in 90-day transfers.  So, transfers from the Debtors in the 90 days preceding the petition date.  I alluded to before with Mr. Kelley a number of transfers under the supply chain and factoring bucket, and that totals about $12 billion. I'm not using that entire amount.  Based on my understanding, it looks like there's going to be a focus on really about 15 percent of that, or about $2 billion.

So, if you add those items up, we're at about $7 billion already.  And then there are some other categories. So, as an example, recoveries under D&O insurance for breach of fiduciary duties.  There may be a variety of other claims as well.  But it's just with those categories, we're north of $7 billion.

Q    And so with that amount, just mathematically, what fraction of that amount would be needed to pay in full the administrative and priority claimants based on the current estimate of about $300 million?

A    So, if we assume no one takes the discount program on the administrative side, and we have to use our full 20 percent cushion.  So, just confirming if it's $300 million, we would need to collect on about 27 percent of those $7 billion that I just went through in order for those parties to be paid in full.

Q    Okay.  Now, do you recall questions from the U.S. Trustee about how there is not currently an account or

escrow fund that is funded with $200 million for administrative creditors?  Do you recall that?

A    Yes.

Q    Okay.  And do you have an understanding of what is required before that $200 million must be funded?

A    If I recall correctly, there is either an event of default or some trigger that is required in order for that to be funded.

Q    And do you recall whether the DIP-A payment must first be paid in cash in full?

A    Yes, before that comes into play.

Q    Okay.  So, under the plan waterfall, once you get to the point where there are distributable proceeds sufficient to pay the DIP-A Claims, do you recall that's about $1.85 billion?

A    Yes.

Q    And that obviously includes the 16 percent that's being paid to other parties and the 10 percent.  But the total required to pay the DIP-A Claims in full under the waterfall is $1.85 billion?

A    Yes, that would also at that point pay the administrative and priority claimants as well.  So, around $1.9 billion is where they're both paid.

Q    Right.  And just focusing on the administrative expense claimants, so by the time you get to the point where the

DIP-A Claims are paid, $1.85 billion, which under the DIP order would require $200 million in funding for Administrative Claims, would the full $200 million have already been paid to administrative expense creditors?

A     Yes.

Q     And in fact, they would have been paid in full by that point?

A     That's right.

Q     Oh, I think you've got this.  All right.  So, you testified a little bit about this, but I don't think you've really been given an opportunity to give your complete testimony about the alternative to pursuing a plan.

So, what alternatives are available if the Debtors cannot pursue the proposed plan in Chapter 11?

A     I'm really not aware of another alternative other than converting the cases to Chapter 7.

Q     And have you considered the likely effect of conversion on Creditors, especially administrative expense and priority creditors?

A     I have.

Q     What are some of the consequences in the event that -- or the differences between a plan scenario where we move forward with our plan, and a scenario where the cases convert?

A     There are several really key differentiators.  Number

one, the assets that are really used to pay claims, it's a different situation.  So, if these cases convert, there are a lot of questions.  We have, of the approximately 112 debtor entities, four of those cases have been converted to Chapter 7 already.  I don't know how many Chapter 7 trustees would be appointed over the remaining 108 debtor cases.  So, that's the first question.

And because of the nature of a lot of these claims, there would be significant, I think, questions as to how a Chapter 7 trustee would approach each debtor case.  I do not expect that our DIP Lenders would stand by.  I believe that the DIP Lenders themselves would actually take action to be able to control those claims.  And assuming that the DIP Lenders are able to control those claims and pursue them, then we have two really important items.

One, the waterfall is no longer what we have contemplated in the plan.  So, we don't have both the threshold points as well as the sharing that is in the plan.  But the other item, and this is a very important item in my eyes, and it was heavily negotiated, there's no governance there as it relates to the pursuit of the claims.  Right now, this Committee has representation of the Unsecured Creditor Committee or an appointment.  And after a certain pay down occurs, there's even a further reconstitution of that committee with more say from our Unsecured Creditor

Committee or their representative.

These are just a few of the items that I think would be significantly different just as it relates to the Estate Claims. There is one other part related to the Estate Claims that's also key, and that is the actual funds to pursue these. If there are, whether it's one Chapter 7 trustee or multiple Chapter 7 trustees, they don't really have the funding to go after these claims as similar to what we have contemplated and arranged for in the plan.

So, from that standpoint, just to summarize, you have a situation where I'm not sure the Chapter 7 trustees would actually retain control over the claims. There wouldn't necessarily be funding there to pursue the claims. The waterfall would be significantly worse, especially for our Unsecured Creditors, including Admin and Priority Claims. And then lastly, you wouldn't have the governance in place. And then, you have a whole host of other items related to the other assets.

My expectation is that our Secured Lenders would look to foreclose on the remaining assets. And again, the sharing that has been heavily negotiated and built into the plan would not exist.

Q    And let me ask you some specific questions. The U.S. Trustee asked about the difference between the lien that the DIP-A Lenders have and the DIP Lenders have on proceeds of

avoidance actions, but not the claims themselves.  Do you remember that?

A    I do.

Q    Okay.  Have you considered what might unfold in a Chapter 7, given the fact that the DIP Lenders have a lien on proceeds from these claims, but not on the claims themselves?

A    I think that the DIP Lenders would take action to try to -- doing whatever they would need to do in order to be able to ensure that there are proceeds and then to take those proceeds.

Q    And to what extent could disputes and litigation result from all of that?

A    Certainly, there could be a lot of litigation, and I'm not sure the cost necessarily to defend that litigation.

Q    So, in your view, is conversion of these cases in the best interest of Creditors?

A    No.

Q    Why not?

A    Across the board, this is much better for all Creditors, but in particular, our administrative priority in Unsecured Creditors.  As I've answered multiple times today, there's no guarantee on the timing of when the plan would go effective.  We think second half of 2028 is very reasonable.

       Given all of the assets -- I should say, given all of

the claims that I talked about, and I hesitate to use the word claims, but at least the transactions that I referred to, in light of the point that would have to be achieved in order for administrative and priority claimants to be paid in full, this is far, far superior to the outcome that would be realized by our Creditors if these cases convert.

MR. BEREZIN:  Thank you. Mr. Moore.  I'll pass the witness, Your Honor.

THE COURT:  Okay.

Mr. Ruff?

MR. RUFF:  Thank you, Your Honor.

CROSS-EXAMINATION OF CHARLES MOORE

BY MR. RUFF:

Q    All right, Mr. Moore, I can smell the finish line.  I can taste it.

A    Thank you.

Q    So -- and just before we go, as Mr. Kelley had asked before, are you fine to continue right now?  You don't need a break?

A    I am, thank you.

Q    Excellent.

THE COURT:  Nobody asked me.

MR. RUFF:  Well, Judge, you're the boss, so you can just tell us when you need a break.

THE COURT:  Let's continue.

MR. RUFF:  All right.

BY MR. RUFF:

Q    So, I just want to go back to some of the things that you just testified when Debtors' counsel was asking you. So, you were talking about that when you came into these businesses as the advisors, that there was a substantial loss and a continuing loss that was going on that you observed; is that correct?

A    That's right.

Q    All right.  And it became clear that these Debtors were not going to reorganize?  I just want to make sure I heard it correctly.  Did you say around December 23rd of 2025 was that?

A    I think I said mid-December.

Q    Okay.

A    Mid to late December, yes.

Q    And so, it was at that time that in, you know, maybe end of December, certainly by January, the Debtors pivoted towards thinking about we need to do a liquidation wind-down sale process?

A    We launched a sale process.  We knew that liquidation was a possibility depending on the level of interest, but the key item was we pivoted to a comprehensive sale process at that time.

Q    Okay.  And now -- and then, you had some discussion

about cash forecasting, and I believe most of that was talking about the budget from here through the expected confirmation if Debtors get the green light to go forward with their plan, right?

A    That's right.

Q    Okay.  And so, you were also cast for -- I don't know why I can't talk.  I'm not even on the stand.  You were also cash forecasting from the petition through January as well, correct?

A    From the petition date through January?

Q    Yes.

A    Yes.  We -- well, we've prepared multiple cash forecasts all along.

Q    Yeah.  Yet that is when you ended up with those unfunded liabilities, right?

A    The unfunded liabilities that you're referring to?

Q    Are the unpaid administrative costs?

A    Throughout this process, yes, we have unpaid administrative expenses from the entire Chapter 11 period.

Q    Right.  But those haven't really grown in any significant amount since January.  You've been able to maintain kind of the same level of unfunded administrative expenses from January 2026 forward, right?

A    That's -- we discussed that before, and I think that's about right.  I don't have the exact numbers as of the end

of January, but I think that's about right.

Q    And we'll go -- and that's fine.  We can go with approximations.  I understand if it might be plus one, you know, minus one, whatever the case may be.

A    Sure.

Q    And part of a function of that is you have support from your OEM Customers to actually pay for ongoing operations from week to week, correct?

A    We had that, yes.  That's winding down now.

Q    Okay.  And so, but again -- I'll just move on.  So, you were talking about the -- and I think you were -- the way you, when I was questioning you the first time, you were talking about filling in the different categories of claims when we were trying to talk about value.  And I think what I heard when you were just being asked questions now that you at least put, like, $7 billion of estimated value on those claims right now?

A    Not that -- two things.  One, I'm not necessarily saying that they're all claims, and that's not a valuation. This is really looking more at the quantum of transactions that occurred that may give rise to claims.

Q    Okay.  I'll go with that.  But and that total was $7 billion, correct?

A    Just in the categories that I went through.

Q    Right, right, right.  So, $7 billion, if that was

collected, that would be enough to pay the DIP-A Claims, correct?

A    If we collected $7 billion, that's correct.

Q    Right.  That would actually be enough to pay the Roll-Up Claims too, wouldn't it?

A    I believe that's the case.

Q    Yeah.  And those $7 billion in those buckets or those categories, that would be available even to any party who is pursuing those claims on behalf of the estate, correct?

A    Yeah, the waterfall contemplates a sharing with the Unsecured Creditors all along.

Q    I'm just saying, set aside the waterfall for a moment, because the waterfall says where the money goes after it comes in.  I'm just saying the ability to bring those claims in is available to anybody who controls the estate, right?

A    That I don't know.  That's really more than that --

Q    Well, who else would they be available to?

A    I don't know who -- again, I'm not the attorney, so I don't know who would have standing to bring certain actions.  That's really beyond what I know.

Q    Okay.  But the plan contemplates that the liquidation -- Litigation Trustee will be the one who will be pursuing those claims, right?

A    Yes.

Q    Okay.  And probably if we converted to a Chapter 7, it

would be a Chapter 7 trustee that would be the one trying to pursue the $7 billion of claims, right?

A    Not likely.

Q    Why not?

A    Because I expect that the DIP Lenders would actually take control of those claims.

Q    Well, now it sounds like you're making a legal conclusion, Mr. Moore.  I didn't think that you were a lawyer?

A    It's more from the standpoint of understanding who has liens and the fact that that party is not going to stand still.

Q    Are there cash reserves for the DIP-A Collateral?

A    Yes, there are.

Q    Okay.  How much?

A    We have a minimum cash requirement, which originally was $50 million, and right now I believe it's around $32 million.

Q    And then if solicitation is not allowed to happen, what -- let me rephrase that again.  If solicitation is not approved by the Court, not allowed to go forward, what happens to the OEM Funding?  Does that remain?

A    The OEM Funding has been used.

Q    Mm hmm.

A    The last of the OEM Funding is scheduled to come in at

the beginning of next week.  And so, I don't think that the OEM Funding really plays a role anymore.  We do reconcile with the OEMs from the funding that's provided, which is based on estimates, compared to the actual disbursements. Because we are down to a very small amount, there may be a little bit of funding, cash, that we are sitting on right now that would go back to the OEM, the only OEM Customer that remains.  It would be very small.

Q    Okay.  But because the transactions have now been completed, you're not anticipating any ongoing funding from the OEMs then?

A    That's right.  We're expecting $3.5 million early next week, and that's it.

Q    All right.  I want to go back to -- so, one of the questions that your counsel was talking with you about was the Patrick James and some of the other claims.  I just want to make sure we got this correct in the record.

Has any analysis been done as to how collectible, like Patrick James is, for example?  Let's say you got a judgment against him, you know, in 2028 -- the second half of 2028, like you're expecting, like your gut tells you.  How collectible is he?  Do you even know?

A    I personally don't know.  I don't know if those activities have been undertaken.  I haven't been involved in all aspects of the litigation.

Q    And there's nothing to stop him from spending every last dollar that he has on defending those claims, right?

A    I'm not sure.

Q    So, for -- and this might be my last question, for the 90-day -- for the Preference Claims, 90-Day Preference Claims, maybe the One-Year Preference Claims, but for Preference Claims, has any analysis been done on defenses to those claims as required by the Bankruptcy Code?

A    At this point, I don't know if there's been an extensive analysis of potential defenses.  I believe that maybe that has been looked at a little bit.  I don't know the status of that, but I don't think a comprehensive evaluation of potential defenses has been undertaken.

Q    Okay.  So, to recap, and just correct me if I'm wrong, no valuation of the claims, correct?

A    Correct.

Q    All right.  No estimation really of time other than it might be second half of 2028, but it could be longer, could be shorter, we don't really know?

A    I think that there has been an estimate, but I agree with your point, which is there's no guarantee it's the second half of 2028.  It could be earlier, it could be later.

Q    And there's no determination of collectability in these claims either, right?

A      Not that I'm aware of.

         MR. RUFF:  All right.  Thank you, Mr. Moore.

         CROSS-EXAMINATION OF CHARLES MOORE

BY MR. KELLEY:

Q     I wrote down your words carefully, Mr. Moore.

         MR. KELLEY:  First off, for the record, Charles

Kelley on behalf of Katsumi Servicing.

BY MR. KELLEY:

Q     I wrote down carefully, you said if the case converts

to Chapter 7, you think the DIP Lenders will want to ensure

to collect on the proceeds, correct?  Do you recall that?

A      Those may have been my exact words.  I'm not sure, Mr.

Kelley, but the bottom line is that I would expect the DIP

Lenders will try to control those claims.

Q     Right.  And I think we beat this horse to death.  They

don't have liens on the Chapter 5 Cause of Action, only the

proceeds, right?  We've gone down that path repeatedly, both

counsel have, so I'm going to jump on it too.

A      Okay.

Q     They only have liens on the proceeds, right?

A      That's my understanding.

Q     So, they need those proceeds to come in, right?

A      That's my understanding.

Q     That's why I thought your words were important.  You

said you thought the DIP Lenders would want to ensure those

proceeds come in, even in a Chapter 7, right?

A    So, we are talking about a couple of different potential claims.  For that category, the Avoidance Actions, yes, I'm sure that the DIP Lenders are going to want to see those proceeds come in, but then they will take those proceeds.

Q    And we'll talk about that.  But the Chapter 7 trustee now has the leverage at the time at which the Chapter 7 trustee will want to pursue those claims, will need funding for those claims, and has the ability to negotiate with those lenders in order to be able to get funding to bring those proceeds in, right?

A    I'm not sure exactly how that process may play out between a Chapter 7 trustee or trustees and the DIP Lenders.

Q    Fair, but they have some leverage there?  They have to pursue those claims, and the DIP Lenders need to provide funding to those Chapter 7 trustees, correct?

A    I would imagine that the Chapter 7 trustees would want to pursue those claims.  I don't know if the DIP Lenders have to provide funding.

Q    Real quickly, you were asked questions about your budget, and there's some shorthand in your budget.  Do you have it in front of you?

A    I don't.

Q    Off the top of your head, for the 10-week window, I'll

show it to you if that's helpful.  Would you like that?

A    Sure.

        MR. KELLEY:  May I approach the witness, Your Honor?

        THE COURT:  Of course.

BY MR. KELLEY:

Q    Charles, I've got a declaration here I'm just going to show you.  Do you recall being asked questions about that budget, sir?

A    Yes.

Q    I've looked at it, and the abbreviation is a little confusing to me.  What are you forecasting for this 10-week period of professional fee burn and the costs of getting to a -- just getting the Court to sign the order to approve the plan?

A    There is a line item just passed halfway down called, RX Costs.

        THE COURT:  Is there something in evidence, or how are you using this doc?

        MR. KELLEY:  It was put in evidence.

        THE COURT:  Okay.  I'm just making sure.  Some stuff came in, some stuff didn't.  I was just making sure.  Okay.

        MR. KELLEY:  He approved of the business records extension.

THE COURT: That's the same one. Okay, I'm good.

MR. KELLEY: Sorry.

THE COURT: Thank you. No, no, no, I appreciate it. Thank you.

MR. KELLEY: I don't know that we gave him --

MR. BEREZIN: I think we were just referring to it as an attachment to his declaration --

THE COURT: That was the piece that --

MR. BEREZIN: -- just, I think we can call Debtors' Exhibit 1.

THE COURT: You got it. D-1.

MR. KELLEY: Debtors' Exhibit 1, which for the record is the budget that was already admitted during the direct examination.

THE COURT: Got it. Okay. Good, good, good. I just wanted to make sure.

MR. KELLEY: Thank you, Your Honor.

BY MR. KELLEY:

Q    What is that total dollar figure for that 10-week period?

A    About -- just passed halfway down the page, there is a line item called, RX Costs. The total of that over the 10-week period is $70.4 million. That is not what is expected to be incurred during this time period. That is the cash going out, and a fair amount of that cash relates to fees

that were incurred in prior periods.

And also, this is the gross amount, and we are receiving funding for the freeing up of cash from both our ABL Lenders and our DIP Lenders to pay for their fees.

Q    So, let me make sure I understood.  So, this is not -- this is a cash basis, not an accrual basis?

A    Correct.

Q    So, the fees that may be incurred in, say, weeks four onward, given the timing for filing fee applications, do not appear in this budget?

A    No.  This actually is both.  It is an accrual budget plus payment of items that were accrued previously.

Q    So, it's a combination of cash and accrual?

A    It is.  There is no amount at the end of this period that's accrued and unpaid for professional fees.

Q    At least that was what you intended to capture in the --

A    Well, that's what I do capture.

Q    And I think I asked -- oh, never mind.  I'm not going to repeat your question.  Somewhere in there are the costs associated with solicitation; is that --

A    Yes.

Q    -- it's in that line somewhere?

A    Yes.

Q    Okay.

A    And again, just to highlight, there are funds being made available from both our ABL Lenders and our Ad Hoc Group to go towards their fees that are in these line items. This is not just Debtor.  It's not the Unsecured Creditor Committee.  It's everyone.

Q    But when we get here and the judge agrees with you, and I'm anticipating there's going to be more of this when we get to a plain confirmation, if we get that far, that's not all because you're just -- your effective date is out there somewhere in the future, right?

A    We have a provision for how things are funded post-confirmation.

Q    But this doesn't capture that indefinite period until we get to a plain effective date, this budget?

A    No, this budget ends at the end of July.

Q    Right.  And I heard you, you talked about a $7 billion number.  Do you remember?  Both counsel asked you questions about that $7 billion number and the 27 percent ratio on possible collection from that.  Do you remember that exchange?

A    Yes.

Q    I'm not trying to mischaracterize.  I'm just trying to bring you back to that point.  I heard you talk about inventory, transfers of inventory, fraudulent conveyance of inventory, preferences.  Those were the types of things

you're talking about that are those transactions that get

that $7 billion number, right?

A      Those are part of it.

Q      Well, are there other cause of action?  Are you

including the Edward and Patrick James lawsuits in there?

A      Yes.

Q      Okay.  Let's focus on the -- which portion of that are

the inventory and Preference Claims?

A      The -- of the numbers that I indicated.

Q      That $7 billion number?

A      Yeah.  So, starting with what I refer to as the Patrick

James and Patrick James entity, adversary proceeding, I

don't know all of the different types of claims, but there

are likely Fraudulent Transfer Claims within that.  And I

referred to $700 million to $800 million there.

And then I referred to the second adversary proceeding,

which I just generally indicated to Onset, Edward James, and

I mentioned about $2.3 billion there.  That's not everything

related to Onset.  That does not include anything related to

the direct leases.  This is just on the special purpose

vehicle side of things.  And then I went --

Q      Excuse me.  Can I put a finger and take a quick -- I'm

interrupting you.  I apologize.  Are those Fraudulent

Conveyance Claims?

What kind of claims are those, those ones you just got

through talking about?

A    Again, I'm not the attorney.

Q    I understand.

A    Certainly, there are Fraudulent Transfer Claims within there.  And then --

Q    Please, continue.  I interrupted and I apologize.

A    And then I believe the next category that I gave was the various transactions, the transfers that occurred, $12 billion worth, and I'm using a $2 billion number.  And I don't know if those are necessarily Fraudulent Transfer Claims or the nature of what all the different types of claims could be within that bucket.

Q    But you picked the transactions because they might fit within 547 of the Code?

A    I can't reference specific Code provisions.

Q    But that bucket, the ones that (indiscernible) sound like they're Fraudulent Conveyances or Fraudulent Transfers under Section 548 or preferences under 547.  Is that -- am I hearing you correctly?

A    It may be.

Q    Those are the types of things a Chapter 7 trustee would have control over, those large-ticket items that would give that Chapter 7 trustee negotiating power over the DIP language, correct?

A    Again, I don't know exactly how those negotiations may

play out.

Q    Yet, you stood up here and gave an opinion with regard to what's a better outcome for Creditors without considering what a Chapter 7 trustee might be able to do in getting funding?

A    I was just referring -- all you have to do is look at the waterfall, and it's very clear that the plan is much better because of when sharing begins for these parties.

Q    Nothing prohibits a trustee from negotiating the same thing, does it?

A    That's where -- I don't know how that conversation would take place, but --

Q    So, you're speculating a bit on what the Chapter 7 trustee might negotiate or might not be able to negotiate getting these big-ticket claims that would go into a Chapter 7 trust?

A    I don't know exactly what a Chapter 7 trustee would do. I feel fairly confident that the DIP Lenders would exert control over the pursuit of these claims so that proceeds come in.

Q    I'm not going to debate whether they're entitled to or not.  That's -- you've already made it very clear you're not a lawyer here.  I had a question and I'm just capture it real quick before it escapes.

How did you forecast the admin expenses that would be

incurred from that week 10 until the effective date?  How could you forecast what type of expenses would show up in that two-year window?

A    It hasn't been forecasted in detail, but in the plan, it is provided for in terms of covering expenses incurred by the trust.  So, as an example, we've talked about the litigation trust, and there's $75 million in seed funding, plus provisions to increase that under certain conditions.  So, that funds those costs.  The litigation trustee, in the end, will run that budget.  The DIP Collateral Trust provides for funding of up to $20 million to come in.  The ABL Trust, there's already cash that exists, and as I indicated before, we have cash coming in from our ABL Lenders to cover facility costs.

So, these are the mechanisms whereby any administrative expenses that are incurred will be covered.

Q    You just mentioned the ABL Lender Trust.  Under the plan, in the ABL Lender Trust, all of the preposition accounts receivable that have been gathered and held in account go into that trust, correct?

A    Yes.

Q    That's inconsistent with the Court's prior orders.  You're doing something different than with respect to the cash management in what you're putting into that trust, right?

A    Well, we specifically provide for how disputes over that collateral will be handled.  There is no handover of those assets to the ABL Lenders for payout.  That ABL Trust, though, is the party that will go about liquidating those assets.

Q    But they're cash, and in addition, you never engage in a conversation at all with the collective factoring parties to determine how much of that trust they contend to have claims to.  As far as you know, all of those loans are challenged?

A    And that's what we've provided for.  That's what we expect.

Q    What happens to that money if you never get to the effective date?  Does it stay in the ABL Trust?  Does it come back?  What happens then?

A    I expect that those parties are going to litigate that, and I don't expect that they're going to be waiting until the second half of 2028.

Q    Yes, but there's no disclosure as to what happens to it in the disclosure statement.  There's no provision for it in the plan as to what happens if you don't get to the effective date.  I only heard that for the first time because you just said that, correct?

A    I lost track of what it is.

Q    Your speculation as to what parties will litigate about

doesn't undo the fact that you're moving our money, factoring parties' money, and I'm using that collectively, that have been sitting in an account into the ABL Trust, and it only comes back if you shift the burden of proof to us?

MR. BEREZIN:  Your Honor, I object on multiple grounds, it's compounded in multiple different ways.  It's argumentative.  It assumes facts.  I don't know how the witness can answer that.

THE COURT:  I think the witness can answer if he understands whether the money is moving into the ABL Trust.

THE WITNESS:  I think that --

THE COURT:  Or the plan.

THE WITNESS:  -- I think it's important to distinguish.  You're implying that this is going to the ABL Lender.  We have engaged Hilco.  Hilco is the party right now that is pursuing collection on these receivables.

THE COURT:  I'm asking a different -- I think the question was a little different.

Is the money getting transferred to another account, and if it is, which one is it?

THE WITNESS:  The receivables are getting transferred into the ABL Collateral Trust.

THE COURT:  I think that's the question.  Just that.  I'm not trying to, like -- I just think that was the question.

MR. KELLEY:  We'll start with that.

THE COURT:  Oh.

BY MR. KELLEY:

Q    And there is no explanation in the plan as to what happens to that, or Hilco's control over it, if the plan ever goes effective?

THE COURT:  I think for purposes of today, the question is, is it disclosed anywhere?  What happens?

THE WITNESS:  What I would say, first of all, there are multiple parts to your question.  Any collections on those receivables are not getting distributed to any trust beneficiaries until it's --

THE COURT:  Mr. Moore, I just need you to answer the question.  We've been here for a while, just -- you're talking about distributions.  We're talking about where the money is going to go, and is it disclosed?  Like, I mean, I don't -- we've been doing this for a minute.  I'm just trying to get to the point.

It either is or it's not.  But is the money going to go into a trust or a collection account?  It'll move from one place to another place.  Is it disclosed?  What happens if you don't get to the effective date?

THE WITNESS:  I don't think that it is disclosed what happens if we don't get to the effective date.  I just want to be clear, Your Honor. It's not funds that are

getting moved over.  It's receivables.

THE COURT:  No, I think that's a fair point.

THE WITNESS:  Okay.

BY MR. KELLEY:

Q    But those receivables sit in two combinations, those that have to be collected that are still outstanding pre-petition and those that are cash, right?

A    I'm not sure of that second part of receivable that's cash.

Q    There's been an account from which all pre-petition receivables have been collected, the money has gone into it?

A    That's a separate matter.

Q    And where does that go?

A    I don't think that goes into the trust.  I could be wrong on that, but that has to get still litigated, which has been an ongoing process.  You're referring to approximately $97 million that's in the collections account that multiple parties have asserted.

Q    I will agree with you that the terminology and the definitions are incredibly loose, and I can't find anywhere in the plan where that's going.  Do you know, as you sit here now, as the signatory of the plan and being intimately familiar with it, what happens to that cash account under this plan?

A    I am certainly intimately familiar.  I have not

memorized the plan.  And so, I don't -- as we sit here today, I don't know exactly the provisions on that.

Q    All right.  And then, the last step of the point goes to something you said about timing.  You are aware that the prosecution of Mr. James, both Mr. James, have been delayed, right?

A    Yeah, I answered before.  That starts February 9th, and the parties in that case have jointly submitted an indication that they expect the trial to take place over five to seven weeks.

Q    And all these Causes of Action we're talking about is going to involve discovery involving those individuals, correct?

A    I don't know.

Q    It's reasonable to assume because it relates to their combat prepetition?

A    Not necessarily.

Q    You don't think it's reasonable to assume parties are going to want discovery from those individuals for these Causes of Action?  You've just totaled up $6 billion.

A    I think that there are certain claims that don't necessarily impact those criminal proceedings.

Q    Okay.  I'm not asking you to agree with me, but if parties need discovery from those criminal defendants, you understand that the United States Department of Justice has

concerns with that kind of discovery going on knowing these prosecutions, right?

A    I do understand that.

Q    And that may delay all of the timelines associated with any claims for which discovery is needed from those individuals.  Is that be a reasonable assumption?

A    As I indicated earlier, that was taken into account in our estimate of second half of 2028.

MR. KELLEY:  No further questions, Your Honor. Thank you.

THE COURT:  Thank you.

Any further redirect or cross from anyone in the courtroom?

Thank you very much for your time, sir.

THE WITNESS:  Thank you.

MR. RUFF:  Your Honor, that's all the evidence that we have for today, so I think the evidentiary record is closed.

THE COURT:  Thank you.  And can I consider it also for the conditional approval?

MR. BEREZIN:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.  Do you want to take a few minutes, or are you ready now?

MR. RUFF:  No, we're ready to move right into closing.

THE COURT:  Okay.

MR. RUFF:  And I think Debtors' response, their plan really is a response to our closing, or what we're seeking anyway.  So, I think it'll flow better that way.

So, Your Honor --

THE COURT:  Well, before you do, I'm just going to tell you, because I know there will be a number of parties who will wish to address the Court.  I'm going to just listen to folks in the courtroom first.  And then if anyone wishes to address the Court briefly who has filed something, you're more than welcome to.  I'll get to you, but I'm going to start with folks in the courtroom.  We can turn off the witness cam, too.

And, Mr. Ruff --

MR. RUFF:  Yes.

THE COURT:  -- please start.

MR. RUFF:  All right.  Thank you, Your Honor.
Your Honor, I think the evidence shows, and I think certainly we have moved for these cases to be converted to Chapter 7, and that the request of the Debtors for permission to solicit this plan and this disclosure statement for conditional approval of the disclosure statement should be denied.

Debtors admit that they have very limited liquidity, such that they cannot waste time and expense in

soliciting a plan that is not confirmable on its face. Debtors also admit that they are presently administratively insolvent to the tune of approximately $223 million. And yet, rather than seek conversion or dismissal of these cases as prescribed by the Code, they are putting forth a plan that seeks to stretch the Bankruptcy Code's limitations on confirming a plan without paying all Administrative Creditors within some specific period of time. And we have no certainty whether this plan will ever go effective.

Now, we heard Mr. Moore over and over say, well, we estimate that it could be, you know, second quarter of 2028. But when you peel away the layers of what he was basing that on, we have no valuation of the claims. We have no thought as to what the actual timing of the pursuit of those claims could be. And we have no looking at even the collectability of those claims and/or the defenses that could be raised to them.

So, I don't know how valuable that estimate is to say. It just seems like a very rough estimate that has not really given a whole lot of thought to detail as to what goes into pursuing of claims. Your Honor knows, because you're a judge and you were a lawyer for a long time before that, that litigation can realistically stretch on for many, many years. And these cases are not even going to get started -- the pursuit of these claims is not even going to

get started in earnest until almost a year from now.  So, Your Honor, I just think that instead of having specificity for when the effective date might occur, we have speculation instead.  And that is not what the Code allows for.

The other problem, Your Honor, and Mr. Kelley was hitting on this, and I was trying to hit on it as well, is the plan, if it was allowed to go forward, allows for removal of Debtors' most valuable remaining assets from the estates via the credit bid transaction.  Once those are out, it's like the toothpaste is out of the tube.  You can't put it back in.  This plan has nothing in it that if we get five years down the road and they got to pay their priority claims under the Code within the five years, five years from the petition date, that what are Creditors left with?  They could move for the Court to say there's a default under the plan, they're never going to go effective, they're not even close to going effective.  But in that case, what leverage do they really have?  Because if the cases convert, there's no assets left in the estates anymore.  All the assets of value have already been transferred out, and now they're stuck in limbo and they're waiting indefinitely.

The other problem with the credit bid that we alluded on is, Your Honor, we've had a DIP Order in place since the beginning of these cases.  And it would modify the terms of that DIP Order, allowing them to credit bid.  And I

Case 25-90399   Document 3443-1   Filed in TXSB on 07/27/26   Page 166 of 236   Page 165

know Mr. Moore is not a lawyer, but we all understand that you cannot credit bid on something that you don't have a lien on.  And they specifically do not have liens on the avoidance actions.  The very thing that, as Mr. Kelley in his examination was just highlighting right there, that those include the claims against Mr. James, those are Chapter 5 claims, those are avoidance actions, all the claims for any of the fraud that has happened in these cases.  And those are the ones that are of major value. Those would exist for a Chapter 7 trustee.  Not only that, it gives the (indiscernible) additional collateral that they don't have today without them actually providing additional value for that, making such a court-approved fraudulent transfer.

And then, of course, Your Honor, we've hammered it over and over again.  And it takes away the requirement to fund the Administrative Claims Basket.  That's $200 million that was already put there for Administrative Creditors that will never come into play if this plan is approved.  This would essentially leave Creditors without any real options if things go awry as conversion at a later date will not be a viable option, when the estates have already been emptied of all the assets of value.  The plan is neither fair nor equitable, as it works to allow for all the benefits of confirming a plan for certain parties who are able to run

these cases for their own benefit with involuntary financing from the Administrative Creditors.

Your Honor, the protections given to Administrative Creditors in the Code are essential to making bankruptcy work.  Allowing Debtors to go forward with a plan that does not even pretend to guarantee, and we heard it over and over, there's no guarantees in this plan that it can go effective by any such date and time.  So, if or when -- it gives no guarantees of if or when Administrative Creditors will be paid, not only goes against what is prescribed by the Bankruptcy Code, but also sends a message to administrative creditors everywhere that they should not do business with a Chapter 11 debtor because those protections that they're given in the Code might not be upheld.

And to add insult to injury, Administrative Creditors won't be able to help but notice that the professionals in these cases, whose fees are prescribed the same level of priority by the Code, were protected in the form of a carve-out and a professional fee escrow, while the admins are being asked to wait indefinitely for payment. This is especially insulting when the Administrative Creditors are provided assurances in a DIP Order, such as the Administrative Expenses Claims Basket provided here, only to have it taken away at the end, after the Debtors and

the Ad Hoc Group have received the benefit of those goods and services provided by such claimants.

Quite frankly, if the professionals didn't have the benefit of the carve-out and the professional fee escrow, I don't think we would be here today.  I think the decision, now maybe I'm being speculative, but I mean, I'm a lawyer.  I don't think I would have been allowed by my firm when I was in private practice to go work six months for free.  I just -- it would not have happened.  Your Honor, this Court is a law -- a court of law and equity, and this plan seeks to avoid both.  One, the requirements of the laws prescribed by the Code, and also by providing -- failing to provide fair and equitable treatment to similarly situated creditors.

Well, the term of effective date is not defined in the Bankruptcy Code, right?  It's there, but it's not defined.  And I know Your Honor is familiar with some of this, but just for this record, I just want to just go through it.

THE COURT:  Mm hmm.

MR. RUFF:  And there's two essential views on that.  That, you know, some say it should be as close to the confirmation order as possible.  Others say it should be around the time when the confirmation order becomes effective.  What's universal, though, with all the Courts is

there has to be some specificity.  There has to be some certainty as to when the effective date might occur.

Now, it might be upon a certain event, like a regulatory approval or something like that, but we don't even have that here.  We have, it's going to be when these assets are liquidated.  We don't know what the value of the assets are.  We think maybe $7 billion is what I just last heard, but we don't know how collectible that $7 billion is.  We think maybe perhaps it could be in the second half of 2028, but there's no guarantees that's going to happen there.  There's no guarantees that's even going to happen within the five years that's required for them to have to pay their priority claims under the Bankruptcy Code, under 1129.  So, Your Honor, there's absolutely zero specificity.  Instead, we have nothing but speculation.  And that is what the evidence here today shows.

The reason there needs to be specificity, Your Honor, is because the risk of failure is increased whenever something is pushed too far out.  There's just too many unknown variables that can come into play.  Mr. James might have hundreds of millions of dollars that he socked away, that he stole from this estate, but he might spend -- he's got very good lawyers, he might spend tens of millions or hundreds of millions of that in defending and prolonging the ability to collect them from him.  Who else knows whatever

else might come up?  Look what has happened in these cases just from the filing of the cases when they first came in and then they realized, oh my goodness, it's even worse than we even expected.

It's very, very different from what we were being told they were pursuing versus at the beginning of the cases to even January, and that only was a three-month period. Now, we're talking about years and years.  Here, all of the risk of failure has been shifted to Administrative Creditors, Priority Claims, and Unsecured Creditors.  And the best Debtors can propose right now is that two or more years from the order confirming the plan and becoming file, the effective date might occur, or it might not.  And there's no guarantee that it's going to happen in less than five years.  That is certainly not specific.

The fact that the Debtors provide no guarantee in this plan that they will be able to meet the requirements, and specifically it would be of 1129(a)(9)(C)(ii) and pay the claims within five years of the petition date, should be enough for this Court just to say enough is enough, we need to convert.  Debtors do not meet their burden of showing that their plan is feasible and has a reasonable prospect of success and provides a reasonable assurance that proponents can comply with the plan.

Rather, the plan is speculative and leaves a high

likelihood of being followed by further reorganization or liquidation, which we know is forbidden by the Code pursuant to 1129(a)(11).  The Bankruptcy Code does not contemplate that Administrative Creditors are to be planned financiers, and that is certainly not what they signed up for.  Debtors' cases are presently administratively insolvent, and this latest plan does not solve that issue, despite Debtors' baseless assurances to the contrary.

As such, the motion to convert should be granted, and the Debtors should not be permitted to solicit this plan, Your Honor.

THE COURT:  Thank you.

Mr. Kelley?

MR. RUFF:  Thank you, Your Honor.

MR. KELLEY:  And thank you, Your Honor, for your patience while I asked the questions.  I did that for a reason.  I thought the factual record here was critically important.  I listened carefully to Your Honor two status conferences ago where you basically gave Debtors guidelines on that first plan that was rejected, where you wanted to see an understanding of the retained causes of action.  If the case is being built on that kind of value, there should be some disclosure to it.  There's still no list of retained causes of action.  On that basis alone, I would reject a preliminary approval of the disclosure statement.

I just think that that is the driver.  There has been no dispute by the parties.  This case is built entirely around litigation, and there's nothing there.  Maybe it'll show up in a plan supplement, but then why are we here today to try to approve what is fundamentally in the record is replete with a defective disclosure statement.

While I appreciate that Mr. Moore played judge and jury in terms of whether or not administrative claims that are pending and filed should or should not be listed, it's a disclosure statement hearing.  It's not his job to hold back information about a filed claim.  I heard him say from the stand, and we certainly will seek discovery to understand this, why he thinks that there's overpayments to an entity that provided a lot of material, up to $61 million post-petition and doesn't make it on that sheet.

I am particularly distraught about the fact that this is a plan that is a lottery ticket.  It is saying we're going to go pursue litigation.  But I haven't valued the litigation.  I can't even tell you the defenses.  He didn't even mention a number of the defenses that are available to a number of those Chapter 5 parties just based on the Ponzi scheme alone that has occurred prepetition.  There is going to be hard-fought litigation.  And as a litigator I will tell you it is preposterous to me to suggest that somewhere in the middle of 2028 you're going to clear a $1.8 billion

number.

I have no idea for the foundation for it.  It is ipse dixit.  It is so because he says so.  There's no foundation for it.  There's no disclosure in the disclosure statement.  Parties ought to be able to evaluate the substance of it, not what a professional of this estate.  And let's be honest, the unspoken issue in the room a plan is valuable to the professionals because they get to final fee app.  I get that.  I understand that.  These are fantastic professionals.  I respect them all.

But that person has a certain amount of bias and we ought to look at it with an element of jaundiced eye to understand whether there's adequate disclosures to the individual creditors who are going to have to address a complicated plan that goes out indefinitely, a non-litigator who himself indicated he forecast in 2028 hitting these numbers, he used high-level numbers without regard to defense payment collection to try to talk about whether or not they can get there.

I have been trying to think in my mind what constitutes speculative.  I know there is probably a broad array you could call speculative.  But that record shows the utter speculation of whether or not admins will ever get paid or priorities will ever get paid.  I understand why the secured parties want it.  I understand why the professionals

want it.

The unsecured creditors of which my client is now one -- I started this case on behalf of Katsumi Servicing thinking I was not a creditor in this case.  We had bought things from the estate.  We were depending upon the financial wherewithal of the Amazons of the world, of the O'Reilly Auto Parts of the world, all of those entities who were buying products and we were not going to be a creditor of the estate.  As the case unfolded, we found out a $1.7 billion creditor.  We're probably one of the largest unsecured creditors in this case, depending on how the outcome of the $97 million in funds that were part of my questions that were asked of the witness at the tail end of what happens to that account.

Fundamentally, I have found myself sitting in a bus that I didn't expect to be in, which is the creditor bus, but in the back row, and this plan pushes me even further back.

The concept that no one discusses is the fact that this budget has $70 million of additional professional fees that come from a carve-out that push value out the door up front and make it less available for satisfying the DIP lenders and their right hierarchy in this case and before it ever gets to admins or creditors.  The fact that that is a burn and this swinging for the fences, I want to hit a grand

slam, my last shot, and I don't think this plan should be looked at independent of the first one that was proposed because it shows the steps that have gone here as this Court considers a fundamental issue.

Today is not the day for determining good faith. We have a completely different case we will make for that at confirmation.  But watching the way this has gone, it should raise questions in the Court's mind as to whether or not the disclosure statement even meets the minimum threshold of adequate disclosure.

I want to step aside and I want to compliment obviously U.S. trustee's office.  We came into this over the past few days still trying to process the plan.  It's a lot of material to process.  Definitions are where a lot of issues are and we have to dive into it.  I have three partners working on this case and a number of associates and it still took us a week.  I'd like to think we're roughly sophisticated.  I have no idea how unsecured creditors are going to understand this plan and disclosure statement.

Fundamentally the trustee has proven, and I think my questions have helped establish record that cause exists. There is a substantial or continuing loss of the estate and the absence of a reasonable likelihood.  I listened carefully to the questions.  The record and the questions asked were on that comment: are there some factors you want

to point to?  And yes, they talked about activities accomplished and they also talked about, yes, it's true, the fraud that occurred prepetition, by the time the petition date came, it all came cascading home and there was a lot of losses.  But that's all post-petition losses.

The part that concerns me is the testimony that they've known since December that they didn't have replacement funding, that at the end of January they had accumulated substantial administrative expenses and they were working on OEM funding while they were trying to go -- and Your Honor tried to keep them on a very short leash -- through the mediation to hurry up and get to a point before we built a hole that was too big to come out of, and I think that's where we are.

And that's why I think we shouldn't incur whatever unsure amounts there are to try to solicit a plan on the hope and a prayer that maybe this litigation will deal with down the road, and it's going to be far longer than 2028 because we aren't sure what the DOJ is going to permit in of terms of discovery.  Your Honor will control that.  I understand and I respect that.  But there is no way that these claims are going to go forward without obtaining discovery of what occurred prepetition.  And I just think it's nonsense to think that's not going to be a component of this.

I also think the tracing of funds is fundamentally at odds here.  We all know from the Court's docket the examiner hasn't even paid their $7 million.  They're an administrative claimant in this case, and the examiner is the most impartial party and its conclusions on substantive consolidation are fantastic.

THE COURT:  I thought the examiner was paid already.

MR. KELLEY:  No.

THE COURT:  $7 million.  I thought they came back and asked for three more.

MR. SINGH:  That's correct, Your Honor.

MR. KELLEY:  But as of my discussion with their counsel, they have not received the $7 million.  Are you saying they received the $7 million?

MR. SINGH:  I'm saying that it's been segregated for, and that they're only asking for $3 million more.  It's specifically segregated for them.

THE COURT:  Okay.  No, no, no.  I'm just --

MR. KELLEY:  They haven't received it, but I respect what Mr. Singh is saying.

THE COURT:  I will --  I was waiting for the time to pass so people could respond to that.  That's why I haven't just ruled on it yet, but just in terms of process.

MR. KELLEY:  And the fee burn on this while it

stays in 11 is in fact contributing to a substantial continuing loss or diminution of the estate.  I understand that in times we make the argument that availability or accessibility for rehabilitation could include putting a plan together and getting across the goal line.  But that's not what rehabilitation speaks to under the Fifth Circuit standard.  There is no business to rehabilitate.  There are no jobs to save.  There is no business here to preserve.  Debtors tried to sell it the best they can.  This is basically an inverted type of pot plan with a risk, but with inability to pay admins.

The fundamental issue is the source of income.  As I've indicated, I think it's speculative.  I would encourage the Court to look long and hard at dismissal or conversion to Chapter 7.  I think this record supports only that conclusion, and I definitely think the record says this disclosure statement cannot go out for solicitation.

THE COURT:  Thank you.

Is there anyone who opposes -- who supports the motion to dismiss or opposes have conditional approval in the courtroom that wishes to be heard?

Yes?

MR. CASSEL:  Good afternoon, Your Honor.  Michael Cassel, Wachtel Lipton Rosen & Katz, for the Leucadia parties.  Emil Kleinhaus is on the line.  I have Paul Heath

in the courtroom as well from Vinson & Elkins.  We filed a protective objection and reservation of rights at Docket 2978.  We're not taking a position on the conversion or dismissal motion.  We have not -- we're not objecting to conditional approval of the disclosure statement today, but did want to point out a few things.

So as we highlighted in our objection, one of our major substantive concerns with this plan is the selective use of substantive consolidation --

THE COURT:  A sub con issue, right?

MR. CASSEL:  -- for some purposes, but not for others.  So in the negotiations leading up to this hearing, you'll see in the redline, its new Section 6.2(c) was added, came in this morning.  And that section at least clarifies the Debtors' intent, what they are proposing to do.  It doesn't resolve our substantive concern about whether it works.

What we understand the Debtors to be trying to do is to say that the plan itself is not resolving whether substantive consolidation here is appropriate for purposes of litigation against third parties.  But they are seeking to substantively consolidate for purposes of distribution, and at least until this morning, also for voting purposes.  Judge Ambro said 20 years ago, this sort of pretend substantive consolidation, where you're doing it for some

purposes when it benefits you not for other purposes, doesn't work.  That's the Owens Corning case from the Third Circuit 2005.  And so at confirmation we intend to object on that basis.

I should mention, so the version that went out that was filed until this morning said that the plan was substantively consolidating for two purposes, for voting and for distribution.  This morning in the redlines, the Debtors filed the revised plan.  They filed a revised disclosure statement, and they changed Section 5.2(k) of the plan and they deleted the words "and voting".  That's at Page 50 in the blue pagination.

THE COURT:  I'm just -- I'm getting there.  I'm looking at it now.  Okay.

MR. CASSEL:  And they did the same thing in the disclosure statement redline that's at page, I think, 23 in the internal pagination where there's an FAQ, I think FAQ Number 10, and they delete the words "and voting" for the purposes for which they're seeking substantive consolidation.

They have not filed new ballots.  They've not filed new tabulation procedures.  I spoke to Debtors' counsel in the hallway and they said they will be filing new ballots later tonight to, like, add a name of the Debtor entity that you're asserting a claim against when you're

submitting a ballot.

But they also still want to have this voting record date of Monday, June 15th.  And so if you're not listed on the schedules or you haven't filed a proof of claim against every particular debt or entity that you might want to submit a vote against, you're out of luck unless you've filed it by June 15th.  We think that's at least aggressive.

Turning to another point which we mentioned in our objection is this adverse conduct definition.  I don't want to linger on it too long.  But it's been a continuing point of confusion.  I think a number of parties don't really know what it means, and it's a non-Code-based concept.

It flows in most primarily in the preference settlement, where if you are guilty of this adverse conduct definition, you're not eligible to participate.  It also flows through the plan in a number of other ways, being a specified non-release party.  And to cut to the chase, on the merits, we don't think it works to distinguish among people, among creditors, based on a non-Code basis, to alter their treatment in any way based on that concept.  With that, unless the Court has any further questions, I'm happy to sit down.  Thank you, Your Honor.

THE COURT:  Thank you.

Anyone else in the courtroom?  Let me go online,

and I'll give the Debtors an opportunity to respond all at once.  Is there anyone on the line that wishes to be heard?  There's a 212 number.

Mr. Duke, is that you?

MR. DUKE:  It's me, Your Honor.  Thank you.

THE COURT:  Okay.  Perfect.

MR. DUKE:  Perfect.  I don't want to repeat what others have raised.  We filed our objection this morning.  We're still obviously going through the plan disclosure statement that was filed again just a couple hours before this hearing.  But right now we have two issues that we wanted to raise before the Court.  One relates to adverse conduct, and again, I'm not going to get that in detail.  I just want to add one additional point on that.  And then two is related to the transfer into the trust of assets.

With respect to the first point on the adverse conduct, I agree with what Mr. Cassel just noted.  I want to note, though, one additional point, which is that this is a negative value proposition where you can opt into the preference settlement, then contribute your direct claims as part of that, and then have your participation retroactively disqualified.  So if that's the case, which it is under the plan, I would expect it to be abundantly clear what causes you to be disqualified, right?  You need to assess what your risk is that you're going to end up contributing a valuable

asset in exchange for absolutely nothing.

But again, as you heard from Mr. Cassel, there are numerous issues with this definition.  No one really understands what it means.  I don't know what it means to engage in wrongful conduct.  I don't know what it means to participate in wrongful conduct.  It seems like the strict liability provision, I guess.  It's not clear to me.  I don't know if there's a mens rea requirement.  So these are all issues with the disclosure statement that I think need to be fleshed out before it goes out for any type of solicitation of votes.

With respect to the trust assets, there's a transfer of many assets to the DIP and ABL trust.  We don't know what those assets are.  If you look at the plan supplement, it doesn't state that they're going to supplement with respect to this point.  So we won't know in the plan supplement what the trust assets are that are being contributed to the trust.  I understand from the Debtors that they plan to be providing that.  So that's great if that's the case.  It'd be helpful if they'd confirm that on the record today so that we can get confirmation that at least the parties will know what the trust assets are at some point down the line because as we all know here, what are assets of the ABL, of the DIP parties, of the term loan lenders, that's a hotly contested issue.

One final point I'd like to raise on that is that if you look at the carve-outs for the DIP and ABL trust, what it states is that it will not include any assets that are determined by final order to be property of the SPV Debtors or their estates, any of the factors or any of the SPV lenders or subject to a valid perfected first priority lien asserted by a factor or the SPV lenders.

THE COURT:  Mr. Duke, where exactly are -- I just want to -  where exactly are you looking, just so I can follow you?

MR. DUKE:  It's at Page 14, I believe, and 17 of the disclosure statement, depending on if you're looking at the DIP or the ABL.

THE COURT:  Okay.

MR. DUKE:  And what that doesn't tell you is what's going to happen to these assets before there's a final order.  They're going in -  I don't know if they're going into the trust.  I heard that from Mr. Moore today. But you look at the disclosure statement, what it states is that the ABL -- I'm reading for the ABL one.  The ABL collateral trust assets include, but are not limited to the following: FBG Debtors' interest in factored receivables account.  Of course, what their interest is in the factored receivables account is the entire question we have throughout this case.  I don't know what their interest is.

We believe that we have the interest.  They believe that they have the interest.  That's the question.

So with that, Your Honor, again, I won't belabor what we reserve as well.  But I wanted to raise those points before Your Honor.  Unless you have questions, that's all I have.

THE COURT:  No question.  Thank you very much.  And you said you thought it was on page which?  You said Page 14, and I couldn't hear the second part where you were looking, of the DS?

MR. DUKE:  I believe 14 and 17.  That's what I have.

THE COURT:  Okay.  Perfect.  Oh, 14 and 17.  That's what you said.  Okay.  Thank you.

MR. DUKE:  And then with respect to the ABL collateral trust assets, that's at page -- I'll give you the docket entry number.  It's 2983-3, at PDF 160, which is -- out of that third exhibit, it's Page 12 of 31.

THE COURT:  Perfect.  Thank you.

MR. DUKE:  Thank you.

THE COURT:  Is there anyone else on the line who wishes to be heard?

Okay.  I'll hear from the Debtors.

MR. SINGH:  Thank you, Your Honor.  Sonny Singh, Weil Gotshal, on behalf of the Debtors.  Your Honor, I was

going to intervene earlier when we were trying to describe which side parties were on with respect to the motions and say, are you on team Debtor or are you on team U.S. trustee? But we could have just ended it there.

Your Honor, there's been a lot that's happened today.  Quite honestly, I think almost all of what we've heard from counsel and parties opposing our request to solicit the disclosure statement and the U.S. trustee's request to convert the Chapter 11 cases are confirmation objections.  The issues fundamentally go to feasibility of our Chapter 11 plan, and the elicitation of testimony focused almost entirely on that.  We even had testimony from counsel incorrectly, in fact, from here, saying they've got a problem with respect to the feasibility of the Chapter 11 plan.  That's not before you today.

What I want to do, given all of the motions that are on file and all of the issues is bring the Court and parties-in-interest back to what is before you today, right? We've got the U.S. trustee's motion to convert the Chapter 11 case.  They bear -- this side of the house bears the burden of proof with respect to that motion.

Okay.  Converting the Chapter 11 case, as we all know, Your Honor, is a drastic measure, and there's case law to support the proposition that all doubts must be resolved in favor of the Debtors at this stage.

Your Honor, Mr. Moore was asked a lot of hypotheticals today, a lot of questions about confirmation, and essentially he's being criticized because he couldn't provide a guarantee that admin creditors will be repaid. I'll note, Your Honor, none of the parties who are objecting are actually admin creditors, prepetition creditors, Katsumi, the Evolution parties, et cetera.  We're not hearing from admin creditors that we don't like this plan. I appreciate the position of the U.S. trustee to represent all parties-in-interest.  But I would note that that is an issue, Your Honor.

And so going back to Mr. Moore being asked for a guarantee, of course he cannot make a guarantee that that will happen.  No one could.  But fortunately for the Debtors, Your Honor, that's not the standard to consider the motion of the United States trustee to convert the case. They bear the burden to prove that either there is a substantial or continuing loss, and they bear the burden to prove that there is not a reasonable likelihood of rehabilitation.  And I would note, although Mr. Kelley made the comment that rehabilitation -- there's no more operating business, et cetera, Your Honor has ruled before in Steward that that's not standard.  You can have rehabilitation in the context of a liquidating case, a liquidating Chapter 11 plan, and that's frequently what happens, Your Honor.

So with respect to those particular issues, the uncontroverted testimony in the record, Your Honor, is there is not a substantial loss here with respect to admin claims. Ninety-one percent of claims, administrative expense claims, have been repaid or paid in the ordinary course, as Mr. Moore testified, $1.9 billion in total.  And what you've got on a post-petition basis, putting aside 503(b)(9) and the 20 percent cushion, is about $145 million, which, as Mr. Moore testified, when you consider in the context the fact that this is a $4 billion per year sort of operation prepetition, is not substantial when you're talking about these cases.

In addition, Your Honor, let's focus on no continuing loss from this point to confirmation.  What we're talking about, Your Honor, and the relief requested from the Debtors with respect to the disclosure statement and the timeline that we're asking for you to approve is to get from today to confirmation.  Mr. Moore testified earlier and he was asked questions about, well, what happens post-confirmation or pre-effective date.  That's a confirmation issue.  We'll be back before Your Honor, if you let us solicit this plan, to prove our case as to what happens and why there's a feasibility issue.

But the only issue before you today on the United States trustee's motion to convert these cases to Chapter 7 is can we get from here to the end of confirmation to the

end of July without having a continuing loss.  The only evidence that you have is the budget that's been approved by the lenders.  They're paying for this process, nobody else. They think that's a good use of their money and they should be entitled to be deferred to on that decision, right?

All of the downside is not on admin creditors. The hole is not getting any bigger by virtue of the fact that if Your Honor were to not convert the case today and allow us to solicit the plan, that if we end up at the end of July, that administrative creditors somehow have a bigger pool of claims to share with or have fewer assets.  Those are not their assets to begin with.  Those are assets of the secured lenders, and they have consented to the use of that collateral from now until the end of July.

Your Honor, going to the reasonable likelihood of rehabilitation factor, and that really is the issue I think fundamentally is pretty simple.  Is conversion to Chapter 7 today better than giving creditors an opportunity to consider and vote on our Chapter 11 plan on regular notice, right?

Mr. Moore testified extensively to that as to why he believes that that is the case.  And Your Honor, even if you were to assume that the questions that were asked by counsel of Mr. Moore, sort of you assume them in their favor in the best case, what does that mean?  And I'm not saying

you should assume that, but what does that mean?

That means that the administrative liabilities, they're going to be exactly the same in a Chapter 11 and a Chapter 7.  If you convert this case today, it's not going to be some miracle that tomorrow there will be no more admin claims in a Chapter 7 or that somehow there's actually going to be a difference between, to the penny, the size of the administrative hole from a Chapter 11 case to a Chapter 7. Nothing is changing with respect to that.  The assets are exactly the same.  The Chapter 7 trustee is not going to miraculously find some new asset that Mr. Moore has not considered, right?

The assets are exactly the same.  Actually, he testified that he doesn't think that the recovery on those assets is going to be the same based on his experience and the fact that a Chapter 7 trustee is going to have to come up to speed with respect to historical knowledge, does not actually have funding with respect to these cases.  But even if you were to ignore his testimony, which is the only testimony that's actually in evidence today, even if you were to ignore it, it's exactly the same, right?

A Chapter 7 trustee is not going to recover more dollars and find more value than what the litigation trustee will be.  We think a litigation trustee will recover more. But best case for this side of the house, they recover

exactly the same.

So what does that mean?  You just have to look at the waterfall, Your Honor.  In a Chapter 7 case, by definition, by your DIP order -- and I'm going to get to some of the points that were raised with respect to the DIP order.  The DIP A claims must recover in full $1.3 billion as of today, plus accruing interest, right, before any administrative creditor is entitled to a single penny, including that $200 million admin basket, right?

Under our settlement, people can come in and start participating earlier, right?  So by definition, the Chapter 11 plan is better for administrative expense claimants because you get to participate earlier on the same pool of claims and liabilities against the estate and on the same exact assets.

Second, they're waiving interest as part of our plan, right?  So the DIP A claim is going to continue to get bigger and get bigger until they're paid in full.  Under our Chapter 11 plan, not so.  They're agreeing to limit the size and weigh, frankly, interest on and beyond the confirmation date.  So it's just a waterfall exercise, which is exactly what Mr. Moore testified to.  He had other reasons why the Chapter 7 case is better.  But even if you were to ignore all of those, the waterfall alone proves that Chapter 11, there's a reasonable likelihood of rehabilitation.

Your Honor, if you consider all of that, we think the U.S. trustee, who bears the burden on this particular issue loses, right? We're just talking -- we're not talking about confirmation. We're talking about is there ongoing substantial or continuing loss. There's not. And is there a likelihood of rehabilitation, including in a liquidating Chapter 11 case? And there is. We've put forth a reasonable prospect that this plan is going to get confirmed and that admin creditors are going to get paid. We don't have to guarantee it. That's not the burden of proof. Frankly, it's their burden to prove that we're not going to be able to do it, if you're just talking about the U.S. trustee's motion. They have to prove that we will not be able to pay administrative expense creditors. I think we've shown the opposite. I think Mr. Moore has shown that there is not a guarantee, but there is a reasonable likelihood of rehabilitation and likelihood that administrative expense creditors will get paid, and that's all you need to consider with respect to their motion.

Your Honor, some other points with respect to the motion that the U.S. trustee has made, and then I'll get to the disclosure statement, obviously. Let's talk about the administrative expense claims basket. Your Honor, I'm going to point you to some specific language. Do you have a copy of the DIP order or may I --

THE COURT:  I can pull it up.

MR. SINGH:  I can hand you a copy, and it's already been admitted into evidence.

THE COURT:  Okay.

MR. SINGH:  Either.  May I approach, Your Honor?

THE COURT:  Yes.

MR. SINGH:  Thank you.

THE COURT:  Thank you.

MR. SINGH:  Your Honor, if you turn to Page 42, which is in Subsection B of that page, this is the administrative expense claims basket that we've been talking about today.

THE COURT:  Oh, yeah, you're talking about the part -- got it.

MR. SINGH:  Yeah.  So, Your Honor, I'm just going to read from it because the point here is the administrative expense claims basket is only triggered once the DIP A claims are repaid in full in cash, which is obviously not happening, right?

If you read the language, notwithstanding anything to the contrary in this interim order, or this, or in the interim order, excuse me, or this final order to the contrary, prior to the payment of the roll-up obligations, but following indefeasible payment in full in cash of the new money DIP loans, including all the applicable DIP

obligations, including DIP fees and expenses, but excluding roll-up obligations, unpaid and undisputed administrative expense claims of the DIP loan parties up to an aggregate of $200 million shall be paid.

And then it goes on to say, in terms of when do you actually have to fund the $200 million, and upon any carve-out trigger date.  Neither of those things has happened, Your Honor.  The DIP A claims are not being repaid in full.  So this obligation has not been triggered.  A carve-out trigger has not been called.  So an obligation to fund $200 million, which by the way, if you continue to read the rest of this paragraph, says you don't actually get paid that amount until the DIP A claims are paid in full.  Yeah, we can fund that.

So even if you got that, what good does that do anybody?  So, Your Honor, if you compare that to our Chapter 11 plan, right, so there is no trigger of the admin claims basket, but our Chapter 11 plan is doing better.  Prior to the repayment of the DIP A claims, administrative expense claims are now going to start to get paid.  And following the repayment of the DIP A claims, but prior to a single penny going to the roll-up claims, all DIP claims have to be repaid in full, not just $200 million.  Excuse me, all admin claims have to be repaid in full, not just $200 million.

So admin claims are participating earlier.

They're getting a waiver of this condition effectively of the DIP order because they're otherwise not entitled to any of this, and they're going to collect in excess of $200 million should the claim amount be there before the DIP -- before the roll-up gets paid.  So, Your Honor, that's the improvement and there's been no trigger.

Now, I appreciate what Mr. -- you know, the United States -- Mr. Ruff said with respect to the United States trustee.  There are admin creditors that haven't been paid and their expectations may or may not have been met.  We're not going to be able to guess and I don't think it's fair to ask Mr. Moore hypothetically what each admin creditor was thinking when they made this loan.

But Your Honor, the DIP A claimants, and you'll hear probably from Ms. Gains, they had expectations under this DIP order as well that they were going to get repaid in full in cash on their DIP A claims, and that hasn't happened.  So adjustments need to be made.  And not a single admin creditor here was compelled.

Your Honor, we never filed a motion to compel an admin creditor to provide trade post-petition.  They did that voluntarily.  People understood the facts.  People understood and could have publicly read this language and made a decision on whether or not they wanted to provide post-petition credit to the Debtors and on what terms.  And

frankly, a lot of them didn't do it.  A lot of them did it on delivery in advance or cash in advance.  A lot of them did it on different terms on what they felt comfortable.

And so, Your Honor, I appreciate and I'm not happy about the fact that we are where we are and we've got a mismatch in timing.  I do not agree that we are administratively insolvent.  We have a mismatch in timing with respect to the assets that we have and the administrative expense claims that remain still outstanding and unpaid.  But we are where we are.  And converting this case to Chapter 7 is not going to improve the likelihood or opportunity for administrative expense claimants to get paid.

Your Honor, another point that was made with respect to the DIP order is the professional fee carve-out. And Your Honor, if you look at Paragraph 7, Mr. Ruff asked Mr. Moore a legal question and he also made a statement in his comments.  Are professional fees a higher priority than ordinary course administrative claims?  The answer to that is absolutely yes.

Look at Paragraph 7A, Your Honor, each of the -- and I'm just going to read from it: each of the DIP liens, the DIP superpriority claims, the prepetition liens, the adequate protection liens, and the adequate protection claims, and any other liens, claims, or interests that any

creditor, the prepetition secured parties, the DIP secured parties, or any of their respective affiliates hold, own, or control in relations to the Debtors or their affiliates shall be subject and subordinate to the payment of the carve-out.

This is the language, as Judge Drain found in the Sears case, that professionals negotiated in order to have their professional fees protected.  I'm not trying to pin professionals versus administrative expense creditors in this case, Your Honor.  That's the last thing I want to do. The issue has been raised, so I'm responding.

But there is a difference in treatment that Your Honor ordered and authorized with respect to professional fee claims and ordinary course administrative expense claims.  And to criticize Mr. Moore for complying with your order that says professional fees are senior and that they get funded into the professional fee escrow on the terms and conditions of this order which have been satisfied, but to not fund an administrative expense carve-out that has not been triggered, I think is unfair and is inconsistent with Your Honor's order.

Your Honor, now let's shift to the Debtors' burden today with respect to their motion.  What are we really asking for?  We're asking you to approve the amended disclosure statement because we believe it has adequate

information.  I'm going to address a couple of the comments that -- the limited nature of the comments that went to the adequacy of disclosure because I do have responses to those. And we're asking you to authorize a solicitation on our timeline.  That's it.  It's a rather simple request, right? And there's actually not been many questions on these issues because they're really going to core plan issues.

But let me address the few solicitation issues that have been raised.  There was some back and forth, Your Honor, with respect to there's no bar date.  We're going to file claims, and we've got a big date coming up on June 15th.  Everybody ignores Rule 3018 of the Bankruptcy Code. Mr. Moore has testified to this issue.  He was asked a lot of technical questions about solicitation.  But Your Honor, I think you can read our proposed order.  3018 motions. That's how these issues are handled.  We don't need a bar date.  If somebody has an issue with respect to which Debtor should I file a claim against or I want to vote on this, you pick up the phone, you call the Debtors, and we negotiate a 3018 stipulation.  That happens every time there is a plan that's being solicited.  It's done without prejudice to the actual amount of the claim.

And if, Your Honor, there's no stipulation, there's a procedure that's contemplated on plenty of notice where people can file a motion for allowance of that type of

relief.  So there's no magic to if you don't do something by the 15th.  Mr. Kelley doesn't need to have associates working around the clock this weekend.  All he needs to do is pick up the phone and we'll talk about a 3018 stipulation.  It's rather simple, Your Honor.

Your Honor, there was also some comments about sub con for voting purposes and the changes that we made.  We'll deal with sub con at confirmation.  I think counsel acknowledged that that is a confirmation issue.  Why the reason for the change for voting purposes, Your Honor?  It was honestly an error.  We are not trying to propose that we are consolidating all of the Debtors and therefore only have to satisfy Section 1129 on a consolidated basis.  What we're clarifying is that the Debtors will have to satisfy Section 1129 on an individual Debtor basis.  And we'll take the votes and we'll come to Your Honor, and we'll make our case with respect to that issue.  It's not prejudicial to anybody.  It's actually probably beneficial to people that we have to go through and do all of that.

But there's nothing nefarious about that issue, Your Honor.  We're not changing substance.  We'll deal with the substantive issue later.  But that's a procedural change, and that is actually a favorable procedural change from an adequacy of disclosure perspective.

Your Honor, there's also a lot of comments about

the factored receivables account.  Section 5.4 of the plan actually says factored receivables account.  What does it say?  If you read through the entire paragraph, basically what it's saying is following the confirmation date, it's going to be continued and transferred to the wind-down administrator's authority.  I know it's a little confusing.  There's the ABL trust.  No disputed collateral is going to the ABL trust.  There's a DIP trust.  No disputed collateral is going to the DIP trust.  There's a litigation trust, claims trust, no disputed collateral.

So what happens to all the disputed collateral?  Chapter 11 estates continue under a wind-down administrator who's going to figure out and continue to administer those assets and figure out the disputes.  And if they get resolved in favor of one of the DIP lenders or ABL lenders, then they go to the trust.  If it turns out that that collateral belongs to a factoring party, they go to a factoring party.  And if you read Section 5.4 in full, it says we're going to continue to comply with Your Honor's cash management order.

So it's unfair to say to Mr. Moore we're going to violate some orders.  I think he got a little confused with respect to the questioning because we're talking about ABL assets.  But I think he clarified at the end that the $97 million in the factored receivables account, the Evolution

disputes and all the other factors, nothing is changing with respect to that.

And what are we giving?  We're giving our interest, whatever that it may be.  We're not asking you to decide that we own the factored receivables account, but the Debtors are going away and the ABL lenders are the primary beneficiaries.  If the Debtors are right, that money, as you heard about in the settlement this morning, that money is likely to go get paid down to the ABL lenders because it's going to be their collateral.  If we have an interest, it really means it's their cash or potentially DIP lender cash if there's a dispute with respect to that matter.

But all we're saying is whatever interest we have, and Your Honor is not being asked to determine, whatever interest we have that's going to the ABL lenders and they'll pick up the torch and carry on that fight unless they want the wind-down administrator to do it.  We're not changing any of your orders.  And all you have to do, Your Honor, is read Section 5.4 of the plan specifically carved out and called out.  There's plenty of disclosure with respect to that issue.

Your Honor, the other comment, and I think Mr. Kelley asked Mr. Moore about this.  I don't think he made it in his closing remarks.  One of the changes to the plan is that you have to file a motion with respect to set-off.  All

I'll note is, Your Honor, that that has come out in resolution of some of the objections that we filed this morning.  That provision is no longer in the plan.

So, Your Honor, we think we've satisfied our burden, frankly, low burden, to prove that there's adequacy of disclosure.  Again, confirmation issues, we'll deal with that.  But adequacy of disclosure as to what's happening and what's going to happen and we're still going to file, and consistent with Your Honor's comments, a plan supplement that files a litigation trust agreement in the schedules with 28 days' notice to continue to object, this is an adequate disclosure statement, Your Honor.

And the only way it should not go out is if they can show -- now it's their burden again -- that this plan is patently unconfirmable.  And that is a very heavy burden, Your Honor, and with the modifications that we've made to this plan, there is nothing in this Chapter 11 plan that has not been done before.  The delayed effective date structure, for example, that was approved by this Court in Steward, by Judge Drain in Sears, the admin consent program, the preference settlement, the plan settlement related to the distributions, none of that is something new that we cooked up and has never been seen before the Court.

Now, I'm not raising this issue to say, Your Honor, you should approve this plan because you approved the

Steward plan.  Not at all.  We'll be back before you.  We'll make that case.  We'll put on the evidence.  But what I am saying is that because you approved a very similar plan structure in Steward, and Judge Drain approved a very similar plan structure in Sears, and for that matter, Judge Lane in American Airlines, too, that by definition, this plan is not patently unconfirmable.  Similar plans with similar structures and issues have been approved.  We deserve the right to put on our case and show to Your Honor that this plan should also be approved like those plans.

Your Honor, I'll last address due process, and I think Katsumi raised these arguments about due process and whether the Debtor should be able to go forward on a conditional disclosure statement today.  Your Honor, so again, let's talk about that because I think we're asking for rather narrow relief, right?  We're not minimizing any of the plan solicitation deadlines.  You're going to get 28 days and more after the plan supplement is filed to vote or object.  You're going to get the opportunity to file a 3018 motion.  You're going to get more than 35 days to file an objection with respect to the plan and be heard.  Excuse me, not file an objection.  That's 28 days, but be heard at the hearing.

So what are we asking for?  We're narrowing the window that we would have filed a disclosure statement and

showed up to Your Honor on 28 days' notice and said, please approve this disclosure statement and then it can go out. So it's the front end that's being narrowed.  And it's not being narrowed materially or just because, Your Honor, we have -- we just feel like having it narrowed.

Mr. Moore testified, you have uncontroverted evidence in the record that we must proceed this way because we don't have funding to proceed in any other fashion.  And we don't believe that creditors are being prejudiced with respect to this because I think it's really frankly unfair to say that there's only been seven days' notice of the hearing today.

Your Honor, we've been at this now for almost two months.  People did not get the plan, the new plan cold seven days ago.  It's unfair to ignore the history here and in fact, the issues in our disclosure statement and plan, I appreciate that the treatment is changing, but the issues, all of the fundamental issues have been out there since we filed our original plan to on April 28th, 45 days ago.

The U.S. trustee filed their motion on May 13th raising all of these issues.  Frankly, I don't think anyone can credibly say that they're surprised or haven't had enough time to consider all the issues that are before you today.  And again, all we're asking to do is solicit our disclosure statement on this timeline.  And there has been

45 days, Your Honor, since we filed the original plan to get to this point.

I appreciate, and I concede that there are changes to the plan. But that doesn't change the issues that were on the table. When we filed that original plan, people knew the hole of the admin creditors that we had to fill. People understood the global settlement and the sharing of the claim mechanic, which frankly, has improved. People understood that there was going to be three trusts that were created. People understood, if they had read the plan, that the factoring account was not being impacted and we were not changing that issue.

So we have made plenty of disclosure here. And I appreciate, Your Honor, it may not be perfect, but Your Honor, under the record that you have here today, it is more than adequate and due process has been satisfied. And as I mentioned, Your Honor, on due process issues, we've made a number of improvements with respect to the plan. Parties will have 28 days again from the filing of the plan supplement to vote on the plan or to object to it. The admin consent program, you get 60 days post-confirmation. Nobody is being forced or rushed into a decision today to come into that. And it's entirely voluntary. It's not opt out. It's opt in. The preference settlement, which we heard on substance today, we'll address the substantive

issues later.

But I'll note, Your Honor, completely voluntary. If you don't think you've got enough notice with respect to your particular claim after you read the disclosure statement and you pick up the phone and you call the Debtors, or you call the committee and say, how does this affect me, if you don't think you've got enough, you don't have to opt in. Nobody's forcing anybody to come into the preference settlement. Keep your claims. You know what your direct claims may or may not be worth. We don't know what they're worth. Keep your claims. It's an entirely voluntary structure. In that context, there's more than adequate disclosure with respect to this plan.

And as I mentioned, Your Honor, this is now a joint plan of all of the FBG Debtors. The concerns that Your Honor raised with respect to the 9019 motion which we took to heart and addressed in this plan and have now made clear that for voting purposes, we're not trying to do a consolidated plan and that we are trying to make sure that every Debtor and every creditor with respect to every Debtor, would have an opportunity to vote prepetition creditor and be heard, will be heard.

So, Your Honor, we believe that we've satisfied our burden, which frankly is much lower than the U.S. trustee's burden today to solicit this plan, to solicit this

plan on our timeline.  We've satisfied our burden, or frankly, we've shown that the U.S. trustee has not satisfied its burden to direct a conversion of this case today.  And Your Honor, unless you have any questions for me, that's the end of my comments.

THE COURT:  Thank you.

MR. SINGH:  Thank you.

MR. AULET:  Good afternoon, Your Honor.  Kenneth Aulet, of Brown Rudnick for the committee.  The first thing I'd like to address, there was a little bit of questioning of Mr. Moore about who does the committee represent.  And I just want to note for the record, 11 USC 101(10)(a) notes that a creditor is a prepetition creditor.  And so the committee, as a committee, represents prepetition unsecured creditors.  I just want to make clear that the committee has never suggested that it represents administrative creditors.

I want to go to what's really at issue here today, which is that these estates, because of just the pervasive fraud that happened prepetition, are essentially a pile of litigation assets.  And that is driving pretty much everything that we have here today.  It goes to both sort of the disclosure issues and the burden of proof issues because disclosure-wise, it's very difficult to properly calibrate how much do you disclose about litigation claims.

There are defendants in existing litigation in the

courtroom today.  Mr. Moore's testimony made clear that at least the Debtors are considering other targets of potential litigation who may be here today who will certainly read the disclosure statement.  So that has to be very carefully calibrated.

But that also goes to the burden of proof.  At the confirmation hearing, the Debtors will need to prove feasibility.  They will need to make a decision about what information can be disclosed in a way that shows that they satisfy the Bankruptcy code, but preserves the estate value, because the estate value is only in these litigation claims at this moment.  And so that's why the burden of proof here matters.  The Debtors have made clear that if this plan fails, then these cases are going to Chapter 7.  And at that point they will have put on their burden of proof.  If they're unsuccessful, then these cases will convert.

But the U.S. trustee has come here today asking for it to happen today.  And today the U.S. trustee bears the burden of proof.  And so when we hear about speculation as to the value of the assets, that will be fatal potentially in July if we cannot satisfy Your Honor about what the value of the claims are.  But today it is the U.S. trustee's burden to show that these cases -- that the plan cannot be feasible today.  And no testimony to that effect was elicited.

I also want to go to one of the things that has been discussed, which is how can an unsecured creditor decide how to vote here, given the lack of information on litigation claims, which is consistent in every plan where an unsecured creditor's main value is litigation.  And there we have to go to what does the Code provide in Chapter 7 and what does the plan provide today.

We don't know.  Even the committee professionals who have access to privileged, non-public information could not stand before you today and tell you what the claims will ultimately generate.  At the end of the day, litigation is uncertain.  For the litigation against Onset, the Debtors have put out their complaint.  Onset gets a vote.  There will be discovery.  There will be -- you know, this is a case where a lot of 2004 discovery did not occur due to the appointment of the examiner.  And so there's still significant discovery that needs to happen.

But what an unsecured creditor will look at is what does the Code provide in Chapter 7.  And here it's not just the code, but the DIP order.  What the DIP order and the Code provide is that unsecured creditors cannot receive a penny because there's no assets other than the proceeds of litigation until the DIP A is paid, until the $1.1 billion of the DIP B roll-up that sort of sits ahead of unsecured creditors -- as you may, if Your Honor recalls, there's a

very large roll-up, but only sort of one of the three times applies to the proceeds of litigation claims.

So an unsecured creditor sits behind $2.5 billion of secured administrative expenses, then sits behind whatever the administrative expenses may be.  We know to a large degree what they are today.  But in a Chapter 7, there will be additional expenses of the Chapter 7 trustee that come ahead of not only unsecured creditors, but the Chapter 11 administrative creditors today.  And so at the end of the day, that's a pretty hard burden to meet.  Can the litigation claims reach that level?  Maybe, maybe not.

But whatever they're worth, you got to hit 2.5, 2.7, 2.8.  You know, it may increase as the DIP A increases versus the plan.  Under the plan, it's fixed.  You've got to pay off $90 million to pay off the litigation funding. You've got to get to 350 before the DIP A starts sharing. You have to pay off all of the admin and priority claims and pay off the DIP A.  But at about 1.8, I believe maybe 1.9, the DIP A is paid off, admins are paid off, priority is paid off, and unsecured creditors start to share in the proceeds.

So we're not going to be able to tell Mr. Kelley the litigation is worth $3 billion.  It's worth $4 billion. What we can tell Mr. Kelley or any other creditor is $1.9 billion is a lot less than $2.5 billion.  And Mr. Kelley said that this may be a lottery ticket, and he's right.

There are no certainties in litigation.  But 1.9 is less than 2.5.

Mr. Ruff also said a lot about the administrative creditors of this estate, and unfortunately, they're not going to get paid in full in July.  And that's not due to anybody here today.  That's due to the fact that this business collapsed.  It is what it is.  And going to Chapter 7 is not going to change anything because again Chapter 7 administrative expenses rank above Chapter 11.  So they go into a less favorable waterfall.  They can get primed with new expenses rather than sharing pro rata with all existing expenses.

And so at the end of the day again they look to the waterfall.  What does a waterfall look like for a Chapter 11 admin expense creditor?  It's going to be relatively fixed in the plan.  Again you've got to pay off about $350 million.  You can make a decision about does money today and a little more certainty today worth waiving half of your claim.  But you're first in the waterfall and that's 16 percent.  Sixteen percent is not a lot.  But they sit behind a DIP lender who holds liens.

And you know, I'm a committee lawyer.  Every day I stand up and represent people who are owed money the same as secured creditors, but they're going to get paid less or not at all because they don't have liens.  The same thing

applies today.  Unfortunately, the admin creditors do not have liens.  And the DIP As and the DIP Bs, to the extent of the roll-up, they do.  And that's the unfortunate situation we find ourselves in and we have to figure out what is best for the estate.  How do we get everybody repaid?  Because we have to maximize the value of these litigation assets.  And I didn't hear anything that suggested how Chapter 7 does that better than Chapter 11.

Frankly, the only person who seems to do better in Chapter 7 is potentially the DIP lenders, or potentially due to the chaos of a Chapter 7 as you've heard might be multiple Chapter 7 trustees appointed, you may have dueling litigation because I think -- I don't remember if it was Mr. Kelley or Mr. Moore who said this, but I completely agreed.  In Chapter 7 there is certain to be litigation over what is happening.  Mr. Moore gave his view on what happens in Chapter 7 when the DIP lenders have a lien on the proceeds.  The committee has a view.  Ms. Gains has a view.  The committee won't exist at that point.  But you know, unsecured creditors sure will and that will certainly be litigated to nobody's benefit.

So I think that all brings us back to what's the standard today.  And I submit that there's no evidence that the U.S. trustee has provided that shows that these cases should be converted today.  The Debtors and all the plan

supporters will bear a burden of proof at the confirmation hearing.  But the confirmation hearing is not today, nor should it be today on the issue of what are these claims worth because forcing a quick decision on how much do you disclose would not benefit the estates by potentially prejudicing that litigation.  Thank you, Your Honor.

THE COURT:  Thank you.

MS. DEXTER:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. DEXTER:  Erin Dexter, from Milbank, on behalf of Onset.  There's competing motions today, passing motions.

THE COURT:  Yeah.

MS. DEXTER:  So I abstained today from commenting on the plan and disclosure statement before Your Honor.  We filed our reservation of rights.  We will be in discussions with the Debtors between now and confirmation to narrow issues where we can.  So I won't belabor that.

But I did want to speak today with respect to the U.S. trustee's motion to convert or dismiss the cases.  Onset filed a limited objection at Docket 2885.  That's directed only to the U.S. trustee's motion with respect to certain SPV Debtors at which Onset holds the overwhelming majority of claims, and as a shorthand, we've been referring to those Debtors as the Carnaby Debtors.

And Your Honor, I rise to emphasize that much of

what you heard today in terms of argument and testimony was really about what we're calling the FBG Debtors, the non-SPV Debtors.  And to the extent the U.S. trustee is seeking to convert all of the Debtors, some of their arguments just don't apply in equal force to the Carnaby Debtors as they do or as they might to the First Brands Debtors.

And that's primarily because the Carnaby Debtors as SPV Debtors here are non-operating entities.  Their admin burden and their admin burn is extraordinarily low.  And as we've heard today, the administrative expense burden of the estates as a whole is a key concern of the U.S. trustee.  That concern simply doesn't apply in equal measure to the Carnaby Debtors.  And as to the path to rehabilitation prong, Your Honor, though there is not currently today a Chapter 11 plan on file for the Carnaby Debtors, we submit that there very well may be a path to one.  But the creditors of those entities have not yet been given a fair shot at formulating and proposing one.  And we do want that, Your Honor.  Exclusivity of course plays into this question and Onset has opposed the extension of the Debtors' exclusive periods at the Carnaby Debtors for that reason.  We look forward to being back before Your Honor in about a week and a half to argue that.  So I won't argue that now.

But what I will say now, Your Honor, is that conversion of the Carnaby Debtors' cases is premature at

this juncture.  Mr. Moore today spoke eloquently on why Chapter 7 is a far less preferable alternative and one that leads to far inferior recoveries than Chapter 11.  And that same analysis applies to the Carnaby Debtors, just as it does to the First Brands Debtors.  There very well may be a Chapter 11 path for the Carnaby Debtors, Your Honor, and their creditors like Onset deserve the opportunity to explore that.

THE COURT:  Thank you.

MS. GAINS:  Good afternoon, Your Honor.  For the record, AnnElyse Gaines, of Gibson Dunn, on behalf of the ad hoc group.  I'll be short.  I think I'm the last person today.  It's been a long day.  So I'm not going to rehash anything that was said by anyone else, and we filed our papers and we stand behind that.

So I just want to raise a couple of more unique issues.  The DIP order that Your Honor entered, the final DIP order last November, early November, is 98 pages long and like 50 good paragraphs.  So it's not surprising that a lot of parties have been using it as both a sword and a shield in both of these dueling motions.

So I rise to say -- I was going to use a different analogy, but I think Mr. Ruff, he kind of used the concept of you squeeze the toothpaste out of the tube and then what happens?  I want to give you the other perspective of that

because the insinuation is that this case has been run for the benefit of the ad hoc group. We aren't estate fiduciaries. We're teamed up with estate fiduciaries that support the same thing we support. That wasn't always the case in this case. It's not always the case generally, but it exists today.

But we aren't estate fiduciaries. So it's great to maximize value. And it's obviously what we contend with in negotiating with estate fiduciaries. But it doesn't have to be the goal of the ad hoc group. But I think what's getting lost here is that the concession after concession from the ad hoc group has been for the benefit of these estates. The DIP order could very easily have been used as a sword months ago to our benefit for our collateral rights, taken or come before your Court in a different manner on these very valuable claims. We were in very hard-fought mediation/negotiation sessions to come up with a sharing waterfall that Your Honor is now very familiar with through the course of a couple of amended plans.

So going back to the toothpaste analogy, on the confirmation date, it's not just a sale and a transfer to a litigation trust. That's not the only thing that's happening. My clients on the confirmation date are providing committed, irrevocable funding to fund that process. The toothpaste is out of the tube on the whole

thing in the sense that in order to get to the recoveries, there still needs to be funding.  And we've talked a lot about -  and this will come up more in confirmation, like, what is the consequence of all that?  My clients are -- we're working through all of that.

But one of the consequences of this plan is that there's committed funding on that date, committed funding coming in to finance the litigation trust.  And the reason I raise that is because I want to take just a couple steps back on what this plan does vis-à-vis the secured creditors, the ad hoc group specifically.

The admin claims basket, from our perspective, is just not capable of being triggered because even if we got paid in full under the litigation trust, which obviously everyone wants more funds to come in, my clients are impaired.  We're impaired.  We aren't receiving cash on account of our DIP liens on the confirmation date or on the effective date.  They are taking an impaired treatment on the $1.1 billion of new money that's coming in.  They're doing that as a concession.  They are admin creditors.

They also don't have to make that concession. They could have stood up here and said to Weil and to the company, you can't put this plan forward without our consent.  And so we've consented to a budget to get through solicitation, to get through to confirmation to put on the

case.  We've made all of the consents that are needed as admin creditors, as parties that don't have to take impaired treatment and that have a very lengthy DIP order that would protect them if they didn't want to do that.  And so we stand here today in a very different posture because we're secured, and I recognize that.

But we still stand here in a posture where you have new money loans impaired and accepting impaired treatment to facilitate a plan that benefits a whole host of other creditors.  And that just might not be the case in a Chapter 7.  And there's a lot of speculation about that.  And I don't want to go into that because I think there's too many open variables, and I think Your Honor is familiar with them.  So unless Your Honor has any questions, that's everything from the ad hoc group.

THE COURT:  No questions.  Thank you.

Does anyone else wish to be heard?  Here's a 312 number.

Mr. McGuire?  You may be on mute, Mr. McGuire.

MR. MCGUIRE:  I sure was, Your Honor.  Sorry about that.  Dan McGuire, from Winston Taylor, for the ABL agent. Your Honor, I'll be very brief.  I don't want to repeat things either.

I just want to point out that there is no evidence in the record after today of any -- not only no substantial

and continuing loss, but really no loss at all.  The funding between now and the end of July to get to a confirmation hearing is being entirely provided by the DIP lenders and the ABL lenders.  There is no projected increase in administrative claims that will be unpaid between now and that date.  Therefore, it's nearly impossible to show that there will be a substantial and continuing loss or harm to creditor between now and then.

Why are we doing that?  Because the ABL lenders, and presumably the DIP lenders, and presumably the committee all think this path is a recovery maximizing path.  Under those circumstances, Your Honor, where we've got a plan that, sure, it has provisions you don't see every day, but there's precedent for every one of these provisions in this plan that's out there.  Therefore, while there may be challenges to confirmation, it's not patently unconfirmable on its face.

So let's solicit this plan.  Let's let the creditors vote.  The creditors are here saying they think this is value maximizing.  We're not hurting people by going out and soliciting this.  And let's get to a confirmation hearing.  The world will turn between now and then.  It may get better from some people's perspective between now and then.  But there's really almost no harm to anyone in doing that other than the parties that are putting the money where

their mouth is and saying this is better.  We will put money out here to get to confirmation because we think it's better.

So, Your Honor, we think under these facts and circumstances, it's worth solicitation and that the burden just hasn't been met to convert these cases.  And really, there's no evidence that this plan is patently unconfirmable.  Thank you.

THE COURT:  Thank you.  Thank you.  I'm going to hear two more folks and the other folks who have hit -- there's a 646 number.

MR. ZYLBERBERG:  Your Honor, David Zylberberg, of Simpson Thacher & Bartlett, for the SPV entities.  I just wanted to raise two points, the first of which is we did not take a position at today's hearing because we don't think this is a conflict matter.  This Debtors moved on behalf of all Debtors who opposed conversion.  But we may have views at confirmation and we reserve all rights.  We're simply -- there's no -- there's no misalignment between the silos at today's hearing.

And then just a second point, which is a housekeeping point, shortly before this hearing, we filed a certification of counsel for a settlement between Global Assets GmbH and the UMB agent.  This is one of the SPV entities.  We've achieved consensus, which seems hard to do

in this case, but we've done so.  So that's at Docket Number 2986.  And we just want to make sure that no matter the outcome of today's hearing, that settlement gets entered.  It's also kind of evidence that there is continuing productive activity on the SPV side of the house in Chapter 11.  Thank you.

THE COURT:  Way to sneak that one in, Mr. Zylberberg.  I appreciate it.

There's a 516 number?

MR. GRILLO:  Your Honor, that's me, Emmanuel Grillo, on behalf of the Raistone party.  It's been a while, Your Honor, since we've appeared in the cases, with my partner, Laura Metzger and our colleagues.  Obviously, Raistone itself was one of the casualties of these cases.  We obviously still represent the Raistone investors in connection with the receivables financing as well as the supply chain financing.

We think there's a really simple answer for now, Your Honor, and that is to allow the plan to go forward.  The motion to convert can effectively be adjourned to confirmation.  I think if people don't -- if confirmation doesn't work at the end of the day, if the Debtors don't meet their burden and the like, I think everyone understands what the result is going to be.

There's no reason to do that today, and there's no

reason really to rule on the motion today.  We can carry the motion until the end of the confirmation hearing and do it then.  I think what the Debtors made clear is that the marginal cost at this point, especially given all of the resources that have been committed to these cases over the last number of months and how hard people have worked to get to a result at the end of the day, maybe we get there, maybe we don't.  Even the result, if we get to it, that's the plan, is certainly no one's idea of anything that's terrific.

We're not commenting on anything specific today.  But we do think that the Debtors should have the opportunity to try and confirm their plan.  If they can't, we all know what's going to happen.  Effectively, the motion grants itself with respect to conversion or dismissal.  So it would be our suggestion, frankly, that that motion just be carried.  The Court doesn't have to rule on it today.  And then we get to confirmation.  And then if confirmation doesn't go forward on its current schedule, then Your Honor can always pick the motion to convert or dismiss back up.  So we're not in an endless loop of adjournments and things like that.  That's all we have, Your Honor.

THE COURT:  Thank you.

Okay, and I know you're going to tell me that I got a rule on it within 15 days.  So you're going to get a

ruling today.

MR. RUFF:  You got it.  You got it right, Judge.

THE COURT:  Thank you.

MR. RUFF:  We agree.

THE COURT:  Give me -- I'll come back at 4:30 and give everyone an answer.  Thank you.

CLERK:  All rise.

(Recess.)

THE COURT:  All righty.  This is Judge Lopez back on the record in First Brands.  I'm going to take up and rule simultaneously on the U.S. trustee's motion to dismiss or convert these cases under Section 1112(b) of the Bankruptcy Code and the Debtors' request for conditional approval of its disclosure statement and related plan solicitation, related procedures and proposed dates.

I'm going to find for both motions there's been proper notice and service of each under the circumstances and notice of hearings as well, and the Court has jurisdiction to consider these matters under 28 USC 1334.  Both constitute core proceedings under 28 USC 157(b).  One involves dismissal or conversion of a case.  One seeks approval to solicit votes in connection with the Chapter 11 plan.  It's as core as you get on both of them.

I note that the Court has considered the evidence based in the record today and considered the testimony of

Mr. Moore and the documents.  And here's the Court's ruling, and I'm going to take up first, because it was the first one filed, the motion to dismiss or convert.

The U.S. trustee seeks to dismiss or convert these Chapter 11 cases under Section 1112(b) of the Bankruptcy Code for cause.  I'd say it's supported by Katsumi who had very strong questions in connection with both the motion to dismiss and also not to approve conditional approval of the disclosure statement.  The Court has also considered the arguments of all parties and has read all objections.  So as always, let us begin with the text.

Section 1112(b) establishes a two-step structure, and the two steps ask different questions about different things.  Section 1112(b)(1) says that on request of a party-in-interest, then after a notice and a hearing, a Court "shall convert a case under this chapter to a case under Chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate for cause."

The first question is whether cause exists.  There are 16 examples of cause listed in Section 1112(b)(4).  The examples of cause describe a present condition of the estate or a course of the debtor's post-petition conduct.  The examples are about, for example, substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.  That's gross

mismanagement of the estate, the failure to maintain insurance, unauthorized use of cash collateral, the failure to comply with an order of the Court, the failure to pay taxes or to satisfy filing and reporting requirements, including failing to file a plan or a disclosure statement within the time set under the Code or as prescribed by a Court order.

Cause really comes down to looking at the facts about what's happening to the estate and what the debtor is or isn't doing.  They highlight instances of distress or a debtor in some form of a default.

Assuming there is cause, Section 1112(b)(2) provides for a mandatory inquiry that may result in not converting or dismissing even if (b)(1) says you shall convert for cause.  It says the Court may not convert or dismiss a case if the Court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interest of creditors and the estate.

In addition to kind of this unusual circumstances, the Court must also find that there's a reasonable likelihood that a plan will be confirmed within a reasonable period of time, together with a reasonable justification for in a timely cure of any act or omission that may have given rise to the -- you didn't pay your taxes, you can cure by,

the Court can find that you can do that timely.

The U.S. trustee says there's cause and relies on Section 1112(b)(4)(A) which is the substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.

Textually, 1112(b)(4)(A) is best read as two prongs, right?  First, the movant must establish that there's a substantial or continuing loss to or diminution of the estate, and then second, the absence of a reasonable likelihood of rehabilitation.  The first prong is a present factual inquiry into the condition of the estate.  Is the estate suffering a substantial or continuing loss or diminution, right; that is, value presently being lost or are there liabilities mounting without the ability to change?  There can be a substantial loss like a onetime hit or there can be a continuing loss.  If there's a substantial or a continuing loss to or diminution of the estate, the second prong asks whether there's a reasonable likelihood of rehabilitation.

So textually, the first prong identifies loss or a diminution of the estate.  Either it happened or it's continuing to happen.  The second prong asks whether that loss or diminution is reasonably likely to be stopped.

Within Chapter 11, the word rehabilitation, right, define a reasonable likelihood of rehabilitation.

Rehabilitation.  The word appears in Chapter 11 only in Section 1112, and across Title 11, it appears twice, once in Section 1112(b)(4)(A), a second in Section 1208(c)(9), which is the parallel conversion or dismissal provision in Chapter 12 cases, which are for farmers.  Both times Congress used the word in a conversion provision.

I think it's important to highlight textually that Section 1129, which governs plan confirmation, doesn't use the word rehabilitation.  Section 1129(a) sets out the requirements for confirmation.  Congress used rehabilitation in 1112(b)(4)(A) and kept confirmation requirements in Section 1129 separate.

Webster defines rehabilitation.  So that's kind of the intertextual analysis.  You first look to see if it's being used, how it's being used within the Code itself to derive meaning.  And then second, you can also -- if it's hard to -- if one is trying to look for meaning, you can look within the text first.  And then you can also look to kind of the plain language definition sometimes.

And Webster defines rehabilitation to mean to restore.  It's a deverbal noun, right?  It's a noun that retains its kind of verb character.  It's like when someone says they're going on a run.  The run is the noun.  It's a deverbal noun.  Rehabilitation takes rehabilitates and kind of makes it a noun.

In sum, what does all that mean?  Rehabilitation is best understood operationally.  When there's a substantial or continuing loss, rehabilitation is about whether something's reasonably likely to happen that ends the bleeding, if you will.

Framed this way, the absence of a plan is not what dooms the debtor, and the presence of a plan is not what saves one.  A debtor can demonstrate a reasonable likelihood of rehabilitation without filing a plan at all, right?  A debtor has -- could obtain new financing, or it could show a likelihood that there was some operational change.  A debtor can reject certain contracts.  A debtor can make certain operational changes, right?  And all that could show that the substantial loss or continuing loss, there could be a rehabilitation, a restoration.  Debtors can point to a materially improved forecasting, right?  Like this is not a good season for us, but here comes the holiday season and we're going to make a lot of money there.  It's supported by actual changes in revenue, cost structure, or funding rather than just mere hope, right?  It shows rehabilitation because the trajectory of loss can be reversed.  In those examples, there doesn't need to be a plan because what supplies the likelihood of rehabilitation is the kind of some operational event or some event that can stop the loss.

A Chapter 11 plan can, however, supply the same

likelihood in the same operational way, but just not because you just filed one.  A plan that proposes to liquidate can be the answer to a motion to convert because an orderly liquidation that caps and terminates, kind of stops administrative burn, maybe marshals assets and brings the case to a defined conclusion is itself the operational stop of continuing loss, or of substantial loss.

So a plan of liquidation that stops losses, I find is consistent within the text of 1112(b)(4)(A); for example, a placeholder plan that's just a piece of paper, right? There are a lot of cases, I think, talking about what rehabilitation means.  I think this is what those cases are trying to get at.  I'm just sticking closely to the text.

My reading is entirely grounded in the statutory text.  I think it's also the reading that avoids an absurd result, right?  Because if a filed plan defeated cause just because it was filed, then someone could just file a plan the night before and 1112(b)(4)(A) would just turn into a functional checklist and there'd be no cause inquiry necessary.  But if a plan could never be relevant to rehabilitation at the cause stage, right, if it could only be considered in kind of the unusual circumstances, then you get this kind of strange, absurd result where you've got a plan on file and somebody could file a motion to dismiss and you'd have to find unusual circumstances.

Well, I've got a plan on file and there's nothing unusual about getting a plan on file that seeks to maybe liquidate or even a plan that's confirming.  But if it followed a substantial loss, it just -- it leads to that you've got to then go find that there's a likelihood that a plan can be filed.  Even if there's a plan that's already on file that maybe already been scheduled, you don't have to get to the override provision.  You should be able to deal with it at the cause level.

So how does all of this apply today?  The first prong is whether there's a substantial or continuing loss or diminution to the estate.  I think that's easily satisfied today for many of the Debtors, right?  There was a billion dollar DIP and it's basically gone.  The Debtors had to sell assets sometimes with the assistance of proposed buyers.

I'll take judicial notice of the record, right? There's over $200 million in admin claims and an overwhelming amount can't be paid now, right?  Several cases have already converted.  Professional fees continue to accrue.  The Debtors can't make it to August.  There's no operating business left.  Everybody quite frankly in this case is fighting for every solid dollar they can get their hands on.  That's what's happening.

So this can apply for the FBG Debtors.  I do note I don't have evidence that it applies to every Debtor like

the ones that are called the Carnaby Debtors or other related SPV Debtors.  But so the question, I don't think with respect to the SPV Debtors I heard sufficient evidence.

But let's just go to the next prong.  Assuming that there was, is there a reasonable likelihood of rehabilitation?  I think the first plan proposed by the Debtor was built on a global settlement.  I didn't grant conditional approval of disclosure statement for the reasons I stated on the record at that hearing.  I stand by every word there.

There's a new plan on file.  It proposes to establish a trust and pay creditors.  Kind of has all the -- at least the FBG Debtors in a plan here and not kind of doing the one-off premier thing.  Proposes to wrap the case up at least to plan confirmation in the next 45 days. Proposes to fund and essentially limit professional fee burn through the confirmation of the plan and it proposes to rehabilitate by bringing the case to a close.

Today's not the day to test whether the plan can comply with the Code confirmation standards.  But there is a fact-based operational fix and it's supported by a lot of the creditors here at least at this stage.  The plan proposes to satisfy with the agreement of the ABL which would have been a gating issue today obviously and the DIP lender, had the DIP lender changed or the ad hoc group

changed their minds.

So I think for that reason there's not an absence of a reasonable likelihood of rehabilitation because we were talking another five, six months, three, four months.  The parties are still in mediation.  I think that could have gotten -- I think a stronger case would have been there.  There's a plan and there's a request to come out in 45 days and that's really kind of a hard deadline.  I don't need to get to 1112(b)(2) on those facts.

But I do find quite frankly that there would be unusual circumstances here.  I'm never seen a DIP lender proposing to compromise billions and allow admin creditors and some general unsecured creditors to partake in something, especially in a case in which not every dollar can be accounted for, and that started quite frankly from the beginning of the case.

The plan on file has a possibility of confirmation, but that's really all that's being asked for today.  So I think it's in the best interest of creditors, many of whom I've heard today, to deny based on the record.

I want to be really clear here though today the Debtors are going to have to satisfy every section required under the Code.  Much of the testimony today and the objections went to plan confirmation objections.  Based on what I heard today, feasibility is going to be an obvious

issue.

I do think the disclosure statement should include statements about what happens to funds in the factoring account and whether they're going to be transferred and if so, where, and that includes the receivables that are coming in.  My understanding is that the current version of the plan requires the wind-down administrator to segregate the fund funds in the account, including the new funds that are coming in .  This should be made clear in the disclosure statement.  If it is, then just it is.  But just I want to make sure.

I would note that at plan confirmation the Debtors, they're going to have to provide details on payment of admin claims and the proposed effective date, right, and whether that's a -  what they think the proposed effective date is.  And we've already heard that's going to be heavily contested and I know they know this, but you know, just citing Steward and telling me it's the best deal for everyone's not going to get it done.  There are some strong objections raised.  It sounds like the credit bid has proposed -- it's going to get teed up for a decision as well, and I'll be ready.

The Debtors are also going to have to convince me that giving a litigation trustee the right to just allege a wrongful act, whatever that means, means that you're an

adverse creditor and that somehow is grounded in a legal basis and that somehow is an objective metric, at least the way I read it.  If that's the case, then there needs to be disclosure, if that's the case, that you can voluntarily give something and then someone can come in and allege something, that something is wrongful, whatever that means.  And if it's wrongful, they should define it.  I know that there's other objections to that point.  That's just the one that I point out.

I do note that there are also creditors who filed objections and they're going to have their voices heard in their day and they'll be able to take discovery and connection with plan confirmation and lodge objections.  It's probably going to include voices I didn't hear from today because today's not the day for plan confirmation.  But I think the day for that will be confirmation, which is from where I sit, the last real shot.

The proposed plan only covers the FBG Debtors, but I think the same result would be for the remaining Debtors because the inquiry under 1112 is debtor by debtor.  And I'm not really sure there's been an individualized showing of cause as to any of the SPV Debtors.  But the denial is without prejudice.  I'm not really sure someone's going to need to file a motion, but that's without prejudice.

I'm also saying nothing about other pending

motions that are -- exclusivity, what you have, what have you, stuff like that.  But I'm going to conditionally approve the disclosure statement.  But that means everyone's rights are preserved in connection with the final and disclosures therein.

I'm also going to approve the voting and the solicitation procedures.  I obviously take voting real seriously.  So we'll see how it goes.  That's my ruling.

I'll get a short order on file.  I don't know what happens at plan confirmation.  But that's what plan confirmation hearings are for.  I encourage the parties to continue to talk to at least, from my perspective, at least crystallize the issues that will be relevant at plan confirmation.  Everybody's rights are reserved in connection with disclosures under the disclosure statement and final approval of plan confirmation.

I think it's important to note that come end of July, we'll know exactly where this case is going.  We'll take it up there.  We'll take it one step at a time.  Thank you very much, everyone.  We're adjourned.  Thank you.  Everyone's excused.  Thank you.

MR. RUFF:  Thank you, Your Honor.

MR. SINGH:  Thank you, Your Honor.

THE COURT:  Have a good weekend.

(Proceedings adjourned at 4:53 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Sonya M. Ledanski Hyde

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  June 16, 2026