<u>**Exhibit 3**</u>

**Transcript for July 21, 2026 Oral Ruling on LAM Parties' and Katsumi's Motions to Compel**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

                                ) CASE NO: 25-90399-cml
                                )
FIRST BRANDS GROUP LLC,         ) Houston, Texas
                                )
            Debtor.             ) Tuesday, July 21, 2026
                                )
                                ) 9:00 a.m. to 9:50 a.m.
------------------------------)
FIRST BRANDS GROUP, LLC et al.) CASE NO: 25-03803-cml
                                ) ADVERSARY
            Plaintiffs,         )
                                )
      Vs.                       )
                                )
SEALED DEFENDANTS et al.        )
                                )
            Defendants.         )
------------------------------)


RULING HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Debtor:              CLIFFORD WILLIAM CARLSON
                         Weil Gotshal and Manges LLP
                         700 Louisiana Street
                         Houston, TX 77002


For Katsumi Servicing:   CHARLES S. KELLEY
                         Mayer Brown LLP
                         700 Louisiana Street, Suite 3400
                         Houston, TX 77002

For Leucadia Asset       PAUL E. HEATH
Management:              Wachtell, Lipton, Rosen & Katz and
                         Vinson & Elkins LLP
                         845 Texas Avenue, Suite 4700
                         Houston, TX 77002

EMIL A. KLEINHAUS
Wachtell, Lipton, Rosen & Katz and
Vinson & Elkins LLP
51 West 52nd Street
New York, NY 10019

For Evolution Credit     MICHAEL DUKE
Partners:                Elsberg Baker & Maruri PLLC
                         One Penn Plaza, Suite 4015
                         New York, NY 10119

For Onset Financial &    ERIN DEXTER
Silver Point Capital:    Milbank LLP
                         1101 New York Avenue NW
                         Washington, DC 20005

For Unsecured Creditors  MICHAEL WINOGRAD
Committee:               Brown Rudnick LLP
                         7 Times Square
                         New York, NY 10036

For Ad Hoc Group of      ANNELYSE SCARLETT GAINS
Lenders:                 Gibson, Dunn & Crutcher LLP
                         1050 Connecticut Avenue, N.W.
                         Washington, DC 20036

Court Reporter:          YESENIA LILA

Courtroom Deputy:        YESENIA LILA

Transcribed by:          Veritext Legal Solutions
                         330 Old Country Road, Suite 300
                         Mineola, NY 11501
                         Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

HOUSTON, TEXAS; TUESDAY, JULY 21, 2026; 9:00 AM

THE COURT:  Okay.  Good morning.  This is Judge Lopez.  Today is July 21st.  I'm going to call the First Brands case.  If someone can just -- Mr. (Indiscernible), I see you there.  If you can give me a thumbs up that you can hear me, I can get started.  Okay.  I appreciate everyone showing up.  I'm going to read about ten-and-a-half pages, so, my goal, after this hearing, is to upload the audio right away.  So, hopefully 10:30, it will be up, just in case the parties need.  I just want the parties to know that we're going to try to do that as soon as the hearing is over, but it takes a little bit of time to, kind of, upload it.  But we'll get it there.  I'm just going to start, unless someone tells me otherwise.  All right.  Here we go.

The LAM parties and Katsumi Servicing move to compel discovery, Evolution Credit Partners, and Onset Financial, join the parties' dispute, mainly the scope of mediation, confidentiality, the reach of the common interest doctrine and the Debtors' responses to certain interrogatories and requests for production.  The Court has reviewed the motions, the Debtor's objections, the replies, the discovery responses, and prior orders approving mediation.  I also reviewed the declarations of Mr. Moore and Mr. Kirschner just to understand what is stated in them for purposes of addressing the motions to compel and not for

the truth of anything stated in them.  I also reviewed the transcripts of the May 20, 2026 hearings and the record.  I also heard argument yesterday and considered the arguments of counsel.

I'm going to start with mediation confidentiality. The Debtors and the plan proponents were in mediation from January 29, 2026 through March 27, 2026.  Katsumi seeks the facts -- primarily Katsumi seeks the facts underlying mediation discussions about estate causes of action.  At the hearing, Katsumi set its focus on the causes of action the Debtors identified in the plan supplement, which are the claims the Debtors will presumably address in connection with plan confirmation.  Movants and the plan proponents dispute the value of those claims.  Katsumi seeks communications, like side conversations among the mediation parties, not sessions with the mediator.

The Movants also argue, in their papers, that no federal mediation privilege exists and that any protection ended when the mediation expired.  The Debtors rely on this Court's mediation orders and not recognizing a federal mediation privilege.  The Fifth Circuit has cautioned that confidentiality and privilege are not the same, in the case, In Re: Grand Jury Subpoena, 148 F.3d (487) (492), Fifth Circuit 1998.

But I will enforce my own orders entered by

agreement of the parties and I expressly retained authority to retain and enforce them.  Those orders are final.  Those orders provide that discussions among the parties, mediation statements and other documents provided to the mediator or the parties in the course of the mediation, correspondence and draft resolutions in connection with, and as a result of, the mediation and offers and counterproposals won't be admissible, discoverable, or otherwise, for any purpose in any proceeding outside of the mediation.  Those discussions are confidential.

Katsumi argues this reaches only submissions to the mediations and only when formal sessions occur.  I don't agree because it doesn't reflect how mediation works in complex Chapter 11 cases.  Mediation in complex cases often involves more than two or three parties.  Many parties negotiated ones with and without the mediator present, but always under the mediator's supervision and instruction. The mediator may assign work between sessions, and the parties return with it.  The mediator focuses on one part of a deal while other parties work on another.  Confidentiality protected by a court order is the beating heart of that process.  It doesn't work without it.

First Brands is among the most complicated cases ever filed.  This is not a two-party liability dispute. There are proposals that could move between constituencies.

No clean line separates what happens inside a session from what happens in furtherance of it.  There's no such thing as a mediation session set.  You have to have rooms full of people at all times.  The guidance and supervision of the mediator is the key link.  The orders were drafted that way for a reason.  A session-by-session approach would make the protection illusory.  The orders do not draw the line that Movant, primarily Katsumi, proposes, because that line cannot be drawn.

Communications tied to the mediations' discussions and negotiations are covered.  So, communications falling within the categories described within the mediation orders exchanged from January through May 27th are protected from discovery in the confirmation hearing.  That period begins with the entry of the first mediation order and ends when the mediation period expired by its own terms.  It doesn't expire past March 27th.  The parties, I believe, resolved this already.  But to the extent they're not, I read in the Debtor's response in response to the (Indiscernible) Interrogatory No. 8 that mediation protection ran from January 29th through the present.  I'm going to overrule that, but I think that's already been already addressed.

One limitation, all of the mediation orders incorporate Paragraphs 48 through 57 of the procedures for the complex cases in this District.  Paragraph 53 says that

information otherwise discoverable, does not become exempt merely because a party used it in mediation. And so, I read my orders as a whole. Mediation communications are protected. The preexisting facts, business records, financial data, and analysis generated independently of the mediation don't become undiscoverable because someone carried them into a mediation session or handed it to a mediator. I stress: the analysis generated independent of the mediation is not protected. Analysis prepared in connection with the mediation is protected.

I'll turn to common interests. The Debtors assert two common interests. One related to the investigation and prosecution of estate claims shared with, among others, the Creditors Committee, from its inception, and the Ad Hoc Group from September 27, 2025. In one relating to plan settlement negotiations and prosecution of the plan, which was shared with negotiation parties from May 20th going forward -- May 20, 2026, going forward. Common interests is not an independent privilege, it is an exception to the rule that disclosure to a third party waives the attorney/client privilege. The threshold question is always whether the underlying communication was itself privileged. If it was not, the doctrine has nothing to operate on. Factual information provided to a counterparty is not transformed into privileged material because the parties share

objective.

The binding authority in this circuit is, In Re: Santa Fe International Corp., 272 F.3d (705), Fifth Circuit 2001.  And it was recently affirmed in U.S. v. Brown, 151 F.4th (647), Fifth Circuit 2025.  I'm going to focus on Santa Fe.  Santa Fe holds that the doctrine protects two categories of communication, those between co-defendants in actual litigation and their counsel and those between potential co-defendants and their counsel.  Because the privilege obstructs the truth seeking, the term "potential" is construed narrowly and there must be a palpable threat of litigation at the time of the communication, rather than mere awareness that questionable conduct might someday result in litigation and the party asserting the doctrine bears the burden.

The authorities many people relied on in this, primarily were In Re: Tribune, which is the 2011 Delaware, February 2011 holding, In Re: Imerys Talc and other -- a 2021 Delaware bankruptcy case.  There were two of them, actually, a 2021, February 23rd holding and an August '21 holding.  And then, In Re: Leslie Controls, Inc., a Bankr. Delaware 2010 case and In Re: Velo Holdings, a Bankr. 7th District of New York 2012 case, all apply Third Circuit of New York law, which, kind of, holds that principally, the substantially similar legal interest test.  That was

articulated in In Re: Teleglobe Communications, Tribune quotes authority stating that the privilege applies even where the parties' interests are adverse in substantial respects.  I'm applying Santa Fe, but I do think Delaware and New York decisions were persuasive on certain points, and I'll talk about those.

Let's talk about plan negotiations.  The Debtors argue that the plan proponents who have agreed on the material terms of restructuring share a common legal interest in obtaining confirmation and Movants respond that no such interest is cognizable in this circuit because Santa Fe only recognizes communications among co-defendants and potential co-defendants defending a -- facing, excuse me, a palpable threat of litigation.  I should note that the circuit didn't specifically define "palpable", but the circuit contrasted that with "a mere awareness that one's questionable conduct might someday result in litigation."  So, the focus is on what is perceived at the time of the communication, and not with the benefit of hindsight.

I'd also note, and if we were just to look at the plain definition of "palpable", you, kind of, go to an awareness at the time, a real awareness at the time.  So, it, kind of, goes to what the circuit was defining, or using in contrasting with, kind of, a mere awareness that one day it might result in litigation.  I hold that a common legal

interest may exist among joint proponents of a Chapter 11 plan defending that plan against confirmation objections and as such, an interest exists here.

A contested confirmation proceeding is actual litigation.  It's a contest matter under Bank. Rule 9014. Rule 9014(c) applies discovery and evidentiary rules to a contested matter.  So, it's litigation in substance and not just in name.  It proceeds on pleadings, discovery, witnesses, exhibit lists, in an evidentiary hearing.  The plan now before the Court and the one that was rejected at the disclosure statement hearing, both face palpable threats of litigation.  There were billions of dollars missing.  The record contains allegations of fraud.  Quite frankly, everything in this case is contested.  And the Movants have challenged every plan the Debtors have proposed, the LAM parties, Katsumi, Evolution, Onset, throw the U.S. Trustee in there, and others have filed objections.  A party doesn't have to wait for objection before the threat becomes palpable.  Waiting, that is -- it's inconsistent with the definition of "palpable" and it also defeats the purpose.

The Debtors, the Committee and the Ad Hoc Groups stand on one side of that proceeding and the proponent bearing the burden under Section 29.  They bear the burden under Section 1129, and the objecting parties stand on the other.  But the proponents are not styled defendants doesn't

change the structure.  They are aligned parties defending a common position against adversaries in a pending adversary proceeding, in a pending adversarial proceeding.  I don't want to confuse adversary with adversarial.  They're adversarial, they're on the other side.  That's the circumstance that Santa Fe describes.

A limiting principle does apply recognizing a common interest does not make everything that plan proponents say to one another privileged, right.  The interest that I'm recognizing here is an interest in defending the plan against objections and obtaining confirmation.  The common interest is not an interest in negotiating plans' terms among themselves.  Mediation confidentiality may or may not cover some of that separately, right.  It depends on when it was spoken.  But I do think Judge Sontchi's distinction in Leslie Controls is the right one.  Parties may share a common interest in the size of the pie, while holding opposing interest in how the pie is divided, right.  Communications directed at defending the plan against the objections now pending may be protected.  A holding doesn't disturb the requirement that communications be independently privileged.

As Judge Carey, the late great Judge Carey, who I wish I would have spent more time with, observed in Tribune, fixing the date on which a common interest arose does not

mean that every subsequent communication is protected.  The asserting party must still show an underlying attorney/client work product or attorney/client work product privilege, and that the communication was made in the furtherance as a matter of the common interests, and that it was designed to further that effort.  The interests here arises from a pending contested proceeding to confirm the plan that's before the Court.  It cannot predate the proceeding it defends.

So, that brings me to the date.  The Debtors (indiscernible) May 20, 2026 on the grounds that an agreement in principle was reached and announced in open court.  I carefully reviewed that transcript.  Debtor's counsel said that he thought the Debtors had finalized their agreement with the committee and an ad hoc group.  And what had been filed that afternoon reflected an agreement and that there remained some open issues about -- that there may be some open issues about definitive docs.  Counsel for Evolution identified what he described in that record as some drafting errors and the definition of "ineligible" or "eligible" creditor definition.  Counsel for the LAM parties identified two items that were still not to be resolved.  Counsel for Bank of America stated that the ABL members were not supportive of the plan as filed.  Neither the ad hoc group nor the committee confirmed any agreement on the

record that day.  But all this does establish, as an aside, a palpable threat of litigation.

But I think May 20th works for, kind of, what was agreed upon between the parties on that day.  But it's possible something else was still being negotiated and it may move the date as to other stuff because six days later, on May 26th, I considered conditional approval of a disclosure statement and on May 27th, I entered an order denying it.  I didn't deny it on notice or timing ground, I denied it because (indiscernible) over the, kind of, what the settlement sought to accomplish, and the parties came up with a different structure, a different plan and a different disclosure statement that was conditionally approved.

Judge Carey, in Tribune, fixed the common interest date by the date mediator term sheets were on file.  He considered and rejected arguments that continued negotiation (indiscernible), but only after finding that the term which had changed distributable enterprise value was not material. So, the Debtors are pointing to, kind of, an oral characterization by their counter.  Imerys, kind of, pointed to the same direction.  There, Judge Silverstein, fixed the date, as the date plan proponents had a common legal interest confirming the plan.  I would note in that case, though, neither objective seriously contested the representations were materially agreed on that date.  So, it

is possible that treating every communication from May 20th forward as protected sweeps too broadly.  It's possible that there were some material changes that were made.  I just don't have the evidence in front of me.  So, I think it's possible that independent discussions may have continued where there was serious disagreement.  I think the Movants are entitled to a privilege log and I think they may be able to explore questions about agreement on those points May 20th going forward.

We talk about the estate claims and the credit bid.  Except that a debtor of creditor's committee and a funding lender may share common legal interests in investigating and prosecuting estate causes of action against third parties.  To the extent the Debtors, the Committee and Ad Hoc Group exchanged privileged legal analysis directed at developing claims against potential defendants, and to the extent the palpable threat of litigation against those defendants existed, that exchange did not waive privilege.  The parties who are targets of those claims are not entitled to that analysis through plan discovery.

I think Judge Glenn in Velo Holdings supports that conclusion.  Judge Glenn sustained debtor's objections and found that common legal interest between the debtors and the admin agent there covered certain analysis.  I do think Velo

is distinguishable in one respect that matters here, right. The agent in Velo was not bidding for the assets, and the ad hoc group is the credit bidder for estate claims. A seller and a bidder are adverse on price. The estate must maximize value. A bidder is not expected to bid against itself. I think here, Imerys is instructive. Parties may share an interest in the size of the pie while holding conflicting interests in how the pie is divided. Prosecuting estate claims enlarges the pie, pricing a credit bid may divide it. So, I think I would note that Imerys, and again, those cases are reaching conclusions under, kind of, the Third Circuit standard.

But I think the Debtor's position as to credit bid discussions, that position fares no better under Santa Fe. I don't think a common interest protects communications about the price, terms and negotiations about estate claims credit bid transactions or what information was provided to the ad hoc group in its capacity as a bidder. The line is subject matter, right, not date. Privileged legal analysis directing at prosecuting estate claims against third parties may have been withheld and logged. Information transmitted to the ad hoc group in its capacity as a bidder in communications about what it would pay, may not pay, that line is fine. But I think it's the right line.

I think the Debtor's own responses to the LAM

Interrogatory No. 8 illustrate the difficulty with their position.  And again, it may have changed, but I'm just, kind of, doing this based upon my information at the hearing yesterday and trying to reconcile everything.  In one sentence, they assert that documents exchanged with the ad hoc group about estate claims are protected.  But they also state that they're not claiming privilege as to documents exchanged with any bidders participated in the process.  Now, the ad hoc group is the bidder, right, so both statements can't be true.

I make an observation, Mr. Moore's declaration states that the Debtors offered interested parties meetings with the Debtor's litigation counsel and members of the A&M Investigation Team.  If the Investigation Team briefed their party bidders under NDAs and that bears on any claim that the same material is privileged against the Movants, at a minimum, the Debtors are going to have to disclose what information was provided to any bidder in its capacity as a bidder.  The Debtors seek approval under, I think what's, kind of, a hybrid, 1123, with parts of Section 363.  I didn't see 363(k) and that's what (indiscernible).  And the bidder seeks the protections of 363(m), the Court's going to need evidence to make findings, and adequate production is going to matter for that reason.  It doesn't necessarily reach draft pleadings provided in mediation or in efforts to

enlarge the estate.  There's a lot of actions that are already pending and allegations are already on file.

I know the Committee has also filed, I think, in connection with that -- I think they sought -- well, the Debtor -- the Committee has also sought standing to pursue claims and made statements there.  But also, in connection with that automatic stay hearing.  They made a presentation to me about -- some of this is already in in the public record.  More may remain to be produced.  But I do think the Debtors are going to have to say what they gave to the ad hoc group in its capacity as a bidder.  Some of it may be -- at the time it was in its capacity as an ad hoc group member before it turned into a bidder.  But I think there's a subject matter matters here.

Let me talk about the Moore declaration.  Moore is not just a professional.  He's the Chief Restructuring Officer and the Interim Chief Executive Officer of the FBG Debtors.  He's saying, and again, I'm not taking this for the truth of the matter asserted, I'm just saying what's stated in the declaration, that he has independent, non-privileged knowledge of the company's books and records and operations that he can testify from.  The Movants argue his knowledge derives from the special committee investigation.  The declaration doesn't say that.  The special committee, as I read it, appears in it principally in connection with

government and exculpation.  That being said, I don't want to, kind of, parse the Moore declaration.  Parties will have studied it far more than I have.  I will say a party can't place analysis in evidence and withhold it.

The declaration does considerably more than just recite facts within Moore's personal knowledge, from my reading, it states that he and his A&M team uncovered significant facts through an extensive month-long factual review.  It states that A&M's analysis indicates a scheme beginning as early as 2018.  And there were, like, over $20 billion in transfers and there's a chart, and states that about over $5 billion in liabilities outstanding as of the petition date were unrecorded and under-recorded.  And in Paragraph 62, the declaration names Katsumi and Leucadia and states that those parties obtained documents and examples of invoices and otherwise discovered material irregularities related to the scheme.

The Debtors are entitled to make that case through Moore or maybe Kirschner.  But they're not entitled to make while withholding its foundation from the parties they've accused.  The Debtors must produce analysis and underlying materials supporting the findings, figures, statements that Moore relies on about what was identified in the Moore declaration.  So, the waiver is, kind of, if one can call it that, it's targeted, what I'm talking about.  Whether it

reaches a special committee investigation depends on what Moore relies on, and I don't think the record before me adequately discloses what that is yet.  But I do think it touches the analytical work and source materials supporting the quantified findings and statements about identified parties.

So, I'd say that the Katsumi request for production and the LAM parties' corresponding request is granted to that extent.  I don't think the Debtor's offer to meet and confer is an adequate response.  And all parties reserve their rights as to whether Moore may offer to -- I'm not getting into, kind of, what Moore may ultimately testify about and whether he's qualified to give opinions or facts, disputes.  I'm not talking about that.  I'm just saying, parties are entitled to discovery about what's in there and I'm just pointing to that.  Everybody's rights are reserved about -- I'm trying to not get into, kind of, taking a matter for the truth of matter asserted or that what he will testify in there.  I'm simply reviewing, to the best of my ability, 112-page declaration and parsing through it and identifying, trying to give the parties guidance.

I'd note that the parties also filed a declaration of Mark Kirschner and that was filed about seven days ago. Mr. Kirschner stands in a different position from Moore. Kirschner is not an officer of the Debtors.  He was a

retained expert, retained by, it looks like, Debtor's counsel, to provide consulting services and expert testimony on the estate claims that the plan is trying to transfer to the litigation trust.  He was asked to opine about the amount of proceeds reasonably expected to be generated from those claims and anticipated timing, kind of, what could be recovered by the end of 2028.

Again, I'm reciting, for the purposes of these motions, and I'm taking no position on the merits or whether he can testify about any of that.  But it's a valuation opinion, but it's also the very asset, based on my understanding that the ad hoc group opposes to credit bid for.  It's offered in support of confirmation.  It's offered by a retained testifying expert.  And so, just the Rule 26(a)(2)(B) requires disclosures of the facts or data considered by witnesses, the work product, protection.  That Rule 26(b) is afforded to, kind of, draft reports and certain communication between counsel and an expert.  But it doesn't extend to the facts or data the expert considered. No common interest analysis is required here to reach this conclusion.

Kirschner identifies the materials that he relied on in Exhibit B to his declaration, and lists, among other things, the examiner's report, criminal indictments, certain plea agreements, pleadings and two adversary proceedings,

the Moore declarations on November 3, 2025, and then the July 2026 one.  I was referring to the July 2026 one when I was talking earlier.  I should have mentioned that.  Looks like Kirschner also reviewed the plan, the disclosure statement, the plan supplement, and a liquidation analysis and about 30 individual pre-petition emails or electronic mail communications, maybe that's emails, identified by date, sender, and recipient.  There's also a reference described as Apollo First Brands overview, April 2024, and a document described as Centerbridge First Brands diligence request, October 2023.  The Debtors are obviously going to have to produce every document identified on Exhibit B that hasn't already been produced.

I would note on the document described as the Apollo 2024 one, Moore's declaration, I think it's at Paragraph 66, refers to an April 2024 internal presentation.  In the course of statements he made at Paragraph 62 about identified parties, if those are the same document, then it sounds like that would be considered by the testifying expert and can't be withheld on a separate basis.  I may be confusing stuff, I'm just making the connection.  But I think the timing bears on the objections.  Looks like Kirschner started work in June of 2026 (indiscernible) retention apps and his declaration was filed in July.  Parties can, kind of, work through that issue.

Let me talk about the estate claims marketing process. A central discovery question is whether the ad hoc group received information that other bidders didn't. From what I can tell, the estate claims marketing process was launched in May of 2026, and it was after mediation expired, so no mediation protection would reach it. Moore testified that the process permitted in form comparison of alternatives and afforded potentially interested parties a full and fair opportunity to submit offers and that the credit bid represents the highest and otherwise offer. Those are the findings the Court has asked to make.

The plan further asked the Court again to find that the transactions were negotiated in good faith and to afford the parties protections of 363(m). So, the fairness of the process is directly at issue. I think the Debtors are going to produce the comparisons. 26 parties were contacted and received summary marketing materials. It sounds like a few executed NDAs, and one withdrew. Whether the ad hoc group received the summary or the detail or more detail as a bidder, I think the Movants are entitled to learn that. The discovery sought here is kind of the same stuff that was requested in Tribune if you really think about it where the Court permitted the parties to, kind of, take discovery to test the arms-length nature and the good faith settlement negotiations. So, I think Katsumi's

request for production No. 11 is granted, including subpart 6 covering communications provided to the ad hoc group.  But I would limit it to its connection with the estate claims as a bidder.

I think the LAM parties' interrogatories 6 and 8 are compelled.  Interrogatory No. 8 asked whether the information was shared with the ad hoc group that was not made available to the other bidders.  That seems to call for a yes or no and I think the Debtors have to answer that. Katsumi's Interrogatories Nos. 4, 10, 11, 18, 21 and 22 and the LAM parties' Interrogatories Nos. 5 and 6, they, kind of, got the same responses from what I can tell.  And again, this may have changed.  I'm just kind of going through based upon additional statements that were made on the record. So, I think, you know, it basically said there's going to be information that's going to be reflected in witness declarations to be filed with the underlying material produced on a rolling basis.  The privilege language in those responses, to the extent it seeks information by, I think there's a tension in that position.  The Debtors can't maintain that these topics are too premature to answer while undertaking to answer them through rolling production.  If a subject is right enough for a declaration, it's right enough for an interrogatory answer.

So, I'm going to immediately compel the answers to

these questions in the Interrogatories 4, 10, 11, 18, 21 and 22 and LAM parties' Interrogatories 5 and 6.  The Debtors must also immediately complete production of materials underlying any declaration in support of confirmation.  No rolling production.  The confirmation can't run out because of discovery.  That's going to have to be done immediately. Maybe it's not already or not.  I'm just stating it.

Let me talk about Katsumi Interrogatory No. 7 which kind of corresponds to, at the same time, LAM Interrogatory No. 16.  Based on my reading, there seems to be either tension or the appearing conflict.  And again, parties will -- I'm just kind of doing this based on my reading.  In response to Katsumi Interrogatory No. 7, the Debtors state that all the docs and communications about the development of the schedule of non-released parties are protected by privilege.  And then it responds to the LAM parties Interrogatory No. 16, which asks for the basis for contending that the entities on that schedule engaged in adverse conduct.  The Debtors enumerate their sources, plea allocutions, indictments, the examiner's reports, the adversary complaints, and Moore's declaration.  So, I think the blanket assertion in Katsumi No. 7 just has to be overruled.  Subparts A and B are who made the determination.

Now, I think LAM Interrogatory No. 16, to the extent it can be further supplemented, should.  I think the

practical stakes support this because a creditor placed on the non-released party's schedule is ineligible, my understanding on the preference settlement and receives no release.  So, placement carries a direct legal consequence. And if Moore is going to talk about it in his declaration and talk about it, I do think parties can certainly explore what Moore is relying on in his independent analysis that parties should be placed on it.  If there's more or something different, then I think parties, like the LAM parties, are entitled to know what that means.  I think LAM -- and this could have been resolved already.

LAM Interrogatories 10 and 14 conclude with, like, a statement that the Debtors will respond.  I don't think that's a sufficient answer.  I think the Debtors have to answer both.  I think Katsumi's request for production -- I think I wrote all these down, 5, 6, 14, 19, 20 through 22. I think in certain interrogatories -- I know 2 and 6, for sure, the Debtors agreed to produce non-privileged material. And I think it's going to have to be a privilege log about that and that will be there.  I'd note -- that just may give me more work, but I'll do it.  You know, if parties need a quick in-camera review, it sounds like we better do it fast. And I don't know if we get there, but the work has to be done.

So, in summary, I think mediation protection is

enforced under my prior orders from January 29th through March 22nd subject to the limitation (indiscernible) about pre-existing work.  But it doesn't extend past March 27th. Santa Fe is the governing standard.  Joint proponents of a Chapter 11 plan defending that plan against confirmation objections may share a common legal interest to defend the plan.  But that may not necessarily extend to their negotiation of its terms amongst themselves.  The plan's settlement common interest attached initially on May 20th subject to the parties -- well, let me just say, that date may not make every communication between the parties protected.  There could have been additional finalizations on really key material terms, and I think the parties are entitled to explore that.  No common interest protects negotiation pricing or information flow about estate claims credit bid to the ad hoc group in its capacity as a bidder.

No protection over the analysis and materials supporting specific findings and statements in the Moore declaration and including the identified parties there.  And I would add Kirschner to that.  I think the Debtors are going to have to produce their marketing comparison.  And to the extent it hasn't already been done, the materials identified on Exhibit B to the Kirschner declaration must be produced and any item withheld should be logged, individually.  And I think the Debtors have to immediately

respond to the interrogatory responses and, kind of, really produce things final, on a final basis because the rolling production kind of just has to stop if this is really going to happen next week and depositions taking place.

And again, agreement of the parties, I leave it up to them to see whether the parties agree on something, but I do, kind of, want to establish strict boundaries so we don't find ourselves, kind of, early next week with the Debtors producing really material documents, and someone asking on a Tuesday, that they just received, a ton of information.  I'm not saying that's going to happen or not happen.  I'm just stating it based upon where we are.

I really had a lot of time to try to walk through every one of the objections and tried to listen carefully to the parties.  It was my goal to try to answer as many questions as I could and give as much guidance as I could on these subjects.  I will -- again, we're going to upload this and so, you'll be able to hear it, hopefully by no later than 11.  But you know, start checking around 10:30.  Are there any kind of really big-ticket questions that I still didn't answer, or tried to answer?  A 646 number?

MR. KELLEY:  Good morning, Your Honor.  Charles Kelley from Mayer Brown on behalf of Katsumi.  Let me begin by thanking Your Honor for what is clearly a tremendous amount of work that the Court did to try to reach more

carefully reasoned rulings by the Court, for which effort we are most greatly appreciative of.  But I would like to take advantage of the Court's invitation, at the end of the hearing yesterday, to schedule a status conference on Friday.  I think parties need to process, understand, and look at the Court's ruling, understand the workload and what that has done and allow us to confer with each other.  But I do think that a status conference on Friday, as Your Honor suggested, implied, might be useful.  We'd certainly love to take you up on that.

THE COURT:  Just give me one second.  I'm going to unmute another line.  I cannot tell -- I need to check with some -- kind of some pending matters that are scheduled on Friday and I just maybe need to get a time estimate.  So, what I will do is just -- I'm going to talk to my case manager this morning and maybe we can just kind of find the time.  What I don't want to do is kind of schedule something now and then have a bunch of kind of folks, if something is really litigious.  I think it would -- kind of a clean time that you can all look at.  Let me get with my case manager and kind of propose a time or two, and then kind of reach -- have her reach out to the parties and see where we go.  But I'll do that this morning.  By 11 a.m. she'll be sending out proposed times within -- I just have a 10 o'clock.  So, once I get through that, I can talk to her.

MR. KELLEY:  Thank you, Your Honor.  I think there are a number of people here in New York at the deposition session.  We can certainly, if useful for the Court, or for Rosario, we can certainly confer and try to identify a time on Friday which may align with a number of folks if that's useful.  I'll follow your lead, though.

THE COURT:  Okay.  Yeah.  I'm just going to check.  You know, my 9 o'clock may be contentious.  My 1 o'clock may or may not be, and so I just (indiscernible) is at 10.  So, maybe there's a window at 11, maybe there's a window at 1:30 or 2.  But I'd rather kind of just be sure because I know that there'd be a lot of folks on the line who may want to listen.  But by 11 o'clock this morning, she'll be sending out -- so, within the hour, you'll have the audio and then this uploaded.

MR. KELLEY:  That's fair, Your Honor, and I think given there will be depositions going on, we'll just take a break in the depo as we did this morning to participate in that status conference.  So, the Court should feel free to select a time that's convenient for the Court.

THE COURT:  Okay.  Thank you.  There was a 212 number, I unmuted.

MR. TSEKERIDES:  That was me, Your Honor.  Ted Tsekerides from Weil.  We agree.  I think a status conference would make sense.  I would imagine by then we

will have done all the things you asked us to do.  Many of the things you directed have already been done.  But I think having another conference going into the weekend, coming up on the hearing, is a good idea.  We're all going to be together in one deposition or another.  So, whatever time you pick, we'll make ourselves available.

THE COURT:  I think, from what everybody's describing, I think it probably makes the most sense to try to schedule something, and I don't think it needs to be super long.  But maybe earlier in the morning so that we talk about stuff, we're not talking about it on Friday in the evening with the weekend coming and maybe we can take advantage of, kind of, at least -- at least --

MR. TSEKERIDES:  If that works with your schedule, that would be better.  I'm sorry to interrupt.

THE COURT:  Yeah.  No, the only thing I would just ask, if between now and then, once we kind of throw out the date, if the parties could just talk about, you know, the basic stuff, you know, how the parties intend to proceed, how many witnesses are you thinking you're going to put on and course of proceeding by deck or is it going to be by -- just some of that stuff.  And you know, what docs the parties may or may not, you know -- at least start the conversation about some of that stuff.  And then we can talk about scheduling from there.

MR. TSEKERIDES:  Absolutely.

THE COURT:  Okay.  I will -- I'll work on that and we'll get working to upload.  I thank everyone for their time.  I'll let you get back to deposing, and we'll go from there.  Thank you very much.  I'm going to keep my line open and turn the camera off so I can start the 10 o'clock. Thank you.

MR. TSEKERIDES:  Okay.  Thank you, Your Honor.

(Proceedings adjourned at 9:50 a.m.)

                    C E R T I F I C A T I O N


        I, Sonya Ledanski Hyde, certified that the foregoing

transcript is a true and accurate record of the proceedings.


Sonya Ledanski Hyde


Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501


Date:  July 23, 2026