**Exhibit 15**

**Examiner's Report (Dkt. No. 2538)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| FIRST BRANDS GROUP, LLC *et al.*, | : | Case No. 25-90399 (CML) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| | : | |

**NOTICE OF FILING EXAMINER'S REPORT**
**(Relates to ECF No. 1650)**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.       On November 19, 2025, the Court entered its *Order Directing Appointment of Examiner* [ECF No. 726] (the "**Examiner Order**").[2]

2.       On December 16, 2025, the U.S. Trustee filed its *Notice of Appointment of Examiner* [ECF No. 961], indicating the appointment of Martin De Luca as Examiner, and its *Application to Approve Appointment of Examiner* [ECF No. 964].

3.       On January 9, 2026, the Court granted the U.S. Trustee's application to appoint Martin De Luca as Examiner in the above-captioned cases and entered the *Order Approving the Appointment of Examiner* [ECF No. 1260].

4.       On January 16, 2026, the Court entered the *Addendum to Agreed Protective Order* [ECF No. 1362] and the *Supplemental Agreed Protective Order* [ECF No. 1364] (collectively, the "**Protective Orders**").  Among other things, the Protective Orders provide that the Examiner shall not disclose Privileged Material to any party without the Debtors' express written permission,

---

[1]  A complete list of the Debtors in the Cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for the Cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Examiner Order.

including in any report prepared by the Examiner.[3]   Further, the Protective Orders require designated material in the Examiner's report that discloses Highly Confidential or Confidential Material to be filed under seal.[4]

5.      The Examiner filed his proposed Work Plan [ECF No. 1650]  (the "**Work Plan**") on January 21, 2026, and the Court entered its order [ECF No. 1819] approving the Work Plan on January 29, 2026.

6.      On April 17, 2026, the Examiner's Report (the "**Report**") was filed under seal pursuant to the Protective Orders.  Since that date, the Examiner has conferred with the Debtors and other producing parties regarding the treatment of Highly Confidential and Confidential Material contained in the Report.[5]  Following those consultations, the Examiner has reached agreement with producing parties that certain confidential information should remain sealed.  The Examiner also made several minor, non-substantive edits to the Report for accuracy and grammar.

7.      Accordingly, a revised Examiner's Report, dated April 27, 2026, is attached hereto as **Exhibit A**.  It is being filed under seal.

8.      A redacted version of the revised Examiner's Report, dated April 27, 2026, is attached hereto as **Exhibit B** and is being filed on the public docket.  The redacted sections contain

---

[3] *See* ECF No. 1364, ¶ 4.

[4] *See* ECF No. 1362, ¶ 5 ("unless otherwise agreed by the producing person, all designated material included in the Examiner's report that disclose Highly Confidential or Confidential Material, shall be filed under seal in accordance with the Federal Rules, the Bankruptcy Rules, and the Local Rules, such as by redacting designated material in the report, and replacing exhibits that constitute designated material with a placeholder, and providing unredacted and complete copies of all such submissions to all Parties to this Order, to the United States Trustee, and to the Court").

[5] *See* ECF No. 1362, ¶ 5 ("the designated material shall become public seven (7) days after the filing of the Examiner's report unless the producing person files an objection with the Court to the unsealing of the designated material. If an objection is filed, the designated material shall remain under seal until such time as either the Court determines whether the designated material shall remain confidential, or the parties reach an agreement on the unsealing of the designated material").

Highly Confidential or Confidential Material that should remain under seal pursuant to the Protective Orders.

Dated: April 27, 2026

Respectfully submitted,

/s/ *Jesse Panuccio*
BOIES SCHILLER FLEXNER LLP
Jesse Panuccio (admitted *pro hac vice*)
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
(954) 356-0011
jpanuccio@bsfllp.com

Robert D. Gordon (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
(212) 446-2300
rgordon@bsfllp.com

Benjamin Waisbren (admitted *pro hac vice*)
1401 New York Ave, NW
Washington, DC 20005
(202) 237-2727
bwaisbren@bsfllp.com

*-and-*

OKIN ADAMS BARTLETT CURRY LLP
Matthew S. Okin
Texas Bar No. 00784695
Email: mokin@okinadams.com
Ryan A. O'Connor
Texas Bar No. 24098190
Email: roconnor@okinadams.com
Madeline M. Schmidt
Texas Bar No. 24130309
Email: mschmidt@okinadams.com
1113 Vine Street, Suite 240
Houston, Texas 77002
Tel: 713.228.4100

*Counsel to the Examiner*

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2026, a true and correct copy of the foregoing Notice was served via the Court's CM/ECF system to all parties consenting to service through the same.

By: /s/ *Ryan A. O'Connor*
Ryan A. O'Connor

**Exhibit A**

**Examiner's Report**

**(Filed Under Seal)**

**Exhibit B**

**Examiner's Report**

**(Redacted)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
|  | : |  |
| In re: | : | Chapter 11 |
|  | : |  |
| FIRST BRANDS GROUP, *et al.*, | : | Case No. 25-90399 (CML) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
|  | : |  |

# REPORT OF E. MARTIN DE LUCA, EXAMINER

BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
(202) 237-2727

55 Hudson Yards
New York, NY 10001
(212) 446-2300

*Counsel to the Examiner*

April 27, 2026

## TABLE OF CONTENTS

I.    Executive Summary.................................................................................................4

II.   Introduction and Investigation Update....................................................................5

III.  Procedural Background and Nature of Examination ...............................................7

 A.   The Examiner's Authority .................................................................................7

IV.   Investigative Steps and Work Performed to Date.................................................10

 A.   Document Collection .......................................................................................12

 B.   Systems Access................................................................................................14

 C.   Consultations with Interested Parties and Witness Interviews............................17

 D.   Cooperation and Coordination with the Government..........................................19

 E.   Benefit of Examiner Role in the Investigation ....................................................19

V.    Factual Background ..............................................................................................20

VI.   Areas Investigated to Date ...................................................................................22

 A.   Legal Standards...............................................................................................24

 B.   Transfers of Value from the Debtors to Patrick James and Affiliated Entities......26

  1.   Direct Transfers to Patrick James and the Patrick James Trust .......................27

  2.   Extracting Value from FBG Acquisitions.......................................................30

  3.   Separation of Real Estate, Physical Assets, and Intellectual Property.............33

  4.   Transfer of Value to Non-Debtor Entities.......................................................39

 C.   Third-Party Factoring.......................................................................................46

  1.   Context and Methods ....................................................................................46

  2.   Mechanics of Receivables Sales and Payment Flows.....................................48

3. Primary Third-Party Factors and Their Arrangements.....................................49

4. Expansion of Factoring as a Liquidity Source During the Prepetition Period ..58

5. Scale of Factoring Activity at the Petition Date ..............................................59

6. Invoice Origination and Verification Processes...............................................60

7. Alleged Irregularities......................................................................................70

8. Outstanding Investigative Steps......................................................................73

D. The Off-Balance Sheet Transactions..................................................................74

1. Overview of First Brands' Off-Balance Sheet Financing Structures................75

2. Examiner's Review of Off-Balance-Sheet Financing Transaction Documents.84

3. Witness Interviews .........................................................................................89

4. Outstanding Investigative Steps......................................................................93

5. Substantive Consolidation ..............................................................................94

VII. Additional Preliminary Findings Relating to FBG's Accounting Practices..........94

A. Evidence of Improper FBG Accounting Practices...............................................94

B. FBG's Interactions with Auditors .......................................................................98

C. Accounting Standards Codification 810 Consolidation Analysis and Perimeter Implications .......................................................................................................100

D. External Audit Firms Engaged by FBG ............................................................100

VIII. Conclusion..............................................................................................................104

Appendix 1

Appendix 2

Appendix 3

## I. EXECUTIVE SUMMARY

The evidence developed to date indicates that First Brands Group, LLC ("**First Brands**") and a web of affiliated special purpose vehicles ("**SPVs**") and non-Debtor entities were operated, in practice, as a single liquidity generating and value extracting enterprise directed by Patrick James and others. Substantial financing was raised through third-party factoring and off-balance-sheet structures based on purported receivables and collateral that, in most instances, were fabricated, repeatedly pledged, or never transferred as represented. Significant value generated within the enterprise did not remain there.

The Examiner's investigation has so far identified more than $700 million in transfers to Patrick James, his affiliated trust, and related entities. It has also uncovered evidence that value was extracted through acquisitions, including discrepancies between internally reported acquisition values and transaction payments; through the separation of real estate, equipment, and intellectual property from acquired operating companies and their placement into entities owned or controlled by Patrick James; and through the transfer of personnel, assets, and operating capacity to non-Debtor entities outside the Chapter 11 perimeter. These findings are consistent with an enterprise that used financing not simply to sustain operations but to create and move liquidity while facilitating the movement of goods and value across borders through a commingled structure that obscured ownership, control, and creditor rights.

There are colorable claims for substantive consolidation of First Brands and its affiliated debtors (collectively with First Brands, the "**Debtors**" or "**FBG**") and veil piercing against Patrick James and related entities, among others. The evidence places before the Court the threshold questions of whether assets said to be outside the estate were ever validly transferred free and clear

of existing liens, whether purported "true sales" were economically or legally effective, and whether certain lenders' asserted collateral was in fact Debtor property all along.

This is an interim report. The investigation was paused because the Court-approved budget was exhausted while significant work remained. If modest additional funding is approved, the Examiner believes that targeted additional discovery, witness interviews, and forensic tracing can materially refine and strengthen these findings within approximately 90 days. Even in its present form, however, the record already developed establishes that First Brands did not merely become insolvent. The evidence suggests it was used as a financial engine for generating and extracting liquidity through structures that concealed the enterprise's true perimeter and depleted value otherwise available to creditors.

## II. INTRODUCTION AND INVESTIGATION UPDATE

This interim report (the "**Report**") is submitted by E. Martin De Luca (the "**Examiner**"), appointed by the United States Trustee on December 16, 2025 and confirmed to the position by the U.S. Bankruptcy Court for the Southern District of Texas (the "**Court**") on January 9, 2026[1] to serve as Examiner in these jointly administered chapter 11 cases (the "**Case**") of FBG. Certain Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code on September 24, 2025; the remaining Debtors filed on September 28, 2025 (as applicable, the "**Petition Date**").

On January 21, 2026, the Examiner filed his proposed Work Plan[2] (the "**Work Plan**"), outlining the topics, details, and timeline for his investigation (the "**Investigation**") in accordance

---

[1] Order Approving the Appointment of Examiner, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Jan. 9, 2026), Dkt. 1260.
[2] Notice of Filing Examiner's Proposed Work Plan, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Jan. 21, 2026), Dkt. 1650.

with the Court's *Order Directing Appointment of an Examiner* entered on November 19, 2025[3] (the "**Examiner Order**"). On January 29, 2026, the Court approved the Work Plan.[4] The Work Plan contemplated an interim report within ninety (90) days of the Examiner's appointment (*i.e.,* by April 9, 2026).[5] On April 7, 2026, the Examiner filed a status update, advising the Report would be submitted by April 17, 2026.[6] Given the breadth and complexity of the Investigation, the Work Plan contemplated that the interim report would present initial factual findings, together with a proposed timeline for the Examiner's final report.

In the weeks immediately following his appointment, the Examiner and his professionals engaged in an intensive Investigation which built significant momentum in developing a detailed factual record regarding the principal concerns identified by the Court in the Examiner Order. Since the Examiner Order was entered, the circumstances of the Case have materially changed. The Debtors' financial condition and restructuring prospects deteriorated, and in early January, under the shadow of a potential administrative insolvency, the Debtors pivoted to an expedited asset sale and liquidation. Accordingly, in mid-February the Investigation was essentially paused due to the imminent exhaustion of the Court-approved $7 million budget (the "**Examination Budget**") and the Debtors' financial condition—not because the work reached a natural end. As detailed in the *Examiner's Status Report* of April 1, 2026,[7] the Examiner has determined that a

---

[3] Order Directing Appointment of an Examiner, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Nov. 19, 2025), Dkt. 726.

[4] Order Approving the Examiner's Work Plan, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Jan. 29, 2026), Dkt. 1819.

[5] Work Plan of the Court-Appointed Examiner, Martin De Luca, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Jan. 21, 2026), Dkt. 1650-1 at 8–9.

[6] Examiner's Status Report, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. April 7, 2026), Dkt. 2360-1 at 2.

[7] Examiner's Status Report, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. April 1, 2026), Dkt. 2282-1 at 2.

comprehensive Investigation would require substantially more time and resources than the Examiner Order and Work Plan allocated.

The Examiner has noticed his intent to seek a modest budget increase and, if approved, can promptly complete critical investigative work and issue a final report within 90 days. He has consulted with counsel for the Debtors, the Official Committee of Unsecured Creditors, the DIP Lenders, the U.S. Trustee, and others on this issue.

The Report provides the Court and interested parties with a summary of the Examiner's investigative work to date, including (1) the investigative steps undertaken and work performed; and (2) the Examiner's preliminary impressions based on those steps. Consistent with the Examiner's neutrality as an officer of the Court, the preliminary findings below are framed to assist the Court and interested parties by describing the evidentiary foundation relevant to potential estate and creditor causes of action and for lien-validity and lien-priority determinations.

This is not a final report. While substantial in content, it remains preliminary and reflects that the Investigation could not continue to completion due to the unexpected circumstances of the Case. It reflects the best efforts of the Examiner and his team to date. The Examiner reserves the right to amend or supplement this Report, or to continue the Investigation and issue supplemental reports, if circumstances permit.

## III. PROCEDURAL BACKGROUND AND NATURE OF EXAMINATION

### A. The Examiner's Authority

On November 19, 2025, the Court entered the Examiner Order directing the United States Trustee to appoint an examiner and delineating the examiner's investigation.[8] The Examiner Order

---

[8] Order Directing Appointment of an Examiner, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 726.

mandates that the Examiner perform the duties set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code.[9]  Under section § 1106(a)(3), the Examiner is to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan [unless ordered otherwise]." *Id.* § 1106(a)(3).  Under section 1106(a)(4), the Examiner must "file a statement of any investigation conducted … including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate …." *Id.* § 1106(a)(4).

The Examiner Order sets the scope of the examination as follows:

> a. Investigate the facts and circumstances, including general corporate practices, concerning the Debtors' prepetition factoring processes and factoring transactions related to:
>
> > i. Allegations that the Debtors' prepetition third-party factoring transactions ("**Factoring Transactions**") included (A) fraudulent or inaccurate invoices and the related accounts receivable in the Debtors' books and records and audit reports; and (B) accounts receivable factored more than once and, in each case of (A) and (B), the persons or entities responsible for any of the Factoring Transactions;
>
> > ii. Transactions and/or transfers between any of (A) the Debtors, (B) any insiders or affiliates of the Debtors, and (C) entities owned or controlled by an insider or affiliates, and (D) the unaffiliated third party factors (the "**Third-Party Factors**") concerning (X) the Factoring Transactions and (Y) the transfers and use of the proceeds of such Factoring Transactions; and
>
> > iii. Any accounting with respect to the proceeds of the Factoring Transactions and any property of third parties

---

[9] *Id.* ¶ 2.

received by the Debtors that the Examiner deems appropriate.

b. Investigate the facts and circumstances, including general corporate practices, concerning the Debtors' Off-Balance Sheet Financing Transactions, related to any transactions and/or transfers in connection therewith.[10]

On December 16, 2025, the United States Trustee for the Southern District of Texas appointed Martin De Luca as Examiner.[11]  On January 9, 2026, the Court approved the appointment.[12]  On February 6, 2026, the Court approved the Examiner's request to employ Boies Schiller Flexner LLP ("**BSF**") as counsel to the Examiner, effective as of December 16, 2025.[13] On January 29, 2026, the Court approved the Examiner's Work Plan.[14]  On January 22, 2026, the Court granted the Examiner's motion for modified procedures under Bankruptcy Rule 2004, authorizing the Examiner to issue subpoenas to compel oral examinations under oath and the production of documents, and establishing expedited procedures—including shortened response times and the ability to file subpoenas under seal to protect investigation strategy—in connection with the Examination.[15]

---

[10] *Id.* ¶ 3.

[11] Application to Approve Appointment of Examiner, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Dec. 16, 2025), Dkt. 964.

[12] Order Approving the Appointment of Examiner, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 1260.

[13] Order Authorizing Employment of Boies Schiller Flexner LLP as Counsel to the Examiner Effective as of December 16, 2025, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Feb. 26, 2026), Dkt. No. 1886.

[14] Order Approving the Examiner's Work Plan, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Jan. 29, 2026), Dkt. 1819.

[15] Order Authorizing Modified Procedures for the Examiner to Conduct Bankruptcy Rule 2004 Examinations, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Mar. 9, 2026), Dkt. 1657.  The Court authorized the Examiner to employ Guidepost Solutions, LLC as his forensic accountant, financial investigator, and financial advisor on March 9, 2026, and Okin Adams Bartlett Curry LLP was retained as bankruptcy counsel on February 23, 2026. *See* Order Authorizing the Employment and Retention of Guidepost Solutions, LLC as Forensic Accountant of the Examiner, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Mar. 9, 2026), Dkt. 2077; Order Authorizing the Employment and Retention of Okin Adams Bartlett Curry LLP as bankruptcy counsel for the Examiner, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Feb. 23, 2026), Dkt. 1978.

## IV.    INVESTIGATIVE STEPS AND WORK PERFORMED TO DATE

Within weeks of the Examiner's appointment, the Examiner established an investigative platform of unusual breadth and depth combining three features that increased the efficiency and yield of the Investigation.  First, access to a substantial body of data and systems, including financial consolidation tools, enterprise reporting repositories, and custodial ESI; second, a broad witness development process spanning multiple jurisdictions, business functions, and levels of seniority; and third, regular coordination with U.S. law enforcement and the United States Trustee to ensure that investigative steps proceeded efficiently and without interference with parallel proceedings.  These elements created a platform that could move quickly across issues of proceeds tracing, perimeter integrity, financial reporting, and third-party knowledge in a manner that would be difficult and costly for any single constituency in the Case to replicate.

Immediately following the Examiner's appointment, his team executed an evidence preservation and collection protocol that yielded concrete interim results across three categories: systems and data, witnesses, and information from interested parties and third parties.  Given the Debtors' expedited asset sale process and imminent workforce reductions, these efforts were prioritized to capture time-sensitive information before employee departures and potential loss or third-party control of records.

Systems and Data.  The Debtors maintained approximately thirty-five enterprise resource planning ("**ERP**") systems—including SAP, Oracle, JD Edwards, and QuickBooks—inherited through acquisitions, with entity-level data consolidated through Oracle's Hyperion Financial Management System ("**HFM**") for US GAAP reporting and sales data aggregated separately through Vizion and Snowflake.  The Examiner secured direct login access to HFM, Vizion, and Snowflake.  The Examiner also gained visibility to certain business units' bespoke Power BI

10

reporting. Additionally, the Examiner gained direct access to a former FBG employee's personal OneDrive and FBG Treasury SharePoint site, both of which stored financial records, including receivable reports used in the accounts receivable ("**AR**") factoring transactions, tracking spreadsheets, and documentation of factoring processes. In addition, the Examiner gained access to the virtual data room ("**VDR**") that stored bank statements, appraisals, inventory records, and other business documents.

Witnesses. The Examiner's team conducted over seventy-five interviews across eleven (11) countries, including Argentina, Brazil, China, France, Germany, India, Luxembourg, Mexico, Romania, the United Kingdom, and the United States. Witnesses spanned senior finance leadership, regional controllers, and IT personnel. Categories of witnesses included current and former FBG employees, Alvarez & Marsal ("**A&M**") restructuring professionals, and third-party advisors and counterparties.

Information from Interested Parties and Third Parties. The Examiner obtained productions from the Debtors' principal lenders and factors, including Onset Financial, Inc. ("**Onset**"), Katsumi Servicing, LLC, Leucadia Asset Management LLC ("**Leucadia**"), and Aequum Capital Financial II LLC ("**Aequum**").

The Examiner also collected documents responsive to twenty-six subpoenas served on third parties, including correspondent banks and financial institutions. All these high-value workstreams were actively in progress when the Debtors represented that the DIP Lenders would not provide further financing, and there was no willingness of the DIP Lenders to fund an increase in the Examiner's limited budget. These workstreams had progressed to the point where the remaining steps are discrete and could be completed efficiently if the Examiner's budget and funding is increased.

To facilitate the sharing of information, the Examiner, the Debtors, and the Committee entered into an agreed Addendum to the Agreed Protective Order, which the Court entered.[16] The Addendum extended the protections of the Protective Order to materials provided to the Examiner and established a process for the treatment of confidential information in the Examiner's report.[17] The Examiner and the Debtors also entered into a Supplemental Agreed Protective Order to prevent waiver of any privileges and protections for information that the Debtors provided to the Examiner.[18]

## A. Document Collection

The Examiner undertook an extensive document collection process spanning six weeks, sending about sixty-five preservation letters and serving document requests and/or subpoenas on about fifty-one parties and third parties.[19] In total, the Examiner's team collected approximately 14 terabytes of electronic data—comprising over 13.5 million documents—from at least 123 custodians, including the Debtors, non-Debtor interested parties, and third parties, and processed about 10 terabytes of that data. The volume of data collected reflects the breadth of issues within the scope of the Investigation. The Examiner's forensic information technology ("**IT**") provider, Lineal, also facilitated the identification, collection, and transfer of electronically stored information ("**ESI**") in a forensically sound manner.

---

[16] Addendum to Agreed Protective Order, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Jan. 16, 2026), Dkt. 1362; Agreed Protective Order, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Jan. 16, 2026), Dkt. 408.

[17] *Id*.

[18] Supplemental Agreed Protective Order, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Jan. 16, 2026), Dkt. 1364.

[19] See **Appendix 1** for information regarding custodians, voluntary document requests, subpoenas, and preservation letters issued in the Investigation.

Collected information includes, among other things, evidence that third-party witnesses affirmatively identified and provided to the Examiner, and financial data obtained via subpoenas issued to financial institutions to trace the flow of FBG funds. Below is a non-exhaustive list of the types of documents collected:

- Communications via email, text, and electronic messaging platforms (including metadata).

- Accounting and financial records including general ledger data, accounts receivable subledgers, cash balance reports, treasury management documents, AR and AP reports, vendor payment authorizations, P&L balance sheets, and other accounting and financial statements.

- Bank statements and FBG treasury department workpapers and business records.

- Factoring schedules, spreadsheets, and supporting invoice-level data.

- Intercompany transaction and reconciliation records.

- Internal policies and controls relating to receivables, financing, treasury, and cash management.

- Documents concerning the separation of Debtor and non-Debtor entities.

- Off-balance sheet financings (the "**Off-Balance Sheet Financing Transactions**" or "**OBTs**") records—SPV documentation, sale-leaseback transaction records, and documents relating to pledges of inventory and other collateral.

- Intercompany loan documents.

- Email, Microsoft OneDrive, Microsoft Teams, and Microsoft SharePoint data.

- Organizational information, employee directories, and organizational charts.

- IT infrastructure and systems data.

- External audit materials.

- Acquisition documentation, sell-side diligence records, and lending arrangement data.

- Financing documents between FBG and third-party lenders.

13

The Examiner's team worked closely with the Debtors' counsel, the Debtors' restructuring advisor A&M, and current and former employees to understand the nature, location, and accessibility of relevant information across the Debtors' data systems and repositories. Collection efforts prioritized custodial data and ESI from the Debtors and their employees—including from laptops, mobile phones, network and local hard drives, email accounts, and electronic employee files.

The collection and review process was substantially halted in February. Nevertheless, the Examiner's team conducted targeted searches of the processed data to identify materials pertinent to this Report and to research issues within the scope of the examination. The team employed keyword searches, date filters, custodian filters, and other analytical tools, including technology-assisted review methodologies, to identify relevant documents.

### B. Systems Access

To conduct the Investigation, the Examiner obtained access to certain Debtor electronic systems, databases, and document repositories.[20] This included financial systems (HFM, Vizion, and Snowflake), document-storage platforms (a former FBG employee's OneDrive and the FBG Treasury SharePoint site), the virtual data room, and certain business unit Power BI reporting.

Access required extensive coordination with the Debtors' counsel, A&M, and Debtors' IT personnel to identify relevant data sources and ensure data was processed and hosted for review, with ongoing engagement to understand system architecture and address technical issues as they arose.

---

[20] See **Appendix 2** for information regarding the financial, operational, and data systems identified and/or accessed by the Examiner in the Investigation.

The Examiner also made onsite visits to key FBG office locations, both domestic and international, which enabled direct access to systems, personnel, and infrastructure. These visits facilitated the prompt identification of relevant data sources and witnesses and allowed access-related issues to be addressed in real time.

The enterprise financial and accounting systems accessed by the Examiner to date include:

- *Hyperion Financial Management System*: HFM is a financial consolidation tool that combines financial data from business entities within an organization and rolls it up to a parent company for reporting purposes.[21] HFM aggregates the Debtors' many ERP systems and is used to consolidate subsidiary ERP data through mapped account codes and prepare US GAAP consolidated financial statements.[22]

- *Vizion*: Vizion is a database and data aggregation platform managed by a third-party company called Trans Impact.[23] Vizion is used to: (1) pull and aggregate customer invoice data from various ERP systems across FBG entities; (2) serve as the primary source for sales reporting and tracking sales data across business units; (3) feed data into Power BI dashboards for reporting to sales organizations; and (4) store invoice-level data including sales quantities, business units, legal entities, product categories, and customer information.[24]

---

[21] Hyperion Financial Management User's Guide, Oracle (July 2025) https://docs.oracle.com/en/applications/enterprise-performance-management/11.2/hfmus/consol_overview.html; What is Hyperion Financial Management?, Cloud Foundation, https://cloudfoundation.com/blog/what-is-hyperion-financial-management/ (last visited March 31, 2026).

[22] Examiner Meeting with Weil and A&M (January 20, 2026); Examiner Interview of Victor Esquivel (Director of Finance, FBG) (January 15, 2026); Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 13, 2026).

[23] Examiner Interview of Romanian IT Team (January 19, 2026).

[24] *Id.*; Examiner Interview of Roxanna Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).

- *Snowflake*: Snowflake is a cloud-based data warehouse intended to centralize data from the Debtors' approximately 35+ ERP systems into a single reporting repository.[25] It contains raw sales data replicated directly from the ERP system as-is, meaning any errors at the ERP level are carried through to Snowflake.[26] Snowflake was initially intended to replace Vizion as the primary data aggregation platform, but the migration was ultimately paused.[27]

- *Microsoft Power BI*: Power BI is a business intelligence and data visualization tool[28] used by FBG to generate dashboards and reports for sales teams and other business functions,[29] primarily sourcing data from Vizion and Snowflake.[30] Power BI also displays reconciliation data comparing ERP figures to HFM figures, including manual entries and discrepancies,[31] and tracks operating expenses, profitability, and other financial metrics by business unit.[32]

- *Systems, Applications, and Products in Data Processing*: SAP is one of the primary ERP platforms used by FBG (operating in multiple versions including SAP Business One).[33] The system managed entity-level financial activity, including inventory values,

---

[25] Examiner Interview of Romanian IT Team (January 14, 2026); Examiner Interview of Romanian IT Team (January 19, 2026).

[26] Examiner Interview of Romanian IT Team (January 19, 2026).

[27] *Id.*; Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).

[28] Power BI Product Overview, Microsoft, https://www.microsoft.com/en-us/power-platform/products/power-bi#Product-overview (last visited March 31, 2026).

[29] Examiner Interview of Alina Papa (Director of Accounts Receivables, FBG) (January 14, 2026); Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).

[30] Examiner Interview of Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).

[31] Examiner Interview of Oana Andreias (Global Finance Team Lead, FBG) (February 4, 2026).

[32] *Id.*; Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).

[33] Examiner Interview of Victor Esquivel (Director of Finance, FBG) (January 15, 2026); Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 10, 2026).

16

standard costs, sales transactions, accounts payable, accounts receivable, and general ledger functions, which were later mapped into HFM.[34] SAP was managed by Prakash Shah and his development team in North America.[35]

- *QuickBooks*: The QuickBooks system was used by FBG for smaller business units.[36] It was one of many disparate systems contributing to FBG's fragmented ERP landscape.[37]

- *Treasury Sharepoint / OneDrive*: These electronic storage files contained vast financial records including receivable reports used in the AR factoring transactions, tracking spreadsheets, and factoring scheme execution steps.

The Examiner's access to the Debtors' core financial systems and data (HFM, ERP, Vizion, Snowflake, Power BI, and Treasury files on electronic drives), combined with direct third-party data (including factor funding records and bank activity), enabled a data-driven inquiry focused on where value left the Debtors' perimeter, the mechanics of the Third-Party Factoring and Off-Balance Sheet Financing Transactions, and when key information was known and by whom.

Rather than undertaking a full reconstruction, the forensic team has used this access to pinpoint high-impact issues, including identifying value diversion and suspicious transactions.

This combined Debtors' system and third-party access has allowed the Examiner to target the most important data without the cost and delay of a full enterprise-wide reconstruction.

## C. Consultations with Interested Parties and Witness Interviews

During the Investigation, the Examiner met with numerous non-Debtor interested parties, including secured and unsecured creditors, factoring lenders, financial institutions, and their

---

[34] *Id.*
[35] Examiner Interview of Romanian IT Team (January 14, 2026).
[36] Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 10, 2026).
[37] *Id.*

respective legal and financial advisors.[38]  These consultations helped the Examiner understand each party's commercial relationship with the Debtors—including the nature of their financing arrangements, the platforms and processes used to facilitate transactions, and their potential financial exposure.  They also provided valuable insight into the history and evolution of each party's relationship with the Debtors, including key personnel involved, the circumstances under which credit was extended, receivables or inventory were purchased, or assets were leased, and any due diligence or auditing activities undertaken.  These discussions also assisted the Examiner in gathering critical information and documents.

The Examiner team also interviewed over seventy-five (75) witnesses in-person or virtually in eleven (11) countries: Argentina, Brazil, China, France, Germany, India, Luxembourg, Mexico, Romania, the United Kingdom, and the United States.  These included current and former employees of FBG, A&M restructuring employees working with the Debtors, and interested party and third-party witnesses.  A non-exhaustive list of topics covered include:

- FBG organizational structure, department functions, and the identities and responsibilities of decision-makers.

- FBG's acquisition-driven expansion strategy, the financial condition of acquired businesses, and management's assessment of those transactions.

- The sources and flow of funds used to finance business acquisitions.

- Transfers of funds and assets to Patrick James and related entities in connection with FBG's acquisitions.

- Transfers of funds and assets among affiliated entities prior to the Petition Date and their effect on the allocation of value between Debtor and non-Debtor entities.

- Efforts to separate affiliated entities that historically operated in an integrated manner.

---

[38] See **Appendix 3** for information regarding witnesses interviewed by the Examiner during the Investigation.

- FBG's factoring arrangements and relationships with counterparties.

- FBG's process for creating, approving, and submitting invoices.

- Allegations of duplicate, inflated, or unsupported invoices.

- Disclosures to lenders and auditors concerning FBG's financial condition and material transactions.

- The use of SPVs in connection with financing transactions.

- Off-balance-sheet transactions and financing structures.

### D. Cooperation and Coordination with the Government

Shortly after his appointment, the Examiner met with the United States Attorney's Office for the Southern District of New York ("**SDNY USAO**") and the Federal Bureau of Investigation ("**FBI**") to establish protocols for clearing proposed witness interviews so as not to interfere with the Government's ongoing criminal investigation. Throughout the Investigation, the Examiner conducted regular calls with the government to update them on its progress. The Examiner likewise maintained regular communication with the United States Trustee on investigative progress and procedural matters.

This coordination infrastructure—the interview clearing protocols, regular communication with the SDNY and FBI, and the cooperative relationship with the U.S. Trustee—remains in place and would not need to be reconstructed if the Investigation resumes.

### E. Benefit of Examiner Role in the Investigation

The Examiner found his court-appointed role highly beneficial to the Investigation. His status significantly aided cooperation; the Examiner conducted his work to date exclusively with voluntary interviews and nearly exclusively with voluntary document productions. A significant number of witnesses indicated they would be reluctant to provide information voluntarily to parties to the Case or potential litigants, but were willing to cooperate with the Examiner. Voluntary

cooperation was beneficial throughout the Investigation but especially so internationally, where the ability to compel testimony and document production is more circumscribed and burdensome. It also allowed the Examiner to proceed more efficiently at a quicker pace and lower cost by minimizing discovery disputes. This benefit is unique to the Examiner's role and would be difficult to replicate by interested parties.

## V. FACTUAL BACKGROUND

Headquartered in Cleveland, Ohio, FBG was a leading supplier of automotive aftermarket parts.[39] Before its collapse due to the discovery of the principals' alleged fraud, FBG manufactured, distributed, and sold products through a number of different brands and product categories—including brakes, filters, wipers, lights, pumps, and towing solutions.[40] It operated manufacturing and distribution centers worldwide, and it sold its products through automotive retailers, aftermarket vehicle dealerships, mass merchants, warehouse distributors, e-commerce channels, and directly to original equipment manufacturers ("**OEMs**").[41] FBG's growth was driven largely by debt-financed acquisitions.[42] In the approximately fifteen (15) years preceding the Petition Date, FBG completed over fifteen (15) acquisitions, expanding its portfolio to over twenty-five (25) automotive brands.[43]

A core part of the Investigation included an initial analysis of the flow of funds throughout the FBG entities. As noted above, the Examiner's preliminary view is that the Debtors operated as a conventional commercial enterprise sustained by fraudulent financing transactions. The

---

[39] Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Sept. 29, 2025), Dkt. 22, ¶¶ 8–9.
[40] *Id.* ¶¶ 9–11.
[41] *Id.*
[42] *Id.* ¶¶ 11–12.
[43] *Id.* ¶ 11.

principals used the Debtor and non-Debtor entities interchangeably to further their fraudulent enterprise.  Two key funding sources for that combined operation were the following.  First, FBG regularly used accounts receivable factoring to accelerate cash collections and support liquidity.[44] These arrangements allowed FBG to sell accounts receivable—either through customer-linked programs ("**Customer Factoring**") or to unaffiliated third parties ("**Third-Party Factoring**")—in exchange for near-term payment.[45]  Second, FBG relied on Off-Balance Sheet Financing structures involving SPVs that were not First Brands subsidiaries[46] and were purportedly owned or controlled by Patrick James.[47]  Under these arrangements, an SPV generally acquired inventory, materials, or equipment from First Brands subsidiaries and then used those assets  in connection with borrowing-base financing or other financing transactions, including sale-leaseback transactions.[48]

With respect to Third-Party Factoring, the evidence indicates that the Debtors engaged in widespread fraud on the Third-Party Factors to generate massive amounts of cash for FBG.[49] Regarding the Off-Balance Sheet Financing Transactions, those structures now sit at the core of a lien integrity dispute among creditors and the SPVs, with the central allegation being that certain

---

[44] *Id.* ¶ 69; Declaration of Daniel Jerneycic in Support of the Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables without Liability; and (III) Granting Related Relief, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Dec. 1, 2025), Dkt. 808, ¶ 4.

[45] Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 22, ¶¶ 69–71.

[46] *Id.* ¶¶ 37, 48.

[47] Indictment, *U.S. v. James*, Case No. 26-cr-00029 (S.D.N.Y. Jan. 27, 2026), Dkt. 2, ¶¶ 22–25, 32.

[48] Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 22, ¶¶ 37, 48–52, 55–56, 59–60, 64–66; Supplemental Declaration of Charles M. Moore in Support of DIP Motion, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Nov. 4, 2025), Dkt. 527, ¶¶ 23, 39, 41.

[49] *See generally*, Indictment, *U.S. v. James*, Case No. 26-cr-00029, Dkt. 2.

inventory or enforceable security interests in inventory were never transferred to the SPVs.[50]
Together, these financing practices resulted in a substantial amount of cash flowing to FBG.  Both
are discussed in more detail below.

## VI.    AREAS INVESTIGATED TO DATE

At the outset of the Investigation, the Examiner focused on tracing proceeds from Third-
Party Factoring transactions and Off-Balance Sheet Financing arrangements.  In doing so, it
became apparent that First Brands, the Off-Balance Sheet SPVs, and certain non-FBG entities
purportedly owned[51] by Patrick James operated as a single financial enterprise—not for traditional
profit-seeking, but for improperly extracting cash and other assets from the Debtors to enrich their
principals.  For example, as described below, the Examiner's financial advisor uncovered that
several hundred million dollars originating with Off-Balance Sheet Financing provider Onset were
transferred to Patrick James and his trust.

A key related issue has been the lack of a fixed perimeter separating the Debtors from non-
Debtor entities.  Evidence uncovered in the Investigation shows cash, physical property, and other
assets being transferred outside the Debtors' perimeter or commingled between Debtor and non-
Debtor entities.  Pre-petition, there was often no clear legal or operational distinction between
them.  Simultaneously, evidence of fraud on the Debtors' lenders—including in the Third-Party
Factoring and Off-Balance Sheet Financing Transactions—potentially complicates the validity of
creditors' liens and other claims on the Debtors' remaining assets.  As the Court framed the issue

---

[50] *See generally*, Complaint, Case No. Case 25-03800, Dkt. 1; Complaint, Case No. 26-03091, Dkt. 1.
[51] Any references to entities being "owned" by Patrick James are not intended to suggest such ownership is valid and not subject to challenge, pending further investigation.

at the January 22, 2026 hearing: "How can the debtor turn something over to you to which it may not have the right to do so?"[52]

The Examiner's preliminary findings independently corroborate certain public allegations, but also go materially beyond them in several areas, including acquisition-related extraction, asset retitling, IP diversion, and post-petition value migration to non-Debtor entities.  In its indictment against Patrick James and Edward James (Patrick James' brother and former FBG executive) (the "**Indictment**"), the SDNY USAO alleges that FBG obtained billions of dollars in financing through a series of coordinated fraudulent schemes.[53]  According to the Indictment, FBG provided lenders with fabricated or inflated accounts receivable, double-pledged collateral, falsified financial statements, and concealed significant liabilities.[54]  The Indictment further alleges that FBG's off-balance sheet financing arrangements functioned as a parallel borrowing structure designed to inject liquidity into the company.[55]  Through these transactions, it alleges that Patrick James personally transferred millions of dollars from off-balance sheet lenders into his personal accounts.[56]

The Debtors adversary complaint against Patrick James, the Patrick James Trust, and affiliated entities alleges similar misconduct.[57]  The Debtors allege that Patrick James misappropriated millions (if not billions) of dollars of FBG funds, including hundreds of millions of dollars transferred to the Patrick James Trust.[58]  Specifically, the complaint alleges that over

---

[52] Jan. 22 Hr'g. Tr. at 19:11–19:14.
[53] Indictment, *U.S. v. James*, Case No. 26-cr-00029, Dkt. 2, ¶¶ 1–2.
[54] *Id.* ¶¶ 1–2, 12–15, 20–22, 24, 27, 29, 32, 35.
[55] *Id.* ¶ 28.
[56] *Id.*
[57] *See* Complaint, *First Brands Group, LLC v. James*, Adv. Pro. No. 25-03803 (Bankr. S.D. Tex. Nov. 7, 2025), Dkt. 17.
[58] *Id.* ¶¶ 1, 66, 68, 70.

$600 million of that sum was distributed directly from FBG's bank accounts to the Patrick James Trust, a trust held by Patrick James, for "no consideration and for no valid business purpose."[59] The complaint further alleges that, while Patrick James fraudulently secured billions of dollars in financing for FBG through fabricated accounts receivable and off-balance-sheet SPV structures, he diverted those proceeds for personal use, leaving FBG with just $12 million in cash when it filed for Chapter 11.[60]

The Examiner's preliminary work tracing the flow of funds uncovered evidence that Patrick James and entities under his control appeared to improperly extract value from FBG. Beyond the allegations made by the SDNY USAO and the Debtors, the Examiner's Investigation revealed the significance of FBG acquisitions and non-Debtor entities owned by Patrick James. Among other things, the Examiner found that Patrick James and related entities appear to have extracted significant value during FBG's acquisition of third-party companies, and that non-Debtor, non-FBG entities owned by Patrick James benefited from the separation of those entities' operations from the Debtors.

Key topics for continued investigation include completing the analysis of the Third-Party Factoring and Off-Balance Sheet Financing Transactions, the details and amounts of fund and asset transfers outside the FBG perimeter, and the knowledge and role of the Debtors' counterparties and other third parties, including its lenders and auditors. With funding, the Examiner believes this work can be completed within 90 days.

### A. Legal Standards

---

[59] *Id.* ¶ 70.
[60] *Id.* ¶¶ 1, 5–7, 11–12, 45, 47–49, 56–62, 70, 76.

During the Investigation, the Examiner also preliminarily reviewed whether colorable claims exist for (i) substantive consolidation of the Debtors in the Case, as well as for (ii) piercing the corporate veil against Patrick James and several of his wholly-owned non-Debtor entities. Although that analysis is not complete, the legal standards by which the Examiner began making those determinations are described in more detail in the footnotes below. In short, to determine whether substantive consolidation is appropriate, courts in the Fifth Circuit generally apply one of two parallel standards: (1) a traditional, multi-factor test, which is often distilled to two factors, one of which is based on the entanglement of the affairs of the debtor; and (2) a balancing test that focuses on the impact of consolidation on the creditors.[61] With respect to piercing the corporate

---

[61] Substantive Consolidation. "As a general matter, substantive consolidation in a bankruptcy case results in the combination of two or more debtors into a single pool from which the claims of creditors are paid ratably." *In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 91 (Bankr. N.D. Tex. 2017). "There seems to be no universally accepted legal standard for when substantive consolidation is appropriate (or not)," and "[t]he Fifth Circuit has not adopted its own criteria for determining when substantive consolidation is appropriate." *Id.* at 93–94. "However, the Fifth Circuit has acknowledged that bankruptcy courts do have the authority to order substantive consolidation." *In re Introgen Therapeutics, Inc.*, 429 B.R. 570, 581 (Bankr. W.D. Tex. 2010). Without clear guidance from the Fifth Circuit, courts have generally applied the following two parallel standards to determine whether substantive consolidation is appropriate: (1) a traditional, multi-factor test, which caselaw has distilled to two critical factors, and (2), a balancing test. *See In re ADPT DFW Holdings*, 574 B.R. at 941; *In re Introgen Therapeutics*, 429 B.R. at 582.

i.       Traditional Test: Under the traditional test, "courts have considered many different factors, most commonly looking at: (1) the degree of difficulty in segregating and ascertaining individual assets and liability; (2) the presence or absence of consolidated financial statements; (3) the profitability of consolidation at a single physical location; (4) the commingling of assets and business functions; (5) the unity of interests and ownership between the various corporate entities; (6) the existence of parent and inter-corporate guarantees on loans; and (7) the transfer of assets without formal observance of corporate formalities." *In re Introgen Therapeutics*, 429 B.R. at 582; *see In re Permian Producers Drilling, Inc.*, 263 B.R. 510, 518 (W.D. Tex. 2000) (same); *see also In re ADPT DFW Holdings*, 574 B.R. at 94.

The modern trend, followed by bankruptcy courts within the Fifth Circuit, is to boil down these elements to two disjunctive factors: (1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (2) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.[61] *See In re Introgen Therapeutics*, 429 B.R. at 583.

ii.       Balancing Test:  This test focuses "on the impact of consolidation on the creditors." *In re Permian Producers Drilling*, 263 B.R. at 518. It "tends to identify certain elements from the traditional multi-factor test, but ultimately balances the harms or prejudice along with considering how many of the traditional factors exist." *In re ADPT DFW Holdings*, 574 B.R. at 100. To succeed under this test, "the party proposing consolidation must first [1] show identity between the entities to be consolidated, and then [2] show that consolidation is necessary in order to prevent harm or prejudice, or to effect a benefit generally." *In re Introgen Therapeutics,* 429 B.R. at 584.

25

veil, courts focus on whether the parties at issue operated as a single economic entity such that it would be inequitable to uphold the legal distinction between them.[62]

**B. Transfers of Value from the Debtors to Patrick James and Affiliated Entities**

The Examiner's independent work tracing proceeds from the Third-Party Factoring and Off-Balance Sheet Transactions preliminarily identified several areas of potentially improper value extraction. These include (i) direct cash transfers to Patrick James and related trusts; (ii) the extraction of value in connection with FBG's acquisitions of third-party businesses, including through acquisition-price inflation and side payments; (iii) the separation of real estate, physical assets, and intellectual property from acquired operating companies and their placement into entities owned or controlled by Patrick James; and (iv) the transfer of value to non-Debtor entities

---

[62] Piercing the Corporate Veil. "Piercing the corporate veil is not a cause of action, but is instead a means of imposing liability for an underlying cause of action." *7600 Beach Boulevard Invs., LLC v. Texas Corral*, LLC, No. 4:22-CV-00549, 2022 WL 20717363, at *2 (S.D. Tex. Aug. 1, 2022) (quotation marks omitted); *accord Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 469 n.10 (D. Del. 2010). The applicable Delaware law recognizes piercing the corporate veil under an alter-ego theory. *See In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 788 (Bankr. W.D. La. 2013) (summarizing Delaware law). "Under Delaware law, in order to pierce the corporate veil on an alter-ego theory, traditionally a plaintiff must prove: (1) the parent and subsidiary operated as a single economic entity; and (2) an overall element of injustice or unfairness is present. In short, the question is whether the two corporations operated as a single economic entity such that it would be inequitable to uphold the legal distinction." *ASARCO*, 396 B.R. at 317 (S.D. Tex. 2008). The alter ego theory can also be used to pierce the corporate veil "to hold liable an individual owner who controls the [company]." *Dopf v. Jankovic*, No. CV 25-797-GBW, 2026 WL 44838, at *2 (D. Del. Jan. 7, 2026) (quoting *In re Opus E., L.L.C.*, 480 B.R. 561, 570 (Bankr. D. Del. 2012)).

The first prong subsumes the lengthy list of factors that courts traditionally consider. *In re Foxmeyer Corp.*, 290 B.R. 229, 235 (Bankr. D. Del. 2003) ("These factors include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder." (quoting Delaware caselaw)). "With respect to the second prong of the alter ego doctrine—the presence of injustice or unfairness-while proof of actual fraud is not required, courts have held that 'something like fraud must be proven' and that a party seeking to pierce the corporate veil must prove "reasonable reliance and intent to deceive." *In re Gulf Fleet Holdings*, 491 B.R. 747, 788 (quoting *In re Moll Indus., Inc.*, 454 B.R. 574, 591 (Bankr. D. Del. 2011)). "Additionally, a court shall only pierce a corporate veil 'in order to prevent fraud, illegality, or injustice,' or the adverse effects thereof." *In re Foxmeyer*, 290 B.R. at 236 (quotation marks omitted).

that operated alongside, but outside of, the FBG corporate structure. While more work remains, the Examiner's preliminary findings in each category are addressed in the subsections that follow.

1. Direct Transfers to Patrick James and the Patrick James Trust

The Examiner's initial analysis of direct transfers between FBG-related entities and Patrick James reveals a pattern of sustained, large-scale cash movement to James and his trust. Analyzing relevant bank statements and other financial information obtained in the Investigation, the Examiner and his financial advisor identified thirty-six (36) transfers to Patrick James and the Patrick James Trust from March 18, 2021 through April 7, 2025, aggregating to more than $720 million. Of this amount, approximately $287 million was sent from SPV accounts—specifically, Carnaby IV, Carnaby I, Viceroy Private Capital, and Carnaby FA—while the remaining approximately $433 million was sent from non-SPV accounts, including First Brands, Albion Realty, Spartacus Shipping, VCAA, Alester Technologies, and SA Eagle Holdings.

The Examiner's financial advisor attempted to trace these funds back to their originating sources. The largest identified sources include approximately $349 million from FBG's Bank of America account (x6262), approximately $223.1 million from Onset, $40.5 million from NextProcess LP, and $38.2 million from First American, among other sources. The following table summarizes these transfers:

| Origin | Amount | Count |
|---|---|---|
| First Brands BOA x6262 | (349,000,000) | 15 |
| Onset | (223,059,395) | 9 |
| NextProcess LP | (40,500,000) | 3 |
| First American | (38,182,977) | 1 |
| NextProcess LP (Brake Parts) | (30,000,000) | 2 |
| Bowery x4822 | (9,000,000) | 1 |
| Bowery x1437 | (18,550,000) | 2 |
| Carnaby I x3788 | (5,000,000) | 1 |
| Jacq Pierot Jr | (5,000,000) | 1 |
| Midland Title | (2,000,000) | 1 |

|  | (720,292,372) | 36 |
|---|---|---|

This amount includes $123.2 million in eleven direct transfers to Patrick James and the Patrick James Trust that were routed through intermediary entities such as Albion Realty, Spartacus Shipping, Viceroy Private Capital, VCAA, SA Eagle Holdings, and Alester Technologies, with originating sources including Onset, NextProcess LP, First American, and FBG operating accounts. This is a traced subset illustrating the use of intermediary entities to obscure the true source and destination of funds. Those identified transfers are as follows:

| Date | Amount | Description | Account Number | Account Entity | Originating Source Traced[63] |
|---|---|---|---|---|---|
| 3/18/21 | (38,182,977) | 727269 Wire Withdrawal Patrick James Tr 5795 | ██████ | Albion Realty | First American |
| 12/13/21 | (13,550,000) | 844165 Wire Withdrawal Patrick James Tr 5795 | ██████ | Spartacus Shipping | NextProcess LP |
| 12/31/21 | (6,000,000) | 123307 Wire Withdrawal Patrick James Tr 5795 | ██████ | Viceroy Private Capital | Onset |
| 7/12/22 | (12,500,000) | 750079 Wire Withdrawal Patrick James Tr 5795 | ██████ | Viceroy Private Capital | NextProcess LP |
| 11/1/22 | (9,000,000) | 218681 Wire Withdrawal Patrick James Tr 5795 | ██████ | VCAA | Bowery x4822 |
| 1/12/23 | (5,000,000) | 137503 Wire Withdrawal Patrick James Tr 5795 | ██████ | VCAA | Carnaby I x3788 |
| 1/12/23 | (5,000,000) | 137553 Wire Withdrawal Patrick James Tr 5795 | ██████ | Spartacus Shipping | Jacq Pierot Jr |
| 1/26/23 | (2,000,000) | 294052 Wire Withdrawal Patrick James Tr 5794 | ██████ | Albion Realty | Midland Title |
| 3/1/23 | (5,000,000) | 740708 Wire Withdrawal Patrick James Tr 5795 | ██████ | SA Eagle Holdings | Bowery Finance x1437 |

---

[63] Because funds were commingled, the Examiner applied a tracing methodology and generally used the Last-In, First-Out ("**LIFO**") method (recent deposits presumed to fund subsequent disbursements). Where Bank of America accounts reflected same-day deposits followed by equal same-day disbursements (often resulting in a zero daily balance), the Examiner treated those deposit-and-equal-disbursement sequences as related transactions.

| Date | Amount | Description | Account Number | Account Entity | Originating Source Traced[63] |
|---|---|---|---|---|---|
| 7/1/24 | (20,000,000) | WIRE TYPE:WIRE OUT DATE:070124 TIME:1801 ET TRN:2024070100732849 SERVICE REF:026198 FED IMAD:20240701B6B7HU2R026198 RELATED REF:2471H1225PZQ2901 ORIG:FIRST BRANDS GROUP LLC ID:8670316808 BNF:PATRICK JAMES MAIN TRUST 383 MADISON AVENUE NEW YORK NY 10017 US ID:514719304 BNF BK:JPMORGAN CHASE BANK NA ID:021000021 INT BK: ID: RECV BK: ID: PAYMENT DETAILS: DECLARATION OF TRUST FOR THE PATRICK JAMES MAIN TRUST | ▮▮▮▮ | First Brands Group | First Brands BOA x6262 |
| 8/15/2024 | (7,000,000) | 87606YC00PS8 87606YC00PS8 228342904 DECLARATION OF TRUST PATRICK JAMES 514719304 37SEND CHIP CHIPSEQ:00419084 JPMORGAN CHASE BANK | ▮▮▮▮ | Alester Technologies | NextProcess LP |
| | (123,232,977) | | | | |

The scale and pattern of these transfers[64]—over $720 million across 36 transactions in approximately four years, drawn from both on- and off-balance-sheet sources and routed through multiple intermediary entities—are consistent with the use of FBG and its affiliated non-debtor entities as vehicles for extracting cash for the benefit of Patrick James, rather than as profit-seeking operating businesses in the traditional sense.

---

[64] As a cross-check, the Examiner's financial advisor compared its preliminary analysis with work performed by the Debtors' financial advisor A&M. A&M identified $39.2 million in transfers to Patrick James or his associated accounts that are not included in the $720 million listed above. Of that amount, $6 million consists of transfers that predate the bank transaction records obtained by the Examiner in the Investigation. The remaining $33.2 million represents A&M-identified journal entries, presumably from the company's general ledger, coded as transfers to "Patrick James Distribution – Tax and Dividend," all dated pre-2022. To date, the Examiner has not yet received and been able to analyze the financial data to confirm these transfers.

2. <u>Extracting Value from FBG Acquisitions</u>

The Investigation uncovered evidence that FBG acquisitions were an important source of value extraction for Patrick James and his non-FBG entities. FBG closed several billion dollars in acquisitions from 2011 through 2024, and a number of them appear to lack a valid business rationale. Witnesses reported, for example, that many of FBG's "Rest of World" acquisitions outside the United States involved companies in economic distress with outdated technologies. Moreover, witnesses and documents showed how Patrick James extracted cash and other valuable assets in connection with several acquisitions.

The Investigation preliminarily examined whether FBG's acquisition activity was used to extract value through inflated purchase prices, side payments, or other transaction structures designed to benefit Patrick James personally. The evidence raises questions about whether amounts recorded as acquisition consideration—or as ancillary transaction costs—accurately reflected the value paid to third-party sellers, or instead masked transfers to Patrick James. FBG's acquisitions warrant further scrutiny to identify potential sources of recovery for the Debtors' estates.

**FRAM/Autolite.** FRAM/Autolite is a North American manufacturer and distributor of automotive maintenance and ignition components serving aftermarket and original equipment channels.[65] The FRAM division (defined below) produces and distributes oil and air filtration products primarily sold through mass retail, while the Autolite division manufactures components

---

[65] KLD002828_0475_0013118; KLD002828_0023_0002094.

for spark plugs primarily sold to original equipment suppliers.[66] The business operates throughout the United States and Mexico.[67]

On February 26, 2019, FBG acquired subsidiaries of FRAM Group Holdings Inc. and FRAM Group Holdings Limited (together, "**FRAM**") for a stated purchase price of approximately $306 million.[68] FRAM had significant manufacturing operations in Juárez, Mexico, as well as facilities in Mississauga, Canada, and Kentucky, United States.[69] In a later transaction in 2021, FRAM made a $2.3 million payment in connection with the repurchase of FRAM brand rights.[70] Evidence reflects that although the purchase price was $2.3 million, the transaction was structured so that additional funding—approximately $9 million—was obtained and transferred directly to Patrick James.[71]

**Winning Group.**  Winning Group ("**Winning**") is a European manufacturer of automotive components for OEMs and other customers.[72] It consists of two businesses, Winning CoFo and Winning Plastics, located in Germany and Czechia.[73] Winning has eight plants and a headcount of 1,670 employees.[74] Winning's CoFo division produces precision cold-formed metal parts used

---

[66] KLD002828_0023_0002094.

[67] KLD002828_0475_0013118; KLD002828_0023_0002094.

[68] KLD002828_0001_0001180; Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 10, 2026).

[69] Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 10, 2026).

[70] Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 13, 2026); Ric Tomaszewski, *Re: Key Bank National Association 07.29.2021* (email exchanges between Ric Tomaszewski, Kevin Ruminski, Andy Brumbergs, and Alejandrina Perez).

[71] Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 13, 2026); Ric Tomaszewski, *Re: Key Bank National Association 07.29.2021* (email exchanges between Ric Tomaszewski, Kevin Ruminski, Andy Brumbergs, and Alejandrina Perez); Ric Tomaszewski, *Re: Trico Brazil Wiring Instructions* (email exchanges between Ric Tomaszewski, Edward James, Kevin Dong, and Jay Machado).

[72] KLD002828_0012_0015582; KLD002828_0498_0011574.

[73] KLD002828_0012_0015582; KLD002828_0012_0017872.

[74] KLD002828_0012_0015582.

in transmission, drivetrain, brake, and steering systems, while its Plastics division manufactures chrome-plated and painted plastic components.[75]

On January 4, 2024, FBG acquired Winning CoFo, and on May 10, 2024, it acquired Winning Plastics.[76] In FBG's internal records, there is a significant discrepancy in the purchase price of the Winning companies that necessitates further investigation. A document provided to the Examiner by a former high-level FBG employee indicates that FBG's records reflected an acquisition price of approximately $139 million.[77] However, a witness advised the Examiner that FBG paid a much lower figure for the Winning businesses, and that the seller had recently acquired the two Winning businesses through German insolvency proceedings for only a nominal amount.[78]

Transaction documents and financial records obtained in the Investigation corroborate the witness's account. Based on the Examiner's financial advisor's analysis of those documents, the base purchase price of the two Winning companies combined was approximately EUR 60 million (or approximately US $66 million), and the cash paid was approximately EUR 53 million (or approximately US $59 million). The Winning CoFo acquisition agreement reflects a base purchase price of approximately EUR 30 million,[79] funded through a series of transfers totaling approximately US $24.4 million.[80] The Winning Plastics acquisition reflects a base purchase price of approximately ███████████, with total funds disbursed at closing of approximately ███████ ████████[81]

---

[75] KLD002828_0012_0015582.
[76] KLD002828_0012_0017872.
[77] KLD002828_0012_0014130.
[78] Examiner Interview of Frederic Sipahi (Group Chief Executive Officer, Global Technologies) (February 4, 2026).
[79] KLD002828_0023_0000782.
[80] KLD002828_0134_0001500; KLD002828_0016_0003685; KLD002828_0016_0008859; ████████████████████; USBOSC0011_00000230.
[81] ████████████████████; ████████████████ KLD002828_0046_0013164.

Given the substantial discrepancy in FBG's internal records regarding the acquisition price for the Winning companies, this is another area that warrants further scrutiny as a potential instance of acquisition-related diversion.

3. <u>Separation of Real Estate, Physical Assets, and Intellectual Property</u>

The Investigation also revealed evidence that real estate, intellectual property, and other assets were being diverted outside of FBG's control.

a. *Real Estate Diversion*

Evidence indicates that several entities owned by Patrick James were used to hold real estate separately from FBG's operating businesses. These entities include Bleecker Group, LLC ("**Bleecker**") and Albion Realty, LLC ("**Albion**"). Each of these entities sits outside of the FBG ownership structure.[82] The evidence reflects that, in connection with the acquisition of certain companies by FBG, real estate assets belonging to the acquired company appeared to be diverted to entities owned by Patrick James outside of the FBG corporate umbrella. Following the closing of an acquisition, the now FBG-owned company would continue to use those properties and in certain instances pay the non-FBG entity to lease the property.

**The UCI/Airtex Acquisition.** When the UCI corporate acquisition closed on July 31, 2020, evidence indicates that real estate in Albion, Illinois, and Fairfield, Illinois, was conveyed to Bleecker—a James entity—rather than remaining with the operating businesses.[83]

At or around the same time, Bleecker leased the properties to FBG entities—the Albion properties to Champion Laboratories, Inc. and the Fairfield properties to Airtex Products, LP.[84]

---

[82] KLD002828_0040_0004007.
[83] KLD002828_0011_0005955; KLD002828_0040_0004007.
[84] KLD002828_0011_0005955.

Shortly thereafter, all properties were deeded from Bleecker to Albion Realty—another James entity.[85]

The Albion Realty portfolio included multiple industrial and commercial facilities, including[86]:

- 200 South 4th Street Albion, IL 62806 (408,000 sq. ft. plant);

- 230 East Walnut Street Albion, IL 62806 (4,800 sq. ft. storage and 31,000 sq. ft. tech center);

- 301 Industrial Drive Albion, IL 62806 (243,000 sq. ft. plant);

- 329 Industrial Drive Albion, IL 62806 (335,000 sq. ft. warehouse and distribution center);

- 549 South Illinois Route 130 Albion, IL 62806 (165,000 sq. ft. warehouse and distribution center);

- 810 Leininger Road, Fairfield, IL 62837 (350,000 sq. ft. distribution center and plant);

- 407 West Delaware Street, Fairfield, IL 62837 (130,000 sq. ft. office and plant); and

- 503 West Delaware Street, Fairfield, IL 62837 (10,000 sq. ft. test lab).

In March 2021, Albion Realty sold certain Albion, Illinois properties to STORE Capital Acquisitions, LLC and FRAM Group Operations LLC became the tenant under a leaseback arrangement.[87] Further investigation is needed into additional potential instances of real estate being diverted from FBG to James-owned entities.

       *b. Property, Plant, and Equipment Diversion*

---

[85] KLD002828_0011_0005955; KLD002828_0040_0004007.
[86] KLD002828_0013_0035056.
[87] KLD002828_0011_0005955.

Internal communications also reflect discussions among FBG personnel regarding the ownership of physical assets by non-FBG entities—specifically property, plant, and equipment ("**PPE**")—following certain FBG acquisitions. On June 29, 2023, one day before FBG's acquisition of Cardone Industries, Inc. ("**Cardone**") closed,[88] FBG finance executives discussed in an internal messaging platform whether the Cardone Stock Purchase Agreement ("**SPA**") contained "any landmines related to PPE[,]"[89] "in case we want to have certain Cardone PPE go to Viceroy."[90] In response, it was noted that a transfer of PPE would require consideration of tax and accounting implications, including how such a disposition would be reflected for tax purposes.[91] The discussion further contemplated an approach under which FBG would not hold inventory or PPE associated with certain locations; instead, those assets would be "ignore[d] at FBG level and monetize[d] at Viceroy/Carnaby to get cash up there to be able to pay Onset themselves without asking for cash from FBG."[92] Further investigation is warranted into the transfer of PPE to James-owned non-FBG entities in connection with FBG acquisitions.

### c. Intellectual Property Diversion

#### i. The Alester Structure

In several acquisitions, valuable intellectual property ("**IP**") was stripped from the acquired operating companies and contributed to Alester Technologies, LLC ("**Alester**"), a non-Debtor Delaware IP holding company that was outside of the FBG corporate structure.[93] █████████

---

[88] USBOSC0011_00000033.

[89] KLD002828_0018_0090420.

[90] KLD002828_0018_0090432.

[91] KLD002828_0018_0090465; KLD002828_0018_0090473.

[92] KLD002828_0018_0090468.

[93] Patrick James owned 99% of Viceroy Enterprises, LLC. The remaining 1% is owned by Aztec Corporation, which is wholly owned by Patrick James. Viceroy Enterprises, LLC wholly owns Viceroy Private Capital, LLC, which wholly owns Alester Technologies Holdings, LLC, which in turn wholly owns Alester Technologies, LLC. KLD002828_0013_0037935; *see also* KLD002828_0040_0005335 (Patrick James listed as 100% beneficial owner



The Investigation has uncovered evidence that transactions in connection with certain FBG acquisitions were structured such that IP owned by the acquired operating companies was transferred to Alester outside of the FBG corporate umbrella, while the FBG-owned operating companies continued to use that IP pursuant to licensing arrangements.

## ii.   The IP Contribution Agreements

Across multiple FBG acquisitions, the Investigation revealed instances where an acquired company owned IP, and that IP was transferred to Alester pursuant to an IP contribution agreement executed in close proximity with the acquisition.   In each instance identified, the contribution agreements were executed by Mr. Baker on behalf of Alester and Mr. Kumar on behalf of the acquired entity.[96]

The following IP contribution agreements were identified:

**IBI Contribution Agreement**.   On December 30, 2022, FBG acquired TAE Brakes, LLC, which consisted primarily of the operating unit International Brake Industries, Inc. (collectively,

---

of Alester Technologies Holdings, LLC); █████████████████████

[94]
[95]

KLD002828_0010_0001894; KLD002828_0040_0003246.
[96] KLD002828_0042_0000362; KLD002828_0042_0000363; KLD002828_0042_0000365;

36

"**IBI**").[97]  IBI then contributed its IP to Alester.[98]  The IP consisted of patents for disk break shims, trademarks, and copyrights.[99]

**Horizon Contribution Agreement**.  On February 8, 2023, FBG acquired Horizon Global Corporation ("**Horizon**").[100]  In connection with that acquisition, Horizon similarly contributed its IP to Alester, which consisted of numerous copyrights, patents, and trademarks.[101]

**Cardone Contribution Agreement**. On July 3, 2023, FBG acquired Cardone.[102]  That same day, Cardone contributed its IP to Alester.[103]  The Cardone IP included trademarks, copyrights, and domain names.[104]

**Carter/Walbro Contribution Agreement**. On September 29, 2023, FBG acquired Walbro Engine Management for 60 million euros.[105] ███████████████████████████████
███████████████████████[106]

### iii.    The IP Licensing Arrangements

Following the transfer of intellectual property to Alester, Alester then entered into licensing arrangements pursuant to which FBG operating companies were granted the right to use that IP.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[97] KLD002828_0001_0004109.
[98] KLD002828_0042_0000362.
[99] *Id.* (Schedule A).
[100] KLD002828_0042_0000363.
[101] *Id.* (Schedule A).
[102] KLD002828_0042_0000365.
[103] *Id.*
[104] *Id.* (Schedule A).
[105] KLD002828_0012_0017872.
[106] ████████████████████



Further investigation into these arrangements is warranted.

### iv.   Internal Communications Regarding IP Treatment

Internal communications among FBG executives also reflect advance discussions regarding the post-closing treatment of intellectual property in connection with the Cardone acquisition. On June 29, 2023, one day before the Cardone acquisition closed, internal correspondence reflects a discussion concerning whether the Cardone SPA contained provisions affecting PPE and IP.[110] In that exchange, it was noted that intellectual property appeared throughout the SPA.[111]

In that context, the correspondence reflects discussion of a contemplated post-closing allocation under which certain PPE and IP would be addressed outside the operating business,

---

[109] The Examiner has been unable to locate licensing agreements for the Cardone and Carter/Walbro IP contributions due to time constraints in the Investigation.

[110] KLD002828_0018_0090420; KLD002828_0018_0090432; KLD002828_0018_0090487.

[111] KLD002828_0018_0090487.

consistent with transaction structures used in prior acquisitions.[112] The communications reference the anticipated post-closing distribution of IP to Alester and a desire to minimize the valuation attributed to that IP.[113] Related communications from two days earlier similarly reference the continued inclusion of IP in the SPA notwithstanding an expectation that such IP would ultimately be held outside the acquired operating company.[114]

Taken together, these communications indicate that, prior to the closing of the Cardone acquisition, there was contemporaneous consideration of transferring intellectual property out of the acquired business following closing and structuring the transaction to limit the value attributed to that IP.

### 4. Transfer of Value to Non-Debtor Entities

The Investigation has revealed significant value leaving the FBG estate for non-Debtor entities owned by Patrick James outside the Chapter 11 corporate structure. The evidence identifies two principal categories of concern: (a) transfers of estate value to the Novares and Global Technologies entities, and (b) broader issues arising from pre- and post-petition operational integration and employee solicitation by those entities.

#### a. *The Novares Acquisition and Diversion of Estate Value*

In 2025, Global Technologies S.à.r.l. ("**Global Technologies**")—a Luxembourg entity owned by Patrick James outside of the FBG corporate umbrella—acquired Novares Group S.A.S.

---

[112] KLD002828_0018_0090432.
[113] KLD002828_0018_0090487; KLD002828_0018_0090491; KLD002828_0018_0090507.
[114] KLD002828_0012_0080523.

("**Novares**"),[115] an automotive parts manufacturer specializing in plastics.[116] ███████████

███████████████████████████████████████████

████ [117]   It appears that First Brands paid approximately €27 million through Butterworth Capital Management, LLC for the sale of the Novares subsidiaries and assumed certain liabilities in connection with the transaction.[118]   According to correspondence from counsel for the Debtors, Weil, Gotshal & Manges LLP ("**Weil**"), a December 2024 Santander Bank side letter agreement reflected First Brands' undertaking to become the owner of the Novares Subsidiaries.[119]

The plan was for Novares' North American operations to reside within FBG.[120]   Following the bankruptcy petition, however, counsel for Global Technologies—Debevoise & Plimpton LLP—challenged that characterization, asserting that no transfer documentation between Global Technologies and FBG existed.[121]   Counsel for the Debtors confirmed to the Examiner that Global Technologies purchased Novares and the acquisition was intended to be "back-to-back"—with the Novares entities transferred to FBG—but that no transfer documentation appeared to have been executed.[122]

---

[115]   Novares Acquired by Global Technologies, Novares (April 22, 2025), https://www.novaresteam.com/global-technologies/; Global Technologies Expands its Expertise with the Acquisition of Novares, Global Technologies (April 24, 2025), https://global-technologies.com/global-technologies-enters-the-market-with-the-acquisition-of-novares/; As First Brands Headed for Failure, Its Founder Spent Big in Europe, WSJ (Nov. 14, 2025), https://www.wsj.com/business/autos/as-first-brands-headed-for-failure-its-founder-spent-big-in-europe-a82fa778?mod=article_inline.

[116] About Us, Novares, https://www.novaresteam.com/discover-novares/about-us/ (last visited April 8, 2026).

[117] ████████████████████ KLD002828_0012_0020536; ████████████████ ████████████████████

[118] Opposition to Debtors' Application for Preliminary Injunction, Ex. A, *First Brands Group, LLC v. James*, Adv. Pro. No. 25-03803 (Bankr. S.D. Tex. Nov. 7, 2025), Dkt. 37-1 (letter dated October 24, 2025 from Robert S. Berezin, Weil, Gotshal & Manges LLP, to Erica S. Weisgerber, Debevoise & Plimpton LLP, Re: Novares Subsidiaries).

[119] *Id.*

[120] *Id.*

[121] Examiner Meeting with Weil (February 11, 2026).

[122] *Id.*

Post-petition negotiations to bring Novares within the FBG structure failed, and Novares U.S. started operating under Novares S.A.S.—outside the Debtor group.[123]  Patrick James owned Novares through Global Technologies at the time, ███████████████████████████ ███████████████████████████████████████████████████[124]  FBG has reserved all rights to pursue claims against Global Technologies, including for the return of the $31.1 million payment.[125]

### b.  Direct payments from First Brands to Novares

Beyond the $31.1 million acquisition payment, the Examiner identified multiple additional transfers from Debtor entities to Novares.

First, on September 17, 2025—eleven days before the Petition Date—Cequent Nederland, an entity owned by Debtor entities, transferred €1 million to Novares labeled as an "advance payment."[126]  A second €1 million transfer between the same entities under the same label followed on September 19, 2025.[127]  FBG employees reported that these transfers lacked valid justification, and that an invoice was created after the fact to justify them.[128]  A&M reported that Saad Madani, Chief Financial Officer of Global Technologies, had referenced an intention to enter into a service contract with Novares, but the purpose appeared unclear.[129]

---

[123] *Id.*
[124] ███████████████████████████████████████████████
[125] Examiner Meeting with Weil (February 11, 2026).
[126] HSBC Payment Details, Reference No. 17092025 (Sept. 17, 2025).
[127] HSBC Payment Details, Reference No. 19092025 (Sept. 19, 2025).
[128] Examiner Interview of Saad Madani (Chief Financial Officer, Global Technologies) (February 17, 2026); Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) (January 16, 2026).
[129] Examiner Meeting with A&M (February 20, 2026).

41

Second, between August 13 and August 20, 2025, stock parts valued at about $3 million were transferred from the plant of an FBG-owned entity, Trico RO SRL, to a Novares Automotive Romania SRL plant without a sales contract.[130]  When Trico tried to invoice Novares, Novares claimed the parts had been transferred only for "storage/warehousing" and requested that Trico reverse the invoices and take the parts back.[131]  A witness confirmed that Novares did not actually pay and there was no contract.[132]

Third, FBG entities continued paying about $10,000 to $11,000 per month for corporate vehicle leases held by Frederic Sipahi's executive team at Novares—specifically through the Debtor subsidiary Ultinon.[133]  A&M confirmed that even after controls were implemented, these payments continued.[134]

Fourth, Novares invoiced FBG for approximately €50,000 for purportedly unjustified legal services.[135]  The invoice was later supported by what was described as a *post-facto* agreement.[136]

Fifth, additional seemingly unsupported payments from FBG to Novares in August 2025 included three transfers totaling about $1.63 million ($431,124, $501,036, and $699,120) and a $735,000 payment to Novares Brazil on August 13, 2025.[137]

These preliminary findings raise concerns about transfers of estate value to non-Debtor entities owned and operated by Patrick James and warrant further investigation.

---

[130] Notice from Novares Automotive Romania SRL to Trico RO SRL (Nov. 24, 2025) (notice requesting return of equipment and describing the nature of the underlying transaction as "storage").

[131] *Id.*; Examiner Interview of Ionica Niculae (Human Resources, FBG) (January 16, 2026).

[132] Examiner Interview of Christina Lefter (Senior Legal Advisor, FBG) (January 15, 2026).

[133] Examiner Meeting with A&M (February 20, 2026); Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) (January 16, 2026).

[134] Examiner Meeting with A&M (February 20, 2026).

[135] Examiner Interview of Christina Lefter (Senior Legal Advisor, FBG) (January 15, 2026).

[136] *Id.*

[137] Examiner Meeting with A&M (February 20, 2026).

### c. Pre- and Post-Petition Operational Integration

Prior to the Chapter 11 filings and under Patrick James's leadership, both the Novares and the Eagle entities (another non-Debtor group) were operationally treated as part of the FBG enterprise.[138] Witnesses consistently reported that funds were commingled among Eagle and FBG entities, personnel worked across entities without regard to corporate boundaries, shared departments and enterprise systems served Novares, Eagle, and FBG operations, and employees were unaware these entities were legally distinct from FBG.[139] One witness stated that prior to November 2025, "from an operations standpoint everything was part of FBG and everything was part of the company."[140] A&M confirmed that under pre-petition management by Patrick James and his team, there were not legal or operational distinctions between certain entities, including entities that Patrick James otherwise owned outside FBG.[141] FBG IT personnel also reported significant pressure to integrate Novares data into FBG's systems as late as September 2025—immediately before the Petition Date.[142]

### d. Employee Solicitation and the Cease-and-Desist Letter

---

[138] The Eagle entities refers to a second group of non-debtor entities held through SA Eagle Holdings, LLC. Patrick James directly owns Mayfair Enterprises LLC, which controls Bond Street Asset Management, LLC, which in turn owns SA Eagle Holdings, LLC. SA Eagle Holdings owns three operating entities: Eagle de Argentina S.A.U., Eagle do Brasil Ltda., and Eagle Manufacturing Canada Ltd. None of these entities are debtors, borrowers, guarantors, or pledgors under the credit facilities supporting the Chapter 11 cases.

[139] Examiner Meeting with A&M (January 20, 2026); Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) (January 15, 2026); Examiner Interview of Christina Lefter (Senior Legal Advisor, FBG) (January 15, 2026); Examiner Interview of Ionica Niculae (Human Resources, FBG) (January 16, 2026); Examiner Interview of Morosan (Corporate Finance, FBG) (January 14, 2026) Examiner Interview of Yessica Faz (Senior Finance Manager, FBG) (January 16, 2026); Examiner Interview of Tere Pedrosa (Claims and Credit Supervisor, FBG) (January 16, 2026); Examiner Interview of Erika Espinoza (Manager of Data Compliance, FBG) (January 16, 2026); Examiner Interview of Romanian IT Team (January 14, 2026).

[140] Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) (January 15, 2026).

[141] Examiner Meeting with A&M (January 20, 2026).

[142] Examiner Interview of Romanian IT Team (January 19, 2026).

43

Employees reported hearing that certain non-debtor entities would survive while FBG entities would be put into bankruptcy.  One FBG employee reported that a member of Frederic Sipahi's team told her Novares was the "sanitized boat that would not sink" and that she was "unlucky to be on the sinking boat, that is FBG."[143]

In early 2024, Patrick James recruited Mr. Sipahi from his position as Chief Executive Officer of Sogefi to join FBG.[144]  Beginning in the fall of 2024, Mr. Sipahi assumed responsibility for managing FBG's European and Rest of World operations.[145]  Over the following months, he built his team and developed the institutional knowledge necessary to run FBG's Rest of World business.[146]

As described above, Novares Group S.A.S. sits under Global Technologies S.à.r.l., which is owned by Patrick James outside the FBG corporate structure.  In July 2025—approximately two months before the Petition Date—Mr. Sipahi's and other team member's employment contracts were moved from FBG to Global Technologies.[147]  Saad Madani, Chief Financial Officer of Global Technologies, stated that Global Technologies' purpose was "to have a separate business from the U.S., to have something based in Europe and to raise funds in Europe and build something clean."[148]  Following the Chapter 11 filing, Mr. Sipahi and his team departed FBG in the fall of 2025 and began working for Global Technologies and its subsidiary Novares, taking with them the

---

[143] Examiner Interview of Ionica Niculae (Human Resources, FBG) (January 16, 2026).

[144] Examiner Interview of Frederic Sipahi (Group Chief Executive Officer, Global Technologies) (February 1, 2026).

[145] *Id.*

[146] Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) (January 15, 2026); Examiner Interview of Frederic Sipahi (Group Chief Executive Officer, Global Technologies) (February 4, 2026).

[147] Examiner Interview of Saad Madani (Chief Financial Officer, Global Technologies) (February 17, 2026).

[148] *Id.*

operational capacity and institutional knowledge they had built at the Debtors' expense.[149]  Internal records identify specific employees transferred to Novares between September and October 2025, including Frederic Muller, Gian Matteo Marrocco, Sofiane Bouguern, Allan Gouret, and Annalisa Sivieri.[150]  Witnesses in Romania corroborated a broader pattern of employee departures across Europe during July through September 2025, concurrent with the operational separation of Novares from FBG.

Counsel for the Debtors confirmed that ███████████████████████████ ███████████████████████████████, Patrick James agreed not to contact employees— yet FBG learned that he was "trying to pull employees away."[151]  In October 2025, Weil sent a cease-and-desist letter to counsel for Patrick James, demanding that Patrick James and his affiliates cease soliciting FBG employees to work at Novares and Global Technologies.[152]

The evidence raises substantial questions about whether estate value—in the form of personnel, operational capacity, and institutional knowledge developed at the Debtors' expense— was systematically transferred to non-Debtor entities owned by Patrick James before and after the Petition Date.

### e.  Outstanding Investigative Steps

With additional budget, in addition to the transfers of cash and other assets to Patrick James and affiliated entities identified to date, over the next 90 days the Examiner would pursue

---

[149] Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) (January 15, 2026); Examiner Interview of Frederic Sipahi (Group Chief Executive Officer, Global Technologies) (February 4, 2026).

[150] Examiner Interview of Scott Wallace (Chief Operating Officer, FBG) (February 23, 2026); FBG_EX_00000182.  Diana Salim received an offer letter to move to Novares, though it is unclear whether a transfer occurred.

[151] Examiner Meeting with Weil (February 11, 2026); ███████████

[152] FBG_EX_00000182.

additional records to perform a more comprehensive forensic tracing of funds and other assets. This would include triangulating bank records, deal documentation, and supporting schedules to identify the source and ultimate disposition of funds. The Examiner would continue this analysis to identify other diversions of funds and assets beyond the FBG estate. Additionally, he would continue to conduct targeted document review and witness interviews to inform this analysis.

### f. Piercing the Corporate Veil

As a final note on the transfer of Debtor assets to Patrick James and his affiliated entities, the Examiner preliminarily finds that creditors of the Debtors would have colorable claims for piercing the corporate veil against Mr. James and certain of his non-Debtor entities. Here, the evidence indicates that "the dominant shareholder siphoned corporate funds…and, in general, the corporation simply functioned as a façade for the dominant shareholder." *In re Foxmeyer Corp.*, 290 B.R. 229, 235 (Bankr. D. Del. 2003) (quoting Delaware caselaw). Other requirements appear to be found here as well, including "the presence of injustice or unfairness," and courts order the piercing of the corporate veil "in order to prevent fraud, illegality, or injustice, or the adverse effects thereof." *In re Gulf Fleet Holdings*, 491 B.R. 747, 788 (quoting *In re Moll Indus., Inc.*, 454 B.R. 574, 591 (Bankr. D. Del. 2011)); *In re Foxmeyer*, 290 B.R. at 236 (quotation marks omitted). While more investigation is needed to determine the specific entities to which it would apply, the Examiner's preliminary finding is that piercing the corporate veil may be appropriate here.

### C. Third-Party Factoring

#### 1. Context and Methods

In the course of the Investigation, the Examiner undertook substantial efforts to assess FBG's Third-Party Factoring practices and related liabilities. The Examiner began comparing invoice-level records exported from FBG's internal systems (Treasury Sharepoint and personal

OneDrives) against nomination packages transmitted to Third-Party Factors (including spreadsheets prepared by FBG personnel) and with information provided by third-party factoring lenders (the "**Third Party Factors**"), including PrimeRevenue data.  This data analysis was supplemented by initial interviews of FBG personnel closely involved with the Third-Party Factoring process.

The preliminary analysis concentrated on analysis of factoring transactions with LAM Parties and Katsumi, as Debtor information related to these factors was the most easily attainable. Illustrative reconciliations include instances in which FBG invoice data was manipulated, resulting in final nomination files provided to factors that diverged from the original source data.

The Investigation has identified instances in which invoices submitted by FBG to certain Third-Party Factors did not correspond to FBG's system-generated invoice records.  These instances include, among others: (i) invoices for which identifying information—such as invoice number, customer, or supplier—did not match internal records; (ii) invoices for which the amounts presented to Third-Party Factors materially exceeded the amounts reflected in FBG's internal records; and (iii) invoices that were presented to more than one Third-Party Factor, giving rise to the potential for competing claims to the same receivable.  These anomalies are consistent with fabrication and are probative of fraud.  They could also undermine claims that factor liens attach to genuine receivables.

On or about September 12, 2025, FBG discontinued all Third-Party Factoring and has not sold any receivables to a Third-Party Factor since that date.[153]  Following diligence by FBG's

---

[153] Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables without Liability; and (III) Granting Related Relief, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Dec. 1, 2025), Dkt. 807, ¶ 2.

advisors, the Debtors estimated the total accrued prepetition balance relating to Third-Party Factoring arrangements at approximately $2.3 billion as of the Petition Date.[154] This figure (submitted by the Debtors in the nascent stages of this proceeding)[155] reflects unpaid balances prior to reconciliation and does not, standing alone, represent a final measure of net loss. Any preliminary assessment of attributable economic loss for the Third-Party Factors is necessarily provisional and subject to material adjustment based on (i) the outcome of invoice-level validation and reconciliation, (ii) the allocation to the Third-Party Factors of customer payments received or to be received on prepetition receivables, as appropriate, and (iii) the resolution of related legal and factual disputes. The scope, viability, and economic valuation of any such claims have not been determined as of the date of this Report.

### 2. Mechanics of Receivables Sales and Payment Flows

FBG's highly decentralized organizational structure created an operating environment in which fraudulent Third-Party Factoring activity could be executed without detection by rank-and-file employees. Under Third-Party Factoring, FBG would sell inventory to a customer and subsequently sell the associated receivable to an unaffiliated Third-Party Factor.[156] Through these arrangements, the factor would pay FBG for the receivable in the near-term (sometimes within seven days), in exchange for a payment approximately 105 days later.[157] Unlike Customer Factoring, in which customers typically pay a partnered financial institution directly, Third-Party

---

[154] Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions, Case No. 25-90399, Dkt. 22, ¶ 72.

[155] *Id.* (filed September 29, 2025).

[156] Declaration of Daniel Jerneycic in Support of the Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables without Liability; and (III) Granting Related Relief, Case No. 25-90399, Dkt. 808, ¶ 4.

[157] Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions, Case No. 25-90399, Dkt. 22, ¶ 71.

Factoring required FBG to remit payment to the Third-Party Factors.[158] This structural distinction proved critical to the fraudulent scheme, as it allowed FBG to maintain control over the flow of funds and facilitated the manipulation of receivable data provided to Third-Party Factors. The factoring arrangements were represented to be structured as transactions intended to function as "true sales" of receivables and to be insulated from the effects of a bankruptcy filing.[159] The purchasers of the receivables appear to have believed that they were not assuming the credit risk of the FBG receivables sellers themselves, but rather the risk that the underlying customers would fail to pay the receivables.[160] Although the FBG receivables sellers continued to collect payments from customers and remit those amounts onward, the arrangements were described by Third-Party Factors as contemplating that the collected funds would not become property of FBG and, therefore, not become part of the FBG bankruptcy estates.[161] Rather, certain Third-Party Factors assert that they believed they were purchasing actual receivables and would be repaid from customer collections, with FBG serving merely as a conduit for those funds.[162]

### 3. Primary Third-Party Factors and Their Arrangements

The Debtors worked with several Third-Party Factors that purchased their accounts receivable. These include: Raistone, the LAM Parties, Evolution, Katsumi, ING Belgium S.A./N.V. ("**ING**") and Arab Banking Corporation B.S.C. ("**Bank ABC**").[163]

---

[158] *Id.*

[159] Hearing held January 13, 2026, *In re First Brands Grp., LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Jan. 13, 2026), Dkts. 1341–1343, Hr'g Tr. 35:05–35:10, 59:25–60:06; Examiner Meeting with Katsumi (January 12, 2026).

[160] Hearing held January 13, 2026, Case No. 25-90399, Dkts. 1341–1343, Hr'g Tr. 59:25–60:12; Examiner Meeting with Katsumi (January 12, 2026).

[161] Hearing held January 13, 2026, Case No. 25-90399, Dkts. 1341–1343, Hr'g Tr. 59:25–60:12.

[162] Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions, Case No. 25-90399, Dkt. 22, ¶ 71; Examiner Meeting with Leucadia (January 7, 2026).

[163] Declaration of Daniel Jerneycic in Support of the Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables without Liability; and (III) Granting Related Relief, Case No. 25-90399, Dkt. 808, ¶ 4 n.5.

### a. Raistone

Raistone worked with the Debtors under two separate arrangements. First, under a receivables purchase agreement dated May 14, 2024, Raistone purchased accounts receivable from the Debtors arising from goods and services that the Debtors provided to non-Debtor third parties.[164] Under the agreement, the Debtors acted as Raistone's servicer and agent, responsible for collecting payments and ensuring that collections were deposited into designated accounts.[165] Any funds received by the Debtors were required to be held in trust, segregated from their other property, and promptly remitted to Raistone.[166] On September 25, 2025, Raistone terminated the Debtors' role as servicer and directed that customers make payments directly to a Raistone-designated account.[167] The agreement terminated shortly thereafter upon the commencement of the Chapter 11 cases.[168] Raistone claims it was owed more than $172 million under the agreement as of the Petition Date.[169]

Second, Raistone worked with the Debtors under a supply chain finance agreement dated August 15, 2019.[170] Through this agreement, the Debtors were provided access to a technology platform to submit approved invoices for goods and services that the Debtors purchased from third-party suppliers.[171] Once the Debtors approved an invoice (an "approved amount"), the supplier

---

[164] Objection and Reservation of Rights of the Raistone Parties, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Sept. 30, 2025), Dkt. 138, ¶ 6. This agreement involved Raistone Purchasing Series LLC–Series XXXII.

[165] *Id.* ¶¶ 7–8.

[166] *Id.* ¶ 8

[167] *Id.* ¶ 9

[168] *Id.* ¶ 10

[169] *Id.* ¶ 11.

[170] *Id.* ¶ 12. Raistone Purchasing LLC (formerly SGSF Master Purchasing DE LLC) originally provided the funding under the supply chain financing agreement and Raistone Capital LLC operated the invoice-submission platform. Raistone Purchasing LLC subsequently assigned its rights and obligations under the agreement to Raistone Purchasing LLC–Series XXVIII.

[171] *Id.*

50

could request early payment from Raistone at a discount (a "settlement").[172]  When Raistone paid a supplier early, the Debtors were required to repay Raistone the full invoice amount on the due date.[173]  Raistone alleges that, by late September 2025, the Debtors had failed to pay over $92 million in approved amounts and, as of the Petition Date, owed at least $684 million related to settled invoices.[174]

### b.  LAM Parties

Leucadia, a subsidiary of Jefferies Financial Group Inc.,[175] maintained a factoring relationship with FBG through its Point Bonita Capital Division,[176] LAM Trade Finance Group LLC ("**LAM TFG**"), and LAM Trade Finance Group II LLC ("**LAM TFG II**") (collectively, the "**LAM Parties**").[177]

In 2019, LAM TGF entered into a master receivables purchase agreement with FBG[178] under which LAM TGF purchased accounts receivable owed to certain FBG entities by their customers.[179]  The agreement characterized each receivables transaction as "an absolute and

---

[172] *Id.* ¶ 14.

[173] *Id.* ¶ 15.

[174] *Id.* ¶¶ 16, 18.

[175] Examiner Meeting with Leucadia (January 7, 2026).

[176] According to the LAM Parties' advisors, Point Bonita operated as a pooled capital vehicle used for multiple trade-finance and factoring investments. *Id.*

[177] Leucadia Parties' Objection to Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors' Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables Without Liability; and (III) Granting Related Relief, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Dec. 21, 2025), Dkt. 1049; LAM Parties' Response to Motions for Appointment of an Examiner, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Nov. 10, 2025), Dkt. 617, 1.

[178] Under the operative version of the master receivables purchase agreement, dated September 19, 2022 (and subsequently amended, most recently on May 27, 2025), the FBG sellers include Trico Products Corporation; Carter Fuel Systems; LLC; ASC Industries, Inc.; Fram Group Operations LLC; Brake Parts Inc. LLC; Champion Laboratories, Inc.; Qualis Automotive, L.L.C.; and Pylon Manufacturing Corp.; and CWD, LLC. *Id.* ¶ 5 n.4.

[179] Leucadia Parties' Objection to Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors' Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables Without Liability; and (III) Granting Related Relief, Case No. 25-90399, Dkt. 1049, ¶ 9. LAM TFG II entered into similar receivables purchase agreements with certain non-Debtor foreign affiliates of the Debtors, including Trico Belgium S.A., Trico Anco Distribucion de

51

irrevocable sale" of the receivable, with the parties agreeing to treat the transactions as "true sale[s]."[180]  To the extent any purchase of receivables was not characterized as a sale, LAM TFG was entitled to a protective, first-priority security interest in the purchased receivables and their proceeds under the agreement.[181]

The FBG entities were designated as servicers responsible for administering and servicing the sold receivables.[182]  In that role, the FBG entities were required to direct customers to make payments into a designated LAM TFG collections account and to promptly remit any proceeds it nonetheless received.[183]  According to the LAM Parties' advisors, however, customer payments appear to have been deposited into FBG general operating accounts instead.[184]  The advisors also raised concerns based on information obtained post-petition from First Brands, about whether payments on factored receivables were consistently funded by collections on the sold receivables, as opposed to other sources such as unrelated receivables or proceeds from new factoring transactions.[185]

---

Mexico, S de RL de C.V., Fram Group Operations Mexico City S.A. de C.V., BPI Distribution Mexico S.A. de C.V., and Airtex Products S.A. LAM Parties' Response to Motions for Appointment of an Examiner, Case No. 25-90399, Dkt. 617, ¶ 5 n.5.

[180] Leucadia Parties' Objection to Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors' Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables Without Liability; and (III) Granting Related Relief, Case No. 25-90399, Dkt. 1049, ¶ 10.

[181] *Id.* ¶ 10 n.7; LAM Parties' Protective Objection and Preservation of Rights in Response to Debtors' DIP and Cash Management Motions, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Oct. 31, 2025), Dkt. 480, ¶ 7.

[182] Leucadia Parties' Objection to Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors' Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables Without Liability; and (III) Granting Related Relief, Case No. 25-90399, Dkt. 1049, ¶ 11.

[183] *Id.* ¶¶ 11, 13.

[184] Examiner Meeting with Leucadia (January 7, 2026).

[185] *Id.*

The FBG entities sold receivables to the LAM Parties through PrimeRevenue, a third-party platform used by both sides to facilitate factoring transactions.[186]  Representatives explained that FBG prepared spreadsheets containing invoice-level data—such as customer name, invoice number, and amount—for upload into PrimeRevenue.[187]  Leucadia relied on the invoice-level data presented in PrimeRevenue in making purchase decisions and did not independently receive or review underlying spreadsheets or invoice documents at the time of purchase.[188]

Berkeley Research Group ("**BRG**"), the LAM Parties' forensic advisor, compared data in PrimeRevenue with Vizion, FBG's internal invoice-tracking platform.[189]  BRG found that while some invoices reflected in PrimeRevenue matched corresponding entries in Vizion, many did not.[190]  In particular, BRG identified repeated mismatches in invoice numbers and systematic differences in invoice amounts, including instances where invoice amounts differed by a consistent percentage.[191]  BRG also identified patterns suggesting invoice recycling or double-factoring, including cases where more invoices appeared in PrimeRevenue than existed in Vizion, and instances where the total value of invoices sold exceeded contractual purchase limits that PrimeRevenue was expected to monitor.[192]

Once collections on receivables ceased, the LAM Parties notified the Debtors of noncompliance and terminated their servicing role.[193]  As of the Petition Date, the LAM Parties

---

[186] *Id.*
[187] *See id.*
[188] *See id.*
[189] Examiner Meeting with Berkley Research Group (January 9, 2026).
[190] *Id.*
[191] *Id.*
[192] *Id.*
[193] Leucadia Parties' Objection to Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors' Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables Without Liability; and (III) Granting Related Relief, Case No. 25-90399, Dkt. 1049, ¶ 16.

assert unpaid balances of roughly $885 million in purchased receivables, reflecting their stated gross outstanding exposure under the factoring program.[194]

### c. Evolution

Evolution entered into a master receivables purchase agreement with certain FBG subsidiaries on March 28, 2023.[195] Under the agreement, Evolution purchased receivables owed to those subsidiaries, and was entitled to collect payment directly from their customers when those receivables became due.[196] Evolution contends that these transactions were structured as absolute and irrevocable sales, and treated as "true sales" for all purposes.[197] Prior to the Petition Date, Evolution claims it purchased receivables with a stated value of approximately $60.5 million.[198]

Evolution alleges that, under the agreement, those FBG subsidiaries made representations, warranties, and covenants relating to the authenticity and validity of the receivables and the underlying invoices.[199] For example, Evolution claims that the subsidiaries represented and warranted that the receivables were valid and authentic, were supported by valid and enforceable invoices, and reflected fair value for the amounts paid.[200]

---

[194] LAM Parties' Response to Motions for Appointment of an Examiner, Case No. 25-90399, Dkt. 617, ¶ 8.

[195] Complaint, *Evolution Credit Opportunity Master Fund II-B, LP v. First Brands Grp., LLC*, Adv. Pro. No. 26-03006 (Bankr. S.D. Tex. Jan. 9, 2026), Dkt. 1, ¶ 25. Evolution purchased invoices from eight FBG entities: First Brands Group, LLC; Strongarm, LLC; Carter Fuel Systems, LLC; Trico Products Corporation; ASC Industries, Inc.; Fram Group Operations LLC; Brake Parts Inc. LLC; Champion Laboratories, Inc. *Id.* ¶¶ 1, 25; Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Jan. 9, 2026), Dkt. 147 at 1 n.2. Other Evolution affiliates include Evolution Credit Opportunities Master Fund II-B, L.P., Evolution Credit Opportunity Master Fund III-B, L.P., and Evolution Credit Partners Trade Finance Master L.P. (as successor in interest to Evolution Credit Partners Trade Finance L.P.) (collectively, "**Evolution**").

[196] *Id.* ¶ 26.

[197] *Id.* ¶ 26.

[198] *Id.* ¶ 32.

[199] *Id.* ¶ 27.

[200] *Id.*

54

Evolution further alleges that the agreement gave it a lien on and security interest in all of the receivables those FBG subsidiaries owned or held (to the extent not sold and purchased under the agreement), along with related assets, collections, and proceeds.[201] Evolution claims that it holds a security interest in all non-factored receivables of those subsidiaries.[202] Evolution also alleges that it perfected its security interests by filing UCC-1 Financing Statements on March 31, 2023 and April 3, 2023.[203] In total, Evolution claims it is owed $230 million.[204]

### d.  Katsumi

Katsumi Servicing, LLC and KARS Funding, LLC ("**KARS**") (collectively, "**Katsumi**") entered into a receivables purchase agreement with FBG in 2022.[205] Under the agreement, Katsumi purchased receivables from various FBG subsidiaries, including Brake Parts Inc. LLC, Trico Products Corporation, Horizon Global Americas Inc., FRAM Group Operations LLC, and Champion Laboratories, Inc.[206] Katsumi contends that the agreement was structured as an absolute and irrevocable "true sale" of receivables, transferring to the buyer "the full benefits and risks of ownership" of the purchased receivables.[207] Katsumi further asserts that the agreement required

---

[201] *Id.* ¶ 30.

[202] *Id.* ¶ 42.

[203] *Id.* ¶ 31.

[204] Stipulation By First Brands Group, LLC and Evolution Credit Partners, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Oct. 1, 2025), Dkt. 147, 3.

[205] Objection of Katsumi Servicing, LLC to Debtors' (I) DIP Motion and (II) Cash Management Motion, *In re First Brands Grp., LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Oct. 30, 2025), Dk. 456, 1 n.2.

[206] Objection of Ing Belgium S.A./N.V. to the Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) The Review and Reconciliation of the Debtors' Receipts, and (B) The Release of Funds to the Debtors' Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables Without Liability; and (III) Granting Related Relief, *In re First Brands Grp., LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Dec. 21, 2025), Dkt. 1045, ¶ 2 n.5.

[207] Objection of Katsumi Servicing, LLC to Debtors' (I) DIP Motion and (II) Cash Management Motion, Case No. 25-90399, Dk. 456, ¶ 15.

the FBG sellers to hold collected funds in trust for Katsumi's benefit and promptly remit them to Katsumi.[208]

Counsel for Katsumi explained that Katsumi provided Third-Party Factoring for receivables from various customers before the bankruptcy filing.[209] Counsel stated that the total outstanding as of the initial filing was $1.7 billion.[210] Counsel further explained that Katsumi's business model had been centered on providing trade finance solutions, and Katsumi viewed its transactions with FBG as typical receivables financing.[211] According to counsel, Katsumi viewed its dealings with FBG as bankruptcy-remote by taking on the credit risk of creditworthy customers such as Walmart and Amazon, rather than relying on FBG's credit, and by structuring the transactions as true sales under a standard purchasing agreement.[212] An A&M witness further indicated that Katsumi appeared to engage in regular invoice auditing during the relationship, including conducting weekly audits in October 2024.[213]

Katsumi's nomination process differed from that of other factors. A Romania-based FBG employee involved in the nomination process explained that while invoice data for other factors was uploaded via Excel to the PrimeRevenue platform, nominations for Katsumi were sent by email.[214] An A&M witness further indicated that emails from Katsumi or Jefferies were deliberately routed to Edward James or Andy Brumbergs, with all other FBG employees blocked from receiving Katsumi's communications.[215]

---

[208] *Id.* 5–7.
[209] Examiner Meeting with Katsumi (January 12, 2026).
[210] *Id.*
[211] *Id.*
[212] *Id.*
[213] Examiner Meeting with A&M (January 12, 2026).
[214] Examiner Interview of Vlad Botescu (Financial Analyst, FBG) (January 15, 2026).
[215] Examiner Meeting with A&M (January 14, 2026).

Katsumi alleges that during the Chapter 11 proceedings it discovered that many of the receivables it purchased were based on invoices that FBG inflated, sold more than once, or "invented out of whole cloth."[216]  In total, Katsumi alleges it is owed, as of the Petition Date, $1.75 billion from Debtors.[217]

### e. ING and Bank ABC

Katsumi sold some of its purchased receivables to ING and Bank ABC under separate transfer agreements in 2025.[218]  Those institutions now hold a portion of the underlying claims.[219]

### i. ING

ING did not factor receivables directly with FBG.  Instead, ING purchased certain receivables from Katsumi pursuant to a receivables transfer agreement.[220]  Through that agreement, ING acquired Katsumi's rights in certain receivables that Katsumi had purchased from FBG, together with related collateral, collections, and proceeds.[221]  Prior to the Petition Date, Katsumi notified customers that certain receivables had been transferred to ING, and ING separately confirmed the assignment.[222]

---

[216] *Id.* ¶ 1.

[217] Objection of Katsumi Servicing, LLC to Debtors' (I) DIP Motion and (II) Cash Management Motion, Case No. 25-90399, Dkt. 456 ¶ 8.

[218] Objection of Ing Belgium S.A./N.V. to the Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) The Review and Reconciliation of the Debtors' Receipts, and (B) The Release of Funds to the Debtors' Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables Without Liability; and (III) Granting Related Relief, *In re First Brands Grp., LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Dec. 21, 2025), Dkt. 1045, ¶ 1 n.3;     Joinder of Arab Banking Corporation B.S.C. in Consolidated Limited Objection and Reservation of Rights of Katsumi Servicing, LLC to Debtors' (I) DIP Motion and (II) Cash Management Motion, *In re First Brands Grp., LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Oct. 1, 2025), Dkt. 144, 1.

[219] *See id.*

[220] Objection of Ing Belgium S.A./N.V. to the Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) The Review and Reconciliation of the Debtors' Receipts, and (B) The Release of Funds to the Debtors' Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables Without Liability; and (III) Granting Related Relief, Case No. 25-90399, Dkt. 1045, ¶¶ 1–2.

[221] *Id.* ¶ 3.

[222] *Id.* ¶ 4.

Counsel for ING explained to the Examiner's team that all of ING's reporting and information regarding the factored receivables flowed through Katsumi, who served as the main investor for both ING and Bank ABC.[223]

ii.  Bank ABC

Bank ABC became involved as a transferee of receivables through its relationship with Katsumi.  Under a master receivables transfer agreement entered into in February 28, 2025,  Bank ABC purchased for cash all right, title, and interest in certain receivables Katsumi purchased from FBG, together with any related rights, collections, and proceeds.[224]  Prior to the Petition Date, Bank ABC notified certain customers that Katsumi transferred and assigned to Bank ABC the identified accounts receivable.[225]

4.  Expansion of Factoring as a Liquidity Source During the Prepetition Period

Factoring became an increasingly critical source of liquidity for FBG during the prepetition period.  Witnesses and advisors described a pattern in which proceeds from new factoring transactions were used to pay off obligations to existing factors.  Advisors noted that, based on information obtained post-petition from First Brands, a substantial portion of the funds used to settle receivables appeared to derive from sources other than associated customer collections.[226]

Some of the factoring arrangements operated at extraordinarily high interest rates, with evidence indicating rates of 20-30%, significantly above market rates for traditional asset-based

---

[223] Examiner Meeting with ING (January 27, 2026).

[224] Joinder of Arab Banking Corporation B.S.C. in Consolidated Limited Objection and Reservation of Rights of Katsumi Servicing, LLC, *In re First Brands Grp., LLC*, No. 25-90399 (Bankr. S.D. Tex. Oct. 1, 2025), Dkt. 144, ¶ 1.

[225] Joinder of Arab Banking Corporation B.S.C. in the Objection of Katsumi Servicing, LLC and ING Belgium S.A./N.V. to the Debtors' Third-Party Factoring Procedures Motion, *In re First Brands Grp., LLC*, No. 25-90399 (Bankr. S.D. Tex. Dec. 21, 2025), Dkt. 1047, ¶¶ 1–2.

[226] Examiner Meeting with Leucadia (January 7, 2026).

58

lending.[227] These elevated rates reflected both the risk profile of the transactions and, as would later become apparent, FBG's desperate liquidity needs.

The Investigation has uncovered that the factoring operation expanded substantially over time. The Third-Party Factors' confidence was sustained by consistent payment performance. Counsel for Leucadia explained that for five years, First Brands made all payments by the due date or, in rare circumstances, shortly thereafter.[228] This track record appears to have mitigated concerns that might otherwise have prompted more rigorous scrutiny of the underlying business model.

     5.   Scale of Factoring Activity at the Petition Date

Following diligence performed by FBG's Advisors, the Debtors believe that an unpaid prepetition balance of approximately $2.3 billion has accrued with respect to the Third-Party Factoring arrangements as of the Petition Date.[229] The records provided by the Third-Party Factors allege that their factored invoices total $3 billion in invoice value, with those invoices carrying a loan value of $2.3 billion.[230] An A&M witness explained that the $3 billion figure represented invoice value, while the lower amount represents the funds that were actually advanced, with most of the outstanding factored invoices having been issued in 2025.[231]

---

[227] Examiner Meeting with Weil and A&M (January 5, 2026).
[228] Examiner Meeting with Leucadia (January 7, 2026).
[229] Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions, Case No. 25-90399, Dkt. 22, ¶ 72.
[230] Declaration of Daniel Jerneycic in Support of the Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables without Liability; and (III) Granting Related Relief, Case No. 25-90399, Dkt. 808, ¶ 21.
[231] Examiner Meeting with A&M (January 14, 2026).

The reconciliation conducted by A&M after the Petition Date indicated that the value of actual, authenticated invoices sold to the Third-Party Factors still outstanding was materially less than the values reflected in the data received from the Third-Party Factors.[232]

### 6. Invoice Origination and Verification Processes

The Examiner's Investigation found that FBG operated through a highly fragmented finance and accounting infrastructure spanning multiple countries, including the United States, Mexico, Romania, and India, which extended to its core financial systems.[233] FBG maintained numerous ERP systems—including Oracle, SAP, JD Edwards, AS/400, and Pronto—with system usage dictated largely by the legacy platforms of acquired entities rather than by a centralized system.[234] This fragmentation was exacerbated by FBG's acquisition-driven growth strategy, under which acquired businesses generally retained their existing ERP environments rather than being integrated into a unified platform, resulting in parallel and non-integrated accounting systems across the organization.[235] Accounting and reporting functions were performed at the site or business-unit level before being consolidated at corporate headquarters in Cleveland, a process that multiple witnesses described as hindered by disparate access protocols, region-specific IT configurations, and limited centralized visibility into FBG's financial reporting systems.[236]

---

[232] Declaration of Daniel Jerneycic in Support of the Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables without Liability; and (III) Granting Related Relief, Case No. 25-90399, Dkt. 808, ¶ 21.

[233] Examiner Interview of Victor Esquivel (Director of Finance, FBG) (January 15, 2026); Examiner Interview of Ric Tomaszewski (former Chief Financial Officer, FBG) (February 10, 2026); Examiner Interview of Tere Pedrosa (Claims and Credit Supervisor, FBG) (January 16, 2026).

[234] Examiner Interview of Victor Esquivel (Director of Finance, FBG) (January 15, 2026); Examiner Interview of Ric Tomaszewski (former Chief Financial Officer, FBG) (February 10, 2026); Examiner Interview of Jane Doe 1 (January 16, 2026).

[235] *Id.*

[236] Examiner's First Consultation with Debtor Professionals (January 5, 2026); Examiner Interview of FB Romania IT Team, Romania (January 14, 2026).

FBG's decentralized operating structure was accompanied by significant information barriers that limited employee visibility into FBG's broader financial activities. Andrea Alexandrescu, a data and reporting professional based in Romania, explained that FBG lacked basic organizational clarity, including a formal organizational chart, and operated through siloed dashboards that impeded cross-functional comparison and customer-level analysis.[237] According to Ms. Alexandrescu, the absence of integrated customer mapping made it difficult to locate or reconcile data efficiently, reinforcing fragmentation across business units and regions.[238] Witness statements suggest that this compartmentalization was not incidental. Decision-making and instructions flowed from corporate leadership in Cleveland to site-level personnel who executed tasks without context or insight into their purpose.[239] Andy Brumbergs, FBG's former Vice President of Finance and board member, functioned as a key intermediary by receiving direction from senior leadership, including Patrick James, and distributing discrete assignments to subordinates who were unaware of parallel workstreams.[240] This structure limited transparency and diffused accountability, making it difficult to attribute responsibility for end-to-end processes.

Although operational and accounting activities were dispersed across multiple jurisdictions and systems, control over financial consolidation was concentrated in a narrow group. For example, Nelly Luna, the global head of accounting located in Matamoros, Mexico, supervised the centralized consolidation process conducted in Mexico using HFM, while regional finance personnel outside Mexico, including in Europe, had no access to the HFM system.[241] Roxana

---

[237] Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).
[238] *Id.*
[239] Examiner's First Consultation with Debtor Professionals (January 5, 2026).
[240] *Id.*
[241] Examiner's First Consultation with Debtor Professionals (January 5, 2026); Examiner Interview of Christina Rubliceanu (European Accounting Leader, FBG) (January 17, 2026).

61

Tent, who served in operations at FBG Romania, stated that site controllers worked with personnel in Mexico to submit financial information, but that access to consolidated financial statements required prior approval and was not available to regional leadership.[242]  Christina Rubliceanu, the European Accounting Leader based in Romania, similarly reported that no personnel in Europe had access to HFM and that when she raised concerns regarding the absence of consolidated financial statements required under European law, she was informed by Ms. Luna that such consolidations would not be provided.[243]

The Investigation further revealed that the geographic dispersion of finance and accounting functions contributed to operational opacity.  Shared service and back-office functions were distributed across India, Romania, and Mexico, with personnel in Romania extracting financial data that was subsequently modified in Cleveland before external use.[244]  Alberto Ochoa, a sales Vice President located in Monterrey, Mexico, described persistent disconnects between regions, noting limited visibility into accounts receivable, reliance on email due to time-zone differences, and confusion over ownership of customer accounts.[245]

FBG's decentralized infrastructure—encompassing fragmented ERP systems, siloed operations, geographically dispersed finance functions, and concentrated control over financial consolidation—created an environment susceptible to manipulation and conducive to factoring fraud.

     *a.  Creation and Submission of Invoices*

---

[242] Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).
[243] Examiner Interview of Christina Rubliceanu (January 17, 2026).
[244] Examiner Meeting with A&M (January 9, 2026).
[245] Examiner Interview of Alberto Ochoa (Vice President of Inside Sales, FBG) (January 14, 2026).

The process by which invoices were created, consolidated, and submitted to the Third-Party Factors was central to the scheme, involving personnel in multiple countries operating under the direction of key individuals within FBG.  Based on information obtained to date, the factoring nomination process operated through a defined workflow that was largely administered within FBG's shared service center in Romania, with final review and submission controlled by Cleveland-based personnel.[246]  Vlad Botescu, a Romania-based employee involved in the nomination process, explained that he worked from system-generated, spreadsheet-level accounts-receivable reports, rather than invoice-level source documents, which were produced by FBG's reporting systems and provided to him for consolidation and nomination.[247]  Consistent with that account, A&M's investigation corroborates that lists of invoices were periodically prepared for submission to specific factoring counterparties, with the timing, structure, and content of those lists varying by factor, and that the resulting nomination files were transmitted to Andy Brumbergs for further handling.[248]  For example, the nomination activity for FBG's largest third-party factoring programs, the LAM Parties and Katsumi,[249] was a recurring, labor-intensive process.  Mr. Botescu described the nomination function for these programs as a recurring and

---

[246] Examiner Interview of Vlad Botescu (Financial Analyst, FBG) (January 15, 2026).

[247] Examiner Interview of Vlad Botescu (Financial Analyst, FBG) (January 14, 2026); Examiner Interview of Vlad Botescu (Financial Analyst, FBG) (January 15, 2026).

[248] Examiner Meeting with A&M (January 9, 2026).

[249] The Debtor's documentation of the factoring process for the LAM Parties and Katsumi was maintained on shared network drives including a Treasury SharePoint and a personal OneDrive (Mintz, Sam).  The Treasury SharePoint is where the documentation was maintained with the step-by-step process of accumulating invoice data for the factored invoices for the time period 2023 through 2025.  The Mintz, Sam OneDrive is where the raw data for the nominations extracted from Vizion was originally saved.  The members of the Treasury SharePoint included Nigel Crighton, Joe DiFranco, Raisa Mocanu, Florin Enache, Carina Minzu, Nina Moldoveanu, and Vlad Botescu. Andy Brumbergs was granted access to individual files saved on the Treasury SharePoint.

time-intensive responsibility, occurring on a fixed weekly cadence, typically on Mondays, Wednesdays, and Fridays, with additional runs for other programs during the week.[250]

The process involved sequential steps beginning with Romania-based personnel extracting and consolidating raw accounts receivable data, followed by filtering invoices to exclude non-invoice line items and previously used invoice numbers.[251] The consolidated files were then transmitted to Cleveland for review, after which finalized nomination files were uploaded to the applicable third-party factor's portal.[252] Communication and coordination for this process occurred primarily through Teams-based channels linking Romania-based personnel with individuals in Cleveland.[253] Florin Enache, a Romania-based employee who periodically performed the nomination function as a backup to Mr. Botescu, described a Teams group that included Enache, Mr. Botescu, Joe DiFranco, and Mr. Brumbergs.[254] According to Enache's account, Enache would notify Cleveland when nomination files were ready for review and would await confirmation before proceeding with submission.[255] Multiple accounts corroborate a process in which invoice data was prepared and consolidated in Romania, but reviewed, adjusted, and authorized for submission by Cleveland-based personnel, principally Mr. Brumbergs, before being transmitted to Third-Party Factors.[256]

---

[250] Examiner Interview of Vlad Botescu (Financial Analyst, FBG) (January 14, 2026); Examiner Interview of Vlad Botescu (Financial Analyst, FBG) (January 15, 2026); Examiner Interview of Florin Enache (Treasury, FBG) (January 15, 2026).

[251] Examiner Interview of Vlad Botescu (Financial Analyst, FBG) (January 15, 2026).

[252] *Id.*

[253] Examiner Interview of Vlad Botescu (Financial Analyst, FBG) (January 15, 2026); Examiner's Interview with Florin Enache (Treasury, FBG) (January 15, 2026).

[254] Examiner's Interview with Florin Enache (Treasury, FBG) (January 15, 2026).

[255] *Id.*

[256] *Id.*; Examiner Interview of Vlad Botescu (Financial Analyst, FBG) (January 15, 2026); Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).

Mr. Brumbergs appears to have functioned as the primary point of contact with most Third-Party Factors.[257]  Witnesses further described that Mr. Brumbergs, together with Edward James, implemented a system whereby incoming communications from Third-Party Factors were automatically rerouted to Mr. Brumbergs or Edward James, effectively preventing other company personnel, including treasury and accounting staff, from receiving such communications.[258]  This arrangement isolated the nomination process from broader internal oversight and enabled Mr. Brumbergs to respond to factor inquiries without the knowledge of other employees.  According to witness accounts, Romania-based personnel routinely transmitted spreadsheets reflecting available factoring capacity to Mr. Brumbergs, who would then modify the data, most often by increasing invoice amounts to approach, but not exceed, the applicable capacity limits—before the nomination files were submitted to the Third-Party Factors.[259]

### b.  Role of Internal Controls, Customer Confirmations, and Factor Diligence

Factoring processes in Europe differed materially from those employed in North America, both in structure and oversight.[260]  European factoring arrangements were conducted primarily with regulated banks, which required regular and recurring reporting, including the submission of financial information and invoice-level data on a weekly or quarterly basis, and maintained direct visibility into accounts receivable.[261]  The banks imposed borrowing-base limitations tied to verified receivables and, according to witnesses, could suspend or terminate factoring access if

---

[257] Examiner Meeting with Weil and A&M (January 5, 2026).
[258] Examiner Meeting with A&M (January 14, 2026).
[259] Examiner Meeting with Weil and A&M (January 5, 2026); Examiner Interview of Vlad Botescu (Financial Analyst, FBG) (January 15, 2026).
[260] Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).
[261] Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).

timely and accurate information was not provided.[262] Saad Madani, who served in senior finance and purchasing roles within European operations, stated that European banks, including Citibank and Banco Bilbao Vizcaya Argentaria, declined to proceed with factoring arrangements after reviewing the financial information provided and identifying concerns with the statements themselves.[263] European factoring processes were further constrained by local legal and regulatory requirements, including the registration of guarantees and transparency obligations that limited the use of secondary or non-bank factors, as well as mandatory e-invoicing regimes under which issued invoices were visible to tax authorities.[264] Witnesses also explained that European factoring structures featured direct technical integration between banks and company ERP systems, allowing banks to pull data directly from ERP platforms rather than relying on manually prepared submissions and enabling continuous or near-daily monitoring and reconciliation to sales ledgers, which would rapidly surface discrepancies between reported receivables and underlying commercial activity.[265]

In contrast, witnesses described North American factoring practices as centralized and less transparent at the operating-unit level.[266] Accounts receivable data was consolidated by designated personnel into spreadsheets that were transmitted to Third-Party Factors via electronic platforms or email, without the real-time verification or direct system access characteristic of European

---

[262] Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).

[263] Examiner Interview of Saad Madani (Chief Financial Officer, Global Technologies) (February 17, 2026).

[264] Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).

[265] Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026); Examiner Interview of Saad Madani (Chief Financial Officer, Global Technologies) (February 17, 2026); *See also* Examiner Interview of Diana Salim (January 15, 2026).

[266] Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).

arrangements.[267] Witnesses confirmed that these North American factoring relationships involved non-bank financial institutions rather than regulated banks.[268] European finance teams had no visibility into North American factoring nominations and did not participate in the preparation or submission of receivable data for U.S. factoring programs.[269] Although limited European and Mexican nominations were prepared on occasion, these constituted a small portion of overall activity and were typically prepared only once per week.[270] U.S. nominations were substantially larger and more frequent.[271] Witnesses further stated that the spreadsheet-based nomination practices observed in North America, including the repeated submission of consolidated files with materially altered receivable values, would not have been feasible within the European bank-based framework due to continuous bank monitoring, mandatory reconciliation to sales ledgers, regulatory oversight, and e-invoicing regimes that would have quickly exposed discrepancies.[272] The absence of real-time oversight, independent verification, and system-level controls in the North American factoring practices significantly weakened the Third-Party Factors' ability to detect manipulation or fraud.

The Third-Party Factors' due diligence procedures did not detect any manipulation of receivable data or other fraud by FBG entities. The Third-Party Factors primarily relied upon FBG's representations regarding invoice authenticity and did not implement robust verification

---

[267] Examiner Interview of Vlad Botescu (Financial Analyst, FBG) (January 15, 2026); Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).

[268] Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).

[269] *Id.*

[270] Examiner Interview of Vlad Botescu (Financial Analyst, FBG) (January 15, 2026).

[271] *Id.*

[272] *Id.*; Examiner Interview of Roxana Tent (Chief Executive Officer of Europe, the Middle East, and Africa, FBG) & Andrea Alexandrescu (Director of Sales Operations, FBG) (January 17, 2026).

67

procedures. For example, the LAM Parties' audit procedure primarily consisted of occasional random requests for backup invoices.[273] Leucadia's factoring facility was financed in part by Western Alliance Bank ("**WAB**"), which conducted periodic audits, including one in 2022 and another in early 2025 covering 2024 transactions.[274] As part of the 2025 audit, WAB tested a sample of transactions by requesting supporting invoices and bank records from FBG.[275] Analysis by the LAM Parties' forensic advisor, BRG, indicates that the invoices provided to WAB matched the pre-petition data entries in PrimeRevenue; however, subsequent post-petition information provided by First Brands revealed that these invoices did not match First Brands' internal records. The conclusion that the invoices provided to WAB were manipulated is based on differences in formatting, invoice identifiers, remittance information and payment terms when compared to real invoices.[276] The LAM Parties separately requested supporting documentation from First Brands on an informal basis but did not conduct independent audits and lacked access to First Brands' internal invoice-generation systems, limiting their ability to verify the information received.[277] In addition, the absence of a direct payment structure from customers to the LAM Parties allowed FBG to retain control over cash flows and continue remitting payments funded by new factoring activity rather than by underlying customer collections.

The Third-Party Factors' sampling methodology was exploited by those perpetrating the fraud. Witness statements indicate that FBG knew that auditors and factors would only confirm large balances, so it kept fabricated amounts at levels that would escape sampling or, alternatively,

---

[273] *See* Examiner Meeting with Weil and A&M (January 5, 2026).
[274] *See* Examiner Meeting with Leucadia (January 7, 2026).
[275] *See id.*; Examiner Meeting with Berkeley Research Group (January 9, 2026).
[276] *See* Examiner Meeting with Leucadia (January 7, 2026).
[277] *See* Examiner Meeting with Leucadia (January 7, 2026).

ensured that any invoices selected for sampling could be supported with created documentation.[278] When Third-Party Factors did request specific invoices for verification, FBG would create fraudulent invoices or modify existing invoices to match the factored amounts.[279]

### c. Use of Invoice Data Across Multiple Financing Arrangements

Analysis of data indicates that invoices were sometimes submitted to multiple Third-Party Factors, creating the risk that the same underlying receivable may have been pledged to more than one Third-Party Factor and/or further pledged in connection with other off-balance sheet financing structures. For example, the LAM Parties' nomination for August 27, 2025 and Katsumi's nomination for August 28, 2025 contained the same 348 invoices based on invoice number.[280] Within these nominations, on August 25, 2025, FRAM Group Operations LLC sold automotive parts to Walmart Stores Inc.[281] The invoice data extraction for this sale showed a total invoice value of $5,425.20.[282] The LAM Parties were sold this invoice at a value of $39,987.01 and Katsumi was sold this invoice at a value of $65,187.38.[283] This example is illustrative of a broader pattern of double pledging uncovered by the Investigation's independent analysis of financial data.

Additionally, invoice data was managed by different teams, contributing to the complexity of the reconciliation process and the magnitude of the fraud. Firstly, the cash application teams had limited visibility into whether particular receivables had been factored.[284] Witnesses familiar

---

[278] Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 10, 2026).

[279] Examiner Meeting with Weil and A&M (January 5, 2026).

[280] Analysis of five spreadsheets sourced from FBG: Jefferies - supplier_invoice_views_2025.09.15, Step 1 - Consolidate Agings 08.27.25, JEFF Agings and Open orders consolidated 08.27.25, Katsumi - Client_Asset_Status__FB__2025 09 05, Step 1 - Consolidate Agings 08.28.25.

[281] *Id.*

[282] *Id.*

[283] *Id.*

[284] Examiner Interview of P V Suresh (Cash Applications Team, FBG) and Prakash G N (Cash Applications Team, FBG) (January 19, 2026).

with FBG's accounting records state that the records did not reliably identify factored receivables, and that cash application personnel lacked both system visibility and routine documentation to determine whether payments related to factored invoices.[285]  Instead, witnesses described that factored payments were identified indirectly, such as by observing anomalies in remittance information, including payments originating from financial institutions that were not direct customers or the presence of deductions, typically in the range of 4% to 8% percent, consistent with factoring fees.[286]

Secondly, FBG operated different ERP systems across its various business units, creating significant challenges in maintaining consistent invoice numbering and tracking.  Different business units (such as Trico, FRAM, Brake Parts, and Carter) each had their own systems with separate invoice numbering conventions, which the Romania team would consolidate for factoring purposes.[287]  When consolidating invoices from multiple ERP systems, the Romania team encountered duplicate invoice numbers—*i.e.*, different invoices from different business units that happened to share the same invoice number.[288]  Mr. Botescu stated that he would see 400 to 500 duplicate invoice numbers on a typical day and would assign new, unused numbers to these duplicates using a tracker spreadsheet before uploading to the factors.[289] While this process was purportedly designed to accommodate the systems' requirements, it also created opportunities for manipulation and made reconciliation extremely difficult.

       7.  <u>Alleged Irregularities</u>

---

[285] *Id.*
[286] *Id.*
[287] Examiner Interview of Vlad Botescu (Financial Analyst, FBG) (January 14, 2026).
[288] *Id.*
[289] *Id.*

The investigation conducted by A&M revealed three significant categories of irregularities in FBG's prepetition factoring practices, totaling approximately $3 billion in invoice value: (a) inflated invoices; (b) fabricated invoices; and (c) multi-pledging of the same receivables.[290]  These allegations are summarized below.  Due to the premature conclusion of the Investigation, these irregularities remain subject to further investigation.

### a. Inflated Invoices

FBG's historical Third-Party Factoring practices included inflating the invoice amount generated by the Debtor's records and providing that inflated amount to the Third-Party Factors.[291] A&M's investigation showed that approximately $2.5 billion of the total invoice reported is either unsupported by the Debtors' system-generated invoice records (invoice number, supplier, customer) (a $1.4 billion variance) or is inflated from the matched invoice amount in the Debtors' records (a $1.1 billion variance).[292]

Forensic analysis revealed the systemic inflation of invoice amounts.  One example showed a nomination originally amounting to just over $3 million with capacity of $6.1 million which was sent to Mr. Brumbergs.[293]  The nomination was modified to $9.2 million with some additional capacity—dramatic inflations designed to maximize borrowing up to the limit of available capacity.[294]

---

[290] Declaration of Daniel Jerneycic in Support of the Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables without Liability; and (III) Granting Related Relief, Case No. 25-90399, Dkt. 808, ¶¶ 20–21.
[291] *Id.* ¶ 20.
[292] *Id.* ¶ 21.
[293] Examiner Interview of Vlad Botescu (Financial Analyst, FBG) (January 14, 2026)..
[294] *Id.*

Further, analysis of invoice data revealed that in some cases invoices were deflated rather than inflated, suggesting sophisticated management of the fraud to avoid detection and to maximize borrowing within limits specified in factoring agreements.[295]

### b. Fabricated Invoices

A&M found that in many instances, purported invoices representing customer orders were created and submitted to Third-Party Factors for payment even though the Debtors' books and records do not reflect that such customer invoices ever existed.[296] A&M's investigation mapped invoice data provided by the Third-Party Factors against FBG's system-generated invoice records, which led to the realization that invoice information (invoice number, customer, supplier) provided by FBG to the Third-Party Factors frequently did not match FBG's system-generated invoice records.[297] As a result of this analysis, A&M determined that approximately $1.4 billion of the invoice value reported by the Third-Party Factors was unsupported by the Debtors' system-generated invoice records.[298]

The fabrication appears to have been accomplished through manual manipulation of Excel spreadsheets. FBG appears to have submitted spreadsheets with fraudulent invoice level data, and lenders typically did not see the actual underlying invoices or verify the data against the invoices stored in FBG's database.[299] Moreover, the fraud appears to have been highly organized and systematic. Forensic analysis revealed patterns across different customers and business units. For

---

[295] Examiner Meeting with Berkley Research Group (January 9, 2026).

[296] Declaration of Daniel Jerneycic in Support of the Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables without Liability; and (III) Granting Related Relief, Case No. 25-90399, Dkt. 808, ¶ 20.

[297] Id. ¶¶ 11–12, 20.

[298] Id. ¶ 21.

[299] Examiner Meeting with Weil and A&M (January 5, 2026).

72

the Trico business unit, certain invoice dates showed a consistent approximately 5.25% discrepancy between data in the PrimeRevenue system and FBG's Vizion system.[300]   For other units, no consistent scheme has been identified, which suggests different manipulation patterns were used for different business units.

### c.   Multi-Pledging of the Same Receivables

A&M's investigation revealed instances where the same invoice was factored to multiple Third-Party Factors and, in some cases, factored multiple times by the same Third-Party Factor.[301]

The double-pledging—and sometimes multi-pledging—appears to have been enabled by FBG's control over the information provided to each Factor independently.  Investigators found that FBG maintained separate files tracking which invoices had or had not been used for factoring, enabling FBG to (knowingly) recycle invoice numbers and submit previously factored receivables to additional factors.[302]

### 8.   Outstanding Investigative Steps

The Examiner's Investigation in this area was paused due to budget exhaustion after substantial progress.  Additional high value investigative steps are queued for completion over the next 90 days upon approval of additional budget.  These would include continuing to analyze and trace the funds and purported accounts receivable in the Third-Party Factoring transactions to determine amounts paid and owed, identifying fictitious and inflated invoices with specificity, and confirming the employees involved.  This work would be integrated into the broader asset tracing

---

[300] Examiner Meeting with Berkley Research Group (January 9, 2026).
[301] Declaration of Daniel Jerneycic in Support of the Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables without Liability; and (III) Granting Related Relief, Case No. 25-90399, Dkt. 808, ¶¶ 20–21.
[302] Examiner Interview of Vlad Botescu (Financial Analyst, FBG) (January 15, 2026).

workstream to continue analyzing the extent to which factoring proceeds were transferred to non-Debtor entities or otherwise diverted from the estate. The Investigation would also assess the nature and extent of diligence and monitoring performed by each Third-Party Factor, including onboarding and site visits, and reconcile lender reporting packages to FBG financial reporting data (e.g., the HFM/ERP systems).

### D. The Off-Balance Sheet Transactions

The Court directed the Examiner to investigate the facts and circumstances, including general corporate practices, concerning the Debtors' Off-Balance Sheet Financing Transactions and/or transfers in connection therewith[303]—specifically, the OBTs and SPVs involving the Aequum financing facilities, CarVal facilities, Evolution facilities, and Onset master leases (collectively, the "**OBT Lenders**").[304] The Examiner investigated the OBTs using a three-step approach. First, the Examiner reviewed certain court filings the OBT Lenders submitted in this matter and others to gain a preliminary understanding of (1) how the OBTs were intended to be structured, (2) the amount of funds provided to the SPVs, (3) the amount repaid, and (4) the assets claimed as collateral.

Next, the Examiner reviewed the declarations, exhibits, and other underlying documentation filed by the OBT Lenders to make a preliminary determination as to whether the transaction documents matched the OBT Lenders' descriptions of the anticipated transaction structures. The Examiner focused on transaction structure, funding amounts, stated collateral, professional opinions, and due diligence requirements, such as inventory audits or inspections.

---

[303] Order Directing Appointment of Examiner, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 726, ¶ 3(b).
[304] *Id.*

74

Third, the Examiner simultaneously interviewed witnesses, reviewed available bank records, and consulted with counsel for the Debtors and interested parties. Although the Investigation concluded prematurely with significant work remaining, the evidence reviewed to date indicates that the OBTs were another means by which senior FBG actors engaged in fraud to extract value from the company. It appears that inventory "sold" from the Debtors to the SPVs remained on FBG's balance sheet, and that OBT funds lent to the SPVs flowed through FBG's accounts. Additional investigative work will focus on the mechanics of the OBTs—including analysis of the extent to which FBG misrepresented the transactions to lenders—as well as the knowledge and participation of the OBT Lenders and the due diligence they conducted. Below is a summary of the Examiner's preliminary findings with respect to the OBTs as of the date of this filing.

1. Overview of First Brands' Off-Balance Sheet Financing Structures

    *a.  Aequum Capital Financial II LLC*

Based on the Examiner's review of court filings, Aequum contends that, in its capacity as administrative agent for the lenders under a revolving credit facility, it provided financing to Debtor Broad Street Financial LLC ("**Broad Street**" or the "**Aequum Borrower**"), a subsidiary and SPV of Viceroy Private Capital, LLC ("**Viceroy**"), and to Carnaby Capital Holdings, LLC ("**Carnaby Holdings**"), both affiliates of FBG.[305]

Aequum asserts that, on March 28, 2024, Broad Street, as borrower, entered into a credit agreement (the "**Aequum Credit Agreement**") with Aequum Capital Financial II, LLC, as administrative agent and collateral agent, and the lenders party to the Aequum Credit Agreement

---

[305] Aequum's Objection to Emergency Motion of Debtors, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 139, ¶¶ 2–3.

75

(the "**Aequum Lenders**").[306]   Under the Aequum Credit Agreement, the Aequum Lenders provided an asset-based revolving credit facility in an aggregate amount of $45 million to Broad Street (the "**Aequum Facility**"), of which approximately $44.32 million in principal was outstanding as of the Petition Date.[307]

The proceeds of the Aequum Facility were advanced to Broad Street to enable it to purchase inventory from FBG (the "**Aequum Inventory**").[308]   The Aequum Borrower's obligations under the Aequum Facility are guaranteed by Debtor Broad Street Financial Holdings, LLC ("**Parent Holdings**") and Debtor Carnaby Holdings and are secured by liens on substantially all assets, including inventory, of the Aequum Borrower, including all products and proceeds thereof (together, the "**Aequum Collateral**").[309]   FBG also acted as servicer under the Aequum Credit Agreement.[310]

Aequum further asserts that, among other representations made in connection with the Aequum Credit Agreement, it relied on representations from FBG and the Aequum Borrower that the Aequum Borrower would remain a separate, bankruptcy-remote entity with assets and liabilities distinct from those of FBG and would continue to qualify as a bankruptcy-remote entity at all times. [311]

---

[306] Stipulation and Agreed Order Regarding Adequate Protection of Aequum and the Aequum Lenders, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 485-1, 1–2.

[307] *Id.* at 2.

[308] Aequum's Objection to Emergency Motion of Debtors, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 139, ¶ 2–3.

[309] Stipulation and Agreed Order Regarding Adequate Protection of Aequum and the Aequum Lenders, Case No. 25-90399, Dkt. 485-1 at 2; Declaration of Eric Weisheit, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 485-2, ¶ 2.

[310] Declaration of Eric Weisheit, Case No. 25-90399, Dkt. 485-2, ¶ 4.

[311] Declaration of Eric Weisheit, Case No. 25-90399, Dkt. 631-1, ¶¶ 7–11.

Aequum asserts that the facility was secured by first-priority liens on the Aequum Collateral, and that UCC financing statements were filed to perfect those liens.[312]

### b. UMB Bank N.A. (Aequum)[313]

UMB Bank, N.A. ("**UMB**") contends that, in its capacity as administrative and collateral agent for the lenders under a revolving credit facility, it provided financing to Debtors Global Assets LLC, as U.S. borrower, and Global Assets GmbH, a German limited liability company and an affiliate of the Debtors, as German borrower (together with Global Assets LLC, the "**UMB Borrowers**").[314] UMB asserts that, on December 2, 2024, the UMB Borrowers entered into a credit agreement (the "**UMB Credit Agreement**") with UMB, as administrative and collateral agent, and the lenders party thereto from time to time (the "**UMB Lenders**").[315] UMB alleges that, under the UMB Credit Agreement, the UMB Lenders provided an asset-based revolving credit facility in an aggregate principal amount of $45 million (the "**UMB Facility**"), of which UMB alleges approximately $33.43 million in principal was outstanding as of the Petition Date.[316]

UMB asserts that the UMB Borrowers "were each formed as a special purpose entity to facilitate inventory financing from the UMB lenders," and that the proceeds of the UMB Credit Agreement were advanced to enable the UMB Borrowers to purchase inventory (the "UMB Inventory") from the non-Debtor affiliates Ultinon Motion Germany GmbH and Ultinon Motion

---

[312] Declaration of Eric Weisheit, Case No. 25-90399, Dkt. 485-2, ¶¶ 9–11; Aequum's Objection to Emergency Motion of Debtors, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 139, ¶¶ 2–3.

[313] UMB's facility is related to the Aequum facility and thus the Examiner treated it as falling within the Court's mandate, in part, because UMB expressly joined Aequum's objection to the Debtors' use of cash collateral and DIP financing, demonstrating that the two lender groups asserted aligned rights and concerns arising from the same inventory-financing structure. (*See* Dkt. 149.)

[314] Stipulation and Agreed Order Regarding Adequate Protection of UMB.and the UMB Lenders, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 210 at 1–2; Motion of UMB for Order Granting Relief from the Automatic Stay, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 759, 2.

[315] Stipulation and Agreed Order Regarding Adequate Protection of UMB and the UMB Lenders, Case No. 25-90399, Dkt. 210, 1–2.

[316] *Id.* at 2; Motion of UMB for Order Granting Relief from the Automatic Stay, Case No. 25-90399, Dkt. 759, ¶ 14.

Delaware LLC (collectively, "**Ultinon**") and to finance that inventory pursuant to a prepetition revolving credit facility between the UMB Borrowers, their parent entity, Carnaby Holdings, FBG, as servicer, the lenders party thereto from time to time (collectively, "**UMB Lenders**") and UMB in its capacity as administrative agent.[317]  UMB alleges that the UMB Borrowers' obligations under the UMB Facility are guaranteed by Debtor Carnaby Holdings, and that they entered into a Pledge and Security Agreement ("**UMB Security Agreement**") dated as of December 2, 2024.[318]

With respect to collateral, UMB asserts that the UMB Security Agreement secured the UMB Facility by first-priority liens on substantially all assets of the UMB Borrowers and Carnaby Holdings, including Carnaby Holdings' equity interests in the UMB Borrowers.[319]  UMB maintains that it filed UCC financing statements with the Delaware Secretary of State, perfecting the UMB liens.[320]  UMB further contends that it is the primary creditor of the UMB Borrowers and that no other party holds liens or security interests in the assets of the UMB Borrowers.[321]

### c.  AB CarVal (Carnaby II and III Secured Lenders)

The Carnaby II and III Secured Lenders (as defined below), the funds of which are managed by AB CarVal Investors L.P., ("**CarVal**") contend that they provided financing to Carnaby Inventory II, LLC ("**Carnaby II**") and Carnaby Inventory III, LLC ("**Carnaby III**" and together with Carnaby II, the "**Carnaby Debtors**") pursuant to the following credit agreements:

> (1) The Carnaby II Credit Agreement dated as of May 31, 2022 among Carnaby II, as Borrower, First Brands Group, LLC, as the

---

[317] Motion of UMB for Order Granting Relief from the Automatic Stay, Case No. 25-90399, Dkt. 759, ¶¶ 13–14; UMB's Emergency Motion and Second Objection, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 486, ¶¶ 2–3.

[318] UMB's Emergency Motion and Second Objection, Case No. 25-90399, Dkt. 486, ¶¶ 10–12.

[319] Motion of UMB for Order Granting Relief from the Automatic Stay, Case No. 25-90399, Dkt. 759, ¶¶ 15–16.

[320] Motion of UMB for Order Granting Relief from the Automatic Stay, Case No. 25-90399, Dkt. 759, ¶¶ 16; UMB's Emergency Motion and Second Objection, Case No. 25-90399, Dkt. 486, ¶ 5.

[321] UMB's Preliminary Objection to Emergency Motion of Debtors, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 1366, ¶¶ 1–2.

Servicer, First Brands Group Holdings, LLC and Carnaby Inventory Holdings II, LLC ("**Holdings II**"), as Guarantors, the Lenders from time to time party thereto (the "**Carnaby II Lenders**"), and the GLAS Trust Company LLC, as Administrative Agent (the "**Carnaby II Agent**"), as amended; and

(2) The Carnaby III Credit Agreement (together with the Carnaby II Credit Agreement, the "**Carnaby Credit Agreements**"), dated as of July 6, 2022 among Carnaby III, as Borrower (together with Carnaby II, the "**Carnaby Debtors**"), First Brands Group, LLC, as the Servicer, First Brands Group Holdings, LLC and Carnaby Inventory Holdings III, LLC ("**Holdings III**," and together with Holdings II, "**Holdings**"), as Guarantors, the Lenders from time to time party thereto (the "**Carnaby III Lenders**," and together with the Carnaby II Lenders, the "**Carnaby II and III Secured Lenders**"), and the GLAS Trust Company LLC, as Administrative Agent (the "**Carnaby III Agent**," and together with the Carnaby II Agent and Carnaby II and III Secured Lenders, the "**Carnaby II and III Secured Parties**").[322]

The Carnaby II and III Secured Lenders assert that, pursuant to the Carnaby Credit Agreements, they lent the Carnaby Debtors an aggregate of $160 million in financing.[323] The Carnaby II and III Secured Lenders further contend that the proceeds of the Carnaby Credit Agreements were used by the Carnaby Debtors to finance the acquisition of inventory to be used in the production of windshield wipers and brakes in Mexico under a "maquiladora manufacturing program," with First Brands Group, LLC acting as servicer in connection with such arrangements.[324]

The Carnaby II and III Secured Lenders further assert that they relied on representations made in connection with the Carnaby Credit Agreements, including representations in financial

---

[322] Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Carnaby Inventory II, LLC and Carnaby Inventory III, LLC, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 192, 1–2.
[323] Amended Declaration of Philip J. Gund, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 1644, ¶ 8.
[324] Amended Declaration of Philip J. Gund, Case No. 25-90399, Dkt. 1644, ¶ 9.

statements, borrowing base certificates, and other credit documents.[325]  The Carnaby II and III Secured Lenders allege that borrowing base certificates falsely represented the eligibility of certain inventory, that cash required to be held in Carnaby accounts was missing prior to and as of the Petition Date, and that First Brands falsely represented that it had no indebtedness other than its guarantees under the Carnaby Credit Agreements.[326]

### d. Evolution

Evolution Credit Partners contends that it provided off-balance-sheet financing to Debtors Patterson Inventory, LLC ("**Patterson Borrower**") and Starlight Inventory I, LLC ("**Starlight Borrower**," and together with Patterson, the "**Evolution Borrowers**") pursuant to certain uncommitted inventory finance agreements (the "**Patterson Facility**" and "**Starlight Facility**," respectively, and collectively the "**Evolution Facilities**").[327]

Evolution asserts that, under the Evolution Facilities, it provided uncommitted asset-based revolving credit facilities with maximum aggregate advances of up to $150 million to Patterson and up to $150 million to Starlight.[328]  Evolution further asserts that, as of the Petition Date, approximately $230 million of principal obligations under the Evolution Facilities remained outstanding.[329]

---

[325] Carnaby Secured Lenders' Objection to Debtors' Motion for Post-Petition Financing and Certain First Day Relief, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 463, ¶¶ 2, 26.

[326] Carnaby Secured Lenders' Objection to Debtors' Motion for Post-Petition Financing and Certain First Day Relief, Case No. 25-90399, Dkt. 463, ¶¶ 2, 5, 23–24.

[327] Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 216 at 1–3 (whereas clauses).

[328] Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners, Case No. 25-90399, Dkt. 216 at 2–3 (whereas clauses); Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 609 at 1–3 (whereas clauses).

[329] Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners, Case No. 25-90399, Dkt. 216 at 3 (whereas clauses); Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners, Case No. 25-90399, Dkt. 609 at 4 (whereas clauses).

Evolution maintains that Starlight Borrower's obligations under the Starlight Facility are guaranteed by Starlight Inventory Holdings I, LLC ("**Starlight Parent**"), and are secured by a pledge of Starlight Parent's holdings of 100% of the equity interests in the Starlight Borrower and by a lien on certain inventory of the Starlight Borrower (the "**Starlight Collateral**").[330] Similarly, Evolution maintains that the Patterson Borrower's obligations under the Patterson Facility are guaranteed by Debtor Patterson Inventory Holdings, LLC ("**Patterson Parent**"), secured by a pledge of Patterson Parent's holdings of 100% of the equity interests in the Patterson Borrower and by a lien on certain inventory of the Patterson Borrower (the "**Patterson Collateral**" and together with the Starlight Collateral, the "**Evolution Collateral**").[331]

Evolution further contends that, as a condition to close the Evolution Facilities, the Evolution Borrowers purchased inventory from FBG entities to generate a borrowing base and provided financial statements and borrowing-base certificates representing that they owned the financed inventory free and clear of other liens.[332]

### e.   Onset Financial, Inc.

Onset contends that it provided liquidity to FBG through a series of equipment and inventory lease transactions dating back to 2018.[333]   One set of those transactions consisted of "direct" arrangements, including direct leases of automotive manufacturing fixtures, equipment,

---

[330] Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners, Case No. 25-90399, Dkt. 216 at 3 (whereas clauses); Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners, Case No. 25-90399, Dkt. 609 at 4 (whereas clauses).

[331] Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners, Case No. 25-90399, Dkt. 216 at 3 (whereas clauses); Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners, Case No. 25-90399, Dkt. 609 at 4 (whereas clauses).

[332] Declaration of Michael P. Guarnieri, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 538 ¶¶ 4–13.

[333] Supplemental Objection of Onset to Debtors' DIP Financing Motion, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 470, ¶ 8.

81

inventory, and other assets newly purchased by Onset.[334]  Onset identifies these arrangements as including a May 9, 2018, master lease with Trico Products Corporation ("**Trico**") (the "**Trico Master Lease**"), one of three master lease agreements governing these arrangements.[335]

The other two master lease agreements consist of a June 28, 2022 master lease with Carnaby Inventory IV, LLC ("**Carnaby IV**") (the "**Carnaby IV Master Lease**"), and an October 24, 2023 master lease with Carnaby FA, LLC ("**Carnaby FA**") (the "**Carnaby FA Master Lease**" and collectively with the Trico Master Lease and Carnaby IV Master Lease, the "**Onset Master Lease Documents**").[336]

The other set of transactions consisted of the Carnaby Master Leases, which Onset characterized as "conduit" sale-leaseback arrangements.[337]  Onset maintains that these conduit transactions were intended to function as follows: First, a FBG subsidiary sold inventory and equipment to an SPV, either Carnaby IV or Carnaby FA, pursuant to a series of asset purchase agreements ("**APAs**").[338]  Second, pursuant to the corresponding APA between the Carnaby SPV and Onset, the applicable Carnaby SPV transferred title to the Carnaby assets to Onset and confirmed that such transfer was free and clear of liens and encumbrances.[339]  Third, Onset leased

---

[334] Supplemental Objection of Onset to Debtors' DIP Financing Motion, Case No. 25-90399, Dkt. 470 ¶ 8; Onset's Omnibus Limited Objection to the Debtors' Retention Applications for Weil and A&M, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 679, ¶ 14.

[335] Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Onset, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 214 at 1–2 (whereas clauses); Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Onset, *In re First Brands Group, LLC*, Case No. 25-90399, Dkt. 732 at 2–3.

[336] Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Onset, Case No. 25-90399, Dkt. 214, 1–3; Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Onset, Case No. 25-90399, Dkt. 732 at 2–3.

[337] Supplemental Objection of Onset to Debtors' DIP Financing Motion, Case No. 25-90399, Dkt. 470, ¶ 8.

[338] Onset's Answer and Counterclaim, Cross-Claim, and Third-Party Complaint, *First Brands Group, LLC v. Onset Financial, Inc.*, Case No. 26-03005, Dkt. 16, ¶¶ 124–25.

[339] Onset's Answer and Counterclaim, Cross-Claim, and Third-Party Complaint, Case No. 26-03005, Dkt. 16, ¶¶ 124–26.

the applicable Carnaby assets back to the Carnaby SPVs.[340]  Fourth, the Carnaby assets were delivered to a FBG affiliate as "bailee."[341]  Following the completion of these four steps, Onset maintains that the Carnaby SPVs were required to sell the leased Carnaby inventory and equipment in the ordinary course of business.[342]

Onset asserts that, as of the Petition Date, obligations under the Onset Master Lease Documents totaled approximately $2.2 billion.[343]  Specifically, as of the Petition Date, there were approximately $294.3 million in obligations remaining under the Trico Lease Schedules and $1.88 billion in obligations under the Carnaby Lease Schedules.[344]  Onset further alleges that, at the Debtors' request, Onset advanced to FBG more than $1 billion over the twelve months preceding the Petition Date, including approximately $375 million in November 2024, $200 million in January 2025, $85 million in February 2025, $180 million in March 2025, and $230 million in April 2025.[345]

Onset further asserts that the obligations under the Trico Master Lease are guaranteed by Airtex Products, S.A., Brake Parts Inc India LLC, Brake Parts India Private Limited, FB Intermediate, Talleres Mecanicos Montserrat S.A. de C.V., Trico Belgium, Trico Group, LLC, Trico Italy S.R.L. and Trico Wipers Ploiesti S.R.L.[346]  Likewise, Onset asserts that (1) in the case of the Carnaby IV Master Lease, the obligations were guaranteed by Viceroy; Carnaby Capital

---

[340] Onset's Answer and Counterclaim, Cross-Claim, and Third-Party Complaint, Case No. 26-03005, Dkt. 16, ¶ 126.
[341] Onset's Answer and Counterclaim, Cross-Claim, and Third-Party Complaint, Case No. 26-03005, Dkt. 16, ¶ 130.
[342] Onset's Answer and Counterclaim, Cross-Claim, and Third-Party Complaint, Case No. 26-03005, Dkt. 16, ¶ 131.
[343] Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Onset, Case No. 25-90399, Dkt. 732 at 3.
[344] Onset's Answer and Counterclaim, Cross-Claim, and Third-Party Complaint, Case No. 26-03005, Dkt. 16, ¶¶ 109, 147.
[345] Onset's Omnibus Limited Objection to the Debtors' Retention Applications for Weil and A&M, Case No. 25-90399, Dkt. 679, ¶ 21.
[346] Onset's Omnibus Limited Objection to the Debtors' Retention Applications for Weil and A&M, Case No. 25-90399, Dkt. 679, ¶ 20, n. 7; Onset's Answer and Counterclaim, Cross-Claim, and Third-Party Complaint, Case No. 26-03005, Dkt. 16, ¶ 108.

Holdings, LLC; Carnaby Capital, LLC; Carnaby Inventory Holdings IV, LLC; and FB Holdings;

and (2) the obligations under the Carnaby FA Master Lease were guaranteed by Carnaby Capital

Holdings, LLC, Carnaby Capital, LLC, Carnaby FA Holdings, LLC, Eagle Casting Holdings, LLC;

Eagle Casting, LLC, FB Holdings, and Viceroy.[347]

    2.   Examiner's Review of Off-Balance-Sheet Financing Transaction Documents

As explained above, the Examiner conducted a preliminary review of the underlying Off-Balance Sheet Financing Transaction documents submitted in court filings, as well as documents already produced to the Examiner, to determine whether they matched the OBT Lenders' descriptions of the transactions—specifically, the stated amount of financing extended to the SPVs, the stated collateral (including the borrowing-bases, inventory, and leases), any legal opinions regarding the collateral, and any due diligence requirements, such as inventory audits or inspections.

    *a.  The Total Amount of OBT Financing*

To determine the contractual amount of financing extended to the SPVs, the Examiner reviewed the relevant credit agreements, lease agreements, equity pledge agreements, security agreements, purchase agreements, and sale agreements executed by the applicable SPVs and the applicable OBT Lenders.  Based on the Examiner's preliminary review of these documents, the contractual amount of financing that the OBT Lenders agreed to provide to the SPVs was as follows:

| Administrative Agent | Total Amount |
|---|---|
| Aequum | $45,000,000[348] |

---

[347] Onset's Answer and Counterclaim, Cross-Claim, and Third-Party Complaint, Case No. 26-03005, Dkt. 16, ¶ 146.
[348] Broad Street Financial, LLC Credit Agreement, dated March 28, 2024, Schedule A – Commitments, In re First Brands Group, LLC, Case No. 25-90399 (Bankr. S.D. Tex. Nov. 4, 2025), Dkt. 508-3.

| Administrative Agent | Total Amount |
|:---:|:---:|
| UMB | $45,000,000[349] |
| CarVal | $160,000,000[350] |
| Evolution | $300,000,000[351] |
| Onset | $2,236,000,000[352] |

The Examiner's financial advisor then conducted a preliminary bank analysis to determine the actual amount of funds the OBT Lenders transferred to the SPVs between November 6, 2020 and August 29, 2025.   Below is a chart summarizing the amount of funds the OBT Lenders transferred out to the SPVs, the amount of funds the OBT Lenders received back from the SPVs and any remaining balances or credits:

| OBT Lender | Transfers from Lender to SPV | Transfers from SPV to Lender | Net Transfers |
|:---:|:---:|:---:|:---:|
| Aequum | $46,143,868.71 | $12,488,214.05 | ($33,655,654.66) |
| CarVal | $149,758,288.22 | $92,919,281.80 | ($56,839,006.42) |
| Onset | $2,516,666,447.17 | $2,959,649,751.31 | $442,983,304.14 |
| Evolution | $564,523,692.46 | $153,932,914.61 | ($410,590,777.85) |

   b. *The Collateral for the OBT Financing*

---

[349] Global Assets, LLC and Global Assets GmbH Credit Agreement, dated Dec. 2, 2024 Schedule A – Commitments, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Nov. 4, 2025), Dkt. 512-3.

[350] *See* USBOSC0011_00003664 (Carnaby Inventory II, LLC Credit Agreement, dated May 31, 2022) and USBOSC0011_00003690 (Carnaby Inventory III, LLC Credit Agreement, dated July 6, 2022).

[351] *See* USBOSC0011_00003815 (Starlight Inventory I, LLC Uncommitted Inventory Finance Agreement, dated March 28, 2024, Ex. A Monthly Borrowing Base Report and Reconciliation and Ex. D. Inventory Finance Agreement Revolving Credit Note); *see also* USBOSC0011_00003804 (Patterson Inventory, LLC Uncommitted Inventory Finance Agreement, dated November 9, 2023, Ex. A Monthly Borrowing Base Report and Reconciliation and Ex. D. Inventory Finance Agreement Revolving Credit Note).

[352] This amount is based on the Examiner's review of documents prepared by Charles Moore, which the Examiner has not independently verified as of the date of this filing. *See* Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions, Case No. 25-90399, Dkt. 22.

Based on the Examiner's preliminary review of the underlying transaction documents, each of the applicable OBT Lenders required the applicable SPVs to provide collateral as security for the financing they provided to the SPVs. The nature of the collateral provided by each of the SPVs varied but is summarized below.

- *Aequum*: The Aequum Lenders required a collateral pledge of: (i) all equity interests in Broad Street owned by Broad Street Financial Holdings, LLC,[353] and (ii) a parts inventory located in Dallas, Texas.[354]

- *UMB Bank N.A. (Aequum)*: For the Global Assets, LLC and Global Assets GmbH transactions, the collateral requirement included a pledge to the UMB Lenders of: (i) all equity interests in Global Assets, LLC owned by Carnaby Capital Holdings, LLC;[355] (ii) all shares of Global Assets GmbH owned by Carnaby Capital Holdings, LLC;[356] and (iii) certain inventory located at facilities in Poland, Germany, and the State of Michigan.[357]

- *CarVal*: With respect to Carnaby Inventory II, LLC, the collateral included a pledge to the CarVal Lenders of: (i) all equity interests in Carnaby Inventory II, LLC;[358] and (ii) eligible inventory located at two facilities in Mexico (one owned by Brake Parts Manufacturing Juarez, S.A. de C.V. and the other by BPI Braking Systems Mexico S.A. de C.V.).[359]

---

[353] *See* Broad Street Financial, LLC Pledge and Security Agreement, dated March 28, 2024, *In re First Brands Group*, LLC, Case No. 25-90399 (Bankr. S.D. Tex. Nov. 4, 2025), Dkt. 508-4.

[354] *See* Broad Street Financial, LLC Credit Agreement, dated March 28, 2024, Ex. IX [Form of] Monthly Report and Borrowing Base Certificate, Annex I, Borrowing Base Certificate, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Nov. 4, 2025), Dkt. 508-3.

[355] *See* USBOSC0011_00004276 (Carnaby Capital Holdings, LLC Pledge and Security Agreement, dated Dec. 2, 2024).

[356] *See* USBOSC0011_00004209 (Global Assets, LLC and Global Assets GmbH Credit Agreement, dated Dec. 2, 2024).

[357] *See* USBOSC0011_00004209 (Global Assets, LLC and Global Assets GmbH Credit Agreement, dated Dec. 2, 2024).

[358] *See* USBOSC0011_00003672 (Carnaby Inventory II, LLC Pledge and Security Agreement, dated May 31, 2022).

[359] *See* USBOSC0011_00003664 (Carnaby Inventory II, LLC Credit Agreement, dated May 31, 2022, Ex. VIII-A Form of Monthly Report – Carnaby Inventory II Borrowing Base).

Similarly, the collateral for Carnaby Inventory III, LLC consisted of a pledge to the CarVal Lenders of: (i) all equity interests in Carnaby Inventory III, LLC owned by Carnaby Inventory Holdings III, LLC;[360] and (ii) eligible inventory located at several warehouses located in Mexico.[361]

- *Evolution*: For Starlight Inventory I, LLC, the collateral pledged to Evolution consisted of: (i) all equity interests in Starlight Inventory I, LLC held by Starlight Inventory Holdings I, LLC;[362] and (ii) certain eligible inventory located at Brake Parts, Inc. warehouses in the State of Illinois.[363]  Similarly, the Patterson Inventory, LLC collateral included: (i) a pledge of all securities held by Patterson Inventory Holdings, LLC;[364] and (ii) eligible inventory located at Brake Parts, Inc. warehouses in California.[365]

- *Onset Financial, Inc.*: The collateral supporting specific Onset transactions appears to have varied depending upon the applicable lease agreement.  In general, the credit extended to Carnaby Inventory IV, LLC and Carnaby FA, LLC (collectively, the "**Onset SPVs**") was secured by various inventory and/or equipment of FBG.  The specific collateral (*i.e.,* inventory and/or equipment) is not identified within an Onset master schedule; rather, it is identified property-by-property through separate lease schedules of which there were many (approximately 49).[366]  The Examiner has conducted a preliminary review of two master

---

[360] *See* USBOSC0011_00003691 (Carnaby Inventory III, LLC Pledge and Security Agreement, dated July 6, 2022).

[361] *See* USBOSC0011_00003690 (Carnaby Inventory III, LLC Credit Agreement, dated July 6, 2022, Ex. VIII-A Form of Monthly Report – Carnaby Inventory III Borrowing Base).

[362] *See* USBOSC0011_00003816 (Starlight Inventory Holdings I, LLC Pledge Agreement, dated March 28, 2024).

[363] *See* USBOSC0011_00003815 (Starlight Inventory I, LLC Uncommitted Inventory Finance Agreement, dated March 28, 2024, Schedule 1.1A Approved Warehouses).

[364] *See* USBOSC0011_00003803 (Patterson Inventory Holdings, LLC Pledge Agreement, dated November 9, 2023).

[365] *See* USBOSC0011_00003804 (Patterson Inventory, LLC Uncommitted Inventory Finance Agreement, dated November 9, 2023, Schedule 1.1A Approved Warehouses).

[366] Onset's Answer and Counterclaim, Cross-Claim, and Third-Party Complaint, *First Brands Group, LLC v. Onset Financial, Inc.*, Case No. 26-03005, Dkt. 16, ¶ 137.

lease agreements with the Onset SPVs that controlled several lease transactions. These master lease agreements required that a FBG subsidiary execute an asset purchase agreement with an Onset SPV, whereby it sold specific assets to the Onset SPV at a set purchase price. The Onset SPV executed an assignment and transfer agreement with Onset for the total purchase price specified in the asset purchase agreement, transferring title of the assets acquired from the FBG subsidiary to Onset. After the Onset SPV assigned title of the acquired assets to Onset, those assets were leased back to the Onset SPV, so that it could be used by the FBG subsidiary in its business to generate revenues and make the lease payments.

### c. Involvement of Professionals

Based on the Examiner's preliminary review of the underlying transaction documents, it appears that many of the SPVs, except for Onset, obtained a "True Sale" legal opinion prepared by Paul Hastings, their outside legal counsel, and provided it to the OBT Lenders.[367] Each stated, in substance, that, in the event FBG were to become a debtor in a case filed in bankruptcy court, it was the opinion of legal counsel that the bankruptcy court would hold that the conveyance of inventory to the SPVs was a true sale (when sold) rather than a financing, such that it would not constitute property of the bankruptcy estate of FBG under Section 541(a)(1) of the Bankruptcy Code, and the bankruptcy court would not hold that the exercise of any rights of the SPV in the

---

[367] *See* USBOSC0011_00003684 (Paul Hasting LLP, Lending Facility for Carnaby Inventory II, LLC (True Sale Opinion) (Execution Version) (May 31, 2022) (the "Carnaby II True Sale Opinion")); *see also* USBOSC0011_00003713 Paul Hasting LLP, Lending Facility for Carnaby Inventory III, LLC (True Sale Opinion) (July 6, 2022) (the "Carnaby III True Sale Opinion")).

inventory would be subject to the automatic stay provisions of Section 362(a) of the Bankruptcy Code.[368]

### d. Inventory Audit or Inspection Requirements

Based on the Examiner's preliminary review of the underlying transaction documents, several, if not all, of the OBT Lenders had the right to audit or inspect the inventory and other assets identified as the collateral for the financing.[369]  These provisions did not *require* the OBT Lenders to conduct an audit or inspection of the collateral.  They simply gave them the right to do so and typically at the expense of the SPV.  Although the language of these provisions differed slightly across each of the transactions, they generally provided that the SPVs had to allow any representatives designated by the OBT Lenders (including any consultants, accountants, collateral auditors and appraisers) to conduct appraisals, valuations, updates, audits, and inspections of the collateral, including the eligible inventory on an annual basis.[370]

### 3. Witness Interviews

The Examiner conducted interviews and met with counsel for several of the OBT Lenders. The Examiner focused on current and former employees of First Brands that worked in accounting,

---

[368] *See* USBOSC0011_00003684 Carnaby II True Sale Opinion; *see* USBOSC0011_00003713 Carnaby III True Sale Opinion.

[369] *See, e.g.*, Broad Street Financial, LLC Credit Agreement, dated March 28, 2024, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Nov. 4, 2025), Dkt. 508-3; USBOSC0011_00003672 (Carnaby Inventory II, LLC Pledge and Security Agreement, dated May 31, 2022); USBOSC0011_00003690 (Carnaby Inventory III, LLC Credit Agreement, dated July 6, 2022); USBOSC0011_00003804 (Patterson Inventory, LLC Uncommitted Inventory Finance Agreement, dated November 9, 2023); USBOSC0011_00003815 (Starlight Inventory I, LLC Uncommitted Inventory Finance Agreement, dated March 28, 2024); and USBOSC0011_00004209 (Global Assets, LLC and Global Assets GmbH Credit Agreement, dated Dec. 2, 2024).

[370] *See e.g.* Broad Street Financial, LLC Credit Agreement, dated March 28, 2024, *In re First Brands Group, LLC*, Case No. 25-90399 (Bankr. S.D. Tex. Nov. 4, 2025), Dkt. 508-3; USBOSC0011_00003672 (Carnaby Inventory II, LLC Pledge and Security Agreement, dated May 31, 2022); USBOSC0011_00003690 (Carnaby Inventory III, LLC Credit Agreement, dated July 6, 2022); USBOSC0011_00003804 (Patterson Inventory, LLC Uncommitted Inventory Finance Agreement, dated November 9, 2023); USBOSC0011_00003815 (Starlight Inventory I, LLC Uncommitted Inventory Finance Agreement, dated March 28, 2024); and USBOSC0011_00004209 (Global Assets, LLC and Global Assets GmbH Credit Agreement, dated Dec. 2, 2024).

as well as A&M restructuring employees. As of this filing, the Examiner has interviewed or consulted with approximately sixteen (16) individuals related to the OBTs.

### a. Alleged Irregularities

Based on these initial interviews, the Examiner has uncovered additional evidence corroborating the Debtors' allegation that the OBT Lenders appear to have been misled regarding both the intended use of the OBT financing proceeds and the collateral they would receive. The interviews and other evidence appear to confirm that Patrick James and his affiliated entities were misappropriating OBT funds and that FBG was double-pledging inventory collateral. These findings are preliminary and more confirmatory work is needed.

A former senior member of FBG's accounting and finance team stated that inventory that was supposed to be allocated as collateral for the OBT Lenders was double-pledged, and that falsified borrowing bases were provided to the OBT Lenders.[371] On this topic, the Examiner also interviewed an A&M restructuring employee working at FBG post-petition. He stated that there was overlap and double pledging of collateral.[372] A&M provided an example of this with the inventory of Brake Parts Inc.[373] According to A&M, the inventory that was pledged as collateral should have been transferred from FBG to the SPV's accounts, so it was not on FBG's balance sheet.[374] Instead, FBG kept the inventory on its balance sheet while only removing the debt. FBG's failure to remove inventory from its balance sheet that was being used as collateral by an SPV was also corroborated by a member of A&M's team attempting to restate FBG's financial

---

[371] Examiner Interview of Ric Tomaszewski (former Chief Financial Officer, FBG) (February 10, 2026).
[372] Examiner Meeting with A&M (January 14, 2026).
[373] *Id.*
[374] *Id.*

statements. He explained that there appeared to be no record of FBG removing inventory from its books after it purportedly transferred that inventory to the SPVs.[375]

### b. Role of Professionals

None of the financing the OBT Lenders provided to the SPVs appeared on FBG's audited consolidated financial statements. And many SPVs—including Global Assets, LLC and Global Assets GmbH, Carnaby Inventory II, LLC, Carnaby Inventory III, LLC, and Starlight Inventory I, LLC—provided "True Sale" legal opinions to the OBT Lenders. Accordingly, the Examiner began examining what role, if any, accounting and legal professionals played in the OBTs. Accounting professionals would typically determine what accounting treatment SPVs receive on FBG's consolidated financial statements. The Financial Accounting Standards Board establishes and issues the Accounting Standards Codification ("ASC"), which prescribes the requirements of accounting principles generally accepted in the United States of America ("GAAP"). ASC 810 *Consolidation* provides that consolidation is required when a reporting entity has a controlling financial interest in the SPV. The Examiner's preliminary findings indicate the SPVs never underwent an ASC 810 consolidation analysis. As discussed in more detail below, more investigation is needed on this topic.

As for the legal professionals, many of the SPVs obtained legal opinions from Paul Hastings that the transfer of assets from FBG to the SPVs was a "true sale." This meant, in substance, that if FBG were to become a debtor, the bankruptcy court would hold that the conveyance of inventory to the SPVs was a true sale (when sold) rather than a financing, such that

---

[375] *Id.*

91

the inventory would not constitute property of the bankruptcy estate of FBG or be subject to the automatic stay provisions of Section 362(a) of the Bankruptcy Code.

The Examiner interviewed in-house FBG attorney Shekhar Kumar, who stated that he and Michael Baker had worked together at two prior law firms, including Paul Hastings.[376] FBG was Paul Hastings' client and in August 2021, Mr. Baker and Mr. Kumar both left the firm to join FBG.[377] To assist with the OBT financings, FBG generally used Paul Hastings to represent the SPVs.[378] As for the OBT Lenders, CarVal used Dechert LLP, Aequum used Blank Rome LLP, and Evolution used Zuckerman Gore Brandeis & Crossman, LLP.[379]

Mr. Kumar stated that the only transactions that did not involve outside counsel were with Onset.[380] Neither side had outside counsel, and Edward James, Patrick James' brother, handled the negotiations for FBG.[381] Counsel for Onset also confirmed they worked almost exclusively with Edward James on their transactions. [382] More investigation would be required to assess the role of the Debtors' legal professionals with respect to the OBTs.

> c. *Governance, Oversight, and Internal Controls*

The Examiner also asked certain witnesses what steps, if any, the OBT Lenders took to protect and verify their security interests. As explained above, the transaction documents gave the OBT Lenders the right to audit or inspect the inventory or other assets identified as the collateral for the financing, but it was unclear whether and to what extent the OBT Lenders conducted such

---

[376] Examiner Interview of Shekhar Kumar (Senior Vice President of Mergers & Acquisitions, FBG) (January 14, 2026).
[377] *Id.*
[378] *Id.*
[379] *Id.*
[380] *Id.*
[381] *Id.*
[382] Examiner Meeting with Onset (January 8, 2026).

audits or inspections. Counsel for many of the SPVs stated that they did conduct audits and/or inspections.[383] Counsel for Evolution said they received and reviewed auditing sheets.[384] Counsel for Onset said there was due diligence done, including inspection of inventory and verifying its worth.[385] Onset also mentioned having a third-party vendor perform on-site visits.[386] Aequum's counsel reported having an examiner on-site regularly, both pre- and post-petition.[387] All this was consistent with A&M's observations, who reported that the SPVs were routinely tested in the ordinary course of business pre-petition.[388] However, A&M was not sure how frequently or how comprehensively these inspections were conducted.[389]

Counsel for Evolution indicated that, in connection with its due diligence for the Starlight transaction in March 2024, it did come across an article from 2017 about fraudulent activities by Patrick James.[390] Counsel stated that FBG provided an explanation of what happened, although when Evolution raised questions about it, FBG was surprised because they had taken efforts to scrub references to negative publicity from the Internet.[391]

### 4. Outstanding Investigative Steps

With additional budget over the next 90 days, the Examiner would analyze the OBT contract language from an accounting and economic standpoint and compare requirements to actual recoveries by each SPV. This analysis would include evaluating underlying collateral

---

[383] *Id.*; Examiner Meeting with Evolution (January 6, 2026); Examiner Meeting with CarVal (January 6, 2026); Examiner Meeting with Aequum (January 20, 2026).
[384] Examiner Meeting with Evolution (January 6, 2026).
[385] Examiner Meeting with Onset (January 8, 2026).
[386] *Id.*
[387] Examiner Meeting with Aequum (January 20, 2026).
[388] Examiner Meeting with A&M (January 14, 2026).
[389] *Id.*
[390] Examiner Meeting with Evolution (January 6, 2026).
[391] *Id.*

pledging and comparing contractual terms to actual cash and asset title flows to identify inconsistencies between the intended structure and economic reality. The Investigation would also analyze onboarding, site visits, and other diligence procedures performed by each OBT lender. In addition, the Examiner would conduct further targeted document review and witness interviews bearing on the transfer of asset title, warehouse control, and lender notifications, as well as reconcile lender reporting packages with FBG financial reporting data (e.g., HFM/ERP systems).

### 5. Substantive Consolidation

Finally, based on the evidence obtained in the Investigation, under the legal standard set forth above the Examiner's preliminary determination is that there are colorable claims for substantive consolidation of First Brands with the SPV Debtors. The tangled flow of funds between and among First Brands and the SPV Debtors as well as the disputed ownership of assets that were purportedly transferred to the SPV Debtors to secure the OBTs indicate that their affairs are likely so entangled that consolidation will benefit creditors. *See In re Introgen Therapeutics*, 429 B.R. at 583. The degree of difficulty in segregating and ascertaining individual assets and liability will be high, assets and business functions were commingled, they share common ownership, and assets appear to have been transferred among them without observing corporate formalities. *See id*. at 582. Accordingly, substantive consolidation may be appropriate.

## VII. ADDITIONAL PRELIMINARY FINDINGS RELATING TO FBG'S ACCOUNTING PRACTICES

Although the company's accounting practices were not a specific focus of the Examiner's mandate, the scope of the Investigation necessarily intersected with them. In reviewing financial reporting practices, interviewing witnesses, and analyzing financial data and other documents, the Examiner encountered recurring evidence of improper accounting practices at FBG.

### A. Evidence of Improper FBG Accounting Practices

The Investigation identified a set of internal FBG accounting practices that materially affected the accuracy of its financial reporting, particularly in the recording and adjustment of financial transactions. Central to these practices were "adjustments"—entries made in connection with year-end reporting and audit preparation—that, as alleged in the SDNY USAO Indictment, were at times "untethered to business realities."[392] The evidence developed in the Investigation provides context for how such adjustments were conceived, implemented, and recorded in the company's financial records.

As alleged in the Indictment, Patrick James "direct[ed]" employees to implement financial adjustments "designed to achieve benchmarks" he established.[393] Witness accounts are consistent with that allegation. Witnesses reported that Patrick James regularly withdrew available cash from company accounts for personal use, thereby reducing liquidity.[394] In turn, witnesses described a need to secure additional borrowing to sustain operations.[395] That dynamic, in their view, heightened the importance of presenting financial statements reflecting strong EBITDA and revenue, and created pressure to align reported results with lender expectations.[396]

Witnesses further reported that Mr. Brumbergs operationalized these directives.[397] According to those accounts, once Patrick James communicated desired outcomes, Mr. Brumbergs implemented corresponding accounting changes, including by making entries directly in HFM, the company's consolidation system.[398] Witnesses described this process as enabling "instant"

---

[392] Indictment, *U.S. v. James*, Case No. 26-cr-00029, Dkt. 2, ¶ 31.
[393] *Id.*
[394] Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 10, 2026).
[395] *Id.*
[396] *Id.*
[397] Examiner Meeting with Weil and A&M (January 5, 2026); Examiner Meeting with A&M (January 13, 2026).
[398] Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 13, 2026).

adjustments to financial results.[399]   HFM-generated outputs—including interim financials and lender-facing reports—were then transmitted to lenders.[400]

The SDNY USAO Indictment also alleges that employees maintained internal "bridge" files that reconciled underlying financial data with additional adjustments needed to meet Patrick James' targets.[401]   Witness testimony aligns with that description.   Witnesses reported that, after determining the desired financial presentation, Mr. Brumbergs directed downstream personnel to record corresponding entries in subsidiary-level systems.[402]   Those directives were often communicated via spreadsheets and, according to witnesses, were not consistently supported by contemporaneous documentation.[403]

Witnesses explained that the company operated multiple ERP systems—including Oracle, SAP, JD Edwards, and AS/400—which did not uniformly accommodate such adjustments.[404]   As a result, local teams reported the need, in some instances, to maintain parallel records or manual archives reflecting adjusted figures for purposes of consolidation in HFM.[405]   Witnesses described this process as resulting in the maintenance of effectively "two sets of books": one reflecting underlying transactions and another reflecting adjusted figures.[406]

Consistent with the allegations in the Indictment, witnesses generally characterized the purpose of these adjustments as affecting reported financial results, including by decreasing

---

[399] *Id.*

[400] *Id.*

[401] Indictment, *U.S. v. James*, Case No. 26-cr-00029, Dkt. 2, ¶ 31.

[402] Examiner Interview of Victor Esquivel (Director of Finance, FBG) (January 16, 2026).

[403] Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 13, 2026); Examiner Interview of Victor Esquivel (Director of Finance, FBG) (January 16, 2026); Examiner Interview of Yessica Faz (Senior Finance Manager, FBG) (January 16, 2026).

[404] Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 13, 2026); Examiner Interview of Jane Doe 1 (January 16, 2026).

[405] Examiner Interview of Jane Doe 1 (January 16, 2026).

[406] *Id.*

expenses and improving margins presented to lenders.[407]  For example, one accounting employee reported receiving instructions to reclassify amounts between accounts and described the adjustments as intended "to make the numbers look better."[408]  Another stated that the purpose of certain adjustments was to "improve reported results"—to "lower costs and raise reported profit."[409]

The Investigation identified accounts of workplace practices surrounding these adjustments.  Witnesses reported that rapid implementation was expected, and that employee responses to such directives carried professional consequences.[410]  Some witnesses described compensation, including bonuses, as linked to participation in adjustment-related activities.[411]  Another witness described being excluded from an "audit-related" bonus pool after questioning adjustments, while others who did not raise concerns were included.[412]  Bonus records reviewed from Mexico are consistent with witness accounts that certain employees associated with these activities received additional compensation.[413]  Witnesses also described instances of adverse consequences, including limited advancement or termination, for employees who declined to participate.[414]

The evidence to date provides sufficient credible evidence for colorable claims against the Debtors for accounting fraud.  The preliminary findings strongly support the existence of a

---

[407] Indictment, *U.S. v. James*, Case No. 26-cr-00029, Dkt. 2, ¶ 31.
[408] Examiner Interview of Jane Doe 1 (January 16, 2026).
[409] Examiner Interview of Arturo Arellano (Accounting Manager, FBG) (January 16, 2026).
[410] Examiner Interview of Jane Doe 2 (January 18, 2026); █████████████████
[411] *Id.*
[412] Examiner Interview of Jane Doe 2 (January 18, 2026).
[413] Examiner Interview of Oskar Mendez (Payroll Manager, FBG) (January 16, 2026).
[414] Examiner Interview of John Doe 1 (January 17, 2026) (witness alleged that "the prize for reporting was getting demoted"); Examiner Interview of John Doe 1 (January 22, 2026); Examiner Interview of Jane Doe 1 (January 16, 2026); Examiner Interview of Jane Doe 2 (January 18, 2026).

criminal financial enterprise built on the maintenance of parallel books and directed consolidation adjustments reflected in HFM and lender-facing reports. With additional funding, the Investigation would conduct further work to confirm these initial findings. This would include conducting additional witness interviews of FBG accounting personnel, completing the analysis of prioritized accounting system and general ledger data, and performing reconciliations to confirm the preliminary accounting findings.

### B. FBG's Interactions with Auditors

The Investigation also uncovered evidence regarding FBG's interactions with its auditors. FBG retained external auditors to conduct periodic audits of its financial statements. As a privately held entity, FBG was not subject to public reporting requirements, but audited financial statements were nonetheless required under certain debt agreements and were necessary to maintain access to financing.[415] The audit process therefore played a central role in FBG's financial reporting and its relationships with lenders. The Investigation identified evidence of a pattern in how FBG managed (and limited) auditor access, with communications centralized among select personnel and disclosures to auditors tightly controlled.

As alleged in the Indictment, FBG "restrict[ed] the flow of information" to external auditors to conceal FBG's "true financial picture."[416] According to the Indictment, to prevent a "low-level employee" from "inadvertently supply[ing] accurate information to an inquiring" outsider, Patrick James' restricted communications to an "inner circle of First Brands executives involved in the fraudulent scheme."[417] Consistent with these allegations, multiple witnesses

---

[415] Examiner Interview of Kevin Ruminski (Vice President of Finance and Treasury, FBG) (January 15, 2026).
[416] *See* Indictment, *U.S. v. James*, Case No. 26-cr-00029, Dkt. 2, ¶ 34.
[417] *Id.* ¶¶ 13, 34.

described a directive barring rank-and-file employees from communicating with auditors. One employee recalled being told unequivocally that she "could not speak with the auditors."[418] Another reported that he was instructed not to respond to auditor emails, that SharePoint access was blocked, and that auditors' email addresses were removed from communication chains altogether.[419] Instead, communications with auditors were funneled through a small, centralized group,[420] with witnesses consistently identifying Mr. Brumbergs, Mr. Ruminski, and Mr. DiFranco as the principal—and often the exclusive—points of contact.[421]

The Indictment further alleges that the James brothers directed "employees in their inner circle" to withhold information from auditors.[422] Consistent with this allegation, witnesses reported senior management directives limiting disclosures. One A&M restructuring employee reported that Mr. Brumbergs instructed corporate accounting not to disclose the existence of SPVs.[423]

Witnesses also described efforts to make transactions more difficult to trace. One employee reported that entries were intentionally split across multiple journals—moving amounts from inventory to cost accounts, then to overtime, and then again to another journal—so that the audit trail would be fragmented.[424]

---

[418] Examiner Interview of Jane Doe 2 (January 18, 2026); *see also* KLD002828_0144_0056870 (message from an accounting employee to another employee on August 25, 2022 (5:57:53 PM) stating, "es que me habian dicho que yo no podia hablar con los auditores").

[419] Examiner Interview of John Doe 1 (January 17, 2026).

[420] Examiner Meeting with Weil and A&M (January 6, 2026).

[421] Examiner Interview of Kevin Ruminski (Vice President of Finance and Treasury, FBG) (January 15, 2026); Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 10, 2026).

[422] Indictment, *U.S. v. James*, Case No. 26-cr-00029, Dkt. 2, ¶ 34.

[423] Examiner Meeting with Weil and A&M (January 6, 2026).

[424] Examiner Interview of Jane Doe 2 (January 18, 2026).

The Examiner would, upon budget resumption, conduct further investigation into the Debtors' interactions with their auditors. This would include additional witness interviews of auditor-facing FBG personnel and outside audit team members, reviewing targeted workpapers and additional audit firm documents, and reconciling HFM bridge file adjustments with other entries in the Debtors' accounting systems. These steps can be completed within an approximately 90-day timeframe and will allow the Examiner to finalize his initial findings in this area.

### C. Accounting Standards Codification 810 Consolidation Analysis and Perimeter Implications

Another accounting issue was FBG's decision of whether to consolidate the financial records of SPVs implicated in off-balance-sheet financing with FBG. The consolidation issue is governed by ASC 810. Under ASC 810, consolidation is required where a reporting entity has a controlling financial interest in another entity. This is a substance over form framework that depends, among other things, on the reporting entity's power to direct significant activities and its exposure to potentially significant economic benefits or losses. The Examiner's preliminary findings indicate that FBG did not perform an ASC 810 consolidation analysis to determine if the SPVs should be consolidated for accounting purposes. The fact that the SPVs were not consolidated has significant implications for the FBG counterparties relying on its financial statements, and evidence that inventory that FBG purportedly "sold" to the SPVs remained on FBG's balance sheet and loan borrowing bases bears directly on lien validity and lien priority disputes now before the Court. Further investigation would be necessary to determine the nature and circumstances of these decisions.

### D. External Audit Firms Engaged by FBG

FBG initially engaged Cohen & Company, Ltd. ("**Cohen**") as its external auditor.[425]   In 2021, it transitioned the engagement to BDO USA, P.C. ("**BDO**"), which then conducted FBG's external audits.[426]

Witness accounts provide context for that transition.  As FBG moved from Cohen to a more national accounting firm, one former senior employee recalled a discussion among senior leadership in which BDO was described as preferred among the larger firms based on its audit approach, which was viewed as less rigorous.  According to the witness, BDO was characterized as having "the most unsophisticated audit process," and that, as a result, "[w]e can do what we want with these guys."[427]

BDO conducted independent audits of FBG's combined consolidated financial statements for fiscal years 2020 through 2024 (collectively, the "**Audits**") in accordance with generally accepted auditing standards ("**GAAS**") in the U.S.[428]   The Audits state that management is responsible for the "preparation and fair presentation" of the financial statements, and for the "design, implementation, and maintenance of internal control[s]" to prevent misstatement, whether due to fraud or error.[429]  BDO sought to obtain "reasonable assurance" about whether the financial

---

[425] Examiner Interview of Shekhar Kumar (Senior Vice President of Mergers & Acquisitions, FBG) (January 14, 2026); Examiner Interview of Kevin Ruminski (Vice President of Finance and Treasury, FBG) (January 15, 2026).
[426] KLD002828_0007_0000028 (audit of consolidated financial statements for the fiscal years ended January 1, 2022 and January 2, 2021); KLD002828_0007_0000026 (audit of consolidated financial statements for the fiscal years ended December 31, 2022 and January 1, 2022); KLD002828_0021_0002345 (audit of consolidated financial statements for the fiscal years ended December 30, 2023 and December 31, 2022); USBOSC0011_00000033 (audit of consolidated financial statements for the fiscal years ended December 28, 2024 and December 30, 2023).
[427] Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 10, 2026).
[428] KLD002828_0007_0000028 (audit of consolidated financial statements for the fiscal years ended January 1, 2022 and January 2, 2021); KLD002828_0007_0000026 (audit of consolidated financial statements for the fiscal years ended December 31, 2022 and January 1, 2022); KLD002828_0021_0002345 (audit of consolidated financial statements for the fiscal years ended December 30, 2023 and December 31, 2022); USBOSC0011_00000033 (audit of consolidated financial statements for the fiscal years ended December 28, 2024 and December 30, 2023).
[429] *Id.*

statements "as a whole are free from material misstatement, whether due to fraud or error."[430]  The Audits note that reasonable assurance is a "high level of assurance" but is "not absolute assurance" and therefore does not guarantee that all material misstatements will be detected.[431]  The Audits explain that, "[i]n performing an audit in accordance with GAAS," BDO examines financial information "on a test basis," evaluates the "appropriateness" of "accounting policies" and the "reasonableness" of "significant accounting estimates," obtains an "understanding of internal control[s]" to design audit procedures, and assesses the "risks of material misstatement" while maintaining "professional skepticism."[432]  Based on this work, BDO issued unqualified opinions concluding that the financial statements "present fairly, in all material respects," FBG's financial position, and that the results of its operations and its cash flows for the years ended in conformity with Generally Accepted Accounting Principles ("**GAAP**") in the U.S.[433]

With respect to the auditing process, A&M restructuring personnel reported that portions of the audit work were performed using offshore resources and that much of the engagement was conducted remotely, without on-site presence at corporate locations.[434]

Witnesses described the nature and scope of BDO's procedures.  According to these accounts, the Audits relied on materials prepared by FBG personnel, including spreadsheets and document extracts compiled centrally.[435]  Witnesses reported that BDO did not directly access underlying enterprise systems, such as Oracle or SAP, and did not consistently perform

---

[430] *Id.*
[431] *Id.*
[432] *Id.*
[433] *Id.*
[434] Examiner Meeting with A&M (January 13, 2026).
[435] Examiner Interview of Ric Tomaszewski (Former Chief Financial Officer of Operations, FBG) (February 10, 2026).

102

independent verification in certain areas, including customer confirmations, manual journal entry testing, or analysis of cash activity around period-end.[436]

Witnesses recounted that verification and analysis in these areas could potentially have surfaced accounting discrepancies.[437]  Under GAAS standard AU-C 240 *Consideration of Fraud in a Financial Statement Audit,*  the auditor should address the risk of management override of controls apart from any conclusions regarding the existence of more specifically identifiable risks by designing and performing audit procedures to test the appropriateness of journal entries recorded in the general ledger and other adjustments made in the preparation of the financial statements, including entries posted directly to financial statement drafts.  In designing and performing audit procedures for such tests, the auditor should select journal entries and other adjustments made at the end of a reporting period.[438]

Additional investigation into the scope of the auditors' knowledge and conduct is needed. If additional funds are allocated, the Examiner with the assistance of his financial advisor would perform a forensic assessment of the auditors' compliance with GAAS (Generally Accepted Auditing Standards).  One consideration is whether there were red flags noted during the audits. For example, a comparison of the FBG balance sheet accounts for the factored loans and accounts receivable may have indicated that factored receivables were greater than total receivables, leading to additional audit procedures. To evaluate whether the auditors complied with GAAS, the Examiner would conduct additional witness interviews of auditor-facing FBG personnel and

---

[436] *Id.*
[437] Examiner Meeting with A&M (January 13, 2026).
[438] AU-C 240.32.

outside audit team members, and review targeted workpapers, as well as analyze the correspondence between the audit team and FBG management.

The objective of this work would be to develop an assessment of potential accounting irregularities and audit deficiencies. The Examiner and his financial advisors would also analyze the financial reporting data, reconciling ERP ledgers to HFM, reviewing bridge spreadsheets and top-side journal entries to assess the accuracy of the information provided to the auditors. The Examiner anticipates that these steps can be completed within an approximately 90-day time period at a reasonable cost.

## VIII.  CONCLUSION

The case of FBG is, ultimately, not the story of a company that simply ran into tariffs that caused supply chain pressure or an overambitious acquisition strategy. Rather, the evidence developed to date suggests that FBG was operated through a set of financing structures, acquisitions, and affiliated entities that generated liquidity while obscuring where assets were located, who controlled them, and who benefited from them. In that system, the formal boundaries between Debtor and non-Debtor entities mattered less in practice than they did on paper.

The Investigation remains incomplete but has already surfaced evidence of fabricated or repeatedly pledged receivables, collateral that may never have been transferred as represented, hundreds of millions of dollars moving out of FBG sources to Patrick James and affiliated entities, and acquisition and restructuring activity that appears to have separated value from operating businesses while leaving creditors behind. The estate presented in these Chapter 11 cases is therefore only a partial reflection of the economic enterprise that existed when the money was raised and spent.

First Brands matters beyond First Brands because it reveals what can happen when leverage and complexity migrate into structures that are difficult to test, easy to manipulate, and profitable

104

enough that warning signs can be ignored.  In FBG, opacity was functional.  The more opaque the structure became, the easier it was to move value, blur accountability, and delay detection.

The Court approved the appointment of an Examiner to establish the facts. The facts developed so far are serious, incomplete, and too consequential to ignore. They warrant further work because the difference between a failed company and a constructed extraction enterprise is the difference between ordinary loss and recoverable value.

Respectfully submitted,

*/s/ E. Martin De Luca*
E. Martin De Luca, Examiner