**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| FIRST BRANDS GROUP, LLC *et al.*,[1] | Case No. 25-90399 (CML) |
| Debtors. | (Jointly Administered) |

**ONSET FINANCIAL, INC.'S <u>EMERGENCY</u> MOTION *IN LIMINE* TO EXCLUDE THE
DECLARATION OF MARC S. KIRSCHNER**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NO LATER THAN 9:00 A.M. (CENTRAL TIME) ON JULY 28, 2026. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Onset Financial, Inc. ("<u>Onset</u>"), by and through its undersigned counsel, submits this motion *in limine* (the "<u>Motion</u>"), pursuant to Federal Rule of Evidence 702 ("<u>FRE 702</u>"), made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 9017, for entry of an order, in substantially the form attached hereto as <u>Exhibit A</u> (the "<u>Proposed Order</u>"), to exclude the *Declaration of Marc S. Kirschner*, Dkt. No. 3190 (the "<u>Kirschner Declaration</u>" or "<u>Kirschner Decl.</u>") and any testimony related thereto.  In support of the Motion, Onset respectfully states as follows:[2]

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands/. The Debtors' service address for these chapter 11 cases (the "<u>Chapter 11 Cases</u>") is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]    Capitalized terms not defined herein shall have the meaning assigned to them in the Kirschner Declaration or in the Proposed Plan (defined herein), as applicable.

**PRELIMINARY STATEMENT**

1.     The Kirschner Declaration lacks any probative value.  The FBG Debtors offer this expert declaration seeking to establish the feasibility of their proposed plan:  that the Litigation Trust, by prosecuting and/or settling the Estate Claims, will generate enough proceeds by the end of 2028 to fully satisfy all the Administrative and Priority Claims pending against the FBG Debtors' estates.  In support of this speculative—and convenient—conclusion, Kirschner draws from a curated set of facts fed to him by the FBG Debtors that he admittedly did not independently verify in opining that the Estate Claims are meritorious and therefore will generate the requisite funds within the FBG Debtors' proposed timeline.  This conclusion, though purporting to be a valuation exercise, is a legal opinion that does nothing to aid the trier of fact.  Kirschner performs no empirical exercise and applies no criteria or industry standard; he offers simple legal analysis of an incomplete set of underlying assumptions.  His opinion is a check-the-box exercise regarding whether the Debtors' previously-given estimates of how and when their Plan may go effective are right.  The Court should exclude the Kirschner Declaration.

2.     The Kirschner Declaration is replete with legal conclusions.  In his declaration, Kirschner opines generally on the merits of the Estate Claims, asserting that each of the Estate Claim categories is colorable or meritorious and that the Litigation Trustee is therefore likely to realize substantial proceeds from the prosecution or settlement of such claims within two years.  Kirschner did not reach these conclusions by applying unique expertise that this Court lacks.  Instead, he applied his knowledge of the applicable law to "facts" chosen by the FBG Debtors and, predictably, found that those facts satisfy the elements of the contemplated claims.  These legal conclusions will not aid the Court in understanding any of the evidence or facts at issue.

3.     Worse, these legal conclusions were drawn from an incomplete and biased record.  As his testimony lays plain, Kirschner relied primarily, and at times exclusively, on the purported

facts set forth in the *Declaration of Charles M. Moore in Support of Confirmation of FBG Debtors'* *Chapter 11 Plan*. Kirschner did not review a complete factual record in preparing his Declaration (nor could he, as the Debtors' investigation of the Estate Claims on which Moore relies is admittedly incomplete); he reviewed only the documents the Debtors' counsel pre-selected for him and a handful of pleadings. Fatally, Kirschner took no steps to verify that the facts he reviewed were accurate and complete.

4. Kirschner's opinions accordingly suffer from numerous evidentiary defects. The premise of these opinions—that the Estate Claims are worth $25.4 billion—is drawn, without scrutiny, from the Moore Declaration. Kirschner cannot explain how that amount was calculated, nor did he verify it. Nor did Kirschner know that only a month earlier, Moore testified that the Estate Claims sought to recover $7 billion, rather than $25.4 billion. Kirschner then makes the subjective (legal) determination that all of the Estate Claims are cognizable, reciting the same anecdotal facts as Moore and without engaging with or even acknowledging potential weaknesses in, or defenses to, the Estate Claims. Kirschner admitted under oath that he did not evaluate the strength of *any* defenses to the Estate Claims, rendering his opinion as to the ultimate success of those claims completely meaningless. Kirschner further fails to offer analysis of comparable claims or litigation outcomes. Without reference to *any* other comparable circumstance, seemingly crafted on mere instinct, he then conveniently opines broadly that the Litigation Trust can recover $2 billion by the end of 2028. The gut-based nature of Kirschner's opinions is further confirmed by the fact that, with respect to the six diverse categories of claims he identifies, he did not evaluate the likelihood of success for each category. Instead, he merely agreed that $2 billion can be generated from these claims ***in the aggregate*** in the aspirational timeframe aimed for by the FBG Debtors. This is not a bottom-up expert analysis meriting consideration; this is not analysis at all.

5.      Kirschner's opinions, made without all relevant information and without any testable principles or methodologies, are unreliable and therefore inadmissible.  The FBG Debtors have made no effort to support the reliability of the facts and data upon which Kirschner relied.  Nor could they—as further explained in Onset's motion *in limine* to exclude Moore's declaration, filed contemporaneously with this Motion, the factual assertions in Moore's declaration themselves are unexplained, are unsupported by any citations or sources, rely on unjustified assumptions, and improperly incorporate hearsay (among other issues).  But even if the Court is inclined to allow the Moore Declaration into evidence (it should not), the Kirschner Declaration should nevertheless be excluded.  Kirschner's failure to independently verify and demonstrate to the Court the reliability of the assertions made in the Moore Declaration, even though he relies upon them, runs afoul of FRE 702.

6.      The Kirschner Declaration does not satisfy the requirements for admissibility under the applicable Federal Rules of Evidence.  The Court should exclude it.

## BACKGROUND

### I.      The FBG Debtors' Proposed Plan and Disclosure Statement

7.      On June 16, 2026, the FBG Debtors filed the *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors*, Dkt. No. 3019 (the "Proposed Plan"), and the *Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors*, Dkt. No. 3020 (the "Disclosure Statement").

8.      Among other things, the Proposed Plan provides for the establishment of the Litigation Trust, administered by the Litigation Trustee.  *See* Proposed Plan § 6.1(a).  The Litigation Trust will be vested with the Litigation Trust Assets, which primarily consist of all claims and/or remedies that are held or controlled by, or that were or could have been asserted by,

the FBG Debtors or their estates (the "Estate Claims").  *See id.*; *see also id.* § 1.1 (defining Litigation Trust Assets to include the Estate Claims).

9.      Under section 1129(a)(9)(A) of the Bankruptcy Code, as a condition precedent for the Proposed Plan to become effective, among other requirements, the Litigation Trust must fully satisfy all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims (together, the "Administrative and Priority Claims") against the FBG Debtors.  To do this, given the structure of the Litigation Trust Waterfall [*defined in the Plan Supp Ex. D which was a Moore decl. exhibit*], the Litigation Trust must recover approximately $1.965 billion.  Proposed Plan § 12.1(o); Moore Decl. ¶ 228.  The Proposed Plan provides that all Administrative and Priority Claims shall be paid through the recoveries generated from the Litigation Trustee's prosecution of the Estate Claims.  *See id.* §§ 6.5(d)(ii)-(iv); Disclosure Statement at 10-11.  The FBG Debtors also contend that the Effective Date, at which time Administrative and Priority Claims shall be paid in full, will occur in the second half of 2028. Disclosure Statement at 28.  Thus, the confirmability of the Proposed Plan turns, in significant part, on whether the Litigation Trustee will be able to recover at least $1.965 billion on the Estate Claims by the end of 2028. *Id.* Ex. F at 9.

10.     On June 12, 2026, the Court held a hearing (the "Disclosure Statement Hearing") on the FBG Debtors' motion to conditionally approve a prior version of the Disclosure Statement, at which hearing the Debtors discussed the need for the Litigation Trust to generate nearly $2 billion by the second half of 2028 for the Plan to go effective. *See* Disclosure Statement Hearing Tr. 132:14-23.  During the hearing, Charles Moore, the FBG Debtors' Interim Chief Executive Officer, testified that the estimated total value of the Estate Claims was "about $7 billion," excluding certain categories of claims such as claims for recovery under D&O insurance for breach

of fiduciary duties.   Disclosure Statement Hearing Tr. at 132:08-13.   Accordingly, Moore estimated that, to fully pay the Administrative and Priority Claims, the Litigation Trust would "need to collect on about 27 percent of those $7 billion." *Id.* at 132:29-23.   Consistent with that estimate, on June 23, 2026, the FBG Debtors' financial advisors represented to potential third-party buyers of the Estate Claims that such claims "relate to more than $7 billion of underlying transactions."[3]

## II.      Kirschner's Engagement in these Chapter 11 Cases

11.      In support of confirmation of the Proposed Plan, on July 14, 2026, the FBG Debtors filed two declarations: the Kirschner Declaration and the *Declaration of Charles M. Moore in Support of Confirmation of FBG Debtors' Chapter 11 Proposed Plan*, Dkt. No. 3188 (the "Moore Declaration").

12.      The Debtors retained Kirschner just a few weeks prior, on June 20, 2026, "to provide expert consulting services and expert testimony regarding the FBG Debtors' Estate Claims that will be transferred to the Litigation Trust in accordance with the terms of the Plan." Kirschner Decl. ¶ 18.   This retention was over a week following conditional approval of the Disclosure Statement.  This timing is significant:  after stating in their Proposed Plan and Disclosure Statement that they would pay all $2 billion of Administrative and Priority Claims by the end of 2028 using the Estate Claims' recoveries, the FBG Debtors then asked Kirschner, who had full knowledge of the quantum and timing hurdles he was being asked to validate, to "provide expert analysis and opinions as to the amount of proceeds that are reasonably expected to be generated from such Estate Claims and the anticipated timing thereof." *Id.*

---

[3]    *See* Ex. C, Email from M. Uhrin (Alvarez and Marsal) re: "FBG Litigation Assets Teaser" (June 23, 2026), FBG_CH1_00220754.

13.     Kirschner's professional experience is primarily as a bankruptcy/reorganization lawyer: for most of his professional career, he worked as a practicing attorney and was involved in several high-profile bankruptcy cases. *Id.* ¶¶ 5, 7. Kirschner also has served as a litigation trustee. *Id.* ¶ 8.

14.     In his declaration, Kirschner offers three opinions:

- "the Estate Claims are valuable assets of the FBG Debtors,"

- "it is reasonable to conclude that the various Estate Claims are reasonably probable to result in the recovery of proceeds in excess of . . . $2 billion," and

- "it is reasonably probable that at least these amounts could be recovered by a litigation trustee by the end of 2028."

*Id.* ¶ 21.

15.     Kirschner's opinions are thus directed squarely at the question raised by the Proposed Plan's central funding mechanism—whether, by prosecuting the Estate Claims, the Litigation Trust will timely recover roughly $2 billion needed for the Proposed Plan to go effective, which the Debtors need to demonstrate to establish the Proposed Plan's feasibility. *Id.* And they confirm the answer the Debtors already gave the Court on this question a week before his engagement.

## ARGUMENT

16.     "The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *Harris v. BMW of N. Am., LLC*, No. 4:19-CV-00016, 2022 WL 125345, at *1 (E.D. Tex. Jan. 12, 2022) (quoting *Harkness v. Bauhaus U.S.A., Inc.*, No. 3:13-CV-00129, 2015 WL 631512, at *1 (N.D. Miss. Feb. 13, 2015)). In addressing a motion *in limine*, the Court "must weigh the evidence's contribution to the case against any potential prejudice or confusion." *F.D.I.C. v. Wheat*, 970 F.2d 124, 131 (5th Cir.

1992).  The decision whether to admit testimonial evidence ultimately "is entrusted to the sound discretion of the trial court."  *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 197 (5th Cir. 1996).

17.     FRE 702 sets forth the legal standard governing the admissibility of expert opinions, commonly referred to as the *Daubert* standard.  Under that standard, "[t]he proponent . . . must prove by a preponderance of the evidence that the testimony is reliable."  *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 850 (5th Cir. 2015) (citation omitted).  Specifically, for an expert opinion to be admitted, the proponent must first demonstrate that it is "more likely than not" that:

a.    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

b.    the testimony is based on sufficient facts or data;

c.    the testimony is the product of reliable principles and methods; and

d.    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FRE 702.

18.     When a party seeks to introduce expert testimony, the trial court "must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case."  *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997); *see also Knox v. Com. Contracting Corp.*, No. 4:14-cv-128, 2015 WL 11023599, at *1 (N.D. Tex. June 23, 2015) ("The trial court is charged with making this preliminary determination[.]").

## I.    Kirschner Offers Impermissible Legal Opinions.

### A.    Under FRE 702, Legal Conclusions Are Inadmissible.

19.     Expert testimony is admissible only if it will help the trier of fact "understand the evidence or to determine a fact in issue."  FRE 702(a); *see also Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) ("[T]he expert's proposed opinion [must] assist the trier of fact

4912-7985-1201v.1

to understand or determine a fact in issue"); FRE 702 advisory committee's note to proposed rule ("When [expert] opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time."). For expert testimony to help the fact finder, the expert must bring to bear some specialized knowledge or experience that the trier of fact **otherwise would not have**. *See Pierce v. Thaler*, 355 F. App'x 784, 790-91 (5th Cir. 2009) (per curiam) (affirming district court's exclusion of expert testimony that "offered the jury no helpful specialized knowledge"); *Dunlap v. Hood*, No. 3-07-CV-2147-BD, 2009 WL 362292, at *1 (N.D. Tex. Feb. 13, 2009) (excluding expert testimony that was "unaided by any specialized knowledge" and thus of no assistance to a fact finder).

20.     As the purported expertise must be something a court will not possess, "experts are not permitted to offer legal conclusions in their testimony." *Mendoza v. Amarillo Indep. Sch. Dist.*, No. 2:24-cv-169-BR, 2026 WL 776225, at *3 (N.D. Tex. Mar. 19, 2026). Legal expert testimony is inherently unhelpful as it "both invades the court's province and is irrelevant." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983); *see Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) ("It is not for [the expert] to tell the trier of fact what to decide."). This makes sense; "if an expert were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position." *Est. of Sowell v. United States*, 198 F.3d 169, 172 (5th Cir. 1999) (citation omitted).

21.     Accordingly, expert testimony "that attempts to tell the fact finder what law to apply is improper." *In re Wyly*, 552 B.R. 338, 359 (Bankr. N.D. Tex. 2016); *see id.* ("It is all but axiomatic that the judge should be the sole source of the applicable legal standard in any case[.]"). In other words, expert witnesses cannot "define the particular legal principles applicable to a case; that is the role of the trial court." *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 95

(Tex. App. 2004) (finding that trial court erred in permitting a law professor and a former judge to testify on questions of law); *see also United States v. Cross*, 113 F. Supp. 2d 1282, 1284 (S.D. Ind. 2000) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards" (citation omitted)). Additionally, expert opinions that "attribute legal significance to certain facts" are "not helpful to the trier of fact and must be excluded under Rule 702." *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 811 (N.D. Tex. 2013). Yet precisely this occurs here.

> **B. The Opinions in the Kirschner Declaration Are Inadmissible Legal Conclusions.**

22. The opinions in the Kirschner Declaration are legal conclusions that do not assist this Court. The FBG Debtors offer the Kirschner Declaration seeking to support their now-longstanding claim that prosecuting the Estate Claims will likely generate enough proceeds to fully satisfy all the Administrative and Priority Claims. The scope of Kirschner's assignment confirms this; he was tasked with "provid[ing] expert analysis and opinions as to the amount of proceeds that are reasonably expected to be generated from [the] Estate Claims and the anticipated timing thereof." Kirschner Decl. ¶ 18. In other words, the FBG Debtors hired Kirschner to use his knowledge and experience as a bankruptcy lawyer and litigation trustee to opine on the likelihood of success and timing of the Estate Claims—that is, to evaluate such claims' legal merits, potential recoveries, and speculate as to the legal process.

23. And Kirschner did just that. In his declaration, Kirschner ultimately concludes that the Estate Claims are meritorious, and therefore valuable, and will bring in just the right amount of recoveries at exactly the time the Debtors previously, and publicly, predicted. *See*, *e.g.*, *id.* ¶ 21.

24. But this is not, as the FBG Debtors contend, a valuation opinion. Though Kirschner purports to opine regarding the quantum of recoveries and the time by which a certain quantum

could be obtained, he does not in fact engage in valuation or consideration of timing.  It is no more than a check-the-box exercise:  the FBG Debtors said they need to generate a certain amount of funds in a certain time.  The Kirschner Declaration merely says yes, this is possible.  And the only analysis in support of that "yes" is legal in nature.

25.     Considering both the scope of Kirschner's retention and his professional background, it is no surprise that the Kirschner Declaration is *replete* with textbook legal conclusions.  Indeed, the opinion section of the Kirschner Declaration follows the format of a legal brief.  It generally begins by stating the overall conclusion, and, predictably, for all six categories of the Estate Claims, Kirschner finds that the claims are colorable or meritorious and likely to yield substantial recoveries.[4]  Next, Kirschner repeats the facts set forth in the Moore Declaration and then superficially applies the law to those cherry-picked facts to opine that cognizable legal claims lie therein.  As outlined below, Kirschner repeats this structure for each of the six categories of Estate Claims:

- ***Third-Party Factoring Claims*** – citing to the Moore Declaration, Kirschner states that "the Debtors' former officers engaged in a sustained, coordinated scheme to fraudulently obtain funds and misrepresent the Debtors' financial condition."  *See id.* ¶ 35 & n.18.  Based on this, Kirschner concludes that the "FBG Debtors' prior management committed fraudulent acts to obtain additional credit that was used to pay off older credit, which . . . support[s] a finding of a Ponzi scheme."  *Id.* ¶ 39.  Kirschner further concludes that the facts also provide "substantial grounds for actual and constructive fraud claims" and sets forth a cursory application of the facts to some of the legal elements of such claims.  *Id.* ¶ 40.

- ***Supply Chain Financing ("SCF") Claims*** – citing exclusively to the Moore Declaration, Kirschner describes how "the FBG Debtors' former management created fake invoices . . .  and submitted them to the third-party bill payers" to obtain additional funding, *id.* ¶ 38 & n.25, and how the vendors that facilitated these invoice submissions knew that the invoices were illegitimate, *id.* ¶ 54.  Kirschner

---

[4]   Kirschner describes five of the six categories as "meritorious" and "valuable."  *See* Kirschner Decl. ¶¶ 32, 87, 100, 121, 136.  Kirschner describes the SCF Claims as "colorable."  *Id.* ¶ 55.

therefore concludes that "a litigation trustee would have colorable claims relating to the SCF programs." *Id.* ¶ 55.

- *SPV Lender Claims* – drawing again from the Moore Declaration, Kirschner asserts that as "part of a scheme to defraud FBG's existing lenders," FBG caused the "SPV entities to enter into more than $2 billion dollars in inventory . . . financings that neither the SPV entities nor FBG could afford to repay from operations." *Id.* ¶¶ 58-59 & n.58, 63. Kirschner then concludes that these facts "give rise to . . . numerous cognizable claims for fraudulent transfer and other avoidance actions," *id.* ¶ 57, and that "a litigation trustee would have significant and cognizable claims for recovery against Onset and other SPV Lenders," *id.* ¶ 86.

- *Insider Claims* – Kirschner summarizes the allegations in the James Complaint and additional related facts from the Moore Declaration. In particular, Kirschner describes how James misappropriated FBG Debtors' funds for personal enrichment, falsified invoices to obtain company financing, and entered into several fraudulent transactions using the SPV Debtors. *See id.* ¶¶ 89-100. Kirschner then explains how these facts satisfy the elements of the FBG Debtors' various claims. *See id.* ¶¶ 101-125. He concludes that the Insider Claims are meritorious and reasonably likely to generate significant recoveries. *Id.* ¶ 100.

- *Suspect Acquisition Claims* – relying on the purported facts from the Moore Declaration, Kirschner opines, in conclusory fashion, that "from 2022 to 2025 . . . FBG engaged in a series of acquisitions at well-above-market prices, receiving less than reasonably equivalent value," when there was "a good faith basis to believe that FBG was already insolvent." *Id.* ¶ 127.

- *Other Claims* – again citing the Moore Declaration, Kirschner summarizes how Helios Strategic Advisors ("Helios"), which brokered SPV financing arrangements for the Debtors, received brokerage fees and related payments from the Debtors for its services, which Helios then covertly diverted to Edward James. *Id.* ¶¶ 132-134. Based on these facts, Kirschner then concludes that the Debtors' claims against Helios are meritorious and worth pursuing. *Id.* ¶¶ 135-136. Separately, Kirschner also opines that the Debtors may also bring preference claims against creditors and counterparties who received transfers from the FBG Debtors during the applicable preference period. *Id.* ¶¶ 137-139.

26. The only feature of the Kirschner Declaration absent from the Moore Declaration is the conclusion that all the various Estate Claims have merit and that prosecuting such claims will generate sufficient recoveries by the end of 2028. For each category of claims, Kirschner simply restates in circular fashion the assertions in the Moore Declaration (and, in the case of the Insider Claims, in the James Complaint). Kirschner did not himself test the factual assertions

12

provided by Moore nor seek to identify any other facts, including mitigating facts. (Nor did Moore.)

27.     And Kirschner's opinions regarding the merits of the claims are definitionally legal conclusions. Kirschner identifies what he contends is the applicable law, explains how the facts purportedly satisfy the legal elements of such law, and declares the claims meritorious on that basis. Courts have consistently excluded such expert testimony as unhelpful. *See*, *e.g.*, *Owen*, 698 F.2d at 240; *Askanase*, 130 F.3d at 673 (excluding an attorney's testimony and holding that experts may not opine on what law governs an issue or what the applicable law means); *In re Wyly*, 552 B.R. at 359 (striking portions of debtors' trust-and-estate expert's testimony explaining the applicable law because "expert testimony that states a legal opinion [and] tells the fact finder what result to reach is improper."); *BNY Mellon, N.A. v. Affordable Holdings, Inc.*, No. 1:09CV226-SA-JAD, 2011 WL 2746301, at *1-2 (N.D. Miss. July 12, 2011) (excluding corporate-law expert's report in its entirety where the expert cited a Mississippi statute, "attempt[ed] to explain how that code section should be interpreted," and applied that interpretation to a disputed corporate resolution, because "***experts cannot opine as to what law governs an issue or what the applicable law means***." (emphasis added)).

28.     Moreover, to the extent Kirschner seeks to support his opinions with legal analysis, such analysis also constitutes impermissible legal conclusions. Kirschner did not, as required by FRE 702(a), derive his opinions by applying any specialized knowledge or experience that the trier of fact otherwise would lack. *Pierce*, 355 F. App'x at 790. Instead, he simply applied his ***legal*** knowledge to facts that others, mainly Moore, provided. Indeed, when asked whether he was applying anything other than his legal knowledge, he admitted he was not. For example, the bulk of Mr. Kirschner's opinions regarding recovery are based on his belief that a number of First

Brands counterparties "knew or should have known" of the fraud at First Brands. But Kirschner offers no recognized standard or principle for reaching this conclusion, instead offering a "you know it when you see it," black-box opinion that offers nothing resembling analysis, standards or principles (other than his legal knowledge) that this Court might find even remotely helpful.[5]

29.     For example, to support his overall conclusion that the FBG Debtors hold meritorious actual fraudulent transfer claims against the FBG Debtors' factors, Kirschner opines *solely* on the law and legal principles that a court would use to evaluate such claims. Specifically, he asserts that a litigation trustee could prove actual fraudulent intent by invoking the Ponzi Scheme Presumption, which he states requires "proof that a company operated as a fraudulent enterprise at the time of the transfer can be sufficient for purposes of the Ponzi Scheme Presumption." Kirschner Decl. ¶ 33. Kirschner then concludes that, here, the facts support that "a Ponzi scheme existed and that each [third-party Factor] received transfers of money from the Ponzi scheme." *Id.* Kirschner further opines that, even if the Ponzi Scheme Presumption did not apply, the litigation trustee "would still be able to support an actual fraudulent transfer claim," *id.* ¶ 33, because "there exist facts to support the conclusion of a persistent illegal course of conduct, including many acts of intentional fraud to support the 'badges of fraud,' " *id.* ¶ 40. None of these opinions reflect an application of expertise that this Court lacks, and they must be excluded.

## II.     Kirschner Fails to Demonstrate that His Opinions Are Reliable.

### A.     Under FRE 702 and 703, Experts Must Justify Their Reliance on Information Provided by Other Parties.

30.     Under the *Daubert* standard, "[t]he proponent . . . must prove by a preponderance of the evidence that the testimony is reliable." *MM Steel*, 806 F.3d at 850 (citation omitted).

---

[5]    *See* Ex. B, July 24, 2026 Kirschner Deposition Transcript (Excerpted) ("Kirschner Tr.") at 5 ██████ ████████

4912-7985-1201v.1

Specifically, expert testimony must be "based on sufficient facts or data," FRE 702(b), be a "product of reliable principles and methods," *id.* 702(c), and reflect "a reliable application of the principles and methods to the facts of the case," *id.* 702(d).  To the extent an expert relies on inadmissible facts or data in forming an opinion, under FRE 703, the expert must demonstrate that such facts or data are the type "a reasonable expert in the field would use in rendering an opinion on the subject at issue[.]"[6]  *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 857 (3d Cir. 1990) (citation omitted).

31.     Under these combined rules, when an expert relies on information provided by another party, that expert must justify that reliance: he must explain why he relied on such information and why such reliance is reasonable.  *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012) ("[A]n expert might be able to rely on the estimates of others . . . but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable."); *Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 804-06 (N.D. Tex. 2018) ("[A]n expert who relies on work provided by another party . . . must show some basis for believing that party's projections.").  And, to the extent the expert relies on conclusions supplied by a third party, the facts and data underlying those third-party conclusions become the basis for the expert's opinion, and the expert bears the burden of demonstrating the sufficiency of such facts and data.  *See ZF Meritor*, 696 F.3d at 292 ("Arguably, [third-party estimates] that an expert relies on are not his underlying data, but rather the data that went into the [third-party

---

[6]  These requirements are distinct but often overlap—"[i]t can be difficult to determine whether the putative problem with scientific evidence lies in the underlying data itself or the method by which the data is analyzed." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 856 (3d Cir. 1990); *see In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748 (3d Cir. 1994) (discussing how an expert's reliance on insufficient facts and data may also be "a methodological 'flaw' *consisting of* relying on data not of a type reasonably relied upon by experts").  Accordingly, the standard for reliability is the same across FRE 702 and 703.

estimates] in the first place are his underlying data." (quoting *In re Paoli R.R.*, 35 F.3d at 748 n.18)).

32.     In *In re Taxotere (Docetaxel) Products Liability Litigation*, 26 F.4th 256 (5th Cir. 2022), the Fifth Circuit set forth criteria for evaluating the reliability of expert testimony based on inadmissible evidence.  *Id.* at 269 n.10.  There, the Fifth Circuit reversed the lower court's judgment and remanded for a new trial where the proponent "effectively smuggled inadmissible opinion testimony past the expert-disclosure and expert-discovery obligations" by presenting such testimony as a lay opinion and then using that testimony to "bootstrap yet more expert testimony" from an expert witness.  *Id.* at 267.  The Fifth Circuit held that an expert may not rely on inadmissible evidence when such evidence is:

1)     from a witness testifying at the same trial,

2)     critical to the expert's testimony, and

3)     not independently verified by the expert.

*Id.* at 269 n.10.

33.     Under this framework, expert witnesses have an affirmative obligation to verify the information upon which they rely.  Courts exclude expert opinions "where the expert failed to conduct any independent research to determine the reliability of his assumptions."  *JRL Enters. v. Procorp Assocs., Inc.*, 2003 WL 21284020, at *822 (E.D. La. June 3, 2003) (collecting cases).  The record here is clear: Kirschner failed to conduct any independent research at all.

**B.     Kirschner Fails to Demonstrate that His Opinions Are Reliable.**

      i.     Kirschner's Opinions Derive from and Depend on Unverified Facts from the Defective Moore Declaration.

34.     It is beyond dispute that Kirschner's opinions depend, almost exclusively, on the Moore Declaration, which is problematic on its own.  As previously noted, nearly every factual

assertion in the Kirschner Declaration is directly drawn from the Moore Declaration. Kirschner did not independently develop the factual record underlying his opinions, and he very likely could not have, as he was retained only about three weeks before he submitted his declaration. Instead, Kirschner merely assumed that the factual assertions in the Moore Declaration were accurate and complete and built his opinions based on that assumption. *See, e.g.*, Kirschner Decl. ¶¶ 32, 40, 51, 87. Indeed, during his deposition, Kirschner █████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████ ███████████████████████████████████████ ████████████████████████████████████████████████

35.    By way of example, in the following instances, Kirschner relies on, or incorporates by reference, facts set forth in the Moore Declaration:

- **Third-Party Factoring and Supply Chain Financing Claims.** Kirschner states that his belief that the FBG Debtors "hold valuable claims against these parties, including fraudulent transfer claims," is "[b]ased on the facts set forth in paragraphs 80–102 of the Moore Declaration . . . ." Kirschner Decl. ¶ 32. As to whether FBG's factoring and supply chain financing programs support a Ponzi scheme conclusion, Kirschner states his belief is "[b]ased on my experience and review of the relevant documents and the facts set out in the Moore Declaration." *Id.* ¶ 34.

- **The Underlying Investigation.** Kirschner's description of the underlying investigation into the Debtors' financial condition—that it "revealed substantial evidence" of fraud, "uncovered pervasive manipulation and doctoring" of financial records, and "found that $12 billion flowed through the Bowery Account"—cites only to the Moore Declaration. *Id.* ¶ 35 & nn.18-20.

- **Other Fraudulent Activity.** Kirschner's account of how "falsified financial records likely served multiple purposes," of the "commingling of funds," and of the "cycle whereby new falsified invoices were continuously needed," cites exclusively to the

---

[7]    *See* Kirschner Tr. at 182:18-183:02 ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████

[8]    *See id.* at 198:02-11 ██████████████████████████████████████████ █████████████████████████████████████████████████████████████████

Moore Declaration. *Id.* ¶¶ 36-37 & nn.27-24.  Similarly, Kirschner's discussion of the SCF programs, "fake invoices," and the "Dummy Invoices" submitted to Crescendo Asset Management under the Raistone factoring program cites exclusively to the Moore Declaration. *Id.* ¶ 38 & nn. 25-27.

- **Katsumi Analysis.**  Kirschner's analysis—that Katsumi purchased "approximately $4.9 billion" of factored invoices, that it discovered inflated invoices "by more than 180,000%," and that Katsumi "received approximately an estimated $3.8 billion" thereafter—cites only to the Moore Declaration. *Id.* ¶¶ 41-44 & nn.29-30, 35.

- **LAM/Jeffries Analysis.**  Kirschner's categorization of LAM/Jeffries as "among FBG's largest factoring counterparties," and his discussion of an "estimated $4.2 billion in transfers on account of fraudulent receivables from FBG," again cite only to the Moore Declaration. *Id.* ¶¶ 45-48 & nn.36, 44.

- **SPV Lender Claims.**  Kirschner's analysis regarding the Debtors' claims against the SPV Lenders cites exclusively to the Moore Declaration. *Id.* ¶¶ 56-61 & nn.58-64.

- **Insider Claims.**  As to the Insider Claims, Kirschner states that his belief that "the Insider Claims are meritorious and reasonably likely to result in significant recoveries" is based on "the allegations in the amended complaint in the James Adversary Proceeding . . . as well as additional facts set forth in the Moore Declaration." *Id.* ¶ 87.  His examples of misappropriation—the "$708 million" to the Patrick James Trust, "$38 million" to Larchmont, "$18 million" to Battery Park, and "$455,000 . . . to Patrick James' private chef"—all cite to the Moore Declaration.  Kirschner Decl. ¶ 89 & nn.119-122.

36.     As Kirschner relies on the facts in the Moore Declaration, Kirschner must first demonstrate that such facts are, in fact, reliable in order for his opinions to be admissible.  But he cannot and does not do so.

37.     Kirschner did nothing to verify the information presented in the Moore Declaration.  Despite citing the Moore Declaration *144* times, Kirschner never describes his process for confirming that the cited facts were accurate, complete, or otherwise a sound basis for his opinions.  That silence is deafening: ██████████████████████

████████████████████████████████

---

9       Kirschner Tr. at 79:06-1 ████████████████
████████████████████████████████



Considering Kirschner's lack of independent verification, including of the core premise, his opinions are plainly inadmissible under the *Taxotere* framework.  26 F.4th at 269 n.10 ("[W]here the inadmissible evidence (1) is from a witness testifying at the same trial, (2) is critical to the expert's testimony, and (3) is not independently verified by the expert—the expert's testimony relying on that inadmissible evidence does not pass muster under Rules 702 and 703.").

38.     Although the Kirschner Declaration fails on its own for this lack of verification, among other reasons, it is also inadmissible because the information in the Moore Declaration is by itself defective.  Kirschner's opinions, which derive from the Moore Declaration, therefore are equally defective.  *See U.S. All. Grp., Inc. v. Cardtronics USA, Inc.*, 645 F. Supp. 3d 554, 559 (E.D. La. 2022) ("Where the expert's opinion is based on insufficient information, the analysis is unreliable." (citation omitted)); *Paz v. Brush Engineered Materials Inc.*, 555 F.3d 383, 389 (5th Cir. 2009) ("Dr. Maier's diagnosis was fundamentally based on insufficient information, rendering her conclusion unreliable.").  As explained more fully in Onset's motion *in limine* to exclude the

---

[10]   *Id.* at 199:23-200:06

[11]   *Id.* at 237:02-0

[12]   *Id.* at 237:19-25

Moore Declaration, filed contemporaneously with this Motion, the Moore Declaration suffers from multiple defects that render it unreliable and inadmissible.  Among other issues, Moore (1) did not use reliable principles and methods to develop the testimony in his declaration; (2) did not base his testimony on sufficient facts or data; and (3) relied impermissibly on hearsay.  Accordingly, because Kirschner's opinions hinge on the unreliable Moore Declaration, they must also be excluded.  *See*, *e.g.*, *Loy v. Rehab Synergies, LLC*, 558 F. Supp. 3d 402, 414-15 (S.D. Tex. 2021) (excluding a damages expert whose opinions were "unsupported" because they "relied exclusively" on inaccurate information and the expert "reviewed no other sources of data to make her calculations").

> ii.      Kirschner Does Not Justify His Opinions About the Value of the Estate Claims with Facts, Data, or Analysis.

39.      Although the FBG Debtors cast the Kirschner Declaration as a valuation opinion, as noted above, Kirschner does not actually provide any insight into the Estate Claims' monetary worth.  Instead, he merely recites the facts in the Moore Declaration regarding the Estate Claims; assumes such facts are true; and, based on such facts, opines, in a conclusory manner tailored to serve the Debtors' position, that, the prosecution of the Estate Claims will yield enough recoveries to satisfy the Administrative and Priority Claims.  He provides no analysis to support this conclusion.

40.      The "valuation" and "timing" conclusions of the Kirschner Declaration are an untestable *ipse dixit*.  He states that the "total gross amount potentially available with respect to all Estate Claims" is $25.4 billion.[13]   Kirschner Decl. ¶ 31.  From that figure, without numerical analysis, discounting, or any attempt to address specific recovery amounts from specific claims,

---

[13]   Kirschner (and Moore) fail to acknowledge whether the $25.4 billion amount includes projected recoveries on the Estate Claims that may be attributable to the SPV Debtors, which are co-plaintiffs in several of the pending actions.

he concludes that "it is reasonable to believe that a litigation trustee will recover sufficient funds by the end of 2028 to make the payment . . . required under the Proposed Plan," *id.* ¶ 147, because "it is reasonable to conclude that a litigation trustee will succeed in recovering at least $2 billion on account of the Estate Claims [*i.e.*, 8% of the Estate Claims' value] by the end of 2028," *id.* ¶ 148.

41.     Not a shred of analysis is offered to support the premise of these opinions: that the Estate Claims target $25.4 billion in recoveries.  As Kirschner admitted during his deposition, he received that figure from Moore,[14] and he provides no explanation or justification for how that amount was calculated.  He did not conduct any empirical analysis of the facts or data supporting that figure, apply any method or standard to test that valuation, or even analyze the recoveries that each category of Estate Claims is likely to generate.  Indeed, during his deposition, Kirschner

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████     He does not explain how the Litigation Trust is likely to recover 8% of that amount; he does not specify which claims are most likely to be successful, which claims will bring what size recoveries, nor which claims will be resolved most quickly.  Kirschner's opinion is not based on the outcomes of the anticipated litigations or timelines imposed by the courts, nor does it attempt to engage with any

---

[14]     Kirschner Tr. at 199:23-200:03 ████████████████████████

[15]     *Id*. 77:05-1 ████████████████████████
████████████████████

[16]     *Id.* at 236:13-21 ████████████████████████
███████████████████████████████████

of those litigation realities.  Nevertheless, precisely as the FBG Debtors need, Kirschner finds he can endorse their previous promise regarding what proceeds are recoverable by the end of 2028.

42.     Kirschner's opinions on the Estate Claims' collectability and timing not only lack analytical and factual support but also suffer from further glaring omissions.  Kirschner provides no specific facts regarding the various defendants' solvency or available assets.  He provides no analysis on the defendants' liabilities and how, if the Litigation Trustee successfully prosecutes the Estate Claims, the defendants' assets may be allocated amongst competing judgments or settlements.  ████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████.[17]  He fails to compare the contemplated prosecution of the Estate Claims to any specific data points from prior bankruptcies to support his conclusions about the Estate Claims' likelihood of success, collectability, and timing of recovery, including cases where Kirschner was the litigation trustee.  Indeed, Kirschner attaches to his declaration an article, *The Refco Litigation War*, describing litigation ongoing in 2008, years after Kirschner was appointed the Refco litigation trustee; if anything, this article suggests that near-term recoveries *cannot* be expected.[18]  Otherwise, he relies primarily, in general terms, on his own authority, repeatedly citing his "extensive experience" in working in supposedly similar litigations.

---

[17]    *Id.* at 125:21-126:08 ████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

[18]    *See* Kirschner Decl. Ex. C at 5-6 (describing the litigation being pursued by the litigation trust years after the Refco effective date).

Kirschner Decl. ¶¶ 145, 148 & n.197.  Such conclusory, unsupported projections are not grounded in sufficient facts and data and are inadmissible.  FRE 702(b).

43.     Kirschner's optimistic conclusions about the collectability and timing of recovering on the Estate Claims are not grounded in facts and data and are unreliable.   They must be excluded.

## CONCLUSION

44.     For the reasons set forth herein, Onset respectfully requests that the Court grant this Motion and enter the Proposed Order.

Dated:  July 27, 2026
         Houston, Texas

**MUNSCH HARDT KOPF & HARR, PC**

*/s/ Deborah M. Perry*
Deborah M. Perry
Texas Bar No. 24002755
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: dperry@munsch.com

-and-

**MORRISON & FOERSTER LLP**
Carrie H. Cohen (admitted *pro hac vice*)
James Newton (admitted *pro hac vice*)
Ben Butterfield (admitted *pro hac vice*)
Bryan Kotliar (admitted *pro hac vice*)
250 West 55th Street
New York, NY 10019
Email: ccohen@mofo.com
Email: jnewton@mofo.com
Email: bbutterfield@mofo.com
Email: bkotliar@mofo.com

-and-

**MORRISON & FOERSTER LLP**
Anthony S. Fiotto (admitted *pro hac vice*)
Julia C. Koch (admitted *pro hac vice*)
200 Clarendon Street
Boston, MA 02116
Email: afiotto@mofo.com
Email: jkoch@mofo.com

-and-

**MORRISON & FOERSTER LLP**
Brian R. Michael (admitted *pro hac vice*)
707 Wilshire Boulevard
Los Angeles, CA 90017-3543
Email: bmichael@mofo.com

-and-

24
4912-7985-1201v.1

**MILBANK LLP**
Dennis F. Dunne (admitted *pro hac vice*)
Lisa Laukitis (admitted *pro hac vice*)
Jason Kestecher (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530 5858
Facsimile: (212) 530-5219
Email: ddunne@milbank.com
Email: llaukitis@milbank.com
Email: jkestecher@milbank.com

-and-

**MILBANK LLP**
Andrew M. Leblanc (admitted *pro hac vice*)
Erin E. Dexter (admitted *pro hac vice*)
1101 New York Avenue NW,
Washington, DC 20005
Telephone: (202) 835-7500
Facsimile: (202) 263-7586
Email: aleblanc@milbank.com
Email: edexter@milbank.com

*Attorneys for Onset Financial, Inc.*

4912-7985-1201v.1

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed on this 27th day of July 2026, with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

/s/ *Deborah M. Perry*
Deborah M. Perry

4912-7985-1201v.1