**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re<br><br>FIRST BRANDS GROUP, LLC *et al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 25-90399 (CML)<br><br>(Jointly Administered) |

**ONSET FINANCIAL, INC.'S EMERGENCY MOTION *IN LIMINE* TO EXCLUDE**
**THE DECLARATION OF CHARLES M. MOORE**

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NO LATER THAN 9:00 A.M. (CENTRAL TIME) ON JULY 28, 2026. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ." CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands/. The Debtors' service address for these chapter 11 cases (the "Chapter 11 Cases") is 127 Public Square, Suite 5300, Cleveland, OH 44114.

Onset Financial, Inc. ("Onset"), by and through its undersigned counsel, submits this motion *in limine* (the "Motion") for entry of an order, in substantially the form attached hereto as Exhibit A (the "Proposed Order"), excluding the *Declaration of Charles Moore in Support of Confirmation of FBG Debtors' Chapter 11 Proposed Plan* [Dkt. No. 3188] (the "Moore Declaration" or "Moore Decl.") and any testimony related thereto.  In support of the Motion, Onset respectfully states as follows:[2]

## PRELIMINARY STATEMENT

1. It is less than one day before the confirmation hearing is set to begin, yet the FBG Debtors have failed to make clear, as they must, what testimony to be offered by Charles Moore will be fact testimony and what will be opinion testimony.  Confusingly described by the Debtors as "an amalgam of fact and expert" testimony, the Moore Declaration fails to meet threshold evidentiary standards as either fact or opinion testimony, and should be excluded.

2. If Moore is offered as a fact witness, the Moore Declaration is built entirely on hearsay and therefore contains inadmissible fact testimony.  The Moore Declaration is nothing more than a repackaged collection of statements offered in plea allocutions, the Examiner's Report, or documents Moore admits he has never read and cannot identify; his Declaration also fails to cite or identify the documents quoted therein.  Because Moore himself admittedly did not perceive the facts he now seeks to report, he lacks the requisite foundation for this testimony.  Moore testifies merely to the observations of the team from Alvarez & Marsal North America LLC ("A&M"), while elsewhere in that same declaration, testifies that he "understands" certain facts to be the case without identifying with specificity the basis for his understanding.  Fact testimony

---

[2]   Capitalized terms not defined herein shall have the meaning assigned to them in the Moore Declaration or in the Proposed Plan (defined herein), as applicable.

requires a percipient witness with actual knowledge, not one who is simply summarizing and recapping facts (or, worse, assumptions) identified by someone else.

3.      Aware that Moore offers impermissible hearsay, the FBG Debtors attempt to spackle over the crack.  Just nine days after filing the Moore Declaration and less than ten hours before Moore's deposition began, the FBG Debtors began to take steps suggesting Moore would *also* offer expert testimony, providing a list of materials Moore purportedly considered in preparing his declaration.  (It has become apparent through his testimony that Moore did not in fact review each document listed in that list and provided no edits to such list.)  And during the course of Moore's deposition that same day, the FBG Debtors suddenly announced that the Moore Declaration is an "amalgam" of fact and expert testimony.

4.      This gambit fares no better.  Nowhere in more than 100 pages does the Moore Declaration set forth any expert opinions.  Moore himself repeatedly disclaimed that he was presenting any conclusions, insisting instead ██████████████████████████████ ████████████████████████████████████████████████████▌ A recitation of facts is not an appropriate subject of expert testimony; no expertise is brought to bear. Nor do the FBG Debtors (or Moore himself) identify the area of expertise Moore provides that the Court lacks.  Without offering opinions or identifiable expertise, no expert opinions lie.

5.      Still, the FBG Debtors rely on Moore to establish that there are more than $25.4 billion in Estate Claims that can be pursued in litigation.[4]  But Moore does not offer that figure through the reliable application of empirical principles and methodology; instead, he (or, more accurately, the A&M team) has merely summed up all transfers out of the estates in a four-year

---

[3]    Transcript of Deposition of Charles M. Moore (July 23, 2026) ("July 23 Moore Tr."), attached as Exhibit B, at 30:10–31:4.

[4]    Moore Decl. ¶ 60.

period to certain cherry-picked parties that are not receiving releases under the Plan.  Moore does not identify the number of transactions analyzed, how they were analyzed, by whom, using what factors, how any potential duplication was eliminated, or how the totals were determined.  Instead, the Moore Declaration includes a basic chart that sets out a ***summary*** of transfers purportedly made in furtherance of an alleged fraudulent scheme.[5]

6.      At bottom, Moore identifies no reliable method used to determine how any particular transfer was determined to be in furtherance of the purported "Scheme."  Moore conceded at his deposition that he did not apply ***any*** factors to determine which transfers were part of the scheme, nor any rigorous analysis to determine why transfers to certain parties are included while transfers to other parties are excluded.  ████████████████████████████████

██████████████████████████████████████████████████████████████████████████

But Moore did not assess whether every such amount transferred in the four years prepetition can equally form the basis of a litigation claim; this figure is unreliable.

7.      Compounding the unreliability of the total figure is the incomplete set of "facts" from which Moore builds that total's components.  Moore fails to relate facts that could be used to defend against the Estate Claims or otherwise limit amounts potentially recoverable.  Moore recites ***certain*** facts that the FBG Debtors believe support their determination of the value of the Estate Claims, but Moore admits his Declaration does not purport to provide the full picture

---

[5]    Moore Decl. ¶ 61.

[6]    ████████████████████████████████████████████████████████
████████████████████████████████████████████  █████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████

because the Debtors' investigation is not complete.  To the extent Moore offers an expert determination, it is not based on all relevant facts and data, and therefore cannot be reliable.

8.      Moreover, "facts" selectively chosen for presentation also lack indicia of reliability. Moore generally fails to cite any support for his assertions, using only a handful of footnotes across the 255 paragraphs.  Even where the Moore Declaration utilizes quotations from documents, the underlying document is not cited, and Moore admitted several times that he has not seen and did not select that document for inclusion in his declaration.  And at times, the so-called "facts" are so speculative as to be unhelpful to this Court.  For example, the Moore Declaration states that the parties discussed in his report should have been aware of fraud occurring at First Brands.  ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████ ██

██████████████████████████████████████

9.      Moore's testimony also lacks requisite disclosure.  Moore repeatedly references work conducted by the FBG Debtors' advisors, including counsel, making it impossible to discern what information is generated from legal work product not provided to the objectors. Significantly, the FBG Debtors identified two spreadsheets as documents relied upon by Moore in preparing his declaration, but then clawed back the production of those spreadsheets on the basis

---

[7] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████ ██ █ ██ █ ██████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████ .

of privilege.  The FBG Debtors have also asserted privilege over the investigative work conducted by Weil and A&M, yet Moore testified that "all of the investigation activities informed my declaration."[8]  The FBG Debtors cannot use privilege as both sword and shield.[9]

10.     Regardless of whether the FBG Debtors seek to proffer the Moore Declaration as fact or expert testimony, it does not satisfy the evidentiary requirements necessary for the declaration's introduction as evidence in these cases.  The Court should exclude the Moore Declaration and all testimony related thereto.

## **BACKGROUND**

### I.     Moore's Engagement in these Chapter 11 Cases

11.     In September 2025, the FBG Debtors filed voluntary petitions for bankruptcy. Around the same time, Moore was appointed as Chief Restructuring Officer of First Brands Group, LLC and its Debtor affiliates.  Moore Decl. ¶ 4.  On October 13, 2025, Moore was appointed Interim Chief Executive Officer of First Brands Group, LLC, First Brands Group Intermediate, LLC, First Brands Group Holdings, LLC, and Viceroy Private Capital, LLC.  *Id*.  Moore was not an employee or representative of First Brands prior to September 2025.

12.     Moore is a Managing Director at A&M, a management consulting firm.  *Id.* ¶ 3. His professional background lies primarily in "providing turnaround consulting and advisory services," particularly in the restructuring context.  *Id.* ¶¶ 5-6.  As a Certified Public Accountant and Certified Turnaround Professional, he has experience in analyzing financial statements.  *Id.* ¶

---

[8]  ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████

[9]  These disclosure defects are compounded by the timing of the FBG Debtors' document productions and purported expert disclosures to the parties.  Nearly 40,000 pages of documents were produced only hours before Moore's deposition began, and a list of materials purportedly considered in Moore's creation of his declaration were provided at midnight before the start of the deposition the following morning.

5. Nothing in the Declaration, however, indicates that Moore has any experience in assessing whether evidence is sufficient to warrant prosecution of legal claims. *See id.*

## II. The A&M Investigation

13. Shortly after his appointment as Chief Restructuring Officer in September 2025, Moore oversaw A&M's entire engagement for First Brands. In this capacity, he engaged a team of professionals at A&M, led by Michael Malloy, another Managing Director at A&M, to investigate potential misconduct regarding the Debtors' financial practices. A&M formally began its investigation on October 14, 2025. ████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

## III. The FBG Debtors' Proposed Plan and Disclosure Statement

14. On June 16, 2026, the FBG Debtors filed *the Joint Chapter 11 Proposed Plan of First Brands Group, LLC and Certain Affiliated Debtors* [Dkt. No. 3019] (the "Proposed Plan") and the *Disclosure Statement for Joint Chapter 11 Proposed Plan of First Brands Group, LLC and Certain Affiliated Debtors* [Dkt. No. 3020] (the "Disclosure Statement").

15. Among other things, the Proposed Plan provides for the establishment of the Litigation Trust, administered by a Litigation Trustee. *See* Proposed Plan, Art. 6.1(a). The Litigation Trust will be vested with the Litigation Trust Assets, which primarily consist of all claims and/or remedies held or controlled by, or which were or could have been asserted by, the FBG Debtors or their estates (the "Estate Claims"). *See id.*; *see also id.* at Art. 1.1 (defining Litigation Trust Assets to include the Estate Claims).

---

[10]

16.     Under the Proposed Plan, the Litigation Trust will initially be funded with $75 million (the "Litigation Trust Funding"): $25 million from the FBG Debtors' balance sheet and $50 million from certain DIP Secured Parties.  Moore Decl. ¶ 53.  In return, the contributing DIP Secured Parties will receive the greater of (i) a 20% internal rate of return on their contributions or (ii) 1.75 times the capital they invested.  *Id.*  Those contributors will additionally receive a piece of the Litigation Trust's subsequent distributions: 15% of all the Litigation Trust's distributions until the distributions reach $350 million and 10% thereafter.  *Id.*  Under this structure, if the Litigation Trust distributes $2 billion, the DIP Secured Parties would recover roughly ***six times*** the amount of their investment.  *Id.*  ███████████████████████████████████
███████████

17.     According to Moore, however, the FBG Debtors had no choice but to agree to the lopsided terms of the Litigation Trust Funding.  He states that "[n]o other litigation financers [came] forward with an alternative financing proposal" and "the Litigation Trust Funding represents the only viable source of financing for the Litigation Trust."  *Id.* ¶ 54.  And, as "the Litigation [Trust] Funding is a critical aspect of the [Proposed Plan] . . . absent an agreement on the terms of the Litigation [Trust] Funding, the FBG Debtors likely would not have reached an agreement on the Plan Settlement."  *Id.*

18.     Under section 1129(a)(9)(A) of the Bankruptcy Code, as a condition precedent for the Proposed Plan to become effective, among other requirements, the Litigation Trust must fully satisfy all Allowed Administrative Expense Claims,[12] Allowed Priority Tax Claims, and Allowed

---

[11] ███████████████████████████████████████████████████
███████████████████████████████

[12] Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims are defined in the Proposed Plan at Article 1.1.

Other Priority Claims (together, the "Administrative and Priority Claims") against the FBG Debtors—approximately $300 million.  Proposed Plan Art. 12.1(o); Disclosure Statement Ex. F at 9.  The Proposed Plan provides that all Administrative and Priority Claims shall be paid through the recoveries generated from the Litigation Trustee's prosecution of the Estate Claims.  *See* Proposed Plan Section 6.5(d); Disclosure Statement at 10–11.  The FBG Debtors also contend that the Effective Date, at which time Administrative and Priority Claims shall be paid in full, will occur in the second half of 2028.  *Id*. at 28.  Thus, the Proposed Plan entirely depends on speculation regarding the Litigation Trustee's ability to recover at least $2 billion on the Estate Claims by the end of 2028.  *Id.* Ex. F at 9.

19.     On June 12, 2026, the Court held a hearing (the "Disclosure Statement Hearing") on, among other things, the FBG Debtors' motion to conditionally approve a prior version of the Disclosure Statement.  At that hearing, Moore testified that the estimated total value of the Estate Claims was "about $7 billion," excluding certain categories of claims such as claims for recovery under D&O insurance for breach of fiduciary duties.  Disclosure Statement Hearing Tr. at 132:08 –13.  ███████████████████████████████████

███████████████████████████████████████████████████████

██████

## IV.     The Estate Claims Credit Bid

20.     In January 2026, the FBG Debtors, through their professionals, including A&M, initiated a marketing and sales process for the Litigation Trust Assets, including the Estate Claims.  *See* Moore Decl. ¶ 37.  In connection therewith, the FBG Debtors identified 26 financial and

---

[13] ██████████████████████████████████████████████
████████████████████████████████████████
███████████████████████████

9

strategic parties that may be potentially interested in acquiring the Estate Claims. *Id.* ¶ 38. On May 4, 2026, members of A&M conducted initial outreach to each of these 26 potential bidders and provided them with summary marketing materials. *Id.* ¶ 38–39. Following the Court's conditional approval of the Disclosure Statement on June 12, 2026, A&M reached out again to each of the 26 potential bidders to invite them to engage in further discussions with the FBG Debtors and their advisors regarding a potential transaction involving the Estate Claims. *Id.* ¶ 41.

21.     To date, however, only two of the 26 contacted parties have executed a non-disclosure agreement to receive additional diligence materials, and none has submitted a bid for the Estate Claims. *Id.* ¶ 42. Accordingly, there currently is no indication that the FBG Debtors will receive a bid for the Estate Claims from a third-party buyer. *Id.* ¶ 43.

## V.     The Moore Declaration

22.     On July 14, 2026, the FBG Debtors filed two declarations in support of the Proposed Plan—the Moore Declaration and the Kirschner Declaration.

23.     Generally, among many other assertions, Moore concludes in his Declaration that "the Plan provides a structure to (i) monetize all of the FBG Debtors' remaining assets and (ii) allocate recoveries on Estate Claims among creditors . . . ." Moore Decl. ¶ 11.

24.     In connection with this conclusion, in sections VII and VIII of his declaration ("Sections VII and VIII"), Moore summarizes a number of purported findings regarding the "financial scheme" (the "Scheme") underlying the transferred amount. In particular, Moore claims that "the aggregate amount of transfers made by the FBG Debtors in furtherance of the Scheme during the four years prior to the Petition Date . . . exceeds approximately $25.4 billion." *Id.* ¶ 60. Moore, however, does not set forth any testable principles or methodology for reaching that conclusion, which he states is not a conclusion. Nor does Moore adequately explain why, in under

a month, his estimate of the total value of the transfers giving rise to the Estate Claims rose from around $7 billion to more than $25.4 billion.

25.     Moore did not discover these purported facts independently.  As he states in his declaration:

> I, ***along with my team at A&M, in coordination with the FBG Debtors' other professionals and advisors***, have uncovered significant facts about the true nature of the activities of prior management and the FBG Debtors' prepetition business based on an extensive, and months-long, factual review and analysis of the FBG Debtors' books and records, financial data, electronic records, and prepetition transactions and events.  *Id.* ¶ 58 (emphasis added).

In other words, Moore derived the purported facts in his declaration from an "extensive" review and analysis of communications and documents prepared by the Debtors' third-party advisors, including counsel.  Furthermore, Moore did not conduct this analysis on his own—as he admits, he relied on an unspecified "team" from A&M.  Moore does not further clarify what specific role that team had in developing his declaration.

26.     Finally, Moore fails to provide the source for almost every factual assertion in his declaration.  His 111-page declaration contains just a smattering of citations, all to the plea allocutions of two of the FBG Debtors' former executives and the Examiner's Report.  Otherwise, Moore fails to identify the source of even the direct quotes in his declaration, nor could he at his deposition.  The Moore Declaration reads far more like allegations in an adversarial complaint than a rigorous presentation of facts or opinions.

27.     It is still unclear whether the Moore Declaration is offered as expert or fact testimony, or which portions are which.  During Moore's deposition, the FBG Debtors' counsel initially took the position that the Moore Declaration "unequivocally" "was not an expert report." Later in the same deposition, however, counsel did an about-face, stating that "the report is

11

probably an amalgam of expert and fact." *Id*. at 109:6–17.[14]  Counsel then stated moments later, without qualification, that the Moore Declaration "is an expert report." *Id.* at 110:12–13.[15]  The uncertainty as to whether Moore's Declaration is expert or fact witness testimony continued through the second day of Moore's questioning, when Moore stated, "I leave it up to the attorneys to determine whether it's a fact or expert report."[16]  Earlier today, the FBG Debtors confirmed that this is indeed what has occurred:  the FBG Debtors have stated in a public filing that Moore "will be offering testimony as an expert and as a fact witness," without identifying what portions of the Moore Declaration are which, leaving it to the Court to figure it out on its own absent clear guidance or sufficient basis to do so.[17]

---



[17]  *Debtor's Opposition to Emergency Motion of Patrick James and the Related Entities to Exclude Portions of the Declaration of Charles M. Moore and Entire Declaration of Marc S. Kirschner* [Dkt. No. 3414] ¶ 6.

**ARGUMENT**

28.     "The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *Harris v. BMW of N. Am., LLC*, No. 4:19-CV-00016, 2022 WL 125345, at *3 (E.D. Tex. Jan. 12, 2022) (quoting *Harkness v. Bauhaus U.S.A., Inc.*, 2015 WL 631512, at *1 (N.D. Miss. Feb. 13, 2015)); *King v. King*, 117 F.4th 301, 306 (5th Cir. 2024) ("Motions *in limine* are prophylactic motions intended 'to exclude anticipated prejudicial evidence before the evidence is actually offered' at trial because it runs afoul of applicable rules of evidence" (quoting 21 Charles Alan Wright et al., *Federal Practice & Procedure* § 5037.10 (2d ed. 2005))).  Here, the Moore Declaration fails to satisfy fundamental evidentiary rules: as an expert opinion, it is not based on any reliable or testable methodology or on sufficient facts and data; as a fact declaration, it is replete with hearsay.  In either event, Moore testifies in his declaration regarding matters not directly observed by him, does not present any mitigating factors, and thus, is more prejudicial than probative.[18]  This Court should exclude the Moore Declaration and any related testimony.

**I.      The Moore Declaration Is Improper Expert Opinion Testimony Under FRE 702.**

29.     Federal Rule of Evidence ("FRE") 702, made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 9017, sets forth the legal standard governing the admissibility of expert opinions, commonly referred to as the *Daubert* standard.  Under that standard, for an expert opinion to be admitted, the proponent must first demonstrate that it is "more likely than not" that:

> a. the witness is qualified as an expert by knowledge, skill, experience, training, or education;

---

[18]   Onset reserves the right to supplement this Motion, including during argument on the Motion expected to occur on the morning of July 28, 2026, in light of ongoing depositions.

b.  the witness's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

c.  the testimony is based on sufficient facts or data;

d.  the testimony is the product of reliable principles and methods; and

e.  the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FRE 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993) ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

30.  The decision whether to admit expert testimony ultimately "is entrusted to the sound discretion of the trial court." *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 197 (5th Cir. 1996). "[A] trial judge acts as a gatekeeper to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres,* 949 F.3d 825, 832 (3d Cir. 2020).

### A.  Moore Does Not Offer Any Opinions or Conclusions Based on Specialized Knowledge.

31.  Moore conceded that he is ***unable*** to offer conclusions because he does not have the full picture.  He does not explain what expertise he utilized to determine that there are $25.4 billion of transfers made in furtherance of a purported fraud scheme or that such amounts are an exact equal to Estate Claims.[19]  Instead, Moore confirms that he is not offering any independent analysis on the value of any of the Estate Claims, the legal strengths or weaknesses of those claims,

---

[19]  Notably, Moore himself does not state outright that the amount of transfers is equal to the value of Estate Claims. But the FBG Debtors rely on it in that way, as does their other witness, Kirschner.  Kirschner reports that the "[f]rom the information provided by the Debtors, I understand that the total gross amount potentially available with respect to all Estate Claims is as set forth in the chart below . . . Total: $25.4 billion."  Kirschner Decl. ¶ 31.

14

or any analysis of collectability.[20]  In fact, Moore explicitly stated that he relies entirely on the Kirschner Declaration for the Estate Claims valuation (while Kirschner testified, in circular fashion, he relies on the Moore Declaration, as addressed in the contemporaneously filed motion to strike Kirschner's testimony).[21]  Accordingly, his declaration is no more than a recitation of anecdotal facts and a tallying-up of unsourced numbers.  Moore's repeated disavowal that he was offering any expert opinions ends the issue.  ███████████████████████

█████████████████████████████

32.    Facts alone, however, are not a proper subject matter for expert testimony.  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (excluding expert testimony that was a factual narrative).  Presenting a factual narrative as expert opinion has the risk of presenting "sweeping conclusions" that stray away from any reliable methodology.  *See United*



*States v. Dukagjini*, 326 F.3d 45, 54–55 (2d Cir. 2003) (affirming conviction below but finding an expert should not have been permitted to stray beyond the limits of his expertise and acting "as a summary prosecution witness"). The FBG Debtors cannot seek to evade the strictures of the hearsay rules through a sudden pivot to offering the Moore Declaration as expert testimony if Moore does nothing but summarize the FBG Debtors' curated facts.

**B.      Moore Does Not Demonstrate that His Testimony Is the Product of Reliable Principles and Methods.**

33.      To the extent that Moore's unverified assertions about an incomplete investigation constitute expert opinion testimony, such testimony is subject to the requirements of FRE 702. Courts do not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The Moore Declaration, however, attempts to do just this. It makes the leap from identifying certain facts or anecdotal discoveries to concluding that the Estate Claims target $25.4 billion in potential recoveries.[23] If Moore is offered to support this $25.4 billion figure, Moore must lay out the principles and methods used to reach that conclusion.[24]

34.      But he does not. The Moore Declaration lacks sufficient (and in some cases, any) description of the sources and data used, methodology employed, the data collected and analyzed, the assumptions made, the limitations of the work, or the analytical framework underpinning this grand conclusion, which is a cornerstone of the FBG Debtors' Proposed Plan.[25] Notably, Moore

---

[23]   Moore Decl. ¶ 60 ("[a]ll told [he] estimate[s] the aggregate amount of the transfers made by the FBG Debtors in furtherance of the Scheme during the four years prior to the Petition Date . . . exceeds approximately $25.4 billion.").

[24]   *Cf.* Moore Decl. ¶¶ 204–227 (setting forth the methodology for evaluating the size of administrative and priority claims).

[25]   ███████████████████████████ ███████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

provides no description about the factors used to determine that any particular transfer gives rise to an Estate Claim of any particular amount.  Nor could he.  During ████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████

35.     The lack of methodology in concluding that there are $25.4 billion in Estate Claims is even more troubling in light of Moore's testimony only last month that there were approximately $7 billion in Estate Claims.  During the Disclosure Statement Hearing, Moore testified regarding the general categories of Estate Claims, including claims against the James entities, claims in the Edward James adversary proceeding, 90-day transfers, supply chain and factoring claims and stated that the total amount of the Estate Claims was about $7 billion.[27]

36.     Testimony has confirmed that no work was performed between January 5, 2026 and the present that would justify such a substantial upward revision of the total of potential Estate Claims.  Michael Malloy, a Managing Director at A&M who conducted the investigation of the Debtors, testified that A&M began its investigative work around October 14, 2025 and concluded

---

[26]   July 26 Moore Tr. at 686:21–687:12.

[27]   June 12, 2026 Hr'g Tr. at 131:10–132:13.  Mr. Moore testified that "some other categories" like "recoveries under D&O insurance for breach of fiduciary duties" were not included in the $7 billion figure.

it on January 5, 2026, at which time the investigation was incomplete.[28] ████████████████

██████████████████████████████████████████████████ ▪ Then, on June 23,

2026, A&M emailed a potential Estate Claims bidder, still reporting about $7 billion in Estate

Claims.[30]  Why then, in the last month, did the value of Estate Claims triple, especially considering

the lack of additional investigation?  Moore answers neither this question nor the antecedent one:

what methodology he used to calculate the original $7 billion figure.

37.     Expert testimony must be testable; it must be objectively verifiable.  It is the FBG

Debtors' burden to so establish.  *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir.

1998); *see Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997) ("[T]he party seeking to

have the [] court admit expert testimony must demonstrate that the expert's findings and

conclusions are based on the scientific method, and therefore, are reliable.  This requires some

objective, independent validation of the expert's methodology.") (excluding expert testimony

because it was not testable).  The untestable assertions Moore offers here fall far short of this bar.

C.     **The Moore Declaration Is Not Based On Sufficient Facts and Data and Fails to Aid the Trier of Fact.**

38.     Expert testimony must be "based on sufficient facts or data."  FRE 702(b).  "Where

the expert's opinion is based on insufficient information, the analysis is unreliable." *U.S. All. Grp.,*

*Inc. v. Cardtronics USA, Inc.*, 645 F. Supp. 3d 554, 559 (E.D. La. 2022) (citation omitted); *see Paz*

---

[28]   Malloy Tr. at 145:14–146:3.

[29]
███████████████████████████████████████████████████
██████████████████████ ██████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████

[30]   *See* Ex. E.

*v. Brush Engineered Materials Inc.*, 555 F.3d 383, 389 (5th Cir. 2009) (excluding expert's opinion as it "was fundamentally based on insufficient information, rendering her conclusion unreliable.").

39.   Here, Moore's opinions are not based on sufficient facts or data.  According to his own testimony, Moore is unable to offer conclusions because he does not have the full picture.[31] Although Moore provides curated examples that illustrate his narrative, he fails to demonstrate that those examples are representative of all the transactions at issue.  His calculations of the fraudulent amounts, moreover, rest on unexplained and unjustified assumptions.  Finally, Moore neither attaches the underlying evidence nor cites the documents supporting his conclusions, making it impossible for parties or the Court to verify them.

40.   For example, of the $25.4 billion in transfers purportedly made in furtherance of the Scheme, Moore attributes roughly $15.36 billion—approximately 60% of the total—to the Debtors' purportedly fraudulent factoring programs (the "Factoring Scheme").  Moore Decl. ¶ 61. Yet none of the facts he offers regarding the Factoring Scheme explain how he arrived at that $15.36 billion figure.

---

[31]

41.     According to Moore, the Factoring Scheme operated as follows: the FBG Debtors submitted false, inflated invoices to the factors to pay significantly more than the actual value of the accounts receivable underlying the invoices. *See id.* ¶ 80.  In particular, the FBG Debtors ran three accounts receivable factoring programs, each involving a different factor: Katsumi, Leucadia, and Evolution.  *See id.* ¶ 82.  To "determine the extent and scope of the factoring Scheme," Moore "compared values of the factored invoices . . . to FBG's internal database of actual invoices owed by customers to identify the percentage of inflated invoices submitted to each factor."  *Id.* ¶ 81.  He then "applied this percentage to the total payments made to each third-party factor for the period prior to the Petition Date to estimate the total value of prepetition transfers to each third-party factor[.]"  *Id.*  On this basis, Moore concluded that roughly 61%, 81%, and 100% (the "<u>Fraudulent Percentages</u>") of the amounts factored under the Leucadia, Katsumi, and Evolution programs, respectively, were fraudulent.  *Id.* ¶ 82.  However, after Moore's deposition was concluded, another A&M employee testified that the percentages were determined in error and are not reliable.  FBG Debtor's counsel has since confirmed that Moore would no longer be relying on those percentages and will not provide new ones.

42.     Even assuming *arguendo* that Moore's description of the Factoring Scheme is accurate notwithstanding this error, nothing Moore offers actually explains how he arrived at the $15.36 billion figure or the Fraudulent Percentages.  First, apart from aggregate factored and invoiced totals, Moore fails to provide specific information about the transactions underlying the Factoring Scheme.  He does not identify the number of transfers, the number and/or nature of the fraudulent invoices, the payment(s) associated with each transfer, the dates of the invoices and corresponding payments, or any other information needed to evaluate the validity of his conclusion.  Instead, he hand-picks examples of individual transactions that illustrate his

contentions and asks the Court to assume those examples fairly represent all of the transactions at issue. *See, e.g., id.* ¶ 84.

43.     And the Fraudulent Percentages, unreliable as they are, were nevertheless ***not used*** in determining the total Estate Claims amount. After examining a subset of information, the A&M team determined the Fraudulent Percentages and applied those percentages to the total payments to the third-party factors to estimate the total purportedly fraudulent amount (although the FBG Debtors, again, now disclaim any reliance on those percentages). *Id.*[32] But the percentage in fact ***never mattered*** for the Moore Declaration. A comparison of the tables depicting these Fraudulent Percentages (Moore Decl. ℙ 95) with the table of transfers allegedly made in furtherance of the Scheme (*id.* ℙ 61), reveals ***all*** of the transfers were ***always*** included in the Estate Claims number— the total Estate Claims were never adjusted, even for the Fraudulent Percentages the FBG Debtors attempted to calculate and now disclaim. The $25.4 billion figure was always a simple total.

44.     To cap it off: Moore does not provide any citations to support his statements. He asks the Court instead to take his recitations on faith, with no way to test or verify the underlying evidence. One error has already been identified. Others may exist.

45.     These same kinds of defects infect Moore's account of the transfers the FBG Debtors made to the SPV Lenders. Moore asserts—without specifying the number of, dates of, or amounts of any transfers—that in the four years preceding the Petition Date, the FBG Debtors transferred more than $2.5 billion to various SPV Lenders. *Id.* ¶ 139. Yet Moore again offers no insight into the information he and his team reviewed, and he does not show how he calculated these figures. He points to several individual transactions that appear problematic but makes no

---

[32]   That Moore ***applied*** the Fraudulent Percentages to the total payments made to each third-party factor to ***estimate*** the total value of the fraudulent factored transfers indicates that he calculated the Fraudulent Percentages based on a subset of the transfers at issue. But Moore does not explain the parameters of the subset of the transactions he reviewed to generate the Fraudulent Percentages. *See id.* ¶ 81.

effort to establish that they are representative of all the transactions at issue.[33]  And, as before, he does not cite the documents underlying his conclusions, rendering them unverifiable.

46.     In sum, the Moore Declaration offer only unsupported conclusions: Moore fails to disclose the transaction-level data underlying his estimates, extrapolates from unjustified assumptions, advances valuations that contradict his own prior testimony, and cites no documents that would enable other parties-in-interest to test his factual conclusions.  As those sections consist of unverifiable assertions, they lack any reliable foundation and should be excluded.

## II.     Moore Impermissibly Relies on Hearsay.

47.     To the extent that the FBG Debtors fall back on presenting the Moore Declaration as fact testimony, it must still be excluded because it is inadmissible hearsay; it includes numerous out-of-court statements made for the truth of the matter asserted in violation of FRE 802.  Subject to certain exceptions not applicable here, hearsay is inadmissible.  Notwithstanding this black letter prohibition, Moore's declaration is peppered with statements taken from the respective plea allocutions of Andy Brumbergs (the FBG Debtors' former SVP of Finance) and of Stephen Graham (the FBG Debtors' former CFO), the Examiner's Report, and other uncited and therefore unverifiable observations that have been related to him.[34]

48.     The Federal Rules of Evidence prevent Moore from offering, as his own fact testimony, statements from the plea allocutions of Brumbergs and Graham, neither of whom is a

---

[33]   *See, e.g.*, Moore Decl. ¶ 106 (describing six individual Onset transfers, including an August 25, 2023 transfer of $48 million to Carnaby IV that was returned as $48,353,350 one week later, and a January 16, 2025 transfer of $192 million to Carnaby IV); *id.* ¶ 107 (describing an October 31, 2024 transfer of $25 million routed through the Patrick James Trust to fund a $36.9 million payment to Onset); *id.* ¶ 117 (tracing $81.6 million of an $85 million advance under Onset Lease Schedule 025); *id.* ¶ 126 (describing a single $58,926,662 interest payment routed through four intermediaries to Onset).

[34]   To the extent Moore's Declaration is offered as expert testimony, a party cannot use an expert "simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as a basis of his testimony." *In re Lyondell Chem. Co.*, 558 B.R. 661, 667 (Bankr. S.D.N.Y. 2016).

witness in support of confirmation. *See United States v. Ricardo*, 472 F.3d 277, 287 (5th Cir. 2006) (affirming decision excluding co-defendant's plea colloquy); *see also Williamson v. United States*, 512 U.S. 594, 600-01 (1994) ("FRE 804(b)(3) does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self inculpatory. . . . and this is especially true when the statement implicates someone else."). Yet Moore does precisely this, and repeatedly so. *See, e.g.,* Moore Decl. ¶¶ 70, 76, 80, 122, 127 (each repeating selected portions of Brumbergs' plea allocution); ¶ 79 (repeating portion of Graham's and Brumberg's plea allocution). These allocutions are out-of-court statements that Moore presents for the truth of the matter asserted. Even more damning, Moore regurgitates the out-of-court statements in an effort to fill evidentiary gaps that his team did not "ha[ve] the time" to investigate directly. *Id.* ¶ 76 (relying on Brumbergs' plea allocution statements to suggest broad wrongdoing in 2022 and 2023); *see also id.* ¶ 80.

49.     The same defect applies to Moore's adoption of the finding in the Examiner's Report. *Id.* ¶ 153. As the Examiner is not testifying in connection with confirmation, the Examiner's Report constitutes an out-of-court statement offered for the truth of the matter. *Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, 623 F. Supp. 2d 798, 825 n. 23 (S.D. Tex. 2009) (finding the Examiner report "is not admissible for the truth of its contents," when the Examiner was not designated as an expert and did not testify, but granting Plaintiffs more time to designate the Examiner as an expert). Moore cannot serve as a conduit for the Examiner's conclusions (which were, as described by the Examiner, premised on an incomplete investigation) by repeating them in his declaration.

50.     And to the extent Moore relies on still other out-of-court statements, Moore testifies as to hearsay within hearsay. As one example, Moore relays what a PrimeRevenue employee

allegedly told an FBG employee, without any citation whatsoever, to establish that the Supply Chain Financer counterparties should have identified the alleged fraud. Moore Decl. ¶ 101. Further, Moore asserts that "interviews with FBG's accounting staff" revealed that Andy Brumbergs told the accounting staff to conceal information from FBG's auditors. *Id.* ¶ 124. What Moore learned about what Brumbergs did, from an interviewer who spoke to an employee who heard it from Brumbergs, is hearsay within hearsay within hearsay.

51.     The Court should exclude the Moore Declaration because it is impermissibly permeated with testimony that verbatim repeats, is derived from, or is predicated upon hearsay, and no hearsay exception applies. To the extent the Court declines to exclude the entire Moore Declaration on hearsay grounds, the Court should exclude all testimony that is derived from the plea allocutions, the Examiner's Report, and other out-of-court statements.

## III.    Moore Fails the Personal Knowledge Requirement of FRE 602.

52.     A fact witness may testify only to matters within his personal knowledge. FRE 602.[35] Moore impermissibly attributes critical factual findings not to his own observations, but to that of the A&M team. At times, Moore goes so far as to loosely state, without disclosing the basis, that he "understands" a fact to be the case and then repeats it as if it were his own observation.

53.     Moore's references to his A&M team abound throughout his declaration; he references the A&M team more than 80 times. For example, Moore testifies:

- "I, along with my team at A&M, in coordination with the FBG Debtors' other professionals and advisors, have uncovered significant facts . . . ." Moore Decl. ¶ 58;

---

[35]    To the extent that the FBG Debtors seek to introduce the Moore Declaration as lay opinion testimony, FRE 701 requires that such lay opinion is based on the witness's perception. FRE 701(a); *see also DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 685 (5th Cir. 2003) ("[L]ay opinion testimony may be elicited only if it is based on the witness's first-hand knowledge or observations"). For the reasons set forth herein, the Moore Declaration cannot satisfy that standard.

- "The A&M team also determined that the [FBG] Debtors' former management improperly commingled the funds . . . " *Id.* ¶ 73;

- "In total, the A&M team found . . . ." *Id.*

- "my team analyzed the FBG Debtors' adjustments for aged and obsolete inventory . . ." *Id.* ¶ 78;

- "My team uncovered that, prior to the Petition Date, certain counterparties received . . ." *Id.* ¶ 85;

- "my team has calculated the average percentage of fraudulent invoice value . . . ." *Id.* ¶ 95;

- "My team at A&M also uncovered evidence that . . ." *Id.* ¶ 107;

- "My team also determined that, in the prepetition period . . . ." *Id.* ¶ 115;

- "My team also determined that . . . ." *Id.* ¶ 124;

- "My team compared the inventory data utilized by the audit firm . . ." *Id.* ¶ 132;

- "My A&M team traced estate funds from First Brands bank accounts . . ." *Id.* ¶ 141.

54.     Such testimony does not establish that Moore personally, for example: uncovered significant facts regarding the FBG Debtors' false financial records; determined how much money flowed through the Bowery Account; identified the FBG Debtors' alleged overstatement of asset values; ascertained whether factoring counterparties or others had sufficient knowledge of red flags; or estimated the amount of transfers to factoring parties. The A&M team, whose individual members are not identified and who have not submitted declarations, performed the analytical work. Moore merely provides regurgitated inferences.

55.     Similarly, Moore asserts that he "understand[s] that, beginning at least as early as 2018, Patrick and Edward James, among others, caused the FBG Debtors to provide lenders with a version of financial statements that did not reflect the Company's true financial position." Moore Decl. ¶ 70. Moore also states that Edward James received millions of dollars in purported

25

commission. *Id.* ¶ 156.  Moore provides no citations or sources for these understandings.  Moore's Declaration must be excluded because it is not based on Moore's personal knowledge.

**IV.    The Moore Declaration Must Be Excluded to the Extent it Relies on Information that FBG Debtors are Withholding as Privileged.**

56.    "[T]he attorney-client privilege cannot at once be used as a shield and a sword." *U.S. v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991).  Put differently, "[a party] may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes."  *Troublé v. The Wet Seal, Inc.*, 179 F. Supp. 2d 291, 304 (S.D.N.Y. 2001).

57.    Accordingly, a party that intends to rely at trial on the advice of counsel "must make a full disclosure during discovery; failure to do so constitutes a waiver" of the advice-of-counsel defense.  *Arista Recs. LLC v. Lime Grp LLC*, No. 06 Civ. 5936 (KMW), 2011 WL 1642434, at *2 (S.D.N.Y. Apr. 20, 2011) (citation omitted).  This principle extends beyond formal defenses. As the court held in *In re Residential Capital*, a party that contends that it made a decision "because of its reliance on counsel"—regardless of whether that contention is framed as a "defense"—waives the attorney-client privilege by placing its reliance on counsel directly at issue.  491 B.R. at 63 (S.D.N.Y. 2013).  In *Reitz v. City of Mt. Juliet*, the court applied the same logic, holding that a defendant could not premise its defense on an investigative report while simultaneously invoking privilege or work-product protection to shield the documents underlying that report from discovery.  680 F. Supp. 2d 888, 893 (M.D. Tenn. 2010).

58.    Courts apply this shield-and-sword principle in the analogous context of summaries of evidence, excluding such summaries where the proponent fails to produce the underlying materials.  *See Powell v. Penhollow*, 260 F. App'x 683, 688 (5th Cir. 2007) ("[F]ailure to make the original or duplicate copies of the evidence underlying a summary available for inspection renders the summary inadmissible."); *Davis v. Progressive Cas. Ins. Co.*, 220 F. App'x 708, 711

(9th Cir. 2007) (holding that the trial court properly excluded a summary exhibit where the party relying on it failed to tender the underlying documents after being requested to do so).

59.     Moore himself concedes that his factual findings are the product of an "extensive, and months-long, factual review and analysis of the FBG Debtors' books and records, financial data, electronic records, and prepetition transactions and events." Moore Decl. ¶ 58. During his deposition, Moore confirmed as much, testifying that "[a]ll of the investigation activities informed my declaration."[36] That underlying evidence is the only basis on which Moore's conclusions could be tested. When a party places the fruits of its investigation at issue, that party "must make a full disclosure during discovery; failure to do so constitutes a waiver[.]" *Arista Recs.*, 2011 WL 1642434, at *2; *see also In re Residential Cap., LLC*, 491 B.R. at 71 (a party that relies on privileged material "waives its attorney-client privilege by placing its reliance on counsel directly at issue"); *Reitz*, 680 F. Supp. 2d at 893 (a party cannot premise its position on an investigation while invoking privilege to withhold the materials underlying it).

60.     Just as a proponent may not introduce a summary while withholding the materials it purports to summarize, the FBG Debtors may not offer Moore's distillation of the investigation while refusing to produce the underlying records. *See Powell*, 260 F. App'x at 688; *Davis*, 220 F. App'x at 711. The FBG Debtors cannot rely on Moore's summary of a privileged investigation to carry their burden at confirmation and, at the same time, deny parties the evidence needed to test that summary.

## CONCLUSION

61.     For the reasons set forth herein, the Court should exclude the Moore Declaration and any related testimony, and grant such other relief as the Court deems just and proper.

---

[36]     *See supra* n.6.

27

Dated: July 27, 2026
      Houston, Texas

**MUNSCH HARDT KOPF & HARR, PC**

*/s/ Deborah M. Perry*
Deborah M. Perry
Texas Bar No. 24002755
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: dperry@munsch.com

-and-

**MORRISON & FOERSTER LLP**
Carrie H. Cohen (admitted *pro hac vice*)
James Newton (admitted *pro hac vice*)
Ben Butterfield (admitted *pro hac vice*)
Bryan Kotliar (admitted *pro hac vice*)
250 West 55th Street
New York, NY 10019
Email: ccohen@mofo.com
Email: jnewton@mofo.com
Email: bbutterfield@mofo.com
Email: bkotliar@mofo.com

-and-

**MORRISON & FOERSTER LLP**
Anthony S. Fiotto (admitted *pro hac vice*)
Julia C. Koch (admitted *pro hac vice*)
200 Clarendon Street
Boston, MA 02116
Email: afiotto@mofo.com
Email: jkoch@mofo.com

-and-

**MORRISON & FOERSTER LLP**
Brian R. Michael (admitted *pro hac vice*)
707 Wilshire Boulevard
Los Angeles, CA 90017-3543
Email: bmichael@mofo.com

-and-

**MILBANK LLP**
Dennis F. Dunne (admitted *pro hac vice*)
Lisa Laukitis (admitted *pro hac vice*)
Jason Kestecher (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530 5858
Facsimile: (212) 530-5219
Email: ddunne@milbank.com
Email: llaukitis@milbank.com
Email: jkestecher@milbank.com

-and-

**MILBANK LLP**
Andrew M. Leblanc (admitted *pro hac vice*)
Erin E. Dexter (admitted *pro hac vice*)
1101 New York Avenue NW,
Washington, DC 20005
Telephone: (202) 835-7500
Facsimile: (202) 263-7586
Email: aleblanc@milbank.com
Email: edexter@milbank.com

*Attorneys for Onset Financial, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a copy of the foregoing was filed on this 27th day of July 2026, with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

/s/ *Deborah M. Perry*
Deborah M. Perry