# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC**, *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| | § | |
| Debtors.[1] | § | |
| | § | |

### STATEMENT OF AD HOC GROUP IN SUPPORT
### OF CONFIRMATION OF JOINT CHAPTER 11 PLAN OF
### FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED DEBTORS

The Ad Hoc Group,[2] through its undersigned counsel, submits this statement in support of confirmation of the *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* [Docket No. 3019] (as amended, supplemented, or otherwise modified from time to time, the "Plan") and hereby joins in both the *FBG Debtors' Memorandum of Law in Support of (I) Final Approval of the Disclosure Statement and (II) Confirmation of Joint Chapter 11 Plan* [Docket No. 3426] and the *FBG Debtors' Omnibus Reply to Objections to (I) Final Approval of the Disclosure Statement and (II) Confirmation of Joint Chapter 11 Plan* [Docket No. 3433] (collectively, the "Debtors' Confirmation Brief and Response").

---

[1]  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]  Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Plan (defined below) or the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 608] (the "DIP Order"), as applicable.

**STATEMENT**

1.     The First Brands bankruptcy cases, involving a fraud of staggering size and complexity, have proven to be "among the most complicated cases ever filed."[3]  These cases have featured $1.1 billion in court-approved postpetition financing, numerous fiduciary-led investigations, criminal indictments, guilty pleas, multi-billion-dollar adversary proceedings, complex lien disputes, going-concern sales, business-line liquidations and winddowns, sub-Debtor chapter 7 filings, and myriad other proceedings.  Many of these matters remain ongoing, but the Plan, a carefully and thoroughly negotiated set of compromises between the FBG Debtors, the Ad Hoc Group, the ABL Secured Parties, and the Creditors' Committee, among others, undoubtedly maximizes the value of the FBG Debtors' Estates.

2.     The centerpiece of the Plan is a well-capitalized and professionally managed litigation trust with a straight-forward purpose:  to pursue claims to restitute victims of the James brothers' fraud.  The Litigation Trust has countless claims against not only the James brothers, but also against those that participated in the scheme, the insiders who looted the enterprise, the sophisticated and opportunistic financial counterparties that supercharged and funded the James brothers' illicit activities, and those that looked the other way when things were too good to be true.  The FBG Debtors believe that these claims have tremendous value that will likely result in billions of dollars in recoveries, the sharing of which is only made possible through the Plan, with the consent and invaluable contributions of the DIP Secured Parties.

3.     The DIP Secured Parties' contributions in furtherance of the Plan (which Plan inures to the benefit of the FBG Debtors, their Estates, and their creditors) provide significant and quantifiable value.  Under the Plan, the DIP Secured Parties are not only ***purchasing*** the FBG

---

[3]     Hr'g Tr. at 5:23–24, *In re First Brands Grp., LLC*, No. 25-90399 (CML) (Bankr. S.D. Tex. July 21, 2026).

Debtors' Estate Claims through a credit bid, but they are ***contributing them*** to the Litigation Trust, ***consensually subordinating their recoveries*** to junior creditors to allow other victims of the fraud to share in the proceeds.  Vis-à-vis the Litigation Trust, the holders of DIP A Claims are ***waiving*** their post-Confirmation Date interest against Litigation Trust recoveries, and holders of Roll-Up Claims are both (a) capping the recovery of the Roll-Up Claims (that otherwise should have been accruing interest throughout these cases) and (b) forgoing their super-priority administrative recovery ahead of other administrative and general unsecured creditors, recovering *pari passu* with other holders of Class 3 Litigation Trust Interests.  Moreover, despite the DIP Facility maturing on June 29, 2026, the DIP Secured Parties have also agreed to ***forbear*** on enforcing their rights to, among other things, the indefeasible repayment of their DIP Loans in full and in cash,[4] as well as cash-pay interest at the default rate against recoveries under the Trusts.

4.      Critically, in addition, holders of DIP A Claims are funding the Litigation Trust with tens of millions of dollars in ***new value*** in the form of ***irrevocable funding commitments***, fully ***backstopped*** by the Ad Hoc Group SteerCo.  This Litigation Trust Funding is remarkable; it is not "debt" on the Litigation Trust with recourse to any assets or collateral and it will be irrevocably and fully committed on the Confirmation Date (as outlined in section 6.3 of the Plan and Exhibit D to the Litigation Trust Agreement), with Litigation Trust Class 1 Funding Contributors required to hold such commitments open for a 5-year commitment period.  Stated differently, for at least five years, the Litigation Trust Class 1 Funding Contributors must fund their commitments on demand for the Litigation Trust.  The commitments have no covenants, no cash visibility, no special Class 1 control, voting, information, or budget rights.  This funding is

---

[4]    *See Stipulation and Agreed Order Regarding Forbearance from the Exercise of Remedies Arising from the Occurrence of the Maturity Date Under the DIP Credit Agreement* [Docket No. 3434] (the "<u>DIP Stipulation</u>") ¶ 4.

committed, enforceable, essential, on favorable terms for these Estates, reasonable given the circumstances, and gives the Litigation Trust a strong foundation to monetize the Estate Claims.

5.      The Ad Hoc Group's concessions were the product of intense negotiations and compromise.  Without the Plan, the value from Estate Claims would be unavailable to the FBG Debtors, their Estates, and their stakeholders.  As the Debtors' Chief Restructuring Officer and Interim Chief Executive Officer attested under oath:  "The Plan Settlement allows the FBG Debtors to avoid the substantial litigation costs and risk associated with the DIP Secured Parties seeking relief from the automatic stay to exercise remedies against their collateral and terminating the FBG Debtors' consensual use of cash collateral."[5]  There is no debate, and no evidence to the contrary, that "there is a significant risk that the DIP Secured Parties would be granted relief from the automatic stay and could foreclose on all DIP Collateral, including the FBG Debtors' litigation assets, which would allow the DIP Secured Parties to keep 100% of all litigation recoveries until their DIP A Claims are paid in full in cash (with interest)."[6]

6.      Nevertheless, the Ad Hoc Group chose to support the Plan, which avoids costly litigation and further delays to recovery against those that pushed the Debtors into bankruptcy.  The Plan, and the Plan Settlement that it incorporates, is complex, and multifaceted, and its material features, including protections afforded the DIP Secured Parties under Bankruptcy Code section 363(m), are inextricably intertwined and should be confirmed.

7.      The Objectors[7] ignore the DIP Secured Parties' contributions underlying the Plan and the value that they provide to these Estates.  Related to the Plan's sale of assets to the

---

[5]   *Declaration of Charles M. Moore in Support of Confirmation of FBG Debtors' Chapter 11 Plan* [Docket No. 3188] (the "Moore Declaration") ¶ 19.

[6]   *Id.*

[7]   "Objectors" means, collectively, the parties that filed objections to confirmation of the Plan (each, an "Objection" and collectively, the "Objections"), including but not limited to Onset, the LAM Parties, Evolution, Katsumi, the

DIP Secured Parties, for example, some Objectors press that the DIP Secured Parties cannot credit bid under Bankruptcy Code section 363(k) because the DIP Secured Parties do not have liens on *all* of the Estate Claims (only some of the Estate Claims) and, in particular, only have liens of the proceeds of Avoidance Actions, as opposed to the Avoidance Actions themselves. True. But the Plan does *not* ask the Court to authorize a credit bid under section 363(k) on account of assets that are not subject to a DIP Lien, nor does it grant the DIP Secured Parties any new or expanded DIP Liens or related collateral rights. What the Plan describes as a "credit bid" is simply a colloquial label for a package of consideration (including, without limitation, a waiver and release of otherwise valid, un-avoidable DIP A Claims against the FBG Debtors' Estates), that the DIP Secured Parties are providing to purchase the Litigation Trust Assets and the DIP Collateral Trust Assets. To be clear, the waiver and release of DIP A Claims is not limited to the reduction of DIP A Claims in the amount of the Credit Bid Claims against the FBG Debtors' Estates, which will occur under the terms of the Plan.[8] It is also the waiver of the DIP Secured Parties' unequivocal recovery rights under the DIP Order to assert first lien, super-priority payment on account of the first $2.5 billion (*i.e.*, the DIP Hurdle) in value from the Estate Claims (including Avoidance Actions) if the terms of the DIP Order are unmodified.[9]

8.      Similarly, other Objectors argue (contrary to applicable law) that the DIP Secured Parties are, somehow, not "third party bidders" entitled to the protections of section 363(m). The Debtors' CRO and Interim CEO confirmed, however, that "neither the DIP Secured Parties, nor any of their affiliates, members, partners, officers, directors, managers, principals, or

---

Carnaby Secured Lenders, Aequum, Patrick James, UMB, and the Office of the United States Trustee, each as further identified in the Debtors' Confirmation Brief and Response.

[8]     *See* Plan § 1.1 (definition of "Remaining DIP A Claims").

[9]     *See* DIP Order ¶ 54(e).

shareholders are 'insiders' of the Debtors and there exists no common identity of directors, managers, controlling shareholders, or members between the Debtors and the DIP Secured Parties,"[10] and there is simply is no evidence to the contrary.

9.        As these examples illustrate, the Objectors work hard to obfuscate both the vital role that the DIP Secured Parties have played in these cases—having funded, in good faith,[11] over $1 billion in fresh capital to the Debtors (including the SPV Debtors, who benefited from the case funding that the DIP Loans afforded them)—and the fact that the DIP Secured Parties are the single largest administrative creditor in these cases, as well as the only administrative creditors with Bankruptcy Court-ordered unavoidable, non-contingent, non-disputed secured claims against the FBG Debtors.  The Objectors' misdirection, however, starts to make sense when you step back and look at who the principal opponents to the Plan are:  (a) Patrick James and Ed James, both indicted for numerous felonies;[12] (b) Onset and its funding partners, who are defendants in the multi-billion-dollar complaint filed by the Debtors;[13] and (c) Katsumi and the LAM Parties, who have been identified in the Debtors' investigation[14] as having notice of the fraud years ago[15]—all anticipated defendants expected to be prosecuted by the Litigation Trust.  As such, their objections should be considered in such context.

---

[10]    Moore Declaration ¶ 52.

[11]    *See* DIP Order ¶ H(xi).

[12]    *United States v. James*, No. 1:26-cr-00029 (S.D.N.Y. Jan. 27, 2026).

[13]    Compl. ¶ 1, *First Brands Grp., LLC v. Onset Fin., Inc.* (*In re First Brands Grp., LLC*), No. 25-90399 (CML) (Bankr. S.D. Tex. Jan. 9, 2026), Docket No. 1255 (the "Onset Complaint").

[14]    *See* Moore Declaration ¶¶ 85–93.

[15]    *See Declaration of Marc S. Kirschner* [Docket No. 3190] (the "Kirschner Declaration") ¶¶ 41–49; Moore Declaration ¶¶ 86–89.

10. For the reasons set forth herein and in the Debtors' Confirmation Brief and Response, the Ad Hoc Group respectfully requests that the Court overrule the Objections and enter the Confirmation Order.

## I. THE DIP FACILITY.

11. On September 30, 2025, the Debtors filed a motion to obtain postpetition financing and use cash collateral,[16] which motion was granted on a final basis on November 7, 2025, with the Bankruptcy Court entering the DIP Order on November 9, 2025. The DIP Facility consisted of a multiple-draw term loan facility providing for (i) New Money DIP Loans in an aggregate principal amount of $1.1 billion and (ii) Roll-Up Obligations in an aggregate principal amount of $3.3 billion.

12. Under the DIP Order, and as part of the Committee Settlement, the DIP Secured Parties obtained DIP Liens and DIP Superpriority Claims on a broad range of the Debtors' assets, extending well beyond the proceeds of Avoidance Actions.[17] The DIP Superpriority Claims have recourse to the DIP Collateral, which expressly includes not only the proceeds and property recovered from Avoidance Actions, but also commercial tort claims, other estate claims and causes of action, and the proceeds of the foregoing.[18] The DIP Order granted the DIP Secured Parties this priority position in the clearest possible terms: "the Recovery Action Proceeds shall constitute DIP Term Priority Collateral . . . for all purposes of lien and claim priority . . . *notwithstanding anything to the contrary in any DIP Document, Prepetition Secured Document, or the Intercreditor*

---

[16] *See Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 49].

[17] *See* DIP Order ¶ 54(a).

[18] *Id*. ¶ 8(a) and 54(a).

*Agreements.*"[19]   In other words, the DIP Secured Parties hold a DIP Lien on the aforementioned assets as their ***unequivocal*** priority collateral and ***expressly*** lent $1 billion against those litigation-based recoveries.

13.   Effective upon entry of the Interim Order (and reaffirmed by the DIP Order), each of the Debtors and their Estates, without regard to whether a Debtor was an SPV Debtor or an FBG Debtor, "absolutely, unconditionally and irrevocably releas[ed] and forever discharge[ed] and acquit[ted] the Prepetition Secured Parties (solely in their capacity as DIP Lenders and Prepetition Secured Parties) and the DIP Secured Parties [together defined as the "Released Parties" as defined in the DIP Order], from any and all . . . claims . . . and causes of action arising prior to the Petition Date."[20]   That release was both binding immediately upon entry of the DIP Order by the Debtors' Estates and was subject ***only*** to the Challenge Period, which under the Plan will expire against all parties, including the Creditors' Committee, on the Confirmation Date.   Moreover, the DIP Order provides that "the DIP Liens, the DIP Superpriority Claims . . . and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties . . . shall survive . . . [and] continue in these Chapter 11 Cases, in any Successor Cases, if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code."[21]   On June 29, 2026, the DIP Facility matured by its own terms.

## II.   THE PLAN SETTLEMENT.

14.   In April 2026, following months of negotiations and multiple rounds of mediation, the FBG Debtors, the Ad Hoc Group, and the Creditors' Committee reached agreement on a settlement, which was embodied in the previously filed chapter 11 plan of the singular "Plan

---

[19]   *Id.* ¶ 8(a) (emphasis added).

[20]   *Id.* ¶ G(xxi) (emphasis added).

[21]   *Id.* ¶ 40.

Debtor" Premier Marketing Group, LLC[22] and became the foundation for the Plan Settlement underlying the Plan, which endeavored to resolve these cases in advance of the Maturity Date. That settlement reflected substantial concessions by the Ad Hoc Group, including the formation of a Litigation Trust funded with up to $75 million provided by the DIP Secured Parties, as well as the Litigation Trust Waterfall, the foundation of the sharing mechanism entitling junior creditors to 16% of Litigation Trust distributions after the first $400 million of distributions,[23] *i.e.*, before the indefeasible repayment in full in cash of the more than $1.3 billion of DIP A Claims.

15. When conditional approval of the Premier Marketing Plan was denied, that underlying settlement was incorporated into the Plan, but, frankly, on worse economic terms for the DIP Secured Parties (*e.g.*, the Ad Hoc Group agreed to lower the $400 million sharing hurdle to $350 million, further accelerating and enlarging junior creditors' participation above the secured lenders in the Ad Hoc Group who are receiving Class 3 Litigation Trust Interests (*i.e.*, the holders of Roll-Up Claims, First Lien Claims, and Second Lien Claims), without any (i) reallocation of economics in favor of the Ad Hoc Group, (ii) reduction in funding commitments, or (iii) compensating change to its own distribution allocation). Moreover, the Ad Hoc Group was faced with a new hurdle—the impending Maturity Date. The Ad Hoc Group nonetheless continued to support the FBG Debtors in their pursuit of a global resolution. That support persisted even as the timeline slipped (again, implicating the Maturity Date) and as the structure for winding up these cases changed.

---

[22]   *Chapter 11 Plan of Premier Marketing Group, LLC* [Docket No. 2784] (the "Premier Marketing Plan").
[23]   *See* Premier Marketing Plan § 6.5(a)(iii)(3).

16.     In sum, the Ad Hoc Group has provided considerable value to the FBG Debtors, as embodied in the Plan, including each of the concessions and accommodations listed below:

(a)     **The holders of DIP A Claims subordinated their own recovery**.  Under the DIP Order, the DIP Secured Parties hold more than $1.3 billion of Allowed DIP A Claims that are unequivocally entitled to be paid in full from "all encumbered and unencumbered Collateral, including all Previously Unencumbered Property" before any junior creditor receives a dollar.[24]  The FBG Debtors' expert projects those recoveries would exceed $2 billion.[25]  Rather than hold their priority position and capture all of that value, the holders of DIP A Claims agreed to let other administrative, priority, and unsecured creditors share in the proceeds of their Collateral before their DIP A Claims are indefeasibly paid in full in cash.  Put plainly, the holders of DIP A Claims gave up their place at the front of the line for billions of dollars that they had every legal right to keep.

(b)     **The DIP Secured Parties agreed to a minimum liquidity reduction**.  The DIP Secured Parties agreed to amend the minimum liquidity covenant under the DIP Credit Agreement (lowering it from $50 million to $25 million).

(c)     **The DIP Secured Parties agreed to take payment in kind over cash interest payments**.  Under the DIP Order, the Court approved a cash return on the New Money DIP Loans, payable monthly in cash.[26]  Beginning February 5, 2026, for interest accrued as of January 5, 2026, the Ad Hoc Group agreed to take payment-in-kind interest.  That accommodation alone deferred approximately $103 million in cash interest payments that the DIP Secured Parties were entitled to receive as administrative creditors of the Estates.[27]

(d)     **The DIP Secured Parties agreed to forbear notwithstanding the Maturity Date**.  Despite the DIP Facility maturing on June 29, 2026, the DIP Secured Parties agreed to forbear on enforcing their rights against the Debtors, including their right to the indefeasible repayment of their DIP

---

[24]     *See* DIP Order ¶ 54(a).

[25]     *See* Kirschner Declaration ¶¶ 21, 143, 148.

[26]     *See* DIP Order ¶ 2(b).

[27]     *See* Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of October 2, 2025 (as amended by the First Amendment thereto, the "DIP Credit Agreement"), §§ 1.01, 2.08 (providing that interest on the New Money Term Loans accrues at Adjusted Term SOFR (or Adjusted EURIBOR, as applicable) plus 10.00% per annum, of which 1.55% is payable in cash and the remaining 8.45% is PIK Interest that is capitalized and added to the principal balance of the loans on each monthly Interest Payment Date).  From January 5, 2026 through the June 29, 2026 Maturity Date, approximately $86.6 million of interest on the New Money DIP Loans accrued in kind rather than being paid in cash, an aggregate deferral estimated at approximately $103 million through July 31, 2026.

Loans in full in cash,[28] as well as cash-pay interest at the default rate ***against recoveries under the Trusts***.

(e)   **The holders of DIP A Claims are funding the vehicle that makes a recovery in these cases possible**.  The Ad Hoc Group negotiated for the Litigation Trust to receive $25 million of the Cash Collateral that the DIP Secured Parties funded on day one, along with $50 million in irrevocable funding commitments to fully capitalize the Litigation Trust.  That incremental $50 million is new, fully backstopped money to ensure that the Litigation Trust has the resources necessary to prosecute the Estate Claims.  *No other party stepped up to fund this effort, without which there would be no prosecution of Estate Claims and no possibility of recovery for anyone.*

(f)   **The DIP Secured Parties accepted impaired treatment under the Plan**.  Rather than demand payment in full in cash under the Plan, the DIP Secured Parties agreed to take *per se* impaired treatment (on account of both DIP A Claims and Roll-Up Claims).

(g)   **The Ad Hoc Group consented to the Preference Settlement**.  By allowing the Debtors to compromise these specific Avoidance Actions, the Ad Hoc Group facilitated an important source of value for all stakeholders: the contribution of direct causes of action by the Preference Settlement Electing Creditors to the Litigation Trust, increasing the value available for all Litigation Trust Beneficiaries.  Importantly, the full waiver of preference liability against Preference Settlement Electing Creditors is a waiver and release of the proceeds of Avoidance Actions that are uncontested DIP Collateral.

(h)   **The Ad Hoc Group agreed to a governance structure incorporating unsecured creditor input**.  Among other things, the Litigation Trust provides for a UCC Member, to be selected by the Creditors' Committee, that is vested with numerous "Sacred Rights" and various fundamental protections.

17.   All of these are concessions and accommodations that the Ad Hoc Group was under no obligation to make.

---

[28]   *See* DIP Stipulation ¶ 4.

### III.   THE CREDIT BID TRANSACTIONS ARE VALID SALES UNDER SECTION 363 AND THE DIP SECURED PARTIES ARE GOOD FAITH PURCHASERS UNDER SECTION 363(M).

18.     The Plan effectuates two sales under section 363 of the Bankruptcy Code: (a) the Estate Claims Credit Bid Transaction, through which the Litigation Trust Assets are sold to the DIP Secured Parties and contributed by such parties to the Litigation Trust, and (b) the DIP Collateral Credit Bid Transaction (together with the Estate Claims Credit Bid Transaction, the "Credit Bid Transactions"), through which the majority of the DIP Collateral Trust Assets are sold to the DIP Secured Parties and contributed by such parties to the DIP Collateral Trust.  Each is an appropriate sale transaction that was proposed by the FBG Debtors in good faith and as part of the Plan.

19.     The Objectors attack the Credit Bid Transactions, contending that the Plan could have been built without them, and that the contemplated sales are therefore not entitled to the protections afforded by the Bankruptcy Code.  Whether cloaked as an objection to the FBG Debtors' good faith under Bankruptcy Code section 1129(a)(3) or otherwise, the Objectors' arguments are wrong.

20.     Bankruptcy plans may include sales of the estates' assets.  Bankruptcy Code section 1123(b)(4) expressly provides that a plan may provide "for the sale of all or substantially all of the property of the estate."[29]  In turn, sales that are included in bankruptcy plans are governed by section 363(b), which provides for various protections and requirements for both the buyer and seller.[30]  These provisions reflect a careful balance codified by Congress to ensure parties have sufficient due process and judicial oversight, while also promoting finality and protecting

---

[29]   11 U.S.C. § 1123(b)(4).

[30]   *See* 11 U.S.C. § 363(b); 3 COLLIER ON BANKRUPTCY ¶ 363.01 (16th ed. 2026) (overview of requirements for the use, sale, or lease of property of the estate and protections afforded to parties with interests in such property).

transacting parties from undue delay in receiving the benefits of their transaction.[31]  This includes section 363(m), which provides that a sale to a "good faith purchaser" authorized under section 363(b) or (c) cannot be reversed or modified on appeal, unless such sale was stayed pending appeal.[32]

21.    Although the term "good-faith purchaser" is not defined in the Bankruptcy Code, the term is understood to mean one who purchases the assets for value, in good faith, and without notice of adverse claims.[33]  The United States Court of Appeals for the Fifth Circuit has two proscribed tests for a "good faith" purchaser:  a "notice" and a "conduct" based test.  Under the notice-based test, a good faith purchaser is someone who purchases "the assets for value, in good faith, and without notice of adverse claims."[34]  Under the conduct based test, a good faith purchaser is someone who "does not engage in misconduct including, inter alia, fraud, collusion between the purchaser and other bidders, or an attempt to take grossly unfair advantage of other bidders."[35]  The DIP Secured Parties undoubtedly meet both tests.

22.    In *RE Palm Springs II*, the Fifth Circuit held that DIP lenders can be good faith purchasers through a credit bid.  There, objectors argued that the DIP lenders were not good faith purchasers because they allegedly inhibited the auction process through their rights to select

---

[31]   *See, e.g.*, *Swiss Re Corp. Sols. Am. Ins. Co. v. Fieldwood Energy III, L.L.C.* (*In re Fieldwood Energy LLC*), 93 F.4th 817, 822 (5th Cir. 2024) ("The limits on reversal or modification imposed by Section 363(m) serve the interests of finality and certainty, and by extension, encourage bidding for estate property.")

[32]   *See* 11 U.S.C. § 363(m).

[33]    *See* *TMT Procurement Corp. v. Vantage Drilling Co.* (*In re TMT Procurement Corp.*), 764 F.3d 512, 521 (5th Cir. 2014) (noting the Court has defined "good faith purchaser" in two ways: (i) a purchaser who buys assets for value, in good faith, and without notice of adverse claims and (ii) a purchaser's good faith is destroyed by fraud, collusion with other bidders or the trustee, or an attempt to take a "grossly unfair" advantage over other bidders) (citation omitted).

[34]   *RE Palm Springs II, L.L.C. v. Hall Palm Springs, L.L.C.* (*In re RE Palm Springs II*), 65 F.4th 752, 759 (5th Cir. 2023) (internal citations omitted) (emphasis added).

[35]   *Id.* at 759 (internal citations omitted).

the bidders to the auction, leading to DIP lenders winning the auction.  The Court disagreed, holding that the DIP lenders were entitled to 363(m) protections.[36]

23.     Likewise, courts in the Fifth Circuit have found that a buyer purchases "for value" where the buyer provides consideration that is not "so shocking or facially inadequate," in whatever form—including credit bids, discharge of existing debt, releases from ongoing obligations, and other transaction benefits to the estate.[37]  There is no prescribed test for "for value" but one way to demonstrate value is through a market test or auction, where the auction price suffices to demonstrate the purchaser paid "value" for the assets.[38]

24.     Here, the DIP Secured Parties are undoubtedly good faith purchasers.  As described in the Moore Declaration, the Estate Claims were marketed broadly and publicly, yet no competing or higher bid emerged.  Likewise, the DIP Collateral Trust Assets have been marketed since January, when the Debtors filed their bidding procedures motion,[39] but have not yet found a third-party purchaser.  Thus, the Credit Bid Transactions are plainly for value.

25.     Further, the Credit Bid Transactions were negotiated between the FBG Debtors and the DIP Secured Parties (and frankly, the Creditors' Committee and the ABL Secured

---

[36]   *Id.* at 763–65.

[37]   *See In re Searex Energy Servs., Inc.*, No. Civ.A. 00-3501, 2001 WL 803736, at *3 (E.D. La. July 16, 2001) (declining to reach whether the sale package represented the "highest and best value" and finding "nothing so shocking or facially inadequate about the sale terms as to indicate lack of good faith," where the purchaser "unquestionably provided Searex with value for its property, including the discharge of approximately $700,000 in pre-existing debt, the release from its obligation to make future, sizeable interest payments, and (presumably) the opportunity to retain its place of business").

[38]   *See Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (because the record lacked the appraised value of the assets sold, the "crux" of the "good-faith purchaser" appeal was purchaser's good faith); *see also Willemain v. Kivitz*, 764 F.2d 1019, 1023–24 (4th Cir. 1985) (purchaser gave "value" despite not giving 75% of the appraised value of the asset because the purchase price was "not unreasonable" and the purchaser acted in good faith).

[39]   *Emergency Motion of Debtors for Order (I) Approving (A) Bidding Procedures for Sale of Assets of the Debtors, (B) Form and Manner  of Notice of Sale, Auction, and Sale Hearing, and  (C) Assumption and Assignment Procedures, (II) Authorizing  Designation of Stalking Horse Bidders, (III) Scheduling  Auction and Sale Hearing, and (IV) Granting Related Relief* [Docket No. 1253]

Parties with respect to certain terms) at arm's length and without collusion or fraud.[40]  Moreover, the DIP Secured Parties are not insiders of the Debtors (and do not hold undisclosed controls over or connections with the Debtors).[41]  Lastly, and most importantly, the Credit Bid Transactions represent the highest or otherwise best offers for the assets.[42]  These facts are largely undisputed and confirmed by the Debtors' CRO and Interim CEO.[43]  The Objectors can point to no competing bid, no side agreement, no concealed term, and no indication that the DIP Secured Parties did anything other than deal at arm's length and in good faith.

26.     Further, the ***irrevocable***, ***non-recourse***, Litigation Class 1 Funding Commitments capitalize the Litigation Trust and are the necessary inducement that makes the entire structure work, and they were also the product of a fair, open process.  The Litigation Trust Participation Notice and the DIP Collateral Trust Participation Notice (each as defined in the Disclosure Statement), which the Court approved under the Disclosure Statement Order, offered every holder of a DIP A Claim the right to commit to its pro rata share of the Class 1 Litigation Trust Interests, which commitments were then backstopped by the Ad Hoc Group SteerCo.  The resulting Litigation Trust Class 1 Interests are not a windfall; they are an actual and necessary cost of preserving these Estates, warranted precisely because they are what induces the holders of DIP A Claims to irrevocably advance new money, credit bid a portion of their DIP A Claims, and accept impaired treatment of their remaining DIP A Claims.  The commitments, the backstop, and the returns for Class 1 DIP Collateral Trust Interests are all bargained-for and integral components

---

[40]   *See* Moore Declaration ¶¶ 52.

[41]   Notwithstanding the allegations set forth in the Objections, there is absolutely no basis to conclude that the DIP Secured Parties are *de facto* insiders or that they hold **undisclosed** ties with, or controls over, the Debtors or their marketing process that renders a good faith finding improper under the law.  *See RE Palm Springs II*, 65 F.4th at 763–65 (facts and evidence required to show that a lender, who maintains a form of control over the debtor as a DIP lender, exerted this control to commit a fraud upon the bankruptcy court).

[42]   *See* Moore Declaration ¶¶ 44, 49.

[43]   *Id.*

of the Plan that were fully disclosed in the first iteration of the Premier Marketing Plan filed in April and have been largely unchanged in every subsequent plan filed. No party has come forward, having seen those funding terms, and offered the FBG Debtors, or the DIP Secured Parties, any alternative or better terms. Absent this funding, there is no vehicle to monetize the Estate Claims and no recovery for anyone junior to the DIP Secured Parties.

27. Thus, as provided in the Debtors' Confirmation Brief and Response, the DIP Secured Parties are providing the FBG Debtors with significant consideration for the purchased assets. Such consideration refutes any suggestion that the Credit Bid Transactions provide no or immaterial value to the FBG Debtors; rather, the record clearly establishes that the Ad Hoc Group's consideration constitutes value that is neither shockingly or facially inadequate and that the Ad Hoc Group acted in good faith, such that the auction price here suffices to demonstrate that they paid "value" for the assets.[44]

28. Certain Objectors recast the Plan's ordinary use of section 363 as a scheme, arguing that the Plan is "transparently designed" to drain the Effective Date of meaning and to lock in the sale (and attendant section 363(m) protections) regardless of confirmation.[45] Yet, such protections are not a scheme; they are critical protections (common to all 363 sales) provided to

---

[44] The Objectors' argument that section 363(m) is unavailable unless the purchase price clears "some fixed percentage of a hypothesized asset value" finds no support in binding Fifth Circuit law and rests on inapposite authority. The LAM Parties cite to a "75%-of-appraised-value" test borrowed from the Third Circuit (*In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149–50 (3d Cir. 1986)) which has never been adopted by the Fifth Circuit; indeed, *Abbotts Dairies* itself was remanded for a Fifth Circuit style "conduct-based" good-faith finding. *Id*. at 151 (case remanded to the district court to determine whether there was any impermissible collusion that would negate the purchaser's status as a purchaser "in good faith"). The Fifth Circuit's conduct-based good faith standard asks only whether the purchaser's conduct involved fraud, collusion, or an attempt to take grossly unfair advantage of other bidders. *See TMT Procurement*, 764 F.3d at 521; *see also RE Palm Springs II*, 65 F.4th at 759. No Objector has argued that the DIP Secured Parties are not entitled to a section 363(m) finding as a result of their notice of adverse claims. Moreover, a properly conducted marketing process (whether or not it yields any actionable bids) is the undisputable best evidence that fair market value is at or near zero, and the Fifth Circuit has historically provided that even a failed marketing process can support a good-faith-purchaser finding. *See RE Palm Springs II*, 65 F.4th at 764–65.

[45] *See, e.g.*, LAM Parties Objection ¶¶ 6, 57–60; Katsumi Objection ¶ 43; Carnaby Secured Lenders Objection ¶ 58; First-Citizens Bank Objection ¶ 3(c).

purchasers by Congress.   Moreover, here, they are absolutely essential, as they provide the foundation for the DIP Secured Parties' myriad consideration.

29.    As discussed above, the DIP Secured Parties will, among other things, contribute their purchased Litigation Trust Assets into the Litigation Trust and irrevocably commit to inject up to $75 million of cash that will be immediately used to monetize the Estate Claims. No rational economic actor would pour tens of millions of dollars in additional capital into a sale transaction where an appeal could later unwind and strand their new money, particularly where the expectation is that such money will be put to use immediately.  The DIP Secured Parties are simply asking for assurances that the Credit Bid Transactions will not be disturbed, assurances that Congress has decided are an appropriate part of a bargained-for exchange under section 363(m).

## IV.    THE UST'S OBJECTION CANNOT OVERCOME A RECORD IN WHICH THE PLAN BEATS A LIQUIDATION FOR EVERY CLASS OF CREDITOR.

30.    Given all the work that the Ad Hoc Group has put in to reaching consensus in these cases, the Ad Hoc Group is disappointed that it could not resolve the objections of the Office of the United States Trustee (the "UST"), who stands on different footing from the defendant-Objectors but whose objection fares no better.  The UST is an arm of the Department of Justice, which department, through the United States Attorney General for the Southern District of New York, has indicted Patrick James and Edward James as financial fraudsters and criminals, secured guilty pleas from the Debtors' former chief financial officer, Stephen Graham, and former senior vice president of finance, Andy Brumbergs, and is preparing to try the James brothers in 2027. The United States Attorney General for the Southern District of New York has told a federal court, under the highest standard the law knows, that it believes that these men orchestrated a criminal fraud.   The Litigation Trust exists to hold these very men, and the sophisticated counterparties who enabled them, civilly accountable and to return their ill-gotten gains to their

17

victims.  There is no daylight between what the Department of Justice is doing in the United States District Court for the Southern District of New York and what the Plan is doing here:  requiring the perpetrators of the First Brands fraud to answer for it.  Regardless, the UST's substantive contentions are answered by the same record that supports confirmation.

31.    ***First***, the UST repeatedly insinuates, without reference to a single supporting fact or piece of evidence, that the FBG Debtors' releases of the DIP Secured Parties are improper or conceal value of "unknown" worth.[46]  That insinuation is inflammatory, unsupported, and wrong.  The DIP Secured Parties already received full releases from the all of the Debtors and their Estates, including the SPV Debtors, when this Court entered the DIP Order in November 2025, and those releases were effective as of the Petition Date.[47]  The Plan therefore releases only incremental postpetition conduct.[48]  The releases under the DIP Order were duly and properly noticed, litigated in connection with entry of the DIP Order, and approved subject only to the expiration of the Challenge Period (during which time any party in interest, the UST included, could have investigated and asserted a claim against any DIP Secured Party).  Over the last ten, almost eleven months that these cases have been proceeding, no party has brought, or even suggested, any fraud or equity-based wrongdoing by any DIP Secured Party or any Prepetition Secured Party.[49]  To the contrary, the Debtors, the Examiner, and the Creditors' Committee each conducted extensive investigations, and none identified any claims or causes of action against the DIP Secured Parties or the Prepetition Secured Parties.[50]  Thus, it is crystal clear that the releases

---

[46]    *See Id.* ¶¶ 2–3.

[47]    *See* DIP Order. ¶ G(xxi) (emphasis added).

[48]    *See* Moore Declaration ¶ 243.

[49]    The Ad Hoc Group does not dispute that certain adversary proceedings have been filed which constitute Challenges under the DIP Order.  However, those have been *in rem* lien disputes and have not contained any accusations of fraud or other alleged wrongdoing by the DIP Secured Parties or the Prepetition Secured Parties or inappropriate connections to the alleged perpetrators of the prepetition misconduct.

[50]    *See* Moore Declaration ¶ 243.

being granted under the Plan are not being granted to bury value but in exchange for the ***substantial*** value provided in furtherance of the Plan.[51]

32.    ***Second***, the UST's claim that the Plan hands the DIP Secured Parties "control" over the Estate Claims that they would not otherwise have[52] misreads the Plan.  Today, the Estate Claims are controlled by the Estates and their fiduciaries.  Under the Plan, the DIP Secured Parties purchase those claims through the Estate Claims Credit Bid Transaction[53] and contribute them to the Litigation Trust, which is to be administered by a Litigation Trustee who owes duties to *all* Litigation Trust Beneficiaries and has no special or heightened duty to the DIP Secured Parties, the holders of Class 1 Litigation Trust Interests, the holders of Class 2 Litigation Trust Interests, or any other Litigation Trust Beneficiary.[54]  The selection of the Litigation Trustee was made in mediation, as a joint decision between the Ad Hoc Group and the Creditors' Committee; it was not a unilateral choice made by the DIP Secured Parties.  The DIP Secured Parties will not direct the Litigation Trust's litigation efforts, select its targets, or capture its recoveries outside of the Bankruptcy Court-approved Litigation Trust Waterfall.  The premise that confirmation will vest the DIP Secured Parties with litigation control that they lack today is false. The governance structure under the Litigation Trust Agreement, including the UCC Member's consent rights with respect to Sacred Rights and the duties owed by the Litigation Trustee to all holders of Litigation Trust Interests, is clear and has been fully disclosed.[55]

---

[51]    *See id*. ¶ 242.

[52]    *See* UST Objection ¶ 2; *see also* Evolution Objection ¶ 4; Carnaby Secured Lenders Objection ¶¶1–2.

[53]    Relatedly, the UST's objection includes a misreading of the Plan.  It asserts that the Plan permits the DIP Secured Parties to "foreclose" on the Estate Claims. *See* UST Objection ¶ 2.  The DIP Secured Parties are not foreclosing under the Plan.  The only foreclosure contemplated by the Plan is by the ABL Secured Parties with respect to the ABL Collateral Trust Assets.

[54]    *See* Plan Art. VI; Litigation Trust Agreement §§ 2.2, 3.2.

[55]    *See* Litigation Trust Agreement [Docket No. 3046-4] §§ 5.1, 6.11, 6.12(b).

33.     ***Third***, the UST (selectively) objects that the Plan modifies the DIP Order.[56] To be clear, the Plan does, in several respects, modify the DIP Order, but every one of those modifications benefits junior creditors at the DIP Secured Parties' expense.  Chief among them is the modification to the paradigm set forth in paragraph 54 of the DIP Order.  As entered, paragraph 54 of the DIP Order embodies a settlement with the Creditors' Committee under which no junior creditor receives any sharing or distribution of value until the DIP A Claims are indefeasibly paid in full in cash, subject to a $2.5 billion "DIP Hurdle."[57]  Left unmodified, that structure would have delivered ***nothing*** to administrative, priority, or unsecured creditors until the DIP Secured Parties (owed ~$1.3 billion in DIP A Claims and $1.1 billion in Roll-Up Claims) were made whole. The Plan rewrites that waterfall and enables junior creditors to share in value ahead of the full repayment of senior secured obligations.

34.     ***Fourth***, the UST mischaracterizes the DIP Order's treatment of administrative expense claims.  The objection states that the Roll-Up Obligations are subordinated to unpaid, undisputed administrative expense claims "up to $200 million."[58]  That is not what the DIP Order provides.  The DIP Order provides that, ***following*** the indefeasible payment in full in cash of the DIP A Claims and prior to payment of the Roll-Up Obligations, certain unpaid and undisputed administrative expense claims of the DIP Loan Parties, up to an aggregate of $200 million, shall be paid.[59]  ***Only*** if the DIP A Claims are indefeasibly paid in full in cash do the remaining DIP Liens, DIP Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Claims become subject and subordinate to payment of the Specified

---

[56]     *See* UST Objection ¶ 4.
[57]     *See* DIP Order ¶ 54(e).
[58]     *See* UST Objection ¶ 12.
[59]     *See* DIP Order ¶ 8(b).

Administrative Expense Claims from the Administrative Expense Claims Basket.  Under the Plan, the DIP A Claims are not being paid in full in cash, and even if the Litigation Trust were to repay Class 2 Litigation Trust Interests in full, holders of DIP A Claims are *per se* Impaired under the Plan.  The Administrative Expense Claims Basket is therefore never triggered, and the UST's suggestion that the Plan raids a $200 million administrative claims protection collapses on the text of the DIP Order it purports to enforce.[60]

35.     ***Lastly***, the UST (and other Objectors)[61] assert that the Plan "depends on a determination that the proceeds of the Avoidance Actions are encumbered."[62]  The Plan makes (and requires) no such determination.  As discussed at length above, the Estate Claims are conveyed to the Litigation Trust through a Bankruptcy Court-approved sale process under section 363, and the consideration for that sale is, among other things, the DIP Secured Parties' agreement to retire a portion of their DIP A Claims and waive priority in repayment of those claims (*i.e.*, a "credit bid").  Whether a sale under to section 363 of the Bankruptcy Code is authorized turns on business judgment, value, good faith, and process, not on the abstract lien-scope "determination" the UST invents or the colloquial description of the transaction as a "credit bid" because the Plan involves the purchase of both assets that are subject to a lien and assets that are simply purchased outright.

---

[60]   Onset repeats the UST's error about the Administrative Expense Claims Basket, and compounds it.  Onset asserts that the DIP Secured Parties are using the Plan to "escape" a $200 million obligation that subordinates their Roll-Up Obligations to administrative expense claims.  *See* Onset Objection ¶¶ 8, 66. That assertion misreads the DIP Order for the reasons already explained.  There is no $200 million obligation for the Plan to "restructure away" because, by the DIP Order's own terms, that obligation never arises.  Onset has the mechanic exactly backwards: the Plan does not eliminate a protection that administrative creditors would otherwise enjoy; it delivers administrative creditors sharing they would never have received under the unmodified DIP Order, where no value flows to any creditor until the DIP A Claims are paid in full in cash.

[61]   *See* Katsumi Objection ¶¶ 39–43.

[62]   *See* UST Objection ¶14.

## V.     THE REMAINING OBJECTIONS ARE INFIRM.

36.     The majority of the remaining objections come from parties who share a universally defining trait: each is a defendant, or a likely defendant, of the Litigation Trust. Onset,[63] the LAM Parties, Evolution, Katsumi, the Carnaby Secured Lenders, PrimeRevenue, Aequum, Patrick James, and UMB do not object as disinterested creditors seeking a better recovery; they object as targets seeking to weaken and defund the very vehicle built to pursue them.  The Ad Hoc Group joins in the Debtors' Confirmation Brief and Response with respect to the remaining objections and offers a few additional brief responses below.

37.     Onset's suggestion of improper informational asymmetry is remarkable.[64] If any party in these cases possesses superior information about the First Brands fraud, it is Onset, who participated in many of the problematic transactions that the Litigation Trust will challenge. The DIP Secured Parties' knowledge of the Estate Claims is the ordinary product of having financed these cases and diligenced the DIP Collateral; there is nothing improper about that, and Onset identifies nothing to suggest otherwise.

38.     Evolution, among other misstatements regarding the Plan, asserts that the Plan provides no recourse to administrative and general unsecured creditors who received nothing while the DIP Lenders "retain possession of all of the Debtors' assets" transferred upon confirmation.[65]  This could not be more inaccurate.  The protections set forth in section 363(m) protect the Litigation Trust and the attendant Litigation Trust Agreement.  There is no escape hatch in the Litigation Trust Agreement that allows the Litigation Trustee to distribute proceeds outside

---

[63]   Onset casts itself as a wronged administrative creditor, but it is a primary target of the very claims the Litigation Trust exists to prosecute, and its objections track that interest at every turn.  Onset's self-description of its "contributions to the Chapter 11 Cases" (Onset Objection ¶¶ 19–20) does not withstand scrutiny.  Onset is a defendant, not a benefactor.

[64]   *See* Onset Objection ¶ 7.

[65]   *See* Evolution Objection ¶ 6.

22

of the Litigation Trust Waterfall that is expressly built into the definitive documentation as Exhibit D to the Litigation Trust Agreement.  If the contribution of Litigation Trust Assets to the Litigation Trust is preserved, and section 363(m) facilitates that preservation, the governing Litigation Trust Agreement protects the Litigation Trust Waterfall.

## CONCLUSION

39.     From the outset of these cases, the Ad Hoc Group has acted in good faith and has shown a clear willingness to get to a reasonable resolution of what this Court has referred to as one of the "most complicated cases ever filed."  It provided $1.1 billion to fund these cases, negotiated with every constituency, and gave up value it was entitled to keep in order to build a Plan and a Litigation Trust that benefits the Estates and holds the perpetrators of the First Brands fraud to account.  It is undisputed that the only alternative to this Plan is a chapter 7 liquidation in which all junior creditors will almost certainly receive nothing.

40.     Further, no Objector has offered a shred of credible evidence of collusion or a lack of value and thus, the record affirmatively compels the good-faith finding the DIP Secured Parties need to consummate the Credit Bid Transactions.

WHEREFORE the Ad Hoc Group respectfully requests entry of the Confirmation Order and such other and further relief as the Court may deem just and appropriate.

Dated: July 27, 2026
   Houston, Texas

        Respectfully submitted,

        /s/ *Tom A. Howley*
        Tom A. Howley (Texas Bar No. 24010115)
        Eric Terry (Texas Bar No. 00794729)
        **HOWLEY LAW PLLC**
        700 Louisiana Street, Suite 4220
        Houston, TX 77002
        Telephone: 713-333-9125
        Email: tom@howley-law.com
          eric@howley-law.com

        Scott J. Greenberg (admitted *pro hac vice*)
        C. Lee Wilson (admitted *pro hac vice*)
        Christina M. Brown (admitted *pro hac vice*)
        **GIBSON, DUNN & CRUTCHER LLP**
        200 Park Avenue
        New York, New York 10166
        Telephone: 212-351-4000
        Email: sgreenberg@gibsondunn.com
          clwilson@gibsondunn.com
          christina.brown@gibsondunn.com

        -and-

        AnnElyse Scarlett Gains (admitted *pro hac vice*)
        Robert Marsters (admitted *pro hac vice*)
        **GIBSON, DUNN & CRUTCHER LLP**
        1700 M Street N.W.
        Washington, D.C. 20036-3504
        Telephone: 202-955-8500
        Email: agains@gibsondunn.com
          rmarsters@gibsondunn.com

        *Counsel to the Ad Hoc Group*

**<u>Certificate of Service</u>**

I certify that on July 27, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<u>/s/ *Tom A. Howley*</u>
Tom A. Howley