IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In re:                      | Chapter 11
                            |
FIRST BRANDS GROUP,         | Case No. 25-90399 (CML)
LLC, et al.,                |
                            |
Debtors.                    | (Jointly Administered)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL AND VIDEOTAPED DEPOSITION OF
KERRI PALEN
JULY 27, 2026
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of KERRI PALEN, produced as a witness at the instance of the Creditors, and duly sworn, was taken in the above-styled and numbered cause on July 27, 2026, from 9:35 a.m. to 3:53 p.m., before Mendy A. Schneider, CSR, RPR, in and for the State of Texas, recorded by machine shorthand, at the offices of Weil Gotshal & Manges, 700 Louisiana Street, Suite 3700, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition shall be read and signed.

8351700

Page 1

APPEARANCES

ON BEHALF OF THE LAM PARTIES:
CHRISTINE CALABRESE
KYLE FERRIER (Remote)
GREG BURTON (Remote)
JUSTIN KANOFF (Remote)
KEVIN BOSTEL (Remote)
KEYA PATEL (Remote)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
212.310.8083
Christine.calabrese@weil.com

FOR KATSUMI SERVICING, LLC:
GARY W. JOHNSON
RICHARD STIEGLITZ
SEAN SCOTT (Remote)
MAYER BROWN LLP
700 Louisiana Street, Suite 3400
Houston, Texas 77002
ckelly@mayerbrown.com

ON BEHALF OF AD HOC GROUP:
ROBERT MARSTERS
ANNELYSE SCARLETT GAINS
GIBSON DUNN
202.955.8502
Rmarsters@gibsondunn.com

ON BEHALF OF EVOLUTION CREDIT PARTNERS:
JORDAN SAZANT
PROSKAUER
70 West Madison, Suite 3800
Chicago, Illinois 60602
Jsazant@proskauer.com

ON BEHALF OF EVOLUTION:
MICHAEL DUKE
ELSBERG BAKER & MARURI
350 Fifth Avenue, 38th Floor
New York, New York 10118
212.597.2605
mduke@elsberglaw.com

Veritext Legal Solutions
346-293-7000

APPEARANCES (CONTINUED)

ON BEHALF OF THE LAM PARTIES:
    MICHAEL H. CASSEL (Remote)
    ANGELA HERRING
    THEODORE FURCHTGOTT
    WACHTELL, LIPTON, ROSEN & KATZ
    51 West 52nd Street
    New York, New York 10019
    212.403.1000
    MHCassel@wlrk.com

ON BEHALF OF ONSET:
    ERIN DEXTER
    ALLISON CHESKY
    NATHAN SCHNEIDER (Remote)
    JAMIE SLOCUM (Remote)
    HANNAH BLAZEK (Remote)
    MILBANK LLP
    55 Hudson Yards
    New York, New York 1000
    edexter@milbank.com
    eobrien@milbank.com
    CAMERON LAKIN (Remote)
    ALLISON ANKER
    MORRISON & FOERSTER LLP
    250 West 55th Street
    New York, New York 10019
    clakin@mofo.com

ON BEHALF OF CARNABY SECURED LENDERS:
    GARY MENNITT
    DECHERT LLP
    1095 Avenue of the Americas
    New York, New York 10036
    gary.mennitt@dechert.com
    eric.hilmo@dechert.com

ALSO PRESENT:
    DANIEL ALPIZAR, THE VIDEOGRAPHER

Page 3

REMOTE APPEARANCES

ON BEHALF OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS:
  JASNOOR HUNDAL
  MATTHEW JANG
  MICHAEL WINOGRAD
  BROWN RUDNICK
  Seven Times Square
  New York, New York 10036
  jhundal@brownrudnick.com

ON BEHALF OF BANK OF AMERICA, N.A.:
  CHRIS LESTER
  WINSTON TAYLOR
  312.558.8302
  chris.lester@winstontaylor.com

ON BEHALF ED JAMES, JCMC, AND OPTIMUS PRIVATE
CAPITAL:
  ALEXANDRIA MORIARTY
  BRACEWELL PATTERSON
  31 W. 52nd Street, Suite 1900
  New York, New York 10019
  212.508.6170
  Alexandria.moriarty@bracewell.com

ON BEHALF OF ING BELGIUM:
  SARAH CAMPBELL
  CLIFFORD CHANCE
  375 9th Avenue
  New York, New York 10001
  212.878.3427
  Ness.cohen@cliffordchance.com

ON BEHALF OF U.S. TRUSTEE:
  VIANEY GARZA
  OFFICE OF THE U.S. TRUSTEE
  515 Rusk Street, Suite 3516
  Houston, Texas 77002
  713.718.4660

Veritext Legal Solutions
346-293-7000

REMOTE APPEARANCES (CONTINUED)

ON BEHALF OF PATRICK JAMES AND RELATED
ENTITIES:
JESSICA WU
ANIL MAKHIJANI
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
212.849.7000
Jessicawu@quinnemanuel.com

EMILY MORGAN
DEBEVOISE & PLIMPTON
66 Hudson Boulevard
New York, New York 10001
212.909.6000
Elmorgan@debevoise.com

ALSO PRESENT:
ALLY CHEN
LAUREN GILL, FTI Consulting
SPENCER LLOYD
BEN BLEWITT, FTI Consulting
BRIAN GRIFFITH

Page 5

A.   I had my team rerun some numbers, or look into some numbers.

Q.   What numbers did you have your team look into?

A.   The accounts receivable factoring estimate of fraud percentage.

Q.   Is that the 61 percent, the 81 percent, those numbers from the Charles Moore declaration?

A.   Yes.  And we're not going to rely on those numbers.  We found that there was an error in the mapping file.  Our forensic technology team ran those numbers and determined that there was an error in the mapping file where the business customer name got trunc- -- got truncated.

And so I'm not a technical expert; but because there was an error, we're pulling that -- the percentages.  And we're not relying on it and Chuck is not going to be testifying about it.

Q.   Are there new percentages?

A.   No.

Q.   In terms of taking another look or rerunning the numbers, does it only -- was

Page 15

that only with respect to the 61 percent and the 81 percent fraudulent amounts in Mr. Moore's declaration or is it something else?

A.     It was only with respect to those numbers, the estimated fraud amount.

Q.     So just so it's clear and to make sure I understand, there are not going to be new percentages that your team presents to Mr. Moore; is that correct?

A.     That's correct.

Q.     When did you all discover that there was an error in the mapping file?

A.     In response to some of the questioning last night, we went back and I asked the FTS team to look into the issue. It was about 8:00 last night. They continued to look into the issue and I went to bed.

Q.     And what -- what did they tell you this morning?

A.     I didn't talk to them. I just -- I know that there was an -- I -- we know that there was an issue last night and we're not -- we're not going to rely on them.

Q.     So just so I can put it

Veritext Legal Solutions
346-293-7000

together so it's clear in my head, after Mr. Moore's deposition yesterday or maybe during Mr. Moore's deposition yesterday, some of the questioning prompted A&M to discover that there was an error in the mapping file; is that right?

A.      Correct.

Q.      And who directed the A&M team to look into that issue last night?

A.      I asked the techno- -- the technical expert to look into it.

Q.      And the technical expert looked into the issue last night and then you went to sleep, right?

A.      He told me that there was an issue.

Q.      What happened next in terms of A&M's conclusion now that they are not going to rely on the 61 percent, the 81 percent, those percentages?

A.      I don't understand your question.  What do you mean "what happened"?

Q.      So what error did the technical expert discover last night?

A.      He explained to me that in a

Page 17

file that's used for mapping, the -- the global customer, there was a space in the Excel file about halfway down. And that space didn't allow the look-ups to work properly, and so the global customer mapping was truncated.

And so, for example, if the nomination file had a customer for Walmart and it said Walmart SE, for example, that should have been mapped to a global customer -- and I'm -- I'm kind of making these up -- that should have been mapped to a global customer Walmart.

That mapping didn't happen. So when the matching process was conducted, it was determined that it was a false match because it didn't match on global customer, and so those were false falses.

Q.   And you haven't had any discussions with Mr. Moore since this work was done last night; is that right?

A.   That's right.

Q.   Other than the work that you just described for me and listening to some of Mr. Moore's deposition last -- last week

Page 18

Mr. Malloy?

A.     We reported our findings to Mr. Malloy, Mr. Moore, special committee, Weil.

Q.     Did you meet with the First Brands special committee at any point?

A.     Yes, regularly.

Q.     Pre-January 7, 2026, how frequently did you meet with the First Brands special committee?

A.     I know initially it was weekly. I know at one point it stopped being weekly but I don't remember how frequently it was and I don't remember what time period that changed, but it was regularly.

Q.     After January 7, 2026, did you meet with the First Brands special committee at any point?

A.     No.

Q.     Do you know if Mr. Malloy did?

A.     No.

Q.     You don't know or you know he did not?

A.     I don't know.

Q.     As your team or Mr. Malloy's

Page 32

Q.    And from your perspective, what is fraud?

A.    Misconduct with scienter.

Q.    Before the petition date, is one of the things that the A&M investigation team found that First Brands engaged in fraud prepetition?

MS. CALABRESE:  Object to form.

A.    I'm going to say no.

(BY MR. JOHNSON)

Q.    Prepetition, did the A&M investigation team reach a finding that insiders at First Brands engaged in misconduct prepetition?

A.    We have evidence that there was misconduct.

Q.    Who at First Brands engaged in misconduct prepetition?

A.    Andy Brumbergs.  Stephen Graham.  Ed James.

Q.    Why did the A&M investigation team go pencils down on January 7, 2026?

A.    My understanding is because there were budgetary constraints.

Q.    What were the budgetary

Page 49

How is it stored?

A.    It's on Box.

Q.    So on an A&M Box, there's a repository of the supporting documents for the April 2026 report?

A.    Yes.

Q.    What conversations did you have with Mr. Moore about preparing the April 2026 report for a litigation trustee?

A.    Mr. Moore wanted us to reflect the findings that we had and pull together the documentation that supported those findings.

Q.    Did Mr. Moore tell you anything about why there was a litigation trustee?

A.    No.

Q.    Were there any other conversations you had with Mr. Moore about the April 2026 report being prepared for a litigation trustee?

A.    No.

Q.    Nothing else you remember about it?

A.    No.

Q.    I want to go back to the

Page 73

PowerPoint file that got started apparently on October 14.

For that file, I think you've said that it eventually became, in part, the April 2026 report; is that right?

A.    I -- it became a part of.

Q.    Tell me about how the process worked.  Let's start at just a very simple technical level.

On a PowerPoint file being created on October 14 and then a Power -- a PowerPoint file being marked as completed in April 2026, what happened in terms of saving new files during that period?

A.    It became a report for the DOJ on December 4th.  It became a report for the examiner.  So there's a file saved as the examiner report.

And then from there it became the special litigation -- sorry -- the summary of findings.

Q.    All right.  So the initial PowerPoint file that gets created in October eventually gets saved as a DOJ report; is that right?

Page 74

A.     Correct.

Q.     And then it -- then it subsequently gets saved as an examiner report or presentation, right?

A.     Correct.

Q.     And then ultimately some version of it becomes a part of the April 2026 report --

A.     Correct.

Q.     -- is that correct?

Other than that file, that got saved as a bunch of different, sounds like, subsequent files; is that right?

A.     Yes.

Q.     Has the A&M investigation team prepared any other reports or summaries regarding the findings of the A&M investigation team?

A.     Yes.

Q.     What else?

A.     We prepared reports for the special committee.

Q.     Are those written reports?

A.     Yes.

Q.     Were those prepared on a

Page 75

A.       Correct.  I didn't.

Q.       Other than the report that you recall to the special committee, the DOJ presentation or report, the examiner presentation or report, and the April 2026 final report, are there any other reports, summaries, presentations in writing that the A&M investigation team created?

A.       Not that we created.

Q.       For the versions of the PowerPoint file that predated the final April 2026 report, was all of the information from those previous versions put into the April 2026 report?

A.       I didn't do a comparison of that.  But, in general, our knowledge evolved over the course of the time that we worked on the matter.

But the buckets of information were generally the same.

Q.       So it's fair to say that earlier versions of the PowerPoint file would be draft -- partial drafts of the April 2026 report, right?

MS. CALABRESE:  Object to form.

Page 77

Q.      Just to be clear, you did not attend in person, orally, remotely, in any way, any meetings with the UCC after April 1, 2026, right?

A.      Not that I recall.

MR. JOHNSON:  You want to take a break before we start this or you want to start this now?

MS. CALABRESE:  Yeah.  Let's take a break.

MR. JOHNSON:  Let's go off the record.

THE VIDEOGRAPHER:  The time is 11:44.  Off the record.

(Break from 11:44 a.m. to 12:16 p.m.)

THE VIDEOGRAPHER:  The time is 12:16.  Back on the record.

(BY MR. JOHNSON)

Q.      I've handed you what's been marked as Exhibit 1.  This is the first --
First Brands Group, LLC, summary of findings, April 2026.

Do you see that?

(Marked Palen Exhibit No. 1.)

A.      Yes.

Page 92

(BY MR. JOHNSON)

Q.      For the record, it's the Bates number ending in 206939.

This is one of the documents you reviewed in preparation for today, right?

A.      Correct.

Q.      Let's go to Page 4 of this, please.  I'm going to use the footer number in the bottom right corner.

A.      Okay.

Q.      Take a minute to look at the content of forensic document collection and review.

A.      Okay.

Q.      For the A&M activities that are listed under forensic document collection and review, all of this activity was done before January 7, right?

A.      Correct.

Q.      Look at the heading Forensic -- Forensic Witness Interviews.

Do you see that?

A.      Yes.

Q.      Take a minute to read that bullet point.

Page 93

A.      Okay.

Q.      The 33 in -- formal interviews of FBG employees and frequent informal discussions with key employees, that work was all done before January 7, right?

A.      Correct.

Q.      Flip to the next page, which is Page 5.  The first bullet point under forensic analysis, Obtained and analyzed large volumes of bank records and other financial records as well as critical FBG and third-party data.

You see that?

A.      Yes.

Q.      That work was all done before January 7, right?

A.      Yes.

Q.      The second bullet point, Researched and created a number of business intelligent memoranda and identified several entities affiliated with Patrick James and other executives.

That work was done before January 7, right?

A.      Yes.

Page 94

Q.      Let's go to Page 28 of the presentation.

Second bullet point, first sentence says, The presentation that follows is a summary of findings based on the investigation team's review through approximately January 7, 2026, when the investigation team had to cease activity due to budgetary constraints.

Do you see that?

A.      Yes.

Q.      The A&M investigative findings in this report are based on investigative work done on or before January 7, right?

A.      Correct.

Q.      Let's go to Page 35, please. We're in the section about accounts receivable factor.

You see that?

A.      Yes.

Q.      First bullet point says, For witness interviews and extensive reviews of FBG communications and data, the investigation team has found evidence that First Brands Group defrauded factoring

Page 95

Page 46?

A.    At some point, yes.

Q.    When?

A.    When we started working on the declaration of Chuck Moore.

Q.    Specifically with respect to the matching work that was done on the declaration, when did that work start?

A.    I just wanted to point out that we didn't rely on the matching analysis. We've removed all of the conclusions that surrounds the matching analysis.

Q.    That's what we talked about at the beginning of the morning?

A.    Yes.

Q.    To your knowledge, is Charles Moore preparing a new declaration?

A.    I have no idea.

Q.    So, as you understand it, for purposes of the confirmation hearing this week, Charles Moore will not be relying on any of the matching work done by A&M; is that correct?

A.    That's my understanding.

Q.    All right.  Let's go back to

Page 99

factors, right?

A.    So our cash tracing was generally dictated by the litigations that were going on for the most part because we had to get ready for the Patrick James adversary hearing.  Then we were getting ready for the Onset hearing.

So our work started in those areas and basically took us through the times we got our pencils down.

We did not try to do the -- the SPV and its supply chain factoring tracing went through Bowery and through the SPV accounts.  They were a lot more straightforward to trace and they weren't as commingled.

So we did not do any accounts receivable tracing.  It wasn't -- we weren't -- we weren't just provided with a direction go do all the cash tracing that there is at FBG.  That would be an enormous task.

We did it based on selective in response to what we were dealing with.

Q.    It wasn't until June that the

Page 129

A&M investigative team started an analysis of whether or not money coming in from third-party factors was used to pay other third-party factors, right?

A.   I can't remember doing it before then.

Q.   And it was counsel that directed the A&M team to do that work beginning around June or July --

A.   Yes.

Q.   -- right?

A.   Yes.

Q.   At a high level, describe for me the cash tracing exercise that your team undertook with respect to whether money coming in from third-party factors was used to pay other third-party factors.

A.   So I didn't actually perform that task but my understanding is that they were looking for examples where money would have come in and gone out in the same day to the same factor where there was not other funds being commingled, which does not happen frequently.

So basically looking at ending

Page 130

balances and money going in and out right -- right on the same time period.

Q.    You said you all were looking for examples, right?

A.    Uh-huh.

Q.    Was that cash tracing exercise doing anything more than looking at examples?

A.    No.

MS. CALABRESE:  Object to form.

(BY MR. JOHNSON)

Q.    So help me understand what you mean by examples.

What do you mean by examples in terms of the cash tracing exercise that was done?

A.    Well, what do you mean by examples because you asked me, I think.

Q.    Sure.  You've told me that with respect to the investigation about money coming in from third-party factors and whether that was used to pay other third-party factors, that your team looked at examples, right?

A.    Looked for examples.

Q.    So can you give me an example

Page 131

Q.      For what time period did the A&M investigative team look for bank statements or transactions to do this exercise?

A.      I don't know.

Q.      What role did you have in the investigation of whether money coming in from a third-party factor was used to pay another third-party factor?

A.      I want to be clear that it was a data forens- -- it was a data analysis to find an example.  It wasn't a large investigation to do that exercise.

Q.      Other than the examples reflected in Mr. Moore's July 14 investigation, were there other examples identified by the A&M investigative team?

MS. CALABRESE:  Objection.

You mean Mr. Moore's declaration?

MR. JOHNSON:  That is what I meant.  I see that I misstated it.

(BY MR. JOHNSON)

Q.      Let me ask the question again.

Other than the examples

Page 134

reflected in Mr. Moore's July 14 declaration, did the A&M investigative team identify other examples of money coming in from a third-party factor being used to pay other third-party factors?

A.      I'm not sure.

Q.      You told me a few minutes ago that there was, within First Brands, a lot of commingling of funds, right?

A.      Correct.

Q.      What did you mean by that?

A.      There's a lot of bank accounts and the bank accounts get swept from the sites' bank accounts up to corporate on a daily basis and then it gets swept out to a sweep account.

Q.      Let's look back at Exhibit 1, the April 2026 report.  Let's go to Page 48.

Does Page 48 generally describe the cash tracing work, process-wise, that was done by the A&M investigative team as of the date of this report?

A.      Page 48 and 49 both talk about cash tracing.  Yes.

Q.      It says on the fourth bullet

Page 135

of this.  Tell me when you've read both paragraphs.

A.    I know what the paragraphs say.

Q.    Great.

A.    We didn't -- we're -- we're not including this in the declaration anymore. Chuck will not be testifying on this.

Q.    So we can all treat Paragraphs 81 and 82 as not being there; is that right?

MS. CALABRESE:  Object to the extent it calls for a legal conclusion.

THE WITNESS:  Yeah.

MS. CALABRESE:  Answer to the extent of your knowledge.

A.    My understanding is Chuck is not going to be testifying on it.  I don't know what that means logistically for the declaration.

(BY MR. JOHNSON)

Q.    You all have determined that the fraudulent amount percentages in Paragraph 82 are incorrect, right?

A.    We're not going to rely on

Page 165

them, correct.  They were estimates, but we're not going to rely on them.

Q.   Does that also extend to the matching work that's described in Paragraph 81?

A.   Yes.

Q.   And you told me at the beginning of the deposition that you all, after the deposition yesterday, went back and determined that some of the information was incorrect that's in the Paragraph 82 table; is that right?

MR. MARSTERS:  Objection; form.

A.   I didn't talk about eighty -- the Paragraph 82 table before.

(BY MR. JOHNSON)

Q.   The information that's reflected in the Paragraph 82 table, the fraudulent amounts, you all determined that there were mistakes in calculating those amounts; is that right?

MS. CALABRESE:  Object to form.

A.   There was an error in the mapping file that I explained earlier.  And so we are not relying on the estimated fraud

Page 166

amount.

(BY MR. JOHNSON)

Q.      You've reviewed this declaration after July 14, including in preparation for today, right?

A.      Correct.

Q.      How many times have you read the declaration after July 14?

A.      No idea.

Q.      More than one?

A.      I would read pieces here and there.  I don't know.

Q.      How can you be sure that there aren't other mistakes or errors in the declaration?

A.      How can anyone be sure a hundred percent there's no errors somewhere?

Q.      Have you identified any other errors or mistakes in the declaration?

A.      No.

Q.      After July 14, did you do anything to vet or test whether the information in the declaration was correct?

A.      Sure.  I'm sure in reviewing for the deposition, looking at supporting

Page 167