# EXHIBIT 4

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>FIRST BRANDS GROUP, LLC *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-90399 (CML)<br><br>(Jointly Administered) |

**ONSET FINANCIAL, INC.'S OBJECTION TO (I) CONFIRMATION OF THE JOINT
CHAPTER 11 PLAN OF FIRST BRANDS GROUP, LLC AND CERTAIN AFFILIATED
DEBTORS AND (II) FINAL APPROVAL OF THE DISCLOSURE STATEMENT**

---

[1]  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands/. The Debtors' service address for these chapter 11 cases (the "Chapter 11 Cases") is 127 Public Square, Suite 5300, Cleveland, OH 44114.

## TABLE OF CONTENTS

Pages

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT FACTUAL BACKGROUND ................................................................................. 5

I.       The FBG Debtors' Plan and Disclosure Statement ....................................................... 5

II.      Onset's Contributions to the Chapter 11 Cases ............................................................. 9

III.     The Carnaby Debtors' Estate Claims ........................................................................... 10

IV.      The Exclusion of the Carnaby Debtors' Fiduciary and Onset from the Plan Process ...... 10

ARGUMENT ............................................................................................................................. 11

I.       The Court Should Deny Confirmation of the Plan ...................................................... 11

         A.       The Plan Violates Sections 1129(a)(9) and 1129(a)(11) Because It Does Not
                  Provide for Timely Payment of Administrative Expense Claims ........................ 11

                  i.       The Debtors Cannot Manipulate Terminology to Avoid Paying
                           Administrative Expense Claims ............................................................... 13

                  ii.      The Debtors Cannot Currently Pay Their Estimated Administrative
                           Expense Claims ........................................................................................ 15

                  iii.     The FBG Debtors Have Not Shown a Reasonable Likelihood of
                           Recovery Sufficient to Pay Administrative and Priority Claims .............. 16

         B.       The Litigation Trust Funding Is Unreasonable .................................................... 19

         C.       The Plan Inappropriately Prejudices the Carnaby Estate Claims ........................ 23

         D.       The Estate Claims Marketing Process and Estate Claims Credit Bid Do Not
                  Satisfy Section 363 ............................................................................................. 26

                  i.       The Estate Claims Marketing Process Does Not Satisfy Section
                           363(b) of the Bankruptcy Code ............................................................... 26

                  ii.      The Estate Claims Credit Bid Violates Section 363(k) of the
                           Bankruptcy Code ..................................................................................... 26

         E.       The FBG Debtors Have Not Satisfied the Good Faith Requirement of
                  Section 1129(a)(3) of the Bankruptcy Code ....................................................... 27

i. The Asymmetry in Recoveries Under the Plan Does Not Promote a Result Consistent with the Code's Objectives ........................................... 27

ii. Unresolved Conflicts of Interest Infect the Plan and Negotiation Process ................................................................................................. 29

iii. The Deficient Evidentiary Record in Support of Confirmation Is Untested and Prejudicial .......................................................... 30

II. The Court Should Deny Final Approval of the Disclosure Statement ............................. 33

A. Material Risks to Potential Litigation Trust Recoveries Are Not Disclosed ........ 33

B. Administrative Expense Claims Are Not Adequately Quantified ......................... 34

C. Creditors Are Left to Guess the Outcome if the Effective Date Does Not Occur ................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re ACandS, Inc.*,
311 B.R. 36 (Bankr. D. Del. 2004) ..................................................................................30

*Ad Hoc Grp. of Excluded Lenders v. ConvergeOne Holdings, Inc. (In re ConvergeOne Holdings, Inc.)*,
No. 24-02001 (ASH) (S.D. Tex. Sep. 25, 2025) ............................................................20

*Begier v. IRS*,
496 U.S. 53 (1990) ..........................................................................................................28

*In re Bullough*,
No. 05-31531-BJH-11, 2006 WL 6510983 (Bankr. N.D. Tex. Apr. 7, 2006) .................27

*In re Coram Healthcare Corp.*,
271 B.R. 228 (Bankr. D. Del. 2001) ................................................................................30

*Matter of Criswell*,
102 F.3d 1411 (5th Cir. 1997) .........................................................................................28

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D. Tex. 2009) ............................................................................11

*In re Dernick*,
624 B.R. 799 (Bankr. S.D. Tex. 2020) ............................................................................27

*In re Divine Ripe, L.L.C.*,
554 B.R. 395 (Bankr. S.D. Tex. 2016) ............................................................................33

*In re Faye Foods, Inc.*, 766 F. App'x. 204 (6th Cir. 2019) ................................................13

*First Brands Group, LLC v. Onset Financial, Inc.*,
No. 26-03005 (Bankr. S.D. Tex. Jan. 9, 2026) ..................................................................9

*In re Gulf Coast Oil Corp.*,
404 B.R. 407 (Bankr. S.D. Tex. 2009) ............................................................................26

*Irving H. Picard v. Madoff Family Estates.*,
Adv. Pro. Nos. 09-01503 (SMB), 10-03483 (SMB) (Bankr. S.D.N.Y. July 24, 2017) ............................................................................................................................18

*Matter of Jasik*,
727 F.2d 1379 (5th Cir. 1984) .........................................................................................27

iii

*In re LATAM Airlines Grp., S.A.*,
No. 20-11254 (JLG), 2022 WL 790414 (Bankr. S.D.N.Y. Mar. 15, 2022)............................20

*In re Malkus, Inc.*,
No. 03-07711-GLP, 2004 WL 3202212 (Bankr. M.D. Fla. Nov. 15, 2004) ..........................30

*In re Mangia Pizza Invs., LP.*,
480 B.R. 669 (Bankr. W.D. Tex. 2012) ...................................................................................27

*In re Molycorp, Inc.*,
562 B.R. 67 (Bankr. D. Del. 2017) ..........................................................................................12

*In re Northbelt, LLC*,
630 B.R. 228 (Bankr. S.D. Tex. 2020) .....................................................................................27

*In re Pac. Drilling S.A.*,
No. 17-13193 (MEW) (Bankr. S.D.N.Y. Oct. 1, 2018)......................................................20, 21

*In re Peabody Energy Corp.*,
No. 16-42529 (BSS) (Bankr. E.D. Mo. Feb. 28, 2017) ..........................................................32

*In re Potomac Iron Works, Inc.*,
217 B.R. 170 (Bankr. D. Md. 1997) ...................................................................................12, 13

*In re Premier Int'l Holdings, Inc.*,
423 B.R. 58 (Bankr. D. Del. 2010) ..........................................................................................30

*In re Premier Network Services, Inc.*,
No. 04-33402-HDH-11, 2005 WL 6443624 (Bankr. N.D. Tex. 2005) ...................................12

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639, 132 S. Ct. 2065, 182 L. Ed. 2d 967 (2012).......................................................26

*In re Red River Talc, LLC*,
No. 24-90505 (CML) (Bankr. S.D. Tex. Dec. 27, 2024).........................................................32

*In re Robertshaw US Holding Corp.*,
662 B.R. 300 (Bankr. S.D. Tex. 2024) .....................................................................................19

*In re Robertshaw US Holding Corp.*,
No. 24-90052 (Bankr. S.D. Tex. July 31, 2024).......................................................................14

*In re Star Ambulance Serv., LLC*,
540 B.R. 251 (Bankr. S.D. Tex. 2015) .....................................................................................27

*In re Steward Health Care System LLC*
(No. 24-90213 (CML) (Bankr. S.D. Tex.))...............................................................................19

*In re Trinity Fam. Prac. & Urgent Care PLLC,*
   661 B.R. 793 (Bankr. W.D. Tex. 2024) ...................................................................27, 28, 30

*In re Two Streets, Inc.,*
   597 B.R. 309 (Bankr. S.D. Miss. 2019) ...............................................................................12

*United States v. Marc Dreier,*
   No. 09 Cr. 085 (JSR) (S.D.N.Y. Feb. 5, 2010) ...................................................................18

*United States v. Patrick James & Edward James,*
   No. 26 Cr. 29 (AT) (S.D.N.Y.) ............................................................................................16

*United States v. Pelullo,*
   178 F.3d 196 (3d Cir. 1999) .................................................................................................18

*In re Vill. at Camp Bowie I, L.P.,*
   710 F.3d 239 (5th Cir. 2013) ...............................................................................................27

*In re White-Robinson,*
   777 F.3d 792 (5th Cir. 2015) ...............................................................................................32

*Wright v. Sw. Bank,*
   554 F.2d 661 (5th Cir. 1977) ...............................................................................................32

**Statutes**

11 U.S.C. § 363(b) .....................................................................................................................26

11 U.S.C. § 363(k) .....................................................................................................................26

11 U.S.C. § 363(m) ..................................................................................................................4, 7

11 U.S.C. § 503(b) .....................................................................................................................13

11 U.S.C. § 1125 ..........................................................................................................................5

11 U.S.C. § 1129 ..........................................................................................................................2

11 U.S.C. § 1129(a)(1) ...............................................................................................................11

11 U.S.C. § 1129(a)(3) ...............................................................................................................27

11 U.S.C. § 1129(a)(4) ..........................................................................................................19, 20

11 U.S.C. § 1129(a)(9) ...............................................................................................11, 12, 13, 14, 15

11 U.S.C. § 1129(a)(11) .................................................................................................2, 13, 15

v

**Other Authorities**

Black's Law Dictionary (12th ed. 2004)........................................................................ 13

Webster's Third New International Dictionary (2002)................................................. 13

Onset Financial, Inc. ("Onset"), by and through its undersigned counsel, hereby submits this objection (the "Objection") to (a) confirmation of the *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* [Docket No. 3019][2] (as may be amended, modified, and/or supplemented from time to time, the "Plan"),[3] and (b) final approval of the related disclosure statement [Docket No. 3020] (the "Disclosure Statement") filed by First Brands Group, LLC (together with its Debtor and non-Debtor subsidiaries, "First Brands"), and respectfully states as follows:[4]

## PRELIMINARY STATEMENT[5]

1. The FBG Debtors' Plan proposes to transfer estate assets to a Litigation Trust in a manner that provides certain favored parties with outsized returns while nearly $300 million in Allowed Administrative and Priority Claims remain unpaid. This creates a fundamental inconsistency at the heart of the case for confirmation: the claims to be transferred to the Litigation Trust are allegedly so valuable that recoveries sufficient to repay administrative creditors are assured, yet so uncertain that the funding parties are entitled to astronomical returns. Both cannot be true.

2. Not only does the Plan seek involuntary financing from administrative claimholders like Onset, it also operates to prejudice the SPV Debtors. Despite no plan having been filed for the SPV Debtors and no path forward contemplated, the FBG Debtors' Plan irrevocably transfers

---

[2] Unless otherwise stated, citations to the docket will refer to the docket of the Chapter 11 Cases.

[3] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan or the DIP Order, as applicable.

[4] As of the filing of this Objection, discovery with respect to the Plan and Disclosure Statement remain ongoing. Onset reserves all rights to amend, modify, and/or supplement this Objection prior to or at the Combined Hearing (as defined herein).

[5] Capitalized terms used but not otherwise defined in this Preliminary Statement have the meanings ascribed to such terms below.

assets and work product jointly owned and shared among the SPV Debtors and FBG Debtors alike to the Litigation Trust for the FBG Debtors' sole benefit.

3. These cases have been long and hard-fought, but resolution of the FBG Debtors' cases at any cost—particularly the costs borne by administrative expense creditors and the SPV Debtors under this Plan—is not allowed by law. As detailed herein, the Plan fails to satisfy the requirements of section 1129 of the Bankruptcy Code and cannot be confirmed. The Disclosure Statement, failing to provide creditors with key information necessary to cast informed votes, is also inadequate and should not be approved on a final basis.

4. Confirmation fails for the following reasons. *First*, the Plan violates sections 1129(a)(9) and (a)(11) of the Bankruptcy Code because it does not provide for timely payment of Administrative Expense Claims. Under the Plan, payment of Administrative and Priority Claims depends on the Litigation Trust generating sufficient recoveries from its pursuit of Estate Claims to pay its funders—the DIP Lenders—before allocating sufficient proceeds to pay Allowed Administrative Expense Claims or fund a reserve for disputed Administrative Expense Claims. But two significant Estate Claims remain stayed pending a criminal trial scheduled for February 2027, and the Litigation Trust must recover approximately *$1.965 billion* before the Plan can go effective. Payment to administrative and priority claimants is therefore likely years away— if it occurs at all. The FBG Debtors acknowledge this, admitting that payment could be postponed for years, is "inherently uncertain," and depends on "numerous factors outside of the FBG Debtors' control."

5. *Second*, the FBG Debtors do not establish that the terms of the Litigation Trust Funding are reasonable. They do not because they cannot; the returns to be received by the parties providing this financing are incredible. By the time the Litigation Trust has generated sufficient

proceeds to fund recoveries for Administrative and Priority Claims—estimated at $1.965 billion—the funding contributors will have received approximately $286 million, or *5.7x their initial $50 million investment*. And the returns grow from there. The funding parties will continue to receive a percentage of every additional dollar recovered in perpetuity, even after full repayment of their capital, return, and fees. These eye-popping terms were negotiated behind closed doors; Onset has not been permitted to probe those negotiations. The FBG Debtors have offered no evidence that the proposed funding terms are reasonable, reflect market terms, or were subject to a market test.

6. *Third*, the Plan would materially impair the administration of litigation in which the Carnaby Debtors are co-plaintiffs. On information and belief, the provisions of the Plan accomplishing this were drafted without the input, authority, or consent of the SPV Director, the Carnaby Debtors' only independent fiduciary. The Plan transfers Joint Estate Claims, together with related insurance rights, privileged materials, and litigation files, to the Litigation Trust without any mechanism governing continued assertion of common-interest privilege, joint-defense privilege, allocation of insurance proceeds, or coordinated control of litigation materials, even though this work product also belongs to the SPV Debtors. Joint Estate Claims currently prosecuted jointly by the FBG Debtors and the Carnaby Debtors through common counsel will instead be fragmented, prosecuted by separate estate representatives with divergent fiduciary obligations and conflicting litigation objectives. The Court should not confirm a plan allowing fiduciaries with duties to *all* Debtors to prejudice the Carnaby Debtors and their estates.

7. *Fourth*, the Estate Claims Marketing Process does not support the sale of the Estate Claims to the DIP Lenders. The Plan proposes to transfer the Litigation Trust Assets to the DIP Lenders through the Estate Claims Credit Bid without meaningful judicial oversight or a genuine market test. The purported marketing process was conducted unilaterally by the FBG Debtors

3

without court-approved bidding procedures, allowed the FBG Debtors to exclude potential bidders at their sole discretion, and was announced only after the Plan Settlement had already been negotiated. Moreover, the Debtors have conceded that DIP Lenders knowing "more about the assets than potential bidders is not unusual" (MTC Objection[6] ¶ 21), acknowledging an informational asymmetry that makes it effectively impossible for any other bidder to truly compete. And bidders certainly could not compete with the FBG Debtors effectively gifting the DIP Lenders the Avoidance Actions, which are included in the Estate Claims Credit Bid despite the DIP Lenders having no liens on them. These procedures represent a clear attempt to retrofit the marketing process to justify a pre-agreed credit bid and do not support any findings that may be requested of this Court, including that the sale is for fair value and that the DIP Lenders are entitled to the protections of section 363(m) of the Bankruptcy Code.

8.  *Fifth*, the Plan was not proposed in good faith as required by section 1129(a)(3). The Plan was negotiated in a Mediation that was open only to the parties who benefit most from it—the FBG Debtors, the Ad Hoc Group of DIP Lenders, and the Creditors' Committee—while those most detrimentally affected, including the Carnaby Debtors, were excluded. The resulting structure is a win-win for the DIP Lenders: through the Estate Claims Credit Bid, they convert their debt into a portion of every dollar recovered from the Litigation Trust—without any independent valuation—and install themselves atop the Litigation Trust Waterfall ahead of the administrative and priority creditors whose goods, services, and forbearance preserved these estates. Those same administrative and priority creditors stand to be repaid only after the DIP Lenders take home outsized returns, and risk never recovering at all. Further, the deficient and

---

[6] *Debtors' Omnibus Objection to the Emergency Motions to Compel Filed by the LAM Parties (Dkt. 3210) and Katsumi (Dkt. 3211) and the Joinders Filed by Onset (Dkt. 3223) and Evolution (Dkt. 3224)* [Dkt. No. 3235] (the "MTC Objection").

prejudicial evidentiary record raises serious concerns about good faith. So too does the Debtors' tiresome presentation of untested allegations against Onset, which is again placed before this Court as the Debtors simultaneously press to stay the Onset Adversary Proceeding they initiated.

9.   As for the Disclosure Statement: though conditionally approved, final approval should not be granted, as the Disclosure Statement fails to provide adequate information as required by section 1125 of the Bankruptcy Code. Among other things, the Disclosure Statement does not meaningfully disclose the substantial litigation risks associated with the Estate Claims, fails to disclose the amount of potential additional Administrative Expense Claims, and does not explain what will happen if the Effective Date never occurs. Creditors were asked to vote on a Plan proposed to be funded almost entirely through uncertain litigation recoveries without the information necessary to evaluate the probability, timing, or amount of those recoveries.

10.  For these reasons and as described more fully below, the Court should deny confirmation of the Plan and final approval of the Disclosure Statement.

## RELEVANT FACTUAL BACKGROUND

### I.   The FBG Debtors' Plan and Disclosure Statement

11.  The FBG Debtors filed the Plan on June 16, 2026, and the Disclosure Statement on June 17, 2026. Ahead of the June 12, 2026, hearing (the "June 12 Hearing") on conditional approval of the Disclosure Statement and in support thereof, the FBG Debtors filed the *Declaration of Charles M. Moore in Support of (I) the Proposed Confirmation Schedule and (II) the Debtors' Objection to United States Trustee's Motion to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b)* [Docket No. 2911] (the "First Moore Declaration"). The Plan and Disclosure Statement are supported by the *Declaration of Charles M. Moore in Support of Confirmation of FBG Debtors' Chapter 11 Plan* [Docket No. 3188] (the "Second Moore Declaration" and together with the First Moore Declaration the "Moore Declarations") and *Declaration of Marc S. Kirschner*

5

[Docket No. 3190] (the "Kirschner Declaration"), both of which were not filed until four weeks later (only six days before the Plan objection deadline). As of the filing of this Objection, the Moore Declarations and the Kirschner Declaration are the only evidence offered by the FBG Debtors in support of the Plan.

12. The Plan reflects a settlement (the "Plan Settlement") among the FBG Debtors, the Ad Hoc Group of DIP Lenders, and the Creditors' Committee, following a months-long mediation (the "Mediation") between such parties, regarding the wind-down of the FBG Debtors' estates. *See* Disclosure Statement, at 1 (PDF 13 of 307). Onset participated in the Mediation with respect to certain discrete issues but was excluded from Mediation discussions concerning the negotiation and formulation of the Plan and Plan Settlement. To Onset's knowledge, the Plan Settlement does not reflect any input from other key stakeholders in these Chapter 11 Cases, including the SPV Director (as defined below), Onset, or any other factoring or off-balance sheet financier.

13. Following the June 12 Hearing, the Court entered an order conditionally approving the Disclosure Statement and scheduling the hearing (the "Combined Hearing") to consider approval of the Disclosure Statement on a final basis and confirmation of the Plan for July 28, 2026, at 9:00 a.m. (prevailing Central Time).

14. Before proposing the Plan, the FBG Debtors ceased operating as a going concern. The FBG Debtors consummated certain going-concern sales of certain business segments and retained Hilco Merchant Resources, LLC to liquidate their remaining inventory. *See* Disclosure Statement at 53–55, 85–86 (PDF 65–67, 97–98 of 307). By the time the Plan was negotiated, the FBG Debtors no longer operated any business, had terminated the vast majority of their employees, and had no ongoing operations to reorganize.

15.     The Plan proposes a series of transactions whereby the FBG Debtors will transfer their assets to three newly-created trusts: the DIP Collateral Trust, the ABL Collateral Trust, and the Litigation Trust. *See* Disclosure Statement, at 1–2 (PDF 13–14 of 307). The creation of the Litigation Trust is premised on a sale to the DIP Lenders "via credit bid and other consideration" (referred to as the "Estate Claims Credit Bid") of "all Estate Claims and certain other assets of the FBG Debtors as set forth in the Plan" (referred to as the "Litigation Trust Assets"). *See id*. at 2 (PDF 14 of 307).

16.     On the Confirmation Date, (i) the Estate Claims Credit Bid Transaction and the DIP Collateral Credit Bid Transaction will be consummated; (ii) the Litigation Trust, the DIP Collateral Trust, and the ABL Collateral Trust will each be established and the applicable assets will be transferred thereto; (iii) holders of Allowed Claims will receive their respective Litigation Trust Interests, DIP Collateral Trust Interests, or ABL Collateral Trust Interests, as applicable; and (iv) the Litigation Trust Cash Funding of $25 million will be transferred to the Litigation Trust. *See* Plan §§ 5.2, 5.3. In the Plan, the FBG Debtors state that they will request that the Bankruptcy Court find that "(i) the Estate Claims Credit Bid Transaction is (a) in exchange for good and valuable consideration, (b) in the best interests of the FBG Debtors and their Estates, (c) fair, equitable, reasonable, and free and clear, and (d) effected after due notice and opportunity for hearing; and (ii) the relevant parties are afforded the protections of section 363(m) of the Bankruptcy Code." Plan § 5.2(e). As of the date hereof, no proposed confirmation order has been filed.

17.     Proceeds of the Litigation Trust Assets will be distributed to three classes of beneficiaries in the following order pursuant to the waterfall (the "Litigation Trust Waterfall") set

7

forth in the Plan: Class 1 (Litigation Trust Class 1 Funding Contributors[7]), Class 2 (DIP A Claims[8]), and Class 3 (Administrative Expense Claims, Priority Tax Claims, Other Priority Claims (collectively, "Administrative and Priority Claims"), Settled Administrative Expense Claims, Roll-Up Claims, General Unsecured Claims, First Lien Claims, and Second Lien Claims). Disclosure Statement, Ex. E, at 5; First Moore Decl., Ex. B, at 5. Under the Litigation Trust Waterfall, Administrative Expense Claims do not begin to receive any distributions until aggregate distributions from the Litigation Trust exceed $350 million. *See* Disclosure Statement, at 27–28 (PDF 39–40 of 307); Plan §§ 6.5(a)(ii)– (iii). The FBG Debtors project that Administrative and Priority Claims will not be fully funded until the Litigation Trust has recovered approximately $1.965 billion in aggregate distributable proceeds (assuming no additional litigation trust funding that further dilutes recoveries available to pay administrative creditors is needed or obtained). *See* Disclosure Statement, at 22 (PDF 34 of 307); First Moore Decl., Ex. B, at 9; Second Moore Decl. ¶ 228. That figure is based on Mr. Moore's estimation of Administrative Expense Claims as of June 26, 2026, which figure may be higher or lower as no bar date for submitting Administrative Expense Claims has been established.

18. The Effective Date of the Plan is conditioned upon the Litigation Trust and/or the DIP Collateral Trust having enough cash on hand to satisfy all Allowed Administrative and Priority Claims *and* fund a reserve for disputed Administrative and Priority Claims. Plan § 12.1(o). The Disclosure Statement acknowledges that "there will be a significant executory period between

---

[7] The Litigation Trust Funding Contributors are DIP Lenders who have chosen to participate in funding the Litigation Trust.

[8] The same constituency of DIP A lenders appears to be funding both the Litigation Trust and DIP Collateral Trust (collectively, the "Trusts"). Therefore, in addition to what they are receiving under the Litigation Trust, the same parties are receiving the greater of 20% internal rate of return or 1.75x multiple on invested capital on their $20 million of funding for the DIP Collateral Trust. *See* Plan, at 73 (PDF 79 of 125). The Plan also provides that for each of the Trusts, Allowed DIP A Claims will not be reduced on account of the Estate Claims Credit Bid. *See* Plan, at 57, 74 (PDF 63, 80 of 125).

the Confirmation Date . . . and the Effective Date" during which holders of Allowed Administrative Expense Claims (who do not opt in to the Administrative Expense Claims Consent Program) will receive nothing. Disclosure Statement, at 24, 26 (PDF 36, 38 of 307).

## II.     Onset's Contributions to the Chapter 11 Cases

19.     Onset holds Administrative Expense Claims against the FBG Debtors of at least $14,510,528.86. Pursuant to the *Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Onset Financial, Inc.* [Docket No. 732] (the "Onset AP Order"), Onset agreed to permit the Debtors to continue using Onset's equipment and inventory assets in the ordinary course, thereby enabling continued operations and going-concern sales. But the FBG Debtors failed to make required adequate protection payments beginning January 1, 2026. *See Onset Financial Inc.'s Emergency Motion (1) for Relief from the Automatic Stay, and (2) to Enforce the Onset AP Order* [Docket No. 2011] ¶ 27. Despite these breaches, Onset has cooperated in good faith with the FBG Debtors, the DIP Lenders, and the ABL Lenders, consenting to $244.5 million in asset sales and agreeing to allocate proceeds notwithstanding Onset's ownership interests.

20.     Meanwhile, the FBG Debtors initiated an adversary proceeding against Onset (the "Onset Adversary Proceeding") challenging Onset's claims, then obtained a series of stays holding the litigation in abeyance—leaving Onset with no forum to contest the FBG Debtors' allegations even as the FBG Debtors advance a Plan that relies on those same unresolved claims. *See Complaint, First Brands Group, LLC v. Onset Financial, Inc.*, No. 26-03005 (Bankr. S.D. Tex. Jan. 9, 2026) [Onset Adv. Pro. Docket No. 1]; *Order Staying Adversary Case Deadlines and Discovery* [Onset Adv. Pro. Docket No. 78].

9

## III.     The Carnaby Debtors' Estate Claims

21.     The Carnaby Debtors[9] hold significant estate claims (the "Carnaby Estate Claims"), including approximately $1.1 billion in prepetition transfers to insiders disclosed in their schedules. *See Global Notes and Statements of Limitations, Methodology, and Disclaimers Regarding Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* [Docket Nos. 1538, 1597]. The Disclosure Statement recognizes that the Carnaby Debtors and FBG Debtors both assert claims arising from the same underlying conduct (the "Joint Estate Claims") and states that "all rights regarding allocation of proceeds" are preserved. Disclosure Statement, at 2 (PDF 14 of 307). But the Plan's mechanics fail to accomplish this promise.

22.     The Litigation Trust will receive all "attorney-client privileges, work product protections, joint client privilege, mediation privilege, common interest or joint defense privilege or protection and all other privileges, immunities or protections" with respect to the Estate Claims—including Joint Estate Claims—with the right to waive any privilege subject only to FBG Debtor consent, not any SPV Debtor. Plan § 6.2(d). The Litigation Trust Assets also include all Insurance Rights under the D&O Policies, even though the Carnaby Debtors are co-insureds. Plan, at 19 (PDF 25 of 125). The Plan contains no mechanism for allocating or sharing insurance proceeds among the various insureds.

## IV.     The Exclusion of the Carnaby Debtors' Fiduciary and Onset from the Plan Process

23.     Onset and other creditors have repeatedly objected that the FBG Debtors' management and professionals labor under conflicts of interest that prevent them from adequately representing the SPV Debtors' interests. *See* Raistone UST Objection [Docket No. 621] ¶¶ 2–13;

---

[9]     "Carnaby Debtors" means Carnaby Inventory IV, LLC and Carnaby FA, LLC.

Retention Objection [Docket No. 680] ¶¶ 24–36.[10] In response, the FBG Debtors noted the appointment of Benjamin Duster as "independent director" (the "SPV Director") for the SPV Debtors. See Debtors' Omnibus Reply [Docket No. 870] ¶¶ 2, 26–27. Yet Onset understands the SPV Director was excluded from the portions of the Mediation that produced the Plan Settlement—even though the Plan directly affects assets, claims, and privileges belonging to the Carnaby Debtors. Onset was likewise excluded. *See* Disclosure Statement, at 1 (PDF 13 of 307).

## ARGUMENT

### I. The Court Should Deny Confirmation of the Plan

24.     A plan may be confirmed only if all requirements of section 1129(a) are satisfied. 11 U.S.C. § 1129(a)(1). For the reasons detailed below, the FBG Debtors cannot satisfy their burden of demonstrating that the Plan complies with section 1129(a). *See, e.g., In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009). The Plan cannot be confirmed.

#### A. The Plan Violates Sections 1129(a)(9) and 1129(a)(11) Because It Does Not Provide for Timely Payment of Administrative Expense Claims

25.     Section 503 of the Bankruptcy Code grants priority to claims arising from "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b). Section 1129(a)(9) enforces this priority at confirmation: a holder of an administrative expense claim must "receive on account of such claim ***cash equal to the allowed amount of such claim***"

---

[10]     Similar objections were filed by all of the other SPV Lenders. *See Limited Objection of Evolution Inventory Lender to Application of Debtors for Authority to Retain and Employ Weil, Gotshal & Manges LLP as Attorneys for Debtors Effective as of the Petition Date* [Docket No. 462]; *Omnibus Limited Objection and Reservation of Rights of UMB Bank, N.A. to Applications of Debtors for Authority to Retain and Employ (I) Weil, Gotshal & Manges LLP, (II) Lazard Freres & Co., LLC, and (III) Alvarez & Marshal [sic] North America, LLC* [Docket No. 644]; *Aequum Capital Financial II LLC's Joinder to the Omnibus Limited Objection and Reservation of Rights of UMB Bank, N.A. to Applications of Debtors for Authority to Retain and Employ (I) Weil, Gotshal & Manges LLP, (II) Lazard Freres & Co., LLC, and (III) Alvarez & Marshal [sic] North America, LLC* [Docket No. 656]; *Omnibus Limited Objection of the Carnaby Secured Lenders to Debtors' Motion to Authorize the Retention of Professionals* [Docket No. 649].

11

on the "effective date of the plan" unless the holder has agreed to different treatment. 11 U.S.C. § 1129(a)(9)(A).

26.     The effective date must bear a reasonable relationship to the timing of confirmation—a plan may provide for a short delay tied to finality or legitimate implementation steps, but not an indefinite one. *In re Potomac Iron Works, Inc.*, 217 B.R. 170, 173–75 (Bankr. D. Md. 1997) (one-year delay "to buy extra time to collect accounts receivable" was unreasonable where debtor "d[id] not have the cash" and "may never collect that sum," forcing priority claimants "to bear all the risk of the plan"). Courts have also required secured creditors to invade their collateral to satisfy administrative claims. *See In re Molycorp, Inc.*, 562 B.R. 67, 78 (Bankr. D. Del. 2017) ("[I]f the secured parties desire confirmation, the administration claims must be paid in full in cash at confirmation even if it means invading their collateral."). As the bankruptcy court in *In re Premier Network Services, Inc.* explained:

> [U]nder the present Plan the effective date . . . is further conditioned on sufficient funds. The proponents need cash to pay administrative expenses, as required by § 1129. However, they do not have the funds presently . . . ***Courts are typically reluctant to confirm a plan that shifts risk to the claimants. . . . Although the present Plan proposes to pay claimants required to be paid on the effective date, extending and creating uncertainty as to the effective date forces these priority claimants to subsidize the proposed joint Plan and bear the risk of failure.***

No. 04-33402-HDH-11, 2005 WL 6443624, at *6 (Bankr. N.D. Tex. 2005) (emphasis added).

27.     A delayed and indeterminate effective date also implicates the feasibility requirement of section 1129(a)(11), which permits confirmation only if the plan is "not likely to be followed by the liquidation, or the need for further financial reorganization" of the debtor. 11 U.S.C. § 1129(a)(11). In the liquidating plan context, courts ask whether the liquidation itself will generate sufficient funds to satisfy plan obligations. *See In re Two Streets, Inc.*, 597 B.R. 309, 317

12

(Bankr. S.D. Miss. 2019) (denying confirmation where debtor "failed to demonstrate that there will be sufficient funds to pay the administrative and priority claims").

28. The Plan fails to satisfy both section 1129(a)(9)'s mandate that priority claims be paid in full in cash on the effective date and section 1129(a)(11)'s requirement that the Plan be feasible.

      i.    <u>The Debtors Cannot Manipulate Terminology to Avoid Paying Administrative Expense Claims</u>

29. As a preliminary matter, instead of complying with section 1129(a)(9)'s requirements to pay administrative claims in full on the "effective date of the plan," the Debtors attempt to reinvent the concept of an "effective date." This fails; this Plan is effective on the Confirmation Date in every relevant way other than the payment of administrative expense claims.

30. While the Bankruptcy Code does not define "effective date," its ordinary meaning has long been understood. Webster's Third New International Dictionary defines "effective" as "being in effect" or "operative." *Effective*, Webster's Third New International Dictionary (2002). Black's Law Dictionary similarly defines "effective date" as "[t]he date on which a statute, contract, insurance policy, or other such instrument becomes enforceable or otherwise takes effect." *Effective date*, Black's Law Dictionary (12th ed. 2024). In other words, under its plain and ordinary meaning, the "effective date" of a plan is the date on which the plan actually goes into effect and becomes operative—the date its provisions are implemented and binding upon creditors and distributions commence—and not some artificial, deferred milestone. *See In re Faye Foods, Inc.*, 766 F. Appx. 204, 211-212 (6th Cir. 2019); *Potomac Iron Works*, 217 B.R. at 172.

31. Other cases involving administratively insolvent debtors dependent on liquidation proceeds to pay administrative claims have solved this issue by delaying true plan effectiveness until those claims could be paid in full. For example, in *Sears Holdings Corporation*, Judge Drain

approved the administratively insolvent debtors' liquidating plan under which a portion of administrative claims were to be paid out of anticipated litigation proceeds. Case No. 18-23538 (Bankr. S.D.N.Y. Oct. 19, 2019) [Docket No. 5370]. Critically, however, the *Sears* plan (i) had binding effect only upon its effective date, (ii) delayed any vesting of assets until administrative creditors were paid in full, and (iii) made any releases subject to its effective date occurring. The same was true in *Robertshaw*: the plan had "no force and effect" unless and until the effective date occurred, which was when the liquidating trust was established and any releases became effective. *In re Robertshaw US Holding Corp.*, No. 24-90052 at 60-61, 70 (Bankr. S.D. Tex. July 31, 2024) [Docket No. 857]. Not so here.

32.    Here, by contrast, the Plan becomes "effective" within the meaning of section 1129(a)(9) long before the "Effective Date," for on the Confirmation Date: (i) all Litigation Trust Assets, DIP Collateral Trust Assets, and ABL Collateral Trust Assets are transferred to the applicable trusts and vest free and clear of all liens, claims, and encumbrances; (ii) the Litigation Trustee, DIP Collateral Trustee, and ABL Collateral Trustee assume management of all property dealt with by the Plan; (iii) distributions to the DIP Lenders and ABL Lenders commence pursuant to the credit bid transactions; and (iv) the Plan becomes binding on all parties. *See* Plan §§ 5.2, 5.3, 6.1, 7.1, 8.1, 13.1, 13.2, 15.11. The only event of economic substance that the Plan defers until the "Effective Date" is the funding of Administrative and Priority Claims.

33.    Thus, by the time administrative claimants find out whether the "Effective Date" will in fact occur, irrevocable Plan transactions will have closed and distributions to secured creditors will have commenced. Administrative creditors will have no recourse if the "Effective Date" never occurs. Not only is this attempt to redefine "effective date" as is it is used in section 1129(a)(9) infirm as a matter of statutory interpretation, permitting the manipulation of the

Bankruptcy Code in this manner would set a dangerous precedent, enabling future debtors to selectively satisfy requirements for plan effectiveness that benefit themselves—and their favored creditors—while indefinitely deferring those requirements designed to protect others.

        ii.      <u>The Debtors Cannot Currently Pay Their Estimated Administrative Expense Claims</u>

34. Even setting aside the foregoing—and accepting for argument's sake the FBG Debtors' artificial definition of "Effective Date"—the Plan still fails. The FBG Debtors cannot demonstrate that the Effective Date will ever occur, and therefore cannot satisfy either section 1129(a)(9) or section 1129(a)(11).

35. The FBG Debtors admit that they cannot currently pay their estimated approximately $222 million[11] in Administrative Expense Claims. *See* June 12, 2026 Hr'g Tr. [Docket No. 3016], 35: 5–7 ("Q. But just . . . so we're clear, they don't have the money to pay [administrative claims] today? A. No. As the Debtors, we do not have $222 million [in cash on hand today]."). The First Moore Declaration further states that the FBG Debtors' budget through the proposed confirmation hearing—which relies on continued OEM funding, ABL Secured Party funding, and freed cash reserves—is designed only to fund case costs through the anticipated Confirmation Date, not to pay Administrative Expense Claims. *See* First Moore Decl. ¶¶ 10–11. As such, the FBG Debtors cannot satisfy their burden to demonstrate compliance with section 1129(a)(9) of the Bankruptcy Code. The Plan may be denied on that basis alone.

---

[11] As of mid-May 2026, the FBG Debtors have estimated accrued and unpaid administrative expense claims of approximately $222 million, comprised of (i) $147 million in unpaid administrative expense claims incurred since the Petition Date, (ii) approximately $38 million of 503(b)(9) claims, and (iii) an additional 20% estimate for expenses that have not yet been invoiced. *See* First Moore Decl. ¶ 10. The First Moore Declaration provides that the aggregate amount of Allowed Administrative and Priority Claims is approximately $300 million. *See* First Moore Decl., Ex. B, at 9.

36.     Moreover, the FBG Debtors' estimate of Allowed Administrative Expense Claims does not include, among other things, contingent administrative expense claims that may be asserted by any factoring party or the approximately $53 million administrative expense claim asserted by Longkou Haimeng Machinery Co., Ltd. *See* Disclosure Statement, at 81–82 (PDF 93–94 of 307). Accordingly, from and after the Combined Hearing, the actual amount of Administrative Expense Claims may be materially higher than the FBG Debtors' estimate and holders thereof, like Onset and the Carnaby Debtors, are likely to be at an even greater disadvantage than the FBG Debtors currently admit.

### iii.     The FBG Debtors Have Not Shown a Reasonable Likelihood of Recovery Sufficient to Pay Administrative and Priority Claims

37.     Administratively insolvent today, the FBG Debtors cannot establish that they will ever reach administrative solvency.

38.     Among other potential hindrances,[12] two significant Estate Claims are stayed pending a criminal trial currently set for February 2027.[13] Even if these Estate Claims proceed on

---

[12]     For example, the FBG Debtors fail to account for the uncertainty surrounding the availability and amount of potential D&O insurance proceeds. To the extent the applicable D&O policies are eroding policies, defense costs incurred in the ongoing civil and criminal proceedings continue to reduce the insurance proceeds potentially available to the Litigation Trust.

[13]     The United States Attorney for the Southern District of New York's criminal indictment of former First Brands executives Patrick and Edward James in *United States v. Patrick James & Edward James*, No. 26 Cr. 29 (AT) (S.D.N.Y.) (the "Criminal Case") is not set to go to trial until February 9, 2027, with a status conference currently set for October 5, 2026. The Criminal Case has significantly affected the PJ Adversary Proceeding and the Onset Adversary Proceeding (each as defined herein). In February 2026, this Court granted the Debtors' emergency motion for a blanket 60-day stay of the PJ Adversary Proceeding. [PJ Adv. Pro. Docket No. 160]. In April 2026, it granted the United States' motion to intervene and stayed all discovery pending resolution of the Criminal Case. [PJ Adv. Pro. Docket No. 181]. A similar cadence has governed the Onset Adversary Proceeding. The Court entered a corresponding blanket 60-day stay of the proceeding in February 2026, following which it granted the United States' motion to intervene and stay all discovery pending resolution of the Criminal Case. [Onset Adv. Pro. Docket Nos. 78, 127]. In June 2026, the Court granted the Debtors' motion to further extend the blanket stay of the proceeding. [Onset Adv. Pro. Docket No. 136]. Onset has consistently opposed any stay of the merits of the Onset Adversary Proceeding. It has filed numerous briefs for reconsideration of the Debtors' blanket stay [Onset Adv. Pro. Docket Nos. 100, 103, 123, 129; *see also* Docket No. 130], as well as a proposed case schedule [Onset Adv. Pro. Docket No. 132] that would have permitted briefing and resolution of any party's pending Rule 12 motions—which require no discovery—while preserving the stay of discovery.

schedule, the FBG Debtors have offered scant evidence to support the value of the Litigation Trust Assets, how long it will take to monetize them, what it will cost to enforce any judgments, or whether they will ever generate the billions of dollars in proceeds assumed by the Plan. At the June 12 Hearing, Mr. Moore testified that the Estate Claims are worth "north of $7 billion." [Docket No. 3016] June 12, 2026 Hr'g Tr., 131:15-132:13. The FBG Debtors now argue those claims target approximately $25.4 billion in transfers—but the actual *value* of the claims themselves is ill-supported.

39. The only evidence proffered is the Kirschner Declaration, which purports to opine on the value of the Estate Claims but in fact provides no valuation at all and offers no testable basis for its conclusions. The claim-by-claim "valuation" discussion consists almost entirely of restating—without independent verification—the factual statements in the Second Moore Declaration.[14] Mr. Kirschner admits that the "total gross amount potentially available" for all Estate Claims was "provided by the FBG Debtors" (Kirschner Decl. ¶ 31); he accepts this provided value without question, then provides a superficial and conclusory overview of various legal theories, without addressing the costs, risks, or timing of any particular claim. The declaration provides no methodology, discount rate, or claim-specific probability of success from which a factfinder could test or replicate the analysis. This is unsurprising given the timeline: Mr. Kirschner began work on June 20, 2026 (Kirschner Decl. ¶ 19), meaning his entire analysis—spanning at least five categories of claims against dozens of defendants, multiple alleged fraudulent schemes, and complex off-balance-sheet financing structures—was compressed into less than a month.[15]

---

[14]  *See, e.g.*, Kirschner Decl. ¶¶ 32, 34, 56, 61, 88, 126, 132, citing Second Moore Decl. ¶¶ 80–102, 105–139, 141–167.

[15]  Onset reserves all rights to move the Court with respect to the propriety and admissibility of the Declarations, and any testimony derived therefrom. Nothing in this Objection shall constitute a waiver of any right, claim, defense, or objection available to Onset with respect to any Declaration.

40. Among other glaring omissions in the analysis, there is no meaningful acknowledgement of serious collectability issues with respect to certain Estate Claims. In the PJ Adversary Proceeding (as defined below), the FBG Debtors themselves sought an injunction based on the "immediate and significant risk" that Patrick James would transfer assets offshore, "potentially in ways that may make [such] funds difficult or impossible to recover." PJ Adv. Pro. Docket No. 18, ¶ 23. Having anticipated this risk, the FBG Debtors cannot now ignore it—yet the Kirschner Declaration pays it lip service at best, noting only that it is "reasonable to conclude" the Department of Justice would take steps to prevent defendants from dissipating assets. Kirschner Decl. ¶ 145. These conclusory and unverifiable opinions fail entirely to account for an existential risk to the only active cases in the Estate Claims portfolio.[16]

41. Forfeiture risk compounds the problem. If the government obtains a forfeiture order in the Criminal Case, the FBG Debtors will be subjected to a claims process before receiving any recoveries. *See United States v. Pelullo*, 178 F.3d 196, 201–02 (3d Cir. 1999). The FBG Debtors have disclosed no agreement with the DOJ on coordination of recoveries. Any recovery from Patrick James (or Ed James) therefore remains speculative—a reality with which the Kirschner Declaration fails to engage.[17]

42. Recent cases concerning administratively insolvent liquidating debtors illustrate that a delayed effective date is only appropriate where such date is found to be reasonably likely

---

[16]  Mr. Kirschner expresses optimism that the Litigation Trust and Department of Justice will cooperate, but again offers nothing concrete or testable. Kirschner Decl. ¶ 145.

[17]  *See*, *e.g.*, *Irving H. Picard v. Madoff Family Estates*, Adv. Pro. Nos. 09-01503 (SMB), 10-03483 (SMB) [Docket No. 311] (Bankr. S.D.N.Y. July 24, 2017) (approving a stipulation among Picard, in his capacity as SIPA trustee, the U.S. Government, and the defendants in those actions pursuant to which the SIPA trustee and the U.S. Government would share equally in any recoveries from such defendants, with each distributing its share in accordance with its respective claims process); *see also United States v. Marc Dreier*, No. 09 Cr. 085 (JSR) (S.D.N.Y. Feb. 5, 2010) (approving coordination agreements between the chapter 11 trustee for Mr. Dreier and the U.S. Government governing the administration of the overlapping bankruptcy and forfeiture proceedings and coordinating distributions to victims and claimants).

18

to occur, as supported by robust evidence. In *In re Robertshaw US Holding Corp.*, 662 B.R. 300 (Bankr. S.D. Tex. 2024), the Court confirmed a liquidating plan where the debtors' financial advisor testified that proceeds of the sale of the debtors' assets would be sufficient to make all distributions, and if they were not, the purchaser had agreed to fund any shortfall on or prior to the effective date. *Id.* at 321–22. Here, by contrast, no party has committed to fund any shortfall for administrative claimants to ensure the Plan goes effective.

43.     This case is also distinguishable from *In re Steward Health Care System LLC*, Case No. 24-90213 (Bankr. S.D. Tex.). In *Steward*, this Court confirmed a liquidating plan where the debtors needed to recover approximately $300 million on claims to satisfy administrative creditors, and where the record included $46 million in non-litigation assets, market-tested funding commitments, and detailed recovery evidence. *See Steward* Confirmation Hr'g Tr. 29:17-20, 37:8-18, July 16, 2025. Here, the FBG Debtors must recover approximately $1.9 billion before the Plan may go effective. That is a significantly larger recovery, which will inevitably come with collectability hurdles, with none of the evidentiary support provided in *Steward*. And unlike *Steward*, where substantial litigation was already underway and recoveries had been realized, the only two adversary proceedings that have been initiated here are stayed until at least 2027.

44.     In sum, the FBG Debtors have failed to establish that the Effective Date will occur at all—the FBG Debtors do not have sufficient cash to pay Administrative and Priority Claims, and the speculative nature of the Litigation Trust recoveries makes it impossible to determine with any semblance of certainty whether such will ever be paid. The Plan, by its own terms, may never become effective, and accordingly cannot be confirmed.

## B.     The Litigation Trust Funding Is Unreasonable

45.     Section 1129(a)(4) of the Bankruptcy Code requires that for a plan to be confirmed, "[a]ny payment made or to be made by the proponent . . . in connection with the plan and incident

19

to the case, has been approved by . . . the court as reasonable." 11 U.S.C. § 1129(a)(4). Here, the terms of the Litigation Trust's proposed funding (the "Litigation Trust Funding") are well beyond the bounds of reasonable, and the FBG Debtors offer no support for the reasonableness of such terms.

46.     When approving financing, the relevant question is whether the economics are reasonable in light of the risk assumed, alternatives available, and market evidence, and whether the funders are receiving value beyond what is justified by the commitment. *See In re Pac. Drilling S.A.*, No. 17-13193 (MEW), 2018 WL 11435661 (Bankr. S.D.N.Y. Oct. 1, 2018); *In re LATAM Airlines Grp., S.A.*, No. 20-11254 (JLG), 2022 WL 790414 (Bankr. S.D.N.Y. Mar. 15, 2022); *Ad Hoc Grp. of Excluded Lenders v. ConvergeOne Holdings, Inc. (In re ConvergeOne Holdings, Inc.)*, No. 24-02001 (ASH), 2025 WL 4700341 (S.D. Tex. Sep. 25, 2025). Terms cannot be merely negotiated with existing lenders behind closed doors. *Pac. Drilling*, No. 17-13193 (MEW), [Docket No. 631, at 5].

47.     In *Pacific Drilling*, the court recognized that certain backstop commitments could be permissible but emphasized that fees must compensate for real financing risk and cannot serve as a disguised distribution to favored creditors. *Id.* at 5–6. Similarly, in *LATAM*, the court evaluated backstop arrangements by looking at the economics of the entire package, including market comparables. *LATAM*, 2022 WL 790414, at **27–34. And in *ConvergeOne*, the district court rejected parts of an exclusive, non-market-tested opportunity available only to selected creditors. *ConvergeOne*, No. 24-02001, slip op. at 13–22.

20

48.     Identical concerns abound here. Here, the Litigation Trust Funding was negotiated behind the closed doors of the Mediation in which only select parties participated.[18] The FBG Debtors offer no evidence demonstrating the economic reasonableness of the proposed funding terms, the necessity of the proposed returns, or that the arrangement reflects market terms or was subject to any post-Mediation market testing.[19] Unable to investigate the negotiations or the propriety of the financing terms, the parties and the Court are left to conclude that the proposed arrangement is designed to benefit a favored group of creditors.[20]

49.     The FBG Debtors estimate that the threshold for payment in full of Class 1 claims is approximately $90 million, which is inclusive of the $50 million funding, approximately $38 million for the 20% internal rate of return / 1.75x multiple on invested capital hurdle, and approximately $3 million of backstop fees. First Moore Decl., Ex. B, at 11. The FBG Debtors estimate that holders of Class 2 Litigation Trust Interests will continue receiving distributions until aggregate Litigation Trust recoveries reach approximately $1.85 to $1.88 billion, at which point Class 2 will have been paid in full and will cease participating in further distributions.[21] *Id.* at 9-11. Until that threshold is reached, and only after the Litigation Trust has first recovered $350 million, holders of Allowed Administrative Expense Claims begin to receive a 16% share of Litigation

---

[18]   *Pac. Drilling*, No. 17-13193 (MEW), [Docket No. 631, at 10] ("I am concerned that nobody else was given a similar opportunity, which raises the possibility again that the backstop fee is really just an extra payment and an extra recovery rather than a reasonable, stand-alone financing term.").

[19]   *Pac. Drilling*, No. 17-13193 (MEW), [Docket No. 631, at 11] ("I hope that in the future when these structures are presented, the parties will explore in more detail the issues and concerns that I have raised.").

[20]   The terms of the DIP Collateral Trust similarly favor the DIP Lenders. To the extent Allowed Administrative Expense Claims have not been repaid in full from the Litigation Trust, holders are also entitled to receive distributions from the DIP Collateral Trust, but only after the Allowed DIP A Claims have been repaid in full from the aggregate distributions made from both the Litigation Trust and the DIP Collateral Trust. *See* Plan § 7.4(a)(iv); Disclosure Statement, at 28 (PDF 40 of 307).

[21]   The Plan, however, does not provide for a cooperation mechanism among the Trusts to coordinate on distributions and prevent double recoveries to holders of Allowed DIP A Claims.

21

Trust recoveries.[22] *Id*. at 8-9. The FBG Debtors estimate that when Litigation Trust has recovered enough proceeds to pay the projected Administrative and Priority Claims in full (*i.e.*, approximately $1.965 billion), the Class 1 holders will have received approximately $286 million, equal to **5.7x their initial $50 million investment** (excluding their recoveries on account of any other claims, such as DIP Claims). *See id.*

50.  While the Second Moore Declaration states that these terms "[are] the best litigation financing available to the FBG Debtors" and are "reasonable, market-based, and actionable[,]" this statement is entirely unsupported. Second Moore Decl. ¶ 54. The Moore Declarations offer no independent valuation, no comparison to market terms for similar litigation funding facilities (or the terms offered by contingency counsel), and no analysis by any disinterested financial advisor to substantiate that characterization. The FBG Debtors have not proffered any expert testimony, comparable transaction data, or other extrinsic evidence establishing that these terms reflect an arm's-length, market-clearing price for litigation funding of this kind, as opposed to a rate dictated by the very parties who stand to benefit most.[23]

51.  The sole support offered is Mr. Moore's own statement that "[n]o other litigation financers have come forward with an alternative financing proposal"—which, standing alone, is not evidence of reasonableness but merely an assertion of the absence of competing bids. *Id.* And Mr. Moore then *undermines* the use of this statement as an indicator of reasonableness: he confirms that the financing opportunity for the Litigation Trust itself was never independently marketed to third parties because the DIP Lenders "are purchasing the Litigation Trust Assets outright through the Estate Claims Credit Bid . . . and would not consent to be primed by, or subordinate their

---

[22]  This is based on the FBG Debtors' assumption that no holders of Administrative Expense Claims opt in to the Administrative Expense Claims Consent Program.

[23]  Tellingly, the FBG Debtors are not offering any testimony from Lazard, their investment banker.

22

recoveries to, alternative litigation funders." *Id.* That the DIP Lenders were not interested in or willing to submit to a *bona fide* market test is further supported by the FBG Debtors' extrajudicial Estate Claims Marketing Process requirements, which made clear that the FBG Debtors would only entertain bids to **purchase all of the Estate Claims for cash**. *See* Disclosure Statement, at 36 (PDF 48 of 307).[24]

52.     The FBG Debtors may contend that this arrangement properly compensates the DIP Lenders for the risk associated with their investment. But this argument is self-defeating. If the risk is sufficiently high to justify a 5.7x return, then the Plan cannot be feasible because it depends entirely on speculative litigation recoveries to pay Administrative and Priority Claims. If, on the other hand, the litigation risk is manageable enough to support Plan feasibility, then the DIP Lenders are not entitled to returns that far exceed market norms for comparable litigation funding.

53.     The FBG Debtors cannot have it both ways: they cannot simultaneously argue that the litigation is valuable enough to fund the Plan yet so risky that it justifies extraordinary funder returns at the expense of administrative claimants.

### C.     The Plan Inappropriately Prejudices the Carnaby Estate Claims

54.     The FBG Debtors repeatedly assert that the Plan does not affect the Carnaby Debtors because it relates only to the FBG Debtors and purports to address only claims against such Debtors. But in practice, even though the Debtors' advisors who crafted the Plan in Mediation owe fiduciary duties to **all** Debtors—not just the FBG Debtors—confirmation would materially impair the prosecution and administration of the Joint Estate Claims, including ongoing litigation in which the Carnaby Debtors remain active plaintiffs.

---

[24]   The FBG Debtors also do not present any evidence or analysis demonstrating that the $75 million in Litigation Trust Funding will be sufficient to prosecute the Estate Claims and realize the approximately $2 billion in recoveries required for the Plan to become effective.

55. Some of the Joint Estate Claims have already been filed. For example, on November 11, 2025, the Debtors—including the Carnaby Debtors—commenced an adversary proceeding (the "PJ Adversary Proceeding") against Patrick James and certain of his affiliated companies (the "PJ Complaint Defendants"). See First Brands Group LLC et al. v. James, et al., Adv. Pro. No. 25-ap-03803 (CML) (Bankr. S.D. Tex. Nov. 3, 2025) [PJ Adv. Pro. Docket No. 17] (as amended at PJ Adv. Pro. Docket No. 141, the "PJ Complaint"). In the PJ Complaint, the Debtors—including the Carnaby Debtors—assert various causes of action against the PJ Complaint Defendants, including breach of fiduciary duty and clawback of fraudulent transfers of more than approximately $700 million. *See* PJ Compl. ¶ 70. The PJ Complaint alone identifies approximately $229,196,643.25 in fraudulent transfers directly traceable to the Carnaby Debtors. *See* PJ Compl., Ex. A.

56. Nevertheless, if the Plan is confirmed, litigation of the Joint Estate Claims—presently prosecuted jointly by the same plaintiffs through common counsel—will instead proceed with two different estate representatives (the Litigation Trustee and the Carnaby Debtors) pursuing overlapping claims, subject to different fiduciary obligations, different settlement authority, and potentially conflicting litigation objectives. The Plan provides no mechanism for coordinating those competing interests or protecting the Carnaby Debtors' estates from prejudice arising from that division.

57. As an example, the Litigation Trust alone stands to receive all "attorney-client privileges, work product protections, joint client privilege, mediation privilege, common interest or joint defense privilege or protection and all other privileges, immunities or protections" relating to the Estate Claims. Plan § 6.2(d). But the Plan does not differentiate treatment of privileges arising from Estate Claims that are also Joint Estate Claims, nor does it contain any mechanism

24

governing continued assertion of common-interest privilege, joint-defense privilege, allocation of insurance proceeds, or coordinated control of litigation materials following confirmation. The Litigation Trust would have the right to preserve, enforce, or waive any privilege—with any such waiver subject to the consent of the applicable FBG Debtor but *not* any SPV Debtor, including the Carnaby Debtors. *Id.* As a result, the Plan could permit the Litigation Trustee to take actions that materially prejudice the Carnaby Debtors' privilege and confidentiality interests notwithstanding that they are not parties to the Plan.

58.     The Plan also provides for the transfer to the Litigation Trust of "all books, records, and investigative and/or discovery findings of the FBG Debtors, including to the extent such records are owned or controlled by advisors to the FBG Debtors, any independent director or manager of the FBG Debtors, the Examiner and the advisors thereto (subject to a mutual agreement on cooperation/transfer), and the advisors to the Creditors' Committee[.]" Plan, § 6.15(vii); Plan, at 19 (PDF 25 of 125). In other words, under the Plan, work product created by the foregoing parties for the benefit of *all* of the Debtors (including the SPV Debtors) is transferred to the Litigation Trust to benefit only some creditors.

59.     With respect to other Litigation Trust Assets, the Litigation Trust will receive "all Insurance Rights of the FBG Debtors with respect to Insurance Policies that provide coverage for the Estate Claims, including for the avoidance of doubt, the rights to the proceeds of the D&O Policies." Plan, at 19 (PDF 25 of 125). Although the Plan states that such transfer to the Litigation Trust "shall not impair the rights of any other Person in the relevant Insurance Policies[,]" the Plan provides no mechanism by which it ensures that result. Plan § 6.2(a). As the Litigation Trust accesses and exhausts policy proceeds—particularly under shared D&O policies—the insurance

25

coverage available to the Carnaby Debtors correspondingly diminishes, potentially leaving the Carnaby Debtors without coverage for their estate claims.

### D. The Estate Claims Marketing Process and Estate Claims Credit Bid Do Not Satisfy Section 363

#### i. The Estate Claims Marketing Process Does Not Satisfy Section 363(b) of the Bankruptcy Code

60. Section 363(b) permits a debtor to sell property outside the ordinary course only with court approval, and courts require "aggressive marketing" to ensure the estate obtains "maximum benefit." *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 422, 424 (Bankr. S.D. Tex. 2009). Here, the Estate Claims Marketing Process fails this standard. It was designed behind closed doors in the Mediation—from which the Carnaby Debtors' fiduciary was excluded—and conducted without court-approved bidding procedures. The FBG Debtors reserved the unilateral right to modify or cancel the process, and the Estate Claims Credit Bid was negotiated before the process even launched. Only two parties executed NDAs, one withdrew, and no alternative bid was submitted. Second Moore Decl. ¶ 42. The Disclosure Statement confirms the Estate Claims Credit Bid is "non-severable" from the Plan Settlement. Disclosure Statement, at 37 (PDF 49 of 307). This is not a genuine market test—it is a *post hoc* attempt to validate a pre-negotiated transaction.

#### ii. The Estate Claims Credit Bid Violates Section 363(k) of the Bankruptcy Code

61. Section 363(k) permits a secured creditor to credit bid only on "the property that is subject to" its lien. 11 U.S.C. § 363(k); *see RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644 (2012). Here, the Estate Claims Credit Bid includes Avoidance Actions over which the DIP Lenders have no liens. Plan § 1.1 (definition of "Litigation Trust Assets"); DIP Order [Docket No. 608] ¶ 8(a) (excluding "claims and causes of action under sections 502(d), 544,

26

545, 547, 548 and 550 of the Bankruptcy Code"). The DIP Lenders cannot credit bid for assets in which they hold no security interest. The Estate Claims Credit Bid should not be approved.

**E. The FBG Debtors Have Not Satisfied the Good Faith Requirement of Section 1129(a)(3) of the Bankruptcy Code**

62. A plan must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The FBG Debtors bear the burden of establishing good faith by a preponderance of the evidence. *In re Dernick*, 624 B.R. 799, 811 (Bankr. S.D. Tex. 2020); *In re Bullough*, No. 05-31531-BJH-11, 2006 WL 6510983, at *1 (Bankr. N.D. Tex. Apr. 7, 2006). They cannot meet that burden here.

63. "Good faith" is not defined in the Bankruptcy Code, but courts examine the "totality of the circumstances." *In re Mangia Pizza Invs., LP.*, 480 B.R. 669, 705 (Bankr. W.D. Tex. 2012); *Matter of Jasik*, 727 F.2d 1379, 1383 (5th Cir. 1984); *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013). Three factors are relevant: (1) whether the plan promotes a result consistent with the Bankruptcy Code's objectives; (2) whether the plan was proposed with honesty and good intentions, not for ulterior motives; and (3) whether the plan "treated all parties fairly and comported with due process." *In re Trinity Fam. Prac. & Urgent Care PLLC*, 661 B.R. 793, 813-14 (Bankr. W.D. Tex. 2024). The inquiry "speaks more to the process of plan development than to the content of [the] plan." *In re Northbelt, LLC*, 630 B.R. 228, 277 (Bankr. S.D. Tex. 2020); *see also In re Star Ambulance Serv., LLC*, 540 B.R. 251, 262 (Bankr. S.D. Tex. 2015). The asymmetries in recoveries and deficiencies in process here call motive into question and defeat a showing of good faith.

      i.    <u>The Asymmetry in Recoveries Under the Plan Does Not Promote a Result Consistent with the Code's Objectives</u>

64. A plan is consistent with the objectives of the Bankruptcy Code if it maximizes property available to satisfy creditors, expeditiously liquidates and distributes the bankruptcy

estate to its creditors, and achieves fundamental fairness and justice. *Trinity Fam. Prac.*, 661 B.R. at 814. Equality of distribution among creditors is a central policy of the Bankruptcy Code. *Begier v. IRS*, 496 U.S. 53, 58 (1990); *Matter of Criswell*, 102 F.3d 1411, 1414 (5th Cir. 1997). The Plan fails to satisfy these objectives.

65. The Plan is fundamentally unfair as it delivers undue benefit to the DIP Lenders to the detriment of other creditors. The Plan conditions the Effective Date on the Litigation Trust recovering sufficient proceeds to pay Allowed Administrative Expense Claims and fund a reserve for disputed Administrative Expense Claims—rather than providing for such payment on or near the Confirmation Date. This creates a circular trap: holders of Allowed Administrative Expense Claims cannot receive cash on the "Effective Date" because the Effective Date cannot occur until they are paid, and they cannot be paid until the Litigation Trust generates sufficient recoveries. This structure effectively strips administrative expense claimants of their Code-guaranteed protections by making their payment contingent on speculative future litigation outcomes.

66. The unfairness of this arrangement is compounded by the fact that the DIP Lenders are using the Plan to escape obligations they already owe to administrative claimants. The DIP Order [Docket No. 608] contains a $200 million "Administrative Expense Claims Basket" that expressly subordinates the DIP Lenders' Roll-Up Obligations to the payment of specified administrative expense claims—including postpetition trade claims, wage claims, taxes, and section 503(b)(9) claims. DIP Order ¶ 8(b). This carve-out was a critical protection negotiated as part of the DIP financing and was a material inducement for the Court's approval. Yet under the Plan, the DIP Lenders seek to replace this $200 million guaranteed protection with the Litigation Trust Waterfall—under which administrative claimants receive nothing until the Trust recovers $350 million, then receive only 16% of subsequent recoveries, and must wait until the Trust

28

recovers nearly $2 billion before being paid in full. The DIP Lenders' purported "sharing" of Litigation Trust recoveries is not generosity; it is a mechanism to eliminate their existing $200 million subordination obligation by confirming a chapter 11 plan that restructures it away.

67. The extraordinary returns the DIP Lenders stand to receive through their Class 1 claims stand in sharp contrast to the uncertain returns administrative and priority claimants stand to receive. Under the Plan, Class 1 will receive approximately $286 million on a $50 million investment (a 5.7x return) by the time Administrative Expense Claims are paid in full, plus a perpetual 10% participation even after full repayment of principal and returns. *See supra* ¶¶ 5, 48. Without the FBG Debtors producing a single comparable or any evidence whatsoever demonstrating that these returns bear any relationship to market terms, it is difficult to see how such returns are anything but a preferential distribution to favored creditors disguised as litigation financing. A plan whose centerpiece transaction delivers overlarge returns to its proponents— while administrative creditors remain unpaid indefinitely—does not promote a result consistent with the core tenets of the Bankruptcy Code. This asymmetry demonstrates that the Plan was not proposed in good faith but rather to benefit a favored group of creditors at the expense of others.

## ii. Unresolved Conflicts of Interest Infect the Plan and Negotiation Process

68. Throughout these Chapter 11 Cases, Onset and other creditors have repeatedly warned that the FBG Debtors' management and advisors suffer from conflicts of interest and therefore cannot adequately represent the interests of the Carnaby Debtors. *See supra* ¶ 23. Nonetheless, although the FBG Debtors appointed Benjamin Duster as the "independent director" for the SPV Debtors, they proceeded to bar him from meaningful inclusion in the Plan Settlement and Litigation Trust structure negotiations, even though the Plan directly affects assets subject to the Carnaby Debtors' claims and privileges. These acknowledged conflicts—combined with the exclusion of the Carnaby Debtors' fiduciary from the negotiation process—pervaded the Plan

29

process and undermined the arm's-length character of the resulting settlement. These conflicts, and these exclusions, indicate that the Plan was not proposed in good faith.

69. Furthermore, the Plan Settlement was negotiated during the Mediation among only the FBG Debtors, the Ad Hoc Group of DIP Lenders, and the Creditors' Committee—the very parties who benefit most from it. *See* Disclosure Statement, at 1 (PDF 13 of 307). Onset, among many other creditors, was excluded from the portions of the Mediation concerning the negotiation and formulation of the Plan. This exclusion is compounded by a systematic refusal to provide information; as discussed further below, the FBG Debtors have refused to provide any basis for the assertions in the Moore Declarations, refused to explain why the Litigation Trust Funding is the "only viable" option, and refused to produce any documents reflecting the Plan development process.

70. The effect is a complete refusal to engage on the Plan's merits—the antithesis of due process. *See In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004) (plan not proposed in good faith given "unbridled dominance" of one constituency and "obvious self-dealing that resulted from control of the debtor"); *In re Coram Healthcare Corp.*, 271 B.R. 228 (Bankr. D. Del. 2001) (finding the plan was proposed in bad faith where there was an actual conflict of interest). A plan tainted by self-dealing, conflicts of interest, and exclusion of affected parties from the plan process is not proposed in good faith. *See In re Malkus, Inc.*, No. 03-07711-GLP, 2004 WL 3202212, at *3–4 (Bankr. M.D. Fla. Nov. 15, 2004); *In re Premier Int'l Holdings, Inc.*, 423 B.R. 58, 67 (Bankr. D. Del. 2010).

      iii.    <u>The Deficient Evidentiary Record in Support of Confirmation Is Untested and Prejudicial</u>

71. A "good faith" inquiry probes whether a plan has been produced and prosecuted with honesty and good intentions. *Trinity*, 661 B.R. at 814. The FBG Debtors are attempting to

confirm a complex liquidating Plan—premised on the assertion that the estates will target $25.4 billion in transfers for recovery—on an evidentiary record that consists only of untestable legal conclusions clothed as fact testimony. The FBG Debtors have stonewalled discovery at every turn, producing no Plan negotiations, no Litigation Trust Funding negotiations, and no basis for many of the "facts" asserted in the Moore Declarations. For example:

- ***The "only viable source" of Litigation Trust Funding.*** Moore asserts the Litigation Trust Funding "represents the only viable source of financing" (Second Moore Decl. ¶ 54), but provides no analysis of alternative financing structures, no explanation of what terms were explored, and no basis for concluding that the DIP Lenders' refusal to be primed is reasonable rather than self-serving.

- ***The Unsupported "Scheme" Narrative.*** Moore describes the purported Scheme, transfers, and counterparty conduct in more than 100 paragraphs of his declaration (Second Moore Decl. ¶¶ 56–167), refering extensively to internal A&M work product and internal emails among the FBG Debtors' former executives. But none of the materials on which Moore's statements rely have been identified for verification.

- ***The Insider-Transfer Tracing.*** Moore asserts that his A&M team "traced" over 1,400 transfers totaling approximately $966 million in insider misconduct (Second Moore Decl. ¶¶ 141–142) and "identified" billions in claims against SPV Lenders (Second Moore Decl. ¶ 139) and factoring counterparties (Second Moore Decl. ¶ 95). But again, not one of the underlying tracing analyses, bank records, or financial models is identified in the Second Moore Declaration.

- ***Absence of Any Valuation Methodology.*** Moore offers no expert valuation, no financial model, no discounted cash flow analysis, no litigation risk assessment, and no collectability analysis to support the $25.4 billion estimate for the sum total of gross "transfers made . . . in furtherance of the Scheme" (Second Moore Decl. ¶ 60)—he simply tallies gross transfer amounts and presents them as recoverable value without any discount for litigation risk, defenses, collectability, or time value of money.[25]

- ***The $12 Billion Bowery Account Finding.*** Moore describes an "investigation" that found $12 billion flowed through the "Bowery Account" between January 2022 and October 2025 (Second Moore Decl. ¶¶ 70, 73), but does not identify the account records.

- ***The $2.3 Billion in SPV Financing Obligations.*** Moore asserts that the FBG Debtors "owed more than $2.3 billion in off-balance-sheet financing obligations incurred through the four SPV facilities" (Second Moore Decl. ¶ 139) but identifies no underlying facility

---

[25] Kirschner does the same. He offers no financial or evidentiary support for his $25.4 "assertable value", and instead asks this Court and interested creditors to take these projections at face value. Kirschner Decl. ¶ 31.

agreements, lender balance statements, borrowing base certificates, accounting reconciliations, or supporting workpapers by which the $2.3 billion figure can be independently verified.

72. The Kirschner Declaration fares no better. Kirschner was retained on June 20, 2026—less than five weeks before the Combined Hearing—and his conclusions rest entirely on the Moore Declarations and materials provided by FBG Debtors' counsel. Kirschner Decl. ¶¶ 32, 34, 40, 51, 58, 61, 79, 84, 87, 127–32. Conspicuously absent is any evidence that would permit the Court or parties in interest to test these assertions: no financial models supporting the $25.4 billion transfer estimate, no term sheets for the current Plan or pertinent Mediation communications, and no market comparables for the credit bid or funding structure.

73. This is not simply a discovery dispute—it is foundational to whether the FBG Debtors can meet their burden of proof at confirmation on the central issue in their case, and whether they have afforded parties in interest a reasonable opportunity to test it. Having touted the strength of the Estate Claims as the cornerstone of the Plan, the FBG Debtors cannot simply make assertions and present selective (if any) evidence without giving opposing parties the ability to look at and challenge that evidence.[26] By refusing to let objectors test the evidence on which the Plan depends, the FBG Debtors cannot establish that the Plan was proposed in good faith.

---

[26] *See In re Peabody Energy Corp.*, No. 16-42529, Hr'g Tr. at 8:25–9:6 (Bankr. E.D. Mo. Feb. 28, 2017) ("[Y]ou can't make assertions and present selective evidence without our being able to look at that evidence and challenge it."); *In re White-Robinson*, 777 F.3d 792, 798 (5th Cir. 2015) (explaining that due process is only satisfied when a party is "given the opportunity to appear, object to documentary evidence, and put on evidence of their own."); *Wright v. Sw. Bank*, 554 F.2d 661, 663 (5th Cir. 1977) ("[I]t is an error to accept evidence *ex parte* because it is inherently unlawful to allow one party to put evidence before the court without allowing his opponent the opportunity to test its validity."). As this Court has recognized explicitly, parties who decline to answer questions about the plan during discovery cannot then "show up and want to tell me how great it is" at the confirmation hearing. *In re Red River Talc, LLC*, No. 24-90505 (CML), Dec. 27, 2024 Hr'g Tr. at 13:13–16 (Bankr. S.D. Tex. Dec. 27, 2024) ("[P]eople may just have to live with the answers they gave all across the board as I've got to avoid the whole shield/sword situation where someone kind of doesn't answer any question about the plan or what they think about the plan but then show up and want to tell me how great it is.").

## II. The Court Should Deny Final Approval of the Disclosure Statement[27]

74. A disclosure statement must provide creditors with sufficient information about the debtor's litigation assets to enable an informed voting decision. *See In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401 (Bankr. S.D. Tex. 2016) (adopting the *Metrocraft* factors, which require disclosure of, among other things, "information relevant to the risks posed to creditors under the plan" and "the actual or projected realizable value from recovery of preferential or otherwise voidable transfers").

75. The Disclosure Statement falls short of the adequate information standard in at least three critical respects: it materially understates the litigation risks associated with the Estate Claims; it fails to adequately quantify Administrative Expense Claims and it fails to articulate what happens if the Effective Date never occurs.

### A. Material Risks to Potential Litigation Trust Recoveries Are Not Disclosed

76. Most notably, the Disclosure Statement touts the Estate Claims as the Plan's most valuable assets while materially understating the litigation risks associated with such claims. This is particularly true for the Onset Adversary Proceeding. Creditors were provided only a cursory acknowledgment that Onset has "filed motions to dismiss" without any meaningful disclosure of the legal grounds for those motions or the material defenses Onset has asserted. *See* Disclosure Statement, at 8 (PDF 20 of 307). The Disclosure Statement does not explain that Onset's claims seek affirmative relief arising from the same underlying transactions and, if successful, could substantially offset or eliminate any net recovery realized by the Litigation Trust. It also fails to describe the alleged procedural shortcomings in the FBG Debtors' pleadings raised in Onset's motion for a judgment on the pleadings [Onset Adv. Pro. Docket No. 32] (the "Onset JOP") that:

---

[27] The *Reservation of Rights of Onset Financial, Inc. Regarding the Second Disclosure Statement Motion* [Docket No. 2974] and Onset's statements at the June 12 Hearing are hereby incorporated by reference.

- the claims are barred as a matter of law because in certain forbearance agreements, the Debtors agreed to release *any and all* claims they may have had against Onset arising from the transactions between the parties (*see* Onset JOP ¶¶ 30-33);

- the claims are barred as a matter of law due to the doctrine of *in pari delicto* and the applicable lookback periods or statutes of limitations (*see* Onset JOP ¶¶ 34-44);

- the Debtors fail to satisfy the pleading requirements of Rule 8 for each of the Onset Claims and improperly engage in group pleading in an attempt to shift Ed James' misconduct onto Onset (*see* Onset JOP ¶¶ 17-20, 25-29);

- the Debtors fail to satisfy the heightened pleading standard of Rule 9(b) for the Onset Claims that sound in fraud and only offer vague allegations made on "information and belief," rather than the documents. (*see* Onset JOP ¶¶ 21-24); and

- the Debtors fail to adequately plead the elements of each of the Onset Claims (*see* Onset JOP ¶¶ 45-146).

## B. Administrative Expense Claims Are Not Adequately Quantified

77. The FBG Debtors estimate approximately $222 million in Allowed Administrative Expense Claims, but the absence of a bar date means this figure is not a meaningful upper bound. Disclosure Statement, at 25, 81 (PDF 37, 93 of 307). Creditors were asked to vote on the Plan without knowing the value of claims that must be paid as a condition to the Effective Date.

## C. Creditors Are Left to Guess the Outcome if the Effective Date Does Not Occur

78. Perhaps most concerning is the FBG Debtors' failure to address what happens if the Plan never goes effective. *See* [Docket No. 3016] June 12, 2026 Hr'g Tr., 27:16-18 ("To the extent . . . the plan eventually doesn't go effective, I don't know exactly what happens in that regard."), 48:17-25 ("You asked earlier about what happens if the plan never goes effective, and I don't know the answer to that); 91:6-17 (Q: What happens to the proceeds that have come in for that litigation trust? Are they going to be clawed back and sent back to the individual entities? A: . . . I don't know offhand as we sit here today what would happen.").

34

79. The truth is that the Estate Claims will have already vested beyond the FBG Debtors' estates, and through their expensive litigation financing, the DIP Lenders will have siphoned whatever value can be derived from the Estate Claims even though administrative creditors have not been paid in full. None of this is disclosed.

## CONCLUSION

80. For the foregoing reasons, Onset respectfully requests that the Court deny confirmation of the Plan, deny final approval of the Disclosure Statement, and grant such other and further relief as the Court deems just and proper.

[*Remainder of page intentionally left blank*]

35

Dated:  July 20, 2026
           Houston, Texas

**MUNSCH HARDT KOPF & HARR, PC**

*/s/ Deborah M. Perry*
Deborah M. Perry
Texas Bar No. 24002755
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: dperry@munsch.com

-and-

**MORRISON & FOERSTER LLP**
James Newton (admitted *pro hac vice*)
Ben Butterfield (admitted *pro hac vice*)
Bryan Kotliar (admitted *pro hac vice*)
250 West 55th Street
New York, NY 10019
Email: ccohen@mofo.com
Email: jnewton@mofo.com
Email: bbutterfield@mofo.com
Email: bkotliar@mofo.com

-and-

**MORRISON & FOERSTER LLP**
Anthony S. Fiotto (admitted *pro hac vice*)
Julia C. Koch (admitted *pro hac vice*)
200 Clarendon Street
Boston, MA 02116
Email: afiotto@mofo.com
Email: jkoch@mofo.com

-and-

**MORRISON & FOERSTER LLP**
Brian R. Michael (admitted *pro hac vice*)
707 Wilshire Boulevard
Los Angeles, CA 90017-3543
Email: bmichael@mofo.com

-and-

**MILBANK LLP**
Dennis F. Dunne (admitted *pro hac vice*)

Lisa Laukitis (admitted *pro hac vice*)
Jason Kestecher (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530 5858
Facsimile: (212) 530-5219
Email: ddunne@milbank.com
Email: llaukitis@milbank.com
Email: jkestecher@milbank.com

-and-

**MILBANK LLP**
Andrew M. Leblanc (admitted *pro hac vice*)
Erin E. Dexter (admitted *pro hac vice*)
1101 New York Avenue NW,
Washington, DC 20005
Telephone: (202) 835-7500
Facsimile: (202) 263-7586
Email: aleblanc@milbank.com
Email: edexter@milbank.com

*Attorneys for Onset Financial, Inc.*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed on this 20thth day of July 2026, with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

/s/ *Deborah M. Perry*
Deborah M. Perry