**Transcript of Deposition of Christopher Moffatt on February 10, 2026**

CONFIDENTIAL



Q.     Good morning, Mr. Moffatt.
Could you please state your full name.

CONFIDENTIAL

**Page 7**

A.      Christopher Moffatt.

Q.      Do you prefer Chris or Christopher?

A.      Chris.

Q.      I will do my best to call you Mr. Moffatt the whole time.  Currently employed by Alvarez & Marsal?

A.      Correct.

Q.      For how long?

A.      Six years.

Q.      What is your title?

A.      Senior director.

Q.      Have you been senior director the entire time?

A.      Yes.

Q.      Before you joined Alvarez & Marsal, where were you employed?

A.      I was with a firm called Emerald Capital Advisors.

Q.      And how long were you with Emerald?

A.      Two years.

Q.      I am going to try to summarily to go through your background just to understand it.

CONFIDENTIAL

Page 8

A.    Sure.

Q.    What did you do at Emerald?

A.    Restructuring.  Similar to what I do now.

Q.    When you describe your role as restructuring, why don't you explain to me what that means to you?

A.    We work with companies either prebankruptcy or during bankruptcy to help them navigate the bankruptcy process or manage cash flow, just to return to profitability.

Q.    Do you tend to do one particular aspect of restructuring or do you provide a whole -- you personally, provide a whole array of services in the restructuring space?

A.    A whole array of services.

Q.    So you have done things from be a chief restructuring officer to financial advisor to tracking prepetition operations of debtors?

A.    Correct.

Q.    Did you do the same sort of scope of work when you were at Emerald?

CONFIDENTIAL

Page 9

A.    Similar, yes.

Q.    And before Emerald, where were you employed?

A.    I've worked at Bear Stearns.

Q.    I'm sorry?

A.    Bear Stearns, Wachovia, Merrill Lynch, KPMG throughout my career.  Some in investment banking and some in public accounting.

Q.    Roughly how long were you in Bear Stearns?

A.    Three years.

Q.    Was that right before Emerald?

A.    It was right before Emerald.

Q.    And right before Bear Stearns was Wachovia?

A.    Wachovia.

Q.    For how long?

A.    Roughly three years.

Q.    And before Wachovia?

A.    Merrill Lynch.

Q.    And before Merrill Lynch?

A.    KPMG.

Q.    How long were you at Merrill Lynch?

CONFIDENTIAL

Page 10

A.    Roughly three years.

Q.    KPMG?

A.    About the same, three or four years.

Q.    And were you in the consulting side?

A.    I was in the audit side.

Q.    And what particular industry were you in the audit?

A.    Financial services.

Q.    Was that right out of college?

A.    Yes.

Q.    Where did you get your undergrad?

A.    Notre Dame.

Q.    And your degree was in?

A.    Accounting.

Q.    Do you have a master's?

A.    I do.

Q.    And what's your master's in?

A.    Business, MBA.

Q.    And where did you get that?

A.    At Columbia.

Q.    When did you graduate -- let me start over.

CONFIDENTIAL

Page 11

What year did you graduate from Notre Dame with your undergraduate degree?

A.    '95.

Q.    Did you go straight into your MBA or did you work?

A.    No, I worked in accounting and then I graduated Columbia in '01.

Q.    Okay.  When did you first become introduced to First Brands Group?

A.    Early September.

Q.    September of 2025?

A.    2025.

Q.    Was that when Alvarez & Marsal commenced their engagement on First Brands Group or was that when Chris Moffatt began working on First Brands Group?

A.    It was right at the beginning of our commencement at A&M.

CONFIDENTIAL



Page 14

Q.    What do you understand Katsumi Servicing to be, sir.

A.    I believe they were a factoring party for First Brands Group.

Q.    When you use the phrase

CONFIDENTIAL

Page 15

"factoring party," can you explain what that means to you?

A.    The factoring is they purchased receivables from First Brands Group.

Q.    And when we are talking about receivables, let's make sure we understand what this is.

First Brands Group, as I understand it, at least in debtor entities, is about 114 entities that filed for bankruptcy, is that correct?

A.    That sounds right.

Q.    And those 114 entities, those are operating companies, they are responsible for a particular product, OEM part or something that they manufacture and sell, and First Brands Group is the overall holding company that holds all of those 114 entities?

MS. FALK:  Objection.

You can answer.

Q.    Loosely speaking?

MS. FALK:  Objection.

You can answer.

A.    I don't believe they are all

CONFIDENTIAL

Page 16

operating companies, but loosely speaking First Brands Group is the holding company above those entities.

Q.    Okay.   The entities that are out there selling products that are generating receivables, they are one of the 114 companies, is that a fair statement?

A.    There's ones outside of those 114 that are non-debtors that are operating.  But there were a bunch of operating that have receivables.

Q.    Are you testifying that First Brands Group has been receiving revenue or selling receivables from entities that are non-debtor entities?

MS. FALK:  Objection.

You can answer.

A.    Yes, there are non-debtors that have sold receivables.

Q.    Which non-debtors can you think of as you sit here now that have been selling receivables?

A.    I believe some of the European non-debtor entities have sold receivables

and I believe there are Mexican entities that have sold receivables.

Q. Is the revenue from the operating companies that are these European or Mexican entities, is any of that going through the debtors?

MS. FALK: Objection.

You can answer.

A. No.

Q. So the revenue from those are --

A. Well, sorry. In a consolidated reporting, yes. As of today, those funds are staying at those non-debtor entities.

CONFIDENTIAL

Page 152

Q.    What other adjustments that these spreadsheets that came from the SharePoint allow you to then further correlate, separate and apart from invoice correction correlation -- invoice number correction correlation?

A.    Yeah, so the invoice number was helpful for our analysis on matching.

What we also saw in those files were between the iterations of the same file for a nomination, you would see the whole listing of invoices.  You would see

CONFIDENTIAL

Page 153

an amount of those invoices.  Let's say it's a listing of invoices that totaled $5 million.  There is a tab in these sheets if you look at it that shows the capacity with the factor with Jefferies, let's call it, it may be $10 million of capacity that's available.  That original file that listed the invoices for $5 million would come back as a listing of invoices, likely the same, maybe with invoice number changes, with $10 million of value.

So it appears that they were trying to utilize capacity regardless of any underlying invoice.

Q.    But did that enable you then to correlate what was purportedly sold to third-party factors to a source receivable or did it just explain how they were inflating the prices to utilize the capacity?

A.    Yeah, that wasn't able to impact my analysis.  The invoice number changes allowed three-party factor matching.  The amount of inflation, it

CONFIDENTIAL

**Page 154**

doesn't impact the analysis I am doing.

Q. It sort of goes to a motive of what they were trying to get, which was to drawdown capacity?

A. It appears they were focused on capacity.

Q. To bring in more money?

A. Is that a question? It wasn't really a question.

Q. I will rephrase it. To do this to raise more money for the debtors?

A. It allowed them to raise more money, yes.

Q. As you sit here now, can you tell me whether the money that was fraudulently obtained from the receivables parties in this room was using purely for Mr. James' personal use or was it used to operate the debtors?

MS. FALK: Objection.

You can answer.

A. I couldn't tell you what it was used for. It came into the company's accounts and it goes through a concentration account. It was fungible.

CONFIDENTIAL

Page 155

It was used for many purposes.

Q.    You have not engaged in an analysis to determine whether these stolen funds were used to pay lenders of the debtors, third-party suppliers of the debtors, professionals of the debtors in any way, shape or form, you yourself cannot testify to that, is that correct?

MS. FALK:  Objection to form. You can answer.

A.    That's correct.

CONFIDENTIAL

Page 213

Q.    Do you recall the time frame that you learned those Jefferies related files were located?

A.    Yeah, I heard about it, I think sometime in November.

Q.    So in November?

A.    Uh-huh.

Q.    And that would have been after your November 25th presentation?

A.    It was probably before that I heard about it.

Q.    Okay.  And do you remember where those files were found, where they were located?

A.    I just heard they found some files.  I don't think I ever saw them.  I know they were working to validate and they were going to reach out to factors to see.

Q.    When you say they?

CONFIDENTIAL

Page 214

A.    When I say they, I just call it DI.  It's Mike and Kerri's team.

Q.    That's fine.  I need specificity.  I don't know if the Vlad is in Romania?

A.    Mike Malloy and Kerri Palen were involved and their teams.

Q.    So they located these files and made them available to you.  Because you make it sound like you didn't see them. Is that correct?

A.    I don't remember seeing the files.  I remember hearing that they found files that they were looking into that which had to do with factoring.

Q.    It had to do with Jefferies Leucadia?

A.    It had to do with Jefferies or LAM, yeah.

Q.    And when did you ultimately get to see those files?

A.    It was around Christmastime that I used them.

CONFIDENTIAL

**Page 231**

Q.    If I told you that Volume 12 consists of the production of the spreadsheets that you had been referring to with Mr. Kelley, would that surprise you?

MS. FALK:  Objection to form.

A.    It wouldn't surprise me, February 9th?

Q.    January 9th.

A.    January 9th?

Q.    Was the date that Volume 12 was produced.

A.    Okay.

Q.    In questioning with Mr. Kelley earlier, you said that at least some of these spreadsheets containing Jefferies

CONFIDENTIAL

Page 232

invoices were located as early as November?

A.   I believe I became aware of it sometime in November, yes.

Q.   Aware of it in November.  Where were those documents found?

MS. FALK:  Objection to form.

A.   Again, they were found in the company's records.  Maybe a SharePoint. I am not sure exactly.

Q.   Who at A&M found them?

A.   They were -- I was made aware of it through our D&I team.

Q.   Specifically, from which member of the D&I team?

A.   It would have been Mike Malloy or Kerri Palen.

Q.   So Mike Malloy or Kerri Palen in November would have told you that they had located at least some of these files related to Jefferies?

A.   They mentioned that there were Jefferies files that they found that they were trying to validate at the time.

Q.   But they did not share them

CONFIDENTIAL



Page 233

with you at that time?

A.    I don't recall seeing the files at that time.

CONFIDENTIAL

Page 243

A.      Yes.

Q.      Who did you have conversations with?

A.      As I mentioned earlier, when we did our analysis we had an emergency call with individuals at First Brands Group where Chuck Moore, for lack of a better word, read them the riot act to let us know if there were any other factoring type files like this that would allow us to understand what was going on with the factoring process.  And that was some time in late December/early January.

Q.      And so if Chuck Moore was reading them the riot act, who else from A&M was on the phone?

A.      Myself and Dan Jerneycic.

Q.      Anyone else from A&M?

A.      I don't believe so.

Q.      And who were the recipients of the riot act warning for lack of a better word?

A.      There were two calls, because some people couldn't make it.  The people on the call was Joe Salvia.  Vlad B.

CONFIDENTIAL



Page 244

Maks C.   Joe DiFranco.

Q.    Anyone else?

A.    I believe that's who it was. Those are the people that kind of would have touched that factoring world that we were aware of.

CONFIDENTIAL

Page 245

Q.    Why did Mr. Moore read these individuals the riot act?

MS. FALK:  Objection to form.

A.    I think probably because we found information that showed that invoice numbers may have been switched in the factoring nominations.  And now we wanted to make sure we had all the data available and everybody came clean, is there other stuff they hadn't told us, now is the time to let us know.

Q.    And that was new information, at least to Mr. Moore?

CONFIDENTIAL

Page 246

A.    It was new information that these files existed, yes.

Q.    Was it new information to you that invoice numbers may have been switched?

A.    No.  We were aware that there were alterations to what the factors thought they purchased and what we saw in the company records.  But we hadn't seen the support that would allow us to maybe trace it back to the original invoice numbers or amounts.

Q.    So what these files demonstrated is that merely comparing the invoice number in the debtor's records to the invoice number in the third-party factor's records was not a sufficient methodology, because there was a direct link between the fake invoice number and the real invoice number, right?

A.    Well, I think it was sufficient to determine what my process was -- I was trying to determine did the list that the third-party factors told me that they bought, invoice number, customer,

CONFIDENTIAL

Page 247

business unit, did that match to the company's records.  So they bought an invoice number from a business for a customer for a certain amount.  I was trying to validate that.  So this really doesn't have anything to do with me validating that.  Now, if you want to say that the invoice number changed and you can find the original invoice number, this helps you do that.  I am not saying they bought that original invoice number, I am saying this is a mapping tool that you could use to find the original invoice number.  So we used this to kind of rerun our analysis on that basis.  I just didn't like your characterization that what we did was not adequate.  It was adequate for what we were trying to do at the time.

Q.   Do you have a view of how these spreadsheets were used by First Brands before the petition date?

A.   Yes.

Q.   What is that view?

A.   I believe that -- I think there

CONFIDENTIAL

Page 248

is a page missing here, because I remember seeing like a capacity tab.  So maybe there is another tab that wasn't printed.  So what I believe happened is that they identified invoices that were created that they wanted to factor.  And they saw that they had an amount of capacity with Jefferies, and they would try to get as close to that open capacity as possible.  And they would change the amounts of the invoices to take advantage of that capacity regardless of any underlying invoice.  So I don't think the invoices really were what they were factoring.  I think they were just using it like a line of credit.  So they would start with a real invoice number.  They would then change the invoice number.  And they would change the amount.  Right.

MS. FALK:  Objection to form.

A.    Well, I think they would start -- I believe they were starting with original invoices.  For some reason they were changing invoice numbers, which I still don't understand, but, yes, I think

CONFIDENTIAL

Page 249

they were changing the amount to get to a capacity to borrow.

Q.     So the answer to my question is yes they would start with an original number.  They would change the invoice number.  And they would change the amounts?

MS. FALK:  Objection to form.

A.     I wonder if it's in that order, right.  They would start with the original.  They would make some changes.  Sometimes they would change invoice numbers.  Sometimes they would change the amount.  Are we saying the same thing?

Q.     And sometimes both, right?

A.     And sometimes both.