**Transcript of Deposition of Robert Winning on July 24, 2026**

HIGHLY CONFIDENTIAL



Q.    Could you state your full name

Page 5

HIGHLY CONFIDENTIAL

R.  WINNING

for the record?

A.      Robert Benjamin Winning.

Q.      How do you spell your last name?

A.      W-I-N-N-I-N-G.

Q.      Thank you.   Mr. Winning, how are you currently employed?

A.      I'm employed by M3 Partners.

Q.      Is that, in your view, a financial advisory firm?   How would you characterize it?

A.      Financial advisory firm is good.

Page 6

HIGHLY CONFIDENTIAL



Q.   Okay.  Was there oral conveyance of any of the contents?  And again, I'm not asking for the contents. I'm just asking was any of the information orally presented or a presentation given to other constituents outside of the committee?

A.   It is my understanding that there was a presentation of, related to at least some aspects of the investigation

HIGHLY CONFIDENTIAL

R. WINNING

made in late April to Mr. Uzzi as an advisor of the ad hoc group, certain ad hoc group members, and I think certain Debtor professionals.

Q.    Is that related from just a time and date standpoint roughly the April -- Monday, April 27th meeting that occurred?

A.    That's -- I don't know for sure.   That sounds right.

Page 49

HIGHLY CONFIDENTIAL



Q.    Was Huron in the meeting of --
that I characterize as April 27th --
A.    I think so --
Q.    -- to your knowledge?
A.    I think so, but I'm not sure.
Q.    Were ad hoc group committee
members present in that?
A.    I think so.

Page 50

HIGHLY CONFIDENTIAL

R.  WINNING

Roughly how long did that meeting last?

A.    My understanding was about three hours, I think.



Page 51

HIGHLY CONFIDENTIAL

MR. MILLER:   April 22nd meeting we're not -- we're going to object to.  The 27th meeting, which concerns what Debtors presented, we're not -- we're not objecting to anything that he learned about the April 27th meeting held at Weil by Debtors' professionals.

MR. KELLEY:  Got it.

MR. MILLER:   I'll hear the question, but there's two different

Veritext Legal Solutions
346-293-7000

HIGHLY CONFIDENTIAL

R. WINNING

meetings is my understanding.

MR. KELLEY:   Okay. Respectfully, may I take that as a representation so I can dance around these issues carefully?

MR. MILLER:   Yes.   We'll represent there was a meeting that the committee presented, which I think was what you were inquiring about, that occurred on April 27th at Brown Rudnick.

Page 60

HIGHLY CONFIDENTIAL



Q.    With your counsel's representation, does that help prod your recollection, sir?

A.    Yes.

Q.    Okay.  Roughly five days apart between the meetings?

A.    It sounds right and -- to me.

Q.    Did you participate in the presentation that occurred with Mr. Uzzi on the 22nd?

A.    I believe I dialled in

Page 62

HIGHLY CONFIDENTIAL

R. WINNING

periodically mostly.  But, no, I wouldn't say I participated.

Q.    You weren't a presenter?

A.    I did not present.

MR. KELLEY:  If I were to inquire about the content of what was discussed in the April 22nd meeting, which I understand the committee presented its conclusions to the ad hoc committee and to Mr. Uzzi, you're

Page 63

HIGHLY CONFIDENTIAL

R. WINNING

going to instruct your witness not to answer on the basis of privilege?

MR. MILLER:  Yes.  We represent that -- we'll instruct him not to answer on the basis of privilege with respect to any of the contents discussed during that meeting.

MR. KELLEY:  So I don't need to go further in asking that question. I can rely on that stipulation or that representation?

MR. MILLER:  You have our representation.

Q.    Are you aware of any other meetings other than those April 22nd or April 27th meeting at which those presentations were made associated with the causes of action?

A.    I'm not aware of anything else.

Q.    You did not participate in any others to your knowledge?

Veritext Legal Solutions
346-293-7000

HIGHLY CONFIDENTIAL

R. WINNING

A.      Not to my recollection.

Page 65

HIGHLY CONFIDENTIAL



Q.    In regards to the preference settlement, let's just start at a high level.  What do you understand the way that works?

Veritext Legal Solutions
346-293-7000

HIGHLY CONFIDENTIAL

R. WINNING

A.    It's fairly complex but at a high level.  If a creditor, other than a certain group of creditors that's been identified, but if a creditor agrees to sign their direct claim to the litigation trust, then they will get the benefit of certain -- well, if they're a trade creditor, they would not be sued for preference, again, with certain exceptions. And if they are a supply chain financing party or a factor party, they get certain modified new value defenses.  And there are some other components, but it's a fairly long settlement.

Q.    It's my understanding that discussions concerning that aspect extended beyond the mediation.  Is that fair?

A.    Yes.

Q.    What can you tell me about the post-mediation discussions concerning the negotiations concerning the preference settlement?

MR. MILLER:  Objection to form to the extent you can testify to

Page 74

HIGHLY CONFIDENTIAL

R. WINNING

discussions but nothing concerning attorney deliberations.

A.      There was significant discussions over the contours of the preference settlement.

Q.      What was the committee's view versus the Debtors' view in that negotiation?

MR. MILLER:  Objection. Privileged to the extent it's speaking about internal views -- to the extent it's concerning views as expressed to the committee -- sorry, to the ad hoc group, you can testify to that.

MR. KELLEY:  And I'll say it differently.

Q.      There was negotiations going on about this preference settlement between the committee and the Debtors?

A.      Yes, but it was primarily between the committee and the ad hoc group.

Q.      And you were negotiating over the preference settlement?

Page 75

HIGHLY CONFIDENTIAL

R. WINNING

A.    Yes.

Q.    And its construct?

A.    Yes.

Q.    Okay.

A.    I'm not sure I know what you mean by "construct," so, sorry.  I don't know.

Q.    How it should be implemented, who it should apply to, who gets the protections of it, things along those lines?

A.    The preference settlement was a contentious topic of negotiations between the committee and primarily the ad hoc group.

Q.    I'm going to limit my questions to what was communicated to the ad hoc group as to the committee's position.

What did the committee inform the ad hoc group its position was as to the way that preference settlement ought to operate?

A.    There was back and forth on different issues and it evolved over time.

Page 76

HIGHLY CONFIDENTIAL



Q.    I'm just looking for at a high level.  What was it the committee wanted that preference settlement to look like that it communicated to the ad hoc group outside of the mediation?

A.    At the end of -- at the highest level, the committee was negotiating towards a fairly broad preference protection and the ad hoc group was -- was negotiating, you know, limits to that protection.

Page 78

HIGHLY CONFIDENTIAL



Q.    What do you understand the --
we're using terms called "modified new
value defense."

Page 94

HIGHLY CONFIDENTIAL

R. WINNING

So, in your words, what do you understand that to mean?

A.    Generally speaking, that the defendant would get the benefit of a new value defense for, you know, money, goods, value delivered to the -- delivered after receiving a potential preference, regardless of which Debtor that money, value goods may have benefitted or if the value goods, et cetera, arguably didn't benefit a debtor because, say, it was misappropriated, but it was still, the vendor was told pay X or ship to X and they did, unaware that X was not a debtor.

Q.    Did I understand you to say that the modified new value defense would sort of blend the Debtor entities together? If you paid one entity and two entities, you treat them as one for the modified new value defense?

MR. MILLER:  Objection, mischaracterizes testimony.

You can answer.

A.    Yeah, this is where, you know,

Veritext Legal Solutions
346-293-7000

HIGHLY CONFIDENTIAL

R. WINNING

the language said, but generally, yes.  If the value goods services went to one Debtor but the payment was another, it would -- I think use the word blend --

Q.    Treat them as one?

A.    I think that's fine.  That would be my --

Q.    Consolidate?

A.    Yes.

Q.    For purpose of defense, I get it.  So that defense is available under the preference settlement for certain parties but not for others?

A.    Yes.

Page 96

HIGHLY CONFIDENTIAL



Q.    Okay.  I just wanted to make sure we didn't have a disagreement that the trust is not a successor to the Debtors. It's a separately created thing?

A.    I don't know exactly what "successor" means in this context, but the trust is being created on the confirmation date and the Debtors will still exist until the effective date.

Page 106

HIGHLY CONFIDENTIAL

Q.    Did the committee ever -- so is the answer as to Katsumi you know that they did not interview Katsumi?

A.    To the best of my knowledge, no.

Q.    Did the committee ever interview Onset?

A.    To the best of my knowledge -- to the best of my knowledge, certainly no formal interview.

Q.    Did the committee ever interview Leucadia parties or LAN parties?

A.    To the best of my knowledge, no.

Q.    Did the committee ever interview Evolution?

A.    Not to my knowledge.

Page 110

HIGHLY CONFIDENTIAL

R. WINNING

Q.     Did -- I'm not involved with the balance sheet financing so I don't know all the entities.

Did the committee ever interview CarVal?

A.     Not to my knowledge.

Q.     Did the committee ever interview any of the pre-petition members of the management?

A.     I don't know if the -- if the committee would have ever been in any Debtor interviews, but to my knowledge, no.

Page 111