**<u>Exhibit A</u>**

**Response Chart**

*In re First Brands Group, LLC, et al.*
CH. 11 CASE NO. 25-90399 (CML)

**Summary Chart of Objections to Confirmation of the Joint Chapter 11 Plan and Final Approval of the Disclosure Statement[1]**

| | Docket No. | Objecting Party | Summary of Objection | Response |
|---|---|---|---|---|
| 1 | 3228 | Texas Taxing Authorities (Cameron County, Tarrant County, Hidalgo County, City of McAllen, and Brownsville ISD) | The Texas Taxing Authorities object to confirmation of the Plan: | |
| | | | i. asserting that the Plan's treatment of the Secured Ad Valorem Tax Claims is unduly vague, provides no certainty about the proposed payment scheme, and fails to comply with §§ 1129(a)(1) and 1123(a)(2)–(3). (¶ 4). | The Texas Taxing Authorities' Secured Ad Valorem Tax Claims are classified as Priority Tax Claims under the Plan. The treatment provided to these claims is clearly set forth in Section 2.5 of the Plan. The treatment complies with section 1129(a)(9)(C) of the Bankruptcy Code. Plan § 2.5. |
| | | | ii. asserting that the Plan treats the Secured Ad Valorem Tax Claims as non-voting Priority Tax Claims yet reserves payment options that would render such claims impaired and entitled to vote. (¶ 5). | The Plan provides for payment of all Allowed Priority Tax Claims within five years of the Petition Date, in compliance with section 1129(a)(9)(C). Accordingly, the Texas Taxing Authorities' Secured Ad Valorem Tax Claims are not impaired. Plan § 2.5. |
| | | | iii. to the extent it purports to transfer any assets to the trusts free and clear of unavoidable tax liens and without payment of the Texas Taxing Authorities claims. (¶¶ 6, 12). | The Plan provides for payment of all Allowed Priority Tax Claims within five years of the Petition Date, in compliance with section 1129(a)(9)(C). Plan § 2.5. |
| | | | iv. seeking clarification that the claims will be paid with statutory interest under § 506(b) and Texas Property Tax Code § 33.01 until confirmation. Failure to provide statutory interest violates § 1129(a)(7). (¶ 8). | The Plan provides for payment in full of Allowed Priority Tax Claims by Cash on the Effective Date (or 45 days after becoming an Allowed Priority Tax Claim), or in equal annual Cash payments over a period not exceeding five years from the Petition Date with interest equal to the applicable statutory rate. Plan § 2.5. |
| | | | v. with respect to the 180-day (plus optional additional 180-day extension at the sole discretion of the Claims Ombudsman) claim-objection deadline as to the tax claims, which are final and not subject to redetermination. (¶ 9). | The Claims Ombudsman's authority to object within the prescribed period is a standard administrative mechanism that does not prejudice holders of Allowed Priority Tax Claims. Plan § 9.2 (providing for 180-day Claims objection deadline). |
| | | | vi. asserting that the Plan fails to require the 2026 administrative tax claims to be paid in cash and in full prior to delinquency as required by § 1129(a)(9)(A). (¶ 10). | The Plan provides for payment of cash in full of all allowed administrative expense claims, including administrative tax claims, on or before the Effective Date, in compliance with section 1129(a)(9). Plan § 2.1(a). |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *FBG Debtors' Omnibus Reply to Objections to (I) Final Approval of the Disclosure Statement and (II) Confirmation of Joint Chapter 11 Plan* (Docket No. 3433) (the "**Reply**"), the applicable Objection, the Plan, or the Disclosure Statement, as applicable. The chart summarizes certain key issues raised in the Objections. To the extent that an Objection or a specific point raised in an Objection is not addressed herein, the Debtors reserve the right to respond to such Objection at the Combined Hearing.

| | | | | vii. | asserting that the Plan contains no default provisions as may be required by § 1123(a)(5)(G). (¶ 11). | The Plan is in compliance with section 1123(a)(5)(G).  To the extent that all Allowed Priority Tax Claims are not paid within five years of the Petition Date, the Texas Taxing Authorities may seek an order compelling payment.  Section 14.1 of the Plan provides that the Bankruptcy Court retains exclusive jurisdiction over distributions, payment of Claims, enforcement of the Plan and Confirmation Order, and federal, state and local tax matters under sections 346, 505, and 1146.  Under Section 15.11 of the Plan, those obligations are immediately effective, enforceable, and binding on the FBG Debtors, the Claims Ombudsman, and the Trustees upon the Confirmation Date. |
| 2 | 3262 | LAM Parties[2] | | i. | The LAM Parties argue that the Plan is not feasible under § 1129(a)(11) asserting that: | |
| | | | | | a. the "delayed effective date" structure is impermissible or at least highly suspect. (¶¶ 30–33). | *See* Reply ¶¶ 19–46. |
| | | | | | b. key market indicators—the trading prices of the Debtors' debt instruments, the results of the Estate Claims Marketing Process, and the purchase price of the Estate Claims Credit Bid Transaction—show the Debtors' proposed valuation of the Estate Claims is misguided and the true value of the Estate Claims is less than $2 billion. (¶¶ 34–37). | *See* Reply ¶¶ 116–121. |
| | | | | | c. there are issues with the Estate Claims Marketing process and proposed sale that warrant heighted scrutiny, including that there has been unequal access to information as between the DIP A Lenders and other potential bidders in the Estate Claims Marketing Process and that the sale to the DIP A Lenders is inextricably tied to a release of insider claims.  (¶ 38). | *See* Reply ¶¶ 142–154. |
| | | | | | d. the Debtors have not shown they are likely to recover $2 billion, or anything from the LAM Parties, because Mr. Kirschner's supporting opinion is significantly flawed because the Kirschner Declaration: | *See* Reply ¶¶ 63–99. |
| | | | | | 1. with respect to preference claims, does not take into account the new value or ordinary course defenses, (¶¶ 39–42) | *See* Reply ¶¶ 92. |
| | | | | | 2. with respect to fraudulent transfer claims, does not take into account the defense that the transferee gave value in "good faith," (¶¶ 43–44) | *See* Reply ¶¶ 96. |
| | | | | | 3. with respect to fraudulent transfer claims, aggregates gross payments to LAM TFG without accounting for the amounts LAM TFG returned to the Debtors, affording the estate an impermissible windfall in violation of the single-satisfaction rule of § 550(d), (¶¶ 45–46) and | *See* Reply ¶¶ 97. |
| | | | | | 4. with respect to fraudulent transfer claims, does not consider whether the Debtors had an equitable interest in the funds transferred to LAM TFG and | *See* Reply ¶¶ 99. |

---

[2]   "**LAM Parties**" means, collectively Leucadia Asset Management LLC, through its Point Bonita Capital Division, LAM Trade Finance Group LLC, and LAM TFG I SPV LLC.

| | | |
|---|---|---|
| | others, which the LAM Parties argue the Debtors do not given the prepetition fraud and the government's forfeiture powers. (¶¶ 47–50). | |
| ii. | The LAM Parties assert that the Plan violates § 1129(a)(9)(A) because administrative and priority claims will not be paid in full on the statutory "effective date." (¶¶ 51–63). | *See* Reply ¶¶ 36–46. |
| | a. The LAM Parties contend that the real "effective date" of the Plan, for purposes of the statute, is the "Confirmation Date" because that is when the sale transactions will occur and be binding and immediately effective on the parties, despite administrative expense claims not being paid in full on that date, in violation of § 1129(a)(9). (¶¶ 51–56). | *See* Reply ¶¶ 36–46. |
| | b. The LAM Parties assert that the Plan's use of § 363 to deprive the "effective date" of significance is improper, § 363(m) protections are not permitted because there is no outside third-party purchaser, and § 363 is arguably not applicable in the context of a plan sale. (¶¶ 57–63). | *See* Reply ¶¶ 133–136, 142–154. |
| iii. | The LAM Parties assert that the Preference Settlement violates § 1123(a)(4), *Serta*, and *ConvergeOne* because it provides disparate and discriminatory treatment and recoveries among similarly situated creditors in Class 7 (General Unsecured Claims) without a valid legal basis and argues that: | |
| | a. the Preference Settlement provides disparate treatment and recoveries to similarly situated Class 7 creditors because it, without a legal basis, prohibits certain Class 7 creditors, such those identified on the "Specified Non-Released Parties" list, or are found to meet the non-statutory definition of "Adverse Conduct," from participation while affording others substantial benefits. (¶¶ 64–68). | *See* Reply ¶¶ 155–159. |
| | b. the Preference Settlement discriminates among similarly situated creditors without a Code-based reason, because the Debtors, without any market test, impermissibly provide a valuable opportunity to some creditors to improve their recoveries without offering it to all creditors on the same basis. (¶¶ 69–76). | *See* Reply ¶¶ 159–165. |
| iv. | The LAM Parties argue that the Plan impermissibly uses substantive consolidation for some but not all purposes asserting that: | |
| | a. the factual record—including prepetition commingling of the Debtors' assets and business functions, Patrick James's control over the enterprise, and lack of corporate formalities—demonstrates substantive consolidation for all purposes is necessary. (¶¶ 80–92). | *See* Reply ¶¶ 173–190. |
| | b. the Debtors impermissibly use substantive consolidation tactically to benefit some creditors over others. (¶¶ 93–99). | *See* Reply ¶¶ 173–190. |

| | | | | |
|---|---|---|---|---|
| | | | v. The LAM Parties argue that the Plan impermissibly classifies the prepetition secured lenders' unsecured deficiency claims separately from other unsecured claims to gerrymander an impaired accepting class. (¶¶ 100–106). | *See* Reply ¶¶ 243–254. |
| | | | vi. The LAM Parties assert that the definition of "Estate Claims" is overbroad and sweeps beyond Fifth Circuit precedent (which uses an injury-focused analysis) by including any claim "duplicative of" or "in substance" an Estate Claim, and should be amended to conform to controlling precedent. (¶¶ 107–108). | The FBG Debtors have amended the definition of Estate Claims in the revised version of the Plan to remove the "duplicative of" and "in substance" language.  Plan § 1.1 (definition of "Estate Claims"). |
| | | | vii. The LAM Parties allege that § 9.11(b)'s treatment of setoff rights lacks any basis under § 553. (¶ 109). | This provision was removed in the version of the Plan which was solicited to creditors (Docket No. 3019). |
| | | | viii. The LAM Parties urge that the sale of Estate Claims must conform to applicable state-law transfer restrictions and that the Plan misuses Fed. R. Evid. 502(b)/(d) to protect privilege on transfer. (¶¶ 110–111). | The Estate Claims being transferred include avoidance actions arising under the Bankruptcy Code, and the Fifth Circuit has expressly held that such claims may be transferred.  *See In re S. Coast Supply Co.*, 91 F.4th 376, 382 (5th Cir. 2024).  To the extent the LAM Parties suggest that some subset of the Estate Claims arises under state law and is subject to transfer restrictions, they have not identified any such claim, explained what purportedly cannot be transferred, or articulated why any such restriction presents an obstacle to confirmation.<br><br>In any event, the transfer of the Estate Claims is a means of implementing the Plan under section 1123(a)(5)(B) of the Bankruptcy Code, which authorizes the "transfer of all or any part of the property of the estate to one or more entities" and, like all of section 1123(a), applies "[n]otwithstanding any otherwise applicable nonbankruptcy law."  11 U.S.C. § 1123(a).  Courts have held that this preemptory language overrides contrary state law and contractual restrictions on transfer.  *See In re Federal-Mogul Global Inc.*, 684 F.3d 355, 369 (3d Cir. 2012) ("The plain language of § 1123(a) evinces Congress's clear intent to preempt state law."); *id.* at 382 (holding anti-assignment provisions "preempted by § 1123(a)(5)(B) to the extent they prohibit transfer" to a trust). |
| 3 | 3263 | Aequum Capital Financial II LLC ("**Aequum**") | Aequum objects to confirmation of the Plan arguing that: | |
| | | | i. the Plan's exculpation, gatekeeping, and injunction provisions are overbroad and improperly shield the Exculpated Parties (including the FBG Debtors, Special Committee members, Independent Managers, and the Committee) from claims of the SPV Debtors and their creditors, whose claims should be carved out and preserved since the SPV Debtors themselves are neither exculpated nor receiving releases. (¶¶ 12–16). | *See* Reply ¶¶ 233–242. |
| | | | ii. the Plan improperly blocks the SPV Debtors, their estates, and their creditors from pursuing claims sharing a common nucleus of fact with FBG Debtor claims, by bundling and vesting SPV Debtor claims in the Litigation Trust via an ambiguous, overbroad "Estate Claims" definition. (¶¶ 17–24). | *See* Reply ¶ 194. |
| | | | iii. the Plan fails to adequately preserve the SPV Debtors' defenses, setoff, and related rights against related parties other than the Litigation Trust. (¶¶ 25–28). | The Plan appropriately preserves setoff rights against the Litigation Trust—the only party that will assert Estate Claims post-Confirmation—and Plan § 6.3(c) adequately preserves the SPV Debtors' rights to bring defenses and setoff claims.  The FBG Debtors further modified |

| | |
|---|---|
| | section 6.3(c) of the Plan to specify that setoff rights are preserved against the FBG Debtors and their successors (in addition to the Litigation Trustee).  *See* Reply ¶¶ 195–200; Plan § 6.3(c). |
| iv. the Plan does not adequately preserve defenses based on substantive consolidation, veil piercing, or alter ego, and does not provide reciprocal protections to the SPV Debtors that are provided to the Litigation Trust.  The Plan also fails to address the primary issue—whether the Plan itself is deemed a substantive consolidation.  (¶¶ 29–31). | Plan § 6.2(c) expressly preserves all defenses, responses, and arguments based on substantive consolidation, veil piercing, alter ego, or any similar doctrine (including recoupment, setoff, and offset) for all parties—not just the FBG Debtors.  The Plan provides for consolidation solely for distribution purposes and is not a substantive consolidation.  *See* Reply ¶¶ 195–200; Plan § 6.2(c). |
| v. the Plan does not make clear how the SPV Debtors will be governed after the Effective Date; Article V appears to divest Viceroy's control persons and vest authority in a conflicted Wind Down Administrator appointed by the FBG Debtors, Ad Hoc Group SteerCo, and Committee, when the SPV Debtors should be governed by independent fiduciaries, and Viceroy cannot be dissolved under § 5.10 while it remains the indirect owner.  (¶ 32). | There is no requirement for the FBG Debtors to establish a governance structure for the SPV Debtors in the context of the FBG Debtors' Plan.  Section 5.8(a) of the Plan provides that the Wind Down Administrator will serve as the initial director or manager of each FBG Debtor upon the confirmation of the Plan, which includes Viceroy, the holding company to the SPV Debtors.  Plan § 5.8. |
| vi. Viceroy should not be a Plan Debtor because its primary purpose is to serve as the indirect parent/holding company for the excluded SPV Debtors, which the Plan should specify are not FBG Debtors.  (¶ 32). | *See* Reply ¶ 201. |
| vii. the Plan fails to specify how proceeds from the Adversary Proceedings against Patrick and Edward James—asserted jointly by the FBG Debtors and the SPV Debtors—will be apportioned and accounted for the SPV Stakeholders.  (¶ 32). | *See* Reply ¶ 202. |
| viii. the Plan fails to preserve the SPV Debtors' interest in the shared D&O Policies and provides no mechanism to reserve coverage for them.  The Plan must ensure the Litigation Trust does not disproportionately exhaust available coverage.  (¶ 32). | *See* Reply ¶¶ 195–200. |
| ix. the Litigation Trust Assets include assets acquired as a result of any government enforcement action and therefore the Plan should expressly preserve the SPV Debtors' entitlement to any such recoveries allocable to them.  (¶ 32). | *See* Reply ¶¶ 195–200. |
| x. the Litigation Trust Assets include all books, records, and investigative/discovery findings of the FBG Debtors, which are equally critical to the SPV Debtors' own claims.  The Plan must include procedures ensuring the SPV Debtors are afforded access.  (¶ 32). | *See* Reply ¶¶ 195–200. |
| xi. the Plan transfers broadly defined privileges to the Litigation Trust (§ 6.2(d)), which could shield materials about predicate inter-Debtor transfers from discovery in avoidance actions.  The Plan should provide that it does not limit any party's right to seek discovery concerning alleged voidable transactions to the same extent available before confirmation.  (¶ 32). | *See* Reply ¶ 203. |
| xii. section 15.12 of the Plan should expressly provide that the Lift Stay Order's cooperation obligations are binding on the Trusts, which receive the Debtors' books and records.  (¶ 32). | The Plan does not need to address whether the Lift Stay Order (Docket No. 1820) is binding—the order expressly states the parties on which it is binding.  Lift Stay Order ¶ 12. |
| xiii. section 10.2 of the Plan should expressly state that nothing in the Plan prevents a creditor from filing an effective § 502(h) claim.  (¶ 32). | *See* Reply ¶¶ 195–200. |

| | | | | |
|---|---|---|---|---|
| | | | xiv. the protections and savings clauses in the objection (including the books-and-records and privilege objections) must expressly supersede any contrary provisions in the Trust agreements. (¶ 32). | *See* Reply ¶ 203. |
| | | | xv. the Plan is not feasible and delays paying $222 million of administrative expenses and $245 million of asserted priority claims until well after the Effective Date on speculative litigation recoveries. (¶ 33). | *See* Reply ¶¶ 100–121. |
| 4 | 3265 | Evolution (Evolution Credit Opportunity Master Funds and affiliates) | i. Evolution asserts that the Plan violates § 1129(a)(9)(A) because it fails to pay administrative expense and priority tax claims in full in cash on the effective date, which is actually the Confirmation Date because, on the Confirmation Date, (a) the Plan irreversibly vests all assets in the various trusts and the Wind Down Administrator; (b) Preference Settlement Electing Creditors irrevocably contribute their Direct Creditor Claims to the Litigation Trust; (c) broad releases, exculpation, and injunctions are granted; (d) the Litigation Trust is funded with $75 million; and (e) Debtor and lender professionals are paid more than $245 million on their administrative claims—while all other administrative claims await uncertain litigation recoveries. (¶¶ 26–33). | *See* Reply ¶¶ 19–46. |
| | | | ii. Evolution asserts the Plan is not feasible under § 1129(a)(11) because it depends on speculative "home-run" litigation recoveries of ~$1.9–2 billion, and, if those recoveries do not materialize, the Secured Parties retain all of the Debtors' assets while administrative expense creditors receive nothing. (¶¶ 33–36). | *See* Reply ¶¶ 108–121. |
| | | | iii. Evolution argues that the Debtors vastly overstate potential litigation values because the Kirschner Declaration relies on ~$25.4 billion of gross transfers and the Ponzi-Scheme Presumption does not override defenses (good faith, return of principal, new value, ordinary course)—accounting for return of principal alone reduces assertable claims from over $25 billion to just over $3 billion, and as to Evolution would largely eliminate the ~$277 million and ~$73 million asserted. (¶¶ 37–43). | *See* Reply ¶¶ 52–99. |
| | | | iv. Evolution argues that the Kirschner Declaration offers no creditworthiness analysis, no supported litigation or appeal timeline, and D&O coverage does not exceed ~$190 million against insider claims. (¶¶ 44–45). | *See* Reply ¶¶ 108–113. |
| 5 | 3267 | U.S. Trustee (Kevin M. Epstein) | i. The U.S. Trustee argues that the Plan is not proposed in good faith under § 1129(a)(3), asserting that: | |
| | | | a. the Plan is premised on the Estate Claims Credit Bid Transaction, an improper transfer because the DIP Secured Parties hold a lien only on the proceeds of Avoidance Actions, not the actions themselves. (¶¶ 2, 4, 21(a)(i), 23). | *See* Reply ¶¶ 137–141. |
| | | | b. the Estate Claims Credit Bid Transaction is effective on the Confirmation Date rather than the Effective Date, and it is unclear what happens to the Estate Claims if the Plan never goes effective while the releases to the DIP Secured Parties remain binding. (¶¶ 2, 3, 5, 15, 21(a)(ii), 23). | *See* Reply ¶¶ 33–46. |

| | | | | |
|---|---|---|---|---|
| | | | c. the Plan treats Administrative Claims as a de facto class without affording them the legal protections given to classes of claims. (¶¶ 21(a)(iii), 25). | The Plan does not classify Administrative Expense Claims.  The treatment of Administrative Expense Claims complies with section 1129(a)(9).  Plan § 2.1. |
| | | | d. the Administrative Expense Claims Consent Program is improper and coercive because it elicits an election to reduce a claim by 50% and to consent to delayed payment. (¶¶ 6, 21(a)(iv), 26–27). | *See* Reply ¶¶ 213–220. |
| | | | e. the delayed Effective Date is prejudicial to administrative claimants, who are treated as a de facto class without a collective voice to negotiate terms or vote on treatment. (¶¶ 6, 7, 21(a)(v), 25, 27–28). | *See* Reply ¶¶ 122–131. |
| | | | f. the Plan does not provide administrative creditors interest on their claims on account of the delay. (¶ 32). | The Bankruptcy Code does not require the payment of interest on an administrative expense claim.  The Plan's treatment of Administrative Expense Claims complies with section 1129(a)(9). Plan § 2.1. |
| | | ii. The U.S. Trustee contends that there is no guarantee the Effective Date will occur by September 2030 as required by § 1129(a)(9)(C), or ever, as required by § 1129(a)(9)(A). (¶¶ 21(b), 31–33). | | A debtor need not guarantee success of a plan, only that the plan is commercially viable.  *See* Reply ¶¶ 52–131. |
| | | iii. The U.S. Trustee maintains that the Disclosure Statement does not include adequate information about the value of the Estate Claims, the probability of success in litigating them, the time to liquidate them, or their collectability. (¶¶ 8, 21(c), 34–40). | | The Disclosure Statement sets forth adequate information about the Estate Claims, including details all types of Claims, including Claims from the James Adversary Proceeding and Onset Adversary Proceeding, Avoidance Actions, Recovery Actions, and other Claims.  Disclosure Statement § I.A.1(a).  Further, the Disclosure Statement provides various risk factors associated with litigating the Estate Claims, including their collectability.  *Id.* § V.B.1–9. |
| | | iv. The U.S. Trustee argues that the injunction/discharge provision violates § 1141(d)(3) by providing an improper discharge because the FBG Debtors are liquidating substantially all assets and will not engage in business post-consummation. (¶¶ 21(d), 41–46). | | The FBG Debtors are working with the U.S. Trustee to resolve this objection. |
| | | v. The U.S. Trustee asserts that the exculpation provision is impermissibly broad because it includes parties not entitled to exculpation in the Fifth Circuit (e.g., Special Committee members). (¶¶ 21(e), 47–50). | | *See* Reply ¶¶ 233–237. |
| | | vi. The U.S. Trustee alleges that the injunction and gatekeeper provisions violate the Bankruptcy Code and Fifth Circuit precedent (*Highland*) because they cover parties not entitled to exculpation. (¶¶ 21(f), 51–56). | | *See* Reply ¶¶ 238–242. |
| | | vii. The U.S. Trustee objects to any waiver of the fourteen-day stay under Fed. R. Bankr. P. 3020(e), for which the Debtors have shown no exigency. (¶¶ 21(g), 57). | | There evidence will show that there are exigent circumstances supporting the waiver of the fourteen-day stay.  Specifically, the Confirmation Budget, as agreed to among the FBG Debtors, the ABL Parties, and the Ad Hoc Group, provides limited runway for these chapter 11 cases to extend beyond the date of the Combined Hearing. |
| 6 | 3269 | UMB Bank, N.A. ("**UMB**") | i. UMB joins the Aequum Objection and requests that the Court sustain the Aequum Objection, condition confirmation upon incorporation of the revisions and clarifications requested therein, and deny confirmation unless the Plan is modified to cure the identified deficiencies. | *See* above Response to the objection of Aequum. |

| 7 | 3271 | Katsumi Servicing, LLC ("**Katsumi**") | i. | Katsumi argues that the Plan is not feasible under § 1129(a)(11) asserting that: | |
|---|---|---|---|---|---|
| | | | a. | feasibility depends entirely on recoveries from speculative and largely unasserted litigation claims, requiring the Litigation Trust to generate nearly $2 billion to satisfy the Debtors' estimated $222 million of administrative claims and $78 million of priority claims, against only $75 million of committed funding for the Plan to go effective. (¶¶ 9–13). | *See* Reply ¶¶ 47–51. |
| | | | b. | Mr. Moore's feasibility opinion rests on the Kirschner Declaration, however Mr. Kirschner was retained less than a month prior to submitting his declaration, therefore relies entirely on Mr. Moore's declaration, therefore any feasibility analysis from Mr. Moore is circular and conclusory and Mr. Kirschner's opinion is speculative and unsupported by reliable analysis. (¶¶ 14–17). | *See* Reply ¶¶ 63–99. |
| | | | c. | neither the Plan nor the Kirschner Declaration contain any analysis of defendants' ultimate collectability | *See* Reply ¶¶ 108–121. |
| | | | d. | the Effective Date is a "moving target" and the litigation claims are more speculative, making this case materially different from *Steward*. (¶¶ 18–21). | *See* Reply ¶¶ 100–107. |
| | | | ii. | Katsumi contends that administrative claims will not be paid in full in cash on the "functional" effective date, which is the Confirmation Date, as required under § 1129(a)(9)(A), yet the Plan binds parties, vests assets, and is substantially consummated at confirmation. (¶¶ 22–24). | *See* Reply ¶¶ 33–46. |
| | | | iii. | Katsumi argues that the Plan fails to provide equal treatment in violations of § 1123(a)(4), *Serta*, and *ConvergeOne*, asserting that: | |
| | | | a. | the Preference Settlement grants Trade Creditors a complete release while similarly classified Factors and Supply Chain Financers remain exposed to Preference Actions and receive only limited protections in defending against such actions, despite Trade Creditors holding only $205 million in preference exposure as compared to the ~$1.8 billion held by Factors and Supply Chain Financers combined. (¶¶ 28–33). | *See* Reply ¶¶ 159–165. |
| | | | b. | the "Specified Non-Released Party" and "Adverse Conduct" constructs categorically exclude similarly situated creditors from participating in the Preference Settlement based on a non-statutory criterion. (¶¶ 34–38). | *See* Reply ¶¶ 155–172. |
| | | | iv. | Katsumi argues that the Estate Claims Credit Bid Transaction impermissibly permits the DIP Secured Parties to credit bid on Avoidance Actions, which are expressly excluded from their DIP Collateral, in violation of § 363(k) and, therefore, the good faith purchaser protections of section 363(m) are improper. (¶¶ 39–43). | *See* Reply ¶¶ 133–136. |
| | | | v. | Katsumi argues that the Plan impermissibly classifies substantially similar claims in different classes under § 1122(a), constituting vote gerrymandering, asserting that: | |

8

| | | | | | |
|---|---|---|---|---|---|
| | | | a. | the Plan impermissibly classifies unsecured deficiency claims separately from Class 7 General Unsecured Claims. (¶¶ 46–49). | *See* Reply ¶¶ 243–254. |
| | | | b. | the Plan Settlement construct relies on improper classification because the Roll-Up, First Lien, Second Lien, and General Unsecured Claims share pro rata in the same Litigation Trust Waterfall distribution tier with the General Unsecured Claims, yet all claims are separately classified for voting. (¶¶ 50–55). | *See* Reply ¶¶ 243–254. |
| | | | vi. | Katsumi asserts that the Plan impermissibly consolidates the estates for some purposes (including, distribution and the Preference Settlement's Modified New Value Elements) but not others—a tactical "pretend" consolidation. (¶¶ 56–62). | *See* Reply ¶¶ 173–190. |
| | | | vii. | Katsumi argues that the Plan contains other defects precluding confirmation, including that: | |
| | | | a. | the definition of "ABL Collateral Trust Assets" rewrites the Court's Initial Factoring Order to the detriment of Factors. (¶¶ 63–68). | "ABL Collateral Trust Assets" explicitly says that the ABL Trust Assets shall not include any assets that are determined by Final Order to be (a) property of the SPV Debtors or their estates, any of the Factors, or any of the SPV Lenders *or* (b) subject to a validly perfected first-priority lien asserted by a Factor or SPV Lender. *See* Disclosure Statement §§ I.A.1.a, I.A.2.a, I.A.3.a. |
| | | | b. | the definition of "Estate Claims" is impermissibly overbroad under § 541 and sweeps in Direct Creditor Claims. (¶¶ 69–74). | *See* Reply ¶ 194. |
| | | | c. | section 9.11(b) of the Plan impermissibly extinguishes setoff rights outside § 553. (¶¶ 75–77). | Language requiring a lift stay motion to seek setoff in setoff of section 9.11 of the Plan was removed prior to solicitation of the Plan. *See* Plan (Docket No. 3019). |
| | | | d. | the third-party release, exculpation, and injunction provisions (§§ 13.4(b), 13.5(b), 13.6, 13.8) are impermissible under *Highland*/*Purdue* and must be narrowed. (¶¶ 78–82). | *See* Reply ¶¶ 233–237. |
| | | | viii. | Katsumi contends that the Disclosure Statement should not be approved on a final basis because it misleadingly states substantive consolidation applies "solely for purposes of distributions" when in fact, the Plan substantively consolidates for voting and classification, and the Disclosure Statement includes no disclosure regarding the consequences if the Effective Date never occurs. (¶¶ 83–90). | The Disclosure Statement contains adequate information in accordance with section 1125 of the Bankruptcy Code. The FBG Debtors are only substantially consolidating for distribution purposes. Reply ¶¶ 173–190. Further, the Disclosure Statement contains appropriate risk factors regarding the risk of not achieving the Effective Date, including risks inherent to litigation claims such as collectability or the success of the actions and litigations. Disclosure Statement § V.A.3., V.B.8. |
| 8 | 3272 | Orbian Corporation and Orbian Financial Services XXVI LLC (collectively, "**Orbian**") | i. | Orbian objects to confirmation of the Plan, arguing that: | |
| | | | a. | Application of the Modified New Value Elements to Supply Chain Financers that opt in to Preference Settlement should be mandatory and not subject to the Litigation Trustee's discretion. (¶¶ 6–12). | The Preference Settlement was carefully negotiated and is optional. Parties that do not believe the Preference Settlement benefits them are not obligated to participate. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | b. | the Plan is ambiguous regarding application of the Modified New Value Elements across multiple Debtors, because although §§ 6.2(b)–(c) prevent litigation counterparties from asserting defenses across debtors, the Modified New Value Element under § 6.11(e) includes subsequent payments made "without regard to which FBG Debtor such payment was made." (¶¶ 13–14). | Orbian misstates the import of Section 6.2(b)–(c).  In any event, neither section has any impact on the application of the Modified New Value Element in Section 6.11.  Accordingly, this objection should be overruled. |
| | | | | c. | the definition of "Adverse Conduct" does not exclude receiving a transfer under § 548.  The Litigation Trustee could nullify protections to Supply Chain Financers and Factors under § 6.11(c) by characterizing payments as non-§ 547 avoidance actions, placing all such parties within "Adverse Conduct," and it is unclear what conduct is "wrongful." (¶¶ 15–20). | The Preference Settlement only applies to Preference Actions and not to fraudulent transfer actions or other Avoidance Actions.  The Preference Settlement is voluntary.  If a party does not believe the Preference Settlement benefits them, they are not obligated to participate.  *See also* Reply ¶ 169. |
| | | | ii. | Orbian alleges that the Disclosure Statement does not contain adequate information because it fails to disclose that parties that opt into the Preference Settlement but are later determined ineligible will have permanently relinquished their claims. (¶ 21). | | The Disclosure Statement states that if it is determined that Preference Settlement Electing Creditor is ineligible to participate in the Preference Settlement, in accordance with the Plan, such creditor will no longer receive the benefits of the Preference Settlement and the waiver of Preference Actions (for Trade Creditors) or the modified new value defense to Preference Actions (for Supply Chain Financers or Factors) will be reversed.  In such an instance, such creditor will not regain ownership and/or control of their Direct Creditor Claims.  However, such Preference Settlement Electing Creditor's grant of Third-Party Releases will be reversed and such creditor will no longer be a "Releasing Party" (or a Released Party) under the Plan.  Plan § 6.11; Disclosure Statement § I.E.2. |
| | | | iii. | Orbian urges that the Preference Settlement Opt-In Form erroneously stated that objecting parties would be barred from participating in the Preference Settlement.  Although the Debtors confirmed the sentence was erroneous and removed it, the version Orbian received still included it, calling into question the validity of the solicitation. (¶ 22). | | The FBG Debtors have clarified that objecting to the Plan no longer disqualifies a party from participating in the Preference Settlement.  *See* Confirmation Order ¶ 37. |
| 9 | 3273 | Garza WARN Plaintiffs | i. | The Garza WARN Plaintiffs posit that the Plan does not specify how any WARN Act claims, if allowed, will be paid in full consistent with § 1129(a)(1), which trust is responsible for paying disputed WARN claims, how disputed WARN claims will be treated pending allowance, whether sufficient assets exist, or how the Plan is feasible. (¶¶ 10–13). | | The FBG Debtors dispute the allowance and classification of any WARN Act Claims as administrative expense claims and have moved to dismiss the amended complaint of the Garza Plaintiffs (Adv. Pro. 26-3038, Docket No. 18).  In any event, the Plan provides that the Claims Ombudsman shall be responsible for reconciling all Disputed Claims.  Plan § 5.2(g).  The Plan also provides a mechanism by which the Claims Ombudsman or applicable Trustee will retain, for the benefit of each holder of a Disputed Claim against the FBG Debtors, an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim against the FBG Debtors if it were an Allowed Claim (subject to additional modifications as set forth Section 9.4(a) of the Plan).  Plan § 9.4(a). |
| | | | ii. | The Garza WARN Plaintiffs argue that the Plan cannot satisfy § 1129(a)(11) because there is no reserve or other mechanism to satisfy contingent litigation claims. (¶¶ 14–15). | | As discussed above, the FBG Debtors dispute the allowance and classification of any WARN Act Claims as administrative claims and have moved dismiss the amended complaint of the Garza Plaintiffs (Adv. Pro. 26-3038, Docket No. 18).  In the event that the claims ultimately become allowed administrative claims, such claims would be satisfied in accordance with Section 2.1 of the Plan and the Litigation Trust Waterfall. |
| | | | iii. | The Garza WARN Plaintiffs maintain that the best-interests test under § 1129(a)(7) cannot be evaluated without knowing how the Garza WARN Plaintiffs' claims are classified. (¶ 16). | | As set forth in the Liquidation Analysis, in a hypothetical chapter 7, junior creditors such as the WARN Plaintiffs would likely not receive any recoveries on account of their Claims (whether classified as administrative claims or general unsecured claims).  Accordingly, the Plan satisfies |

| | | | | | the best interests test with respect to the WARN Plaintiffs' Claims regardless of their classification. |
|---|---|---|---|---|---|
| | | | iv. | The Garza WARN Plaintiffs claim that, to the extent the Plan is silent on the WARN claims "for the purpose of eliminating them without proper resolution," the Plan has been proposed in bad faith and cannot be confirmed under § 1129(a)(3). (¶ 17–20). | The Plan does not purport to eliminate any claims, including disputed claims such as the Garza WARN Plaintiffs' Claims. To the contrary, the Plan provides for various mechanism for reconciling disputed claims (and providing distributions on account of those claims to the extent such claims ultimately become allowed). |
| | | | v. | The Garza WARN Plaintiffs assert that the Disclosure Statement fails to provide adequate information regarding the Debtors' position on and classification of the WARN claims, and confirmation is premature because an entire category of actively litigated claims remains unaddressed. (¶¶ 21–28). | The FBG Debtors dispute the allowance and classification of the Garza WARN Plaintiffs' Claims as administrative expense claims and have moved to dismiss their amended complaint. In any event, the Plan provides a mechanism for retaining amounts for Disputed Claims. *See* Reply ¶¶ 103 n.150; Plan §§ 5.2(g); 9.4(a). |
| 10 | 3274 | Carnaby Secured Lenders (lenders under the Carnaby II and Carnaby III Credit Agreements) | i. | The Carnaby Secured Lenders assert that the delayed-Effective-Date construct renders the Plan unconfirmable under § 1129(a)(9) because the true "effective date" is the Confirmation Date or soon thereafter, when the Plan is substantially consummated, including by irrevocably transferring all assets to trusts through the credit bid transactions, and beginning to make distributions, yet administrative and priority creditors are not paid. (¶¶ 66–71). | *See* Reply ¶¶ 33–46. |
| | | | ii. | The Carnaby Secured Lenders assert that the Plan is not feasible under § 1129(a)(11) because | |
| | | | a. | the Debtors lack sufficient assets to pay administrative claims, given that no bar date has passed, the Debtors have not succeeded in objections to the filed administrative and priority claims, and most of the Debtors' asserted litigation claims have not been commenced, in contrast to *Steward*, therefore there is no evidence to support the Debtors' assertions that the Litigation Trust could recover $2 billion by the end of 2028 to go effective. (¶¶ 72–81). | *See* Reply ¶¶ 47–131. |
| | | | b. | the Plan forecloses any possibility to unwind the transfer of Estate Claims to the Litigation Trust through a strained use of § 363(m) protections in the event the Effective Date never occurs. (¶ 82). | *See* Reply ¶¶ 150–154. |
| | | | c. | feasibility of the Plan rests on inadmissible hearsay, speculation, and legal assertions in the Moore Declaration, on which the Kirschner Declaration unquestionably accepts. (¶¶ 83–87). | *See* Reply ¶¶ 63–99. |
| | | | d. | the Kirschner Declaration and analysis mistakenly assumes the Ponzi Scheme Presumption automatically applies without taking into consideration potential "good faith transferee" defenses under § 550(b). (¶¶ 88–98). | *See* Reply ¶¶ 70, 80, 93–95. |
| | | | e. | the market price of the DIP loans and the absence of any competing bid confirm the recoveries are speculative. (¶ 99). | *See* Reply ¶¶ 116–121. |
| | | | iii. | The Carnaby Secured Lenders posit that the Administrative Expense Claims Program cannot be approved because it elevates the priority of certain administrative claims over others based solely | *See* Reply ¶¶ 213–220. |

| | | | | |
|---|---|---|---|---|
| | | | on a holder's willingness to settle for 50% of face value, circumventing the Code's safeguards and contravening *Jevic*. (¶¶ 100–101). | |
| | | | iv.   The Carnaby Secured Lenders contend that the Plan prejudices creditors of the SPV Debtors and their estates, arguing that: | |
| | | | a.   the Plan improperly seeks to grant the Litigation Trust greater interests in the Estate Claims than the FBG Debtors possess and fails to specifically provide that the trusts remain subject to all applicable defense, rights of recoupment, setoff, offset, and legal and equitable doctrines, including, *in pari delicto*. (¶¶ 102–104). | *See* Reply ¶¶ 195–200. |
| | | | b.   and the Plan does not preserve the SPV Debtors' access to books and records in which they hold a common interest. (¶¶ 105–108). | To the extent the SPV Debtors have books and records, the Plan does not purport to transfer or otherwise treat such books and records. |
| | | | c.   the Plan's broad exculpation and injunction provisions (including the § 13.4(c) gatekeeper provision) impair the SPV Debtors' and their creditors' ability to bring claims, effectively exculpate non-Debtors (impermissible in the Fifth Circuit), and exculpate Special Committee members without a carve-out for the SPV Debtors, their estates, or creditors. (¶¶ 109–113). | *See* Reply ¶¶ 192–193. |
| | | | v.   The Carnaby Secured Lenders claim that the Plan is not proposed in good faith because its delayed-effective-date construct and permanent transfer of Estate Claims are designed to give the DIP Lenders the benefits while forcing administrative creditors to take a 50% haircut or subordinate their claims. (¶¶ 114–115). | The Plan is feasible and does not prejudice administrative creditors but rather protects them. *See* Reply ¶¶ 122–131. |
| 11 | 3275 | Total Quality Logistics, LLC ("**TQL**") | TQL objects to confirmation of the Plan arguing that: | |
| | | | i.   the Plan fails to provide adequate means of implementation under § 1123(a)(5) because payment of administrative expense claims depends on the Litigation Trust first generating ~$1.9 billion and the Plan may be rendered null and void if its conditions are not met. (¶¶ 16–22). | *See* Reply ¶¶ 100–107. |
| | | | ii.   the Plan does not provide a concrete, enforceable means to pay administrative expense claims in cash on the effective date as § 1129(a)(9)(A) requires, because payment is tied to speculative future litigation recoveries. (¶¶ 23–24). | *See* Reply ¶¶ 100–107. |
| | | | iii.   the Administrative Expense Claims Consent Program impermissibly creates a super-priority administrative-claims class and subordinates non-consenting administrative creditors without their consent, violating § 1129(a)(9)(A). (¶¶ 24–29). | *See* Reply ¶¶ 213–220. |
| | | | iv.   the Plan disregards the Administrative Expense Claims Basket established under the Final DIP Order and pays prepetition and ABL lenders ahead of administrative expense claims contrary to § 8(b) of the Final DIP Order. (¶¶ 30–36, 41). | *See* Reply ¶¶ 205–212. |

| | | | | |
|---|---|---|---|---|
| | | | v. the Plan and Disclosure Statement lack critical financial and other information, including credit-bid amounts, valuable assets in the Liquidation Analysis, and the DIP lenders' recoveries from assets assumed to be foreclosed on in chapter 7. (¶¶ 37–40). | The assets that TQL asserts are absent from the Liquidation Analysis are discussed in the Global Notes and assumptions thereto. The Disclosure Statement includes adequate information as required by § 1125. |
| | | | vi. the Trust waterfalls are ambiguous regarding whether the Litigation Trust Waterfall thresholds account for aggregate distributions under both the DIP Collateral Trust and the Litigation Trust in determining when the DIP A Claims are satisfied. (¶¶ 42–43). | The Plan does not provide that the Litigation Trust Waterfall return thresholds are impacted by recoveries obtained by the DIP Collateral Trust. Plan § 6.5. |
| 12 | 3276 | Patrick James and Related Entities | The James Parties object to confirmation of the Plan, arguing that: | |
| | | | i. the Debtors improperly seek to prosecute and value their claims against Mr. James at the confirmation hearing on a rushed basis, violating the Court's stay orders in the Adversary Proceeding and Mr. James's due-process rights. (¶¶ 1–11). | *See* Reply ¶¶ 52–62. |
| | | | ii. the Debtors' allegations of fraud committed by Mr. James specifically are insufficient to plead claims of wrongdoing by Mr. James and disregard his substantial capital contributions to the Company. (¶¶ 12–29). | *See* Reply ¶¶ 63–99. |
| | | | iii. the Debtors do not connect Mr. James to (a) third-party factoring, which the record attributes to Mr. Brumbergs, (¶¶ 30–32), (b) to supply-chain financing, which rested with the Company's finance and accounting personnel, (¶¶ 33–34), (c) off-balance-sheet financing, most of which was done through Onset, for which Mr. James is not the relationship person, (¶¶ 35–36), (d) alleged false financial reporting, which is undermined by the Company's general ledger and unchallenged top-line metrics, and no insolvency analysis was performed for 2022–2023, (¶¶ 37–39). | *See* Reply ¶¶ 63–99. |
| | | | iv. because the claims against Mr. James lack merit and will not generate sufficient value to pay DIP financing and administrative expense claims in full, the Plan does not satisfy § 1129(a)(9) and is not feasible. (¶ 40). | *See* Reply ¶¶ 108–121. |
| | | | v. substantive consolidation is not warranted, has not been shown, and cannot excuse the Debtors from proving their claims on a debtor-by-debtor basis. (¶ 41). | *See* Reply ¶¶ 173–190. |
| | | | vi. The James Parties join the objections of the LAM Parties and Aequum to the extent they address abrogation of defenses, setoff, and the one-sided use of substantive consolidation. (¶ 42). | *See* above Responses to the objections of the LAM Parties and Aequum. |
| 13 | 3277 | Onset Financial, Inc. ("**Onset**") | i. Onset urges that the Plan violates §§ 1129(a)(9) and 1129(a)(11) because it does not provide for timely payment of Administrative Expense Claims, leaving nearly $300 million in Allowed Administrative and Priority Claims unpaid while favored parties receive outsized returns. (¶¶ 1, 25–44). | *See* Reply ¶¶ 26–46. |
| | | | a. Onset argues that the Debtors cannot manipulate the "effective date" terminology to avoid paying administrative claims, because the Plan is effective on the Confirmation | *See* Reply ¶¶ 26–46. |

| | | | |
|---|---|---|---|
| | | Date in every relevant respect other than the payment of administrative claims, distinguishable from *Robertshaw* and *Sears*. (¶¶ 26–33). | |
| | | b. Onset argues that the Debtors cannot currently pay their estimated ~$300 million in Administrative and Priority Claims. (¶¶ 34–35). | *See* Reply ¶¶ 26–46. |
| | | c. Onset argues that the Debtors have not shown a reasonable likelihood of recovery, because payment depends on the Litigation Trust recovering ~$1.965 billion (with two key Estate Claims stayed pending a February 2027 criminal trial), and the Kirschner Declaration provides no testable valuation, was produced in under five weeks, and ignores collectability and forfeiture risk; *Steward* is distinguishable. (¶¶ 36–44). | *See* Reply ¶¶ 52–99. |
| | | ii. Onset asserts that the Litigation Trust Funding is unreasonable under § 1129(a)(4) because the funders would receive ~$286 million (5.7x their $50 million investment) plus a perpetual percentage, with no market test or supporting evidence. (¶¶ 45–53). | *See* Reply ¶¶ 221–28. |
| | | iii. Onset posits that the Plan inappropriately prejudices the Carnaby Estate Claims by transferring Joint Estate Claims, privileges, insurance rights, and litigation files to the Litigation Trust without any mechanism governing common-interest/joint-defense privilege, insurance allocation, or coordinated control. (¶¶ 54–59). | *See* Reply ¶¶ 191–204. |
| | | iv. Onset contends that the Estate Claims Marketing Process and Estate Claims Credit Bid do not satisfy § 363 because: | *See* Reply ¶¶ 132–54. |
| | | a. the marketing process failed § 363(b)'s aggressive-marketing and court-approved-bidding requirements. (¶ 60). | *See* Reply ¶¶ 142–54. |
| | | b. the credit bid violates § 363(k) by including Avoidance Actions over which the DIP Lenders have no lien. (¶ 61). | *See* Reply ¶¶ 137–141. |
| | | v. Onset argues that the Plan was not proposed in good faith under § 1129(a)(3) (¶¶ 64–73). | *See FBG Debtors' Memorandum of Law in Support of (I) Final Approval of the Disclosure Statement and (II) Confirmation of Joint Chapter 11 Plan* (Docket No. 3426) ¶¶116–119. |
| | | vi. Onset maintains that the Disclosure Statement should not receive final approval under § 1125 because it understates the litigation risks associated with the Estate Claims (including Onset's defenses), fails to adequately quantify Administrative Expense Claims (no bar date), and does not explain what happens if the Effective Date never occurs. (¶¶ 74–79). | The Disclosure Statement contains adequate information as required by § 1125, including information on risks associated with prosecuting and recovering on account of Estate Claims (Disclosure Statement § V(B)(9)), information on the FBG Debtors' reasonable estimated administrative expense claims, including a 20% cushion (Disclosure Statement § V(A)(8)),), and an explanation of the risk that the Effective Date may never occur and the risk of a resulting chapter 7 conversion (Disclosure Statement § V(A)(12)). |
| 14 | 3278 | Ronald J. Sommers, Chapter 7 Trustee for the Converted SPV Debtors (the "**Chapter 7 Trustee**") | The Chapter 7 Trustee objects to confirmation of the Plan arguing that the Plan: |

| | | | | |
|---|---|---|---|---|
| | | | i. does not exclude assets that are subject to a bona fide dispute with the Converted SPV Debtors from transferring to a Trust. (¶¶ 23–26). | The definitions of Litigation Trust Assets, DIP Collateral Trust Assets, ABL Collateral Trust Assets in the Plan are each clear that assets of the SPV Debtors and their estates are not property of the Trusts. *See* Plan, at 19 (definition of Litigation Trust Assets), 11 (definition of DIP Collateral Trust Assets), and 1-2 (definition of ABL Collateral Trust Assets). |
| | | | ii. should not permit the Litigation Trust to exercise control over property of the Converted SPV Debtors, including claims held by such Converted SPV Debtors. (¶¶ 27–28). | Nothing in the Plan permits the FBG Debtors or Litigation Trust to prosecute claims, or assert control over claims, held by the SPV Debtors. Only the claims owned by the FBG Debtors will be transferred to the Litigation Trust. *See* Plan, at 14 (defining "Estate Claims" to include "claims and/or remedies that are held or controlled by, or which were or could have been asserted by, *the FBG Debtors or their Estates* . . ."). |
| | | | iii. should not permit the transfer of D&O policies and rights thereunder to any Trust. (¶¶ 28–32). | The Plan only transfers the FBG Debtors' rights in the D&O policies to the Litigation Trust. It does not transfer the SPV Debtors' rights, if any, in any D&O policy. *See* Plan, at 19 (defining the "Litigation Trust Assets" to include "all Insurance Rights *of the FBG Debtors* with respect to Insurance Policies that provide or may provide coverage for Estate Claims . . ."); § 11.4(d) (providing for only the transfer of the rights and obligations of the FBG Debtors under the D&O Policies to the Litigation Trust). There is nothing impermissible about transferring the FBG Debtors' rights in the D&O policies to the Trust. Moreover, the Plan expressly includes language providing that "the transfer of the Insurance Rights of the FBG Debtors' and their Estates to recover proceeds from D&O Policies to the Litigation Trust shall not hinder the ability of any beneficiaries or insureds of such D&O Policies to submit claims and otherwise pursue and obtain coverage under the D&O Policies." *See* Plan § 11.4(d) Accordingly, all rights of the SPV Debtors to access D&O proceeds are preserved. |
| | | | iv. should not permit the transfer of the books and records to the Litigation Trust until the dispute over ownership of such books and records are resolved. (¶¶ 33–34). | *See* Reply ¶¶ 191–204. |
| | | | v. should not allow estate professionals, independent directors or managers, the Examiner, or the Creditors' Committee's advisors to refuse to turn over work product and communications to the Converted SPV Debtors. (¶¶ 35-37). | The language cited by the Chater 7 trustee does not allow these parties to "refuse" turnover but rather only applies to what materials are required to be turned over to the Litigation Trust, and not to any SPV Debtor. *See* Plan, at 19 (defining the scope of books, records, and investigative findings that are "Litigation Trust Assets" and therefore transfer to the Litigation Trust). |
| | | | vi. should preserve allocation disputes for claims and causes of action filed against a common defendant by one or more of the Converted Debtors. (¶¶ 38–39). | Nothing in the Plan resolve allocation disputes with respect to claims against common defendants held by the FBG Debtor and one or more SPV Debtors. As the Chapter 7 Trustee acknowledges, the Disclosure Statement expressly provides that there allocation disputes are preserved. |
| 15 | 3279 | Arab Banking Corporation B.S.C. ("**Bank ABC**") | i. Bank ABC joins and supports the Katsumi Objection and the LAM Parties Objection and requests that the Court deny confirmation, deny final approval of the Disclosure Statement, and sustain and/or modify the Plan consistent with the Objections. (¶¶ 4–5). | *See* above Responses to the objections of the LAM Parties and Katsumi. |
| 16 | 3280 | ING Belgium S.A./N.V. ("**ING Belgium**") | i. ING Belgium joins and incorporates the legal arguments in the Katsumi Objection and the LAM Parties Objection to final approval of the Disclosure Statement and confirmation of the Plan. (¶ 5). | *See* above Responses to the objections of the LAM Parties and Katsumi. |

| 17 | 3287 | Oracle America, Inc. ("**Oracle**") | i. | Oracle objects to any assumption or assumption and assignment of the Oracle Agreements absent Oracle's consent because the agreements are, or pertain to, non-exclusive licenses of copyrighted software, which they assert are non-assignable under § 365(c)(1) and applicable federal law. (Argument § III.A (pp. 3–4). | Reserving all rights as to whether the Oracle Agreements could be assumed and assigned without Oracle's consent, the Oracle Agreements are not proposed to be assumed and assigned under the Plan. Therefore, this objection is moot. |
| --- | --- | --- | --- | --- | --- |
| | | | ii. | To the extent the Debtors seek to assume or assume and assign the Oracle Agreements (with Oracle's consent), the Debtors must (i) cure all outstanding invoices (or provide adequate assurance of prompt cure) and (ii) provide adequate assurance of future performance under § 365(b).  (Argument §§ III.B–III.C (pp. 4–5)). | The FBG Debtors do not seek to assume the Oracle Agreements under the Plan.  Therefore, this objection is moot. |
| 18 | 2780, 3291 | Tapia WARN Claimants (Maria Tapia, Giancarlo Hernandez, Chad Compton, Kyle Bennett, and Brittany Johnson, on behalf of a putative class of former employees) | i. | The Tapia WARN Claimants object to confirmation for the reasons set forth in their previously-filed Disclosure Statement objection (Docket No. 2780) and join in and fully adopt the objection of the U.S. Trustee. | The Tapia WARN Claimants' previously filed Disclosure Statement objection was to a Plan proposed by Debtor Premier Marketing Group, LLC and not to the Joint Plan filed by the FBG Debtors.  The objections raised in the Disclosure Statement objection are stale.  As to the joinder to the U.S. Trustee's objection, *see* above Responses to the objection of the U.S. Trustee.  For the avoidance of doubt, as set forth in Tapia Motion to Dismiss, the Debtors oppose the Tapia Plaintiffs' assertions that the Debtors violated the WARN Act and the allegations set forth in the complaint initiating the Tapia AP. *See* Tapia Motion to Dismiss (Adv. Pro. 26-03052, Docket No. 34). |
| 19 | 3313 | Texas Comptroller of Public Accounts (by and through the Office of the Texas Attorney General) (the "**Texas Comptroller**") | | The Comptroller objects to confirmation of the Plan, asserting that: | The Debtors are working with the Comptroller's counsel on consensual language to be included in the Confirmation Order. |
| | | | i. | Section 13.4(b)(D) of the Plan impermissibly impairs the Texas Comptroller's setoff rights in violation of § 553 (¶¶ 12–17). | The Plan expressly preserves the Comptroller's setoff rights in Section 6.2(c). |
| | | | ii. | the Plan fails to provide any default remedy or enforcement provisions for the Texas Comptroller and therefore lacks adequate means of implementation, in violation of §§ 1123(a)(5) and 1129(a)(1). | The Plan is in compliance with section 1123(a)(5)(G).  To the extent that all Allowed Priority Tax Claims are not paid within five years of the Petition Date, the Texas Comptroller may seek an order compelling payment.  Section 14.1 of the Plan provides that the Bankruptcy Court retains exclusive jurisdiction over distributions, payment of Claims, enforcement of the Plan and Confirmation Order, and federal, state and local tax matters under sections 346, 505, and 1146.  Under Section 15.11 of the Plan, those obligations are immediately effective, enforceable, and binding on the FBG Debtors, the Claims Ombudsman, and the Trustees upon the Confirmation Date. |
| 20 | 3319 | First-Citizens Bank & Trust Company ("**First-Citizens**") | i. | First-Citizens joins and adopts the objections of the LAM Parties, Katsumi, the Carnaby Secured Lenders, and Orbian, to the extent applicable. | *See* above Responses to the objections of the LAM Parties, Katsumi, Orbian, and the Carnaby Secured Parties. |
| | | | ii. | First Citizens argues that the Plan is not feasible because its effectiveness is dependent on nearly $2 billion in future litigation proceeds to pay $300 million of administrative and priority claims with only $75 million in litigation funding and without a dedicated reserve or binding shortfall commitment, in violation of §§ 1123(a)(5), 1129(a)(9)(A), and 1129(a)(11).  (¶¶ 3(a), 5). | *See* Reply ¶¶ 19–131. |
| | | | iii. | First-Citizens asserts that the Preference Settlement violates § 1123(a)(4) and cannot be approved under § 1123(b)(3)(A) and Rule 9019, arguing that: | |

| | | | | | |
|---|---|---|---|---|---|
| | | | a. | the settlement demands the same consideration from each Class 7 cohort (third-party releases and contribution of all Direct Creditor Claims), while providing materially different protection—Trade Creditors receive complete preference peace and a post-suit election, while Supply Chain Financers and Factors remain exposed with only Modified New Value procedures.  (¶¶ 18–25). | *See* Reply ¶¶ 155–172. |
| | | | b. | the Plan gives an unadjudicated allegation of broadly defined "Adverse Conduct" (§ 6.11(c)) the operative effect of a final order, allowing the Litigation Trustee to suspend the settlement's benefit despite § 6.11(a)'s Final Order standard.  (¶¶ 26–31). | *See* Reply ¶¶ 155–172. |
| | | | c. | § 6.11(f)'s conclusive good-faith presumption improperly forecloses proof of bad faith. (¶ 32). | Participation in the Preference Settlement is entirely voluntary, and its terms apply equally to all Supply Chain Financers and Factors.  If a party does not want to participate in the Preference Settlement, they have the option to not opt in.  Regardless, for the reasons set for in the Reply Brief, the Preference Settlement does not violate § 1123(a)(4).  *See* Reply ¶¶ 155–172. |
| | | iv. | First-Citizens alleges that § 5.2(k) of the Plan seeks to substantively consolidate for select purposes—pooling claims and eliminating guarantees and joint-and-several liability—without the debtor-by-debtor showing § 1129(a)(7) requires, while preserving separateness for prosecution (§ 6.2(b)); deploying consolidation selectively wields it impermissibly "as a sword and not a shield" under *Owens Corning*. (¶¶ 33–35). | *See* Reply ¶¶ 173–190. | |
| | | v. | First-Citizens argues that the Trust governance and future-funding provisions do not comply with §§ 1123(a)(7) and 1125, because Ad Hoc Group appointees hold decisive voting over Major Decisions until the Final Return Threshold is satisfied, and uncapped Additional Waterfall Litigation Trust Funding may prime the waterfall on economic terms (no maximum amount, pricing, rate of return, or dilution formula) not fixed in the Plan, so Class 7 creditors cannot determine the value of the interests distributed to them.  (¶¶ 3(f), 36–39). | Section 1123(a)(7) of the Bankruptcy Code does not apply to the appointment of members of the Litigation Trust Oversight Committee.  Nevertheless, the selection of the members of the Litigation Trust Oversight Committee is consistent with the interests of creditors and public policy.  The Litigation Trust Oversight Committee is comprised of members appointed by both the Ad Hoc Group and the Creditors' Committee, ensuring that the various classes of beneficial interests in the Litigation Trust are represented in the governance of the Trust. | |
| | | vi. | First-Citizens objects to the Plan because it provides for the transfer of assets to the DIP Secured Parties that are not their collateral through an undisclosed credit bid with immediate § 363(m) protection without requiring the assets to be returned if the Effective Date never occurs (§§ 363(b), (k), (m)), and releases estate claims against financing and fiduciary constituencies notwithstanding an incomplete investigation while burdening creditor-owned direct claims (§ 1123(b)(3)(A); *Purdue*).  (¶¶ 3(c), 3(d)). | *See* Reply ¶¶ 132–154. | |
| | | vii. | First-Citizens submits that everything the DIP Secured Parties bargained for is delivered and insulated at the Confirmation Date while everything the Code requires for creditors is deferred for years and conditioned on litigation success, and requests, among other relief, a fixed outside Effective Date and an express unwind.  (¶¶ 4, 40). | *See* Reply ¶¶ 122–131. | |
| 21 | 3384 | The Chubb Companies (Indemnity Insurance Company of North America, ACE American Insurance Company, Federal Insurance Company, and their affiliated insurers) | i. | The Chubb Companies assert that the Plan must be clarified to provide that, to the extent the FBG Debtors or their successors, seek to retain the benefits of any portion of the Insurance Programs, the entirety of each shall be assumed by the FBG Debtors' successors, who shall remain liable in full for all Obligations arising under the Insurance Program. (¶¶ 22–27). | The Debtors and Chubb are working on consensual language in the Confirmation Order to address Chubb's objections.<br><br>The Plan has been revised to provide that Insurance Policies shall be deemed to be non-executory contracts and neither assumed nor assigned upon the Confirmation Date.  Assignment of the Insurance Rights to the applicable Trusts in accordance with the Plan is authorized under section 1123(a)(5)(B) of the Bankruptcy Code.  *See In re Federal-Mogul Global Inc.*, 684 F.3d 355, 369 (3d Cir. 2012). |

| | | | | | |
|---|---|---|---|---|---|
| | | | ii. | The Chubb Companies contend that the Plan contains multiple provisions that impermissibly modify the Insurance Programs, including the release of liens, the vesting of assets free and clear of liens, third-party releases, limitations on setoff rights, the assignment of Insurance Rights to different entities, the splitting of the Insurance Rights from the Obligations, and exculpation and injunctions (Plan §§ 6.2, 9.11, 13.4, 13.5, 13.6).  The Chubb Companies claim that the Plan must clarify that nothing therein or in any related document modifies, alters, or impairs the Insurance Programs, including the rights and obligations of the Chubb Companies, the FBG Debtors, or any other entity thereunder.  (¶¶ 28–35). | The Plan's third-party releases are permissible. *See* Confirmation Brief ¶¶ 69–77. The Plan does not impair the Chubb Companies' setoff rights. *See* Reply ¶¶ 195–200 (citing Plan § 6.2(c)). The assignment of the Insurance Rights under the Plan is authorized under section 1123(a)(5)(B) of the Bankruptcy Code. *See In re Federal-Mogul Global Inc.*, 684 F.3d 355, 369 (3d Cir. 2012). |
| | | | iii. | The Chubb Companies claim that the Plan's Injunction contains an improper "gatekeeping" provision (Plan § 13.4(c)) permitting certain claims against the FBG Debtors and certain third parties—including claims that may be covered by insurance—to proceed only if the claimant first obtains a determination from the Bankruptcy Court that the claim is "colorable," over which the Court would purportedly have "sole and exclusive jurisdiction."  The Chubb Companies maintain that a plan cannot confer subject-matter jurisdiction on a bankruptcy court, and that bankruptcy courts lack core jurisdiction to liquidate or estimate contingent or unliquidated personal injury tort claims under 28 U.S.C. § 157(b)(2)(B).  (¶¶ 36–40). | *See* Reply ¶¶ 238–242. |
| | | | iv. | The Chubb Companies assert that the Plan fails to provide for the handling of workers' compensation claims and direct action claims, both of which are subject to state-law regulations that cannot be modified by the terms of the Plan.  The Chubb Companies maintain that the Plan must clarify that workers' compensation and direct action claims must continue to be administered, handled, defended, settled, and/or paid in the ordinary course, pursuant to the terms of the Insurance Programs and applicable non-bankruptcy law.  (¶¶ 41–43). | The Final Insurance Order (Docket No. 567) authorized the relief the Chubb Companies seek with respect to workers' compensation and direct action claims, *see* Docket No. 567 ¶ 9, and nothing in the Plan modifies the relief granted under such order.  Accordingly, this objection should be overruled. |
| | | | v. | The Chubb Companies further object to final approval of the Disclosure Statement under § 1125 because it fails to provide "adequate information" regarding how the Debtors propose to treat the Insurance Programs and the Chubb Companies' claims under the Plan.  (¶ 21 n.7). | The Disclosure Statement states that Insurance Rights of the FBG Debtors will transfer to the Litigation Trust or ABL Collateral Trust, as applicable, in respect of Estate Claims or ABL Priority Collateral, as applicable.  Disclosure Statement § I.A.1, 3 |
| 22 | 3416 | Supplemental Joint Objection of the LAM Parties and Katsumi | i. | The Roll-Up Claims do not count as a valid impaired accepting class.  Rather, paragraph 25(e) of the DIP Order should only apply for purposes of determining whether holders of Roll-Up Claims' consent to non-cash treatment, given that paragraph 25(e) explicitly dictates that the Roll-Up Obligations remain superpriority administrative expense claims. | Paragraph 25(e) of the DIP Order expressly allows a plan proponent to solicit a plan that provides for classification of Roll-Up Claims in one or more ***classes of claims entitled to vote on such plan***.  Under the Bankruptcy Code, claims entitled to vote on a plan must be impaired and must comply with the requirements of section 1123. Therefore, the DIP Order clearly provides that if the Roll-Up Obligations are impaired, they may be classified and holders are entitled to vote on the Plan in connection with solicitation.<br><br>The purpose of paragraph 25(e) is clear—as a result of a settlement between the Debtors, DIP Lenders, and Creditors' Committee, holders of Roll-Up Obligations may have such claims impaired and receive non-cash consideration under the Plan.  That is exactly what is happening here.  The FBG Debtors proposed a Plan that constitutes a "Roll-Up Classification Plan" which provides for the impairment of the Roll-Up Obligations by offering holders of such claims non-cash consideration on account of such Roll-Up Obligations.  Roll-Up Obligations are secured by all Debtors in these chapter 11 cases, including, First Brands Group Holdings, LLC ("**FBG Holdings**") and Viceroy Private Capital, LLC ("**Viceroy**").  As such, holders of Roll-Up Obligations are entitled to vote on the Plan at all 92 FBG Debtors, notwithstanding that FBG Holding and Viceroy were not obligors on the prepetition claims.<br><br>LAM and Katsumi attempt to read words, meanings or implications into 25(e). However, such attempt fails as 25(e) is unambiguous; the debtors comply with section 1129(a)(10) of the bankruptcy code. |

| | | | | | |
|---|---|---|---|---|---|
| **Resolved Objections** | | | | | |
| 1 | 3249 | PrimeRevenue, Inc. | i. | PrimeRevenue asserts that the Plan and Plan Supplement incorrectly identify it as a Supply Chain Financer rather than a Trade Creditor, and the misclassification wrongfully deprives it of the full release from Preference Actions afforded to Trade Creditors under the Preference Settlement. (Preamble; ¶¶ 25, 30). | **RESOLVED**. The FBG Debtors have added language to the Confirmation Order resolving this objection. Confirmation Order Schedule 1 ¶ 13. |
| 2 | 3250 | The Unions[3] | i. | The Unions acknowledge the Debtors have begun and are continuing to negotiate the terms of the retiree benefit plans. (¶ 6). The Unions file a limited objection and reservation of rights asserting that, until there is a negotiated resolution or court order determining the treatment of the retiree benefit plans, the Debtors are not able to comply with § 1129(a)(13) and confirm the Plan. (¶ 8). | **RESOLVED**. The FBG Debtors and the Unions have reached a consensual agreement regarding the termination of the retiree benefit arrangements for retired employees represented by the Unions ("**Union Retiree Benefit Arrangements**"). Accordingly, the FBG Debtors will be able to satisfy the requirements of § 1129(a)(13) with respect the Union Retiree Benefit Arrangements. |
| 3 | 3285 | Texas Commission on Environmental Quality ("**TCEQ**"), by and through the Office of the Texas Attorney General | i. | TCEQ requests inclusion of reservation of rights language in the Confirmation Order to ensure that all applicable laws and regulations are followed in connection with the Plan and that public health and natural resources are protected. (¶ 4). | **RESOLVED**. The FBG Debtors are including negotiated reservation of rights language in the Confirmation Order to resolve this objection. |
| 4 | 3268 | LBA RV-Company XVII, LP ("**LBA**") | i. | LBA argues that the injunction provisions improperly impair creditors' rights of setoff, as preserved by § 553, by requiring the filing of a proof of claim or other documents prior to the Effective Date (while inequitably preserving setoff and recoupment for the FBG Debtors and the Trusts). (¶¶ 7–12). | **RESOLVED**. The FBG Debtors are adding language to the Confirmation Order resolving this objection. |
| | | | ii. | LBA submits that, because the deadline to assume or reject the Patterson Lease (July 31, 2026) falls after the Combined Hearing, any pre-Confirmation-Date action requirement imposes additional burdens on the Landlord. (¶ 9). | |
| | | | iii. | LBA joins any objection filed by other real-property landlords. (¶ 13). | |
| 5 | 3258 | Official Committee of Non-Union Retirees (the "**Retiree Committee**") | i. | The Retiree Committee alleges that the Plan cannot be confirmed because the Debtors seek to cease payments under the retiree benefits without a consensual agreement with the Retiree Committee and, pursuant to § 1129(a)(13), the Debtors are required to maintain continued payment of all retiree benefits absent modification of the retiree benefits via consensual agreement or a court order pursuant to § 1114. (¶¶ 13–15). | **RESOLVED**. The FBG Debtors and the Retiree Committee have agreed to the consensual termination of the retiree benefit arrangements for non-union retired employees ("**Non-Union Retiree Benefit Arrangements**"). Accordingly, the FBG Debtors will be able to satisfy the requirements of § 1129(a)(13) with respect the Non-Union Retiree Benefit Arrangements. |
| | | | ii. | The Retiree Committee argues that it and its members should be included as "Released Parties" under the Plan because § 1114(b)(2) gives a retiree committee the same rights, powers, and duties as any other statutory creditors' committee. (¶ 16). | The FBG Debtors have agreed to include the Retiree Committee and its members as "Released Parties" under the Plan. |
| 6 | 3317 | BPP Cannonball Park A LP (f/k/a BPP Shiraz Park A LP) ("**BPP**") | i. | BPP objects to the extent its lease is being assumed without its consent, without any proper showing of adequate assurance and without payment of cure. (¶ 9). | **RESOLVED**. The FBG Debtors discussed the objections with BPP, and BPP's counsel confirmed the objections are resolved. |
| | | | ii. | BPP objects to the rejection of its lease unless the Debtors return the premises to "broom clean" condition. (¶ 10). | |

---

[3] "**The Unions**" means, collectively United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("**USW**") and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("**UAW**").

| | | | | |
|---|---|---|---|---|
| | | | iii. BPP asserts that the Confirmation Order should include language stating that upon rejection of any Lease, any personal property left at the premises is deemed abandoned, and that the landlord shall have the right to dispose of any abandoned property without the need for further Court order. (¶ 11). | |
| | | | iv. BPP asserts that the Confirmation Order needs to be clarified so that the rejection damages bar date will be thirty (30) days after the later of (1) the date an Order authorizing the rejection is entered; (2) the date that the premises is actually surrendered to the Landlord in a "broom clean" condition or (3) the Effective Date of the Plan. (¶ 12). | |
| | | | v. BPP asserts that the Confirmation Order needs to be clarified to protect BPP's rights to setoff its security deposit against its prepetition and rejection damages claims as section 9.11 of the Plan appears to require a motion for relief from stay to preserve such rights, in violation of section 553 of the Bankruptcy Code. (¶ 12). | |