**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **Re: Docket Nos. 3431 & 3444** |

**FBG DEBTORS' OMNIBUS OPPOSITION TO**
**(I) KATSUMI SERVICING, LLC'S AND LAM PARTIES' EMERGENCY**
**MOTION IN LIMINE TO EXCLUDE EXPERT DECLARATION AND TESTIMONY**
**OF MARC S. KIRSCHNER AND (II) ONSET FINANCIAL, INC.'S EMERGENCY**
**MOTION IN LIMINE TO EXCLUDE THE DECLARATION OF MARC S. KIRSCHNER**

First Brands Group, LLC ("**FBG**") and certain of its subsidiaries, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**")

respectfully submit this omnibus opposition (this "**Opposition**") to (i) the Katsumi Servicing,

LLC's and LAM Parties' Emergency Motion in Limine to Exclude Expert Declaration and

Testimony of Marc S. Kirschner [Dkt. No. 3431] (the "**Katsumi/LAM Motion**"), filed by Katsumi

Servicing, LLC ("**Katsumi**") and the LAM Parties[2], and (ii) Onset Financial, Inc.'s ("**Onset**")

Emergency Motion in Limine to Exclude the Declaration of Marc S. Kirschner [Dkt. No. 3444]

(the "**Onset Motion**" and, together with the Katsumi/LAM Motion, the "**Motions**"). The Motions

should be denied. In support of this Opposition, the Debtors respectfully state as follows:

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims
and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these
chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]     The "LAM Parties" are Leucadia Asset Management LLC, acting through its Point Bonita Capital Division,
LAM Trade Finance Group LLC, and LAM TFG I SPV LLC. Capitalized terms used and not otherwise defined
herein have the meanings ascribed to them in the Kirschner Declaration or the Motion, as applicable.

**Preliminary Statement**

1.      As a threshold matter, the Motions should be denied because they seek relief this Court does not need to grant. This is a bench trial, which makes the Motions largely beside the point. "Motions in limine are intended to prevent allegedly prejudicial evidence from being so much as whispered before a jury" prior to "obtaining the Court's permission to broach the topic." *See In re LTL Mgmt. LLC*, No. 21-30589 (Bankr. D.N.J.) (Tr. of Hr'g on Mots. in Limine) (quoting *Cramer v. Sabine Transp. Co.*, 141 F. Supp. 2d 727 (S.D. Tex. 2001)). "In a bench trial, such procedures are unnecessary, as the Court can and does readily exclude from its consideration inappropriate evidence of whatever ilk." *Id.* The Court here is fully capable of hearing Mr. Kirschner's testimony, weighing any legitimate objections through cross-examination, and according that testimony whatever weight it deserves—without the blunt instrument of wholesale exclusion that Katsumi, the LAM Parties, and Onset (together, the "**Movants**") now seek.

2.      Beyond that threshold defect, the Motions rest on a series of mischaracterizations and selectively truncated quotations of the Declaration of Marc S. Kirschner [Dkt. No. 3190] (the "**Kirschner Declaration**") that, once compared to the actual text of the Declaration, confirm that Mr. Kirschner's opinions are the product of exactly the kind of experience-based, carefully qualified analysis that Rule 702 and Fifth Circuit precedent permit. The Katsumi/LAM Motion and the Onset Motion raise substantially overlapping arguments—both challenge the sufficiency of the facts and data underlying Mr. Kirschner's opinions, his methodology, and whether his opinions constitute impermissible legal conclusions. However, each of these arguments fail for the following straightforward reasons.

3.      **The Katsumi/LAM Motion misstates Mr. Kirschner's ultimate opinion as an unqualified prediction.** The Katsumi/LAM Motion asserts that the "FBG Debtors ask this Court to accept, essentially on faith, Mr. Kirschner's bottom-line forecast that the Litigation Trust

2

will recover 'in excess of $2 billion' by the end of 2028." K/L Mot. ¶ 1 (citing Kirschner Decl. ¶ 143). That is not what Mr. Kirschner said. What he actually wrote is that, based on "the extensive work done in the various investigations, the overlapping nature of the claims, the $75 million in initial funding provided to a litigation trustee under the FBG Debtors' Plan, that adversary proceedings have been initiated, and the tools available to expedite proceedings through consolidation of common issues, I believe *it is reasonably possible* that recoveries in excess of $2 billion *could* be received by the end of 2028." Kirschner Decl. ¶ 143 (emphasis added). By converting "reasonably possible" and "could be received" into "will recover," the Katsumi/LAM Motion manufactures an argument it then attacks. A carefully hedged probabilistic opinion, offered by a witness with decades of relevant experience, is precisely the sort of testimony Rule 702 is designed to admit, not exclude.

4.      **The Katsumi/LAM Motion mischaracterizes the scope of Mr. Kirschner's retention and his stated opinions.** The Katsumi/LAM Motion repeatedly asserts that "the FBG Debtors retained him to forecast, to the dollar and to the year, the amount and timing of recoveries from a portfolio of largely unasserted and wholly unliquidated litigation claims." K/L Mot. ¶ 2; *see also id.* ¶ 19 ("to forecast the specific timing and specific dollar amount of recoveries"). That is not what Mr. Kirschner is doing and no such language appears anywhere in the Kirschner Declaration. Mr. Kirschner was retained "to provide expert analysis and opinions as to the amount of proceeds that are reasonably expected to be generated from [the] Estate Claims and the anticipated timing thereof." Kirschner Decl. ¶ 18. And his stated opinions are not a to-the-dollar forecast at all, but three qualified conclusions: "(i) that the Estate Claims are valuable assets of the FBG Debtors, (ii) that it is reasonable to conclude that the various Estate Claims are reasonably probable to result in the recovery of proceeds in excess of what I understand is the

approximately $2 billion required to satisfy certain obligations under the Plan, and (iii) that it is reasonably probable that at least these amounts could be recovered by a litigation trustee by the end of 2028." *Id.* ¶ 21. The Katsumi/LAM Motion's "to the dollar and to the year" framing a fabrication that should be disregarded.

5.      **The Katsumi/LAM Motion strips the qualifying language from Mr. Kirschner's legal-doctrine discussion to manufacture legal conclusions that are not there.** For example, the Katsumi/LAM Motion asserts that Mr. Kirschner tells the Court that "the Ponzi Scheme Presumption 'would apply.'" K/L Mot. ¶ 33. In fact, Mr. Kirschner wrote that, based on the facts he reviewed, "***I believe it is reasonable to conclude*** that the Ponzi Scheme Presumption would apply to an actual fraudulent transfer claim that a litigation trustee would bring." Kirschner Decl. ¶ 39 (emphasis added). Similarly, the Katsumi/LAM Motion asserts that Mr. Kirschner declares that Katsumi "'should have known' of FBG's fraudulent scheme" and "would face liability." K/L Mot. ¶ 34. What Mr. Kirschner actually wrote is that "I believe that Katsumi—one of FBG's largest factoring counterparties…—would face liability because ***it appears that*** Katsumi had knowledge of particular facts such that it 'should have known' of FBG's fraudulent scheme." Kirschner Decl. ¶ 41 (emphasis added). In each instance, the Katsumi/LAM Motion deletes the qualifying language—"I believe it is reasonable to conclude," "it appears"—that shows Mr. Kirschner is offering his professional assessment of the strength and value of prospective claims, not instructing the Court on what the law is or how it must rule.

6.      **The Onset Motion mischaracterizes the Declaration as an unreasoned, aggregate-only "check-the-box exercise."** Onset asserts that Mr. Kirschner "merely agreed that $2 billion can be generated from these claims in the aggregate" and that, because he purportedly "did not evaluate the likelihood of success for each category" of Estate Claims, "[t]his is not a

4

bottom-up expert analysis meriting consideration; this is not analysis at all." Onset Mot. ¶ 4. The Declaration refutes this characterization on its face. Mr. Kirschner presents a category-by-category breakdown of the $25.4 billion in "total gross amount potentially available with respect to all Estate Claims," itemized by claim type: Third-Party Factoring Claims ($15.4 billion), Supply Chain Financing Claims ($4.7 billion), SPV Lender Claims ($2.5 billion), Insider Claims ($1.0 billion), Suspect Acquisition Claims ($1.6 billion), and Other Claims ($280 million). Kirschner Decl. ¶ 31. He then separately analyzes each category and reaches an individualized, category specific conclusion for each—for example, that the Third-Party Factoring Claims are "valuable" and "meritorious," *id.* ¶ 32, that the SCF Claims are "colorable," *id.* ¶ 55, that the SPV Lender Claims against Onset and other SPV Lenders are "significant and cognizable," *id.* ¶ 86, that the Insider Claims are "meritorious and reasonably likely to result in significant recoveries," *id.* ¶ 100, and that the Suspect Acquisition and Other Claims are similarly viable, *id.* ¶¶ 128, 135–36. That is the opposite of an undifferentiated, aggregate-only opinion.

7.    **The Onset Motion mischaracterizes the Declaration as ignoring defenses to the Estate Claims.** Onset asserts that "Kirschner admitted under oath that he did not evaluate the strength of any defenses to the Estate Claims, rendering his opinion as to the ultimate success of those claims completely meaningless." Onset Mot. ¶ 4. The Declaration says otherwise. With respect to the Insider Claims, Mr. Kirschner expressly states: "I have reviewed and considered the various defenses asserted by the defendants in the adversary proceedings but believe it remains reasonable to conclude that these claims are viable and valuable." Kirschner Decl. ¶ 125. And with respect to the Preference Claims, Mr. Kirschner devotes multiple paragraphs to the statutory defenses available under 11 U.S.C. § 547(c)—including the ordinary-course-of-business, new-value, and contemporaneous-exchange defenses—as well as the Plan's separate

5

"Preference Settlement" mechanism, and he expressly accounts for the fact that "[t]hese defenses have the potential to reduce the amount of proceeds a litigation trustee could ultimately recover." *Id.* ¶¶ 140–41. Indeed, Mr. Kirschner's ultimate, view that a litigation trust could recover $2 billion by the end of 2028 "accounts for the uncertainty and time associated with litigation, and the potential that the FBG Debtors might settle certain litigation claims for less than the asserted amounts," which necessarily reflects the litigation risk that defenses of this kind present. *Id.* ¶ 143.

8.      Once the Kirschner Declaration is read as written, rather than as recast by the Motions, none of the Movants' grounds for exclusion—lack of qualification, insufficient facts or data, unreliable methodology, and impermissible legal advocacy—withstands scrutiny.

## Background

9.      On September 28, 2025, the FBG Debtors commenced these chapter 11 cases. The FBG Debtors subsequently filed the Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors [Dkt. No. 3019] (the "**Plan**") and the related Disclosure Statement [Dkt. No. 3020]. A combined hearing on final approval of the Disclosure Statement and confirmation of the Plan (the "**Combined Hearing**") is scheduled for July 28, 2026.

10.      On July 14, 2026, the FBG Debtors filed the Kirschner Declaration and a companion declaration of Charles M. Moore [Dkt. No. 3188] (the "**Moore Declaration**"), and filed an application to retain Mr. Kirschner as an expert consultant and expert witness [Dkt. No. 3192], seeking nunc pro tunc approval of his retention effective June 20, 2026. Mr. Kirschner's Declaration sets out his opinions regarding the value and likely recoverability of the FBG Debtors' Estate Claims that will be transferred to the Litigation Trust under the Plan. Kirschner Decl. ¶¶ 18, 21, 30–1. Mr. Kirschner was deposed on July 24, 2026.

11. On July 27, 2026—the evening before the Combined Hearing—Katsumi and the LAM Parties filed the Katsumi/LAM Motion, and Onset separately filed the Onset Motion, each seeking to exclude the Kirschner Declaration and any related testimony in its entirety on substantially overlapping grounds. For the reasons set forth below, both Motions should be denied.

**Argument**

## I. Mr. Kirschner Is Qualified to Offer the Opinions in His Declaration

12. Katsumi and the LAM Parties argue that Mr. Kirschner is unqualified to offer the opinions in his Declaration. Katsumi/LAM do not dispute—indeed, they concede—that Mr. Kirschner has the relevant experience for the opinions he actually offers. The Katsumi/LAM Motion itself acknowledges that Mr. Kirschner "has spent decades as a restructuring advisor and bankruptcy lawyer and has served as liquidation trustee and in other post-confirmation fiduciary capacities" in cases including Refco Capital Markets, Tribune, and Highland. K/L Mot. ¶ 17. That concession is dispositive. Whether a witness is qualified "can only be determined by comparing the area in which the witness has superior knowledge, skill, experience or education with the subject matter of the witness's testimony." *Kozak v. Medtronic, Inc.*, 512 F. Supp. 2d 913, 917–18 (S.D. Tex. 2007) (quoted at K/L Mot. ¶ 16). Mr. Kirschner's subject matter is not, as the Katsumi/LAM Motion insists, quantitative financial forecasting—it is the value to an estate and litigation viability of a portfolio of fraudulent transfer, breach of fiduciary duty, and related estate causes of action, evaluated by a lawyer and trustee who has spent decades prosecuting exactly those kinds of claims. Kirschner Decl. ¶¶ 5–16.

13. The Katsumi/LAM Motion attempts to manufacture a mismatch between Mr. Kirschner's experience and his assignment by mischaracterizing the assignment. Mr. Kirschner was not retained "to forecast, to the dollar and to the year, the amount and timing of

recoveries," K/L Mot. ¶ 2, but "to provide expert analysis and opinions as to the amount of proceeds that are reasonably expected to be generated from [the] Estate Claims and the anticipated timing thereof." Kirschner Decl. ¶ 18. That assignment calls for precisely the judgment a seasoned restructuring lawyer and litigation trustee brings to bear: assessing the strength of fraudulent transfer, breach of fiduciary duty, and related causes of action; assessing likely categories and considering recovery based on experience litigating comparable claims; and assessing the practical realities of collection and timing. Those are the questions Mr. Kirschner answers, and are squarely within the "decades" of experience the Katsumi/LAM Motion concedes he has. K/L Mot. ¶ 17.

14.     The two cases the Katsumi/LAM Motion relies on to argue that industry familiarity cannot substitute for specialized expertise are readily distinguishable. *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998), excluded a proposed real estate valuation witness because the "essential elements of the real estate expert's competency" turn on "his evaluating skill and experience as an appraiser," a distinctive and formally credentialed discipline that has no bearing on Mr. Kirschner's assignment here. *Id.* Tellingly, the *Hidden Oaks* court nonetheless allowed the very same witness to testify to property value in his capacity as an owner, because "an owner always may testify as to value." *Id. In re Med Diversified, Inc.*, is likewise inapposite. 334 B.R. 89, 96–97 (Bankr. E.D.N.Y. 2005). There, the excluded expert had trustee experience, but was asked to perform a business valuation of a "unique and highly regulated business of in-home health care services," a specialized valuation exercise far removed from his background. *Id.* at 96. The *Med Diversified* court expressly recognized that experts may be qualified by "sufficient experience in the field at issue to overcome [a] lack of formal training and certification"—it simply found that particular witness's experience "inadequate to overcome his lack of formal training and certification" for a specialized valuation task. *Id.* Mr. Kirschner, by

contrast, has more than twice the trustee experience of the witness in *Med Diversified*, and he was asked to evaluate the very type of claims—fraudulent transfer, insider, and related estate causes of action—that he has spent his career prosecuting as a practitioner and litigation trustee, not to perform a specialized business valuation in an unfamiliar regulated industry. And excluded expert there did not merely lack formal credentials—he admitted on *voir dire* that he had "no experience in preparing valuation reports" at all, and he further misapplied the quantitative methods he did attempt, employing a non-discounted-cash-flow approach on inadequate data and invoking a valuation model outside its accepted context. 334 B.R. at 96–97, 102. Mr. Kirschner presents the inverse case: he has decades of direct, hands-on experience with the very type of claims he evaluates, and he offers reasoned, experience-based judgment rather than a misapplied quantitative model.

15.     Indeed, *Med Diversified*'s own authority undercuts the Katsumi/LAM Motion. In recognizing that experience may substitute for formal training and certification, *Med Diversified* cites *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995), for precisely that proposition. In *McCullock*, the Second Circuit held that a consulting engineer's "background and practical experience qualify as 'specialized knowledge' gained through 'experience, training, or education,'" rejecting the manufacturer's argument that the witness needed formal academic training in the specific discipline (there, fume dispersal and air quality analysis) at issue. *McCullock*, 61 F.3d at 1043 (quoting Fed. R. Evid. 702). The McCullock court further explained that the witness's asserted shortcomings—his lack of formal coursework in the precise sub-discipline and his inability to answer certain technical questions on cross-examination—"were properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility." *Id. Med Diversified*'s reliance on *McCullock* therefore confirms that it does not

9

stand for the blanket proposition the Katsumi/LAM Motion advances—that "practical familiarity with an industry, without more," can never satisfy Rule 702, K/L Mot. ¶ 20—but rather for the narrower, fact-specific holding that a particular witness's experience must be examined against the particular opinion offered. Measured against the standard *Med Diversified* itself applies (and draws from *McCullock*), Mr. Kirschner's decades of hands-on experience evaluating, assessing, and prosecuting fraudulent transfer, insider, and related estate litigation claims as a bankruptcy lawyer and litigation trustee is exactly the kind of "specialized knowledge" gained through "experience, training, or education" that qualifies him to offer the opinions in his Declaration. *McCullock*, 61 F.3d at 1043; Fed. R. Evid. 702. Nor does Mr. Kirschner's candid, accurate disclaimer that he is not "a finance expert," "an accounting expert," or "a valuation expert," K/L Mot. ¶ 2 (citing Kirschner Dep. Tr. 56:23–57:6), undermine his qualification to offer the opinions he actually gives, which do not purport to be a certified valuation, a forensic accounting opinion, or a quantitative financial model, but rather the informed judgment of an experienced restructuring lawyer and litigation trustee. Kirschner Decl. ¶¶ 5–16.

## II.     Mr. Kirschner's Testimony Is Based on Sufficient Facts and Data

16.     Katsumi, the LAM Parties, and Onset each argue that Mr. Kirschner's opinions rest on insufficient facts or data because they draw substantially on the Moore Declaration and information the FBG Debtors provided, which Mr. Kirschner did not independently audit or verify. K/L Mot. ¶¶ 22–24; Onset Mot. ¶¶ 30–43. That argument, in all its variations, confuses the sufficiency of an expert's factual basis with the separate question of how much weight that basis deserves. So long as an expert's testimony has "a factual basis in the record and an underlying rationale," it is admissible. *Kickz v. Chubb Lloyds Ins. Co.*, 2025 WL 3272098, at *6 (N.D. Tex. Nov. 4, 2025). To the extent the Movants challenge the underlying facts on which the Kirschner

10

Declaration relies—including the ten-month investigation reflected in the Moore Declaration, Moore Decl. ¶¶ 3, 58, and the materials Mr. Kirschner separately considered—that is "a question of weight, not admissibility." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002).

17.     Moreover, Mr. Kirschner is an expert witness, and it is "well settled that an expert may rely on hearsay when forming their opinions." *Vazquez v. Aguilera*, 2022 WL 2292888, at \*3 n.4 (S.D. Tex. Mar. 25, 2022) (citing Fed. R. Evid. 703); *see also In re Couture Hotel Corp.*, 536 B.R. 712, 725–26 (Bankr. N.D. Tex. 2015) (explaining that expert may use "charts and data derived from third-party sources" to arrive at an ultimate opinion on the value of property). Onset's own cited authority confirms as much: under Rule 703, an expert may rely on facts or data he "has been made aware of," including inadmissible facts, so long as they are "of a type reasonably relied upon by experts in the particular field." *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 850 (5th Cir. 2015); *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 857 (3d Cir. 1990). Mr. Kirschner considered the facts set forth in the Moore Declaration and the materials FBG Debtors' counsel provided for the purpose of informing his opinions regarding potential recoveries on the Estate Claims—he does not cite those facts as established truths, but as the factual predicate against which he applies his professional judgment. Kirschner Decl. ¶¶ 20, 31.

18.     Nor do the specific decisions the Katsumi/LAM Motion cites support exclusion here. *Paz v. Brush Engineered Materials Inc.* does state that "[w]here an expert's opinion is based on insufficient information, the analysis is unreliable," but the same decision holds that "[t]he proponent of an expert's testimony need not prove the testimony is factually correct, but rather need only prove by a preponderance of the evidence the testimony is reliable." 555 F.3d 383, 388 (5th Cir. 2009) (cited at K/L Mot. ¶ 22 and, as adopted by *U.S. All. Grp., Inc. v. Cardtronics USA, Inc.*, 645 F. Supp. 3d 554, 559 (E.D. La. 2022), at Onset Mot. ¶ 38). *Paz*

11

excluded a physician's diagnosis because it depended entirely on slides prepared by another doctor who "could not remember" making them, such that the very existence of the underlying data was in doubt. *Id.* at 389. Mr. Kirschner's reliance on the Moore Declaration and the underlying documents presents no comparable defect: the existence and content of that investigation is not in question, and Mr. Kirschner's opinions do not depend on a single piece of data of uncertain provenance.

19.     Nor does U*.S. Alliance Group, Inc. v. Cardtronics USA, Inc.*, 645 F. Supp. 3d 554, 559–62 (E.D. La. 2022) (cited via *Paz* at Onset Mot. ¶ 38), support exclusion here. There, the "Bases and Reasons for the Opinions" section of the expert's report supplied no bases or reasons at all, but instead "recite[d], word-for-word," the retaining party's own version of the facts, without any explanation of the investigation performed, the sources of information relied upon, or the methodology employed to reach any conclusion. *Id.* at 560–61. Indeed, the expert's "opinions" were, in substance, verbatim duplications of paragraphs from the complaint itself, and the "opinions" the expert offered were themselves bare legal conclusions—for example, that the defendant "materially breached the Agreement," that the plaintiff was "entitled to recover all attorney's fees," and that the defendant "engaged in unlawful conduct." *Id.* at 560, 562. Mr. Kirschner did nothing of the kind. He did not parrot the FBG Debtors' litigating position back to the Court as his own; rather, based on his independent review of the facts and evidence presented to him and his decades of relevant experience, he reached his own reasoned, claim-specific conclusions regarding the strength of each category of Estate Claims. *See supra* ¶¶ 16–18. Nor does the Kirschner Declaration contain the kind of sweeping, conclusory legal pronouncements condemned in *U.S. Alliance Group*; as explained further below, Mr. Kirschner consistently qualifies his opinions with careful, measured professional judgment rather than unqualified

declarations of liability. *See infra* Part IV.

20. *Brickley v. Scattered Corp. (In re H&M Oil & Gas, LLC)*, 511 B.R. 408, 416–17 (Bankr. N.D. Tex. 2014), is also distinguishable. There, the court excluded testimony premised on the expert's alleged decision to "blindly follow the Trustee's counsel's instruction" in reclassifying oil and gas wells, reasoning that, if true, the expert would have had "no basis upon which to conclude" that the wells at issue would have become proved developed wells with additional funding. *Id.* at 416 (emphasis added). Here, Mr. Kirschner did not blindly adopt counsel's instructions; to the contrary, he provided "extensive comments" on drafts of his Declaration and "worked very extra hard on the second draft" before conforming footnote references and correcting typographical errors. Kirschner Dep. Tr. 192:25–193:11. And unlike the Brickley expert, Mr. Kirschner would not be left with "no basis" for his opinions even if the Movants' characterization of his process were credited: he had ample independent bases for his conclusions, including the underlying documents, pleadings in the James Adversary Proceeding and Onset Adversary Proceeding, the Moore Declaration, the Examiner's Report, guilty pleas, and other materials identified in Exhibit B to his Declaration. Kirschner Decl. ¶ 20 & Ex. B.

21. And *MGM Well Services, Inc. v. Mega Lift Systems, LLC*, No. H-05-1634, 2007 WL 150606, at *4 (S.D. Tex. Jan. 16, 2007) (cited at K/L Mot. ¶ 22), excluded an expert who relied "heavily, if not exclusively," on what an interested party told him, such that his report was, "at best[,] an effort to synthesize [that party's] positions and present them summarily as an expert opinion," without the rigor the expert himself would otherwise have applied in his own field of electrical engineering. *Id.* That is not this case. Mr. Kirschner did not synthesize and repackage the FBG Debtors' litigating positions; he independently assessed the strength of each category of Estate Claims against the elements of the applicable causes of action, applying the same rigor a

litigation trustee brings to evaluating whether to pursue comparable claims in any other case. *See* Kirschner Decl. ¶¶ 30–142.

22.      *JRL Enterprises v. Procorp Associates*, No. 01-2893, 2003 WL 21284020, at *7-8 (E.D. La. June 3, 2003) (cited at K/L Mot. ¶ 22 and Onset Mot. ¶ 33), excluded an expert whose report was "devoid of any analysis of figures other than those provided by" the retaining party, because "reasonable accountants would [not] simply and blindly accept such numbers in formulating opinions." *Id.* at *8. Mr. Kirschner's Declaration is not so limited. He accepted certain facts as true based on two sources: the underlying documents he reviewed, and the Moore Declaration—and Mr. Moore is an experienced individual in his own right, reflecting a ten-month investigation and more than thirty years of forensic and restructuring experience, not simply a mouthpiece for the retaining party's litigating position. Moore Decl. ¶¶ 3, 58; Kirschner Decl. ¶ 20.

23.      *Diabetes Centers of America, Inc. v. Healthpia America, Inc.*, No. H-06-3457, 2008 WL 375505, at *2 (S.D. Tex. Feb. 11, 2008) (cited at K/L Mot. ¶ 22), excluded a lost-profits expert who relied on a third party's patient-usage projections without any independent research into whether those projected figures "were valid, or even reasonable," and who could not even explain how the projections were developed or by whom. *Id.* That decision is distinguishable on two independent grounds. First, the facts Mr. Kirschner relies on from the Moore Declaration are not "projections" of the kind at issue in *Diabetes Centers*—they are findings from a completed ten-month forensic investigation into historical transfers, financial records, and misconduct that has already occurred, which removes the layer of speculation inherent in forecasting future, uncertain events. Second, *Diabetes Centers* was a lost-profits case in which the third party's projection was the chief, and in some respects the only, fact underlying the expert's opinion; here,

by contrast, Mr. Kirschner draws on an extensive factual record—including the Moore Declaration, the underlying documents, the adversary pleadings, and his own decades of relevant experience—of which the Moore Declaration is only one component. Moreover, *Diabetes Centers* itself recognizes that "[a]lthough a challenge to the factual basis for a proffered expert opinion often goes to weight rather than to admissibility," exclusion is warranted only where the source of information is of "such little weight that the jury should not be permitted to receive that opinion." *Id.* The Moore Declaration—a 112-page account reflecting ten months of forensic investigation by an advisor with more than thirty years of relevant experience—is not information of "such little weight" that the Court cannot receive Mr. Kirschner's opinions built upon it. Moore Decl. ¶¶ 3, 58.

24. Finally, *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 798–99 (N.D. Tex. 2013) (cited at K/L Mot. ¶ 23), excluded damages testimony where the proponents failed to establish that the expert's damages calculations were reliable, and held that the opportunity for cross-examination alone does not cure testimony that is otherwise unreliable under Daubert. The Debtors agree with the unremarkable proposition, also reflected in Orthoflex, that "an expert cannot forgo his own independent analysis and rely exclusively on what an interested party tells him." *Id.* at 798. But Mr. Kirschner did not forgo independent analysis: he reviewed voluminous pleadings, an examiner's report, the underlying facts across dozens of paragraphs of the Moore Declaration and additional source materials identified in Exhibit B to his Declaration, and then applied his own professional judgment—built on decades of experience prosecuting and evaluating fraudulent transfer, insider, and related estate claims—to reach independent conclusions regarding the strength and timing of recovery on each category of Estate Claims. Kirschner Decl. ¶¶ 20, 30–142. Unlike the testimony in *Orthoflex*, Mr. Kirschner's testimony is

not unreliable, and he has explained the process by which he reached each of his conclusions.

25.      Onset's reliance on *Loy v. Rehab Synergies, LLC*, 558 F. Supp. 3d 402, 414–15 (S.D. Tex. 2021), fares no better. Onset Mot. ¶ 38. There, the court excluded a damages expert whose opinions were "unsupported" because she "relied exclusively" on inaccurate information and "reviewed no other sources of data to make her calculations." 558 F. Supp. 3d at 414–15. Mr. Kirschner's Declaration presents a fundamentally different record. While the Moore Declaration is a significant source Mr. Kirschner relied upon, it is not, as a whole, defective—the subsequent withdrawal of certain calculations underlying discrete figures, discussed further below, does not render the entirety of a 112-page, ten-month forensic investigation unreliable. *See infra* ¶ 30. And unlike the expert in Loy, Mr. Kirschner did not rely exclusively on a single source: he also reviewed the underlying documents, the James Complaint and other adversary pleadings, and the materials identified in Exhibit B to his Declaration, in addition to drawing on his own decades of relevant experience. Kirschner Decl. ¶ 20 & Ex. B. Mr. Kirschner's multi-source, experience-informed analysis is precisely what Loy found lacking.

26.      Courts applying Rule 702(b) routinely admit expert testimony that, like Mr. Kirschner's, rests on records and sworn declarations furnished by others, recognizing that any resulting concerns go to weight rather than admissibility. In *Alorica Inc. v. Tech Mahindra (Americas) Inc.*, 2025 WL 2577788, at *3 (E.D. Tex. Sept. 5, 2025), the court admitted expert testimony that relied on payroll records and a sworn declaration to determine employee compensation, holding that such reliance "provide[d] sufficient factual basis to satisfy Rule 702(b)" even though the opposing party argued the expert had not independently verified those sources, because "any challenge to those inputs' reliability speaks to the weight of the testimony, not its admissibility." *Id.* Similarly, in *In re Roman Catholic Church of the Archdiocese of New*

16

*Orleans*, the court admitted expert testimony over an objection that the expert could not rely on financial data supplied by his client, explaining that Rule 703 "allows an expert to base his opinion 'on facts or data in the case that the expert has been made aware of or personally observed,'" and noting that valuation-type opinions in the restructuring context, like other "soft sciences," necessarily involve "diminished methodological precision" relative to disciplines such as mathematics or engineering. 632 B.R. 593, 607–08 (Bankr. E.D. La. 2021). And in *BHI Energy I Power Services LLC v. KVP Holdings, LLC*, 2024 WL 1809499, at *4-5 (N.D. Tex. Apr. 24, 2024), the court confirmed that "[e]xperts are permitted to rely on assumptions when reaching their opinions," so long as "those assumptions [have] some factual basis in the record and an underlying rationale," and that a motion to exclude is not properly grounded in a dispute over whether the expert's opinion is correct, as opposed to whether it is reliable. The same principles compel denial of the Motions here: Mr. Kirschner's assumptions are grounded in the extensive factual record reflected in the Moore Declaration and the underlying documents, and the Movants' disagreement with his conclusions is, at bottom, a disagreement about correctness, not reliability.

27.     Onset separately invokes *In re Taxotere (Docetaxel) Products Liability Litigation*, 26 F.4th 256, 269 n.10 (5th Cir. 2022), which held that an expert may not rely on inadmissible evidence that is (1) from a witness testifying at the same trial, (2) critical to the expert's testimony, and (3) not independently verified by the expert. Onset Mot. ¶¶ 32–33, 37. *Taxotere* is readily distinguishable. There, the Fifth Circuit found that a party had "effectively smuggled inadmissible opinion testimony past the expert-disclosure and expert-discovery obligations" by first presenting the testimony as lay opinion and then using it to "bootstrap yet more expert testimony" from a retained expert. 26 F.4th at 267. No such procedural sleight-of-hand is present here: Mr. Moore's Declaration was filed contemporaneously with, and cited

extensively and transparently throughout, the Kirschner Declaration, and Mr. Moore is separately subject to cross-examination on his own sworn testimony. And even under *Taxotere*'s own third factor, Mr. Kirschner did not merely adopt Mr. Moore's conclusions wholesale; he applied his own independent professional judgment—built on decades of experience evaluating comparable fraudulent transfer, insider, and related claims—to the facts Mr. Moore's investigation developed, which is a materially different exercise than passing through another witness's untested opinion.

28.     Onset also argues that, under *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012), and *Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 804–06 (N.D. Tex. 2018), an expert who relies on another party's estimates or projections "must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." Onset Mot. ¶ 31. Mr. Kirschner does exactly that. He explains that, in addition to relying on his own relevant experience, he considered the materials identified in Exhibit B to his Declaration, including the Moore Declaration. Kirschner Decl. ¶ 20. And he repeatedly grounds his reliance on the Moore Declaration in the scope and rigor of the underlying investigation it reflects—a ten-month forensic investigation conducted by an advisor with more than thirty years of relevant restructuring and forensic experience, corroborated by parallel criminal proceedings, guilty pleas, and the Examiner's own independent findings. *See, e.g.*, *id.* ¶¶ 22, 29, 35, 116, 130. That explanation satisfies *ZF Meritor* and *Jacked Up*; those decisions do not require an expert to independently re-perform the underlying investigation before he may rely on it, only that he explain and justify his reliance, which Mr. Kirschner has done. *Jacked Up* is equally distinguishable on its facts: the damages expert there relied on a "one-page set of profit and volume projections without knowing the circumstances under which such projections were created or the assumptions on which they were based," and "lacked critical information that would be necessary

18

for [opposing counsel] to effectively cross-examine him." 696 F.3d at 292–93. Mr. Kirschner's reliance on a 112-page declaration and the extensive underlying documents it cites presents no comparable opacity, and Mr. Kirschner was examined at length on the underlying facts at his deposition. *See ZF Meritor*, 291 F. Supp. 3d at 805 (emphasis added). By omitting the phrase "to calculate lost profits," Onset recasts a lost-profits-specific rule as a general standard governing any expert's reliance on another party's work. But Mr. Kirschner did not calculate lost profits from unverified sales projections; he evaluated the merits and assessment of the validity of a portfolio of litigation claims and their ability to generate recovery based on the findings of a completed, ten-month forensic investigation.

29.     Onset further suggests that Mr. Kirschner's opinions are suspect because the Debtors retained him only after publicly representing, at the June 12, 2026 Disclosure Statement Hearing, that the Litigation Trust would need to recover approximately $2 billion for the Plan to become effective. Onset Mot. ¶¶ 2, 12. But the timing of an expert's retention relative to a party's litigating position is not a basis for exclusion under Rule 702; experts are, as a matter of routine practice, retained by parties who have already staked out the positions the expert is asked to evaluate. What matters is whether the expert's analysis and application of that analysis to the facts are reliable—not when, or under what circumstances, the expert came to be retained. *See Pipitone*, 288 F.3d at 249–50; *Kickz*, 2025 WL 3272098, at *6. To the extent Onset believes the timing of Mr. Kirschner's engagement bears on the credibility or weight of his opinions, that is a proper subject for cross-examination, not a ground to exclude his testimony altogether.

30.     Finally, to the extent the Movants point to the withdrawal of certain calculations underlying discrete figures in the Moore Declaration as grounds to discredit the Kirschner Declaration wholesale, K/L Mot. ¶ 3 n.4, that development, at most, may bear on the

weight the Court affords particular components of Mr. Kirschner's analysis—it does not render inadmissible the entirety of testimony addressing multiple independent categories of claims against multiple different defendants, the vast majority of which do not depend on the withdrawn calculations at all. *See* Kirschner Decl. ¶¶ 30–142 (addressing Third-Party Factoring Claims, SCF Claims, SPV Lender Claims, Insider Claims, Suspect Acquisition Claims, and Other Claims, each supported by independently discussed facts and analysis).

31.     As explained above, *supra* ¶ 7, Onset's related contention that Mr. Kirschner ignored defenses to the Estate Claims is contradicted by the Declaration itself, which expressly considers defenses to, and factors those risks into his ultimate opinions. Kirschner Decl. ¶¶ 125, 140–41, 143. That Mr. Kirschner did not separately catalog every conceivable defense to every category of Estate Claims does not render his opinions inadmissible; an expert need not anticipate and rebut every possible defense to offer a reliable opinion on the value of a litigation portfolio, particularly at the confirmation-feasibility stage where the Court is not adjudicating the merits of any individual Estate Claim. Any perceived gaps in Mr. Kirschner's treatment of particular defenses go to the weight of his testimony, not its admissibility. *See Pipitone*, 288 F.3d at 249–50.

## III.     Mr. Kirschner's Methodology Is Reliable

32.     Both the Katsumi/LAM Motion and the Onset Motion assert that Mr. Kirschner's conclusions are an untestable "ipse dixit" unconnected to any methodology. K/L Mot. ¶¶ 26, 28 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); Onset Mot. ¶ 40. That characterization ignores both the nature of the assignment and the analysis Mr. Kirschner actually performed. *Daubert*'s gatekeeping obligation applies with equal force to experience-based testimony, but the touchstone is whether the expert "employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field"—not whether the expert built a discounted cash flow model. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (quoted at K/L Mot. ¶ 15).

33.     The Advisory Committee's own commentary to Rule 702 confirms that experience-based expert testimony of exactly this kind is properly admissible. The Advisory Committee Note recognizes that "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony," citing as an example a law enforcement agent's application of "extensive experience to analyze the meaning of [recorded] conversations," and explaining that "[s]o long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted." Fed. R. Evid. 702 advisory committee's note (2000 amendment). Where a witness relies primarily on experience, the Advisory Committee requires only that he "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts"—precisely what Mr. Kirschner does throughout his Declaration, applying his decades of restructuring and litigation-trustee experience to the specific facts of each category of Estate Claims. *Id.*; *see supra* ¶¶ 12–15. The Supreme Court's decision in *Kumho Tire* confirms the same principle: "[n]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience," and reliability concerns "may focus upon personal knowledge or experience." 526 U.S. at 150, 156. The portion of *Kumho Tire* that excluded the challenged expert's testimony turned not on his reliance on experience as a method, but on the mismatch between his experience and the specific application he attempted: the expert stretched general tire-failure experience to a tire he conceded was worn bald and inadequately repaired, and "there was no indication in the record that other experts in the industry

21

use [his] particular approach." *Id.* at 157. Mr. Kirschner presents no comparable mismatch. His experience is directly on point for the task at hand—assessing the value to the estate and litigation viability of fraudulent transfer, insider, and related estate claims as a bankruptcy lawyer and litigation trustee who has spent decades doing precisely that—and his elements-based method is the approach litigation trustees in this field routinely use to evaluate prospective recoveries.

34.    The Fifth Circuit's decision in *Pipitone v. Biomatrix, Inc.* illustrates the same point. There, the court held that a district court "abused its discretion in excluding the testimony" of a treating physician who opined, based on his specialized knowledge and experience, that a joint infection "extremely rare in joints" was caused by a contaminated syringe rather than other potential sources. 288 F.3d 239, 241–42, 248 (5th Cir. 2002). Applying *Kumho Tire*'s recognition that reliability may rest on personal experience, the Fifth Circuit explained that the physician had properly "ruled out" alternative explanations "[b]ased on the lack of these symptoms and his specialized knowledge and experience." *Id.* at 247–48. The court further emphasized that a trial court's gatekeeping "role . . . is not intended to serve as a replacement for the adversary system," and that "[v]igorous cross-examination" remains the proper tool for testing the factual bases of an expert's experience-based conclusions. *Id.* at 250. The same is true here: Mr. Kirschner's application of his decades of experience as a restructuring lawyer and litigation trustee to the facts developed in the Moore Declaration and the underlying record reflects the same kind of specialized, experience-based judgment the Fifth Circuit held admissible in *Pipitone*, and any remaining factual disputes are for cross-examination, not exclusion.

35.    The Katsumi/LAM Motion frames the reliability inquiry broadly, asserting that it "extends to all aspects of an expert's testimony, including the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." K/L Mot. ¶

22

25 (quoting *Jacked Up, LLC v. Sara Lee Corp.*, 807 F. App'x 344, 348 (5th Cir. 2020); citing *Robles v. Eminent Med. Ctr., LLC*, 619 F. Supp. 3d 609, 647 (N.D. Tex. 2022)). Neither case supports exclusion here. In *Jacked Up*, the Fifth Circuit affirmed exclusion of a lost-profits expert who, in forming his opinion, simply accepted the defendant's own sales projections—supplied by the defendant's marketing director—as true, without conducting any independent determination as to their accuracy. 807 F. App'x at 348–49. But *Jacked Up* itself recognizes that "[i]n some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and demonstrate why he believed they were reliable." *Id.* (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 294 (3d Cir. 2012)). As explained above, Mr. Kirschner does exactly that: he describes his understanding of the facts developed through the Moore Declaration, explains why he relied on that investigation, and applies his own professional judgment in concluding that the various Estate Claims are colorable or meritorious. *See supra* ¶ 28. *Robles* is even further afield: the court there disqualified an expert who testified as to lost income on a claim actually premised on job loss from alleged disability discrimination, ignored a dispositive intervening fact (the plaintiff's acquisition of a higher-paying job that cut off back pay), relied on an undesignated expert in forming his opinion, and failed to supplement a report as requested. 619 F. Supp. 3d at 649–50. None of those defects has any application to the Kirschner Declaration.

36.    Nor do the specific factual circumstances of the cases underlying the Katsumi/LAM Motion's reliability standard support exclusion. *Dart v. Kitchens Bros. Manufacturing Co.*, from which the Katsumi/LAM Motion draws its gatekeeping quotation, excluded two experts in an erosion-damage case because neither had examined the land before timber harvesting began (and so could not establish causation from any pre-harvest baseline), one

employed a methodology never before used, and one made basic mathematical errors. 253 F. App'x 395, 397–98 (5th Cir. 2007). Those flaws are simply inapplicable to Mr. Kirschner's assignment, which rests on materials compiled through a ten-month forensic investigation and multiple adversary complaints. Similarly, *General Electric Co. v. Joiner*, cited by the Katsumi/LAM Motion for the proposition that a court need not admit opinion evidence "connected to existing data only by the ipse dixit of the expert," excluded testimony that relied on animal and epidemiological studies too dissimilar—in species, dose, cancer type, and confounding exposures—to the plaintiff's actual circumstances to reliably support the experts' conclusions. 522 U.S. 136, 144–46 (1997). Mr. Kirschner's opinions present no comparable mismatch: the Moore Declaration, the Examiner's Report, sworn guilty pleas, and the adversary complaints all concern the specific transfers, specific defendants, and specific claims on which he opines—not, as in *Joiner*, an unrelated species or chemical exposure bearing only a general resemblance to the facts.

37.    The remaining decisions the Katsumi/LAM Motion cites in this section fare no better. *Johnson v. Arkema, Inc.*, cited for the proposition that an expert opinion must be "more than unsupported speculation or subjective belief," excluded a toxic-tort expert for failing to establish general causation through a proper differential diagnosis—a medical-causation methodology with no bearing on Mr. Kirschner's opinions. 685 F.3d 452, 468 (5th Cir. 2012). And while the Katsumi/LAM Motion again invokes *In re Med Diversified, Inc.* for the proposition that "[r]epeated conclusory assertions . . . do not become reliable simply by repetition," 334 B.R. 89, 102 (Bankr. E.D.N.Y. 2005), that decision excluded a valuation expert who had no formal training, certification, or peer recognition in business valuation, failed to use the discounted cash flow method his own field's leading treatise identifies as the standard check on any valuation, and had an undisclosed conflict of interest. *Id.* at 96–102. As explained above, Mr. Kirschner is not being

offered as a valuation expert; he is offered as an experienced restructuring lawyer and litigation trustee assessing the merits and value to the estate of a litigation portfolio—precisely the specialized knowledge his experience and career qualify him to provide. *See supra* ¶¶ 14–15. Finally, *In re TMI Litigation* excluded dose-reconstruction testimony because one expert—a meteorologist, not a dose specialist—built his model on data supplied by counsel rather than his own field's methods, and another's estimates implied lethal radiation levels that would have caused mass casualties never observed, findings the Third Circuit held could be rejected as flying "in the face of reality" independent of any methodological defect. 193 F.3d 613, 670–71, 682–83, 703–04 (3d Cir. 1999). Mr. Kirschner is an expert in the field in which he opines, and his conclusions are the opposite of findings that defy reality.

39.     Both Motions fault Mr. Kirschner for not applying "a discount rate," "probability weighting," or "sensitivity analyses" to move from the $25.4 billion aggregate "Assertable Value" of the Estate Claims to his $2 billion recovery opinion. K/L Mot. ¶¶ 4, 26; Onset Mot. ¶¶ 40–42. But Mr. Kirschner's $2 billion figure is not a mechanical percentage applied to an undifferentiated gross claim total—it is the product of his category-by-category assessment of litigation strength, reflected in the itemized Assertable Value breakdown at paragraph 31 of the Declaration, tempered by his considered judgment (grounded in decades of experience resolving similar claims, including his experience that litigation trustees typically recover a fraction of asserted preference claims) regarding "the uncertainty and time associated with litigation, and the potential that the FBG Debtors might settle certain litigation claims for less than the asserted amounts." Kirschner Decl. ¶¶ 31, 142–43. The Kirschner Declaration makes clear that Mr. Kirschner is not opining that the claims are worth $2 billion, only that it is reasonably likely that the estate can recover the $2 billion needed under the plan by 2028. *Id.* 143. That an expert reaches

25

a risk-adjusted conclusion through professional judgment rather than a numeric formula does not render the opinion inadmissible; it goes, at most, to the weight the fact finder assigns it. *See Pipitone*, 288 F.3d at 249–50.

40.     Nor is Mr. Kirschner's 10% experience-based estimate for preference claim recoveries the kind of unsupported ipse dixit the Motions suggest. K/L Mot. ¶ 29. Mr. Kirschner explained that, "based on my experience, litigation trustees recover approximately 10% of the amount of preference claims," Kirschner Decl. ¶ 142—a professional estimate drawn from his direct experience serving as a litigation trustee overseeing preference litigation in numerous cases, not a number pulled from thin air. An expert's reliance on the pattern of results he has personally observed across a career of comparable engagements is a permissible, testable methodology; the reliability inquiry does not require that every experience-based estimate be traceable to a published dataset. *See Kumho Tire*, 526 U.S. at 150–52. Indeed, Mr. Kirschner's 10% estimate, like the recollections credited in *In re Wyly*, rests on decades of firsthand experience administering and litigating preference claims as a trustee, and is equally testable on cross-examination. *Wyly* considered and rejected a nearly identical attack on a lawyer-expert's recollection-based estimate, holding that such opinions are "reliable for what they are"—recollections grounded in decades of practice "coupled with some confirmatory research"—and are properly "testable" through cross-examination "probing the accuracy of his own recollections," rather than excluded outright. 552 B.R. 338, 364 (Bankr. N.D. Tex. 2016).

41.     Onset separately criticizes Mr. Kirschner for failing to "compare the contemplated prosecution of the Estate Claims to any specific data points from prior bankruptcies," and points to Exhibit C to the Kirschner Declaration—an article titled *The Refco Litigation War*, describing litigation still pending in 2008, several years after Mr. Kirschner was appointed the

*Refco* litigation trustee—as supposedly showing that "near-term recoveries cannot be expected." Onset Mot. ¶ 42. That critique misreads why the exhibit was offered. Mr. Kirschner cites the Refco Litigation War article to illustrate the case-management and consolidation tools he developed and successfully implemented as Refco's trustee—including a coordinated discovery protocol across multiple related lawsuits—which allowed him to resolve, in a compressed period set by the court, over $9 billion in disputed and unliquidated claims. Kirschner Decl. ¶¶ 10, 148 & Ex. C. It is these consolidation tools, not a specific recovery timeline drawn from *Refco*, that Mr. Kirschner explains a litigation trustee could bring to bear here to expedite resolution of the Estate Claims. *Id.* ¶ 148. That some *Refco*-related litigation remained pending years after Mr. Kirschner's appointment does not undermine that observation; if anything, it underscores why Mr. Kirschner believes the litigation trustee could recover at least $2 billion by the end of 2028. *See id.* ¶ 143 (stating the recovery estimate "accounts for the uncertainty and time associated with litigation").

42.     More broadly, Onset's demand for comparison to "specific data points from prior bankruptcies" ignores that Mr. Kirschner's own career supplies exactly that comparative, empirical foundation. He has served as litigation or liquidation trustee in numerous complex fraud-driven bankruptcies presenting fact patterns similar to FBG's—including *Refco*, *Tribune*, *Millennium Health*, *Nine West*, *Yellowstone Mountain*, *Le-Nature's Bottling Company*, and *Highland Capital Management*—several of which, like this case, involved indictments of controlling insiders, falsified financial records, and off-balance-sheet transactions. Kirschner Decl. ¶¶ 8, 10, 13. An expert's reliance on the pattern of outcomes he has personally observed across a career of comparable engagements is a permissible, testable methodology under *Kumho Tire*; it is not a substitute for data, but a well-established form of it. 526 U.S. at 150–52; *see supra* ¶ 39.

43.     Courts confronted with challenges to an expert's underlying facts or assumptions—rather than his qualifications or the existence of a methodology altogether—routinely conclude that such challenges are for cross-examination, not exclusion. In *Barry v. Medtronic, Inc.*, the court admitted a damages expert's testimony because it was, on its face, "based on reasonable facts and economic analysis, not an ipse dixit justification based on experience alone," and explained that it was "confident that counsel will, by skillful cross-examination, illuminate for the jury each error and omission" in the analysis, since "[the] criticisms regarding the facts and conclusions . . . go to the weight of his opinion, not the admissibility." 2016 WL 7665423, at *3 (E.D. Tex. July 19, 2016). And in *Douglas v. Potter County, Texas*, the court admitted a physician's opinion based on his review of the relevant medical records, holding that "[e]xperts are permitted to rely on assumptions when reaching their opinions, when grounded in some factual basis in the record and an underlying rational[e]," and that the expert's "review of case materials, coupled with his training, experience, and education," rose above the level of a mere ipse dixit. 2025 WL 824582, at *5 (N.D. Tex. Mar. 13, 2025). The same is true of Mr. Kirschner: his review of the Moore Declaration, the underlying documents, and the adversary pleadings, coupled with his decades of training and experience as a restructuring lawyer and litigation trustee, supplies a sufficiently reliable methodology, and any remaining criticisms of his facts or conclusions are properly tested through cross-examination, not a motion to exclude.

44.     Recent bench-trial decisions confirm the same result. In *Spence v. American Airlines, Inc.*, the court admitted expert opinions that "do not require specific scientific support because [the expert] relies on his personal observations, professional experience, training, and education," holding the reliability standard satisfied and leaving remaining attacks to go to weight. 775 F. Supp. 3d 963, 976–77 (N.D. Tex. 2025). Likewise, *BHI Energy I Power Services LLC v.*

28

*KVP Holdings, LLC* confirms that "[a] witness's experience, studies and education, combined with a review of the relevant materials can provide a reliable basis for expert testimony." 2024 WL 1809499, at *8 (N.D. Tex. Apr. 24, 2024); *see supra* ¶ 26 (discussing *BHI Energy*). And unlike the excluded expert in *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, who "referred to his experience a number of times in his report" but "failed to link the experience to the conclusions he reached," 581 B.R. 370, 383–84 (Bankr. S.D.N.Y. 2017), Mr. Kirschner draws that link expressly and repeatedly: for each category of Estate Claims, he ties his stated conclusions directly to his review of the specific facts developed in the Moore Declaration and the underlying record, and to his decades of relevant experience prosecuting comparable claims. *See supra* ¶ 38 (citing Kirschner Decl. ¶¶ 32–142).

45.     In any event, any perceived gaps in Mr. Kirschner's methodology go to weight, not admissibility, particularly in the bench-trial context presented here, where the Court itself will separate the wheat from the chaff without the risks a jury presents. *See infra* ¶¶ 49–50.

## IV.     Mr. Kirschner's Testimony Does Not Constitute Impermissible Legal Advocacy

46.     Both the Katsumi/LAM Motion and the Onset Motion argue that large portions of the Kirschner Declaration consist of impermissible legal conclusions. K/L Mot. ¶¶ 31–35; Onset Mot. ¶¶ 19–29 (Section I, "Kirschner Offers Impermissible Legal Opinions"). Both arguments fail for two independent reasons: they misread what Mr. Kirschner actually says, and they misapply the governing law to a bench trial.

47.     First, as explained above, the Katsumi/LAM Motion's framing depends on stripping the qualifying language from Mr. Kirschner's opinions. *See supra* ¶ 5. Mr. Kirschner does not tell the Court that the Ponzi Scheme Presumption applies or that Katsumi is liable as a matter of law; he states his professional belief, informed by decades of experience litigating exactly

these kinds of claims, that a litigation trustee could reasonably assert and likely prevail on such claims based on the facts he reviewed. *See, e.g.*, Kirschner Decl. ¶¶ 39, 41, 55, 77, 86–87 ("I believe it is reasonable to conclude that a litigation trustee would have colorable claims relating to the SCF programs"; "I believe that a litigation trustee would have significant and cognizable claims for recovery against Onset and other SPV Lenders"; "I believe the Insider Claims are meritorious and reasonably likely to result in significant recoveries by the Litigation Trust."). Lawyers "may testify as to legal matters when those matters involve questions of fact." *Askanase v. Fatjo*, 130 F.3d 657, 672 (5th Cir. 1997) (quoted at K/L Mot. ¶ 20). Mr. Kirschner testifies to precisely such a question of fact: whether the Estate Claims can generate $2 billion and when a litigation trustee could realistically expect to collect on them. The Court decides no individual Estate Claim on the merits at confirmation; it assesses, at most, for feasibility purposes, the value of estate assets—the exact task Mr. Kirschner's opinions are designed to assist.

48. Onset's version of this argument fares no better. Onset contends that the "opinion section of the Kirschner Declaration follows the format of a legal brief," because for each category of Estate Claims Mr. Kirschner "begins by stating the overall conclusion," "repeats the facts set forth in the Moore Declaration," and "superficially applies the law to those cherry-picked facts." Onset Mot. ¶ 25. But identifying the elements of a cause of action before evaluating whether the available facts satisfy those elements is not a legal conclusion—it is the ordinary, necessary methodology any experienced litigator or litigation trustee uses to assess whether a category of claims is worth pursuing, and precisely the task Mr. Kirschner was retained to perform. Kirschner Decl. ¶ 18. Onset's suggestion that "the only feature of the Kirschner Declaration absent from the Moore Declaration is the conclusion that all the various Estate Claims have merit," *id.* ¶ 26, actually proves the point: synthesizing an extensive factual record against the elements of the

applicable causes of action to reach an independent, reasoned opinion on about those causes of action is the specialized service Mr. Kirschner was retained to provide, and it is exactly what Rule 702 permits an experienced litigation-trustee expert to do.

49.     Second, in each of the non-bankruptcy jury-trial decisions both Motions rely upon, the challenged expert purported to answer the ultimate question reserved for a jury. *See Askanase*, 130 F.3d at 673 (excluding a lawyer's opinion on whether officers and directors breached their fiduciary duties, because jurors are "very susceptible to adopting the expert's conclusion"); *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) (barring testimony on whether the plaintiff was contributorily negligent, "the issue the jury must resolve after appropriate legal instructions by the court"); *Green v. CBS Broad., Inc.*, No. 3:98-CV-2740-T, 2000 WL 33243748, at *3-4 (N.D. Tex. Dec. 19, 2000) (striking testimony only "to the extent" it stated legal conclusions on the elements of a libel claim to be presented to a jury); *C.P. Interests, Inc. v. Cal. Pools, Inc.*, 238 F.3d 690, 697-98 (5th Cir. 2001) (finding any error in admitting an attorney expert's "unequivocal" conclusions on jury questions to be harmless); *Mendoza v. Amarillo Indep. Sch. Dist.*, No. 2:24-cv-169-BR, 2026 WL 776225, at *3 (N.D. Tex. Mar. 19, 2026) (jury-trial employment case); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) (jury-trial personal injury case); *Pierce v. Thaler*, 355 F. App'x 784, 790–91 (5th Cir. 2009) (excluding testimony offering "no helpful specialized knowledge"—unlike Mr. Kirschner's decades of directly relevant trustee experience); *Dunlap v. Hood*, No. 3-07-CV-2147-BD, 2009 WL 362292, at *1 (N.D. Tex. Feb. 13, 2009) (same). The sole non-jury decision the Katsumi/LAM Motion cites, *Snap-Drape, Inc. v. Commissioner*, 98 F.3d 194, 198 (5th Cir. 1996), excluded accountants' reports that were "nothing more than legal arguments" on the statutory question the

Tax Court itself had to decide—a far cry from Mr. Kirschner's factual and experience-based assessment of estate litigation assets.

50.     And Onset's remaining citations are equally inapposite. *Est. of Sowell v. United States*, 198 F.3d 169, 172 (5th Cir. 1999), and *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 95 (Tex. App. 2004), both involved experts—including, in Greenberg Traurig, a law professor and a former judge—who were asked to instruct the fact finder on what the governing law actually was or means, a fundamentally different exercise than a litigation-trustee expert applying his claims-evaluation experience to a developed factual record. Likewise, *United States v. Cross*, rests on the premise that "each courtroom comes equipped with a 'legal expert,' called a judge" who must instruct the jury on the law—a concern with jury instruction that has no application in this bench-trial confirmation proceeding. *See* 113 F. Supp. 2d 1282, 1284 (S.D. Ind. 2000). And *BNY Mellon, N.A. v. Affordable Holdings, Inc.*, excluded an expert report that did nothing but cite a Mississippi statute, interpret it, and apply that interpretation to a disputed corporate resolution—pure statutory interpretation untethered to any specialized factual analysis, unlike Mr. Kirschner's claim-by-claim application of his litigation-trustee experience to an extensive, case-specific factual record. *See* No. 1:09CV226-SA-JAD, 2011 WL 2746301, at *1–2 (N.D. Miss. July 12, 2011).

51.     The two bankruptcy decisions the Motions cite likewise support denying the Motions, not granting them, and neither excluded the challenged expert. *In re Wyly* struck only testimony that "simply told the Court what the law was or is," while admitting the lawyer-expert's experience-based opinions at their "proper weight," because there is "little need for the Court to serve as a gate-keeper for itself" in a bench trial. 552 B.R. 338, 360, 362, 364–65 (Bankr. N.D. Tex. 2016). And *In re Lyondell Chemical Co.* the court excluded only the experts' factual

narratives and state-of-mind speculation, leaving their challenged solvency opinions fully intact—directly refuting the Katsumi/LAM Motion's suggestion that an opinion on insolvency is per se an impermissible legal conclusion. 558 B.R. 661, 668–71 (Bankr. S.D.N.Y. 2016); *see* K/L Mot. ¶ 34. Rather than strike entire reports, *Lyondell* explained that in a bench trial the court "will disregard those portions . . . that are not properly admitted in evidence." 558 B.R. at 670–71. That is the appropriate remedy here as well, to the (limited) extent the Court finds any specific statement in the Kirschner Declaration crosses the line—not wholesale exclusion of expert testimony assessing categories of estate claims.

52.     Nor is the concern that animates the legal-conclusion doctrine present here. The "chief concern with improper legal testimony is that such opinions will 'merely tell the jury what result to reach.'" *United States v. Thomas*, 847 F.3d 193, 206 (5th Cir. 2017). There is no jury in this proceeding. The Court can hear Mr. Kirschner's testimony, consider any cross-examination, and accord it whatever weight it warrants. Furthermore, an expert opinion is not objectionable "just because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a); *Stringer v. Pablos*, No. 5:16-CV-257, 2017 WL 11638257, at *2 (W.D. Tex. Nov. 14, 2017). Mr. Kirschner recites the elements of relevant causes of action, as any experienced practitioner evaluating a litigation portfolio would, and then explains why, based on his experience and the facts reviewed, he believes those elements are reasonably likely to be satisfied. *See, e.g.*, Kirschner Decl. ¶¶ 33–39 (Ponzi Scheme Presumption elements and application), ¶¶ 78–84 (badges of fraud elements and application), ¶¶ 137–41 (preference claim elements, applicable defenses, and the Plan's Preference Settlement). That is not usurping the Court's role; it is providing the Court with the same kind of experience-based analysis of estate litigation assets that courts in this District and elsewhere routinely admit and weigh appropriately. S*ee Guzman v.*

33

*Mem'l Hermann Hosp. Sys.*, 637 F. Supp. 2d 464, 476-77 (S.D. Tex. 2009) (overruling an ultimate-issue objection and denying exclusion "as to the remainder of the affidavit" after striking only the specific statements that a statutory violation "occurred").

53.     Relatedly, to the extent the Motions ask this Court to resolve, on a motion to exclude, whether Mr. Kirschner correctly analyzed the underlying legal doctrines he applies—such as the Ponzi Scheme Presumption or the badges-of-fraud test—that request misunderstands the purpose of a Rule 702 motion. "[M]otions to exclude expert testimony under [Rule] 702 are not the appropriate medium for resolving" disputes over "the parties' competing views of the law"; "not one of the factors for determining" reliability listed in Rule 702 "includes an evaluation of the parties' underlying legal arguments," and a court cannot, "as a practical matter," weigh the validity of the parties' legal arguments in assessing reliability. *U.S. Magnesium, LLC v. ATI Titanium, LLC*, No. 2:17-CV-00923-HCN-JCB, 2021 WL 615412, at *3 (D. Utah Feb. 17, 2021). To whatever extent the Movants believe Mr. Kirschner has mischaracterized the Ponzi Scheme Presumption, the badges of fraud, or any other legal doctrine he discusses, that is a matter for legal argument at the Combined Hearing—not a basis to exclude his testimony under Rule 702.

### Conclusion

54.     For the foregoing reasons, the Debtors respectfully request that the Court deny the Katsumi/LAM Motion and the Onset Motion in their entirety and allow Mr. Kirschner to testify at the Combined Hearing, together with such other and further relief as the Court deems just and proper.

34

Dated:  July 28, 2026
       Houston, Texas

*/s/ Clifford W. Carlson*

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   gabriel.morgan@weil.com
        clifford.carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
Robert S. Berezin (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
Andriana Georgallas (admitted *pro hac vice*)
Kevin Bostel (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
Elaina K. Aquila (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   matt.barr@weil.com
        sunny.singh@weil.com
        robert.berezin@weil.com
        andriana.georgallas@weil.com
        kevin.bostel@weil.com
        jason.george@weil.com
        elaina.aquial@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

**Certificate of Service**

I hereby certify that on July 28, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                        /s/ Clifford W. Carlson
                                        Clifford W. Carlson