**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § § § | **Chapter 11** |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § § § | **No. 25-90399 (CML)** |
| | § § | **(Jointly Administered)** |
| Debtors.[1] | § § | |

| | | |
|---|---|---|
| **GLAS TRUST COMPANY LLC, as administrative agent for the lenders to the Carnaby II Credit Agreement and Carnaby III Credit Agreement, AB CARVAL CREDIT OPPORTUNITIES FUND, CVI AA MASTER FUND I LP, CVI AV MASTER FUND I LP, CVI EMCOF US, LLC, CARVAL CONTINGENT CREDIT FUND LP, CVI CVF V POOLING FUND I LP, CVI CSF MASTER FUND I LP** | § § § § § § § § § § § § | |
| Plaintiffs, | § § | **Adv. Pro. No. [__] (CML)** |
| v. | § § § | |
| **BANK OF AMERICA, N.A., and ONSET FINANCIAL, INC.** Defendants. | § § § § | |

## ADVERSARY PROCEEDING COMPLAINT

GLAS Trust Company LLC (the "Carnaby Agent" or "Plaintiff"),[2] as administrative

agent for the lenders, AB CarVal Credit Opportunities Fund, CVI AA Master Fund I LP, CVI

---

[1]. A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the Debtors' claims and noticing agent website at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] Unless otherwise noted herein, reference to the Carnaby Agent or Plaintiff shall include all plaintiffs listed in Footnote 3 and the "Parties" section herein.

AV Master Fund I LP, CVI EMCOF US, LLC, CarVal Contingent Credit Fund LP, CVI CVF V Pooling Fund I LP, and CVI CSF Master Fund I LP, party to the Carnaby II Credit Agreement (as defined below) and the Carnaby III Credit Agreement (as defined below) (collectively, the "Carnaby Credit Agreements," and the financings and related transactions thereunder, the "Carnaby Inventory Financings"), by and through its undersigned counsel, hereby brings this complaint for Declaratory Judgment (the "Complaint") against Bank of America, N.A. ("BofA" or "ABL Agent," as further defined below), as administrative agent and collateral agent for the lenders under the ABL Credit Agreement (as defined below), and Onset Financial, Inc. ("Onset"), and alleges as follows:

## NATURE OF THE ACTION

1.    This is an adversary proceeding.

2.    Plaintiff seeks declaratory and related relief.

3.    An actual, justiciable controversy exists between the parties regarding the ownership, priority, validity, and extent of their respective claimed interests in the Carnaby Secured Lenders' Inventory Collateral (as defined below), which controversy is ripe for judicial determination.

## JURISDICTION AND VENUE

4.    This adversary proceeding relates to the chapter 11 cases being jointly administered for procedural purposes under *In re First Brands Group, LLC*, No. 25-90399 (CML) (Bankr. S.D. Tex.) (the "Bankruptcy Cases"), which are pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").

5.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

6.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O).  Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Plaintiff consents to entry of final orders or judgment by the Court if it is determined

2

that the Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

7.      This adversary proceeding is commenced pursuant to Rule 7001 of the Bankruptcy Rules to (i) determine the validity, priority, or extent of a lien or other interest in property; and (ii) obtain a declaratory judgment relating to the foregoing.  Fed. R. Bankr. P. 7001(b), 7001(i).

8.      To the extent necessary, this adversary proceeding also constitutes a Challenge (as that term is defined in the Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief, *In re First Brands Group, LLC*, No. 25-90399 (Bankr. S.D. Tex. Nov. 9, 2025), ECF No. 608 (the "<u>DIP Order</u>")) to any competing lien or claim held by any creditor asserting a competing lien or claim against the collateral.  The filing of this adversary proceeding is also authorized by, and consistent with, the Stipulation and Agreed Order Resolving Onset, Inc.'s Emergency Motion for Relief from the Automatic Stay and the Carnaby Secured Lenders' Lift Stay Motion, *In re First Brands Group, LLC*, No. 25-90399 (Bankr. S.D. Tex. June 1, 2026), ECF No. 2871 (the "<u>Carnaby and Onset Stipulation and Agreed Order</u>"), which expressly preserves the Carnaby Secured Lenders' right to assert claims and seek a determination with respect to their interests in the Disputed Inventory (as defined therein).

9.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     This adversary proceeding is also brought pursuant to sections 105 and 506 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

11.     Plaintiff, the Carnaby Agent, is a Delaware limited liability company, and is the administrative agent and collateral agent acting for and on behalf of the Carnaby Secured

Lenders in connection with the Carnaby Inventory Financings (each as defined below).

12. Plaintiff, AB CarVal Credit Opportunities Fund, is organized as a statutory trust under the laws of Delaware, and a lender under the Carnaby Inventory Financings.

13. Plaintiff, CVI AA Master Fund I LP, is a Delaware limited partnership, and a lender under the Carnaby Inventory Financings.

14. Plaintiff, CVI AV Master Fund I LP, is a Delaware limited partnership, and a lender under the Carnaby Inventory Financings.

15. Plaintiff, CVI EMCOF US, LLC, is a Delaware limited liability company, and a lender under the Carnaby Inventory Financings.

16. Plaintiff, CarVal Contingent Credit Fund LP, is a Delaware limited partnership, and a lender under the Carnaby Inventory Financings.

17. Plaintiff, CVI CVF V Pooling Fund I LP, is a Delaware limited partnership, and a lender under the Carnaby Inventory Financings.

18. Plaintiff, CVI CSF Master Fund I LP, is a Delaware limited partnership, and a lender under the Carnaby Inventory Financings (together, AB CarVal Credit Opportunities Fund, CVI AA Master Fund I LP, CVI AV Master Fund I LP, CVI EMCOF US, LLC, CarVal Contingent Credit Fund LP, CVI CVF V Pooling Fund I LP, and CVI CSF Master Fund I LP, are collectively referred to as the "Carnaby Secured Lenders" and each, a "Carnaby Secured Lender").

19. Defendant, Bank of America, N.A. ("BofA" or "ABL Agent") is a national banking association with a principal place of business in North Carolina. BofA is named in its capacity as administrative agent and collateral agent for prepetition secured ABL Secured Parties pursuant to that certain ABL Credit Agreement, dated as of February 2, 2018, as amended, restated, amended and restated, supplemented, or otherwise modified (the "ABL Credit Agreement"). The ABL Agent has asserted, or may assert, an interest in all of the

4

Inventory Collateral (as defined below), which is disputed by the Carnaby Secured Lenders.

20. Defendant, Onset Financial, Inc. ("Onset") is a Utah corporation, founded in 2008. Onset has asserted it acquired interests in certain of the Inventory Collateral through transactions involving Carnaby Inventory IV (as defined below), and through the Carnaby III Maquiladoras (as defined below) in Mexico. Its Chief Executive Officer is Justin Nielsen, and its Chief Financial Officer is Remington Atwood.

21. Debtor, First Brands Group, LLC ("FBG"), is a Delaware limited liability company, formerly known as Trico Group, LLC, with a principal place of business at 127 Public Square, Suite 5300, Cleveland, OH 44114. FBG is one of the Debtors in these Bankruptcy Cases and served as servicer under the Carnaby Inventory Financings.

22. Debtor, Brake Parts Inc LLC ("BPI"), is a Delaware limited liability company with an address at 127 Public Square, Suite 5300, Cleveland, OH 44114. BPI is one of the Debtors in these Bankruptcy Cases and is the Operating Debtor (as defined below) from which inventory was purchased by the Carnaby II and to which inventory was sold by Carnaby II.

23. Debtor, Trico Products Corporation ("Trico Products"), is a New York corporation with an address at 127 Public Square, Suite 5300, Cleveland, OH 44114. Trico Products is one of the Debtors in these Bankruptcy Cases and is one of the Operating Debtors from which inventory was purchased by Carnaby III and to which inventory was sold by Carnaby III.

24. Debtor, Trico Technologies Corporation ("Trico Technologies"), is a Delaware corporation with an address at 127 Public Square, Suite 5300, Cleveland, OH 44114. Trico Technologies is one of the Debtors in these Bankruptcy Cases and is one of the Operating Debtors from which inventory was purchased by Carnaby III and to which inventory was sold by Carnaby III. Trico Products and Trico Technologies are collectively referred to herein as the "Trico Entities," and BPI, Trico Products, and Trico Technologies are collectively referred

5

to herein as the "Operating Debtors".

25.   Debtor, Carnaby Inventory II, LLC ("Carnaby II"), is a Delaware limited liability company with an address at 127 Public Square, Suite 5300, Cleveland, OH 44114. Carnaby II is one of the Debtors in the Bankruptcy Cases, the borrower under the Carnaby II Credit Agreement, and the owner of certain of the Inventory Collateral.

26.   Debtor, Carnaby Inventory III, LLC ("Carnaby III"), is a Delaware limited liability company with an address at 127 Public Square, Suite 5300, Cleveland, OH 44114. Carnaby III is one of the Debtors in the Bankruptcy Cases, the borrower under the Carnaby III Credit Agreement, and the owner of certain of the Inventory Collateral.  Carnaby II and Carnaby III are collectively referred to herein as the "Carnaby II and III SPVs."

27.   Debtor, First Brands Group Holdings, LLC ("FB Holdings"), is a Delaware limited liability company with an address at 127 Public Square, Suite 5300, Cleveland, OH 44114.  FB Holdings is one of the Debtors in these Bankruptcy Cases and served as a guarantor under both the Carnaby II Credit Agreement and the Carnaby III Credit Agreement.

28.   Debtor, Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II"), is a Delaware limited liability company with an address at 3010 LBJ Freeway, Suite 1200, Dallas, TX 75234. Carnaby Holdings II is one of the Debtors in these Bankruptcy Cases, served as a guarantor under the Carnaby II Credit Agreement, and is the direct parent of Carnaby II.

29.   Debtor Carnaby Inventory Holdings III, LLC ("Carnaby Holdings III") is a Delaware limited liability company with an address at 3010 LBJ Freeway, Suite 1200, Dallas, TX 75234. Carnaby Holdings III is one of the Debtors in these Bankruptcy Cases, served as a guarantor under the Carnaby III Credit Agreement, and is the direct parent of Carnaby III.

30.   Debtor, Carnaby Inventory IV, LLC ("Carnaby IV"), is a Delaware limited liability company with an address at 127 Public Square, Suite 5300, Cleveland, OH 44114. Carnaby IV is one of the Debtors in the Bankruptcy Cases and is counterparty to certain

6

inventory lease agreements with Onset and purported inventory purchase agreements with the Carnaby III Maquiladoras.

31.     Non-Debtor affiliate, BPI Brake Manufacturing Juárez, S.A. de C.V. ("BPI Juárez"), is a Mexican limited liability company with operations in Mexico, operating at Enrique Pinocelli #9010, Parque Industrial Aerojuárez, Ciudad Juárez, Chihuahua.  BPI Juárez is a "Maquiladora," as that term is defined under the Carnaby II Credit Agreement, and is party to that certain Assembly (Maquila) Agreement, dated May 2, 2016, entered into by and between BPI Juárez and BPI as amended by the first amendment thereto dated May 31, 2022.

32.     Non-Debtor affiliate, BPI Braking Systems Mexico, S.A. de C.V. ("BPI Braking Mexico"), is a Mexican limited liability company with operations in Mexico, operating at Ave. Industrias #6024, Col. Parque Industrial Finsa, Nuevo Laredo, Tamaulipas, 88275.  BPI Braking Mexico is a "Maquiladora," as that term is defined under the Carnaby II Credit Agreement, and is party to that certain Assembly (Maquila) Agreement, dated December 29, 2014, entered into by and between BPI Braking Mexico and BPI as amended by the first amendment thereto dated May 31, 2022. BPI Juárez and BPI Braking Mexico are collectively referred to herein as the "Carnaby II Maquiladoras."

33.     Non-Debtor affiliate, Subensambles Internacionales, S. de R.L. de C.V. ("SI"), is a Mexican limited liability company with operations in Mexico, operating at Michigan 200, Industrial del Norte, Matamoros, Mexico. SI is a "Maquiladora," as that term is defined under the Carnaby III Credit Agreement, and is party to that certain Assembly (Maquila) Agreement, dated January 2, 1990, originally entered into by and between Federal-Mogul Motorparts LLC and Subensambles Internacionales, S. de R.L. de C.V., as assigned by Federal-Mogul Motorparts LLC to Trico Products pursuant to that certain Assignment Agreement dated February 14, 2019.

34.     Non-Debtor affiliate, Trico Componentes, S.A. de C.V. ("TC"), is a Mexican

7

corporation with operations in Mexico, operating at Av. Hermanos Escobar 7151, Omega, Cd. Juárez, Mexico. TC is a "Maquiladora," as that term is defined under the Carnaby III Credit Agreement, and is party to that certain Assembly (Maquila) Agreement, dated June 20, 2014, entered into between Trico Componentes, S.A. de C.V. and Trico Technologies.  SI and TC are collectively referred to herein as the "Carnaby III Maquiladoras" and together with the Carnaby II Maquiladoras, the "Maquiladoras."

## FACTUAL BACKGROUND

### I.     The Chapter 11 Cases

35.     FBG was a leading global supplier of aftermarket automotive parts, including brakes, filters, wipers, lighting, pumps, and towing products, employing approximately 26,000 people worldwide.  On September 24, 2025 (the "Petition Date"), the Carnaby II and III SPVs, among certain other Debtors, commenced voluntary cases under chapter 11 of title 11 of the United States Code in this Court.   Between September 28 and September 29, 2025, approximately 99 additional Debtors, including FBG and its operating subsidiaries (collectively, the "FBG Debtors"), filed their own bankruptcy petitions.  The Bankruptcy Cases are jointly administered under case number 25-90399 (CML) before this Court.  *See* Order Directing Joint Administration of Chapter 11 Cases, *In re First Brands Group, LLC*, No. 25-90399 (Bankr. S.D. Tex. Sep. 29, 2025), ECF No. 9.

36.     Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No chapter 11 trustee has been appointed in their cases.

### II.    The Carnaby Inventory Financings

37.     Both of the Carnaby II and III SPVs were formed on February 4, 2022, as Delaware limited liability companies and structured as bankruptcy-remote, special-purpose entities ("SPVs") pursuant to section 18-201(b) of the Delaware Limited Liability Company Act.  *See* Amended and Restated Limited Liability Company Agreement of Carnaby Inventory

8

II, LLC, dated May 31, 2022 (the "Carnaby II LLC Agreement"), Recitals (Ex. 1); Amended and Restated Limited Liability Company Agreement of Carnaby Inventory III, LLC, dated June 22, 2022 (the "Carnaby III LLC Agreement," and together with the Carnaby II LLC Agreement, the "LLC Agreements"), Recitals (Ex. 2). The sole equity member and manager of Carnaby II is Carnaby Holdings II. *See* Carnaby II LLC Agreement § 5(a) (Ex. 1). The sole equity member and manager of Carnaby III is Carnaby Holdings III. *See* Carnaby III LLC Agreement § 5(a) (Ex. 2). From their incorporation until the Petition Date, Donald J. Puglisi served as the initial Independent Manager of both of the Carnaby II and III SPVs. *See* Carnaby II LLC Agreement, preamble (Ex. 1); Carnaby III LLC Agreement, preamble (Ex. 2).

38. The Carnaby II and III SPVs are bankruptcy-remote SPVs created in connection with the financings under the Carnaby Credit Agreements. Each of the LLC Agreements enumerates four purposes for Carnaby II and Carnaby III, as applicable: (i) acquiring and owning assets; (ii) entering into the Transaction Documents (as defined below), incurring indebtedness thereunder, pledging its assets, and performing its obligations thereunder; (iii) negotiating, authorizing, executing, delivering, and performing obligations under related agreements; and (iv) engaging in lawful acts incidental thereto, including establishing bank accounts and entering into hedging arrangements. *See* Carnaby II LLC Agreement § 7(a)(i)–(iii) (Ex. 1); Carnaby III LLC Agreement § 7(a)(i)–(iii) (Ex. 2).

39. The LLC Agreements further prohibit the Carnaby II and III SPVs—without the unanimous written consent of the member, manager, and Independent Manager—from, among other things: incurring indebtedness other than under the Transaction Documents; creating or suffering any lien other than under the Transaction Documents; engaging in any dissolution, liquidation, or merger; or having any employees. *See* Carnaby II LLC Agreement § 9(e)(iii) (Ex. 1); Carnaby III LLC Agreement § 9(e)(iii) (Ex. 2).

40. The Carnaby II and III SPVs have identical officers appointed under each of the

LLC Agreements: Patrick James (President and CEO), Edward James (Executive Vice President), Michael Baker (Managing Director and Secretary), Shekhar Kumar (Managing Director), Jean Gillian Graham (Managing Director), and Peter Andrew Brumbergs (Managing Director). *See* Carnaby II LLC Agreement § 11(a) (Ex. 1); Carnaby III LLC Agreement § 11(a) (Ex. 2). These same individuals simultaneously held officer positions at FBG and at the Operating Debtors.

41. The Carnaby II Credit Agreement, dated May 31, 2022, provides for an asset-based revolving loan facility in an aggregate maximum principal amount of $60,000,000 and the Carnaby III Credit Agreement, dated July 6, 2022, provides for an asset-based revolving loan facility in an aggregate maximum principal amount of $100,000,000. *See* Carnaby II Credit Agreement, Preliminary Statements (Ex. 3); Carnaby III Credit Agreement, Preliminary Statements (Ex. 4). The parties to the Carnaby II Credit Agreement are: Carnaby II, as borrower; FB Holdings and Carnaby Holdings II, as guarantors; FBG, as Servicer; the Carnaby Secured Lenders; and GLAS Trust Company LLC, as administrative agent, and the Carnaby II Credit Agreement was acknowledged and agreed to by BPI and the Carnaby II Maquiladoras. *See* Carnaby II Credit Agreement, preamble (Ex. 3). The parties to the Carnaby III Credit Agreement are: Carnaby III, as borrower; FB Holdings and Carnaby Holdings III, as guarantors; FBG, as Servicer; the Carnaby Secured Lenders; and GLAS Trust Company LLC, as administrative agent, and the Carnaby III Credit Agreement was acknowledged and agreed to by the Trico Entities and the Carnaby III Maquiladoras. *See* Carnaby III Credit Agreement, preamble (Ex. 4).

42. The Carnaby Secured Lenders are, and at all relevant times have been, the only material creditors of the Carnaby II and III SPVs.

43. The Carnaby Secured Lenders advanced $58,964,276 aggregate principal amount of loans to Carnaby II under the Carnaby II Credit Agreement and $100,000,000

10

aggregate principal amount of loans to Carnaby III under the Carnaby III Credit Agreement.

44.     The advances under the Carnaby Credit Agreements funded the Carnaby II and III SPVs' purchases of Inventory Collateral from the Operating Debtors under a recurring purchase and sale cycle under the related Purchase Agreements and Sale Agreements described below.  Upon closing of each of the Carnaby Inventory Financings, the Carnaby Secured Lenders advanced loan proceeds into Carnaby II's or Carnaby III's bank account (as applicable), and the Carnaby II and III SPVs paid those proceeds as consideration for the Inventory Collateral they had received from the BPI and the Trico Entities.  The Carnaby II and III SPVs transferred the cash proceeds of the loans advanced to the main group concentration account maintained at BofA in the name of FBG, the servicer under the Carnaby Inventory Financings.  The FBG concentration account receives daily sweeps of funds from the Operating Debtors' bank accounts as part of the Debtors' integrated cash management arrangements.

45.     Borrowing Base Certificates (as defined in the Carnaby Credit Agreements) delivered at each closing identified, on a line-item basis, the specific inventory that had been transferred to the applicable Carnaby II or III SPV as of that date.

46.     The Carnaby Inventory Financings provided secured asset-based financing to facilitate a largely cashless manufacturing cycle for the Operating Debtors' brakes and wipers manufacturing business in Mexico.  Under the structure, the Carnaby II and III SPVs purchased goods and materials (whether located in the United States, Mexico, or elsewhere) from the Operating Debtors, which goods the Carnaby II and III SPVs then simultaneously consigned back to the Operating Debtors to be manufactured and finished as needed under the Operating Debtors' "maquila" agreements with the Maquiladoras.  Once finished, the Carnaby II and III SPVs then sold the finished goods inventory back to the Operating Debtors and received, as payment for the finished goods, new goods and raw materials that would in turn be

manufactured again under consignment in the same cycle to become finished goods or cash. The Carnaby II and III SPVs applied cash received to service the obligations under the Carnaby Credit Agreements and the Transaction Documents.

47. ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████.

## III. The Carnaby II and III SPVs' Purchase and Sale of Inventory Collateral

48. Under the Carnaby Inventory Financings structures, Carnaby II and III SPVs purchased and sold inventory from and to the Operating Debtors on a recurring basis, which inventory consisted of raw materials, work-in-process, and finished goods (primarily brakes components, for Carnaby II, and windshield wiper components, for Carnaby III) (together with all proceeds thereof, the "Inventory Collateral"). The vast majority of the Inventory Collateral is and was at all relevant times located at facilities in Mexico (the "Mexican Inventory").

49. The Carnaby II and III SPVs executed written Asset Purchase Agreements with the Operating Debtors, each dated as of the closing date of the applicable facility, to establish the structure for the recurring purchases of Inventory Collateral: (i) the Asset Purchase Agreement, dated May 31, 2022, between BPI (as seller) and Carnaby II (as buyer) (the "BPI Purchase Agreement"); (ii) the Asset Purchase Agreement, dated July 6, 2022, between Trico Products (as seller) and Carnaby III (as buyer) (the "Trico Products Purchase Agreement"); and (iii) the Asset Purchase Agreement, dated July 6, 2022, between Trico Technologies (as

12

seller) and Carnaby III (as buyer) (the "Trico Technologies Purchase Agreement," and collectively with the BPI Purchase Agreement and the Trico Products Purchase Agreement, the "Purchase Agreements"). *See* BPI Purchase Agreement (Ex. 9); Trico Products Purchase Agreement (Ex. 10); Trico Technologies Purchase Agreement (Ex. 11).

50.     The Carnaby II and III SPVs also executed written Asset Purchase Agreements with the Operating Debtors, each dated as of the closing date of the applicable facility, to facilitate the recurring sales of finished goods Inventory Collateral back to the Operating Debtors: (i) the Asset Purchase Agreement, dated May 31, 2022, between Carnaby II (as seller) and BPI (as buyer) (the "BPI Sale Agreement"); (ii) the Asset Purchase Agreement, dated July 6, 2022, between Carnaby III (as seller) and Trico Products (as buyer) (the "Trico Products Sale Agreement"); and (iii) the Asset Purchase Agreement, dated July 6, 2022, between Carnaby III (as seller) and Trico Technologies (as buyer) (the "Trico Technologies Sale Agreement," and collectively with the BPI Sale Agreement and the Trico Products Sale Agreement, the "Sale Agreements"). *See* BPI Sale Agreement (Ex. 12); Trico Products Sale Agreement (Ex. 13); Trico Technologies Sale Agreement (Ex. 14).

51.     ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████████ The structure also employed cashless "offsets" to satisfy mutual obligations between the Carnaby II and III SPVs and their counterparties under the Transaction Documents. *See* Carnaby Credit Agreements § 3.2(f) (Exs. 3, 4).

52.     ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

53.      ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

54.      As contemplated by the Transaction Documents, following the transfer of ownership to the Carnaby II and III SPVs, the Inventory Collateral remained physically at, or in transit through, the same manufacturing and distribution locations as before.  Therefore, the Inventory Collateral remained in the possession of the Operating Debtors and the Maquiladoras (which maintained possession of the Inventory Collateral while it was undergoing manufacture at the Maquiladoras' facilities in Mexico) under a bailment. ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

14

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████

## IV.    The Carnaby Secured Lenders' Perfected Security Interests

55.    To secure their obligations under the Carnaby Inventory Financings, at or about the time of the closing of each facility, the Carnaby II and III SPVs, and their immediate parent guarantors,[3] granted to the Carnaby Agent, for the ratable benefit of the Carnaby Secured Lenders, valid and enforceable first-priority security interests and liens in substantially all of their respective assets (collectively, the "Carnaby II and III Collateral") pursuant to: (i) the Pledge and Security Agreement, dated May 31, 2022, among Carnaby Holdings II (as parent and guarantor), Carnaby II (as borrower), GLAS Trust Company LLC (as administrative agent) (the "Carnaby II Security Agreement"); and (ii) the Pledge and Security Agreement, dated July 6, 2022, among Carnaby Holdings III (as parent and guarantor), Carnaby III (as borrower), and GLAS Trust Company LLC (as administrative agent) (the "Carnaby III Security Agreement," and the Carnaby II Security Agreement and Carnaby III Security Agreement, together, the "Carnaby Security Agreements"). *See* Carnaby II Security Agreement, Article 2, § 2.01 (Ex.

---

[3]    Carnaby Holdings II owns 100% of the outstanding units of Carnaby Inventory II, LLC and Carnaby Holdings III owns 100% of the outstanding equity units of Carnaby Inventory III, LLC (Carnaby Holdings II and Carnaby Holdings III together, the "Carnaby Holdings SPVs"), all of which the Carnaby Holdings SPVs have pledged to secure the obligations owing to the Carnaby Secured Lenders under the Carnaby Credit Agreements. *See* Carnaby Security Agreements at Exs. 24, 25.

24); Carnaby III Security Agreement, Article 2, § 2.01 (Ex. 25).

56.     Under Section 2.01 of each of the Carnaby Security Agreements, each of the Carnaby II and III SPVs and Carnaby Holdings SPVs granted a continuing security interest in "all of [the Grantor's] right, title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Grantor, and regardless of where located," including, without limitation, all Inventory and Goods (each as defined in the Uniform Commercial Code ("UCC")).  *See id.*  This language expressly encompassed the Inventory Collateral held in bailment by the Operating Debtors and the Maquiladoras wherever held (including the Mexican Inventory at the Maquiladora facilities in Mexico).

57.     Pursuant to the Cross-Collateralization Agreement, dated July 6, 2022, among GLAS Trust Company LLC, the Carnaby II and III SPVs, the Carnaby II and III Holdings SPVs, FB Holdings, and FBG, and agreed to BPI, the Carnaby II Maquiladoras, Trico Technologies, Trico Products, and certain of their maquiladora subsidiaries (the "Cross-Collateralization Agreement") (attached hereto as Ex. 26), the Carnaby Secured Lenders under each of the Carnaby Inventory Financings received crossing liens and security interests in the collateral securing the other Carnaby Inventory Financing. ███████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

58.     The Carnaby Secured Lenders perfected their security interests in the Carnaby II and III Collateral under United States law by filing UCC-1 financing statements (the "UCC

Filings") with the Secretary of State of Delaware.  The following four UCC-1 financing statements each properly filed in Delaware, and duly accepted for filing by the office of the Secretary of the State of Delaware each name GLAS Trust Company LLC (as administrative agent) as secured party and cover all assets of the Carnaby II and III SPVs and their parent companies:  (i) UCC Financing Statement File No. 2022 4634697, filed at 12:39 PM on June 2, 2022, against Carnaby Inventory II, LLC as debtor; (ii) UCC Financing Statement File No. 2022 4634796, filed at 12:42 PM on June 2, 2022, against Carnaby Inventory Holdings II, LLC as debtor; (iii) UCC Financing Statement File No. 2022 5629043, filed at 3:58 PM on July 6, 2022, against Carnaby Inventory III, LLC as debtor; and (iv) UCC Financing Statement File No. 2022 5628912, filed at 3:55 PM on July 6, 2022, against Carnaby Inventory Holdings III, LLC as debtor.  *See* Filed UCC-1 Financing Statements (Ex. 27).

59.     The Carnaby II and III SPVs also granted the Carnaby Secured Lenders security interests in the Mexican Inventory under Mexican law, by executing non-possessory floating lien pledge agreements (*Contratos de Prenda sin Transmisión de Posesión*), which security interests were perfected when registered with the *Registro Único de Garantías Mobiliarias* (the "RUG"), Mexico's national registry for security interests in personal property governed by the General Law of Negotiable Instruments and Credit Transactions.  Registration in the RUG is the operative act of perfection for non-possessory pledges under Mexican commercial law, and confers first-priority status against any later-registered or unregistered interest.

60.     For the Carnaby II facility, the Original Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*) was dated May 31, 2022 (the "Carnaby II Original Pledge"), by and among Carnaby II (as pledgor) and GLAS Trust Company LLC (as pledgee), with the appearance, acknowledgement, and acceptance of the Carnaby II Maquiladoras (as depositaries) and BPI.  *See* Original Floating Lien Pledge Agreement (Ex. 22). The Carnaby II Original Pledge included a specific listing of thousands of inventory items

constituting Inventory Collateral owned by Carnaby II and subject to the security interests granted thereunder. *See id*. at Exhibit C. The Carnaby II Original Pledge was registered with the RUG on June 7, 2022 (at 15:08:37 ZULU GMT/UTC), as Asiento No. 31302386, Garantía Mobiliaria No. 16927095, Folio Electrónico R20220601MG36, ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████.

████████████████████.

61.    On July 6, 2022, the Carnaby II Original Pledge was amended by the Amendment Agreement (as so amended, the "Carnaby II Pledge") to extend the secured obligations to cover the Carnaby III facility obligations as well, consistent with the Cross-Collateralization Agreement. *See* Carnaby II Pledge Amendment Agreement (Ex. 29). ███

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████.

62.    For the Carnaby III facility, a separate Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*) was entered into on July 6, 2022 (the "Carnaby III Pledge" and together with the Carnaby II Pledge, the "Mexican Pledge Agreements"), by and among Carnaby III (as pledgor) and GLAS Trust Company LLC (as pledgee), with the appearance, acknowledgment, and acceptance of the Carnaby III Maquiladoras (as depositaries) and the Trico Entities. ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████  *See* RUG Registration Certificate for Carnaby III ("Carnaby III RUG Registration") (Ex. 31).

63.     The respective parties to each of the Mexican Pledge Agreements executed the Mexican Pledge Agreements before a Mexican Notary Public.  *See* Carnaby II Pledge, Ex. 22 at 67-68; Carnaby III Pledge, Ex. 23 at 13.

64.     ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████.

65.     ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████.  By causing the Mexican Pledge Agreements to be registered in the RUG on June 7, 2022 (Carnaby II) and July 8, 2022 (Carnaby III), the Carnaby Secured Lenders took all steps necessary to perfect their security interests in the Mexican Inventory under Mexican law in first-priority position, more than two-and-a-half years before any transaction through which Onset asserts it acquired an interest in the Mexican Inventory.

66.     As a matter of Mexican law, the Mexican Pledge Agreements registered with

the RUG in 2022 constitute valid, perfected, and enforceable security interests and liens on the Mexican Inventory (including after acquired inventory), wherever located in Mexico (including at the Maquiladora facilities), and confer upon the Carnaby Secured Lenders first-priority security interests therein.

67.     Together, the Mexican Pledge Agreements registered with the RUG and the four UCC Filings establish a comprehensive, dual-jurisdiction perfection record in favor of the Carnaby Secured Lenders in the Inventory Collateral.

## V.     The Maquiladora Structure and Ownership of the Mexican Inventory

68.     As part of the Carnaby Inventory Financings, the Carnaby II and III SPVs engaged the Operating Debtors and the Maquiladoras under manufacturing agreements to manufacture their Inventory Collateral from raw materials and work in progress into finished goods.

69.     Carnaby II entered into a Manufacturing Agreement, dated May 31, 2022 (the "BPI Manufacturing Agreement"), with BPI.  *See* BPI Manufacturing Agreement (Ex. 15).

██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████.

70.     For the Carnaby III facility, two separate manufacturing agreements were entered into on July 6, 2022: (i) the Manufacturing Agreement between Trico Products and Carnaby III, pursuant to which Trico Products agreed to carry out manufacturing services for Carnaby III through the Carnaby III Maquiladoras; and (ii) the Manufacturing Agreement between Trico Technologies and Carnaby III (collectively, (i) and (ii), the "Trico Manufacturing Agreements") (Ex. 16); Trico Technologies Manufacturing Agreement (Ex.

20

17). ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

71. ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████.

72.     Under the IMMEX Program, raw materials, components, and other inputs are temporarily imported into Mexico under a special customs regime for the purpose of manufacturing and processing, with the resulting finished goods destined for export. The legal foundation for this regime is set out in Article 108 of the Mexican Customs Law, which provides that goods temporarily imported must be returned abroad or assigned to another customs regime within applicable time limits and, if not, shall be deemed unlawfully present in the country. Article 105 of the Mexican Customs Law further provides that ownership or use of goods subject to the temporary import regime may not be transferred or conveyed, except among maquiladoras, companies with authorized export programs, and foreign trade companies, and only if they comply with established regulatory conditions.

73.     A critical feature of the IMMEX Program is that maquiladora entities generally do not—and under the applicable customs regime, cannot—acquire property rights in goods

21

that are temporarily imported to carry out a manufacturing process.  For a maquiladora entity to acquire transferable title to temporarily imported goods, a costly change of customs regime from "temporary" to "definitive" importation is required, which triggers payment of import duties, Value Added Tax, countervailing duties, and compliance with non-tariff regulations and Official Mexican Standards.

74.     Regime changes are "exceedingly rare and contrary to established industry practice," due to the severe negative tax consequences.  There is no evidence that any of the Maquiladoras at issue here have ever made any change to their customs regime or that they are permitted to acquire property rights in any goods they manufacture.

75.     Because the Mexican Inventory was imported into Mexico and consigned to the Maquiladoras for manufacturing purposes under the IMMEX Program, ███████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████ the Maquiladoras never acquired ownership of, or title to, any of the Mexican Inventory.

76.     ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████.

77.     ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

78.   ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████.   These express, written acknowledgments—made by each Maquiladora before a Mexican Notary Public and registered with the RUG—constitute binding contractual and public-record admissions that the Maquiladoras hold no ownership interest in the Mexican Inventory.

79.   Moreover, the Maquiladoras never entered into any agreement with any other party—whether an Operating Debtor, Carnaby II and III SPV, or otherwise—to purchase or otherwise acquire any ownership interest in any of the Mexican Inventory.  Any such agreement would violate both the Maquiladoras' various contractual obligations with the Operating Debtors and the Carnaby II and III SPVs and the rules and regulations of the IMMEX Program.

80.   Because the Maquiladoras at all times held the Mexican Inventory solely as bailees and depositaries—and never possessed any ownership interest or title therein—the Maquiladoras had no interest in the Mexican Inventory that they could convey, sell, assign, transfer, or pledge to any third party.  This foundational property law principle *nemo dat quod non habet*—a transferor cannot convey greater rights than it possesses—is codified in Mexican Federal Civil Code Articles 2269 and 2270.  "[N]o one may sell except that which is his own,"

23

and the sale of property belonging to another is null and void. *See* Mexican Federal Civil Code (Código Civil Federal) arts. 2269, 2270).  Accordingly, no party can transfer any rights in property where the party itself had no such rights, and therefore Maquiladoras could not transfer title to any of the Pledged Assets.

81.     Further, even if the Maquiladoras had somehow transferred Carnaby II Pledged Assets or Carnaby III Pledged Assets to another person, any such transfer to an affiliated entity would require the prior written consent of the Carnaby Secured Lenders as secured creditors under Article 374 of the Mexican General Law of Negotiable Instruments and Credit Transactions (*Ley General de Títulos y Operaciones de Crédito*), and any transfers made without such consent are null and void.  The Carnaby Secured Lenders never consented to any such transfer.  Accordingly, even if the Maquiladoras had made such transfers they would be null and void.

## VI.     The Debtors' Performance Under the Transaction Documents

82.     In connection with closing under the Carnaby Inventory Financings and throughout the term of the financing, the Carnaby Secured Lenders relied on the numerous protections afforded them in the Transaction Documents by the Carnaby II and III SPVs, the Operating Debtors, FBG, and the Maquiladoras, including representations and covenants, regular reporting, and regular officer certification of compliance that the Carnaby II and III SPVs, the Operating Debtors, and FBG adhered to the terms of the Transaction Documents.

83.     The Carnaby Credit Agreements and related Transaction Documents contain extensive representations, warranties, and covenants specifically designed to protect the Carnaby Secured Lenders' interests.  ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

84.     The Carnaby Credit Agreements also included affirmative covenants requiring the Carnaby II and III SPVs, FBG, and the Operating Debtors to vest legal and equitable title to the Inventory Collateral in the Carnaby II and III SPVs, and requiring the Carnaby II and III SPVs and FBG to maintain accurate books, records, and accounting systems reflecting the Carnaby II and III SPVs' ownership of the same. *See* Carnaby II Credit Agreement §§ 5.1(a) (Financial Accounting Practices), 5.1(t) (Ownership); Carnaby III Credit Agreement §§ 5.1(a) (Financial Accounting Practices), 5.1(t) (Ownership).

85.     At the closing of each Carnaby Inventory Financing, officers of the Carnaby II and III SPVs executed and delivered Closing Certificates confirming: ██████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████

86.     In addition, upon the closing of each Carnaby Inventory Financing and regularly

thereafter, authorized officers of FBG (acting as Servicer) or of Carnaby II or Carnaby III, as applicable, delivered Borrowing Base Certificates and related supporting schedules of inventory (collectively, the "Borrowing Base Certificates") to the Carnaby Agent for the benefit of the Carnaby Secured Lenders. *See, e.g.,* Carnaby II Borrowing Base Certificates, Exs. 34–42; Carnaby III Borrowing Base Certificates, Exs. 43–49; Carnaby II Credit Agreement § 6.6; Carnaby III Credit Agreement § 6.6. The initial Carnaby II Borrowing Base Certificate—Borrowing Base No. 1, with a Borrowing Base Date of May 27, 2022, reflecting the month-end balance for April 2022—reported Gross Inventory of ███████████████

████████████████████████████████████████████

████████████████████████████████████. The initial Carnaby III Borrowing Base Certificate—Borrowing Base No. 1, with a Borrowing Base Date of June 22, 2022, reflecting the month ending May 2022—reported Gross Inventory of █████████

██████████████████████████████████████████████

███████████████████████████████████.

87.     The Borrowing Base Certificates and associated schedules delivered in connection therewith, reflected, on a line-item basis, the Inventory Collateral owned by the Carnaby II and III SPVs as of the applicable reporting date. *See* Supporting Excel Schedules (Exs. 50 and 51).

88.     Periodic compliance certificates delivered pursuant to the Carnaby Credit Agreements (the "Compliance Certificates") were also delivered throughout the life of the facilities, confirming continuing compliance with all covenants and the absence of defaults. *See* Compliance Certificates (Exs. 52–60).

89.     Over the full life of the Carnaby Inventory Financings—from mid-2022 through the Petition Date—FBG caused to be delivered more than seventy (70) Borrowing Base Certificates and Compliance Certificates on behalf of the Carnaby II and III SPVs, each

executed by a senior authorized officer. *See, e.g.*, Borrowing Base Certificate dated August 2, 2025 (Ex. 42 and Ex. 76); Compliance Certificate dated May 22, 2023 (Exs. 52 and 60); Officer Closing Certificates (Exs. 32 and 33).

90.     Each Borrowing Base Certificate and Compliance Certificate carried officer certifications that: (a) all information therein was true, complete, and correct; (b) the applicable Carnaby II and III SPV held title to the pledged Inventory Collateral, including the Mexican Inventory; (c) there were no defaults or events of default under the Carnaby transaction documents; and (d) the Carnaby II and III SPVs had maintained their required separateness from the Operating Debtors. *Id.*

91.     The Carnaby Secured Lenders used the information contained in the Borrowing Base Certificates to conduct physical inspections of the Debtors' facilities both prior to closing and periodically thereafter. *See* CXC Field Examination Report (Apr. 26, 2024) (Ex. 61); CXC Field Examination Report (May 30, 2025) (Ex. 62); CXC Field Examination Report (Oct. 16, 2025) (Ex. 63).

92.     Based largely on the Debtors' repeated representations, on May 30, 2025—only four months before the Petition Date—the Carnaby Secured Lenders entered into the Carnaby II Extension Agreement and the Carnaby III Extension Agreement (collectively, the "Extension Agreements") to extend the maturity dates of the Carnaby II Credit Agreement and the Carnaby III Credit Agreement, respectively, to December 1, 2025.   *See* Extension Agreement for Carnaby II, dated May 30, 2025 ("Carnaby II Extension Agreement") (Ex. 64); Extension Agreement for Carnaby III, dated May 30, 2025 ("Carnaby III Extension Agreement") (Ex. 65).

**VII.     Sales of Carnaby II and III Inventory**

93.     On October 2, 2025, the Court entered the Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Carnaby Inventory II, LLC and Carnaby Inventory III, LLC, *In re First Brands Group, LLC*, No. 25-90399 (Bankr. S.D. Tex. Oct. 2,

2025), ECF No. 230 (the "Carnaby II and III Interim AP Order") which authorized the Carnaby II and III SPVs to make sales of Carnaby II's and Carnaby III's Inventory Collateral to the Operating Debtors subject to the requirements specified therein.

94.     The Carnaby II and III Interim AP Order authorized the Operating Debtors to make purchases of Inventory Collateral from Carnaby II and Carnaby III at fair market value and only in exchange for cash or for accounts receivable arising out of the sale of Inventory Collateral to certain credit-worthy customers satisfying the requirements specified in the Carnaby II and III Interim AP Order (the "Eligible Accounts Receivable").  The Carnaby II and III Interim AP Order limited the Operating Debtors' authorization to purchase Inventory Collateral with Eligible Accounts Receivable to $20 million.  The Carnaby II and III Interim AP Order provided the Carnaby Secured Lenders with automatically perfected liens in any Eligible Accounts Receivable generated by Operating Debtors' sales of Inventory Collateral to third parties.  The Carnaby II and III Interim AP Order further provided that all cash and all accounts receivable paid as consideration for Inventory Collateral to the Carnaby II and III SPVs be deposited in a collateral account maintained by the Carnaby Agent.

95.     From and after the Petition Date, the Operating Debtors continued to make sales of Inventory Collateral to third parties.  Other than with respect to the Carnaby III OEM Sales (as described below), at no time after the Petition Date did the Operating Debtors, Carnaby II, or Carnaby III make any deposits of cash or accounts receivable (or the proceeds thereof) into any collateral account maintained by the Carnaby Agent as required by the Carnaby II and III Interim AP Order.

96.     On information and belief, the Carnaby Secured Lenders assert that (other than in respect of the Carnaby III OEM Sales described below) the Operating Debtors received the cash proceeds (or proceeds of accounts receivable) generated from sales of the Carnaby II and III SPVs' Inventory Collateral and deposited such proceeds into bank accounts maintained with

28

the ABL Agent and subject to the ABL Agent's liens, in violation of the Carnaby II and III Interim AP Order, and applied such amounts either to fund the Debtors' operating expenses or to satisfy obligations owing to the ABL Agent, in either case, in violation of the Carnaby II and III Interim AP Order.

97.     Commencing on January 23, 2026, the Carnaby II and III SPVs made sales of Inventory Collateral located at the Carnaby III Maquiladoras' facilities (the "Carnaby III OEM Sales") in Mexico to the Operating Debtors for immediate resale to certain original equipment manufacturers ("OEMs").  In accordance with the Carnaby II and III Interim AP Order, the Carnaby II and III SPVs caused the Operating Debtors and the OEMs to deposit the proceeds of the Inventory Collateral sold in the Carnaby III OEM Sales in a collateral account (the "Carnaby III Collateral Account") maintained by and under the control of the Carnaby Agent.

98.     On May 29, 2026, the Court entered the Agreed Order (I) Granting Carnaby Secured Lenders' Motion for Relief from the Automatic Stay, and (II) Withdrawing Without Prejudice the Carnaby Secured Lenders' Motion to Dismiss, *In re First Brands Group, LLC*, No. 25-90399 (Bankr. S.D. Tex. May 29, 2026), ECF No. 2840 (the "Carnaby II and III Lift Stay Order").  On June 1, 2026, the Court entered the Carnaby and Onset Stipulation and Agreed Order.  In accordance with the Carnaby II and III Lift Stay Order and the Carnaby and Onset Stipulation and Agreed Order, proceeds of subsequent sales of Inventory Collateral from the Carnaby III Maquiladoras' facilities (or manufactured with Onset's purported equipment collateral at the Carnaby III Maquiladoras' facilities) have been deposited in the Carnaby III Collateral Account.  As of the date of this filing, the balance in the account is $15,795,390. Under the Carnaby Security Agreements and the Carnaby II and III Interim AP Order, the Inventory Collateral proceeds deposited in the Carnaby III Collateral Account constitute collateral securing the obligations under the Carnaby Credit Agreements.

## VIII.   The ABL Credit Agreement and Excluded Assets

99.     ███████████████████████████████████████████

29

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

100.     According to the Debtors, as of the Petition Date, the obligations outstanding under the ABL Credit Agreement included: (i) $133,479,006.83 principal amount of loans under the ABL Credit Agreement, (ii) $93,409,474.32 aggregate stated principal amount under all outstanding letters of credit under the ABL Credit Agreement, and (iii) $219,447,227 of cash management obligations owing to the ABL Agent.  *See* DIP Order ¶ G(viii).

101.     The ABL Agent asserts security interests in certain assets of the Operating Debtors which the ABL Agent asserts include the Inventory Collateral.[4]

102.     Each of the Trico Entities guaranteed the obligations owing under the ABL Credit Agreement pursuant to the U.S. Guarantee, dated as of February 2, 2018 (the "ABL

---

[4]   While not party to this adversary proceeding, certain of the Prepetition Secured Parties (as defined in the DIP Order) (which includes the First Lien Secured Parties and the Second Lien Secured Parties) and the DIP Secured Parties (as defined in the DIP Order) assert security interests in certain assets of the Operating Debtors which they maintain include the Inventory Collateral.  Additionally, the Operating Debtors assert ownership interests in the Inventory Collateral.  Pursuant to the Stipulation and Agreed Order Resolving Onset Financial, Inc.'s Emergency Motion for Relief from the Automatic Stay and the Carnaby Secured Lenders' Lift Stay Motion, *In re First Brands Group, LLC*, No. 25-90399 (Bankr. S.D. Tex. June 1, 2026), ECF No. 2871 (the "Carnaby and Onset Lift Stay Stipulation"), the rulings of the Court in these adversary proceedings shall be binding and enforceable against the Debtors, the DIP Secured Parties, the First Lien Secured Parties, and the Second Lien Secured Parties and their respective successors and assigns to the extent set forth in the Carnaby and Onset Lift Stay Stipulation.

Guarantee Agreement"). *See* ABL Guarantee Agreement (Ex. 69).

103. Each of the Operating Debtors executed the ABL Security Agreement, dated February 2, 2018 (as amended, the "ABL Security Agreement"), by and among Trico Group, LLC (as lead borrower), Trico Group Holdings, LLC (as parent), their restricted subsidiaries that are U.S. Domestic Subsidiaries, and the ABL Agent (as collateral agent). *See* ABL Security Agreement, preamble and Article III (Ex. 66). ██████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████.

104. ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████.

105. ████████████████████████████████

31

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████.

106.   ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████

107.   ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

108.   Furthermore, substantially all of the raw materials comprising the Mexican Inventory was procured by the Operating Debtors from foreign suppliers outside the United

32

States and shipped directly to the Maquiladora facilities in Mexico, never entering the United States at any point.  Because those raw materials were sourced and delivered abroad, the ABL Agent's liens— ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████. There was no moment at which those assets were within the United States and subject to the ABL Agent's lien; accordingly, those raw materials, and the work-in-process and finished goods manufactured from them at the Maquiladora facilities, were never encumbered by any ABL lien and constitute "Excluded Assets" entirely independent of the Carnaby Inventory Financings.

109.    Moreover, even if—contrary to the foregoing—the ABL Agent had ever held a lien or security interest in any of the Mexican Inventory (which the Carnaby Secured Lenders deny), any such lien or security interest was automatically released upon the consummation of the Carnaby Inventory Financings on at least two independent grounds.  ████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████.

110.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███

111.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

112.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████

113.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

34

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████ Accordingly, the ABL Agent holds no liens, security interests, or other interests of any kind in or against the Inventory Collateral whether constituting Mexican inventory located in Mexico or Inventory Collateral located in the United States (or anywhere else).

114.    The same is true for the cash proceeds of the Carnaby III OEM Sales and deposited in the Carnaby III Collateral Account all of which proceeds arose out of sales of Mexican Inventory.  Because the ABL Agent's liens never attached to the Mexican Inventory sold in the Carnaby III OEM Sales (or were automatically released pursuant to the terms of the ABL Credit Agreement and ABL Security Agreement prior to any sale as set forth above) the ABL Agent has no interests of any kind in the funds deposited in the Carnaby III Collateral Account.

115.    Finally, under the ABL Credit Agreement and related collateral documents, the ABL Agent's security interests attach only to assets in which the applicable Operating Debtor grantor holds rights.  The ABL Agent can obtain no greater interest in any asset than the applicable Operating Debtor itself possesses. ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

IX.    **Onset's Claimed Interests in and Claims Against the Mexican Inventory at the Carnaby III Maquiladoras' Facilities**

116.    Onset is a Utah corporation, founded in 2008, that describes itself as a

35

"dominant force and leader in the equipment lease and finance industry." *See* Complaint ¶ 27, *First Brands Group, LLC v. Onset, Inc.* (*In re First Brands Group, LLC*), Ch. 11 Case No. 25-90399, Adv. Pro. No. 26-03005 (Bankr. S.D. Tex. Jan. 9, 2026), ECF No. 1 (the "Onset Complaint").  Beginning in 2018, Onset entered into a series of financing transactions with FBG's operating subsidiaries, which include, from 2022 onward, a series of purported sale-leaseback transactions involving certain of the Debtors.  *Id.* ¶¶ 77–78.  The Debtors have alleged that these transactions were the product of a conspiracy between Onset and Edward James in which James caused the FBG Debtors and certain other Debtors, including the Carnaby IV, to enter into concealed, non-arm's-length arrangements that were used to extract billions of dollars from the Debtors.  *See id.* ¶¶ 1, 74, 78, 84–86, 89, 103.

117.     Ultimately, Onset and its management became one of the Debtors' principal financing partners and extended $2.2 billion in financing under the leasing structure.  *See* Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Onset at 3, *In re First Brands Group, LLC*, No. 25-90399 (Bankr. S.D. Tex. Nov. 19, 2025), ECF No. 732.[5]  As a result, Onset has extensive familiarity with the Debtors' operations, including those involving the Carnaby III Maquiladoras where Onset has financed equipment through equipment sale-leaseback transactions and had previously contemplated providing inventory financing.  *See* Onset, Inc.'s Answer, Counterclaim, Crossclaim, and Third-Party Complaint, *First Brands Group, LLC v. Onset, Inc.* (*In re First Brands Group, LLC*), Ch. 11 Case No. 25-90399, Adv. Pro. No. 26-03005 (Bankr. S.D. Tex. Feb. 19, 2026), ECF No. 16 (the "Onset Answer"), App. A (Trico Bailees by Trico Lease Schedule, reflecting equipment leases at Subensambles Internacionales and Trico Componentes facilities in Matamoros and Juárez); App. B (Carnaby Bailees by Carnaby Lease Schedule, reflecting Carnaby IV Lease Schedule

---

[5]     On December 31, 2025, Silver Point Capital, L.P. ("Silver Point") acquired a controlling interest in the claims of Onset and certain of its funding partners against the Debtors and certain of their affiliates.

Nos. 024 (inventory at Trico Componentes, Matamoros) and 026 (inventory at Subensambles Internacionales, Juárez)).

118.    Onset asserts that, in 2025, Onset acquired an interest in certain of the Mexican Inventory at the Carnaby III Maquiladoras' facilities in a series of transactions involving Carnaby IV and the Carnaby III Maquiladoras.

119.    First, Onset asserts that Carnaby IV purchased all Mexican Inventory located at the Carnaby III Maquiladoras pursuant to two Purchase Agreements (collectively, the "Carnaby IV Maquiladora Purchase Agreements") dated January 8, 2025, and March 4, 2025, respectively.  *See* Carnaby IV Maquiladora Purchase Agreements, Ex. 70 and Ex. 71.

120.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

121.    Next, Onset asserts that Carnaby IV sold the Mexican Inventory it had purchased from the Carnaby III Maquiladoras to Onset and then leased back such assets from Onset pursuant to:  (i) Master Lease Agreement No. OFI1445416, dated June 28, 2022, between Onset, Inc. (as Lessor) and Carnaby IV (as Lessee); (ii) Lease Schedule No. 024 to the Master Lease Agreement, dated January 16, 2025 (relating to Mexican Inventory located at address:  Michigan 200, Industrial del Norte, Matamoros, Tamaulipas, Mexico, C.P. 87316 (the Trico Componentes, S.A. de C.V. facility) ; and (iii) Lease Schedule No. 026 to the Master Lease Agreement, dated March 10, 2025 (relating to Mexican Inventory at address:  Av. Hermanos Escobar 7151, Omega, CP 32410, Cd. Juárez, Chihuahua, Mexico (the Subensambles Internacionales, S. de R.L. de C.V. facility)  (together with an Assignment and Transfer of Inventory dated March 10, 2025) (collectively, the "Carnaby IV Sale-Leaseback Agreements" and together with the Carnaby IV Maquiladora Purchase Agreements,

37

collectively, the "Relevant Onset Inventory Transactions")).

122.   The execution of the Relevant Onset Inventory Transactions occurred in January 2025 and March 2025, approximately two-and-a-half years after the Carnaby Secured Lenders entered into the Carnaby Inventory Financings and registered the Mexican Pledge Agreements with the RUG.

123.   Any alleged acquisition by Onset of an interest in the Mexican Inventory suffers from a fatal defect at its inception:  the chain of title on which Onset relies originates with the Carnaby III Maquiladoras, which never owned any of the Mexican Inventory.  Under each of the Maquila Agreements with the Trico Entities, the Manufacturing Agreements with Carnaby III, and applicable Mexican Law, the Carnaby III Maquiladoras at all times held Carnaby III's Mexican Inventory solely as bailees and depositaries and never acquired any ownership interest, title, or other property right in it.  Because the Carnaby III Maquiladoras had no ownership rights in Carnaby III's Mexican Inventory, they could not—and did not—convey any ownership interest or title in such assets to Carnaby IV, and Carnaby IV in turn could not—and did not—convey any ownership interest or title in such assets to Onset.

124.   Any purported sale of property belonging to another is void under Mexican Federal Civil Code Articles 2269 and 2270.  Moreover, under Article 374 of the Mexican General Law of Negotiable Instruments and Credit Transactions, the transfer of collateral to an affiliated entity—here, from the Carnaby III Maquiladoras to Carnaby IV, an affiliate— required the prior written consent of the Carnaby Secured Lenders as secured creditors holding liens in such assets, which consent was never obtained.  Such unauthorized transfers are null and void and cannot release the collateral from the lien.  Onset's claimed interest in the Mexican Inventory is accordingly void *ab initio* under Mexican Law, and Onset therefore acquired no valid ownership interest, security interest, lien, or other cognizable right in the Mexican Inventory through any purported transaction with the Carnaby III Maquiladoras or

38

with Carnaby IV.

125. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

126. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

127. Both of the Carnaby IV UCC-1 Filings describe the collateral as ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

128. These "backup" UCC filings are ineffective to create or perfect any security interest of Onset senior to the security interests of the Carnaby Secured Lenders for multiple independent reasons.

129. *First*, as established above, the Carnaby III Maquiladoras had no ownership interest in the Mexican Inventory to transfer to Carnaby IV or that could support a grant of any

security interest in those assets. A grantor can encumber only what it owns. *See* U.C.C. § 9-203(b)(2).

130. *Second*, the Carnaby IV UCC-1 filings were made on October 24, 2025—more than three years after the Carnaby Secured Lenders registered their Mexican Pledge Agreements in the RUG in June and July 2022. Even if Onset's UCC filings could somehow perfect an interest in the Mexican Inventory (which they cannot), those filings would be junior in every respect to the Carnaby Secured Lenders' prior perfected RUG registrations. *See* U.C.C. § 9-322(a)(1).

131. *Finally*, Onset's counsel made the Carnaby IV UCC-1 filings after the Petition Date in violation of the Bankruptcy Code's automatic stay and there is no evidence to suggest that Carnaby IV, a debtor in the chapter 11 proceedings and the secured creditor listed on the same, authorized Onset to make such filings. *See, e.g.,* 11 U.S.C. § 362(a)(3) (prohibiting "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate"); 11 U.S.C. § 362(a)(4) (prohibiting "any act to create, perfect, or enforce any lien against property of the estate"); 11 U.S.C. § 362(a)(6) (prohibiting "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.") As such, any alleged perfection of the asserted security interests is void *ab initio*.

132. Other deficiencies cloud any interests Onset might assert in the Mexican Inventory and strongly suggest that Onset did not enter into the Relevant Onset Inventory Transactions in good faith. On information and belief, the Carnaby Secured Lenders assert that Onset knew or should have known that Carnaby III Maquiladoras held the Mexican Inventory in their possession as bailees and held no title or other ownership interest in the Mexican Inventory.

133. Among other things, Onset's extensive financing arrangements with the Debtors

would have provided considerable familiarity with the Carnaby III Maquiladoras' operations and the fact that maquiladora entities generally do not own the inventory assets they manufacture and that the Carnaby III Maquiladoras held all of the Mexican Inventory in their possession under a bailment.

134. To the extent Onset claims it was unaware of the nature of the Carnaby III Maquiladoras' bailment of the Mexican Inventory, it can only be as a result of willful ignorance. Onset performed no pre-closing diligence ahead of execution of the Relevant Onset Inventory Transactions in Mexico. Specifically, as stipulated by Onset itself: (i) Onset was not represented by outside counsel or other outside professionals in connection with Lease Schedule Nos. 024 and 026, the operative Onset transactions at issue; (ii) Onset did not obtain legal advice regarding Mexican law in connection with those transactions; (iii) Onset did not record any claimed pledge, ownership, or other interest in the Mexican Inventory in Mexico or under Mexican law; (iv) Onset did not take possession of the Mexican Inventory in Mexico; (v) Onset did not conduct a lien search in Mexico of any kind; and (vi) Onset conducted a lien search in the United States only for Carnaby Inventory IV, LLC as the debtor—*i.e.,* it searched for liens against its own SPV counterparty. Stipulation of Facts in Connection with Onset's Emergency Stay Relief Motion ¶¶ 1–6, *In re First Brands Group, LLC*, No. 25-90399 (Bankr. S.D. Tex. Mar 31, 2026), ECF No. 2266 (the "Stay Relief Stipulation").

135. Onset's only alleged diligence consisted of: (a) contractual covenants and representations in the transaction documents; (b) several email chains involving Edward James and Shekhar Kumar dated January 7–16, 2025, March 5–10, 2025, and May 1–29, 2025; and (c) following the closing of the Relevant Onset Inventory Transactions, limited site visits at the Matamoros facility (Michigan 200, Parque Industrial del Norte, 87316 Heroica Matamoros, Mexico) on January 30, 2025 and at the Juárez facility (Av. Hermanos Escobar 7151, Omega, CP 32410, Cd. Juárez, Chihuahua, Mexico) on April 8, 2025. *Id.* ¶ 4. A competent buyer's

counsel transacting with respect to Mexican inventory would, at a minimum, inquire into whether the Mexican entities in the chain of title operated as maquiladoras, whether any regime change had occurred, whether Mexican taxes were paid on the purchase, and whether the RUG showed any existing encumbrances on the goods. Onset did none of these things. *See* Stay Relief Stipulation ¶¶ 1–6.

136.   Had Onset searched the RUG for "Carnaby," it would have found Carnaby Inventory III, LLC and the Carnaby Secured Lenders' registered first-priority pledge over the exact Mexican Inventory at issue—registered more than two-and-a-half years before Onset's transactions.

137.   To the extent Onset held some cognizable junior interest in the Mexican Inventory—which the Carnaby Secured Lenders expressly deny—the Carnaby Secured Lenders' RUG registrations from June and July 2022 (Asiento Nos. 31302386 and 32020337) are senior in priority to any interest Onset might assert. Under the first-in-time, first-in-right rule of lien priority, applicable under both Mexican law and U.C.C. § 9-322(a)(1), any interest Onset may hold is junior to the Carnaby Secured Lenders' prior perfected liens, which fully encumber and exhaust all value in the Mexican Inventory before any junior interest could participate in a recovery.

138.   Under Mexican law, a transfer of assets between affiliates such as the purported sale of Mexican Inventory by the Carnaby III Maquiladoras to Carnaby IV would require notice to and the affirmative consent of the Carnaby Secured Lenders, neither of which occurred, thus voiding the transfer and preventing the release of the Carnaby Secured Lenders' liens. United States law provides for the same result. *See* UCC § 9-315(a) ("a security interest . . . continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest"); § 9-507(a) ("A filed financing statement remains effective with respect to collateral that is sold, exchanged, leased,

42

licensed, or otherwise disposed of and in which a security interest . . . continues").

139.   For substantially the same reasons, Onset also has no interests in the funds deposited in the Carnaby III Collateral Account.  Because Onset never acquired any interest in Carnaby III Inventory Collateral located at the Carnaby III Maquiladoras' facilities and never held any valid security interest in such assets, Onset has no interest in the proceeds of the Carnaby III OEM Sales deposited in the Carnaby III Collateral Account.

140.   The value of the Mexican Inventory that constitutes Carnaby III's Inventory Collateral does not exceed the total amount of the Carnaby Secured Lenders' secured claims against Carnaby III.  No party has disputed that the Carnaby III Inventory Collateral in which Onset asserts an interest is worth less than the secured debt owed to the Carnaby Secured Lenders.  Accordingly, even if Onset were determined to hold a valid but junior interest in the Mexican Inventory located at the Carnaby III Maquiladoras—which the Carnaby Secured Lenders expressly deny—that interest would be of no economic value, because the Carnaby Secured Lenders' superior first-priority liens fully encumber and exhaust all value in such Mexican Inventory before any junior interest could participate in a recovery. There is simply no value remaining in the Inventory Collateral to which any interest claimed by Onset could attach.

141.   Aside from its asserted interests in Carnaby III's Inventory Collateral arising from the Relevant Onset Inventory Transactions, Onset has also asserted claims against the Carnaby Secured Lenders, the Carnaby III Inventory Collateral, and any proceeds of Mexican Inventory deposited in the Carnaby III Collateral Account, in each case, arising out of the Debtors' or certain non-Debtor affiliates' use of manufacturing and other equipment located at the Carnaby III Maquiladora facilities in which Onset asserts an interest (the "Alleged Onset Equipment").

142.   Onset maintains that the Alleged Onset Equipment has been sold to and leased

back from Onset pursuant to a Master Lease Agreement No. OFI11045321, dated May 9, 2018, between Trico Products (as Lessee) and Onset (as Lessor) (along with all ancillary agreements related thereto, the "Onset Equipment Master Lease Agreement").  According to Onset, since the initial execution of the Onset Equipment Master Lease Agreement, Trico Products Corporation has from time to time executed thirteen schedules to the Onset Equipment Master Lease (specifically, LS16, LS22, LS23, LS24, LS24A, LS26, LS27, LS29, LS30, LS31, LS31A, LS31B, and LS31D)  (the "Relevant Onset Equipment Lease Schedules") pursuant to which Trico Products sold to and leased back from Onset the Alleged Onset Equipment located at the Carnaby III Maquiladoras' operating locations and used in the Carnaby III Maquiladoras' operations.  Accordingly, Onset maintains that the Carnaby III Maquiladoras hold the Alleged Onset Equipment as bailees and use the Alleged Onset Equipment to manufacture or store Carnaby III's Inventory Collateral.

143.    The Onset Equipment Master Lease Agreement purports to grant to Onset back-up security interests in the Alleged Onset Equipment subject to the Relevant Onset Equipment Lease Schedules and located at the Carnaby III Maquiladora facilities to secure the obligations under the Onset Equipment Master Lease Agreement in the event the agreement were not recognized as a "true lease".

144.    However, neither the Onset Equipment Master Lease Agreement nor the Relevant Onset Equipment Lease Schedules grant any security interest to Onset in any inventory (including any Inventory Collateral) located at the Carnaby III Maquiladora facilities, regardless of whether it is owned or held by Carnaby III, the Trico Entities, the Carnaby III Maquiladoras, or otherwise.  Nor are there any materialmen's liens or mechanics' liens under Mexican law that might attach to the Inventory Collateral manufactured or improved by the Carnaby III Maquiladoras using the Alleged Onset Equipment.

145.    Additionally, Carnaby III is not party to any equipment or inventory lease with

44

Onset.

146.     To the extent Onset holds any valid claims for the use of the Alleged Onset Equipment, whether arising under the Onset Equipment Master Lease Agreement or otherwise, such claims may be asserted only against the Trico Entities, the Carnaby III Maquiladoras (or their respective bankruptcy estates as applicable), or the other parties to the Onset Equipment Master Lease Agreement.  Moreover, any such claims, if they exist at all, would only be secured by any perfected security interests Onset may hold in the Alleged Onset Equipment itself.

147.     Accordingly, Onset has no cognizable interests in or claims at law or equity in respect of the Carnaby Secured Lenders, Carnaby III's Inventory Collateral, or Carnaby III and thus no interests in or claims against Carnaby III's Inventory Collateral stored, manufactured, or otherwise improved through the Carnaby III Maquiladora's use of the Alleged Onset Equipment.

## CLAIMS FOR RELIEF

### Count I

**Declaratory Judgment That the Carnaby Secured Lenders Have Valid Perfected Liens and Security Interests in the Inventory Collateral Senior to Any Asserted Claims and Interests of the ABL Agent and Onset**
*(28 U.S.C. §§ 2201 and 2202; Bankruptcy Rules 7001(b) and 7001(i))*

148.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 147 above as if fully set forth herein.

149.     The Inventory Collateral is property of the Carnaby II and III SPVs and subject to the perfected first-priority senior ranking liens of the Carnaby Secured Lenders.

150.     The Carnaby Inventory Financings were structured as true and constituted sales of inventory from the Operating Debtors to the Carnaby II and III SPVs. Pursuant to those true sales, and consistent with the transaction documents, the officer certifications, and the more than seventy Borrowing Base Certificates and Compliance Certificates delivered over the life of the financings, all right, title, and interest in and to the Inventory Collateral (including the

Mexican Inventory) was transferred to and is owned by Carnaby Inventory II, LLC and Carnaby Inventory III, LLC, as applicable.

151. The Operating Debtors and the Maquiladoras expressly disclaimed any ownership interest in the Inventory Collateral under the transaction documents and have at all times held the Inventory Collateral (including the Mexican Inventory) only as bailees and depositaries for the benefit of the Carnaby II and III SPVs.

152. The Carnaby II and III SPVs performed their purchase obligations by paying for the inventory identified in the Borrowing Base Certificates. The transaction documents, closing certificates, Borrowing Base Certificates, and the parties' longstanding course of dealing and performance are wholly consistent with, and evidence, the conclusion that full ownership of the Inventory Collateral was sold to and vested in the Carnaby II and III SPVs.

153. Equitable principles also support the Carnaby II and III SPVs' ownership interest in the Inventory Collateral. The Operating Debtors had full knowledge of the structure, terms, and mechanics of the Carnaby Inventory Financings and the inventory sales thereunder. The same individuals who managed the Operating Debtors also managed and effectuated the inventory transfers and the reporting and certification obligations of the Carnaby II and III SPVs, and accordingly had the ability — and the obligation — to properly document those purchases and sales.

154. The Debtors made and ratified repeated, consistent representations and certifications to the Carnaby Secured Lenders, including through more than seventy Borrowing Base Certificates and Compliance Certificates, that: (a) the Carnaby II and III SPVs owned the Inventory Collateral; (b) all representations and warranties in the Carnaby transaction documents were true and correct; (c) there were no defaults or events of default under the Carnaby transaction documents; and (d) the Carnaby II and III SPVs had maintained their required separateness from the Operating Debtors.

46

155.    The Carnaby Secured Lenders, acting in justifiable reliance upon those representations, certifications, and the parties' longstanding course of performance, advanced and continued to advance loans under the Carnaby Inventory Financings and refrained from declaring defaults and exercising remedies to which they otherwise would have been entitled.

156.    The elements of equitable estoppel are satisfied here: (a) the Debtors (including the Operating Debtors and the Carnaby II and III SPVs) had knowledge of the true facts regarding the inventory transfers; (b) the Debtors (including the Operating Debtors and the Carnaby II and III SPVs) intended, or reasonably should have expected, that the Carnaby Secured Lenders would rely upon the Debtors' representations, certifications, and course of performance; (c) the Carnaby Secured Lenders were ignorant of any claimed defect in the inventory sales and relied upon the repeated representations of the Debtors to the contrary; and (d) the Carnaby Secured Lenders suffered and will continue to suffer injury if the Debtors (including the Operating Debtors and the Carnaby II and III SPVs) are permitted to disavow the inventory sales and assert an ownership interest in the Inventory Collateral after inducing such reliance.

157.    The doctrine of equitable estoppel and the principle that no party may take advantage of its own wrong bar the Debtors (including the Carnaby II and III SPVs, FBG, BPI, and the Trico Entities), their respective bankruptcy estates, and other parties in interest that assert interests in the Inventory Collateral such as the ABL Agent and Onset, from now asserting that the sales of inventory to the Carnaby II and III SPVs were improperly documented, incomplete, or ineffective. Parties cannot weaponize recordkeeping deficiencies or documentation gaps that were exclusively within the knowledge, management, and control of the Debtor entities (or their affiliates) through whom such parties assert their interests to deny the validity of inventory sales repeatedly represented, implemented, reported, and certified to the Carnaby Secured Lenders by those same Debtor entities and affiliates.

47

Accordingly, transfer of the Inventory Collateral from the Operating Debtors to the Carnaby II and III SPVs is enforceable against the Debtors, the Debtors' estates, and against other parties in interest that assert claims and interests against the Debtors and their estates—such as the ABL Agent and Onset.

158.     As property of the Carnaby II and III SPVs, the Inventory Collateral is subject to the Carnaby Secured Lenders valid perfected and senior-ranking security interests and liens. The Carnaby II and III SPVs granted security interests in substantially all of their assets pursuant to the Carnaby Security Agreements including all of the Inventory Collateral (including after acquired inventory) and all proceeds thereof.  The Carnaby Secured Lenders caused the security interests granted under the Carnaby Security Agreements to be perfected by the filing of the UCC Filings with the Delaware Secretary of State substantially concurrently with the closings of the Carnaby Credit Agreements in 2022.

159.     In addition, the Carnaby II and III SPVs executed the Mexican Pledge Agreements granting the Carnaby Secured Lenders liens in all inventory (including after acquired inventory) of the Carnaby II and III SPVs in Mexico.  These security interests were perfected when registered with the RUG in 2022.

160.     Accordingly, the Carnaby Secured Lenders hold and at all relevant times have held valid and perfected liens in all of the Inventory Collateral and the proceeds thereof.

161.     An actual, justiciable controversy exists regarding whether the Carnaby Secured Lenders hold valid and perfected liens in the Inventory Collateral senior in priority to any asserted claims or interests of the ABL Agent or Onset, which controversy is ripe for judicial resolution under 28 U.S.C. § 2201.

162.     Plaintiff is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 and Bankruptcy Rules 7001(b) and 7001(i) that the Carnaby Secured Lenders hold valid and perfected liens in the Inventory Collateral and the proceeds thereof under the laws of the United

48

States and of Mexico that are senior in priority to any interests, security interests, or liens (if any) that any other person may assert including the ABL Agent and Onset. Plaintiff is further entitled to related relief pursuant to 28 U.S.C. § 2202.

### Count II

**Declaratory Judgment That the Carnaby Secured Lenders Have Valid Perfected Liens and Security Interests in the Carnaby III Collateral Account Senior to Any Asserted Claims and Interests of the ABL Agent and Onset**
*(28 U.S.C. §§ 2201 and 2202; Bankruptcy Rules 7001(b) and 7001(i))*

163.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 147 above as if fully set forth herein.

164.    Carnaby III granted security interests in substantially all of its assets pursuant to the Carnaby III Security Agreement including all of Carnaby III's Inventory Collateral (including after acquired inventory) and all proceeds thereof.  The Carnaby Secured Lenders caused the security interests granted under the Carnaby III Security Agreement to be perfected by the filing of the UCC Filings with the Delaware Secretary of State substantially concurrently with the closings of the Carnaby III Credit Agreement in 2022.

165.    The Carnaby III Collateral Account is a bank account maintained by and subject to the control of the Carnaby Agent.  The Carnaby II and III Interim AP Order granted the Carnaby Secured Lenders fully perfected liens in the proceeds of the Carnaby Secured Lenders' Inventory Collateral.

166.    All funds deposited in the Carnaby III Collateral Account are proceeds of sales of Mexican Inventory by Carnaby III or by the Trico Entities (on immediate resale from Carnaby III) to OEMs under the Carnaby II and III Interim AP Order.

167.    Accordingly, the Carnaby Secured Lenders hold and at all relevant times have held valid and perfected liens in all funds deposited in the Carnaby III Collateral Account.

168.    An actual, justiciable controversy exists regarding whether the Carnaby Secured Lenders hold valid and perfected liens in the Carnaby III Collateral Account, which

controversy is ripe for judicial resolution under 28 U.S.C. § 2201.

169.    Plaintiff is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 and Bankruptcy Rules 7001(b) and 7001(i) that the Carnaby Secured Lenders hold valid and perfected liens in the cash deposited in the Carnaby III Collateral Account as it is proceeds of the Carnaby Secured Lenders' Inventory Collateral that are senior in priority to any interests, security interests, or liens (if any) that any other person may assert including the ABL Agent and Onset. Plaintiff is further entitled to related relief pursuant to 28 U.S.C. § 2202.

### Count III

**Declaratory Judgment That the ABL Agent Does Not Have Any Interests or Security Interests in the Inventory Collateral of the Carnaby II and III SPVs**
*(28 U.S.C. §§ 2201 and 2202; Bankruptcy Rules 7001(b), 7001(g), and 7001(i))*

170.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 147 above as if fully set forth herein.

171.    Under applicable law, a secured party's lien or security interest can attach to a debtor's assets only to the extent that the debtor itself holds rights in the collateral. A lender can obtain no greater interest in any asset than the debtor-grantor itself possesses.

172.    BPI, Trico Products, and Trico Technologies transferred all of their right, title, and interest in and to the Mexican Inventory to the Carnaby II and III SPVs pursuant to the Carnaby Inventory Financings, which constituted "Permitted Inventory Financings" expressly authorized under the ABL Credit Agreement. Upon consummation of those sales, the Operating Debtors retained no residual ownership interest in or rights to the Inventory Collateral. Any failure of the Operating Debtors or the SPV Debtors to accurately reflect such sales in their books and records is of no moment and the Debtors (including the Operating Debtors and the Carnaby II and III SPVs) are equitably estopped from asserting any ownership interest in the assets.

173.    Accordingly, and because the Operating Debtors hold no rights in the Inventory Collateral, the security interests granted by the Operating Debtors to the ABL Agent do not

50

encumber the Carnaby II and III SPVs' Inventory Collateral.

174. ███████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████

175. Accordingly, even if the ABL Agent previously held a security interest in any of the Inventory Collateral — which is denied — such interest terminated upon such assets entering Mexico and becoming Mexican Inventory. Any asserted security interest of the ABL Agent in such assets was also automatically released upon consummation of each sale of such assets to the Carnaby II and III SPVs under the Carnaby Inventory Financings and is therefore of no force or effect. This is true whether such sale happened in Mexico or the United States. Indeed, even if assets constituting Inventory Collateral entered Mexico and then reentered the United States, so long as such assets remain property of the Carnaby II and III SPVs and until they are purchased by the Operating Debtors, they remain free of the ABL Agent's liens.

176. An actual, justiciable controversy exists regarding whether the ABL Agent's asserted security interests in the Inventory Collateral are limited or extinguished by the limitations on the Operating Debtors' interests therein, which controversy is ripe for judicial resolution under 28 U.S.C. § 2201.

177. Plaintiff is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 and

51

Bankruptcy Rules 7001(b), 7001(g), and 7001(i) that: (a) because BPI, Trico Products, and Trico Technologies transferred all of their right, title, and interest in the Inventory Collateral to the Carnaby II and III SPVs pursuant to the Permitted Inventory Financings, the Operating Debtors hold no residual rights in the Inventory Collateral (including the proceeds of Mexican Inventory deposited in the Carnaby III Collateral Account) to which any ABL Agent security interest could attach; (b) any security interests the ABL Agent purports to assert in the Inventory Collateral (including the funds in the Carnaby III Collateral Account) are subject to and limited by the Operating Debtors' own limited or nonexistent rights in the Mexican Inventory (including as a result of equitable estoppel); and (c) any pre-existing ABL Agent security interest in assets transferred to the Carnaby II and III SPVs was automatically released upon consummation of the Carnaby Inventory Financings in accordance with the express terms of the ABL Credit Agreement. Plaintiff is further entitled to related relief pursuant to 28 U.S.C. § 2202.

## Count IV

**Declaratory Judgment That the ABL Agent Holds No Security Interests in Any Assets of the BPI, Trico Products, or Trico Technologies Located in Mexico and No Security Interests in any Assets of the Carnaby II and III SPVs Wherever Located**
*(28 U.S.C. §§ 2201 and 2202; Bankruptcy Rules 7001(b) and 7001(i))*

178.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 147 above as if fully set forth herein.

179.    The ABL Credit Agreement expressly defines and excludes from the ABL Agent's collateral package certain categories of assets designated as "Excluded Assets." Among those Excluded Assets are all assets located outside the United States, including all assets located in Mexico. *See* ABL Credit Agreement, Article I , def. "Excluded Assets" (Ex. 68).

180.    BPI, Trico Products, and Trico Technologies each have or have had assets located in Mexico, including Mexican Inventory held at or in connection with the Maquiladora

manufacturing facilities in Matamoros, Mexico, and Juárez, Mexico. As assets located outside the United States, the Mexican Inventory—even if it were owned by the Operating Debtors (it is not)—constitutes Excluded Assets under the ABL Credit Agreement and accordingly, are not, and have never been, subject to the ABL Agent's liens or security interests. *See* ABL Credit Agreement § 6.11(c)(iii) (Ex. 68); BPI Manufacturing Agreement, Recitals (Ex. 15); Trico Products Manufacturing Agreement, Recitals (Ex. 16); Trico Technologies Manufacturing Agreement, Recitals (Ex. 17).

181.    By the express terms of the ABL Credit Agreement, the ABL Agent's security interests did not attach to, and could not encumber, any of the Mexican Inventory, regardless of whether those assets consist of inventory, equipment, receivables, or any other category of property. No action by any Debtor, and no future amendment to or modification of the ABL Credit Agreement, can retroactively render any Mexican Inventory subject to the ABL Agent's liens.

182.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

183.    Finally, as noted above, the ABL Agent has no liens in any assets of the Carnaby II and III SPVs including all Inventory Collateral, whether located in Mexico or the United States, because they are property of the Carnaby II and III SPVs.

184.    An actual, justiciable controversy exists regarding whether the ABL Agent

holds any security interest in any property in Mexico owned by any of the Carnaby II and III SPVs, BPI, Trico Products, or Trico Technologies or any security interests in any assets owned by the Carnaby II and III SPVs which controversy is ripe for judicial resolution under 28 U.S.C. § 2201.

185.    Plaintiff is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 and Bankruptcy Rules 7001(b) and 7001(i) that: (a) the ABL Agent has no security interest in any assets owned by the Carnaby II and III SPVs regardless of its location; (b) all assets of BPI, Trico Products, and Trico Technologies located in Mexico, including all assets located at or in connection with the Maquiladora facilities (and the proceeds thereof deposited in the Carnaby III Collateral Account), constitute "Excluded Assets" under the ABL Credit Agreement; (c) the ABL Agent holds no security interest, lien, pledge, charge, or other encumbrance of any kind in or against any assets of the Carnaby II and III SPVs , BPI, Trico Products, and Trico Technologies located in Mexico (or the proceeds thereof located in the Carnaby III Collateral Account); and (d) any purported security interest of the ABL Agent in any Mexican Inventory (whether owned by the Carnaby II and III SPVs, BPI, Trico Products, or Trico Technologies) that may have arisen at any time was automatically released pursuant to the express terms of the ABL Credit Agreement and the ABL Security Agreement. Plaintiff is further entitled to related relief pursuant to 28 U.S.C. § 2202.

### Count V

**Declaratory Judgment That the ABL Agent Has Been Unjustly Enriched by Receipt of the Proceeds of Accounts Receivable Constituting Inventory Collateral of Carnaby II or Carnaby III**
*(28 U.S.C. §§ 2201 and 2202; Bankruptcy Rules 7001(b), 7001(g), and 7001(i))*

186.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 147 above as if fully set forth herein.

187.    Equity provides that a party which unjustly receives a benefit such as money or property at the expense of another party is liable to the injured party where it would be

inequitable and against good conscience to the first party to retain such benefit without compensation.

188.     The Carnaby II and III Interim AP Order granted the Carnaby Secured Lenders first-priority, automatically perfected security interests in any Eligible Accounts Receivable generated from the sale of the Carnaby II and III SPVs' Inventory Collateral.  The Carnaby II and III Interim AP Order also required that any proceeds received on account of the Eligible Accounts Receivable be deposited in a collateral account of the Carnaby Agent not subject to any other liens, claims, or encumbrances.

189.     From and after the Petition Date, until the creation of the Carnaby III Collateral Account, the Operating Debtors sold the Carnaby II and III SPV's Inventory Collateral and deposited the cash proceeds and proceeds of Eligible Accounts Receivable received from such sales in bank accounts maintained with the ABL Agent and subject to the ABL Agent's asserted security interests in violation of the Carnaby II and III Interim AP Order.  These amounts were then applied by the Debtors to pay their operating or administrative expenses, to satisfy obligations owing to the ABL Agent, or continue to be held in such accounts subject to the ABL Agent's liens and claims.

190.     Accordingly, the ABL Agent has been unjustly enriched from the consummation of the sales of the Carnaby II and III SPVs' Inventory Collateral in violation of the Carnaby II and III Interim AP Order.  The cash proceeds (or proceeds of Eligible Accounts Receivable) arising from such sales (other than those stemming from the Carnaby III OEM Sales) have been applied to pay the operating expenses of the Debtors party to the ABL Credit Agreement, to satisfy obligations owing to the ABL Agent, or remain in bank accounts subject to the ABL Agent's first priority liens.

191.     The diversion of the cash proceeds and proceeds of accounts receivable (including the Eligible Accounts Receivable) stemming from the sales of the Carnaby II and

III SPV's Inventory Collateral in violation of the Carnaby II and III Interim AP Order directly harmed the Carnaby Secured Lenders because the Carnaby Secured Lenders never received the cash proceeds or proceeds of Eligible Accounts Receivable required under the Carnaby II and III Interim AP Order.

192.   The ABL Agent knew or should have known of the Carnaby II and III Interim AP Order and the violations by Carnaby II, Carnaby III, and the Operating Debtors thereunder. The ABL Agent took no action to require that the Operating Debtors comply with the Carnaby II and III Interim AP Order or deposit of the cash proceeds (or proceeds of Eligible Accounts Receivable) received from the sale of Carnaby II's and Carnaby III's Inventory Collateral to third parties into a collateral account with the Carnaby Agent.  In fact, the ABL Agent has continued to assert a superior security interest in all such amounts deposited in the bank accounts in which it asserts a superior perfected security interest.

193.   An actual, justiciable controversy exists regarding whether the ABL Agent has been unjustly enriched by the violations of the Carnaby II and III Interim AP Order and the ABL Agent's receipt of the proceeds of accounts receivable arising out of sales the Carnaby II and III SPVs Inventory Collateral, which controversy is ripe for judicial resolution under 28 U.S.C. § 2201.

194.   Plaintiff is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 and Bankruptcy Rules 7001(b), 7001(g), and 7001(i) that the ABL Agent has been unjustly enriched in an amount to be determined, but in any event no less than $20 million, by the Debtors' deposit of the cash proceeds and proceeds of accounts receivable (including Eligible Accounts Receivable) from sales of the Carnaby II and III SPVs' Inventory Collateral into bank accounts maintained by the ABL Agent and subject to its liens, in violation of the Carnaby II and III Interim AP Order.

195.   Plaintiff is entitled to entry of an order pursuant to 28 U.S.C. § 2202 directing

the ABL Agent to turn over to the Carnaby Secured Lenders all the cash proceeds and proceeds of accounts receivable (including Eligible Accounts Receivable) from sales of the Carnaby II and III SPVs' Inventory Collateral deposited with the ABL Agent.

**Count VI**

**Declaratory Judgment That Onset Holds No Interest in Any Mexican Inventory Located at the Facilities of the Maquiladora Entities**
*(28 U.S.C. §§ 2201 and 2202; Bankruptcy Rules 7001(b) and 7001(i))*

196.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 147 above as if fully set forth herein.

197.   As set forth herein, the Maquiladoras operate the manufacturing facilities in Matamoros, Mexico, and Juárez, Mexico, at which brakes and wipers inventory — including all raw materials, work-in-process, and finished goods held at those facilities—is manufactured, stored, and processed.  At all relevant times, all inventory located at the Maquiladora facilities has been owned by the Carnaby II and III SPVs or, prior to transfer to the Carnaby II and III SPVs, by the Operating Debtors—not by the Maquiladoras themselves.

198.   The Maquiladoras operate under the IMMEX customs framework, which governs the temporary importation of raw materials and components into Mexico for manufacturing and export. Under this framework, as well as under the Manufacturing Agreements and the Mexican Pledge Agreements, the Maquiladoras at all times held inventory located at their facilities as bailees and depositaries only. The Maquiladoras never acquired, and at no time held, any ownership interest, title, or other property rights in any inventory located at their facilities, including the Mexican Inventory.

199.   Because the Maquiladoras held no ownership interest, title, or other property rights in any inventory at their facilities — whether characterized as raw materials, work-in-process, or finished goods — the Maquiladoras had nothing to sell, transfer, assign, or pledge to Onset or to any other third party—a fact Onset knew or should have known in light of its numerous transactions with the Debtors and the Maquiladoras themselves.

57

200.    Under the fundamental principle of property law that a transferor cannot convey greater rights than it possesses, Onset could not have acquired, and did not acquire, any valid ownership interest, title, security interest, lien, or other cognizable interest in any inventory located at the Maquiladora facilities.

201.    Additionally, the Carnaby IV Maquiladora Purchase Agreements provided for only a one-time sale of certain specified Mexican Inventory and did not provide for recurring sales to replace such assets.  Even if the Carnaby IV Maquiladora Purchase Agreements had resulted in an effective sale of the specified assets to Carnaby IV, the assets transferred included only those listed in the Carnaby IV Maquiladora Purchase Agreements and Carnaby IV (and by extension Onset) would have no interests of any kind in any replacement after-acquired Mexican Inventory held at the Carnaby III Maquiladora facilities as of the Petition Date.

202.    Any interest Onset asserts in the Mexican Inventory at the Maquiladora facilities — whether characterized as an ownership interest, a security interest, a "backup security interest," or any other form of property right — is therefore void and of no force or effect as against the Carnaby Secured Lenders, the Carnaby II and III SPVs, or the Debtors' estates.

203.    An actual, justiciable controversy exists regarding whether Onset holds any cognizable interest of any kind in any inventory located at the Maquiladora facilities, which controversy is ripe for judicial resolution under 28 U.S.C. § 2201.

204.    Plaintiff is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 and Bankruptcy Rules 7001(b) and 7001(i) that: (a) the Maquiladoras held, at all relevant times, all inventory located at their facilities solely as bailees and depositaries and never held any ownership interest, title, or other property rights in such inventory; (b) because the Maquiladoras held no rights in any inventory at their facilities, they could not transfer, sell, assign, or pledge any such inventory, or any interest therein, to Onset; (c) Onset holds no valid

ownership interest, title, security interest, lien, or other interest of any kind in any inventory located at the Maquiladora facilities in Mexico (or the proceeds thereof deposited in the Carnaby III Collateral Account); and (d) any purported transfer, sale, assignment, or pledge of any interest in any inventory at the Maquiladora facilities to Onset is void and of no force or effect. Plaintiff is further entitled to related relief pursuant to 28 U.S.C. § 2202.

## Count VII

**Declaratory Judgment That the Carnaby Secured Lenders Hold Superior Interests in the Mexican Inventory as Against Onset**
***(28 U.S.C. §§ 2201 and 2202; Bankruptcy Rules 7001(b) and 7001(i))***

205.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 147 above as if fully set forth herein.

206.    The Carnaby Secured Lenders hold valid, perfected, first-priority security interests and liens in all of the Mexican Inventory, which security interests and liens were perfected in 2022 via the Mexican Pledge Agreements registered with the RUG in Mexico and via the UCC Filings in the United States.

207.    Any interest Onset asserts in the Mexican Inventory, to the extent it exists at all, arose in 2025 — more than two years after the Carnaby Secured Lenders perfected their security interests and liens in the Mexican Inventory. Any asserted Onset interest is therefore junior in time to the Carnaby Secured Lenders' prior perfected liens.

208.    The Maquiladoras, through which Onset asserts it obtained its claimed interests in the Mexican Inventory, never owned the Mexican Inventory and held it only as bailees and depositaries under the IMMEX customs framework and the Manufacturing Agreements, with express contractual acknowledgments that all right, title, and interest in the Mexican Inventory belonged to the Carnaby II and III SPVs. Because the Maquiladoras had no ownership rights in or title to the Mexican Inventory, they could not — and did not — transfer any title, ownership interest, security interest, or other rights in the Mexican Inventory to Onset.

209.    To the extent Onset asserts a "backup security interest" in the Mexican

59

Inventory, such asserted interest likewise fails because the Maquiladoras possessed no rights in the Mexican Inventory that could support a valid grant of a security interest under applicable law—a fact Onset knew or should have known, given its extensive interactions with the Debtors and the Maquiladoras themselves.

210.    Additionally, the Carnaby IV UCC-1 filings made to perfect the "backup security interests" occurred after the Petition Date, violated the automatic stay, and were made without the Carnaby IV Debtor's authority and thus are invalid.  Accordingly, no "backup security interest" of Carnaby IV is perfected in the Mexican Inventory.

211.    Even if Onset were determined to hold any cognizable security interest in the Mexican Inventory such, security interest would in any event be junior and subordinate to the Carnaby Secured Lenders' prior, earlier-perfected security interests and liens.

212.    Furthermore, the value of the Mexican Inventory does not exceed the total amount of the Carnaby Secured Lenders' secured claims. Accordingly, any junior interest claimed by Onset in the Mexican Inventory is of no value and is fully encumbered by the Carnaby Secured Lenders' superior first-priority liens.

213.    An actual, justiciable controversy exists regarding the priority, validity, and extent of their respective claimed interests in the Mexican Inventory, which controversy is ripe for judicial resolution under 28 U.S.C. § 2201.

214.    Plaintiff is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 and Bankruptcy Rules 7001(b) and 7001(i) that: (a) the Carnaby Secured Lenders hold valid, perfected, first-priority security interests and liens in all of the Mexican Inventory (and the proceeds thereof deposited in the Carnaby III Collateral Account); (b) the Carnaby Secured Lenders' security interests and liens are senior and superior to any interest asserted by Onset in the Mexican Inventory (and the proceeds thereof deposited in the Carnaby III Collateral Account); (c) the Maquiladoras had no title to or ownership interest in the Mexican Inventory

and therefore could not transfer any interest therein to Onset; and (d) Onset holds no valid title, ownership interest, security interest, lien, or other interest in the Mexican Inventory (or the proceeds thereof deposited in the Carnaby III Collateral Account) that is superior to or *pari passu* with the Carnaby Secured Lenders' interests.  Plaintiff is further entitled to related relief pursuant to 28 U.S.C. § 2202.

### Count VIII

**Declaratory Judgment That Onset Holds No Interests or Claims Against Carnaby III or Carnaby III's Inventory Collateral Arising Out of the Carnaby III Maquiladoras' Use of the Alleged Onset Equipment**
***(28 U.S.C. §§ 2201 and 2202; Bankruptcy Rules 7001(b) and 7001(i))***

215. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 147 above as if fully set forth herein.

216. The Carnaby Secured Lenders hold valid, perfected, first-priority security interests and liens in all of Carnaby III's Mexican Inventory located at the Carnaby III Maquiladoras' facilities some or all of which may have been stored, manufactured, or improved through the Carnaby III Maquiladoras' use of the Alleged Onset Equipment.

217. Notwithstanding the Carnaby III Maquiladora's use of the Alleged Onset Equipment, Onset has no cognizable claims at law or equity against the Carnaby Secured Lenders, Carnaby III, or Carnaby III's Inventory Collateral.

218. The Carnaby Secured Lenders are just lenders and have never used the Alleged Onset Equipment and never operated any of the Debtors' businesses.

219. Carnaby III also has never used the Alleged Onset Equipment.  Carnaby III itself performs no manufacturing activities using the Alleged Onset Equipment.  Instead, Carnaby III through its Manufacturing Agreements has contracted with the Trico Entities and the Carnaby III Maquiladoras to perform manufacturing services in respect of Carnaby III's Inventory Collateral.  The Trico Entities and the Carnaby III Maquiladoras are separate legal entities with their own third-party vendors and suppliers with whom they contract to perform

their services, which may include Onset.

220.    Carnaby III has no direct contractual relationship with Onset and has no obligation under its Manufacturing Agreements or any other agreement with the Trico Entities or the Carnaby III Maquiladoras to pay any of the Trico Entities' or the Carnaby III Maquiladoras' vendors, suppliers, or lessors (including Onset) on behalf of the Carnaby III Maquiladoras.

221.    Additionally, neither the Onset Equipment Master Lease Agreement nor any of the Relevant Onset Equipment Lease Schedules grants Onset any liens or security interests in any inventory located at the Carnaby III Maquiladoras' locations.  Nor do any materialmen's liens or mechanics' liens exist under the laws of Mexico which might encumber Carnaby III's Inventory Collateral as a result of the Carnaby III Maquiladoras' use of the Alleged Onset Equipment.

222.    Accordingly, Onset has no cognizable interests in or claims at law or equity in respect of Carnaby III's Inventory Collateral or Carnaby III, including any interests in or claims against Carnaby III's Inventory Collateral stored, manufactured, or otherwise improved through the Carnaby III Maquiladoras' use of the Alleged Onset Equipment.

223.    To the extent Onset asserts a "backup security interest" to secure the obligations owing under the Onset Equipment Master Lease Agreement, such asserted interest encumbers only the Alleged Onset Equipment, if it exists at all.

224.    An actual, justiciable controversy exists regarding the existence of any claims or interests in the Carnaby III Inventory Collateral stemming from the Carnaby III Maquiladoras' use of the Alleged Onset Equipment, which controversy is ripe for judicial resolution under 28 U.S.C. § 2201.

225.    Plaintiff is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 and Bankruptcy Rules 7001(b), 7001(g), and 7001(i) that: (a) Onset has no cognizable claim against

62

Carnaby III or the Carnaby III Inventory Collateral at law or equity stemming from the Carnaby III Maquiladoras' use of the Alleged Onset Equipment, (b) that Onset has no interests in the Carnaby III Inventory Collateral stemming from Carnaby III Maquiladoras' use of the Alleged Onset Equipment, (c) to the extent Onset holds any valid claims stemming from Carnaby III Maquiladoras' use of the Alleged Onset Collateral, such claims are assertable only against Trico Products, TC, or SI (or their respective bankruptcy estates, as applicable), and (d) to the extent Onset holds any valid interests or security interests stemming from the Carnaby III Maquiladoras' use of the Alleged Onset Collateral, such interests or security interests, as applicable, encumber only the Alleged Onset Equipment.  Plaintiff is further entitled to related relief pursuant to 28 U.S.C. § 2202.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, and grant the following relief:

A.  A declaratory judgment pursuant to 28 U.S.C. § 2201 that the Carnaby Secured Lenders hold valid, perfected, first-priority security interests and liens in substantially all of the assets of the Carnaby II and III SPVs including all of the Inventory Collateral and all proceeds thereof that are senior in priority to any interests, security interests, or liens (if any) that any other person may assert including the ABL Agent and Onset;

B.  A declaratory judgment pursuant to 28 U.S.C. § 2201 that the Carnaby Secured Lenders hold valid, perfected, first-priority security interests and liens in all funds deposited in the Carnaby III Collateral Account that are senior in priority to any interests, security interests, or liens (if any) that any other person may assert including the ABL Agent and Onset;

C.  A declaratory judgment pursuant to 28 U.S.C. § 2201 that the ABL Agent has no interests in respect of the Inventory Collateral owned by the Carnaby II and III SPVs; and that any purported security interest of the ABL Agent in any such assets never existed or was automatically released and is of no force or effect pursuant to the express terms of the ABL Credit Agreement;

D.  A declaratory judgment pursuant to 28 U.S.C. § 2201 that all assets of the Operating Debtors located in Mexico constitute "Excluded Assets" under the ABL Security Agreement; that the ABL Agent holds no security interest, lien, pledge, charge, or other encumbrance of any kind in or against any assets of the Operating Debtors located in Mexico or against any assets of the Carnaby II and III SPVs (or the proceeds of the Carnaby III Inventory Collateral deposited in the Carnaby III Collateral Account) regardless of where located; and that any purported security interest of the ABL Agent in any such assets never existed or was automatically released and is of no force or effect pursuant to the express terms of the ABL Credit Agreement and the ABL Security Agreement;

E.  A declaratory judgment pursuant to 28 U.S.C. § 2201 that the ABL Agent has been unjustly enriched in an amount to be determined, but in any event no less than $20 million by the Debtors' deposit of the cash proceeds and proceeds of accounts receivable (including Eligible Accounts Receivable) from sales of the Carnaby II and III SPVs' Inventory Collateral into bank accounts maintained by the ABL Agent and subject to its liens, in violation of the Carnaby II and III Interim AP Order;

F.     A declaratory judgment pursuant to 28 U.S.C. § 2201 that the Maquiladoras held all inventory located at their facilities solely as bailees and depositaries; that the Maquiladoras held no ownership interest, title, or other property rights in any such inventory; that Onset holds no valid ownership interest, title, security interest, lien, or other interest of any kind in any inventory located at the Maquiladora facilities in Mexico; and that any purported transfer, sale, assignment, or pledge of any interest in any such inventory to Onset is void and of no force or effect;

G.     A declaratory judgment pursuant to 28 U.S.C. § 2201 that the Carnaby Secured Lenders hold valid, perfected, first-priority security interests and liens in all of the Mexican Inventory (and the proceeds thereof including those deposited in the Carnaby III Collateral Account) that are senior and superior to any interest claimed by Onset in such assets, and that Onset holds no valid title, ownership interest, security interest, lien, or other interest in the Mexican Inventory that is superior to or *pari passu* with the Carnaby Secured Lenders' interests;

H.     A declaratory judgment pursuant to 28 U.S.C. § 2201 that Onset has no cognizable claim at law or equity against the Carnaby Secured Lenders, Carnaby III, or the Carnaby III Inventory Collateral stemming from the Carnaby III Maquiladoras' use of the Alleged Onset Equipment and that Onset has no interests in the Carnaby III Inventory Collateral stemming from the Carnaby III Maquiladoras' use of the Alleged Onset Equipment; and that to the extent Onset holds any valid claims stemming from the Carnaby III Maquiladoras' use of the Alleged Onset Collateral, such claims are assertable only against the Trico Entities, TC, or SI (or their respective bankruptcy estates, as applicable), and that to the extent Onset holds any valid interests or security interests stemming from the Carnaby III Maquiladoras' use of the Alleged Onset Collateral, such interests or security interests, as applicable, encumber only the Alleged Onset Equipment;

I.     An order pursuant to 28 U.S.C. § 2202 authorizing the Carnaby Secured Lenders to take all actions necessary to liquidate the Inventory Collateral, collect the proceeds in respect thereof (including the amounts in the Carnaby III Collateral Account), and apply the proceeds thereof in satisfaction of the obligations under the Carnaby Credit Agreements, in each case, consistent with the Court's prior orders (except to the extent superseded) and applicable law;

J.     An order pursuant to 28 U.S.C. § 2202 directing the ABL Agent to turn over to the Carnaby Secured Lenders any cash proceeds and proceeds of accounts receivable (including Eligible Accounts Receivable) from sales of the Carnaby II and III SPVs' Inventory Collateral deposited with the ABL Agent;

K.     An award of costs, including reasonable attorneys' fees, to the extent permitted by applicable law and the Court's discretion; and

L.     Such other and further relief as the Court deems just and proper.

65

Respectfully submitted on the 28th day of July, 2026.

Houston, Texas

Porter Hedges LLP


/s/ Allan S. Brilliant
John F. Higgins (TX Bar No. 09597500)
Megan Young-John (TX Bar No. 24088700)
James A. Keefe (TX Bar No. 24122842)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
Email: jhiggins@porterhedges.com
myoung-john@porterhedges.com
jkeefe@porterhedges.com

-and-

Allan S. Brilliant (admitted *pro hac vice*)
Stephen M. Wolpert (admitted *pro hac vice*)
Eric O. Hilmo (admitted *pro hac vice*)
**Dechert LLP**
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Email:    allan.brilliant@dechert.com
stephen.wolpert@dechert.com
eric.hilmo@dechert.com


*Counsel to the Carnaby Secured Lenders*

66