Case 25-90399   Document 853-8   Filed in TXSB on 10/02/25   Page 1 of 11

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 02, 2025

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § § | **Chapter 11** |
| **FIRST BRANDS GROUP, LLC**, *et al.*, | § § § | **Case No. 25-90399 (CML)** |
| Debtors.[1] | § § | **(Jointly Administered)** |

**STIPULATION AND AGREED INTERIM ORDER
REGARDING ADEQUATE PROTECTION AMONG DEBTORS
AND CARNABY INVENTORY II, LLC AND CARNABY INVENTORY III, LLC**

This Stipulation and Order (this "**Stipulation**") is entered into by and among (i) the above-captioned debtors (collectively, the "**Debtors**") and (ii) the Carnaby II and III Secured Parties (as defined below, and together with the Debtors, the "**Parties**").[2]  The Parties hereby stipulate and agree as follows:

WHEREAS, on September 24, 2025 (the "**Carnaby Petition Date**") and September 28, 2025, the Debtors commenced the chapter 11 cases in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

WHEREAS, on September 30, 2025, the Debtors filed an emergency motion seeking entry of an interim order (the "**Interim DIP Order**") and a final order (the "**Final DIP Order**") authorizing the Debtors to, among other things, obtain postpetition financing and use cash collateral (Docket No 49).

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]   Capitalized terms not defined herein have the meaning ascribed to such terms in the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**") (Docket No. 22).

WHEREAS, the Parties make reference to (a) that certain credit agreement (the "**Carnaby II Credit Agreement**") dated as of May 31, 2022 among Carnaby Inventory II, LLC, as Borrower ("**Carnaby II**"), First Brands Group, LLC, as the Servicer, First Brands Group Holdings, LLC and Carnaby Inventory Holdings II, LLC ("**Holdings II**"), as Guarantors, the Lenders from time to time party thereto (the "**Carnaby II Lenders**"), and the GLAS Trust Company LLC, as Administrative Agent (the "**Carnaby II Agent**"), as amended and (b) that certain credit agreement (the "**Carnaby III Credit Agreement**," and together with the Carnaby II Credit Agreement, the "**Credit Agreements**") dated as of July 6, 2022 among Carnaby Inventory III, LLC, as Borrower ("**Carnaby III**," and together with Carnaby II, the "**SPV Debtors**"), First Brands Group, LLC, as the Servicer, First Brands Group Holdings, LLC and Carnaby Inventory Holdings III, LLC ("**Holdings III**," and together with Holdings II, "**Holdings**"), as Guarantors, the Lenders from time to time party thereto (the "**Carnaby III Lenders**," and together with the Carnaby II Lenders, the "**Carnaby II and III Secured Lenders**"), and the GLAS Trust Company LLC, as Administrative Agent (the "**Carnaby III Agent**," and together with the Carnaby II Agent and Carnaby II and III Secured Lenders, the "**Carnaby II and III Secured Parties**"), as amended;

WHEREAS, from time to time, Debtor First Brands Group Holdings, LLC and its direct and indirect subsidiaries (the "**FBG Debtors**") may seek to continue using the Carnaby II and III Collateral and the proceeds thereof in the ordinary course of business, and acknowledge and agree that the Carnaby II and III Secured Parties are entitled to adequate protection from any diminution in value of the Carnaby II and III Collateral during the course of these chapter 11 cases;

2

**NOW, THEREFORE, IT IS HEREBY STIPULATED, AGREED, AND ORDERED THAT:**

1.      From and after the Carnaby Petition Date until the date of termination of this Stipulation, the Debtors shall not sell or transfer any inventory that is "Collateral" as defined in the respective Credit Agreements (the "**Carnaby II and III Collateral**") or otherwise use any other asset, including, without limitation, cash collateral, that is Carnaby II and III Collateral or collateral pledged by Holdings to the Carnaby II and III Secured Parties (the "**Holdings Collateral**") except pursuant to the following terms of this Stipulation.

2.      *No Other Indebtedness or Liens*. None of (a) the SPV Debtors, (b) Holdings, or (c) FRAM Group Operations Mexicali, S.A. de C.V., Subensambles Internacionales, S. de R.L. de C.V., Trico Componentes, S.A. de C.V., BPI Brake Manufacturing Juarez, S.A. de C.V., and BPI Braking Systems Mexico, S.A. de C.V. (collectively, the "**Maquiladora Entities**"), or any direct parent entity of any Maquiladora Entity, shall incur any indebtedness or claims on account of any debtor-in-possession financing or any liens (whether senior, pari passu, or junior) on any of their assets to secure any indebtedness under the Interim DIP Order, the Final DIP Order, any other order authorizing the Debtors to use cash collateral and/or obtain DIP financing, or otherwise.

3.      *Purchase and Sale of Inventory*.  From the entry by the Court of this Stipulation until the earlier of (i) October 22, 2025; and (ii) entry of a final order providing adequate protection to the Carnaby Secured Parties (the "**Interim Period**"), Carnaby II and Carnaby III shall not sell or transfer any inventory that is Carnaby II and III Collateral or otherwise use any other asset, including, without limitation, cash collateral, that is Carnaby II and III Collateral or Holdings Collateral except as provided in this paragraph.  Carnaby II and III may sell inventory that is Carnaby II and Carnaby III Collateral (the "**Carnaby Inventory Collateral**") to Debtors Brake

3

Case 25-90399   Document 3308   Filed in TXSB on 10/24/25   Page 4 of 11

Parts Inc. LLC, Trico Products Corporation, and Trico Technologies Corporation (collectively, the "**Debtor Purchasers**") for cash on delivery for Fair Market Value (as defined in the respective Credit Agreements) (the "**Purchase Price**").  In addition, during the Interim Period, Carnaby II and Carnaby III may sell up to $20 million in the aggregate of Carnaby Inventory Collateral to the Debtor Purchasers for immediate resale to customers that have a credit rating of at least BB or its equivalent from a nationally recognized credit rating agency ("**Eligible Customers**") for accounts receivable with a tenor of not longer than 45 days (the "**Eligible Customer A/R**") on the following conditions:

a. After the transfer by Carnaby II or Carnaby III of any Carnaby Inventory Collateral to any Debtor Purchaser, but prior to the sale by such Debtor Purchaser of such Carnaby Inventory Collateral to a customer, Carnaby II and Carnaby III shall maintain, and the Court hereby grants, a first priority, automatically perfected lien on such Carnaby Inventory Collateral, and the Eligible Customer A/R that is proceeds of such resale, and such Carnaby Inventory Collateral and Eligible Customer A/R shall not be subject to any other liens, claims or encumbrances of any other party, including, without limitation, in connection with the DIP financing facility to be approved under the DIP Order (the "**DIP Facility**");

b. Carnaby II and Carnaby III shall immediately deposit any cash proceeds of sales of Carnaby Inventory Collateral in an amount equal to the Purchase Price into a segregated cash account, with the balance to be remitted to the FBG Debtors (as defined in the First Day Declaration), in the name of Carnaby II or Carnaby III and subject to the Carnaby II and III Secured Parties' liens (the "**Adequate Protection Account**");

c. In the event that the Debtor Purchaser sells Carnaby Inventory Collateral to an Eligible Customer pursuant to this paragraph 2, the Carnaby Secured Parties shall have, and the Court hereby grants, a first priority, automatically perfected lien on the associated Eligible Customer A/R, which Eligible Customer A/R shall not be subject to any other liens, claims or encumbrances, including, without limitation, in connection with the DIP Facility.  Upon any collection of any Eligible Customer A/R by a Debtor Purchaser, the Debtor Purchaser shall immediately deposit cash equal to the Purchase Price of Carnaby Inventory Collateral sold into the Adequate Protection Account, with the balance to be remitted to the FBG Debtors;

Case 25-90399   Document 3308   Filed in TXSB on 10/24/25   Page 5 of 101

d.  For the avoidance of doubt, during the Interim Period, Carnaby II and Carnaby III may not (a) transfer any Carnaby Inventory Collateral except as provided in paragraph 2 hereof, or (b) use any cash that is Carnaby II and III Collateral, all of which shall be deposited in the Adequate Protection Account, without prior written consent of the Carnaby II and III Secured Parties.  During the Interim Period, Holdings may not transfer any Holdings Collateral without the Carnaby II and III Secured Parties' consent.

4.  ***Continuation of Lien, Adequate Protection Liens and Superpriority Claims***. Subject to the reservations set forth in paragraph 4 hereof, the Carnaby II and III Secured Parties will retain, and the Court hereby grants, a first priority, automatically perfected lien on any Carnaby II and III Collateral, the Holdings Collateral, and the proceeds thereof, including, without limitation, cash collateral, and will receive, and the Court hereby grants, as adequate protection of the interests of the Carnaby II and III Secured Parties in the Carnaby II and III Collateral against any diminution in value of such interests, pursuant to sections 361 and 363(e) of the Bankruptcy Code, additional and replacement continuing valid, binding, enforceable, non-avoidable, and automatically perfected postpetition first priority security interests in and liens on all of the presently owned or hereafter acquired property and assets of Carnaby II and Carnaby III and Holdings.  To the extent of any diminution in value of the interests of the Carnaby II and III Secured Parties in the Carnaby II and III Collateral and the Holdings Collateral, the Carnaby II and III Secured Parties, the Court hereby grants an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "**507(b) Claim**"), which 507(b) Claim shall be an allowed claim against the SPV Debtors and Holdings, with priority over any and all administrative expenses and all other claims against such SPV Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any other

provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code.

5.      ***Reservation of Rights***.   All parties' rights to challenge the validity, amount, perfection, and priority of the Carnaby II and III Secured Parties' liens are reserved, and the Carnaby II and III Secured Parties' rights to, among other things, seek (a) additional adequate protection, (b) relief from the automatic stay, (c) an order dismissing the Chapter 11 Cases for the SPV Debtors, or (d) an order appointing a chapter 11 trustee are reserved.

6.      ***No Waivers***. Nothing in this Stipulation shall provide waivers of claims for necessary costs and expenses of preserving or disposing of property securing an allowed secured claim pursuant to section 506(c) of the Bankruptcy Code and the section 552 "equities of the case" exception to the Carnaby II and III Secured Parties.

7.      ***Post-Petition Interest***.   To the extent allowed under section 506(b) of the Bankruptcy Code, interest on the Carnaby II and III Secured Parties' prepetition claims at the applicable contract rate, and the Carnaby II and III Secured Parties' rights to receive reasonable fees, costs, and charges will continue to accrue postpetition.

8.      ***Site Access; Books and Records***.   The Debtors shall coordinate reasonable access to the Carnaby II and III Secured Parties (and their representatives) to their warehouses, other facilities, and books and records to conduct updated appraisals, field exams, and inventory taking of the Carnaby II and III Collateral and to identify and trace the creation, acquisition and transfer of, and any collections with respect to, the Carnaby II and III Collateral.

9.      ***Reporting***.   The Debtors will provide (a) weekly reporting on the transfer of any Carnaby II and III Collateral and related customer sales, including, without limitation, relevant purchase orders, (b) weekly Borrowing Base Certificates (as defined in the respective Credit

Case 25-90399   Document 3308   Filed in TXSB on 10/24/25   Page 7 of 11

Agreements), with the first to be delivered by end of day Friday October 10, 2025, and by end of day Friday for each subsequent week, (c) within one week of the entry of the Interim AP Order, the most recent bank statements for all bank accounts at Carnaby II and Carnaby III, (d) all financial statements required to be provided under the Credit Agreements, and (e) all written reporting provided to the DIP financing secured parties under the DIP Orders.

10.     *Termination*.  The Carnaby Secured Parties' consent to the sale or use of any Carnaby II and III Collateral shall terminate on the earlier to occur of: (i) October 22, 2025; and (ii) entry of a final order providing adequate protection to the Carnaby Secured Parties.

11.     The rights, claims, causes of action, and defenses, at law and in equity, with respect to the Credit Agreements of all parties in interest in the jointly administered chapter 11 cases of the Debtors are expressly reserved.

12.     This Stipulation shall not be modified, altered, amended, or vacated without the written consent of each of the Parties or by further order of the Bankruptcy Court.

13.     The Debtors are authorized to take all actions necessary to effectuate this Stipulation.

14.     To the extent any provision of this Stipulation is inconsistent with the Interim DIP Order, the Final DIP Order, or any order granting "first day" relief in these Chapter 11 Cases, this Stipulation shall govern and control.

15.     Termination of this Stipulation shall not affect the validity, amount, or priority of any liens or claims (including superpriority administrative claims) granted to the Carnaby II and III Secured Parties hereunder.

16.     The Bankruptcy Court retains sole and exclusive jurisdiction over all matters related to this Stipulation.

Signed:  October 02, 2025

_____

Christopher Lopez
United States Bankruptcy Judge

**STIPULATED AND AGREED TO BY:**

Dated:  October 1, 2025

  /s/  Clifford W. Carlson
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email: gabriel.morgan@weil.com
        clifford.carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted pro hac vice)
Sunny Singh (admitted pro hac vice)
Andriana Georgallas (admitted pro hac vice)
Kevin Bostel (admitted pro hac vice)
Jason H. George (admitted pro hac vice)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  matt.barr@weil.com
        sunny.singh@weil.com
        andriana.georgallas@weil.com
        kevin.bostel@weil.com
        jason.george@weil.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

Dated:  October 1, 2025

  /s/   John F. Higgins
John F. Higgins
Megan Young-John
James A. Keefe
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
Email: jhiggins@porterhedges.com
myoung-john@porterhedges.com
jkeefe@porterhedges.com

-and-

Allan S. Brilliant (pending *pro hac vice*
admission)
Stephen M. Wolpert (pending *pro hac vice*
admission)

**DECHERT LLP**
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Email: allan.brilliant@dechert.com
stephen.wolpert@dechert.com

*Attorneys for Carnaby II and III Secured*
*Lenders*

**JOINT EXHIBIT NO. 18**
**Page 9 of 812**

## CERTIFICATE OF SERVICE

I certify that on October 1, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<div align="right">

*/s/ Clifford W. Carlson*
Clifford W. Carlson

</div>

## **Exhibit A**

**Execution Version**

---

**CREDIT AGREEMENT**

**DATED AS OF MAY 31, 2022**

*AMONG*

**CARNABY INVENTORY II, LLC, AS BORROWER,**

**FIRST BRANDS GROUP, LLC, AS THE SERVICER,**

**FIRST BRANDS GROUP HOLDINGS, LLC AND
CARNABY INVENTORY HOLDINGS II, LLC, AS GUARANTORS,**

**THE LENDERS FROM TIME TO TIME PARTY HERETO,**

*AND*

**GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT**

---

*Credit Agreement*

28997904

**TABLE OF CONTENTS**

**Page**

ARTICLE I. THE FACILITY ......................................................................................................... 1

    Section 1.1      The Commitments ....................................................................................... 1

    Section 1.2      Requesting Advances. ................................................................................. 2

    Section 1.3      Prepayment; Termination of Commitments. ............................................. 2

    Section 1.4      Payment Requirements ............................................................................... 3

    Section 1.5      Repayment ................................................................................................... 3

    Section 1.6      Interest ........................................................................................................ 3

    Section 1.7      [Reserved]. ................................................................................................... 4

    Section 1.8      Defaulting Lenders ...................................................................................... 4

    Section 1.9      Designated Funding Offices. ....................................................................... 5

    Section 1.10    Protective Advances .................................................................................... 5

    Section 1.11    Fees .............................................................................................................. 6

    Section 1.12    [Reserved] .................................................................................................... 6

    Section 1.13    Inability to Determine Rates ....................................................................... 6

    Section 1.14    Illegality ....................................................................................................... 7

    Section 1.15    Benchmark Replacement Setting ............................................................... 7

ARTICLE II. PAYMENTS AND COLLECTIONS .......................................................................... 9

    Section 2.1      Collections during the Revolving Period. ................................................... 9

    Section 2.2      [Reserved] .................................................................................................. 10

    Section 2.3      Payment Rescission. ................................................................................. 10

    Section 2.4      Currencies ................................................................................................. 10

ARTICLE III. REPRESENTATIONS AND WARRANTIES ............................................................ 10

    Section 3.1      Representations and Warranties of the Borrower .................................. 10

    Section 3.2      Representations and Warranties of the Servicer. ................................... 18

ARTICLE IV. CONDITIONS OF CLOSING AND ADVANCES ..................................................... 21

    Section 4.1      Conditions Precedent to Closing ............................................................... 21

    Section 4.2      Conditions Precedent to Initial Advance .................................................. 24

    Section 4.3      Conditions Precedent to All Advances ...................................................... 25

ARTICLE V. COVENANTS ..................................................................................................... 25

    Section 5.1      Affirmative Covenants ............................................................................... 25

    Section 5.2      Negative Covenants. ................................................................................. 35

ARTICLE VI. ADMINISTRATION AND COLLECTION ............................................................... 38

    Section 6.1      Designation of the Servicer ....................................................................... 38

    Section 6.2      Duties of the Servicer ................................................................................ 39

    Section 6.3      Collection Account ..................................................................................... 39

    Section 6.4      [Reserved] .................................................................................................. 39

735706711 19631142

-i-

*Credit Agreement*

28997904

**TABLE OF CONTENTS**
(continued)

**Page**

| | | |
|---|---|---|
| Section 6.5 | Responsibilities under Contracts | 40 |
| Section 6.6 | Reports | 40 |
| Section 6.7 | Servicing Fees | 40 |
| ARTICLE VII. EVENTS OF DEFAULT | | 40 |
| Section 7.1 | Events of Default | 40 |
| Section 7.2 | Remedies. | 43 |
| ARTICLE VIII. INDEMNIFICATION | | 44 |
| Section 8.1 | Indemnities by Loan Parties | 44 |
| Section 8.2 | Indemnities by the Servicer | 46 |
| Section 8.3 | Increased Cost and Reduced Return | 48 |
| Section 8.4 | Other Costs and Expenses | 49 |
| Section 8.5 | Taxes | 50 |
| Section 8.6 | Currency Indemnity. | 52 |
| ARTICLE IX. THE ADMINISTRATIVE AGENT | | 53 |
| Section 9.1 | Appointment | 53 |
| Section 9.2 | Delegation of Duties | 54 |
| Section 9.3 | Exculpatory Provisions | 54 |
| Section 9.4 | Reliance by the Administrative Agent and the Lenders | 55 |
| Section 9.5 | Notice of Events of Default | 55 |
| Section 9.6 | Non-Reliance on the Administrative Agent or Other Lender | 55 |
| Section 9.7 | Indemnification of the Administrative Agent | 56 |
| Section 9.8 | Administrative Agent in Its Individual Capacity | 56 |
| Section 9.9 | Successor Administrative Agent | 56 |
| Section 9.10 | Collateral | 57 |
| Section 9.11 | Borrowing Base | 58 |
| ARTICLE X. ASSIGNMENTS; PARTICIPATIONS | | 58 |
| Section 10.1 | Assignments and Transfer of Commitments | 58 |
| Section 10.2 | The Register. | 59 |
| Section 10.3 | Certain Representations and Warranties; Limitations; Covenants | 59 |
| Section 10.4 | No Assignment to Borrower | 60 |
| Section 10.5 | No Assignment to Natural Persons | 60 |
| Section 10.6 | Participations | 60 |
| Section 10.7 | Pledge by Lenders. | 61 |
| ARTICLE XI. GUARANTY | | 61 |
| Section 11.1 | Guaranty | 61 |
| Section 11.2 | Guaranty of Payment | 62 |

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 11.3 | No Discharge or Diminishment of Guaranty | 62 |
| Section 11.4 | Defenses Waived | 63 |
| Section 11.5 | Subrogation | 63 |
| Section 11.6 | Reinstatement; Stay of Acceleration | 63 |
| Section 11.7 | Information | 63 |
| Section 11.8 | Maximum Liability | 64 |
| Section 11.9 | Contribution | 64 |
| Section 11.10 | Liability Cumulative | 64 |
| Section 11.11 | Holdings. | 65 |
| ARTICLE XII. MISCELLANEOUS | | 65 |
| Section 12.1 | Waivers and Amendments | 65 |
| Section 12.2 | Notices | 65 |
| Section 12.3 | Setoff; Ratable Payments | 66 |
| Section 12.4 | Intended Tax Characterization | 67 |
| Section 12.5 | Protection of Ownership and Security Interests | 67 |
| Section 12.6 | Confidentiality | 67 |
| Section 12.7 | CHOICE OF LAW | 68 |
| Section 12.8 | CONSENT TO JURISDICTION | 69 |
| Section 12.9 | WAIVER OF JURY TRIAL | 69 |
| Section 12.10 | Integration; Binding Effect; Survival of Terms | 69 |
| Section 12.11 | Counterparts; Severability; Section References | 69 |
| Section 12.12 | Mutual Negotiations | 70 |
| Section 12.13 | Bankruptcy Petition | 70 |
| Section 12.14 | USA PATRIOT Act; Anti-Money Laundering Laws | 70 |

**JOINT EXHIBIT NO. 18**
**Page 15 of 812**

**EXHIBITS AND SCHEDULES**

| | |
|---|---|
| Exhibit I | Definitions |
| Exhibit II-A | Form of Borrowing Notice |
| Exhibit II-B | Form of Prepayment Notice |
| Exhibit III | Chief Executive Office, Principal Place of Business, Records Locations, Federal Taxpayer ID Number and Organizational ID Number |
| Exhibit IV | Form of Solvency Certificate |
| Exhibit V-A | Form of Compliance Certificate |
| Exhibit V-B | Form of Holdings Certificate |
| Exhibit VI | Form of Assignment Agreement |
| Exhibit VII | Form of Promissory Note |
| Exhibit VIII-A | Form of Monthly Report |
| Exhibit IX | UCC-1 Financing Statements |
| Exhibit X | Borrowing Base Certificate |
| Exhibit XI | Form of Purchase Agreement |
| Exhibit XII | Form of Sale Agreement |
| Exhibit XIII | Form of Manufacturing Agreement |
| Exhibit XIV | Form of Purchase Order |
| Schedule 12.2 | Addresses for Notices |
| Schedule 3.1(gg) | Insurance |
| Schedule 3.1(n) | Real Property |
| Schedule A | Commitments |

735706711 19631142                                      iv

*Credit Agreement*

28997904

## CREDIT AGREEMENT

***THIS CREDIT AGREEMENT,*** dated as of May 31, 2022, is entered into by and among:

(a)      Carnaby Inventory II, LLC, a Delaware limited liability company (the ***"Borrower"***),

(b)      First Brands Group Holdings, LLC and Carnaby Inventory Holdings II, LLC, as Guarantors hereunder,

(c)      First Brands Group, LLC, a Delaware limited liability company (***"Servicer"***),

(d)      the lenders set forth on the signatures pages hereof (collectively, ***"Lenders"***), and

(e)      GLAS Trust Company LLC, in its capacity as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the ***"Administrative Agent"***).

***Unless defined elsewhere herein, capitalized terms used in this Agreement shall have the meanings assigned to such terms in Exhibit I hereto.***

### *PRELIMINARY STATEMENTS*

WHEREAS, the Borrower has requested that the Lenders extend credit pursuant to a revolving loan facility (the "***Credit Facility***") in an aggregate maximum principal amount of $60,000,000; and

WHEREAS, the Lenders are willing to provide the Credit Facility, and the Lenders and the Administrative Agent are willing to enter into this Agreement, upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

### ARTICLE I.

### THE FACILITY

Section 1.1      <u>The Commitments</u>.  On the terms and subject to the conditions set forth in this Agreement, including, without limitation, the conditions set forth in Article IV:  (a) from time to time during the Revolving Period, Borrower may request Advances in accordance with Section 1.2, and (b) each of the Lenders, severally and not jointly, agrees to make a Loan in the principal amount equal to its Percentage of the requested Advance on the applicable Borrowing Date; *provided that* the Borrower shall at all times ensure that (i) the aggregate principal amount of any Lender's Loans at any one time outstanding may not exceed the lesser of (A) the amount of such Lender's Commitment hereunder, (B) such Lender's Percentage of the Borrowing Base, and (ii) in no event may the aggregate principal amount of all Loans outstanding hereunder at any time exceed the lesser of (A) the Facility Limit, and (B) the Borrowing Base at such time.  Each Lender's several Commitment shall automatically terminate on the Maturity Date (unless earlier terminated in accordance with the terms hereof).

*Credit Agreement*

735706711 19631142
28997904

Section 1.2      Requesting Advances.

(a)      If, on any Business Day during the Revolving Period, there is Borrowing Availability, Borrower may request an Advance by delivering to the Administrative Agent a written notice in the form set forth as Exhibit II-A hereto (each, a *"Borrowing Notice"*) not later than 12:00 noon (New York City time) three (3) Business Days prior to the proposed Borrowing Date of such Advance.  The initial Advance shall be subject to Sections 4.1 and 4.2 hereof, and all Advances (including the initial Advance) shall be subject to Section 4.3 hereof.  Each Borrowing Notice shall (i) be prepared by the Borrower based on the numbers set forth in the most recent Borrowing Base Certificate delivered to the Administrative Agent and the Lenders and based upon subsequent valuations of Eligible Inventory by the Servicer hereunder to the date of such Borrowing Notice, (ii) be irrevocable, (iii) specify the requested aggregate principal Advance amount (which shall be not less than $5,000,000), and (iv) specify the applicable Borrowing Date (which shall be a Business Day). On the Borrowing Date of each Advance, upon satisfaction of the applicable conditions precedent set forth in Article IV, each Lender shall initiate a wire transfer to the Administrative Agent's Account, in immediately available funds, no later than 1:00 p.m. (New York City time), in an amount equal to its Percentage of the principal amount of the Advance requested, and the Administrative Agent shall wire transfer the proceeds of each Lender's Loan to the Facility Account promptly upon its receipt thereof.  Borrower shall not request more than one (1) Advance in any two consecutive calendar weeks.  Each of the Borrower and Servicer agrees (i) that, from and after the Closing Date, the aggregate principal amount of all Loans outstanding hereunder shall not be less than the lesser of (x) $45,000,000 and (y) the Borrowing Base and (ii) to use its best efforts to maintain the Borrowing Base hereunder at all times in excess of $45,000,000.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Loans.

(b)      The Administrative Agent may assume that each Lender has made or will make the proceeds of its Loan comprising an Advance available to the Administrative Agent unless the Administrative Agent shall have been notified by such Lender at least one (1) hour before the time on which the Administrative Agent actually funds the Advance to Borrower (whether using its own funds pursuant to this Section 1.2 or using proceeds deposited with the Administrative Agent by the Lenders and whether such funding occurs before or after the time on which the Lenders are required to deposit the proceeds of their Loans with the Administrative Agent).  The Administrative Agent may, in reliance upon such assumption (but shall not be required to), make available to Borrower a corresponding amount of principal.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Advance. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such amount on demand from such Lender together with interest thereon, in respect of each day during the period commencing on the date such amount was made available to Borrower and ending on the date the Administrative Agent recovers such amount, at a rate per annum equal to (A) the Federal Funds Rate during the first three (3) days after such interest shall begin to accrue and (B) the Interest Rate in respect of such Loan after the end of such three (3) day period.

Section 1.3      Prepayment; Termination of Commitments. Mandatory Prepayment. So long as no Event of Default shall have occurred, if, on any date, an Overadvance exists, Borrower shall pay (or shall cause the Servicer to pay) and the Servicer shall pay to the Administrative Agent's Account not later than one (1) Business Day thereafter, for prompt distribution to the Lenders in accordance with their respective Percentages, an amount to be applied to reduce the aggregate principal amount of Loans, such that after giving effect to such payment, no Overadvance exists or is continuing.

735706711 19631142
28997904

(b)      Optional Prepayment. If, on any Business Day, Borrower wishes to make a voluntary prepayment with respect to the aggregate principal amount of Loans outstanding, Borrower shall deliver to each Lender an irrevocable written notice of such prepayment in the form set forth as Exhibit II-B hereto (each, a *"Prepayment Notice"*) by 12:00 noon (New York City time) one (1) Business Day prior to the date of the proposed prepayment.  Each Prepayment Notice shall designate (i) the Business Day upon which any such prepayment of aggregate principal amount of Loans shall occur (the *"Prepayment Date"*), (ii) the aggregate principal amount of Loans to be prepaid which shall not be less than $1,000,000 (the *"Aggregate Prepayment"*), and (iii) each Lender's Percentage of such Aggregate Prepayment.  On the Prepayment Date, Borrower shall pay to the Administrative Agent's Account for prompt distribution to each Lender such Lender's Percentage of each Aggregate Prepayment.  Only one (1) Prepayment Notice shall be outstanding at any time and no more than one (1) Prepayment Notice shall be delivered in any calendar week.  Prepayments hereunder shall be subject to Section 1.3(c) and Section 1.6.

(c)      Prepayment Fee. In the event that, on or prior to the date occurring fifteen (15) months after the Closing Date, the Borrower makes any payment of principal on the Loans in excess of the amount necessary to repay any Overadvance (other than pursuant to a refinancing of the facility evidenced by this Agreement in which the Lenders participate and shall have furnished their prior written consent), the Borrower shall pay to the Administrative Agent, for the ratable account of each of the applicable Lenders, a prepayment fee equal to 3.00% of the aggregate principal amount of the Loans so prepaid.  Such amounts shall be due and payable on the date of such payment.

(d)      Termination of Commitments. Borrower may, upon at least five (5) Business Days' irrevocable written notice to the Administrative Agent and the Lenders, permanently reduce in part, ratably amongst the Lenders in accordance with their respective Percentages, the unused portion of the Lenders' several Commitments and the Facility Limit; **provided** that each reduction of the Facility Limit shall be in an aggregate amount of not less than $1,000,000 and no such partial reduction shall reduce the Facility Limit to an amount less than $45,000,000.

Section 1.4      Payment Requirements.  The Borrower or the Servicer, as the case may be, shall initiate a wire transfer to the Administrative Agent's Account of amounts payable by it to the Administrative Agent or the Lenders no later than 2:00 p.m. (New York City time) on the Business Day when due in immediately available funds, and the Administrative Agent shall promptly forward to the Lenders their respective shares of the funds so received.  All computations of Interest and *per annum* Fees under the Transaction Documents shall be made on the basis of a year consisting of three hundred sixty (360) days for the actual number of days elapsed (or, in the case of Interest calculated by reference to the Prime Rate, three hundred sixty-five (365) days or, in the case of a leap year, three hundred sixty-six (366) days).  If any amount hereunder shall be payable on a day which is not a Business Day, such amount shall be payable on the next succeeding Business Day.

Section 1.5      Repayment.  Unless the Loans have been earlier accelerated or otherwise become due, the Borrower hereby unconditionally promises to pay to the Administrative Agent for the ratable account of the Lenders the then unpaid aggregate principal amount of the Loans, together with accrued and unpaid Interest and all other Obligations outstanding on the Maturity Date.

Section 1.6      Interest.

(a)      The outstanding principal balance of the Loans shall accrue Interest at a rate per annum equal to the applicable Interest Rate.

735706711 19631142
28997904

(b)      Accrued but unpaid Interest on each Loan shall be payable in arrears on each Payment Date; provided that (i) Interest accrued at the Default Rate shall be payable in cash on demand and (ii) in the event of any prepayment of any Loan, accrued but unpaid interest on the principal amount prepaid shall be payable on the date of such prepayment.

(c)      On each Payment Date, Borrower shall pay to the Administrative Agent for distribution to the Lenders in accordance with Article II their respective portions of such accrued and unpaid Interest.

(d)      In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Transaction Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Transaction Document.  The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

Section 1.7      [Reserved].

Section 1.8      Defaulting Lenders.

(a)      Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)      Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 12.1.

(ii)      Any payment of principal, Interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 12.3 shall be applied at such time or times as may be determined by the Administrative Agent as follows:  *first,* to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second,* as Borrower may direct (so long as no Event of Default or Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third,* if so determined by the Administrative Agent and Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth,* to the payment of any amounts owing to the Administrative Agent or the other Lenders as a result of any judgment of a court of competent jurisdiction obtained by the Administrative Agent or such other Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth,* so long as no Event of Default or Default exists, to the payment of any amounts owing to Borrower as a result of any judgment of a court of competent jurisdiction obtained by Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth,* to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loan in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Advance was made at a time when the conditions

<div align="center">4</div>
<div align="center">*Credit Agreement*</div>

735706711 19631142
28997904

set forth in Section 4.2 (with respect to the initial Advance) and 4.3 (with respect to any subsequent Advance) were satisfied, as applicable, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are funded and held by the Lenders pro rata in accordance with the Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 1.8(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)     No Defaulting Lender shall be entitled to receive any Unused Credit Facility Fee for any period during which that Lender is a Defaulting Lender (and Borrower shall not be required to pay any such Unused Credit Facility Fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)     If Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the other parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be funded on a pro rata basis by the Lenders in accordance with their respective Percentages, whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of Borrower while that Lender was a Defaulting Lender; and ***provided, further,*** that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 1.9     Designated Funding Offices.  Each Lender at its option may make any Loan or otherwise perform its obligations hereunder through any funding office (each, a ***"Designated Funding Office"***); ***provided*** that any exercise of such option shall not affect the obligation of Servicer to administer Collections received in the Collection Account in accordance with the terms of this Agreement.  Any Designated Funding Office shall be considered part of the applicable Lender; ***provided*** that such provisions that would be applicable with respect to Loans actually provided by an Affiliate or branch of such Lender shall apply to such Affiliate or branch of such Lender to the same extent as such Lender.

Section 1.10     Protective Advances.

(a)     Notwithstanding anything herein to the contrary and subject to the limitations set forth below, the Administrative Agent is authorized by the Borrower and the Lenders, from time to time, to make Loans to the Borrower, on behalf of all Lenders, which the Administrative Agent, in its Permitted Discretion (or at the direction of the Required Lenders), deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations, or (iii) to pay any other amount chargeable to or required to be paid by the Borrower pursuant to the terms of this Agreement, including payments of reimbursable expenses (including costs, fees, and expenses as described in Section 8.4) and other sums payable under the Transaction Documents (any of such Loans are herein referred to as "***Protective Advances***"); provided that, the aggregate amount of outstanding Protective Advances plus all the aggregate principal amount of Loans shall not exceed the Facility Limit.  Protective Advances may be made

5

*Credit Agreement*

735706711 19631142
28997904

even if the conditions precedent set forth in Section 4.02 or Section 4.03 have not been satisfied.  The Protective Advances shall be secured by the Liens in favor of the Administrative Agent in and to the Collateral and shall constitute Obligations hereunder.  All Protective Advances shall be treated as Advances.  The Administrative Agent's authorization to make Protective Advances may be revoked at any time by the Required Lenders.  Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof.  At any time that there is sufficient Borrowing Availability and the conditions precedent set forth in Section 4.03 have been satisfied, the Administrative Agent may request the Lenders to make a Loan to repay a Protective Advance.

(b)      Upon the making of a Protective Advance by the Administrative Agent (whether before or after the occurrence of an Event of Default), each Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Administrative Agent without recourse or warranty, an undivided interest and participation in such Protective Advance in proportion to its Percentage.  From and after the date, if any, on which any Lender is required to fund its participation in any Protective Advance purchased hereunder, the Administrative Agent shall promptly distribute to such Lender, such Lender's Percentage of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Protective Advance.

Section 1.11     Fees.

(a)      Commitment Fee. On the Closing Date, the Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Percentage of Commitment, a commitment fee (the "Commitment Fee") equal to one percent (1.00%) of the Aggregate Commitment.

(b)      Unused Credit Facility Fee.  The Borrower shall pay to the Administrative Agent for the account of each Lender an unused line fee (the "Unused Credit Facility Fee"), which shall accrue at a rate per annum equal to the Applicable Unused Credit Facility Fee Rate on the average daily amount of the undrawn portion of the Aggregate Commitment.  Accrued Unused Credit Facility Fees shall be payable in arrears on the first Business Day of each calendar month and on the Termination Date, commencing on the first such date to occur after the date hereof.

(c)      Administrative Fee.  The Borrower shall pay to the Administrative Agent an administrative fee (the "Administrative Fee"), equal to $50,000 per annum, payable on the Closing Date and on each anniversary thereof thereafter.

(d)      All fees payable hereunder shall be paid on the dates due, in Dollars and in immediately available funds, to the Administrative Agent for distribution to the applicable Lenders entitled thereto. The fees paid hereunder shall not be refundable under any circumstances.

Section 1.12     [Reserved].

Section 1.13     Inability to Determine Rates.  Subject to Section 1.15, if, on or prior to the first day of any Interest Period for any SOFR Loan:

(a)      the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Term SOFR" cannot be determined pursuant to the definition thereof, or the Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Term SOFR for any requested Interest Period

with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent, the Administrative Agent will promptly so notify the Borrower and each Lender.  Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Administrative Agent (at the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, (i) the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for an Advance of or conversion to ABR Loans in the amount specified therein and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into ABR Loans at the end of the applicable Interest Period.  Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 8.3. Subject to Section 1.15, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on ABR Loans shall be determined by the Administrative Agent without reference to clause (iii) of the definition of "Alternate Base Rate" until the Administrative Agent revokes such determination.

Section 1.14     Illegality.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to SOFR, the Term SOFR Reference Rate or Term SOFR, or to determine or charge interest based upon SOFR, the Term SOFR Reference Rate or Term SOFR, then, upon notice thereof by such Lender to the Borrower (through the Administrative Agent) (an "Illegality Notice"), (a) any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended, and (b) the interest rate on which ABR Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "ABR", in each case until each affected Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of an Illegality Notice, the Borrower shall, if necessary to avoid such illegality, upon demand from any Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans to ABR Loans (the interest rate on which ABR Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "ABR"), on the last day of the Interest Period therefor, if all affected Lenders may lawfully continue to maintain such SOFR Loans to such day, or immediately, if any Lender may not lawfully continue to maintain such SOFR Loans to such day, in each case until the Administrative Agent is advised in writing by each affected Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate or Term SOFR.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 8.3.

Section 1.15     Benchmark Replacement Setting.

(a)     Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Transaction Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Borrower may amend this Agreement to replace the then-current Benchmark with a

735706711 19631142
28997904

Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all affected Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders.  No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 1.15 will occur prior to the applicable Benchmark Transition Start Date.

(b)      <u>Benchmark Replacement Conforming Changes</u>.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Transaction Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Transaction Document.

(c)      <u>Notices; Standards for Decisions and Determinations</u>.  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 1.15 and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 1.15, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Transaction Document, except, in each case, as expressly required pursuant to this Section 1.15.

(d)      <u>Unavailability of Tenor of Benchmark</u>.  Notwithstanding anything to the contrary herein or in any other Transaction Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)      <u>Benchmark Unavailability Period</u>.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for an Advance, conversion to or continuation of SOFR Loans to be made, converted or continued during any

<div align="center">8

*Credit Agreement*</div>

735706711 19631142
28997904

Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for an Advance of or conversion to ABR Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Alternate Base Rate.

**ARTICLE II.**

**PAYMENTS AND COLLECTIONS**

Section 2.1    Collections during the Revolving Period.

(a)    Commencing on the Closing Date and ending on the Termination Date, any and all Collections (including proceeds of Inventory that are no longer Eligible Inventory for purposes of the Borrowing Base) received by the Borrower or the Servicer shall be deposited directly into a segregated account in the United States held in the name of the Borrower (the "Collection Account") maintained at a bank or other financial institution satisfactory to the Administrative Agent and the Lenders ("Collection Account Bank").  The Collection Account shall be under the control (as defined in Section 9-104 of the UCC) of the Administrative Agent and be subject to a Collection Account Control Agreement, providing for springing exclusive control by the Administrative Agent upon the occurrence and continuance of an Event of Default (which, for the avoidance of doubt, shall not be exercised by the Administrative Agent prior to an Event of Default).

(b)    So long as no Event of Default has occurred, the aggregate principal amount of Loans shall not be required to be paid during the Revolving Period except to the extent that (i) an Overadvance exists or (ii) a Prepayment Notice is delivered.

(c)    On each Payment Date, the Borrower shall, and shall cause the Servicer to, use all cash on deposit in the Collection Account to pay, in the following order of priority (the "Waterfall"):

       (i)    Any and all fees and expenses owed to the Administrative Agent;

       (ii)    Any and all unpaid fees and expenses owed to any Lender;

       (iii)    Any and all accrued and unpaid interest owed to any Lender

       (iv)    Any and all amounts necessary to maintain the Borrowing Base and related advance limits payable to any Lender;

       (v)    To the extent the Obligations have been accelerated or are otherwise due, all Obligations owed to the Lenders until all Obligations have been paid in full and the Commitment of all Lenders have terminated or expired; and

       (vi)    The Servicing Fee to the Servicer.

(d)    Subject to Section 5.1(ff), if, on any Payment Date during the Revolving Period on which there is no Default or Event of Default, there is cash remaining in the Collection Account after all amounts required to be paid pursuant to Section 2.1(b) and Section 2.1(c) have been paid, the Borrower may

*Credit Agreement*
735706711 19631142
28997904

withdraw such remaining amounts from the Collection Account; provided that, notwithstanding the foregoing, the Borrower shall not make any such withdrawal to the extent that the remaining cash in such Collection Account remaining thereafter is less than the sum of (a) $100,000 plus (b) the reasonably expected amount of interest that will become due hereunder on the then immediately following Payment Date.

(e)       If, on any Payment Date during the Revolving Period, there are insufficient funds in the Collection Account to pay all amounts required to be paid pursuant to Section 2.1(b) or Section 2.1(c), no new Advance shall be made until such amounts have been paid in full.

Section 2.2       [Reserved].

Section 2.3       Payment Rescission.  No payment of any of the Obligations shall be considered paid or applied hereunder to the extent that, at any time, all or any portion of such payment or application is rescinded by application of law or judicial authority, or must otherwise be returned or refunded for any reason.  Borrower shall remain obligated for the amount of any payment or application so rescinded, returned or refunded, and shall promptly pay to the Administrative Agent for distribution to the Lenders the full amount thereof together with any Interest thereon from the date of any such rescission, return or refunding.

Section 2.4       Currencies.

(a)       Conversion of Currencies.

(i)       If on any Payment Date or any other day a payment is due and payable hereunder it is necessary for funds in one currency to be converted into any other currency in order to make any payment required to be made hereunder, the Administrative Agent shall solicit offer quotations from at least two (2) foreign exchange dealers reasonably acceptable to the Administrative Agent for effecting such exchange and shall select the quotation which provides for the best exchange rate.  The Borrower or the Servicer on its behalf shall effect such exchange on such Payment Date or other day, as the case may be.

(ii)       On any day when any computation or calculation hereunder requires the aggregation of amounts denominated in more than one currency, all amounts that are denominated in an Alternative Currency shall be deemed to be the U.S. Dollar Equivalent thereof on such day for purposes of such computation or calculation.

## ARTICLE III.

### REPRESENTATIONS AND WARRANTIES

Section 3.1       Representations and Warranties of the Borrower.  Each of the Loan Parties (and, solely with respect to clauses (a), (b), (c), (e), (f), (g), (i), (j), (t), and (y) below, Holdings) hereby represents and warrants to the Administrative Agent and the Lenders as of the date hereof, as of each Payment Date and as of each Borrowing Date, that:

(a)       Organization and Qualification.  Each Loan Party and Holdings is a limited liability company duly organized, validly existing and in good standing under the Laws of Delaware.  Each Loan

10
*Credit Agreement*

735706711 19631142
28997904

Party and Holdings is duly qualified or licensed to do business as a foreign limited liability company and is in good standing in all jurisdictions in which the ownership of its properties or the nature of its activities or both makes such qualification or licensing necessary, where a failure to do so could reasonably be expected to have or result in a Material Adverse Effect.

(b)     Authority; No Conflict or Violation.  The execution, delivery and performance by each of the Loan Parties and Holdings of the Transaction Documents to which it is a party, the performance of its obligations under this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated in this Agreement and the other Transaction Documents to which it is a party, have been duly authorized by all necessary limited liability company action on the part of such Loan Party or Holdings, as applicable, and do not and will not (i) require any consent or approval of its member(s), or any authorization, consent, approval, order, filing, registration or qualification by or with any Governmental Authority, except those that have been obtained and are in full force and effect and except for the filings or notices as may be necessary to perfect the Security Interest granted pursuant to this Agreement, (ii) violate any provision of (A) any applicable Law or of any order, writ, injunction or decree presently in effect having applicability to any Loan Party and/or Holdings or (B) the Organizational Documents of each Loan Party and/or Holdings, (iii) result in a breach of or constitute a default under (A) any Transaction Document or (B) any indenture or loan or credit agreement or any other material agreement, lease or instrument to which each Loan Party and/or Holdings is a party or by which it or its properties may be bound or affected, or (iv) result in, or require, the creation or imposition of any Lien or other charge or encumbrance of any nature upon or with respect to any of the assets now owned or hereafter acquired by Borrower except, with respect to clauses (i), (ii)(A) and (iv) above, where the failure to so comply with any of the foregoing could not reasonably be expected to have a Material Adverse Effect.

(c)     Legal Agreements.  This Agreement and each of the other Transaction Documents to which each Loan Party and/or Holdings is a party have been duly authorized, executed and delivered by Borrower, and constitute the legal, valid and binding obligations of Borrower, enforceable against it in accordance with their respective terms, except to the extent that such enforcement may be limited by bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by general equitable principles.

(d)     Compliance with Laws.  Each Loan Party has complied with all applicable Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business or property, the non-compliance with which could reasonably be expected to have a Material Adverse Effect.  Except as would not reasonably be expected to have a Material Adverse Effect, no Loan Party (i) has failed to comply with any law (including common law), rule, regulation or ordinance applicable to the protection of the environment or human health or safety or applicable to hazardous or toxic materials, substances or wastes, pollutants or contaminants ("*Hazardous Materials*") ("*Environmental Laws*") or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to or received written notice of any claim of any liability pursuant to Environmental Laws, (iii) has had any actual or alleged release or presence of Hazardous Materials in violation of or giving rise to obligations under Environmental Laws on, at, under, to or migrating from any property or facility currently or formerly owned, leased or operated by any of the Loan Parties, or any of its Affiliates or Subsidiaries (or at which any of the Loan Parties or any of its Affiliates or Subsidiaries has arranged for or caused any release or disposal of Hazardous Materials), or (iv) has actual knowledge of any event or

735706711 19631142
28997904

circumstance which is reasonably expected to give rise to any liability of a Loan Party pursuant to Environmental Laws.

(e)     Margin Regulations.  Each Loan Party and Holdings is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of the Advances will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

(f)     Not an Investment Company; Volcker Rule.  Each Loan Party and Holdings (i) is not a "covered fund" under the Volcker Rule and (ii) is not required to register as, an "investment company" within the meaning of the Investment Company Act.  In determining that each Loan Party is not a "covered fund" under the Volcker Rule, each Loan Party relies on, and is entitled to rely on, the exemption from the definition of "investment company" set forth in Section 3(c)(5) of the Investment Company Act.

(g)     Solvency.  As of the date hereof, and immediately prior to and after giving effect to each Advance, each of the Loan Parties and Holdings is and will be Solvent.

(h)     Anti-Corruption Laws; Anti-Money Laundering Laws and Sanctions.

(i)     None of (A) of the Loan Parties, any Subsidiary or, to the knowledge of the Loan Parties, any of their respective directors, officers, employees or Affiliates, or (B) any agent or representative of the Loan Parties that will act in any capacity in connection with or benefit from the Transaction Documents, (I) is a Sanctioned Person, (II) to the extent in violation of any Sanctions, has its assets located in a Sanctioned Country, (III) is under administrative, civil or criminal investigation for an alleged violation of, or during the past five (5) years received notice from or made a voluntary disclosure to any governmental entity regarding a possible violation of, Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions by a governmental authority that enforces Sanctions or any Anti-Corruption Laws or Anti-Money Laundering Laws, or (IV) to the extent in violation of any Sanctions, directly or indirectly derives revenues from investments in, or transactions with, Sanctioned Persons.

(ii)     Each of the Loan Parties has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance by the Loan Parties and their respective directors, officers, employees, and agents with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(iii)     Each of the Loan Parties, and to the knowledge of its respective directors, officers, employees, agents and Affiliates, is in compliance with applicable Anti-Corruption Laws, Anti-Money Laundering Laws in all respects and applicable Sanctions.

(iv)     No proceeds of any Advance have been used, directly or indirectly, by the Loan Parties or any of its or their respective directors, officers, employees and agents in violation of Section 5.2(h).

735706711 19631142
28997904

(i)      Places of Business and Locations of Records.  Each Loan Party's and Holdings' principal place of business, chief executive office and the other locations (if any) where its Records are located are at the addresses listed on Exhibit III.

(j)      Names and Identification Numbers.  None of the Loan Parties nor Holdings has not used any legal names, trade names or assumed names other than the name in which it has executed this Agreement.  Each Loan Party's Federal Employer Identification Number and State of Organization and ID Number are correctly set forth on Exhibit III.

(k)      No Borrower Subsidiaries.  The Borrower does not own any Capital Stock issued by any other Person.

(l)      Ownership of SPEs.

(i)      Ownership of Borrower.  Parent owns, directly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of the Borrower, free and clear of any Adverse Claim.  All Capital Stock issued by Borrower are validly issued and there are no options, warrants or other rights to acquire membership interests of Borrower.

(ii)      Ownership of Holdings.  First Brands Parent owns, directly or indirectly, a majority of the issued and outstanding Capital Stock and all other equity interests of the Holdings, free and clear of any Adverse Claim.  All Capital Stock issued by Holdings are validly issued and there are no options, warrants or other rights to acquire Capital Stock of Holdings.

(iii)      Ownership of Servicer.  First Brands Parent owns, directly or indirectly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of the Servicer, free and clear of any Adverse Claim.  All Capital Stock issued by Servicer are validly issued and there are no options, warrants or other rights to acquire Capital Stock of Servicer.

(iv)      Ownership of BPI.  First Brands Parent owns, directly or indirectly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of BPI, free and clear of any Adverse Claim.  All Capital Stock issued by BPI are validly issued and there are no options, warrants or other rights to acquire membership interests of BPI.

(v)      Ownership of Maquiladoras.  First Brands Parent owns, directly or indirectly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of each Maquiladora, free and clear of any Adverse Claim.  All Capital Stock issued by each Maquiladora are validly issued and there are no options, warrants or other rights to acquire membership interests of any Maquiladora.

(m)      Good Title.  Each Loan Party is the legal and beneficial owner of its Collateral free and clear of any Lien except for Permitted Liens.

13
*Credit Agreement*

735706711 19631142
28997904

(n)    Real Property.  Except as set forth on Schedule 3.1(n), none of the Loan Parties owns or leases any real property.

(o)    Security Interest in Collateral.  The Security Documents are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and enforceable first priority liens and security interests under the laws of the United States and Mexico, as applicable, in the Collateral as further described therein and proceeds thereof as security for the Obligations, in each case prior and superior in right to any other Person (except Permitted Liens).

(i)    Perfection in the U.S.  Assuming the filing of the financing statement approved by Borrower on the date hereof, this Agreement, together with such financing statement, is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a valid and perfected Security Interest in the Collateral, free and clear of any Lien except for Permitted Liens.

(ii)    Perfection in Mexico. Assuming that, on the date hereof, the Mexican Security Agreement was executed before a Mexican Notary Public and it is registered before the RUG as provided herein, this Agreement, together with the Mexican Security Agreement, is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a valid and perfected Security Interest in the Collateral, free and clear of any Lien except for Permitted Liens.

(p)    The Collection Account.

(i)    Nature of Collection Account. The Collection Account constitutes a "deposit account" within the meaning of the applicable UCC.

(ii)    Ownership. The Collection Account is in the name of the Borrower, and the Borrower owns and has good and marketable title to the Collection Account free and clear of any Adverse Claim.

(iii)    Control Agreements. The Collection Account is subject to a Collection Account Control Agreement.  Borrower has not granted any Person (other than the Administrative Agent, the Servicer and their respective assigns) access to or control of any such Collection Account, or the right to take dominion and control of any such Collection Account at a future time or upon the occurrence of a future event.  To the extent that funds other than Collections are deposited into the Collection Account, Borrower or the Servicer can promptly trace and identify which funds constitute Collections.

(iv)    Perfection. The Administrative Agent has "control" (as defined in Section 9-104 of the UCC) over the Collection Account.

(q)    Compliance with USMCA.  Each of the Loan Parties has complied in all material respects with the United States-Mexico-Canada Agreement ("USMCA").  The Loan Parties and their Affiliates have obtained full benefits under the USMCA in respect of tariff and tax issues.

(r)    Enforceability of Contracts.  Each Contract with respect to the purchase and sale of Inventory is effective to create, and has created, a valid and binding obligation of the non-Loan Party counterparty party thereto, enforceable against such party in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws

735706711 19631142
28997904

relating to or limiting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(s)      Bulk Sales Act.  No transaction contemplated by any Transaction Document will require compliance by it or any of the Loan Parties with any bulk sales act or similar law.

(t)      Accuracy of Information.  Each Loan Party and Holdings has disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No written information heretofore furnished by the Loan Parties and/or Holdings to the Administrative Agent or any of the Lenders for purposes of or in connection with this Agreement or any transaction contemplated hereby contains, and no such written information hereafter furnished by the Loan Parties and/or Holdings to the Administrative Agent or any of the Lenders, will contain, any material misstatement of fact or omit to state any material fact necessary to make such information not materially misleading in light of the circumstances under which made.

(u)      Material Adverse Effect.  The Loan Parties have previously delivered to the Administrative Agent such financial statements for the Loan Parties and their Affiliates as requested by the Administrative Agent and the Lenders.  Since December 31, 2021, no event has occurred that could reasonably be expected to have a Material Adverse Effect.

(v)      Purchase and Sale of Inventory.  With respect to each Contract for the purchase and sale of Inventory, (i) Borrower has given reasonably equivalent value to the seller and/or purchaser counterparty, as applicable, in consideration therefor and such transfer was not made for or on account of an antecedent debt and (ii) such seller and/or purchaser counterparty, as applicable, has given reasonably equivalent value to the Borrower in consideration therefor and such transfer was not made for or on account of an antecedent debt.  No transfer by the Borrower to any purchaser and/or seller counterparty, as applicable, under the applicable Contract is or may be voidable under any section of the Federal Bankruptcy Code or any other applicable Law.  No transfer by any purchaser and/or seller counterparty, as applicable, under the applicable Contract is or may be voidable under any section of the Federal Bankruptcy Code or any other applicable Law.

(w)      Financial Information.  All balance sheets, all statements of income and of cash flow and all other financial information of the Loan Parties furnished to the Administrative Agent or any of the Lenders and described in Section 5.1 have been or will be prepared in accordance with GAAP and do or will present fairly in all material respects the financial condition and results of operations of the Loan Parties, as at such dates and for such periods in accordance with GAAP, subject, in the case of unaudited financial statements, to changes resulting from normal year-end audit adjustments and the absence of footnotes.

(x)      No Event of Default.  No event has occurred and is continuing and no condition exists, that constitutes or may reasonably be expected to constitute an Event of Default or Default.

(y)      Taxes.  Each of the Loan Parties and Holdings has (i) timely filed all federal and other material tax returns required to be filed by it and (ii) paid, or caused to be paid, all federal and other material taxes, assessments and other governmental charges, if any, other than taxes, assessments and other governmental charges being contested in good faith by appropriate proceedings and as to which adequate reserves have been provided in accordance with GAAP.

<div align="center">15</div>

<div align="center">*Credit Agreement*</div>

735706711 19631142
28997904

<div align="center">**JOINT EXHIBIT NO. 18**
**Page 31 of 812**</div>

(z)      Tax Status.  Each of the Loan Parties (i) is, and shall at all relevant times continue to be, a "disregarded entity" within the meaning of U.S. Treasury Regulation § 301.7701-3 for U.S. federal income tax purposes that is wholly owned by a United States person (within the meaning of Section 7701(a)(30) of the Code), (ii) is not and will not at any relevant time become an association (or publicly traded partnership) taxable as a corporation for U.S. federal income tax purposes and (iii) does not have tax residence or is otherwise subject to tax in any jurisdiction outside the United States.

(aa)      Opinions.  The facts regarding the Loan Parties, the Collateral, and the related matters set forth or assumed in each of the Opinions of counsel delivered in connection with this Agreement and the Transaction Documents are true and correct in all material respects.

(bb)      ERISA Compliance.

(i)      Each Pension Plan is in compliance in form and operation with its terms and with ERISA, the Code and other applicable Laws and regulations, except where any failure to comply could not reasonably be expected to have a Material Adverse Effect;

(ii)      (A) no ERISA Event has occurred other than as would not have a Material Adverse Effect and (B) none of the Loan Parties or ERISA Affiliates has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, except as would not reasonably be expected to have a Material Adverse Effect; and

(iii)      None of the Loan Parties and none of the Collateral constitutes "plan assets" of a benefit plan investor (within the meaning of 29 CFR 2510.3-101, as modified by Section 3(42) of ERISA).

(cc)      Litigation and Other Proceedings.  (i)  There is no action, suit, proceeding or investigation pending (including without limitation, any environmental claims) or, to the best knowledge of the Borrower, threatened, against any Loan Party before any Governmental Authority and (ii) no Loan Party is subject to any order, judgment, decree, injunction, stipulation or consent order of or with any Governmental Authority (including without limitation, relating to any environmental liability).

(dd)      Labor Matters.  There are no strikes, lockouts or slowdowns against any of the Loan Parties pending or, to the knowledge of any Loan Party, threatened in writing by any labor union or labor organization purporting to act as exclusive bargaining representative of employees of any Loan Party.

(ee)      Beneficial Ownership Certification.  As of the Closing Date, all of the information included in the Beneficial Ownership Certification is true and correct.

(ff)      Burdensome Agreements.  No Loan Party is a party to or bound by, nor are any of the properties or assets owned by any Loan Party used in the conduct of their respective businesses affected by, any agreement, ordinance, resolution, decree, bond, note, indenture, order or judgment (including, without limitation, any of the foregoing relating to any environmental liability).

(gg)      Insurance.  Schedule 3.1(gg) sets forth a description of all insurance maintained by or on behalf of the Loan Parties as of the Closing Date.  As of the Closing Date, no premiums in respect of such insurance are overdue.

16
*Credit Agreement*

735706711 19631142
28997904

(hh)   <u>Swap Agreements</u>.  None of the Loan Parties is a party to any Swap Agreement.

(ii)   <u>Affiliate Transactions</u>.  All purchases, sales and other transfers of Inventory between any of the Loan Parties and any of its Affiliates are made at fair market value and pursuant to arm's-length transactions.  Any and all servicing arrangements between any Loan Party and Servicer have been disclosed to the Lenders.

(jj)   <u>Maquiladora Agreements</u>.

(A)   Each Maquiladora Agreement is effective to create, and has created, a valid and binding obligation of each Maquiladora, enforceable against such party in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws relating to or limiting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(B)   Neither Loan Party, BPI and/or the Maquiladoras has received any written notice of any pending or threatened proceedings that could reasonably be expected to (i) have an adverse effect on any provision contained in each Maquiladora Agreement, or (ii) affect the enforceability, validity, and legality of each Maquiladora Agreement.

(C)   Neither Loan Party, BPI and/or the Maquiladoras is aware of any facts or conditions that could reasonably be expected to cause or permit any of such licenses or permits to be voided, revoked or withdrawn.  The Loan Parties and/or BPI, as applicable, own, and shall at all times continue to own, any and all Inventory located at the maquiladora location indicated in each Maquiladora Agreement.

(D)   Each Loan Party and the Servicer shall cause BPI to ensure that each Maquiladora has all federal, state, local and other licenses and permits (including without limitation, export and import licenses, records and filings) required to be maintained in connection with each Maquiladora Agreement, and all such licenses and permits are valid and in full force and effect.  Each Loan Party and the Servicer shall cause BPI to ensure that each Maquiladora complies with the requirements of such licenses and permits in all respects, and has received no written notice of any pending or threatened proceedings for the suspension, termination, revocation or limitation thereof.

(kk)   <u>Use of Proceeds</u>.  The Loan Parties shall use the proceeds of all Advances in accordance with Section 5.2(h).

(ll)   <u>Equity Interests</u>. No Capital Stock issued by the Borrower incorporated, formed or otherwise organized in the United States (or any state, province, territory or similar jurisdiction therein) is (i) represented by one or more certificates or (ii) subject to an election made by on behalf of the Borrower to have such Capital Stock constitute securities governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and/or any other applicable jurisdiction.

(mm)   <u>Valuation</u>.  At all times, 90% of the value of the Eligible Inventory at such time (valued at all times hereunder at the Borrower's cost, determined in accordance with GAAP) exceeds the aggregate

17

*Credit Agreement*

735706711 19631142
28997904

principal amount of the Loans outstanding at such time, and the Fair Market Value of such Eligible Inventory shall at all times exceed such GAAP cost.  For the avoidance of doubt, the foregoing determination shall also be made by the Borrower and Servicer taking into account any and all reserves, offsets and similar items with respect to any of the foregoing items from time to time.

(nn)    Manufacturing Agreement.  The Manufacturing Agreement is effective to create, and has created, a valid and binding obligation of BPI, enforceable against such party in accordance with its terms.

Section 3.2    Representations and Warranties of the Servicer.  The Servicer hereby represents and warrants to the Administrative Agent and the Lenders as of the date hereof, as of each Payment Date and as of each Borrowing Date, that:

(a)    Organization and Qualification.  The Servicer is a limited liability company duly organized, validly existing and in good standing under the Laws of Delaware.  The Servicer has obtained all necessary licenses and approvals in all jurisdictions in which the conduct of its business as required by this Agreement requires such qualification, licenses or approvals where a failure to do so would reasonably be expected to have or result in a Material Adverse Effect.

(b)    Authority; No Conflict or Violation.  The execution, delivery and performance by the Servicer of the Transaction Documents to which it is a party, the performance of its obligations under this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated in this Agreement and the other Transaction Documents to which it is a party, have been duly authorized by all necessary corporate action on the part of the Servicer and do not and will not (i) require any consent or approval of its Board of Directors, or any authorization, consent, approval, order, filing, registration or qualification by or with any Governmental Authority, except those that have been obtained and are in full force and effect, (ii) violate any provision of (A) any applicable Law or of any order, writ, injunction or decree presently in effect having applicability to the Servicer or (B) the Organizational Documents of the Servicer, (iii) result in a breach of or constitute a default under (A) any Transaction Document or (B) any indenture or loan or credit agreement or any other material agreement, lease or instrument to which the Servicer is a party or by which it or its properties may be bound or affected, or (iv) result in, or require, the creation or imposition of any Lien or other charge or encumbrance of any nature upon or with respect to any of the assets now owned or hereafter acquired by the Servicer except, with respect to clauses (i), (ii)(A) and (iv) above, where the failure to so comply with any of the foregoing could not reasonably be expected to have a Material Adverse Effect.

(c)    Legal Agreements.  This Agreement and each of the other Transaction Documents to which the Servicer is a party have been duly authorized, executed and delivered by the Servicer, and constitute the legal, valid and binding obligations of the Servicer, enforceable against it in accordance with their respective terms, except to the extent that such enforcement may be limited by bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by general equitable principles.

(d)    Anti-Corruption Laws; Anti-Money Laundering Laws and Sanctions.

(i)    None of (A) the Servicer, any Subsidiary or, to the knowledge of the Servicer or such Subsidiary, any of their respective directors, officers, employees or Affiliates, or (B) any agent or representative of the Servicer or any Subsidiary that will act in any capacity in connection with or benefit from the Transaction Documents, (I) is a Sanctioned Person, (II) to the extent in violation

18

*Credit Agreement*

735706711 19631142
28997904

**JOINT EXHIBIT NO. 18**
**Page 34 of 812**

of any Sanctions, has its assets located in a Sanctioned Country, (III) is under administrative, civil or criminal investigation for an alleged violation of, or during the past five (5) years received notice from or made a voluntary disclosure to any governmental entity regarding a possible violation of, Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions by a governmental authority that enforces Sanctions or any Anti-Corruption Laws or Anti-Money Laundering Laws, or (IV) to the extent in violation of any Sanctions, directly or indirectly derives revenues from investments in, or transactions with, Sanctioned Persons.

(ii)     Each of the Servicer and its Subsidiaries has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance by the Servicer and its Subsidiaries and their respective directors, officers, employees and agents with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(iii)     Each of the Servicer and its Subsidiaries, and to the knowledge of the Servicer, director, officer, employee, agent and Affiliate of the Servicer and each such Subsidiary, is in compliance with applicable Anti-Corruption Laws, Anti-Money Laundering Laws in all respects and applicable Sanctions.

(iv)     No proceeds of any Advance have been used, directly or indirectly, by the Servicer, any of its Subsidiaries or any of its or their respective directors, officers, employees or agents in violation of Section 5.2(h).

(e)     Information.  No written information furnished by the Servicer to the Administrative Agent or any Lender for purposes of or in connection with this Agreement and the transactions contemplated hereby contains any material misstatement of fact or omits to state any material fact necessary to make such information taken as a whole not materially misleading in light of the circumstances under which made.

(f)     Collections.  Servicer has directed each Qualified Purchaser to make payments of Collections on the sale of Collateral (including Inventory) directly to the Collection Account.  The conditions and requirements set forth in Section 5.1(v) and Section 6.2 have at all times been satisfied and duly performed in all material respects by the Loan Parties or the Servicer.  To the extent that funds other than Collections of Collateral are deposited into the Collection Account, the Servicer can promptly trace and identify which funds constitute Collections of Collateral.  To the extent that Collections of Collateral are deposited into any bank account other than the Collection Account, the Servicer can promptly trace and identify which funds deposited into such bank account constitute Collections of the Collateral.  It is understood and agreed that, notwithstanding anything herein to the contrary, any mutual obligations in connection with any Purchase Agreement or Sale Agreement of any Loan Party, on the one hand, and BPI, on the other hand (including, for the avoidance of doubt, any payment obligations owing to by BPI under any Sale Agreement) shall be subject to offset between such parties of such mutual obligations.

(g)     Compliance with USMCA.  Servicer has complied in all material respects with the United States-Mexico-Canada Agreement ("USMCA").  Servicer and its Affiliates have obtained full benefits under the USMCA in respect of tariff and tax issues.

735706711 19631142
28997904

(h)      Compliance with Laws.  The Servicer has complied with all applicable Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business or property, the non-compliance with which could reasonably be expected to have a Material Adverse Effect.

(i)      Servicing Programs.  No license or approval is required for the Administrative Agent's use of any software or other computer program used by the Servicer, other than those which have been obtained and are in full force and effect.

(j)      Servicing.  Since the Closing Date there has been no material adverse change in the ability of the Servicer or any Sub-Servicer to perform its duties and obligations set forth in Article VI hereof.

(k)      No Event of Default.  No event has occurred and is continuing and no condition exists, that constitutes or may reasonably be expected to constitute an Event of Default or Default.

(l)      Material Adverse Effect.  The Loan Parties have previously delivered to the Administrative Agent such financial statements for the Loan Parties and their Affiliates as requested by the Administrative Agent and the Lenders.  Since December 31, 2021, no event has occurred that could reasonably be expected to have a Material Adverse Effect.

(m)      Opinions.  The facts regarding the Loan Parties, the Collateral, and the related matters set forth or assumed in each of the Opinions of counsel delivered in connection with this Agreement and the Transaction Documents are true and correct in all material respects.

(n)      ERISA Compliance.

(i)      Each Pension Plan is in compliance in form and operation with its terms and with ERISA, the Code and other applicable Laws and regulations, except where any failure to comply could not reasonably be expected to have a Material Adverse Effect;

(ii)      (A) no ERISA Event has occurred other than as would not have a Material Adverse Effect and (B) none of the Loan Parties or ERISA Affiliates has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, except as would not reasonably be expected to have a Material Adverse Effect; and

(iii)      None of the Loan Parties or the Collateral constitutes "plan assets" of a benefit plan investor (within the meaning of 29 CFR 2510.3-101, as modified by Section 3(42) of ERISA).

(o)      Litigation and Other Proceedings.  There is no action, suit, proceeding or investigation pending, or to the Servicer's knowledge threatened, against the Servicer before any Governmental Authority: (i) asserting the invalidity of this Agreement or any of the other Transaction Documents; (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement or any other Transaction Document; or (iii) seeking any determination or ruling that could materially and adversely affect the performance by the Servicer of its obligations under, or the validity or enforceability of, this Agreement or any of the other Transaction Documents.

(p)      Affiliate Transactions.  All purchases, sales and other transfers of Inventory between any of the Loan Parties and any of its Affiliates are made at fair market value and pursuant to arm's-length

735706711 19631142
28997904

transactions.  Any and all servicing arrangements between any Loan Party and Servicer have been disclosed to the Lenders.

(q)    <u>Accuracy of Information</u>. The Servicer has disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No written information heretofore furnished by the Servicer to the Administrative Agent or any of the Lenders for purposes of or in connection with this Agreement or any transaction contemplated hereby contains, and no such written information hereafter furnished by the Servicer to the Administrative Agent or any of the Lenders, will contain, any material misstatement of fact or omit to state any material fact necessary to make such information not materially misleading in light of the circumstances under which made.

(r)    <u>Financial Information</u>.  All balance sheets, all statements of income and of cash flow and all other financial information of the Loan Parties furnished to the Administrative Agent or any of the Lenders and described in <u>Section 5.1</u> have been or will be prepared in accordance with GAAP and do or will present fairly in all material respects the financial condition and results of operations of the Loan Parties, as at such dates and for such periods in accordance with GAAP, subject, in the case of unaudited financial statements, to changes resulting from normal year-end audit adjustments and the absence of footnotes.

(s)    <u>Valuation</u>.  At all times, 90% of the value of the Eligible Inventory at such time (valued at all times hereunder at the Borrower's cost, determined in accordance with GAAP) exceeds the aggregate principal amount of the Loans outstanding at such time, and the Fair Market Value of such Eligible Inventory shall at all times exceed such GAAP cost.  For the avoidance of doubt, the foregoing determination shall also be made by the Borrower and Servicer taking into account any and all reserves, offsets and similar items with respect to any of the foregoing items from time to time.

**ARTICLE IV.**
**CONDITIONS OF CLOSING AND ADVANCES**

Section 4.1    <u>Conditions Precedent to Closing</u>.  The effectiveness of this Agreement is subject to the conditions precedent that:

(a)    <u>Transaction Documents</u>.  The Administrative Agent shall have received all of the following Transaction Documents (together with the schedules and exhibits thereto, if any), each of which shall be originals or electronic copies, unless otherwise specified, each executed by a Responsible Officer of the signing Loan Party (where execution is applicable), each dated as of the Closing Date (unless otherwise specified) (or, in the case of certificates of governmental officials, a recent date before the Closing Date):

(i)    this Agreement;

(ii)    U.S. Security Agreement;

(iii)    Mexican Security Agreement;

21
*Credit Agreement*

**JOINT EXHIBIT NO. 18**
**Page 37 of 812**

(iv)     each promissory note, substantially in the form attached hereto as Exhibit VII, requested by a Lender (with originals to be mailed to counsel for the Administrative Agent and Lenders within two (2) Business Days after the Closing Date);

(v)     the Purchase Agreement;

(vi)     the Sale Agreement; and

(vii)     the Manufacturing Agreement.

(b)     Secretary's Certificate and Attachments.  The Administrative Agent shall have received a copy of an executed certificate from the secretary or assistant secretary (or another officer authorized to provide such certificate) of each Loan Party, together with all applicable attachments, certifying as to the following:

(i)     Organizational Documents.     Attached thereto is a copy of each Organizational Document of such Loan Party originally executed and delivered by each party thereto and, to the extent applicable, certified as of a recent date by the appropriate governmental official.

(ii)     Signature and Incumbency.  Set forth therein are the signature and incumbency of the officers or other authorized representatives of such Loan Party executing the Transaction Documents to which it is a party.

(iii)     Resolutions.  Attached thereto are copies of resolutions of the board of directors, board of managers or functional equivalent of such Loan Party approving and authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party, or by which it or its assets may be bound as of the Closing Date and approving the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Transaction Documents to which such Loan Party is a party or is to be a party on the Closing Date, certified as of the Closing Date as being in full force and effect without modification or amendment.

(iv)     Good Standing Certificates.     Attached thereto is a good standing certificate from the applicable Governmental Authority of such Loan Party's jurisdiction of incorporation, organization or formation, each dated a recent date prior to the Closing Date.

(c)     Borrowing Notice; Flow of Funds Memorandum.  The Administrative Agent shall have received a fully executed and delivered Borrowing Notice, no later than (i) 11:00 a.m. (ET) two (2) Business Days prior to the Closing Date (or such shorter period as may be agreed to by the Administrative Agent and the Lenders), together with a customary direction letter attaching a flow of funds memorandum with respect to the transactions contemplated by the Transaction Documents to occur as of the Closing Date.

(d)     Closing Date Certificate and Attachments.  The following shall have occurred (or shall occur concurrently with the making of the Advance on the Closing Date), and the Administrative Agent shall have received an executed Closing Date certificate, together with all applicable attachments, certifying as to the following:

22
*Credit Agreement*

735706711 19631142
28997904

(i)      the representations and warranties set forth in <u>Article III</u> are true and correct in all material respects on and as of Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall remain true and correct in all material respects as of such earlier date;

(ii)      no event has occurred and is continuing, or would result from such Advance, that constitutes a Default or Event of Default;

(iii)      the most recently delivered Borrowing Base Certificate does not show that an Overadvance exists or will result from such Advance; and

(iv)      no Overadvance exists or will result from such Advance.

(v)      <u>Material Adverse Effect</u>.  Since December 31, 2021, no event, effect, occurrence, fact, condition, change or development shall have occurred that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)      <u>Collateral</u>.  The Administrative Agent shall have received:

(i)      <u>Lien Searches</u>.  The results of a recent search, by a Person reasonably satisfactory to the Administrative Agent, of all effective UCC financing statements (or equivalent filings) made with respect to any personal or mixed property of any Loan Party in the appropriate jurisdictions, together with copies of all such filings disclosed by such search.

(ii)      <u>UCC Financing Statements</u>.  Copies of proper financing statements, filed or duly prepared for filing under the UCC in all United States jurisdictions that the Administrative Agent may deem reasonably necessary in order to perfect and protect the Liens created under the Security Documents on assets of each Loan Party that is party to the Security Documents, covering the Collateral described therein.

(iii)      <u>Mexican Security Agreement</u>. Evidence that the Mexican Security Agreement has been registered in the RUG within three (3) Business Days following the Closing Date.

(f)      <u>Financial Statements</u>.  The Administrative Agent and the Lenders shall have received:

(i)      financial statements and annual reports of the type set forth in Section 5.1(b) and Section 5.1(c) for the Fiscal Year ended December 31, 2021, and

(ii)      a quarterly report of the type set forth in Section 5.1(d) for the Fiscal Quarter ended March 31, 2022.

(g)      <u>Opinions of Counsel to Loan Parties</u>.  The Administrative Agent and the Lenders shall have received (the items in sub-clauses (i) through (iv), collectively, the "***Opinions***"):

735706711 19631142
28997904

(i)	an opinion of Baker McKenzie, as U.S. counsel for the Loan Parties, in form and substance satisfactory to the Administrative Agent and the Lenders, dated as of the Closing Date;

(ii)	a true sale opinion of Paul Hastings, LLP, as U.S. counsel for the Loan Parties, in form and substance satisfactory to the Administrative Agent and the Lenders, dated as of the Closing Date;

(iii)	a non-consolidation opinion of Paul Hastings, LLP, as U.S. counsel for the Loan Parties, in form and substance satisfactory to the Administrative Agent and the Lenders, dated as of the Closing Date; and

(iv)	an opinion of Baker McKenzie Abogados, S.C., as Mexican counsel for the Loan Parties, in form and substance satisfactory to the Administrative Agent and the Lenders, dated as of the Closing Date, as to the Mexican Security Agreement and any other transaction documents governed by the laws of Mexico, in form and substance satisfactory to the Administrative Agent and the Lenders, dated as of the Closing Date.

(h)	Fees.

(i)	The Borrower shall have paid (or shall cause to be paid from the proceeds of funding on the Closing Date) to the Administrative Agent, the Lenders and the Servicer such fees payable to each such Person on the Closing Date pursuant to the terms hereof to the extent due and invoiced on or prior to the Closing Date; and

(ii)	Upon execution of this Agreement, the Servicer shall have paid (x) to the Lenders an initial work fee (the "***Work Fee***") equal to $100,000 and (y) to Helios Strategic Advisors, LLC the Broker Fee from the Servicer.

(i)	Solvency.  The Administrative Agent shall have received a copy of the executed Solvency Certificate, in the form of Exhibit IV attached hereto.

(j)	"Know-Your-Customer", Etc.  The Administrative Agent shall have received not less than three (3) Business Days prior to the Closing Date (or such shorter period as the Administrative Agent may agree) all such documentation and other information required by regulatory authorities under any "know-your-customer" Laws or Anti-Money Laundering Laws in order to allow the Lenders to comply therewith.

(k)	Holdings Closing Date Certification.  The Administrative Agent shall have received a closing date certificate executed by a Responsible Officer of Holdings that, as of the Closing Date, the net equity value of Holdings exceeds the Holdings Minimum Equity Value.

Section 4.2	Conditions Precedent to Initial Advance.  The initial Advance under this Agreement may be made on or after the Closing Date and is subject to the conditions precedent that (a) the conditions in Section 4.1 have been satisfied and (b) the Administrative Agent and the Lenders shall have received fees and expenses required to be paid as of such date pursuant to the terms of this Agreement for which Borrower has received an invoice as of the Closing Date.

735706711 19631142
28997904

Section 4.3     Conditions Precedent to All Advances.  Each Advance shall be subject to the conditions precedent that (a) the Servicer shall have delivered to the Lenders on or prior to the intended Borrowing Date of such Advance, in form satisfactory to the Administrative Agent, financial statements and other financial reporting as due on or before the applicable Borrowing Date under Section 6.6, (b) the Maturity Date shall not have occurred, (c) the Administrative Agent shall have received a Borrowing Notice pursuant to Section 1.2 and (d) on the applicable Borrowing Date, the following statements shall be true (and acceptance of the proceeds of such Advance shall be deemed a representation and warranty by Borrower that such statements are then true):

(i)     the representations and warranties set forth in Article III are true and correct in all material respects on and as of the Borrowing Date of such Advance as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall remain true and correct in all material respects as of such earlier date;

(ii)     no event has occurred and is continuing, or would result from such Advance, that constitutes a Default or Event of Default;

(iii)     the most recently delivered Borrowing Base Certificate does not show that an Overadvance exists or will result from such Advance, unless the Borrower has made a payment to the Lenders to reduce the aggregate principal of Loans in an amount equal to the Overadvance; and

(iv)     no Overadvance exists or will result from such Advance.

(v)     The Borrower is Solvent immediately prior to and after giving effect to each Advance and the use of the proceeds thereof.

**ARTICLE V.**

**COVENANTS**

Section 5.1     Affirmative Covenants.  Until the Termination Date:

(a)     Financial Accounting Practices.  Each of the Loan Parties and Servicer shall make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect in all material respects its transactions and dispositions of its assets and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (x) transactions are recorded as necessary (A) to permit preparation of financial statements in conformity with GAAP and (B) to maintain accountability for assets and (y) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(b)     Loan Party Annual Financial Statements.  As soon as practicable, and in any event within ninety (90) days after the close of each fiscal year, Borrower will furnish to the Administrative Agent and the Lenders the unaudited balance sheet and statements of income, changes in member's equity and cash flows for such fiscal year, certified by a Responsible Officer of Borrower as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Loan Parties.

<div align="center">25<br><em>Credit Agreement</em></div>

735706711 19631142
28997904

(c)      Annual Reports.  Within five (5) Business Days after the same are provided to the agent or lenders under each of the ABL Credit Agreement and the Term Loan Credit Agreement, and in any event within one hundred (100) days after the close of each fiscal year of the Servicer, Servicer shall furnish to the Administrative Agent and the Lenders a consolidated balance sheet of Servicer and its consolidated Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of Cohen & Co. or any other independent certified public accountant of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit, together with, to the extent provided to the lenders under the ABL Credit Agreement and/or the Term Loan Credit Agreement, a customary management's discussion and analysis of financial information. The foregoing shall be provided together with a certification by the Servicer that there has been no material adverse effect to the Servicer's brake products segment from the prior brake products segment information furnished to the Administrative Agent and Lenders hereunder pursuant to Section 5.1(k)(ii).

(d)      Quarterly Reports.  Within five (5) Business Days after the same are provided to the agent or lenders under each of the ABL Credit Agreement and the Term Loan Credit Agreement, and in any event within fifty-five (55) days after the close of each Fiscal Quarter of Servicer other than the last Fiscal Quarter of each fiscal year, Servicer shall furnish to the Administrative Agent and the Lenders a consolidated balance sheet of Servicer and its consolidated subsidiaries as at the end of such Fiscal Quarter, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Quarter and for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding Fiscal Quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of Servicer as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of Servicer and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes, together with a customary management's discussion and analysis of financial information (which, for the avoidance of doubt, shall contain broken out information set forth in Section 5.1(k)(ii)).

(e)      Monthly Reports. The Borrower shall ensure that the Servicer furnish each monthly report to the Administrative Agent and the Lenders pursuant to and in accordance with Section 6.6(a).  In addition, on each Monthly Reporting Date, the Borrower shall furnish to the Administrative Agent and the Lenders a monthly reporting package consisting of: (i) a copy of all of the Borrower's bank account statements for the immediately preceding month, together with a certification (which may be made in the Borrowing Base Certificate) that there have been no payments made by or from the Borrower during such month other than as set forth in such bank account statements; and (ii) a Borrowing Base Certificate, together with a certification that, among other things, stating that no Event of Default or Default exists and is continuing, or if any such event exists and is continuing, specifying in detail the nature and period of existence of such Event of Default or Default and any action taken or contemplated to be taken by Borrower with respect thereto.

(f)      Compliance Certificates.

*Credit Agreement*

735706711 19631142
28997904

(i)      The Loan Parties' delivery of information, including without limitation, financial statements and reports, pursuant to Section 5.1(b) of this Agreement shall be accompanied by a compliance certificate, substantially in the form of Exhibit V-A hereto, addressed to the Administrative Agent and the Lenders, executed by a Responsible Officer of Borrower, stating that no Event of Default or Default exists and is continuing, or if any such event exists and is continuing, such compliance certificate shall specify in detail the nature and period of existence of such Event of Default or Default and any action taken or contemplated to be taken by Borrower with respect thereto.

(ii)      The financial statements delivered pursuant to Sections 5.1(c) and 5.1(d) of this Agreement shall be accompanied by

1.      a compliance certificate, substantially in the form of Exhibit V-A hereto, addressed to the Administrative Agent and the Lenders, executed by a Responsible Officer of Servicer, stating that no Event of Default or Default exists under this Agreement, or if any such event exists and is continuing, such certificate shall specify in detail the nature and period thereof and any action taken or contemplated to be taken by Servicer with respect thereto, and

2.      a certificate addressed to the Administrative Agent and the Lenders, substantially in the form of Exhibit V-B hereto, executed by a Responsible Officer of Holdings, certifying that, as of the date of such certificate, the net equity value of Holdings exceeds the Holdings Minimum Equity Value.

(g)      Maintenance of Properties and Insurance.

(i)      Each Loan Party shall keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.  Servicer will, and will cause each Loan Party, BPI and the Maquiladoras to keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

(ii)      Each Loan Party shall maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations and each such policy of insurance shall, and the Borrower shall deliver the following within thirty (30) days after the Closing Date, (i) in the case of each liability insurance policy, name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder, (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Secured Parties, as the lenders loss payee thereunder, and (iii) if obtainable from the applicable insurer, provide for at least 30 days' prior written notice to the Administrative Agent of any cancellation of such policy.  Servicer will, and will cause each Loan Party, BPI and the Maquiladoras to, maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

735706711 19631142
28997904

(h)     Notice of Certain Events.  Promptly upon becoming aware of the occurrence of any of the following events, the Loan Parties and the Servicer, and with respect to clause (K) below, Holdings, shall give the Administrative Agent and each Lender notice of such event, together with a written statement signed on behalf of such Person setting forth the details of such event and any action taken or contemplated to be taken with respect thereto:

(A)     the occurrence of an event of default or similar event under the Credit Agreement, Term Loan Credit Agreement, any Transaction Document or any Material Indebtedness of any Loan Party;

(B)     an Event of Default or Default under this Agreement;

(C)     any Lien (other than Permitted Liens) or claim made or asserted against any of the Collateral;

(D)     any casualty, loss, damage or destruction to the Collateral in the amount of $1,000,000 or more, whether or not covered by insurance;

(E)     the commencement of any action or proceeding for the taking of any portion of the Collateral or interest therein with an aggregate value in excess of $1,000,000 under power of eminent domain or by condemnation or similar proceeding, in which case, the Loan Parties and Servicer shall ensure that the cash proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are deposited into the Collection Account and applied in accordance with the applicable provisions of this Agreement and the Security Documents;

(F)     any and all default notices received under or with respect to any leased location or warehouse where Collateral is located (which shall be delivered within two (2) Business Days after receipt thereof), including any facility leased by any Maquiladora or any default notices or termination noticed received under the Purchase Agreement, Sale Agreement or Manufacturing Agreement;

(G)     any Loan Party, or any Subsidiary or any ERISA Affiliate of any of the foregoing knows or has reason to know that any ERISA Event has occurred, in which case a certificate of the chief financial officer of the Borrower describing such ERISA Event and the action, if any, proposed to be taken with respect to such ERISA Event and a copy of any notice filed with the PBGC or the IRS pertaining to such ERISA Event and any notices received by such Borrower, Subsidiary or ERISA Affiliate from the PBGC or any other governmental agency with respect thereto;

(H)     any Loan Party, or any Subsidiary or any ERISA Affiliate of any of the foregoing maintains or contributes to (or incurs and obligation to contribute to) a Multiemployer Plan;

(I)     any Loan Party or any of their Subsidiaries or the Collateral constitutes "plan assets" of a benefit plan investor (within the meaning of 29 CFR 2510.3-101, as modified by Section 3(42) of ERISA);

<div align="center">28

*Credit Agreement*</div>

735706711 19631142
28997904

<div align="center">**JOINT EXHIBIT NO. 18**
**Page 44 of 812**</div>

(J)      the assertion in writing of any environmental claim by any Person against, or with respect to the activities of, any Loan Party and any alleged violation of or non-compliance with any Environmental Laws or any permits, licenses or authorizations, other than any environmental claim or alleged violation that, alone or together with any other such matters that have occurred, could reasonably be expected to result in liability of the Loan Party in an aggregate amount of or exceeding $1,000,000; or

(K)      the occurrence of any development or event which could reasonably be expected to result in the net equity value of Holdings being or becoming less than the Holdings Minimum Equity Value, including a reasonably detailed background summary as to the relevant liability, obligation, item or other information in respect of Holdings.

(i)      Notice of Material Adverse Effect.  Promptly upon becoming aware thereof, each of the Borrower and Servicer will give the Administrative Agent and each Lender written notice with respect to any development or occurrence which could reasonably be expected to have a Material Adverse Effect.

(j)      Notice of Proceedings.  Promptly upon becoming aware thereof, each of the Loan Parties and the Servicer will give the Administrative Agent and each Lender notice of (i) the commencement, existence or, to the knowledge of Borrower or Servicer, threat of all proceedings by or before any Governmental Authority against or affecting any Loan Party, Guarantor, BPI, Servicer or the Maquiladoras, if adversely decided, could reasonably be expected to have a Material Adverse Effect and (ii) any action, suit, proceeding or investigation pending or to the knowledge of Borrower or Servicer, threatened, against any Loan Party, Guarantor, BPI, Servicer or the Maquiladoras before any Governmental Authority.

(k)      Further Information; Lender Calls.

(i)      Each of the Loan Parties and the Servicer will promptly furnish to the Administrative Agent and each Lender such other information, and in such form, as the Administrative Agent or the Lenders may reasonably request from time to time in connection with this Agreement or the other Transaction Documents.

(ii)      Within one (1) Business Day after the same are provided to the agent or lenders under each of the ABL Credit Agreement and the Term Loan Credit Agreement, the Borrower and Servicer shall furnish a copy of all such financial, reporting and other information so furnished thereto, to the Administrative Agent and the Lenders, including without limitation, each lender presentation and management discussion and analysis, which, for the avoidance of doubt, shall contain broken out information regarding the brake products segment, including quarterly revenue and gross margin reporting for such segment and related items.

(iii)      Promptly following delivery of the annual financial statements pursuant to Section 5.1(b), upon request of any Lender, the Borrower and Servicer shall conduct a call at a mutually agreeable date and time between the Lenders and the Chief Financial Officer of Holdings, the Servicer and the Loan Parties to answer Lender questions and for discussion.

(l)      Audits.  Each of the Loan Parties and the Servicer will, from time to time during regular business hours as requested by the Administrative Agent, in its Permitted Discretion, upon five (5)

<div align="center">29</div>
<div align="center">*Credit Agreement*</div>

735706711 19631142
28997904

Business Days advance notice to Borrower, and at the sole cost of Borrower, permit the Administrative Agent and the Lenders or their respective agents or representatives:  (i) to examine and make copies of and abstracts from all Records in the possession or under the control of such Person relating to the Inventory or other Collateral, including, without limitation, the related Contracts, and (ii) to visit the offices and properties of such Person during reasonable business hours for the purpose of examining such materials described in clause (i) above, and to discuss matters relating to such Person's financial condition or the Inventory or other Collateral or any Person's performance under any of the Transaction Documents or any Person's performance under the Contracts and, in each case, with any of the officers, managers, employees, accountants or other representatives of each of the Loan Parties and the Servicer having knowledge of such matters (each such visit, a *"Review"*); *provided* that no more than one (1) Review under this Section 5.1(l) shall be required in any one calendar year (it being understood and agreed that any follow-up examinations, analysis, discussions or visits to address any material adverse findings discovered during the course of a Review shall not constitute a separate Review), ***provided further*** that there shall be no limitation on the frequency of Reviews during any calendar year upon the occurrence and continuance of an Event of Default and (ii) each Review shall be coordinated through and by the Administrative Agent.

(m)     Separateness.     Each of the Loan Parties and the Servicer acknowledge that the Administrative Agent and the Lenders are entering into the transactions contemplated by this Agreement in reliance upon Borrower's identity as a legal entity that is separate from Parent, BPI, Servicer, First Brands Parent, and their respective other Affiliates (each, a *"Related Entity"*).  Therefore, each of the Borrower and Servicer shall take all steps specifically required by this Agreement or reasonably required by the Administrative Agent or any Lender to continue the Borrower's identity as a separate legal entity and to make it apparent to third Persons that the Borrower is an entity with assets and liabilities distinct from those of BPI, First Brands Parent, the Servicer and any other Person, and is not a division of BPI, First Brands Parent, the Servicer, its Affiliates or any other Person.  In furtherance thereof, each of Borrower and Servicer hereby agrees to:  (i) maintain Borrower's books and records and bank accounts separate from those of any other Related Entity; (ii) at all times hold Borrower out to the public and all other Persons as a legal entity separate from Borrower's member, Servicer and any other Person (and in doing so, corrects any known misunderstanding regarding the Borrower's separate identity); (iii) Borrower shall not act as an agent of Servicer, but instead present itself to the public as an entity separate from Servicer; (iv) ensures the Borrower's board members act independently and in the Borrower's interests, and in the interests of its creditors; (v) ensures the Borrower's board duly authorize all of its limited liability company actions; (vi) maintains at least one Independent Manager in accordance with Section 7.1(m)(i); (vii) file tax returns, if any, for Borrower as may be required under applicable law, to the extent not part of a consolidated group filing a consolidated return or returns, and pays any taxes so required to be paid under applicable law; (viii) except as contemplated herein or in any other Transaction Document, not commingle Borrower's assets with assets of the Servicer, any of the Borrower's Affiliates or any other Person; (ix) conduct Borrower's business in Borrower's own name and strictly comply with all organizational formalities to maintain Borrower's separate existence; (x) maintain separate financial statements for Borrower; (xi) pay Borrower's own liabilities only out of Borrower's own funds; (xii) maintain an arm's length relationship between Borrower and each other Related Entity; (xiii) pay the salaries of Borrower's own employees, if any, with Borrower's own funds; (xiv) not hold out Borrower's credit or assets as being available to satisfy the obligations of others; (xv) allocate fairly and reasonably with other Persons any of Borrower's overhead for shared office space; (xvi) except as contemplated herein or in any other Transaction Document, use separate stationery, invoices and checks; (xvii) except as expressly permitted herein or in any other Transaction Document, not pledge Borrower's assets for the benefit of any other

735706711 19631142
28997904

Person and not hold out Borrower's credit or assets as being available to satisfy obligations of others; (xviii) correct any known misunderstanding regarding Borrower's separate identity; (xix) maintain adequate capital in light of its contemplated business purpose, transactions and liabilities; (xx) cause Borrower's manager(s) or member, as applicable, to keep minutes of any meetings and actions and observe all other Delaware limited liability company formalities; (xxi) not to have Borrower acquire any obligations or securities of its member; (xxii) act solely in its own name and through its own authorized managers, directors, members, officers and agents, except as expressly permitted under the Transaction Documents; (xxiii) ensure Borrower does not engage in any business or activity except as set forth in this Agreement and the other Transaction Documents, nor incur any indebtedness or liability other than any incurred pursuant to the Transaction Documents; (xxiv) maintain Borrower's assets in a manner that facilitates their identification and segregation from those of Borrower's Affiliates; (xxv) ensure that Borrower maintains arm's-length relationships with its Affiliates and the other Loan Parties; (xxvi) comply in all material respects with each of the assumptions made with respect to it in the non-consolidation opinion delivered hereunder, and in any certifications contained in any certificate referred to therein; and (xxvii) cause Borrower's directors, officers, agents and other representatives to act at all times with respect to Borrower consistently and in furtherance of the foregoing.

(n)     <u>Preservation of Existence and Franchises</u>.  Each of the Loan Parties and the Servicer shall maintain its organizational existence and its rights and franchises in full force and effect in its jurisdiction of incorporation or organization, as the case may be except as would not result in a Material Adverse Effect.  Each of the Loan Parties and Servicer will qualify and remain licensed or qualified as a foreign corporation or limited liability company, as the case may be, in each jurisdiction in which the failure to receive or retain such licensing or qualification could reasonably be expected to have a Material Adverse Effect.  With respect to Holdings, Servicer, BPI, and each Maquiladora, Servicer shall, or shall cause such Persons, to (x) maintain its organizational existence and its rights and franchises in full force and effect in its jurisdiction of incorporation or organization and (y) qualify and remain licensed or qualified as a foreign corporation or limited liability company, as the case may be, in each jurisdiction in which the failure to receive or retain such licensing or qualification could reasonably be expected to have a Material Adverse Effect.

(o)     <u>Compliance with Laws</u>.  Each of the Loan Parties and the Servicer will comply with all applicable Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business or property, the non-compliance with which could reasonably be expected to have a Material Adverse Effect.  Each of the Loan Parties and the Servicer will comply with the United States-Mexico-Canada Agreement ("USMCA") and will take all actions to ensure that the Loan Parties, Servicer and their respective Affiliates obtain full benefits under the USMCA in respect of tariff and tax issues.

(p)     <u>Further Assurances</u>.  Each of the Loan Parties and the Servicer will, at their own cost and expense, cause to be promptly and duly taken, executed, acknowledged and delivered all such further acts, documents and assurances as the Administrative Agent and the Lenders may reasonably request from time to time in order to carry out the intent and purposes of this Agreement and the transactions contemplated by this Agreement and the other Transaction Documents, including, without limitation, any documents the Administrative Agent and the Lenders reasonably agree are necessary to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest in any property acquired by any Loan Party after the Closing Date.

735706711 19631142
28997904

(q)     Compliance with Anti-Corruption Laws; Beneficial Ownership Regulation, Anti-Money Laundering Laws and Sanctions.  Each of the Loan Parties and the Servicer will (i) maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, the Servicer, their respective Subsidiaries and their respective directors, officers, employees and agents with all Anti-Corruption Laws, Anti-Money Laundering Laws and applicable Sanctions, (ii) notify the Administrative Agent and each Lender that previously received a Beneficial Ownership Certification (or a certification that the Borrower qualifies for an express exclusion to the "legal entity customer" definition under the Beneficial Ownership Regulation) of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified therein (or, if applicable, the Borrower ceasing to fall within an express exclusion to the definition of "legal entity customer" under the Beneficial Ownership Regulation) and (iii) promptly upon the reasonable request of the Administrative Agent or any Lender, provide the Administrative Agent or directly to such Lender, as the case may be, any information or documentation requested by it for purposes of complying with the Beneficial Ownership Regulation.

(r)     Change of Independent Manager.  At least ten (10) days prior to any proposed change of the Independent Manager of Borrower, Borrower will deliver to the Administrative Agent and the Lenders notice of such proposed change together with a certificate of Borrower certifying that the proposed replacement manager satisfies the criteria set forth in the definition of "***Independent Manager***".

(s)     Performance and Enforcement of the Purchase Agreement, Sale Agreement, and Manufacturing Agreement.

a.     Each of the Loan Parties and Servicer shall require BPI (and each Qualified Purchaser) to perform all obligations of BPI (or such Qualified Purchaser) under and pursuant to each Purchase Agreement and Sale Agreement (including without limitation, and for the avoidance of doubt, to cause BPI (and each such Qualified Purchaser) to purchase from time to time during the term of this Agreement each respective item of Eligible Inventory hereunder).  Borrower will purchase raw materials and other goods under the Purchase Agreement in strict compliance with the terms thereof and will diligently enforce the rights and remedies accorded to it as the buyer under the Purchase Agreement.  Borrower will take all actions to perfect and enforce its rights and interests (and the rights and interests of the Administrative Agent and the Lenders as assignees of Borrower) under the Purchase Agreement and any Sale Agreement as the Administrative Agent may from time to time reasonably request, including, without limitation, making claims to which it may be entitled under any indemnity, reimbursement or similar provision contained in the Purchase Agreement or Sale Agreement.

b.     Each of the Loan Parties and Servicer shall require BPI to perform all obligations of BPI under and pursuant to the Manufacturing Agreement.  Borrower will diligently enforce the rights and remedies accorded to it under the Manufacturing Agreement.  Borrower will take all actions to perfect and enforce its rights and interests (and the rights and interests of the Administrative Agent and the Lenders as assignees of Borrower) under the Manufacturing Agreement as the Administrative Agent may from time to time reasonably request, including, without limitation, making claims to which it may be entitled under any indemnity, reimbursement or similar provision contained in the Manufacturing Agreement.

*Credit Agreement*

735706711 19631142
28997904

(t)     Ownership.  Borrower will, and Servicer will cause Borrower and BPI to, take all necessary action to (i) vest legal and equitable title to the Inventory and other Collateral, irrevocably in Borrower, free and clear of any Liens other than Permitted Liens, and (ii) establish and maintain, in favor of the Administrative Agent, for the benefit of the Secured Parties, a valid and perfected first priority Security Interest in the Collateral to the full extent contemplated herein, free and clear of any Liens other than Permitted Liens (including, without limitation, the filing of all financing statements or other similar instruments or documents necessary under the UCC (or any comparable law) of all appropriate jurisdictions) to perfect the Administrative Agent's (for the benefit of the Secured Parties) Security Interest in the Collateral and such other action to perfect, protect or more fully evidence the Security Interest of the Administrative Agent for the benefit of the Secured Parties as the Administrative Agent or any Lender may reasonably request.

(u)     Tax Status.  Each of the Loan Parties and the Servicer will take such actions as needed to ensure that each of the Loan Parties will (i) remain a "disregarded entity" within the meaning of U.S. Treasury Regulation § 301.7701-3 for U.S. federal income tax purposes that is wholly owned by a United States person (within the meaning of Section 7701(a)(30) of the Code), (ii) not become an association taxable as a corporation or a publicly traded partnership taxable as a corporation for U.S. federal income tax purposes and (iii) not become subject to taxation in any jurisdiction outside of the United States.

(v)     Books and Records.  Each of the Loan Parties and the Servicer will maintain and implement administrative and operating procedures, and keep and maintain all documents, books, records, computer tapes and disks and other information reasonably necessary or advisable for the collection of all Collections and the identification and reporting of all Inventory, including Eligible Inventory.

(w)     Collection Account.  Each of the Loan Parties and the Servicer shall, or will, cause all Collections to be deposited into the Collection Account.  If, notwithstanding the foregoing, any Qualified Purchaser makes any payment constituting Collections to an account other than the Collection Account, Borrower and the Servicer shall remit such Collections directly to the Collection Account within two (2) Business Days after payment thereof.  The Borrower and the Servicer shall ensure that no disbursements are made from the Collection Account, other than such disbursements pursuant to Article II.  The Borrower and Servicer shall ensure that the Collection Account remains open until the Termination Date and shall pay all fees associated with maintaining such account with the Collection Account Bank.

(x)     Information.  Promptly, but in no event later than five (5) days after delivery thereof, Servicer will deliver to the Administrative Agent and each Lender a copy of each report, document, instrument, record and agreement that has been delivered, directly or indirectly, by any Loan Party or any of its Affiliates to any Person in connection with the Credit Agreement or any other Material Indebtedness of any Loan Party.

(y)     Valuation.  The Borrower and the Servicer shall ensure that, at all times, 90% of the value of the Eligible Inventory at such time (valued at all times hereunder at the Borrower's cost, determined in accordance with GAAP) exceeds the aggregate principal amount of the Loans outstanding at such time, and the Fair Market Value of such Eligible Inventory shall at all times exceed such GAAP cost.  For the avoidance of doubt, the foregoing determination shall also be made by the Borrower and Servicer taking into account any and all reserves, offsets and similar items with respect to any of the foregoing items from time to time.

33
*Credit Agreement*

735706711 19631142
28997904

(z)     Broker Fee. The Borrower and Servicer shall cause Servicer to pay Helios Strategic Advisors, LLC a one half of one percent (0.50%) fee per annum on the aggregate principal amount Loans outstanding, payable monthly in arrears on the first day of each calendar month (the "Broker Fee").

(aa)     BPI Obligations.  BPI shall perform all of its obligations, including payment obligations, under each Purchase Order, Sale Agreement, Purchase Agreement, Manufacturing Agreement and Maquiladora Agreement on a timely basis in accordance with the terms thereof.

(bb)     Maquiladoras.

(i)     The Loan Parties and the Servicer shall cause BPI to ensure that (i) the Maquiladoras (x) hold a valid and effective IMMEX program (*Programa para la Industria Manufacturera, Maquiladora y de Servicio de Exportación*; "IMMEX Program"), VAT certification (*Certificación para empresas IMMEX en materia de IVA*; "VAT Certification"); (y) have obtained all permits, licenses, certifications, registrations, consents and authorizations by any Governmental Authority (the "Ancillary Maquila Permits") required for the Maquiladoras to conduct import and export activities under its IMMEX Programs and VAT Certification; and (z) is in compliance with (1) the Ancillary Maquila Permits, and (2) all obligations set forth under the IMMEX Programs and VAT Certification; (ii) each Maquiladora Agreement remains at all times in full force and effect and that all obligations under such agreements are complied with; and (iii) the obligations of the Maquiladoras under each Maquiladora Agreement shall not be assigned to any Person without the prior written consent of the Administrative Agent and the Lenders, *provided however*, that the BPI Braking Systems Mexico, S.A. de C.V. agreement with Borrower may be assigned to BPI Brake Manufacturing Juarez, S.A. de C.V. upon the wind down or liquidation of BPI Braking Systems Mexico, S.A. de C.V.

(ii)     The Loan Parties and the Servicer shall cause BPI to carry out any and all actions and/or execute any and all documents, including, without limitation, any amendments and renewals to the Maquiladora Agreements, in order to maintain the Maquiladora Agreements in full force and effect.

(iii)     The Loan Parties and the Servicer shall cause BPI to ensure that the Maquiladoras have, and will continue at all times to have, all federal, state, local and other licenses and permits (including without limitation, export and import licenses, records and filings) required to be maintained in connection with the Maquiladora Agreements, and all such licenses and permits are valid and in full force and effect.  The Loan Parties and the Servicer shall ensure that the Maquiladoras have, and will continue at all times to have, complied with the requirements of such licenses and permits in all respects.

(cc)     Solvency.  Each Loan Party and the Servicer shall ensure that each Loan Party and BPI remains Solvent at all times.

(dd)     Servicing Arrangements.  Each Loan Party, the Servicer and BPI shall ensure that any and all servicing arrangements by and between any Loan Party, the Servicer and BPI will be, at all times, in form and substance to the Administrative Agent and the Lenders.

735706711 19631142
28997904

(ee)     Purchase Agreement; Sale Agreement; Manufacturing Agreement.  Each of the Purchase Agreement, Sale Agreement and Manufacturing Agreement shall be in the form attached hereto as Exhibit XI, XII, and XIII, respectively, and shall be satisfactory to the Administrative Agent and the Lenders.

(ff)     Collection Account Control Agreement. Within thirty (30) days after the Closing Date, the Borrower shall deliver to the Administrative Agent and Lenders a Collection Account Control Agreement for the Collection Account, in form and substance satisfactory to the Administrative Agent and the Lenders.  Neither the Borrower nor the Servicer shall cause any cash to be withdrawn from the Collection Account until such Collection Account Control Agreement is delivered to the Administrative Agent and Lenders.

Section 5.2     Negative Covenants.  Until the Termination Date:

(a)     Name or Structural Changes.

(i)     No Loan Party shall (i) change its name, identity or legal structure (within the meaning of any applicable enactment of the UCC) or make any other change in the Borrower's identity or corporate structure that could impair or otherwise render any UCC financing statement filed in connection with this Agreement or any other Transaction Document "seriously misleading" as such term (or similar term) is used in the UCC, (ii) permit itself to merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to, any Person, (iii) undertake any division of its rights, assets, obligations or liabilities pursuant to a plan of division or otherwise pursuant to applicable Law, (iv) permit itself to form any new Subsidiaries or (v) permit itself to be directly owned by any Person other First Brands Parent, in each case, without (x) the prior written consent of the Administrative Agent and (y) delivery to the Administrative Agent of all financing statements, instruments and other documents and opinions reasonably requested by the Administrative Agent in connection with such change.  In addition, no Loan Party shall (i) change or relocate its chief executive office or any office where Records are kept unless it gives the Administrative Agent written notice of such change not later than ten (10) days thereafter and (ii) change its jurisdiction of organization to any location other than the State of Delaware.

(ii)     Without the prior written consent of the Administrative Agent and the Lenders, Holdings shall not, and shall cause any of its Subsidiaries to not, transfer any Capital Stock issued by (i) BPI or (ii) each Maquiladora to any Person, other than to any wholly-owned subsidiary of Holdings that is incorporated and operating in either the United States or Mexico.

(b)     Change in Payment Instructions.  Neither the Servicer nor any Loan Party shall (i) add any bank as a Collection Account Bank or (ii) add any deposit account, in each case, unless the Administrative Agent shall have received:  (A) at least ten (10) days before the proposed effective date therefor, written notice of such addition, and (B) an executed Collection Account Control Agreement with respect to such new deposit account, in form and substance acceptable to the Administrative Agent and the Lenders, prior to depositing any Collections therein.  Neither the Servicer nor any Loan Party shall (i) terminate or close the Collection Account, in any case, without the prior written consent of the Administrative Agent shall make any change in the instructions to any party, including any Qualified Purchaser, as to where payments constituting Collections should be made.

735706711 19631142
28997904

(c)     Modifications to Certain Documents.  Neither the Loan Parties nor the Servicer shall, consent to any modification, amendment, supplement or waiver of any of the provisions of (A) its charter, by-laws or other organizational documents or any other agreement or instrument to which any of its Affiliates is a party or is bound or (B) any of the Transaction Documents, in each case without the prior written consent of the Lenders.

(d)     Dispositions. No Loan Party shall convey, sell, lease or otherwise dispose of, in one transaction or a series of transactions, any part of its business or property, whether now owned or hereafter acquired, except any Inventory sold pursuant to the Sale Agreement or as otherwise expressly permitted by this Agreement.

(e)     Termination of Sale Agreements and Maquiladora Agreements.  No Loan Party shall terminate any Sale Agreement, Purchase Agreement, Manufacturing Agreement or Maquiladora Agreement or send any termination notice to a Qualified Purchaser in respect thereof other than, in each case, in the ordinary course of business, without the prior written consent of each of the Lenders.

(f)     Restricted Payments.  After the occurrence and during the continuance of any Event of Default or Overadvance, no Loan Party shall make any Restricted Payment while any Obligations or Guaranteed Obligations remain outstanding.  Prior to the occurrence of an Event of Default, the only Restricted Payment permitted by any Loan Party hereunder shall be pursuant to and in accordance with Section 2.1(d).

(g)     Indebtedness.  No Loan Party shall create, incur, assume or permit to exist any Indebtedness except: (i) the Obligations and the Guaranteed Obligations and (ii) other current accounts payable arising in the ordinary course of business and not overdue, unless such overdue accounts payable are disputed and being contested in good faith.

(h)     Use of Proceeds.  No Loan Party shall use the proceeds of any Advance, either directly or indirectly, for the purpose, whether immediate, incidental or ultimate, of "purchasing or carrying" any margin stock.  Borrower shall not request any Advance, and Borrower shall not use, and shall ensure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Advance, directly or indirectly, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or Anti-Money Laundering Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto. The Borrower shall use the proceeds of each Advance for ongoing inventory financing in respect of Eligible Inventory identified in the Borrowing Notice.

(i)     Liens. No Loan Party shall create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof except Permitted Liens and the Loan Parties will defend the right, title and interest of the Administrative Agent and the Lenders in, to and under any of the foregoing property, against all Adverse Claims of third parties.

(j)     Mergers, Consolidations, Etc. No Loan Party, Holdings, Servicer, BPI or Maquiladora shall enter into any transaction of merger or consolidation or amalgamation (other than, in each case, any merger, consolidation or amalgamation of Servicer or BPI with a wholly-owned subsidiary of Holdings with

36
*Credit Agreement*

735706711 19631142
28997904

respect to which the surviving entity assumes all obligations of such party under the Transaction Documents), or liquidate, wind up or dissolve itself, provided however that BPI Braking Systems Mexico, S.A. de C.V. may be liquidated, wound up or dissolved as set forth in the definition of Maquiladora.

(k)    Lines of Business.  No Loan Party shall engage in any business other than businesses of the type conducted by the Loan Parties on the date hereof and businesses reasonably related thereto.

(l)    Investments and Acquisitions.  No Loan Party shall make or suffer to exist any Investment in any Person or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit.

(m)    Transactions with Affiliates. No Loan Party shall sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (i) transactions in the ordinary course of business at prices and on terms and conditions not less favorable than could be obtained on an arm's length basis from a Person that is not an Affiliate; and (ii) transactions pursuant to the Transaction Documents.

(n)    Restrictive Agreements.  No Loan Party shall, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of any of the Loan Parties to create, incur or permit to exist any Lien upon any of its property or assets.

(o)    Capital Expenditures. The Loan Parties shall not incur or make any Capital Expenditures in any fiscal year in an aggregate amount exceeding $100,000.

(p)    Fiscal Year.  The Loan Parties shall not permit their fiscal year to end on a day other than as in effect on the Closing Date.

(q)    Collections.  Neither the Servicer nor any Loan Party shall permit any funds other than Collections to be deposited into the Collection Account.

(r)    Stock Issuance; Subsidiaries.  The Loan Parties shall not, and shall not permit any of their Subsidiaries to, issue any additional shares, or any right or option to acquire any shares or any security convertible into any shares, of the Capital Stock of any Subsidiary.  Borrower shall not acquire any shares or any security convertible into shares, of the Capital Stock of any Person.

(s)    Swap Agreements.  No Loan Party shall enter into any Swap Agreement.

(t)    Capital Stock.  None of the Loan Parties shall elect to have any of the Capital Stock issued by Borrower constitute securities governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and each other applicable jurisdiction.

(u)    Passive Parent Company Status. Parent shall not (i) conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business or operations other than those incidental to its ownership of the Capital Stock of the Borrower, (ii) incur, create, assume or suffer to exist any Indebtedness or other liabilities or financial obligations, except (x) nonconsensual obligations imposed by operation of law, (y) obligations pursuant to the Transactions Documents to which it is a party and (z)

<div align="center">37</div>
<div align="center"><em>Credit Agreement</em></div>

735706711 19631142
28997904

<div align="center">**JOINT EXHIBIT NO. 18**
**Page 53 of 812**</div>

obligations with respect to its Capital Stock, or (iii) own, lease, manage or otherwise operate any properties or assets (other than cash, cash equivalents or other than the ownership of shares of Capital Stock of the Borrower).

**ARTICLE VI.**

**ADMINISTRATION AND COLLECTION**

Section 6.1    Designation of the Servicer.

(a)    The servicing, administration and collection of Collections shall be conducted by such Person (the *"Servicer"*) so designated from time to time in accordance with this Section 6.1.  First Brands is hereby designated as, and hereby agrees to perform the duties and obligations of the Servicer pursuant to the terms of this Agreement.  At any time after the occurrence and during the continuance of an Event of Default or a Default resulting from an action or inaction of, or circumstance existing with respect to, the Servicer (each, a *"Servicer Termination Event"*), the Administrative Agent and the Lenders may, upon written notice to the current Servicer and Borrower, designate as the Servicer any Person to succeed First Brands or any successor Servicer.

(b)    Servicer may delegate any entity acceptable to the Lenders, as sub-servicers of the Servicer (each, a *"Sub-Servicer"*), certain of its duties and responsibilities as the Servicer hereunder, so long as such delegation does not cause the Borrower to be subject to taxation in any jurisdiction outside of the United States.  Without the prior written consent of the Lenders and the Borrower, the Servicer shall not be permitted to delegate any of its duties or responsibilities as the Servicer to any Person.  None of the Sub-Servicers shall be permitted to further delegate to any other Person any of the duties or responsibilities of the Servicer delegated to it by Servicer.  If at any time following the occurrence of a Servicer Termination Event, the Lenders shall designate as the Servicer any Person other than First Brands, all duties and responsibilities theretofore delegated by First Brands to any of the Sub-Servicers shall automatically be terminated.

(c)    Notwithstanding the foregoing subsection (b), (i) the Servicer shall be and remain primarily liable to the Administrative Agent and the Lenders for the full and prompt performance of all duties and responsibilities of the Servicer hereunder in accordance with the terms hereof and (ii) the Administrative Agent and the Lenders shall be entitled to deal exclusively with the Servicer in matters relating to the discharge by the Servicer of its duties and responsibilities hereunder.  The Administrative Agent and the Lenders shall not be required to give notice, demand or other communication to any Person other than the Servicer in order for communication to the Servicer and the Sub-Servicers or other delegate with respect thereto to be accomplished.  The Servicer, at all times that it is the Servicer, shall be responsible for providing any Sub-Servicer or other delegate of the Servicer with any notice given to the Servicer under this Agreement, as necessary for such Sub-Servicer or other delegate to perform its respective obligations in such capacity.

(d)    Notwithstanding anything else contained in this Agreement or any other Transaction Document: (i) to the extent any duties or obligations of the Servicer involve or require the Servicer to contract for, or conclude a contract in the name of Borrower, the Administrative Agent or any other Secured Party, such servicing responsibility shall be fulfilled solely by the Servicer or by an affiliate of the Servicer and the Servicer or such affiliate is authorized to take such action; and (ii) the Servicer shall not, directly or indirectly, assign, delegate or subcontract any servicing responsibility under this Agreement to

38
*Credit Agreement*

735706711 19631142
28997904

any Person, except upon written consent (which consent shall not be unreasonably withheld, conditioned or delayed) of the Administrative Agent.

Section 6.2    Duties of the Servicer.

(a)    The Servicer shall take or cause to be taken all such actions as may be necessary or advisable to provide inventory custody and marketing services to the Borrower and will store and market the Inventory for the Borrower with reasonable care and diligence and in accordance with applicable Laws, rules and regulations.

(b)    The Servicer shall direct each Qualified Purchaser to make payments constituting Collections to the Collection Account.  If, notwithstanding the foregoing, any Qualified Purchaser makes payment other than directly to the Collection Account, Borrower and the Servicer agrees to remit, or to cause such Qualified Purchaser to remit, such Collections directly to the Collection Account within two (2) Business Days upon receipt of such Collections by the Borrower or Servicer, and further agrees that all such Collections shall be deemed to be received in trust for the Administrative Agent and the Lenders.

(c)    The Servicer shall ensure that at all times, no Overadvance occurs.

(d)    The Servicer shall administer the Collections in accordance with the procedures described herein and in Article II.  Prior to the Termination Date, to the extent any Collections come into the possession of the Servicer, the Servicer shall immediately segregate, in a manner acceptable to the Administrative Agent, all such Collections from the general funds of the Servicer or Borrower prior to the remittance thereof in accordance with Article II to the extent of any accrued and unpaid Obligations. Subject to Section 2.2, at all times while the Servicer is required to segregate Collections pursuant to the preceding sentence, the Servicer shall segregate and deposit in the Collection Account all Collections following receipt thereof by the Servicer of such Collections, duly endorsed or with duly executed instruments of transfer.

(e)    [Reserved].

(f)    The Servicer shall hold in trust for Borrower and the Administrative Agent and each Lender all Records in its possession that (i) evidence or relate to the Inventory and Collateral, the related Contracts or (ii) are otherwise necessary or desirable to collect the Collections and shall, following the occurrence and during the continuance of an Event of Default, as soon as practicable upon demand of the Administrative Agent, deliver or make available to the Administrative Agent all such Records, at a place selected by the Administrative Agent.  The Servicer shall, one (1) Business Day following receipt thereof, deposit any cash Collections into the Collection Account for distribution in accordance with Article II.  The Servicer shall, from time to time at the request of the Administrative Agent or any Lender, furnish to the Lenders (not later than two (2) Business Days after any such request) a calculation of the amounts set aside for the Lenders pursuant to Article II.

Section 6.3    Collection Account.  Borrower has with respect to the Collection Account, granted to the Administrative Agent for the benefit of the Secured Parties "control" (within the meaning of the UCC) over such Collection Account.

Section 6.4    [Reserved].

<div align="center">39</div>
<div align="center">*Credit Agreement*</div>

735706711 19631142
28997904

Section 6.5    Responsibilities under Contracts.    Anything herein to the contrary notwithstanding, the exercise by the Administrative Agent and the Lenders of their rights hereunder shall not release the Servicer, BPI, any Maquiladora or any Loan Party from any of their duties or obligations with respect to any Contracts.  The Lenders shall have no obligation or liability with respect to any Contracts, nor shall any of them be obligated to perform the obligations of any Loan Party, Servicer, Maquiladora or BPI.

Section 6.6    Reports.

(a)    On each Monthly Reporting Date, the Servicer shall prepare and deliver not later than 1:00 p.m. (New York City time) to the Lenders, (i) a Borrowing Base Certificate for the calendar month (or portion thereof) then most recently ended (appropriately completed and executed), (ii) an electronic file of the data contained therein, and (iii) and the information set forth in Section 5.1(e).

(b)    During the continuation of an Event of Default, the Servicer shall prepare and deliver to the Lenders such other reports as requested by the Administrative Agent in its Permitted Discretion or at the direction of the Required Lenders.

(c)    If requested by the Administrative Agent on any Business Day, the Servicer shall prepare and deliver to the Lenders not later than 1:00 p.m. (New York City time) on the following Business Day, a pro forma calculation of the Borrowing Base at such time.

(d)    During the continuation of an Event of Default, at such times as any Lender shall reasonably request, the Servicer shall prepare and deliver not later than 1:00 p.m. (New York City time) five (5) Business Days after such request a listing of all Inventory.  Prior to the occurrence of any Event of Default, the Servicer shall provide such information and reports as may be reasonably requested by the Administrative Agent or any Lender to the extent such information is readily available and prepared by the Servicer or the Borrower in the ordinary course of business.

Section 6.7    Servicing Fees.  In consideration of First Brands' agreement to act as the Servicer hereunder, so long as First Brands shall continue to perform as the Servicer hereunder, First Brands shall be paid a fee (the *"Servicing Fee"*) equal to $10,000 per annum, which shall be payable in arrears on the first day of each calendar month.  At any time while the Servicer is not an Affiliate of Borrower, the Servicing Fee shall be computed at such rate per annum as the Administrative Agent, Borrower and the substitute the Servicer may mutually agree.

**ARTICLE VII.**

**EVENTS OF DEFAULT**

Section 7.1    Events of Default.  The occurrence of any one or more of the following events shall constitute an *"Events of Default"*:

(a)    (i) Borrower shall fail to pay principal on any of the Loans on the date due or (ii) any Overadvance shall exist and shall fail to be cured within the time period set forth in Section 1.3(a); or

(b)    Borrower shall fail to pay Interest on the Loans within two (2) Business Days of the date such Interest is due; or

40
*Credit Agreement*

735706711 19631142
28997904

(c)      Any Loan Party shall fail to pay any other fee or other amount payable pursuant to this Agreement or any of the other Transaction Documents within two (2) Business Days after written notice to such Loan Party by the Administrative Agent or any Lender; or

(d)      Any representation or warranty made by any Loan Party, Holdings or the Servicer under this Agreement or any of the other Transaction Documents or any written statement made by any Loan Party or Servicer in any financial statement, certificate, report, exhibit or document furnished by any Loan Party, Holdings or Servicer to the Administrative Agent or any Lender pursuant to this Agreement or the other Transaction Documents shall prove to have been false or misleading in any material respect as of the time made; or

(e)      Any Loan Party shall default in the performance or observance of any covenant contained in Section 5.1(ff) or Section 5.2 of this Agreement; or Holdings shall default in the performance or observance of any covenant contained in Section 11.11 of this Agreement; or

(f)      Any Loan Party shall default in the performance or observance of any covenant contained in Section 6.6 of this Agreement and such default shall continue for a period of two (2) Business Days; or

(g)      Any Loan Party, Guarantor, Servicer, BPI or Maquiladora shall default in the performance or observance of any other covenant, agreement or duty under (x) this Agreement or (y) any other Transaction Document (not constituting an Event of Default under any other provision of this Section 7.1) or any document delivered thereunder and in connection therewith, and, in each case, such default shall continue for a period of five (5) consecutive days; or

(h)      (i) Any "Event of Default" (under and as defined in the Credit Agreement or the Term Loan Credit Agreement, respectively) shall occur and be continuing; (ii) the Borrower shall (A) default (as principal or guarantor or other surety) in any payment of principal of or interest on any obligation (or set of related obligations) for borrowed money in excess of one million U.S. Dollars ($1,000,000) beyond any period of grace with respect to the payment or, if any such obligation (or set of related obligations) is or are payable or repayable on demand, fail to pay or repay such obligation or obligations when demanded, or (B) default in the observance of any other covenant, term or condition contained in any agreement or instrument by which such an obligation (or set of related obligations) is or are created, secured or evidenced, if the effect of such default is to give the applicable holder or holders of such obligation or obligations (or a trustee or agent on behalf of such holder or holders) the right (whether acted upon or not) to accelerate the maturity of all or part of such obligation or obligations or to terminate the commitment of any lender thereunder; or (iii) any Loan Party (other than the Borrower) or any of its Affiliates (other than the Borrower) shall (A) default (as principal or guarantor or other surety) in any payment of principal of or interest on any obligation (or set of related obligations) for borrowed money in excess of fifteen million U.S. Dollars ($15,000,000) beyond any period of grace with respect to the payment or, if any such obligation (or set of related obligations) is or are payable or repayable on demand, fail to pay or repay such obligation or obligations when demanded, or (B) default in the observance of any other covenant, term or condition contained in any agreement or instrument by which such an obligation (or set of related obligations) is or are created, secured or evidenced, if the effect of such default is to give the applicable holder or holders of such obligation or obligations (or a trustee or agent on behalf of such holder or holders) the right (whether acted upon or not) to accelerate the maturity of all or part of such obligation or obligations or to terminate the commitment of any lender thereunder; or

*Credit Agreement*
735706711 19631142
28997904

(i)      (a) one or more final judgments for the payment of money in excess of one million U.S. Dollars ($1,000,000) (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied coverage thereof) shall have been entered against the Borrower and shall remain undischarged or unstayed for a period of thirty (30) consecutive days or (b) one or more final judgments for the payment of money in excess of fifteen million U.S. Dollars ($15,000,000) (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied coverage thereof) shall have been entered against any Loan Party (other than the Borrower), Holdings, the Servicer, BPI or any Maquiladora and shall remain undischarged or unstayed for a period of thirty (30) consecutive days; or

(j)      A writ or warrant of attachment, garnishment, execution, distraint or similar process shall have been issued against any Loan Party or Holdings or any of their respective properties; or

(k)      Any Loan Party shall be required to register as, an "investment company" within the meaning of the Investment Company Act; or

(l)      A Change of Control shall occur; or

(m)      Borrower shall fail (i) at any time (other than for ten (10) Business Days following notice of the death or resignation of any Independent Manager) to have a director who satisfies the definition of "Independent Manager" or (ii) to timely notify the Administrative Agent of any replacement or appointment of any Independent Manager as required pursuant to Section 5.1(r) of this Agreement; or

(n)      (i) An ERISA Event occurs or (ii) there is or arises any potential Withdrawal Liability under Section 4201 of ERISA if any Loan Party or the ERISA Affiliates were to withdraw completely from one or more Multiemployer Plans; or

(o)      Any Event of Bankruptcy shall occur with respect to any Loan Party; or

(p)      Any Loan Party, any Qualified Purchaser, Maquiladora or the Servicer shall cease to be Solvent; or

(q)      (i) Any Person other than Parent shall, directly or indirectly, have an Adverse Claim on any issued and outstanding Capital Stock or other equity interests of Borrower or (ii) any Person other than First Brands Parent shall, directly or indirectly, have an Adverse Claim on any issued and outstanding Capital Stock or other equity interests of Holdings; or

(r)      BPI shall default in the performance or observance of any covenant, agreement or duty under this to perform its obligations under any Purchase Order, Purchase Agreement or Manufacturing Agreement in accordance with its terms; or

(s)      Any Qualified Purchaser shall default in the performance or observance of any covenant, agreement or duty under this to perform its obligations under any Sale Agreement in accordance with its terms; or

(t)      Any material provision of any Transaction Document for any reason (other than as expressly permitted hereunder or thereunder) shall cease to be effective or to be the legally valid, binding

735706711 19631142
28997904

and enforceable obligation of Borrower, or any other Loan Party shall directly or indirectly contest in any manner such effectiveness, validity, binding nature or enforceability; or

(u)      (i) The Liens created by the Security Documents shall at any time not constitute a valid and perfected Lien on the Collateral intended to be covered thereby (to the extent perfection by filing, registration, recordation or possession is required herein or therein), free and clear of all other Liens (other than Permitted Liens) or (ii) any of the Security Documents, or any material provision thereof, shall cease to be effective, or any Loan Party or any Affiliate of any Loan Party shall directly or indirectly contest in any manner such effectiveness, validity, binding nature or enforceability; or

(v)      This Agreement shall terminate in whole or in part (except in accordance with its terms), or shall cease to be effective or to be the legally valid, binding and enforceable obligation of Borrower, or any other Loan Party or any Affiliate of any Loan Party shall directly or indirectly contest in any manner such effectiveness, validity, binding nature or enforceability; or

(w)      The Guaranty contained in Article XI shall cease to be effective or to be the legally valid, binding and enforceable obligation of the Guarantors, or any Guarantor or other Loan Party or any Affiliate of any Loan Party shall directly or indirectly contest in any manner such effectiveness, validity, binding nature or enforceability; or

(x)      The Purchase Agreement, Sale Agreement or Manufacturing Agreement shall terminate in whole or in part (except in accordance with its terms), or shall cease to be effective or to be the legally valid, binding and enforceable obligation of BPI, or any other Loan Party shall directly or indirectly contest in any manner such effectiveness, validity, binding nature or enforceability; or

(y)      The Administrative Agent (for the benefit of the Secured Parties) shall cease to have a valid and perfected first priority perfected security interest under all applicable laws, in (i) any material part of the Collateral or (ii) the Collection Account, in each case, free and clear of any Adverse Claim; or

(z)      The Borrower and its assigns shall cease to have a valid and perfected first priority perfected Security Interest under all applicable laws, in any material portion of the Collateral free and clear of any Adverse Claim; or

(aa)     The Internal Revenue Service shall file notice of a Lien pursuant to Section 6323 of the Code with regard to any of the Collateral; or

(bb)     The Servicer shall default in the performance or observance of any covenant, agreement or duty under this Agreement or any other Transaction Document; or

(cc)     The occurrence of a Financial Covenant Breach during any Credit Agreement Compliance Period.

Section 7.2      Remedies.   Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent may, and upon the direction of the Required Lenders, shall, take any of the following actions, at the same or different times: (i) terminate any Commitment, and thereupon such Commitments shall terminate immediately and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to

735706711 19631142
28997904

be due and payable, together with accrued but unpaid interest thereon and all fees and other Obligations accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties and Guarantors; ***provided, however,*** that upon the occurrence of an Event of Default described in Section 7.1(o), any such Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued but unpaid interest thereon and all fees (including, without limitation, for the avoidance of doubt, prepayment fees pursuant to Section 1.3) and other Obligations of the Borrower and Guarantors accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower and Guarantors. Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and at the request of the Required Lenders shall, exercise any rights and remedies provided to the Administrative Agent under the Transaction Documents or at law or equity, including all remedies provided under the UCC.  The aforementioned rights and remedies shall be without limitation, and shall be in addition to all other rights and remedies of the Administrative Agent and the Lenders otherwise available under any other provision of this Agreement, by operation of law, at equity or otherwise, all of which are hereby expressly preserved, including, without limitation, all rights and remedies provided under the UCC and all other applicable Laws, all of which rights shall be cumulative.

## ARTICLE VIII.

## INDEMNIFICATION

Section 8.1     Indemnities by Loan Parties.

(a)     Without limiting any other rights that the Administrative Agent or any of the Lenders may have hereunder or under applicable Law, each of the Loan Parties hereby agrees to indemnify (and pay upon demand to) the Administrative Agent, the Lenders and their respective affiliates, and the respective successors, assigns, officers, directors, partners, shareholders, managers, agents and employees (each of the foregoing, an ***"Indemnified Party"***) from and against any and all damages, losses, claims, Taxes, liabilities, costs, reasonable expenses and for all other amounts payable, including reasonable fees and disbursements of external counsel (including, without limitation, reasonable fees and disbursements of U.S. and Mexican counsel) incurred by or asserted against any of the Indemnified Parties in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of this Agreement or any Transaction Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) any Commitment, Advance or Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged release or presence of Hazardous Materials in violation of or giving rise to obligations under Environmental Laws on, at, under, to or migrating from any property or facility currently or formerly owned, leased or operated by any of the Loan Parties, or any of its affiliates or subsidiaries (or at which any of the Loan Parties or any of its Affiliates or Subsidiaries has arranged for or caused any release or disposal of hazardous materials), or any environmental action or environmental liability related to the Borrower or any of its affiliates or subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (all the foregoing, collectively, the "***Indemnified Amounts***"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnified Party and whether brought by an Indemnified Party, a third party or by the

Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnified Party is a party thereto and whether or not any of the transactions contemplated hereby are consummated, ***excluding, however,*** in all of the foregoing instances:

(A)     Indemnified Amounts to the extent a final judgment of a court of competent jurisdiction holds that such Indemnified Amounts resulted from gross negligence or willful misconduct on the part of the Indemnified Party seeking indemnification; or

(B)     Taxes (which shall be governed by <u>Sections 8.3</u> and <u>8.5</u>) other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim or Taxes imposed on the Collateral or with respect to a transfer of the Collateral;

***provided, however,*** that nothing contained in this sentence shall limit the liability of any of the Loan Parties or limit the recourse of the Administrative Agent or the Lenders to the Loan Parties for amounts otherwise specifically provided to be paid by the Loan Parties under the terms of the Transaction Documents.  Without limiting the generality of the foregoing indemnification, each of the Loan Parties shall indemnify the Indemnified Parties for Indemnified Amounts relating to or resulting from:

(i)     any representation or warranty made by any Loan Party (or any officers of any such Person) under or in connection with this Agreement, any other Transaction Document or any other information or report delivered or required to be delivered by any such Person pursuant hereto or thereto, which shall have been false or incorrect when made or deemed made;

(ii)     the failure by any Loan Party to comply with any applicable Law with respect to any Contract, or the nonconformity of any Contract included therein with any such applicable Law or any failure of any Qualified Purchaser to keep or perform any of its obligations, express or implied, with respect to any Contract;

(iii)     any failure of any Loan Party to perform its duties, covenants or other obligations in accordance with the provisions of any Transaction Document to which it is a party;

(iv)     any environmental liability, products liability, personal injury or damage suit, or other similar claim arising out of or in connection with merchandise, insurance or services that are the subject of any Contract;

(v)     [reserved];

(vi)     the commingling of Collections at any time with other funds;

(vii)     any investigation, litigation or proceeding related to or arising from this Agreement or any other Transaction Document, the transactions contemplated hereby, the use of the proceeds of any Advance, the ownership of the Collateral or any other investigation, litigation or proceeding relating to any Loan Party in which any Indemnified Party becomes involved as a result of any of the transactions contemplated hereby;

735706711 19631142
28997904

(viii)    any inability to litigate any claim against any Qualified Purchaser in respect of any Contract as a result of such Qualified Purchaser being immune from civil and commercial law and suit on the grounds of sovereignty or otherwise from any legal action, suit or proceeding;

(ix)    any claim brought by any Person other than a Indemnified Party arising from any activity by the any Loan Party in servicing, administering or collecting any Collections;

(x)    any failure of any Loan Party to acquire and maintain legal and equitable title to, and ownership of any Inventory or other Collateral from BPI, free and clear of any Adverse Claim; or any failure of Borrower to give reasonably equivalent value to BPI under the Purchase Agreement in consideration of the transfer by it of any Inventory, or any attempt by any Person to void such transfer under statutory provisions or common law or equitable action;

(xi)    any failure to vest and maintain vested in the Administrative Agent (for the benefit of the Secured Parties) a valid and perfected first priority perfected security interest under all applicable Laws in the Collateral, free and clear of any Adverse Claim;

(xii)    the failure to have filed, or any delay in filing, financing statements or other similar instruments or documents under the UCC of any applicable jurisdiction or other applicable laws with respect to any Collateral, whether on the date hereof or at any subsequent time;

(xiii)    the failure by any Loan Party to pay when due any Taxes, including, without limitation, sales, excise or personal property taxes;

(xiv)    any action or omission by any Loan Party which reduces or impairs the rights of the Administrative Agent or the Lenders with respect to any Collateral or the value of any Collateral;

(xv)    any attempt by any Person to void any Advance or the Security Interest in the Collateral granted hereunder or in the Security Documents, whether under statutory provision, common law or equitable action;

(xvi)    any civil penalty or fine assessed by OFAC or any other Governmental Authority administering any Anti-Corruption Law, Anti-Money Laundering Laws or Sanctions, incurred in connection with the Transaction Documents; and

(xvii)    Collections being initially deposited in any bank account other than the Collection Account.

(xviii)    the inclusion of any Inventory in the calculation of the Borrowing Base as Eligible Inventory when it is not Eligible Inventory at the time so included.

Section 8.2    <u>Indemnities by the Servicer</u>.

(a)    Without limiting any other rights that the Administrative Agent or any Lender may have hereunder or under applicable law, each of the Borrower and Servicer jointly and severally hereby agrees to indemnify (and pay upon demand to) each Indemnified Party from and against any and all damages, losses, claims, Taxes, liabilities, costs, reasonable expenses and for all other amounts payable, including

735706711 19631142
28997904

reasonable fees and disbursements of external counsel (including, without limitation, reasonable fees and disbursements of U.S. and Mexican counsel) (all of the foregoing being collectively referred to as *"Servicer Indemnified Amounts"*) awarded against or incurred by any of them arising out of or as a result of the Servicer's failure to duly and punctually perform its obligations under this Agreement, in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnified Party and whether brought by an Indemnified Party, a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnified Party is a party thereto and whether or not any of the transactions contemplated hereby are consummated, *excluding, however,* in all of the foregoing instances:

> (A)     Servicer Indemnified Amounts to the extent a final judgment of a court of competent jurisdiction holds that such Servicer Indemnified Amounts resulted from gross negligence or willful misconduct on the part of the Indemnified Party seeking indemnification; and

> (B)     Taxes (which shall be governed by Sections 8.3 and 8.5) other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim or Taxes imposed on the Collateral or with respect to a transfer of the Collateral.

*provided, however,* that nothing contained in this sentence shall limit the liability of the Borrower or Servicer or limit the recourse of the Administrative Agent or the Lenders to the Borrower or Servicer for Collections received by the Servicer and required to be remitted by it under the terms of this Agreement. Without limiting the generality of the foregoing indemnification, the Servicer shall indemnify the Indemnified Parties for Servicer Indemnified Amounts relating to or resulting from:

> (i)     any representation or warranty made by any Loan Party or the Servicer (or any officers of any such Person) under or in connection with this Agreement, any other Transaction Document or any other information or report delivered or required to be delivered by any such Person pursuant hereto or thereto, which shall have been false or incorrect when made or deemed made;

> (ii)     the failure by the Servicer to comply with any applicable Law with respect to any Contract or the failure by the Servicer to keep or perform any of its obligations hereunder;

> (iii)     any failure of by the Servicer to perform its duties, covenants or other obligations in accordance with the provisions of this Agreement or any other Transaction Document;

> (iv)     the commingling of Collections or funds or other assets arising therefrom at any time with other funds;

> (v)     any investigation, litigation or proceeding relating to the Servicer in which any Indemnified Party becomes involved as a result of any of the transactions contemplated hereby, by any Contract or by any other Transaction Document;

> (vi)     any amounts payable by the Administrative Agent to the Collection Account Bank under the Collection Account Control Agreement;

<div align="center">47</div>

<div align="center">*Credit Agreement*</div>

<div align="center">**JOINT EXHIBIT NO. 18**
**Page 63 of 812**</div>

(vii)     any attempt by any Servicer to void any Security Interest in the Collateral granted hereunder or in the Security Documents, whether under statutory provision, common law or equitable action;

(viii)     any civil penalty or fine assessed by OFAC or any other Governmental Authority administering any Anti-Corruption Law, Anti-Money Laundering Laws or Sanctions, incurred in connection with the Transaction Documents;

(ix)     Collections being initially deposited in any bank account other than the Collection Account;

(x)     any action or omission by the Servicer relating to its obligations hereunder or under any other Transaction Document which reduces or impairs the rights of the Administrative Agent or the Lenders with respect to any Collections or the value thereof; and

(xi)     the inclusion of any Inventory in the calculation of the Borrowing Base as Eligible Inventory when it is not Eligible Inventory at the time so included.

Notwithstanding anything to the contrary in any Transaction Document, if any Loan Party is required to make any payment on account of Taxes under Section 8.5, or on or in relation to any of the transactions contemplated hereunder or under the other Transaction Documents (including, without limitation, any Taxes imposed by any jurisdiction as a result of such Loan Party having or being deemed to have a permanent establishment or other taxable presence (outside the United States) due to the activities of the Servicer, a Sub-Servicer or the Borrower in the jurisdiction imposing such Taxes), the Servicer undertakes in each case to promptly indemnify such Loan Party against such payment or liability, together with any interest, penalties and expenses payable or incurred in connection therewith.

Section 8.3     Increased Cost and Reduced Return.

(a)     If after the Closing Date, the Administrative Agent or any Lender shall be charged any fee, expense or increased cost on account of the adoption after the date hereof of any applicable Law, rule or regulation (including any applicable Law, rule or regulation regarding capital adequacy and any accounting principles) or any change after the date hereof in any applicable Law, rule or regulation, or any change after the date hereof in the interpretation or administration of any applicable Law, rule or regulation by the Financial Accounting Standards Board or any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency (a **“Regulatory Change”**): (a) that subjects the Administrative Agent or any Lender to any Taxes—other than Indemnified Taxes, Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and Connection Income Taxes—on its interest in the Collateral or its Commitment or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, (b) that imposes, modifies or deems applicable any reserve, assessment, liquidity requirement, compulsory loan, insurance or other insurance-related charge, special deposit or similar requirement against assets of, deposits with or for the account of the Administrative Agent or a Lender, or credit extended or any commitments to extend credit by the Administrative Agent or any Lender pursuant to this Agreement or any other Transaction Document, or (c) that imposes any other condition the result of which is to increase the cost to the Administrative Agent or any Lender of performing its obligations under the Transaction Documents, or to reduce the rate of return on the Administrative Agent's or any Lender's capital as a consequence of

735706711 19631142
28997904

its obligations under the Transaction Documents, or to reduce the amount of any sum received or receivable by the Administrative Agent or any Lender under any Transaction Document or to require any payment calculated by reference to the amount of interests in Collateral, then, upon demand by the Administrative Agent or such Lender, Borrower shall pay to the Administrative Agent or such Lender such amounts charged to such Person amounts to otherwise compensate such Person for such increased cost or such reduction; ***provided*** *that* notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act adopted on July 21, 2010 and all requests, rules, guidelines or directives thereunder and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a ***"Regulatory Change"***, regardless of the date enacted, adopted or issued.  For the avoidance of doubt, payments under this Section 8.3 in respect of increased Taxes shall be without duplication of any Taxes payable pursuant to Section 8.5.

(b)        In the event of (a)  the payment of any principal of any SOFR Loan other than on the last day of the Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any SOFR Loan other than on the last day of the Interest Period applicable thereto (including as a result of an Event of Default), (c) the failure to borrow, convert, continue or prepay any SOFR Loan on the date specified in any notice delivered pursuant hereto, or (d)  the assignment of any SOFR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower, then, in any such event, the Borrower shall compensate each Lender for any loss, cost and expense attributable to such event, including any loss, cost or expense arising from the liquidation or redeployment of funds or from any fees payable.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(c)        Delay in Requests.  Failure or delay on the part of the Administrative Agent or any Lender to demand compensation pursuant to this Section 8.3 shall not constitute a waiver of the Administrative Agent's or such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate the Administrative Agent or any Lender pursuant to this Section 8.3 for any increased costs incurred or reductions suffered more than nine months prior to the date that the Administrative Agent or such Lender, as the case may be, notifies the Borrower of the Regulatory Change giving rise to such increased costs or reductions, and of the Administrative Agent's or such Lender's intention to claim compensation therefor (except that, if the Regulatory Change giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 8.4        Other Costs and Expenses.  The Loan Parties shall pay, within ten (10) days following receipt of an invoice therefor: all out-of-pocket fees, costs and expenses incurred by the Administrative Agent and the Lenders (including, without limitation, reasonable fees, charges and disbursements of U.S. and Mexican counsel for the Administrative Agent and U.S. and Mexican counsel for the Lenders), in connection with (i) the preparation, negotiation, execution, delivery and administration of this Agreement and the other Transaction Documents (including (x) amounts incurred by the Administrative Agent and/or the Lenders in connection with certificates, searches and reports ordered by the Administrative Agent and/or the Lenders with respect to the Loan Parties during the term of this Agreement and the structuring and preparation of any proposal, commitment or financing

**JOINT EXHIBIT NO. 18**
**Page 65 of 812**

documents) or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) financial, legal and collateral due diligence (including, without limitation, travel costs and expenses); and

(b)     all out-of-pocket fees and expenses incurred by the Administrative Agent or any Lender (including the fees, charges and disbursements of one primary outside counsel to the Administrative Agent and the Lenders taken as a whole, and, if necessary, one local counsel in each relevant jurisdiction and special counsel and, in the event of any actual or potential conflict of interest, one additional counsel for each Lender subject to such conflict), in connection with (i) the enforcement or protection of its rights in connection with this Agreement and the other Transaction Documents, including its rights under this Section 8.4, and the documents and instruments referred to herein and therein or in connection with the Loans, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any of the Collateral or (iii) any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings (including, in each case, the fees and disbursements of counsel and consultants for the Administrative Agent and the Lenders).

Section 8.5     Taxes.

(a)     Any and all payments by or on account of any obligation of Borrower under any Transaction Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of Borrower) requires the deduction or withholding of any Tax from any such payment by Borrower, Servicer or the Administrative Agent, then such Person shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 8.5) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)     Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the written request of the applicable Recipient timely reimburse it for the payment of, any Other Taxes.

(c)     Borrower and Servicer shall indemnify each Recipient, on the first Payment Date which is at least forty-five (45) days after demand therefor, for the full amount of any (I) Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 8.5) payable or paid by such Recipient and any reasonable out-of-pocket expenses arising therefrom or with respect thereto other than any penalties or interest resulting from the gross negligence or willful misconduct of such Recipient, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; ***provided, however,*** that any amount of penalties and interest shall only be payable so long as such amounts have accrued on or after the date which is one hundred eighty (180) days prior to the date on which such Recipient firm made a demand therefor; ***provided*** that if the Borrower reasonably believes that such Taxes were not correctly asserted, such Recipient will use reasonable efforts to cooperate with the Borrower to obtain a refund of such Taxes (which shall be repaid to the Borrower in accordance with subsection 8.5(e)) so long as such efforts would

735706711 19631142
28997904

not, in the sole determination of such Recipient result in any additional out-of-pocket costs or expenses not reimbursed by the Borrower or be otherwise disadvantageous to such Recipient.  Each Recipient will promptly notify Borrower of any event of which it has knowledge, which will entitle such Recipient to compensation pursuant to this Section 8.5; ***provided, however,*** that failure of any Recipient to demand indemnification for any Taxes shall not constitute a waiver of such right to indemnification.  Any notice claiming indemnification under this Section 8.5 shall set forth in reasonable detail the additional amount or amounts to be paid to it hereunder and shall be conclusive in the absence of manifest error.  Borrower shall indemnify each Recipient for any damages and losses from any breach of the covenants in Section 5.1(u) and for any failure of Borrower to make any payment required pursuant to this Section 8.5.

(d)      Each Recipient agrees that it will use reasonable efforts to reduce or eliminate any claim for indemnity pursuant to this Section 8.5, including, subject to applicable law, a change in the funding office of such Recipient; ***provided, however,*** that nothing contained herein shall obligate any Recipient to take any action that imposes on such Recipient any additional unreimbursed costs or imposes material legal or regulatory burdens, or that would otherwise be disadvantageous to such Recipient.  Borrower hereby agrees to pay all reasonable costs and expenses incurred by a Recipient in connection with any such action.

(e)      If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 8.5 (including by the payment of additional amounts pursuant to this Section 8.5), it shall pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made under this Section 8.5 with respect to the Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Borrower, upon the request of such Recipient, shall repay to such Recipient the amount paid over pursuant to this clause (e) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Recipient is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this clause (e), in no event will the Recipient be required to pay any amount to Borrower pursuant to this clause (e) the payment of which would place the Recipient in a less favorable net after-Tax position than the Recipient would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any Recipient to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to Borrower or any other Person.

(f)      Each Lender shall deliver to Borrower, Servicer and the Administrative Agent, on or prior to the date on which such Lender becomes a Lender under this Agreement and as otherwise prescribed by applicable law or reasonably requested by Borrower or the Administrative Agent, such valid, properly completed and duly executed forms, certificates and documentation (including, as applicable, Internal Revenue Service Form W-8ECI, W-8BEN-E, W-8IMY or W-9 or successor form of the foregoing), along with any applicable attachments (including, in case of a Person claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, a certificate reasonably satisfactory to Borrower to the effect that such Person is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a ***"10 percent shareholder"*** of Borrower or Servicer within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code), prescribed by applicable law or reasonably requested by Borrower, Servicer or the Administrative Agent as will enable Borrower,

735706711 19631142
28997904

Servicer or the Administrative Agent to determine whether or not such Lender is entitled to any exemption from or reduction in the rate of withholding.  Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower, Servicer and Administrative Agent, in writing of its legal inability to do so.  Each Lender shall replace or update such forms when necessary to maintain any applicable exemption or reduction (if applicable) and as requested by the Administrative Agent or Borrower, as applicable.  Each Lender agrees to indemnify the Administrative Agent for and hold the Administrative Agent harmless from (i) any Indemnified Taxes attributable to such Lender (but only to the extent that Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of Borrower to do so), (ii) any Taxes relating to payments by Borrower to such Lender or such indemnitee arising from such Lender's failure to comply with this Section 8.5(f) or with the provisions of Section 10.6(a) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case together with any reasonable expenses arising therefrom or with respect thereto, regardless of whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  Any notice claiming indemnification under this Section 8.5(f) shall set forth in reasonable detail the additional amount or amounts to be paid to it hereunder and shall be conclusive in the absence of manifest error.  Each Lender hereby authorizes the Administrative Agent to set off any apply any and all amounts at any time owing to such Lender hereunder or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this Section 8.5(f).

(g)     If a payment made to the Administrative Agent or any Lender hereunder would be subject to U.S. federal withholding Tax imposed by FATCA if such payee were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such payee shall deliver to Borrower at the time or times prescribed by law and at such time or times reasonably requested by Borrower, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by Borrower as may be necessary for Borrower to comply with its obligations under FATCA and to determine that such payee has complied with such payee's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (g), the term *"FATCA"* shall include any amendments made to FATCA after the date of this Agreement.

(h)     If the Administrative Agent is a "United States person" (as defined in Section 7701(a)(30) of the Code), it shall provide the Borrower with two duly completed copies of Internal Revenue Service Form W-9. If the Administrative Agent is not a "United States person" (as defined in Section 7701(a)(30) of the Code), it shall provide (1) executed copies of Internal Revenue Service Form W-8ECI with respect to any amounts payable to the Administrative Agent for its own account and (2) executed copies of United States Internal Revenue Service Form W-8IMY certifying on Part I and Part VI of such Form W-8IMY that it is a U.S. branch that has agreed to be treated as a U.S. person for U.S. federal withholding tax purposes with respect to payments received by it from the Borrower.  The Administrative Agent shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide the certification described in the prior sentence.

Section 8.6      Currency Indemnity.

735706711 19631142
28997904

(a)       If, for the purpose of obtaining judgment in any court, it is necessary to convert an amount owing hereunder in one currency into another currency, each party hereto agrees, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that provided for in the definition of Spot Rate.

(b)       The obligations of Borrower and Servicer in respect of any amount due to any party hereto (or their respective assigns) or any holder of the obligations owing hereunder or under any other Transaction Agreement (the "*Applicable Creditor*") shall, notwithstanding any judgment in a currency (the "*Judgment Currency*") other than the currency in which such amount is stated to be due hereunder (the "*Agreement Currency*"), be discharged only to the extent that, on the Business Day following receipt by the Applicable Creditor of any amount adjudged to be so due in the Judgment Currency, the Applicable Creditor may in accordance with normal banking procedures in the relevant jurisdiction purchase the Agreement Currency with the Judgment Currency; if the amount of the Agreement Currency so purchased is less than the sum originally due to the Applicable Creditor in the Agreement Currency, the Borrower or Servicer, as the case may be, shall, as a separate obligation and notwithstanding any such judgment, indemnify the Applicable Creditor against such loss.

(c)       Any indemnification under this Section shall survive the termination of this Agreement.

## ARTICLE IX.

### THE ADMINISTRATIVE AGENT

Section 9.1       Appointment.

(a)       Each Lender hereby irrevocably designates and appoints GLAS Trust Company LLC, as Administrative Agent hereunder, and authorizes the Administrative Agent to take such action on its behalf under the provisions of the Transaction Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of the Transaction Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities on the part of the Administrative Agent shall be read into this Agreement or otherwise exist against the Administrative Agent. Also, each Lender hereby authorizes and appoints the Administrative Agent as an agent (*comisionista*) and consequently each Lender grants to the Administrative Agent a *comisión mercantil con representación* pursuant to Articles 273, 274 and other applicable Articles of the Mexican Commerce Code (*Código de Comercio*) to execute, deliver and perform any of the Transaction Document, and any other document or agreement derived, related or ancillary thereto which the Administrative Agent is a party, as well as any other document, agreement or instrument necessary or convenient for the delivery, perfection, execution and foreclosure of the referred agreement and any other collateral that may be granted in connection with any of the Transaction Documents or any of the Loans. Each such Lender irrevocably authorizes the Administrative Agent, as the agent for such Lender, to take such action on its behalf and in Administrative Agent's designated capacity under the provisions of this Agreement and the other Transaction Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Transaction Documents, together with such other powers as are reasonably incidental thereto. Furthermore, each of

735706711 19631142
28997904

the Lenders hereby authorizes the Administrative Agent to delegate the abovementioned *comisión mercantil con representación* pursuant to Article 280 and any other applicable Articles of the Mexican Commerce Code (*Código de Comercio*) to the extent permitted by and under the terms provided in any of the Transaction Documents. Notwithstanding any provision to the contrary elsewhere in this Agreement and the other Transaction Documents, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein or therein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Transaction Document or otherwise exist against the Administrative Agent and in favor of Lenders.

(b)      The provisions of this Article IX are solely for the benefit of the Administrative Agent and the Lenders, and the Loan Parties shall not have any rights as a third-party beneficiary or otherwise under any of the provisions of this Article IX (other than as provided in Section 9.9), except that this Article IX shall not affect any obligations which the Administrative Agent or any Lender may have to any of the Loan Parties under the other provisions of this Agreement.

(c)      In performing its functions and duties hereunder, the Administrative Agent shall act solely as the Administrative Agent of the Lenders and does not assume nor shall be deemed to have assumed any obligation or relationship of trust or agency with or for any of the Loan Parties or any of their respective successors and assigns.

Section 9.2      Delegation of Duties.  The Administrative Agent may execute any of its duties under the applicable Transaction Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

Section 9.3      Exculpatory Provisions.  Neither the Administrative Agent nor any of its directors, officers, agents or employees shall be (i) liable for any action lawfully taken or omitted to be taken by it or them or any Person described in Section 9.2 under or in connection with the Transaction Documents (except for its, their or such Person's own gross negligence, fraud or willful misconduct), or (ii) responsible in any manner to any of the Lenders or other agents for any recitals, statements, representations or warranties made by Borrower contained in any Transaction Document or in any certificate, report, statement or other document referred to or provided for in, or received under or in connection with, any Transaction Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other document furnished in connection herewith, or for any failure of either of Loan Parties to perform its respective obligations hereunder, or for the satisfaction of any condition specified in Article IV, except receipt of items required to be delivered to the Administrative Agent.  The Administrative Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements or covenants contained in, or conditions of, any Transaction Document, or to inspect the properties, books or records of Loan Parties.  This Section 9.3 is intended solely to govern the relationship between the Administrative Agent, on the one hand, and the Lenders, on the other.  In no event shall the Administrative Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes, pandemics or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware)

735706711 19631142
28997904

services.   In no event shall the Administrative Agent be liable for any indirect, special, punitive or consequential loss or damage of any kind whatsoever, including, but not limited to, lost profits, even if such loss or damage was foreseeable or it has been advised of the likelihood of such loss or damage and regardless of the form of action.

Section 9.4      Reliance by the Administrative Agent and the Lenders.

(a)      Each of the Administrative Agent and the Lenders shall in all cases be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, facsimile, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to Loan Parties), independent accountants and other experts selected by the Administrative Agent or such Lender.  The Administrative Agent shall be entitled to seek written directions from the requisite Lenders prior to taking any action under this Agreement or any of the Transaction Documents. The Administrative Agent shall in all cases be fully justified in failing or refusing to take any action under this Agreement or any other Transaction Document unless it shall first receive such written consent of the requisite Lenders.

(b)      Any action taken by the Administrative Agent in accordance with Section 9.4(a) shall be binding upon all Lenders.

Section 9.5      Notice of Events of Default.  The Administrative Agent and the Lenders shall not be deemed to have knowledge or notice of the occurrence of any Event of Default or Default unless it has received notice from another party referring to this Agreement, stating that an Event of Default or Default has occurred hereunder and describing such Event of Default or Default.   In the event that the Administrative Agent or one of the Lenders receives such a notice, it shall promptly give notice thereof to the other Lenders.  The Administrative Agent shall take such action with respect to such Event of Default or Default as shall be directed by either of the Lenders.

Section 9.6      Non-Reliance on the Administrative Agent or Other Lender.  Each of the Lenders expressly acknowledges that the Administrative Agent, the other Lender, and the respective officers, directors, employees, agents, attorneys-in-fact or affiliates of any of the foregoing has made no representations or warranties to it and that no act by the Administrative Agent or the other Lender hereafter taken, including, without limitation, any review of the affairs of Loan Parties, shall be deemed to constitute any representation or warranty by the Administrative Agent or such other Lender.  Each of the Lenders also represents and warrants to the Administrative Agent and the other Lender that it has, independently and without reliance upon any such Person (or any of their Affiliates) and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, prospects, financial and other conditions and creditworthiness of Loan Parties and made its own decision to enter into this Agreement.  Each of the Lenders also represents that it will, independently and without reliance upon any of the Administrative Agent or the other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, prospects, financial and other condition and creditworthiness of Loan Parties.  The Administrative Agent, the Lenders and the respective Affiliates of the foregoing, shall have no duty or responsibility to provide any party to this Agreement with any credit or other information concerning the

735706711 19631142
28997904

business, operations, property, prospects, financial and other condition or creditworthiness of Loan Parties which may come into the possession of such Person or any of its respective officers, directors, managers, employees, agents, attorneys-in-fact or affiliates.

Section 9.7       Indemnification of the Administrative Agent.  The Lenders severally agree to indemnify the Administrative Agent and its officers, directors, employees, representatives and agents (to the extent not reimbursed by Loan Parties and Guarantors and without limiting the obligation of Loan Parties and Guarantors to do so), ratably in accordance with their respective Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for the Administrative Agent or such Person in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not the Administrative Agent acts in its capacity as Administrative Agent, or such Person shall be designated a party thereto) that may at any time be imposed on, incurred by or asserted against the Administrative Agent or such Person as a result of, or arising out of, or in any way related to or by reason of, any of the transactions contemplated hereunder or the execution, delivery or performance of this Agreement or any other document furnished in connection herewith (but excluding any such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from the gross negligence, fraud or willful misconduct of the Administrative Agent or such Person, as the case may be, as finally determined by a court of competent jurisdiction).  The Administrative Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

Section 9.8       Administrative Agent in Its Individual Capacity.  The Administrative Agent in its individual capacity and the affiliates thereof may make loans to accept deposits from and generally engage in any kind of business with Loan Parties and their Affiliates as though the Administrative Agent were not the Administrative Agent hereunder.  With respect to its Loans, if any, the Administrative Agent shall have the same rights and powers under this Agreement as any Lender and may exercise the same as though it were not one of the Administrative Agent, and the terms "Lender" and "Lenders" shall include the Administrative Agent in its individual capacity.

Section 9.9       Successor Administrative Agent.

(a)       The Administrative Agent may at any time give written notice of its resignation to the Lenders and Borrower.  Upon receipt of any such notice of resignation, the Lenders shall have the right, with, prior to the occurrence of an Event of Default, the consent of Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Lenders) (the "Resignation Closing Date"), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Closing Date.  Upon resignation or replacement of any Administrative Agent in accordance with this Section 9.9, the retiring Administrative Agent shall execute or authorize the filing of such UCC-3

<div align="center">56</div>
<div align="center">*Credit Agreement*</div>

735706711 19631142
28997904

<div align="center">**JOINT EXHIBIT NO. 18**
**Page 72 of 812**</div>

assignments and amendments, and assignments and amendments of the Transaction Documents, as may be necessary to give effect to its replacement by a successor Administrative Agent.  After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of Article VIII and this Article IX shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.

(b)        If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Lenders may, to the extent permitted by applicable law, by written notice in writing to Borrower and such Person remove such Person as Administrative Agent and, in consultation with Borrower, appoint a successor.  If no such successor shall have been so appointed by the Lenders and shall have accepted such appointment within thirty (30) days after delivery of such notice (or such earlier day as shall be agreed by the Lenders) (the *"Removal Closing Date"*), then such removal shall nonetheless become effective in accordance with such notice on the Removal Closing Date.

(c)        With effect from the Resignation Closing Date or the Removal Closing Date (as applicable) (1) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Transaction Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Transaction Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (2) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Administrative Agent (other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Closing Date or the Removal Closing Date, as applicable), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Transaction Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor.  After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Transaction Documents, the provisions of this Article IX and Section 9.7 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

Section 9.10      Collateral.  Each of the Lenders hereby expressly recognizes and agrees that the Administrative Agent may be designated as the secured party of record on the various filings (including without limitation UCC filings) or registrations required to be made under this Agreement in order to perfect their respective interests in the Collateral and the party entitled to amend, release and terminate any such filings or registrations, and that such designation shall be for administrative convenience only in creating a record or nominee holder to take certain actions hereunder on behalf of the Lenders and that such listing will not affect in any way the status of the Lenders as the true parties in interest with respect to the Collateral.  In addition, such listing shall impose no duties on the Administrative Agent other than those expressly and specifically undertaken in accordance with this Article IX.  Notwithstanding anything in the Transaction Documents to the contrary, the Administrative Agent shall have no responsibility for

*Credit Agreement*

735706711 19631142
28997904

the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder. The Administrative Agent shall not be responsible for (i) the existence, genuineness or value of any of the Collateral, (ii) the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, fraud, bad faith or willful misconduct on the part of the Administrative Agent, (iii) the validity or sufficiency of the Collateral or any agreement or assignment contained therein, (iv) the validity of the title to the Collateral or (v) insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.  Other than as expressly set forth in Section 9.11 below, the Administrative Agent shall have no duty to ascertain or inquire as to or monitor the performance or observance of any of the terms of any other Transaction Documents by any other Person.

Section 9.11     Borrowing Base.  The Administrative Agent shall (a) check whether the Borrower has provided a Borrowing Base Certificate as and when required under this Agreement; (b) examine each Borrowing Base Certificate provided to it to ensure that the calculations made by the Borrower in the relevant Borrowing Base Certificate, based on the figures set out therein, are, on their face, accurate; (c) to the extent requested by any Lender, liaise with the Borrower to seek clarification and further information in relation to the calculations set out in each Borrowing Base Certificate; and (d) furnish to each Lender a copy of each Borrowing Base Certificate received by it by placing it in an online portal as agreed between the Administrative Agent and the Lenders.  The Administrative Agent is not, and shall not be held to be, liable for any information contained in the Borrowing Base Certificate (including without limitation, any inaccurate valuations or calculations contained therein) or any incorrect interest or fee calculations arising from any error in a Borrowing Base Certificate.

## ARTICLE X.

### ASSIGNMENTS; PARTICIPATIONS

Section 10.1     Assignments and Transfer of Commitments.  Each Lender shall have the right at any time or times to assign or transfer to an Eligible Assignee or any Affiliate of such Lender, without recourse, all or a portion of (a) that Lender's Commitment, and (b) all Loans made by that Lender; *provided, however,* in each such case, that the transferor and the transferee shall have complied with the following requirements:

(a)     No Prior Consent of Administrative Agent.  Assignments and transfers by any Lender may be consummated pursuant to this Section 10.1 without the prior written consent of the Administrative Agent;

(b)     Prior Consent of Borrower.  No assignments and/or transfers may be consummated pursuant to this Section 10.1 without the prior written consent of Borrower other than (i) an assignment or transfer by a Lender to another Lender or (ii) an assignment or transfer by any Lender to any Approved Fund or Affiliate of such Lender which consent of the Borrower shall not be unreasonably withheld, conditioned or delayed, provided however that no consent of the Borrower is needed for any assignment or transfer occurring during the existence of an Event of Default.

735706711 19631142
28997904

(c)      Minimum Amount.  No transfer may be consummated pursuant to this Section 10.1 (other than a transfer by any Lender to an Affiliate of such Lender) in an aggregate amount less than (a) one million U.S. Dollars ($1,000,000) or (b) if such Lender's Commitment is at any time less than one million U.S. Dollars ($1,000,000), the entire amount of such Lender's Commitment; and

(d)      Agreement; Transfer Fee.  Unless the transfer shall be to an Affiliate of the transferor or the transfer shall be due to merger of the transferor or for regulatory purposes, the transferor (A) shall remit to the Administrative Agent, for its own account, an administrative fee of three thousand five hundred U.S. Dollars ($3,500.00)(which fee may be waived or reduced in the sole discretion of the Administrative Agent) and (B) shall cause the transferee to execute and deliver to Borrower, the Administrative Agent and each Lender (1) an Assignment Agreement, in the form of Exhibit VI attached hereto and made a part hereof (an *"Assignment Agreement"*) together with the consents thereto in writing, and (2) such additional amendments, assurances and other writings as the Administrative Agent may reasonably require.

(e)      Upon satisfaction of the requirements of this Section 10.1, including the payment of the fee and the delivery of the documents set forth above, (A) the transferee shall become and thereafter be deemed to be a "Lender" for the purposes of this Agreement, (B) if the transferor transfers all of its interest, the transferor shall cease to be and thereafter shall no longer be deemed to be a "Lender" and shall have no further rights or obligations under or in connection herewith, and (C) the signature pages hereof and Schedule A hereto shall be automatically amended, without further action, to reflect the result of any such transfer.

Section 10.2      The Register.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of Borrower, shall maintain a copy of each Assignment Agreement delivered to it and a register or similar list (the *"Register"*) for the recordation of the names and addresses of the Lenders and the Commitment, Percentage, and principal amount (and stated interest) of the Loans owing to, each Lender from time to time.  The entries in the Register shall be conclusive, in the absence of manifest error, with respect to such information, and Borrower, the Administrative Agent and the Lenders shall treat each financial institution whose name is recorded in the Register pursuant to the terms hereof as the owner of the Loan recorded therein for all purposes of this Agreement.  The Register shall be available for inspection by Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.

Section 10.3      Certain Representations and Warranties; Limitations; Covenants.  By executing and delivering an Assignment Agreement, the parties to the assignment thereunder confirm to and agree with each other and the other parties hereto as follows:

(a)      Other than the representation and warranty that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim, the assigning Lender makes no representation and warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, the other Transaction Documents or any other instrument or document furnished pursuant hereto;

(b)      The assigning Lender makes no representation or warranty and assumes no responsibility of the financial condition of any Loan Party or any other Person primarily or secondarily liable in respect of any of the Indebtedness of Borrower to the Lenders, or the performance or observance by any Loan Party or any other Person primarily or secondarily liable in respect of any of the Indebtedness of Borrower

59

*Credit Agreement*

735706711 19631142
28997904

**JOINT EXHIBIT NO. 18**
**Page 75 of 812**

to the Lenders or any of their obligations under this Agreement or any of the other Transaction Documents or any other instrument or document furnished pursuant hereto or thereto;

(c)     Such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 5.1 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into the Assignment Agreement;

(d)     Such assignee will, independently and without reliance upon the assigning Lender, the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement;

(e)     Such assignee represents and warrants that it is an Eligible Assignee;

(f)     Such assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Transaction Documents as are delegated to the Administrative Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto;

(g)     Such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender; and

(h)     Such assignee represents and warrants that it is legally authorized to enter into such Assignment Agreement.

Section 10.4     No Assignment to Borrower.  No such assignment shall be made to Borrower or any of Borrower's Affiliates or Subsidiaries.

Section 10.5     No Assignment to Natural Persons.  No such assignment shall be made to a natural Person.

Section 10.6     Participations.  Each Lender shall have the right at any time or times, without the consent of any other party, to sell one or more participations or sub-participations to one or more financial institutions or any Affiliate of such Lender, in all or any part of that Lender's Commitment and any Loan made by that Lender.

(a)     Rights Reserved.  In the event any Lender shall sell any participation or sub-participation, that Lender shall, as between itself and the purchaser, retain all of its rights (including, without limitation, rights to enforce against the Loan Parties the Transaction Documents and any and all other documents in connection therewith) and duties pursuant to the Transaction Documents and any and all other documents in connection therewith, including, without limitation, that Lender's right to approve any waiver, consent or amendment pursuant to Section 9.02; ***provided, however,*** that (a) any such participation shall be in a minimum amount of one million U.S. Dollars ($1,000,000) and (b) the holder of any such participation shall not be entitled to require such Lender to take any action hereunder except action directly affecting (i) any reduction in the principal amount or an interest rate on any Loan in which such holder participates; (ii) any extension of the Maturity Date or the date fixed for any payment of Interest or principal payable with respect to any Loan in which such holder participates; and (iii) any

60
*Credit Agreement*

735706711 19631142
28997904

reduction in the amount of any fees payable under this Agreement with respect to any Loan in which such holder participates.  Borrower hereby acknowledges and agrees that the participant under each participation (the *"Participant"*) shall for purposes of Sections 8.3, 8.4 and 8.5 be considered to be a "Lender".  Except as otherwise set forth herein, no participant shall have any rights or obligations hereunder, and the Loan Parties and the Administrative Agent shall continue to deal solely and directly with the Lenders in connection with the Lenders' rights and obligations under this Agreement.  Borrower agrees that each Participant shall be entitled to the benefits of Section 8.5 (subject to the requirements and limitations therein, including the requirements under Sections 8.5(f) and 8.5(g) (it being understood that the documentation required under Sections 8.5(f) and 8.5(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.1; provided that such Participant (A) agrees to be subject to the provisions of Section 8.5(d) as if it were an assignee under Section 10.1; and (B) shall not be entitled to receive any greater payment under Section 8.3 or 8.5, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Regulatory Change that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Transaction Documents (the *"Participant Register"*); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Transaction Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(b)    No Delegation.  No participation shall operate as a delegation of any duty of the seller thereof.  Under no circumstances shall any participation be deemed a novation in respect of all or any part of the seller's obligations pursuant to this Agreement.

Section 10.7    Pledge by Lenders.  Notwithstanding any other provision of this Article X, any Lender may at any time pledge all or any portion of its interest and rights under the Transaction Documents to any of the federal reserve banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. §341.  No such pledge or the enforcement thereof shall release the pledgor Lender from its obligations hereunder or under any of the other Transaction Documents.

**ARTICLE XI.**

**GUARANTY**

Section 11.1    Guaranty. Each Guarantor hereby agrees that it is jointly and severally liable for, and, as primary obligor and not merely as surety, absolutely and unconditionally guarantees to the Secured Parties the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all costs and expenses including, without

61
*Credit Agreement*

735706711 19631142
28997904

limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations (such costs and expenses, together with the Obligations, collectively the "Guaranteed Obligations"). Each Guarantor further agrees that the Guaranteed Obligations may, to the extent permitted by the terms of this Agreement or any other Transaction Document, be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of any Lender that extended any portion of the Guaranteed Obligations.

Section 11.2    Guaranty of Payment. This Guaranty is a guaranty of payment and not of collection. Each Guarantor waives any right to require the Administrative Agent, or any Lender to sue any Borrower, any Guarantor, any other guarantor, or any other person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

Section 11.3    No Discharge or Diminishment of Guaranty.

(a)    Except as otherwise provided for herein or in any other Transaction Document, the obligations of each Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of any Borrower or any other guarantor of or other person liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Guarantor may have at any time against any Obligated Party, the Administrative Agent, any Lender, or any other person, whether in connection herewith or in any unrelated transactions.

(b)    The obligations of each Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)    Further, the obligations of any Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Administrative Agent, or any Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of any Borrower for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other person liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Administrative Agent, or any Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or

735706711 19631142
28997904

performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

Section 11.4    Defenses Waived.   To the fullest extent permitted by applicable law, each Guarantor hereby waives any defense based on or arising out of any defense of any Borrower or any Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of any Borrower or any Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against any Obligated Party, or any other person.  The Administrative Agent may, at its election, foreclose on any Collateral held by it by one or more judicial or non-judicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Guarantor under this Guaranty except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash.  To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any Obligated Party or any security.

Section 11.5    Subrogation.   No Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any collateral, until the Loan Parties and the Guarantors have fully performed all their obligations to the Administrative Agent, and the Secured Parties.

Section 11.6    Reinstatement; Stay of Acceleration If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of any Borrower or otherwise, each Guarantor's obligations under this Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Administrative Agent, and the Secured Parties are in possession of this Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of any Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantors forthwith on demand by the Lender.

Section 11.7    Information. Each Guarantor assumes all responsibility for being and keeping itself informed of the Loan Parties' financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Guaranty, and agrees that neither the Administrative Agent nor any Lender shall have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

735706711 19631142
28997904

Section 11.8    Maximum Liability.  The provisions of this Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Guaranty, then, notwithstanding any other provision of this Guaranty to the contrary, the amount of such liability shall, without any further action by the Guarantors or the Secured Parties, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "***Maximum Liability***").  This Section with respect to the Maximum Liability of each Guarantor is intended solely to preserve the rights of the Secured Parties to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other person or entity shall have any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law. Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor without impairing this Guaranty or affecting the rights and remedies of the Secured Parties hereunder, provided that, nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

Section 11.9    Contribution.  In the event any Guarantor (a "***Paying Guarantor***") shall make any payment or payments under this Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Guaranty, each other Guarantor (each a "***Non-Paying Guarantor***") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Applicable Percentage" of such payment or payments made, or losses suffered, by such Paying Guarantor.  For purposes of this Article X, each Non-Paying Guarantor's "Applicable Percentage" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from the Loan Parties after the date hereof (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Guarantor, the aggregate amount of all monies received by such Guarantors from the Loan Parties after the date hereof (whether by loan, capital infusion or by other means).  Nothing in this provision shall affect any Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Guarantor's Maximum Liability).  Each of the Guarantors covenants and agrees that its right to receive any contribution under this Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of the Guaranteed Obligations.  This provision is for the benefit of the Administrative Agent, the Secured Parties and the Guarantors and may be enforced by anyone, or more, or all of them in accordance with the terms hereof.

Section 11.10   Liability Cumulative.   The liability of each Loan Party as a Guarantor under this Article XI is in addition to and shall be cumulative with all liabilities of each Loan Party to the Administrative Agent and the Secured Parties under this Agreement and the other Transaction Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any

limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

Section 11.11    Holdings.

(a)    Holdings hereby represents and warrants to the Administrative Agent and the Lenders that, as of the date hereof, the net equity value of Holdings exceeds the product obtained by multiplying the Facility Limit by twenty (20) (the "Holdings Minimum Equity Value").

(b)    Holdings shall take such action as shall be necessary from time to time to ensure that the net equity value of Holdings, at all times, will not be less than the Holdings Minimum Equity Value.

(c)    Holdings shall conduct, transact and otherwise engage in and commit to conduct, transact and otherwise engage in only such operations and activities as are or shall be reasonably and directly related to its direct and indirect ownership of its subsidiaries, its obligations under the Transaction Documents and agreements relating to additional equity investments in Holdings so long as the same do not and will not result in any Change of Control.

**ARTICLE XII.**

**MISCELLANEOUS**

Section 12.1    Waivers and Amendments.

(a)    No failure or delay on the part of the Administrative Agent or any of the Lenders in exercising any power, right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude any other further exercise thereof or the exercise of any other power, right or remedy.  The rights and remedies herein provided shall be cumulative and nonexclusive of any rights or remedies provided by law.  Any waiver of this Agreement shall be effective only in the specific instance and for the specific purpose for which given.

(b)    No provision of this Agreement may be amended, supplemented, modified or waived except in writing in accordance with the provisions of this Section 12.1(b).  This Agreement and the provisions hereof may only be amended, supplemented, modified or waived in a writing signed by Borrower, the Servicer, the Administrative Agent and the Lenders.

(c)    Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender, and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

Section 12.2    Notices.  Except as provided in this Section 12.2, all communications and notices provided for hereunder shall be in writing (including email, bank wire, facsimile or electronic transmission or similar writing) and shall be given to the other parties hereto at their respective addresses or facsimile

735706711 19631142
28997904

numbers set forth on Schedule 12.2 hereto or at such other address or facsimile number as such Person may hereafter specify in writing for the purpose of notice to each of the other parties hereto.  Each such notice or other communication shall be effective (a) if given by facsimile or email, upon the receipt thereof, (b) if given by mail, three (3) Business Days after the time such communication is deposited in the mail with first class postage prepaid or (c) if given by any other means, when received at the address specified in this Section 12.2.

Section 12.3     Setoff; Ratable Payments.

(a)     If an Event of Default or Default shall have occurred and be continuing, each Lender and each of its respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Loan Party against any and all of the obligations of such Loan Party now or hereafter existing under this Agreement or any other Transaction Document to such Lender or its respective Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Transaction Document and although such obligations of such Loan Party may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; ***provided,*** that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 1.8 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the outstanding Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.

(b)     If an Event of Default or Default shall have occurred and be continuing, each Lender and each of its respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Servicer against any and all of the obligations of the Servicer now or hereafter existing under this Agreement or any other Transaction Document to such Lender or its respective Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Transaction Document and although such obligations of the Servicer may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; ***provided***, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 1.8 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the outstanding Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.

(c)     The rights of each Lender and its respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may

735706711 19631142
28997904

**JOINT EXHIBIT NO. 18**
**Page 82 of 812**

have.  Each Lender agrees to notify Borrower, Servicer and the Administrative Agent promptly after any such setoff and application, ***provided*** that the failure to give such notice shall not affect the validity of such setoff and application.  The provisions of this Section 12.3 shall not be construed to apply to any payment made by Borrower or Servicer pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender).

(d)      If any Lender (whether voluntary or involuntary, through the exercise of any right of by setoff or otherwise) has payment made to it with respect to any portion of the Obligations owing to such Lender (other than payments received pursuant to Section 8.3 or Section 1.9) in a greater proportion than that received by any other Lender entitled to receive a ratable share of such amount, such Lender agrees, promptly upon demand, to purchase for cash without recourse or warranty a portion of such Obligations held by the other Lenders so that after such purchase each Lender will hold its ratable proportion of such Obligations; ***provided*** that (i) if all or any portion of such excess amount is thereafter recovered from such Lender, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by any Loan Party or Guarantor pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant.

Section 12.4      Intended Tax Characterization.  The parties hereto intend and agree that, for the purposes of all Taxes, each Advance constitutes debt that is secured by the Collateral (the ***"Intended Tax Characterization"***).  The parties hereto agree to report and otherwise to act for the purposes of all Taxes in a manner consistent with the Intended Tax Characterization.

Section 12.5      Protection of Ownership and Security Interests.

(a)      Each Loan Party and Servicer agrees that from time to time, at the Loan Parties' expense, it will promptly execute and deliver all instruments and documents, and take all actions, that may be necessary or desirable, or that the Administrative Agent may reasonably request, to perfect, protect or more fully evidence the Administrative Agent's Security Interest (on behalf of the Lenders) in the Collateral, or to enable the Administrative Agent or the Lenders to exercise and enforce their rights and remedies hereunder.  At any time after the occurrence of an Event of Default, the Administrative Agent may direct any of the Loan Parties or the Servicer to notify each Qualified Purchaser, at the Loan Parties' expense, of the ownership or Security Interests of the Administrative Agent (on behalf of the Lenders) under this Agreement, and if such notification is not made within five (5) days after the Administrative Agent has so directed Borrower and the Servicer, the Administrative Agent may make such notification. Borrower or the Servicer (as applicable) shall, at the Administrative Agent's or any Lender's request, withhold the identity of the Administrative Agent or such Lender in any such notification.

(b)      If any of the Loan Parties or Servicer fails to perform any of its obligations hereunder, the Administrative Agent or any Lender may (but shall not be required to) perform, or cause performance of, such obligations, and the Administrative Agent's or such Lender's costs and expenses incurred in connection therewith shall be payable by the Loan Parties as provided in Section 8.4.

Section 12.6      Confidentiality.

(a)      General.  The Administrative Agent and each Lender agree to keep confidential all information obtained from the Loan Parties, BPI and their respective Affiliates, which is nonpublic and

confidential or proprietary in nature (including without limitation any information a Loan Party specifically designates as confidential), except as provided below, and to use such information only in connection with this Agreement and for the purposes contemplated hereby.  The Administrative Agent and each Lender shall be permitted to disclose such information (i) to outside legal counsel, accountants and other professional advisors who need to know such information in connection with the administration and enforcement of this Agreement, subject to agreement of such Persons to maintain the confidentiality of such information in accordance with the terms hereof, (ii) to assignees and Participants as contemplated by Section 10.6, and prospective assignees and participants, subject to the agreement of such Persons to maintain the confidentiality of such information in accordance with the terms hereof, (iii) to the extent requested by any bank regulatory authority or, with notice to the applicable Loan Party, as otherwise required by applicable Law or by any subpoena or similar legal process, or in connection with any investigation or proceeding arising out of the transactions contemplated by this Agreement or the other Transaction Documents, (iv) in connection with the exercise of any remedies hereunder or under any other Transaction Document or any action or proceeding relating to this Agreement or any other Transaction Document or the enforcement of rights hereunder or thereunder, (v) if it becomes publicly available other than as a result of a breach of this Agreement or becomes available from a source not known to be subject to confidentiality restrictions, or (vi) if the applicable Loan Party, BPI or the applicable Affiliate of the foregoing shall have consented, in writing, to such disclosure. Notwithstanding anything herein to the contrary, the information subject to this Section 12.6 shall not include, and the Administrative Agent and the Lenders may disclose without limitation of any kind, any information with respect to the "Tax treatment" and "Tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Administrative Agent or such Lender relating to such Tax treatment and Tax structure; *provided* that with respect to any document or similar item that in either case contains information concerning the Tax treatment or Tax structure of the transaction as well as other information, this sentence shall only apply to such portions of the document or similar item that relate to the Tax treatment or Tax structure of the Loans and transactions contemplated hereby.

(b)     Sharing Information with Affiliates of the Lenders.  The Loan Parties acknowledge that from time to time financial advisory, investment banking and other services may be offered or provided to the Loan Parties or one or more of its Affiliates (in connection with this Agreement or otherwise) by the Administrative Agent, a Lender or by one or more Subsidiaries or Affiliates thereof and each Loan Party hereby authorizes the Administrative Agent and the Lenders to share any information delivered to the Administrative Agent or such Lender by any Loan Party pursuant to this Agreement, or in connection with the decision of any Lender to enter into this Agreement, to any such Subsidiary or Affiliate of the Administrative Agent or such Lender, it being understood that any such Subsidiary or Affiliate of such Person receiving such information shall be bound by the provisions of this Section 12.6 as if it were a Lender hereunder.  Such authorization shall survive the repayment of the Loans and termination of the Commitments.

Section 12.7     CHOICE OF LAW.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW WHICH SHALL APPLY HERETO) EXCEPT TO THE EXTENT THAT THE PERFECTION OF THE ADMINISTRATIVE AGENT'S SECURITY INTEREST IN THE COLLATERAL OR REMEDIES HEREUNDER IN

735706711 19631142
28997904

RESPECT THEREOF ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

Section 12.8   <u>CONSENT TO JURISDICTION</u>.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, NEW YORK, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY DOCUMENT EXECUTED BY SUCH PERSON PURSUANT TO THIS AGREEMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM.   NOTHING HEREIN SHALL LIMIT THE RIGHT OF THE ADMINISTRATIVE AGENT OR THE LENDERS TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY OR HOLDINGS IN THE COURTS OF ANY OTHER JURISDICTION.   ANY JUDICIAL PROCEEDING BY ANY LOAN PARTY AGAINST THE ADMINISTRATIVE AGENT OR THE LENDERS OR ANY AFFILIATE THEREOF INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY DOCUMENT EXECUTED BY SUCH LOAN PARTY OR HOLDINGS PURSUANT TO THIS AGREEMENT SHALL BE BROUGHT ONLY IN A COURT IN THE BOROUGH OF MANHATTAN, NEW YORK.<u>WAIVER OF JURY TRIAL</u>.   EACH PARTY HERETO HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT, ANY DOCUMENT EXECUTED BY ANY LOAN PARTY OR HOLDINGS PURSUANT TO THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER OR THEREUNDER.

Section 12.10   <u>Integration; Binding Effect; Survival of Terms</u>.

(a)      This Agreement and each other Transaction Document contain the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof superseding all prior oral or written understandings.

(b)      This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns (including any trustee in bankruptcy) except that (i) the none of the Loan Parties, Guarantors or Servicer may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrowers without such consent shall be null and void).  This Agreement shall create and constitute the continuing obligations of the parties hereto in accordance with its terms and shall remain in full force and effect until terminated in accordance with its terms; ***provided, however,*** that the rights and remedies with respect to (i) any breach of any representation and warranty made by the Borrower or Servicer pursuant to <u>Article V</u>, (ii) the indemnification and payment provisions of <u>Article VIII</u>, (iii) <u>Sections 12.5</u> through and including <u>12.9</u> and (iv) <u>Sections 9.7</u> and <u>12.13</u>, shall be continuing and shall survive any termination of this Agreement.

Section 12.11   <u>Counterparts; Severability; Section References</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement.  To the fullest extent permitted by applicable law, delivery of an executed

735706711 19631142
28997904

**JOINT EXHIBIT NO. 18**
**Page 85 of 812**

counterpart of a signature page of this Agreement by telefacsimile or electronic image scan transmission (such as a "pdf" file) will be effective to the same extent as delivery of a manually executed original counterpart of this Agreement.  Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Unless otherwise expressly indicated, all references herein to *"Article," "Section," "Schedule"* or *"Exhibit"* shall mean articles and sections of, and schedules and exhibits to, this Agreement.

Section 12.12    Mutual Negotiations . This Agreement and the other Transaction Documents are the product of mutual negotiations by the parties thereto and their counsel, and no party shall be deemed the draftsperson of this Agreement or any other Transaction Document or any provision hereof or thereof or to have provided the same.  Accordingly, in the event of any inconsistency or ambiguity of any provision of this Agreement or any other Transaction Document, such inconsistency or ambiguity shall not be interpreted against any party because of such party's involvement in the drafting thereof.

Section 12.13    Bankruptcy Petition.  Servicer hereby covenants and agrees that, prior to the date that is one (1) year and one (1) day after the date after the Termination Date, it will not institute against, or join any other Person in instituting against, Borrower any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings or other similar proceeding under the Laws of the United States or any state of the United States.

Section 12.14    USA PATRIOT Act; Anti-Money Laundering Laws.  The Administrative Agent and each Lender hereby notifies the Borrower that pursuant to the requirements of the PATRIOT Act or any other Anti-Money Laundering Laws, each of them is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender to identify each Loan Party in accordance with the PATRIOT Act or such Anti-Money Laundering Laws.

[Signature pages to follow]

735706711 19631142
28997904

**JOINT EXHIBIT NO. 18**
**Page 86 of 812**

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date hereof.


**CARNABY INVENTORY II, LLC**, AS BORROWER


By: _____

Name:   Edward James

Title:    Executive Vice President


**FIRST BRANDS GROUP HOLDINGS, LLC**, AS GUARANTOR


By: _____

Name:   Michael Baker

Title:    Chief Corporate Strategy Officer


**CARNABY INVENTORY HOLDINGS II, LLC**, AS GUARANTOR


By: _____

Name:   Edward James

Title:    Executive Vice President


**FIRST BRANDS GROUP, LLC,** AS THE SERVICER


By: _____

Name:   Michael Baker

Title:    Chief Corporate Strategy Officer


*Credit Agreement*

ACKNOWLEDGED AND AGREED:

**BRAKE PARTS INC LLC**


By:_____
Name:  Michael Baker
Title:    Chief Corporate Strategy Officer



ACKNOWLEDGED AND AGREED:

**BPI BRAKE MANUFACTURING JUAREZ, S.A. DE C.V.**


By:_____
Name:  Michael Baker
Title:    Authorized Signatory



ACKNOWLEDGED AND AGREED:

**BPI BRAKING SYSTEMS MEXICO, S.A. DE C.V.**

By:_____
Name:  Michael Baker
Title:    Authorized Signatory

*Credit Agreement*

**GLAS TRUST COMPANY LLC**,
AS ADMINISTRATIVE AGENT

By:
Name:    Yana Kislenko
Title:    Vice President

*Credit Agreement*

**CVI CVF V POOLING FUND I LP,** AS LENDER
BY: CARVAL CVF V GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager

**CARVAL CONTINGENT CREDIT FUND LP**, AS LENDER
BY: CARVAL CCF GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager

**CVI CSF MASTER FUND I LP**, AS LENDER
BY: CARVAL CSF GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager

*Credit Agreement*

**CVI AA Master Fund I LP**, as Lender
CarVal AA GP LP, its General Partner
By: CVI General Partner, LLC, its general partner

By: _____
Name: Gerardo Bernaldez
Title: Manager

**CVI AV Master Fund I LP**, as Lender
CarVal AV General Partner LP, its General Partner
By: CVI General Partner, LLC, its general partner

By: _____
Name: Gerardo Bernaldez
Title: Manager

**CVI EMCOF US LLC**, as Lender
By: CarVal EMCOF GP LP, its Manager
By: CVI General Partner, LLC, its Manager

By: _____
Name: Gerardo Bernaldez
Title: Manager

**CarVal GCF Master Fund I LP**, as Lender
By: CarVal GCF GP LP, its General Partner
By: CVI General Partner, LLC, its general partner

By: _____
Name: Gerardo Bernaldez
Title: Manager

*Credit Agreement*

SCHEDULE A
COMMITMENTS

| Lender | Total Commitment | Allocation (%) |
|---|---|---|
| CVI CVF V Pooling Fund I LP | $ 31,080,000.00 | 51.8% |
| CarVal Contingent Credit Fund LP | $ 3,480,000.00 | 5.8% |
| CVI CSF Master Fund I LP | $ 1,140,000.00 | 1.9% |
| CVI AA Master Fund I LP | $ 10,320,000.00 | 17.2% |
| CVI AV Master Fund I LP | $ 2,700,000.00 | 4.5% |
| CarVal GCF Master Fund I LP | $ 1,260,000.00 | 2.1% |
| CVI EMCOF US LLC | $ 10,020,000.00 | 16.7% |
| | | |
| **Total** | **$ 60,000,000.00** | **100.0%** |

*Credit Agreement*

735706711 19631142
28997904

**JOINT EXHIBIT NO. 18**
**Page 92 of 812**

SCHEDULE 3.1(n)
REAL PROPERTY

None.

*Credit Agreement*

735706711 19631142
28997904

SCHEDULE 3.1(gg)
INSURANCE

| Line of Coverage | Carrier | Policy Number | Policy Period |
|---|---|---|---|
| Global Property Program | Zurich | PPR 0534586 02 | 7/1/2021 - 7/1/2022 |
| Global Property Program | Helvetia Swiss Insurance Company in Liechtenstein Ltd | PTNAM2107215 | 7/1/2021 - 7/1/2022 |
| Global Property Program | Aon Client Treaty | PTNAM2107215 | 7/1/2021 - 7/1/2022 |
| Global Property Program | ACE American Insurance Company (Starr Tech) | PGL N18228075 | 7/1/2021 - 7/1/2022 |
| Global Property Program | AIG Specialty Insurance Company | 25032984 | 7/1/2021 - 7/1/2022 |
| Global Property Program | Certain Underwriters at Lloyd's, Syndicate 4444 (Canopius) | B72230AAA | 7/1/2021 - 7/1/2022 |
| Global Property Program | Allied World Assurance Company, Ltd. | P072214/001 | 7/1/2021 - 7/1/2022 |
| Global Property Program | Princeton Excess and Surplus Lines Insurance Company | 78-A3-XP-0000820-00 | 7/1/2021 - 7/1/2022 |
| Global Property Program | Partner Re Insurance Ireland | PTNAM2107216 | 7/1/2021 - 7/1/2022 |
| Global Property Program | Aon Client Treaty | PTNAM2107216 | 7/1/2021 - 7/1/2022 |
| Global Property Program | Starr Surplus Lines Insurance Company | 21SUFDN11350101 | 7/1/2021 - 7/1/2022 |

*Credit Agreement*

735706711 19631142
28997904

| Global Property Program | Starr Surplus Lines Insurance Company | 21SUFDN11350201 | 7/1/2021 - 7/1/2022 |
|---|---|---|---|
| Global Property Program | Princeton Excess and Surplus Lines Insurance Company | 78-A3-XP-0000820-00 | 7/1/2021 - 7/1/2022 |
| Excess CA Earthquake (Centric and all California) | Bridgeway Insurance Company Illinois Union Insurance Company | 7EA7XP1001090-01 I11183128 002 | 12/30/21 to 7/1/22 |
| Workers Compensation and Employers Liability (AR, FL, MA, MN, VA, WI) | Travelers | UB-7P319783-21-51-R | 10/1/2021-22 |
| Workers Compensation and Employers Liability (AOS = All Other States) | Travelers | UB-7P330658-21-51-K | 10/1/2021-22 |
| General Liability | Travelers | TC2JGLSA-3J708077-TIL-20 | 10/1/2021-22 |
| Automobile Liability & Auto Physical Damage | Travelers | TJCAP-3J708028-20 | 10/1/2021-22 |
| Umbrella Liability | Chubb | G7254383A001 | 10/1/2021-2022 |
| Excess Liability | National Union Fire Ins. Co. (AIG) | 66323364 | 10/1/2021-2022 |

*Credit Agreement*

735706711 19631142
28997904

**JOINT EXHIBIT NO. 18**
**Page 95 of 812**

| Excess Liability | Endurance American Insurance Company (Sompo) | EXC30002039401 | 10/1/2021-2022 |
|---|---|---|---|
| Excess Liability | Axis Surplus Insurance Company | P-001-000437750-02 | 10/1/2021-2022 |
| Excess Liability | Ascot Bermuda Limited | AB2021-00254 | 10/1/2021-2022 |
| Excess Liability | Chaucer - 50% Convex - 50% | CSUSA2105410 | 10/1/2021-2022 |
| Excess Liability | Great American E&S Insurance Co. | XS E653547-01 | 10/1/2021-2022 |
| Excess Liability | Argo Re Ltd. | ARGO-CAS-OCC-001587.2 | 10/1/2021-2022 |
| Excess Liability | Ascot Bermuda - Allianz Global | RA21RF536M2X | 10/1/2021-2022 |
| Excess Liability | XL Insurance America, Inc. | US00107612L121B | 10/1/2021-2022 |

*Credit Agreement*

735706711 19631142
28997904

SCHEDULE 12.2
ADDRESSES FOR NOTICES

Administrative Agent

GLAS Trust Company LLC
3 Second Street, Suite 206
Jersey City, NJ 07311
Fax:      212-202-6246
Phone:  +1 (201) 839-2200
Email:   ClientServices.Americas@glas.agency;
          tmgus@glas.agency

and

Dechert LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Attn:     Jeffrey Katz
Email:   jeffrey.katz@dechert.com

Loan Parties

Carnaby Inventory II, LLC
1540 Broadway, Suite 3710
New York, New York
Attn:     Shekhar Kumar, Managing Director
Email:   shekhar.kumar@viceroyprivatecapital.co

Holdings

First Brands Group Holdings, LLC
c/o First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attn:     Edward James, Executive Vice President
Email:   ed.james@firstbrandsgroup.com

Servicer

First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attn:     Edward James, Executive Vice President
Email:   ed.james@firstbrandsgroup.com

*Credit Agreement*

28997904

**EXHIBIT I**

**DEFINITIONS**

Except as otherwise specified in this Agreement, all references in this Agreement (i) to any Person (other than Borrower) shall be deemed to include such Person's successors and assigns, and (ii) to any law, agreement, statute or contract specifically defined or referred to in this Agreement shall be deemed references to such law, agreement, statute or contract as the same may be supplemented, amended, waived, consolidated, replaced or modified from time to time, but only to the extent permitted by, and effected in accordance with, the terms thereof. The words *"herein," "hereof"* and *"hereunder"* and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any provision of this Agreement, and references to *"Article," "Section," "paragraph," "Exhibit," "Schedule"* and *"Appendix"* are references to this Agreement unless otherwise specified.  Whenever the context so requires, words importing any gender include the other gender.  Any of the defined terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference; the singular includes the plural, and the plural includes the singular.  The word *"or"* shall not be exclusive.

All accounting terms not otherwise defined in this Agreement shall have the meanings assigned them in conformity with GAAP.  All terms used in Article 9 of the UCC and not specifically defined in this Agreement shall be defined herein and in the Transaction Documents as such terms are defined in the UCC as in effect in the State of New York.  Each reference to this Agreement, any other Transaction Document, or any other agreement shall be a reference to such agreement together with all exhibits, schedules, attachments and appendices thereto, in each case as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof.  References to *"writing"* include facsimile, printing, typing, lithography and other means of reproducing words in a tangible visible form including computer-generated information accessible in tangible visible form. References to *"written"* include faxed, printed, typed, lithographed and other means of reproducing words or symbols in a tangible visible form consistent with the preceding sentence.  The words *"including," "includes"* and *"include"* shall be deemed to be followed by the words *"without limitation"*.

Unless otherwise expressly provided herein, any period of time ending on a day which is not a Business Day shall end on the next succeeding Business Day.  Unless otherwise stated in this Agreement, in the computation of a period of time from a specified date to a later specified date, the word *"from"* means *"from and including"* and the words *"to"* and *"until"* each means *"to but excluding."*

In addition, as used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

*"ABR Loan"* means a Loan that bears interest based on the Alternate Base Rate.

*"Administrative Agent"* has the meaning set forth in the preamble to this Agreement.

*"Administrative Agent's Account"* means account no. 780895600, at JPMorgan Chase, or any other account or accounts as the Administrative Agent may indicate in writing to Borrower and the Servicer from time to time.

1

*"Advance"* means an advance made by the Lenders pursuant to this Agreement, including any Overadvances and Protective Advances.

*"Adverse Claim"* means any claim of ownership or any Lien; it being understood that any Permitted Lien shall not constitute an Adverse Claim.

*"Affiliate"* means, with respect to any Person hereto, any Person that directly or indirectly controls, is controlled by or is under common control with such Person.  The term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and in any case, without limitation, "control" as defined under the laws of the relevant jurisdiction.

*"Aggregate Commitment"* means, on any date of determination, the aggregate of all Lenders' Commitments.

*"Aggregate Prepayment"* has the meaning specified in Section 1.3(b).

*"Agreement"* means this Credit Agreement, as it may be amended, restated, supplemented or otherwise modified and in effect from time to time.

*"Alternate Base Rate"* or "*ABR*" means, for any day, a rate *per annum* equal to the higher as of such day of (i) the Prime Rate, (ii) 0.50% above the Federal Funds Rate or (iii) 1.00% above Term SOFR for a one-month tenor in effect on such day.  For purposes of determining the Alternate Base Rate for any day, changes in the Prime Rate, the Federal Funds Rate or Term SOFR shall be effective on the date of each such change.

*"Alternative Currency"* means Mexican pesos.

"*Anti-Corruption Laws*" means all laws, rules, and regulations of any jurisdiction from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder and the U.K. Bribery Act 2010 and the rules and regulations thereunder and the Corruption of Foreign Public Officials Acts (Canada) and the rules and regulations thereunder.

"*Anti-Money Laundering Laws*" means any and all laws, statutes, regulations or obligatory government orders, decrees, ordinances or rules related to terrorism financing, money laundering, any predicate crime to money laundering or any financial record keeping, including any applicable provision of the PATRIOT Act and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959) and the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada).

*"Applicable Margin"* means 14.00%.

"*Applicable Unused Credit Facility Fee Rate*" means, with respect to the calculation of the Unused Credit Facility Fee at any time, (a) a rate per annum equal to one half of one percent (0.50%) with respect to that portion of the relevant average daily amount of the undrawn aggregate Commitment that does not exceed $15,000,000, and (b) a rate per annum equal to the Interest Rate hereunder with respect to that portion of the relevant average daily amount of the undrawn aggregate Commitment that exceeds $15,000,000. For the avoidance of doubt, the Unused Credit Facility Fee due at any time hereunder in

2

28997904

**JOINT EXHIBIT NO. 18**
**Page 99 of 812**

accordance herewith shall equal the sum of the amounts as calculated in accordance with clause (a) and clause (b) above.

"*Approved Foreign Jurisdiction*" means, at any time, any country that that satisfies each of the following: (i) is not a Sanctioned Country and (ii) is not a country as to which the Administrative Agent has notified the Borrower that such country is ineligible.

"*Approved Fund*" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or Affiliate of an entity that administers or manages a Lender.

"*Assignment Agreement*" has the meaning set forth in Section 10.1(d).

"*Available Tenor*" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 1.15.

"*Benchmark*" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 1.15(a).

"*Benchmark Replacement*" means, with respect to any Benchmark Transition Event, the sum of: (a) the ABR that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment; provided that, if such Benchmark Replacement as so determined would be less than 1.00%, such Benchmark Replacement will be deemed to be 1.00% for the purposes of this Agreement and the other Transaction Documents.

"*Benchmark Replacement Adjustment*" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"*Benchmark Replacement Date*" means the earliest to occur of the following events with respect to the then-current Benchmark:

<div align="center">3</div>

28997904

(a)  in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)  in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; <u>provided</u> that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"***Benchmark Transition Event***" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

4

28997904

"**Benchmark Transition Start Date**" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"**Benchmark Unavailability Period**" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Transaction Document in accordance with Section 1.15 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Transaction Document in accordance with Section 1.15.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 CFR § 1010.230.

"**Borrower**" has the meaning set forth in the preamble to this Agreement.

"**Borrowing Availability**" means, on any Business Day, after giving prospective effect to a contemplated Advance, that the aggregate principal amount of Loans outstanding hereunder will be less than the lesser of (a) the Facility Limit and (b) the Borrowing Base as of such day.

"**Borrowing Base**" means, on any date of determination, an amount equal to 90% of the Net Orderly Liquidation Value of Eligible Inventory of the Borrower.  The Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 5.1(e).

"**Borrowing Base Certificate**" means a certificate, signed and certified as accurate and complete by the chief financial officer or treasurer of the Borrower, in substantially the form of Exhibit X or another form which is acceptable to the Administrative Agent in its Permitted Discretion.

"**Borrowing Date**" means the Business Day on which any Advance occurs.

"**Borrowing Notice**" has the meaning set forth in Section 1.2(a).

"**BPI**" means Brake Parts Inc LLC.

"**Business Day**" means any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in New York, New York or in any location where a Collection Account is maintained.

"**Capital Expenditures**" means, for any period, expenditures during such period for any purchase or other acquisition of any asset which would be classified as a fixed or capital asset on a consolidated balance sheet of the Loan Parties prepared in accordance with GAAP.

28997904

*"Capital Stock"* means, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, whether now outstanding or issued or acquired after the Closing Date, including common shares, *acciones*, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership, interests in a trust, interests in other unincorporated organizations, warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests) or any other equivalent of such ownership interest.

*"Change of Control"* means the occurrence of any of the following:

(i)     First Brands Parent shall cease to own, directly or indirectly, a majority of the issued and outstanding Capital Stock and all other equity interests of Holdings;

(ii)    First Brands Parent shall cease to own, directly or indirectly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of Parent;

(iii)   Parent shall cease to own, directly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of the Borrower free and clear of any Adverse Claim;

(iv)    Holdings shall cease to own, directly or indirectly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of First Brands;

(v)     First Brands shall cease to own, directly or indirectly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of BPI and each Maquiladora (other than, for the avoidance of doubt, as expressly set forth in the definition of Maquiladora);

(vi)    at any time prior to the consummation of a Qualifying IPO, the Permitted Holders ceasing to own or control, directly or indirectly, at least 50.1% of the then outstanding voting stock of Holdings in the aggregate;

(vii)   at any time upon or after the consummation of a Qualifying IPO, and for any reason whatsoever, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person and its Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders shall be the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of more than the lesser of (i) 30% of the then outstanding voting stock of Holdings in the aggregate and (ii) the aggregate amount of outstanding voting stock of Holdings held, directly or indirectly, by the Permitted Holders; or

(viii)  a "Change of Control" (as defined in the Credit Agreement) or under the Term Loan Agreement shall have occurred.

*"Closing Date"* means May 31, 2022.

6

28997904

*"Code"* means the Internal Revenue Code of 1986, and the rules and regulations thereunder, each as amended or modified from time to time.

*"Collateral"* means any and all assets on which a Lien is granted to the Administrative Agent, for the benefit of the Secured Parties, pursuant to any Security Document to secure the Obligations and any guaranty thereof.

*"Collection Account"* has the meaning set forth in Section 2.1(a).

*"Collection Account Bank"* has the meaning set forth in Section 2.1(a).

*"Collection Account Control Agreement"* means an agreement, in form and substance acceptable to the Administrative Agent and the Lenders, in which the Collection Account Bank agrees to take instructions from the Administrative Agent, either directly or as assignee of Borrower, with respect to the disposition of funds in the Collection Account without further consent of any applicable Loan Party; *provided, however,* that such agreement shall allow the Borrower to give instructions with respect to such Collection Account prior to the Administrative Agent's delivery of a notice of exclusive control, pursuant to which the Administrative Agent exercises its exclusive right to direct the disposition of funds on deposit in the Collection Account in accordance with such Collection Account Control Agreement.

*"Collections"* means, with respect to all cash collections and other cash proceeds in respect of the sale, transfer or disposition of Inventory or other Collateral.

*"Commitment"* means, for each Lender, the commitment of such Lender to make Loans to Borrower from time to time, in an amount not to exceed (a) in the aggregate, the amount set forth opposite such Lender's name on Schedule A to this Agreement, as such amount may be modified in accordance with the terms hereof and (b) with respect to any individual Loan hereunder, such Lender's Percentage of the aggregate principal amount of the requested Advance.

*"Commitment Fee"* has the meaning specified in Section 1.11(a).

"*Conforming Changes*" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 8.3 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Transaction Documents).

*"Connection Income Taxes"* means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

7

28997904

*"Contract"* means, with respect to any purchase or sale of Inventory, any and all instruments, agreements, invoices or other writings evidencing the purchase or sale of Inventory, including each Purchase Order.

*"Credit Agreement"* means that certain ABL Credit Agreement, dated as of February 2, 2018, among First Brands, as lead borrower, First Brands Limited, as UK borrower, Trico Belgium SA, as Belgian Borrower, the other borrowers from time to time party thereto, First Brands Group Intermediate, LLC, as parent, Bank of America, N.A., as Administrative Agent and collateral agent (the "**Credit Agreement Agent**") and the other parties from time to time party thereto, as the same may be amended, restated or otherwise modified from time to time.  In the event that the "Credit Agreement" is terminated, references herein to "Credit Agreement" shall mean the "Credit Agreement" as in effect immediately prior to the termination thereof.

*"Credit Agreement Agent"* has the meaning set forth in the definition of "Credit Agreement".

*"Credit Agreement Compliance Period"* means the "Compliance Period" (or other similar or replacement term) under and as defined in the Credit Agreement as in effect on the Closing Date and without giving effect to any amendment, restatement, waiver, supplement or termination thereof (unless otherwise agreed to in writing by the Administrative Agent hereunder at the direction of the Required Lenders).

*"Default"* means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

*"Defaulting Lender"* means, subject to Section 1.8(b), any Lender that (a) has failed to fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and Borrower in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default or Event of Default, shall be specifically identified in such writing) has not been satisfied, (b) has notified the Administrative Agent and Borrower in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable Default or Event of Default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or Borrower, to confirm in writing to the Administrative Agent and Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any debtor relief law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or such Lender or its direct or indirect parent company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment or become insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of creditors; *provided* that a Lender shall not

28997904

be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 1.8(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to Borrower and each other Lender promptly following such determination.  Failure of the Administrative Agent to conclude that a Lender is a Defaulting Lender shall not limit the rights and remedies of Borrower in regards to any Lender that constitutes a Defaulting Lender.

"*Designated Funding Office*" has the meaning set forth in Section 1.9.

"*Eligible Assignee*" means (a) a Lender, (b) an Approved Fund, (c) any commercial bank, insurance company, mutual fund, finance company, financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act) and (d) any Affiliate of a Lender, provided that, in any event, "Eligible Assignee" shall not include (i) any natural person or (ii) the Borrower, First Brands or any of its respective Affiliates or Subsidiaries.

"*Eligible Inventory*" means Inventory owned by the Borrower consisting of all brakes inventory, including raw materials and finished goods, that is physically located in the Servicer's facilities located in Mexico, other than Inventory:

    a.   which is not subject to a first priority perfected Lien in favor of the Administrative Agent under the Security Documents;

    b.   which is subject to any Lien other than a Permitted Lien;

    c.   which is obsolete, unmerchantable or defective;

    d.   in which any Person other than the Borrower shall (i) have any direct or indirect ownership, interest or title (including retention of title claims) or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein (other than rights of a bailee or transporter in the ordinary course of business);

    e.   which is not located in the U.S. or Mexico;

    f.   which is being processed offsite at a third party location or outside processor, or is in-transit to or from such third party location or outside processor;

    g.   which is a discontinued product or component thereof;

    h.   which is the subject of a consignment by such Loan Party as consignor;

9

28997904

i.  which contains or bears any intellectual property rights licensed to the Borrower unless the Administrative Agent is satisfied in its Permitted Discretion that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

j.  which is not reflected in a current perpetual inventory report of the Borrower;

k.  for which reclamation rights have been asserted by the seller; or

l.  which is not subject to a Purchase Order.

In the event that Inventory which was previously Eligible Inventory ceases to be Eligible Inventory hereunder (other than a result of the sale of such Inventory to a Qualified Purchaser pursuant to any Sale Agreement), the Borrower shall notify the Administrative Agent thereof on and at the time of submission to the Administrative Agent of the next Borrowing Base Certificate. To the extent the Administrative Agent uses its Permitted Discretion under this definition to make the standards of eligibility hereunder more restrictive, then any such change will only be effective three (3) Business Days after notice thereof from the Administrative Agent to the Borrower.

Notwithstanding anything herein to the contrary, Inventory shall cease to be Eligible Inventory and shall be excluded from the Borrowing Base for all purposes once a period of 90 days has elapsed from the earlier of (i) the date of purchase or other acquisition of such inventory by the Borrower and (ii) the date of the related Advance in respect of such inventory, it being understood and agreed that if no Advance is requested concurrently with the addition of any such Eligible Inventory to the Borrowing Base, the date of "Advance" with respect to such Eligible Inventory shall be deemed to be the date on which it is first included in the Borrowing Base.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time and the regulations promulgated and rulings issued thereunder.

"*ERISA Affiliate*" means any Person that is under common control with any Loan Party or Subsidiary thereof and is treated as a "single employer," or otherwise aggregated with the Borrower or a Subsidiary under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"*ERISA Event*" means (a) any Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations at any facility of any Loan Party or any ERISA Affiliate as described in Section 4062(e) of ERISA, in each case, resulting in liability pursuant to Section 4063 of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan resulting in the imposition of Withdrawal Liability on any Loan Party, notification of any Loan Party or any ERISA Affiliate concerning the imposition of Withdrawal Liability or notification that a Multiemployer Plan is "insolvent" within the meaning of Section 4245 of ERISA; (d) the filing of a notice of intent to terminate any Pension Plan under Section 4041(c) of ERISA, the treatment of a Pension Plan amendment as a termination under Section 4041(c) of ERISA, the commencement of proceedings by the PBGC to terminate a Pension Plan or the receipt by any Loan Party or any ERISA Affiliate of notice of the treatment of a Multiemployer Plan amendment as a termination under Section 4041A of ERISA or of notice of the commencement of proceedings by the PBGC

10

28997904

to terminate a Multiemployer Plan; (e) the occurrence of an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or ERISA Affiliates, with respect to the termination of any Pension Plan; (g) the conditions for imposition of a Lien under Section 303(k) of ERISA shall have been met with respect to any Pension Plan; (h) with respect to any Pension Plan, the failure to meet the minimum funding standard of Section 412 of the Code or the failure to make any required contribution in accordance with Section 515 of ERISA; (i) receipt from the Internal Revenue Service of notice of the failure of any Plan to qualify under Section 401(a) of the Code that is intended to be so qualified, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code; (j) the occurrence of a non-exempt prohibited transaction under Sections 406 or 407 of ERISA or Section 4975 of the Code for which any Loan Party or any ERISA Affiliate may be directly or indirectly liable; (k) the determination that any Multiemployer Plan is considered a plan in "endangered", "critical", or "critical and declining" status within the meaning of Section 432 of the Code or Section 305 of ERISA; or (l) a Foreign Plan Event.

"***Event of Bankruptcy***" shall be deemed to have occurred with respect to a Person if either:

(a)        (i) a case, application, petition or other proceeding shall be commenced, without the application or consent of such Person, in any court, seeking *concurso mercantil*, *quiebra,* liquidation, examinership, reorganization, debt arrangement, dissolution, administration, winding up, or composition or readjustment of debts of such Person, the appointment of a trustee, receiver, interim receiver, receiver and manager, monitor, custodian, liquidator, examiner, administrator, assignee, sequestrator, *visitador*, *conciliador*, *síndico* (or other similar official) for such Person or all or substantially all of its assets, or any similar action with respect to such Person under any applicable Law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, including any applicable corporations legislation to the extent the relief sought under such corporations legislation relates to or involves the compromise, settlement, adjustment or arrangement of debt; or (ii) an order for relief in respect of such Person shall be entered in an involuntary case under federal bankruptcy laws or other similar applicable Laws, including any applicable corporations legislation to the extent the relief sought under such corporations legislation relates to or involves the compromise, settlement, adjustment or arrangement of debt, now or hereafter in effect; or

(b)        such Person (i) shall commence a voluntary case, application, petition or other proceeding under any applicable bankruptcy, *concurso mercantil*, *quiebra,* insolvency, reorganization, debt arrangement, dissolution, administration or other similar law, including any applicable corporations legislation to the extent the relief sought under such corporations legislation relates to or involves the compromise, settlement, adjustment or arrangement of debt, now or hereafter in effect, (ii) shall consent to the appointment of or taking possession by a receiver, interim receiver, receiver and manager, monitor, liquidator, examiner, administrator, assignee, trustee, custodian, sequestrator, *visitador*, *conciliador*, *síndico* (or other similar official) for, such Person or for any substantial part of its property or (iii) shall make any general assignment for the benefit of creditors, or shall fail to, or admit in writing its inability to, pay its debts generally as they become due, or, if a corporation or similar entity, its board of directors (or any board or Person holding similar rights to control the activities of such Person) shall vote to implement any of the foregoing.

"***Event of Default***" has the meaning specified in Section 7.1.

11

28997904

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended or otherwise modified from time to time.

"*Excluded Taxes*" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to any Recipient:  (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in an Advance or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Advance or Commitment, or (ii) such Lender changes its funding office, except in each case to the extent amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before its changed its funding office, (c) Taxes attributable to any Recipient's failure to comply with Section 8.5(f) or 8.5(g), and (d) any Taxes imposed under FATCA.

"*Facility Account*" means Borrower's account no. 359681655965 maintained at Keybank National Association, Account Name: Carnaby Inventory II, LLC, or such other account as may be designated by Borrower in writing from time to time.

"*Facility Limit*" means, at any time prior to the Maturity Date, the sum of the Commitments, as they may be amended from time to time in accordance with this Agreement.  As of the Closing Date, the Facility Limit is $60,000,000.

"*Fair Market Value*" means, at the time of any given transaction, with respect to any asset or property, the price (after taking into account any liabilities related to such asset or property) that could be negotiated in an arm's-length transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction.

"*FATCA*" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with) any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"*Federal Bankruptcy Code*" means Title 11 of the United States Code entitled "Bankruptcy," as amended, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency, *concurso mercantil*, or creditors' rights or any other Federal or state bankruptcy or insolvency law, including, without limitation the Mexican Insolvency Law (*Ley General de Concursos Mercantiles*).

"*Federal Funds Rate*" means, for any day, (i) the rate per annum determined by the Federal Reserve Bank of New York based on federal funds transactions on such day (or, if such day is not a Business Day, for the immediately preceding Business Day) and published as the federal funds effective rate by the Federal Reserve Bank of New York on the Business Day next succeeding such day, or, (ii) if such rate is not so published for any day that is a Business Day, the rate otherwise established by the Administrative Agent

12

28997904

in any reasonable manner as the rate per annum applicable to federal funds transactions (which in any event, with respect to clause (i) and (ii) above, shall not be less than 1.00%).

"**Financial Covenant Breach**" means a breach that shall occur if the "Fixed Charge Coverage Ratio" calculated as of the last day of each fiscal quarter of First Brands exceeds 1.00 to 1.00. For purposes of this definition of "Financial Covenant Breach":

(a)     unless otherwise defined in this Agreement, the terms used in this definition (including all defined terms used within such terms) shall have the respective meaning assigned to such terms in the Credit Agreement; and

(b)     any reference to the "Credit Agreement" is to such agreement as in effect on the Closing Date and without giving effect to any amendment, restatement, waiver, supplement or termination thereof (unless otherwise agreed to in writing by the Administrative Agent hereunder at the direction of the Required Lenders).

"*First Brands*" has the meaning set forth in the preamble to this Agreement.

"*First Brands Parent*" means Viceroy Private Capital, LLC, a Delaware limited liability company.

"*Fiscal Quarter*" means the period(s) of October 1 through December 31, January 1 through March 31, April 1 through June 30, and July 1 through September 30 of each calendar year.

"**Foreign Plan**" means any employee benefit plan, program, policy, arrangement or agreement established, maintained or contributed to by any Loan Party or any of their respective Subsidiaries primarily for the benefit of employees of any Loan Party or any of its Subsidiaries employed outside the United States.

"**Foreign Plan Event**" means, with respect to any Foreign Plan, (a) the existence of unfunded liabilities materially in excess of the amount permitted under any applicable Law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure in any material respect to make the required contributions or payments, under any applicable Law, on or before the due date for such contributions or payments, (c) the receipt of a notice from a Governmental Authority relating to the intention to terminate any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (d) the incurrence of any liability by any Loan Party or any of their respective Subsidiaries under applicable Law on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any participating employer therein, or (e) the occurrence of any material transaction that is prohibited under any applicable Law and that would reasonably be expected to result in the incurrence of any material liability by any Loan Party or any of their respective Subsidiaries, or the imposition on any Loan Party or any of their respective Subsidiaries of any material fine, excise tax or penalty resulting from any noncompliance with any applicable Law.

"**Fund**" means any Person (other than a natural person) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"*GAAP*" means generally accepted accounting principles as are in effect in the United States of America (as such principles may change from time to time), which shall include the official interpretations thereof by the Financial Accounting Standards Board, applied on a consistent basis.

13

28997904

*"Governmental Authority"* means the government of the United States, Mexico or any other nation, or of any political subdivision thereof, whether state, provincial territorial or local, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank) and any group or body charged with setting financial accounting or regulatory capital rules or standards (including, without limitation, the Financial Accounting Standards Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

*"Guarantor"* means (a) Holdings and (b) Parent.

*"Guaranty"* of any Person means any obligation of such Person guarantying or in effect guarantying any Indebtedness, liability or obligation of any other Person in any manner, whether directly or indirectly, including any such liability arising by virtue of partnership agreements, including any agreement to indemnify or hold harmless any other Person, any performance bond or other surety ship arrangement and any other form of assurance against loss, except endorsement of negotiable or other instruments for deposit or collection in the ordinary course of business.

*"Holdings"* means First Brands Group Holdings, LLC, a Delaware limited liability company.

"*Holdings Minimum Equity Value*" has the meaning set forth in Section 11.11.

*"Indebtedness"* means, as to any Person at any time of determination, any and all indebtedness, obligations or liabilities (whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several) of such Person for or in respect of:  (i) borrowed money, (ii) amounts raised under or liabilities in respect of any bonds, debentures, notes, note purchase, acceptance or credit facility, or other similar instruments or facilities, (iii) reimbursement obligations (contingent or otherwise) under any letter of credit, (iv) any other transaction (including production payments (excluding royalties), installment purchase agreements, forward sale or purchase agreements, capitalized leases and conditional sales agreements) having the commercial effect of a borrowing of money entered into by such Person to finance its operations or capital requirements (but not including accounts payable incurred in the ordinary course of such Person's business payable on terms customary in the trade), (v) all net obligations of such Person in respect of interest rate on currency hedges or (vi) any Guaranty of any such Indebtedness.

*"Indemnified Amounts"* has the meaning set forth in Section 8.1.

*"Indemnified Party"* has the meaning set forth in Section 8.1.

*"Indemnified Taxes"* means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Transaction Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

*"Independent Manager"* means a director of Borrower who shall be a natural person who (a) shall not have been at the time of such person's appointment or at any time during the preceding five (5) years and shall not be as long as such person is a director of Borrower:  (i) a director, officer, employee, partner, shareholder, member, manager or Affiliate of any of the following Persons (collectively, the "*First Brands Group*"):  the Servicer, BPI, or any of their respective Affiliates (other than Borrower or another

14

28997904

special purpose entity which is an Affiliate of the Servicer), (ii) a supplier to any of the First Brands Group or Borrower, (iii) the beneficial owner (at the time of such individual's appointment as an Independent Manager or at any time thereafter while serving as an Independent Manager) of any of the outstanding membership or other equity interests of Borrower or any of the First Brands Group having general voting rights, (iv) a Person controlling or under common control with any director, officer, employee, partner, shareholder, member, manager, Affiliate or supplier of any of the First Brands Group or Borrower, or (v) a member of the immediate family of any director, officer, employee, partner, shareholder, member, manager, Affiliate or supplier of any of the First Brands Group or Borrower; (b) has not less than three (3) years of experience in serving as an independent director or independent manager for special purpose vehicles engaged in securitization and/or structured financing transactions; and (c) is employed by Global Securitization Services, LLC, Lord Securities Corporation, AMACAR Group LLC, CT Corporation, Corporation Service Company, Citadel SPV (USA) LLC or such other Person that provides independent director or independent manager services for special purpose vehicles engaged in securitization and/or structured financing transactions in the ordinary course of its business, and their respective successors. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise.

"**Intended Tax Characterization**" has the meaning set forth in <u>Section 12.4</u>.

"**Interest**" means for each day for each Lender, an amount equal to the product of the applicable Interest Rate multiplied by the principal of such Lender, annualized on the basis set forth in <u>Section 1.4</u>.

"**Interest Period**" means, as to any Advance, the period commencing on the date of such Advance and ending on the numerically corresponding day in the calendar month that is one month thereafter; <u>provided</u> that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day, (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period and (iii) no Interest Period shall extend beyond the Maturity Date.

"**Interest Rate**" means (a) at all times prior to the occurrence and during the continuance of an Event of Default, the sum of Term SOFR (or, solely in the instances set forth in <u>Section 1.15</u>, the Alternate Base Rate) plus the Applicable Margin, and (b) at all times from and after the occurrence and during the continuance of an Event of Default, the sum of Term SOFR (or, solely in the instances set forth in <u>Section 1.15</u>, the Alternate Base Rate) plus the Applicable Margin plus 3.00% (this clause (b), the "**Default Rate**").

"**Inventory**" has the meaning set forth in the UCC.

"**Investment**" means, by any Person, (a) the amount paid or committed to be paid, or the value of property or services contributed or committed to be contributed, by such person for or in connection with the acquisition by such Person of any stock, bonds, notes, debentures, partnership or other ownership interests or other securities of any other Person and (b) the amount of any advance, loan or extension of credit by such Person, to any other Person, or guaranty or other similar obligation of such Person with respect to any Indebtedness of such other Person (other than Indebtedness constituting trade payables in the ordinary course of business), and (without duplication) any amount committed to be advanced, loans, or extended by such Person to any other Person, or any amount the payment of which

15

28997904

is committed to be assured by a guaranty or similar obligation by such Person for the benefit of, such other Person.

*"Investment Company Act"* means the Investment Company Act of 1940, as amended or otherwise modified from time to time.

*"IRS"* means the United States Internal Revenue Service.

*"Law"* means any international, foreign, Federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and any applicable administrative order, directed duty, request, license, authorization or permit of, or agreement with, any Governmental Authority, in each case whether or not having the force of law.

*"Lender"* has the meaning set forth in the preamble to this Agreement and shall include such Person's respective successors and permitted assigns.

*"Lien"* means any mortgage, deed of trust, pledge (including possessory or non-possessory pledge), security interest, hypothecation, charge, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement, preferential arrangement or similar agreement or arrangement of any kind or nature whatsoever, including any conditional sale or other title retention agreement and any assignment, deposit arrangement or lease intended as, or having the effect of, security and any filed financing statement or other notice of any of the foregoing (whether or not a lien or other encumbrance is created or exists at the time of the filing).

*"Loan Parties"* means Borrower and Parent.

*"Loans"* means the loans and Advances made by the Lenders pursuant to this Agreement, including Overadvances and Protective Advances.

*"Manufacturing Agreement"* means that certain manufacturing agreement, dated as of the Closing Date, by and among the Borrower and BPI, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms thereof.

*"Maquiladora Agreements"* means, collectively, (i) the Maquila Agreement, dated December 29, 2014, entered into by and between BPI Braking Systems Mexico, S.A. de C.V. and BPI, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms hereof; and (ii) the Maquila Agreement, dated May 2, 2016, entered into by and between BPI Brake Manufacturing Juarez, S.A. de C.V. and BPI, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms hereof.

*"Maquiladoras"* means BPI Brake Manufacturing Juarez, S.A. de C.V. and BPI Braking Systems Mexico, S.A. de C.V.; *provided*, *however*, that the BPI Braking Systems Mexico, S.A. de C.V. may be wound down or liquidated, and the operations in respect thereof transferred to BPI Brake Manufacturing Juarez S.A. de C.V. following the Closing Date and upon the occurrence of any such winddown or liquidation and transfer, each reference to Maquiladora herein shall be automatically, and retroactively, deemed to be a refence solely to BPI Brake Manufacturing Juarez S.A. de C.V.

16

28997904

*"Material Adverse Effect"* means, a material adverse effect on (a) the business, assets, liabilities (actual or contingent), financial condition or results of operations of any Loan Party, Guarantor, the Servicer, BPI or each Maquiladora; (b) the ability of (i) any Loan Party to perform any of its payment or other obligations under the Transaction Documents to which it is a party or (ii) any of Holdings, the Servicer, BPI or each Maquiladora to perform any of such Person's payment or other obligations under the Transaction Documents to which it is a party; (c) the rights and remedies of the Lenders or the Administrative Agent under the Transaction Documents; (d) the Administrative Agent's or any Lender's interest in any substantial portion of the Collateral; or (e) the collectability of any Collections.

*"Material Indebtedness"* means, as to any Person at any time of determination, any Indebtedness for borrowed money in excess of one million U.S. Dollars ($1,000,000).

*"Maturity Date"* means (i) May 31, 2025, provided that the Borrower and the Lenders may agree in writing, within 60 days prior to the expiration thereof, to extend this date for up to two (2) additional years or (ii) any earlier date on which the Commitments are reduced to zero or otherwise terminated pursuant to the terms hereof.

*"Mexican Security Agreement"* means that certain Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*) dated as of the Closing Date, by and among the Borrower and BPI, as pledgors, and the Administrative Agent, as pledgee; with acknowledgement and consent of the Maquiladoras, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms thereof.

*"Mexico"* means the United Mexican States.

*"Monthly Report"* means the monthly reporting package, furnished by the Servicer to the Administrative Agent and the Lenders pursuant to Section 5.1(e) and Section 6.6.

*"Monthly Reporting Date"* means, for any calendar month, the 30th day following the end of such calendar month (or, if any such day is not a Business Day, the next succeeding Business Day thereafter).

*"Multiemployer Plan"* means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Loan Party or ERISA Affiliates is making or has an obligation to make contributions or with respect to which any Loan Party or ERISA Affiliates has any liability.

*"Net Orderly Liquidation Value"* means with respect to Inventory or assets of any Person, the orderly liquidation value thereof as reasonably determined by the Borrower in good faith.

*"Non-Defaulting Lender"* means each Lender other than any Defaulting Lender.

*"Obligations"* means all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other

17

28997904

obligations that accrue after the commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding).

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"*Organizational Document*" means, relative to any Person, its certificate, deed or articles of incorporation or formation, its notices of articles, its by-laws, its partnership agreement, its memorandum and articles of association, its limited liability company agreement and/or operating agreement, share designations or similar organization documents and all shareholder agreements, voting trusts and similar arrangements applicable to any of its authorized Capital Stock.

"*Other Connection Taxes*" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a Security Interest under, engaged in any other transaction pursuant to or enforced any Transaction Document, or sold or assigned an interest in any Security Interest or Transaction Document).

"*Other Taxes*" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Transaction Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"*Overadvance*" means, on any Business Day, that the aggregate principal amount of Loans outstanding hereunder exceeds the lesser of (a) the Facility Limit and (b) the Borrowing Base on such date.

"*Parent*" means the direct parent of Borrower.  As of the Closing Date, the Parent is Carnaby Inventory Holdings II, LLC.

"*Participant*" has the meaning set forth in Section 10.6(a).

"*Participant Register*" has the meaning set forth in Section 10.6(a).

"*PATRIOT Act*" means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"*Payment Date*" means the first Business Day of each calendar month and the Maturity Date.

"*PBGC*" means the Pension Benefit Guaranty Corporation (or any successor thereof).

"*Pension Plan*" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA) other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or ERISA Affiliates or to which any Loan Party or ERISA Affiliates contributes or has an obligation to contribute or with respect to which any Loan Party or ERISA Affiliates has any liability.

28997904

"***Percentage***" means, as to any Lender, the ratio (expressed as a percentage) of its Commitment to the Aggregate Commitment, provided that when there is a Defaulting Lender, any such Defaulting Lender's Commitment shall be disregarded in the relevant calculations.

"***Permitted Discretion***" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured lender) business judgment in accordance with customary and market business practices for comparable asset-based lending transactions.

"***Permitted Holder***" means each of Patrick James, and any family members of Patrick James (including his spouse, lineal descendants, spouses of such descendants, the lineal descendants of any such spouse and the spouses of any such spouse's lineal descendants), and trusts for estate planning purposes where any of the foregoing persons or a spouse of any such person is a beneficiary or trustee of any such trust or trusts, including a voting trust or any other business entity, regardless of form, organized solely for the benefit of one or more of the foregoing persons. For purposes of this paragraph, the relationship of any person that is derived by or through legal adoption prior to age 18 shall be considered a natural one. A minor for whom a Capital Stock interest is held pursuant to a Uniform Transfers to Minors Act or similar law shall be considered a holder of such Capital Stock.

"***Permitted Lien***" means, with respect to any Person or its assets, (a) any inchoate Liens for current taxes, assessments, levies, fees and other government and similar charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been established in accordance with GAAP, but only so long as foreclosure with respect to such Lien is not imminent and the use and value of the property to which the liens attach are not impaired during the pendency of such proceedings and (b) any Lien in favor of, or assigned to, the Administrative Agent (for the benefit of the Secured Parties) under the Transaction Documents.

"***Person***" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"***Prepayment Date***" has the meaning set forth in Section 1.3(b).

"***Prepayment Notice***" has the meaning set forth in Section 1.3(b).

"***Prime Rate***" means the rate of interest per annum publicly announced from time to time by the Administrative Agent as its prime rate (which in any event, shall not be less than 1.00%); each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"***Protective Advances***" has the meaning set forth in Section 1.10.

"***Purchase Agreement***" means that certain Asset Purchase Agreement, dated as of the Closing Date, by and among the BPI, as seller, and Borrower, as buyer, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms thereof.

"***Purchase Order***" means an irrevocable purchase order, in form and substance satisfactory to the Lenders, substantially in the form attached hereto as Exhibit XIV, pursuant to which a Qualified Purchaser shall purchase Inventory from Borrower.

28997904

"**Qualified Purchaser**" means any purchaser of inventory from the Borrower that is reasonably acceptable to the Administrative Agent, it being understood and agreed that, notwithstanding anything herein to the contrary, Servicer and each of its direct and indirect Subsidiaries shall be deemed to be a Qualified Purchaser for all purposes hereunder and under the other Transaction Documents.

"**Qualifying IPO**" means the issuance by Holdings or any successor thereof of its common Capital Stock in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering) or in a firm commitment underwritten offering (or series of related offerings of securities to the public pursuant to a final prospectus) made pursuant to the Securities Act.

"**Recipient**" means the Administrative Agent or any Lender.

"**Records**" means, with respect to any Collateral, all Contracts and other documents, books, records and other information (including, without limitation, computer programs, tapes, disks, punch cards, data processing software and related property and rights) relating to such Collateral.

"**Register**" has the meaning set forth in Section 10.2.

"**Related Entity**" has the meaning set forth in Section 5.1(l).

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**Removal Closing Date**" has the meaning set forth in Section 9.9(b).

"**Reportable Event**" means with respect to any Pension Plan or Multiemployer Plan any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the thirty (30) day notice period is waived under PBGC Reg. Section 4043.

"**Required Lenders**" means, at any time, Lenders (other than Defaulting Lenders) having Loans and unused Commitments representing more than 50% of the sum of the outstanding Loans and unused Commitments under this Agreement at such time.

"**Resignation Closing Date**" has the meaning set forth in Section 9.9(a).

"**Responsible Officer**" means, in respect of any Loan Party or Holdings, as applicable, the chief executive officer, director, president, vice president, executive vice president, general counsel, chief operating officer, chief financial officer, treasurer, director of risk, secretary, assistant secretary, controller or assistant controller of a Loan Party or Holdings, as applicable and any other officer or employee of such Loan Party or Holdings, as applicable, so designated by any of the foregoing officers or employees in a notice to the Administrative Agent.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party or Holdings, as applicable shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party or Holdings, as applicable, as applicable, and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party or Holdings, as applicable, as applicable.

28997904

*"Restricted Payment"* means (i) any dividend or other distribution, direct or indirect, on account of any membership interest of any class of Borrower now or hereafter outstanding, (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of Borrower now or hereafter outstanding, (iii) any payment or prepayment of principal of, premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance, sinking fund or similar payment and any claim for rescission with respect to the loans subordinated to the Obligations, (iv) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire any membership interest of Borrower now or hereafter outstanding, and (v) any payment of management fees by Borrower.

*"Review"* shall have the meaning specified in Section 5.1(k) of this Agreement.

*"Revolving Period"* means the period from and after the Closing Date to a date that is ten (10) Business Days prior to the scheduled Maturity Date.

*"RUG"* means the Mexican Sole Registry of Liens over Movable Assets (*Registro Único de Garantías Mobiliarias*).

*"Sale Agreement"* means any sale agreement by and among Borrower, as seller and one or more Qualified Purchasers, as buyer, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms thereof.

*"Sanctioned Country"* means at any time, a country, region or territory which is itself the subject or target of any Sanctions (including, as of the Closing Date, Cuba, Iran, North Korea, Syria, Crimea, the Donetsk People's Republic, and the Luhansk People's Republic).

*"Sanctioned Person"* means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC (including OFAC's Specially Designated Nationals and Blocked Persons List and OFAC's Consolidated Non-SDN List), the U.S. Department of State, the United Nations Security Council, the European Union, any European member state, Her Majesty's Treasury, or other relevant sanctions authority, (b) any Person located, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by, or acting or purporting to act for or on behalf of, directly or indirectly, any such Person or Persons described in clauses (a) and (b), including a Person that is deemed by OFAC to be a Sanctions target based on the ownership of such legal entity by Sanctioned Person(s) or (d) any Person otherwise a target of Sanctions, including vessels and aircraft, that are designated under any Sanctions program.

*"Sanctions"* means any and all economic or financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes and restrictions and anti-terrorism laws, including but not limited to those imposed, administered or enforced from time to time by the U.S. government (including those administered by OFAC or the U.S. Department of State), the United Nations Security Council, the European Union, any European member state, Her Majesty's Treasury, or other relevant sanctions authority in any jurisdiction in which (a) any Loan Party or any of its Subsidiaries or Affiliates is located or conducts business, (b) in which any of the proceeds of the Advances will be used, or (c) from which repayment of the Obligations will be derived.

*"SEC"* means the U.S. Securities and Exchange Commission or any governmental agencies substituted therefor.

21

28997904

*"Secured Parties"* means each Lender, the Administrative Agent and each other Indemnified Party.

"*Securities Act*" means the Securities Act of 1933 (15 U.S.C. § 77 *et seq.*).

*"Security Documents"* means the U.S. Security Agreement, the Mexican Security Agreement, the Collection Account Control Agreement and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent of the benefit of the Secured Parties to secure the Obligations or any guaranty thereof.

*"Security Interest"* has the meaning ascribed thereto in Article 9 of the UCC.

*"Servicer"* has the meaning set forth in Section 6.1(a).

*"Servicer Termination Event"* has the meaning set forth in Section 6.1(a).

*"Servicing Fee"* has the meaning set forth in Section 6.7.

"*SOFR*" means a rate equal to the secured overnight financing rate as administered by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

*"SOFR Loan"* means a Loan that bears interest based on SOFR, other than pursuant to clause (iii) of the definition of "Alternate Base Rate".

*"Solvent"* means, with respect to any Person and as of any particular date, (i) the present fair market value (or present fair saleable value) of the assets of such Person is not less than the total amount required to pay the probable liabilities of such Person on its total existing debts and liabilities (including contingent liabilities) as they become absolute and matured, (ii) such Person is able to realize upon its assets and pay its debts and other liabilities, contingent obligations and commitments as they mature and become due in the normal course of business, (iii) such Person is not incurring debts or liabilities beyond its ability to pay such debts and liabilities as they mature, (iv) such Person is not engaged in any business or transaction, and is not about to engage in any business or transaction, for which its property would constitute unreasonably small capital after giving due consideration to the prevailing practice in the industry in which such Person is engaged, and (v) such Person is not insolvent pursuant to Article 2166 of the Mexican Federal Civil Code (*Código Civil Federal*) or its correlative provisions of the Civil Codes of the States that comprise Mexico or that is applicable in Mexico City and Articles 9, 10 and 11 of the Mexican Insolvency Law (*Ley General de Concursos Mercantiles*) (or any successor provision).

"*Spot Rate*" means, on any day, (i) for the purpose of exchanging U.S. Dollars to Alternative Currency or Alternative Currency to U.S. Dollars in connection with applying funds to pay amounts owing hereunder or under the Transaction Documents in accordance with this Agreement, the actual rate used by the Administrative Agent's principal foreign exchange trading office for the purchase by the Administrative Agent of the applicable currency with the other currency through its principal foreign exchange trading office, and (ii) for the purpose of making any calculation hereunder that does not require the actual exchange of U.S. Dollars for Alternative Currency or Alternative Currency for U.S. Dollars to make a payment of amounts owing hereunder or under the Transaction Documents or, (a) with respect to the determination of the U.S. Dollar Equivalent of any amount denominated in Alternative Currency, the exchange rate at which such Alternative Currency may be exchanged into U.S. Dollars as set forth at approximately 11:00 a.m. New York City time, on such day as published on the Bloomberg Key Cross-

22

28997904

Currency Rates Page for such Alternative Currency and (b) with respect to the determination of the Alternative Currency equivalent of any amount denominated in U.S. Dollars, the exchange rate at which U.S. Dollars may be exchanged into Alternative Currency as set forth at approximately 11:00 a.m. New York City time, on such day as published on the Bloomberg Key Cross-Currency Rates Page for U.S. Dollars. In the event that such rate does not appear on any Bloomberg Key Cross Currency Rates Page, the Spot Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be selected by the Administrative Agent and is reasonably satisfactory to the applicable Servicer, or, in the absence of such an agreement, such Spot Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 11:00 a.m. New York time, on such date for the purchase of U.S. Dollars with the applicable Alternative Currency for delivery two (2) Business Days later; *provided* that if at the time of any such determination, for any reason, no such spot rate is being quoted, the Administrative Agent may use any reasonable method it deems appropriate to determine such rate, and such determination shall be conclusive absent manifest error.

"**Sub-Servicer**" has the meaning set forth in Section 6.1(b).

"**Subsidiary**" or "**Subsidiaries**" of a Person shall mean (i) any corporation or trust of which 50% or more (by number of shares or number of votes) of the outstanding capital stock or shares of beneficial interest normally entitled to vote for the election of one or more directors or trustees (regardless of any contingency which does or may suspend or dilute the voting rights) is at such time owned directly or indirectly by such Person or one or more of such Person's Subsidiaries, (ii) any partnership of which such Person is a general partner or of which 50% or more of the partnership interests is at the time directly or indirectly owned by such Person or one or more of such Person's Subsidiaries, (iii) any limited liability company of which such Person is a manager or managing member or of which 50% or more of the limited liability company interests is at the time directly or indirectly owned by such Person or one or more of such Person's Subsidiaries or (iv) any corporation, trust, partnership, limited liability company or other entity which is controlled or capable of being controlled by such Person or one or more of such Person's Subsidiaries, and in any case, without limitation, "control" as defined under the laws of the relevant jurisdiction.

"**Swap Agreement**" means to any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"**Tax**" or "**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Loan Credit Agreement**" means that certain First Lien Term Loan Agreement, dated as of February 2, 2018 (as amended, amended and restated, supplemented or otherwise modified from time to time), among First Brands, as borrower, First Brands Group Intermediate, LLC, as parent, Jefferies Finance LLC, as Administrative Agent and collateral agent, and the other parties from time to time party thereto.  In the event that the "Term Loan Credit Agreement" is terminated, references herein to "Term Loan Credit Agreement" shall mean the "Term Loan Credit Agreement" as in effect immediately prior to the termination thereof.

23

28997904

"**Term SOFR**" means, with respect to a Loan that bears interest at a rate based on Term SOFR, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, with respect to a Loan that bears interest at a rate based on the Alternate Base Rate, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day, provided, further, that if Term SOFR determined as provided above (including pursuant to the proviso under clause (a) or clause (b) above) shall ever be less than 1.00%, then Term SOFR shall be deemed to be 1.00%.

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"**Term SOFR Reference Rate**" means the forward-looking term rate based on SOFR.

"**Termination Date**" means the date on which (i) the aggregate outstanding principal amount of Loans has been reduced to zero and all accrued interest on each Loan have been indefeasibly paid in full, (ii) all other Obligations (other than contingent, unmatured indemnification obligations for which demand has not been made) have been indefeasibly paid in full, (iii) all other amounts owing to the Secured Parties hereunder and under the other Transaction Documents have been indefeasibly paid in full and (iv) the Commitments of all Lenders have terminated or expired.

"**Transaction Documents**" means, collectively, this Agreement, each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto.

"**U.S. Dollar Equivalent**" means, on any date on which a determination thereof is to be made, with respect to (a) any amount denominated in U.S. Dollars, such amount and (b) any amount denominated in an Alternative Currency, the U.S. Dollar equivalent of such amount of such Alternative Currency determined by referenced to the Spot Rate determined as of such determination date.

28997904

"**U.S. Dollars**" and "**$**" each mean the lawful currency of the United States of America.

"**U.S. Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"*U.S. Security Agreement*" means the Pledge and Security Agreement, dated as of the date hereof, among the Borrower, Parent and the Administrative Agent.

"*UCC*" means the Uniform Commercial Code as in effect in the State of New York or, as the context may require, any other applicable jurisdiction.

"**UCC-1 Financing Statement**" means each UCC financing statement set forth on <u>Exhibit IX</u>.

"**Unadjusted Benchmark Replacement**" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"*Unused Credit Facility Fee*" has the meaning set forth in Section 1.11(b).

"*Volcker Rule*" means Section 13 of the U.S. Bank Holding Company Act of 1956, as amended, and the applicable rules and regulations thereunder.

"*Waterfall*" has the meaning set forth in Section 2.1(c).

"**Withdrawal Liability**" means the liability to a Multiemployer Plan as the result of a "complete" or "partial" withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA by any Loan Party or the ERISA Affiliates of such Loan Party.

28997904

**JOINT EXHIBIT NO. 18**
**Page 122 of 812**

EXHIBIT II-A

FORM OF BORROWING NOTICE

**[Date]**[1]

GLAS TRUST COMPANY LLC, as Administrative Agent
3 Second Street, Suite 206
Jersey City, NJ 07311
Fax: 212-202-6246
Phone: +1 (201) 839-2200
Email: ClientServices.Americas@glas.agency; tmgus@glas.agency

   **Re:  BORROWING NOTICE**

Ladies and Gentlemen:

   Reference is hereby made to the Credit Agreement, dated as of May [_], 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among Carnaby Inventory II, LLC (*"Borrower"*), First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS TRUST COMPANY LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the *"Administrative Agent"*).  Capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

   The undersigned hereby gives you notice pursuant to Section 1.2 of the Credit Agreement of its request of an Advance (the "Requested Advance") under the Credit Agreement, and in that connection sets forth below the terms thereof:

(A)   Proposed Borrowing Date (which shall be a Business Day):  [●]

(B)   Aggregate principal amount of Requested Advance: $[●][2]

   Please transfer the Requested Advance in immediately available funds to:

| Wire Transfer Instructions: | |
| --- | --- |
| Amount | $[●] |
| Bank: | [●] |

---

[1] Borrowing Notice to be delivered no later than 12:00 p.m. (New York City time) two (2) Business Days prior to the proposed Borrowing Date.

[2] Amount of Requested Advance shall be based on the numbers set forth in the most recent Borrowing Base Certificate delivered to the Administrative Agent and the Lenders and based upon subsequent valuations of Eligible Inventory by the Servicer to the date of such Borrowing Notice.

II-A-1

*Credit Agreement*

BUSINESS.29042819.5

| ABA No.: | [●] |
|---|---|
| Account No.: | [●] |
| Account Name: | [●] |

In connection with the Requested Advance to be made on the above-specified Borrowing Date, Borrower hereby certifies that the following statements are true on the date hereof, and will be true on the Borrowing Date (before and after giving effect to the Requested Advance):

(i)        the representations and warranties set forth in Article III of the Credit Agreement are true and correct in all material respects on and as of the Borrowing Date of such Advance as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall remain true and correct in all material respects as of such earlier date;

(ii)        no event has occurred and is continuing, or would result from the Requested Advance, that constitutes a Default or Event of Default;

(iii)        the most recent Borrowing Base Certificate delivered to the Administrative Agent and the Lenders does not show that an Overadvance exists or will result from the Requested Advance;

(iv)        no Overadvance exists or will result from such Requested Advance; and

(v)        The Borrower is Solvent immediately prior to and after giving effect to the Proposed Advance and the use of the proceeds thereof.

Very truly yours,

Carnaby Inventory II, LLC

By: _____
Name:
Title:

II-A-2

*Credit Agreement*

BUSINESS.29042819.5

**JOINT EXHIBIT NO. 18**
**Page 124 of 812**

EXHIBIT II-B
FORM OF PREPAYMENT NOTICE

[Date][3]

GLAS TRUST COMPANY LLC, as Administrative Agent
3 Second Street, Suite 206
Jersey City, NJ 07311
Fax: 212-202-6246
Phone: +1 (201) 839-2200
Email: ClientServices.Americas@glas.agency; tmgus@glas.agency

**Re:  BORROWING NOTICE**

Ladies and Gentlemen:

Reference is hereby made to the Credit Agreement, dated as of May [_], 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among Carnaby Inventory II, LLC (*"Borrower"*), First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS TRUST COMPANY LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the *"Administrative Agent"*).  Capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

The undersigned hereby gives you notice pursuant to and in accordance with Section 1.3 of the Credit Agreement that, on the date hereof, the Borrower intends to prepay the aggregate principal amount of $[•][4] of the Revolving Loans, together with all accrued and unpaid interest thereon (including without limitation any prepayment fees pursuant to Section 1.3(c) of the Credit Agreement).

Very truly yours,

Carnaby Inventory II, LLC

By: _____
Name:
Title:

---

[3] Prepayment Notice to be delivered no later than 12:00 p.m. (New York City time) on the Business Day of the proposed prepayment.

[4] Minimum prepayment amount of $1,000,000.

II-A-1

*Credit Agreement*

BUSINESS.29042819.5

**JOINT EXHIBIT NO. 18**
**Page 125 of 812**

EXHIBIT III
CHIEF EXECUTIVE OFFICE, PRINCIPAL PLACE OF BUSINESS, RECORDS LOCATIONS, FEDERAL TAXPAYER ID NUMBER AND ORGANIZATIONAL
ID NUMBER

| NAME | CHIEF EXECUTIVE OFFICE ADDRESS | PRINCIPAL PLACE OF BUSINESS | LOCATION OF RECORDS | STATE OF ORGANIZATION (ORGANIZATIONAL ID NUMBER) | FEDERAL TAXPAYER ID NUMBER |
|---|---|---|---|---|---|
| CARNABY INVENTORY II, LLC | 3010 LBJ FREEWAY, SUITE 1200, DALLAS, TX 75234 | 3010 LBJ FREEWAY, SUITE 1200, DALLAS, TX 75234 | 3010 LBJ FREEWAY, SUITE 1200, DALLAS, TX 75234 | DE (6596209) | 88-0589845 |
| CARNABY INVENTORY HOLDINGS II, LLC | 3010 LBJ FREEWAY, SUITE 1200, DALLAS, TX 75234 | 3010 LBJ FREEWAY, SUITE 1200, DALLAS, TX 75234 | 3010 LBJ FREEWAY, SUITE 1200, DALLAS, TX 75234 | DE (6596203) | 88-0529704 |
| FIRST BRANDS GROUP HOLDINGS, LLC | 127 PUBLIC SQUARE, SUITE 5300, CLEVELAND, OH 44114 | 127 PUBLIC SQUARE, SUITE 5300, CLEVELAND, OH 44114 | 3010 LBJ FREEWAY, SUITE 1200, DALLAS, TX 75234 | DE (7962867) | 85-1927700 |

III-1

*Credit Agreement*

BUSINESS.29042819.5

**JOINT EXHIBIT NO. 18**
**Page 126 of 812**

EXHIBIT IV

FORM OF SOLVENCY CERTIFICATE

[DATE]

This Solvency Certificate is being executed and delivered pursuant to Section 4.1(i) of the Credit Agreement, dated as of May [_], 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among Carnaby Inventory II, LLC (*"Borrower"*), First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS TRUST COMPANY LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the *"Administrative Agent"*).  Capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

I, [NAME], the Managing Director of Parent, in such capacity and not in an individual capacity, hereby certify as follows:

1.      I am generally familiar with the businesses and assets of the Loan Parties, taken as a whole, and am duly authorized to execute this Solvency Certificate on behalf of the Borrower pursuant to the Credit Agreements; and

2.      As of the date hereof and immediately after giving effect to the consummation of the transactions contemplated under the Credit Agreement and the other Transaction Documents on the Closing Date, (i) the present fair market value (or present fair saleable value) of the assets of the Loan Parties, taken as a whole, is not less than the total amount required to pay the probable liabilities of the Loan Parties, taken as a whole, on their total existing debts and liabilities (including contingent liabilities) as they become absolute and matured, (ii) the Loan Parties, taken as a whole, are able to realize upon their assets and pay their debts and other liabilities, contingent obligations and commitments as they mature and become due in the normal course of business, (iii) the Loan Parties, taken as a whole, are not incurring debts or liabilities beyond their ability to pay such debts and liabilities as they mature, (iv) the Loan Parties, taken as a whole, are not engaged in any business or transaction, and are not about to engage in any business or transaction, for which their property would constitute unreasonably small capital after giving due consideration to the prevailing practice in the industry in which the Loan Parties are engaged, and (v) none of the Loan Parties are insolvent pursuant to Article 2166 of the Mexican Federal Civil Code (*Código Civil Federal*) or its correlative provisions of the Civil Codes of the States that comprise Mexico or that is applicable in Mexico City and Articles 9, 10 and 11 of the Mexican Insolvency Law (*Ley General de Concursos Mercantiles*) (or any successor provision).

IV-1

*Credit Agreement*

**JOINT EXHIBIT NO. 18**
**Page 127 of 812**

IN WITNESS WHEREOF, I have executed this Solvency Certificate on the date first written above.

CARNABY INVENTORY HOLDINGS II, LLC

By:_____

Name:

Title:   Managing Director

IV-1

*Credit Agreement*

BUSINESS.29042819.5

EXHIBIT V-A

[FORM OF] COMPLIANCE CERTIFICATE

[Date]

GLAS TRUST COMPANY LLC, as Administrative Agent
3 Second Street, Suite 206
Jersey City, NJ 07311
Fax: 212-202-6246
Phone: +1 (201) 839-2200
Email: ClientServices.Americas@glas.agency; tmgus@glas.agency

Ladies and Gentlemen:

Reference is hereby made to the Credit Agreement, dated as of May [_], 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among Carnaby Inventory II, LLC (*"Borrower"*), First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS TRUST COMPANY LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the *"Administrative Agent"*).  Capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

This Compliance Certificate is being executed and delivered pursuant to Section 5.1[(b)] [(c)] [(d)] of the Credit Agreement.

The undersigned hereby represents, warrants, certifies and confirms that:

1.      The undersigned is a duly elected Responsible Officer of the undersigned.

2.      Attached hereto are copies of the financial statements of [First Brands] [the Borrower], [together with a customary management's discussion and analysis of financial information provided to the lenders under the ABL Credit Agreement and/or the Term Loan Credit Agreement][5].  [There has been no material adverse effect to the First Brands' brake products segment from the prior brake products segment information furnished to the Administrative Agent and Lenders pursuant to Section 5.1(k)(ii) of the Credit Agreement.][6]

3.      The undersigned has reviewed the terms of the Credit Agreement and each of the other Transaction Documents and I have made, or have caused to be made under my supervision, a detailed review of the transactions and condition of [the Borrower] [First Brands] during the accounting period covered by the financial statements attached as Annex I.

---

[5] Remove brackets if compliance certificate is being provided with annual and quarterly reports of First Brands pursuant to Section 5.1(c) or Section 5.1(d).

[6] NTD: To be included if compliance certificate is being delivered pursuant to Section 5.1(d) and signed by First Brands.

V-2

*Credit Agreement*

BUSINESS.29042819.5

4.      The examinations described in paragraph 3 hereof did not disclose, and the undersigned has no knowledge of, the existence of any condition or event which constitutes a Default or Event of Default, during or at the end of the accounting period covered by the attached financial statements or as the date of this Compliance Certificate, except as set forth below.

5.      Based on the examinations described in paragraph 3 hereof, the undersigned confirms that the representations and warranties contained in the Credit Agreement are true and correct as though made on the date hereof, except as set forth below.

6.      True and correct calculations of the [Fixed Charge Coverage Ratio] are set forth in <u>Schedule II</u> hereto.

7.      Described below are the exceptions, if any, to paragraphs 4 and 5 listing, in detail, the nature of the condition or event, the period during which it has existed and the action the undersigned have taken, are taking or propose to take with respect to each such condition or event:

**[IF NONE, INSERT-NONE-]**

The foregoing certifications and the financial statements delivered with this Compliance Certificate in support hereof, are made and delivered this _____ day of _____, _____.

Carnaby Inventory II, LLC

By: _____
Name:
Title:

**Attachments:**

<u>Schedule I</u>, financial statements

V-3

*Credit Agreement*

**JOINT EXHIBIT NO. 18**
**Page 130 of 812**

Annex I

Financial Statements

(attached)

V-4

*Credit Agreement*

EXHIBIT V-B

[FORM OF] HOLDINGS CERTIFICATE[7]

[Date]

GLAS TRUST COMPANY LLC, as Administrative Agent
3 Second Street, Suite 206
Jersey City, NJ 07311
Fax: 212-202-6246
Phone: +1 (201) 839-2200
Email: ClientServices.Americas@glas.agency; tmgus@glas.agency

Ladies and Gentlemen:

Reference is hereby made to the Credit Agreement, dated as of May [_], 2022 (as amended, restated, supplemented or otherwise modified from time to time, the **"Credit Agreement"**), by and among Carnaby Inventory II, LLC (**"Borrower"**), First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the **"Lenders"**), and GLAS TRUST COMPANY LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the **"Administrative Agent"**).  Capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

This Compliance Certificate is being executed and delivered pursuant to Section 5.1(f) of the Credit Agreement.

The undersigned hereby represents, warrants, certifies and confirms that:

1.      The undersigned is a duly elected Responsible Officer of Holdings.

2.      As of the date hereof, the net equity value of Holdings exceeds the Holdings Minimum Equity Value.

The foregoing certifications are made and delivered this _____ day of _____, _____.

<div align="right">

First Brands Group Holdings, LLC

By: _____
Name:
Title:

</div>

---

[7] NTD: To be delivered with the financial statements furnished pursuant to Section 5.1(c) and Section 5.1(d) of the Credit Agreement (First Brands' audited annual and unaudited quarterly financial statements).

V-5

*Credit Agreement*

BUSINESS.29042819.5

EXHIBIT VI
**[FORM OF]** ASSIGNMENT AGREEMENT

This **ASSIGNMENT AGREEMENT** (this *"Assignment Agreement"*) is entered into as of the ___ day of _____, ____, by and between _____ (*"Assignor"*) and _____ (*"Assignee"*).

This Assignment Agreement is being executed and delivered in accordance with <u>Section 10.1</u> of that certain Credit Agreement, dated as of May [_], 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among Carnaby Inventory II, LLC (*"Borrower"*), First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS TRUST COMPANY LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the *"Administrative Agent"*). Capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

For an agreed consideration, Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the terms hereof and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) an undivided _____% (the *"Transferred Percentage"*) interest in all of Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and the other Transaction Documents including, without limitation, Assignor's Commitment and (if applicable) the principal of Assignor's Loans as set forth herein; (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (i) and (ii) above being referred to in this Assignment and Assumption collectively as the *"Assigned Interest"*). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment Agreement, without representation or warranty by the Assignor

The sale, transfer and assignment effected by this Assignment Agreement shall become effective (the *"Closing Date"*) on {DATE}.[8] From and after the Closing Date, Assignee shall be a Lender party to the Credit Agreement for all purposes thereof as if Assignee were an original party thereto and Assignee agrees to be bound by all of the terms and provisions contained therein.

If Assignor has no outstanding Loans under the Credit Agreement on the Closing Date, Assignor shall be deemed to have hereby transferred and assigned to Assignee, without recourse, representation or warranty (except as provided below), and the Assignee shall be deemed to have hereby irrevocably taken, received and assumed from Assignor, the Transferred Percentage of Assignor's Commitment and all rights and obligations associated therewith under the terms of the Credit Agreement, including,

---

[8] To be inserted by Administrative Agent.

VI-1

*Credit Agreement*

**JOINT EXHIBIT NO. 18**
**Page 133 of 812**

without limitation, the Transferred Percentage of Assignor's future funding obligations under Section 1.1 of the Credit Agreement.

Concurrently with the execution and delivery hereof, Assignor will provide to Assignee copies of all documents requested by Assignee which were delivered to Assignor pursuant to the Credit Agreement.

Each of the parties to this Assignment Agreement agrees that at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Assignment Agreement.

By executing and delivering this Assignment Agreement, Assignor and Assignee confirm to and agree with each other as follows:

Other than the representations and warranties set forth below, Assignor makes no representation or warranty and assumes no responsibility with respect to (i) any statements, warranties or representations made by any other Person in or in connection with the Credit Agreement, or the other Transaction Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document furnished pursuant thereto or the perfection, priority, condition, value or sufficiency of any Collateral, (ii) the financial condition of Assignee, Borrower, any Guarantor, any Affiliate of Borrower and (iii) the performance or observance by Borrower, any Guarantor or any Affiliate of Borrower of any of their respective obligations under the Transaction Documents or any other instrument or document furnished pursuant thereto or in connection therewith.

The Assignor represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby.

The Assignor assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Transaction Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Transaction Documents or any collateral thereunder, (iii) the financial condition of Borrowers, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Transaction Document or (iv) the performance or observance by Borrowers, any of Borrowers' Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Transaction Document.

The Assignee represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement; (ii) it meets all the requirements to be an Eligible Assignee under the Credit Agreement (subject to any consents as are required under the Credit Agreement); (iii) from and after the Closing Date, it will be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, will have the obligations of a Lender thereunder; (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of that type; (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 5.1 thereof, as

<div align="center">VI-2</div>

*Credit Agreement*

<div align="center">**JOINT EXHIBIT NO. 18**
**Page 134 of 812**</div>

applicable, and all other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest; and (vi) it has, independently and without reliance upon Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest.

The Assignee agrees that (i) it will, independently and without reliance upon Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it deems appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Transaction Documents; (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Transaction Documents are required to be performed by it as a Lender; (iii) it appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Transaction Documents as are delegated to such Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto.

Schedule I hereto sets forth the revised Commitment and Principal, if any, of Assignor and the Commitment and Principal, if any, of Assignee, as well as administrative information with respect to Assignee.

From and after the Closing Date, Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Closing Date and to the Assignee for amounts which have accrued from and after the Closing Date.

This Assignment Agreement is binding upon, and will inure to the benefit of, the parties to this Assignment and Assumption and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together will constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment Agreement by telecopy will be effective as delivery of a manually executed counterpart of this Assignment and Assumption.

THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT-OF-LAWS PRINCIPLES.

[Remainder of page left intentionally blank.]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment Agreement to be executed by their respective duly authorized officers of the date hereof.

[ASSIGNOR]


By: _____
Title:


[ASSIGNEE]


By: _____
Title:

[CONSENTED TO:

[_]


By: _____
Name:
Title:]


cc:
     GLAS TRUST COMPANY LLC, as Administrative Agent
     3 Second Street, Suite 206
     Jersey City, NJ 07311
     Fax: 212-202-6246
     Phone: +1 (201) 839-2200
     Email: ClientServices.Americas@glas.agency; tmgus@glas.agency

**SCHEDULE I TO ASSIGNMENT AGREEMENT**

**LIST OF LENDING OFFICES, ADDRESSES**
**FOR NOTICES AND COMMITMENT AMOUNTS**

**Date:  _____, _____**

**Transferred Percentage: _____%**

| Aggregate Amount of Commitment/Loans | Amount of Commitment Assigned | Amount of Loans Assigned[9] | Percentage Assigned of Commitment/Loans |
|---|---|---|---|
| $ | $ | $ | % |
| $ | $ | $ | % |

**<u>Address for Notices</u>**

_____
_____
Attention:
Phone:
Fax

---

[9] Not to be less than $[•] unless Assigned Interest is the entire amount of Lender's loan/commitment.

VI-4

*Credit Agreement*

**JOINT EXHIBIT NO. 18**
**Page 137 of 812**

EXHIBIT VII

[FORM OF] PROMISSORY NOTE

[$60,000,000]                                                                                                    May [●], 2021

**FOR VALUE RECEIVED**, the undersigned hereby absolutely and unconditionally promises to pay on demand [●] (the "Lender") or its registered permitted assign, at the office of GLAS TRUST COMPANY LLC at 3 Second Street, Suite 206, Jersey City, New Jersey 07311, Loans in the principal amount of $[●] ([●] Dollars), or such lesser amount as is outstanding from time to time, and any and all other amounts owing to such Lender, on the dates and in the amounts set forth in the Credit Agreement, dated as of May [_], 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among Borrower, First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS TRUST COMPANY LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the *"Administrative Agent"*).  Capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

The undersigned also promises to pay interest from the Closing Date on the principal amount thereof from time to time outstanding, in Dollars, at such office, in each case, in the manner and at the rate or rates per annum and payable on the dates provided in the Credit Agreement. The undersigned also promises to pay interest on any overdue principal and interest amounts to the extent permitted by applicable Law, in each case, in the manner, at the rate or rates and under the circumstances provided in the Credit Agreement.  If any one or more of the Events of Default shall occur and be continuing, the entire unpaid principal amount of this Note and all of the unpaid interest accrued hereon may become or be declared due and payable in the manner and rate or rates provided in the Credit Agreement.

The undersigned hereby waives diligence, presentment, demand, protest and notice of any kind to the extent possible under any applicable Law (except as expressly provided for in the Credit Agreement). The Lender, and any holder hereof, is entitled to the benefits of the Credit Agreement, the Security Agreement and the other Security Documents, and may enforce the agreements of the Borrower and Guarantors contained therein, and any holder hereof may exercise the respective remedies provided for thereby or otherwise available in respect thereof, all in accordance with the respective terms thereof. The obligations hereunder are guaranteed and secured as provided in the Credit Agreement, Security Agreement and the other Security Documents. No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercises of any other right or power.

This Note evidences Loans under and has been issued by the undersigned in accordance with the terms of the Credit Agreement.

Each payment of principal, interest or other sum payable on or in respect of this Note shall be made by the undersigned to the Administrative Agent at the Administrative Agent's office on the date when due, in immediately available funds.  All payments on or in respect of this Note shall be made

BUSINESS.29042819.5

**JOINT EXHIBIT NO. 18**
**Page 138 of 812**

without set-off or counterclaim and free and clear of and without any deductions, withholdings, restrictions or conditions of any nature.

THIS NOTE AND THE OBLIGATIONS OF THE BORROWER HEREUNDER SHALL FOR ALL PURPOSES BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK (EXCLUDING THE LAWS APPLICABLE TO CONFLICTS OR CHOICE OF LAW).  THE UNDERSIGNED AGREES THAT ANY SUIT FOR THE ENFORCEMENT OF THIS NOTE MAY BE BROUGHT IN ANY UNITED STATES FEDERAL OR STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, NEW YORK AND CONSENTS TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURT AND THE SERVICE OF PROCESS IN ANY SUCH SUIT BEING MADE UPON THE UNDERSIGNED BY CERTIFIED MAIL AT THE ADDRESS SPECIFIED IN SECTION 12.22 OF THE CREDIT AGREEMENT.  THE UNDERSIGNED HEREBY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH SUIT OR ANY SUCH COURT OR THAT SUCH SUIT IS BROUGHT IN AN INCONVENIENT COURT.

[*Remainder of page left intentionally blank.*]

BUSINESS.29042819.5

IN WITNESS WHEREOF, the undersigned has caused this Note to be signed in its corporate name by its duly authorized officer as of the day and year first above written.

Carnaby Inventory II, LLC

By: _____
Name:
Title:

AGREED:

Carnaby Inventory Holdings II, LLC, as guarantor

By: _____
Name:
Title:

AGREED:

First Brands Group Holdings, LLC, as guarantor

By: _____
Name:
Title:

VII-1

*Credit Agreement*

BUSINESS.29042819.5

EXHIBIT VIII-A

FORM OF MONTHLY REPORT[10]

**CARNABY INVENTORY II BORROWING BASE**

Borrowing Base Number:  [#●]
Borrowing Base Month Ending:  [DATE]
Borrowing Base Date:  [DATE]

| | Loan Number | | |
| --- | --- | --- | --- |
| | | BPI Juarez | BPI Laredo |
| **Carnaby Inventory II** | | | |
| Prior Gross Inventory Balance | | | |
| Increase/Decrease | - | - | - |
| Gross Inventory (valued at all times hereunder at the Borrower's cost, determined in accordance with GAAP) | | | |
| | | | |
| **INELIGIBLE INVENTORY** | | | |
| Not Subject to Admin Agent's Priority Lien | - | | |
| Subject to any other Lien | - | - | - |
| Obsolete/unmerchantable/defective/discontinued | - | - | - |
| Subject to third party interest/ownership or on consignment | - | - | - |
| Foreign Inventory - Not Located in US or Mexico | | | |
| Outside Processors | - | | |
| Subject to IP restrictions upon sale | | | |
| Not reflected in inventory report | | | |
| Subject to reclamation rights asserted by seller | | | |
| Not subject to Purchase Orders to Qualified Purchaser | | | |
| 90-day elapsed | - | | |
| | | | |
| Reserves and Offsets for Inventory under GAAP | | | |
| | | | |

---

[10] Attach bank account statements.

VIII-A-1

*Credit Agreement*

BUSINESS.29042819.5

| | Loan Number | BPI Juarez | BPI Laredo |
|---|---|---|---|
| Total Ineligible Inventory | - | - | - |
| Eligible Inventory | | | |
| | | | |
| Management's Representation NOLV | | 100.0% | 100.0% |
| NOLV @ 90% | | 90.0% | 90.0% |
| Eligible Inventory @ Adv % (NOLV) | | | |
| **Inventory Availability** | | | |
| | | | |
| Facility Limit | **60,000,000** | | |
| | | | |
| Revolving Loan Balance | - | | |
| | | | |
| **NET AVAILABILITY / (SHORTFALL)** | | | |

*The undersigned represents and warrants that:*

1.      The information provided above and in the accompanying supporting documentation is true, complete and correct, and complies fully with the conditions, terms and covenants of the Credit Agreement, dated as of May [_], 2022 (as amended from time to time, the *"Credit Agreement"*), by and among Borrower, First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and [GLAS], as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the *"Administrative Agent"*).

2.      Since the date of the last financial statement or certification furnished to the Administrative Agent:

(a)      There has been no material adverse change in the financial condition or operations of the undersigned; and

(b)      no Event of Default or Default exists and is continuing; and

(c)      the representations and warranties set forth in Article III are true and correct in all material respects on and as of the date hereof as though made on and as of the date hereof, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall remain true and correct in all material respects as of such earlier date.

BUSINESS.29042819.5

**JOINT EXHIBIT NO. 18**
**Page 142 of 812**

      3.      There have been no payments made by or from the Borrower during [MONTH, YEAR] other than as set forth in such bank account statements for such month.

**Carnaby Inventory II, LLC**

By: _____     Date: _____
     Edward James, EVP

If this document is being transmitted electronically, the Borrower acknowledges that by entering the name of its duly authorized officer on the Certificate, that officer has reviewed the Certificate and affirmed the representations, warranties and certifications referenced above.

BUSINESS.29042819.5

[ATTACH SUPPORTING DOCUMENTATION]

BUSINESS.29042819.5

[ATTACH ALL BORROWER BANK ACCOUNT STATEMENTS FOR RELEVANT MONTH]

BUSINESS.29042819.5

EXHIBIT IX

UCC-FINANCING STATEMENTS

[Attached]

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME **Carnaby Inventory II, LLC** | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c.  MAILING ADDRESS **1540 Broadway, Suite 3710** | CITY **New York** | STATE **NY** POSTAL CODE **10001** | COUNTRY **USA** |

2. DEBTOR'S NAME:  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c.  MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME **GLAS Trust Company LLC** | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c.  MAILING ADDRESS **3 Second Street, Suite 206** | CITY **Jersey City** | STATE **NJ** POSTAL CODE **07311** | COUNTRY **USA** |

4. COLLATERAL:  This financing statement covers the following collateral:
**All assets of the Debtor whether now owned or hereafter acquired and any proceeds thereof.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

International Association of Commercial Administrators (IACA)
FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

**JOINT EXHIBIT NO. 18**
**Page 147 of 812**

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS  Filer:  attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial):  Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION:  Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☑ PARTY INFORMATION CHANGE:

Check one of these two boxes:

This Change affects ☑ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:

☑ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c

☐ ADD name:  Complete item 7a or 7b, and item 7c

☐ DELETE name:  Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME  **Carnaby Inventory II, LLC** | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION:  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c.  MAILING ADDRESS  **3010 LBJ Freeway, Suite 1200** | CITY  **Dallas** | STATE  **TX** | POSTAL CODE  **75234** | COUNTRY  **USA** |
|---|---|---|---|---|

8. ☐ COLLATERAL CHANGE:  Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:  Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:

International Association of Commercial Administrators (IACA)

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

**JOINT EXHIBIT NO. 18**
**Page 148 of 812**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Carnaby Inventory Holdings II, LLC** | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS **1540 Broadway, Suite 3710** | CITY **New York** | STATE **NY** POSTAL CODE **10001** | COUNTRY **USA** |

2. DEBTOR'S NAME:  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **GLAS Trust Company LLC** | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS **3 Second Street, Suite 206** | CITY **Jersey City** | STATE **NJ** POSTAL CODE **07311** | COUNTRY **USA** |

4. COLLATERAL:  This financing statement covers the following collateral:
**All assets of the Debtor whether now owned or hereafter acquired and any proceeds thereof.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)      International Association of Commercial Administrators (IACA)

**JOINT EXHIBIT NO. 18**
**Page 149 of 812**

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Filer:  attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial):  Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION:  Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☑ PARTY INFORMATION CHANGE:

Check one of these two boxes:  
This Change affects ☑ Debtor or  ☐ Secured Party of record

AND Check one of these three boxes to:  
☑ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c  
☐ ADD name:  Complete item 7a or 7b, and item 7c  
☐ DELETE name:  Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Carnaby Inventory Holdings II, LLC** | | | |
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION:  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME

7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

| 7c.  MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **3010 LBJ Freeway, Suite 1200** | **Dallas** | **TX** | **75234** | **USA** |

8. ☐ COLLATERAL CHANGE:  Also check one of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:  Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:

International Association of Commercial Administrators (IACA)
FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

**JOINT EXHIBIT NO. 18**

EXHIBIT X

[RESERVED]

BUSINESS.29042819.5

EXHIBIT XI

FORM OF PURCHASE AGREEMENT

[Attached]

*Execution Version*

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of May [•], 2022 (the "*Execution Date*"), by and between BRAKE PARTS INC LLC, a Delaware limited liability company (the "*Seller*") and CARNABY INVENTORY II, LLC (the "*Buyer*"). The Seller and the Buyer are each a "*Party*" and collectively, the "*Parties*."

**RECITALS**

WHEREAS, the Seller desires to sell, assign and transfer free and clear of any lien, and the Buyer desires to purchase, all of the assets set forth on any schedule under this Agreement executed by Seller and Buyer (each, a "*Schedule*") in the form attached hereto as **Annex I,** free and clear of any lien, which consist of certain inventory of the Seller (collectively, the "*Acquired Assets*"), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties to this Agreement, intending to be legally bound, hereby agree as follows:

1.  **Sale and Purchase of Assets**. At each Subsequent Closing, the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and its affiliates in and to all of the Acquired Assets described on a Schedule as of the Subsequent Closing Date.

2.  **Purchase Price**. The purchase price for each Acquired Asset will be the fair market value thereof (the "*Purchase Price*"), which amount may be paid in the form of cash, in kind or by an increase in the amount payable under the Seller's Subordinated Note (as defined below).

3.  **Closing**. The purchase and sale of the Acquired Assets pursuant to an executed Schedule shall occur a upon payment of the applicable Purchase Price for each Acquired Asset (each, a "*Subsequent Closing*" and the date thereof, a "*Subsequent Closing Date*"). The risk of loss and full benefit of ownership of the Acquired Assets shall transfer to the Buyer immediately upon the Subsequent Closing.

4.  **Subordinated Note**. Seller irrevocably agrees to advance each subordinated loan requested by the Buyer as payment for the applicable Purchase Price (or portion thereof). Each subordinated loan shall be evidenced by, and shall be payable in accordance with the terms and provisions of, a Subordinated Note. "*Subordinated Note*" for purposes hereof means a promissory note in substantially the form of **Annex II** hereto.

5.  **Seller's Representations and Warranties**. Seller represents and warrants to the Buyer, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

    (a)  **Organization, Existence, Good Standing**. Seller is duly incorporated, organized, or formed, and is existing and in good standing under the laws of its jurisdiction of incorporation, organization, or formation.

    (b)  **Power and Authority**. Seller has full power and authority to enter into and perform this Agreement. The execution, delivery and performance of this Agreement by Seller have

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 153 of 812**

been duly and validly approved by Seller's board of directors or equivalent governing body, as applicable.  No other proceedings are necessary on the part of Seller to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein.  Seller has the necessary power and authority to own and operate the Acquired Assets.

(c)   **Enforceability**.  This Agreement has been duly authorized, executed and delivered by Seller and constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(d)   **Governmental Consents and Conflicts**.  No consent, authorization, order or approval of, or filing or registration with, any Governmental Authority is required for or in connection with the consummation by Seller of the transactions contemplated by this Agreement.

(e)   **Other Consents and Conflicts**.  Neither the execution nor delivery of this Agreement by Seller, nor the consummation by Seller of the transactions contemplated in this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any claim upon any of the Acquired Assets, under (i) Seller's corporate governing or other organizational documents, or (ii) any contract that is material to the operation of the business of Seller.

(f)   **Title to Assets**.  Seller has good title to the Acquired Assets, in each case free and clear of any Liens.

(g)   **Transfer Taxes**.  Seller hereby represents and warrants with respect to the Acquired Assets that the sale, transfer, assignment and conveyance of the Acquired Assets by Seller pursuant to this Agreement is not subject to and will not result in any tax, fee or governmental charge payable by the Buyer or Seller to any federal, state or local government ("*Transfer Taxes*").  In the event that Seller receives notice of any Transfer Taxes arising out of the transfer of such Assets, Seller shall give notice thereof to the Buyer, and Seller shall pay any such Transfer Taxes.

(h)   **Condition and Sufficiency of Acquired Assets**.  The Acquired Assets are in good condition for use in the business as used by Seller as of the date hereof, ordinary wear and tear excepted.

(i)   **Right of Others to Purchase Assets**. Seller has not entered into any other contracts for the sale of any of the Acquired Assets, nor are there any rights of first refusal or options to purchase any of the Acquired Assets or any other rights of others that might prevent the consummation of this Agreement.

6.   **Transfers Intended as Sales**.  Each purchase of the Acquired Assets is made without recourse to Seller. The parties hereto have structured each transaction contemplated by this Agreement as an absolute and irrevocable sale, and the Buyer and Seller agree to treat each such transaction as a "true sale" for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings (and shall reflect such sale in their respective financial

2

29078448.2

statements). Seller will advise anyone inquiring about the ownership of any Acquired Assets that all Acquired Assets have been sold to the Buyer.

7.   **Buyer's Representations and Warranties**.  The Buyer represents and warrants to Seller, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

   (a)   **Organization, Existence, Good Standing**.  The Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all the requisite power and authority to enter into this Agreement and to purchase the Acquired Assets.

   (b)   **Enforceability**.  This Agreement constitutes the Buyer's legal, valid and binding obligation and is enforceable according to its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

   (c)   **Power and Authority**.  The Buyer's execution and delivery of this Agreement, and the consummation of the transactions it contemplates, will not (i) violate, breach or be a default under any contract, agreement or commitment, (ii) violate any order, injunction, rule, regulation or ordinance of any court, administrative agency or governmental body, or (iii) violate or breach the Buyer's organizational or governing documents.

8.   **Further Assurances**.  From and after the Closing, at the request of the Buyer, Seller will execute and deliver, or cause to be executed and delivered, to the Buyer such instruments and other documents as the Buyer may request in order to implement the purchase and sale of the Acquired Assets, including, without limitation, bills of sale, transfer or assignment agreements, the filing of certificates of title and similar instruments, and any filings relating to the payment of Transfer Taxes.  Seller and the Buyer shall cooperate and use their respective reasonable best efforts to comply with their respective obligations under this Agreement.

9.   **Expenses**.  Except as otherwise provided in this Agreement with respect to Transfer Taxes, each Party will bear its own expenses incurred or to be incurred in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby.

10.   **No Assignment**.  The rights and obligations of the Seller under this Agreement may not be assigned without the prior written consent of the Buyer, except that Seller may, without the consent of Buyers, assign any or all of its rights and obligations to any of its affiliates, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of Seller hereunder or the failure of Seller to perform any of its covenants hereunder, and provided that no such assignment shall relieve Seller of any of its liabilities or obligations hereunder.  The rights and obligations of the Buyer under this Agreement may not be assigned without prior written consent of Seller, except that the Buyer may, without the consent of Seller, assign any or all of its rights and obligations under this Agreement to (a) any affiliate of the Buyer, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of the Buyer hereunder or the failure of the Buyer to perform any of its covenants hereunder, and provided that no such assignment shall relieve the Buyer of any of its liabilities or obligations hereunder; or (b) any lenders of the Buyer or any affiliate of the Buyer as collateral security.  Notwithstanding anything herein to the contrary, the prior written consent of

3

29078448.2

GLAS Trust Company LLC, as administrative agent for the lenders under that Credit Agreement, dated as of May 31, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among buyer, as the borrower, First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS Trust Company LLC, as administrative agent, shall be required for any assignment pursuant to this Section 10.

11.  **Headings**.  The headings contained in this Agreement are included for purposes of convenience only, and do not affect the meaning or interpretation of this Agreement.

12.  **Severability**.  If any provision of this Agreement or the application of any provision of this Agreement to any Party or circumstance is, to any extent, adjudged invalid or unenforceable, then the application of the remainder of such provision to such Party or circumstance, the application of such provision to other Parties or circumstances, and the application of the remainder of this Agreement will not be affected thereby.  Upon such determination that any term or other provision is invalid or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13.  **Notices**.  All notices and other communications required or permitted under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) one day after deposit with an overnight delivery service (prepaid, return receipt requested), (c) three days after being mailed if sent by registered or certified mail (postage prepaid, return receipt requested), (d) upon receipt of electronic evidence of successful electronic mail transmission or (e) upon electronic confirmation of successful facsimile transmission, in each case, to the appropriate Party at the address or facsimile number specified below:

   (a)  If to Seller:

   c/o First Brands Group, LLC
   127 Public Square, Suite 5300
   Cleveland, Ohio 44114
   Attention: Edward James, Executive Vice President
   Email: ed.james@firstbrandsgroup.com

   (b)  If to the Buyer:

   Carnaby Inventory II, LLC
   1540 Broadway, Suite 3710
   New York, New York
   Attention:  Shekhar Kumar, Managing Director
   Email:  shekhar.kumar@viceroyprivatecapital.co

14.  **Governing Law**.  This Agreement will be governed by and construed and enforced in accordance with the laws of the State of New York without regard to principles of conflicts of law.

15.  **Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED UPON, ARISING OUT OF OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR THE

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 156 of 812**

ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

16.     **Counterparts**.  This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission (including documents in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Agreement.

<div align="center">

**[Signatures Pages Follow]**

</div>

29078448.2

IN WITNESS WHEREOF, each of the Parties have duly executed this Agreement or have caused this Asset Agreement to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY II, LLC**

By:_____
Name:  Shekhar Kumar
Title:    Director

**SELLER:**

**BRAKE PARTS INC LLC**

By:_____
Name:
Title:

[Signature Page to Asset Purchase Agreement]
**JOINT EXHIBIT NO. 18**
**Page 158 of 812**

Annex I to Asset Purchase Agreement

Form of Schedule

This SCHEDULE NO. ___, dated as of _____ __, 20___ (the "***Schedule***) to that certain Asset Purchase Agreement dated as of [•], 20__ (as may be further amended, supplemented or modified from time to time, the "***Asset Purchase Agreement***"), is executed among BRAKE PARTS INC LLC, a Delaware limited liability company (the "***Seller***") and CARNABY INVENTORY II, LLC (the "***Buyer***"). The Seller and the Buyer are each a "***Party***" and collectively, the "***Parties***."

WHEREAS, the Asset Purchase Agreement provides for the execution and delivery of a Schedule to the Asset Purchase Agreement substantially in the form hereof in connection with any sale of Acquired Assets on a Subsequent Closing Date;

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, the Parties hereby agree as follows:

1. The Seller and the Buyer hereby confirm that all of the assets described on Exhibit A to this Schedule are Acquired Assets under the Asset Purchase Agreement, and that the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and their respective affiliates to those Acquired Assets described on Exhibit A hereto as of the Subsequent Closing Date.

2. All capitalized terms used in this Schedule but not defined in this Schedule shall have the meaning set forth in the Asset Purchase Agreement.

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 159 of 812**

IN WITNESS WHEREOF, the Parties have duly executed this Schedule or have caused this Schedule to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY II, LLC**


By:_____
Name:   Shekhar Kumar
Title:    Director

**SELLER:**

**BRAKE PARTS INC LLC**


By:_____
Name:
Title:

29078448.2

<u>Exhibit A to Schedule No.</u> ____

Acquired Assets

_____

29078448.2

<u>Annex II to Asset Purchase Agreement</u>

Form of Subordinated Note

29078448.2

SUBORDINATED NOTE

_____, 202_

1.    Note.  FOR VALUE RECEIVED, the undersigned, Carnaby Inventory II, LLC, a Delaware limited liability company (the "*Buyer*"), hereby unconditionally promises to pay to Brake Parts Inc LLC, a Delaware limited liability company (the "*Supplier*"), in lawful money of the United States of America and in immediately available funds, the aggregate unpaid principal sum of all outstanding obligations owed by the Buyer to the Supplier pursuant to and in accordance with the terms of any purchase agreement between the Buyer and Supplier.

2.    Definitions.  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Credit Agreement.  The following terms have the following meanings:

"*Available Cash*" means, on any date of determination, cash available to the Buyer from any source that is not required to be paid to or set aside for the benefit of the Administrative Agent and the Lenders on such date under the Credit Agreement.

"*Bankruptcy Proceedings*" has the meaning set forth in clause (b) of Section 7 hereof.

"*Contractual Maturity Date*" means the "Maturity Date" as defined in the Credit Agreement.

"*Credit Agreement*" means that certain Credit Agreement, dated as of May 31, 2022 by and among the Buyer, as borrower, Carnaby Inventory Holdings II, LLC, as guarantor, First Brands Group Holdings, LLC, as guarantor, First Brands Group, LLC, as servicer, the Lenders from time to time party thereto, and GLAS Trust Company LLC, as the Administrative Agent (as amended, restated, supplemented or otherwise modified from time to time).

"*Discount Factor*" means a percentage calculated to provide the Buyer with a reasonable return on its investment in the purchased inventory after taking account of the time value of money and the risk of nonpayment and/or failure of a counterparty to purchase such inventory.  Each of the Seller and the Buyer may agree from time to time and at any time to change the Discount Factor based on changes in one or more of the items affecting the calculation thereof.  As of the date of this agreement, the Discount Factor is 5.00%.

"*Highest Lawful Rate*" has the meaning set forth in Section 9 hereof.

"*Holder*" has the meaning set forth in Section 7 hereof.

"*Lenders*" means the lenders from time to time party to the Credit Agreement.

"*Maturity Date*" means the date that is 365 days following the Contractual Maturity Date.

"*Senior Claim*" means, collectively, the Obligations under, and as defined in, the Credit Agreement, together with any and all interest accruing on any such amount after the commencement of any Bankruptcy Proceedings, notwithstanding any provision or rule of law that might restrict the rights of any Senior Claimant, as against the Buyer or anyone else, to collect such interest.

29101141.3

**JOINT EXHIBIT NO. 18**
**Page 163 of 812**

"**Senior Claimants**" means the Administrative Agent, the Lenders and/or any of their successors or permitted assignees under the Credit Agreement.

"**Subordination Provisions**" means, collectively, clauses (a) through (l) of Section 7 hereof.

3.      Interest.  The Buyer further promises to pay interest on the outstanding unpaid principal amount hereof from the date hereof until payment in full hereof at a rate equal to the Discount Factor, computed for actual days elapsed on the basis of a year consisting of 360 days, on each Payment Date hereafter on which no Default or Event of Default exists and is continuing, to the extent of the Buyer's Available Cash and to the extent expressly set forth in accordance with Section 2.1(d) of the Credit Agreement (it being understood and agreed that any amount of interest which the Buyer is precluded from paying due to the existence and continuance of a Default or Event of Default or the lack of sufficient Available Cash shall become due and payable on the next Payment Date on which no such condition persists); *provided*, *however*, that if the Buyer shall default in the payment of any principal hereof, the Buyer promises to pay, on demand, interest at the rate equal to the Default Rate per annum on any such unpaid amounts, from the date such payment is due to the date of actual payment; and *provided further*, that the Buyer may elect on the date any interest payment is due hereunder to defer such payment and upon such election the amount of interest due but unpaid on such date shall constitute principal under this Subordinated Note.  The outstanding unpaid interest of any loan made under this Subordinated Note shall be due and payable on the Maturity Date and may be paid with the prepayment of principal at any time without premium or penalty.

4.      Principal Payments.  On each Payment Date hereafter on which no Default or Event of Default (each, as defined in the Credit Agreement) exists and is continuing, the Buyer shall pay to the Seller the outstanding principal balance of this Subordinated Note to the extent of the Buyer's Available Cash and to the extent expressly set forth in accordance with Section 2.1(d) of the Credit Agreement (it being understood and agreed that any amount of principal which the Buyer is precluded from paying due to the existence and continuance of a Default or Event of Default or the lack of sufficient Available Cash shall become due and payable on the next Payment Date on which no such condition persists).  The Seller is authorized and directed by the Buyer to enter in its books and records, the date and amount of each loan made by it which is evidenced by this Subordinated Note and the amount of each payment of principal owed or made by the Buyer, and absent manifest error, such entries shall constitute prima facie evidence of the accuracy of the information so entered; *provided* that neither the failure of the Seller to make any such entry or any error therein shall expand, limit or affect the obligations of the Buyer hereunder.  The outstanding principal of any loan made under this Subordinated Note shall be due and payable on the Maturity Date and may be repaid or prepaid at any time, to the extent expressly set forth in accordance with Section 2.1(d) of the Credit Agreement, without premium or penalty.

5.      Payment Mechanics.  All payments of principal and interest hereunder are to be made in lawful money of the United States of America in the manner specified in the applicable purchase and sale documentation.

6.      Enforcement Expenses.  In addition to and not in limitation of the foregoing, but subject to the Subordination Provisions set forth above and to any limitation imposed by applicable Law and to the extent expressly set forth in accordance with Section 2.1(d) of the Credit Agreement, the Buyer agrees to pay all expenses, including attorney fees, incurred by the Seller in seeking to collect any amounts payable hereunder which are not paid when due.

29101141.3

7.      <u>Subordination Provisions</u>.  Buyer covenants and agrees, and the Seller and any other holder of this Subordinated Note (collectively, the Seller and any such other holder are called the "***Holder***"), by its acceptance of this Subordinated Note, likewise covenants and agrees on behalf of itself and any Holder, that the payment of the principal amount of and interest on this Subordinated Note is hereby expressly subordinated in right of payment to the payment in full and in cash and performance in full of the Senior Claim in all respects.  Without limiting the generality of the foregoing,

(a)      No payment or other distribution of the Buyer's assets of any kind or character, whether in cash, securities, or other rights or property, shall be made on account of this Subordinated Note except to the extent such payment or other distribution is (i) permitted under the Credit Agreement or (ii) made pursuant to <u>Section 4</u> of this Subordinated Note;

(b)      In the event of any dissolution, winding up, liquidation, readjustment, reorganization or other similar event relating to the Buyer, whether voluntary or involuntary, partial or complete, and whether in bankruptcy, insolvency or receivership proceedings, or upon an assignment for the benefit of creditors, or any other marshalling of the assets and liabilities of the Buyer or any sale of all or substantially all of the assets of the Buyer other than as permitted by the Credit Agreement (such proceedings being herein collectively called "***Bankruptcy Proceedings***"), the Senior Claim shall first be paid in full and in cash and performed in full, and all commitments of the lenders under the Credit Agreement shall have been terminated, before the Seller shall be entitled to receive and to retain any payment or distribution in respect of this Subordinated Note.  In order to implement the foregoing:  (i) all payments and distributions of any kind or character in respect of this Subordinated Note to which the Holder would be entitled except for this clause (b) shall be made directly to the Administrative Agent (for the benefit of the Senior Claimants); (ii) the Holder shall promptly file a claim or claims, in the form required in any Bankruptcy Proceedings, for the full outstanding amount of this Subordinated Note, and shall use commercially reasonable efforts to cause said claim or claims to be approved and all payments and other distributions in respect thereof to be made directly to the Administrative Agent (for the benefit of the Senior Claimants) until the Senior Claim shall have been paid in full in cash and performed in full and all commitments of the lenders under the Credit Agreement shall have been terminated; and (iii) the Holder hereby irrevocably agrees that the Administrative Agent (acting on behalf of the Lenders), may in the name of the Holder or otherwise, demand, sue for, collect, receive and receipt for any and all such payments or distributions, and file, prove and vote or consent in any such Bankruptcy Proceedings with respect to any and all claims of the Holder relating to this Subordinated Note, in each case until the Senior Claim shall have been paid in full and in cash and performed in full and all commitments of the lenders under the Credit Agreement shall have been terminated;

(c)      In the event that the Holder receives any payment or other distribution of any kind or character from the Buyer or from any other source whatsoever, in respect of this Subordinated Note, other than as expressly permitted by the terms of this Subordinated Note, such payment or other distribution shall be received in trust for the Senior Claimants and shall be turned over by the Holder to the Administrative Agent (for the benefit of the Senior Claimants) forthwith.  The Holder will mark its books and records so as clearly to indicate that this Subordinated Note is subordinated in accordance with the terms hereof.  All payments and distributions received by the Administrative Agent in respect of this Subordinated Note, to the extent received in or converted into cash, may be applied by the Administrative Agent (for the benefit of the Senior Claimants) first to the payment of any and all expenses (including attorney

29101141.3

fees) paid or incurred by the Senior Claimants in enforcing these Subordination Provisions, or in endeavoring to collect or realize upon this Subordinated Note, and any balance thereof shall, solely as between the Seller and the Senior Claimants, be applied by the Administrative Agent (in the order of application of the Waterfall set forth in Section 2.1(c) of the Credit Agreement) toward the payment of the Senior Claim; but as between the Buyer and its creditors, no such payments or distributions of any kind or character shall be deemed to be payments or distributions in respect of the Senior Claim;

(d)      Notwithstanding any payments or distributions received by the Senior Claimants in respect of this Subordinated Note, the Holder shall not be subrogated to the then existing rights of the Senior Claimants in respect of the Senior Claim until the Senior Claim has been paid and performed in full and in cash and all commitments of the lenders under the Credit Agreement have been terminated.

(e)      These Subordination Provisions are intended solely for the purpose of defining the relative rights of the Holder, on the one hand, and the Senior Claimants on the other hand. Nothing contained in these Subordination Provisions or elsewhere in this Subordinated Note is intended to or shall impair, as between the Buyer, its creditors (other than the Senior Claimants) and the Holder, the Buyer's obligation, which is unconditional and absolute, to pay the Holder the principal of and interest on this Subordinated Note as and when the same shall become due and payable in accordance with the terms hereof or to affect the relative rights of the Holder and creditors of the Buyer (other than the Senior Claimants);

(f)      Prior to the payment in full in cash and performance in full of the Senior Claim and termination of all commitments of the lenders under the Credit Agreement, the Holder shall not sue, or initiate or participate with any others in any suit, action or proceeding against, the Buyer to enforce payment of or collect any payments owing by the Buyer to the Holder under this Subordinated Note that are not permitted to be made to the Holder by operation of this Section 7.  The Holder shall not, until after the occurrence of the Termination Date, (i) cancel, waive, forgive, transfer or assign, or commence legal proceedings to enforce or collect, or subordinate to any obligation of the Buyer, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or now or hereafter existing, or due or to become due, other than the Senior Claim, this Subordinated Note or any rights in respect hereof or (ii) convert this Subordinated Note into an equity interest in the Buyer, unless the Holder shall, in either case, have received the prior written consent of the Administrative Agent (at the direction of the Required Lenders);

(g)      The Holder shall not, without the advance written consent of the Administrative Agent and each Lender, commence, or join with any other Person in commencing, any Bankruptcy Proceedings with respect to the Buyer until at least one year and one day shall have passed since the Senior Claim shall have been paid in full in cash and performed in full and in cash and all commitments of the lenders under the Credit Agreement shall have been terminated;

(h)      If, at any time, any payment (in whole or in part) of any Senior Claim is rescinded or must be restored or returned by a Senior Claimant (whether in connection with Bankruptcy Proceedings or otherwise), these Subordination Provisions shall continue to be effective or shall be reinstated, as the case may be, as though such payment had not been made;

29101141.3

(i)        Holder hereby waives notice, and without waiving any of its rights under these Subordination Provisions, of any action taken or to be taken by any Senior Claimant, including without limitation: (i) retaining or obtaining an interest in any property to secure the Senior Claim; (ii) retaining or obtaining the primary or secondary obligations of any other obligor or obligors with respect to the Senior Claim; (iii) extending the Contractual Maturity Date, altering or exchanging the Senior Claim, or releasing or compromising any obligation of any nature with respect to the Senior Claim; (iv) amending, supplementing, amending and restating, or otherwise modifying any Transaction Document; and (v) releasing its security interest in, or surrendering, releasing or permitting any substitution or exchanging for all or any part of any rights or property securing the Senior Claim, or extending or renewing for one or more periods (whether or not longer than the original period), or releasing, compromising, altering or exchanging any obligations of any nature of any obligor with respect to any such rights or property;

(j)        The Holder hereby waives:  (i) notice of acceptance of these Subordination Provisions by any of the Senior Claimants; (ii) notice of the existence, creation, non-payment or non-performance of all or any part of the Senior Claim; and (iii) all diligence in enforcement, collection or protection of, or realization upon, the Senior Claim, or any thereof, or any security therefor;

(k)        Each of the Senior Claimants may, from time to time, on the terms and subject to the conditions set forth in the Transaction Documents to which such Persons are party, but without notice to the Holder, assign or transfer all or part of the Senior Claim, or any interest therein; and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such part of the Senior Claim shall be and remain part of the Senior Claim for the purposes of these Subordination Provisions, and every immediate and successive assignee or transferee of any part of the Senior Claim or of any interest of such assignee or transferee in the Senior Claim shall be entitled to the benefits of these Subordination Provisions to the same extent as if such assignee or transferee were the assignor or transferor; and

(l)        These Subordination Provisions constitute a continuing offer from the Holder to all Persons who become the holders of, or who continue to hold, the Senior Claim; and these Subordination Provisions are made for the benefit of the Senior Claimants, and the Administrative Agent may proceed to enforce such provisions on behalf of each of such Persons.

8.        <u>General</u>.  No failure or delay on the part of the Seller in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.  No amendment, modification or waiver of, or consent with respect to, any provision of this Subordinated Note shall in any event be effective unless (i) the same shall be in writing and signed and delivered by the Buyer and the Holder and (ii) all consents required for such actions under the Transaction Documents shall have been received by the appropriate Persons.

9.        <u>Maximum Interest</u>.  Notwithstanding anything in this Subordinated Note to the contrary, the Buyer shall never be required to pay unearned interest on any amount outstanding hereunder and shall never be required to pay interest on the principal amount outstanding hereunder at a rate in excess of the maximum nonusurious interest rate that may be contracted for, charged or received under applicable federal or state Law (such maximum rate being herein called the "***Highest Lawful Rate***").  If the effective rate of interest which would otherwise be payable under this Subordinated Note would exceed

29101141.3

the Highest Lawful Rate, or if the holder of this Subordinated Note shall receive any unearned interest or shall receive monies that are deemed to constitute interest which would increase the effective rate of interest payable by the Buyer under this Subordinated Note to a rate in excess of the Highest Lawful Rate, then (i) the amount of interest which would otherwise be payable by the Buyer under this Subordinated Note shall be reduced to the amount allowed by applicable Law, and (ii) any unearned interest paid by the Buyer or any interest paid by the Buyer in excess of the Highest Lawful Rate shall be refunded to the Buyer.  Without limitation of the foregoing, all calculations of the rate of interest contracted for, charged or received by the Seller under this Subordinated Note that are made for the purpose of determining whether such rate exceeds the Highest Lawful Rate applicable to the Seller (such Highest Lawful Rate being herein called the "**Seller's Maximum Permissible Rate**") shall be made, to the extent permitted by usury laws applicable to the Seller (now or hereafter enacted), by amortizing, prorating and spreading in equal parts during the actual period during which any amount has been outstanding hereunder all interest at any time contracted for, charged or received by the Seller in connection herewith.  If at any time and from time to time (i) the amount of interest payable to the Seller on any date shall be computed at the Seller's Maximum Permissible Rate pursuant to the provisions of the foregoing sentence and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Seller would be less than the amount of interest payable to the Seller computed at the Seller's Maximum Permissible Rate, then the amount of interest payable to the Seller in respect of such subsequent interest computation period shall continue to be computed at the Seller's Maximum Permissible Rate until the total amount of interest payable to the Seller shall equal the total amount of interest which would have been payable to the Seller if the total amount of interest had been computed without giving effect to the provisions of the foregoing sentence.

10.     No Negotiation.  This Subordinated Note is not negotiable.

11.     Amendments.  The terms of this Subordinated Note may not be amended or otherwise modified without the prior written consent of the Administrative Agent and the Lenders.

12.     GOVERNING LAW.  THIS SUBORDINATED NOTE HAS BEEN MADE AND DELIVERED AT NEW YORK, NEW YORK, AND SHALL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS AND DECISIONS OF THE STATE OF NEW YORK.  WHEREVER POSSIBLE EACH PROVISION OF THIS SUBORDINATED NOTE SHALL BE INTERPRETED IN SUCH MANNER AS TO BE EFFECTIVE AND VALID UNDER APPLICABLE LAW, BUT IF ANY PROVISION OF THIS SUBORDINATED NOTE SHALL BE PROHIBITED BY OR INVALID UNDER APPLICABLE LAW, SUCH PROVISION SHALL BE INEFFECTIVE TO THE EXTENT OF SUCH PROHIBITION OR INVALIDITY, WITHOUT INVALIDATING THE REMAINDER OF SUCH PROVISION OR THE REMAINING PROVISIONS OF THIS SUBORDINATED NOTE.

13.     Waivers.  All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.  The Seller additionally expressly waives all notice of the acceptance by any Senior Claimant of the subordination and other provisions of this Subordinated Note and expressly waives reliance by any Senior Claimant upon the subordination and other provisions herein provided.

14.     Non-petition.  In accepting this Subordinated Note, the Seller shall be deemed to have agreed, on behalf of itself and its successors and assigns, that, prior to the date that is one year and one day after the payment in full in cash and performance in full of all outstanding obligations of the Buyer under the Credit Agreement and all commitments of the lenders under the Credit Agreement have been terminated, it will not institute against, or join any other Person in instituting against, the Buyer, any

29101141.3

bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings or other similar proceeding under the Laws of the United States or any state of the United States.

15.     Captions.  Section captions used in this Subordinated Note are for convenience only and shall not affect the meaning or interpretation of any provision of this Subordinated Note.

16.     Third Party Beneficiaries.  The terms of Section 3, Section 4, Section 6 and the Subordination Provisions set forth in Section 7 are for the benefit of the Administrative Agent and the Lenders under the Credit Agreement and the Administrative Agent shall be a third party beneficiary of the foregoing provisions.  No right of the Administrative Agent to enforce the terms of Section 3, Section 4, Section 6 and the Subordination Provisions set forth in Section 7 shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Buyer or the Holder or by any noncompliance by the Buyer or the Holder with the terms of this Subordinated Note.


**CARNABY INVENTORY II, LLC**


By: _____
Name:
Title:


29101141.3

EXHIBIT XII

FORM OF SALE AGREEMENT

[Attached]

*Execution Version*

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of May 31, 2022 (the "*Execution Date*"), by and between CARNABY INVENTORY II, LLC, a Delaware limited liability company (the "*Seller*") and BRAKE PARTS INC LLC (the "*Buyer*").  The Seller and the Buyer are each a "*Party*" and collectively, the "*Parties*."

**RECITALS**

WHEREAS, the Seller desires to sell, assign and transfer free and clear of any lien, and the Buyer desires to purchase, all of the assets set forth on any schedule under this Agreement executed by Seller and Buyer (each, a "*Schedule*") in the form attached hereto as **Annex I,** free and clear of any lien, which consist of certain inventory of the Seller (collectively, the "*Acquired Assets*"), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties to this Agreement, intending to be legally bound, hereby agree as follows:

1.  **Sale and Purchase of Assets**.  At each Subsequent Closing, the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and its affiliates in and to all of the Acquired Assets described on a Schedule as of the Subsequent Closing Date.

2.  **Purchase Price**.  The purchase price for each Acquired Asset will be the fair market value thereof (the "*Purchase Price*"), which amount may be paid in the form of cash or in kind.

3.  **Closing**.  The purchase and sale of the Acquired Assets pursuant to an executed Schedule shall occur a upon payment of the applicable Purchase Price for each Acquired Asset (each, a "*Subsequent Closing*" and the date thereof, a "*Subsequent Closing Date*").  The risk of loss and full benefit of ownership of the Acquired Assets shall transfer to the Buyer immediately upon the Subsequent Closing.

4.  **[Reserved]**.

5.  **Seller's Representations and Warranties**.  Seller represents and warrants to the Buyer, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

    (a)  **Organization, Existence, Good Standing**. Seller is duly incorporated, organized, or formed, and is existing and in good standing under the laws of its jurisdiction of incorporation, organization, or formation.

    (b)  **Power and Authority**. Seller has full power and authority to enter into and perform this Agreement.  The execution, delivery and performance of this Agreement by Seller have been duly and validly approved by Seller's board of directors or equivalent governing body, as applicable.  No other proceedings are necessary on the part of Seller to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein.  Seller has the necessary power and authority to own and operate the Acquired Assets.

29078448.2

(c)  **Enforceability**.  This Agreement has been duly authorized, executed and delivered by Seller and constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(d)  **Governmental Consents and Conflicts**.  No consent, authorization, order or approval of, or filing or registration with, any Governmental Authority is required for or in connection with the consummation by Seller of the transactions contemplated by this Agreement.

(e)  **Other Consents and Conflicts**.  Neither the execution nor delivery of this Agreement by Seller, nor the consummation by Seller of the transactions contemplated in this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any claim upon any of the Acquired Assets, under (i) Seller's corporate governing or other organizational documents, or (ii) any contract that is material to the operation of the business of Seller.

(f)  **Title to Assets**.  Seller has good title to the Acquired Assets, in each case free and clear of any Liens.

(g)  **Transfer Taxes**.  Seller hereby represents and warrants with respect to the Acquired Assets that the sale, transfer, assignment and conveyance of the Acquired Assets by Seller pursuant to this Agreement is not subject to and will not result in any tax, fee or governmental charge payable by the Buyer or Seller to any federal, state or local government ("*Transfer Taxes*").  In the event that Seller receives notice of any Transfer Taxes arising out of the transfer of such Assets, Seller shall give notice thereof to the Buyer, and Seller shall pay any such Transfer Taxes.

(h)  **Condition and Sufficiency of Acquired Assets**.  The Acquired Assets are in good condition for use in the business as used by Seller as of the date hereof, ordinary wear and tear excepted.

(i)  **Right of Others to Purchase Assets**. Seller has not entered into any other contracts for the sale of any of the Acquired Assets, nor are there any rights of first refusal or options to purchase any of the Acquired Assets or any other rights of others that might prevent the consummation of this Agreement.

6.  **Transfers Intended as Sales**.  Each purchase of the Acquired Assets is made without recourse to Seller. The parties hereto have structured each transaction contemplated by this Agreement as an absolute and irrevocable sale, and the Buyer and Seller agree to treat each such transaction as a "true sale" for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings (and shall reflect such sale in their respective financial statements). Seller will advise anyone inquiring about the ownership of any Acquired Assets that all Acquired Assets have been sold to the Buyer.

7.  **Buyer's Representations and Warranties**.  The Buyer represents and warrants to Seller, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

2

29078448.2
DRAFT

(a) **Organization, Existence, Good Standing**.  The Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all the requisite power and authority to enter into this Agreement and to purchase the Acquired Assets.

(b) **Enforceability**.   This Agreement constitutes the Buyer's legal, valid and binding obligation and is enforceable according to its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(c) **Power and Authority**.  The Buyer's execution and delivery of this Agreement, and the consummation of the transactions it contemplates, will not (i) violate, breach or be a default under any contract, agreement or commitment, (ii) violate any order, injunction, rule, regulation or ordinance of any court, administrative agency or governmental body, or (iii) violate or breach the Buyer's organizational or governing documents.

8. **Further Assurances**.  From and after the Closing, at the request of the Buyer, Seller will execute and deliver, or cause to be executed and delivered, to the Buyer such instruments and other documents as the Buyer may request in order to implement the purchase and sale of the Acquired Assets, including, without limitation, bills of sale, transfer or assignment agreements, the filing of certificates of title and similar instruments, and any filings relating to the payment of Transfer Taxes.  Seller and the Buyer shall cooperate and use their respective reasonable best efforts to comply with their respective obligations under this Agreement.

9. **Expenses**.  Except as otherwise provided in this Agreement with respect to Transfer Taxes, each Party will bear its own expenses incurred or to be incurred in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby.

10. **No Assignment**.  The rights and obligations of the Seller under this Agreement may not be assigned without the prior written consent of the Buyer, except that Seller may, without the consent of Buyers, assign any or all of its rights and obligations to any of its affiliates, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of Seller hereunder or the failure of Seller to perform any of its covenants hereunder, and provided that no such assignment shall relieve Seller of any of its liabilities or obligations hereunder.  The rights and obligations of the Buyer under this Agreement may not be assigned without prior written consent of Seller, except that the Buyer may, without the consent of Seller, assign any or all of its rights and obligations under this Agreement to (a) any affiliate of the Buyer, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of the Buyer hereunder or the failure of the Buyer to perform any of its covenants hereunder, and provided that no such assignment shall relieve the Buyer of any of its liabilities or obligations hereunder; or (b) any lenders of the Buyer or any affiliate of the Buyer as collateral security.  Notwithstanding anything herein to the contrary, the prior written consent of GLAS Trust Company LLC, as administrative agent for the lenders under that Credit Agreement, dated as of May 31, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among buyer, as the borrower, First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS Trust Company LLC, as administrative agent, shall be required for any assignment pursuant to this Section 10.

3

29078448.2
DRAFT

**JOINT EXHIBIT NO. 18**
**Page 173 of 812**

11. **Headings**.  The headings contained in this Agreement are included for purposes of convenience only, and do not affect the meaning or interpretation of this Agreement.

12. **Severability**.  If any provision of this Agreement or the application of any provision of this Agreement to any Party or circumstance is, to any extent, adjudged invalid or unenforceable, then the application of the remainder of such provision to such Party or circumstance, the application of such provision to other Parties or circumstances, and the application of the remainder of this Agreement will not be affected thereby.  Upon such determination that any term or other provision is invalid or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13. **Notices**.  All notices and other communications required or permitted under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) one day after deposit with an overnight delivery service (prepaid, return receipt requested), (c) three days after being mailed if sent by registered or certified mail (postage prepaid, return receipt requested), (d) upon receipt of electronic evidence of successful electronic mail transmission or (e) upon electronic confirmation of successful facsimile transmission, in each case, to the appropriate Party at the address or facsimile number specified below:

    (a)    If to Buyer:

        c/o First Brands Group, LLC
        127 Public Square, Suite 5300
        Cleveland, Ohio 44114
        Attention: Edward James, Executive Vice President
        Email: ed.james@firstbrandsgroup.com

    (b)    If to the Seller:

        Carnaby Inventory II, LLC
        1540 Broadway, Suite 3710
        New York, New York
        Attention:  Shekhar Kumar, Managing Director
        Email:  shekhar.kumar@viceroyprivatecapital.co

14. **Governing Law**.  This Agreement will be governed by and construed and enforced in accordance with the laws of the State of New York without regard to principles of conflicts of law.

15. **Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED UPON, ARISING OUT OF OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

16. **Counterparts**.  This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission

<center>4</center>

29078448.2
DRAFT

<center>**JOINT EXHIBIT NO. 18**
**Page 174 of 812**</center>

(including documents in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Agreement.

**[Signatures Pages Follow]**

29078448.2
DRAFT

**JOINT EXHIBIT NO. 18**
**Page 175 of 812**

IN WITNESS WHEREOF, each of the Parties have duly executed this Agreement or have caused this Asset Agreement to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY II, LLC**

By:_____
Name:  Shekhar Kumar
Title:    Director

**SELLER:**

**BRAKE PARTS INC LLC**

By:_____
Name:
Title:

[Signature Page to Asset Purchase Agreement]

**JOINT EXHIBIT NO. 18**
**Page 176 of 812**

<u>Annex I to Asset Purchase Agreement</u>

<u>Form of Schedule</u>

This SCHEDULE NO. \_\_\_, dated as of _____ \_\_, 20\_\_\_ (the "**Schedule**) to that certain Asset Purchase Agreement dated as of [•], 20\_\_ (as may be further amended, supplemented or modified from time to time, the "**Asset Purchase Agreement**"), is executed among BRAKE PARTS INC LLC, a Delaware limited liability company (the "**Seller**") and CARNABY INVENTORY II, LLC (the "**Buyer**"). The Seller and the Buyer are each a "**Party**" and collectively, the "**Parties**."

WHEREAS, the Asset Purchase Agreement provides for the execution and delivery of a Schedule to the Asset Purchase Agreement substantially in the form hereof in connection with any sale of Acquired Assets on a Subsequent Closing Date;

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, the Parties hereby agree as follows:

1.  The Seller and the Buyer hereby confirm that all of the assets described on Exhibit A to this Schedule are Acquired Assets under the Asset Purchase Agreement, and that the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and their respective affiliates to those Acquired Assets described on Exhibit A hereto as of the Subsequent Closing Date.

2.  All capitalized terms used in this Schedule but not defined in this Schedule shall have the meaning set forth in the Asset Purchase Agreement.

DRAFT
290784448.2
DR

IN WITNESS WHEREOF, the Parties have duly executed this Schedule or have caused this Schedule to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY II, LLC**

By:_____
Name:
Title:


**SELLER:**

**BRAKE PARTS INC LLC**

By:_____
Name:
Title:

AFT
DR
29073448.2

**JOINT EXHIBIT NO. 18**
**Page 178 of 812**

Exhibit A to Schedule No. _____

Acquired Assets

_____

29078448.2

AFT
DR
20078448.2

EXHIBIT XIII

FORM OF MANUFACTURING AGREEMENT

[Attached]

*EXECUTION VERSION*

## MANUFACTURING AGREEMENT

This Manufacturing Agreement (hereinafter referred to as the "Agreement") is entered into by and between **Brake Parts Inc LLC** (hereinafter "**Brake Parts**"), limited liability company, duly organized and validly existing under the laws of Delaware, United States of America, represented by **Michael Baker** in his capacity as Chief Corporate Strategy Officer, and **Carnaby Inventory II, LLC** (hereinafter as "**Carnaby**") limited liability company, duly organized and validly existing under the laws of Delaware, United States of America, represented by **Shekhar Kumar** in his capacity as Managing Director, pursuant to the following recitals and clauses.

## RECITALS

WHEREAS, **Brake Parts** has entered into two Maquila Agreements (jointly referred to as the "Maquila Agreements"), one between **Brake Parts** and **BPI Brake Manufacturing Juarez, S.A. de C.V.**, and the other between **Brake Parts** and **BPI Braking Systems Mexico, S.A. de C.V**. A copy of said Maquila Agreements and their corresponding amendments is attached hereto and identified as **Exhibit "A"**;

WHEREAS, **BPI Brake Manufacturing Juarez, S.A. de C.V.** and **BPI Braking Systems Mexico, S.A. de C.V**. (jointly referred to as the "**Maquiladoras**") are companies duly organized and validly existing under the laws of the United States of Mexico and perform their operations in Mexico, in the locations specified in **Exhibit "B"**;

WHEREAS, **Brake Parts** and **Carnaby** (jointly referred to as the "**Parties**") wish to enter into this manufacturing agreement pursuant to which **Carnaby** will hire and request the manufacturing services from **Brake Parts** to manufacture and produce the products requested by **Carnaby** (the "**Products**");

WHEREAS, the parties intend to establish the terms and conditions of their business understanding with the purpose that hereinafter such business relationship is governed under the terms and conditions set forth herein;

WHEREAS, **Carnaby** acknowledges that the commercial manufacturing business relationship is with **Brake Parts** and accepts that **Brake Parts** could perform the manufacture processes required by **Carnaby** with another entity that could be located in the United States of America, in Mexico or in any other Country;

WHEREAS, for purposes of this Agreement, the parties agree that the commercial manufacturing business relationship is between **Carnaby** and **Brake Parts** and **Brake Parts** will provide the manufacturing services set forth herein through its **Maquiladoras** located in Mexico;

WHEREAS, **Brake Parts** has the expertise, facilities, equipment and appropriate personnel to carry out the manufacturing services requested by **Carnaby** through its **Maquiladoras** located in Mexico;

WHEREAS, **Carnaby** will license to **Brake Parts** and in turn its **Maquiladoras** certain intellectual property rights and know-how relating to the Products and will deliver directly to the **Maquiladoras** the necessary **Materials** for the manufacturing of the requested Products**;**

WHEREAS, the **Maquiladoras** have secured authorization from the Ministry of Economy to operate under a maquiladora program ("**Maquiladora Program**") in accordance with the Decree for the Development of the Manufacturing, Maquiladora and Export Services Industry ("**IMMEX Decree**"), and other customs authorization, program, license and/or registry required to import on a temporarily basis, export and manufacture, accordingly, in the most efficient way, the machinery, equipment and materials (jointly, the "**IMMEX Permits**");

WHEREAS, BPI Brake Manufacturing Juarez, S.A. de C.V. has secured a Value Added Tax and Excise Tax Certification under modality A ("**VAT Certification**"), which entitles to a tax credit benefit for Value Added Tax and Excise Tax upon temporary importations;

29117807.2

**JOINT EXHIBIT NO. 18**
**Page 182 of 812**

*EXECUTION VERSION*

**WHEREAS**, the commercial manufacturing business relationship will be exclusively at all times between **Carnaby** and **Brake Parts**;

**WHEREAS**, **Brake Parts** acknowledges that it is the intention of **Carnaby** to have a business relationship that will not be taxable as a Permanent Establishment (**"PE"**) for **Carnaby** under Mexican income tax law (**"Mexican Income Tax Law"**);

**WHEREAS**, on the date hereof, **Carnaby,** Carnaby Inventory Holdings II, LLC, First Brands Group Holdings, LLC, and First Brands Group, LLC, have entered into a certain credit agreement (the **"Credit Agreement"**);

**WHEREAS**, the representatives of the parties have sufficient authority to enter into this Agreement, same that at the date of execution of this Agreement have not been revoked; and

**NOW THEREFORE**, in consideration of the of the recitals mentioned above, **Brake Parts** and **Carnaby** agree to establish their commercial manufacturing business relationship in accordance with the following:

<div align="center"><strong>CLAUSES</strong></div>

**FIRST. Brake Parts** binds itself to carry out in benefit of **Carnaby**, the requested manufacturing process through its **Maquiladoras**. **Brake Parts** binds itself to transfer exclusively the Products manufactured under the instructions of **Carnaby** in accordance with the technical specifications and quality standards that will be provided by the **Carnaby** and strictly under the terms hereof.

**SECOND. Brake Parts** will provide through its **Maquiladoras** the manufacturing process required by **Carnaby** with its expertise, facilities, machinery, equipment and appropriate personnel; **Brake Part** will be responsible before **Carnaby** for the use of the Materials provided by Carnaby, for Manufacturing process, the manufactured Products by **Brake Part** through its **Maquiladoras**.

**THIRD. Carnaby** hires **Brake Parts** to carry out the manufacturing services of the Products requested by **Carnaby**, as well as any other products, as may be agreed by the parties in the future in writing and **Brake Parts** accepts and agrees to perform the manufacturing process through its **Maquiladoras** in accordance with the terms of this Agreement.

**FOURTH. Carnaby** shall deliver to **Brake Parts** at a previously agreed Maquiladora location, on a periodic basis, on consignment, under gratuitous bailment, the raw materials, components, subassemblies, and supplies (**"Materials"**) as are necessary to carry out the Manufacturing process of the Products performed by **Brake Parts** through its **Maquiladoras**. The parties shall agree in writing the Maquiladora and location where the Materials will be delivered by **Carnaby**, as well as the amounts, delivery dates and times, materials, and any other relevant aspect or information concerning the delivery of Materials.

Neither **Brake Parts** or its **Maquiladoras** shall under no circumstances be considered to have any proprietary interest on the **Materials** which **Carnaby** may deliver to **Brake Parts** as provided for herein nor on the Products. Any commercial invoice that may be issued by **Carnaby** in order to comply with customs requirements for the exportation or importation of any **Materials** provided by **Carnaby** to **Brake Parts and Maquiladoras,** shall not be considered for any purposes to be evidence of conveyance of title in the **Materials** in favor of **Brake Parts** or its **Maquiladoras.** Once the Products covered by this Agreement have been manufactured by **Brake Parts** through its **Maquiladoras,** they must be returned to **Carnaby** in accordance with the terms of this Agreement.

**Brake Parts** and its **Maquiladoras** shall provide necessary administrative services for shipment, including the arrangement of proper transportation, of the **Materials** and the Products under this Agreement between the United Mexican States and the United States of America using information supplied by **Carnaby** (the "**Administrative**

29117807.2

<div align="center"><strong>JOINT EXHIBIT NO. 18</strong><br><strong>Page 183 of 812</strong></div>

*EXECUTION VERSION*

**Services**"); such Administrative Services shall include, but not be limited to, preparation of required United States of America and United States of Mexico Customs documentation and **Brake Parts** agrees to duly and timely comply with all the applicable customs laws.  **Brake Parts** may be the importer and exporter of record for United States of America customs purposes, in which case  **Brake Parts** shall obtain any validated export licenses required by United States of America export laws and regulations; if agreed by the parties separately to this Agreement,  **Brake Parts** shall be responsible for all compliance and all costs relating to compliance with United States of America customs regulations, including but not limited to, any and all United States of America import bonds; United States of America customs duties, import fees and taxes; fines and penalties; and United States of America customhouse brokerage fees. The **Maquiladoras** shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the **Materials** and Products and shall comply with all record keeping and reporting obligations pursuant to the applicable law.

**Carnaby** shall be responsible for providing to **Brake Parts** a detailed list of the **Materials** required to perform the Manufacturing process in order that the **Maquiladoras** may obtain the necessary permits and authorizations to import the **Materials** under its IMMEX Program.

At all times during the term of this Agreement, **Brake Parts** and its **Maquiladoras** shall (i) be duly authorized by the competent governmental authority to operate the **Maquiladora Program**, (ii) hold valid and in force licenses, authorizations, permits, programs, licenses and/or registries required to perform the manufacturing services in the facilities in accordance to applicable laws and pursuant to this Agreement in the most cost-efficient and diligent way (the "Operating Permits" and together with the IMMEX Permits, the "Permits"), and (iii) carry out all the necessary activities before the corresponding governmental authority, to render the manufacturing services on time and agreed manner.

**FIFTH.** For the Products to be in compliance with the technical specifications and quality standards that **Carnaby** requires, **Carnaby** shall make available to **Brake Parts** and subsequently **Brake Parts** to its **Maquiladoras** the knowledge, technical experience, and practice and other industrial information (the "Technical Information").

**Carnaby** will be able and allowed to supervise the manufacturing processes and if necessary, could assist **Brake Parts** and in turn **its Maquiladoras** to manufacture the Products pursuant to the terms herein.

The parties hereto agree that the transferring of Technical Information shall not trigger any consideration whatsoever, since all Technical Information is necessary for the Products to fulfill the technical specifications and quality standards that **Carnaby** requires, and does not serve any other purpose.

**Brake Parts** and its **Maquiladoras** shall pay any and all sales taxes, use taxes, personal taxes, flat taxes, value-added taxes, assessments, duties and all other governmental exactions of any nature, in connection with this Agreement, the **Materials,** the **Products** and the **Permits**, or in connection with the operations conducted in the facilities or the manufacturing services performed by **Brake Parts** and its **Maquiladoras** pursuant to this Agreement.

**SIXTH.** In consideration **Carnaby** shall pay to **Brake Parts** the prices agreed separately to this Agreement for the Manufacturing services provided, based on the volume of units manufactured and sold; the payment conditions and terms will be agreed separately from this Agreement between **Carnaby** and **Brake Parts**; provided that, any payments from **Carnaby** are subject to it being permitted to do so under Section 2.1(d) of the Credit Agreement

**SEVENTH.** Any samples of the Products officially requested by an agency or department of the Federal Government of Mexico or of other applicable authority of any other applicable country, may only be delivered upon written authorization of **Carnaby**, and provided an official receipt is secured from the requesting agency or department.

29117807.2

*EXECUTION VERSION*

**EIGHTH. Brake Parts** shall treat and preserve as confidential all information related to **Carnaby's** business, including the Technical Information, revealed to or learned by Brake Parts and its Maquiladoras from any source as a result of this Agreement. **Brake Parts** will not disclose nor disseminate, nor permit to be disclosed nor disseminated, any customer list, pricing, technical information, know-how, industrial information, patents, trademarks, processes, programs, practices, methods or other material or data conceived, designed, created, developed, used, assembled or manufactured by **Brake Parts** through its **Maquiladoras**, unless, it is strictly necessary during the training process of the employees to carry out the Processes.

**NINTH. Brake Parts** and its **Maquiladoras** shall comply with all existing laws and regulations in Mexico, and shall hold the Products, free of any liens, claims or charges by any agency or department of the Federal, State or Municipal governments.

**TENTH.** In performing its obligations under this Agreement, **Brake Parts** shall comply with all applicable laws and regulations, including without limitation the applicable laws in Mexico and the Unites States of America or any other country, including without limitation the customs laws and regulations, and any rulings or guidelines issued by the customs authorities in the applicable country. **Brake Parts** shall keep a comprehensive and detailed record of all Materials, Products, and any other goods imported into Mexico for purposes of this Agreement, as well as of all exportations of Products, waste, and any other items, maintaining copies of all import and export declarations and related documentation.

**ELEVENTH.** The parties agree that all notices and other communications required or desired to be given pursuant to this Agreement will be given in writing and will be deemed duly given upon personal delivery, or on the day after mailing if sent by a nationally recognized overnight delivery service which maintains records of the time, place and recipient of delivery, or upon receipt of a confirmed transmission if sent by telecopy or facsimile transmission, and in each case if addressed as follows:

**Carnaby Inventory II, LLC**
**Address:** 1540 Broadway, Suite 3710, New York, New York
**Attention:** Legal Department
**Email address:** Shekhar Kumar -  shekhar.kumar@firstbrandsgroup.com

**Brake Parts Inc LLC**:
**Address:** 4400 Prime Parkway, McHenry, Illinois, 60050, USA.
**Attention:** Legal Department
**Email Address**:  Matthew Liebson  - matthew.liebson@firstbrandsgroup.com

c/o First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention: Edward James, Executive Vice President
Email: ed.james@firstbrandsgroup.com

or to such other person, entity, address or facsimile number as a party may respectively designate in like manner from time to time.

**TWELFTH.-** This Agreement shall continue in force until terminated by either party. Either party may terminate this Agreement upon thirty (30) days prior written notice to the other party in accordance with the notice provisions of Clause Eleventh hereof

**THIRTEENTH.** If, for any reason, any provision of this Agreement is determined to be invalid or unenforceable, such invalidity or enforceability shall not affect the remaining provisions of this Agreement.

29117807.2

*EXECUTION VERSION*

**FOURTEENTH.** Time is of the essence for the performance of all obligations and the satisfaction of all conditions of this Agreement.

**FIFTEENTH.** Neither party shall be held responsible for any delay or failure in the performance of any part of this Agreement to the extent that such delay or failure is caused by fire, flood, explosion, war, seize, pandemic, government requirement, civil or military authority, act of God, act or omission of carriers, or any lockout, strike, labor trouble or other industrial disturbance, inevitable accident, export delays by governmental authorities or industry or trade association of whatever nature that limits the importation or exportation of the Materials, work in process or Products thereof or another cause beyond any of the parties reasonable control.  Any party excused from performance shall make a good faith effort to minimize the effect of the delay or non-performance.

**SIXTEENTH** This Agreement shall be interpreted pursuant to the laws of the State of New York, United States of America, without giving effect to its choice of law provisions.  Litigation brought to contest disputes arising under this Agreement shall be brought only in the state or federal courts of the State of New York, United States of America.

<u>WAIVER OF JURY TRIAL</u>.  THE PARTIES HEREBY IRREVOCABLY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, COUNTERCLAIM OR CROSS-COMPLAINT IN ANY ACTION OR OTHER PROCEEDING BROUGHT BY THE OTHER WITH RESPECT TO ANY MATTER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH OR RELATED TO THIS AGREEMENT, WHETHER BASED UPON CONTRACTUAL, STATUTORY, TORTIOUS OR OTHER THEORIES OF LIABILITY.

**IN WITNESS WHEREOF,** the parties have executed this Agreement through their duly authorized representatives, on May 31st , 2022, being fully effective as of said date.

<table>
<tr><td>**Carnaby Inventory II, LLC**</td><td>**Brake Parts Inc LLC**</td></tr>
<tr><td>_____</td><td>_____</td></tr>
<tr><td>**Name:**  Shekhar Kumar</td><td>**Name:** Michael Baker</td></tr>
<tr><td>**Title:** Managing Director</td><td>**Title:** Chief Corporate Strategy Officer</td></tr>
</table>

29117807.2

EXHIBIT XIV

FORM OF PURCHASE ORDER

[Attached]

# Carnaby Inventory II, LLC Purchase Order

| | Date of Order: | Page: 1 of |
|---|---|---|
| | ATP Number: | |

| Buyer (entity) | | | Payment Terms |
|---|---|---|---|
| Brake Parts Inc LLC | | | STANDARD |

**Supplier**
CARNABY INVENTORY II, LLC

**Manufacturing  Code / Site Name / Address**

**PO Address**

| Currency | | | |
|---|---|---|---|
| USD | | | |

| Plant Code / Name | % | UoM | Price | Effective Date | Ship from Country | | |
|---|---|---|---|---|---|---|---|
| | | EA | | | Mexico | | |
| | | EA | | | Mexico | | |

**Remarks**

Buyer hereby agrees that, upon acceptance by Seller of the attached Purchase Order, the purchase of the inventory set forth herein by Buyer from Seller shall be irrevocable.

Case 25-90399   Document 3563-20   Filed in TXSB on 10/30/25   Page 12 of 178

# **Exhibit B**

*Execution Version*

CREDIT AGREEMENT

DATED AS OF JULY 6, 2022

*AMONG*

CARNABY INVENTORY III, LLC, AS BORROWER,

FIRST BRANDS GROUP, LLC, AS THE SERVICER,

FIRST BRANDS GROUP HOLDINGS, LLC AND
CARNABY INVENTORY HOLDINGS III, LLC, AS GUARANTORS,

THE LENDERS FROM TIME TO TIME PARTY HERETO,

*AND*

GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT

*Credit Agreement*

29164506

## TABLE OF CONTENTS

Page

ARTICLE I. THE FACILITY ...........................................................................................................................1

Section 1.1     The Commitments ......................................................................................1

Section 1.2     Requesting Advances. ...............................................................................2

Section 1.3     Prepayment; Termination of Commitments..........................................2

Section 1.4     Payment Requirements ............................................................................3

Section 1.5     Repayment...............................................................................................3

Section 1.6     Interest.....................................................................................................3

Section 1.7     [Reserved]. ...............................................................................................4

Section 1.8     Defaulting Lenders..................................................................................4

Section 1.9     Designated Funding Offices. ...................................................................5

Section 1.10    Protective Advances ................................................................................5

Section 1.11    Fees .........................................................................................................6

Section 1.12    [Reserved] ................................................................................................6

Section 1.13    Inability to Determine Rates....................................................................6

Section 1.14    Illegality...................................................................................................7

Section 1.15    Benchmark Replacement Setting ..........................................................7

ARTICLE II. PAYMENTS AND COLLECTIONS ..............................................................................................9

Section 2.1     Collections during the Revolving Period. ...............................................9

Section 2.2     [Reserved] .............................................................................................10

Section 2.3     Payment Rescission. .............................................................................10

Section 2.4     Currencies .............................................................................................10

ARTICLE III. REPRESENTATIONS AND WARRANTIES................................................................................10

Section 3.1     Representations and Warranties of the Borrower .............................10

Section 3.2     Representations and Warranties of the Servicer. ..............................18

ARTICLE IV. CONDITIONS OF CLOSING AND ADVANCES.........................................................................22

Section 4.1     Conditions Precedent to Closing...........................................................22

Section 4.2     Conditions Precedent to Initial Advance ............................................25

Section 4.3     Conditions Precedent to All Advances..................................................25

ARTICLE V. COVENANTS .........................................................................................................................25

Section 5.1     Affirmative Covenants ...........................................................................25

Section 5.2     Negative Covenants. ..............................................................................35

ARTICLE VI. ADMINISTRATION AND COLLECTION...................................................................................38

Section 6.1     Designation of the Servicer...................................................................38

Section 6.2     Duties of the Servicer.............................................................................39

Section 6.3     Collection Account..................................................................................40

Section 6.4     [Reserved].............................................................................................40

735706711 19631142            -i-                      *Credit Agreement*

29164506

**TABLE OF CONTENTS**
(continued)

<div align="right">**Page**</div>

| | | |
|---|---|---|
| Section 6.5 | Responsibilities under Contracts | 40 |
| Section 6.6 | Reports | 40 |
| Section 6.7 | Servicing Fees | 40 |
| ARTICLE VII. EVENTS OF DEFAULT | | 41 |
| Section 7.1 | Events of Default | 41 |
| Section 7.2 | Remedies. | 44 |
| ARTICLE VIII. INDEMNIFICATION | | 44 |
| Section 8.1 | Indemnities by Loan Parties | 44 |
| Section 8.2 | Indemnities by the Servicer | 47 |
| Section 8.3 | Increased Cost and Reduced Return | 48 |
| Section 8.4 | Other Costs and Expenses | 50 |
| Section 8.5 | Taxes | 50 |
| Section 8.6 | Currency Indemnity. | 53 |
| ARTICLE IX. THE ADMINISTRATIVE AGENT | | 53 |
| Section 9.1 | Appointment | 53 |
| Section 9.2 | Delegation of Duties | 54 |
| Section 9.3 | Exculpatory Provisions | 54 |
| Section 9.4 | Reliance by the Administrative Agent and the Lenders | 55 |
| Section 9.5 | Notice of Events of Default | 55 |
| Section 9.6 | Non-Reliance on the Administrative Agent or Other Lender | 56 |
| Section 9.7 | Indemnification of the Administrative Agent | 56 |
| Section 9.8 | Administrative Agent in Its Individual Capacity | 56 |
| Section 9.9 | Successor Administrative Agent | 57 |
| Section 9.10 | Collateral | 58 |
| Section 9.11 | Borrowing Base | 58 |
| ARTICLE X. ASSIGNMENTS; PARTICIPATIONS | | 59 |
| Section 10.1 | Assignments and Transfer of Commitments | 59 |
| Section 10.2 | The Register. | 59 |
| Section 10.3 | Certain Representations and Warranties; Limitations; Covenants | 60 |
| Section 10.4 | No Assignment to Borrower | 61 |
| Section 10.5 | No Assignment to Natural Persons | 61 |
| Section 10.6 | Participations | 61 |
| Section 10.7 | Pledge by Lenders. | 62 |
| ARTICLE XI. GUARANTY | | 62 |
| Section 11.1 | Guaranty | 62 |
| Section 11.2 | Guaranty of Payment | 62 |

735706711 19631142

-ii-

<div align="right">*Credit Agreement*</div>

29164506

## TABLE OF CONTENTS
(continued)

**Page**

Section 11.3    No Discharge or Diminishment of Guaranty ....................................................... 62

Section 11.4    Defenses Waived ................................................................................................ 63

Section 11.5    Subrogation ....................................................................................................... 63

Section 11.6    Reinstatement; Stay of Acceleration ................................................................ 64

Section 11.7    Information ......................................................................................................... 64

Section 11.8    Maximum Liability ............................................................................................. 64

Section 11.9    Contribution ....................................................................................................... 64

Section 11.10   Liability Cumulative .......................................................................................... 65

Section 11.11   Holdings. ............................................................................................................ 65

ARTICLE XII. MISCELLANEOUS ....................................................................................................... 65

Section 12.1    Waivers and Amendments ............................................................................... 65

Section 12.2    Notices ............................................................................................................... 66

Section 12.3    Setoff; Ratable Payments ................................................................................. 66

Section 12.4    Intended Tax Characterization ......................................................................... 67

Section 12.5    Protection of Ownership and Security Interests ............................................... 68

Section 12.6    Confidentiality .................................................................................................... 68

Section 12.7    CHOICE OF LAW ................................................................................................. 69

Section 12.8    CONSENT TO JURISDICTION .............................................................................. 69

Section 12.9    WAIVER OF JURY TRIAL ..................................................................................... 69

Section 12.10   Integration; Binding Effect; Survival of Terms ................................................. 70

Section 12.11   Counterparts; Severability; Section References ............................................... 70

Section 12.12   Mutual Negotiations .......................................................................................... 70

Section 12.13   Bankruptcy Petition ........................................................................................... 70

Section 12.14   USA PATRIOT Act; Anti-Money Laundering Laws ............................................. 70

**JOINT EXHIBIT NO. 18**
**Page 193 of 812**

**EXHIBITS AND SCHEDULES**

Exhibit I            Definitions
Exhibit II-A         Form of Borrowing Notice
Exhibit II-B         Form of Prepayment Notice
Exhibit III          Chief Executive Office, Principal Place of Business, Records Locations, Federal
                     Taxpayer ID Number and Organizational ID Number
Exhibit IV           Form of Solvency Certificate
Exhibit V-A          Form of Compliance Certificate
Exhibit V-B          Form of Holdings Certificate
Exhibit VI           Form of Assignment Agreement
Exhibit VII          Form of Promissory Note
Exhibit VIII-A       Form of Monthly Report
Exhibit IX           UCC-1 Financing Statements
Exhibit X            [Reserved]
Exhibit XI           Form of Purchase Agreement
Exhibit XII          Form of Sale Agreement
Exhibit XIII         Form of Manufacturing Agreements
Exhibit XIV          Form of Purchase Order
Schedule 12.2        Addresses for Notices
Schedule 3.1(gg)     Insurance
Schedule 3.1(n)      Real Property
Schedule A           Commitments

*Credit Agreement*

**CREDIT AGREEMENT**

***THIS CREDIT AGREEMENT,*** dated as of July 6, 2022, is entered into by and among:

(a)      Carnaby Inventory III, LLC, a Delaware limited liability company (the ***"Borrower"***),

(b)      First Brands Group Holdings, LLC and Carnaby Inventory Holdings III, LLC, as Guarantors hereunder,

(c)      First Brands Group, LLC, a Delaware limited liability company (***"Servicer"***),

(d)      the lenders set forth on the signatures pages hereof (collectively, ***"Lenders"***), and

(e)      GLAS Trust Company LLC, in its capacity as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the ***"Administrative Agent"***).

***Unless defined elsewhere herein, capitalized terms used in this Agreement shall have the meanings assigned to such terms in Exhibit I hereto.***

*PRELIMINARY STATEMENTS*

WHEREAS, the Borrower has requested that the Lenders extend credit pursuant to a revolving loan facility (the "***Credit Facility***") in an aggregate maximum principal amount of $100,000,000 ($85 million of which is contemplated to be made available on the Closing Date with the remainder to be made available after the Closing Date, in each case, subject to the terms and conditions set forth herein); and

WHEREAS, the Lenders are willing to provide the Credit Facility, and the Lenders and the Administrative Agent are willing to enter into this Agreement, upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

**ARTICLE I.**

**THE FACILITY**

Section 1.1      <u>The Commitments</u>.  On the terms and subject to the conditions set forth in this Agreement, including, without limitation, the conditions set forth in Article IV:  (a) from time to time during the Revolving Period, Borrower may request Advances in accordance with Section 1.2 and (b) each of the Lenders, severally and not jointly, agrees to make a Loan in the principal amount equal to its Percentage of the requested Advance on the applicable Borrowing Date; *provided that* the Borrower shall at all times ensure that (i) the aggregate principal amount of any Lender's Loans at any one time outstanding may not exceed the lesser of (A) the amount of such Lender's Commitment hereunder, (B) such Lender's Percentage of the Borrowing Base, and (ii) in no event may the aggregate principal amount of all Loans outstanding hereunder at any time exceed the lesser of (A) the Facility Limit, and (B) the Borrowing Base at such time.  Each Lender's several Commitment shall automatically terminate on the Maturity Date (unless earlier terminated in accordance with the terms hereof).

*Credit Agreement*

735706711 19631142
29164506

Section 1.2      Requesting Advances.

(a)      If, on any Business Day during the Revolving Period, there is Borrowing Availability, Borrower may request an Advance by delivering to the Administrative Agent a written notice in the form set forth as Exhibit II-A hereto (each, a *"Borrowing Notice"*) not later than 12:00 noon (New York City time) three (3) Business Days prior to the proposed Borrowing Date of such Advance.  The initial Advance shall be subject to Sections 4.1 and 4.2 hereof, and all Advances (including the initial Advance) shall be subject to Section 4.3 hereof.  Each Borrowing Notice shall (i) be prepared by the Borrower based on the numbers set forth in the most recent Borrowing Base Certificate delivered to the Administrative Agent and the Lenders and based upon subsequent valuations of Eligible Inventory by the Servicer hereunder to the date of such Borrowing Notice, (ii) be irrevocable, (iii) specify the requested aggregate principal Advance amount (which shall be not less than $5,000,000), and (iv) specify the applicable Borrowing Date (which shall be a Business Day). On the Borrowing Date of each Advance, upon satisfaction of the applicable conditions precedent set forth in Article IV, each Lender shall initiate a wire transfer to the Administrative Agent's Account, in immediately available funds, no later than 1:00 p.m. (New York City time), in an amount equal to its Percentage of the principal amount of the Advance requested, and the Administrative Agent shall wire transfer the proceeds of each Lender's Loan to the Facility Account promptly upon its receipt thereof.  Borrower shall not request more than one (1) Advance in any two consecutive calendar weeks.  Each of the Borrower and Servicer agrees (i) that, from and after the Closing Date, the aggregate principal amount of all Loans outstanding hereunder shall not be less than the lesser of (x) $80,000,000 and (y) the Borrowing Base and (ii) to use its best efforts to maintain the Borrowing Base hereunder at all times in excess of $80,000,000.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Loans.

(b)      The Administrative Agent may assume that each Lender has made or will make the proceeds of its Loan comprising an Advance available to the Administrative Agent unless the Administrative Agent shall have been notified by such Lender at least one (1) hour before the time on which the Administrative Agent actually funds the Advance to Borrower (whether using its own funds pursuant to this Section 1.2 or using proceeds deposited with the Administrative Agent by the Lenders and whether such funding occurs before or after the time on which the Lenders are required to deposit the proceeds of their Loans with the Administrative Agent).  The Administrative Agent may, in reliance upon such assumption (but shall not be required to), make available to Borrower a corresponding amount of principal.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Advance. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such amount on demand from such Lender together with interest thereon, in respect of each day during the period commencing on the date such amount was made available to Borrower and ending on the date the Administrative Agent recovers such amount, at a rate per annum equal to (A) the Federal Funds Rate during the first three (3) days after such interest shall begin to accrue and (B) the Interest Rate in respect of such Loan after the end of such three (3) day period.

Section 1.3      Prepayment; Termination of Commitments. Mandatory Prepayment. So long as no Event of Default shall have occurred, if, on any date, an Overadvance exists, Borrower shall pay (or shall cause the Servicer to pay) and the Servicer shall pay to the Administrative Agent's Account not later than one (1) Business Day thereafter, for prompt distribution to the Lenders in accordance with their respective Percentages, an amount to be applied to reduce the aggregate principal amount of Loans, such that after giving effect to such payment, no Overadvance exists or is continuing.

735706711 19631142
29164506

(b)      Optional Prepayment. If, on any Business Day, Borrower wishes to make a voluntary prepayment with respect to the aggregate principal amount of Loans outstanding, Borrower shall deliver to each Lender an irrevocable written notice of such prepayment in the form set forth as Exhibit II-B hereto (each, a *"Prepayment Notice"*) by 12:00 noon (New York City time) one (1) Business Day prior to the date of the proposed prepayment.  Each Prepayment Notice shall designate (i) the Business Day upon which any such prepayment of aggregate principal amount of Loans shall occur (the *"Prepayment Date"*), (ii) the aggregate principal amount of Loans to be prepaid which shall not be less than $1,000,000 (the *"Aggregate Prepayment"*), and (iii) each Lender's Percentage of such Aggregate Prepayment.  On the Prepayment Date, Borrower shall pay to the Administrative Agent's Account for prompt distribution to each Lender such Lender's Percentage of each Aggregate Prepayment.  Only one (1) Prepayment Notice shall be outstanding at any time and no more than one (1) Prepayment Notice shall be delivered in any calendar week.  Prepayments hereunder shall be subject to Section 1.3(c) and Section 1.6.

(c)      Prepayment Fee. In the event that, on or prior to the date occurring fifteen (15) months after the Closing Date, the Borrower makes any payment of principal on the Loans in excess of the amount necessary to repay any Overadvance (other than pursuant to a refinancing of the facility evidenced by this Agreement in which the Lenders participate and shall have furnished their prior written consent), the Borrower shall pay to the Administrative Agent, for the ratable account of each of the applicable Lenders, a prepayment fee equal to 3.00% of the aggregate principal amount of the Loans so prepaid.  Such amounts shall be due and payable on the date of such payment.

(d)      Termination of Commitments. Borrower may, upon at least five (5) Business Days' irrevocable written notice to the Administrative Agent and the Lenders, permanently reduce in part, ratably amongst the Lenders in accordance with their respective Percentages, the unused portion of the Lenders' several Commitments and the Facility Limit; **provided** that each reduction of the Facility Limit shall be in an aggregate amount of not less than $1,000,000 and no such partial reduction shall reduce the Facility Limit to an amount less than $80,000,000.

Section 1.4      Payment Requirements.  The Borrower or the Servicer, as the case may be, shall initiate a wire transfer to the Administrative Agent's Account of amounts payable by it to the Administrative Agent or the Lenders no later than 2:00 p.m. (New York City time) on the Business Day when due in immediately available funds, and the Administrative Agent shall promptly forward to the Lenders their respective shares of the funds so received.  All computations of Interest and *per annum* Fees under the Transaction Documents shall be made on the basis of a year consisting of three hundred sixty (360) days for the actual number of days elapsed (or, in the case of Interest calculated by reference to the Prime Rate, three hundred sixty-five (365) days or, in the case of a leap year, three hundred sixty-six (366) days).  If any amount hereunder shall be payable on a day which is not a Business Day, such amount shall be payable on the next succeeding Business Day.

Section 1.5      Repayment.  Unless the Loans have been earlier accelerated or otherwise become due, the Borrower hereby unconditionally promises to pay to the Administrative Agent for the ratable account of the Lenders the then unpaid aggregate principal amount of the Loans, together with accrued and unpaid Interest and all other Obligations outstanding on the Maturity Date.

Section 1.6      Interest.

(a)      The outstanding principal balance of the Loans shall accrue Interest at a rate per annum equal to the applicable Interest Rate.

3
*Credit Agreement*

735706711 19631142
29164506

(b)      Accrued but unpaid Interest on each Loan shall be payable in arrears on each Payment Date; provided that (i) Interest accrued at the Default Rate shall be payable in cash on demand and (ii) in the event of any prepayment of any Loan, accrued but unpaid interest on the principal amount prepaid shall be payable on the date of such prepayment.

(c)      On each Payment Date, Borrower shall pay to the Administrative Agent for distribution to the Lenders in accordance with <u>Article II</u> their respective portions of such accrued and unpaid Interest.

(d)      In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Transaction Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Transaction Document.  The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

Section 1.7      <u>[Reserved]</u>.

Section 1.8      <u>Defaulting Lenders</u>.

(a)      Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)      Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in <u>Section 12.1</u>.

(ii)      Any payment of principal, Interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to <u>Section 12.3</u> shall be applied at such time or times as may be determined by the Administrative Agent as follows:  *first,* to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second,* as Borrower may direct (so long as no Event of Default or Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third,* if so determined by the Administrative Agent and Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Administrative Agent or the other Lenders as a result of any judgment of a court of competent jurisdiction obtained by the Administrative Agent or such other Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth,* so long as no Event of Default or Default exists, to the payment of any amounts owing to Borrower as a result of any judgment of a court of competent jurisdiction obtained by Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth,* to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loan in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Advance was made at a time when the conditions

<div align="center">

4

*Credit Agreement*

</div>

735706711 19631142
29164506

<div align="center">

**JOINT EXHIBIT NO. 18**
**Page 198 of 812**

</div>

set forth in Section 4.2 (with respect to the initial Advance) and 4.3 (with respect to any subsequent Advance) were satisfied, as applicable, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are funded and held by the Lenders pro rata in accordance with the Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 1.8(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)     No Defaulting Lender shall be entitled to receive any Unused Credit Facility Fee for any period during which that Lender is a Defaulting Lender (and Borrower shall not be required to pay any such Unused Credit Facility Fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)     If Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the other parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be funded on a pro rata basis by the Lenders in accordance with their respective Percentages, whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of Borrower while that Lender was a Defaulting Lender; and ***provided, further,*** that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 1.9     Designated Funding Offices.  Each Lender at its option may make any Loan or otherwise perform its obligations hereunder through any funding office (each, a ***"Designated Funding Office"***); ***provided*** that any exercise of such option shall not affect the obligation of Servicer to administer Collections received in the Collection Account in accordance with the terms of this Agreement.  Any Designated Funding Office shall be considered part of the applicable Lender; ***provided*** that such provisions that would be applicable with respect to Loans actually provided by an Affiliate or branch of such Lender shall apply to such Affiliate or branch of such Lender to the same extent as such Lender.

Section 1.10     Protective Advances.

(a)     Notwithstanding anything herein to the contrary and subject to the limitations set forth below, the Administrative Agent is authorized by the Borrower and the Lenders, from time to time, to make Loans to the Borrower, on behalf of all Lenders, which the Administrative Agent, in its Permitted Discretion (or at the direction of the Required Lenders), deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations, or (iii) to pay any other amount chargeable to or required to be paid by the Borrower pursuant to the terms of this Agreement, including payments of reimbursable expenses (including costs, fees, and expenses as described in Section 8.4) and other sums payable under the Transaction Documents (any of such Loans are herein referred to as "***Protective Advances***"); provided that, the aggregate amount of outstanding Protective Advances plus all the aggregate principal amount of Loans shall not exceed the Facility Limit.  Protective Advances may be made

even if the conditions precedent set forth in Section 4.02 or Section 4.03 have not been satisfied. The Protective Advances shall be secured by the Liens in favor of the Administrative Agent in and to the Collateral and shall constitute Obligations hereunder. All Protective Advances shall be treated as Advances. The Administrative Agent's authorization to make Protective Advances may be revoked at any time by the Required Lenders. Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof. At any time that there is sufficient Borrowing Availability and the conditions precedent set forth in Section 4.03 have been satisfied, the Administrative Agent may request the Lenders to make a Loan to repay a Protective Advance.

(b)     Upon the making of a Protective Advance by the Administrative Agent (whether before or after the occurrence of an Event of Default), each Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Administrative Agent without recourse or warranty, an undivided interest and participation in such Protective Advance in proportion to its Percentage. From and after the date, if any, on which any Lender is required to fund its participation in any Protective Advance purchased hereunder, the Administrative Agent shall promptly distribute to such Lender, such Lender's Percentage of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Protective Advance.

Section 1.11     Fees.

(a)     Commitment Fee. On the Closing Date, the Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Percentage of Commitment, a commitment fee (the "Commitment Fee") equal to one percent (1.00%) of the Aggregate Commitment.

(b)     Unused Credit Facility Fee. The Borrower shall pay to the Administrative Agent for the account of each Lender an unused line fee (the "Unused Credit Facility Fee"), which shall accrue at a rate per annum equal to the Applicable Unused Credit Facility Fee Rate on the average daily amount of the undrawn portion of the Aggregate Commitment. Accrued Unused Credit Facility Fees shall be payable in arrears on the first Business Day of each calendar month and on the Termination Date, commencing on the first such date to occur after the date hereof.

(c)     Administrative Fee. The Borrower shall pay to the Administrative Agent an administrative fee (the "Administrative Fee"), equal to $50,000 per annum, payable on the Closing Date and on each anniversary thereof thereafter.

(d)     All fees payable hereunder shall be paid on the dates due, in Dollars and in immediately available funds, to the Administrative Agent for distribution to the applicable Lenders entitled thereto. The fees paid hereunder shall not be refundable under any circumstances.

Section 1.12     [Reserved].

Section 1.13     Inability to Determine Rates. Subject to Section 1.15, if, on or prior to the first day of any Interest Period for any SOFR Loan:

(a)     the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Term SOFR" cannot be determined pursuant to the definition thereof, or the Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Term SOFR for any requested Interest Period

6
*Credit Agreement*

735706711 19631142
29164506

with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent, the Administrative Agent will promptly so notify the Borrower and each Lender.  Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Administrative Agent (at the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, (i) the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for an Advance of or conversion to ABR Loans in the amount specified therein and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into ABR Loans at the end of the applicable Interest Period.  Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 8.3. Subject to Section 1.15, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on ABR Loans shall be determined by the Administrative Agent without reference to clause (iii) of the definition of "Alternate Base Rate" until the Administrative Agent revokes such determination.

Section 1.14     Illegality.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to SOFR, the Term SOFR Reference Rate or Term SOFR, or to determine or charge interest based upon SOFR, the Term SOFR Reference Rate or Term SOFR, then, upon notice thereof by such Lender to the Borrower (through the Administrative Agent) (an "Illegality Notice"), (a) any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended, and (b) the interest rate on which ABR Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "ABR", in each case until each affected Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of an Illegality Notice, the Borrower shall, if necessary to avoid such illegality, upon demand from any Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans to ABR Loans (the interest rate on which ABR Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "ABR"), on the last day of the Interest Period therefor, if all affected Lenders may lawfully continue to maintain such SOFR Loans to such day, or immediately, if any Lender may not lawfully continue to maintain such SOFR Loans to such day, in each case until the Administrative Agent is advised in writing by each affected Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate or Term SOFR.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 8.3.

Section 1.15     Benchmark Replacement Setting.

(a)     Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Transaction Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Borrower may amend this Agreement to replace the then-current Benchmark with a

7

*Credit Agreement*

735706711 19631142
29164506

Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all affected Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders.  No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 1.15 will occur prior to the applicable Benchmark Transition Start Date.

(b)     <u>Benchmark Replacement Conforming Changes</u>.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Transaction Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Transaction Document.

(c)     <u>Notices; Standards for Decisions and Determinations</u>.  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 1.15 and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 1.15, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Transaction Document, except, in each case, as expressly required pursuant to this Section 1.15.

(d)     <u>Unavailability of Tenor of Benchmark</u>.  Notwithstanding anything to the contrary herein or in any other Transaction Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     <u>Benchmark Unavailability Period</u>.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for an Advance, conversion to or continuation of SOFR Loans to be made, converted or continued during any

<div align="center">8</div>
<div align="center"><i>Credit Agreement</i></div>

735706711 19631142
29164506

Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for an Advance of or conversion to ABR Loans. During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Alternate Base Rate.

**ARTICLE II.**

**PAYMENTS AND COLLECTIONS**

Section 2.1    Collections during the Revolving Period.

(a)    Commencing on the Closing Date and ending on the Termination Date, any and all Collections (including proceeds of Inventory that are no longer Eligible Inventory for purposes of the Borrowing Base) received by the Borrower or the Servicer shall be deposited directly into a segregated account in the United States held in the name of the Borrower (the "Collection Account") maintained at a bank or other financial institution satisfactory to the Administrative Agent and the Lenders ("Collection Account Bank"). The Collection Account shall be under the control (as defined in Section 9-104 of the UCC) of the Administrative Agent and be subject to a Collection Account Control Agreement, providing for springing exclusive control by the Administrative Agent upon the occurrence and continuance of an Event of Default (which, for the avoidance of doubt, shall not be exercised by the Administrative Agent prior to an Event of Default).

(b)    So long as no Event of Default has occurred, the aggregate principal amount of Loans shall not be required to be paid during the Revolving Period except to the extent that (i) an Overadvance exists or (ii) a Prepayment Notice is delivered.

(c)    On each Payment Date, the Borrower shall, and shall cause the Servicer to, use all cash on deposit in the Collection Account to pay, in the following order of priority (the "Waterfall"):

(i)    Any and all fees and expenses owed to the Administrative Agent;

(ii)    Any and all unpaid fees and expenses owed to any Lender;

(iii)    Any and all accrued and unpaid interest owed to any Lender

(iv)    Any and all amounts necessary to maintain the Borrowing Base and related advance limits payable to any Lender;

(v)    To the extent the Obligations have been accelerated or are otherwise due, all Obligations owed to the Lenders until all Obligations have been paid in full and the Commitment of all Lenders have terminated or expired; and

(vi)    The Servicing Fee to the Servicer.

(d)    Subject to Section 5.1(ff), if, on any Payment Date during the Revolving Period on which there is no Default or Event of Default, there is cash remaining in the Collection Account after all amounts required to be paid pursuant to Section 2.1(b) and Section 2.1(c) have been paid, the Borrower may

735706711 19631142
29164506

withdraw such remaining amounts from the Collection Account; provided that, notwithstanding the foregoing, the Borrower shall not make any such withdrawal to the extent that the remaining cash in such Collection Account remaining thereafter is less than the sum of (a) $200,000 plus (b) the reasonably expected amount of interest that will become due hereunder on the then immediately following Payment Date.

(e)       If, on any Payment Date during the Revolving Period, there are insufficient funds in the Collection Account to pay all amounts required to be paid pursuant to Section 2.1(b) or Section 2.1(c), no new Advance shall be made until such amounts have been paid in full.

Section 2.2       [Reserved].

Section 2.3       Payment Rescission.   No payment of any of the Obligations shall be considered paid or applied hereunder to the extent that, at any time, all or any portion of such payment or application is rescinded by application of law or judicial authority, or must otherwise be returned or refunded for any reason.   Borrower shall remain obligated for the amount of any payment or application so rescinded, returned or refunded, and shall promptly pay to the Administrative Agent for distribution to the Lenders the full amount thereof together with any Interest thereon from the date of any such rescission, return or refunding.

Section 2.4       Currencies.

(a)       Conversion of Currencies.

(i)       If on any Payment Date or any other day a payment is due and payable hereunder it is necessary for funds in one currency to be converted into any other currency in order to make any payment required to be made hereunder, the Administrative Agent shall solicit offer quotations from at least two (2) foreign exchange dealers reasonably acceptable to the Administrative Agent for effecting such exchange and shall select the quotation which provides for the best exchange rate.   The Borrower or the Servicer on its behalf shall effect such exchange on such Payment Date or other day, as the case may be.

(ii)       On any day when any computation or calculation hereunder requires the aggregation of amounts denominated in more than one currency, all amounts that are denominated in an Alternative Currency shall be deemed to be the U.S. Dollar Equivalent thereof on such day for purposes of such computation or calculation.

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES

Section 3.1       Representations and Warranties of the Borrower.  Each of the Loan Parties (and, solely with respect to clauses (a), (b), (c), (e), (f), (g), (i), (j), (t), and (y) below, Holdings) hereby represents and warrants to the Administrative Agent and the Lenders as of the date hereof, as of each Payment Date and as of each Borrowing Date, that:

(a)       Organization and Qualification.   Each Loan Party and Holdings is a limited liability company duly organized, validly existing and in good standing under the Laws of Delaware.   Each Loan

735706711 19631142
29164506

Party and Holdings is duly qualified or licensed to do business as a foreign limited liability company and is in good standing in all jurisdictions in which the ownership of its properties or the nature of its activities or both makes such qualification or licensing necessary, where a failure to do so could reasonably be expected to have or result in a Material Adverse Effect.

(b) <u>Authority; No Conflict or Violation</u>.  The execution, delivery and performance by each of the Loan Parties and Holdings of the Transaction Documents to which it is a party, the performance of its obligations under this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated in this Agreement and the other Transaction Documents to which it is a party, have been duly authorized by all necessary limited liability company action on the part of such Loan Party or Holdings, as applicable, and do not and will not (i) require any consent or approval of its member(s), or any authorization, consent, approval, order, filing, registration or qualification by or with any Governmental Authority, except those that have been obtained and are in full force and effect and except for the filings or notices as may be necessary to perfect the Security Interest granted pursuant to this Agreement, (ii) violate any provision of (A) any applicable Law or of any order, writ, injunction or decree presently in effect having applicability to any Loan Party and/or Holdings or (B) the Organizational Documents of each Loan Party and/or Holdings, (iii) result in a breach of or constitute a default under (A) any Transaction Document or (B) any indenture or loan or credit agreement or any other material agreement, lease or instrument to which each Loan Party and/or Holdings is a party or by which it or its properties may be bound or affected, or (iv) result in, or require, the creation or imposition of any Lien or other charge or encumbrance of any nature upon or with respect to any of the assets now owned or hereafter acquired by Borrower except, with respect to <u>clauses (i)</u>, <u>(ii)(A)</u> and <u>(iv)</u> above, where the failure to so comply with any of the foregoing could not reasonably be expected to have a Material Adverse Effect.

(c) <u>Legal Agreements</u>.  This Agreement and each of the other Transaction Documents to which each Loan Party and/or Holdings is a party have been duly authorized, executed and delivered by Borrower, and constitute the legal, valid and binding obligations of Borrower, enforceable against it in accordance with their respective terms, except to the extent that such enforcement may be limited by bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by general equitable principles.

(d) <u>Compliance with Laws</u>.  Each Loan Party has complied with all applicable Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business or property, the non-compliance with which could reasonably be expected to have a Material Adverse Effect.  Except as would not reasonably be expected to have a Material Adverse Effect, no Loan Party (i) has failed to comply with any law (including common law), rule, regulation or ordinance applicable to the protection of the environment or human health or safety or applicable to hazardous or toxic materials, substances or wastes, pollutants or contaminants ("***Hazardous Materials***") ("***Environmental Laws***") or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to or received written notice of any claim of any liability pursuant to Environmental Laws, (iii) has had any actual or alleged release or presence of Hazardous Materials in violation of or giving rise to obligations under Environmental Laws on, at, under, to or migrating from any property or facility currently or formerly owned, leased or operated by any of the Loan Parties, or any of its Affiliates or Subsidiaries (or at which any of the Loan Parties or any of its Affiliates or Subsidiaries has arranged for or caused any release or disposal of Hazardous Materials), or (iv) has actual knowledge of any event or

<div align="center">11<br><em>Credit Agreement</em></div>

<div align="center">**JOINT EXHIBIT NO. 18**<br>**Page 205 of 812**</div>

circumstance which is reasonably expected to give rise to any liability of a Loan Party pursuant to Environmental Laws.

(e)    <u>Margin Regulations</u>.  Each Loan Party and Holdings is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of the Advances will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

(f)    <u>Not an Investment Company; Volcker Rule</u>.  Each Loan Party and Holdings (i) is not a "covered fund" under the Volcker Rule and (ii) is not required to register as, an "investment company" within the meaning of the Investment Company Act.  In determining that each Loan Party is not a "covered fund" under the Volcker Rule, each Loan Party relies on, and is entitled to rely on, the exemption from the definition of "investment company" set forth in Section 3(c)(5) of the Investment Company Act.

(g)    <u>Solvency</u>.  As of the date hereof, and immediately prior to and after giving effect to each Advance, each of the Loan Parties and Holdings is and will be Solvent.

(h)    <u>Anti-Corruption Laws; Anti-Money Laundering Laws and Sanctions</u>.

(i)    None of (A) of the Loan Parties, any Subsidiary or, to the knowledge of the Loan Parties, any of their respective directors, officers, employees or Affiliates, or (B) any agent or representative of the Loan Parties that will act in any capacity in connection with or benefit from the Transaction Documents, (I) is a Sanctioned Person, (II) to the extent in violation of any Sanctions, has its assets located in a Sanctioned Country, (III) is under administrative, civil or criminal investigation for an alleged violation of, or during the past five (5) years received notice from or made a voluntary disclosure to any governmental entity regarding a possible violation of, Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions by a governmental authority that enforces Sanctions or any Anti-Corruption Laws or Anti-Money Laundering Laws, or (IV) to the extent in violation of any Sanctions, directly or indirectly derives revenues from investments in, or transactions with, Sanctioned Persons.

(ii)    Each of the Loan Parties has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance by the Loan Parties and their respective directors, officers, employees, and agents with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(iii)    Each of the Loan Parties, and to the knowledge of its respective directors, officers, employees, agents and Affiliates, is in compliance with applicable Anti-Corruption Laws, Anti-Money Laundering Laws in all respects and applicable Sanctions.

(iv)    No proceeds of any Advance have been used, directly or indirectly, by the Loan Parties or any of its or their respective directors, officers, employees and agents in violation of <u>Section 5.2(h)</u>.

735706711 19631142
29164506

(i)      <u>Places of Business and Locations of Records</u>.  Each Loan Party's and Holdings' principal place of business, chief executive office and the other locations (if any) where its Records are located are at the addresses listed on <u>Exhibit III</u>.

(j)      <u>Names and Identification Numbers</u>.  None of the Loan Parties nor Holdings has not used any legal names, trade names or assumed names other than the name in which it has executed this Agreement.  Each Loan Party's Federal Employer Identification Number and State of Organization and ID Number are correctly set forth on <u>Exhibit III</u>.

(k)      <u>No Borrower Subsidiaries</u>.  The Borrower does not own any Capital Stock issued by any other Person.

(l)      <u>Ownership of SPEs</u>.

     (i)      <u>Ownership of Borrower</u>.  Parent owns, directly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of the Borrower, free and clear of any Adverse Claim.  All Capital Stock issued by Borrower are validly issued and there are no options, warrants or other rights to acquire membership interests of Borrower.

     (ii)      <u>Ownership of Holdings</u>.  First Brands Parent owns, directly or indirectly, a majority of the issued and outstanding Capital Stock and all other equity interests of the Holdings, free and clear of any Adverse Claim.  All Capital Stock issued by Holdings are validly issued and there are no options, warrants or other rights to acquire Capital Stock of Holdings.

     (iii)      <u>Ownership of Servicer</u>. First Brands Parent owns, directly or indirectly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of the Servicer, free and clear of any Adverse Claim.  All Capital Stock issued by Servicer are validly issued and there are no options, warrants or other rights to acquire Capital Stock of Servicer.

     (iv)      <u>Ownership of FRAM</u>.  First Brands Parent owns, directly or indirectly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of FRAM, free and clear of any Adverse Claim.  All Capital Stock issued by FRAM are validly issued and there are no options, warrants or other rights to acquire membership interests of FRAM.

     (v)      <u>Ownership of Trico Products</u>.  First Brands Parent owns, directly or indirectly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of Trico Products, free and clear of any Adverse Claim.  All Capital Stock issued by Trico Products are validly issued and there are no options, warrants or other rights to acquire membership interests of Trico Products.

     (vi)      <u>Ownership of Trico Technologies</u>.  First Brands Parent owns, directly or indirectly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of Trico Technologies, free and clear of any Adverse Claim.  All

<div align="center">13<br><i>Credit Agreement</i></div>

735706711 19631142
29164506

Capital Stock issued by Trico Technologies are validly issued and there are no options, warrants or other rights to acquire membership interests of Trico Technologies.

(vii)    Ownership of Maquiladoras.    First Brands Parent owns, directly or indirectly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of each Maquiladora, free and clear of any Adverse Claim. All Capital Stock issued by each Maquiladora are validly issued and there are no options, warrants or other rights to acquire membership interests of any Maquiladora.

(m)    Good Title.    Each Loan Party is the legal and beneficial owner of its Collateral free and clear of any Lien except for Permitted Liens.

(n)    Real Property.    Except as set forth on Schedule 3.1(n), none of the Loan Parties owns or leases any real property.

(o)    Security Interest in Collateral.    The Security Documents are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and enforceable first priority liens and security interests under the laws of the United States and Mexico, as applicable, in the Collateral as further described therein and proceeds thereof as security for the Obligations, in each case prior and superior in right to any other Person (except Permitted Liens).

(i)    Perfection in the U.S.    Assuming the filing of the financing statement approved by Borrower on the date hereof, this Agreement, together with such financing statement, is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a valid and perfected Security Interest in the Collateral, free and clear of any Lien except for Permitted Liens.

(ii)    Perfection in Mexico.    Assuming that, on the date hereof, the Mexican Security Agreement was executed before a Mexican Notary Public and it is registered before the RUG as provided herein, this Agreement, together with the Mexican Security Agreement, is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a valid and perfected Security Interest in the Collateral, free and clear of any Lien except for Permitted Liens.

(p)    The Collection Account.

(i)    Nature of Collection Account.    The Collection Account constitutes a "deposit account" within the meaning of the applicable UCC.

(ii)    Ownership.    The Collection Account is in the name of the Borrower, and the Borrower owns and has good and marketable title to the Collection Account free and clear of any Adverse Claim.

(iii)    Control Agreements.    The Collection Account is subject to a Collection Account Control Agreement.    Borrower has not granted any Person (other than the Administrative Agent, the Servicer and their respective assigns) access to or control of any such Collection Account, or the right to take dominion and control of any such Collection Account at a future time or upon the occurrence of a future event.    To the extent that funds other than Collections are deposited into the Collection Account, Borrower or the Servicer can promptly trace and identify which funds constitute Collections.

14
*Credit Agreement*

735706711 19631142
29164506

(iv) <u>Perfection</u>. The Administrative Agent has "control" (as defined in Section 9-104 of the UCC) over the Collection Account.

(q) <u>Compliance with USMCA</u>. Each of the Loan Parties has complied in all material respects with the United States-Mexico-Canada Agreement ("USMCA"). The Loan Parties and their Affiliates have obtained full benefits under the USMCA in respect of tariff and tax issues.

(r) <u>Enforceability of Contracts</u>. Each Contract with respect to the purchase and sale of Inventory is effective to create, and has created, a valid and binding obligation of the non-Loan Party counterparty party thereto, enforceable against such party in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws relating to or limiting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(s) <u>Bulk Sales Act</u>. No transaction contemplated by any Transaction Document will require compliance by it or any of the Loan Parties with any bulk sales act or similar law.

(t) <u>Accuracy of Information</u>. Each Loan Party and Holdings has disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No written information heretofore furnished by the Loan Parties and/or Holdings to the Administrative Agent or any of the Lenders for purposes of or in connection with this Agreement or any transaction contemplated hereby contains, and no such written information hereafter furnished by the Loan Parties and/or Holdings to the Administrative Agent or any of the Lenders, will contain, any material misstatement of fact or omit to state any material fact necessary to make such information not materially misleading in light of the circumstances under which made.

(u) <u>Material Adverse Effect</u>. The Loan Parties have previously delivered to the Administrative Agent such financial statements for the Loan Parties and their Affiliates as requested by the Administrative Agent and the Lenders. Since December 31, 2021, no event has occurred that could reasonably be expected to have a Material Adverse Effect.

(v) <u>Purchase and Sale of Inventory</u>. With respect to each Contract for the purchase and sale of Inventory, (i) Borrower has given reasonably equivalent value to the seller and/or purchaser counterparty, as applicable, in consideration therefor and such transfer was not made for or on account of an antecedent debt and (ii) such seller and/or purchaser counterparty, as applicable, has given reasonably equivalent value to the Borrower in consideration therefor and such transfer was not made for or on account of an antecedent debt. No transfer by the Borrower to any purchaser and/or seller counterparty, as applicable, under the applicable Contract is or may be voidable under any section of the Federal Bankruptcy Code or any other applicable Law. No transfer by any purchaser and/or seller counterparty, as applicable, under the applicable Contract is or may be voidable under any section of the Federal Bankruptcy Code or any other applicable Law.

(w) <u>Financial Information</u>. All balance sheets, all statements of income and of cash flow and all other financial information of the Loan Parties furnished to the Administrative Agent or any of the Lenders and described in <u>Section 5.1</u> have been or will be prepared in accordance with GAAP and do or will present fairly in all material respects the financial condition and results of operations of the Loan Parties, as at such dates and for such periods in accordance with GAAP, subject, in the case of unaudited

15
*Credit Agreement*

735706711 19631142
29164506

Case 25-90399   Document 3563-20   Filed in TXSB on 11/30/25   Page 223 of 1178

financial statements, to changes resulting from normal year-end audit adjustments and the absence of footnotes.

(x)     No Event of Default.  No event has occurred and is continuing and no condition exists, that constitutes or may reasonably be expected to constitute an Event of Default or Default.

(y)     Taxes.  Each of the Loan Parties and Holdings has (i) timely filed all federal and other material tax returns required to be filed by it and (ii) paid, or caused to be paid, all federal and other material taxes, assessments and other governmental charges, if any, other than taxes, assessments and other governmental charges being contested in good faith by appropriate proceedings and as to which adequate reserves have been provided in accordance with GAAP.

(z)     Tax Status.  Each of the Loan Parties (i) is, and shall at all relevant times continue to be, a "disregarded entity" within the meaning of U.S. Treasury Regulation § 301.7701-3 for U.S. federal income tax purposes that is wholly owned by a United States person (within the meaning of Section 7701(a)(30) of the Code), (ii) is not and will not at any relevant time become an association (or publicly traded partnership) taxable as a corporation for U.S. federal income tax purposes and (iii) does not have tax residence or is otherwise subject to tax in any jurisdiction outside the United States.

(aa)    Opinions.  The facts regarding the Loan Parties, the Collateral, and the related matters set forth or assumed in each of the Opinions of counsel delivered in connection with this Agreement and the Transaction Documents are true and correct in all material respects.

(bb)    ERISA Compliance.

(i)     Each Pension Plan is in compliance in form and operation with its terms and with ERISA, the Code and other applicable Laws and regulations, except where any failure to comply could not reasonably be expected to have a Material Adverse Effect;

(ii)    (A) no ERISA Event has occurred other than as would not have a Material Adverse Effect and (B) none of the Loan Parties or ERISA Affiliates has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, except as would not reasonably be expected to have a Material Adverse Effect; and

(iii)   None of the Loan Parties and none of the Collateral constitutes "plan assets" of a benefit plan investor (within the meaning of 29 CFR 2510.3-101, as modified by Section 3(42) of ERISA).

(cc)    Litigation and Other Proceedings.  (i) There is no action, suit, proceeding or investigation pending (including without limitation, any environmental claims) or, to the best knowledge of the Borrower, threatened, against any Loan Party before any Governmental Authority and (ii) no Loan Party is subject to any order, judgment, decree, injunction, stipulation or consent order of or with any Governmental Authority (including without limitation, relating to any environmental liability).

(dd)    Labor Matters. There are no strikes, lockouts or slowdowns against any of the Loan Parties pending or, to the knowledge of any Loan Party, threatened in writing by any labor union or labor organization purporting to act as exclusive bargaining representative of employees of any Loan Party.

16
*Credit Agreement*

735706711 19631142
29164506

(ee)     Beneficial Ownership Certification.  As of the Closing Date, all of the information included in the Beneficial Ownership Certification is true and correct.

(ff)     Burdensome Agreements.  No Loan Party is a party to or bound by, nor are any of the properties or assets owned by any Loan Party used in the conduct of their respective businesses affected by, any agreement, ordinance, resolution, decree, bond, note, indenture, order or judgment (including, without limitation, any of the foregoing relating to any environmental liability).

(gg)     Insurance. Schedule 3.1(gg) sets forth a description of all insurance maintained by or on behalf of the Loan Parties as of the Closing Date.  As of the Closing Date, no premiums in respect of such insurance are overdue.

(hh)     Swap Agreements.  None of the Loan Parties is a party to any Swap Agreement.

(ii)     Affiliate Transactions.  All purchases, sales and other transfers of Inventory between any of the Loan Parties and any of its Affiliates are made at fair market value and pursuant to arm's-length transactions.  Any and all servicing arrangements between any Loan Party and Servicer have been disclosed to the Lenders.

(jj)     Maquiladora Agreements.

(A)     Each Maquiladora Agreement is effective to create, and has created, a valid and binding obligation of each Maquiladora, enforceable against such party in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws relating to or limiting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(B)     Neither Loan Party, the FBG Counterparties and/or the Maquiladoras has received any written notice of any pending or threatened proceedings that could reasonably be expected to (i) have an adverse effect on any provision contained in each Maquiladora Agreement, or (ii) affect the enforceability, validity, and legality of each Maquiladora Agreement.

(C)     Neither Loan Party, the FBG Counterparties and/or the Maquiladoras is aware of any facts or conditions that could reasonably be expected to cause or permit any of such licenses or permits to be voided, revoked or withdrawn.  The Loan Parties and/or the FBG Counterparties, as applicable, own, and shall at all times continue to own, any and all Inventory located at the maquiladora location indicated in each Maquiladora Agreement.

(D)     Each Loan Party and the Servicer shall cause each FBG Counterparty to ensure that each Maquiladora has all federal, state, local and other licenses and permits (including without limitation, export and import licenses, records and filings) required to be maintained in connection with each Maquiladora Agreement, and all such licenses and permits are valid and in full force and effect.  Each Loan Party and the Servicer shall cause each applicable FBG Counterparty to ensure that each Maquiladora complies with the requirements of such licenses and permits in all respects, and has received no written

17
*Credit Agreement*

735706711 19631142
29164506

**JOINT EXHIBIT NO. 18**
**Page 211 of 812**

notice of any pending or threatened proceedings for the suspension, termination, revocation or limitation thereof.

(E)      Federal-Mogul Motorparts LLC has duly and irrevocable assigned to Trico Products all of its rights and obligations under the corresponding Maquiladora Agreement in accordance with its terms.

(kk)      Use of Proceeds.  The Loan Parties shall use the proceeds of all Advances in accordance with Section 5.2(h).

(ll)      Equity Interests.  No Capital Stock issued by the Borrower incorporated, formed or otherwise organized in the United States (or any state, province, territory or similar jurisdiction therein) is (i) represented by one or more certificates or (ii) subject to an election made by on behalf of the Borrower to have such Capital Stock constitute securities governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and/or any other applicable jurisdiction.

(mm)      Valuation.  At all times, 90% of the value of the Eligible Inventory at such time (valued at all times hereunder at the Borrower's cost, determined in accordance with GAAP) exceeds the aggregate principal amount of the Loans outstanding at such time, and the Fair Market Value of such Eligible Inventory shall at all times exceed such GAAP cost.  For the avoidance of doubt, the foregoing determination shall also be made by the Borrower and Servicer taking into account any and all reserves, offsets and similar items with respect to any of the foregoing items from time to time.

(nn)      Manufacturing Agreements.  Each Manufacturing Agreement is effective to create, and has created, a valid and binding obligation of the applicable FBG Counterparty, enforceable against such party in accordance with its terms.

Section 3.2      Representations and Warranties of the Servicer.  The Servicer hereby represents and warrants to the Administrative Agent and the Lenders as of the date hereof, as of each Payment Date and as of each Borrowing Date, that:

(a)      Organization and Qualification.  The Servicer is a limited liability company duly organized, validly existing and in good standing under the Laws of Delaware.  The Servicer has obtained all necessary licenses and approvals in all jurisdictions in which the conduct of its business as required by this Agreement requires such qualification, licenses or approvals where a failure to do so would reasonably be expected to have or result in a Material Adverse Effect.

(b)      Authority; No Conflict or Violation.  The execution, delivery and performance by the Servicer of the Transaction Documents to which it is a party, the performance of its obligations under this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated in this Agreement and the other Transaction Documents to which it is a party, have been duly authorized by all necessary corporate action on the part of the Servicer and do not and will not (i) require any consent or approval of its Board of Directors, or any authorization, consent, approval, order, filing, registration or qualification by or with any Governmental Authority, except those that have been obtained and are in full force and effect, (ii) violate any provision of (A) any applicable Law or of any order, writ, injunction or decree presently in effect having applicability to the Servicer or (B) the Organizational Documents of the Servicer, (iii) result in a breach of or constitute a default under (A) any Transaction Document or (B) any indenture or loan or credit agreement or any other material agreement,

18
*Credit Agreement*

735706711 19631142
29164506

lease or instrument to which the Servicer is a party or by which it or its properties may be bound or affected, or (iv) result in, or require, the creation or imposition of any Lien or other charge or encumbrance of any nature upon or with respect to any of the assets now owned or hereafter acquired by the Servicer except, with respect to clauses (i), (ii)(A) and (iv) above, where the failure to so comply with any of the foregoing could not reasonably be expected to have a Material Adverse Effect.

(c)      Legal Agreements.  This Agreement and each of the other Transaction Documents to which the Servicer is a party have been duly authorized, executed and delivered by the Servicer, and constitute the legal, valid and binding obligations of the Servicer, enforceable against it in accordance with their respective terms, except to the extent that such enforcement may be limited by bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by general equitable principles.

(d)      Anti-Corruption Laws; Anti-Money Laundering Laws and Sanctions.

(i)      None of (A) the Servicer, any Subsidiary or, to the knowledge of the Servicer or such Subsidiary, any of their respective directors, officers, employees or Affiliates, or (B) any agent or representative of the Servicer or any Subsidiary that will act in any capacity in connection with or benefit from the Transaction Documents, (I) is a Sanctioned Person, (II) to the extent in violation of any Sanctions, has its assets located in a Sanctioned Country, (III) is under administrative, civil or criminal investigation for an alleged violation of, or during the past five (5) years received notice from or made a voluntary disclosure to any governmental entity regarding a possible violation of, Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions by a governmental authority that enforces Sanctions or any Anti-Corruption Laws or Anti-Money Laundering Laws, or (IV) to the extent in violation of any Sanctions, directly or indirectly derives revenues from investments in, or transactions with, Sanctioned Persons.

(ii)      Each of the Servicer and its Subsidiaries has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance by the Servicer and its Subsidiaries and their respective directors, officers, employees and agents with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(iii)      Each of the Servicer and its Subsidiaries, and to the knowledge of the Servicer, director, officer, employee, agent and Affiliate of the Servicer and each such Subsidiary, is in compliance with applicable Anti-Corruption Laws, Anti-Money Laundering Laws in all respects and applicable Sanctions.

(iv)      No proceeds of any Advance have been used, directly or indirectly, by the Servicer, any of its Subsidiaries or any of its or their respective directors, officers, employees or agents in violation of Section 5.2(h).

(e)      Information.  No written information furnished by the Servicer to the Administrative Agent or any Lender for purposes of or in connection with this Agreement and the transactions contemplated hereby contains any material misstatement of fact or omits to state any material fact necessary to make such information taken as a whole not materially misleading in light of the circumstances under which made.

<div align="center">19</div>
<div align="center">*Credit Agreement*</div>

735706711 19631142
29164506

(f)     Collections.  Servicer has directed each Qualified Purchaser to make payments of Collections on the sale of Collateral (including Inventory) directly to the Collection Account.  The conditions and requirements set forth in Section 5.1(v) and Section 6.2 have at all times been satisfied and duly performed in all material respects by the Loan Parties or the Servicer.  To the extent that funds other than Collections of Collateral are deposited into the Collection Account, the Servicer can promptly trace and identify which funds constitute Collections of Collateral.  To the extent that Collections of Collateral are deposited into any bank account other than the Collection Account, the Servicer can promptly trace and identify which funds deposited into such bank account constitute Collections of the Collateral.  It is understood and agreed that, notwithstanding anything herein to the contrary, any mutual obligations in connection with any Purchase Agreement or Sale Agreement of any Loan Party, on the one hand, and the applicable FBG Counterparty, on the other hand (including, for the avoidance of doubt, any payment obligations owing by any FBG Counterparty under any Sale Agreement) shall be subject to offset between such parties of such mutual obligations.

(g)     Compliance with USMCA.  Servicer has complied in all material respects with the United States-Mexico-Canada Agreement ("USMCA").  Servicer and its Affiliates have obtained full benefits under the USMCA in respect of tariff and tax issues.

(h)     Compliance with Laws.  The Servicer has complied with all applicable Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business or property, the non-compliance with which could reasonably be expected to have a Material Adverse Effect.

(i)     Servicing Programs.  No license or approval is required for the Administrative Agent's use of any software or other computer program used by the Servicer, other than those which have been obtained and are in full force and effect.

(j)     Servicing.  Since the Closing Date there has been no material adverse change in the ability of the Servicer or any Sub-Servicer to perform its duties and obligations set forth in Article VI hereof.

(k)     No Event of Default.  No event has occurred and is continuing and no condition exists, that constitutes or may reasonably be expected to constitute an Event of Default or Default.

(l)     Material Adverse Effect.  The Loan Parties have previously delivered to the Administrative Agent such financial statements for the Loan Parties and their Affiliates as requested by the Administrative Agent and the Lenders.  Since December 31, 2021, no event has occurred that could reasonably be expected to have a Material Adverse Effect.

(m)     Opinions.  The facts regarding the Loan Parties, the Collateral, and the related matters set forth or assumed in each of the Opinions of counsel delivered in connection with this Agreement and the Transaction Documents are true and correct in all material respects.

(n)     ERISA Compliance.

(i)     Each Pension Plan is in compliance in form and operation with its terms and with ERISA, the Code and other applicable Laws and regulations, except where any failure to comply could not reasonably be expected to have a Material Adverse Effect;

*Credit Agreement*
735706711 19631142
29164506

(ii)     (A) no ERISA Event has occurred other than as would not have a Material Adverse Effect and (B) none of the Loan Parties or ERISA Affiliates has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, except as would not reasonably be expected to have a Material Adverse Effect; and

(iii)     None of the Loan Parties or the Collateral constitutes "plan assets" of a benefit plan investor (within the meaning of 29 CFR 2510.3-101, as modified by Section 3(42) of ERISA).

(o)     <u>Litigation and Other Proceedings</u>.  There is no action, suit, proceeding or investigation pending, or to the Servicer's knowledge threatened, against the Servicer before any Governmental Authority: (i) asserting the invalidity of this Agreement or any of the other Transaction Documents; (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement or any other Transaction Document; or (iii) seeking any determination or ruling that could materially and adversely affect the performance by the Servicer of its obligations under, or the validity or enforceability of, this Agreement or any of the other Transaction Documents.

(p)     <u>Affiliate Transactions</u>.  All purchases, sales and other transfers of Inventory between any of the Loan Parties and any of its Affiliates are made at fair market value and pursuant to arm's-length transactions.  Any and all servicing arrangements between any Loan Party and Servicer have been disclosed to the Lenders.

(q)     <u>Accuracy of Information</u>. The Servicer has disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No written information heretofore furnished by the Servicer to the Administrative Agent or any of the Lenders for purposes of or in connection with this Agreement or any transaction contemplated hereby contains, and no such written information hereafter furnished by the Servicer to the Administrative Agent or any of the Lenders, will contain, any material misstatement of fact or omit to state any material fact necessary to make such information not materially misleading in light of the circumstances under which made.

(r)     <u>Financial Information</u>.  All balance sheets, all statements of income and of cash flow and all other financial information of the Loan Parties furnished to the Administrative Agent or any of the Lenders and described in <u>Section 5.1</u> have been or will be prepared in accordance with GAAP and do or will present fairly in all material respects the financial condition and results of operations of the Loan Parties, as at such dates and for such periods in accordance with GAAP, subject, in the case of unaudited financial statements, to changes resulting from normal year-end audit adjustments and the absence of footnotes.

(s)     <u>Valuation</u>.  At all times, 90% of the value of the Eligible Inventory at such time (valued at all times hereunder at the Borrower's cost, determined in accordance with GAAP) exceeds the aggregate principal amount of the Loans outstanding at such time, and the Fair Market Value of such Eligible Inventory shall at all times exceed such GAAP cost.  For the avoidance of doubt, the foregoing determination shall also be made by the Borrower and Servicer taking into account any and all reserves, offsets and similar items with respect to any of the foregoing items from time to time.

<div align="center">21<br>
<em>Credit Agreement</em></div>

735706711 19631142
29164506

<div align="center"><strong>JOINT EXHIBIT NO. 18</strong><br>
<strong>Page 215 of 812</strong></div>

## ARTICLE IV.
### CONDITIONS OF CLOSING AND ADVANCES

Section 4.1    Conditions Precedent to Closing.  The effectiveness of this Agreement is subject to the conditions precedent that:

(a)    Transaction Documents.  The Administrative Agent shall have received all of the following Transaction Documents (together with the schedules and exhibits thereto, if any), each of which shall be originals or electronic copies, unless otherwise specified, each executed by a Responsible Officer of the signing Loan Party (where execution is applicable), each dated as of the Closing Date (unless otherwise specified) (or, in the case of certificates of governmental officials, a recent date before the Closing Date):

(i)    this Agreement;

(ii)    U.S. Security Agreement;

(iii)    Mexican Security Agreement;

(iv)    each promissory note, substantially in the form attached hereto as Exhibit VII, requested by a Lender (with originals to be mailed to counsel for the Administrative Agent and Lenders within two (2) Business Days after the Closing Date);

(v)    the Purchase Agreement;

(vi)    the Sale Agreement; and

(vii)    the Manufacturing Agreements.

(b)    Secretary's Certificate and Attachments.  The Administrative Agent shall have received a copy of an executed certificate from the secretary or assistant secretary (or another officer authorized to provide such certificate) of each Loan Party, together with all applicable attachments, certifying as to the following:

(i)    Organizational Documents.    Attached thereto is a copy of each Organizational Document of such Loan Party originally executed and delivered by each party thereto and, to the extent applicable, certified as of a recent date by the appropriate governmental official.

(ii)    Signature and Incumbency.  Set forth therein are the signature and incumbency of the officers or other authorized representatives of such Loan Party executing the Transaction Documents to which it is a party.

(iii)    Resolutions.  Attached thereto are copies of resolutions of the board of directors, board of managers or functional equivalent of such Loan Party approving and authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party, or by which it or its assets may be bound as of the Closing Date and approving the identity, authority and capacity of each Responsible Officer thereof authorized

22
*Credit Agreement*

735706711 19631142
29164506

to act as a Responsible Officer in connection with this Agreement and the other Transaction Documents to which such Loan Party is a party or is to be a party on the Closing Date, certified as of the Closing Date as being in full force and effect without modification or amendment.

(iv)     Good Standing Certificates.    Attached thereto is a good standing certificate from the applicable Governmental Authority of such Loan Party's jurisdiction of incorporation, organization or formation, each dated a recent date prior to the Closing Date.

(c)     Borrowing Notice; Flow of Funds Memorandum.  The Administrative Agent shall have received a fully executed and delivered Borrowing Notice, no later than (i) 11:00 a.m. (ET) two (2) Business Days prior to the Closing Date (or such shorter period as may be agreed to by the Administrative Agent and the Lenders), together with a customary direction letter attaching a flow of funds memorandum with respect to the transactions contemplated by the Transaction Documents to occur as of the Closing Date.

(d)     Closing Date Certificate and Attachments.  The following shall have occurred (or shall occur concurrently with the making of the Advance on the Closing Date), and the Administrative Agent shall have received an executed Closing Date certificate, together with all applicable attachments, certifying as to the following:

(i)     the representations and warranties set forth in Article III are true and correct in all material respects on and as of Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall remain true and correct in all material respects as of such earlier date;

(ii)     no event has occurred and is continuing, or would result from such Advance, that constitutes a Default or Event of Default;

(iii)     the most recently delivered Borrowing Base Certificate does not show that an Overadvance exists or will result from such Advance; and

(iv)     no Overadvance exists or will result from such Advance.

(v)     Material Adverse Effect.  Since December 31, 2021, no event, effect, occurrence, fact, condition, change or development shall have occurred that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)     Collateral.  The Administrative Agent shall have received:

(i)     Lien Searches.  The results of a recent search, by a Person reasonably satisfactory to the Administrative Agent, of all effective UCC financing statements (or equivalent filings) made with respect to any personal or mixed property of any Loan Party in the appropriate jurisdictions, together with copies of all such filings disclosed by such search.

(ii)     UCC Financing Statements.  Copies of proper financing statements, filed or duly prepared for filing under the UCC in all United States jurisdictions that the Administrative Agent may deem reasonably necessary in order to perfect and protect the Liens created under

<center>23<br>*Credit Agreement*</center>

735706711 19631142
29164506

the Security Documents on assets of each Loan Party that is party to the Security Documents, covering the Collateral described therein.

(iii)    Mexican Security Agreement. Evidence that the Mexican Security Agreement has been registered in the RUG within three (3) Business Days following the Closing Date.

(f)    Financial Statements.  The Administrative Agent and the Lenders shall have received:

(i)    financial statements and annual reports of the type set forth in Section 5.1(b) and Section 5.1(c) for the Fiscal Year ended December 31, 2021, and

(ii)    a quarterly report of the type set forth in Section 5.1(d) for the Fiscal Quarter ended March 31, 2022.

(g)    Opinions of Counsel to Loan Parties.  The Administrative Agent and the Lenders shall have received (the items in sub-clauses (i) through (iv), collectively, the "***Opinions***"):

(i)    an opinion of Paul Hastings LLP, as U.S. counsel for the Loan Parties, in form and substance satisfactory to the Administrative Agent and the Lenders, dated as of the Closing Date; and

(ii)    a true sale opinion of Paul Hastings, LLP, as U.S. counsel for the Loan Parties, in form and substance satisfactory to the Administrative Agent and the Lenders, dated as of the Closing Date;

(iii)    a non-consolidation opinion of Paul Hastings, LLP, as U.S. counsel for the Loan Parties, in form and substance satisfactory to the Administrative Agent and the Lenders, dated as of the Closing Date; and

(iv)    an opinion of Gonzalez Calvillo, as Mexican counsel for the Loan Parties, in form and substance satisfactory to the Administrative Agent and the Lenders, dated as of the Closing Date, as to the Mexican Security Agreement and any other transaction documents governed by the laws of Mexico, in form and substance satisfactory to the Administrative Agent and the Lenders, dated as of the Closing Date.

(h)    Fees.  The Borrower shall have paid (or shall cause to be paid from the proceeds of funding on the Closing Date) to the Administrative Agent, the Lenders and the Servicer such fees payable to each such Person on the Closing Date pursuant to the terms hereof to the extent due and invoiced on or prior to the Closing Date.

(i)    Solvency.  The Administrative Agent shall have received a copy of the executed Solvency Certificate, in the form of Exhibit IV attached hereto.

(j)    "Know-Your-Customer", Etc.  The Administrative Agent shall have received not less than three (3) Business Days prior to the Closing Date (or such shorter period as the Administrative Agent may agree) all such documentation and other information required by regulatory authorities under

735706711 19631142
29164506

any "know-your-customer" Laws or Anti-Money Laundering Laws in order to allow the Lenders to comply therewith.

(k)     Holdings Closing Date Certification.  The Administrative Agent shall have received a closing date certificate executed by a Responsible Officer of Holdings that, as of the Closing Date, the net equity value of Holdings exceeds the Holdings Minimum Equity Value.

Section 4.2     Conditions Precedent to Initial Advance.   The initial Advance under this Agreement may be made on or after the Closing Date and is subject to the conditions precedent that (a) the conditions in Section 4.1 have been satisfied, and (b) the Administrative Agent and the Lenders shall have received fees and expenses required to be paid as of such date pursuant to the terms of this Agreement for which Borrower has received an invoice as of the Closing Date.

Section 4.3     Conditions Precedent to All Advances.  Each Advance shall be subject to the conditions precedent that (a) the Servicer shall have delivered to the Lenders on or prior to the intended Borrowing Date of such Advance, in form satisfactory to the Administrative Agent, financial statements and other financial reporting as due on or before the applicable Borrowing Date under Section 6.6, (b) the Maturity Date shall not have occurred, (c) the Administrative Agent shall have received a Borrowing Notice pursuant to Section 1.2 and (d) on the applicable Borrowing Date, the following statements shall be true (and acceptance of the proceeds of such Advance shall be deemed a representation and warranty by Borrower that such statements are then true):

(i)     the representations and warranties set forth in Article III are true and correct in all material respects on and as of the Borrowing Date of such Advance as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall remain true and correct in all material respects as of such earlier date;

(ii)     no event has occurred and is continuing, or would result from such Advance, that constitutes a Default or Event of Default;

(iii)     the most recently delivered Borrowing Base Certificate does not show that an Overadvance exists or will result from such Advance, unless the Borrower has made a payment to the Lenders to reduce the aggregate principal of Loans in an amount equal to the Overadvance; and

(iv)     no Overadvance exists or will result from such Advance.

(v)     The Borrower is Solvent immediately prior to and after giving effect to each Advance and the use of the proceeds thereof.

**ARTICLE V.**

**COVENANTS**

Section 5.1     Affirmative Covenants.  Until the Termination Date:

735706711 19631142
29164506

(a)      Financial Accounting Practices.  Each of the Loan Parties and Servicer shall make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect in all material respects its transactions and dispositions of its assets and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (x) transactions are recorded as necessary (A) to permit preparation of financial statements in conformity with GAAP and (B) to maintain accountability for assets and (y) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(b)      Loan Party Annual Financial Statements.  As soon as practicable, and in any event within ninety (90) days after the close of each fiscal year, Borrower will furnish to the Administrative Agent and the Lenders the unaudited balance sheet and statements of income, changes in member's equity and cash flows for such fiscal year, certified by a Responsible Officer of Borrower as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Loan Parties.

(c)      Annual Reports.  Within five (5) Business Days after the same are provided to the agent or lenders under each of the ABL Credit Agreement and the Term Loan Credit Agreement, and in any event within one hundred (100) days after the close of each fiscal year of the Servicer, Servicer shall furnish to the Administrative Agent and the Lenders a consolidated balance sheet of Servicer and its consolidated Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of Cohen & Co. or any other independent certified public accountant of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit, together with, to the extent provided to the lenders under the ABL Credit Agreement and/or the Term Loan Credit Agreement, a customary management's discussion and analysis of financial information. The foregoing shall be provided together with a certification by the Servicer that there has been no material adverse effect to the Servicer's wipers products segment from the prior wipers products segment information furnished to the Administrative Agent and Lenders hereunder pursuant to Section 5.1(k)(ii).

(d)      Quarterly Reports.  Within five (5) Business Days after the same are provided to the agent or lenders under each of the ABL Credit Agreement and the Term Loan Credit Agreement, and in any event within fifty-five (55) days after the close of each Fiscal Quarter of Servicer other than the last Fiscal Quarter of each fiscal year, Servicer shall furnish to the Administrative Agent and the Lenders a consolidated balance sheet of Servicer and its consolidated subsidiaries as at the end of such Fiscal Quarter, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Quarter and for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding Fiscal Quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of Servicer as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of Servicer and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes, together with a customary management's discussion and analysis of financial information (which, for the avoidance of doubt, shall contain broken out information set forth in Section 5.1(k)(ii)).

<div align="center">26</div>
<div align="center"><em>Credit Agreement</em></div>

735706711 19631142
29164506

(e)      Monthly Reports. The Borrower shall ensure that the Servicer furnish each monthly report to the Administrative Agent and the Lenders pursuant to and in accordance with Section 6.6(a).  In addition, on each Monthly Reporting Date, the Borrower shall furnish to the Administrative Agent and the Lenders a monthly reporting package consisting of: (i) a copy of all of the Borrower's bank account statements for the immediately preceding month, together with a certification (which may be made in the Borrowing Base Certificate) that there have been no payments made by or from the Borrower during such month other than as set forth in such bank account statements; and (ii) a Borrowing Base Certificate, together with a certification that, among other things, stating that no Event of Default or Default exists and is continuing, or if any such event exists and is continuing, specifying in detail the nature and period of existence of such Event of Default or Default and any action taken or contemplated to be taken by Borrower with respect thereto.

(f)      Compliance Certificates.

(i)      The Loan Parties' delivery of information, including without limitation, financial statements and reports, pursuant to Section 5.1(b) of this Agreement shall be accompanied by a compliance certificate, substantially in the form of Exhibit V-A hereto, addressed to the Administrative Agent and the Lenders, executed by a Responsible Officer of Borrower, stating that no Event of Default or Default exists and is continuing, or if any such event exists and is continuing, such compliance certificate shall specify in detail the nature and period of existence of such Event of Default or Default and any action taken or contemplated to be taken by Borrower with respect thereto.

(ii)      The financial statements delivered pursuant to Sections 5.1(c) and 5.1(d) of this Agreement shall be accompanied by

1.      a compliance certificate, substantially in the form of Exhibit V-A hereto, addressed to the Administrative Agent and the Lenders, executed by a Responsible Officer of Servicer, stating that no Event of Default or Default exists under this Agreement, or if any such event exists and is continuing, such certificate shall specify in detail the nature and period thereof and any action taken or contemplated to be taken by Servicer with respect thereto, and

2.      a certificate addressed to the Administrative Agent and the Lenders, substantially in the form of Exhibit V-B hereto, executed by a Responsible Officer of Holdings, certifying that, as of the date of such certificate, the net equity value of Holdings exceeds the Holdings Minimum Equity Value.

(g)      Maintenance of Properties and Insurance.

(i)      Each Loan Party shall keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.  Servicer will, and will cause each Loan Party, the FBG Counterparties and the Maquiladoras to keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

(ii)      Each Loan Party shall maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by

735706711 19631142
29164506

companies engaged in the same or similar businesses operating in the same or similar locations and each such policy of insurance shall, and the Borrower shall deliver the following within thirty (30) days after the Closing Date, (i) in the case of each liability insurance policy, name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder, (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Secured Parties, as the lenders loss payee thereunder, and (iii) if obtainable from the applicable insurer, provide for at least 30 days' prior written notice to the Administrative Agent of any cancellation of such policy.  Servicer will, and will cause each Loan Party, the FBG Counterparties and the Maquiladoras to, maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

(h)     Notice of Certain Events.  Promptly upon becoming aware of the occurrence of any of the following events, the Loan Parties and the Servicer, and with respect to clause (K) below, Holdings, shall give the Administrative Agent and each Lender notice of such event, together with a written statement signed on behalf of such Person setting forth the details of such event and any action taken or contemplated to be taken with respect thereto:

(A)     the occurrence of an event of default or similar event under the Credit Agreement, Term Loan Credit Agreement, any Transaction Document or any Material Indebtedness of any Loan Party;

(B)     an Event of Default or Default under this Agreement;

(C)     any Lien (other than Permitted Liens) or claim made or asserted against any of the Collateral;

(D)     any casualty, loss, damage or destruction to the Collateral in the amount of $1,000,000 or more, whether or not covered by insurance;

(E)     the commencement of any action or proceeding for the taking of any portion of the Collateral or interest therein with an aggregate value in excess of $1,000,000 under power of eminent domain or by condemnation or similar proceeding, in which case, the Loan Parties and Servicer shall ensure that the cash proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are deposited into the Collection Account and applied in accordance with the applicable provisions of this Agreement and the Security Documents;

(F)     any and all default notices received under or with respect to any leased location or warehouse where Collateral is located (which shall be delivered within two (2) Business Days after receipt thereof), including any facility leased by any Maquiladora or any default notices or termination noticed received under the Purchase Agreement, Sale Agreement or any Manufacturing Agreement;

(G)     any Loan Party, or any Subsidiary or any ERISA Affiliate of any of the foregoing knows or has reason to know that any ERISA Event has occurred, in which case a certificate of the chief financial officer of the Borrower describing such ERISA Event and

28
*Credit Agreement*

735706711 19631142
29164506

the action, if any, proposed to be taken with respect to such ERISA Event and a copy of any notice filed with the PBGC or the IRS pertaining to such ERISA Event and any notices received by such Borrower, Subsidiary or ERISA Affiliate from the PBGC or any other governmental agency with respect thereto;

(H)      any Loan Party, or any Subsidiary or any ERISA Affiliate of any of the foregoing maintains or contributes to (or incurs and obligation to contribute to) a Multiemployer Plan;

(I)      any Loan Party or any of their Subsidiaries or the Collateral constitutes "plan assets" of a benefit plan investor (within the meaning of 29 CFR 2510.3-101, as modified by Section 3(42) of ERISA);

(J)      the assertion in writing of any environmental claim by any Person against, or with respect to the activities of, any Loan Party and any alleged violation of or non-compliance with any Environmental Laws or any permits, licenses or authorizations, other than any environmental claim or alleged violation that, alone or together with any other such matters that have occurred, could reasonably be expected to result in liability of the Loan Party in an aggregate amount of or exceeding $1,000,000; or

(K)      the occurrence of any development or event which could reasonably be expected to result in the net equity value of Holdings being or becoming less than the Holdings Minimum Equity Value, including a reasonably detailed background summary as to the relevant liability, obligation, item or other information in respect of Holdings.

(i)      <u>Notice of Material Adverse Effect</u>.  Promptly upon becoming aware thereof, each of the Borrower and Servicer will give the Administrative Agent and each Lender written notice with respect to any development or occurrence which could reasonably be expected to have a Material Adverse Effect.

(j)      <u>Notice of Proceedings</u>.  Promptly upon becoming aware thereof, each of the Loan Parties and the Servicer will give the Administrative Agent and each Lender notice of (i) the commencement, existence or, to the knowledge of Borrower or Servicer, threat of all proceedings by or before any Governmental Authority against or affecting any Loan Party, Guarantor, the FBG Counterparties, Servicer or the Maquiladoras, if adversely decided, could reasonably be expected to have a Material Adverse Effect and (ii) any action, suit, proceeding or investigation pending or to the knowledge of Borrower or Servicer, threatened, against any Loan Party, Guarantor, the FBG Counterparties, Servicer or the Maquiladoras before any Governmental Authority.

(k)      <u>Further Information; Lender Calls</u>.

(i)      Each of the Loan Parties and the Servicer will promptly furnish to the Administrative Agent and each Lender such other information, and in such form, as the Administrative Agent or the Lenders may reasonably request from time to time in connection with this Agreement or the other Transaction Documents.

(ii)      Within one (1) Business Day after the same are provided to the agent or lenders under each of the ABL Credit Agreement and the Term Loan Credit Agreement, the Borrower and Servicer shall furnish a copy of all such financial, reporting and other

<div align="center">29<br>
<em>Credit Agreement</em></div>

735706711 19631142
29164506

<div align="center"><strong>JOINT EXHIBIT NO. 18</strong><br>
<strong>Page 223 of 812</strong></div>

information so furnished thereto, to the Administrative Agent and the Lenders, including without limitation, each lender presentation and management discussion and analysis, which, for the avoidance of doubt, shall contain broken out information regarding the wipers products segment, including quarterly revenue and gross margin reporting for such segment and related items.

(iii)      Promptly following delivery of the annual financial statements pursuant to Section 5.1(b), upon request of any Lender, the Borrower and Servicer shall conduct a call at a mutually agreeable date and time between the Lenders and the Chief Financial Officer of Holdings, the Servicer and the Loan Parties to answer Lender questions and for discussion.

(l)      Audits.  Each of the Loan Parties and the Servicer will, from time to time during regular business hours as requested by the Administrative Agent, in its Permitted Discretion, upon five (5) Business Days advance notice to Borrower, and at the sole cost of Borrower, permit the Administrative Agent and the Lenders or their respective agents or representatives:  (i) to examine and make copies of and abstracts from all Records in the possession or under the control of such Person relating to the Inventory or other Collateral, including, without limitation, the related Contracts, and (ii) to visit the offices and properties of such Person during reasonable business hours for the purpose of examining such materials described in clause (i) above, and to discuss matters relating to such Person's financial condition or the Inventory or other Collateral or any Person's performance under any of the Transaction Documents or any Person's performance under the Contracts and, in each case, with any of the officers, managers, employees, accountants or other representatives of each of the Loan Parties and the Servicer having knowledge of such matters (each such visit, a *"Review"*); *provided* that no more than one (1) Review under this Section 5.1(l) shall be required in any one calendar year (it being understood and agreed that any follow-up examinations, analysis, discussions or visits to address any material adverse findings discovered during the course of a Review shall not constitute a separate Review), *provided further* that there shall be no limitation on the frequency of Reviews during any calendar year upon the occurrence and continuance of an Event of Default and (ii) each Review shall be coordinated through and by the Administrative Agent.

(m)      Separateness.   Each of the Loan Parties and the Servicer acknowledge that the Administrative Agent and the Lenders are entering into the transactions contemplated by this Agreement in reliance upon Borrower's identity as a legal entity that is separate from Parent, each FBG Counterparty, Servicer, First Brands Parent, and their respective other Affiliates (each, a *"Related Entity"*).  Therefore, each of the Borrower and Servicer shall take all steps specifically required by this Agreement or reasonably required by the Administrative Agent or any Lender to continue the Borrower's identity as a separate legal entity and to make it apparent to third Persons that the Borrower is an entity with assets and liabilities distinct from those of the FBG Counterparties, First Brands Parent, the Servicer and any other Person, and is not a division of any FBG Counterparty, First Brands Parent, the Servicer, its Affiliates or any other Person.  In furtherance thereof, each of Borrower and Servicer hereby agrees to:  (i) maintain Borrower's books and records and bank accounts separate from those of any other Related Entity; (ii) at all times hold Borrower out to the public and all other Persons as a legal entity separate from Borrower's member, Servicer and any other Person (and in doing so, corrects any known misunderstanding regarding the Borrower's separate identity); (iii) Borrower shall not act as an agent of Servicer, but instead present itself to the public as an entity separate from Servicer; (iv) ensures the Borrower's board members act independently and in the Borrower's interests, and in the interests of its creditors; (v) ensures the

30
*Credit Agreement*

**JOINT EXHIBIT NO. 18**
**Page 224 of 812**

Case 25-90399   Document 3563-20   Filed in TXSB on 10/30/25   Page 33 of 178

Borrower's board duly authorize all of its limited liability company actions; (vi) maintains at least one Independent Manager in accordance with Section 7.1(m)(i); (vii) file tax returns, if any, for Borrower as may be required under applicable law, to the extent not part of a consolidated group filing a consolidated return or returns, and pays any taxes so required to be paid under applicable law; (viii) except as contemplated herein or in any other Transaction Document, not commingle Borrower's assets with assets of the Servicer, any of the Borrower's Affiliates or any other Person; (ix) conduct Borrower's business in Borrower's own name and strictly comply with all organizational formalities to maintain Borrower's separate existence; (x) maintain separate financial statements for Borrower; (xi) pay Borrower's own liabilities only out of Borrower's own funds; (xii) maintain an arm's length relationship between Borrower and each other Related Entity; (xiii) pay the salaries of Borrower's own employees, if any, with Borrower's own funds; (xiv) not hold out Borrower's credit or assets as being available to satisfy the obligations of others; (xv) allocate fairly and reasonably with other Persons any of Borrower's overhead for shared office space; (xvi) except as contemplated herein or in any other Transaction Document, use separate stationery, invoices and checks; (xvii) except as expressly permitted herein or in any other Transaction Document, not pledge Borrower's assets for the benefit of any other Person and not hold out Borrower's credit or assets as being available to satisfy obligations of others; (xviii) correct any known misunderstanding regarding Borrower's separate identity; (xix) maintain adequate capital in light of its contemplated business purpose, transactions and liabilities; (xx) cause Borrower's manager(s) or member, as applicable, to keep minutes of any meetings and actions and observe all other Delaware limited liability company formalities; (xxi) not to have Borrower acquire any obligations or securities of its member; (xxii) act solely in its own name and through its own authorized managers, directors, members, officers and agents, except as expressly permitted under the Transaction Documents; (xxiii) ensure Borrower does not engage in any business or activity except as set forth in this Agreement and the other Transaction Documents, nor incur any indebtedness or liability other than any incurred pursuant to the Transaction Documents; (xxiv) maintain Borrower's assets in a manner that facilitates their identification and segregation from those of Borrower's Affiliates; (xxv) ensure that Borrower maintains arm's-length relationships with its Affiliates and the other Loan Parties; (xxvi) comply in all material respects with each of the assumptions made with respect to it in the non-consolidation opinion delivered hereunder, and in any certifications contained in any certificate referred to therein; and (xxvii) cause Borrower's directors, officers, agents and other representatives to act at all times with respect to Borrower consistently and in furtherance of the foregoing.

(n)     Preservation of Existence and Franchises.  Each of the Loan Parties and the Servicer shall maintain its organizational existence and its rights and franchises in full force and effect in its jurisdiction of incorporation or organization, as the case may be except as would not result in a Material Adverse Effect.  Each of the Loan Parties and Servicer will qualify and remain licensed or qualified as a foreign corporation or limited liability company, as the case may be, in each jurisdiction in which the failure to receive or retain such licensing or qualification could reasonably be expected to have a Material Adverse Effect.  With respect to Holdings, Servicer, each FBG Counterparty, and each Maquiladora, Servicer shall, or shall cause such Persons, to (x) maintain its organizational existence and its rights and franchises in full force and effect in its jurisdiction of incorporation or organization and (y) qualify and remain licensed or qualified as a foreign corporation or limited liability company, as the case may be, in each jurisdiction in which the failure to receive or retain such licensing or qualification could reasonably be expected to have a Material Adverse Effect.

(o)     Compliance with Laws.  Each of the Loan Parties and the Servicer will comply with all applicable Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business

735706711 19631142
29164506

or property, the non-compliance with which could reasonably be expected to have a Material Adverse Effect.  Each of the Loan Parties and the Servicer will comply with the United States-Mexico-Canada Agreement ("USMCA") and will take all actions to ensure that the Loan Parties, Servicer and their respective Affiliates obtain full benefits under the USMCA in respect of tariff and tax issues.

(p)     Further Assurances.  Each of the Loan Parties and the Servicer will, at their own cost and expense, cause to be promptly and duly taken, executed, acknowledged and delivered all such further acts, documents and assurances as the Administrative Agent and the Lenders may reasonably request from time to time in order to carry out the intent and purposes of this Agreement and the transactions contemplated by this Agreement and the other Transaction Documents, including, without limitation, any documents the Administrative Agent and the Lenders reasonably agree are necessary to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest in any property acquired by any Loan Party after the Closing Date.

(q)     Compliance with Anti-Corruption Laws; Beneficial Ownership Regulation, Anti-Money Laundering Laws and Sanctions.  Each of the Loan Parties and the Servicer will (i) maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, the Servicer, their respective Subsidiaries and their respective directors, officers, employees and agents with all Anti-Corruption Laws, Anti-Money Laundering Laws and applicable Sanctions, (ii) notify the Administrative Agent and each Lender that previously received a Beneficial Ownership Certification (or a certification that the Borrower qualifies for an express exclusion to the "legal entity customer" definition under the Beneficial Ownership Regulation) of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified therein (or, if applicable, the Borrower ceasing to fall within an express exclusion to the definition of "legal entity customer" under the Beneficial Ownership Regulation) and (iii) promptly upon the reasonable request of the Administrative Agent or any Lender, provide the Administrative Agent or directly to such Lender, as the case may be, any information or documentation requested by it for purposes of complying with the Beneficial Ownership Regulation.

(r)     Change of Independent Manager.  At least ten (10) days prior to any proposed change of the Independent Manager of Borrower, Borrower will deliver to the Administrative Agent and the Lenders notice of such proposed change together with a certificate of Borrower certifying that the proposed replacement manager satisfies the criteria set forth in the definition of "***Independent Manager***".

(s)     Performance and Enforcement of the Purchase Agreement, Sale Agreement, and Manufacturing Agreements.

a.     Each of the Loan Parties and Servicer shall require each FBG Counterparty (and each Qualified Purchaser) to perform all obligations of such FBG Counterparty (or such Qualified Purchaser) under and pursuant to each Purchase Agreement and Sale Agreement (including without limitation, and for the avoidance of doubt, to cause such FBG Counterparty (and each such Qualified Purchaser) to purchase from time to time during the term of this Agreement each respective item of Eligible Inventory hereunder). Borrower will purchase raw materials and other goods under the Purchase Agreement in strict compliance with the terms thereof and will diligently enforce the rights and remedies accorded to it as the buyer under the Purchase Agreement.  Borrower will take all actions to perfect and enforce its rights and interests (and the rights and interests of

32
*Credit Agreement*

735706711 19631142
29164506

the Administrative Agent and the Lenders as assignees of Borrower) under the Purchase Agreement and any Sale Agreement as the Administrative Agent may from time to time reasonably request, including, without limitation, making claims to which it may be entitled under any indemnity, reimbursement or similar provision contained in the Purchase Agreement or Sale Agreement.

b.       Each of the Loan Parties and Servicer shall require each applicable FBG Counterparty to perform all obligations of such FBG Counterparty under and pursuant to the applicable Manufacturing Agreement.  Borrower will diligently enforce the rights and remedies accorded to it under the Manufacturing Agreement.  Borrower will take all actions to perfect and enforce its rights and interests (and the rights and interests of the Administrative Agent and the Lenders as assignees of Borrower) under the Manufacturing Agreements as the Administrative Agent may from time to time reasonably request, including, without limitation, making claims to which it may be entitled under any indemnity, reimbursement or similar provision contained in any Manufacturing Agreement.

(t)      Ownership.  Borrower will, and Servicer will cause Borrower and the FBG Counterparties to, take all necessary action to (i) vest legal and equitable title to the Inventory and other Collateral, irrevocably in Borrower, free and clear of any Liens other than Permitted Liens, and (ii) establish and maintain, in favor of the Administrative Agent, for the benefit of the Secured Parties, a valid and perfected first priority Security Interest in the Collateral to the full extent contemplated herein, free and clear of any Liens other than Permitted Liens (including, without limitation, the filing of all financing statements or other similar instruments or documents necessary under the UCC (or any comparable law) of all appropriate jurisdictions) to perfect the Administrative Agent's (for the benefit of the Secured Parties) Security Interest in the Collateral and such other action to perfect, protect or more fully evidence the Security Interest of the Administrative Agent for the benefit of the Secured Parties as the Administrative Agent or any Lender may reasonably request.

(u)      Tax Status.  Each of the Loan Parties and the Servicer will take such actions as needed to ensure that each of the Loan Parties will (i) remain a "disregarded entity" within the meaning of U.S. Treasury Regulation § 301.7701-3 for U.S. federal income tax purposes that is wholly owned by a United States person (within the meaning of Section 7701(a)(30) of the Code), (ii) not become an association taxable as a corporation or a publicly traded partnership taxable as a corporation for U.S. federal income tax purposes and (iii) not become subject to taxation in any jurisdiction outside of the United States.

(v)      Books and Records.  Each of the Loan Parties and the Servicer will maintain and implement administrative and operating procedures, and keep and maintain all documents, books, records, computer tapes and disks and other information reasonably necessary or advisable for the collection of all Collections and the identification and reporting of all Inventory, including Eligible Inventory.

(w)      Collection Account.  Each of the Loan Parties and the Servicer shall, or will, cause all Collections to be deposited into the Collection Account.  If, notwithstanding the foregoing, any Qualified Purchaser makes any payment constituting Collections to an account other than the Collection Account, Borrower and the Servicer shall remit such Collections directly to the Collection Account within two (2) Business Days after payment thereof.  The Borrower and the Servicer shall ensure that no disbursements are made from the Collection Account, other than such disbursements pursuant to Article II.  The

<div align="center">33<br>*Credit Agreement*</div>

735706711 19631142
29164506

<div align="center">**JOINT EXHIBIT NO. 18**<br>**Page 227 of 812**</div>

Borrower and Servicer shall ensure that the Collection Account remains open until the Termination Date and shall pay all fees associated with maintaining such account with the Collection Account Bank.

(x)     Information.  Promptly, but in no event later than five (5) days after delivery thereof, Servicer will deliver to the Administrative Agent and each Lender a copy of each report, document, instrument, record and agreement that has been delivered, directly or indirectly, by any Loan Party or any of its Affiliates to any Person in connection with the Credit Agreement or any other Material Indebtedness of any Loan Party.

(y)     Valuation.  The Borrower and the Servicer shall ensure that, at all times, 90% of the value of the Eligible Inventory at such time (valued at all times hereunder at the Borrower's cost, determined in accordance with GAAP) exceeds the aggregate principal amount of the Loans outstanding at such time, and the Fair Market Value of such Eligible Inventory shall at all times exceed such GAAP cost.  For the avoidance of doubt, the foregoing determination shall also be made by the Borrower and Servicer taking into account any and all reserves, offsets and similar items with respect to any of the foregoing items from time to time.

(z)     Broker Fee. The Borrower and Servicer shall cause Servicer to pay Helios Strategic Advisors, LLC a fee equal to 0.375% per annum on the aggregate principal amount Loans outstanding, payable on each Payment Date (the "Broker Fee").

(aa)     FBG Counterparties Obligations.  Each FBG Counterparty shall perform all of its obligations, including payment obligations, under each Purchase Order, Sale Agreement, Purchase Agreement, Manufacturing Agreement and Maquiladora Agreement on a timely basis in accordance with the terms thereof.

(bb)     Maquiladoras.

(i)     The Loan Parties and the Servicer shall cause each applicable FBG Counterparty to ensure that (i) each applicable Maquiladora (x) holds a valid and effective IMMEX program (*Programa para la Industria Manufacturera, Maquiladora y de Servicio de Exportación*; "IMMEX Program"), VAT certification (*Certificación para empresas IMMEX en materia de IVA*; "VAT Certification"); (y) has obtained all permits, licenses, certifications, registrations, consents and authorizations by any Governmental Authority (the "Ancillary Maquila Permits") required for the Maquiladoras to conduct import and export activities under its IMMEX Programs and VAT Certification; and (z) is in compliance with (1) the Ancillary Maquila Permits, and (2) all obligations set forth under the IMMEX Programs and VAT Certification; (ii) each Maquiladora Agreement remains at all times in full force and effect and that all obligations under such agreements are complied with; and (iii) the obligations of the Maquiladoras under each Maquiladora Agreement shall not be assigned to any Person without the prior written consent of the Administrative Agent and the Lenders.

(ii)     The Loan Parties and the Servicer shall cause each FBG Counterparty to carry out any and all actions and/or execute any and all documents, including, without limitation, any amendments and renewals to the Maquiladora Agreements, in order to maintain the Maquiladora Agreements in full force and effect.

<div align="center">34<br>*Credit Agreement*</div>

735706711 19631142
29164506

<div align="center">**JOINT EXHIBIT NO. 18**<br>**Page 228 of 812**</div>

(iii)     The Loan Parties and the Servicer shall cause each FBG Counterparty to ensure that the Maquiladoras have, and will continue at all times to have, all federal, state, local and other licenses and permits (including without limitation, export and import licenses, records and filings) required to be maintained in connection with the Maquiladora Agreements, and all such licenses and permits are valid and in full force and effect.  The Loan Parties and the Servicer shall ensure that the Maquiladoras have, and will continue at all times to have, complied with the requirements of such licenses and permits in all respects.

(cc)     Solvency.  Each Loan Party and the Servicer shall ensure that each Loan Party and each FBG Counterparty remains Solvent at all times.

(dd)     Servicing Arrangements.  Each Loan Party, the Servicer and each FBG Counterparty shall ensure that any and all servicing arrangements by and between any Loan Party, the Servicer and the FBG Counterparties will be, at all times, in form and substance to the Administrative Agent and the Lenders.

(ee)     Purchase Agreement; Sale Agreement; Manufacturing Agreements.  Each of the Purchase Agreement, Sale Agreement and Manufacturing Agreements shall be in the form attached hereto as Exhibit XI, XII, and XIII, respectively, and shall be satisfactory to the Administrative Agent and the Lenders.

(ff)     Collection Account Control Agreement. Within thirty (30) days after the Closing Date, the Borrower shall deliver to the Administrative Agent and Lenders a Collection Account Control Agreement for the Collection Account, in form and substance satisfactory to the Administrative Agent and the Lenders.  Neither the Borrower nor the Servicer shall cause any cash to be withdrawn from the Collection Account until such Collection Account Control Agreement is delivered to the Administrative Agent and Lenders.

Section 5.2     Negative Covenants.  Until the Termination Date:

(a)     Name or Structural Changes.

(i)     No Loan Party shall (i) change its name, identity or legal structure (within the meaning of any applicable enactment of the UCC) or make any other change in the Borrower's identity or corporate structure that could impair or otherwise render any UCC financing statement filed in connection with this Agreement or any other Transaction Document "seriously misleading" as such term (or similar term) is used in the UCC, (ii) permit itself to merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to, any Person, (iii) undertake any division of its rights, assets, obligations or liabilities pursuant to a plan of division or otherwise pursuant to applicable Law, (iv) permit itself to form any new Subsidiaries or (v) permit itself to be directly owned by any Person other First Brands Parent, in each case, without (x) the prior written consent of the Administrative Agent and (y) delivery to the Administrative Agent of all financing statements, instruments and other documents and opinions reasonably requested by the Administrative Agent in connection with such change.  In addition, no Loan Party shall (i) change or relocate its chief executive office or any office where Records are kept unless it gives the Administrative Agent written notice of such change not later than ten (10) days thereafter and (ii) change its jurisdiction of organization to any location other than the State of Delaware.

735706711 19631142
29164506

(ii)      Without the prior written consent of the Administrative Agent and the Lenders, Holdings shall not, and shall cause any of its Subsidiaries to not, transfer any Capital Stock issued by (i) each FBG Counterparty or (ii) each Maquiladora to any Person, other than to any wholly-owned subsidiary of Holdings that is incorporated and operating in either the United States or Mexico.

(b)      <u>Change in Payment Instructions</u>.  Neither the Servicer nor any Loan Party shall (i) add any bank as a Collection Account Bank or (ii) add any deposit account, in each case, unless the Administrative Agent shall have received:  (A) at least ten (10) days before the proposed effective date therefor, written notice of such addition, and (B) an executed Collection Account Control Agreement with respect to such new deposit account, in form and substance acceptable to the Administrative Agent and the Lenders, prior to depositing any Collections therein.  Neither the Servicer nor any Loan Party shall (i) terminate or close the Collection Account, in any case, without the prior written consent of the Administrative Agent shall make any change in the instructions to any party, including any Qualified Purchaser, as to where payments constituting Collections should be made.

(c)      <u>Modifications to Certain Documents</u>.  Neither the Loan Parties nor the Servicer shall, consent to any modification, amendment, supplement or waiver of any of the provisions of (A) its charter, by-laws or other organizational documents or any other agreement or instrument to which any of its Affiliates is a party or is bound or (B) any of the Transaction Documents, in each case without the prior written consent of the Lenders.

(d)      <u>Dispositions</u>. No Loan Party shall convey, sell, lease or otherwise dispose of, in one transaction or a series of transactions, any part of its business or property, whether now owned or hereafter acquired, except any Inventory sold pursuant to the Sale Agreement or as otherwise expressly permitted by this Agreement.

(e)      <u>Termination of Sale Agreements and Maquiladora Agreements</u>.  No Loan Party shall terminate any Sale Agreement, Purchase Agreement, Manufacturing Agreements or Maquiladora Agreement or send any termination notice to a Qualified Purchaser in respect thereof other than, in each case, in the ordinary course of business, without the prior written consent of each of the Lenders.

(f)      <u>Restricted Payments</u>.  After the occurrence and during the continuance of any Event of Default or Overadvance, no Loan Party shall make any Restricted Payment while any Obligations or Guaranteed Obligations remain outstanding.  Prior to the occurrence of an Event of Default, the only Restricted Payment permitted by any Loan Party hereunder shall be pursuant to and in accordance with Section 2.1(d).

(g)      <u>Indebtedness</u>.  No Loan Party shall create, incur, assume or permit to exist any Indebtedness except: (i) the Obligations and the Guaranteed Obligations and (ii) other current accounts payable arising in the ordinary course of business and not overdue, unless such overdue accounts payable are disputed and being contested in good faith.

(h)      <u>Use of Proceeds</u>.  No Loan Party shall use the proceeds of any Advance, either directly or indirectly, for the purpose, whether immediate, incidental or ultimate, of "purchasing or carrying" any margin stock.  Borrower shall not request any Advance, and Borrower shall not use, and shall ensure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Advance, directly or indirectly, (i) in furtherance of an offer, payment, promise to pay, or

735706711 19631142
29164506

Case 25-90399   Document 3563-20   Filed in TXSB on 10/30/25   Page 43 of 178

authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or Anti-Money Laundering Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto. The Borrower shall use the proceeds of each Advance for ongoing inventory financing in respect of Eligible Inventory identified in the Borrowing Notice.

(i)     Liens. No Loan Party shall create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof except Permitted Liens and the Loan Parties will defend the right, title and interest of the Administrative Agent and the Lenders in, to and under any of the foregoing property, against all Adverse Claims of third parties.

(j)     Mergers, Consolidations, Etc. No Loan Party, Holdings, Servicer, FBG Counterparty or Maquiladora shall enter into any transaction of merger or consolidation or amalgamation (other than, in each case, any merger, consolidation or amalgamation of Servicer or any FBG Counterparty with a wholly-owned subsidiary of Holdings with respect to which the surviving entity assumes all obligations of such party under the Transaction Documents), or liquidate, wind up or dissolve itself.

(k)     Lines of Business.  No Loan Party shall engage in any business other than businesses of the type conducted by the Loan Parties on the date hereof and businesses reasonably related thereto.

(l)     Investments and Acquisitions.  No Loan Party shall make or suffer to exist any Investment in any Person or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit.

(m)     Transactions with Affiliates. No Loan Party shall sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (i) transactions in the ordinary course of business at prices and on terms and conditions not less favorable than could be obtained on an arm's length basis from a Person that is not an Affiliate; and (ii) transactions pursuant to the Transaction Documents.

(n)     Restrictive Agreements.  No Loan Party shall, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of any of the Loan Parties to create, incur or permit to exist any Lien upon any of its property or assets.

(o)     Capital Expenditures. The Loan Parties shall not incur or make any Capital Expenditures in any fiscal year in an aggregate amount exceeding $100,000.

(p)     Fiscal Year.  The Loan Parties shall not permit their fiscal year to end on a day other than as in effect on the Closing Date.

(q)     Collections.  Neither the Servicer nor any Loan Party shall permit any funds other than Collections to be deposited into the Collection Account.

735706711 19631142
29164506

(r)    Stock Issuance; Subsidiaries.  The Loan Parties shall not, and shall not permit any of their Subsidiaries to, issue any additional shares, or any right or option to acquire any shares or any security convertible into any shares, of the Capital Stock of any Subsidiary.  Borrower shall not acquire any shares or any security convertible into shares, of the Capital Stock of any Person.

(s)    Swap Agreements.  No Loan Party shall enter into any Swap Agreement.

(t)    Capital Stock.  None of the Loan Parties shall elect to have any of the Capital Stock issued by Borrower constitute securities governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and each other applicable jurisdiction.

(u)    Passive Parent Company Status. Parent shall not (i) conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business or operations other than those incidental to its ownership of the Capital Stock of the Borrower, (ii) incur, create, assume or suffer to exist any Indebtedness or other liabilities or financial obligations, except (x) nonconsensual obligations imposed by operation of law, (y) obligations pursuant to the Transactions Documents to which it is a party and (z) obligations with respect to its Capital Stock, or (iii) own, lease, manage or otherwise operate any properties or assets (other than cash, cash equivalents or other than the ownership of shares of Capital Stock of the Borrower).

**ARTICLE VI.**

**ADMINISTRATION AND COLLECTION**

Section 6.1    Designation of the Servicer.

(a)    The servicing, administration and collection of Collections shall be conducted by such Person (the *"Servicer"*) so designated from time to time in accordance with this Section 6.1.  First Brands is hereby designated as, and hereby agrees to perform the duties and obligations of the Servicer pursuant to the terms of this Agreement.  At any time after the occurrence and during the continuance of an Event of Default or a Default resulting from an action or inaction of, or circumstance existing with respect to, the Servicer (each, a *"Servicer Termination Event"*), the Administrative Agent and the Lenders may, upon written notice to the current Servicer and Borrower, designate as the Servicer any Person to succeed First Brands or any successor Servicer.

(b)    Servicer may delegate any entity acceptable to the Lenders, as sub-servicers of the Servicer (each, a *"Sub-Servicer"*), certain of its duties and responsibilities as the Servicer hereunder, so long as such delegation does not cause the Borrower to be subject to taxation in any jurisdiction outside of the United States.  Without the prior written consent of the Lenders and the Borrower, the Servicer shall not be permitted to delegate any of its duties or responsibilities as the Servicer to any Person.  None of the Sub-Servicers shall be permitted to further delegate to any other Person any of the duties or responsibilities of the Servicer delegated to it by Servicer.  If at any time following the occurrence of a Servicer Termination Event, the Lenders shall designate as the Servicer any Person other than First Brands, all duties and responsibilities theretofore delegated by First Brands to any of the Sub-Servicers shall automatically be terminated.

(c)    Notwithstanding the foregoing subsection (b), (i) the Servicer shall be and remain primarily liable to the Administrative Agent and the Lenders for the full and prompt performance of all

735706711 19631142
29164506

duties and responsibilities of the Servicer hereunder in accordance with the terms hereof and (ii) the Administrative Agent and the Lenders shall be entitled to deal exclusively with the Servicer in matters relating to the discharge by the Servicer of its duties and responsibilities hereunder.  The Administrative Agent and the Lenders shall not be required to give notice, demand or other communication to any Person other than the Servicer in order for communication to the Servicer and the Sub-Servicers or other delegate with respect thereto to be accomplished.  The Servicer, at all times that it is the Servicer, shall be responsible for providing any Sub-Servicer or other delegate of the Servicer with any notice given to the Servicer under this Agreement, as necessary for such Sub-Servicer or other delegate to perform its respective obligations in such capacity.

(d)       Notwithstanding anything else contained in this Agreement or any other Transaction Document: (i) to the extent any duties or obligations of the Servicer involve or require the Servicer to contract for, or conclude a contract in the name of Borrower, the Administrative Agent or any other Secured Party, such servicing responsibility shall be fulfilled solely by the Servicer or by an affiliate of the Servicer and the Servicer or such affiliate is authorized to take such action; and (ii) the Servicer shall not, directly or indirectly, assign, delegate or subcontract any servicing responsibility under this Agreement to any Person, except upon written consent (which consent shall not be unreasonably withheld, conditioned or delayed) of the Administrative Agent.

Section 6.2       Duties of the Servicer.

(a)       The Servicer shall take or cause to be taken all such actions as may be necessary or advisable to provide inventory custody and marketing services to the Borrower and will store and market the Inventory for the Borrower with reasonable care and diligence and in accordance with applicable Laws, rules and regulations.

(b)       The Servicer shall direct each Qualified Purchaser to make payments constituting Collections to the Collection Account.  If, notwithstanding the foregoing, any Qualified Purchaser makes payment other than directly to the Collection Account, Borrower and the Servicer agrees to remit, or to cause such Qualified Purchaser to remit, such Collections directly to the Collection Account within two (2) Business Days upon receipt of such Collections by the Borrower or Servicer, and further agrees that all such Collections shall be deemed to be received in trust for the Administrative Agent and the Lenders.

(c)       The Servicer shall ensure that at all times, no Overadvance occurs.

(d)       The Servicer shall administer the Collections in accordance with the procedures described herein and in Article II.  Prior to the Termination Date, to the extent any Collections come into the possession of the Servicer, the Servicer shall immediately segregate, in a manner acceptable to the Administrative Agent, all such Collections from the general funds of the Servicer or Borrower prior to the remittance thereof in accordance with Article II to the extent of any accrued and unpaid Obligations. Subject to Section 2.2, at all times while the Servicer is required to segregate Collections pursuant to the preceding sentence, the Servicer shall segregate and deposit in the Collection Account all Collections following receipt thereof by the Servicer of such Collections, duly endorsed or with duly executed instruments of transfer.

(e)       [Reserved].

<div align="center">39</div>
<div align="center"><em>Credit Agreement</em></div>

735706711 19631142
29164506

(f)      The Servicer shall hold in trust for Borrower and the Administrative Agent and each Lender all Records in its possession that (i) evidence or relate to the Inventory and Collateral, the related Contracts or (ii) are otherwise necessary or desirable to collect the Collections and shall, following the occurrence and during the continuance of an Event of Default, as soon as practicable upon demand of the Administrative Agent, deliver or make available to the Administrative Agent all such Records, at a place selected by the Administrative Agent.  The Servicer shall, one (1) Business Day following receipt thereof, deposit any cash Collections into the Collection Account for distribution in accordance with Article II.  The Servicer shall, from time to time at the request of the Administrative Agent or any Lender, furnish to the Lenders (not later than two (2) Business Days after any such request) a calculation of the amounts set aside for the Lenders pursuant to Article II.

Section 6.3      Collection Account.  Borrower has with respect to the Collection Account, granted to the Administrative Agent for the benefit of the Secured Parties "control" (within the meaning of the UCC) over such Collection Account.

Section 6.4      [Reserved].

Section 6.5      Responsibilities under Contracts.      Anything herein to the contrary notwithstanding, the exercise by the Administrative Agent and the Lenders of their rights hereunder shall not release the Servicer, any FBG Counterparty, any Maquiladora or any Loan Party from any of their duties or obligations with respect to any Contracts.  The Lenders shall have no obligation or liability with respect to any Contracts, nor shall any of them be obligated to perform the obligations of any Loan Party, Servicer, Maquiladora or any FBG Counterparty.

Section 6.6      Reports.

(a)      On each Monthly Reporting Date, the Servicer shall prepare and deliver not later than 1:00 p.m. (New York City time) to the Lenders, (i) a Borrowing Base Certificate for the calendar month (or portion thereof) then most recently ended (appropriately completed and executed), (ii) an electronic file of the data contained therein, and (iii) and the information set forth in Section 5.1(e).

(b)      During the continuation of an Event of Default, the Servicer shall prepare and deliver to the Lenders such other reports as requested by the Administrative Agent in its Permitted Discretion or at the direction of the Required Lenders.

(c)      If requested by the Administrative Agent on any Business Day, the Servicer shall prepare and deliver to the Lenders not later than 1:00 p.m. (New York City time) on the following Business Day, a pro forma calculation of the Borrowing Base at such time.

(d)      During the continuation of an Event of Default, at such times as any Lender shall reasonably request, the Servicer shall prepare and deliver not later than 1:00 p.m. (New York City time) five (5) Business Days after such request a listing of all Inventory.  Prior to the occurrence of any Event of Default, the Servicer shall provide such information and reports as may be reasonably requested by the Administrative Agent or any Lender to the extent such information is readily available and prepared by the Servicer or the Borrower in the ordinary course of business.

Section 6.7      Servicing Fees.  In consideration of First Brands' agreement to act as the Servicer hereunder, so long as First Brands shall continue to perform as the Servicer hereunder, First Brands shall

735706711 19631142
29164506

Case 25-90399   Document 3563-20   Filed in TXSB on 11/30/25   Page 478 of 1178

be paid a fee (the *"Servicing Fee"*) equal to $10,000 per annum, which shall be payable in arrears on the first day of each calendar month.  At any time while the Servicer is not an Affiliate of Borrower, the Servicing Fee shall be computed at such rate per annum as the Administrative Agent, Borrower and the substitute the Servicer may mutually agree.

**ARTICLE VII.**

**EVENTS OF DEFAULT**

Section 7.1      Events of Default.  The occurrence of any one or more of the following events shall constitute an *"Events of Default"*:

(a)      (i) Borrower shall fail to pay principal on any of the Loans on the date due or (ii) any Overadvance shall exist and shall fail to be cured within the time period set forth in Section 1.3(a); or

(b)      Borrower shall fail to pay Interest on the Loans within two (2) Business Days of the date such Interest is due; or

(c)      Any Loan Party shall fail to pay any other fee or other amount payable pursuant to this Agreement or any of the other Transaction Documents within two (2) Business Days after written notice to such Loan Party by the Administrative Agent or any Lender; or

(d)      Any representation or warranty made by any Loan Party, Holdings or the Servicer under this Agreement or any of the other Transaction Documents or any written statement made by any Loan Party or Servicer in any financial statement, certificate, report, exhibit or document furnished by any Loan Party, Holdings or Servicer to the Administrative Agent or any Lender pursuant to this Agreement or the other Transaction Documents shall prove to have been false or misleading in any material respect as of the time made; or

(e)      Any Loan Party shall default in the performance or observance of any covenant contained in Section 5.1(ff) or Section 5.2 of this Agreement; or Holdings shall default in the performance or observance of any covenant contained in Section 11.11 of this Agreement; or

(f)      Any Loan Party shall default in the performance or observance of any covenant contained in Section 6.6 of this Agreement and such default shall continue for a period of two (2) Business Days; or

(g)      Any Loan Party, Guarantor, Servicer, FBG Counterparty or Maquiladora shall default in the performance or observance of any other covenant, agreement or duty under (x) this Agreement or (y) any other Transaction Document (not constituting an Event of Default under any other provision of this Section 7.1) or any document delivered thereunder and in connection therewith, and, in each case, such default shall continue for a period of five (5) consecutive days; or

(h)      (i) Any "Event of Default" (under and as defined in the Credit Agreement or the Term Loan Credit Agreement, respectively) shall occur and be continuing; (ii) the Borrower shall (A) default (as principal or guarantor or other surety) in any payment of principal of or interest on any obligation (or set of related obligations) for borrowed money in excess of one million U.S. Dollars ($1,000,000) beyond any period of grace with respect to the payment or, if any such obligation (or set of related obligations) is or are payable or repayable on demand, fail to pay or repay such obligation or obligations when demanded,

<div align="center">41<br><em>Credit Agreement</em></div>

735706711 19631142<br>29164506

or (B) default in the observance of any other covenant, term or condition contained in any agreement or instrument by which such an obligation (or set of related obligations) is or are created, secured or evidenced, if the effect of such default is to give the applicable holder or holders of such obligation or obligations (or a trustee or agent on behalf of such holder or holders) the right (whether acted upon or not) to accelerate the maturity of all or part of such obligation or obligations or to terminate the commitment of any lender thereunder; or (iii) any Loan Party (other than the Borrower) or any of its Affiliates (other than the Borrower) shall (A) default (as principal or guarantor or other surety) in any payment of principal of or interest on any obligation (or set of related obligations) for borrowed money in excess of fifteen million U.S. Dollars ($15,000,000) beyond any period of grace with respect to the payment or, if any such obligation (or set of related obligations) is or are payable or repayable on demand, fail to pay or repay such obligation or obligations when demanded, or (B) default in the observance of any other covenant, term or condition contained in any agreement or instrument by which such an obligation (or set of related obligations) is or are created, secured or evidenced, if the effect of such default is to give the applicable holder or holders of such obligation or obligations (or a trustee or agent on behalf of such holder or holders) the right (whether acted upon or not) to accelerate the maturity of all or part of such obligation or obligations or to terminate the commitment of any lender thereunder; or

(i)      (a) one or more final judgments for the payment of money in excess of one million U.S. Dollars ($1,000,000) (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied coverage thereof) shall have been entered against the Borrower and shall remain undischarged or unstayed for a period of thirty (30) consecutive days or (b) one or more final judgments for the payment of money in excess of fifteen million U.S. Dollars ($15,000,000) (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied coverage thereof) shall have been entered against any Loan Party (other than the Borrower), Holdings, the Servicer, any FBG Counterparty or any Maquiladora and shall remain undischarged or unstayed for a period of thirty (30) consecutive days; or

(j)      A writ or warrant of attachment, garnishment, execution, distraint or similar process shall have been issued against any Loan Party or Holdings or any of their respective properties; or

(k)      Any Loan Party shall be required to register as, an "investment company" within the meaning of the Investment Company Act; or

(l)      A Change of Control shall occur; or

(m)      Borrower shall fail (i) at any time (other than for ten (10) Business Days following notice of the death or resignation of any Independent Manager) to have a director who satisfies the definition of "Independent Manager" or (ii) to timely notify the Administrative Agent of any replacement or appointment of any Independent Manager as required pursuant to Section 5.1(r) of this Agreement; or

(n)      (i) An ERISA Event occurs or (ii) there is or arises any potential Withdrawal Liability under Section 4201 of ERISA if any Loan Party or the ERISA Affiliates were to withdraw completely from one or more Multiemployer Plans; or

(o)      Any Event of Bankruptcy shall occur with respect to any Loan Party; or

735706711 19631142
29164506

(p)    Any Loan Party, any Qualified Purchaser, Maquiladora or the Servicer shall cease to be Solvent; or

(q)    (i) Any Person other than Parent shall, directly or indirectly, have an Adverse Claim on any issued and outstanding Capital Stock or other equity interests of Borrower or (ii) any Person other than First Brands Parent shall, directly or indirectly, have an Adverse Claim on any issued and outstanding Capital Stock or other equity interests of Holdings; or

(r)    Any FBG Counterparty shall default in the performance or observance of any covenant, agreement or duty under this to perform its obligations under any Purchase Order, Purchase Agreement or Manufacturing Agreement in accordance with its terms; or

(s)    Any Qualified Purchaser shall default in the performance or observance of any covenant, agreement or duty under this to perform its obligations under any Sale Agreement in accordance with its terms; or

(t)    Any material provision of any Transaction Document for any reason (other than as expressly permitted hereunder or thereunder) shall cease to be effective or to be the legally valid, binding and enforceable obligation of Borrower, or any other Loan Party shall directly or indirectly contest in any manner such effectiveness, validity, binding nature or enforceability; or

(u)    (i) The Liens created by the Security Documents shall at any time not constitute a valid and perfected Lien on the Collateral intended to be covered thereby (to the extent perfection by filing, registration, recordation or possession is required herein or therein), free and clear of all other Liens (other than Permitted Liens) or (ii) any of the Security Documents, or any material provision thereof, shall cease to be effective, or any Loan Party or any Affiliate of any Loan Party shall directly or indirectly contest in any manner such effectiveness, validity, binding nature or enforceability; or

(v)    This Agreement shall terminate in whole or in part (except in accordance with its terms), or shall cease to be effective or to be the legally valid, binding and enforceable obligation of Borrower, or any other Loan Party or any Affiliate of any Loan Party shall directly or indirectly contest in any manner such effectiveness, validity, binding nature or enforceability; or

(w)    The Guaranty contained in Article XI shall cease to be effective or to be the legally valid, binding and enforceable obligation of the Guarantors, or any Guarantor or other Loan Party or any Affiliate of any Loan Party shall directly or indirectly contest in any manner such effectiveness, validity, binding nature or enforceability; or

(x)    The Purchase Agreement, Sale Agreement or any Manufacturing Agreement shall terminate in whole or in part (except in accordance with its terms), or shall cease to be effective or to be the legally valid, binding and enforceable obligation of any FBG Counterparty, or any other Loan Party shall directly or indirectly contest in any manner such effectiveness, validity, binding nature or enforceability; or

(y)    The Administrative Agent (for the benefit of the Secured Parties) shall cease to have a valid and perfected first priority perfected security interest under all applicable laws, in (i) any material part of the Collateral or (ii) the Collection Account, in each case, free and clear of any Adverse Claim; or

735706711 19631142
29164506

(z)      The Borrower and its assigns shall cease to have a valid and perfected first priority perfected Security Interest under all applicable laws, in any material portion of the Collateral free and clear of any Adverse Claim; or

(aa)     The Internal Revenue Service shall file notice of a Lien pursuant to Section 6323 of the Code with regard to any of the Collateral; or

(bb)     The Servicer shall default in the performance or observance of any covenant, agreement or duty under this Agreement or any other Transaction Document; or

(cc)     The occurrence of a Financial Covenant Breach during any Credit Agreement Compliance Period.

Section 7.2      Remedies.   Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent may, and upon the direction of the Required Lenders, shall, take any of the following actions, at the same or different times: (i) terminate any Commitment, and thereupon such Commitments shall terminate immediately and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued but unpaid interest thereon and all fees and other Obligations accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties and Guarantors; **_provided, however,_** that upon the occurrence of an Event of Default described in Section 7.1(o), any such Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued but unpaid interest thereon and all fees (including, without limitation, for the avoidance of doubt, prepayment fees pursuant to Section 1.3) and other Obligations of the Borrower and Guarantors accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower and Guarantors. Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and at the request of the Required Lenders shall, exercise any rights and remedies provided to the Administrative Agent under the Transaction Documents or at law or equity, including all remedies provided under the UCC.  The aforementioned rights and remedies shall be without limitation, and shall be in addition to all other rights and remedies of the Administrative Agent and the Lenders otherwise available under any other provision of this Agreement, by operation of law, at equity or otherwise, all of which are hereby expressly preserved, including, without limitation, all rights and remedies provided under the UCC and all other applicable Laws, all of which rights shall be cumulative.

## ARTICLE VIII.

## INDEMNIFICATION

Section 8.1      Indemnities by Loan Parties.

(a)      Without limiting any other rights that the Administrative Agent or any of the Lenders may have hereunder or under applicable Law, each of the Loan Parties hereby agrees to indemnify (and pay upon demand to) the Administrative Agent, the Lenders and their respective affiliates, and the respective successors, assigns, officers, directors, partners, shareholders, managers, agents and employees (each of the foregoing, an **_"Indemnified Party"_**) from and against any and all damages, losses, claims, Taxes,

735706711 19631142
29164506

liabilities, costs, reasonable expenses and for all other amounts payable, including reasonable fees and disbursements of external counsel (including, without limitation, reasonable fees and disbursements of U.S. and Mexican counsel) incurred by or asserted against any of the Indemnified Parties in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of this Agreement or any Transaction Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) any Commitment, Advance or Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged release or presence of Hazardous Materials in violation of or giving rise to obligations under Environmental Laws on, at, under, to or migrating from any property or facility currently or formerly owned, leased or operated by any of the Loan Parties, or any of its affiliates or subsidiaries (or at which any of the Loan Parties or any of its Affiliates or Subsidiaries has arranged for or caused any release or disposal of hazardous materials), or any environmental action or environmental liability related to the Borrower or any of its affiliates or subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (all the foregoing, collectively, the "**Indemnified Amounts**"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnified Party and whether brought by an Indemnified Party, a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnified Party is a party thereto and whether or not any of the transactions contemplated hereby are consummated, ***excluding, however,*** in all of the foregoing instances:

> (A)    Indemnified Amounts to the extent a final judgment of a court of competent jurisdiction holds that such Indemnified Amounts resulted from gross negligence or willful misconduct on the part of the Indemnified Party seeking indemnification; or

> (B)    Taxes (which shall be governed by Sections 8.3 and 8.5) other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim or Taxes imposed on the Collateral or with respect to a transfer of the Collateral;

***provided, however,*** that nothing contained in this sentence shall limit the liability of any of the Loan Parties or limit the recourse of the Administrative Agent or the Lenders to the Loan Parties for amounts otherwise specifically provided to be paid by the Loan Parties under the terms of the Transaction Documents.  Without limiting the generality of the foregoing indemnification, each of the Loan Parties shall indemnify the Indemnified Parties for Indemnified Amounts relating to or resulting from:

> (i)    any representation or warranty made by any Loan Party (or any officers of any such Person) under or in connection with this Agreement, any other Transaction Document or any other information or report delivered or required to be delivered by any such Person pursuant hereto or thereto, which shall have been false or incorrect when made or deemed made;

> (ii)    the failure by any Loan Party to comply with any applicable Law with respect to any Contract, or the nonconformity of any Contract included therein with any such applicable Law or any failure of any Qualified Purchaser to keep or perform any of its obligations, express or implied, with respect to any Contract;

<div align="center">45</div>
<div align="center">*Credit Agreement*</div>

735706711 19631142
29164506

(iii)   any failure of any Loan Party to perform its duties, covenants or other obligations in accordance with the provisions of any Transaction Document to which it is a party;

(iv)   any environmental liability, products liability, personal injury or damage suit, or other similar claim arising out of or in connection with merchandise, insurance or services that are the subject of any Contract;

(v)   [reserved];

(vi)   the commingling of Collections at any time with other funds;

(vii)   any investigation, litigation or proceeding related to or arising from this Agreement or any other Transaction Document, the transactions contemplated hereby, the use of the proceeds of any Advance, the ownership of the Collateral or any other investigation, litigation or proceeding relating to any Loan Party in which any Indemnified Party becomes involved as a result of any of the transactions contemplated hereby;

(viii)   any inability to litigate any claim against any Qualified Purchaser in respect of any Contract as a result of such Qualified Purchaser being immune from civil and commercial law and suit on the grounds of sovereignty or otherwise from any legal action, suit or proceeding;

(ix)   any claim brought by any Person other than a Indemnified Party arising from any activity by the any Loan Party in servicing, administering or collecting any Collections;

(x)   any failure of any Loan Party to acquire and maintain legal and equitable title to, and ownership of any Inventory or other Collateral from the FBG Counterparties, free and clear of any Adverse Claim; or any failure of Borrower to give reasonably equivalent value to the applicable FBG Counterparty under the Purchase Agreement in consideration of the transfer by it of any Inventory, or any attempt by any Person to void such transfer under statutory provisions or common law or equitable action;

(xi)   any failure to vest and maintain vested in the Administrative Agent (for the benefit of the Secured Parties) a valid and perfected first priority perfected security interest under all applicable Laws in the Collateral, free and clear of any Adverse Claim;

(xii)   the failure to have filed, or any delay in filing, financing statements or other similar instruments or documents under the UCC of any applicable jurisdiction or other applicable laws with respect to any Collateral, whether on the date hereof or at any subsequent time;

(xiii)   the failure by any Loan Party to pay when due any Taxes, including, without limitation, sales, excise or personal property taxes;

(xiv)   any action or omission by any Loan Party which reduces or impairs the rights of the Administrative Agent or the Lenders with respect to any Collateral or the value of any Collateral;

<div align="center">46<br><em>Credit Agreement</em></div>

735706711 19631142
29164506

(xv)     any attempt by any Person to void any Advance or the Security Interest in the Collateral granted hereunder or in the Security Documents, whether under statutory provision, common law or equitable action;

(xvi)     any civil penalty or fine assessed by OFAC or any other Governmental Authority administering any Anti-Corruption Law, Anti-Money Laundering Laws or Sanctions, incurred in connection with the Transaction Documents; and

(xvii)     Collections being initially deposited in any bank account other than the Collection Account.

(xviii)     the inclusion of any Inventory in the calculation of the Borrowing Base as Eligible Inventory when it is not Eligible Inventory at the time so included.

Section 8.2     Indemnities by the Servicer.

(a)     Without limiting any other rights that the Administrative Agent or any Lender may have hereunder or under applicable law, each of the Borrower and Servicer jointly and severally hereby agrees to indemnify (and pay upon demand to) each Indemnified Party from and against any and all damages, losses, claims, Taxes, liabilities, costs, reasonable expenses and for all other amounts payable, including reasonable fees and disbursements of external counsel (including, without limitation, reasonable fees and disbursements of U.S. and Mexican counsel) (all of the foregoing being collectively referred to as *"Servicer Indemnified Amounts"*) awarded against or incurred by any of them arising out of or as a result of the Servicer's failure to duly and punctually perform its obligations under this Agreement, in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnified Party and whether brought by an Indemnified Party, a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnified Party is a party thereto and whether or not any of the transactions contemplated hereby are consummated, *excluding, however,* in all of the foregoing instances:

(A)     Servicer Indemnified Amounts to the extent a final judgment of a court of competent jurisdiction holds that such Servicer Indemnified Amounts resulted from gross negligence or willful misconduct on the part of the Indemnified Party seeking indemnification; and

(B)     Taxes (which shall be governed by Sections 8.3 and 8.5) other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim or Taxes imposed on the Collateral or with respect to a transfer of the Collateral.

*provided, however,* that nothing contained in this sentence shall limit the liability of the Borrower or Servicer or limit the recourse of the Administrative Agent or the Lenders to the Borrower or Servicer for Collections received by the Servicer and required to be remitted by it under the terms of this Agreement. Without limiting the generality of the foregoing indemnification, the Servicer shall indemnify the Indemnified Parties for Servicer Indemnified Amounts relating to or resulting from:

(i)     any representation or warranty made by any Loan Party or the Servicer (or any officers of any such Person) under or in connection with this Agreement, any other Transaction Document or any other information or report delivered or required to be delivered by any such

735706711 19631142
29164506

Person pursuant hereto or thereto, which shall have been false or incorrect when made or deemed made;

(ii)     the failure by the Servicer to comply with any applicable Law with respect to any Contract or the failure by the Servicer to keep or perform any of its obligations hereunder;

(iii)     any failure of by the Servicer to perform its duties, covenants or other obligations in accordance with the provisions of this Agreement or any other Transaction Document;

(iv)     the commingling of Collections or funds or other assets arising therefrom at any time with other funds;

(v)     any investigation, litigation or proceeding relating to the Servicer in which any Indemnified Party becomes involved as a result of any of the transactions contemplated hereby, by any Contract or by any other Transaction Document;

(vi)     any amounts payable by the Administrative Agent to the Collection Account Bank under the Collection Account Control Agreement;

(vii)     any attempt by any Servicer to void any Security Interest in the Collateral granted hereunder or in the Security Documents, whether under statutory provision, common law or equitable action;

(viii)     any civil penalty or fine assessed by OFAC or any other Governmental Authority administering any Anti-Corruption Law, Anti-Money Laundering Laws or Sanctions, incurred in connection with the Transaction Documents;

(ix)     Collections being initially deposited in any bank account other than the Collection Account;

(x)     any action or omission by the Servicer relating to its obligations hereunder or under any other Transaction Document which reduces or impairs the rights of the Administrative Agent or the Lenders with respect to any Collections or the value thereof; and

(xi)     the inclusion of any Inventory in the calculation of the Borrowing Base as Eligible Inventory when it is not Eligible Inventory at the time so included.

Notwithstanding anything to the contrary in any Transaction Document, if any Loan Party is required to make any payment on account of Taxes under Section 8.5, or on or in relation to any of the transactions contemplated hereunder or under the other Transaction Documents (including, without limitation, any Taxes imposed by any jurisdiction as a result of such Loan Party having or being deemed to have a permanent establishment or other taxable presence (outside the United States) due to the activities of the Servicer, a Sub-Servicer or the Borrower in the jurisdiction imposing such Taxes), the Servicer undertakes in each case to promptly indemnify such Loan Party against such payment or liability, together with any interest, penalties and expenses payable or incurred in connection therewith.

Section 8.3     Increased Cost and Reduced Return.

735706711 19631142
29164506

(a)      If after the Closing Date, the Administrative Agent or any Lender shall be charged any fee, expense or increased cost on account of the adoption after the date hereof of any applicable Law, rule or regulation (including any applicable Law, rule or regulation regarding capital adequacy and any accounting principles) or any change after the date hereof in any applicable Law, rule or regulation, or any change after the date hereof in the interpretation or administration of any applicable Law, rule or regulation by the Financial Accounting Standards Board or any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency (a *"Regulatory Change"*): (a) that subjects the Administrative Agent or any Lender to any Taxes—other than Indemnified Taxes, Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and Connection Income Taxes—on its interest in the Collateral or its Commitment or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, (b) that imposes, modifies or deems applicable any reserve, assessment, liquidity requirement, compulsory loan, insurance or other insurance-related charge, special deposit or similar requirement against assets of, deposits with or for the account of the Administrative Agent or a Lender, or credit extended or any commitments to extend credit by the Administrative Agent or any Lender pursuant to this Agreement or any other Transaction Document, or (c) that imposes any other condition the result of which is to increase the cost to the Administrative Agent or any Lender of performing its obligations under the Transaction Documents, or to reduce the rate of return on the Administrative Agent's or any Lender's capital as a consequence of its obligations under the Transaction Documents, or to reduce the amount of any sum received or receivable by the Administrative Agent or any Lender under any Transaction Document or to require any payment calculated by reference to the amount of interests in Collateral, then, upon demand by the Administrative Agent or such Lender, Borrower shall pay to the Administrative Agent or such Lender such amounts charged to such Person amounts to otherwise compensate such Person for such increased cost or such reduction; *provided that* notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act adopted on July 21, 2010 and all requests, rules, guidelines or directives thereunder and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a *"Regulatory Change"*, regardless of the date enacted, adopted or issued.  For the avoidance of doubt, payments under this <u>Section 8.3</u> in respect of increased Taxes shall be without duplication of any Taxes payable pursuant to <u>Section 8.5</u>.

(b)      In the event of (a)  the payment of any principal of any SOFR Loan other than on the last day of the Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any SOFR Loan other than on the last day of the Interest Period applicable thereto (including as a result of an Event of Default), (c) the failure to borrow, convert, continue or prepay any SOFR Loan on the date specified in any notice delivered pursuant hereto, or (d)  the assignment of any SOFR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower, then, in any such event, the Borrower shall compensate each Lender for any loss, cost and expense attributable to such event, including any loss, cost or expense arising from the liquidation or redeployment of funds or from any fees payable.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

735706711 19631142
29164506

(c)     Delay in Requests.  Failure or delay on the part of the Administrative Agent or any Lender to demand compensation pursuant to this Section 8.3 shall not constitute a waiver of the Administrative Agent's or such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate the Administrative Agent or any Lender pursuant to this Section 8.3 for any increased costs incurred or reductions suffered more than nine months prior to the date that the Administrative Agent or such Lender, as the case may be, notifies the Borrower of the Regulatory Change giving rise to such increased costs or reductions, and of the Administrative Agent's or such Lender's intention to claim compensation therefor (except that, if the Regulatory Change giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 8.4     Other Costs and Expenses.  The Loan Parties shall pay, within ten (10) days following receipt of an invoice therefor: all out-of-pocket fees, costs and expenses incurred by the Administrative Agent and the Lenders (including, without limitation, reasonable fees, charges and disbursements of U.S. and Mexican counsel for the Administrative Agent and U.S. and Mexican counsel for the Lenders), in connection with (i) the preparation, negotiation, execution, delivery and administration of this Agreement and the other Transaction Documents (including (x) amounts incurred by the Administrative Agent and/or the Lenders in connection with certificates, searches and reports ordered by the Administrative Agent and/or the Lenders with respect to the Loan Parties during the term of this Agreement and the structuring and preparation of any proposal, commitment or financing documents) or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) financial, legal and collateral due diligence (including, without limitation, travel costs and expenses); and

(b)     all out-of-pocket fees and expenses incurred by the Administrative Agent or any Lender (including the fees, charges and disbursements of one primary outside counsel to the Administrative Agent and the Lenders taken as a whole, and, if necessary, one local counsel in each relevant jurisdiction and special counsel and, in the event of any actual or potential conflict of interest, one additional counsel for each Lender subject to such conflict), in connection with (i) the enforcement or protection of its rights in connection with this Agreement and the other Transaction Documents, including its rights under this Section 8.4, and the documents and instruments referred to herein and therein or in connection with the Loans, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any of the Collateral or (iii) any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings (including, in each case, the fees and disbursements of counsel and consultants for the Administrative Agent and the Lenders).

Section 8.5     Taxes.

(a)     Any and all payments by or on account of any obligation of Borrower under any Transaction Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of Borrower) requires the deduction or withholding of any Tax from any such payment by Borrower, Servicer or the Administrative Agent, then such Person shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such

<div align="center">50</div>
<div align="center">*Credit Agreement*</div>

735706711 19631142
29164506

<div align="center">**JOINT EXHIBIT NO. 18**</div>
<div align="center">**Page 244 of 812**</div>

Case 25-90399   Document 3503-20   Filed in TXSB on 12/04/25   Page 58 of 178

deductions and withholdings applicable to additional sums payable under this Section 8.5) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)       Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the written request of the applicable Recipient timely reimburse it for the payment of, any Other Taxes.

(c)       Borrower and Servicer shall indemnify each Recipient, on the first Payment Date which is at least forty-five (45) days after demand therefor, for the full amount of any (I) Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 8.5) payable or paid by such Recipient and any reasonable out-of-pocket expenses arising therefrom or with respect thereto other than any penalties or interest resulting from the gross negligence or willful misconduct of such Recipient, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; *provided, however,* that any amount of penalties and interest shall only be payable so long as such amounts have accrued on or after the date which is one hundred eighty (180) days prior to the date on which such Recipient firm made a demand therefor; *provided* that if the Borrower reasonably believes that such Taxes were not correctly asserted, such Recipient will use reasonable efforts to cooperate with the Borrower to obtain a refund of such Taxes (which shall be repaid to the Borrower in accordance with subsection 8.5(e)) so long as such efforts would not, in the sole determination of such Recipient result in any additional out-of-pocket costs or expenses not reimbursed by the Borrower or be otherwise disadvantageous to such Recipient.  Each Recipient will promptly notify Borrower of any event of which it has knowledge, which will entitle such Recipient to compensation pursuant to this Section 8.5; *provided, however,* that failure of any Recipient to demand indemnification for any Taxes shall not constitute a waiver of such right to indemnification.  Any notice claiming indemnification under this Section 8.5 shall set forth in reasonable detail the additional amount or amounts to be paid to it hereunder and shall be conclusive in the absence of manifest error.  Borrower shall indemnify each Recipient for any damages and losses from any breach of the covenants in Section 5.1(u) and for any failure of Borrower to make any payment required pursuant to this Section 8.5.

(d)       Each Recipient agrees that it will use reasonable efforts to reduce or eliminate any claim for indemnity pursuant to this Section 8.5, including, subject to applicable law, a change in the funding office of such Recipient; *provided, however,* that nothing contained herein shall obligate any Recipient to take any action that imposes on such Recipient any additional unreimbursed costs or imposes material legal or regulatory burdens, or that would otherwise be disadvantageous to such Recipient.  Borrower hereby agrees to pay all reasonable costs and expenses incurred by a Recipient in connection with any such action.

(e)       If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 8.5 (including by the payment of additional amounts pursuant to this Section 8.5), it shall pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made under this Section 8.5 with respect to the Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Borrower, upon the request of such Recipient, shall repay to such Recipient the amount paid over pursuant to this clause (e) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Recipient is required to repay

735706711 19631142
29164506

such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this clause (e), in no event will the Recipient be required to pay any amount to Borrower pursuant to this clause (e) the payment of which would place the Recipient in a less favorable net after-Tax position than the Recipient would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any Recipient to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to Borrower or any other Person.

(f)      Each Lender shall deliver to Borrower, Servicer and the Administrative Agent, on or prior to the date on which such Lender becomes a Lender under this Agreement and as otherwise prescribed by applicable law or reasonably requested by Borrower or the Administrative Agent, such valid, properly completed and duly executed forms, certificates and documentation (including, as applicable, Internal Revenue Service Form W-8ECI, W-8BEN-E, W-8IMY or W-9 or successor form of the foregoing), along with any applicable attachments (including, in case of a Person claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, a certificate reasonably satisfactory to Borrower to the effect that such Person is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a **"10 percent shareholder"** of Borrower or Servicer within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code), prescribed by applicable law or reasonably requested by Borrower, Servicer or the Administrative Agent as will enable Borrower, Servicer or the Administrative Agent to determine whether or not such Lender is entitled to any exemption from or reduction in the rate of withholding.  Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower, Servicer and Administrative Agent, in writing of its legal inability to do so.  Each Lender shall replace or update such forms when necessary to maintain any applicable exemption or reduction (if applicable) and as requested by the Administrative Agent or Borrower, as applicable.  Each Lender agrees to indemnify the Administrative Agent for and hold the Administrative Agent harmless from (i) any Indemnified Taxes attributable to such Lender (but only to the extent that Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of Borrower to do so), (ii) any Taxes relating to payments by Borrower to such Lender or such indemnitee arising from such Lender's failure to comply with this Section 8.5(f) or with the provisions of Section 10.6(a) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case together with any reasonable expenses arising therefrom or with respect thereto, regardless of whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  Any notice claiming indemnification under this Section 8.5(f) shall set forth in reasonable detail the additional amount or amounts to be paid to it hereunder and shall be conclusive in the absence of manifest error.  Each Lender hereby authorizes the Administrative Agent to set off any apply any and all amounts at any time owing to such Lender hereunder or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this Section 8.5(f).

(g)      If a payment made to the Administrative Agent or any Lender hereunder would be subject to U.S. federal withholding Tax imposed by FATCA if such payee were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such payee shall deliver to Borrower at the time or times prescribed by law and at such time or times reasonably requested by Borrower, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such

735706711 19631142
29164506

additional documentation reasonably requested by Borrower as may be necessary for Borrower to comply with its obligations under FATCA and to determine that such payee has complied with such payee's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this underline(g), the term **"FATCA"** shall include any amendments made to FATCA after the date of this Agreement.

(h)    If the Administrative Agent is a "United States person" (as defined in Section 7701(a)(30) of the Code), it shall provide the Borrower with two duly completed copies of Internal Revenue Service Form W-9. If the Administrative Agent is not a "United States person" (as defined in Section 7701(a)(30) of the Code), it shall provide (1) executed copies of Internal Revenue Service Form W-8ECI with respect to any amounts payable to the Administrative Agent for its own account and (2) executed copies of United States Internal Revenue Service Form W-8IMY certifying on Part I and Part VI of such Form W-8IMY that it is a U.S. branch that has agreed to be treated as a U.S. person for U.S. federal withholding tax purposes with respect to payments received by it from the Borrower.  The Administrative Agent shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide the certification described in the prior sentence.

Section 8.6    Currency Indemnity.

(a)    If, for the purpose of obtaining judgment in any court, it is necessary to convert an amount owing hereunder in one currency into another currency, each party hereto agrees, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that provided for in the definition of Spot Rate.

(b)    The obligations of Borrower and Servicer in respect of any amount due to any party hereto (or their respective assigns) or any holder of the obligations owing hereunder or under any other Transaction Agreement (the "**Applicable Creditor**") shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than the currency in which such amount is stated to be due hereunder (the "**Agreement Currency**"), be discharged only to the extent that, on the Business Day following receipt by the Applicable Creditor of any amount adjudged to be so due in the Judgment Currency, the Applicable Creditor may in accordance with normal banking procedures in the relevant jurisdiction purchase the Agreement Currency with the Judgment Currency; if the amount of the Agreement Currency so purchased is less than the sum originally due to the Applicable Creditor in the Agreement Currency, the Borrower or Servicer, as the case may be, shall, as a separate obligation and notwithstanding any such judgment, indemnify the Applicable Creditor against such loss.

(c)    Any indemnification under this Section shall survive the termination of this Agreement.

## ARTICLE IX.

## THE ADMINISTRATIVE AGENT

Section 9.1    Appointment.

(a)    Each Lender hereby irrevocably designates and appoints GLAS Trust Company LLC, as Administrative Agent hereunder, and authorizes the Administrative Agent to take such action on its behalf under the provisions of the Transaction Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of the Transaction Documents,

53
*Credit Agreement*

735706711 19631142
29164506

Case 25-90399   Document 3563-20   Filed in TXSB on 12/30/25   Page 61 of 178

together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities on the part of the Administrative Agent shall be read into this Agreement or otherwise exist against the Administrative Agent. Also, each Lender hereby authorizes and appoints the Administrative Agent as an agent (*comisionista*) and consequently each Lender grants to the Administrative Agent a *comisión mercantil con representación* pursuant to Articles 273, 274 and other applicable Articles of the Mexican Commerce Code (*Código de Comercio*) to execute, deliver and perform any of the Transaction Document, and any other document or agreement derived, related or ancillary thereto which the Administrative Agent is a party, as well as any other document, agreement or instrument necessary or convenient for the delivery, perfection, execution and foreclosure of the referred agreement and any other collateral that may be granted in connection with any of the Transaction Documents or any of the Loans. Each such Lender irrevocably authorizes the Administrative Agent, as the agent for such Lender, to take such action on its behalf and in Administrative Agent's designated capacity under the provisions of this Agreement and the other Transaction Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Transaction Documents, together with such other powers as are reasonably incidental thereto. Furthermore, each of the Lenders hereby authorizes the Administrative Agent to delegate the abovementioned *comisión mercantil con representación* pursuant to Article 280 and any other applicable Articles of the Mexican Commerce Code (*Código de Comercio*) to the extent permitted by and under the terms provided in any of the Transaction Documents. Notwithstanding any provision to the contrary elsewhere in this Agreement and the other Transaction Documents, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein or therein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Transaction Document or otherwise exist against the Administrative Agent and in favor of Lenders.

(b)     The provisions of this Article IX are solely for the benefit of the Administrative Agent and the Lenders, and the Loan Parties shall not have any rights as a third-party beneficiary or otherwise under any of the provisions of this Article IX (other than as provided in Section 9.9), except that this Article IX shall not affect any obligations which the Administrative Agent or any Lender may have to any of the Loan Parties under the other provisions of this Agreement.

(c)     In performing its functions and duties hereunder, the Administrative Agent shall act solely as the Administrative Agent of the Lenders and does not assume nor shall be deemed to have assumed any obligation or relationship of trust or agency with or for any of the Loan Parties or any of their respective successors and assigns.

Section 9.2     Delegation of Duties.  The Administrative Agent may execute any of its duties under the applicable Transaction Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

Section 9.3     Exculpatory Provisions.  Neither the Administrative Agent nor any of its directors, officers, agents or employees shall be (i) liable for any action lawfully taken or omitted to be taken by it

735706711 19631142
29164506

or them or any Person described in Section 9.2 under or in connection with the Transaction Documents (except for its, their or such Person's own gross negligence, fraud or willful misconduct), or (ii) responsible in any manner to any of the Lenders or other agents for any recitals, statements, representations or warranties made by Borrower contained in any Transaction Document or in any certificate, report, statement or other document referred to or provided for in, or received under or in connection with, any Transaction Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other document furnished in connection herewith, or for any failure of either of Loan Parties to perform its respective obligations hereunder, or for the satisfaction of any condition specified in Article IV, except receipt of items required to be delivered to the Administrative Agent.  The Administrative Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements or covenants contained in, or conditions of, any Transaction Document, or to inspect the properties, books or records of Loan Parties.  This Section 9.3 is intended solely to govern the relationship between the Administrative Agent, on the one hand, and the Lenders, on the other.  In no event shall the Administrative Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes, pandemics or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.  In no event shall the Administrative Agent be liable for any indirect, special, punitive or consequential loss or damage of any kind whatsoever, including, but not limited to, lost profits, even if such loss or damage was foreseeable or it has been advised of the likelihood of such loss or damage and regardless of the form of action.

Section 9.4    Reliance by the Administrative Agent and the Lenders.

(a)    Each of the Administrative Agent and the Lenders shall in all cases be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, facsimile, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to Loan Parties), independent accountants and other experts selected by the Administrative Agent or such Lender.  The Administrative Agent shall be entitled to seek written directions from the requisite Lenders prior to taking any action under this Agreement or any of the Transaction Documents. The Administrative Agent shall in all cases be fully justified in failing or refusing to take any action under this Agreement or any other Transaction Document unless it shall first receive such written consent of the requisite Lenders.

(b)    Any action taken by the Administrative Agent in accordance with Section 9.4(a) shall be binding upon all Lenders.

Section 9.5    Notice of Events of Default.  The Administrative Agent and the Lenders shall not be deemed to have knowledge or notice of the occurrence of any Event of Default or Default unless it has received notice from another party referring to this Agreement, stating that an Event of Default or Default has occurred hereunder and describing such Event of Default or Default.  In the event that the Administrative Agent or one of the Lenders receives such a notice, it shall promptly give notice thereof to the other Lenders.  The Administrative Agent shall take such action with respect to such Event of Default or Default as shall be directed by either of the Lenders.

55
*Credit Agreement*

735706711 19631142
29164506

Section 9.6    Non-Reliance on the Administrative Agent or Other Lender.  Each of the Lenders expressly acknowledges that the Administrative Agent, the other Lender, and the respective officers, directors, employees, agents, attorneys-in-fact or affiliates of any of the foregoing has made no representations or warranties to it and that no act by the Administrative Agent or the other Lender hereafter taken, including, without limitation, any review of the affairs of Loan Parties, shall be deemed to constitute any representation or warranty by the Administrative Agent or such other Lender.  Each of the Lenders also represents and warrants to the Administrative Agent and the other Lender that it has, independently and without reliance upon any such Person (or any of their Affiliates) and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, prospects, financial and other conditions and creditworthiness of Loan Parties and made its own decision to enter into this Agreement.  Each of the Lenders also represents that it will, independently and without reliance upon any of the Administrative Agent or the other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, prospects, financial and other condition and creditworthiness of Loan Parties.  The Administrative Agent, the Lenders and the respective Affiliates of the foregoing, shall have no duty or responsibility to provide any party to this Agreement with any credit or other information concerning the business, operations, property, prospects, financial and other condition or creditworthiness of Loan Parties which may come into the possession of such Person or any of its respective officers, directors, managers, employees, agents, attorneys-in-fact or affiliates.

Section 9.7    Indemnification of the Administrative Agent.  The Lenders severally agree to indemnify the Administrative Agent and its officers, directors, employees, representatives and agents (to the extent not reimbursed by Loan Parties and Guarantors and without limiting the obligation of Loan Parties and Guarantors to do so), ratably in accordance with their respective Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for the Administrative Agent or such Person in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not the Administrative Agent acts in its capacity as Administrative Agent, or such Person shall be designated a party thereto) that may at any time be imposed on, incurred by or asserted against the Administrative Agent or such Person as a result of, or arising out of, or in any way related to or by reason of, any of the transactions contemplated hereunder or the execution, delivery or performance of this Agreement or any other document furnished in connection herewith (but excluding any such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from the gross negligence, fraud or willful misconduct of the Administrative Agent or such Person, as the case may be, as finally determined by a court of competent jurisdiction).  The Administrative Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

Section 9.8    Administrative Agent in Its Individual Capacity.  The Administrative Agent in its individual capacity and the affiliates thereof may make loans to accept deposits from and generally engage in any kind of business with Loan Parties and their Affiliates as though the Administrative Agent were not the Administrative Agent hereunder.  With respect to its Loans, if any, the Administrative Agent shall have

735706711 19631142
29164506

the same rights and powers under this Agreement as any Lender and may exercise the same as though it were not one of the Administrative Agent, and the terms "Lender" and "Lenders" shall include the Administrative Agent in its individual capacity.

Section 9.9     Successor Administrative Agent.

(a)     The Administrative Agent may at any time give written notice of its resignation to the Lenders and Borrower.  Upon receipt of any such notice of resignation, the Lenders shall have the right, with, prior to the occurrence of an Event of Default, the consent of Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Lenders) (the *"Resignation Closing Date"*), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Closing Date.  Upon resignation or replacement of any Administrative Agent in accordance with this Section 9.9, the retiring Administrative Agent shall execute or authorize the filing of such UCC-3 assignments and amendments, and assignments and amendments of the Transaction Documents, as may be necessary to give effect to its replacement by a successor Administrative Agent.  After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of Article VIII and this Article IX shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.

(b)     If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Lenders may, to the extent permitted by applicable law, by written notice in writing to Borrower and such Person remove such Person as Administrative Agent and, in consultation with Borrower, appoint a successor.  If no such successor shall have been so appointed by the Lenders and shall have accepted such appointment within thirty (30) days after delivery of such notice (or such earlier day as shall be agreed by the Lenders) (the *"Removal Closing Date"*), then such removal shall nonetheless become effective in accordance with such notice on the Removal Closing Date.

(c)     With effect from the Resignation Closing Date or the Removal Closing Date (as applicable) (1) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Transaction Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Transaction Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (2) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Administrative Agent (other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Closing Date or the Removal Closing Date, as applicable), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Transaction Documents

735706711 19631142
29164506

(if not already discharged therefrom as provided above in this Section).  The fees payable by Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor.  After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Transaction Documents, the provisions of this Article IX and Section 9.7 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

Section 9.10    Collateral.  Each of the Lenders hereby expressly recognizes and agrees that the Administrative Agent may be designated as the secured party of record on the various filings (including without limitation UCC filings) or registrations required to be made under this Agreement in order to perfect their respective interests in the Collateral and the party entitled to amend, release and terminate any such filings or registrations, and that such designation shall be for administrative convenience only in creating a record or nominee holder to take certain actions hereunder on behalf of the Lenders and that such listing will not affect in any way the status of the Lenders as the true parties in interest with respect to the Collateral.  In addition, such listing shall impose no duties on the Administrative Agent other than those expressly and specifically undertaken in accordance with this Article IX.  Notwithstanding anything in the Transaction Documents to the contrary, the Administrative Agent shall have no responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder. The Administrative Agent shall not be responsible for (i) the existence, genuineness or value of any of the Collateral, (ii) the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, fraud, bad faith or willful misconduct on the part of the Administrative Agent, (iii) the validity or sufficiency of the Collateral or any agreement or assignment contained therein, (iv) the validity of the title to the Collateral or (v) insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.  Other than as expressly set forth in Section 9.11 below, the Administrative Agent shall have no duty to ascertain or inquire as to or monitor the performance or observance of any of the terms of any other Transaction Documents by any other Person.

Section 9.11    Borrowing Base.  The Administrative Agent shall (a) check whether the Borrower has provided a Borrowing Base Certificate as and when required under this Agreement; (b) examine each Borrowing Base Certificate provided to it to ensure that the calculations made by the Borrower in the relevant Borrowing Base Certificate, based on the figures set out therein, are, on their face, accurate; (c) to the extent requested by any Lender, liaise with the Borrower to seek clarification and further information in relation to the calculations set out in each Borrowing Base Certificate; and (d) furnish to each Lender a copy of each Borrowing Base Certificate received by it by placing it in an online portal as agreed between the Administrative Agent and the Lenders.  The Administrative Agent is not, and shall not be held to be, liable for any information contained in the Borrowing Base Certificate (including without limitation, any inaccurate valuations or calculations contained therein) or any incorrect interest or fee calculations arising from any error in a Borrowing Base Certificate.

735706711 19631142
29164506

**JOINT EXHIBIT NO. 18**
**Page 252 of 812**

## ARTICLE X.

## ASSIGNMENTS; PARTICIPATIONS

Section 10.1    Assignments and Transfer of Commitments.  Each Lender shall have the right at any time or times to assign or transfer to an Eligible Assignee or any Affiliate of such Lender, without recourse, all or a portion of (a) that Lender's Commitment, and (b) all Loans made by that Lender; ***provided, however,*** in each such case, that the transferor and the transferee shall have complied with the following requirements:

(a)    No Prior Consent of Administrative Agent.  Assignments and transfers by any Lender may be consummated pursuant to this Section 10.1 without the prior written consent of the Administrative Agent;

(b)    Prior Consent of Borrower.  No assignments and/or transfers may be consummated pursuant to this Section 10.1 without the prior written consent of Borrower other than (i) an assignment or transfer by a Lender to another Lender or (ii) an assignment or transfer by any Lender to any Approved Fund or Affiliate of such Lender which consent of the Borrower shall not be unreasonably withheld, conditioned or delayed, provided however that no consent of the Borrower is needed for any assignment or transfer occurring during the existence of an Event of Default.

(c)    Minimum Amount.  No transfer may be consummated pursuant to this Section 10.1 (other than a transfer by any Lender to an Affiliate of such Lender) in an aggregate amount less than (a) one million U.S. Dollars ($1,000,000) or (b) if such Lender's Commitment is at any time less than one million U.S. Dollars ($1,000,000), the entire amount of such Lender's Commitment; and

(d)    Agreement; Transfer Fee.  Unless the transfer shall be to an Affiliate of the transferor or the transfer shall be due to merger of the transferor or for regulatory purposes, the transferor (A) shall remit to the Administrative Agent, for its own account, an administrative fee of three thousand five hundred U.S. Dollars ($3,500.00) (which fee may be waived or reduced in the sole discretion of the Administrative Agent) and (B) shall cause the transferee to execute and deliver to Borrower, the Administrative Agent and each Lender (1) an Assignment Agreement, in the form of Exhibit VI attached hereto and made a part hereof (an ***"Assignment Agreement"***) together with the consents thereto in writing, and (2) such additional amendments, assurances and other writings as the Administrative Agent may reasonably require.

(e)    Upon satisfaction of the requirements of this Section 10.1, including the payment of the fee and the delivery of the documents set forth above, (A) the transferee shall become and thereafter be deemed to be a "Lender" for the purposes of this Agreement, (B) if the transferor transfers all of its interest, the transferor shall cease to be and thereafter shall no longer be deemed to be a "Lender" and shall have no further rights or obligations under or in connection herewith, and (C) the signature pages hereof and Schedule A hereto shall be automatically amended, without further action, to reflect the result of any such transfer.

Section 10.2    The Register.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of Borrower, shall maintain a copy of each Assignment Agreement delivered to it and a register or similar list (the ***"Register"***) for the recordation of the names and addresses of the Lenders and the Commitment, Percentage, and principal amount (and stated interest) of the Loans owing to, each

735706711 19631142
29164506

Case 25-90399   Document 3563-20   Filed in TXSB on 12/04/25   Page 67 of 178

Lender from time to time.  The entries in the Register shall be conclusive, in the absence of manifest error, with respect to such information, and Borrower, the Administrative Agent and the Lenders shall treat each financial institution whose name is recorded in the Register pursuant to the terms hereof as the owner of the Loan recorded therein for all purposes of this Agreement.  The Register shall be available for inspection by Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.

Section 10.3    Certain Representations and Warranties; Limitations; Covenants.  By executing and delivering an Assignment Agreement, the parties to the assignment thereunder confirm to and agree with each other and the other parties hereto as follows:

(a)    Other than the representation and warranty that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim, the assigning Lender makes no representation and warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, the other Transaction Documents or any other instrument or document furnished pursuant hereto;

(b)    The assigning Lender makes no representation or warranty and assumes no responsibility of the financial condition of any Loan Party or any other Person primarily or secondarily liable in respect of any of the Indebtedness of Borrower to the Lenders, or the performance or observance by any Loan Party or any other Person primarily or secondarily liable in respect of any of the Indebtedness of Borrower to the Lenders or any of their obligations under this Agreement or any of the other Transaction Documents or any other instrument or document furnished pursuant hereto or thereto;

(c)    Such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 5.1 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into the Assignment Agreement;

(d)    Such assignee will, independently and without reliance upon the assigning Lender, the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement;

(e)    Such assignee represents and warrants that it is an Eligible Assignee;

(f)    Such assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Transaction Documents as are delegated to the Administrative Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto;

(g)    Such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender; and

(h)    Such assignee represents and warrants that it is legally authorized to enter into such Assignment Agreement.

735706711 19631142
29164506

Case 25-90399   Document 3563-20   Filed in TXSB on 11/04/25   Page 67 of 178

Section 10.4     No Assignment to Borrower.  No such assignment shall be made to Borrower or any of Borrower's Affiliates or Subsidiaries.

Section 10.5     No Assignment to Natural Persons.  No such assignment shall be made to a natural Person.

Section 10.6     Participations.  Each Lender shall have the right at any time or times, without the consent of any other party, to sell one or more participations or sub-participations to one or more financial institutions or any Affiliate of such Lender, in all or any part of that Lender's Commitment and any Loan made by that Lender.

(a)     Rights Reserved.  In the event any Lender shall sell any participation or sub-participation, that Lender shall, as between itself and the purchaser, retain all of its rights (including, without limitation, rights to enforce against the Loan Parties the Transaction Documents and any and all other documents in connection therewith) and duties pursuant to the Transaction Documents and any and all other documents in connection therewith, including, without limitation, that Lender's right to approve any waiver, consent or amendment pursuant to Section 9.02; ***provided, however,*** that (a) any such participation shall be in a minimum amount of one million U.S. Dollars ($1,000,000) and (b) the holder of any such participation shall not be entitled to require such Lender to take any action hereunder except action directly affecting (i) any reduction in the principal amount or an interest rate on any Loan in which such holder participates; (ii) any extension of the Maturity Date or the date fixed for any payment of Interest or principal payable with respect to any Loan in which such holder participates; and (iii) any reduction in the amount of any fees payable under this Agreement with respect to any Loan in which such holder participates.  Borrower hereby acknowledges and agrees that the participant under each participation (the ***"Participant"***) shall for purposes of Sections 8.3, 8.4 and 8.5 be considered to be a "Lender".  Except as otherwise set forth herein, no participant shall have any rights or obligations hereunder, and the Loan Parties and the Administrative Agent shall continue to deal solely and directly with the Lenders in connection with the Lenders' rights and obligations under this Agreement.  Borrower agrees that each Participant shall be entitled to the benefits of Section 8.5 (subject to the requirements and limitations therein, including the requirements under Sections 8.5(f) and 8.5(g) (it being understood that the documentation required under Sections 8.5(f) and 8.5(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.1; provided that such Participant (A) agrees to be subject to the provisions of Section 8.5(d) as if it were an assignee under Section 10.1; and (B) shall not be entitled to receive any greater payment under Section 8.3 or 8.5, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Regulatory Change that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Transaction Documents (the ***"Participant Register"***); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Transaction Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in

61
*Credit Agreement*

735706711 19631142
29164506

the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(b)      No Delegation.  No participation shall operate as a delegation of any duty of the seller thereof.  Under no circumstances shall any participation be deemed a novation in respect of all or any part of the seller's obligations pursuant to this Agreement.

Section 10.7      Pledge by Lenders.  Notwithstanding any other provision of this Article X, any Lender may at any time pledge all or any portion of its interest and rights under the Transaction Documents to any of the federal reserve banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. §341.  No such pledge or the enforcement thereof shall release the pledgor Lender from its obligations hereunder or under any of the other Transaction Documents.

## ARTICLE XI.

## GUARANTY

Section 11.1      Guaranty.  Each Guarantor hereby agrees that it is jointly and severally liable for, and, as primary obligor and not merely as surety, absolutely and unconditionally guarantees to the Secured Parties the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations (such costs and expenses, together with the Obligations, collectively the "Guaranteed Obligations"). Each Guarantor further agrees that the Guaranteed Obligations may, to the extent permitted by the terms of this Agreement or any other Transaction Document, be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of any Lender that extended any portion of the Guaranteed Obligations.

Section 11.2      Guaranty of Payment. This Guaranty is a guaranty of payment and not of collection. Each Guarantor waives any right to require the Administrative Agent, or any Lender to sue any Borrower, any Guarantor, any other guarantor, or any other person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

Section 11.3      No Discharge or Diminishment of Guaranty.

(a)      Except as otherwise provided for herein or in any other Transaction Document, the obligations of each Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including:  (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of any Borrower or any other

735706711 19631142
29164506

guarantor of or other person liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Guarantor may have at any time against any Obligated Party, the Administrative Agent, any Lender, or any other person, whether in connection herewith or in any unrelated transactions.

(b) The obligations of each Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c) Further, the obligations of any Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Administrative Agent, or any Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of any Borrower for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other person liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Administrative Agent, or any Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

Section 11.4    Defenses Waived.   To the fullest extent permitted by applicable law, each Guarantor hereby waives any defense based on or arising out of any defense of any Borrower or any Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of any Borrower or any Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against any Obligated Party, or any other person.  The Administrative Agent may, at its election, foreclose on any Collateral held by it by one or more judicial or non-judicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Guarantor under this Guaranty except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash.  To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any Obligated Party or any security.

Section 11.5    Subrogation.   No Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against

<div align="center">63</div>
<div align="center">*Credit Agreement*</div>

<div align="center">**JOINT EXHIBIT NO. 18**
**Page 257 of 812**</div>

any Obligated Party, or any collateral, until the Loan Parties and the Guarantors have fully performed all their obligations to the Administrative Agent, and the Secured Parties.

Section 11.6    Reinstatement; Stay of Acceleration If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of any Borrower or otherwise, each Guarantor's obligations under this Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Administrative Agent, and the Secured Parties are in possession of this Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of any Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantors forthwith on demand by the Lender.

Section 11.7    Information. Each Guarantor assumes all responsibility for being and keeping itself informed of the Loan Parties' financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Guaranty, and agrees that neither the Administrative Agent nor any Lender shall have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

Section 11.8    Maximum Liability.  The provisions of this Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Guaranty, then, notwithstanding any other provision of this Guaranty to the contrary, the amount of such liability shall, without any further action by the Guarantors or the Secured Parties, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "*Maximum Liability*").  This Section with respect to the Maximum Liability of each Guarantor is intended solely to preserve the rights of the Secured Parties to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other person or entity shall have any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law. Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor without impairing this Guaranty or affecting the rights and remedies of the Secured Parties hereunder, provided that, nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

Section 11.9    Contribution.  In the event any Guarantor (a "*Paying Guarantor*") shall make any payment or payments under this Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Guaranty, each other Guarantor (each a "*Non-Paying Guarantor*") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Applicable Percentage" of such payment or payments made, or losses suffered, by such Paying Guarantor.  For purposes of this Article X, each Non-Paying Guarantor's "Applicable Percentage" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's

735706711 19631142
29164506

Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from the Loan Parties after the date hereof (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Guarantor, the aggregate amount of all monies received by such Guarantors from the Loan Parties after the date hereof (whether by loan, capital infusion or by other means).  Nothing in this provision shall affect any Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Guarantor's Maximum Liability).  Each of the Guarantors covenants and agrees that its right to receive any contribution under this Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of the Guaranteed Obligations.  This provision is for the benefit of the Administrative Agent, the Secured Parties and the Guarantors and may be enforced by anyone, or more, or all of them in accordance with the terms hereof.

Section 11.10    Liability Cumulative.   The liability of each Loan Party as a Guarantor under this Article XI is in addition to and shall be cumulative with all liabilities of each Loan Party to the Administrative Agent and the Secured Parties under this Agreement and the other Transaction Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

Section 11.11    Holdings.

(a)      Holdings hereby represents and warrants to the Administrative Agent and the Lenders that, as of the date hereof, the net equity value of Holdings exceeds the product obtained by multiplying the Facility Limit by twenty (20) (the "Holdings Minimum Equity Value").

(b)      Holdings shall take such action as shall be necessary from time to time to ensure that the net equity value of Holdings, at all times, will not be less than the Holdings Minimum Equity Value.

(c)      Holdings shall conduct, transact and otherwise engage in and commit to conduct, transact and otherwise engage in only such operations and activities as are or shall be reasonably and directly related to its direct and indirect ownership of its subsidiaries, its obligations under the Transaction Documents and agreements relating to additional equity investments in Holdings so long as the same do not and will not result in any Change of Control.

## ARTICLE XII.

## MISCELLANEOUS

Section 12.1    Waivers and Amendments.

(a)      No failure or delay on the part of the Administrative Agent or any of the Lenders in exercising any power, right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude any other further exercise thereof or the exercise of any other power, right or remedy.  The rights and remedies herein provided

65

*Credit Agreement*

735706711 19631142
29164506

shall be cumulative and nonexclusive of any rights or remedies provided by law.  Any waiver of this Agreement shall be effective only in the specific instance and for the specific purpose for which given.

(b)      No provision of this Agreement may be amended, supplemented, modified or waived except in writing in accordance with the provisions of this Section 12.1(b).  This Agreement and the provisions hereof may only be amended, supplemented, modified or waived in a writing signed by Borrower, the Servicer, the Administrative Agent and the Lenders.

(c)      Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender, and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

Section 12.2      Notices.  Except as provided in this Section 12.2, all communications and notices provided for hereunder shall be in writing (including email, bank wire, facsimile or electronic transmission or similar writing) and shall be given to the other parties hereto at their respective addresses or facsimile numbers set forth on Schedule 12.2 hereto or at such other address or facsimile number as such Person may hereafter specify in writing for the purpose of notice to each of the other parties hereto.  Each such notice or other communication shall be effective (a) if given by facsimile or email, upon the receipt thereof, (b) if given by mail, three (3) Business Days after the time such communication is deposited in the mail with first class postage prepaid or (c) if given by any other means, when received at the address specified in this Section 12.2.

Section 12.3      Setoff; Ratable Payments.

(a)      If an Event of Default or Default shall have occurred and be continuing, each Lender and each of its respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Loan Party against any and all of the obligations of such Loan Party now or hereafter existing under this Agreement or any other Transaction Document to such Lender or its respective Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Transaction Document and although such obligations of such Loan Party may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; ***provided,*** that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 1.8 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the outstanding Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.

66
*Credit Agreement*

735706711 19631142
29164506

(b)      If an Event of Default or Default shall have occurred and be continuing, each Lender and each of its respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Servicer against any and all of the obligations of the Servicer now or hereafter existing under this Agreement or any other Transaction Document to such Lender or its respective Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Transaction Document and although such obligations of the Servicer may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; *provided*, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 1.8 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the outstanding Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.

(c)      The rights of each Lender and its respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have.  Each Lender agrees to notify Borrower, Servicer and the Administrative Agent promptly after any such setoff and application, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.  The provisions of this Section 12.3 shall not be construed to apply to any payment made by Borrower or Servicer pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender).

(d)      If any Lender (whether voluntary or involuntary, through the exercise of any right of by setoff or otherwise) has payment made to it with respect to any portion of the Obligations owing to such Lender (other than payments received pursuant to Section 8.3 or Section 1.9) in a greater proportion than that received by any other Lender entitled to receive a ratable share of such amount, such Lender agrees, promptly upon demand, to purchase for cash without recourse or warranty a portion of such Obligations held by the other Lenders so that after such purchase each Lender will hold its ratable proportion of such Obligations; *provided* that (i) if all or any portion of such excess amount is thereafter recovered from such Lender, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by any Loan Party or Guarantor pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant.

Section 12.4      Intended Tax Characterization.  The parties hereto intend and agree that, for the purposes of all Taxes, each Advance constitutes debt that is secured by the Collateral (the *"Intended Tax Characterization"*).  The parties hereto agree to report and otherwise to act for the purposes of all Taxes in a manner consistent with the Intended Tax Characterization.

735706711 19631142
29164506

Case 25-90399   Document 3563-20   Filed in TXSB on 12/04/25   Page 75 of 178

Section 12.5    Protection of Ownership and Security Interests.

(a)    Each Loan Party and Servicer agrees that from time to time, at the Loan Parties' expense, it will promptly execute and deliver all instruments and documents, and take all actions, that may be necessary or desirable, or that the Administrative Agent may reasonably request, to perfect, protect or more fully evidence the Administrative Agent's Security Interest (on behalf of the Lenders) in the Collateral, or to enable the Administrative Agent or the Lenders to exercise and enforce their rights and remedies hereunder.  At any time after the occurrence of an Event of Default, the Administrative Agent may direct any of the Loan Parties or the Servicer to notify each Qualified Purchaser, at the Loan Parties' expense, of the ownership or Security Interests of the Administrative Agent (on behalf of the Lenders) under this Agreement, and if such notification is not made within five (5) days after the Administrative Agent has so directed Borrower and the Servicer, the Administrative Agent may make such notification. Borrower or the Servicer (as applicable) shall, at the Administrative Agent's or any Lender's request, withhold the identity of the Administrative Agent or such Lender in any such notification.

(b)    If any of the Loan Parties or Servicer fails to perform any of its obligations hereunder, the Administrative Agent or any Lender may (but shall not be required to) perform, or cause performance of, such obligations, and the Administrative Agent's or such Lender's costs and expenses incurred in connection therewith shall be payable by the Loan Parties as provided in Section 8.4.

Section 12.6    Confidentiality.

(a)    General.  The Administrative Agent and each Lender agree to keep confidential all information obtained from the Loan Parties, the FBG Counterparties and their respective Affiliates, which is nonpublic and confidential or proprietary in nature (including without limitation any information a Loan Party specifically designates as confidential), except as provided below, and to use such information only in connection with this Agreement and for the purposes contemplated hereby.  The Administrative Agent and each Lender shall be permitted to disclose such information (i) to outside legal counsel, accountants and other professional advisors who need to know such information in connection with the administration and enforcement of this Agreement, subject to agreement of such Persons to maintain the confidentiality of such information in accordance with the terms hereof, (ii) to assignees and Participants as contemplated by Section 10.6, and prospective assignees and participants, subject to the agreement of such Persons to maintain the confidentiality of such information in accordance with the terms hereof, (iii) to the extent requested by any bank regulatory authority or, with notice to the applicable Loan Party, as otherwise required by applicable Law or by any subpoena or similar legal process, or in connection with any investigation or proceeding arising out of the transactions contemplated by this Agreement or the other Transaction Documents, (iv) in connection with the exercise of any remedies hereunder or under any other Transaction Document or any action or proceeding relating to this Agreement or any other Transaction Document or the enforcement of rights hereunder or thereunder, (v) if it becomes publicly available other than as a result of a breach of this Agreement or becomes available from a source not known to be subject to confidentiality restrictions, or (vi) if the applicable Loan Party, the applicable FBG Counterparty, or the applicable Affiliate of the foregoing shall have consented, in writing, to such disclosure. Notwithstanding anything herein to the contrary, the information subject to this Section 12.6 shall not include, and the Administrative Agent and the Lenders may disclose without limitation of any kind, any information with respect to the "Tax treatment" and "Tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Administrative

68
*Credit Agreement*

Agent or such Lender relating to such Tax treatment and Tax structure; *provided* that with respect to any document or similar item that in either case contains information concerning the Tax treatment or Tax structure of the transaction as well as other information, this sentence shall only apply to such portions of the document or similar item that relate to the Tax treatment or Tax structure of the Loans and transactions contemplated hereby.

(b)  <u>Sharing Information with Affiliates of the Lenders</u>.  The Loan Parties acknowledge that from time to time financial advisory, investment banking and other services may be offered or provided to the Loan Parties or one or more of its Affiliates (in connection with this Agreement or otherwise) by the Administrative Agent, a Lender or by one or more Subsidiaries or Affiliates thereof and each Loan Party hereby authorizes the Administrative Agent and the Lenders to share any information delivered to the Administrative Agent or such Lender by any Loan Party pursuant to this Agreement, or in connection with the decision of any Lender to enter into this Agreement, to any such Subsidiary or Affiliate of the Administrative Agent or such Lender, it being understood that any such Subsidiary or Affiliate of such Person receiving such information shall be bound by the provisions of this <u>Section 12.6</u> as if it were a Lender hereunder.  Such authorization shall survive the repayment of the Loans and termination of the Commitments.

Section 12.7    <u>CHOICE OF LAW</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW WHICH SHALL APPLY HERETO) EXCEPT TO THE EXTENT THAT THE PERFECTION OF THE ADMINISTRATIVE AGENT'S SECURITY INTEREST IN THE COLLATERAL OR REMEDIES HEREUNDER IN RESPECT THEREOF ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

Section 12.8    <u>CONSENT TO JURISDICTION</u>.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, NEW YORK, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY DOCUMENT EXECUTED BY SUCH PERSON PURSUANT TO THIS AGREEMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM.   NOTHING HEREIN SHALL LIMIT THE RIGHT OF THE ADMINISTRATIVE AGENT OR THE LENDERS TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY OR HOLDINGS IN THE COURTS OF ANY OTHER JURISDICTION.  ANY JUDICIAL PROCEEDING BY ANY LOAN PARTY AGAINST THE ADMINISTRATIVE AGENT OR THE LENDERS OR ANY AFFILIATE THEREOF INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY DOCUMENT EXECUTED BY SUCH LOAN PARTY OR HOLDINGS PURSUANT TO THIS AGREEMENT SHALL BE BROUGHT ONLY IN A COURT IN THE BOROUGH OF MANHATTAN, NEW YORK.<u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT, ANY DOCUMENT EXECUTED BY ANY LOAN PARTY OR HOLDINGS PURSUANT TO THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER OR THEREUNDER.

735706711 19631142
29164506

Section 12.10    Integration; Binding Effect; Survival of Terms.

(a)    This Agreement and each other Transaction Document contain the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof superseding all prior oral or written understandings.

(b)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns (including any trustee in bankruptcy) except that (i) the none of the Loan Parties, Guarantors or Servicer may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrowers without such consent shall be null and void).  This Agreement shall create and constitute the continuing obligations of the parties hereto in accordance with its terms and shall remain in full force and effect until terminated in accordance with its terms; ***provided, however,*** that the rights and remedies with respect to (i) any breach of any representation and warranty made by the Borrower or Servicer pursuant to Article V, (ii) the indemnification and payment provisions of Article VIII, (iii) Sections 12.5 through and including 12.9 and (iv) Sections 9.7 and 12.13, shall be continuing and shall survive any termination of this Agreement.

Section 12.11    Counterparts; Severability; Section References.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement.  To the fullest extent permitted by applicable law, delivery of an executed counterpart of a signature page of this Agreement by telefacsimile or electronic image scan transmission (such as a "pdf" file) will be effective to the same extent as delivery of a manually executed original counterpart of this Agreement.  Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Unless otherwise expressly indicated, all references herein to ***"Article," "Section," "Schedule"*** or ***"Exhibit"*** shall mean articles and sections of, and schedules and exhibits to, this Agreement.

Section 12.12    Mutual Negotiations .  This Agreement and the other Transaction Documents are the product of mutual negotiations by the parties thereto and their counsel, and no party shall be deemed the draftsperson of this Agreement or any other Transaction Document or any provision hereof or thereof or to have provided the same.  Accordingly, in the event of any inconsistency or ambiguity of any provision of this Agreement or any other Transaction Document, such inconsistency or ambiguity shall not be interpreted against any party because of such party's involvement in the drafting thereof.

Section 12.13    Bankruptcy Petition.  Servicer hereby covenants and agrees that, prior to the date that is one (1) year and one (1) day after the date after the Termination Date, it will not institute against, or join any other Person in instituting against, Borrower any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings or other similar proceeding under the Laws of the United States or any state of the United States.

Section 12.14    USA PATRIOT Act; Anti-Money Laundering Laws.  The Administrative Agent and each Lender hereby notifies the Borrower that pursuant to the requirements of the PATRIOT Act or any other Anti-Money Laundering Laws, each of them is required to obtain, verify and record information that

735706711 19631142
29164506

identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender to identify each Loan Party in accordance with the PATRIOT Act or such Anti-Money Laundering Laws.

[Signature pages to follow]

71
*Credit Agreement*

735706711 19631142
29164506

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date hereof.

**CARNABY INVENTORY III, LLC**, AS BORROWER

By: _____

Name: Edward James

Title: Executive Vice President

**FIRST BRANDS GROUP HOLDINGS, LLC**, AS GUARANTOR

By: _____

Name: Michael Baker

Title: Chief Corporate Strategy Officer

**CARNABY INVENTORY HOLDINGS III, LLC**, AS GUARANTOR

By: _____

Name: Edward James

Title: Executive Vice President

**FIRST BRANDS GROUP, LLC,** AS THE SERVICER

By: _____

Name: Michael Baker

Title: Chief Corporate Strategy Officer

*Credit Agreement*

**JOINT EXHIBIT NO. 18**
**Page 266 of 812**

ACKNOWLEDGED AND AGREED:

**TRICO TECHNOLOGIES CORPORATION**

By: _____

Name:   Michael Baker

Title:   Chief Corporate Strategy Officer


ACKNOWLEDGED AND AGREED:

**TRICO PRODUCTS CORPORATION**

By: _____

Name:   Michael Baker

Title:   Chief Corporate Strategy Officer


*Credit Agreement*

ACKNOWLEDGED AND AGREED:

**TRICO COMPONENTES, S.A. DE C.V.**


By:
Name:    Stephen Graham
Title:      Sole Director


ACKNOWLEDGED AND AGREED:

**SUBENSAMBLES INTERNACIONALES, S. DE R.L. DE C.V.**

By:
Name:    Michael Baker
Title:     Authorized Signatory

*Credit Agreement*

**GLAS TRUST COMPANY LLC**,
AS ADMINISTRATIVE AGENT

By:

Name:      Yana Kislenko
Title:       Vice President

*Credit Agreement*

**CVI AA MASTER FUND I LP**, AS LENDER
CARVAL AA GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____

Name: Gerardo Bernaldez
Title: Manager

**CARVAL GCF MASTER FUND I LP**, AS LENDER
BY: CARVAL GCF GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____

Name: Gerardo Bernaldez
Title: Manager

**CVI AV MASTER FUND I LP**, AS LENDER
CARVAL AV GENERAL PARTNER LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____

Name: Gerardo Bernaldez
Title: Manager

**CVI EMCOF US, LLC**, AS LENDER
BY: CARVAL EMCOF GP LP, ITS MANAGER
BY: CVI GENERAL PARTNER, LLC, ITS MANAGER

By: _____

Name: Gerardo Bernaldez
Title: Manager

*Credit Agreement*

**CARVAL CONTINGENT CREDIT FUND LP**, AS LENDER
BY: CARVAL CCF GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager


**CVI CVF V POOLING FUND I LP**, AS LENDER
BY: CARVAL CVF V GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager


**CVI CSF MASTER FUND I LP**, AS LENDER
BY: CARVAL CSF GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager


*Credit Agreement*

**EXHIBIT I**

**DEFINITIONS**

Except as otherwise specified in this Agreement, all references in this Agreement (i) to any Person (other than Borrower) shall be deemed to include such Person's successors and assigns, and (ii) to any law, agreement, statute or contract specifically defined or referred to in this Agreement shall be deemed references to such law, agreement, statute or contract as the same may be supplemented, amended, waived, consolidated, replaced or modified from time to time, but only to the extent permitted by, and effected in accordance with, the terms thereof. The words *"herein," "hereof"* and *"hereunder"* and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any provision of this Agreement, and references to *"Article," "Section," "paragraph," "Exhibit," "Schedule"* and *"Appendix"* are references to this Agreement unless otherwise specified. Whenever the context so requires, words importing any gender include the other gender. Any of the defined terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference; the singular includes the plural, and the plural includes the singular. The word *"or"* shall not be exclusive.

All accounting terms not otherwise defined in this Agreement shall have the meanings assigned them in conformity with GAAP. All terms used in Article 9 of the UCC and not specifically defined in this Agreement shall be defined herein and in the Transaction Documents as such terms are defined in the UCC as in effect in the State of New York. Each reference to this Agreement, any other Transaction Document, or any other agreement shall be a reference to such agreement together with all exhibits, schedules, attachments and appendices thereto, in each case as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof. References to *"writing"* include facsimile, printing, typing, lithography and other means of reproducing words in a tangible visible form including computer-generated information accessible in tangible visible form. References to *"written"* include faxed, printed, typed, lithographed and other means of reproducing words or symbols in a tangible visible form consistent with the preceding sentence. The words *"including," "includes"* and *"include"* shall be deemed to be followed by the words *"without limitation"*.

Unless otherwise expressly provided herein, any period of time ending on a day which is not a Business Day shall end on the next succeeding Business Day. Unless otherwise stated in this Agreement, in the computation of a period of time from a specified date to a later specified date, the word *"from"* means *"from and including"* and the words *"to"* and *"until"* each means *"to but excluding."*

In addition, as used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

*"ABR Loan"* means a Loan that bears interest based on the Alternate Base Rate.

*"Administrative Agent"* has the meaning set forth in the preamble to this Agreement.

*"Administrative Agent's Account"* means account no. 780895899, at JPMorgan Chase, or any other account or accounts as the Administrative Agent may indicate in writing to Borrower and the Servicer from time to time.

1

29164506

**JOINT EXHIBIT NO. 18**
**Page 272 of 812**

*"Advance"* means an advance made by the Lenders pursuant to this Agreement, including any Overadvances and Protective Advances.

*"Adverse Claim"* means any claim of ownership or any Lien; it being understood that any Permitted Lien shall not constitute an Adverse Claim.

*"Affiliate"* means, with respect to any Person hereto, any Person that directly or indirectly controls, is controlled by or is under common control with such Person.  The term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and in any case, without limitation, "control" as defined under the laws of the relevant jurisdiction.

*"Aggregate Commitment"* means, on any date of determination, the aggregate of all Lenders' Commitments.

*"Aggregate Prepayment"* has the meaning specified in Section 1.3(b).

*"Agreement"* means this Credit Agreement, as it may be amended, restated, supplemented or otherwise modified and in effect from time to time.

*"Alternate Base Rate"* or "**ABR**" means, for any day, a rate *per annum* equal to the higher as of such day of (i) the Prime Rate, (ii) 0.50% above the Federal Funds Rate or (iii) 1.00% above Term SOFR for a one-month tenor in effect on such day.  For purposes of determining the Alternate Base Rate for any day, changes in the Prime Rate, the Federal Funds Rate or Term SOFR shall be effective on the date of each such change.

*"Alternative Currency"* means Mexican pesos.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder and the U.K. Bribery Act 2010 and the rules and regulations thereunder and the Corruption of Foreign Public Officials Acts (Canada) and the rules and regulations thereunder.

"**Anti-Money Laundering Laws**" means any and all laws, statutes, regulations or obligatory government orders, decrees, ordinances or rules related to terrorism financing, money laundering, any predicate crime to money laundering or any financial record keeping, including any applicable provision of the PATRIOT Act and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959) and the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada).

*"Applicable Margin"* means 13.625%.

"**Applicable Unused Credit Facility Fee Rate**" means, with respect to the calculation of the Unused Credit Facility Fee at any time, (a) a rate per annum equal to one half of one percent (0.50%) with respect to that portion of the relevant average daily amount of the undrawn aggregate Commitment that does not exceed $20,000,000, and (b) a rate per annum equal to the Interest Rate hereunder with respect to that portion of the relevant average daily amount of the undrawn aggregate Commitment that exceeds $20,000,000. For the avoidance of doubt, the Unused Credit Facility Fee due at any time hereunder in

2

29164506

Case 25-90399   Document 3563-20   Filed in TXSB on 12/04/25   Page 367 of 1178

accordance herewith shall equal the sum of the amounts as calculated in accordance with clause (a) and clause (b) above.

"*Approved Foreign Jurisdiction*" means, at any time, any country that that satisfies each of the following: (i) is not a Sanctioned Country and (ii) is not a country as to which the Administrative Agent has notified the Borrower that such country is ineligible.

"*Approved Fund*" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or Affiliate of an entity that administers or manages a Lender.

"*Assignment Agreement*" has the meaning set forth in Section 10.1(d).

"*Available Tenor*" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 1.15.

"*Benchmark*" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 1.15(a).

"*Benchmark Replacement*" means, with respect to any Benchmark Transition Event, the sum of: (a) the ABR that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment; provided that, if such Benchmark Replacement as so determined would be less than 1.00%, such Benchmark Replacement will be deemed to be 1.00% for the purposes of this Agreement and the other Transaction Documents.

"*Benchmark Replacement Adjustment*" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"*Benchmark Replacement Date*" means the earliest to occur of the following events with respect to the then-current Benchmark:

3

29164506

(a)  in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)  in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)  a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)  a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)  a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

<div align="center">4</div>

29164506

"**Benchmark Transition Start Date**" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"**Benchmark Unavailability Period**" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Transaction Document in accordance with Section 1.15and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Transaction Document in accordance with Section 1.15.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 CFR § 1010.230.

"**Borrower**" has the meaning set forth in the preamble to this Agreement.

"**Borrowing Availability**" means, on any Business Day, after giving prospective effect to a contemplated Advance, that the aggregate principal amount of Loans outstanding hereunder will be less than the lesser of (a) the Facility Limit and (b) the Borrowing Base as of such day.

"**Borrowing Base**" means, on any date of determination, an amount equal to 90% of the Net Orderly Liquidation Value of Eligible Inventory of the Borrower.  The Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 5.1(e).

"**Borrowing Base Certificate**" means a certificate, signed and certified as accurate and complete by the chief financial officer or treasurer of the Borrower, in substantially the form of Exhibit VIII-A or another form which is acceptable to the Administrative Agent in its Permitted Discretion.

"**Borrowing Date**" means the Business Day on which any Advance occurs.

"**Borrowing Notice**" has the meaning set forth in Section 1.2(a).

"**Business Day**" means any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in New York, New York or in any location where a Collection Account is maintained.

"**Capital Expenditures**" means, for any period, expenditures during such period for any purchase or other acquisition of any asset which would be classified as a fixed or capital asset on a consolidated balance sheet of the Loan Parties prepared in accordance with GAAP.

"**Capital Stock**" means, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, whether now outstanding or issued or acquired after the Closing Date, including common shares, *acciones*, preferred

5

29164506

shares, membership interests in a limited liability company, limited or general partnership interests in a partnership, interests in a trust, interests in other unincorporated organizations, warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests) or any other equivalent of such ownership interest.

"**Change of Control**" means the occurrence of any of the following:

(i)       First Brands Parent shall cease to own, directly or indirectly, a majority of the issued and outstanding Capital Stock and all other equity interests of Holdings;

(ii)      First Brands Parent shall cease to own, directly or indirectly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of Parent;

(iii)     Parent shall cease to own, directly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of the Borrower free and clear of any Adverse Claim;

(iv)     Holdings shall cease to own, directly or indirectly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of First Brands;

(v)      First Brands shall cease to own, directly or indirectly, one hundred percent (100%) of the issued and outstanding Capital Stock and all other equity interests of each FBG Counterparty and each Maquiladora;

(vi)     at any time prior to the consummation of a Qualifying IPO, the Permitted Holders ceasing to own or control, directly or indirectly, at least 50.1% of the then outstanding voting stock of Holdings in the aggregate;

(vii)    at any time upon or after the consummation of a Qualifying IPO, and for any reason whatsoever, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person and its Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders shall be the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of more than the lesser of (i) 30% of the then outstanding voting stock of Holdings in the aggregate and (ii) the aggregate amount of outstanding voting stock of Holdings held, directly or indirectly, by the Permitted Holders; or

(viii)   a "Change of Control" (as defined in the Credit Agreement) or under the Term Loan Agreement shall have occurred.

"**Closing Date**" means July 6, 2022.

"**Code**" means the Internal Revenue Code of 1986, and the rules and regulations thereunder, each as amended or modified from time to time.

29164506

*"Collateral"* means any and all assets on which a Lien is granted to the Administrative Agent, for the benefit of the Secured Parties, pursuant to any Security Document to secure the Obligations and any guaranty thereof.

*"Collection Account"* has the meaning set forth in Section 2.1(a).

*"Collection Account Bank"* has the meaning set forth in Section 2.1(a).

*"Collection Account Control Agreement"* means an agreement, in form and substance acceptable to the Administrative Agent and the Lenders, in which the Collection Account Bank agrees to take instructions from the Administrative Agent, either directly or as assignee of Borrower, with respect to the disposition of funds in the Collection Account without further consent of any applicable Loan Party; *provided, however,* that such agreement shall allow the Borrower to give instructions with respect to such Collection Account prior to the Administrative Agent's delivery of a notice of exclusive control, pursuant to which the Administrative Agent exercises its exclusive right to direct the disposition of funds on deposit in the Collection Account in accordance with such Collection Account Control Agreement.

*"Collections"* means, with respect to all cash collections and other cash proceeds in respect of the sale, transfer or disposition of Inventory or other Collateral.

*"Commitment"* means, for each Lender, the commitment of such Lender to make Loans to Borrower from time to time, in an amount not to exceed (a) in the aggregate, the amount set forth opposite such Lender's name on Schedule A to this Agreement, as such amount may be modified in accordance with the terms hereof and (b) with respect to any individual Loan hereunder, such Lender's Percentage of the aggregate principal amount of the requested Advance.

*"Commitment Fee"* has the meaning specified in Section 1.11(a).

"*Conforming Changes*" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 8.3 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Transaction Documents).

*"Connection Income Taxes"* means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

7

29164506

Case 25-90399   Document 4563-20   Filed in TXSB on 12/04/25   Page 92 of 178

*"Contract"* means, with respect to any purchase or sale of Inventory, any and all instruments, agreements, invoices or other writings evidencing the purchase or sale of Inventory, including each Purchase Order.

*"Credit Agreement"* means that certain ABL Credit Agreement, dated as of February 2, 2018, among First Brands, as lead borrower, First Brands Limited, as UK borrower, Trico Belgium SA, as Belgian Borrower, the other borrowers from time to time party thereto, First Brands Group Intermediate, LLC, as parent, Bank of America, N.A., as Administrative Agent and collateral agent (the *"Credit Agreement Agent"*) and the other parties from time to time party thereto, as the same may be amended, restated or otherwise modified from time to time. In the event that the "Credit Agreement" is terminated, references herein to "Credit Agreement" shall mean the "Credit Agreement" as in effect immediately prior to the termination thereof.

*"Credit Agreement Agent"* has the meaning set forth in the definition of "Credit Agreement".

*"Credit Agreement Compliance Period"* means the "Compliance Period" (or other similar or replacement term) under and as defined in the Credit Agreement as in effect on the Closing Date and without giving effect to any amendment, restatement, waiver, supplement or termination thereof (unless otherwise agreed to in writing by the Administrative Agent hereunder at the direction of the Required Lenders).

*"Default"* means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

*"Defaulting Lender"* means, subject to Section 1.8(b), any Lender that (a) has failed to fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and Borrower in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default or Event of Default, shall be specifically identified in such writing) has not been satisfied, (b) has notified the Administrative Agent and Borrower in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable Default or Event of Default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or Borrower, to confirm in writing to the Administrative Agent and Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any debtor relief law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or such Lender or its direct or indirect parent company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment or become insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of creditors; *provided* that a Lender shall not

29164506

be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 1.8(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to Borrower and each other Lender promptly following such determination.  Failure of the Administrative Agent to conclude that a Lender is a Defaulting Lender shall not limit the rights and remedies of Borrower in regards to any Lender that constitutes a Defaulting Lender.

"*Designated Funding Office*" has the meaning set forth in Section 1.9.

"*Eligible Assignee*" means (a) a Lender, (b) an Approved Fund, (c) any commercial bank, insurance company, mutual fund, finance company, financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act) and (d) any Affiliate of a Lender, provided that, in any event, "Eligible Assignee" shall not include (i) any natural person or (ii) the Borrower, First Brands or any of its respective Affiliates or Subsidiaries.

"*Eligible Inventory*" means Inventory owned by the Borrower consisting of all wipers inventory, including raw materials and finished goods, that is physically located in the Servicer's facilities located in Mexico, other than Inventory:

    a.  which is not subject to a first priority perfected Lien in favor of the Administrative Agent under the Security Documents;

    b.  which is subject to any Lien other than a Permitted Lien;

    c.  which is obsolete, unmerchantable or defective;

    d.  in which any Person other than the Borrower shall (i) have any direct or indirect ownership, interest or title (including retention of title claims) or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein (other than rights of a bailee or transporter in the ordinary course of business);

    e.  which is not located in the U.S. or Mexico;

    f.  which is being processed offsite at a third party location or outside processor, or is in-transit to or from such third party location or outside processor;

    g.  which is a discontinued product or component thereof;

    h.  which is the subject of a consignment by such Loan Party as consignor;

9

29164506

Case 25-90399   Document 4563-10   Filed in TXSB on 11/30/25   Page 934 of 1178

i.   which contains or bears any intellectual property rights licensed to the Borrower unless the Administrative Agent is satisfied in its Permitted Discretion that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

j.   which is not reflected in a current perpetual inventory report of the Borrower;

k.   for which reclamation rights have been asserted by the seller; or

l.   which is not subject to a Purchase Order.

In the event that Inventory which was previously Eligible Inventory ceases to be Eligible Inventory hereunder (other than a result of the sale of such Inventory to a Qualified Purchaser pursuant to any Sale Agreement), the Borrower shall notify the Administrative Agent thereof on and at the time of submission to the Administrative Agent of the next Borrowing Base Certificate. To the extent the Administrative Agent uses its Permitted Discretion under this definition to make the standards of eligibility hereunder more restrictive, then any such change will only be effective three (3) Business Days after notice thereof from the Administrative Agent to the Borrower.

Notwithstanding anything herein to the contrary, Inventory shall cease to be Eligible Inventory and shall be excluded from the Borrowing Base for all purposes once a period of 90 days has elapsed from the earlier of (i) the date of purchase or other acquisition of such inventory by the Borrower and (ii) the date of the related Advance in respect of such inventory, it being understood and agreed that if no Advance is requested concurrently with the addition of any such Eligible Inventory to the Borrowing Base, the date of "Advance" with respect to such Eligible Inventory shall be deemed to be the date on which it is first included in the Borrowing Base.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time and the regulations promulgated and rulings issued thereunder.

"*ERISA Affiliate*" means any Person that is under common control with any Loan Party or Subsidiary thereof and is treated as a "single employer," or otherwise aggregated with the Borrower or a Subsidiary under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"*ERISA Event*" means (a) any Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations at any facility of any Loan Party or any ERISA Affiliate as described in Section 4062(e) of ERISA, in each case, resulting in liability pursuant to Section 4063 of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan resulting in the imposition of Withdrawal Liability on any Loan Party, notification of any Loan Party or any ERISA Affiliate concerning the imposition of Withdrawal Liability or notification that a Multiemployer Plan is "insolvent" within the meaning of Section 4245 of ERISA; (d) the filing of a notice of intent to terminate any Pension Plan under Section 4041(c) of ERISA, the treatment of a Pension Plan amendment as a termination under Section 4041(c) of ERISA, the commencement of proceedings by the PBGC to terminate a Pension Plan or the receipt by any Loan Party or any ERISA Affiliate of notice of the treatment of a Multiemployer Plan amendment as a termination under Section 4041A of ERISA or of notice of the commencement of proceedings by the PBGC

10

29164506

to terminate a Multiemployer Plan; (e) the occurrence of an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or ERISA Affiliates, with respect to the termination of any Pension Plan; (g) the conditions for imposition of a Lien under Section 303(k) of ERISA shall have been met with respect to any Pension Plan; (h) with respect to any Pension Plan, the failure to meet the minimum funding standard of Section 412 of the Code or the failure to make any required contribution in accordance with Section 515 of ERISA; (i) receipt from the Internal Revenue Service of notice of the failure of any Plan to qualify under Section 401(a) of the Code that is intended to be so qualified, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code; (j) the occurrence of a non-exempt prohibited transaction under Sections 406 or 407 of ERISA or Section 4975 of the Code for which any Loan Party or any ERISA Affiliate may be directly or indirectly liable; (k) the determination that any Multiemployer Plan is considered a plan in "endangered", "critical", or "critical and declining" status within the meaning of Section 432 of the Code or Section 305 of ERISA; or (l) a Foreign Plan Event.

"***Event of Bankruptcy***" shall be deemed to have occurred with respect to a Person if either:

(a)　　(i) a case, application, petition or other proceeding shall be commenced, without the application or consent of such Person, in any court, seeking *concurso mercantil*, *quiebra,* liquidation, examinership, reorganization, debt arrangement, dissolution, administration, winding up, or composition or readjustment of debts of such Person, the appointment of a trustee, receiver, interim receiver, receiver and manager, monitor, custodian, liquidator, examiner, administrator, assignee, sequestrator, *visitador*, *conciliador*, *síndico* (or other similar official) for such Person or all or substantially all of its assets, or any similar action with respect to such Person under any applicable Law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, including any applicable corporations legislation to the extent the relief sought under such corporations legislation relates to or involves the compromise, settlement, adjustment or arrangement of debt; or (ii) an order for relief in respect of such Person shall be entered in an involuntary case under federal bankruptcy laws or other similar applicable Laws, including any applicable corporations legislation to the extent the relief sought under such corporations legislation relates to or involves the compromise, settlement, adjustment or arrangement of debt, now or hereafter in effect; or

(b)　　such Person (i) shall commence a voluntary case, application, petition or other proceeding under any applicable bankruptcy, *concurso mercantil*, *quiebra,* insolvency, reorganization, debt arrangement, dissolution, administration or other similar law, including any applicable corporations legislation to the extent the relief sought under such corporations legislation relates to or involves the compromise, settlement, adjustment or arrangement of debt, now or hereafter in effect, (ii) shall consent to the appointment of or taking possession by a receiver, interim receiver, receiver and manager, monitor, liquidator, examiner, administrator, assignee, trustee, custodian, sequestrator, *visitador*, *conciliador*, *síndico* (or other similar official) for, such Person or for any substantial part of its property or (iii) shall make any general assignment for the benefit of creditors, or shall fail to, or admit in writing its inability to, pay its debts generally as they become due, or, if a corporation or similar entity, its board of directors (or any board or Person holding similar rights to control the activities of such Person) shall vote to implement any of the foregoing.

"***Event of Default***" has the meaning specified in Section 7.1.

29164506

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended or otherwise modified from time to time.

"*Excluded Taxes*" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to any Recipient:  (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in an Advance or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Advance or Commitment, or (ii) such Lender changes its funding office, except in each case to the extent amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before its changed its funding office, (c) Taxes attributable to any Recipient's failure to comply with Section 8.5(f) or 8.5(g), and (d) any Taxes imposed under FATCA.

"*Facility Account*" means Borrower's account no. 359681655981 maintained at KeyBank National Association, Account Name: Carnaby Inventory III, LLC, or such other account as may be designated by Borrower in writing from time to time.

"*Facility Limit*" means, at any time prior to the Maturity Date, the sum of the Commitments, as they may be amended from time to time in accordance with this Agreement.  As of the Closing Date, the Facility Limit is $100,000,000.

"*Fair Market Value*" means, at the time of any given transaction, with respect to any asset or property, the price (after taking into account any liabilities related to such asset or property) that could be negotiated in an arm's-length transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction.

"*FATCA*" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with) any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"*FBG Counterparties*" means, collectively, FRAM, Trico Products and Trico Technologies.

"*Federal Bankruptcy Code*" means Title 11 of the United States Code entitled "Bankruptcy," as amended, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency, *concurso mercantil*, or creditors' rights or any other Federal or state bankruptcy or insolvency law, including, without limitation the Mexican Insolvency Law (*Ley General de Concursos Mercantiles*).

"*Federal Funds Rate*" means, for any day, (i) the rate per annum determined by the Federal Reserve Bank of New York based on federal funds transactions on such day (or, if such day is not a Business Day, for the immediately preceding Business Day) and published as the federal funds effective rate by the Federal Reserve Bank of New York on the Business Day next succeeding such day, or, (ii) if such rate is not

12

29164506

so published for any day that is a Business Day, the rate otherwise established by the Administrative Agent in any reasonable manner as the rate per annum applicable to federal funds transactions (which in any event, with respect to clause (i) and (ii) above, shall not be less than 1.00%).

"*Financial Covenant Breach*" means a breach that shall occur if the "Fixed Charge Coverage Ratio" calculated as of the last day of each fiscal quarter of First Brands exceeds 1.00 to 1.00. For purposes of this definition of "Financial Covenant Breach":

> (a)       unless otherwise defined in this Agreement, the terms used in this definition (including all defined terms used within such terms) shall have the respective meaning assigned to such terms in the Credit Agreement; and

(b)      any reference to the "Credit Agreement" is to such agreement as in effect on the Closing Date and without giving effect to any amendment, restatement, waiver, supplement or termination thereof (unless otherwise agreed to in writing by the Administrative Agent hereunder at the direction of the Required Lenders).

"*First Brands*" has the meaning set forth in the preamble to this Agreement.

"*First Brands Parent*" means Viceroy Private Capital, LLC, a Delaware limited liability company.

"*Fiscal Quarter*" means the period(s) of October 1 through December 31, January 1 through March 31, April 1 through June 30, and July 1 through September 30 of each calendar year.

"*Foreign Plan*" means any employee benefit plan, program, policy, arrangement or agreement established, maintained or contributed to by any Loan Party or any of their respective Subsidiaries primarily for the benefit of employees of any Loan Party or any of its Subsidiaries employed outside the United States.

"*Foreign Plan Event*" means, with respect to any Foreign Plan, (a) the existence of unfunded liabilities materially in excess of the amount permitted under any applicable Law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure in any material respect to make the required contributions or payments, under any applicable Law, on or before the due date for such contributions or payments, (c) the receipt of a notice from a Governmental Authority relating to the intention to terminate any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (d) the incurrence of any liability by any Loan Party or any of their respective Subsidiaries under applicable Law on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any participating employer therein, or (e) the occurrence of any material transaction that is prohibited under any applicable Law and that would reasonably be expected to result in the incurrence of any material liability by any Loan Party or any of their respective Subsidiaries, or the imposition on any Loan Party or any of their respective Subsidiaries of any material fine, excise tax or penalty resulting from any noncompliance with any applicable Law.

"*FRAM*" means FRAM Group Operations LLC.

13

29164506

"*Fund*" means any Person (other than a natural person) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"*GAAP*" means generally accepted accounting principles as are in effect in the United States of America (as such principles may change from time to time), which shall include the official interpretations thereof by the Financial Accounting Standards Board, applied on a consistent basis.

"*Governmental Authority*" means the government of the United States, Mexico or any other nation, or of any political subdivision thereof, whether state, provincial territorial or local, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank) and any group or body charged with setting financial accounting or regulatory capital rules or standards (including, without limitation, the Financial Accounting Standards Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

"*Guarantor*" means (a) Holdings and (b) Parent.

"*Guaranty*" of any Person means any obligation of such Person guarantying or in effect guarantying any Indebtedness, liability or obligation of any other Person in any manner, whether directly or indirectly, including any such liability arising by virtue of partnership agreements, including any agreement to indemnify or hold harmless any other Person, any performance bond or other surety ship arrangement and any other form of assurance against loss, except endorsement of negotiable or other instruments for deposit or collection in the ordinary course of business.

"*Holdings*" means First Brands Group Holdings, LLC, a Delaware limited liability company.

"*Holdings Minimum Equity Value*" has the meaning set forth in Section 11.11.

"*Indebtedness*" means, as to any Person at any time of determination, any and all indebtedness, obligations or liabilities (whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several) of such Person for or in respect of: (i) borrowed money, (ii) amounts raised under or liabilities in respect of any bonds, debentures, notes, note purchase, acceptance or credit facility, or other similar instruments or facilities, (iii) reimbursement obligations (contingent or otherwise) under any letter of credit, (iv) any other transaction (including production payments (excluding royalties), installment purchase agreements, forward sale or purchase agreements, capitalized leases and conditional sales agreements) having the commercial effect of a borrowing of money entered into by such Person to finance its operations or capital requirements (but not including accounts payable incurred in the ordinary course of such Person's business payable on terms customary in the trade), (v) all net obligations of such Person in respect of interest rate on currency hedges or (vi) any Guaranty of any such Indebtedness.

"*Indemnified Amounts*" has the meaning set forth in Section 8.1.

"*Indemnified Party*" has the meaning set forth in Section 8.1.

14

29164506

*"Indemnified Taxes"* means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Transaction Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

*"Independent Manager"* means a director of Borrower who shall be a natural person who (a) shall not have been at the time of such person's appointment or at any time during the preceding five (5) years and shall not be as long as such person is a director of Borrower:  (i) a director, officer, employee, partner, shareholder, member, manager or Affiliate of any of the following Persons (collectively, the "*First Brands Group*"):  the Servicer, any FBG Counterparty, or any of their respective Affiliates (other than Borrower or another special purpose entity which is an Affiliate of the Servicer), (ii) a supplier to any of the First Brands Group or Borrower, (iii) the beneficial owner (at the time of such individual's appointment as an Independent Manager or at any time thereafter while serving as an Independent Manager) of any of the outstanding membership or other equity interests of Borrower or any of the First Brands Group having general voting rights, (iv) a Person controlling or under common control with any director, officer, employee, partner, shareholder, member, manager, Affiliate or supplier of any of the First Brands Group or Borrower, or (v) a member of the immediate family of any director, officer, employee, partner, shareholder, member, manager, Affiliate or supplier of any of the First Brands Group or Borrower; (b) has not less than three (3) years of experience in serving as an independent director or independent manager for special purpose vehicles engaged in securitization and/or structured financing transactions; and (c) is employed by Global Securitization Services, LLC, Lord Securities Corporation, AMACAR Group LLC, CT Corporation, Corporation Service Company, Citadel SPV (USA) LLC or such other Person that provides independent director or independent manager services for special purpose vehicles engaged in securitization and/or structured financing transactions in the ordinary course of its business, and their respective successors. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise.

*"Intended Tax Characterization"* has the meaning set forth in Section 12.4.

*"Interest"* means for each day for each Lender, an amount equal to the product of the applicable Interest Rate multiplied by the principal of such Lender, annualized on the basis set forth in Section 1.4.

"*Interest Period*" means, as to any Advance, the period commencing on the date of such Advance and ending on the numerically corresponding day in the calendar month that is one month thereafter; provided that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day, (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period and (iii) no Interest Period shall extend beyond the Maturity Date.

*"Interest Rate"* means (a) at all times prior to the occurrence and during the continuance of an Event of Default, the sum of Term SOFR (or, solely in the instances set forth in Section 1.15, the Alternate Base Rate) plus the Applicable Margin, and (b) at all times from and after the occurrence and during the continuance of an Event of Default, the sum of Term SOFR (or, solely in the instances set forth in Section 1.15, the Alternate Base Rate) plus the Applicable Margin plus 3.00% (this clause (b), the "*Default Rate*").

"*Inventory*" has the meaning set forth in the UCC.

29164506

"*Investment*" means, by any Person, (a) the amount paid or committed to be paid, or the value of property or services contributed or committed to be contributed, by such person for or in connection with the acquisition by such Person of any stock, bonds, notes, debentures, partnership or other ownership interests or other securities of any other Person and (b) the amount of any advance, loan or extension of credit by such Person, to any other Person, or guaranty or other similar obligation of such Person with respect to any Indebtedness of such other Person (other than Indebtedness constituting trade payables in the ordinary course of business), and (without duplication) any amount committed to be advanced, loans, or extended by such Person to any other Person, or any amount the payment of which is committed to be assured by a guaranty or similar obligation by such Person for the benefit of, such other Person.

"*Investment Company Act*" means the Investment Company Act of 1940, as amended or otherwise modified from time to time.

"*IRS*" means the United States Internal Revenue Service.

"*Law*" means any international, foreign, Federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and any applicable administrative order, directed duty, request, license, authorization or permit of, or agreement with, any Governmental Authority, in each case whether or not having the force of law.

"*Lender*" has the meaning set forth in the preamble to this Agreement and shall include such Person's respective successors and permitted assigns.

"*Lien*" means any mortgage, deed of trust, pledge (including possessory or non-possessory pledge), security interest, hypothecation, charge, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement, preferential arrangement or similar agreement or arrangement of any kind or nature whatsoever, including any conditional sale or other title retention agreement and any assignment, deposit arrangement or lease intended as, or having the effect of, security and any filed financing statement or other notice of any of the foregoing (whether or not a lien or other encumbrance is created or exists at the time of the filing).

"*Loan Parties*" means Borrower and Parent.

"*Loans*" means the loans and Advances made by the Lenders pursuant to this Agreement, including Overadvances and Protective Advances.

"*Manufacturing Agreement*" means, each of (i) that certain manufacturing agreement, dated as of the Closing Date, by and among the Borrower and FRAM, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms thereof, (ii) that certain manufacturing agreement, dated as of the Closing Date, by and among the Borrower and Trico Products, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms thereof and (iii) that certain manufacturing agreement, dated as of the Closing Date, by and among the Borrower and Trico Technologies, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms thereof.

16

29164506

*"Maquiladora Agreements"* means, collectively, (i) the Contrato de Maquila, dated June 2, 2011, entered into between FRAM Group Operations Mexicali, S.A. de C.V. and FRAM, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms hereof; (ii) the Maquila Agreement, dated January 2, 1990, entered into by and between Federal-Mogul Motorparts LLC and Subensambles Internacionales, S. de R.L. de C.V., as assigned by Federal-Mogul Motorparts LLC to Trico Products pursuant to that certain Assignment Agreement dated February 14, 2019, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms hereof; and (iii) the Assembly (Maquila) Agreement, dated June 20, 2014, entered into between Trico Componentes, S.A. de C.V. and Trico Technologies, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms hereof.

*"Maquiladoras"* means FRAM Group Operations Mexicali, S.A. de C.V., Subensambles Internacionales, S. de R.L. de C.V., and Trico Componentes, S.A. de C.V.

*"Material Adverse Effect"* means, a material adverse effect on (a) the business, assets, liabilities (actual or contingent), financial condition or results of operations of any Loan Party, Guarantor, the Servicer, each FBG Counterparty or each Maquiladora; (b) the ability of (i) any Loan Party to perform any of its payment or other obligations under the Transaction Documents to which it is a party or (ii) any of Holdings, the Servicer, each FBG Counterparty or each Maquiladora to perform any of such Person's payment or other obligations under the Transaction Documents to which it is a party; (c) the rights and remedies of the Lenders or the Administrative Agent under the Transaction Documents; (d) the Administrative Agent's or any Lender's interest in any substantial portion of the Collateral; or (e) the collectability of any Collections.

*"Material Indebtedness"* means, as to any Person at any time of determination, any Indebtedness for borrowed money in excess of one million U.S. Dollars ($1,000,000).

*"Maturity Date"* means (i) May 31, 2025, provided that the Borrower and the Lenders may agree in writing, within 60 days prior to the expiration thereof, to extend this date for up to two (2) additional years or (ii) any earlier date on which the Commitments are reduced to zero or otherwise terminated pursuant to the terms hereof.

*"Mexican Security Agreement"* means that certain Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*) dated as of the Closing Date, by and among the Borrower, as pledgor, and the Administrative Agent, as pledgee; with acknowledgement and consent of the Maquiladoras and the appliable FBG Counterparty, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms thereof.

*"Mexico"* means the United Mexican States.

*"Monthly Report"* means the monthly reporting package, furnished by the Servicer to the Administrative Agent and the Lenders pursuant to Section 5.1(e) and Section 6.6.

*"Monthly Reporting Date"* means, for any calendar month, the 30th day following the end of such calendar month (or, if any such day is not a Business Day, the next succeeding Business Day thereafter).

*"Multiemployer Plan"* means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Loan Party or ERISA Affiliates is making or has an obligation to make contributions or with respect to which any Loan Party or ERISA Affiliates has any liability.

17

29164506

Case 25-90399   Document 3563-20   Filed in TXSB on 12/04/25   Page 102 of 178

*"Net Orderly Liquidation Value"* means with respect to Inventory or assets of any Person, the orderly liquidation value thereof as reasonably determined by the Borrower in good faith.

*"Non-Defaulting Lender"* means each Lender other than any Defaulting Lender.

*"Obligations"* means all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding).

"*OFAC*" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

*"Organizational Document"* means, relative to any Person, its certificate, deed or articles of incorporation or formation, its notices of articles, its by-laws, its partnership agreement, its memorandum and articles of association, its limited liability company agreement and/or operating agreement, share designations or similar organization documents and all shareholder agreements, voting trusts and similar arrangements applicable to any of its authorized Capital Stock.

*"Other Connection Taxes"* means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a Security Interest under, engaged in any other transaction pursuant to or enforced any Transaction Document, or sold or assigned an interest in any Security Interest or Transaction Document).

*"Other Taxes"* means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Transaction Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

*"Overadvance"* means, on any Business Day, that the aggregate principal amount of Loans outstanding hereunder exceeds the lesser of (a) the Facility Limit and (b) the Borrowing Base on such date.

"*Parent*" means the direct parent of Borrower.  As of the Closing Date, the Parent is Carnaby Inventory Holdings III, LLC.

*"Participant"* has the meaning set forth in Section 10.6(a).

*"Participant Register"* has the meaning set forth in Section 10.6(a).

"*PATRIOT Act*" means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

<div align="center">18</div>

29164506

*"Payment Date"* means the first Business Day of each calendar month and the Maturity Date.

*"PBGC"* means the Pension Benefit Guaranty Corporation (or any successor thereof).

*"Pension Plan"* means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA) other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or ERISA Affiliates or to which any Loan Party or ERISA Affiliates contributes or has an obligation to contribute or with respect to which any Loan Party or ERISA Affiliates has any liability.

*"Percentage"* means, as to any Lender, the ratio (expressed as a percentage) of its Commitment to the Aggregate Commitment, provided that when there is a Defaulting Lender, any such Defaulting Lender's Commitment shall be disregarded in the relevant calculations.

"*Permitted Discretion*" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured lender) business judgment in accordance with customary and market business practices for comparable asset-based lending transactions.

"*Permitted Holder*" means each of Patrick James, and any family members of Patrick James (including his spouse, lineal descendants, spouses of such descendants, the lineal descendants of any such spouse and the spouses of any such spouse's lineal descendants), and trusts for estate planning purposes where any of the foregoing persons or a spouse of any such person is a beneficiary or trustee of any such trust or trusts, including a voting trust or any other business entity, regardless of form, organized solely for the benefit of one or more of the foregoing persons. For purposes of this paragraph, the relationship of any person that is derived by or through legal adoption prior to age 18 shall be considered a natural one. A minor for whom a Capital Stock interest is held pursuant to a Uniform Transfers to Minors Act or similar law shall be considered a holder of such Capital Stock.

*"Permitted Lien"* means, with respect to any Person or its assets, (a) any inchoate Liens for current taxes, assessments, levies, fees and other government and similar charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been established in accordance with GAAP, but only so long as foreclosure with respect to such Lien is not imminent and the use and value of the property to which the liens attach are not impaired during the pendency of such proceedings and (b) any Lien in favor of, or assigned to, the Administrative Agent (for the benefit of the Secured Parties) under the Transaction Documents.

*"Person"* means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

*"Prepayment Date"* has the meaning set forth in Section 1.3(b).

*"Prepayment Notice"* has the meaning set forth in Section 1.3(b).

*"Prime Rate"* means the rate of interest per annum publicly announced from time to time by the Administrative Agent as its prime rate (which in any event, shall not be less than 1.00%); each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

19

29164506

*"Protective Advances"* has the meaning set forth in Section 1.10.

*"Purchase Agreement"* means that certain Asset Purchase Agreement, dated as of the Closing Date, by and among the one or more FBG Counterparty, as seller, and Borrower, as buyer, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms thereof.

"*Purchase Order*" means an irrevocable purchase order, in form and substance satisfactory to the Lenders, substantially in the form attached hereto as Exhibit XIV, pursuant to which a Qualified Purchaser shall purchase Inventory from Borrower.

"*Qualified Purchaser*" means any purchaser of inventory from the Borrower that is reasonably acceptable to the Administrative Agent, it being understood and agreed that, notwithstanding anything herein to the contrary, Servicer and each of its direct and indirect Subsidiaries shall be deemed to be a Qualified Purchaser for all purposes hereunder and under the other Transaction Documents.

"*Qualifying IPO*" means the issuance by Holdings or any successor thereof of its common Capital Stock in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering) or in a firm commitment underwritten offering (or series of related offerings of securities to the public pursuant to a final prospectus) made pursuant to the Securities Act.

*"Recipient"* means the Administrative Agent or any Lender.

*"Records"* means, with respect to any Collateral, all Contracts and other documents, books, records and other information (including, without limitation, computer programs, tapes, disks, punch cards, data processing software and related property and rights) relating to such Collateral.

*"Register"* has the meaning set forth in Section 10.2.

*"Related Entity"* has the meaning set forth in Section 5.1(l).

"*Relevant Governmental Body*" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

*"Removal Closing Date"* has the meaning set forth in Section 9.9(b).

*"Reportable Event"* means with respect to any Pension Plan or Multiemployer Plan any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the thirty (30) day notice period is waived under PBGC Reg. Section 4043.

*"Required Lenders"* means, at any time, Lenders (other than Defaulting Lenders) having Loans and unused Commitments representing more than 50% of the sum of the outstanding Loans and unused Commitments under this Agreement at such time.

*"Resignation Closing Date"* has the meaning set forth in Section 9.9(a).

29164506

Case 25-90399   Document 3563-10   Filed in TXSB on 11/30/25   Page 105 of 178

*"Responsible Officer"* means, in respect of any Loan Party or Holdings, as applicable, the chief executive officer, director, president, vice president, executive vice president, general counsel, chief operating officer, chief financial officer, treasurer, director of risk, secretary, assistant secretary, controller or assistant controller of a Loan Party or Holdings, as applicable and any other officer or employee of such Loan Party or Holdings, as applicable, so designated by any of the foregoing officers or employees in a notice to the Administrative Agent.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party or Holdings, as applicable shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party or Holdings, as applicable, as applicable, and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party or Holdings, as applicable, as applicable.

*"Restricted Payment"* means (i) any dividend or other distribution, direct or indirect, on account of any membership interest of any class of Borrower now or hereafter outstanding, (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of Borrower now or hereafter outstanding, (iii) any payment or prepayment of principal of, premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance, sinking fund or similar payment and any claim for rescission with respect to the loans subordinated to the Obligations, (iv) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire any membership interest of Borrower now or hereafter outstanding, and (v) any payment of management fees by Borrower.

*"Review"* shall have the meaning specified in <u>Section 5.1(k)</u> of this Agreement.

*"Revolving Period"* means the period from and after the Closing Date to a date that is ten (10) Business Days prior to the scheduled Maturity Date.

*"RUG"* means the Mexican Sole Registry of Liens over Movable Assets (*Registro Único de Garantías Mobiliarias*).

*"Sale Agreement"* means any sale agreement by and among Borrower, as seller and one or more Qualified Purchasers, as buyer, as the same may be amended, restated or otherwise modified from time to time in accordance with the terms thereof.

*"Sanctioned Country"* means at any time, a country, region or territory which is itself the subject or target of any Sanctions (including, as of the Closing Date, Cuba, Iran, North Korea, Syria, Crimea, the Donetsk People's Republic, and the Luhansk People's Republic).

*"Sanctioned Person"* means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC (including OFAC's Specially Designated Nationals and Blocked Persons List and OFAC's Consolidated Non-SDN List), the U.S. Department of State, the United Nations Security Council, the European Union, any European member state, Her Majesty's Treasury, or other relevant sanctions authority, (b) any Person located, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by, or acting or purporting to act for or on behalf of, directly or indirectly, any such Person or Persons described in <u>clauses (a)</u> and <u>(b)</u>, including a Person that is deemed by OFAC to be a Sanctions target based on the ownership of such legal entity by Sanctioned Person(s) or (d) any Person otherwise a target of Sanctions, including vessels and aircraft, that are designated under any Sanctions program.

21

29164506

*"Sanctions"* means any and all economic or financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes and restrictions and anti-terrorism laws, including but not limited to those imposed, administered or enforced from time to time by the U.S. government (including those administered by OFAC or the U.S. Department of State), the United Nations Security Council, the European Union, any European member state, Her Majesty's Treasury, or other relevant sanctions authority in any jurisdiction in which (a) any Loan Party or any of its Subsidiaries or Affiliates is located or conducts business, (b) in which any of the proceeds of the Advances will be used, or (c) from which repayment of the Obligations will be derived.

*"SEC"* means the U.S. Securities and Exchange Commission or any governmental agencies substituted therefor.

*"Secured Parties"* means each Lender, the Administrative Agent and each other Indemnified Party.

"*Securities Act*" means the Securities Act of 1933 (15 U.S.C. § 77 *et seq*.).

*"Security Documents"* means the U.S. Security Agreement, the Mexican Security Agreement, the Collection Account Control Agreement and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent of the benefit of the Secured Parties to secure the Obligations or any guaranty thereof.

*"Security Interest"* has the meaning ascribed thereto in Article 9 of the UCC.

*"Servicer"* has the meaning set forth in Section 6.1(a).

*"Servicer Termination Event"* has the meaning set forth in Section 6.1(a).

*"Servicing Fee"* has the meaning set forth in Section 6.7.

"*SOFR*" means a rate equal to the secured overnight financing rate as administered by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

*"SOFR Loan"* means a Loan that bears interest based on SOFR, other than pursuant to clause (iii) of the definition of "Alternate Base Rate".

*"Solvent"* means, with respect to any Person and as of any particular date, (i) the present fair market value (or present fair saleable value) of the assets of such Person is not less than the total amount required to pay the probable liabilities of such Person on its total existing debts and liabilities (including contingent liabilities) as they become absolute and matured, (ii) such Person is able to realize upon its assets and pay its debts and other liabilities, contingent obligations and commitments as they mature and become due in the normal course of business, (iii) such Person is not incurring debts or liabilities beyond its ability to pay such debts and liabilities as they mature, (iv) such Person is not engaged in any business or transaction, and is not about to engage in any business or transaction, for which its property would constitute unreasonably small capital after giving due consideration to the prevailing practice in the industry in which such Person is engaged, and (v) such Person is not insolvent pursuant to Article 2166 of the Mexican Federal Civil Code (*Código Civil Federal*) or its correlative provisions of the Civil Codes of the States that comprise Mexico or that is applicable in Mexico City and Articles 9, 10 and 11 of the Mexican Insolvency Law (*Ley General de Concursos Mercantiles*) (or any successor provision).

29164506

"**Spot Rate**" means, on any day, (i) for the purpose of exchanging U.S. Dollars to Alternative Currency or Alternative Currency to U.S. Dollars in connection with applying funds to pay amounts owing hereunder or under the Transaction Documents in accordance with this Agreement, the actual rate used by the Administrative Agent's principal foreign exchange trading office for the purchase by the Administrative Agent of the applicable currency with the other currency through its principal foreign exchange trading office, and (ii) for the purpose of making any calculation hereunder that does not require the actual exchange of U.S. Dollars for Alternative Currency or Alternative Currency for U.S. Dollars to make a payment of amounts owing hereunder or under the Transaction Documents or, (a) with respect to the determination of the U.S. Dollar Equivalent of any amount denominated in Alternative Currency, the exchange rate at which such Alternative Currency may be exchanged into U.S. Dollars as set forth at approximately 11:00 a.m. New York City time, on such day as published on the Bloomberg Key Cross-Currency Rates Page for such Alternative Currency and (b) with respect to the determination of the Alternative Currency equivalent of any amount denominated in U.S. Dollars, the exchange rate at which U.S. Dollars may be exchanged into Alternative Currency as set forth at approximately 11:00 a.m. New York City time, on such day as published on the Bloomberg Key Cross-Currency Rates Page for U.S. Dollars. In the event that such rate does not appear on any Bloomberg Key Cross Currency Rates Page, the Spot Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be selected by the Administrative Agent and is reasonably satisfactory to the applicable Servicer, or, in the absence of such an agreement, such Spot Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 11:00 a.m. New York time, on such date for the purchase of U.S. Dollars with the applicable Alternative Currency for delivery two (2) Business Days later; *provided* that if at the time of any such determination, for any reason, no such spot rate is being quoted, the Administrative Agent may use any reasonable method it deems appropriate to determine such rate, and such determination shall be conclusive absent manifest error.

"**Sub-Servicer**" has the meaning set forth in Section 6.1(b).

"**Subsidiary**" or "**Subsidiaries**" of a Person shall mean (i) any corporation or trust of which 50% or more (by number of shares or number of votes) of the outstanding capital stock or shares of beneficial interest normally entitled to vote for the election of one or more directors or trustees (regardless of any contingency which does or may suspend or dilute the voting rights) is at such time owned directly or indirectly by such Person or one or more of such Person's Subsidiaries, (ii) any partnership of which such Person is a general partner or of which 50% or more of the partnership interests is at the time directly or indirectly owned by such Person or one or more of such Person's Subsidiaries, (iii) any limited liability company of which such Person is a manager or managing member or of which 50% or more of the limited liability company interests is at the time directly or indirectly owned by such Person or one or more of such Person's Subsidiaries or (iv) any corporation, trust, partnership, limited liability company or other entity which is controlled or capable of being controlled by such Person or one or more of such Person's Subsidiaries, and in any case, without limitation, "control" as defined under the laws of the relevant jurisdiction.

"**Swap Agreement**" means to any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

29164506

"*Tax*" or "*Taxes*" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Term Loan Credit Agreement*" means that certain First Lien Term Loan Agreement, dated as of February 2, 2018 (as amended, amended and restated, supplemented or otherwise modified from time to time), among First Brands, as borrower, First Brands Group Intermediate, LLC, as parent, Jefferies Finance LLC, as Administrative Agent and collateral agent, and the other parties from time to time party thereto.  In the event that the "Term Loan Credit Agreement" is terminated, references herein to "Term Loan Credit Agreement" shall mean the "Term Loan Credit Agreement" as in effect immediately prior to the termination thereof.

"*Term SOFR*" means, with respect to a Loan that bears interest at a rate based on Term SOFR, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, with respect to a Loan that bears interest at a rate based on the Alternate Base Rate, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day, provided, further, that if Term SOFR determined as provided above (including pursuant to the proviso under clause (a) or clause (b) above) shall ever be less than 1.00%, then Term SOFR shall be deemed to be 1.00%.

"*Term SOFR Administrator*" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"*Term SOFR Reference Rate*" means the forward-looking term rate based on SOFR.

"*Termination Date*" means the date on which (i) the aggregate outstanding principal amount of Loans has been reduced to zero and all accrued interest on each Loan have been indefeasibly paid in full, (ii) all other Obligations (other than contingent, unmatured indemnification obligations for which demand has not been made) have been indefeasibly paid in full, (iii) all other amounts owing to the Secured Parties

24

29164506

hereunder and under the other Transaction Documents have been indefeasibly paid in full and (iv) the Commitments of all Lenders have terminated or expired.

*"Transaction Documents"* means, collectively, this Agreement, each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreements and all other instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto.

*"Trico Products"* means Trico Products Corporation.

*"Trico Technologies"* means Trico Technologies Corporation.

"*U.S. Dollar Equivalent*" means, on any date on which a determination thereof is to be made, with respect to (a) any amount denominated in U.S. Dollars, such amount and (b) any amount denominated in an Alternative Currency, the U.S. Dollar equivalent of such amount of such Alternative Currency determined by referenced to the Spot Rate determined as of such determination date.

"*U.S. Dollars*" and "*$*" each mean the lawful currency of the United States of America.

"*U.S. Government Securities Business Day*" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

*"U.S. Security Agreement"* means the Pledge and Security Agreement, dated as of the date hereof, among the Borrower, Parent and the Administrative Agent.

*"UCC"* means the Uniform Commercial Code as in effect in the State of New York or, as the context may require, any other applicable jurisdiction.

"*UCC-1 Financing Statement*" means each UCC financing statement set forth on Exhibit IX.

"*Unadjusted Benchmark Replacement*" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

*"Unused Credit Facility Fee"* has the meaning set forth in Section 1.11(b).

*"Volcker Rule"* means Section 13 of the U.S. Bank Holding Company Act of 1956, as amended, and the applicable rules and regulations thereunder.

*"Waterfall"* has the meaning set forth in Section 2.1(c).

"*Withdrawal Liability*" means the liability to a Multiemployer Plan as the result of a "complete" or "partial" withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA by any Loan Party or the ERISA Affiliates of such Loan Party.

25

29164506

EXHIBIT II-A

FORM OF BORROWING NOTICE

**[Date]**[1]

GLAS TRUST COMPANY LLC, as Administrative Agent
3 Second Street, Suite 206
Jersey City, NJ 07311
Fax: 212-202-6246
Phone: +1 (201) 839-2200
Email: ClientServices.Americas@glas.agency; tmgus@glas.agency

 **Re:  BORROWING NOTICE**

Ladies and Gentlemen:

 Reference is hereby made to the Credit Agreement, dated as of July 6, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among Carnaby Inventory III, LLC (*"Borrower"*), First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS TRUST COMPANY LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the *"Administrative Agent"*).  Capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

 The undersigned hereby gives you notice pursuant to Section 1.2 of the Credit Agreement of its request of an Advance (the "Requested Advance") under the Credit Agreement, and in that connection sets forth below the terms thereof:

(A) Proposed Borrowing Date (which shall be a Business Day):  [●]

(B) Aggregate principal amount of Requested Advance: $[●][2]

 Please transfer the Requested Advance in immediately available funds to:

| Wire Transfer Instructions: | |
|---|---|
| Amount | $[●] |
| Bank: | [●] |

---

[1] Borrowing Notice to be delivered no later than 12:00 p.m. (New York City time) two (2) Business Days prior to the proposed Borrowing Date.

[2] Amount of Requested Advance shall be based on the numbers set forth in the most recent Borrowing Base Certificate delivered to the Administrative Agent and the Lenders and based upon subsequent valuations of Eligible Inventory by the Servicer to the date of such Borrowing Notice.

II-A-1

*Credit Agreement*

BUSINESS.29164525.2

| ABA No.: | [●] |
|---|---|
| Account No.: | [●] |
| Account Name: | [●] |

In connection with the Requested Advance to be made on the above-specified Borrowing Date, Borrower hereby certifies that the following statements are true on the date hereof, and will be true on the Borrowing Date (before and after giving effect to the Requested Advance):

(i)     the representations and warranties set forth in <u>Article III</u> of the Credit Agreement are true and correct in all material respects on and as of the Borrowing Date of such Advance as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall remain true and correct in all material respects as of such earlier date;

(ii)    no event has occurred and is continuing, or would result from the Requested Advance, that constitutes a Default or Event of Default;

(iii)   the most recent Borrowing Base Certificate delivered to the Administrative Agent and the Lenders does not show that an Overadvance exists or will result from the Requested Advance;

(iv)    no Overadvance exists or will result from such Requested Advance; and

(v)     The Borrower is Solvent immediately prior to and after giving effect to the Proposed Advance and the use of the proceeds thereof.

Very truly yours,

Carnaby Inventory III, LLC

By: _____
Name:
Title:

II-A-2

*Credit Agreement*

BUSINESS.29164525.2

EXHIBIT II-B
FORM OF PREPAYMENT NOTICE

[Date][3]

GLAS TRUST COMPANY LLC, as Administrative Agent
3 Second Street, Suite 206
Jersey City, NJ 07311
Fax: 212-202-6246
Phone: +1 (201) 839-2200
Email: ClientServices.Americas@glas.agency; tmgus@glas.agency

**Re:  BORROWING NOTICE**

Ladies and Gentlemen:

Reference is hereby made to the Credit Agreement, dated as of July 6, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among Carnaby Inventory III, LLC (*"Borrower"*), First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS TRUST COMPANY LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the *"Administrative Agent"*).  Capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

The undersigned hereby gives you notice pursuant to and in accordance with Section 1.3 of the Credit Agreement that, on the date hereof, the Borrower intends to prepay the aggregate principal amount of $[•][4] of the Revolving Loans, together with all accrued and unpaid interest thereon (including without limitation any prepayment fees pursuant to Section 1.3(c) of the Credit Agreement).

Very truly yours,

Carnaby Inventory III, LLC

By: _____
Name:
Title:

---

[3] Prepayment Notice to be delivered no later than 12:00 p.m. (New York City time) on the Business Day of the proposed prepayment.

[4] Minimum prepayment amount of $1,000,000.

II-A-1

*Credit Agreement*

BUSINESS.29164525.2

**JOINT EXHIBIT NO. 18**
**Page 299 of 812**

EXHIBIT III
CHIEF EXECUTIVE OFFICE, PRINCIPAL PLACE OF BUSINESS, RECORDS LOCATIONS, FEDERAL TAXPAYER ID NUMBER AND ORGANIZATIONAL ID NUMBER

| NAME | CHIEF EXECUTIVE OFFICE ADDRESS | PRINCIPAL PLACE OF BUSINESS | LOCATION OF RECORDS | STATE OF ORGANIZATION (ORGANIZATIONAL ID NUMBER) | FEDERAL TAXPAYER ID NUMBER |
|---|---|---|---|---|---|
| CARNABY INVENTORY III, LLC | 3010 LBJ FREEWAY, SUITE 1200, DALLAS, TX 75234 | 3010 LBJ FREEWAY, SUITE 1200, DALLAS, TX 75234 | 3010 LBJ FREEWAY, SUITE 1200, DALLAS, TX 75234 | DE (6596198) | 88-0615839 |
| CARNABY INVENTORY HOLDINGS III, LLC | 3010 LBJ FREEWAY, SUITE 1200, DALLAS, TX 75234 | 3010 LBJ FREEWAY, SUITE 1200, DALLAS, TX 75234 | 3010 LBJ FREEWAY, SUITE 1200, DALLAS, TX 75234 | DE (6596207) | 88-0555850 |
| FIRST BRANDS GROUP HOLDINGS, LLC | 127 PUBLIC SQUARE, SUITE 5300, CLEVELAND, OH 44114 | 127 PUBLIC SQUARE, SUITE 5300, CLEVELAND, OH 44114 | 3010 LBJ FREEWAY, SUITE 1200, DALLAS, TX 75234 | DE (7962867) | 85-1927700 |

III-1

*Credit Agreement*

**JOINT EXHIBIT NO. 18**
**Page 300 of 812**

EXHIBIT IV

FORM OF SOLVENCY CERTIFICATE

[DATE]

This Solvency Certificate is being executed and delivered pursuant to <u>Section 4.1(i)</u> of the Credit Agreement, dated as of July 6, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among Carnaby Inventory III, LLC (*"Borrower"*), First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS TRUST COMPANY LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the *"Administrative Agent"*).  Capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

I, [NAME], the Managing Director of Parent, in such capacity and not in an individual capacity, hereby certify as follows:

1.    I am generally familiar with the businesses and assets of the Loan Parties, taken as a whole, and am duly authorized to execute this Solvency Certificate on behalf of the Borrower pursuant to the Credit Agreements; and

2.    As of the date hereof and immediately after giving effect to the consummation of the transactions contemplated under the Credit Agreement and the other Transaction Documents on the Closing Date, (i) the present fair market value (or present fair saleable value) of the assets of the Loan Parties, taken as a whole, is not less than the total amount required to pay the probable liabilities of the Loan Parties, taken as a whole, on their total existing debts and liabilities (including contingent liabilities) as they become absolute and matured, (ii) the Loan Parties, taken as a whole, are able to realize upon their assets and pay their debts and other liabilities, contingent obligations and commitments as they mature and become due in the normal course of business, (iii) the Loan Parties, taken as a whole, are not incurring debts or liabilities beyond their ability to pay such debts and liabilities as they mature, (iv) the Loan Parties, taken as a whole, are not engaged in any business or transaction, and are not about to engage in any business or transaction, for which their property would constitute unreasonably small capital after giving due consideration to the prevailing practice in the industry in which the Loan Parties are engaged, and (v) none of the Loan Parties are insolvent pursuant to Article 2166 of the Mexican Federal Civil Code (*Código Civil Federal*) or its correlative provisions of the Civil Codes of the States that comprise Mexico or that is applicable in Mexico City and Articles 9, 10 and 11 of the Mexican Insolvency Law (*Ley General de Concursos Mercantiles*) (or any successor provision).

*Credit Agreement*

BUSINESS.29164525.2

IN WITNESS WHEREOF, I have executed this Solvency Certificate on the date first written above.

CARNABY INVENTORY HOLDINGS III, LLC

By:_____
Name:
Title:  Managing Director

*Credit Agreement*

BUSINESS.29164525.2

EXHIBIT V-A

[FORM OF] COMPLIANCE CERTIFICATE

[Date]

GLAS TRUST COMPANY LLC, as Administrative Agent
3 Second Street, Suite 206
Jersey City, NJ 07311
Fax: 212-202-6246
Phone: +1 (201) 839-2200
Email: ClientServices.Americas@glas.agency; tmgus@glas.agency

Ladies and Gentlemen:

Reference is hereby made to the Credit Agreement, dated as of July 6, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among Carnaby Inventory III, LLC (*"Borrower"*), First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS TRUST COMPANY LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the *"Administrative Agent"*). Capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

This Compliance Certificate is being executed and delivered pursuant to Section 5.1[(b)] [(c)] [(d)] of the Credit Agreement.

The undersigned hereby represents, warrants, certifies and confirms that:

1.      The undersigned is a duly elected Responsible Officer of the undersigned.

2.      Attached hereto are copies of the financial statements of [First Brands] [the Borrower], [together with a customary management's discussion and analysis of financial information provided to the lenders under the ABL Credit Agreement and/or the Term Loan Credit Agreement][5]. [There has been no material adverse effect to the First Brands' brake products segment from the prior brake products segment information furnished to the Administrative Agent and Lenders pursuant to Section 5.1(k)(ii) of the Credit Agreement.][6]

3.      The undersigned has reviewed the terms of the Credit Agreement and each of the other Transaction Documents and I have made, or have caused to be made under my supervision, a detailed review of the transactions and condition of [the Borrower] [First Brands] during the accounting period covered by the financial statements attached as Annex I.

---

[5] Remove brackets if compliance certificate is being provided with annual and quarterly reports of First Brands pursuant to Section 5.1(c) or Section 5.1(d).

[6] NTD: To be included if compliance certificate is being delivered pursuant to Section 5.1(d) and signed by First Brands.

V-2

*Credit Agreement*

BUSINESS.29164525.2

4.	The examinations described in paragraph 3 hereof did not disclose, and the undersigned has no knowledge of, the existence of any condition or event which constitutes a Default or Event of Default, during or at the end of the accounting period covered by the attached financial statements or as the date of this Compliance Certificate, except as set forth below.

5.	Based on the examinations described in paragraph 3 hereof, the undersigned confirms that the representations and warranties contained in the Credit Agreement are true and correct as though made on the date hereof, except as set forth below.

6.	True and correct calculations of the [Fixed Charge Coverage Ratio] are set forth in Schedule II hereto.

7.	Described below are the exceptions, if any, to paragraphs 4 and 5 listing, in detail, the nature of the condition or event, the period during which it has existed and the action the undersigned have taken, are taking or propose to take with respect to each such condition or event:

**[IF NONE, INSERT-NONE-]**

The foregoing certifications and the financial statements delivered with this Compliance Certificate in support hereof, are made and delivered this _____ day of _____, _____.

<div align="right">

Carnaby Inventory III, LLC


By: _____
Name:
Title:

</div>

**Attachments:**

Schedule I, financial statements

<div align="center">V-3</div>

<div align="right">*Credit Agreement*</div>

Annex I

Financial Statements

(attached)

*Credit Agreement*

**JOINT EXHIBIT NO. 18**
**Page 305 of 812**

EXHIBIT V-B

**[FORM OF] HOLDINGS CERTIFICATE**[7]

**[Date]**

GLAS TRUST COMPANY LLC, as Administrative Agent
3 Second Street, Suite 206
Jersey City, NJ 07311
Fax: 212-202-6246
Phone: +1 (201) 839-2200
Email: ClientServices.Americas@glas.agency; tmgus@glas.agency

Ladies and Gentlemen:

Reference is hereby made to the Credit Agreement, dated as of July 6, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among Carnaby Inventory III, LLC (*"Borrower"*), First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS TRUST COMPANY LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the *"Administrative Agent"*).  Capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

This Compliance Certificate is being executed and delivered pursuant to Section 5.1(f) of the Credit Agreement.

The undersigned hereby represents, warrants, certifies and confirms that:

1.      The undersigned is a duly elected Responsible Officer of Holdings.

2.      As of the date hereof, the net equity value of Holdings exceeds the Holdings Minimum Equity Value.

The foregoing certifications are made and delivered this _____ day of _____, _____.

First Brands Group Holdings, LLC

By: _____
Name:
Title:

---

[7] NTD: To be delivered with the financial statements furnished pursuant to Section 5.1(c) and Section 5.1(d) of the Credit Agreement (First Brands' audited annual and unaudited quarterly financial statements).

V-5

*Credit Agreement*

EXHIBIT VI
**[FORM OF]** ASSIGNMENT AGREEMENT

This **ASSIGNMENT AGREEMENT** (this **"Assignment Agreement"**) is entered into as of the ___ day of _____, ____, by and between _____ (**"Assignor"**) and _____ (**"Assignee"**).

This Assignment Agreement is being executed and delivered in accordance with Section 10.1 of that certain Credit Agreement, dated as of July 6, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the **"Credit Agreement"**), by and among Carnaby Inventory III, LLC (**"Borrower"**), First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the **"Lenders"**), and GLAS TRUST COMPANY LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the **"Administrative Agent"**). Capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

For an agreed consideration, Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the terms hereof and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) an undivided _____% (the **"Transferred Percentage"**) interest in all of Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and the other Transaction Documents including, without limitation, Assignor's Commitment and (if applicable) the principal of Assignor's Loans as set forth herein; (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (i) and (ii) above being referred to in this Assignment and Assumption collectively as the **"Assigned Interest"**). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment Agreement, without representation or warranty by the Assignor

The sale, transfer and assignment effected by this Assignment Agreement shall become effective (the **"Closing Date"**) on {DATE}.[8] From and after the Closing Date, Assignee shall be a Lender party to the Credit Agreement for all purposes thereof as if Assignee were an original party thereto and Assignee agrees to be bound by all of the terms and provisions contained therein.

If Assignor has no outstanding Loans under the Credit Agreement on the Closing Date, Assignor shall be deemed to have hereby transferred and assigned to Assignee, without recourse, representation or warranty (except as provided below), and the Assignee shall be deemed to have hereby irrevocably taken, received and assumed from Assignor, the Transferred Percentage of Assignor's Commitment and all rights and obligations associated therewith under the terms of the Credit Agreement, including,

---

[8] To be inserted by Administrative Agent.

*Credit Agreement*

without limitation, the Transferred Percentage of Assignor's future funding obligations under Section 1.1 of the Credit Agreement.

Concurrently with the execution and delivery hereof, Assignor will provide to Assignee copies of all documents requested by Assignee which were delivered to Assignor pursuant to the Credit Agreement.

Each of the parties to this Assignment Agreement agrees that at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Assignment Agreement.

By executing and delivering this Assignment Agreement, Assignor and Assignee confirm to and agree with each other as follows:

Other than the representations and warranties set forth below, Assignor makes no representation or warranty and assumes no responsibility with respect to (i) any statements, warranties or representations made by any other Person in or in connection with the Credit Agreement, or the other Transaction Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document furnished pursuant thereto or the perfection, priority, condition, value or sufficiency of any Collateral, (ii) the financial condition of Assignee, Borrower, any Guarantor, any Affiliate of Borrower and (iii) the performance or observance by Borrower, any Guarantor or any Affiliate of Borrower of any of their respective obligations under the Transaction Documents or any other instrument or document furnished pursuant thereto or in connection therewith.

The Assignor represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby.

The Assignor assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Transaction Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Transaction Documents or any collateral thereunder, (iii) the financial condition of Borrowers, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Transaction Document or (iv) the performance or observance by Borrowers, any of Borrowers' Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Transaction Document.

The Assignee represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement; (ii) it meets all the requirements to be an Eligible Assignee under the Credit Agreement (subject to any consents as are required under the Credit Agreement); (iii) from and after the Closing Date, it will be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, will have the obligations of a Lender thereunder; (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of that type; (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 5.1 thereof, as

<div align="center">VI-2</div>

<div align="right">*Credit Agreement*</div>

applicable, and all other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest; and (vi) it has, independently and without reliance upon Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest.

The Assignee agrees that (i) it will, independently and without reliance upon Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it deems appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Transaction Documents; (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Transaction Documents are required to be performed by it as a Lender; (iii) it appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Transaction Documents as are delegated to such Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto.

Schedule I hereto sets forth the revised Commitment and Principal, if any, of Assignor and the Commitment and Principal, if any, of Assignee, as well as administrative information with respect to Assignee.

From and after the Closing Date, Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Closing Date and to the Assignee for amounts which have accrued from and after the Closing Date.

This Assignment Agreement is binding upon, and will inure to the benefit of, the parties to this Assignment and Assumption and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together will constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment Agreement by telecopy will be effective as delivery of a manually executed counterpart of this Assignment and Assumption.

THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT-OF-LAWS PRINCIPLES.

[Remainder of page left intentionally blank.]

VI-3

*Credit Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Assignment Agreement to be executed by their respective duly authorized officers of the date hereof.

[ASSIGNOR]


By: _____
Title:


[ASSIGNEE]


By: _____
Title:

[CONSENTED TO:

[_]


By: _____
Name:
Title:]


cc:

> GLAS TRUST COMPANY LLC, as Administrative Agent
> 3 Second Street, Suite 206
> Jersey City, NJ 07311
> Fax: 212-202-6246
> Phone: +1 (201) 839-2200
> Email: ClientServices.Americas@glas.agency; tmgus@glas.agency

*Credit Agreement*

Case 25-90399   Document 3563-20   Filed in TXSB on 10/30/25   Page 124 of 178

**SCHEDULE I TO ASSIGNMENT AGREEMENT**

**LIST OF LENDING OFFICES, ADDRESSES
FOR NOTICES AND COMMITMENT AMOUNTS**

**Date:  _____, _____**

**Transferred Percentage: _____%**

| Aggregate Amount of Commitment/Loans | Amount of Commitment Assigned | Amount of Loans Assigned[9] | Percentage Assigned of Commitment/Loans |
|---|---|---|---|
| $ | $ | $ | % |
| $ | $ | $ | % |

**Address for Notices**

_____
_____
Attention:
Phone:
Fax

---

[9] Not to be less than $[•] unless Assigned Interest is the entire amount of Lender's loan/commitment.

VI-4

*Credit Agreement*

EXHIBIT VII

[FORM OF] PROMISSORY NOTE

[$100,000,000]                                                                                          July 6, 2022

**FOR VALUE RECEIVED**, the undersigned hereby absolutely and unconditionally promises to pay on demand [●] (the "Lender") or its registered permitted assign, at the office of GLAS TRUST COMPANY LLC at 3 Second Street, Suite 206, Jersey City, New Jersey 07311, Loans in the principal amount of $[●] ([●] Dollars), or such lesser amount as is outstanding from time to time, and any and all other amounts owing to such Lender, on the dates and in the amounts set forth in the Credit Agreement, dated as of July 6, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among Borrower, First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS TRUST COMPANY LLC, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the *"Administrative Agent"*).  Capitalized terms used herein shall have the meanings assigned to such terms in the Credit Agreement.

The undersigned also promises to pay interest from the Closing Date on the principal amount thereof from time to time outstanding, in Dollars, at such office, in each case, in the manner and at the rate or rates per annum and payable on the dates provided in the Credit Agreement. The undersigned also promises to pay interest on any overdue principal and interest amounts to the extent permitted by applicable Law, in each case, in the manner, at the rate or rates and under the circumstances provided in the Credit Agreement.  If any one or more of the Events of Default shall occur and be continuing, the entire unpaid principal amount of this Note and all of the unpaid interest accrued hereon may become or be declared due and payable in the manner and rate or rates provided in the Credit Agreement.

The undersigned hereby waives diligence, presentment, demand, protest and notice of any kind to the extent possible under any applicable Law (except as expressly provided for in the Credit Agreement). The Lender, and any holder hereof, is entitled to the benefits of the Credit Agreement, the Security Agreement and the other Security Documents, and may enforce the agreements of the Borrower and Guarantors contained therein, and any holder hereof may exercise the respective remedies provided for thereby or otherwise available in respect thereof, all in accordance with the respective terms thereof. The obligations hereunder are guaranteed and secured as provided in the Credit Agreement, Security Agreement and the other Security Documents. No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercises of any other right or power.

This Note evidences Loans under and has been issued by the undersigned in accordance with the terms of the Credit Agreement.

Each payment of principal, interest or other sum payable on or in respect of this Note shall be made by the undersigned to the Administrative Agent at the Administrative Agent's office on the date when due, in immediately available funds.  All payments on or in respect of this Note shall be made

BUSINESS.29164525.2

Case 25-90399   Document 3563-20   Filed in TXSB on 12/30/25   Page 125 of 178

without set-off or counterclaim and free and clear of and without any deductions, withholdings, restrictions or conditions of any nature.

**THIS NOTE AND THE OBLIGATIONS OF THE BORROWER HEREUNDER SHALL FOR ALL PURPOSES BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK (EXCLUDING THE LAWS APPLICABLE TO CONFLICTS OR CHOICE OF LAW).  THE UNDERSIGNED AGREES THAT ANY SUIT FOR THE ENFORCEMENT OF THIS NOTE MAY BE BROUGHT IN ANY UNITED STATES FEDERAL OR STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, NEW YORK AND CONSENTS TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURT AND THE SERVICE OF PROCESS IN ANY SUCH SUIT BEING MADE UPON THE UNDERSIGNED BY CERTIFIED MAIL AT THE ADDRESS SPECIFIED IN SECTION 12.22 OF THE CREDIT AGREEMENT.  THE UNDERSIGNED HEREBY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH SUIT OR ANY SUCH COURT OR THAT SUCH SUIT IS BROUGHT IN AN INCONVENIENT COURT.**

[*Remainder of page left intentionally blank.*]

BUSINESS.29164525.2

**IN WITNESS WHEREOF**, the undersigned has caused this Note to be signed in its corporate name by its duly authorized officer as of the day and year first above written.

Carnaby Inventory III, LLC

By: _____
Name:
Title:

AGREED:

Carnaby Inventory Holdings III, LLC, as guarantor

By: _____
Name:
Title:

AGREED:

First Brands Group Holdings, LLC, as guarantor

By: _____
Name:
Title:

VII-1

*Credit Agreement*

BUSINESS.29164525.2

EXHIBIT VIII-A

FORM OF MONTHLY REPORT[10]

**CARNABY INVENTORY III BORROWING BASE**

Borrowing Base Number:          [#•]
Borrowing Base Month Ending:    [DATE]
Borrowing Base Date:            [DATE]

| | Loan Number | Trico | FRAM | Subensambles |
|---|---|---|---|---|
| **Carnaby Inventory III** | | | | |
| Prior Gross Inventory Balance | | | | |
| Increase/Decrease | - | - | - | |
| Gross Inventory (valued at all times hereunder at the Borrower's cost, determined in accordance with GAAP) | | | | |
| | | | | |
| **INELIGIBLE INVENTORY** | | | | |
| Not Subject to Admin Agent's Priority Lien | - | | | |
| Subject to any other Lien | - | - | - | |
| Obsolete/unmerchantable/defective/discontinued | - | - | - | |
| Subject to third party interest/ownership or on consignment | - | - | - | |
| Foreign Inventory - Not Located in US or Mexico | | | | |
| Outside Processors | - | | | |
| Subject to IP restrictions upon sale | | | | |
| Not reflected in inventory report | | | | |
| Subject to reclamation rights asserted by seller | | | | |
| Not subject to Purchase Orders to Qualified Purchaser | | | | |
| 90-day elapsed | - | | | |
| | | | | |
| Reserves and Offsets for Inventory under GAAP | | | | |
| | | | | |

---

[10] Attach bank account statements.

VIII-A-1

*Credit Agreement*

BUSINESS.29164525.2

| | Loan Number | | Trico | FRAM | Subensambles |
|---|---|---|---|---|---|
| Total Ineligible Inventory | - | | - | - | |
| Eligible Inventory | | | | | |
| | | | | | |
| Management's Representation NOLV | | | 100.0% | 100.0% | |
| NOLV @ 90% | | | 90.0% | 90.0% | |
| Eligible Inventory @ Adv % (NOLV) | | | | | |
| **Inventory Availability** | | | | | |
| | | | | | |
| Facility Limit | **100,000,000** | | | | |
| | | | | | |
| Revolving Loan Balance | - | | | | |
| | | | | | |
| **NET AVAILABILITY / (SHORTFALL)** | | | | | |

*The undersigned represents and warrants that:*

1.      The information provided above and in the accompanying supporting documentation is true, complete and correct, and complies fully with the conditions, terms and covenants of the Credit Agreement, dated as of July 6, 2022 (as amended from time to time, the *"Credit Agreement"*), by and among Borrower, First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and [GLAS], as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the *"Administrative Agent"*).

2.      Since the date of the last financial statement or certification furnished to the Administrative Agent:

(a)      There has been no material adverse change in the financial condition or operations of the undersigned; and

(b)      no Event of Default or Default exists and is continuing; and

(c)      the representations and warranties set forth in Article III are true and correct in all material respects on and as of the date hereof as though made on and as of the date hereof, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall remain true and correct in all material respects as of such earlier date.

BUSINESS.29164525.2

Case 25-90399   Document 3563-10   Filed in TXSB on 10/30/25   Page 129 of 178

3. There have been no payments made by or from the Borrower during [MONTH, YEAR] other than as set forth in such bank account statements for such month.


**Carnaby Inventory III, LLC**


By: _____     Date: _____
    Edward James, EVP


If this document is being transmitted electronically, the Borrower acknowledges that by entering the name of its duly authorized officer on the Certificate, that officer has reviewed the Certificate and affirmed the representations, warranties and certifications referenced above.


BUSINESS.29164525.2

Case 25-90399 Document 3563-20 Filed in TXSB on 10/30/25 Page 131 of 178

[ATTACH SUPPORTING DOCUMENTATION]

**JOINT EXHIBIT NO. 18**
**Page 318 of 812**

[ATTACH ALL BORROWER BANK ACCOUNT STATEMENTS FOR RELEVANT MONTH]

EXHIBIT IX

UCC-FINANCING STATEMENTS

[Attached]

BUSINESS.29164525.2

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Alana Gramer**

B. E-MAIL CONTACT AT FILER (optional)
**alana.gramer@firstbrandsgroup.com**

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Carnaby Inventory Holdings III, LLC** | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **3010 LBJ Freeway, Suite 1200** | **Dallas** | **TX** | **75234** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **GLAS Trust Company LLC, as Administrative Agent** | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **3 Second Street, Suite 206** | **Jersey City** | **NJ** | **07311** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**All assets of Debtor whether now owned or hereafter acquired or arising and wherever located.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**Filed with: Delaware Secretary of State**

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

**JOINT EXHIBIT NO. 18**
**Page 321 of 812**

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| **Alana Gramer** |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| **alana.gramer@firstbrandsgroup.com** |

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Carnaby Inventory III, LLC** | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c.  MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **3010 LBJ Freeway, Suite 1200** | **Dallas** | **TX** | **75234** | **USA** |

2. DEBTOR'S NAME:  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c.  MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **GLAS Trust Company LLC, as Administrative Agent** | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c.  MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **3 Second Street, Suite 206** | **Jersey City** | **NJ** | **07311** | **USA** |

4. COLLATERAL:  This financing statement covers the following collateral:

**All assets of Debtor whether now owned or hereafter acquired or arising and wherever located.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**Filed with: Delaware Secretary of State**

International Association of Commercial Administrators (IACA)
FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

**JOINT EXHIBIT NO. 18**
**Page 322 of 812**

EXHIBIT X

[RESERVED]

BUSINESS.29164525.2

EXHIBIT XI

FORM OF PURCHASE AGREEMENT

[Attached]

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "***Agreement***") is made and entered into as of June [•], 2022 (the "***Execution Date***"), by and between TRICO TECHNOLGIES CORPORATION,[1] a Delaware corporation (the "***Seller***") and CARNABY INVENTORY III, LLC (the "***Buyer***").  The Seller and the Buyer are each a "***Party***" and collectively, the "***Parties***."

**RECITALS**

WHEREAS, the Seller desires to sell, assign and transfer free and clear of any lien, and the Buyer desires to purchase, all of the assets set forth on any schedule under this Agreement executed by Seller and Buyer (each, a "***Schedule***") in the form attached hereto as **Annex I,** free and clear of any lien, which consist of certain inventory of the Seller (collectively, the "***Acquired Assets***"), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties to this Agreement, intending to be legally bound, hereby agree as follows:

1.  **Sale and Purchase of Assets**.  At each Subsequent Closing, the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and its affiliates in and to all of the Acquired Assets described on a Schedule as of the Subsequent Closing Date.

2.  **Purchase Price**.  The purchase price for each Acquired Asset will be the fair market value thereof (the "***Purchase Price***"), which amount may be paid in the form of cash, in kind or by an increase in the amount payable under the Seller's Subordinated Note (as defined below).

3.  **Closing**.  The purchase and sale of the Acquired Assets pursuant to an executed Schedule shall occur a upon payment of the applicable Purchase Price for each Acquired Asset (each, a "***Subsequent Closing***" and the date thereof, a "***Subsequent Closing Date***"). The risk of loss and full benefit of ownership of the Acquired Assets shall transfer to the Buyer immediately upon the Subsequent Closing.

4.  **Subordinated Note**.  Seller irrevocably agrees to advance each subordinated loan requested by the Buyer as payment for the applicable Purchase Price (or portion thereof).  Each subordinated loan shall be evidenced by, and shall be payable in accordance with the terms and provisions of, a Subordinated Note.  "***Subordinated Note***" for purposes hereof means a promissory note in substantially the form of **Annex II** hereto.

5.  **Seller's Representations and Warranties**.  Seller represents and warrants to the Buyer, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

    (a)  **Organization, Existence, Good Standing**.  Seller is duly incorporated, organized, or formed, and is existing and in good standing under the laws of its jurisdiction of incorporation, organization, or formation.

---

[1] NTD:  To be duped out for FRAM Group Operations LLC and Trico Products Corporation once agreed.

BUSINESS.29168794.2

(b) **Power and Authority**. Seller has full power and authority to enter into and perform this Agreement.  The execution, delivery and performance of this Agreement by Seller have been duly and validly approved by Seller's board of directors or equivalent governing body, as applicable.  No other proceedings are necessary on the part of Seller to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein.  Seller has the necessary power and authority to own and operate the Acquired Assets.

(c) **Enforceability**.  This Agreement has been duly authorized, executed and delivered by Seller and constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(d) **Governmental Consents and Conflicts**.  No consent, authorization, order or approval of, or filing or registration with, any Governmental Authority is required for or in connection with the consummation by Seller of the transactions contemplated by this Agreement.

(e) **Other Consents and Conflicts**.  Neither the execution nor delivery of this Agreement by Seller, nor the consummation by Seller of the transactions contemplated in this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any claim upon any of the Acquired Assets, under (i) Seller's corporate governing or other organizational documents, or (ii) any contract that is material to the operation of the business of Seller.

(f) **Title to Assets**.  Seller has good title to the Acquired Assets, in each case free and clear of any Liens.

(g) **Transfer Taxes**.  Seller hereby represents and warrants with respect to the Acquired Assets that the sale, transfer, assignment and conveyance of the Acquired Assets by Seller pursuant to this Agreement is not subject to and will not result in any tax, fee or governmental charge payable by the Buyer or Seller to any federal, state or local government ("*Transfer Taxes*").  In the event that Seller receives notice of any Transfer Taxes arising out of the transfer of such Assets, Seller shall give notice thereof to the Buyer, and Seller shall pay any such Transfer Taxes.

(h) **Condition and Sufficiency of Acquired Assets**.  The Acquired Assets are in good condition for use in the business as used by Seller as of the date hereof, ordinary wear and tear excepted.

(i) **Right of Others to Purchase Assets**. Seller has not entered into any other contracts for the sale of any of the Acquired Assets, nor are there any rights of first refusal or options to purchase any of the Acquired Assets or any other rights of others that might prevent the consummation of this Agreement.

6. **Transfers Intended as Sales**. Each purchase of the Acquired Assets is made without recourse to Seller. The parties hereto have structured each transaction contemplated by this Agreement as an absolute and irrevocable sale, and the Buyer and Seller agree to treat each such transaction as a "true sale" for all purposes under applicable law and accounting principles, including, without

<div align="center">2</div>

BUSINESS.29168794.2
DRAFT

<div align="center">**JOINT EXHIBIT NO. 18**
**Page 326 of 812**</div>

limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings (and shall reflect such sale in their respective financial statements). Seller will advise anyone inquiring about the ownership of any Acquired Assets that all Acquired Assets have been sold to the Buyer.

7.   **Buyer's Representations and Warranties**.  The Buyer represents and warrants to Seller, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

    (a)   **Organization, Existence, Good Standing**.  The Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all the requisite power and authority to enter into this Agreement and to purchase the Acquired Assets.

    (b)   **Enforceability**.   This Agreement constitutes the Buyer's legal, valid and binding obligation and is enforceable according to its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

    (c)   **Power and Authority**.  The Buyer's execution and delivery of this Agreement, and the consummation of the transactions it contemplates, will not (i) violate, breach or be a default under any contract, agreement or commitment, (ii) violate any order, injunction, rule, regulation or ordinance of any court, administrative agency or governmental body, or (iii) violate or breach the Buyer's organizational or governing documents.

8.   **Further Assurances**.  From and after the Closing, at the request of the Buyer, Seller will execute and deliver, or cause to be executed and delivered, to the Buyer such instruments and other documents as the Buyer may request in order to implement the purchase and sale of the Acquired Assets, including, without limitation, bills of sale, transfer or assignment agreements, the filing of certificates of title and similar instruments, and any filings relating to the payment of Transfer Taxes.  Seller and the Buyer shall cooperate and use their respective reasonable best efforts to comply with their respective obligations under this Agreement.

9.   **Expenses**.  Except as otherwise provided in this Agreement with respect to Transfer Taxes, each Party will bear its own expenses incurred or to be incurred in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby.

10.   **No Assignment**.  The rights and obligations of the Seller under this Agreement may not be assigned without the prior written consent of the Buyer, except that Seller may, without the consent of Buyers, assign any or all of its rights and obligations to any of its affiliates, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of Seller hereunder or the failure of Seller to perform any of its covenants hereunder, and provided that no such assignment shall relieve Seller of any of its liabilities or obligations hereunder.  The rights and obligations of the Buyer under this Agreement may not be assigned without prior written consent of Seller, except that the Buyer may, without the consent of Seller, assign any or all of its rights and obligations under this Agreement to (a) any affiliate of the Buyer, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of the Buyer hereunder or the failure of the Buyer to perform any of its covenants hereunder, and provided that no such assignment shall relieve the Buyer of any of its

BUSINESS.29168794.2
DRAFT

liabilities or obligations hereunder; or (b) any lenders of the Buyer or any affiliate of the Buyer as collateral security.  Notwithstanding anything herein to the contrary, the prior written consent of GLAS Trust Company LLC, as administrative agent for the lenders under that Credit Agreement, dated as of June [•], 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among buyer, as the borrower, First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS Trust Company LLC, as administrative agent, shall be required for any assignment pursuant to this Section 10.

11. **Headings**.  The headings contained in this Agreement are included for purposes of convenience only, and do not affect the meaning or interpretation of this Agreement.

12. **Severability**.  If any provision of this Agreement or the application of any provision of this Agreement to any Party or circumstance is, to any extent, adjudged invalid or unenforceable, then the application of the remainder of such provision to such Party or circumstance, the application of such provision to other Parties or circumstances, and the application of the remainder of this Agreement will not be affected thereby.  Upon such determination that any term or other provision is invalid or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13. **Notices**.  All notices and other communications required or permitted under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) one day after deposit with an overnight delivery service (prepaid, return receipt requested), (c) three days after being mailed if sent by registered or certified mail (postage prepaid, return receipt requested), (d) upon receipt of electronic evidence of successful electronic mail transmission or (e) upon electronic confirmation of successful facsimile transmission, in each case, to the appropriate Party at the address or facsimile number specified below:

    (a)    If to Seller:

        c/o First Brands Group, LLC
        127 Public Square, Suite 5300
        Cleveland, Ohio 44114
        Attention: Edward James, Executive Vice President
        Email: ed.james@firstbrandsgroup.com

    (b)    If to the Buyer:

        Carnaby Inventory III, LLC
        1540 Broadway, Suite 3710
        New York, New York
        Attention:  Shekhar Kumar, Managing Director
        Email:  shekhar.kumar@viceroyprivatecapital.co

14. **Governing Law**.  This Agreement will be governed by and construed and enforced in accordance with the laws of the State of New York without regard to principles of conflicts of law.

4

BUSINESS.29168794.2
DRAFT

**JOINT EXHIBIT NO. 18**
**Page 328 of 812**

15. **Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED UPON, ARISING OUT OF OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

16. **Counterparts**.  This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission (including documents in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Agreement.

**[Signatures Pages Follow]**

BUSINESS.29168794.2
DRAFT

**JOINT EXHIBIT NO. 18**
**Page 329 of 812**

IN WITNESS WHEREOF, each of the Parties have duly executed this Agreement or have caused this Asset Agreement to be duly executed as of the date first written above.

**BUYER:**


**CARNABY INVENTORY III, LLC**


By:_____
Name:   Shekhar Kumar
Title:    Managing Director

**SELLER:**

**TRICO TECHNOLOGIES CORPORATION**


By:_____
Name:   Michael Baker
Title:    Chief Corporate Strategy Officer


[Signature Page to Asset Purchase Agreement]

BUSINESS.29168794.2

Annex I to Asset Purchase Agreement

Form of Schedule

      This SCHEDULE NO. ___, dated as of _____ __, 20___ (the "**Schedule**") to that certain Asset Purchase Agreement dated as of [•], 20__ (as may be further amended, supplemented or modified from time to time, the "**Asset Purchase Agreement**"), is executed among TRICO TECHNOLOGIES CORPORATION, a Delaware corporation (the "**Seller**") and CARNABY INVENTORY III, LLC (the "**Buyer**").  The Seller and the Buyer are each a "**Party**" and collectively, the "**Parties**."

      WHEREAS, the Asset Purchase Agreement provides for the execution and delivery of a Schedule to the Asset Purchase Agreement substantially in the form hereof in connection with any sale of Acquired Assets on a Subsequent Closing Date;

      NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, the Parties hereby agree as follows:

1.  The Seller and the Buyer hereby confirm that all of the assets described on Exhibit A to this Schedule are Acquired Assets under the Asset Purchase Agreement, and that the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and their respective affiliates to those Acquired Assets described on Exhibit A hereto as of the Subsequent Closing Date.

2.  All capitalized terms used in this Schedule but not defined in this Schedule shall have the meaning set forth in the Asset Purchase Agreement.

BUSINESS.29168794.2
DRAFT

Case 25-90399   Document 3503-20   Filed in TXSB on 11/04/25   Page 145 of 178

IN WITNESS WHEREOF, the Parties have duly executed this Schedule or have caused this Schedule to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY III, LLC**

By:_____
Name:
Title:    Managing Director

**SELLER:**

**TRICO TECHNOLOGIES CORPORATION**

By:_____
Name:
Title:

BUSINESS.29168794.2
DRAFT

**JOINT EXHIBIT NO. 18**
**Page 332 of 812**

Exhibit A to Schedule No. ____

Acquired Assets

_____

BUSINESS.29168794.2

<u>Annex II to Asset Purchase Agreement</u>

Form of Subordinated Note

BUSINESS.29168794.2
DRAFT

EXHIBIT XII

FORM OF SALE AGREEMENT

[Attached]

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of June [•], 2022 (the "*Execution Date*"), by and between CARNABY INVENTORY III, LLC, a Delaware limited liability company (the "*Seller*") and TRICO TECHNOLOGIES CORPORATION[1] (the "*Buyer*").  The Seller and the Buyer are each a "*Party*" and collectively, the "*Parties*."

**RECITALS**

WHEREAS, the Seller desires to sell, assign and transfer free and clear of any lien, and the Buyer desires to purchase, all of the assets set forth on any schedule under this Agreement executed by Seller and Buyer (each, a "*Schedule*") in the form attached hereto as **Annex I,** free and clear of any lien, which consist of certain inventory of the Seller (collectively, the "*Acquired Assets*"), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties to this Agreement, intending to be legally bound, hereby agree as follows:

1. **Sale and Purchase of Assets**.  At each Subsequent Closing, the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and its affiliates in and to all of the Acquired Assets described on a Schedule as of the Subsequent Closing Date.

2. **Purchase Price**.  The purchase price for each Acquired Asset will be the fair market value thereof (the "*Purchase Price*"), which amount may be paid in the form of cash or in kind.

3. **Closing**.  The purchase and sale of the Acquired Assets pursuant to an executed Schedule shall occur a upon payment of the applicable Purchase Price for each Acquired Asset (each, a "*Subsequent Closing*" and the date thereof, a "*Subsequent Closing Date*").  The risk of loss and full benefit of ownership of the Acquired Assets shall transfer to the Buyer immediately upon the Subsequent Closing.

4. **[Reserved]**.

5. **Seller's Representations and Warranties**.  Seller represents and warrants to the Buyer, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

    (a) **Organization, Existence, Good Standing**. Seller is duly incorporated, organized, or formed, and is existing and in good standing under the laws of its jurisdiction of incorporation, organization, or formation.

    (b) **Power and Authority**. Seller has full power and authority to enter into and perform this Agreement.  The execution, delivery and performance of this Agreement by Seller have been duly and validly approved by Seller's board of directors or equivalent governing body, as applicable.  No other proceedings are necessary on the part of Seller to authorize the execution, delivery and performance of this Agreement and the consummation of the

---

[1] To be duped out for FRAM Group Operations LLC and Trico Products Corporation once agreed.

29168788.2

transactions contemplated herein.  Seller has the necessary power and authority to own and operate the Acquired Assets.

(c) **Enforceability**.  This Agreement has been duly authorized, executed and delivered by Seller and constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(d) **Governmental Consents and Conflicts**.  No consent, authorization, order or approval of, or filing or registration with, any Governmental Authority is required for or in connection with the consummation by Seller of the transactions contemplated by this Agreement.

(e) **Other Consents and Conflicts**.  Neither the execution nor delivery of this Agreement by Seller, nor the consummation by Seller of the transactions contemplated in this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any claim upon any of the Acquired Assets, under (i) Seller's corporate governing or other organizational documents, or (ii) any contract that is material to the operation of the business of Seller.

(f) **Title to Assets**.  Seller has good title to the Acquired Assets, in each case free and clear of any Liens.

(g) **Transfer Taxes**.  Seller hereby represents and warrants with respect to the Acquired Assets that the sale, transfer, assignment and conveyance of the Acquired Assets by Seller pursuant to this Agreement is not subject to and will not result in any tax, fee or governmental charge payable by the Buyer or Seller to any federal, state or local government ("*Transfer Taxes*").  In the event that Seller receives notice of any Transfer Taxes arising out of the transfer of such Assets, Seller shall give notice thereof to the Buyer, and Seller shall pay any such Transfer Taxes.

(h) **Condition and Sufficiency of Acquired Assets**.  The Acquired Assets are in good condition for use in the business as used by Seller as of the date hereof, ordinary wear and tear excepted.

(i) **Right of Others to Purchase Assets**.  Seller has not entered into any other contracts for the sale of any of the Acquired Assets, nor are there any rights of first refusal or options to purchase any of the Acquired Assets or any other rights of others that might prevent the consummation of this Agreement.

6. **Transfers Intended as Sales**.  Each purchase of the Acquired Assets is made without recourse to Seller. The parties hereto have structured each transaction contemplated by this Agreement as an absolute and irrevocable sale, and the Buyer and Seller agree to treat each such transaction as a "true sale" for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings (and shall reflect such sale in their respective financial statements). Seller will advise anyone inquiring about the ownership of any Acquired Assets that all Acquired Assets have been sold to the Buyer.

2

29168788.2
DRAFT

Case 25-90399   Document 3563-20   Filed in TXSB on 11/04/25   Page 151 of 178

7.  **<u>Buyer's Representations and Warranties</u>**.  The Buyer represents and warrants to Seller, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

    (a)  **<u>Organization, Existence, Good Standing</u>**.  The Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all the requisite power and authority to enter into this Agreement and to purchase the Acquired Assets.

    (b)  **<u>Enforceability</u>**.  This Agreement constitutes the Buyer's legal, valid and binding obligation and is enforceable according to its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

    (c)  **<u>Power and Authority</u>**.  The Buyer's execution and delivery of this Agreement, and the consummation of the transactions it contemplates, will not (i) violate, breach or be a default under any contract, agreement or commitment, (ii) violate any order, injunction, rule, regulation or ordinance of any court, administrative agency or governmental body, or (iii) violate or breach the Buyer's organizational or governing documents.

8.  **<u>Further Assurances</u>**.  From and after the Closing, at the request of the Buyer, Seller will execute and deliver, or cause to be executed and delivered, to the Buyer such instruments and other documents as the Buyer may request in order to implement the purchase and sale of the Acquired Assets, including, without limitation, bills of sale, transfer or assignment agreements, the filing of certificates of title and similar instruments, and any filings relating to the payment of Transfer Taxes.  Seller and the Buyer shall cooperate and use their respective reasonable best efforts to comply with their respective obligations under this Agreement.

9.  **<u>Expenses</u>**.  Except as otherwise provided in this Agreement with respect to Transfer Taxes, each Party will bear its own expenses incurred or to be incurred in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby.

10.  **<u>No Assignment</u>**.  The rights and obligations of the Seller under this Agreement may not be assigned without the prior written consent of the Buyer, except that Seller may, without the consent of Buyers, assign any or all of its rights and obligations to any of its affiliates, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of Seller hereunder or the failure of Seller to perform any of its covenants hereunder, and provided that no such assignment shall relieve Seller of any of its liabilities or obligations hereunder.  The rights and obligations of the Buyer under this Agreement may not be assigned without prior written consent of Seller, except that the Buyer may, without the consent of Seller, assign any or all of its rights and obligations under this Agreement to (a) any affiliate of the Buyer, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of the Buyer hereunder or the failure of the Buyer to perform any of its covenants hereunder, and provided that no such assignment shall relieve the Buyer of any of its liabilities or obligations hereunder; or (b) any lenders of the Buyer or any affiliate of the Buyer as collateral security.  Notwithstanding anything herein to the contrary, the prior written consent of GLAS Trust Company LLC, as administrative agent for the lenders under that Credit Agreement, dated as of June [•], 2022 (as amended, restated, supplemented or otherwise modified from time to time, the **_"Credit Agreement"_**), by and among buyer, as the borrower, First Brands Group, LLC,

<div align="center">3</div>

29168788.2
DRAFT

<div align="center">**JOINT EXHIBIT NO. 18**
**Page 338 of 812**</div>

as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS Trust Company LLC, as administrative agent, shall be required for any assignment pursuant to this Section 10.

11. **Headings**.  The headings contained in this Agreement are included for purposes of convenience only, and do not affect the meaning or interpretation of this Agreement.

12. **Severability**.  If any provision of this Agreement or the application of any provision of this Agreement to any Party or circumstance is, to any extent, adjudged invalid or unenforceable, then the application of the remainder of such provision to such Party or circumstance, the application of such provision to other Parties or circumstances, and the application of the remainder of this Agreement will not be affected thereby.  Upon such determination that any term or other provision is invalid or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13. **Notices**.  All notices and other communications required or permitted under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) one day after deposit with an overnight delivery service (prepaid, return receipt requested), (c) three days after being mailed if sent by registered or certified mail (postage prepaid, return receipt requested), (d) upon receipt of electronic evidence of successful electronic mail transmission or (e) upon electronic confirmation of successful facsimile transmission, in each case, to the appropriate Party at the address or facsimile number specified below:

   (a)    If to Buyer:

   c/o First Brands Group, LLC
   127 Public Square, Suite 5300
   Cleveland, Ohio 44114
   Attention: Edward James, Executive Vice President
   Email: ed.james@firstbrandsgroup.com

   (b)    If to the Seller:

   Carnaby Inventory III, LLC
   1540 Broadway, Suite 3710
   New York, New York
   Attention:  Shekhar Kumar, Managing Director
   Email:  shekhar.kumar@viceroyprivatecapital.co

14. **Governing Law**.  This Agreement will be governed by and construed and enforced in accordance with the laws of the State of New York without regard to principles of conflicts of law.

15. **Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED UPON, ARISING OUT OF OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

29168788.2
DRAFT

16.     **Counterparts**.  This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission (including documents in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Agreement.

**[Signatures Pages Follow]**

29168788.2
DRAFT

Case 25-90399   Document 3563-20   Filed in TXSB on 11/30/25   Page 154 of 178

IN WITNESS WHEREOF, each of the Parties have duly executed this Agreement or have caused this Asset Agreement to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY III, LLC**

By:_____
Name:  Shekhar Kumar
Title:   Managing Director

**SELLER:**

**TRICO TECHNOLOGIES CORPORATION**

By:_____
Name:  Michael Baker
Title:   Chief Corporate Strategy Officer

[Signature Page to Asset Purchase Agreement]

29168788.2

**JOINT EXHIBIT NO. 18**
**Page 341 of 812**

Annex I to Asset Purchase Agreement

Form of Schedule

     This SCHEDULE NO. ___, dated as of _____ __, 20___ (the "**Schedule**) to that certain Asset Purchase Agreement dated as of [•], 20__ (as may be further amended, supplemented or modified from time to time, the "**Asset Purchase Agreement**"), is executed among TRICO TECHNOLOGIES CORPORATION, a Delaware corporation (the "**Seller**") and CARNABY INVENTORY III, LLC (the "**Buyer**").  The Seller and the Buyer are each a "**Party**" and collectively, the "**Parties**."

     WHEREAS, the Asset Purchase Agreement provides for the execution and delivery of a Schedule to the Asset Purchase Agreement substantially in the form hereof in connection with any sale of Acquired Assets on a Subsequent Closing Date;

     NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, the Parties hereby agree as follows:

1.  The Seller and the Buyer hereby confirm that all of the assets described on Exhibit A to this Schedule are Acquired Assets under the Asset Purchase Agreement, and that the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and their respective affiliates to those Acquired Assets described on Exhibit A hereto as of the Subsequent Closing Date.

2.  All capitalized terms used in this Schedule but not defined in this Schedule shall have the meaning set forth in the Asset Purchase Agreement.

29168788.2
DRAFT

IN WITNESS WHEREOF, the Parties have duly executed this Schedule or have caused this Schedule to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY III, LLC**


By:_____
Name:
Title:



**SELLER:**

**TRICO TECHNOLOGIES CORPORATION**



By:_____
Name:
Title:

29168788.2
DRAFT

Exhibit A to Schedule No. ____

Acquired Assets

29168788.2

EXHIBIT XIII

FORM OF MANUFACTURING AGREEMENT

[Attached]

Case 25-90399   Document 3563-20   Filed in TXSB on 12/30/25   Page 159 of 178

## MANUFACTURING  AGREEMENT

This Manufacturing Agreement (hereinafter referred to as the "Agreement") is entered into by and between **Trico Products Corporation** (hereinafter "**Trico Products**"), a corporation, duly organized and validly existing under the laws of Delaware, United States of America, represented by **Shekhar Kumar** in his capacity as Corporate Finance Manager, and **Carnaby Inventory III, LLC** (hereinafter as "**Carnaby**") limited liability company, duly organized and validly existing under the laws of Delaware, United States of America, represented by **Shekhar Kumar** in his capacity as Managing Director; pursuant to the following recitals and clauses.

## RECITALS

**WHEREAS**, **Trico Products** has entered into a Maquila Agreement with Subensambles Internacionales, S. de R.L. de C.V. (the "**Maquila Agreement**"). A copy of said Maquila Agreements and their corresponding amendments is attached hereto and identified as **Exhibit "A"**;

**WHEREAS**, **Subensambles Internacionales, S. de R.L. de C.V.** (the "**Maquiladora**") is a company duly organized and validly existing under the laws of the United States of Mexico and performs its operations in Mexico, in the location specified in **Exhibit "B"**;

**WHEREAS**, **Trico Products** and **Carnaby** (jointly referred to as the "**Parties**") wish to enter into this manufacturing agreement pursuant to which **Carnaby** will hire and request the manufacturing services from **Trico Products** to manufacture and produce the products requested by **Carnaby** (the "**Products**");

**WHEREAS,** the parties intend to establish the terms and conditions of their business understanding with the purpose that hereinafter such business relationship is governed under the terms and conditions set forth herein;

**WHEREAS**, **Carnaby** acknowledges that the commercial manufacturing business relationship is with **Trico Products** and accepts that **Trico Products** could perform the manufacture processes required by **Carnaby** with another entity that could be located in the United States of America, in Mexico or in any other Country;

**WHEREAS**, for purposes of this Agreement, the parties agree that the commercial manufacturing business relationship is between **Carnaby** and **Trico Products** and Trico Products will provide the manufacturing services set forth herein through its **Maquiladora** located in Mexico;

**WHEREAS**, **Trico Products** has the expertise, facilities, equipment and appropriate personnel to carry out the manufacturing services requested by **Carnaby** through its **Maquiladora** located in Mexico;

**WHEREAS**, **Carnaby** will license to **Trico Products** and in turn its **Maquiladora** certain intellectual property rights and know-how relating to the Products and will deliver directly to the **Maquiladora** the necessary **Materials** for the manufacturing of the requested Products**;**

**WHEREAS,** the **Maquiladora** has secured authorization from the Ministry of Economy to operate under a maquiladora program ("**Maquiladora Program**") in accordance with the Decree for the Development of the Manufacturing, Maquiladora and Export Services Industry ("**IMMEX Decree**"), and other customs authorization, program, license and/or registry required to import on a temporarily basis, export and manufacture, accordingly, in the most efficient way, the machinery, equipment and materials (jointly, the "**IMMEX Permits**");

**WHEREAS,** the **Maquiladora** is a registered enterprise for value added tax and excise tax purposes and has secured a Value Added Tax and Excise Tax Certification under modality A ("**VAT Certification**"), which entitles to a tax credit benefit for Value Added Tax and Excise Tax upon temporary importations;

**WHEREAS**, the commercial manufacturing business relationship will be exclusively at all times between **Carnaby**

Case 25-90399   Document 3563-20   Filed in TXSB on 11/30/25   Page 159 of 178

and **Trico Products**;

WHEREAS, **Trico Products** acknowledges that it is the intention of **Carnaby** to have a business relationship that will not be taxable as a Permanent Establishment ("**PE**") for **Carnaby** under Mexican income tax law ("**Mexican Income Tax Law**");

WHEREAS, on the date hereof, **Carnaby,** Carnaby Inventory Holdings III, LLC, First Brands Group Holdings, LLC, and First Brands Group, LLC, have entered into a certain credit agreement (the "**Credit Agreement**");

WHEREAS, the representatives of the parties have sufficient authority to enter into this Agreement, same that at the date of execution of this Agreement have not been revoked; and

NOW THEREFORE, in consideration of the of the recitals mentioned above, **Trico Products** and **Carnaby** agree to establish their commercial manufacturing business relationship in accordance with the following:

<p align="center">CLAUSES</p>

**FIRST. Trico Products** binds itself to carry out in benefit of **Carnaby**, the requested manufacturing process through its **Maquiladora**. **Trico Products** binds itself to transfer exclusively the Products manufactured under the instructions of **Carnaby** in accordance with the technical specifications and quality standards that will be provided by **Carnaby** and strictly under the terms hereof.

**SECOND. Trico Products** will provide through its **Maquiladora** the manufacturing process required by **Carnaby** with its expertise, facilities, machinery, equipment and appropriate personnel; **Trico Products** will be responsible before **Carnaby** for the use of the Materials provided by **Carnaby**, for Manufacturing process, the manufactured Products by **Trico Products** through its **Maquiladora**.

**THIRD. Carnaby** hires **Trico Products** to carry out the manufacturing services of the Products requested by **Carnaby**, as well as any other products, as may be agreed by the parties in the future in writing and **Trico Products** accepts and agrees to perform the manufacturing process through its **Maquiladora** in accordance with the terms of this Agreement.

**FOURTH. Carnaby** shall deliver to **Trico Products** at a previously agreed Maquiladora location, on a periodic basis, on consignment, under gratuitous bailment, the raw materials, components, subassemblies, and supplies ("**Materials**") as are necessary to carry out the Manufacturing process of the Products performed by **Trico Products** through its **Maquiladora**. The parties shall agree in writing the Maquiladora and location where the Materials will be delivered by **Carnaby**, as well as the amounts, delivery dates and times, materials, and any other relevant aspect or information concerning the delivery of Materials.

Neither **Trico Products** or its **Maquiladora** shall under no circumstances be considered to have any proprietary interest on the **Materials** which **Carnaby** may deliver to **Trico Products** as provided for herein nor on the Products. Any commercial invoice that may be issued by **Carnaby** in order to comply with customs requirements for the exportation or importation of any **Materials** provided by **Carnaby** to **Trico Products** and **Maquiladora,** shall not be considered for any purposes to be evidence of conveyance of title in the **Materials** in favor of **Trico Products** or its **Maquiladora.** Once the Products covered by this Agreement have been manufactured by **Trico Products** through its **Maquiladora,** they must be returned to **Carnaby** in accordance with the terms of this Agreement.

**Trico Products** and its **Maquiladora** shall provide necessary administrative services for shipment, including the arrangement of proper transportation, of the **Materials** and the Products under this Agreement between the United Mexican States and the United States of America using information supplied by **Carnaby** (the "**Administrative Services**"); such Administrative Services shall include, but not be limited to, preparation of required United States of America and United States of Mexico Customs documentation and **Trico Products** agrees to duly and timely comply with all the applicable customs laws. **Trico Products** may be the importer and exporter of record for United

<div align="right">2</div>

<p align="center">**JOINT EXHIBIT NO. 18**<br>**Page 347 of 812**</p>

States of America customs purposes, in which case **Trico Products** shall obtain any validated export licenses required by United States of America export laws and regulations; if agreed by the parties separately to this Agreement, **Trico Products** shall be responsible for all compliance and all costs relating to compliance with United States of America customs regulations, including but not limited to, any and all United States of America import bonds; United States of America customs duties, import fees and taxes; fines and penalties; and United States of America customhouse brokerage fees. The **Maquiladora** shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the **Materials** and Products and shall comply with all record keeping and reporting obligations pursuant to the applicable law.

**Carnaby** shall be responsible for providing to **Trico Products** a detailed list of the **Materials** required to perform the Manufacturing process in order that the **Maquiladora** may obtain the necessary permits and authorizations to import the **Materials** under its IMMEX Program.

At all times during the term of this Agreement, **Trico Products** and its **Maquiladora** shall (i) be duly authorized by the competent governmental authority to operate the **Maquiladora Program**, (ii) hold valid and in force licenses, authorizations, permits, programs, licenses and/or registries required to perform the manufacturing services in the facilities in accordance to applicable laws and pursuant to this Agreement in the most cost-efficient and diligent way (the "Operating Permits" and together with the IMMEX Permits, the "Permits"), and (iii) carry out all the necessary activities before the corresponding governmental authority, to render the manufacturing services on time and agreed manner.

**FIFTH.** For the Products to be in compliance with the technical specifications and quality standards that **Carnaby** requires, **Carnaby** shall make available to **Trico Products** and subsequently **Trico Products** to its **Maquiladora** the knowledge, technical experience, and practice and other industrial information (the "Technical Information").

**Carnaby** will be able and allowed to supervise the manufacturing processes and if necessary, could assist **Trico Products** and in turn **its Maquiladora** to manufacture the Products pursuant to the terms herein.

The parties hereto agree that the transferring of Technical Information shall not trigger any consideration whatsoever, since all Technical Information is necessary for the Products to fulfill the technical specifications and quality standards that **Carnaby** requires, and does not serve any other purpose.

**Trico Products** and its **Maquiladora** shall pay any and all sales taxes, use taxes, personal taxes, flat taxes, value-added taxes, assessments, duties and all other governmental exactions of any nature, in connection with this Agreement, the **Materials,** the **Products** and the **Permits**, or in connection with the operations conducted in the facilities or the manufacturing services performed by **Trico Products** and its **Maquiladora** pursuant to this Agreement.

**SIXTH.** In consideration **Carnaby** shall pay to **Trico Products** the prices agreed separately to this Agreement for the Manufacturing services provided, based on the volume of units manufactured and sold; the payment conditions and terms will be agreed separately from this Agreement between **Carnaby** and **Trico Products**; provided that, any payments from **Carnaby** are subject to it being permitted to do so under Section 2.1(d) of the Credit Agreement

**SEVENTH.** Any samples of the Products officially requested by an agency or department of the Federal Government of Mexico or of other applicable authority of any other applicable country, may only be delivered upon written authorization of **Carnaby**, and provided an official receipt is secured from the requesting agency or department.

**EIGHTH. Trico Products** shall treat and preserve as confidential all information related to **Carnaby's** business, including the Technical Information, revealed to or learned by **Trico Products** and its Maquiladora from any source as a result of this Agreement. **Trico Products** will not disclose nor disseminate, nor permit to be disclosed nor disseminated, any customer list, pricing, technical information, know-how, industrial information, patents,

3

**JOINT EXHIBIT NO. 18**
**Page 348 of 812**

trademarks, processes, programs, practices, methods or other material or data conceived, designed, created, developed, used, assembled or manufactured by **Trico Products** through its **Maquiladora**, unless it is strictly necessary during the training process of the employees to carry out the Processes.

**NINTH. Trico Products** and its **Maquiladora** shall comply with all existing laws and regulations in Mexico, and shall hold the Products, free of any liens, claims or charges by any agency or department of the Federal, State or Municipal governments.

**TENTH.** In performing its obligations under this Agreement, **Trico Products** shall comply with all applicable laws and regulations, including without limitation the applicable laws in Mexico and the Unites States of America or any other country, including without limitation the customs laws and regulations, and any rulings or guidelines issued by the customs authorities in the applicable country. **Trico Products** shall keep a comprehensive and detailed record of all Materials, Products, and any other goods imported into Mexico for purposes of this Agreement, as well as of all exportations of Products, waste, and any other items, maintaining copies of all import and export declarations and related documentation.

**ELEVENTH.** The parties agree that all notices and other communications required or desired to be given pursuant to this Agreement will be given in writing and will be deemed duly given upon personal delivery, or on the day after mailing if sent by a nationally recognized overnight delivery service which maintains records of the time, place and recipient of delivery, or upon receipt of a confirmed transmission if sent by telecopy or facsimile transmission, and in each case if addressed as follows:

**Carnaby Inventory III, LLC**
**Address:** 1540 Broadway Suite 3710, New York, New York
**Attention:** Legal Department
**Email address:** Shekhar Kumar – Shekhar.kumar@viceroyprivatecapital.com


**Trico Products Corporation**:
**Address:** 127 Public Square, Suite 5300, Cleveland, Ohio 44114
**Attention:** Legal Department
**Email Address**:  ed.james@firstbrandsgroup.com

c/o First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention: Edward James, Executive Vice President
Email: ed.james@firstbrandsgroup.com


or to such other person, entity, address or facsimile number as a party may respectively designate in like manner from time to time.

**TWELFTH.-** This Agreement shall continue in force until terminated by either party. Either party may terminate this Agreement upon thirty (30) days prior written notice to the other party in accordance with the notice provisions of Clause Eleventh hereof.

**THIRTEENTH.** If, for any reason, any provision of this Agreement is determined to be invalid or unenforceable, such invalidity or enforceability shall not affect the remaining provisions of this Agreement.

**FOURTEENTH.** Time is of the essence for the performance of all obligations and the satisfaction of all conditions of this Agreement.

4

Case 25-90399   Document 3563-20   Filed in TXSB on 12/30/25   Page 163 of 178

**FIFTEENTH.** Neither party shall be held responsible for any delay or failure in the performance of any part of this Agreement to the extent that such delay or failure is caused by fire, flood, explosion, war, seize, pandemic, government requirement, civil or military authority, act of God, act or omission of carriers, or any lockout, strike, labor trouble or other industrial disturbance, inevitable accident, export delays by governmental authorities or industry or trade association of whatever nature that limits the importation or exportation of the Materials, work in process or Products thereof or another cause beyond any of the parties reasonable control.  Any party excused from performance shall make a good faith effort to minimize the effect of the delay or non-performance.

**SIXTEENTH** This Agreement shall be interpreted pursuant to the laws of the State of New York, United States of America, without giving effect to its choice of law provisions.  Litigation brought to contest disputes arising under this Agreement shall be brought only in the state or federal courts of the State of New York, United States of America.

WAIVER OF JURY TRIAL.  THE PARTIES HEREBY IRREVOCABLY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, COUNTERCLAIM OR CROSS-COMPLAINT IN ANY ACTION OR OTHER PROCEEDING BROUGHT BY THE OTHER WITH RESPECT TO ANY MATTER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH OR RELATED TO THIS AGREEMENT, WHETHER BASED UPON CONTRACTUAL, STATUTORY, TORTIOUS OR OTHER THEORIES OF LIABILITY.

[*Signature page follows*]

Case 25-90399   Document 3563-20   Filed in TXSB on 10/30/25   Page 164 of 178

**IN WITNESS WHEREOF,** the parties have executed this Agreement through their duly authorized representatives, on July 6, 2022, being fully effective as of said date.

**Carnaby Inventory III, LLC**                           **Trico Products Corporation**

_____                    _____
**Name:** Shekhar Kumar                              **Name:** Shekhar Kumar
**Title:** Managing Director                         **Title:** Corporate Finance Manager

[*Signature page of the manufacturing agreement entered into by and between Trico Products Corporation and Carnaby Inventory III, LLC, with acknowledgement and consent of GLAS Trust Company LLC exclusively in its capacity as administrative agent of the Credit Agreement*]

Case 25-90399   Document 3503-20   Filed in TXSB on 12/04/25   Page 165 of 178

## MANUFACTURING AGREEMENT

This Manufacturing Agreement (hereinafter referred to as the "Agreement") is entered into by and between **Trico Technologies Corporation** (hereinafter "**Trico Technologies**"), a corporation, duly organized and validly existing under the laws of Delaware, United States of America, represented by **Shekhar Kumar** in his capacity as Corporate Finance Manager, and **Carnaby Inventory III, LLC** (hereinafter as "**Carnaby**") limited liability company, duly organized and validly existing under the laws of Delaware, United States of America, represented by **Shekhar Kumar** in his capacity as Managing Director; pursuant to the following recitals and clauses.

ssss

## RECITALS

**WHEREAS**, **Trico Technologies** has entered into a Maquila Agreement with Trico Componentes, S.A. de C.V. (the "Maquila Agreement"). A copy of said Maquila Agreements and their corresponding amendments is attached hereto and identified as **Exhibit "A"**;

**WHEREAS**, **Trico Componentes, S.A. de C.V.** (the "**Maquiladora**") is a company duly organized and validly existing under the laws of the United States of Mexico and performs its operations in Mexico, in the location specified in **Exhibit "B"**;

**WHEREAS**, **Trico Technologies** and **Carnaby** (jointly referred to as the "**Parties**") wish to enter into this manufacturing agreement pursuant to which **Carnaby** will hire and request the manufacturing services from **Trico Technologies** to manufacture and produce the products requested by **Carnaby** (the "**Products**");

**WHEREAS,** the parties intend to establish the terms and conditions of their business understanding with the purpose that hereinafter such business relationship is governed under the terms and conditions set forth herein;

**WHEREAS**, **Carnaby** acknowledges that the commercial manufacturing business relationship is with **Trico Technologies** and accepts that **Trico Technologies** could perform the manufacture processes required by **Carnaby** with another entity that could be located in the United States of America, in Mexico or in any other Country;

**WHEREAS**, for purposes of this Agreement, the parties agree that the commercial manufacturing business relationship is between **Carnaby** and **Trico Technologies** and Trico Technologies will provide the manufacturing services set forth herein through its **Maquiladora** located in Mexico;

**WHEREAS**, **Trico Technologies** has the expertise, facilities, equipment and appropriate personnel to carry out the manufacturing services requested by **Carnaby** through its **Maquiladora** located in Mexico;

**WHEREAS**, **Carnaby** will license to **Trico Technologies** and in turn its **Maquiladora** certain intellectual property rights and know-how relating to the Products and will deliver directly to the **Maquiladora** the necessary **Materials** for the manufacturing of the requested Products**;**

**WHEREAS,** the **Maquiladora** has secured authorization from the Ministry of Economy to operate under a maquiladora program ("**Maquiladora Program**") in accordance with the Decree for the Development of the Manufacturing, Maquiladora and Export Services Industry ("**IMMEX Decree**"), and any other customs authorization, program, license and/or registry required to import on a temporarily basis, export and manufacture, accordingly, in the most efficient way, the machinery, equipment and materials (jointly, the "**IMMEX Permits**");

**WHEREAS,** the **Maquiladora** is a registered enterprise for value added tax and excise tax purposes and has secured a Value Added Tax and Excise Tax Certification under modality A ("**VAT Certification**"), which entitles to a tax credit benefit for Value Added Tax and Excise Tax upon temporary importations;

**WHEREAS,** the commercial manufacturing business relationship will be exclusively at all times between **Carnaby**

and **Trico Technologies**;

WHEREAS, **Trico Technologies** acknowledges that it is the intention of **Carnaby** to have a business relationship that will not be taxable as a Permanent Establishment ("**PE**") for **Carnaby** under Mexican income tax law ("**Mexican Income Tax Law**");

WHEREAS, on the date hereof, **Carnaby,** Carnaby Inventory Holdings III, LLC, First Brands Group Holdings, LLC, and First Brands Group, LLC, have entered into a certain credit agreement (the "**Credit Agreement**");

WHEREAS, the representatives of the parties have sufficient authority to enter into this Agreement, same that at the date of execution of this Agreement have not been revoked; and

NOW THEREFORE, in consideration of the of the recitals mentioned above, **Trico Technologies** and **Carnaby** agree to establish their commercial manufacturing business relationship in accordance with the following:

<p align="center">CLAUSES</p>

FIRST. **Trico Technologies** binds itself to carry out in benefit of **Carnaby**, the requested manufacturing process through its **Maquiladora**. **Trico Technologies** binds itself to transfer exclusively the Products manufactured under the instructions of **Carnaby** in accordance with the technical specifications and quality standards that will be provided by **Carnaby** and strictly under the terms hereof.

SECOND. **Trico Technologies** will provide through its **Maquiladora** the manufacturing process required by **Carnaby** with its expertise, facilities, machinery, equipment and appropriate personnel; **Trico Technologies** will be responsible before **Carnaby** for the use of the Materials provided by **Carnaby**, for Manufacturing process, the manufactured Products by **Trico Technologies** through its **Maquiladora**.

THIRD. **Carnaby** hires **Trico Technologies** to carry out the manufacturing services of the Products requested by **Carnaby**, as well as any other products, as may be agreed by the parties in the future in writing and **Trico Technologies** accepts and agrees to perform the manufacturing process through its **Maquiladora** in accordance with the terms of this Agreement.

FOURTH. **Carnaby** shall deliver to **Trico Technologies** at a previously agreed Maquiladora location, on a periodic basis, on consignment, under gratuitous bailment, the raw materials, components, subassemblies, and supplies ("**Materials**") as are necessary to carry out the Manufacturing process of the Products performed by **Trico Technologies** through its **Maquiladora**. The parties shall agree in writing the Maquiladora and location where the Materials will be delivered by **Carnaby**, as well as the amounts, delivery dates and times, materials, and any other relevant aspect or information concerning the delivery of Materials.

Neither **Trico Technologies** or its **Maquiladora** shall under no circumstances be considered to have any proprietary interest on the **Materials** which **Carnaby** may deliver to **Trico Technologies** as provided for herein nor on the Products. Any commercial invoice that may be issued by **Carnaby** in order to comply with customs requirements for the exportation or importation of any **Materials** provided by **Carnaby** to **Trico Technologies** and **Maquiladora,** shall not be considered for any purposes to be evidence of conveyance of title in the **Materials** in favor of **Trico Technologies** or its **Maquiladora.** Once the Products covered by this Agreement have been manufactured by **Trico Technologies** through its **Maquiladora,** they must be returned to **Carnaby** in accordance with the terms of this Agreement.

**Trico Technologies** and its **Maquiladora** shall provide necessary administrative services for shipment, including the arrangement of proper transportation, of the **Materials** and the Products under this Agreement between the United Mexican States and the United States of America using information supplied by **Carnaby** (the "**Administrative Services**"); such Administrative Services shall include, but not be limited to, preparation of required United States of America and United States of Mexico Customs documentation and **Trico Technologies**

agrees to duly and timely comply with all the applicable customs laws. **Trico Technologies** may be the importer and exporter of record for United States of America customs purposes, in which case **Trico Technologies** shall obtain any validated export licenses required by United States of America export laws and regulations; if agreed by the parties separately to this Agreement, **Trico Technologies** shall be responsible for all compliance and all costs relating to compliance with United States of America customs regulations, including but not limited to, any and all United States of America import bonds; United States of America customs duties, import fees and taxes; fines and penalties; and United States of America customhouse brokerage fees. The **Maquiladora** shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the **Materials** and Products and shall comply with all record keeping and reporting obligations pursuant to the applicable law.

**Carnaby** shall be responsible for providing to **Trico Technologies** a detailed list of the **Materials** required to perform the Manufacturing process in order that the **Maquiladora** may obtain the necessary permits and authorizations to import the **Materials** under its IMMEX Program.

At all times during the term of this Agreement, **Trico Technologies** and its **Maquiladora** shall (i) be duly authorized by the competent governmental authority to operate the **Maquiladora Program**, (ii) hold valid and in force licenses, authorizations, permits, programs, licenses and/or registries required to perform the manufacturing services in the facilities in accordance to applicable laws and pursuant to this Agreement in the most cost-efficient and diligent way (the "Operating Permits" and together with the IMMEX Permits, the "Permits"), and (iii) carry out all the necessary activities before the corresponding governmental authority, to render the manufacturing services on time and agreed manner.

**FIFTH.** For the Products to be in compliance with the technical specifications and quality standards that **Carnaby** requires, **Carnaby** shall make available to **Trico Technologies** and subsequently **Trico Technologies** to its **Maquiladora** the knowledge, technical experience, and practice and other industrial information (the "Technical Information").

**Carnaby** will be able and allowed to supervise the manufacturing processes and if necessary, could assist **Trico Technologies** and in turn **its Maquiladora** to manufacture the Products pursuant to the terms herein.

The parties hereto agree that the transferring of Technical Information shall not trigger any consideration whatsoever, since all Technical Information is necessary for the Products to fulfill the technical specifications and quality standards that **Carnaby** requires, and does not serve any other purpose.

**Trico Technologies** and its **Maquiladora** shall pay any and all sales taxes, use taxes, personal taxes, flat taxes, value-added taxes, assessments, duties and all other governmental exactions of any nature, in connection with this Agreement, the **Materials,** the **Products** and the **Permits**, or in connection with the operations conducted in the facilities or the manufacturing services performed by **Trico Technologies** and its **Maquiladora** pursuant to this Agreement.

**SIXTH.** In consideration **Carnaby** shall pay to **Trico Technologies** the prices agreed separately to this Agreement for the Manufacturing services provided, based on the volume of units manufactured and sold; the payment conditions and terms will be agreed separately from this Agreement between **Carnaby** and **Trico Technologies**; provided that, any payments from **Carnaby** are subject to it being permitted to do so under Section 2.1(d) of the Credit Agreement

**SEVENTH.** Any samples of the Products officially requested by an agency or department of the Federal Government of Mexico or of other applicable authority of any other applicable country, may only be delivered upon written authorization of **Carnaby**, and provided an official receipt is secured from the requesting agency or department.

3

**EIGHTH. Trico Technologies** shall treat and preserve as confidential all information related to **Carnaby's** business, including the Technical Information, revealed to or learned by **Trico Technologies** and its Maquiladora from any source as a result of this Agreement. **Trico Technologies** will not disclose nor disseminate, nor permit to be disclosed nor disseminated, any customer list, pricing, technical information, know-how, industrial information, patents, trademarks, processes, programs, practices, methods or other material or data conceived, designed, created, developed, used, assembled or manufactured by **Trico Technologies** through its **Maquiladora**, unless it is strictly necessary during the training process of the employees to carry out the Processes.

**NINTH. Trico Technologies** and its **Maquiladora** shall comply with all existing laws and regulations in Mexico, and shall hold the Products, free of any liens, claims or charges by any agency or department of the Federal, State or Municipal governments.

**TENTH.** In performing its obligations under this Agreement, **Trico Technologies** shall comply with all applicable laws and regulations, including without limitation the applicable laws in Mexico and the Unites States of America or any other country, including without limitation the customs laws and regulations, and any rulings or guidelines issued by the customs authorities in the applicable country. **Trico Technologies** shall keep a comprehensive and detailed record of all Materials, Products, and any other goods imported into Mexico for purposes of this Agreement, as well as of all exportations of Products, waste, and any other items, maintaining copies of all import and export declarations and related documentation.

**ELEVENTH.** The parties agree that all notices and other communications required or desired to be given pursuant to this Agreement will be given in writing and will be deemed duly given upon personal delivery, or on the day after mailing if sent by a nationally recognized overnight delivery service which maintains records of the time, place and recipient of delivery, or upon receipt of a confirmed transmission if sent by telecopy or facsimile transmission, and in each case if addressed as follows:

**Carnaby Inventory III, LLC**
**Address:** 1540 Broadway Suite 3710, New York, New York
**Attention:** Legal Department
**Email address:** Shekhar Kumar – Shekhar.kumar@viceroyprivatecapital.com

**Trico Technologies Corporation**:
**Address:** 127 Public Square, Suite 5300, Cleveland, Ohio 44114
**Attention:** Legal Department
**Email Address**:  ed.james@firstbrandsgroup.com

c/o First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention: Edward James, Executive Vice President
Email: ed.james@firstbrandsgroup.com

or to such other person, entity, address or facsimile number as a party may respectively designate in like manner from time to time.

**TWELFTH.-** This Agreement shall continue in force until terminated by either party. Either party may terminate this Agreement upon thirty (30) days prior written notice to the other party in accordance with the notice provisions of Clause Eleventh hereof.

**THIRTEENTH.** If, for any reason, any provision of this Agreement is determined to be invalid or unenforceable, such invalidity or enforceability shall not affect the remaining provisions of this Agreement.

4

**FOURTEENTH.** Time is of the essence for the performance of all obligations and the satisfaction of all conditions of this Agreement.

**FIFTEENTH.** Neither party shall be held responsible for any delay or failure in the performance of any part of this Agreement to the extent that such delay or failure is caused by fire, flood, explosion, war, seize, pandemic, government requirement, civil or military authority, act of God, act or omission of carriers, or any lockout, strike, labor trouble or other industrial disturbance, inevitable accident, export delays by governmental authorities or industry or trade association of whatever nature that limits the importation or exportation of the Materials, work in process or Products thereof or another cause beyond any of the parties reasonable control.  Any party excused from performance shall make a good faith effort to minimize the effect of the delay or non-performance.

**SIXTEENTH** This Agreement shall be interpreted pursuant to the laws of the State of New York, United States of America, without giving effect to its choice of law provisions.  Litigation brought to contest disputes arising under this Agreement shall be brought only in the state or federal courts of the State of New York, United States of America.

<u>WAIVER OF JURY TRIAL</u>.  THE PARTIES HEREBY IRREVOCABLY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, COUNTERCLAIM OR CROSS-COMPLAINT IN ANY ACTION OR OTHER PROCEEDING BROUGHT BY THE OTHER WITH RESPECT TO ANY MATTER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH OR RELATED TO THIS AGREEMENT, WHETHER BASED UPON CONTRACTUAL, STATUTORY, TORTIOUS OR OTHER THEORIES OF LIABILITY.

[*Signature page follows*]

5

**IN WITNESS WHEREOF,** the parties have executed this Agreement through their duly authorized representatives, on July 6, 2022, being fully effective as of said date.

<table>
<tr><td>**Carnaby Inventory III, LLC**</td><td>**Trico Technologies Corporation**</td></tr>
</table>

| | |
|---|---|
| **Name:**  Shekhar Kumar | **Name:**  Shekhar Kumar |
| **Title:** Managing Director | **Title:** Corporate Finance Manager |

[*Signature page of the manufacturing agreement entered into by and between Trico Products Corporation and Carnaby Inventory III, LLC, with acknowledgement and consent of GLAS Trust Company LLC exclusively in its capacity as administrative agent of the Credit Agreement*]

EXHIBIT XIV

FORM OF PURCHASE ORDER

[Attached]

# Carnaby Inventory III, LLC Purchase Order

| | Date of Order: | Page: 1 of |
|---|---|---|
| | ATP Number: | |

| Buyer (entity) | | | Payment Terms |
|---|---|---|---|
| Trico Products Corporation | | | STANDARD |

**Supplier**
CARNABY INVENTORY III, LLC

**PO Address**

**Manufacturing  Code / Site Name / Address**

**Currency**
USD

| Plant Code / Name | % | UoM | Price | Effective Date | Ship from Country | | |
|---|---|---|---|---|---|---|---|
| | | EA | | | Mexico | | |
| | | EA | | | Mexico | | |

**Remarks**

Buyer hereby agrees that, upon acceptance by Seller of the attached Purchase Order, the purchase of the inventory set forth herein by Buyer from Seller shall be irrevocable.

SCHEDULE A
COMMITMENTS

| Lender | Allocation $ | Allocation % |
|---|---|---|
| CVI AA Master Fund I LP | $19,300,000 | 19.30% |
| CarVal GCF Master Fund I LP | $2,400,000 | 2.40% |
| CVI AV Master Fund I LP | $5,000,000 | 5.00% |
| CVI EMCOF US, LLC | $6,500,000 | 6.50% |
| CarVal Contingent Credit Fund LP | $6,500,000 | 6.50% |
| CVI CVF V Pooling Fund I LP | $58,100,000 | 58.10% |
| CVI CSF Master Fund I LP | $2,200,000 | 2.20% |
| **Total** | **$100,000,000.00** | **100.00%** |

Case 25-90399   Document 3563-20   Filed in TXSB on 10/30/25   Page 174 of 178

SCHEDULE 3.1(n)
REAL PROPERTY

None.

Case 25-90399   Document 3563-20   Filed in TXSB on 10/30/25   Page 175 of 178

SCHEDULE 3.1(gg)
INSURANCE

| Line of Coverage | Carrier | Policy Number | Policy Period |
|---|---|---|---|
| Global Property Program | Zurich | PPR 0534586 02 | 7/1/2021 - 7/1/2022 |
| Global Property Program | Helvetia Swiss Insurance Company in Liechtenstein Ltd | PTNAM2107215 | 7/1/2021 - 7/1/2022 |
| Global Property Program | Aon Client Treaty | PTNAM2107215 | 7/1/2021 - 7/1/2022 |
| Global Property Program | ACE American Insurance Company (Starr Tech) | PGL N18228075 | 7/1/2021 - 7/1/2022 |
| Global Property Program | AIG Specialty Insurance Company | 25032984 | 7/1/2021 - 7/1/2022 |
| Global Property Program | Certain Underwriters at Lloyd's, Syndicate 4444 (Canopius) | B72230AAA | 7/1/2021 - 7/1/2022 |
| Global Property Program | Allied World Assurance Company, Ltd. | P072214/001 | 7/1/2021 - 7/1/2022 |
| Global Property Program | Princeton Excess and Surplus Lines Insurance Company | 78-A3-XP-0000820-00 | 7/1/2021 - 7/1/2022 |
| Global Property Program | Partner Re Insurance Ireland | PTNAM2107216 | 7/1/2021 - 7/1/2022 |
| Global Property Program | Aon Client Treaty | PTNAM2107216 | 7/1/2021 - 7/1/2022 |
| Global Property Program | Starr Surplus Lines Insurance Company | 21SUFDN11350101 | 7/1/2021 - 7/1/2022 |

| Global Property Program | Starr Surplus Lines Insurance Company | 21SUFDN11350201 | 7/1/2021 - 7/1/2022 |
|---|---|---|---|
| Global Property Program | Princeton Excess and Surplus Lines Insurance Company | 78-A3-XP-0000820-00 | 7/1/2021 - 7/1/2022 |
| Excess CA Earthquake (Centric and all California) | Bridgeway Insurance Company Illinois Union Insurance Company | 7EA7XP1001090-01 I11183128 002 | 12/30/21 to 7/1/22 |
| Workers Compensation and Employers Liability (AR, FL, MA, MN, VA, WI) | Travelers | UB-7P319783-21-51-R | 10/1/2021-22 |
| Workers Compensation and Employers Liability (AOS = All Other States) | Travelers | UB-7P330658-21-51-K | 10/1/2021-22 |
| General Liability | Travelers | TC2JGLSA-3J708077-TIL-20 | 10/1/2021-22 |
| Automobile Liability & Auto Physical Damage | Travelers | TJCAP-3J708028-20 | 10/1/2021-22 |
| Umbrella Liability | Chubb | G7254383A001 | 10/1/2021-2022 |
| Excess Liability | National Union Fire Ins. Co. (AIG) | 66323364 | 10/1/2021-2022 |

**JOINT EXHIBIT NO. 18**
**Page 363 of 812**

| Excess Liability | Endurance American Insurance Company (Sompo) | EXC30002039401 | 10/1/2021-2022 |
|---|---|---|---|
| Excess Liability | Axis Surplus Insurance Company | P-001-000437750-02 | 10/1/2021-2022 |
| Excess Liability | Ascot Bermuda Limited | AB2021-00254 | 10/1/2021-2022 |
| Excess Liability | Chaucer - 50% Convex - 50% | CSUSA2105410 | 10/1/2021-2022 |
| Excess Liability | Great American E&S Insurance Co. | XS E653547-01 | 10/1/2021-2022 |
| Excess Liability | Argo Re Ltd. | ARGO-CAS-OCC-001587.2 | 10/1/2021-2022 |
| Excess Liability | Ascot Bermuda - Allianz Global | RA21RF536M2X | 10/1/2021-2022 |
| Excess Liability | XL Insurance America, Inc. | US00107612L121B | 10/1/2021-2022 |

Case 25-90399   Document 3563-20   Filed in TXSB on 10/30/25   Page 177 of 178

SCHEDULE 12.2
ADDRESSES FOR NOTICES

<u>Administrative Agent</u>

GLAS Trust Company LLC
3 Second Street, Suite 206
Jersey City, NJ 07311
Fax:      212-202-6246
Phone:  +1 (201) 839-2200
Email:   ClientServices.Americas@glas.agency;
         tmgus@glas.agency

and

Dechert LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Attn:    Jeffrey Katz
Email:   jeffrey.katz@dechert.com

<u>Loan Parties</u>

Carnaby Inventory III, LLC
1540 Broadway, Suite 3710
New York, New York
Attn:    Shekhar Kumar, Managing Director
Email:   shekhar.kumar@viceroyprivatecapital.co

<u>Holdings</u>

First Brands Group Holdings, LLC
c/o First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attn:    Edward James, Executive Vice President
Email:   ed.james@firstbrandsgroup.com

<u>Servicer</u>

First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attn:    Edward James, Executive Vice President
Email:   ed.james@firstbrandsgroup.com

**<u>Exhibit C</u>**

Execution Version

CROSS-COLLATERALIZATION AGREEMENT

CROSS-COLLATERALIZATION AGREEMENT, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**"), by and among GLAS Trust Company LLC, in its capacity as administrative agent (together with its successors and permitted assigns in such capacity, the "**Brakes Facility Agent**") under the Brakes Facility Credit Agreement (as defined below), GLAS Trust Company LLC, in its capacity as administrative agent (together with its successors and permitted assigns in such capacity, the "**Wipers Facility Agent**") under the Wipers Facility Credit Agreement (as defined below) and each of the other parties to each of the Brakes Facility Credit Agreement, the other Brakes Facility Loan Documents (as defined below), the Wipers Facility Credit Agreement and the other Wipers Facility Loan Documents (as defined below).  The Credit Parties (as defined below), Holdings (as defined below), FBG (as defined below), Brakes Parts Inc LLC, BPI Brakes Manufacturing Juarez, S.A. de C.V., BPI Braking Systems Mexico, S.A. de C.V., Trico Technologies Corporation, FRAM Group Operations LLC, Trico Componentes, S.A. de C.V., Fram Group Operations Mexicali, S.A. de C.V., Subensambles Internacionales, S.de R.L. de C.V. are collectively referred to herein as the "**FBG Parties**".

RECITALS

WHEREAS, Carnaby Inventory II, LLC (the "**Brakes Facility Borrower**") entered into the Credit Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Brakes Facility Credit Agreement**" and together with the Transaction Documents thereunder, the "**Brakes Facility Loan Documents**"), with Carnaby Inventory Holdings II, LLC ("**Brakes Facility Parent**" and together with the Brakes Facility Borrower, the "**Brakes Facility Loan Parties**"), First Brands Group Holdings, LLC ("**Holdings**"), First Brands Group, LLC ("**FBG**"), the Brakes Facility Agent and the lenders from time to time party thereto (the "**Brakes Facility Lenders**" and together with the Brakes Facility Agent, the "**Brakes Facility Secured Parties**");

WHEREAS, in connection with the Brakes Facility Credit Agreement, each of the Brakes Facility Loan Parties granted a security interest in substantially all of their respective assets (the "**Brakes Facility Collateral**") to the Brakes Facility Agent, for the benefit of the Brakes Facility Secured Parties, pursuant to the Pledge and Security Agreement, dated as of May 31, 2022 (the "**Brakes Facility U.S. Security Agreement**") and the Floating Lien Pledge Agreement *(Contrato de Prenda Sin Transmisión de Poesión)*, dated as of May 31, 2022 (the "**Brakes Facility Mexican Security Agreement**") to secure (i) all Obligations (as defined in the Brakes Facility U.S. Security Agreement) and (ii) all Secured Obligations ("*Obligaciones Garantizadas*", as defined in the Brakes Facility Mexican Security Agreement);

WHEREAS, Carnaby Inventory III, LLC (the "**Wipers Facility Borrower**") entered into the Credit Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Wipers Facility Credit Agreement**" and together with the Transaction Documents thereunder, the "**Wipers Facility Loan Documents**"), with Carnaby Inventory Holdings III, LLC ("**Wipers Facility Parent**" and together with the Wipers Facility Borrower, the "**Wipers Facility Loan Parties**"), Holdings, FBG, the Brakes Facility Agent and the lenders from time to time party thereto (the "**Wipers Facility Lenders**" and together with the Wipers Facility Agent, the "**Wipers Facility Secured Parties**");

WHEREAS, in connection with the Wipers Facility Credit Agreement, each of the Wipers Facility Loan Parties granted a security interest in substantially all of their respective assets (the "**Wipers Facility Collateral**") to the Wipers Facility Agent, for the benefit of the Wipers Facility Secured Parties, pursuant to the Pledge and Security Agreement, dated as of July 6, 2022 (the "**Wipers Facility U.S. Security**

**Agreement**") and the Floating Lien Pledge Agreement *(Contrato de Prenda Sin Transmisión de Posesión)*, dated as of July 6, 2022 (the "**Wipers Facility Mexican Security Agreement**") to secure (i) all Obligations (as defined in the Wipers Facility U.S. Security Agreement) and (ii) all Secured Obligations ("*Obligaciones Garantizadas*", as defined in the Wipers Facility Mexican Security Agreement);

WHEREAS, the parties hereto are entering into this Agreement in order to provide for cross-default and cross-collateralization as between the Brakes Facility Loan Documents and the Wipers Facility Loan Documents and therefore wish to supplement and amend certain terms set forth in the Brakes Facility Loan Documents and the Wipers Facility Loan Documents as set forth herein;

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      <u>Cross-Default</u>.

a.      Any "Event of Default" (under the Brakes Facility Credit Agreement) that exists and is continuing after giving effect to any grace period applicable thereto under the Brakes Facility Credit Agreement shall constitute an "Event of Default" under the Wipers Facility Credit Agreement, entitling the Wipers Facility Agent and other Wipers Facility Secured Parties to accelerate the obligations thereunder and/or exercise any and all other remedies available thereto under the Wipers Facility Loan Documents, applicable law and otherwise; *provided* that any such "Event of Default" (under the Brakes Facility Credit Agreement) shall only shall constitute an "Event of Default" under the Wipers Facility Credit Agreement if such Event of Default is not waived by the Brakes Facility Secured Parties prior to any such acceleration of obligations and/or exercise of remedies.

b.      Any "Event of Default" (under the Wipers Facility Credit Agreement) that exists and is continuing after giving effect to any grace period applicable thereto under the Wipers Facility Credit Agreement  shall constitute an "Event of Default" under the Brakes Facility Credit Agreement, entitling the Brakes Facility Agent and other Brakes Facility Secured Parties to accelerate the obligations thereunder and/or exercise any and all other remedies available thereto under the Brakes Facility Loan Documents, applicable law and otherwise; *provided* that any such "Event of Default" (under the Wipers Facility Credit Agreement) shall only shall constitute an "Event of Default" under the Brakes Facility Credit Agreement if such Event of Default is not waived by the Wipers Facility Secured Parties prior to any such acceleration of obligations and/or exercise of remedies.

2.      <u>Remedies</u>.

a.      Nothing herein shall affect in any way the manner or substance of any or all remedies exercise under the terms of the Brakes Facility Loan Documents, other than as expressly set forth in Section 3 hereof.

b.      Nothing herein shall affect in any way the manner or substance of any or all remedies exercise under the terms of the Wipers Facility Loan Documents, other than as expressly set forth in Section 3 hereof.

3.      <u>Collateral Proceeds</u>.

a.      In the event (x) all outstanding Loans under the Brakes Facility Credit Agreement shall have been accelerated (or otherwise come due) and the Brakes Facility Secured Parties shall have exercised remedies against the Brakes Facility Collateral and (y) all outstanding Loans under the Wipers

2

Facility Credit Agreement shall have been accelerated (or otherwise come due) and the Wipers Facility Secured Parties shall have exercised remedies against the Wipers Facility Collateral,

> i.   to the extent there shall be excess net proceeds of Brakes Facility Collateral after payment in full in cash of all obligations under the Brakes Facility Loan Documents and there shall be insufficient proceeds of Wipers Facility Collateral to pay in full in cash all obligations under the Wipers Facility Loan Documents, then the Brakes Facility Agent (at the direction of the Required Lenders under the Brakes Credit Agreement) shall hold such excess proceeds of the Brakes Facility Collateral for the benefit of the Wipers Facility Secured Parties and shall promptly remit such excess proceeds to the Wipers Facility Agent for distribution to the Wipers Facility Secured Parties in accordance with the Wipers Facility Loan Documents (until all obligations owing to the Wipers Facility Secured Parties under the Wipers Facility Loan Documents shall have been paid thereto in full in cash, after which any remaining proceeds shall be remitted to the Brakes Facility Borrower).

> ii.   to the extent there shall be excess net proceeds of Wipers Facility Collateral after payment in full in cash of all obligations under the Wipers Facility Loan Documents and there shall be insufficient proceeds of Brakes Facility Collateral to pay in full in cash all obligations under the Brakes Facility Loan Documents, then the Wipers Facility Agent (at the direction of the Required Lenders under the Wipers Credit Agreement) shall hold such excess proceeds of the Wipers Facility Collateral for the benefit of the Brakes Facility Secured Parties and shall promptly remit such excess proceeds to the Brakes Facility Agent for distribution to the Brakes Facility Secured Parties in accordance with the Brakes Facility Loan Documents (until all obligations owing to the Brakes Facility Secured Parties under the Brakes Facility Loan Documents shall have been paid thereto in full in cash, after which any remaining proceeds shall be remitted to the Wipers Facility Borrower).

4.   <u>Cross-Collateralization</u>.

a.   In furtherance of the terms of Section 3 hereof, until the payment in full in cash of all Obligations under the Brakes Facility Loan Documents and all Obligations under the Wipers Facility Loan Documents, (i) each of the Brakes Facility Loan Parties acknowledges and agrees that the Brakes Facility Collateral shall secure both the Obligations under the Brakes Facility Loan Documents and also the Obligations under the Wipers Facility Loan Documents and (ii) each of the Wipers Facility Loan Parties acknowledges and agrees that the Wipers Facility Collateral shall secure both the Obligations under the Wipers Facility Loan Documents and also the Obligations under the Brakes Facility Loan Documents.

b.   In furtherance of the terms of Section 3 hereof, the following amendments are hereby made to the Brakes Facility Loan Documents and the Wipers Facility Loan Documents:

> i.   The definition of "Secured Parties" under the Brakes Facility U.S. Security Agreement is hereby amended to read in full as follows:

> "**Secured Parties**" means (i) each Lender, the Administrative Agent and each other Indemnified Party under the Credit Agreement and (ii) each of the Secured Parties (as defined in the Credit Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, Holdings, Servicer, GLAS Trust Company LLC, as administrative agent, and the lenders from time to time party thereto, among others).

<div align="center">3</div>

<div align="center">
**JOINT EXHIBIT NO. 18**
**Page 369 of 812**
</div>

ii.    The definition of "Obligations" under the Brakes Facility U.S. Security Agreement is hereby amended to read in full as follows:

"**Obligations**" means (i) "Obligations" (as defined in the Credit Agreement), (ii) Guaranteed Obligations (as defined in the Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, and GLAS Trust Company LLC, as administrative agent).

iii.    The definition of "Secured Parties" under the Wipers Facility U.S. Security Agreement is hereby amended to read in full as follows:

"**Secured Parties**" means (i) each Lender, the Administrative Agent and each other Indemnified Party under the Credit Agreement and (ii) each of the Secured Parties (as defined in the Credit Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory II, LLC, as borrower, Carnaby Inventory Holdings II, LLC, Holdings, Servicer, GLAS Trust Company LLC, as administrative agent, and the lenders from time to time party thereto, among others).

iv.    The definition of "Obligations" under the Wipers Facility U.S. Security Agreement is hereby amended to read in full as follows:

"**Obligations**" means (i) "Obligations" (as defined in the Credit Agreement), (ii) Guaranteed Obligations (as defined in the Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory II, LLC, as borrower, Carnaby Inventory Holdings II, LLC, and GLAS Trust Company LLC, as administrative agent).

c.    With respect to the Brakes Facility Mexican Security Agreement, an amendment agreement shall be executed in order to (i) provide for cross-default and cross-collateralization as between the Brakes Facility Loan Documents and the Wipers Facility Loan Documents in accordance with the terms provided herein; (ii) amend the definition of "Secured Obligations" ("*Obligaciones Garantizadas*", as defined in the Brakes Facility Mexican Security Agreement) in accordance with the terms provided herein; and (iii) acknowledge the capacity of the pledgee thereunder as Administrative Agent for the benefit of the Brakes Facility Secured Parties and the Wipers Facility Secured Parties.

d.    Until the payment in full in cash of all Obligations under the Brakes Facility Loan Documents and all Obligations under the Wipers Facility Loan Documents, each of the Brakes Facility Loan Parties and Wipers Facility Loan Parties (collectively, the "**Credit Parties**") and the other FBG Parties agrees that it will not (i) ask, collect, demand, sue for, take or receive any payment or assert any claim with respect to any obligations or liabilities that is owed (or may be owed) by any of the other FBG Parties, including without limitation any claim for subrogation or otherwise or (ii) commence or join with any other creditors of any of the FBG Parties in commencing any bankruptcy, reorganization, receivership, insolvency or similar type proceeding against any of the FBG Parties.

4

BUSINESS.29189494.5

e.	Notwithstanding anything to the contrary in the Brakes Facility Loan Documents or the Wipers Facility Loan Documents, each of the Credit Parties hereby consents and agrees that the liens granted by each thereof in favor of the Brakes Facility Agent and the Wipers Facility Agent over the applicable Brakes Facility Collateral or Wipers Facility Collateral shall not be released until the payment in full in cash of all Obligations under the Brakes Facility Loan Documents and all Obligations under the Wipers Facility Loan Documents.

f.	Each of the Credit Parties hereby authorizes GLAS Trust Company LLC, to act in its capacity as Administrative Agent, for the benefit of the Brakes Facility Secured Parties and the Wipers Facility Secured Parties, in terms of and in accordance with the provisions set forth in Section 9.1 of the Brakes Facility Credit Agreement and the Wipers Facility Credit Agreement.

5.	Representations and Warranties.

a.	Each of the Brakes Facility Borrower, Brakes Facility Parent and Holdings represents and warrants to the Brakes Facility Secured Parties as follows:

i.	This Agreement has been duly authorized, executed and delivered thereby and constitutes a legal, valid and binding obligation thereof, enforceable against such party in accordance with its terms.

ii.	The representations and warranties set forth in Article III in the Brakes Facility Credit Agreement are true and correct in all material respects on and as of the date hereof, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall remain true and correct in all material respects as of such earlier date;

iii.	No Default or Event of Default under the Brakes Facility Loan Documents has occurred and is continuing; and

iv.	As of the date hereof, and immediately prior to and after giving effect to this Agreement, each of the Brakes Facility Borrower, Brakes Facility Parent and Holdings is and will be Solvent (as defined in the Brakes Facility Credit Agreement).

b.	Each of the Wipers Facility Borrower, Wipers Facility Parent and Holdings represents and warrants to the Wipers Facility Secured Parties as follows:

i.	This Agreement has been duly authorized, executed and delivered thereby and constitutes a legal, valid and binding obligation thereof, enforceable against such party in accordance with its terms.

ii.	The representations and warranties set forth in Article III in the Wipers Facility Credit Agreement are true and correct in all material respects on and as of the date hereof, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall remain true and correct in all material respects as of such earlier date.

iii.	No Default or Event of Default under the Wipers Facility Loan Documents has occurred and is continuing.

5

BUSINESS.29189494.5

Case 25-90399   Document 3563-31   Filed in TXSB on 11/04/25   Page 73 of 120

iv.     As of the date hereof, and immediately prior to and after giving effect to this Agreement, each of the Wipers Facility Borrower, Wipers Facility Parent and Holdings is and will be Solvent (as defined in the Wipers Facility Credit Agreement).

6.      Conditions Precedent.  The effectiveness of this Agreement is subject to the conditions precedent that each of the Brakes Facility Agent and the Wipers Facility Agent shall have received, in form and substance satisfactory to each thereof:

a.      this Agreement, duly executed and delivered by a duly authorized officer of each of the undersigned parties.

b.      A Solvency Certificate, in substantially the form attached to the Brakes Facility Credit Agreement and the Wipers Facility Credit Agreement.

c.      An opinion of Paul Hastings, LLC, as U.S. counsel for the FBG Parties under each of the Brakes Facility Credit Agreement and the Wipers Facility Credit Agreement, in form and substance satisfactory to the Administrative Agent and the Lenders, dated as of the date hereof.

d.      Each of the Brakes Facility Borrower and the Wipers Facility Borrower shall have paid to the Brakes Facility Secured Parties and the Wipers Facility Secured Parties, respectively, such fees payable to such parties pursuant to the terms of the Brakes Facility Loan Documents and the Wipers Facility Loan Documents, respectively.

7.      Reinstatement.  To the extent that any Brakes Facility Secured Party or Wipers Facility Secured Party receives any payment by or on behalf of any FBG Party, which payment or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to such FBG Party or to its estate, trustee, receiver, administrative receiver, custodian or any other party under any bankruptcy, insolvency or similar law or otherwise, then to the extent that any Brakes Facility Secured Party or Wipers Facility Secured Party is required to repay any such amount received, the obligation to which such payment initially related shall be reinstated at such time as though the payment had not been made by the amount so repaid and shall be included within the Obligations under the Brakes Facility Loan Documents and the Wipers Facility Loan Documents, as applicable, as of the date such initial payment occurred.

8.      Inconsistency.  In the event of a conflict or inconsistency between any term or provision under this Agreement, on the one hand, and any term or provision under any Brakes Facility Loan Document or any Wipers Facility Loan Document, on the other hand, the terms and provisions of this Agreement shall control.

9.      Transaction Document.  This Agreement shall constitute a "Transaction Document" for all purposes of the Brakes Facility Loan Documents and the Wipers Facility Loan Documents.

10.     Governing Law. This Agreement shall be governed by and construed in accordance with the law of the State of New York (without giving effect to the conflict of law principles thereof other than sections 5-1401 and 5-1402 of the New York General Obligations Law which shall apply hereto) except to the extent that the perfection of any security interest in collateral or remedies are governed by the laws of a jurisdiction other than the State of New York.

11.     Consent to Jurisdiction Submission to Jurisdiction. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, NEW

6

BUSINESS.29189494.5

**JOINT EXHIBIT NO. 18**
**Page 372 of 812**

YORK, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY DOCUMENT EXECUTED BY SUCH PERSON PURSUANT TO THIS AGREEMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT FORUM.  NOTHING HEREIN SHALL LIMIT THE RIGHT OF THE BRAKES FACILITY AGENT, THE BRAKES FACILITY LENDERS, THE WIPERS FACILITY AGENT OR THE WIPERS FACILITY LENDERS TO BRING PROCEEDINGS AGAINST ANY FBG PARTY IN THE COURTS OF ANY OTHER JURISDICTION.  ANY JUDICIAL PROCEEDING BY ANY PARTY AGAINST ANY BRAKES FACILITY SECURED PARTY OR WIPER SECURED PARTY INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY DOCUMENT EXECUTED BY ANY PARTY PURSUANT TO THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER OR THEREUNDER SHALL BE BROUGHT ONLY IN A COURT IN THE BOROUGH OF MANHATTAN, NEW YORK.

12.     Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT, ANY DOCUMENT EXECUTED BY ANY PARTY PURSUANT TO THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER OR THEREUNDER.

13.     Effect of This Agreement; No Novation. Except as expressly set forth herein, this Agreement shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of any Brakes Facility Secured Party or Wipers Facility Secured Party under any of the Brakes Facility Loan Documents or Wipers Facility Loan Documents, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in such loan documents, all of which are ratified and affirmed in all respects and shall continue in full force and effect. Each of the parties hereto irrevocably and unconditionally agrees that this Agreement shall not be deemed to evidence or result in a novation of any of the Brakes Facility Loan Documents or Wipers Facility Loan Documents.

14.     Counterparts; Severability. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement.  To the fullest extent permitted by applicable law, delivery of an executed counterpart of a signature page of this Agreement by telefacsimile or electronic image scan transmission (such as a "pdf" file) will be effective to the same extent as delivery of a manually executed original counterpart of this Agreement.  Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

15.     Acknowledgment. This Agreement is an inducement of the FBG Parties to the Brakes Facility Secured Parties and the Wipers Facility Secured Parties, to induce them to make credit available to the FBG Parties, and its provisions are and are intended solely for the benefit of the Brakes Facility Secured Parties and the Wipers Facility Secured Parties in connection with the cross-default, cross-collateralization and other terms hereof, and it is understood that the FBG Parties are each bound hereby, but are not intended

7

BUSINESS.29189494.5

to be benefitted by the terms of this Agreement, nor shall any of the FBG Parties have any rights hereunder. Nothing in this Agreement shall impair, as between each of the FBG Parties and each of the Brakes Facility Secured Parties and each of the Wipers Facility Secured Parties, the obligations of any such FBG Parties to pay principal, interest, fees and other amounts as provided under the Brakes Facility Loan Documents and Wipers Facility Loan Documents, as applicable. Nothing in this Agreement is intended to or shall impair the obligations of any of the FBG Parties, which are absolute and unconditional, to pay the Obligations under the Brakes Facility Loan Documents and the Obligations under the Wipers Facility Loan Documents, as applicable, as and when the same shall become due and payable in accordance with their respective terms.

16.     Amendments.   This Agreement and the provisions hereof may only be amended, supplemented, modified or waived in a writing signed by the Brakes Facility Agent, the Brakes Facility Lenders, the Wipers Facility Agent, the Wipers Facility Lenders and the FBG Parties.

17.     Required Lender Direction.

a.   By its execution hereof, the Required Lenders under the Brakes Facility Credit Agreement hereby direct the Administrative Agent to acknowledge and agree to this Agreement and it is understood that the Administrative Agent shall conclusively rely on such Required Lenders' direction in connection with its acknowledgment and agreement of this Agreement pursuant to Article IX of the Brakes Facility Credit Agreement.   All of the rights, protections and immunities applicable to the Administrative Agent and set forth in the Brakes Facility Credit Agreement shall be incorporated by reference herein.

b.   By its execution hereof, the Required Lenders under the Wipers Facility Credit Agreement hereby direct the Administrative Agent to acknowledge and agree to this Agreement and it is understood that the Administrative Agent shall conclusively rely on such Required Lenders' direction in connection with its acknowledgment and agreement of this Agreement pursuant to Article IX of the Wipers Facility Credit Agreement.   All of the rights, protections and immunities applicable to the Administrative Agent and set forth in the Wipers Facility Credit Agreement shall be incorporated by reference herein.

[*Remainder of page left intentionally blank.*]

8

BUSINESS.29189494.5

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date hereof.

CARNABY INVENTORY II, LLC,
AS BORROWER UNDER THE BRAKES FACILITY LOAN DOCUMENTS

By: _____
Name:   Edward James
Title:    Executive Vice President

CARNABY INVENTORY HOLDINGS II, LLC,
AS GUARANTOR UNDER THE BRAKES FACILITY LOAN DOCUMENTS

By: _____
Name:   Edward James
Title:    Executive Vice President

FIRST BRANDS GROUP HOLDINGS, LLC,
AS GUARANTOR UNDER THE BRAKES FACILITY LOAN DOCUMENTS

By: _____
Name:   Michael Baker
Title:    Chief Corporate Strategy Officer

FIRST BRANDS GROUP, LLC,
AS THE SERVICER UNDER THE BRAKES FACILITY LOAN DOCUMENTS

By: _____
Name:   Michael Baker
Title:    Chief Corporate Strategy Officer

Signature Page to Cross-Collateralization Agreement

**GLAS TRUST COMPANY LLC,**
AS ADMINISTRATIVE AGENT UNDER THE BRAKES FACILITY LOAN DOCUMENTS

By:
Name:        Yana Kislenko
Title:        Vice President

Signature Page to Cross-Collateralization Agreement
**JOINT EXHIBIT NO. 18**
**Page 376 of 812**

**CVI CVF V Pooling Fund I LP**,
AS LENDER UNDER THE BRAKES FACILITY LOAN DOCUMENTS
BY: CARVAL CVF V GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager

**CARVAL CONTINGENT CREDIT FUND LP**,
AS LENDER UNDER THE BRAKES FACILITY LOAN DOCUMENTS
BY: CARVAL CCF GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager

**CVI CSF MASTER FUND I LP**,
AS LENDER UNDER THE BRAKES FACILITY LOAN DOCUMENTS
BY: CARVAL CSF GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager

**CVI AA MASTER FUND I LP**,
AS LENDER UNDER THE BRAKES FACILITY LOAN DOCUMENTS
CARVAL AA GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager

Signature Page to Cross-Collateralization Agreement

**JOINT EXHIBIT NO. 18**
**Page 377 of 812**

**CVI AV MASTER FUND I LP**,
AS LENDER UNDER THE BRAKES FACILITY LOAN DOCUMENTS
CARVAL AV GENERAL PARTNER LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager

**CARVAL GCF MASTER FUND I LP**,
AS LENDER UNDER THE BRAKES FACILITY LOAN DOCUMENTS
BY: CARVAL GCF GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager

**CVI EMCOF US, LLC**,
AS LENDER UNDER THE BRAKES FACILITY LOAN DOCUMENTS
BY: CARVAL EMCOF GP LP, ITS MANAGER
BY: CVI GENERAL PARTNER, LLC, ITS MANAGER

By: _____
Name: Gerardo Bernaldez
Title: Manager

Signature Page to Cross-Collateralization Agreement

**JOINT EXHIBIT NO. 18**

**CARNABY INVENTORY III, LLC,**
AS BORROWER UNDER THE WIPERS FACILITY LOAN DOCUMENTS

By: _____

Name:   Edward James

Title:   Executive Vice President

**CARNABY INVENTORY HOLDINGS III, LLC,**
AS GUARANTOR UNDER THE WIPERS FACILITY LOAN DOCUMENTS

By: _____

Name:   Edward James

Title:   Executive Vice President

**FIRST BRANDS GROUP HOLDINGS, LLC,**
AS GUARANTOR UNDER THE WIPERS FACILITY LOAN DOCUMENTS

By: _____

Name:   Michael Baker

Title:   Chief Corporate Strategy Officer

**FIRST BRANDS GROUP, LLC,**
AS THE SERVICER UNDER THE WIPERS FACILITY LOAN DOCUMENTS

By: _____

Name:   Michael Baker

Title:   Chief Corporate Strategy Officer

Signature Page to Cross-Collateralization Agreement

**JOINT EXHIBIT NO. 18**
**Page 379 of 812**

**GLAS TRUST COMPANY LLC**,
AS ADMINISTRATIVE AGENT UNDER THE WIPERS FACILITY LOAN DOCUMENTS

By: _____

Name:        Yana Kislenko

Title:        Vice President

**CVI CVF V POOLING FUND I LP**,
AS LENDER UNDER THE WIPERS FACILITY LOAN DOCUMENTS
BY: CARVAL CVF V GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager


**CARVAL CONTINGENT CREDIT FUND LP**,
AS LENDER UNDER THE WIPERS FACILITY LOAN DOCUMENTS
BY: CARVAL CCF GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager


**CVI CSF MASTER FUND I LP**,
AS LENDER UNDER THE WIPERS FACILITY LOAN DOCUMENTS
BY: CARVAL CSF GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager


**CVI AA MASTER FUND I LP**,
AS LENDER UNDER THE WIPERS FACILITY LOAN DOCUMENTS
CARVAL AA GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____
Name: Gerardo Bernaldez
Title: Manager


Signature Page to Cross-Collateralization Agreement

**JOINT EXHIBIT NO. 18**
**Page 381 of 812**

**CVI AV MASTER FUND I LP**,
AS LENDER UNDER THE WIPERS FACILITY LOAN DOCUMENTS
CARVAL AV GENERAL PARTNER LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____

Name: Gerardo Bernaldez
Title: Manager

**CARVAL GCF MASTER FUND I LP**,
AS LENDER UNDER THE WIPERS FACILITY LOAN DOCUMENTS
BY: CARVAL GCF GP LP, ITS GENERAL PARTNER
BY: CVI GENERAL PARTNER, LLC, ITS GENERAL PARTNER

By: _____

Name: Gerardo Bernaldez
Title: Manager

**CVI EMCOF US, LLC**,
AS LENDER UNDER THE WIPERS FACILITY LOAN DOCUMENTS
BY: CARVAL EMCOF GP LP, ITS MANAGER
BY: CVI GENERAL PARTNER, LLC, ITS MANAGER

By: _____

Name: Gerardo Bernaldez
Title: Manager

Signature Page to Cross-Collateralization Agreement

**JOINT EXHIBIT NO. 18**

AGREED:

**BRAKES PARTS INC LLC**

By:_____

Name:  Michael Baker

Title:    Chief Corporate Strategy Officer

**BPI BRAKES MANUFACTURING JUAREZ, S.A. DE C.V.**

By:_____

Name:  Michael Baker

Title:    Authorized Signatory

**BPI BRAKING SYSTEMS MEXICO, S.A. DE C.V.**

By:_____

Name:  Michael Baker

Title:    Authorized Signatory

AGREED:

**TRICO TECHNOLOGIES CORPORATION**

By: _____
Name:   Michael Baker
Title:    Chief Corporate Strategy Officer

**TRICO PRODUCTS CORPORATION**

By: _____
Name:   Michael Baker
Title:    Chief Corporate Strategy Officer

**TRICO COMPONENTES, S.A. DE C.V.**

By: _____
Name:   Stephen Graham
Title:    Sole Director

**SUBENSAMBLES INTERNACIONALES, S. DE R.L. DE C.V.**

By: _____
Name:   Michael Baker
Title:    Authorized Signatory

Signature Page to Cross-Collateralization Agreement

**Exhibit D**

# AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT
### OF
## CARNABY INVENTORY II, LLC

This Amended and Restated Limited Liability Company Agreement (together with the schedules attached hereto, this "*Agreement*") of Carnaby Inventory II, LLC (the "*Company*"), is entered into on May 31, 2022, by Carnaby Inventory Holdings II, LLC ("*Holdings*"), a Delaware limited liability company, as the sole equity member (the "*Member*") and the manager (the "*Manager*"), and Donald J. Puglisi, as the independent manager (the "*Independent Manager*"), and amends and restates in its entirety the Limited Liability Company Agreement of the Company entered into on February 4, 2022. Unless otherwise specified, capitalized terms used herein shall have the meanings set forth on Schedule A hereto, and unless otherwise provided for on Schedule A hereto, capitalized terms used but not defined herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the meanings assigned to such terms in the Credit Agreement (including definitions incorporated by reference therein).

WHEREAS, on February 4, 2022 (the "*Formation Date*"), the Company was formed as a bankruptcy remote, special purpose limited liability company pursuant to Section 18-201(b) of the Delaware Limited Liability Company Act, as amended from time to time (the "*Act*"), pursuant to a Certificate of Formation (the "*Certificate*") filed with the Secretary of State of the State of Delaware; and

NOW THEREFORE, in consideration of the mutual promises of the parties hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned parties agree in their entirety, as follows:

Section 1.          Name; Formation.

(a)     The name of the limited liability company is Carnaby Inventroy II, LLC and all business of the Company shall be conducted in such name.

(b)     The Company was formed as a Delaware limited liability company as of the Formation Date by filing the Certificate.

Section 2.          Principal Business Office.

The principal business office of the Company shall be located at 3010 LBJ Freeway, Suite 1200, Dallas, Texas 75234, or such other location as may hereafter be determined by the Manager.

Section 3.          Registered Office.

The address, including street, number, city, and county of the registered office of the Company in the State of Delaware is c/o Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

Section 4.          Registered Agent.

The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

Section 5.                Member.

(a)        Carnaby Inventory Holdings II, LLC is the sole Member of the Company effective as of the date of the Formation Date.  The mailing address of the Member is set forth on Schedule B attached hereto.

(b)        The membership interests of the Company are set forth on Schedule B.  Subject to the terms of this Agreement and the Transaction Documents regarding transfers of Interests, additional Interests may only be issued by the Company or assigned or pledged by the Member with the approval of the Member and the Independent Manager.

(c)        Subject to Section 9(e), the Member may act by written consent.

(d)        Notwithstanding any provision in this Agreement to the contrary, if there is only one Member, upon the occurrence of any event that causes the Member to cease to be a member of the Company (other than (i) upon an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee pursuant to Sections 22 and 24, or (ii) the resignation of the Member and the admission of an additional member of the Company pursuant to Sections 23 and 24), the designated Independent Manager appointed pursuant to Section 10 shall, without any action of any Person and simultaneously with the Member ceasing to be a member of the Company, automatically be admitted to the Company as a Special Member and shall continue the Company without dissolution. No Special Member may resign from the Company or transfer its rights as Special Member unless (i) a successor Special Member has been admitted to the Company as Special Member by executing a counterpart to this Agreement, and (ii) such successor has also accepted its appointment as an Independent Manager pursuant to Section 10; provided, however, any Special Member shall automatically cease to be a member of the Company upon the admission to the Company of a substitute Member but shall not thereby cease to be an Independent Manager. A Special Member shall be a member of the Company that has no interest in the profits, losses and capital of the Company and has no right to receive any distributions of Company assets. Pursuant to Section 18-301(d) of the Act, a Special Member shall not be required to make any capital contributions to the Company and shall not receive a limited liability company interest in the Company. A Special Member, in its capacity as a Special Member, may not bind the Company. Except as required by any mandatory provision of the Act, a Special Member, in its capacity as a Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Company, including, without limitation, the merger, consolidation or conversion of the Company. In order to implement the future, contingent admission to the Company of Special Members, any individual acting as an Independent Manager pursuant to Section 10 shall execute a counterpart to this Agreement upon his or her appointment as an Independent Manager. Prior to its admission to the Company as a Special Member, any individual acting as an Independent Manager pursuant to Section 10 shall not be a member of the Company.

Section 6.                Certificate.

(a)        Alana Gramer, an "authorized person" within the meaning of the Act, executed, delivered and filed the Certificate with the Secretary of State of the State of Delaware.  Upon the filing of the Certificate with the Secretary of State of the State of Delaware, her powers as an "authorized person" ceased, and the Manager and the Officers, if any, thereupon became the designated "authorized persons" and shall continue as the designated "authorized persons" within the meaning of the Act.  The Manager, or any other Officer designated by the Manager, shall execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

2

(b)      The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate as provided in the Act.

Section 7.               Purposes.

(a)      Except as may otherwise be expressly provided in this Agreement, the nature of the activities or purpose to be conducted or promoted by the Company is to engage exclusively in the following activities, in each case in accordance with the terms of this Agreement and the Transaction Documents:

(i)      to acquire and own assets and all other related rights, benefits, income and proceeds thereof;

(ii)      to enter into the Transaction Documents, incur indebtedness thereunder, pledge its assets thereunder, exercise its rights thereunder and perform its obligations thereunder;

(iii)      to negotiate, authorize, execute, deliver, assume or perform its obligations under any agreement, instrument or document relating to the activities set forth in clauses (i) and (ii) above, including any Transaction Documents; and

(iii)      to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of Delaware that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above-mentioned purposes, including, without limitation, the establishment of bank accounts, the entering into of currency, interest rate or basis swap, cap, floor or collar agreements or similar hedging transactions and referral, management, servicing and administration agreements.

(b)      The Company, by or through the Manager or any Officer on behalf of the Company, may enter into, execute, deliver and perform the Transaction Documents and all documents, agreements, certificates, or financing statements contemplated thereby or related or incidental thereto, and establish one or more bank accounts, all without any further act, vote or approval of the Member, Officer or other Person notwithstanding any other provision of this Agreement, the Act or applicable law, rule or regulation. The foregoing authorization shall not be deemed a restriction on the powers of the Member, the Manager or any Officer to enter into other agreements on behalf of the Company, so long as doing so is consistent with the terms of the Transaction Documents.

Section 8.               Powers.

Subject to Section 9(e) and to the Act, the Member, the Manager and any Officers of the Company on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 7 above and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

Section 9.               Management.

(a)      Authority of the Manager.  The Member intends that the Company will be managed by Carnaby Inventory Holdings II, LLC, as the Manager of the Company, in accordance with Section 18-402 of the Act and within the meaning of Section 18-101(10) of the Act and subject to any restrictions and limitations set forth in this Agreement, including those set forth in Section 7, this Section 9, Section 10 and Section 31.  All powers to control and manage the business and affairs of the Company and to bind the Company shall, subject to such restrictions and limitations, be exclusively vested in the Manager, and

3

**JOINT EXHIBIT NO. 18**
**Page 388 of 812**

the Manager may exercise all powers of the Company and do all such lawful acts as are not by statute or this Agreement directed or required to be exercised or done by the Member and in so doing shall have the right and authority to take all actions which the Manager deems necessary, useful, or appropriate for the management and conduct of the Company's business and affairs and in the pursuit of the purposes of the Company, including delegating the right and authority to take such actions to employees of the Manager as are designated by the Manager to hold the Officer positions as provided in Section 11 of this Agreement.   The Manager and each such Officer shall be an "authorized person" on behalf of the Company, as such term is used in the Act.

(b)      Duties and Obligations of the Manager.  The Manager shall take all actions that may be necessary or appropriate for the (i) continuation of the Company's valid existence as a limited liability company under the laws of the State of Delaware and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Member or to enable the Company to conduct the business in which it is engaged and (ii) accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation and operation of the Company's assets subject to and in accordance with the provisions of this Agreement and applicable laws and regulations.

(c)      Withdrawal.  The Manager may not withdraw as the "manager" of the Company (within the meaning of the Act) without the affirmative written consent of the Member.  If the Manager seeks to withdraw as the manager of the Company, the Member shall appoint a successor manager with the Manager remaining as a manager until such successor manager is appointed.

(d)      Compensation of Manager; Expenses.  The Manager shall not receive any compensation for its management services pursuant to this Agreement.  The Manager shall be entitled to be reimbursed by the Company for all reasonable out-of-pocket costs, fees and expenses incurred, including reasonable attorney fees, in connection with the performance of its duties hereunder.

(e)      Limitations on the Company's Activities.

(i)      This Section 9(e) is being adopted in order to comply with certain provisions required in order to qualify the Company as a "special purpose" entity.

(ii)      The Member shall not, prior to the Termination Date, amend, alter, change or repeal the definition of "Independent Manager" or Sections 5(d), 7, 8, 9, 10, 20, 21, 22, 23, 24, 25, 26, 27, 30 or 32 or Schedule A of this Agreement without the unanimous written consent of the Manager and the Independent Manager. Subject to this Section 9(e), the Member reserves the with Section 32.

(iii)      Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Member, the Manager, any Officer or any other Person, none of the Member, the Manager, any Officer or any other Person shall be authorized or empowered, nor shall they permit the Company, without the prior unanimous written consent of the Member, the Manager and the Independent Manager, to take any Material Action; provided, however that no Material Action may be authorized unless there is at least one (1) Independent Manager then serving in such capacity and such Independent Manager consents to such Material Action.

(iv)      Prior to the Termination Date, the Manager shall cause the Company to do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises; provided, however, that the Company shall not be required to preserve any such right or franchise if the Manager shall determine that the

preservation thereof is no longer desirable for the conduct of its business and that the loss thereof is not disadvantageous in any material respect to the Company. The Company also shall:

(A)     maintain its own separate books and records and bank accounts;

(B)     at all times not hold itself out to the public or any other Persons as a legal entity not separate from the Member, the Manager or any other Person;

(C)     file its own tax returns, if any, as may be required under applicable law, to the extent (1) not part of a consolidated group filing a consolidated return or returns or (2) not treated as a division for tax purposes of another taxpayer, and pay any taxes so required to be paid under applicable law;

(D)     except as contemplated by any Transaction Documents, not commingle its assets with assets of any other Person;

(E)     conduct its business and affairs in its own name and strictly comply with all organizational formalities to maintain its separate existence;

(F)     either maintain separate financial statements which indicate that the assets of the Company are not available to satisfy the obligations of the Member, or, if financial statements are prepared on a consolidated basis with the Member or its parent, or ultimate parent, such financial statements shall contain notes clearly (i) disclosing the separate legal existences of the Company, and (ii) stating that the assets of the Company are owned by the Company and either stating that such assets are not available to satisfy obligations of the Member, its parent or ultimate parent, as applicable or that such assets are solely available to satisfy the creditors of the Company;

(G)     pay its own liabilities only out of its own funds;

(H)     maintain an arm's length relationship with its Affiliates, including the Member, and cause all business transactions entered into by the Company with any such Affiliates to be on terms that are not more or less favorable to the Company, as the case may be, than terms and conditions available at the time to the Company for comparable arm's length transactions with unaffiliated Persons, in each case, with the exception of the transactions contemplated by the Credit Agreement and the other Transaction Documents;

(I)     pay the salaries of its own employees and officers, if any, only out of its own funds;

(J)     not hold out its credit or assets as being available to satisfy the obligations of others;

(K)     maintain and clearly identify its office (by signage or otherwise) as its office and, if such office is located in the office of any Affiliate, including the Member, allocate fairly and reasonably any overhead for its shared office space;

(L)     use separate stationery, invoices and checks from those of any other Person, to the extent such items are used by the Company;

(M)     except as contemplated by any Transaction Documents, not pledge its assets for the benefit of any other Person;

(N)     correct any known misunderstanding regarding its separate existence and identity;

(O)     maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(P)     maintain adequate capital in light of its contemplated business purpose, transactions and liabilities;

(Q)     at all times have at least one (1) Independent Manager;

(R)     observe all limited liability company formalities and record keeping;

(S)     not account for or treat (whether in financial statements or otherwise) the transactions contemplated by the Purchase Agreement in any manner other than as the sale of Acquired Assets (as defined in the Purchase Agreement) to the Company or in any other respect account for or treat the transactions contemplated therein in any manner other than as a sale of Acquired Assets to the Company;

(T)     except as permitted by any Transaction Documents, not acquire any securities of the Member;

(U)     allocate all overhead expenses (including, without limitation, telephone and other utility charges), for items shared between the Company and any Affiliate with which the Company conducts a transaction, on the basis of actual use to the extent practicable and, to the extent such allocation is not practicable, on a basis reasonably related to actual use; and

(V)     make all oral and written communications, including without limitation, letters, invoices, purchase orders, contracts and statements, by the Company solely in the Company's own name, and by the Manager (acting in any capacity) in such a manner, so as not to mislead others as to the separate identity of the Company.

Failure of the Company, or the Manager on behalf of the Company, to comply with any of the foregoing covenants shall not affect the status of the Company as a separate legal entity or the limited liability of the Member, the Manager and the Special Member, if any.

(v)     Prior to the Termination Date, the Manager shall not cause or permit the Company to, and without the written consent of the Independent Manager, the Company shall not and shall not permit any Person acting on its behalf to:

(A)     except as contemplated by any Transaction Documents, guarantee any obligation of any Person, including any Affiliate;

(B)     engage, directly or indirectly, in any business or activity other than the actions required or permitted to be performed under Section 7, any Transaction Documents or this Section 9(e);

6

(C)     incur, create or assume any indebtedness other than as permitted under any Transaction Documents;

(D)     create, assume or suffer to exist any Lien on any of its assets other than any Lien created pursuant to the Transaction Documents;

(E)     make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any Person, except that the Company may invest in those investments permitted under the Transaction Documents and may make any advance required or expressly permitted to be made pursuant to any provisions of the Transaction Documents and permit the same to remain outstanding in accordance with such provisions;

(F)     to the fullest extent permitted by law, engage in any dissolution, liquidation, consolidation, merger, asset sale or transfer of ownership interests other than such activities as are expressly permitted pursuant to any provision of the Transaction Documents;

(G)     be named, directly or indirectly, as a contingent beneficiary or loss payee on any insurance policy covering the property of Servicer, the Member or any Affiliate of any of them;

(H)     except as not prohibited by the Transaction Documents, issue any security of any kind;

(I)     except as not prohibited by the Transaction Documents, sell, pledge or dispose of any of its assets for the benefit of any other Person;

(J)     purchase any asset (or make any investment, by share purchase, loan or otherwise) except as not prohibited by the Transaction Documents;

(K)     engage in any activity (whether or not pursued for gain or other pecuniary advantage) other than as permitted by the Transaction Documents;

(L)     except as expressly permitted in the Transaction Documents (including pursuant to Section 16 hereof) make any payment, directly or indirectly, to, or for the account or benefit of, Member or any Affiliate thereof; or

(M)     have any employees.

Section 10.     Independent Manager.

The Member hereby appoints the undersigned Independent Manager as the initial Independent Manager and such Independent Manager accepts such appointment by its signature hereto. Until the date that is one year and one day after the Termination Date, the Manager and the Member shall cause the Company at all times to have at least one (1) Independent Manager, who will be appointed by the Manager.  To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any duty otherwise existing at law or in equity, the Independent Manager shall consider only the interests of the Company, including its respective creditors, and not the Member in acting or otherwise voting on the matters referred to in Section 9(e).  Except for duties to the Company as set forth in the immediately preceding sentence (including duties to the Member and the Company's creditors

solely to the extent of their respective economic interests in the Company but excluding all other interests of the Member), the Independent Manager shall not have any fiduciary duties to the Member or any other Person bound by this Agreement; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.  No resignation or removal of the Independent Manager, and no appointment of a successor Independent Manager by the Company, shall be effective until a successor Independent Manager shall have accepted his or her appointment by a written instrument, which may be a counterpart signature page to this Agreement.  In the event of a vacancy in the position of the Independent Manager, the Company shall appoint a successor Independent Manager within ten (10) Business Days, provided, that in connection with any such replacement of the Independent Manager, the Company shall be deemed to have represented that any such successor Independent Manager satisfies the criteria set forth in the definition of "Independent Manager" on Schedule A hereto. No Independent Manager shall at any time serve as trustee in bankruptcy for any Affiliate of the Company.  On and after the date that is one year and one day after the Termination Date, any provision herein requiring the consent of the Independent Manager shall no longer be effective.

Section 11.　　Officers.

(a)　　Powers; Appointment.  The officers of the Company (the "**Officers**") may be appointed and removed by the Manager.  Officers of the Company will have the powers and duties in the management of the Company as will be granted by the Manager and are not inconsistent with this Agreement, subject to the control of the Manager.  Officers will not have powers in excess of those granted by the Manager.  Any number of offices may be held by the same person.  Each Officer of the Company will be an "authorized person" within the meaning of the Act.  Unless the Manager decides otherwise, if the title of an Officer of the Company is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of the title will constitute the delegation to the person of the authorities and duties that are normally associated with that office.  The following persons are appointed as officers of the Company:

| Name | Title |
|---|---|
| Patrick James | President and Chief Executive Officer |
| Edward James | Executive Vice President |
| Michael Baker | Managing Director and Secretary |
| Shekhar Kumar | Managing Director |
| Jean Gillian Graham | Managing Director |
| Peter Andrew Brumbergs | Managing Director |

(b)　　Term of Office; Resignation; Removal; Vacancy.  Each Officer will hold office until his or her successor is appointed or until his or her earlier resignation or removal.  Any Officer may resign at any time upon written notice to the Company.  The resignation will take effect at the time specified therein, and unless otherwise specified therein no acceptance of the resignation will be necessary to make it effective.  Any Officer may be removed, with or without cause, by the Manager.  Any removal will be without prejudice to contractual rights of the Officer, if any, with the Company, but the appointment of an Officer will not itself create contractual rights.

Section 12.　　Limited Liability.

Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and none of the Member, the Manager, the Officers, the Special Members, if any,

8

or the Independent Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being the Member, the Manager, an Officer, a Special Member or an Independent Manager of the Company.

Section 13.     Capital Contributions.

The Member has made an initial capital contribution to the Company in the amount set forth on Schedule B attached hereto.  In accordance with Section 5(d), no Special Member shall be required to make any capital contributions to the Company.

Section 14.     Additional Contributions.

The Member is not required to make any additional capital contribution to the Company. However, the Member may make additional capital contributions to the Company at any time in its sole and absolute discretion.  To the extent that the Member makes an additional capital contribution to the Company, Schedule B of this Agreement shall be deemed revised.  The provisions of this Agreement, including this Section 14, are intended solely to benefit the Member and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor of the Company shall be a third-party beneficiary of this Agreement) and the Member shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.  All or any part of additional capital contributions may be returned to the Member subject to the terms of any Transaction Documents.

Section 15.     Allocation of Profits and Losses.

The Company's profits and losses shall be allocated to the Member.

Section 16.     Distributions.

Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Manager.  Notwithstanding any provision to the contrary contained in this Agreement, the Company, and the Manager on behalf of the Company, shall not be permitted or required to make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or any other applicable law or any Credit Document.

Section 17.     Books and Records.

The Manager shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business.  The books of the Company shall at all times be maintained by the Manager.  The Member and its duly authorized representatives shall have the right to examine the Company books, records and documents during normal business hours.  The Company, and the Manager on behalf of the Company, shall not have the right to keep confidential from the Member any information that the Manager would otherwise be permitted to keep confidential from the Member pursuant to Section 18-305(c) of the Act.  The Company's books of account shall be kept using the method of accounting determined by the Manager.  The Company's independent auditor, if any, shall be an independent public accounting firm selected by the Manager.

9

Section 18.    Reports.  The Manager shall, after the end of each fiscal year, use diligent efforts to cause to be prepared and transmitted to the Member as promptly as possible any tax information as may be reasonably necessary to enable the Member to prepare its federal, state and local income tax returns relating to such fiscal year.

Section 19.    Other Business.

The Member, the Manager, the Officers, the Independent Manager and any Affiliate of a Member may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others.  The Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

Section 20.    Exculpation; Indemnification; No Fiduciary Duties.

(a)    To the fullest extent permitted by applicable law, none of the Member, the Manager, the Special Members, if any, the Independent Manager, any Officer, or any employee or agent of the Company or any employee, representative, agent or Affiliate of the Member, the Manager, the Special Members, if any, or the Independent Manager (collectively, the "***Covered Persons***") shall be liable to the Company or any other Person who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's willful misconduct, fraud, or breach of this Agreement.  Notwithstanding anything in this Agreement to the contrary, the liability of the Independent Manager is hereby limited to the fullest extent as would be permitted by the Delaware General Corporation Law if the Company was a corporation and the Independent Manager was a director thereof.

(b)    To the fullest extent permitted by applicable law, the Company shall indemnify any Person:

(i)    who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company) by reason of the fact that such Person is or was a Covered Person against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such Person in connection with such action, suit or proceeding if such Person acted in good faith on behalf of the Company and in a manner believed to be within the scope of authority conferred on such Covered Person by this Agreement and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful; provided that, the termination of any action, suit, or proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that such Person did not act in good faith and in a manner which such Person reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had reasonable cause to believe such Person's action was unlawful; or

(ii)    who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that the Person is or was a Covered Person against expenses (including attorneys' fees) actually and reasonably incurred by such Person in connection with the defense or settlement of such action or suit if such Person acted in good faith and in a manner believed to be within the scope of authority conferred on such Covered Person by this Agreement; provided that, that no indemnification

10

shall be made in respect of any claim, issue or matter that is finally determined by a court of competent jurisdiction or binding arbitration to have resulted from such Covered Person's willful misconduct, fraud, or breach of this Agreement, unless and only to the extent that the Delaware Court of Chancery or the court of competent jurisdiction in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such Person is fairly and reasonably entitled to indemnity for such expenses that the Delaware Court of Chancery or such other court shall deem proper.

To the extent that a present or former member, manager, Officer, employee or agent of the Company has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in paragraph (i) or (ii) above, or in defense of any claim, issue or matter therein, such Person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such Person in connection therewith.

Any indemnification under paragraphs (i) or (ii) above (unless ordered by a court of competent jurisdiction) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of the present or former member, manager, Officer, employee or agent is proper in the circumstances because such Person has met the applicable standard of conduct set forth in paragraphs (i) or (ii), respectively.  Such determination shall be made, with respect to a Person who is a member, manager, Officer, employee or agent at the time of such determination, (a) by the Manager, if the Manager is not a party to such action, suit or proceeding, or (b) if the Manager is party to such action, or if the Manager so directs, by independent legal counsel in a written opinion or (c) by the Member.

Expenses (including attorneys' fees) incurred by a current or former member, manager or Officer in defending a civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such member, manager or Officer to repay such amount if it shall ultimately be determined that such Person is not entitled to be indemnified by the Company as authorized in this Section 20.  Such expenses (including attorneys' fees) incurred by former non-Officer employees and agents may be so paid upon such terms and conditions, if any, as the Company deems appropriate.

The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 20 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of Member, action of the Manager or otherwise, both as to action in such Person's official capacity and as to action in another capacity while holding such office.

The Company may purchase and maintain insurance on behalf of any Person who is or was a member, manager, officer, employee or agent of the Company against any liability asserted against him or her and incurred by such Person in any such capacity, or arising out of such status as such, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of this Section 20.

For purposes of this Section 20, references to the "Company" shall include, in addition to the resulting entity, any constituent entity (including any constituent of a constituent) absorbed in a consolidation or merger with the Company which, if its separate existence had continued, would have had the power and authority to indemnify its members, managers, officers, employees or agents, so that any Person who is or was a member, manager, officer, employee or agent of such constituent entity shall stand in the same position under this Section 20 with respect to the resulting or surviving entity as he or she would have with respect to such constituent entity if its separate existence had continued.

11

JOINT EXHIBIT NO. 18
Page 396 of 812

For purpose of this Section 20, references to "other enterprises" shall include, without limitation, employee benefit plans; references to "fines" shall include, without limitation, any excise taxes assessed on a Person with respect to an employee benefit plan; and references to "serving at the request of the Company" shall include, without limitation, any service as a member, manager, officer, employee or agent of the Company that imposes duties on, or involves services by, such member, manager, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries.

This Section 20 shall not be construed as a limitation upon the power of the Company to enter into contracts or undertakings of indemnity with a member (including the Manager and the Independent Manager), manager, Officer, employee or agent of the Company, nor shall it be construed as a limitation upon any other rights to which a Person seeking indemnification may be entitled under any agreement, vote of shareholders or his official capacity and as to action in another capacity while holding office. In the event the Act is amended after the date hereof so as to authorize corporate action to further indemnify any of the foregoing Persons, the Company shall have the power to provide indemnification to the maximum extent permitted by the Act.

The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 20 shall continue as to a Person who has ceased to be a member, manager (including the Manager and the Independent Manager), Officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a Person.

(d)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid.

(e)     Any duties (including fiduciary duties) of a Covered Person, other than the Independent Manager, to the Company, to any other Covered Person, or to any other Person (including any creditor) that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law, provided that (i) the foregoing shall not eliminate the obligation of each Covered Person to act in compliance with the express terms of this Agreement and (ii) the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing. In furtherance of the foregoing (but subject to the provisos in the foregoing), when any Covered Person, other than the Independent Manager, takes any action under this Agreement to give or withhold its consent, such Covered Person shall have no duty (fiduciary or other) to consider the interests of the Company, its subsidiaries, or the other Members, and may act exclusively in its own interest (or in the interest of the Member that appointed it).

(f)     To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, to the fullest extent permitted by applicable law, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement or any approval or authorization granted by the Company or any other Covered Person. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Member and the Special Members, if any, to replace such other duties and liabilities of such Covered Person.

12

(g)     To the fullest extent permitted by applicable law, if any portion of the Section 20 shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify any Covered Person as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative, or investigative, including an action by or in the right of the Company, to the fullest extent permitted by any applicable portion of this Section 20 (including Section 20(b)) that shall not have been invalidated.

(h)     The foregoing provisions of this Section 20 shall survive any termination of this Agreement.

Section 21.     Nonpetition.

Until the date that is one year and one day following the Termination Date, each of the Covered Persons, solely in its capacity as a creditor of the Company on account of any indemnification or other payment owing to the Covered Person by the Company, shall be deemed, to the fullest extent permitted by law, to agree by such Covered Person's acceptance of the rights and benefits provided by Section 20 (i) not to acquiesce, petition or otherwise invoke or cause the Company to invoke the process of any court or governmental authority for the purpose of commencing or sustaining a case against the Company under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Company or any substantial part of the property of the Company, or ordering the winding up or liquidation of the affairs of the Company, and (ii) not to join with or cooperate or encourage any other Person to do any of the foregoing.

Section 22.     Assignments.

Subject to any limitations set forth in the Transaction Documents, the Member may assign in whole or in part its limited liability company interest in the Company at any time (an assignee of such Interest is hereinafter referred to as a "***Permitted Transferee***"); provided, however, that prior to the Termination Date, the Administrative Agent must provide prior written approval of such assignment. Subject to Section 24, if the Member transfers all of its limited liability company interest in the Company pursuant to this Section 22, the transferee shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such admission shall be deemed effective immediately prior to the transfer and, immediately following such admission, the transferor Member shall cease to be a member of the Company. Notwithstanding anything in this Agreement to the contrary, any successor to the Member by merger or consolidation in compliance with the Transaction Documents, shall, without further act, be the Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution.

13

Section 23.      Resignation.  Prior to the Termination Date, the Member may not resign, unless (i) permitted under the Transaction Documents, and (ii) an additional member of the Company shall be admitted concurrently with or prior to such resignation to the Company, upon such additional member's execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.  Such admission shall be deemed effective immediately prior to the resignation and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

Section 24.      Admission of Additional Members.

Subject to any limitations set forth in the Transaction Documents, one or more additional members of the Company may be admitted to the Company with the written consent of the Member.

Section 25.      Dissolution.

(a)      Subject to Section 9(e), the Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) the affirmative consent of the Manager or (ii) any event which under Delaware law would cause the dissolution of the Company, provided that unless required by Delaware law the Company will not be wound up as a result of such event and the business of the Company shall be continued.

(b)      Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member or a Special Member, if any, shall not cause such Member or any Special Member, as the case may be, to cease to be the Member or Special Member, as the case may be, of the Company and upon the occurrence of such an event, the business of the Company shall continue without dissolution.

(c)      Notwithstanding any provision to the contrary contained in this Agreement, each of the Member and each Special Member, if any, waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of such Member or Special Member, or the occurrence of an event that causes the Member or such Special Member to cease to be a member of the Company.

(d)      Upon the occurrence of any event that causes the last remaining member (which may be the Member) of the Company to cease to be a member of the Company, to the fullest extent permitted by law, the personal representative of such last remaining member is hereby authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership in the Company of such last remaining member, agree in writing (i) to continue the Company and (ii) to the admission of such last remaining member's personal representative or its nominee or designee, as the case may be, as a substitute Member of the Company, effective as of the occurrence of the event that terminated the continued membership in the Company of such last remaining member.

(e)      In the event of dissolution, unless provided for otherwise in this Section 25, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(f)      The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to each Member in the manner provided for in this Agreement and (ii) the Certificate shall have been canceled in the manner required by the Act.

Section 26.        <u>Waiver of Partition; Nature of Interest</u>.

Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each of the Member, the Manager, the Special Members, if any, and the Independent Manager hereby irrevocably waive any right or power that such Person might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company.  The Member shall not have any interest in any specific assets of the Company, and the Member shall not have the status of a creditor with respect to any distribution pursuant to <u>Section 16</u> hereof.  The interest of the Member in the Company is personal property.

Section 27.        <u>Benefits of Agreement; No Third-Party Rights</u>.

None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any creditor of the Member or Special Members.  Nothing in this Agreement shall be deemed to create any right in any Person (other than Covered Persons) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person.

Section 28.        <u>Severability of Provisions</u>.

Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

Section 29.        <u>Entire Agreement</u>.

This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

Section 30.        <u>Binding Agreement</u>.

Notwithstanding any other provision of this Agreement, each of the Company, the Member and the Manager agree that this Agreement constitutes a legal, valid and binding agreement of the Company, the Member and the Manager, and is enforceable against the Company, the Member and the Manager, by the Independent Manager in accordance with its terms.  In addition, the Independent Manager shall be an intended beneficiary of this Agreement. Prior to the Termination Date, the Lenders and their respective successors or assigns are intended third-party beneficiaries of this Agreement and may enforce the provisions of <u>Sections 5(d)</u>, <u>7</u>, <u>9(e)</u>, <u>10</u>, <u>16</u>, <u>21</u> and <u>32</u>.

Section 31.        <u>Governing Law</u>.

This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of Delaware, and all rights and remedies shall be governed by such laws without regard to principles of conflict of law.

15

Section 32.    Amendments.

Subject to Section 9(e) and the terms of the Credit Agreement, this Agreement may be modified, altered, supplemented or amended pursuant to a written action executed by the Member.

Section 33.    Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

Section 34.    Notices.

Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in Section 2, (b) in the case of the Member or the Manager, to the Member at its address as listed on Schedule B attached hereto and (c) in the case of either of the foregoing, at such other address as may be designated by written notice to the other party.

Section 35.    Effectiveness.

This Agreement shall be effective as of May 31, 2022.

Section 36.    Membership Interests.

All Interests shall not be securities governed by Article 8 of the Uniform Commercial Code as in effect in from time to time within the State of Delaware and Article 8 of the Uniform Commercial Code of any other applicable jurisdiction.  The Interests shall not be evidenced by certificates.

Section 37.    Tax Elections.  The Member acknowledges that the Company is to be treated as a disregarded entity for federal and (to the extent possible) all relevant state tax purposes and that the activities of the Company be deemed to be activities of the Member for such purposes.  All provisions of the Company's Certificate and this Agreement are to be construed so as to preserve that tax status under those circumstances.  The Manager and Member shall take all actions to satisfy all necessary and appropriate filing and reporting requirements to comply with the preceding sentences.

[*SIGNATURE PAGES FOLLOW*]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the date first written above.

<div style="margin-left:50%">

MEMBER/MANAGER

CARNABY INVENTORY HOLDINGS II, LLC

By: _____

Name:  Patrick James
Title:    President and Chief Executive
            Officer

</div>

Agreed to and consented to by:

INDEPENDENT MANAGER/SPECIAL MEMBER:

By: _____
     Name: Donald J. Puglisi

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the date first written above.

MEMBER/MANAGER

CARNABY INVENTORY HOLDINGS II, LLC

By: _____
      Name:
      Title:

Agreed to and consented to by:

INDEPENDENT MANAGER/SPECIAL MEMBER:

By: _____
      Name: Donald J. Puglisi

SCHEDULE A

**DEFINITIONS**

A.  <u>Definitions</u>.

When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"***Affiliate***" means, with respect to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person.

"***Agreement***" means this Amended and Restated Limited Liability Company Agreement of the Company, together with the schedules attached hereto.

"***Bankruptcy***" means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 60 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 60 days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

"***Credit Agreement***" means that certain Credit Agreement, dated as of the date hereof, among *inter alios* the Company, the Lenders party thereto from time to time and GLAS Trust Company, LLC, as Administrative Agent, as may be amended, supplemented or otherwise modified from time to time pursuant to the terms thereof.

"***Control***" means the possession, directly or indirectly, or the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings. Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the ownership interests.

"***Independent Manager***" means each individual who, (a) is provided by a nationally recognized provider of independent directors; (b) is not and has not been employed by Company or Holdings or any of their respective Subsidiaries or Affiliates as an officer, director, partner, manager, member (other than

A-1

as a special member in the case of single member Delaware limited liability companies), employee, attorney or counsel of, the Company or Holdings or any of their respective Affiliates within the five (5) years immediately prior to such individual's appointment as an Independent Manager, provided that this paragraph (b) shall not apply to any person who serves as an independent director or an independent manager for any Affiliate of any of Company or Holdings; (c) is not, and has not been within the five (5) years immediately prior to such individual's appointment as an Independent Manager, a customer or creditor of, or supplier to, the Company or Holdings or any of their respective Affiliates who derives any of its purchases or revenue from its activities with the Company or Holdings or any of their respective Affiliates thereof (other than a de minimis amount); (d) is not, and has not been within the five (5) years immediately prior to such individual's appointment as an Independent Manager, a person who controls or is under common control with any Person described by (b) or (c); (e) does not have, and has not had within the five (5) years immediately prior to such individual's appointment as an Independent Manager, a personal services contract with the Company or Holdings or any of their respective Subsidiaries or Affiliates, from which fees and other compensation received by the person pursuant to such personal services contract would exceed 5% of his or her gross revenues during the preceding calendar year; (f) is not affiliated with a tax-exempt entity that receives, or has received within the five (5) years prior to such appointment as an Independent Manager, contributions from Company or Holdings or any of their respective Subsidiaries or Affiliates, in excess of the lesser of (i) 3% of the consolidated gross revenues of Holdings and its Subsidiaries during such fiscal year and (ii) 5% of the contributions received by the tax-exempt entity during such fiscal year; (g) is not and has not been a shareholder (or other equity owner) of any of the Company or Holdings or any of their respective Affiliates within the five (5) years immediately prior to such individual's appointment as an Independent Manager; (h) is not a member of the immediate family of any Person described by (b) through (g); (i) is not, and was not within the five (5) years prior to such appointment as an Independent Manager, an employee of a financial institution to which the Company or Holdings or any of their respective Subsidiaries or Affiliates owes outstanding Indebtedness for borrowed money in a sum exceeding more than 5% of Holdings' total consolidated assets; (j) has prior experience as an independent director or manager for a corporation or limited liability company whose charter documents required the unanimous consent of all independent directors thereof before such corporation or limited liability company could consent to the institution of bankruptcy or insolvency proceedings against it or could file a petition seeking relief under any applicable federal or state law relating to bankruptcy; and (k) has at least three (3) years of employment experience with one or more entities that provide, in the ordinary course of their respective businesses, advisory, management or placement services to issuers of securitization or structured finance instruments, agreements or securities. As of the Closing Date, the "Independent Manager" is Donald J. Puglisi.

"*Interest*" means a limited liability company interest of the Company.

"*Material Action*" means to consolidate or merge the Company with or into any Person, or sell all or substantially all of the assets of the Company, or to institute proceedings to have the Company be adjudicated bankrupt or insolvent, or consent to, encourage or cooperate with, the institution of bankruptcy or insolvency proceedings against the Company or file a voluntary bankruptcy petition or any other petition seeking, or consent to, reorganization or relief with respect to the Company under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, or make any assignment for the benefit of creditors of the Company, or admit in writing the Company's inability to pay its debts generally as they become due, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve, terminate or liquidate the Company.

A-2

"***Member***" means Carnaby Inventory Holdings II, LLC, a Delaware limited liability company, as the sole Member of the Company, and includes any Person admitted as an additional member of the Company or a substitute member of the Company pursuant to the provisions of this Agreement, each in their capacity as a member of the Company; provided, however, the term "Member" shall not include any Special Member.

"***Person***" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"***Special Member***" shall mean, upon such Person's admission to the Company as a member of the Company pursuant to Section 10, any Person acting as an Independent Manager, in such Person's capacity as a member of the Company.  A Special Member shall only have the rights and duties expressly set forth in this Agreement.

"***Transaction Documents***" has the meaning set forth in the Credit Agreement.

"***Termination Date***" has the meaning set forth in the Credit Agreement.

B.       Rules of Construction.

Definitions in this Agreement (including the Schedules and Exhibits hereto) apply equally to both the singular and plural forms of the defined terms.  The words "include" and "including" shall be deemed to be followed by the phrase "without limitation".  The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph or subdivision.  The Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement.  All Section, paragraph, clause, Exhibit or Schedule references not attributed to a particular document shall be references to such parts of this Agreement.  Unless otherwise defined in this Agreement, capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement.

For all purposes of this Agreement (including the Schedules and Exhibits hereto), except as otherwise expressly provided or unless the context otherwise requires, (i) the terms used in this Agreement include, as appropriate, all genders and the plural as well as the singular, (ii) any agreement, instrument, statute, rule or regulation defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument, statute, rule or regulation and includes (in the case of agreements or instruments) references to all attachments, annexes, exhibits and schedules thereto and instruments incorporated therein, and (iii) references to a Person shall include its successors and permitted assigns.

**JOINT EXHIBIT NO. 18**
**Page 406 of 812**

SCHEDULE B

**MEMBERS**

Member:

| Name | Mailing Address | Value of Capital Contribution | Membership Interest |
|------|-----------------|-------------------------------|---------------------|
| Carnaby Inventory Holdings II, LLC | 3010 LBJ Freeway, Suite 1200, Dallas, Texas 75234 | $100 | 100% |

Case 25-90399   Document 3563-13   Filed in TXSB on 10/04/25   Page 2 of 234

## **Exhibit E**

# AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY AGREEMENT
# OF
# CARNABY INVENTORY III, LLC

This Amended and Restated Limited Liability Company Agreement (together with the schedules attached hereto, this "*Agreement*") of Carnaby Inventory III, LLC (the "*Company*"), is entered into on June 22, 2022, by Carnaby Inventory Holdings III, LLC ("*Holdings*"), a Delaware limited liability company, as the sole equity member (the "*Member*") and the manager (the "*Manager*"), and Donald J. Puglisi, as the independent manager (the "*Independent Manager*"), and amends and restates in its entirety the Limited Liability Company Agreement of the Company entered into on February 4, 2022. Unless otherwise specified, capitalized terms used herein shall have the meanings set forth on Schedule A hereto, and unless otherwise provided for on Schedule A hereto, capitalized terms used but not defined herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the meanings assigned to such terms in the Credit Agreement (including definitions incorporated by reference therein).

WHEREAS, on February 4, 2022 (the "*Formation Date*"), the Company was formed as a bankruptcy remote, special purpose limited liability company pursuant to Section 18-201(b) of the Delaware Limited Liability Company Act, as amended from time to time (the "*Act*"), pursuant to a Certificate of Formation (the "*Certificate*") filed with the Secretary of State of the State of Delaware; and

NOW THEREFORE, in consideration of the mutual promises of the parties hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned parties agree in their entirety, as follows:

Section 1.          Name; Formation.

(a)     The name of the limited liability company is Carnaby Inventory III, LLC and all business of the Company shall be conducted in such name.

(b)     The Company was formed as a Delaware limited liability company as of the Formation Date by filing the Certificate.

Section 2.          Principal Business Office.

The principal business office of the Company shall be located at 3010 LBJ Freeway, Suite 1200, Dallas, Texas 75234, or such other location as may hereafter be determined by the Manager.

Section 3.          Registered Office.

The address, including street, number, city, and county of the registered office of the Company in the State of Delaware is c/o Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

Section 4.          Registered Agent.

The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is The Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

Section 5.                    Member.

(a)        Carnaby Inventory Holdings III, LLC is the sole Member of the Company effective as of the date of the Formation Date.  The mailing address of the Member is set forth on Schedule B attached hereto.

(b)        The membership interests of the Company are set forth on Schedule B.  Subject to the terms of this Agreement and the Transaction Documents regarding transfers of Interests, additional Interests may only be issued by the Company or assigned or pledged by the Member with the approval of the Member and the Independent Manager.

(c)        Subject to Section 9(e), the Member may act by written consent.

(d)        Notwithstanding any provision in this Agreement to the contrary, if there is only one Member, upon the occurrence of any event that causes the Member to cease to be a member of the Company (other than (i) upon an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee pursuant to Sections 22 and 24, or (ii) the resignation of the Member and the admission of an additional member of the Company pursuant to Sections 23 and 24), the designated Independent Manager appointed pursuant to Section 10 shall, without any action of any Person and simultaneously with the Member ceasing to be a member of the Company, automatically be admitted to the Company as a Special Member and shall continue the Company without dissolution. No Special Member may resign from the Company or transfer its rights as Special Member unless (i) a successor Special Member has been admitted to the Company as Special Member by executing a counterpart to this Agreement, and (ii) such successor has also accepted its appointment as an Independent Manager pursuant to Section 10; provided, however, any Special Member shall automatically cease to be a member of the Company upon the admission to the Company of a substitute Member but shall not thereby cease to be an Independent Manager. A Special Member shall be a member of the Company that has no interest in the profits, losses and capital of the Company and has no right to receive any distributions of Company assets. Pursuant to Section 18-301(d) of the Act, a Special Member shall not be required to make any capital contributions to the Company and shall not receive a limited liability company interest in the Company. A Special Member, in its capacity as a Special Member, may not bind the Company. Except as required by any mandatory provision of the Act, a Special Member, in its capacity as a Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Company, including, without limitation, the merger, consolidation or conversion of the Company. In order to implement the future, contingent admission to the Company of Special Members, any individual acting as an Independent Manager pursuant to Section 10 shall execute a counterpart to this Agreement upon his or her appointment as an Independent Manager. Prior to its admission to the Company as a Special Member, any individual acting as an Independent Manager pursuant to Section 10 shall not be a member of the Company.

Section 6.                    Certificate.

(a)        Alana Gramer, an "authorized person" within the meaning of the Act, executed, delivered and filed the Certificate with the Secretary of State of the State of Delaware.  Upon the filing of the Certificate with the Secretary of State of the State of Delaware, her powers as an "authorized person" ceased, and the Manager and the Officers, if any, thereupon became the designated "authorized persons" and shall continue as the designated "authorized persons" within the meaning of the Act.  The Manager, or any other Officer designated by the Manager, shall execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

2

(b)     The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate as provided in the Act.

Section 7.     <u>Purposes</u>.

(a)     Except as may otherwise be expressly provided in this Agreement, the nature of the activities or purpose to be conducted or promoted by the Company is to engage exclusively in the following activities, in each case in accordance with the terms of this Agreement and the Transaction Documents:

(i)     to acquire and own assets and all other related rights, benefits, income and proceeds thereof;

(ii)     to enter into the Transaction Documents, incur indebtedness thereunder, pledge its assets thereunder, exercise its rights thereunder and perform its obligations thereunder;

(iii)     to negotiate, authorize, execute, deliver, assume or perform its obligations under any agreement, instrument or document relating to the activities set forth in clauses (i) and (ii) above, including any Transaction Documents; and

(iii)     to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of Delaware that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above-mentioned purposes, including, without limitation, the establishment of bank accounts, the entering into of currency, interest rate or basis swap, cap, floor or collar agreements or similar hedging transactions and referral, management, servicing and administration agreements.

(b)     The Company, by or through the Manager or any Officer on behalf of the Company, may enter into, execute, deliver and perform the Transaction Documents and all documents, agreements, certificates, or financing statements contemplated thereby or related or incidental thereto, and establish one or more bank accounts, all without any further act, vote or approval of the Member, Officer or other Person notwithstanding any other provision of this Agreement, the Act or applicable law, rule or regulation. The foregoing authorization shall not be deemed a restriction on the powers of the Member, the Manager or any Officer to enter into other agreements on behalf of the Company, so long as doing so is consistent with the terms of the Transaction Documents.

Section 8.     <u>Powers</u>.

Subject to <u>Section 9(e)</u> and to the Act, the Member, the Manager and any Officers of the Company on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in <u>Section 7</u> above and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

Section 9.     <u>Management</u>.

(a)     <u>Authority of the Manager</u>.  The Member intends that the Company will be managed by Carnaby Inventory Holdings III, LLC, as the Manager of the Company, in accordance with Section 18-402 of the Act and within the meaning of Section 18-101(10) of the Act and subject to any restrictions and limitations set forth in this Agreement, including those set forth in <u>Section 7</u>, this <u>Section 9</u>, <u>Section 10</u> and <u>Section 31</u>.  All powers to control and manage the business and affairs of the Company and to bind the Company shall, subject to such restrictions and limitations, be exclusively vested in the Manager,

3

**JOINT EXHIBIT NO. 18**
**Page 411 of 812**

and the Manager may exercise all powers of the Company and do all such lawful acts as are not by statute or this Agreement directed or required to be exercised or done by the Member and in so doing shall have the right and authority to take all actions which the Manager deems necessary, useful, or appropriate for the management and conduct of the Company's business and affairs and in the pursuit of the purposes of the Company, including delegating the right and authority to take such actions to employees of the Manager as are designated by the Manager to hold the Officer positions as provided in <u>Section 11</u> of this Agreement.  The Manager and each such Officer shall be an "authorized person" on behalf of the Company, as such term is used in the Act.

(b)      <u>Duties and Obligations of the Manager</u>.  The Manager shall take all actions that may be necessary or appropriate for the (i) continuation of the Company's valid existence as a limited liability company under the laws of the State of Delaware and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Member or to enable the Company to conduct the business in which it is engaged and (ii) accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation and operation of the Company's assets subject to and in accordance with the provisions of this Agreement and applicable laws and regulations.

(c)      <u>Withdrawal</u>.  The Manager may not withdraw as the "manager" of the Company (within the meaning of the Act) without the affirmative written consent of the Member.  If the Manager seeks to withdraw as the manager of the Company, the Member shall appoint a successor manager with the Manager remaining as a manager until such successor manager is appointed.

(d)      <u>Compensation of Manager; Expenses</u>.  The Manager shall not receive any compensation for its management services pursuant to this Agreement.  The Manager shall be entitled to be reimbursed by the Company for all reasonable out-of-pocket costs, fees and expenses incurred, including reasonable attorney fees, in connection with the performance of its duties hereunder.

(e)      <u>Limitations on the Company's Activities</u>.

(i)      This <u>Section 9(e)</u> is being adopted in order to comply with certain provisions required in order to qualify the Company as a "special purpose" entity.

(ii)      The Member shall not, prior to the Termination Date, amend, alter, change or repeal the definition of "Independent Manager" or <u>Sections</u> <u>5(d)</u>, <u>7</u>, <u>8</u>, <u>9</u>, <u>10</u>, <u>20</u>, <u>21</u>, <u>22</u>, <u>23</u>, <u>24</u>, <u>25</u>, <u>26</u>, <u>27</u>, <u>30</u> or <u>32</u> or Schedule A of this Agreement without the unanimous written consent of the Manager and the Independent Manager. Subject to this <u>Section 9(e)</u>, the Member reserves the with <u>Section 32</u>.

(iii)      Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Member, the Manager, any Officer or any other Person, none of the Member, the Manager, any Officer or any other Person shall be authorized or empowered, nor shall they permit the Company, without the prior unanimous written consent of the Member, the Manager and the Independent Manager, to take any Material Action; <u>provided</u>, <u>however</u> that no Material Action may be authorized unless there is at least one (1) Independent Manager then serving in such capacity and such Independent Manager consents to such Material Action.

(iv)      Prior to the Termination Date, the Manager shall cause the Company to do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises; <u>provided</u>, <u>however</u>, that the Company shall not be required to preserve any such right or franchise if the Manager shall determine that the

4

preservation thereof is no longer desirable for the conduct of its business and that the loss thereof is not disadvantageous in any material respect to the Company. The Company also shall:

    (A)    maintain its own separate books and records and bank accounts;

    (B)    at all times not hold itself out to the public or any other Persons as a legal entity not separate from the Member, the Manager or any other Person;

    (C)    file its own tax returns, if any, as may be required under applicable law, to the extent (1) not part of a consolidated group filing a consolidated return or returns or (2) not treated as a division for tax purposes of another taxpayer, and pay any taxes so required to be paid under applicable law;

    (D)    except as contemplated by any Transaction Documents, not commingle its assets with assets of any other Person;

    (E)    conduct its business and affairs in its own name and strictly comply with all organizational formalities to maintain its separate existence;

    (F)    either maintain separate financial statements which indicate that the assets of the Company are not available to satisfy the obligations of the Member, or, if financial statements are prepared on a consolidated basis with the Member or its parent, or ultimate parent, such financial statements shall contain notes clearly (i) disclosing the separate legal existences of the Company, and (ii) stating that the assets of the Company are owned by the Company and either stating that such assets are not available to satisfy obligations of the Member, its parent or ultimate parent, as applicable or that such assets are solely available to satisfy the creditors of the Company;

    (G)    pay its own liabilities only out of its own funds;

    (H)    maintain an arm's length relationship with its Affiliates, including the Member, and cause all business transactions entered into by the Company with any such Affiliates to be on terms that are not more or less favorable to the Company, as the case may be, than terms and conditions available at the time to the Company for comparable arm's length transactions with unaffiliated Persons, in each case, with the exception of the transactions contemplated by the Credit Agreement and the other Transaction Documents;

    (I)    pay the salaries of its own employees and officers, if any, only out of its own funds;

    (J)    not hold out its credit or assets as being available to satisfy the obligations of others;

    (K)    maintain and clearly identify its office (by signage or otherwise) as its office and, if such office is located in the office of any Affiliate, including the Member, allocate fairly and reasonably any overhead for its shared office space;

    (L)    use separate stationery, invoices and checks from those of any other Person, to the extent such items are used by the Company;

(M)     except as contemplated by any Transaction Documents, not pledge its assets for the benefit of any other Person;

(N)     correct any known misunderstanding regarding its separate existence and identity;

(O)     maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(P)     maintain adequate capital in light of its contemplated business purpose, transactions and liabilities;

(Q)     at all times have at least one (1) Independent Manager;

(R)     observe all limited liability company formalities and record keeping;

(S)     not account for or treat (whether in financial statements or otherwise) the transactions contemplated by the Purchase Agreement in any manner other than as the sale of Acquired Assets (as defined in the Purchase Agreement) to the Company or in any other respect account for or treat the transactions contemplated therein in any manner other than as a sale of Acquired Assets to the Company;

(T)     except as permitted by any Transaction Documents, not acquire any securities of the Member;

(U)     allocate all overhead expenses (including, without limitation, telephone and other utility charges), for items shared between the Company and any Affiliate with which the Company conducts a transaction, on the basis of actual use to the extent practicable and, to the extent such allocation is not practicable, on a basis reasonably related to actual use; and

(V)     make all oral and written communications, including without limitation, letters, invoices, purchase orders, contracts and statements, by the Company solely in the Company's own name, and by the Manager (acting in any capacity) in such a manner, so as not to mislead others as to the separate identity of the Company.

Failure of the Company, or the Manager on behalf of the Company, to comply with any of the foregoing covenants shall not affect the status of the Company as a separate legal entity or the limited liability of the Member, the Manager and the Special Member, if any.

(v)     Prior to the Termination Date, the Manager shall not cause or permit the Company to, and without the written consent of the Independent Manager, the Company shall not and shall not permit any Person acting on its behalf to:

(A)     except as contemplated by any Transaction Documents, guarantee any obligation of any Person, including any Affiliate;

(B)     engage, directly or indirectly, in any business or activity other than the actions required or permitted to be performed under Section 7, any Transaction Documents or this Section 9(e);

6

(C)      incur, create or assume any indebtedness other than as permitted under any Transaction Documents;

(D)      create, assume or suffer to exist any Lien on any of its assets other than any Lien created pursuant to the Transaction Documents;

(E)      make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any Person, except that the Company may invest in those investments permitted under the Transaction Documents and may make any advance required or expressly permitted to be made pursuant to any provisions of the Transaction Documents and permit the same to remain outstanding in accordance with such provisions;

(F)      to the fullest extent permitted by law, engage in any dissolution, liquidation, consolidation, merger, asset sale or transfer of ownership interests other than such activities as are expressly permitted pursuant to any provision of the Transaction Documents;

(G)      be named, directly or indirectly, as a contingent beneficiary or loss payee on any insurance policy covering the property of Servicer, the Member or any Affiliate of any of them;

(H)      except as not prohibited by the Transaction Documents, issue any security of any kind;

(I)      except as not prohibited by the Transaction Documents, sell, pledge or dispose of any of its assets for the benefit of any other Person;

(J)      purchase any asset (or make any investment, by share purchase, loan or otherwise) except as not prohibited by the Transaction Documents;

(K)      engage in any activity (whether or not pursued for gain or other pecuniary advantage) other than as permitted by the Transaction Documents;

(L)      except as expressly permitted in the Transaction Documents (including pursuant to Section 16 hereof) make any payment, directly or indirectly, to, or for the account or benefit of, Member or any Affiliate thereof; or

(M)      have any employees.

Section 10.      Independent Manager.

The Member hereby appoints the undersigned Independent Manager as the initial Independent Manager and such Independent Manager accepts such appointment by its signature hereto. Until the date that is one year and one day after the Termination Date, the Manager and the Member shall cause the Company at all times to have at least one (1) Independent Manager, who will be appointed by the Manager.   To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any duty otherwise existing at law or in equity, the Independent Manager shall consider only the interests of the Company, including its respective creditors, and not the Member in acting or otherwise voting on the matters referred to in Section 9(e).   Except for duties to the Company as set forth in the immediately preceding sentence (including duties to the Member and the Company's creditors

7

solely to the extent of their respective economic interests in the Company but excluding all other interests of the Member), the Independent Manager shall not have any fiduciary duties to the Member or any other Person bound by this Agreement; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing. No resignation or removal of the Independent Manager, and no appointment of a successor Independent Manager by the Company, shall be effective until a successor Independent Manager shall have accepted his or her appointment by a written instrument, which may be a counterpart signature page to this Agreement. In the event of a vacancy in the position of the Independent Manager, the Company shall appoint a successor Independent Manager within ten (10) Business Days, provided, that in connection with any such replacement of the Independent Manager, the Company shall be deemed to have represented that any such successor Independent Manager satisfies the criteria set forth in the definition of "Independent Manager" on Schedule A hereto. No Independent Manager shall at any time serve as trustee in bankruptcy for any Affiliate of the Company. On and after the date that is one year and one day after the Termination Date, any provision herein requiring the consent of the Independent Manager shall no longer be effective.

Section 11.     Officers.

(a)     Powers; Appointment. The officers of the Company (the "**Officers**") may be appointed and removed by the Manager. Officers of the Company will have the powers and duties in the management of the Company as will be granted by the Manager and are not inconsistent with this Agreement, subject to the control of the Manager. Officers will not have powers in excess of those granted by the Manager. Any number of offices may be held by the same person. Each Officer of the Company will be an "authorized person" within the meaning of the Act. Unless the Manager decides otherwise, if the title of an Officer of the Company is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of the title will constitute the delegation to the person of the authorities and duties that are normally associated with that office. The following persons are appointed as officers of the Company:

| Name | Title |
|---|---|
| Patrick James | President and Chief Executive Officer |
| Edward James | Executive Vice President |
| Michael Baker | Managing Director and Secretary |
| Shekhar Kumar | Managing Director |
| Jean Gillian Graham | Managing Director |
| Peter Andrew Brumbergs | Managing Director |

(b)     Term of Office; Resignation; Removal; Vacancy. Each Officer will hold office until his or her successor is appointed or until his or her earlier resignation or removal. Any Officer may resign at any time upon written notice to the Company. The resignation will take effect at the time specified therein, and unless otherwise specified therein no acceptance of the resignation will be necessary to make it effective. Any Officer may be removed, with or without cause, by the Manager. Any removal will be without prejudice to contractual rights of the Officer, if any, with the Company, but the appointment of an Officer will not itself create contractual rights.

Section 12.     Limited Liability.

Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and none of the Member, the Manager, the Officers, the Special Members, if any,

8

or the Independent Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being the Member, the Manager, an Officer, a Special Member or an Independent Manager of the Company.

Section 13.       Capital Contributions.

The Member has made an initial capital contribution to the Company in the amount set forth on Schedule B attached hereto.  In accordance with Section 5(d), no Special Member shall be required to make any capital contributions to the Company.

Section 14.       Additional Contributions.

The Member is not required to make any additional capital contribution to the Company. However, the Member may make additional capital contributions to the Company at any time in its sole and absolute discretion.  To the extent that the Member makes an additional capital contribution to the Company, Schedule B of this Agreement shall be deemed revised.  The provisions of this Agreement, including this Section 14, are intended solely to benefit the Member and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor of the Company shall be a third-party beneficiary of this Agreement) and the Member shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.  All or any part of additional capital contributions may be returned to the Member subject to the terms of any Transaction Documents.

Section 15.       Allocation of Profits and Losses.

The Company's profits and losses shall be allocated to the Member.

Section 16.       Distributions.

Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Manager.  Notwithstanding any provision to the contrary contained in this Agreement, the Company, and the Manager on behalf of the Company, shall not be permitted or required to make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or any other applicable law or any Credit Document.

Section 17.       Books and Records.

The Manager shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business.  The books of the Company shall at all times be maintained by the Manager.  The Member and its duly authorized representatives shall have the right to examine the Company books, records and documents during normal business hours.  The Company, and the Manager on behalf of the Company, shall not have the right to keep confidential from the Member any information that the Manager would otherwise be permitted to keep confidential from the Member pursuant to Section 18-305(c) of the Act.  The Company's books of account shall be kept using the method of accounting determined by the Manager.  The Company's independent auditor, if any, shall be an independent public accounting firm selected by the Manager.

Section 18.     Reports.  The Manager shall, after the end of each fiscal year, use diligent efforts to cause to be prepared and transmitted to the Member as promptly as possible any tax information as may be reasonably necessary to enable the Member to prepare its federal, state and local income tax returns relating to such fiscal year.

Section 19.     Other Business.

The Member, the Manager, the Officers, the Independent Manager and any Affiliate of a Member may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others.  The Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

Section 20.     Exculpation; Indemnification; No Fiduciary Duties.

(a)     To the fullest extent permitted by applicable law, none of the Member, the Manager, the Special Members, if any, the Independent Manager, any Officer, or any employee or agent of the Company or any employee, representative, agent or Affiliate of the Member, the Manager, the Special Members, if any, or the Independent Manager (collectively, the "*Covered Persons*") shall be liable to the Company or any other Person who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's willful misconduct, fraud, or breach of this Agreement.  Notwithstanding anything in this Agreement to the contrary, the liability of the Independent Manager is hereby limited to the fullest extent as would be permitted by the Delaware General Corporation Law if the Company was a corporation and the Independent Manager was a director thereof.

(b)     To the fullest extent permitted by applicable law, the Company shall indemnify any Person:

(i)     who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company) by reason of the fact that such Person is or was a Covered Person against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such Person in connection with such action, suit or proceeding if such Person acted in good faith on behalf of the Company and in a manner believed to be within the scope of authority conferred on such Covered Person by this Agreement and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful; provided that, the termination of any action, suit, or proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that such Person did not act in good faith and in a manner which such Person reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had reasonable cause to believe such Person's action was unlawful; or

(ii)     who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that the Person is or was a Covered Person against expenses (including attorneys' fees) actually and reasonably incurred by such Person in connection with the defense or settlement of such action or suit if such Person acted in good faith and in a manner believed to be within the scope of authority conferred on such Covered Person by this Agreement; provided that, that no indemnification

10

shall be made in respect of any claim, issue or matter that is finally determined by a court of competent jurisdiction or binding arbitration to have resulted from such Covered Person's willful misconduct, fraud, or breach of this Agreement, unless and only to the extent that the Delaware Court of Chancery or the court of competent jurisdiction in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such Person is fairly and reasonably entitled to indemnity for such expenses that the Delaware Court of Chancery or such other court shall deem proper.

To the extent that a present or former member, manager, Officer, employee or agent of the Company has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in paragraph (i) or (ii) above, or in defense of any claim, issue or matter therein, such Person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such Person in connection therewith.

Any indemnification under paragraphs (i) or (ii) above (unless ordered by a court of competent jurisdiction) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of the present or former member, manager, Officer, employee or agent is proper in the circumstances because such Person has met the applicable standard of conduct set forth in paragraphs (i) or (ii), respectively.  Such determination shall be made, with respect to a Person who is a member, manager, Officer, employee or agent at the time of such determination, (a) by the Manager, if the Manager is not a party to such action, suit or proceeding, or (b) if the Manager is party to such action, or if the Manager so directs, by independent legal counsel in a written opinion or (c) by the Member.

Expenses (including attorneys' fees) incurred by a current or former member, manager or Officer in defending a civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such member, manager or Officer to repay such amount if it shall ultimately be determined that such Person is not entitled to be indemnified by the Company as authorized in this Section 20.  Such expenses (including attorneys' fees) incurred by former non-Officer employees and agents may be so paid upon such terms and conditions, if any, as the Company deems appropriate.

The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 20 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of Member, action of the Manager or otherwise, both as to action in such Person's official capacity and as to action in another capacity while holding such office.

The Company may purchase and maintain insurance on behalf of any Person who is or was a member, manager, officer, employee or agent of the Company against any liability asserted against him or her and incurred by such Person in any such capacity, or arising out of such status as such, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of this Section 20.

For purposes of this Section 20, references to the "Company" shall include, in addition to the resulting entity, any constituent entity (including any constituent of a constituent) absorbed in a consolidation or merger with the Company which, if its separate existence had continued, would have had the power and authority to indemnify its members, managers, officers, employees or agents, so that any Person who is or was a member, manager, officer, employee or agent of such constituent entity shall stand in the same position under this Section 20 with respect to the resulting or surviving entity as he or she would have with respect to such constituent entity if its separate existence had continued.

11

**JOINT EXHIBIT NO. 18**
**Page 419 of 812**

For purpose of this Section 20, references to "other enterprises" shall include, without limitation, employee benefit plans; references to "fines" shall include, without limitation, any excise taxes assessed on a Person with respect to an employee benefit plan; and references to "serving at the request of the Company" shall include, without limitation, any service as a member, manager, officer, employee or agent of the Company that imposes duties on, or involves services by, such member, manager, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries.

This Section 20 shall not be construed as a limitation upon the power of the Company to enter into contracts or undertakings of indemnity with a member (including the Manager and the Independent Manager), manager, Officer, employee or agent of the Company, nor shall it be construed as a limitation upon any other rights to which a Person seeking indemnification may be entitled under any agreement, vote of shareholders or his official capacity and as to action in another capacity while holding office. In the event the Act is amended after the date hereof so as to authorize corporate action to further indemnify any of the foregoing Persons, the Company shall have the power to provide indemnification to the maximum extent permitted by the Act.

The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 20 shall continue as to a Person who has ceased to be a member, manager (including the Manager and the Independent Manager), Officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a Person.

(d)      A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid.

(e)      Any duties (including fiduciary duties) of a Covered Person, other than the Independent Manager, to the Company, to any other Covered Person, or to any other Person (including any creditor) that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law, provided that (i) the foregoing shall not eliminate the obligation of each Covered Person to act in compliance with the express terms of this Agreement and (ii) the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing. In furtherance of the foregoing (but subject to the provisos in the foregoing), when any Covered Person, other than the Independent Manager, takes any action under this Agreement to give or withhold its consent, such Covered Person shall have no duty (fiduciary or other) to consider the interests of the Company, its subsidiaries, or the other Members, and may act exclusively in its own interest (or in the interest of the Member that appointed it).

(f)      To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, to the fullest extent permitted by applicable law, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement or any approval or authorization granted by the Company or any other Covered Person. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Member and the Special Members, if any, to replace such other duties and liabilities of such Covered Person.

12

(g)      To the fullest extent permitted by applicable law, if any portion of the Section 20 shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify any Covered Person as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative, or investigative, including an action by or in the right of the Company, to the fullest extent permitted by any applicable portion of this Section 20 (including Section 20(b)) that shall not have been invalidated.

(h)      The foregoing provisions of this Section 20 shall survive any termination of this Agreement.

Section 21.      Nonpetition.

Until the date that is one year and one day following the Termination Date, each of the Covered Persons, solely in its capacity as a creditor of the Company on account of any indemnification or other payment owing to the Covered Person by the Company, shall be deemed, to the fullest extent permitted by law, to agree by such Covered Person's acceptance of the rights and benefits provided by Section 20 (i) not to acquiesce, petition or otherwise invoke or cause the Company to invoke the process of any court or governmental authority for the purpose of commencing or sustaining a case against the Company under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Company or any substantial part of the property of the Company, or ordering the winding up or liquidation of the affairs of the Company, and (ii) not to join with or cooperate or encourage any other Person to do any of the foregoing.

Section 22.      Assignments.

Subject to any limitations set forth in the Transaction Documents, the Member may assign in whole or in part its limited liability company interest in the Company at any time (an assignee of such Interest is hereinafter referred to as a "*Permitted Transferee*"); provided, however, that prior to the Termination Date, the Administrative Agent must provide prior written approval of such assignment. Subject to Section 24, if the Member transfers all of its limited liability company interest in the Company pursuant to this Section 22, the transferee shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such admission shall be deemed effective immediately prior to the transfer and, immediately following such admission, the transferor Member shall cease to be a member of the Company. Notwithstanding anything in this Agreement to the contrary, any successor to the Member by merger or consolidation in compliance with the Transaction Documents, shall, without further act, be the Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution.

13

Section 23.     Resignation.   Prior to the Termination Date, the Member may not resign, unless (i) permitted under the Transaction Documents, and (ii) an additional member of the Company shall be admitted concurrently with or prior to such resignation to the Company, upon such additional member's execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.  Such admission shall be deemed effective immediately prior to the resignation and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

Section 24.     Admission of Additional Members.

Subject to any limitations set forth in the Transaction Documents, one or more additional members of the Company may be admitted to the Company with the written consent of the Member.

Section 25.     Dissolution.

(a)     Subject to Section 9(e), the Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) the affirmative consent of the Manager or (ii) any event which under Delaware law would cause the dissolution of the Company, provided that unless required by Delaware law the Company will not be wound up as a result of such event and the business of the Company shall be continued.

(b)     Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member or a Special Member, if any, shall not cause such Member or any Special Member, as the case may be, to cease to be the Member or Special Member, as the case may be, of the Company and upon the occurrence of such an event, the business of the Company shall continue without dissolution.

(c)     Notwithstanding any provision to the contrary contained in this Agreement, each of the Member and each Special Member, if any, waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of such Member or Special Member, or the occurrence of an event that causes the Member or such Special Member to cease to be a member of the Company.

(d)     Upon the occurrence of any event that causes the last remaining member (which may be the Member) of the Company to cease to be a member of the Company, to the fullest extent permitted by law, the personal representative of such last remaining member is hereby authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership in the Company of such last remaining member, agree in writing (i) to continue the Company and (ii) to the admission of such last remaining member's personal representative or its nominee or designee, as the case may be, as a substitute Member of the Company, effective as of the occurrence of the event that terminated the continued membership in the Company of such last remaining member.

(e)     In the event of dissolution, unless provided for otherwise in this Section 25, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(f)     The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to each Member in the manner provided for in this Agreement and (ii) the Certificate shall have been canceled in the manner required by the Act.

14

Section 26.    Waiver of Partition; Nature of Interest.

Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each of the Member, the Manager, the Special Members, if any, and the Independent Manager hereby irrevocably waive any right or power that such Person might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company.  The Member shall not have any interest in any specific assets of the Company, and the Member shall not have the status of a creditor with respect to any distribution pursuant to Section 16 hereof.  The interest of the Member in the Company is personal property.

Section 27.    Benefits of Agreement; No Third-Party Rights.

None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any creditor of the Member or Special Members.  Nothing in this Agreement shall be deemed to create any right in any Person (other than Covered Persons) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person.

Section 28.    Severability of Provisions.

Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

Section 29.    Entire Agreement.

This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

Section 30.    Binding Agreement.

Notwithstanding any other provision of this Agreement, each of the Company, the Member and the Manager agree that this Agreement constitutes a legal, valid and binding agreement of the Company, the Member and the Manager, and is enforceable against the Company, the Member and the Manager, by the Independent Manager in accordance with its terms.  In addition, the Independent Manager shall be an intended beneficiary of this Agreement. Prior to the Termination Date, the Lenders and their respective successors or assigns are intended third-party beneficiaries of this Agreement and may enforce the provisions of Sections 5(d), 7, 9(e), 10, 16, 21 and 32.

Section 31.    Governing Law.

This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of Delaware, and all rights and remedies shall be governed by such laws without regard to principles of conflict of law.

15

Section 32.      Amendments.

Subject to Section 9(e) and the terms of the Credit Agreement, this Agreement may be modified, altered, supplemented or amended pursuant to a written action executed by the Member.

Section 33.      Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

Section 34.      Notices.

Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in Section 2, (b) in the case of the Member or the Manager, to the Member at its address as listed on Schedule B attached hereto and (c) in the case of either of the foregoing, at such other address as may be designated by written notice to the other party.

Section 35.      Effectiveness.

This Agreement shall be effective as of June [_], 2022.

Section 36.      Membership Interests.

All Interests shall not be securities governed by Article 8 of the Uniform Commercial Code as in effect in from time to time within the State of Delaware and Article 8 of the Uniform Commercial Code of any other applicable jurisdiction.  The Interests shall not be evidenced by certificates.

Section 37.      Tax Elections.  The Member acknowledges that the Company is to be treated as a disregarded entity for federal and (to the extent possible) all relevant state tax purposes and that the activities of the Company be deemed to be activities of the Member for such purposes.  All provisions of the Company's Certificate and this Agreement are to be construed so as to preserve that tax status under those circumstances.  The Manager and Member shall take all actions to satisfy all necessary and appropriate filing and reporting requirements to comply with the preceding sentences.

[*SIGNATURE PAGES FOLLOW*]

Case 25-90399   Document 3563-13   Filed in TXSB on 10/30/25   Page 19 of 24

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the date first written above.

MEMBER/MANAGER

CARNABY   INVENTORY   HOLDINGS   III, LLC

By: _____
      Name: Patrick James
      Title:  President and Chief Executive Officer

Agreed to and consented to by:

INDEPENDENT MANAGER/SPECIAL MEMBER:

By: _____
      Name: Donald J. Puglisi

**JOINT EXHIBIT NO. 18**
**Page 425 of 812**

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the date first written above.

MEMBER/MANAGER

CARNABY INVENTORY HOLDINGS III, LLC

By: _____
     Name:
     Title:

Agreed to and consented to by:

INDEPENDENT MANAGER/SPECIAL MEMBER:

By: _____
    Name: Donald J. Puglisi

LEGAL_US_E # 163276545.2

**JOINT EXHIBIT NO. 18**
**Page 426 of 812**

SCHEDULE A

**DEFINITIONS**

A.      <u>Definitions</u>.

When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

 "*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person.

"*Agreement*" means this Amended and Restated Limited Liability Company Agreement of the Company, together with the schedules attached hereto.

"*Bankruptcy*" means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 60 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 60 days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

"*Credit Agreement*" means that certain Credit Agreement, dated as of the date hereof, among *inter alios* the Company, the Lenders party thereto from time to time and GLAS Trust Company, LLC, as Administrative Agent, as may be amended, supplemented or otherwise modified from time to time pursuant to the terms thereof.

"*Control*" means the possession, directly or indirectly, or the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings. Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the ownership interests.

"*Independent Manager*" means each individual who, (a) is provided by a nationally recognized provider of independent directors; (b) is not and has not been employed by Company or Holdings or any of their respective Subsidiaries or Affiliates as an officer, director, partner, manager, member (other than

A-1

as a special member in the case of single member Delaware limited liability companies), employee, attorney or counsel of, the Company or Holdings or any of their respective Affiliates within the five (5) years immediately prior to such individual's appointment as an Independent Manager, provided that this paragraph (b) shall not apply to any person who serves as an independent director or an independent manager for any Affiliate of any of Company or Holdings; (c) is not, and has not been within the five (5) years immediately prior to such individual's appointment as an Independent Manager, a customer or creditor of, or supplier to, the Company or Holdings or any of their respective Affiliates who derives any of its purchases or revenue from its activities with the Company or Holdings or any of their respective Affiliates thereof (other than a de minimis amount); (d) is not, and has not been within the five (5) years immediately prior to such individual's appointment as an Independent Manager, a person who controls or is under common control with any Person described by (b) or (c); (e) does not have, and has not had within the five (5) years immediately prior to such individual's appointment as an Independent Manager, a personal services contract with the Company or Holdings or any of their respective Subsidiaries or Affiliates, from which fees and other compensation received by the person pursuant to such personal services contract would exceed 5% of his or her gross revenues during the preceding calendar year; (f) is not affiliated with a tax-exempt entity that receives, or has received within the five (5) years prior to such appointment as an Independent Manager, contributions from Company or Holdings or any of their respective Subsidiaries or Affiliates, in excess of the lesser of (i) 3% of the consolidated gross revenues of Holdings and its Subsidiaries during such fiscal year and (ii) 5% of the contributions received by the tax-exempt entity during such fiscal year; (g) is not and has not been a shareholder (or other equity owner) of any of the Company or Holdings or any of their respective Affiliates within the five (5) years immediately prior to such individual's appointment as an Independent Manager; (h) is not a member of the immediate family of any Person described by (b) through (g); (i) is not, and was not within the five (5) years prior to such appointment as an Independent Manager, an employee of a financial institution to which the Company or Holdings or any of their respective Subsidiaries or Affiliates owes outstanding Indebtedness for borrowed money in a sum exceeding more than 5% of Holdings' total consolidated assets; (j) has prior experience as an independent director or manager for a corporation or limited liability company whose charter documents required the unanimous consent of all independent directors thereof before such corporation or limited liability company could consent to the institution of bankruptcy or insolvency proceedings against it or could file a petition seeking relief under any applicable federal or state law relating to bankruptcy; and (k) has at least three (3) years of employment experience with one or more entities that provide, in the ordinary course of their respective businesses, advisory, management or placement services to issuers of securitization or structured finance instruments, agreements or securities. As of the Closing Date, the "Independent Manager" is Donald J. Puglisi.

"***Interest***" means a limited liability company interest of the Company.

"***Material Action***" means to consolidate or merge the Company with or into any Person, or sell all or substantially all of the assets of the Company, or to institute proceedings to have the Company be adjudicated bankrupt or insolvent, or consent to, encourage or cooperate with, the institution of bankruptcy or insolvency proceedings against the Company or file a voluntary bankruptcy petition or any other petition seeking, or consent to, reorganization or relief with respect to the Company under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, or make any assignment for the benefit of creditors of the Company, or admit in writing the Company's inability to pay its debts generally as they become due, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve, terminate or liquidate the Company.

**JOINT EXHIBIT NO. 18**
**Page 428 of 812**

"*Member*" means Carnaby Inventory Holdings III, LLC, a Delaware limited liability company, as the sole Member of the Company, and includes any Person admitted as an additional member of the Company or a substitute member of the Company pursuant to the provisions of this Agreement, each in their capacity as a member of the Company; provided, however, the term "Member" shall not include any Special Member.

"*Person*" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"*Special Member*" shall mean, upon such Person's admission to the Company as a member of the Company pursuant to Section 10, any Person acting as an Independent Manager, in such Person's capacity as a member of the Company. A Special Member shall only have the rights and duties expressly set forth in this Agreement.

"*Transaction Documents*" has the meaning set forth in the Credit Agreement.

"*Termination Date*" has the meaning set forth in the Credit Agreement.

B.     Rules of Construction.

Definitions in this Agreement (including the Schedules and Exhibits hereto) apply equally to both the singular and plural forms of the defined terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph or subdivision. The Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement. All Section, paragraph, clause, Exhibit or Schedule references not attributed to a particular document shall be references to such parts of this Agreement. Unless otherwise defined in this Agreement, capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement.

For all purposes of this Agreement (including the Schedules and Exhibits hereto), except as otherwise expressly provided or unless the context otherwise requires, (i) the terms used in this Agreement include, as appropriate, all genders and the plural as well as the singular, (ii) any agreement, instrument, statute, rule or regulation defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument, statute, rule or regulation and includes (in the case of agreements or instruments) references to all attachments, annexes, exhibits and schedules thereto and instruments incorporated therein, and (iii) references to a Person shall include its successors and permitted assigns.

A-3

Case 25-90399   Document 3563-13   Filed in TXSB on 10/30/25   Page 234 of 234

SCHEDULE B

**MEMBERS**

Member:

| Name | Mailing Address | Value of Capital Contribution | Membership Interest |
|------|-----------------|-------------------------------|---------------------|
| Carnaby Inventory Holdings III, LLC | 3010 LBJ Freeway, Suite 1200, Dallas, Texas 75234 | $100 | 100% |

**Exhibit F**

*Execution Version*

**EXTENSION AGREEMENT**

This **EXTENSION AGREEMENT** (this "*Extension Agreement*") dated as of May 30, 2025 is by and among Carnaby Inventory II, LLC, a Delaware limited liability company (the "*Borrower*"), First Brands Group Holdings, LLC and Carnaby Inventory Holdings II, LLC as guarantors (collectively, the "*Guarantors*"), First Brands Group, LLC (the "*Servicer*"), the lenders party hereto (the "*Lenders*") and GLAS Trust Company LLC, as Administrative Agent (the "*Agent*").

**W I T N E S S E T H:**

WHEREAS, the Borrower, the Guarantors, the Servicer, the Lenders and the Agent are parties to the Credit Agreement dated as of May 31, 2022 (as amended, supplemented or otherwise modified from time to time, the "*Credit Agreement*"; capitalized terms used but not defined herein have the meanings specified in the Credit Agreement); and

WHEREAS, the Borrower and the Lenders have agreed to extend the Maturity Date of the Credit Agreement to December 1, 2025 on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**SECTION 1.  Extension of Maturity Date.**

Upon the occurrence of the Effective Date (as defined in Section 2 below), the Maturity Date as set forth in the Credit Agreement shall be extended to be December 1, 2025 for all purposes thereunder.

**SECTION 2.  Effectiveness of Extension.**

This Extension Agreement shall become effective on the date (the "*Effective Date*") on which the Lenders shall have received in form and substance reasonably satisfactory to the Lenders):

(a)   this Extension Agreement duly executed and delivered by each of the Borrower, each Guarantor, each Lender and the Agent;

(b)   the payment by the Borrower of all legal reasonable and documented fees and disbursements (for which an invoice has been provided) incurred by the Lenders and Agent in connection with the preparation, execution and delivery of this Extension Agreement or otherwise due under the Credit Agreement; and

(c)   a customary opinion of counsel to the Borrower, the Guarantors and the Servicer in form and substance reasonably satisfactory to the Agent and the Lenders.

**SECTION 3.  Effect of Extension; Representations; Etc.**

(a)   On and after the Effective Date, this Extension Agreement shall be a part of the Credit Agreement, all references to the Credit Agreement in the Transaction Documents shall be deemed to refer to the Credit Agreement as amended by this Extension Agreement, the term "this Agreement", and the words "hereof", "herein", "hereunder" and words of similar import, as used in the Credit Agreement shall mean the Credit Agreement, as amended hereby.

(b)     Except as expressly set forth herein, (i) this Extension Agreement shall not constitute an amendment, waiver or consent with respect to any provision of the Credit Agreement or any other Transaction Document, (ii) the Credit Agreement, each of the other Transaction Documents, including without limitation the Security Documents executed by the Borrower, are hereby ratified, approved and confirmed in all respects and remains in full force and effect, and (iii) the Liens and security interests granted under the Security Documents shall remain in full force and effect, shall continue without interruption as security for the Obligations and shall not be impaired or limited hereby.

(c)     In order to induce the Lenders to enter into this Extension Agreement, the Borrower represents and warrants to Lender that before and after giving effect to the execution and delivery of this Extension Agreement:

(i)         the representations and warranties of the Borrower set forth in the Credit Agreement and in the other Transaction Documents are true and correct as if made on and as of the date hereof, except for those representations and warranties that by their terms were made as of a specified date which were true and correct on and as of such date; and

(ii)        no default or Event of Default has occurred and is continuing.

(d)     Holdings represents and covenants in favor of the Agent and the Lenders that as of the date hereof, it has not incurred, and will not on or after the date hereof incur, any Indebtedness or incur or suffer to exist any Liens other than Permitted Liens, in each case except as set forth on Schedule I attached hereto.

(e)     This Extension Agreement shall be a Transaction Document.

**SECTION 4.  Counterparts.**

This Extension Agreement may be executed by one or more of the parties to this Extension Agreement on any number of separate counterparts (including by facsimile or email transmission of signature pages hereto), and all of said counterparts taken together shall be deemed to constitute one and the same agreement.  A set of the copies of this Extension Agreement signed by all the parties shall be lodged with the Borrower and the Lenders.

**SECTION 5.  Severability.**

Any provision of this Extension Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**SECTION 6.  GOVERNING LAW.**

THIS EXTENSION AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO NEW YORK CONFLICTS OF LAWS PRINCIPLES.

**JOINT EXHIBIT NO. 18**
**Page 433 of 812**

**SECTION 7.  <u>WAIVERS OF JURY TRIAL</u>.**

EACH OF THE BORROWER AND EACH LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS EXTENSION AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.

[*Remainder of Page Intentionally Left Blank; Signature Pages Follow*]

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to be duly executed as of the day and year first above written.

CARNABY INVENTORY II, LLC

By: _____
    Name:  Edward James
    Title:   Executive Vice President

CARNABY INVENTORY HOLDINGS II, LLC

By: _____
    Name:  Edward James
    Title:   Executive Vice President

FIRST BRANDS GROUP HOLDINGS, LLC

By: _____
    Name:  Michael Baker
    Title:   Chief Corporate Strategy Officer

FIRST BRANDS GROUP, LLC

By: _____
    Name:  Michael Baker
    Title:   Chief Corporate Strategy Officer

[Signature Page to Extension Agreement]

**JOINT EXHIBIT NO. 18**
**Page 435 of 812**

**GLAS TRUST COMPANY, LLC**, as
Administrative Agent

By: _____

    Name: Tarik Johnson
    Title: Assistant Vice President

[Signature Page to Extension Agreement]

**JOINT EXHIBIT NO. 18**
**Page 436 of 812**

**CVI CVF V POOLING FUND I LP**, as Lender
By: CarVal CVF V GP LP, its General Partner
By: CVI General Partner, LLC, its General Partner

By: _____
    Name: Bryan Simpson
    Title: Manager


**CARVAL CONTINGENT CREDIT FUND LP**,
as Lender
By: CarVal CCF GP LP, its General Partner
By: CVI General Partner, LLC, its General Partner

By: _____
    Name: Bryan Simpson
    Title: Manager


**CVI CSF MASTER FUND I LP**, as Lender
By: CarVal CSF GP LP, its General Partner
By: CVI General Partner, LLC, its General Partner

By: _____
    Name: Bryan Simpson
    Title: Manager


**CVI AA MASTER FUND I LP**, as Lender
By: CarVal AA GP LP, its General Partner
By: CVI General Partner, LLC, its General Partner

By: _____
    Name: Bryan Simpson
    Title: Manager


[Signature Page to Extension Agreement]

**CVI AV MASTER FUND I LP**, as Lender
By: CarVal AV GP LP, its General Partner
By: CVI General Partner, LLC, its General Partner

By: _____
    Name: Bryan Simpson
    Title: Manager

**CVI EMCOF US, LLC**, as Lender
By: CarVal EMCOF GP LP, its Manager
By: CVI General Partner, LLC, its General Partner

By: _____
    Name: Bryan Simpson
    Title: Manager

**CARVAL GCF MASTER FUND I LP**, as Lender
By: CarVal GCF GP LP, its General Partner
By: CVI General Partner, LLC, its General Partner

By: _____
    Name: Bryan Simpson
    Title: Manager

[Signature Page to Extension Agreement]

**JOINT EXHIBIT NO. 18**
**Page 438 of 812**

**SCHEDULE I**

INDEBTEDNESS AND LIENS

None.

**<u>Exhibit G</u>**

*Execution Version*

### EXTENSION AGREEMENT

This **EXTENSION AGREEMENT** (this "*Extension Agreement*") dated as of May 30, 2025 is by and among Carnaby Inventory III, LLC, a Delaware limited liability company (the "*Borrower*"), First Brands Group Holdings, LLC and Carnaby Inventory Holdings III, LLC as guarantors (collectively, the "*Guarantors*"), First Brands Group, LLC (the "*Servicer*"), the lenders party hereto (the "*Lenders*") and GLAS Trust Company LLC, as Administrative Agent (the "*Agent*").

### W I T N E S S E T H:

WHEREAS, the Borrower, the Guarantors, the Servicer, the Lenders and the Agent are parties to the Credit Agreement dated as of July 6, 2022 (as amended, supplemented or otherwise modified from time to time, the "*Credit Agreement*"; capitalized terms used but not defined herein have the meanings specified in the Credit Agreement); and

WHEREAS, the Borrower and the Lenders have agreed to extend the Maturity Date of the Credit Agreement to December 1, 2025 on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**SECTION 1.  Extension of Maturity Date.**

Upon the occurrence of the Effective Date (as defined in Section 2 below), the Maturity Date as set forth in the Credit Agreement shall be extended to be December 1, 2025 for all purposes thereunder.

**SECTION 2.  Effectiveness of Extension.**

This Extension Agreement shall become effective on the date (the "*Effective Date*") on which the Lenders shall have received in form and substance reasonably satisfactory to the Lenders):

(a)   this Extension Agreement duly executed and delivered by each of the Borrower, each Guarantor, each Lender and the Agent;

(b)   the payment by the Borrower of all legal reasonable and documented fees and disbursements (for which an invoice has been provided) incurred by the Lenders and Agent in connection with the preparation, execution and delivery of this Extension Agreement or otherwise due under the Credit Agreement; and

(c)   a customary opinion of counsel to the Borrower, the Guarantors and the Servicer in form and substance reasonably satisfactory to the Agent and the Lenders.

**SECTION 3.  Effect of Extension; Representations; Etc.**

(a)   On and after the Effective Date, this Extension Agreement shall be a part of the Credit Agreement, all references to the Credit Agreement in the Transaction Documents shall be deemed to refer to the Credit Agreement as amended by this Extension Agreement, the term "this Agreement", and the words "hereof", "herein", "hereunder" and words of similar import, as used in the Credit Agreement shall mean the Credit Agreement, as amended hereby.

(b)     Except as expressly set forth herein, (i) this Extension Agreement shall not constitute an amendment, waiver or consent with respect to any provision of the Credit Agreement or any other Transaction Document, (ii) the Credit Agreement, each of the other Transaction Documents, including without limitation the Security Documents executed by the Borrower, are hereby ratified, approved and confirmed in all respects and remains in full force and effect, and (iii) the Liens and security interests granted under the Security Documents shall remain in full force and effect, shall continue without interruption as security for the Obligations and shall not be impaired or limited hereby.

(c)     In order to induce the Lenders to enter into this Extension Agreement, the Borrower represents and warrants to Lender that before and after giving effect to the execution and delivery of this Extension Agreement:

(i)         the representations and warranties of the Borrower set forth in the Credit Agreement and in the other Transaction Documents are true and correct as if made on and as of the date hereof, except for those representations and warranties that by their terms were made as of a specified date which were true and correct on and as of such date; and

(ii)         no default or Event of Default has occurred and is continuing.

(d)     Holdings represents and covenants in favor of the Agent and the Lenders that as of the date hereof, it has not incurred, and will not on or after the date hereof incur, any Indebtedness or incur or suffer to exist any Liens other than Permitted Liens, in each case except as set forth on Schedule I attached hereto.

(e)     This Extension Agreement shall be a Transaction Document.

**SECTION 4.  Counterparts.**

This Extension Agreement may be executed by one or more of the parties to this Extension Agreement on any number of separate counterparts (including by facsimile or email transmission of signature pages hereto), and all of said counterparts taken together shall be deemed to constitute one and the same agreement.  A set of the copies of this Extension Agreement signed by all the parties shall be lodged with the Borrower and the Lenders.

**SECTION 5.  Severability.**

Any provision of this Extension Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**SECTION 6.  GOVERNING LAW.**

THIS EXTENSION AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO NEW YORK CONFLICTS OF LAWS PRINCIPLES.

**SECTION 7.  <u>WAIVERS OF JURY TRIAL</u>.**

EACH OF THE BORROWER AND EACH LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS EXTENSION AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.

[*Remainder of Page Intentionally Left Blank; Signature Pages Follow*]

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to be duly executed as of the day and year first above written.

**CARNABY INVENTORY III, LLC**

By: _____

    Name:   Edward James

    Title:   Executive Vice President

**CARNABY INVENTORY HOLDINGS III, LLC**

By: _____

    Name:   Edward James

    Title:   Executive Vice President

**FIRST BRANDS GROUP HOLDINGS, LLC**

By: _____

    Name:   Michael Baker

    Title:   Chief Corporate Strategy Officer

**FIRST BRANDS GROUP, LLC**

By: _____

    Name:   Michael Baker

    Title:   Chief Corporate Strategy Officer

[Signature Page to Extension Agreement]

**JOINT EXHIBIT NO. 18**

**Page 444 of 812**

**GLAS TRUST COMPANY, LLC**, as
Administrative Agent

By: _____
    Name: Tarik Johnson
    Title: Assistant Vice President

[Signature Page to Extension Agreement]

**JOINT EXHIBIT NO. 18**
**Page 445 of 812**

**CVI CVF V POOLING FUND I LP**, as Lender
By: CarVal CVF V GP LP, its General Partner
By: CVI General Partner, LLC, its General Partner

By: _____

Name: Bryan Simpson
Title: Manager

**CARVAL CONTINGENT CREDIT FUND LP**,
as Lender
By: CarVal CCF GP LP, its General Partner
By: CVI General Partner, LLC, its General Partner

By: _____

Name: Bryan Simpson
Title: Manager

**CVI CSF MASTER FUND I LP**, as Lender
By: CarVal CSF GP LP, its General Partner
By: CVI General Partner, LLC, its General Partner

By: _____

Name: Bryan Simpson
Title: Manager

**CVI AA MASTER FUND I LP**, as Lender
By: CarVal AA GP LP, its General Partner
By: CVI General Partner, LLC, its General Partner

By: _____

Name: Bryan Simpson
Title: Manager

[Signature Page to Extension Agreement]

**JOINT EXHIBIT NO. 18**
**Page 446 of 812**

**CVI AV MASTER FUND I LP**, as Lender
By: CarVal AV GP LP, its General Partner
By: CVI General Partner, LLC, its General Partner

By: _____
    Name: Bryan Simpson
    Title: Manager


**CVI EMCOF US, LLC**, as Lender
By: CarVal EMCOF GP LP, its Manager
By: CVI General Partner, LLC, its General Partner

By: _____
    Name: Bryan Simpson
    Title: Manager


**CARVAL GCF MASTER FUND I LP**, as Lender
By: CarVal GCF GP LP, its General Partner
By: CVI General Partner, LLC, its General Partner

By: _____
    Name: Bryan Simpson
    Title: Manager


[Signature Page to Extension Agreement]

**JOINT EXHIBIT NO. 18**
**Page 447 of 812**

**SCHEDULE I**

INDEBTEDNESS AND LIENS

None.

EXECUTION VERSION

PLEDGE AND SECURITY AGREEMENT

PLEDGE AND SECURITY AGREEMENT, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Security Agreement**"), by and among Carnaby Inventory Holdings II, LLC, a Delaware limited liability company ("**Parent**"), Carnaby Inventory II, LLC, a Delaware limited liability company (the "**Borrower**"), and GLAS Trust Company LLC, in its capacity as administrative agent (together with its successors and permitted assigns in such capacity, the "**Administrative Agent**") for the Secured Parties under that certain Credit Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among the Parent, the Borrower, Holdings (as defined therein), the Administrative Agent and the Lenders from time to time party thereto, among others.

RECITALS

A.       The Grantors are entering into this Security Agreement in order to induce the Lenders to enter into and extend credit to the Borrower under the Credit Agreement and to secure the Obligations thereunder, including, their obligations under any other Transaction Document.

ACCORDINGLY, the parties hereto agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.       Terms Defined in Credit Agreement.  Except as set forth in Section 1.02 below, capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.  The rules of construction set forth in Exhibit I of the Credit Agreement shall apply to this Security Agreement as if specifically incorporated herein, *mutatis mutandis*.

Section 1.02.       Terms Defined in UCC.  Terms defined in the UCC that are not otherwise defined in this Security Agreement or the Credit Agreement are used herein as defined in Articles 8 or 9 of the UCC, as the context may require (including without limitation, as if such terms were capitalized in Article 8 or 9 of the UCC, as the context may require, the following terms: "**Account**," "**Account Debtor**," "**Chattel Paper**," "**Commercial Tort Claim**," "**Document**," "**Electronic Chattel Paper**," "**Equipment**," "**Financial Asset**", "**Fixture**," "**General Intangible**," "**Goods**," "**Instruments**," "**Inventory**," "**Letter-of-Credit Right**," "**Records**," "**Securities Account**," "**Supporting Obligation**" and "**Tangible Chattel Paper**").

Section 1.03.       Definitions of Certain Terms Used Herein.  As used in this Security Agreement, the following terms shall have the following meanings:

"**Administrative Agent**" has the meaning set forth in the preamble.

"**Article**" means a numbered article of this Security Agreement, unless another document is specifically referenced.

"**Borrower**" has the meaning set forth in the preamble.

"**Collateral**" has the meaning set forth in Article 2.

"**Collateral and Guarantee Requirements**" means, at any time, the requirement that:

BUSINESS.29047517.8

(a) the Administrative Agent shall have received from the Parent, the Borrower and each other Grantor either (i) a counterpart of this Security Agreement, duly executed and delivered on behalf of such Person as of the Closing Date, or (ii) in the case of the formation or acquisition after the Closing Date of any Subsidiary, a supplement to this Security Agreement in substantially the form attached as Exhibit D, duly executed and delivered on behalf of such Person within thirty (30) days after such formation or acquisition (or such later dates as are reasonably agreed by the Administrative Agent), together with such documents and certificates the Administrative Agent shall reasonably request to create in favor of the Administrative Agent, for the benefit of Secured Parties, a valid and perfected first priority security interest in any property acquired by any Grantor;

(b) each Grantor shall cause all of the Pledged Stock owned by such Grantor to comply with Section 4.02(a);

(c) each Grantor shall cause all of the Material Debt Instruments owned or acquired by such Grantor to comply with Section 4.02(a);

(d) all documents and instruments, including UCC financing statements, required by applicable Law to be filed, registered or recorded to perfect the Liens of the Administrative Agent in any Collateral owned by the Grantors and created by the Security Documents and with the priority contemplated by, such Security Documents, shall have been filed, registered or recorded (or delivered to the Administrative Agent for filing, registration or recording), in each case, subject to the timing provisions set forth in clause (a) above for any filings, registrations and recordings with respect to Collateral owned by any Grantor on the Closing Date and with respect to Collateral acquired by any Grantor after the Closing Date, unless the Security Documents specifically permit the Lien in such Collateral not to be perfected;

(e) each Grantor shall cause all of its Real Estate Assets to comply with the following requirements;

(i)  in the event that any Grantor owns any Real Estate Asset as of the Closing Date or acquires a Real Estate Asset after the Closing Date, then such Grantor shall promptly take all such actions and execute and deliver, or cause to be executed and delivered, all such Mortgages, documents, instruments, agreements, opinions and certificates, including the items specified in clause (iii) below, that the Administrative Agent shall reasonably request to create in favor of the Administrative Agent, for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected first priority Lien (subject to Permitted Liens) in such Real Estate Assets;

(ii)  the Borrower shall, at the request of the Administrative Agent, deliver, from time to time, to the Administrative Agent such appraisals as are reasonably required by law or regulation of Real Estate Assets with respect to which the Administrative Agent has been granted a Lien;

(iii)  in the case of any Real Estate Asset referred to herein, the applicable Grantor shall provide the Administrative Agent with UCC financing statements and a Mortgage with respect to such Real Estate Asset (each, a "**Mortgaged Property**"), as the case may be, within ninety (90) days after the date of the consummation of the acquisition of such Real Estate Asset (or such later dates as are reasonably agreed by the Administrative Agent), in each case, to be recorded in the applicable real property records in the county in which the applicable Real Estate Asset is located, together with:

-2-

(A)	evidence that counterparts of any such Mortgage has been duly executed, acknowledged and delivered and that all filing and recording taxes and fees that are due and payable have been paid or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent;

(B)	if reasonably requested by the Administrative Agent, an opinion of counsel (which counsel shall be reasonably satisfactory to the Administrative Agent) in each state in which a Mortgaged Property is located with respect to the enforceability of, and validity and perfection of the lien of, the form(s) of the Mortgages to be recorded in such state and such other matters as the Administrative Agent may reasonably request, in each case in form and substance reasonably satisfactory to the Administrative Agent;

(C)	ALTA mortgagee title insurance policies or unconditional commitments therefor containing such endorsements and affirmative coverages reasonably satisfactory to Administrative Agent and issued by one or more title companies reasonably satisfactory to the Administrative Agent with respect to each Mortgaged Property (each, a "**Title Policy**"), in amounts not less than the Fair Market Value of each Mortgaged Property, together with a title report issued by a title company with respect thereto and copies of all recorded documents listed as exceptions to title or otherwise referred to therein, and Borrower shall take all actions (including, without limitation, executing any and all documents and affidavits) reasonably required by the title company to remove any and all items, liens and/or exceptions disclosed in such title report, such that such items do not appear in, and are insured against by, the Title Policy, each in form and substance reasonably satisfactory to the Administrative Agent and evidence satisfactory to the Administrative Agent that such Grantor has paid to the title company or to the appropriate Governmental Authorities all expenses and premiums of the title company and all other sums required in connection with the issuance of each Title Policy and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages for each Mortgaged Property in the appropriate real estate records;

(D)	(A) a completed Flood Certificate with respect to each Mortgaged Property, which Flood Certificate shall (x) be addressed to the Administrative Agent and (y) otherwise comply with the Flood Program; (B) if the Flood Certificate states that such Mortgaged Property is located in a Flood Zone, the Borrower's written acknowledgment of receipt of written notification from the Administrative Agent (x) as to the existence of such Mortgaged Property and (y) as to whether the community in which each Mortgaged Property is located is participating in the Flood Program; and (C) if such Mortgaged Property is located in a Flood Zone and is located in a community that participates in the Flood Program, evidence that the Borrower has obtained a policy of flood insurance that is in compliance with all applicable requirements of the Flood Program;

(E)	a current survey for such Mortgaged Property, certified to the title company, the applicable Grantor and the Administrative Agent and their respective successors and assigns, in form and substance reasonably acceptable to the Administrative Agent prepared by a professional land surveyor licensed in the state in which the Mortgaged Property is located in accordance with the 2016 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys.  Such survey

-3-

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 451 of 812**

shall reflect the same legal description contained in the Title Policy relating to such Mortgaged Property and shall otherwise satisfy all requirements of the title company issuing the related Title Policy.  The surveyor's seal shall be affixed to each survey and shall designate whether all or any of such Mortgaged Property is located in a "one hundred year flood hazard area"; provided that, notwithstanding the foregoing, a new survey will not be required if an existing survey, together with an "affidavit of no change" reasonably satisfactory to the title insurance company, is delivered to the Administrative Agent and the title insurance company, and the title insurance company removes the so-called "survey exceptions" from the applicable Title Policy; and

(F)      at such times as reasonably required by Administrative Agent, such abstracts, reports, appraisals and other documents as the Administrative Agent may reasonably request; and

(iv)      each Mortgage encumbering a Mortgaged Property shall secure all Obligations, provided that, in the event that the jurisdiction in which the applicable Mortgaged Property is located imposes a mortgage recording, intangibles or similar tax and does not permit the allocation of indebtedness for the purpose of determining the amount of such tax payable, the principal amount secured by such Mortgage shall be equal to one hundred percent (100%) of the amount of the Fair Market Value of such Mortgaged Property.

The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets of the Grantors, or the provision of Guarantees by any Subsidiary, if, and for so long as the Administrative Agent and the Borrower reasonably determine that the cost of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance, legal opinions or other deliverables in respect of such assets, or providing such Guarantees (taking into account any adverse tax consequences to the Parent and the Subsidiaries) exceeds the practical benefit to the Lenders afforded thereby.

Notwithstanding any provision of this Security Agreement or any other Transaction Document to the contrary,

(A)      the Grantors shall enter into a Collection Account Control Agreement with respect to the Collection Account and otherwise take any action requested by the Administrative Agent to provide perfection by control (as defined in Section 9-104 of the UCC)  with respect to Cash and Cash Equivalents, Deposit Accounts, Securities Accounts or commodities accounts (including securities entitlements and related assets) of such Grantor, within 30 days after the Closing Date (or such later dates as reasonably agreed by the Administrative Agent); and

(B)      the Grantors shall obtain access rights (through a power of attorney) with respect to each of the Maquiladoras' facilities located in Mexico on or prior to the Closing Date.

"**Contract Rights**" means all rights of any Grantor under any Contract, including, without limitation, (i) any and all rights to receive and demand payments under such Contract, (ii) any and all rights to receive and compel performance under such Contract and (iii) any and all other rights, interests and claims now existing or in the future arising in connection with such Contract.

-4-

BUSINESS.29047517.8

"**Contracts**" means all contracts between any Grantor and one or more additional parties (including, without limitation, any Swap Agreement, licensing agreement and any partnership agreement, joint venture agreement and/or limited liability company agreement).

"**Control**" has the meaning set forth in Article 8 or, if applicable, in Section 9-104, 9-105, 9-106 or 9-107 of Article 9 of the UCC.

"**Credit Agreement**" has the meaning set forth in the preamble.

"**Domain Names**" means all Internet domain names and associated URL addresses in or to which any Grantor now or hereafter has any right, title or interest.

"**Excluded Assets**" means, collectively:

(a) motor vehicles and all other assets subject to certificates of title (except to the extent a security interest therein can be perfected by the filing of a UCC financing statement);

(b) any Letter-of-Credit Right with a value of less than $500,000(except to the extent a security interest therein can be perfected by the filing of a UCC financing statement);

(c) any Commercial Tort Claim with a value (as reasonably estimated by the Borrower) of less than $500,000 (except to the extent a security interest therein can be perfected by the filing of a UCC financing statement);

(d) pledges and security interests prohibited or restricted by applicable Law (including any requirement to obtain the consent of any Governmental Authority or third party), except to the extent such prohibition is rendered ineffective under the UCC;

(e) Margin Stock;

(f) to the extent not permitted by the terms of the Organizational Documents of such Person or joint venture, Capital Stock in (i) not-for-profit subsidiaries and special purpose entities used for permitted securitization facilities and (ii) joint ventures;

(g) Capital Stock in excess of 65% of the voting Capital Stock (and 100% of the non-voting Capital Stock) of any direct or indirect subsidiary of the Borrower that is a CFC or any direct or indirect subsidiary of the Borrower substantially all of the assets of which consist direct or indirectly of Capital Stock and/or Indebtedness of one or more CFCs;

(h) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable law;

(i) other exceptions to be mutually agreed upon in writing by the Borrower and Administrative Agent,

provided, however, "Excluded Assets" shall not include any Proceeds, products, substitutes or replacement of Excluded Assets (unless such Proceeds, products, substitutions or replacements would otherwise constitute Excluded Assets).

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 453 of 812**

"**Exhibit**" refers to a specific exhibit to this Security Agreement, unless another document is specifically referenced.

"**Fair Market Value**" shall have the meaning assigned to such term in the Credit Agreement.

"**Flood Certificate**" means a life of loan "Standard Flood Hazard Determination Form" of the Federal Emergency Management Agency and any successor Governmental Authority performing a similar function.

"**Grantors**" means (i) the Parent and the Borrower and (ii) each Subsidiary of the Borrower that becomes a party to this Security Agreement as a Grantor after the Closing Date in accordance with Section 7.10 of this Security Agreement.  Notwithstanding anything else provided herein, any reference to Grantors in connection with a representation or covenant under this Security Agreement that is limited by its terms to the Closing Date shall, for such purposes, mean the Grantors on the Closing Date.

"**Intellectual Property Collateral**" means collectively, all (a) Copyrights, Patents, Trademarks, Trade Secrets, Domain Names, Licenses and Software and any and all other IP Rights; (b) all income, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing, including, without limitation, damages, claims and payments for past, present and future infringements, misappropriation, dilution or other violations of any of the foregoing; (c) all rights to sue for past, present and future infringements, misappropriation, dilution or other violations of any of the foregoing; and (d) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

"**Intellectual Property Security Agreement Supplements**" means (a) a Trademark Security Agreement Supplement, (b) a Patent Security Agreement Supplement or (c) a Copyright Security Agreement Supplement, in each case, substantially in the form of Annex A to the relevant Intellectual Property Security Agreement, as applicable.

"**Licenses**" means collectively, with respect to any Grantor, whether as licensor or licensee, all of such Grantor's right, title, and interest in and to (a) any and all licensing agreements or similar arrangements with respect to Copyrights, Patents, Trademarks, Trade Secrets, Software or any and all other IP Rights, (b) all income, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing, including, without limitation, damages, claims and payments for past, present and future breaches thereof, (c) all rights to sue for past, present and future breaches thereof, and (d) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

"**Material Debt Instrument**" means any promissory note payable to, or in favor, of a Grantor with an aggregate principal amount outstanding, in each case, of not less than $500,000.

"**Mexico**" means the United Mexican States.

"**Money**" has the meaning set forth in Article 1 of the UCC.

"**Mortgage**" means a mortgage, deed of trust, deed to secure debt, trust deed or other security document entered into by any Grantor that is the owner of a Real Estate Asset and the Administrative Agent (and/or any third parties required by law), creating and evidencing a Lien on such Real Estate Asset, which shall be in form (i) acceptable for recording in the applicable jurisdiction of such Real Estate Asset, (ii) sufficient to create a valid and perfected security interest in, to and over the applicable Grantor's right,

-6-

title and interest in and to such Real Estate Asset and (iii) reasonably satisfactory to the Administrative Agent, with such schedules and including such provisions as shall be necessary to conform such document to applicable local law or as shall be customary under applicable local law.

"**Obligations**" means (i) "Obligations" (as defined in the Credit Agreement) and (ii) Guaranteed Obligations (as defined in the Credit Agreement).

"**Perfection Requirements**" means the (i) filing of a Uniform Commercial Code financing statement with the appropriate office of the jurisdiction of organization of each Grantor, and/or an intellectual property filing with the United States Patent and Trademark Office and/or United States Copyright Office, as applicable and, (ii) with respect to any Subsidiary of a Grantor, the delivery of any certificate evidencing the Capital Stock issued by such Domestic Subsidiary (and pledged by any Grantor under the Security Documents in effect on the Closing Date), together with instruments of transfer executed in blank (and, solely with respect to the Closing Date, to the extent that such certificates exist prior to the Closing Date and are in Parent's actual possession on or prior to the Closing Date after its use of good faith, commercially reasonable efforts to obtain such certificates) and (iii) with respect to the Mexican Security Agreement, the execution and ratification before a Mexican notary public and its registration before the RUG as provided in the Credit Agreement.

"**Pledged Collateral**" means all Pledged Stock and Stock Rights constituting Collateral, including all stock certificates, options or rights of any nature whatsoever in respect of the Pledged Stock or other Stock Rights that may be issued or granted to, or held by, any Grantor while this Security Agreement is in effect, all Instruments, Securities and other Investment Property owned by any Grantor, whether or not physically delivered to the Administrative Agent pursuant to this Security Agreement, whether now owned or hereafter acquired by such Grantor and any and all Proceeds thereof, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

"**Pledged Stock**" means, with respect to any Grantor, the shares of Capital Stock held by such Grantor as of the Closing Date, together with any other shares of Capital Stock as are hereafter acquired by such Grantor, in each case, unless not required to be pledged by such Grantor hereunder and excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

"**Proceeds**" has the meaning assigned in Article 9 of the UCC and, in any event, shall also include but not be limited to (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Administrative Agent or any Grantor from time to time with respect to any of the Collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to any Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority (or any Person acting under color of Governmental Authority), (iii) any and all Stock Rights and (iv) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"**Real Estate Asset**" means, at any time of determination, all right, title and interest (fee, leasehold or otherwise) of any Grantor in and to real property (including, but not limited to, land, improvements and fixtures thereon).

"**Receivables**" means any Account, Chattel Paper, Document, Instrument and/or any General Intangible, in each case, that is a right or claim to receive money or that is otherwise included as Collateral, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

-7-

**JOINT EXHIBIT NO. 18**
**Page 455 of 812**

"**Section**" means a numbered section of this Security Agreement, unless another document is specifically referenced.

"**Security Agreement**" has the meaning set forth in the preamble.

"**Software**" means computer programs, source code, object code and supporting documentation including "software" as such term is defined in Article 9 of the UCC, as well as computer programs that may be construed as included in the definition of Goods.

"**Stock Rights**" means all dividends, warrants, instruments or other distributions and any other right or property which any Grantor shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any Pledged Stock, any right to receive any Pledged Stock and any right to receive earnings, in which such Grantor now has or hereafter acquires any right, issued by an issuer of such Pledged Stock, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

"**Trade Secrets**" means, with respect to any Grantor, all of such Grantor's right, title and interest in and to the following:  (a) confidential and proprietary information, including unpatented inventions, invention disclosures, engineering or other data, information, production procedures, know-how, financial data, customer lists, supplier lists, business and marketing plans, processes, schematics, algorithms, techniques, analyses, proposals, source code and data collections; (b) all income, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing, including, without limitation, damages, claims and payments for past, present and future misappropriation or infringements of any of the foregoing; (c) all rights to sue for past, present and future misappropriation or infringements of any of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (d) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

ARTICLE 2
GRANT OF SECURITY INTEREST

Section 2.01.      <u>Grant of Security Interest</u>.

(a)      As security for the prompt and complete payment or performance, as the case may be, in full of the Obligations, each Grantor hereby pledges, collaterally assigns and grants to the Administrative Agent, on behalf of and for the benefit of the Secured Parties, a continuing security interest in all of its right, title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Grantor, and regardless of where located (all of which are collectively referred to as the "**Collateral**"):

(i)      all Accounts;

(ii)      all Cash;

(iii)      all Chattel Paper (including, without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper);

(iv)      all Commercial Tort Claims;

-8-

**JOINT EXHIBIT NO. 18**
**Page 456 of 812**

(v)  all Contracts, together with all Contract Rights arising thereunder;

(vi)  all Deposit Accounts;

(vii)  all Documents;

(viii)  all Equipment;

(ix)  all Financial Assets;

(x)  all Fixtures;

(xi)  all General Intangibles;

(xii)  all Goods;

(xiii)  all Governmental Authorizations;

(xiv)  all Instruments;

(xv)  all Intellectual Property Collateral;

(xvi)  all Inventory;

(xvii)  all Investment Property, Pledged Stock and other Pledged Collateral;

(xviii)  all letters of credit and Letter-of-Credit Rights;

(xix)  all Licenses;

(xx)  all Proceeds of insurance;

(xxi)  all Receivables;

(xxii)  all Real Estate Assets;

(xxiii)  all Securities Accounts, Money, Securities and other investments therein, and all Security Entitlements in respect thereof;

(xxiv)  all Software and all recorded data of any kind or nature, regardless of the medium of recording;

(xxv)  all Supporting Obligations relating to any of the foregoing; and

(xxvi)  all accessions to, substitutions and replacements for and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing.

(b)  Notwithstanding the foregoing, no Lien or security interest is granted hereunder on any Excluded Asset and the term "Collateral" (and any component definition thereof) shall not include any

-9-

**JOINT EXHIBIT NO. 18**
**Page 457 of 812**

Excluded Asset or any other asset to the extent expressly limited or excluded by the Collateral and Guarantee Requirements.  Notwithstanding anything to the contrary contained herein, immediately upon the ineffectiveness, lapse or termination of any restriction or condition set forth in the definition of Excluded Assets that prevented the grant of a security interest in any right, interest or other asset that would have, but for such restriction or condition, constituted Collateral, the Collateral shall include, and the relevant Grantor shall be deemed to have automatically granted a security interest in, all relevant previously restricted or conditioned rights, interests or other assets, as the case may be, as if such restriction or condition had never been in effect.

(c)      Notwithstanding anything to the contrary in this Security Agreement or any other Transaction Document, no Grantor shall be required to take any action with respect to the Collateral pledged hereunder (and no Lien on such Collateral shall be required to be perfected and/or perfected on a first priority basis, as applicable) to the extent such action is inconsistent with the Credit Agreement, any other Transaction Document, the Collateral and Guarantee Requirements or the Perfection Requirements.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

On the dates and to the extent required pursuant to the terms of the Credit Agreement, each Grantor hereby represents and warrants to the Administrative Agent, for the benefit of the Secured Parties, in each case, after giving effect to the transactions contemplated under the Transaction Documents on the Closing Date, that:

Section 3.01.      Title, Perfection and Priority; Filing Collateral.  Subject to Section 2.01(c) of this Security Agreement, any other limitations or exceptions set forth in any Transaction Document, the Perfection Requirements, the Collateral and Guarantee Requirements, and any applicable bankruptcy, insolvency, reorganization or other similar laws relating to or limiting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law), this Security Agreement is effective to create legal, valid and enforceable Liens on all of the Collateral of such Grantor that is pledged by such Grantor hereunder, in each case, in favor of the Administrative Agent for the benefit of the Secured Parties and, upon the satisfaction of the Perfection Requirements, such Liens shall constitute perfected first priority Liens (subject to Permitted Liens) on such Collateral (to the extent that a Lien on such Collateral can be perfected by satisfying the applicable Perfection Requirements) securing the Obligations.

Section 3.02.      [Reserved].

Section 3.03.      [Reserved].

Section 3.04.      Intellectual Property.

(a)      Other than as set forth on Schedule 3.04, none of the Grantors owns or otherwise has a license or right to use all rights in any Intellectual Property.  Upon filing of appropriate financing statements with the Secretary of State (or equivalent office) of the state of organization of such Grantor and the filing of the applicable Intellectual Property Security Agreement with the United States Copyright Office or the United States Patent and Trademark Office, as applicable, the Administrative Agent shall have fully perfected first priority Liens (subject to Permitted Liens) on the Intellectual Property Collateral constituting United States issued or registered Patents, Trademarks and Copyrights (and applications therefor).

-10-

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 458 of 812**

(b)     No Grantor is aware of (i) any third-party claim (other than office actions or rejections during ordinary course of prosecution) (A) that any of its owned Patent, Trademark, Domain Name or Copyright registrations or applications is invalid or unenforceable or (B) challenging such Grantor's rights to such registrations and applications or (ii) any basis for such claims with respect to such Grantor, other than, in each case, to the extent any such third-party claims would not reasonably be expected to result in a Material Adverse Effect.

Section 3.05.     Pledged Collateral; Instruments and Chattel Paper.  (i) All Pledged Stock has been duly authorized and validly issued by the issuer thereof and is fully paid and non-assessable (to the extent such concepts are relevant with respect to such Pledged Stock), (ii) each Grantor is the direct owner, beneficially and of record, of the Pledged Stock described in Schedule 3.05 as held by such Grantor as of the Closing Date, (iii) each Grantor holds the Pledged Stock described in Schedule 3.05 as held by such Grantor as of the Closing Date free and clear of all Liens (other than Permitted Liens), (iv) as of the Closing Date, all certificates or instruments representing or evidencing the Pledged Collateral which are required to be delivered pursuant to Section 4.02 hereof or the Collateral and Guarantee Requirements have been delivered to the Administrative Agent together with undated instruments of transfer or assignment duly executed in blank and the Administrative Agent shall have fully perfected first priority Liens (subject to Permitted Liens) on the Pledged Collateral to the extent perfection in such Collateral is required by the Perfection Requirements.

Section 3.06.     Recourse.  This Security Agreement is made with full recourse to each Grantor and pursuant to and upon all the warranties, representations, covenants and agreements on the part of such Grantor contained herein, in the Transaction Documents and otherwise in writing in connection herewith and therewith.

## ARTICLE 4
### COVENANTS

From the Closing Date until the Termination Date (in each case, subject to Section 2.01(c) of this Security Agreement):

Section 4.01.     General.

(a)     Authorization to File Financing Statements; Ratification.     Each Grantor hereby (x) authorizes the Administrative Agent to (A) file all financing statements (including amendments and continuations thereto) with respect to the Collateral naming such Grantor as debtor and the Administrative Agent as secured party, in form appropriate for filing under the UCC of the relevant jurisdiction and (B) make all filings with the United States Patent and Trademark Office and the United States Copyright Office (including filing any Intellectual Property Security Agreement) for the purpose of perfecting, recording, enforcing, maintaining or protecting the Lien of the Administrative Agent created hereunder in each Grantor's United States issued, registered or applied for Patents, Trademarks and Copyrights (in each case, to the extent constituting Collateral) and naming such Grantor as debtor and the Administrative Agent as secured party, and (y) agrees to take such other actions as required, in each case, that may be required under any applicable Law or which the Administrative Agent or the Required Lenders (through the Administrative Agent) may reasonably request to ensure the creation, perfection and priority of the Liens created or intended to be created under the Security Documents.  Each Grantor shall pay any applicable filing fees, recordation fees and related expenses relating to its Collateral in accordance with Section 8.2(a) of the Credit Agreement.  The Administrative Agent may file financing statements in any applicable UCC jurisdiction and may (i) indicate the Collateral (A) as "all assets" or "all assets of the Debtor, whether now existing or hereinafter arising" of the applicable Grantor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of such

-11-

jurisdiction, or (B) by any other description which reasonably approximates the description contained in this Security Agreement and (ii) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (A) in each case to the extent applicable, whether the Grantor is an organization, the type of organization and any organization identification number issued to the Grantor and (B) in the case of a financing statement filed as a fixture filing, a sufficient description of the relevant real property to which the Collateral relates. Each Grantor agrees to furnish any such information to the Administrative Agent promptly upon request.

(b)     Further Assurances. Each Grantor agrees, at its own expense, to take any and all actions reasonably necessary to defend title to the Collateral against all Persons (other than Persons holding Permitted Liens on such Collateral that have priority over the Administrative Agent's Lien) and to defend the security interest of the Administrative Agent in the Collateral and the priority thereof against any Lien that is not a Permitted Lien.

(c)     Change of Name, Etc. Following the occurrence of a change for which delivery of any notice is required by Section 5.2(a) of the Credit Agreement, the relevant Grantor shall comply with Sections 4.01(a) and 4.01(b) of this Security Agreement and Section 5.1(p) of the Credit Agreement.

Section 4.02.     Pledged Collateral.

(a)     Delivery of Certificated Securities, Tangible Chattel Paper, Instruments and Documents. Each Grantor will, subject to the Perfection Requirements and the Collateral and Guarantee Requirements, (i) on the Closing Date, deliver to the Administrative Agent for the benefit of the Secured Parties, the originals of all (x) certificated Pledged Stock and (y) Material Debt Instruments, in each case under clauses (x) and (y), to the extent constituting Collateral owned by such Grantor as of the Closing Date, accompanied by undated instruments of transfer or assignment duly executed in blank, and (ii) after the Closing Date and after any Subsidiary becomes a Grantor under this Security Agreement, hold on behalf of and for the benefit of the Administrative Agent upon receipt and, promptly (and in any event within the latest of (1) thirty (30) days after such Subsidiary becomes a Grantor, (2) thirty (30) days after the receipt by such Grantor or (3) such longer period as may be reasonably agreed by the Administrative Agent) after the receipt thereof, deliver to the Administrative Agent for the benefit of the Secured Parties, the originals of all (A) certificated Pledged Stock and (B) Material Debt Instruments, in each case under clauses (A) and (B), to the extent constituting Collateral received by such Grantor after the Closing Date, accompanied by undated instruments of transfer or assignment duly executed in blank.

(b)     Uncertificated Securities and Pledged Collateral. Except to the extent in connection with any Investment or Disposition expressly permitted by the Credit Agreement, with respect to any Pledged Stock owned by any Grantor (other than Capital Stock held by a Clearing Corporation, Securities Intermediary or other financial intermediary of any kind) which is not a certificated Security for purposes of the UCC, to the extent constituting Pledged Collateral, such Grantor shall not permit any issuer of such Pledged Stock to (i) enter into any agreement with any Person, other than the Administrative Agent, whereby such issuer effectively delivers "control" of any such Pledged Stock that is in the form of partnership interests or limited liability company interests (as applicable) under the UCC to such Person, or (ii) if such Pledged Stock is not a Security for purposes of the UCC, allow such Pledged Stock to become a Security unless such Grantor certificates such Pledged Stock and complies with the procedures set forth in Section 4.02(a) within the time period prescribed therein. Each Grantor which is an issuer of any uncertificated Pledged Collateral described in this Section 4.02(b) hereby agrees to comply with all instructions from the Administrative Agent without such Grantor's further consent, in each case, subject to the notice requirements set forth in Section 5.01(a)(iv) hereof.

(c)     [Reserved].

-12-

BUSINESS.29047517.8

(d)      Rights in Pledged Collateral.  It is agreed that:

(i)      without in any way limiting the foregoing and subject to clause (ii) below, each Grantor shall have the right, unless an Event of Default has occurred and is continuing and subject to the Administrative Agent's delivery of prior written notice to the Borrower pursuant to Section 5.01(a)(iv), to exercise all voting rights or other rights relating to the Pledged Collateral for any purpose that does not violate this Security Agreement, the Credit Agreement or any other Transaction Document;

(ii)      the Administrative Agent at any time when an Event of Default has occurred and is continuing shall have the right to exercise the rights and remedies provided under Section 5.01(a)(iv) (subject to the notice requirements set forth therein) and, upon the occurrence and during the continuance of an Event of Default after prior written notice to the Borrower, all rights of the Grantors to exercise or refrain from exercising voting or other rights relating to the Pledged Collateral shall cease or be limited as set forth in such notice; and

(iii)      subject to Section 5.01(a)(iv), each Grantor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Collateral (unless, and solely to the extent, otherwise provided under the Credit Agreement or the other Transaction Documents); provided that any non-cash dividends or other distributions that would constitute Pledged Collateral, whether resulting from a subdivision, combination or reclassification of any Pledged Stock or received in exchange for Pledged Collateral or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall, to the extent constituting Collateral, be held on behalf of and for the benefit of the Administrative Agent and be and become part of the Pledged Collateral, and, if received by any Grantor, shall be delivered to the Administrative Agent as and to the extent required by clause (a) above.  The Administrative Agent shall promptly deliver to the applicable Grantor (without recourse and without any representation or warranty) any Pledged Collateral in its possession if requested to be delivered to the issuer or the holder thereof in connection with any redemption or exchange of such Pledged Collateral not prohibited by the Credit Agreement.

Section 4.03.      Intellectual Property.

(a)      At any time when an Event of Default has occurred and is continuing, and upon the written request of the Administrative Agent, each Grantor will (i) use its commercially reasonable efforts to obtain all consents and approvals necessary and appropriate for the assignment to or for the benefit of the Administrative Agent of any License held by such Grantor in the U.S. to enable the Administrative Agent to enforce the security interests granted hereunder and (ii) to the extent required pursuant to any material License in the U.S. under which such Grantor is the licensee, deliver to the licensor thereunder any notice of the grant of security interest hereunder or such other notices required to be delivered thereunder in order to permit the security interest created or permitted to be created hereunder pursuant to the terms of such License.

(b)      Each Grantor shall notify the Administrative Agent promptly if it knows that any application for or registration of any Patent, Trademark, Domain Name, or Copyright (now or hereafter existing) has become abandoned or dedicated to the public, or of any determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court) abandoning such Grantor's ownership of any such Patent, Trademark or Copyright, its right to register the same, or to keep and maintain the same, except, in each case, for Dispositions not prohibited by the Credit Agreement or

-13-

where such occurrences, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(c)      In the event that any Grantor (x) files an application for the registration of any Patent, Trademark or Copyright with the United States Patent and Trademark Office or the United States Copyright Office, (y) acquires any such Patent, Trademark or Copyright by purchase or assignment, or (z) files a Statement of Use or an Amendment to Allege Use with respect to any "intent-to-use" Trademark application, in each case, after the Closing Date and to the extent the same constitutes Collateral (and other than as a result of an application that is then subject to an Intellectual Property Security Agreement or Intellectual Property Security Agreement Supplement becoming registered), it shall promptly notify the Administrative Agent and, execute and deliver to the Administrative Agent, at such Grantor's sole cost and expense, any Intellectual Property Security Agreement or Intellectual Property Security Agreement Supplement, as applicable, or any other instrument as the Administrative Agent may reasonably request to evidence the Administrative Agent's security interest in such registered Patent, Trademark or Copyright (or application therefor), and the General Intangibles of such Grantor relating thereto or represented thereby.

(d)      Each Grantor shall take all actions necessary or reasonably requested by the Administrative Agent to (i) maintain and pursue each application and to obtain and maintain the registration of each Patent, Trademark, Domain Name and, to the extent consistent with past practices, Copyright that constitutes Collateral (now or hereafter existing), including by filing applications for renewal, affidavits of use, affidavits of non-contestability and, if consistent with good business judgment (as determined by such Grantor), by initiating opposition and interference and cancellation proceedings against third parties, (ii) maintain and protect the secrecy or confidentiality of its Trade Secrets and (iii) otherwise protect and preserve such Grantor's rights in, and the validity or enforceability of, its Intellectual Property Collateral, in each case except where failure to do so (A) would not reasonably be expected to result in a Material Adverse Effect, or (B) is otherwise permitted under the Credit Agreement.

(e)      Each Grantor shall promptly notify the Administrative Agent of any material infringement or misappropriation of such Grantor's Patents, Trademarks, Copyrights or Trade Secrets of which it becomes aware, and shall take such actions as are reasonable and appropriate under the circumstances to protect such Patent, Trademark, Copyright or Trade Secret, except where such infringement, misappropriation or dilution would not reasonably be expected to result in a Material Adverse Effect.

Section 4.04.      Commercial Tort Claims.  After the Closing Date, on or before the date that is sixty (60) days after the date on which any Grantor acquires an interest therein (or such later dates as are reasonably agreed by the Administrative Agent), each relevant Grantor shall notify the Administrative Agent of any Commercial Tort Claim with an individual value (as reasonably estimated by the Borrower) in excess of $500,000 acquired by it, together with a summary description thereof sufficient to create a security interest therein, and such Commercial Tort Claim (and the Proceeds thereof) shall automatically constitute Collateral (to the extent not constituting Excluded Assets), all upon the terms of this Security Agreement.

Section 4.05.      Inventory. After the Closing Date, if Collateral with an aggregate Fair Market Value in excess of $500,000 is located at any leased location in the United States, the Grantors shall deliver to the Administrative Agent, within thirty (30) days after entering into such lease (or such later dates as reasonably agreed by the Administrative Agent), a landlord waiver, collateral access agreement or similar agreement, in each case in form and substance satisfactory to the Administrative Agent and the Lenders.

Section 4.06.      Grantors Remain Liable Under Contracts.  Each Grantor (rather than the Administrative Agent or any Secured Party) shall remain liable (as between itself and any relevant counterparty) to observe and perform all the conditions and obligations to be observed and performed by it

-14-

under any Contract included in or related to the Collateral, all in accordance with the terms and conditions thereof.  Neither the Administrative Agent nor any other Secured Party shall have any obligation or liability under any Contract included in or related to the Collateral by reason of or arising out of this Security Agreement or the receipt by the Administrative Agent or any other Secured Party of any payment relating to such Contract pursuant hereto, nor shall the Administrative Agent or any other Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Contract included in or related to the Collateral, to make any payment, to make any inquiry as to the nature or sufficiency of any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

Section 4.07.     Grantors Remain Liable Under Accounts.    Each Grantor (rather than the Administrative Agent or any Secured Party) shall remain liable (as between itself and any relevant counterparty) to observe and perform all of the conditions and obligations to be observed and performed by it under any Account included in or related to the Collateral, all in accordance with the terms and conditions of any agreement giving rise to such Accounts.  Neither the Administrative Agent nor any other Secured Party shall have any obligation or liability under any Account included in or related to the Collateral (or any agreement giving rise thereto) by reason of or arising out of this Security Agreement or the receipt by the Administrative Agent or any other Secured Party of any payment relating to such Account pursuant hereto, nor shall the Administrative Agent or any other Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Account included in or related to the Collateral (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

ARTICLE 5
REMEDIES

Section 5.01.     Remedies.

(a)     Each Grantor agrees that, at any time when an Event of Default has occurred and is continuing, the Administrative Agent may exercise any or all of the following rights and remedies (in addition to the rights and remedies existing under applicable Requirements of Law), in each case, with respect to the Collateral:

(i)     the rights and remedies provided in this Security Agreement, the Credit Agreement, or any other Transaction Document;

(ii)     the rights and remedies available to a secured party under the UCC of each relevant jurisdiction (whether or not the UCC applies to the affected Collateral) or under any other applicable Law (including, without limitation, any law governing the exercise of a bank's right of setoff or bankers' Lien) or in equity when a debtor is in default under a security agreement;

(iii)     without prior notice (except as specifically provided in Section 7.1 of the Credit Agreement, the provisions of this Security Agreement or any other Transaction Document, or otherwise in accordance with the terms of the UCC) or demand of any kind to any Grantor or any other Person, but subject to the terms of any applicable lease or sublease agreement, the Administrative Agent may (A) personally, or by agents or attorneys, enter the premises of any Grantor where any Collateral, or the books and Records relating thereto, or both, are located (through self-help and without judicial process) for purposes of taking possession or removing all or any part of the Collateral or the books and Records relating thereto, or both and (B) sell, lease, assign, grant an option or options to purchase or otherwise dispose of, deliver, or realize upon, the

-15-

Collateral or any part thereof in one or more parcels at one or more public or private sales (which sales may be adjourned or continued from time to time with or without notice and may take place at such Grantor's premises or elsewhere), for Cash, on credit or for future delivery without assumption of any credit risk, and upon such other terms as the Administrative Agent may deem commercially reasonable;

(iv)    upon not less than one (1) Business Day's prior written notice to the Borrower, the Administrative Agent may (A) transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral, (B) exchange the certificates representing Pledged Collateral for certificates of smaller or larger denominations for any purpose consistent with this Security Agreement and (C) exercise the voting and all other rights as a holder with respect thereto, to collect and receive all cash dividends, interest, principal and other distributions made thereon and to otherwise act with respect to the Pledged Collateral as though the Administrative Agent was the outright owner thereof; and

(v)    the Administrative Agent may take possession of the Collateral or any part thereof, by directing such Grantor in writing to deliver the same to the Administrative Agent at a place designated by the Administrative Agent that is reasonably convenient to both parties, in which event such Grantor shall at its own expense forthwith cause the same to be moved to the place so designated by the Administrative Agent and there make it available to the Administrative Agent.

(b)    Each Grantor acknowledges and agrees that compliance by the Administrative Agent, on behalf of the Secured Parties, with any applicable state or federal Law in connection with a disposition of the Collateral will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(c)    The Administrative Agent shall have the right in any public sale and, to the extent permitted by applicable Law, in any private sale, to purchase for the benefit of the Administrative Agent and the Secured Parties, all or any part of the Collateral so sold, free of any right of equity redemption that Grantor is permitted to release and waive pursuant to applicable Law, and, each Grantor hereby expressly releases such right to equity redemption to the extent permitted by applicable Law.

(d)    Until the Administrative Agent is able to effect a sale, lease, transfer or other disposition of any particular Collateral under this Section 5.01, the Administrative Agent shall have the right to hold or use such Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving such Collateral or the value of such Collateral.  At any time when an Event of Default has occurred and is continuing, the Administrative Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Administrative Agent's remedies (for the benefit of the Administrative Agent and Secured Parties), with respect to such appointment, without prior notice or hearing as to such appointment.

(e)    Notwithstanding the foregoing, the Administrative Agent shall not be required to (i) make any demand upon, or pursue or exhaust any of its rights or remedies against, the Grantors, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Obligations or to pursue or exhaust any of their rights or remedies with respect to any Collateral therefor or any direct or indirect Guarantee thereof, (ii) marshal the Collateral or any Guaranty of the Obligations or to resort to the Collateral or any such Guaranty in any particular order (and, to the extent it lawfully may, each Grantor hereby waives and releases all rights it has, if any, of marshaling the Collateral), or (iii) effect a public sale of any Collateral.

(f)    Each Grantor recognizes that the Administrative Agent may be unable to effect a public sale of any or all the Pledged Collateral and may be compelled to resort to one or more private sales thereof.

-16-

BUSINESS.29047517.8

Each Grantor also acknowledges that any private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that no such private sale shall be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private.  The Administrative Agent shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit any Grantor or the issuer of any Pledged Collateral to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws, even if any Grantor and the issuer would agree to do so.

(g)     The Administrative Agent acknowledges and agrees that notwithstanding any other provisions in this Security Agreement or any other Transaction Document, the exercise of rights or remedies with respect to certain Collateral and the enforcement of any security interests therein may be limited or restricted by, or require any consents, authorizations approvals or licenses under, any applicable Law.

Section 5.02.     Grantors' Obligations Upon Default.  Upon the request of the Administrative Agent at any time when an Event of Default has occurred and is continuing, each Grantor will, at its own cost and expense:

(a)     deliver all tangible evidence of its Accounts and Contract Rights (including, without limitation, all documents evidencing the Accounts and all Contracts) and such books and Records to the Administrative Agent or to its representatives (copies of which evidence and books and Records may be retained by such Grantor), and

(b)     if the Administrative Agent so directs and in a form and in a manner reasonably satisfactory to the Administrative Agent, legend the Accounts and the Contracts, as well as books, Records and documents (if any) of such Grantor evidencing or pertaining to such Accounts and Contracts with an appropriate reference to the fact that such Accounts and Contracts have been assigned to the Administrative Agent and that the Administrative Agent has a security interest therein.

Section 5.03.     Intellectual Property Remedies.

(a)     For the purpose of enabling the Administrative Agent to exercise the rights and remedies under this Article 5 at any time when an Event of Default has occurred and is continuing, and at such time as the Administrative Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Administrative Agent a power of attorney to sign any document which may be required by the United States Patent and Trademark Office, the United States Copyright Office or similar registrar or domain name registrar in order to effect an assignment of all right, title and interest in each registered Patent, Trademark, Domain Name and Copyright and each application for any such registration, and record the same.  At any time when an Event of Default has occurred and is continuing, the Administrative Agent may (i) declare the entire right, title and interest of such Grantor in and to each item of Intellectual Property Collateral to be vested in the Administrative Agent for the benefit of the Secured Parties, in which event such right, title and interest shall immediately vest in the Administrative Agent for the benefit of the Secured Parties, and the Administrative Agent shall be entitled to exercise the power of attorney referred to in this Section 5.03 to execute, cause to be acknowledged and notarized and record such assignment with the applicable agency or registrar; (ii) sell any Grantor's Inventory directly to any Person, including without limitation Persons who have previously purchased any Grantor's Inventory from such Grantor and in connection with any such sale or other enforcement of the Administrative Agent's rights under this Security Agreement and subject to any restrictions contained in applicable third party licenses entered into by such Grantor, sell Inventory which bears any Trademark owned by or licensed to any Grantor and any Inventory that is covered by any Intellectual Property Collateral owned by or licensed to any Grantor, and the Administrative Agent may finish any work in process and affix any relevant Trademark owned by or

-17-

JOINT EXHIBIT NO. 18
Page 465 of 812

licensed to such Grantor, and sell such Inventory as provided herein; (iii) direct such Grantor to refrain, in which event such Grantor shall refrain, from using any Intellectual Property Collateral in any manner whatsoever, directly or indirectly; and (iv) assign or sell any Intellectual Property, in each case to the extent constituting Collateral, as well as the goodwill of such Grantor's business connected with the use of and symbolized by any such Trademark and the right to carry on the business and use the assets of such Grantor in connection with which any such Trademark or Domain Name has been used.

(b)      Each Grantor hereby grants to the Administrative Agent an irrevocable (until the Termination Date), nonexclusive, royalty-free, world-wide license to its right to use, license or sublicense any IP Rights now owned or hereafter acquired by such Grantor, wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and (to the extent not prohibited by any applicable license) to all computer software and programs used for compilation or printout thereof.  The use of the license granted to the Administrative Agent pursuant to the preceding sentence may be exercised, at the option of the Administrative Agent, only when an Event of Default has occurred and is continuing; provided that such licenses to be granted hereunder with respect to Trademarks shall be subject to, with respect to the goods and/or services on which such Trademarks are used, the maintenance of quality standards that are sufficient to preserve the validity of such Trademarks and are consistent with past practices.

Section 5.04.      Application of Proceeds.

(a)      The Administrative Agent shall apply the proceeds of any collection, sale, foreclosure or other realization upon any Collateral received by it pursuant to the exercise of remedies in accordance with this Security Agreement and as set forth in Section 2.1(c) of the Credit Agreement (with any excess amounts remaining after such application, if any, to be returned to the Borrower).

(b)      Except as otherwise provided herein or in any other Transaction Document, the Administrative Agent shall have absolute discretion as to the time of application of any such proceeds, money or balance received by it pursuant to the exercise of remedies in accordance with this Security Agreement.  Upon any sale of Collateral by the Administrative Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), a receipt by the Administrative Agent or of the officer making the sale of such proceeds, moneys or balances shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Administrative Agent or such officer or be answerable in any way for the misapplication thereof.  It is understood that the Grantors shall remain jointly and severally liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate amount of the Obligations.

ARTICLE 6
ACCOUNT VERIFICATION; ATTORNEY IN FACT; PROXY

Section 6.01.      Account Verification.  The Administrative Agent may at any time and from time to time when an Event of Default has occurred and is continuing, and upon prior written notice to the relevant Grantor, in the Administrative Agent's own name, in the name of a nominee of the Administrative Agent, or in the name of any Grantor, communicate (by mail, telephone, facsimile or otherwise) with the Account Debtors of such Grantor, parties to Contracts with such Grantor and obligors in respect of Instruments of such Grantor to verify with such Persons, to the Administrative Agent's reasonable

-18-

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 466 of 812**

satisfaction, the existence, amount, terms of, and any other matter relating to, Accounts, Contracts, Instruments, Chattel Paper, payment intangibles and/or other Receivables that constitute Collateral.

Section 6.02.    Authorization for the Administrative Agent to Take Certain Action.

(a)    Each Grantor hereby irrevocably authorizes the Administrative Agent and appoints the Administrative Agent, until the Termination Date, as its true and lawful attorney in fact (i) at any time and from time to time in its reasonable discretion (subject to the limitations set forth herein) (A) to execute (to the extent necessary under the applicable Law) on behalf of such Grantor as debtor and to file financing statements necessary or desirable in the Administrative Agent's reasonable discretion to perfect and to maintain the perfection and priority of the Administrative Agent's security interest in the Collateral and (B) to file a carbon, photographic or other reproduction of this Security Agreement as a financing statement and to file any amendment of a financing statement with respect to the Collateral (which would not add new collateral or add a debtor, except as otherwise provided for herein or in any other Transaction Document) in such offices as the Administrative Agent in its reasonable discretion deems necessary or desirable to perfect and to maintain the perfection and priority of the Administrative Agent's security interest in the Collateral, (ii) during the continuation of an Event of Default after prior written notice to the Borrower and the applicable Grantor, in the sole discretion of the Administrative Agent (in the name of such Grantor or otherwise) to contact and enter into one or more agreements with the issuers of uncertificated securities that constitute Pledged Collateral or with securities intermediaries holding Pledged Collateral as may be necessary or advisable to give the Administrative Agent Control over such Pledged Collateral in accordance with the terms hereof (including, without limitation, Section 2.01(c) of this Security Agreement) and (iii) during the continuation of an Event of Default after prior written notice to the Borrower and the applicable Grantor, in the sole discretion of the Administrative Agent (in the name of such Grantor or otherwise), (A) to endorse and collect any cash proceeds of the Collateral and to apply the proceeds of any Collateral received by the Administrative Agent to the Obligations as provided herein or in the Credit Agreement or any other Transaction Document, (B) to notify the Account Debtors or other Persons obligated under any Receivable of the assignment of such Accounts to the Administrative Agent and to demand payment or enforce payment of such Receivable in the name of the Administrative Agent or such Grantor and to endorse any check, draft and/or any other instrument for the payment of money relating to any such Receivable, (C) to sign such Grantor's name on any invoice or bill of lading relating to any Receivable, any draft against any Account Debtor of such Grantor, and/or any assignment and/or verification of any Receivable, (D) to exercise all of any Grantor's rights and remedies with respect to the collection of any Receivable and any other Collateral, (E) to settle, adjust, compromise, extend or renew any Receivable, (F) to settle, adjust or compromise any legal proceedings brought to collect any Receivable, (G) to prepare, file and sign such Grantor's name on a proof of claim in bankruptcy or similar document against any Account Debtor of such Grantor, (H) to prepare, file and sign such Grantor's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with any Receivable, (I) to change the address for delivery of mail addressed to such Grantor to such address as the Administrative Agent may designate and to receive, open and dispose of all mail addressed to such Grantor (provided copies of such mail are provided to such Grantor), (J) to discharge past due taxes, assessments, charges, fees or Liens on the Collateral (except for Permitted Liens), (K) to make, settle and adjust claims in respect of Collateral under policies of insurance and endorse the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect thereto, (L) to obtain or maintain the policies of insurance of the types referred to in Section 5.1(g) of the Credit Agreement or to pay any premium in whole or in part relating thereto, (M) [reserved], (N) to perform or pay any obligation which any Grantor has agreed to perform or pay under any contract, lease, or other agreement, and which obligation is due and unpaid and not being contested by such Grantor in good faith, and to exercise any and all rights of any Grantor contained therein as fully as such Grantor itself could, (O) to repair, alter, or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any Person obligated to such Grantor in respect of any

-19-

BUSINESS.29047517.8

Receivables of such Grantor and (P) to do all other acts and things or institute any proceedings which the Administrative Agent may reasonably deem to be necessary (pursuant to this Security Agreement and the other Transaction Document and in accordance with applicable Law) to carry out the terms of this Security Agreement and to protect the interests of the Secured Parties, in each case, with respect to clauses (A) – (P), solely with respect to assets that are Collateral and not Excluded Assets; and, when and to the extent required pursuant to Section 8.1 of the Credit Agreement, such Grantor agrees to reimburse the Administrative Agent for any payment made in connection with this paragraph or any expense (including reasonable and documented attorneys' fees, court costs and out-of-pocket expenses) and other charges related thereto incurred by the Administrative Agent in connection with any of the foregoing (it being understood that any such sums shall constitute additional Obligations); provided that this authorization shall not relieve such Grantor of any of its obligations under this Security Agreement or under the Credit Agreement.

(b)      All such acts of such attorney or designee are hereby ratified and approved by each Grantor. The powers conferred on the Administrative Agent, for the benefit of the Administrative Agent and Secured Parties, under this Section 6.02 are solely to protect the Administrative Agent's interests in the Collateral and shall not impose any duty upon the Administrative Agent to exercise any such powers.

Section 6.03.    PROXY.    EACH GRANTOR HEREBY IRREVOCABLY (UNTIL THE TERMINATION DATE) CONSTITUTES AND APPOINTS THE ADMINISTRATIVE AGENT AS ITS PROXY AND ATTORNEY-IN-FACT (AS SET FORTH IN SECTION 6.02 ABOVE) WITH RESPECT TO THE PLEDGED COLLATERAL, INCLUDING, DURING THE CONTINUATION OF AN EVENT OF DEFAULT, AND SUBJECT TO THE ADMINISTRATIVE AGENT'S DELIVERY OF PRIOR WRITTEN NOTICE TO THE BORROWER, THE RIGHT TO VOTE SUCH PLEDGED COLLATERAL, WITH FULL POWER OF SUBSTITUTION TO DO SO.  IN ADDITION TO THE RIGHT TO VOTE ANY SUCH PLEDGED COLLATERAL, THE APPOINTMENT OF THE ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT SHALL, DURING THE CONTINUATION OF AN EVENT OF DEFAULT AND SUBJECT TO THE ADMINISTRATIVE AGENT'S DELIVERY OF PRIOR WRITTEN NOTICE TO THE BORROWER, INCLUDE THE RIGHT TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF SUCH PLEDGED COLLATERAL WOULD BE ENTITLED (INCLUDING GIVING OR WITHHOLDING WRITTEN CONSENTS OF SHAREHOLDERS, CALLING SPECIAL MEETINGS OF SHAREHOLDERS AND VOTING AT SUCH MEETINGS). SUCH PROXY SHALL BE EFFECTIVE, AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY SUCH PLEDGED COLLATERAL ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY PERSON (INCLUDING THE ISSUER OF SUCH PLEDGED COLLATERAL OR ANY OFFICER OR ADMINISTRATIVE AGENT THEREOF), IN EACH CASE ONLY WHEN AN EVENT OF DEFAULT HAS OCCURRED AND IS CONTINUING AND UPON ONE BUSINESS DAY'S PRIOR WRITTEN NOTICE TO THE BORROWER.

Section 6.04.    NATURE OF APPOINTMENT; LIMITATION OF DUTY.    THE APPOINTMENT OF THE ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT IN THIS ARTICLE 6 IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE DATE ON WHICH THIS SECURITY AGREEMENT IS TERMINATED IN ACCORDANCE WITH SECTION 7.12.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN, NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL HAVE ANY DUTY TO EXERCISE ANY RIGHT OR POWER GRANTED HEREUNDER OR OTHERWISE OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO, EXCEPT TO THE EXTENT SUCH DAMAGES ARE ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH PERSON AS FINALLY DETERMINED BY

-20-

BUSINESS.29047517.8

A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE DECISION; PROVIDED THAT THE FOREGOING EXCEPTION SHALL NOT BE CONSTRUED TO OBLIGATE THE ADMINISTRATIVE AGENT TO TAKE OR REFRAIN FROM TAKING ANY ACTION WITH RESPECT TO THE COLLATERAL.

ARTICLE 7
GENERAL PROVISIONS

Section 7.01.      Waivers.  To the maximum extent permitted by applicable Law, each Grantor hereby waives notice of the time and place of any judicial hearing in connection with the Administrative Agent's taking possession of the Collateral or of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made, including without limitation, any and all prior notice and hearing for any prejudgment remedy or remedies.  To the extent such notice may not be waived under applicable Law, any notice made shall be deemed reasonable if sent to any Grantor, addressed as set forth in Article 8, at least ten (10) days prior to (a) the date of any such public sale or (b) the time after which any such private Disposition may be made.  To the maximum extent permitted by applicable Law, each Grantor waives all claims, damages and demands against the Administrative Agent arising out of the repossession, retention or sale of the Collateral, except those arising out of the bad faith, the gross negligence or willful misconduct of the Administrative Agent as determined by a court of competent jurisdiction in a final and non-appealable judgment.  To the extent it may lawfully do so, each Grantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent, any valuation, stay (other than an automatic stay under the Federal Bankruptcy Code or any applicable law ), appraisal, extension, moratorium, redemption or similar law and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Security Agreement, or otherwise.  Except as otherwise specifically provided herein, each Grantor hereby waives presentment, demand, protest, any notice (to the maximum extent permitted by applicable Law) of any kind or all other requirements as to the time, place and terms of sale in connection with this Security Agreement or any Collateral.

Section 7.02.      Limitation on the Administrative Agent's Duty with Respect to the Collateral. The Administrative Agent shall not have any obligation to clean or otherwise prepare the Collateral for sale.  The Administrative Agent shall use reasonable care with respect to the Collateral in its possession; provided that the Administrative Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to which the Administrative Agent accords its own property.  The Administrative Agent shall not have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of the Administrative Agent, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.  To the extent that applicable Law imposes duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it would be commercially reasonable for the Administrative Agent, subject to Section 7.06, (a) to fail to incur expenses to prepare Collateral for Disposition or otherwise to transform raw material or work in process into finished goods or other finished products for Disposition, (b) to fail to obtain third party consents for access to Collateral to be Disposed of (unless expressly required under any applicable agreement), or to obtain or, if not required by any other applicable Law, to fail to obtain governmental or third party consents for the collection or Disposition of Collateral to be collected or Disposed of, (c) to fail to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (d) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise Dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to

-21-

contact other Persons, whether or not in the same business as any Grantor, for expressions of interest in acquiring all or any portion of such Collateral, (g) to hire one or more professional auctioneers to assist in the Disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to Dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (i) to Dispose of assets in wholesale rather than retail markets, (j) to disclaim Disposition warranties, such as title, possession or quiet enjoyment, (k) to purchase insurance or credit enhancements (which, subject to Section 8.1 of the Credit Agreement, shall be at the cost of the Grantors) to insure the Administrative Agent against risks of loss in connection with any collection or Disposition of Collateral or to provide to the Administrative Agent a guaranteed return from the collection or Disposition of Collateral or (l) to the extent deemed appropriate by the Administrative Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or Disposition of any of the Collateral.  Each Grantor acknowledges that the purpose of this Section 7.02 is to provide non-exhaustive indications of what actions or omissions by the Administrative Agent would be commercially reasonable in the Administrative Agent's exercise of remedies with respect to the Collateral and that other actions or omissions by the Administrative Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 7.02.  Without limitation upon the foregoing, nothing contained in this Section 7.02 shall be construed to grant any rights to any Grantor or to impose any duties on the Administrative Agent that would not have been granted or imposed by this Security Agreement or by applicable Law in the absence of this Section 7.02.

Section 7.03.    Compromises and Collection of Collateral.  Each Grantor and the Administrative Agent recognize that setoffs, counterclaims, defenses and other claims may be asserted by obligors with respect to certain of the Receivables, that certain of the Receivables may be or become uncollectible in whole or in part and that the expense and probability of success in litigating a disputed Receivable may exceed the amount that reasonably may be expected to be recovered with respect to any Receivable.  In view of the foregoing, each Grantor agrees that the Administrative Agent may at any time and from time to time, if an Event of Default has occurred and is continuing and upon prior written notice to the relevant Grantor, compromise with the obligor on any Receivable, accept in full payment of any Receivable such amount as the Administrative Agent in its sole discretion shall determine or abandon any Receivable, and any such action by the Administrative Agent shall be commercially reasonable so long as the Administrative Agent acts in good faith based on information known to it at the time it takes any such action.

Section 7.04.    Administrative Agent Performance of Debtor Obligations.  Without having any obligation to do so, the Administrative Agent may, at any time when an Event of Default has occurred and is continuing after prior written notice to the Borrower by the Administrative Agent, perform or pay any obligation which any Grantor has agreed to perform or pay under this Security Agreement and which obligation is due and unpaid and not being contested by such Grantor in good faith, and such Grantor shall reimburse the Administrative Agent for any amounts paid by the Administrative Agent pursuant to this Section 7.04 as an Obligation payable in accordance with Section 8.1 of the Credit Agreement.

Section 7.05.    No Waiver; Amendments; Cumulative Remedies.  No failure or delay by the Administrative Agent in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  Neither this Security Agreement nor any provision hereof may be waived, amended or modified except in writing entered into by the Grantors and the Administrative Agent with the consent of the Lenders to the extent required under Section 12.1 of the Credit Agreement.  The rights and remedies of the Administrative Agent hereunder are cumulative and are not exclusive of any rights or remedies that it would otherwise have.

-22-

BUSINESS.29047517.8

Section 7.06.      Limitation by Law; Severability of Provisions.  All rights, remedies and powers provided in this Security Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable Law, and all of the provisions of this Security Agreement are intended to be subject to all applicable Laws that may be controlling and to be limited to the extent necessary so that such provisions do not render this Security Agreement invalid, unenforceable or not entitled to be recorded or registered, in whole or in part.  To the extent permitted by law, any provision of this Security Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions of this Security Agreement; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  If the exercise of rights or remedies with respect to certain Collateral and the enforcement of any security interests therein require any consents, authorizations approvals or licenses under any Law, no such actions shall be taken unless and until all requisite consents, authorizations approvals or licenses have been obtained.

Section 7.07.      Security Interest Absolute.  All rights of the Administrative Agent hereunder, the security interests granted hereunder and all obligations of each Grantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Transaction Document, any agreement with respect to any of the Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Transaction Document or any other agreement or instrument relating to the foregoing, (c) any exchange, release or non-perfection of any Lien on any Collateral, or any release or amendment or waiver of or consent under or departure from any guaranty, securing or guaranteeing all or any of the Obligations, (d) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Grantor, (e) any exercise or non-exercise, or any waiver of, any right, remedy, power or privilege under or in respect of this Security Agreement or any other Transaction Document or (f) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Grantor in respect of the Obligations or this Security Agreement (other than a termination of any Lien contemplated by Section 7.12 or the occurrence of the Termination Date).

Section 7.08.      [Reserved.]

Section 7.09.      [Reserved.]

Section 7.10.      Additional Subsidiaries.  Each Person required to become a Grantor pursuant to and in accordance with Section 5.1(p) of the Credit Agreement shall, within the time periods specified in the Collateral and Guaranty Requirements, execute an instrument substantially in the form of Exhibit D.  The execution and delivery of any such instrument shall not require the consent of any other Grantor hereunder.  The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Security Agreement.

Section 7.11.      Headings.  Article and Section headings used herein are for convenience of reference only, are not party of this Security Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Security Agreement.

Section 7.12.      Termination or Release.

(a)      This Security Agreement shall continue in effect until the Termination Date, and the Liens granted hereunder shall automatically be released.

-23-

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 471 of 812**

(b)      In connection with any termination or release pursuant to paragraph (a) above, the Administrative Agent shall promptly execute (if applicable) and deliver to any Grantor, at such Grantor's expense, all UCC termination statements and similar documents that such Grantor shall reasonably request to evidence and/or effectuate such termination or release and deliver all applicable Pledged Collateral to such Grantor or its designee.  Except as otherwise set forth in such delivered documents, any execution and delivery of documents pursuant to this Section 7.12 shall be without recourse to or representation or warranty by the Administrative Agent.  The Borrower shall reimburse the Administrative Agent for all reasonable and documented out-of-pocket expenses incurred by it in connection with any action contemplated by this Section 7.12 pursuant to and to the extent required by Section 8.1 of the Credit Agreement.

(c)      The Administrative Agent shall have no liability whatsoever to any other Secured Party as the result of any release of Collateral by it in accordance with (or which the Administrative Agent in good faith believes to be in accordance with) the terms of this Section 7.12.

Section 7.13.      Entire Agreement.  This Security Agreement, together with the other Transaction Documents, constitute the entire agreement among the parties relating to the subject matter hereof and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

Section 7.14.      CHOICE OF LAW.    THIS SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW WHICH SHALL APPLY HERETO) EXCEPT TO THE EXTENT THAT THE PERFECTION OF THE ADMINISTRATIVE AGENT'S SECURITY INTEREST IN THE COLLATERAL OR REMEDIES HEREUNDER IN RESPECT THEREOF ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

Section 7.15.      CONSENT TO JURISDICTION; CONSENT TO SERVICE OF PROCESS.

(a)      EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION (SUBJECT TO THE LAST SENTENCE OF THIS CLAUSE (a)) OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW YORK (OR ANY APPELLATE COURT THEREFROM) OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL (EXCEPT AS PERMITTED BELOW) BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, FEDERAL COURT.  EACH PARTY HERETO AGREES THAT SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT BY REGISTERED MAIL ADDRESSED TO SUCH PERSON SHALL BE EFFECTIVE SERVICE OF PROCESS AGAINST SUCH PERSON FOR ANY SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT.  EACH PARTY HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT IN ANY COURT REFERRED TO IN THIS CLAUSE (a).  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED

-24-

BUSINESS.29047517.8

BY LAW, ANY CLAIM OR DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION, SUIT OR PROCEEDING IN ANY SUCH COURT.  EACH PARTY HERETO AGREES THAT THE ADMINISTRATIVE AGENT RETAINS THE RIGHT TO BRING PROCEEDINGS AGAINST ANY GRANTOR IN THE COURTS OF ANY OTHER JURISDICTION SOLELY IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS IN RESPECT OF THE COLLATERAL UNDER THIS SECURITY AGREEMENT.

(b)    TO THE EXTENT PERMITTED BY LAW, EACH PARTY TO THIS SECURITY AGREEMENT HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL) DIRECTED TO IT AT ITS ADDRESS FOR NOTICES AS PROVIDED FOR IN SCHEDULE 12.2 OF THE CREDIT AGREEMENT.  EACH PARTY TO THIS SECURITY AGREEMENT HEREBY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER THAT SERVICE OF PROCESS WAS INVALID AND INEFFECTIVE.  NOTHING IN THIS SECURITY AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS SECURITY AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

Section 7.16.    WAIVER OF JURY TRIAL.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS SECURITY AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.16.

Section 7.17.    Indemnity.  Each Grantor hereby agrees to indemnify the Indemnitees, as, and to the extent, set forth in Section 8.1 of the Credit Agreement.

Section 7.18.    Counterparts.  This Security Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page to this Security Agreement by facsimile or by email as a ".pdf" or ".tiff" attachment shall be effective as delivery of a manually executed counterpart of this Security Agreement.

Section 7.19.    Waiver of Consequential Damages, Etc.  To the extent permitted by applicable Law, none of the Grantors, the Administrative Agent or Secured Parties shall assert, and each hereby waives, any claim against each other or any Related Entity thereof, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Security Agreement or any agreement or instrument contemplated hereby, except, in the case of any claim by any Indemnified Party against any of the Grantors, to the extent such damages would otherwise be subject to indemnification pursuant to the terms of Section 7.17.

Section 7.20.    Successors and Assigns.  The provisions of this Security Agreement shall be binding upon and inure to the benefit of each Grantor, the Administrative Agent and the Secured Parties

-25-

and their respective successors and permitted assigns (including all Persons who become bound as a Grantor to this Security Agreement).  Except in a transaction expressly permitted (or not prohibited) under the Credit Agreement, no Grantor may assign any of its rights or obligations hereunder without the prior written consent of the Administrative Agent.

Section 7.21.    Survival of Agreement.    All covenants, agreements, representations and warranties made by the Grantors in this Security Agreement and in the certificates or other instruments delivered in connection with or pursuant to this Security Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Security Agreement regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent may have had notice or knowledge of any existing Default or Event of Default or incorrect representation or warranty at the time any credit is extended under the Credit Agreement, and shall continue in full force and effect until the Termination Date, or with respect to any individual Grantor, until such Grantor is otherwise released from its obligations under this Security Agreement in accordance with the terms hereof.

## ARTICLE 8
### NOTICES

Section 8.01.    Sending Notices.  All notices and other communications provided for in this Security Agreement (except as otherwise permitted herein) shall be delivered in accordance with Schedule 12.2 of the Credit Agreement *mutatis mutandis*.

Section 8.02.    Change in Address for Notices.  The Administrative Agent, any Grantor and any Secured Party may change its address or facsimile number or other notice information hereunder by notice to the other parties hereto.

## ARTICLE 9
### THE ADMINISTRATIVE AGENT

GLAS Trust Company LLC has been appointed Administrative Agent for the Lenders hereunder pursuant to Article IX of the Credit Agreement.  It is expressly understood and agreed by the parties to this Security Agreement that any authority conferred upon the Administrative Agent hereunder is subject to the terms of the delegation of authority made by the Lenders to the Administrative Agent pursuant to the Credit Agreement, and that the Administrative Agent has agreed to act (and any successor Administrative Agent shall act) as such hereunder only on the express conditions contained in such Article IX.  Any successor Administrative Agent appointed pursuant to Article IX of the Credit Agreement shall be entitled to all the rights, interests and benefits of the Administrative Agent hereunder. The permissive authorizations, entitlements, powers and rights granted to the Administrative Agent herein shall not be construed as duties. Any exercise of discretion on behalf of the Administrative Agent shall be exercised in accordance with the terms of the Credit Agreement.

By accepting the benefits of this Security Agreement and each other Transaction Document, each Secured Party expressly acknowledges and agrees that this Security Agreement and each other Transaction Document may be enforced only by the action of the Administrative Agent, and that such Secured Party shall not have any right individually to seek to enforce or to enforce this Security Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Administrative Agent for the benefit of the Secured Parties upon the terms of this Security Agreement and the other Transaction Documents.

-26-

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 474 of 812**

The Administrative Agent may rely on advice of counsel as to whether any or all UCC financing statements of the Grantors need to be amended as a result of any of the changes described in Section 5.1(x) of the Credit Agreement.  If any Grantor fails to provide information to the Administrative Agent about such changes on a timely basis, the Administrative Agent shall not be liable or responsible to any Secured Party for any failure to maintain a perfected security interest in such Grantor's property constituting Collateral, for which the Administrative Agent needed to have information relating to such changes.  The Administrative Agent shall have no duty to inquire about such changes if any Grantor does not inform the Administrative Agent of such changes and the Secured Parties acknowledge and agree that it would not be feasible or practical for the Administrative Agent to search for information on such changes if such information is not provided by any Grantor. Notwithstanding anything herein to the contrary, the Administrative Agent shall have no responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder.

[Signature Pages Follow]

-27-

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 475 of 812**

IN WITNESS WHEREOF, each Grantor and the Administrative Agent have executed this Security Agreement as of the date first above written.

**GRANTORS**

CARNABY INVENTORY II, LLC

By: _____
Name:   Edward James
Title:   Executive Vice President

CARNABY INVENTORY HOLDINGS II, LLC

By: _____
Name:   Edward James
Title:   Executive Vice President

GLAS TRUST COMPANY LLC,
as Administrative Agent

By: _____

Name:          Yana Kislenko

Title:          Vice President

Schedule 3.04

Intellectual Property

None.

BUSINESS.29047517.8

<u>Schedule 3.05</u>

Pledged Stock

| Owner | Issuer | Percentage of Interest Owned | Number of Units |
|---|---|---|---|
| Carnaby Inventory Holdings II, LLC | Carnaby Inventory II, LLC | 100% | 100 |

BUSINESS.29047517.8

**EXHIBIT A**

**FORM OF COPYRIGHT SECURITY AGREEMENT**

COPYRIGHT SECURITY AGREEMENT dated as of [☐], 20[☐] (this "**Copyright Security Agreement**"), by and [between][among] [☐], a [☐] ([each, a][the] "**Grantor**") and [_____], as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Administrative Agent**") for the Secured Parties (as defined in the Credit Agreement).

Reference is made to that certain Credit Agreement, dated as of [____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Carnaby Inventory II, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors, the Administrative Agent and the Lenders from time to time parties thereto, among others.

Reference is also made [ to that certain Joinder No. [☐] dated as of [☐], 20[☐], by [and among ][☐] [and [☐] ]and acknowledged and agreed by the Administrative Agent,][1] to that certain Pledge and Security Agreement dated as of [____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and among the Borrower, the other Grantors (as defined therein) and the Administrative Agent for the benefit of the Secured Parties.

The Lenders (as defined in the Credit Agreement) have extended credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement.  Consistent with the requirements set forth in Section 4.1 of the Credit Agreement [and Section 4.03(c) of the Security Agreement], the parties hereto agree as follows:

SECTION 1.  Terms.  Capitalized terms used herein and not otherwise defined herein have the meanings specified in the Security Agreement.

SECTION 2.  Grant of Security Interest.  As security for the prompt and complete payment or performance, as the case may be, in full of the Obligations, [each][the] Grantor, pursuant to the Security Agreement, did and hereby does pledge, collaterally assign and grant to the Administrative Agent, its successors and permitted assigns, on behalf of and for the benefit of the Secured Parties, a continuing security interest in all of its right, title and interest in, to and under all of the following assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of [such][the] Grantor, and regardless of where located (collectively, the "**Copyright Collateral**"):

(a) all copyrights, rights and interests in copyrights, works protectable by copyright whether published or unpublished, registrations and copyright applications (including but not limited to the Copyright registrations and applications and the exclusive Copyright Licenses set forth on Schedule I hereto); (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past, present or future infringements for any of the foregoing; (d) the right to sue for past, present, and future infringements of any of the foregoing; and (e) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

---

[1] To be used after a Joinder by a new Grantor.

A-1

**JOINT EXHIBIT NO. 18**
**Page 480 of 812**

SECTION 3.  <u>Security Agreement</u>.  The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement.  [Each][The] Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Copyright Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.  In the event of any conflict between the terms of this Copyright Security Agreement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4.  <u>Governing Law</u>.  This Copyright Security Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

SECTION 5.  <u>Counterparts</u>.  This Copyright Security Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

[*Signature Pages Follow*]

A-2

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 481 of 812**

IN WITNESS WHEREOF, the parties hereto have duly executed this Copyright Security Agreement as of the day and year first above written.

[□]

By:_____
    Name:  [□]
    Title:  [□]

[Signature Page to Copyright Security Agreement]

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 482 of 812**

[_____],
as Administrative Agent


By:_____
   Name:
   Title:

[Signature Page to Copyright Security Agreement]

BUSINESS.29047517.8

## SCHEDULE I

COPYRIGHTS

| REGISTERED OWNER | REGISTRATION NUMBER | REGISTRATION DATE | TITLE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

COPYRIGHT APPLICATIONS

| APPLICANT | APPLICATION NUMBER | FILING DATE | TITLE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

EXCLUSIVE COPYRIGHT LICENSES

BUSINESS.29047517.8

**ANNEX A TO COPYRIGHT SECURITY AGREEMENT**


**FORM OF COPYRIGHT SECURITY AGREEMENT SUPPLEMENT**


COPYRIGHT SECURITY AGREEMENT SUPPLEMENT dated as of [⬜], 20[⬜] (this "**Copyright Security Agreement Supplement**"), by and [between][among] [⬜], a [⬜] ([each, a][the] "**Grantor**") and [_____], as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Administrative Agent**") for the Secured Parties (as defined in the Credit Agreement).

Reference is made to that certain Credit Agreement, dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Carnaby Inventory II, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors, the Administrative Agent and the Lenders from time to time parties thereto, among others.

Reference is also made [ to that certain Joinder No. [⬜] dated as of [⬜], 20[⬜], by [and among ][⬜] [and [⬜] ]and acknowledged and agreed by the Administrative Agent,][2] to that certain Pledge and Security Agreement dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and among the Borrower, the other Grantors (as defined therein) and the Administrative Agent for the benefit of the Secured Parties.

Reference is also made to that certain Copyright Security Agreement, dated as of [⬜], 20[⬜] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time and in effect on the date hereof, the "**Copyright Security Agreement**") by and [between][among] the Grantor[s] thereto and the Administrative Agent for the Secured Parties.

The Lenders have extended credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement. Under the terms of the Security Agreement, [each][the] Grantor has granted to the Administrative Agent for the benefit of the Secured Parties a security interest in the Additional Copyright Collateral (as defined below) and has agreed, consistent with the requirements of <u>Section 4.03(c)</u> of the Security Agreement, to execute this Copyright Security Agreement Supplement. Now, therefore, the parties hereto agree as follows:

SECTION 1. <u>Terms</u>.  Capitalized terms used in this Copyright Security Agreement Supplement and not otherwise defined herein have the meanings specified in the Security Agreement.

SECTION 2. <u>Grant of Security Interest</u>.  As security for the prompt and complete payment or performance, as the case may be, in full of the Obligations, [each][the] Grantor, pursuant to the Security Agreement, did and hereby does pledge, collaterally assign and grant to the Administrative Agent, its successors and permitted assigns, on behalf of and for the benefit of the Secured Parties, a continuing security interest in all of its right, title and interest in, to and under all of the following assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of [such][the] Grantor, and regardless of where located (collectively, the "**Additional Copyright Collateral**"):

---

[2] To be used after a Joinder by a new Grantor.

Annex A-1

BUSINESS.29047517.8

(a) all copyrights, rights and interests in copyrights, works protectable by copyright whether published or unpublished, registrations and copyright applications (including but not limited to the Copyright registrations and applications and exclusive Copyright License set forth on Schedule I hereto); (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past, present or future infringements for any of the foregoing; (d) the right to sue for past, present, and future infringements of any of the foregoing; and (e) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

SECTION 3.  Security Agreement.  The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement.  [Each][The] Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Additional Copyright Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.  In the event of any conflict between the terms of this Copyright Security Agreement Supplement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4.  Governing Law.  This Copyright Security Agreement Supplement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

SECTION 5.  Counterparts.  This Copyright Security Agreement Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

[*Signature Pages Follow*]

Annex A-2

BUSINESS.29047517.8

IN WITNESS WHEREOF, the parties hereto have duly executed this Copyright Security Agreement Supplement as of the day and year first above written.

[☐]

By:_____
     Name:  [☐]
     Title:   [☐]

[Signature Page to Copyright Security Agreement Supplement]

BUSINESS.29047517.8

[_____],
as Administrative Agent


By:_____
   Name:
   Title:

[Signature Page to Copyright Security Agreement Supplement]

BUSINESS.29047517.8

## SCHEDULE I

COPYRIGHTS

| REGISTERED OWNER | REGISTRATION NUMBER | REGISTRATION DATE | TITLE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

COPYRIGHT APPLICATIONS

| APPLICANT | APPLICATION NUMBER | FILING DATE | TITLE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

EXCLUSIVE COPYRIGHT LICENSES

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 489 of 812**

**EXHIBIT B**

**FORM OF PATENT SECURITY AGREEMENT**

PATENT SECURITY AGREEMENT dated as of [□], 20[□] (this "**Patent Security Agreement**"), by and [between][among] [□], a [□] ([each, a][the] "**Grantor**") and [_____], as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Administrative Agent**") for the Secured Parties (as defined in the Credit Agreement).

Reference is made to that certain Credit Agreement, dated as of [____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Carnaby Inventory II, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors, the Administrative Agent and the Lenders from time to time parties thereto, among others.

Reference is also made [ to that certain Joinder No. [□] dated as of [□], 20[□], by [and among ][□] [and [□] ]and acknowledged and agreed by the Administrative Agent,]³ to that certain Pledge and Security Agreement dated as of [____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and among the Borrower, the other Grantors (as defined therein) and the Administrative Agent for the benefit of the Secured Parties.

The Lenders have extended credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement.  Consistent with the requirements set forth in Section 4.1 of the Credit Agreement [and Section 4.03(c) of the Security Agreement], the parties hereto agree as follows:

SECTION 1.  Terms.  Capitalized terms used herein and not otherwise defined herein have the meanings specified in the Security Agreement.

SECTION 2.  Grant of Security Interest.  As security for the prompt and complete payment or performance, as the case may be, in full of the Obligations, [each][the] Grantor, pursuant to the Security Agreement, did and hereby does pledge, collaterally assign and grant to the Administrative Agent, its successors and permitted assigns, on behalf of and for the benefit of the Secured Parties, a continuing security interest in all of its right, title and interest in, to and under all of the following assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of [such][the] Grantor, and regardless of where located (collectively, the "**Patent Collateral**"):

(a) any and all patents and patent applications (including but not limited to the patents and patent applications listed on Schedule I hereto); (b) all inventions described and claimed therein; (c) all reissues, divisions, continuations, renewals, extensions, reexaminations and continuations in part thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past, present and future infringements thereof; (e) all rights to sue for past, present, and future infringements thereof; and (f) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

SECTION 3.   Security Agreement.  The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement.  [Each][The] Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Patent Collateral are more fully set

---

³ To be used after a Joinder by a new Grantor.

B-1

BUSINESS.29047517.8

forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.  In the event of any conflict between the terms of this Patent Security Agreement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4.  <u>Governing Law</u>.   This Patent Security Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

SECTION 5.  <u>Counterparts</u>.  This Patent Security Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

[Signature Pages Follow]

B-2

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 491 of 812**

IN WITNESS WHEREOF, the parties hereto have duly executed this Patent Security Agreement as of the day and year first above written.

[ ]

By:_____
    Name:  [ ]
    Title:  [ ]

[Signature Page to Patent Security Agreement]

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 492 of 812**

[_____],
as Administrative Agent


By:_____
    Name:
    Title:

## SCHEDULE I

PATENTS

| REGISTERED OWNER | PATENT NO. | ISSUE DATE | TITLE |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

PATENT APPLICATIONS

| APPLICANT | APPLICATION NO. | FILING DATE | TITLE |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

BUSINESS.29047517.8

**ANNEX A TO PATENT SECURITY AGREEMENT**


**FORM OF PATENT SECURITY AGREEMENT SUPPLEMENT**


PATENT SECURITY AGREEMENT SUPPLEMENT dated as of [☐], 20[☐] (this "**Patent Security Agreement Supplement**"), by and [between][among] [☐], a [☐] ([each, a][the] "**Grantor**") and KeyBank National Association, as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Administrative Agent**") for the Secured Parties (as defined in the Credit Agreement).

Reference is made to that certain Credit Agreement, dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Carnaby Inventory II, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors, the Administrative Agent and the Lenders from time to time parties thereto, among others.

Reference is also made [ to that certain Joinder No. [☐] dated as of [☐], 20[☐], by [and among ][☐] [and [☐] ]and acknowledged and agreed by the Administrative Agent,][4] to that certain Pledge and Security Agreement dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and among the Borrower, the other Grantors (as defined therein) and the Administrative Agent for the benefit of the Secured Parties.

Reference is also made to that certain Patent Security Agreement, dated as of [☐], 20[☐] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time and in effect on the date hereof, the "**Patent Security Agreement**") by and [between][among] the Grantor[s] thereto and the Administrative Agent for the Secured Parties.

The Lenders (as defined in the Credit Agreement) have extended credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement.  Under the terms of the Security Agreement, [each][the] Grantor has granted to the Administrative Agent for the benefit of the Secured Parties a security interest in the Additional Patent Collateral (as defined below) and has agreed, consistent with the requirements of Section 4.03(c) of the Security Agreement, to execute this Patent Security Agreement Supplement.  Now, therefore, the parties hereto agree as follows:

SECTION 1.  <u>Terms</u>.  Capitalized terms used in this Patent Security Agreement Supplement and not otherwise defined herein have the meanings specified in the Security Agreement.

SECTION 2.  <u>Grant of Security Interest</u>.  As security for the prompt and complete payment or performance, as the case may be, in full of the Obligations, [each][the] Grantor, pursuant to the Security Agreement, did and hereby does pledge, collaterally assign and grant to the Administrative Agent, its successors and permitted assigns, on behalf of and for the benefit of the Secured Parties, a continuing security interest in all of its right, title and interest in, to and under all of the following assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of [such][the] Grantor, and regardless of where located (collectively, the "**Additional Patent Collateral**"):

---

[4] To be used after a Joinder by a new Grantor.

Annex A-1

BUSINESS.29047517.8

(a) any and all patents and patent applications (including but not limited to the patents and patent applications listed on <u>Schedule I</u> hereto); (b) all inventions described and claimed therein; (c) all reissues, divisions, continuations, renewals, extensions, reexaminations and continuations in part thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past, present and future infringements thereof; (e) all rights to sue for past, present, and future infringements thereof; and (f) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

SECTION 3. <u>Security Agreement</u>. The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement. [Each][The] Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Additional Patent Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein. In the event of any conflict between the terms of this Patent Security Agreement Supplement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4. <u>Governing Law</u>. This Patent Security Agreement Supplement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

SECTION 5. <u>Counterparts</u>. This Patent Security Agreement Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

[*Signature Pages Follow*]

Annex A-2

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 496 of 812**

IN WITNESS WHEREOF, the parties hereto have duly executed this Patent Security Agreement Supplement as of the day and year first above written.

[☐]


By:_____
    Name:  [☐]
    Title:   [☐]

[Signature Page to Patent Security Agreement Supplement]

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 497 of 812**

[_____],
as Administrative Agent


By:_____
    Name:
    Title:

[Signature Page to Patent Security Agreement Supplement]

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**

## SCHEDULE I

PATENTS

| REGISTERED OWNER | PATENT NO. | ISSUE DATE | TITLE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

PATENT APPLICATIONS

| APPLICANT | APPLICATION NO. | FILING DATE | TITLE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

C-1

**EXHIBIT C**

**FORM OF TRADEMARK SECURITY AGREEMENT**

TRADEMARK SECURITY AGREEMENT dated as of [□], 20[□] (this "**Trademark Security Agreement**"), by and [between][among] [□], a [□] ([each, a][the] "**Grantor**") and KeyBank National Association, as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Administrative Agent**") for the Secured Parties (as defined in the Credit Agreement).

Reference is made to that certain Credit Agreement, dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Carnaby Inventory II, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors, the Administrative Agent and the Lenders from time to time parties thereto, among others.

Reference is also made [ to that certain Joinder No. [□] dated as of [□], 20[□], by [and among ][□] [and [□] ]and acknowledged and agreed by the Administrative Agent,][5] to that certain Pledge and Security Agreement dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and among the Borrower, the other Grantors (as defined therein) and the Administrative Agent for the benefit of the Secured Parties.

The Lenders have extended credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement.  Consistent with the requirements set forth in Section 4.01 of the Credit Agreement [and Section 4.03(c) of the Security Agreement], the parties hereto agree as follows:

SECTION 1.  Terms.  Capitalized terms used herein and not otherwise defined herein have the meanings specified in the Security Agreement.

SECTION 2.  Grant of Security Interest.  As security for the prompt and complete payment or performance, as the case may be, in full of the Obligations, [each][the] Grantor, pursuant to the Security Agreement, did and hereby does pledge, collaterally assign and grant to the Administrative Agent, its successors and permitted assigns, on behalf of and for the benefit of the Secured Parties, a continuing security interest in all of its right, title and interest in, to and under all of the following assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of [such][the] Grantor, and regardless of where located (collectively, the "**Trademark Collateral**"):

(a) all trademarks (including service marks), common law marks, trade names, trade dress, domain names and logos, slogans and other indicia of origin under the laws of any jurisdiction in the world, and the registrations and applications for registration thereof (including but not limited to the Trademark registrations and applications listed on Schedule I hereto); and the goodwill of the business connected with the use of and symbolized by the foregoing; (b) all renewals of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims and payments for past, present and future infringements or dilutions thereof; (d) all rights to sue for past, present, and future infringements or dilutions of any of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (e) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

---

[5] To be used after a Joinder by a new Grantor.

C-1

BUSINESS.29047517.8

SECTION 3.  Security Agreement.  The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement.  [Each][The] Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Trademark Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.  In the event of any conflict between the terms of this Trademark Security Agreement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4.  Governing Law.  This Trademark Security Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

SECTION 5.  Counterparts.  This Trademark Security Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

[*Signature Pages Follow*]

C-2

BUSINESS.29047517.8

IN WITNESS WHEREOF, the parties hereto have duly executed this Trademark Security Agreement as of the day and year first above written.

[□]

By:_____
    Name:  [□]
    Title:   [□]

[Signature Page to Trademark Security Agreement]

BUSINESS.29047517.8

[_____],
as Administrative Agent


By:_____
   Name:
   Title:

[Signature Page to Trademark Security Agreement]

BUSINESS.29047517.8

## SCHEDULE I

TRADEMARKS

| REGISTERED OWNER | REGISTRATION NUMBER | REGISTRATION DATE | TRADEMARK |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

TRADEMARK APPLICATIONS

| APPLICANT | APPLICATION NO. | FILING DATE | TRADEMARK |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

BUSINESS.29047517.8

**ANNEX A TO TRADEMARK SECURITY AGREEMENT**

**FORM OF TRADEMARK SECURITY AGREEMENT SUPPLEMENT**

TRADEMARK SECURITY AGREEMENT SUPPLEMENT dated as of [□], 20[□] (this "**Trademark Security Agreement Supplement**"), by and [between][among] [□], a [□] ([each, a][the] "**Grantor**") and KeyBank National Association, as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Administrative Agent**") for the Secured Parties (as defined in the Credit Agreement).

Reference is made to that certain Credit Agreement, dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Carnaby Inventory II, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors, the Administrative Agent and the Lenders from time to time parties thereto.

Reference is also made [ to that certain Joinder No. [□] dated as of [□], 20[□], by [and among ][□] [and [□] ]and acknowledged and agreed by the Administrative Agent,][6] to that certain Pledge and Security Agreement dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and among the Borrower, the other Grantors (as defined therein) and the Administrative Agent for the benefit of the Secured Parties.

Reference is also made to that certain Trademark Security Agreement, dated as of [□], 20[□] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time and in effect on the date hereof, the "**Trademark Security Agreement**") by and [between][among] the Grantor[s] thereto and the Administrative Agent for the Secured Parties.

The Lenders have extended credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement.  Under the terms of the Security Agreement, [each][the] Grantor has granted to the Administrative Agent for the benefit of the Secured Parties a security interest in the Additional Trademark Collateral (as defined below) and has agreed, consistent with the requirements of Section 4.03(c) of the Security Agreement, to execute this Trademark Security Agreement Supplement.  Now, therefore, the parties hereto agree as follows

SECTION 1.  Terms.  Capitalized terms used in this Trademark Security Agreement Supplement and not otherwise defined herein have the meanings specified in the Security Agreement.

SECTION 2.  Grant of Security Interest.  As security for the prompt and complete payment or performance, as the case may be, in full of the Obligations, [each][the] Grantor, pursuant to the Security Agreement, did and hereby does pledge, collaterally assign and grant to the Administrative Agent, its successors and permitted assigns, on behalf of and for the ratable benefit of the Secured Parties, a continuing security interest in all of its right, title or interest in, to or under all of the following assets, whether now owned or at any time hereafter acquired by or arising in favor of the [such][the] Grantor and regardless of where located (collectively, the "**Additional Trademark Collateral**"):

(a) all trademarks (including service marks), common law marks, trade names, trade dress, domain names and logos, slogans and other indicia of origin under the laws of any jurisdiction in the world, and the registrations and applications for registration thereof (including but not limited

---

[6] To be used after a Joinder by a new Grantor.

Annex A-1

BUSINESS.29047517.8

to the Trademark registrations and applications listed on <u>Schedule I</u> hereto); and the goodwill of the business connected with the use of and symbolized by the foregoing; (b) all renewals of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims and payments for past, present and future infringements or dilutions thereof; (d) all rights to sue for past, present, and future infringements or dilutions of any of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (e) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

SECTION 3. <u>Security Agreement</u>. The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement. [Each][The] Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Additional Trademark Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein. In the event of any conflict between the terms of this Trademark Security Agreement Supplement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4. <u>Governing Law</u>. This Trademark Security Agreement Supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 5. <u>Counterparts</u>. This Trademark Security Agreement Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

[*Signature Pages Follow*]

<div align="center">Annex A-2</div>

BUSINESS.29047517.8

<div align="center">**JOINT EXHIBIT NO. 18**
**Page 506 of 812**</div>

IN WITNESS WHEREOF, the parties hereto have duly executed this Trademark Security Agreement Supplement as of the day and year first above written.

[☐]

By:_____

    Name:  [☐]
    Title:   [☐]

[Signature Page to Trademark Security Agreement Supplement]

BUSINESS.29047517.8

[_____],
as Administrative Agent


By:_____
    Name:
    Title:

[Signature Page to Trademark Security Agreement Supplement]

BUSINESS.29047517.8

## SCHEDULE I

TRADEMARKS

| REGISTERED OWNER | REGISTRATION NUMBER | REGISTRATION DATE | TRADEMARK |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

TRADEMARK APPLICATIONS

| APPLICANT | APPLICATION NO. | FILING DATE | TRADEMARK |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

BUSINESS.29047517.8

**EXHIBIT D**

**FORM OF SECURITY AGREEMENT JOINDER**

JOINDER NO. [□] dated as of [□] (this "**Joinder**"), to the Pledge and Security Agreement, dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and among Carnaby Inventory II, LLC, a Delaware limited liability company (the "**Borrower**"), the other Grantors (as defined below) and [_____], in its capacities as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Administrative Agent**") for the Secured Parties.

A.       Reference is made to that certain Credit Agreement, dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Parent, Borrower, Holdings (as defined therein), the Administrative Agent and the Lenders from time to time parties thereto, among others.

B.       Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement or the Security Agreement, as applicable.

C.       [The][Each] undersigned Subsidiary ([each a][the] "**New Subsidiary**") is executing this Joinder in accordance with Section 7.10 of the Security Agreement and Section 5.1(p) of the Credit Agreement, each of which require that each additional Subsidiary of the Borrower becomes a Grantor under the Security Agreement by executing and delivering an instrument in the form of this Joinder in order to induce the Lenders to make additional Loans and as consideration for Loans previously made.

Accordingly, the Administrative Agent and [each][the] New Subsidiary agree as follows:

SECTION 1.    In accordance with Section 7.10 of the Security Agreement, [the][each] New Subsidiary by its signature below becomes a Grantor under the Security Agreement with the same force and effect as if originally named therein as a Grantor, and [the][each] New Subsidiary hereby (a) agrees to all the terms and provisions of the Security Agreement applicable to it as a Grantor thereunder and (b) represents and warrants that the applicable representations and warranties made by it as a Grantor thereunder shall be true and correct in all material respects (without duplication of any materiality qualifier therein) as of the date hereof, except that any such representation and warranty that expressly relates to a given date or period shall be true and correct in all material respects (without duplication of any materiality qualifier therein) as of the respective date or for the respective period, as the case may be.  In furtherance of the foregoing, [the][each] New Subsidiary, as security for the prompt and complete payment and performance, as the case may be, in full when due (whether at stated maturity, by acceleration or otherwise) of the Obligations, hereby pledges and grants to the Administrative Agent, for the benefit of the Secured Parties, a continuing security interest in all of [the][each] New Subsidiary's right, title and interest in, to and under the Collateral of [the][each] New Subsidiary to the extent provided in Section 2.01 of the Security Agreement.  Upon the effectiveness of this Joinder, each reference to a "Grantor" in the Security Agreement shall be deemed to include [the][each] New Subsidiary.  The Security Agreement is hereby incorporated herein by reference.

SECTION 2.    [The][Each] New Subsidiary represents and warrants to the Administrative Agent and the other Secured Parties that this Joinder has been duly authorized by all necessary corporate or other organizational action of [the][such] New Subsidiary, executed and delivered by it and is a legal, valid and binding obligation of [the][such] New Subsidiary, enforceable against [the][such] New Subsidiary in accordance with its terms, subject to any applicable bankruptcy, insolvency, reorganization or other similar

D-1

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 510 of 812**

laws relating to or limiting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

SECTION 3.   This Joinder may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Joinder shall become effective when the Administrative Agent has received a counterpart hereof that bears the signature of [the][each] New Subsidiary.  Delivery of an executed signature page to this Joinder by facsimile transmission or by email as a ".pdf" or ".tiff" attachment shall be as effective as delivery of a manually executed counterpart of this Joinder.

SECTION 4.   [Reserved].

SECTION 5.   Except as expressly supplemented hereby, the Security Agreement shall remain in full force and effect.

SECTION 6.   THIS JOINDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

SECTION 7.   To the extent permitted by law, any provision of any Transaction Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.   All notices and other communications provided for in this Joinder (except as otherwise permitted herein) shall be delivered in accordance with Section 8.01 of the Security Agreement *mutatis mutandis*.

SECTION 9.   [The][Each] New Subsidiary agrees to reimburse the Administrative Agent for all reasonable and documented out-of-pocket expenses incurred by it in connection with this Joinder, pursuant to and to the extent required by Section 9.1) of the Credit Agreement.

SECTION 10.   This Joinder shall constitute a Transaction Document, under and as defined in, the Credit Agreement.

[*Signature pages follow*]

D-2

IN WITNESS WHEREOF, [the][each] New Subsidiary has duly executed this Joinder to the Security Agreement, and the Administrative Agent, for the benefit of the Secured Parties, has caused the same to be accepted, as of the day and year first above written.

[NAME OF NEW SUBSIDIARY]

By: _____
    Name:
    Title:

[Signature Page to Security Agreement Joinder]

BUSINESS.29047517.8

ACKNOWLEDGED AND ACCEPTED:

[_____],
as Administrative Agent

By:_____
    Name:
    Title:

[Signature Page to Security Agreement Joinder]

BUSINESS.29047517.8

**JOINT EXHIBIT NO. 18**
**Page 513 of 812**

**EXECUTION VERSION**

PLEDGE AND SECURITY AGREEMENT

PLEDGE AND SECURITY AGREEMENT, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Security Agreement**"), by and among Carnaby Inventory Holdings III, LLC, a Delaware limited liability company ("**Parent**"), Carnaby Inventory III, LLC, a Delaware limited liability company (the "**Borrower**"), and GLAS Trust Company LLC, in its capacity as administrative agent (together with its successors and permitted assigns in such capacity, the "**Administrative Agent**") for the Secured Parties under that certain Credit Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among the Parent, the Borrower, Holdings (as defined therein), the Administrative Agent and the Lenders from time to time party thereto, among others.

RECITALS

A.      The Grantors are entering into this Security Agreement in order to induce the Lenders to enter into and extend credit to the Borrower under the Credit Agreement and to secure the Obligations thereunder, including, their obligations under any other Transaction Document.

ACCORDINGLY, the parties hereto agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.      Terms Defined in Credit Agreement.  Except as set forth in Section 1.02 below, capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.  The rules of construction set forth in Exhibit I of the Credit Agreement shall apply to this Security Agreement as if specifically incorporated herein, *mutatis mutandis*.

Section 1.02.      Terms Defined in UCC.  Terms defined in the UCC that are not otherwise defined in this Security Agreement or the Credit Agreement are used herein as defined in Articles 8 or 9 of the UCC, as the context may require (including without limitation, as if such terms were capitalized in Article 8 or 9 of the UCC, as the context may require, the following terms: "**Account**," "**Account Debtor**," "**Chattel Paper**," "**Commercial Tort Claim**," "**Document**," "**Electronic Chattel Paper**," "**Equipment**," "**Financial Asset**", "**Fixture**," "**General Intangible**," "**Goods**," "**Instruments**," "**Inventory**," "**Letter-of-Credit Right**," "**Records**," "**Securities Account**," "**Supporting Obligation**" and "**Tangible Chattel Paper**").

Section 1.03.      Definitions of Certain Terms Used Herein.  As used in this Security Agreement, the following terms shall have the following meanings:

"**Administrative Agent**" has the meaning set forth in the preamble.

"**Article**" means a numbered article of this Security Agreement, unless another document is specifically referenced.

"**Borrower**" has the meaning set forth in the preamble.

"**Collateral**" has the meaning set forth in Article 2.

"**Collateral and Guarantee Requirements**" means, at any time, the requirement that:

BUSINESS.29164507.2

(a) the Administrative Agent shall have received from the Parent, the Borrower and each other Grantor either (i) a counterpart of this Security Agreement, duly executed and delivered on behalf of such Person as of the Closing Date, or (ii) in the case of the formation or acquisition after the Closing Date of any Subsidiary, a supplement to this Security Agreement in substantially the form attached as Exhibit D, duly executed and delivered on behalf of such Person within thirty (30) days after such formation or acquisition (or such later dates as are reasonably agreed by the Administrative Agent), together with such documents and certificates the Administrative Agent shall reasonably request to create in favor of the Administrative Agent, for the benefit of Secured Parties, a valid and perfected first priority security interest in any property acquired by any Grantor;

(b) each Grantor shall cause all of the Pledged Stock owned by such Grantor to comply with Section 4.02(a);

(c) each Grantor shall cause all of the Material Debt Instruments owned or acquired by such Grantor to comply with Section 4.02(a);

(d) all documents and instruments, including UCC financing statements, required by applicable Law to be filed, registered or recorded to perfect the Liens of the Administrative Agent in any Collateral owned by the Grantors and created by the Security Documents and with the priority contemplated by, such Security Documents, shall have been filed, registered or recorded (or delivered to the Administrative Agent for filing, registration or recording), in each case, subject to the timing provisions set forth in clause (a) above for any filings, registrations and recordings with respect to Collateral owned by any Grantor on the Closing Date and with respect to Collateral acquired by any Grantor after the Closing Date, unless the Security Documents specifically permit the Lien in such Collateral not to be perfected;

(e) each Grantor shall cause all of its Real Estate Assets to comply with the following requirements;

(i) in the event that any Grantor owns any Real Estate Asset as of the Closing Date or acquires a Real Estate Asset after the Closing Date, then such Grantor shall promptly take all such actions and execute and deliver, or cause to be executed and delivered, all such Mortgages, documents, instruments, agreements, opinions and certificates, including the items specified in clause (iii) below, that the Administrative Agent shall reasonably request to create in favor of the Administrative Agent, for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected first priority Lien (subject to Permitted Liens) in such Real Estate Assets;

(ii) the Borrower shall, at the request of the Administrative Agent, deliver, from time to time, to the Administrative Agent such appraisals as are reasonably required by law or regulation of Real Estate Assets with respect to which the Administrative Agent has been granted a Lien;

(iii) in the case of any Real Estate Asset referred to herein, the applicable Grantor shall provide the Administrative Agent with UCC financing statements and a Mortgage with respect to such Real Estate Asset (each, a "**Mortgaged Property**"), as the case may be, within ninety (90) days after the date of the consummation of the acquisition of such Real Estate Asset (or such later dates as are reasonably agreed by the Administrative Agent), in each case, to be recorded in the applicable real property records in the county in which the applicable Real Estate Asset is located, together with:

-2-

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**
**Page 515 of 812**

(A)     evidence that counterparts of any such Mortgage has been duly executed, acknowledged and delivered and that all filing and recording taxes and fees that are due and payable have been paid or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent;

(B)     if reasonably requested by the Administrative Agent, an opinion of counsel (which counsel shall be reasonably satisfactory to the Administrative Agent) in each state in which a Mortgaged Property is located with respect to the enforceability of, and validity and perfection of the lien of, the form(s) of the Mortgages to be recorded in such state and such other matters as the Administrative Agent may reasonably request, in each case in form and substance reasonably satisfactory to the Administrative Agent;

(C)     ALTA mortgagee title insurance policies or unconditional commitments therefor containing such endorsements and affirmative coverages reasonably satisfactory to Administrative Agent and issued by one or more title companies reasonably satisfactory to the Administrative Agent with respect to each Mortgaged Property (each, a "**Title Policy**"), in amounts not less than the Fair Market Value of each Mortgaged Property, together with a title report issued by a title company with respect thereto and copies of all recorded documents listed as exceptions to title or otherwise referred to therein, and Borrower shall take all actions (including, without limitation, executing any and all documents and affidavits) reasonably required by the title company to remove any and all items, liens and/or exceptions disclosed in such title report, such that such items do not appear in, and are insured against by, the Title Policy, each in form and substance reasonably satisfactory to the Administrative Agent and evidence satisfactory to the Administrative Agent that such Grantor has paid to the title company or to the appropriate Governmental Authorities all expenses and premiums of the title company and all other sums required in connection with the issuance of each Title Policy and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages for each Mortgaged Property in the appropriate real estate records;

(D)     (A) a completed Flood Certificate with respect to each Mortgaged Property, which Flood Certificate shall (x) be addressed to the Administrative Agent and (y) otherwise comply with the Flood Program; (B) if the Flood Certificate states that such Mortgaged Property is located in a Flood Zone, the Borrower's written acknowledgment of receipt of written notification from the Administrative Agent (x) as to the existence of such Mortgaged Property and (y) as to whether the community in which each Mortgaged Property is located is participating in the Flood Program; and (C) if such Mortgaged Property is located in a Flood Zone and is located in a community that participates in the Flood Program, evidence that the Borrower has obtained a policy of flood insurance that is in compliance with all applicable requirements of the Flood Program;

(E)     a current survey for such Mortgaged Property, certified to the title company, the applicable Grantor and the Administrative Agent and their respective successors and assigns, in form and substance reasonably acceptable to the Administrative Agent prepared by a professional land surveyor licensed in the state in which the Mortgaged Property is located in accordance with the 2016 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys.  Such survey

-3-

BUSINESS.29164507.2

shall reflect the same legal description contained in the Title Policy relating to such Mortgaged Property and shall otherwise satisfy all requirements of the title company issuing the related Title Policy.  The surveyor's seal shall be affixed to each survey and shall designate whether all or any of such Mortgaged Property is located in a "one hundred year flood hazard area"; provided that, notwithstanding the foregoing, a new survey will not be required if an existing survey, together with an "affidavit of no change" reasonably satisfactory to the title insurance company, is delivered to the Administrative Agent and the title insurance company, and the title insurance company removes the so-called "survey exceptions" from the applicable Title Policy; and

(F)     at such times as reasonably required by Administrative Agent, such abstracts, reports, appraisals and other documents as the Administrative Agent may reasonably request; and

(iv)     each Mortgage encumbering a Mortgaged Property shall secure all Obligations, provided that, in the event that the jurisdiction in which the applicable Mortgaged Property is located imposes a mortgage recording, intangibles or similar tax and does not permit the allocation of indebtedness for the purpose of determining the amount of such tax payable, the principal amount secured by such Mortgage shall be equal to one hundred percent (100%) of the amount of the Fair Market Value of such Mortgaged Property.

The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets of the Grantors, or the provision of Guarantees by any Subsidiary, if, and for so long as the Administrative Agent and the Borrower reasonably determine that the cost of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance, legal opinions or other deliverables in respect of such assets, or providing such Guarantees (taking into account any adverse tax consequences to the Parent and the Subsidiaries) exceeds the practical benefit to the Lenders afforded thereby.

Notwithstanding any provision of this Security Agreement or any other Transaction Document to the contrary,

(A)     the Grantors shall enter into a Collection Account Control Agreement with respect to the Collection Account and otherwise take any action requested by the Administrative Agent to provide perfection by control (as defined in Section 9-104 of the UCC)  with respect to Cash and Cash Equivalents, Deposit Accounts, Securities Accounts or commodities accounts (including securities entitlements and related assets) of such Grantor, within 30 days after the Closing Date (or such later dates as reasonably agreed by the Administrative Agent); and

(B)     the Grantors shall obtain access rights (through a power of attorney) with respect to each of the Maquiladoras' facilities located in Mexico on or prior to the Closing Date.

"**Contract Rights**" means all rights of any Grantor under any Contract, including, without limitation, (i) any and all rights to receive and demand payments under such Contract, (ii) any and all rights to receive and compel performance under such Contract and (iii) any and all other rights, interests and claims now existing or in the future arising in connection with such Contract.

-4-

BUSINESS.29164507.2

"**Contracts**" means all contracts between any Grantor and one or more additional parties (including, without limitation, any Swap Agreement, licensing agreement and any partnership agreement, joint venture agreement and/or limited liability company agreement).

"**Control**" has the meaning set forth in Article 8 or, if applicable, in Section 9-104, 9-105, 9-106 or 9-107 of Article 9 of the UCC.

"**Credit Agreement**" has the meaning set forth in the preamble.

"**Domain Names**" means all Internet domain names and associated URL addresses in or to which any Grantor now or hereafter has any right, title or interest.

"**Excluded Assets**" means, collectively:

(a) motor vehicles and all other assets subject to certificates of title (except to the extent a security interest therein can be perfected by the filing of a UCC financing statement);

(b) any Letter-of-Credit Right with a value of less than $500,000(except to the extent a security interest therein can be perfected by the filing of a UCC financing statement);

(c) any Commercial Tort Claim with a value (as reasonably estimated by the Borrower) of less than $500,000 (except to the extent a security interest therein can be perfected by the filing of a UCC financing statement);

(d) pledges and security interests prohibited or restricted by applicable Law (including any requirement to obtain the consent of any Governmental Authority or third party), except to the extent such prohibition is rendered ineffective under the UCC;

(e) Margin Stock;

(f) to the extent not permitted by the terms of the Organizational Documents of such Person or joint venture, Capital Stock in (i) not-for-profit subsidiaries and special purpose entities used for permitted securitization facilities and (ii) joint ventures;

(g) Capital Stock in excess of 65% of the voting Capital Stock (and 100% of the non-voting Capital Stock) of any direct or indirect subsidiary of the Borrower that is a CFC or any direct or indirect subsidiary of the Borrower substantially all of the assets of which consist direct or indirectly of Capital Stock and/or Indebtedness of one or more CFCs;

(h) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable law;

(i) other exceptions to be mutually agreed upon in writing by the Borrower and Administrative Agent,

provided, however, "Excluded Assets" shall not include any Proceeds, products, substitutes or replacement of Excluded Assets (unless such Proceeds, products, substitutions or replacements would otherwise constitute Excluded Assets).

-5-

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**
**Page 518 of 812**

"**Exhibit**" refers to a specific exhibit to this Security Agreement, unless another document is specifically referenced.

"**Fair Market Value**" shall have the meaning assigned to such term in the Credit Agreement.

"**Flood Certificate**" means a life of loan "Standard Flood Hazard Determination Form" of the Federal Emergency Management Agency and any successor Governmental Authority performing a similar function.

"**Grantors**" means (i) the Parent and the Borrower and (ii) each Subsidiary of the Borrower that becomes a party to this Security Agreement as a Grantor after the Closing Date in accordance with Section 7.10 of this Security Agreement.  Notwithstanding anything else provided herein, any reference to Grantors in connection with a representation or covenant under this Security Agreement that is limited by its terms to the Closing Date shall, for such purposes, mean the Grantors on the Closing Date.

"**Intellectual Property Collateral**" means collectively, all (a) Copyrights, Patents, Trademarks, Trade Secrets, Domain Names, Licenses and Software and any and all other IP Rights; (b) all income, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing, including, without limitation, damages, claims and payments for past, present and future infringements, misappropriation, dilution or other violations of any of the foregoing; (c) all rights to sue for past, present and future infringements, misappropriation, dilution or other violations of any of the foregoing; and (d) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

"**Intellectual Property Security Agreement Supplements**" means (a) a Trademark Security Agreement Supplement, (b) a Patent Security Agreement Supplement or (c) a Copyright Security Agreement Supplement, in each case, substantially in the form of Annex A to the relevant Intellectual Property Security Agreement, as applicable.

"**Licenses**" means collectively, with respect to any Grantor, whether as licensor or licensee, all of such Grantor's right, title, and interest in and to (a) any and all licensing agreements or similar arrangements with respect to Copyrights, Patents, Trademarks, Trade Secrets, Software or any and all other IP Rights, (b) all income, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing, including, without limitation, damages, claims and payments for past, present and future breaches thereof, (c) all rights to sue for past, present and future breaches thereof, and (d) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

"**Material Debt Instrument**" means any promissory note payable to, or in favor, of a Grantor with an aggregate principal amount outstanding, in each case, of not less than $500,000.

"**Mexico**" means the United Mexican States.

"**Money**" has the meaning set forth in Article 1 of the UCC.

"**Mortgage**" means a mortgage, deed of trust, deed to secure debt, trust deed or other security document entered into by any Grantor that is the owner of a Real Estate Asset and the Administrative Agent (and/or any third parties required by law), creating and evidencing a Lien on such Real Estate Asset, which shall be in form (i) acceptable for recording in the applicable jurisdiction of such Real Estate Asset, (ii) sufficient to create a valid and perfected security interest in, to and over the applicable Grantor's right,

-6-

**JOINT EXHIBIT NO. 18**
**Page 519 of 812**

title and interest in and to such Real Estate Asset and (iii) reasonably satisfactory to the Administrative Agent, with such schedules and including such provisions as shall be necessary to conform such document to applicable local law or as shall be customary under applicable local law.

"**Obligations**" means (i) "Obligations" (as defined in the Credit Agreement) and (ii) Guaranteed Obligations (as defined in the Credit Agreement).

"**Perfection Requirements**" means the (i) filing of a Uniform Commercial Code financing statement with the appropriate office of the jurisdiction of organization of each Grantor, and/or an intellectual property filing with the United States Patent and Trademark Office and/or United States Copyright Office, as applicable and, (ii) with respect to any Subsidiary of a Grantor, the delivery of any certificate evidencing the Capital Stock issued by such Domestic Subsidiary (and pledged by any Grantor under the Security Documents in effect on the Closing Date), together with instruments of transfer executed in blank (and, solely with respect to the Closing Date, to the extent that such certificates exist prior to the Closing Date and are in Parent's actual possession on or prior to the Closing Date after its use of good faith, commercially reasonable efforts to obtain such certificates) and (iii) with respect to the Mexican Security Agreement, the execution and ratification before a Mexican notary public and its registration before the RUG as provided in the Credit Agreement.

"**Pledged Collateral**" means all Pledged Stock and Stock Rights constituting Collateral, including all stock certificates, options or rights of any nature whatsoever in respect of the Pledged Stock or other Stock Rights that may be issued or granted to, or held by, any Grantor while this Security Agreement is in effect, all Instruments, Securities and other Investment Property owned by any Grantor, whether or not physically delivered to the Administrative Agent pursuant to this Security Agreement, whether now owned or hereafter acquired by such Grantor and any and all Proceeds thereof, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

"**Pledged Stock**" means, with respect to any Grantor, the shares of Capital Stock held by such Grantor as of the Closing Date, together with any other shares of Capital Stock as are hereafter acquired by such Grantor, in each case, unless not required to be pledged by such Grantor hereunder and excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

"**Proceeds**" has the meaning assigned in Article 9 of the UCC and, in any event, shall also include but not be limited to (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Administrative Agent or any Grantor from time to time with respect to any of the Collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to any Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority (or any Person acting under color of Governmental Authority), (iii) any and all Stock Rights and (iv) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"**Real Estate Asset**" means, at any time of determination, all right, title and interest (fee, leasehold or otherwise) of any Grantor in and to real property (including, but not limited to, land, improvements and fixtures thereon).

"**Receivables**" means any Account, Chattel Paper, Document, Instrument and/or any General Intangible, in each case, that is a right or claim to receive money or that is otherwise included as Collateral, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

-7-

"**Section**" means a numbered section of this Security Agreement, unless another document is specifically referenced.

"**Security Agreement**" has the meaning set forth in the preamble.

"**Software**" means computer programs, source code, object code and supporting documentation including "software" as such term is defined in Article 9 of the UCC, as well as computer programs that may be construed as included in the definition of Goods.

"**Stock Rights**" means all dividends, warrants, instruments or other distributions and any other right or property which any Grantor shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any Pledged Stock, any right to receive any Pledged Stock and any right to receive earnings, in which such Grantor now has or hereafter acquires any right, issued by an issuer of such Pledged Stock, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

"**Trade Secrets**" means, with respect to any Grantor, all of such Grantor's right, title and interest in and to the following:  (a) confidential and proprietary information, including unpatented inventions, invention disclosures, engineering or other data, information, production procedures, know-how, financial data, customer lists, supplier lists, business and marketing plans, processes, schematics, algorithms, techniques, analyses, proposals, source code and data collections; (b) all income, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing, including, without limitation, damages, claims and payments for past, present and future misappropriation or infringements of any of the foregoing; (c) all rights to sue for past, present and future misappropriation or infringements of any of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (d) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

ARTICLE 2
GRANT OF SECURITY INTEREST

Section 2.01.    Grant of Security Interest.

(a)    As security for the prompt and complete payment or performance, as the case may be, in full of the Obligations, each Grantor hereby pledges, collaterally assigns and grants to the Administrative Agent, on behalf of and for the benefit of the Secured Parties, a continuing security interest in all of its right, title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Grantor, and regardless of where located (all of which are collectively referred to as the "**Collateral**"):

(i)    all Accounts;

(ii)    all Cash;

(iii)    all Chattel Paper (including, without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper);

(iv)    all Commercial Tort Claims;

-8-

BUSINESS.29164507.2

(v)     all Contracts, together with all Contract Rights arising thereunder;

(vi)    all Deposit Accounts;

(vii)   all Documents;

(viii)  all Equipment;

(ix)    all Financial Assets;

(x)     all Fixtures;

(xi)    all General Intangibles;

(xii)   all Goods;

(xiii)  all Governmental Authorizations;

(xiv)   all Instruments;

(xv)    all Intellectual Property Collateral;

(xvi)   all Inventory;

(xvii)  all Investment Property, Pledged Stock and other Pledged Collateral;

(xviii) all letters of credit and Letter-of-Credit Rights;

(xix)   all Licenses;

(xx)    all Proceeds of insurance;

(xxi)   all Receivables;

(xxii)  all Real Estate Assets;

(xxiii) all Securities Accounts, Money, Securities and other investments therein, and all Security Entitlements in respect thereof;

(xxiv)  all Software and all recorded data of any kind or nature, regardless of the medium of recording;

(xxv)   all Supporting Obligations relating to any of the foregoing; and

(xxvi)  all accessions to, substitutions and replacements for and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing.

(b)     Notwithstanding the foregoing, no Lien or security interest is granted hereunder on any Excluded Asset and the term "Collateral" (and any component definition thereof) shall not include any

-9-

**JOINT EXHIBIT NO. 18**
**Page 522 of 812**

Excluded Asset or any other asset to the extent expressly limited or excluded by the Collateral and Guarantee Requirements.  Notwithstanding anything to the contrary contained herein, immediately upon the ineffectiveness, lapse or termination of any restriction or condition set forth in the definition of Excluded Assets that prevented the grant of a security interest in any right, interest or other asset that would have, but for such restriction or condition, constituted Collateral, the Collateral shall include, and the relevant Grantor shall be deemed to have automatically granted a security interest in, all relevant previously restricted or conditioned rights, interests or other assets, as the case may be, as if such restriction or condition had never been in effect.

(c)     Notwithstanding anything to the contrary in this Security Agreement or any other Transaction Document, no Grantor shall be required to take any action with respect to the Collateral pledged hereunder (and no Lien on such Collateral shall be required to be perfected and/or perfected on a first priority basis, as applicable) to the extent such action is inconsistent with the Credit Agreement, any other Transaction Document, the Collateral and Guarantee Requirements or the Perfection Requirements.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

On the dates and to the extent required pursuant to the terms of the Credit Agreement, each Grantor hereby represents and warrants to the Administrative Agent, for the benefit of the Secured Parties, in each case, after giving effect to the transactions contemplated under the Transaction Documents on the Closing Date, that:

Section 3.01.     Title, Perfection and Priority; Filing Collateral.  Subject to Section 2.01(c) of this Security Agreement, any other limitations or exceptions set forth in any Transaction Document, the Perfection Requirements, the Collateral and Guarantee Requirements, and any applicable bankruptcy, insolvency, reorganization or other similar laws relating to or limiting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law), this Security Agreement is effective to create legal, valid and enforceable Liens on all of the Collateral of such Grantor that is pledged by such Grantor hereunder, in each case, in favor of the Administrative Agent for the benefit of the Secured Parties and, upon the satisfaction of the Perfection Requirements, such Liens shall constitute perfected first priority Liens (subject to Permitted Liens) on such Collateral (to the extent that a Lien on such Collateral can be perfected by satisfying the applicable Perfection Requirements) securing the Obligations.

Section 3.02.     [Reserved].

Section 3.03.     [Reserved].

Section 3.04.     Intellectual Property.

(a)     Other than as set forth on Schedule 3.04, none of the Grantors owns or otherwise has a license or right to use all rights in any Intellectual Property.  Upon filing of appropriate financing statements with the Secretary of State (or equivalent office) of the state of organization of such Grantor and the filing of the applicable Intellectual Property Security Agreement with the United States Copyright Office or the United States Patent and Trademark Office, as applicable, the Administrative Agent shall have fully perfected first priority Liens (subject to Permitted Liens) on the Intellectual Property Collateral constituting United States issued or registered Patents, Trademarks and Copyrights (and applications therefor).

-10-

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**
**Page 523 of 812**

(b)     No Grantor is aware of (i) any third-party claim (other than office actions or rejections during ordinary course of prosecution) (A) that any of its owned Patent, Trademark, Domain Name or Copyright registrations or applications is invalid or unenforceable or (B) challenging such Grantor's rights to such registrations and applications or (ii) any basis for such claims with respect to such Grantor, other than, in each case, to the extent any such third-party claims would not reasonably be expected to result in a Material Adverse Effect.

Section 3.05.     Pledged Collateral; Instruments and Chattel Paper.  (i) All Pledged Stock has been duly authorized and validly issued by the issuer thereof and is fully paid and non-assessable (to the extent such concepts are relevant with respect to such Pledged Stock), (ii) each Grantor is the direct owner, beneficially and of record, of the Pledged Stock described in Schedule 3.05 as held by such Grantor as of the Closing Date, (iii) each Grantor holds the Pledged Stock described in Schedule 3.05 as held by such Grantor as of the Closing Date free and clear of all Liens (other than Permitted Liens), (iv) as of the Closing Date, all certificates or instruments representing or evidencing the Pledged Collateral which are required to be delivered pursuant to Section 4.02 hereof or the Collateral and Guarantee Requirements have been delivered to the Administrative Agent together with undated instruments of transfer or assignment duly executed in blank and the Administrative Agent shall have fully perfected first priority Liens (subject to Permitted Liens) on the Pledged Collateral to the extent perfection in such Collateral is required by the Perfection Requirements.

Section 3.06.     Recourse.  This Security Agreement is made with full recourse to each Grantor and pursuant to and upon all the warranties, representations, covenants and agreements on the part of such Grantor contained herein, in the Transaction Documents and otherwise in writing in connection herewith and therewith.

## ARTICLE 4
### COVENANTS

From the Closing Date until the Termination Date (in each case, subject to Section 2.01(c) of this Security Agreement):

Section 4.01.     General.

(a)     Authorization to File Financing Statements; Ratification.     Each Grantor hereby (x) authorizes the Administrative Agent to (A) file all financing statements (including amendments and continuations thereto) with respect to the Collateral naming such Grantor as debtor and the Administrative Agent as secured party, in form appropriate for filing under the UCC of the relevant jurisdiction and (B) make all filings with the United States Patent and Trademark Office and the United States Copyright Office (including filing any Intellectual Property Security Agreement) for the purpose of perfecting, recording, enforcing, maintaining or protecting the Lien of the Administrative Agent created hereunder in each Grantor's United States issued, registered or applied for Patents, Trademarks and Copyrights (in each case, to the extent constituting Collateral) and naming such Grantor as debtor and the Administrative Agent as secured party, and (y) agrees to take such other actions as required, in each case, that may be required under any applicable Law or which the Administrative Agent or the Required Lenders (through the Administrative Agent) may reasonably request to ensure the creation, perfection and priority of the Liens created or intended to be created under the Security Documents.  Each Grantor shall pay any applicable filing fees, recordation fees and related expenses relating to its Collateral in accordance with Section 8.2(a) of the Credit Agreement.  The Administrative Agent may file financing statements in any applicable UCC jurisdiction and may (i) indicate the Collateral (A) as "all assets" or "all assets of the Debtor, whether now existing or hereinafter arising" of the applicable Grantor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of such

-11-

BUSINESS.29164507.2

jurisdiction, or (B) by any other description which reasonably approximates the description contained in this Security Agreement and (ii) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (A) in each case to the extent applicable, whether the Grantor is an organization, the type of organization and any organization identification number issued to the Grantor and (B) in the case of a financing statement filed as a fixture filing, a sufficient description of the relevant real property to which the Collateral relates.  Each Grantor agrees to furnish any such information to the Administrative Agent promptly upon request.

(b)      Further Assurances.  Each Grantor agrees, at its own expense, to take any and all actions reasonably necessary to defend title to the Collateral against all Persons (other than Persons holding Permitted Liens on such Collateral that have priority over the Administrative Agent's Lien) and to defend the security interest of the Administrative Agent in the Collateral and the priority thereof against any Lien that is not a Permitted Lien.

(c)      Change of Name, Etc.  Following the occurrence of a change for which delivery of any notice is required by Section 5.2(a) of the Credit Agreement, the relevant Grantor shall comply with Sections 4.01(a) and 4.01(b) of this Security Agreement and Section 5.1(p) of the Credit Agreement.

Section 4.02.      Pledged Collateral.

(a)      Delivery of Certificated Securities, Tangible Chattel Paper, Instruments and Documents.  Each Grantor will, subject to the Perfection Requirements and the Collateral and Guarantee Requirements, (i) on the Closing Date, deliver to the Administrative Agent for the benefit of the Secured Parties, the originals of all (x) certificated Pledged Stock and (y) Material Debt Instruments, in each case under clauses (x) and (y), to the extent constituting Collateral owned by such Grantor as of the Closing Date, accompanied by undated instruments of transfer or assignment duly executed in blank, and (ii) after the Closing Date and after any Subsidiary becomes a Grantor under this Security Agreement, hold on behalf of and for the benefit of the Administrative Agent upon receipt and, promptly (and in any event within the latest of (1) thirty (30) days after such Subsidiary becomes a Grantor, (2) thirty (30) days after the receipt by such Grantor or (3) such longer period as may be reasonably agreed by the Administrative Agent) after the receipt thereof, deliver to the Administrative Agent for the benefit of the Secured Parties, the originals of all (A) certificated Pledged Stock and (B) Material Debt Instruments, in each case under clauses (A) and (B), to the extent constituting Collateral received by such Grantor after the Closing Date, accompanied by undated instruments of transfer or assignment duly executed in blank.

(b)      Uncertificated Securities and Pledged Collateral.  Except to the extent in connection with any Investment or Disposition expressly permitted by the Credit Agreement, with respect to any Pledged Stock owned by any Grantor (other than Capital Stock held by a Clearing Corporation, Securities Intermediary or other financial intermediary of any kind) which is not a certificated Security for purposes of the UCC, to the extent constituting Pledged Collateral, such Grantor shall not permit any issuer of such Pledged Stock to (i) enter into any agreement with any Person, other than the Administrative Agent, whereby such issuer effectively delivers "control" of any such Pledged Stock that is in the form of partnership interests or limited liability company interests (as applicable) under the UCC to such Person, or (ii) if such Pledged Stock is not a Security for purposes of the UCC, allow such Pledged Stock to become a Security unless such Grantor certificates such Pledged Stock and complies with the procedures set forth in Section 4.02(a) within the time period prescribed therein.  Each Grantor which is an issuer of any uncertificated Pledged Collateral described in this Section 4.02(b) hereby agrees to comply with all instructions from the Administrative Agent without such Grantor's further consent, in each case, subject to the notice requirements set forth in Section 5.01(a)(iv) hereof.

(c)      [Reserved].

-12-

JOINT EXHIBIT NO. 18
Page 525 of 812

(d)      Rights in Pledged Collateral.  It is agreed that:

(i)      without in any way limiting the foregoing and subject to clause (ii) below, each Grantor shall have the right, unless an Event of Default has occurred and is continuing and subject to the Administrative Agent's delivery of prior written notice to the Borrower pursuant to Section 5.01(a)(iv), to exercise all voting rights or other rights relating to the Pledged Collateral for any purpose that does not violate this Security Agreement, the Credit Agreement or any other Transaction Document;

(ii)      the Administrative Agent at any time when an Event of Default has occurred and is continuing shall have the right to exercise the rights and remedies provided under Section 5.01(a)(iv) (subject to the notice requirements set forth therein) and, upon the occurrence and during the continuance of an Event of Default after prior written notice to the Borrower, all rights of the Grantors to exercise or refrain from exercising voting or other rights relating to the Pledged Collateral shall cease or be limited as set forth in such notice; and

(iii)      subject to Section 5.01(a)(iv), each Grantor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Collateral (unless, and solely to the extent, otherwise provided under the Credit Agreement or the other Transaction Documents); provided that any non-cash dividends or other distributions that would constitute Pledged Collateral, whether resulting from a subdivision, combination or reclassification of any Pledged Stock or received in exchange for Pledged Collateral or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall, to the extent constituting Collateral, be held on behalf of and for the benefit of the Administrative Agent and be and become part of the Pledged Collateral, and, if received by any Grantor, shall be delivered to the Administrative Agent as and to the extent required by clause (a) above.  The Administrative Agent shall promptly deliver to the applicable Grantor (without recourse and without any representation or warranty) any Pledged Collateral in its possession if requested to be delivered to the issuer or the holder thereof in connection with any redemption or exchange of such Pledged Collateral not prohibited by the Credit Agreement.

Section 4.03.      Intellectual Property.

(a)      At any time when an Event of Default has occurred and is continuing, and upon the written request of the Administrative Agent, each Grantor will (i) use its commercially reasonable efforts to obtain all consents and approvals necessary and appropriate for the assignment to or for the benefit of the Administrative Agent of any License held by such Grantor in the U.S. to enable the Administrative Agent to enforce the security interests granted hereunder and (ii) to the extent required pursuant to any material License in the U.S. under which such Grantor is the licensee, deliver to the licensor thereunder any notice of the grant of security interest hereunder or such other notices required to be delivered thereunder in order to permit the security interest created or permitted to be created hereunder pursuant to the terms of such License.

(b)      Each Grantor shall notify the Administrative Agent promptly if it knows that any application for or registration of any Patent, Trademark, Domain Name, or Copyright (now or hereafter existing) has become abandoned or dedicated to the public, or of any determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court) abandoning such Grantor's ownership of any such Patent, Trademark or Copyright, its right to register the same, or to keep and maintain the same, except, in each case, for Dispositions not prohibited by the Credit Agreement or

-13-

BUSINESS.29164507.2

where such occurrences, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(c)  In the event that any Grantor (x) files an application for the registration of any Patent, Trademark or Copyright with the United States Patent and Trademark Office or the United States Copyright Office, (y) acquires any such Patent, Trademark or Copyright by purchase or assignment, or (z) files a Statement of Use or an Amendment to Allege Use with respect to any "intent-to-use" Trademark application, in each case, after the Closing Date and to the extent the same constitutes Collateral (and other than as a result of an application that is then subject to an Intellectual Property Security Agreement or Intellectual Property Security Agreement Supplement becoming registered), it shall promptly notify the Administrative Agent and, execute and deliver to the Administrative Agent, at such Grantor's sole cost and expense, any Intellectual Property Security Agreement or Intellectual Property Security Agreement Supplement, as applicable, or any other instrument as the Administrative Agent may reasonably request to evidence the Administrative Agent's security interest in such registered Patent, Trademark or Copyright (or application therefor), and the General Intangibles of such Grantor relating thereto or represented thereby.

(d)  Each Grantor shall take all actions necessary or reasonably requested by the Administrative Agent to (i) maintain and pursue each application and to obtain and maintain the registration of each Patent, Trademark, Domain Name and, to the extent consistent with past practices, Copyright that constitutes Collateral (now or hereafter existing), including by filing applications for renewal, affidavits of use, affidavits of non-contestability and, if consistent with good business judgment (as determined by such Grantor), by initiating opposition and interference and cancellation proceedings against third parties, (ii) maintain and protect the secrecy or confidentiality of its Trade Secrets and (iii) otherwise protect and preserve such Grantor's rights in, and the validity or enforceability of, its Intellectual Property Collateral, in each case except where failure to do so (A) would not reasonably be expected to result in a Material Adverse Effect, or (B) is otherwise permitted under the Credit Agreement.

(e)  Each Grantor shall promptly notify the Administrative Agent of any material infringement or misappropriation of such Grantor's Patents, Trademarks, Copyrights or Trade Secrets of which it becomes aware, and shall take such actions as are reasonable and appropriate under the circumstances to protect such Patent, Trademark, Copyright or Trade Secret, except where such infringement, misappropriation or dilution would not reasonably be expected to result in a Material Adverse Effect.

Section 4.04.  Commercial Tort Claims.  After the Closing Date, on or before the date that is sixty (60) days after the date on which any Grantor acquires an interest therein (or such later dates as are reasonably agreed by the Administrative Agent), each relevant Grantor shall notify the Administrative Agent of any Commercial Tort Claim with an individual value (as reasonably estimated by the Borrower) in excess of $500,000 acquired by it, together with a summary description thereof sufficient to create a security interest therein, and such Commercial Tort Claim (and the Proceeds thereof) shall automatically constitute Collateral (to the extent not constituting Excluded Assets), all upon the terms of this Security Agreement.

Section 4.05.  Inventory. After the Closing Date, if Collateral with an aggregate Fair Market Value in excess of $500,000 is located at any leased location in the United States, the Grantors shall deliver to the Administrative Agent, within thirty (30) days after entering into such lease (or such later dates as reasonably agreed by the Administrative Agent), a landlord waiver, collateral access agreement or similar agreement, in each case in form and substance satisfactory to the Administrative Agent and the Lenders.

Section 4.06.  Grantors Remain Liable Under Contracts.  Each Grantor (rather than the Administrative Agent or any Secured Party) shall remain liable (as between itself and any relevant counterparty) to observe and perform all the conditions and obligations to be observed and performed by it

-14-

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**
**Page 527 of 812**

under any Contract included in or related to the Collateral, all in accordance with the terms and conditions thereof.  Neither the Administrative Agent nor any other Secured Party shall have any obligation or liability under any Contract included in or related to the Collateral by reason of or arising out of this Security Agreement or the receipt by the Administrative Agent or any other Secured Party of any payment relating to such Contract pursuant hereto, nor shall the Administrative Agent or any other Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Contract included in or related to the Collateral, to make any payment, to make any inquiry as to the nature or sufficiency of any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

Section 4.07.    Grantors Remain Liable Under Accounts.    Each Grantor (rather than the Administrative Agent or any Secured Party) shall remain liable (as between itself and any relevant counterparty) to observe and perform all of the conditions and obligations to be observed and performed by it under any Account included in or related to the Collateral, all in accordance with the terms and conditions of any agreement giving rise to such Accounts.  Neither the Administrative Agent nor any other Secured Party shall have any obligation or liability under any Account included in or related to the Collateral (or any agreement giving rise thereto) by reason of or arising out of this Security Agreement or the receipt by the Administrative Agent or any other Secured Party of any payment relating to such Account pursuant hereto, nor shall the Administrative Agent or any other Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Account included in or related to the Collateral (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

ARTICLE 5
REMEDIES

Section 5.01.    Remedies.

(a)    Each Grantor agrees that, at any time when an Event of Default has occurred and is continuing, the Administrative Agent may exercise any or all of the following rights and remedies (in addition to the rights and remedies existing under applicable Requirements of Law), in each case, with respect to the Collateral:

(i)    the rights and remedies provided in this Security Agreement, the Credit Agreement, or any other Transaction Document;

(ii)    the rights and remedies available to a secured party under the UCC of each relevant jurisdiction (whether or not the UCC applies to the affected Collateral) or under any other applicable Law (including, without limitation, any law governing the exercise of a bank's right of setoff or bankers' Lien) or in equity when a debtor is in default under a security agreement;

(iii)    without prior notice (except as specifically provided in Section 7.1 of the Credit Agreement, the provisions of this Security Agreement or any other Transaction Document, or otherwise in accordance with the terms of the UCC) or demand of any kind to any Grantor or any other Person, but subject to the terms of any applicable lease or sublease agreement, the Administrative Agent may (A) personally, or by agents or attorneys, enter the premises of any Grantor where any Collateral, or the books and Records relating thereto, or both, are located (through self-help and without judicial process) for purposes of taking possession or removing all or any part of the Collateral or the books and Records relating thereto, or both and (B) sell, lease, assign, grant an option or options to purchase or otherwise dispose of, deliver, or realize upon, the

-15-

Collateral or any part thereof in one or more parcels at one or more public or private sales (which sales may be adjourned or continued from time to time with or without notice and may take place at such Grantor's premises or elsewhere), for Cash, on credit or for future delivery without assumption of any credit risk, and upon such other terms as the Administrative Agent may deem commercially reasonable;

(iv)     upon not less than one (1) Business Day's prior written notice to the Borrower, the Administrative Agent may (A) transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral, (B) exchange the certificates representing Pledged Collateral for certificates of smaller or larger denominations for any purpose consistent with this Security Agreement and (C) exercise the voting and all other rights as a holder with respect thereto, to collect and receive all cash dividends, interest, principal and other distributions made thereon and to otherwise act with respect to the Pledged Collateral as though the Administrative Agent was the outright owner thereof; and

(v)     the Administrative Agent may take possession of the Collateral or any part thereof, by directing such Grantor in writing to deliver the same to the Administrative Agent at a place designated by the Administrative Agent that is reasonably convenient to both parties, in which event such Grantor shall at its own expense forthwith cause the same to be moved to the place so designated by the Administrative Agent and there make it available to the Administrative Agent.

(b)     Each Grantor acknowledges and agrees that compliance by the Administrative Agent, on behalf of the Secured Parties, with any applicable state or federal Law in connection with a disposition of the Collateral will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(c)     The Administrative Agent shall have the right in any public sale and, to the extent permitted by applicable Law, in any private sale, to purchase for the benefit of the Administrative Agent and the Secured Parties, all or any part of the Collateral so sold, free of any right of equity redemption that Grantor is permitted to release and waive pursuant to applicable Law, and, each Grantor hereby expressly releases such right to equity redemption to the extent permitted by applicable Law.

(d)     Until the Administrative Agent is able to effect a sale, lease, transfer or other disposition of any particular Collateral under this Section 5.01, the Administrative Agent shall have the right to hold or use such Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving such Collateral or the value of such Collateral.  At any time when an Event of Default has occurred and is continuing, the Administrative Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Administrative Agent's remedies (for the benefit of the Administrative Agent and Secured Parties), with respect to such appointment, without prior notice or hearing as to such appointment.

(e)     Notwithstanding the foregoing, the Administrative Agent shall not be required to (i) make any demand upon, or pursue or exhaust any of its rights or remedies against, the Grantors, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Obligations or to pursue or exhaust any of their rights or remedies with respect to any Collateral therefor or any direct or indirect Guarantee thereof, (ii) marshal the Collateral or any Guaranty of the Obligations or to resort to the Collateral or any such Guaranty in any particular order (and, to the extent it lawfully may, each Grantor hereby waives and releases all rights it has, if any, of marshaling the Collateral), or (iii) effect a public sale of any Collateral.

(f)     Each Grantor recognizes that the Administrative Agent may be unable to effect a public sale of any or all the Pledged Collateral and may be compelled to resort to one or more private sales thereof.

<div align="center">-16-</div>

<div align="center">**JOINT EXHIBIT NO. 18**
**Page 529 of 812**</div>

Each Grantor also acknowledges that any private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that no such private sale shall be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private.  The Administrative Agent shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit any Grantor or the issuer of any Pledged Collateral to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws, even if any Grantor and the issuer would agree to do so.

(g)      The Administrative Agent acknowledges and agrees that notwithstanding any other provisions in this Security Agreement or any other Transaction Document, the exercise of rights or remedies with respect to certain Collateral and the enforcement of any security interests therein may be limited or restricted by, or require any consents, authorizations approvals or licenses under, any applicable Law.

Section 5.02.      Grantors' Obligations Upon Default.  Upon the request of the Administrative Agent at any time when an Event of Default has occurred and is continuing, each Grantor will, at its own cost and expense:

(a)      deliver all tangible evidence of its Accounts and Contract Rights (including, without limitation, all documents evidencing the Accounts and all Contracts) and such books and Records to the Administrative Agent or to its representatives (copies of which evidence and books and Records may be retained by such Grantor), and

(b)      if the Administrative Agent so directs and in a form and in a manner reasonably satisfactory to the Administrative Agent, legend the Accounts and the Contracts, as well as books, Records and documents (if any) of such Grantor evidencing or pertaining to such Accounts and Contracts with an appropriate reference to the fact that such Accounts and Contracts have been assigned to the Administrative Agent and that the Administrative Agent has a security interest therein.

Section 5.03.      Intellectual Property Remedies.

(a)      For the purpose of enabling the Administrative Agent to exercise the rights and remedies under this Article 5 at any time when an Event of Default has occurred and is continuing, and at such time as the Administrative Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Administrative Agent a power of attorney to sign any document which may be required by the United States Patent and Trademark Office, the United States Copyright Office or similar registrar or domain name registrar in order to effect an assignment of all right, title and interest in each registered Patent, Trademark, Domain Name and Copyright and each application for any such registration, and record the same.  At any time when an Event of Default has occurred and is continuing, the Administrative Agent may (i) declare the entire right, title and interest of such Grantor in and to each item of Intellectual Property Collateral to be vested in the Administrative Agent for the benefit of the Secured Parties, in which event such right, title and interest shall immediately vest in the Administrative Agent for the benefit of the Secured Parties, and the Administrative Agent shall be entitled to exercise the power of attorney referred to in this Section 5.03 to execute, cause to be acknowledged and notarized and record such assignment with the applicable agency or registrar; (ii) sell any Grantor's Inventory directly to any Person, including without limitation Persons who have previously purchased any Grantor's Inventory from such Grantor and in connection with any such sale or other enforcement of the Administrative Agent's rights under this Security Agreement and subject to any restrictions contained in applicable third party licenses entered into by such Grantor, sell Inventory which bears any Trademark owned by or licensed to any Grantor and any Inventory that is covered by any Intellectual Property Collateral owned by or licensed to any Grantor, and the Administrative Agent may finish any work in process and affix any relevant Trademark owned by or

-17-

BUSINESS.29164507.2

licensed to such Grantor, and sell such Inventory as provided herein; (iii) direct such Grantor to refrain, in which event such Grantor shall refrain, from using any Intellectual Property Collateral in any manner whatsoever, directly or indirectly; and (iv) assign or sell any Intellectual Property, in each case to the extent constituting Collateral, as well as the goodwill of such Grantor's business connected with the use of and symbolized by any such Trademark and the right to carry on the business and use the assets of such Grantor in connection with which any such Trademark or Domain Name has been used.

(b)    Each Grantor hereby grants to the Administrative Agent an irrevocable (until the Termination Date), nonexclusive, royalty-free, world-wide license to its right to use, license or sublicense any IP Rights now owned or hereafter acquired by such Grantor, wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and (to the extent not prohibited by any applicable license) to all computer software and programs used for compilation or printout thereof.  The use of the license granted to the Administrative Agent pursuant to the preceding sentence may be exercised, at the option of the Administrative Agent, only when an Event of Default has occurred and is continuing; provided that such licenses to be granted hereunder with respect to Trademarks shall be subject to, with respect to the goods and/or services on which such Trademarks are used, the maintenance of quality standards that are sufficient to preserve the validity of such Trademarks and are consistent with past practices.

Section 5.04.    Application of Proceeds.

(a)    The Administrative Agent shall apply the proceeds of any collection, sale, foreclosure or other realization upon any Collateral received by it pursuant to the exercise of remedies in accordance with this Security Agreement and as set forth in Section 2.1(c) of the Credit Agreement (with any excess amounts remaining after such application, if any, to be returned to the Borrower).

(b)    Except as otherwise provided herein or in any other Transaction Document, the Administrative Agent shall have absolute discretion as to the time of application of any such proceeds, money or balance received by it pursuant to the exercise of remedies in accordance with this Security Agreement.  Upon any sale of Collateral by the Administrative Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), a receipt by the Administrative Agent or of the officer making the sale of such proceeds, moneys or balances shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Administrative Agent or such officer or be answerable in any way for the misapplication thereof.  It is understood that the Grantors shall remain jointly and severally liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate amount of the Obligations.

ARTICLE 6
ACCOUNT VERIFICATION; ATTORNEY IN FACT; PROXY

Section 6.01.    Account Verification.  The Administrative Agent may at any time and from time to time when an Event of Default has occurred and is continuing, and upon prior written notice to the relevant Grantor, in the Administrative Agent's own name, in the name of a nominee of the Administrative Agent, or in the name of any Grantor, communicate (by mail, telephone, facsimile or otherwise) with the Account Debtors of such Grantor, parties to Contracts with such Grantor and obligors in respect of Instruments of such Grantor to verify with such Persons, to the Administrative Agent's reasonable

-18-

satisfaction, the existence, amount, terms of, and any other matter relating to, Accounts, Contracts, Instruments, Chattel Paper, payment intangibles and/or other Receivables that constitute Collateral.

Section 6.02.    Authorization for the Administrative Agent to Take Certain Action.

(a)    Each Grantor hereby irrevocably authorizes the Administrative Agent and appoints the Administrative Agent, until the Termination Date, as its true and lawful attorney in fact (i) at any time and from time to time in its reasonable discretion (subject to the limitations set forth herein) (A) to execute (to the extent necessary under the applicable Law) on behalf of such Grantor as debtor and to file financing statements necessary or desirable in the Administrative Agent's reasonable discretion to perfect and to maintain the perfection and priority of the Administrative Agent's security interest in the Collateral and (B) to file a carbon, photographic or other reproduction of this Security Agreement as a financing statement and to file any amendment of a financing statement with respect to the Collateral (which would not add new collateral or add a debtor, except as otherwise provided for herein or in any other Transaction Document) in such offices as the Administrative Agent in its reasonable discretion deems necessary or desirable to perfect and to maintain the perfection and priority of the Administrative Agent's security interest in the Collateral, (ii) during the continuation of an Event of Default after prior written notice to the Borrower and the applicable Grantor, in the sole discretion of the Administrative Agent (in the name of such Grantor or otherwise) to contact and enter into one or more agreements with the issuers of uncertificated securities that constitute Pledged Collateral or with securities intermediaries holding Pledged Collateral as may be necessary or advisable to give the Administrative Agent Control over such Pledged Collateral in accordance with the terms hereof (including, without limitation, Section 2.01(c) of this Security Agreement) and (iii) during the continuation of an Event of Default after prior written notice to the Borrower and the applicable Grantor, in the sole discretion of the Administrative Agent (in the name of such Grantor or otherwise), (A) to endorse and collect any cash proceeds of the Collateral and to apply the proceeds of any Collateral received by the Administrative Agent to the Obligations as provided herein or in the Credit Agreement or any other Transaction Document, (B) to notify the Account Debtors or other Persons obligated under any Receivable of the assignment of such Accounts to the Administrative Agent and to demand payment or enforce payment of such Receivable in the name of the Administrative Agent or such Grantor and to endorse any check, draft and/or any other instrument for the payment of money relating to any such Receivable, (C) to sign such Grantor's name on any invoice or bill of lading relating to any Receivable, any draft against any Account Debtor of such Grantor, and/or any assignment and/or verification of any Receivable, (D) to exercise all of any Grantor's rights and remedies with respect to the collection of any Receivable and any other Collateral, (E) to settle, adjust, compromise, extend or renew any Receivable, (F) to settle, adjust or compromise any legal proceedings brought to collect any Receivable, (G) to prepare, file and sign such Grantor's name on a proof of claim in bankruptcy or similar document against any Account Debtor of such Grantor, (H) to prepare, file and sign such Grantor's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with any Receivable, (I) to change the address for delivery of mail addressed to such Grantor to such address as the Administrative Agent may designate and to receive, open and dispose of all mail addressed to such Grantor (provided copies of such mail are provided to such Grantor), (J) to discharge past due taxes, assessments, charges, fees or Liens on the Collateral (except for Permitted Liens), (K) to make, settle and adjust claims in respect of Collateral under policies of insurance and endorse the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect thereto, (L) to obtain or maintain the policies of insurance of the types referred to in Section 5.1(g) of the Credit Agreement or to pay any premium in whole or in part relating thereto, (M) [reserved], (N) to perform or pay any obligation which any Grantor has agreed to perform or pay under any contract, lease, or other agreement, and which obligation is due and unpaid and not being contested by such Grantor in good faith, and to exercise any and all rights of any Grantor contained therein as fully as such Grantor itself could, (O) to repair, alter, or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any Person obligated to such Grantor in respect of any

-19-

**JOINT EXHIBIT NO. 18**
**Page 532 of 812**

Receivables of such Grantor and (P) to do all other acts and things or institute any proceedings which the Administrative Agent may reasonably deem to be necessary (pursuant to this Security Agreement and the other Transaction Document and in accordance with applicable Law) to carry out the terms of this Security Agreement and to protect the interests of the Secured Parties, in each case, with respect to clauses (A) – (P), solely with respect to assets that are Collateral and not Excluded Assets; and, when and to the extent required pursuant to Section 8.1 of the Credit Agreement, such Grantor agrees to reimburse the Administrative Agent for any payment made in connection with this paragraph or any expense (including reasonable and documented attorneys' fees, court costs and out-of-pocket expenses) and other charges related thereto incurred by the Administrative Agent in connection with any of the foregoing (it being understood that any such sums shall constitute additional Obligations); provided that this authorization shall not relieve such Grantor of any of its obligations under this Security Agreement or under the Credit Agreement.

(b)      All such acts of such attorney or designee are hereby ratified and approved by each Grantor. The powers conferred on the Administrative Agent, for the benefit of the Administrative Agent and Secured Parties, under this Section 6.02 are solely to protect the Administrative Agent's interests in the Collateral and shall not impose any duty upon the Administrative Agent to exercise any such powers.

Section 6.03.      PROXY.  EACH GRANTOR HEREBY IRREVOCABLY (UNTIL THE TERMINATION DATE) CONSTITUTES AND APPOINTS THE ADMINISTRATIVE AGENT AS ITS PROXY AND ATTORNEY-IN-FACT (AS SET FORTH IN SECTION 6.02 ABOVE) WITH RESPECT TO THE PLEDGED COLLATERAL, INCLUDING, DURING THE CONTINUATION OF AN EVENT OF DEFAULT, AND SUBJECT TO THE ADMINISTRATIVE AGENT'S DELIVERY OF PRIOR WRITTEN NOTICE TO THE BORROWER, THE RIGHT TO VOTE SUCH PLEDGED COLLATERAL, WITH FULL POWER OF SUBSTITUTION TO DO SO.  IN ADDITION TO THE RIGHT TO VOTE ANY SUCH PLEDGED COLLATERAL, THE APPOINTMENT OF THE ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT SHALL, DURING THE CONTINUATION OF AN EVENT OF DEFAULT AND SUBJECT TO THE ADMINISTRATIVE AGENT'S DELIVERY OF PRIOR WRITTEN NOTICE TO THE BORROWER, INCLUDE THE RIGHT TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF SUCH PLEDGED COLLATERAL WOULD BE ENTITLED (INCLUDING GIVING OR WITHHOLDING WRITTEN CONSENTS OF SHAREHOLDERS, CALLING SPECIAL MEETINGS OF SHAREHOLDERS AND VOTING AT SUCH MEETINGS).  SUCH PROXY SHALL BE EFFECTIVE, AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY SUCH PLEDGED COLLATERAL ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY PERSON (INCLUDING THE ISSUER OF SUCH PLEDGED COLLATERAL OR ANY OFFICER OR ADMINISTRATIVE AGENT THEREOF), IN EACH CASE ONLY WHEN AN EVENT OF DEFAULT HAS OCCURRED AND IS CONTINUING AND UPON ONE BUSINESS DAY'S PRIOR WRITTEN NOTICE TO THE BORROWER.

Section 6.04.      NATURE OF APPOINTMENT; LIMITATION OF DUTY.   THE APPOINTMENT OF THE ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT IN THIS ARTICLE 6 IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE DATE ON WHICH THIS SECURITY AGREEMENT IS TERMINATED IN ACCORDANCE WITH SECTION 7.12.   NOTWITHSTANDING ANYTHING CONTAINED HEREIN, NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL HAVE ANY DUTY TO EXERCISE ANY RIGHT OR POWER GRANTED HEREUNDER OR OTHERWISE OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO, EXCEPT TO THE EXTENT SUCH DAMAGES ARE ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH PERSON AS FINALLY DETERMINED BY

-20-

A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE DECISION; PROVIDED THAT THE FOREGOING EXCEPTION SHALL NOT BE CONSTRUED TO OBLIGATE THE ADMINISTRATIVE AGENT TO TAKE OR REFRAIN FROM TAKING ANY ACTION WITH RESPECT TO THE COLLATERAL.

ARTICLE 7
GENERAL PROVISIONS

Section 7.01.    Waivers.  To the maximum extent permitted by applicable Law, each Grantor hereby waives notice of the time and place of any judicial hearing in connection with the Administrative Agent's taking possession of the Collateral or of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made, including without limitation, any and all prior notice and hearing for any prejudgment remedy or remedies.  To the extent such notice may not be waived under applicable Law, any notice made shall be deemed reasonable if sent to any Grantor, addressed as set forth in Article 8, at least ten (10) days prior to (a) the date of any such public sale or (b) the time after which any such private Disposition may be made.  To the maximum extent permitted by applicable Law, each Grantor waives all claims, damages and demands against the Administrative Agent arising out of the repossession, retention or sale of the Collateral, except those arising out of the bad faith, the gross negligence or willful misconduct of the Administrative Agent as determined by a court of competent jurisdiction in a final and non-appealable judgment.  To the extent it may lawfully do so, each Grantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent, any valuation, stay (other than an automatic stay under the Federal Bankruptcy Code or any applicable law ), appraisal, extension, moratorium, redemption or similar law and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Security Agreement, or otherwise.  Except as otherwise specifically provided herein, each Grantor hereby waives presentment, demand, protest, any notice (to the maximum extent permitted by applicable Law) of any kind or all other requirements as to the time, place and terms of sale in connection with this Security Agreement or any Collateral.

Section 7.02.    Limitation on the Administrative Agent's Duty with Respect to the Collateral. The Administrative Agent shall not have any obligation to clean or otherwise prepare the Collateral for sale.  The Administrative Agent shall use reasonable care with respect to the Collateral in its possession; provided that the Administrative Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to which the Administrative Agent accords its own property.  The Administrative Agent shall not have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of the Administrative Agent, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.  To the extent that applicable Law imposes duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it would be commercially reasonable for the Administrative Agent, subject to Section 7.06, (a) to fail to incur expenses to prepare Collateral for Disposition or otherwise to transform raw material or work in process into finished goods or other finished products for Disposition, (b) to fail to obtain third party consents for access to Collateral to be Disposed of (unless expressly required under any applicable agreement), or to obtain or, if not required by any other applicable Law, to fail to obtain governmental or third party consents for the collection or Disposition of Collateral to be collected or Disposed of, (c) to fail to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (d) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise Dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to

-21-

contact other Persons, whether or not in the same business as any Grantor, for expressions of interest in acquiring all or any portion of such Collateral, (g) to hire one or more professional auctioneers to assist in the Disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to Dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (i) to Dispose of assets in wholesale rather than retail markets, (j) to disclaim Disposition warranties, such as title, possession or quiet enjoyment, (k) to purchase insurance or credit enhancements (which, subject to Section 8.1 of the Credit Agreement, shall be at the cost of the Grantors) to insure the Administrative Agent against risks of loss in connection with any collection or Disposition of Collateral or to provide to the Administrative Agent a guaranteed return from the collection or Disposition of Collateral or (l) to the extent deemed appropriate by the Administrative Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or Disposition of any of the Collateral.  Each Grantor acknowledges that the purpose of this Section 7.02 is to provide non-exhaustive indications of what actions or omissions by the Administrative Agent would be commercially reasonable in the Administrative Agent's exercise of remedies with respect to the Collateral and that other actions or omissions by the Administrative Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 7.02.  Without limitation upon the foregoing, nothing contained in this Section 7.02 shall be construed to grant any rights to any Grantor or to impose any duties on the Administrative Agent that would not have been granted or imposed by this Security Agreement or by applicable Law in the absence of this Section 7.02.

Section 7.03.      Compromises and Collection of Collateral.  Each Grantor and the Administrative Agent recognize that setoffs, counterclaims, defenses and other claims may be asserted by obligors with respect to certain of the Receivables, that certain of the Receivables may be or become uncollectible in whole or in part and that the expense and probability of success in litigating a disputed Receivable may exceed the amount that reasonably may be expected to be recovered with respect to any Receivable.  In view of the foregoing, each Grantor agrees that the Administrative Agent may at any time and from time to time, if an Event of Default has occurred and is continuing and upon prior written notice to the relevant Grantor, compromise with the obligor on any Receivable, accept in full payment of any Receivable such amount as the Administrative Agent in its sole discretion shall determine or abandon any Receivable, and any such action by the Administrative Agent shall be commercially reasonable so long as the Administrative Agent acts in good faith based on information known to it at the time it takes any such action.

Section 7.04.      Administrative Agent Performance of Debtor Obligations.  Without having any obligation to do so, the Administrative Agent may, at any time when an Event of Default has occurred and is continuing after prior written notice to the Borrower by the Administrative Agent, perform or pay any obligation which any Grantor has agreed to perform or pay under this Security Agreement and which obligation is due and unpaid and not being contested by such Grantor in good faith, and such Grantor shall reimburse the Administrative Agent for any amounts paid by the Administrative Agent pursuant to this Section 7.04 as an Obligation payable in accordance with Section 8.1 of the Credit Agreement.

Section 7.05.      No Waiver; Amendments; Cumulative Remedies.  No failure or delay by the Administrative Agent in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  Neither this Security Agreement nor any provision hereof may be waived, amended or modified except in writing entered into by the Grantors and the Administrative Agent with the consent of the Lenders to the extent required under Section 12.1 of the Credit Agreement.  The rights and remedies of the Administrative Agent hereunder are cumulative and are not exclusive of any rights or remedies that it would otherwise have.

-22-

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**
**Page 535 of 812**

Section 7.06.     Limitation by Law; Severability of Provisions.  All rights, remedies and powers provided in this Security Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable Law, and all of the provisions of this Security Agreement are intended to be subject to all applicable Laws that may be controlling and to be limited to the extent necessary so that such provisions do not render this Security Agreement invalid, unenforceable or not entitled to be recorded or registered, in whole or in part.  To the extent permitted by law, any provision of this Security Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions of this Security Agreement; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  If the exercise of rights or remedies with respect to certain Collateral and the enforcement of any security interests therein require any consents, authorizations approvals or licenses under any Law, no such actions shall be taken unless and until all requisite consents, authorizations approvals or licenses have been obtained.

Section 7.07.     Security Interest Absolute.  All rights of the Administrative Agent hereunder, the security interests granted hereunder and all obligations of each Grantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Transaction Document, any agreement with respect to any of the Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Transaction Document or any other agreement or instrument relating to the foregoing, (c) any exchange, release or non-perfection of any Lien on any Collateral, or any release or amendment or waiver of or consent under or departure from any guaranty, securing or guaranteeing all or any of the Obligations, (d) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Grantor, (e) any exercise or non-exercise, or any waiver of, any right, remedy, power or privilege under or in respect of this Security Agreement or any other Transaction Document or (f) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Grantor in respect of the Obligations or this Security Agreement (other than a termination of any Lien contemplated by Section 7.12 or the occurrence of the Termination Date).

Section 7.08.     [Reserved.]

Section 7.09.     [Reserved.]

Section 7.10.     Additional Subsidiaries.  Each Person required to become a Grantor pursuant to and in accordance with Section 5.1(p) of the Credit Agreement shall, within the time periods specified in the Collateral and Guaranty Requirements, execute an instrument substantially in the form of Exhibit D.  The execution and delivery of any such instrument shall not require the consent of any other Grantor hereunder.  The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Security Agreement.

Section 7.11.     Headings.  Article and Section headings used herein are for convenience of reference only, are not party of this Security Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Security Agreement.

Section 7.12.     Termination or Release.

(a)     This Security Agreement shall continue in effect until the Termination Date, and the Liens granted hereunder shall automatically be released.

BUSINESS.29164507.2

(b)      In connection with any termination or release pursuant to paragraph (a) above, the Administrative Agent shall promptly execute (if applicable) and deliver to any Grantor, at such Grantor's expense, all UCC termination statements and similar documents that such Grantor shall reasonably request to evidence and/or effectuate such termination or release and deliver all applicable Pledged Collateral to such Grantor or its designee.  Except as otherwise set forth in such delivered documents, any execution and delivery of documents pursuant to this Section 7.12 shall be without recourse to or representation or warranty by the Administrative Agent.  The Borrower shall reimburse the Administrative Agent for all reasonable and documented out-of-pocket expenses incurred by it in connection with any action contemplated by this Section 7.12 pursuant to and to the extent required by Section 8.1 of the Credit Agreement.

(c)      The Administrative Agent shall have no liability whatsoever to any other Secured Party as the result of any release of Collateral by it in accordance with (or which the Administrative Agent in good faith believes to be in accordance with) the terms of this Section 7.12.

Section 7.13.      Entire Agreement.  This Security Agreement, together with the other Transaction Documents, constitute the entire agreement among the parties relating to the subject matter hereof and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

Section 7.14.      CHOICE OF LAW.   THIS SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW WHICH SHALL APPLY HERETO) EXCEPT TO THE EXTENT THAT THE PERFECTION OF THE ADMINISTRATIVE AGENT'S SECURITY INTEREST IN THE COLLATERAL OR REMEDIES HEREUNDER IN RESPECT THEREOF ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

Section 7.15.      CONSENT TO JURISDICTION; CONSENT TO SERVICE OF PROCESS.

(a)      EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION (SUBJECT TO THE LAST SENTENCE OF THIS CLAUSE (a)) OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW YORK (OR ANY APPELLATE COURT THEREFROM) OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL (EXCEPT AS PERMITTED BELOW) BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, FEDERAL COURT.  EACH PARTY HERETO AGREES THAT SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT BY REGISTERED MAIL ADDRESSED TO SUCH PERSON SHALL BE EFFECTIVE SERVICE OF PROCESS AGAINST SUCH PERSON FOR ANY SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT.  EACH PARTY HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT IN ANY COURT REFERRED TO IN THIS CLAUSE (a).  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED

-24-

BUSINESS.29164507.2

BY LAW, ANY CLAIM OR DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION, SUIT OR PROCEEDING IN ANY SUCH COURT.  EACH PARTY HERETO AGREES THAT THE ADMINISTRATIVE AGENT RETAINS THE RIGHT TO BRING PROCEEDINGS AGAINST ANY GRANTOR IN THE COURTS OF ANY OTHER JURISDICTION SOLELY IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS IN RESPECT OF THE COLLATERAL UNDER THIS SECURITY AGREEMENT.

(b)    TO THE EXTENT PERMITTED BY LAW, EACH PARTY TO THIS SECURITY AGREEMENT HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL) DIRECTED TO IT AT ITS ADDRESS FOR NOTICES AS PROVIDED FOR IN SCHEDULE 12.2 OF THE CREDIT AGREEMENT.  EACH PARTY TO THIS SECURITY AGREEMENT HEREBY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER THAT SERVICE OF PROCESS WAS INVALID AND INEFFECTIVE.  NOTHING IN THIS SECURITY AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS SECURITY AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

Section 7.16.    WAIVER OF JURY TRIAL.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS SECURITY AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.16.

Section 7.17.    Indemnity.  Each Grantor hereby agrees to indemnify the Indemnitees, as, and to the extent, set forth in Section 8.1 of the Credit Agreement.

Section 7.18.    Counterparts.  This Security Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page to this Security Agreement by facsimile or by email as a ".pdf" or ".tiff" attachment shall be effective as delivery of a manually executed counterpart of this Security Agreement.

Section 7.19.    Waiver of Consequential Damages, Etc.  To the extent permitted by applicable Law, none of the Grantors, the Administrative Agent or Secured Parties shall assert, and each hereby waives, any claim against each other or any Related Entity thereof, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Security Agreement or any agreement or instrument contemplated hereby, except, in the case of any claim by any Indemnified Party against any of the Grantors, to the extent such damages would otherwise be subject to indemnification pursuant to the terms of Section 7.17.

Section 7.20.    Successors and Assigns.  The provisions of this Security Agreement shall be binding upon and inure to the benefit of each Grantor, the Administrative Agent and the Secured Parties

-25-

and their respective successors and permitted assigns (including all Persons who become bound as a Grantor to this Security Agreement). Except in a transaction expressly permitted (or not prohibited) under the Credit Agreement, no Grantor may assign any of its rights or obligations hereunder without the prior written consent of the Administrative Agent.

Section 7.21.    Survival of Agreement.    All covenants, agreements, representations and warranties made by the Grantors in this Security Agreement and in the certificates or other instruments delivered in connection with or pursuant to this Security Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Security Agreement regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent may have had notice or knowledge of any existing Default or Event of Default or incorrect representation or warranty at the time any credit is extended under the Credit Agreement, and shall continue in full force and effect until the Termination Date, or with respect to any individual Grantor, until such Grantor is otherwise released from its obligations under this Security Agreement in accordance with the terms hereof.

ARTICLE 8
NOTICES

Section 8.01.    Sending Notices.    All notices and other communications provided for in this Security Agreement (except as otherwise permitted herein) shall be delivered in accordance with Schedule 12.2 of the Credit Agreement *mutatis mutandis*.

Section 8.02.    Change in Address for Notices.    The Administrative Agent, any Grantor and any Secured Party may change its address or facsimile number or other notice information hereunder by notice to the other parties hereto.

ARTICLE 9
THE ADMINISTRATIVE AGENT

GLAS Trust Company LLC has been appointed Administrative Agent for the Lenders hereunder pursuant to Article IX of the Credit Agreement. It is expressly understood and agreed by the parties to this Security Agreement that any authority conferred upon the Administrative Agent hereunder is subject to the terms of the delegation of authority made by the Lenders to the Administrative Agent pursuant to the Credit Agreement, and that the Administrative Agent has agreed to act (and any successor Administrative Agent shall act) as such hereunder only on the express conditions contained in such Article IX. Any successor Administrative Agent appointed pursuant to Article IX of the Credit Agreement shall be entitled to all the rights, interests and benefits of the Administrative Agent hereunder. The permissive authorizations, entitlements, powers and rights granted to the Administrative Agent herein shall not be construed as duties. Any exercise of discretion on behalf of the Administrative Agent shall be exercised in accordance with the terms of the Credit Agreement.

By accepting the benefits of this Security Agreement and each other Transaction Document, each Secured Party expressly acknowledges and agrees that this Security Agreement and each other Transaction Document may be enforced only by the action of the Administrative Agent, and that such Secured Party shall not have any right individually to seek to enforce or to enforce this Security Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Administrative Agent for the benefit of the Secured Parties upon the terms of this Security Agreement and the other Transaction Documents.

-26-

BUSINESS.29164507.2

The Administrative Agent may rely on advice of counsel as to whether any or all UCC financing statements of the Grantors need to be amended as a result of any of the changes described in Section 5.1(x) of the Credit Agreement.  If any Grantor fails to provide information to the Administrative Agent about such changes on a timely basis, the Administrative Agent shall not be liable or responsible to any Secured Party for any failure to maintain a perfected security interest in such Grantor's property constituting Collateral, for which the Administrative Agent needed to have information relating to such changes.  The Administrative Agent shall have no duty to inquire about such changes if any Grantor does not inform the Administrative Agent of such changes and the Secured Parties acknowledge and agree that it would not be feasible or practical for the Administrative Agent to search for information on such changes if such information is not provided by any Grantor. Notwithstanding anything herein to the contrary, the Administrative Agent shall have no responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder.

[Signature Pages Follow]

-27-

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**
**Page 540 of 812**

IN WITNESS WHEREOF, each Grantor and the Administrative Agent have executed this Security Agreement as of the date first above written.

<u>**GRANTORS**</u>

CARNABY INVENTORY III, LLC

By: _____

Name:     Shekhar Kumar
Title:      Managing Director

CARNABY INVENTORY HOLDINGS III, LLC

By: _____

Name:     Shekhar Kumar
Title:      Managing Director

Signature Page to Pledge and Security Agreement

**JOINT EXHIBIT NO. 18**
**Page 541 of 812**

GLAS Trust Company LLC,
as Administrative Agent

By: _____

Name:     Yana Kislenko

Title:     Vice President

Schedule 3.04

Intellectual Property

None.

BUSINESS.29164507.2

<u>Schedule 3.05</u>

Pledged Stock

| Owner | Issuer | Percentage of Interest Owned | Number of Units |
|---|---|---|---|
| Carnaby Inventory Holdings III, LLC | Carnaby Inventory III, LLC | 100% | 100 |

BUSINESS.29164507.2

**EXHIBIT A**

**FORM OF COPYRIGHT SECURITY AGREEMENT**

COPYRIGHT SECURITY AGREEMENT dated as of [☐], 20[☐] (this "**Copyright Security Agreement**"), by and [between][among] [☐], a [☐] ([each, a][the] "**Grantor**") and [_____], as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Administrative Agent**") for the Secured Parties (as defined in the Credit Agreement).

Reference is made to that certain Credit Agreement, dated as of [____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Carnaby Inventory III, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors, the Administrative Agent and the Lenders from time to time parties thereto, among others.

Reference is also made [ to that certain Joinder No. [☐] dated as of [☐], 20[☐], by [and among ][☐] [and [☐] ]and acknowledged and agreed by the Administrative Agent,][1] to that certain Pledge and Security Agreement dated as of [____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and among the Borrower, the other Grantors (as defined therein) and the Administrative Agent for the benefit of the Secured Parties.

The Lenders (as defined in the Credit Agreement) have extended credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement.  Consistent with the requirements set forth in Section 4.1 of the Credit Agreement [and Section 4.03(c) of the Security Agreement], the parties hereto agree as follows:

SECTION 1.  <u>Terms</u>.  Capitalized terms used herein and not otherwise defined herein have the meanings specified in the Security Agreement.

SECTION 2.  <u>Grant of Security Interest</u>.  As security for the prompt and complete payment or performance, as the case may be, in full of the Obligations, [each][the] Grantor, pursuant to the Security Agreement, did and hereby does pledge, collaterally assign and grant to the Administrative Agent, its successors and permitted assigns, on behalf of and for the benefit of the Secured Parties, a continuing security interest in all of its right, title and interest in, to and under all of the following assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of [such][the] Grantor, and regardless of where located (collectively, the "**Copyright Collateral**"):

>    (a) all copyrights, rights and interests in copyrights, works protectable by copyright whether published or unpublished, registrations and copyright applications (including but not limited to the Copyright registrations and applications and the exclusive Copyright Licenses set forth on <u>Schedule I</u> hereto); (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past, present or future infringements for any of the foregoing; (d) the right to sue for past, present, and future infringements of any of the foregoing; and (e) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

---

[1] To be used after a Joinder by a new Grantor.

A-1

**JOINT EXHIBIT NO. 18**
**Page 545 of 812**

SECTION 3.  Security Agreement.  The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement.  [Each][The] Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Copyright Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.  In the event of any conflict between the terms of this Copyright Security Agreement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4.  Governing Law.  This Copyright Security Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

SECTION 5.  Counterparts.  This Copyright Security Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

[*Signature Pages Follow*]

A-2

BUSINESS.29164507.2

IN WITNESS WHEREOF, the parties hereto have duly executed this Copyright Security Agreement as of the day and year first above written.

[□]

By:_____
    Name:  [□]
    Title:   [□]

[Signature Page to Copyright Security Agreement]

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**
**Page 547 of 812**

[_____],
as Administrative Agent


By:_____
    Name:
    Title:

[Signature Page to Copyright Security Agreement]

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**

## SCHEDULE I

COPYRIGHTS

| REGISTERED OWNER | REGISTRATION NUMBER | REGISTRATION DATE | TITLE |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

COPYRIGHT APPLICATIONS

| APPLICANT | APPLICATION NUMBER | FILING DATE | TITLE |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

EXCLUSIVE COPYRIGHT LICENSES

BUSINESS.29164507.2

**ANNEX A TO COPYRIGHT SECURITY AGREEMENT**

**FORM OF COPYRIGHT SECURITY AGREEMENT SUPPLEMENT**

COPYRIGHT SECURITY AGREEMENT SUPPLEMENT dated as of [☐], 20[☐] (this "**Copyright Security Agreement Supplement**"), by and [between][among] [☐], a [☐] ([each, a][the] "**Grantor**") and [_____], as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Administrative Agent**") for the Secured Parties (as defined in the Credit Agreement).

Reference is made to that certain Credit Agreement, dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Carnaby Inventory III, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors, the Administrative Agent and the Lenders from time to time parties thereto, among others.

Reference is also made [ to that certain Joinder No. [☐] dated as of [☐], 20[☐], by [and among ][☐] [and [☐] ]and acknowledged and agreed by the Administrative Agent,][2] to that certain Pledge and Security Agreement dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and among the Borrower, the other Grantors (as defined therein) and the Administrative Agent for the benefit of the Secured Parties.

Reference is also made to that certain Copyright Security Agreement, dated as of [☐], 20[☐] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time and in effect on the date hereof, the "**Copyright Security Agreement**") by and [between][among] the Grantor[s] thereto and the Administrative Agent for the Secured Parties.

The Lenders have extended credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement. Under the terms of the Security Agreement, [each][the] Grantor has granted to the Administrative Agent for the benefit of the Secured Parties a security interest in the Additional Copyright Collateral (as defined below) and has agreed, consistent with the requirements of Section 4.03(c) of the Security Agreement, to execute this Copyright Security Agreement Supplement. Now, therefore, the parties hereto agree as follows:

SECTION 1. Terms. Capitalized terms used in this Copyright Security Agreement Supplement and not otherwise defined herein have the meanings specified in the Security Agreement.

SECTION 2. Grant of Security Interest. As security for the prompt and complete payment or performance, as the case may be, in full of the Obligations, [each][the] Grantor, pursuant to the Security Agreement, did and hereby does pledge, collaterally assign and grant to the Administrative Agent, its successors and permitted assigns, on behalf of and for the benefit of the Secured Parties, a continuing security interest in all of its right, title and interest in, to and under all of the following assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of [such][the] Grantor, and regardless of where located (collectively, the "**Additional Copyright Collateral**"):

---

[2] To be used after a Joinder by a new Grantor.

Annex A-1

BUSINESS.29164507.2

(a) all copyrights, rights and interests in copyrights, works protectable by copyright whether published or unpublished, registrations and copyright applications (including but not limited to the Copyright registrations and applications and exclusive Copyright License set forth on Schedule I hereto); (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past, present or future infringements for any of the foregoing; (d) the right to sue for past, present, and future infringements of any of the foregoing; and (e) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

SECTION 3.  Security Agreement.  The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement.  [Each][The] Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Additional Copyright Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.  In the event of any conflict between the terms of this Copyright Security Agreement Supplement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4.  Governing Law.  This Copyright Security Agreement Supplement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

SECTION 5.  Counterparts.  This Copyright Security Agreement Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

[*Signature Pages Follow*]

Annex A-2

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**
**Page 551 of 812**

IN WITNESS WHEREOF, the parties hereto have duly executed this Copyright Security Agreement Supplement as of the day and year first above written.

[□]

By:_____
    Name:   [□]
    Title:   [□]

[Signature Page to Copyright Security Agreement Supplement]

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**
**Page 552 of 812**

[_____],
as Administrative Agent


By:_____
    Name:
    Title:

[Signature Page to Copyright Security Agreement Supplement]

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**
**Page 553 of 812**

## SCHEDULE I

COPYRIGHTS

| REGISTERED OWNER | REGISTRATION NUMBER | REGISTRATION DATE | TITLE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

COPYRIGHT APPLICATIONS

| APPLICANT | APPLICATION NUMBER | FILING DATE | TITLE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

EXCLUSIVE COPYRIGHT LICENSES

BUSINESS.29164507.2

**EXHIBIT B**

**FORM OF PATENT SECURITY AGREEMENT**

PATENT SECURITY AGREEMENT dated as of [□], 20[□] (this "**Patent Security Agreement**"), by and [between][among] [□], a [□] ([each, a][the] "**Grantor**") and [_____], as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Administrative Agent**") for the Secured Parties (as defined in the Credit Agreement).

Reference is made to that certain Credit Agreement, dated as of [____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Carnaby Inventory III, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors, the Administrative Agent and the Lenders from time to time parties thereto, among others.

Reference is also made [ to that certain Joinder No. [□] dated as of [□], 20[□], by [and among ][□] [and [□] ]and acknowledged and agreed by the Administrative Agent,][3] to that certain Pledge and Security Agreement dated as of [____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and among the Borrower, the other Grantors (as defined therein) and the Administrative Agent for the benefit of the Secured Parties.

The Lenders have extended credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement.  Consistent with the requirements set forth in Section 4.1 of the Credit Agreement [and Section 4.03(c) of the Security Agreement], the parties hereto agree as follows:

SECTION 1.  Terms.  Capitalized terms used herein and not otherwise defined herein have the meanings specified in the Security Agreement.

SECTION 2.  Grant of Security Interest.  As security for the prompt and complete payment or performance, as the case may be, in full of the Obligations, [each][the] Grantor, pursuant to the Security Agreement, did and hereby does pledge, collaterally assign and grant to the Administrative Agent, its successors and permitted assigns, on behalf of and for the benefit of the Secured Parties, a continuing security interest in all of its right, title and interest in, to and under all of the following assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of [such][the] Grantor, and regardless of where located (collectively, the "**Patent Collateral**"):

(a) any and all patents and patent applications (including but not limited to the patents and patent applications listed on Schedule I hereto); (b) all inventions described and claimed therein; (c) all reissues, divisions, continuations, renewals, extensions, reexaminations and continuations in part thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past, present and future infringements thereof; (e) all rights to sue for past, present, and future infringements thereof; and (f) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

SECTION 3.   Security Agreement.  The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement.  [Each][The] Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Patent Collateral are more fully set

---

[3] To be used after a Joinder by a new Grantor.

B-1

BUSINESS.29164507.2

forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.  In the event of any conflict between the terms of this Patent Security Agreement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4.  Governing Law.   This Patent Security Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

SECTION 5.  Counterparts.  This Patent Security Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

[Signature Pages Follow]

B-2

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**
**Page 556 of 812**

IN WITNESS WHEREOF, the parties hereto have duly executed this Patent Security Agreement as of the day and year first above written.

[□]

By:_____
    Name:  [□]
    Title:   [□]

[Signature Page to Patent Security Agreement]

**JOINT EXHIBIT NO. 18**
**Page 557 of 812**

[_____],
as Administrative Agent

By:_____
   Name:
   Title:

[Signature Page to Patent Security Agreement]

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**

## SCHEDULE I

PATENTS

| REGISTERED OWNER | PATENT NO. | ISSUE DATE | TITLE |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

PATENT APPLICATIONS

| APPLICANT | APPLICATION NO. | FILING DATE | TITLE |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

BUSINESS.29164507.2

**ANNEX A TO PATENT SECURITY AGREEMENT**

**FORM OF PATENT SECURITY AGREEMENT SUPPLEMENT**

PATENT SECURITY AGREEMENT SUPPLEMENT dated as of [☐], 20[☐] (this "**Patent Security Agreement Supplement**"), by and [between][among] [☐], a [☐] ([each, a][the] "**Grantor**") and KeyBank National Association, as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Administrative Agent**") for the Secured Parties (as defined in the Credit Agreement).

Reference is made to that certain Credit Agreement, dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Carnaby Inventory III, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors, the Administrative Agent and the Lenders from time to time parties thereto, among others.

Reference is also made [ to that certain Joinder No. [☐] dated as of [☐], 20[☐], by [and among ][☐] [and [☐] ]and acknowledged and agreed by the Administrative Agent,][4] to that certain Pledge and Security Agreement dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and among the Borrower, the other Grantors (as defined therein) and the Administrative Agent for the benefit of the Secured Parties.

Reference is also made to that certain Patent Security Agreement, dated as of [☐], 20[☐] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time and in effect on the date hereof, the "**Patent Security Agreement**") by and [between][among] the Grantor[s] thereto and the Administrative Agent for the Secured Parties.

The Lenders (as defined in the Credit Agreement) have extended credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement. Under the terms of the Security Agreement, [each][the] Grantor has granted to the Administrative Agent for the benefit of the Secured Parties a security interest in the Additional Patent Collateral (as defined below) and has agreed, consistent with the requirements of Section 4.03(c) of the Security Agreement, to execute this Patent Security Agreement Supplement. Now, therefore, the parties hereto agree as follows:

SECTION 1. <u>Terms</u>. Capitalized terms used in this Patent Security Agreement Supplement and not otherwise defined herein have the meanings specified in the Security Agreement.

SECTION 2. <u>Grant of Security Interest</u>. As security for the prompt and complete payment or performance, as the case may be, in full of the Obligations, [each][the] Grantor, pursuant to the Security Agreement, did and hereby does pledge, collaterally assign and grant to the Administrative Agent, its successors and permitted assigns, on behalf of and for the benefit of the Secured Parties, a continuing security interest in all of its right, title and interest in, to and under all of the following assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of [such][the] Grantor, and regardless of where located (collectively, the "**Additional Patent Collateral**"):

---

[4] To be used after a Joinder by a new Grantor.

Annex A-1

BUSINESS.29164507.2

(a) any and all patents and patent applications (including but not limited to the patents and patent applications listed on Schedule I hereto); (b) all inventions described and claimed therein; (c) all reissues, divisions, continuations, renewals, extensions, reexaminations and continuations in part thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past, present and future infringements thereof; (e) all rights to sue for past, present, and future infringements thereof; and (f) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

SECTION 3. Security Agreement. The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement. [Each][The] Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Additional Patent Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein. In the event of any conflict between the terms of this Patent Security Agreement Supplement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4. Governing Law. This Patent Security Agreement Supplement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

SECTION 5. Counterparts. This Patent Security Agreement Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

[*Signature Pages Follow*]

<div align="center">Annex A-2</div>

<div align="center">**JOINT EXHIBIT NO. 18**
**Page 561 of 812**</div>

IN WITNESS WHEREOF, the parties hereto have duly executed this Patent Security Agreement Supplement as of the day and year first above written.

[□]

By:_____
  Name:  [□]
  Title:  [□]

[_____],
as Administrative Agent


By:_____
   Name:
   Title:

[Signature Page to Patent Security Agreement Supplement]

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**

## SCHEDULE I

PATENTS

| REGISTERED OWNER | PATENT NO. | ISSUE DATE | TITLE |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

PATENT APPLICATIONS

| APPLICANT | APPLICATION NO. | FILING DATE | TITLE |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

C-1

BUSINESS.29164507.2

**EXHIBIT C**

**FORM OF TRADEMARK SECURITY AGREEMENT**

TRADEMARK SECURITY AGREEMENT dated as of [ ], 20[ ] (this "**Trademark Security Agreement**"), by and [between][among] [ ], a [ ] ([each, a][the] "**Grantor**") and KeyBank National Association, as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Administrative Agent**") for the Secured Parties (as defined in the Credit Agreement).

Reference is made to that certain Credit Agreement, dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Carnaby Inventory III, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors, the Administrative Agent and the Lenders from time to time parties thereto, among others.

Reference is also made [ to that certain Joinder No. [ ] dated as of [ ], 20[ ], by [and among ][ ] [and [ ] ]and acknowledged and agreed by the Administrative Agent,][5] to that certain Pledge and Security Agreement dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and among the Borrower, the other Grantors (as defined therein) and the Administrative Agent for the benefit of the Secured Parties.

The Lenders have extended credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement.  Consistent with the requirements set forth in Section 4.01 of the Credit Agreement [and Section 4.03(c) of the Security Agreement], the parties hereto agree as follows:

SECTION 1.  Terms.  Capitalized terms used herein and not otherwise defined herein have the meanings specified in the Security Agreement.

SECTION 2.  Grant of Security Interest.  As security for the prompt and complete payment or performance, as the case may be, in full of the Obligations, [each][the] Grantor, pursuant to the Security Agreement, did and hereby does pledge, collaterally assign and grant to the Administrative Agent, its successors and permitted assigns, on behalf of and for the benefit of the Secured Parties, a continuing security interest in all of its right, title and interest in, to and under all of the following assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of [such][the] Grantor, and regardless of where located (collectively, the "**Trademark Collateral**"):

(a) all trademarks (including service marks), common law marks, trade names, trade dress, domain names and logos, slogans and other indicia of origin under the laws of any jurisdiction in the world, and the registrations and applications for registration thereof (including but not limited to the Trademark registrations and applications listed on Schedule I hereto); and the goodwill of the business connected with the use of and symbolized by the foregoing; (b) all renewals of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims and payments for past, present and future infringements or dilutions thereof; (d) all rights to sue for past, present, and future infringements or dilutions of any of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (e) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

---

[5] To be used after a Joinder by a new Grantor.

C-1

BUSINESS.29164507.2

SECTION 3.  Security Agreement.  The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement.  [Each][The] Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Trademark Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.  In the event of any conflict between the terms of this Trademark Security Agreement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4.  Governing Law.  This Trademark Security Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

SECTION 5.  Counterparts.  This Trademark Security Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

[*Signature Pages Follow*]

C-2

BUSINESS.29164507.2

IN WITNESS WHEREOF, the parties hereto have duly executed this Trademark Security Agreement as of the day and year first above written.

[☐]

By: _____
    Name:  [☐]
    Title:  [☐]

**JOINT EXHIBIT NO. 18**
**Page 567 of 812**

[_____],
as Administrative Agent


By:_____
   Name:
   Title:

[Signature Page to Trademark Security Agreement]

BUSINESS.29164507.2

### <u>SCHEDULE I</u>

TRADEMARKS

| REGISTERED OWNER | REGISTRATION NUMBER | REGISTRATION DATE | TRADEMARK |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

TRADEMARK APPLICATIONS

| APPLICANT | APPLICATION NO. | FILING DATE | TRADEMARK |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

BUSINESS.29164507.2

**ANNEX A TO TRADEMARK SECURITY AGREEMENT**

**FORM OF TRADEMARK SECURITY AGREEMENT SUPPLEMENT**

TRADEMARK SECURITY AGREEMENT SUPPLEMENT dated as of [ ], 20[ ] (this "**Trademark Security Agreement Supplement**"), by and [between][among] [ ], a [ ] ([each, a][the] "**Grantor**") and KeyBank National Association, as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Administrative Agent**") for the Secured Parties (as defined in the Credit Agreement).

Reference is made to that certain Credit Agreement, dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Carnaby Inventory III, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors, the Administrative Agent and the Lenders from time to time parties thereto.

Reference is also made [ to that certain Joinder No. [ ] dated as of [ ], 20[ ], by [and among ][ ] [and [ ] ]and acknowledged and agreed by the Administrative Agent,][6] to that certain Pledge and Security Agreement dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and among the Borrower, the other Grantors (as defined therein) and the Administrative Agent for the benefit of the Secured Parties.

Reference is also made to that certain Trademark Security Agreement, dated as of [ ], 20[ ] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time and in effect on the date hereof, the "**Trademark Security Agreement**") by and [between][among] the Grantor[s] thereto and the Administrative Agent for the Secured Parties.

The Lenders have extended credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement.  Under the terms of the Security Agreement, [each][the] Grantor has granted to the Administrative Agent for the benefit of the Secured Parties a security interest in the Additional Trademark Collateral (as defined below) and has agreed, consistent with the requirements of Section 4.03(c) of the Security Agreement, to execute this Trademark Security Agreement Supplement.  Now, therefore, the parties hereto agree as follows

SECTION 1.  Terms.  Capitalized terms used in this Trademark Security Agreement Supplement and not otherwise defined herein have the meanings specified in the Security Agreement.

SECTION 2.  Grant of Security Interest.  As security for the prompt and complete payment or performance, as the case may be, in full of the Obligations, [each][the] Grantor, pursuant to the Security Agreement, did and hereby does pledge, collaterally assign and grant to the Administrative Agent, its successors and permitted assigns, on behalf of and for the ratable benefit of the Secured Parties, a continuing security interest in all of its right, title or interest in, to or under all of the following assets, whether now owned or at any time hereafter acquired by or arising in favor of the [such][the] Grantor and regardless of where located (collectively, the "**Additional Trademark Collateral**"):

> (a) all trademarks (including service marks), common law marks, trade names, trade dress, domain names and logos, slogans and other indicia of origin under the laws of any jurisdiction in the world, and the registrations and applications for registration thereof (including but not limited

---

[6] To be used after a Joinder by a new Grantor.

Annex A-1

BUSINESS.29164507.2

to the Trademark registrations and applications listed on <u>Schedule I</u> hereto); and the goodwill of the business connected with the use of and symbolized by the foregoing; (b) all renewals of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims and payments for past, present and future infringements or dilutions thereof; (d) all rights to sue for past, present, and future infringements or dilutions of any of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (e) all rights corresponding to any of the foregoing, in each case, excluding any items constituting Excluded Assets and/or otherwise expressly limited or excluded by the Collateral and Guarantee Requirements.

SECTION 3.  <u>Security Agreement</u>.  The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement.  [Each][The] Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Additional Trademark Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.  In the event of any conflict between the terms of this Trademark Security Agreement Supplement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4.  <u>Governing Law</u>.  This Trademark Security Agreement Supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 5.  <u>Counterparts</u>.  This Trademark Security Agreement Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

[*Signature Pages Follow*]

Annex A-2

BUSINESS.29164507.2

IN WITNESS WHEREOF, the parties hereto have duly executed this Trademark Security Agreement Supplement as of the day and year first above written.

[☐]
By:_____
    Name:  [☐]
    Title:  [☐]

[Signature Page to Trademark Security Agreement Supplement]

BUSINESS.29164507.2

[_____],
as Administrative Agent


By:_____
    Name:
    Title:

[Signature Page to Trademark Security Agreement Supplement]

BUSINESS.29164507.2

## <u>SCHEDULE I</u>

TRADEMARKS

| REGISTERED OWNER | REGISTRATION NUMBER | REGISTRATION DATE | TRADEMARK |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

TRADEMARK APPLICATIONS

| APPLICANT | APPLICATION NO. | FILING DATE | TRADEMARK |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

BUSINESS.29164507.2

**EXHIBIT D**

**FORM OF SECURITY AGREEMENT JOINDER**

JOINDER NO. [□] dated as of [□] (this "**Joinder**"), to the Pledge and Security Agreement, dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), by and among Carnaby Inventory III, LLC, a Delaware limited liability company (the "**Borrower**"), the other Grantors (as defined below) and [_____], in its capacities as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Administrative Agent**") for the Secured Parties.

A.        Reference is made to that certain Credit Agreement, dated as of [_____], 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Parent, Borrower, Holdings (as defined therein), the Administrative Agent and the Lenders from time to time parties thereto, among others.

B.        Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement or the Security Agreement, as applicable.

C.        [The][Each] undersigned Subsidiary ([each a][the] "**New Subsidiary**") is executing this Joinder in accordance with Section 7.10 of the Security Agreement and Section 5.1(p) of the Credit Agreement, each of which require that each additional Subsidiary of the Borrower becomes a Grantor under the Security Agreement by executing and delivering an instrument in the form of this Joinder in order to induce the Lenders to make additional Loans and as consideration for Loans previously made.

Accordingly, the Administrative Agent and [each][the] New Subsidiary agree as follows:

SECTION 1.    In accordance with Section 7.10 of the Security Agreement, [the][each] New Subsidiary by its signature below becomes a Grantor under the Security Agreement with the same force and effect as if originally named therein as a Grantor, and [the][each] New Subsidiary hereby (a) agrees to all the terms and provisions of the Security Agreement applicable to it as a Grantor thereunder and (b) represents and warrants that the applicable representations and warranties made by it as a Grantor thereunder shall be true and correct in all material respects (without duplication of any materiality qualifier therein) as of the date hereof, except that any such representation and warranty that expressly relates to a given date or period shall be true and correct in all material respects (without duplication of any materiality qualifier therein) as of the respective date or for the respective period, as the case may be.  In furtherance of the foregoing, [the][each] New Subsidiary, as security for the prompt and complete payment and performance, as the case may be, in full when due (whether at stated maturity, by acceleration or otherwise) of the Obligations, hereby pledges and grants to the Administrative Agent, for the benefit of the Secured Parties, a continuing security interest in all of [the][each] New Subsidiary's right, title and interest in, to and under the Collateral of [the][each] New Subsidiary to the extent provided in Section 2.01 of the Security Agreement.  Upon the effectiveness of this Joinder, each reference to a "Grantor" in the Security Agreement shall be deemed to include [the][each] New Subsidiary.  The Security Agreement is hereby incorporated herein by reference.

SECTION 2.    [The][Each] New Subsidiary represents and warrants to the Administrative Agent and the other Secured Parties that this Joinder has been duly authorized by all necessary corporate or other organizational action of [the][such] New Subsidiary, executed and delivered by it and is a legal, valid and binding obligation of [the][such] New Subsidiary, enforceable against [the][such] New Subsidiary in accordance with its terms, subject to any applicable bankruptcy, insolvency, reorganization or other similar

D-1

BUSINESS.29164507.2

laws relating to or limiting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

SECTION 3.    This Joinder may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Joinder shall become effective when the Administrative Agent has received a counterpart hereof that bears the signature of [the][each] New Subsidiary.  Delivery of an executed signature page to this Joinder by facsimile transmission or by email as a ".pdf" or ".tiff" attachment shall be as effective as delivery of a manually executed counterpart of this Joinder.

SECTION 4.    [Reserved].

SECTION 5.    Except as expressly supplemented hereby, the Security Agreement shall remain in full force and effect.

SECTION 6.    THIS JOINDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

SECTION 7.    To the extent permitted by law, any provision of any Transaction Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.    All notices and other communications provided for in this Joinder (except as otherwise permitted herein) shall be delivered in accordance with Section 8.01 of the Security Agreement *mutatis mutandis*.

SECTION 9.    [The][Each] New Subsidiary agrees to reimburse the Administrative Agent for all reasonable and documented out-of-pocket expenses incurred by it in connection with this Joinder, pursuant to and to the extent required by Section 9.1) of the Credit Agreement.

SECTION 10.   This Joinder shall constitute a Transaction Document, under and as defined in, the Credit Agreement.

[*Signature pages follow*]

D-2

BUSINESS.29164507.2

IN WITNESS WHEREOF, [the][each] New Subsidiary has duly executed this Joinder to the Security Agreement, and the Administrative Agent, for the benefit of the Secured Parties, has caused the same to be accepted, as of the day and year first above written.

[NAME OF NEW SUBSIDIARY]

By: _____
      Name:
      Title:

[Signature Page to Security Agreement Joinder]

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**
**Page 577 of 812**

ACKNOWLEDGED AND ACCEPTED:

[_____],
as Administrative Agent

By:_____
    Name:
    Title:

[Signature Page to Security Agreement Joinder]

BUSINESS.29164507.2

**JOINT EXHIBIT NO. 18**
**Page 578 of 812**



**CT Corporation**
a Wolters Kluwer Business

## Search Results

**Date:** 09/23/2025
**JADE JANG**
**Dechert LLP**
**Order #:** 105864288
**1095 Avenue of the Americas**
**Customer #:** 507533
**New York, NY 10036-6797**
**Reference 1:** 190343
**Reference 2:** --

**Target Name: Carnaby Inventory II, LLC**

**Jurisdiction: Secretary of State, Delaware**

| | | |
|---|---|---|
| **Search Type: Federal Tax Lien** | | **Searched Through: 09/05/2025** |
| Results: | No Records Found /See Attached Certified Search | Searched: 10 Years |
| **Search Type: UCC Lien** | | **Searched Through: 09/05/2025** |
| Results: | See Attached Certified Search with 3 Copies Attached | Searched: 5 Years |

**TERRI FAULKS**
**UCC Team 6**
**4400 Easton Commons Way**
**Suite 125**
**Columbus, OH 43219**
**800-713-0755**
**terri.faulks@wolterskluwer.com**

This report contains information compiled from sources which CT Corporation considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Corporation does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Corporation is not an insurer with regard to this information or these services. Under no circumstances shall CT Corporation be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings .



# Delaware

Page 1

The First State

CERTIFICATE

SEARCHED SEPTEMBER 23, 2025 AT 1:27 P.M.
FOR DEBTOR, CARNABY INVENTORY II, LLC

| | | |
|---|---|---|
| 1 OF 2 | FINANCING STATEMENT | 20224581377 |

EXPIRATION DATE: 05/31/2027

| | | | |
|---|---|---|---|
| DEBTOR: | CARNABY INVENTORY II, LLC | | |
| | 1540 BROADWAY, SUITE 3710 | ADDED | 05-31-22 |
| | NEW YORK, NY US 10001 | REMOVED | 06-09-22 |
| DEBTOR: | CARNABY INVENTORY II, LLC | | |
| | 3010 LBJ FREEWAY, SUITE 1200 | ADDED | 06-09-22 |
| | DALLAS, TX US 75234 | | |
| SECURED: | GLAS TRUST COMPANY LLC | | |
| | 3 SECOND STREET, SUITE 206 | ADDED | 05-31-22 |
| | JERSEY CITY, NJ US 07311 | | |

## F I L I N G   H I S T O R Y

| | | | |
|---|---|---|---|
| 20224581377 | FILED 05-31-22 | AT 9:59 P.M. | FINANCING STATEMENT |
| 20224870168 | FILED 06-09-22 | AT 7:46 P.M. | AMENDMENT |

| | | |
|---|---|---|
| 2 OF 2 | FINANCING STATEMENT | 20224634697 |



*Charuni Patibanda-Sanchez, Secretary of State*

20263891444-UCC11
SR# 20254056619

Authentication: 204831218
Date: 09-23-25

You may verify this certificate online at corp.delaware.gov/authver.shtml



# Delaware

### The First State

Page 2

EXPIRATION DATE: 06/02/2027

DEBTOR:        CARNABY INVENTORY II, LLC

3010 LBJ FREEWAY, SUITE 1200          ADDED    06-02-22

DALLAS, TX US 75234

SECURED:       GLAS TRUST COMPANY LLC

3 SECOND STREET, SUITE 206           ADDED    06-02-22

JERSEY CITY, NJ US 07311

FILING   HISTORY

20224634697    FILED 06-02-22   AT 12:39 P.M.   FINANCING STATEMENT

END   OF   FILING   HISTORY

THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE ABOVE LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING STATEMENTS, FEDERAL TAX LIENS AND UTILITY SECURITY INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE ABOVE DEBTOR, CARNABY INVENTORY II, LLC AS OF SEPTEMBER 5, 2025 AT 11:59 P.M.



*C. B. Sanchez*

Charuni Patibanda-Sanchez, Secretary of State

20263891444-UCC11
SR# 20254056619

Authentication: 204831218
Date: 09-23-25

You may verify this certificate online at corp.delaware.gov/authver.shtml

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 09:59 PM 05/31/2022**
**U.C.C. Initial Filing No: 2022 4581377**

**Service Request No:   20222545108**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Carnaby Inventory II, LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 1540 Broadway, Suite 3710 | New York | NY  10001 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GLAS Trust Company LLC | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 3 Second Street, Suite 206 | Jersey City | NJ  07311 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
**All assets of the Debtor whether now owned or hereafter acquired and any proceeds thereof.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 07:46 PM 06/09/2022**
**U.C.C. Initial Filing No: 2022 4581377**
**Amendment No: 2022 4870168**
**Service Request No:   20222680307**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**20224581377**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☑ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:

This Change affects ☑ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☑ CHANGE name and/or address. Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name. Complete item 7a or 7b, and item 7c
☐ DELETE name. Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Carnaby Inventory II, LLC** | | | |
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Carnaby Inventory II, LLC** | | | |
| 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **3010 LBJ Freeway, Suite 1200** | **Dallas** | **TX** | **75234** | **USA** |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR check here ☑ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Carnaby Inventory II, LLC** | | | |
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

**UCC FINANCING STATEMENT**

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Delaware Department of State
U.C.C. Filing Section
Filed: 12:39 PM 06/02/2022
U.C.C. Initial Filing No: 2022 4634697

Service Request No:  20222599764

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Carnaby Inventory II, LLC** | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **3010 LBJ Freeway, Suite 1200** | **Dallas** | **TX** | **75234** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **GLAS Trust Company LLC** | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **3 Second Street, Suite 206** | **Jersey City** | **NJ** | **07311** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
**All assets of the Debtor whether now owned or hereafter acquired and any proceeds thereof.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

**JOINT EXHIBIT NO. 18**
**Page 584 of 812**



**CT Corporation**
a Wolters Kluwer Business

## Search Results

| | |
|---|---|
| **JADE JANG** | **Date:** 09/23/2025 |
| **Dechert LLP** | **Order #:** 105864288 |
| **1095 Avenue of the Americas** | **Customer #:** 507533 |
| **New York, NY 10036-6797** | **Reference 1:** 190343 |
| | **Reference 2:** -- |

**Target Name: Carnaby Inventory III, LLC**

**Jurisdiction: Secretary of State, Delaware**

| | | |
|---|---|---|
| **Search Type: Federal Tax Lien** | | **Searched Through:** 09/05/2025 |
| Results: | No Records Found /See Attached Certified Search | Searched: 10 Years |
| **Search Type: UCC Lien** | | **Searched Through:** 09/05/2025 |
| Results: | See Attached Certified Search with 1 Copy Attached | Searched: 5 Years |

**TERRI FAULKS**
**UCC Team 6**
**4400 Easton Commons Way**
**Suite 125**
**Columbus, OH 43219**
**800-713-0755**
**terri.faulks@wolterskluwer.com**

This report contains information compiled from sources which CT Corporation considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Corporation does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Corporation is not an insurer with regard to this information or these services. Under no circumstances shall CT Corporation be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings .

1 of 1



# Delaware

## The First State

Page 1

CERTIFICATE

SEARCHED SEPTEMBER 23, 2025 AT 1:30 P.M.
FOR DEBTOR, CARNABY INVENTORY III, LLC

1 OF 1            FINANCING STATEMENT                20225629043

                EXPIRATION DATE: 07/06/2027
DEBTOR:        CARNABY INVENTORY III, LLC

              3010 LBJ FREEWAY, SUITE 1200          ADDED    07-06-22

              DALLAS, TX US 75234

SECURED:       GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT

              3 SECOND STREET, SUITE 206            ADDED    07-06-22

              JERSEY CITY, NJ US 07311


              F I L I N G   H I S T O R Y

    20225629043    FILED 07-06-22    AT 3:58 P.M.    FINANCING STATEMENT


        E N D   O F   F I L I N G   H I S T O R Y

      THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE ABOVE
LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING STATEMENTS,
FEDERAL TAX LIENS AND UTILITY SECURITY INSTRUMENTS FILED IN THIS
OFFICE WHICH NAME THE ABOVE DEBTOR, CARNABY INVENTORY III, LLC AS OF
SEPTEMBER 5, 2025 AT 11:59 P.M.

Charuni Patibanda-Sanchez, Secretary of State

20263891507-UCC11                              Authentication: 204831253
SR# 20254056645                                        Date: 09-23-25

You may verify this certificate online at corp.delaware.gov/authver.shtml

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Jaclyn Flood

**B. E-MAIL CONTACT AT FILER (optional)**
jaclyn.flood@dechert.com

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

Delaware Department of State
U.C.C. Filing Section
Filed: 03:58 PM 07/06/2022
U.C.C. Initial Filing No: 2022 5629043

Service Request No:  20222918245

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Carnaby Inventory III, LLC** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **3010 LBJ Freeway, Suite 1200** | **Dallas** | **TX** | **75234** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **GLAS Trust Company LLC, as Administrative Agent** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **3 Second Street, Suite 206** | **Jersey City** | **NJ** | **07311** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**All assets of Debtor whether now owned or hereafter acquired or arising and wherever located.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**Filed with: Delaware Secretary of State**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

**CT Corporation**
a Wolters Kluwer Business

## Search Results

JADE JANG
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797

Date: 09/23/2025
Order #: 105864288
Customer #: 507533
Reference 1: 190343
Reference 2: --

**Target Name: Carnaby Inventory Holdings II, LLC**

**Jurisdiction: Secretary of State, Delaware**

| | |
|---|---|
| **Search Type: Federal Tax Lien** | **Searched Through: 09/05/2025** |
| Results:  No Records Found /See Attached Certified Search | Searched: 10 Years |
| **Search Type: UCC Lien** | **Searched Through: 09/05/2025** |
| Results:  See Attached Certified Search with 3 Copies Attached | Searched: 5 Years |

TERRI FAULKS
UCC Team 6
4400 Easton Commons Way
Suite 125
Columbus, OH 43219
800-713-0755
terri.faulks@wolterskluwer.com

This report contains information compiled from sources which CT Corporation considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Corporation does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Corporation is not an insurer with regard to this information or these services. Under no circumstances shall CT Corporation be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings .

1 of 1

**JOINT EXHIBIT NO. 18**
**Page 588 of 812**

# Delaware

Page 1

### The First State

CERTIFICATE

SEARCHED SEPTEMBER 23, 2025 AT 1:30 P.M.
FOR DEBTOR, CARNABY INVENTORY HOLDINGS II, LLC

1 OF 2            FINANCING STATEMENT                20224581310

EXPIRATION DATE: 05/31/2027

DEBTOR:        CARNABY INVENTORY HOLDINGS II, LLC

1540 BROADWAY, SUITE 3710              ADDED    05-31-22

NEW YORK, NY US 10001                  REMOVED 06-09-22

DEBTOR:        CARNABY INVENTORY HOLDINGS II, LLC

3010 LBJ FREEWAY, SUITE 1200           ADDED    06-09-22

DALLAS, TX US 75234

SECURED:       GLAS TRUST COMPANY LLC

3 SECOND STREET, SUITE 206             ADDED    05-31-22

JERSEY CITY, NJ US 07311


F I L I N G   H I S T O R Y

20224581310    FILED 05-31-22    AT 9:58 P.M.    FINANCING STATEMENT

20224869806    FILED 06-09-22    AT 7:28 P.M.    AMENDMENT


2 OF 2            FINANCING STATEMENT                20224634796


Charuni Patibanda-Sanchez, Secretary of State

20263891582-UCC11
SR# 20254056692

Authentication: 204831292
Date: 09-23-25

You may verify this certificate online at corp.delaware.gov/authver.shtml

**JOINT EXHIBIT NO. 18**
**Page 589 of 812**



# Delaware

### The First State

Page 2

EXPIRATION DATE: 06/02/2027

DEBTOR:     CARNABY INVENTORY HOLDINGS II, LLC

3010 LBJ FREEWAY, SUITE 1200          ADDED    06-02-22

DALLAS, TX US 75234

SECURED:    GLAS TRUST COMPANY LLC

3 SECOND STREET, SUITE 206            ADDED    06-02-22

JERSEY CITY, NJ US 07311

## F I L I N G   H I S T O R Y

20224634796    FILED 06-02-22   AT 12:42 P.M.   FINANCING STATEMENT

## E N D   O F   F I L I N G   H I S T O R Y

THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE ABOVE
LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING STATEMENTS,
FEDERAL TAX LIENS AND UTILITY SECURITY INSTRUMENTS FILED IN THIS
OFFICE WHICH NAME THE ABOVE DEBTOR, CARNABY INVENTORY HOLDINGS II, LLC
AS OF SEPTEMBER 5, 2025 AT 11:59 P.M.



_C. B. Sanchez_
_____
Charuni Patibanda-Sanchez, Secretary of State

20263891582-UCC11                                    Authentication: 204831292
SR# 20254056692                                      Date: 09-23-25

You may verify this certificate online at corp.delaware.gov/authver.shtml

**JOINT EXHIBIT NO. 18**
**Page 590 of 812**

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 09:58 PM 05/31/2022**
**U.C.C. Initial Filing No: 2022 4581310**

**Service Request No:   20222545039**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Carnaby Inventory Holdings II, LLC** | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **1540 Broadway, Suite 3710** | **New York** | **NY** | **10001** | **USA** |

2. DEBTOR'S NAME:  Provide only one Debtor name (2a or 2b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **GLAS Trust Company LLC** | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **3 Second Street, Suite 206** | **Jersey City** | **NJ** | **07311** | **USA** |

4. COLLATERAL:  This financing statement covers the following collateral:
**All assets of the Debtor whether now owned or hereafter acquired and any proceeds thereof.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)     International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 07:28 PM 06/09/2022**
**U.C.C. Initial Filing No: 2022 4581310**
**Amendment No: 2022 4869806**
**Service Request No:   20222680217**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**20224581310**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☑ PARTY INFORMATION CHANGE:

Check one of these two boxes:            AND Check one of these three boxes to:

This Change affects ☑ Debtor or ☐ Secured Party of record    ☑ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c   ☐ ADD name: Complete item 7a or 7b, and item 7c   ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME
**Carnaby Inventory Holdings II, LLC**

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME
**Carnaby Inventory Holdings II, LLC**

7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                                    SUFFIX

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **3010 LBJ Freeway, Suite 1200** | **Dallas** | **TX** | **75234** | **USA** |

8. ☐ COLLATERAL CHANGE:  Also check one of these four boxes:   ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR check here ☑ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME
**Carnaby Inventory Holdings II, LLC**

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

10. OPTIONAL FILER REFERENCE DATA:

International Association of Commercial Administrators (IACA)
FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

**JOINT EXHIBIT NO. 18**
**Page 592 of 812**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

⌐                              ⌐

L                              ⌐

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 12:42 PM 06/02/2022**
**U.C.C. Initial Filing No: 2022 4634796**

**Service Request No:  20222599839**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Carnaby Inventory Holdings II, LLC** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS **3010 LBJ Freeway, Suite 1200** | CITY **Dallas** | STATE **TX** | POSTAL CODE **75234** | COUNTRY **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **GLAS Trust Company LLC** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS **3 Second Street, Suite 206** | CITY **Jersey City** | STATE **NJ** | POSTAL CODE **07311** | COUNTRY **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
**All assets of the Debtor whether now owned or hereafter acquired and any proceeds thereof.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

**JOINT EXHIBIT NO. 18**
**Page 593 of 812**

CT Corporation
a Wolters Kluwer Business

## Search Results

**JADE JANG**
**Dechert LLP**
**1095 Avenue of the Americas**
**New York, NY 10036-6797**

**Date:** 09/23/2025
**Order #:** 105864288
**Customer #:** 507533
**Reference 1:** 190343
**Reference 2:** --

**Target Name: Carnaby Inventory Holdings III, LLC**

**Jurisdiction: Secretary of State, Delaware**

| | |
|---|---|
| **Search Type: Federal Tax Lien** | **Searched Through: 09/05/2025** |
| Results:    No Records Found /See Attached Certified Search | Searched: 10 Years |
| **Search Type: UCC Lien** | **Searched Through: 09/05/2025** |
| Results:    See Attached Certified Search with 1 Copy Attached | Searched: 5 Years |

**TERRI FAULKS**
**UCC Team 6**
**4400 Easton Commons Way**
**Suite 125**
**Columbus, OH 43219**
**800-713-0755**
**terri.faulks@wolterskluwer.com**

This report contains information compiled from sources which CT Corporation considers reliable but does not control. The information provided is not a certified record of the applicable jurisdiction unless otherwise indicated. CT Corporation does not (i) warrant or guarantee the accuracy, completion or timeliness of the information provided or (ii) accept any liability for delays, errors or omissions in the information provided. CT Corporation is not an insurer with regard to this information or these services. Under no circumstances shall CT Corporation be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings .

# Delaware



Page 1

## The First State

CERTIFICATE

SEARCHED SEPTEMBER 23, 2025 AT 1:31 P.M.
FOR DEBTOR, CARNABY INVENTORY HOLDINGS III, LLC

| 1 OF 1 | FINANCING STATEMENT | 20225628912 |

EXPIRATION DATE: 07/06/2027

DEBTOR:      CARNABY INVENTORY HOLDINGS III, LLC

3010 LBJ FREEWAY, SUITE 1200          ADDED    07-06-22

DALLAS, TX US 75234

SECURED:     GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT

3 SECOND STREET, SUITE 206            ADDED    07-06-22

JERSEY CITY, NJ US 07311

F I L I N G   H I S T O R Y

20225628912   FILED 07-06-22   AT 3:55 P.M.   FINANCING STATEMENT

E N D   O F   F I L I N G   H I S T O R Y

    THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE ABOVE
LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING STATEMENTS,
FEDERAL TAX LIENS AND UTILITY SECURITY INSTRUMENTS FILED IN THIS
OFFICE WHICH NAME THE ABOVE DEBTOR, CARNABY INVENTORY HOLDINGS III,
LLC AS OF SEPTEMBER 5, 2025 AT 11:59 P.M.

Charuni Patibanda-Sanchez, Secretary of State

20263891623-UCC11                                      Authentication: 204831306
SR# 20254056715                                        Date: 09-23-25

You may verify this certificate online at corp.delaware.gov/authver.shtml

**JOINT EXHIBIT NO. 18**
**Page 595 of 812**

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Jaclyn Flood

B. E-MAIL CONTACT AT FILER (optional)
jaclyn.flood@dechert.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Delaware Department of State
U.C.C. Filing Section
Filed: 03:55 PM 07/06/2022
U.C.C. Initial Filing No: 2022 5628912

Service Request No: 20222918199

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Carnaby Inventory Holdings III, LLC** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **3010 LBJ Freeway, Suite 1200** | **Dallas** | **TX** | **75234** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **GLAS Trust Company LLC, as Administrative Agent** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **3 Second Street, Suite 206** | **Jersey City** | **NJ** | **07311** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**All assets of Debtor whether now owned or hereafter acquired or arising and wherever located.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**Filed with: Delaware Secretary of State**

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

 **Wolters Kluwer**

| Customer: Dechert LLP | |
| --- | --- |
| BillCode: 190343 | Ref2: |
| Order No: 105864288 | Date: 9/24/2025 8:59:05 AM CST |

## Full Listing

### Carnaby Inventory II, LLC

#### Delaware, Secretary of State

| Federal Tax Lien | Through Date: 09/05/25 | Clear |
| --- | --- | --- |
| UCC Lien | Through Date: 09/05/25 | Record Found |
| Liens Listing | Through Date: 09/05/25 | Record Found |

**Listings:**

**Liens Listing**

| File Type | File Number | File Date | Expiration Date | Debtor Party | Secured Party | Lien Summary |
| --- | --- | --- | --- | --- | --- | --- |
| Original | 20224581377 | 05/31/22 | 05/31/27 | CARNABY INVENTORY II, LLC | GLAS Trust Company LLC | Blanket lien |
| AMENDMENT | 20224870168 | 06/09/22 | - | | | |
| Original | 20224634697 | 06/02/22 | 06/02/27 | CARNABY INVENTORY II, LLC | GLAS Trust Company LLC | Blanket lien |

### Carnaby Inventory III, LLC

#### Delaware, Secretary of State

| Federal Tax Lien | Through Date: 09/05/25 | Clear |
| --- | --- | --- |
| UCC Lien | Through Date: 09/05/25 | Record Found |
| Liens Listing | Through Date: 09/05/25 | Record Found |

**Listings:**

**Liens Listing**

| File Type | File Number | File Date | Expiration Date | Debtor Party | Secured Party | Lien Summary |
| --- | --- | --- | --- | --- | --- | --- |
| Original | 20225629043 | 07/06/22 | 07/06/27 | CARNABY INVENTORY IIIF, LLC | GLAS Trust Company LLC, as Administrative Agent | Blanket lien |

### Carnaby Inventory Holdings II, LLC

#### Delaware, Secretary of State

| Federal Tax Lien | Through Date: 09/05/25 | Clear |
|---|---|---|
| UCC Lien | Through Date: 09/05/25 | Record Found |
| Liens Listing | Through Date: 09/05/25 | Record Found |

**Listings:**

**Liens Listing**

| File Type | File Number | File Date | Expiration Date | Debtor Party | Secured Party | Lien Summary |
|---|---|---|---|---|---|---|
| Original | 20224581310 | 05/31/22 | 05/31/27 | CARNABY INVENTORY HOLDINGS II, LLC | GLAS Trust Company LLC | Blanket lien |
| AMENDMENT | 20224869806 | 06/09/22 | - | | | |
| Original | 20224634796 | 06/02/22 | 06/02/27 | CARNABY INVENTORY HOLDINGS II, LLC | GLAS Trust Company LLC | Blanket lien |

**Carnaby Inventory Holdings III, LLC**

**Delaware, Secretary of State**

| Federal Tax Lien | Through Date: 09/05/25 | Clear |
|---|---|---|
| UCC Lien | Through Date: 09/05/25 | Record Found |
| Liens Listing | Through Date: 09/05/25 | Record Found |

**Listings:**

**Liens Listing**

| File Type | File Number | File Date | Expiration Date | Debtor Party | Secured Party | Lien Summary |
|---|---|---|---|---|---|---|
| Original | 20225628912 | 07/06/22 | 07/06/27 | CARNABY INVENTORY HOLDINGS III, LLC | GLAS Trust Company LLC, as Administrative Agent | Blanket lien |

**First Brands Group Holdings, LLC**

**Delaware, Secretary of State**

| UCC Lien | Through Date: 09/05/25 | Clear |
|---|---|---|
| Federal Tax Lien | Through Date: 09/05/25 | Clear |

**First Brands Group, LLC**

**Delaware, Secretary of State**

| Federal Tax Lien | Through Date: 09/05/25 | Clear |
|---|---|---|
| UCC Lien | Through Date: 09/05/25 | Record Found |

| Liens Listing | | | Through Date: 09/05/25 | | Record Found | |
|---|---|---|---|---|---|---|
| **Listings:** | | | | | | |
| **Liens Listing** | | | | | | |
| **File Type** | **File Number** | **File Date** | **Expiration Date** | **Debtor Party** | **Secured Party** | **Lien Summary** |
| Original | 20180829024 | 02/05/18 | 02/05/28 | FIRST BRANDS GROUP, LLC | GOLDMAN SACHS BANK USA, AS FIRST LIEN ADMINISTRATIVE AGENT AND COLLATERAL AGENT | Blanket lien |
| | | | | | CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, AS ADMINISTRATIVE AGENT | |
| | | | | | Jefferies Finance LLC, as Collateral Agent | |
| ASSIGNMENT | 20191362784 | 02/26/19 | - | | | |
| ASSIGNMENT | 20205277696 | 07/31/20 | - | | | |
| CONTINUATION | 20226970065 | 08/19/22 | - | | | |
| AMENDMENT | 20227669245 | 09/13/22 | - | | | |
| | | | | | | |
| Original | 20180829396 | 02/05/18 | 02/05/28 | FIRST BRANDS GROUP, LLC | GOLDMAN SACHS BANK USA, AS ABL ADMINISTRATIVE AGENT AND COLLATERAL AGENT | Blanket lien |
| | | | | | BANK OF AMERICA, N.A., AS ABL ADMINISTRATIVE AGENT AND COLLATERAL AGENT | |

**JOINT EXHIBIT NO. 18**
**Page 599 of 812**

| | | | | | | |
|---|---|---|---|---|---|---|
| ASSIGNMENT | 20183824543 | 06/05/18 | - | | | |
| AMENDMENT | 20204992170 | 07/20/20 | - | | | |
| CONTINUATION | 20230492164 | 01/19/23 | - | | | |
| | | | | | | |
| Original | 20191361927 | 02/26/19 | 02/26/29 | FIRST BRANDS GROUP, LLC | CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, AS ADMINISTRATIVE AGENT | Blanket lien |
| | | | | | Jefferies Finance LLC, as Collateral Agent | |
| AMENDMENT | 20204973451 | 07/20/20 | - | | | |
| ASSIGNMENT | 20205282639 | 07/31/20 | - | | | |
| CONTINUATION | 20237437261 | 11/01/23 | - | | | |
| | | | | | | |
| Original | 20191364020 | 02/26/19 | 02/26/29 | FIRST BRANDS GROUP, LLC | CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, AS ADMINISTRATIVE AGENT | Blanket lien |
| | | | | | Jefferies Finance LLC, as Collateral Agent | |
| AMENDMENT | 20204973519 | 07/20/20 | - | | | |
| ASSIGNMENT | 20205282654 | 07/31/20 | - | | | |
| CONTINUATION | 20237437253 | 11/01/23 | - | | | |
| | | | | | | |
| Original | 20204423283 | 06/26/20 | 06/26/30 | TRICO GROUP, LLC | SGSF MASTER PURCHASING DE LLC | Equipment lien (specific to Purchase Agreements of 7/5/2020, 6/5/2020) |
| | | | | FIRST BRANDS GROUP, LLC | RAISTONE PURCHASING LLC-SERIES XXVIII | |

**JOINT EXHIBIT NO. 18**
**Page 600 of 812**

| | | | | | RAISTONE PURCHASING LLC-SERIES XXXII | |
|---|---|---|---|---|---|---|
| AMENDMENT | 20204476562 | 06/29/20 | - | | | |
| AMENDMENT | 20206508834 | 09/21/20 | - | | | |
| AMENDMENT | 20206597969 | 09/24/20 | - | | | |
| ASSIGNMENT | 20226133524 | 07/22/22 | - | | | |
| ASSIGNMENT | 20232064706 | 03/17/23 | - | | | |
| AMENDMENT | 20233342622 | 05/03/23 | - | | | |
| AMENDMENT | 20244214233 | 06/21/24 | - | | | |
| CONTINUATION | 20252644687 | 04/15/25 | - | | | |
| | | | | | | |
| Original | 20205274669 | 07/31/20 | 07/31/30 | FIRST BRANDS GROUP, LLC | Jefferies Finance LLC, as Collateral Agent | Blanket lien |
| CONTINUATION | 20253615272 | 05/20/25 | - | | | |
| | | | | | | |
| Original | 20206570602 | 09/23/20 | 09/23/30 | FIRST BRANDS GROUP, LLC | SGSF MASTER PURCHASING DE LLC | Equipment lien (specific to A&R Receivables Purchase Agreement of 9/23/2020) |
| | | | | FIRST BRANDS GROUP, LLC | RAISTONE PURCHASING LLC-SERIES XXVIII | |
| | | | | | RAISTONE PURCHASING LLC-SERIES XXXII | |
| ASSIGNMENT | 20226133144 | 07/22/22 | - | | | |
| ASSIGNMENT | 20232064649 | 03/17/23 | - | | | |
| AMENDMENT | 20233306395 | 05/02/23 | - | | | |
| CONTINUATION | 20255082307 | 07/15/25 | - | | | |
| | | | | | | |

| Original | 20224491544 | 05/27/22 | 05/27/27 | FIRST BRANDS GROUP, LLC | KARS FUNDING, LLC | Equipment lien (specific to Exhibit A detailing Receivables Purchase Agreement of 5/27/2022) |
|---|---|---|---|---|---|---|
| Original | 20230414580 | 01/17/23 | 01/17/28 | FIRST BRANDS GROUP, LLC | HARBOR CAPITAL LEASING, INC. | Equipment lien (specific to Master Lease Agreement #2239 of 10/12/2022) |
| Original | 20232461878 | 03/31/23 | 03/31/28 | FIRST BRANDS GROUP, LLC | EVOLUTION CREDIT OPPORTUNITY MASTER FUND II-B, LP | Equipment lien (specific to Master Receivables Purchase Agreement of 03/28/2023) |
| Original | 20232461902 | 03/31/23 | 03/31/28 | FIRST BRANDS GROUP, LLC | EVOLUTION CREDIT PARTNERS TRADE FINANCE, L.P. | Equipment lien (specific to Master Receivables Purchase Agreement of 03/28/2023) |
| Original | 20235227680 | 07/31/23 | 07/31/28 | FIRST BRANDS GROUP, LLC | INGRAM MICRO FLEX PYMT SOL. | Equipment lien (VLIC Commercial products, etc) |
| Original | 20237667925 | 11/09/23 | 11/09/28 | FIRST BRANDS GROUP, LLC | EVOLUTION CREDIT OPPORTUNITY MASTER FUND II-B, L.P. | Equipment lien (specific to Master Origin Sale and Exchange Agreement of 11/9/2023) |
| Original | 20242066098 | 03/28/24 | 03/28/29 | FIRST BRANDS GROUP, LLC | EVOLUTION CREDIT OPPORTUNITY MASTER FUND II-B, L.P. | Equipment lien (aftermarket automotive parts and similar goods specific to Master Origin Sale and Exchange Agreement of 03/28/2024) |

**JOINT EXHIBIT NO. 18**

| File Type | File Number | File Date | Expiration Date | Debtor Party | Secured Party | Lien Summary |
|---|---|---|---|---|---|---|
| Original | 20242784567 | 04/26/24 | 04/26/29 | FIRST BRANDS GROUP, LLC | AEQUUM CAPITAL FINANCIAL II, LLC | Equipment lien (aftermarket automotive parts and similar goods specific to Master Origin Sale and Exchange Agreement of 03/28/2024) |
| Original | 20254341472 | 06/17/25 | 06/17/30 | FIRST BRANDS GROUP, LLC | GLAS USA LLC, AS ADMINISTRATIVE AGENT AND COLLATERAL AGENT | Blanket lien |
| Original | 20256769977 | 09/13/25 | 09/13/30 | FIRST BRANDS GROUP, LLC | CARNABY INVENTORY IV, LLC | Equipment lien (inventory specific to that identified in the Master Lease Agreement ending in -5416) |

## FRAM Group Operations Mexicali, S.A. de C.V.

### Dist. of Columbia, Recorder of Deeds

| | | |
|---|---|---|
| Federal Tax Lien | Through Date: 09/18/25 | Clear |
| State Tax Lien | Through Date: 09/18/25 | Clear |
| UCC Lien | Through Date: 09/18/25 | Record Found |

Listings:

UCC Lien

| File Type | File Number | File Date | Expiration Date | Debtor Party | Secured Party | Lien Summary |
|---|---|---|---|---|---|---|
| Original Financing Statement | 2022094732 | 09/15/22 | - | | RAISTONE PURCHASING LLC-SERIES XXXII | Equipment lien (specific to A&R Receivables Purchase Agreement of 9/14/2022) |

## Subensambles Internacionales, S. de R.L. de C.V.

### Dist. of Columbia, Recorder of Deeds

| | | |
|---|---|---|
| UCC Lien | Through Date: 09/18/25 | Clear |
| Federal Tax Lien | Through Date: 09/18/25 | Clear |
| State Tax Lien | Through Date: 09/18/25 | Clear |

## Trico Componentes, S.A. de C.V.

### Dist. of Columbia, Recorder of Deeds

| | | |
|---|---|---|
| UCC Lien | Through Date: 09/18/25 | Clear |
| Federal Tax Lien | Through Date: 09/18/25 | Clear |
| State Tax Lien | Through Date: 09/18/25 | Clear |

**BPI Brake Manufacturing Juarez, S.A. de C.V.**

**Dist. of Columbia, Recorder of Deeds**

| Federal Tax Lien | Through Date: 09/18/25 | Clear |
|---|---|---|
| State Tax Lien | Through Date: 09/18/25 | Clear |
| UCC Lien | Through Date: 09/18/25 | Record Found |

Listings:

UCC Lien

| File Type | File Number | File Date | Expiration Date | Debtor Party | Secured Party | Lien Summary |
|---|---|---|---|---|---|---|
| Original Financing Statement | 2022094722 | 09/15/22 | - | | RAISTONE PURCHASING LLC-SERIES XXXII | Equipment lien (specific to A&R Receivables Purchase Agreement of 9/14/2022) |

**BPI Braking Systems Mexico, S.A. de C.V.**

**Dist. of Columbia, Recorder of Deeds**

| Federal Tax Lien | Through Date: 09/18/25 | Clear |
|---|---|---|
| State Tax Lien | Through Date: 09/18/25 | Clear |
| UCC Lien | Through Date: 09/18/25 | Record Found |

Listings:

UCC Lien

| File Type | File Number | File Date | Expiration Date | Debtor Party | Secured Party | Lien Summary |
|---|---|---|---|---|---|---|
| Original Financing Statement | 2022094722 | 09/15/22 | - | | RAISTONE PURCHASING LLC-SERIES XXXII | Equipment lien (specific to A&R Receivables Purchase Agreement of 9/14/2022) |

**Execution Version**

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of July 6, 2022 (the "*Execution Date*"), by and between CARNABY INVENTORY III, LLC, a Delaware limited liability company (the "*Seller*") and TRICO TECHNOLOGIES CORPORATION (the "*Buyer*"). The Seller and the Buyer are each a "*Party*" and collectively, the "*Parties*."

**RECITALS**

WHEREAS, the Seller desires to sell, assign and transfer free and clear of any lien, and the Buyer desires to purchase, all of the assets set forth on any schedule under this Agreement executed by Seller and Buyer (each, a "*Schedule*") in the form attached hereto as **Annex I,** free and clear of any lien, which consist of certain inventory of the Seller (collectively, the "*Acquired Assets*"), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties to this Agreement, intending to be legally bound, hereby agree as follows:

1. **Sale and Purchase of Assets**.  At each Subsequent Closing, the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and its affiliates in and to all of the Acquired Assets described on a Schedule as of the Subsequent Closing Date.

2. **Purchase Price**.  The purchase price for each Acquired Asset will be the fair market value thereof (the "*Purchase Price*"), which amount may be paid in the form of cash or in kind.

3. **Closing**.  The purchase and sale of the Acquired Assets pursuant to an executed Schedule shall occur a upon payment of the applicable Purchase Price for each Acquired Asset (each, a "*Subsequent Closing*" and the date thereof, a "*Subsequent Closing Date*").  The risk of loss and full benefit of ownership of the Acquired Assets shall transfer to the Buyer immediately upon the Subsequent Closing.

4. **[Reserved]**.

5. **Seller's Representations and Warranties**.  Seller represents and warrants to the Buyer, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

   (a) **Organization, Existence, Good Standing**. Seller is duly incorporated, organized, or formed, and is existing and in good standing under the laws of its jurisdiction of incorporation, organization, or formation.

   (b) **Power and Authority**. Seller has full power and authority to enter into and perform this Agreement.  The execution, delivery and performance of this Agreement by Seller have been duly and validly approved by Seller's board of directors or equivalent governing body, as applicable.  No other proceedings are necessary on the part of Seller to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein.  Seller has the necessary power and authority to own and operate the Acquired Assets.

29078448.2

(c) **Enforceability**.  This Agreement has been duly authorized, executed and delivered by Seller and constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(d) **Governmental Consents and Conflicts**.  No consent, authorization, order or approval of, or filing or registration with, any Governmental Authority is required for or in connection with the consummation by Seller of the transactions contemplated by this Agreement.

(e) **Other Consents and Conflicts**.  Neither the execution nor delivery of this Agreement by Seller, nor the consummation by Seller of the transactions contemplated in this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any claim upon any of the Acquired Assets, under (i) Seller's corporate governing or other organizational documents, or (ii) any contract that is material to the operation of the business of Seller.

(f) **Title to Assets**.  Seller has good title to the Acquired Assets, in each case free and clear of any Liens.

(g) **Transfer Taxes**.  Seller hereby represents and warrants with respect to the Acquired Assets that the sale, transfer, assignment and conveyance of the Acquired Assets by Seller pursuant to this Agreement is not subject to and will not result in any tax, fee or governmental charge payable by the Buyer or Seller to any federal, state or local government ("*Transfer Taxes*").  In the event that Seller receives notice of any Transfer Taxes arising out of the transfer of such Assets, Seller shall give notice thereof to the Buyer, and Seller shall pay any such Transfer Taxes.

(h) **Condition and Sufficiency of Acquired Assets**.  The Acquired Assets are in good condition for use in the business as used by Seller as of the date hereof, ordinary wear and tear excepted.

(i) **Right of Others to Purchase Assets**. Seller has not entered into any other contracts for the sale of any of the Acquired Assets, nor are there any rights of first refusal or options to purchase any of the Acquired Assets or any other rights of others that might prevent the consummation of this Agreement.

6. **Transfers Intended as Sales**.  Each purchase of the Acquired Assets is made without recourse to Seller. The parties hereto have structured each transaction contemplated by this Agreement as an absolute and irrevocable sale, and the Buyer and Seller agree to treat each such transaction as a "true sale" for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings (and shall reflect such sale in their respective financial statements). Seller will advise anyone inquiring about the ownership of any Acquired Assets that all Acquired Assets have been sold to the Buyer.

7. **Buyer's Representations and Warranties**.  The Buyer represents and warrants to Seller, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

2

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 606 of 812**

(a)     **Organization, Existence, Good Standing**.  The Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all the requisite power and authority to enter into this Agreement and to purchase the Acquired Assets.

(b)     **Enforceability**.    This Agreement constitutes the Buyer's legal, valid and binding obligation and is enforceable according to its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(c)     **Power and Authority**.  The Buyer's execution and delivery of this Agreement, and the consummation of the transactions it contemplates, will not (i) violate, breach or be a default under any contract, agreement or commitment, (ii) violate any order, injunction, rule, regulation or ordinance of any court, administrative agency or governmental body, or (iii) violate or breach the Buyer's organizational or governing documents.

8.     **Further Assurances**.  From and after the Closing, at the request of the Buyer, Seller will execute and deliver, or cause to be executed and delivered, to the Buyer such instruments and other documents as the Buyer may request in order to implement the purchase and sale of the Acquired Assets, including, without limitation, bills of sale, transfer or assignment agreements, the filing of certificates of title and similar instruments, and any filings relating to the payment of Transfer Taxes.  Seller and the Buyer shall cooperate and use their respective reasonable best efforts to comply with their respective obligations under this Agreement.

9.     **Expenses**.  Except as otherwise provided in this Agreement with respect to Transfer Taxes, each Party will bear its own expenses incurred or to be incurred in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby.

10.     **No Assignment**.  The rights and obligations of the Seller under this Agreement may not be assigned without the prior written consent of the Buyer, except that Seller may, without the consent of Buyers, assign any or all of its rights and obligations to any of its affiliates, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of Seller hereunder or the failure of Seller to perform any of its covenants hereunder, and provided that no such assignment shall relieve Seller of any of its liabilities or obligations hereunder.  The rights and obligations of the Buyer under this Agreement may not be assigned without prior written consent of Seller, except that the Buyer may, without the consent of Seller, assign any or all of its rights and obligations under this Agreement to (a) any affiliate of the Buyer, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of the Buyer hereunder or the failure of the Buyer to perform any of its covenants hereunder, and provided that no such assignment shall relieve the Buyer of any of its liabilities or obligations hereunder; or (b) any lenders of the Buyer or any affiliate of the Buyer as collateral security.  Notwithstanding anything herein to the contrary, the prior written consent of GLAS Trust Company LLC, as administrative agent for the lenders under that Credit Agreement, dated as of July 6, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among buyer, as the borrower, First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS Trust Company LLC, as administrative agent, shall be required for any assignment pursuant to this Section 10.

3

29078448.2

11. **Headings**.  The headings contained in this Agreement are included for purposes of convenience only, and do not affect the meaning or interpretation of this Agreement.

12. **Severability**.  If any provision of this Agreement or the application of any provision of this Agreement to any Party or circumstance is, to any extent, adjudged invalid or unenforceable, then the application of the remainder of such provision to such Party or circumstance, the application of such provision to other Parties or circumstances, and the application of the remainder of this Agreement will not be affected thereby.  Upon such determination that any term or other provision is invalid or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13. **Notices**.  All notices and other communications required or permitted under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) one day after deposit with an overnight delivery service (prepaid, return receipt requested), (c) three days after being mailed if sent by registered or certified mail (postage prepaid, return receipt requested), (d) upon receipt of electronic evidence of successful electronic mail transmission or (e) upon electronic confirmation of successful facsimile transmission, in each case, to the appropriate Party at the address or facsimile number specified below:

    (a)    If to Buyer:

        c/o First Brands Group, LLC
        127 Public Square, Suite 5300
        Cleveland, Ohio 44114
        Attention: Edward James, Executive Vice President
        Email: ed.james@firstbrandsgroup.com

    (b)    If to the Seller:

        Carnaby Inventory III, LLC
        1540 Broadway, Suite 3710
        New York, New York
        Attention:  Shekhar Kumar, Managing Director
        Email:  shekhar.kumar@viceroyprivatecapital.co

14. **Governing Law**.  This Agreement will be governed by and construed and enforced in accordance with the laws of the State of New York without regard to principles of conflicts of law.

15. **Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED UPON, ARISING OUT OF OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

16. **Counterparts**.  This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission

<div align="center">4</div>

29078448.2

<div align="center">**JOINT EXHIBIT NO. 18**
**Page 608 of 812**</div>

(including documents in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Agreement.

**[Signatures Pages Follow]**

5

29078448.2

IN WITNESS WHEREOF, each of the Parties have duly executed this Agreement or have caused this Asset Agreement to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY III, LLC**

By: _____
Name:  Shekhar Kumar
Title:    Managing Director

**SELLER:**

**TRICO TECHNOLOGIES CORPORATION**

By: _____
Name:  Michael Baker
Title:    Chief Corporate Strategy Officer

[Signature Page to Asset Purchase Agreement]

**JOINT EXHIBIT NO. 18**
**Page 610 of 812**

<u>Annex I to Asset Purchase Agreement</u>

<u>Form of Schedule</u>

This SCHEDULE NO. ___, dated as of _____ __, 20___ (the "**Schedule**) to that certain Asset Purchase Agreement dated as of [•], 20__ (as may be further amended, supplemented or modified from time to time, the "**Asset Purchase Agreement**"), is executed among TRICO TECHNOLOGIES CORPORATION, a Delaware corporation (the "**Seller**") and CARNABY INVENTORY III, LLC (the "**Buyer**").  The Seller and the Buyer are each a "**Party**" and collectively, the "**Parties**."

WHEREAS, the Asset Purchase Agreement provides for the execution and delivery of a Schedule to the Asset Purchase Agreement substantially in the form hereof in connection with any sale of Acquired Assets on a Subsequent Closing Date;

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, the Parties hereby agree as follows:

1.  The Seller and the Buyer hereby confirm that all of the assets described on Exhibit A to this Schedule are Acquired Assets under the Asset Purchase Agreement, and that the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and their respective affiliates to those Acquired Assets described on Exhibit A hereto as of the Subsequent Closing Date.

2.  All capitalized terms used in this Schedule but not defined in this Schedule shall have the meaning set forth in the Asset Purchase Agreement.

29078448.2

IN WITNESS WHEREOF, the Parties have duly executed this Schedule or have caused this Schedule to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY III, LLC**

By:_____
Name:
Title:

**SELLER:**

**TRICO TECHNOLOGIES CORPORATION**

By:_____
Name:
Title:

29078448.2

<u>Exhibit A to Schedule No. ___</u>

Acquired Assets

29078448.2

**Execution Version**

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of July 6, 2022 (the "*Execution Date*"), by and between CARNABY INVENTORY III, LLC, a Delaware limited liability company (the "*Seller*") and TRICO PRODUCTS CORPORATION (the "*Buyer*").  The Seller and the Buyer are each a "*Party*" and collectively, the "*Parties*."

**RECITALS**

WHEREAS, the Seller desires to sell, assign and transfer free and clear of any lien, and the Buyer desires to purchase, all of the assets set forth on any schedule under this Agreement executed by Seller and Buyer (each, a "*Schedule*") in the form attached hereto as **Annex I,** free and clear of any lien, which consist of certain inventory of the Seller (collectively, the "*Acquired Assets*"), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties to this Agreement, intending to be legally bound, hereby agree as follows:

1. **Sale and Purchase of Assets**.  At each Subsequent Closing, the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and its affiliates in and to all of the Acquired Assets described on a Schedule as of the Subsequent Closing Date.

2. **Purchase Price**.  The purchase price for each Acquired Asset will be the fair market value thereof (the "*Purchase Price*"), which amount may be paid in the form of cash or in kind.

3. **Closing**.  The purchase and sale of the Acquired Assets pursuant to an executed Schedule shall occur a upon payment of the applicable Purchase Price for each Acquired Asset (each, a "*Subsequent Closing*" and the date thereof, a "*Subsequent Closing Date*").  The risk of loss and full benefit of ownership of the Acquired Assets shall transfer to the Buyer immediately upon the Subsequent Closing.

4. **[Reserved]**.

5. **Seller's Representations and Warranties**.  Seller represents and warrants to the Buyer, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

    (a) **Organization, Existence, Good Standing**. Seller is duly incorporated, organized, or formed, and is existing and in good standing under the laws of its jurisdiction of incorporation, organization, or formation.

    (b) **Power and Authority**. Seller has full power and authority to enter into and perform this Agreement.  The execution, delivery and performance of this Agreement by Seller have been duly and validly approved by Seller's board of directors or equivalent governing body, as applicable.  No other proceedings are necessary on the part of Seller to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein.  Seller has the necessary power and authority to own and operate the Acquired Assets.

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 614 of 812**

(c) **Enforceability**.  This Agreement has been duly authorized, executed and delivered by Seller and constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(d) **Governmental Consents and Conflicts**.  No consent, authorization, order or approval of, or filing or registration with, any Governmental Authority is required for or in connection with the consummation by Seller of the transactions contemplated by this Agreement.

(e) **Other Consents and Conflicts**.  Neither the execution nor delivery of this Agreement by Seller, nor the consummation by Seller of the transactions contemplated in this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any claim upon any of the Acquired Assets, under (i) Seller's corporate governing or other organizational documents, or (ii) any contract that is material to the operation of the business of Seller.

(f) **Title to Assets**.  Seller has good title to the Acquired Assets, in each case free and clear of any Liens.

(g) **Transfer Taxes**.  Seller hereby represents and warrants with respect to the Acquired Assets that the sale, transfer, assignment and conveyance of the Acquired Assets by Seller pursuant to this Agreement is not subject to and will not result in any tax, fee or governmental charge payable by the Buyer or Seller to any federal, state or local government ("*Transfer Taxes*").  In the event that Seller receives notice of any Transfer Taxes arising out of the transfer of such Assets, Seller shall give notice thereof to the Buyer, and Seller shall pay any such Transfer Taxes.

(h) **Condition and Sufficiency of Acquired Assets**.  The Acquired Assets are in good condition for use in the business as used by Seller as of the date hereof, ordinary wear and tear excepted.

(i) **Right of Others to Purchase Assets**. Seller has not entered into any other contracts for the sale of any of the Acquired Assets, nor are there any rights of first refusal or options to purchase any of the Acquired Assets or any other rights of others that might prevent the consummation of this Agreement.

6. **Transfers Intended as Sales**.  Each purchase of the Acquired Assets is made without recourse to Seller. The parties hereto have structured each transaction contemplated by this Agreement as an absolute and irrevocable sale, and the Buyer and Seller agree to treat each such transaction as a "true sale" for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings (and shall reflect such sale in their respective financial statements). Seller will advise anyone inquiring about the ownership of any Acquired Assets that all Acquired Assets have been sold to the Buyer.

7. **Buyer's Representations and Warranties**.  The Buyer represents and warrants to Seller, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

29078448.2

2

(a) **Organization, Existence, Good Standing**.  The Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of New York, and has all the requisite power and authority to enter into this Agreement and to purchase the Acquired Assets.

(b) **Enforceability**.   This Agreement constitutes the Buyer's legal, valid and binding obligation and is enforceable according to its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(c) **Power and Authority**.  The Buyer's execution and delivery of this Agreement, and the consummation of the transactions it contemplates, will not (i) violate, breach or be a default under any contract, agreement or commitment, (ii) violate any order, injunction, rule, regulation or ordinance of any court, administrative agency or governmental body, or (iii) violate or breach the Buyer's organizational or governing documents.

8. **Further Assurances**.  From and after the Closing, at the request of the Buyer, Seller will execute and deliver, or cause to be executed and delivered, to the Buyer such instruments and other documents as the Buyer may request in order to implement the purchase and sale of the Acquired Assets, including, without limitation, bills of sale, transfer or assignment agreements, the filing of certificates of title and similar instruments, and any filings relating to the payment of Transfer Taxes.  Seller and the Buyer shall cooperate and use their respective reasonable best efforts to comply with their respective obligations under this Agreement.

9. **Expenses**.  Except as otherwise provided in this Agreement with respect to Transfer Taxes, each Party will bear its own expenses incurred or to be incurred in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby.

10. **No Assignment**.  The rights and obligations of the Seller under this Agreement may not be assigned without the prior written consent of the Buyer, except that Seller may, without the consent of Buyers, assign any or all of its rights and obligations to any of its affiliates, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of Seller hereunder or the failure of Seller to perform any of its covenants hereunder, and provided that no such assignment shall relieve Seller of any of its liabilities or obligations hereunder.  The rights and obligations of the Buyer under this Agreement may not be assigned without prior written consent of Seller, except that the Buyer may, without the consent of Seller, assign any or all of its rights and obligations under this Agreement to (a) any affiliate of the Buyer, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of the Buyer hereunder or the failure of the Buyer to perform any of its covenants hereunder, and provided that no such assignment shall relieve the Buyer of any of its liabilities or obligations hereunder; or (b) any lenders of the Buyer or any affiliate of the Buyer as collateral security.  Notwithstanding anything herein to the contrary, the prior written consent of GLAS Trust Company LLC, as administrative agent for the lenders under that Credit Agreement, dated as of July 6, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the **"Credit Agreement"**), by and among buyer, as the borrower, First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the **"Lenders"**), and GLAS Trust Company LLC, as administrative agent, shall be required for any assignment pursuant to this Section 10.

3

29078448.2

11. **Headings**.  The headings contained in this Agreement are included for purposes of convenience only, and do not affect the meaning or interpretation of this Agreement.

12. **Severability**.  If any provision of this Agreement or the application of any provision of this Agreement to any Party or circumstance is, to any extent, adjudged invalid or unenforceable, then the application of the remainder of such provision to such Party or circumstance, the application of such provision to other Parties or circumstances, and the application of the remainder of this Agreement will not be affected thereby.  Upon such determination that any term or other provision is invalid or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13. **Notices**.  All notices and other communications required or permitted under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) one day after deposit with an overnight delivery service (prepaid, return receipt requested), (c) three days after being mailed if sent by registered or certified mail (postage prepaid, return receipt requested), (d) upon receipt of electronic evidence of successful electronic mail transmission or (e) upon electronic confirmation of successful facsimile transmission, in each case, to the appropriate Party at the address or facsimile number specified below:

   (a)   If to Buyer:

   c/o First Brands Group, LLC
   127 Public Square, Suite 5300
   Cleveland, Ohio 44114
   Attention: Edward James, Executive Vice President
   Email: ed.james@firstbrandsgroup.com

   (b)   If to the Seller:

   Carnaby Inventory III, LLC
   1540 Broadway, Suite 3710
   New York, New York
   Attention:  Shekhar Kumar, Managing Director
   Email:  shekhar.kumar@viceroyprivatecapital.co

14. **Governing Law**.  This Agreement will be governed by and construed and enforced in accordance with the laws of the State of New York without regard to principles of conflicts of law.

15. **Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED UPON, ARISING OUT OF OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

16. **Counterparts**.  This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission

4

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 617 of 812**

(including documents in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Agreement.

**[Signatures Pages Follow]**

29078448.2

IN WITNESS WHEREOF, each of the Parties have duly executed this Agreement or have caused this Asset Agreement to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY III, LLC**

By: _____

Name:   Shekhar Kumar

Title:    Managing Director

**SELLER:**

**TRICO PRODUCTS CORPORATION**

By: _____

Name:   Michael Baker

Title:    Chief Corporate Strategy Officer

[Signature Page to Asset Purchase Agreement]

**JOINT EXHIBIT NO. 18**
**Page 619 of 812**

Annex I to Asset Purchase Agreement

Form of Schedule

This SCHEDULE NO. ___, dated as of _____ __, 20___ (the "**Schedule**) to that certain Asset Purchase Agreement dated as of [•], 20__ (as may be further amended, supplemented or modified from time to time, the "**Asset Purchase Agreement**"), is executed among TRICO PRODUCTS CORPORATION, a New York corporation (the "**Seller**") and CARNABY INVENTORY III, LLC (the "**Buyer**").  The Seller and the Buyer are each a "**Party**" and collectively, the "**Parties**."

WHEREAS, the Asset Purchase Agreement provides for the execution and delivery of a Schedule to the Asset Purchase Agreement substantially in the form hereof in connection with any sale of Acquired Assets on a Subsequent Closing Date;

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, the Parties hereby agree as follows:

1.  The Seller and the Buyer hereby confirm that all of the assets described on Exhibit A to this Schedule are Acquired Assets under the Asset Purchase Agreement, and that the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and their respective affiliates to those Acquired Assets described on Exhibit A hereto as of the Subsequent Closing Date.

2.  All capitalized terms used in this Schedule but not defined in this Schedule shall have the meaning set forth in the Asset Purchase Agreement.

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 620 of 812**

IN WITNESS WHEREOF, the Parties have duly executed this Schedule or have caused this Schedule to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY III, LLC**

By:_____
Name:
Title:

**SELLER:**

**TRICO PRODUCTS CORPORATION**

By:_____
Name:
Title:

29078448.2

Exhibit A to Schedule No. ____

Acquired Assets

29078448.2

*Execution Version*

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of July 6, 2022 (the "*Execution Date*"), by and between TRICO TECHNOLGIES CORPORATION, a Delaware corporation (the "*Seller*") and CARNABY INVENTORY III, LLC (the "*Buyer*"). The Seller and the Buyer are each a "*Party*" and collectively, the "*Parties*."

**RECITALS**

WHEREAS, the Seller desires to sell, assign and transfer free and clear of any lien, and the Buyer desires to purchase, all of the assets set forth on any schedule under this Agreement executed by Seller and Buyer (each, a "*Schedule*") in the form attached hereto as **Annex I,** free and clear of any lien, which consist of certain inventory of the Seller (collectively, the "*Acquired Assets*"), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties to this Agreement, intending to be legally bound, hereby agree as follows:

1.  **Sale and Purchase of Assets**. At each Subsequent Closing, the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and its affiliates in and to all of the Acquired Assets described on a Schedule as of the Subsequent Closing Date.

2.  **Purchase Price**. The purchase price for each Acquired Asset will be the fair market value thereof (the "*Purchase Price*"), which amount may be paid in the form of cash, in kind or by an increase in the amount payable under the Seller's Subordinated Note (as defined below).

3.  **Closing**. The purchase and sale of the Acquired Assets pursuant to an executed Schedule shall occur a upon payment of the applicable Purchase Price for each Acquired Asset (each, a "*Subsequent Closing*" and the date thereof, a "*Subsequent Closing Date*"). The risk of loss and full benefit of ownership of the Acquired Assets shall transfer to the Buyer immediately upon the Subsequent Closing.

4.  **Subordinated Note**. Seller irrevocably agrees to advance each subordinated loan requested by the Buyer as payment for the applicable Purchase Price (or portion thereof). Each subordinated loan shall be evidenced by, and shall be payable in accordance with the terms and provisions of, a Subordinated Note. "*Subordinated Note*" for purposes hereof means a promissory note in substantially the form of **Annex II** hereto.

5.  **Seller's Representations and Warranties**. Seller represents and warrants to the Buyer, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

    (a)  **Organization, Existence, Good Standing**. Seller is duly incorporated, organized, or formed, and is existing and in good standing under the laws of its jurisdiction of incorporation, organization, or formation.

    (b)  **Power and Authority**. Seller has full power and authority to enter into and perform this Agreement. The execution, delivery and performance of this Agreement by Seller have

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 623 of 812**

been duly and validly approved by Seller's board of directors or equivalent governing body, as applicable.  No other proceedings are necessary on the part of Seller to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein.  Seller has the necessary power and authority to own and operate the Acquired Assets.

(c)     **Enforceability**.  This Agreement has been duly authorized, executed and delivered by Seller and constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(d)     **Governmental Consents and Conflicts**.  No consent, authorization, order or approval of, or filing or registration with, any Governmental Authority is required for or in connection with the consummation by Seller of the transactions contemplated by this Agreement.

(e)     **Other Consents and Conflicts**.  Neither the execution nor delivery of this Agreement by Seller, nor the consummation by Seller of the transactions contemplated in this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any claim upon any of the Acquired Assets, under (i) Seller's corporate governing or other organizational documents, or (ii) any contract that is material to the operation of the business of Seller.

(f)     **Title to Assets**.  Seller has good title to the Acquired Assets, in each case free and clear of any Liens.

(g)     **Transfer Taxes**.  Seller hereby represents and warrants with respect to the Acquired Assets that the sale, transfer, assignment and conveyance of the Acquired Assets by Seller pursuant to this Agreement is not subject to and will not result in any tax, fee or governmental charge payable by the Buyer or Seller to any federal, state or local government ("*Transfer Taxes*").  In the event that Seller receives notice of any Transfer Taxes arising out of the transfer of such Assets, Seller shall give notice thereof to the Buyer, and Seller shall pay any such Transfer Taxes.

(h)     **Condition and Sufficiency of Acquired Assets**.  The Acquired Assets are in good condition for use in the business as used by Seller as of the date hereof, ordinary wear and tear excepted.

(i)     **Right of Others to Purchase Assets**. Seller has not entered into any other contracts for the sale of any of the Acquired Assets, nor are there any rights of first refusal or options to purchase any of the Acquired Assets or any other rights of others that might prevent the consummation of this Agreement.

6.     **Transfers Intended as Sales**.  Each purchase of the Acquired Assets is made without recourse to Seller. The parties hereto have structured each transaction contemplated by this Agreement as an absolute and irrevocable sale, and the Buyer and Seller agree to treat each such transaction as a "true sale" for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings (and shall reflect such sale in their respective financial

2

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 624 of 812**

statements). Seller will advise anyone inquiring about the ownership of any Acquired Assets that all Acquired Assets have been sold to the Buyer.

7. **Buyer's Representations and Warranties**.  The Buyer represents and warrants to Seller, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

    (a) **Organization, Existence, Good Standing**.  The Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all the requisite power and authority to enter into this Agreement and to purchase the Acquired Assets.

    (b) **Enforceability**.  This Agreement constitutes the Buyer's legal, valid and binding obligation and is enforceable according to its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

    (c) **Power and Authority**.  The Buyer's execution and delivery of this Agreement, and the consummation of the transactions it contemplates, will not (i) violate, breach or be a default under any contract, agreement or commitment, (ii) violate any order, injunction, rule, regulation or ordinance of any court, administrative agency or governmental body, or (iii) violate or breach the Buyer's organizational or governing documents.

8. **Further Assurances**.  From and after the Closing, at the request of the Buyer, Seller will execute and deliver, or cause to be executed and delivered, to the Buyer such instruments and other documents as the Buyer may request in order to implement the purchase and sale of the Acquired Assets, including, without limitation, bills of sale, transfer or assignment agreements, the filing of certificates of title and similar instruments, and any filings relating to the payment of Transfer Taxes.  Seller and the Buyer shall cooperate and use their respective reasonable best efforts to comply with their respective obligations under this Agreement.

9. **Expenses**.  Except as otherwise provided in this Agreement with respect to Transfer Taxes, each Party will bear its own expenses incurred or to be incurred in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby.

10. **No Assignment**.  The rights and obligations of the Seller under this Agreement may not be assigned without the prior written consent of the Buyer, except that Seller may, without the consent of Buyers, assign any or all of its rights and obligations to any of its affiliates, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of Seller hereunder or the failure of Seller to perform any of its covenants hereunder, and provided that no such assignment shall relieve Seller of any of its liabilities or obligations hereunder.  The rights and obligations of the Buyer under this Agreement may not be assigned without prior written consent of Seller, except that the Buyer may, without the consent of Seller, assign any or all of its rights and obligations under this Agreement to (a) any affiliate of the Buyer, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of the Buyer hereunder or the failure of the Buyer to perform any of its covenants hereunder, and provided that no such assignment shall relieve the Buyer of any of its liabilities or obligations hereunder; or (b) any lenders of the Buyer or any affiliate of the Buyer as collateral security.  Notwithstanding anything herein to the contrary, the prior written consent of

3

29078448.2

GLAS Trust Company LLC, as administrative agent for the lenders under that Credit Agreement, dated as of July 6, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among buyer, as the borrower, First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS Trust Company LLC, as administrative agent, shall be required for any assignment pursuant to this Section 10.

11. **Headings**.  The headings contained in this Agreement are included for purposes of convenience only, and do not affect the meaning or interpretation of this Agreement.

12. **Severability**.  If any provision of this Agreement or the application of any provision of this Agreement to any Party or circumstance is, to any extent, adjudged invalid or unenforceable, then the application of the remainder of such provision to such Party or circumstance, the application of such provision to other Parties or circumstances, and the application of the remainder of this Agreement will not be affected thereby.  Upon such determination that any term or other provision is invalid or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13. **Notices**.  All notices and other communications required or permitted under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) one day after deposit with an overnight delivery service (prepaid, return receipt requested), (c) three days after being mailed if sent by registered or certified mail (postage prepaid, return receipt requested), (d) upon receipt of electronic evidence of successful electronic mail transmission or (e) upon electronic confirmation of successful facsimile transmission, in each case, to the appropriate Party at the address or facsimile number specified below:

   (a)    If to Seller:

          c/o First Brands Group, LLC
          127 Public Square, Suite 5300
          Cleveland, Ohio 44114
          Attention: Edward James, Executive Vice President
          Email: ed.james@firstbrandsgroup.com

   (b)    If to the Buyer:

          Carnaby Inventory III, LLC
          1540 Broadway, Suite 3710
          New York, New York
          Attention:  Shekhar Kumar, Managing Director
          Email:  shekhar.kumar@viceroyprivatecapital.co

14. **Governing Law**.  This Agreement will be governed by and construed and enforced in accordance with the laws of the State of New York without regard to principles of conflicts of law.

15. **Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED UPON, ARISING OUT OF OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR THE

4

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 626 of 812**

ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

16.     **Counterparts**.  This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission (including documents in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Agreement.

**[Signatures Pages Follow]**

5

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 627 of 812**

IN WITNESS WHEREOF, each of the Parties have duly executed this Agreement or have caused this Asset Agreement to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY III, LLC**

By: _____
Name:   Shekhar Kumar
Title:    Managing Director

**SELLER:**

**TRICO TECHNOLOGIES CORPORATION**

By: _____
Name:   Michael Baker
Title:    Chief Corporate Strategy Officer

[Signature Page to Asset Purchase Agreement]
**JOINT EXHIBIT NO. 18**
**Page 628 of 812**

<u>Annex I to Asset Purchase Agreement</u>

<u>Form of Schedule</u>

This SCHEDULE NO. ___, dated as of _____ __, 20___ (the "*Schedule*) to that certain Asset Purchase Agreement dated as of [•], 20__ (as may be further amended, supplemented or modified from time to time, the "*Asset Purchase Agreement*"), is executed among TRICO TECHNOLOGIES CORPORATION, a Delaware corporation (the "*Seller*") and CARNABY INVENTORY III, LLC (the "*Buyer*").  The Seller and the Buyer are each a "*Party*" and collectively, the "*Parties*."

WHEREAS, the Asset Purchase Agreement provides for the execution and delivery of a Schedule to the Asset Purchase Agreement substantially in the form hereof in connection with any sale of Acquired Assets on a Subsequent Closing Date;

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, the Parties hereby agree as follows:

1.  The Seller and the Buyer hereby confirm that all of the assets described on Exhibit A to this Schedule are Acquired Assets under the Asset Purchase Agreement, and that the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and their respective affiliates to those Acquired Assets described on Exhibit A hereto as of the Subsequent Closing Date.

2.  All capitalized terms used in this Schedule but not defined in this Schedule shall have the meaning set forth in the Asset Purchase Agreement.

29078448.2

IN WITNESS WHEREOF, the Parties have duly executed this Schedule or have caused this Schedule to be duly executed as of the date first written above.

<u>**BUYER:**</u>

**CARNABY INVENTORY III, LLC**

By:_____
Name:
Title:    Managing Director

<u>**SELLER:**</u>

**TRICO TECHNOLOGIES CORPORATION**

By:_____
Name:
Title:

29078448.2

Exhibit A to Schedule No. \_\_\_\_

Acquired Assets

_____

29078448.2

<u>Annex II to Asset Purchase Agreement</u>

Form of Subordinated Note

29078448.2

*Execution Version*

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of July 6, 2022 (the "*Execution Date*"), by and between TRICO PRODUCTS CORPORATION, a New York corporation (the "*Seller*") and CARNABY INVENTORY III, LLC (the "*Buyer*").  The Seller and the Buyer are each a "*Party*" and collectively, the "*Parties*."

**RECITALS**

WHEREAS, the Seller desires to sell, assign and transfer free and clear of any lien, and the Buyer desires to purchase, all of the assets set forth on any schedule under this Agreement executed by Seller and Buyer (each, a "*Schedule*") in the form attached hereto as **Annex I,** free and clear of any lien, which consist of certain inventory of the Seller (collectively, the "*Acquired Assets*"), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties to this Agreement, intending to be legally bound, hereby agree as follows:

1. **Sale and Purchase of Assets**.  At each Subsequent Closing, the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and its affiliates in and to all of the Acquired Assets described on a Schedule as of the Subsequent Closing Date.

2. **Purchase Price**.  The purchase price for each Acquired Asset will be the fair market value thereof (the "*Purchase Price*"), which amount may be paid in the form of cash, in kind or by an increase in the amount payable under the Seller's Subordinated Note (as defined below).

3. **Closing**.  The purchase and sale of the Acquired Assets pursuant to an executed Schedule shall occur a upon payment of the applicable Purchase Price for each Acquired Asset (each, a "*Subsequent Closing*" and the date thereof, a "*Subsequent Closing Date*"). The risk of loss and full benefit of ownership of the Acquired Assets shall transfer to the Buyer immediately upon the Subsequent Closing.

4. **Subordinated Note**.  Seller irrevocably agrees to advance each subordinated loan requested by the Buyer as payment for the applicable Purchase Price (or portion thereof).  Each subordinated loan shall be evidenced by, and shall be payable in accordance with the terms and provisions of, a Subordinated Note.  "*Subordinated Note*" for purposes hereof means a promissory note in substantially the form of **Annex II** hereto.

5. **Seller's Representations and Warranties**.  Seller represents and warrants to the Buyer, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

   (a) **Organization, Existence, Good Standing**. Seller is duly incorporated, organized, or formed, and is existing and in good standing under the laws of its jurisdiction of incorporation, organization, or formation.

   (b) **Power and Authority**. Seller has full power and authority to enter into and perform this Agreement.  The execution, delivery and performance of this Agreement by Seller have

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 633 of 812**

been duly and validly approved by Seller's board of directors or equivalent governing body, as applicable.  No other proceedings are necessary on the part of Seller to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein.  Seller has the necessary power and authority to own and operate the Acquired Assets.

(c)     **Enforceability**.  This Agreement has been duly authorized, executed and delivered by Seller and constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(d)     **Governmental Consents and Conflicts**.  No consent, authorization, order or approval of, or filing or registration with, any Governmental Authority is required for or in connection with the consummation by Seller of the transactions contemplated by this Agreement.

(e)     **Other Consents and Conflicts**.  Neither the execution nor delivery of this Agreement by Seller, nor the consummation by Seller of the transactions contemplated in this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any claim upon any of the Acquired Assets, under (i) Seller's corporate governing or other organizational documents, or (ii) any contract that is material to the operation of the business of Seller.

(f)     **Title to Assets**.  Seller has good title to the Acquired Assets, in each case free and clear of any Liens.

(g)     **Transfer Taxes**.  Seller hereby represents and warrants with respect to the Acquired Assets that the sale, transfer, assignment and conveyance of the Acquired Assets by Seller pursuant to this Agreement is not subject to and will not result in any tax, fee or governmental charge payable by the Buyer or Seller to any federal, state or local government ("*Transfer Taxes*").  In the event that Seller receives notice of any Transfer Taxes arising out of the transfer of such Assets, Seller shall give notice thereof to the Buyer, and Seller shall pay any such Transfer Taxes.

(h)     **Condition and Sufficiency of Acquired Assets**.  The Acquired Assets are in good condition for use in the business as used by Seller as of the date hereof, ordinary wear and tear excepted.

(i)     **Right of Others to Purchase Assets**. Seller has not entered into any other contracts for the sale of any of the Acquired Assets, nor are there any rights of first refusal or options to purchase any of the Acquired Assets or any other rights of others that might prevent the consummation of this Agreement.

6.     **Transfers Intended as Sales**.  Each purchase of the Acquired Assets is made without recourse to Seller. The parties hereto have structured each transaction contemplated by this Agreement as an absolute and irrevocable sale, and the Buyer and Seller agree to treat each such transaction as a "true sale" for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings (and shall reflect such sale in their respective financial

2

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 634 of 812**

statements). Seller will advise anyone inquiring about the ownership of any Acquired Assets that all Acquired Assets have been sold to the Buyer.

7.   **Buyer's Representations and Warranties**.  The Buyer represents and warrants to Seller, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

(a)   **Organization, Existence, Good Standing**.  The Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of New York, and has all the requisite power and authority to enter into this Agreement and to purchase the Acquired Assets.

(b)   **Enforceability**.   This Agreement constitutes the Buyer's legal, valid and binding obligation and is enforceable according to its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(c)   **Power and Authority**.  The Buyer's execution and delivery of this Agreement, and the consummation of the transactions it contemplates, will not (i) violate, breach or be a default under any contract, agreement or commitment, (ii) violate any order, injunction, rule, regulation or ordinance of any court, administrative agency or governmental body, or (iii) violate or breach the Buyer's organizational or governing documents.

8.   **Further Assurances**.  From and after the Closing, at the request of the Buyer, Seller will execute and deliver, or cause to be executed and delivered, to the Buyer such instruments and other documents as the Buyer may request in order to implement the purchase and sale of the Acquired Assets, including, without limitation, bills of sale, transfer or assignment agreements, the filing of certificates of title and similar instruments, and any filings relating to the payment of Transfer Taxes.  Seller and the Buyer shall cooperate and use their respective reasonable best efforts to comply with their respective obligations under this Agreement.

9.   **Expenses**.  Except as otherwise provided in this Agreement with respect to Transfer Taxes, each Party will bear its own expenses incurred or to be incurred in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby.

10.   **No Assignment**.  The rights and obligations of the Seller under this Agreement may not be assigned without the prior written consent of the Buyer, except that Seller may, without the consent of Buyers, assign any or all of its rights and obligations to any of its affiliates, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of Seller hereunder or the failure of Seller to perform any of its covenants hereunder, and provided that no such assignment shall relieve Seller of any of its liabilities or obligations hereunder.  The rights and obligations of the Buyer under this Agreement may not be assigned without prior written consent of Seller, except that the Buyer may, without the consent of Seller, assign any or all of its rights and obligations under this Agreement to (a) any affiliate of the Buyer, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of the Buyer hereunder or the failure of the Buyer to perform any of its covenants hereunder, and provided that no such assignment shall relieve the Buyer of any of its liabilities or obligations hereunder; or (b) any lenders of the Buyer or any affiliate of the Buyer as collateral security.  Notwithstanding anything herein to the contrary, the prior written consent of

3

29078448.2

GLAS Trust Company LLC, as administrative agent for the lenders under that Credit Agreement, dated as of July 6, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among buyer, as the borrower, First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS Trust Company LLC, as administrative agent, shall be required for any assignment pursuant to this Section 10.

11.   **Headings**.   The headings contained in this Agreement are included for purposes of convenience only, and do not affect the meaning or interpretation of this Agreement.

12.   **Severability**.   If any provision of this Agreement or the application of any provision of this Agreement to any Party or circumstance is, to any extent, adjudged invalid or unenforceable, then the application of the remainder of such provision to such Party or circumstance, the application of such provision to other Parties or circumstances, and the application of the remainder of this Agreement will not be affected thereby.  Upon such determination that any term or other provision is invalid or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13.   **Notices**.   All notices and other communications required or permitted under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) one day after deposit with an overnight delivery service (prepaid, return receipt requested), (c) three days after being mailed if sent by registered or certified mail (postage prepaid, return receipt requested), (d) upon receipt of electronic evidence of successful electronic mail transmission or (e) upon electronic confirmation of successful facsimile transmission, in each case, to the appropriate Party at the address or facsimile number specified below:

   (a)      If to Seller:

   c/o First Brands Group, LLC
   127 Public Square, Suite 5300
   Cleveland, Ohio 44114
   Attention: Edward James, Executive Vice President
   Email: ed.james@firstbrandsgroup.com

   (b)      If to the Buyer:

   Carnaby Inventory III, LLC
   1540 Broadway, Suite 3710
   New York, New York
   Attention:  Shekhar Kumar, Managing Director
   Email:  shekhar.kumar@viceroyprivatecapital.co

14.   **Governing Law**.   This Agreement will be governed by and construed and enforced in accordance with the laws of the State of New York without regard to principles of conflicts of law.

15.   **Waiver of Jury Trial**.   EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED UPON, ARISING OUT OF OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR THE

4

29078448.2

ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

16.    **Counterparts**.  This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission (including documents in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Agreement.

**[Signatures Pages Follow]**

5

29078448.2

IN WITNESS WHEREOF, each of the Parties have duly executed this Agreement or have caused this Asset Agreement to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY III, LLC**

By: _____
Name:   Shekhar Kumar
Title:   Managing Director

**SELLER:**

**TRICO PRODUCTS CORPORATION**

By: _____
Name:   Michael Baker
Title:   Chief Corporate Strategy Officer

[Signature Page to Asset Purchase Agreement]
**JOINT EXHIBIT NO. 18**
**Page 638 of 812**

Annex I to Asset Purchase Agreement

Form of Schedule

This SCHEDULE NO. ___, dated as of _____ __, 20___ (the "***Schedule***) to that certain Asset Purchase Agreement dated as of [•], 20__ (as may be further amended, supplemented or modified from time to time, the "***Asset Purchase Agreement***"), is executed among TRICO PRODUCTS CORPORATION, a New York corporation (the "***Seller***") and CARNABY INVENTORY III, LLC (the "***Buyer***").  The Seller and the Buyer are each a "***Party***" and collectively, the "***Parties***."

WHEREAS, the Asset Purchase Agreement provides for the execution and delivery of a Schedule to the Asset Purchase Agreement substantially in the form hereof in connection with any sale of Acquired Assets on a Subsequent Closing Date;

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, the Parties hereby agree as follows:

1.  The Seller and the Buyer hereby confirm that all of the assets described on Exhibit A to this Schedule are Acquired Assets under the Asset Purchase Agreement, and that the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and their respective affiliates to those Acquired Assets described on Exhibit A hereto as of the Subsequent Closing Date.

2.  All capitalized terms used in this Schedule but not defined in this Schedule shall have the meaning set forth in the Asset Purchase Agreement.

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 639 of 812**

IN WITNESS WHEREOF, the Parties have duly executed this Schedule or have caused this Schedule to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY III, LLC**

By:_____
Name:
Title:    Managing Director

**SELLER:**

**TRICO PRODUCTS CORPORATION**

By:_____
Name:
Title:

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 640 of 812**

<u>Exhibit A to Schedule No. ___</u>

Acquired Assets

_____

29078448.2

<u>Annex II to Asset Purchase Agreement</u>

Form of Subordinated Note

29078448.2

## MANUFACTURING  AGREEMENT

This Manufacturing Agreement (hereinafter referred to as the "Agreement") is entered into by and between **Trico Products Corporation** (hereinafter "**Trico Products**"), a corporation, duly organized and validly existing under the laws of Delaware, United States of America, represented by **Shekhar Kumar** in his capacity as Corporate Finance Manager, and **Carnaby Inventory III, LLC** (hereinafter as "**Carnaby**") limited liability company, duly organized and validly existing under the laws of Delaware, United States of America, represented by **Shekhar Kumar** in his capacity as Managing Director; pursuant to the following recitals and clauses.

### RECITALS

**WHEREAS**, **Trico Products** has entered into a Maquila Agreement with Subensambles Internacionales, S. de R.L. de C.V. (the "**Maquila Agreement**"). A copy of said Maquila Agreements and their corresponding amendments is attached hereto and identified as **Exhibit "A"**;

**WHEREAS**, **Subensambles Internacionales, S. de R.L. de C.V.** (the "**Maquiladora**") is a company duly organized and validly existing under the laws of the United States of Mexico and performs its operations in Mexico, in the location specified in **Exhibit "B";**

**WHEREAS**, **Trico Products** and **Carnaby** (jointly referred to as the "**Parties**") wish to enter into this manufacturing agreement pursuant to which **Carnaby** will hire and request the manufacturing services from **Trico Products** to manufacture and produce the products requested by **Carnaby** (the "**Products**");

**WHEREAS,** the parties intend to establish the terms and conditions of their business understanding with the purpose that hereinafter such business relationship is governed under the terms and conditions set forth herein;

**WHEREAS**, **Carnaby** acknowledges that the commercial manufacturing business relationship is with **Trico Products** and accepts that **Trico Products** could perform the manufacture processes required by **Carnaby** with another entity that could be located in the United States of America, in Mexico or in any other Country;

**WHEREAS**, for purposes of this Agreement, the parties agree that the commercial manufacturing business relationship is between **Carnaby** and **Trico Products** and Trico Products will provide the manufacturing services set forth herein through its **Maquiladora** located in Mexico;

**WHEREAS**, **Trico Products** has the expertise, facilities, equipment and appropriate personnel to carry out the manufacturing services requested by **Carnaby** through its **Maquiladora** located in Mexico;

**WHEREAS**, **Carnaby** will license to **Trico Products** and in turn its **Maquiladora** certain intellectual property rights and know-how relating to the Products and will deliver directly to the **Maquiladora** the necessary **Materials** for the manufacturing of the requested Products**;**

**WHEREAS,** the **Maquiladora** has secured authorization from the Ministry of Economy to operate under a maquiladora program ("**Maquiladora Program**") in accordance with the Decree for the Development of the Manufacturing, Maquiladora and Export Services Industry ("**IMMEX Decree**"), and other customs authorization, program, license and/or registry required to import on a temporarily basis, export and manufacture, accordingly, in the most efficient way, the machinery, equipment and materials (jointly, the "**IMMEX Permits**");

**WHEREAS,** the **Maquiladora** is a registered enterprise for value added tax and excise tax purposes and has secured a Value Added Tax and Excise Tax Certification under modality A ("**VAT Certification**"), which entitles to a tax credit benefit for Value Added Tax and Excise Tax upon temporary importations;

**WHEREAS**, the commercial manufacturing business relationship will be exclusively at all times between **Carnaby**

and **Trico Products**;

WHEREAS, **Trico Products** acknowledges that it is the intention of **Carnaby** to have a business relationship that will not be taxable as a Permanent Establishment ("**PE**") for **Carnaby** under Mexican income tax law ("**Mexican Income Tax Law**");

WHEREAS, on the date hereof, **Carnaby,** Carnaby Inventory Holdings III, LLC, First Brands Group Holdings, LLC, and First Brands Group, LLC, have entered into a certain credit agreement (the "**Credit Agreement**");

WHEREAS, the representatives of the parties have sufficient authority to enter into this Agreement, same that at the date of execution of this Agreement have not been revoked; and

NOW THEREFORE, in consideration of the of the recitals mentioned above, **Trico Products** and **Carnaby** agree to establish their commercial manufacturing business relationship in accordance with the following:

## CLAUSES

**FIRST. Trico Products** binds itself to carry out in benefit of **Carnaby**, the requested manufacturing process through its **Maquiladora**. **Trico Products** binds itself to transfer exclusively the Products manufactured under the instructions of **Carnaby** in accordance with the technical specifications and quality standards that will be provided by **Carnaby** and strictly under the terms hereof.

**SECOND. Trico Products** will provide through its **Maquiladora** the manufacturing process required by **Carnaby** with its expertise, facilities, machinery, equipment and appropriate personnel; **Trico Products** will be responsible before **Carnaby** for the use of the Materials provided by **Carnaby**, for Manufacturing process, the manufactured Products by **Trico Products** through its **Maquiladora**.

**THIRD. Carnaby** hires **Trico Products** to carry out the manufacturing services of the Products requested by **Carnaby**, as well as any other products, as may be agreed by the parties in the future in writing and **Trico Products** accepts and agrees to perform the manufacturing process through its **Maquiladora** in accordance with the terms of this Agreement.

**FOURTH. Carnaby** shall deliver to **Trico Products** at a previously agreed Maquiladora location, on a periodic basis, on consignment, under gratuitous bailment, the raw materials, components, subassemblies, and supplies ("**Materials**") as are necessary to carry out the Manufacturing process of the Products performed by **Trico Products** through its **Maquiladora**. The parties shall agree in writing the Maquiladora and location where the Materials will be delivered by **Carnaby**, as well as the amounts, delivery dates and times, materials, and any other relevant aspect or information concerning the delivery of Materials.

Neither **Trico Products** or its **Maquiladora** shall under no circumstances be considered to have any proprietary interest on the **Materials** which **Carnaby** may deliver to **Trico Products** as provided for herein nor on the Products. Any commercial invoice that may be issued by **Carnaby** in order to comply with customs requirements for the exportation or importation of any **Materials** provided by **Carnaby** to **Trico Products** and **Maquiladora,** shall not be considered for any purposes to be evidence of conveyance of title in the **Materials** in favor of **Trico Products** or its **Maquiladora.** Once the Products covered by this Agreement have been manufactured by **Trico Products** through its **Maquiladora,** they must be returned to **Carnaby** in accordance with the terms of this Agreement.

**Trico Products** and its **Maquiladora** shall provide necessary administrative services for shipment, including the arrangement of proper transportation, of the **Materials** and the Products under this Agreement between the United Mexican States and the United States of America using information supplied by **Carnaby** (the "**Administrative Services**"); such Administrative Services shall include, but not be limited to, preparation of required United States of America and United States of Mexico Customs documentation and **Trico Products** agrees to duly and timely comply with all the applicable customs laws. **Trico Products** may be the importer and exporter of record for United

States of America customs purposes, in which case **Trico Products** shall obtain any validated export licenses required by United States of America export laws and regulations; if agreed by the parties separately to this Agreement, **Trico Products** shall be responsible for all compliance and all costs relating to compliance with United States of America customs regulations, including but not limited to, any and all United States of America import bonds; United States of America customs duties, import fees and taxes; fines and penalties; and United States of America customhouse brokerage fees. The **Maquiladora** shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the **Materials** and Products and shall comply with all record keeping and reporting obligations pursuant to the applicable law.

**Carnaby** shall be responsible for providing to **Trico Products** a detailed list of the **Materials** required to perform the Manufacturing process in order that the **Maquiladora** may obtain the necessary permits and authorizations to import the **Materials** under its IMMEX Program.

At all times during the term of this Agreement, **Trico Products** and its **Maquiladora** shall (i) be duly authorized by the competent governmental authority to operate the **Maquiladora Program**, (ii) hold valid and in force licenses, authorizations, permits, programs, licenses and/or registries required to perform the manufacturing services in the facilities in accordance to applicable laws and pursuant to this Agreement in the most cost-efficient and diligent way (the "Operating Permits" and together with the IMMEX Permits, the "Permits"), and (iii) carry out all the necessary activities before the corresponding governmental authority, to render the manufacturing services on time and agreed manner.

**FIFTH.** For the Products to be in compliance with the technical specifications and quality standards that **Carnaby** requires, **Carnaby** shall make available to **Trico Products** and subsequently **Trico Products** to its **Maquiladora** the knowledge, technical experience, and practice and other industrial information (the "Technical Information").

**Carnaby** will be able and allowed to supervise the manufacturing processes and if necessary, could assist **Trico Products** and in turn **its Maquiladora** to manufacture the Products pursuant to the terms herein.

The parties hereto agree that the transferring of Technical Information shall not trigger any consideration whatsoever, since all Technical Information is necessary for the Products to fulfill the technical specifications and quality standards that **Carnaby** requires, and does not serve any other purpose.

**Trico Products** and its **Maquiladora** shall pay any and all sales taxes, use taxes, personal taxes, flat taxes, value-added taxes, assessments, duties and all other governmental exactions of any nature, in connection with this Agreement, the **Materials,** the **Products** and the **Permits**, or in connection with the operations conducted in the facilities or the manufacturing services performed by **Trico Products** and its **Maquiladora** pursuant to this Agreement.

**SIXTH.** In consideration **Carnaby** shall pay to **Trico Products** the prices agreed separately to this Agreement for the Manufacturing services provided, based on the volume of units manufactured and sold; the payment conditions and terms will be agreed separately from this Agreement between **Carnaby** and **Trico Products**; provided that, any payments from **Carnaby** are subject to it being permitted to do so under Section 2.1(d) of the Credit Agreement

**SEVENTH.** Any samples of the Products officially requested by an agency or department of the Federal Government of Mexico or of other applicable authority of any other applicable country, may only be delivered upon written authorization of **Carnaby**, and provided an official receipt is secured from the requesting agency or department.

**EIGHTH. Trico Products** shall treat and preserve as confidential all information related to **Carnaby's** business, including the Technical Information, revealed to or learned by **Trico Products** and its Maquiladora from any source as a result of this Agreement. **Trico Products** will not disclose nor disseminate, nor permit to be disclosed nor disseminated, any customer list, pricing, technical information, know-how, industrial information, patents,

3

trademarks, processes, programs, practices, methods or other material or data conceived, designed, created, developed, used, assembled or manufactured by **Trico Products** through its **Maquiladora**, unless it is strictly necessary during the training process of the employees to carry out the Processes.

**NINTH. Trico Products** and its **Maquiladora** shall comply with all existing laws and regulations in Mexico, and shall hold the Products, free of any liens, claims or charges by any agency or department of the Federal, State or Municipal governments.

**TENTH.** In performing its obligations under this Agreement, **Trico Products** shall comply with all applicable laws and regulations, including without limitation the applicable laws in Mexico and the Unites States of America or any other country, including without limitation the customs laws and regulations, and any rulings or guidelines issued by the customs authorities in the applicable country. **Trico Products** shall keep a comprehensive and detailed record of all Materials, Products, and any other goods imported into Mexico for purposes of this Agreement, as well as of all exportations of Products, waste, and any other items, maintaining copies of all import and export declarations and related documentation.

**ELEVENTH.** The parties agree that all notices and other communications required or desired to be given pursuant to this Agreement will be given in writing and will be deemed duly given upon personal delivery, or on the day after mailing if sent by a nationally recognized overnight delivery service which maintains records of the time, place and recipient of delivery, or upon receipt of a confirmed transmission if sent by telecopy or facsimile transmission, and in each case if addressed as follows:

**Carnaby Inventory III, LLC**
**Address:** 1540 Broadway Suite 3710, New York, New York
**Attention:** Legal Department
**Email address:** Shekhar Kumar – Shekhar.kumar@viceroyprivatecapital.com


**Trico Products Corporation**:
**Address:** 127 Public Square, Suite 5300, Cleveland, Ohio 44114
**Attention:** Legal Department
**Email Address**:  ed.james@firstbrandsgroup.com

c/o First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention: Edward James, Executive Vice President
Email: ed.james@firstbrandsgroup.com


or to such other person, entity, address or facsimile number as a party may respectively designate in like manner from time to time.

**TWELFTH.-** This Agreement shall continue in force until terminated by either party. Either party may terminate this Agreement upon thirty (30) days prior written notice to the other party in accordance with the notice provisions of Clause Eleventh hereof.

**THIRTEENTH.** If, for any reason, any provision of this Agreement is determined to be invalid or unenforceable, such invalidity or enforceability shall not affect the remaining provisions of this Agreement.

**FOURTEENTH.** Time is of the essence for the performance of all obligations and the satisfaction of all conditions of this Agreement.

4

**FIFTEENTH.** Neither party shall be held responsible for any delay or failure in the performance of any part of this Agreement to the extent that such delay or failure is caused by fire, flood, explosion, war, seize, pandemic, government requirement, civil or military authority, act of God, act or omission of carriers, or any lockout, strike, labor trouble or other industrial disturbance, inevitable accident, export delays by governmental authorities or industry or trade association of whatever nature that limits the importation or exportation of the Materials, work in process or Products thereof or another cause beyond any of the parties reasonable control.  Any party excused from performance shall make a good faith effort to minimize the effect of the delay or non-performance.

**SIXTEENTH** This Agreement shall be interpreted pursuant to the laws of the State of New York, United States of America, without giving effect to its choice of law provisions.  Litigation brought to contest disputes arising under this Agreement shall be brought only in the state or federal courts of the State of New York, United States of America.

WAIVER OF JURY TRIAL.  THE PARTIES HEREBY IRREVOCABLY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, COUNTERCLAIM OR CROSS-COMPLAINT IN ANY ACTION OR OTHER PROCEEDING BROUGHT BY THE OTHER WITH RESPECT TO ANY MATTER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH OR RELATED TO THIS AGREEMENT, WHETHER BASED UPON CONTRACTUAL, STATUTORY, TORTIOUS OR OTHER THEORIES OF LIABILITY.

[*Signature page follows*]

5

**IN WITNESS WHEREOF,** the parties have executed this Agreement through their duly authorized representatives, on July 6, 2022, being fully effective as of said date.

<div style="display:flex; justify-content:space-between;">

**Carnaby Inventory III, LLC**

**Trico Products Corporation**

</div>

**Name:** Edward James
**Title:** Executive Vice President

**Name:** Michael Baker
**Title:** Chief Corporate Strategy Officer

[*Signature page of the manufacturing agreement entered into by and between Trico Products Corporation and Carnaby Inventory III, LLC, with acknowledgement and consent of GLAS Trust Company LLC exclusively in its capacity as administrative agent of the Credit Agreement*]

**JOINT EXHIBIT NO. 18**
**Page 648 of 812**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| | § | |
| Debtors.[1] | § | |

**DECLARATION OF TYLER W. COWAN**
**IN SUPPORT OF THE EMERGENCY MOTION OF DEBTORS**
**FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO**
**(A) OBTAIN POSTPETITION FINANCING, (B) USE CASH COLLATERAL,**
**AND (C) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE CLAIMS; (II) GRANTING ADEQUATE PROTECTION**
**TO PREPETITION SECURED PARTIES; (III) MODIFYING**
**THE AUTOMATIC STAY; (IV) SCHEDULING A FINAL HEARING;**
**AND (V) GRANTING RELATED RELIEF**

I, Tyler W. Cowan, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am Global Head of Restructuring   Liability Management at Lazard Fr res   Co. LLC ("**Lazard**"), the primary U.S. operating subsidiary of a preeminent international financial advisory and asset management firm founded in 1848, which has its principal office at 30 Rockefeller Plaza, New York, New York 10012.  I have been one of the principal personnel working on Lazard's engagement as the proposed investment banker for First Brands Group, LLC and its affiliated debtors and debtors in possession (collectively, the "**Debtors**" and together with the Debtors' non-Debtor affiliates, the "**Company**") in the above-captioned chapter 11 cases.

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

Case 25-90399 Document 855-38 Filed in TXSB on 09/30/2025 Page 2 of 19

2.    I submit this declaration (the "**Declaration**") in support of the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**DIP Motion**").[2]

3.    Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant documents, including the Debtors' books and records, (iii) information provided to me by Lazard employees working directly with me or under my supervision, (iv) information provided to me by, or discussions with, the members of the Debtors' management team, the Special Committee of the board of managers of First Brands Group, LLC (the "**Board**"), or the other advisors to the Debtors, including Weil, Gotshal    Manges LLP ("**Weil**") and Alvarez    Marsal North America, LLC ("**A&M**"), and/or (v) my experience as a restructuring professional.  I am not being compensated specifically for this testimony other than through payments to be received by Lazard as a professional proposed to be retained by the Debtors, which payments include a fee for securing debtor-in-possession financing, subject to Court approval.  If called to testify, I could and would testify to each of the facts set forth herein on the foregoing bases.  I am authorized to submit this declaration on behalf of the Debtors.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion, the interim order attached as Exhibit A thereto (the "**Interim Order**"), or that certain *Senior Secured Superpriority Debtor-in-Possession Credit Agreement* (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**") attached as Exhibit 1 to the Interim Order, as applicable.

**Background and Qualifications**

4.      I am Global Head of and a Managing Director in the Restructuring Liability Management Group at Lazard.  Lazard is a global investment bank providing financial advisory services, including with respect to mergers and acquisitions, capital raises, liability management and restructurings.  Together with its predecessors and affiliates, Lazard has been advising clients around the world for more than 175 years.  Lazard is registered as a broker-dealer with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority.  Since 1990, Lazard professionals have been involved in over 500 restructurings, representing over $1 trillion in debtor assets.

5.      Lazard and its senior professionals have extensive experience in the reorganization, restructuring, and sale of distressed companies, in both out-of-court and in-court contexts.  In addition, Lazard's investment banking professionals have extensive experience advising debtors in chapter 11 cases and have served as investment bankers to numerous debtors, chapter 11 trustees, creditors' committees, and prospective buyers in chapter 11 proceedings. Lazard's business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including, among others: *In re Global Clean Energy Holdings, Inc.*, No. 25-90113 (ARP) (Bankr. S.D. Tex. 2025); *In re Wellpath Holdings, Inc.*, No. 24-90533 (ARP) (Bankr. S.D. Tex. 2024); *In re Steward Health Care System, LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. 2024); *In re Enviva Inc.*, No 24-10453 (BFK) (Bankr. S.D. Va. 2024); *In re Air Methods Corp.*, No. 23-90886 (MI) (Bankr. S.D. Tex 2023); *In re SiO2 Medical Prod., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del 2023); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D. N.J. 2023); *In re National Cinemedia, LLC*, No. 23-90291 (DRJ) (Bankr. S.D. Tex. 2023); *In re Belk, Inc.*, No. 21-30630 (MI) (Bankr. S.D. Tex. 2021); *In re Basic Energy Servs., Inc.*, No. 21-90002 (DRJ) (Bankr. S.D. Tex. 2021); *In re FTS Int'l, Inc.*, No. 20-34622 (DRJ) (Bankr. S.D. Tex. 2020);

3

Case 25-90399 Document 855-38 Filed in TXSB on 09/30/2025 Page 4 of 27

*In re 24 Hour Fitness Worldwide, Inc.*, No. 20-11558 (KBO) (Bankr. D. Del 2020); *In re Chinos Holdings, Inc.*, No. 20-32181 (KLP) (Bankr. E.D. Va. 2020); *In re J.C. Penney Co.*, No. 20-20182 (DRJ) (Bankr. S.D. Tex. 2020); *In re Neiman Marcus Grp. Ltd.*, No. 20-32519 (Bankr. S.D. Tex. 2020); *In re Forever21*, No. 19-12122 (KG) (Bankr. D. Del. 2019); *In re Weatherford Int'l PLC*, No. 19-33694 (DRJ) (Bankr. S.D. Tex. 2019); *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. 2018); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. 2018); *In re Stone Energy Corp.*, No. 16-36390 (MI) (Bankr. S.D. Tex. 2017); and *In re LINN Energy, LLC*, No. 16-60040 (Bankr. S.D. Tex. 2016).

6.      Since joining Lazard in 2003, I have advised companies and creditors, including in situations involving automotive companies, with respect to in-court and out-of-court restructurings, recapitalizations, and reorganizations.  I have also advised companies regarding capital raises, mergers, acquisitions, and divestitures.  I have been involved in a variety of restructuring engagements including, among others, 24 Hour Fitness, Accuride (advisor to term loan lenders), Air Methods, Alpha Natural Resources (advisor to Rice Energy, the stalking horse bidder for certain gas assets), Altice France, Anthology (advisor to term loan lenders), Atlas Iron, Avison Young (advisor to term loan lenders), Bed Bath     Beyond, Belk, Blackboard, Boart Longyear (advisor to bondholders), Brazos Electric Power Cooperative (advisor to the Unsecured Creditors' Committee), Cengage Learning, Chassix, Claire's Stores, Dex Media (formerly R.H. Donnelley), Dish (advisor to DBS bondholders), Empire Today (advisor to term loan lenders), EmployBridge (advisor to term loan lenders), Energy Future Holdings (advisor to the TCEH Creditors' Committee), First Energy Solutions, Foresight Energy (advisor to secured lenders), Forever 21, Franchise Group (advisor to term loan lenders), The Great Atlantic     Pacific Tea Company, Heubach (advisor to term loan lenders), Hostess (advisor to secured lenders), iFIT

4

Health   Fitness, Illinois Power Holdings (advisor to Dynegy), Intelsat (advisor to convertible noteholders), JCPenney, J.Crew, JOANN (advisor to term loan lenders), Local Insight Media, Longview Power/Mepco, Macy's, Neiman Marcus, Party City (advisor to secured noteholders), Patriot Coal (advisor to Peabody Energy), Peabody Energy, Petmate (advisor to second lien lenders), Remington Outdoor, Revlon (advisor to Citi), Rite Aid (advisor to Unsecured Creditors' Committee), Saks (advisor to secured bondholders), SI Group (advisor to term loan lenders), SiO2, Sirva (advisor to crossholder group), Solo Brands, Steward Health Care System, Superior Industries, Tops Markets (advisor to secured noteholders), United States Enrichment Corp., Venator (advisor to secured lenders), Walter Energy (advisor to first lien lenders), Wellness Pet (advisor to term loan lenders), Westgate Resorts, and Westmoreland Resource Partners.

7.     Pursuant to these engagements, among others, I have worked on a variety of financings for troubled companies, including a number of DIP financings and marketing processes.  Additionally, I have provided testimony in the following bankruptcy cases: *In re Steward Health Care System LLC*, Case No. 24-90213 (CML) (Bankr. S.D. Tex. 2024); *In re SiO2 Medical Prods., Inc.*, Case No. 23-10366 (JTD) (Bankr. D. Del. 2023); *In re Intelsat S.A.*, Case No. 20-32299 (KLP) (Bankr. E.D. Va. 2021); *In re Belk, Inc.*, No. 21-30630 (MI) (Bankr. S.D. Tex. 2021); *In re 24 Hour Fitness Worldwide, Inc.*, No. 20-11558 (KBO) (Bankr. D. Del 2020); *In re Chinos Holdings, Inc.*, Case No. 20-32181 (KLP) (Bankr. E.D. Va. 2020); *In re Neiman Marcus Grp. Ltd.*, Case No. 20-32519 (Bankr. S.D. Tex. 2020); *In re Forever21,* No. 19-12122 (KG) (Bankr. D. Del. 2019); *In re Westmoreland Coal Company*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. 2019) (advisor to Westmoreland Resource Partners, LP); *In re FirstEnergy Sols. Corp.*, No. 18-50757 (AMK) (Bankr. N.D. Ohio 2018); *In re Claire's Stores, Inc.,* No. 18-10584 (MFW) (Bankr. D. Del. 2018); *In re Peabody Energy Corp.*, No. 16-42529-399 (Bankr. E.D. Mo. 2016);

5

*In re Walter Energy, Inc.*, No. 15-02741 (TOM) (Bankr N.D. Ala. 2015), *In re Chassix Holdings, Inc.*, No. 15-10578 (Bankr. S.D.N.Y. Mar. 12, 2015); *In re Longview Power, LLC,* No. 13-12211 (BLS) (Bankr. D. Del. 2013); and *In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (Bankr. S.D.N.Y. 2011).  Prior to joining Lazard in 2003, I attended Northwestern University where I graduated with a Bachelor of Science in Engineering.

<u>**Lazard's Retention**</u>

8.     Lazard was engaged as investment banker to the Debtors in August 2025 to advise the Debtors on potential out-of-court financing and capital structure alternatives, as well as potential M A alternatives.  Specifically, pursuant to an engagement letter dated as of August 3, 2025 (as amended by letters dated as of September 2, 2025 and as of September 24, 2025), Lazard has rendered investment banking services to the Debtors in connection with the evaluation of potential strategic and financial alternatives to improve their capital structure, liquidity, and overall financial position, including with respect to reviewing and negotiating the terms and conditions of their proposed DIP Facility.

9.     Since Lazard's retention, members of my team and I have worked closely with the Debtors' management, the Special Committee, A M, and Weil analyzing the Debtors' business affairs, assets, financial position, contractual arrangements, and various proposed strategic and financing transactions.  Pursuant to this work, I, and other members of the Lazard team, have become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.  Members of my team and I have also assisted the Debtors in reviewing and negotiating the terms, conditions, and potential impact of the proposed DIP Facility and various strategic alternatives.

Case 25-90399   Document 855-38   Filed in TXSB on 09/30/2025   Page 7 of 927

**Debtors' Exploration of Strategic Alternatives**

10.    In July 2025, the Company launched a refinancing process led by Jefferies Finance LLC, seeking to raise approximately $6.2 billion of financing that would be used to comprehensively refinance its capital structure by paying down its existing funded debt obligations (the "**Global Refinancing Process**").  The primary purpose of the Global Refinancing Process was to extend the maturities on the substantial majority of the Company's funded debt, as well as enhance the Company's liquidity through an upsize of the ABL Facility. I have been advised by the Company that, given the Company's historical acquisitions and complex off-balance sheet financing arrangements, potential investors were focused on undertaking additional diligence around the size and terms of the Company's factoring, supply chain and inventory SPV financing programs, segment-level profitability, organic growth trends and synergy realization over time, among other areas.  The Company paused the Global Refinancing Process in early August 2025 to enable the Company to engage a third party to complete a "quality of earnings" report, which was expected to take six to eight weeks to complete, and provide answers on the other outstanding diligence questions raised by potential investors.  At that time, Lazard was engaged to initially explore raising bridge financing to provide the Company with sufficient liquidity to fund operations while the Company completed the quality of earnings process and, ultimately, attempted to complete the Global Refinancing Process.

11.    On or around August 11, 2025, with the assistance of the Debtors' management team and other advisors, Lazard launched a marketing process to solicit bridge financing proposals.  Lazard reached out to six (6) parties, four (4) of which agreed to sign non-disclosure agreements (the "**NDAs**") for the purpose of engaging on the financing opportunity.  At the time, the belief was that the Company needed to raise approximately $425 million of

7

incremental liquidity and had flexibility around the financing structure so long as it was permissible under the Company's existing debt documents and related agreements (*e.g.*, incremental term loans, non-loan party debt, supply chain financing). Parties were presented with both a request for proposal ("**RFP**") that provided background on the Company and its situation at that time (based on information provided by the Company), the investment opportunity and proposed financing structure, as well as a more detailed management presentation. Parties were also provided with access to a virtual dataroom that was populated with a variety of financial and legal information, including details on the capital structure and liquidity information, provided by management.  In the subsequent three weeks, Lazard engaged with parties around potential financing structures, facilitated business and legal due diligence and provided access to management, including through management presentations. The Company progressed both non-loan party and inventory financing-based structures with several parties.  Despite the Debtors' efforts, however, this process did not yield any actionable proposals for out-of-court financing. Specifically, the Debtors only received one (1) financing proposal, which was not actionable because the amount of the proposed financing was (i) insufficient to meet the Company's liquidity needs, (ii) subject to significant incremental asset-level and financial diligence, and (iii) structured in a manner that introduced material execution risk.

12.     As part of the bridge financing process, the Company also engaged Lazard's automotive mergers and acquisitions team to explore a minority, majority or entire sale of the Company. In connection with this process, Lazard contacted five (5) parties, two (2) of which executed NDAs.  Parties were provided access to a separate VDR and meaningful business and legal diligence facilitated through Lazard and Weil, with the goal of trying to get to an indication of interest ("**IOI**") in a matter of weeks.  Despite those efforts, and partly because of publicity

related to the Debtors' capital structure challenges, both parties declined to provide an IOI, but confirmed their continued interest in the Company to the extent those challenges were resolved.

13.     As both the bridge financing and M&A processes unfolded in August 2025, the Company's financial position worsened and certain information became available that required further refinement of the Company's liquidity needs, as well as the advisors' view of the timing and viability of out-of-court processes.  The new information that become available to Lazard included  (i) updated  financial  information  on  the  available  collateral  for  new  financings, (ii) additional detail about the Company's accounts receivable factoring programs and off-balance sheet supply chain and inventory financings, and (iii) updated information that demonstrated a material decline in liquidity throughout August and early September, and therefore resulted in a greater overall financing need than was previously anticipated.

14.     The third-party bridge financing process was ultimately unsuccessful due to, among other things, the Company's complex capital structure, the limited availability of unencumbered assets, and the amount of financing needed and the complexity and need for further review  of  the  company's  off-balance  sheet  financing  arrangements  and  related  accounting. Furthermore,  the  information  requests  from  potential  M&A  counterparties  suggested  that  the timeline  to  reach  agreement  on  economic  terms  and  close  a  transaction  would  take  multiple additional months.  These facts made it apparent that third-party bridge financing, the Global Refinancing Process and potential out-of-court M&A transaction(s) no longer represented viable paths forward.  As such, in or around the second week of September, the Company pivoted its strategy and began conversations around both out-of-court and in-court financing alternatives with advisors of certain of the Debtors' prepetition secured lenders who had formed an ad hoc group

(the "**Ad Hoc Group**") and retained counsel, Gibson, Dunn    Crutcher LLP, and a banker, Evercore Inc.

15.    The Company thereafter decided that it had no choice but to seek chapter 11 protection and stabilize the business through DIP financing.

### Debtors' Efforts to Obtain DIP Financing

16.    With no third-party source of additional funding available on an out-of-court basis, the Debtors' only apparent viable option for raising the financing necessary to stabilize the business and pursue a value-maximizing restructuring process was to file for chapter 11 protection and secure debtor-in-possession financing.  A chapter 11 filing would also allow the Debtors to review and diligence the Company's operations, accounting, financing and contractual arrangements, among others, and to be protected by an automatic stay, preventing creditors from seizing Company assets.

17.    I understand that substantially all of the Debtors' domestic assets are subject to the Prepetition Secured Lenders' and/or the ABL Lenders' liens and the Prepetition Secured Lenders and ABL Lenders have communicated that they would not consent to any third-party providing DIP financing on a priming basis.  Moreover, as evidenced by the Debtors' efforts to raise financing prior to the Petition Date, the Debtors do not have sufficient unencumbered property to pledge as collateral to support an adequately sized DIP facility. Therefore, any third-party DIP financing would either have to be provided on a junior basis or otherwise be subject to a priming contest or valuation dispute with the Debtors' prepetition secured lenders at the outset of these chapter 11 cases, neither of which, in my view, is in the Company's interests. Accordingly, the Debtors and their advisors focused their primary efforts during their remaining liquidity runway towards developing and negotiating an actionable DIP financing proposal with their existing prepetition lenders.

18.     In the aggregate, as of the Petition Date, the Ad Hoc Group holds approximately (i) 86% of the principal outstanding First Lien Term Loans, (ii) 100% of the principal outstanding Side-Car Term Loans, and (iii) 78% of the principal outstanding Second Lien Term Loans.  By mid-September, members of the Ad Hoc Group and their advisors executed non-disclosure agreements and were provided with diligence information, including access to a virtual dataroom, marketing materials and diligence sessions.  In a matter of days, Lazard and the Debtors' other advisors were in frequent discussions with the Ad Hoc Group and their advisors regarding the consensual use of their cash collateral and the terms of a potential DIP financing.  On September 17, 2025, the Debtors delivered an initial debtor-in-possession financing proposal to the Ad Hoc Group as part of such discussions.

19.     Simultaneously, the Debtors, with the assistance of Lazard and their other advisors, negotiated with their ABL Lenders regarding the terms of consensual use of cash collateral and adequate protection, and sought a DIP proposal from such lenders.  The parties exchanged multiple proposals outlining the potential terms of adequate protection and consensual use of cash collateral in the week leading up to the Petition Date.  The DIP proposal ultimately received from the ABL Lenders was not actionable, as it did not include any new money, and would not have been sufficient to meet the Debtors' needs, among other deficiencies.

20.     In the week leading up to the Petition Date, the Debtors also received one DIP financing proposal from an inventory financing counterparty. However, the proposal was not actionable given the limited quantum of new money made available, request for a roll-up of the existing exposure despite uncertainty over the nature of the claims and the need for support from multiple key stakeholders, including the Ad Hoc Group, who were not supportive.

21.     During the approximately ten days leading up to the Petition Date, the Debtors negotiated the underlying economics and other material terms of the DIP Facility, including the size of the facility, the amount and timing of the roll-up of the DIP Lenders' First Lien Term Loans, the conditions for drawing on the DIP tranches, the associated economics and fees, milestones, and definitive documentation for the financing.  Throughout the negotiation process, the Debtors' advisors held several calls and briefings with the Debtors' management team, Special Committee, and the Board, each of which provided feedback with respect to the proposed terms of the DIP Facility.

22.     On September 23, 2025, in the lead up to the Petition Date, the Debtors' available cash was swept by one of their banks, which also had exposure on the supply chain financing.  As a result, the Debtors were left with virtually no cash.  In conjunction with these negotiations, with the advice of the Lazard team and the Debtors' other advisors, the Debtors and the Ad Hoc Group negotiated the terms of an out-of-court bridge financing on an emergency basis in the amount of $24.5 million (the "**Bridge Financing**"), which closed and funded on September 25, 2025, to provide the Debtors with (i) four (4) critical days to further prepare for a more orderly chapter 11 filing, (ii) the funds necessary to pay employees and other critical expenses during this time, and (iii) additional time to negotiate comprehensive DIP financing and consensual use of cash collateral.  As set forth in the DIP Motion, and as a condition to the Ad Hoc Group providing the Bridge Financing, the Debtors are seeking approval to repay the Bridge Financing with DIP Financing proceeds.

### Debtors' Immediate Need for Liquidity

23.     The Debtors require an immediate capital infusion, as well as continued use of Cash Collateral, to continue to operate their business postpetition, including paying their employees and vendors, and administer these chapter 11 cases.

24.     I believe that the DIP Facility is critical to these chapter 11 cases because it provides the Debtors with the urgent liquidity needed to (i) stabilize the Debtors' global operations and avoid immediate and irreparable harm, (ii) pay certain outstanding prepetition amounts owed to employees, critical vendors, taxing authorities, and other critical stakeholders consistent with the DIP Budget, as requested by the Debtors in their first day motions, (iii) pay ordinary course operating expenses necessary to support their operations, and (iv) provide runway to allow the Debtors to maximize the value of their assets during these chapter 11 cases.

## DIP Facility Was Negotiated in Good Faith and at Arm's Length

25.     I believe the Debtors, with the oversight of the independent Special Committee and assistance from the Debtors' advisors, engaged in arm's-length, good-faith negotiations with the DIP Lenders regarding the terms of the DIP Facility.  Prior to the Petition Date, the Debtors negotiated the underlying economics and other material terms of the DIP Facility, including, among other things, the sizing of the facility, the Roll-Up, the applicable interest rate, and the associated fees.  Through these efforts, the Debtors, with the oversight of the independent Special Committee and assistance of the Debtors' advisors, negotiated DIP financing that provides the Debtors with the financing projected to stabilize their business and prepare for and undertake a value-maximizing restructuring process.

## Terms of the DIP Facility

26.     The following summarizes certain key terms of the DIP Facility:

- *Amount/ Structure*:

    - A $1.1 billion multi-draw term loan facility comprised of (i) $1.1 billion in new money (the "**New Money DIP Loans**"), $500 million of New Money DIP Loans available upon entry of the Interim Order ($325 million of which will be funded into escrow) and $600 million of New Money DIP Loans to be funded into escrow upon entry of the Final Order and (ii) $1.5 billion of First Lien Obligations held by DIP Lenders that fund the Interim Draw of the New Money DIP Loans (the "**Interim Roll-Up**"), and (iii) $1.8 billion

13

First Lien Obligations held by DIP Lenders that fund the Final Draw of the New Money DIP Loans shall automatically be deemed exchanged and converted pro rata on a cashless basis into and constitute DIP Obligations (the "**Final Roll-Up**").

- *Collateral*:

  - Superpriority priming first liens on First Lien Term Loan Collateral.

  - Priming second liens on ABL Priority Collateral, which are senior to First Lien Term Loan Obligations.

  - First liens on substantially all unencumbered assets, including avoidance actions and any proceeds thereof and commercial tort claims (each subject to entry of the Final Order) and pledges of equity in certain foreign subsidiaries of the Debtors.

- *Maturity*:

  - 270 days with two (2) 45-day extensions at the Debtors' discretion and three (3) additional 45-day extensions with the consent of the Debtors and DIP Lenders holding at least 50.1% of the DIP Facility, each extension subject to a 0.75% extension fee.

- *Interest Rate*:

  - New Money DIP Loans: SOFR cash *plus* 1.55% cash *plus* 8.45%, payable monthly in kind.

  - Roll-Up Loans: SOFR *plus* 7.0%, payable monthly in kind (the default rate under the Prepetition 1L Credit Agreement).

- *Fees*:

  - Anchor Premium: 10.0% of the New Money Term Commitment (as defined in the DIP Credit Agreement) payable in kind, which shall be earned and payable upon entry of the Interim Order.

  - Upfront Premium: 5.0% payable in kind, which shall be earned and payable to all Participating Lenders *pro rata* upon entry of the Interim Order and/or Final Order, as applicable.

  - Exit Premium:  5.0% cash, which shall be earned upon entry of the Interim Order and/or Final Order, as applicable, and payable to all Participating Lenders *pro rata* upon maturity, acceleration, termination, conversion, payment, prepayment, or repayment.

14

- Extension Premium: 0.75% per each 45-day extension.

- ***Roll-Up***: All Participating Lenders are offered a "roll-up" of all obligations under the First Lien Term Loans at a 3:1 ratio. Roll-up will occur proportionally with each funding pursuant to the Interim Order and Final Order.

## A.    Roll-Up of the Prepetition Obligations is Reasonable

27.    As a condition for providing $1.1 billion of New Money DIP Loans, the DIP Lenders required a "creeping" roll up of their Prepetition 1L Loans on a 3:1 basis, effective only upon the DIP Lenders funding amounts under the DIP Facility. I believe the Roll-Up is appropriate under the circumstances of these chapter 11 cases. The Roll-Up is a material component of the structure of the DIP Facility required by the DIP Lenders as a condition to their commitment to provide postpetition financing and their consent to the Debtors' use of Cash Collateral. Importantly, each First Lien Lender has been or will be offered the opportunity to participate in the DIP Facility and have their prepetition claims rolled-up. It is my understanding that approximately 86% of the First Lien Lenders have agreed to an allocation of the DIP. The Ad Hoc Group intends to negotiate with the remaining holders of the approximately 14% of the First Lien Lenders.

28.    The Debtors and the DIP Lenders engaged in arm's length negotiations and ultimately agreed to the Roll-Up as consideration for, among other things, the Debtors' continued use of Cash Collateral and the extension of additional funding through the DIP Facility (including $1.1 billion of commitments, $500 million of which is available immediately upon entry of the Interim Order). Without the additional protections and compensation offered by the Roll-Up, which does not increase the total secured indebtedness of the Debtors (beyond the new money provided by the DIP), I do not believe the DIP Lenders would have provided the DIP Facility.

15

**JOINT EXHIBIT NO. 18**
**Page 663 of 812**

**B.      Terms of the DIP Facility are Reasonable under the Circumstances**

29.      Based on my experience as a restructuring professional and my understanding of the Debtors' capital structure and immediate need for postpetition financing, I believe that the DIP Facility, taken as a whole, is reasonable under the facts and circumstances and is the Debtors' best (and only) currently available option.  I believe that the obligations, interest rate, fees, milestones, and other material terms under the DIP Facility are reasonable under the circumstances, considering, among other things, the (i) lack of other alternatives, (ii) additional diligence required regarding the Debtors' acquisition history, accounting practices and off-balance sheet factoring and financing arrangements, (iii) rates and fees of the Debtors' Prepetition Secured Obligations (including those secured by junior liens), (iv) the nature and extent of the collateral securing the DIP Facility, (v) the risks for the DIP Lenders associated with lending against collateral that multiple parties assert is theirs, (vi) market terms for companies facing similar situations, and (vii) negative sentiments in the market regarding the Company's operations.

30.      The DIP Lenders have committed $1.1 billion of capital to allow the Debtors time to stabilize their business over the next few months and to run a value-maximizing restructuring process for the benefit of the Debtors and their stakeholders.  In view of those commitments and the circumstances of these cases, including the magnitude of the Debtors' chapter 11 cases and the tangible benefit to the estates of having substantial committed postpetition financing, I believe that the consideration being provided to the DIP Lenders for such commitments are reasonable in amount, appropriately compensate those parties for their costs and the assurances they are providing to the process, and are necessary for the Debtors to continue operating their businesses in the ordinary course and maximize the value of their estates.

31.      In exchange for participating in the New Money DIP Loans, the Participating Lenders are entitled to receive their pro rata share of (i) an upfront fee equal to 5.0%

of the New Money DIP Loans, earned and payable upon entry of the Interim Order and/or Final Order, as applicable, and (ii) an exit fee equal to 5.0% of the New Money DIP Loans, which are earned upon entry of the Interim Order and/or Final Order, as applicable and payable upon maturity, acceleration, termination, conversion, payment, prepayment, or repayment.

32.     Additionally, in exchange for their work negotiating, structuring, and obtaining the support of the other first and second lien term loan lenders, certain members of the Ad Hoc Group will receive a fee equal to 10.0% of the aggregate $1.1 billion commitment amount under the DIP Facility payable in kind and (the "**Structuring Fees**").  I believe that the Structuring Fees are reasonable under the circumstances given that certain members of the Ad Hoc Group have expended significant effort and resources structuring the DIP Financing in a compressed timeline and obtaining consents from the vast majority of the Debtors' prepetition term loan lenders.

33.     Based on my familiarity with the Debtors' capital structure, financial situation and experience as a restructuring professional, I believe the pricing and fees are reasonable under the circumstances and generally consistent with comparable DIP Financings in complex cases where there is substantial uncertainty such as these, given (i) the magnitude of the financing need, (ii) the lack of comprehensive accounting and financial diligence when investors have substantial concerns related thereto (as evidenced by the failed Global Refinancing Process), and (iii) the accelerated timeframe.  Therefore, I do not believe that a financing commitment with terms similar to those in the DIP Financing is available to the Debtors for lower fees or without the Roll-Up.  Accordingly, I believe that paying these fees and allowing for a roll up is reasonable and necessary under the circumstances of these chapter 11 cases.

17

**C.      Debtors' Proposed Adequate Protection**

34.      As part of the proposed DIP Facility, the Debtors propose to provide the

following as adequate protection:[3]

a. **First Lien Lenders**: In exchange for the use of cash collateral, the First Lien Term Loan Lenders will receive (i) first priority adequate protection liens on substantially all unencumbered assets (excluding avoidance actions and commercial tort claims, subject to entry of the Final Order) of the Debtors, (ii) payment in kind of the interest on the First Lien Term Loan Claims at the default rate, and (iii) superpriority claims and cash payment of reasonable and documented fees and expenses of the Ad Hoc Group's professionals.

b. **Second Lien Lenders**: In exchange for the use of cash collateral, the Second Lien Lenders will receive (i) second priority adequate protection liens on substantially all unencumbered assets (excluding avoidance actions and commercial tort claims, subject to entry of the Final Order) of the Debtors, and (ii) payment in kind of the interest on the Second Lien Term Loan Claims at the default rate.

c. **SPV Lenders**:

  i. The Debtors have proposed to provide certain of the SPV Lenders with one or more of the following rights and protections to maintain the status quo and not prejudice the SPV Debtors or the SPV Lenders during the interim period, depending upon the facts and circumstances for each SPV Lender:

    1. continuation of the SPV Lenders' liens on their inventory collateral and all proceeds generated therefrom (including accounts receivables generated from the sale of such inventory by the FBG Debtors);

    2. if any of the applicable SPV Lender's asserted collateral is sold to a third party, repayment in cash or segregation of any proceeds;

    3. to the extent oversecured, payment of interest from their respective SPV Debtor obligor; and

    4. various information and reporting requirements.

  ii. In addition, the Interim Order will provide that the DIP Liens and Adequate Protection Liens will not extend to the SPV Debtors.  However, the SPV Debtors must bear their fair share of costs fairly allocable to the SPV Debtors (e.g., professional fees and other costs to monetize their assets). Therefore, the FBG Debtor will be entitled to a superpriority administrative

---

[3] The below reflects a summary of the proposed adequate protection for the Debtors' prepetition lenders. Refer to the Interim Order for the comprehensive adequate protection package.

expense claim and senior lien against the SPV Debtor in the amount of such costs allocable to the SPV Debtor.  The Debtors, the SPV Lenders, and all other parties in interest will reserve their rights regarding the amount of such allocable costs, and all rights will be reserved regarding the validity, amount, secured status and/or priority of any claims asserted by the SPV Lenders and any of the Debtors.

### Conclusion

35.   Based on my experience and involvement in the third-party prepetition financing process, as well as the good faith, arm's length negotiations with the DIP Lenders, I believe that the terms of the DIP Facility are reasonable under the circumstances.  The DIP Facility is a critical component to the overall restructuring and provides the projected necessary liquidity for the Debtors to maintain operations in the normal course during the first phase of these chapter 11 cases.  Finally, the DIP Facility is the best (and only actionable) postpetition financing option currently available to the Debtors.  Accordingly, I believe that it would be appropriate for the Court to approve the DIP Facility as contemplated by the DIP Motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

September 30, 2025  
New York, New York

/s/ Tyler W. Cowan  
Tyler W. Cowan  
Global Head of Restructuring     Liability Management  
Lazard Fr res     Co. LLC

19

**JOINT EXHIBIT NO. 18**  
**Page 667 of 812**

## MANUFACTURING AGREEMENT

This Manufacturing Agreement (hereinafter referred to as the "Agreement") is entered into by and between **Trico Technologies Corporation** (hereinafter "**Trico Technologies**"), a corporation, duly organized and validly existing under the laws of Delaware, United States of America, represented by **Shekhar Kumar** in his capacity as Corporate Finance Manager, and **Carnaby Inventory III, LLC** (hereinafter as "**Carnaby**") limited liability company, duly organized and validly existing under the laws of Delaware, United States of America, represented by **Shekhar Kumar** in his capacity as Managing Director; pursuant to the following recitals and clauses.

ssss

### RECITALS

**WHEREAS**, **Trico Technologies** has entered into a Maquila Agreement with Trico Componentes, S.A. de C.V. (the "Maquila Agreement"). A copy of said Maquila Agreements and their corresponding amendments is attached hereto and identified as **Exhibit "A"**;

**WHEREAS**, **Trico Componentes, S.A. de C.V.** (the "**Maquiladora**") is a company duly organized and validly existing under the laws of the United States of Mexico and performs its operations in Mexico, in the location specified in **Exhibit "B";**

**WHEREAS**, **Trico Technologies** and **Carnaby** (jointly referred to as the "**Parties**") wish to enter into this manufacturing agreement pursuant to which **Carnaby** will hire and request the manufacturing services from **Trico Technologies** to manufacture and produce the products requested by **Carnaby** (the "**Products**");

**WHEREAS,** the parties intend to establish the terms and conditions of their business understanding with the purpose that hereinafter such business relationship is governed under the terms and conditions set forth herein;

**WHEREAS**, **Carnaby** acknowledges that the commercial manufacturing business relationship is with **Trico Technologies** and accepts that **Trico Technologies** could perform the manufacture processes required by **Carnaby** with another entity that could be located in the United States of America, in Mexico or in any other Country;

**WHEREAS**, for purposes of this Agreement, the parties agree that the commercial manufacturing business relationship is between **Carnaby** and **Trico Technologies** and Trico Technologies will provide the manufacturing services set forth herein through its **Maquiladora** located in Mexico;

**WHEREAS**, **Trico Technologies** has the expertise, facilities, equipment and appropriate personnel to carry out the manufacturing services requested by **Carnaby** through its **Maquiladora** located in Mexico;

**WHEREAS**, **Carnaby** will license to **Trico Technologies** and in turn its **Maquiladora** certain intellectual property rights and know-how relating to the Products and will deliver directly to the **Maquiladora** the necessary **Materials** for the manufacturing of the requested Products**;**

**WHEREAS,** the **Maquiladora** has secured authorization from the Ministry of Economy to operate under a maquiladora program ("**Maquiladora Program**") in accordance with the Decree for the Development of the Manufacturing, Maquiladora and Export Services Industry ("**IMMEX Decree**"), and any other customs authorization, program, license and/or registry required to import on a temporarily basis, export and manufacture, accordingly, in the most efficient way, the machinery, equipment and materials (jointly, the "**IMMEX Permits**");

**WHEREAS,** the **Maquiladora** is a registered enterprise for value added tax and excise tax purposes and has secured a Value Added Tax and Excise Tax Certification under modality A ("**VAT Certification"**), which entitles to a tax credit benefit for Value Added Tax and Excise Tax upon temporary importations;

**WHEREAS**, the commercial manufacturing business relationship will be exclusively at all times between **Carnaby**

**JOINT EXHIBIT NO. 18**
**Page 668 of 812**

and **Trico Technologies**;

**WHEREAS**, **Trico Technologies** acknowledges that it is the intention of **Carnaby** to have a business relationship that will not be taxable as a Permanent Establishment (**"PE"**) for **Carnaby** under Mexican income tax law (**"Mexican Income Tax Law"**);

**WHEREAS**, on the date hereof, **Carnaby,** Carnaby Inventory Holdings III, LLC, First Brands Group Holdings, LLC, and First Brands Group, LLC, have entered into a certain credit agreement (the **"Credit Agreement"**);

**WHEREAS**, the representatives of the parties have sufficient authority to enter into this Agreement, same that at the date of execution of this Agreement have not been revoked; and

**NOW THEREFORE**, in consideration of the of the recitals mentioned above, **Trico Technologies** and **Carnaby** agree to establish their commercial manufacturing business relationship in accordance with the following:

### CLAUSES

**FIRST. Trico Technologies** binds itself to carry out in benefit of **Carnaby**, the requested manufacturing process through its **Maquiladora**. **Trico Technologies** binds itself to transfer exclusively the Products manufactured under the instructions of **Carnaby** in accordance with the technical specifications and quality standards that will be provided by **Carnaby** and strictly under the terms hereof.

**SECOND. Trico Technologies** will provide through its **Maquiladora** the manufacturing process required by **Carnaby** with its expertise, facilities, machinery, equipment and appropriate personnel; **Trico Technologies** will be responsible before **Carnaby** for the use of the Materials provided by **Carnaby**, for Manufacturing process, the manufactured Products by **Trico Technologies** through its **Maquiladora**.

**THIRD. Carnaby** hires **Trico Technologies** to carry out the manufacturing services of the Products requested by **Carnaby**, as well as any other products, as may be agreed by the parties in the future in writing and **Trico Technologies** accepts and agrees to perform the manufacturing process through its **Maquiladora** in accordance with the terms of this Agreement.

**FOURTH. Carnaby** shall deliver to **Trico Technologies** at a previously agreed Maquiladora location, on a periodic basis, on consignment, under gratuitous bailment, the raw materials, components, subassemblies, and supplies (**"Materials"**) as are necessary to carry out the Manufacturing process of the Products performed by **Trico Technologies** through its **Maquiladora**. The parties shall agree in writing the Maquiladora and location where the Materials will be delivered by **Carnaby**, as well as the amounts, delivery dates and times, materials, and any other relevant aspect or information concerning the delivery of Materials.

Neither **Trico Technologies** or its **Maquiladora** shall under no circumstances be considered to have any proprietary interest on the **Materials** which **Carnaby** may deliver to **Trico Technologies** as provided for herein nor on the Products. Any commercial invoice that may be issued by **Carnaby** in order to comply with customs requirements for the exportation or importation of any **Materials** provided by **Carnaby** to **Trico Technologies** and **Maquiladora,** shall not be considered for any purposes to be evidence of conveyance of title in the **Materials** in favor of **Trico Technologies** or its **Maquiladora.** Once the Products covered by this Agreement have been manufactured by **Trico Technologies** through its **Maquiladora,** they must be returned to **Carnaby** in accordance with the terms of this Agreement.

**Trico Technologies** and its **Maquiladora** shall provide necessary administrative services for shipment, including the arrangement of proper transportation, of the **Materials** and the Products under this Agreement between the United Mexican States and the United States of America using information supplied by **Carnaby** (the "**Administrative Services**"); such Administrative Services shall include, but not be limited to, preparation of required United States of America and United States of Mexico Customs documentation and **Trico Technologies**

2

**JOINT EXHIBIT NO. 18**
**Page 669 of 812**

agrees to duly and timely comply with all the applicable customs laws. **Trico Technologies** may be the importer and exporter of record for United States of America customs purposes, in which case **Trico Technologies** shall obtain any validated export licenses required by United States of America export laws and regulations; if agreed by the parties separately to this Agreement, **Trico Technologies** shall be responsible for all compliance and all costs relating to compliance with United States of America customs regulations, including but not limited to, any and all United States of America import bonds; United States of America customs duties, import fees and taxes; fines and penalties; and United States of America customhouse brokerage fees. The **Maquiladora** shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the **Materials** and Products and shall comply with all record keeping and reporting obligations pursuant to the applicable law.

**Carnaby** shall be responsible for providing to **Trico Technologies** a detailed list of the **Materials** required to perform the Manufacturing process in order that the **Maquiladora** may obtain the necessary permits and authorizations to import the **Materials** under its IMMEX Program.

At all times during the term of this Agreement, **Trico Technologies** and its **Maquiladora** shall (i) be duly authorized by the competent governmental authority to operate the **Maquiladora Program**, (ii) hold valid and in force licenses, authorizations, permits, programs, licenses and/or registries required to perform the manufacturing services in the facilities in accordance to applicable laws and pursuant to this Agreement in the most cost-efficient and diligent way (the "Operating Permits" and together with the IMMEX Permits, the "Permits"), and (iii) carry out all the necessary activities before the corresponding governmental authority, to render the manufacturing services on time and agreed manner.

**FIFTH.** For the Products to be in compliance with the technical specifications and quality standards that **Carnaby** requires, **Carnaby** shall make available to **Trico Technologies** and subsequently **Trico Technologies** to its **Maquiladora** the knowledge, technical experience, and practice and other industrial information (the "Technical Information").

**Carnaby** will be able and allowed to supervise the manufacturing processes and if necessary, could assist **Trico Technologies** and in turn **its Maquiladora** to manufacture the Products pursuant to the terms herein.

The parties hereto agree that the transferring of Technical Information shall not trigger any consideration whatsoever, since all Technical Information is necessary for the Products to fulfill the technical specifications and quality standards that **Carnaby** requires, and does not serve any other purpose.

**Trico Technologies** and its **Maquiladora** shall pay any and all sales taxes, use taxes, personal taxes, flat taxes, value-added taxes, assessments, duties and all other governmental exactions of any nature, in connection with this Agreement, the **Materials,** the **Products** and the **Permits**, or in connection with the operations conducted in the facilities or the manufacturing services performed by **Trico Technologies** and its **Maquiladora** pursuant to this Agreement.

**SIXTH.** In consideration **Carnaby** shall pay to **Trico Technologies** the prices agreed separately to this Agreement for the Manufacturing services provided, based on the volume of units manufactured and sold; the payment conditions and terms will be agreed separately from this Agreement between **Carnaby** and **Trico Technologies**; provided that, any payments from **Carnaby** are subject to it being permitted to do so under Section 2.1(d) of the Credit Agreement

**SEVENTH.** Any samples of the Products officially requested by an agency or department of the Federal Government of Mexico or of other applicable authority of any other applicable country, may only be delivered upon written authorization of **Carnaby**, and provided an official receipt is secured from the requesting agency or department.

3

**EIGHTH. Trico Technologies** shall treat and preserve as confidential all information related to **Carnaby's** business, including the Technical Information, revealed to or learned by **Trico Technologies** and its Maquiladora from any source as a result of this Agreement. **Trico Technologies** will not disclose nor disseminate, nor permit to be disclosed nor disseminated, any customer list, pricing, technical information, know-how, industrial information, patents, trademarks, processes, programs, practices, methods or other material or data conceived, designed, created, developed, used, assembled or manufactured by **Trico Technologies** through its **Maquiladora**, unless it is strictly necessary during the training process of the employees to carry out the Processes.

**NINTH. Trico Technologies** and its **Maquiladora** shall comply with all existing laws and regulations in Mexico, and shall hold the Products, free of any liens, claims or charges by any agency or department of the Federal, State or Municipal governments.

**TENTH.** In performing its obligations under this Agreement, **Trico Technologies** shall comply with all applicable laws and regulations, including without limitation the applicable laws in Mexico and the Unites States of America or any other country, including without limitation the customs laws and regulations, and any rulings or guidelines issued by the customs authorities in the applicable country. **Trico Technologies** shall keep a comprehensive and detailed record of all Materials, Products, and any other goods imported into Mexico for purposes of this Agreement, as well as of all exportations of Products, waste, and any other items, maintaining copies of all import and export declarations and related documentation.

**ELEVENTH.** The parties agree that all notices and other communications required or desired to be given pursuant to this Agreement will be given in writing and will be deemed duly given upon personal delivery, or on the day after mailing if sent by a nationally recognized overnight delivery service which maintains records of the time, place and recipient of delivery, or upon receipt of a confirmed transmission if sent by telecopy or facsimile transmission, and in each case if addressed as follows:

**Carnaby Inventory III, LLC**
**Address:** 1540 Broadway Suite 3710, New York, New York
**Attention:** Legal Department
**Email address:** Shekhar Kumar – Shekhar.kumar@viceroyprivatecapital.com

**Trico Technologies Corporation**:
**Address:** 127 Public Square, Suite 5300, Cleveland, Ohio 44114
**Attention:** Legal Department
**Email Address**: ed.james@firstbrandsgroup.com

c/o First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention: Edward James, Executive Vice President
Email: ed.james@firstbrandsgroup.com

or to such other person, entity, address or facsimile number as a party may respectively designate in like manner from time to time.

**TWELFTH.-** This Agreement shall continue in force until terminated by either party. Either party may terminate this Agreement upon thirty (30) days prior written notice to the other party in accordance with the notice provisions of Clause Eleventh hereof.

**THIRTEENTH.** If, for any reason, any provision of this Agreement is determined to be invalid or unenforceable, such invalidity or enforceability shall not affect the remaining provisions of this Agreement.

4

**FOURTEENTH.** Time is of the essence for the performance of all obligations and the satisfaction of all conditions of this Agreement.

**FIFTEENTH.** Neither party shall be held responsible for any delay or failure in the performance of any part of this Agreement to the extent that such delay or failure is caused by fire, flood, explosion, war, seize, pandemic, government requirement, civil or military authority, act of God, act or omission of carriers, or any lockout, strike, labor trouble or other industrial disturbance, inevitable accident, export delays by governmental authorities or industry or trade association of whatever nature that limits the importation or exportation of the Materials, work in process or Products thereof or another cause beyond any of the parties reasonable control.  Any party excused from performance shall make a good faith effort to minimize the effect of the delay or non-performance.

**SIXTEENTH** This Agreement shall be interpreted pursuant to the laws of the State of New York, United States of America, without giving effect to its choice of law provisions.  Litigation brought to contest disputes arising under this Agreement shall be brought only in the state or federal courts of the State of New York, United States of America.

WAIVER OF JURY TRIAL.  THE PARTIES HEREBY IRREVOCABLY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, COUNTERCLAIM OR CROSS-COMPLAINT IN ANY ACTION OR OTHER PROCEEDING BROUGHT BY THE OTHER WITH RESPECT TO ANY MATTER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH OR RELATED TO THIS AGREEMENT, WHETHER BASED UPON CONTRACTUAL, STATUTORY, TORTIOUS OR OTHER THEORIES OF LIABILITY.

[*Signature page follows*]

5

**JOINT EXHIBIT NO. 18**
**Page 672 of 812**

**Exhibit 44**

**IN WITNESS WHEREOF,** the parties have executed this Agreement through their duly authorized representatives, on July 6, 2022, being fully effective as of said date.

**Carnaby Inventory III, LLC**                    **Trico Technologies Corporation**


**Name:**  Edward James                            **Name:**  Michael Baker
**Title:**  Executive Vice President                 **Title:**  Chief Corporate Strategy Officer


[*Signature page of the manufacturing agreement entered into by and between Trico Products Corporation and Carnaby Inventory III, LLC, with acknowledgement and consent of GLAS Trust Company LLC exclusively in its capacity as administrative agent of the Credit Agreement*]

**JOINT EXHIBIT NO. 18**
**Page 674 of 812**

*Execution Version*

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "***Agreement***") is made and entered into as of May 31, 2022 (the "***Execution Date***"), by and between CARNABY INVENTORY II, LLC, a Delaware limited liability company (the "***Seller***") and BRAKE PARTS INC LLC (the "***Buyer***").  The Seller and the Buyer are each a "***Party***" and collectively, the "***Parties***."

**RECITALS**

WHEREAS, the Seller desires to sell, assign and transfer free and clear of any lien, and the Buyer desires to purchase, all of the assets set forth on any schedule under this Agreement executed by Seller and Buyer (each, a "***Schedule***") in the form attached hereto as **Annex I,** free and clear of any lien, which consist of certain inventory of the Seller (collectively, the "***Acquired Assets***"), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties to this Agreement, intending to be legally bound, hereby agree as follows:

1.  **Sale and Purchase of Assets**.  At each Subsequent Closing, the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and its affiliates in and to all of the Acquired Assets described on a Schedule as of the Subsequent Closing Date.

2.  **Purchase Price**.  The purchase price for each Acquired Asset will be the fair market value thereof (the "***Purchase Price***"), which amount may be paid in the form of cash or in kind.

3.  **Closing**.  The purchase and sale of the Acquired Assets pursuant to an executed Schedule shall occur a upon payment of the applicable Purchase Price for each Acquired Asset (each, a "***Subsequent Closing***" and the date thereof, a "***Subsequent Closing Date***").  The risk of loss and full benefit of ownership of the Acquired Assets shall transfer to the Buyer immediately upon the Subsequent Closing.

4.  **[Reserved]**.

5.  **Seller's Representations and Warranties**.  Seller represents and warrants to the Buyer, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

    (a)  **Organization, Existence, Good Standing**. Seller is duly incorporated, organized, or formed, and is existing and in good standing under the laws of its jurisdiction of incorporation, organization, or formation.

    (b)  **Power and Authority**. Seller has full power and authority to enter into and perform this Agreement.  The execution, delivery and performance of this Agreement by Seller have been duly and validly approved by Seller's board of directors or equivalent governing body, as applicable.  No other proceedings are necessary on the part of Seller to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein.  Seller has the necessary power and authority to own and operate the Acquired Assets.

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 675 of 812**

(c) **Enforceability**.  This Agreement has been duly authorized, executed and delivered by Seller and constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(d) **Governmental Consents and Conflicts**.  No consent, authorization, order or approval of, or filing or registration with, any Governmental Authority is required for or in connection with the consummation by Seller of the transactions contemplated by this Agreement.

(e) **Other Consents and Conflicts**.  Neither the execution nor delivery of this Agreement by Seller, nor the consummation by Seller of the transactions contemplated in this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any claim upon any of the Acquired Assets, under (i) Seller's corporate governing or other organizational documents, or (ii) any contract that is material to the operation of the business of Seller.

(f) **Title to Assets**.  Seller has good title to the Acquired Assets, in each case free and clear of any Liens.

(g) **Transfer Taxes**.  Seller hereby represents and warrants with respect to the Acquired Assets that the sale, transfer, assignment and conveyance of the Acquired Assets by Seller pursuant to this Agreement is not subject to and will not result in any tax, fee or governmental charge payable by the Buyer or Seller to any federal, state or local government ("*Transfer Taxes*").  In the event that Seller receives notice of any Transfer Taxes arising out of the transfer of such Assets, Seller shall give notice thereof to the Buyer, and Seller shall pay any such Transfer Taxes.

(h) **Condition and Sufficiency of Acquired Assets**.  The Acquired Assets are in good condition for use in the business as used by Seller as of the date hereof, ordinary wear and tear excepted.

(i) **Right of Others to Purchase Assets**. Seller has not entered into any other contracts for the sale of any of the Acquired Assets, nor are there any rights of first refusal or options to purchase any of the Acquired Assets or any other rights of others that might prevent the consummation of this Agreement.

6. **Transfers Intended as Sales**.  Each purchase of the Acquired Assets is made without recourse to Seller. The parties hereto have structured each transaction contemplated by this Agreement as an absolute and irrevocable sale, and the Buyer and Seller agree to treat each such transaction as a "true sale" for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings (and shall reflect such sale in their respective financial statements). Seller will advise anyone inquiring about the ownership of any Acquired Assets that all Acquired Assets have been sold to the Buyer.

7. **Buyer's Representations and Warranties**.  The Buyer represents and warrants to Seller, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

29078448.2

(a) **Organization, Existence, Good Standing**. The Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all the requisite power and authority to enter into this Agreement and to purchase the Acquired Assets.

(b) **Enforceability**. This Agreement constitutes the Buyer's legal, valid and binding obligation and is enforceable according to its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(c) **Power and Authority**. The Buyer's execution and delivery of this Agreement, and the consummation of the transactions it contemplates, will not (i) violate, breach or be a default under any contract, agreement or commitment, (ii) violate any order, injunction, rule, regulation or ordinance of any court, administrative agency or governmental body, or (iii) violate or breach the Buyer's organizational or governing documents.

8. **Further Assurances**. From and after the Closing, at the request of the Buyer, Seller will execute and deliver, or cause to be executed and delivered, to the Buyer such instruments and other documents as the Buyer may request in order to implement the purchase and sale of the Acquired Assets, including, without limitation, bills of sale, transfer or assignment agreements, the filing of certificates of title and similar instruments, and any filings relating to the payment of Transfer Taxes. Seller and the Buyer shall cooperate and use their respective reasonable best efforts to comply with their respective obligations under this Agreement.

9. **Expenses**. Except as otherwise provided in this Agreement with respect to Transfer Taxes, each Party will bear its own expenses incurred or to be incurred in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby.

10. **No Assignment**. The rights and obligations of the Seller under this Agreement may not be assigned without the prior written consent of the Buyer, except that Seller may, without the consent of Buyers, assign any or all of its rights and obligations to any of its affiliates, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of Seller hereunder or the failure of Seller to perform any of its covenants hereunder, and provided that no such assignment shall relieve Seller of any of its liabilities or obligations hereunder. The rights and obligations of the Buyer under this Agreement may not be assigned without prior written consent of Seller, except that the Buyer may, without the consent of Seller, assign any or all of its rights and obligations under this Agreement to (a) any affiliate of the Buyer, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of the Buyer hereunder or the failure of the Buyer to perform any of its covenants hereunder, and provided that no such assignment shall relieve the Buyer of any of its liabilities or obligations hereunder; or (b) any lenders of the Buyer or any affiliate of the Buyer as collateral security. Notwithstanding anything herein to the contrary, the prior written consent of GLAS Trust Company LLC, as administrative agent for the lenders under that Credit Agreement, dated as of May 31, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the **"Credit Agreement"**), by and among buyer, as the borrower, First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the **"Lenders"**), and GLAS Trust Company LLC, as administrative agent, shall be required for any assignment pursuant to this Section 10.

3

29078448.2

11.   **Headings**.  The headings contained in this Agreement are included for purposes of convenience only, and do not affect the meaning or interpretation of this Agreement.

12.   **Severability**.  If any provision of this Agreement or the application of any provision of this Agreement to any Party or circumstance is, to any extent, adjudged invalid or unenforceable, then the application of the remainder of such provision to such Party or circumstance, the application of such provision to other Parties or circumstances, and the application of the remainder of this Agreement will not be affected thereby.  Upon such determination that any term or other provision is invalid or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13.   **Notices**.  All notices and other communications required or permitted under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) one day after deposit with an overnight delivery service (prepaid, return receipt requested), (c) three days after being mailed if sent by registered or certified mail (postage prepaid, return receipt requested), (d) upon receipt of electronic evidence of successful electronic mail transmission or (e) upon electronic confirmation of successful facsimile transmission, in each case, to the appropriate Party at the address or facsimile number specified below:

(a)   If to Buyer:

c/o First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention: Edward James, Executive Vice President
Email: ed.james@firstbrandsgroup.com

(b)   If to the Seller:

Carnaby Inventory II, LLC
1540 Broadway, Suite 3710
New York, New York
Attention:  Shekhar Kumar, Managing Director
Email:  shekhar.kumar@viceroyprivatecapital.co

14.   **Governing Law**.  This Agreement will be governed by and construed and enforced in accordance with the laws of the State of New York without regard to principles of conflicts of law.

15.   **Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED UPON, ARISING OUT OF OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

16.   **Counterparts**.  This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission

4

29078448.2

(including documents in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Agreement.

**[Signatures Pages Follow]**

29078448.2

IN WITNESS WHEREOF, each of the Parties have duly executed this Agreement or have caused this Asset Agreement to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY II, LLC**

By: _____

Name:   Shekhar Kumar

Title:     Managing Director

**SELLER:**

**BRAKE PARTS INC LLC**

By: _____

Name:   Michael Baker

Title:     Chief Corporate Strategy Officer

[Signature Page to Asset Purchase Agreement]

**JOINT EXHIBIT NO. 18**
**Page 680 of 812**

Annex I to Asset Purchase Agreement

Form of Schedule

     This SCHEDULE NO. ___, dated as of _____ __, 20___ (the "**Schedule**") to that certain Asset Purchase Agreement dated as of [•], 20__ (as may be further amended, supplemented or modified from time to time, the "***Asset Purchase Agreement***"), is executed among BRAKE PARTS INC LLC, a Delaware limited liability company (the "***Seller***") and CARNABY INVENTORY II, LLC (the "***Buyer***"). The Seller and the Buyer are each a "***Party***" and collectively, the "***Parties***."

     WHEREAS, the Asset Purchase Agreement provides for the execution and delivery of a Schedule to the Asset Purchase Agreement substantially in the form hereof in connection with any sale of Acquired Assets on a Subsequent Closing Date;

     NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, the Parties hereby agree as follows:

1. The Seller and the Buyer hereby confirm that all of the assets described on Exhibit A to this Schedule are Acquired Assets under the Asset Purchase Agreement, and that the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and their respective affiliates to those Acquired Assets described on Exhibit A hereto as of the Subsequent Closing Date.

2. All capitalized terms used in this Schedule but not defined in this Schedule shall have the meaning set forth in the Asset Purchase Agreement.

29078448.2

IN WITNESS WHEREOF, the Parties have duly executed this Schedule or have caused this Schedule to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY II, LLC**

By:_____
Name:
Title:

**SELLER:**

**BRAKE PARTS INC LLC**

By:_____
Name:
Title:

29078448.2

<u>Exhibit A to Schedule No. ___</u>

Acquired Assets

29078448.2

*Execution Version*

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of May 31, 2022 (the "*Execution Date*"), by and between BRAKE PARTS INC LLC, a Delaware limited liability company (the "*Seller*") and CARNABY INVENTORY II, LLC (the "*Buyer*").  The Seller and the Buyer are each a "*Party*" and collectively, the "*Parties*."

**RECITALS**

WHEREAS, the Seller desires to sell, assign and transfer free and clear of any lien, and the Buyer desires to purchase, all of the assets set forth on any schedule under this Agreement executed by Seller and Buyer (each, a "*Schedule*") in the form attached hereto as **Annex I,** free and clear of any lien, which consist of certain inventory of the Seller (collectively, the "*Acquired Assets*"), subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties to this Agreement, intending to be legally bound, hereby agree as follows:

1.  **Sale and Purchase of Assets**.  At each Subsequent Closing, the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and its affiliates in and to all of the Acquired Assets described on a Schedule as of the Subsequent Closing Date.

2.  **Purchase Price**.  The purchase price for each Acquired Asset will be the fair market value thereof (the "*Purchase Price*"), which amount may be paid in the form of cash, in kind or by an increase in the amount payable under the Seller's Subordinated Note (as defined below).

3.  **Closing**.  The purchase and sale of the Acquired Assets pursuant to an executed Schedule shall occur a upon payment of the applicable Purchase Price for each Acquired Asset (each, a "*Subsequent Closing*" and the date thereof, a "*Subsequent Closing Date*"). The risk of loss and full benefit of ownership of the Acquired Assets shall transfer to the Buyer immediately upon the Subsequent Closing.

4.  **Subordinated Note**.  Seller irrevocably agrees to advance each subordinated loan requested by the Buyer as payment for the applicable Purchase Price (or portion thereof).  Each subordinated loan shall be evidenced by, and shall be payable in accordance with the terms and provisions of, a Subordinated Note.  "*Subordinated Note*" for purposes hereof means a promissory note in substantially the form of **Annex II** hereto.

5.  **Seller's Representations and Warranties**.  Seller represents and warrants to the Buyer, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

    (a)  **Organization, Existence, Good Standing**. Seller is duly incorporated, organized, or formed, and is existing and in good standing under the laws of its jurisdiction of incorporation, organization, or formation.

    (b)  **Power and Authority**. Seller has full power and authority to enter into and perform this Agreement.  The execution, delivery and performance of this Agreement by Seller have

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 684 of 812**

been duly and validly approved by Seller's board of directors or equivalent governing body, as applicable.  No other proceedings are necessary on the part of Seller to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein.  Seller has the necessary power and authority to own and operate the Acquired Assets.

(c)  **Enforceability**.  This Agreement has been duly authorized, executed and delivered by Seller and constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

(d)  **Governmental Consents and Conflicts**.  No consent, authorization, order or approval of, or filing or registration with, any Governmental Authority is required for or in connection with the consummation by Seller of the transactions contemplated by this Agreement.

(e)  **Other Consents and Conflicts**.  Neither the execution nor delivery of this Agreement by Seller, nor the consummation by Seller of the transactions contemplated in this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any claim upon any of the Acquired Assets, under (i) Seller's corporate governing or other organizational documents, or (ii) any contract that is material to the operation of the business of Seller.

(f)  **Title to Assets**.  Seller has good title to the Acquired Assets, in each case free and clear of any Liens.

(g)  **Transfer Taxes**.  Seller hereby represents and warrants with respect to the Acquired Assets that the sale, transfer, assignment and conveyance of the Acquired Assets by Seller pursuant to this Agreement is not subject to and will not result in any tax, fee or governmental charge payable by the Buyer or Seller to any federal, state or local government ("*Transfer Taxes*").  In the event that Seller receives notice of any Transfer Taxes arising out of the transfer of such Assets, Seller shall give notice thereof to the Buyer, and Seller shall pay any such Transfer Taxes.

(h)  **Condition and Sufficiency of Acquired Assets**.  The Acquired Assets are in good condition for use in the business as used by Seller as of the date hereof, ordinary wear and tear excepted.

(i)  **Right of Others to Purchase Assets**. Seller has not entered into any other contracts for the sale of any of the Acquired Assets, nor are there any rights of first refusal or options to purchase any of the Acquired Assets or any other rights of others that might prevent the consummation of this Agreement.

6.  **Transfers Intended as Sales**.  Each purchase of the Acquired Assets is made without recourse to Seller. The parties hereto have structured each transaction contemplated by this Agreement as an absolute and irrevocable sale, and the Buyer and Seller agree to treat each such transaction as a "true sale" for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings (and shall reflect such sale in their respective financial

2

29078448.2

**JOINT EXHIBIT NO. 18**
**Page 685 of 812**

statements). Seller will advise anyone inquiring about the ownership of any Acquired Assets that all Acquired Assets have been sold to the Buyer.

7. **Buyer's Representations and Warranties**.  The Buyer represents and warrants to Seller, as of the date of this Agreement, as of the Execution Date and as of each Subsequent Closing, each of the following.

   (a) **Organization, Existence, Good Standing**.  The Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all the requisite power and authority to enter into this Agreement and to purchase the Acquired Assets.

   (b) **Enforceability**.  This Agreement constitutes the Buyer's legal, valid and binding obligation and is enforceable according to its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

   (c) **Power and Authority**.  The Buyer's execution and delivery of this Agreement, and the consummation of the transactions it contemplates, will not (i) violate, breach or be a default under any contract, agreement or commitment, (ii) violate any order, injunction, rule, regulation or ordinance of any court, administrative agency or governmental body, or (iii) violate or breach the Buyer's organizational or governing documents.

8. **Further Assurances**.  From and after the Closing, at the request of the Buyer, Seller will execute and deliver, or cause to be executed and delivered, to the Buyer such instruments and other documents as the Buyer may request in order to implement the purchase and sale of the Acquired Assets, including, without limitation, bills of sale, transfer or assignment agreements, the filing of certificates of title and similar instruments, and any filings relating to the payment of Transfer Taxes.  Seller and the Buyer shall cooperate and use their respective reasonable best efforts to comply with their respective obligations under this Agreement.

9. **Expenses**.  Except as otherwise provided in this Agreement with respect to Transfer Taxes, each Party will bear its own expenses incurred or to be incurred in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby.

10. **No Assignment**.  The rights and obligations of the Seller under this Agreement may not be assigned without the prior written consent of the Buyer, except that Seller may, without the consent of Buyers, assign any or all of its rights and obligations to any of its affiliates, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of Seller hereunder or the failure of Seller to perform any of its covenants hereunder, and provided that no such assignment shall relieve Seller of any of its liabilities or obligations hereunder.  The rights and obligations of the Buyer under this Agreement may not be assigned without prior written consent of Seller, except that the Buyer may, without the consent of Seller, assign any or all of its rights and obligations under this Agreement to (a) any affiliate of the Buyer, as long as such assignment does not delay or impede the Closing or result in the breach of any representation or warranty of the Buyer hereunder or the failure of the Buyer to perform any of its covenants hereunder, and provided that no such assignment shall relieve the Buyer of any of its liabilities or obligations hereunder; or (b) any lenders of the Buyer or any affiliate of the Buyer as collateral security.  Notwithstanding anything herein to the contrary, the prior written consent of

3

**JOINT EXHIBIT NO. 18**
**Page 686 of 812**

GLAS Trust Company LLC, as administrative agent for the lenders under that Credit Agreement, dated as of May 31, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the *"Credit Agreement"*), by and among buyer, as the borrower, First Brands Group, LLC, as Servicer, the Guarantors and the lenders from time to time party thereto (the *"Lenders"*), and GLAS Trust Company LLC, as administrative agent, shall be required for any assignment pursuant to this Section 10.

11.   **Headings**.  The headings contained in this Agreement are included for purposes of convenience only, and do not affect the meaning or interpretation of this Agreement.

12.   **Severability**.  If any provision of this Agreement or the application of any provision of this Agreement to any Party or circumstance is, to any extent, adjudged invalid or unenforceable, then the application of the remainder of such provision to such Party or circumstance, the application of such provision to other Parties or circumstances, and the application of the remainder of this Agreement will not be affected thereby.  Upon such determination that any term or other provision is invalid or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13.   **Notices**.  All notices and other communications required or permitted under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) one day after deposit with an overnight delivery service (prepaid, return receipt requested), (c) three days after being mailed if sent by registered or certified mail (postage prepaid, return receipt requested), (d) upon receipt of electronic evidence of successful electronic mail transmission or (e) upon electronic confirmation of successful facsimile transmission, in each case, to the appropriate Party at the address or facsimile number specified below:

(a)   If to Seller:

c/o First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention: Edward James, Executive Vice President
Email: ed.james@firstbrandsgroup.com

(b)   If to the Buyer:

Carnaby Inventory II, LLC
1540 Broadway, Suite 3710
New York, New York
Attention:  Shekhar Kumar, Managing Director
Email:  shekhar.kumar@viceroyprivatecapital.co

14.   **Governing Law**.  This Agreement will be governed by and construed and enforced in accordance with the laws of the State of New York without regard to principles of conflicts of law.

15.   **Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED UPON, ARISING OUT OF OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR THE

4

29078448.2

ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

16.     **Counterparts**.  This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission (including documents in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Agreement.

**[Signatures Pages Follow]**

5

29078448.2

IN WITNESS WHEREOF, each of the Parties have duly executed this Agreement or have caused this Asset Agreement to be duly executed as of the date first written above.

<u>**BUYER:**</u>

**CARNABY INVENTORY II, LLC**

By: _____

Name:   Shekhar Kumar

Title:   Managing Director

<u>**SELLER:**</u>

**BRAKE PARTS INC LLC**

By: _____

Name:   Michael Baker

Title:   Chief Corporate Strategy Officer

[Signature Page to Asset Purchase Agreement]

**JOINT EXHIBIT NO. 18**

Annex I to Asset Purchase Agreement

Form of Schedule

This SCHEDULE NO. ___, dated as of _____ __, 20___ (the "***Schedule***) to that certain Asset Purchase Agreement dated as of [•], 20__ (as may be further amended, supplemented or modified from time to time, the "***Asset Purchase Agreement***"), is executed among BRAKE PARTS INC LLC, a Delaware limited liability company (the "***Seller***") and CARNABY INVENTORY II, LLC (the "***Buyer***"). The Seller and the Buyer are each a "***Party***" and collectively, the "***Parties***."

WHEREAS, the Asset Purchase Agreement provides for the execution and delivery of a Schedule to the Asset Purchase Agreement substantially in the form hereof in connection with any sale of Acquired Assets on a Subsequent Closing Date;

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, the Parties hereby agree as follows:

1.  The Seller and the Buyer hereby confirm that all of the assets described on Exhibit A to this Schedule are Acquired Assets under the Asset Purchase Agreement, and that the Buyer shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Buyer, all right, title and interest of the Seller and their respective affiliates to those Acquired Assets described on Exhibit A hereto as of the Subsequent Closing Date.

2.  All capitalized terms used in this Schedule but not defined in this Schedule shall have the meaning set forth in the Asset Purchase Agreement.

29078448.2

IN WITNESS WHEREOF, the Parties have duly executed this Schedule or have caused this Schedule to be duly executed as of the date first written above.

**BUYER:**

**CARNABY INVENTORY II, LLC**

By:_____
Name:
Title:    Managing Director

**SELLER:**

**BRAKE PARTS INC LLC**

By:_____
Name:
Title:

29078448.2

Exhibit A to Schedule No.

Acquired Assets

29078448.2

<u>Annex II to Asset Purchase Agreement</u>

Form of Subordinated Note

29078448.2

SUBORDINATED NOTE

_____, 202_

1.    Note.  FOR VALUE RECEIVED, the undersigned, Carnaby Inventory II, LLC, a Delaware limited liability company (the "**Buyer**"), hereby unconditionally promises to pay to Brake Parts Inc LLC, a Delaware limited liability company (the "**Supplier**"), in lawful money of the United States of America and in immediately available funds, the aggregate unpaid principal sum of all outstanding obligations owed by the Buyer to the Supplier pursuant to and in accordance with the terms of any purchase agreement between the Buyer and Supplier.

2.    Definitions.  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Credit Agreement.  The following terms have the following meanings:

"**Available Cash"** means, on any date of determination, cash available to the Buyer from any source that is not required to be paid to or set aside for the benefit of the Administrative Agent and the Lenders on such date under the Credit Agreement.

"**Bankruptcy Proceedings**" has the meaning set forth in clause (b) of Section 7 hereof.

"**Contractual Maturity Date**" means the "Maturity Date" as defined in the Credit Agreement.

"**Credit Agreement**" means that certain Credit Agreement, dated as of May 31, 2022 by and among the Buyer, as borrower, Carnaby Inventory Holdings II, LLC, as guarantor, First Brands Group Holdings, LLC, as guarantor, First Brands Group, LLC, as servicer, the Lenders from time to time party thereto, and GLAS Trust Company LLC, as the Administrative Agent (as amended, restated, supplemented or otherwise modified from time to time).

"**Discount Factor**" means a percentage calculated to provide the Buyer with a reasonable return on its investment in the purchased inventory after taking account of the time value of money and the risk of nonpayment and/or failure of a counterparty to purchase such inventory.  Each of the Seller and the Buyer may agree from time to time and at any time to change the Discount Factor based on changes in one or more of the items affecting the calculation thereof.  As of the date of this agreement, the Discount Factor is 5.00%.

"**Highest Lawful Rate**" has the meaning set forth in Section 9 hereof.

"**Holder**" has the meaning set forth in Section 7 hereof.

"**Lenders**" means the lenders from time to time party to the Credit Agreement.

"**Maturity Date**" means the date that is 365 days following the Contractual Maturity Date.

"**Senior Claim**" means, collectively, the Obligations under, and as defined in, the Credit Agreement, together with any and all interest accruing on any such amount after the commencement of any Bankruptcy Proceedings, notwithstanding any provision or rule of law that might restrict the rights of any Senior Claimant, as against the Buyer or anyone else, to collect such interest.

29101141.3

**JOINT EXHIBIT NO. 18**
**Page 694 of 812**

"**Senior Claimants**" means the Administrative Agent, the Lenders and/or any of their successors or permitted assignees under the Credit Agreement.

"**Subordination Provisions**" means, collectively, clauses (a) through (l) of Section 7 hereof.

3.      Interest.  The Buyer further promises to pay interest on the outstanding unpaid principal amount hereof from the date hereof until payment in full hereof at a rate equal to the Discount Factor, computed for actual days elapsed on the basis of a year consisting of 360 days, on each Payment Date hereafter on which no Default or Event of Default exists and is continuing, to the extent of the Buyer's Available Cash and to the extent expressly set forth in accordance with Section 2.1(d) of the Credit Agreement (it being understood and agreed that any amount of interest which the Buyer is precluded from paying due to the existence and continuance of a Default or Event of Default or the lack of sufficient Available Cash shall become due and payable on the next Payment Date on which no such condition persists); **provided**, **however**, that if the Buyer shall default in the payment of any principal hereof, the Buyer promises to pay, on demand, interest at the rate equal to the Default Rate per annum on any such unpaid amounts, from the date such payment is due to the date of actual payment; and **provided further**, that the Buyer may elect on the date any interest payment is due hereunder to defer such payment and upon such election the amount of interest due but unpaid on such date shall constitute principal under this Subordinated Note.  The outstanding unpaid interest of any loan made under this Subordinated Note shall be due and payable on the Maturity Date and may be paid with the prepayment of principal at any time without premium or penalty.

4.      Principal Payments.  On each Payment Date hereafter on which no Default or Event of Default (each, as defined in the Credit Agreement) exists and is continuing, the Buyer shall pay to the Seller the outstanding principal balance of this Subordinated Note to the extent of the Buyer's Available Cash and to the extent expressly set forth in accordance with Section 2.1(d) of the Credit Agreement (it being understood and agreed that any amount of principal which the Buyer is precluded from paying due to the existence and continuance of a Default or Event of Default or the lack of sufficient Available Cash shall become due and payable on the next Payment Date on which no such condition persists).  The Seller is authorized and directed by the Buyer to enter in its books and records, the date and amount of each loan made by it which is evidenced by this Subordinated Note and the amount of each payment of principal owed or made by the Buyer, and absent manifest error, such entries shall constitute prima facie evidence of the accuracy of the information so entered; **provided** that neither the failure of the Seller to make any such entry or any error therein shall expand, limit or affect the obligations of the Buyer hereunder.  The outstanding principal of any loan made under this Subordinated Note shall be due and payable on the Maturity Date and may be repaid or prepaid at any time, to the extent expressly set forth in accordance with Section 2.1(d) of the Credit Agreement, without premium or penalty.

5.      Payment Mechanics.  All payments of principal and interest hereunder are to be made in lawful money of the United States of America in the manner specified in the applicable purchase and sale documentation.

6.      Enforcement Expenses.  In addition to and not in limitation of the foregoing, but subject to the Subordination Provisions set forth above and to any limitation imposed by applicable Law and to the extent expressly set forth in accordance with Section 2.1(d) of the Credit Agreement, the Buyer agrees to pay all expenses, including attorney fees, incurred by the Seller in seeking to collect any amounts payable hereunder which are not paid when due.

29101141.3

7.      Subordination Provisions.  Buyer covenants and agrees, and the Seller and any other holder of this Subordinated Note (collectively, the Seller and any such other holder are called the "***Holder***"), by its acceptance of this Subordinated Note, likewise covenants and agrees on behalf of itself and any Holder, that the payment of the principal amount of and interest on this Subordinated Note is hereby expressly subordinated in right of payment to the payment in full and in cash and performance in full of the Senior Claim in all respects.  Without limiting the generality of the foregoing,

(a)      No payment or other distribution of the Buyer's assets of any kind or character, whether in cash, securities, or other rights or property, shall be made on account of this Subordinated Note except to the extent such payment or other distribution is (i) permitted under the Credit Agreement or (ii) made pursuant to Section 4 of this Subordinated Note;

(b)      In the event of any dissolution, winding up, liquidation, readjustment, reorganization or other similar event relating to the Buyer, whether voluntary or involuntary, partial or complete, and whether in bankruptcy, insolvency or receivership proceedings, or upon an assignment for the benefit of creditors, or any other marshalling of the assets and liabilities of the Buyer or any sale of all or substantially all of the assets of the Buyer other than as permitted by the Credit Agreement (such proceedings being herein collectively called "***Bankruptcy Proceedings***"), the Senior Claim shall first be paid in full and in cash and performed in full, and all commitments of the lenders under the Credit Agreement shall have been terminated, before the Seller shall be entitled to receive and to retain any payment or distribution in respect of this Subordinated Note.  In order to implement the foregoing:  (i) all payments and distributions of any kind or character in respect of this Subordinated Note to which the Holder would be entitled except for this clause (b) shall be made directly to the Administrative Agent (for the benefit of the Senior Claimants); (ii) the Holder shall promptly file a claim or claims, in the form required in any Bankruptcy Proceedings, for the full outstanding amount of this Subordinated Note, and shall use commercially reasonable efforts to cause said claim or claims to be approved and all payments and other distributions in respect thereof to be made directly to the Administrative Agent (for the benefit of the Senior Claimants) until the Senior Claim shall have been paid in full in cash and performed in full and all commitments of the lenders under the Credit Agreement shall have been terminated; and (iii) the Holder hereby irrevocably agrees that the Administrative Agent (acting on behalf of the Lenders), may in the name of the Holder or otherwise, demand, sue for, collect, receive and receipt for any and all such payments or distributions, and file, prove and vote or consent in any such Bankruptcy Proceedings with respect to any and all claims of the Holder relating to this Subordinated Note, in each case until the Senior Claim shall have been paid in full and in cash and performed in full and all commitments of the lenders under the Credit Agreement shall have been terminated;

(c)      In the event that the Holder receives any payment or other distribution of any kind or character from the Buyer or from any other source whatsoever, in respect of this Subordinated Note, other than as expressly permitted by the terms of this Subordinated Note, such payment or other distribution shall be received in trust for the Senior Claimants and shall be turned over by the Holder to the Administrative Agent (for the benefit of the Senior Claimants) forthwith.  The Holder will mark its books and records so as clearly to indicate that this Subordinated Note is subordinated in accordance with the terms hereof.  All payments and distributions received by the Administrative Agent in respect of this Subordinated Note, to the extent received in or converted into cash, may be applied by the Administrative Agent (for the benefit of the Senior Claimants) first to the payment of any and all expenses (including attorney

29101141.3

fees) paid or incurred by the Senior Claimants in enforcing these Subordination Provisions, or in endeavoring to collect or realize upon this Subordinated Note, and any balance thereof shall, solely as between the Seller and the Senior Claimants, be applied by the Administrative Agent (in the order of application of the Waterfall set forth in Section 2.1(c) of the Credit Agreement) toward the payment of the Senior Claim; but as between the Buyer and its creditors, no such payments or distributions of any kind or character shall be deemed to be payments or distributions in respect of the Senior Claim;

(d)    Notwithstanding any payments or distributions received by the Senior Claimants in respect of this Subordinated Note, the Holder shall not be subrogated to the then existing rights of the Senior Claimants in respect of the Senior Claim until the Senior Claim has been paid and performed in full and in cash and all commitments of the lenders under the Credit Agreement have been terminated.

(e)    These Subordination Provisions are intended solely for the purpose of defining the relative rights of the Holder, on the one hand, and the Senior Claimants on the other hand. Nothing contained in these Subordination Provisions or elsewhere in this Subordinated Note is intended to or shall impair, as between the Buyer, its creditors (other than the Senior Claimants) and the Holder, the Buyer's obligation, which is unconditional and absolute, to pay the Holder the principal of and interest on this Subordinated Note as and when the same shall become due and payable in accordance with the terms hereof or to affect the relative rights of the Holder and creditors of the Buyer (other than the Senior Claimants);

(f)    Prior to the payment in full in cash and performance in full of the Senior Claim and termination of all commitments of the lenders under the Credit Agreement, the Holder shall not sue, or initiate or participate with any others in any suit, action or proceeding against, the Buyer to enforce payment of or collect any payments owing by the Buyer to the Holder under this Subordinated Note that are not permitted to be made to the Holder by operation of this Section 7.  The Holder shall not, until after the occurrence of the Termination Date, (i) cancel, waive, forgive, transfer or assign, or commence legal proceedings to enforce or collect, or subordinate to any obligation of the Buyer, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or now or hereafter existing, or due or to become due, other than the Senior Claim, this Subordinated Note or any rights in respect hereof or (ii) convert this Subordinated Note into an equity interest in the Buyer, unless the Holder shall, in either case, have received the prior written consent of the Administrative Agent (at the direction of the Required Lenders);

(g)    The Holder shall not, without the advance written consent of the Administrative Agent and each Lender, commence, or join with any other Person in commencing, any Bankruptcy Proceedings with respect to the Buyer until at least one year and one day shall have passed since the Senior Claim shall have been paid in full in cash and performed in full and in cash and all commitments of the lenders under the Credit Agreement shall have been terminated;

(h)    If, at any time, any payment (in whole or in part) of any Senior Claim is rescinded or must be restored or returned by a Senior Claimant (whether in connection with Bankruptcy Proceedings or otherwise), these Subordination Provisions shall continue to be effective or shall be reinstated, as the case may be, as though such payment had not been made;

29101141.3

(i)      Holder hereby waives notice, and without waiving any of its rights under these Subordination Provisions, of any action taken or to be taken by any Senior Claimant, including without limitation: (i) retaining or obtaining an interest in any property to secure the Senior Claim; (ii) retaining or obtaining the primary or secondary obligations of any other obligor or obligors with respect to the Senior Claim; (iii) extending the Contractual Maturity Date, altering or exchanging the Senior Claim, or releasing or compromising any obligation of any nature with respect to the Senior Claim; (iv) amending, supplementing, amending and restating, or otherwise modifying any Transaction Document; and (v) releasing its security interest in, or surrendering, releasing or permitting any substitution or exchanging for all or any part of any rights or property securing the Senior Claim, or extending or renewing for one or more periods (whether or not longer than the original period), or releasing, compromising, altering or exchanging any obligations of any nature of any obligor with respect to any such rights or property;

(j)      The Holder hereby waives:  (i) notice of acceptance of these Subordination Provisions by any of the Senior Claimants; (ii) notice of the existence, creation, non-payment or non-performance of all or any part of the Senior Claim; and (iii) all diligence in enforcement, collection or protection of, or realization upon, the Senior Claim, or any thereof, or any security therefor;

(k)      Each of the Senior Claimants may, from time to time, on the terms and subject to the conditions set forth in the Transaction Documents to which such Persons are party, but without notice to the Holder, assign or transfer all or part of the Senior Claim, or any interest therein; and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such part of the Senior Claim shall be and remain part of the Senior Claim for the purposes of these Subordination Provisions, and every immediate and successive assignee or transferee of any part of the Senior Claim or of any interest of such assignee or transferee in the Senior Claim shall be entitled to the benefits of these Subordination Provisions to the same extent as if such assignee or transferee were the assignor or transferor; and

(l)      These Subordination Provisions constitute a continuing offer from the Holder to all Persons who become the holders of, or who continue to hold, the Senior Claim; and these Subordination Provisions are made for the benefit of the Senior Claimants, and the Administrative Agent may proceed to enforce such provisions on behalf of each of such Persons.

8.      General.  No failure or delay on the part of the Seller in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.  No amendment, modification or waiver of, or consent with respect to, any provision of this Subordinated Note shall in any event be effective unless (i) the same shall be in writing and signed and delivered by the Buyer and the Holder and (ii) all consents required for such actions under the Transaction Documents shall have been received by the appropriate Persons.

9.      Maximum Interest.  Notwithstanding anything in this Subordinated Note to the contrary, the Buyer shall never be required to pay unearned interest on any amount outstanding hereunder and shall never be required to pay interest on the principal amount outstanding hereunder at a rate in excess of the maximum nonusurious interest rate that may be contracted for, charged or received under applicable federal or state Law (such maximum rate being herein called the "*Highest Lawful Rate*").  If the effective rate of interest which would otherwise be payable under this Subordinated Note would exceed

29101141.3

the Highest Lawful Rate, or if the holder of this Subordinated Note shall receive any unearned interest or shall receive monies that are deemed to constitute interest which would increase the effective rate of interest payable by the Buyer under this Subordinated Note to a rate in excess of the Highest Lawful Rate, then (i) the amount of interest which would otherwise be payable by the Buyer under this Subordinated Note shall be reduced to the amount allowed by applicable Law, and (ii) any unearned interest paid by the Buyer or any interest paid by the Buyer in excess of the Highest Lawful Rate shall be refunded to the Buyer.  Without limitation of the foregoing, all calculations of the rate of interest contracted for, charged or received by the Seller under this Subordinated Note that are made for the purpose of determining whether such rate exceeds the Highest Lawful Rate applicable to the Seller (such Highest Lawful Rate being herein called the "**Seller's Maximum Permissible Rate**") shall be made, to the extent permitted by usury laws applicable to the Seller (now or hereafter enacted), by amortizing, prorating and spreading in equal parts during the actual period during which any amount has been outstanding hereunder all interest at any time contracted for, charged or received by the Seller in connection herewith.  If at any time and from time to time (i) the amount of interest payable to the Seller on any date shall be computed at the Seller's Maximum Permissible Rate pursuant to the provisions of the foregoing sentence and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Seller would be less than the amount of interest payable to the Seller computed at the Seller's Maximum Permissible Rate, then the amount of interest payable to the Seller in respect of such subsequent interest computation period shall continue to be computed at the Seller's Maximum Permissible Rate until the total amount of interest payable to the Seller shall equal the total amount of interest which would have been payable to the Seller if the total amount of interest had been computed without giving effect to the provisions of the foregoing sentence.

10.      No Negotiation.  This Subordinated Note is not negotiable.

11.      Amendments.  The terms of this Subordinated Note may not be amended or otherwise modified without the prior written consent of the Administrative Agent and the Lenders.

12.      GOVERNING LAW.  THIS SUBORDINATED NOTE HAS BEEN MADE AND DELIVERED AT NEW YORK, NEW YORK, AND SHALL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS AND DECISIONS OF THE STATE OF NEW YORK.  WHEREVER POSSIBLE EACH PROVISION OF THIS SUBORDINATED NOTE SHALL BE INTERPRETED IN SUCH MANNER AS TO BE EFFECTIVE AND VALID UNDER APPLICABLE LAW, BUT IF ANY PROVISION OF THIS SUBORDINATED NOTE SHALL BE PROHIBITED BY OR INVALID UNDER APPLICABLE LAW, SUCH PROVISION SHALL BE INEFFECTIVE TO THE EXTENT OF SUCH PROHIBITION OR INVALIDITY, WITHOUT INVALIDATING THE REMAINDER OF SUCH PROVISION OR THE REMAINING PROVISIONS OF THIS SUBORDINATED NOTE.

13.      Waivers.  All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.  The Seller additionally expressly waives all notice of the acceptance by any Senior Claimant of the subordination and other provisions of this Subordinated Note and expressly waives reliance by any Senior Claimant upon the subordination and other provisions herein provided.

14.      Non-petition.  In accepting this Subordinated Note, the Seller shall be deemed to have agreed, on behalf of itself and its successors and assigns, that, prior to the date that is one year and one day after the payment in full in cash and performance in full of all outstanding obligations of the Buyer under the Credit Agreement and all commitments of the lenders under the Credit Agreement have been terminated, it will not institute against, or join any other Person in instituting against, the Buyer, any

29101141.3

bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings or other similar proceeding under the Laws of the United States or any state of the United States.

15.     Captions. Section captions used in this Subordinated Note are for convenience only and shall not affect the meaning or interpretation of any provision of this Subordinated Note.

16.     Third Party Beneficiaries.  The terms of Section 3, Section 4, Section 6 and the Subordination Provisions set forth in Section 7 are for the benefit of the Administrative Agent and the Lenders under the Credit Agreement and the Administrative Agent shall be a third party beneficiary of the foregoing provisions.  No right of the Administrative Agent to enforce the terms of Section 3, Section 4, Section 6 and the Subordination Provisions set forth in Section 7 shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Buyer or the Holder or by any noncompliance by the Buyer or the Holder with the terms of this Subordinated Note.

**CARNABY INVENTORY II, LLC**

By: _____
Name:
Title:

29101141.3

*EXECUTION VERSION*

## MANUFACTURING AGREEMENT

This Manufacturing Agreement (hereinafter referred to as the "Agreement") is entered into by and between **Brake Parts Inc LLC** (hereinafter "**Brake Parts**"), limited liability company, duly organized and validly existing under the laws of Delaware, United States of America, represented by **Michael Baker** in his capacity as Chief Corporate Strategy Officer, and **Carnaby Inventory II, LLC** (hereinafter as "**Carnaby**") limited liability company, duly organized and validly existing under the laws of Delaware, United States of America, represented by **Shekhar Kumar** in his capacity as Managing Director, pursuant to the following recitals and clauses.

## RECITALS

**WHEREAS**, **Brake Parts** has entered into two Maquila Agreements (jointly referred to as the "Maquila Agreements"), one between **Brake Parts** and **BPI Brake Manufacturing Juarez, S.A. de C.V.,** and the other between **Brake Parts** and **BPI Braking Systems Mexico, S.A. de C.V**. A copy of said Maquila Agreements and their corresponding amendments is attached hereto and identified as **Exhibit "A"**;

**WHEREAS**, **BPI Brake Manufacturing Juarez, S.A. de C.V.** and **BPI Braking Systems Mexico, S.A. de C.V**. (jointly referred to as the "**Maquiladoras**") are companies duly organized and validly existing under the laws of the United States of Mexico and perform their operations in Mexico, in the locations specified in **Exhibit "B";**

**WHEREAS**, **Brake Parts** and **Carnaby** (jointly referred to as the "**Parties**") wish to enter into this manufacturing agreement pursuant to which **Carnaby** will hire and request the manufacturing services from **Brake Parts** to manufacture and produce the products requested by **Carnaby** (the "**Products**");

**WHEREAS,** the parties intend to establish the terms and conditions of their business understanding with the purpose that hereinafter such business relationship is governed under the terms and conditions set forth herein;

**WHEREAS**, **Carnaby** acknowledges that the commercial manufacturing business relationship is with **Brake Parts** and accepts that **Brake Parts** could perform the manufacture processes required by **Carnaby** with another entity that could be located in the United States of America, in Mexico or in any other Country;

**WHEREAS**, for purposes of this Agreement, the parties agree that the commercial manufacturing business relationship is between **Carnaby** and **Brake Parts** and **Brake Parts** will provide the manufacturing services set forth herein through its **Maquiladoras** located in Mexico;

**WHEREAS**, **Brake Parts** has the expertise, facilities, equipment and appropriate personnel to carry out the manufacturing services requested by **Carnaby** through its **Maquiladoras** located in Mexico;

**WHEREAS**, **Carnaby** will license to **Brake Parts** and in turn its **Maquiladoras** certain intellectual property rights and know-how relating to the Products and will deliver directly to the **Maquiladoras** the necessary **Materials** for the manufacturing of the requested Products**;**

**WHEREAS,** the **Maquiladoras** have secured authorization from the Ministry of Economy to operate under a maquiladora program ("**Maquiladora Program**") in accordance with the Decree for the Development of the Manufacturing, Maquiladora and Export Services Industry ("**IMMEX Decree**"), and other customs authorization, program, license and/or registry required to import on a temporarily basis, export and manufacture, accordingly, in the most efficient way, the machinery, equipment and materials (jointly, the "**IMMEX Permits**");

**WHEREAS, BPI Brake Manufacturing Juarez, S.A. de C.V.** has secured a Value Added Tax and Excise Tax Certification under modality A ("**VAT Certification"**), which entitles to a tax credit benefit for Value Added Tax and Excise Tax upon temporary importations;

29117807.2

**JOINT EXHIBIT NO. 18**
**Page 701 of 812**

*EXECUTION VERSION*

**WHEREAS**, the commercial manufacturing business relationship will be exclusively at all times between **Carnaby** and **Brake Parts**;

**WHEREAS**, **Brake Parts** acknowledges that it is the intention of **Carnaby** to have a business relationship that will not be taxable as a Permanent Establishment (**"PE"**) for **Carnaby** under Mexican income tax law (**"Mexican Income Tax Law"**);

**WHEREAS**, on the date hereof, **Carnaby,** Carnaby Inventory Holdings II, LLC, First Brands Group Holdings, LLC, and First Brands Group, LLC, have entered into a certain credit agreement (the **"Credit Agreement"**);

**WHEREAS**, the representatives of the parties have sufficient authority to enter into this Agreement, same that at the date of execution of this Agreement have not been revoked; and

**NOW THEREFORE**, in consideration of the of the recitals mentioned above, **Brake Parts** and **Carnaby** agree to establish their commercial manufacturing business relationship in accordance with the following:

<div align="center">

**CLAUSES**

</div>

**FIRST. Brake Parts** binds itself to carry out in benefit of **Carnaby**, the requested manufacturing process through its **Maquiladoras**. **Brake Parts** binds itself to transfer exclusively the Products manufactured under the instructions of **Carnaby** in accordance with the technical specifications and quality standards that will be provided by the **Carnaby** and strictly under the terms hereof.

**SECOND. Brake Parts** will provide through its **Maquiladoras** the manufacturing process required by **Carnaby** with its expertise, facilities, machinery, equipment and appropriate personnel; **Brake Part** will be responsible before **Carnaby** for the use of the Materials provided by Carnaby, for Manufacturing process, the manufactured Products by **Brake Part** through its **Maquiladoras**.

**THIRD. Carnaby** hires **Brake Parts** to carry out the manufacturing services of the Products requested by **Carnaby**, as well as any other products, as may be agreed by the parties in the future in writing and **Brake Parts** accepts and agrees to perform the manufacturing process through its **Maquiladoras** in accordance with the terms of this Agreement.

**FOURTH. Carnaby** shall deliver to **Brake Parts** at a previously agreed Maquiladora location, on a periodic basis, on consignment, under gratuitous bailment, the raw materials, components, subassemblies, and supplies (**"Materials"**) as are necessary to carry out the Manufacturing process of the Products performed by **Brake Parts** through its **Maquiladoras**. The parties shall agree in writing the Maquiladora and location where the Materials will be delivered by **Carnaby**, as well as the amounts, delivery dates and times, materials, and any other relevant aspect or information concerning the delivery of Materials.

Neither **Brake Parts** or its **Maquiladoras** shall under no circumstances be considered to have any proprietary interest on the **Materials** which **Carnaby** may deliver to **Brake Parts** as provided for herein nor on the Products. Any commercial invoice that may be issued by **Carnaby** in order to comply with customs requirements for the exportation or importation of any **Materials** provided by **Carnaby** to **Brake Parts and Maquiladoras,** shall not be considered for any purposes to be evidence of conveyance of title in the **Materials** in favor of **Brake Parts** or its **Maquiladoras.** Once the Products covered by this Agreement have been manufactured by **Brake Parts** through its **Maquiladoras,** they must be returned to **Carnaby** in accordance with the terms of this Agreement.

**Brake Parts** and its **Maquiladoras** shall provide necessary administrative services for shipment, including the arrangement of proper transportation, of the **Materials** and the Products under this Agreement between the United Mexican States and the United States of America using information supplied by **Carnaby** (the "**Administrative**

29117807.2

<div align="center">

**JOINT EXHIBIT NO. 18**
**Page 702 of 812**

</div>

*EXECUTION VERSION*

**Services**"); such Administrative Services shall include, but not be limited to, preparation of required United States of America and United States of Mexico Customs documentation and **Brake Parts** agrees to duly and timely comply with all the applicable customs laws.  **Brake Parts** may be the importer and exporter of record for United States of America customs purposes, in which case  **Brake Parts** shall obtain any validated export licenses required by United States of America export laws and regulations; if agreed by the parties separately to this Agreement,  **Brake Parts** shall be responsible for all compliance and all costs relating to compliance with United States of America customs regulations, including but not limited to, any and all United States of America import bonds; United States of America customs duties, import fees and taxes; fines and penalties; and United States of America customhouse brokerage fees. The **Maquiladoras** shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the **Materials** and Products and shall comply with all record keeping and reporting obligations pursuant to the applicable law.

**Carnaby** shall be responsible for providing to **Brake Parts** a detailed list of the **Materials** required to perform the Manufacturing process in order that the **Maquiladoras** may obtain the necessary permits and authorizations to import the **Materials** under its IMMEX Program.

At all times during the term of this Agreement, **Brake Parts** and its **Maquiladoras** shall (i) be duly authorized by the competent governmental authority to operate the **Maquiladora Program**, (ii) hold valid and in force licenses, authorizations, permits, programs, licenses and/or registries required to perform the manufacturing services in the facilities in accordance to applicable laws and pursuant to this Agreement in the most cost-efficient and diligent way (the "Operating Permits" and together with the IMMEX Permits, the "Permits"), and (iii) carry out all the necessary activities before the corresponding governmental authority, to render the manufacturing services on time and agreed manner.

**FIFTH.** For the Products to be in compliance with the technical specifications and quality standards that **Carnaby** requires, **Carnaby** shall make available to **Brake Parts** and subsequently **Brake Parts** to its **Maquiladoras** the knowledge, technical experience, and practice and other industrial information (the "Technical Information").

**Carnaby** will be able and allowed to supervise the manufacturing processes and if necessary, could assist **Brake Parts** and in turn **its Maquiladoras** to manufacture the Products pursuant to the terms herein.

The parties hereto agree that the transferring of Technical Information shall not trigger any consideration whatsoever, since all Technical Information is necessary for the Products to fulfill the technical specifications and quality standards that **Carnaby** requires, and does not serve any other purpose.

**Brake Parts** and its **Maquiladoras** shall pay any and all sales taxes, use taxes, personal taxes, flat taxes, value-added taxes, assessments, duties and all other governmental exactions of any nature, in connection with this Agreement, the **Materials,** the **Products** and the **Permits**, or in connection with the operations conducted in the facilities or the manufacturing services performed by **Brake Parts** and its **Maquiladoras** pursuant to this Agreement.

**SIXTH.** In consideration **Carnaby** shall pay to **Brake Parts** the prices agreed separately to this Agreement for the Manufacturing services provided, based on the volume of units manufactured and sold; the payment conditions and terms will be agreed separately from this Agreement between **Carnaby** and **Brake Parts**; provided that, any payments from **Carnaby** are subject to it being permitted to do so under Section 2.1(d) of the Credit Agreement

**SEVENTH.** Any samples of the Products officially requested by an agency or department of the Federal Government of Mexico or of other applicable authority of any other applicable country, may only be delivered upon written authorization of **Carnaby**, and provided an official receipt is secured from the requesting agency or department.

29117807.2

*EXECUTION VERSION*

**EIGHTH. Brake Parts** shall treat and preserve as confidential all information related to **Carnaby's** business, including the Technical Information, revealed to or learned by Brake Parts and its Maquiladoras from any source as a result of this Agreement. **Brake Parts** will not disclose nor disseminate, nor permit to be disclosed nor disseminated, any customer list, pricing, technical information, know-how, industrial information, patents, trademarks, processes, programs, practices, methods or other material or data conceived, designed, created, developed, used, assembled or manufactured by **Brake Parts** through its **Maquiladoras**, unless, it is strictly necessary during the training process of the employees to carry out the Processes.

**NINTH. Brake Parts** and its **Maquiladoras** shall comply with all existing laws and regulations in Mexico, and shall hold the Products, free of any liens, claims or charges by any agency or department of the Federal, State or Municipal governments.

**TENTH.** In performing its obligations under this Agreement, **Brake Parts** shall comply with all applicable laws and regulations, including without limitation the applicable laws in Mexico and the Unites States of America or any other country, including without limitation the customs laws and regulations, and any rulings or guidelines issued by the customs authorities in the applicable country. **Brake Parts** shall keep a comprehensive and detailed record of all Materials, Products, and any other goods imported into Mexico for purposes of this Agreement, as well as of all exportations of Products, waste, and any other items, maintaining copies of all import and export declarations and related documentation.

**ELEVENTH.** The parties agree that all notices and other communications required or desired to be given pursuant to this Agreement will be given in writing and will be deemed duly given upon personal delivery, or on the day after mailing if sent by a nationally recognized overnight delivery service which maintains records of the time, place and recipient of delivery, or upon receipt of a confirmed transmission if sent by telecopy or facsimile transmission, and in each case if addressed as follows:

**Carnaby Inventory II, LLC**
**Address:** 1540 Broadway, Suite 3710, New York, New York
**Attention:** Legal Department
**Email address:** Shekhar Kumar -  shekhar.kumar@viceroyprivatecapital.co

**Brake Parts Inc LLC**:
**Address:** 4400 Prime Parkway, McHenry, Illinois, 60050, USA.
**Attention:** Legal Department
**Email Address**:  Matthew Liebson  - matthew.liebson@firstbrandsgroup.com

c/o First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention: Edward James, Executive Vice President
Email: ed.james@firstbrandsgroup.com

or to such other person, entity, address or facsimile number as a party may respectively designate in like manner from time to time.

**TWELFTH.-** This Agreement shall continue in force until terminated by either party. Either party may terminate this Agreement upon thirty (30) days prior written notice to the other party in accordance with the notice provisions of Clause Eleventh hereof

**THIRTEENTH.** If, for any reason, any provision of this Agreement is determined to be invalid or unenforceable, such invalidity or enforceability shall not affect the remaining provisions of this Agreement.

29117807.2

**JOINT EXHIBIT NO. 18**
**Page 704 of 812**

*EXECUTION VERSION*

**FOURTEENTH.** Time is of the essence for the performance of all obligations and the satisfaction of all conditions of this Agreement.

**FIFTEENTH.** Neither party shall be held responsible for any delay or failure in the performance of any part of this Agreement to the extent that such delay or failure is caused by fire, flood, explosion, war, seize, pandemic, government requirement, civil or military authority, act of God, act or omission of carriers, or any lockout, strike, labor trouble or other industrial disturbance, inevitable accident, export delays by governmental authorities or industry or trade association of whatever nature that limits the importation or exportation of the Materials, work in process or Products thereof or another cause beyond any of the parties reasonable control. Any party excused from performance shall make a good faith effort to minimize the effect of the delay or non-performance.

**SIXTEENTH** This Agreement shall be interpreted pursuant to the laws of the State of New York, United States of America, without giving effect to its choice of law provisions. Litigation brought to contest disputes arising under this Agreement shall be brought only in the state or federal courts of the State of New York, United States of America.

WAIVER OF JURY TRIAL. THE PARTIES HEREBY IRREVOCABLY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, COUNTERCLAIM OR CROSS-COMPLAINT IN ANY ACTION OR OTHER PROCEEDING BROUGHT BY THE OTHER WITH RESPECT TO ANY MATTER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH OR RELATED TO THIS AGREEMENT, WHETHER BASED UPON CONTRACTUAL, STATUTORY, TORTIOUS OR OTHER THEORIES OF LIABILITY.

**IN WITNESS WHEREOF,** the parties have executed this Agreement through their duly authorized representatives, on May 31st , 2022, being fully effective as of said date.

|  |  |
|---|---|
| **Carnaby Inventory II, LLC** | **Brake Parts Inc LLC** |
| **Name:** Shekhar Kumar | **Name:** Michael Baker |
| **Title:** Managing Director | **Title:** Chief Corporate Strategy Officer |

29117807.2

**JOINT EXHIBIT NO. 18**
**Page 705 of 812**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § § § | **Chapter 11** |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § § | **Case No. 25-90399 (CML)** |
| **Debtors.** | § § § § § | **(Jointly Administered)** |

# JOINT EXHIBIT NUMBER 18

**FOR COMBINED HEARING HELD JULY 28–30, 2026**

CARNABY EXHIBIT NUMBER 23
*Carnaby II Closing Certificate, dated May 31, 2022 (Docket No. 842-24)*

(*Filed Under Seal*)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| FIRST BRANDS GROUP, LLC, *et al.*, | § | Case No. 25-90399 (CML) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | |
| | § | |

# JOINT EXHIBIT NUMBER 18

**FOR COMBINED HEARING HELD JULY 28–30, 2026**

CARNABY EXHIBIT NUMBER 24
*Carnaby II Solvency Certificate, dated May 31, 2022 (Docket No. 842-25)*

(*Filed Under Seal*)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| FIRST BRANDS GROUP, LLC, *et al.*, | § | Case No. 25-90399 (CML) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | |
| | § | |

JOINT EXHIBIT NUMBER 18

FOR COMBINED HEARING HELD JULY 28–30, 2026

CARNABY EXHIBIT NUMBER 25
*Carnaby Inventory II Holdings Certificate (Glas Trust), dated May 31, 2022 (Docket No. 842-26)*

(*Filed Under Seal*)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  | § |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| FIRST BRANDS GROUP, LLC, *et al.*, | § | Case No. 25-90399 (CML) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |
|  | § |  |

**JOINT EXHIBIT NUMBER 18**

**FOR COMBINED HEARING HELD JULY 28–30, 2026**

CARNABY EXHIBIT NUMBER 26
*Carnaby Inventory III Solvency Certificate (Glas Trust), dated July 6, 2022 (Docket No. 842-71)*

(*Filed Under Seal*)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |
| | § | |
| | § | |

**JOINT EXHIBIT NUMBER 18**

**FOR COMBINED HEARING HELD JULY 28–30, 2026**

CARNABY EXHIBIT NUMBER 27
*Carnaby Inventory III Holdings Certificate (Glas Trust), dated July 6, 2022 (Docket No. 842-72)*

(*Filed Under Seal*)

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |
| | § | |
| | § | |

**JOINT EXHIBIT NUMBER 18**

**FOR COMBINED HEARING HELD JULY 28–30, 2026**

CARNABY EXHIBIT NUMBER 28
*Carnaby III Closing Certificate, dated July 6, 2022 (Docket No. 842-73)*

(*Filed Under Seal*)

**E**

Case 25-90399 Document 3357-1 Filed in TXSB on 09/27/25 Page 2 of 36

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § § § | **Chapter 11** |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § § | **Case No. 25-90399 (CML)** |
| | § § | **(Joint Administration Requested)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |

**EMERGENCY MOTION
OF DEBTORS FOR INTERIM AND FINAL
ORDERS (I) AUTHORIZING DEBTORS TO (A) CONTINUE
USING EXISTING CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS,
(B) IMPLEMENT ORDINARY COURSE CHANGES TO CASH MANAGEMENT
SYSTEM, AND (C) HONOR CERTAIN RELATED PREPETITION OBLIGATIONS,
(II) GRANTING ADMINISTRATIVE EXPENSE PRIORITY FOR POSTPETITION
INTERCOMPANY CLAIMS, (III) EXTENDING TIME TO COMPLY WITH
REQUIREMENTS OF 11 U.S.C. § 345(b), AND (IV) GRANTING RELATED RELIEF**

> EMERGENCY RELIEF HAS BEEN REQUESTED.  RELIEF IS REQUESTED NOT LATER THAN 9:00 A.M. (PREVAILING CENTRAL TIME) ON OCTOBER 1, 2025.
>
> IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.
>
> IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING.  UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN 21 DAYS FROM THE DATE THIS MOTION WAS FILED.  IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN 21 DAYS FROM THE DATE THIS MOTION WAS FILED.  OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.
>
> THE DEBTORS HAVE REQUESTED THAT A HEARING BE CONDUCTED ON THIS MATTER ON OCTOBER 1, 2025, AT 9:00 A.M. (PREVAILING CENTRAL TIME).

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

> **PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY.   YOU MAY ACCESS THE FACILITY AT 1-832-917-1510.   ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER.  JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153.  VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE.  THE MEETING CODE IS "JUDGELOPEZ." CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**
>
> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS.   TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE.  SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

First Brands Group, LLC ("**FBG**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows:

### Relief Requested

1.      By this motion (the "**Motion**"), pursuant to sections 105, 345, 363, 364, 503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors request entry of an order (i) authorizing the Debtors to (a) continue using their existing Cash Management System (as defined below), including through the continued use of their existing bank accounts (the "**Bank Accounts**" and the financial institutions maintaining the Bank Accounts, the "**Banks**") and existing business forms (the "**Business Forms**"), (b) continue to perform and honor intercompany transactions between and among the Debtors and non-Debtor affiliates (the "**Non-Debtor Affiliates**") in the ordinary course of business (the "**Intercompany Transactions**" and each intercompany receivable and payable generated pursuant to an Intercompany Transaction, an "**Intercompany Claim**"), in their business judgment,

2

(c) implement changes to their Cash Management System in the ordinary course of business, including opening new or closing existing Bank Accounts, and (d) honor certain prepetition obligations related to the Cash Management System; (ii) granting administrative expense priority for Intercompany Claims (as defined below); (iii) extending the time to comply with the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to the Bank Accounts; and (iv) granting related relief.

2.      A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**") and, pending a final hearing on the relief requested herein, on a final basis as **Exhibit B** (the "**Proposed Final Order**"), respectively.

### Background

3.      On September 24, 2025, Global Assets LLC and 12 of the Debtors in the above-captioned chapter 11 cases each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  Commencing on September 28, 2025 (the "**Petition Date**"), First Brands Group, LLC and the remaining Debtors each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in these chapter 11 cases.

4.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

3

5.  Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**"),[2] filed contemporaneously herewith and incorporated herein by reference.

### Jurisdiction and Venue

6.  The Court has jurisdiction and authority to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Cash Management System

7.  In the ordinary course of business, the Debtors utilize an integrated cash management system in North America (the "**Cash Management System**") to collect, transfer, and disburse funds generated by their operations and the operations of their Non-Debtor Affiliates. The Cash Management System operates as a cash pool among the Debtor entities and is tailored to meet the Debtors' operating needs as a leading global supplier of aftermarket automotive parts.

8.  The Cash Management System has features similar to those commonly employed by businesses of comparable size and scale to the Debtors.  Large, global businesses like the Debtors use integrated systems to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple entities.  Thus, every cash pool participant has either a net payable or net receivable position on the Debtors' books.  The Cash Management System enables the Debtors to collect and disburse cash generated by their business effectively and efficiently, pay their financial obligations,

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

**JOINT EXHIBIT NO. 18**
**Page 716 of 812**

centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, produce financial forecasts and reports, streamline use of their cash and invested funds, reduce administrative expenses, facilitate tracking between certain entities and business units, and obtain accurate account balances and other financial data.

9.      The Debtors' treasury team, now operating under the control of the Debtors' Chief Restructuring Officer, maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  In addition, the Debtors' treasury and accounting teams regularly reconcile the Debtors' books and records to ensure that all transfers are properly recorded, and periodically settle intercompany balances arising between and among the Debtors and their Non-Debtor Affiliates.  While some of the Debtors' internal and external payments are automated, the Debtors' treasury and accounts payable teams approve and initiate manual wires, checks, and Automatic Clearing House ("**ACH**") payments when necessary.

10.     The Cash Management System is a critical component of the Debtors' day-to-day operations, and any disruption would adversely impact the Debtors' operations to the detriment of the Debtors, their estates, and all parties in interest in these chapter 11 cases.  Simply put, the Debtors' business, like any business of similar size, requires prompt and reliable access to cash and accurate cash tracking.  It is critical that the Cash Management System remains intact during these chapter 11 cases to ensure seamless continuation of transactions and uninterrupted collection of revenues.

11.     As explained in further detail below, the Bank Accounts that comprise the Cash Management System generally function as follows:  (i) a single centralized concentration account held by FBG and maintained at Bank of America ("**BOFA**" and the centralized

<div align="center">5</div>

concentration account, the "**Main Concentration Account**") serves as the main concentration account for the Cash Management System; (ii) non-BOFA concentration accounts maintained by certain Debtor subsidiaries of FBG (the "**Subsidiary Concentration Accounts**") are swept periodically into the Main Concentration Account; (iii) collection accounts are funded with customer, factored, and non-factored receipts (the "**Collection Accounts**"); (iv) disbursement accounts fund general corporate and operational disbursements (the "**Disbursement Accounts**") with amounts transferred via both automatic and manual transfers from the Main Concentration Account; and (v) investment accounts (the "**Investment Accounts**") are maintained, although they currently carry de minimis balances.

12.     In addition, in connection with these chapter 11 cases, the Debtors also will establish or designate (i) an adequate assurance escrow account for utility providers (the "**Utility Deposit Account**"), (ii) an account for amounts funded pursuant to the proposed interim and final orders approving the DIP Motion[3] (the "**DIP Orders**" and such account, the "**DIP Financing Account**"), and (iii) a professional fees escrow account to be established in accordance with the DIP Orders (the "**Professional Fees Account**").

13.     Finally, the Non-Debtor Affiliates based outside of North America, or the "Rest of World" entities (each, a "**ROW Entity**" and together, the "**ROW Entities**"), utilize a separate cash management system that operates on a regional basis (the "**ROW Cash Management System**").[4]   The ROW Cash Management System and the non-Debtor businesses

---

[3]   The Debtors filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Senior Secured Parties, (IV) Modifying Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**DIP Motion**") contemporaneously herewith.

[4]   The ROW Cash Management System is overseen by the International Treasury Director and is supported by a treasury team primarily based in Romania and India (the "**ROW Treasury Team**").  Unlike the Debtors, which

that it serves are generally cash flow positive and self-sustaining, subject to the continuation of certain Intercompany Transactions on a postpetition basis.  Although the ROW Entities do not participate in external cash pooling with the Debtors and the two cash management systems largely operate independently, the ROW Entities do participate in Intercompany Transactions with the Debtors, as described in greater detail below.

14.     A list of the Bank Accounts is annexed hereto as **Exhibit C**.  A diagram illustrating the movement of cash through the Cash Management System is annexed hereto as **Exhibit D** (the "**Cash Management Schematic**").

## A.  Bank Accounts and Flow of Funds

15.     In connection with the Cash Management System and its cash pooling, the Debtors maintain the Bank Accounts and Investment Accounts with multiple Banks.  As of the Petition Date, the Debtors maintained 160 Bank Accounts across 11 Banks for various purposes. The Debtors' primary Bank is BOFA, where the Debtors maintain 92 Bank Accounts.  As of the Petition Date, the Debtors have an aggregate amount of approximately $12 million in the Bank Accounts.[5]

---

generally operate under a standardized three-account structure, the ROW Entities typically maintain multiple accounts, each capable of both receiving and disbursing funds across a variety of currencies.

While the structures of the ROW Entities' accounts differ from those of the Debtors, the control environment is broadly consistent with North American practices.  Local accounts payable teams that service certain ROW Entities are responsible for payment initiation, after which the ROW Treasury Team reviews, approves, and releases disbursements.

[5]     As of the Petition Date, the ROW Cash Management System consisted of 328 bank accounts maintained across 70 banks, all of which, except one, are owned and controlled by Non-Debtor Affiliates.

**JOINT EXHIBIT NO. 18**
**Page 719 of 812**

16. The following table summarizes the function of, and flow of funds to and from, the Bank Accounts:

| Account | Description of Account |
|---|---|
| **Main Concentration Account (BOFA)**<br><br>Account No. 6975 | The Debtors utilize a cash pooling arrangement centered on the Main Concentration Account, which is funded by periodic automatic sweeps of the Subsidiary Concentration Accounts or directly through automatic and manual sweeps of the Collection Accounts. The Debtors maintain the Main Concentration Account at BOFA and fund payroll obligations through the Main Concentration Account via reverse wire to OneSource, their payroll administrator.<br><br>As of the Petition Date, the Main Concentration Account had a balance of approximately $9 million. |
| **Subsidiary Concentration Accounts**<br><br>Account Nos. 1110, 5479, 5487 | Three (3) Debtors and one (1) Non-Debtor Affiliate maintain Subsidiary Concentration Accounts, which are generally maintained at low balances, with amounts in excess of the target balances swept periodically to the Main Concentration Account. The remaining Debtors which are subsidiaries of FBG do not hold Subsidiary Concentration Accounts, but maintain only Collection Accounts and Disbursement Accounts that interface with the Main Concentration Account.<br><br>As of the Petition Date, the Debtors' Subsidiary Concentration Accounts had a combined balance of approximately $825,000. |
| **Collection Accounts**<br><br>Account Nos. 3189, 6892, 8856, 6897, 6878, 4406, 6343, 7312, 7294, 3205, 3213, 3264, 5647, 5655, 8417, 0101, 6101, 3221, 3240, 0287, 4362, 7901, 7753, 4354, 6577, 7002, 6999, 9118, 9340, 1879, 6224, 9126, 9134, 8920, 4377, 4222, 9092, 9100, 8904, 6262, 9571, 7106, 5565, 0366, 2289, 7724, 3919, 3938, 7128, 7136, 2136, 7144, 3617, 5570, 7111, 6637, 7734, 5588, 7149, 7507, 7649, 7521, 7272, 7088, 0213, 8995, 7415, 8573, 9656, | Certain Debtor subsidiaries of FBG maintain Collection Accounts at BOFA, which receive cash generated from the Debtors' day-to-day operations, including on account of customer receipts and factored and non-factored receivables (as described in more detail in the Customer Programs Motion[6] and First Day Declaration).<br><br>The Collection Accounts are generally zero-balance accounts, with funds swept on a daily basis into the Main Concentration Account directly or first through a Subsidiary Concentration Account—with the exception of certain accounts that maintain a balance and are manually swept. The majority of the Collection Accounts are maintained at BOFA, though certain subsidiaries of FBG also continue to maintain legacy Collection Accounts at other Banks to ensure that no customer payments are missed during the transition period to BOFA.[7]<br><br>As of the Petition Date, the Collection Accounts had a combined balance of approximately $2 million. |

---

[6]   The Debtors filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Honor Certain Prepetition Obligations to Customers and Continue Customer Programs in the Ordinary Course of Business and (II) Granting Related Relief* (the "**Customer Programs Motion**") contemporaneously herewith.

[7]   The Debtors have largely completed a process of moving the majority of the Bank Accounts to BOFA.

**JOINT EXHIBIT NO. 18**
**Page 720 of 812**

| Account | Description of Account |
|---|---|
| 9210, 9244, 7633, 0956, 5877, 0964, 5872, 6348 | |
| **Disbursement Accounts**<br><br>Account Nos. 3202, 3688, 6910, 0327, 6572, 0974, 7827, 7299, 3269, 3720, 3725, 3744, 6317, 5639, 6309, 6325, 2329, 3159, 3226, 3245, 1476, 7715, 1414, 7021, 7007, 1396, 6216, 7710, 6808, 2114, 0657, 2869, 7120, 7729, 3947, 2305, 3933, 3952, 2324, 8825, 9641, 4117, 4512, 7152, 4125, 4133, 3631, 2263, 5415, 5423, 0025, 0583, 5431, 5596, 8233, 6651, 9299, 1490, 7739, 5639, 7163, 7540, 7526, 7277, 0205, 0221, 7101, 7434, 9775, 8906, 9236, 2548, 9909, 0699, 9945 | The Disbursement Accounts are used to fund general corporate disbursements, including payments to vendors, and to cover general operating costs. The Disbursement Accounts are generally funded daily via automatic transfers from the Main Concentration Account in amounts sufficient to fund the necessary third-party payments.<br><br>As of the Petition Date, the Disbursement Accounts had a combined balance of approximately $1,000. |
| **Investment Accounts**<br><br>Account No. 9394, 1400, 4957, 9161 | The Debtors' four Investment Accounts currently have very little activity and de minimis balances. Historically, the Investment Accounts were funded with excess cash produced by the Debtors' operations as well as borrowings in connection with the Debtors' secured and unsecured credit facilities and invested at the Debtors' discretion. The Investment Accounts also accrue cash interest.<br><br>As of the Petition Date, the Investment Accounts had a combined balance of approximately $200,000. |
| **Utility Deposit Account** | The Debtors will establish or designate a Utility Deposit Account with Bank of America to provide for adequate assurance of payment to utility companies pursuant to section 366 of the Bankruptcy Code in accordance with the Utilities Motion[8] filed contemporaneously herewith. |

---

[8]   The Debtors filed the *Emergency Motion of Debtors for Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief* (the "**Utilities Motion**") contemporaneously herewith.

| Account | Description of Account |
|---|---|
|  | The Utility Deposit Account will be funded with amounts from the Main Concentration Account and in accordance with the terms of any order of the Court approving the Utilities Motion. |
| **DIP Financing Account** | As more fully set forth in the DIP Motion, the Debtors will maintain a segregated account where the proceeds from the Debtors' DIP financing will be deposited. |
| **Professional Fees Account** | As described in the DIP Motion, the Debtors will maintain a segregated account that the Debtors propose will hold the professional fees escrow amounts that will accrue during the pendency of the chapter 11 cases. |

**B. Receipts and Disbursements**

17.    *Collection Accounts*.  The Collection Accounts regularly receive funds on account of sales of automotive parts and other products.  Customers are typically billed for these services on a daily basis as shipments occur, and collections are received in the form of ACH transfer, physical check, or wire transfer.  Receipts primarily flow through the Collection Accounts held by Debtors subsidiary to FBG and, subsequently, to the Main Concentration Account to be distributed as necessary to other Debtor entities.  The Debtors also receive payments from factor counterparties on account of factored and non-factored accounts receivable in the Collection Accounts.

18.    *Disbursement Accounts.*  The Disbursement Accounts make disbursements to other Debtors, Non-Debtor Affiliates, and third parties to meet the Debtors' payment obligations.  These disbursements primarily consist of payments to vendors and suppliers for general corporate and operating costs or to affiliates in connection with Intercompany Transactions.  Disbursements made from Debtors to Non-Debtor Affiliates is discussed in greater detail below with respect to intercompany transactions and claims.  Disbursements are made utilizing Check Positive Pay, ACH, ACH Positive Pay and wires.  Vendor disbursements are

10

Case 25-90399 Document 3357-1 Filed in TXSB on 07/24/26 Page 11 of 56

approved, and payments are entered by the accounts payables team.  Payments are approved and released by the treasury team.

19.     An average of approximately $55 million in receipts and approximately $35 million in disbursements are processed through the Cash Management System per week.

## C.  Bank Fees

20.     In the ordinary course of business, the Debtors incur and pay, as well as honor and/or allow to be deducted, certain service charges and other fees, costs, and expenses charged by the Banks in connection with the maintenance of the Cash Management System (such charges and fees, the "**Bank Fees**").  The Bank Fees average approximately $150,000 per month. As of the Petition Date, the Debtors estimate that they owe approximately $150,000 in unpaid Bank Fees, all of which will come due within 30 days of the Petition Date.

21.     To maintain the integrity of their Cash Management System, the Debtors request authority, but not direction, to pay all prepetition Bank Fees and to continue to pay the Bank Fees in the ordinary course of business on a postpetition basis and consistent with historical practice.

## D.  Intercompany Transactions and Claims

22.     In the ordinary course of their business, the Debtors maintain relationships with each other and certain of their Non-Debtor Affiliates, including certain ROW Entities.  In turn, the Debtors engage in Intercompany Transactions with each other and with Non-Debtor Affiliates, including the ROW Entities.  The Debtors and the applicable Non-Debtor Affiliates regularly engage in cash settlements of amounts owed on account of Intercompany Claims on an as-needed basis, with the exception of Non-Debtor Affiliates in Mexico, with whom the Debtors engage in such settlements on a weekly basis.

23.     The Intercompany Transactions typically arise from (i) operational activities, including commercial trade transactions and non-inventory transactions, such as shared services (the "**Operational Intercompany Transactions**"), and (ii) cash pooling arrangements. The following table summarizes the Intercompany Transactions:

| Intercompany Transaction Type | Description of Intercompany Transaction |
|---|---|
| **Operational Intercompany Transactions** | Operational Intercompany Transactions carried out among the Debtors and between the Debtors and their Non-Debtor Affiliates are essential components of the Debtors' global operations and relate to, among other things: (i) intercompany production costs, which primarily consist of contract manufacturing costs; (ii) intercompany product sales; (iii) payment for global shared services, which include certain centralized treasury, accounting, and other management and administrative services— documented via intercompany invoices. As described in further detail below, the operational Intercompany Transactions take place between and among the Debtors and certain Non-Debtor Affiliates. |
| **Cash Pooling** | As part of the Cash Management System, funds flow into the Main Concentration Account from customer receipts and out of the Main Concentration Account for general corporate and operational costs. The funds in the Collection Accounts are swept daily into the Main Concentration Account. Funds also flow out for payroll, taxes, and vendor disbursements. Amounts transferred to or drawn from the Main Concentration Account are recorded on the Debtors' books and records as intercompany payables and receivables. Thus, every cash pool participant has either a net payable or net receivable position in the Debtors' books and records. These cash pool transactions are largely conducted automatically within the Cash Management System and recorded as Intercompany Claims. |
| **Financing** | The Debtors and Non-Debtor Affiliates engage in intercompany financing through the use of intercompany loans (the "**Intercompany Loans**"). Specifically, 23 Intercompany Loans are maintained between Debtors and Non-Debtor Affiliates, and 4 Intercompany Loans are maintained between Non-Debtor Affiliates. The Intercompany Loans with an outstanding principal of approximately $674 million. The Intercompany Loans are issued by the Debtors and their Non-Debtor Affiliates, including ROW Entities. The interest rates on the Intercompany Loans range from zero percent to approximately 11% percent. |

24.     Although general cash transfers between the Debtors and their Non-Debtor Affiliates are infrequent, in connection with the Operational Intercompany Transactions, the Debtors provide regular funding to certain of their Non-Debtor Affiliates for invoiced goods and services provided and purchased for the benefit of the Debtors' enterprise. Such goods and

services include manufacturing, administrative functions, inventory, accounting, and treasury. The Non-Debtor Affiliates—whose locations include, but are not limited to, Mexico, China, India, and Romania—invoice Operational Intercompany Transactions on an arm's length basis, and the Debtors record these invoices on their books as Intercompany Claims, which are settled in the ordinary course. Such services include, but are not limited to, back-office services and inventory in Mexico; the manufacturing of brakes, rotors, and pumps in China; and treasury and service centers in India and Romania. These services resulting from these Operational Intercompany Transactions enable the Debtors to run their global business and service customers around the world. The benefits of the Intercompany Transactions ultimately inure to the Debtors' estates, and failing to honor prepetition Intercompany Claims among the Debtors and between Debtors and Non-Debtor Affiliates, or ceasing Intercompany Transactions in the ordinary course postpetition, would negatively impact the Debtors' ability to operate in chapter 11. As of the Petition Date, the Debtors estimate they pay, on average, between $30 million and $40 million on a monthly basis on account of the Operational Intercompany Transactions.

25.     The Debtors anticipate that the quantum of postpetition Intercompany Transactions with Non-Debtor Affiliates will continue at prepetition levels. This will ensure the Debtors have access to critical goods and services without interruption. The Debtors maintain, and will continue to maintain, records of these transfers of cash and bookkeeping entries on a postpetition basis and will implement such other internal mechanisms as needed to permit them, with the assistance of their advisors, to accurately track the balance of, and account for, all prepetition and postpetition Intercompany Transactions. By this Motion, the Debtors request authority to continue entering into ordinary course Intercompany Transactions among the Debtors and between the Debtors and Non-Debtor Affiliates consistent with prepetition practices.

13

26.     In addition, to help ensure that each individual Debtor will not disadvantage its creditors by funding the operations of its Debtor affiliates, the Debtors request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, the Court grant administrative expense status to all Intercompany Claims against a Debtor that arise postpetition from Intercompany Transactions.  For the avoidance of doubt, the Debtors are not seeking to pay, satisfy or set-off any prepetition Intercompany Transaction against post-petition amounts.

### E.  Business Forms

27.     In the ordinary course of business, the Debtors use a variety of correspondence and business forms, including, among other things, checks, purchase orders, invoices, and letterheads (collectively, the "**Business Forms**").  To minimize expenses, the Debtors seek authority to continue using all Business Forms substantially in the forms used immediately prior to the commencement of these chapter 11 cases, without reference to the Debtors' status as debtors in possession.  The Debtors have prepared communications to the various parties with which they conduct business, which will, among other things, notify such parties of the commencement of these chapter 11 cases.  The Debtors believe that these communications will provide adequate notice of the Debtors' status as debtors in possession. Nevertheless, the Debtors will use reasonable efforts to have electronic checks include a legend referring to the Debtors as "Debtors-in-Possession" as soon as practicable following the Petition Date.

### F.  Credit Card Program

28.     In the ordinary course of business, the Debtors utilize corporate credit cards issued by BOFA, American Express, and HSBC, which employees use to make authorized business purchases on behalf of the Debtors or in connection with their employment duties (collectively, the "**Credit Cards**" and the program under which the Credit Cards are maintained,

<div align="center">14</div>

the "**Credit Card Program**").  Historically, the Credit Cards are used by certain of the Debtors'

employees for various corporate expenses in the ordinary course of business, including, but not

limited to, travel expenses that these employees incur in the course and scope of their employment

with the Debtors—such as airfare, accommodations and meals—as well as minor vendor expenses

for marketing purposes.  The Debtors pay for expenses charged to such cards directly.

29.     As of the Petition Date, there are approximately 200 issued and active Credit

Cards, for which the Debtors owe approximately $250,000 on account thereof.  Based on historical

figures, the Debtors estimate that they incur total liabilities of approximately $500,000 per month

on account of the Credit Cards.

30.     By this Motion, the Debtors seek authority to continue the Credit Card

Program in the ordinary course of business, including making ordinary course modifications

thereto, and to pay any outstanding amounts, regardless of whether such amounts arose before or

after the Petition Date, in the ordinary course and consistent with historical practices.

<div align="center">

**Relief Requested Should Be Granted**

</div>

**I.   Continuation of Cash Management System Is Warranted Under Sections 363
and 105(a) of Bankruptcy Code**

31.     The efficient and economical operation of the Debtors' business requires

that the Cash Management System continue during the pendency of these chapter 11 cases.  As a

practical matter, it would be difficult and expensive to establish and maintain a separate cash

management system for each Debtor.  Further, requiring the Debtors to adopt new, segmented cash

management systems would be expensive, create unnecessary administrative burdens, and be

extraordinarily disruptive to their business operations.  Any such disruption would have a severe

and adverse impact upon the success of these chapter 11 cases.  Accordingly, the Debtors seek

authority to continue using the Cash Management System in the same manner as the Cash

<div align="center">

15

**JOINT EXHIBIT NO. 18
Page 727 of 812**

</div>

Management System was utilized prior to the Petition Date, and to implement ordinary course changes to it consistent with past practices.  The Bankruptcy Code provides for such relief.

32.     Section 363(c)(1) of the Bankruptcy Code authorizes the debtor-in-possession to "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business . . . and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  The purpose of section 363(c)(1) is to provide a debtor-in-possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the Court.  *In re HLC Props., Inc.*, 55 B.R. 685, 686 (Bankr. N.D. Tex. 1985) (finding "no need to further burden the docket or the staff of the Court with a superfluous order" when a transaction is in the ordinary course of business); *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997).  Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by its cash management system.  *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996).  A cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets."  *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1114 (5th Cir. 1995).  Accordingly, section 363(c)(1) authorizes the continuation of the Cash Management System as it operated prepetition without the Court's approval.

33.     The Court may also grant the relief requested herein pursuant to section 363(b) of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property

of the estate." 11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g.*, *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 434–35 (5th Cir. 2016) (noting that section 363 "requires that a sale of the estate's assets be supported by an articulated business justification, good business judgment, or sound business reasons") (internal quotation and citation omitted); *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted).

34.   In addition, the Court has authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Under section 105(a) of the Bankruptcy Code, "[t]he

17

court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see CoServ*, 273 B.R. at 491–93 & n.6 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); *see also In re Tusa-Expo Holdings, Inc.*, No. 08-45057-DML-11, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *In re CEI Roofing*, 315 B.R. at 56. Moreover, Bankruptcy Rule 6003 implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. Accordingly, the Bankruptcy Code authorizes the payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of the debtor's estate.

35.     Maintaining the existing Cash Management System is in the best interests of the Debtors' estates and all parties in interest and, therefore, should be approved. The Cash Management System constitutes an ordinary course and essential business practice of the Debtors and provides significant benefits to the Debtors, including the ability to (i) control corporate funds, (ii) ensure the maximum availability of funds when and where necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of timely and accurate account information. Authorizing the Debtors to continue operating under the existing Cash Management System is necessary to avoid severe disruptions to the Debtors' operations, which ultimately would frustrate the Debtors' ability to effectuate their restructuring strategy and maximize the value of their estates. Accordingly, the Debtors request authority to maintain their existing Cash Management System to the extent set forth herein.

**II.     Maintenance of Debtors' Existing Bank Accounts is Warranted**

36.     The Operating Guidelines for Chapter 11 Cases (the "**UST Operating Guidelines**") of the Office of the United States Trustee for Region 7 (the "**U.S. Trustee**")

generally require that a chapter 11 debtor, among other things (i) open new bank accounts at a depository approved by the U.S. Trustee, (ii) establish one debtor-in-possession account for all estate monies required for the payment of taxes (including payroll taxes), (iii) close all existing bank accounts and open new debtor-in-possession accounts, (iv) maintain a separate debtor-in-possession account for cash collateral, (v) obtain checks that bear the designation "Debtor-in-Possession," and (vi) reference the debtor's bankruptcy case number and type of account on each such check. *See* U.S. Dep't of Justice, Region 7 Guidelines for Debtors-in-Possession § IV (2024).

37.     Accordingly, the Debtors request that the Court waive the requirements of the UST Operating Guidelines with respect to the Debtors' Bank Accounts and Business Forms, including checks. Strict enforcement of the UST Operating Guidelines with respect to the Cash Management System will severely disrupt the Debtors' ordinary course financial operations by reducing efficiencies, increasing administrative burdens, and creating unnecessary expenses. These chapter 11 cases will be more orderly and efficient if the Debtors are permitted to maintain all Bank Accounts with the same account numbers during these cases and to continue to use their Business Forms, including checks, in the ordinary course.

38.     Nevertheless, as previously discussed, with respect to checks that the Debtors or their agents print themselves, the Debtors and their agents will begin printing the "Debtor-in-Possession" legend and include the jointly administered bankruptcy case number on such checks within 10 business days after the date of entry of the Proposed Interim Order and, to the extent that the Debtors order new Business Forms, the Debtors will use reasonable efforts to include the "Debtor-in-Possession" legend and the jointly administered bankruptcy case number on such checks.

Case 25-90399   Document 357-1   Filed in TXSB on 09/02/25   Page 20 of 56

39.     In addition, to the extent necessary, the Debtors request authority to make ordinary course changes to the Cash Management System such as opening or closing their Bank Accounts or opening new Bank Accounts at authorized depositories designated by the U.S. Trustee in accordance with the terms of the Proposed Order.

40.     By preserving business continuity and avoiding the disruption and delay to the Debtors' disbursement obligations, the relief requested herein will benefit all parties in interest, including employees, vendors, and customers.

**III.     An Extension of Time to Comply with Requirements of Section 345(b) of Bankruptcy Code is Warranted to the Extent They Apply to the Bank Accounts and Cash Management System**

41.     Section 345 of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes such deposits as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C. § 345(a). For deposits that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires that the debtor obtain from the "entity with which such money is deposited or invested a bond in favor of the United States [that is] secured by the undertaking of a[n adequate] corporate surety, . . . unless the court for cause orders otherwise." 11 U.S.C. § 345(b).  In the alternative, the debtor may require the entity to deposit governmental securities in accordance with 31 U.S.C. § 9303, which provides that when a person is required by law to give a surety bond, such person may instead provide an eligible obligation, designated by the Secretary of the Treasury, as an acceptable substitute for a surety bond.

42.     Additionally, the UST Operating Guidelines generally require chapter 11 debtors, among other things, to deposit all estate funds into an account with a financial institution

20

**JOINT EXHIBIT NO. 18**
**Page 732 of 812**

that has executed a Uniform Deposit Agreement ("**UDA**") with, and is designated as an authorized depository by, the U.S. Trustee (each, an "**Authorized Depository**").

43.     In complex chapter 11 cases such as these involving debtors with far-reaching, global operations, strict adherence to the requirements of section 345(b) of the Bankruptcy Code would be inconsistent with the value-maximizing purpose of chapter 11 by unduly disrupting the debtor's cash management system and banking relationships.  Investment of cash in strict compliance with the requirements of section 345(b) of the Bankruptcy Code would, in cases such as this, be inconsistent with section 345(a), which permits a debtor to make such investments of money of the estate "as will yield the maximum reasonable net return on such money."  Thus, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) to provide that its strict investment requirements may be waived or modified if the court so orders "for just cause."  140 Cong. Rec. H. 10,767 (Oct. 4, 1994).

44.     The Debtors' Bank Accounts are located in the United States, Canada, and India.  All but nine (9) of the Debtors' active Bank Accounts are maintained at a financial institution that is an Authorized Depository.  Seven (7) Bank Accounts are located in Canada, one (1) Bank Account is located in India, and all other Bank Accounts are located in the United States.  Each of the Debtors' Bank Accounts located outside the United States is maintained at BOFA, which is an Authorized Depository, and each is also covered under the applicable non-U.S. equivalent to the Federal Deposit Insurance Corporation (the "**FDIC**").  Those accounts located in the United States are insured by the FDIC.  Of those accounts insured by the FDIC, three (3) hold amounts which exceed the FDIC insurance limit of $250,000.  Nevertheless, there is no risk known to the Debtors suggesting that funds in excess of the FDIC insurance limit held in those Bank Accounts will be in jeopardy during the pendency of these chapter 11 cases.  Thus,

**JOINT EXHIBIT NO. 18**
**Page 733 of 812**

Case 25-90399 Document 3357-1 Filed in TXSB on 07/24/26 Page 22 of 56

the Debtors believe that any funds that are deposited in the Bank Accounts are secure, and, therefore, the Debtors are in compliance with section 345 of the Bankruptcy Code with respect to such Bank Accounts.

45.     Nevertheless, out of an abundance of caution, to the extent that the Bank Accounts and Cash Management System are inconsistent with the requirements of section 354(b) of the Bankruptcy Code, the Debtors request a 45-day period (or such additional time to which the U.S. Trustee may agree) following the Petition Date in which the Debtors have to either come into compliance with section 345(b) of the Bankruptcy Code or to make other arrangements that would be acceptable to the U.S. Trustee (without prejudice to the Debtors' rights to request further extensions by motion to this Court).  Prior to the Petition Date, the Debtors discussed the requested 45-day extension with the U.S. Trustee and understand that the U.S. Trustee does not object to that extension.

## IV.     Payment of Bank Fees Should Be Approved

46.     Payment of the prepetition Bank Fees is in the best interests of the Debtors and all parties in interest in these chapter 11 cases, as it will prevent unnecessary disruptions to the Cash Management System and ensure that the Debtors' receipt of funds is not delayed.  Payment of prepetition Bank Fees will not prejudice any parties in interest.  Indeed, because the Banks likely have setoff rights for the Bank Fees, payment of prepetition Bank Fees should not prejudice the rights of unsecured creditors in these chapter 11 cases.  Accordingly, the Debtors request authority to pay any outstanding prepetition Bank Fees and other similar service charges to maintain the Cash Management System.

### V.  Continuation of Credit Card Program and Payment of Prepetition Amounts Due Thereunder Should be Authorized

47.     As stated above, under section 363(c)(1) of the Bankruptcy Code, a debtor in possession may use property of the estate in the ordinary course of business without a hearing. Furthermore, section 364(a) of the Bankruptcy Code permits a debtor in possession to "obtain unsecured credit and incur unsecured debt in the ordinary course of business" without a court order.  11 U.S.C. § 364(a).  Purchases made using the Credit Cards fall within the ordinary course of business under section 363(c)(1) of the Bankruptcy Code.  The use of Credit Cards and similar payment methods is widespread as a means of facilitating day-to-day business activities.  As a result, the Debtors believe they do not require the Court's approval to continue using the Credit Cards on a postpetition basis.

48.     Nonetheless, out of an abundance of caution, the Debtors request authority to continue using the Credit Card Program in the ordinary course of business consistent with past practices and to pay all obligations related thereto, including any obligations that arose before the Petition Date but remain outstanding.  Yet, in the event the Court finds that such transactions do not fall within the ordinary course of business, the Debtors request authority pursuant to sections 363(b)(1) and 105(a) of the Bankruptcy Code to continue using the Credit Card Program and to pay all obligations related thereto.

49.     The Credit Card Program is essential to the Debtors' operations.  The Credit Card Program allows the Debtors' employees to charge certain business-related expenses directly to the Debtors, thereby enabling the employees to conduct business more efficiently.  Continuing the Credit Card Program and satisfying any prepetition and postpetition amounts outstanding thereunder, including any credit card processing fees, will help minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' business.  Accordingly, the Debtors

23

request authority to continue the Credit Card Program in the ordinary course of business, including making ordinary course modifications thereto, and to pay any outstanding obligations, whether arising prepetition or postpetition, regarding the same.

50.     The Debtors also seek authorization to pay all outstanding prepetition amounts owing on the Credit Cards.  If the Debtors do not pay these outstanding amounts, there is a risk that the credit card issuers could restrict the Debtors' access to their Credit Card Program or cease extending credit to the Debtors after the Petition Date.  If that were to occur, it would be costly, disruptive to the Debtors' operations, burdensome to the Debtors and their estates, and time-consuming for the Debtors to establish new credit card programs with one or more alternative providers.  Accordingly, the Court should authorize the Debtors to maintain their Credit Card Program and pay all obligations related thereto.

## VI.     Continued Performance of Intercompany Transactions Is Warranted and Granting Administrative Expense Priority to Postpetition Intercompany Claims Is Appropriate

51.     As stated above, under section 363(c)(1) of the Bankruptcy Code, a debtor in possession "may use property of the estate in the ordinary course of business without notice or a hearing."  The Debtors enter into and perform Intercompany Transactions "in the ordinary course of business" within the meaning of section 363(c)(1) of the Bankruptcy Code.  The Intercompany Transactions are not just a matter of routine in the Debtors' business—they are the sort of transactions that are common among many business enterprises that operate through multiple affiliates.  It is precisely because of their routine nature that the Intercompany Transactions are integral to the Debtors' ability to operate their business and successfully emerge from these chapter 11 cases.  Accordingly, while the Debtors believe that they do not require the Court's approval to continue entering into and performing Intercompany Transactions, out of an abundance of caution, the Debtors request express authority to engage in such transactions postpetition.  This

will ensure the Debtors have access to critical goods and services without interruption, as the Intercompany Transactions are essential to the Debtors' core business operations.  If the Debtors and Non-Debtor Affiliates are not permitted to continue engaging in Intercompany Transactions, the Debtors and the Non-Debtor Affiliates may not be able to sufficiently fund their expenses.

52.    Additionally, if the Debtors were not authorized to engage in postpetition Intercompany Transactions, several Debtors and Non-Debtor Affiliates would be immediately cut off from their principal sources of financing, triggering a cascade of operational challenges.  As certain Non-Debtor Affiliates provide critical services to the Debtors necessary to their ongoing operations, the shutdown of such businesses would be to the detriment of the Debtors and their estates.

53.    The Debtors also request that the Court grant administrative expense status to all Intercompany Claims arising postpetition as a result of Intercompany Transactions under section 503(b)(1)(A) of the Bankruptcy Code, which provides, "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . the actual, necessary costs and expenses of preserving the estate . . . ."  11 U.S.C. § 503(b)(1)(A).  If the Intercompany Claims are accorded administrative expense status, each entity that participates in the Cash Management System and provides a benefit to the Debtors' estates will be assured that it will be compensated for its efforts.

**Applicable Financial Institutions
Should Be Authorized to Receive, Process,
Honor, and Pay Checks Issued and Transfers
Requested to Pay Obligations Related to Cash Management System**

54.    The Debtors further request that the Court authorize applicable Banks to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by or on behalf of the Debtors relating to the Cash Management System, to the extent that sufficient funds are on deposit and standing in the Debtors'

credit in the applicable Bank Accounts to cover such payment.  The Debtors represent that these checks are drawn on identifiable Disbursement Accounts and can be readily identified as relating directly to the authorized payment of the Cash Management System.  Accordingly, the Debtors believe that checks other than those relating to authorized payments will not be honored inadvertently.  Any such financial institution may rely on the representations of such Debtors as to which checks are issued or wire transfers are made (or, as applicable, requested to be issued or made) and authorized to be paid in accordance with this Motion without any duty of further inquiry.  The Debtors also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or funds transfer requests on account of prepetition obligations related to the Cash Management System that are dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

**Debtors Have Satisfied Bankruptcy Rule 6003(a)**

55.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003.  Bankruptcy Rule 6003(a) provides that, to the extent relief is needed to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting a motion to "use, sell, or lease property of the estate, including a motion to pay all or a part of a claim that arose before the petition was filed" or a motion to "incur any other obligation regarding the property of the estate" prior to 21 days after the Petition Date.  Fed. R. Bankr. P. 6003(a).  As explained above and in the First Day Declaration, the Debtors would suffer immediate and irreparable harm if the relief sought herein is not promptly granted.  Accordingly, the Debtors submit that the relief requested herein is needed to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

**Debtors' Compliance with Bankruptcy Rule 6004(a) and 6004(h)**

56.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**Reservation of Rights**

57.     Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors or any liens satisfied pursuant to this Motion, (ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (v) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (vi) a waiver of the obligation of any party in interest to file a proof of claim, or (vii) an approval, assumption, or rejection of any unexpired lease or executory contract under section 365 of the Bankruptcy Code.  The Debtors expressly reserve all rights with respect to the foregoing matters.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

**Notice**

58.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

**No Previous Request**

59.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and Proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: September 29, 2025
      Houston, Texas

              _/s/ Clifford W. Carlson_
              WEIL, GOTSHAL & MANGES LLP
              Gabriel A. Morgan (24125891)
              Clifford W. Carlson (24090024)
              700 Louisiana Street, Suite 3700
              Houston, Texas 77002
              Telephone:  (713) 546-5000
              Facsimile:  (713) 224-9511
              Email:   gabriel.morgan@weil.com
                      clifford.carlson@weil.com

              -and-

              WEIL, GOTSHAL & MANGES LLP
              Matthew S. Barr (*pro hac vice* pending)
              Sunny Singh (*pro hac vice* pending)
              Andriana Georgallas (*pro hac vice* pending)
              Kevin Bostel (*pro hac vice* pending)
              Jason H. George (*pro hac vice* pending)
              767 Fifth Avenue
              New York, New York 10153
              Telephone:  (212) 310-8000
              Facsimile:  (212) 310-8007
              Email:   matt.barr@weil.com
                      sunny.singh@weil.com
                      andriana.georgallas@weil.com
                      kevin.bostel@weil.com
                      jason.george@weil.com

              *Proposed Attorneys for Debtors*
              *and Debtors in Possession*

29

Case 25-90399   Document 3357-1   Filed in TXSB on 09/29/25   Page 31 of 56

### Certificate of Service

I hereby certify that on September 29, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/  Clifford W. Carlson
Clifford W. Carlson

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § § | **Chapter 11** |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § § | **Case No. 25-90399 (CML)** |
|  | § § | **(Jointly Administered)** |
| **Debtors.**[1] | § § |  |

**INTERIM ORDER (I) AUTHORIZING
DEBTORS TO (A) CONTINUE USING EXISTING
CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS, (B) IMPLEMENT
ORDINARY COURSE CHANGES TO CASH MANAGEMENT SYSTEM,
AND (C) HONOR CERTAIN RELATED PREPETITION OBLIGATIONS,
(II) GRANTING ADMINISTRATIVE EXPENSE PRIORITY FOR POSTPETITION
INTERCOMPANY CLAIMS, (III) EXTENDING TIME TO COMPLY WITH
REQUIREMENTS OF 11 U.S.C. § 345(b), AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated September 29, 2025 (the "**Motion**"),[2] of First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of interim and final orders, pursuant to sections 105, 345, 363, 364, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing the Debtors to (a) continue using their existing Cash Management System, (b) implement changes to their Cash Management System in the ordinary course of business, and (c) honor certain prepetition obligations related to the Cash Management System, (ii) grant administrative expense priority for Intercompany Claims, (iii) extend time to comply with the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to the Bank Accounts, and (iv) granting related relief, all as more fully set forth in the Motion; and this Court

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

having jurisdiction and authority to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and upon consideration of the First Day Declaration; and upon any hearing held on the Motion; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003 and is in the best interests of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**

1.     The Debtors are authorized, but not directed, pursuant to sections 105(a) and 363 of the Bankruptcy Code, to continue to manage their cash pursuant to the Cash Management System maintained before the Petition Date, to collect and disburse cash in accordance with the Cash Management System, and to make ordinary course changes to their Cash Management System without further order of this Court, including to open and close bank accounts, subject to the limitations contained in this Interim Order.  For the avoidance of doubt, nothing in this Interim Order shall authorize the Debtors to (a) pay, reimburse, or settle (directly or indirectly) claims of "insider[s]" (as that term is defined in section 101(31) of the Bankruptcy

2

Code), or "professional persons" (as that phrase appears in section 327(a) of the Bankruptcy Code) absent line-item approval in an Approved Budget (as defined in the DIP Orders) or (b) modify, alter, amend, terminate or implement a new Cash Management System and related programs (including Intercompany Transactions), policies or benefits without the consent of Required Lenders (as defined in the DIP Orders).

2. The Debtors are further authorized, but not directed, to (i) designate, maintain, and continue to use their existing Bank Accounts, as listed on **Exhibit C** to the Motion, in the names and with the account numbers existing immediately before the Petition Date; (ii) deposit funds in, and withdraw funds from, such Bank Accounts by all usual means, including checks, wire transfers, ACH transfers, and other debits, (iii) pay any Bank Fees and other charges or payment obligations associated with the Bank Accounts and the Cash Management System, whether arising before or after the Petition Date, under the terms of and in accordance with their contractual arrangements with the Debtors, (iv) otherwise perform their obligations under the documents governing the Bank Accounts and the Bank Fees, and (v) treat their prepetition Bank Accounts for all purposes as debtor-in-possession accounts.

3. The Banks are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, in accordance with the terms of the documents governing the Bank Accounts, and to receive, process, honor, and pay, to the extent sufficient funds are available for deposit in the applicable Bank Accounts to cover such payments, any and all checks, drafts, wires, credit card payments, and ACH transfers issued, presented, or drawn on the Bank Accounts on and after the Petition Date by the holders, makers, or payors thereof, as the case may be.

4.      The Debtors are authorized, but not directed, with the consent of Required Lenders, to open new bank accounts and close any existing Bank Accounts in the ordinary course of business, and any relevant bank is authorized to honor the Debtors' requests to open or close such Bank Accounts; *provided*, that, all accounts opened by any of the Debtors on or after the Petition Date at any bank, shall, for purposes of this Interim Order, (i) be deemed a Bank Account as if it had been listed on **Exhibit C** to the Motion; (ii) must be subject to deposit account control agreements acceptable to the Required Lender; and (iii) shall be at a bank that has executed a Uniform Depository Agreement ("**UDA**") with the U.S. Trustee or at a bank that is willing to immediately execute such an agreement; *provided*, that the Debtors will notify the U.S. Trustee and any statutory committee appointed in these chapter 11 cases within 14 days after opening a new bank account or closing an existing bank account.

5.      Within 14 days from the date of the entry of this Interim Order, the Debtors shall (i) contact each Bank, (ii) provide each Bank with each of the Debtors' tax identification numbers and the jointly administered case number, and (iii) identify each of their Bank Accounts held at such Banks as being held by a debtor-in-possession.

6.      Nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Hearing**").

7.      The Debtors shall maintain, and cause their Non-Debtor Affiliates to maintain, accurate and current records with respect to all transfers of cash and non-cash setoffs (including Intercompany Transactions) so that all prepetition and postpetition transfers and transactions, including the Intercompany Transactions, may be readily ascertained, traced, and

<div align="center">4</div>

recorded properly and shall make such records available to the Lender Advisors (as defined in the DIP Orders), the U.S. Trustee, and any statutory committee appointed in these cases upon request.

8.      Subject to the limitations provided in this Interim Order, the Debtors are authorized to continue to enter into and engage in the Intercompany Transactions solely to the extent necessary to maintain operations pending entry of a final order; *provided*, however, the Debtors are not authorized, on an interim basis, to provide any Intercompany Loans absent the consent of the Required Lenders.  Subject to the terms of this Interim Order, the Debtors are authorized to set off mutual postpetition obligations relating to intercompany receivables and payables between Debtors and Non-Debtor Affiliates through the Cash Management System in the ordinary course of business consistent with prepetition practices.  Notwithstanding anything herein to the contrary, the Debtors may not amend, modify, change, or terminate their existing Intercompany Transactions without the prior consent of the Required Lenders.  All postpetition payments from a Debtor or a Non-Debtor Affiliate to another Debtor under any postpetition Intercompany Transaction are hereby accorded administrative expense status; *provided* that any such administrative expense status claim shall be subordinate and subject to the Carve Out (as defined in the Interim DIP Order) and approved superpriority administrative expense claims provided for under the DIP Orders (defined below).  For the avoidance of doubt, this Interim Order only authorizes the payment or set-off of any postpetition obligations against any prepetition obligations to the extent necessary to maintain operations, pending entry of a final order.  All proposed Intercompany Transactions between Debtors and between Debtors and Non-Debtor Affiliates shall only be authorized if expressly approved in accordance with the Approved Budget.

9.      The Debtors are authorized to use their existing Business Forms substantially in the forms used immediately prior to the commencement of these chapter 11 cases,

5

without use of "debtor in possession" on any of their Business Forms; *provided*, that, the Debtors will use reasonable efforts to have electronic checks include the legend referring to the Debtors as "Debtors-in-Possession" as soon as practicable, and if the Debtors generate new checks during the pendency of these chapter 11 cases, such checks shall include a legend referring to the Debtors as "Debtors-in-Possession."

10.     To the extent that the Bank Accounts and Cash Management System are inconsistent with the requirements of section 345(b) of the Bankruptcy Code, the Debtors shall have 45 calendar days (or such additional time as the U.S. Trustee may agree to) from the Petition Date within which either to come into compliance with section 345(b) of the Bankruptcy Code with respect to the Bank Accounts listed on **Exhibit C** or to make such other arrangements as agreed to by the U.S. Trustee with the consent of the Required Lenders.  Such extension is without prejudice to the Debtors' rights to request a further extension or waiver of the requirements of section 345(b) of the Bankruptcy Code at a later date.

11.     Each of the Banks is authorized to debit the Debtors' Bank Accounts in the ordinary course of business without the need for further order of this Court for:  (i) all drafts, checks, wire transfers, electronic funds transfers, ACH transfers, or other items drawn on the Debtors' accounts which are cashed or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of Debtors' accounts with the Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) all undisputed prepetition and postpetition amounts outstanding, if any, owed to the Bank as Bank Fees for the maintenance of

the Cash Management System and charge back returned items to the Bank Accounts in the ordinary course.

12.     The Banks are authorized to accept and rely on all representations and instructions made by the Debtors with respect to whether any checks, drafts, wires, or ACH transfers or other payment order drawn or issued by the Debtors prior to, on, or subsequent to the Petition Date, should be honored or dishonored pursuant to this Interim Order or any other order of this Court, without any duty to inquire otherwise.  Such Banks and financial institutions shall not have liability to any party as a result of their reliance on any representations or instructions of the Debtors as provided herein, nor shall any Bank or financial institution honoring any check or other item as a result of a good faith error be liable to any party therefor.

13.     The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic funds or ACH transfers, and to replace any prepetition checks or electronic fund or ACH transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases with respect to any prepetition amounts that are authorized to be paid pursuant to this Interim Order.

14.     The Debtors are authorized to continue the Credit Card Program in the ordinary course and continue using, and performing their obligations under, the Credit Cards, including paying any obligations related thereto, regardless of whether such obligations arose prior to, on, or after the Petition Date.

15.     Notwithstanding anything to the contrary contained in the Motion or this Interim Order, any payment made or to be made pursuant to the authority granted herein, and any authorization contained herein, shall be subject to and in accordance with any interim and final orders, as applicable, entered by the Court approving the Debtors' entry into any postpetition

debtor-in-possession financing facility and/or the Debtors' use of cash collateral (such orders, the "**DIP Orders**") and any budget in connection with any use of cash collateral and/or postpetition debtor-in-possession financing authorized therein (subject to any permitted variances). To the extent there is any inconsistency between the terms of the DIP Orders and any action taken or proposed to be taken under this Interim Order, the terms of the DIP Orders shall control. Nothing in the Motion or this Interim Order shall constitute a waiver or substitution of any consent right required under the DIP Orders.

16.     Nothing in the Motion or this Interim Order or any payment made pursuant to the authority granted by this Interim Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors or any liens satisfied pursuant to this Interim Order, (ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (v) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (vi) a waiver of the obligation of any party in interest to file a proof of claim, or (vii) an approval, assumption, or rejection of any unexpired lease or executory contract under section 365 of the Bankruptcy Code.

17.     The requirements of Bankruptcy Rule 6003(a) have been satisfied.

18.     Notice of the Motion is adequate under Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules.

19.     Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

**JOINT EXHIBIT NO. 18**
**Page 750 of 812**

20.     The Debtors are authorized to take all actions necessary or appropriate to carry out the relief granted in this Interim Order.

21.     This Court retains exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Interim Order.

22.     The Final Hearing to consider the relief requested in the Motion shall be held on _____, **2025, at** _____ (Prevailing Central Time) and any objections or responses to the Motion shall be filed and served on or prior to _____, **2025, at** _____ (Prevailing Central Time).

Dated: _____, 2025
       Houston, Texas

_____
CHRISTOPHER LOPEZ
UNITED STATES BANKRUPTCY JUDGE

**JOINT EXHIBIT NO. 18**
**Page 751 of 812**

**<u>Exhibit B</u>**

**Proposed Final Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| FIRST BRANDS GROUP, LLC, *et al.*, | § § § | Case No. 25-90399 (CML) |
| Debtors.[1] | § § § | (Jointly Administered) |

**FINAL ORDER**
**(I) AUTHORIZING DEBTORS TO (A) CONTINUE**
**USING EXISTINGCASH MANAGEMENT SYSTEM**
**AND BANK ACCOUNTS, (B) IMPLEMENT ORDINARY COURSE**
**CHANGES TO CASH MANAGEMENT SYSTEM, AND (C) HONOR**
**CERTAIN RELATED PREPETITION OBLIGATIONS, (II) GRANTING**
**ADMINISTRATIVE EXPENSE PRIORITY FOR POSTPETITION**
**INTERCOMPANY CLAIMS, (III) EXTENDING TIME TO COMPLY WITH**
**REQUIREMENTS OF 11 U.S.C. § 345(b), AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated September 29, 2025 (the "**Motion**"),[2] of First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of interim and final orders, pursuant to sections 105, 345, 363, 364, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing the Debtors to (a) continue using their existing Cash Management System, (b) implement changes to their Cash Management System in the ordinary course of business, and (c) honor certain prepetition obligations related to the Cash Management System, (ii) grant administrative expense priority for Intercompany Claims, (iii) extend time to comply with the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to the Bank

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Accounts, and (iv) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction and authority to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and upon consideration of the First Day Declaration; and this Court having entered an order granting the relief requested in the Motion on an interim basis; and upon any hearing held on the Motion; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**

1. The Debtors are authorized, but not directed, pursuant to sections 105(a) and 363 of the Bankruptcy Code, to continue to manage their cash pursuant to the Cash Management System maintained before the Petition Date, to collect and disburse cash in accordance with the Cash Management System, and to make ordinary course changes to their Cash Management System without further order of this Court, including to open and close bank accounts, subject to the limitations contained in this Final Order.  For the avoidance of doubt, nothing in this Final Order shall authorize the Debtors to (a) pay, reimburse, or settle (directly or

**JOINT EXHIBIT NO. 18**
**Page 754 of 812**

indirectly) claims of "insider[s]" (as that term is defined in section 101(31) of the Bankruptcy Code), or "professional persons" (as that phrase appears in section 327(a) of the Bankruptcy Code) absent line-item approval in an Approved Budget (as defined in the DIP Orders) or (b) modify, alter, amend, terminate or implement a new Cash Management System and related programs (including Intercompany Transactions), policies or benefits without the consent of Required Lenders (as defined in the DIP Orders).

2.      The Debtors are further authorized, but not directed, to (i) designate, maintain, and continue to use their existing Bank Accounts, as listed on **Exhibit C** to the Motion, in the names and with the account numbers existing immediately before the Petition Date, (ii) deposit funds in, and withdraw funds from, such Bank Accounts by all usual means, including checks, wire transfers, ACH transfers, and other debits, (iii) pay any Bank Fees and other charges or payment obligations associated with the Bank Accounts and the Cash Management System, whether arising before or after the Petition Date, under the terms of and in accordance with their contractual arrangements with the Debtors, (iv) otherwise perform their obligations under the documents governing the Bank Accounts and the Bank Fees, and (v) treat their prepetition Bank Accounts for all purposes as debtor-in-possession accounts.

3.      The Banks are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, in accordance with the terms of the documents governing the Bank Accounts, and to receive, process, honor, and pay, to the extent sufficient funds are available for deposit in the applicable Bank Accounts to cover such payments, any and all checks, drafts, wires, credit card payments, and ACH transfers issued, presented, or drawn on the Bank Accounts on and after the Petition Date by the holders, makers, or payors thereof, as the case may be.

4.      The Debtors are authorized, but not directed, with the consent of Required Lenders, to open new bank accounts and close any existing Bank Accounts in the ordinary course of business, and any relevant bank is authorized to honor the Debtors' requests to open or close such Bank Accounts; *provided*, that, all accounts opened by any of the Debtors on or after the Petition Date at any bank, shall, for purposes of this Final Order, (i) be deemed a Bank Account as if it had been listed on **Exhibit C** to the Motion; (ii) must be subject to deposit account control agreements acceptable to the Required Lender; and (iii) shall be at a bank that has executed a Uniform Depository Agreement ("**UDA**") with the U.S. Trustee or at a bank that is willing to immediately execute such an agreement; *provided*, that the Debtors will notify the U.S. Trustee and any statutory committee appointed in these chapter 11 cases within 14 days after opening a new bank account or closing an existing bank account.

5.      The Debtors shall maintain, and cause their Non-Debtor Affiliates to maintain, accurate and current records with respect to all transfers of cash and non-cash setoffs (including Intercompany Transactions) so that all prepetition and postpetition transfers and transactions, including the Intercompany Transactions, may be readily ascertained, traced, and recorded properly and shall make such records available to the Lender Advisors (as defined in the DIP Orders), the U.S. Trustee, and any statutory committee appointed in these cases upon request.

6.      Subject to the limitations provided in this Final Order, the Debtors are authorized to continue to enter into and engage in the Intercompany Transactions solely to the extent necessary to maintain operations pending entry of this Final Order.  Subject to the terms of this Final Order, the Debtors are authorized to set off mutual postpetition obligations relating to intercompany receivables and payables between Debtors and Non-Debtor Affiliates through the Cash Management System in the ordinary course of business consistent with prepetition practices.

4

Notwithstanding anything herein to the contrary, the Debtors may not amend, modify, change, or terminate their existing Intercompany Transactions without the prior consent of the Required Lenders.  All postpetition payments from a Debtor or a Non-Debtor Affiliate to another Debtor under any postpetition Intercompany Transaction are hereby accorded administrative expense status; *provided* that any such administrative expense status claim shall be subordinate and subject to the Carve Out (as defined in the Interim DIP Order) and approved superpriority administrative expense claims provided for under the DIP Orders (defined below).  All proposed Intercompany Transactions between Debtors and between Debtors and Non-Debtor Affiliates shall only be authorized if expressly approved in accordance with the Approved Budget.

7.       The Debtors are authorized to use their existing Business Forms substantially in the forms used immediately prior to the commencement of these chapter 11 cases, without use of "debtor in possession" on any of their Business Forms; *provided*, that, the Debtors will use reasonable efforts to have electronic checks include the legend referring to the Debtors as "Debtors-in-Possession" as soon as practicable, and if the Debtors generate new checks during the pendency of these chapter 11 cases, such checks shall include a legend referring to the Debtors as "Debtors-in-Possession."

8.       To the extent that the Bank Accounts and Cash Management System are inconsistent with the requirements of section 345(b) of the Bankruptcy Code, the Debtors shall have 45 calendar days (or such additional time as the U.S. Trustee may agree to) from the Petition Date within which either to come into compliance with section 345(b) of the Bankruptcy Code with respect to the Bank Accounts listed on **Exhibit C** or to make such other arrangements as agreed to by the U.S. Trustee with the consent of the Required Lenders.  Such extension is without

prejudice to the Debtors' rights to request a further extension or waiver of the requirements of section 345(b) of the Bankruptcy Code at a later date.

9. Each of the Banks is authorized to debit the Debtors' Bank Accounts in the ordinary course of business without the need for further order of this Court for:  (i) all drafts, checks, wire transfers, electronic funds transfers, ACH transfers, or other items drawn on the Debtors' accounts which are cashed or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of Debtors' accounts with the Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) all undisputed prepetition and postpetition amounts outstanding, if any, owed to the Bank as Bank Fees for the maintenance of the Cash Management System and charge back returned items to the Bank Accounts in the ordinary course.

10. The Banks are authorized to accept and rely on all representations and instructions made by the Debtors with respect to whether any checks, drafts, wires, or ACH transfers or other payment order drawn or issued by the Debtors prior to, on, or subsequent to the Petition Date, should be honored or dishonored pursuant to this Final Order or any other order of this Court, without any duty to inquire otherwise.  Such Banks and financial institutions shall not have liability to any party as a result of their reliance on any representations or instructions of the Debtors as provided herein, nor shall any Bank or financial institution honoring any check or other item as a result of a good faith error be liable to any party therefor.

11. The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic funds or automated clearing house transfers, and to replace any

prepetition checks or electronic fund or automated clearing house transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases with respect to any prepetition amounts that are authorized to be paid pursuant to this Final Order

12.    The Debtors are authorized to continue the Credit Card Program in the ordinary course and continue using, and performing their obligations under, the Credit Cards, including paying any obligations related thereto, regardless of whether such obligations arose prior to, on, or after the Petition Date.

13.    Notwithstanding anything to the contrary contained in the Motion or this Final Order, any payment made or to be made pursuant to the authority granted herein, and any authorization contained herein, shall be subject to and in accordance with any interim and final orders, as applicable, entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and/or the Debtors' use of cash collateral (such orders, the "**DIP Orders**") and any budget in connection with any use of cash collateral and/or postpetition debtor-in-possession financing authorized therein (subject to any permitted variances).  To the extent there is any inconsistency between the terms of the DIP Orders and any action taken or proposed to be taken under this Final Order, the terms of the DIP Orders shall control.  Nothing in the Motion or this Final Order shall constitute a waiver or substitution of any consent right required under the DIP Orders.

14.    Nothing in the Motion or this Final Order or any payment made pursuant to the authority granted by this Final Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors or any liens satisfied pursuant to this Final Order, (ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (iv) a waiver of the Debtors' or any

**JOINT EXHIBIT NO. 18**
**Page 759 of 812**

appropriate party in interest's rights to dispute any claim, (v) a waiver or limitation of the Debtors'

or any other party in interest's rights under the Bankruptcy Code or any other applicable

nonbankruptcy law, (vi) a waiver of the obligation of any party in interest to file a proof of claim,

or (vii) an approval, assumption, or rejection of any unexpired lease or executory contract under

section 365 of the Bankruptcy Code.

15.     Notice of the Motion is adequate under Bankruptcy Rule 6004(a) and the

Bankruptcy Local Rules.

16.     Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Final

Order shall be immediately effective and enforceable upon its entry.

17.     The Debtors are authorized to take all actions necessary or appropriate to

carry out the relief granted in this Final Order.

18.     This Court retains exclusive jurisdiction to hear and determine all matters

arising from or related to the implementation, interpretation, or enforcement of this Final Order.

Dated:  _____, 2025
          Houston, Texas

_____
CHRISTOPHER LOPEZ
UNITED STATES BANKRUPTCY JUDGE

8

**JOINT EXHIBIT NO. 18**
**Page 760 of 812**

## Exhibit C

## List of Bank Accounts

| **Legal Entity** | **Financial Institution** | **Last Four Digits of Bank Account Number** | **Account Type** |
|---|---|---|---|
| Airtex Products LP | Bank of America | 8856 | Collection |
| Airtex Products LP | Wells Fargo | 8904 | Collection |
| ASC Industries Inc | Bank of America | 6878 | Collection |
| ASC Industries Inc | Bank of America | 6572 | Disbursement |
| BPI EC LLC | Bank of America | 4406 | Collection |
| BPI Holdings International LLC | Bank of America | 6343 | Collection |
| Brake Parts Inc India LLC | Bank of America | 6348 | Collection |
| Brake Parts Inc LLC | Bank of America | 0974 | Disbursement |
| Brake Parts Inc LLC | Bank of America | 7312 | Collection |
| Brake Parts Inc LLC | Bank of America | 7294 | Collection |
| Brake Parts Inc LLC | Bank of America | 7827 | Disbursement |
| Brake Parts Inc LLC | Bank of America | 7299 | Disbursement |
| Brake Parts Inc LLC | Bank of America | 3205 | Collection |
| Brake Parts Inc LLC | Bank of America | 3213 | Collection |
| Cardone Industries, Inc | Bank of America | 3264 | Collection |
| Cardone Industries, Inc | Bank of America | 3269 | Disbursement |
| Cardone Industries, Inc | Bank of America | 3725 | Disbursement |
| Cardone Industries, Inc | Citizens | 6317 | Disbursement |
| Cardone Industries, Inc | Citizens | 5639 | Disbursement |
| Cardone Industries, Inc | Citizens | 5647 | Collection |
| Cardone Industries, Inc | Citizens | 5655 | Collection |
| Cardone Industries, Inc | Citizens | 6309 | Disbursement |
| Cardone Industries, Inc | Citizens | 6325 | Disbursement |

| Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|
| Cardone Industries, Inc | Citizens | 2329 | Disbursement |
| Cardone Industries, Inc | JP Morgan Chase | 3159 | Disbursement |
| Cardone Industries, Inc | JP Morgan Chase | 0101 | Collection |
| Cardone Industries, Inc | JP Morgan Chase | 6101 | Collection |
| Carter Carburetor Holdings, LLC | Bank of America | 3720 | Disbursement |
| Carter Carburetor Holdings, LLC | Bank of America | 3221 | Collection |
| Carter Carburetor Holdings, LLC | Bank of America | 3226 | Disbursement |
| Carter Carburetor LLC | Bank of America | 3744 | Disbursement |
| Carter Carburetor LLC | Bank of America | 3240 | Collection |
| Carter Carburetor LLC | Bank of America | 3245 | Disbursement |
| Carter Fuel Systems LLC | Bank of America | 6892 | Collection |
| Carter Fuel Systems LLC | Bank of America | 6577 | Collection |
| Carter Fuel Systems LLC | Bank of America | 7002 | Collection |
| Carter Fuel Systems LLC | Bank of America | 7021 | Disbursement |
| Carter Fuel Systems LLC | Bank of America | 6999 | Collection |
| Carter Fuel Systems LLC | Bank of America | 7007 | Disbursement |
| Champion Laboratories Inc | Bank of America | 1396 | Disbursement |
| Champion Laboratories Inc | Bank of America | 1879 | Collection |
| Champion Laboratories Inc | Bank of America | 6216 | Disbursement |
| Champion Laboratories Inc | Bank of America | 7710 | Disbursement |
| Champion Laboratories Inc | Bank of America | 6224 | Collection |

| Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|
| Champion Laboratories Inc | Wells Fargo | 9092 | Collection |
| Champion Laboratories Inc | Wells Fargo | 9100 | Collection |
| CWD LLC | Wells Fargo | 4362 | Collection |
| CWD LLC | Bank of America | 1476 | Disbursement |
| CWD LLC | Bank of America | 7715 | Disbursement |
| CWD LLC | Bank of America | 7901 | Collection |
| CWD LLC | Wells Fargo | 4354 | Collection |
| Dalton Corporation | CIBC | 5872 | Collection |
| Dalton Corporation | CIBC | 1110 | Concentration |
| Eagle Casting, LLC | HSBC | 5479 | Concentration |
| Eagle Machining, LLC | HSBC | 5487 | Concentration |
| First Brands Group LLC | Bank of America | 6975 | Concentration |
| First Brands Group LLC | Bank of America | 6262 | Collection |
| First Brands Group LLC | Bank of America | 6808 | Disbursement |
| First Brands Group LLC | Bank of America | 9394 | Investment |
| First Brands Group LLC | Bank of America | 2114 | Disbursement |
| First Brands Group LLC | Bank of America | 0657 | Disbursement |
| First Brands Group LLC | US Bank | 1400 | Investment |
| First Brands Group LLC | SouthState | 4957 | Investment |
| First Brands Group LLC | Bank United | 9656 | Collection |
| First Brands Group LLC | Bank United | 9161 | Investment |
| FRAM Group Operations LLC | Bank of America | 9571 | Collection |
| FRAM Group Operations LLC | Bank of America | 2869 | Disbursement |

| Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|
| HEATHERTON HOLDINGS LLC | Bank of America | 7106 | Collection |
| HEATHERTON HOLDINGS LLC | Bank of America | 7120 | Disbursement |
| Hopkins Manufacturing Corp | US Bank | 5565 | Collection |
| Hopkins Manufacturing Corp | US Bank | 0366 | Collection |
| Hopkins Manufacturing Corp | US Bank | 2289 | Collection |
| Hopkins Manufacturing Corp | Bank of America | 7724 | Collection |

**Exhibit D**

**Cash Management System Schematic**



**E**

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

November 07, 2025

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC**, *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**FINAL ORDER
(I) AUTHORIZING DEBTORS TO (A) CONTINUE
USING EXISTING CASH MANAGEMENT SYSTEM
AND BANK ACCOUNTS, (B) IMPLEMENT ORDINARY COURSE
CHANGES TO CASH MANAGEMENT SYSTEM, AND (C) HONOR
CERTAIN RELATED PREPETITION OBLIGATIONS, (II) GRANTING
ADMINISTRATIVE EXPENSE PRIORITY FOR POSTPETITION
INTERCOMPANY CLAIMS, (III) EXTENDING TIME TO COMPLY WITH
REQUIREMENTS OF 11 U.S.C. § 345(b), AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated September 29, 2025 (the "**Motion**"),[2] of First Brands

Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "**Debtors**"), for entry of interim and final orders, pursuant to

sections 105, 345, 363, 364, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and

6004, (i) authorizing the Debtors to (a) continue using their existing Cash Management System,

(b) implement changes to their Cash Management System in the ordinary course of business, and

(c) honor certain prepetition obligations related to the Cash Management System, (ii) grant

administrative expense priority for Intercompany Claims, (iii) extend time to comply with the

requirements of section 345(b) of the Bankruptcy Code to the extent they apply to the Bank

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims
and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these
chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
Motion.

Accounts, and (iv) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction and authority to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and upon consideration of the First Day Declaration; and this Court having entered an order granting the relief requested in the Motion on an interim basis (Docket No. 222) (the "**Interim Order**"); and upon any hearing held on the Motion; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**

1.      The Debtors are authorized, but not directed, pursuant to sections 105(a) and 363 of the Bankruptcy Code, to continue to manage their cash pursuant to the Cash Management System maintained before the Petition Date, to collect and disburse cash in accordance with the Cash Management System, and to make ordinary course changes to their Cash Management System without further order of this Court, including to open and close bank accounts, subject to the limitations contained in this Final Order; *provided* without limitation that the Debtors give prior notice of any material changes to the Cash Management System, including

2

with respect to Intercompany Transactions, closing or opening of any Bank Accounts, and Bank Fees, to counsel to the official committee of unsecured creditors (the "**Creditors' Committee**"). For the avoidance of doubt, nothing in this Final Order shall authorize the Debtors to (a) pay, reimburse, or settle (directly or indirectly) claims of "insider[s]" (as that term is defined in section 101(31) of the Bankruptcy Code), or "professional persons" (as that phrase appears in section 327(a) of the Bankruptcy Code) absent line-item approval in an Approved Budget (as defined in the DIP Orders) or (b) modify, alter, amend, terminate or implement a new Cash Management System and related programs (including Intercompany Transactions), policies or benefits without the consent of Required Lenders (as defined in the DIP Orders).

2.      The Debtors are further authorized, but not directed, to (i) designate, maintain, and continue to use their existing Bank Accounts, as listed on **Schedule 1** hereto (the "**Bank Account List**"), in the names and with the account numbers existing immediately before the Petition Date, (ii) deposit funds in, and withdraw funds from, such Bank Accounts by all usual means, including checks, wire transfers, ACH transfers, and other debits, (iii) pay any Bank Fees and other charges or payment obligations associated with the Bank Accounts and the Cash Management System, whether arising before or after the Petition Date, under the terms of and in accordance with their contractual arrangements with the Debtors, (iv) otherwise perform their obligations under the documents governing the Bank Accounts and the Bank Fees, and (v) treat their prepetition Bank Accounts for all purposes as debtor-in-possession accounts.

3.      The Banks are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, in accordance with the terms of the documents governing the Bank Accounts, and to receive, process, honor, and pay, to the extent sufficient funds are available for

deposit in the applicable Bank Accounts to cover such payments, any and all checks, drafts, wires, credit card payments, and ACH transfers issued, presented, or drawn on the Bank Accounts on and after the Petition Date by the holders, makers, or payors thereof, as the case may be.

4.      The Debtors are authorized, but not directed, with the consent of the Required Lenders, to open new bank accounts and close any existing Bank Accounts in the ordinary course of business, and any relevant bank is authorized to honor the Debtors' requests to open or close such Bank Accounts; *provided*, that, all accounts opened by any of the Debtors on or after the Petition Date at any bank, shall, for purposes of this Final Order, (i) be deemed a Bank Account as if it had been listed on the Bank Account List; (ii) except for Bank Accounts of the SPV Debtors, be subject to deposit account control agreements acceptable to the Required Lenders, unless otherwise agreed by the Required Lenders; and (iii) be at a bank that has executed a Uniform Depository Agreement ("**UDA**") with the U.S. Trustee or at a bank that is willing to immediately execute such an agreement; *provided*, that the Debtors will notify the U.S. Trustee and counsel to the Creditors' Committee within 14 days after opening a new Bank Account or closing an existing Bank Account.  Nothing in the Motion or this Final Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due and payable.

5.      Notwithstanding anything to the contrary in this Final Order, unless otherwise ordered by the Court, the Debtors shall not (i) close any Bank Accounts relating to any prepetition third-party factoring arrangement or receivables facility (each a "**Receivables Facility**") or (ii) terminate any Bank Account relating to a Receivables Facility that is subject to an account control agreement, lockbox agreement or similar agreement or arrangement without the consent of the relevant parties.

4

6.      The FBG Debtors shall direct, to the extent received by the FBG Debtors, and segregate (and continue with any prepetition segregation) all collections regardless of whether received prepetition or postpetition into the Factored Receivables Account (as defined in the Interim Order) and shall not disburse any such segregated funds from such account pending further order of this Court after notice to all affected parties and all such parties being provided an opportunity to be heard; *provided* that the Debtors shall not be required to segregate any funds received on account of any postpetition sale and related invoice.  Unless otherwise ordered by this Court after notice to all affected parties and all such parties being provided an opportunity to be heard, no bank, creditor, or any other party or entity may set off or recoup, or exercise any other rights, defenses or remedies against any funds held in the Factored Receivables Account.  All rights, claims, and remedies of the FBG Debtors, the counterparties to such arrangements, the DIP Secured Parties (as defined in the DIP Orders), and the Prepetition Secured Parties (as defined in the DIP Orders) are expressly preserved, including without limitation the right of any counterparties to argue that amounts collected are required to be held in trust for such counterparties or remitted to accounts held or controlled by such counterparties.  For the avoidance of doubt, (i) neither this Final Order nor the documents governing the Factored Receivables Account grants or shall be deemed to grant any security interests, liens, claims, or encumbrances in, to, or on the Factored Receivables Account or any amounts therein in favor of the bank at which the Factored Receivables and any amounts therein are held or maintained, and (ii) the mere maintenance of the Factored Receivables Account at any such bank shall in no way impact the priority of the counterparties to such arrangements' security interest in the funds in the Factored Receivables Account.

7.     The Debtors shall provide the counterparties to any Receivables Facility on a confidential basis with weekly reporting of the amount on deposit in the Factored Receivables Account.  Beginning November 15, 2025, the Debtors shall provide the counterparties to any Receivables Facility on a confidential basis with bi-weekly reporting of the (i) total receivables collected, (ii) the entities that made payments on account of any Receivables Facility, (iii) the applicable invoice numbers corresponding to such payments, and (iv) the amounts of such payments.  The Debtors and each counterparty to any Receivables Facility will reasonably consult with each other from time to time with respect to the segregation of factored receivables.  The Debtors shall provide the reporting of this paragraph 7 to (i) the U.S. Trustee on a confidential basis, and (ii) the Ad Hoc Group Advisors (as defined in the DIP Orders) on a confidential basis, and (iii) and counsel to the Creditors' Committee on a confidential, professional eyes' only basis.

8.     Subject to the limitations provided in this Final Order, the Debtors are authorized to continue to enter into and engage in the Intercompany Transactions in the ordinary course; *provided* that the Debtors are not authorized to provide any Intercompany Loans absent the consent of the Required Lenders; *provided further* that the Debtors shall provide three (3) days' advance notice to the Creditors' Committee before providing any such Intercompany Loan, and if the Creditors' Committee objects to the Debtors providing such Intercompany Loan before the end of such three (3) day period and such objection remains unresolved, the Debtors shall not make such Intercompany Loan without further order of this Court.  Unless otherwise ordered by this Court, the SPV Accounts[3] shall remain segregated from the rest of the Cash Management System,

---

[3]   "**SPV Accounts**" refers to those Bank Accounts listed as "Special Purpose Vehicle" accounts in the Bank Account List.

**JOINT EXHIBIT NO. 18**
**Page 774 of 812**

and there shall be no Intercompany Transactions between the SPV Debtors and any of the other Debtors.

9.      Subject to the terms of this Final Order, the Debtors are authorized to set off mutual postpetition obligations relating to intercompany receivables and payables between Debtors and Non-Debtor Affiliates through the Cash Management System in the ordinary course of business consistent with prepetition practices.  All postpetition payments from a Debtor or a Non-Debtor Affiliate to another Debtor under any postpetition Intercompany Transaction are hereby accorded administrative expense status; *provided* that any such administrative expense status claim shall be subordinate and subject to the Carve Out (as defined in the DIP Orders) and approved superpriority administrative expense claims provided for under the DIP Orders.  All proposed Intercompany Transactions between Debtors and between Debtors and Non-Debtor Affiliates shall only be authorized if expressly approved in accordance with the Approved Budget. Notwithstanding anything to the contrary herein, no FBG Debtor may set off against any obligation owed to any SPV Debtors, and no SPV Debtor may set off against any obligation owed to any FBG Debtor, pending further order of the Court.

10.      The Debtors shall maintain, and cause their Non-Debtor Affiliates to maintain, accurate and current records with respect to all transfers of cash and non-cash setoffs (including Intercompany Transactions) so that all prepetition and postpetition transfers and transactions, including the Intercompany Transactions, may be readily ascertained, traced, and recorded properly, and shall make such records available to the U.S. Trustee and Ad Hoc Group Advisors, on a confidential basis, and counsel and advisors to each of the Creditors' Committee and any counterparty to a Receivables Facility, on a confidential, professionals' eyes only basis, upon reasonable request.

11.     The Debtors are authorized to use their existing Business Forms substantially in the forms used immediately prior to the commencement of these chapter 11 cases, without use of "debtor in possession" on any of their Business Forms; *provided*, that, the Debtors will use reasonable efforts to have electronic checks include the legend referring to the Debtors as "Debtors-in-Possession" as soon as practicable following entry of this Final Order.

12.     To the extent that the Bank Accounts and Cash Management System are inconsistent with the requirements of section 345(b) of the Bankruptcy Code, the Debtors shall have 30 calendar days (or such additional time as the U.S. Trustee may agree to) from the entry of this Final Order within which either to come into compliance with section 345(b) of the Bankruptcy Code with respect to the Bank Accounts listed on the Bank Account List or to make such other arrangements as agreed to by the U.S. Trustee, with the consent of the Required Lenders and the Creditors' Committee.  Such extension is without prejudice to the Debtors' rights to request a further extension or waiver of the requirements of section 345(b) of the Bankruptcy Code at a later date.

13.     Each of the Banks is authorized to debit the Debtors' Bank Accounts in the ordinary course of business without the need for further order of this Court for:  (i) all drafts, checks, wire transfers, electronic funds transfers, ACH transfers, or other items drawn on the Debtors' accounts which are cashed or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of Debtors' accounts with the Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) all undisputed prepetition and postpetition amounts outstanding, if any, owed to the Bank as Bank Fees for the maintenance of

8

the Cash Management System and charge back returned items to the Bank Accounts in the ordinary course.

14.     The Banks are authorized to accept and rely on all representations and instructions made by the Debtors with respect to whether any checks, drafts, wires, or ACH transfers or other payment order drawn or issued by the Debtors prior to, on, or subsequent to the Petition Date should be honored or dishonored pursuant to this Final Order or any other order of this Court, without any duty to inquire otherwise.  Such Banks and financial institutions shall not have liability to any party as a result of their reliance on any representations or instructions of the Debtors as provided herein, nor shall any Bank or financial institution honoring any check or other item as a result of a good faith error be liable to any party therefor.

15.     Subject to the limitations otherwise stated herein, the Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic funds or automated clearing house transfers, and to replace any prepetition checks or electronic fund or automated clearing house transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases with respect to any prepetition amounts that are authorized to be paid pursuant to this Final Order or any other order of this Court.

16.     Subject to the limitations otherwise stated herein, the Debtors are authorized to continue the Credit Card Program in the ordinary course and continue using, and performing their obligations under, the Credit Cards, including paying any obligations related thereto, regardless of whether such obligations arose prior to, on, or after the Petition Date.

17.     For the avoidance of doubt, and notwithstanding anything to the contrary herein, this Order does not (i) provide the Debtors or any other person with any rights in favor of cash deposited by customers of Novares US LLC and Novares US Engine Components

9

**JOINT EXHIBIT NO. 18**
**Page 777 of 812**

(together, "**Novares**") into segregated accounts held by non-debtors for the benefit of FactoFrance S.A. and affiliates (the "**FactoFrance Accounts**") unless the parties have rights pursuant to applicable non-bankruptcy law or (ii) authorize the Debtors or Novares to take any action outside of the ordinary course of business with respect to the FactoFrance Accounts.  Further, for the avoidance of doubt, to the extent any lien of FactoFrance is a valid, binding, enforceable, properly perfected, and non-avoidable prepetition lien on Collateral (a "**FactoFrance Lien**"), nothing set forth in this Final Order or the DIP Documents grants or shall be deemed to grant any lien of senior or equal priority as to any FactoFrance Lien, provided that nothing in this Order shall operate to approve, perfect, or otherwise elevate any FactoFrance Lien.

18.     Notwithstanding anything to the contrary contained in the Motion or this Final Order, any payment made or to be made pursuant to the authority granted herein, and any authorization contained herein, shall be subject to and in accordance with any interim and final orders, as applicable, entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and/or the Debtors' use of cash collateral (such orders, the "**DIP Orders**") and any budget in connection with any use of cash collateral and/or postpetition debtor-in-possession financing authorized therein (subject to any permitted variances).  To the extent there is any inconsistency between the terms of the DIP Orders and any action taken or proposed to be taken under this Final Order, the terms of the DIP Orders shall control.  Nothing in the Motion or this Final Order shall constitute a waiver or substitution of any consent right required under the DIP Orders.

19.     Nothing in the Motion or this Final Order or any payment made pursuant to the authority granted by this Final Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors or any liens satisfied pursuant to this Final Order,

(ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (v) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (vi) a waiver of the obligation of any party in interest to file a proof of claim, or (vii) an approval, assumption, or rejection of any unexpired lease or executory contract under section 365 of the Bankruptcy Code.

20.    Notice of the Motion is adequate under Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules.

21.    Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Final Order shall be immediately effective and enforceable upon its entry.

22.    The Debtors are authorized to take all actions necessary or appropriate to carry out the relief granted in this Final Order.

23.    This Court retains exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Final Order.

Signed:  November 07, 2025

_____
Christopher Lopez
United States Bankruptcy Judge

11

Case 25-90399   Document 3594-2   Filed in TXSB on 07/24/26   Page 13 of 22

## Schedule 1

### Bank Account List

| | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 1. | Airtex Products LP | Bank of America | 8856 | Collection |
| 2. | Airtex Products LP | Wells Fargo | 8904 | Collection |
| 3. | ASC Industries Inc | Bank of America | 6878 | Collection |
| 4. | ASC Industries Inc | Bank of America | 6572 | Disbursement |
| 5. | BPI EC LLC | Bank of America | 4406 | Collection |
| 6. | BPI Holdings International LLC | Bank of America | 6343 | Collection |
| 7. | Brake Parts Inc India LLC | Bank of America | 6348 | Collection |
| 8. | Brake Parts Inc LLC | Bank of America | 0974 | Disbursement |
| 9. | Brake Parts Inc LLC | Bank of America | 7312 | Collection |
| 10. | Brake Parts Inc LLC | Bank of America | 7294 | Collection |
| 11. | Brake Parts Inc LLC | Bank of America | 7827 | Disbursement |
| 12. | Brake Parts Inc LLC | Bank of America | 7299 | Disbursement |
| 13. | Brake Parts Inc LLC | Bank of America | 3205 | Collection |
| 14. | Brake Parts Inc LLC | Bank of America | 3213 | Collection |
| 15. | Cardone Industries, Inc | Bank of America | 3264 | Collection |
| 16. | Cardone Industries, Inc | Bank of America | 3269 | Disbursement |

| | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 17. | Cardone Industries, Inc | Bank of America | 3725 | Disbursement |
| 18. | Cardone Industries, Inc | Citizens | 6317 | Disbursement |
| 19. | Cardone Industries, Inc | Citizens | 5639 | Disbursement |
| 20. | Cardone Industries, Inc | Citizens | 5647 | Collection |
| 21. | Cardone Industries, Inc | Citizens | 5655 | Collection |
| 22. | Cardone Industries, Inc | Citizens | 6309 | Disbursement |
| 23. | Cardone Industries, Inc | Citizens | 6325 | Disbursement |
| 24. | Cardone Industries, Inc | Citizens | 2329 | Disbursement |
| 25. | Cardone Industries, Inc | JP Morgan Chase | 3159 | Disbursement |
| 26. | Cardone Industries, Inc | JP Morgan Chase | 0101 | Collection |
| 27. | Cardone Industries, Inc | JP Morgan Chase | 6101 | Collection |
| 28. | Carnaby FA, LLC | HSBC | 5207 | Special Purpose Vehicle |
| 29. | Carnaby Inventory Holdings II, LLC | HSBC | 5525 | Special Purpose Vehicle |
| 30. | Carnaby Inventory Holdings III, LLC | HSBC | 5436 | Special Purpose Vehicle |
| 31. | Carnaby Inventory Holdings IV, LLC | HSBC | 5509 | Special Purpose Vehicle |
| 32. | Carnaby Inventory II, LLC | HSBC | 4324 | Special Purpose Vehicle |
| 33. | Carnaby Inventory III, LLC | HSBC | 5258 | Special Purpose Vehicle |
| 34. | Carnaby Inventory IV, LLC | HSBC | 5363 | Special Purpose Vehicle |

**JOINT EXHIBIT NO. 18**
**Page 781 of 812**

| | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 35. | Carter Carburetor Holdings, LLC | Bank of America | 3720 | Disbursement |
| 36. | Carter Carburetor Holdings, LLC | Bank of America | 3221 | Collection |
| 37. | Carter Carburetor Holdings, LLC | Bank of America | 3226 | Disbursement |
| 38. | Carter Carburetor LLC | Bank of America | 3744 | Disbursement |
| 39. | Carter Carburetor LLC | Bank of America | 3240 | Collection |
| 40. | Carter Carburetor LLC | Bank of America | 3245 | Disbursement |
| 41. | Carter Fuel Systems LLC | Bank of America | 6892 | Collection |
| 42. | Carter Fuel Systems LLC | Bank of America | 6577 | Collection |
| 43. | Carter Fuel Systems LLC | Bank of America | 7002 | Collection |
| 44. | Carter Fuel Systems LLC | Bank of America | 7021 | Disbursement |
| 45. | Carter Fuel Systems LLC | Bank of America | 6999 | Collection |
| 46. | Carter Fuel Systems LLC | Bank of America | 7007 | Disbursement |
| 47. | Champion Laboratories Inc | Bank of America | 1396 | Disbursement |
| 48. | Champion Laboratories Inc | Bank of America | 1879 | Collection |
| 49. | Champion Laboratories Inc | Bank of America | 6216 | Disbursement |
| 50. | Champion Laboratories Inc | Bank of America | 7710 | Disbursement |
| 51. | Champion Laboratories Inc | Bank of America | 6224 | Collection |
| 52. | Champion Laboratories Inc | Wells Fargo | 9092 | Collection |

3

| | **Legal Entity** | **Financial Institution** | **Last Four Digits of Bank Account Number** | **Account Type** |
|---|---|---|---|---|
| 53. | Champion Laboratories Inc | Wells Fargo | 9100 | Collection |
| 54. | CWD LLC | Wells Fargo | 4362 | Collection |
| 55. | CWD LLC | Bank of America | 1476 | Disbursement |
| 56. | CWD LLC | Bank of America | 7715 | Disbursement |
| 57. | CWD LLC | Bank of America | 7901 | Collection |
| 58. | CWD LLC | Wells Fargo | 4354 | Collection |
| 59. | Dalton Corporation | CIBC | 5872 | Collection |
| 60. | Dalton Corporation | CIBC | 1110 | Concentration |
| 61. | Eagle Casting, LLC | HSBC | 5479 | Concentration |
| 62. | Eagle Machining, LLC | HSBC | 5487 | Concentration |
| 63. | First Brands Group LLC | Bank of America | 6975 | Concentration |
| 64. | First Brands Group LLC | Bank of America | 6262 | Collection |
| 65. | First Brands Group LLC | Bank of America | 6808 | Disbursement |
| 66. | First Brands Group LLC | Bank of America | 9394 | Investment |
| 67. | First Brands Group LLC | Bank of America | 2114 | Disbursement |
| 68. | First Brands Group LLC | Bank of America | 0657 | Disbursement |
| 69. | First Brands Group LLC | US Bank | 1400 | Investment |
| 70. | First Brands Group LLC | SouthState | 4957 | Investment |
| 71. | First Brands Group LLC | Bank United | 9656 | Collection |
| 72. | First Brands Group LLC | Bank United | 9161 | Investment |

4

**JOINT EXHIBIT NO. 18**
**Page 783 of 812**

|  | **Legal Entity** | **Financial Institution** | **Last Four Digits of Bank Account Number** | **Account Type** |
|---|---|---|---|---|
| 73. | FRAM Group Operations LLC | Bank of America | 9571 | Collection |
| 74. | FRAM Group Operations LLC | Bank of America | 2869 | Disbursement |
| 75. | Global Assets LLC | HSBC | 5606 | Special Purpose Vehicle |
| 76. | Heatherton Holdings LLC | Bank of America | 7106 | Collection |
| 77. | Heatherton Holdings LLC | Bank of America | 7120 | Disbursement |
| 78. | Hopkins Manufacturing Corp | US Bank | 5565 | Collection |
| 79. | Hopkins Manufacturing Corp | US Bank | 0366 | Collection |
| 80. | Hopkins Manufacturing Corp | US Bank | 2289 | Collection |
| 81. | Hopkins Manufacturing Corp | Bank of America | 7724 | Collection |
| 82. | Hopkins Manufacturing Corp | Bank of America | 7729 | Disbursement |
| 83. | Hopkins Manufacturing Corp | Bank of America | 3947 | Disbursement |
| 84. | Horizon Euro Finance, LLC | Bank of America | 3189 | Collection |
| 85. | Horizon Euro Finance, LLC | Bank of America | 3202 | Disbursement |
| 86. | Horizon Euro Finance, LLC | Bank of America | 3688 | Disbursement |
| 87. | Horizon Global Americas Inc | Bank of America | 2305 | Disbursement |
| 88. | Horizon Global Americas Inc | Bank of America | 3919 | Collection |
| 89. | Horizon Global Americas Inc | Bank of America | 3933 | Disbursement |
| 90. | Horizon Global Americas Inc | PNC | 7144 | Collection |
| 91. | Horizon Global Americas Inc | PNC | 7152 | Disbursement |
| 92. | Horizon Global Americas Inc | PNC | 4125 | Disbursement |

5

| | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 93. | Horizon Global Americas Inc | PNC | 4133 | Disbursement |
| 94. | Horizon Global Company LLC | Bank of America | 3938 | Collection |
| 95. | Horizon Global Company LLC | Bank of America | 3952 | Disbursement |
| 96. | Horizon Global Company LLC | Bank of America | 2324 | Disbursement |
| 97. | Horizon Global Company LLC | PNC | 6286 | Collection |
| 98. | Horizon Global Corporation | PNC | 7128 | Collection |
| 99. | Horizon Global Corporation | PNC | 7136 | Collection |
| 100. | Horizon Global Corporation | PNC | 8825 | Disbursement |
| 101. | Horizon Global Corporation | PNC | 9641 | Disbursement |
| 102. | Horizon Global Corporation | PNC | 4117 | Disbursement |
| 103. | Horizon Global Corporation | PNC | 4512 | Disbursement |
| 104. | Horizon Global Corporation | PNC | 2136 | Collection |
| 105. | Horizon International Holdings, LLC | HSBC | 1008 | Collection |
| 106. | Horizon International Holdings, LLC | HSBC | 1016 | Collection |
| 107. | IBI International Holding Company Inc. | CIBC | 8233 | Disbursement |
| 108. | International Brake Industries, Inc | Bank of America | 3617 | Collection |
| 109. | International Brake Industries, Inc | Bank of America | 3631 | Disbursement |
| 110. | International Brake Industries, Inc | Bank of America | 2263 | Disbursement |
| 111. | International Brake Industries, Inc | CIBC | 0583 | Disbursement |
| 112. | International Brake Industries, Inc | CIBC | 5431 | Disbursement |
| 113. | International Brake Industries, Inc | CIBC | 5596 | Disbursement |
| 114. | International Brake Industries, Inc | CIBC | 8906 | Disbursement |
| 115. | Jasper Rubber Products, Inc. | Bank of America | 6637 | Collection |
| 116. | Jasper Rubber Products, Inc. | Bank of America | 6651 | Disbursement |

6

| | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 117. | Jasper Rubber Products, Inc. | Bank of America | 9299 | Disbursement |
| 118. | Jasper Rubber Products, Inc. | BMO | 9210 | Collection |
| 119. | Jasper Rubber Products, Inc. | BMO | 9236 | Disbursement |
| 120. | Jasper Rubber Products, Inc. | BMO | 9244 | Collection |
| 121. | Patterson Inventory Holdings LLC | HSBC | 5347 | Special Purpose Vehicle |
| 122. | Patterson Inventory LLC | HSBC | 5215 | Special Purpose Vehicle |
| 123. | Premier Marketing Group LLC | Bank of America | 7149 | Collection |
| 124. | Premier Marketing Group LLC | Bank of America | 7163 | Disbursement |
| 125. | Pylon Manufacturing Corp | CIBC | 5423 | Disbursement |
| 126. | Pylon Manufacturing Corp | Bank of America | 31490 | Disbursement |
| 127. | Pylon Manufacturing Corp | Bank of America | 7739 | Disbursement |
| 128. | Pylon Manufacturing Corp | Bank of America | 7734 | Collection |
| 129. | Pylon Manufacturing Corp | CIBC | 5588 | Collection |
| 130. | Pylon Manufacturing Corp | CIBC | 7633 | Collection |
| 131. | Qualis Automotive, LLC | Wells Fargo | 0287 | Collection |
| 132. | Qualis Automotive, LLC | Bank of America | 7753 | Collection |
| 133. | Qualis Automotive, LLC | Bank of America | 1414 | Disbursement |
| 134. | Smart Choice LLC | Citizens | 8417 | Collection |
| 135. | Starlight Inventory Holdings I LLC | HSBC | 5410 | Special Purpose Vehicle |

7

**JOINT EXHIBIT NO. 18**
**Page 786 of 812**

| | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 136. | Starlight Inventory I LLC | HSBC | 5304 | Special Purpose Vehicle |
| 137. | StrongArm LLC | Bank of America | 7507 | Collection |
| 138. | StrongArm LLC | Bank of America | 7649 | Collection |
| 139. | StrongArm LLC | Bank of America | 7521 | Collection |
| 140. | StrongArm LLC | Bank of America | 7540 | Disbursement |
| 141. | StrongArm LLC | Bank of America | 7526 | Disbursement |
| 142. | Tae Brakes LLC | CIBC | 0025 | Disbursement |
| 143. | Tae Brakes LLC | CIBC | 7111 | Collection |
| 144. | TAE China Holdings, Inc. | CIBC | 5639 | Disbursement |
| 145. | Toledo Molding & Die, LLC | Bank of America | 7277 | Disbursement |
| 146. | Toledo Molding & Die, LLC | Bank of America | 7272 | Collection |
| 147. | Toledo Molding & Die, LLC | PNC | 0956 | Collection |
| 148. | Toledo Molding & Die, LLC | HSBC | 5877 | Collection |
| 149. | Toledo Molding & Die, LLC | PNC | 0964 | Collection |
| 150. | Toledo Molding & Die, LLC | PNC | 2548 | Disbursement |
| 151. | Toledo Molding & Die, LLC | Bank of America | 0699 | Disbursement |
| 152. | Toledo Molding & Die, LLC | Bank of America | 9945 | Disbursement |
| 153. | Transportation Aftermarket Enterprise | CIBC | 5415 | Disbursement |
| 154. | Transportation Aftermarket Enterprise | CIBC | 5570 | Collection |
| 155. | Trico Products Corporation | Bank of America | 6897 | Collection |
| 156. | Trico Products Corporation | Bank of America | 6910 | Disbursement |

8

| | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 157. | Trico Products Corporation | Bank of America | 0327 | Disbursement |
| 158. | Trico Products Corporation | Bank of America | 7088 | Collection |
| 159. | Trico Products Corporation | Bank of America | 0205 | Disbursement |
| 160. | Trico Products Corporation | Bank of America | 0213 | Collection |
| 161. | Trico Products Corporation | Bank of America | 0221 | Disbursement |
| 162. | Trico Products Corporation | Bank of America | 7101 | Disbursement |
| 163. | Trico Products Corporation | Bank of America | 9909 | Disbursement |
| 164. | UCI International, LLC | Wells Fargo | 8920 | Collection |
| 165. | United Components, LLC | Wells Fargo | 9118 | Collection |
| 166. | United Components, LLC | Wells Fargo | 9340 | Collection |
| 167. | United Components, LLC | Wells Fargo | 9126 | Collection |
| 168. | United Components, LLC | Wells Fargo | 9134 | Collection |
| 169. | Universal Auto Filter, LLC | Wells Fargo | 4377 | Collection |
| 170. | Universal Auto Filter, LLC | Wells Fargo | 4222 | Collection |
| 171. | Viceroy Private Capital, LLC | City National | 5307 | Special Purpose Vehicle |
| 172. | Walbro LLC | Bank of America | 7415 | Collection |
| 173. | Walbro LLC | Bank of America | 7434 | Disbursement |

9

**JOINT EXHIBIT NO. 18**
**Page 788 of 812**

|  | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 174. | Walbro LLC | Bank of America | 9775 | Disbursement |
| 175. | Walbro LLC | JP Morgan Chase | 8573 | Collection |
| 176. | WEM US Co | JP Morgan Chase | 8995 | Collection |

10

**JOINT EXHIBIT NO. 18**
**Page 789 of 812**

**Exhibit 147**

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

November 07, 2025

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**FINAL ORDER
(I) AUTHORIZING DEBTORS TO (A) CONTINUE
USING EXISTING CASH MANAGEMENT SYSTEM
AND BANK ACCOUNTS, (B) IMPLEMENT ORDINARY COURSE
CHANGES TO CASH MANAGEMENT SYSTEM, AND (C) HONOR
CERTAIN RELATED PREPETITION OBLIGATIONS, (II) GRANTING
ADMINISTRATIVE EXPENSE PRIORITY FOR POSTPETITION
INTERCOMPANY CLAIMS, (III) EXTENDING TIME TO COMPLY WITH
REQUIREMENTS OF 11 U.S.C. § 345(b), AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated September 29, 2025 (the "**Motion**"),[2] of First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of interim and final orders, pursuant to sections 105, 345, 363, 364, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing the Debtors to (a) continue using their existing Cash Management System, (b) implement changes to their Cash Management System in the ordinary course of business, and (c) honor certain prepetition obligations related to the Cash Management System, (ii) grant administrative expense priority for Intercompany Claims, (iii) extend time to comply with the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to the Bank

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Case 25-90399   Document 850-9   Filed in TXSB on 11/24/25   Page 3 of 22

Accounts, and (iv) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction and authority to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and upon consideration of the First Day Declaration; and this Court having entered an order granting the relief requested in the Motion on an interim basis (Docket No. 222) (the "**Interim Order**"); and upon any hearing held on the Motion; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**

1.      The Debtors are authorized, but not directed, pursuant to sections 105(a) and 363 of the Bankruptcy Code, to continue to manage their cash pursuant to the Cash Management System maintained before the Petition Date, to collect and disburse cash in accordance with the Cash Management System, and to make ordinary course changes to their Cash Management System without further order of this Court, including to open and close bank accounts, subject to the limitations contained in this Final Order; *provided* without limitation that the Debtors give prior notice of any material changes to the Cash Management System, including

with respect to Intercompany Transactions, closing or opening of any Bank Accounts, and Bank Fees, to counsel to the official committee of unsecured creditors (the "**Creditors' Committee**"). For the avoidance of doubt, nothing in this Final Order shall authorize the Debtors to (a) pay, reimburse, or settle (directly or indirectly) claims of "insider[s]" (as that term is defined in section 101(31) of the Bankruptcy Code), or "professional persons" (as that phrase appears in section 327(a) of the Bankruptcy Code) absent line-item approval in an Approved Budget (as defined in the DIP Orders) or (b) modify, alter, amend, terminate or implement a new Cash Management System and related programs (including Intercompany Transactions), policies or benefits without the consent of Required Lenders (as defined in the DIP Orders).

2.       The Debtors are further authorized, but not directed, to (i) designate, maintain, and continue to use their existing Bank Accounts, as listed on **Schedule 1** hereto (the "**Bank Account List**"), in the names and with the account numbers existing immediately before the Petition Date, (ii) deposit funds in, and withdraw funds from, such Bank Accounts by all usual means, including checks, wire transfers, ACH transfers, and other debits, (iii) pay any Bank Fees and other charges or payment obligations associated with the Bank Accounts and the Cash Management System, whether arising before or after the Petition Date, under the terms of and in accordance with their contractual arrangements with the Debtors, (iv) otherwise perform their obligations under the documents governing the Bank Accounts and the Bank Fees, and (v) treat their prepetition Bank Accounts for all purposes as debtor-in-possession accounts.

3.       The Banks are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, in accordance with the terms of the documents governing the Bank Accounts, and to receive, process, honor, and pay, to the extent sufficient funds are available for

3

deposit in the applicable Bank Accounts to cover such payments, any and all checks, drafts, wires, credit card payments, and ACH transfers issued, presented, or drawn on the Bank Accounts on and after the Petition Date by the holders, makers, or payors thereof, as the case may be.

4.    The Debtors are authorized, but not directed, with the consent of the Required Lenders, to open new bank accounts and close any existing Bank Accounts in the ordinary course of business, and any relevant bank is authorized to honor the Debtors' requests to open or close such Bank Accounts; *provided*, that, all accounts opened by any of the Debtors on or after the Petition Date at any bank, shall, for purposes of this Final Order, (i) be deemed a Bank Account as if it had been listed on the Bank Account List; (ii) except for Bank Accounts of the SPV Debtors, be subject to deposit account control agreements acceptable to the Required Lenders, unless otherwise agreed by the Required Lenders; and (iii) be at a bank that has executed a Uniform Depository Agreement ("**UDA**") with the U.S. Trustee or at a bank that is willing to immediately execute such an agreement; *provided*, that the Debtors will notify the U.S. Trustee and counsel to the Creditors' Committee within 14 days after opening a new Bank Account or closing an existing Bank Account.  Nothing in the Motion or this Final Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due and payable.

5.    Notwithstanding anything to the contrary in this Final Order, unless otherwise ordered by the Court, the Debtors shall not (i) close any Bank Accounts relating to any prepetition third-party factoring arrangement or receivables facility (each a "**Receivables Facility**") or (ii) terminate any Bank Account relating to a Receivables Facility that is subject to an account control agreement, lockbox agreement or similar agreement or arrangement without the consent of the relevant parties.

6.      The FBG Debtors shall direct, to the extent received by the FBG Debtors, and segregate (and continue with any prepetition segregation) all collections regardless of whether received prepetition or postpetition into the Factored Receivables Account (as defined in the Interim Order) and shall not disburse any such segregated funds from such account pending further order of this Court after notice to all affected parties and all such parties being provided an opportunity to be heard; *provided* that the Debtors shall not be required to segregate any funds received on account of any postpetition sale and related invoice.  Unless otherwise ordered by this Court after notice to all affected parties and all such parties being provided an opportunity to be heard, no bank, creditor, or any other party or entity may set off or recoup, or exercise any other rights, defenses or remedies against any funds held in the Factored Receivables Account.  All rights, claims, and remedies of the FBG Debtors, the counterparties to such arrangements, the DIP Secured Parties (as defined in the DIP Orders), and the Prepetition Secured Parties (as defined in the DIP Orders) are expressly preserved, including without limitation the right of any counterparties to argue that amounts collected are required to be held in trust for such counterparties or remitted to accounts held or controlled by such counterparties.  For the avoidance of doubt, (i) neither this Final Order nor the documents governing the Factored Receivables Account grants or shall be deemed to grant any security interests, liens, claims, or encumbrances in, to, or on the Factored Receivables Account or any amounts therein in favor of the bank at which the Factored Receivables and any amounts therein are held or maintained, and (ii) the mere maintenance of the Factored Receivables Account at any such bank shall in no way impact the priority of the counterparties to such arrangements' security interest in the funds in the Factored Receivables Account.

7.     The Debtors shall provide the counterparties to any Receivables Facility on a confidential basis with weekly reporting of the amount on deposit in the Factored Receivables Account.  Beginning November 15, 2025, the Debtors shall provide the counterparties to any Receivables Facility on a confidential basis with bi-weekly reporting of the (i) total receivables collected, (ii) the entities that made payments on account of any Receivables Facility, (iii) the applicable invoice numbers corresponding to such payments, and (iv) the amounts of such payments.  The Debtors and each counterparty to any Receivables Facility will reasonably consult with each other from time to time with respect to the segregation of factored receivables.  The Debtors shall provide the reporting of this paragraph 7 to (i) the U.S. Trustee on a confidential basis, and (ii) the Ad Hoc Group Advisors (as defined in the DIP Orders) on a confidential basis, and (iii) and counsel to the Creditors' Committee on a confidential, professional eyes' only basis.

8.     Subject to the limitations provided in this Final Order, the Debtors are authorized to continue to enter into and engage in the Intercompany Transactions in the ordinary course; *provided* that the Debtors are not authorized to provide any Intercompany Loans absent the consent of the Required Lenders; *provided further* that the Debtors shall provide three (3) days' advance notice to the Creditors' Committee before providing any such Intercompany Loan, and if the Creditors' Committee objects to the Debtors providing such Intercompany Loan before the end of such three (3) day period and such objection remains unresolved, the Debtors shall not make such Intercompany Loan without further order of this Court.  Unless otherwise ordered by this Court, the SPV Accounts[3] shall remain segregated from the rest of the Cash Management System,

---

[3]     "**SPV Accounts**" refers to those Bank Accounts listed as "Special Purpose Vehicle" accounts in the Bank Account List.

and there shall be no Intercompany Transactions between the SPV Debtors and any of the other Debtors.

9.      Subject to the terms of this Final Order, the Debtors are authorized to set off mutual postpetition obligations relating to intercompany receivables and payables between Debtors and Non-Debtor Affiliates through the Cash Management System in the ordinary course of business consistent with prepetition practices.  All postpetition payments from a Debtor or a Non-Debtor Affiliate to another Debtor under any postpetition Intercompany Transaction are hereby accorded administrative expense status; *provided* that any such administrative expense status claim shall be subordinate and subject to the Carve Out (as defined in the DIP Orders) and approved superpriority administrative expense claims provided for under the DIP Orders.  All proposed Intercompany Transactions between Debtors and between Debtors and Non-Debtor Affiliates shall only be authorized if expressly approved in accordance with the Approved Budget. Notwithstanding anything to the contrary herein, no FBG Debtor may set off against any obligation owed to any SPV Debtors, and no SPV Debtor may set off against any obligation owed to any FBG Debtor, pending further order of the Court.

10.      The Debtors shall maintain, and cause their Non-Debtor Affiliates to maintain, accurate and current records with respect to all transfers of cash and non-cash setoffs (including Intercompany Transactions) so that all prepetition and postpetition transfers and transactions, including the Intercompany Transactions, may be readily ascertained, traced, and recorded properly, and shall make such records available to the U.S. Trustee and Ad Hoc Group Advisors, on a confidential basis, and counsel and advisors to each of the Creditors' Committee and any counterparty to a Receivables Facility, on a confidential, professionals' eyes only basis, upon reasonable request.

11.     The Debtors are authorized to use their existing Business Forms substantially in the forms used immediately prior to the commencement of these chapter 11 cases, without use of "debtor in possession" on any of their Business Forms; *provided*, that, the Debtors will use reasonable efforts to have electronic checks include the legend referring to the Debtors as "Debtors-in-Possession" as soon as practicable following entry of this Final Order.

12.     To the extent that the Bank Accounts and Cash Management System are inconsistent with the requirements of section 345(b) of the Bankruptcy Code, the Debtors shall have 30 calendar days (or such additional time as the U.S. Trustee may agree to) from the entry of this Final Order within which either to come into compliance with section 345(b) of the Bankruptcy Code with respect to the Bank Accounts listed on the Bank Account List or to make such other arrangements as agreed to by the U.S. Trustee, with the consent of the Required Lenders and the Creditors' Committee.  Such extension is without prejudice to the Debtors' rights to request a further extension or waiver of the requirements of section 345(b) of the Bankruptcy Code at a later date.

13.     Each of the Banks is authorized to debit the Debtors' Bank Accounts in the ordinary course of business without the need for further order of this Court for:  (i) all drafts, checks, wire transfers, electronic funds transfers, ACH transfers, or other items drawn on the Debtors' accounts which are cashed or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of Debtors' accounts with the Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) all undisputed prepetition and postpetition amounts outstanding, if any, owed to the Bank as Bank Fees for the maintenance of

8

the Cash Management System and charge back returned items to the Bank Accounts in the ordinary course.

14.     The Banks are authorized to accept and rely on all representations and instructions made by the Debtors with respect to whether any checks, drafts, wires, or ACH transfers or other payment order drawn or issued by the Debtors prior to, on, or subsequent to the Petition Date should be honored or dishonored pursuant to this Final Order or any other order of this Court, without any duty to inquire otherwise.  Such Banks and financial institutions shall not have liability to any party as a result of their reliance on any representations or instructions of the Debtors as provided herein, nor shall any Bank or financial institution honoring any check or other item as a result of a good faith error be liable to any party therefor.

15.     Subject to the limitations otherwise stated herein, the Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic funds or automated clearing house transfers, and to replace any prepetition checks or electronic fund or automated clearing house transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases with respect to any prepetition amounts that are authorized to be paid pursuant to this Final Order or any other order of this Court.

16.     Subject to the limitations otherwise stated herein, the Debtors are authorized to continue the Credit Card Program in the ordinary course and continue using, and performing their obligations under, the Credit Cards, including paying any obligations related thereto, regardless of whether such obligations arose prior to, on, or after the Petition Date.

17.     For the avoidance of doubt, and notwithstanding anything to the contrary herein, this Order does not (i) provide the Debtors or any other person with any rights in favor of cash deposited by customers of Novares US LLC and Novares US Engine Components

9

(together, "**Novares**") into segregated accounts held by non-debtors for the benefit of FactoFrance S.A. and affiliates (the "**FactoFrance Accounts**") unless the parties have rights pursuant to applicable non-bankruptcy law or (ii) authorize the Debtors or Novares to take any action outside of the ordinary course of business with respect to the FactoFrance Accounts.  Further, for the avoidance of doubt, to the extent any lien of FactoFrance is a valid, binding, enforceable, properly perfected, and non-avoidable prepetition lien on Collateral (a "**FactoFrance Lien**"), nothing set forth in this Final Order or the DIP Documents grants or shall be deemed to grant any lien of senior or equal priority as to any FactoFrance Lien, provided that nothing in this Order shall operate to approve, perfect, or otherwise elevate any FactoFrance Lien.

18.     Notwithstanding anything to the contrary contained in the Motion or this Final Order, any payment made or to be made pursuant to the authority granted herein, and any authorization contained herein, shall be subject to and in accordance with any interim and final orders, as applicable, entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and/or the Debtors' use of cash collateral (such orders, the "**DIP Orders**") and any budget in connection with any use of cash collateral and/or postpetition debtor-in-possession financing authorized therein (subject to any permitted variances).  To the extent there is any inconsistency between the terms of the DIP Orders and any action taken or proposed to be taken under this Final Order, the terms of the DIP Orders shall control.  Nothing in the Motion or this Final Order shall constitute a waiver or substitution of any consent right required under the DIP Orders.

19.     Nothing in the Motion or this Final Order or any payment made pursuant to the authority granted by this Final Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors or any liens satisfied pursuant to this Final Order,

(ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (v) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (vi) a waiver of the obligation of any party in interest to file a proof of claim, or (vii) an approval, assumption, or rejection of any unexpired lease or executory contract under section 365 of the Bankruptcy Code.

20. Notice of the Motion is adequate under Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules.

21. Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Final Order shall be immediately effective and enforceable upon its entry.

22. The Debtors are authorized to take all actions necessary or appropriate to carry out the relief granted in this Final Order.

23. This Court retains exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Final Order.

Signed:  November 07, 2025

_____
Christopher Lopez
United States Bankruptcy Judge

11

**JOINT EXHIBIT NO. 18**
**Page 801 of 812**

## Schedule 1

### Bank Account List

|     | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|-----|--------------|----------------------|------------------------------------------|--------------|
| 1.  | Airtex Products LP | Bank of America | 8856 | Collection |
| 2.  | Airtex Products LP | Wells Fargo | 8904 | Collection |
| 3.  | ASC Industries Inc | Bank of America | 6878 | Collection |
| 4.  | ASC Industries Inc | Bank of America | 6572 | Disbursement |
| 5.  | BPI EC LLC | Bank of America | 4406 | Collection |
| 6.  | BPI Holdings International LLC | Bank of America | 6343 | Collection |
| 7.  | Brake Parts Inc India LLC | Bank of America | 6348 | Collection |
| 8.  | Brake Parts Inc LLC | Bank of America | 0974 | Disbursement |
| 9.  | Brake Parts Inc LLC | Bank of America | 7312 | Collection |
| 10. | Brake Parts Inc LLC | Bank of America | 7294 | Collection |
| 11. | Brake Parts Inc LLC | Bank of America | 7827 | Disbursement |
| 12. | Brake Parts Inc LLC | Bank of America | 7299 | Disbursement |
| 13. | Brake Parts Inc LLC | Bank of America | 3205 | Collection |
| 14. | Brake Parts Inc LLC | Bank of America | 3213 | Collection |
| 15. | Cardone Industries, Inc | Bank of America | 3264 | Collection |
| 16. | Cardone Industries, Inc | Bank of America | 3269 | Disbursement |

| | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 17. | Cardone Industries, Inc | Bank of America | 3725 | Disbursement |
| 18. | Cardone Industries, Inc | Citizens | 6317 | Disbursement |
| 19. | Cardone Industries, Inc | Citizens | 5639 | Disbursement |
| 20. | Cardone Industries, Inc | Citizens | 5647 | Collection |
| 21. | Cardone Industries, Inc | Citizens | 5655 | Collection |
| 22. | Cardone Industries, Inc | Citizens | 6309 | Disbursement |
| 23. | Cardone Industries, Inc | Citizens | 6325 | Disbursement |
| 24. | Cardone Industries, Inc | Citizens | 2329 | Disbursement |
| 25. | Cardone Industries, Inc | JP Morgan Chase | 3159 | Disbursement |
| 26. | Cardone Industries, Inc | JP Morgan Chase | 0101 | Collection |
| 27. | Cardone Industries, Inc | JP Morgan Chase | 6101 | Collection |
| 28. | Carnaby FA, LLC | HSBC | 5207 | Special Purpose Vehicle |
| 29. | Carnaby Inventory Holdings II, LLC | HSBC | 5525 | Special Purpose Vehicle |
| 30. | Carnaby Inventory Holdings III, LLC | HSBC | 5436 | Special Purpose Vehicle |
| 31. | Carnaby Inventory Holdings IV, LLC | HSBC | 5509 | Special Purpose Vehicle |
| 32. | Carnaby Inventory II, LLC | HSBC | 4324 | Special Purpose Vehicle |
| 33. | Carnaby Inventory III, LLC | HSBC | 5258 | Special Purpose Vehicle |
| 34. | Carnaby Inventory IV, LLC | HSBC | 5363 | Special Purpose Vehicle |

2

**JOINT EXHIBIT NO. 18**
**Page 803 of 812**

|  | **Legal Entity** | **Financial Institution** | **Last Four Digits of Bank Account Number** | **Account Type** |
|---|---|---|---|---|
| 35. | Carter Carburetor Holdings, LLC | Bank of America | 3720 | Disbursement |
| 36. | Carter Carburetor Holdings, LLC | Bank of America | 3221 | Collection |
| 37. | Carter Carburetor Holdings, LLC | Bank of America | 3226 | Disbursement |
| 38. | Carter Carburetor LLC | Bank of America | 3744 | Disbursement |
| 39. | Carter Carburetor LLC | Bank of America | 3240 | Collection |
| 40. | Carter Carburetor LLC | Bank of America | 3245 | Disbursement |
| 41. | Carter Fuel Systems LLC | Bank of America | 6892 | Collection |
| 42. | Carter Fuel Systems LLC | Bank of America | 6577 | Collection |
| 43. | Carter Fuel Systems LLC | Bank of America | 7002 | Collection |
| 44. | Carter Fuel Systems LLC | Bank of America | 7021 | Disbursement |
| 45. | Carter Fuel Systems LLC | Bank of America | 6999 | Collection |
| 46. | Carter Fuel Systems LLC | Bank of America | 7007 | Disbursement |
| 47. | Champion Laboratories Inc | Bank of America | 1396 | Disbursement |
| 48. | Champion Laboratories Inc | Bank of America | 1879 | Collection |
| 49. | Champion Laboratories Inc | Bank of America | 6216 | Disbursement |
| 50. | Champion Laboratories Inc | Bank of America | 7710 | Disbursement |
| 51. | Champion Laboratories Inc | Bank of America | 6224 | Collection |
| 52. | Champion Laboratories Inc | Wells Fargo | 9092 | Collection |

3

| | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 53. | Champion Laboratories Inc | Wells Fargo | 9100 | Collection |
| 54. | CWD LLC | Wells Fargo | 4362 | Collection |
| 55. | CWD LLC | Bank of America | 1476 | Disbursement |
| 56. | CWD LLC | Bank of America | 7715 | Disbursement |
| 57. | CWD LLC | Bank of America | 7901 | Collection |
| 58. | CWD LLC | Wells Fargo | 4354 | Collection |
| 59. | Dalton Corporation | CIBC | 5872 | Collection |
| 60. | Dalton Corporation | CIBC | 1110 | Concentration |
| 61. | Eagle Casting, LLC | HSBC | 5479 | Concentration |
| 62. | Eagle Machining, LLC | HSBC | 5487 | Concentration |
| 63. | First Brands Group LLC | Bank of America | 6975 | Concentration |
| 64. | First Brands Group LLC | Bank of America | 6262 | Collection |
| 65. | First Brands Group LLC | Bank of America | 6808 | Disbursement |
| 66. | First Brands Group LLC | Bank of America | 9394 | Investment |
| 67. | First Brands Group LLC | Bank of America | 2114 | Disbursement |
| 68. | First Brands Group LLC | Bank of America | 0657 | Disbursement |
| 69. | First Brands Group LLC | US Bank | 1400 | Investment |
| 70. | First Brands Group LLC | SouthState | 4957 | Investment |
| 71. | First Brands Group LLC | Bank United | 9656 | Collection |
| 72. | First Brands Group LLC | Bank United | 9161 | Investment |

4

**JOINT EXHIBIT NO. 18**
**Page 805 of 812**

| | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 73. | FRAM Group Operations LLC | Bank of America | 9571 | Collection |
| 74. | FRAM Group Operations LLC | Bank of America | 2869 | Disbursement |
| 75. | Global Assets LLC | HSBC | 5606 | Special Purpose Vehicle |
| 76. | Heatherton Holdings LLC | Bank of America | 7106 | Collection |
| 77. | Heatherton Holdings LLC | Bank of America | 7120 | Disbursement |
| 78. | Hopkins Manufacturing Corp | US Bank | 5565 | Collection |
| 79. | Hopkins Manufacturing Corp | US Bank | 0366 | Collection |
| 80. | Hopkins Manufacturing Corp | US Bank | 2289 | Collection |
| 81. | Hopkins Manufacturing Corp | Bank of America | 7724 | Collection |
| 82. | Hopkins Manufacturing Corp | Bank of America | 7729 | Disbursement |
| 83. | Hopkins Manufacturing Corp | Bank of America | 3947 | Disbursement |
| 84. | Horizon Euro Finance, LLC | Bank of America | 3189 | Collection |
| 85. | Horizon Euro Finance, LLC | Bank of America | 3202 | Disbursement |
| 86. | Horizon Euro Finance, LLC | Bank of America | 3688 | Disbursement |
| 87. | Horizon Global Americas Inc | Bank of America | 2305 | Disbursement |
| 88. | Horizon Global Americas Inc | Bank of America | 3919 | Collection |
| 89. | Horizon Global Americas Inc | Bank of America | 3933 | Disbursement |
| 90. | Horizon Global Americas Inc | PNC | 7144 | Collection |
| 91. | Horizon Global Americas Inc | PNC | 7152 | Disbursement |
| 92. | Horizon Global Americas Inc | PNC | 4125 | Disbursement |

**JOINT EXHIBIT NO. 18**
**Page 806 of 812**

| | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 93. | Horizon Global Americas Inc | PNC | 4133 | Disbursement |
| 94. | Horizon Global Company LLC | Bank of America | 3938 | Collection |
| 95. | Horizon Global Company LLC | Bank of America | 3952 | Disbursement |
| 96. | Horizon Global Company LLC | Bank of America | 2324 | Disbursement |
| 97. | Horizon Global Company LLC | PNC | 6286 | Collection |
| 98. | Horizon Global Corporation | PNC | 7128 | Collection |
| 99. | Horizon Global Corporation | PNC | 7136 | Collection |
| 100. | Horizon Global Corporation | PNC | 8825 | Disbursement |
| 101. | Horizon Global Corporation | PNC | 9641 | Disbursement |
| 102. | Horizon Global Corporation | PNC | 4117 | Disbursement |
| 103. | Horizon Global Corporation | PNC | 4512 | Disbursement |
| 104. | Horizon Global Corporation | PNC | 2136 | Collection |
| 105. | Horizon International Holdings, LLC | HSBC | 1008 | Collection |
| 106. | Horizon International Holdings, LLC | HSBC | 1016 | Collection |
| 107. | IBI International Holding Company Inc. | CIBC | 8233 | Disbursement |
| 108. | International Brake Industries, Inc | Bank of America | 3617 | Collection |
| 109. | International Brake Industries, Inc | Bank of America | 3631 | Disbursement |
| 110. | International Brake Industries, Inc | Bank of America | 2263 | Disbursement |
| 111. | International Brake Industries, Inc | CIBC | 0583 | Disbursement |
| 112. | International Brake Industries, Inc | CIBC | 5431 | Disbursement |
| 113. | International Brake Industries, Inc | CIBC | 5596 | Disbursement |
| 114. | International Brake Industries, Inc | CIBC | 8906 | Disbursement |
| 115. | Jasper Rubber Products, Inc. | Bank of America | 6637 | Collection |
| 116. | Jasper Rubber Products, Inc. | Bank of America | 6651 | Disbursement |

| | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 117. | Jasper Rubber Products, Inc. | Bank of America | 9299 | Disbursement |
| 118. | Jasper Rubber Products, Inc. | BMO | 9210 | Collection |
| 119. | Jasper Rubber Products, Inc. | BMO | 9236 | Disbursement |
| 120. | Jasper Rubber Products, Inc. | BMO | 9244 | Collection |
| 121. | Patterson Inventory Holdings LLC | HSBC | 5347 | Special Purpose Vehicle |
| 122. | Patterson Inventory LLC | HSBC | 5215 | Special Purpose Vehicle |
| 123. | Premier Marketing Group LLC | Bank of America | 7149 | Collection |
| 124. | Premier Marketing Group LLC | Bank of America | 7163 | Disbursement |
| 125. | Pylon Manufacturing Corp | CIBC | 5423 | Disbursement |
| 126. | Pylon Manufacturing Corp | Bank of America | 31490 | Disbursement |
| 127. | Pylon Manufacturing Corp | Bank of America | 7739 | Disbursement |
| 128. | Pylon Manufacturing Corp | Bank of America | 7734 | Collection |
| 129. | Pylon Manufacturing Corp | CIBC | 5588 | Collection |
| 130. | Pylon Manufacturing Corp | CIBC | 7633 | Collection |
| 131. | Qualis Automotive, LLC | Wells Fargo | 0287 | Collection |
| 132. | Qualis Automotive, LLC | Bank of America | 7753 | Collection |
| 133. | Qualis Automotive, LLC | Bank of America | 1414 | Disbursement |
| 134. | Smart Choice LLC | Citizens | 8417 | Collection |
| 135. | Starlight Inventory Holdings I LLC | HSBC | 5410 | Special Purpose Vehicle |

7

| | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 136. | Starlight Inventory I LLC | HSBC | 5304 | Special Purpose Vehicle |
| 137. | StrongArm LLC | Bank of America | 7507 | Collection |
| 138. | StrongArm LLC | Bank of America | 7649 | Collection |
| 139. | StrongArm LLC | Bank of America | 7521 | Collection |
| 140. | StrongArm LLC | Bank of America | 7540 | Disbursement |
| 141. | StrongArm LLC | Bank of America | 7526 | Disbursement |
| 142. | Tae Brakes LLC | CIBC | 0025 | Disbursement |
| 143. | Tae Brakes LLC | CIBC | 7111 | Collection |
| 144. | TAE China Holdings, Inc. | CIBC | 5639 | Disbursement |
| 145. | Toledo Molding & Die, LLC | Bank of America | 7277 | Disbursement |
| 146. | Toledo Molding & Die, LLC | Bank of America | 7272 | Collection |
| 147. | Toledo Molding & Die, LLC | PNC | 0956 | Collection |
| 148. | Toledo Molding & Die, LLC | HSBC | 5877 | Collection |
| 149. | Toledo Molding & Die, LLC | PNC | 0964 | Collection |
| 150. | Toledo Molding & Die, LLC | PNC | 2548 | Disbursement |
| 151. | Toledo Molding & Die, LLC | Bank of America | 0699 | Disbursement |
| 152. | Toledo Molding & Die, LLC | Bank of America | 9945 | Disbursement |
| 153. | Transportation Aftermarket Enterprise | CIBC | 5415 | Disbursement |
| 154. | Transportation Aftermarket Enterprise | CIBC | 5570 | Collection |
| 155. | Trico Products Corporation | Bank of America | 6897 | Collection |
| 156. | Trico Products Corporation | Bank of America | 6910 | Disbursement |

**JOINT EXHIBIT NO. 18**
**Page 809 of 812**

| | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 157. | Trico Products Corporation | Bank of America | 0327 | Disbursement |
| 158. | Trico Products Corporation | Bank of America | 7088 | Collection |
| 159. | Trico Products Corporation | Bank of America | 0205 | Disbursement |
| 160. | Trico Products Corporation | Bank of America | 0213 | Collection |
| 161. | Trico Products Corporation | Bank of America | 0221 | Disbursement |
| 162. | Trico Products Corporation | Bank of America | 7101 | Disbursement |
| 163. | Trico Products Corporation | Bank of America | 9909 | Disbursement |
| 164. | UCI International, LLC | Wells Fargo | 8920 | Collection |
| 165. | United Components, LLC | Wells Fargo | 9118 | Collection |
| 166. | United Components, LLC | Wells Fargo | 9340 | Collection |
| 167. | United Components, LLC | Wells Fargo | 9126 | Collection |
| 168. | United Components, LLC | Wells Fargo | 9134 | Collection |
| 169. | Universal Auto Filter, LLC | Wells Fargo | 4377 | Collection |
| 170. | Universal Auto Filter, LLC | Wells Fargo | 4222 | Collection |
| 171. | Viceroy Private Capital, LLC | City National | 5307 | Special Purpose Vehicle |
| 172. | Walbro LLC | Bank of America | 7415 | Collection |
| 173. | Walbro LLC | Bank of America | 7434 | Disbursement |

**JOINT EXHIBIT NO. 18**
**Page 810 of 812**

| | Legal Entity | Financial Institution | Last Four Digits of Bank Account Number | Account Type |
|---|---|---|---|---|
| 174. | Walbro LLC | Bank of America | 9775 | Disbursement |
| 175. | Walbro LLC | JP Morgan Chase | 8573 | Collection |
| 176. | WEM US Co | JP Morgan Chase | 8995 | Collection |

**JOINT EXHIBIT NO. 18**
**Page 811 of 812**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC**, *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |
| | § | |
| | § | |

# JOINT EXHIBIT NUMBER 18

**FOR COMBINED HEARING HELD JULY 28–30, 2026**

CARNABY EXHIBIT NUMBER 32
*Carnaby II Compliance Certificate, dated March 31, 2024 (Docket No. 842-109)*

(*Filed Under Seal*)