## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>  FIRST BRANDS GROUP, LLC *et al.*,<br><br>    Debtors.[1] | Chapter 11<br><br>Case No. 25-90399 (CML)<br><br>(Jointly Administered) |
| FIRST BRANDS GROUP, LLC *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>PATRICK JAMES, THE PATRICK JAMES TRUST, ALBION REALTY, LLC, ALESTER TECHNOLOGIES LLC, BATTERY PARK HOLDINGS LLC, BOND STREET ASSET MANAGEMENT LLC, IGNITE ACQUISITION HOLDINGS LLC, LARCHMONT LLC, PEGASUS AVIATION, LLC, JOHN AND JANE DOE(S) 1-100, and ABC CORPORATION(S) 1-100,<br><br>    Defendants. | Adv. Pro. No. 25-03803 (CML) |

**MOTION OF ONSET FINANCIAL, INC. FOR ENTRY OF AN ORDER PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 24 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 7024 AUTHORIZING INTERVENTION IN ADVERSARY PROCEEDING**

> **THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. YOUR RESPONSE MUST STATE WHY THE APPLICATION SHOULD NOT**

---

[1]   A complete list of the Debtors in the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these Chapter 11 Cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

FBG_CH1_00089754

**BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.  REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Onset Financial, Inc. ("Onset") hereby moves this Court (the "Motion") for entry of an order substantially in the form of the proposed order attached hereto as Exhibit A (the "Proposed Order"), pursuant to sections 105(a) and 1109(b) of Title 11 of the United States Code, Rule 24 of the Federal Rules of Civil Procedure (the "Federal Rules"), and Rule 7024 of the Federal Rules of Bankruptcy Procedure, authorizing Onset to intervene in this adversary proceeding (the "Adversary Proceeding").[2]

## PRELIMINARY STATEMENT

1.      Onset should be permitted to intervene as a matter of right under Rule 24.  In the Complaint, the Debtors allege a vast and systematic fraud in which Patrick James misappropriated hundreds of millions of dollars from the Debtors to fund his and his family's lavish lifestyle.  The alleged fraud includes the diversion of approximately $200 million from Debtors Carnaby IV and Carnaby FA (together, the "Carnaby Debtors") within days of nearly contemporaneous funding by Onset, with the misappropriated amounts directly traceable to Onset's capital.  Because Onset is the only creditor of the Carnaby Debtors, the ability of those entities to recover from Mr. James and the other Defendants will directly and materially impact Onset's recovery in the Chapter 11 Cases.  Moreover, as the Debtors represent the interests of the broader First Brands enterprise and

---

[2]      Citations in the form "C11 Docket No. __" refer to entries on the docket for the Chapter 11 Cases.  Citations in the form "Adv. Docket No. __" refer to entries on the docket of this Adversary Proceeding.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Complaint filed in the Adversary Proceeding [Adv. Docket No. 17].

2

FBG_CH1_00089755

**DEBTORS' EXHIBIT NO. 164**
**Page 2 of 29**
**JOINT EXHIBIT NO. 40**
**Page 2 of 29**

its competing stakeholders, they cannot adequately represent Onset's interests as the only stakeholder in the Carnaby Debtors.

2.      Onset's interests are not, and cannot be, adequately represented absent intervention. Although the Debtors seek to recover funds allegedly misappropriated by Mr. James and his affiliates, the manner in which those claims are framed and pursued will form the factual and legal basis for any subsequent allocation of recoveries among the various Debtors and their related entities; issues that directly and materially affect Onset's rights.  The same pool of diverted funds that Onset traces to the Carnaby Debtors may be claimed by other stakeholders as originating from their own entities, giving rise to inevitable disputes regarding ownership, tracing, and entitlement to any recovery.  Because Onset is the sole creditor of the Carnaby Debtors, its perspective and position regarding how those funds were obtained, transferred, and ultimately misused (including who at First Brands participated and the nature of their participation), is essential to ensuring that recoveries are allocated fairly and equitably.  The Debtors, representing the broader First Brands enterprise and its competing constituencies, cannot be expected to advocate for Onset's interests or ensure that the Carnaby Debtors' rights are fully and fairly pursued.

3.      Onset's participation is also essential to developing a fair and comprehensive record.  As one of the largest (if not the largest) single victims of Mr. James's scheme, Onset possesses first-hand knowledge of the transactions, communications, and misrepresentations that form the core of the alleged fraud, at least with respect to Onset.  Among other things, Mr. James and his affiliates induced Onset to provide more than $2.2 billion in credit to the Carnaby Debtors through a series of sale-leaseback transactions, repeatedly assuring Onset in writing and orally that it would acquire free and clear ownership of the underlying assets and that its capital would be properly applied in accordance with the governing agreements.  As alleged by the Debtors, those

3

FBG_CH1_00089756

DEBTORS' EXHIBIT NO. 164
Page 3 of 29
JOINT EXHIBIT NO. 40
Page 3 of 29

assurances were knowingly false when made.  The same individuals who deceived Onset diverted hundreds of millions of funding from Onset to accounts they controlled, contrary to their repeated assurances and the terms of their written agreements, within days of receipt.

4.     Compounding this shocking fraud was the conduct of Mr. James's brother, Edward James, a senior First Brands executive, who not only participated in initiating and structuring the transactions with Onset but, after several years of doing business with Onset, sought to invest personally in those transactions too.  Edward's active role and investments lent added credibility to the deal structure and directly influenced Onset's continued participation, as his personal investments served to confirm the transactions and Onset's position.   In truth, Edward's investments were an integral part of the systematic fraud by misleading Onset and presumably others into extending credit.   Because Onset is uniquely positioned to shed light on these misrepresentations, the mechanics of the relevant deals and diverted transfers, and the Defendants' knowledge of and complicity in the fraud, Onset's intervention is indispensable to ensuring that the full scope of the wrongdoing of Patrick and Edward James, and their cohorts, is uncovered and adjudicated before this Court.

5.     Onset readily meets the standard for intervention.  Under Rule 24(a)(2), Onset easily satisfies each requirement for intervention as of right: its motion is timely; it has a direct and substantial interest in the transactions at issue, namely, the alleged diversion of approximately $200 million from the Carnaby Debtors that is traceable to its own capital; disposition of the proceeding without Onset's participation would impair its ability to protect that interest; and the Debtors, who represent the broader First Brands enterprise and its competing constituencies, cannot adequately represent Onset's distinct position as the sole creditor of the Carnaby Debtors. Onset just as easily satisfies the requirements for permissive intervention under Rule 24(b) because

FBG_CH1_00089757

DEBTORS' EXHIBIT NO. 164
Page 4 of 29
JOINT EXHIBIT NO. 40
Page 4 of 29

the direct claims it intends to assert against Mr. James and the other Defendants share common questions of law and fact with those alleged in the Adversary Proceeding, and allowing intervention will neither delay the litigation nor prejudice the existing parties.

6.      Given Onset's unique stake in the outcome, the substantial factual overlap between its interests and the issues before the Court, and the critical insight only it can offer, intervention is both warranted and appropriate.  Accordingly, the Motion should be granted.

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over the Adversary Proceeding and this Motion pursuant to 28 U.S.C. § 1334.

8.      The statutory and procedural predicates for the relief requested herein are Bankruptcy Code sections 105(a) and 1109(b), Federal Rule of Civil Procedure 24, and Federal Rule of Bankruptcy Procedure 7024.

9.      This Adversary Proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (H), and (O), and this Court has jurisdiction to hear and determine this proceeding and to enter a final order and judgment.  If this Court or any other court finds any part of this Adversary Proceeding to be "non-core," this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334 because the relief sought herein relates to Debtors' bankruptcy cases and will have a material impact on the administration of Debtors' estates.

10.      Onset consents to entry of final orders and judgments by this Court in this Adversary Proceeding pursuant to Bankruptcy Rule 7008 and Bankruptcy Local Rule 7008-1. Debtors also consent to entry of final orders or judgment by this Court if it is determined that this Court cannot enter final orders or judgments consistent with Article III of the United States Constitution absent consent of the parties.

FBG_CH1_00089758

DEBTORS' EXHIBIT NO. 164
Page 5 of 29
JOINT EXHIBIT NO. 40
Page 5 of 29

11.     Venue in this Court is proper pursuant to 28 U.S.C. § 1409 because this Adversary Proceeding arises under the Bankruptcy Code or arises in, or is related to, Debtors' bankruptcy cases pending before this Court.

## BACKGROUND

### I.     The Onset Transactions.

12.     Founded in 2008, Onset is a leader in the equipment leasing and financing industry and has successfully partnered with businesses throughout the United States on billions of dollars of equipment leasing and financing transactions.  Onset structures and funds leases for a wide range of industries, offering flexible options such as deferred payments, step payments, and progress funding.  Onset maintains a strong presence in the national commercial finance market, maintains a disciplined underwriting process designed to ensure each transaction is sound and tailored to its clients' needs, and is recognized for its broad industry reach and award-winning corporate culture.

13.     Since 2018, Onset has provided First Brands with significant liquidity.  Beginning in 2018, Onset and the Company entered into a series of transactions (the "Onset Transactions") that included both (i) direct leases of automotive manufacturing furniture, fixtures, equipment, inventory, and other assets newly purchased by Onset, and (ii) sale-leaseback transactions structured using the Carnaby Debtors, two conduit entities created and maintained by First Brands, from which Onset purchased assets (which had previously been purchased by the Carnaby Debtors from a First Brands subsidiary) and immediately leased those same assets back to the same entity (the "Conduit Transactions").[3]

---

[3]    Copies of the sample documentation for the Conduit Transactions, involving inventory and equipment, are attached to the *Declaration of Julia C. Koch in Support of the Supplemental Objection of Onset Financial, Inc. to Debtors' DIP Financing Motion* [C11 Docket No. 497] (the "Koch Declaration").

FBG_CH1_00089759

**DEBTORS' EXHIBIT NO. 164**
**Page 6 of 29**
**JOINT EXHIBIT NO. 40**
**Page 6 of 29**

14.     Using these transaction structures, Onset was the single most significant provider of liquidity to the Debtors in the year leading up to the Petition Date.  At the Debtors' request, Onset advanced more than $1 billion over the past twelve months, including approximately $375 million in November 2024, $200 million in January 2025, $85 million in February 2025, $180 million in March 2025, and $230 million in April 2025.  The Debtors repeatedly informed Onset that the funding it provided would support their liquidity needs, including maintaining ordinary course operations and continuing to capitalize on their acquisition-growth strategy, as the Debtors claimed, with great appreciation, it had in prior years.

**II.     The Conduit Transactions.**

15.     Beginning in June 2022, the Company and Onset entered into a series of "conduit" transactions relating to inventory, furniture, fixtures, and equipment.  The Conduit Transactions were conducted through the Carnaby Debtors, two affiliated conduit entities created and maintained by the Company for the purpose of these transactions, and were documented under two master lease agreements: *Master Lease Agreement No. OFI1445416*, dated June 28, 2022, between Onset and the Carnaby IV Debtor, and *Master Lease Agreement No. OFI154565*, dated October 24, 2023, between Onset and the Carnaby FA Debtor (collectively, the "Carnaby MLAs").  Koch. Decl., Exs. 3, 5; *see also id.*, Exs. 4, 6.

16.     Under the Conduit Transaction structure, the Company sold inventory and equipment to the Carnaby Debtors pursuant to a series of asset purchase or similar agreements (the "Carnaby APAs").  The Carnaby Debtors then sold that same property to Onset (such property, the "Onset Conduit Property") under assignment and purchase or similar agreements (the "Onset APAs"), for consideration equal to the price paid under the Carnaby APAs.  The Onset APAs provided that title to the Onset Conduit Property vested in Onset "free and clear of all liens and

FBG_CH1_00089760

**DEBTORS' EXHIBIT NO. 164**
**Page 7 of 29**
**JOINT EXHIBIT NO. 40**
**Page 7 of 29**

encumbrances." *See, e.g.*, Koch Decl., Ex. 9 at ONSET_00032133; Ex. 10 at ONSET_00000387; *see also id.*, Ex. 9 at ONSET_00032922; Ex. 10 at ONSET_00000383.

17.     Onset then leased the Onset Conduit Property back to the Carnaby Debtors under individual lease schedules (each, a "Carnaby Lease Schedule," and together with the Carnaby MLAs and related documents, the "Carnaby Lease Documents"). Each Carnaby Lease Schedule identified the covered assets, including by category and location, incorporated the terms of its governing master lease, and provided that Onset retained ownership of the Onset Conduit Property at all times. Onset's ownership interest was subject only to (a) the sale of inventory to third parties in the ordinary course of business, upon which Onset's interest in such inventory was automatically released, and (b) the applicable Carnaby Debtor's acquisition of such goods upon termination or expiration of the lease. In connection with each Carnaby Lease Schedule, the Carnaby Debtors granted Onset a "back-up" security interest in the Onset Conduit Property, and Onset properly filed UCC-1 financing statements to perfect its security interests in the same.

18.     The Carnaby Lease Documents required the Carnaby Debtors and certain affiliates with possession of the Onset Conduit Property (the "Conduit Bailees") to maintain possession and control of the Onset Conduit Property at designated locations and to provide Onset with quarterly inventory reports.[4] Each Conduit Bailee executed a waiver wherein they expressly acknowledged that the Onset Conduit Property was not owned by the Conduit Bailee and was in the Conduit Bailee's possession and control subject to the Carnaby Lease Documents.

19.     Following the steps outlined above, Onset's equipment was used by the Carnaby Debtors and/or certain of the Conduit Bailees to manufacture inventory, the sale of which

---

[4]     A summary chart identifying each of the Conduit Bailees that is a Debtor, as well as the location of assets in their respective possession, is attached to the Koch Declaration as Exhibit 12.

8

FBG_CH1_00089761

**DEBTORS' EXHIBIT NO. 164**
**Page 8 of 29**
**JOINT EXHIBIT NO. 40**
**Page 8 of 29**

generated proceeds that could be used to repay Onset. Onset's inventory was sold by the Carnaby Debtors and/or certain of the Conduit Bailees in the ordinary course of business, which also generated proceeds that could be used to repay Onset and replenish inventory levels in accordance with the terms of the Carnaby Lease Documents.

20.     As of the Petition Date, Onset was owed approximately $1,880,000,000 on account of the Conduit Transactions following acceleration of the obligations under the Carnaby Lease Documents, consisting of about $1,351,758,190 relating to inventory transactions and $528,241,810 relating to the use of equipment transactions. Onset believes the Onset Conduit Property that constitutes inventory has a value of not less than $▮▮▮▮▮▮[5] and the Onset Conduit Property that constitutes equipment within the United States alone has a book value of at least $▮▮▮▮▮.

### III.     The Defendants' Representations to Onset.

21.     From inception, and throughout the relationship, Patrick James and the other Defendants assured Onset that the structure of the Onset Transactions as set forth in the applicable agreements would be followed. Onset had no reason to believe otherwise given the agreements and the assurances set forth therein. Onset also conducted robust diligence, including numerous site visits. And, until May of this year, the Company had a near-flawless track record of timely payments to Onset, bolstered by reporting and disclosures that purported to represent the stability of the Company's financial condition, the interests Onset held in the Assets, and the faithful performance of the applicable agreements.

22.     Individuals who appear to be among the unnamed "John Doe" Defendants, including Patrick's brother Edward James, Shekhar Kumar, Stephen Graham, Andy Brumbergs,

---

[5]     Redactions contained in this Motion are made pursuant to and in accordance with the *Agreed Protective Order* dated October 23, 2025 [C11 Docket No. 408].

FBG_CH1_00089762

**DEBTORS' EXHIBIT NO. 164**
**Page 9 of 29**
**JOINT EXHIBIT NO. 40**
**Page 9 of 29**

and Michael Baker, through a series of actions, such as executing transaction documents, participating in frequent discussions with Onset, and otherwise engaging in conduct intended to induce Onset's continued funding, led Onset to believe that the funds it was providing would be used by the Debtors to maintain ordinary-course operations and to continue their acquisition-driven growth strategy.  As the Debtors now allege, however, significant portions of those funds were instead misappropriated by Patrick James and others for their own personal use.

23.     To the extent the Debtors suggest that any alleged misappropriation affects Onset's interests in the Onset Conduit Property, Onset expressly reserves all rights.  And, in any case, the governing transaction documents speak for themselves: the Carnaby APAs make clear that the proceeds funded by Onset were to be used to acquire the identified assets from the FBG Debtors for the full purchase price provided by Onset, which the Carnaby Debtors would then assign to Onset to facilitate Onset's leasing program.  Each of the Carnaby APAs expressly provided that the Onset-funded purchase price would be paid to the FBG Debtors in cash at closing, which was to occur simultaneously with execution of the agreement.  Each was executed on behalf of the applicable Debtors by Edward James or Shekhar Kumar, a Senior Vice President of the Company and a former leveraged finance partner at a prominent law firm.  The Onset APAs, pursuant to which Onset subsequently acquired those same assets from the Carnaby Debtors, expressly represented that the transferred assets were conveyed to Onset "free and clear of liens, encumbrances or security interests of any kind." *See, e.g.*, Koch Decl., Exs. 9, 10.

24.     Further reinforcing Onset's confidence in the Onset Transactions, Edward James, Patrick James's brother and a senior executive of First Brands, took a series of actions that had the natural, and likely intended, effect of validating Onset's trust in the structure and performance of those transactions.  In or around 2022, several years after establishing the relationship with Onset

10

FBG_CH1_00089763

**DEBTORS' EXHIBIT NO. 164**
**Page 10 of 29**
**JOINT EXHIBIT NO. 40**
**Page 10 of 29**

in 2018, Edward began investing what he represented to be his own funds, through his personal investment vehicles, in the Onset Transactions.   Given his status with First Brands, these investments were assumed to be relatively *de minimis* for Edward but carried significant weight for Onset, as they served to validate his repeated representations regarding the transactions and his oft-expressed belief in the value and stability of the First Brands business and the expected performance of the Onset Transactions.   Because Edward was both the brother of First Brands' equity owner and a senior vice president of the Company (and therefore intimately familiar with the Company's ownership and operations), Onset logically viewed his participation as further confirmation that the collateral underlying the transactions was genuine and that Onset's ownership interests were secure.   Indeed, it is inconceivable that, after nearly five years of successful transactions, Edward would have put his own funds at risk, except as part of a calculated effort to bolster Onset's confidence in First Brands and perpetuate what now appears to have been a simply stunning fraud scheme, as alleged in the Complaint.

25.    To be clear, from the start of Onset's relationship with First Brands in 2018, Edward was the most senior executive with whom Onset interacted most frequently throughout the course of its relationship with First Brands, representing and providing access to his brother Patrick James, regularly seeking additional funding, negotiating terms, and offering unwavering assurances regarding the security granted to Onset. Starting in or around 2022, Edward's multiple personal investments alongside Onset yielded millions of dollars in gains for him and appear, in hindsight, to have been a calculated step in perpetuating and legitimizing the broader fraud scheme.

26.    In the months leading up to the Petition Date, the Debtors and their principals, including Patrick James, Edward James, and others acting at their direction, repeatedly and unequivocally assured Onset that the Company remained stable, that its operations were sound,

FBG_CH1_00089764

DEBTORS' EXHIBIT NO. 164
Page 11 of 29
JOINT EXHIBIT NO. 40
Page 11 of 29

and that Onset's collateral was fully protected. These assurances were made both orally and in writing, including through express representations and warranties incorporated into a series of forbearance agreements executed in May and June 2025. The Debtors told Onset that temporary forbearances were necessary to allow them to refinance their syndicated term loans, raise capital in Europe, or pursue a potential sale of the business, and warned that declaring a default would cause significant and avoidable harm to both parties. Relying on these assurances, Onset agreed to forbear from exercising remedies while the Debtors purportedly worked to stabilize their capital structure. The final forbearance agreement contemplated repayment of the outstanding balance through a series of payments in 2025 and 2026, payments that remain unpaid as a result of the filing of the Chapter 11 Cases.

### IV.   The Debtors' Adversary Proceeding.

27.   On November 3, 2025, Debtors initiated the Adversary Proceeding and filed the Complaint against Patrick James, entities owned or controlled by Mr. James, and additional unnamed individuals and entities.[6]

28.   As alleged in the Complaint, Mr. James engaged in "grievous misconduct" as the founder and former CEO of First Brands. *See* Complaint ¶ 1. Mr. James exploited his position to "commandeer[] the enterprise to engage in a fraudulent conduct to enrich himself and his family at the expense of Debtors and their creditors." *Id.* ¶ 3. With respect to financing transactions involving SPVs like the Carnaby Debtors, the Debtors allege that Mr. James caused the SPVs to incur "at least $2.3 billion in debt, including by double-pledging collateral that First Brands could not itself borrow against a second time." *Id.* ¶ 6.

---

[6]   During the November 10, 2025, hearing on Debtors' motion for a preliminary injunction freezing Mr. James' assets, during the direct examination of acting CEO Charles Moore, counsel for Debtors revealed the Debtors' belief that Edward James was involved in the alleged fraud. *See* Hr'g Tr. 116:9-12; 117:23-25.

FBG_CH1_00089765

**DEBTORS' EXHIBIT NO. 164**
**Page 12 of 29**
**JOINT EXHIBIT NO. 40**
**Page 12 of 29**

29.     Instead of using this financing to support the SPVs, the Complaint alleges, "James—aided and abetted by the other Defendants, including Jane and John Does 1-100 and ABC Corporations 1-100—secretly pilfered some of the Company's assets to fund his and his family's lavish lifestyle. In short, he lined his pockets at the expense of First Brands and its creditors." *Id.* ¶ 7. The Complaint further alleges that "hundreds of millions of dollars were transferred from First Brands, directly to Mr. James or his affiliated entities from 2018 to 2025, with the majority of such transfers occurring between 2023 and 2025." *Id.* ¶ 8.

30.     The Complaint provides examples of the movement of cash from Onset, financing that was provided to the Carnaby Debtors according to the terms of the Carnaby Lease Documents, to accounts held by the Carnaby Debtors, and then to Mr. James's personal entities:

> At the start of the day on April 4, 2025, Carnaby FA, an SPV that sits under Viceroy Private Capital, LLC (both siloed SPVs that are not subsidiaries of First Brands Group, LLC) had just $4,833.98 in its accounts. On that same day Carnaby FA received $67.2 million as part of a purported sale-leaseback transaction from Onset, ostensibly collateralized by First Brands' assets. Then, also on April 4, 2025, Carnaby FA—an entity which, that very morning had less than five thousand dollars in its bank account—paid Defendant Patrick James Trust approximately $17 million.

> On January 15, 2025, for example, the bank account for Carnaby Inventory IV LLC ("Carnaby IV")—another SPV sitting under Viceroy Private Capital, LLC—had just $22,137.40 in deposits in its account at the beginning of the day. On that same day, Onset provided approximately $192 million in purported sale-leaseback funding, again ostensibly collateralized by First Brands' assets. The same day, Carnaby IV paid $25 million into an account belonging to Defendant Patrick James Trust.

> Onset provided a purported sale-leaseback in the amount of $115.2 million on March 10, 2025, which was followed the same day by a $35 million transfer from Carnaby IV to Defendant Patrick James Trust. Following additional transfers, Carnaby IV held only $16.9 million in its account by March 11, and on March 12, Onset provided another $57.6 million from a purported sale-leaseback. On March 13, Carnaby IV transferred an additional $35 million to

FBG_CH1_00089766

Patrick James Trust.  By the beginning of the day on March 17, 2025, Carnaby IV held only a balance of $2,952.95.

*Id.* ¶¶ 72–74.  As a result of this and similar conduct, the Debtors allege that Mr. James and the other Defendants siphoned approximately $200 million of the financing received from Onset to Mr. James and his entities.  *Id.* ¶ 75.

### V.  Debtors' Inability to Represent Onset's Interests.

31.    The Debtors are not positioned to advance or protect Onset's interests in this Adversary Proceeding.  First Brands has a highly complex financing structure involving diverse borrower groups, multiple layers of debt, and distinct sets of collateral securing different obligations.  Within that framework, the Onset Transactions were designed to provide a separate source of funding for the Debtors' ongoing operations and acquisitions, primarily through a conduit structure that differed from the Debtors' other lending relationships.

32.    The Debtors' pleadings suggest that they have already reached conclusions about the Onset Transactions, singling those transactions out for particular scrutiny and implying that Onset's structure is somehow compromised before any factual record has been developed or Onset has had an opportunity to present its legal position.  In their pleadings, the Debtors describe their term loan facilities as valid and enforceable, while consistently referring to Onset's agreements and collateral in the Complaint in qualified terms (*i.e.*, "purported").  Yet, if the Onset Transactions are found to be valid (and Onset believes they will be), that fact will be central to understanding the source and ownership of the assets the Debtors claim were misappropriated and to determining where those assets properly reside.

33.    The Debtors' pleadings also contain numerous statements and conclusions about the supposed effect of the alleged fraud on Onset's collateral position.  In several instances, the Complaint and accompanying declaration of Mr. Charles Moore go beyond describing transactions

14

FBG_CH1_00089767

DEBTORS' EXHIBIT NO. 164
Page 14 of 29
JOINT EXHIBIT NO. 40
Page 14 of 29

and instead opine on the impact of those transactions on Onset's legal position. These passages are presented as factual findings, but in substance they reflect improper and premature legal conclusions concerning ownership, perfection, and priority. Mr. Moore, a financial advisor to the Debtors who is not an attorney, frames these determinations as matters of fact, even though they involve complex legal issues that Mr. Moore himself testified are still being investigated, and that ultimately and properly will need to be decided by this Court.

34.     The Debtors' approach is understandable. Their operations (and this litigation) are being funded by a subset of their prepetition term loan lenders, a competing stakeholder group with a direct financial interest in the outcome. The Debtors have agreed to restrictions on their uses of cash that prevent them from spending estate resources to assert legal positions that are contrary the interests of those term loan lenders. *See Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [C11 Docket No. 608] (the "Final DIP Order"), at ¶ 28. In a case where recoveries are effectively a zero-sum game among creditor constituencies, that restriction leaves the Debtors, as currently represented, structurally unable to advocate for Onset's interests. This limitation is particularly evident in their treatment of entities such as the Carnaby Debtors, whose only creditor is Onset, where the Debtors' pleadings fail to acknowledge that any recovery from Patrick James or his affiliates to those entities would inure solely to Onset's benefit.

## RELIEF REQUESTED

35.     Onset seeks entry of the Proposed Order authorizing it to intervene in the Adversary Proceeding to ensure its interests are adequately represented.

15

FBG_CH1_00089768

**BASIS FOR REQUESTED RELIEF**

36.     Under Section 1109 of the Bankruptcy Code, parties in interest "may raise and may appear and be heard on any issue in a case under" Chapter 11.  11 U.S.C. § 1109(b).  Although this right to "appear and be heard" does not comprise an absolute statutory right to intervene in adversary proceedings, Section 1109 "in no way restricts the broad, legitimate right to appear and be heard" that Section 1109 of the Bankruptcy Code grants to parties in interest in bankruptcy matters.  *Fuel Oil Supply & Terminaling v. Gulf Oil Corp.*, 762 F.2d 1283, 1286–87 (5th Cir. 1985); *accord Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1363 (5th Cir. 1986) ("In *Fuel Oil*, we further held that the intervention rights under section 1109(b) are quite broad in keeping with the policies of the Bankruptcy Code.").  Accordingly, parties in interest "may still intervene as of right under Rule 24(a)(2)." *Fuel Oil*, 762 F.2d at 1287.  "[P]ermissive intervention under Rule 24(b) is likewise a possibility." *Id.*

37.     Onset satisfies the requirements for both mandatory intervention under Federal Rule 24(a)(2) and permissive intervention under Federal Rule 24(b).

**I.      Onset Is Entitled to Intervene in the Adversary Proceeding as a Matter of Right Under Federal Rule 24(a)(2).**

38.     Rule 24 provides that:

> [o]n timely motion, the court must permit anyone to intervene who[]
> . . . claims an interest relating to the property or transaction that is
> the subject of the action, and is so situated that disposing of the
> action may as a practical matter impair or impede the movant's
> ability to protect its interest, unless existing parties adequately
> represent that interest.

Fed. R. Civ. P. 24(a)(2).

39.     To intervene under Rule 24(a)(2), Onset must demonstrate only that (a) its motion is timely; (b) it has an interest relating to the property or transaction that is the subject of the adversary proceeding; (c) it is so situated that the disposition of the action may, as a practical

FBG_CH1_00089769

**DEBTORS' EXHIBIT NO. 164**
**Page 16 of 29**
**JOINT EXHIBIT NO. 40**
**Page 16 of 29**

matter, impair its ability to protect that interest; and (d) its interests are not adequately represented by the current parties to the proceeding. *See Ford v. City of Huntsville*, 242 F.3d 235, 239 (5th Cir. 2001). Onset satisfies each of these elements.

### A.      The Motion Is Timely.

40.      The Fifth Circuit has identified four factors for courts to consider when determining the timeliness of a motion to intervene: "(a) the length of time the intervenor knew or should have known of his interest in the case; (b) prejudice to the existing parties resulting from the intervenor's failure to apply for intervention sooner; (c) prejudice to the intervenor if his application for intervention is denied; and (d) the existence of unusual circumstances." *Trans Chem. Ltd. v. China Nat'l Mach. Imp. & Exp. Corp.*, 332 F.3d 815, 822 (5th Cir. 2003) (citing *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264–66 (5th Cir. 1977)). "These factors are 'not a formula for determining timeliness'; instead, it should be determined based on *all* the circumstances." *Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc.*, 346 F.3d 552, 561 (5th Cir. 2003) (quoting *John Doe #1 v. Glickman*, 256 F.3d 371, 376 (5th Cir. 2001)).

41.      Here, Onset's Motion is timely. Onset seeks to intervene in the earliest stages of the Adversary Proceeding, which was filed less than two weeks ago. No party can legitimately assert prejudice based on Onset having filed this Motion at this earliest possible juncture. *See, e.g.*, *McClenny Moseley & Assocs., P.L.L.C. v. Equal Access Justice Fund, L.P.*, No. 23-30670, 2024 WL 2874371, at *4 (5th Cir. June 7, 2024) ("[Lender's] motion is timely because it sought to intervene within 13 days of [learning of its interest in this case].") (citing *Stallworth* 558 F.2d at 267 ("By filing their petition less than one month after learning of their interest in this case, the appellants discharged their duty to act quickly.")). Further, should the Court grant intervention, Onset will coordinate with First Brands to avoid duplication of effort where Onset's and First

17

FBG_CH1_00089770

**DEBTORS' EXHIBIT NO. 164**
**Page 17 of 29**
**JOINT EXHIBIT NO. 40**
**Page 17 of 29**

Brands' interests are aligned. *See Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (explaining that "[f]ederal courts should allow intervention 'where no one would be hurt and greater justice could be attained'") (quoting *McDonald v. E.J. Lavino Co.*, 430 F.2d 1065, 1074 (5th Cir. 1970)).

### B.      Onset Has an Interest in the Property and the Transactions at Issue.

42.     Onset has an indisputable interest relating to the property and transactions at issue in the Adversary Proceeding for several reasons.

43.     *First*, Onset was a direct party to the Onset Transactions that the Debtors now allege were implicated in the Defendants' fraudulent conduct.  The Debtors allege that hundreds of millions of dollars that Onset advanced under those transaction documents appear to have been misappropriated by the Defendants, often within days after funding by Onset.  By the Debtors' own admission, those funds are directly traceable to Onset and, if the Debtors' allegations are accurate, were obtained under false pretenses.  The fact that Onset's own capital is at the center of the transactions described in the Complaint establishes its direct and substantial interest in the outcome of this proceeding.

44.     *Second*, Onset is the only creditor of the Carnaby Debtors.  In a case where the available value is finite and every recovery to one party reduces what remains for others, the consequences of this litigation are effectively zero-sum among the Debtors' various stakeholders. The implications for Onset extend beyond how any recovered funds are ultimately distributed, because the legal and factual theories the Debtors advance in the Adversary Proceeding, including how they characterize the source of the diverted funds and the entities from which those funds were taken, will directly affect the allocation process.  For example, if the Debtors allege that funds were taken from the FBG Debtors when, in fact, they were taken from the Carnaby Debtors, that

FBG_CH1_00089771

mischaracterization would have an immediate and material impact on Onset. Yet the Debtors, who cannot compensate their counsel for advancing positions that are adverse to their prepetition term loan lenders, are structurally unable to ensure that Onset's interests are accurately reflected or protected in those determinations.

45.     *Third*, certain remedies that may arise from the facts alleged, such as the imposition of a constructive trust, equitable lien, or other equitable relief tied to Onset's diverted funds, would uniquely benefit Onset. The issue is not only the pursuit of those remedies, but also the development and framing of the factual record that would give rise to them. No other party has an incentive to allege or substantiate those facts, and the Debtors are precluded by their current funding arrangements from doing so. Without Onset's participation, the factual and evidentiary foundation necessary to support such remedies would not be presented to the Court or developed in the record. To preclude Onset from doing so would be manifestly unjust.

46.     *Finally*, the Debtors' own pleadings take the position that this Adversary Proceeding directly implicates Onset's position. The Complaint and related declarations contain repeated, and often gratuitous, commentary on the supposed effect of the alleged conduct on Onset's collateral package. While Onset does not ascribe any weight to those assertions, their inclusion is an admission by the Debtors that the matters at issue in the Adversary Proceeding bear directly on Onset's rights. That alone demonstrates why Onset must be permitted to participate to ensure that its interests are accurately described and fully protected.

### C.     First Brands May Not Be Able to Adequately Represent the Interests of Onset.

47.     The Debtors cannot adequately represent Onset's interests in this Adversary Proceeding. The Debtors' own pleadings show that their objectives and incentives diverge sharply from Onset's. In formulating and prosecuting claims against Patrick James and the other

FBG_CH1_00089772

Defendants, the Debtors will necessarily develop a factual record regarding which funds were taken, from which entities they were taken, and when those transfers occurred (including who at First Brands participated and the nature of their participation). Those factual determinations will have a direct impact on how any recoveries are allocated among Debtor entities and, by extension, among creditor constituencies with competing interests. The Debtors have no incentive to develop or present facts that would support an allocation favorable to Onset, and every incentive to shape the record in ways that minimize Onset's recovery.

48. This conflict is compounded by the Debtors' DIP Facility (as defined in the Final DIP Order) and the constraints on the uses of cash and other DIP collateral contained in the Final DIP Order. As an initial matter, the FBG Debtors are motivated to allocate value to the entities that are obligated under the DIP Facility, because that facility is a superpriority administrative obligation of their estates. In addition, the Final DIP Order prohibits the Debtors from compensating their legal counsel for services that are opposed to the interests of the Prepetition Secured Parties (as defined in the Final DIP Order), one of many competing creditor constituencies in these Chapter 11 Cases. As a practical matter, these features constrain the Debtors' ability and incentive to advance positions favorable to Onset, particularly if doing so could disadvantage the lenders funding their operations.

49. The Debtors' pleadings also demonstrate an apparent animus toward Onset. From the outset, the Debtors have described Onset's agreements and collateral interests in qualified terms and have suggested that Onset's position is somehow compromised, despite the absence of a developed factual record, completed discovery, or any meaningful opportunity for Onset to present its case. Indeed, the Debtors have repeatedly acknowledged, including in Mr. Moore's most recent testimony, that their investigation remains ongoing and there is still much they do not

FBG_CH1_00089773

DEBTORS' EXHIBIT NO. 164
Page 20 of 29
JOINT EXHIBIT NO. 40
Page 20 of 29

know.  Although Onset does not question the Debtors' ability to act on behalf of their estates generally, the undeniable framing of their allegations at this early stage reflects a clear predisposition against Onset's position and strongly suggests that they cannot, and will not, fairly and fully represent Onset's interests.

50.    Finally, the Debtors cannot adequately represent Onset's interests with respect to certain potential remedies that may be available only to Onset or the Carnaby Debtors.  Certain forms of relief that may arise from the facts alleged, such as constructive trust, equitable lien, or other equitable relief tied to Onset's diverted funds, would benefit Onset alone.  The Debtors lack both the incentive and the ability to advance the factual or legal theories necessary to support those remedies; only Onset is positioned to do so, and therefore it must intervene.

51.    The standard for intervention under Rule 24(a)(2) requires only a "minimal" showing that existing parties may not adequately represent the applicant's interests.  *See Sierra Club*, 18 F.3d at 1207 (inadequate representation requires "minimal" showing and is satisfied where representation of other parties in litigation "*may be*" inadequate) (emphasis added) (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)).  That standard is readily met here.  The Debtors' litigation posture, funding constraints, and inherent conflicts preclude them from advocating for Onset's rights.  Onset's intervention is therefore necessary to ensure that its interests are fully and fairly represented.  However, to the extent Onset's interests align with those of the Debtors on discrete issues, Onset will coordinate with the Debtors and their professionals to minimize duplication of effort and preserve the Court's resources.[7]

---

[7]    In the Fifth Circuit, there is no need for the intervenor to attach a proposed pleading to its motion where, as here, the intervenor puts the parties "on notice of his grounds for intervention." *Liberty Surplus Ins. Cos. v. Slick Willies of Am., Inc.*, No. H-07-0706, 2007 WL 2330294, at *2 (S.D. Tex. Aug. 15, 2007); *In re Today's Destiny, Inc.*, No. 06-32852007 WL 2028111, at *4 (Bankr. S.D. Tex. July 6, 2007) (finding that there was no need for intervenor to attach a proposed pleading to the motion where the parties had notice from the motion of the positions the intervenor planned to take in the proceeding); *In re Royal Alice Props., LLC*, No. 20-1022, 2021

21

FBG_CH1_00089774

**DEBTORS' EXHIBIT NO. 164**
**Page 21 of 29**
**JOINT EXHIBIT NO. 40**
**Page 21 of 29**

## II.  Alternatively, Onset Should Be Permitted to Intervene Under Rule 24(b).

52.  Assuming arguendo that the requirements for a mandatory intervention are not met, Onset should be permitted nonetheless, and with equal force, to intervene under Rule 24(b), which provides, in relevant part:

> [o]n timely motion, the court may permit anyone to intervene who[]
> . . . has a claim or defense that shares with the main action a common
> question of law or fact.

Fed. R. Civ. P. 24(b)(1)(B).

53.  Under Rule 24(b), if a proposed intervenor timely files a motion and "there is a common question of law or fact, the requirement of the rule has been met and then it is within the Court's discretion to allow or refuse intervention." *In re Charter Co.*, 50 B.R. 57, 63 (Bankr. W.D. Tex. 1985).  In exercising its discretion under Rule 24(b), the only consideration that the Court must undertake is "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3); *see also, e.g.*, *Charter*, 50 B.R. at 63.  Here, Onset has filed a timely motion that demonstrates common questions of law and fact with the parties to the Adversary Proceeding.  Moreover, because the Adversary Proceeding is just beginning, intervention will not unduly delay or prejudice the adjudication of any party's rights. As such, permissive intervention is appropriate.

### A.  The Motion Is Timely.

54.  For the reasons stated in paragraphs 40-41, *supra*, the Motion is timely.

---

WL 150397, at *2 (Bankr. E.D. La. Jan. 15, 2021) (same); *see also Piambino v. Bailey*, 757 F.2d 1112, 1121 (11th Cir. 1985) (finding intervention proper despite failure to annex complaint to motion where "[e]veryone knew the nature of [the intervenor's] substantive claims for relief").

FBG_CH1_00089775

**DEBTORS' EXHIBIT NO. 164**
**Page 22 of 29**
**JOINT EXHIBIT NO. 40**
**Page 22 of 29**

**B.      Onset Shares Common Questions of Law and
Fact with the Parties to the Adversary Proceeding.**

55.      Both Onset and First Brands are victims of Mr. James's and the other Defendants' alleged fraudulent scheme and therefore share common claims against the Defendants.  As alleged, Mr. James orchestrated a deliberate pattern of deception that victimized numerous parties dealing with First Brands, including its lenders and financing partners such as Onset.  Mr. James and his agents misrepresented First Brands' financial condition, falsified documentation, and manipulated collateral records to induce First Brands' creditors, including Onset, into transactions based on fraud.  Mr. James, with his brother Edward, caused First Brands to enter into financing arrangements (including the Onset Transactions) that they later exploited for personal gain, diverting loan and lease proceeds to entities under their control.  In doing so, the Defendants not only stripped First Brands of corporate assets but also exposed Onset to substantial losses and reputational harm.  Given these allegations, both First Brands and Onset therefore have aligned interests in pursuing claims against Mr. James, his affiliated entities, and the other Defendants seeking recovery of funds misappropriated through deceit.

**C.      Onset's Intervention Will Not Unduly Delay
or Prejudice the Adjudication of the Parties' Rights.**

56.      The Adversary Proceeding remains in its early stages.  Allowing Onset to intervene less than two weeks after its filing will not cause undue delay or prejudice to the adjudication of the parties' rights.  *See, e.g.*, *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, No. H-05-3167, 2006 WL 2382250, at *6 (S.D. Tex. Aug. 16, 2006) (finding that where a case "is at an early stage . . . intervention will neither delay the proceedings nor prejudice the existing parties").

**<u>NOTICE</u>**

57.      Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) proposed counsel to Debtors; (c) counsel to Defendants; and

FBG_CH1_00089776

**DEBTORS' EXHIBIT NO. 164
Page 23 of 29
JOINT EXHIBIT NO. 40
Page 23 of 29**

(d) any party that has requested service in this Adversary Proceeding.  Based on the nature of the relief requested, Onset respectfully submits that no further notice of the Motion is necessary or required under the circumstances.

## NO PRIOR REQUEST

58.    No previous request for the relief sought herein has been made to this or any other court.

**WHEREFORE**, for the reasons set forth in the Motion, Onset Financial, Inc. respectfully requests that this Court enter the Proposed Order and grant such other and further relief as the Court deems just and proper.

FBG_CH1_00089777

**DEBTORS' EXHIBIT NO. 164**
**Page 24 of 29**
**JOINT EXHIBIT NO. 40**
**Page 24 of 29**

Dated: November 14, 2025        MUNSCH HARDT KOPF & HARR, PC
        Houston, Texas

By: /s/ *Deborah M. Perry*

Deborah M. Perry
Texas Bar No. 24002755
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
E-mail: dperry@munsch.com

-and-

MORRISON & FOERSTER LLP
James Newton (*pro hac vice* pending)
Ben Butterfield (*pro hac vice* pending)
Bryan Kotliar (*pro hac vice* pending)
250 West 55th Street
New York, NY 10019
Email: jnewton@mofo.com
Email: bbutterfield@mofo.com
Email: bkotliar@mofo.com

-and-

MORRISON & FOERSTER LLP
Anthony S. Fiotto (*pro hac vice* pending)
Julia Koch (*pro hac vice* pending)
200 Clarendon Street, Floor 21
Boston, MA 02116
Email: afiotto@mofo.com
Email: jkoch@mofo.com

-and-

MORRISON & FOERSTER LLP
Brian R. Michael (*pro hac vice* pending)
707 Wilshire Boulevard
Los Angeles, CA 90017-3543
Email: bmichael@mofo.com

*Attorneys for Onset Financial, Inc.*

FBG_CH1_00089778

**DEBTORS' EXHIBIT NO. 164**
**Page 25 of 29**
**JOINT EXHIBIT NO. 40**
**Page 25 of 29**

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed on this 14th day of November, 2025, with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.


/s/ Deborah M. Perry
Deborah M. Perry

FBG_CH1_00089779

**DEBTORS' EXHIBIT NO. 164**
**Page 26 of 29**
**JOINT EXHIBIT NO. 40**
**Page 26 of 29**

**EXHIBIT A**

**Proposed Order**

FBG_CH1_00089780

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>FIRST BRANDS GROUP, LLC *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 25-90399 (CML)<br><br>(Jointly Administered) |
| FIRST BRANDS GROUP, LLC *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>PATRICK JAMES, THE PATRICK JAMES TRUST, ALBION REALTY, LLC, ALESTER TECHNOLOGIES LLC, BATTERY PARK HOLDINGS LLC, BOND STREET ASSET MANAGEMENT LLC, IGNITE ACQUISITION HOLDINGS LLC, LARCHMONT LLC, PEGASUS AVIATION, LLC, JOHN AND JANE DOE(S) 1-100, and ABC CORPORATION(S) 1-100,<br><br>Defendants. | Adv. Pro. No. 25-03803 (CML) |

**[PROPOSED] ORDER GRANTING MOTION OF ONSET FINANCIAL, INC.**
**FOR ENTRY OF AN ORDER PURSUANT TO FEDERAL RULE OF CIVIL**
**PROCEDURE 24 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 7024**
**AUTHORIZING INTERVENTION IN ADVERSARY PROCEEDING**

Upon consideration of the motion (the "Motion") of Onset Financial, Inc. ("Onset") for

entry of an order pursuant to Sections 105(a) and 1109(b) of Title 11 of the United States Code,

Rule 24 of the Federal Rules of Civil Procedure, and Rule 7024 of the Federal Rules of Bankruptcy

Procedure authorizing Onset to intervene in the Adversary Proceeding; and it appearing that this

Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and notice of the

Motion and the opportunity for a hearing on the Motion being appropriate under the circumstances

FBG_CH1_00089781

such that no other or further notice need be given; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED as follows:

1.      The Motion is GRANTED as set forth herein.

2.      Onset is authorized to intervene in the Adversary Proceeding and may participate fully therein.

3.      Onset is bound by all orders entered in the Adversary Proceeding prior to its intervention to the same extent that the parties to the Adversary Proceeding are bound by those orders.

4.      This Court shall retain exclusive jurisdiction to interpret and enforce the provisions of this Order in all respects and further to hear and determine all matters arising from the construction and implementation of this Order.


   Dated: _____
               Houston, Texas

                                                 _____
                                                 THE HONORABLE CHRISTOPHER M. LOPEZ
                                                 UNITED STATES BANKRUPTCY JUDGE

2

FBG_CH1_00089782

**DEBTORS' EXHIBIT NO. 164**
**Page 29 of 29**
**JOINT EXHIBIT NO. 40**
**Page 29 of 29**