**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| FIRST BRANDS GROUP, *et al.*, | : Case No. 25-90399 (CML) |
| | : |
| Debtors.[1] | : (Jointly Administered) |
| | : |
| | : |
| | : |
| FIRST BRANDS GROUP, *et al.*, | : |
| Plaintiffs | : Adv. Pro. No. 25-3803 (CML) |
| | : |
| v. | : |
| | : |
| PATRICK JAMES, THE PATRICK JAMES | : |
| TRUST, ALBION REALTY, LLC, ALESTER | : |
| TECHNOLOGIES LLC, BATTERY PARK | : |
| HOLDINGS LLC, LARCHMONT LLC, PEGASUS | : |
| AVIATION, LLC, MICHAEL BAKER, PETER | : |
| ANDREW BRUMBERGS, STEPHEN GRAHAM, | : |
| JOHN AND JANE DOE(S) 1-100, and ABC | : |
| CORPORATION(S): 1-100, | : |
| Defendants | : |
| | ; |

**RENEWED MOTION OF PATRICK JAMES AND RELATED ENTITIES TO DISMISS**
**PURSUANT TO FED. R. CIV. P. 12(B)(6) DEBTORS' AMENDED COMPLAINT FOR**
**FAILURE TO STATE A CLAIM, OR, ALTERNATIVELY, PURSUANT TO FED. R.**
**CIV. P. 12(E) FOR A MORE DEFINITE STATEMENT**

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

FBG_CH1_00089991

**DEBTORS' EXHIBIT NO. 171**
**Page 1 of 61**
**JOINT EXHIBIT NO. 47**
**Page 1 of 61**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................ 1

SUMMARY OF LEGAL ARGUMENT ................................................................................... 13

ARGUMENT ............................................................................................................................. 19

    I.    The Amended Complaint Should Be Dismissed for Failure to State a Plausible Claim for Relief.................................................................................. 19

    A.    The Amended Complaint Lacks Well-Pleaded Allegations of Mr. James or the Related Entities' Involvement in Fraudulent Acts or Other Misconduct........ 19

    B.    The Equitable Claims Are Barred by the Doctrine of *In Pari Delicto.* ................ 22

    C.    Numerous Claims Are Outside the Lookback Period or Barred by the Statute of Limitations.............................................................................. 24

    D.    The Fraudulent Transfer Claims Are Inadequately Pled. ..................................... 28

        1.    The Actual Fraudulent Transfer Claims Fail to Satisfy Rule 9(b)'s Heightened Standard for Pleading Intent. ................................................... 28

        2.    The Constructive Fraudulent Transfer Claims Fail Because the Amended Complaint Fails to Plead Insolvency........................................ 30

        3.    The Constructive Fraudulent Transfer Claims Fails Because the Amended Complaint Fails to Plead Lack of Reasonably Equivalent Value. ...................................................................................................... 33

        4.    The Amended Complaint Fails to Plead that Certain Transfers Were "For the Benefit of" Any Defendants............................................. 35

    E.    The Amended Complaint Fails to Adequately Plead a Claim of Illegal Dividend Against Patrick James. ......................................................................... 35

    F.    The Amended Complaint Fails to Adequately Plead a Claim for Turnover......... 37

    G.    The Amended Complaint Fails to Adequately Plead a Claim for Unjust Enrichment or Money Had and Received Against Any Defendant....................... 39

    H.    The Amended Complaint Fails to Adequately Plead a Claim for Constructive Trust or Accounting.......................................................................... 40

i

FBG_CH1_00089992

I.    The Amended Complaint Fails to Adequately Plead a Claim of Breach of
       Fiduciary Duty or Aiding and Abetting Breach of Fiduciary Duty Against
       Patrick James. ....................................................................................................... 42

       1.    The LLC Agreements Eliminated Traditional Fiduciary Duties. ............. 42

       2.    The Debtors Have Not Adequately Pled a Breach of Fiduciary
             Duty....................................................................................................... 45

       3.    The Debtors Have Not Alleged That Mr. James Knowingly
             Participated in Any Breach of Fiduciary Duty. ....................................... 47

J.     The Amended Complaint Fails to Adequately Plead a Claim of Conspiracy
       Against Patrick James. ........................................................................................... 48

       1.    The Debtors Have Not Sufficiently Alleged an Unlawful Act
             Independent of the Purported Conspiracy................................................. 49

       2.    The Debtors Have Not Alleged A "Malicious Combination." ................. 50

       3.    The Intracorporate Conspiracy Doctrine Bars Debtors' Conspiracy
             Claim....................................................................................................... 51

II.    Alternatively, the Court Should Order the Debtors to Provide a More
       Definite Statement Pursuant to Rule 12(e). ........................................................... 52

CONCLUSION........................................................................................................... 54

FBG_CH1_00089993

**DEBTORS' EXHIBIT NO. 171**
**Page 3 of 61**
**JOINT EXHIBIT NO. 47**
**Page 3 of 61**

Patrick James and the so-called "**Related Entities**," i.e., (a) The Patrick James Trust, (b) Albion Realty, LLC, (c) Alester Technologies, LLC, (d) Battery Park Holdings LLC, (e) Larchmont LLC, and (f) Pegasus Aviation LLC (the Related Entities, together with Mr. James, the "**Moving Defendants**") file this renewed motion (the "**Motion**[2]") pursuant to Fed. R. Civ. P. 12(b)(6) and 12(e) and Fed. R. Bankr. P. 7012 to dismiss the Amended Complaint in the above-captioned proceeding, Adv. Proc. Dkt. No. 141, (the "**Complaint**" or "**Amended Complaint**"), for failure to state a claim.

**PRELIMINARY STATEMENT**

1.      Given the volume of the hyperbole in the Initial Complaint and at the Preliminary Injunction Hearing, the Moving Defendants expected a vociferous response to their Initial Motion to Dismiss.  That is not the Amended Complaint.  It leaves unanswered the Moving Defendants' call for the Debtors to adduce specific facts relevant to assertions of fraud that permeate the Amended Complaint.  Actually, the Amended Complaint does not add anything new with respect to Mr. James or the Related Entities.  Notably absent are additional allegations supposedly unearthed from the Debtors' months of work, unilateral access to the Company's employees and internal systems, and documents produced to the estates by third parties.

2.      That the Amended Complaint is a retread of the deficient Initial Complaint is a tacit admission that the Debtors cannot support the elements of their claims.  It even indicates the Debtors rely on the same documents they brought four months ago in November 2025 to the

---

[2]      This is Mr. James' second motion to dismiss.  The Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) the Debtors' Complaint for Failure to State a Claim, or Alternatively, Pursuant to Fed. R. Civ. P. 12(e) for a More Definite Statement filed on December 15, 2025, Adv. Proc. Dkt. No. 108, ("**Initial Motion to Dismiss**") raised various arguments, most of which the Amended Complaint ignores.  Regardless, capitalized terms not defined herein have the meanings ascribed to them in the Amended Complaint or the Initial Motion to Dismiss the Debtors' first Complaint filed on November 3, 2025, Adv. Proc. Dkt. No. 4 ("**Initial Complaint**").

FBG_CH1_00089994

**DEBTORS' EXHIBIT NO. 171**
**Page 4 of 61**
**JOINT EXHIBIT NO. 47**
**Page 4 of 61**

Preliminary Injunction Hearing.[3]  Given the gravity of the Debtors' assertions and the time they have dedicated to investigating Mr. James, by now they ought to have populated the Amended Complaint with documents and statements directly attributable to him that support their claims. The Amended Complaint does no such thing, requiring dismissal of Mr. James and the Related Entities.

###### A.   ALLEGATIONS SPECIFIC TO MR. JAMES ARE STILL LACKING

3.      Notwithstanding their assertion that Mr. James was the so-called "ringleader"[4] of a fraudulent enterprise among the Defendants, the Amended Complaint does not explain in required detail how he controlled or directed others, *e.g.*, what statements Mr. James made to them and when he made them.  Just like the Initial Complaint, the Amended Complaint does not deliver the particularity required to make out claims sounding in fraud.

4.      For example, the Amended Complaint challenges transfers involving Mr. James and the Related Entities allegedly totaling $763 million.  But the Amended Complaint does not provide sufficient detail about the purported fraudulent intent surrounding each of these payments—making it impossible for Mr. James and the Related Entities to defend against claims those funds were transferred over a seven (7)-year period with the actual intent to hinder, delay, and defraud creditors each and every time.  At best, a handful of paragraphs relating to three transfers attempt to provide context.  Even still, none reference instructions given directly by Mr.

---

[3]    Am. Compl. ¶ 51 & n.4 ("First Brands presented evidence of these transactions and other instances of Defendants' misconduct, including over sixty exhibits and several hours of sworn testimony, at the preliminary injunction hearing in this matter.  First Brands incorporates by reference all evidence offered at that preliminary injunction hearing.  This evidence includes, among other things, bank records reflecting transfers from First Brands accounts to James, entities under this control, or third parties for his and his family's personal benefit.").

[4]    Am. Compl. ¶¶ 113-116.

2

FBG_CH1_00089995

DEBTORS' EXHIBIT NO. 171
Page 5 of 61
JOINT EXHIBIT NO. 47
Page 5 of 61

James—or in some cases, given by any identified individual.[5]  Instead, the Debtors put forth hearsay descriptions of others' understandings of something Mr. James or other unidentified persons allegedly wanted to happen (including transfers like tax distributions or payment of management fees that the Debtors try to characterize as nefarious).[6]  Nor are these discussions anything new; the Amended Complaint just incorporates certain documents the Debtors used at the November 2025 Preliminary Injunction Hearing.[7]

5.      The Amended Complaint also presents no new facts that would support a showing Mr. James or others concealed the transfers the Debtors challenge.  As observed at the Preliminary Injunction Hearing, these payments appeared in the Company's general ledger.[8]  What is more, the Amended Complaint suffers from the same defect found in the Initial Complaint—an

---

[5]    *See* Am. Compl. ¶ 80 ("Brumbergs indicated that he had been 'instructed to make a $25 million USD distribution' to a Patrick James Trust account.").

[6]    *See id.*; *id.* ¶ 78 ("[O]n April 5, 2022, James' Chief of Staff emailed Brumbergs . . . that James 'wants a $10M *tax distribution* paid to him this week.' Brumbergs wrote to members of the First Brands Finance department that he had discussed the payment and timing with James and instructed them to make a transfer at the end of the week.  On April 8, 2022, First Brands transferred $10 million to Defendant Patrick James Trust." (emphasis added)); *id.* ¶ 88 ("[O]n July 19, 2022, an employee of Defendant Larchmont, James' family office, emailed First Brands to request payment, indicating that 'Patrick has asked that we invoice weekly.'  On October 31, 2022, the same Larchmont employee submitted an invoice to First Brands for more than $400,000, writing:  'Per Patrick, this should be paid tomorrow.'"); *id.* ¶ 89 ("[O]n December 31, 2022, a Larchmont employee stated that James 'had us go back and recode' certain charges so that expenses borne by Defendant Battery Park would be reimbursed by First Brands."); *id.* ¶ 90 ("[O]n March 5, 2025, a Larchmont employee sent an email to First Brands, which noted that James had asked that a $468,000 invoice be 'paid this week if possible.'"); *id.* ¶ 96 ("James often dictated the timing and quantity of payments to Defendant Larchmont.  For example, on April 12, 2021, Brumbergs stated to another member of the Finance team that James 'wants the entire Q2 amount paid today.'  That day, First Brands transferred $1.25 million to Larchmont.  On July 6, 2021, Brumbergs indicated that he would 'check with PJ' regarding the timing and amount of subsequent payments to Larchmont")).

[7]    *See* Adv. Proc. Dkt. No. 35, 41 (Debtors' Exhibit List Nos. 4, 5, 9, 10, 11, 16, 19, 20, 21, 23, 28, 31, 32, 33, 34, 35, 36, 37, 42, 43, 51, 52, 53, 54, 55, 56, 59, 60, 61, 64, 65, 66).

[8]    *See* Am. Compl. ¶¶ 13, 18; Tr., Adv. Proc. Hr'g Nov. 12, 2025 at 23:2-7 ("The Record shows that this does not appear to have been done alone if James is behind it.  It doesn't appear to have been done in the dark either, and doesn't appear to be the work of one person.  That's not to let anyone off the hook here.  This was all done while James was CEO."); *id.* at 24:7-9 ("[I]t appears that many of these transfers were done with the knowledge of other First Brands parties as they appeared in the First Brands general ledger."); Tr., Adv. Proc. Hr'g Nov. 10, 2025 at 152:22-25 ("[F]rom 2020 . . . through on or around December 31st, 2024, BDO provided an audit report for First Brands."); *see also id.* at 130:16-131:7 (email openly discussing "dummy invoices"); *id.* at 134:7-14 (no statement found where Mr. James directed double-pledging).

3

FBG_CH1_00089996

**DEBTORS' EXHIBIT NO. 171**
**Page 6 of 61**
**JOINT EXHIBIT NO. 47**
**Page 6 of 61**

overreliance on "information and belief" to plead claims sounding in fraud. This fallback appears over thirty times.[9] It permeated the Initial Complaint in November 2025, and its reappearance months into the proceeding notwithstanding the Debtors' investigative efforts and unilateral access to reams of data signals that the Debtors still cannot support their factual allegations.

6. Instead of expanding their allegations against Mr. James, the Debtors just added more defendants (Mr. Brumbergs, Mr. Graham, and Mr. Baker), place blame at their feet, and assert, without support, that they acted in concert with or at Mr. James' direction.[10] But additional parties are no substitute for pleading fraud with particularity. The addition of these individuals with generic descriptions about their various roles seems to reduce the Debtors' complaint about Mr. James to be his alleged failure to maintain proper books and records for the Company.[11]

### B.   COMPLAINT DOES NOT TIE MR. JAMES TO FIVE AREAS OF CHALLENGE

7. The Amended Complaint speaks to five (5) supposed areas of misconduct: (1) so-called "commingling" of funds and transfers for Mr. James' personal benefit; (2) inaccurate

---

[9]   Am. Compl. ¶¶ 14, 20, 27, 28, 29, 30, 31, 61, 65 (2x), 83, 84, 85, 87, 91, 95, 98, 100 (2x), 106, 111, 117, 121, 124, 125 (2x), 126 (2x), 134, 135, 150.

[10]   Am. Compl. ¶¶ 117-126.

[11]   Am. Compl. ¶ 61 ("[F]unds were transferred from SPV Debtors to a non-Debtor entity controlled by James known as 'Bowery Finance II.' Inadequate books and records were maintained for these SPV Debtors, and cash that was supposed to be transferred to the First Brands subsidiaries under the applicable transaction documents was transferred to Bowery II Finance instead."); *id.* ¶ 62 ("First Brands incurred at least approximately $900 million in unsecured SCF liabilities that were not fully recorded as liabilities on First Brands' balance sheet, further obscuring First Brands' true financial condition."); *id.* ¶ 101 ("The transaction documentation that First Brands has uncovered fails to show that James' transfers were made for any legitimate business purpose. These transfers were not documented or treated by First Brands as ordinary dividends or distributions and contributed to First Brands' insolvency or occurred while First Brands was insolvent or nearing insolvency."); *id.* ¶ 102 ("Many of the transfers seem to have been made without any contemporaneous documentation of their purpose."); *id.* ¶ 106 ("The debt resulting from off-balance sheet financing, factoring liabilities, and unsecured SCF liabilities, did not appear overnight. First Brands' practices in incurring these obligations, and its deliberate and repeated failure to record them, long predate the Petition Date. The off-balance sheet financing transactions, factoring arrangements, and SCF obligations should have been recognized as liabilities in the Company's books and records when the debts were actually incurred. But the historical accumulation of this debt—particularly SPV-related obligations—was not transparently recorded on First Brands' books and materially distorted the Company's true financial condition. On information and belief, had these liabilities been properly accounted for, they would have demonstrated that First Brands was insolvent or nearing insolvency at the time of—or rendered insolvent by—the improper transfers.").

4

FBG_CH1_00089997

**DEBTORS' EXHIBIT NO. 171**
**Page 7 of 61**
**JOINT EXHIBIT NO. 47**
**Page 7 of 61**

financial reporting; (3) off-balance-sheet financing involving the Onset (defined below), CarVal, Aequum, and Evolution Facilities; (4) supply-chain financing of accounts payable to First Brand's various vendors; and (5) third-party factoring of accounts receivable.   Allegations concerning these transactions require many more details with respect to Mr. James to support the claims asserted against him than appear in the Amended Complaint.[12]   Carried over from the Initial Complaint are the same bare-bones assertions with respect to Mr. James that are not sufficient to satisfy Federal Rule of Civil Procedure ("**Rule**") 9(b), which is applicable to nearly all the Amended Complaint's counts.

8.     **TRANSFERS TO "BENEFIT" MR. JAMES.**   While the Debtors finally identified the transfers they want returned, these span nearly *eight* years (2018-2025) and are scheduled with no explanation of the facts and circumstances surrounding any one of them.[13]   For each transfer, the Debtors must provide details regarding the supposed actual intent to hinder, delay, and defraud then-existing creditors accompanying each such transfer; explain how that intent was carried out by the transferring debtor; and illustrate how the transfer rendered the transferring-debtor insolvent.   The Debtors chide Mr. James for not having supplied an "accounting,"[14] but that has not been Mr. James' burden.   And the Debtors still have not produced relevant materials to Mr. James (including documents belonging to the Related Entities that the Debtors have refused to return) that would assist in comprehensively doing so.

9.     Regardless, collapsing these transactions and looking at the challenged transfers in the aggregate (as the Debtors do), it bears emphasizing that while the Debtors allege First Brands Holdings LLC distributed roughly $800 million directly or indirectly to Mr. James and the Related

---

[12]   *See* Am. Compl. ¶¶ 3, 5, 6, 7, 8, 9, 10, 17, 43, 44, 45, 49, 50, 53, 58-62, 64-69, 73, 78, 85, 92, 95-97, 101.

[13]   *See* Am. Compl. ¶¶ 11, 71-72; *id.* at Ex. A.

[14]   *See* Am. Compl. ¶ 73.

5

FBG_CH1_00089998

Entities, *over that same time period, Mr. James and the Related Entities subsequently transferred no less than approximately $600 million back into First Brands and other accounts to which First Brands had access.* In 2024 and 2025 alone, *these amounts totaled no less than approximately $400 million*—hardly conduct of "departing" CEO.  The significance of taking into account cash that flowed into First Brands from the Related Entities has been long established. *Swift v. Holdridge*, 1840 WL 44, at *2 (Ohio Dec. 1840) ("[If the so-called fraudulent alienee] has honestly parted with what he fraudulently received before the rights of the creditors are fixed . . . he must be exonerated from further liability. Though a party may have intended to defraud the creditors of a debtor by taking and converting his property into cash, such intent is rendered harmless by his delivering the proceeds of the sale to the debtor or his authorized agent.").  And separate from those amounts transferred *by* Mr. James and the Related Entities, the Debtors' own exhibits at the Preliminary Injunction Hearing indicated that more than $300 million of the amounts transferred *to* Mr. James were associated with tax distributions, *see infra*.

10.   Consideration of the context around the transfers, some of which can be gleaned from the face of the Amended Complaint, also is relevant.[15]  Among other things:

- the Debtors concede in the Amended Complaint—as they must—that the transfers were not concealed.  They appeared in the Company's general ledger;[16]

- according to Exhibit A to the Amended Complaint, nearly all of the payments originated from First Brands Group, LLC, a Delaware limited liability company owned by Mr. James.[17]  Delaware law purposely affords First Brands Group, LLC freedom to craft the

---

[15]   *Cf. Barnes v. Alexander*, 2011 WL 2552480, at *1 n.2 (S.D. Tex. June 27, 2011) ("Rule 8 does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions, and only a complaint that states a plausible claim for relief survives a motion to dismiss, a determination involving a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.") (internal quotations omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)).

[16]   *See* Am. Compl. ¶¶ 13, 81.

[17]   *See* Decl. of Charles M. Moore in Support of Debtors' Chapter 11 Pets. ¶ 14, Bankr. Dkt. No. 22 (the "**Moore Decl.**"); Tr., Adv. Proc. Hr'g Nov. 10, 2025 at 24:20-25:3 ("[DEBTORS' COUNSEL:]  You testified that First Brands organization includes over 100 entities. We just saw that on Exhibit 51, the web of entities. Can you tell the Court the ownership structure of those 100-plus entities?  [MR. MOORE:]  They eventually roll up to

6

members' rights and obligations as it deems fit.[18]   Also, pass-through entities like Delaware LLCs commonly reimburse their members for tax payments[19] and can otherwise distribute dividends when they are solvent;[20]

- significant portions of the payments were associated with tax distributions that Mr. James was responsible for as the ultimate owner of First Brands Group, LLC.  To provide just one example, the Debtors' Exhibit No. 4 from the Preliminary Injunction Hearing shows at least $145 million and $125 million relating to taxes in 2023 and 2024, respectively;[21]

- for "personal" reimbursements, the total challenged is just over $12 million out of $763 million—and of that, $10 million was for a "tax distribution;"[22]

- according to the general ledger, the transfers include "dividends" from First Brands Group, LLC, but there is no prohibition against a limited liability company making dividend payments to its sole member when the company is solvent (and as discussed herein, the Amended Complaint does not actually plead insolvency of any entity at any time);

- the Amended Complaint assumes First Brands (as a consolidated enterprise) was insolvent from 2018 to 2025.[23]   Putting aside the lack of insolvency allegations on a debtor-by-debtor basis, more generally that position is not plausible; and

- the Debtors maintain as much as "$12 billion" flowed through the Bowery Finance II LLC account, some of which was used "to meet repayments due to Onset," a purported creditor claiming it is owed nearly $2 billion in the chapter 11 cases.[24]

11.     **FINANCIAL REPORTING.**  The Debtors allege nebulously that financial reporting was not accurate,[25] but do not provide specific detail to explain those assertions.  Nonetheless,

---

ownership by Mr. Patrick James. [DEBTORS' COUNSEL:]  So is Mr. James the sole owner of each and one of those entities?  [MR. MOORE:]  That's my understanding.").

[18]   *See* 6 Del. Code § 18-1101(b) ("It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements.").

[19]   *Cf. In re F-Squared Inv. Mgmt., LLC*, 633 B.R. 663, 671 (Bankr. D. Del. 2021) (gathering cases "where the respective courts found reasonably equivalent value for tax distributions because the debtor elected into a pass-through tax status").

[20]   The Delaware Limited Liability Act provides that an LLC may not make a distribution to any member if, after giving effect to the distribution, all liabilities of the LLC exceed the fair market value of its assets.  6 Del. Code § 18-607(a).

[21]   *See* Tr., Adv. Proc. Hr'g Nov. 10, 2025 at 90:2-91:8.

[22]   *See* Am. Comp. ¶¶ 14, 75, 78, 88, 90, 96.

[23]   *See id.* ¶¶ 17, 103-105.

[24]   *See* Am. Compl. ¶ 61.

[25]   *See id.* ¶¶ 8, 41, 67-70.

7

FBG_CH1_00090000

**DEBTORS' EXHIBIT NO. 171**
**Page 10 of 61**
**JOINT EXHIBIT NO. 47**
**Page 10 of 61**

this portion of the Amended Complaint—to the extent not dismissed outright—calls for a more definite statement pursuant to Rule 12(e).  The Debtors say generically that Mr. James "manipulat[ed] . . . books" and "concealed First Brands' true financial condition . . . by personally directing the alterations of First Brands financial statements" and that he "directed senior First Brands executives, including Brumbergs, to make these alterations."[26] But Mr. James cannot defend against these allegations if the Debtors cannot list the figures and financial statements that were manipulated.[27]  The only actual allegation of manual changes to financial statements is not made with respect to Mr. James.[28]  And the Debtors' theory is inconsistent with the Amended Complaint's acknowledgment that the Company maintained a general ledger[29] as well as testimony from the Preliminary Injunction hearing that payments to and from the Patrick James Trust appeared in that general ledger.[30]  At minimum, the Debtors should be required to file an amended complaint providing a more definite statement or to abandon the theory because Mr. James cannot defend against opaque statements.

12.    **OFF-BALANCE-SHEET FINANCING.**  None of the Amended Complaint's allegations about off-balance-sheet financing contain specific factual allegations implicating Mr. James or connect him to the supposed double pledging of collateral.[31]  Moreover, the Debtors brought a

---

[26]    *See id.* ¶¶ 67-68, 70.

[27]    *In re Kovacs*, 2021 WL 1603600, at *12 (Bankr. E.D.N.Y. Apr. 23, 2021) ("Reciting reliance on unspecified financial documents in alleging material falsity or fraud falls short of the heightened pleading requirements of Rule 9(b).") (cleaned up).

[28]    See Am. Compl. ¶ 108.

[29]    *See id.* ¶¶ 13, 81; Tr., Adv. Proc. Hr'g Nov. 10, 2025 at 90:2-91:16.; Adv. Proc. Hr'g Nov. 12, 2025. at 24:7-9.

[30]    *See* Tr., Adv. Proc. Hr'g Nov. 12, 2025 at 24:7-9; Tr., Adv. Proc. Hr'g Nov. 10, 2025 at 152:22-24 ("[F]rom 2020 . . . through on or around December 31st, 2024, BDO provided an audit report for First Brands.").

[31]    *See* Am. Compl. ¶¶ 6, 53-61; *see also* Tr., Adv. Proc. Hr'g Nov. 10, 2025 at 134:7-20 ("[DEFENDANTS' COUNSEL:]  Okay.  But you don't have a statement where he directed people—you don't have a statement made by him with respect to the double-pledging of assets.  Isn't that correct?  You haven't identified a single statement that he made in your testimony today, or in this affidavit, about the double-pledging of assets. Correct? [MR. MOORE:]  Mr. James never said that he did, but he never said that he didn't, either.  [DEFENDANTS' COUNSEL:]  So the answer to my question is yes, sir.  You have not identified a single statement made by Mr.

8

FBG_CH1_00090001

separate lawsuit against Edward James and Onset Financial Inc. ("**Onset**") challenging their overreaching and usurious lending practices, exorbitant fees, and grossly-inflated claims.[32]  The Onset lawsuit shows the extent to which the Amended Complaint's allegations do not tie to Mr. James; it maintains that the alleged misconduct of the defendants in that case was done in secret, without others' knowledge (even Mr. James).[33]  Onset contends its claims against First Brands total $1.9 billion, but incidentally Onset has a guaranty from Viceroy Private Capital, LLC that is inconsistent with its claim to be an equipment lender and more consistent with a commercial payday loan.   Regardless, these off-balance-sheet lenders' predatory practices drilled the Company in the weeks leading up to the chapter 11 filing and the lenders themselves may face liability for avoidable transfers, recharacterization of their alleged debt, equitable subordination, or improperly charging unconscionable fees and defaulting the Company.[34]

13.   **SUPPLY-CHAIN FINANCING OF ACCOUNTS PAYABLE TO VENDORS.**  The Amended Complaint adds this form of financing to those challenged in the Initial Complaint, *e.g.*, factoring and off-balance-sheet financing.  But the Debtors do not explain the alleged wrongdoing or Mr. James' involvement.  Their complaint is that supply-chain financing involving accounts

---

James in connection with the allegations in paragraph 29 in your testimony today, or in the affidavit.  Yes, or no?  [MR. MOORE:]  My response is he never made a statement either way, either denying it or affirming it.").  While the Amended Complaint claims Mr. James received financing extended by Onset, it does not indicate the amount, the date, time, or transferor with respect to those amounts.

[32]   *See First Brands Group, LLC v. Onset Financial, Inc.*, Adv. Proc. No. 26-03005 (the "**Onset Litigation**").

[33]   *See, e.g.*, Onset Litigation, Dkt. No. 1, Compl. ¶¶ 78, 84, 96-98.

[34]   *See, e.g.*, Moore Decl. ¶ 15 ("[U]pcoming maturity events, pressure from counterparties, and unrelenting systemic factors catalyzed a mounting liquidity crisis.  Operational pressures rose as counterparties alleged that the Company was in default on certain financial obligations, threatened to exercise remedies, and/or demanded unconscionable late fees . . . .  This onslaught of factors gave the Company little time to design, evaluate, and execute a complex restructuring solution.").

9

FBG_CH1_00090002

**DEBTORS' EXHIBIT NO. 171**
**Page 12 of 61**
**JOINT EXHIBIT NO. 47**
**Page 12 of 61**

payable to First Brand's vendors was not properly recorded on First Brand's balance sheet.[35] Many of their allegations are "upon information and belief."

14. **THIRD-PARTY FACTORING OF ACCOUNTS RECEIVABLE.** Other than alleging in conclusory fashion that the third-party factoring practices were "under [Mr.] James' leadership and direction," and that "First Brands, at [Mr.] James' direction, fabricated and sold non-existent receivables to third parties," the Amended Complaint does not detail Mr. James' alleged misconduct concerning factoring.[36] The Amended Complaint refers to conversations regarding certain invoices, but none of these implicate Mr. James.[37] And during the Preliminary Injunction Hearing it was observed that invoices referred to in paragraph 51 of the Amended Complaint were modified by a representative from a third-party factor, and in some instances the modified amounts were lower than recorded.[38]

15. Also, the Amended Complaint does not account for the Debtors' own evolving theories with respect to First Brand's so-called Third-Party Factoring. The Debtors noted on the first day of the chapter 11 cases their concern about these arrangements and their Special

---

[35] *See* Am. Compl. ¶¶ 7, 62-66.

[36] Am. Compl. ¶¶ 49, 5245, 55; *see, e.g., id.* ¶¶ 37, 47-55.

[37] *See id.* ¶ 51; Tr., Adv. Proc. Hr'g Nov. 12, 2025 at 23:8-15 ("In James' defense, there's nothing I saw where he's personally directing anyone to do anything. There are messages from parties indicating he is aware and messages between parties saying James wants funds transferred. I'm not sure what all that means yet. There's nothing showing that James, himself, was manipulating invoices, but it's clear First Brands was moving tens of millions of dollars through unaffiliated accounts.").

[38] *See* Tr., Adv. Proc. Hr'g Nov. 10, 2025 at 61:14-20 ("[DEBTORS' COUNSEL:] And so that's an instance where the invoice number was not inflated . . . . Were there also some instances in the nomination packet sent to Katsumi or other third-party factors where there was no change reflected in the invoice value? [MR. MOORE:] Yes."); *id.* at 62:7-12 ("[DEBTORS' COUNSEL:] So we've now seen examples of invoices that were increased at significant proportions, and we've seen examples of invoices that were decreased, and we've seen at least one example where the invoice stayed the same. Despite that smattering of decreased invoices, unchanged invoices . . . ."); *id.* at 129:19-22 ("[DEFENDANTS' COUNSEL:] And so the schedule that you testified about today was the schedule that [Katsumi representative] attached to her email. Correct? [MR. MOORE:] Yes."); *id.* at 130:2-5 ("[DEFENDANTS' COUNSEL:] So that's Mr. Brumbergs' file [from First Brand's], but [Katsumi representative] created her own file, and that's the one you testified to. Correct? [MR. MOORE:] She updated the file that he had sent for the specific areas that she mentioned.").

10

FBG_CH1_00090003

**DEBTORS' EXHIBIT NO. 171**
**Page 13 of 61**
**JOINT EXHIBIT NO. 47**
**Page 13 of 61**

Committee's investigation into them.[39] It is becoming clearer that substantively these financings were something different than standard third-party factoring. Typically, a factor purchases the company's account receivable owing from a customer at a discount to face value and then removes the company from the relationship.[40] That did not happen here. First Brands kept servicing the receivable; and the factors became lenders to First Brands, extending an unsecured loan at high interest rates, *e.g.*, in the mid-teens.[41] Yet at the same time, those lenders were giving their investors and limited partners an alternative explanation, *i.e.*, that they were exposed to Walmart—not First Brands.[42]

---

[39]     Moore Decl. ¶¶ 32, 72.

[40]     *See* Black's Law Dictionary (12th ed. 2024) (defining "factoring" as "[t]he buying of accounts receivable at a discount. The price is discounted because the factor (who buys them) assumes the risk of delay in collection and loss on the accounts receivable."); *id.* (defining "factor's lien" as "[a] lien, usu. statutory, on property held on consignment by a factor. It allows the factor to keep possession of the property until the account has been settled.").

[41]     *See, e.g.*, Tr., Adv. Proc. Hr'g Nov. 10, 2025 at 147:5-19 ("[DEFENDANTS' COUNSEL:] [T]hese are payments that were made to . . . Katsumi, . . . Jefferies—These are lenders to First Brands and/or its affiliates[?] . . . [MR. MOORE:] These are not lenders. These are third-party factors . . . [DEFENDANTS' COUNSEL:] But they're creditors of the company. Correct? [MR. MOORE:] They shouldn't be. In a normal factoring arrangement, they would have purchased the invoices from the company. [DEFENDANTS' COUNSEL:] But they're receiving funds from the company, according to this schedule. Correct? [MR. MOORE:] They are supposed to be, yes . . . . But that's one of the red flags . . . ."); Debtors' Factoring Procedures Mot. ¶ 1, Bankr. Dkt. No. 807 ("Under the structure of the Factoring Facilities, even though the Company had technically sold the receivable to a Third-Party Factor, the Company continued to service the Factored Receivable (i.e., the Customer would remit the payment to the Company once the receivable became due and the Company would then transfer the amount owed to the Third-Party Factor related to that particular receivable.)); Eric Platt et al., *First Brands Financier Says 'A Lot of People Made a Lot of Money' From Bankrupt Group*, Fin. Times, Dec. 3, 2025, https://www.ft.com/content/40e93423-b551-478c-ab0d-447a62dcfda5 ("First Brands often paid interest in the mid-teens percentage range, compared with the typical 5 to 8 per cent that might be charged on similar loans."); Alexander Gladstone & Lauren Thomas, *How Jefferies Found Itself at the Center of the First Brands' Collapse*, Wall St. J., Oct. 16, 2025, https://www.wsj.com/finance/how-jefferies-found-itself-at-the-center-of-first-brands-collapse-290f0a74 ("Jefferies' asset management arm, Leucadia, had become one of First Brands' biggest financiers by purchasing First Brands' accounts receivables, an arrangement known as factoring. Beginning in 2019, it had been buying the company's expected payments from retailers . . . . First Brands made near-daily payments to Point Bonita [a Leucadia entity] for years, as customers paid invoices on the roughly $715 million in accounts receivable that Point Bonita held.").

[42]     *See, e.g.*, Kaye Wiggins & Ortenca Aliaj, *SEC Probes Jefferies over First Brands*, Fin. Times, Nov. 27, 2025, https://www.ft.com/content/86d90ce5-5800-4514-a757-f46a38aa521d ("The US Securities and Exchange Commission is investigating investment bank Jefferies over its relationship with collapsed car parts company First Brands Group. The regulator is seeking information about whether Jefferies gave investors in its Point Bonita fund enough information about their exposure to the auto business . . . . It is also looking into internal controls and potential conflicts within and between different parts of the bank. . . . [A] specialist invoice-finance fund [Jefferies] manages, Point Bonita Capital, had about $715mn invested in 'receivables'—money owed under

11

FBG_CH1_00090004

**DEBTORS' EXHIBIT NO. 171**
**Page 14 of 61**
**JOINT EXHIBIT NO. 47**
**Page 14 of 61**

### C.   ALLEGATIONS MADE ON AN EVOLVING RECORD

16.   These cases started with the Debtors casting aspersions exclusively at Mr. James. Yet as time passes and more facts emerge, it becomes increasingly clear that other parties that the Debtors have not targeted with estate claims are not free from responsibility for the transactions they now challenge.  It also is important to note what is now being said out loud in the market: First Brands' financiers earned significant amounts of money from their relationships with First Brands.  Raistone, who was supposedly so disgruntled with First Brands that it was the first party to seek the appointment of an examiner,[43] openly admitted during a conference in New York in December that "*a lot of people made a lot of money over many, many, years on First Brands . . . . So they're not all sad.  They're not all kicking themselves*."[44]  Indeed, while the Debtors are pursuing Mr. James and the Related Entities for roughly $700 million in transfers over the course of nearly eight years, such lenders captured billions of dollars in interest and fees

---

customer invoices — from retailers that bought First Brands products such as windscreen wipers to sell to consumers. *Jefferies has said the receivables were due from blue-chip companies including Walmart. Point Bonita documents did not list any exposure to First Brands as of June, but showed that the fund's second and third largest exposures were to its customers, Walmart and auto parts retailer O'Reilly* . . . .  Bankruptcy filings have confirmed that invoice lenders that provided $2.3bn of financing linked to receivables were all paid by First Brands rather than its customers . . . .  The Financial Times also reported in October that Jefferies earned extra fees on financing it provided to First Brands through a 'side letter' with the company, which some lenders said was not disclosed to them and may have violated the terms of their loan.  Jefferies has since confirmed the existence of the arrangement.  It stated that First Brands received a legal opinion confirming the fees did not breach its loan terms and that a document listing the letter was disclosed to all of the group's lenders." (emphasis added)).

[43]   *See* Emergency Mot. of Raistone Parties For Appointment of Examiner Pursuant to Section 1104(c) of Bankruptcy Code, filed by Raistone Capital LLC and Raistone Purchasing LLC—Series XXXII (collectively, "**Raistone**"), Bankr. Dkt. No. 307.

[44]   *See* Eric Platt et al., *First Brands Financier Says 'A Lot of People Made a Lot of Money' From Bankrupt Group*, Fin. Times, Dec. 3, 2025, https://www.ft.com/content/40e93423-b551-478c-ab0d-447a62dcfda5 ("One of the largest middle men in the First Brands' financings has said that 'a lot of people made a lot of money' lending to the bankrupt car parts maker, as they chased the high yields that it paid on its debt.  The comments came from Raistone chief executive David Skirzenski on Wednesday at a conference for investors in trade and supply chain finance . . . .  'Frankly a lot of people made a lot of money over many, many, years on First Brands,' Skirzenski said at the Global Trade Review annual conference in New York.  'So they're not all sad.  They're not all kicking themselves.'").

12

FBG_CH1_00090005

over the past several years alone.  These lenders seem content to have all the focus on Mr. James, be it from the Debtors or a Court-appointed examiner.

17.     Unfortunately, the zeal to prosecute Mr. James may have needlessly destroyed value.  Chronic disparagement of the Company from all constituencies in the cases veiled as attacks on its founder and prior management has harmed the business.  Had parties been more circumspect, they might have preserved the inherent and significant value associated with a business that spanned five continents and employed 26,000 people;[45] that had twenty-five well-known brands exclusively supplying the auto industry's largest after-market customers, including well-known automotive retailers (Napa Auto Parts, AutoZone, O'Reilly, and Advanced Auto Parts), national retailers (Walmart and Costco), and original equipment manufacturers (OEMs); and that weathered COVID and interest rate hikes.[46]

## SUMMARY OF LEGAL ARGUMENT

18.     The now eleven (11) count[47] Complaint sounds in fraud without satisfying Rule 9(b)'s stringent standards; alleges things like accounting fraud without any definiteness;

---

[45]   *See, e.g.*, Declaration Of Charles M. Moore In Support Of Debtors' Chapter 11 Petitions ¶¶ 8-10., Bankr. Dkt. No. 22 (the "**Moore Decl.**").

[46]   *See* Moore Decl. ¶ 12 ("Although the Company has implemented this acquisition strategy to great effect over the past fifteen years, in recent months geopolitical uncertainty and headwinds from newly imposed tariffs have pressurized global supply chains and layered additional complications to the Company's Operations …. At the same time, the Company faced mounting funded debt and lease obligations between May and August 2025, particularly with respect to its equipment and inventory lessor, Onset.  These factors snowballed into a liquidity crisis . . . ."); Tr., Hr'g Ch. 11 First Day at 21:11-19 ("[DEBTORS' COUNSEL:]  [H]ow did we get here? . . . We'll start off with the tariffs . . . .  The tariffs have caused additional landing costs for good for the company, but also provided the company with an opportunity, given where some of its facilities were, to try to minimize the future exposure to tariffs, especially between the United States and Mexico, but that required capital and reinvestments.").

[47]   The Counts are: Count 1:  Turnover Of Estate Property Pursuant to 11 U.S.C. § 542; Count 2:  Actual Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(A), 544(b), Ohio Rev. Code Ann. § 1336.04(A)(1), 6 Del. Code § 1304(a)(1); Count 3:  Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 544(b), Ohio Rev. Code Ann. § 1336.04(A)(2), 6 Del. Code § 1304(a)(2); Count 4:  Money Had and Received Pursuant to Ohio Law; Count 5:  Unjust Enrichment Pursuant to Delaware and Ohio Law; Count 6:  Constructive Trust Pursuant to Delaware and Ohio Law; Count 7:  Accounting Pursuant to Delaware and Ohio Law; Count 8:  Illegal Dividend and Unlawful Distribution Pursuant to 8 Del. C. § 170, 8 Del. C. § 174, and 6 Del. C. § 18-607; Count

13

**DEBTORS' EXHIBIT NO. 171**
**Page 16 of 61**
**JOINT EXHIBIT NO. 47**
**Page 16 of 61**

engages in impermissible group pleading; and pleads counts with imprecision on critical elements. Even with the Debtors' free amendment, they still have not detailed their theory of Mr. James' or the Related Entities' supposed contributions to fraudulent activity on a defendant-by-defendant basis, *i.e.,* the "who, what, when, where, and why as to the fraudulent conduct," as they must.[48] Other than collective references to defrauding lenders,[49] the Amended Complaint does not identify specific statements that Mr. James or any of the Related Entities made; indicate to whom Mr. James or the Related Entities made them; explain how the statement was false or how its recipient relied on the statement to its detriment; or list the date(s) when this supposedly occurred.[50] Nor does it contain anything but conclusory allegations suggesting that others acted at Mr. James' direction; there are no documents or specifics detailing such direction at any time, let alone as to each of the hundreds of purportedly fraudulent transfers.

---

9: Breach of Fiduciary Duty pursuant to Delaware Law; Count 10: Aiding and Abetting Breach of Fiduciary Duty under Delaware Law; and Count 11: Civil Conspiracy pursuant to Ohio Law.

[48] *In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 733 (Bankr. S.D. Tex. 2020) ("Rule 9 applies whenever fraud is an essential part of the claim. In an actual fraudulent transfer case, fraud is an essential element . . . . the Trustee must plead the who, what, when, where, and why as to the fraudulent conduct . . . . General allegations, which lump all defendants together failing to segregate the alleged wrongdoing of one from those of another do not meet the requirements of Rule 9(b).") (internal citations and quotations omitted).

[49] *See* Am. Compl. ¶¶ 4, 13, 17, 136, and the handful of instances where the Debtors claim third parties had an understanding of what Mr. James wanted. *See* Am. Compl. ¶¶ 78, 79, 88, 89, 90, 96.

[50] *See In re RSL COM PRIMECALL, Inc.*, 2003 WL 22989669, at *7 (Bankr. S.D.N.Y. Dec. 11, 2003) (dismissing fraud claims because of insufficient allegations concerning multiple defendants: "simply stating that [one defendant] was 'insolvent from inception' and that Defendants—all eighteen of them—are somehow culpable does not comport with the requirements of Rule 9(b)."); *Mascaro Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 2011 WL 856805, at *10 (S.D. Fla. Mar. 8, 2011) (Where there are multiple claimants, Rule 9(b) "require[s] that each Plaintiff must support its fraud claims on a showing of individualized facts and proofs" and dismissing the plaintiffs' complaint because plaintiffs "failed to separate their unique transactions into different claims."); *In re Shipley Garcia Enters., LLC*, 2014 WL 1329252, at *4 (Bankr. S.D. Tex. Mar. 28, 2014) (Rule 9(b) requires facts as to "each individual defendant" rather than "lumping the defendants together." (internal quotations and citations omitted)); *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 382 (S.D. Tex. 2011) ("[G]eneral allegations, which lump all defendants together failing to segregate the alleged wrongdoing of one from those of another, do not meet the requirements of Rule 9(b)."), *aff'd sub nom. Harold Roucher Trust U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012).

14

FBG_CH1_00090007

**DEBTORS' EXHIBIT NO. 171**
**Page 17 of 61**
**JOINT EXHIBIT NO. 47**
**Page 17 of 61**

19.     The Related Entities are referenced substantively in two paragraphs as "upon information and belief" having received funds.[51] Nothing more is said about them.

20.     Scant as they are, though, the allegations of wrongdoing do present a significant obstacle—for the Debtors.  The Debtors cannot surmount *in pari delicto* given the Company's alleged involvement.[52]

21.     In any event, each individual Count suffers from its own infirmities, as detailed below and herein.

- ***Count 1:  Turnover***.  Section 542 of the Bankruptcy Code does not provide for entry of a money judgment.  It further requires specifically identified property, title to which is not in dispute.[53]  The Amended Complaint is devoid of such allegations.

- ***Count 2:  Actual Fraudulent Transfer***.  The Amended Complaint does not properly plead an actual intent to hinder, delay, or defraud creditors because it contains no specific facts for each of Mr. James and the respective Related Entities.[54]  The intent of the ***transferor*** is the legally relevant one—not that of any initial or subsequent transferee.[55]  By opting to lump individuals and entities together, the Amended Complaint never states with the necessary precision whose intent controlled or what that intent was.  Moreover, $272,998,087 of the transfers alleged by the Debtors fall outside the relevant lookback periods under federal law and $54,548,487 outside the state-law lookback periods.

---

[51]  Am. Compl. ¶¶ 61, 65.

[52]  *See Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008) (under the defense of *in pari delicto*, "a plaintiff's recovery may be barred by his own wrongful conduct"); *Matter of Royale Airlines, Inc.*, 98 F.3d 852, 855 (5th Cir. 1996) (same).

[53]  *See In re ATP Oil & Gas Corp.*, 2015 WL 1093568, at *3 (Bankr. S.D. Tex. Mar. 10, 2015) ("Section 542 is inapplicable when there is a title dispute between parties."); *In re Alofs Mfg. Co.*, 209 B.R. 83, 97 (Bankr. W.D. Mich. 1997) (until title passes to debtors, property is not part of the Debtors' estate).

[54]  *See In re Juliet Homes, LP*, 2010 WL 5256806, at *19 (Bankr. S.D. Tex. Dec. 16, 2010) (applying Rule 9(b)'s heightened pleading standards to actual fraudulent transfer claims); *In re Northstar*, 616 B.R. at 732 ("under Rule 9(b), the plaintiff must plead the who, what, when, where, and why as to the fraudulent conduct") (citation omitted)).

[55]  *See SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) (TUFTA requires a finding of fraudulent intent on the part of the "debtor"; the transferee's participation is irrelevant); *In re Andrew Velez Constr., Inc.*, 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007) (transferee's intent irrelevant; dismissing claim because "the Complaint has no allegations whatsoever of the Debtor's own intent to hinder, delay, or defraud its creditors"); *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 444 (S.D.N.Y. 2001) ("The only inquiry concerning actual intent that matters is that of the debtor").

15

FBG_CH1_00090008

**DEBTORS' EXHIBIT NO. 171**
**Page 18 of 61**
**JOINT EXHIBIT NO. 47**
**Page 18 of 61**

- ***Count 3: Constructive Fraudulent Transfer; Count 8: Illegal Dividend.***
  Insolvency and lack of reasonably equivalent value have not been pled on a transfer-by-transfer, debtor-by-debtor, defendant-by-defendant basis.[56]  Indeed, insolvency is only pled in a conclusory fashion without any supporting factual allegations at all.  In fact, what the Debtors actually allege is that the Company was "insolvent or nearly insolvent"—which, given the disjunctive nature of the statement, does not even amount to a conclusory allegation of actual insolvency as of any date.  Further, it is not plausible that any transferring entity within the Company was insolvent years ago yet continued operating until 2025.  In addition, all of the early transfers are outside the applicable lookback periods as delineated above and outside of the statute of repose under Delaware law for illegal dividends.[57]

- ***Count 4: Money Had And Received; Count 6: Constructive Trust; Count 7: Accounting.***  Each of these claims suffers from the same problem beleaguering the avoidance counts.  The Debtors do not identify and trace the funds at issue with sufficient precision.[58]

---

[56]  *See In re Lyondell Chem. Co.*, 567 B.R. 55, 104-05, 107 (Bankr. S.D.N.Y. 2017) (finding testimony "regarding [debtor's] insolvency on a consolidated basis" to be "seriously flawed;" observing "Maxwell's testimony regarding LBI's insolvency is simply not reliable.  Notably, the Trustee chose not to present specific evidence of Lyondell's stand-alone insolvency at trial"); *ATP Oil*, 711 F. App'x at 216 (insolvency not pled by "conclusory assertions about . . . financial condition and subjective determinations regarding the amount of available capital"); *In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 733 (Bankr. S.D.N.Y. 2008) (plaintiff must "specify the property that was allegedly conveyed, the timing and frequency of those allegedly fraudulent conveyances, and the consideration paid" (citation omitted)); *Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, 2006 WL 2802092, at *9 (E.D.N.Y. Sept. 28, 2006) (dismissing fraudulent transfer claims that lumped a series of cash transfers made over three-to-five-year periods and failed to identify how many transfers were being challenged or specific dates or amounts of those transfers).

[57]  *See In re Extended Stay, Inc.*, 2020 WL 10762310, at *97 (Bankr. S.D.N.Y. Aug. 8, 2020) ("[F]act[s] necessary to establish liability" when alleging an Illegal Dividend claim include "the dates, amounts and recipients of [the] dividends and distributions" and by whom they were "authorized."); *ATP Oil*, 711 F. App'x at 223 (finding the "conclusory assertions about . . . financial condition and subjective determinations regarding the amount of available capital" do not state a claim); *In re Northstar*, 616 B.R. at 738 (connection between the two transactions was "far too tenuous;" declining to "leap from 2012 to 2014" (citation omitted)); *In re Bateman*, 2012 WL 3061181, at *4, *4 n.1 (Bankr. E.D.N.C. July 26, 2012) ("[T]he Amended Complaint fails on its face . . . under the *Twombly* and *Iqbal* pleading standards . . . .  The petition date was over a year and a half after the transfer date.  As such, the Amended Complaint fails to reasonably allege the value of the Property at the time of the transfer."); *In re Nanodynamics, Inc.*, 474 B.R. 422, 427-28, 427 n.5 (Bankr. W.D.N.Y. 2012) (rejecting plausibility of allegations of insolvency between 90 days and one year before petition date; noting "Twombly and Iqbal call upon a court to use its 'experience.'").  *Cf. MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) ("That the company remained viable so long after the LBO strongly suggests that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the buyout."); *Credit Managers Assoc. of S. Cal. v. Fed. Co.*, 629 F. Supp. 175, 186-87 (C.D. Cal. 1986) (refusing to find unreasonably small capital when debtor "pa[id] its creditors and its debt service" for twelve months after transaction).

[58]  *See, e.g., LRC Realty, Inc. v. B.E.B. Props.*, 166 N.E.3d 37, 41 (Ohio Ct. App. 2020) (money had and received requires showing defendant "acted to withhold money that in justice and equity belonged to another"); *Estate of Cowling v. Estate of Cowling*, 847 N.E.2d 405, 412 (Ohio 2006) ("[B]efore a constructive trust can be imposed, there must be adequate tracing from the time of the wrongful deprivation of the relevant assets to the specific property over which the constructive trust should be placed."); *Phillippi v. Jim Phillippi, Inc.*, 2009 WL 1911763,

16

FBG_CH1_00090009

DEBTORS' EXHIBIT NO. 171
Page 19 of 61
JOINT EXHIBIT NO. 47
Page 19 of 61

- ***Count 5: Unjust Enrichment.*** The Debtors do not identify the specific payments that they argue unjustly enriched Mr. James and the Related Entities.

- ***Counts 9 and 10: Breach of Fiduciary Duty and Aiding & Abetting Breach of Fiduciary Duty.*** As the Amended Complaint seems to recognize,[59] the broad exculpatory provisions in the formation documents for First Brands Group, LLC and other relevant Debtors preclude fiduciary duty claims. The Delaware Limited Liability Company Act reflects the legislature's intent that limited liability companies are creatures of contract under which parties can agree to exculpate fiduciary obligations in a way not available with respect to Delaware corporations.[60] The limited liability agreements here offer broad exculpations.[61] Additionally, a limited liability company's members can rely on professionals to protect their decisions from rebuke.[62] And even if Mr. James was party to a "conflicted" transaction, every conflicted transaction is not presumptively illegal.[63]

---

at *3 (S.D. Ohio June 26, 2009) ("A bare allegation that the plaintiff is entitled to an accounting without any legal basis is insufficient to state a claim.").

[59] *See* Am. Compl. ¶¶ 193-204.

[60] *See* 6 Del. Code § 18-1101(e) ("A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company."); *DG BF, LLC v. Ray*, 2021 WL 776742, at *10 (Del. Ch. Mar. 1, 2021) ("[W]hile somewhat analogous to 8 Del. Code § 102(b)(7), which authorizes a corporation to adopt provisions limiting liability for a director's breach of the duty of care, Section 18-1101(e) goes further by allowing broad exculpation of all liabilities for breach of fiduciary duties—including the duty of loyalty." (internal quotations and citations omitted)); *CML V, LLC v. Bax*, 6 A.3d 238, 249-250 (Del. Ch. 2010) ("[T]he conceptual underpinnings of the corporation law and Delaware's alternative entity law are different." (citation omitted)); *In re Bayou Steel BD Holdings, LLC*, 642 B.R. 371, 401 (Bankr. D. Del. 2022) (noting that the Delaware Limited Liability Company Act "is broad, allowing exculpation of all liabilities for breach of fiduciary duty, including the duty of loyalty").

[61] *See, e.g.*, First Brands Group, LLC, LLC Agreement § 8.3 ("No Fiduciary Duties. Any duties (including fiduciary duties) . . . that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law . . . [W]hen any Covered Person takes any action under this Agreement to give or withhold its consent, such Covered Person shall have no duty(fiduciary or other) to consider the interests of the Company, its Subsidiaries, or the other Members, and may act exclusively in its own interest"); *MKE Holdings, Ltd. v. Schwartz*, 2019 WL 4723816, at *22 (Del. Ch. Sep. 26, 2019) ("Verdesian was formed as a Delaware limited liability company and, therefore, pursuant to Delaware law its operating or governing agreement may eliminate the fiduciary duties its managers would otherwise owe."); *Marubeni Spar One, LLC v. Williams Field Services – Gulf Coast Company, L.P.*, 2020 WL 64761, at *10 (Del.Ch., 2020) ("LLC agreements import corporate fiduciary duties by default, unless the pertinent agreement provides to the contrary. The parties to LLC agreements are free, however, to impose or eschew what duties they like; indeed, that is one of the advantages of the LLC form of entity.").

[62] *See* 8 Del. Code § 141(e) (Under Delaware law, these directors are "fully protected in relying in good faith upon . . . opinions . . . presented … by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care . . . .").

[63] *See In re Match Grp., Inc. Derivative Lit.*, 315 A.3d 446, 461 (Del. 2024), 315 A.3d 446, 461 (Del. 2024) ("[I]t is important to recognize that an interest conflict is not in itself a crime or tort necessarily injurious to others . . . . [H]aving a 'conflict of interest' is not something one is 'guilty of.'" (internal citation and quotations omitted)).

17

FBG_CH1_00090010

**DEBTORS' EXHIBIT NO. 171**
**Page 20 of 61**
**JOINT EXHIBIT NO. 47**
**Page 20 of 61**

- ***Count 11: Civil Conspiracy.*** The Amended Complaint lacks particular explanation of how Mr. James, Mr. Brumbergs, Mr. Graham, and Mr. Baker worked in concert.[64] Civil conspiracy requires an underlying tort and specific meeting of the minds from the outset, neither of which is pled. Instead, the Amended Complaint relies on an insufficiently pled fraudulent transfer claim to support a "conspiracy." That is not sufficient. Nor can employees of the same company "conspire" with one another under the intracorporate conspiracy doctrine.

22.    To summarize:

| COUNTS | ALTERNATIVE BASES FOR DISMISSAL |
|---|---|
| **Count 1:** Turnover Of Estate Property Pursuant to 11 U.S.C. § 542 | • § 542(a) does not provide for entry of a money judgment<br>• Title to property is disputed |
| **Count 2:** Actual Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(A), 544(b), Ohio Rev. Code Ann. §§ 1336.04(A)(1), 6 Del. Code § 1304(a)(1) | • Fed. R. Civ. P. 9(b) not satisfied<br>• Intent of transferor not identified<br>• Transfers not "for the benefit" of any Defendants<br>• Transfers fall outside the applicable lookback periods |
| **Count 3:** Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B), 544(b), Ohio Rev. Code Ann. §§ 1336.04(A)(2), 6 Del. Code § 1304(a)(2) | • Insolvency not properly pled<br>• Lack of reasonably equivalent value not properly pled<br>• Transfers not "for the benefit" of any Defendants<br>• Transfers fall outside the applicable lookback period |
| **Count 4:** Money Had and Received | • Barred at least in part by statute of limitations<br>• Fed. R. Civ. P. 8 not satisfied, e.g., no assets of Debtors' wrongfully retained<br>• Barred by *in pari delicto* |
| **Count 5:** Unjust Enrichment | • Barred at least in part by statute of limitations<br>• Fed. R. Civ. P. 8 not satisfied, e.g., no assets of Debtors' wrongfully retained<br>• Barred by *in pari delicto* |
| **Count 6:** Constructive Trust | • Not a stand-alone cause of action<br>• Barred at least in part by statute of limitations<br>• Barred by *in pari delicto*<br>• Fed. R. Civ. P. 9(b) not satisfied to extent predicated on fraud<br>• No identifiable res<br>• Tracing not alleged sufficiently |
| **Count 7:** Accounting | • Not a stand-alone cause of action<br>• Barred by *in pari delicto* |

---

[64]    *See* Am. Compl. ¶¶ 9, 43, 44.

18

FBG_CH1_00090011

**DEBTORS' EXHIBIT NO. 171**
**Page 21 of 61**
**JOINT EXHIBIT NO. 47**
**Page 21 of 61**

| COUNTS | ALTERNATIVE BASES FOR DISMISSAL |
|---|---|
| | • Fed. R. Civ. P. 8 not satisfied, e.g., no listing of transfers by day, date, amount, transferor, transferee<br>• Fed. R. Civ. P. 9(b) not satisfied to extent predicated on fraud<br>• Discovery provides an adequate remedy |
| **Count 8:** Illegal Dividend and Unlawful Distribution Pursuant to 8 Del. Code § 170, 8 Del. Code § 174, and 6 Del. C. § 18-607 | • Barred at least in part by statute of repose<br>• Insolvency/lack of surplus not properly pled<br>• Fed. R. Civ. P. 8 not satisfied, e.g., no listing of purported "dividends"<br>• Willful or negligent acts not identified |
| **Count 9, Count 10:** Breach of Fiduciary Duty, Aiding & Abetting Breach of Fiduciary Duty | • Barred at least in part by statute of limitations<br>• Exculpated under Limited Liability Company Agreements<br>• Fed. R. Civ. P. 8 not satisfied, e.g., which Debtor is asserting claim, no factual support for elements<br>• "Knowing participation" not alleged |
| **Count 11:** Civil Conspiracy | • Barred at least in part by statute of limitations<br>• Fed. R. Civ. P. 9(b) not satisfied<br>• No underlying unlawful act<br>• No "malicious combination"<br>• Barred by intracorporate conspiracy doctrine |

23.     For these and other reasons discussed below, the Amended Complaint should be dismissed in its entirety.

ARGUMENT

I.     **The Amended Complaint Should Be Dismissed for Failure to State a Plausible Claim for Relief.**

    A.     **The Amended Complaint Lacks Well-Pleaded Allegations of Mr. James or the Related Entities' Involvement in Fraudulent Acts or Other Misconduct.**

24.     To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  A court "will accept as true the well-pleaded factual allegations of the . . . complaint and any reasonable inferences to be drawn."

19

FBG_CH1_00090012

*Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). "Although a district court must assume the veracity of well-pleaded facts, a complaint that 'fail[s] to show more than mere conclusory allegations' is properly met with dismissal for failure to state a claim." *Smith ex rel. Smith v. Dep't of Health & Hosps. La.*, 581 F. App'x 319, 321 (5th Cir. 2014) (citation omitted). Likewise, a complaint with only "[g]eneral allegations lumping all defendants together and failing to identify specific actions of individual defendants" constitutes impermissible group pleading and does not satisfy the Rule 8 standard. *Callier v. Nat'l United Grp., LLC*, 2021 WL 5393829, at *4 (W.D. Tex. Nov. 17, 2021) ("A pleading must provide specific factual allegations of violations against specific defendants to suffice."); *see also 7 Santini Bros. Trucking Inc. v. City Ocean Int'l Inc.*, 2024 WL 2836274, at *2 (S.D. Tex. June 4, 2024) (dismissing complaint as impermissible "shotgun pleading" where the complaint "fail[ed] to differentiate between [the defendants] in critical respects" such that it failed to allege essential elements of the causes of action); *Burkette v. Travis*, 2024 WL 1253920, at *5 (M.D. La. Feb. 23, 2024), *report and recommendation adopted sub nom. Burkette v. E. Feliciana Par. Sheriff*, 2024 WL 1253594 (M.D. La. Mar. 22, 2024) (dismissing complaint where it "fail[ed] to delineate which of [p]laintiff's alleged facts support each of his claims for relief, so that as to some claims, it is unclear which claim is being asserted against which defendant").

25. Fraud claims, including claims for actual fraudulent transfer, must satisfy Rule 9(b)'s heightened pleading standard, requiring "a party [to] state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "To plead fraud adequately, the plaintiff must 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 551 (5th Cir. 2010) (citation omitted).

20

FBG_CH1_00090013

26.     The Amended Complaint seeks to allege five categories of purported misconduct or fraud by the Defendants but fails to allege with particularity Mr. James' or the Related Entities' involvement in any of those categories of supposed misconduct:

- The Amended Complaint's allegations of "alter[ed] . . . financial statements" contain no details.[65] The Amended Complaint fails to identify specific amounts, figures, or statements that were manipulated, which is what Rule 9(b) requires. *See id.* The Debtors say generically that Mr. James "manipulat[ed] books" and "concealed [the] true financial condition . . . by personally directing the alterations of First Brands' financial statements" – but do not include any detail how Mr. James played any specific role in the preparation of First Brand's financial statements, which "alterations" he "direct[ed]," or which figures he allegedly manipulated.[66]

- Although the Amended Complaint complains about Mr. James' "actions" "causing First Brands to incur substantial debt through off-balance sheet financing,"[67] it does not provide the basis for the contention beyond saying "[Mr.] James was instrumental" in incurring such debt.[68] That is not sufficient. The Debtors cannot fill the gaps in their pleading by pointing to Mr. James's role within the Company or interactions with management. *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."); *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (finding allegations that "the individual defendants must have known of the irregularities because of their executive positions in the company, and [plaintiffs] emphasize Bernhard's 'hands-on management style,' and the magnitude and extent of the accounting standards violations" insufficient to plead scienter); *In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 816 (S.D. Tex. 2012) ("Broad, conclusory allegations of scienter against Hayward, based solely on his position as CEO and a member of the GORC, are insufficient to meet the heightened pleading standard of Rule 9(b).").

- So too regarding the third-party factoring and supply chain financing allegations. There are no particularized allegations or evidentiary support indicating that Mr. James himself altered, doctored, or double-factored any invoices. *See* Am. Compl. ¶¶ 46–52, 62–69.

- The Debtors try to connect the dots by alleging that other personnel engaged in misconduct at the behest of Mr. James. For example, with respect to the financial reporting, the Amended Complaint alleges that Mr. James "directed senior First Brands executives, including

---

[65]   *See* Am. Compl. ¶¶ 8, 67-70.

[66]   The only actual allegation of purported manual changes to financial statements is not made with respect to Mr. James. *See id.* ¶ 108.

[67]   Compl. ¶ 17.

[68]   *Id.*

21

FBG_CH1_00090014

Brumbergs, to make these alterations."[69]   That is conclusory and insufficient to withstand dismissal because it does not describe what Mr. James said or did, when he said or did it, how it was communicated, how, e.g., Mr. Brumbergs relied on the statement, or how that reliance was reasonable. *See, e.g., JCW Software, LLC v. Embroidme.com, Inc.*, 2011 WL 13225174, at *11 (S.D. Fla. July 26, 2011), *report and recommendation adopted*, 2011 WL 13225175 (S.D. Fla. Sept. 8, 2011) ("Instead of setting forth facts explaining how the individuals were involved or how they directed the alleged unlawful acts of [two other defendants], the [t]hird [a]mended [c]omplaint merely states in a conclusory fashion that the [individuals] caused, directed, and authorized the acts. These allegations are the types of 'naked assertion[s]' bereft of 'further factual enhancement' that both Iqbal and Twombly warn against"); *see also Taylor v. Trevino*, 2021 WL 347566, at *3 (N.D. Tex. Feb. 2, 2021) (finding allegations that "'Faulkner caused these transfers to be made from the fraudulent scheme alleged herein with actual intent to hinder, delay or defraud creditors of the Breitling entities,' . . . insufficient under Rule 9(b) to plead actual intent with regard to the specific transaction in question")

**B.      The Equitable Claims Are Barred by the Doctrine of *In Pari Delicto*.**

27.      The Debtors' equitable claims—unjust enrichment, money had and received, accounting, and constructive trust as well as breach of fiduciary duty—must be dismissed because the Amended Complaint's allegations, accepted as true for purposes of the Rule 12 motion, mean the Debtors themselves actively participated in the allegedly unlawful conduct.  The doctrine of *in pari delicto* bars a plaintiff from "recovering damages resulting from [its] own wrongdoing." *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 604 F. Supp. 2d 1128, 1141 (S.D. Ohio 2009) (citing *Pinter v. Dahl*, 486 U.S. 622, 632 (1988)).  "The defense is used to prevent one wrongdoer from recovering from the other because each should bear the consequences of his own actions without recourse against the other." *In re Motorwerks, Inc.*, 371 B.R. 281, 291 n.6 (Bankr. S.D. Ohio 2007).  The *in pari delicto* defense is appropriate for resolution on a motion to dismiss where the complaint establishes conclusively that the defense applies. *See In re Dublin Sec., Inc.*, 133 F.3d 377, 380-81 (6th Cir. 1997).

---

[69]      *See* Am. Compl. ¶¶ 67-68, 70; *see also* Am. Compl. ¶ 66 ("James, through Brumbergs, coordinated with senior First Brands executives to conceal the extent of SCF financing.").

22

FBG_CH1_00090015

28.     Here, the Amended Complaint contends the Debtors actively participated in the very conduct that they allege was unlawful, barring any recovery on their equitable claims. *See, e.g.*, Am. Compl. ¶¶ 50-52, 60–61, 71–72, 76. It maintains First Brands and its employees, among other things, (a) falsified records and submitted doctored invoices to be sold to the Company's factoring counterparties, to enable the Debtors to obtain millions of dollars in financing from such parties (Am. Compl. ¶¶ 50-52); (b) factored certain receivables multiple times and double-pledged inventory to serve as collateral under multiple of the Debtors' financing facilities in order to obtain favorable terms under such facilities (Am. Compl. ¶¶ 49–50, 60); (c) actively participated in the allegedly fraudulent transfers and transactions forming the basis for the Debtors alleged claims against Defendants. *See, e.g.*, Am. Compl. ¶ 71 (alleging that First Brands transferred the money to Mr. James or his affiliated entities); *id.* ¶ 50 ("[I]n certain instances the First Brands sold erroneous or fabricated invoices to the third-party factors."); *id.* ¶ 51 (alleging a fabricated invoice where a Debtor sold a package of invoices to a factoring company for approximately $11.18 million but the actual value was approximately $2.3 million); *see In re Dublin Sec., Inc.*, 133 F.3d at 380 (affirming dismissal of complaint upon finding that "[plaintiff] admit[ted] in his complaint that the debtors' own actions were instrumental in perpetrating the fraud on the individuals choosing to invest in the Dublin Securities schemes").

29.     Indeed, other than unsupported assertions that the Debtors' conduct was undertaken at Mr. James' direction, there are no allegations that Mr. James or the Related Entities (as opposed to the Debtors) took any of the actions underlying the purportedly wrongful conduct. *See supra*; *see also* Am. Compl. ¶¶ 43, 64-68, 77, 91, 136, 187, 196. Under these circumstances, the *in pari delicto* defense plainly applies based on the allegations in the Amended Complaint, mandating dismissal of the Debtors' equitable claims for unjust enrichment, money had and received,

23

FBG_CH1_00090016

accounting, constructive trust, and fraudulent transfer, as well as breach of fiduciary duty as against Mr. James and the Related Entities. *See In re Dublin Sec., Inc.*, 133 F.3d at 380-81 (affirming dismissal of claims where the *in pari delicto* defense clearly applied on the face of the pleading); *see also In re Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 895 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of La. v. Gen. Re Corp.*, 11 A.3d 228 (Del. 2010) (granting motion to dismiss on grounds of *in pari delicto*); *Nisselson v. Lernout*, 469 F.3d 143, 158 (1st Cir. 2006) (affirming district court's grant of a motion to dismiss based on *in pari delicto* where "uncontroverted facts sufficient to establish the *in pari delicto* defense [we]re definitively ascertainable from the amended complaint and other allowable sources of information"); *see also In re Liquid Holdings Grp., Inc.*, 2018 WL 2759301, at *16 (Bankr. D. Del. June 6, 2018) (dismissing fiduciary duty claims on a motion to dismiss because the doctrine of in pari delicto applied).

### C. Numerous Claims Are Outside the Lookback Period or Barred by the Statute of Limitations.

30. Significant portions of the Debtors' claims for relief must also be dismissed because they fall outside statutory lookback periods or are otherwise barred by the statute of limitations.

31. *Fraudulent Transfer.* The Debtors' fraudulent transfer claims under the Bankruptcy Code are subject to a two-year lookback period, *see* 11 U.S.C. §§ 548(a)(1)(A) & (B), and the analogous claims under Delaware and Ohio law are subject to a four-year lookback period, *see* Ohio Rev. Code Ann. § 1336.04(A)(1), 6 Del. Code §§ 1304(a)(1), 1309(1); Ohio Rev. Code Ann. § 1336.04(A)(2), 6 Del. Code §§ 1304(a)(2), 1309(2). Accordingly, the lookback period extends to September 28, 2023 (or September 24, 2023 for certain Debtors) for the claims under the Bankruptcy Code and to September 28, 2021 (or September 24, 2021 for certain Debtors) for the claims under state law.

24

FBG_CH1_00090017

32.     Notwithstanding these clear time limitations on the transfers subject to avoidance, the Amended Complaint improperly seeks to assert claims relating to purported fraudulent transfers dating back to at least 2018.  Am. Compl. Ex. A (alleging transfers before September 2021 and before September 2023).  This is improper.  Approximately $272,998,087 of the transfers alleged by the Debtors fall outside the relevant lookback periods under federal law and approximately $54,548,487 of the transfers fall outside the state-law lookback periods.  The Debtors' fraudulent transfer claims should be dismissed to the extent they seek recovery of funds transferred outside the relevant lookback periods.  *See Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 119 (5th Cir. 2019) (affirming dismissal of fraudulent transfer claims on motion to dismiss where transfers occurred outside the lookback period); *In re Bolon*, 538 B.R. 391, 404 (Bankr. S.D. Ohio 2015) (dismissing fraudulent transfer claim brought under 11 U.S.C. § 548(a) on a motion to dismiss because the transfer occurred outside the lookback period).

33.     ***Money Had & Received and Unjust Enrichment.*** Similarly, the statutes of limitations for claims of money had and received and unjust enrichment are three years in Delaware and six years in Ohio.  *See Alban Tractor Co. v. Land Preparation Specialists, Inc.*, 2001 WL 914008, at *2 (Del. Super. Ct. July 30, 2001); *Stone & Paper Invs., LLC v. Blanch*, 2021 WL 3240373, at *33 (Del. Ch. July 30, 2021), *aff'd*, 312 A.3d 1155 (Del. 2024) ("Delaware law sets a three[-]year statute of limitations for claims for unjust enrichment." (quoting *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *15 (Del. Ch. Dec. 1, 2009) (alteration in original))); *Drozeck v. Laws. Title Ins. Corp.*, 749 N.E.2d 775, 780 (Ohio Ct. App. 2000) (affirming dismissal of money had and received and unjust enrichment claims as barred by the six-year statute of limitations in Ohio).[70]  Likewise, to the extent "the cause of action in which

---

[70]     Defendants reserve the right to contest Debtors' choice of law analysis at a later date.

25

FBG_CH1_00090018

imposition of a constructive trust is sought as a remedy is barred by a statute of limitation, the imposition of a constructive trust is likewise barred." *Cundall v. U.S. Bank*, 909 N.E.2d 1244, 1252 (Ohio 2009) (internal citation and quotations omitted).

34. As such, to the extent the Debtors' claims of money had and received, unjust enrichment, and constructive trust are based on purported transfers before September 28, 2019 or September 28, 2022, *see, e.g.*, Am. Compl Ex. A (alleging transfers before September 28, 2019 and September 28, 2022), they should be dismissed under Ohio law and Delaware law, respectively. *See Drozeck*, 749 N.E.2d at 780 (affirming dismissal of claims for unjust enrichment and money had an received because "the complaint on its face [wa]s statutorily barred"); *Danziger & De Llano, LLP v. Morgan Verkamp, LLC*, 2023 WL 3606699, at *8 (Ohio Ct. App. May 24, 2023 (affirming dismissal on motion to dismiss "[b]ecause the limitations period for the unjust enrichment claim expired in December of 2020, well before [plaintiff] filed its Ohio complaint"); *Lehman Bros. Holdings, Inc. v. Kee*, 268 A.3d 178, 196-97 (Del. 2021) (affirming dismissal of unjust enrichment claim as time-barred); *see also Krohn v. Ostafi*, 2020 WL 1899529, at *6 (Ohio Ct. App. Apr. 17, 2020) (affirming dismissal of constructive trust claim with prejudice where the underlying fraud and breach of fiduciary duty claims were time-barred); *East v. Tansey*, 1993 WL 487807, at *2 (Del. Ch. Oct. 22, 1993) (finding claim for constructive trust arising out of misappropriation of money barred by three year statute of limitations).

35. *Illegal Dividend.* Under Delaware law, there is a six-year statute of repose for illegal dividend claims. *See* 8 Del. Code § 174 ("[T]he directors . . . shall be jointly and severally liable, at any time within 6 years after paying such unlawful dividend . . . ."). Under this statute of repose, the limitations period begins to run at the time the allegedly unlawful dividend was paid. *See JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211, 1235 (Del. Ch. 2019). As

26

FBG_CH1_00090019

such, to the extent the Debtors claim illegal dividends before September 28, 2019 (or September 24, 2019 for certain Debtors), they should be dismissed as outside the statute of repose. *See JPMorgan Chase Bank*, 213 A.3d at 1238 (dismissing claim for illegal dividend where the challenged dividends were paid more than six years before the action was filed).

36.     ***Fiduciary Duty/Aiding & Abetting.*** The Amended Complaint attempts to allege various breaches of fiduciary duty by Defendants.  A three-year statute of limitations applies to claims for breach of fiduciary duty under Delaware law.  *Fike v. Ruger*, 754 A.2d 254, 260 (Del. Ch. 1999) ("Under Delaware law, a three-year statute of limitations applies to claims for breach of contract or breach of fiduciary duty." (citing 10 Del. C. § 8106)).  The breach of fiduciary duty allegations are conclusory as to Mr. James as explained below, *see infra*.  But to the extent the Court does not dismiss for failure to state a claim, any alleged breaches predicated on purported conduct prior to September 24, 2022 (for the SPV Debtors) or September 28, 2022 or September 29, 2022 (for other Debtors) should be dismissed.

37.     ***Conspiracy.*** Under Ohio law, the applicable statute of limitations in a claim for civil conspiracy is based on the underlying cause of action.  *See Pincus v. Pincus*, 270 N.E.3d 275, 280 (Ohio Ct. App. 2025) ("Arlene's claim for civil conspiracy has the same statute of limitations as her fraudulent-transfer claims."); *see also Figgie v. Figgie*, 263 N.E.3d 1116, 1126 (Ohio Ct. App. 2025) ("[A] civil-conspiracy claim is derivative and cannot be maintained absent an underlying tort that is actionable without the conspiracy." (citing *Arnoff v. PAJ Ents., LLC*, 2022 WL 1675501 (Ohio Ct. App. May 26, 2022))); *Ford Motor Credit Co. v. Jones*, , 2009 WL 1912626, at *4 (Ohio Ct. App. July 2, 2009) ("[T]he applicable statute of limitations for the underlying cause of action applies to the civil conspiracy charge.").  To the extent the civil conspiracy claim is based on the fraudulent transfer claims, such claims, therefore, must have

27

been brought within the two or four years after the transfer was made, and such claims are subject to dismissal with all fraudulent transfer claims outside the statutory lookback periods.

38.     To the extent such conspiracy claims are predicated on alleged fraud—which is not a standalone cause of action in the Amended Complaint—such claims would barred to the extent the conduct falls outside the statute of limitations for fraud, which is four years under Ohio law. *See* Ohio Rev. Code Ann. § 2305.09.

**D.     The Fraudulent Transfer Claims Are Inadequately Pled.**

**1.     The Actual Fraudulent Transfer Claims Fail to Satisfy Rule 9(b)'s Heightened Standard for Pleading Intent.**

39.     To plead a claim for actual fraudulent transfer, the Amended Complaint must allege specific facts showing that the alleged transferor acted with "actual intent to hinder, delay, or defraud a present or future creditor" with respect to the challenged transfers. *In re Cyr*, 602 B.R. 315, 327 (Bankr. W.D. Tex. 2019); *see also* Ohio Rev. Code Ann. § 1336.04(A)(1); 6 Del. Code § 1304(a)(1).  Courts in the Fifth Circuit have applied the heightened pleading standard under Rule 9(b) to actual fraudulent transfer claims.  *See In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 733 (Bankr. S.D. Tex. 2020) (applying Rule 9(b) to actual fraudulent transfer claim); *In re Brown Med. Ctr., Inc.*, 552 B.R. 165, 168 (S.D. Tex. 2016) (same).  "[Rule] 9(b) requires those asserting fraudulent transfer claims in bankruptcy proceedings to plead them with specificity." *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009).  This particularity requirement mandates that the Amended Complaint plead "the who, what, when, where, and why of the claim for relief." *In re Legendary Field Exhibitions, LLC*, 2023 WL 7852657, at *20 (Bankr. W.D. Tex. Nov. 13, 2023) (internal citation and quotation omitted).  The Amended Complaint's actual fraudulent transfer claims fall woefully short of this standard for multiple reasons.

28

**Page 31 of 61**
**JOINT EXHIBIT NO. 47**
**Page 31 of 61**

40.     First, the Amended Complaint includes no specific allegations that each specific transferor identified in Exhibit A engaged in the specific transfers alleged for the purpose of hindering, delaying, or otherwise defrauding creditors.  Instead, the Amended Complaint paints with a broad brush, pointing to isolated examples of purported fraudulent conduct by one individual and attributing it to the Debtors as a whole, and suggesting that such purported conduct was the underlying basis for hundreds of transfers.  *Taylor v. Rothstein Kass & Co., PLLC*, 2020 WL 554583, at *12 (N.D. Tex. Feb. 4, 2020) ("Although [plaintiff] 'alleges that Faulkner *caused* BOG and BECC to make transfers totaling at least $215,000 between December 1, 2013 and April 1, 2014 with actual intent to hinder, delay or defraud creditors of BOG and BECC,' . . . such generalized allegations are insufficient under Rule 9(b) to plead actual intent with regard to the specific transaction in question." (emphasis added)); *VeroBlue Farms USA, Inc. v. Wulf*, 465 F. Supp. 3d 633, 655 (N.D. Tex. 2020) (Fraud claims dismissed where plaintiff "fail[ed] to illuminate who made the fraudulent statements and what their state of mind was at the time.  For example, the BAJJER stock scheme factual background alleges that BAJJER 'is owned or controlled by some or all of the Founders' and that 'the Founders *directed* [VeroBlue] to transfer 1,250,000 shares'" to BAJJER for $1.25 total. The complaint neither says which of the Founders directed the transfer nor does it illuminate that person's state of mind." (emphasis added)); *In re Reagor-Dykes Motors, LP*, 2022 WL 2046144, at *3 (Bankr. N.D. Tex. June 3, 2022) ("A plaintiff must provide evidence that the debtor made each transfer with intent to hinder, delay, or defraud creditors.").   The Amended Complaint further makes wholly conclusory assertions that Defendants "directed First Brands to pay Defendants with the actual intent of hindering, delaying, and/or defrauding First Brands' creditors and investors," Am. Compl. ¶ 136, or "did not direct any of the transfers in good faith," *id.* ¶ 143.  These "formulaic recitation[s] of the elements of a

29

FBG_CH1_00090022

cause of action" are insufficient to state a claim. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

41.     Further underscoring these deficiencies, the Amended Complaint fails to adequately plead insolvency, as described below—which is important since Delaware LLCs can distribute dividends when they are solvent,[71] and there is nothing inherently nefarious about doing so.  Nor does the Amended Complaint contain any factually supported allegations to permit an inference that any transactions were concealed; to the contrary, the Amended Complaint acknowledges that the transfers were recorded in the Company's general ledger, email systems, and bank account statements.  *See* Am. Compl. ¶¶ 11, 69 (acknowledging that transactions were in the Company's general ledger); *id.* ¶ 68 (acknowledging transactions via internal communications); *id.* ¶ 72-74 (acknowledging transactions though bank account balances).

### 2.     The Constructive Fraudulent Transfer Claims Fail Because the Amended Complaint Fails to Plead Insolvency.

42.     To plead a claim for constructive fraudulent transfer, the Amended Complaint must allege, among other elements, that the transferor was insolvent at the time of the challenged transfer or was rendered insolvent thereby.   11 U.S.C. § 548(a)(1)(B)); Ohio Rev. Code Ann. § 1336.04(A)(2); 6 Del. Code § 1304(a)(2).  The Amended Complaint contains no well-pleaded factual allegations evincing any transferor's alleged insolvency at the time of any particular transfer.

43.     *First*, the Amended Complaint only makes conclusory references to "First Brands'" purported insolvency on an enterprise basis, *see, e.g.*, Am. Compl. ¶¶ 1, 13, 17, 101, 103–08, without "identify[ing] which specific transferors were insolvent at the time of the allegedly

---

[71]     *See* 6 Del. Code § 18-607(a).

30

FBG_CH1_00090023

fraudulent transfers." *In re Neighbors Legacy Holdings, Inc.*, 645 B.R. 864, 895 (Bankr. S.D. Tex. 2022). As noted, because the Amended Complaint defines First Brands to include First Brands Group, LLC and its Debtor affiliates (comprising over 100 separate entities), *see* Am. Compl. 2, Defendants are left guessing which entities were purportedly insolvent or rendered insolvent by the challenged transfers. Insolvency must be alleged on an entity-by-entity basis. *See ATP Oil*, 711 F. App'x at 223 (finding that "conclusory assertions about . . . financial condition and subjective determinations regarding the amount of available capital" do not state a claim).

44.    ***Second***, the Debtors do not plausibly articulate a factual basis to maintain insolvency, which requires "'specific reference to [the specific transferor's] financial condition at the time' of the transfer." *In re Neighbors Legacy Holdings*, 645 B.R. at 895 (quoting *ATP Oil*, 711 F. App'x at 223); *Innovative Custom Brands, Inc. v. Minor*, Docket No. 15-CV-2955 (AJN), 2016 U.S. Dist. LEXIS 8354, at *7-8 (S.D.N.Y. Jan. 25, 2016) ("An adequate pleading of insolvency requires some sort of balance sheet . . . information . . . that the Court can use to infer that the corporation's liabilities exceeded their assets at the time the transfers took place.") (internal quotation marks omitted). Instead, the Amended Complaint resorts to *ipse dixit*, asserting that "James' actions contributed to First Brands' insolvency and continued while First Brands was nearing insolvency and insolvent," without alleging specific facts that would support such assertions. *See e.g.*, Am. Compl. ¶ 82. The Amended Complaint attempts to buttress these allegations with allusions to "widespread issues with First Brands' accounting and business practices," Am. Compl. ¶ 105—but only refers to the fact of the Company's use of off-balance sheet financing through SPVs, alleged "overstated . . . gross book value of its inventory, which improperly inflated the value of its assets," and purported "manual changes to the Company's

31

FBG_CH1_00090024

financial statements." Am. Compl. ¶¶ 106–08.  The Amended Complaint—like its predecessor—
is bereft of specific financial details or financial metrics by which to evaluate solvency.  *See In re
Cyr*, 602 B.R. at 332 (finding that trustee "failed to properly plead insolvency for purposes of a
constructively fraudulent transfer claim" where "[t]he [t]rustee presented no allegations regarding
the value of the [debtor's] debt relative to the value of the [debtor's] assets at the time the transfers
were made"); *see also In re Uplift RX, LLC*, 667 B.R. 665, 685 (Bankr. S.D. Tex. 2024) (dismissing
constructive fraudulent transfer claim with prejudice where the "[c]omplaint [did] not allege[] any
facts demonstrating that [transferor] was insolvent at the time of the transfers"); *In re All Tex. Elec.
Contractors, Inc. v. NSPS Metals LLC*, 2022 WL 162786, at \*8 (Bankr. S.D. Tex. Jan. 18, 2022)
(finding failure to plead insolvency where the complaint "provide[d] no factual support for
[allegations of insolvency] such as balance sheets or additional financial information").

45.    Additionally, the Amended Complaint assumes perpetual, longstanding insolvency
dating back years before the bankruptcy filing.  It is simply not plausible that First Brands was
persistently insolvent dating back more than seven years to 2018—but all the while continued
operating until 2025.  *See* Am. Compl. ¶¶ 71, 101, 153 (alleging that First Brands was insolvent
on the date of each transfer and alleging transfers back to 2018); *see In re Northstar*, 616 B.R. at
738 (link from transaction in September 2012 to need for loan in 2013 was "far too tenuous";
declining to "leap from 2012 to 2014") (citation omitted); *In re Bateman*, 2012 WL 3061181, at
\*4, \*4 n.1 ("The [a]mended [c]omplaint fails on its face . . . under the *Twombly* and *Iqbal* pleading
standards . . . .  The petition date was over a year and a half after the transfer date.  As such, the
[a]mended [c]omplaint fails to reasonably allege the value of the [p]roperty at the time of the
transfer."); *In re Nanodynamics, Inc.*, 474 B.R. at 427-28, 427 n.5 (rejecting plausibility of
allegations of insolvency between ninety days and one year before petition date; noting "*Twombly*

32

FBG_CH1_00090025

DEBTORS' EXHIBIT NO. 171
Page 35 of 61
JOINT EXHIBIT NO. 47
Page 35 of 61

and *Iqbal* call upon a court to use its 'experience'"); *cf. MFS/Sun Life Trust-High Yield Series,* 910 F. Supp. at 944 ("That the company remained viable so long after the LBO strongly suggests that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the buyout."); *Credit Managers Assoc. of S. Cal.,* 629 F. Supp. at 186-87 (refusing to find unreasonably small capital when debtor "pa[id] its creditors and its debt service" for twelve months after transaction).

<blockquote>

**3.      The Constructive Fraudulent Transfer Claims Fails Because the Amended Complaint Fails to Plead Lack of Reasonably Equivalent Value.**

</blockquote>

46.      "Reasonably equivalent value" is determined on the date of the transfer. *In re La. Pellets, Inc.,* 838 F. App'x 45, 50 (5th Cir. 2020) ("Because value is determined at the time of transfer, '[n]either subsequent depreciation in nor appreciation in value of the consideration affects the question whether reasonable equivalent value as given." (citation omitted)). To determine reasonably equivalent value, "a court determines whether the debtor received an economic benefit at the time of the transfers or obligations" and whether "the value provided must be 'reasonably equivalent' to what the debtor received." *In re Triplett,* 651 B.R. 196, 203 (Bankr. E.D. Tex. 2023) (citation omitted).

47.      Here, other than a few isolated attempts to plead lack of reasonably equivalent value as to specific transfers, the Amended Complaint relies on the generic statement that "First Brands did not receive reasonably equivalent value in exchange for . . . the transfers." Am. Compl. ¶¶ 109, 151, 167. Fifth Circuit law requires more. *See In re Reagor-Dykes Motors, LP,* 2021 WL 2546664, at *4 (Bankr. N.D. Tex. June 21, 2021) ("A complaint that only states that the debtor received less than reasonably equivalent value does not meet the pleading standard of Rule 8[;]" a "complaint must plausibly allege that the debtor received less than reasonably equivalent value"); *In re All Tex. Elec. Contractors,* 2022 WL 162786, at *7 (On a motion to dismiss, "it [i]s

33

**DEBTORS' EXHIBIT NO. 171**
**Page 36 of 61**
**JOINT EXHIBIT NO. 47**
**Page 36 of 61**

[p]laintiff's burden to break down each transfer and show that it did not receive reasonably equivalent value.").

48.     In fact, more specific allegations concerning the Debtors' basis for alleging lack of reasonably equivalent value are particularly important here.  Certain alleged transfers—on their face—appear to have been made for reasonably equivalent value.  Moreover, the fact that Mr. James and the Related Entities transferred hundreds of millions of dollars back *into* the Company during the relevant time period is very important.  As pled, the Debtors themselves collapse these transactions.  To that end, consideration of the total amount of money Mr. James and the Related Entities contributed back into First Brands over the same seven-year period is required.

49.     *Tax Distributions*.  First Brands Group, LLC was a Delaware limited liability company owned by Mr. James.  *See* Am. Compl. ¶¶ 19, 20.  Pass-through entities like Delaware LLCs commonly reimburse their members for tax payments.  But the Debtors fail to acknowledge in their Amended Complaint that at least some of the so-called distributions to the Patrick James Trust were, in fact, tax distributions which are presumed to be for reasonably equivalent value. *See In re Northlake Foods, Inc.*, 715 F.3d 1251, 1255 (11th Cir. 2013) (finding that transfer to shareholder of a pass-through corporation in the amount of personal income tax attributable to shareholder's share of the corporation's tax was made for reasonably equivalent value "[b]ecause [S corporation] would have had to pay income taxes itself had it not elected to be an S corporation" and so its creditors were no worse off); *In re F-Squared Inv. Mgmt., LLC*, 633 B.R. 663, 671 (Bankr. D. Del. 2021) (gathering cases "where the respective courts found reasonably equivalent value for tax distributions because the debtor elected into a pass-through tax status").  Instead, the Debtors treat these transfers as though they were something nefarious.  *See* Am. Compl. ¶ 78; *id.* ¶ 111 ("To the extent [Mr.] James directed that First Brands classify these payments as tax

34

FBG_CH1_00090027

'distributions,' he did not provide First Brands with documentation verifying his own tax payments.").

### 4. The Amended Complaint Fails to Plead that Certain Transfers Were "For the Benefit of" Any Defendants.

50.     Exhibit A to the Amended Complaint identifies a slew of purportedly fraudulent transfers where neither Mr. James nor the Related Entities are identified as transferees.  While 11 U.S.C. § 550(a)(1) recognizes that a fraudulent transfer may be recovered from an initial transferee of such transfer or the entity for whose benefit such transfer was made, the Amended Complaint does not contain specific allegations identifying how each of the alleged transfers that were received by non-Defendant transferees benefited any of the Defendants (and if so, which Defendant).  Without identifying such purported benefit, the Debtors fail to identify a basis to pursue such claims against Mr. James or the Related Entities.

### E. The Amended Complaint Fails to Adequately Plead a Claim of Illegal Dividend Against Patrick James.

51.     The Debtors purport to assert a cause of action for illegal dividend under 8 Del. Code § 170, claiming that "James directed First Brands to approve and complete numerous distributions to himself and the Patrick James Trust, and other entities under his control that constituted illegal dividends and unlawful distributions."  Am. Compl. ¶ 187.

52.     Under 8 Del. Code § 170, "dividends may be paid only out of the corporation's 'surplus' or 'net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year.'"  *JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211, 1235 (Del. Ch. 2019) (quoting 8 Del. Code § 170).  To plead a claim of director liability for improper dividend, the Amended Complaint must plead the (i) declaration of dividend (ii) that was not paid out of the corporation's surplus or net profits.  8 Del. Code §§ 170, 174.  Further, a director must have "willfully" or "negligently" violated Delaware's statutory restriction on dividends.  *See* 8 Del.

35

Code § 174; *see also Ballard*, 213 A.3d at 1224.  The Amended Complaint fails to adequately allege these elements.

53.     ***First***, the Amended Complaint does not even attempt to identify which subset of the alleged transfers it is challenging as purported unlawful dividends.  This alone is fatal because "[w]hen evaluating claimed violations of the DGCL, Delaware law takes a formal and technical approach."  *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 201 (Del. Ch. 2014).  Although the Amended Complaint characterizes certain unspecified transfers to Defendants variously, as "dividends" or "distributions," Am. Compl. ¶¶ 74, it never articulates which transfers on Exhibit A are subject to 8 Del. C. § 170.  This failure is notable because "[n]o section of the DGCL extends the restrictions governing the payment of dividends to other transactions between a corporation and stockholders, including its sole stockholder."  *Quadrant Structured Prods.*, 102 A.3d at 202.

54.     ***Second***, the Amended Complaint fails to allege the purported dividends were not paid out of First Brands' surplus or net profits.  To do so, the Amended Complaint must allege facts showing that the Company's net assets were less than its stated capital, the dividend exceeded the Company's available surplus, or the dividend rendered the Company balance sheet insolvent.  *See* 8 Del. Code § 170; *see also In re Chemours Co. Derivative Litig.*, 2021 WL 5050285, at *15 (Del. Ch. Nov. 1, 2021) (dismissing claims for illegal dividend on a motion to dismiss for the years at issue where "[t]he [c]omplaint concede[d] that [the company's] net profits exceeded its dividend payments").  As noted above, the Amended Complaint pleads no specific facts or metrics whatsoever concerning the Company's financial condition, the value of its assets versus its liabilities, or its profitability as of any particular date, much less as of the specific dates that any alleged dividends were paid to Mr. James.

36

FBG_CH1_00090029

55.    *Finally*, the Amended Complaint fails to allege that Mr. James himself acted willfully or negligently with respect to any purported dividend, also requiring dismissal under 8 Del. Code § 174.  *See* Am. Compl. ¶¶ 74, 81, 82, 111, 187-92.

56.    To the extent the Amended Complaint attempts to assert similar claims under 6 Del. Code § 18-607 applicable to LLCs, such claims fail for the same reasons.  Moreover, under § 18-607, a member of an LLC who receives a distribution in violation of subsection (a) of that statute, is only liable to the company if such member "knew at the time of the distribution that the distribution violated subsection (a) of this section"; conversely, a "member who receives a distribution in violation of subsection (a) of this section, and who did not know at the time of the distribution that the distribution violated subsection (a) of this section, shall not be liable for the amount of the distribution."  *Id.*   The Amended Complaint contains no factual allegations supporting Mr. James or the Related Entities' "knowledge" of any such violation (perhaps because the Amended Complaint does not and cannot establish such a violation in the first place).

**F.    The Amended Complaint Fails to Adequately Plead a Claim for Turnover.**

57.    To adequately plead a turnover claim under section 542 of the Bankruptcy Code, the Debtors must allege facts showing that (1) the property sought is property of the estate; (2) the property was in the possession, custody, or control of the defendant during the case; and (3) the trustee may use, sell, or lease the property under § 363.  *See In re Longhorn Paving & Oilfield Servs., Inc.*, 647 B.R. 679, 689–90 (Bankr. S.D. Tex. 2022) ("It is well-settled that, in turnover proceedings, the trustee must prove by clear and convincing evidence both that the property at issue is property of the bankruptcy estate and that it is in the possession of the party proceeded against.").

58.    As a threshold matter, to the extent that the Debtors are seeking "turnover" of the funds that are allegedly subject to the fraudulent transfer claims or other claims seeking imposition

37

FBG_CH1_00090030

**DEBTORS' EXHIBIT NO. 171**
**Page 40 of 61**
**JOINT EXHIBIT NO. 47**
**Page 40 of 61**

of a money judgment, invoking § 542(a) is improper. Where, as here, the trustee seeks to recover only money, § 542(a) does not apply because it "does not provide for entry of on a money judgment." *See In re Network Staffing Servs., Inc.*, 2004 WL 3007082, at *2 (Bankr. N.D. Tex. Oct. 22, 2004) ("Assuming that the plan trustee proves the allegations of the complaint, the plan trustee will establish a claim under 11 U.S.C. §§ 544(b), 547 and/or 548, with a resulting judgment under § 550 . . . The plan trustee does not seek to recover property other than money. Section 542(a) does not provide for the entry of a money judgment. Section 542(a) therefore cannot be invoked to obtain a money judgment against [Defendant]. Section 542(a) does not apply to this dispute.").

59. As to the elements of the claim, the Debtors' turnover action fails because the Amended Complaint does not plead that the Debtors possess undisputed title to the property allegedly subject to turnover. *See In re ATP Oil & Gas Corp.*, 2015 WL 1093568, at *3 ("Section 542 is inapplicable when there is a title dispute between parties."); *see also In re Alofs*, 209 B.R. at 97 (until title passes to debtors, property is not part of the Debtors' estate). Instead, the Amended Complaint simply asserts that Defendants, and/or other entities and trusts that Mr. James controls "have possession, custody, or control over property of the estate." Am. Compl ¶ 129. Curiously, the Amended Complaint further asserts that such property and debts belonging to the estate include, "without limitation, cash, *accounts receivable*, *intellectual property*, and other *matured payment obligations* due and payable to the creditors, and any proceeds thereof." *Id.* (emphases added). Such alleged transfers of accounts receivable, intellectual property, and other matured payment obligations are not described in the Amended Complaint; the Amended Complaint only seeks recovery of cash. The Debtors' allegations are not a valid basis for a turnover action because Mr. James and the Related Entities dispute their

38

FBG_CH1_00090031

liability as to such claims. *See Trefny v. Bear Stearns Sec. Corp.*, 243 B.R. 300, 320 (S.D. Tex. 1999) ("Unless and until [d]ebtor's claims against the defendants are liquidated in a court of competent jurisdiction or by agreement, they cannot be enforced here through a turnover order."); *see also In re All Tex. Elec. Contractors*, 2022 WL 162786, at *5 (dismissing turnover claim on motion to dismiss where "[i]n the [m]otion to [d]ismiss, [d]efendant clearly dispute[d] that it is personally liable to [p]laintiff for the damages sought in the [complaint]" for a breach of contract).

### G.   The Amended Complaint Fails to Adequately Plead a Claim for Unjust Enrichment or Money Had and Received Against Any Defendant.

60.    The Amended Complaint fails to adequately allege equitable claims for unjust enrichment and money had and received for the same reasons that the fraudulent transfer and turnover claims fail, namely, there are no specific allegations that Defendants have wrongfully received or retained specific funds belonging to the Debtors. An unjust enrichment claim requires "retention of [a] benefit by defendant in circumstances where retention without payment to plaintiff is unjust," *In re Est. of Udell v. Seely*, 71 N.E.3d 724, 727 (Ohio St. App. 2016), or "an enrichment" of defendant without "justification," *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). "The common law claim for money had and received is a quasi-contractual claim akin to unjust enrichment." *Lorad, LLC v. Azteca Milling L.P.*, 670 F. Supp. 3d 470, 514–15 (N.D. Ohio 2023). A money had and received claim "is an equitable action, based not on contract but on a moral obligation to make restitution where retention of benefits bestowed would result in inequity and injustice." *LRC Realty, Inc. v. B.E.B. Props.*, 166 N.E.3d 37, 41 (Ohio Ct. App. 2020) (quoting *Nat'l City Bank v. Stang*, 618 N.E.2d 241, 242 (Ohio Ct. App. 1992)); *see also In re Mission of Care, Inc.*, 164 B.R. 877, 879 (Bankr. D. Del. 1994) (explaining that a money had and received claim requires that a payment benefitted the defendant and "it would be inequitable not

39

FBG_CH1_00090032

**DEBTORS' EXHIBIT NO. 171**
**Page 42 of 61**
**JOINT EXHIBIT NO. 47**
**Page 42 of 61**

to reimburse [plaintiff] for the[] benefits"). It is appropriate where a party "acted to withhold money that in justice and equity belonged to another." *LRC Realty*, 166 N.E.3d at 41.

61. Here, the Amended Complaint never says there were assets rightfully belonging to the Debtors that were wrongfully retained by Defendants—particularly important where, as noted above, many transfers were for business purposes including management fees, intellectual property licensing, and tax distributions—for which an LLC's sole member bears ultimate financial responsibility. *See Theobald v. Wells Fargo Bank, N.A.*, 2014 WL 1330632, at *3 (S.D. Ohio Apr. 1, 2014) (dismissing unjust enrichment claim on motion to dismiss for "fail[ure] to allege any facts that demonstrate that [defendant] retained funds which in all fairness belong to [p]laintiff"); *cf. Wick v. Ach*, 139 N.E.3d 480, 486 (Ohio Ct. App. 2019) ("Simply pleading . . . that the other party was unjustly enriched by keeping money that 'properly belongs' to [plaintiff] leaves too much to the imagination.").

**H.    The Amended Complaint Fails to Adequately Plead a Claim for Constructive Trust or Accounting.**

62. "[A] constructive trust is not an independent cause of action," but instead is a remedy that may only be imposed if that imposition is consistent with principles of equity. *Figgie v. Figgie*, 2021 WL 1309775, at *9, *11 (Ohio Ct. App Apr. 8, 2021); *Kobal v. Edward Jones Sec.*, 2021 WL 1235200, at *3 (Ohio Ct. App. Apr. 1, 2021) (affirming dismissal of constructive trust claim because it is not an independent cause of action); *Miller v. Mott*, 2023 WL 6467368, at *9 (Bankr. D. Del. Oct. 4, 2023) (dismissing claim for constructive trust on motion to dismiss because "[u]nder Delaware law, constructive trust is not a cause of action"). So too for Debtors' claim for an accounting: "An accounting, like a constructive trust, is an equitable remedy, not a cause of action, and the claim for an accounting remedy is properly dismissed under [Rule 12(b)(6)]." *Krohn*, 2020 WL 1899529, at *7; *Garza v. Citigroup Inc.*, 192 F. Supp. 3d 508, 511

40

FBG_CH1_00090033

(D. Del. 2016), *aff'd*, 724 F. App'x 95 (3d Cir. 2018) (quoting *Stevanov v. O'Connor*, 2009 WL 1059640, at *15 (Del. Ch. Apr. 21, 2009)) ("[A]n accounting 'reflects a request for a particular type of remedy, rather than an equitable claim in and of itself.'").

63.     Even if a separate cause of action for constructive trust could be maintained as a legal matter, the Amended Complaint does not make out circumstances where the remedy would be available.  To start, a constructive trust claim must be based in allegations that the subject property "was acquired through fraud, duress, undue influence, or mistake, through a breach of a fiduciary duty, or through the wrongful disposition of another's property," including unjust enrichment. *Johnson v. Kuehn*, 2020 WL 4036875, at *5 (Ohio Ct. App. July 10, 2020); *see Stewart v. Martin*, 2023 WL 2401720, at *8 (S.D. Ohio Mar. 8, 2023) ("[I]f [p]laintiffs' claim for constructive trust is going to survive, it must contain a viable claim for unjust enrichment.").  The conclusory assertion alone that Mr. James or the Related Entities received or obtained property of the Debtors through improper means, including fraud or breach of fiduciary duty, is not enough. Both are inadequately plead in any event.

64.     A constructive trust claim also requires "'a claimant . . . [to] specify the particular property over which the constructive trust is to be placed'" because it "'is an equitable remedy imposed on particular assets, not on a value.'" *Weyand v. Barnes*, 945 N.E.2d 530, 534 (Ohio Ct. App. 2010) (citation omitted); *McMahon v. New Castle Assocs.*, 532 A.2d 601, 608 (Del. Ch. 1987) (constructive trust is "primarily a proprietary [remedy] that is, a remedy relating to specific property or identifiable proceeds of specific property[,]" and it can be used for recovery of money where there is "an identifiable fund to which plaintiff claims equitable ownership through tracing[.]").  Here, the Amended Complaint makes no effort to allege facts or otherwise engage

41

FBG_CH1_00090034

**DEBTORS' EXHIBIT NO. 171**
**Page 44 of 61**
**JOINT EXHIBIT NO. 47**
**Page 44 of 61**

in a tracing analysis for "identifying the specific asset[s] or identifiable product[s] that [are] being wrongfully held" and that would fall under the constructive trust. *Weyand*, 945 N.E.2d at 532.

65. And, even if accounting could be sustained as an independent cause of action, discovery in this adversary proceeding will provide the Debtors with an adequate remedy as to the subject of their accounting claim, mandating dismissal of the separate accounting claim. *See, e.g., Phillippi v. Jim Phillippi, Inc.*, 2009 WL 1911763, at *3 (S.D. Ohio June 26, 2009) ("[Plaintiff's] breach of fiduciary duty claim, and the liberal discovery it affords, provides [plaintiff] an adequate legal remedy for determining whether and the extent to which [d]efendants commingled and misused corporate assets.").

### I.   The Amended Complaint Fails to Adequately Plead a Claim of Breach of Fiduciary Duty or Aiding and Abetting Breach of Fiduciary Duty Against Patrick James.

#### 1.   The LLC Agreements Eliminated Traditional Fiduciary Duties.

66. The default rule in Delaware is that "the managers of an LLC owe traditional fiduciary duties of care and loyalty." *CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, 2015 WL 1839684, at *11 (Del. Ch. Apr. 21, 2015) (citing *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 660 (Del. Ch. 2012)), *aff'd sub nom. In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39 (Del. 2019). But under the Delaware Limited Liability Company Act, the members of an LLC may modify or eliminate these duties, as the policy is to "give the maximum effect to the principle of freedom of contract." 6 Del. Code § 18-1101(b); *see also CSH Theatres*, 2015 WL 1839684, at *11 ("The drafters of an LLC agreement can modify the traditional duties of care and loyalty or displace them altogether . . . ."); 6 Del. Code § 18-1101(e) ("A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person . . . provided, that a limited liability company agreement may not limit

42

FBG_CH1_00090035

or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.").[72]   Any such "disclaimer of fiduciary duties . . . is fully respected and controlling in bankruptcy." *In re Pack Liquidating, LLC*, 658 B.R. 305, 334 (Bankr. D. Del. 2024).

67.   The exculpation clause states:

> No Fiduciary Duties. *Any duties (including fiduciary duties) of a Covered Person*[73] *to the Company or to any other Covered Person that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law, provided* that (i) the foregoing shall not eliminate the obligation of each Covered Person to act in compliance with the express terms of this Agreement and (ii) the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing. In furtherance of the foregoing (but subject to the provisos in the foregoing), when any Covered Person takes any action under this Agreement to give or withhold its consent, such Covered Person shall have no duty (fiduciary or other) to consider the interests of the Company, its Subsidiaries, or the other Members, and may act exclusively in its own interest (or in the interest of the Member that appointed it).

Second Amended and Restated Limited Liability Company Agreement of Patterson Inventory, LLC § 8.3, Bankr. Dkt. No. 571-6 ("Patterson LLC Agreement") (emphasis added).[74]   By its plain

---

[72]   The only duty that cannot be eliminated for the managers of an LLC is the implied covenant of good faith and fair dealing.  *CSH Theatres*, 2015 WL 1839684, at *11.  But "[t]he implied covenant of good faith and fair dealing is a creature of contract, distinct from the fiduciary duties." *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008); *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 580 n.235 (Del. Ch. 2023) ("The statement that an LLC agreement 'may not eliminate the implied contractual covenant of good faith and fair dealing' seems like an attempt to preserve some form of obligation to act in good faith.  But in its role as a source of implied terms, the implied covenant cannot fulfill that mission, because the implied covenant does not operate as a fiduciary substitute.").  Here, the Debtors have not alleged any contractual claims in the Amended Complaint, and so the implied covenant of good faith and fair dealing does not apply.  *See generally* Am. Compl.

[73]   "Covered Person" is defined as "Each current or former Member, the Special Members, if any, the Independent Manager, each Affiliate of each current or former Member, the Special Members, if any, the Independent Manager, each officer, director, shareholder, partner, manager, member, employee, advisor, representative or agent of each current or former Member, the Special Members, if any, the Independent Manager and any of their respective Affiliates, and each current or former officer, employee, or agent of the Company or any of its Affiliates." Patterson LLC Agreement § 1.8.  Patrick James is a "Covered Person" as the manager. *See id.* § 7.2.

[74]   The same is true for the other LLC transferor entities on Exhibit A.  *See, e.g.*, Amended and Restated Limited Liability Company Agreement of First Brands Group, LLC § 8.3; Second Amended and Restated Limited Liability Company Agreement of FRAM Group Operations LLC § 8.3; Limited Liability Company Agreement of Bowery Finance II, LLC § 8.3; Limited Liability Company Agreement of Carnaby FA, LLC § 8.3; Limited Liability Company Agreement of Carnaby Inventory I, LLC § 8.3; Amended and Restated Limited Liability Company Agreement of Brake Parts Inc LLC § 8.3.

43

FBG_CH1_00090036

DEBTORS' EXHIBIT NO. 171
Page 46 of 61
JOINT EXHIBIT NO. 47
Page 46 of 61

language, the broad exculpatory provision above eliminates fiduciary duties to the "fullest extent permits under the [Delaware Limited Liability Company] Act." Anticipating this problem, the Debtors try to argue this exculpation "do[es] not extend to the bad faith, willful misconduct, and self-dealing alleged." Am. Compl. ¶ 202. The Debtors are wrong: "a limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of . . . fiduciary duties." 6 Del. Code § 18-1101(e); *see also New Enter. Assocs. 14, L.P.*, 295 A.3d at 580 ("the constitutive document of an LLC (the LLC agreement) can (i) fully eliminate any duties existing at law or in equity, including fiduciary duties").

68. Accordingly, the claims for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty against Patrick James should be dismissed. *See, e.g.*, *Riverside Risk Advisors LLC v. Chao*, 2022 WL 14672745, at *30 (Del. Ch. Oct. 26, 2022) ("[T]he 2015 LLC Agreement expressly eliminated fiduciary duties as is permitted under Delaware's LLC Act. There cannot be a breach of non-existent fiduciary duties."); *Ryan v. Buckeye Partners, L.P.*, 2022 WL 389827, at *9 (Del. Ch. Feb. 9, 2022), *aff'd*, 285 A.3d 459 (Del. 2022) (dismissing a breach of fiduciary duty claim where the limited partnership agreement "displaced traditional fiduciary duties"); *In re Optim Energy, LLC*, 2014 WL 1924908, at *6 (Bankr. D. Del. May 13, 2014), *aff'd*, 527 B.R. 169 (D. Del. 2015) ("[D]ue to the specific statement in the [LLC's] operating agreement that no fiduciary duties were owed, the Court determines that the breach of fiduciary duties claim against [shareholder] and the aiding and abetting breach of fiduciary duties claim against [shareholder] must fail."); *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *11 (Del. Ch. May 7, 2008) (finding that fiduciary duty claims failed, inter alia, because "the LLC Agreement, in accordance with Delaware law, greatly restricts or even eliminates fiduciary duties.").

44

FBG_CH1_00090037

**2.      The Debtors Have Not Adequately Pled a Breach of Fiduciary Duty.**

69.      A claim for breach of fiduciary duty requires two elements (1) a fiduciary duty existed; and (2) the defendant breached that duty. *In re Tropicana Ent., LLC*, 520 B.R. 455, 470 (Bankr. D. Del. 2014).  A complaint fails to state a claim against an alleged director or officer for breach of fiduciary duty "when it fails to allege facts demonstrating that (1) he took part in the challenged conduct and (2) failed to demonstrate the due care attendant to his particular office in doing so." *In re Our Alchemy, LLC*, 2019 WL 4447541, at *10 (Bankr. D. Del. Sept. 16, 2019) (quoting *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 573 (Bankr. D. Del. 2008)).  "To state a plausible claim for a breach of fiduciary duty, the plaintiff should allege specific conduct by each individual officer or director in authorizing the challenged transaction." *Id.*

70.      Assuming arguendo that the exculpation clauses do not dispense with these claims, to the extent he was a director or officer of specific First Brands entities, Mr. James owes the duties of care and loyalty to such entities.  *See CSH Theatres, LLC*, 2015 WL 1839684, at *11. The Debtors have failed to (i) identify which specific Debtors assert breach of fiduciary duty claims against Mr. James (which is particularly important since certain Debtor entities are not incorporated in Delaware and because, depending on whether such Debtor is an SPV Debtor that filed for bankruptcy on September 24, 2025 or another Debtor that filed for bankruptcy on September 28, 2025, the statute of limitation would differ); or (ii) factually support the elements of a breach of any applicable fiduciary duty in the Amended Complaint.

71.      *First*, the duty of care required Mr. James to "use that amount of care which ordinarily careful and prudent men would use in similar circumstances" and "consider all material information reasonably available." *Bridgeport Holdings*, 388 B.R. at 568 (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005)).  If not exculpated (which was the case here), a claim for the breach of the duty of care requires a "showing of gross negligence."

45

FBG_CH1_00090038

*In re Fedders N. Am., Inc.*, 405 B.R. 527, 539 (Bankr. D. Del. 2009). Under Delaware law, directors are "fully protected in relying in good faith upon . . . opinions . . . presented … by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care . . . ." 8 Del. Code § 141(e).

72.     The Debtors present no particularized facts that if proven would show Mr. James engaging in fraudulent conduct. *See generally* Am. Compl. Nor are there allegations supporting Mr. James' participation in any purported "fraudulent transfer," since the Amended Complaint not only lacks specific allegations detailing Mr. James' alleged involvement in directing or causing each of the fraudulent transfers at issue but also lacks any allegations of insolvency at the time of any transfers. *See supra*. Moreover, Mr. James was entitled to rely on reports from professionals, including an independent auditor, to review the financial statements and provide the basis for the financing decisions that the Debtors made. *See Brehm v. Eisner*, 746 A.2d 244, 261 (Del. 2000) (dismissing duty of care claim where the directors "were advised by . . . an expert and . . . they relied on his expertise").

73.     *Second*, the duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *In re Fedders*, 405 B.R. at 540. "To state a legally sufficient claim for breach of the duty of loyalty, plaintiffs must allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs." *Id.* "[C]laims for breach of the duty of loyalty are notably—and intentionally— difficult claims to assert." *In re Cred Inc.*, 650 B.R. 803, 830 (Bankr. D. Del. 2023), *aff'd*, 658 B.R. 783 (D. Del. 2024).

46

FBG_CH1_00090039

74.     The crux of the Debtors' claims against Mr. James for breach of the duty of loyalty is that he purportedly subordinated First Brands' interest by securing fraudulent financing and diverting Company funds for his own use through the various transfers alleged in the Amended Complaint.  Am. Compl. ¶¶ 195-97.  But, as indicated above, *see supra*, there are no allegations in the Amended Complaint detailing Mr. James' connection to the allegedly fraudulent transfers, without which the Debtors cannot plead a breach of a duty of loyalty.  *See In re Our Alchemy*, 2019 WL 4447541, at *10.

75.     In any event, the receipt of a fraudulent transfer by itself is not grounds for a breach of fiduciary duty claim.  Under 11 U.S.C. § 548(a)(1)(A), "[t]here is no reference at all in the text to any requirement implicating the debtor's transferee." *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 444 (S.D.N.Y. 2001).  Rather, "[t]he only inquiry concerning actual intent that matters is that of the *debtor*." *Id.*  As such the Debtors' allegation of breach of fiduciary duty may not rest exclusively on their allegations that Mr. James supposedly received fraudulent transfers.

76.     ***Finally***, "[t]he duty to act in good faith . . . is a subsidiary element of the duty of loyalty." *In re Fedders*, 405 B.R. at 540.  It is not enough to simplistically say Mr. James acted in "bad faith," Am. Compl. ¶¶ 197, 202, because "the hollow invocation of 'bad faith' does not magically render a deficient complaint dismissal-proof." *Fisk Ventures*, 2008 WL 1961156, at *11 ("this Court will not blindly accept conclusory allegations").

### 3.     The Debtors Have Not Alleged That Mr. James Knowingly Participated in Any Breach of Fiduciary Duty.

77.     To state a claim for aiding and abetting a breach of fiduciary duty, the Debtors must adequately allege:  "(1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendant[,] and (4) damages proximately caused by the breach." *In re Hennessy Cap. Acquisition Corp. IV S'holder Litig.*,

47

FBG_CH1_00090040

318 A.3d 306, 329 (Del. Ch. 2024), *aff'd*, 337 A.3d 1214 (Del. 2024).  Even if another Defendant apart from Mr. James breached his fiduciary duties to the Company, the Debtors have not alleged how Mr. James knowingly participated in any such purported breach, as is required.   The "knowing participation" element has two requirements:  participation and knowledge. *Witmer v. Armistice Cap., LLC*, 344 A.3d 632, 660 (Del. Ch. 2025).  The Debtors have pled neither.

78.   "[P]articipation in a primary actor's breach of fiduciary duty must be of an active nature, as compared to mere passive awareness."  *Id.* (internal quotations omitted).  Here, the Amended Complaint's repeated assertion that Mr. James "directed" certain actions or that other defendants were acting "through" Mr. James does not suffice to make out knowing participation. *See* Am. Compl. ¶¶ 43, 64-68, 77, 91, 136, 187, 196.  *See In re Hennessy Cap.*, 318 A.3d at 329 (dismissing aiding and abetting fiduciary duty claim where "the [c]omplaint lack[ed] adequate allegations that [defendant] knowingly participated in any purported breach of fiduciary duty" because "there [we]re no allegations whatsoever that [defendant] took action with regard to the merger or proxy"); *Witmer*, 344 A.3d at 660 (finding allegations of "participation" in an aiding and abetting claim conclusory where "'[t]here [we]re no allegations whatsoever that [defendant] took action' with regard to the [c]hallenged [t]ransactions").

**J.    The Amended Complaint Fails to Adequately Plead a Claim of Conspiracy Against Patrick James.**

79.   The Ohio Supreme Court has defined a civil conspiracy as "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995) (quoting *LeFort v. Century 21-Maitland Realty Co.*, 512 N.E.2d 640, 645 (Ohio 1987)).  To plead such a claim, the Debtors need to adequately allege: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence

48

FBG_CH1_00090041

of an unlawful act independent from the actual conspiracy." *In re Nat'l Century Fin. Enters., Inc.*, 504 F. Supp. 2d 287, 326 (S.D. Ohio 2007) (quoting *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993)).  They fail to do so.

### 1.    The Debtors Have Not Sufficiently Alleged an Unlawful Act Independent of the Purported Conspiracy.

80.    "Conspiracy in and of itself does not normally establish a basis for recovery in a civil action in Ohio; rather, there must be an actionable wrong committed as a result of the conspiracy." *NPF IV, Inc. v. Transitional Health Servs.*, 922 F. Supp. 77, 83 (S.D. Ohio 1996); *see also Mender v. Chauncey*, 41 N.E.3d 1289, 1301 (Ohio App. Ct. 2015) ("A civil action for civil conspiracy requires a viable claim distinct from the conspiracy in order for the conspiracy claim to survive.").  "Where all the substantive causes of action on which a conspiracy claim is based are without merit, a conspiracy claim must also fail." *Nilavar v. Mercy Health Sys. W. Ohio*, 142 F. Supp. 2d 859, 889 (S.D. Ohio 2000) (citing *El–Shiekh v. Northwest Ohio Cardiology Consultants, Inc.*, 2000 WL 1298761 (Ohio App. Sept. 15, 2000)); *see also NPF IV.*, 922 F. Supp. at 83 (dismissing conspiracy claim where the underlying unlawful act was dismissed for failure to state a claim).  For the reasons set forth above, the Debtors have failed to adequately allege their fraudulent transfer and fiduciary duty claims.

81.    Similarly, to the extent that the Debtors intend to rest their conspiracy allegations on an underlying act of fraud, they have not satisfied the heightened pleading standard of Rule 9(b). *See supra*.

82.    As such, the Debtors have not sufficiently pleaded an unlawful act, and their claim of civil conspiracy should be dismissed. *See AAA Installers v. Sears Holdings Corp.*, 764 F. Supp. 2d 931, 941 (S.D. Ohio 2011) (dismissing civil conspiracy claim where plaintiffs did not adequately allege a claim for fraud and thus alleged no underlying unlawful act).

49

FBG_CH1_00090042

**2.       The Debtors Have Not Alleged A "Malicious Combination."**

83.     To satisfy the "malicious combination" requirement, the Debtors "must show that the coconspirators 'shared in the general conspiratorial objective.'" *In re Nat'l Century*, 504 F. Supp. 2d at 326 (quoting *Aetna Cas. and Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 538 (6th Cir. 2000)).  While this requirement does not require an express agreement between defendants, it does require "a common understanding or design, even if tacit, to commit an unlawful act."  *Id.* (quoting *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996)).  "The malice involved in the tort 'is that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.'"  *Plastics Mach. Grp., Inc. v. Thermoforming Process Prods., Inc.*, 2025 WL 1836299, at *5 (N.D. Ohio Feb. 28, 2025) (quoting *Fed. Ins. Co. v. Webne*, 513 F. Supp. 2d 921, 927 (N.D. Ohio 2007)).

84.     Notably absent from the Amended Complaint are any allegations that Mr. James, explicitly or implicitly, "engaged in a meeting, discussion or agreement to join in alleged wrongful conduct or a 'malicious combination' with the other [d]efendants" (or anyone else, for that matter).  *Koyo Corp. of U.S.A. v. Comerica Bank*, 2011 WL 4540957, at *9 (N.D. Ohio Sept. 29, 2011).  Instead, the Amended Complaint alleges that Mr. Baker, Mr. Brumbergs, and Mr. Graham "provided substantial assistance" or "worked closely" with Mr. James.  Am. Compl. ¶¶ 114-15. As the Chief Corporate Strategy Officer, Vice President of Finance, and Chief Financial Officer, respectively, it would be expected for these individuals to work closely with Mr. James, the CEO. *See id.* ¶ 4.  But merely working together, whether involved in an unlawful act or not, is not enough to allege a conspiracy; there must be some agreement.  *Cf. Valente v. Univ. of Dayton*, 689 F. Supp. 2d 910, 929 (S.D. Ohio 2010), *aff'd*, 438 F. App'x 381 (6th Cir. 2011) (explaining that merely "not[ing] that many different people were involved" is insufficient to plead conspiracy).  It is similarly insufficient to allege in conclusory fashion that "Baker, Brumbergs,

50

FBG_CH1_00090043

and Graham, knowingly participated in, substantially assisted, and/or conspired with James in implementing each of the . . . plans." Am. Compl. ¶ 9; *see Koyo Corp*, 2011 WL 4540957, at *9 (granting motion to dismiss civil conspiracy claim under Ohio law where "[plaintiff's] allegations concerning a conspiracy among the [d]efendants rest[ed] on mere 'labels and conclusions'").

### 3. The Intracorporate Conspiracy Doctrine Bars Debtors' Conspiracy Claim.

85. Under Ohio law, the intracorporate conspiracy doctrine dictates that "a corporation cannot conspire with its own agents or employees." *Ohio Bureau of Workers' Comp. v. MDL Active Duration Fund, Ltd.*, 476 F. Supp. 2d 809, 825 (S.D. Ohio 2007). Specifically, "members of the same legal entity cannot conspire with one another as long as their alleged acts were within the scope of their employment." *Jackson v. City of Columbus*, 194 F.3d 737, 753 (6th Cir. 1999); *Kerr v. Hurd*, 694 F. Supp. 2d 817, 834 (S.D. Ohio 2010) ("Where all defendants, allegedly co-conspirators, are members of the same collective entity, there are not two separate 'people' to form a conspiracy.").

86. Here, Mr. James, Mr. Baker, Mr. Brumbergs, and Mr. Graham all worked for the same legal entity. *See* Am Compl. ¶¶ 20, 27-19. Consequently, they cannot conspire with one another unless their activities were outside the scope of their employment. The Amended Complaint alleges that "[e]ach conspirator acted outside the scope of legitimate corporate duties." Am. Compl. ¶ 215. But such a conclusory allegation, without additional factual allegations, is insufficient to overcome the intracorporate conspiracy doctrine. *See Innovative Architectural Planners, Inc. v. Ohio Dep't of Admin. Servs.*, 239 N.E.3d 942, 956 (Ohio Ct. App. 2024) (dismissing conspiracy claim where "all the alleged co-conspirators were members of the same legal entity"); *see also Harris v. Board of Educ.*, 798 F. Supp. 1331, 1346 (S.D. Ohio 1992) ("Simply joining corporate officers as defendants in their individual capacities is not enough to

51

FBG_CH1_00090044

make them persons separate from the corporation in legal contemplation. The plaintiff must also allege . . . that they acted other than in the normal course of their corporate duties.") (internal quotation marks and citation omitted); *Reynolds v. Duke Energy Corp.*, 2023 Ohio Misc. LEXIS 3683, at *34-35 (C.P. Aug. 9, 2023) (granting motion to dismiss civil conspiracy claim under the intracorporate conspiracy doctrine where the individual defendants worked for the same parent company or subsidiary of the parent company).

## II.   Alternatively, the Court Should Order the Debtors to Provide a More Definite Statement Pursuant to Rule 12(e).

87.   To the extent that the Debtors' claims are not dismissed in their entirety—and they should be—the Debtors should be required to articulate a more definitive statement of their claims under Federal Rule of Civil Procedure 12(e).  That Rule provides that "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response."  Fed. R. Civ. P. 12(e). Courts are "given considerable discretion" in deciding a motion under Rule 12(e).  *In re Briar Bldg. Houston LLC*, 2021 WL 2460979, at *11 (Bankr. S.D. Tex. June 16, 2021) (granting Rule 12(e) motion where movant was "not on proper notice to respond" because the pleading was "so vague and ambiguous").

88.   A court should grant a motion under Rule 12(e) where "a pleading . . . is so vague or ambiguous that the [defendants] cannot reasonably prepare a response."  Fed. R. Civ. P. 12(e). The motion "must point out the defects complained of and the details desired."  *Id.*  "The decision to order a more definite statement lies within the Court's discretion, and if a complaint is overly prolix or complex, a more definite statement may assist the court in 'the cumbersome task of sifting through myriad claims, many of which may be foreclosed by various defenses.'"  *In re*

52

FBG_CH1_00090045

*WonderWork, Inc.*, 626 B.R. 94, 135 (Bankr. S.D.N.Y. 2020) (quoting Moore's Federal Practice § 12.36).

89.     Unless the Debtors specifically identify certain additional information concerning the transactions they seek to challenge—rather than treating all of the fraudulent transfers as a whole for purposes of, e.g., "actual" fraudulent intent, insolvency, and reasonably equivalent value—it is impossible for Defendants to meaningfully respond to the Amended Complaint or prepare their defense. *In re WonderWork, Inc.*, 626 B.R. at 136 (granting Rule 12(e) motion on fraudulent transfer claim where "[t]he shotgun approach to recover all American Express payments made over several years, without differentiation, makes it impossible for [defendant] to frame his answer"); *In re Motorwerks, Inc.*, 371 B.R. at 293 (granting Rule 12(e) motion on fraudulent transfer claim where the complaint "fail[ed] to identify, by date or amount, even one actual transfer from the [d]ebtor to [defendant] that is to be avoided" and therefore "fail[ed] to provide [defendant] with notice of the underlying transfers to be avoided hindering the bank's ability to prepare an adequate answer and affirmative defenses").

90.     It may be the transfers should be collapsed, particularly considering the funds Mr. James contributed back into the Company; such amounts should be considered on a consolidated basis. But that does not relieve the Debtors of their pleading obligations. The Debtors should in accordance with Rule 12(e) to file an amended pleading setting forth a more definitive statement, providing at a minimum, the following information:

- The specific facts and circumstances surrounding transfer, *e.g.*, whether the transfer was a dividend, a distribution, or otherwise;

- In the case of actual-intent claims, the basis for the specific "intent to hinder, delay or defraud" for each transfer, including who held that intent and whether

53

FBG_CH1_00090046

that person caused the transfer or why that person's intent should be imputed to the Debtors;

- The date on which each of the relevant Debtors allegedly became insolvent and supporting factual allegations detailing the basis for such insolvency;

- Specific allegations of how Mr. James "caused" or "directed" any individual to take any purported action alleged in the Amended Complaint or specifically tying Mr. James to the conduct alleged;

- With respect to the Debtors' allegations of accounting fraud, how the accounting was incorrect, which metrics were misstated and by how much, for each specific entity alleged to be subject to such purported fraud;

- With respect to the Debtors' other claims of fraud, specific factual allegations detailing what was said, to whom, when, and how such conduct was fraudulent, including detailed allegations regarding Mr. James' purported involvement.

## CONCLUSION

91.   For the reasons stated above, the Court should dismiss the Debtors' Amended Complaint or in the alternative, order the Debtors to provide a more definite statement.

## RESERVATION OF RIGHTS

Mr. James and the Related Entities have rights to a trial by jury with respect to the claims filed in the adversary proceeding.  Any and all rights to demand a trial by jury at the appropriate time are reserved.  Similarly, Mr. James and the Related Entities reserve any and all rights to seek to withdraw the reference at the appropriate time, and nothing herein should be construed as a waiver or admission with respect to the same.

54

FBG_CH1_00090047

**Respectfully submitted**

Dated: February 2, 2026

**DEBEVOISE & PLIMPTON LLP**
Erica S. Weisgerber (admitted *pro hac vice*)
Matthew J. Sorensen (admitted *pro hac vice*)
Emily Morgan (*pro hac vice* forthcoming)
66 Hudson Boulevard
New York, NY  10001
Telephone: (212) 909-6000
eweisgerber@debevoise.com
mjsorensen@debevoise.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*/s/ Cameron Kelly*
————————————————————————

Cameron Kelly (TX SBN: 24120936)
700 Louisiana Street, Suite 3900
Houston, Texas 77002
Telephone: (713) 221-7000
Email: cameronkelly@quinnemanuel.com

Michael B. Carlinsky (admitted *pro hac vice*)
James C. Tecce (admitted *pro hac vice*)
Scott Hartman (admitted *pro hac vice*)
Anil Makhijani (admitted *pro hac vice*)
Eric S. Kay (admitted *pro hac vice*)
Reece Pelley (admitted *pro hac vice*)
Grace Sullivan (admitted *pro hac vice*)
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849-7000

*Attorneys for Defendants Patrick James, The Patrick James Trust, Albion Realty, LLC, Alester Technologies LLC, Battery Park Holding LLC, Larchmont LLC, Pegasus Aviation, LLC*

55

FBG_CH1_00090048

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed on the 2nd day of February, 2026, with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.


*/s/ Cameron Kelly*
Cameron Kelly

FBG_CH1_00090049

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| FIRST BRANDS GROUP, *et al.*, | : | Case No. 25-90399 (CML) |
|  | : |  |
| Debtors.[1] | : | (Jointly Administered) |
|  | : |  |
|  | : |  |
| FIRST BRANDS GROUP, *et al.*, | : |  |
| Plaintiffs | : | Adv. Pro. No. 25-3803 (CML) |
|  | : |  |
| v. | : |  |
|  | : |  |
| PATRICK JAMES, THE PATRICK JAMES TRUST, | : |  |
| ALBION REALTY, LLC, ALESTER | : |  |
| TECHNOLOGIES LLC, BATTERY PARK | : |  |
| HOLDINGS LLC, LARCHMONT LLC, PEGASUS | : |  |
| AVIATION, LLC, MICHAEL BAKER, PETER | : |  |
| ANDREW BRUMBERGS, STEPHEN GRAHAM, | : |  |
| JOHN AND JANE DOE(S) 1-100, and ABC | : |  |
| CORPORATION(S): 1-100, | : |  |
| Defendants | : |  |
|  | : |  |

**ORDER GRANTING RENEWED MOTION OF PATRICK JAMES AND RELATED
ENTITIES TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6) DEBTORS'
AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM, OR,
ALTERNATIVELY, PURSUANT TO FED. R. CIV. P. 12(E)
FOR A MORE DEFINITE STATEMENT**

The Court has considered the motion filed by Patrick James and the so-called "**Related**

**Entities**," i.e., (a) The Patrick James Trust, (b) Albion Realty, LLC, (c) Alester Technologies,

LLC, (d) Battery Park Holdings LLC, (e) Larchmont LLC, and (f) Pegasus Aviation LLC pursuant

to Federal Rule of Civil Procedure 12(b)(6) or alternatively for a more definite statement pursuant

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these
chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

FBG_CH1_00090050

to Federal Rule of Civil Procedure 12(e) (the "**Renewed Motion to Dismiss**").  This Court having reviewed the Renewed Motion to Dismiss and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and for sufficient cause, it is therefore:

**ORDERED** that the Renewed Motion to Dismiss is granted pursuant to Federal Rule of Civil Procedure 12(b)(6), and the Amended Complaint is dismissed in its entirety.

Dated:  February ___, 2026
        Houston, Texas

_____
CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

2

FBG_CH1_00090051

**DEBTORS' EXHIBIT NO. 171**
**Page 61 of 61**
**JOINT EXHIBIT NO. 47**
**Page 61 of 61**