**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FIRST BRANDS GROUP, LLC, *et al.*,[1] | ) Case No. 25-90399 (CML) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**AEQUUM CAPITAL FINANCIAL II LLC'S OBJECTION TO MOTION OF THE**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR (I) LEAVE, STANDING,**
**AND AUTHORITY TO COMMENCE AND PROSECUTE CERTAIN CLAIMS AND**
**CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES**
**AND (II) EXCLUSIVE SETTLEMENT AUTHORITY**

---

[1] A complete list of Debtors in these chapter 11 cases may be obtained on the website of Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

1

158165314

FBG_CH1_00093192

**DEBTORS' EXHIBIT NO. 181**
**Page 1 of 71**
**JOINT EXHIBIT NO. 57**
**Page 1 of 71**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 5

STANDARD OF REVIEW .................................................................................................... 14

ARGUMENT ......................................................................................................................... 18

   I.    The Committee's Proposed Claims Are Not Colorable. .................................................. 18

      A.    The Committee Improperly Disregards the Value Conferred Upon Broad Street. ....... 19

      B.    The Committee Cannot Establish that Broad Street Held a Recoverable Interest in
Funds Allegedly Belonging to Other Debtors ........................................................................ 21

      C.    The Ponzi Scheme Presumption Does Not Apply to a Legitimate Loan. ..................... 22

      E.    The Committee Has Not Stated a Colorable Claim for Intentional Fraudulent Transfer.
26

      F.    The Committee Has Not Stated a Colorable Claim for Constructive Fraudulent
Transfer. .................................................................................................................................. 30

      G.    The Equitable Subordination Claim Fails ..................................................................... 34

      H.    The Committee's Alleged Post-Petition Transfer Claim Is Unsupported by the Record
and Contradicted by the Filings in this Case as well as Aequum's Financial Records ......... 36

   II.    The Debtors Have Not Unjustifiably Refused to Bring the Proposed Claims ................. 37

   III.    The Cost-Benefit Analysis Independently Forecloses Standing ................................. 38

   IV.    The Aequum Secured Parties' Good Faith Independently Undermines the Colorability
of the Proposed Claims and Reinforces the Cost-Benefit Analysis ........................................ 39

CONCLUSION ...................................................................................................................... 40

i

158165314

FBG_CH1_00093193

**DEBTORS' EXHIBIT NO. 181**
**Page 2 of 71**
**JOINT EXHIBIT NO. 57**
**Page 2 of 71**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 1701 Commerce, LLC,*
    511 B.R. 841 (Bankr. N.D. Tex. 2014).....................................................................................29

*In re Atl. Nat. Foods, LLC,*
    Case No. 25-10676, 2025 WL 1747930 (Bankr. E.D. La. June 24, 2025) ...............................17

*In re Bayou Steel BD Holdings, L.L.C.,*
    651 B.R. 179 (Bankr. D. Del. 2023) ........................................................................................24

*Burtch v. Salem Inv. Partners, III, LP (In re Parker Sch. Unifs., LLC),*
    2021 WL 4553016 (Bankr. D. Del. Oct. 5, 2021) .......................................................5, 8, 9, 20

*Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.),*
    466 B.R. 626 (Bankr. D. Del. 2012) ........................................................................................35

*In re Chris Pettit & Assocs., P.C.,*
    No. 22-50591-CAG, 2024 WL 5316334 (Bankr. W.D. Tex. Dec. 16, 2024).........................29

*In re Clear the Air, LLC,*
    631 B.R. 286 (Bankr. S.D. Tex. 2021) ...............................................................................15, 16

*Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics
    Corp. v. Chinery,*
    330 F.3d 548 (3d Cir. 2003).....................................................................................................15

*In re DBSI, Inc.,*
    477 B.R. 504 (Bankr. D. Del. 2012) ........................................................................................20

*In re Enron Corp.,*
    319 B.R. 128 (Bankr. S.D. Tex. 2004) .....................................................................................16

*In re FBI Wind Down, Inc.,*
    581 B.R. 387 (Bankr. D. Del. 2018) ........................................................................................31

*In re Fedders N. Am., Inc.,*
    405 B.R. 527 (Bankr. D. Del. 2009) ........................................................................................28

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
    954 F.3d 1 (1st Cir. 2020).........................................................................................................16

*In re FTX Trading Ltd.,*
    No. 22-11068 (JTD), 2024 WL 4562675 (Bankr. D. Del. Oct. 23, 2024).........................25, 27

i

FBG_CH1_00093194

**DEBTORS' EXHIBIT NO. 181**
**Page 3 of 71**
**JOINT EXHIBIT NO. 57**
**Page 3 of 71**

*G-I Holdings, Inc. v. Those Parties (In re G-I Holdings, Inc.)*,
 313 B.R. 612 (Bankr. D.N.J. 2004) ........................................................................................15

*Giuliano v. Fleming (In re Nobilis Health Corp.)*,
 661 B.R. 891 (Bankr. D. Del. 2024) ......................................................................................35

*Glassman v. Heimbach, Spitko & Heckman (In re Spitko)*,
 2007 WL 1720242 (Bankr. E.D. Pa. June 11, 2007) ..............................................................20

*In re Green Field Energy Servs., Inc.*,
 No. 13-12783(KG), 2018 WL 6191949 (Bankr. D. Del. Nov. 28, 2018)................................21

*In re HH Liquidation, LLC*,
 590 B.R. ...................................................................................................................................34

*In re Highland Cap. Mgmt., L.P.*,
 Case No. 19-34054-SGJ-11, 2023 WL 5523949 (Bankr. N.D. Tex. Aug. 25,
 2023) ........................................................................................................................................16

*Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.)*,
 421 B.R. 251 (Bankr. W.D. Tex. 2009)..............................................................................28, 29

*Janvey v. Alguire*,
 647 F.3d at 597–98 ..................................................................................................................22

*Johnson v. First Nat. Bank*,
 81 B.R. 87 (Bankr. N.D. Fla. 1987)......................................................................................2, 31

*Judgment Factors, L.L.C. v. Packer (In re Packer)*,
 816 F.3d 87 (5th Cir. 2016) ....................................................................................................15

*In re Live Well Fin., Inc.*,
 No. 19-11317 (LSS), 2023 WL 3995900 (Bankr. D. Del. June 13, 2023) ..............................23

*Louisiana World Exposition v. Fed. Ins. Co.*,
 858 F.2d 233 (5th Cir. 1988) ..................................................................................................15

*In re Manhattan Inv. Fund Ltd.*,
 397 B.R. 1 (S.D.N.Y. 2007).....................................................................................................24

*In re Modivcare*,
 Case No. 25-90309 (S.D. Tex. Bankr.)............................................................................4, 36, 37

*Off. Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital
 Mgmt., L.P. (In re Broadstripe, LLC)*,
 444 B.R. 51 (Bankr. D. Del. 2010) .........................................................................................34

158165314

FBG_CH1_00093195

**DEBTORS' EXHIBIT NO. 181**
**Page 4 of 71**
**JOINT EXHIBIT NO. 57**
**Page 4 of 71**

*Off. Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.)*,
   984 F.2d 1305 (1st Cir. 1993) ................................................................................................14

*In re Pac. Lumber Co.*,
   584 F.3d 229 (5th Cir. 2009) .................................................................................................25

*PW Enters., Inc. v. N.D. Racing Comm'n (In re Racing Servs., Inc.)*,
   540 F.3d 892 (8th Cir. 2008) ...........................................................................................15, 16

*Quilling v. Schonsky*,
   247 F. App'x at 586 (5th Cir. 2007)......................................................................................22

*Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.)*,
   No. 06-10894(PJW), 2009 WL 2004226................................................................................21

*In re Reagor-Dykes Motors, LP*,
   No. 18-50214-RLJ-11, 2022 WL 2046144 (Bankr. N.D. Tex. June 3, 2022)...................22, 23

*Reed v. Cooper (In re Cooper)*,
   405 B.R. 801 (Bankr. N.D. Tex. 2009)..................................................................................15

*In re Sabine Oil & Gas Corp.*,
   547 B.R. 503 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016) ................................17

*Scott v. Nat. Century Fin. Enters., Inc. (In re Balt. Emergency Servs. II, Corp.)*,
   432 F.3d 557 (4th Cir. 2005) .................................................................................................14

*Senior Care Centers, LLC, et al. v. Eric Wills (In re Senior Care Centers, LLC)*,
   No. 3:21-CV-01357-C, 2023 WL 6519756 (Bankr. N.D. Tex. Mar. 24, 2023)......................29

*In re Smart World Techs., LLC*,
   423 F.3d 166 (2d Cir. 2005)..................................................................................................14

*Taylor v. Trevino*,
   No. 3:20-CV-393-D, 2021 WL 347566 (N.D. Tex. Feb. 2, 2021) .........................................29

*Templeton v. O'Cheskey (In re Am. Hous. Found.)*,
   785 F. 3d 143 (5th Cir. 2015), *as revised* (June 8, 2015) ......................................................38

*In re Texas E&P Operating, Inc.*,
   Case No. 17-34386-SGJ-7, 2022 WL 2719472 (Bankr. N.D. Tex. July 13,
   2022) .....................................................................................................................................28

*In re Tidewater Landfill LLC*,
   Case No. 20-11646, 2025 WL 2013686 (Bankr. E.D. La. July 16, 2025)...............................16

*Tilton v. MBIA Inc. (In re Zohar III, Corp.)*,
   639 B.R. 73 (Bankr. D. Del. 2022) ...................................................................................34, 35

158165314

FBG_CH1_00093196

DEBTORS' EXHIBIT NO. 181
Page 5 of 71
JOINT EXHIBIT NO. 57
Page 5 of 71

*United States v. Fernon,*
    640 F.2d 609 (5th Cir. 1981) ................................................................................................28

*Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim Energy, LLC),*
    527 B.R. 169 (D. Del. 2015) ...............................................................................................35

*Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.),*
    714 F.3d 860 (5th Cir. 2013) ...............................................................................................14

*Zazzali v. 1031 Exch. Grp. LLC,*
    476 B.R. 413 (Bankr. D. Del. 2012) ...................................................................................24

*Zazzali v. Hirschler Fleischer, P.C.,*
    482 B.R. 495 (Bankr. D. Del. 2012) ...................................................................................28

**Statutes**

11 U.S.C.
    § 502(d) ................................................................................................................................18
    § 502(j) .................................................................................................................................18
    § 544 ........................................................................................................................18, 26, 30
    § 548 ..............................................................................................................................21, 38
    § 548(a)(1) ............................................................................................................................21
    § 548(a)(1)(A) .......................................................................................................18, 26, 27, 30
    § 548(a)(1)(B) ................................................................................................................18, 30
    § 548(c) ................................................................................................................................38
    § 549 ....................................................................................................................................18
    § 550 ........................................................................................................................18, 26, 30
    § 1112(b) ................................................................................................................................8

Tex. Bus. & Com. Code § 24.005(a)(1) .........................................................................................26

iv

158165314

FBG_CH1_00093197

**DEBTORS' EXHIBIT NO. 181**
**Page 6 of 71**
**JOINT EXHIBIT NO. 57**
**Page 6 of 71**

Aequum Capital Financial II LLC, in its capacity as administrative agent ("Aequum") for the lenders (the "Aequum Lenders," and together with Aequum, the "Aequum Secured Parties") under a revolving credit facility (the "Revolving Credit Facility") to debtor Broad Street Financial, LLC ("Broad Street"), by and through its undersigned counsel, hereby files this objection to the *Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* [Docket No. 2685] (the "Standing Motion") filed by the Official Committee of Unsecured Creditors (the "Committee") and states as follows:

## PRELIMINARY STATEMENT

1.      The Standing Motion is, at its core, an attempt by the Committee to unwind approximately $11.7 million in pre-petition loan repayments made by *Broad Street* to Aequum under the Credit Agreement (the "Broad Street-Aequum Loan Payments"). Although the Committee devotes substantial attention to transfers among affiliated Debtors and deposits into Broad Street's bank account, it does not seek standing to avoid those transfers. Instead, the Committee contends that because Broad Street allegedly used funds from sources not contemplated under the Credit Agreement (defined below) to repay its obligations, the resulting payments to the Aequum Secured Parties should be unwound and returned to *Broad Street*. That theory fails as a matter of law.

2.      The Committee's allegations, at most, suggest that Broad Street may have failed to comply with certain covenants or restrictions contained in the Credit Agreement. But alleged non-compliance by a borrower does not render an otherwise valid financing transaction void, negate the value provided by the lender, or transform ordinary loan repayments into avoidable transfers. Indeed, case law recognizes that funds deposited into and commingled within a debtor's bank

1

FBG_CH1_00093198

DEBTORS' EXHIBIT NO. 181
Page 7 of 71
JOINT EXHIBIT NO. 57
Page 7 of 71

account are presumptively property of that debtor.  The Aequum Secured Parties are not responsible for, involved in, or complicit in any alleged misuse of funds by Broad Street and nothing in the Committee's allegations supports a contrary conclusion.

3.     The Committee's theory also turns the Credit Agreement and the underlying purpose of the financing transaction on their head.  The Aequum Secured Parties fulfilled all of their obligations under the Credit Agreement, advanced the agreed financing, and exercised their contractual rights to conduct due diligence and investigations.  The Committee's assertion that alleged noncompliance by Broad Street somehow invalidates the entire financing transaction ignores both the governing documents and the commercial realities of structured finance transactions.   Acceptance of the Committee's position would undermine standard and commonplace protections relied upon by lenders, investors and special purpose vehicles— protections that this Circuit has repeatedly recognized as legitimate and enforceable.

4.     Once the relevant transfer is properly identified, the deficiencies in the Standing Motion become apparent.  To obtain derivative standing, the Committee must demonstrate that the proposed claims are colorable, the Debtors unjustifiably refused to pursue them, and the prosecution of those claims would yield a tangible benefit to the estate.  The Committee fails on each element

5.     *First*, the proposed avoidance claims with respect to the Broad Street-Aequum Loan Payments are not colorable.  The Committee has not plausibly alleged fraud—actual or constructive—under either bankruptcy law or state law. There is no dispute that the Aequum Lenders extended a loan of $45,000,000.00 (the "Aequum Loan") to Broad Street, resulting in the deposit of approximately $43,781,942.62 into Broad Street's bank account (after deduction of contractually contemplated fees and expenses).  Broad Street therefore received the full economic

158165314

FBG_CH1_00093199

value contemplated by the transaction. What Broad Street subsequently did with those loan proceeds cannot negate the value given by the Aequum Secured Parties to Broad Street at the time the Aequum Loan was made.

6. Nor has the Committee adequately alleged fraudulent intent. The relevant inquiry is the intent of Broad Street, as the transferor—not the intent of Aequum. Yet, the Standing Motion offers no meaningful analysis demonstrating fraudulent intent on the part of Broad Street. Instead, the Committee improperly focuses on Aequum's conduct while largely ignoring the transferor-intent requirement that is critical to its claims.

7. The Committee likewise fails to allege facts supporting constructive fraudulent transfer claims. It faces an insurmountable challenge in arguing that a repayment of a $45 million loan whose proceeds were deposited directly into Broad Street's account lacked reasonably equivalent value or rendered Broad Street insolvent. The Committee's repeated invocation of a purported "Ponzi scheme" does not relieve it of its obligation to plead and ultimately prove the essential elements of its claims, including lack of reasonably equivalent value and insolvency. It has done neither.

8. The Committee's narrative that Aequum somehow furthered a Ponzi scheme is unsupported by the facts. The Aequum Loan was a legitimate financing transaction that provided substantial value to the Debtors. To the extent that certain parties may have derived ancillary benefits from the transaction, such considerations do not alter the fundamental reality that the Aequum Lenders advanced substantial capital in exchange for bargained-for rights and protection.

9. *Second,* the Committee fails to establish that the Debtors unjustifiably declined to pursue claims against Aequum. Rather than identifying the deficient or unreasonable decision-making by the Debtors, the Committee merely speculates about purported conflicts involving the

3

158165314

FBG_CH1_00093200

**DEBTORS' EXHIBIT NO. 181**
**Page 9 of 71**
**JOINT EXHIBIT NO. 57**
**Page 9 of 71**

Special Committee.  Such speculation is insufficient.  As this Court recently recognized in its oral ruling after a 5-day evidentiary hearing on the official committee of unsecured creditors' standing motion in *In re Modivcare,* Case No. 25-90309, (S.D. Tex. Bankr.) (Perez, Bankr. J.) ("*Modivcare*"), unsupported allegations of conflict do not establish an unjustifiable refusal to pursue claims. The transcript of this extensive oral ruling ultimately denying the committee's standing motion [Case No. 25-90309, Docket No. 1145] is attached as **Exhibit 1** hereto.

10.     *Third*, the Committee cannot demonstrate that prosecution of the proposed claims would benefit Broad Street's estate and its creditors.  The only creditors of Broad Street are the Aequum Secured Parties.  The Committee identifies no creditor that will benefit from the avoidance of the Broad Street-Aequum Loan Payments.  Even under the Committee's theory, any recovered funds would simply be returned to Broad Street, producing no meaningful benefit for unsecured creditors.

11.     Moreover, the validity and priority of Aequum's liens are already the subject of a pending declaratory judgment adversary proceeding brought by certain prepetition secured creditors.  To the extent any value could be realized through a successful challenge to Aequum's liens, that value would inure to the benefit of those secured creditors—not to the unsecured creditor body represented by the Committee.

12.     As Judge Perez recognized in *Modivcare*, where the costs and burdens of litigation substantially outweigh any potential benefit to the estate, a standing motion may be denied without further consideration of the colorability of the proposed claims—that principle applies here.

13.     The timing of the Standing Motion further underscores its deficiencies.  The Committee waited until the eve of the challenge deadline to seek standing, despite (a) having received multiple extensions of that deadline, (b) Aequum's voluntarily production of documents

4

158165314

FBG_CH1_00093201

relating to the Aequum Loan, and (c) extensive litigation concerning the Committee's Rule 2004 requests, culminating in the Court's decision to quash those requests.  After failing to uncover evidence supporting its narrative, the Committee now seeks standing based on speculative and not colorable claims.

14.    Because the Committee has failed to establish colorable claims, unjustifiable refusal by the Debtors, or any meaningful benefit to the estate, Aequum respectfully requests that the Standing Motion be denied in its entirety.

**BACKGROUND**[2]

**A.  The Revolving Credit Facility and Formation of Broad Street as an SPE**

15.    The Aequum Loan was issued pursuant to that certain Credit Agreement, dated as of March 28, 2024 (as amended, amended and restated, restated, supplemented, modified or otherwise in effect from time to time, the "Credit Agreement") entered into between Broad Street, Debtor Broad Street Financial Holdings, LLC ("Parent"), First Brands Group, LLC ("First Brands"), as servicer, Aequum, and the Aequum Lenders.  Weisheit Declaration, Ex. A.[3]  Pursuant to the Credit Agreement, the Aequum Lenders extended the Revolving Credit Facility to Broad Street in an aggregate maximum principal amount of $45,000,000 (together with all other obligations under the Credit Agreement, the "Obligations").

16.    Broad Street was formed as a bankruptcy-remote special purpose entity ("SPE" or "SPV") for the purpose of entering into the Credit Agreement, the other Transaction Documents

---

[2]    For avoidance of duplication, the Background section (¶¶ 14-28) of the *Motion of Aequum Capital Financial II LLC for Entry of an Order (I) Dismissing Chapter 11 Case of Debtor Broad Street Financial, LLC, or, in the Alternative, (II) Granting Relief from the Automatic Stay, or (III) Appointing a Chapter 11 Trustee* [Docket No. 631] is incorporated as if fully stated herein.

[3]    All references to the "Weisheit Declaration" herein refer to the declaration of Eric Weisheit filed in support of the *Motion of Aequum Capital Financial II LLC for Entry of an Order (I) Dismissing Chapter 11 Case of Debtor Broad Street Financial, LLC, or, in the Alternative, (II) Granting Relief from the Automatic Stay, or (III) Appointing a Chapter 11 Trustee* [Docket No. 631-1].

5

158165314

FBG_CH1_00093202

**DEBTORS' EXHIBIT NO. 181**
**Page 11 of 71**
**JOINT EXHIBIT NO. 57**
**Page 11 of 71**

(as defined in the Credit Agreement) and the transactions contemplated therein. Broad Street, Parent and First Brands each agreed to take all steps required to (a) continue Broad Street's identity as a separate legal entity and make it apparent to third Persons that Broad Street is an entity with assets and liabilities distinct from those of Viceroy Private Capital, LLC (the "First Brands Parent"), First Brands and any other Person and is not a division of First Brands Parent, First Brands, its Affiliates or any other Person and (b) ensure that Broad Street shall at all times qualify as a bankruptcy-remote entity. Credit Agreement, § 5.1(m).

17. The Revolving Credit Facility allows Broad Street to purchase inventory directly from First Brands and its subsidiaries, including brake parts, electronics, steering components, calipers, pumps, and motors, and utilize that inventory as a borrowing base to obtain credit from the Aequum Lenders. *See Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* [Docket No. 22] (the "Moore Declaration") ¶ 50. Subsequently, Broad Street may sell the inventory back to the Debtors. *Id.*

18. In order to further ensure Broad Street's separateness from the rest of the First Brands enterprise, the Amended and Restated Limited Liability Company Agreement of Broad Street Financials, LLC dated March 25, 2024 (as amended, amended and restated, restated, supplemented, modified or otherwise in effect from time to time, the "LLC Agreement"), enacted certain specific requirements, including the appointment of one or more Independent Managers *See* Weisheit Declaration, Ex. F.

**B. Case Background and Investigations Conducted Prior to Debtors' Filing of the Plan and Disclosure Statement and Determination Not to Pursue Claims Against Aequum**

19. On September 24, 2025, and September 28, 2025 (the "Petition Dates"), the Debtors each commenced with the Court a voluntary case (collectively, this "Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). [Docket No. 1]. As of the

6

FBG_CH1_00093203

**DEBTORS' EXHIBIT NO. 181**
**Page 12 of 71**
**JOINT EXHIBIT NO. 57**
**Page 12 of 71**

Petition Dates, the Debtors had already appointed a special committee of independent directors (the "Special Committee") and authorized it to investigate any potential claims and causes of action belonging to the Debtors' estates, including those that might arise from the conduct of current or former employees. [Docket No. 22 ¶ 32].

20.     Shortly after the commencement of these cases, on October 15, 2025, the United States Trustee moved for the appointment of an examiner (the "Examiner") to conduct substantially similar investigation into the Debtors' affairs.  [Docket No. 340].  The United States Attorney's Office for the Southern District of New York and the Securities and Exchange Commission also commenced parallel criminal and civil investigations, respectively, concerning the Debtors and their operations.

21.     On November 19, 2025, the Court entered the *Order Directing Appointment of an Examiner* [Docket No. 726] (the "Examiner Order").  The examiner's mandate expressly includes, among other things, investigation into the Debtors' financing arrangements and off-balance sheet financing.

22.     On January 9, 2026, the Court approved the appointment of Martin De Luca as examiner (the "Examiner") [Docket No. 1260].  The Examiner promptly filed its work plan on January 22, 2026 [Docket No. 1650] (the "Work Plan").  The Committee objected to the Work Plan on January 27, 2026 [Docket No. 1722]—not because the investigation was insufficient, but because the Committee sought greater control over the investigation itself.  [Docket No. 1722]. The Court rejected that position and approved the Work Plan over the Committee's objection on January 28, 2026.  [Docket No. 1819].

7

158165314

FBG_CH1_00093204

DEBTORS' EXHIBIT NO. 181
Page 13 of 71
JOINT EXHIBIT NO. 57
Page 13 of 71

23.     On April 18, 2026, the Examiner filed the Examiner's Report under seal [Docket No. 2479] and subsequently filed a redacted version [Docket No. 2538-1] (the "Examiner Report") on April 27, 2026.

24.     On May 4, 2026, the Examiner filed his *Emergency Motion to Increase the Examination Budget* [Docket No. 2571] (the "Examiner Budget Motion").

25.     On May 13, 2026, the U.S. Trustee filed the *Motion to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b)* [Docket No. 2670] (the "UST's Motion to Convert or Dismiss"), alleging that the Debtors are administratively insolvent.

26.     After filing several preliminary versions of a plan and disclosure statement, Debtors, on the morning of the May 26, 2026 contested hearing on the contingent approval of the disclosure statement (the "Contested Contingent Approval Hearing"), filed finalized versions of the *Chapter 11 Plan of Premier Marketing Group* [Docket No. 2784] (the "Plan") and the *Disclosure Statement for Chapter 11 Plan of Premier Marketing Group* [Docket No. 2786] (the "Disclosure Statement") for the Court's consideration. The Disclosure Statement clarifies that the Debtors do not intend to seek substantive consolidation of the Debtors' estates.

27.     Additionally, also immediately prior to the Contested Contingent Approval Hearing, the Debtors filed the *Motion of FBG Debtors for Entry of an Order (I) Approving Global Settlement; (II) Authorizing and Directing Sale and Transfer of Assets in Connection Therewith; (III) Converting Certain Chapter 11 Cases to Chapter 7; and (IV) Granting Related Relief* [Docket No. 2783] ) (the "Settlement Motion").

28.     After the Contested Contingent Approval Hearing, the Court denied contingent approval of the Disclosure Statement without prejudice, expressing concerns about how intertwined it was with the Settlement Motion and how the proposed settlement thereunder would

158165314

FBG_CH1_00093205

**DEBTORS' EXHIBIT NO. 181**
**Page 14 of 71**
**JOINT EXHIBIT NO. 57**
**Page 14 of 71**

function as a sub rosa plan by binding all Debtors' creditors without voting rights. At the time of the filing of this Objection, an amended disclosure statement and plan have not been submitted.

29. The Standing Motion does not engage with how the current status of the case, including with respect to the Examiner Report, the Examiner Budget Motion, the Disclosure Statement, the Plan, and the Settlement Motion, factors into the relief sought.

**C. The Challenge Deadline**

30. On November 9, 2025, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 608] (the "Final DIP Order").

31. On December 19, 2025, the Debtors and the Aequum Secured Parties entered into the *Stipulation and Agreed Order Regarding Adequate Protection of the Aequum Secured Parties* [Docket No. 1018] (the "Adequate Protection Stipulation"), which unambiguously fixed March 4, 2026 (the "Challenge Deadline")[4] as the deadline to challenge the validity, amount, extent, perfection, and priority of the Aequum Secured Parties' liens. On March 23, 2026, the Committee submitted a request to further extend such deadline through and including thirty (30) days after the date that Aequum produces all documents to the Committee requested in a contemporaneously filed request for Rule 2004 discovery [Docket No. 2213]. On April 1, 2026, pursuant to a stipulation and agreement between Aequum and the Committee, the deadline was extended to May 15, 2026, by order of this Court [Docket No. 2276].

**D. The Committee's Duplicative Investigation**

---

[4] The Court entered an order extending the Challenge Deadline to April 1, 2026 [Docket No. 2045].

158165314

FBG_CH1_00093206

32.     The investigations undertaken by the Special Committee, the Examiner, and governmental authorities have included the very transactions and relationships that the Committee now cites in support of the Standing Motion.  Thus, long before the Committee filed the Standing Motion, multiple independent fiduciaries and investigative bodies had already examined, or were examining, the very transactions the Committee bases its Proposed Claims (defined below).  The Committee's disagreement with the conclusions reached, or the pace and scope of those investigations, does not establish that the Debtors unjustifiably refused to pursue estate causes of action.

33.     The Committee's conduct reflects a pattern of procedural gamesmanship—not legitimate investigation.  Aequum, by contrast, has engaged in good faith from the outset.  After receiving the Committee's initial document requests on November 4, 2025, Aequum responded within two weeks with detailed objections and, on November 18, 2025, voluntarily produced over 18,000 pages of documents—the same materials provided to the government, the Examiner, and the Debtors.  Aequum also explained that the Committee's sweeping requests exceeded the bounds of Rule 2004.

34.     Rather than engage with Aequum's responses, the Committee sidestepped them.  Instead, on December 19, 2025, the Committee filed the *Notice of Rule 2004 Requests for Production of Documents from Aequum* [Docket No. 1036] recycling the same overbroad requests, while imposing an artificially compressed response deadline.  Days later, it noticed a deposition (the "<u>Deposition Notice</u>")—against without addressing Aequum's objections.  Even then, Aequum agreed to accept service and proceed with the deposition.

35.     Faced with this overreach, on December 26, 2025, Aequum moved to quash pursuant to its *Motion for an Order (I) to Enforce the Examiner Appointment Order and to Show*

10

158165314

FBG_CH1_00093207

**DEBTORS' EXHIBIT NO. 181**
**Page 16 of 71**
**JOINT EXHIBIT NO. 57**
**Page 16 of 71**

*Cause, and (II) to Quash the Notice and Subpoena Propounded by the Official Committee of Unsecured Creditors, or, in the Alternative, (III) for a Protective Order* [Docket No. 1096] (the "First Motion to Quash").  Even after filing the First Motion to Quash, Aequum continued to cooperate, offering to proceed with the deposition on January 12, 2026.  The Committee declined to meet with Aequum.

36.     The Court's guidance could not have been clearer.  At the January 7, 2026, on similar motions to quash, the Court held that the Examiner—not the Committee—should take the lead on the investigation.  Confronted with that directive, on January 13, 2026, the parties entered into the *Stipulation between the Official Committee of Unsecured Creditors and Aequum Capital Financial II, LLC Regarding the Committee's Rule 2004 Requests for Production of Documents* [Docket No. 1315] (the "Committee Discovery Stipulation").  Pursuant to the Committee Discovery Stipulation, the Committee withdrew the Deposition Notice and the Rule 2004 Notice, and any future discovery was expressly conditioned on further guidance from the Court regarding the Examiner's role.  *See* Committee Discovery Stipulation, ¶ F.

37.     The Committee ignored that agreement as well.  On March 4, 2026—the Challenge Deadline—the Committee sought and obtained a short extension of the Challenge Deadline to April 1, 2026 [Docket Nos. 2032, 2045].

38.     On March 10, 2026, without serving any new requests, the Committee abruptly demanded production of unspecified "prior document requests" within seven days.  No such operative requests existed at such time.

39.     Aequum responded on March 17, 2026, pointing out the obvious—that there were no pending requests—and offered to meet and confer.  The Committee did not respond.  Instead, it escalated.  On March 23, 2026, the Committee filed a renewed 2004 notice [Docket No. 2214]

11

158165314

FBG_CH1_00093208

**DEBTORS' EXHIBIT NO. 181**
**Page 17 of 71**
**JOINT EXHIBIT NO. 57**
**Page 17 of 71**

asserting the same defective requests (the "Renewed Document Requests") and, in parallel, sought a second extension of the Challenge Deadline—this time untethered to any date certain and conditioned solely on Aequum's capitulation to those requests. On March 26, 2026, the Committee filed the Emergency Bridge Motion, seeking an extension of one business day following the Court's entry of an order in connection with the Second Extension Motion.

40.    On March 27, 2026, Aequum filed the *(I) Preliminary Objection to (A) Second Motion of Official Committee of Unsecured Creditors to Extend Challenge Deadline Under the Stipulation and Agreed Order Regarding Adequate Protection of the Aequum Secured Parties, and (B) Emergency Motion of the Official Committee of Unsecured Creditors for Entry of a Bridge Order Extending Challenge Deadline Under the Stipulation and Agreed Order Regarding Adequate Protection of the Aequum Secured Parties, and (II) Request For Hearing* [Docket No. 2245].

41.    On April 1, 2026, in an effort to resolve these issues consensually, Aequum and the Committee entered into the *Stipulation and Agreed Order Further Extending the Challenge Deadline of the Official Committee of Unsecured Creditors Pursuant to Stipulation and Agreed Order Regarding Adequate Protection of the Aequum Secured Parties* [Docket No. 2276]. On March 30, 2026, Aequum filed the *Motion for an Order (I) to Enforce the Stipulation Between the Official Committee of Unsecured Creditors and Aequum Capital Financial II LLC Regarding the Committee's Rule 2004 Requests for Production of Documents, and (II) to Quash Notice of the Official Committee of Unsecured Creditors' Renewed Bankruptcy Rule 2004 Requests for Production of Documents From Aequum Capital Financial II LLC, or, in the Alternative, (III) for a Protective Order* [Docket No. 2253] (the "Second Motion to Quash").

158165314

FBG_CH1_00093209

DEBTORS' EXHIBIT NO. 181
Page 18 of 71
JOINT EXHIBIT NO. 57
Page 18 of 71

42.     On April 29, 2026, the Committee filed the *Emergency Third Motion of Official Committee of Unsecured Creditors to Extend Challenge Deadline Under the Stipulation and Agreed Order Regarding Adequate Protection of the Aequum Secured Parties* [Docket No. 2549] (the "Third Extension Motion"), again tying the extension to the Renewed Document Requests in effort to compel Aequum to produce documents.

43.     On May 5, 2026, Aequum filed the *Objection to the Emergency Third Motion of Official Committee of Unsecured Creditors to Extend Challenge Deadline Under the Stipulation and Agreed Order Regarding Adequate Protection of the Aequum Secured Parties* [Docket No. 2578].

44.     On May 7, 2026, the Committee filed the *Reply in Support of Emergency Third Motion of Official Committee of Unsecured Creditors to Extend Challenge Deadline Under the Stipulation and Agreed Order Regarding Adequate Protection of the Aequum Secured Parties* [Docket No. 2587].

45.     A status conference was held on May 8, 2026, where the Court indicated that a ruling would be issued on the Second Motion to Quash without further hearing.

46.     On May 8, 2026, the Court issued the *Order Granting Motion for an Order to (I) to Enforce the Stipulation Between the Official Committee of Unsecured Creditors and Aequum Capital Financial II LLC Regarding the Committee's Rule 2004 Requests for Production of Documents, and (II) to Quash Notice of the Official Committee of Unsecured Creditors' Renewed Bankruptcy Rule 2004 Requests for Production of Documents* [Docket No. 2612] (the "Enforcement Order"). The Enforcement Order rendered the relief sought in the Third Extension Motion effectively moot.

158165314

FBG_CH1_00093210

**DEBTORS' EXHIBIT NO. 181**
**Page 19 of 71**
**JOINT EXHIBIT NO. 57**
**Page 19 of 71**

47.     Notwithstanding the Court's decision not to grant the Third Extension Motion by the extended Challenge Deadline, the Committee filed the Standing Motion on the eve of the Challenge Deadline's expiration.

## STANDARD OF REVIEW

### A.  Derivative Standing Is an Extraordinary and Limited Remedy.

48.     It is well established that causes of action belonging to a debtor's estate ordinarily are prosecuted by the trustee or debtor-in-possession.  "[T]he enforcement of [causes of action belonging to the debtor's estate] generally falls to the debtor-in-possession, which has most of the powers of a bankruptcy trustee to pursue claims on behalf of the estate."  *Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)*, 714 F.3d 860, 864 (5th Cir. 2013) (internal quotation marks and citations omitted).

49.     The grant of derivative standing to a creditors' committee constitutes a narrow and limited exception to that general rule.  *See Scott v. Nat. Century Fin. Enters., Inc. (In re Balt. Emergency Servs. II, Corp.)*, 432 F.3d 557, 560 (4th Cir. 2005) ("Derivative standing is thus an implicit exception to the 'general rule' whereby the Bankruptcy Code assigns to the trustee or debtor-in-possession 'the privilege of prosecuting' various actions on behalf of the estate.") (quoting 7 Collier on Bankruptcy ¶ 1109.05[1] (15th ed. 2005)).

50.     Courts have exercised caution in granting derivative standing because a creditors' committee does not serve as a fiduciary for the estate as a whole, but rather for the creditor constituency that it represents.  *In re Balt. Emergency Servs. II, Corp.*, 432 F.3d 557, 562 (4th Circ. 2005) (internal quotations omitted); a*ccord Off. Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1316 (1st Cir. 1993); *see also In re Smart World Techs., LLC*, 423 F.3d

14

158165314

FBG_CH1_00093211

DEBTORS' EXHIBIT NO. 181
Page 20 of 71
JOINT EXHIBIT NO. 57
Page 20 of 71

166, 175 n.12 (2d Cir. 2005) ("A creditors' committee owes a fiduciary duty to the class it represents, but not to the debtor, other classes of creditors, or the estate.").

51.     Accordingly, derivative standing is appropriate only in limited circumstances where the Bankruptcy Code's contemplated allocation of authority has broken down and intervention is necessary to protect estate interests.  *Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 553 (3d Cir. 2003); *Reed v. Cooper (In re Cooper)*, 405 B.R. 801, 812 (Bankr. N.D. Tex. 2009) (explaining that the grant of derivative standing is appropriate only when there is deviation from "the Bankruptcy Code's . . . scheme.").

**B.  The Committee Bears the Burden of Establishing the Requirements for Derivative Standing.**

52.     Although the Bankruptcy Code does not expressly authorize derivative standing, bankruptcy courts generally require that a creditors' committee seeking standing to establish that: (1) the proposed claims are colorable, (2) the debtor-in-possession unjustifiably refused to pursue those claims, and (3) granting standing to the committee would be in the best interests of the estate. *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988).

53.     The burden of proof rests squarely with the Committee—because derivative standing constitutes an extraordinary departure from the Bankruptcy Code's ordinary allocation of authority, the Committee must affirmatively establish each element and the failure to satisfy any one of those requirements is fatal to the Standing Motion.  *See In re Clear the Air, LLC*, 631 B.R. 286, 295 (Bankr. S.D. Tex. 2021); *see also G-I Holdings, Inc. v. Those Parties (In re G-I Holdings, Inc.)*, 313 B.R. 612, 629 (Bankr. D.N.J. 2004); *Judgment Factors, L.L.C. v. Packer (In re Packer)*, 816 F.3d 87, 92 (5th Cir. 2016) (observing that standing may be warranted "[i]f the creditor shows that the[] conditions are met") (emphasis added); *PW Enters., Inc. v. N.D. Racing Comm'n (In re Racing Servs., Inc.)*, 540 F.3d 892, 900, n.9 (8th Cir. 2008) ("We emphasize that the burden of

15

FBG_CH1_00093212

**DEBTORS' EXHIBIT NO. 181**
**Page 21 of 71**
**JOINT EXHIBIT NO. 57**
**Page 21 of 71**

persuasion always remains with the creditor."); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 954 F.3d 1, 7, n.8 (1st Cir. 2020) ("Here, the [movants] bear the burden of showing that the Board unjustifiably refused to bring an avoidance action against the Commonwealth on behalf of the System.") (citing *Racing Servs.*, 540 F.3d at 900); *In re Enron Corp.*, 319 B.R. 128, 131 (Bankr. S.D. Tex. 2004) ("In the Fifth Circuit, to be granted standing to act on behalf of the trustee, the committee must establish the existence of a colorable claim and an unjustifiable refusal by the trustee or debtor in possession to prosecute the claim."). A committee seeking derivative standing "does not meet its burden with a naked assertion that the [debtor-in-possession's] refusal is unjustified." *Racing Servs.*, 540 F.3d at 900 (citation omitted).

54. To establish a colorable claim, the Committee must demonstrate a claim that has a realistic possibility of success based upon the facts and applicable law. *In re Tidewater Landfill LLC*, Case No. 20-11646, 2025 WL 2013686, at *4 (Bankr. E.D. La. July 16, 2025); *see also In re Clear the Air, LLC*, 631 B.R. at 295 ("For a creditor's claim to be colorable, it must have a possibility of success.").

55. In assessing colorability, the Court may consider not only allegations of the proposed complaint but also its familiarity with the chapter 11 cases, the procedural history, and any evidence presented in the standing request. *In re Highland Cap. Mgmt., L.P.*, Case No. 19-34054-SGJ-11, 2023 WL 5523949, at *41 (Bankr. N.D. Tex. Aug. 25, 2023).

56. In determining whether a debtor's refusal to pursue proposed claims was justified and whether granting standing would benefit the estate, courts conduct a cost-benefit analysis. *In re Clear the Air, LLC*, 631 B.R. at 295; *see also In re Enron Corp.*, 319 B.R. 128, 132 (Bankr. S.D. Tex. 2004) (considering whether the prosecution of the claims "is in the best interests of the

158165314

FBG_CH1_00093213

Debtors' estates, and is necessary and beneficial to the fair and efficient resolution of these proceedings").

57.     Relevant considerations include the probability of success, the anticipated recovery, the costs of litigation, the effect on estate resources, and whether prosecution of the proposed claims is likely to produce a meaningful benefit to the estate and its stakeholders. *In re Atl. Nat. Foods, LLC*, Case No. 25-10676, 2025 WL 1747930, at *2 (Bankr. E.D. La. June 24, 2025) ("Court may weigh the probability of success and financial recovery, as well as the anticipated costs of litigation, as part of a cost-benefit analysis conducted to determine whether pursuit of the colorable claims are likely to benefit the estate."); *see also In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 568 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016) ("The Court must determine … whether … the potential benefits of the litigation outweigh the costs, monetary and otherwise, to the Debtors' reorganization").

58.     As set forth below, the Committee cannot satisfy any element of this standard. The alleged claims (the "Proposed Claims") asserted in the proposed complaint [Docket No. 2865-1] ("Proposed Complaint") against Aequum are not colorable, the Debtors' decision not to pursue those claims was unjustified, and the prosecution of the Proposed Claims would not provide a meaningful benefit to the estates.

59.     Indeed, the Committee fails to address or even identify (a) the estimated costs of pursuing the Proposed Claims, and (b) the expected delay to the Debtors' reorganization or other efforts going forward, including (i) additional administrative expense costs, any proposed means of financing the litigation, (ii) any estimate of the probable recoveries, (iii) damage to the Debtors' businesses, (iv) increasing the liabilities of the Debtors by reinstating debts for which the Debtors are not currently liable, or (v) any other critical factors informing the cost-benefit inquiry, including

158165314

FBG_CH1_00093214

how even success on the Proposed Claims would result in a better treatment for general unsecured claims than that already contemplated by a proposed plan or conversion to a chapter 7 liquidation case. Accordingly, the Standing Motion should be denied.

## ARGUMENT

60.     The Committee cannot meet its burden to obtain derivative standing because (i) the Proposed Claims are not colorable; (ii) the Debtors have not unjustifiably refused to pursue the Proposed Claims; (iii) the cost-benefit analysis does not support standing; and (iv) Aequum's good faith further underscores both the lack of colorable claims and the absence of any meaningful benefit to the estates from the proposed litigation.

### I.     The Committee's Proposed Claims Are Not Colorable.

61.     The Proposed Complaint asserts claims for (a) intentional fraudulent transfer pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A), and 550 and applicable state law; (b) constructive fraudulent transfer pursuant to 11 U.S.C. §§ 544, 548(a)(1)(B) and 550 and applicable state law; (c) disallowance pursuant to 11 U.S.C. § 502(d) and (j); (d) equitable subordination of Aequum's claims; and (e) avoidance and recovery of post-petition transfer pursuant to 11 U.S.C. §§ 549 and 550. Each Proposed Claim is premised upon the same fundamental theory—that approximately $11.7 million in repayments made by Broad Street to the Aequum Lenders under the Credit Agreement should be unwound because funds originating from other Debtors allegedly found their way into Broad Street's accounts.

62.     That theory fails as a matter of law. The Committee seeks to isolate loan repayments while ignoring the transaction that created the debt being repaid and conferred substantial value upon Broad Street. Fraudulent transfer law does not permit such a selective analysis. Instead, courts evaluating avoidance claims focus on the specific transfer challenged and

18

158165314

FBG_CH1_00093215

the value exchanged in connection with that transfer.  Here, the Committee ignores the value conferred by the Aequum Loan, focuses on transactions several steps removed from the challenged repayments, and attempts to substitute allegations of broader misconduct for facts demonstrating that the transfers at issue are themselves avoidable.  As a result, each of the Proposed Claims lacks merit and is not colorable.

**A. The Committee Improperly Disregards the Value Conferred Upon Broad Street.**

63.    The challenged transfers consist of approximately $11.7 million in payments made by Broad Street to Aequum under the Credit Agreement.  The Committee does not dispute that the Aequum Lenders extended a $45 million revolving credit facility to Broad Street or that approximately $43.8 million in loan proceeds were deposited into Broad Street's account after deduction of contractually contemplated fees and expenses.  Thus, the transaction at issue involved a straightforward exchange: the Aequum Lenders advanced tens of millions of dollars to Broad Street and Broad Street subsequently made payments to Aequum on account of those obligations.  Whatever disputes the Committee may have regarding the Debtors' subsequent use of the loan proceeds, those disputes do not negate the substantial value indisputably provided by the Aequum Lenders at the outset of the transaction.

64.    The Committee instead attempts to shift the Court's focus away from the challenged transfers and toward alleged transfers occurring before and after the Aequum Loan.  According to the Committee, funds originating from other Debtors were deposited into Broad Street's accounts and later used to make payments to Aequum.  Even if true, those allegations do not establish that the Broad Street-Aequum Loan Payments were fraudulent transfers.  At most, they raise issues regarding transactions distinct from the payments that the Committee seeks authority to avoid.

158165314

FBG_CH1_00093216

65.     Courts evaluating fraudulent transfer claims consistently focus on the specific transfer sought to be avoided rather than generalized allegations regarding a debtor's business operations or broader alleged misconduct. *In re DBSI, Inc.*, 477 B.R. 504, 511 (Bankr. D. Del. 2012) ("The Court must focus precisely on the specific transaction or transfer sought to be avoided in order to determine whether that transaction falls within the statutory parameters of [an actual fraudulent transfer].")

66.     The Committee's allegations fail under this standard because they focus primarily on transactions several steps removed from the Broad Street-Aequum Loan Payments. This same fatal flaw exists with respect to the Committee's allegations regarding Helios Strategic Advisors LLC ("Helios") and other purportedly related transactions. The Committee attempts to connect the challenged transfers to allegations that Helios paid kickbacks in connection with unrelated transactions. Even accepting these allegations as true, they do not establish that the Broad Street-Aequum Loan Payments were made with actual fraudulent intent, lacked reasonably equivalent value, or otherwise constitute avoidable transfers.

67.     Nor does the Committee plausibly allege that Aequum occupied insider status or exercised the degree of control necessary to support such a finding. Courts have consistently held that ordinary commercial lenders do not become insiders merely because they maintain a significant lending relationship with a debtor. Rather, non-statutory insider status generally requires a showing of domination, control, or involvement in management decisions are beyond what is alleged here. *See, e.g., Glassman v. Heimbach, Spitko & Heckman (In re Spitko)*, 2007 WL 1720242, at *9 (Bankr. E.D. Pa. June 11, 2007); *Burtch v. Salem Inv. Partners, III, LP (In re Parker Sch. Unifs., LLC)*, 2021 WL 4553016, at *7 (Bankr. D. Del. Oct. 5, 2021) (noting that "it is well-settled that courts do not apply insider status 'absent a showing of a high level of control'").

20

158165314

FBG_CH1_00093217

68.     Because the Committee's theory depends upon disregarding the transaction that conferred value upon Broad Street and instead focusing on collateral allegations concerning other transfers and actors, the Proposed Complaint fails to allege any colorable avoidance claims.

**B. The Committee Cannot Establish that Broad Street Held a Recoverable Interest in Funds Allegedly Belonging to Other Debtors.**

69.     The Committee alleges that the funds used to make the Broad Street-Aequum Loan Payments were derived from other sources (i.e., transfers originating with other Debtors) and were therefore improperly used by Broad Street.  But if the Committee's allegations are accepted, they undermine rather than support the relief the Committee seeks.

70.     As a threshold matter, a plaintiff seeking to avoid a transfer under section 548 must establish that the transfer involved "an interest of the debtor in property."  11 U.S.C. § 548(a)(1).  "As a predicate to avoiding any transfer, the Trustee must first prove that Debtor held an interest in the property transferred."  *In re Green Field Energy Servs., Inc.*, No. 13-12783(KG), 2018 WL 6191949, at *37 (Bankr. D. Del. Nov. 28, 2018).

71.     Here, the Committee repeatedly alleges that the funds at issue belonged to entities other than Broad Street.  If that allegation is correct, then the Committee faces a substantial obstacle in demonstrating that Broad Street possessed a cognizable property interest sufficient to support the avoidance claims the Committee seeks to prosecute on Broad Street's behalf.

72.     Moreover, the Committee's theory ignores the settled presumption that money paid from a bank account under a debtor's control is presumptively property of that debtor, even where funds have been commingled.  *Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.)*, No. 06-10894(PJW), 2009 WL 2004226, at *——, 2009 Bankr. LEXIS 1815 at *7 (Bankr. D. Del. July 9, 2009) ("Money paid from a bank account containing commingled funds under a debtor's control is presumptively property of the debtor.").

158165314

FBG_CH1_00093218

**DEBTORS' EXHIBIT NO. 181**
**Page 27 of 71**
**JOINT EXHIBIT NO. 57**
**Page 27 of 71**

73.     Aequum was entitled to rely on that presumption in receiving payment from Broad Streets accounts in the ordinary course.  Nothing in the Proposed Complaint plausibly suggests that the Aequum Secured Parties knew of, participated in, or benefited from any purported misallocation of funds among the Debtors.  Ultimately, the Committee seeks to recover payments made by Broad Street while simultaneously alleging that the funds never truly belonged to Broad Street.  That contradiction further demonstrates the lack of a coherent and colorable fraudulent transfer theory.

### C.  The Ponzi Scheme Presumption Does Not Apply to a Legitimate Loan.

74.     Unable to plead facts demonstrating actual fraudulent intent with respect to the challenged transfers, the Committee relies heavily on allegations that the Debtors operated a broader fraudulent enterprise and seeks to invoke the so-called "Ponzi-scheme" presumption.  That effort fails because the allegations in the Proposed Complaint do not describe a Ponzi scheme as that concept has been narrowly defined by the Fifth Circuit.

75.     The Fifth Circuit has consistently limited application of the Ponzi scheme presumption to traditional investment schemes in which returns paid to existing investors are funded by money obtained from new investors. *Janvey v. Alguire*, 647 F.3d at 597–98; *Quilling*, 247 F. App'x at 586.  The presumption is not a substitute for proof of fraudulent intent whenever a debtor is alleged to have engaged in misconduct or operated a fraudulent business.

76.     In *In re Reagor-Dykes Motors, LP*, the court declined to extend the Ponzi scheme presumption to payments made under a legitimate lending arrangement notwithstanding substantial allegations of fraud throughout the debtor's operations.  *In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2022 WL 2046144, at *8 (Bankr. N.D. Tex. June 3, 2022).  The court emphasized that the challenged transfers were payments made pursuant to a traditional debtor-

158165314

FBG_CH1_00093219

creditor relationship rather than transfers designed to attract new investors or perpetuate a classic Ponzi scheme. *Id.*

77.   The same reasoning applies here. The transfers at issue are payments made by Broad Street to Aequum under the Revolving Credit Facility. They are not investor distributions. They are not payments designed to induce new investments. Nor are they alleged to have been made to conceal losses from existing investors. Rather, they are ordinary course debt service payments arising from a traditional lending relationship.

78.   The Committee's allegations instead concern purported inventory irregularities, alleged commingling of funds among affiliated entities, and other asserted misconduct within the Debtors' business enterprise. Even if accepted as true, such allegations do not transform a legitimate commercial loan transaction into a Ponzi scheme or justify application of a presumption that relieves the Committee of its burden to plead and prove actual fraudulent intent. Extending the Ponzi scheme presumption to the circumstances alleged by the Committee would expand the doctrine well beyond the limits recognized by the Fifth Circuit and effectively eliminate the requirement that the Committee demonstrate fraudulent intent with respect to the specific transfers it seeks to avoid. The Court should decline to do so.

**D. The Ponzi Scheme Presumption Also Does Not Apply Because the Aequum Loan Was Not in Furtherance of Any Alleged Scheme.**

79.   Even where a Ponzi scheme is adequately alleged, not every transfer made by the debtor is avoidable. Courts consistently require a plaintiff to demonstrate that the specific transfer challenged was made in furtherance of the alleged scheme. *See also In re Live Well Fin., Inc.*, No. 19-11317 (LSS), 2023 WL 3995900, at *17 (Bankr. D. Del. June 13, 2023).

80.   Accordingly, the relevant inquiry is not whether the Debtors generally engaged in wrongdoing. Instead, it is whether the Aequum Loan and the Broad Street-Aequum Loan

158165314

FBG_CH1_00093220

DEBTORS' EXHIBIT NO. 181
Page 29 of 71
JOINT EXHIBIT NO. 57
Page 29 of 71

Payments were integral to the continuation of the alleged scheme and were undertaken for the purpose of perpetuating it.  Courts applying the "in furtherance" requirement have imposed a demanding standard.  Transfers have been found to further a Ponzi scheme where they were necessary to attract new investors, maintain investor confidence, conceal the fraud, or otherwise prevent the immediate collapse of the scheme.  S*ee, e.g., Zazzali v. 1031 Exch. Grp. LLC*, 476 B.R. 413, 423 (Bankr. D. Del. 2012) (concluding that commissions and referral fees paid to brokers and agents in exchange for sales of TIC interests were made in furtherance of a Ponzi scheme because "the scheme was dependant [sic] upon the sale of TIC interests to generate cash flow"); *In re Bayou Steel BD Holdings, L.L.C.*, 651 B.R. 179, 302 (Bankr. D. Del. 2023) (concluding redemption payments were in furtherance of a Ponzi scheme where the plaintiff alleged that redemption payments were made "'[t]o avoid detection of the fraud, to retain existing investors and to lure new investors,' and constituted 'an integral and essential element of the alleged fraud, necessary to validate the false financials and to avoid disclosure'" (alteration in original)); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 13 (S.D.N.Y. 2007) (concluding payments "made to open new trading positions" or "to support open positions" "were essential to the continuation of the scheme" because "the Fund could have collapsed almost immediately" in their absence).

81.     The Proposed Complaint contains no such allegations.  It does not plausibly allege that the Debtors' operations depended upon the Aequum Loan to avoid imminent collapse, that the Revolving Credit Facility was used to attract new investors, or that the challenged payments were necessary to conceal or perpetuate any alleged fraud.

82.     Instead, the allegations establish the opposite.  The Aequum Loan had a legitimate and independent commercial purpose: providing financing in connection with the acquisition and financing of inventory and related collateral.  The existence of a valid business purpose weighs

24

158165314

FBG_CH1_00093221

strongly against any inference that the transaction was undertaken solely to perpetuate a fraudulent scheme.

83. The Bankruptcy Court for the District of Delaware's decision in *In re FTX Trading Ltd.* is instructive. There, the court rejected fraudulent transfer claims because the complaint failed to explain how the challenged transaction furthered the alleged fraudulent scheme, notwithstanding extensive allegations of wrongdoing elsewhere in the debtors' enterprise. *In re FTX Trading Ltd.*, No. 22-11068 (JTD), 2024 WL 4562675, at *9 (Bankr. D. Del. Oct. 23, 2024). The same deficiency exists here. The Committee alleges a broad course of misconduct but does not plausibly connect the Aequum Loan or the Broad Street-Aequum Loan Payments to the continuation of that alleged misconduct.

84. Notably, neither the criminal proceedings involving Edward James ("Mr. James") nor the allegations relied upon by the Committee identify the Aequum Secured Parties as participants in any fraudulent scheme or otherwise connect any Aequum Secured Party to the alleged wrongdoing. The Committee instead seeks to treat all special purpose entities and related financing as inherently suspect. That approach ignores the legitimate role that such entities serve in structured finance transactions and the protections they provide to lenders and investors. The Fifth Circuit has expressly recognized the importance of respecting the separateness of special purpose entities and the commercial expectations that underlie lending transactions. *In re Pac. Lumber Co.*, 584 F.3d 229, 249 (5th Cir. 2009). The Committee's theory would effectively disregard those principles without any factual basis for doing so.

85. At most, the Proposed Complaint suggests that the Aequum Loan may have provided ancillary benefits to the Debtors beyond its stated commercial purpose. That is

25

158165314

FBG_CH1_00093222

DEBTORS' EXHIBIT NO. 181
Page 31 of 71
JOINT EXHIBIT NO. 57
Page 31 of 71

insufficient.   The Committee must plausibly allege that the challenged transfers served no meaningful purpose other than perpetuating the alleged fraud.  It has not done so.

86.      Because the Proposed Complaint fails to plausibly allege that the Aequum Loan or the Broad Street-Aequum Loan Payments were made in furtherance of any alleged Ponzi scheme, the Committee cannot rely upon the Ponzi-scheme presumption to establish colorable claims.

**E.   The Committee Has Not Stated a Colorable Claim for Intentional Fraudulent Transfer.**

87.      The Committee seeks standing to assert claims for intentional fraudulent transfer under Bankruptcy Code Sections 544, 548(a)(1)(A), and 550 and Section 24.005(a)(1) of the Texas Uniform Fraudulent Transfer Act ("TUFTA").   To establish a colorable claim, however, the Committee must allege facts plausibly demonstrating that Broad Street made the challenged transfers with actual intent to hinder, delay, or defraud creditors.  It has not done so.

88.      The Standing Motion relies principally on two theories: (i) purported "direct evidence" of fraudulent intent arising from alleged misconduct elsewhere in the Debtors' enterprise and (ii) certain purported badges of fraud.  Neither theory plausibly supports an inference that the specific transfers at issue were made with the requisite fraudulent intent.

89.      Section 548(a)(1)(A) of the Bankruptcy Code permits avoidance of a transfer only where the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1)(A).  The focus therefore must remain on the intent associated with the challenged transfers themselves, not on generalized allegations concerning other conduct within the Debtors' enterprise.  As demonstrated below, the Committee fails to plead facts sufficient to establish actual fraudulent intent under either theory.

*i.      There is no direct evidence of fraud.*

158165314

FBG_CH1_00093223

90.     Contrary to the Committee's characterization, the Proposed Complaint contains no direct evidence that Broad Street made the challenged transfers with actual intent to hinder, delay, or defraud creditors.  Rather, the Committee relies on generalized allegations concerning the conduct of former management, alleged accounting irregularities, purported intercompany transfers, and the Committee's broader "Ponzi scheme" narrative.  Such allegations are not direct evidence of fraudulent intent with respect to the transfers the Committee seeks to avoid.  *See* Standing Motion ¶¶ 25-26.

91.     Section 548(a)(1)(A) requires proof that the transferor made the challenged transfer with actual fraudulent intent.  The focus therefore must remain on the Broad Street-Aequum Loan Payments themselves.  Yet the Committee identifies no document, communication, witness testimony, admission, or other evidence demonstrating that Broad Street made those payments for the purpose of hindering, delaying, or defrauding creditors.

92.     Instead, the Committee points to allegations that: (a) Broad Street participated in inventory financing transactions; (b) accounting records allegedly did not reflect certain transactions in the manner the Committee believes they should have been recorded; (c) funds allegedly moved among affiliated entities; and (d) non-debtor parties allegedly received payments in connection with other transactions.  Even if accepted as true, those allegations do not establish fraudulent intent with respect to the Aequum Loan and the Broad Street-Aequum Loan Payments.

93.     To the contrary, several of the Committee's allegations acknowledge legitimate commercial purposes underlying the Aequum Loan, including financing inventory acquisitions and providing liquidity.  Such allegations are fundamentally inconsistent with the Committee's attempt to character the transaction as inherently fraudulent.  *See In re FTX Trading Ltd.*, No. 22-11068 (JTD), 2024 WL 4562675, at *9 (Bankr. D. Del. Oct. 23, 2024).  The Committee's purported

158165314

FBG_CH1_00093224

"direct evidence" therefore amounts to little more than an invitation to infer fraudulent intent from allegations of broader misconduct elsewhere within the Debtors' enterprise. That is insufficient as a matter of law.

### ii.     *The Alleged Badges of Fraud Do Not Support a Plausible Inference of Actual Intent.*

94.     Lacking direct evidence, the Committee relies on purported badges of fraud. *See In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009); *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 520 n.30 (Bankr. D. Del. 2012).

95.     The Bankruptcy Code does not set forth badges of fraud in the statute. However, the Fifth Circuit has identified badges of fraud that may serve as evidence that a transfer was made with actual intent to defraud:

> (1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.

*In re Texas E&P Operating, Inc.*, Case No. 17-34386-SGJ-7, 2022 WL 2719472, *8 (Bankr. N.D. Tex. July 13, 2022) (quoting *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008)).

96.     As a matter of law, a finding of fraudulent intent cannot properly be inferred from the existence of just one "badge of fraud." *Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.)*, 421 B.R. 251, 300 (Bankr. W.D. Tex. 2009). "While a badge of fraud standing alone may amount to little more than a suspicious circumstance, insufficient in itself to constitute a fraud per se, several of them when considered together may afford a basis from which its existence is properly inferable." *United States v. Fernon*, 640 F.2d 609, 613 (5th Cir. 1981) (internal citations omitted).

28

158165314

FBG_CH1_00093225

**DEBTORS' EXHIBIT NO. 181**
**Page 34 of 71**
**JOINT EXHIBIT NO. 57**
**Page 34 of 71**

Courts in Texas have ordinarily regarded two or three badges of fraud as insufficient. *See, e.g., 1701 Commerce, LLC*, 511 B.R. at 841 (finding three badges of fraud insufficient to infer actual intent, two of which were insolvency and pending litigation badges); *In re SMTC Mfg. of Tex*, 421 B.R. at 300 ("Proof of four to five badges of fraud has been found sufficient in several reported cases," but where at most one badge of fraud can be found, that is insufficient to prove actual intent); *Taylor v. Trevino*, No. 3:20-CV-393-D, 2021 WL 347566, at *3 (N.D. Tex. Feb. 2, 2021) (fewer than four to five badges of fraud "may be insufficient to establish the existence of fraudulent intent"). Courts must "consider all the factors and the 'totality' of the circumstances." *Senior Care Centers, LLC, et al. v. Eric Wills (In re Senior Care Centers, LLC)*, No. 3:21-CV-01357-C, 2023 WL 6519756, at *20 (Bankr. N.D. Tex. Mar. 24, 2023); *In re Chris Pettit & Assocs., P.C.*, No. 22-50591-CAG, 2024 WL 5316334, at *2 (Bankr. W.D. Tex. Dec. 16, 2024).

97.    The badges identified by the Committee either do not exist or carry little weight under the circumstances.  Most notably, the challenged transfers were not made to insiders, family members, or related parties.  They were made to an arm's-length commercial lender pursuant to a documented credit facility under which Broad Street received substantial financing.  That fact alone substantially weakens any inference of fraudulent intent.

98.    Nor do the Committee's allegations concerning insolvency, chronology, or purported concealment alter the analysis.  As discussed above, the Committee cannot rely on the Ponzi scheme presumption; the Aequum Loan indisputably provided substantial value; and the chronology alleged by the Committee is entirely consistent with a legitimate commercial financing transaction.  The Committee's allegations regarding a purportedly denied appraisal request are inaccurate and, even if true, fail to establish either fraudulent intent or knowledge on the part of Aequum.

158165314

FBG_CH1_00093226

99.     Courts have repeatedly cautioned that badges of fraud must be considered collectively and in context.  Here, the totality of the circumstances cuts strongly against any inference of actual fraudulent intent.  Broad Street entered into a documented financing arrangement and received approximately $43.8 million in loan proceeds. Those facts describe an ordinary commercial lending relationship—not an intentionally fraudulent transfer.

100.     The weakness of the Committee's allegations is particularly notable given the extensive investigations conducted by the Special Committee, the Examiner, governmental authorities, and the Committee itself.  Despite substantial investigative resources, the Committee still cannot identify direct evidence of fraudulent intent with respect to the challenged transfers and instead relies on speculation, conclusory assertions, and theories contradicted by the documentary record.

**F.  The Committee Has Not Stated a Colorable Claim for Constructive Fraudulent Transfer.**

101.     The Committee also seeks standing to assert constructive fraudulent transfer claims under Sections 544, 548(a)(1)(B), and 550 of the Bankruptcy Code and applicable state law.  Under section 548(a)(1)(B) of the Bankruptcy Code, to demonstrate a constructive fraudulent transfer, the alleging party must prove the debtor:

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

158165314

FBG_CH1_00093227

102.	The Committee has not plausibly alleged any of these elements. Indeed, the allegations in the Standing Motion and the Proposed Complaint affirmatively demonstrate that Broad Street received substantial value in connection with the Revolving Credit Facility.

   i.	***Broad Street Received Reasonably Equivalent Value as a Matter of Law.***

103.	The Committee's constructive fraudulent transfer claims fail at the outset because the allegations in the Standing Motion and the Proposed Complaint affirmatively demonstrate that Broad Street received substantial value in exchange for the obligations it incurred and the payments it later made under the Revolving Credit Facility.

104.	The reasonably equivalent value inquiry focuses on the value received by the debtor at the time of the challenged transaction. The relevant question is whether the debtor received value that was reasonably equivalent to what it transferred or obligated itself to provide, not whether the transaction ultimately proved to be successful or whether the debtor later encountered financial distress.

105.	Here, the Committee does not dispute that the Aequum Lenders provided a $45 million revolving credit facility to Broad Street and that after deduction of fees expressly contemplated by the governing loan documents, approximately $43,781,942.62 of the loan proceeds was deposited into Broad Street's bank account. There is no dispute that those funds were delivered by the Aequum Lenders to Broad Street.

106.	Receipt of such loan proceeds constitutes value as a matter of law. *In re FBI Wind Down, Inc.*, 581 B.R. 387, 416 (Bankr. D. Del. 2018) (finding that equivalent value includes "preserving value in a subsidiary by passing along consideration for a transfer by a debtor-parent[.]"); *Johnson v. First Nat. Bank*, 81 B.R. 87 (Bankr. N.D. Fla. 1987) (finding Chapter 11 debtors received reasonably equivalent value in exchange for transfer of a mortgage where loan

158165314

FBG_CH1_00093228

proceeds were received by their wholly owned corporation and thus debtors shared in the benefits conferred). Numerous courts have recognized that where a lender advances funds to a borrower, the borrower receives reasonably equivalent value in exchange for the resulting repayment obligations because the borrower obtains the use and benefit of the loan proceeds. The Committee identifies no authority holding that a borrower fails to receive value where the lender fully funds the loan as agreed.

107.    Unable to dispute that Broad Street received the loan proceeds, the Committee instead focuses on what allegedly occurred after the funds were deposited into Broad Street's account. Such allegations, even if true, do not negate the value that Broad Street received when the Aequum Lenders funded the Revolving Credit Facility. Constructive fraudulent transfer law evaluates the exchange between the transferor and the transferee. The relevant exchange here is straightforward: the Aequum Lenders advanced approximately $45 million in financing and Broad Street received approximately $43.8 million in cash proceeds. What Broad Street subsequently chose to do with those proceeds is a separate issue and does not retroactively eliminate the value provided by the Aequum Lenders. Moreover, the tracing analysis conducted by Debtors reflects that the loan proceeds ultimately flowed to operating subsidiaries within the First Brands enterprise [*See* Docket No. 836]. Thus, the proceeds were not simply dissipated or diverted for no consideration but were utilized within the enterprise.

108.    The Committee's principal criticism appears to be that the cost of financing exceeded what might have been available under other lending arrangements. However, constructive fraudulent transfer law does not require a borrower to obtain the best financing available in the marketplace. Nor does a higher interest rate establish a lack of reasonably equivalent value. The relevant question is whether Broad Street received value in exchange for its

158165314

FBG_CH1_00093229

obligations.  The undisputed answer is yes.  Because the undisputed facts demonstrate that Broad Street received approximately $43.8 million in loan proceeds and the Committee has identified no plausible basis for disregarding that value, the proposed constructive fraudulent transfer claims are not colorable.

109.    Significantly, the Committee itself acknowledges that a determination regarding reasonably equivalent value should await a more developed evidentiary record.  Standing Motion, ¶ 43.

### ii.      *The Committee Has Not Plausibly Alleged Insolvency.*

110.    The Committee likewise has failed to plead any facts demonstrating that Broad Street (a) was insolvent when its obligations to the Aequum Secured Parties were incurred or when the challenged transfers were made, (b) became insolvent as a result of those transactions, was left with unreasonably small capital, or (c) intended to incur debts beyond its ability to pay.

111.    Conclusory assertions of insolvency are insufficient.  A plaintiff must plead facts supporting insolvency under one of the three relevant tests for insolvency: the cash flow test, the balance sheet test, and the capital adequacy test. The Standing Motion contains no meaningful analysis under any of those standards.  It does not identify Broad Street's assets and liabilities at the time of the transaction, provide any balance sheet analysis, estimate enterprise value, analyze projected cash flows, or explain how the Revolving Credit Facility rendered Broad Street unable to meet its obligations as they became due.  Instead, the Committee asks the Court to infer insolvency from its broader allegations of misconduct and from the Debtors' eventual bankruptcy filing.  But insolvency must be evaluated at the time of the challenged transaction, not with the benefit of hindsight.  The fact that the Debtors later encountered financial distress does not

158165314

FBG_CH1_00093230

establish that Broad Street was insolvent when the facility was originated or when payments were made thereunder.

112.    The absence of any meaningful insolvency analysis is particularly significant given the nature of the transaction at issue.  The Revolving Credit Facility injected $43.8 million of liquidity into Broad Street.  The Committee offers no explanation as to how a transaction that provided substantial cash proceeds simultaneously rendered Broad Street insolvent.  Because the Committee has failed to plausibly allege either lack of reasonably equivalent value or insolvency, its constructive fraudulent transfer claims are not colorable and cannot support derivative standing.

### G.  The Equitable Subordination Claim Fails.

113.    The Committee likewise fails to state a colorable claim for equitable subordination. Equitable subordination is an extraordinary remedy that is applied sparingly and only in exceptional circumstances.  To state a claim for equitable subordination, Plaintiff must establish that "(1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *In re HH Liquidation, LLC*, 590 B.R. at 298  (quoting *Shubert v. Lucent Techs. Inc (In re Winstar Communs., Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009)).

114.    The burden is particularly demanding where, as here, the claimant is a non-insider lender.  Courts have repeatedly recognized that equitable subordination of non-insider claims is appropriate only in rare circumstances involving egregious misconduct such as fraud, spoliation, overreaching, or comparable inequitable conduct.  See *Tilton v. MBIA Inc. (In re Zohar III, Corp.)*, 639 B.R. 73, 91 (Bankr. D. Del. 2022) (quoting *United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 87 (Bankr. D. Del. 2014) (internal alterations omitted)); *Off. Unsecured Creditors' Comm. of*

34

FBG_CH1_00093231

**DEBTORS' EXHIBIT NO. 181**
**Page 40 of 71**
**JOINT EXHIBIT NO. 57**
**Page 40 of 71**

*Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 79 (Bankr. D. Del. 2010). Allegations of ordinary commercial conduct, even where a lender aggressively exercises contractual rights, are insufficient as a matter of law.

115.   The Committee's allegations fall short of this standard.  The Proposed Complaint does not plausibly allege that Aequum engaged in fraud, illegality, breach of fiduciary duty, domination or control of Broad Street, spoliation of evidence, or any other form of egregious misconduct.  Nor does it plausibly allege that Aequum exercised the type of control necessary to transform an arm's-length lender into an insider.  Instead, the Committee alleges only that Aequum entered into a commercial lending transaction, advanced the agreed financing, exercised diligence and monitoring rights contemplated by the Credit Agreement, and received payments expressly authorized by the governing loan documents.

116.   Such allegations do not constitute inequitable conduct.  Courts consistently reject equitable subordination claims predicated upon a lender's exercise of contractual rights, even where those actions may benefit the lender or disadvantage other creditors.  *See In re Zohar III*, 639 B.R. at 113, 114.  *See also, e.g., Giuliano v. Fleming (In re Nobilis Health Corp.)*, 661 B.R. 891, 922 (Bankr. D. Del. 2024) (dismissing equitable subordination claim where nothing was inherently inequitable about defendants' acquisition of claims against debtor); *Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim  Energy, LLC)*, 527 B.R. 169, 177 (D. Del. 2015) (obtaining security interest that advantaged one creditor over others was not inequitable); *Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.)*, 466 B.R. 626, 661 (Bankr. D. Del. 2012) (dismissing equitable subordination claim where defendant "merely exercised its rights under [relevant agreements]").  The Committee's theory rests on the premise that alleged misconduct by Broad Street and its former management somehow renders Aequum's conduct

158165314

FBG_CH1_00093232

**DEBTORS' EXHIBIT NO. 181**
**Page 41 of 71**
**JOINT EXHIBIT NO. 57**
**Page 41 of 71**

inequitable. But even accepting the Committee's allegations concerning Broad Street as true, they do not establish inequitable conduct by Aequum.

117.   The absence of any plausible allegation of inequitable conduct is fatal to the Committee's equitable subordination claim. Because the Committee cannot satisfy the threshold requirement for equitable subordination, the Court need not reach the remaining elements. The proposed equitable subordination claim is therefore not colorable and cannot support derivative standing.

**H.  The Committee's Alleged Post-Petition Transfer Claim Is Unsupported by the Record and Contradicted by the Filings in this Case as well as Aequum's Financial Records.**

118.   The Committee asserts that Broad Street made a post-petition transfer in the amount of $570,000 (the "Alleged Post-Petition Transfer") to Aequum on September 30, 2026 [sic]. However, neither the Standing Motion nor the Proposed Complaint identify any evidentiary support for that allegation.

119.   Aequum is unaware of any filing in this Case reflecting the Alleged Post-Petition Transfer. Following a review of the docket, Aequum has not identified any filings evidencing such a transaction. Likewise, the Debtors' monthly operating reports for the relevant period [Docket Nos. 834, 1091] and other financial disclosures filed in the Case do not reflect the Alleged Post-Petition Transfer. Nor does the Examiner Report identify or reference the Alleged Post-Petition Transfer. Notably, the Committee does not address the Examiner's findings in the Standing Motion. Given that the Examiner and the Committee received the same document production from Aequum, the absence of any reference to the Alleged Post-Petition Transfer in the Examiner Report further undermines the Committee's allegation.

120.   Additionally, Aequum conducted a review of its books and records and found no record of the Alleged Post-Petition Transfer. *See Declaration of Eric Weisheit in Support of*

158165314

FBG_CH1_00093233

**DEBTORS' EXHIBIT NO. 181**
**Page 42 of 71**
**JOINT EXHIBIT NO. 57**
**Page 42 of 71**

*Aequum Capital Financial II LLC's Objection to Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of The Debtors' Estates and (II) Exclusive Settlement Authority*, a true and correct copy of which is attached hereto as **Exhibit 2**.

121.   Based on the record presently before the Court, the Committee has failed to identify evidence supporting the Alleged Post-Petition Transfer and therefore has not established a colorable claim for avoidance of such transfer.

**II.   The Debtors Have Not Unjustifiably Refused to Bring the Proposed Claims.**

122.   The Committee has failed to carry its burden of showing that the Debtors' decision not to pursue the Proposed Claims was unjustified.  The Committee expressly disclaims any basis to "cast aspersions or opine as to the reason for the Debtors' failure to bring these Claims." Standing Motion ¶ 60.  That concession is dispositive at the standing stage, where the Committee must affirmatively demonstrate an unjustifiable refusal—not merely speculate about it.

123.   The Committee's only critique is its general assertion that the Debtors' Special Committee is purportedly "independent" but was appointed by prior management allegedly implicated in the wrongdoing.  Standing Motion ¶ 60.  That type of hindsight-based attack on independence is insufficient to establish unjustifiable refusal.  Courts routinely credit the determinations of independent fiduciaries tasked with evaluating estate claims, particular where, as here, their conclusions are grounded in investigation and record review.

124.   Indeed, in *Modivcare*, the Court credited the conclusions of the independent director notwithstanding similar challenges to impartiality, finding him "credible, not conflicted and independent," and noting "he conducted an investigation" and identified only limited viable causes of action.  [Docket No. 1145, at 14:20-23].  The same reasoning applies here as the mere

158165314

FBG_CH1_00093234

fact that independent decision makers were initially selected by prior management does not, without more, render their subsequent determinations unjustifiable. The Committee offers no evidence that the Debtors' decision-making process was uninformed, conflicted, or commercially unreasonable. Absent such a showing, the Debtors' refusal to pursue the Proposed Claims cannot be deemed unjustified under the circumstances.

### III.   The Cost-Benefit Analysis Independently Forecloses Standing.

125.   Even if the Committee could show colorable claims and unjustifiable refusal (which it cannot), derivative standing is independently inappropriate because the cost-benefit analysis weighs decisively against it. Courts routinely deny standing where the anticipated litigation costs, risks, and delay outweigh the speculative benefit to the estate.

126.   As recognized in *Modivcare*, the Court may deny standing based on cost-benefit considerations alone, particularly where prosecution of proposed claims would impose significant administrative expenses without producing a net benefit to the estate. [Docket No. 1145, at 10:13-16].

127.   That principle applies with even greater force here. The Committee seeks to pursue claims that, at most, could result in recovery of $11.7 million. Against that speculative recovery must be weighed the substantial professional fees, expert costs, litigation burden, the probability of success, and the disruption to these estates inherent in prosecuting complex fraudulent transfer and equitable subordination litigation against a secured lender.

128.   The net benefit to the estate is further diminished because any recovery on the Broad Street-Aequum Loan Payments would not increase distributable value to unsecured creditors in any meaningful way. Broad Street has no meaningful creditor constituency other than

158165314

FBG_CH1_00093235

**DEBTORS' EXHIBIT NO. 181**
**Page 44 of 71**
**JOINT EXHIBIT NO. 57**
**Page 44 of 71**

the Aequum Secured Parties.  Accordingly, avoidance of the challenged transfers would largely result in a circular redistribution of funds rather than a net increase in estate value.

129.   To the extent the Committee suggests that recovery could enhance recoveries for unsecured creditors generally, that contention is undermined by the structure of the Debtors' capital stack.  The Aequum Loan and related collateral are also the subject of a separate adversary proceeding by certain of the Debtors' prepetition secured creditors.  *See* Adv. Pro. No. 26-03091. Any incremental value realized from litigation invalidating Aequum's liens would flow primarily to these secured creditors rather than general unsecured creditors.  The Bankruptcy Code does not permit derivative standing where litigation serves primarily to generate expense and delay rather than meaningful incremental recovery for the estate.

**IV.   The Aequum Secured Parties' Good Faith Independently Undermines the Colorability of the Proposed Claims and Reinforces the Cost-Benefit Analysis.**

130.   Even assuming *arguendo* that the Committee could otherwise satisfy the elements for derivative standing, the good faith of the Aequum Secured Parties further confirms that the Proposed Claims are not colorable and that litigation would not benefit the estate.

131.   A transfer is not voidable as fraudulent under § 548 if the transferee received the transfer "for value and in good faith." 11 U.S.C. § 548(c).  A transferee does not receive a transfer in good faith when (1) the transferee was "on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose," and (2) if put on inquiry notice, the transferee failed to engage in a "diligent investigation." *See Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F. 3d 143, 164 (5th Cir. 2015), *as revised* (June 8, 2015) (quoting *Horton v. O'Cheskey (In re Am. Hous. Found.)*, 544 F. App'x 516, 520 (5th Cir. 2013)).

132.   The Committee does not allege that Aequum had actual knowledge of any fraudulent scheme or participated in any misconduct.  Instead, it relies on allegations directed at

39

FBG_CH1_00093236

**DEBTORS' EXHIBIT NO. 181**
**Page 45 of 71**
**JOINT EXHIBIT NO. 57**
**Page 45 of 71**

third parties and former management.  Those allegations, even if accepted, do not establish that Aequum was on inquiry notice of any avoidable transfer or fraudulent purpose.  To the contrary, the Aequum Secured Parties entered into an arms-length financing transaction supported by extensive documentation, due diligence, and customary lending protections.  The record reflects that the purpose of the Revolving Credit Facility was to finance inventory acquisition and provide liquidity—an ordinary commercial lending purpose inconsistent with any inference of bad faith.

133.    The Committee's reliance on alleged misconduct by Mr. James or other non-parties does not alter this analysis.  Allegations of concealing or misreporting by borrowers do not, without more, impute knowledge or bad faith to sophisticated third-party lenders who are entitled to rely on transaction documentation and contractual representations.  Because the Aequum Secured Parties received the challenged transfers and related benefits in good faith and for value, the Proposed Claims are independently weakened at this stage.

134.    Accordingly, the good faith of the Aequum Secured Parties further supports that there are no colorable claims and that the costs of pursuing such action would outweigh any benefit to unsecured creditors.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Aequum respectfully requests that the Court deny the Standing Motion.

158165314

FBG_CH1_00093237

DEBTORS' EXHIBIT NO. 181
Page 46 of 71
JOINT EXHIBIT NO. 57
Page 46 of 71

Respectfully submitted,

**BLANK ROME LLP**

Dated: June 5, 2026

*/s/ Jennifer K. Malow*
Jennifer K. Malow (Bar No. 3925677)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464
Email: Jennifer.Malow@blankrome.com

Kenneth J. Ottaviano (admitted *pro hac vice*)
Stephanie K. Hor-Chen (admitted *pro hac vice*)
444 West Lake Street, Suite 1650
Chicago, Illinois 60606
Telephone: (312)776-2500
Facsimile: (312) 776-2601
Email: Ken.Ottaviano@blankrome.com
           Stephanie.HorChen@blankrome.com

*Counsel for Aequum Capital Financial II LLC*

41

158165314

FBG_CH1_00093238

## CERTIFICATE OF SERVICE

I certify that on June 5, 2026, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Bankruptcy Court for the Southern District of Texas, using the CM/ECF system. The ECF system will send a "Notice of Electronic Filing" to all counsel of record who have consented in writing to accept service of this document by electronic means.

*/s/ Jennifer K. Malow*
Jennifer K. Malow

## CERTIFICATE OF ACCURACY

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Jennifer K. Malow*
Jennifer K. Malow

158165314

FBG_CH1_00093239

**DEBTORS' EXHIBIT NO. 181**
**Page 48 of 71**
**JOINT EXHIBIT NO. 57**
**Page 48 of 71**

# EXHIBIT 1

FBG_CH1_00093240

**DEBTORS' EXHIBIT NO. 181**
**Page 49 of 71**
**JOINT EXHIBIT NO. 57**
**Page 49 of 71**

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

IN RE:                              §    CASE NO. 25-90309-11
                                    §    HOUSTON, TEXAS
MODIVCARE, INC., ET AL,             §    FRIDAY,
                                    §    DECEMBER 12, 2025
        DEBTORS.                    §    11:00 A.M. TO 11:27 A.M.


**CONFIRMATION AND STANDING MOTION HEARING**
**DAY FIVE - COURT'S RULING**

BEFORE THE HONORABLE ALFREDO R. PEREZ
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:                        SEE NEXT PAGE

COURTROOM DEPUTY/ERO:               YESENIA LILA


TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FBG_CH1_00093241

**DEBTORS' EXHIBIT NO. 181**
**Page 50 of 71**
**JOINT EXHIBIT NO. 57**
**Page 50 of 71**

2

**<u>APPEARANCES (VIA ZOOM)</u>:**

FOR MODIVCARE, INC.:          LATHAM & WATKINS, LLP
                              Ray C. Schrock, Esq.
                              Jamie L. Wine, Esq.
                              Keith A. Simon, Esq.
                              George Klidonas, Esq.
                              Kamali Houston, Esq.
                              1271 Avenue of the Americas
                              New York, NY 10020
                              212-906-133

                              LATHAM & WATKINS, LLP
                              Elizabeth (Betsy) Marks, Esq.
                              200 Clarendon Street
                              Boston, MA 02116
                              617-880-4654

                              HUNTON ANDREWS KURTH, LLP
                              Timothy A. Davidson, II, Esq.
                              600 Travis, Ste. 4200
                              Houston, TX  77002
                              713-220-3810

FOR THE 1st LIEN AGENT        PAUL HASTINGS, LLP
AND CONSENTING CREDITORS:     Kris Hansen, Esq.
                              200 Park Avenue
                              New York, NY 10166
                              212-318-6400

                              PAUL HASTINGS, LLP
                              Matthew Warren, Esq.
                              Lindsey Henrikson, Esq.
                              71 S. Wacker Drive
                              45th Floor
                              Chicago, IL 60606
                              312-499-6045

                              PAUL HASTINGS, LLP
                              Craig Stanfield, Esq.
                              609 Main Street
                              Suite 2500
                              Houston, TX 77002
                              713-860-7300

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FBG_CH1_00093242

**DEBTORS' EXHIBIT NO. 181**
**Page 51 of 71**
**JOINT EXHIBIT NO. 57**
**Page 51 of 71**

3

**APPEARANCES (VIA ZOOM - CONT'D):**

FOR THE OFFICIAL COMMITTEE          WHITE & CASE, LLP
OF UNSECURED CREDITORS:             Kristopher Shore, Esq.
                                    Ashley Chase, Esq.
                                    Colin T. West, Esq.
                                    Erin Smith, Esq.
                                    1221 Avenue of the Americas
                                    New York NY 10020
                                    212-819-8394

                                    WHITE & CASE, LLP
                                    Jason Zakia, Esq.
                                    111 S. Wacker Drive
                                    Suite 5100
                                    Chicago, IL 60606
                                    312-881-5400

                                    WHITE & CASE, LLP
                                    Charles R. Koster, Esq.
                                    609 Main Street
                                    Suite 2100
                                    Houston, TX 77002
                                    713-496-9700

FOR THE US TRUSTEE:                 OFFICE OF THE US TRUSTEE
                                    Jana Whitworth, Esq.
                                    515 Rusk Street, Ste. 3516
                                    Houston, TX  77002
                                    713-718-4650

(Please also see Electronic Appearances)

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FBG_CH1_00093243

4

**HOUSTON, TEXAS; FRIDAY, DECEMBER 12, 2025; 11:00 A.M.**

THE COURT:  All right.  Why don't we just get quick appearances of Counsel, and then I'll go into my ruling?

MR. KLIDONAS:  Good morning, Your Honor.  George Klidonas from Latham & Watkins on behalf of the company.

THE COURT:  All right.  Thank you.

MS. WINE:  Good morning, Your Honor.  Jamie Wine also on behalf of the Debtors.

MR. SCHROCK:  Good morning, Your Honor.  Ray Schrock on behalf of the Debtors.

MR. KOSTER:  Good morning, Your Honor.  Charles Koster of White & Case for the Committee, joined on the phone by several colleagues, including Kris Shore.

THE COURT:  Okay.  Thank you.

MR. HANSEN:  Good morning, Your Honor.  Kris Hansen of Paul Hastings on behalf of the Consenting Creditors.  I'm also joined by my colleagues, Craig Stanfield, Matt Warren and Lindsey Henrikson.

THE COURT:  All right.  All right.  So I'm going to -- this is the 11:00 o'clock Docket, Case Number 25-90309, ModivCare, Inc.  There were several matters pending.

First of all, I want to thank everyone for their presentations and their professionalism.  I think I was

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FBG_CH1_00093244

5

very, very happy with the level of the quality of the briefs, the quality of the arguments, and I commend everybody for in a very, very short period of time being able to do that.

You gave me a lot to consider, a lot to read and to digest.  So -- and literally there are -- there could be thousands of issues here.  So in my ruling, I'm going to try to simplify matters to the extent that I can and only rule on those matters in which I believe that are outcome determinative.

You know, I find that I have jurisdiction over these matters.  The Confirmation Hearing, the Motions for Derivative Standing, they're core matters and I have constitutional authority.

Before me today is the Debtors' Plan of Reorganization.  There are many issues that are not disputed, and there are only a few issues which are heavily disputed and I'm going to focus on those issues.

And as several of you said during the hearing, I think the first issue that I have to determine is the reasonableness of the Debtors' projections because I think that that is, in my mind, the key to the rest of the -- of my rulings.

So with respect to the projections, let me just state that I don't view my role as substituting my business

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FBG_CH1_00093245

6

judgment for that of the Debtors, but to defer to the Debtors' business judgment, so long as I don't find it unreasonable.

And this is particularly true in light of the nature of this company, having faced significant headwinds, being in a situation where it is subject to significant regulatory and contractual issues, a redetermination, legislative challenges, and just the history.  I'm not in a position to substitute my judgment.

Basically the Committee has presented three main objections as to the reasonableness of the Debtors' business projections.

First, they state that the Debtors should have additional revenue, particularly based on the stickiness of the United Health contract.

Nevertheless, all of the testimony that has been presented indicates otherwise.  There's simply no basis in the Record to show that it's reasonable to assume that in the face of all of the evidence to the contrary by the Debtors -- and by the witnesses who are on the ground dealing with this situation would indicate that there should be additional revenue.

Second, there's the notion that you need additional cuts to both SGNA and service costs.  Again, the Debtor has already had a $25 million cut in Project Forward.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FBG_CH1_00093246

Case 25-90399   Document 2845-1   Filed in TXSB on 06/05/26   Page 78 of 89

7

The other cuts are relating to offshoring jobs, not giving current employees raises, not giving them 401K matching contributions, and doing those types of things.

Those are things that all businesses do.  And I think that I found management to be responsive, to be credible, and I believe that all managements are always doing that.

Mr. Shandler I think that the opportunities will be there, but I don't believe that I can, again, substitute my judgment for the judgment of the company with respect to which cuts are achievable.

Finally, the next aspect or criticism is that there was excess CapX involved in the projections.  I think everybody agrees that at least for the next couple of years, the $40-plus-million of CapX is necessary because the Debtors have underspent.

But again, the testimony of the people who have to manage the CapX indicate that not only do they have to have the CapX in order to meet their business needs, but also just to maintain the contracts because they have traditionally underspent.

And again, this is before we know the impact of the One Big Beautiful Bill, which may significantly affect Medicaid and which is a substantial part of the company.

And let me say that I don't -- I didn't find any

FBG_CH1_00093247

8

evidence that somehow the projections were results oriented. The fact that the Debtor had missed their projections and then tried to project in a way that allowed them to meet their projections, if that is conservatism.

Again, I'm not here to substitute my business judgment.  I don't find any indication, any evidence whatsoever that the Debtors did this, other than because this is the way that they want to manage their business.  It was not -- there's no evidence to indicate that somehow this was intended to manipulate the valuation or to do anything other than to run the business.

And furthermore, if that were the case, then you wouldn't have the remote monitoring business being at levels -- growth levels significantly above what they would have been projected otherwise.  They would have also been, you know, skewed down.

So again, I don't find any indication at all that these projections are anything other than reasonable based on the business and based on the inputs from the company that they're doing.

So the next question I have to determine what these projections lead you to believe in terms of valuation? So I listened to the testimony of both Mr. Jamal and Mr. Brown.  I found them both to be credible.  The testimony indicated that Mr. Jamal was acting on behalf of the Debtors

FBG_CH1_00093248

9

in their best interest.

I don't find any evidence -- credible evidence that Mr. Jamal acted in any other way than as a professional giving the Debtors his best advice. Any hint that he was conflicted or results oriented is just simply not supported by any credible evidence.

So since I have found that the Debtors' projections are reasonable, I'm going to focus with respect to Mr. Brown only on his criticisms of Mr. Jamal's valuations. They have both different approaches. I believe the approaches are both valid. One of them values the company as a whole. One of them values the company in segments.

And as you would expect when you have two experts, the main point of difference in most of these cases are going to be the assumptions. What comps can you use? What discount rate do you use? What terminable value do you use?

And then my question is to determine, was Mr. Jamal's assumptions, were they reasonable?

So outside of the $33 million error in the first year EBITDA, which Mr. Jamal admittedly -- he recognized. I don't think that his approach was at all discredited. If you add back some of the -- something for the $33 million error, I think the value still breaks in the first lien.

The Committee offers, you know, several criticisms

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FBG_CH1_00093249

10

of Mr. Jamal applying Mr. Brown's assumptions, growth rate, terminable value and comps, but it's still uncontroverted that Mr. Brown took the assumptions based on Mr. Magrisi's view of the new ModivCare and applied them back to a fundamentally different company.

It was an apples to oranges comparison.

Recognizing that the Court could find Mr. Jamal's valuation persuasive, the Committee argues that the secured debt is only 399 million, instead of 881 million.  I'll address that later.

So once we determined that value breaks in the first lien, what does that do for the standing motions?

So again, having determined that value breaks in the first liens, I'm not sure that I need to address the standing motions because the fifth amendment treats and the Plan treats the second lienholders as unsecured debt.

Nevertheless, I'm going to address some of the issues.

With respect to the derivative standing motions under the Fifth Circuit standard, you have to have a colorable claim and there has to be unjustifiable refusal.

With respect to the colorability of the claims, I'm not going to address those in great deals, except to mention that as it relates to the intentional fraudulent conveyance claim, which I guess is limited to the hindrance

FBG_CH1_00093250

11

part -- at least that's what the argument was yesterday.

I find the credible evidence to simply not indicate that that would happen.  I think the testimony, especially the deposition testimony from Ms. Gutierrez, the other testimony indicated that they all thought that the fifth amendment would give them sufficient runway, so -- especially when they got the additional 30 million from Coliseum.

As it relates to the reasonably equivalent value, there are certainly many arguments that there was -- that there was an exchange.  There were additional considerations, but I'm not going to talk about that at length.

I am going to talk about the unjustifiable refusal and I find that there was no unjustifiable refusal.  The participants in the second liens are being treated as Unsecured Creditors.  The cost benefit analysis based on the evidence clearly indicates that the Debtors were incurring significant costs and may have to indemnify people that as a practical matter the net effect would be less than the treatment that they're getting under the Plan.

And if the Debtors did prosecute those claims, doing so would not be an economically efficient transaction because the Debtors have already in essence achieved that result.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FBG_CH1_00093251

**DEBTORS' EXHIBIT NO. 181**
**Page 60 of 71**
**JOINT EXHIBIT NO. 57**
**Page 60 of 71**

12

And let me talk a little bit about the subordination agreement and the release of the guarantees. And I think it's telling that no one has challenged those transactions, that no participant has brought a claim, that there's been no allegation of fiduciary duty breaches.

And simply, I'm not sure that I would have the jurisdiction to rule as it relates to the subordination agreement because that's between parties that are not before me.

The notion that if granted standing and the Committee was able to bring the claims, that somehow the transaction would be unwound, I just don't find that any basis-in-fact or in law to do that.

As I said, you know, I really question whether I would have jurisdiction to address the subordination questions.

So then the -- let me go back to the issue that I raised before, which is whether 552 cuts off the company's revenue generated post-petition.

Again, I don't -- based on my review of the cases and my knowledge of the business and how this business works, based on the testimony, I don't believe that the receivable generated by the contracts that the first lien lenders have a lien on the most valuable asset of the estate are not subject to 552(b).

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FBG_CH1_00093252

Case 25-90399   Document 2845-1   Filed in TXSB on 06/05/26   Page 14 of 18

13

And let me just put that another way.  I find that the receivables generated by the contract are the proceeds of those contracts and that they are covered by 552(b) and that they form the collateral of the first lien lenders. That's not even to say that, you know, you have the replacement liens under the Cash Collateral Order, you have the DIP liens, you have the potential diminution in value liens, obviously that's not before me.

The Final DIP Order waived the equities of the case exceptions.  Again, I'm very familiar with the *Cafeteria Operators* case, the hotel cases, and this is not that case.  These receivables were generated by contracts that were subject to a lien.

You know, much was made of the unencumbered assets in the case, you know, the $400,000 in a deposit account, the cars, the commercial torts, the retained causes of action.  There was really -- other than the deposit account and the cars, there was really no testimony as to the value of these amounts.  The Debtors listed on their Schedules 11 million for the commercial torts.

The retained causes of action, you know, when I looked at them closely, most of the claims were claims in which the Debtors were Defendants, not Plaintiffs.  So I don't -- there's no value that I can ascribe, actual value, any testimony as to actual value in front of me.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FBG_CH1_00093253

14

But what I do know is that based on the Plan, the Unsecured Creditors are receiving a significant recovery, not only in the 2 percent, the ability to get cash, as well as the resets of warrants with a five-year period.

So having said that, let me address the 1129 factors.  And again, most of these really were not disputed. I find that the Debtors proposed the Plan in good faith. The company intends to reorganize.  It's doing it for a proper purpose.  The classification was appropriate and does not unfairly discriminate.

And again, I don't think there's any question but that this Plan meets the best interest test.  I think a Chapter 7 liquidation would be disastrous for this company. So I don't think anyone seriously disputes that.

As it relates to the Debtor releases, again, I think the Debtor exercised their business judgment. Mr. Silvers conducted an investigation, found no viable causes of action, other than the Coliseum preference, which is dealt with by treating Coliseum as an Unsecured Creditor.

He had the assistance of Quinn and although much was made of Mr. Silvers' alleged impartiality, based on his testimony, I find him to be credible, not conflicted and independent.

Next, let me address the third party releases.

You know, I review them very carefully in every

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FBG_CH1_00093254

15

case.  In fact, I have a case in which I suggested that the releases needed to be opt-in because it was a fraud case. So in many cases I limit the releases to just post-petition actions.

In this case I think the third party releases are appropriate.  They were certainly given for value by the recipients.  There are over 300 opt-outs, so it worked.

And with respect to both the gatekeeping function and the injunction, again, unlike I think the Plan's gatekeeping function and injunction follow *Highland Capital*. In *Highland Capital*, as I've said before, what the Court found that was not appropriate was a gatekeeper or a gatekeeping function or an injunction for non-consensual exculpations.

Here, we have consensual releases and so I find that to be appropriate.

And so I think, you know, especially the contribution made by the first lienholders in both with respect to the DIP and the potential exit financing or potential take back debt, which is going to finance this company.  I think -- and the fact that they're going to be the 98 percent owners makes these releases appropriate.

So that is my ruling.

I know there was a question about a proposed form of Order and so I guess -- I don't know, Mr. Schrock,

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FBG_CH1_00093255

16

Mr. Simon, if you could get with Mr. Koster and figure out if we have an agreed form of Order reflecting -- as to form only -- reflecting my ruling or -- and if there's competing form of Order, just each one submit it and I'll review them simultaneously.

But thank you very much and that is my ruling.

MR. SCHROCK:  Thank you very much, Your Honor. This is Ray Schrock from Latham for the Debtors.

We'll take care of it and thanks again for your Court and your Chambers for everything.  We greatly appreciate it.

THE COURT:  All right.  We'll be in recess.

MR. KOSTER:  Your Honor, Charles Koster?

THE COURT:  Yes.

MR. KOSTER:  Very briefly.

I thank you to you and your staff for obviously very carefully reviewing the evidence and listening to the presentations this week.

A few questions that we may need your guidance on as we discuss the Order with the parties.

One, our objection, we included a request for a waiver.  The Debtors request a waiver of the 14-day stay, which we've objected to.  We, of course, are going --

THE COURT:  I forgot to mention that.

So as a practical matter, the current milestone is

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FBG_CH1_00093256

17

12/24.  I don't want to second-guess the Debtors' business judgment with respect to that.  I don't mind granting a stay till like maybe Tuesday of next week.  I don't think anything is going to happen by Tuesday of next week.

But I'm not going to -- I am going to waive it so that they can close before the 24th -- based on the evidence.

MR. KOSTER:  Thank you.

MALE SPEAKER:  Thank you, Your Honor.

MALE SPEAKER:  Thank you, Your Honor.

THE COURT:  As a practical matter, I don't think -- I mean, you'd still have to do the DIP financing, you still have to, you know, corral people, you know, the week before Christmas -- the two weeks before Christmas.

All right.  Anything else?

MR. SCHROCK:  Nothing further, Your Honor, from the Debtors.

THE COURT:  All right.  All right.  We'll be in recess.

(The parties thank the Court)

(Proceedings concluded at 11:27 a.m.)

* * * * *

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FBG_CH1_00093257

18

I certify that the foregoing is a correct transcript to the best of my ability due to the condition of the electronic sound recording of the proceedings in the above-entitled matter.

/S/ MARY D. HENRY

CERTIFIED BY THE AMERICAN ASSOCIATION OF

ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

JTT TRANSCRIPT #70370

DATE FILED:   DECEMBER 31, 2025

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FBG_CH1_00093258

# EXHIBIT 2

FBG_CH1_00093259

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| FIRST BRANDS GROUP, LLC, *et al.*,[1] | ) Case No. 25-90399 (CML) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |

**DECLARATION OF ERIC WEISHEIT IN SUPPORT OF
AEQUUM CAPITAL FINANCIAL II LLC'S
OBJECTION TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR (I) LEAVE, STANDING, AND AUTHORITY TO COMMENCE AND
PROSECUTE CERTAIN CLAIMS AND CAUSES OF ACTION ON BEHALF OF THE
<u>DEBTORS' ESTATES AND (II) EXCLUSIVE SETTLEMENT AUTHORITY</u>**

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

1

FBG_CH1_00093260

I, Eric Weisheit, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      I am an Executive Director of Aequum Capital Financial II LLC ("Aequum").

2.      As an Executive Director of Aequum, I have personal knowledge of the facts stated in this declaration, and they are true and correct.

3.      I submit this declaration in support of *Aequum Capital Financial II LLC's Objection to Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of The Debtors' Estates and (II) Exclusive Settlement Authority* (the "Objection") filed herewith by Aequum.[2]

4.      I have reviewed the allegations made by the Committee in the Standing Motion.

5.      On or about June 4, 2026, I conducted a search of Aequum's financial records for the period relevant to the Committee's allegation of a $570,000 post-petition transfer from Broad Street to Aequum.  That search did not identify any record reflecting receipt by Aequum of such funds on September 30, 2025.

*[Continued on Following Page]*

--------------------------------------------------

[2] All capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Objection.

2

158288819

FBG_CH1_00093261

**DEBTORS' EXHIBIT NO. 181**
**Page 70 of 71**
**JOINT EXHIBIT NO. 57**
**Page 70 of 71**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  June 5, 2026

By: */s/ Eric Weisheit*

Eric Weisheit
Executive Director
Aequum Capital Financial II LLC

3

158288819

FBG_CH1_00093262