**Exhibit 210**

**United States Bankruptcy Court, Southern District of Texas**

---

**Fill in this information to identify the case (Select only one Debtor per claim form):**

**Debtor:** Carnaby Inventory III, LLC

**Case Number:** 25-90390

---

Modified Official Form 410

# Proof of Claim

4/25

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

---

**Part 1:**   **Identify the Claim**

| | | |
|---|---|---|
| 1. **Who is the current creditor?** | GLAS Trust Company LLC | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor | |

**2. Has this claim been acquired from someone else?**
☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**
Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Address1: 3 Second Street | Address1: |
| Address2: Suite 206 | Address2: |
| Address3: | Address3: |
| Address4: | Address4: |
| City: Jersey City | City: |
| State: NJ | State: |
| Postal Code: 07311 | Postal Code: |
| Country: | Country: |
| Contact phone 201-201-8642 | Contact phone |
| Contact email tarik.johnson@glas.agency | Contact email |

**Uniform Claim Identifier (if you use one)**

**4. Does this claim amend one already filed?**
☑ No
☐ Yes.   Claim number on court claims registry (if known)_____    Filed on _____
                                                                                                        MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**
☑ No
☐ Yes. Who made the earlier filing?

---

Claim Number: 1236                                 Proof of Claim                                 page 1

**JOINT EXHIBIT NO. 61**
**Page 2 of 540**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ Not less than $101,094,207.00 .   **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:**   See Addendum

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____

**Amount of the claim that is secured:**   $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $ See Addendum

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**Proof of Claim**                                                                                     page 2

**JOINT EXHIBIT NO. 61**
**Page 3 of 540**

| | |
|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check one:*                       **Amount entitled to priority**<br><br>☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____<br><br>☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____<br><br>☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____<br><br>☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____<br><br>☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____<br><br>☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies.    $_____<br><br>       * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. |
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.**    $_____ |

**Part 3:**   **Sign Below**

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>*Tarik Johnson*    12/04/2025<br>_____    _____<br>Electronic Signature            Date<br><br>**Name of the person who is completing and signing this claim**<br><br>Name    Tarik Johnson<br>       First name        Middle name        Last name<br><br>Title/Company    GLAS Trust Company LLC<br>       Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address    3 Second Street<br>       Suite 206<br>       Number        Street<br>       Jersey City    NJ    07311<br>       City        State        ZIP Code        Country<br><br>Contact phone    201-201-8642        Email    tarik.johnson@glas.agency |

**JOINT EXHIBIT NO. 61**
**Page 4 of 540**

**Additional Noticing Addresses (if provided):**

**Additional Address 1**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
Postal Code:
Country:

Contact Phone:
Contact Email:

_____

**Additional Address 2**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
Postal Code:
Country:

Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**

☑ Yes
☐ No

--------------------------------------------------------------------------------------------------------

Attachment Filename:

Carnaby Inventory III, LLC (25-90390) POC Form (Carnaby III Secured Lenders against CIII) (Execution Version with Addendum).pdf

**KROLL**

**United States Bankruptcy Court, Southern District of Texas**

| Fill in this information to identify the case (Select only one Debtor per claim form): |
|---|
| **Debtor Name and Case Number:**<br><br>Carnaby Inventory III, LLC (25-90390) |

Modified Official Form 410

# Proof of Claim

04/25

Read the instructions before filling out this form. **This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

| 1. | **Who is the current creditor?** | GLAS Trust Company LLC as administrative agent for the Carnaby III Secured Lenders |
|---|---|---|
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| 2. | **Has this claim been acquired from someone else?** | ☑ No |
|---|---|---|
| | | ☐ Yes. From whom? _____ |

| 3. | **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>See Addendum<br>Name<br>See Addendum<br>Number     Street<br>See Addendum<br>City                    State            ZIP Code<br><br>Contact phone  See Addendum<br>Contact email  See Addendum<br><br>Uniform claim identifier (if you use one):<br>_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | **Where should payments to the creditor be sent?** (if different)<br><br>_____<br>Name<br>_____<br>Number     Street<br>_____<br>City                    State            ZIP Code<br><br>Contact phone _____<br>Contact email _____ |
|---|---|---|---|

| 4. | **Does this claim amend one already filed?** | ☑ No |
|---|---|---|
| | | ☐ Yes.   Claim number on court claims registry (if known)_____      Filed on _____<br> MM / DD / YYYY |

| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
|---|---|---|
| | | ☐ Yes. Who made the earlier filing? _____ |

**JOINT EXHIBIT NO. 61**
**Page 6 of 540**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ <u>Not less than $101,094,207</u>.   **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe:   See Addendum

**Basis for perfection:**   See Addendum

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____

**Amount of the claim that is secured:**   $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $ See Addendum

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**Proof of Claim**                                                                 page 2

**JOINT EXHIBIT NO. 61**
**Page 7 of 540**

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No<br>☐ Yes. *Check one:* | Amount entitled to priority |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(   ) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment. | |

| 13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)? | ☑ No<br><br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $_____ |
|---|---|---|

---

**Part 3:   Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐   I am the creditor.

☑   I am the creditor's attorney or authorized agent.

☐   I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐   I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   12/04/2025
                   MM / DD / YYYY

Signature

**Name of the person who is completing and signing this claim:**

| Name | Tarik | Johnson |
|---|---|---|
| | First name          Middle name | Last name |

| Title | Authorized Signatory |
|---|---|

| Company | GLAS Trust Company LLC as administrative agent for Carnaby III Secured Lenders |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 3 Second Street, Suite 206 |
|---|---|
| | Number          Street |
| | Jersey City          NJ          07311 |
| | City          State          ZIP Code |

| Contact phone | 201 - 201 - 8642 | Email | Tarik.Johnson@glas.agency |
|---|---|---|---|

**JOINT EXHIBIT NO. 61**
**Page 8 of 540**

**OMNIBUS ADDENDUM TO PROOFS OF CLAIMS FILED BY**
**GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT TO**
**THE CARNABY III SECURED LENDERS**

GLAS Trust Company LLC, in its capacity as administrative agent (the "Administrative Agent") for the Lenders[1] (the "Carnaby III Secured Lenders") under that certain credit agreement dated as of July 6, 2022 (the "Carnaby III Credit Agreement"), hereby submits this omnibus addendum (the "Addendum") in support of its proofs of claim (together with the proof of claim form, the "Proof of Claim") submitted against Carnaby Inventory III, LLC ("Carnaby III") and Carnaby Inventory II, LLC ("Carnaby II").  This Addendum is intended to be and should be treated as part of the Proof of Claim.

1.     On September 24, 2025 (the "Initial Petition Date"), certain Debtors,[2] including Carnaby II and Carnaby III, commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Court"). Between September 28, 2025, and September 29, 2025, approximately 99 additional Debtors, including First Brands Group, LLC ("FBG") and other related FBG Debtors, filed their own bankruptcy petitions.

**BASIS FOR CLAIM**

2.     The Carnaby III Credit Agreement. On or about July 6, 2022, Carnaby III, as the Borrower, FBG, as the Servicer, First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings III, LLC ("Carnaby Holdings III," together with FB Holdings, the "Guarantors"), as Guarantors, the Carnaby III Secured Lenders party thereto as Lenders from time

---

[1]     Capitalized terms not defined herein shall have the meanings ascribed to those terms in the Carnaby III Credit Agreement.

[2]     A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby III Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time).[3]

3.    The Carnaby III Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $100 million under which such funds were advanced by the Carnaby III Secured Lenders in the maximum principal amount to Carnaby III.

4.    Carnaby III's obligations under the Carnaby III Credit Agreement and the Transaction Documents[4] are secured by first priority liens on the Collateral (as defined below) pursuant to the U.S. Security Agreement (as defined below) and the Mexican Security Agreement (as defined below), as further detailed below.

5.    The Administrative Agent holds, on behalf of the Carnaby III Secured Lenders, $100 million in outstanding principal amount (defined as the "Loans"), due and payable by Carnaby III and the Guarantors under the Carnaby III Credit Agreement.  In addition to the obligation to repay the principal amount of the Loans, Carnaby III and the Guarantors assumed the obligation to pay accrued and unpaid Interest and all other Obligations[5] and Guaranteed

---

[3]    On May 30, 2025, the parties to the Carnaby III Credit Agreement entered into an Extension Agreement, extending the Maturity Date originally set forth in the Carnaby III Credit Agreement.

[4]    The Carnaby III Credit Agreement defines the "Transaction Documents" as "collectively, [the Carnaby III Credit Agreement], each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto." Carnaby III Credit Agreement, Ex. I.

[5]    The Carnaby III Credit Agreement defines "Obligations" as "all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the

1

**JOINT EXHIBIT NO. 61**
**Page 10 of 540**

Obligations[6] outstanding under the Carnaby III Credit Agreement and other Transaction Documents.

6.      The Carnaby III Promissory Notes. Carnaby III's obligations to repay the Obligations under the Carnaby III Credit Agreement were also evidenced through Promissory Notes executed by Carnaby III with respect to each advancement, and guaranteed in each case, by the Guarantors.

7.      U.S. Security Agreement. On or about July 6, 2022, Carnaby III, Carnaby Holdings III, and the Administrative Agent for the benefit of the Carnaby III Secured Lenders, entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "U.S. Security Agreement").

8.      As security for the prompt and complete payment or performance, as the case may be, in full of the "Obligations" (as defined in the U.S. Security Agreement, as amended by the Cross-Collateralization Agreement),[7] Carnaby III and Carnaby Holdings III, pledged, collaterally assigned and granted to the Administrative Agent, on behalf of and for the benefit of the Secured Parties (including the Carnaby III Secured Lenders), a continuing security interest in all of its right,

---

commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding)." Carnaby III Credit Agreement, Ex. I.

[6]   The Carnaby III Credit Agreement defines "Guaranteed Obligations" as "the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations[.]" Carnaby III Credit Agreement, section 11.1.

[7]   "Obligations" under the U.S. Security Agreements means "(i) "Obligations" (as defined in the [Carnaby III] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby III] Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory II, LLC, as borrower, Carnaby Inventory Holdings II, LLC, and GLAS Trust Company LLC, as administrative agent). Cross-Collateralization Agreement, section 4(b)(iv).

2

**JOINT EXHIBIT NO. 61**
**Page 11 of 540**

title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such, and regardless of where located: (i) all Accounts; (ii) all Cash; (iii) all Chattel Paper (including without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper); (iv) all Commercial Tort Claims; (v) all Contracts, together with all Contract Rights arising thereunder (as each such term is defined in the U.S. Security Agreement); (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Financial Assets; (x) all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Governmental Authorizations; (xiv) all Instruments; (xv) all Intellectual Property Collateral; (xvi) all Inventory; (xvii) all Investment Property, Pledged Stock and other Pledged Collateral; (xviii) all letters of credit and Letter-of-Credit Rights; (xix) all Licenses; (xx) all Proceeds of insurance; (xxi) all Receivables; (xxii) all Real Estate Assets; (xxiii) all Securities Accounts, Money, Securities, and other investments therein, and all Security Entitlements in respect thereof; (xxiv) all Software and all recorded data of any kind or nature, regardless of the medium of recording; (xxv) all Supporting Obligations relating to any of the foregoing; and (xxvi) all accessions to, substitutions and replacements for and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing (collectively, the "U.S. Collateral"), thereby achieving a complete cross-collateralization of the Carnaby II Credit Agreement and Carnaby III Credit Agreement in respect of all obligations owing under such facilities and all collateral pledged under them.

**JOINT EXHIBIT NO. 61**
**Page 12 of 540**

9.    <u>Mexican Security Agreement</u>. As additional security for the payment, performance and satisfaction in full of any and all of the Obligations, on July 6, 2022, Carnaby III, as Pledgor, the Administrative Agent for the benefit of the Carnaby III Secured Lenders, as Pledgee, Subensambles Internacionales, S. de R.L. and Trico Componentes, S.A. de C.V., as depositaries (jointly, the "<u>Depositaries</u>"), and Trico Products Corporation ("<u>TPC</u>") and Trico Technologies Corporation ("<u>TTC</u>," together with TPC, the "<u>FBG Entities</u>") entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión* ), under Mexican law (the "<u>Mexican Security Agreement</u>").

10.    Under the Mexican Security Agreement, Carnaby III granted to the Administrative Agent, for the benefit of the Carnaby III Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  The Mexican Security Agreement defines Pledged Assets as any and all property and inventory located in Mexico, currently owned by the Pledgor, or acquired by the Pledgor or arising in the future, including without limitation, all Raw Materials,[8] together with (i) all documents, documents of title, warehouse receipts (or similar documents), bills of lading or orders for delivery of all, or any portion of the foregoing; and (ii) all products and/or sale proceeds of any and all of the foregoing, including, without limitation, insurance proceeds (collectively, the "<u>Mexican Collateral</u>" and together with the U.S. Collateral, the "<u>Collateral</u>").

---

[8]    "Raw Materials" are defined under the Mexican Security Agreement as "all the assets that comprise the inventory of the Pledgor, whether now owned or hereafter acquired, including without limitation, all inventory of the Pledgor (i) held for sale or lease, (ii) furnished or to be furnished under any service agreement, (iii) held for display or demonstration, or (iv) on lease or consignment, in favor of third parties; including accessories, packaging and shipping materials, spare parts, repair parts, returned and repossessed inventory, all raw materials, work-in-process, finished inventory and supplies used or consumed in the Pledgor business together with all documents, documents of title, warehouse receipts, pledge bonds, bills of lading, deposit certificates or orders for the delivery of all, or any portion, of the foregoing, including without limitation the assets listed in Exhibit C [attached thereto]."

4

11.     The Mexican Security Agreement also contains representations that Carnaby III is the sole, legal, and beneficial owner of the Mexican Collateral, which are free and clear of any liens and/or any other documents whatsoever which by its terms restrict or otherwise prohibit any lien, assignment, transfer, use or exercise of such Mexican Collateral or any portion thereof, which have been duly and legally imported into Mexico under the temporary importation regime.  It also provides that the Mexican Security Agreement and the security interest granted hereunder constitute a legal, valid, binding and enforceable security over the Mexican Collateral.

12.     Perfection. The security interests granted under the U.S. Security Agreement were properly perfected by filing UCC financing statements with the Delaware Secretary of State.  As a result, the Administrative Agent holds, on behalf of and for the benefit of the Carnaby III Secured Lenders, properly perfected security interests in all assets of Carnaby III.

13.     In turn, the Mexican Security Agreement was executed in compliance with Mexican law, before a Mexican Notary Public and it is duly registered before the Mexican Sole Registry of Liens over Movable Assets (*Registro Unico de Garantias Mobiliarias*) ("RUG").  As a result, the Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the benefit of the Carnaby III Secured Lenders, a valid and perfected first-priority security interest in the Mexican Collateral.

14.     Cross-Collateralization Agreement.  On July 6, 2022, the parties to the Carnaby III Credit Agreement entered into a Cross-Collateralization Agreement with the parties to the Carnaby II Credit Agreement.[9]  Under the Cross-Collateralization Agreement, the parties under the Carnaby

---

[9]     The "Carnaby II Credit Agreement" refers to certain credit agreement dated as of May 31, 2022 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time), entered into among Carnaby II, as borrower, FBG, as the servicer, FB Holdings and Carnaby Inventory Holdings II, LLC, as guarantors, the Lenders party thereto from time to time, and GLAS Trust Company LLC, as administrative agent.

**JOINT EXHIBIT NO. 61**
**Page 14 of 540**

II Credit Agreement agreed that the Collateral securing the Carnaby II Credit Agreement would also secure the obligations under the Carnaby III Credit Agreement, and vice versa.

15.     Other Transaction Documents. The Mexican Security Agreement provides that Carnaby III maintains a manufacturing business relationship with the FBG Entities, as evidenced by certain Manufacturing Agreements, pursuant to which Carnaby III provides to the Depositories the Raw Material for the Services to be provided under certain Maquiladora Agreements.  In turn, the FBG Entities have entered into certain Maquiladora Agreements with the Depositaries, pursuant to which the Mexican Collateral have been duly imported (and/or will continue to be duly imported) on a temporary basis into Mexican territory in accordance with the "maquiladora program" in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreements).

16.     The Manufacturing Agreements were executed by and among (i) Carnaby III and TPC; and (ii) Carnaby III and TTC, on July 6, 2022.  The Manufacturing Agreements created valid and binding obligations for each FBG Entity, enforceable against them in accordance with their terms.   Under the Manufacturing Agreements, Carnaby III hired and requested certain manufacturing services from each of the FBG Entities to manufacture and produce the products requested by Carnaby III.  The FBG Entities were authorized to perform the manufacture processes required by Carnaby III through its Maquiladoras located in Mexico.

17.     The Manufacturing Agreements provide that neither the FBG Entities nor its Maquiladoras shall under any circumstances be considered to have any proprietary interest in the Materials (as defined in the Manufacturing Agreements) which Carnaby III may deliver to the FBG Entities nor on the Products (as defined in the Manufacturing Agreements).  It also provides

that each of the FBG Entities and their Maquiladoras shall provide necessary administrative services for shipment, including the arrangement of proper transportation of the Materials and the Products between Mexico and the United States. The Manufacturing Agreements also provide that the Maquiladoras shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the Materials and Products.

**ASSERTION OF CLAIM**

18.     Proof of Claim. This Proof of Claim is filed by the Administrative Agent for the benefit of the Carnaby III Secured Lenders and sets forth their claims against (i) Carnaby III, including outstanding amounts owed under the Carnaby III Credit Agreement and other Transaction Documents, and (ii) Carnaby II, under the Cross-Collateralization Agreement, in the aggregate principal amount of at least **$100,000,000.00** and accrued and unpaid interest of at least **$1,094,207.28**, plus post-petition and default interest, as well as any other fees, out-of-pocket fees and expenses (including, but not limited to the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby III Secured Lenders), costs, and other charges, together with all amounts payable under section 506(b) of title 11 of the United States Code (the "Bankruptcy Code"), and any other obligations incurred in connection with the Carnaby III Credit Agreement and related Transaction Documents that are required to be paid by Carnaby III or any Guarantor pursuant to any Transaction Documents and not paid, or Carnaby II pursuant to the Cross-Collateralization Agreement (collectively, the "Secured Obligations").

19.     Additional Claims. The Administrative Agent is also entitled on behalf of the Carnaby III Secured Lenders to seek payment in full of, among other things, (i) any accrued and unpaid interest (including post-petition and default interest); (ii) any and all unpaid fees and expenses owed to the Administrative Agent and/or any Carnaby III Secured Lender; (iii) any

7

indemnifications, out-of-pocket fees and expenses (including, but not limited to the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby III Secured Lenders), premiums, reimbursements, charges, damages, and/or claims (as defined in the Bankruptcy Code) arising under the Transaction Documents, and in particular covered and secured by the security interests granted under the U.S. Security Agreement, the Mexican Security Agreement, and the Cross-Collateralization Agreement, and (iii) all obligations owed to the Carnaby III Secured Lenders until all Obligations have been paid in full (collectively, the "Additional Claims," together with the Secured Obligations, the "Claims").

20.     Federal Rule of Bankruptcy Procedure 3001(e)(3) states that "[i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount."  Fed. R. Bankr. P. 3001(e)(3). Section 101(54) of the Bankruptcy Code defines "transfer" as "the creation of a lien." 11 U.S.C. § 101(54)(A).   Pursuant to the U.S. Security Agreement, the Administrative Agent has been granted properly perfected, first-priority liens, for the benefit of the Carnaby III Secured Lenders, over, *inter alia,* all Carnaby III's Contracts, together with all Contract Rights arising thereunder.  Accordingly, the Administrative Agent holds any claims arising out of any such Contracts or Contract Rights that may be asserted by Carnaby III (or by virtue of the Cross Collateralization Agreement, Carnaby II) against any person or entity, including, without limitation, any other Debtor and non-Debtor entities.  Such claims include in the case of the other Debtors counterparty to the Credit Agreement and the Transactions Documents, any claims held by Carnaby II or Carnaby III for breach of contract, in each case, up to the full amount of the Obligations and Guaranteed Obligations.

8

**JOINT EXHIBIT NO. 61**
**Page 17 of 540**

21.     The Administrative Agent on behalf of the Carnaby III Secured Lenders, reserves the right to assert any other claim as part of this Proof of Claim, subject to discovery or further disclosure by Carnaby III, Carnaby II or any other party, as well as its rights to seek payment as an oversecured creditor of all amounts to which it may be entitled under 11 U.S.C. § 506.

22.     Nature of the Claims. The Claims asserted in this Proof of Claim are secured by properly perfected, valid and enforceable first-priority liens and pledges on all of the assets of Carnaby III as contemplated by the U.S. Security Agreement and the Mexican Security Agreement, and all of the assets of Carnaby II as contemplated by the Cross-Collateralization Agreement.  Consequently, the Claims are secured, except to the extent that the value of the Collateral securing the Claims is insufficient to satisfy the Claims in full.  To the extent of any deficiency, the remainder of the Claim is filed as a superpriority adequate protection claim under section 507(b) of the Bankruptcy Code and/or as a general unsecured claim.

## RESERVATION OF RIGHTS

23.     By filing this Proof of Claim, the Administrative Agent does not waive, and expressly reserves, all rights and remedies at law or in equity under any applicable law or jurisdiction that the Administrative Agent has or may have against Carnaby III, Carnaby II, any guarantor or obligor (including but not limited to Carnaby Holdings III or FB Holdings), and any of their respective affiliates and subsidiaries, or any other person or entity.  Without limiting the generality of the foregoing, this Proof of Claim is not, ***nor shall it be deemed or construed to be***: (a) a waiver or release of any terms or provisions of the Carnaby III Credit Agreement, the Carnaby II Credit Agreement or any of its related transaction documents, the Cross-Collateralization Agreement, or the Transaction Documents; (b) an election of remedies or waiver of any past, present or future breaches, defaults or events of default under the Carnaby II Credit Agreement or any of its related transaction documents, the Carnaby III Credit Agreement, the Cross-

9

Collateralization Agreement, or any related Transaction Documents; (c) a waiver of the rights and remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether and affiliate or guarantor of Carnaby III or Carnaby II, an assignee or otherwise; (d) consent by the Administrative Agent to the jurisdiction of the Court with respect to any proceeding commenced against or otherwise involving the Administrative Agent; (e) a waiver of any right to (1) withdraw the reference, or otherwise challenge the jurisdiction of the Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in this case against or otherwise involving the Administrative Agent, or (2) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Administrative Agent; (f) a waiver or release of, or any other limitation on, the Administrative Agent's right to assert that any portion of the claims asserted herein or any other claims are entitled to treatment as priority claims including under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (g) a waiver of any rights that the Administrative Agent may have pursuant to section 506(b) of the Bankruptcy Code; (h) a waiver or release of any lien, pledge or security interest against Carnaby II, Carnaby III, any other Debtor or any third parties; (i) a waiver or release of, or any other limitation on, the Administrative Agent's rights to assert that any nonrecourse claim should be treated as a recourse claim, including but not limited to the exercise of any right that the Administrative Agent may have pursuant section 1111(b) of the Bankruptcy Code; (j) consent to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. section 157(e) or otherwise; (k) a waiver by the Administrative Agent of the right to have final orders in non-core matters entered only by a United States District Court judge;

**JOINT EXHIBIT NO. 61**
**Page 19 of 540**

or (l) a waiver or release of the Administrative Agent's right to have any and all final orders in any all noncore matters or proceedings entered only after de novo review by a United States District Court Judge.

24.     The Administrative Agent expressly reserves the right to amend, replace, update, or supplement this Proof of Claim (including, the Proof of Claim's form) at any time and in any respect (including, without limitation, as necessary or appropriate to amend, quantify, or correct amounts, to provide additional detail regarding the Claims set forth herein, to fix the amount of any contingent or unliquidated component of the Claims, or to include any claim, at law or in equity), to add or amend documents and other information, to file additional proofs of claim or further pleadings for additional claims, to contest the validity, priority, and extent of any other purported liens and security interests other than those described herein, and to assert any and all other claims, actions, defenses, setoffs, recoupments, rights or remedies of whatever kind or nature that it currently has, or may have in the future against Carnaby III, Carnaby II, and/or any other Debtors or non-Debtors, or any other person or entity, including without limitation, rights against guarantors, officers, directors, and other creditors of Carnaby III, Carnaby II, or any other Debtors, at law or in equity, including, without limitation, administrative or other priority claims, setoff and recoupment rights, lien rights, interest, and the right to assert claims that are otherwise warranted in any related actions.

25.     The filing of this Proof of Claim shall not be deemed a waiver of any claim, at law or in equity or under any applicable law that the Administrative Agent may have against Carnaby III, or Carnaby II, including, but not limited to, administrative claims, priority claims, secured claims, unsecured claims, constructive trust claims, or the right to assert claims that are otherwise warranted in any related action. This Proof of Claim also expressly includes any and all rights to

11

assert a constructive trust against assets or cash held by Carnaby III, Carnaby II, and claims for any and all amounts owed, in damages or otherwise, that the Administrative Agent has or may have, whether known or unknown, against Carnaby III, Carnaby II, and all those purporting to act on its behalf, whether presently asserted or to be asserted, including, without limitation, claims based upon common law fraud, misrepresentation, subrogation, indemnity, contribution, unjust enrichment, constructive trust, fraudulent conveyance, failure to fulfill contractual and fiduciary obligations, breach of the implied covenant of good faith and fair dealing, making, causing, or permitting to be made misleading statements regarding the business and activities of Carnaby III, Carnaby II, or any other person or entity, failure to take prudent and appropriate action regarding adverse business conditions affecting the business operations of Carnaby III, Carnaby II, or any other person or entity, tortious interference, unjust enrichment, quantum meruit, failure to require adequate financial and accounting controls for Carnaby III or Carnaby II, and any other theory available under applicable law or equity, all of which singularly or collectively may have caused the Administrative Agent to incur damages.

26.     Nothing herein shall be deemed to waive, stop, or derogate from the rights of Administrative Agent under the Transaction Documents, and in particular, in connection with the Carnaby III Credit Agreement, the Carnaby II Credit Agreement or its transactional documents, the Cross-Collateralization Agreement, the U.S. Security Agreement, or the Mexican Security Agreement. This Proof of Claim also is without prejudice to any and all of the Administrative Agent's rights, claims, and defenses under the Bankruptcy Code or otherwise, including, but not limited to, the right to vote on any plan(s) in the Debtors' Chapter 11 Cases.

27.     The Administrative Agent reserves the right to claim that the portion of its fees, interest, costs, expenses, and other charges incurred or accruing after the Initial Petition Date

constitute administrative expenses of Carnaby III's estate to the extent such expenses are not otherwise paid in full, and reserves the right to file a claim or application for payment of such administrative expenses.

28.     No judgment has been rendered on the Claims set forth in this Proof of Claim.

29.     With respect to any portion of the Claims that is unliquidated or as to which the amount is undetermined, the Administrative Agent does not waive their rights thereto by not claiming specific amounts at this time.

30.     The Administrative Agent expressly reserves, and does not waive, its right to payment of any amounts due from the guarantors, FB Holdings and Carnaby Holdings III, or from any other sources under any applicable law and jurisdiction.

31.     The Administrative Agent expressly reserves its rights to exercise judicial actions under any applicable law and jurisdiction against non-debtor entities during and after this Chapter 11 Cases.

32.     Nothing contained in this Proof of Claim shall be deemed an admission by the Administrative Agent.

33.     To the best of the Administrative Agent's knowledge, the claims set forth herein are not subject to setoff or counterclaim, provided, however, that the Claimant Parties expressly reserve and do not waive any right of set-off or recoupment they may possess.

34.     The Administrative Agent does not consent to the surcharge of the Collateral (or such collateral as may be provided by certain orders of the Court) by Carnaby III's estates or the Debtors' estates, their representatives or any other person or party-in-interest pursuant to 11 U.S.C. §506(c) or otherwise.

**JOINT EXHIBIT NO. 61**
**Page 22 of 540**

35.     The Administrative Agent expressly reserves the right to withdraw this Proof of Claim as if it had never been filed.

## NOTICES AND COMMUNICATIONS

36.     Any and all notices and communications concerning the Proof of Claim shall be sent to the following addresses both in hard copy and via e-mail:

Tarik Johnson
**GLAS TRUST COMPANY LLC**, in its capacity as Administrative Agent
3 Second Street, Suite 206, Jersey City, NJ 07311
Tel.: +1 201 201 8642
E-mails:
Tarik.Johnson@glas.agency

with a copy to (which shall not constitute notice)

Allan S. Brilliant
Stephen Wolpert
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Tel.: +1 212 698 3599
E-mails:
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

## SUPPORTING DOCUMENTS

37.     The Administrative Agent's claims are based on the Carnaby III Credit Agreement, the Cross-Collateralization Agreement, the U.S. Security Agreement, the Mexican Security Agreement, and other related Transaction Documents.  Copies of these documents and additional related documents are not attached to the Proof of Claim because of their voluminous nature. Counsel to the Administrative Agent will provide copies of such documents to any party in interest in these Chapter 11 Cases, upon a reasonable written request (and entry into an appropriate

confidentiality agreement, if necessary) addressed to counsel to the Administrative Agent at the address set forth herein.

38.     Each and every description in this Addendum to the Carnaby III Credit Agreement and Transaction Documents is qualified in its entirety by the reference to the applicable provisions of such documents, and all such documents are incorporated herein by reference.  In the event of any inconsistency between this Addendum and any such document, including the proof of claim form, the relevant document shall control.

**GLAS Trust Company LLC**
In its capacity as Administrative Agent under the
Carnaby III Credit Agreement and related Transaction Documents

Dated: December 4, 2025

**JOINT EXHIBIT NO. 61**
**Page 24 of 540**

Electronic Proof of Claim Confirmation:  3950-1-OQTQK-560603273

Claim Electronically Submitted on (UTC) :  2025-12-04T20:51:29.869Z

Submitted by:  GLAS Trust Company LLC
               tarik.johnson@glas.agency

KROLL

**<u>Exhibit 36</u>**

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ _Not less than $59,622,980.00_ . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe:     See Addendum

**Basis for perfection:**     See Addendum

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                              $ _____

**Amount of the claim that is secured:**          $ _____

**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**     $ See Addendum

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**     $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**Proof of Claim**                                                                page 2

**JOINT EXHIBIT NO. 61**
**Page 28 of 540**

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
|---|---|---|
| | ☐ Yes. *Check one:* | **Amount entitled to priority** |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $ _____

☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $ _____

☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)( ) that applies.  $ _____

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No | |
|---|---|---|
| | ☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $ _____ |

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Tarik Johnson*    12/04/2025
_____    _____
Electronic Signature                                    Date

**Name of the person who is completing and signing this claim**

Name    Tarik Johnson
_____
First name          Middle name          Last name

Title/Company    GLAS Trust Company LLC
_____
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    3 Second Street

Suite 206
_____
Number          Street

Jersey City          NJ          07311
_____
City          State          ZIP Code          Country

Contact phone    201-201-8642          Email    tarik.johnson@glas.agency

---

**Proof of Claim**                                                                 page 3

**JOINT EXHIBIT NO. 61**
**Page 29 of 540**

**Additional Noticing Addresses (if provided):**

**Additional Address 1**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
Postal Code:
Country:

Contact Phone:
Contact Email:

**Additional Address 2**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
 Postal Code:
 Country:

Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**

☑ Yes
☐ No
--------------------------------------------------------------------------------------------------------

 Attachment Filename:

Carnaby Inventory III, LLC (25-90390) POC Form (Carnaby II Secured Lenders against CIII) (Execution Version with Addendum).pdf

**KROLL**

**United States Bankruptcy Court, Southern District of Texas**

> **Fill in this information to identify the case (Select only one Debtor per claim form):**
>
> ## Debtor Name and Case Number:

Modified Official Form 410

# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

❑ No
❑ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Name _____

Number      Street

City          State          ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**Where should payments to the creditor be sent?** (if different)

Name _____

Number      Street

City          State          ZIP Code

Contact phone _____

Contact email _____

**4. Does this claim amend one already filed?**

❑ No
❑ Yes.   Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

❑ No
❑ Yes. Who made the earlier filing? _____

**JOINT EXHIBIT NO. 61**
**Page 31 of 540**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

❏ No
❏ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____. **Does this amount include interest or other charges?**

❏ No
❏ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_____

**9. Is all or part of the claim secured?**

❏ No
❏ Yes. The claim is secured by a lien on property.

    **Nature of property:**

    ❏ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
    ❏ Motor vehicle
    ❏ Other. Describe: _____

    **Basis for perfection:** _____
    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

    **Value of property**: $_____

    **Amount of the claim that is secured:** $_____

    **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

    **Amount necessary to cure any default as of the date of the petition:** $_____

    **Annual Interest Rate** (when case was filed)_____%
    ❏ Fixed
    ❏ Variable

**10. Is this claim based on a lease?**

❏ No
❏ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

❏ No
❏ Yes. Identify the property: _____

**Proof of Claim**                                      page 2

**JOINT EXHIBIT NO. 61**
**Page 32 of 540**

| | | Amount entitled to priority |
|---|---|---|

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☑ No

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Yes. *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____

☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____

☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(    ) that applies.    $_____

\* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.**    $_____

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   12/04/2025
                   MM / DD / YYYY

Signature _____

Name of the person who is completing and signing this claim:

Name    Tarik                          Johnson
        First name    Middle name      Last name

Title   Authorized Signatory

Company   GLAS Trust Company LLC as administrative agent for Carnaby II Secured Lenders
          Identify the corporate servicer as the company if the authorized agent is a servicer.

Address   3 Second Street, Suite 206
          Number    Street
          Jersey City          NJ        07311
          City                 State     ZIP Code

Contact phone   201 - 201 - 8642        Email    Tarik.Johnson@glas.agency

---

Proof of Claim    page 3

**JOINT EXHIBIT NO. 61**
**Page 33 of 540**

**OMNIBUS ADDENDUM TO PROOFS OF CLAIMS FILED BY
GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT TO
THE CARNABY II SECURED LENDERS**

GLAS Trust Company LLC, in its capacity as administrative agent (the "Administrative Agent") for the Lenders[1] (the "Carnaby II Secured Lenders") under that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement"), hereby submits this omnibus addendum (the "Addendum") in support of its proofs of claim (together with the proof of claim form, the "Proof of Claim") submitted against Carnaby Inventory II, LLC ("Carnaby II") and Carnaby Inventory III, LLC ("Carnaby III"). This Addendum is intended to be and should be treated as part of the Proof of Claim.

1. On September 24, 2025 (the "Initial Petition Date"), certain Debtors,[2] including Carnaby II and Carnaby III, commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Court"). Between September 28, 2025, and September 29, 2025, approximately 99 additional Debtors, including First Brands Group, LLC ("FBG") and other related FBG Debtors, filed their own bankruptcy petitions.

### BASIS FOR CLAIM

2. The Carnaby II Credit Agreement. On or about May 31, 2022, Carnaby II, as the Borrower, FBG, as the Servicer, First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II," together with FB Holdings, the "Guarantors"), as Guarantors, the Carnaby II Secured Lenders party thereto as Lenders from time

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to those terms in the Carnaby II Credit Agreement.

[2] A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby II Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time).[3]

3. The Carnaby II Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $60 million under which such funds were advanced by the Carnaby II Secured Lenders in the maximum principal amount to Carnaby II.

4. Carnaby II's obligations under the Carnaby II Credit Agreement and the Transaction Documents[4] are secured by first priority liens on the Collateral (as defined below) pursuant to the U.S. Security Agreement (as defined below) and the Mexican Security Agreement (as defined below), as further detailed below.

5. The Administrative Agent holds, on behalf of the Carnaby II Secured Lenders, $58,964,276.00 in outstanding principal amount (defined as the "Loans"), due and payable by Carnaby II and the Guarantors under the Carnaby II Credit Agreement.  In addition to the obligation to repay the principal amount of the Loans, Carnaby II and the Guarantors assumed the obligation to pay accrued and unpaid Interest and all other Obligations[5] and Guaranteed

---

[3]   On May 30, 2025, the parties to the Carnaby II Credit Agreement entered into an Extension Agreement, extending the Maturity Date originally set forth in the Carnaby II Credit Agreement.

[4]   The Carnaby II Credit Agreement defines the "Transaction Documents" as "collectively, [the Carnaby II Credit Agreement], each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto." Carnaby II Credit Agreement, Ex. I.

[5]   The Carnaby II Credit Agreement defines "Obligations" as "all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the

2

**JOINT EXHIBIT NO. 61**
**Page 35 of 540**

Obligations[6] outstanding under the Carnaby II Credit Agreement and other Transaction Documents.

6.     The Carnaby II Promissory Notes. Carnaby II's obligations to repay the Obligations under the Carnaby II Credit Agreement were also evidenced through Promissory Notes executed by Carnaby II with respect to each advancement, and guaranteed in each case, by the Guarantors.

7.     U.S. Security Agreement. On May 31, 2022, Carnaby II, Carnaby Holdings II, and the Administrative Agent for the benefit of the Carnaby II Secured Lenders, entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "U.S. Security Agreement").

8.     As security for the prompt and complete payment or performance, as the case may be, in full of the "Obligations" (as defined in the U.S. Security Agreement, as amended by the Cross-Collateralization Agreement),[7] Carnaby II and Carnaby Holdings II, pledged, collaterally assigned and granted to the Administrative Agent, on behalf of and for the benefit of the Secured Parties (including the Carnaby II Secured Lenders), a continuing security interest in all of its right,

---

commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding)." Carnaby II Credit Agreement, Ex. I.

[6]   The Carnaby II Credit Agreement defines "Guaranteed Obligations" as "the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations[.]" Carnaby II Credit Agreement, section 11.1.

[7]   "Obligations" under the U.S. Security Agreements means "(i) "Obligations" (as defined in the [Carnaby II] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby II] Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(ii).

3

**JOINT EXHIBIT NO. 61**
**Page 36 of 540**

title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such, and regardless of where located: (i) all Accounts; (ii) all Cash; (iii) all Chattel Paper (including, without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper); (iv) all Commercial Tort Claims; (v) all Contracts, together with all Contract Rights arising thereunder; (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Financial Assets; (x) all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Governmental Authorizations; (xiv) all Instruments; (xv) all Intellectual Property Collateral; (xvi) all Inventory; (xvii) all Investment Property, Pledged Stock and other Pledged Collateral; (xviii) all letters of credit and Letter-of-Credit Rights; (xix) all Licenses; (xx) all Proceeds of insurance; (xxi) all Receivables; (xxii) all Real Estate Assets; (xxiii) all Securities Accounts, Money, Securities, and other investments therein, and all Security Entitlements in respect thereof; (xxiv) all Software and all recorded data of any kind or nature, regardless of the medium of recording; (xxv) all Supporting Obligations relating to any of the foregoing; and (xxvi) all accessions to, substitutions and replacements for and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing (collectively, the "U.S. Collateral"), thereby achieving a complete cross-collateralization of the Carnaby II Credit Agreement and Carnaby III Credit Agreement in respect of all obligations owing under such facilities and all collateral pledged under them.

9.      Mexican Security Agreement. As additional security for the payment, performance and satisfaction in full of any and all of the Obligations, on May 31, 2022, Carnaby II, as Pledgor,

4

the Administrative Agent for the benefit of the Carnaby II Secured Lenders, as Pledgee, BPI Brake

Manufacturing Juarez S.A. de C.V. and BPI Braking Systems Mexico, S.A. de C.V. as depositaries

(jointly, the "Depositaries"), and Brake Parts Inc. LLC ("BPI") entered into a Floating Lien Pledge

Agreement (*Contrato de Prenda sin Transmisión de Posesión*), under Mexican law (the "Mexican

Security Agreement").

10. Under the Mexican Security Agreement, Carnaby II granted to the Administrative

Agent, for the benefit of the Carnaby II Secured Lenders, a first-priority floating lien pledge and

security interest over the "Pledged Assets" to secure the due and timely payment, performance and

satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of

the Obligations.  The Mexican Security Agreement defines Pledged Assets as any and all property

and inventory located in Mexico, currently owned by the Pledgor, or acquired by the Pledgor or

arising in the future, including without limitation, all Raw Materials,[8] together with (i) all

documents, documents of title, warehouse receipts (or similar documents), bills of lading or orders

for delivery of all, or any portion of the foregoing; and (ii) all products and/or sale proceeds of any

and all of the foregoing, including, without limitation, insurance proceeds (collectively, the

"Mexican Collateral" and together with the U.S. Collateral, the "Collateral").

11. The Mexican Security Agreement also contains representations that Carnaby II is

the sole, legal, and beneficial owner of the Mexican Collateral, which are free and clear of any

liens and/or any other documents whatsoever which by its terms restrict or otherwise prohibit any

---

[8]   "Raw Materials" are defined under the Mexican Security Agreement as "all the assets that comprise the inventory of the Pledgor, whether now owned or hereafter acquired, including without limitation, all inventory of the Pledgor (i) held for sale or lease, (ii) furnished or to be furnished under any service agreement, (iii) held for display or demonstration, or (iv) on lease or consignment, in favor of third parties; including accessories, packaging and shipping materials, spare parts, repair parts, returned and repossessed inventory, all raw materials, work-in-process, finished inventory and supplies used or consumed in the Pledgor business together with all documents, documents of title, warehouse receipts, pledge bonds, bills of lading, deposit certificates or orders for the delivery of all, or any portion, of the foregoing, including without limitation the assets listed in Exhibit C [attached thereto]."

**JOINT EXHIBIT NO. 61**
**Page 38 of 540**

lien, assignment, transfer, use or exercise of such Mexican Collateral or any portion thereof, which have been duly and legally imported into Mexico under the temporary importation regime.  It also provides that the Mexican Security Agreement and the security interest granted hereunder constitute a legal, valid, binding and enforceable security over the Mexican Collateral.

12.     Perfection. The security interests granted under the U.S. Security Agreement were properly perfected by filing UCC financing statements with the Delaware Secretary of State.  As a result, the Administrative Agent holds, on behalf of and for the benefit of the Carnaby II Secured Lenders, properly perfected security interests in all assets of Carnaby II.

13.     In turn, the Mexican Security Agreement was executed in compliance with Mexican law, before a Mexican Notary Public and it is duly registered before the Mexican Sole Registry of Liens over Movable Assets (*Registro Unico de Garantias Mobiliarias*) ("RUG").  As a result, the Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the benefit of the Carnaby II Secured Lenders, a valid and perfected first-priority security interest in the Mexican Collateral.

14.     Cross-Collateralization Agreement.  On July 6, 2022, the parties to the Carnaby II Credit Agreement entered into a Cross-Collateralization Agreement with the parties to the Carnaby III Credit Agreement.[9]   Under the Cross-Collateralization Agreement, the parties under the Carnaby III Credit Agreement agreed that the Collateral securing the Carnaby III Credit Agreement would also secure the obligations under the Carnaby II Credit Agreement, and vice versa.

---

[9]     The "Carnaby III Credit Agreement" refers to certain credit agreement dated as of July 6, 2025 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time), entered into among Carnaby III, as borrower, FBG, as the servicer, FB Holdings and Carnaby Inventory Holdings III, LLC, as guarantors, the Carnaby II Secured Lenders party thereto from time to time, and GLAS Trust Company LLC, as administrative agent.

6

**JOINT EXHIBIT NO. 61**
**Page 39 of 540**

15.     Other Transaction Documents. The Mexican Security Agreement provides that Carnaby II maintains a manufacturing business relationship with BPI, as evidenced by a certain Manufacturing Agreement, pursuant to which Carnaby II provides to the Depositories the Raw Material for the Services to be provided under the Maquiladora Agreements.  In turn, BPI has entered into certain Maquiladora Agreements with the Depositaries, pursuant to which the Mexican Collateral have been duly imported (and/or will continue to be duly imported) on a temporary basis into Mexican territory in accordance with the "maquiladora program" in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreements).

16.     The Manufacturing Agreement was executed by and among Carnaby II and BPI on May 31, 2022, and created valid and binding obligations of BPI, enforceable against such party in accordance with its terms.  Under the Manufacturing Agreement, Carnaby II hired and requested certain manufacturing services from BPI to manufacture and produce the products requested by Carnaby II.  BPI was authorized to perform the manufacture processes required by Carnaby II through its Maquiladoras located in Mexico.

17.     The Manufacturing Agreement provides that neither BPI nor its Maquiladoras shall under any circumstances be considered to have any proprietary interest in the Materials (as defined in the Manufacturing Agreement) which Carnaby II may deliver to BPI nor on the Products (as defined in the Manufacturing Agreement).  It also provides that BPI and its Maquiladoras shall provide necessary administrative services for shipment, including the arrangement of proper transportation of the Materials and the Products between Mexico and the United States.  The Manufacturing Agreement also provides that the Maquiladoras shall be the importer and exporter

7

of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the Materials and Products.

## **ASSERTION OF CLAIM**

18.     <u>Proof of Claim</u>.  This Proof of Claim is filed by the Administrative Agent for the benefit of the Carnaby II Secured Lenders and sets forth their claims against (i) Carnaby II, including outstanding amounts owed under the Carnaby II Credit Agreement and other Transaction Documents, and (ii) Carnaby III, under the Cross-Collateralization Agreement, in the aggregate principal amount of at least **$58,964,276.00**, accrued and unpaid interest of at least **$658,704.05**, plus post-petition and default interest, as well as any other fees, out-of-pocket fees and expenses (including, but not limited to the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II Secured Lenders), costs, and other charges, together with all amounts payable under section 506(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and any other obligations incurred in connection with the Carnaby II Credit Agreement and related Transaction Documents that are required to be paid by Carnaby II or any Guarantor pursuant to any Transaction Documents and not paid, or Carnaby III pursuant to the Cross-Collateralization Agreement (collectively, the "<u>Secured Obligations</u>").

19.     <u>Additional Claims</u>.  The Administrative Agent is also entitled on behalf of the Carnaby II Secured Lenders to seek payment in full of, among other things, (i) any accrued and unpaid interest (including post-petition and default interest); (ii) any and all unpaid fees and expenses owed to the Administrative Agent and/or any Carnaby II Secured Lender; (iii) any indemnifications, out-of-pocket fees and expenses (including, but not limited to the fees, charges

8

and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II Secured Lenders), premiums, reimbursements, charges, damages, and/or claims (as defined in the Bankruptcy Code) arising under the Transaction Documents, and in particular covered and secured by the security interests granted under the U.S. Security Agreement, the Mexican Security Agreement, and the Cross-Collateralization Agreement, and (iii) all obligations owed to the Carnaby II Secured Lenders until all Obligations have been paid in full (collectively, the "Additional Claims," together with the Secured Obligations, the "Claims").

20.     Federal Rule of Bankruptcy Procedure 3001(e)(3) states that "[i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount."  Fed. R. Bankr. P. 3001(e)(3). Section 101(54) of the Bankruptcy Code defines "transfer" as "the creation of a lien." 11 U.S.C. § 101(54)(A).   Pursuant to the U.S. Security Agreement, the Administrative Agent has been granted properly perfected, first-priority liens, for the benefit of the Carnaby II Secured Lenders, over, *inter alia,* all Carnaby II's Contracts, together with all Contract Rights arising thereunder.  Accordingly, the Administrative Agent holds any claims arising out of any such Contracts or Contract Rights (as each such term is defined in the U.S. Security Agreement) that may be asserted by Carnaby II (or by virtue of the Cross Collateralization Agreement, Carnaby II) against any person or entity, including, without limitation, any other Debtor and non-Debtor entities.  Such claims include in the case of the other Debtors counterparty to the Credit Agreement and the Transactions Documents, any claims held by Carnaby II or Carnaby III for breach of contract, in each case, up to the full amount of the Obligations and Guaranteed Obligations.

9

21.     The Administrative Agent on behalf of the Carnaby II Secured Lenders, reserves the right to assert any other claim as part of this Proof of Claim, subject to discovery or further disclosure by Carnaby II, Carnaby III or any other party, as well as its rights to seek payment as an oversecured creditor of all amounts to which it may be entitled under 11 U.S.C. § 506.

22.     <u>Nature of the Claims</u>. The Claims asserted in this Proof of Claim are secured by properly perfected, valid and enforceable first-priority liens and pledges on all of the assets of Carnaby II as contemplated by the U.S. Security Agreement and the Mexican Security Agreement, and all of the assets of Carnaby III as contemplated by the Cross-Collateralization Agreement. Consequently, the Claims are secured, except to the extent that the value of the Collateral securing the Claims is insufficient to satisfy the Claims in full.  To the extent of any deficiency, the remainder of the Claim is filed as a superpriority adequate protection claim under section 507(b) of the Bankruptcy Code and/or as a general unsecured claim.

<strong><u>RESERVATION OF RIGHTS</u></strong>

23.     By filing this Proof of Claim, the Administrative Agent does not waive, and expressly reserves, all rights and remedies at law or in equity under any applicable law or jurisdiction that the Administrative Agent has or may have against Carnaby II, Carnaby III, any guarantor or obligor (including but not limited to Carnaby Holdings II or FB Holdings), and any of their respective affiliates and subsidiaries, or any other person or entity.  Without limiting the generality of the foregoing, this Proof of Claim is not, ***nor shall it be deemed or construed to be***: (a) a waiver or release of any terms or provisions of the Carnaby II Credit Agreement, the Carnaby III Credit Agreement or any of its related transaction documents, the Cross-Collateralization Agreement, or the Transaction Documents; (b) an election of remedies or waiver of any past, present or future breaches, defaults or events of default under the Carnaby III Credit Agreement or any of its related transaction documents, the Carnaby II Credit Agreement, the Cross-

10

Collateralization Agreement, or any related Transaction Documents; (c) a waiver of the rights and remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether and affiliate or guarantor of Carnaby II or Carnaby III, an assignee or otherwise; (d) consent by the Administrative Agent to the jurisdiction of the Court with respect to any proceeding commenced against or otherwise involving the Administrative Agent; (e) a waiver of any right to (1) withdraw the reference, or otherwise challenge the jurisdiction of the Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in this case against or otherwise involving the Administrative Agent, or (2) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Administrative Agent; (f) a waiver or release of, or any other limitation on, the Administrative Agent's right to assert that any portion of the claims asserted herein or any other claims are entitled to treatment as priority claims including under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (g) a waiver of any rights that the Administrative Agent may have pursuant to section 506(b) of the Bankruptcy Code; (h) a waiver or release of any lien, pledge or security interest against Carnaby II, Carnaby III, any other Debtor or any third parties; (i) a waiver or release of, or any other limitation on, the Administrative Agent's rights to assert that any nonrecourse claim should be treated as a recourse claim, including but not limited to the exercise of any right that the Administrative Agent may have pursuant section 1111(b) of the Bankruptcy Code; (j) consent to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. section 157(e) or otherwise; (k) a waiver by the Administrative Agent of the right to have final orders in non-core matters entered only by a United States District Court judge;

11

**JOINT EXHIBIT NO. 61**
**Page 44 of 540**

or (l) a waiver or release of the Administrative Agent's right to have any and all final orders in any all noncore matters or proceedings entered only after de novo review by a United States District Court Judge.

24.     The Administrative Agent expressly reserves the right to amend, replace, update, or supplement this Proof of Claim (including, the Proof of Claim's form) at any time and in any respect (including, without limitation, as necessary or appropriate to amend, quantify, or correct amounts, to provide additional detail regarding the claims set forth herein, to fix the amount of any contingent or unliquidated component of the claims, or to include any claim, at law or in equity), to add or amend documents and other information, to file additional proofs of claim or further pleadings for additional claims, to contest the validity, priority, and extent of any other purported liens and security interests other than those described herein, and to assert any and all other claims, actions, defenses, setoffs, recoupments, rights or remedies of whatever kind or nature that it currently has, or may have in the future against Carnaby II, Carnaby III, and/or any other Debtors or non-Debtors, or any other person or entity, including without limitation, rights against guarantors, officers, directors, and other creditors of Carnaby II, Carnaby III, or any other Debtors, at law or in equity, including, without limitation, administrative or other priority claims, setoff and recoupment rights, lien rights, interest, and the right to assert claims that are otherwise warranted in any related actions.

25.     The filing of this Proof of Claim shall not be deemed a waiver of any claim, at law or in equity or under any applicable law that the Administrative Agent may have against Carnaby II, or Carnaby III, including, but not limited to, administrative claims, priority claims, secured claims, unsecured claims, constructive trust claims, or the right to assert claims that are otherwise warranted in any related action. This Proof of Claim also expressly includes any and all rights to

12

**JOINT EXHIBIT NO. 61**
**Page 45 of 540**

assert a constructive trust against assets or cash held by Carnaby II, Carnaby III, and claims for any and all amounts owed, in damages or otherwise, that the Administrative Agent has or may have, whether known or unknown, against Carnaby II, Carnaby III, and all those purporting to act on its behalf, whether presently asserted or to be asserted, including, without limitation, claims based upon common law fraud, misrepresentation, subrogation, indemnity, contribution, unjust enrichment, constructive trust, fraudulent conveyance, failure to fulfill contractual and fiduciary obligations, breach of the implied covenant of good faith and fair dealing, making, causing, or permitting to be made misleading statements regarding the business and activities of Carnaby II, Carnaby III, or any other person or entity, failure to take prudent and appropriate action regarding adverse business conditions affecting the business operations of Carnaby II, Carnaby III, or any other person or entity, tortious interference, unjust enrichment, quantum meruit, failure to require adequate financial and accounting controls for Carnaby II or Carnaby III, and any other theory available under applicable law or equity, all of which singularly or collectively may have caused the Administrative Agent to incur damages.

26.     Nothing herein shall be deemed to waive, stop, or derogate from the rights of Administrative Agent under the Transaction Documents, and in particular, in connection with the Carnaby II Credit Agreement, the Carnaby III Credit Agreement or its transactional documents, the Cross-Collateralization Agreement, the U.S. Security Agreement, or the Mexican Security Agreement. This Proof of Claim also is without prejudice to any and all of the Administrative Agent's rights, claims, and defenses under the Bankruptcy Code or otherwise, including, but not limited to, the right to vote on any plan(s) in the Debtors' Chapter 11 Cases.

27.     The Administrative Agent reserves the right to claim that the portion of its fees, interest, costs, expenses, and other charges incurred or accruing after the Initial Petition Date

13

constitute administrative expenses of Carnaby II's estate to the extent such expenses are not otherwise paid in full, and reserves the right to file a claim or application for payment of such administrative expenses.

28.     No judgment has been rendered on the Claims set forth in this Proof of Claim.

29.     With respect to any portion of the Claims that is unliquidated or as to which the amount is undetermined, the Administrative Agent does not waive their rights thereto by not claiming specific amounts at this time.

30.     The Administrative Agent expressly reserves, and does not waive, its right to payment of any amounts due from the guarantors, FB Holdings and Carnaby Holdings II, or from any other sources under any applicable law and jurisdiction.

31.     The Administrative Agent expressly reserves its rights to exercise judicial actions under any applicable law and jurisdiction against non-debtor entities during and after this Chapter 11 Cases.

32.     Nothing contained in this Proof of Claim shall be deemed an admission by the Administrative Agent.

33.     To the best of the Administrative Agent's knowledge, the claims set forth herein are not subject to setoff or counterclaim, provided, however, that the Claimant Parties expressly reserve and do not waive any right of set-off or recoupment they may possess.

35.     The Administrative Agent does not consent to the surcharge of the Collateral (or such collateral as may be provided by certain orders of the Court) by Carnaby II's estates or the Debtors' estates, their representatives or any other person or party-in-interest pursuant to 11 U.S.C. §506(c) or otherwise.

14

36.     The Administrative Agent expressly reserves the right to withdraw this Proof of Claim as if it had never been filed.

## NOTICES AND COMMUNICATIONS

32.     Any and all notices and communications concerning the Proof of Claim shall be sent to the following addresses both in hard copy and via e-mail:

> Tarik Johnson
> **GLAS TRUST COMPANY LLC**, in its capacity as Administrative Agent
> 3 Second Street, Suite 206, Jersey City, NJ 07311
> Tel.: +1 201 201 8642
> E-mails:
> Tarik.Johnson@glas.agency
>
> with a copy to (which shall not constitute notice)
>
> Allan S. Brilliant
> Stephen Wolpert
> **DECHERT LLP**
> 1095 Avenue of the Americas
> New York, NY 10036
> Tel.: +1 212 698 3599
> E-mails:
> allan.brilliant@dechert.com
> stephen.wolpert@dechert.com

## SUPPORTING DOCUMENTS

33.     The Administrative Agent's claims are based on the Carnaby II Credit Agreement, the Cross-Collateralization Agreement, the U.S. Security Agreement, the Mexican Security Agreement, and other related Transaction Documents.  Copies of these documents and additional related documents are not attached to the Proof of Claim because of their voluminous nature.

Counsel to the Administrative Agent will provide copies of such documents to any party in interest in these Chapter 11 Cases, upon a reasonable written request (and entry into an appropriate confidentiality agreement, if necessary) addressed to counsel to the Administrative Agent at the address set forth herein.

34.     Each and every description in this Addendum to the Carnaby II Credit Agreement and Transaction Documents is qualified in its entirety by the reference to the applicable provisions of such documents, and all such documents are incorporated herein by reference.  In the event of any inconsistency between this Addendum and any such document, including the proof of claim form, the relevant document shall control.

**GLAS Trust Company LLC**
In its capacity as Administrative Agent under the
Carnaby II Credit Agreement and related Transaction Documents

Dated: December 4, 2025

**JOINT EXHIBIT NO. 61**
**Page 49 of 540**

Electronic Proof of Claim Confirmation:  **3950-1-RDXAC-281662536**

Claim Electronically Submitted on (UTC) :  **2025-12-04T20:45:44.899Z**

Submitted by:  **GLAS Trust Company LLC**
**tarik.johnson@glas.agency**

**KROLL**

**<u>Exhibit 102</u>**

**United States Bankruptcy Court, Southern District of Texas**

---

**Fill in this information to identify the case (Select only one Debtor per claim form):**

**Debtor:** Carnaby Inventory II, LLC

**Case Number:** 25-90388

---

Modified Official Form 410

# Proof of Claim

4/25

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

---

**Part 1:    Identify the Claim**

| | | |
|---|---|---|
| 1. | **Who is the current creditor?** | GLAS Trust Company LLC |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor |

| | | |
|---|---|---|
| 2. | **Has this claim been acquired from someone else?** | ☑ No |
| | | ☐ Yes. From whom? |

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|
| Address1: | 3 Second Street | Address1: |
| Address2: | Suite 206 | Address2: |
| Address3: | | Address3: |
| Address4: | | Address4: |
| City: | Jersey City | City: |
| State: | NJ | State: |
| Postal Code: | 07311 | Postal Code: |
| Country: | | Country: |
| Contact phone | 201-201-8642 | Contact phone |
| Contact email | tarik.johnson@glas.agency | Contact email |

**Uniform Claim Identifier (if you use one)**

| | | |
|---|---|---|
| 4. | **Does this claim amend one already filed?** | ☑ No |
| | | ☐ Yes.   Claim number on court claims registry (if known)_____   Filed on _____ MM / DD / YYYY |

| | | |
|---|---|---|
| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
| | | ☐ Yes. Who made the earlier filing? |

---

**Claim Number: 1233**                    **Proof of Claim**                    page 1

**JOINT EXHIBIT NO. 61**
**Page 52 of 540**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ _Not less than $59,622,980.00_ . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe: See Addendum

**Basis for perfection:** See Addendum

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ See Addendum

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**Proof of Claim**                                                                 page 2

**JOINT EXHIBIT NO. 61**
**Page 53 of 540**

| | | |
|---|---|---|
| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |
| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $_____ |

---

**Part 3:**    **Sign Below**

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>*Tarik Johnson*  12/04/2025<br>_____<br>Electronic Signature        Date<br><br>**Name of the person who is completing and signing this claim**<br><br>Name:   Tarik Johnson<br>       First name     Middle name     Last name<br><br>Title/Company:   GLAS Trust Company LLC<br>       Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address:   3 Second Street<br>       Suite 206<br>       Number    Street<br>       Jersey City     NJ     07311<br>       City     State     ZIP Code     Country<br><br>Contact phone   201-201-8642       Email   tarik.johnson@glas.agency |

**JOINT EXHIBIT NO. 61**
**Page 54 of 540**

**Additional Noticing Addresses (if provided):**

**Additional Address 1**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
Postal Code:
Country:

Contact Phone:
Contact Email:
_____

**Additional Address 2**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
 Postal Code:
 Country:

Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**
☑ Yes
☐ No
--------------------------------------------------------------------------------------------------------

 Attachment Filename:

Carnaby Inventory II, LLC (25-90388) POC Form (Carnaby II Secured Lenders against CII) (Execution Version with Addendum).pdf

**KROLL**

**United States Bankruptcy Court, Southern District of Texas**

| Fill in this information to identify the case (Select only one Debtor per claim form): |
| --- |
| **Debtor Name and Case Number:** |
| Carnaby Inventory II, LLC (25-90388) |

<u>Modified Official Form 410</u>

# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| 1. | **Who is the current creditor?** | GLAS Trust Company LLC as administrative agent for the Carnaby II Secured Lenders |
| --- | --- | --- |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor |

| 2. | **Has this claim been acquired from someone else?** | ☑ No ☐ Yes. From whom? |
| --- | --- | --- |

| 3. | **Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- | --- | --- |
| | | See Addendum <br> Name | Name |
| | | See Addendum <br> Number        Street | Number        Street |
| | | See Addendum <br> City          State          ZIP Code | City          State          ZIP Code |
| | | Contact phone  See Addendum | Contact phone |
| | | Contact email  See Addendum | Contact email |
| | | Uniform claim identifier (if you use one): | |

| 4. | **Does this claim amend one already filed?** | ☑ No ☐ Yes.  Claim number on court claims registry (if known)_____        Filed on _____ <br> MM / DD / YYYY |
| --- | --- | --- |

| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No ☐ Yes. Who made the earlier filing? |
| --- | --- | --- |

**JOINT EXHIBIT NO. 61**
**Page 56 of 540**

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

7. **How much is the claim?** $ <u>Not less than $59,622,980</u>. **Does this amount include interest or other charges?**
   ☐ No
   ☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

   Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

   Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

   Limit disclosing information that is entitled to privacy, such as health care information.

   <u>See Addendum</u>

9. **Is all or part of the claim secured?**

   ☐ No
   ☑ Yes. The claim is secured by a lien on property.

   **Nature of property:**

   ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
   ☐ Motor vehicle
   ☑ Other. Describe: <u>See Addendum</u>

   **Basis for perfection:** <u>See Addendum</u>
   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

   **Value of property:** $ _____

   **Amount of the claim that is secured:** $ _____

   **Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

   **Amount necessary to cure any default as of the date of the petition:** $ <u>See Addendum</u>

   **Annual Interest Rate** (when case was filed) _____%
   ☐ Fixed
   ☐ Variable

10. **Is this claim based on a lease?**

    ☑ No
    ☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

11. **Is this claim subject to a right of setoff?**

    ☑ No
    ☐ Yes. Identify the property: _____

**Proof of Claim**                                                                                   page 2

**JOINT EXHIBIT NO. 61**
**Page 57 of 540**

| | |
|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>❑ Yes. *Check one:*                   **Amount entitled to priority** |

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No
❑ Yes. *Check one:*

**Amount entitled to priority**

❑ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____

❑ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____

❑ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____

❑ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____

❑ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____

❑ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.    $_____

\* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

❑ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.**    $_____

---

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

❑ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

❑ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

❑ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   12/04/2025
         MM / DD / YYYY

Signature _____

**Name of the person who is completing and signing this claim:**

Name    Tarik                  Johnson
         First name        Middle name        Last name

Title    Authorized Signatory

Company    GLAS Trust Company LLC as administrative agent for Carnaby II Secured Lenders
         Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    3 Second Street, Suite 206
         Number      Street

Jersey City          NJ      07311
City          State      ZIP Code

Contact phone   201 - 201 - 8642         Email   Tarik.Johnson@glas.agency

**JOINT EXHIBIT NO. 61**
**Page 58 of 540**

**OMNIBUS ADDENDUM TO PROOFS OF CLAIMS FILED BY**
**GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT TO**
**THE CARNABY II SECURED LENDERS**

GLAS Trust Company LLC, in its capacity as administrative agent (the "Administrative Agent") for the Lenders[1] (the "Carnaby II Secured Lenders") under that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement"), hereby submits this omnibus addendum (the "Addendum") in support of its proofs of claim (together with the proof of claim form, the "Proof of Claim") submitted against Carnaby Inventory II, LLC ("Carnaby II") and Carnaby Inventory III, LLC ("Carnaby III"). This Addendum is intended to be and should be treated as part of the Proof of Claim.

1. On September 24, 2025 (the "Initial Petition Date"), certain Debtors,[2] including Carnaby II and Carnaby III, commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Court"). Between September 28, 2025, and September 29, 2025, approximately 99 additional Debtors, including First Brands Group, LLC ("FBG") and other related FBG Debtors, filed their own bankruptcy petitions.

**BASIS FOR CLAIM**

2. <u>The Carnaby II Credit Agreement</u>. On or about May 31, 2022, Carnaby II, as the Borrower, FBG, as the Servicer, First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II," together with FB Holdings, the "Guarantors"), as Guarantors, the Carnaby II Secured Lenders party thereto as Lenders from time

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to those terms in the Carnaby II Credit Agreement.

[2] A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby II Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time).[3]

3.      The Carnaby II Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $60 million under which such funds were advanced by the Carnaby II Secured Lenders in the maximum principal amount to Carnaby II.

4.      Carnaby II's obligations under the Carnaby II Credit Agreement and the Transaction Documents[4] are secured by first priority liens on the Collateral (as defined below) pursuant to the U.S. Security Agreement (as defined below) and the Mexican Security Agreement (as defined below), as further detailed below.

5.      The Administrative Agent holds, on behalf of the Carnaby II Secured Lenders, $58,964,276.00 in outstanding principal amount (defined as the "Loans"), due and payable by Carnaby II and the Guarantors under the Carnaby II Credit Agreement.  In addition to the obligation to repay the principal amount of the Loans, Carnaby II and the Guarantors assumed the obligation to pay accrued and unpaid Interest and all other Obligations[5] and Guaranteed

---

[3]   On May 30, 2025, the parties to the Carnaby II Credit Agreement entered into an Extension Agreement, extending the Maturity Date originally set forth in the Carnaby II Credit Agreement.

[4]   The Carnaby II Credit Agreement defines the "Transaction Documents" as "collectively, [the Carnaby II Credit Agreement], each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto." Carnaby II Credit Agreement, Ex. I.

[5]   The Carnaby II Credit Agreement defines "Obligations" as "all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the

2

**JOINT EXHIBIT NO. 61**
**Page 60 of 540**

Obligations[6] outstanding under the Carnaby II Credit Agreement and other Transaction Documents.

6.   The Carnaby II Promissory Notes. Carnaby II's obligations to repay the Obligations under the Carnaby II Credit Agreement were also evidenced through Promissory Notes executed by Carnaby II with respect to each advancement, and guaranteed in each case, by the Guarantors.

7.   U.S. Security Agreement. On May 31, 2022, Carnaby II, Carnaby Holdings II, and the Administrative Agent for the benefit of the Carnaby II Secured Lenders, entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "U.S. Security Agreement").

8.   As security for the prompt and complete payment or performance, as the case may be, in full of the "Obligations" (as defined in the U.S. Security Agreement, as amended by the Cross-Collateralization Agreement),[7] Carnaby II and Carnaby Holdings II, pledged, collaterally assigned and granted to the Administrative Agent, on behalf of and for the benefit of the Secured Parties (including the Carnaby II Secured Lenders), a continuing security interest in all of its right,

---

commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding)." Carnaby II Credit Agreement, Ex. I.

[6]   The Carnaby II Credit Agreement defines "Guaranteed Obligations" as "the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations[.]" Carnaby II Credit Agreement, section 11.1.

[7]   "Obligations" under the U.S. Security Agreements means "(i) "Obligations" (as defined in the [Carnaby II] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby II] Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(ii).

title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such, and regardless of where located: (i) all Accounts; (ii) all Cash; (iii) all Chattel Paper (including, without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper); (iv) all Commercial Tort Claims; (v) all Contracts, together with all Contract Rights arising thereunder; (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Financial Assets; (x) all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Governmental Authorizations; (xiv) all Instruments; (xv) all Intellectual Property Collateral; (xvi)  all Inventory; (xvii) all Investment Property, Pledged Stock and other Pledged Collateral; (xviii) all letters of credit and Letter-of-Credit Rights; (xix) all Licenses; (xx) all Proceeds of insurance; (xxi) all Receivables; (xxii) all Real Estate Assets; (xxiii) all Securities Accounts, Money, Securities, and other investments therein, and all Security Entitlements in respect thereof; (xxiv) all Software and all recorded data of any kind or nature, regardless of the medium of recording; (xxv) all Supporting Obligations relating to any of the foregoing; and (xxvi) all accessions to, substitutions and replacements for and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing (collectively, the "U.S. Collateral"), thereby achieving a complete cross-collateralization of the Carnaby II Credit Agreement and Carnaby III Credit Agreement in respect of all obligations owing under such facilities and all collateral pledged under them.

9.      Mexican Security Agreement. As additional security for the payment, performance and satisfaction in full of any and all of the Obligations, on May 31, 2022, Carnaby II, as Pledgor,

4

the Administrative Agent for the benefit of the Carnaby II Secured Lenders, as Pledgee, BPI Brake Manufacturing Juarez S.A. de C.V. and BPI Braking Systems Mexico, S.A. de C.V. as depositaries (jointly, the "Depositaries"), and Brake Parts Inc. LLC ("BPI") entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión* ), under Mexican law (the "Mexican Security Agreement").

10.     Under the Mexican Security Agreement, Carnaby II granted to the Administrative Agent, for the benefit of the Carnaby II Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  The Mexican Security Agreement defines Pledged Assets as any and all property and inventory located in Mexico, currently owned by the Pledgor, or acquired by the Pledgor or arising in the future, including without limitation, all Raw Materials,[8] together with (i) all documents, documents of title, warehouse receipts (or similar documents), bills of lading or orders for delivery of all, or any portion of the foregoing; and (ii) all products and/or sale proceeds of any and all of the foregoing, including, without limitation, insurance proceeds (collectively, the "Mexican Collateral" and together with the U.S. Collateral, the "Collateral").

11.     The Mexican Security Agreement also contains representations that Carnaby II is the sole, legal, and beneficial owner of the Mexican Collateral, which are free and clear of any liens and/or any other documents whatsoever which by its terms restrict or otherwise prohibit any

---

[8]     "Raw Materials" are defined under the Mexican Security Agreement as "all the assets that comprise the inventory of the Pledgor, whether now owned or hereafter acquired, including without limitation, all inventory of the Pledgor (i) held for sale or lease, (ii) furnished or to be furnished under any service agreement, (iii) held for display or demonstration, or (iv) on lease or consignment, in favor of third parties; including accessories, packaging and shipping materials, spare parts, repair parts, returned and repossessed inventory, all raw materials, work-in-process, finished inventory and supplies used or consumed in the Pledgor business together with all documents, documents of title, warehouse receipts, pledge bonds, bills of lading, deposit certificates or orders for the delivery of all, or any portion, of the foregoing, including without limitation the assets listed in Exhibit C [attached thereto]."

**JOINT EXHIBIT NO. 61**
**Page 63 of 540**

lien, assignment, transfer, use or exercise of such Mexican Collateral or any portion thereof, which have been duly and legally imported into Mexico under the temporary importation regime.  It also provides that the Mexican Security Agreement and the security interest granted hereunder constitute a legal, valid, binding and enforceable security over the Mexican Collateral.

12.     Perfection. The security interests granted under the U.S. Security Agreement were properly perfected by filing UCC financing statements with the Delaware Secretary of State.  As a result, the Administrative Agent holds, on behalf of and for the benefit of the Carnaby II Secured Lenders, properly perfected security interests in all assets of Carnaby II.

13.     In turn, the Mexican Security Agreement was executed in compliance with Mexican law, before a Mexican Notary Public and it is duly registered before the Mexican Sole Registry of Liens over Movable Assets (*Registro Unico de Garantias Mobiliarias*) ("RUG").  As a result, the Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the benefit of the Carnaby II Secured Lenders, a valid and perfected first-priority security interest in the Mexican Collateral.

14.     Cross-Collateralization Agreement.  On July 6, 2022, the parties to the Carnaby II Credit Agreement entered into a Cross-Collateralization Agreement with the parties to the Carnaby III Credit Agreement.[9]   Under the Cross-Collateralization Agreement, the parties under the Carnaby III Credit Agreement agreed that the Collateral securing the Carnaby III Credit Agreement would also secure the obligations under the Carnaby II Credit Agreement, and vice versa.

---

[9]     The "Carnaby III Credit Agreement" refers to certain credit agreement dated as of July 6, 2025 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time), entered into among Carnaby III, as borrower, FBG, as the servicer, FB Holdings and Carnaby Inventory Holdings III, LLC, as guarantors, the Carnaby II Secured Lenders party thereto from time to time, and GLAS Trust Company LLC, as administrative agent.

15.     Other Transaction Documents. The Mexican Security Agreement provides that Carnaby II maintains a manufacturing business relationship with BPI, as evidenced by a certain Manufacturing Agreement, pursuant to which Carnaby II provides to the Depositories the Raw Material for the Services to be provided under the Maquiladora Agreements.  In turn, BPI has entered into certain Maquiladora Agreements with the Depositaries, pursuant to which the Mexican Collateral have been duly imported (and/or will continue to be duly imported) on a temporary basis into Mexican territory in accordance with the "maquiladora program" in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreements).

16.     The Manufacturing Agreement was executed by and among Carnaby II and BPI on May 31, 2022, and created valid and binding obligations of BPI, enforceable against such party in accordance with its terms.  Under the Manufacturing Agreement, Carnaby II hired and requested certain manufacturing services from BPI to manufacture and produce the products requested by Carnaby II.  BPI was authorized to perform the manufacture processes required by Carnaby II through its Maquiladoras located in Mexico.

17.     The Manufacturing Agreement provides that neither BPI nor its Maquiladoras shall under any circumstances be considered to have any proprietary interest in the Materials (as defined in the Manufacturing Agreement) which Carnaby II may deliver to BPI nor on the Products (as defined in the Manufacturing Agreement).  It also provides that BPI and its Maquiladoras shall provide necessary administrative services for shipment, including the arrangement of proper transportation of the Materials and the Products between Mexico and the United States.  The Manufacturing Agreement also provides that the Maquiladoras shall be the importer and exporter

7

of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the Materials and Products.

**ASSERTION OF CLAIM**

18.     Proof of Claim.  This Proof of Claim is filed by the Administrative Agent for the benefit of the Carnaby II Secured Lenders and sets forth their claims against (i) Carnaby II, including outstanding amounts owed under the Carnaby II Credit Agreement and other Transaction Documents, and (ii) Carnaby III, under the Cross-Collateralization Agreement, in the aggregate principal amount of at least **$58,964,276.00**, accrued and unpaid interest of at least **$658,704.05**, plus post-petition and default interest, as well as any other fees, out-of-pocket fees and expenses (including, but not limited to the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II Secured Lenders), costs, and other charges, together with all amounts payable under section 506(b) of title 11 of the United States Code (the "Bankruptcy Code"), and any other obligations incurred in connection with the Carnaby II Credit Agreement and related Transaction Documents that are required to be paid by Carnaby II or any Guarantor pursuant to any Transaction Documents and not paid, or Carnaby III pursuant to the Cross-Collateralization Agreement (collectively, the "Secured Obligations").

19.     Additional Claims.  The Administrative Agent is also entitled on behalf of the Carnaby II Secured Lenders to seek payment in full of, among other things, (i) any accrued and unpaid interest (including post-petition and default interest); (ii) any and all unpaid fees and expenses owed to the Administrative Agent and/or any Carnaby II Secured Lender; (iii) any indemnifications, out-of-pocket fees and expenses (including, but not limited to the fees, charges

**JOINT EXHIBIT NO. 61**
**Page 66 of 540**

and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II Secured Lenders), premiums, reimbursements, charges, damages, and/or claims (as defined in the Bankruptcy Code) arising under the Transaction Documents, and in particular covered and secured by the security interests granted under the U.S. Security Agreement, the Mexican Security Agreement, and the Cross-Collateralization Agreement, and (iii) all obligations owed to the Carnaby II Secured Lenders until all Obligations have been paid in full (collectively, the "Additional Claims," together with the Secured Obligations, the "Claims").

20.     Federal Rule of Bankruptcy Procedure 3001(e)(3) states that "[i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount." Fed. R. Bankr. P. 3001(e)(3). Section 101(54) of the Bankruptcy Code defines "transfer" as "the creation of a lien." 11 U.S.C. § 101(54)(A).   Pursuant to the U.S. Security Agreement, the Administrative Agent has been granted properly perfected, first-priority liens, for the benefit of the Carnaby II Secured Lenders, over, *inter alia,* all Carnaby II's Contracts, together with all Contract Rights arising thereunder.  Accordingly, the Administrative Agent holds any claims arising out of any such Contracts or Contract Rights (as each such term is defined in the U.S. Security Agreement) that may be asserted by Carnaby II (or by virtue of the Cross Collateralization Agreement, Carnaby II) against any person or entity, including, without limitation, any other Debtor and non-Debtor entities.  Such claims include in the case of the other Debtors counterparty to the Credit Agreement and the Transactions Documents, any claims held by Carnaby II or Carnaby III for breach of contract, in each case, up to the full amount of the Obligations and Guaranteed Obligations.

9

21.     The Administrative Agent on behalf of the Carnaby II Secured Lenders, reserves the right to assert any other claim as part of this Proof of Claim, subject to discovery or further disclosure by Carnaby II, Carnaby III or any other party, as well as its rights to seek payment as an oversecured creditor of all amounts to which it may be entitled under 11 U.S.C. § 506.

22.     <u>Nature of the Claims</u>. The Claims asserted in this Proof of Claim are secured by properly perfected, valid and enforceable first-priority liens and pledges on all of the assets of Carnaby II as contemplated by the U.S. Security Agreement and the Mexican Security Agreement, and all of the assets of Carnaby III as contemplated by the Cross-Collateralization Agreement. Consequently, the Claims are secured, except to the extent that the value of the Collateral securing the Claims is insufficient to satisfy the Claims in full.  To the extent of any deficiency, the remainder of the Claim is filed as a superpriority adequate protection claim under section 507(b) of the Bankruptcy Code and/or as a general unsecured claim.

**<u>RESERVATION OF RIGHTS</u>**

23.     By filing this Proof of Claim, the Administrative Agent does not waive, and expressly reserves, all rights and remedies at law or in equity under any applicable law or jurisdiction that the Administrative Agent has or may have against Carnaby II, Carnaby III, any guarantor or obligor (including but not limited to Carnaby Holdings II or FB Holdings), and any of their respective affiliates and subsidiaries, or any other person or entity.  Without limiting the generality of the foregoing, this Proof of Claim is not, ***nor shall it be deemed or construed to be***: (a) a waiver or release of any terms or provisions of the Carnaby II Credit Agreement, the Carnaby III Credit Agreement or any of its related transaction documents, the Cross-Collateralization Agreement, or the Transaction Documents; (b) an election of remedies or waiver of any past, present or future breaches, defaults or events of default under the Carnaby III Credit Agreement or any of its related transaction documents, the Carnaby II Credit Agreement, the Cross-

10

Collateralization Agreement, or any related Transaction Documents; (c) a waiver of the rights and remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether and affiliate or guarantor of Carnaby II or Carnaby III, an assignee or otherwise; (d) consent by the Administrative Agent to the jurisdiction of the Court with respect to any proceeding commenced against or otherwise involving the Administrative Agent; (e) a waiver of any right to (1) withdraw the reference, or otherwise challenge the jurisdiction of the Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in this case against or otherwise involving the Administrative Agent, or (2) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Administrative Agent; (f) a waiver or release of, or any other limitation on, the Administrative Agent's right to assert that any portion of the claims asserted herein or any other claims are entitled to treatment as priority claims including under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (g) a waiver of any rights that the Administrative Agent may have pursuant to section 506(b) of the Bankruptcy Code; (h) a waiver or release of any lien, pledge or security interest against Carnaby II, Carnaby III, any other Debtor or any third parties; (i) a waiver or release of, or any other limitation on, the Administrative Agent's rights to assert that any nonrecourse claim should be treated as a recourse claim, including but not limited to the exercise of any right that the Administrative Agent may have pursuant section 1111(b) of the Bankruptcy Code; (j) consent to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. section 157(e) or otherwise; (k) a waiver by the Administrative Agent of the right to have final orders in non-core matters entered only by a United States District Court judge;

**JOINT EXHIBIT NO. 61**
**Page 69 of 540**

or (l) a waiver or release of the Administrative Agent's right to have any and all final orders in any all noncore matters or proceedings entered only after de novo review by a United States District Court Judge.

24.     The Administrative Agent expressly reserves the right to amend, replace, update, or supplement this Proof of Claim (including, the Proof of Claim's form) at any time and in any respect (including, without limitation, as necessary or appropriate to amend, quantify, or correct amounts, to provide additional detail regarding the claims set forth herein, to fix the amount of any contingent or unliquidated component of the claims, or to include any claim, at law or in equity), to add or amend documents and other information, to file additional proofs of claim or further pleadings for additional claims, to contest the validity, priority, and extent of any other purported liens and security interests other than those described herein, and to assert any and all other claims, actions, defenses, setoffs, recoupments, rights or remedies of whatever kind or nature that it currently has, or may have in the future against Carnaby II, Carnaby III, and/or any other Debtors or non-Debtors, or any other person or entity, including without limitation, rights against guarantors, officers, directors, and other creditors of Carnaby II, Carnaby III, or any other Debtors, at law or in equity, including, without limitation, administrative or other priority claims, setoff and recoupment rights, lien rights, interest, and the right to assert claims that are otherwise warranted in any related actions.

25.     The filing of this Proof of Claim shall not be deemed a waiver of any claim, at law or in equity or under any applicable law that the Administrative Agent may have against Carnaby II, or Carnaby III, including, but not limited to, administrative claims, priority claims, secured claims, unsecured claims, constructive trust claims, or the right to assert claims that are otherwise warranted in any related action. This Proof of Claim also expressly includes any and all rights to

12

**JOINT EXHIBIT NO. 61**
**Page 70 of 540**

assert a constructive trust against assets or cash held by Carnaby II, Carnaby III, and claims for any and all amounts owed, in damages or otherwise, that the Administrative Agent has or may have, whether known or unknown, against Carnaby II, Carnaby III, and all those purporting to act on its behalf, whether presently asserted or to be asserted, including, without limitation, claims based upon common law fraud, misrepresentation, subrogation, indemnity, contribution, unjust enrichment, constructive trust, fraudulent conveyance, failure to fulfill contractual and fiduciary obligations, breach of the implied covenant of good faith and fair dealing, making, causing, or permitting to be made misleading statements regarding the business and activities of Carnaby II, Carnaby III, or any other person or entity, failure to take prudent and appropriate action regarding adverse business conditions affecting the business operations of Carnaby II, Carnaby III, or any other person or entity, tortious interference, unjust enrichment, quantum meruit, failure to require adequate financial and accounting controls for Carnaby II or Carnaby III, and any other theory available under applicable law or equity, all of which singularly or collectively may have caused the Administrative Agent to incur damages.

26.     Nothing herein shall be deemed to waive, stop, or derogate from the rights of Administrative Agent under the Transaction Documents, and in particular, in connection with the Carnaby II Credit Agreement, the Carnaby III Credit Agreement or its transactional documents, the Cross-Collateralization Agreement, the U.S. Security Agreement, or the Mexican Security Agreement. This Proof of Claim also is without prejudice to any and all of the Administrative Agent's rights, claims, and defenses under the Bankruptcy Code or otherwise, including, but not limited to, the right to vote on any plan(s) in the Debtors' Chapter 11 Cases.

27.     The Administrative Agent reserves the right to claim that the portion of its fees, interest, costs, expenses, and other charges incurred or accruing after the Initial Petition Date

constitute administrative expenses of Carnaby II's estate to the extent such expenses are not otherwise paid in full, and reserves the right to file a claim or application for payment of such administrative expenses.

28.     No judgment has been rendered on the Claims set forth in this Proof of Claim.

29.     With respect to any portion of the Claims that is unliquidated or as to which the amount is undetermined, the Administrative Agent does not waive their rights thereto by not claiming specific amounts at this time.

30.     The Administrative Agent expressly reserves, and does not waive, its right to payment of any amounts due from the guarantors, FB Holdings and Carnaby Holdings II, or from any other sources under any applicable law and jurisdiction.

31.     The Administrative Agent expressly reserves its rights to exercise judicial actions under any applicable law and jurisdiction against non-debtor entities during and after this Chapter 11 Cases.

32.     Nothing contained in this Proof of Claim shall be deemed an admission by the Administrative Agent.

33.     To the best of the Administrative Agent's knowledge, the claims set forth herein are not subject to setoff or counterclaim, provided, however, that the Claimant Parties expressly reserve and do not waive any right of set-off or recoupment they may possess.

35.     The Administrative Agent does not consent to the surcharge of the Collateral (or such collateral as may be provided by certain orders of the Court) by Carnaby II's estates or the Debtors' estates, their representatives or any other person or party-in-interest pursuant to 11 U.S.C. §506(c) or otherwise.

**JOINT EXHIBIT NO. 61**
**Page 72 of 540**

36. The Administrative Agent expressly reserves the right to withdraw this Proof of Claim as if it had never been filed.

## NOTICES AND COMMUNICATIONS

32. Any and all notices and communications concerning the Proof of Claim shall be sent to the following addresses both in hard copy and via e-mail:

Tarik Johnson
**GLAS TRUST COMPANY LLC**, in its capacity as Administrative Agent
3 Second Street, Suite 206, Jersey City, NJ 07311
Tel.: +1 201 201 8642
E-mails:
Tarik.Johnson@glas.agency

with a copy to (which shall not constitute notice)

Allan S. Brilliant
Stephen Wolpert
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Tel.: +1 212 698 3599
E-mails:
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

## SUPPORTING DOCUMENTS

33. The Administrative Agent's claims are based on the Carnaby II Credit Agreement, the Cross-Collateralization Agreement, the U.S. Security Agreement, the Mexican Security Agreement, and other related Transaction Documents.  Copies of these documents and additional related documents are not attached to the Proof of Claim because of their voluminous nature.

15

Counsel to the Administrative Agent will provide copies of such documents to any party in interest in these Chapter 11 Cases, upon a reasonable written request (and entry into an appropriate confidentiality agreement, if necessary) addressed to counsel to the Administrative Agent at the address set forth herein.

34.     Each and every description in this Addendum to the Carnaby II Credit Agreement and Transaction Documents is qualified in its entirety by the reference to the applicable provisions of such documents, and all such documents are incorporated herein by reference.  In the event of any inconsistency between this Addendum and any such document, including the proof of claim form, the relevant document shall control.

**GLAS Trust Company LLC**
In its capacity as Administrative Agent under the
Carnaby II Credit Agreement and related Transaction Documents

Dated: December 4, 2025

Electronic Proof of Claim Confirmation:  3950-1-UXDBS-119274162

Claim Electronically Submitted on (UTC) :  2025-12-04T20:36:46.704Z

Submitted by:  GLAS Trust Company LLC
                        tarik.johnson@glas.agency

**KROLL**

**Exhibit 102**

**United States Bankruptcy Court, Southern District of Texas**

---

**Fill in this information to identify the case (Select only one Debtor per claim form):**

**Debtor:** Carnaby Inventory III, LLC

**Case Number:** 25-90390

---

Modified Official Form 410

# Proof of Claim

4/25

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

---

| Part 1: | Identify the Claim |
|---|---|

| 1. | **Who is the current creditor?** | GLAS Trust Company LLC |
|---|---|---|
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| 2. | **Has this claim been acquired from someone else?** | ☑ No |
|---|---|---|
| | | ☐ Yes. From whom? _____ |

| 3. | **Where should notices and payments to the creditor be sent?** | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|---|
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Address1: 3 Second Street | Address1: |
| | | Address2: Suite 206 | Address2: |
| | | Address3: | Address3: |
| | | Address4: | Address4: |
| | | City: Jersey City | City: |
| | | State: NJ | State: |
| | | Postal Code: 07311 | Postal Code: |
| | | Country: | Country: |
| | | Contact phone 201-201-8642 | Contact phone |
| | | Contact email tarik.johnson@glas.agency | Contact email |
| | | **Uniform Claim Identifier (if you use one)** | |

| 4. | **Does this claim amend one already filed?** | ☑ No | | |
|---|---|---|---|---|
| | | ☐ Yes. Claim number on court claims registry (if known)_____ | Filed on _____ MM / DD / YYYY |

| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
|---|---|---|
| | | ☐ Yes. Who made the earlier filing? _____ |

---

**Claim Number: 1235**                    Proof of Claim                    page 1

**JOINT EXHIBIT NO. 61**
**Page 77 of 540**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ Not less than $59,622,980.00 . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe: See Addendum

**Basis for perfection:** See Addendum

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ See Addendum

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**Proof of Claim** page 2

**JOINT EXHIBIT NO. 61**
**Page 78 of 540**

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check one:* | **Amount entitled to priority** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $_____ |
|---|---|---|

---

**Part 3:   Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Tarik Johnson*   12/04/2025
_____   _____
Electronic Signature        Date

**Name of the person who is completing and signing this claim**

Name:   Tarik Johnson
_____
First name          Middle name          Last name

Title/Company   GLAS Trust Company LLC
_____
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address   3 Second Street

Suite 206
_____
Number          Street

Jersey City          NJ          07311
_____
City          State          ZIP Code          Country

Contact phone   201-201-8642          Email   tarik.johnson@glas.agency

**JOINT EXHIBIT NO. 61**
**Page 79 of 540**

**Additional Noticing Addresses (if provided):**

**Additional Address 1**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
Postal Code:
Country:

Contact Phone:
Contact Email:
_____

**Additional Address 2**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
 Postal Code:
 Country:

Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**

☑ Yes
☐ No

-----------------------------------------------------------------------------------------------------------

 Attachment Filename:

Carnaby Inventory III, LLC (25-90390) POC Form (Carnaby II Secured Lenders against CIII) (Execution Version with Addendum).pdf

**KROLL**

**United States Bankruptcy Court, Southern District of Texas**

| Fill in this information to identify the case (Select only one Debtor per claim form): |
|---|
| **Debtor Name and Case Number:** |
| Carnaby Inventory III, LLC (25-90390) |

Modified Official Form 410

# Proof of Claim

04/25

Read the instructions before filling out this form. **This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

GLAS Trust Company LLC as administrative agent for the Carnaby II Secured Lenders
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

See Addendum
Name

See Addendum
Number        Street

See Addendum
City                State                ZIP Code

Contact phone   See Addendum

Contact email   See Addendum

Uniform claim identifier (if you use one):

**Where should payments to the creditor be sent?** (if different)

Name

Number        Street

City                State                ZIP Code

Contact phone

Contact email

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.   Claim number on court claims registry (if known)_____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

**JOINT EXHIBIT NO. 61**
**Page 81 of 540**

**Part 2:**   **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____  ____ |

**7. How much is the claim?**   $ <u>Not less than $59,622,980</u>. **Does this amount include interest or other charges?**
    ☐ No
    ☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

<u>See Addendum</u>

**9. Is all or part of the claim secured?**

☐ No
☑ Yes. The claim is secured by a lien on property.

    **Nature of property:**

    ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
    ☐ Motor vehicle
    ☑ Other. Describe:   <u>See Addendum</u>

    **Basis for perfection:**   <u>See Addendum</u>

    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

    **Value of property:**   $_____

    **Amount of the claim that is secured:**   $_____

    **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

    **Amount necessary to cure any default as of the date of the petition:**   $ <u>See Addendum</u>

    **Annual Interest Rate** (when case was filed)_____%
    ☐ Fixed
    ☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

**JOINT EXHIBIT NO. 61**
**Page 82 of 540**

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check one:* | **Amount entitled to priority** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(   ) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment. | |

| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.**   $_____ |
|---|---|

---

## Part 3:   Sign Below

| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571. | *Check the appropriate box:*<br><br>☐   I am the creditor.<br>☑   I am the creditor's attorney or authorized agent.<br>☐   I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐   I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date   12/04/2025<br>   MM / DD / YYYY |
|---|---|

Signature _____

**Name of the person who is completing and signing this claim:**

| Name | Tarik | | Johnson |
|---|---|---|---|
| | First name | Middle name | Last name |

Title    Authorized Signatory

Company    GLAS Trust Company LLC as administrative agent for Carnaby II Secured Lenders
Identify the corporate servicer as the company if the authorized agent is a servicer.

| Address | 3 Second Street, Suite 206 | | |
|---|---|---|---|
| | Number    Street | | |
| | Jersey City | NJ | 07311 |
| | City | State | ZIP Code |

Contact phone    201 - 201 - 8642           Email    Tarik.Johnson@glas.agency

**JOINT EXHIBIT NO. 61**
**Page 83 of 540**

### OMNIBUS ADDENDUM TO PROOFS OF CLAIMS FILED BY GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT TO THE CARNABY II SECURED LENDERS

GLAS Trust Company LLC, in its capacity as administrative agent (the "Administrative Agent") for the Lenders[1] (the "Carnaby II Secured Lenders") under that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement"), hereby submits this omnibus addendum (the "Addendum") in support of its proofs of claim (together with the proof of claim form, the "Proof of Claim") submitted against Carnaby Inventory II, LLC ("Carnaby II") and Carnaby Inventory III, LLC ("Carnaby III").  This Addendum is intended to be and should be treated as part of the Proof of Claim.

1. On September 24, 2025 (the "Initial Petition Date"), certain Debtors,[2] including Carnaby II and Carnaby III, commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Court"). Between September 28, 2025, and September 29, 2025, approximately 99 additional Debtors, including First Brands Group, LLC ("FBG") and other related FBG Debtors, filed their own bankruptcy petitions.

### BASIS FOR CLAIM

2. The Carnaby II Credit Agreement. On or about May 31, 2022, Carnaby II, as the Borrower, FBG, as the Servicer, First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II," together with FB Holdings, the "Guarantors"), as Guarantors, the Carnaby II Secured Lenders party thereto as Lenders from time

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to those terms in the Carnaby II Credit Agreement.

[2] A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby II Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time).[3]

3. The Carnaby II Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $60 million under which such funds were advanced by the Carnaby II Secured Lenders in the maximum principal amount to Carnaby II.

4. Carnaby II's obligations under the Carnaby II Credit Agreement and the Transaction Documents[4] are secured by first priority liens on the Collateral (as defined below) pursuant to the U.S. Security Agreement (as defined below) and the Mexican Security Agreement (as defined below), as further detailed below.

5. The Administrative Agent holds, on behalf of the Carnaby II Secured Lenders, $58,964,276.00 in outstanding principal amount (defined as the "Loans"), due and payable by Carnaby II and the Guarantors under the Carnaby II Credit Agreement.  In addition to the obligation to repay the principal amount of the Loans, Carnaby II and the Guarantors assumed the obligation to pay accrued and unpaid Interest and all other Obligations[5] and Guaranteed

---

[3]  On May 30, 2025, the parties to the Carnaby II Credit Agreement entered into an Extension Agreement, extending the Maturity Date originally set forth in the Carnaby II Credit Agreement.

[4]  The Carnaby II Credit Agreement defines the "Transaction Documents" as "collectively, [the Carnaby II Credit Agreement], each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto." Carnaby II Credit Agreement, Ex. I.

[5]  The Carnaby II Credit Agreement defines "Obligations" as "all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the

2

**JOINT EXHIBIT NO. 61**
**Page 85 of 540**

Obligations[6] outstanding under the Carnaby II Credit Agreement and other Transaction Documents.

6. _The Carnaby II Promissory Notes_. Carnaby II's obligations to repay the Obligations under the Carnaby II Credit Agreement were also evidenced through Promissory Notes executed by Carnaby II with respect to each advancement, and guaranteed in each case, by the Guarantors.

7. _U.S. Security Agreement_. On May 31, 2022, Carnaby II, Carnaby Holdings II, and the Administrative Agent for the benefit of the Carnaby II Secured Lenders, entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "U.S. Security Agreement").

8. As security for the prompt and complete payment or performance, as the case may be, in full of the "Obligations" (as defined in the U.S. Security Agreement, as amended by the Cross-Collateralization Agreement),[7] Carnaby II and Carnaby Holdings II, pledged, collaterally assigned and granted to the Administrative Agent, on behalf of and for the benefit of the Secured Parties (including the Carnaby II Secured Lenders), a continuing security interest in all of its right,

---

commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding)." Carnaby II Credit Agreement, Ex. I.

6   The Carnaby II Credit Agreement defines "Guaranteed Obligations" as "the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations[.]" Carnaby II Credit Agreement, section 11.1.

7   "Obligations" under the U.S. Security Agreements means "(i) "Obligations" (as defined in the [Carnaby II] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby II] Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(ii).

3

**JOINT EXHIBIT NO. 61**
**Page 86 of 540**

title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such, and regardless of where located: (i) all Accounts; (ii) all Cash; (iii) all Chattel Paper (including, without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper); (iv) all Commercial Tort Claims; (v) all Contracts, together with all Contract Rights arising thereunder; (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Financial Assets; (x) all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Governmental Authorizations; (xiv) all Instruments; (xv) all Intellectual Property Collateral; (xvi)  all Inventory; (xvii) all Investment Property, Pledged Stock and other Pledged Collateral; (xviii) all letters of credit and Letter-of-Credit Rights; (xix) all Licenses; (xx) all Proceeds of insurance; (xxi) all Receivables; (xxii) all Real Estate Assets; (xxiii) all Securities Accounts, Money, Securities, and other investments therein, and all Security Entitlements in respect thereof; (xxiv) all Software and all recorded data of any kind or nature, regardless of the medium of recording; (xxv) all Supporting Obligations relating to any of the foregoing; and (xxvi) all accessions to, substitutions and replacements for and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing (collectively, the "U.S. Collateral"), thereby achieving a complete cross-collateralization of the Carnaby II Credit Agreement and Carnaby III Credit Agreement in respect of all obligations owing under such facilities and all collateral pledged under them.

9.      Mexican Security Agreement. As additional security for the payment, performance and satisfaction in full of any and all of the Obligations, on May 31, 2022, Carnaby II, as Pledgor,

4

the Administrative Agent for the benefit of the Carnaby II Secured Lenders, as Pledgee, BPI Brake Manufacturing Juarez S.A. de C.V. and BPI Braking Systems Mexico, S.A. de C.V. as depositaries (jointly, the "Depositaries"), and Brake Parts Inc. LLC ("BPI") entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión* ), under Mexican law (the "Mexican Security Agreement").

10.     Under the Mexican Security Agreement, Carnaby II granted to the Administrative Agent, for the benefit of the Carnaby II Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  The Mexican Security Agreement defines Pledged Assets as any and all property and inventory located in Mexico, currently owned by the Pledgor, or acquired by the Pledgor or arising in the future, including without limitation, all Raw Materials,[8] together with (i) all documents, documents of title, warehouse receipts (or similar documents), bills of lading or orders for delivery of all, or any portion of the foregoing; and (ii) all products and/or sale proceeds of any and all of the foregoing, including, without limitation, insurance proceeds (collectively, the "Mexican Collateral" and together with the U.S. Collateral, the "Collateral").

11.     The Mexican Security Agreement also contains representations that Carnaby II is the sole, legal, and beneficial owner of the Mexican Collateral, which are free and clear of any liens and/or any other documents whatsoever which by its terms restrict or otherwise prohibit any

---

[8]     "Raw Materials" are defined under the Mexican Security Agreement as "all the assets that comprise the inventory of the Pledgor, whether now owned or hereafter acquired, including without limitation, all inventory of the Pledgor (i) held for sale or lease, (ii) furnished or to be furnished under any service agreement, (iii) held for display or demonstration, or (iv) on lease or consignment, in favor of third parties; including accessories, packaging and shipping materials, spare parts, repair parts, returned and repossessed inventory, all raw materials, work-in-process, finished inventory and supplies used or consumed in the Pledgor business together with all documents, documents of title, warehouse receipts, pledge bonds, bills of lading, deposit certificates or orders for the delivery of all, or any portion, of the foregoing, including without limitation the assets listed in Exhibit C [attached thereto]."

lien, assignment, transfer, use or exercise of such Mexican Collateral or any portion thereof, which have been duly and legally imported into Mexico under the temporary importation regime.  It also provides that the Mexican Security Agreement and the security interest granted hereunder constitute a legal, valid, binding and enforceable security over the Mexican Collateral.

12.      Perfection. The security interests granted under the U.S. Security Agreement were properly perfected by filing UCC financing statements with the Delaware Secretary of State.  As a result, the Administrative Agent holds, on behalf of and for the benefit of the Carnaby II Secured Lenders, properly perfected security interests in all assets of Carnaby II.

13.      In turn, the Mexican Security Agreement was executed in compliance with Mexican law, before a Mexican Notary Public and it is duly registered before the Mexican Sole Registry of Liens over Movable Assets (*Registro Unico de Garantias Mobiliarias*) ("RUG").  As a result, the Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the benefit of the Carnaby II Secured Lenders, a valid and perfected first-priority security interest in the Mexican Collateral.

14.      Cross-Collateralization Agreement.  On July 6, 2022, the parties to the Carnaby II Credit Agreement entered into a Cross-Collateralization Agreement with the parties to the Carnaby III Credit Agreement.[9]   Under the Cross-Collateralization Agreement, the parties under the Carnaby III Credit Agreement agreed that the Collateral securing the Carnaby III Credit Agreement would also secure the obligations under the Carnaby II Credit Agreement, and vice versa.

---

[9]   The "Carnaby III Credit Agreement" refers to certain credit agreement dated as of July 6, 2025 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time), entered into among Carnaby III, as borrower, FBG, as the servicer, FB Holdings and Carnaby Inventory Holdings III, LLC, as guarantors, the Carnaby II Secured Lenders party thereto from time to time, and GLAS Trust Company LLC, as administrative agent.

15.     Other Transaction Documents. The Mexican Security Agreement provides that Carnaby II maintains a manufacturing business relationship with BPI, as evidenced by a certain Manufacturing Agreement, pursuant to which Carnaby II provides to the Depositories the Raw Material for the Services to be provided under the Maquiladora Agreements.  In turn, BPI has entered into certain Maquiladora Agreements with the Depositaries, pursuant to which the Mexican Collateral have been duly imported (and/or will continue to be duly imported) on a temporary basis into Mexican territory in accordance with the "maquiladora program" in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreements).

16.     The Manufacturing Agreement was executed by and among Carnaby II and BPI on May 31, 2022, and created valid and binding obligations of BPI, enforceable against such party in accordance with its terms.  Under the Manufacturing Agreement, Carnaby II hired and requested certain manufacturing services from BPI to manufacture and produce the products requested by Carnaby II.  BPI was authorized to perform the manufacture processes required by Carnaby II through its Maquiladoras located in Mexico.

17.     The Manufacturing Agreement provides that neither BPI nor its Maquiladoras shall under any circumstances be considered to have any proprietary interest in the Materials (as defined in the Manufacturing Agreement) which Carnaby II may deliver to BPI nor on the Products (as defined in the Manufacturing Agreement).  It also provides that BPI and its Maquiladoras shall provide necessary administrative services for shipment, including the arrangement of proper transportation of the Materials and the Products between Mexico and the United States.  The Manufacturing Agreement also provides that the Maquiladoras shall be the importer and exporter

7

of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the Materials and Products.

**ASSERTION OF CLAIM**

18.     Proof of Claim.  This Proof of Claim is filed by the Administrative Agent for the benefit of the Carnaby II Secured Lenders and sets forth their claims against (i) Carnaby II, including outstanding amounts owed under the Carnaby II Credit Agreement and other Transaction Documents, and (ii) Carnaby III, under the Cross-Collateralization Agreement, in the aggregate principal amount of at least **$58,964,276.00**, accrued and unpaid interest of at least **$658,704.05**, plus post-petition and default interest, as well as any other fees, out-of-pocket fees and expenses (including, but not limited to the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II Secured Lenders), costs, and other charges, together with all amounts payable under section 506(b) of title 11 of the United States Code (the "Bankruptcy Code"), and any other obligations incurred in connection with the Carnaby II Credit Agreement and related Transaction Documents that are required to be paid by Carnaby II or any Guarantor pursuant to any Transaction Documents and not paid, or Carnaby III pursuant to the Cross-Collateralization Agreement (collectively, the "Secured Obligations").

19.     Additional Claims.  The Administrative Agent is also entitled on behalf of the Carnaby II Secured Lenders to seek payment in full of, among other things, (i) any accrued and unpaid interest (including post-petition and default interest); (ii) any and all unpaid fees and expenses owed to the Administrative Agent and/or any Carnaby II Secured Lender; (iii) any indemnifications, out-of-pocket fees and expenses (including, but not limited to the fees, charges

and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II Secured Lenders), premiums, reimbursements, charges, damages, and/or claims (as defined in the Bankruptcy Code) arising under the Transaction Documents, and in particular covered and secured by the security interests granted under the U.S. Security Agreement, the Mexican Security Agreement, and the Cross-Collateralization Agreement, and (iii) all obligations owed to the Carnaby II Secured Lenders until all Obligations have been paid in full (collectively, the "Additional Claims," together with the Secured Obligations, the "Claims").

20.     Federal Rule of Bankruptcy Procedure 3001(e)(3) states that "[i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount." Fed. R. Bankr. P. 3001(e)(3). Section 101(54) of the Bankruptcy Code defines "transfer" as "the creation of a lien." 11 U.S.C. § 101(54)(A).   Pursuant to the U.S. Security Agreement, the Administrative Agent has been granted properly perfected, first-priority liens, for the benefit of the Carnaby II Secured Lenders, over, *inter alia,* all Carnaby II's Contracts, together with all Contract Rights arising thereunder.  Accordingly, the Administrative Agent holds any claims arising out of any such Contracts or Contract Rights (as each such term is defined in the U.S. Security Agreement) that may be asserted by Carnaby II (or by virtue of the Cross Collateralization Agreement, Carnaby II) against any person or entity, including, without limitation, any other Debtor and non-Debtor entities.  Such claims include in the case of the other Debtors counterparty to the Credit Agreement and the Transactions Documents, any claims held by Carnaby II or Carnaby III for breach of contract, in each case, up to the full amount of the Obligations and Guaranteed Obligations.

**JOINT EXHIBIT NO. 61**
**Page 92 of 540**

21.     The Administrative Agent on behalf of the Carnaby II Secured Lenders, reserves the right to assert any other claim as part of this Proof of Claim, subject to discovery or further disclosure by Carnaby II, Carnaby III or any other party, as well as its rights to seek payment as an oversecured creditor of all amounts to which it may be entitled under 11 U.S.C. § 506.

22.     <u>Nature of the Claims</u>. The Claims asserted in this Proof of Claim are secured by properly perfected, valid and enforceable first-priority liens and pledges on all of the assets of Carnaby II as contemplated by the U.S. Security Agreement and the Mexican Security Agreement, and all of the assets of Carnaby III as contemplated by the Cross-Collateralization Agreement. Consequently, the Claims are secured, except to the extent that the value of the Collateral securing the Claims is insufficient to satisfy the Claims in full.  To the extent of any deficiency, the remainder of the Claim is filed as a superpriority adequate protection claim under section 507(b) of the Bankruptcy Code and/or as a general unsecured claim.

<b><u>RESERVATION OF RIGHTS</u></b>

23.     By filing this Proof of Claim, the Administrative Agent does not waive, and expressly reserves, all rights and remedies at law or in equity under any applicable law or jurisdiction that the Administrative Agent has or may have against Carnaby II, Carnaby III, any guarantor or obligor (including but not limited to Carnaby Holdings II or FB Holdings), and any of their respective affiliates and subsidiaries, or any other person or entity.  Without limiting the generality of the foregoing, this Proof of Claim is not, ***nor shall it be deemed or construed to be***: (a) a waiver or release of any terms or provisions of the Carnaby II Credit Agreement, the Carnaby III Credit Agreement or any of its related transaction documents, the Cross-Collateralization Agreement, or the Transaction Documents; (b) an election of remedies or waiver of any past, present or future breaches, defaults or events of default under the Carnaby III Credit Agreement or any of its related transaction documents, the Carnaby II Credit Agreement, the Cross-

10

<b>JOINT EXHIBIT NO. 61</b>
<b>Page 93 of 540</b>

Collateralization Agreement, or any related Transaction Documents; (c) a waiver of the rights and remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether and affiliate or guarantor of Carnaby II or Carnaby III, an assignee or otherwise; (d) consent by the Administrative Agent to the jurisdiction of the Court with respect to any proceeding commenced against or otherwise involving the Administrative Agent; (e) a waiver of any right to (1) withdraw the reference, or otherwise challenge the jurisdiction of the Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in this case against or otherwise involving the Administrative Agent, or (2) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Administrative Agent; (f) a waiver or release of, or any other limitation on, the Administrative Agent's right to assert that any portion of the claims asserted herein or any other claims are entitled to treatment as priority claims including under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (g) a waiver of any rights that the Administrative Agent may have pursuant to section 506(b) of the Bankruptcy Code; (h) a waiver or release of any lien, pledge or security interest against Carnaby II, Carnaby III, any other Debtor or any third parties; (i) a waiver or release of, or any other limitation on, the Administrative Agent's rights to assert that any nonrecourse claim should be treated as a recourse claim, including but not limited to the exercise of any right that the Administrative Agent may have pursuant section 1111(b) of the Bankruptcy Code; (j) consent to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. section 157(e) or otherwise; (k) a waiver by the Administrative Agent of the right to have final orders in non-core matters entered only by a United States District Court judge;

11

or (l) a waiver or release of the Administrative Agent's right to have any and all final orders in any all noncore matters or proceedings entered only after de novo review by a United States District Court Judge.

24.     The Administrative Agent expressly reserves the right to amend, replace, update, or supplement this Proof of Claim (including, the Proof of Claim's form) at any time and in any respect (including, without limitation, as necessary or appropriate to amend, quantify, or correct amounts, to provide additional detail regarding the claims set forth herein, to fix the amount of any contingent or unliquidated component of the claims, or to include any claim, at law or in equity), to add or amend documents and other information, to file additional proofs of claim or further pleadings for additional claims, to contest the validity, priority, and extent of any other purported liens and security interests other than those described herein, and to assert any and all other claims, actions, defenses, setoffs, recoupments, rights or remedies of whatever kind or nature that it currently has, or may have in the future against Carnaby II, Carnaby III, and/or any other Debtors or non-Debtors, or any other person or entity, including without limitation, rights against guarantors, officers, directors, and other creditors of Carnaby II, Carnaby III, or any other Debtors, at law or in equity, including, without limitation, administrative or other priority claims, setoff and recoupment rights, lien rights, interest, and the right to assert claims that are otherwise warranted in any related actions.

25.     The filing of this Proof of Claim shall not be deemed a waiver of any claim, at law or in equity or under any applicable law that the Administrative Agent may have against Carnaby II, or Carnaby III, including, but not limited to, administrative claims, priority claims, secured claims, unsecured claims, constructive trust claims, or the right to assert claims that are otherwise warranted in any related action. This Proof of Claim also expressly includes any and all rights to

12

assert a constructive trust against assets or cash held by Carnaby II, Carnaby III, and claims for any and all amounts owed, in damages or otherwise, that the Administrative Agent has or may have, whether known or unknown, against Carnaby II, Carnaby III, and all those purporting to act on its behalf, whether presently asserted or to be asserted, including, without limitation, claims based upon common law fraud, misrepresentation, subrogation, indemnity, contribution, unjust enrichment, constructive trust, fraudulent conveyance, failure to fulfill contractual and fiduciary obligations, breach of the implied covenant of good faith and fair dealing, making, causing, or permitting to be made misleading statements regarding the business and activities of Carnaby II, Carnaby III, or any other person or entity, failure to take prudent and appropriate action regarding adverse business conditions affecting the business operations of Carnaby II, Carnaby III, or any other person or entity, tortious interference, unjust enrichment, quantum meruit, failure to require adequate financial and accounting controls for Carnaby II or Carnaby III, and any other theory available under applicable law or equity, all of which singularly or collectively may have caused the Administrative Agent to incur damages.

26.    Nothing herein shall be deemed to waive, stop, or derogate from the rights of Administrative Agent under the Transaction Documents, and in particular, in connection with the Carnaby II Credit Agreement, the Carnaby III Credit Agreement or its transactional documents, the Cross-Collateralization Agreement, the U.S. Security Agreement, or the Mexican Security Agreement. This Proof of Claim also is without prejudice to any and all of the Administrative Agent's rights, claims, and defenses under the Bankruptcy Code or otherwise, including, but not limited to, the right to vote on any plan(s) in the Debtors' Chapter 11 Cases.

27.    The Administrative Agent reserves the right to claim that the portion of its fees, interest, costs, expenses, and other charges incurred or accruing after the Initial Petition Date

constitute administrative expenses of Carnaby II's estate to the extent such expenses are not otherwise paid in full, and reserves the right to file a claim or application for payment of such administrative expenses.

28.     No judgment has been rendered on the Claims set forth in this Proof of Claim.

29.     With respect to any portion of the Claims that is unliquidated or as to which the amount is undetermined, the Administrative Agent does not waive their rights thereto by not claiming specific amounts at this time.

30.     The Administrative Agent expressly reserves, and does not waive, its right to payment of any amounts due from the guarantors, FB Holdings and Carnaby Holdings II, or from any other sources under any applicable law and jurisdiction.

31.     The Administrative Agent expressly reserves its rights to exercise judicial actions under any applicable law and jurisdiction against non-debtor entities during and after this Chapter 11 Cases.

32.     Nothing contained in this Proof of Claim shall be deemed an admission by the Administrative Agent.

33.     To the best of the Administrative Agent's knowledge, the claims set forth herein are not subject to setoff or counterclaim, provided, however, that the Claimant Parties expressly reserve and do not waive any right of set-off or recoupment they may possess.

35.     The Administrative Agent does not consent to the surcharge of the Collateral (or such collateral as may be provided by certain orders of the Court) by Carnaby II's estates or the Debtors' estates, their representatives or any other person or party-in-interest pursuant to 11 U.S.C. §506(c) or otherwise.

14
**JOINT EXHIBIT NO. 61**
**Page 97 of 540**

36.    The Administrative Agent expressly reserves the right to withdraw this Proof of Claim as if it had never been filed.

## NOTICES AND COMMUNICATIONS

32.    Any and all notices and communications concerning the Proof of Claim shall be sent to the following addresses both in hard copy and via e-mail:

Tarik Johnson
**GLAS TRUST COMPANY LLC**, in its capacity as Administrative Agent
3 Second Street, Suite 206, Jersey City, NJ 07311
Tel.: +1 201 201 8642
E-mails:
Tarik.Johnson@glas.agency

with a copy to (which shall not constitute notice)

Allan S. Brilliant
Stephen Wolpert
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Tel.: +1 212 698 3599
E-mails:
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

## SUPPORTING DOCUMENTS

33.    The Administrative Agent's claims are based on the Carnaby II Credit Agreement, the Cross-Collateralization Agreement, the U.S. Security Agreement, the Mexican Security Agreement, and other related Transaction Documents.  Copies of these documents and additional related documents are not attached to the Proof of Claim because of their voluminous nature.

Counsel to the Administrative Agent will provide copies of such documents to any party in interest in these Chapter 11 Cases, upon a reasonable written request (and entry into an appropriate confidentiality agreement, if necessary) addressed to counsel to the Administrative Agent at the address set forth herein.

34.     Each and every description in this Addendum to the Carnaby II Credit Agreement and Transaction Documents is qualified in its entirety by the reference to the applicable provisions of such documents, and all such documents are incorporated herein by reference.  In the event of any inconsistency between this Addendum and any such document, including the proof of claim form, the relevant document shall control.

**GLAS Trust Company LLC**
In its capacity as Administrative Agent under the
Carnaby II Credit Agreement and related Transaction Documents

Dated: December 4, 2025

16

**JOINT EXHIBIT NO. 61**
**Page 99 of 540**

Electronic Proof of Claim Confirmation:  **3950-1-RDXAC-281662536**

Claim Electronically Submitted on (UTC) :  **2025-12-04T20:45:44.899Z**

Submitted by:  **GLAS Trust Company LLC**
**tarik.johnson@glas.agency**

**KROLL**

**Exhibit 39**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**   $ not less than $59,622,980 .   **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____

**Amount of the claim that is secured:**   $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**Proof of Claim**   page 2

**JOINT EXHIBIT NO. 61**
**Page 103 of 540**

| | | | Amount entitled to priority |
|---|---|---|---|
| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check one:* | | |
| | ☐ | Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ | Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ | Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ | Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ | Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ | Other. Specify subsection of 11 U.S.C. § 507(a)(_____) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | | |

| | | |
|---|---|---|
| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $_____ |

---

**Part 3:**     **Sign Below**

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐   I am the creditor.<br>☑   I am the creditor's attorney or authorized agent.<br>☐   I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐   I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>*Jeffrey Schoenfeld*    07/07/2026<br>_____<br>Electronic Signature                    Date<br><br>**Name of the person who is completing and signing this claim**<br>Name    Jeffrey Schoenfeld<br>_____<br>First name            Middle name            Last name<br>Title/Company    Vice President / GLAS TRUST COMPANY LLC<br>_____<br>Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>3 Second Street, Suite 203<br>Address    _____<br>Number            Street<br>Jersey City                NEW JERSEY 07311<br>_____<br>City                State        ZIP Code        Country<br>Contact phone  2018392200        Email  jeffrey.schoenfeld@glas.agency |

**JOINT EXHIBIT NO. 61**
**Page 104 of 540**

**Additional Noticing Addresses (if provided):**

**Additional Address 1**

| | |
|---|---|
| Name: | GLAS Trust Company LLC as administrative agent for the Carnaby II Secured Lenders |
| Address1: | C/O DECHERT LLP |
| Address2: | 1095 Avenue of the Americas |
| Address3: | Attn: Allan S. Brilliant and Stephen Wolpert |
| Address4: | |
| City: | New York |
| State: | NY |
| Postal Code: | 10036 |
| Country: | |
| Contact Phone: | 1 212 698 3599 |
| Contact Email: | allan.brilliant@dechert.com, stephen.wolpert@dechert.com |

**Additional Address 2**

| | |
|---|---|
| Name: | |
| Address1: | |
| Address2: | |
| Address3: | |
| Address4: | |
| City: | |
| State: | |
| Postal Code: | |
| Country: | |
| Contact Phone: | |
| Contact Email: | |

**Additional Supporting Documentation Provided**

☑ Yes
☐ No

-------------------------------------------------------------------------------------------------

Attachment Filename:

First Brands - Omnibus Proof of Claim Addendum for FBG Debtors (Dechert 07-06-2026).pdf

**KROLL**

**OMNIBUS ADDENDUM TO PROOFS OF CLAIM FILED BY
GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT TO
THE CARNABY II AND III SECURED LENDERS**

GLAS Trust Company LLC, in its capacity as administrative agent (the "Administrative Agent") for the Lenders[1] under (i) that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement") among Carnaby Inventory II, LLC ("Carnaby II"), as Borrower; First Brands Group, LLC ("FBG"), as Servicer; First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II"), as Guarantors; the Lenders party thereto (the "Carnaby II Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent, and acknowledged and agreed to by Brake Parts Inc LLC ("BPI"), BPI Brake Manufacturing Juarez, S.A. de C.V. ("BPIJ"), and BPI Braking Systems Mexico, S.A. de C.V. ("BPIM")  and (ii) that certain credit agreement dated as of July 6, 2022 (the "Carnaby III Credit Agreement," and together with the Carnaby II Credit Agreement, the "Credit Agreements") among Carnaby Inventory III, LLC ("Carnaby III"), as Borrower; FBG, as Servicer; FB Holdings and Carnaby Inventory Holdings III, LLC ("Carnaby Holdings III"), as Guarantors; the Lenders party thereto (the "Carnaby III Secured Lenders," and together with the Carnaby II Secured Lenders, the "Carnaby II and III Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent and acknowledged and agreed to by Trico Products Corporation ("TPC"), Trico Technologies Corporation ("TTC" and together with TPC, "Trico"), Trico Componentes, S.A. de C.V. ("TC") and Subensambles Internacionales, S. de R.J. de C.V. ("SI"), *hereby submits* this omnibus addendum (the "Addendum") in support of its proofs of claim (together with the applicable proof of claim form, each a "Proof of Claim") submitted against (a) FBG; (b) FB

---

[1]   Capitalized terms not defined herein shall have the meanings ascribed to those terms in the Credit Agreements and the Transaction Documents, as applicable.

Holdings; (c) BPI; (d) TPC; (e) TTC (together with FBG, FB Holdings, BPI, and TPC, collectively, the "FBG Debtors"); (f) Carnaby Holdings II; (g) Carnaby Holdings III, each in its capacity as further described in the applicable Proof of Claim.  This Addendum is intended to be and should be treated as part of each applicable Proof of Claim.

1.     On September 24, 2025 (the "Initial Petition Date"), certain Debtors,[2] including Carnaby Holdings II and Carnaby Holdings III, commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  Between September 28, 2025, and September 29, 2025, approximately 99 additional Debtors, including the FBG Debtors, filed their own bankruptcy petitions (each, in the case of an FBG Debtor, its respective "Petition Date").

## BASIS FOR CLAIM

2.     The Credit Agreements.  On or about May 31, 2022, Carnaby II, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings II, as Guarantors, the Carnaby II Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby II Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time) along with BPI, BPIJ, and BPIM.

3.     On or about July 6, 2022, Carnaby III, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings III, as Guarantors, the Carnaby III Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby III Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise

---

[2]     A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**JOINT EXHIBIT NO. 61**
**Page 107 of 540**

modified from time to time) along with Trico, TC, and SI. [3]  On July 6, 2022, the parties to each of the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into a Cross-Collateralization Agreement (the "Cross-Collateralization Agreement"), pursuant to which the liens securing the Obligations[4] and Guaranteed Obligations[5] outstanding under each Credit Agreement secured the Obligations and Guaranteed Obligations outstanding under the other Credit Agreement, and vice versa.

4.     The Carnaby II Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $60 million aggregate principal amount and the Carnaby III Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $100 million aggregate principal amount, under which funds were advanced by the Carnaby II Secured Lenders and the Carnaby III Secured Lenders, respectively.

5.     Obligations. Each Borrower's obligations under the applicable Credit Agreement and the Transaction Documents[6] thereunder are secured by first-priority liens granted by Carnaby

---

[3]     On May 30, 2025, the parties to the Carnaby II Credit Agreement and to the Carnaby III Credit Agreement entered into Extension Agreements, extending the Maturity Date originally set forth in the Carnaby II Credit Agreement and the Carnaby III Credit Agreement to December 1, 2025.

[4]     Each Credit Agreement defines "Obligations" in identical terms as "all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding)." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

[5]     Each Credit Agreement defines "Guaranteed Obligations" in identical terms as "the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations[.]" Carnaby II Credit Agreement, section 11.1; Carnaby III Credit Agreement, section 11.1.

[6]     Each Credit Agreement defines the "Transaction Documents" in identical terms as "collectively, [the applicable Credit Agreement], each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other

3

II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III, on the applicable Collateral (as defined below) pursuant to the U.S. Security Agreements (as defined below) and the applicable Mexican Security Agreement (as defined below), as further detailed below.

6.      The Administrative Agent holds, on behalf of the Carnaby II Secured Lenders, loans totaling $58,964,276.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $658,704.05 under the Carnaby II Credit Agreement and, on behalf of the Carnaby III Secured Lenders, loans totaling $100,000,000.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $1,094,207.28 under the Carnaby III Credit Agreement (together, the "Loans"), each due and payable by the Borrowers and Guarantors under the Credit Agreements.  In addition to the obligation to repay the principal amount of the Loans, each of the Borrowers and the Guarantors (including FB Holdings) assumed the obligation to pay accrued and unpaid interest and all other Obligations and Guaranteed Obligations outstanding under the respective Credit Agreement and other Transaction Documents.

7.      Promissory Notes.  Each Borrower's obligations to repay the Obligations under the respective Credit Agreement were also evidenced through Promissory Notes executed by such Borrower with respect to each advance, and guaranteed, in each case, jointly and severally, by the applicable Guarantors under such Credit Agreement.

8.      U.S. Security Agreements.  On or about May 31, 2022, Carnaby II, Carnaby Holdings II, and the Administrative Agent for the benefit of the Carnaby II Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby II U.S. Security

---

instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

4

**JOINT EXHIBIT NO. 61**
**Page 109 of 540**

Agreement"). On or about July 6, 2022, Carnaby III, Carnaby Holdings III, and the Administrative Agent for the benefit of the Carnaby III Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby III U.S. Security Agreement," and together with the Carnaby II U.S. Security Agreement, the "U.S. Security Agreements").

9. As security for the prompt and complete payment or performance in full of the applicable "Obligations" (as defined in the U.S. Security Agreements, as amended by the Cross-Collateralization Agreement[7]), each Borrower and the Carnaby Holdings II or Carnaby Holdings III, as applicable, entity pledged, collaterally assigned and granted to the Administrative Agent, on behalf of and for the benefit of the applicable Secured Parties, a continuing security interest in all of their right, title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, such party, and regardless of where located: (i) all Accounts; (ii) all Cash; (iii) all Chattel Paper (including without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper); (iv) all Commercial Tort Claims; (v) all Contracts, together with all Contract Rights arising thereunder; (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Financial Assets; (x)

---

[7] As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby II U.S. Security Agreement means "(i) 'Obligations' (as defined in the [Carnaby II] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby II] Credit Agreement) and (iii) 'Obligations' (as defined in the Pledge and Security Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(ii).

As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby III U.S. Security Agreement means "(i) "Obligations" (as defined in the [Carnaby III] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby III] Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory II, LLC, as borrower, Carnaby Inventory Holdings II, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(iv).

**JOINT EXHIBIT NO. 61**
**Page 110 of 540**

all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Governmental Authorizations; (xiv) all Instruments; (xv) all Intellectual Property Collateral; (xvi)  all Inventory; (xvii) all Investment Property, Pledged Stock and other Pledged Collateral; (xviii) all letters of credit and Letter-of-Credit Rights; (xix) all Licenses; (xx) all Proceeds of insurance; (xxi) all Receivables; (xxii) all Real Estate Assets; (xxiii) all Securities Accounts, Money, Securities, and other investments therein, and all Security Entitlements in respect thereof; (xxiv) all Software and all recorded data of any kind or nature, regardless of the medium of recording; (xxv) all Supporting Obligations relating to any of the foregoing; and (xxvi) all accessions to, substitutions and replacements for, and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing (collectively, the "U.S. Collateral"), thereby achieving a complete cross-collateralization of the Carnaby II Credit Agreement and Carnaby III Credit Agreement in respect of all obligations owing under such facilities and all collateral pledged under them.

10.     Mexican Security Agreements. As additional security for the payment, performance and satisfaction in full of any and all of the Obligations, (i) on May 31, 2022, Carnaby II, as Pledgor, the Administrative Agent for the benefit of the Carnaby II Secured Lenders, as Pledgee, BPIJ and BPIM, as depositaries (jointly, the "Carnaby II Depositaries"), and BPI entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*), under Mexican law (the "Carnaby II Mexican Security Agreement"); and (ii) on July 6, 2022, Carnaby III, as Pledgor, the Administrative Agent for the benefit of the Carnaby III Secured Lenders, as Pledgee, TC and SI, as depositaries (jointly, the "Carnaby III Depositaries"), and TPC and TTC

**JOINT EXHIBIT NO. 61**
**Page 111 of 540**

entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión )*, under Mexican law (the "Carnaby III Mexican Security Agreement," and together with the Carnaby II Mexican Security Agreement, the "Mexican Security Agreements").

11.     Under the Carnaby II Mexican Security Agreement, Carnaby II granted to the Administrative Agent, for the benefit of the Carnaby II Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Under the Carnaby III Mexican Security Agreement, Carnaby III granted to the Administrative Agent, for the benefit of the Carnaby III Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Each Mexican Security Agreement defines Pledged Assets as any and all property and inventory located in Mexico, currently owned by the applicable Pledgor, or acquired by the applicable Pledgor or arising in the future, including without limitation, all Raw Materials,[8] together with (i) all documents, documents of title, warehouse receipts (or similar documents), bills of lading or orders for delivery of all, or any portion of the foregoing; and (ii) all products and/or sale proceeds of any and all of the foregoing, including, without limitation, insurance proceeds (collectively, the "Mexican Collateral" and together with the U.S. Collateral, the "Collateral").  Each Mexican Security Agreement also

---

[8]     "Raw Materials" are defined under the Mexican Security Agreements as "all the assets that comprise the inventory of the Pledgor, whether now owned or hereafter acquired, including without limitation, all inventory of the Pledgor (i) held for sale or lease, (ii) furnished or to be furnished under any service agreement, (iii) held for display or demonstration, or (iv) on lease or consignment, in favor of third parties; including accessories, packaging and shipping materials, spare parts, repair parts, returned and repossessed inventory, all raw materials, work-in-process, finished inventory and supplies used or consumed in the Pledgor business together with all documents, documents of title, warehouse receipts, pledge bonds, bills of lading, deposit certificates or orders for the delivery of all, or any portion, of the foregoing, including without limitation the assets listed in Exhibit C [attached thereto]."

7

provides that the applicable Pledgor is the sole, legal, and beneficial owner of the Mexican Collateral, free and clear of any liens or other encumbrances, and that the security interest granted thereunder constitutes a legal, valid, binding, and enforceable security over the Mexican Collateral.

12.     Perfection. The security interests granted under the U.S. Security Agreements were properly perfected by filing UCC financing statements with the Delaware Secretary of State.[9]  As a result, the Administrative Agent holds, on behalf of and for the benefit of the Carnaby II and III Secured Lenders, properly perfected security interests in all assets of each of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III.

13.     In turn, each Mexican Security Agreement was executed in compliance with Mexican law, before a Mexican Notary Public and is duly registered before the Mexican Sole Registry of Liens over Movable Assets (*Registro Unico de Garantias Mobiliarias*).  As a result, the Carnaby II Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the benefit of the Carnaby II Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby II,[10] and the Carnaby III Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the

---

*See* (i) UCC Financing Statement File No. 2022 4634697, filed at 12:39 PM on June 2, 2022, against Carnaby Inventory II, LLC as debtor; (ii) UCC Financing Statement File No. 2022 4634796, filed at 12:42 PM on June 2, 2022, against Carnaby Inventory Holdings II, LLC as debtor; (iii) UCC Financing Statement File No. 2022 5629043, filed at 3:58 PM on July 6, 2022, against Carnaby Inventory III, LLC as debtor; and (iv) UCC Financing Statement File No. 2022 5628912, filed at 3:55 PM on July 6, 2022, against Carnaby Inventory Holdings III, LLC as debtor.

[10]   The Carnaby II Mexican Security Agreement was registered with the RUG on June 7, 2022 (at 15:08:37 ZULU GMT/UTC), as Asiento No. 31302386, Garantía Mobiliaria No. 16927095, Folio Electrónico R20220601MG36, with a maximum secured amount of USD $60,000,000, covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby II.  On July 6, 2022, the Carnaby II Mexican Security Agreement was amended by the Amendment Agreement (Convenio Modificatorio) to extend the secured obligations to cover the Carnaby III Credit Agreement obligations as well, consistent with the Cross-Collateralization Agreement.  This amendment was registered with the RUG on July 8, 2022 (at 19:21:38 ZULU GMT/UTC), as Asiento No. 32022878, Garantía Mobiliaria No. 16927095 (same folio as the Carnaby II Original Pledge), amending the maximum secured amount to USD $160,000,000.

8

benefit of the Carnaby III Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby III.[11]

14.     Cross-Collateralization Agreement.   As noted in paragraph 2 above, on July 6, 2022, the parties to the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into the Cross-Collateralization Agreement, pursuant to which the Collateral securing each Credit Agreement also secures the obligations under the other Credit Agreement, and vice versa.   This cross-collateralization was also reflected in and effected through the U.S. Security Agreements, and in the Mexican Security Agreements as set forth above.

15.     Other Obligations Under the Transaction Documents.   FBG executed each of the Credit Agreements as "Servicer" and made various representations and warranties and undertakings in favor of the Carnaby II and III Secured Lenders thereunder including, without limitation, (i) to cause each of BPI and Trico to comply with the terms of the Transaction Documents; (ii) to act as Servicer under the Credit Agreements and to perform (or cause to be performed) certain functions for Carnaby II and Carnaby III.   Accordingly, FBG is responsible for ensuring the Carnaby II, Carnaby III, BPI, and Trico, and the Guarantors under the Credit Agreements each perform their obligations under the Transaction Documents (including, without limitation, obligations to maintain and preserve adequate records of the purchases and sales of inventory, to deliver regular reporting, and to maintain corporate separateness of the entities).   (*See* Credit Agreements Sec. 6.2(a)–(f), Sec. 5.1(s), (t); *see also* Sec. 5.1(a), (f), (g), (m), (n), (o), (p), (v), (w), (bb), and (dd); Sec. 5.2(j).   In their respective Credit Agreements, each of BPI and Trico

---

[11]   The Carnaby III Mexican Security Agreement was formalized before Corredor Público No. 7 (Licenciado José Carlos Reyes Cadena) in the State of Nuevo León, Mexico, and was registered with the RUG on July 8, 2022 (at 18:50:02 ZULU GMT/UTC), as Asiento No. 32020337, Garantía Mobiliaria No. 17265862, Folio Electrónico R20220708MSF5, with a maximum secured amount of USD $160,000,000 (covering both facilities per the Cross-Collateralization Agreement), covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby III.

9

covenanted for the benefit of the Carnaby II and III Secured Lenders to timely perform all of their respective obligations under the Transaction Documents to which they are party.  *See* Credit Agreement, Sec. 5.1(aa).

16.     As contemplated by the Carnaby II Credit Agreement, Carnaby II maintains a manufacturing business relationship with BPI, as evidenced by a Manufacturing Agreement, pursuant to which Carnaby II provides to BPI and the Carnaby II Depositaries the Raw Material for manufacture in accordance with BPI's Maquiladora Agreements with the Carnaby II Depositaries.  The Manufacturing Agreement between Carnaby II and BPI was executed on May 31, 2022, and created valid and binding obligations of BPI, enforceable against it in accordance with its terms.  Under that Manufacturing Agreement, Carnaby II hired and requested certain manufacturing services from BPI to manufacture and produce the products requested by Carnaby II.  BPI was authorized to perform the manufacturing processes required by Carnaby II through its "maquiladora program" with the Carnaby II Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreement).

17.     As contemplated by the Carnaby III Credit Agreement, Carnaby III maintains a manufacturing business relationship with Trico, as evidenced by the Manufacturing Agreements, pursuant to which Carnaby III provides to Trico and the Carnaby III Depositaries the Raw Material for manufacture in accordance with Trico's Maquiladora Agreements with the Carnaby III Depositaries.  The Manufacturing Agreements between Carnaby III and Trico were executed on July 6, 2022, and created valid and binding obligations of Trico, enforceable against them in accordance with its terms.  Under the Manufacturing Agreements, Carnaby III hired and requested certain manufacturing services from Trico to manufacture and produce the products requested by

**JOINT EXHIBIT NO. 61**
**Page 115 of 540**

Carnaby III.  Trico was authorized to perform the manufacturing processes required by Carnaby III through its "maquiladora program" with the Carnaby III Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreements).

18.     The Manufacturing Agreements between Carnaby II and Carnaby III and BPI and Trico, as applicable, provide that neither BPI, Trico, the Carnaby II Depositaries, or the Carnaby III Depositaries, as applicable, shall under any circumstances be considered to have any proprietary interest in the Materials (as defined in the Manufacturing Agreements) which Carnaby II and Carnaby III may deliver to BPI, Trico, the Carnaby II Depositaries, or Carnaby III Depositaries, as applicable, nor on the Products (as defined in the Manufacturing Agreements).  They also provide that BPI, Trico, the Carnaby II Depositaries, and the Carnaby III Depositaries, as applicable, shall provide necessary administrative services for shipment, including the arrangement of proper transportation of the Materials and the Products between Mexico and the United States.  The Manufacturing Agreement also provides that the Carnaby II Depositaries and the Carnaby III Depositaries shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the Materials and Products, but that under no circumstances does acting as importer and exporter result in the conveyance of ownership of the Materials or Products to the Carnaby II Depositaries or Carnaby III Depositaries.

19.     Carnaby II executed a Purchase Agreement and Sale Agreement with BPI on May 31, 2022, which provided for the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreement.  Carnaby III executed a Purchase Agreement and Sale Agreement with each of Trico on July 6, 2022 which provided for

11

the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreements.  As buyers and sellers under the Purchase Agreements and Sale Agreements, the parties thereto intended to effect absolute and irrevocable 'true sales' for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings and undertook to reflect such sales in their respective financial statements).  Each Purchase Agreement and Sale Agreement further required that the parties advise anyone inquiring about the ownership of any assets purchases thereunder that all applicable assets had been sold to the applicable buyer.  Additionally, each of applicable selling parties under the Purchase Agreements and Sale Agreements represented and warranted to in their respective Purchase Agreements and Sale Agreements that they had good title to the assets being sold, in each case free and clear of any liens.

20.     Purchases and sales of inventory between Carnaby II and BPI occurred beginning on or about May 31, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).  Purchases and sales of inventory between Carnaby III and Trico occurred beginning on or about July 6, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).

**ASSERTION OF CLAIM**

21.     <u>Proof of Claim</u>.  This Proof of Claim is filed by the Administrative Agent for the benefit of the Carnaby II and III Secured Lenders and sets forth their claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors as follows:

22.     <u>Carnaby Holdings II and Carnaby Holdings III Guarantee Claims</u>.  Each of Carnaby Holdings II and Carnaby Holding III executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI)

12

**JOINT EXHIBIT NO. 61**
**Page 117 of 540**

and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.  The Administrative Agent's claims against Carnaby Holdings II and Carnaby Holdings III therefore include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

23. <u>First Brands Group Holdings, LLC Guarantee Claims</u>.  FB Holdings executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI) and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.   The Administrative Agent's claims against FB Holdings therefore include: (1) the full amount of the Guaranteed Obligations under both Credit Agreements include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

24. <u>503(b)(9) Claims Against BPI and Trico</u>:  The Administrative Agent also asserts claims in an amount to be determined against each of BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code for the fair value of inventory BPI and Trico received from Carnaby II and Carnaby III during the 20 days preceding the Petition Date to the extent Carnaby II and Carnaby III did not receive payment equal to such fair value from BPI and Trico.

25. <u>Additional Claims</u>.  The Administrative Agent also asserts against FBG, on behalf of itself and the Carnaby II and III Secured Lenders, claims in an amount not less than **$160,717,187.33** for payment in full of damages stemming from, among other things, (i) any all

13

outstanding aggregate principal amounts of the loans under the Credit Agreements and all accrued and unpaid interest (including post-petition and default interest) thereon; (ii) any and all unpaid fees and expenses owed to the Administrative Agent and/or any of the Carnaby II and III Secured Lenders; (iii) any indemnifications, out-of-pocket fees and expenses (including, but not limited to, the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II and III Secured Lenders), premiums, reimbursements, charges, damages, and/or claims (as defined in the Bankruptcy Code) arising under the applicable Transaction Documents; (iv) all obligations owed to the Carnaby II and III Secured Lenders until all Obligations have been paid in full; (v) all damages arising from breach by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors of its respective representations, warranties, and obligations under the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or any other Transaction Documents to which it is party; and (vi) all damages arising from the fraudulent misrepresentations and omissions made by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors in connection with the Transaction Documents and the transactions contemplated thereby, including without limitation all amounts necessary to compensate the Carnaby II and III Secured Lenders for losses caused by such misrepresentations and omissions (collectively, the "Additional Claims," and together with the aggregate outstanding principal amount of the Loans, accrued and unpaid interest, fees, costs, and all other Obligations and Guaranteed Obligations due and payable under the Credit Agreements and the related Transaction Documents, the "Claims").  The Administrative Agent also asserts Additional Claims against BPI arising out of the Carnaby II Credit Agreement and related Transaction Documents in an amount not less than $59,622,980.05 and Additional

14

Claims arising out of the Carnaby III Credit Agreement and related Transaction Documents against Trico in an amount not less than $101,094,207.28.   The Administrative Agent also asserts Additional Claims arising out of the Carnaby Credit Agreements against each of FB Holdings, Carnaby Holdings II and Carnaby Holdings III in an amount to be determined.

26.   <u>Breach of Contract and Fraud Claims</u>.   In addition to any Claims set forth above, the Administrative Agent, on behalf of itself and the Carnaby II and III Secured Lenders, asserts claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors for breach of contract and common law fraud/fraudulent misrepresentation.   Each FBG Debtor was party to, and breached, one or more of the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or the other Transaction Documents, and each failed to perform its obligations thereunder, including without limitation by failing to maintain, preserve, and protect the Collateral; failing to comply with applicable covenants, representations, and warranties; and failing to satisfy the Obligations and Guaranteed Obligations when due.

27.   The FBG Debtors committed fraud by making material misrepresentations and omissions in connection with the Transaction Documents and the transactions contemplated thereby, upon which the Administrative Agent and the Carnaby II and III Secured Lenders reasonably relied in advancing funds, extending credit, and entering into the Transaction Documents, and such misrepresentations and omissions caused damage to the Carnaby II and III Secured Lenders in an amount to be determined.   The Administrative Agent expressly reserves the right to supplement the factual basis for these claims as additional information becomes available through discovery or otherwise.

**JOINT EXHIBIT NO. 61**
**Page 120 of 540**

28.     Federal Rule of Bankruptcy Procedure 3001(e)(3) states that "[i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount." Fed. R. Bankr. P. 3001(e)(3). Section 101(54) of the Bankruptcy Code defines "transfer" as "the creation of a lien." 11 U.S.C. § 101(54)(A). Pursuant to the U.S. Security Agreements, the Administrative Agent has been granted properly perfected, first-priority liens, for the benefit of the Carnaby II and III Secured Lenders, over, *inter alia,* all Contracts and Contract Rights of each of Carnaby II and Carnaby III and each of Carnaby Holdings II and Carnaby Holdings III. Accordingly, the Administrative Agent holds any claims arising out of any such Contracts or Contract Rights that may be asserted by any of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III against any person or entity, including, without limitation, any other Debtor and non-Debtor entities (including the FBG Debtors). Such claims include, in the case of the FBG Debtors that are counterparties to the Transaction Documents, any claims held by Carnaby II, Carnaby III, Carnaby Holdings II, or Carnaby Holdings III for breach of contract, in each case up to the full amount of the Obligations and Guaranteed Obligations.

29.     <u>Nature of the Claims Against Carnaby Holdings II and Carnaby Holdings III</u>. The Claims asserted against each of Carnaby Holdings II and Carnaby Holdings III are secured by properly perfected, valid and enforceable first-priority liens and pledges on all of its assets as contemplated by the U.S. Security Agreement, and all of the assets of each of Carnaby II and Carnaby III as contemplated by the Cross-Collateralization Agreement. Consequently, the Claims are secured, except to the extent that the value of the Collateral securing the Claims is insufficient to satisfy the Claims in full. To the extent of any remaining deficiency, the remainder of the Claim is asserted as a general unsecured claim.

**JOINT EXHIBIT NO. 61**
**Page 121 of 540**

30.     Nature of the Claims Against the FBG Debtors:  Except as set forth in the following paragraph, the Claims against the FBG Debtors are asserted as general unsecured claims.

31.     Nature of 503(b)(9) Claims Against BPI and Trico:  The Claims asserted against BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code are asserted as administrative expense priority Claims.

## RESERVATION OF RIGHTS

32.     By filing this Proof of Claim, the Administrative Agent does not waive, and expressly reserves, all rights and remedies at law or in equity under any applicable law or jurisdiction that the Administrative Agent has or may have against each of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors any guarantor or obligor (including but not limited to Carnaby Holdings II, Carnaby Holdings III, and FB Holdings), and any of their respective affiliates and subsidiaries, or any other person or entity, including without limitation its rights to seek payment as an oversecured creditor of all amounts to which it may be entitled under 11 U.S.C. § 506.  Without limiting the generality of the foregoing, this Proof of Claim is not, ***nor shall it be deemed or construed to be***: (a) a waiver or release of any terms or provisions of the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (b) an election of remedies or waiver of any past, present or future breaches, defaults or events of default under the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (c) a waiver of the rights and remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether an affiliate or guarantor of any of the Debtors or an assignee or otherwise; (d) consent by the Administrative Agent to the jurisdiction of the Court with respect to any proceeding commenced against or otherwise involving the Administrative Agent; (e) a waiver of any right to (1) withdraw the reference, or otherwise

17

**JOINT EXHIBIT NO. 61**
**Page 122 of 540**

challenge the jurisdiction of the Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in this case against or otherwise involving the Administrative Agent, or (2) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Administrative Agent; (f) a waiver or release of, or any other limitation on, the Administrative Agent's right to assert that any portion of the claims asserted herein or any other claims are entitled to treatment as priority claims including under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (g) a waiver of any rights that the Administrative Agent may have pursuant to section 506(b) of the Bankruptcy Code; (h) a waiver or release of any lien, pledge or security interest against any Debtor or any third parties; (i) a waiver or release of, or any other limitation on, the Administrative Agent's rights to assert that any nonrecourse claim should be treated as a recourse claim, including but not limited to the exercise of any right that the Administrative Agent may have pursuant to section 1111(b) of the Bankruptcy Code; (j) consent to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. section 157(e) or otherwise; (k) a waiver by the Administrative Agent of the right to have final orders in non-core matters entered only by a United States District Court judge; (l) a waiver or release of the Administrative Agent's right to have any and all final orders in any and all noncore matters or proceedings entered only after de novo review by a United States District Court Judge; or (m) a waiver of any claim, at law or in equity or under any applicable law, including without limitation administrative claims, priority claims, secured claims, unsecured claims, constructive trust claims, claims based upon common law fraud, misrepresentation, subrogation, indemnity, contribution, unjust enrichment, fraudulent

conveyance, failure to fulfill contractual and fiduciary obligations, breach of the implied covenant of good faith and fair dealing, tortious interference, quantum meruit, or any other theory available under applicable law or equity, including, without limitation, the right to assert a constructive trust against assets or cash held by any Debtor, and any and all amounts owed, in damages or otherwise, whether known or unknown, and whether presently asserted or to be asserted, all of which singularly or collectively may have caused the Administrative Agent to incur damages.  Nothing herein shall be deemed to waive, stop, or derogate from the rights of the Administrative Agent under the Transaction Documents, including, without limitation, in connection with the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, and any order of the Court, or to prejudice any and all of the Administrative Agent's rights, claims, and defenses under the Bankruptcy Code or otherwise, including, but not limited to, the right to vote on any plan(s) in the Debtors' Chapter 11 Cases.

33.     The Administrative Agent expressly reserves the right to amend, replace, update, or supplement this Proof of Claim (including the proof of claim form) at any time and in any respect (including, without limitation, as necessary or appropriate to amend, quantify, or correct amounts, to provide additional detail regarding the Claims set forth herein, to fix the amount of any contingent or unliquidated component of the Claims, or to include any claim, at law or in equity), to add or amend documents and other information, to file additional proofs of claim or further pleadings for additional claims, to contest the validity, priority, and extent of any other purported liens and security interests other than those described herein, and to assert any and all other claims, actions, defenses, setoffs, recoupments, rights or remedies of whatever kind or nature that it currently has, or may have in the future against any of Carnaby Holdings II, Carnaby Holdings III, any FBG Debtor, and/or any other Debtors or non-Debtors, or any other person or

19

entity, including without limitation, rights against guarantors, officers, directors, and other creditors any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, at law or in equity, including, without limitation, administrative or other priority claims, setoff and recoupment rights, lien rights, interest, and the right to assert claims that are otherwise warranted in any related actions.

34.     The Administrative Agent reserves the right to claim that the portion of its fees, interest, costs, expenses, and other charges incurred or accruing after the applicable Petition Date of each of any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, constitute administrative expenses of the applicable Debtor's estate to the extent such expenses are not otherwise paid in full, and reserves the right to file a claim or application for payment of such administrative expenses.

35.     No judgment has been rendered on the Claims set forth in this Proof of Claim.

36.     With respect to any portion of the Claims that is unliquidated or as to which the amount is undetermined, the Administrative Agent does not waive their rights thereto by not claiming specific amounts at this time.

37.     The Administrative Agent expressly reserves, and does not waive, its right to payment of any amounts due from any guarantor in respect of the Credit Agreements from any other sources under any applicable law and jurisdiction.

38.     The Administrative Agent expressly reserves its rights to exercise judicial actions under any applicable law and jurisdiction against non-Debtor entities during and after these Chapter 11 Cases.

39.     Nothing contained in this Proof of Claim shall be deemed an admission by the Administrative Agent.

**JOINT EXHIBIT NO. 61**
**Page 125 of 540**

40.    To the best of the Administrative Agent's knowledge, the claims set forth herein are not subject to setoff or counterclaim, provided, however, that the Administrative Agent (on behalf of the Carnaby II and III Secured Lenders) expressly reserves and does not waive any right of set-off or recoupment it may possess.

41.    The Administrative Agent does not consent to the surcharge of the Collateral by any Debtor's estate, their representatives, or any other person or party-in-interest pursuant to 11 U.S.C. §506(c) or otherwise.

42.    The Administrative Agent expressly reserves the right to withdraw this Proof of Claim as if it had never been filed.

## NOTICES AND COMMUNICATIONS

43.    Any and all notices and communications concerning the Proof of Claim shall be sent to the following addresses both in hard copy and via e-mail:


Tarik Johnson
**GLAS TRUST COMPANY LLC**, in its capacity as Administrative Agent
3 Second Street, Suite 206, Jersey City, NJ 07311
Tel.: +1 201 201 8642
E-mails:
Tarik.Johnson@glas.agency

with a copy to (which shall not constitute notice)

Allan S. Brilliant
Stephen Wolpert
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Tel.: +1 212 698 3599
E-mails:
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

21

**JOINT EXHIBIT NO. 61**
**Page 126 of 540**

## SUPPORTING DOCUMENTS

44.    The Administrative Agent's claims are based on the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, the Purchase Agreements, the Promissory Notes, the Sale Agreements, and other related Transaction Documents.  Copies of these documents and additional related documents are not attached to the Proof of Claim because of their voluminous nature.  Counsel to the Administrative Agent will provide copies of such documents to any party in interest in these Chapter 11 Cases, upon a reasonable written request (and entry into an appropriate confidentiality agreement, if necessary) addressed to counsel to the Administrative Agent at the address set forth herein.

45.    Each and every description in this Addendum to the Credit Agreements and the other Transaction Documents is qualified in its entirety by reference to the applicable provisions of such documents, and all such documents are incorporated herein by reference.  In the event of any inconsistency between this Addendum and any such document, including the proof of claim form, the relevant document shall control.

**GLAS Trust Company LLC**
In its capacity as Administrative Agent under the
Carnaby II and Carnaby III Credit Agreements,
related Transaction Documents

Dated: July 6, 2026

22

**JOINT EXHIBIT NO. 61**
**Page 127 of 540**

Electronic Proof of Claim Confirmation:  3950-1-SXTCD-018349786

Claim Electronically Submitted on (UTC) :  2026-07-07T00:58:47.944Z

Submitted by:  GLAS TRUST CO LLC, AGENT FBO CARNABY II SEC. LENDERS
jeffrey.schoenfeld@glas.agency

KROLL

Case 25-90399   Document 3359-5   Filed in TXSB on 07/24/26   Page 1 of 28

**Exhibit**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ not less than $160,717,187 .   **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe:   See Addendum

**Basis for perfection:**   See Addendum

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property**:   $ See Addendum

**Amount of the claim that is secured:**   $ See Addendum

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**Proof of Claim**                                                                 page 2

**JOINT EXHIBIT NO. 61**
**Page 131 of 540**

| | |
|---|---|
| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check one:* |

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

| | |
|---|---|
| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** $_____ |

---

**Part 3:   Sign Below**

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct. |

*Jeffrey Schoenfeld*   07/07/2026
_____   _____
Electronic Signature                                            Date

**Name of the person who is completing and signing this claim**

Name          Jeffrey Schoenfeld
              _____
              First name              Middle name              Last name

Title/Company   Vice President / GLAS TRUST COMPANY LLC
              _____
              Identify the corporate servicer as the company if the authorized agent is a servicer.

              3 Second Street, Suite 203

Address       _____
              Number          Street

              Jersey City               NEW JERSEY 07311
              _____
              City                    State          ZIP Code      Country

Contact phone   2018392200                    Email   jeffrey.schoenfeld@glas.agency

---

**JOINT EXHIBIT NO. 61**
**Page 132 of 540**

**Additional Noticing Addresses (if provided):**

**Additional Address 1**
Name:              GLAS Trust Company LLC as administrative agent for the Carnaby II Secured Lenders
Address1:          C/O DECHERT LLP
Address2:          1095 Avenue of the Americas
Address3:          Attn: Allan S. Brilliant and Stephen Wolpert
Address4:
City:              New York
State:             NY
Postal Code:       10036
Country:

Contact Phone:     1-212-698-3599
Contact Email:     allan.brilliant@dechert.com, stephen.wolpert@dechert.com

**Additional Address 2**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
Postal Code:
Country:

Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**
☑ Yes
☐ No

--------------------------------------------------------------------------------------------------

Attachment Filename:

First Brands - Omnibus Proof of Claim Addendum for FBG Debtors (Dechert 07-06-2026).pdf

**KROLL**

**OMNIBUS ADDENDUM TO PROOFS OF CLAIM FILED BY
GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT TO
THE CARNABY II AND III SECURED LENDERS**

GLAS Trust Company LLC, in its capacity as administrative agent (the "Administrative Agent") for the Lenders[1] under (i) that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement") among Carnaby Inventory II, LLC ("Carnaby II"), as Borrower; First Brands Group, LLC ("FBG"), as Servicer; First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II"), as Guarantors; the Lenders party thereto (the "Carnaby II Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent, and acknowledged and agreed to by Brake Parts Inc LLC ("BPI"), BPI Brake Manufacturing Juarez, S.A. de C.V. ("BPIJ"), and BPI Braking Systems Mexico, S.A. de C.V. ("BPIM")  and (ii) that certain credit agreement dated as of July 6, 2022 (the "Carnaby III Credit Agreement," and together with the Carnaby II Credit Agreement, the "Credit Agreements") among Carnaby Inventory III, LLC ("Carnaby III"), as Borrower; FBG, as Servicer; FB Holdings and Carnaby Inventory Holdings III, LLC ("Carnaby Holdings III"), as Guarantors; the Lenders party thereto (the "Carnaby III Secured Lenders," and together with the Carnaby II Secured Lenders, the "Carnaby II and III Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent and acknowledged and agreed to by Trico Products Corporation ("TPC"), Trico Technologies Corporation ("TTC" and together with TPC, "Trico"), Trico Componentes, S.A. de C.V. ("TC") and Subensambles Internacionales, S. de R.J. de C.V. ("SI"), *hereby submits* this omnibus addendum (the "Addendum") in support of its proofs of claim (together with the applicable proof of claim form, each a "Proof of Claim") submitted against (a) FBG; (b) FB

---

[1]    Capitalized terms not defined herein shall have the meanings ascribed to those terms in the Credit Agreements and the Transaction Documents, as applicable.

**JOINT EXHIBIT NO. 61
Page 134 of 540**

Holdings; (c) BPI; (d) TPC; (e) TTC (together with FBG, FB Holdings, BPI, and TPC, collectively, the "FBG Debtors"); (f) Carnaby Holdings II; (g) Carnaby Holdings III, each in its capacity as further described in the applicable Proof of Claim.  This Addendum is intended to be and should be treated as part of each applicable Proof of Claim.

1.     On September 24, 2025 (the "Initial Petition Date"), certain Debtors,[2] including Carnaby Holdings II and Carnaby Holdings III, commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  Between September 28, 2025, and September 29, 2025, approximately 99 additional Debtors, including the FBG Debtors, filed their own bankruptcy petitions (each, in the case of an FBG Debtor, its respective "Petition Date").

**BASIS FOR CLAIM**

2.     The Credit Agreements.  On or about May 31, 2022, Carnaby II, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings II, as Guarantors, the Carnaby II Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby II Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time) along with BPI, BPIJ, and BPIM.

3.     On or about July 6, 2022, Carnaby III, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings III, as Guarantors, the Carnaby III Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby III Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise

---

2     A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

2

modified from time to time) along with Trico, TC, and SI. [3]  On July 6, 2022, the parties to each of the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into a Cross-Collateralization Agreement (the "Cross-Collateralization Agreement"), pursuant to which the liens securing the Obligations[4] and Guaranteed Obligations[5] outstanding under each Credit Agreement secured the Obligations and Guaranteed Obligations outstanding under the other Credit Agreement, and vice versa.

4.      The Carnaby II Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $60 million aggregate principal amount and the Carnaby III Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $100 million aggregate principal amount, under which funds were advanced by the Carnaby II Secured Lenders and the Carnaby III Secured Lenders, respectively.

5.      Obligations. Each Borrower's obligations under the applicable Credit Agreement and the Transaction Documents[6] thereunder are secured by first-priority liens granted by Carnaby

---

[3]  On May 30, 2025, the parties to the Carnaby II Credit Agreement and to the Carnaby III Credit Agreement entered into Extension Agreements, extending the Maturity Date originally set forth in the Carnaby II Credit Agreement and the Carnaby III Credit Agreement to December 1, 2025.

[4]  Each Credit Agreement defines "Obligations" in identical terms as "all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding)." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

[5]  Each Credit Agreement defines "Guaranteed Obligations" in identical terms as "the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations[.]" Carnaby II Credit Agreement, section 11.1; Carnaby III Credit Agreement, section 11.1.

[6]  Each Credit Agreement defines the "Transaction Documents" in identical terms as "collectively, [the applicable Credit Agreement], each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other

3

II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III, on the applicable Collateral (as defined below) pursuant to the U.S. Security Agreements (as defined below) and the applicable Mexican Security Agreement (as defined below), as further detailed below.

6.  The Administrative Agent holds, on behalf of the Carnaby II Secured Lenders, loans totaling $58,964,276.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $658,704.05 under the Carnaby II Credit Agreement and, on behalf of the Carnaby III Secured Lenders, loans totaling $100,000,000.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $1,094,207.28 under the Carnaby III Credit Agreement (together, the "Loans"), each due and payable by the Borrowers and Guarantors under the Credit Agreements.  In addition to the obligation to repay the principal amount of the Loans, each of the Borrowers and the Guarantors (including FB Holdings) assumed the obligation to pay accrued and unpaid interest and all other Obligations and Guaranteed Obligations outstanding under the respective Credit Agreement and other Transaction Documents.

7.  Promissory Notes.  Each Borrower's obligations to repay the Obligations under the respective Credit Agreement were also evidenced through Promissory Notes executed by such Borrower with respect to each advance, and guaranteed, in each case, jointly and severally, by the applicable Guarantors under such Credit Agreement.

8.  U.S. Security Agreements.  On or about May 31, 2022, Carnaby II, Carnaby Holdings II, and the Administrative Agent for the benefit of the Carnaby II Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby II U.S. Security

---

instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

4

Agreement"). On or about July 6, 2022, Carnaby III, Carnaby Holdings III, and the Administrative Agent for the benefit of the Carnaby III Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby III U.S. Security Agreement," and together with the Carnaby II U.S. Security Agreement, the "U.S. Security Agreements").

9.  As security for the prompt and complete payment or performance in full of the applicable "Obligations" (as defined in the U.S. Security Agreements, as amended by the Cross-Collateralization Agreement[7]), each Borrower and the Carnaby Holdings II or Carnaby Holdings III, as applicable, entity pledged, collaterally assigned and granted to the Administrative Agent, on behalf of and for the benefit of the applicable Secured Parties, a continuing security interest in all of their right, title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, such party, and regardless of where located: (i) all Accounts; (ii) all Cash; (iii) all Chattel Paper (including without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper); (iv) all Commercial Tort Claims; (v) all Contracts, together with all Contract Rights arising thereunder; (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Financial Assets; (x)

---

[7]  As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby II U.S. Security Agreement means "(i) 'Obligations' (as defined in the [Carnaby II] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby II] Credit Agreement) and (iii) 'Obligations' (as defined in the Pledge and Security Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(ii).

As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby III U.S. Security Agreement means "(i) "Obligations" (as defined in the [Carnaby III] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby III] Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory II, LLC, as borrower, Carnaby Inventory Holdings II, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(iv).

all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Governmental Authorizations; (xiv) all Instruments; (xv) all Intellectual Property Collateral; (xvi)  all Inventory; (xvii) all Investment Property, Pledged Stock and other Pledged Collateral; (xviii) all letters of credit and Letter-of-Credit Rights; (xix) all Licenses; (xx) all Proceeds of insurance; (xxi) all Receivables; (xxii) all Real Estate Assets; (xxiii) all Securities Accounts, Money, Securities, and other investments therein, and all Security Entitlements in respect thereof; (xxiv) all Software and all recorded data of any kind or nature, regardless of the medium of recording; (xxv) all Supporting Obligations relating to any of the foregoing; and (xxvi) all accessions to, substitutions and replacements for, and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing (collectively, the "U.S. Collateral"), thereby achieving a complete cross-collateralization of the Carnaby II Credit Agreement and Carnaby III Credit Agreement in respect of all obligations owing under such facilities and all collateral pledged under them.

10.   Mexican Security Agreements. As additional security for the payment, performance and satisfaction in full of any and all of the Obligations, (i) on May 31, 2022, Carnaby II, as Pledgor, the Administrative Agent for the benefit of the Carnaby II Secured Lenders, as Pledgee, BPIJ and BPIM, as depositaries (jointly, the "Carnaby II Depositaries"), and BPI entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*), under Mexican law (the "Carnaby II Mexican Security Agreement"); and (ii) on July 6, 2022, Carnaby III, as Pledgor, the Administrative Agent for the benefit of the Carnaby III Secured Lenders, as Pledgee, TC and SI, as depositaries (jointly, the "Carnaby III Depositaries"), and TPC and TTC

6

**JOINT EXHIBIT NO. 61**
**Page 139 of 540**

entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*), under Mexican law (the "Carnaby III Mexican Security Agreement," and together with the Carnaby II Mexican Security Agreement, the "Mexican Security Agreements").

11.     Under the Carnaby II Mexican Security Agreement, Carnaby II granted to the Administrative Agent, for the benefit of the Carnaby II Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Under the Carnaby III Mexican Security Agreement, Carnaby III granted to the Administrative Agent, for the benefit of the Carnaby III Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Each Mexican Security Agreement defines Pledged Assets as any and all property and inventory located in Mexico, currently owned by the applicable Pledgor, or acquired by the applicable Pledgor or arising in the future, including without limitation, all Raw Materials,[8] together with (i) all documents, documents of title, warehouse receipts (or similar documents), bills of lading or orders for delivery of all, or any portion of the foregoing; and (ii) all products and/or sale proceeds of any and all of the foregoing, including, without limitation, insurance proceeds (collectively, the "Mexican Collateral" and together with the U.S. Collateral, the "Collateral").  Each Mexican Security Agreement also

---

[8]     "Raw Materials" are defined under the Mexican Security Agreements as "all the assets that comprise the inventory of the Pledgor, whether now owned or hereafter acquired, including without limitation, all inventory of the Pledgor (i) held for sale or lease, (ii) furnished or to be furnished under any service agreement, (iii) held for display or demonstration, or (iv) on lease or consignment, in favor of third parties; including accessories, packaging and shipping materials, spare parts, repair parts, returned and repossessed inventory, all raw materials, work-in-process, finished inventory and supplies used or consumed in the Pledgor business together with all documents, documents of title, warehouse receipts, pledge bonds, bills of lading, deposit certificates or orders for the delivery of all, or any portion, of the foregoing, including without limitation the assets listed in Exhibit C [attached thereto]."

7

provides that the applicable Pledgor is the sole, legal, and beneficial owner of the Mexican Collateral, free and clear of any liens or other encumbrances, and that the security interest granted thereunder constitutes a legal, valid, binding, and enforceable security over the Mexican Collateral.

12.     Perfection. The security interests granted under the U.S. Security Agreements were properly perfected by filing UCC financing statements with the Delaware Secretary of State.[9]  As a result, the Administrative Agent holds, on behalf of and for the benefit of the Carnaby II and III Secured Lenders, properly perfected security interests in all assets of each of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III.

13.     In turn, each Mexican Security Agreement was executed in compliance with Mexican law, before a Mexican Notary Public and is duly registered before the Mexican Sole Registry of Liens over Movable Assets (*Registro Unico de Garantias Mobiliarias*).  As a result, the Carnaby II Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the benefit of the Carnaby II Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby II,[10] and the Carnaby III Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the

---

*See* (i) UCC Financing Statement File No. 2022 4634697, filed at 12:39 PM on June 2, 2022, against Carnaby Inventory II, LLC as debtor; (ii) UCC Financing Statement File No. 2022 4634796, filed at 12:42 PM on June 2, 2022, against Carnaby Inventory Holdings II, LLC as debtor; (iii) UCC Financing Statement File No. 2022 5629043, filed at 3:58 PM on July 6, 2022, against Carnaby Inventory III, LLC as debtor; and (iv) UCC Financing Statement File No. 2022 5628912, filed at 3:55 PM on July 6, 2022, against Carnaby Inventory Holdings III, LLC as debtor.

[10]   The Carnaby II Mexican Security Agreement was registered with the RUG on June 7, 2022 (at 15:08:37 ZULU GMT/UTC), as Asiento No. 31302386, Garantía Mobiliaria No. 16927095, Folio Electrónico R20220601MG36, with a maximum secured amount of USD $60,000,000, covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby II.  On July 6, 2022, the Carnaby II Mexican Security Agreement was amended by the Amendment Agreement (Convenio Modificatorio) to extend the secured obligations to cover the Carnaby III Credit Agreement obligations as well, consistent with the Cross-Collateralization Agreement.  This amendment was registered with the RUG on July 8, 2022 (at 19:21:38 ZULU GMT/UTC), as Asiento No. 32022878, Garantía Mobiliaria No. 16927095 (same folio as the Carnaby II Original Pledge), amending the maximum secured amount to USD $160,000,000.

8

benefit of the Carnaby III Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby III.[11]

14.    Cross-Collateralization Agreement.    As noted in paragraph 2 above, on July 6, 2022, the parties to the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into the Cross-Collateralization Agreement, pursuant to which the Collateral securing each Credit Agreement also secures the obligations under the other Credit Agreement, and vice versa.  This cross-collateralization was also reflected in and effected through the U.S. Security Agreements, and in the Mexican Security Agreements as set forth above.

15.    Other Obligations Under the Transaction Documents.    FBG executed each of the Credit Agreements as "Servicer" and made various representations and warranties and undertakings in favor of the Carnaby II and III Secured Lenders thereunder including, without limitation, (i) to cause each of BPI and Trico to comply with the terms of the Transaction Documents; (ii) to act as Servicer under the Credit Agreements and to perform (or cause to be performed) certain functions for Carnaby II and Carnaby III.  Accordingly, FBG is responsible for ensuring the Carnaby II, Carnaby III, BPI, and Trico, and the Guarantors under the Credit Agreements each perform their obligations under the Transaction Documents (including, without limitation, obligations to maintain and preserve adequate records of the purchases and sales of inventory, to deliver regular reporting, and to maintain corporate separateness of the entities).  (*See* Credit Agreements Sec. 6.2(a)–(f), Sec. 5.1(s), (t); *see also* Sec. 5.1(a), (f), (g), (m), (n), (o), (p), (v), (w), (bb), and (dd); Sec. 5.2(j).  In their respective Credit Agreements, each of BPI and Trico

---

[11]    The Carnaby III Mexican Security Agreement was formalized before Corredor Público No. 7 (Licenciado José Carlos Reyes Cadena) in the State of Nuevo León, Mexico, and was registered with the RUG on July 8, 2022 (at 18:50:02 ZULU GMT/UTC), as Asiento No. 32020337, Garantía Mobiliaria No. 17265862, Folio Electrónico R20220708MSF5, with a maximum secured amount of USD $160,000,000 (covering both facilities per the Cross-Collateralization Agreement), covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby III.

covenanted for the benefit of the Carnaby II and III Secured Lenders to timely perform all of their respective obligations under the Transaction Documents to which they are party. *See* Credit Agreement, Sec. 5.1(aa).

16.    As contemplated by the Carnaby II Credit Agreement, Carnaby II maintains a manufacturing business relationship with BPI, as evidenced by a Manufacturing Agreement, pursuant to which Carnaby II provides to BPI and the Carnaby II Depositaries the Raw Material for manufacture in accordance with BPI's Maquiladora Agreements with the Carnaby II Depositaries. The Manufacturing Agreement between Carnaby II and BPI was executed on May 31, 2022, and created valid and binding obligations of BPI, enforceable against it in accordance with its terms. Under that Manufacturing Agreement, Carnaby II hired and requested certain manufacturing services from BPI to manufacture and produce the products requested by Carnaby II. BPI was authorized to perform the manufacturing processes required by Carnaby II through its "maquiladora program" with the Carnaby II Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreement).

17.    As contemplated by the Carnaby III Credit Agreement, Carnaby III maintains a manufacturing business relationship with Trico, as evidenced by the Manufacturing Agreements, pursuant to which Carnaby III provides to Trico and the Carnaby III Depositaries the Raw Material for manufacture in accordance with Trico's Maquiladora Agreements with the Carnaby III Depositaries. The Manufacturing Agreements between Carnaby III and Trico were executed on July 6, 2022, and created valid and binding obligations of Trico, enforceable against them in accordance with its terms. Under the Manufacturing Agreements, Carnaby III hired and requested certain manufacturing services from Trico to manufacture and produce the products requested by

**JOINT EXHIBIT NO. 61**
**Page 143 of 540**

Carnaby III.  Trico was authorized to perform the manufacturing processes required by Carnaby III through its "maquiladora program" with the Carnaby III Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreements).

18.     The Manufacturing Agreements between Carnaby II and Carnaby III and BPI and Trico, as applicable, provide that neither BPI, Trico, the Carnaby II Depositaries, or the Carnaby III Depositaries, as applicable, shall under any circumstances be considered to have any proprietary interest in the Materials (as defined in the Manufacturing Agreements) which Carnaby II and Carnaby III may deliver to BPI, Trico, the Carnaby II Depositaries, or Carnaby III Depositaries, as applicable, nor on the Products (as defined in the Manufacturing Agreements).  They also provide that BPI, Trico, the Carnaby II Depositaries, and the Carnaby III Depositaries, as applicable, shall provide necessary administrative services for shipment, including the arrangement of proper transportation of the Materials and the Products between Mexico and the United States.  The Manufacturing Agreement also provides that the Carnaby II Depositaries and the Carnaby III Depositaries shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the Materials and Products, but that under no circumstances does acting as importer and exporter result in the conveyance of ownership of the Materials or Products to the Carnaby II Depositaries or Carnaby III Depositaries.

19.     Carnaby II executed a Purchase Agreement and Sale Agreement with BPI on May 31, 2022, which provided for the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreement.  Carnaby III executed a Purchase Agreement and Sale Agreement with each of Trico on July 6, 2022 which provided for

11

the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreements.  As buyers and sellers under the Purchase Agreements and Sale Agreements, the parties thereto intended to effect absolute and irrevocable 'true sales' for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings and undertook to reflect such sales in their respective financial statements). Each Purchase Agreement and Sale Agreement further required that the parties advise anyone inquiring about the ownership of any assets purchases thereunder that all applicable assets had been sold to the applicable buyer.  Additionally, each of applicable selling parties under the Purchase Agreements and Sale Agreements represented and warranted to in their respective Purchase Agreements and Sale Agreements that they had good title to the assets being sold, in each case free and clear of any liens.

20.     Purchases and sales of inventory between Carnaby II and BPI occurred beginning on or about May 31, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).  Purchases and sales of inventory between Carnaby III and Trico occurred beginning on or about July 6, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).

**ASSERTION OF CLAIM**

21.     <u>Proof of Claim</u>.  This Proof of Claim is filed by the Administrative Agent for the benefit of the Carnaby II and III Secured Lenders and sets forth their claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors as follows:

22.     <u>Carnaby Holdings II and Carnaby Holdings III Guarantee Claims</u>.  Each of Carnaby Holdings II and Carnaby Holding III executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI)

12

**JOINT EXHIBIT NO. 61**
**Page 145 of 540**

and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.  The Administrative Agent's claims against Carnaby Holdings II and Carnaby Holdings III therefore include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

23.      First Brands Group Holdings, LLC Guarantee Claims.  FB Holdings executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI) and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.   The Administrative Agent's claims against FB Holdings therefore include: (1) the full amount of the Guaranteed Obligations under both Credit Agreements include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

24.      503(b)(9) Claims Against BPI and Trico:  The Administrative Agent also asserts claims in an amount to be determined against each of BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code for the fair value of inventory BPI and Trico received from Carnaby II and Carnaby III during the 20 days preceding the Petition Date to the extent Carnaby II and Carnaby III did not receive payment equal to such fair value from BPI and Trico.

25.      Additional Claims.  The Administrative Agent also asserts against FBG, on behalf of itself and the Carnaby II and III Secured Lenders, claims in an amount not less than **$160,717,187.33** for payment in full of damages stemming from, among other things, (i) any all

13

outstanding aggregate principal amounts of the loans under the Credit Agreements and all accrued and unpaid interest (including post-petition and default interest) thereon; (ii) any and all unpaid fees and expenses owed to the Administrative Agent and/or any of the Carnaby II and III Secured Lenders; (iii) any indemnifications, out-of-pocket fees and expenses (including, but not limited to, the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II and III Secured Lenders), premiums, reimbursements, charges, damages, and/or claims (as defined in the Bankruptcy Code) arising under the applicable Transaction Documents; (iv) all obligations owed to the Carnaby II and III Secured Lenders until all Obligations have been paid in full; (v) all damages arising from breach by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors of its respective representations, warranties, and obligations under the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or any other Transaction Documents to which it is party; and (vi) all damages arising from the fraudulent misrepresentations and omissions made by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors in connection with the Transaction Documents and the transactions contemplated thereby, including without limitation all amounts necessary to compensate the Carnaby II and III Secured Lenders for losses caused by such misrepresentations and omissions (collectively, the "Additional Claims," and together with the aggregate outstanding principal amount of the Loans, accrued and unpaid interest, fees, costs, and all other Obligations and Guaranteed Obligations due and payable under the Credit Agreements and the related Transaction Documents, the "Claims").  The Administrative Agent also asserts Additional Claims against BPI arising out of the Carnaby II Credit Agreement and related Transaction Documents in an amount not less than $59,622,980.05 and Additional

14

**JOINT EXHIBIT NO. 61**
**Page 147 of 540**

Claims arising out of the Carnaby III Credit Agreement and related Transaction Documents against Trico in an amount not less than $101,094,207.28.   The Administrative Agent also asserts Additional Claims arising out of the Carnaby Credit Agreements against each of FB Holdings, Carnaby Holdings II and Carnaby Holdings III in an amount to be determined.

26.    Breach of Contract and Fraud Claims.   In addition to any Claims set forth above, the Administrative Agent, on behalf of itself and the Carnaby II and III Secured Lenders, asserts claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors for breach of contract and common law fraud/fraudulent misrepresentation.   Each FBG Debtor was party to, and breached, one or more of the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or the other Transaction Documents, and each failed to perform its obligations thereunder, including without limitation by failing to maintain, preserve, and protect the Collateral; failing to comply with applicable covenants, representations, and warranties; and failing to satisfy the Obligations and Guaranteed Obligations when due.

27.    The FBG Debtors committed fraud by making material misrepresentations and omissions in connection with the Transaction Documents and the transactions contemplated thereby, upon which the Administrative Agent and the Carnaby II and III Secured Lenders reasonably relied in advancing funds, extending credit, and entering into the Transaction Documents, and such misrepresentations and omissions caused damage to the Carnaby II and III Secured Lenders in an amount to be determined.   The Administrative Agent expressly reserves the right to supplement the factual basis for these claims as additional information becomes available through discovery or otherwise.

28.     Federal Rule of Bankruptcy Procedure 3001(e)(3) states that "[i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount." Fed. R. Bankr. P. 3001(e)(3).  Section 101(54) of the Bankruptcy Code defines "transfer" as "the creation of a lien."  11 U.S.C. § 101(54)(A).  Pursuant to the U.S. Security Agreements, the Administrative Agent has been granted properly perfected, first-priority liens, for the benefit of the Carnaby II and III Secured Lenders, over, *inter alia,* all Contracts and Contract Rights of each of Carnaby II and Carnaby III and each of Carnaby Holdings II and Carnaby Holdings III.  Accordingly, the Administrative Agent holds any claims arising out of any such Contracts or Contract Rights that may be asserted by any of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III against any person or entity, including, without limitation, any other Debtor and non-Debtor entities (including the FBG Debtors).  Such claims include, in the case of the FBG Debtors that are counterparties to the Transaction Documents, any claims held by Carnaby II, Carnaby III, Carnaby Holdings II, or Carnaby Holdings III for breach of contract, in each case up to the full amount of the Obligations and Guaranteed Obligations.

29.     <u>Nature of the Claims Against Carnaby Holdings II and Carnaby Holdings III</u>. The Claims asserted against each of Carnaby Holdings II and Carnaby Holdings III are secured by properly perfected, valid and enforceable first-priority liens and pledges on all of its assets as contemplated by the U.S. Security Agreement, and all of the assets of each of Carnaby II and Carnaby III as contemplated by the Cross-Collateralization Agreement.  Consequently, the Claims are secured, except to the extent that the value of the Collateral securing the Claims is insufficient to satisfy the Claims in full.  To the extent of any remaining deficiency, the remainder of the Claim is asserted as a general unsecured claim.

30.    <u>Nature of the Claims Against the FBG Debtors</u>:  Except as set forth in the following paragraph, the Claims against the FBG Debtors are asserted as general unsecured claims.

31.    <u>Nature of 503(b)(9) Claims Against BPI and Trico:</u>  The Claims asserted against BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code are asserted as administrative expense priority Claims.

**<u>RESERVATION OF RIGHTS</u>**

32.    By filing this Proof of Claim, the Administrative Agent does not waive, and expressly reserves, all rights and remedies at law or in equity under any applicable law or jurisdiction that the Administrative Agent has or may have against each of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors any guarantor or obligor (including but not limited to Carnaby Holdings II, Carnaby Holdings III, and FB Holdings), and any of their respective affiliates and subsidiaries, or any other person or entity, including without limitation its rights to seek payment as an oversecured creditor of all amounts to which it may be entitled under 11 U.S.C. § 506.  Without limiting the generality of the foregoing, this Proof of Claim is not, ***nor shall it be deemed or construed to be***: (a) a waiver or release of any terms or provisions of the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (b) an election of remedies or waiver of any past, present or future breaches, defaults or events of default under the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (c) a waiver of the rights and remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether an affiliate or guarantor of any of the Debtors or an assignee or otherwise; (d) consent by the Administrative Agent to the jurisdiction of the Court with respect to any proceeding commenced against or otherwise involving the Administrative Agent; (e) a waiver of any right to (1) withdraw the reference, or otherwise

17

**JOINT EXHIBIT NO. 61**
**Page 150 of 540**

challenge the jurisdiction of the Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in this case against or otherwise involving the Administrative Agent, or (2) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Administrative Agent; (f) a waiver or release of, or any other limitation on, the Administrative Agent's right to assert that any portion of the claims asserted herein or any other claims are entitled to treatment as priority claims including under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (g) a waiver of any rights that the Administrative Agent may have pursuant to section 506(b) of the Bankruptcy Code; (h) a waiver or release of any lien, pledge or security interest against any Debtor or any third parties; (i) a waiver or release of, or any other limitation on, the Administrative Agent's rights to assert that any nonrecourse claim should be treated as a recourse claim, including but not limited to the exercise of any right that the Administrative Agent may have pursuant to section 1111(b) of the Bankruptcy Code; (j) consent to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. section 157(e) or otherwise; (k) a waiver by the Administrative Agent of the right to have final orders in non-core matters entered only by a United States District Court judge; (l) a waiver or release of the Administrative Agent's right to have any and all final orders in any and all noncore matters or proceedings entered only after de novo review by a United States District Court Judge; or (m) a waiver of any claim, at law or in equity or under any applicable law, including without limitation administrative claims, priority claims, secured claims, unsecured claims, constructive trust claims, claims based upon common law fraud, misrepresentation, subrogation, indemnity, contribution, unjust enrichment, fraudulent

**JOINT EXHIBIT NO. 61**
**Page 151 of 540**

conveyance, failure to fulfill contractual and fiduciary obligations, breach of the implied covenant of good faith and fair dealing, tortious interference, quantum meruit, or any other theory available under applicable law or equity, including, without limitation, the right to assert a constructive trust against assets or cash held by any Debtor, and any and all amounts owed, in damages or otherwise, whether known or unknown, and whether presently asserted or to be asserted, all of which singularly or collectively may have caused the Administrative Agent to incur damages.  Nothing herein shall be deemed to waive, stop, or derogate from the rights of the Administrative Agent under the Transaction Documents, including, without limitation, in connection with the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, and any order of the Court, or to prejudice any and all of the Administrative Agent's rights, claims, and defenses under the Bankruptcy Code or otherwise, including, but not limited to, the right to vote on any plan(s) in the Debtors' Chapter 11 Cases.

33.     The Administrative Agent expressly reserves the right to amend, replace, update, or supplement this Proof of Claim (including the proof of claim form) at any time and in any respect (including, without limitation, as necessary or appropriate to amend, quantify, or correct amounts, to provide additional detail regarding the Claims set forth herein, to fix the amount of any contingent or unliquidated component of the Claims, or to include any claim, at law or in equity), to add or amend documents and other information, to file additional proofs of claim or further pleadings for additional claims, to contest the validity, priority, and extent of any other purported liens and security interests other than those described herein, and to assert any and all other claims, actions, defenses, setoffs, recoupments, rights or remedies of whatever kind or nature that it currently has, or may have in the future against any of Carnaby Holdings II, Carnaby Holdings III, any FBG Debtor, and/or any other Debtors or non-Debtors, or any other person or

19

entity, including without limitation, rights against guarantors, officers, directors, and other creditors any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, at law or in equity, including, without limitation, administrative or other priority claims, setoff and recoupment rights, lien rights, interest, and the right to assert claims that are otherwise warranted in any related actions.

34.     The Administrative Agent reserves the right to claim that the portion of its fees, interest, costs, expenses, and other charges incurred or accruing after the applicable Petition Date of each of any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, constitute administrative expenses of the applicable Debtor's estate to the extent such expenses are not otherwise paid in full, and reserves the right to file a claim or application for payment of such administrative expenses.

35.     No judgment has been rendered on the Claims set forth in this Proof of Claim.

36.     With respect to any portion of the Claims that is unliquidated or as to which the amount is undetermined, the Administrative Agent does not waive their rights thereto by not claiming specific amounts at this time.

37.     The Administrative Agent expressly reserves, and does not waive, its right to payment of any amounts due from any guarantor in respect of the Credit Agreements from any other sources under any applicable law and jurisdiction.

38.     The Administrative Agent expressly reserves its rights to exercise judicial actions under any applicable law and jurisdiction against non-Debtor entities during and after these Chapter 11 Cases.

39.     Nothing contained in this Proof of Claim shall be deemed an admission by the Administrative Agent.

**JOINT EXHIBIT NO. 61**
**Page 153 of 540**

40.     To the best of the Administrative Agent's knowledge, the claims set forth herein are not subject to setoff or counterclaim, provided, however, that the Administrative Agent (on behalf of the Carnaby II and III Secured Lenders) expressly reserves and does not waive any right of set-off or recoupment it may possess.

41.     The Administrative Agent does not consent to the surcharge of the Collateral by any Debtor's estate, their representatives, or any other person or party-in-interest pursuant to 11 U.S.C. §506(c) or otherwise.

42.     The Administrative Agent expressly reserves the right to withdraw this Proof of Claim as if it had never been filed.

## NOTICES AND COMMUNICATIONS

43.     Any and all notices and communications concerning the Proof of Claim shall be sent to the following addresses both in hard copy and via e-mail:

Tarik Johnson
**GLAS TRUST COMPANY LLC**, in its capacity as Administrative Agent
3 Second Street, Suite 206, Jersey City, NJ 07311
Tel.: +1 201 201 8642
E-mails:
Tarik.Johnson@glas.agency

with a copy to (which shall not constitute notice)

Allan S. Brilliant
Stephen Wolpert
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Tel.: +1 212 698 3599
E-mails:
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

21

## SUPPORTING DOCUMENTS

44.     The Administrative Agent's claims are based on the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, the Purchase Agreements, the Promissory Notes, the Sale Agreements, and other related Transaction Documents.  Copies of these documents and additional related documents are not attached to the Proof of Claim because of their voluminous nature.  Counsel to the Administrative Agent will provide copies of such documents to any party in interest in these Chapter 11 Cases, upon a reasonable written request (and entry into an appropriate confidentiality agreement, if necessary) addressed to counsel to the Administrative Agent at the address set forth herein.

45.     Each and every description in this Addendum to the Credit Agreements and the other Transaction Documents is qualified in its entirety by reference to the applicable provisions of such documents, and all such documents are incorporated herein by reference.  In the event of any inconsistency between this Addendum and any such document, including the proof of claim form, the relevant document shall control.

**GLAS Trust Company LLC**
In its capacity as Administrative Agent under the
Carnaby II and Carnaby III Credit Agreements,
related Transaction Documents

Dated: July 6, 2026

22

**JOINT EXHIBIT NO. 61**
**Page 155 of 540**

Electronic Proof of Claim Confirmation: **3950-1-OPQEG-894169466**

Claim Electronically Submitted on (UTC) : **2026-07-07T01:36:28.733Z**

Submitted by: GLAS TRUST CO LLC, AGENT FBO CARNABY II SEC. LENDERS
jeffrey.schoenfeld@glas.agency

**KROLL**

**<u>Exhibit     </u>**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ _Not less than $160,717,187_ . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe:   See Addendum

**Basis for perfection:**   See Addendum

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property**:   $ See Addendum

**Amount of the claim that is secured:**   $ See Addendum

**Amount of the claim that is unsecured:**   $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $ _____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**Proof of Claim**

**JOINT EXHIBIT NO. 61**
**Page 159 of 540**

| | | | Amount entitled to priority |
|---|---|---|---|
| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | |
| | ☐ Yes. *Check one:* | | |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ | Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ | Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ | Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ | Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ | Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ | Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | | |

| | | |
|---|---|---|
| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No | |
| | ☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $_____ |

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Jeffrey Schoenfeld*     07/07/2026
_____
Electronic Signature                     Date

**Name of the person who is completing and signing this claim**

Name          Jeffrey Schoenfeld
_____
              First name          Middle name          Last name

Title/Company     Vice President / GLAS TRUST COMPANY LLC
_____
              Identify the corporate servicer as the company if the authorized agent is a servicer.

              3 Second Street, Suite 203

Address
_____
              Number          Street

              Jersey City          NEW JERSEY  07311
_____
              City                    State          ZIP Code          Country

Contact phone     2018392200                    Email     jeffrey.schoenfeld@glas.agency

**JOINT EXHIBIT NO. 61**
**Page 160 of 540**

**Additional Noticing Addresses (if provided):**

**Additional Address 1**
Name: GLAS Trust Company LLC as administrative agent for the Carnaby III Secured Lenders
Address1: C/O DECHERT LLP
Address2: 1095 Avenue of the Americas
Address3:
Address4:
City: New York
State: NY
Postal Code: 10036
Country:

Contact Phone: 2126983599
Contact Email: allan.brilliant@dechert.com, stephen.wolpert@dechert.com

**Additional Address 2**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
Postal Code:
Country:

Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**

☑ Yes
☐ No

--------------------------------------------------------------------------------------------------------

Attachment Filename:

First Brands - Omnibus Proof of Claim Addendum for FBG Debtors (Dechert 07-06-2026).pdf

**KROLL**

**OMNIBUS ADDENDUM TO PROOFS OF CLAIM FILED BY
GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT TO
THE CARNABY II AND III SECURED LENDERS**

GLAS Trust Company LLC, in its capacity as administrative agent (the "Administrative Agent") for the Lenders[1] under (i) that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement") among Carnaby Inventory II, LLC ("Carnaby II"), as Borrower; First Brands Group, LLC ("FBG"), as Servicer; First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II"), as Guarantors; the Lenders party thereto (the "Carnaby II Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent, and acknowledged and agreed to by Brake Parts Inc LLC ("BPI"), BPI Brake Manufacturing Juarez, S.A. de C.V. ("BPIJ"), and BPI Braking Systems Mexico, S.A. de C.V. ("BPIM")  and (ii) that certain credit agreement dated as of July 6, 2022 (the "Carnaby III Credit Agreement," and together with the Carnaby II Credit Agreement, the "Credit Agreements") among Carnaby Inventory III, LLC ("Carnaby III"), as Borrower; FBG, as Servicer; FB Holdings and Carnaby Inventory Holdings III, LLC ("Carnaby Holdings III"), as Guarantors; the Lenders party thereto (the "Carnaby III Secured Lenders," and together with the Carnaby II Secured Lenders, the "Carnaby II and III Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent and acknowledged and agreed to by Trico Products Corporation ("TPC"), Trico Technologies Corporation ("TTC" and together with TPC, "Trico"), Trico Componentes, S.A. de C.V. ("TC") and Subensambles Internacionales, S. de R.J. de C.V. ("SI"), *hereby submits* this omnibus addendum (the "Addendum") in support of its proofs of claim (together with the applicable proof of claim form, each a "Proof of Claim") submitted against (a) FBG; (b) FB

---

[1]   Capitalized terms not defined herein shall have the meanings ascribed to those terms in the Credit Agreements and the Transaction Documents, as applicable.

Holdings; (c) BPI; (d) TPC; (e) TTC (together with FBG, FB Holdings, BPI, and TPC, collectively, the "FBG Debtors"); (f) Carnaby Holdings II; (g) Carnaby Holdings III, each in its capacity as further described in the applicable Proof of Claim.  This Addendum is intended to be and should be treated as part of each applicable Proof of Claim.

1.     On September 24, 2025 (the "Initial Petition Date"), certain Debtors,[2] including Carnaby Holdings II and Carnaby Holdings III, commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  Between September 28, 2025, and September 29, 2025, approximately 99 additional Debtors, including the FBG Debtors, filed their own bankruptcy petitions (each, in the case of an FBG Debtor, its respective "Petition Date").

## BASIS FOR CLAIM

2.     The Credit Agreements.  On or about May 31, 2022, Carnaby II, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings II, as Guarantors, the Carnaby II Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby II Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time) along with BPI, BPIJ, and BPIM.

3.     On or about July 6, 2022, Carnaby III, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings III, as Guarantors, the Carnaby III Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby III Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise

---

[2]   A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**JOINT EXHIBIT NO. 61**
**Page 163 of 540**

modified from time to time) along with Trico, TC, and SI. [3]  On July 6, 2022, the parties to each of the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into a Cross-Collateralization Agreement (the "Cross-Collateralization Agreement"), pursuant to which the liens securing the Obligations[4] and Guaranteed Obligations[5] outstanding under each Credit Agreement secured the Obligations and Guaranteed Obligations outstanding under the other Credit Agreement, and vice versa.

4.      The Carnaby II Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $60 million aggregate principal amount and the Carnaby III Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $100 million aggregate principal amount, under which funds were advanced by the Carnaby II Secured Lenders and the Carnaby III Secured Lenders, respectively.

5.      Obligations. Each Borrower's obligations under the applicable Credit Agreement and the Transaction Documents[6] thereunder are secured by first-priority liens granted by Carnaby

---

[3]   On May 30, 2025, the parties to the Carnaby II Credit Agreement and to the Carnaby III Credit Agreement entered into Extension Agreements, extending the Maturity Date originally set forth in the Carnaby II Credit Agreement and the Carnaby III Credit Agreement to December 1, 2025.

[4]   Each Credit Agreement defines "Obligations" in identical terms as "all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding)." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

[5]   Each Credit Agreement defines "Guaranteed Obligations" in identical terms as "the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations[.]" Carnaby II Credit Agreement, section 11.1; Carnaby III Credit Agreement, section 11.1.

[6]   Each Credit Agreement defines the "Transaction Documents" in identical terms as "collectively, [the applicable Credit Agreement], each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other

3

**JOINT EXHIBIT NO. 61**
**Page 164 of 540**

II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III, on the applicable Collateral (as defined below) pursuant to the U.S. Security Agreements (as defined below) and the applicable Mexican Security Agreement (as defined below), as further detailed below.

6.      The Administrative Agent holds, on behalf of the Carnaby II Secured Lenders, loans totaling $58,964,276.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $658,704.05 under the Carnaby II Credit Agreement and, on behalf of the Carnaby III Secured Lenders, loans totaling $100,000,000.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $1,094,207.28 under the Carnaby III Credit Agreement (together, the "Loans"), each due and payable by the Borrowers and Guarantors under the Credit Agreements.  In addition to the obligation to repay the principal amount of the Loans, each of the Borrowers and the Guarantors (including FB Holdings) assumed the obligation to pay accrued and unpaid interest and all other Obligations and Guaranteed Obligations outstanding under the respective Credit Agreement and other Transaction Documents.

7.      Promissory Notes.  Each Borrower's obligations to repay the Obligations under the respective Credit Agreement were also evidenced through Promissory Notes executed by such Borrower with respect to each advance, and guaranteed, in each case, jointly and severally, by the applicable Guarantors under such Credit Agreement.

8.      U.S. Security Agreements.  On or about May 31, 2022, Carnaby II, Carnaby Holdings II, and the Administrative Agent for the benefit of the Carnaby II Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby II U.S. Security

---

instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

4

**JOINT EXHIBIT NO. 61**
**Page 165 of 540**

Agreement"). On or about July 6, 2022, Carnaby III, Carnaby Holdings III, and the Administrative Agent for the benefit of the Carnaby III Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby III U.S. Security Agreement," and together with the Carnaby II U.S. Security Agreement, the "U.S. Security Agreements").

9.      As security for the prompt and complete payment or performance in full of the applicable "Obligations" (as defined in the U.S. Security Agreements, as amended by the Cross-Collateralization Agreement[7]), each Borrower and the Carnaby Holdings II or Carnaby Holdings III, as applicable, entity pledged, collaterally assigned and granted to the Administrative Agent, on behalf of and for the benefit of the applicable Secured Parties, a continuing security interest in all of their right, title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, such party, and regardless of where located: (i) all Accounts; (ii) all Cash; (iii) all Chattel Paper (including without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper); (iv) all Commercial Tort Claims; (v) all Contracts, together with all Contract Rights arising thereunder; (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Financial Assets; (x)

---

[7]   As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby II U.S. Security Agreement means "(i) 'Obligations' (as defined in the [Carnaby II] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby II] Credit Agreement) and (iii) 'Obligations' (as defined in the Pledge and Security Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(ii).

As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby III U.S. Security Agreement means "(i) "Obligations" (as defined in the [Carnaby III] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby III] Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory II, LLC, as borrower, Carnaby Inventory Holdings II, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(iv).

**JOINT EXHIBIT NO. 61**
**Page 166 of 540**

all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Governmental Authorizations; (xiv) all Instruments; (xv) all Intellectual Property Collateral; (xvi) all Inventory; (xvii) all Investment Property, Pledged Stock and other Pledged Collateral; (xviii) all letters of credit and Letter-of-Credit Rights; (xix) all Licenses; (xx) all Proceeds of insurance; (xxi) all Receivables; (xxii) all Real Estate Assets; (xxiii) all Securities Accounts, Money, Securities, and other investments therein, and all Security Entitlements in respect thereof; (xxiv) all Software and all recorded data of any kind or nature, regardless of the medium of recording; (xxv) all Supporting Obligations relating to any of the foregoing; and (xxvi) all accessions to, substitutions and replacements for, and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing (collectively, the "U.S. Collateral"), thereby achieving a complete cross-collateralization of the Carnaby II Credit Agreement and Carnaby III Credit Agreement in respect of all obligations owing under such facilities and all collateral pledged under them.

10.     Mexican Security Agreements. As additional security for the payment, performance and satisfaction in full of any and all of the Obligations, (i) on May 31, 2022, Carnaby II, as Pledgor, the Administrative Agent for the benefit of the Carnaby II Secured Lenders, as Pledgee, BPIJ and BPIM, as depositaries (jointly, the "Carnaby II Depositaries"), and BPI entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*), under Mexican law (the "Carnaby II Mexican Security Agreement"); and (ii) on July 6, 2022, Carnaby III, as Pledgor, the Administrative Agent for the benefit of the Carnaby III Secured Lenders, as Pledgee, TC and SI, as depositaries (jointly, the "Carnaby III Depositaries"), and TPC and TTC

6

entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*), under Mexican law (the "Carnaby III Mexican Security Agreement," and together with the Carnaby II Mexican Security Agreement, the "Mexican Security Agreements").

11.     Under the Carnaby II Mexican Security Agreement, Carnaby II granted to the Administrative Agent, for the benefit of the Carnaby II Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Under the Carnaby III Mexican Security Agreement, Carnaby III granted to the Administrative Agent, for the benefit of the Carnaby III Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Each Mexican Security Agreement defines Pledged Assets as any and all property and inventory located in Mexico, currently owned by the applicable Pledgor, or acquired by the applicable Pledgor or arising in the future, including without limitation, all Raw Materials,[8] together with (i) all documents, documents of title, warehouse receipts (or similar documents), bills of lading or orders for delivery of all, or any portion of the foregoing; and (ii) all products and/or sale proceeds of any and all of the foregoing, including, without limitation, insurance proceeds (collectively, the "Mexican Collateral" and together with the U.S. Collateral, the "Collateral").  Each Mexican Security Agreement also

---

[8]     "Raw Materials" are defined under the Mexican Security Agreements as "all the assets that comprise the inventory of the Pledgor, whether now owned or hereafter acquired, including without limitation, all inventory of the Pledgor (i) held for sale or lease, (ii) furnished or to be furnished under any service agreement, (iii) held for display or demonstration, or (iv) on lease or consignment, in favor of third parties; including accessories, packaging and shipping materials, spare parts, repair parts, returned and repossessed inventory, all raw materials, work-in-process, finished inventory and supplies used or consumed in the Pledgor business together with all documents, documents of title, warehouse receipts, pledge bonds, bills of lading, deposit certificates or orders for the delivery of all, or any portion, of the foregoing, including without limitation the assets listed in Exhibit C [attached thereto]."

7

provides that the applicable Pledgor is the sole, legal, and beneficial owner of the Mexican Collateral, free and clear of any liens or other encumbrances, and that the security interest granted thereunder constitutes a legal, valid, binding, and enforceable security over the Mexican Collateral.

12.     Perfection. The security interests granted under the U.S. Security Agreements were properly perfected by filing UCC financing statements with the Delaware Secretary of State.[9] As a result, the Administrative Agent holds, on behalf of and for the benefit of the Carnaby II and III Secured Lenders, properly perfected security interests in all assets of each of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III.

13.     In turn, each Mexican Security Agreement was executed in compliance with Mexican law, before a Mexican Notary Public and is duly registered before the Mexican Sole Registry of Liens over Movable Assets (*Registro Unico de Garantias Mobiliarias*).  As a result, the Carnaby II Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the benefit of the Carnaby II Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby II,[10] and the Carnaby III Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the

---

*See* (i) UCC Financing Statement File No. 2022 4634697, filed at 12:39 PM on June 2, 2022, against Carnaby Inventory II, LLC as debtor; (ii) UCC Financing Statement File No. 2022 4634796, filed at 12:42 PM on June 2, 2022, against Carnaby Inventory Holdings II, LLC as debtor; (iii) UCC Financing Statement File No. 2022 5629043, filed at 3:58 PM on July 6, 2022, against Carnaby Inventory III, LLC as debtor; and (iv) UCC Financing Statement File No. 2022 5628912, filed at 3:55 PM on July 6, 2022, against Carnaby Inventory Holdings III, LLC as debtor.

[10] The Carnaby II Mexican Security Agreement was registered with the RUG on June 7, 2022 (at 15:08:37 ZULU GMT/UTC), as Asiento No. 31302386, Garantía Mobiliaria No. 16927095, Folio Electrónico R20220601MG36, with a maximum secured amount of USD $60,000,000, covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby II.  On July 6, 2022, the Carnaby II Mexican Security Agreement was amended by the Amendment Agreement (Convenio Modificatorio) to extend the secured obligations to cover the Carnaby III Credit Agreement obligations as well, consistent with the Cross-Collateralization Agreement.  This amendment was registered with the RUG on July 8, 2022 (at 19:21:38 ZULU GMT/UTC), as Asiento No. 32022878, Garantía Mobiliaria No. 16927095 (same folio as the Carnaby II Original Pledge), amending the maximum secured amount to USD $160,000,000.

8

benefit of the Carnaby III Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby III.[11]

14.   <u>Cross-Collateralization Agreement</u>.   As noted in paragraph 2 above, on July 6, 2022, the parties to the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into the Cross-Collateralization Agreement, pursuant to which the Collateral securing each Credit Agreement also secures the obligations under the other Credit Agreement, and vice versa.   This cross-collateralization was also reflected in and effected through the U.S. Security Agreements, and in the Mexican Security Agreements as set forth above.

15.   <u>Other Obligations Under the Transaction Documents</u>.   FBG executed each of the Credit Agreements as "Servicer" and made various representations and warranties and undertakings in favor of the Carnaby II and III Secured Lenders thereunder including, without limitation, (i) to cause each of BPI and Trico to comply with the terms of the Transaction Documents; (ii) to act as Servicer under the Credit Agreements and to perform (or cause to be performed) certain functions for Carnaby II and Carnaby III.   Accordingly, FBG is responsible for ensuring the Carnaby II, Carnaby III, BPI, and Trico, and the Guarantors under the Credit Agreements each perform their obligations under the Transaction Documents (including, without limitation, obligations to maintain and preserve adequate records of the purchases and sales of inventory, to deliver regular reporting, and to maintain corporate separateness of the entities).   (*See* Credit Agreements Sec. 6.2(a)–(f), Sec. 5.1(s), (t); *see also* Sec. 5.1(a), (f), (g), (m), (n), (o), (p), (v), (w), (bb), and (dd); Sec. 5.2(j).   In their respective Credit Agreements, each of BPI and Trico

---

[11]   The Carnaby III Mexican Security Agreement was formalized before Corredor Público No. 7 (Licenciado José Carlos Reyes Cadena) in the State of Nuevo León, Mexico, and was registered with the RUG on July 8, 2022 (at 18:50:02 ZULU GMT/UTC), as Asiento No. 32020337, Garantía Mobiliaria No. 17265862, Folio Electrónico R20220708MSF5, with a maximum secured amount of USD $160,000,000 (covering both facilities per the Cross-Collateralization Agreement), covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby III.

covenanted for the benefit of the Carnaby II and III Secured Lenders to timely perform all of their respective obligations under the Transaction Documents to which they are party. *See* Credit Agreement, Sec. 5.1(aa).

16.    As contemplated by the Carnaby II Credit Agreement, Carnaby II maintains a manufacturing business relationship with BPI, as evidenced by a Manufacturing Agreement, pursuant to which Carnaby II provides to BPI and the Carnaby II Depositaries the Raw Material for manufacture in accordance with BPI's Maquiladora Agreements with the Carnaby II Depositaries. The Manufacturing Agreement between Carnaby II and BPI was executed on May 31, 2022, and created valid and binding obligations of BPI, enforceable against it in accordance with its terms. Under that Manufacturing Agreement, Carnaby II hired and requested certain manufacturing services from BPI to manufacture and produce the products requested by Carnaby II. BPI was authorized to perform the manufacturing processes required by Carnaby II through its "maquiladora program" with the Carnaby II Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreement).

17.    As contemplated by the Carnaby III Credit Agreement, Carnaby III maintains a manufacturing business relationship with Trico, as evidenced by the Manufacturing Agreements, pursuant to which Carnaby III provides to Trico and the Carnaby III Depositaries the Raw Material for manufacture in accordance with Trico's Maquiladora Agreements with the Carnaby III Depositaries. The Manufacturing Agreements between Carnaby III and Trico were executed on July 6, 2022, and created valid and binding obligations of Trico, enforceable against them in accordance with its terms. Under the Manufacturing Agreements, Carnaby III hired and requested certain manufacturing services from Trico to manufacture and produce the products requested by

10

Carnaby III.  Trico was authorized to perform the manufacturing processes required by Carnaby III through its "maquiladora program" with the Carnaby III Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreements).

18.     The Manufacturing Agreements between Carnaby II and Carnaby III and BPI and Trico, as applicable, provide that neither BPI, Trico, the Carnaby II Depositaries, or the Carnaby III Depositaries, as applicable, shall under any circumstances be considered to have any proprietary interest in the Materials (as defined in the Manufacturing Agreements) which Carnaby II and Carnaby III may deliver to BPI, Trico, the Carnaby II Depositaries, or Carnaby III Depositaries, as applicable, nor on the Products (as defined in the Manufacturing Agreements).  They also provide that BPI, Trico, the Carnaby II Depositaries, and the Carnaby III Depositaries, as applicable, shall provide necessary administrative services for shipment, including the arrangement of proper transportation of the Materials and the Products between Mexico and the United States.  The Manufacturing Agreement also provides that the Carnaby II Depositaries and the Carnaby III Depositaries shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the Materials and Products, but that under no circumstances does acting as importer and exporter result in the conveyance of ownership of the Materials or Products to the Carnaby II Depositaries or Carnaby III Depositaries.

19.     Carnaby II executed a Purchase Agreement and Sale Agreement with BPI on May 31, 2022, which provided for the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreement.  Carnaby III executed a Purchase Agreement and Sale Agreement with each of Trico on July 6, 2022 which provided for

11

the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreements.  As buyers and sellers under the Purchase Agreements and Sale Agreements, the parties thereto intended to effect absolute and irrevocable 'true sales' for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings and undertook to reflect such sales in their respective financial statements). Each Purchase Agreement and Sale Agreement further required that the parties advise anyone inquiring about the ownership of any assets purchases thereunder that all applicable assets had been sold to the applicable buyer.  Additionally, each of applicable selling parties under the Purchase Agreements and Sale Agreements represented and warranted to in their respective Purchase Agreements and Sale Agreements that they had good title to the assets being sold, in each case free and clear of any liens.

20.     Purchases and sales of inventory between Carnaby II and BPI occurred beginning on or about May 31, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).  Purchases and sales of inventory between Carnaby III and Trico occurred beginning on or about July 6, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).

## ASSERTION OF CLAIM

21.     Proof of Claim.  This Proof of Claim is filed by the Administrative Agent for the benefit of the Carnaby II and III Secured Lenders and sets forth their claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors as follows:

22.     Carnaby Holdings II and Carnaby Holdings III Guarantee Claims.  Each of Carnaby Holdings II and Carnaby Holding III executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI)

12

and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.  The Administrative Agent's claims against Carnaby Holdings II and Carnaby Holdings III therefore include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

23.     <u>First Brands Group Holdings, LLC Guarantee Claims</u>.  FB Holdings executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI) and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.   The Administrative Agent's claims against FB Holdings therefore include: (1) the full amount of the Guaranteed Obligations under both Credit Agreements include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

24.     <u>503(b)(9) Claims Against BPI and Trico</u>:  The Administrative Agent also asserts claims in an amount to be determined against each of BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code for the fair value of inventory BPI and Trico received from Carnaby II and Carnaby III during the 20 days preceding the Petition Date to the extent Carnaby II and Carnaby III did not receive payment equal to such fair value from BPI and Trico.

25.     <u>Additional Claims</u>.  The Administrative Agent also asserts against FBG, on behalf of itself and the Carnaby II and III Secured Lenders, claims in an amount not less than **$160,717,187.33** for payment in full of damages stemming from, among other things, (i) any all

13

outstanding aggregate principal amounts of the loans under the Credit Agreements and all accrued and unpaid interest (including post-petition and default interest) thereon; (ii) any and all unpaid fees and expenses owed to the Administrative Agent and/or any of the Carnaby II and III Secured Lenders; (iii) any indemnifications, out-of-pocket fees and expenses (including, but not limited to, the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II and III Secured Lenders), premiums, reimbursements, charges, damages, and/or claims (as defined in the Bankruptcy Code) arising under the applicable Transaction Documents; (iv) all obligations owed to the Carnaby II and III Secured Lenders until all Obligations have been paid in full; (v) all damages arising from breach by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors of its respective representations, warranties, and obligations under the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or any other Transaction Documents to which it is party; and (vi) all damages arising from the fraudulent misrepresentations and omissions made by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors in connection with the Transaction Documents and the transactions contemplated thereby, including without limitation all amounts necessary to compensate the Carnaby II and III Secured Lenders for losses caused by such misrepresentations and omissions (collectively, the "Additional Claims," and together with the aggregate outstanding principal amount of the Loans, accrued and unpaid interest, fees, costs, and all other Obligations and Guaranteed Obligations due and payable under the Credit Agreements and the related Transaction Documents, the "Claims").  The Administrative Agent also asserts Additional Claims against BPI arising out of the Carnaby II Credit Agreement and related Transaction Documents in an amount not less than $59,622,980.05 and Additional

Claims arising out of the Carnaby III Credit Agreement and related Transaction Documents against Trico in an amount not less than $101,094,207.28. The Administrative Agent also asserts Additional Claims arising out of the Carnaby Credit Agreements against each of FB Holdings, Carnaby Holdings II and Carnaby Holdings III in an amount to be determined.

26. <u>Breach of Contract and Fraud Claims</u>. In addition to any Claims set forth above, the Administrative Agent, on behalf of itself and the Carnaby II and III Secured Lenders, asserts claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors for breach of contract and common law fraud/fraudulent misrepresentation. Each FBG Debtor was party to, and breached, one or more of the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or the other Transaction Documents, and each failed to perform its obligations thereunder, including without limitation by failing to maintain, preserve, and protect the Collateral; failing to comply with applicable covenants, representations, and warranties; and failing to satisfy the Obligations and Guaranteed Obligations when due.

27. The FBG Debtors committed fraud by making material misrepresentations and omissions in connection with the Transaction Documents and the transactions contemplated thereby, upon which the Administrative Agent and the Carnaby II and III Secured Lenders reasonably relied in advancing funds, extending credit, and entering into the Transaction Documents, and such misrepresentations and omissions caused damage to the Carnaby II and III Secured Lenders in an amount to be determined. The Administrative Agent expressly reserves the right to supplement the factual basis for these claims as additional information becomes available through discovery or otherwise.

15

28.     Federal Rule of Bankruptcy Procedure 3001(e)(3) states that "[i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount." Fed. R. Bankr. P. 3001(e)(3).  Section 101(54) of the Bankruptcy Code defines "transfer" as "the creation of a lien."  11 U.S.C. § 101(54)(A).  Pursuant to the U.S. Security Agreements, the Administrative Agent has been granted properly perfected, first-priority liens, for the benefit of the Carnaby II and III Secured Lenders, over, *inter alia,* all Contracts and Contract Rights of each of Carnaby II and Carnaby III and each of Carnaby Holdings II and Carnaby Holdings III.  Accordingly, the Administrative Agent holds any claims arising out of any such Contracts or Contract Rights that may be asserted by any of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III against any person or entity, including, without limitation, any other Debtor and non-Debtor entities (including the FBG Debtors).  Such claims include, in the case of the FBG Debtors that are counterparties to the Transaction Documents, any claims held by Carnaby II, Carnaby III, Carnaby Holdings II, or Carnaby Holdings III for breach of contract, in each case up to the full amount of the Obligations and Guaranteed Obligations.

29.     <u>Nature of the Claims Against Carnaby Holdings II and Carnaby Holdings III</u>. The Claims asserted against each of Carnaby Holdings II and Carnaby Holdings III are secured by properly perfected, valid and enforceable first-priority liens and pledges on all of its assets as contemplated by the U.S. Security Agreement, and all of the assets of each of Carnaby II and Carnaby III as contemplated by the Cross-Collateralization Agreement.  Consequently, the Claims are secured, except to the extent that the value of the Collateral securing the Claims is insufficient to satisfy the Claims in full.  To the extent of any remaining deficiency, the remainder of the Claim is asserted as a general unsecured claim.

16

30. <u>Nature of the Claims Against the FBG Debtors</u>:  Except as set forth in the following paragraph, the Claims against the FBG Debtors are asserted as general unsecured claims.

31. <u>Nature of 503(b)(9) Claims Against BPI and Trico:</u>  The Claims asserted against BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code are asserted as administrative expense priority Claims.

<b><u>RESERVATION OF RIGHTS</u></b>

32. By filing this Proof of Claim, the Administrative Agent does not waive, and expressly reserves, all rights and remedies at law or in equity under any applicable law or jurisdiction that the Administrative Agent has or may have against each of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors any guarantor or obligor (including but not limited to Carnaby Holdings II, Carnaby Holdings III, and FB Holdings), and any of their respective affiliates and subsidiaries, or any other person or entity, including without limitation its rights to seek payment as an oversecured creditor of all amounts to which it may be entitled under 11 U.S.C. § 506.  Without limiting the generality of the foregoing, this Proof of Claim is not, ***nor shall it be deemed or construed to be***: (a) a waiver or release of any terms or provisions of the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (b) an election of remedies or waiver of any past, present or future breaches, defaults or events of default under the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (c) a waiver of the rights and remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether an affiliate or guarantor of any of the Debtors or an assignee or otherwise; (d) consent by the Administrative Agent to the jurisdiction of the Court with respect to any proceeding commenced against or otherwise involving the Administrative Agent; (e) a waiver of any right to (1) withdraw the reference, or otherwise

17

<b>JOINT EXHIBIT NO. 61</b><br><b>Page 178 of 540</b>

challenge the jurisdiction of the Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in this case against or otherwise involving the Administrative Agent, or (2) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Administrative Agent; (f) a waiver or release of, or any other limitation on, the Administrative Agent's right to assert that any portion of the claims asserted herein or any other claims are entitled to treatment as priority claims including under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (g) a waiver of any rights that the Administrative Agent may have pursuant to section 506(b) of the Bankruptcy Code; (h) a waiver or release of any lien, pledge or security interest against any Debtor or any third parties; (i) a waiver or release of, or any other limitation on, the Administrative Agent's rights to assert that any nonrecourse claim should be treated as a recourse claim, including but not limited to the exercise of any right that the Administrative Agent may have pursuant to section 1111(b) of the Bankruptcy Code; (j) consent to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. section 157(e) or otherwise; (k) a waiver by the Administrative Agent of the right to have final orders in non-core matters entered only by a United States District Court judge; (l) a waiver or release of the Administrative Agent's right to have any and all final orders in any and all noncore matters or proceedings entered only after de novo review by a United States District Court Judge; or (m) a waiver of any claim, at law or in equity or under any applicable law, including without limitation administrative claims, priority claims, secured claims, unsecured claims, constructive trust claims, claims based upon common law fraud, misrepresentation, subrogation, indemnity, contribution, unjust enrichment, fraudulent

conveyance, failure to fulfill contractual and fiduciary obligations, breach of the implied covenant of good faith and fair dealing, tortious interference, quantum meruit, or any other theory available under applicable law or equity, including, without limitation, the right to assert a constructive trust against assets or cash held by any Debtor, and any and all amounts owed, in damages or otherwise, whether known or unknown, and whether presently asserted or to be asserted, all of which singularly or collectively may have caused the Administrative Agent to incur damages.  Nothing herein shall be deemed to waive, stop, or derogate from the rights of the Administrative Agent under the Transaction Documents, including, without limitation, in connection with the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, and any order of the Court, or to prejudice any and all of the Administrative Agent's rights, claims, and defenses under the Bankruptcy Code or otherwise, including, but not limited to, the right to vote on any plan(s) in the Debtors' Chapter 11 Cases.

33.     The Administrative Agent expressly reserves the right to amend, replace, update, or supplement this Proof of Claim (including the proof of claim form) at any time and in any respect (including, without limitation, as necessary or appropriate to amend, quantify, or correct amounts, to provide additional detail regarding the Claims set forth herein, to fix the amount of any contingent or unliquidated component of the Claims, or to include any claim, at law or in equity), to add or amend documents and other information, to file additional proofs of claim or further pleadings for additional claims, to contest the validity, priority, and extent of any other purported liens and security interests other than those described herein, and to assert any and all other claims, actions, defenses, setoffs, recoupments, rights or remedies of whatever kind or nature that it currently has, or may have in the future against any of Carnaby Holdings II, Carnaby Holdings III, any FBG Debtor, and/or any other Debtors or non-Debtors, or any other person or

19

entity, including without limitation, rights against guarantors, officers, directors, and other creditors any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, at law or in equity, including, without limitation, administrative or other priority claims, setoff and recoupment rights, lien rights, interest, and the right to assert claims that are otherwise warranted in any related actions.

34.     The Administrative Agent reserves the right to claim that the portion of its fees, interest, costs, expenses, and other charges incurred or accruing after the applicable Petition Date of each of any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, constitute administrative expenses of the applicable Debtor's estate to the extent such expenses are not otherwise paid in full, and reserves the right to file a claim or application for payment of such administrative expenses.

35.     No judgment has been rendered on the Claims set forth in this Proof of Claim.

36.     With respect to any portion of the Claims that is unliquidated or as to which the amount is undetermined, the Administrative Agent does not waive their rights thereto by not claiming specific amounts at this time.

37.     The Administrative Agent expressly reserves, and does not waive, its right to payment of any amounts due from any guarantor in respect of the Credit Agreements from any other sources under any applicable law and jurisdiction.

38.     The Administrative Agent expressly reserves its rights to exercise judicial actions under any applicable law and jurisdiction against non-Debtor entities during and after these Chapter 11 Cases.

39.     Nothing contained in this Proof of Claim shall be deemed an admission by the Administrative Agent.

**JOINT EXHIBIT NO. 61**
**Page 181 of 540**

40.     To the best of the Administrative Agent's knowledge, the claims set forth herein are not subject to setoff or counterclaim, provided, however, that the Administrative Agent (on behalf of the Carnaby II and III Secured Lenders) expressly reserves and does not waive any right of set-off or recoupment it may possess.

41.     The Administrative Agent does not consent to the surcharge of the Collateral by any Debtor's estate, their representatives, or any other person or party-in-interest pursuant to 11 U.S.C. §506(c) or otherwise.

42.     The Administrative Agent expressly reserves the right to withdraw this Proof of Claim as if it had never been filed.

### NOTICES AND COMMUNICATIONS

43.     Any and all notices and communications concerning the Proof of Claim shall be sent to the following addresses both in hard copy and via e-mail:


Tarik Johnson
**GLAS TRUST COMPANY LLC**, in its capacity as Administrative Agent
3 Second Street, Suite 206, Jersey City, NJ 07311
Tel.: +1 201 201 8642
E-mails:
Tarik.Johnson@glas.agency

with a copy to (which shall not constitute notice)

Allan S. Brilliant
Stephen Wolpert
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Tel.: +1 212 698 3599
E-mails:
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

21

**JOINT EXHIBIT NO. 61**
**Page 182 of 540**

## SUPPORTING DOCUMENTS

44.     The Administrative Agent's claims are based on the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, the Purchase Agreements, the Promissory Notes, the Sale Agreements, and other related Transaction Documents.  Copies of these documents and additional related documents are not attached to the Proof of Claim because of their voluminous nature.  Counsel to the Administrative Agent will provide copies of such documents to any party in interest in these Chapter 11 Cases, upon a reasonable written request (and entry into an appropriate confidentiality agreement, if necessary) addressed to counsel to the Administrative Agent at the address set forth herein.

45.     Each and every description in this Addendum to the Credit Agreements and the other Transaction Documents is qualified in its entirety by reference to the applicable provisions of such documents, and all such documents are incorporated herein by reference.  In the event of any inconsistency between this Addendum and any such document, including the proof of claim form, the relevant document shall control.

**GLAS Trust Company LLC**
In its capacity as Administrative Agent under the
Carnaby II and Carnaby III Credit Agreements,
related Transaction Documents

Dated: July 6, 2026

22

Electronic Proof of Claim Confirmation:  **3950-1-TPFJW-378379980**

Claim Electronically Submitted on (UTC) :  **2026-07-07T01:48:12.02Z**

Submitted by:  GLAS TRUST CO LLC, AGENT FBO CARNABY III SEC. LENDERS
jeffrey.schoenfeld@glas.agency

**KROLL**

**Exhibit   **

**Part 2:**  **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

---

7.   **How much is the claim?**   $ <u>Not less than $160,717,187</u> .   **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

<u>See Addendum</u>

---

9. **Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe:   <u>See Addendum</u>

**Basis for perfection:**   <u>See Addendum</u>

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $ <u>See Addendum</u>

**Amount of the claim that is secured:**   $ <u>See Addendum</u>

**Amount of the claim that is unsecured:**  $ _____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $ _____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

---

| | |
|---|---|
| 10. **Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $ _____ |

---

| | |
|---|---|
| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

---

**Proof of Claim**  page 2

**JOINT EXHIBIT NO. 61**
**Page 187 of 540**

| | | | Amount entitled to priority |
|---|---|---|---|
| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | |
| | ☐ Yes. *Check one:* | | |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ | Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ | Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ | Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ | Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ | Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ | Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | | |
| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No | | |
| | ☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | | $_____ |

## Part 3:    Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Jeffrey Schoenfeld*   07/07/2026

_____        _____
Electronic Signature                    Date

**Name of the person who is completing and signing this claim**

Name    Jeffrey Schoenfeld
_____
First name              Middle name              Last name

Title/Company    Vice President / GLAS TRUST COMPANY LLC
_____
Identify the corporate servicer as the company if the authorized agent is a servicer.

3 Second Street, Suite 203

Address    _____
Number          Street

Jersey City              NEW JERSEY 07311
_____
City                    State        ZIP Code    Country

Contact phone    2018392200          Email    jeffrey.schoenfeld@glas.agency

**JOINT EXHIBIT NO. 61**
**Page 188 of 540**

**Additional Noticing Addresses (if provided):**

**Additional Address 1**

Name: GLAS Trust Company LLC as administrative agent for the Carnaby II Secured Lenders

Address1: C/O DECHERT LLP

Address2: 1095 Avenue of the Americas

Address3:

Address4:

City: New York

State: NY

Postal Code: 10036

Country:

Contact Phone: 2126983599

Contact Email: allan.brilliant@dechert.com, stephen.wolpert@dechert.com

**Additional Address 2**

Name:

Address1:

Address2:

Address3:

Address4:

City:

State:

Postal Code:

Country:

Contact Phone:

Contact Email:

**Additional Supporting Documentation Provided**

☑ Yes

☐ No

-------------------------------------------------------------------------------------------------

Attachment Filename:

First Brands - Omnibus Proof of Claim Addendum for FBG Debtors (Dechert 07-06-2026).pdf

**KROLL**

**OMNIBUS ADDENDUM TO PROOFS OF CLAIM FILED BY
GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT TO
THE CARNABY II AND III SECURED LENDERS**

GLAS Trust Company LLC, in its capacity as administrative agent (the "Administrative Agent") for the Lenders[1] under (i) that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement") among Carnaby Inventory II, LLC ("Carnaby II"), as Borrower; First Brands Group, LLC ("FBG"), as Servicer; First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II"), as Guarantors; the Lenders party thereto (the "Carnaby II Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent, and acknowledged and agreed to by Brake Parts Inc LLC ("BPI"), BPI Brake Manufacturing Juarez, S.A. de C.V. ("BPIJ"), and BPI Braking Systems Mexico, S.A. de C.V. ("BPIM")  and (ii) that certain credit agreement dated as of July 6, 2022 (the "Carnaby III Credit Agreement," and together with the Carnaby II Credit Agreement, the "Credit Agreements") among Carnaby Inventory III, LLC ("Carnaby III"), as Borrower; FBG, as Servicer; FB Holdings and Carnaby Inventory Holdings III, LLC ("Carnaby Holdings III"), as Guarantors; the Lenders party thereto (the "Carnaby III Secured Lenders," and together with the Carnaby II Secured Lenders, the "Carnaby II and III Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent and acknowledged and agreed to by Trico Products Corporation ("TPC"), Trico Technologies Corporation ("TTC" and together with TPC, "Trico"), Trico Componentes, S.A. de C.V. ("TC") and Subensambles Internacionales, S. de R.J. de C.V. ("SI"), *hereby submits* this omnibus addendum (the "Addendum") in support of its proofs of claim (together with the applicable proof of claim form, each a "Proof of Claim") submitted against (a) FBG; (b) FB

---

[1]   Capitalized terms not defined herein shall have the meanings ascribed to those terms in the Credit Agreements and the Transaction Documents, as applicable.

Holdings; (c) BPI; (d) TPC; (e) TTC (together with FBG, FB Holdings, BPI, and TPC, collectively, the "FBG Debtors"); (f) Carnaby Holdings II; (g) Carnaby Holdings III, each in its capacity as further described in the applicable Proof of Claim.  This Addendum is intended to be and should be treated as part of each applicable Proof of Claim.

1.     On September 24, 2025 (the "Initial Petition Date"), certain Debtors,[2] including Carnaby Holdings II and Carnaby Holdings III, commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  Between September 28, 2025, and September 29, 2025, approximately 99 additional Debtors, including the FBG Debtors, filed their own bankruptcy petitions (each, in the case of an FBG Debtor, its respective "Petition Date").

## BASIS FOR CLAIM

2.     The Credit Agreements.  On or about May 31, 2022, Carnaby II, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings II, as Guarantors, the Carnaby II Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby II Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time) along with BPI, BPIJ, and BPIM.

3.     On or about July 6, 2022, Carnaby III, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings III, as Guarantors, the Carnaby III Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby III Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise

---

[2]     A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**JOINT EXHIBIT NO. 61**
**Page 191 of 540**

modified from time to time) along with Trico, TC, and SI. [3] On July 6, 2022, the parties to each of the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into a Cross-Collateralization Agreement (the "Cross-Collateralization Agreement"), pursuant to which the liens securing the Obligations[4] and Guaranteed Obligations[5] outstanding under each Credit Agreement secured the Obligations and Guaranteed Obligations outstanding under the other Credit Agreement, and vice versa.

4. The Carnaby II Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $60 million aggregate principal amount and the Carnaby III Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $100 million aggregate principal amount, under which funds were advanced by the Carnaby II Secured Lenders and the Carnaby III Secured Lenders, respectively.

5. Obligations. Each Borrower's obligations under the applicable Credit Agreement and the Transaction Documents[6] thereunder are secured by first-priority liens granted by Carnaby

---

[3] On May 30, 2025, the parties to the Carnaby II Credit Agreement and to the Carnaby III Credit Agreement entered into Extension Agreements, extending the Maturity Date originally set forth in the Carnaby II Credit Agreement and the Carnaby III Credit Agreement to December 1, 2025.

[4] Each Credit Agreement defines "Obligations" in identical terms as "all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding)." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

[5] Each Credit Agreement defines "Guaranteed Obligations" in identical terms as "the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations[.]" Carnaby II Credit Agreement, section 11.1; Carnaby III Credit Agreement, section 11.1.

[6] Each Credit Agreement defines the "Transaction Documents" in identical terms as "collectively, [the applicable Credit Agreement], each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other

3

**JOINT EXHIBIT NO. 61**
**Page 192 of 540**

II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III, on the applicable Collateral (as defined below) pursuant to the U.S. Security Agreements (as defined below) and the applicable Mexican Security Agreement (as defined below), as further detailed below.

6.      The Administrative Agent holds, on behalf of the Carnaby II Secured Lenders, loans totaling $58,964,276.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $658,704.05 under the Carnaby II Credit Agreement and, on behalf of the Carnaby III Secured Lenders, loans totaling $100,000,000.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $1,094,207.28 under the Carnaby III Credit Agreement (together, the "Loans"), each due and payable by the Borrowers and Guarantors under the Credit Agreements.  In addition to the obligation to repay the principal amount of the Loans, each of the Borrowers and the Guarantors (including FB Holdings) assumed the obligation to pay accrued and unpaid interest and all other Obligations and Guaranteed Obligations outstanding under the respective Credit Agreement and other Transaction Documents.

7.      Promissory Notes.  Each Borrower's obligations to repay the Obligations under the respective Credit Agreement were also evidenced through Promissory Notes executed by such Borrower with respect to each advance, and guaranteed, in each case, jointly and severally, by the applicable Guarantors under such Credit Agreement.

8.      U.S. Security Agreements.  On or about May 31, 2022, Carnaby II, Carnaby Holdings II, and the Administrative Agent for the benefit of the Carnaby II Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby II U.S. Security

---

instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

**JOINT EXHIBIT NO. 61**
**Page 193 of 540**

Agreement"). On or about July 6, 2022, Carnaby III, Carnaby Holdings III, and the Administrative Agent for the benefit of the Carnaby III Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby III U.S. Security Agreement," and together with the Carnaby II U.S. Security Agreement, the "U.S. Security Agreements").

9. As security for the prompt and complete payment or performance in full of the applicable "Obligations" (as defined in the U.S. Security Agreements, as amended by the Cross-Collateralization Agreement[7]), each Borrower and the Carnaby Holdings II or Carnaby Holdings III, as applicable, entity pledged, collaterally assigned and granted to the Administrative Agent, on behalf of and for the benefit of the applicable Secured Parties, a continuing security interest in all of their right, title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, such party, and regardless of where located: (i) all Accounts; (ii) all Cash; (iii) all Chattel Paper (including without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper); (iv) all Commercial Tort Claims; (v) all Contracts, together with all Contract Rights arising thereunder; (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Financial Assets; (x)

---

[7] As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby II U.S. Security Agreement means "(i) 'Obligations' (as defined in the [Carnaby II] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby II] Credit Agreement) and (iii) 'Obligations' (as defined in the Pledge and Security Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(ii).

As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby III U.S. Security Agreement means "(i) "Obligations" (as defined in the [Carnaby III] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby III] Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory II, LLC, as borrower, Carnaby Inventory Holdings II, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(iv).

5

**JOINT EXHIBIT NO. 61**
**Page 194 of 540**

all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Governmental Authorizations; (xiv) all Instruments; (xv) all Intellectual Property Collateral; (xvi)  all Inventory; (xvii) all Investment Property, Pledged Stock and other Pledged Collateral; (xviii) all letters of credit and Letter-of-Credit Rights; (xix) all Licenses; (xx) all Proceeds of insurance; (xxi) all Receivables; (xxii) all Real Estate Assets; (xxiii) all Securities Accounts, Money, Securities, and other investments therein, and all Security Entitlements in respect thereof; (xxiv) all Software and all recorded data of any kind or nature, regardless of the medium of recording; (xxv) all Supporting Obligations relating to any of the foregoing; and (xxvi) all accessions to, substitutions and replacements for, and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing (collectively, the "U.S. Collateral"), thereby achieving a complete cross-collateralization of the Carnaby II Credit Agreement and Carnaby III Credit Agreement in respect of all obligations owing under such facilities and all collateral pledged under them.

10.     Mexican Security Agreements. As additional security for the payment, performance and satisfaction in full of any and all of the Obligations, (i) on May 31, 2022, Carnaby II, as Pledgor, the Administrative Agent for the benefit of the Carnaby II Secured Lenders, as Pledgee, BPIJ and BPIM, as depositaries (jointly, the "Carnaby II Depositaries"), and BPI entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*), under Mexican law (the "Carnaby II Mexican Security Agreement"); and (ii) on July 6, 2022, Carnaby III, as Pledgor, the Administrative Agent for the benefit of the Carnaby III Secured Lenders, as Pledgee, TC and SI, as depositaries (jointly, the "Carnaby III Depositaries"), and TPC and TTC

6

entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión* ), under Mexican law (the "Carnaby III Mexican Security Agreement," and together with the Carnaby II Mexican Security Agreement, the "Mexican Security Agreements").

11.     Under the Carnaby II Mexican Security Agreement, Carnaby II granted to the Administrative Agent, for the benefit of the Carnaby II Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Under the Carnaby III Mexican Security Agreement, Carnaby III granted to the Administrative Agent, for the benefit of the Carnaby III Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Each Mexican Security Agreement defines Pledged Assets as any and all property and inventory located in Mexico, currently owned by the applicable Pledgor, or acquired by the applicable Pledgor or arising in the future, including without limitation, all Raw Materials,[8] together with (i) all documents, documents of title, warehouse receipts (or similar documents), bills of lading or orders for delivery of all, or any portion of the foregoing; and (ii) all products and/or sale proceeds of any and all of the foregoing, including, without limitation, insurance proceeds (collectively, the "Mexican Collateral" and together with the U.S. Collateral, the "Collateral").  Each Mexican Security Agreement also

---

[8]     "Raw Materials" are defined under the Mexican Security Agreements as "all the assets that comprise the inventory of the Pledgor, whether now owned or hereafter acquired, including without limitation, all inventory of the Pledgor (i) held for sale or lease, (ii) furnished or to be furnished under any service agreement, (iii) held for display or demonstration, or (iv) on lease or consignment, in favor of third parties; including accessories, packaging and shipping materials, spare parts, repair parts, returned and repossessed inventory, all raw materials, work-in-process, finished inventory and supplies used or consumed in the Pledgor business together with all documents, documents of title, warehouse receipts, pledge bonds, bills of lading, deposit certificates or orders for the delivery of all, or any portion, of the foregoing, including without limitation the assets listed in Exhibit C [attached thereto]."

7

**JOINT EXHIBIT NO. 61**
**Page 196 of 540**

provides that the applicable Pledgor is the sole, legal, and beneficial owner of the Mexican Collateral, free and clear of any liens or other encumbrances, and that the security interest granted thereunder constitutes a legal, valid, binding, and enforceable security over the Mexican Collateral.

12.    Perfection. The security interests granted under the U.S. Security Agreements were properly perfected by filing UCC financing statements with the Delaware Secretary of State.[9]  As a result, the Administrative Agent holds, on behalf of and for the benefit of the Carnaby II and III Secured Lenders, properly perfected security interests in all assets of each of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III.

13.    In turn, each Mexican Security Agreement was executed in compliance with Mexican law, before a Mexican Notary Public and is duly registered before the Mexican Sole Registry of Liens over Movable Assets (*Registro Unico de Garantias Mobiliarias*).  As a result, the Carnaby II Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the benefit of the Carnaby II Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby II,[10] and the Carnaby III Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the

---

*See* (i) UCC Financing Statement File No. 2022 4634697, filed at 12:39 PM on June 2, 2022, against Carnaby Inventory II, LLC as debtor; (ii) UCC Financing Statement File No. 2022 4634796, filed at 12:42 PM on June 2, 2022, against Carnaby Inventory Holdings II, LLC as debtor; (iii) UCC Financing Statement File No. 2022 5629043, filed at 3:58 PM on July 6, 2022, against Carnaby Inventory III, LLC as debtor; and (iv) UCC Financing Statement File No. 2022 5628912, filed at 3:55 PM on July 6, 2022, against Carnaby Inventory Holdings III, LLC as debtor.

[10]    The Carnaby II Mexican Security Agreement was registered with the RUG on June 7, 2022 (at 15:08:37 ZULU GMT/UTC), as Asiento No. 31302386, Garantía Mobiliaria No. 16927095, Folio Electrónico R20220601MG36, with a maximum secured amount of USD $60,000,000, covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby II.  On July 6, 2022, the Carnaby II Mexican Security Agreement was amended by the Amendment Agreement (Convenio Modificatorio) to extend the secured obligations to cover the Carnaby III Credit Agreement obligations as well, consistent with the Cross-Collateralization Agreement.  This amendment was registered with the RUG on July 8, 2022 (at 19:21:38 ZULU GMT/UTC), as Asiento No. 32022878, Garantía Mobiliaria No. 16927095 (same folio as the Carnaby II Original Pledge), amending the maximum secured amount to USD $160,000,000.

benefit of the Carnaby III Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby III.[11]

14.    Cross-Collateralization Agreement.  As noted in paragraph 2 above, on July 6, 2022, the parties to the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into the Cross-Collateralization Agreement, pursuant to which the Collateral securing each Credit Agreement also secures the obligations under the other Credit Agreement, and vice versa.  This cross-collateralization was also reflected in and effected through the U.S. Security Agreements, and in the Mexican Security Agreements as set forth above.

15.    Other Obligations Under the Transaction Documents.  FBG executed each of the Credit Agreements as "Servicer" and made various representations and warranties and undertakings in favor of the Carnaby II and III Secured Lenders thereunder including, without limitation, (i) to cause each of BPI and Trico to comply with the terms of the Transaction Documents; (ii) to act as Servicer under the Credit Agreements and to perform (or cause to be performed) certain functions for Carnaby II and Carnaby III.  Accordingly, FBG is responsible for ensuring the Carnaby II, Carnaby III, BPI, and Trico, and the Guarantors under the Credit Agreements each perform their obligations under the Transaction Documents (including, without limitation, obligations to maintain and preserve adequate records of the purchases and sales of inventory, to deliver regular reporting, and to maintain corporate separateness of the entities).  (*See* Credit Agreements Sec. 6.2(a)–(f), Sec. 5.1(s), (t); *see also* Sec. 5.1(a), (f), (g), (m), (n), (o), (p), (v), (w), (bb), and (dd); Sec. 5.2(j).  In their respective Credit Agreements, each of BPI and Trico

---

[11]    The Carnaby III Mexican Security Agreement was formalized before Corredor Público No. 7 (Licenciado José Carlos Reyes Cadena) in the State of Nuevo León, Mexico, and was registered with the RUG on July 8, 2022 (at 18:50:02 ZULU GMT/UTC), as Asiento No. 32020337, Garantía Mobiliaria No. 17265862, Folio Electrónico R20220708MSF5, with a maximum secured amount of USD $160,000,000 (covering both facilities per the Cross-Collateralization Agreement), covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby III.

9

covenanted for the benefit of the Carnaby II and III Secured Lenders to timely perform all of their respective obligations under the Transaction Documents to which they are party. *See* Credit Agreement, Sec. 5.1(aa).

16.     As contemplated by the Carnaby II Credit Agreement, Carnaby II maintains a manufacturing business relationship with BPI, as evidenced by a Manufacturing Agreement, pursuant to which Carnaby II provides to BPI and the Carnaby II Depositaries the Raw Material for manufacture in accordance with BPI's Maquiladora Agreements with the Carnaby II Depositaries.  The Manufacturing Agreement between Carnaby II and BPI was executed on May 31, 2022, and created valid and binding obligations of BPI, enforceable against it in accordance with its terms.  Under that Manufacturing Agreement, Carnaby II hired and requested certain manufacturing services from BPI to manufacture and produce the products requested by Carnaby II.  BPI was authorized to perform the manufacturing processes required by Carnaby II through its "maquiladora program" with the Carnaby II Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreement).

17.     As contemplated by the Carnaby III Credit Agreement, Carnaby III maintains a manufacturing business relationship with Trico, as evidenced by the Manufacturing Agreements, pursuant to which Carnaby III provides to Trico and the Carnaby III Depositaries the Raw Material for manufacture in accordance with Trico's Maquiladora Agreements with the Carnaby III Depositaries.  The Manufacturing Agreements between Carnaby III and Trico were executed on July 6, 2022, and created valid and binding obligations of Trico, enforceable against them in accordance with its terms.  Under the Manufacturing Agreements, Carnaby III hired and requested certain manufacturing services from Trico to manufacture and produce the products requested by

**JOINT EXHIBIT NO. 61**
**Page 199 of 540**

Carnaby III.  Trico was authorized to perform the manufacturing processes required by Carnaby III through its "maquiladora program" with the Carnaby III Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreements).

18.     The Manufacturing Agreements between Carnaby II and Carnaby III and BPI and Trico, as applicable, provide that neither BPI, Trico, the Carnaby II Depositaries, or the Carnaby III Depositaries, as applicable, shall under any circumstances be considered to have any proprietary interest in the Materials (as defined in the Manufacturing Agreements) which Carnaby II and Carnaby III may deliver to BPI, Trico, the Carnaby II Depositaries, or Carnaby III Depositaries, as applicable, nor on the Products (as defined in the Manufacturing Agreements).  They also provide that BPI, Trico, the Carnaby II Depositaries, and the Carnaby III Depositaries, as applicable, shall provide necessary administrative services for shipment, including the arrangement of proper transportation of the Materials and the Products between Mexico and the United States.  The Manufacturing Agreement also provides that the Carnaby II Depositaries and the Carnaby III Depositaries shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the Materials and Products, but that under no circumstances does acting as importer and exporter result in the conveyance of ownership of the Materials or Products to the Carnaby II Depositaries or Carnaby III Depositaries.

19.     Carnaby II executed a Purchase Agreement and Sale Agreement with BPI on May 31, 2022, which provided for the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreement.  Carnaby III executed a Purchase Agreement and Sale Agreement with each of Trico on July 6, 2022 which provided for

11

the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreements.  As buyers and sellers under the Purchase Agreements and Sale Agreements, the parties thereto intended to effect absolute and irrevocable 'true sales' for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings and undertook to reflect such sales in their respective financial statements).  Each Purchase Agreement and Sale Agreement further required that the parties advise anyone inquiring about the ownership of any assets purchases thereunder that all applicable assets had been sold to the applicable buyer.  Additionally, each of applicable selling parties under the Purchase Agreements and Sale Agreements represented and warranted to in their respective Purchase Agreements and Sale Agreements that they had good title to the assets being sold, in each case free and clear of any liens.

20.     Purchases and sales of inventory between Carnaby II and BPI occurred beginning on or about May 31, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).  Purchases and sales of inventory between Carnaby III and Trico occurred beginning on or about July 6, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).

<strong><u>ASSERTION OF CLAIM</u></strong>

21.     <u>Proof of Claim</u>.  This Proof of Claim is filed by the Administrative Agent for the benefit of the Carnaby II and III Secured Lenders and sets forth their claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors as follows:

22.     <u>Carnaby Holdings II and Carnaby Holdings III Guarantee Claims</u>.  Each of Carnaby Holdings II and Carnaby Holding III executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI)

12

<strong>JOINT EXHIBIT NO. 61</strong><br><strong>Page 201 of 540</strong>

and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.  The Administrative Agent's claims against Carnaby Holdings II and Carnaby Holdings III therefore include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

23.     First Brands Group Holdings, LLC Guarantee Claims.  FB Holdings executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI) and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.   The Administrative Agent's claims against FB Holdings therefore include: (1) the full amount of the Guaranteed Obligations under both Credit Agreements include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

24.     503(b)(9) Claims Against BPI and Trico:  The Administrative Agent also asserts claims in an amount to be determined against each of BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code for the fair value of inventory BPI and Trico received from Carnaby II and Carnaby III during the 20 days preceding the Petition Date to the extent Carnaby II and Carnaby III did not receive payment equal to such fair value from BPI and Trico.

25.     Additional Claims.  The Administrative Agent also asserts against FBG, on behalf of itself and the Carnaby II and III Secured Lenders, claims in an amount not less than **$160,717,187.33** for payment in full of damages stemming from, among other things, (i) any all

13

outstanding aggregate principal amounts of the loans under the Credit Agreements and all accrued and unpaid interest (including post-petition and default interest) thereon; (ii) any and all unpaid fees and expenses owed to the Administrative Agent and/or any of the Carnaby II and III Secured Lenders; (iii) any indemnifications, out-of-pocket fees and expenses (including, but not limited to, the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II and III Secured Lenders), premiums, reimbursements, charges, damages, and/or claims (as defined in the Bankruptcy Code) arising under the applicable Transaction Documents; (iv) all obligations owed to the Carnaby II and III Secured Lenders until all Obligations have been paid in full; (v) all damages arising from breach by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors of its respective representations, warranties, and obligations under the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or any other Transaction Documents to which it is party; and (vi) all damages arising from the fraudulent misrepresentations and omissions made by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors in connection with the Transaction Documents and the transactions contemplated thereby, including without limitation all amounts necessary to compensate the Carnaby II and III Secured Lenders for losses caused by such misrepresentations and omissions (collectively, the "Additional Claims," and together with the aggregate outstanding principal amount of the Loans, accrued and unpaid interest, fees, costs, and all other Obligations and Guaranteed Obligations due and payable under the Credit Agreements and the related Transaction Documents, the "Claims").  The Administrative Agent also asserts Additional Claims against BPI arising out of the Carnaby II Credit Agreement and related Transaction Documents in an amount not less than $59,622,980.05 and Additional

14

Claims arising out of the Carnaby III Credit Agreement and related Transaction Documents against Trico in an amount not less than $101,094,207.28.   The Administrative Agent also asserts Additional Claims arising out of the Carnaby Credit Agreements against each of FB Holdings, Carnaby Holdings II and Carnaby Holdings III in an amount to be determined.

26.     Breach of Contract and Fraud Claims.  In addition to any Claims set forth above, the Administrative Agent, on behalf of itself and the Carnaby II and III Secured Lenders, asserts claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors for breach of contract and common law fraud/fraudulent misrepresentation.  Each FBG Debtor was party to, and breached, one or more of the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or the other Transaction Documents, and each failed to perform its obligations thereunder, including without limitation by failing to maintain, preserve, and protect the Collateral; failing to comply with applicable covenants, representations, and warranties; and failing to satisfy the Obligations and Guaranteed Obligations when due.

27.     The FBG Debtors committed fraud by making material misrepresentations and omissions in connection with the Transaction Documents and the transactions contemplated thereby, upon which the Administrative Agent and the Carnaby II and III Secured Lenders reasonably relied in advancing funds, extending credit, and entering into the Transaction Documents, and such misrepresentations and omissions caused damage to the Carnaby II and III Secured Lenders in an amount to be determined.  The Administrative Agent expressly reserves the right to supplement the factual basis for these claims as additional information becomes available through discovery or otherwise.

15

**JOINT EXHIBIT NO. 61**
**Page 204 of 540**

28.      Federal Rule of Bankruptcy Procedure 3001(e)(3) states that "[i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount." Fed. R. Bankr. P. 3001(e)(3).  Section 101(54) of the Bankruptcy Code defines "transfer" as "the creation of a lien."  11 U.S.C. § 101(54)(A).  Pursuant to the U.S. Security Agreements, the Administrative Agent has been granted properly perfected, first-priority liens, for the benefit of the Carnaby II and III Secured Lenders, over, *inter alia,* all Contracts and Contract Rights of each of Carnaby II and Carnaby III and each of Carnaby Holdings II and Carnaby Holdings III.  Accordingly, the Administrative Agent holds any claims arising out of any such Contracts or Contract Rights that may be asserted by any of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III against any person or entity, including, without limitation, any other Debtor and non-Debtor entities (including the FBG Debtors).  Such claims include, in the case of the FBG Debtors that are counterparties to the Transaction Documents, any claims held by Carnaby II, Carnaby III, Carnaby Holdings II, or Carnaby Holdings III for breach of contract, in each case up to the full amount of the Obligations and Guaranteed Obligations.

29.      <u>Nature of the Claims Against Carnaby Holdings II and Carnaby Holdings III</u>. The Claims asserted against each of Carnaby Holdings II and Carnaby Holdings III are secured by properly perfected, valid and enforceable first-priority liens and pledges on all of its assets as contemplated by the U.S. Security Agreement, and all of the assets of each of Carnaby II and Carnaby III as contemplated by the Cross-Collateralization Agreement.  Consequently, the Claims are secured, except to the extent that the value of the Collateral securing the Claims is insufficient to satisfy the Claims in full.  To the extent of any remaining deficiency, the remainder of the Claim is asserted as a general unsecured claim.

16

30.     <u>Nature of the Claims Against the FBG Debtors</u>:  Except as set forth in the following paragraph, the Claims against the FBG Debtors are asserted as general unsecured claims.

31.     <u>Nature of 503(b)(9) Claims Against BPI and Trico:</u>  The Claims asserted against BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code are asserted as administrative expense priority Claims.

<b><u>RESERVATION OF RIGHTS</u></b>

32.     By filing this Proof of Claim, the Administrative Agent does not waive, and expressly reserves, all rights and remedies at law or in equity under any applicable law or jurisdiction that the Administrative Agent has or may have against each of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors any guarantor or obligor (including but not limited to Carnaby Holdings II, Carnaby Holdings III, and FB Holdings), and any of their respective affiliates and subsidiaries, or any other person or entity, including without limitation its rights to seek payment as an oversecured creditor of all amounts to which it may be entitled under 11 U.S.C. § 506.  Without limiting the generality of the foregoing, this Proof of Claim is not, ***nor shall it be deemed or construed to be***: (a) a waiver or release of any terms or provisions of the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (b) an election of remedies or waiver of any past, present or future breaches, defaults or events of default under the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (c) a waiver of the rights and remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether an affiliate or guarantor of any of the Debtors or an assignee or otherwise; (d) consent by the Administrative Agent to the jurisdiction of the Court with respect to any proceeding commenced against or otherwise involving the Administrative Agent; (e) a waiver of any right to (1) withdraw the reference, or otherwise

17

challenge the jurisdiction of the Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in this case against or otherwise involving the Administrative Agent, or (2) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Administrative Agent; (f) a waiver or release of, or any other limitation on, the Administrative Agent's right to assert that any portion of the claims asserted herein or any other claims are entitled to treatment as priority claims including under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (g) a waiver of any rights that the Administrative Agent may have pursuant to section 506(b) of the Bankruptcy Code; (h) a waiver or release of any lien, pledge or security interest against any Debtor or any third parties; (i) a waiver or release of, or any other limitation on, the Administrative Agent's rights to assert that any nonrecourse claim should be treated as a recourse claim, including but not limited to the exercise of any right that the Administrative Agent may have pursuant to section 1111(b) of the Bankruptcy Code; (j) consent to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. section 157(e) or otherwise; (k) a waiver by the Administrative Agent of the right to have final orders in non-core matters entered only by a United States District Court judge; (l) a waiver or release of the Administrative Agent's right to have any and all final orders in any and all noncore matters or proceedings entered only after de novo review by a United States District Court Judge; or (m) a waiver of any claim, at law or in equity or under any applicable law, including without limitation administrative claims, priority claims, secured claims, unsecured claims, constructive trust claims, claims based upon common law fraud, misrepresentation, subrogation, indemnity, contribution, unjust enrichment, fraudulent

18

**JOINT EXHIBIT NO. 61**
**Page 207 of 540**

conveyance, failure to fulfill contractual and fiduciary obligations, breach of the implied covenant of good faith and fair dealing, tortious interference, quantum meruit, or any other theory available under applicable law or equity, including, without limitation, the right to assert a constructive trust against assets or cash held by any Debtor, and any and all amounts owed, in damages or otherwise, whether known or unknown, and whether presently asserted or to be asserted, all of which singularly or collectively may have caused the Administrative Agent to incur damages.  Nothing herein shall be deemed to waive, stop, or derogate from the rights of the Administrative Agent under the Transaction Documents, including, without limitation, in connection with the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, and any order of the Court, or to prejudice any and all of the Administrative Agent's rights, claims, and defenses under the Bankruptcy Code or otherwise, including, but not limited to, the right to vote on any plan(s) in the Debtors' Chapter 11 Cases.

33.     The Administrative Agent expressly reserves the right to amend, replace, update, or supplement this Proof of Claim (including the proof of claim form) at any time and in any respect (including, without limitation, as necessary or appropriate to amend, quantify, or correct amounts, to provide additional detail regarding the Claims set forth herein, to fix the amount of any contingent or unliquidated component of the Claims, or to include any claim, at law or in equity), to add or amend documents and other information, to file additional proofs of claim or further pleadings for additional claims, to contest the validity, priority, and extent of any other purported liens and security interests other than those described herein, and to assert any and all other claims, actions, defenses, setoffs, recoupments, rights or remedies of whatever kind or nature that it currently has, or may have in the future against any of Carnaby Holdings II, Carnaby Holdings III, any FBG Debtor, and/or any other Debtors or non-Debtors, or any other person or

**JOINT EXHIBIT NO. 61**
**Page 208 of 540**

entity, including without limitation, rights against guarantors, officers, directors, and other creditors any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, at law or in equity, including, without limitation, administrative or other priority claims, setoff and recoupment rights, lien rights, interest, and the right to assert claims that are otherwise warranted in any related actions.

34.     The Administrative Agent reserves the right to claim that the portion of its fees, interest, costs, expenses, and other charges incurred or accruing after the applicable Petition Date of each of any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, constitute administrative expenses of the applicable Debtor's estate to the extent such expenses are not otherwise paid in full, and reserves the right to file a claim or application for payment of such administrative expenses.

35.     No judgment has been rendered on the Claims set forth in this Proof of Claim.

36.     With respect to any portion of the Claims that is unliquidated or as to which the amount is undetermined, the Administrative Agent does not waive their rights thereto by not claiming specific amounts at this time.

37.     The Administrative Agent expressly reserves, and does not waive, its right to payment of any amounts due from any guarantor in respect of the Credit Agreements from any other sources under any applicable law and jurisdiction.

38.     The Administrative Agent expressly reserves its rights to exercise judicial actions under any applicable law and jurisdiction against non-Debtor entities during and after these Chapter 11 Cases.

39.     Nothing contained in this Proof of Claim shall be deemed an admission by the Administrative Agent.

**JOINT EXHIBIT NO. 61**
**Page 209 of 540**

40.     To the best of the Administrative Agent's knowledge, the claims set forth herein are not subject to setoff or counterclaim, <u>provided</u>, <u>however</u>, that the Administrative Agent (on behalf of the Carnaby II and III Secured Lenders) expressly reserves and does not waive any right of set-off or recoupment it may possess.

41.     The Administrative Agent does not consent to the surcharge of the Collateral by any Debtor's estate, their representatives, or any other person or party-in-interest pursuant to 11 U.S.C. §506(c) or otherwise.

42.     The Administrative Agent expressly reserves the right to withdraw this Proof of Claim as if it had never been filed.

<u>**NOTICES AND COMMUNICATIONS**</u>

43.     Any and all notices and communications concerning the Proof of Claim shall be sent to the following addresses both in hard copy and via e-mail:

Tarik Johnson
**GLAS TRUST COMPANY LLC**, in its capacity as Administrative Agent
3 Second Street, Suite 206, Jersey City, NJ 07311
Tel.: +1 201 201 8642
E-mails:
Tarik.Johnson@glas.agency

with a copy to (which shall not constitute notice)

Allan S. Brilliant
Stephen Wolpert
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Tel.: +1 212 698 3599
E-mails:
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

21

**SUPPORTING DOCUMENTS**

44.     The Administrative Agent's claims are based on the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, the Purchase Agreements, the Promissory Notes, the Sale Agreements, and other related Transaction Documents.  Copies of these documents and additional related documents are not attached to the Proof of Claim because of their voluminous nature.  Counsel to the Administrative Agent will provide copies of such documents to any party in interest in these Chapter 11 Cases, upon a reasonable written request (and entry into an appropriate confidentiality agreement, if necessary) addressed to counsel to the Administrative Agent at the address set forth herein.

45.     Each and every description in this Addendum to the Credit Agreements and the other Transaction Documents is qualified in its entirety by reference to the applicable provisions of such documents, and all such documents are incorporated herein by reference.  In the event of any inconsistency between this Addendum and any such document, including the proof of claim form, the relevant document shall control.

**GLAS Trust Company LLC**
In its capacity as Administrative Agent under the
Carnaby II and Carnaby III Credit Agreements,
related Transaction Documents

Dated: July 6, 2026

**JOINT EXHIBIT NO. 61**
**Page 211 of 540**

Electronic Proof of Claim Confirmation:  3950-1-MZCXR-276207545

Claim Electronically Submitted on (UTC) :  2026-07-07T02:05:41.443Z

Submitted by:  GLAS TRUST CO LLC, AGENT FBO CARNABY II SEC. LENDERS
jeffrey.schoenfeld@glas.agency

**KROLL**

**Exhibit   3**

**JOINT EXHIBIT NO. 61**
**Page 214 of 540**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ _Not less than $160,717,187_ . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See addendum

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe: See addendum

**Basis for perfection:** See addendum

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property**: $ See addendum

**Amount of the claim that is secured:** $ See addendum

**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No ☐ Yes. *Check one:* | **Amount entitled to priority** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |
| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No ☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $_____ |

---

| **Part 3:** | **Sign Below** |
|---|---|

| The person completing this proof of claim must sign and date it. FRBP 9011(b). If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:* ☐ I am the creditor. ☑ I am the creditor's attorney or authorized agent. ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct. I declare under penalty of perjury that the foregoing is true and correct. |

*Jeffrey Schoenfeld* 07/07/2026

Electronic Signature _____ Date

**Name of the person who is completing and signing this claim**

Name: Jeffrey Schoenfeld

| First name | Middle name | Last name |
|---|---|---|

Title/Company: Vice President / GLAS TRUST COMPANY LLC

Identify the corporate servicer as the company if the authorized agent is a servicer.

3 Second Street, Suite 203

Address

| Number | Street |
|---|---|

Jersey City         NEW JERSEY 07311

| City | State | ZIP Code | Country |
|---|---|---|---|

Contact phone: 2018392200          Email: jeffrey.schoenfeld@glas.agency

---

**Proof of Claim**                                                                                                                          page 3

**JOINT EXHIBIT NO. 61**
**Page 216 of 540**

**Additional Noticing Addresses (if provided):**

**Additional Address 1**
Name:            GLAS Trust Company LLC as administrative agent for the Carnaby III Secured Lenders
Address1:        C/O DECHERT
Address2:        1095 Avenue of the Americas
Address3:
Address4:
City:            New York
State:           NY
Postal Code:     10036
Country:

Contact Phone:   2126983599
Contact Email:   allan.brilliant@dechert.com, stephen.wolpert@dechert.com

**Additional Address 2**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
Postal Code:
Country:

Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**
☑ Yes
☐ No

-------------------------------------------------------------------------------------------------

Attachment Filename:

First Brands - Omnibus Proof of Claim Addendum for FBG Debtors (Dechert 07-06-2026).pdf

**KROLL**

**OMNIBUS ADDENDUM TO PROOFS OF CLAIM FILED BY
GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT TO
THE CARNABY II AND III SECURED LENDERS**

GLAS Trust Company LLC, in its capacity as administrative agent (the "Administrative Agent") for the Lenders[1] under (i) that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement") among Carnaby Inventory II, LLC ("Carnaby II"), as Borrower; First Brands Group, LLC ("FBG"), as Servicer; First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II"), as Guarantors; the Lenders party thereto (the "Carnaby II Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent, and acknowledged and agreed to by Brake Parts Inc LLC ("BPI"), BPI Brake Manufacturing Juarez, S.A. de C.V. ("BPIJ"), and BPI Braking Systems Mexico, S.A. de C.V. ("BPIM")  and (ii) that certain credit agreement dated as of July 6, 2022 (the "Carnaby III Credit Agreement," and together with the Carnaby II Credit Agreement, the "Credit Agreements") among Carnaby Inventory III, LLC ("Carnaby III"), as Borrower; FBG, as Servicer; FB Holdings and Carnaby Inventory Holdings III, LLC ("Carnaby Holdings III"), as Guarantors; the Lenders party thereto (the "Carnaby III Secured Lenders," and together with the Carnaby II Secured Lenders, the "Carnaby II and III Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent and acknowledged and agreed to by Trico Products Corporation ("TPC"), Trico Technologies Corporation ("TTC" and together with TPC, "Trico"), Trico Componentes, S.A. de C.V. ("TC") and Subensambles Internacionales, S. de R.J. de C.V. ("SI"), *hereby submits* this omnibus addendum (the "Addendum") in support of its proofs of claim (together with the applicable proof of claim form, each a "Proof of Claim") submitted against (a) FBG; (b) FB

---

[1]   Capitalized terms not defined herein shall have the meanings ascribed to those terms in the Credit Agreements and the Transaction Documents, as applicable.

Holdings; (c) BPI; (d) TPC; (e) TTC (together with FBG, FB Holdings, BPI, and TPC, collectively, the "FBG Debtors"); (f) Carnaby Holdings II; (g) Carnaby Holdings III, each in its capacity as further described in the applicable Proof of Claim.  This Addendum is intended to be and should be treated as part of each applicable Proof of Claim.

1.        On September 24, 2025 (the "Initial Petition Date"), certain Debtors,[2] including Carnaby Holdings II and Carnaby Holdings III, commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  Between September 28, 2025, and September 29, 2025, approximately 99 additional Debtors, including the FBG Debtors, filed their own bankruptcy petitions (each, in the case of an FBG Debtor, its respective "Petition Date").

**BASIS FOR CLAIM**

2.        The Credit Agreements.  On or about May 31, 2022, Carnaby II, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings II, as Guarantors, the Carnaby II Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby II Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time) along with BPI, BPIJ, and BPIM.

3.        On or about July 6, 2022, Carnaby III, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings III, as Guarantors, the Carnaby III Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby III Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise

---

2        A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

2

modified from time to time) along with Trico, TC, and SI.[3]  On July 6, 2022, the parties to each of the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into a Cross-Collateralization Agreement (the "Cross-Collateralization Agreement"), pursuant to which the liens securing the Obligations[4] and Guaranteed Obligations[5] outstanding under each Credit Agreement secured the Obligations and Guaranteed Obligations outstanding under the other Credit Agreement, and vice versa.

4.     The Carnaby II Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $60 million aggregate principal amount and the Carnaby III Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $100 million aggregate principal amount, under which funds were advanced by the Carnaby II Secured Lenders and the Carnaby III Secured Lenders, respectively.

5.     Obligations. Each Borrower's obligations under the applicable Credit Agreement and the Transaction Documents[6] thereunder are secured by first-priority liens granted by Carnaby

---

[3]    On May 30, 2025, the parties to the Carnaby II Credit Agreement and to the Carnaby III Credit Agreement entered into Extension Agreements, extending the Maturity Date originally set forth in the Carnaby II Credit Agreement and the Carnaby III Credit Agreement to December 1, 2025.

[4]    Each Credit Agreement defines "Obligations" in identical terms as "all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding)." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

[5]    Each Credit Agreement defines "Guaranteed Obligations" in identical terms as "the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations[.]" Carnaby II Credit Agreement, section 11.1; Carnaby III Credit Agreement, section 11.1.

[6]    Each Credit Agreement defines the "Transaction Documents" in identical terms as "collectively, [the applicable Credit Agreement], each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other

II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III, on the applicable Collateral (as defined below) pursuant to the U.S. Security Agreements (as defined below) and the applicable Mexican Security Agreement (as defined below), as further detailed below.

6.      The Administrative Agent holds, on behalf of the Carnaby II Secured Lenders, loans totaling $58,964,276.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $658,704.05 under the Carnaby II Credit Agreement and, on behalf of the Carnaby III Secured Lenders, loans totaling $100,000,000.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $1,094,207.28 under the Carnaby III Credit Agreement (together, the "Loans"), each due and payable by the Borrowers and Guarantors under the Credit Agreements.  In addition to the obligation to repay the principal amount of the Loans, each of the Borrowers and the Guarantors (including FB Holdings) assumed the obligation to pay accrued and unpaid interest and all other Obligations and Guaranteed Obligations outstanding under the respective Credit Agreement and other Transaction Documents.

7.      Promissory Notes.  Each Borrower's obligations to repay the Obligations under the respective Credit Agreement were also evidenced through Promissory Notes executed by such Borrower with respect to each advance, and guaranteed, in each case, jointly and severally, by the applicable Guarantors under such Credit Agreement.

8.      U.S. Security Agreements.  On or about May 31, 2022, Carnaby II, Carnaby Holdings II, and the Administrative Agent for the benefit of the Carnaby II Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby II U.S. Security

---

instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

**JOINT EXHIBIT NO. 61**
**Page 221 of 540**

Agreement"). On or about July 6, 2022, Carnaby III, Carnaby Holdings III, and the Administrative Agent for the benefit of the Carnaby III Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby III U.S. Security Agreement," and together with the Carnaby II U.S. Security Agreement, the "U.S. Security Agreements").

9.      As security for the prompt and complete payment or performance in full of the applicable "Obligations" (as defined in the U.S. Security Agreements, as amended by the Cross-Collateralization Agreement[7]), each Borrower and the Carnaby Holdings II or Carnaby Holdings III, as applicable, entity pledged, collaterally assigned and granted to the Administrative Agent, on behalf of and for the benefit of the applicable Secured Parties, a continuing security interest in all of their right, title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, such party, and regardless of where located: (i) all Accounts; (ii) all Cash; (iii) all Chattel Paper (including without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper); (iv) all Commercial Tort Claims; (v) all Contracts, together with all Contract Rights arising thereunder; (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Financial Assets; (x)

---

[7]   As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby II U.S. Security Agreement means "(i) 'Obligations' (as defined in the [Carnaby II] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby II] Credit Agreement) and (iii) 'Obligations' (as defined in the Pledge and Security Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(ii).

As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby III U.S. Security Agreement means "(i) "Obligations" (as defined in the [Carnaby III] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby III] Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory II, LLC, as borrower, Carnaby Inventory Holdings II, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(iv).

**JOINT EXHIBIT NO. 61**
**Page 222 of 540**

all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Governmental Authorizations; (xiv) all Instruments; (xv) all Intellectual Property Collateral; (xvi)  all Inventory; (xvii) all Investment Property, Pledged Stock and other Pledged Collateral; (xviii) all letters of credit and Letter-of-Credit Rights; (xix) all Licenses; (xx) all Proceeds of insurance; (xxi) all Receivables; (xxii) all Real Estate Assets; (xxiii) all Securities Accounts, Money, Securities, and other investments therein, and all Security Entitlements in respect thereof; (xxiv) all Software and all recorded data of any kind or nature, regardless of the medium of recording; (xxv) all Supporting Obligations relating to any of the foregoing; and (xxvi) all accessions to, substitutions and replacements for, and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing (collectively, the "U.S. Collateral"), thereby achieving a complete cross-collateralization of the Carnaby II Credit Agreement and Carnaby III Credit Agreement in respect of all obligations owing under such facilities and all collateral pledged under them.

10.     Mexican Security Agreements. As additional security for the payment, performance and satisfaction in full of any and all of the Obligations, (i) on May 31, 2022, Carnaby II, as Pledgor, the Administrative Agent for the benefit of the Carnaby II Secured Lenders, as Pledgee, BPIJ and BPIM, as depositaries (jointly, the "Carnaby II Depositaries"), and BPI entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*), under Mexican law (the "Carnaby II Mexican Security Agreement"); and (ii) on July 6, 2022, Carnaby III, as Pledgor, the Administrative Agent for the benefit of the Carnaby III Secured Lenders, as Pledgee, TC and SI, as depositaries (jointly, the "Carnaby III Depositaries"), and TPC and TTC

6

entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión* ), under Mexican law (the "Carnaby III Mexican Security Agreement," and together with the Carnaby II Mexican Security Agreement, the "Mexican Security Agreements").

11.     Under the Carnaby II Mexican Security Agreement, Carnaby II granted to the Administrative Agent, for the benefit of the Carnaby II Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Under the Carnaby III Mexican Security Agreement, Carnaby III granted to the Administrative Agent, for the benefit of the Carnaby III Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Each Mexican Security Agreement defines Pledged Assets as any and all property and inventory located in Mexico, currently owned by the applicable Pledgor, or acquired by the applicable Pledgor or arising in the future, including without limitation, all Raw Materials,[8] together with (i) all documents, documents of title, warehouse receipts (or similar documents), bills of lading or orders for delivery of all, or any portion of the foregoing; and (ii) all products and/or sale proceeds of any and all of the foregoing, including, without limitation, insurance proceeds (collectively, the "Mexican Collateral" and together with the U.S. Collateral, the "Collateral").  Each Mexican Security Agreement also

---

[8]     "Raw Materials" are defined under the Mexican Security Agreements as "all the assets that comprise the inventory of the Pledgor, whether now owned or hereafter acquired, including without limitation, all inventory of the Pledgor (i) held for sale or lease, (ii) furnished or to be furnished under any service agreement, (iii) held for display or demonstration, or (iv) on lease or consignment, in favor of third parties; including accessories, packaging and shipping materials, spare parts, repair parts, returned and repossessed inventory, all raw materials, work-in-process, finished inventory and supplies used or consumed in the Pledgor business together with all documents, documents of title, warehouse receipts, pledge bonds, bills of lading, deposit certificates or orders for the delivery of all, or any portion, of the foregoing, including without limitation the assets listed in Exhibit C [attached thereto]."

7

**JOINT EXHIBIT NO. 61**
**Page 224 of 540**

provides that the applicable Pledgor is the sole, legal, and beneficial owner of the Mexican Collateral, free and clear of any liens or other encumbrances, and that the security interest granted thereunder constitutes a legal, valid, binding, and enforceable security over the Mexican Collateral.

12.     Perfection. The security interests granted under the U.S. Security Agreements were properly perfected by filing UCC financing statements with the Delaware Secretary of State.[9]  As a result, the Administrative Agent holds, on behalf of and for the benefit of the Carnaby II and III Secured Lenders, properly perfected security interests in all assets of each of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III.

13.     In turn, each Mexican Security Agreement was executed in compliance with Mexican law, before a Mexican Notary Public and is duly registered before the Mexican Sole Registry of Liens over Movable Assets (*Registro Unico de Garantias Mobiliarias*).  As a result, the Carnaby II Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the benefit of the Carnaby II Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby II,[10] and the Carnaby III Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the

---

*See* (i) UCC Financing Statement File No. 2022 4634697, filed at 12:39 PM on June 2, 2022, against Carnaby Inventory II, LLC as debtor; (ii) UCC Financing Statement File No. 2022 4634796, filed at 12:42 PM on June 2, 2022, against Carnaby Inventory Holdings II, LLC as debtor; (iii) UCC Financing Statement File No. 2022 5629043, filed at 3:58 PM on July 6, 2022, against Carnaby Inventory III, LLC as debtor; and (iv) UCC Financing Statement File No. 2022 5628912, filed at 3:55 PM on July 6, 2022, against Carnaby Inventory Holdings III, LLC as debtor.

[10]   The Carnaby II Mexican Security Agreement was registered with the RUG on June 7, 2022 (at 15:08:37 ZULU GMT/UTC), as Asiento No. 31302386, Garantía Mobiliaria No. 16927095, Folio Electrónico R20220601MG36, with a maximum secured amount of USD $60,000,000, covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby II.  On July 6, 2022, the Carnaby II Mexican Security Agreement was amended by the Amendment Agreement (Convenio Modificatorio) to extend the secured obligations to cover the Carnaby III Credit Agreement obligations as well, consistent with the Cross-Collateralization Agreement.  This amendment was registered with the RUG on July 8, 2022 (at 19:21:38 ZULU GMT/UTC), as Asiento No. 32022878, Garantía Mobiliaria No. 16927095 (same folio as the Carnaby II Original Pledge), amending the maximum secured amount to USD $160,000,000.

8

**JOINT EXHIBIT NO. 61**
**Page 225 of 540**

benefit of the Carnaby III Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby III.[11]

14.     Cross-Collateralization Agreement.   As noted in paragraph 2 above, on July 6, 2022, the parties to the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into the Cross-Collateralization Agreement, pursuant to which the Collateral securing each Credit Agreement also secures the obligations under the other Credit Agreement, and vice versa.   This cross-collateralization was also reflected in and effected through the U.S. Security Agreements, and in the Mexican Security Agreements as set forth above.

15.     Other Obligations Under the Transaction Documents.   FBG executed each of the Credit Agreements as "Servicer" and made various representations and warranties and undertakings in favor of the Carnaby II and III Secured Lenders thereunder including, without limitation, (i) to cause each of BPI and Trico to comply with the terms of the Transaction Documents; (ii) to act as Servicer under the Credit Agreements and to perform (or cause to be performed) certain functions for Carnaby II and Carnaby III.   Accordingly, FBG is responsible for ensuring the Carnaby II, Carnaby III, BPI, and Trico, and the Guarantors under the Credit Agreements each perform their obligations under the Transaction Documents (including, without limitation, obligations to maintain and preserve adequate records of the purchases and sales of inventory, to deliver regular reporting, and to maintain corporate separateness of the entities).   (*See* Credit Agreements Sec. 6.2(a)–(f), Sec. 5.1(s), (t); *see also* Sec. 5.1(a), (f), (g), (m), (n), (o), (p), (v), (w), (bb), and (dd); Sec. 5.2(j).   In their respective Credit Agreements, each of BPI and Trico

---

[11]   The Carnaby III Mexican Security Agreement was formalized before Corredor Público No. 7 (Licenciado José Carlos Reyes Cadena) in the State of Nuevo León, Mexico, and was registered with the RUG on July 8, 2022 (at 18:50:02 ZULU GMT/UTC), as Asiento No. 32020337, Garantía Mobiliaria No. 17265862, Folio Electrónico R20220708MSF5, with a maximum secured amount of USD $160,000,000 (covering both facilities per the Cross-Collateralization Agreement), covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby III.

9

**JOINT EXHIBIT NO. 61**
**Page 226 of 540**

covenanted for the benefit of the Carnaby II and III Secured Lenders to timely perform all of their respective obligations under the Transaction Documents to which they are party. *See* Credit Agreement, Sec. 5.1(aa).

16. As contemplated by the Carnaby II Credit Agreement, Carnaby II maintains a manufacturing business relationship with BPI, as evidenced by a Manufacturing Agreement, pursuant to which Carnaby II provides to BPI and the Carnaby II Depositaries the Raw Material for manufacture in accordance with BPI's Maquiladora Agreements with the Carnaby II Depositaries. The Manufacturing Agreement between Carnaby II and BPI was executed on May 31, 2022, and created valid and binding obligations of BPI, enforceable against it in accordance with its terms. Under that Manufacturing Agreement, Carnaby II hired and requested certain manufacturing services from BPI to manufacture and produce the products requested by Carnaby II. BPI was authorized to perform the manufacturing processes required by Carnaby II through its "maquiladora program" with the Carnaby II Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreement).

17. As contemplated by the Carnaby III Credit Agreement, Carnaby III maintains a manufacturing business relationship with Trico, as evidenced by the Manufacturing Agreements, pursuant to which Carnaby III provides to Trico and the Carnaby III Depositaries the Raw Material for manufacture in accordance with Trico's Maquiladora Agreements with the Carnaby III Depositaries. The Manufacturing Agreements between Carnaby III and Trico were executed on July 6, 2022, and created valid and binding obligations of Trico, enforceable against them in accordance with its terms. Under the Manufacturing Agreements, Carnaby III hired and requested certain manufacturing services from Trico to manufacture and produce the products requested by

10

Carnaby III. Trico was authorized to perform the manufacturing processes required by Carnaby III through its "maquiladora program" with the Carnaby III Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreements).

18. The Manufacturing Agreements between Carnaby II and Carnaby III and BPI and Trico, as applicable, provide that neither BPI, Trico, the Carnaby II Depositaries, or the Carnaby III Depositaries, as applicable, shall under any circumstances be considered to have any proprietary interest in the Materials (as defined in the Manufacturing Agreements) which Carnaby II and Carnaby III may deliver to BPI, Trico, the Carnaby II Depositaries, or Carnaby III Depositaries, as applicable, nor on the Products (as defined in the Manufacturing Agreements). They also provide that BPI, Trico, the Carnaby II Depositaries, and the Carnaby III Depositaries, as applicable, shall provide necessary administrative services for shipment, including the arrangement of proper transportation of the Materials and the Products between Mexico and the United States. The Manufacturing Agreement also provides that the Carnaby II Depositaries and the Carnaby III Depositaries shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the Materials and Products, but that under no circumstances does acting as importer and exporter result in the conveyance of ownership of the Materials or Products to the Carnaby II Depositaries or Carnaby III Depositaries.

19. Carnaby II executed a Purchase Agreement and Sale Agreement with BPI on May 31, 2022, which provided for the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreement. Carnaby III executed a Purchase Agreement and Sale Agreement with each of Trico on July 6, 2022 which provided for

11

the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreements. As buyers and sellers under the Purchase Agreements and Sale Agreements, the parties thereto intended to effect absolute and irrevocable 'true sales' for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings and undertook to reflect such sales in their respective financial statements). Each Purchase Agreement and Sale Agreement further required that the parties advise anyone inquiring about the ownership of any assets purchases thereunder that all applicable assets had been sold to the applicable buyer. Additionally, each of applicable selling parties under the Purchase Agreements and Sale Agreements represented and warranted to in their respective Purchase Agreements and Sale Agreements that they had good title to the assets being sold, in each case free and clear of any liens.

20.     Purchases and sales of inventory between Carnaby II and BPI occurred beginning on or about May 31, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date). Purchases and sales of inventory between Carnaby III and Trico occurred beginning on or about July 6, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).

## ASSERTION OF CLAIM

21.     Proof of Claim. This Proof of Claim is filed by the Administrative Agent for the benefit of the Carnaby II and III Secured Lenders and sets forth their claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors as follows:

22.     Carnaby Holdings II and Carnaby Holdings III Guarantee Claims. Each of Carnaby Holdings II and Carnaby Holding III executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI)

12

**JOINT EXHIBIT NO. 61**
**Page 229 of 540**

and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.  The Administrative Agent's claims against Carnaby Holdings II and Carnaby Holdings III therefore include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

23.     First Brands Group Holdings, LLC Guarantee Claims.  FB Holdings executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI) and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.   The Administrative Agent's claims against FB Holdings therefore include: (1) the full amount of the Guaranteed Obligations under both Credit Agreements include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

24.     503(b)(9) Claims Against BPI and Trico:  The Administrative Agent also asserts claims in an amount to be determined against each of BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code for the fair value of inventory BPI and Trico received from Carnaby II and Carnaby III during the 20 days preceding the Petition Date to the extent Carnaby II and Carnaby III did not receive payment equal to such fair value from BPI and Trico.

25.     Additional Claims.  The Administrative Agent also asserts against FBG, on behalf of itself and the Carnaby II and III Secured Lenders, claims in an amount not less than **$160,717,187.33** for payment in full of damages stemming from, among other things, (i) any all

13

outstanding aggregate principal amounts of the loans under the Credit Agreements and all accrued and unpaid interest (including post-petition and default interest) thereon; (ii) any and all unpaid fees and expenses owed to the Administrative Agent and/or any of the Carnaby II and III Secured Lenders; (iii) any indemnifications, out-of-pocket fees and expenses (including, but not limited to, the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II and III Secured Lenders), premiums, reimbursements, charges, damages, and/or claims (as defined in the Bankruptcy Code) arising under the applicable Transaction Documents; (iv) all obligations owed to the Carnaby II and III Secured Lenders until all Obligations have been paid in full; (v) all damages arising from breach by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors of its respective representations, warranties, and obligations under the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or any other Transaction Documents to which it is party; and (vi) all damages arising from the fraudulent misrepresentations and omissions made by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors in connection with the Transaction Documents and the transactions contemplated thereby, including without limitation all amounts necessary to compensate the Carnaby II and III Secured Lenders for losses caused by such misrepresentations and omissions (collectively, the "Additional Claims," and together with the aggregate outstanding principal amount of the Loans, accrued and unpaid interest, fees, costs, and all other Obligations and Guaranteed Obligations due and payable under the Credit Agreements and the related Transaction Documents, the "Claims").  The Administrative Agent also asserts Additional Claims against BPI arising out of the Carnaby II Credit Agreement and related Transaction Documents in an amount not less than $59,622,980.05 and Additional

14

Claims arising out of the Carnaby III Credit Agreement and related Transaction Documents against Trico in an amount not less than $101,094,207.28.   The Administrative Agent also asserts Additional Claims arising out of the Carnaby Credit Agreements against each of FB Holdings, Carnaby Holdings II and Carnaby Holdings III in an amount to be determined.

26.   <u>Breach of Contract and Fraud Claims</u>.   In addition to any Claims set forth above, the Administrative Agent, on behalf of itself and the Carnaby II and III Secured Lenders, asserts claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors for breach of contract and common law fraud/fraudulent misrepresentation.   Each FBG Debtor was party to, and breached, one or more of the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or the other Transaction Documents, and each failed to perform its obligations thereunder, including without limitation by failing to maintain, preserve, and protect the Collateral; failing to comply with applicable covenants, representations, and warranties; and failing to satisfy the Obligations and Guaranteed Obligations when due.

27.   The FBG Debtors committed fraud by making material misrepresentations and omissions in connection with the Transaction Documents and the transactions contemplated thereby, upon which the Administrative Agent and the Carnaby II and III Secured Lenders reasonably relied in advancing funds, extending credit, and entering into the Transaction Documents, and such misrepresentations and omissions caused damage to the Carnaby II and III Secured Lenders in an amount to be determined.   The Administrative Agent expressly reserves the right to supplement the factual basis for these claims as additional information becomes available through discovery or otherwise.

15

**JOINT EXHIBIT NO. 61**
**Page 232 of 540**

28.     Federal Rule of Bankruptcy Procedure 3001(e)(3) states that "[i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount." Fed. R. Bankr. P. 3001(e)(3). Section 101(54) of the Bankruptcy Code defines "transfer" as "the creation of a lien." 11 U.S.C. § 101(54)(A). Pursuant to the U.S. Security Agreements, the Administrative Agent has been granted properly perfected, first-priority liens, for the benefit of the Carnaby II and III Secured Lenders, over, *inter alia,* all Contracts and Contract Rights of each of Carnaby II and Carnaby III and each of Carnaby Holdings II and Carnaby Holdings III. Accordingly, the Administrative Agent holds any claims arising out of any such Contracts or Contract Rights that may be asserted by any of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III against any person or entity, including, without limitation, any other Debtor and non-Debtor entities (including the FBG Debtors). Such claims include, in the case of the FBG Debtors that are counterparties to the Transaction Documents, any claims held by Carnaby II, Carnaby III, Carnaby Holdings II, or Carnaby Holdings III for breach of contract, in each case up to the full amount of the Obligations and Guaranteed Obligations.

29.     <u>Nature of the Claims Against Carnaby Holdings II and Carnaby Holdings III</u>. The Claims asserted against each of Carnaby Holdings II and Carnaby Holdings III are secured by properly perfected, valid and enforceable first-priority liens and pledges on all of its assets as contemplated by the U.S. Security Agreement, and all of the assets of each of Carnaby II and Carnaby III as contemplated by the Cross-Collateralization Agreement. Consequently, the Claims are secured, except to the extent that the value of the Collateral securing the Claims is insufficient to satisfy the Claims in full. To the extent of any remaining deficiency, the remainder of the Claim is asserted as a general unsecured claim.

16

30.     Nature of the Claims Against the FBG Debtors:  Except as set forth in the following paragraph, the Claims against the FBG Debtors are asserted as general unsecured claims.

31.     Nature of 503(b)(9) Claims Against BPI and Trico:  The Claims asserted against BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code are asserted as administrative expense priority Claims.

## RESERVATION OF RIGHTS

32.     By filing this Proof of Claim, the Administrative Agent does not waive, and expressly reserves, all rights and remedies at law or in equity under any applicable law or jurisdiction that the Administrative Agent has or may have against each of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors any guarantor or obligor (including but not limited to Carnaby Holdings II, Carnaby Holdings III, and FB Holdings), and any of their respective affiliates and subsidiaries, or any other person or entity, including without limitation its rights to seek payment as an oversecured creditor of all amounts to which it may be entitled under 11 U.S.C. § 506.  Without limiting the generality of the foregoing, this Proof of Claim is not, ***nor shall it be deemed or construed to be***: (a) a waiver or release of any terms or provisions of the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (b) an election of remedies or waiver of any past, present or future breaches, defaults or events of default under the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (c) a waiver of the rights and remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether an affiliate or guarantor of any of the Debtors or an assignee or otherwise; (d) consent by the Administrative Agent to the jurisdiction of the Court with respect to any proceeding commenced against or otherwise involving the Administrative Agent; (e) a waiver of any right to (1) withdraw the reference, or otherwise

17

**JOINT EXHIBIT NO. 61**
**Page 234 of 540**

challenge the jurisdiction of the Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in this case against or otherwise involving the Administrative Agent, or (2) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Administrative Agent; (f) a waiver or release of, or any other limitation on, the Administrative Agent's right to assert that any portion of the claims asserted herein or any other claims are entitled to treatment as priority claims including under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (g) a waiver of any rights that the Administrative Agent may have pursuant to section 506(b) of the Bankruptcy Code; (h) a waiver or release of any lien, pledge or security interest against any Debtor or any third parties; (i) a waiver or release of, or any other limitation on, the Administrative Agent's rights to assert that any nonrecourse claim should be treated as a recourse claim, including but not limited to the exercise of any right that the Administrative Agent may have pursuant to section 1111(b) of the Bankruptcy Code; (j) consent to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. section 157(e) or otherwise; (k) a waiver by the Administrative Agent of the right to have final orders in non-core matters entered only by a United States District Court judge; (l) a waiver or release of the Administrative Agent's right to have any and all final orders in any and all noncore matters or proceedings entered only after de novo review by a United States District Court Judge; or (m) a waiver of any claim, at law or in equity or under any applicable law, including without limitation administrative claims, priority claims, secured claims, unsecured claims, constructive trust claims, claims based upon common law fraud, misrepresentation, subrogation, indemnity, contribution, unjust enrichment, fraudulent

**JOINT EXHIBIT NO. 61**
**Page 235 of 540**

conveyance, failure to fulfill contractual and fiduciary obligations, breach of the implied covenant of good faith and fair dealing, tortious interference, quantum meruit, or any other theory available under applicable law or equity, including, without limitation, the right to assert a constructive trust against assets or cash held by any Debtor, and any and all amounts owed, in damages or otherwise, whether known or unknown, and whether presently asserted or to be asserted, all of which singularly or collectively may have caused the Administrative Agent to incur damages.  Nothing herein shall be deemed to waive, stop, or derogate from the rights of the Administrative Agent under the Transaction Documents, including, without limitation, in connection with the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, and any order of the Court, or to prejudice any and all of the Administrative Agent's rights, claims, and defenses under the Bankruptcy Code or otherwise, including, but not limited to, the right to vote on any plan(s) in the Debtors' Chapter 11 Cases.

33.     The Administrative Agent expressly reserves the right to amend, replace, update, or supplement this Proof of Claim (including the proof of claim form) at any time and in any respect (including, without limitation, as necessary or appropriate to amend, quantify, or correct amounts, to provide additional detail regarding the Claims set forth herein, to fix the amount of any contingent or unliquidated component of the Claims, or to include any claim, at law or in equity), to add or amend documents and other information, to file additional proofs of claim or further pleadings for additional claims, to contest the validity, priority, and extent of any other purported liens and security interests other than those described herein, and to assert any and all other claims, actions, defenses, setoffs, recoupments, rights or remedies of whatever kind or nature that it currently has, or may have in the future against any of Carnaby Holdings II, Carnaby Holdings III, any FBG Debtor, and/or any other Debtors or non-Debtors, or any other person or

19

entity, including without limitation, rights against guarantors, officers, directors, and other creditors any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, at law or in equity, including, without limitation, administrative or other priority claims, setoff and recoupment rights, lien rights, interest, and the right to assert claims that are otherwise warranted in any related actions.

34.     The Administrative Agent reserves the right to claim that the portion of its fees, interest, costs, expenses, and other charges incurred or accruing after the applicable Petition Date of each of any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, constitute administrative expenses of the applicable Debtor's estate to the extent such expenses are not otherwise paid in full, and reserves the right to file a claim or application for payment of such administrative expenses.

35.     No judgment has been rendered on the Claims set forth in this Proof of Claim.

36.     With respect to any portion of the Claims that is unliquidated or as to which the amount is undetermined, the Administrative Agent does not waive their rights thereto by not claiming specific amounts at this time.

37.     The Administrative Agent expressly reserves, and does not waive, its right to payment of any amounts due from any guarantor in respect of the Credit Agreements from any other sources under any applicable law and jurisdiction.

38.     The Administrative Agent expressly reserves its rights to exercise judicial actions under any applicable law and jurisdiction against non-Debtor entities during and after these Chapter 11 Cases.

39.     Nothing contained in this Proof of Claim shall be deemed an admission by the Administrative Agent.

20

**JOINT EXHIBIT NO. 61**
**Page 237 of 540**

40.     To the best of the Administrative Agent's knowledge, the claims set forth herein are not subject to setoff or counterclaim, provided, however, that the Administrative Agent (on behalf of the Carnaby II and III Secured Lenders) expressly reserves and does not waive any right of set-off or recoupment it may possess.

41.     The Administrative Agent does not consent to the surcharge of the Collateral by any Debtor's estate, their representatives, or any other person or party-in-interest pursuant to 11 U.S.C. §506(c) or otherwise.

42.     The Administrative Agent expressly reserves the right to withdraw this Proof of Claim as if it had never been filed.

## NOTICES AND COMMUNICATIONS

43.     Any and all notices and communications concerning the Proof of Claim shall be sent to the following addresses both in hard copy and via e-mail:

Tarik Johnson
**GLAS TRUST COMPANY LLC**, in its capacity as Administrative Agent
3 Second Street, Suite 206, Jersey City, NJ 07311
Tel.: +1 201 201 8642
E-mails:
Tarik.Johnson@glas.agency

with a copy to (which shall not constitute notice)

Allan S. Brilliant
Stephen Wolpert
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Tel.: +1 212 698 3599
E-mails:
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

21

**JOINT EXHIBIT NO. 61**
**Page 238 of 540**

## SUPPORTING DOCUMENTS

44. The Administrative Agent's claims are based on the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, the Purchase Agreements, the Promissory Notes, the Sale Agreements, and other related Transaction Documents. Copies of these documents and additional related documents are not attached to the Proof of Claim because of their voluminous nature. Counsel to the Administrative Agent will provide copies of such documents to any party in interest in these Chapter 11 Cases, upon a reasonable written request (and entry into an appropriate confidentiality agreement, if necessary) addressed to counsel to the Administrative Agent at the address set forth herein.

45. Each and every description in this Addendum to the Credit Agreements and the other Transaction Documents is qualified in its entirety by reference to the applicable provisions of such documents, and all such documents are incorporated herein by reference. In the event of any inconsistency between this Addendum and any such document, including the proof of claim form, the relevant document shall control.

**GLAS Trust Company LLC**
In its capacity as Administrative Agent under the
Carnaby II and Carnaby III Credit Agreements,
related Transaction Documents

Dated: July 6, 2026

22

**JOINT EXHIBIT NO. 61**
**Page 239 of 540**

Electronic Proof of Claim Confirmation:  3950-1-EIVYI-213343010

Claim Electronically Submitted on (UTC) :  2026-07-07T02:12:43.881Z

Submitted by:  GLAS TRUST CO LLC, AGENT FBO CARNABY III SEC. LENDERS
jeffrey.schoenfeld@glas.agency

KR<span>O</span>LL

**Exhibit**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$ Not less than $160,717,187 . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property**: $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**Proof of Claim** page 2

**JOINT EXHIBIT NO. 61**
**Page 243 of 540**

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
|---|---|---|
| | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No | |
|---|---|---|
| | ☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $_____ |

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Jeffrey Schoenfeld* 07/07/2026

_____     _____
Electronic Signature               Date

**Name of the person who is completing and signing this claim**

Name: Jeffrey Schoenfeld

| First name | Middle name | Last name |
|---|---|---|

Title/Company: Vice President / GLAS TRUST COMPANY LLC

Identify the corporate servicer as the company if the authorized agent is a servicer.

3 Second Street, Suite 203

Address:

| Number | Street | | |
|---|---|---|---|

Jersey City      NEW JERSEY 07311

| City | State | ZIP Code | Country |
|---|---|---|---|

Contact phone: 2018392200     Email: jeffrey.schoenfeld@glas.agency

**JOINT EXHIBIT NO. 61**
**Page 244 of 540**

**Additional Noticing Addresses (if provided):**

**Additional Address 1**

| | |
|---|---|
| Name: | GLAS Trust Company LLC as administrative agent for the Carnaby II Secured Lenders |
| Address1: | C/O DECHERT LLP |
| Address2: | 1095 Avenue of the Americas |
| Address3: | |
| Address4: | |
| City: | New York |
| State: | NY |
| Postal Code: | 10036 |
| Country: | |

Contact Phone: 2126983599
Contact Email:  allan.brilliant@dechert.com, stephen.wolpert@dechert.com

**Additional Address 2**

| | |
|---|---|
| Name: | |
| Address1: | |
| Address2: | |
| Address3: | |
| Address4: | |
| City: | |
| State: | |
| Postal Code: | |
| Country: | |

Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**

☑ Yes
☐ No

-------------------------------------------------------------------------------------------

 Attachment Filename:

First Brands - Omnibus Proof of Claim Addendum for FBG Debtors (Dechert 07-06-2026).pdf

**KROLL**

**OMNIBUS ADDENDUM TO PROOFS OF CLAIM FILED BY
GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT TO
THE CARNABY II AND III SECURED LENDERS**

GLAS Trust Company LLC, in its capacity as administrative agent (the "Administrative Agent") for the Lenders[1] under (i) that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement") among Carnaby Inventory II, LLC ("Carnaby II"), as Borrower; First Brands Group, LLC ("FBG"), as Servicer; First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II"), as Guarantors; the Lenders party thereto (the "Carnaby II Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent, and acknowledged and agreed to by Brake Parts Inc LLC ("BPI"), BPI Brake Manufacturing Juarez, S.A. de C.V. ("BPIJ"), and BPI Braking Systems Mexico, S.A. de C.V. ("BPIM")  and (ii) that certain credit agreement dated as of July 6, 2022 (the "Carnaby III Credit Agreement," and together with the Carnaby II Credit Agreement, the "Credit Agreements") among Carnaby Inventory III, LLC ("Carnaby III"), as Borrower; FBG, as Servicer; FB Holdings and Carnaby Inventory Holdings III, LLC ("Carnaby Holdings III"), as Guarantors; the Lenders party thereto (the "Carnaby III Secured Lenders," and together with the Carnaby II Secured Lenders, the "Carnaby II and III Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent and acknowledged and agreed to by Trico Products Corporation ("TPC"), Trico Technologies Corporation ("TTC" and together with TPC, "Trico"), Trico Componentes, S.A. de C.V. ("TC") and Subensambles Internacionales, S. de R.J. de C.V. ("SI"), *hereby submits* this omnibus addendum (the "Addendum") in support of its proofs of claim (together with the applicable proof of claim form, each a "Proof of Claim") submitted against (a) FBG; (b) FB

---

[1]    Capitalized terms not defined herein shall have the meanings ascribed to those terms in the Credit Agreements and the Transaction Documents, as applicable.

Holdings; (c) BPI; (d) TPC; (e) TTC (together with FBG, FB Holdings, BPI, and TPC, collectively, the "FBG Debtors"); (f) Carnaby Holdings II; (g) Carnaby Holdings III, each in its capacity as further described in the applicable Proof of Claim. This Addendum is intended to be and should be treated as part of each applicable Proof of Claim.

1.     On September 24, 2025 (the "Initial Petition Date"), certain Debtors,[2] including Carnaby Holdings II and Carnaby Holdings III, commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Court"). Between September 28, 2025, and September 29, 2025, approximately 99 additional Debtors, including the FBG Debtors, filed their own bankruptcy petitions (each, in the case of an FBG Debtor, its respective "Petition Date").

### BASIS FOR CLAIM

2.     The Credit Agreements. On or about May 31, 2022, Carnaby II, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings II, as Guarantors, the Carnaby II Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby II Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time) along with BPI, BPIJ, and BPIM.

3.     On or about July 6, 2022, Carnaby III, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings III, as Guarantors, the Carnaby III Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby III Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise

---

[2]     A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**JOINT EXHIBIT NO. 61**
**Page 247 of 540**

modified from time to time) along with Trico, TC, and SI. [3]  On July 6, 2022, the parties to each of the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into a Cross-Collateralization Agreement (the "Cross-Collateralization Agreement"), pursuant to which the liens securing the Obligations[4] and Guaranteed Obligations[5] outstanding under each Credit Agreement secured the Obligations and Guaranteed Obligations outstanding under the other Credit Agreement, and vice versa.

4.    The Carnaby II Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $60 million aggregate principal amount and the Carnaby III Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $100 million aggregate principal amount, under which funds were advanced by the Carnaby II Secured Lenders and the Carnaby III Secured Lenders, respectively.

5.    Obligations. Each Borrower's obligations under the applicable Credit Agreement and the Transaction Documents[6] thereunder are secured by first-priority liens granted by Carnaby

---

[3]    On May 30, 2025, the parties to the Carnaby II Credit Agreement and to the Carnaby III Credit Agreement entered into Extension Agreements, extending the Maturity Date originally set forth in the Carnaby II Credit Agreement and the Carnaby III Credit Agreement to December 1, 2025.

[4]    Each Credit Agreement defines "Obligations" in identical terms as "all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding)." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

[5]    Each Credit Agreement defines "Guaranteed Obligations" in identical terms as "the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations[.]" Carnaby II Credit Agreement, section 11.1; Carnaby III Credit Agreement, section 11.1.

[6]    Each Credit Agreement defines the "Transaction Documents" in identical terms as "collectively, [the applicable Credit Agreement], each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other

II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III, on the applicable Collateral (as defined below) pursuant to the U.S. Security Agreements (as defined below) and the applicable Mexican Security Agreement (as defined below), as further detailed below.

6. The Administrative Agent holds, on behalf of the Carnaby II Secured Lenders, loans totaling $58,964,276.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $658,704.05 under the Carnaby II Credit Agreement and, on behalf of the Carnaby III Secured Lenders, loans totaling $100,000,000.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $1,094,207.28 under the Carnaby III Credit Agreement (together, the "Loans"), each due and payable by the Borrowers and Guarantors under the Credit Agreements. In addition to the obligation to repay the principal amount of the Loans, each of the Borrowers and the Guarantors (including FB Holdings) assumed the obligation to pay accrued and unpaid interest and all other Obligations and Guaranteed Obligations outstanding under the respective Credit Agreement and other Transaction Documents.

7. Promissory Notes. Each Borrower's obligations to repay the Obligations under the respective Credit Agreement were also evidenced through Promissory Notes executed by such Borrower with respect to each advance, and guaranteed, in each case, jointly and severally, by the applicable Guarantors under such Credit Agreement.

8. U.S. Security Agreements. On or about May 31, 2022, Carnaby II, Carnaby Holdings II, and the Administrative Agent for the benefit of the Carnaby II Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby II U.S. Security

---

instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

**JOINT EXHIBIT NO. 61**
**Page 249 of 540**

Agreement"). On or about July 6, 2022, Carnaby III, Carnaby Holdings III, and the Administrative Agent for the benefit of the Carnaby III Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby III U.S. Security Agreement," and together with the Carnaby II U.S. Security Agreement, the "U.S. Security Agreements").

9.      As security for the prompt and complete payment or performance in full of the applicable "Obligations" (as defined in the U.S. Security Agreements, as amended by the Cross-Collateralization Agreement[7]), each Borrower and the Carnaby Holdings II or Carnaby Holdings III, as applicable, entity pledged, collaterally assigned and granted to the Administrative Agent, on behalf of and for the benefit of the applicable Secured Parties, a continuing security interest in all of their right, title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, such party, and regardless of where located: (i) all Accounts; (ii) all Cash; (iii) all Chattel Paper (including without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper); (iv) all Commercial Tort Claims; (v) all Contracts, together with all Contract Rights arising thereunder; (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Financial Assets; (x)

---

[7]   As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby II U.S. Security Agreement means "(i) 'Obligations' (as defined in the [Carnaby II] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby II] Credit Agreement) and (iii) 'Obligations' (as defined in the Pledge and Security Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(ii).

As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby III U.S. Security Agreement means "(i) "Obligations" (as defined in the [Carnaby III] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby III] Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory II, LLC, as borrower, Carnaby Inventory Holdings II, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(iv).

all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Governmental Authorizations; (xiv) all Instruments; (xv) all Intellectual Property Collateral; (xvi)  all Inventory; (xvii) all Investment Property, Pledged Stock and other Pledged Collateral; (xviii) all letters of credit and Letter-of-Credit Rights; (xix) all Licenses; (xx) all Proceeds of insurance; (xxi) all Receivables; (xxii) all Real Estate Assets; (xxiii) all Securities Accounts, Money, Securities, and other investments therein, and all Security Entitlements in respect thereof; (xxiv) all Software and all recorded data of any kind or nature, regardless of the medium of recording; (xxv) all Supporting Obligations relating to any of the foregoing; and (xxvi) all accessions to, substitutions and replacements for, and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing (collectively, the "U.S. Collateral"), thereby achieving a complete cross-collateralization of the Carnaby II Credit Agreement and Carnaby III Credit Agreement in respect of all obligations owing under such facilities and all collateral pledged under them.

10.     Mexican Security Agreements. As additional security for the payment, performance and satisfaction in full of any and all of the Obligations, (i) on May 31, 2022, Carnaby II, as Pledgor, the Administrative Agent for the benefit of the Carnaby II Secured Lenders, as Pledgee, BPIJ and BPIM, as depositaries (jointly, the "Carnaby II Depositaries"), and BPI entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*), under Mexican law (the "Carnaby II Mexican Security Agreement"); and (ii) on July 6, 2022, Carnaby III, as Pledgor, the Administrative Agent for the benefit of the Carnaby III Secured Lenders, as Pledgee, TC and SI, as depositaries (jointly, the "Carnaby III Depositaries"), and TPC and TTC

6

entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión* ), under Mexican law (the "Carnaby III Mexican Security Agreement," and together with the Carnaby II Mexican Security Agreement, the "Mexican Security Agreements").

11.    Under the Carnaby II Mexican Security Agreement, Carnaby II granted to the Administrative Agent, for the benefit of the Carnaby II Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Under the Carnaby III Mexican Security Agreement, Carnaby III granted to the Administrative Agent, for the benefit of the Carnaby III Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Each Mexican Security Agreement defines Pledged Assets as any and all property and inventory located in Mexico, currently owned by the applicable Pledgor, or acquired by the applicable Pledgor or arising in the future, including without limitation, all Raw Materials,[8] together with (i) all documents, documents of title, warehouse receipts (or similar documents), bills of lading or orders for delivery of all, or any portion of the foregoing; and (ii) all products and/or sale proceeds of any and all of the foregoing, including, without limitation, insurance proceeds (collectively, the "Mexican Collateral" and together with the U.S. Collateral, the "Collateral").  Each Mexican Security Agreement also

---

[8]    "Raw Materials" are defined under the Mexican Security Agreements as "all the assets that comprise the inventory of the Pledgor, whether now owned or hereafter acquired, including without limitation, all inventory of the Pledgor (i) held for sale or lease, (ii) furnished or to be furnished under any service agreement, (iii) held for display or demonstration, or (iv) on lease or consignment, in favor of third parties; including accessories, packaging and shipping materials, spare parts, repair parts, returned and repossessed inventory, all raw materials, work-in-process, finished inventory and supplies used or consumed in the Pledgor business together with all documents, documents of title, warehouse receipts, pledge bonds, bills of lading, deposit certificates or orders for the delivery of all, or any portion, of the foregoing, including without limitation the assets listed in Exhibit C [attached thereto]."

7

**JOINT EXHIBIT NO. 61**
**Page 252 of 540**

provides that the applicable Pledgor is the sole, legal, and beneficial owner of the Mexican Collateral, free and clear of any liens or other encumbrances, and that the security interest granted thereunder constitutes a legal, valid, binding, and enforceable security over the Mexican Collateral.

12.      Perfection. The security interests granted under the U.S. Security Agreements were properly perfected by filing UCC financing statements with the Delaware Secretary of State.[9]  As a result, the Administrative Agent holds, on behalf of and for the benefit of the Carnaby II and III Secured Lenders, properly perfected security interests in all assets of each of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III.

13.      In turn, each Mexican Security Agreement was executed in compliance with Mexican law, before a Mexican Notary Public and is duly registered before the Mexican Sole Registry of Liens over Movable Assets (*Registro Unico de Garantias Mobiliarias*).  As a result, the Carnaby II Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the benefit of the Carnaby II Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby II,[10] and the Carnaby III Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the

---

*See* (i) UCC Financing Statement File No. 2022 4634697, filed at 12:39 PM on June 2, 2022, against Carnaby Inventory II, LLC as debtor; (ii) UCC Financing Statement File No. 2022 4634796, filed at 12:42 PM on June 2, 2022, against Carnaby Inventory Holdings II, LLC as debtor; (iii) UCC Financing Statement File No. 2022 5629043, filed at 3:58 PM on July 6, 2022, against Carnaby Inventory III, LLC as debtor; and (iv) UCC Financing Statement File No. 2022 5628912, filed at 3:55 PM on July 6, 2022, against Carnaby Inventory Holdings III, LLC as debtor.

[10]     The Carnaby II Mexican Security Agreement was registered with the RUG on June 7, 2022 (at 15:08:37 ZULU GMT/UTC), as Asiento No. 31302386, Garantía Mobiliaria No. 16927095, Folio Electrónico R20220601MG36, with a maximum secured amount of USD $60,000,000, covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby II.  On July 6, 2022, the Carnaby II Mexican Security Agreement was amended by the Amendment Agreement (Convenio Modificatorio) to extend the secured obligations to cover the Carnaby III Credit Agreement obligations as well, consistent with the Cross-Collateralization Agreement.  This amendment was registered with the RUG on July 8, 2022 (at 19:21:38 ZULU GMT/UTC), as Asiento No. 32022878, Garantía Mobiliaria No. 16927095 (same folio as the Carnaby II Original Pledge), amending the maximum secured amount to USD $160,000,000.

**JOINT EXHIBIT NO. 61**
**Page 253 of 540**

benefit of the Carnaby III Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby III.[11]

14. <u>Cross-Collateralization Agreement</u>. As noted in paragraph 2 above, on July 6, 2022, the parties to the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into the Cross-Collateralization Agreement, pursuant to which the Collateral securing each Credit Agreement also secures the obligations under the other Credit Agreement, and vice versa. This cross-collateralization was also reflected in and effected through the U.S. Security Agreements, and in the Mexican Security Agreements as set forth above.

15. <u>Other Obligations Under the Transaction Documents</u>. FBG executed each of the Credit Agreements as "Servicer" and made various representations and warranties and undertakings in favor of the Carnaby II and III Secured Lenders thereunder including, without limitation, (i) to cause each of BPI and Trico to comply with the terms of the Transaction Documents; (ii) to act as Servicer under the Credit Agreements and to perform (or cause to be performed) certain functions for Carnaby II and Carnaby III. Accordingly, FBG is responsible for ensuring the Carnaby II, Carnaby III, BPI, and Trico, and the Guarantors under the Credit Agreements each perform their obligations under the Transaction Documents (including, without limitation, obligations to maintain and preserve adequate records of the purchases and sales of inventory, to deliver regular reporting, and to maintain corporate separateness of the entities). (*See* Credit Agreements Sec. 6.2(a)–(f), Sec. 5.1(s), (t); *see also* Sec. 5.1(a), (f), (g), (m), (n), (o), (p), (v), (w), (bb), and (dd); Sec. 5.2(j). In their respective Credit Agreements, each of BPI and Trico

---

[11] The Carnaby III Mexican Security Agreement was formalized before Corredor Público No. 7 (Licenciado José Carlos Reyes Cadena) in the State of Nuevo León, Mexico, and was registered with the RUG on July 8, 2022 (at 18:50:02 ZULU GMT/UTC), as Asiento No. 32020337, Garantía Mobiliaria No. 17265862, Folio Electrónico R20220708MSF5, with a maximum secured amount of USD $160,000,000 (covering both facilities per the Cross-Collateralization Agreement), covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby III.

9

covenanted for the benefit of the Carnaby II and III Secured Lenders to timely perform all of their respective obligations under the Transaction Documents to which they are party.  *See* Credit Agreement, Sec. 5.1(aa).

16.     As contemplated by the Carnaby II Credit Agreement, Carnaby II maintains a manufacturing business relationship with BPI, as evidenced by a Manufacturing Agreement, pursuant to which Carnaby II provides to BPI and the Carnaby II Depositaries the Raw Material for manufacture in accordance with BPI's Maquiladora Agreements with the Carnaby II Depositaries.  The Manufacturing Agreement between Carnaby II and BPI was executed on May 31, 2022, and created valid and binding obligations of BPI, enforceable against it in accordance with its terms.  Under that Manufacturing Agreement, Carnaby II hired and requested certain manufacturing services from BPI to manufacture and produce the products requested by Carnaby II.  BPI was authorized to perform the manufacturing processes required by Carnaby II through its "maquiladora program" with the Carnaby II Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreement).

17.     As contemplated by the Carnaby III Credit Agreement, Carnaby III maintains a manufacturing business relationship with Trico, as evidenced by the Manufacturing Agreements, pursuant to which Carnaby III provides to Trico and the Carnaby III Depositaries the Raw Material for manufacture in accordance with Trico's Maquiladora Agreements with the Carnaby III Depositaries.  The Manufacturing Agreements between Carnaby III and Trico were executed on July 6, 2022, and created valid and binding obligations of Trico, enforceable against them in accordance with its terms.  Under the Manufacturing Agreements, Carnaby III hired and requested certain manufacturing services from Trico to manufacture and produce the products requested by

**JOINT EXHIBIT NO. 61**
**Page 255 of 540**

Carnaby III. Trico was authorized to perform the manufacturing processes required by Carnaby III through its "maquiladora program" with the Carnaby III Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreements).

18.     The Manufacturing Agreements between Carnaby II and Carnaby III and BPI and Trico, as applicable, provide that neither BPI, Trico, the Carnaby II Depositaries, or the Carnaby III Depositaries, as applicable, shall under any circumstances be considered to have any proprietary interest in the Materials (as defined in the Manufacturing Agreements) which Carnaby II and Carnaby III may deliver to BPI, Trico, the Carnaby II Depositaries, or Carnaby III Depositaries, as applicable, nor on the Products (as defined in the Manufacturing Agreements).  They also provide that BPI, Trico, the Carnaby II Depositaries, and the Carnaby III Depositaries, as applicable, shall provide necessary administrative services for shipment, including the arrangement of proper transportation of the Materials and the Products between Mexico and the United States.  The Manufacturing Agreement also provides that the Carnaby II Depositaries and the Carnaby III Depositaries shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the Materials and Products, but that under no circumstances does acting as importer and exporter result in the conveyance of ownership of the Materials or Products to the Carnaby II Depositaries or Carnaby III Depositaries.

19.     Carnaby II executed a Purchase Agreement and Sale Agreement with BPI on May 31, 2022, which provided for the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreement.  Carnaby III executed a Purchase Agreement and Sale Agreement with each of Trico on July 6, 2022 which provided for

11

the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreements.  As buyers and sellers under the Purchase Agreements and Sale Agreements, the parties thereto intended to effect absolute and irrevocable 'true sales' for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings and undertook to reflect such sales in their respective financial statements).  Each Purchase Agreement and Sale Agreement further required that the parties advise anyone inquiring about the ownership of any assets purchases thereunder that all applicable assets had been sold to the applicable buyer.  Additionally, each of applicable selling parties under the Purchase Agreements and Sale Agreements represented and warranted to in their respective Purchase Agreements and Sale Agreements that they had good title to the assets being sold, in each case free and clear of any liens.

20.     Purchases and sales of inventory between Carnaby II and BPI occurred beginning on or about May 31, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).  Purchases and sales of inventory between Carnaby III and Trico occurred beginning on or about July 6, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).

## ASSERTION OF CLAIM

21.     Proof of Claim.  This Proof of Claim is filed by the Administrative Agent for the benefit of the Carnaby II and III Secured Lenders and sets forth their claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors as follows:

22.     Carnaby Holdings II and Carnaby Holdings III Guarantee Claims.  Each of Carnaby Holdings II and Carnaby Holding III executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI)

12

and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.  The Administrative Agent's claims against Carnaby Holdings II and Carnaby Holdings III therefore include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

23.     First Brands Group Holdings, LLC Guarantee Claims.  FB Holdings executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI) and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.   The Administrative Agent's claims against FB Holdings therefore include: (1) the full amount of the Guaranteed Obligations under both Credit Agreements include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

24.     503(b)(9) Claims Against BPI and Trico:  The Administrative Agent also asserts claims in an amount to be determined against each of BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code for the fair value of inventory BPI and Trico received from Carnaby II and Carnaby III during the 20 days preceding the Petition Date to the extent Carnaby II and Carnaby III did not receive payment equal to such fair value from BPI and Trico.

25.     Additional Claims.  The Administrative Agent also asserts against FBG, on behalf of itself and the Carnaby II and III Secured Lenders, claims in an amount not less than **$160,717,187.33** for payment in full of damages stemming from, among other things, (i) any all

13

outstanding aggregate principal amounts of the loans under the Credit Agreements and all accrued and unpaid interest (including post-petition and default interest) thereon; (ii) any and all unpaid fees and expenses owed to the Administrative Agent and/or any of the Carnaby II and III Secured Lenders; (iii) any indemnifications, out-of-pocket fees and expenses (including, but not limited to, the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II and III Secured Lenders), premiums, reimbursements, charges, damages, and/or claims (as defined in the Bankruptcy Code) arising under the applicable Transaction Documents; (iv) all obligations owed to the Carnaby II and III Secured Lenders until all Obligations have been paid in full; (v) all damages arising from breach by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors of its respective representations, warranties, and obligations under the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or any other Transaction Documents to which it is party; and (vi) all damages arising from the fraudulent misrepresentations and omissions made by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors in connection with the Transaction Documents and the transactions contemplated thereby, including without limitation all amounts necessary to compensate the Carnaby II and III Secured Lenders for losses caused by such misrepresentations and omissions (collectively, the "Additional Claims," and together with the aggregate outstanding principal amount of the Loans, accrued and unpaid interest, fees, costs, and all other Obligations and Guaranteed Obligations due and payable under the Credit Agreements and the related Transaction Documents, the "Claims").  The Administrative Agent also asserts Additional Claims against BPI arising out of the Carnaby II Credit Agreement and related Transaction Documents in an amount not less than $59,622,980.05 and Additional

14

Claims arising out of the Carnaby III Credit Agreement and related Transaction Documents against Trico in an amount not less than $101,094,207.28. The Administrative Agent also asserts Additional Claims arising out of the Carnaby Credit Agreements against each of FB Holdings, Carnaby Holdings II and Carnaby Holdings III in an amount to be determined.

26. <u>Breach of Contract and Fraud Claims</u>. In addition to any Claims set forth above, the Administrative Agent, on behalf of itself and the Carnaby II and III Secured Lenders, asserts claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors for breach of contract and common law fraud/fraudulent misrepresentation. Each FBG Debtor was party to, and breached, one or more of the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or the other Transaction Documents, and each failed to perform its obligations thereunder, including without limitation by failing to maintain, preserve, and protect the Collateral; failing to comply with applicable covenants, representations, and warranties; and failing to satisfy the Obligations and Guaranteed Obligations when due.

27. The FBG Debtors committed fraud by making material misrepresentations and omissions in connection with the Transaction Documents and the transactions contemplated thereby, upon which the Administrative Agent and the Carnaby II and III Secured Lenders reasonably relied in advancing funds, extending credit, and entering into the Transaction Documents, and such misrepresentations and omissions caused damage to the Carnaby II and III Secured Lenders in an amount to be determined. The Administrative Agent expressly reserves the right to supplement the factual basis for these claims as additional information becomes available through discovery or otherwise.

15

**JOINT EXHIBIT NO. 61**
**Page 260 of 540**

28.     Federal Rule of Bankruptcy Procedure 3001(e)(3) states that "[i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount." Fed. R. Bankr. P. 3001(e)(3).  Section 101(54) of the Bankruptcy Code defines "transfer" as "the creation of a lien."  11 U.S.C. § 101(54)(A).  Pursuant to the U.S. Security Agreements, the Administrative Agent has been granted properly perfected, first-priority liens, for the benefit of the Carnaby II and III Secured Lenders, over, *inter alia,* all Contracts and Contract Rights of each of Carnaby II and Carnaby III and each of Carnaby Holdings II and Carnaby Holdings III.  Accordingly, the Administrative Agent holds any claims arising out of any such Contracts or Contract Rights that may be asserted by any of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III against any person or entity, including, without limitation, any other Debtor and non-Debtor entities (including the FBG Debtors).  Such claims include, in the case of the FBG Debtors that are counterparties to the Transaction Documents, any claims held by Carnaby II, Carnaby III, Carnaby Holdings II, or Carnaby Holdings III for breach of contract, in each case up to the full amount of the Obligations and Guaranteed Obligations.

29.     <u>Nature of the Claims Against Carnaby Holdings II and Carnaby Holdings III</u>. The Claims asserted against each of Carnaby Holdings II and Carnaby Holdings III are secured by properly perfected, valid and enforceable first-priority liens and pledges on all of its assets as contemplated by the U.S. Security Agreement, and all of the assets of each of Carnaby II and Carnaby III as contemplated by the Cross-Collateralization Agreement.  Consequently, the Claims are secured, except to the extent that the value of the Collateral securing the Claims is insufficient to satisfy the Claims in full.  To the extent of any remaining deficiency, the remainder of the Claim is asserted as a general unsecured claim.

16

30.     <u>Nature of the Claims Against the FBG Debtors</u>:  Except as set forth in the following paragraph, the Claims against the FBG Debtors are asserted as general unsecured claims.

31.     <u>Nature of 503(b)(9) Claims Against BPI and Trico:</u>  The Claims asserted against BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code are asserted as administrative expense priority Claims.

## **<u>RESERVATION OF RIGHTS</u>**

32.     By filing this Proof of Claim, the Administrative Agent does not waive, and expressly reserves, all rights and remedies at law or in equity under any applicable law or jurisdiction that the Administrative Agent has or may have against each of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors any guarantor or obligor (including but not limited to Carnaby Holdings II, Carnaby Holdings III, and FB Holdings), and any of their respective affiliates and subsidiaries, or any other person or entity, including without limitation its rights to seek payment as an oversecured creditor of all amounts to which it may be entitled under 11 U.S.C. § 506.  Without limiting the generality of the foregoing, this Proof of Claim is not, ***nor shall it be deemed or construed to be***: (a) a waiver or release of any terms or provisions of the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (b) an election of remedies or waiver of any past, present or future breaches, defaults or events of default under the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (c) a waiver of the rights and remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether an affiliate or guarantor of any of the Debtors or an assignee or otherwise; (d) consent by the Administrative Agent to the jurisdiction of the Court with respect to any proceeding commenced against or otherwise involving the Administrative Agent; (e) a waiver of any right to (1) withdraw the reference, or otherwise

17

**JOINT EXHIBIT NO. 61**
**Page 262 of 540**

challenge the jurisdiction of the Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in this case against or otherwise involving the Administrative Agent, or (2) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Administrative Agent; (f) a waiver or release of, or any other limitation on, the Administrative Agent's right to assert that any portion of the claims asserted herein or any other claims are entitled to treatment as priority claims including under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (g) a waiver of any rights that the Administrative Agent may have pursuant to section 506(b) of the Bankruptcy Code; (h) a waiver or release of any lien, pledge or security interest against any Debtor or any third parties; (i) a waiver or release of, or any other limitation on, the Administrative Agent's rights to assert that any nonrecourse claim should be treated as a recourse claim, including but not limited to the exercise of any right that the Administrative Agent may have pursuant to section 1111(b) of the Bankruptcy Code; (j) consent to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. section 157(e) or otherwise; (k) a waiver by the Administrative Agent of the right to have final orders in non-core matters entered only by a United States District Court judge; (l) a waiver or release of the Administrative Agent's right to have any and all final orders in any and all noncore matters or proceedings entered only after de novo review by a United States District Court Judge; or (m) a waiver of any claim, at law or in equity or under any applicable law, including without limitation administrative claims, priority claims, secured claims, unsecured claims, constructive trust claims, claims based upon common law fraud, misrepresentation, subrogation, indemnity, contribution, unjust enrichment, fraudulent

**JOINT EXHIBIT NO. 61**
**Page 263 of 540**

conveyance, failure to fulfill contractual and fiduciary obligations, breach of the implied covenant of good faith and fair dealing, tortious interference, quantum meruit, or any other theory available under applicable law or equity, including, without limitation, the right to assert a constructive trust against assets or cash held by any Debtor, and any and all amounts owed, in damages or otherwise, whether known or unknown, and whether presently asserted or to be asserted, all of which singularly or collectively may have caused the Administrative Agent to incur damages.  Nothing herein shall be deemed to waive, stop, or derogate from the rights of the Administrative Agent under the Transaction Documents, including, without limitation, in connection with the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, and any order of the Court, or to prejudice any and all of the Administrative Agent's rights, claims, and defenses under the Bankruptcy Code or otherwise, including, but not limited to, the right to vote on any plan(s) in the Debtors' Chapter 11 Cases.

33.     The Administrative Agent expressly reserves the right to amend, replace, update, or supplement this Proof of Claim (including the proof of claim form) at any time and in any respect (including, without limitation, as necessary or appropriate to amend, quantify, or correct amounts, to provide additional detail regarding the Claims set forth herein, to fix the amount of any contingent or unliquidated component of the Claims, or to include any claim, at law or in equity), to add or amend documents and other information, to file additional proofs of claim or further pleadings for additional claims, to contest the validity, priority, and extent of any other purported liens and security interests other than those described herein, and to assert any and all other claims, actions, defenses, setoffs, recoupments, rights or remedies of whatever kind or nature that it currently has, or may have in the future against any of Carnaby Holdings II, Carnaby Holdings III, any FBG Debtor, and/or any other Debtors or non-Debtors, or any other person or

entity, including without limitation, rights against guarantors, officers, directors, and other creditors any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, at law or in equity, including, without limitation, administrative or other priority claims, setoff and recoupment rights, lien rights, interest, and the right to assert claims that are otherwise warranted in any related actions.

34.     The Administrative Agent reserves the right to claim that the portion of its fees, interest, costs, expenses, and other charges incurred or accruing after the applicable Petition Date of each of any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, constitute administrative expenses of the applicable Debtor's estate to the extent such expenses are not otherwise paid in full, and reserves the right to file a claim or application for payment of such administrative expenses.

35.     No judgment has been rendered on the Claims set forth in this Proof of Claim.

36.     With respect to any portion of the Claims that is unliquidated or as to which the amount is undetermined, the Administrative Agent does not waive their rights thereto by not claiming specific amounts at this time.

37.     The Administrative Agent expressly reserves, and does not waive, its right to payment of any amounts due from any guarantor in respect of the Credit Agreements from any other sources under any applicable law and jurisdiction.

38.     The Administrative Agent expressly reserves its rights to exercise judicial actions under any applicable law and jurisdiction against non-Debtor entities during and after these Chapter 11 Cases.

39.     Nothing contained in this Proof of Claim shall be deemed an admission by the Administrative Agent.

20

40.     To the best of the Administrative Agent's knowledge, the claims set forth herein are not subject to setoff or counterclaim, provided, however, that the Administrative Agent (on behalf of the Carnaby II and III Secured Lenders) expressly reserves and does not waive any right of set-off or recoupment it may possess.

41.     The Administrative Agent does not consent to the surcharge of the Collateral by any Debtor's estate, their representatives, or any other person or party-in-interest pursuant to 11 U.S.C. §506(c) or otherwise.

42.     The Administrative Agent expressly reserves the right to withdraw this Proof of Claim as if it had never been filed.

## NOTICES AND COMMUNICATIONS

43.     Any and all notices and communications concerning the Proof of Claim shall be sent to the following addresses both in hard copy and via e-mail:

Tarik Johnson
**GLAS TRUST COMPANY LLC**, in its capacity as Administrative Agent
3 Second Street, Suite 206, Jersey City, NJ 07311
Tel.: +1 201 201 8642
E-mails:
Tarik.Johnson@glas.agency

with a copy to (which shall not constitute notice)

Allan S. Brilliant
Stephen Wolpert
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Tel.: +1 212 698 3599
E-mails:
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

21

**JOINT EXHIBIT NO. 61**
**Page 266 of 540**

## SUPPORTING DOCUMENTS

44.     The Administrative Agent's claims are based on the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, the Purchase Agreements, the Promissory Notes, the Sale Agreements, and other related Transaction Documents.  Copies of these documents and additional related documents are not attached to the Proof of Claim because of their voluminous nature.  Counsel to the Administrative Agent will provide copies of such documents to any party in interest in these Chapter 11 Cases, upon a reasonable written request (and entry into an appropriate confidentiality agreement, if necessary) addressed to counsel to the Administrative Agent at the address set forth herein.

45.     Each and every description in this Addendum to the Credit Agreements and the other Transaction Documents is qualified in its entirety by reference to the applicable provisions of such documents, and all such documents are incorporated herein by reference.  In the event of any inconsistency between this Addendum and any such document, including the proof of claim form, the relevant document shall control.

**GLAS Trust Company LLC**
In its capacity as Administrative Agent under the
Carnaby II and Carnaby III Credit Agreements,
related Transaction Documents

Dated: July 6, 2026

22

Electronic Proof of Claim Confirmation:  3950-1-EUKMW-798497883

Claim Electronically Submitted on (UTC) :  2026-07-07T02:18:43.762Z

Submitted by:  GLAS TRUST CO LLC, AGENT FBO CARNABY II SEC. LENDERS
jeffrey.schoenfeld@glas.agency

KROLL

**Exhibit**

**JOINT EXHIBIT NO. 61**
**Page 270 of 540**

**Part 2:**  **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

7. **How much is the claim?**

$ <u>Not less than $160,717,187</u> . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property**: $ _____

**Amount of the claim that is secured:** $ _____

**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**Proof of Claim**                                                                                                   page 2

**JOINT EXHIBIT NO. 61**
**Page 271 of 540**

| | | |
|---|---|---|
| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |
| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $_____ |

---

**Part 3:   Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Jeffrey Schoenfeld*   07/07/2026

_____   _____
Electronic Signature                        Date

**Name of the person who is completing and signing this claim**

Name   Jeffrey Schoenfeld
_____
First name            Middle name            Last name

Title/Company   Vice President / GLAS TRUST COMPANY LLC
_____
Identify the corporate servicer as the company if the authorized agent is a servicer.

3 Second Street, Suite 203

Address   _____
Number        Street

Jersey City                    NEW JERSEY 07311
_____
City                          State          ZIP Code      Country

Contact phone   2018392200          Email   jeffrey.schoenfeld@glas.agency

---

**JOINT EXHIBIT NO. 61**
**Page 272 of 540**

**Additional Noticing Addresses (if provided):**

**Additional Address 1**

| | |
|---|---|
| Name: | GLAS Trust Company LLC as administrative agent for the Carnaby III Secured Lenders |
| Address1: | C/O DECHERT LLP |
| Address2: | 1095 Avenue of the Americas |
| Address3: | |
| Address4: | |
| City: | New York |
| State: | NY |
| Postal Code: | 10036 |
| Country: | |

Contact Phone: 2126983599
Contact Email:  allan.brilliant@dechert.com, stephen.wolpert@dechert.com

**Additional Address 2**

| | |
|---|---|
| Name: | |
| Address1: | |
| Address2: | |
| Address3: | |
| Address4: | |
| City: | |
| State: | |
| Postal Code: | |
| Country: | |

Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**

☑ Yes
☐ No

----------------------------------------------------------------------------------------------------

Attachment Filename:

First Brands - Omnibus Proof of Claim Addendum for FBG Debtors (Dechert 07-06-2026).pdf

**KROLL**

**OMNIBUS ADDENDUM TO PROOFS OF CLAIM FILED BY
GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT TO
THE CARNABY II AND III SECURED LENDERS**

GLAS Trust Company LLC, in its capacity as administrative agent (the "Administrative Agent") for the Lenders[1] under (i) that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement") among Carnaby Inventory II, LLC ("Carnaby II"), as Borrower; First Brands Group, LLC ("FBG"), as Servicer; First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II"), as Guarantors; the Lenders party thereto (the "Carnaby II Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent, and acknowledged and agreed to by Brake Parts Inc LLC ("BPI"), BPI Brake Manufacturing Juarez, S.A. de C.V. ("BPIJ"), and BPI Braking Systems Mexico, S.A. de C.V. ("BPIM")  and (ii) that certain credit agreement dated as of July 6, 2022 (the "Carnaby III Credit Agreement," and together with the Carnaby II Credit Agreement, the "Credit Agreements") among Carnaby Inventory III, LLC ("Carnaby III"), as Borrower; FBG, as Servicer; FB Holdings and Carnaby Inventory Holdings III, LLC ("Carnaby Holdings III"), as Guarantors; the Lenders party thereto (the "Carnaby III Secured Lenders," and together with the Carnaby II Secured Lenders, the "Carnaby II and III Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent and acknowledged and agreed to by Trico Products Corporation ("TPC"), Trico Technologies Corporation ("TTC" and together with TPC, "Trico"), Trico Componentes, S.A. de C.V. ("TC") and Subensambles Internacionales, S. de R.J. de C.V. ("SI"), *hereby submits* this omnibus addendum (the "Addendum") in support of its proofs of claim (together with the applicable proof of claim form, each a "Proof of Claim") submitted against (a) FBG; (b) FB

---

[1]   Capitalized terms not defined herein shall have the meanings ascribed to those terms in the Credit Agreements and the Transaction Documents, as applicable.

Holdings; (c) BPI; (d) TPC; (e) TTC (together with FBG, FB Holdings, BPI, and TPC, collectively, the "FBG Debtors"); (f) Carnaby Holdings II; (g) Carnaby Holdings III, each in its capacity as further described in the applicable Proof of Claim.  This Addendum is intended to be and should be treated as part of each applicable Proof of Claim.

1.      On September 24, 2025 (the "Initial Petition Date"), certain Debtors,[2] including Carnaby Holdings II and Carnaby Holdings III, commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  Between September 28, 2025, and September 29, 2025, approximately 99 additional Debtors, including the FBG Debtors, filed their own bankruptcy petitions (each, in the case of an FBG Debtor, its respective "Petition Date").

## BASIS FOR CLAIM

2.      The Credit Agreements.  On or about May 31, 2022, Carnaby II, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings II, as Guarantors, the Carnaby II Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby II Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time) along with BPI, BPIJ, and BPIM.

3.      On or about July 6, 2022, Carnaby III, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings III, as Guarantors, the Carnaby III Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby III Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise

---

[2]    A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**JOINT EXHIBIT NO. 61**
**Page 275 of 540**

modified from time to time) along with Trico, TC, and SI.[3]  On July 6, 2022, the parties to each of the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into a Cross-Collateralization Agreement (the "Cross-Collateralization Agreement"), pursuant to which the liens securing the Obligations[4] and Guaranteed Obligations[5] outstanding under each Credit Agreement secured the Obligations and Guaranteed Obligations outstanding under the other Credit Agreement, and vice versa.

4.      The Carnaby II Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $60 million aggregate principal amount and the Carnaby III Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $100 million aggregate principal amount, under which funds were advanced by the Carnaby II Secured Lenders and the Carnaby III Secured Lenders, respectively.

5.      Obligations. Each Borrower's obligations under the applicable Credit Agreement and the Transaction Documents[6] thereunder are secured by first-priority liens granted by Carnaby

---

[3]    On May 30, 2025, the parties to the Carnaby II Credit Agreement and to the Carnaby III Credit Agreement entered into Extension Agreements, extending the Maturity Date originally set forth in the Carnaby II Credit Agreement and the Carnaby III Credit Agreement to December 1, 2025.

[4]    Each Credit Agreement defines "Obligations" in identical terms as "all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding)." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

[5]    Each Credit Agreement defines "Guaranteed Obligations" in identical terms as "the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations[.]" Carnaby II Credit Agreement, section 11.1; Carnaby III Credit Agreement, section 11.1.

[6]    Each Credit Agreement defines the "Transaction Documents" in identical terms as "collectively, [the applicable Credit Agreement], each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other

3

II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III, on the applicable Collateral (as defined below) pursuant to the U.S. Security Agreements (as defined below) and the applicable Mexican Security Agreement (as defined below), as further detailed below.

6.      The Administrative Agent holds, on behalf of the Carnaby II Secured Lenders, loans totaling $58,964,276.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $658,704.05 under the Carnaby II Credit Agreement and, on behalf of the Carnaby III Secured Lenders, loans totaling $100,000,000.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $1,094,207.28 under the Carnaby III Credit Agreement (together, the "Loans"), each due and payable by the Borrowers and Guarantors under the Credit Agreements.  In addition to the obligation to repay the principal amount of the Loans, each of the Borrowers and the Guarantors (including FB Holdings) assumed the obligation to pay accrued and unpaid interest and all other Obligations and Guaranteed Obligations outstanding under the respective Credit Agreement and other Transaction Documents.

7.      Promissory Notes.  Each Borrower's obligations to repay the Obligations under the respective Credit Agreement were also evidenced through Promissory Notes executed by such Borrower with respect to each advance, and guaranteed, in each case, jointly and severally, by the applicable Guarantors under such Credit Agreement.

8.      U.S. Security Agreements.  On or about May 31, 2022, Carnaby II, Carnaby Holdings II, and the Administrative Agent for the benefit of the Carnaby II Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby II U.S. Security

---

instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

4

Agreement"). On or about July 6, 2022, Carnaby III, Carnaby Holdings III, and the Administrative Agent for the benefit of the Carnaby III Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby III U.S. Security Agreement," and together with the Carnaby II U.S. Security Agreement, the "U.S. Security Agreements").

9.     As security for the prompt and complete payment or performance in full of the applicable "Obligations" (as defined in the U.S. Security Agreements, as amended by the Cross-Collateralization Agreement[7]), each Borrower and the Carnaby Holdings II or Carnaby Holdings III, as applicable, entity pledged, collaterally assigned and granted to the Administrative Agent, on behalf of and for the benefit of the applicable Secured Parties, a continuing security interest in all of their right, title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, such party, and regardless of where located: (i) all Accounts; (ii) all Cash; (iii) all Chattel Paper (including without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper); (iv) all Commercial Tort Claims; (v) all Contracts, together with all Contract Rights arising thereunder; (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Financial Assets; (x)

---

[7]    As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby II U.S. Security Agreement means "(i) 'Obligations' (as defined in the [Carnaby II] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby II] Credit Agreement) and (iii) 'Obligations' (as defined in the Pledge and Security Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(ii).

As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby III U.S. Security Agreement means "(i) "Obligations" (as defined in the [Carnaby III] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby III] Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory II, LLC, as borrower, Carnaby Inventory Holdings II, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(iv).

**JOINT EXHIBIT NO. 61**
**Page 278 of 540**

all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Governmental Authorizations; (xiv) all Instruments; (xv) all Intellectual Property Collateral; (xvi)  all Inventory; (xvii) all Investment Property, Pledged Stock and other Pledged Collateral; (xviii) all letters of credit and Letter-of-Credit Rights; (xix) all Licenses; (xx) all Proceeds of insurance; (xxi) all Receivables; (xxii) all Real Estate Assets; (xxiii) all Securities Accounts, Money, Securities, and other investments therein, and all Security Entitlements in respect thereof; (xxiv) all Software and all recorded data of any kind or nature, regardless of the medium of recording; (xxv) all Supporting Obligations relating to any of the foregoing; and (xxvi) all accessions to, substitutions and replacements for, and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing (collectively, the "U.S. Collateral"), thereby achieving a complete cross-collateralization of the Carnaby II Credit Agreement and Carnaby III Credit Agreement in respect of all obligations owing under such facilities and all collateral pledged under them.

10.    Mexican Security Agreements. As additional security for the payment, performance and satisfaction in full of any and all of the Obligations, (i) on May 31, 2022, Carnaby II, as Pledgor, the Administrative Agent for the benefit of the Carnaby II Secured Lenders, as Pledgee, BPIJ and BPIM, as depositaries (jointly, the "Carnaby II Depositaries"), and BPI entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*), under Mexican law (the "Carnaby II Mexican Security Agreement"); and (ii) on July 6, 2022, Carnaby III, as Pledgor, the Administrative Agent for the benefit of the Carnaby III Secured Lenders, as Pledgee, TC and SI, as depositaries (jointly, the "Carnaby III Depositaries"), and TPC and TTC

6

entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión* ), under Mexican law (the "Carnaby III Mexican Security Agreement," and together with the Carnaby II Mexican Security Agreement, the "Mexican Security Agreements").

11.       Under the Carnaby II Mexican Security Agreement, Carnaby II granted to the Administrative Agent, for the benefit of the Carnaby II Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Under the Carnaby III Mexican Security Agreement, Carnaby III granted to the Administrative Agent, for the benefit of the Carnaby III Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Each Mexican Security Agreement defines Pledged Assets as any and all property and inventory located in Mexico, currently owned by the applicable Pledgor, or acquired by the applicable Pledgor or arising in the future, including without limitation, all Raw Materials,[8] together with (i) all documents, documents of title, warehouse receipts (or similar documents), bills of lading or orders for delivery of all, or any portion of the foregoing; and (ii) all products and/or sale proceeds of any and all of the foregoing, including, without limitation, insurance proceeds (collectively, the "Mexican Collateral" and together with the U.S. Collateral, the "Collateral").  Each Mexican Security Agreement also

---

[8]      "Raw Materials" are defined under the Mexican Security Agreements as "all the assets that comprise the inventory of the Pledgor, whether now owned or hereafter acquired, including without limitation, all inventory of the Pledgor (i) held for sale or lease, (ii) furnished or to be furnished under any service agreement, (iii) held for display or demonstration, or (iv) on lease or consignment, in favor of third parties; including accessories, packaging and shipping materials, spare parts, repair parts, returned and repossessed inventory, all raw materials, work-in-process, finished inventory and supplies used or consumed in the Pledgor business together with all documents, documents of title, warehouse receipts, pledge bonds, bills of lading, deposit certificates or orders for the delivery of all, or any portion, of the foregoing, including without limitation the assets listed in Exhibit C [attached thereto]."

7

provides that the applicable Pledgor is the sole, legal, and beneficial owner of the Mexican Collateral, free and clear of any liens or other encumbrances, and that the security interest granted thereunder constitutes a legal, valid, binding, and enforceable security over the Mexican Collateral.

12.     Perfection. The security interests granted under the U.S. Security Agreements were properly perfected by filing UCC financing statements with the Delaware Secretary of State.[9]  As a result, the Administrative Agent holds, on behalf of and for the benefit of the Carnaby II and III Secured Lenders, properly perfected security interests in all assets of each of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III.

13.     In turn, each Mexican Security Agreement was executed in compliance with Mexican law, before a Mexican Notary Public and is duly registered before the Mexican Sole Registry of Liens over Movable Assets (*Registro Unico de Garantias Mobiliarias*).  As a result, the Carnaby II Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the benefit of the Carnaby II Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby II,[10] and the Carnaby III Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the

---

*See* (i) UCC Financing Statement File No. 2022 4634697, filed at 12:39 PM on June 2, 2022, against Carnaby Inventory II, LLC as debtor; (ii) UCC Financing Statement File No. 2022 4634796, filed at 12:42 PM on June 2, 2022, against Carnaby Inventory Holdings II, LLC as debtor; (iii) UCC Financing Statement File No. 2022 5629043, filed at 3:58 PM on July 6, 2022, against Carnaby Inventory III, LLC as debtor; and (iv) UCC Financing Statement File No. 2022 5628912, filed at 3:55 PM on July 6, 2022, against Carnaby Inventory Holdings III, LLC as debtor.

[10]   The Carnaby II Mexican Security Agreement was registered with the RUG on June 7, 2022 (at 15:08:37 ZULU GMT/UTC), as Asiento No. 31302386, Garantía Mobiliaria No. 16927095, Folio Electrónico R20220601MG36, with a maximum secured amount of USD $60,000,000, covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby II.  On July 6, 2022, the Carnaby II Mexican Security Agreement was amended by the Amendment Agreement (Convenio Modificatorio) to extend the secured obligations to cover the Carnaby III Credit Agreement obligations as well, consistent with the Cross-Collateralization Agreement.  This amendment was registered with the RUG on July 8, 2022 (at 19:21:38 ZULU GMT/UTC), as Asiento No. 32022878, Garantía Mobiliaria No. 16927095 (same folio as the Carnaby II Original Pledge), amending the maximum secured amount to USD $160,000,000.

8

benefit of the Carnaby III Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby III.[11]

14. <u>Cross-Collateralization Agreement</u>. As noted in paragraph 2 above, on July 6, 2022, the parties to the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into the Cross-Collateralization Agreement, pursuant to which the Collateral securing each Credit Agreement also secures the obligations under the other Credit Agreement, and vice versa. This cross-collateralization was also reflected in and effected through the U.S. Security Agreements, and in the Mexican Security Agreements as set forth above.

15. <u>Other Obligations Under the Transaction Documents</u>. FBG executed each of the Credit Agreements as "Servicer" and made various representations and warranties and undertakings in favor of the Carnaby II and III Secured Lenders thereunder including, without limitation, (i) to cause each of BPI and Trico to comply with the terms of the Transaction Documents; (ii) to act as Servicer under the Credit Agreements and to perform (or cause to be performed) certain functions for Carnaby II and Carnaby III. Accordingly, FBG is responsible for ensuring the Carnaby II, Carnaby III, BPI, and Trico, and the Guarantors under the Credit Agreements each perform their obligations under the Transaction Documents (including, without limitation, obligations to maintain and preserve adequate records of the purchases and sales of inventory, to deliver regular reporting, and to maintain corporate separateness of the entities). (*See* Credit Agreements Sec. 6.2(a)–(f), Sec. 5.1(s), (t); *see also* Sec. 5.1(a), (f), (g), (m), (n), (o), (p), (v), (w), (bb), and (dd); Sec. 5.2(j). In their respective Credit Agreements, each of BPI and Trico

---

[11] The Carnaby III Mexican Security Agreement was formalized before Corredor Público No. 7 (Licenciado José Carlos Reyes Cadena) in the State of Nuevo León, Mexico, and was registered with the RUG on July 8, 2022 (at 18:50:02 ZULU GMT/UTC), as Asiento No. 32020337, Garantía Mobiliaria No. 17265862, Folio Electrónico R20220708MSF5, with a maximum secured amount of USD $160,000,000 (covering both facilities per the Cross-Collateralization Agreement), covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby III.

9

covenanted for the benefit of the Carnaby II and III Secured Lenders to timely perform all of their respective obligations under the Transaction Documents to which they are party.  *See* Credit Agreement, Sec. 5.1(aa).

16.     As contemplated by the Carnaby II Credit Agreement, Carnaby II maintains a manufacturing business relationship with BPI, as evidenced by a Manufacturing Agreement, pursuant to which Carnaby II provides to BPI and the Carnaby II Depositaries the Raw Material for manufacture in accordance with BPI's Maquiladora Agreements with the Carnaby II Depositaries.  The Manufacturing Agreement between Carnaby II and BPI was executed on May 31, 2022, and created valid and binding obligations of BPI, enforceable against it in accordance with its terms.  Under that Manufacturing Agreement, Carnaby II hired and requested certain manufacturing services from BPI to manufacture and produce the products requested by Carnaby II.  BPI was authorized to perform the manufacturing processes required by Carnaby II through its "maquiladora program" with the Carnaby II Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreement).

17.     As contemplated by the Carnaby III Credit Agreement, Carnaby III maintains a manufacturing business relationship with Trico, as evidenced by the Manufacturing Agreements, pursuant to which Carnaby III provides to Trico and the Carnaby III Depositaries the Raw Material for manufacture in accordance with Trico's Maquiladora Agreements with the Carnaby III Depositaries.  The Manufacturing Agreements between Carnaby III and Trico were executed on July 6, 2022, and created valid and binding obligations of Trico, enforceable against them in accordance with its terms.  Under the Manufacturing Agreements, Carnaby III hired and requested certain manufacturing services from Trico to manufacture and produce the products requested by

**JOINT EXHIBIT NO. 61**
**Page 283 of 540**

Carnaby III. Trico was authorized to perform the manufacturing processes required by Carnaby III through its "maquiladora program" with the Carnaby III Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreements).

18. The Manufacturing Agreements between Carnaby II and Carnaby III and BPI and Trico, as applicable, provide that neither BPI, Trico, the Carnaby II Depositaries, or the Carnaby III Depositaries, as applicable, shall under any circumstances be considered to have any proprietary interest in the Materials (as defined in the Manufacturing Agreements) which Carnaby II and Carnaby III may deliver to BPI, Trico, the Carnaby II Depositaries, or Carnaby III Depositaries, as applicable, nor on the Products (as defined in the Manufacturing Agreements). They also provide that BPI, Trico, the Carnaby II Depositaries, and the Carnaby III Depositaries, as applicable, shall provide necessary administrative services for shipment, including the arrangement of proper transportation of the Materials and the Products between Mexico and the United States. The Manufacturing Agreement also provides that the Carnaby II Depositaries and the Carnaby III Depositaries shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the Materials and Products, but that under no circumstances does acting as importer and exporter result in the conveyance of ownership of the Materials or Products to the Carnaby II Depositaries or Carnaby III Depositaries.

19. Carnaby II executed a Purchase Agreement and Sale Agreement with BPI on May 31, 2022, which provided for the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreement. Carnaby III executed a Purchase Agreement and Sale Agreement with each of Trico on July 6, 2022 which provided for

the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreements.  As buyers and sellers under the Purchase Agreements and Sale Agreements, the parties thereto intended to effect absolute and irrevocable 'true sales' for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings and undertook to reflect such sales in their respective financial statements). Each Purchase Agreement and Sale Agreement further required that the parties advise anyone inquiring about the ownership of any assets purchases thereunder that all applicable assets had been sold to the applicable buyer.  Additionally, each of applicable selling parties under the Purchase Agreements and Sale Agreements represented and warranted to in their respective Purchase Agreements and Sale Agreements that they had good title to the assets being sold, in each case free and clear of any liens.

20.     Purchases and sales of inventory between Carnaby II and BPI occurred beginning on or about May 31, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).  Purchases and sales of inventory between Carnaby III and Trico occurred beginning on or about July 6, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).

## <u>ASSERTION OF CLAIM</u>

21.     <u>Proof of Claim</u>.  This Proof of Claim is filed by the Administrative Agent for the benefit of the Carnaby II and III Secured Lenders and sets forth their claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors as follows:

22.     <u>Carnaby Holdings II and Carnaby Holdings III Guarantee Claims</u>.  Each of Carnaby Holdings II and Carnaby Holding III executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI)

12

**JOINT EXHIBIT NO. 61**
**Page 285 of 540**

and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.  The Administrative Agent's claims against Carnaby Holdings II and Carnaby Holdings III therefore include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

23.       First Brands Group Holdings, LLC Guarantee Claims.  FB Holdings executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI) and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.   The Administrative Agent's claims against FB Holdings therefore include: (1) the full amount of the Guaranteed Obligations under both Credit Agreements include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

24.       503(b)(9) Claims Against BPI and Trico:  The Administrative Agent also asserts claims in an amount to be determined against each of BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code for the fair value of inventory BPI and Trico received from Carnaby II and Carnaby III during the 20 days preceding the Petition Date to the extent Carnaby II and Carnaby III did not receive payment equal to such fair value from BPI and Trico.

25.       Additional Claims.  The Administrative Agent also asserts against FBG, on behalf of itself and the Carnaby II and III Secured Lenders, claims in an amount not less than **$160,717,187.33** for payment in full of damages stemming from, among other things, (i) any all

13

**JOINT EXHIBIT NO. 61**
**Page 286 of 540**

outstanding aggregate principal amounts of the loans under the Credit Agreements and all accrued and unpaid interest (including post-petition and default interest) thereon; (ii) any and all unpaid fees and expenses owed to the Administrative Agent and/or any of the Carnaby II and III Secured Lenders; (iii) any indemnifications, out-of-pocket fees and expenses (including, but not limited to, the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II and III Secured Lenders), premiums, reimbursements, charges, damages, and/or claims (as defined in the Bankruptcy Code) arising under the applicable Transaction Documents; (iv) all obligations owed to the Carnaby II and III Secured Lenders until all Obligations have been paid in full; (v) all damages arising from breach by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors of its respective representations, warranties, and obligations under the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or any other Transaction Documents to which it is party; and (vi) all damages arising from the fraudulent misrepresentations and omissions made by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors in connection with the Transaction Documents and the transactions contemplated thereby, including without limitation all amounts necessary to compensate the Carnaby II and III Secured Lenders for losses caused by such misrepresentations and omissions (collectively, the "Additional Claims," and together with the aggregate outstanding principal amount of the Loans, accrued and unpaid interest, fees, costs, and all other Obligations and Guaranteed Obligations due and payable under the Credit Agreements and the related Transaction Documents, the "Claims").  The Administrative Agent also asserts Additional Claims against BPI arising out of the Carnaby II Credit Agreement and related Transaction Documents in an amount not less than $59,622,980.05 and Additional

14

**JOINT EXHIBIT NO. 61**
**Page 287 of 540**

Claims arising out of the Carnaby III Credit Agreement and related Transaction Documents against Trico in an amount not less than $101,094,207.28. The Administrative Agent also asserts Additional Claims arising out of the Carnaby Credit Agreements against each of FB Holdings, Carnaby Holdings II and Carnaby Holdings III in an amount to be determined.

26.     Breach of Contract and Fraud Claims.  In addition to any Claims set forth above, the Administrative Agent, on behalf of itself and the Carnaby II and III Secured Lenders, asserts claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors for breach of contract and common law fraud/fraudulent misrepresentation. Each FBG Debtor was party to, and breached, one or more of the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or the other Transaction Documents, and each failed to perform its obligations thereunder, including without limitation by failing to maintain, preserve, and protect the Collateral; failing to comply with applicable covenants, representations, and warranties; and failing to satisfy the Obligations and Guaranteed Obligations when due.

27.     The FBG Debtors committed fraud by making material misrepresentations and omissions in connection with the Transaction Documents and the transactions contemplated thereby, upon which the Administrative Agent and the Carnaby II and III Secured Lenders reasonably relied in advancing funds, extending credit, and entering into the Transaction Documents, and such misrepresentations and omissions caused damage to the Carnaby II and III Secured Lenders in an amount to be determined. The Administrative Agent expressly reserves the right to supplement the factual basis for these claims as additional information becomes available through discovery or otherwise.

15

**JOINT EXHIBIT NO. 61**
**Page 288 of 540**

28.     Federal Rule of Bankruptcy Procedure 3001(e)(3) states that "[i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount." Fed. R. Bankr. P. 3001(e)(3).  Section 101(54) of the Bankruptcy Code defines "transfer" as "the creation of a lien."  11 U.S.C. § 101(54)(A).  Pursuant to the U.S. Security Agreements, the Administrative Agent has been granted properly perfected, first-priority liens, for the benefit of the Carnaby II and III Secured Lenders, over, *inter alia,* all Contracts and Contract Rights of each of Carnaby II and Carnaby III and each of Carnaby Holdings II and Carnaby Holdings III.  Accordingly, the Administrative Agent holds any claims arising out of any such Contracts or Contract Rights that may be asserted by any of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III against any person or entity, including, without limitation, any other Debtor and non-Debtor entities (including the FBG Debtors).  Such claims include, in the case of the FBG Debtors that are counterparties to the Transaction Documents, any claims held by Carnaby II, Carnaby III, Carnaby Holdings II, or Carnaby Holdings III for breach of contract, in each case up to the full amount of the Obligations and Guaranteed Obligations.

29.     <u>Nature of the Claims Against Carnaby Holdings II and Carnaby Holdings III</u>. The Claims asserted against each of Carnaby Holdings II and Carnaby Holdings III are secured by properly perfected, valid and enforceable first-priority liens and pledges on all of its assets as contemplated by the U.S. Security Agreement, and all of the assets of each of Carnaby II and Carnaby III as contemplated by the Cross-Collateralization Agreement.  Consequently, the Claims are secured, except to the extent that the value of the Collateral securing the Claims is insufficient to satisfy the Claims in full.  To the extent of any remaining deficiency, the remainder of the Claim is asserted as a general unsecured claim.

**JOINT EXHIBIT NO. 61**
**Page 289 of 540**

30.     Nature of the Claims Against the FBG Debtors:  Except as set forth in the following paragraph, the Claims against the FBG Debtors are asserted as general unsecured claims.

31.     Nature of 503(b)(9) Claims Against BPI and Trico:  The Claims asserted against BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code are asserted as administrative expense priority Claims.

**RESERVATION OF RIGHTS**

32.     By filing this Proof of Claim, the Administrative Agent does not waive, and expressly reserves, all rights and remedies at law or in equity under any applicable law or jurisdiction that the Administrative Agent has or may have against each of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors any guarantor or obligor (including but not limited to Carnaby Holdings II, Carnaby Holdings III, and FB Holdings), and any of their respective affiliates and subsidiaries, or any other person or entity, including without limitation its rights to seek payment as an oversecured creditor of all amounts to which it may be entitled under 11 U.S.C. § 506.  Without limiting the generality of the foregoing, this Proof of Claim is not, ***nor shall it be deemed or construed to be***: (a) a waiver or release of any terms or provisions of the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (b) an election of remedies or waiver of any past, present or future breaches, defaults or events of default under the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (c) a waiver of the rights and remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether an affiliate or guarantor of any of the Debtors or an assignee or otherwise; (d) consent by the Administrative Agent to the jurisdiction of the Court with respect to any proceeding commenced against or otherwise involving the Administrative Agent; (e) a waiver of any right to (1) withdraw the reference, or otherwise

17

challenge the jurisdiction of the Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in this case against or otherwise involving the Administrative Agent, or (2) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Administrative Agent; (f) a waiver or release of, or any other limitation on, the Administrative Agent's right to assert that any portion of the claims asserted herein or any other claims are entitled to treatment as priority claims including under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (g) a waiver of any rights that the Administrative Agent may have pursuant to section 506(b) of the Bankruptcy Code; (h) a waiver or release of any lien, pledge or security interest against any Debtor or any third parties; (i) a waiver or release of, or any other limitation on, the Administrative Agent's rights to assert that any nonrecourse claim should be treated as a recourse claim, including but not limited to the exercise of any right that the Administrative Agent may have pursuant to section 1111(b) of the Bankruptcy Code; (j) consent to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. section 157(e) or otherwise; (k) a waiver by the Administrative Agent of the right to have final orders in non-core matters entered only by a United States District Court judge; (l) a waiver or release of the Administrative Agent's right to have any and all final orders in any and all noncore matters or proceedings entered only after de novo review by a United States District Court Judge; or (m) a waiver of any claim, at law or in equity or under any applicable law, including without limitation administrative claims, priority claims, secured claims, unsecured claims, constructive trust claims, claims based upon common law fraud, misrepresentation, subrogation, indemnity, contribution, unjust enrichment, fraudulent

conveyance, failure to fulfill contractual and fiduciary obligations, breach of the implied covenant of good faith and fair dealing, tortious interference, quantum meruit, or any other theory available under applicable law or equity, including, without limitation, the right to assert a constructive trust against assets or cash held by any Debtor, and any and all amounts owed, in damages or otherwise, whether known or unknown, and whether presently asserted or to be asserted, all of which singularly or collectively may have caused the Administrative Agent to incur damages.  Nothing herein shall be deemed to waive, stop, or derogate from the rights of the Administrative Agent under the Transaction Documents, including, without limitation, in connection with the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, and any order of the Court, or to prejudice any and all of the Administrative Agent's rights, claims, and defenses under the Bankruptcy Code or otherwise, including, but not limited to, the right to vote on any plan(s) in the Debtors' Chapter 11 Cases.

33.     The Administrative Agent expressly reserves the right to amend, replace, update, or supplement this Proof of Claim (including the proof of claim form) at any time and in any respect (including, without limitation, as necessary or appropriate to amend, quantify, or correct amounts, to provide additional detail regarding the Claims set forth herein, to fix the amount of any contingent or unliquidated component of the Claims, or to include any claim, at law or in equity), to add or amend documents and other information, to file additional proofs of claim or further pleadings for additional claims, to contest the validity, priority, and extent of any other purported liens and security interests other than those described herein, and to assert any and all other claims, actions, defenses, setoffs, recoupments, rights or remedies of whatever kind or nature that it currently has, or may have in the future against any of Carnaby Holdings II, Carnaby Holdings III, any FBG Debtor, and/or any other Debtors or non-Debtors, or any other person or

entity, including without limitation, rights against guarantors, officers, directors, and other creditors any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, at law or in equity, including, without limitation, administrative or other priority claims, setoff and recoupment rights, lien rights, interest, and the right to assert claims that are otherwise warranted in any related actions.

34.     The Administrative Agent reserves the right to claim that the portion of its fees, interest, costs, expenses, and other charges incurred or accruing after the applicable Petition Date of each of any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, constitute administrative expenses of the applicable Debtor's estate to the extent such expenses are not otherwise paid in full, and reserves the right to file a claim or application for payment of such administrative expenses.

35.     No judgment has been rendered on the Claims set forth in this Proof of Claim.

36.     With respect to any portion of the Claims that is unliquidated or as to which the amount is undetermined, the Administrative Agent does not waive their rights thereto by not claiming specific amounts at this time.

37.     The Administrative Agent expressly reserves, and does not waive, its right to payment of any amounts due from any guarantor in respect of the Credit Agreements from any other sources under any applicable law and jurisdiction.

38.     The Administrative Agent expressly reserves its rights to exercise judicial actions under any applicable law and jurisdiction against non-Debtor entities during and after these Chapter 11 Cases.

39.     Nothing contained in this Proof of Claim shall be deemed an admission by the Administrative Agent.

**JOINT EXHIBIT NO. 61**
**Page 293 of 540**

40.     To the best of the Administrative Agent's knowledge, the claims set forth herein are not subject to setoff or counterclaim, provided, however, that the Administrative Agent (on behalf of the Carnaby II and III Secured Lenders) expressly reserves and does not waive any right of set-off or recoupment it may possess.

41.     The Administrative Agent does not consent to the surcharge of the Collateral by any Debtor's estate, their representatives, or any other person or party-in-interest pursuant to 11 U.S.C. §506(c) or otherwise.

42.     The Administrative Agent expressly reserves the right to withdraw this Proof of Claim as if it had never been filed.

## NOTICES AND COMMUNICATIONS

43.     Any and all notices and communications concerning the Proof of Claim shall be sent to the following addresses both in hard copy and via e-mail:

Tarik Johnson
**GLAS TRUST COMPANY LLC**, in its capacity as Administrative Agent
3 Second Street, Suite 206, Jersey City, NJ 07311
Tel.: +1 201 201 8642
E-mails:
Tarik.Johnson@glas.agency

with a copy to (which shall not constitute notice)

Allan S. Brilliant
Stephen Wolpert
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Tel.: +1 212 698 3599
E-mails:
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

21

**JOINT EXHIBIT NO. 61**
**Page 294 of 540**

## SUPPORTING DOCUMENTS

44.     The Administrative Agent's claims are based on the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, the Purchase Agreements, the Promissory Notes, the Sale Agreements, and other related Transaction Documents.  Copies of these documents and additional related documents are not attached to the Proof of Claim because of their voluminous nature.  Counsel to the Administrative Agent will provide copies of such documents to any party in interest in these Chapter 11 Cases, upon a reasonable written request (and entry into an appropriate confidentiality agreement, if necessary) addressed to counsel to the Administrative Agent at the address set forth herein.

45.     Each and every description in this Addendum to the Credit Agreements and the other Transaction Documents is qualified in its entirety by reference to the applicable provisions of such documents, and all such documents are incorporated herein by reference.  In the event of any inconsistency between this Addendum and any such document, including the proof of claim form, the relevant document shall control.

**GLAS Trust Company LLC**
In its capacity as Administrative Agent under the
Carnaby II and Carnaby III Credit Agreements,
related Transaction Documents

Dated: July 6, 2026

22

Electronic Proof of Claim Confirmation:  3950-1-HXHAX-536925835

Claim Electronically Submitted on (UTC) :  2026-07-07T02:26:12.718Z

Submitted by:  GLAS TRUST CO LLC, AGENT FBO CARNABY III SEC. LENDERS
jeffrey.schoenfeld@glas.agency

**KROLL**

**<u>Exhibit   6</u>**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____

**7. How much is the claim?**

$ <u>Not less than $59,622,980</u> . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**Proof of Claim**                                                                 page 2

**JOINT EXHIBIT NO. 61**
**Page 299 of 540**

| | |
|---|---|
| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check one:* |

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

| | | |
|---|---|---|
| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $_____ |

---

**Part 3:**   **Sign Below**

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br>☑ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct. |

*Jeffrey Schoenfeld*   07/07/2026
_____     _____
Electronic Signature                          Date

**Name of the person who is completing and signing this claim**

Name: Jeffrey Schoenfeld
_____
First name          Middle name          Last name

Title/Company: Vice President / GLAS TRUST COMPANY LLC
_____
Identify the corporate servicer as the company if the authorized agent is a servicer.

3 Second Street, Suite 203

Address: _____
Number          Street

Jersey City                    NEW JERSEY 07311
_____
City          State          ZIP Code          Country

Contact phone: 2018392200          Email: jeffrey.schoenfeld@glas.agency

---

**Proof of Claim**                                                          page 3

**JOINT EXHIBIT NO. 61**
**Page 300 of 540**

**Additional Noticing Addresses (if provided):**

**Additional Address 1**
Name:             GLAS Trust Company LLC as administrative agent for the Carnaby II Secured Lenders
Address1:         C/O DECHERT LLP
Address2:         1095 Avenue of the Americas
Address3:
Address4:
City:             New York
State:            NY
Postal Code:      10036
Country:

Contact Phone:    2126983599
Contact Email:    allan.brilliant@dechert.com, stephen.wolpert@dechert.com

**Additional Address 2**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
 Postal Code:
 Country:

Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**
☑ Yes
☐ No
-----------------------------------------------------------------------------------------------------

 Attachment Filename:

First Brands - Omnibus Proof of Claim Addendum for FBG Debtors (Dechert 07-06-2026).pdf

**KROLL**

**JOINT EXHIBIT NO. 61**
**Page 301 of 540**

**OMNIBUS ADDENDUM TO PROOFS OF CLAIM FILED BY
GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT TO
THE CARNABY II AND III SECURED LENDERS**

GLAS Trust Company LLC, in its capacity as administrative agent (the "Administrative Agent") for the Lenders[1] under (i) that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement") among Carnaby Inventory II, LLC ("Carnaby II"), as Borrower; First Brands Group, LLC ("FBG"), as Servicer; First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II"), as Guarantors; the Lenders party thereto (the "Carnaby II Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent, and acknowledged and agreed to by Brake Parts Inc LLC ("BPI"), BPI Brake Manufacturing Juarez, S.A. de C.V. ("BPIJ"), and BPI Braking Systems Mexico, S.A. de C.V. ("BPIM")  and (ii) that certain credit agreement dated as of July 6, 2022 (the "Carnaby III Credit Agreement," and together with the Carnaby II Credit Agreement, the "Credit Agreements") among Carnaby Inventory III, LLC ("Carnaby III"), as Borrower; FBG, as Servicer; FB Holdings and Carnaby Inventory Holdings III, LLC ("Carnaby Holdings III"), as Guarantors; the Lenders party thereto (the "Carnaby III Secured Lenders," and together with the Carnaby II Secured Lenders, the "Carnaby II and III Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent and acknowledged and agreed to by Trico Products Corporation ("TPC"), Trico Technologies Corporation ("TTC" and together with TPC, "Trico"), Trico Componentes, S.A. de C.V. ("TC") and Subensambles Internacionales, S. de R.J. de C.V. ("SI"), *hereby submits* this omnibus addendum (the "Addendum") in support of its proofs of claim (together with the applicable proof of claim form, each a "Proof of Claim") submitted against (a) FBG; (b) FB

---

[1]    Capitalized terms not defined herein shall have the meanings ascribed to those terms in the Credit Agreements and the Transaction Documents, as applicable.

Holdings; (c) BPI; (d) TPC; (e) TTC (together with FBG, FB Holdings, BPI, and TPC, collectively, the "FBG Debtors"); (f) Carnaby Holdings II; (g) Carnaby Holdings III, each in its capacity as further described in the applicable Proof of Claim.  This Addendum is intended to be and should be treated as part of each applicable Proof of Claim.

1.      On September 24, 2025 (the "Initial Petition Date"), certain Debtors,[2] including Carnaby Holdings II and Carnaby Holdings III, commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  Between September 28, 2025, and September 29, 2025, approximately 99 additional Debtors, including the FBG Debtors, filed their own bankruptcy petitions (each, in the case of an FBG Debtor, its respective "Petition Date").

### **BASIS FOR CLAIM**

2.      The Credit Agreements.  On or about May 31, 2022, Carnaby II, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings II, as Guarantors, the Carnaby II Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby II Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time) along with BPI, BPIJ, and BPIM.

3.      On or about July 6, 2022, Carnaby III, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings III, as Guarantors, the Carnaby III Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby III Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise

---

[2]      A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

2

**JOINT EXHIBIT NO. 61**
**Page 303 of 540**

modified from time to time) along with Trico, TC, and SI. [3]  On July 6, 2022, the parties to each of the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into a Cross-Collateralization Agreement (the "Cross-Collateralization Agreement"), pursuant to which the liens securing the Obligations[4] and Guaranteed Obligations[5] outstanding under each Credit Agreement secured the Obligations and Guaranteed Obligations outstanding under the other Credit Agreement, and vice versa.

4.     The Carnaby II Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $60 million aggregate principal amount and the Carnaby III Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $100 million aggregate principal amount, under which funds were advanced by the Carnaby II Secured Lenders and the Carnaby III Secured Lenders, respectively.

5.     Obligations. Each Borrower's obligations under the applicable Credit Agreement and the Transaction Documents[6] thereunder are secured by first-priority liens granted by Carnaby

---

[3]   On May 30, 2025, the parties to the Carnaby II Credit Agreement and to the Carnaby III Credit Agreement entered into Extension Agreements, extending the Maturity Date originally set forth in the Carnaby II Credit Agreement and the Carnaby III Credit Agreement to December 1, 2025.

[4]   Each Credit Agreement defines "Obligations" in identical terms as "all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding)." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

[5]   Each Credit Agreement defines "Guaranteed Obligations" in identical terms as "the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations[.]" Carnaby II Credit Agreement, section 11.1; Carnaby III Credit Agreement, section 11.1.

[6]   Each Credit Agreement defines the "Transaction Documents" in identical terms as "collectively, [the applicable Credit Agreement], each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other

3

II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III, on the applicable Collateral (as defined below) pursuant to the U.S. Security Agreements (as defined below) and the applicable Mexican Security Agreement (as defined below), as further detailed below.

6.      The Administrative Agent holds, on behalf of the Carnaby II Secured Lenders, loans totaling $58,964,276.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $658,704.05 under the Carnaby II Credit Agreement and, on behalf of the Carnaby III Secured Lenders, loans totaling $100,000,000.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $1,094,207.28 under the Carnaby III Credit Agreement (together, the "Loans"), each due and payable by the Borrowers and Guarantors under the Credit Agreements.  In addition to the obligation to repay the principal amount of the Loans, each of the Borrowers and the Guarantors (including FB Holdings) assumed the obligation to pay accrued and unpaid interest and all other Obligations and Guaranteed Obligations outstanding under the respective Credit Agreement and other Transaction Documents.

7.      Promissory Notes.  Each Borrower's obligations to repay the Obligations under the respective Credit Agreement were also evidenced through Promissory Notes executed by such Borrower with respect to each advance, and guaranteed, in each case, jointly and severally, by the applicable Guarantors under such Credit Agreement.

8.      U.S. Security Agreements.  On or about May 31, 2022, Carnaby II, Carnaby Holdings II, and the Administrative Agent for the benefit of the Carnaby II Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby II U.S. Security

---

instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

**JOINT EXHIBIT NO. 61**
**Page 305 of 540**

Agreement"). On or about July 6, 2022, Carnaby III, Carnaby Holdings III, and the Administrative Agent for the benefit of the Carnaby III Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby III U.S. Security Agreement," and together with the Carnaby II U.S. Security Agreement, the "U.S. Security Agreements").

9.        As security for the prompt and complete payment or performance in full of the applicable "Obligations" (as defined in the U.S. Security Agreements, as amended by the Cross-Collateralization Agreement[7]), each Borrower and the Carnaby Holdings II or Carnaby Holdings III, as applicable, entity pledged, collaterally assigned and granted to the Administrative Agent, on behalf of and for the benefit of the applicable Secured Parties, a continuing security interest in all of their right, title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, such party, and regardless of where located: (i) all Accounts; (ii) all Cash; (iii) all Chattel Paper (including without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper); (iv) all Commercial Tort Claims; (v) all Contracts, together with all Contract Rights arising thereunder; (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Financial Assets; (x)

---

[7]  As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby II U.S. Security Agreement means "(i) 'Obligations' (as defined in the [Carnaby II] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby II] Credit Agreement) and (iii) 'Obligations' (as defined in the Pledge and Security Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(ii).

As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby III U.S. Security Agreement means "(i) "Obligations" (as defined in the [Carnaby III] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby III] Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory II, LLC, as borrower, Carnaby Inventory Holdings II, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(iv).

all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Governmental Authorizations; (xiv) all Instruments; (xv) all Intellectual Property Collateral; (xvi)  all Inventory; (xvii) all Investment Property, Pledged Stock and other Pledged Collateral; (xviii) all letters of credit and Letter-of-Credit Rights; (xix) all Licenses; (xx) all Proceeds of insurance; (xxi) all Receivables; (xxii) all Real Estate Assets; (xxiii) all Securities Accounts, Money, Securities, and other investments therein, and all Security Entitlements in respect thereof; (xxiv) all Software and all recorded data of any kind or nature, regardless of the medium of recording; (xxv) all Supporting Obligations relating to any of the foregoing; and (xxvi) all accessions to, substitutions and replacements for, and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing (collectively, the "U.S. Collateral"), thereby achieving a complete cross-collateralization of the Carnaby II Credit Agreement and Carnaby III Credit Agreement in respect of all obligations owing under such facilities and all collateral pledged under them.

10.    Mexican Security Agreements. As additional security for the payment, performance and satisfaction in full of any and all of the Obligations, (i) on May 31, 2022, Carnaby II, as Pledgor, the Administrative Agent for the benefit of the Carnaby II Secured Lenders, as Pledgee, BPIJ and BPIM, as depositaries (jointly, the "Carnaby II Depositaries"), and BPI entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*), under Mexican law (the "Carnaby II Mexican Security Agreement"); and (ii) on July 6, 2022, Carnaby III, as Pledgor, the Administrative Agent for the benefit of the Carnaby III Secured Lenders, as Pledgee, TC and SI, as depositaries (jointly, the "Carnaby III Depositaries"), and TPC and TTC

6

entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión* ), under Mexican law (the "Carnaby III Mexican Security Agreement," and together with the Carnaby II Mexican Security Agreement, the "Mexican Security Agreements").

11.     Under the Carnaby II Mexican Security Agreement, Carnaby II granted to the Administrative Agent, for the benefit of the Carnaby II Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Under the Carnaby III Mexican Security Agreement, Carnaby III granted to the Administrative Agent, for the benefit of the Carnaby III Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Each Mexican Security Agreement defines Pledged Assets as any and all property and inventory located in Mexico, currently owned by the applicable Pledgor, or acquired by the applicable Pledgor or arising in the future, including without limitation, all Raw Materials,[8] together with (i) all documents, documents of title, warehouse receipts (or similar documents), bills of lading or orders for delivery of all, or any portion of the foregoing; and (ii) all products and/or sale proceeds of any and all of the foregoing, including, without limitation, insurance proceeds (collectively, the "Mexican Collateral" and together with the U.S. Collateral, the "Collateral").  Each Mexican Security Agreement also

---

[8]     "Raw Materials" are defined under the Mexican Security Agreements as "all the assets that comprise the inventory of the Pledgor, whether now owned or hereafter acquired, including without limitation, all inventory of the Pledgor (i) held for sale or lease, (ii) furnished or to be furnished under any service agreement, (iii) held for display or demonstration, or (iv) on lease or consignment, in favor of third parties; including accessories, packaging and shipping materials, spare parts, repair parts, returned and repossessed inventory, all raw materials, work-in-process, finished inventory and supplies used or consumed in the Pledgor business together with all documents, documents of title, warehouse receipts, pledge bonds, bills of lading, deposit certificates or orders for the delivery of all, or any portion, of the foregoing, including without limitation the assets listed in Exhibit C [attached thereto]."

7

provides that the applicable Pledgor is the sole, legal, and beneficial owner of the Mexican Collateral, free and clear of any liens or other encumbrances, and that the security interest granted thereunder constitutes a legal, valid, binding, and enforceable security over the Mexican Collateral.

12.     Perfection. The security interests granted under the U.S. Security Agreements were properly perfected by filing UCC financing statements with the Delaware Secretary of State.[9]  As a result, the Administrative Agent holds, on behalf of and for the benefit of the Carnaby II and III Secured Lenders, properly perfected security interests in all assets of each of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III.

13.     In turn, each Mexican Security Agreement was executed in compliance with Mexican law, before a Mexican Notary Public and is duly registered before the Mexican Sole Registry of Liens over Movable Assets (*Registro Unico de Garantias Mobiliarias*).  As a result, the Carnaby II Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the benefit of the Carnaby II Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby II,[10] and the Carnaby III Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the

---

*See* (i) UCC Financing Statement File No. 2022 4634697, filed at 12:39 PM on June 2, 2022, against Carnaby Inventory II, LLC as debtor; (ii) UCC Financing Statement File No. 2022 4634796, filed at 12:42 PM on June 2, 2022, against Carnaby Inventory Holdings II, LLC as debtor; (iii) UCC Financing Statement File No. 2022 5629043, filed at 3:58 PM on July 6, 2022, against Carnaby Inventory III, LLC as debtor; and (iv) UCC Financing Statement File No. 2022 5628912, filed at 3:55 PM on July 6, 2022, against Carnaby Inventory Holdings III, LLC as debtor.

[10]     The Carnaby II Mexican Security Agreement was registered with the RUG on June 7, 2022 (at 15:08:37 ZULU GMT/UTC), as Asiento No. 31302386, Garantía Mobiliaria No. 16927095, Folio Electrónico R20220601MG36, with a maximum secured amount of USD $60,000,000, covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby II.  On July 6, 2022, the Carnaby II Mexican Security Agreement was amended by the Amendment Agreement (Convenio Modificatorio) to extend the secured obligations to cover the Carnaby III Credit Agreement obligations as well, consistent with the Cross-Collateralization Agreement.  This amendment was registered with the RUG on July 8, 2022 (at 19:21:38 ZULU GMT/UTC), as Asiento No. 32022878, Garantía Mobiliaria No. 16927095 (same folio as the Carnaby II Original Pledge), amending the maximum secured amount to USD $160,000,000.

**JOINT EXHIBIT NO. 61**
**Page 309 of 540**

benefit of the Carnaby III Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby III.[11]

14. <u>Cross-Collateralization Agreement</u>.  As noted in paragraph 2 above, on July 6, 2022, the parties to the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into the Cross-Collateralization Agreement, pursuant to which the Collateral securing each Credit Agreement also secures the obligations under the other Credit Agreement, and vice versa.  This cross-collateralization was also reflected in and effected through the U.S. Security Agreements, and in the Mexican Security Agreements as set forth above.

15. <u>Other Obligations Under the Transaction Documents</u>.  FBG executed each of the Credit Agreements as "Servicer" and made various representations and warranties and undertakings in favor of the Carnaby II and III Secured Lenders thereunder including, without limitation, (i) to cause each of BPI and Trico to comply with the terms of the Transaction Documents; (ii) to act as Servicer under the Credit Agreements and to perform (or cause to be performed) certain functions for Carnaby II and Carnaby III.  Accordingly, FBG is responsible for ensuring the Carnaby II, Carnaby III, BPI, and Trico, and the Guarantors under the Credit Agreements each perform their obligations under the Transaction Documents (including, without limitation, obligations to maintain and preserve adequate records of the purchases and sales of inventory, to deliver regular reporting, and to maintain corporate separateness of the entities).  (*See* Credit Agreements Sec. 6.2(a)–(f), Sec. 5.1(s), (t); *see also* Sec. 5.1(a), (f), (g), (m), (n), (o), (p), (v), (w), (bb), and (dd); Sec. 5.2(j).  In their respective Credit Agreements, each of BPI and Trico

---

[11]   The Carnaby III Mexican Security Agreement was formalized before Corredor Público No. 7 (Licenciado José Carlos Reyes Cadena) in the State of Nuevo León, Mexico, and was registered with the RUG on July 8, 2022 (at 18:50:02 ZULU GMT/UTC), as Asiento No. 32020337, Garantía Mobiliaria No. 17265862, Folio Electrónico R20220708MSF5, with a maximum secured amount of USD $160,000,000 (covering both facilities per the Cross-Collateralization Agreement), covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby III.

covenanted for the benefit of the Carnaby II and III Secured Lenders to timely perform all of their respective obligations under the Transaction Documents to which they are party. *See* Credit Agreement, Sec. 5.1(aa).

16.     As contemplated by the Carnaby II Credit Agreement, Carnaby II maintains a manufacturing business relationship with BPI, as evidenced by a Manufacturing Agreement, pursuant to which Carnaby II provides to BPI and the Carnaby II Depositaries the Raw Material for manufacture in accordance with BPI's Maquiladora Agreements with the Carnaby II Depositaries. The Manufacturing Agreement between Carnaby II and BPI was executed on May 31, 2022, and created valid and binding obligations of BPI, enforceable against it in accordance with its terms. Under that Manufacturing Agreement, Carnaby II hired and requested certain manufacturing services from BPI to manufacture and produce the products requested by Carnaby II. BPI was authorized to perform the manufacturing processes required by Carnaby II through its "maquiladora program" with the Carnaby II Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreement).

17.     As contemplated by the Carnaby III Credit Agreement, Carnaby III maintains a manufacturing business relationship with Trico, as evidenced by the Manufacturing Agreements, pursuant to which Carnaby III provides to Trico and the Carnaby III Depositaries the Raw Material for manufacture in accordance with Trico's Maquiladora Agreements with the Carnaby III Depositaries. The Manufacturing Agreements between Carnaby III and Trico were executed on July 6, 2022, and created valid and binding obligations of Trico, enforceable against them in accordance with its terms. Under the Manufacturing Agreements, Carnaby III hired and requested certain manufacturing services from Trico to manufacture and produce the products requested by

10

**JOINT EXHIBIT NO. 61**
**Page 311 of 540**

Carnaby III.  Trico was authorized to perform the manufacturing processes required by Carnaby III through its "maquiladora program" with the Carnaby III Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreements).

18.     The Manufacturing Agreements between Carnaby II and Carnaby III and BPI and Trico, as applicable, provide that neither BPI, Trico, the Carnaby II Depositaries, or the Carnaby III Depositaries, as applicable, shall under any circumstances be considered to have any proprietary interest in the Materials (as defined in the Manufacturing Agreements) which Carnaby II and Carnaby III may deliver to BPI, Trico, the Carnaby II Depositaries, or Carnaby III Depositaries, as applicable, nor on the Products (as defined in the Manufacturing Agreements).  They also provide that BPI, Trico, the Carnaby II Depositaries, and the Carnaby III Depositaries, as applicable, shall provide necessary administrative services for shipment, including the arrangement of proper transportation of the Materials and the Products between Mexico and the United States.  The Manufacturing Agreement also provides that the Carnaby II Depositaries and the Carnaby III Depositaries shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the Materials and Products, but that under no circumstances does acting as importer and exporter result in the conveyance of ownership of the Materials or Products to the Carnaby II Depositaries or Carnaby III Depositaries.

19.     Carnaby II executed a Purchase Agreement and Sale Agreement with BPI on May 31, 2022, which provided for the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreement.  Carnaby III executed a Purchase Agreement and Sale Agreement with each of Trico on July 6, 2022 which provided for

11

the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreements.  As buyers and sellers under the Purchase Agreements and Sale Agreements, the parties thereto intended to effect absolute and irrevocable 'true sales' for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings and undertook to reflect such sales in their respective financial statements).  Each Purchase Agreement and Sale Agreement further required that the parties advise anyone inquiring about the ownership of any assets purchases thereunder that all applicable assets had been sold to the applicable buyer.  Additionally, each of applicable selling parties under the Purchase Agreements and Sale Agreements represented and warranted to in their respective Purchase Agreements and Sale Agreements that they had good title to the assets being sold, in each case free and clear of any liens.

20.     Purchases and sales of inventory between Carnaby II and BPI occurred beginning on or about May 31, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).  Purchases and sales of inventory between Carnaby III and Trico occurred beginning on or about July 6, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).

**ASSERTION OF CLAIM**

21.     Proof of Claim.  This Proof of Claim is filed by the Administrative Agent for the benefit of the Carnaby II and III Secured Lenders and sets forth their claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors as follows:

22.     Carnaby Holdings II and Carnaby Holdings III Guarantee Claims.  Each of Carnaby Holdings II and Carnaby Holding III executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI)

12

**JOINT EXHIBIT NO. 61**
**Page 313 of 540**

and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.  The Administrative Agent's claims against Carnaby Holdings II and Carnaby Holdings III therefore include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

23. <u>First Brands Group Holdings, LLC Guarantee Claims</u>.  FB Holdings executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI) and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.   The Administrative Agent's claims against FB Holdings therefore include: (1) the full amount of the Guaranteed Obligations under both Credit Agreements include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

24. <u>503(b)(9) Claims Against BPI and Trico</u>:  The Administrative Agent also asserts claims in an amount to be determined against each of BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code for the fair value of inventory BPI and Trico received from Carnaby II and Carnaby III during the 20 days preceding the Petition Date to the extent Carnaby II and Carnaby III did not receive payment equal to such fair value from BPI and Trico.

25. <u>Additional Claims</u>.  The Administrative Agent also asserts against FBG, on behalf of itself and the Carnaby II and III Secured Lenders, claims in an amount not less than **$160,717,187.33** for payment in full of damages stemming from, among other things, (i) any all

13

outstanding aggregate principal amounts of the loans under the Credit Agreements and all accrued and unpaid interest (including post-petition and default interest) thereon; (ii) any and all unpaid fees and expenses owed to the Administrative Agent and/or any of the Carnaby II and III Secured Lenders; (iii) any indemnifications, out-of-pocket fees and expenses (including, but not limited to, the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II and III Secured Lenders), premiums, reimbursements, charges, damages, and/or claims (as defined in the Bankruptcy Code) arising under the applicable Transaction Documents; (iv) all obligations owed to the Carnaby II and III Secured Lenders until all Obligations have been paid in full; (v) all damages arising from breach by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors of its respective representations, warranties, and obligations under the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or any other Transaction Documents to which it is party; and (vi) all damages arising from the fraudulent misrepresentations and omissions made by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors in connection with the Transaction Documents and the transactions contemplated thereby, including without limitation all amounts necessary to compensate the Carnaby II and III Secured Lenders for losses caused by such misrepresentations and omissions (collectively, the "Additional Claims," and together with the aggregate outstanding principal amount of the Loans, accrued and unpaid interest, fees, costs, and all other Obligations and Guaranteed Obligations due and payable under the Credit Agreements and the related Transaction Documents, the "Claims").  The Administrative Agent also asserts Additional Claims against BPI arising out of the Carnaby II Credit Agreement and related Transaction Documents in an amount not less than $59,622,980.05 and Additional

14

**JOINT EXHIBIT NO. 61**
**Page 315 of 540**

Claims arising out of the Carnaby III Credit Agreement and related Transaction Documents against Trico in an amount not less than $101,094,207.28.   The Administrative Agent also asserts Additional Claims arising out of the Carnaby Credit Agreements against each of FB Holdings, Carnaby Holdings II and Carnaby Holdings III in an amount to be determined.

26.   <u>Breach of Contract and Fraud Claims</u>.   In addition to any Claims set forth above, the Administrative Agent, on behalf of itself and the Carnaby II and III Secured Lenders, asserts claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors for breach of contract and common law fraud/fraudulent misrepresentation.   Each FBG Debtor was party to, and breached, one or more of the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or the other Transaction Documents, and each failed to perform its obligations thereunder, including without limitation by failing to maintain, preserve, and protect the Collateral; failing to comply with applicable covenants, representations, and warranties; and failing to satisfy the Obligations and Guaranteed Obligations when due.

27.   The FBG Debtors committed fraud by making material misrepresentations and omissions in connection with the Transaction Documents and the transactions contemplated thereby, upon which the Administrative Agent and the Carnaby II and III Secured Lenders reasonably relied in advancing funds, extending credit, and entering into the Transaction Documents, and such misrepresentations and omissions caused damage to the Carnaby II and III Secured Lenders in an amount to be determined.   The Administrative Agent expressly reserves the right to supplement the factual basis for these claims as additional information becomes available through discovery or otherwise.

15

**JOINT EXHIBIT NO. 61**
**Page 316 of 540**

28.     Federal Rule of Bankruptcy Procedure 3001(e)(3) states that "[i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount." Fed. R. Bankr. P. 3001(e)(3).  Section 101(54) of the Bankruptcy Code defines "transfer" as "the creation of a lien."  11 U.S.C. § 101(54)(A).  Pursuant to the U.S. Security Agreements, the Administrative Agent has been granted properly perfected, first-priority liens, for the benefit of the Carnaby II and III Secured Lenders, over, *inter alia,* all Contracts and Contract Rights of each of Carnaby II and Carnaby III and each of Carnaby Holdings II and Carnaby Holdings III.  Accordingly, the Administrative Agent holds any claims arising out of any such Contracts or Contract Rights that may be asserted by any of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III against any person or entity, including, without limitation, any other Debtor and non-Debtor entities (including the FBG Debtors).  Such claims include, in the case of the FBG Debtors that are counterparties to the Transaction Documents, any claims held by Carnaby II, Carnaby III, Carnaby Holdings II, or Carnaby Holdings III for breach of contract, in each case up to the full amount of the Obligations and Guaranteed Obligations.

29.     <u>Nature of the Claims Against Carnaby Holdings II and Carnaby Holdings III</u>. The Claims asserted against each of Carnaby Holdings II and Carnaby Holdings III are secured by properly perfected, valid and enforceable first-priority liens and pledges on all of its assets as contemplated by the U.S. Security Agreement, and all of the assets of each of Carnaby II and Carnaby III as contemplated by the Cross-Collateralization Agreement.  Consequently, the Claims are secured, except to the extent that the value of the Collateral securing the Claims is insufficient to satisfy the Claims in full.  To the extent of any remaining deficiency, the remainder of the Claim is asserted as a general unsecured claim.

16

**JOINT EXHIBIT NO. 61**
**Page 317 of 540**

30.    <u>Nature of the Claims Against the FBG Debtors</u>:  Except as set forth in the following paragraph, the Claims against the FBG Debtors are asserted as general unsecured claims.

31.    <u>Nature of 503(b)(9) Claims Against BPI and Trico:</u>  The Claims asserted against BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code are asserted as administrative expense priority Claims.

## RESERVATION OF RIGHTS

32.    By filing this Proof of Claim, the Administrative Agent does not waive, and expressly reserves, all rights and remedies at law or in equity under any applicable law or jurisdiction that the Administrative Agent has or may have against each of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors any guarantor or obligor (including but not limited to Carnaby Holdings II, Carnaby Holdings III, and FB Holdings), and any of their respective affiliates and subsidiaries, or any other person or entity, including without limitation its rights to seek payment as an oversecured creditor of all amounts to which it may be entitled under 11 U.S.C. § 506.  Without limiting the generality of the foregoing, this Proof of Claim is not, ***nor shall it be deemed or construed to be***: (a) a waiver or release of any terms or provisions of the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (b) an election of remedies or waiver of any past, present or future breaches, defaults or events of default under the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (c) a waiver of the rights and remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether an affiliate or guarantor of any of the Debtors or an assignee or otherwise; (d) consent by the Administrative Agent to the jurisdiction of the Court with respect to any proceeding commenced against or otherwise involving the Administrative Agent; (e) a waiver of any right to (1) withdraw the reference, or otherwise

17

challenge the jurisdiction of the Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in this case against or otherwise involving the Administrative Agent, or (2) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Administrative Agent; (f) a waiver or release of, or any other limitation on, the Administrative Agent's right to assert that any portion of the claims asserted herein or any other claims are entitled to treatment as priority claims including under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (g) a waiver of any rights that the Administrative Agent may have pursuant to section 506(b) of the Bankruptcy Code; (h) a waiver or release of any lien, pledge or security interest against any Debtor or any third parties; (i) a waiver or release of, or any other limitation on, the Administrative Agent's rights to assert that any nonrecourse claim should be treated as a recourse claim, including but not limited to the exercise of any right that the Administrative Agent may have pursuant to section 1111(b) of the Bankruptcy Code; (j) consent to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. section 157(e) or otherwise; (k) a waiver by the Administrative Agent of the right to have final orders in non-core matters entered only by a United States District Court judge; (l) a waiver or release of the Administrative Agent's right to have any and all final orders in any and all noncore matters or proceedings entered only after de novo review by a United States District Court Judge; or (m) a waiver of any claim, at law or in equity or under any applicable law, including without limitation administrative claims, priority claims, secured claims, unsecured claims, constructive trust claims, claims based upon common law fraud, misrepresentation, subrogation, indemnity, contribution, unjust enrichment, fraudulent

18

conveyance, failure to fulfill contractual and fiduciary obligations, breach of the implied covenant of good faith and fair dealing, tortious interference, quantum meruit, or any other theory available under applicable law or equity, including, without limitation, the right to assert a constructive trust against assets or cash held by any Debtor, and any and all amounts owed, in damages or otherwise, whether known or unknown, and whether presently asserted or to be asserted, all of which singularly or collectively may have caused the Administrative Agent to incur damages.  Nothing herein shall be deemed to waive, stop, or derogate from the rights of the Administrative Agent under the Transaction Documents, including, without limitation, in connection with the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, and any order of the Court, or to prejudice any and all of the Administrative Agent's rights, claims, and defenses under the Bankruptcy Code or otherwise, including, but not limited to, the right to vote on any plan(s) in the Debtors' Chapter 11 Cases.

33.     The Administrative Agent expressly reserves the right to amend, replace, update, or supplement this Proof of Claim (including the proof of claim form) at any time and in any respect (including, without limitation, as necessary or appropriate to amend, quantify, or correct amounts, to provide additional detail regarding the Claims set forth herein, to fix the amount of any contingent or unliquidated component of the Claims, or to include any claim, at law or in equity), to add or amend documents and other information, to file additional proofs of claim or further pleadings for additional claims, to contest the validity, priority, and extent of any other purported liens and security interests other than those described herein, and to assert any and all other claims, actions, defenses, setoffs, recoupments, rights or remedies of whatever kind or nature that it currently has, or may have in the future against any of Carnaby Holdings II, Carnaby Holdings III, any FBG Debtor, and/or any other Debtors or non-Debtors, or any other person or

19

entity, including without limitation, rights against guarantors, officers, directors, and other creditors any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, at law or in equity, including, without limitation, administrative or other priority claims, setoff and recoupment rights, lien rights, interest, and the right to assert claims that are otherwise warranted in any related actions.

34.    The Administrative Agent reserves the right to claim that the portion of its fees, interest, costs, expenses, and other charges incurred or accruing after the applicable Petition Date of each of any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, constitute administrative expenses of the applicable Debtor's estate to the extent such expenses are not otherwise paid in full, and reserves the right to file a claim or application for payment of such administrative expenses.

35.    No judgment has been rendered on the Claims set forth in this Proof of Claim.

36.    With respect to any portion of the Claims that is unliquidated or as to which the amount is undetermined, the Administrative Agent does not waive their rights thereto by not claiming specific amounts at this time.

37.    The Administrative Agent expressly reserves, and does not waive, its right to payment of any amounts due from any guarantor in respect of the Credit Agreements from any other sources under any applicable law and jurisdiction.

38.    The Administrative Agent expressly reserves its rights to exercise judicial actions under any applicable law and jurisdiction against non-Debtor entities during and after these Chapter 11 Cases.

39.    Nothing contained in this Proof of Claim shall be deemed an admission by the Administrative Agent.

**JOINT EXHIBIT NO. 61**
**Page 321 of 540**

40.     To the best of the Administrative Agent's knowledge, the claims set forth herein are not subject to setoff or counterclaim, provided, however, that the Administrative Agent (on behalf of the Carnaby II and III Secured Lenders) expressly reserves and does not waive any right of set-off or recoupment it may possess.

41.     The Administrative Agent does not consent to the surcharge of the Collateral by any Debtor's estate, their representatives, or any other person or party-in-interest pursuant to 11 U.S.C. §506(c) or otherwise.

42.     The Administrative Agent expressly reserves the right to withdraw this Proof of Claim as if it had never been filed.

## NOTICES AND COMMUNICATIONS

43.     Any and all notices and communications concerning the Proof of Claim shall be sent to the following addresses both in hard copy and via e-mail:

Tarik Johnson
**GLAS TRUST COMPANY LLC**, in its capacity as Administrative Agent
3 Second Street, Suite 206, Jersey City, NJ 07311
Tel.: +1 201 201 8642
E-mails:
Tarik.Johnson@glas.agency

with a copy to (which shall not constitute notice)

Allan S. Brilliant
Stephen Wolpert
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Tel.: +1 212 698 3599
E-mails:
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

21

**JOINT EXHIBIT NO. 61**
**Page 322 of 540**

**SUPPORTING DOCUMENTS**

44.    The Administrative Agent's claims are based on the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, the Purchase Agreements, the Promissory Notes, the Sale Agreements, and other related Transaction Documents.   Copies of these documents and additional related documents are not attached to the Proof of Claim because of their voluminous nature.   Counsel to the Administrative Agent will provide copies of such documents to any party in interest in these Chapter 11 Cases, upon a reasonable written request (and entry into an appropriate confidentiality agreement, if necessary) addressed to counsel to the Administrative Agent at the address set forth herein.

45.    Each and every description in this Addendum to the Credit Agreements and the other Transaction Documents is qualified in its entirety by reference to the applicable provisions of such documents, and all such documents are incorporated herein by reference.   In the event of any inconsistency between this Addendum and any such document, including the proof of claim form, the relevant document shall control.

**GLAS Trust Company LLC**
In its capacity as Administrative Agent under the
Carnaby II and Carnaby III Credit Agreements,
related Transaction Documents

Dated: July 6, 2026

**JOINT EXHIBIT NO. 61**
**Page 323 of 540**

Electronic Proof of Claim Confirmation:   3950-1-IGRSX-764769331

Claim Electronically Submitted on (UTC) :   2026-07-07T02:34:17.352Z

Submitted by:   GLAS TRUST CO LLC, AGENT FBO CARNABY II SEC. LENDERS
jeffrey.schoenfeld@glas.agency

**KROLL**

**Exhibit**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ Not less than $101,094,207 . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ _____

**Amount of the claim that is secured:** $ _____

**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| | |
|---|---|
| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check one:* |

**Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $_____

☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $_____

☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies.   $_____

* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

| | |
|---|---|
| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.**   $_____ |

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Jeffrey Schoenfeld*   07/07/2026

_____         _____
Electronic Signature                                        Date

**Name of the person who is completing and signing this claim**

Name      Jeffrey Schoenfeld
_____
          First name              Middle name              Last name

Title/Company   Vice President / GLAS TRUST COMPANY LLC
_____
          Identify the corporate servicer as the company if the authorized agent is a servicer.

          3 Second Street, Suite 203

Address   _____
          Number          Street

          Jersey City                    NEW JERSEY 07311
          _____
          City                    State          ZIP Code          Country

Contact phone   2018392200          Email   jeffrey.schoenfeld@glas.agency

---

**Proof of Claim**                                                                page 3

**JOINT EXHIBIT NO. 61**
**Page 328 of 540**

**Additional Noticing Addresses (if provided):**

**Additional Address 1**

| | |
|---|---|
| Name: | GLAS Trust Company LLC as administrative agent for the Carnaby III Secured Lenders |
| Address1: | C/O DECHERT LLP |
| Address2: | 1095 Avenue of the Americas |
| Address3: | Attn: Allan S. Brilliant and Stephen Wolpert |
| Address4: | |
| City: | New York |
| State: | NY |
| Postal Code: | 10036 |
| Country: | |

Contact Phone: 2126983599
Contact Email:  allan.brilliant@dechert.com, stephen.wolpert@dechert.com

**Additional Address 2**

Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
 Postal Code:
 Country:

Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**

☑ Yes
☐ No

----------------------------------------------------------------------------------------------------

 Attachment Filename:

First Brands - Omnibus Proof of Claim Addendum for FBG Debtors (Dechert 07-06-2026).pdf

**KROLL**

## OMNIBUS ADDENDUM TO PROOFS OF CLAIM FILED BY GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT TO THE CARNABY II AND III SECURED LENDERS

GLAS Trust Company LLC, in its capacity as administrative agent (the "Administrative Agent") for the Lenders[1] under (i) that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement") among Carnaby Inventory II, LLC ("Carnaby II"), as Borrower; First Brands Group, LLC ("FBG"), as Servicer; First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II"), as Guarantors; the Lenders party thereto (the "Carnaby II Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent, and acknowledged and agreed to by Brake Parts Inc LLC ("BPI"), BPI Brake Manufacturing Juarez, S.A. de C.V. ("BPIJ"), and BPI Braking Systems Mexico, S.A. de C.V. ("BPIM")  and (ii) that certain credit agreement dated as of July 6, 2022 (the "Carnaby III Credit Agreement," and together with the Carnaby II Credit Agreement, the "Credit Agreements") among Carnaby Inventory III, LLC ("Carnaby III"), as Borrower; FBG, as Servicer; FB Holdings and Carnaby Inventory Holdings III, LLC ("Carnaby Holdings III"), as Guarantors; the Lenders party thereto (the "Carnaby III Secured Lenders," and together with the Carnaby II Secured Lenders, the "Carnaby II and III Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent and acknowledged and agreed to by Trico Products Corporation ("TPC"), Trico Technologies Corporation ("TTC" and together with TPC, "Trico"), Trico Componentes, S.A. de C.V. ("TC") and Subensambles Internacionales, S. de R.J. de C.V. ("SI"), *hereby submits* this omnibus addendum (the "Addendum") in support of its proofs of claim (together with the applicable proof of claim form, each a "Proof of Claim") submitted against (a) FBG; (b) FB

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to those terms in the Credit Agreements and the Transaction Documents, as applicable.

Holdings; (c) BPI; (d) TPC; (e) TTC (together with FBG, FB Holdings, BPI, and TPC, collectively, the "FBG Debtors"); (f) Carnaby Holdings II; (g) Carnaby Holdings III, each in its capacity as further described in the applicable Proof of Claim.  This Addendum is intended to be and should be treated as part of each applicable Proof of Claim.

1.  On September 24, 2025 (the "Initial Petition Date"), certain Debtors,[2] including Carnaby Holdings II and Carnaby Holdings III, commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  Between September 28, 2025, and September 29, 2025, approximately 99 additional Debtors, including the FBG Debtors, filed their own bankruptcy petitions (each, in the case of an FBG Debtor, its respective "Petition Date").

## BASIS FOR CLAIM

2.  The Credit Agreements.  On or about May 31, 2022, Carnaby II, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings II, as Guarantors, the Carnaby II Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby II Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time) along with BPI, BPIJ, and BPIM.

3.  On or about July 6, 2022, Carnaby III, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings III, as Guarantors, the Carnaby III Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby III Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise

---

[2]  A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**JOINT EXHIBIT NO. 61**
**Page 331 of 540**

modified from time to time) along with Trico, TC, and SI.[3]  On July 6, 2022, the parties to each of the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into a Cross-Collateralization Agreement (the "Cross-Collateralization Agreement"), pursuant to which the liens securing the Obligations[4] and Guaranteed Obligations[5] outstanding under each Credit Agreement secured the Obligations and Guaranteed Obligations outstanding under the other Credit Agreement, and vice versa.

4.      The Carnaby II Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $60 million aggregate principal amount and the Carnaby III Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $100 million aggregate principal amount, under which funds were advanced by the Carnaby II Secured Lenders and the Carnaby III Secured Lenders, respectively.

5.      Obligations. Each Borrower's obligations under the applicable Credit Agreement and the Transaction Documents[6] thereunder are secured by first-priority liens granted by Carnaby

---

[3]   On May 30, 2025, the parties to the Carnaby II Credit Agreement and to the Carnaby III Credit Agreement entered into Extension Agreements, extending the Maturity Date originally set forth in the Carnaby II Credit Agreement and the Carnaby III Credit Agreement to December 1, 2025.

[4]   Each Credit Agreement defines "Obligations" in identical terms as "all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding)." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

[5]   Each Credit Agreement defines "Guaranteed Obligations" in identical terms as "the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations[.]" Carnaby II Credit Agreement, section 11.1; Carnaby III Credit Agreement, section 11.1.

[6]   Each Credit Agreement defines the "Transaction Documents" in identical terms as "collectively, [the applicable Credit Agreement], each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other

3

II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III, on the applicable Collateral (as defined below) pursuant to the U.S. Security Agreements (as defined below) and the applicable Mexican Security Agreement (as defined below), as further detailed below.

6.      The Administrative Agent holds, on behalf of the Carnaby II Secured Lenders, loans totaling $58,964,276.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $658,704.05 under the Carnaby II Credit Agreement and, on behalf of the Carnaby III Secured Lenders, loans totaling $100,000,000.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $1,094,207.28 under the Carnaby III Credit Agreement (together, the "Loans"), each due and payable by the Borrowers and Guarantors under the Credit Agreements.  In addition to the obligation to repay the principal amount of the Loans, each of the Borrowers and the Guarantors (including FB Holdings) assumed the obligation to pay accrued and unpaid interest and all other Obligations and Guaranteed Obligations outstanding under the respective Credit Agreement and other Transaction Documents.

7.      Promissory Notes.  Each Borrower's obligations to repay the Obligations under the respective Credit Agreement were also evidenced through Promissory Notes executed by such Borrower with respect to each advance, and guaranteed, in each case, jointly and severally, by the applicable Guarantors under such Credit Agreement.

8.      U.S. Security Agreements.  On or about May 31, 2022, Carnaby II, Carnaby Holdings II, and the Administrative Agent for the benefit of the Carnaby II Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby II U.S. Security

---

instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

4

**JOINT EXHIBIT NO. 61**
**Page 333 of 540**

Agreement"). On or about July 6, 2022, Carnaby III, Carnaby Holdings III, and the Administrative Agent for the benefit of the Carnaby III Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby III U.S. Security Agreement," and together with the Carnaby II U.S. Security Agreement, the "U.S. Security Agreements").

9.      As security for the prompt and complete payment or performance in full of the applicable "Obligations" (as defined in the U.S. Security Agreements, as amended by the Cross-Collateralization Agreement[7]), each Borrower and the Carnaby Holdings II or Carnaby Holdings III, as applicable, entity pledged, collaterally assigned and granted to the Administrative Agent, on behalf of and for the benefit of the applicable Secured Parties, a continuing security interest in all of their right, title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, such party, and regardless of where located: (i) all Accounts; (ii) all Cash; (iii) all Chattel Paper (including without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper); (iv) all Commercial Tort Claims; (v) all Contracts, together with all Contract Rights arising thereunder; (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Financial Assets; (x)

---

[7]    As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby II U.S. Security Agreement means "(i) 'Obligations' (as defined in the [Carnaby II] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby II] Credit Agreement) and (iii) 'Obligations' (as defined in the Pledge and Security Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(ii).

As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby III U.S. Security Agreement means "(i) "Obligations" (as defined in the [Carnaby III] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby III] Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory II, LLC, as borrower, Carnaby Inventory Holdings II, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(iv).

5

all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Governmental Authorizations; (xiv) all Instruments; (xv) all Intellectual Property Collateral; (xvi)  all Inventory; (xvii) all Investment Property, Pledged Stock and other Pledged Collateral; (xviii) all letters of credit and Letter-of-Credit Rights; (xix) all Licenses; (xx) all Proceeds of insurance; (xxi) all Receivables; (xxii) all Real Estate Assets; (xxiii) all Securities Accounts, Money, Securities, and other investments therein, and all Security Entitlements in respect thereof; (xxiv) all Software and all recorded data of any kind or nature, regardless of the medium of recording; (xxv) all Supporting Obligations relating to any of the foregoing; and (xxvi) all accessions to, substitutions and replacements for, and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing (collectively, the "U.S. Collateral"), thereby achieving a complete cross-collateralization of the Carnaby II Credit Agreement and Carnaby III Credit Agreement in respect of all obligations owing under such facilities and all collateral pledged under them.

10.     Mexican Security Agreements. As additional security for the payment, performance and satisfaction in full of any and all of the Obligations, (i) on May 31, 2022, Carnaby II, as Pledgor, the Administrative Agent for the benefit of the Carnaby II Secured Lenders, as Pledgee, BPIJ and BPIM, as depositaries (jointly, the "Carnaby II Depositaries"), and BPI entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*), under Mexican law (the "Carnaby II Mexican Security Agreement"); and (ii) on July 6, 2022, Carnaby III, as Pledgor, the Administrative Agent for the benefit of the Carnaby III Secured Lenders, as Pledgee, TC and SI, as depositaries (jointly, the "Carnaby III Depositaries"), and TPC and TTC

6

entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión* ), under Mexican law (the "Carnaby III Mexican Security Agreement," and together with the Carnaby II Mexican Security Agreement, the "Mexican Security Agreements").

11.     Under the Carnaby II Mexican Security Agreement, Carnaby II granted to the Administrative Agent, for the benefit of the Carnaby II Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Under the Carnaby III Mexican Security Agreement, Carnaby III granted to the Administrative Agent, for the benefit of the Carnaby III Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Each Mexican Security Agreement defines Pledged Assets as any and all property and inventory located in Mexico, currently owned by the applicable Pledgor, or acquired by the applicable Pledgor or arising in the future, including without limitation, all Raw Materials,[8] together with (i) all documents, documents of title, warehouse receipts (or similar documents), bills of lading or orders for delivery of all, or any portion of the foregoing; and (ii) all products and/or sale proceeds of any and all of the foregoing, including, without limitation, insurance proceeds (collectively, the "Mexican Collateral" and together with the U.S. Collateral, the "Collateral").  Each Mexican Security Agreement also

---

[8]     "Raw Materials" are defined under the Mexican Security Agreements as "all the assets that comprise the inventory of the Pledgor, whether now owned or hereafter acquired, including without limitation, all inventory of the Pledgor (i) held for sale or lease, (ii) furnished or to be furnished under any service agreement, (iii) held for display or demonstration, or (iv) on lease or consignment, in favor of third parties; including accessories, packaging and shipping materials, spare parts, repair parts, returned and repossessed inventory, all raw materials, work-in-process, finished inventory and supplies used or consumed in the Pledgor business together with all documents, documents of title, warehouse receipts, pledge bonds, bills of lading, deposit certificates or orders for the delivery of all, or any portion, of the foregoing, including without limitation the assets listed in Exhibit C [attached thereto]."

7

**JOINT EXHIBIT NO. 61**
**Page 336 of 540**

provides that the applicable Pledgor is the sole, legal, and beneficial owner of the Mexican Collateral, free and clear of any liens or other encumbrances, and that the security interest granted thereunder constitutes a legal, valid, binding, and enforceable security over the Mexican Collateral.

12.     Perfection. The security interests granted under the U.S. Security Agreements were properly perfected by filing UCC financing statements with the Delaware Secretary of State.[9]  As a result, the Administrative Agent holds, on behalf of and for the benefit of the Carnaby II and III Secured Lenders, properly perfected security interests in all assets of each of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III.

13.     In turn, each Mexican Security Agreement was executed in compliance with Mexican law, before a Mexican Notary Public and is duly registered before the Mexican Sole Registry of Liens over Movable Assets (*Registro Unico de Garantias Mobiliarias*).  As a result, the Carnaby II Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the benefit of the Carnaby II Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby II,[10] and the Carnaby III Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the

---

*See* (i) UCC Financing Statement File No. 2022 4634697, filed at 12:39 PM on June 2, 2022, against Carnaby Inventory II, LLC as debtor; (ii) UCC Financing Statement File No. 2022 4634796, filed at 12:42 PM on June 2, 2022, against Carnaby Inventory Holdings II, LLC as debtor; (iii) UCC Financing Statement File No. 2022 5629043, filed at 3:58 PM on July 6, 2022, against Carnaby Inventory III, LLC as debtor; and (iv) UCC Financing Statement File No. 2022 5628912, filed at 3:55 PM on July 6, 2022, against Carnaby Inventory Holdings III, LLC as debtor.

[10]   The Carnaby II Mexican Security Agreement was registered with the RUG on June 7, 2022 (at 15:08:37 ZULU GMT/UTC), as Asiento No. 31302386, Garantía Mobiliaria No. 16927095, Folio Electrónico R20220601MG36, with a maximum secured amount of USD $60,000,000, covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby II.  On July 6, 2022, the Carnaby II Mexican Security Agreement was amended by the Amendment Agreement (Convenio Modificatorio) to extend the secured obligations to cover the Carnaby III Credit Agreement obligations as well, consistent with the Cross-Collateralization Agreement.  This amendment was registered with the RUG on July 8, 2022 (at 19:21:38 ZULU GMT/UTC), as Asiento No. 32022878, Garantía Mobiliaria No. 16927095 (same folio as the Carnaby II Original Pledge), amending the maximum secured amount to USD $160,000,000.

benefit of the Carnaby III Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby III.[11]

14.     Cross-Collateralization Agreement.  As noted in paragraph 2 above, on July 6, 2022, the parties to the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into the Cross-Collateralization Agreement, pursuant to which the Collateral securing each Credit Agreement also secures the obligations under the other Credit Agreement, and vice versa.  This cross-collateralization was also reflected in and effected through the U.S. Security Agreements, and in the Mexican Security Agreements as set forth above.

15.     Other Obligations Under the Transaction Documents.  FBG executed each of the Credit Agreements as "Servicer" and made various representations and warranties and undertakings in favor of the Carnaby II and III Secured Lenders thereunder including, without limitation, (i) to cause each of BPI and Trico to comply with the terms of the Transaction Documents; (ii) to act as Servicer under the Credit Agreements and to perform (or cause to be performed) certain functions for Carnaby II and Carnaby III.  Accordingly, FBG is responsible for ensuring the Carnaby II, Carnaby III, BPI, and Trico, and the Guarantors under the Credit Agreements each perform their obligations under the Transaction Documents (including, without limitation, obligations to maintain and preserve adequate records of the purchases and sales of inventory, to deliver regular reporting, and to maintain corporate separateness of the entities).  (*See* Credit Agreements Sec. 6.2(a)–(f), Sec. 5.1(s), (t); *see also* Sec. 5.1(a), (f), (g), (m), (n), (o), (p), (v), (w), (bb), and (dd); Sec. 5.2(j).  In their respective Credit Agreements, each of BPI and Trico

---

[11]     The Carnaby III Mexican Security Agreement was formalized before Corredor Público No. 7 (Licenciado José Carlos Reyes Cadena) in the State of Nuevo León, Mexico, and was registered with the RUG on July 8, 2022 (at 18:50:02 ZULU GMT/UTC), as Asiento No. 32020337, Garantía Mobiliaria No. 17265862, Folio Electrónico R20220708MSF5, with a maximum secured amount of USD $160,000,000 (covering both facilities per the Cross-Collateralization Agreement), covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby III.

**JOINT EXHIBIT NO. 61**
**Page 338 of 540**

covenanted for the benefit of the Carnaby II and III Secured Lenders to timely perform all of their respective obligations under the Transaction Documents to which they are party. *See* Credit Agreement, Sec. 5.1(aa).

16.     As contemplated by the Carnaby II Credit Agreement, Carnaby II maintains a manufacturing business relationship with BPI, as evidenced by a Manufacturing Agreement, pursuant to which Carnaby II provides to BPI and the Carnaby II Depositaries the Raw Material for manufacture in accordance with BPI's Maquiladora Agreements with the Carnaby II Depositaries. The Manufacturing Agreement between Carnaby II and BPI was executed on May 31, 2022, and created valid and binding obligations of BPI, enforceable against it in accordance with its terms. Under that Manufacturing Agreement, Carnaby II hired and requested certain manufacturing services from BPI to manufacture and produce the products requested by Carnaby II. BPI was authorized to perform the manufacturing processes required by Carnaby II through its "maquiladora program" with the Carnaby II Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreement).

17.     As contemplated by the Carnaby III Credit Agreement, Carnaby III maintains a manufacturing business relationship with Trico, as evidenced by the Manufacturing Agreements, pursuant to which Carnaby III provides to Trico and the Carnaby III Depositaries the Raw Material for manufacture in accordance with Trico's Maquiladora Agreements with the Carnaby III Depositaries. The Manufacturing Agreements between Carnaby III and Trico were executed on July 6, 2022, and created valid and binding obligations of Trico, enforceable against them in accordance with its terms. Under the Manufacturing Agreements, Carnaby III hired and requested certain manufacturing services from Trico to manufacture and produce the products requested by

**JOINT EXHIBIT NO. 61**
**Page 339 of 540**

Carnaby III.  Trico was authorized to perform the manufacturing processes required by Carnaby III through its "maquiladora program" with the Carnaby III Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreements).

18.     The Manufacturing Agreements between Carnaby II and Carnaby III and BPI and Trico, as applicable, provide that neither BPI, Trico, the Carnaby II Depositaries, or the Carnaby III Depositaries, as applicable, shall under any circumstances be considered to have any proprietary interest in the Materials (as defined in the Manufacturing Agreements) which Carnaby II and Carnaby III may deliver to BPI, Trico, the Carnaby II Depositaries, or Carnaby III Depositaries, as applicable, nor on the Products (as defined in the Manufacturing Agreements).  They also provide that BPI, Trico, the Carnaby II Depositaries, and the Carnaby III Depositaries, as applicable, shall provide necessary administrative services for shipment, including the arrangement of proper transportation of the Materials and the Products between Mexico and the United States.  The Manufacturing Agreement also provides that the Carnaby II Depositaries and the Carnaby III Depositaries shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the Materials and Products, but that under no circumstances does acting as importer and exporter result in the conveyance of ownership of the Materials or Products to the Carnaby II Depositaries or Carnaby III Depositaries.

19.     Carnaby II executed a Purchase Agreement and Sale Agreement with BPI on May 31, 2022, which provided for the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreement.  Carnaby III executed a Purchase Agreement and Sale Agreement with each of Trico on July 6, 2022 which provided for

11

the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreements.  As buyers and sellers under the Purchase Agreements and Sale Agreements, the parties thereto intended to effect absolute and irrevocable 'true sales' for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings and undertook to reflect such sales in their respective financial statements). Each Purchase Agreement and Sale Agreement further required that the parties advise anyone inquiring about the ownership of any assets purchases thereunder that all applicable assets had been sold to the applicable buyer.  Additionally, each of applicable selling parties under the Purchase Agreements and Sale Agreements represented and warranted to in their respective Purchase Agreements and Sale Agreements that they had good title to the assets being sold, in each case free and clear of any liens.

20.     Purchases and sales of inventory between Carnaby II and BPI occurred beginning on or about May 31, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).  Purchases and sales of inventory between Carnaby III and Trico occurred beginning on or about July 6, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).

## ASSERTION OF CLAIM

21.     <u>Proof of Claim</u>.  This Proof of Claim is filed by the Administrative Agent for the benefit of the Carnaby II and III Secured Lenders and sets forth their claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors as follows:

22.     <u>Carnaby Holdings II and Carnaby Holdings III Guarantee Claims</u>.  Each of Carnaby Holdings II and Carnaby Holding III executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI)

12

and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.  The Administrative Agent's claims against Carnaby Holdings II and Carnaby Holdings III therefore include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

23.     First Brands Group Holdings, LLC Guarantee Claims.  FB Holdings executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI) and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.   The Administrative Agent's claims against FB Holdings therefore include: (1) the full amount of the Guaranteed Obligations under both Credit Agreements include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

24.     503(b)(9) Claims Against BPI and Trico:  The Administrative Agent also asserts claims in an amount to be determined against each of BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code for the fair value of inventory BPI and Trico received from Carnaby II and Carnaby III during the 20 days preceding the Petition Date to the extent Carnaby II and Carnaby III did not receive payment equal to such fair value from BPI and Trico.

25.     Additional Claims.  The Administrative Agent also asserts against FBG, on behalf of itself and the Carnaby II and III Secured Lenders, claims in an amount not less than **$160,717,187.33** for payment in full of damages stemming from, among other things, (i) any all

13

outstanding aggregate principal amounts of the loans under the Credit Agreements and all accrued and unpaid interest (including post-petition and default interest) thereon; (ii) any and all unpaid fees and expenses owed to the Administrative Agent and/or any of the Carnaby II and III Secured Lenders; (iii) any indemnifications, out-of-pocket fees and expenses (including, but not limited to, the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II and III Secured Lenders), premiums, reimbursements, charges, damages, and/or claims (as defined in the Bankruptcy Code) arising under the applicable Transaction Documents; (iv) all obligations owed to the Carnaby II and III Secured Lenders until all Obligations have been paid in full; (v) all damages arising from breach by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors of its respective representations, warranties, and obligations under the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or any other Transaction Documents to which it is party; and (vi) all damages arising from the fraudulent misrepresentations and omissions made by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors in connection with the Transaction Documents and the transactions contemplated thereby, including without limitation all amounts necessary to compensate the Carnaby II and III Secured Lenders for losses caused by such misrepresentations and omissions (collectively, the "Additional Claims," and together with the aggregate outstanding principal amount of the Loans, accrued and unpaid interest, fees, costs, and all other Obligations and Guaranteed Obligations due and payable under the Credit Agreements and the related Transaction Documents, the "Claims"). The Administrative Agent also asserts Additional Claims against BPI arising out of the Carnaby II Credit Agreement and related Transaction Documents in an amount not less than $59,622,980.05 and Additional

14

Claims arising out of the Carnaby III Credit Agreement and related Transaction Documents against Trico in an amount not less than $101,094,207.28.   The Administrative Agent also asserts Additional Claims arising out of the Carnaby Credit Agreements against each of FB Holdings, Carnaby Holdings II and Carnaby Holdings III in an amount to be determined.

26.   Breach of Contract and Fraud Claims.   In addition to any Claims set forth above, the Administrative Agent, on behalf of itself and the Carnaby II and III Secured Lenders, asserts claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors for breach of contract and common law fraud/fraudulent misrepresentation.   Each FBG Debtor was party to, and breached, one or more of the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or the other Transaction Documents, and each failed to perform its obligations thereunder, including without limitation by failing to maintain, preserve, and protect the Collateral; failing to comply with applicable covenants, representations, and warranties; and failing to satisfy the Obligations and Guaranteed Obligations when due.

27.   The FBG Debtors committed fraud by making material misrepresentations and omissions in connection with the Transaction Documents and the transactions contemplated thereby, upon which the Administrative Agent and the Carnaby II and III Secured Lenders reasonably relied in advancing funds, extending credit, and entering into the Transaction Documents, and such misrepresentations and omissions caused damage to the Carnaby II and III Secured Lenders in an amount to be determined.   The Administrative Agent expressly reserves the right to supplement the factual basis for these claims as additional information becomes available through discovery or otherwise.

15

**JOINT EXHIBIT NO. 61**
**Page 344 of 540**

28.      Federal Rule of Bankruptcy Procedure 3001(e)(3) states that "[i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount." Fed. R. Bankr. P. 3001(e)(3).  Section 101(54) of the Bankruptcy Code defines "transfer" as "the creation of a lien."  11 U.S.C. § 101(54)(A).  Pursuant to the U.S. Security Agreements, the Administrative Agent has been granted properly perfected, first-priority liens, for the benefit of the Carnaby II and III Secured Lenders, over, *inter alia,* all Contracts and Contract Rights of each of Carnaby II and Carnaby III and each of Carnaby Holdings II and Carnaby Holdings III.  Accordingly, the Administrative Agent holds any claims arising out of any such Contracts or Contract Rights that may be asserted by any of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III against any person or entity, including, without limitation, any other Debtor and non-Debtor entities (including the FBG Debtors).  Such claims include, in the case of the FBG Debtors that are counterparties to the Transaction Documents, any claims held by Carnaby II, Carnaby III, Carnaby Holdings II, or Carnaby Holdings III for breach of contract, in each case up to the full amount of the Obligations and Guaranteed Obligations.

29.      <u>Nature of the Claims Against Carnaby Holdings II and Carnaby Holdings III</u>. The Claims asserted against each of Carnaby Holdings II and Carnaby Holdings III are secured by properly perfected, valid and enforceable first-priority liens and pledges on all of its assets as contemplated by the U.S. Security Agreement, and all of the assets of each of Carnaby II and Carnaby III as contemplated by the Cross-Collateralization Agreement.  Consequently, the Claims are secured, except to the extent that the value of the Collateral securing the Claims is insufficient to satisfy the Claims in full.  To the extent of any remaining deficiency, the remainder of the Claim is asserted as a general unsecured claim.

**JOINT EXHIBIT NO. 61**
**Page 345 of 540**

30.     <u>Nature of the Claims Against the FBG Debtors</u>:  Except as set forth in the following paragraph, the Claims against the FBG Debtors are asserted as general unsecured claims.

31.     <u>Nature of 503(b)(9) Claims Against BPI and Trico:</u>  The Claims asserted against BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code are asserted as administrative expense priority Claims.

## RESERVATION OF RIGHTS

32.     By filing this Proof of Claim, the Administrative Agent does not waive, and expressly reserves, all rights and remedies at law or in equity under any applicable law or jurisdiction that the Administrative Agent has or may have against each of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors any guarantor or obligor (including but not limited to Carnaby Holdings II, Carnaby Holdings III, and FB Holdings), and any of their respective affiliates and subsidiaries, or any other person or entity, including without limitation its rights to seek payment as an oversecured creditor of all amounts to which it may be entitled under 11 U.S.C. § 506.  Without limiting the generality of the foregoing, this Proof of Claim is not, ***nor shall it be deemed or construed to be***: (a) a waiver or release of any terms or provisions of the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (b) an election of remedies or waiver of any past, present or future breaches, defaults or events of default under the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (c) a waiver of the rights and remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether an affiliate or guarantor of any of the Debtors or an assignee or otherwise; (d) consent by the Administrative Agent to the jurisdiction of the Court with respect to any proceeding commenced against or otherwise involving the Administrative Agent; (e) a waiver of any right to (1) withdraw the reference, or otherwise

17

**JOINT EXHIBIT NO. 61**
**Page 346 of 540**

challenge the jurisdiction of the Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in this case against or otherwise involving the Administrative Agent, or (2) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Administrative Agent; (f) a waiver or release of, or any other limitation on, the Administrative Agent's right to assert that any portion of the claims asserted herein or any other claims are entitled to treatment as priority claims including under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (g) a waiver of any rights that the Administrative Agent may have pursuant to section 506(b) of the Bankruptcy Code; (h) a waiver or release of any lien, pledge or security interest against any Debtor or any third parties; (i) a waiver or release of, or any other limitation on, the Administrative Agent's rights to assert that any nonrecourse claim should be treated as a recourse claim, including but not limited to the exercise of any right that the Administrative Agent may have pursuant to section 1111(b) of the Bankruptcy Code; (j) consent to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. section 157(e) or otherwise; (k) a waiver by the Administrative Agent of the right to have final orders in non-core matters entered only by a United States District Court judge; (l) a waiver or release of the Administrative Agent's right to have any and all final orders in any and all noncore matters or proceedings entered only after de novo review by a United States District Court Judge; or (m) a waiver of any claim, at law or in equity or under any applicable law, including without limitation administrative claims, priority claims, secured claims, unsecured claims, constructive trust claims, claims based upon common law fraud, misrepresentation, subrogation, indemnity, contribution, unjust enrichment, fraudulent

**JOINT EXHIBIT NO. 61**
**Page 347 of 540**

conveyance, failure to fulfill contractual and fiduciary obligations, breach of the implied covenant of good faith and fair dealing, tortious interference, quantum meruit, or any other theory available under applicable law or equity, including, without limitation, the right to assert a constructive trust against assets or cash held by any Debtor, and any and all amounts owed, in damages or otherwise, whether known or unknown, and whether presently asserted or to be asserted, all of which singularly or collectively may have caused the Administrative Agent to incur damages.  Nothing herein shall be deemed to waive, stop, or derogate from the rights of the Administrative Agent under the Transaction Documents, including, without limitation, in connection with the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, and any order of the Court, or to prejudice any and all of the Administrative Agent's rights, claims, and defenses under the Bankruptcy Code or otherwise, including, but not limited to, the right to vote on any plan(s) in the Debtors' Chapter 11 Cases.

33.     The Administrative Agent expressly reserves the right to amend, replace, update, or supplement this Proof of Claim (including the proof of claim form) at any time and in any respect (including, without limitation, as necessary or appropriate to amend, quantify, or correct amounts, to provide additional detail regarding the Claims set forth herein, to fix the amount of any contingent or unliquidated component of the Claims, or to include any claim, at law or in equity), to add or amend documents and other information, to file additional proofs of claim or further pleadings for additional claims, to contest the validity, priority, and extent of any other purported liens and security interests other than those described herein, and to assert any and all other claims, actions, defenses, setoffs, recoupments, rights or remedies of whatever kind or nature that it currently has, or may have in the future against any of Carnaby Holdings II, Carnaby Holdings III, any FBG Debtor, and/or any other Debtors or non-Debtors, or any other person or

19

entity, including without limitation, rights against guarantors, officers, directors, and other creditors any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, at law or in equity, including, without limitation, administrative or other priority claims, setoff and recoupment rights, lien rights, interest, and the right to assert claims that are otherwise warranted in any related actions.

34.     The Administrative Agent reserves the right to claim that the portion of its fees, interest, costs, expenses, and other charges incurred or accruing after the applicable Petition Date of each of any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, constitute administrative expenses of the applicable Debtor's estate to the extent such expenses are not otherwise paid in full, and reserves the right to file a claim or application for payment of such administrative expenses.

35.     No judgment has been rendered on the Claims set forth in this Proof of Claim.

36.     With respect to any portion of the Claims that is unliquidated or as to which the amount is undetermined, the Administrative Agent does not waive their rights thereto by not claiming specific amounts at this time.

37.     The Administrative Agent expressly reserves, and does not waive, its right to payment of any amounts due from any guarantor in respect of the Credit Agreements from any other sources under any applicable law and jurisdiction.

38.     The Administrative Agent expressly reserves its rights to exercise judicial actions under any applicable law and jurisdiction against non-Debtor entities during and after these Chapter 11 Cases.

39.     Nothing contained in this Proof of Claim shall be deemed an admission by the Administrative Agent.

**JOINT EXHIBIT NO. 61**
**Page 349 of 540**

40.     To the best of the Administrative Agent's knowledge, the claims set forth herein are not subject to setoff or counterclaim, <u>provided</u>, <u>however</u>, that the Administrative Agent (on behalf of the Carnaby II and III Secured Lenders) expressly reserves and does not waive any right of set-off or recoupment it may possess.

41.     The Administrative Agent does not consent to the surcharge of the Collateral by any Debtor's estate, their representatives, or any other person or party-in-interest pursuant to 11 U.S.C. §506(c) or otherwise.

42.     The Administrative Agent expressly reserves the right to withdraw this Proof of Claim as if it had never been filed.

**NOTICES AND COMMUNICATIONS**

43.     Any and all notices and communications concerning the Proof of Claim shall be sent to the following addresses both in hard copy and via e-mail:


Tarik Johnson
**GLAS TRUST COMPANY LLC**, in its capacity as Administrative Agent
3 Second Street, Suite 206, Jersey City, NJ 07311
Tel.: +1 201 201 8642
E-mails:
Tarik.Johnson@glas.agency

with a copy to (which shall not constitute notice)

Allan S. Brilliant
Stephen Wolpert
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Tel.: +1 212 698 3599
E-mails:
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

21

**JOINT EXHIBIT NO. 61**
**Page 350 of 540**

## SUPPORTING DOCUMENTS

44.     The Administrative Agent's claims are based on the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, the Purchase Agreements, the Promissory Notes, the Sale Agreements, and other related Transaction Documents.  Copies of these documents and additional related documents are not attached to the Proof of Claim because of their voluminous nature.  Counsel to the Administrative Agent will provide copies of such documents to any party in interest in these Chapter 11 Cases, upon a reasonable written request (and entry into an appropriate confidentiality agreement, if necessary) addressed to counsel to the Administrative Agent at the address set forth herein.

45.     Each and every description in this Addendum to the Credit Agreements and the other Transaction Documents is qualified in its entirety by reference to the applicable provisions of such documents, and all such documents are incorporated herein by reference.  In the event of any inconsistency between this Addendum and any such document, including the proof of claim form, the relevant document shall control.

**GLAS Trust Company LLC**
In its capacity as Administrative Agent under the
Carnaby II and Carnaby III Credit Agreements,
related Transaction Documents

Dated: July 6, 2026

**JOINT EXHIBIT NO. 61**
**Page 351 of 540**

Electronic Proof of Claim Confirmation:  **3950-1-RTTTE-426770325**

Claim Electronically Submitted on (UTC) :  **2026-07-07T02:43:29.941Z**

Submitted by:  GLAS TRUST CO LLC, AGENT FBO CARNABY III SEC. LENDERS
jeffrey.schoenfeld@glas.agency

**KROLL**

**Exhibit    **

**Part 2:**    Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ _Not less than $101,094,207_ . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

     See Addendum

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

     **Nature of property:**

     ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

     ☐ Motor vehicle

     ☐ Other. Describe: _____

     **Basis for perfection:** _____

     Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

     **Value of property:**    $_____

     **Amount of the claim that is secured:**    $_____

     **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

     **Amount necessary to cure any default as of the date of the petition:**    $_____

     **Annual Interest Rate** (when case was filed)_____%

     ☐ Fixed

     ☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

 

**Proof of Claim**            page 2

**JOINT EXHIBIT NO. 61**
**Page 355 of 540**

| | | |
|---|---|---|
| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |
| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $_____ |

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Jeffrey Schoenfeld*  07/07/2026
_____   _____
Electronic Signature                        Date

**Name of the person who is completing and signing this claim**

Name   Jeffrey Schoenfeld
_____
First name        Middle name        Last name

Title/Company   Suite 203
_____
Identify the corporate servicer as the company if the authorized agent is a servicer.

3 Second Street, Suite 203

Address   _____
Number       Street

Jersey City          NEW JERSEY 07311
_____
City                State          ZIP Code    Country

Contact phone   2018392200          Email   jeffrey.schoenfeld@glas.agency

**Proof of Claim**                                                                 page 3

**JOINT EXHIBIT NO. 61**
**Page 356 of 540**

**Additional Noticing Addresses (if provided):**

**Additional Address 1**
Name: GLAS Trust Company LLC as administrative agent for the Carnaby III Secured Lenders
Address1: C/O DECHERT
Address2: 1095 Avenue of the Americas
Address3: ATTN: Allan S. Brilliant and Stephen Wolpert
Address4:
City: New York
State: NY
Postal Code: 10036
Country:

Contact Phone: 2126983599
Contact Email: allan.brilliant@dechert.com, stephen.wolpert@dechert.com

**Additional Address 2**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
Postal Code:
Country:

Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**
☑ Yes
☐ No
--------------------------------------------------------------------------------------------

Attachment Filename:

Trico Products - POC Form (Carnaby III Secured Lenders).pdf

**KROLL**

**United States Bankruptcy Court, Southern District of Texas**

Fill in this information to identify the case (Select only one Debtor per claim form):

**Debtor Name and Case Number:**

Trico Products Corporation (25-90472)

Modified Official Form 410

# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

GLAS Trust Company LLC as administrative agent for the Carnaby III Secured Lenders

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

✓ No

Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

See Addendum
Name

See Addendum
Number      Street

See Addendum
City                 State          ZIP Code

Contact phone   See Addendum

Contact email   See Addendum

Uniform claim identifier (if you use one):

Where should payments to the creditor be sent? (if different)

Name

Number      Street

City                 State          ZIP Code

Contact phone

Contact email

**4. Does this claim amend one already filed?**

✓ No

Yes.   Claim number on court claims registry (if known)_____

Filed on _____
MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

✓ No

Yes. Who made the earlier filing? _____

**JOINT EXHIBIT NO. 61**
**Page 358 of 540**

**Part 2:   Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

| | |
|---|---|
| 7. **How much is the claim?** | $ _Not less than $101,094,207_.  **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>See Addendum |

| | |
|---|---|
| 9. **Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**                          $ _____<br><br>**Amount of the claim that is secured:**        $ _____<br><br>**Amount of the claim that is unsecured:**  $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**        $ _____<br><br>**Annual Interest Rate** (when case was filed) _____ %<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| 10. **Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.**        $ _____ |

| | |
|---|---|
| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

**JOINT EXHIBIT NO. 61**
**Page 359 of 540**

| | | Amount entitled to priority |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ✓ No | |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | Yes. *Check one:* | |
| | Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | Other. Specify subsection of 11 U.S.C. § 507(a)( ) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment. | |
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | No ✓ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $ See addendum |

## Part 3:   Sign Below

| | |
|---|---|
| **The person completing this proof of claim must sign and date it. FRBP 9011(b).** | *Check the appropriate box:* |
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☐ I am the creditor. ✓ I am the creditor's attorney or authorized agent. ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct. I declare under penalty of perjury that the foregoing is true and correct. Executed on date  07/06/2026 MM / DD / YYYY |

_____
Signature

**Name of the person who is completing and signing this claim:**

| | | | |
|---|---|---|---|
| Name | Jeffrey | | Schoenfeld |
| | First name | Middle name | Last name |
| Title | Authorized Signatory | | |
| Company | GLAS Trust Company LLC as administrative agent for Carnaby III Secured Lenders | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 3 Second Street, Suite 203 | | |
| | Number        Street | | |
| | Jersey City | NJ | 07311 |
| | City | State | ZIP Code |
| Contact phone | 201 - 839 - 2187 | Email | Jeffrey.Schoenfeld@glas.agency |

Proof of Claim                                                                                                     page 3

**JOINT EXHIBIT NO. 61**
**Page 360 of 540**

## OMNIBUS ADDENDUM TO PROOFS OF CLAIM FILED BY
## GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT TO
## THE CARNABY II AND III SECURED LENDERS

GLAS Trust Company LLC, in its capacity as administrative agent (the "Administrative Agent") for the Lenders[1] under (i) that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement") among Carnaby Inventory II, LLC ("Carnaby II"), as Borrower; First Brands Group, LLC ("FBG"), as Servicer; First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II"), as Guarantors; the Lenders party thereto (the "Carnaby II Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent, and acknowledged and agreed to by Brake Parts Inc LLC ("BPI"), BPI Brake Manufacturing Juarez, S.A. de C.V. ("BPIJ"), and BPI Braking Systems Mexico, S.A. de C.V. ("BPIM")  and (ii) that certain credit agreement dated as of July 6, 2022 (the "Carnaby III Credit Agreement," and together with the Carnaby II Credit Agreement, the "Credit Agreements") among Carnaby Inventory III, LLC ("Carnaby III"), as Borrower; FBG, as Servicer; FB Holdings and Carnaby Inventory Holdings III, LLC ("Carnaby Holdings III"), as Guarantors; the Lenders party thereto (the "Carnaby III Secured Lenders," and together with the Carnaby II Secured Lenders, the "Carnaby II and III Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent and acknowledged and agreed to by Trico Products Corporation ("TPC"), Trico Technologies Corporation ("TTC" and together with TPC, "Trico"), Trico Componentes, S.A. de C.V. ("TC") and Subensambles Internacionales, S. de R.J. de C.V. ("SI"), *hereby submits* this omnibus addendum (the "Addendum") in support of its proofs of claim (together with the applicable proof of claim form, each a "Proof of Claim") submitted against (a) FBG; (b) FB

---

[1]   Capitalized terms not defined herein shall have the meanings ascribed to those terms in the Credit Agreements and the Transaction Documents, as applicable.

Holdings; (c) BPI; (d) TPC; (e) TTC (together with FBG, FB Holdings, BPI, and TPC, collectively, the "FBG Debtors"); (f) Carnaby Holdings II; (g) Carnaby Holdings III, each in its capacity as further described in the applicable Proof of Claim.  This Addendum is intended to be and should be treated as part of each applicable Proof of Claim.

1.      On September 24, 2025 (the "Initial Petition Date"), certain Debtors,[2] including Carnaby Holdings II and Carnaby Holdings III, commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  Between September 28, 2025, and September 29, 2025, approximately 99 additional Debtors, including the FBG Debtors, filed their own bankruptcy petitions (each, in the case of an FBG Debtor, its respective "Petition Date").

## BASIS FOR CLAIM

2.      The Credit Agreements.  On or about May 31, 2022, Carnaby II, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings II, as Guarantors, the Carnaby II Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby II Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time) along with BPI, BPIJ, and BPIM.

3.      On or about July 6, 2022, Carnaby III, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings III, as Guarantors, the Carnaby III Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby III Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise

---

[2]    A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

modified from time to time) along with Trico, TC, and SI. [3]  On July 6, 2022, the parties to each of the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into a Cross-Collateralization Agreement (the "Cross-Collateralization Agreement"), pursuant to which the liens securing the Obligations[4] and Guaranteed Obligations[5] outstanding under each Credit Agreement secured the Obligations and Guaranteed Obligations outstanding under the other Credit Agreement, and vice versa.

4.      The Carnaby II Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $60 million aggregate principal amount and the Carnaby III Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $100 million aggregate principal amount, under which funds were advanced by the Carnaby II Secured Lenders and the Carnaby III Secured Lenders, respectively.

5.      Obligations. Each Borrower's obligations under the applicable Credit Agreement and the Transaction Documents[6] thereunder are secured by first-priority liens granted by Carnaby

---

[3]    On May 30, 2025, the parties to the Carnaby II Credit Agreement and to the Carnaby III Credit Agreement entered into Extension Agreements, extending the Maturity Date originally set forth in the Carnaby II Credit Agreement and the Carnaby III Credit Agreement to December 1, 2025.

[4]    Each Credit Agreement defines "Obligations" in identical terms as "all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding)." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

[5]    Each Credit Agreement defines "Guaranteed Obligations" in identical terms as "the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations[.]" Carnaby II Credit Agreement, section 11.1; Carnaby III Credit Agreement, section 11.1.

[6]    Each Credit Agreement defines the "Transaction Documents" in identical terms as "collectively, [the applicable Credit Agreement], each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other

3

II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III, on the applicable Collateral (as defined below) pursuant to the U.S. Security Agreements (as defined below) and the applicable Mexican Security Agreement (as defined below), as further detailed below.

6.      The Administrative Agent holds, on behalf of the Carnaby II Secured Lenders, loans totaling $58,964,276.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $658,704.05 under the Carnaby II Credit Agreement and, on behalf of the Carnaby III Secured Lenders, loans totaling $100,000,000.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $1,094,207.28 under the Carnaby III Credit Agreement (together, the "Loans"), each due and payable by the Borrowers and Guarantors under the Credit Agreements.  In addition to the obligation to repay the principal amount of the Loans, each of the Borrowers and the Guarantors (including FB Holdings) assumed the obligation to pay accrued and unpaid interest and all other Obligations and Guaranteed Obligations outstanding under the respective Credit Agreement and other Transaction Documents.

7.      Promissory Notes.  Each Borrower's obligations to repay the Obligations under the respective Credit Agreement were also evidenced through Promissory Notes executed by such Borrower with respect to each advance, and guaranteed, in each case, jointly and severally, by the applicable Guarantors under such Credit Agreement.

8.      U.S. Security Agreements.  On or about May 31, 2022, Carnaby II, Carnaby Holdings II, and the Administrative Agent for the benefit of the Carnaby II Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby II U.S. Security

---

instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

**JOINT EXHIBIT NO. 61**
**Page 364 of 540**

Agreement"). On or about July 6, 2022, Carnaby III, Carnaby Holdings III, and the Administrative Agent for the benefit of the Carnaby III Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby III U.S. Security Agreement," and together with the Carnaby II U.S. Security Agreement, the "U.S. Security Agreements").

9.      As security for the prompt and complete payment or performance in full of the applicable "Obligations" (as defined in the U.S. Security Agreements, as amended by the Cross-Collateralization Agreement[7]), each Borrower and the Carnaby Holdings II or Carnaby Holdings III, as applicable, entity pledged, collaterally assigned and granted to the Administrative Agent, on behalf of and for the benefit of the applicable Secured Parties, a continuing security interest in all of their right, title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, such party, and regardless of where located: (i) all Accounts; (ii) all Cash; (iii) all Chattel Paper (including without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper); (iv) all Commercial Tort Claims; (v) all Contracts, together with all Contract Rights arising thereunder; (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Financial Assets; (x)

---

[7] As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby II U.S. Security Agreement means "(i) 'Obligations' (as defined in the [Carnaby II] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby II] Credit Agreement) and (iii) 'Obligations' (as defined in the Pledge and Security Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(ii).

As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby III U.S. Security Agreement means "(i) "Obligations" (as defined in the [Carnaby III] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby III] Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory II, LLC, as borrower, Carnaby Inventory Holdings II, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(iv).

**JOINT EXHIBIT NO. 61**
**Page 365 of 540**

all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Governmental Authorizations; (xiv) all Instruments; (xv) all Intellectual Property Collateral; (xvi)  all Inventory; (xvii) all Investment Property, Pledged Stock and other Pledged Collateral; (xviii) all letters of credit and Letter-of-Credit Rights; (xix) all Licenses; (xx) all Proceeds of insurance; (xxi) all Receivables; (xxii) all Real Estate Assets; (xxiii) all Securities Accounts, Money, Securities, and other investments therein, and all Security Entitlements in respect thereof; (xxiv) all Software and all recorded data of any kind or nature, regardless of the medium of recording; (xxv) all Supporting Obligations relating to any of the foregoing; and (xxvi) all accessions to, substitutions and replacements for, and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing (collectively, the "U.S. Collateral"), thereby achieving a complete cross-collateralization of the Carnaby II Credit Agreement and Carnaby III Credit Agreement in respect of all obligations owing under such facilities and all collateral pledged under them.

10.    Mexican Security Agreements. As additional security for the payment, performance and satisfaction in full of any and all of the Obligations, (i) on May 31, 2022, Carnaby II, as Pledgor, the Administrative Agent for the benefit of the Carnaby II Secured Lenders, as Pledgee, BPIJ and BPIM, as depositaries (jointly, the "Carnaby II Depositaries"), and BPI entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*), under Mexican law (the "Carnaby II Mexican Security Agreement"); and (ii) on July 6, 2022, Carnaby III, as Pledgor, the Administrative Agent for the benefit of the Carnaby III Secured Lenders, as Pledgee, TC and SI, as depositaries (jointly, the "Carnaby III Depositaries"), and TPC and TTC

6

entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión* ), under Mexican law (the "Carnaby III Mexican Security Agreement," and together with the Carnaby II Mexican Security Agreement, the "Mexican Security Agreements").

11.     Under the Carnaby II Mexican Security Agreement, Carnaby II granted to the Administrative Agent, for the benefit of the Carnaby II Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Under the Carnaby III Mexican Security Agreement, Carnaby III granted to the Administrative Agent, for the benefit of the Carnaby III Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Each Mexican Security Agreement defines Pledged Assets as any and all property and inventory located in Mexico, currently owned by the applicable Pledgor, or acquired by the applicable Pledgor or arising in the future, including without limitation, all Raw Materials,[8] together with (i) all documents, documents of title, warehouse receipts (or similar documents), bills of lading or orders for delivery of all, or any portion of the foregoing; and (ii) all products and/or sale proceeds of any and all of the foregoing, including, without limitation, insurance proceeds (collectively, the "Mexican Collateral" and together with the U.S. Collateral, the "Collateral").  Each Mexican Security Agreement also

---

[8]     "Raw Materials" are defined under the Mexican Security Agreements as "all the assets that comprise the inventory of the Pledgor, whether now owned or hereafter acquired, including without limitation, all inventory of the Pledgor (i) held for sale or lease, (ii) furnished or to be furnished under any service agreement, (iii) held for display or demonstration, or (iv) on lease or consignment, in favor of third parties; including accessories, packaging and shipping materials, spare parts, repair parts, returned and repossessed inventory, all raw materials, work-in-process, finished inventory and supplies used or consumed in the Pledgor business together with all documents, documents of title, warehouse receipts, pledge bonds, bills of lading, deposit certificates or orders for the delivery of all, or any portion, of the foregoing, including without limitation the assets listed in Exhibit C [attached thereto]."

**JOINT EXHIBIT NO. 61**
**Page 367 of 540**

provides that the applicable Pledgor is the sole, legal, and beneficial owner of the Mexican Collateral, free and clear of any liens or other encumbrances, and that the security interest granted thereunder constitutes a legal, valid, binding, and enforceable security over the Mexican Collateral.

12.     Perfection. The security interests granted under the U.S. Security Agreements were properly perfected by filing UCC financing statements with the Delaware Secretary of State.[9]  As a result, the Administrative Agent holds, on behalf of and for the benefit of the Carnaby II and III Secured Lenders, properly perfected security interests in all assets of each of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III.

13.     In turn, each Mexican Security Agreement was executed in compliance with Mexican law, before a Mexican Notary Public and is duly registered before the Mexican Sole Registry of Liens over Movable Assets (*Registro Unico de Garantias Mobiliarias*).  As a result, the Carnaby II Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the benefit of the Carnaby II Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby II,[10] and the Carnaby III Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the

---

*See* (i) UCC Financing Statement File No. 2022 4634697, filed at 12:39 PM on June 2, 2022, against Carnaby Inventory II, LLC as debtor; (ii) UCC Financing Statement File No. 2022 4634796, filed at 12:42 PM on June 2, 2022, against Carnaby Inventory Holdings II, LLC as debtor; (iii) UCC Financing Statement File No. 2022 5629043, filed at 3:58 PM on July 6, 2022, against Carnaby Inventory III, LLC as debtor; and (iv) UCC Financing Statement File No. 2022 5628912, filed at 3:55 PM on July 6, 2022, against Carnaby Inventory Holdings III, LLC as debtor.

[10]   The Carnaby II Mexican Security Agreement was registered with the RUG on June 7, 2022 (at 15:08:37 ZULU GMT/UTC), as Asiento No. 31302386, Garantía Mobiliaria No. 16927095, Folio Electrónico R20220601MG36, with a maximum secured amount of USD $60,000,000, covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby II.  On July 6, 2022, the Carnaby II Mexican Security Agreement was amended by the Amendment Agreement (Convenio Modificatorio) to extend the secured obligations to cover the Carnaby III Credit Agreement obligations as well, consistent with the Cross-Collateralization Agreement.  This amendment was registered with the RUG on July 8, 2022 (at 19:21:38 ZULU GMT/UTC), as Asiento No. 32022878, Garantía Mobiliaria No. 16927095 (same folio as the Carnaby II Original Pledge), amending the maximum secured amount to USD $160,000,000.

8

benefit of the Carnaby III Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby III.[11]

14.     Cross-Collateralization Agreement.   As noted in paragraph 2 above, on July 6, 2022, the parties to the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into the Cross-Collateralization Agreement, pursuant to which the Collateral securing each Credit Agreement also secures the obligations under the other Credit Agreement, and vice versa.  This cross-collateralization was also reflected in and effected through the U.S. Security Agreements, and in the Mexican Security Agreements as set forth above.

15.     Other Obligations Under the Transaction Documents.   FBG executed each of the Credit Agreements as "Servicer" and made various representations and warranties and undertakings in favor of the Carnaby II and III Secured Lenders thereunder including, without limitation, (i) to cause each of BPI and Trico to comply with the terms of the Transaction Documents; (ii) to act as Servicer under the Credit Agreements and to perform (or cause to be performed) certain functions for Carnaby II and Carnaby III.  Accordingly, FBG is responsible for ensuring the Carnaby II, Carnaby III, BPI, and Trico, and the Guarantors under the Credit Agreements each perform their obligations under the Transaction Documents (including, without limitation, obligations to maintain and preserve adequate records of the purchases and sales of inventory, to deliver regular reporting, and to maintain corporate separateness of the entities).  (*See* Credit Agreements Sec. 6.2(a)–(f), Sec. 5.1(s), (t); *see also* Sec. 5.1(a), (f), (g), (m), (n), (o), (p), (v), (w), (bb), and (dd); Sec. 5.2(j).  In their respective Credit Agreements, each of BPI and Trico

---

[11]     The Carnaby III Mexican Security Agreement was formalized before Corredor Público No. 7 (Licenciado José Carlos Reyes Cadena) in the State of Nuevo León, Mexico, and was registered with the RUG on July 8, 2022 (at 18:50:02 ZULU GMT/UTC), as Asiento No. 32020337, Garantía Mobiliaria No. 17265862, Folio Electrónico R20220708MSF5, with a maximum secured amount of USD $160,000,000 (covering both facilities per the Cross-Collateralization Agreement), covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby III.

9

covenanted for the benefit of the Carnaby II and III Secured Lenders to timely perform all of their respective obligations under the Transaction Documents to which they are party.  *See* Credit Agreement, Sec. 5.1(aa).

16.     As contemplated by the Carnaby II Credit Agreement, Carnaby II maintains a manufacturing business relationship with BPI, as evidenced by a Manufacturing Agreement, pursuant to which Carnaby II provides to BPI and the Carnaby II Depositaries the Raw Material for manufacture in accordance with BPI's Maquiladora Agreements with the Carnaby II Depositaries.  The Manufacturing Agreement between Carnaby II and BPI was executed on May 31, 2022, and created valid and binding obligations of BPI, enforceable against it in accordance with its terms.  Under that Manufacturing Agreement, Carnaby II hired and requested certain manufacturing services from BPI to manufacture and produce the products requested by Carnaby II.  BPI was authorized to perform the manufacturing processes required by Carnaby II through its "maquiladora program" with the Carnaby II Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreement).

17.     As contemplated by the Carnaby III Credit Agreement, Carnaby III maintains a manufacturing business relationship with Trico, as evidenced by the Manufacturing Agreements, pursuant to which Carnaby III provides to Trico and the Carnaby III Depositaries the Raw Material for manufacture in accordance with Trico's Maquiladora Agreements with the Carnaby III Depositaries.  The Manufacturing Agreements between Carnaby III and Trico were executed on July 6, 2022, and created valid and binding obligations of Trico, enforceable against them in accordance with its terms.  Under the Manufacturing Agreements, Carnaby III hired and requested certain manufacturing services from Trico to manufacture and produce the products requested by

Carnaby III.  Trico was authorized to perform the manufacturing processes required by Carnaby III through its "maquiladora program" with the Carnaby III Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreements).

18.     The Manufacturing Agreements between Carnaby II and Carnaby III and BPI and Trico, as applicable, provide that neither BPI, Trico, the Carnaby II Depositaries, or the Carnaby III Depositaries, as applicable, shall under any circumstances be considered to have any proprietary interest in the Materials (as defined in the Manufacturing Agreements) which Carnaby II and Carnaby III may deliver to BPI, Trico, the Carnaby II Depositaries, or Carnaby III Depositaries, as applicable, nor on the Products (as defined in the Manufacturing Agreements).  They also provide that BPI, Trico, the Carnaby II Depositaries, and the Carnaby III Depositaries, as applicable, shall provide necessary administrative services for shipment, including the arrangement of proper transportation of the Materials and the Products between Mexico and the United States.  The Manufacturing Agreement also provides that the Carnaby II Depositaries and the Carnaby III Depositaries shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the Materials and Products, but that under no circumstances does acting as importer and exporter result in the conveyance of ownership of the Materials or Products to the Carnaby II Depositaries or Carnaby III Depositaries.

19.     Carnaby II executed a Purchase Agreement and Sale Agreement with BPI on May 31, 2022, which provided for the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreement.  Carnaby III executed a Purchase Agreement and Sale Agreement with each of Trico on July 6, 2022 which provided for

11

the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreements.  As buyers and sellers under the Purchase Agreements and Sale Agreements, the parties thereto intended to effect absolute and irrevocable 'true sales' for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings and undertook to reflect such sales in their respective financial statements). Each Purchase Agreement and Sale Agreement further required that the parties advise anyone inquiring about the ownership of any assets purchases thereunder that all applicable assets had been sold to the applicable buyer.  Additionally, each of applicable selling parties under the Purchase Agreements and Sale Agreements represented and warranted to in their respective Purchase Agreements and Sale Agreements that they had good title to the assets being sold, in each case free and clear of any liens.

20.    Purchases and sales of inventory between Carnaby II and BPI occurred beginning on or about May 31, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).  Purchases and sales of inventory between Carnaby III and Trico occurred beginning on or about July 6, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).

## ASSERTION OF CLAIM

21.    Proof of Claim.  This Proof of Claim is filed by the Administrative Agent for the benefit of the Carnaby II and III Secured Lenders and sets forth their claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors as follows:

22.    Carnaby Holdings II and Carnaby Holdings III Guarantee Claims.  Each of Carnaby Holdings II and Carnaby Holding III executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI)

**JOINT EXHIBIT NO. 61**
**Page 372 of 540**

and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors. The Administrative Agent's claims against Carnaby Holdings II and Carnaby Holdings III therefore include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

23.     First Brands Group Holdings, LLC Guarantee Claims. FB Holdings executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI) and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors. The Administrative Agent's claims against FB Holdings therefore include: (1) the full amount of the Guaranteed Obligations under both Credit Agreements include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

24.     503(b)(9) Claims Against BPI and Trico: The Administrative Agent also asserts claims in an amount to be determined against each of BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code for the fair value of inventory BPI and Trico received from Carnaby II and Carnaby III during the 20 days preceding the Petition Date to the extent Carnaby II and Carnaby III did not receive payment equal to such fair value from BPI and Trico.

25.     Additional Claims. The Administrative Agent also asserts against FBG, on behalf of itself and the Carnaby II and III Secured Lenders, claims in an amount not less than **$160,717,187.33** for payment in full of damages stemming from, among other things, (i) any all

13

outstanding aggregate principal amounts of the loans under the Credit Agreements and all accrued and unpaid interest (including post-petition and default interest) thereon; (ii) any and all unpaid fees and expenses owed to the Administrative Agent and/or any of the Carnaby II and III Secured Lenders; (iii) any indemnifications, out-of-pocket fees and expenses (including, but not limited to, the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II and III Secured Lenders), premiums, reimbursements, charges, damages, and/or claims (as defined in the Bankruptcy Code) arising under the applicable Transaction Documents; (iv) all obligations owed to the Carnaby II and III Secured Lenders until all Obligations have been paid in full; (v) all damages arising from breach by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors of its respective representations, warranties, and obligations under the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or any other Transaction Documents to which it is party; and (vi) all damages arising from the fraudulent misrepresentations and omissions made by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors in connection with the Transaction Documents and the transactions contemplated thereby, including without limitation all amounts necessary to compensate the Carnaby II and III Secured Lenders for losses caused by such misrepresentations and omissions (collectively, the "Additional Claims," and together with the aggregate outstanding principal amount of the Loans, accrued and unpaid interest, fees, costs, and all other Obligations and Guaranteed Obligations due and payable under the Credit Agreements and the related Transaction Documents, the "Claims").  The Administrative Agent also asserts Additional Claims against BPI arising out of the Carnaby II Credit Agreement and related Transaction Documents in an amount not less than $59,622,980.05 and Additional

**JOINT EXHIBIT NO. 61**
**Page 374 of 540**

Claims arising out of the Carnaby III Credit Agreement and related Transaction Documents against Trico in an amount not less than $101,094,207.28.   The Administrative Agent also asserts Additional Claims arising out of the Carnaby Credit Agreements against each of FB Holdings, Carnaby Holdings II and Carnaby Holdings III in an amount to be determined.

26.     Breach of Contract and Fraud Claims.  In addition to any Claims set forth above, the Administrative Agent, on behalf of itself and the Carnaby II and III Secured Lenders, asserts claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors for breach of contract and common law fraud/fraudulent misrepresentation.  Each FBG Debtor was party to, and breached, one or more of the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or the other Transaction Documents, and each failed to perform its obligations thereunder, including without limitation by failing to maintain, preserve, and protect the Collateral; failing to comply with applicable covenants, representations, and warranties; and failing to satisfy the Obligations and Guaranteed Obligations when due.

27.     The FBG Debtors committed fraud by making material misrepresentations and omissions in connection with the Transaction Documents and the transactions contemplated thereby, upon which the Administrative Agent and the Carnaby II and III Secured Lenders reasonably relied in advancing funds, extending credit, and entering into the Transaction Documents, and such misrepresentations and omissions caused damage to the Carnaby II and III Secured Lenders in an amount to be determined.  The Administrative Agent expressly reserves the right to supplement the factual basis for these claims as additional information becomes available through discovery or otherwise.

**JOINT EXHIBIT NO. 61**
**Page 375 of 540**

28.     Federal Rule of Bankruptcy Procedure 3001(e)(3) states that "[i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount." Fed. R. Bankr. P. 3001(e)(3). Section 101(54) of the Bankruptcy Code defines "transfer" as "the creation of a lien." 11 U.S.C. § 101(54)(A). Pursuant to the U.S. Security Agreements, the Administrative Agent has been granted properly perfected, first-priority liens, for the benefit of the Carnaby II and III Secured Lenders, over, *inter alia,* all Contracts and Contract Rights of each of Carnaby II and Carnaby III and each of Carnaby Holdings II and Carnaby Holdings III. Accordingly, the Administrative Agent holds any claims arising out of any such Contracts or Contract Rights that may be asserted by any of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III against any person or entity, including, without limitation, any other Debtor and non-Debtor entities (including the FBG Debtors). Such claims include, in the case of the FBG Debtors that are counterparties to the Transaction Documents, any claims held by Carnaby II, Carnaby III, Carnaby Holdings II, or Carnaby Holdings III for breach of contract, in each case up to the full amount of the Obligations and Guaranteed Obligations.

29.     <u>Nature of the Claims Against Carnaby Holdings II and Carnaby Holdings III</u>. The Claims asserted against each of Carnaby Holdings II and Carnaby Holdings III are secured by properly perfected, valid and enforceable first-priority liens and pledges on all of its assets as contemplated by the U.S. Security Agreement, and all of the assets of each of Carnaby II and Carnaby III as contemplated by the Cross-Collateralization Agreement. Consequently, the Claims are secured, except to the extent that the value of the Collateral securing the Claims is insufficient to satisfy the Claims in full. To the extent of any remaining deficiency, the remainder of the Claim is asserted as a general unsecured claim.

**JOINT EXHIBIT NO. 61**
**Page 376 of 540**

30.     Nature of the Claims Against the FBG Debtors:  Except as set forth in the following paragraph, the Claims against the FBG Debtors are asserted as general unsecured claims.

31.     Nature of 503(b)(9) Claims Against BPI and Trico:  The Claims asserted against BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code are asserted as administrative expense priority Claims.

## RESERVATION OF RIGHTS

32.     By filing this Proof of Claim, the Administrative Agent does not waive, and expressly reserves, all rights and remedies at law or in equity under any applicable law or jurisdiction that the Administrative Agent has or may have against each of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors any guarantor or obligor (including but not limited to Carnaby Holdings II, Carnaby Holdings III, and FB Holdings), and any of their respective affiliates and subsidiaries, or any other person or entity, including without limitation its rights to seek payment as an oversecured creditor of all amounts to which it may be entitled under 11 U.S.C. § 506.  Without limiting the generality of the foregoing, this Proof of Claim is not, ***nor shall it be deemed or construed to be***: (a) a waiver or release of any terms or provisions of the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (b) an election of remedies or waiver of any past, present or future breaches, defaults or events of default under the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (c) a waiver of the rights and remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether an affiliate or guarantor of any of the Debtors or an assignee or otherwise; (d) consent by the Administrative Agent to the jurisdiction of the Court with respect to any proceeding commenced against or otherwise involving the Administrative Agent; (e) a waiver of any right to (1) withdraw the reference, or otherwise

17

**JOINT EXHIBIT NO. 61**
**Page 377 of 540**

challenge the jurisdiction of the Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in this case against or otherwise involving the Administrative Agent, or (2) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Administrative Agent; (f) a waiver or release of, or any other limitation on, the Administrative Agent's right to assert that any portion of the claims asserted herein or any other claims are entitled to treatment as priority claims including under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (g) a waiver of any rights that the Administrative Agent may have pursuant to section 506(b) of the Bankruptcy Code; (h) a waiver or release of any lien, pledge or security interest against any Debtor or any third parties; (i) a waiver or release of, or any other limitation on, the Administrative Agent's rights to assert that any nonrecourse claim should be treated as a recourse claim, including but not limited to the exercise of any right that the Administrative Agent may have pursuant to section 1111(b) of the Bankruptcy Code; (j) consent to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. section 157(e) or otherwise; (k) a waiver by the Administrative Agent of the right to have final orders in non-core matters entered only by a United States District Court judge; (l) a waiver or release of the Administrative Agent's right to have any and all final orders in any and all noncore matters or proceedings entered only after de novo review by a United States District Court Judge; or (m) a waiver of any claim, at law or in equity or under any applicable law, including without limitation administrative claims, priority claims, secured claims, unsecured claims, constructive trust claims, claims based upon common law fraud, misrepresentation, subrogation, indemnity, contribution, unjust enrichment, fraudulent

conveyance, failure to fulfill contractual and fiduciary obligations, breach of the implied covenant of good faith and fair dealing, tortious interference, quantum meruit, or any other theory available under applicable law or equity, including, without limitation, the right to assert a constructive trust against assets or cash held by any Debtor, and any and all amounts owed, in damages or otherwise, whether known or unknown, and whether presently asserted or to be asserted, all of which singularly or collectively may have caused the Administrative Agent to incur damages. Nothing herein shall be deemed to waive, stop, or derogate from the rights of the Administrative Agent under the Transaction Documents, including, without limitation, in connection with the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, and any order of the Court, or to prejudice any and all of the Administrative Agent's rights, claims, and defenses under the Bankruptcy Code or otherwise, including, but not limited to, the right to vote on any plan(s) in the Debtors' Chapter 11 Cases.

33.     The Administrative Agent expressly reserves the right to amend, replace, update, or supplement this Proof of Claim (including the proof of claim form) at any time and in any respect (including, without limitation, as necessary or appropriate to amend, quantify, or correct amounts, to provide additional detail regarding the Claims set forth herein, to fix the amount of any contingent or unliquidated component of the Claims, or to include any claim, at law or in equity), to add or amend documents and other information, to file additional proofs of claim or further pleadings for additional claims, to contest the validity, priority, and extent of any other purported liens and security interests other than those described herein, and to assert any and all other claims, actions, defenses, setoffs, recoupments, rights or remedies of whatever kind or nature that it currently has, or may have in the future against any of Carnaby Holdings II, Carnaby Holdings III, any FBG Debtor, and/or any other Debtors or non-Debtors, or any other person or

entity, including without limitation, rights against guarantors, officers, directors, and other creditors any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, at law or in equity, including, without limitation, administrative or other priority claims, setoff and recoupment rights, lien rights, interest, and the right to assert claims that are otherwise warranted in any related actions.

34.     The Administrative Agent reserves the right to claim that the portion of its fees, interest, costs, expenses, and other charges incurred or accruing after the applicable Petition Date of each of any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, constitute administrative expenses of the applicable Debtor's estate to the extent such expenses are not otherwise paid in full, and reserves the right to file a claim or application for payment of such administrative expenses.

35.     No judgment has been rendered on the Claims set forth in this Proof of Claim.

36.     With respect to any portion of the Claims that is unliquidated or as to which the amount is undetermined, the Administrative Agent does not waive their rights thereto by not claiming specific amounts at this time.

37.     The Administrative Agent expressly reserves, and does not waive, its right to payment of any amounts due from any guarantor in respect of the Credit Agreements from any other sources under any applicable law and jurisdiction.

38.     The Administrative Agent expressly reserves its rights to exercise judicial actions under any applicable law and jurisdiction against non-Debtor entities during and after these Chapter 11 Cases.

39.     Nothing contained in this Proof of Claim shall be deemed an admission by the Administrative Agent.

**JOINT EXHIBIT NO. 61**
**Page 380 of 540**

40.     To the best of the Administrative Agent's knowledge, the claims set forth herein are not subject to setoff or counterclaim, <u>provided</u>, <u>however</u>, that the Administrative Agent (on behalf of the Carnaby II and III Secured Lenders) expressly reserves and does not waive any right of set-off or recoupment it may possess.

41.     The Administrative Agent does not consent to the surcharge of the Collateral by any Debtor's estate, their representatives, or any other person or party-in-interest pursuant to 11 U.S.C. §506(c) or otherwise.

42.     The Administrative Agent expressly reserves the right to withdraw this Proof of Claim as if it had never been filed.

## NOTICES AND COMMUNICATIONS

43.     Any and all notices and communications concerning the Proof of Claim shall be sent to the following addresses both in hard copy and via e-mail:

Tarik Johnson
**GLAS TRUST COMPANY LLC**, in its capacity as Administrative Agent
3 Second Street, Suite 206, Jersey City, NJ 07311
Tel.: +1 201 201 8642
E-mails:
Tarik.Johnson@glas.agency

with a copy to (which shall not constitute notice)

Allan S. Brilliant
Stephen Wolpert
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Tel.: +1 212 698 3599
E-mails:
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

21

**JOINT EXHIBIT NO. 61**
**Page 381 of 540**

**SUPPORTING DOCUMENTS**

44.     The Administrative Agent's claims are based on the Credit Agreements,  the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, the Purchase Agreements, the Promissory Notes, the Sale Agreements, and other related Transaction Documents.  Copies of these documents and additional related documents are not attached to the Proof of Claim because of their voluminous nature.  Counsel to the Administrative Agent will provide copies of such documents to any party in interest in these Chapter 11 Cases, upon a reasonable written request (and entry into an appropriate confidentiality agreement, if necessary) addressed to counsel to the Administrative Agent at the address set forth herein.

45.     Each and every description in this Addendum to the Credit Agreements and the other Transaction Documents is qualified in its entirety by reference to the applicable provisions of such documents, and all such documents are incorporated herein by reference.  In the event of any inconsistency between this Addendum and any such document, including the proof of claim form, the relevant document shall control.

**GLAS Trust Company LLC**
In its capacity as Administrative Agent under the
Carnaby II and Carnaby III Credit Agreements,
related Transaction Documents

Dated: July 6, 2026

22

**JOINT EXHIBIT NO. 61**
**Page 382 of 540**

Electronic Proof of Claim Confirmation:  3950-1-YRDRA-984871349

Claim Electronically Submitted on (UTC) :  2026-07-07T02:53:12.456Z

Submitted by:  GLAS TRUST CO LLC, AGENT FBO CARNABY III SEC. LENDERS
jeffrey.schoenfeld@glas.agency

KROLL

**Exhibit**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ Not less than $101,094,207 . **Does this amount include interest or other charges?**

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

**Proof of Claim** page 2

| | | |
|---|---|---|
| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)( ) that applies. | $ _____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |
| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☐ No<br>☑ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $ See Addendum |

### Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Jeffrey Schoenfeld*   07/07/2026
_____    _____
Electronic Signature          Date

**Name of the person who is completing and signing this claim**

Name    Jeffrey Schoenfeld
_____
First name        Middle name        Last name

Title/Company    Vice President / GLAS TRUST COMPANY LLC
_____
Identify the corporate servicer as the company if the authorized agent is a servicer.

3 Second Street, Suite 203

Address
_____
Number        Street

Jersey City        NEW JERSEY 07311
_____
City            State        ZIP Code    Country

Contact phone    2018392200        Email    jeffrey.schoenfeld@glas.agency

---

**Proof of Claim**    page 3

**JOINT EXHIBIT NO. 61**
**Page 387 of 540**

**Additional Noticing Addresses (if provided):**

**Additional Address 1**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
Postal Code:
Country:

Contact Phone:
Contact Email:

**Additional Address 2**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
 Postal Code:
 Country:

Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**

☑ Yes
☐ No

-------------------------------------------------------------------------------------------------

 Attachment Filename:

First Brands - Omnibus Proof of Claim Addendum for FBG Debtors (Dechert 07-06-2026).pdf

**KROLL**

**OMNIBUS ADDENDUM TO PROOFS OF CLAIM FILED BY
GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT TO
THE CARNABY II AND III SECURED LENDERS**

GLAS Trust Company LLC, in its capacity as administrative agent (the "Administrative Agent") for the Lenders[1] under (i) that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement") among Carnaby Inventory II, LLC ("Carnaby II"), as Borrower; First Brands Group, LLC ("FBG"), as Servicer; First Brands Group Holdings, LLC ("FB Holdings") and Carnaby Inventory Holdings II, LLC ("Carnaby Holdings II"), as Guarantors; the Lenders party thereto (the "Carnaby II Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent, and acknowledged and agreed to by Brake Parts Inc LLC ("BPI"), BPI Brake Manufacturing Juarez, S.A. de C.V. ("BPIJ"), and BPI Braking Systems Mexico, S.A. de C.V. ("BPIM")  and (ii) that certain credit agreement dated as of July 6, 2022 (the "Carnaby III Credit Agreement," and together with the Carnaby II Credit Agreement, the "Credit Agreements") among Carnaby Inventory III, LLC ("Carnaby III"), as Borrower; FBG, as Servicer; FB Holdings and Carnaby Inventory Holdings III, LLC ("Carnaby Holdings III"), as Guarantors; the Lenders party thereto (the "Carnaby III Secured Lenders," and together with the Carnaby II Secured Lenders, the "Carnaby II and III Secured Lenders"); and GLAS Trust Company LLC, as Administrative Agent and acknowledged and agreed to by Trico Products Corporation ("TPC"), Trico Technologies Corporation ("TTC" and together with TPC, "Trico"), Trico Componentes, S.A. de C.V. ("TC") and Subensambles Internacionales, S. de R.J. de C.V. ("SI"), *hereby submits* this omnibus addendum (the "Addendum") in support of its proofs of claim (together with the applicable proof of claim form, each a "Proof of Claim") submitted against (a) FBG; (b) FB

---

[1]   Capitalized terms not defined herein shall have the meanings ascribed to those terms in the Credit Agreements and the Transaction Documents, as applicable.

Holdings; (c) BPI; (d) TPC; (e) TTC (together with FBG, FB Holdings, BPI, and TPC, collectively, the "FBG Debtors"); (f) Carnaby Holdings II; (g) Carnaby Holdings III, each in its capacity as further described in the applicable Proof of Claim.  This Addendum is intended to be and should be treated as part of each applicable Proof of Claim.

1.      On September 24, 2025 (the "Initial Petition Date"), certain Debtors,[2] including Carnaby Holdings II and Carnaby Holdings III, commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  Between September 28, 2025, and September 29, 2025, approximately 99 additional Debtors, including the FBG Debtors, filed their own bankruptcy petitions (each, in the case of an FBG Debtor, its respective "Petition Date").

**BASIS FOR CLAIM**

2.      The Credit Agreements.  On or about May 31, 2022, Carnaby II, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings II, as Guarantors, the Carnaby II Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby II Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time) along with BPI, BPIJ, and BPIM.

3.      On or about July 6, 2022, Carnaby III, as Borrower, FBG, as Servicer, FB Holdings and Carnaby Holdings III, as Guarantors, the Carnaby III Secured Lenders as Lenders from time to time, and GLAS Trust Company LLC, as Administrative Agent, executed the Carnaby III Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise

---

[2]     A complete list of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

2

modified from time to time) along with Trico, TC, and SI. [3]  On July 6, 2022, the parties to each of the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into a Cross-Collateralization Agreement (the "Cross-Collateralization Agreement"), pursuant to which the liens securing the Obligations[4] and Guaranteed Obligations[5] outstanding under each Credit Agreement secured the Obligations and Guaranteed Obligations outstanding under the other Credit Agreement, and vice versa.

4.      The Carnaby II Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $60 million aggregate principal amount and the Carnaby III Credit Agreement provides for an asset-based revolving loan facility in the aggregate principal amount of up to $100 million aggregate principal amount, under which funds were advanced by the Carnaby II Secured Lenders and the Carnaby III Secured Lenders, respectively.

5.      Obligations. Each Borrower's obligations under the applicable Credit Agreement and the Transaction Documents[6] thereunder are secured by first-priority liens granted by Carnaby

---

[3]   On May 30, 2025, the parties to the Carnaby II Credit Agreement and to the Carnaby III Credit Agreement entered into Extension Agreements, extending the Maturity Date originally set forth in the Carnaby II Credit Agreement and the Carnaby III Credit Agreement to December 1, 2025.

[4]   Each Credit Agreement defines "Obligations" in identical terms as "all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due, now existing or hereafter arising) of the Loan Parties to Administrative Agent, any Lender and/or any Indemnified Party, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the aggregate principal amount of Loans outstanding hereunder, all Interest, fees and all other amounts due or to become due under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise), including interest, fees and other obligations that accrue after the commencement of any Event of Bankruptcy with respect to the Loan Parties (in each case whether or not allowed as a claim in such proceeding)." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

[5]   Each Credit Agreement defines "Guaranteed Obligations" in identical terms as "the Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, and the Secured Parties in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Obligations[.]" Carnaby II Credit Agreement, section 11.1; Carnaby III Credit Agreement, section 11.1.

[6]   Each Credit Agreement defines the "Transaction Documents" in identical terms as "collectively, [the applicable Credit Agreement], each Borrowing Notice, the Security Documents, Purchase Orders, the Maquiladora Agreements, the Purchase Agreement, the Sale Agreement, the Manufacturing Agreement and all other

II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III, on the applicable Collateral (as defined below) pursuant to the U.S. Security Agreements (as defined below) and the applicable Mexican Security Agreement (as defined below), as further detailed below.

6.      The Administrative Agent holds, on behalf of the Carnaby II Secured Lenders, loans totaling $58,964,276.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $658,704.05 under the Carnaby II Credit Agreement and, on behalf of the Carnaby III Secured Lenders, loans totaling $100,000,000.00 in outstanding principal amount plus accrued and unpaid interest thereon of not less than $1,094,207.28 under the Carnaby III Credit Agreement (together, the "Loans"), each due and payable by the Borrowers and Guarantors under the Credit Agreements.  In addition to the obligation to repay the principal amount of the Loans, each of the Borrowers and the Guarantors (including FB Holdings) assumed the obligation to pay accrued and unpaid interest and all other Obligations and Guaranteed Obligations outstanding under the respective Credit Agreement and other Transaction Documents.

7.      Promissory Notes.  Each Borrower's obligations to repay the Obligations under the respective Credit Agreement were also evidenced through Promissory Notes executed by such Borrower with respect to each advance, and guaranteed, in each case, jointly and severally, by the applicable Guarantors under such Credit Agreement.

8.      U.S. Security Agreements.  On or about May 31, 2022, Carnaby II, Carnaby Holdings II, and the Administrative Agent for the benefit of the Carnaby II Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby II U.S. Security

---

instruments, documents, certificates, reports and agreements required to be executed and delivered pursuant hereto." Carnaby II Credit Agreement, Ex. I; Carnaby III Credit Agreement, Ex. I.

Agreement"). On or about July 6, 2022, Carnaby III, Carnaby Holdings III, and the Administrative Agent for the benefit of the Carnaby III Secured Lenders entered into a Pledge and Security Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "Carnaby III U.S. Security Agreement," and together with the Carnaby II U.S. Security Agreement, the "U.S. Security Agreements").

9.      As security for the prompt and complete payment or performance in full of the applicable "Obligations" (as defined in the U.S. Security Agreements, as amended by the Cross-Collateralization Agreement[7]), each Borrower and the Carnaby Holdings II or Carnaby Holdings III, as applicable, entity pledged, collaterally assigned and granted to the Administrative Agent, on behalf of and for the benefit of the applicable Secured Parties, a continuing security interest in all of their right, title and interest in, to and under all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, such party, and regardless of where located: (i) all Accounts; (ii) all Cash; (iii) all Chattel Paper (including without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper); (iv) all Commercial Tort Claims; (v) all Contracts, together with all Contract Rights arising thereunder; (vi) all Deposit Accounts; (vii) all Documents; (viii) all Equipment; (ix) all Financial Assets; (x)

---

[7]     As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby II U.S. Security Agreement means "(i) 'Obligations' (as defined in the [Carnaby II] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby II] Credit Agreement) and (iii) 'Obligations' (as defined in the Pledge and Security Agreement, dated as of July 6, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory III, LLC, as borrower, Carnaby Inventory Holdings III, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(ii).

As amended by the Cross Collateralization Agreement, "Obligations" under the Carnaby III U.S. Security Agreement means "(i) "Obligations" (as defined in the [Carnaby III] Credit Agreement), (ii) Guaranteed Obligations (as defined in the [Carnaby III] Credit Agreement) and (iii) "Obligations" (as defined in the Pledge and Security Agreement, dated as of May 31, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among, Carnaby Inventory II, LLC, as borrower, Carnaby Inventory Holdings II, LLC, and GLAS Trust Company LLC, as administrative agent)." Cross-Collateralization Agreement, section 4(b)(iv).

5

all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Governmental Authorizations; (xiv) all Instruments; (xv) all Intellectual Property Collateral; (xvi)  all Inventory; (xvii) all Investment Property, Pledged Stock and other Pledged Collateral; (xviii) all letters of credit and Letter-of-Credit Rights; (xix) all Licenses; (xx) all Proceeds of insurance; (xxi) all Receivables; (xxii) all Real Estate Assets; (xxiii) all Securities Accounts, Money, Securities, and other investments therein, and all Security Entitlements in respect thereof; (xxiv) all Software and all recorded data of any kind or nature, regardless of the medium of recording; (xxv) all Supporting Obligations relating to any of the foregoing; and (xxvi) all accessions to, substitutions and replacements for, and Proceeds and products of the foregoing, together with all books and Records, customer lists, credit files, computer files, programs, printouts and other computer materials and Records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and Guarantees given by any Person with respect to any of the foregoing (collectively, the "U.S. Collateral"), thereby achieving a complete cross-collateralization of the Carnaby II Credit Agreement and Carnaby III Credit Agreement in respect of all obligations owing under such facilities and all collateral pledged under them.

10.    Mexican Security Agreements. As additional security for the payment, performance and satisfaction in full of any and all of the Obligations, (i) on May 31, 2022, Carnaby II, as Pledgor, the Administrative Agent for the benefit of the Carnaby II Secured Lenders, as Pledgee, BPIJ and BPIM, as depositaries (jointly, the "Carnaby II Depositaries"), and BPI entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión*), under Mexican law (the "Carnaby II Mexican Security Agreement"); and (ii) on July 6, 2022, Carnaby III, as Pledgor, the Administrative Agent for the benefit of the Carnaby III Secured Lenders, as Pledgee, TC and SI, as depositaries (jointly, the "Carnaby III Depositaries"), and TPC and TTC

6

entered into a Floating Lien Pledge Agreement (*Contrato de Prenda sin Transmisión de Posesión* ), under Mexican law (the "Carnaby III Mexican Security Agreement," and together with the Carnaby II Mexican Security Agreement, the "Mexican Security Agreements").

11.     Under the Carnaby II Mexican Security Agreement, Carnaby II granted to the Administrative Agent, for the benefit of the Carnaby II Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Under the Carnaby III Mexican Security Agreement, Carnaby III granted to the Administrative Agent, for the benefit of the Carnaby III Secured Lenders, a first-priority floating lien pledge and security interest over the "Pledged Assets" to secure the due and timely payment, performance and satisfaction when due (whether at stated maturity, by acceleration or otherwise) of any and all of the Obligations.  Each Mexican Security Agreement defines Pledged Assets as any and all property and inventory located in Mexico, currently owned by the applicable Pledgor, or acquired by the applicable Pledgor or arising in the future, including without limitation, all Raw Materials,[8] together with (i) all documents, documents of title, warehouse receipts (or similar documents), bills of lading or orders for delivery of all, or any portion of the foregoing; and (ii) all products and/or sale proceeds of any and all of the foregoing, including, without limitation, insurance proceeds (collectively, the "Mexican Collateral" and together with the U.S. Collateral, the "Collateral").  Each Mexican Security Agreement also

---

[8]     "Raw Materials" are defined under the Mexican Security Agreements as "all the assets that comprise the inventory of the Pledgor, whether now owned or hereafter acquired, including without limitation, all inventory of the Pledgor (i) held for sale or lease, (ii) furnished or to be furnished under any service agreement, (iii) held for display or demonstration, or (iv) on lease or consignment, in favor of third parties; including accessories, packaging and shipping materials, spare parts, repair parts, returned and repossessed inventory, all raw materials, work-in-process, finished inventory and supplies used or consumed in the Pledgor business together with all documents, documents of title, warehouse receipts, pledge bonds, bills of lading, deposit certificates or orders for the delivery of all, or any portion, of the foregoing, including without limitation the assets listed in Exhibit C [attached thereto]."

7

provides that the applicable Pledgor is the sole, legal, and beneficial owner of the Mexican Collateral, free and clear of any liens or other encumbrances, and that the security interest granted thereunder constitutes a legal, valid, binding, and enforceable security over the Mexican Collateral.

12.     <u>Perfection</u>. The security interests granted under the U.S. Security Agreements were properly perfected by filing UCC financing statements with the Delaware Secretary of State.[9]  As a result, the Administrative Agent holds, on behalf of and for the benefit of the Carnaby II and III Secured Lenders, properly perfected security interests in all assets of each of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III.

13.     In turn, each Mexican Security Agreement was executed in compliance with Mexican law, before a Mexican Notary Public and is duly registered before the Mexican Sole Registry of Liens over Movable Assets (*Registro Unico de Garantias Mobiliarias*).  As a result, the Carnaby II Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the benefit of the Carnaby II Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby II,[10] and the Carnaby III Mexican Security Agreement created in favor of the Administrative Agent, on behalf and for the

---

*See* (i) UCC Financing Statement File No. 2022 4634697, filed at 12:39 PM on June 2, 2022, against Carnaby Inventory II, LLC as debtor; (ii) UCC Financing Statement File No. 2022 4634796, filed at 12:42 PM on June 2, 2022, against Carnaby Inventory Holdings II, LLC as debtor; (iii) UCC Financing Statement File No. 2022 5629043, filed at 3:58 PM on July 6, 2022, against Carnaby Inventory III, LLC as debtor; and (iv) UCC Financing Statement File No. 2022 5628912, filed at 3:55 PM on July 6, 2022, against Carnaby Inventory Holdings III, LLC as debtor.

[10]   The Carnaby II Mexican Security Agreement was registered with the RUG on June 7, 2022 (at 15:08:37 ZULU GMT/UTC), as Asiento No. 31302386, Garantía Mobiliaria No. 16927095, Folio Electrónico R20220601MG36, with a maximum secured amount of USD $60,000,000, covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby II.  On July 6, 2022, the Carnaby II Mexican Security Agreement was amended by the Amendment Agreement (Convenio Modificatorio) to extend the secured obligations to cover the Carnaby III Credit Agreement obligations as well, consistent with the Cross-Collateralization Agreement.  This amendment was registered with the RUG on July 8, 2022 (at 19:21:38 ZULU GMT/UTC), as Asiento No. 32022878, Garantía Mobiliaria No. 16927095 (same folio as the Carnaby II Original Pledge), amending the maximum secured amount to USD $160,000,000.

benefit of the Carnaby III Secured Lenders, a valid and perfected first-priority security interest in the applicable Mexican Collateral owned by Carnaby III.[11]

14.     Cross-Collateralization Agreement.   As noted in paragraph 2 above, on July 6, 2022, the parties to the Carnaby II Credit Agreement and the Carnaby III Credit Agreement entered into the Cross-Collateralization Agreement, pursuant to which the Collateral securing each Credit Agreement also secures the obligations under the other Credit Agreement, and vice versa.   This cross-collateralization was also reflected in and effected through the U.S. Security Agreements, and in the Mexican Security Agreements as set forth above.

15.     Other Obligations Under the Transaction Documents.   FBG executed each of the Credit Agreements as "Servicer" and made various representations and warranties and undertakings in favor of the Carnaby II and III Secured Lenders thereunder including, without limitation, (i) to cause each of BPI and Trico to comply with the terms of the Transaction Documents; (ii) to act as Servicer under the Credit Agreements and to perform (or cause to be performed) certain functions for Carnaby II and Carnaby III.   Accordingly, FBG is responsible for ensuring the Carnaby II, Carnaby III, BPI, and Trico, and the Guarantors under the Credit Agreements each perform their obligations under the Transaction Documents (including, without limitation, obligations to maintain and preserve adequate records of the purchases and sales of inventory, to deliver regular reporting, and to maintain corporate separateness of the entities).   (*See* Credit Agreements Sec. 6.2(a)–(f), Sec. 5.1(s), (t); *see also* Sec. 5.1(a), (f), (g), (m), (n), (o), (p), (v), (w), (bb), and (dd); Sec. 5.2(j).   In their respective Credit Agreements, each of BPI and Trico

---

[11]   The Carnaby III Mexican Security Agreement was formalized before Corredor Público No. 7 (Licenciado José Carlos Reyes Cadena) in the State of Nuevo León, Mexico, and was registered with the RUG on July 8, 2022 (at 18:50:02 ZULU GMT/UTC), as Asiento No. 32020337, Garantía Mobiliaria No. 17265862, Folio Electrónico R20220708MSF5, with a maximum secured amount of USD $160,000,000 (covering both facilities per the Cross-Collateralization Agreement), covering all movable goods and inventory located in Mexico, currently or hereafter owned by Carnaby III.

9

covenanted for the benefit of the Carnaby II and III Secured Lenders to timely perform all of their respective obligations under the Transaction Documents to which they are party. *See* Credit Agreement, Sec. 5.1(aa).

16. As contemplated by the Carnaby II Credit Agreement, Carnaby II maintains a manufacturing business relationship with BPI, as evidenced by a Manufacturing Agreement, pursuant to which Carnaby II provides to BPI and the Carnaby II Depositaries the Raw Material for manufacture in accordance with BPI's Maquiladora Agreements with the Carnaby II Depositaries. The Manufacturing Agreement between Carnaby II and BPI was executed on May 31, 2022, and created valid and binding obligations of BPI, enforceable against it in accordance with its terms. Under that Manufacturing Agreement, Carnaby II hired and requested certain manufacturing services from BPI to manufacture and produce the products requested by Carnaby II. BPI was authorized to perform the manufacturing processes required by Carnaby II through its "maquiladora program" with the Carnaby II Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreement).

17. As contemplated by the Carnaby III Credit Agreement, Carnaby III maintains a manufacturing business relationship with Trico, as evidenced by the Manufacturing Agreements, pursuant to which Carnaby III provides to Trico and the Carnaby III Depositaries the Raw Material for manufacture in accordance with Trico's Maquiladora Agreements with the Carnaby III Depositaries. The Manufacturing Agreements between Carnaby III and Trico were executed on July 6, 2022, and created valid and binding obligations of Trico, enforceable against them in accordance with its terms. Under the Manufacturing Agreements, Carnaby III hired and requested certain manufacturing services from Trico to manufacture and produce the products requested by

Carnaby III.  Trico was authorized to perform the manufacturing processes required by Carnaby III through its "maquiladora program" with the Carnaby III Depositaries in accordance with the Decree for the development of the Manufacturing, Maquiladora and Expert Services Industry, and certain IMMEX Permits (as defined in the Manufacturing Agreements).

18.     The Manufacturing Agreements between Carnaby II and Carnaby III and BPI and Trico, as applicable, provide that neither BPI, Trico, the Carnaby II Depositaries, or the Carnaby III Depositaries, as applicable, shall under any circumstances be considered to have any proprietary interest in the Materials (as defined in the Manufacturing Agreements) which Carnaby II and Carnaby III may deliver to BPI, Trico, the Carnaby II Depositaries, or Carnaby III Depositaries, as applicable, nor on the Products (as defined in the Manufacturing Agreements).  They also provide that BPI, Trico, the Carnaby II Depositaries, and the Carnaby III Depositaries, as applicable, shall provide necessary administrative services for shipment, including the arrangement of proper transportation of the Materials and the Products between Mexico and the United States.  The Manufacturing Agreement also provides that the Carnaby II Depositaries and the Carnaby III Depositaries shall be the importer and exporter of record for Mexican customs purposes and shall obtain and maintain all necessary IMMEX Permits to import the Materials and Products, but that under no circumstances does acting as importer and exporter result in the conveyance of ownership of the Materials or Products to the Carnaby II Depositaries or Carnaby III Depositaries.

19.     Carnaby II executed a Purchase Agreement and Sale Agreement with BPI on May 31, 2022, which provided for the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreement.  Carnaby III executed a Purchase Agreement and Sale Agreement with each of Trico on July 6, 2022 which provided for

the recurring purchase and sale of inventory assets that would constitute the Materials and Products under their Manufacturing Agreements.  As buyers and sellers under the Purchase Agreements and Sale Agreements, the parties thereto intended to effect absolute and irrevocable 'true sales' for all purposes under applicable law and accounting principles, including, without limitation, in their respective books, records, computer files, tax returns (federal, state and local), regulatory and governmental filings and undertook to reflect such sales in their respective financial statements). Each Purchase Agreement and Sale Agreement further required that the parties advise anyone inquiring about the ownership of any assets purchases thereunder that all applicable assets had been sold to the applicable buyer.  Additionally, each of applicable selling parties under the Purchase Agreements and Sale Agreements represented and warranted to in their respective Purchase Agreements and Sale Agreements that they had good title to the assets being sold, in each case free and clear of any liens.

20.     Purchases and sales of inventory between Carnaby II and BPI occurred beginning on or about May 31, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).  Purchases and sales of inventory between Carnaby III and Trico occurred beginning on or about July 6, 2022 and continued up until and after the Petition Date (including during the 20 days before the Petition Date).

<u>**ASSERTION OF CLAIM**</u>

21.     <u>Proof of Claim</u>.  This Proof of Claim is filed by the Administrative Agent for the benefit of the Carnaby II and III Secured Lenders and sets forth their claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors as follows:

22.     <u>Carnaby Holdings II and Carnaby Holdings III Guarantee Claims</u>.  Each of Carnaby Holdings II and Carnaby Holding III executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI)

12

and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.  The Administrative Agent's claims against Carnaby Holdings II and Carnaby Holdings III therefore include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

23.     First Brands Group Holdings, LLC Guarantee Claims.  FB Holdings executed an absolute, unconditional payment guaranty of all Obligations and Guaranteed Obligations under both the Carnaby II Credit Agreement (Article XI) and the Carnaby III Credit Agreement (Article XI), jointly and severally with the applicable Borrower and the other Guarantors.   The Administrative Agent's claims against FB Holdings therefore include: (1) the full amount of the Guaranteed Obligations under both Credit Agreements include the full amount of the Guaranteed Obligations under both Credit Agreements (in the aggregate principal amount of at least **$158,964,276.00** plus at least **$1,752,911.33** of accrued and unpaid interest, plus all other fees, and other amounts due thereunder).

24.     503(b)(9) Claims Against BPI and Trico:  The Administrative Agent also asserts claims in an amount to be determined against each of BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code for the fair value of inventory BPI and Trico received from Carnaby II and Carnaby III during the 20 days preceding the Petition Date to the extent Carnaby II and Carnaby III did not receive payment equal to such fair value from BPI and Trico.

25.     Additional Claims.  The Administrative Agent also asserts against FBG, on behalf of itself and the Carnaby II and III Secured Lenders, claims in an amount not less than **$160,717,187.33** for payment in full of damages stemming from, among other things, (i) any all

13

**JOINT EXHIBIT NO. 61**
**Page 401 of 540**

outstanding aggregate principal amounts of the loans under the Credit Agreements and all accrued and unpaid interest (including post-petition and default interest) thereon; (ii) any and all unpaid fees and expenses owed to the Administrative Agent and/or any of the Carnaby II and III Secured Lenders; (iii) any indemnifications, out-of-pocket fees and expenses (including, but not limited to, the fees, charges and disbursements of outside counsel, special counsel, local counsel and consultants to the Administrative Agent and/or the Carnaby II and III Secured Lenders), premiums, reimbursements, charges, damages, and/or claims (as defined in the Bankruptcy Code) arising under the applicable Transaction Documents; (iv) all obligations owed to the Carnaby II and III Secured Lenders until all Obligations have been paid in full; (v) all damages arising from breach by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors of its respective representations, warranties, and obligations under the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or any other Transaction Documents to which it is party; and (vi) all damages arising from the fraudulent misrepresentations and omissions made by any of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors in connection with the Transaction Documents and the transactions contemplated thereby, including without limitation all amounts necessary to compensate the Carnaby II and III Secured Lenders for losses caused by such misrepresentations and omissions (collectively, the "Additional Claims," and together with the aggregate outstanding principal amount of the Loans, accrued and unpaid interest, fees, costs, and all other Obligations and Guaranteed Obligations due and payable under the Credit Agreements and the related Transaction Documents, the "Claims").  The Administrative Agent also asserts Additional Claims against BPI arising out of the Carnaby II Credit Agreement and related Transaction Documents in an amount not less than $59,622,980.05 and Additional

14

**JOINT EXHIBIT NO. 61**
**Page 402 of 540**

Claims arising out of the Carnaby III Credit Agreement and related Transaction Documents against Trico in an amount not less than $101,094,207.28. The Administrative Agent also asserts Additional Claims arising out of the Carnaby Credit Agreements against each of FB Holdings, Carnaby Holdings II and Carnaby Holdings III in an amount to be determined.

26. <u>Breach of Contract and Fraud Claims</u>. In addition to any Claims set forth above, the Administrative Agent, on behalf of itself and the Carnaby II and III Secured Lenders, asserts claims against each of Carnaby Holdings II, Carnaby Holdings III, and the FBG Debtors for breach of contract and common law fraud/fraudulent misrepresentation. Each FBG Debtor was party to, and breached, one or more of the Credit Agreements, the U.S. Security Agreements, the Mexican Security Agreements, the Manufacturing Agreements, the Maquiladora Agreements, the Cross-Collateralization Agreement, and/or the other Transaction Documents, and each failed to perform its obligations thereunder, including without limitation by failing to maintain, preserve, and protect the Collateral; failing to comply with applicable covenants, representations, and warranties; and failing to satisfy the Obligations and Guaranteed Obligations when due.

27. The FBG Debtors committed fraud by making material misrepresentations and omissions in connection with the Transaction Documents and the transactions contemplated thereby, upon which the Administrative Agent and the Carnaby II and III Secured Lenders reasonably relied in advancing funds, extending credit, and entering into the Transaction Documents, and such misrepresentations and omissions caused damage to the Carnaby II and III Secured Lenders in an amount to be determined. The Administrative Agent expressly reserves the right to supplement the factual basis for these claims as additional information becomes available through discovery or otherwise.

15

**JOINT EXHIBIT NO. 61**
**Page 403 of 540**

28.     Federal Rule of Bankruptcy Procedure 3001(e)(3) states that "[i]f a claim other than one based on a publicly traded note, bond, or debenture has been transferred for security before proof of the claim has been filed, the transferor or transferee or both may file a proof of claim for the full amount." Fed. R. Bankr. P. 3001(e)(3). Section 101(54) of the Bankruptcy Code defines "transfer" as "the creation of a lien." 11 U.S.C. § 101(54)(A). Pursuant to the U.S. Security Agreements, the Administrative Agent has been granted properly perfected, first-priority liens, for the benefit of the Carnaby II and III Secured Lenders, over, *inter alia*, all Contracts and Contract Rights of each of Carnaby II and Carnaby III and each of Carnaby Holdings II and Carnaby Holdings III. Accordingly, the Administrative Agent holds any claims arising out of any such Contracts or Contract Rights that may be asserted by any of Carnaby II, Carnaby III, Carnaby Holdings II, and Carnaby Holdings III against any person or entity, including, without limitation, any other Debtor and non-Debtor entities (including the FBG Debtors). Such claims include, in the case of the FBG Debtors that are counterparties to the Transaction Documents, any claims held by Carnaby II, Carnaby III, Carnaby Holdings II, or Carnaby Holdings III for breach of contract, in each case up to the full amount of the Obligations and Guaranteed Obligations.

29.     <u>Nature of the Claims Against Carnaby Holdings II and Carnaby Holdings III</u>. The Claims asserted against each of Carnaby Holdings II and Carnaby Holdings III are secured by properly perfected, valid and enforceable first-priority liens and pledges on all of its assets as contemplated by the U.S. Security Agreement, and all of the assets of each of Carnaby II and Carnaby III as contemplated by the Cross-Collateralization Agreement. Consequently, the Claims are secured, except to the extent that the value of the Collateral securing the Claims is insufficient to satisfy the Claims in full. To the extent of any remaining deficiency, the remainder of the Claim is asserted as a general unsecured claim.

16

30.      <u>Nature of the Claims Against the FBG Debtors</u>:  Except as set forth in the following paragraph, the Claims against the FBG Debtors are asserted as general unsecured claims.

31.      <u>Nature of 503(b)(9) Claims Against BPI and Trico:</u>  The Claims asserted against BPI and Trico pursuant to Section 503(b)(9) of the Bankruptcy Code are asserted as administrative expense priority Claims.

## **<u>RESERVATION OF RIGHTS</u>**

32.      By filing this Proof of Claim, the Administrative Agent does not waive, and expressly reserves, all rights and remedies at law or in equity under any applicable law or jurisdiction that the Administrative Agent has or may have against each of Carnaby Holdings II, Carnaby Holdings III, or any of the FBG Debtors any guarantor or obligor (including but not limited to Carnaby Holdings II, Carnaby Holdings III, and FB Holdings), and any of their respective affiliates and subsidiaries, or any other person or entity, including without limitation its rights to seek payment as an oversecured creditor of all amounts to which it may be entitled under 11 U.S.C. § 506.  Without limiting the generality of the foregoing, this Proof of Claim is not, ***nor shall it be deemed or construed to be***: (a) a waiver or release of any terms or provisions of the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (b) an election of remedies or waiver of any past, present or future breaches, defaults or events of default under the Credit Agreements, the Cross-Collateralization Agreement, any of the related Transaction Documents, or any order of the Bankruptcy Court; (c) a waiver of the rights and remedies against any other person or entity that may be liable for all or part of the claims set forth herein, whether an affiliate or guarantor of any of the Debtors or an assignee or otherwise; (d) consent by the Administrative Agent to the jurisdiction of the Court with respect to any proceeding commenced against or otherwise involving the Administrative Agent; (e) a waiver of any right to (1) withdraw the reference, or otherwise

17

**JOINT EXHIBIT NO. 61**
**Page 405 of 540**

challenge the jurisdiction of the Court, with respect to the subject matter of these claims, any objection or any other proceeding commenced in this case against or otherwise involving the Administrative Agent, or (2) assert that the reference has already been withdrawn with respect to the subject matter of these claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Administrative Agent; (f) a waiver or release of, or any other limitation on, the Administrative Agent's right to assert that any portion of the claims asserted herein or any other claims are entitled to treatment as priority claims including under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (g) a waiver of any rights that the Administrative Agent may have pursuant to section 506(b) of the Bankruptcy Code; (h) a waiver or release of any lien, pledge or security interest against any Debtor or any third parties; (i) a waiver or release of, or any other limitation on, the Administrative Agent's rights to assert that any nonrecourse claim should be treated as a recourse claim, including but not limited to the exercise of any right that the Administrative Agent may have pursuant to section 1111(b) of the Bankruptcy Code; (j) consent to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto pursuant to 28 U.S.C. section 157(e) or otherwise; (k) a waiver by the Administrative Agent of the right to have final orders in non-core matters entered only by a United States District Court judge; (l) a waiver or release of the Administrative Agent's right to have any and all final orders in any and all noncore matters or proceedings entered only after de novo review by a United States District Court Judge; or (m) a waiver of any claim, at law or in equity or under any applicable law, including without limitation administrative claims, priority claims, secured claims, unsecured claims, constructive trust claims, claims based upon common law fraud, misrepresentation, subrogation, indemnity, contribution, unjust enrichment, fraudulent

18

conveyance, failure to fulfill contractual and fiduciary obligations, breach of the implied covenant of good faith and fair dealing, tortious interference, quantum meruit, or any other theory available under applicable law or equity, including, without limitation, the right to assert a constructive trust against assets or cash held by any Debtor, and any and all amounts owed, in damages or otherwise, whether known or unknown, and whether presently asserted or to be asserted, all of which singularly or collectively may have caused the Administrative Agent to incur damages.  Nothing herein shall be deemed to waive, stop, or derogate from the rights of the Administrative Agent under the Transaction Documents, including, without limitation, in connection with the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, and any order of the Court, or to prejudice any and all of the Administrative Agent's rights, claims, and defenses under the Bankruptcy Code or otherwise, including, but not limited to, the right to vote on any plan(s) in the Debtors' Chapter 11 Cases.

33.     The Administrative Agent expressly reserves the right to amend, replace, update, or supplement this Proof of Claim (including the proof of claim form) at any time and in any respect (including, without limitation, as necessary or appropriate to amend, quantify, or correct amounts, to provide additional detail regarding the Claims set forth herein, to fix the amount of any contingent or unliquidated component of the Claims, or to include any claim, at law or in equity), to add or amend documents and other information, to file additional proofs of claim or further pleadings for additional claims, to contest the validity, priority, and extent of any other purported liens and security interests other than those described herein, and to assert any and all other claims, actions, defenses, setoffs, recoupments, rights or remedies of whatever kind or nature that it currently has, or may have in the future against any of Carnaby Holdings II, Carnaby Holdings III, any FBG Debtor, and/or any other Debtors or non-Debtors, or any other person or

19

**JOINT EXHIBIT NO. 61**
**Page 407 of 540**

entity, including without limitation, rights against guarantors, officers, directors, and other creditors any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, at law or in equity, including, without limitation, administrative or other priority claims, setoff and recoupment rights, lien rights, interest, and the right to assert claims that are otherwise warranted in any related actions.

34.     The Administrative Agent reserves the right to claim that the portion of its fees, interest, costs, expenses, and other charges incurred or accruing after the applicable Petition Date of each of any of Carnaby Holdings II, Carnaby Holdings III, or any FBG Debtor, constitute administrative expenses of the applicable Debtor's estate to the extent such expenses are not otherwise paid in full, and reserves the right to file a claim or application for payment of such administrative expenses.

35.     No judgment has been rendered on the Claims set forth in this Proof of Claim.

36.     With respect to any portion of the Claims that is unliquidated or as to which the amount is undetermined, the Administrative Agent does not waive their rights thereto by not claiming specific amounts at this time.

37.     The Administrative Agent expressly reserves, and does not waive, its right to payment of any amounts due from any guarantor in respect of the Credit Agreements from any other sources under any applicable law and jurisdiction.

38.     The Administrative Agent expressly reserves its rights to exercise judicial actions under any applicable law and jurisdiction against non-Debtor entities during and after these Chapter 11 Cases.

39.     Nothing contained in this Proof of Claim shall be deemed an admission by the Administrative Agent.

**JOINT EXHIBIT NO. 61**
**Page 408 of 540**

40.     To the best of the Administrative Agent's knowledge, the claims set forth herein are not subject to setoff or counterclaim, <u>provided</u>, <u>however</u>, that the Administrative Agent (on behalf of the Carnaby II and III Secured Lenders) expressly reserves and does not waive any right of set-off or recoupment it may possess.

41.     The Administrative Agent does not consent to the surcharge of the Collateral by any Debtor's estate, their representatives, or any other person or party-in-interest pursuant to 11 U.S.C. §506(c) or otherwise.

42.     The Administrative Agent expressly reserves the right to withdraw this Proof of Claim as if it had never been filed.

**NOTICES AND COMMUNICATIONS**

43.     Any and all notices and communications concerning the Proof of Claim shall be sent to the following addresses both in hard copy and via e-mail:

> Tarik Johnson
> **GLAS TRUST COMPANY LLC**, in its capacity as Administrative Agent
> 3 Second Street, Suite 206, Jersey City, NJ 07311
> Tel.: +1 201 201 8642
> E-mails:
> Tarik.Johnson@glas.agency
>
> with a copy to (which shall not constitute notice)
>
> Allan S. Brilliant
> Stephen Wolpert
> **DECHERT LLP**
> 1095 Avenue of the Americas
> New York, NY 10036
> Tel.: +1 212 698 3599
> E-mails:
> allan.brilliant@dechert.com
> stephen.wolpert@dechert.com

21

**JOINT EXHIBIT NO. 61**
**Page 409 of 540**

## SUPPORTING DOCUMENTS

44.     The Administrative Agent's claims are based on the Credit Agreements, the Cross-Collateralization Agreement, the U.S. Security Agreements, the Mexican Security Agreements, the Purchase Agreements, the Promissory Notes, the Sale Agreements, and other related Transaction Documents.  Copies of these documents and additional related documents are not attached to the Proof of Claim because of their voluminous nature.  Counsel to the Administrative Agent will provide copies of such documents to any party in interest in these Chapter 11 Cases, upon a reasonable written request (and entry into an appropriate confidentiality agreement, if necessary) addressed to counsel to the Administrative Agent at the address set forth herein.

45.     Each and every description in this Addendum to the Credit Agreements and the other Transaction Documents is qualified in its entirety by reference to the applicable provisions of such documents, and all such documents are incorporated herein by reference.  In the event of any inconsistency between this Addendum and any such document, including the proof of claim form, the relevant document shall control.

**GLAS Trust Company LLC**
In its capacity as Administrative Agent under the
Carnaby II and Carnaby III Credit Agreements,
related Transaction Documents

Dated: July 6, 2026

22

**JOINT EXHIBIT NO. 61**
**Page 410 of 540**

Electronic Proof of Claim Confirmation:  3950-1-VEUFX-722418444

Claim Electronically Submitted on (UTC) :  2026-07-07T03:03:13.573Z

Submitted by:  GLAS TRUST CO LLC, AGENT FBO CARNABY III SEC. LENDERS
jeffrey.schoenfeld@glas.agency

**KROLL**

**Exhibit**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| | § | |
| **Debtors.**[1] | § | |
| | § | |

### APPLICATION OF GLAS TRUST COMPANY LLC, AS ADMINISTRATIVE AGENT, FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the court may treat the pleading as unopposed and grant the relief requested.**

GLAS Trust Company LLC,[2] as Administrative Agent (the "Administrative Agent") for the

Carnaby II and III Secured Lenders by and through its undersigned counsel, respectfully submits

this application (the "Application") requesting that this Court enter an order, substantially in the

form attached hereto, (i) allowing and directing payment of Administrative Agent's administrative

expense claims (the "Administrative Claims") pursuant to sections 503(b), 507(a)(2), and 507(b)

of title 11 of the United States Code (the "Bankruptcy Code"), and (ii) granting such other and

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Carnaby Inventory II, LLC and Carnaby Inventory III, LLC* [ECF No. 230] (the "Stipulation"). The term "Carnaby II and III Secured Lenders" includes the Carnaby II Lenders and the Carnaby III Lenders as defined in the Stipulation, in the Carnaby II Credit Agreement, or in the Carnaby III Credit Agreement, as applicable.

1

further relief as is just and proper.  In support of this Application, the Administrative Agent respectfully states as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to decide this matter under 28 U.S.C. § 1334(b), and the *General Order of Reference* from the United States District Court for the Southern District of Texas, dated as of May 24, 2012.

2.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory and legal predicate for the relief requested herein are sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code.

## BACKGROUND

4.     On September 24, 2025 (the "Initial Petition Date"), certain Debtors, including Carnaby Inventory II, LLC ("Carnaby II"), Carnaby Inventory III, LLC ("Carnaby III" and together with Carnaby II, the "SPV Debtors") Carnaby Inventory Holdings II, LLC ("Carnaby II Holdings") and Carnaby Inventory Holdings III, LLC ("Carnaby III Holdings" and together with Carnaby II Holdings, "Holdings"), commenced these chapter 11 cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.  Between September 28, 2025 and September 29, 2025, approximately 99 additional debtors, including First Brands Group Holdings, LLC ("FB Holdings"), First Brands Group, LLC ("FBG"), Brake Parts Inc. LLC ("BPI"), Trico Products Corporation ("TPC"), and Trico Technologies Corporation ("TTC") (collectively, the "FBG Debtors"), filed their respective petitions for relief under chapter 11 (each such date, as applicable, the "Petition Date").

5.     The Credit Agreements.  Pursuant to that certain credit agreement dated as of May 31, 2022 (the "Carnaby II Credit Agreement"), Carnaby II, as Borrower, FBG, as Servicer, FB

2

Holdings and Carnaby II Holdings, as Guarantors, and the Carnaby II Secured Lenders, as Lenders, with GLAS Trust Company LLC, as Administrative Agent, entered into an asset-based revolving loan facility providing for aggregate borrowings of up to $60 million.

6.     Pursuant to that certain credit agreement dated as of July 6, 2022 (the "Carnaby III Credit Agreement" and, together with the Carnaby II Credit Agreement, the "Credit Agreements"), Carnaby III, as Borrower, FBG, as Servicer, FB Holdings and Carnaby III Holdings, as Guarantors, and the Carnaby III Secured Lenders, as Lenders, with GLAS Trust Company LLC, as Administrative Agent, entered into an asset-based revolving loan facility providing for aggregate borrowings of up to $100 million.  On July 6, 2022, the parties to both Credit Agreements entered into a Cross-Collateralization Agreement, pursuant to which the collateral securing each Credit Agreement also secures the obligations under the other.

7.     The obligations of each borrower and the guarantors under the Credit Agreements are secured by first-priority liens on the applicable collateral (collectively, the "Carnaby II and III Collateral") granted pursuant to certain New York Law-governed pledge and security agreements issued substantially concurrently with the Credit Agreements (the "U.S. Pledge and Security Agreements") and certain Mexican Law-governed floating lien pledge agreements (the "Mexican Floating Lien Pledge Agreements"), in each case, executed substantially contemporaneously with the respective Credit Agreements.  The security interests granted under the U.S. Security Agreements encumber substantially all of the assets of the SPV Debtors and Holdings party thereto and were properly perfected by filing UCC financing statements with the Delaware Secretary of State.  The security interests granted under the Mexican Floating Len Pledge Agreements encumber all inventory of Carnaby II and Carnaby III located in Mexico and were properly registered with the *Registro Único de Garantías Mobiliarias* (the "RUG"), Mexico's national

3

registry for security interests in personal property governed by Mexico's General Law of Negotiable Instruments and Credit Transactions.

8.  Transaction Framework.  In addition to and in connection with the execution of the Credit Agreements, the SPV Debtors and various FBG Debtors entered into a series of Transaction Documents (as defined in the Credit Agreements) to finance the Debtors' brakes and windshield wiper manufacturing operations in Mexico (collectively, the "Carnaby II and III Inventory Financings").  Under the Carnaby II and III Inventory Financings' structures, Carnaby II and Carnaby III purchased and sold inventory from and to BPI, TPC, and TTC on a recurring basis, which inventory consisted of raw materials, work-in-process, and finished goods (primarily brakes components, for Carnaby II, and windshield wiper components, for Carnaby III) (the "Carnaby Inventory Collateral").  While owned by Carnaby II and Carnaby III, the Carnaby Inventory Collateral is manufactured and finished at certain Debtor-affiliates' maquiladora facilities in Mexico (the "Maquiladoras") pursuant to Manufacturing Agreements between Carnaby II and BPI and Carnaby III and TPC, and TTC, respectively (the "Manufacturing Agreements").  Once converted into finished goods, the Carnaby Inventory Collateral is sold for cash or in kind for new raw materials back to BPI, TPC, and TTC which then resell the finished goods to third party purchasers.

9.  The vast majority of the Carnaby Inventory Collateral is located at facilities in Mexico.

10.  To effect the recurring sales contemplated under the Carnaby II and III Inventory Financings, Carnaby II executed a purchase agreement and a sale agreement with BPI on May 31, 2022, which together provided for the recurring purchase and sale of brake-related inventory assets constituting the materials and products.  Likewise, Carnaby III executed purchase agreements and

4

sale agreements with each of TPC and TTC on July 6, 2022, which together provided for recurring purchases and sales of wipers-related inventory assets constituting the materials and products.

11. Purchases and sales of inventory between Carnaby II and BPI commenced on or about May 31, 2022, and continued up until the cessation of the Debtors' brakes manufacturing operations in early 2026 (including during the 20 days before the applicable Petition Date). Purchases and sales of inventory between Carnaby III and TPC and TTC commenced on or about July 6, 2022, and continued up until the cessation of the Debtors' wipers manufacturing operations in early 2026 (including during the 20 days before the applicable Petition Date).

12. The Stipulation. Prior to the Petition Date, the FBG Debtors' operations included the sale of Carnaby Inventory Collateral to the FBG Debtors, who would in turn sell the inventory to third parties. The Debtors sought to continue such operations postpetition, and requested that Carnaby II and III Secured Parties enter into a stipulation allowing them to do so. On October 2, 2025, this Court entered the Stipulation, which reflected the Debtors' and the Carnaby Secured Parties' negotiated agreement authorizing the FBG Debtors to continue to sell Carnaby Inventory Collateral in exchange for certain protections of the Carnaby Secured Parties' collateral interests.

13. Each of the Debtors, including all of the FBG Debtors, were parties to the Stipulation, and incurred various obligations thereunder for the benefit of the Carnaby Secured Parties as further described herein, including, without limitation, (a) to pay cash for Carnaby Inventory Collateral, or in the alternative, (b) provide Eligible Customer A/R (as defined below) on which the Carnaby Secured Parties' liens would attach and deposit the proceeds of any collected Eligible Customer A/R into the Adequate Protection Account (as defined below).

14. Under the Stipulation, Carnaby II and Carnaby III were permitted to continue to sell Carnaby Inventory Collateral to BPI, TPC, and TTC (the "FBG Debtor Purchasers") solely (i)

5

for payment by the FBG Debtor Purchasers of cash on delivery at Fair Market Value (the "Purchase Price") or (ii) with respect to up to $20 million in the aggregate of Carnaby Inventory Collateral, to the extent the FBG Debtor Purchasers immediately resold such inventory to customers that have a credit rating of at least BB or its equivalent from a nationally recognized credit rating agency ("Eligible Customers") for accounts receivable with a tenor of not longer than 45 days (the "Eligible Customer A/R"). *See* Stipulation ¶ 3. To the extent the FBG Debtor Purchasers paid the Purchase Price in cash, the Stipulation required the cash to be deposited in an account (the "Adequate Protection Account") subject to the Carnaby II and III Secured Parties' liens. *See id.* ¶ 3(b). To the extent the sales were for Eligible Customer A/R, the Court granted the Carnaby Secured Parties (a) a first-priority, automatically perfected lien on all Carnaby Inventory Collateral transferred to each Debtor Purchaser pending resale to a customer; and (b) a first-priority, automatically perfected lien on all Eligible Customer A/R constituting proceeds of any resale by a Debtor Purchaser to Eligible Customers. *See id.* ¶¶ 3(a), 3(c). The Stipulation provided that such Carnaby Inventory Collateral and Eligible Customer A/R could not be subject to any other liens, claims, or encumbrances, including in connection with the DIP Facility, and upon collection of any Eligible Customer A/R, each of the FBG Debtor Purchasers was obligated to immediately deposit cash equal to the Purchase Price in the Adequate Protection Account, with any balance to be remitted to the FBG Debtors. To ensure that the Carnaby Secured Parties were properly informed of (a) the sales for which cash proceeds were required to be deposited in the Adequate Protection Account and (b) the Eligible Customer A/R on which they were granted perfected first priority liens, the Debtors were obligated to provide, among other things, (i) weekly reporting on the transfer of any Carnaby II and III Collateral and related customer sales, including, without limitation, relevant purchase orders, (ii) weekly Borrowing Base Certificates (as defined in the

6

**JOINT EXHIBIT NO. 61**
**Page 418 of 540**

respective Credit Agreements), and (ii) bank statements for all bank accounts at Carnaby II and

Carnaby III (the Debtors' obligations under the Stipulation described in this Paragraph 14, the

"Debtor Purchase and Sale Obligations").

15.     Under the Stipulation, because the Carnaby Inventory Collateral was to be sold at

Fair Market Value for cash or Eligible Customer A/R at Fair Market Value, it was expected that

the Carnaby II and III Collateral would increase to a value higher than the book value of such

collateral on the Petition Date.  Thus, none of the Debtor Purchase and Sale Obligations were

limited by reference to diminution in value of the Carnaby II and III Collateral.  To the extent

Carnaby Inventory Collateral was transferred to an FBG Debtor, the Stipulation simply obligated

that FBG Debtor to either pay for such inventory in cash at Fair Market Value for the benefit of

the Carnaby Secured Parties or to provide the Carnaby Secured Parties with a lien on Eligible

Customer A/R.

16.     In addition to the Debtor Purchase and Sale Obligations, which were obligations of

all the Debtors, including the FBG Debtors, the Stipulation granted the Carnaby Secured Parties

certain adequate protection against diminution of the Carnaby II and III Collateral as against the

SPV Debtors in the form of:

(a)     first-priority, automatically perfected liens on the Carnaby II and III
        Collateral, the Holdings Collateral, and all proceeds thereof;

(b)     additional and replacement automatically perfected first-priority
        postpetition security interests and liens on all presently owned or thereafter
        acquired property and assets of the SPV Debtors and Holdings pursuant to
        sections 361 and 363(e) of the Bankruptcy Code; and

(c)     an allowed superpriority administrative expense claim pursuant to sections
        503(b), 507(a), and 507(b) of the Bankruptcy Code to the extent of any
        diminution in value of the Carnaby II and III Secured Parties' interests in
        the Carnaby II and III Collateral and the Holdings Collateral, with priority
        over any and all administrative expenses and all other claims against the
        SPV Debtors now existing or hereafter arising.

7

17. The Stipulation further provided that termination of the Stipulation shall not affect the validity, amount, or priority of any liens or claims (including superpriority administrative claims) granted to the Carnaby II and III Secured Parties thereunder.

18. The Debtors Breach the Stipulation. The Debtors never complied with any the Debtor Purchase and Sale Obligations. While the SPV Debtors continued to transfer Carnaby Inventory Collateral to the FBG Debtors, and the FBG Debtors continued to sell such collateral to third parties, the FBG Debtors never paid any cash proceeds or proceeds of Eligible Customer A/R to the SPV Debtors. The Debtors never provided any reporting on such transfers or customer sales, leaving the Carnaby Secured Parties unable to identify the assets upon which the Court granted them a first priority lien, and the Debtors did not provide the bank statements or weekly borrowing bases they were obligated to provide under the Stipulation.

19. The Debtors' continuous material breaches of the Stipulation persisted for over a month. On November 6, 2026, at the request of and as an accommodation to the Debtors and in order to help address their dwindling liquidity, the Carnaby Secured Parties confirmed on the record that, in addition to cash and Eligible Customer A/R, they would permit payments in-kind for future sales of Carnaby Inventory Collateral between the SPV Debtors and the FBG Debtor Purchasers under the Stipulation. Tr. Hr'g. 11/6/2025 at 34:9-36:3 (attached hereto as Exhibit A).

20. Throughout this time, the Debtors never properly reported the shipment of finished goods made from the manufacturing facilities in Mexico, any sale of such goods for cash or accounts receivable (whether Eligible Customer A/R or otherwise), any collections of Eligible Customer A/R, or in-kind sales of finished goods for raw materials. Nevertheless, the Debtors continued to make sales of Carnaby Inventory Collateral to third parties and to use the proceeds of

such sales to fund their operations and the administrative costs of the Debtors' Chapter 11 Cases (including the cases of the FBG Debtors).

21.     The Debtors eventually acknowledged that, despite their obligations under the Stipulation to do so, they could not provide adequate protection for the Carnaby II and III Secured Parties, and agreed that from and after January 16, 2026, they would no longer make sales of Carnaby Inventory Collateral without the Carnaby Secured Parties' consent.

## BASIS FOR RELIEF

### I.     Administrative Claim for Breach of Stipulation.

22.     Section 503(b)(1)(A) of the Bankruptcy Code provides administrative priority for the "actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1)(A). Section 507(a)(2) grants administrative expense status priority to claims allowed under section 503(b).  11 U.S.C. § 507(a)(2).

23.     In the Fifth Circuit, "[t]o qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee [or debtor-in-possession] that benefitted the estate." *Nabors Offshore Corp. v. Whistler Energy II, L.L.C. (In re Whistler Energy II, L.L.C.)*, 931 F.3d 432, 441 (5th Cir. 2019). Section 503's purpose is "to encourage third parties to provide necessary services to the debtor-in-possession so that it can continue to conduct its business, thus generating funds from which prepetition creditors can be paid." *In re Transamerican Natural Gas Corp.*, 978 F.2d 1409, 1420 (5th Cir. 1992).

24.     A creditor establishes a prima facie case for an administrative expense claim under section 503(b)(1)(A) by showing that the expense (1) arises from a transaction with the bankruptcy estate and (2) benefitted the estate. *In re Marquez Constr. & Maint., LLC*, 675 B.R. 341, 347

(Bankr. W.D. Tex. 2025) (citing *In re Whistler Energy II, L.L.C.*, 931 F.3d 432, 441 (5th Cir. 2019)).

25.     Where a debtor-in-possession enters into a contract after the commencement of a chapter 11 case, the creditor counterparty generally satisfies the Fifth Circuit's standards for establishing that claims for related expenses are attributable to the actions of the bankruptcy estate. *See In re Marquez Constr. & Maint., LLC*, 675 B.R. 341, 347 (Bankr. W.D. Tex. 2025) (standard set forth in *In re Whistler* met where rental agreement was entered into on request of the Debtor, as debtor in possession, after the petition date).  The Stipulation is a postpetition contract.  Under New York law (which is the law that governs the Credit Agreements), "[a] so-ordered stipulation is a contract between the parties thereto and as such, is binding on them and will be construed in accordance with contract principles and the parties' intent."  *Xie v. Chen*, 247 A.D.3d 1242, 1243, 253 N.Y.S.3d 305, 306 (2026) (internal citations omitted) (enforcing so-ordered stipulation to produce tax returns pursuant to contract principles).   The Fifth Circuit has similarly held that "[a] consent decree is akin to a contract yet also functions as an enforceable judicial order," and that "[g]eneral principles of contract interpretation govern the interpretation of a consent decree." *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349 (5th Cir. 1998) (enforcing plain terms of consent decree under which party thereto assumed responsibility for certain oversight costs); *see also In re Bourbon Saloon, Inc.*, 647 F. App'x 342, 347 (5th Cir. 2016) (applying *Chromalloy Am. Corp.* in the context of a chapter 11 debtor's postpetition agreed order resolving a motion to assume or reject a lease).

26.     The Stipulation was the result of a negotiation between the Carnaby Secured Parties and the Debtors, was entered into postpetition at the Debtors' request, and the payment obligations thereunder arose post-petition through actions of the Debtors' estates.  Thus, the FBG

Administrative Claim arises from a post-petition transaction with the Debtors estates, and meets the first requirement for an allowable administrative expense claim.

27.     With respect to the second requirement, by providing the FBG Debtors access to the Carnaby Inventory Collateral to be sold to third parties under the Stipulation, the Carnaby Secured Lenders allowed the FBG Debtors to continue operating and earning revenue, which clearly provided a benefit to those Debtors' estates.   Moreover, merely by entering into the Stipulation, the FBG Debtors "indicated that [they] believed that [it was] necessary to [their] operations and thus beneficial to [their] reorganization efforts." *In re Marquez Constr. & Maint., LLC*, 675 B.R. at 348.  The FBG Debtors accepted those benefits, but for at least the first month that the Stipulation was in effect, performed none of the obligations that the Court ordered they perform in exchange for those benefits.  Further, even after the Stipulation was amended on the record to permit payments in-kind for sales of Carnaby Inventory Collateral between the SPV Debtors and the FBG Debtor Purchasers occurring after November 6, 2025, any raw materials transferred to the SPV Debtors were not, as required under the Stipulation, of a value equal the Fair Market Value of the Carnaby Inventory Collateral transferred to them.

28.     As the FBG Debtors enjoyed all the benefits of the post-petition Stipulation, but materially breached their obligations under it, the Carnaby Secured Parties have an allowed administrative expense claim under section 503(b)(1)(A) for, among other things, (i) the FBG Debtor Purchasers' failure to deposit required cash Purchase Price proceeds (including proceeds of Eligible Customer A/R) into the Adequate Protection Account in exchange for the transfer of Carnaby Inventory Collateral to the FBG Debtor Purchasers prior to November 6, 2026, (ii) with respect to all Carnaby Inventory Collateral transferred to the FBG Debtor Purchasers after November 6, 2026, the failure to deposit required cash into the Adequate Protection Account in

11

the amount of the difference between (x) the value of any raw materials transferred to the SPV Debtors in exchange for such Carnaby Inventory Collateral and (y) the Purchase Price of such Carnaby Inventory Collateral, (iii) the FBG Debtors' failure to identify and make available to the Carnaby Secured Parties all Eligible Customer A/R received by the FBG Debtors from Eligible Customers in exchange for sales of Carnaby Inventory Collateral, and (iv) any sales of Carnaby Inventory Collateral to customers that are not Eligible Customers or for consideration that was not cash or Eligible Customer A/R (the "FBG Administrative Claim").  The Carnaby Secured Parties assert the FBG Administrative Claim against all of the FBG Debtors, and the claim is secured by first-priority, exclusive, automatically perfected liens granted under the Stipulation against: (i) all Carnaby Inventory Collateral transferred to any FBG Debtor Purchaser pending resale; and (ii) all Eligible Customer A/R constituting proceeds of resales by any FBG Debtor Purchaser to any Eligible Customers.

29.     Because the Debtors—not the Carnaby Secured Parties—maintain sole possession of the books and records necessary to confirm the precise amount of the administrative expense due and have not provided those records to the Carnaby Secured Parties as required under the Stipulation, the precise amount of the FBG Administrative Claim remains unknown to the Carnaby Secured Parties.  The Carnaby Secured Parties do, however, have access to the Debtors' aggregate postpetition sales data broken down by category of product, as well as prepetition trial balances with historical data showing sales of products originating from the Maquiladora locations associated with the Carnaby Secured Parties' loan facilities.  From the prepetition data, the Carnaby Secured Parties calculated the percentages of the Debtors' aggregate sales of windshield wiper and brake parts over the six-month period preceding the Petition Date.  Applying those percentages to the aggregate pospetition wiper and brake part sales, the Carnaby Secured Lenders

estimate that the FBG Administrative Claim is approximately $60.7 million ($24.5 million for the period from October 2, 2025 through November 7, 2025 and $36.2 million for the period from November 8, 2025 through January 16, 2026) *minus* the liquidation value of any raw materials transferred to the SPV Debtors during the period from which such transfers became allowed under the Stipulation (November 8, 2025) through the Debtors' shutdown of operations at the Maquiladoras (January 16, 2026).

## II.    507(b) Superpriority Administrative Expense Claim.

30.    In addition to the FBG Administrative Claim, the Carnaby Secured Parties also have administrative expense claims for diminution of their interests in the Carnaby II and III Collateral. Section 507(b) of the Bankruptcy Code provides that where adequate protection has been granted to a secured creditor and such protection proves insufficient, the secured creditor is entitled to a superpriority administrative expense claim with priority over all other administrative expenses. 11 U.S.C. § 507(b); *see also In re Scopac*, 624 F.3d 274, 282 (5th Cir. 2010) (Section 507(b) of the Bankruptcy Code allows an administrative expense claim under § 503(b) where adequate protection payments prove insufficient to compensate a secured creditor for the diminution in the value of its collateral.). Under the Stipulation, the Court granted the Carnaby II and III Secured Parties an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "507(b) Claim") to the extent of any diminution in value of the Carnaby Secured Parties' interests in the Carnaby II and III Collateral and the Holdings Collateral, with priority over all other administrative expenses and claims against the SPV Debtors and Holdings. *See* Stipulation ¶ 4. In other words, the 507(b) Claim has already been expressly allowed by the Court to the extent of any postpetition diminution in the value of the Carnaby Secured Parties' interests in the Carnaby II and III Collateral.

13

31.     The value of the Carnaby II and III Collateral, and thus the Carnaby Secured Parties' interests therein, diminished during the cases.  Where a secured creditor's collateral is eventually liquidated, courts have found that it is appropriate for diminution purposes to compare the petition date value of the collateral with the value on the date of sale.  *In re Bailey Tool & Mfg. Co.*, No. 16-30503-BJH, 2018 WL 550581, at *4 (Bankr. N.D. Tex. Jan. 23, 2018).  With respect to determining the Petition Date value of the Carnaby II and III Collateral, "the proposed disposition or use of collateral is of paramount importance to a valuation."  *See In re Diamond Beach VP, LP*, 506 B.R. 701, 715 (Bankr. S.D. Tex. 2014), aff'd, 551 B.R. 590 (S.D. Tex. 2016) (citing *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 954 (1997) and *In re Peerman,* 109 B.R. 718, 721 (Bankr.W.D.Tex.1989)).  As of the Petition Date, the Debtors intended to use the Carnaby II and III Collateral to "stabilize their operations, pursue and implement a value-maximizing transaction, and … position the Company for long-term growth and success."  *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* [ECF No. 22] at ¶ 17.  In addition, Mr. Moore stated that "[n]ot only will the significant size of the DIP allow the Company to optimize operations, fill customer orders, and operate in the ordinary course, but it reinforces the potential go-forward value of the Company."  *Id*.  Thus, it is clear that the Debtors' proposed disposition or use of the Carnaby II and III Collateral was to continue its use in operations in furtherance of either a chapter 11 reorganization or a going concern sale of the Debtors.

32.     In light of the above, the appropriate valuation for purposes of valuing the Carnaby II and III Collateral as of the Petition Date is going concern value or, at a minimum, book value. According to the Debtors' perpetual inventory reporting closest in time to the Petition Date (September 30, 2025), the book value of the Carnaby II and III Collateral (which was confirmed to be present and accounted for at the Maquiladora locations through multiple site visits conducted

14

by the Carnaby Secured Lenders' agent) was $240.5 million, which secured the Carnaby Secured Parties' secured claim of no less than $160,717,187.33.

33.     In late January, 2026, the Debtors, in consultation with the Carnaby Secured Lenders, the Debtors began selling certain of the Carnaby II and III Collateral to original equipment manufacturers and depositing those proceeds in a collateral account.  Pursuant to the *Agreed Order (I) Granting Carnaby Secured Lenders' Motion for Relief from the Automatic Stay, and (II) Withdrawing Without Prejudice the Carnaby Secured Lenders' Motion to Dismiss* [ECF No. 2840], the Carnaby Secured Lenders have been authorized to liquidate the remaining Carnaby II and III Collateral, but no additional proceeds of liquidation of Carnaby II and III Collateral have yet been realized.  As of the date hereof, the net proceeds of the sale of Carnaby II and III Collateral are approximately $15,795,390.  The amount of additional proceeds that may be realized from the liquidation process is uncertain.  Accordingly, the Carnaby Secured Parties assert a 507(b) Claim against the SPV Debtors in the amount of up to $144,921,797.33.

## RESERVATION OF RIGHTS

34.     The Administrative Agent expressly reserves all rights with respect to this Application and under applicable law, including, but not limited to, the right to amend, supplement, or modify this Application at any time prior to the Court's determination of the Application, to quantify the amounts of the Administrative Claims asserted herein as further information becomes available, to file additional papers with this Court as circumstances may warrant, and to assert any and all other claims, rights, and remedies at law or in equity that the Administrative Agent[3] has or

---

[3]     As set forth above, purchases and sales of inventory between Carnaby II and BPI occurred beginning on or about May 31, 2022, and continued up until and after the applicable Petition Date, including during the 20-day period preceding such date.  Similarly, purchases and sales of inventory between Carnaby III and Trico (TPC and TTC) occurred beginning on or about July 6, 2022, and continued up until and after the applicable Petition Date, including during the 20-day period preceding such date.  These transactions were conducted pursuant to the Purchase Agreements and Sale Agreements.  To the extent BPI and Trico received inventory from Carnaby II and Carnaby III, respectively, during the 20-day period preceding the applicable Petition Date and Carnaby II and

may have against the FBG Debtors, the SPV Debtors, and any other party.  Nothing herein shall be deemed a waiver of any right, claim, or argument not expressly raised herein.

## NO PRIOR REQUEST

35.     No prior request for the relief sought in this Application has been made to this or any other court.

**WHEREFORE**, GLAS Trust Company LLC, as Administrative Agent for the Carnaby II and III Secured Lenders, respectfully requests that this Court enter an order, (i) allowing the Administrative Claims asserted herein as administrative expense claims under sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code; (ii) directing payment of such Administrative Claims in accordance with the priority afforded by the Bankruptcy Code and the Stipulation; and (iii) granting such other and further relief as is just and proper.

[*Remainder of Page Left Intentionally Blank*]

---

Carnaby III did not receive payment equal to the fair value of such inventory from BPI and Trico, the SPV Debtors are entitled to administrative expense priority for such amounts under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims").  Since the Carnaby Secured Parties have liens on those claims, any proceeds received by the SPV Debtors on account of the 503(b)(9) Claims should be promptly paid over to the Carnaby Secured Parties.  To the extent the SPV Debtors do not assert the 503(b)(9) Claims, the Carnaby Secured Parties reserve the right to assert them on the SPV Debtors' behalf under section 501 of the Bankruptcy Code and Rule 3001 of the Federal Rules of Bankruptcy Procedure.

16

Dated: July 23, 2026                                Respectfully submitted,
Houston, Texas


                                                    */s/ Allan S. Brilliant*

                                                    Allan S. Brilliant (admitted *pro hac vice*)
                                                    Gary J. Mennitt (admitted *pro hac vice*)
                                                    Stephen M. Wolpert (admitted *pro hac vice*)
                                                    Eric O. Hilmo (admitted *pro hac vice*)
                                                    **DECHERT LLP**
                                                    1095 Avenue of the Americas
                                                    New York, New York 10036
                                                    Telephone: (212) 698-3500
                                                    Email:  allan.brilliant@dechert.com
                                                            gary.mennitt@dechert.com
                                                            stephen.wolpert@dechert.com
                                                            eric.hilmo@dechert.com

                                                       -and-

                                                    John F. Higgins (TX Bar No. 09597500)
                                                    Megan Young-John (TX Bar No. 24088700)
                                                    James A. Keefe (TX Bar No. 24122842)
                                                    **PORTER HEDGES LLP**
                                                    1000 Main Street, 36th Floor
                                                    Houston, Texas 77002
                                                    Telephone: (713) 226-6000
                                                    Facsimile: (713) 226-6248
                                                    Email:  jhiggins@porterhedges.com
                                                            myoung-john@porterhedges.com
                                                            jkeefe@porterhedges.com


                                                    ***Counsel to the Carnaby*** *II* ***and III Secured***
                                                    ***Lenders***

## Certificate of Service

I certify that on July 23, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*

John F. Higgins

18

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| FIRST BRANDS GROUP, LLC AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | ) ) ) ) ) ) | CASE NO: 25-90399-cml Houston, Texas Thursday, November 6, 2025 |
| Debtors. | ) | 9:03 a.m. to 3:35 p.m. |

HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For First Brands Group, LLC:
MATTHEW BARR
SUNNY SINGH
CLIFFORD WILLIAM CARLSON
ROBERT S. BEREZIN
JESSICA LYNN FALK
Weil Gotshal and Manges
700 Louisiana Street
Houston, TX 77002

For Official Committee of Unsecured Creditors:
IAN ROSS PHILLIPS
Cole Schotz P.C.
901 Main Street
Dallas, TX 75202

For U.S. Trustee:
JAYSON B. RUFF
Office of the United States Trustee
515 Rusk Street
Houston, TX 77002

For Ad Hoc Prepetition Lenders and the DIP Lenders:
SCOTT J. GREENBERG
JASON ZACHERY GOLDSTEIN
ANNELYSE SCARLETT GAINS
Gibson Dunn & Crutcher
200 Park Avenue
New York, NY 10166

JOINT EXHIBIT NO. 61
Page 432 of 540

For Committee:          JEFFREY L. JONAS
                        MICHAEL WINOGRAD
                        HAYDEN A. MILLER
                        Brown Rudnick
                        Address 1
                        City, State Zip

For Katsumi Servicing,  CHARLES STEPHEN KELLEY
LLC:                    RICHARD A. STIEGLITZ
                        SEAN T. SCOTT
                        KYLE J. TUMSUDEN
                        Mayer Brown LLP
                        700 Louisiana Street
                        Houston, TX 77002

For Onset Financial,    BENJAMIN BUTTERFIELD
Inc.:                   BRYAN KOTLIAR
                        ANTHONY S. FIOTTO
                        JULIA KOCH
                        Morrison Foerster LLP
                        250 W. 55th Street
                        New York, NY 10019

For Carnaby Secured     ALLAN S. BRILLIANT
Lenders:                GARY J. MENNITT
                        STEPHEN M. WOLPERT
                        Dechert LLP
                        1095 Avenue of the Americas
                        New York, NY 10036

                        MEGAN N. YOUNG-JOHN
                        Porter Hedges LLP
                        1000 Main Street
                        Houston, TX 77002

For Aequum Capital      KENNETH J. OTTAVIANO
Financial II LLC:       Blank Rome LLP
                        1201 N. Market Street
                        Wilmington, DE 19801

For UMB Bank, N.A.:     STEPHEN MARK BLANK
                        Alston Bird
                        90 Park Avenue
                        New York, NY 10016

For Bank of America, N.A.: DANIEL J. MCGUIRE AMILA GOLIC Winston & Strawn LLP 800 Capitol Street Houston, TX 77002

For Leucadia Asset Management, LLC: EMIL A. KLEINHAUS Wachtell, Lipton, Rosen & Katz 51 West 52nd Street New York, NY 10019

PAUL E. HEATH Vinson & Elkins 845 Texas Avenue Houston, TX 77002

For Raistone Capital, LLC: LAURA D. METZGER NICHOLAS J. SABATINO EMANUEL GRILLO Orrick Herrington & Sutcliffe LLP 51 West 52nd Street New York, NY 10019

For ING Bank: DOUGLAS DEUTSCH Clifford Chance 375 9th Avenue New York, NY 10001

For Evolution Credit Partners: VINCENT INDELICATO CHARLES A. DALE MATTHEW R. KOCH Proskauer Rose LLP Eleven Times Square New York, NY 10036

JASON S. BROOKNER Gray Reed & McGraw LLP 1601 Elm Street Dallas, TX 75201

For FactoFrance: CASEY WILLIAM DOHERTY, JR. Dentons US LLP 1300 Post Oak Blvd. Houston, TX 77056

For LBA RV Company XVII, LP: IVAN M. GOLD Allen Matkins 3 Embarcadero Center San Francisco, CA 94111

For US Bank National          SCOTT F. GAUTIER
Association:                  Faegre Drinker Biddle & Reath LLP
                              1800 Century Park East
                              Los Angeles, CA 90067

For RLI Insurance             ALANA L. PORRAZZO
Company:                      Jennings Haug Cunningham LLP
                              2800 N Central Avenue
                              Phoenix, AZ 85004

Court Reporter:               UNKNOWN

Courtroom Deputy:             UNKNOWN

Transcribed by:               Veritext Legal Solutions
                              330 Old Country Road, Suite 300
                              Mineola, NY 11501
                              Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

INDEX

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

| PLAINTIFFS' EXHIBITS | RECEIVED |
|---|---|

| GOVERNMENT'S EXHIBITS | RECEIVED |
|---|---|

**JOINT EXHIBIT NO. 61**
**Page 436 of 540**

HOUSTON, TEXAS; THURSDAY, NOVEMBER 6, 2025; 9:03 AM

(Call to Order)

THE COURT:  Okay.  Good morning, everyone.  This is Judge Lopez.  I'm going to turn on my camera.  Today is November 6th.  I'm going to call the 9 o'clock docket.  If folks can just, please simmer down.

I'm going to call the 9 o'clock docket, 25-90399, First Brands Group.  We're in second day hearings.  I'm turning my camera on.  And I'll take -- why don't I take appearances in the courtroom, and then there may be some folks on the line who wish to make appearances, I'll give you that opportunity to do so now.  And we'll see where we go from here.

MR. BARR:  Good morning, Your Honor.  Matthew Barr of Weil Gotshal & Manges on behalf of the Debtors.  With me in the courtroom I have Mr. Sunny Singh, Mr. Cliff Carlson, Rob Berezin, and Jessica Falk, among others.  And thank you for your time this morning.

THE COURT:  Thank you.  Good morning. Mr. Ruff, good to see you.

MR. RUFF:  Good morning, Your Honor.  Jayson Ruff for the U.S. Trustee.

MR. PHILLIPS:  Good morning, Your Honor.  Ian Ross Phillips of Cole Schotz P.C. on behalf of the Unsecured Creditors Committee.

THE COURT:  Very nice to meet you.  Welcome.

MR. GREENBERG:  Good morning, Your Honor.  Scott Greenberg, Gibson Dunn & Crutcher on behalf of the Ad Hoc Prepetition Lenders and the DIP Lenders.  And I'm joined in the courtroom by my partners, Jason Goldstein, AnnElyse Gains, and others.

THE COURT:  Okay.

MR. GREENBERG:  Thank you, Your Honor.

MR. JONAS:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. JONAS:  Jeff Jonas from Brown Rudnick.  You'll also be hearing -- for the Committee.  You'll also be hearing from Mike Winograd and Hayden Miller today.  Thank you.

THE COURT:  Good morning.

MR. KELLEY:  Good morning, Judge.  How are you?

THE COURT:  Good.

MR. KELLEY:  Charles Kelley from Mayer Brown on behalf of Katsumi Servicing.  I'm joined in the courtroom with my partner, Rich Stieglitz and on the video, Sean Scott, whom you probably saw yesterday, in yesterday's first day, and Kyle TumSuden.

THE COURT:  Perfect.  Thank you.

MR. BUTTERFIELD:  Good morning, Your Honor.  Ben Butterfield of Morrison & Foerster for Onset Financial.  I'm

joined here by my colleagues, Bryan Kotliar, Tony Fiotto, and Julia Koch.

THE COURT:  Good morning.

MR. BUTTERFIELD:  Thank you, Your Honor.

MR. BRILLIANT:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. BRILLIANT:  Allen Brilliant from Dechert LLP on behalf of the Carnaby Secured Lenders.  I'm here with my partner, Gary Mennitt, and colleague, Stephen Wolpert, in the courtroom as well as our local counsel at Porter Hedges, Megan Young-John.

THE COURT:  Good morning.  I see you there.  Good morning, Ms. John.

MR. OTTAVIANO:  Good morning, Your Honor.  Kenneth Ottaviano, Blank Rome LLP, on behalf of one of the SPV lenders, Aequum Capital Financial II LLC.

THE COURT:  Good morning.

MR. BLANK:  Good morning, Judge.  Steve Blank from Alston & Bird on behalf of UMB as agent for the lenders under the facility by Debtors, Global Assets LLC, and Global Assets GMBH.  I'm joined by some of my colleagues on the line, and my declarant is in the audience today, who is also Mr. Ottaviano's declarant as well.

THE COURT:  Good morning.  Good morning, good to see you.

MR. MCGUIRE:  Good morning, Your Honor.  Dan McGuire from Winston & Strawn on behalf of Bank of America as ABL agent.  I'm here with my colleague, Amila Golic.

THE COURT:  All right.  Good morning.

MR. KLEINHAUS:  Good morning, Your Honor.  Emil Kleinhaus, Wachtell, Lipton, Rosen & Katz.  I'm here on behalf of Leucadia Asset Management LLC, which is an affiliate of Jeffries Group and Associated Funds.  I'm here with Paul Heath from Vinson & Elkins.

THE COURT:  Good morning.

MS. METZGER:  Good morning, Your Honor.  Laura Metzger from Orrick, Herrington & Sutcliffe on behalf of Raistone Purchasing LLC Series XXXII and Raistone Purchasing LLC Series XXXVIII.  I'm joined here by my colleague, Nick Sabatino, as well as my partner on the line, Emanuel Grillo.

THE COURT:  Good morning.

MS. METZGER:  Good morning.

THE COURT:  Good to see you again.

MS. METZGER:  Good to see you.

MR. DEUTSCH:  Good morning, Your Honor.  Doug Deutsch from Clifford Chance on behalf of ING Bank.  We're one of the factors.

THE COURT:  Good morning.

MR. INDELICATO:  Your Honor, good morning.  For the record, Vincent Indelicato, Proskauer Rose LLP on behalf

of Evolution Credit Partners.  With me today in the
courtroom, my partners Chad Dale and Matt Koch and co-
counsel from the Gray Reed firm, Jason Brookner.

THE COURT:  Good morning.

MR. DOHERTY:  Good morning, Your Honor.  Casey
Doherty, Dentons US LLP, representing FactoFrance SA.  We're
a factoring purchaser.

THE COURT:  Good to see you, Mr. Doherty.

MR. DOHERTY:  Good to see you.

MR. GOLD:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. GOLD:  Ivan Gold of Allen Matkins for LBA RV
Company XVII LP.

THE COURT:  Good morning.

MR. GOLD:  Good to see you.

THE COURT:  Okay.  Let me turn to the phone line.
Anyone wish to make an appearance on the line?  There's one
line at a 310 number.

MR. GAUTIER:  Your Honor, this is Scott Gautier
with the law firm of Gaegre Drinker Biddle & Reath.  I would
advise the Court my Pro Hoc Vice application, that has been
filed but has not yet been approved.  We represent the U.S.
Bank.

THE COURT:  Perfect.  Good morning.  And you're
more than welcome to appear today.  And anyone else who has

a pending Pro Hoc, we'll get to it.  We've been working through them.  But you're more than welcome to appear for purposes of today.  We'll get to it.  Thank you.

MR. GAUTIER:  Thank you, Your Honor.  I'm not sure how to mute this again.

THE COURT:  Oh, you just mute yourself, just kind of on yourself, on your own.

MR. GAUTIER:  Thank you.

THE COURT:  You got it.  Anyone else?  One more line and I'll turn to the Debtors, a 303 number.

MS. PORRAZZO:  Good morning, Your Honor.  Alana Porrazzo of the law firm Jennings Haug Keleher McLeod Waterfall, on behalf of surety creditor, RLI Insurance Company.

THE COURT:  Okay.  Good morning.  Okay.

MR. BARR:  Good morning again, Your Honor. Matthew Barr of Weil Gotshal.

THE COURT:  Good morning.

MR. BARR:  After all those intros, Your Honor, I have a request for a short adjournment.  We have a number of proposals out to a number of parties to resolve some of the open objections.  We've been able to resolve a lot of them. And we think another 30 minutes would be helpful.

If we can't resolve it in the 30 minutes, we will be prepared to move forward, Your Honor.

THE COURT:  All right.

MR. BARR:  There's one other question.

THE COURT:  Go ahead.

MR. BARR:  You may have seen last night in connection with our adversary proceeding in the temporary restraining order, we filed a stipulation with the Defendants.

Your Honor, we would ask, if possible, that you consider that only because of the timing, we, the Debtors, have consented to certain payments being made to make sure that those operations can continue.  And that's a consensual stip that we filed on the docket.

THE COURT:  I did see it.  If parties are okay with me doing it now, I'll sign it right now.  I think it made a lot of sense.  I got a chance to read it.  I'll get it signed and on the docket during the break.  We'll take a 30-minute break.

And I know there was also a request if parties can bring in chairs.  And if you can find one, you're good. I've got no issues.  The only request is just remember where you got it because it would be me trying to put it back. And it's easier if you kind of find it and put it back wherever you are.  Okay.  We'll take a 30-minute break. Thank you.

(Recess)

THE COURT: Okay. Good morning. Back on the record in First Brands. Mr. Singh, any update?

MR. SINGH: Good morning, Your Honor. Sunny Singh, Weil Gotshal, proposed counsel to the Debtors. Your Honor, parties are still in conference rooms and in the hallways trying to see if we can get this settlement done. We'd respectfully request another brief adjournment to a 10:00 a.m. start time, if that's acceptable to Your Honor.

THE COURT: Okay. Another 20 minutes?

MR. SINGH: Yeah, another 20 minutes would be much appreciated.

THE COURT: Okay. I'll give everyone another 20 minutes. There are a number of folks on the line. I just wanted to make sure that they knew as well.

MR. SINGH: Appreciate it.

THE COURT: So, I will step back off and I'll come back on at 10:00 a.m. Thank you.

MR. SINGH: Thank you, Your Honor.

(Recess)

THE COURT: Okay. This is Judge Lopez. Today is November 6th. We're back on the record in Case Number 25-90399, First Brands Group. Mr. Barr, good morning.

MR. BARR: Good morning. Matthew Barr of Weil Gotshal. Your Honor, can you please tell us we have one 15-minutes left and then we're getting on the record, and we

will start?

THE COURT:  Oh, I can promise you that one.

MR. BARR:  I appreciate that.

THE COURT:  I promise.  We'll take another 15-minute break --

MR. BARR:  We will be ready --

THE COURT:  -- and then we will start with openings, no question about it.  Thank you.

MR. BARR:  Appreciate it, Your Honor.  Apologize.

THE COURT:  No worries.

(Recess)

THE COURT:  Okay.  Good morning, this is Judge Lopez.  We're back on the record in First Brands, case number 25-90399.  I'll just make sure everything is on.  Mr. Barr, any update?

MR. BARR:  Yes.  Thank you, Your Honor.  Matt Barr on behalf of the Debtors.  Your Honor, we would like to start.  I would like to give you an update on the last 36 days of the case.  And then, Mr. Singh will take the podium and give you an update on where we stand with respect to the proposed settlements that we've been continuing to negotiate.

THE COURT:  Okay.

MR. BARR:  We're not there yet on one very large, proposed settlement, but we understand that they are talking

Case 25-90399   Document 3345-15   Filed in TXSB on 07/23/26   Page 15 of 109

to their clients.

THE COURT:  Okay.

MR. BARR:  So it could be that after we start to update you, somebody waves and says, "Wait a second."

THE COURT:  Okay.

MR. BARR:  Which we think is in the best interest of everybody, Your Honor.  But we could get started now if that's okay.

THE COURT:  Okay.

MR. BARR:  Thank you, Your Honor.  So as I mentioned, I'll give you an update on a report on the 36 days since the first day hearing.

First, stabilizing the business.  The Debtors and their advisors have focused on stabilizing the business and learning as much as they could about the operations of the business.  Mr. Moore and his team have met and continue to meet with employees, held numerous town halls.  We've set up communication protocols and hotlines for employees to ask questions or provide information.

Mr. Moore and his team also send out weekly updates to employees, which have been very well received. The appointment of A&M as CEO, CFO, and co-CROs has been helpful to build the confidence we needed with the employee base as they recognize the great products this company's -- this company has, irrespective of the noise around the

business in these cases.

The Debtors are finalizing the terms of a key employee retention program, which we will present to Your Honor in due course.  Mr. Moore and his team have met with over 20 of our major customers, in person or by phone, and is in regular contact with major customers, suppliers, and vendors.  We have established working groups with some of our major customers to address open issues, and identify ways to improve product flow.  The patience, support, and understanding expressed by our customers has frankly been overwhelming.

Mr. Moore and his team have implemented a vendor strategy program and negotiated trade agreements to ensure continued receipt of goods, services, and payments.  The team is assessing the businesses, both in the United States and abroad, to ensure we allocate sufficient and appropriate resources to the businesses that are valuable or potentially valuable and assessing whether businesses should be sold, sooner rather than later, or shut down.  This, of course, is a fluid and ongoing process, Your Honor.

Mr. Moore and his team have participated in this week's major industry trade show AAPEX, wearing the First Brands' logo literally on their chest and on their sleeve. Reminding folks about our products and that we still have great products and are open for business.  The business is

Case 25-90399   Document 3345-15   Filed in TXSB on 07/23/26   Page 137 of 199

operating and filling orders and taking new orders.

It's taking longer than we all would have hoped to refill the pipeline with inventory.  But progress is being made and we project to have more inventory by the end of this month than we did in October.  The Debtors' current expectation is to complete a detailed review of the businesses and produce a long-term business plan by January 31st of 2026.

Corporate changes.  Legacy management has been largely changed.  Patrick James resigned from all executive and board positions of the Debtors shortly after the petition date.  Mr. Moore was appointed interim CEO.  The CFO agreed to retire and was replaced by (indiscernible) from A&M on an interim basis.  The vice president of finance was terminated from all positions and others in the organization have been identified to assist and are working with the team.

Mr. Jerkovic and Mr. Malhotra, both of A&M, were appointed co-CROs.  The executive team is now A&M and some internal folks, not the legacy executive team, Your Honor.

What did we have as of the petition date?    The team has focused on figuring out what businesses, inventory, raw material, equipment, et cetera, existed as of the petition date and every day.  The team has conducted significant diligence on mapping the many businesses that

make up this enterprise and which entities own which assets,
share certain assets, or are dependent on one another to
operate their businesses, whether the United States or
abroad, and whether they're a Debtor or a non-debtor foreign
entity.  This is ongoing as well.

Hilco, among others, is assisting the Debtors with
these efforts including inventory, machinery, and equipment
appraisals.  Some of our financing parties have been
extremely helpful in providing information and paperwork to
assist us in figuring out what they believed they had as of
the petition date, and who potentially has claims against
those assets.  And we thank them and continue to thank them
for their efforts.

With respect to factoring, the Debtors have made
significant progress understanding the company's historic
factoring practices and reconciling receipts.
Unfortunately, as reported in Mr. Moore's declarations, we
have uncovered significant issues with respect to those
programs.  We are in a process of working with the factor
and counterparties to collect data, reconcile receipts,
develop a transparent process, which you will hear about
more today to unlock these funds and distribute them to
their rightful owners.

There is still work to be done, but a large part
of progressing was getting a basic understanding of how

these programs actually worked.  And again, many of the factoring parties have been extremely helpful in help -- in getting us the information necessary, and we thank them as well.

Many of our employees have been essential in helping us figure out the true operations of our businesses. All of this is still ongoing.  We have a lot more to do, but we now in 36 days have a great base knowledge of our businesses, our operations, and our assets, and people's relative -- we're trying to sort out people's relative rights with respect to those.

We understand and appreciate parties' concerns and frustrations, and are trying our best to be as transparent as possible as we sort through which assets and liabilities and which parties have rights against them.  We will figure it out and all parties' rights and claims are of course reserved.

With respect to the investigation, the special Committee and the advisors have made substantial progress in connection with the investigation.  The scope of the investigation to date includes, among other things, off-balance-sheet financing practices, and arrangements, including accounts receivable factoring practices; pre-petition financing transactions; related party transactions, including among sister companies owned by Mr. James; and

transfers to insiders.

The Debtors have entered into a common interest agreement and protective order with the official Committee of unsecured creditors, and are cooperating with its advisors and coordinating with its advisors in connection with the investigation.

The team has taken substantial steps to advance the investigation and to preserve critical information, including collecting more than 7 million documents, conducting interviews with current and former employees, drafting and serving 2004 examinations and deposition notices, pursuing bank account records from more than 600 banks, collecting electronic devices and imaging them including computers, cell phones, et cetera, placed numerous litigation holds on current and former employees, disabled the company's two-year auto-delete policy, and established a whistle-blowing hotline.

The company is also shoring up financials, historic financials.  The Debtors are in the process of engaging advisors to perform a quality of earnings report and audit past financial information.  A&M is working to review historic financials as well.

As Your Honor knows, the Debtors commenced an adversary proceeding against Mr. James and other defendants on November 3rd, as a result of the investigation performed

to date and obtained a temporary restraining order to protect against the dissipation of assets.  The Debtors have been and will continue to cooperate with the government and governmental agencies in connection with their investigation.

Non-debtor Rest of World.  The Rest of World consists of eight distinct business units that are not currently in Chapter 11, Your Honor.  The Debtors are experiencing various levels of financial -- operational distress and financial distress.  And the advisors are working with stakeholders to analyze what options these particular businesses and non-debtor entities have.

Two of the businesses, in particular, are subject to creditor agreements, the Ultanon (indiscernible), with Santander and Horizon with UBS.  We currently have forbearance agreements in place with those lenders, and the companies are in discussions with those lenders for further funding support as we try to figure out what to do with those businesses.  Certain other businesses, Plastics and Trico, have received funding through the DIP financing, approximately $5.3 million, to meet short-term operational liquidity needs while options for those businesses are discussed.

Unfortunately, no further funding or strategic investor could be identified for the plastics business.  And

on November 3rd, the plastics business filed an insolvency proceeding in Germany.  An independent administrator has been appointed for that non-debtor entity, and we will be working with them to figure out potential restructuring options for the plastics business.

THE COURT:  What was the name of that entity?

MR. BARR:  It's the plastics business.  We can get you the -- and it's a non-debtor foreign entity.

THE COURT:  Okay.

MR. BARR:  The company continues to assess the options available to these business units, and it's possible that we'll have to file other local insolvency proceedings throughout the world.  The Debtors have communicated in our constant communication with our key stakeholders, the creditors Committee, the DIP lenders, the factoring parties, and we will continue to do that and be as transparent as possible as we try to figure this out.

THE COURT:  Thank you.

MR. BARR:  So unless Your Honor has any questions for me.

THE COURT:  No.  No questions at this time.

MR. BARR:  Thank you, Your Honor.

THE COURT:  I will make a small announcement that I am working hard to get AC down for everyone.  Feel free to loosen ties and all that stuff, it's -- while you proceed.

Thank you.  Mr. Singh?

MR. SINGH:  Good morning, Your Honor.  Sunny Singh, Weil, Gotshal, proposed counsel to the Debtors.  Your Honor, you'll have to indulge me a little bit I have a whole script here and points but parties are literally in the hallway and talking to their clients about a settlement.  So I am hopeful that I can cross a lot of this out as we go.

But we're going to get started and what I'd like to get started with is some good news that we do have some settlements that I think we can put on the record to make a little bit of progress while others continue in the hallway.  And I am hopeful we'll be able to report on other settlements as well.  If not, then then, you know, I will just proceed with my remarks.

I think, Your Honor, as Mr. Barr said, though, you know we have been very busy over the last 30 or so days.  Trying to stabilize the business, advance the investigation, and work transparently with our stakeholders.  But there's still a lot of open questions and a lot of work that needs to be done.

And as it relates to the DIP, and if we get to the evidence, should we need it, as the evidence will show, many of the key facts are still being investigated, they're still unknown.  And that's the approach -- you know with that background, we took an approach today's final DIP hearing

with that background and with that context.  Much like when I was before you at the first day hearing.

What we're trying to do is get approval of critical relief today the DIP on a final basis, and maintain status quo as we figure out what's going on in some of the facts and the circumstances, that, frankly, need more time and work amongst the parties.

You know, just a few examples of those is Your Honor read a lot about the SPV issues.  There's a lot of work that needs to be done there to get to the bottom of what happened and what rights and claims people have. There's information issues.  You know we can't just rely, in A&M in particular, on, you know, pre-petition information and protocols and continue business as usual with respect to those types of items.  You know much, if not all, of that has been rebuilt and is continuing to be rebuilt by the A&M team.

Your Honor knows about the number of findings in -- or preliminary findings coming out of the investigation. Today's not the day for that, but obviously that has a cloud around everything we are doing here and the information that will be put into evidence and will be discussed.

So, Your Honor, to put it mildly, it's a very uncertain situation.  And we're simply not in a position to have, you know, what you would consider or see as a more

traditional final DIP hearing, you know, where we're stipulating to liens and claims and talking about things like challenge periods and carve-outs and leaving it at that.  You know, we've got to take a little bit of a different approach here, given the facts and circumstances in which we find ourselves.

So you know our approach today, Your Honor, is two key objectives.  One, we have to get the DIP approved.  We have to get the DIP approved on a final basis.  Whether it's consensual or on a non-consensual basis, it's got to be done.  There is a lot at stake here, Judge.  As we've said in our papers, and as the evidence will show, the final DIP if it's not approved the company will liquidate.  I think we all believe that, the evidence will show that, and we simply don't have the funds to operate.  We're talking high stakes, as high as they get, and without the DIP, it's frankly game over, Your Honor.

The DIP lenders, with or without any further settlements, have agreed to a number of significant concessions for the benefit of the Debtors' estates.  I will review those.  They're in our reply papers, but I do think it's important to highlight for Your Honor.  Those are real and material changes for the benefit of the estate.  And, you know, we're glad we were able to negotiate those, and they address a lot of the issues that were raised in the

Committee's objections.

You know with those changes, Your Honor, we believe that we have negotiated the best possible DIP from our only source of financing, and we'll demonstrate to you why we think that's fair and reasonable, and complies with all of the legal requirements for the court to grant the relief we are seeking, as modified by the items mentioned in the reply.

Your Honor, Objective Number 2, to maintain the status quo, particularly with respect to our SPV lenders. As the evidence will show, Your Honor, there's a lot of issues there with the SPVs.  It is a difficult and complicated web of transactions that need to be reviewed and addressed.  And really to get to the bottom of a pretty fundamental question, whose collateral is it -- and well, let me take it back.  What is the collateral?   And Step 2, whose collateral it is?   What's the priority?

And while those disputed issues are addressed and resolved, Your Honor, what we've proposed is in our reply an adequate protection package to maintain the status quo.  I will report on a couple of settlements we have there.  But that was our thinking in approaching today.  We're not trying to prejudice the rights of parties to assert their claims to figure all these issues out.

But at the same time we can't stop operating,

right?   We can't shut down the business today and not have access to inventory that's disputed.  Not have access to PP&E that potentially may be disputed.  Because that's going to be value destructive for everybody and then there will be left -- if we're going to fight, there will be much less to fight about.

So Your Honor, that's our approach today.  I think we'd also say that we are also trying to maintain the status quo with respect to the factoring counterparties, right?  There are no liens being granted on any of the Debtors' receipts that constitute factored monies that's traceable, and that actually belongs to one or more of the factors, whether it was through sale or through a senior lien.

But that is the that is the question, right?  How much money should -- actually was factored on a pre-petition basis and belongs to those parties?   We have a declaration in evidence for Mr. Moore.  You know they his team has started to do a lot of that reconciliation.  We've been working transparently with the factoring counterparties to get them information.  They've been very helpful in giving us information to get to that reconciliation.

Unfortunately, as the declaration says, we don't think a lot of that money is actually factored.  A lot of that money is -- and when I say factored, Your Honor, remember, we're talking about third-party factoring vs.

customer.  We're talking about the third party really.  We think a lot of that money at the end of the day is frankly, you know, estate cash that can be used subject to the DIP, subject to, you know, liens and avoidance and cash collateral stipulations.

It's fundamental and critical to have access to that money as part of the DIP, but we're not fighting about that today.  We want to review this process with the factoring counterparties.  We want to get them information about what we did to reconcile all of this information that's been provided.  And then we, frankly, Your Honor, are going to need to file a motion most likely on an emergency basis with you for relief to start using money that we can clearly identify is not factored cash subject to dispute as to -- you know, it's not property of the estate, et cetera.  But anything else, which we think is a significant chunk, we do want access to use.

And we're going to try to work with everybody cooperatively.  We've been telling them that this motion is coming.  We're in the process of drafting it.  We're hopeful it's going to be consensual, and it's going to have procedure so people can kind of take some time to validate the information that we're putting in front of them.

If we can't agree, we'll have to have a disputed hearing.  I really hope that that's not going to be

necessary, but we really need access to this cash, right? It makes the entire DIP model, it makes everything work.

And, Your Honor, the other piece of it is customers are concerned and so they're withholding payments generally, right, which is creating another cash strain on the company.  Because they are concerned because they don't know who to pay, right?   They've gotten Debtor notices for most, if not all, of the factoring counterparties.  And so we're hoping to resolve all of this as part of this motion and hopefully do it on a consensual way.

But today, you know, we are not priming.  To the extent it's factored cash, and that's the key, to the extent, right?   We're going to figure that out.  But if it turns out it is, no DIP liens, no adequate protection liens. We're not priming.  We're not doing anything.  The money's going to sit there.

And by the way, you know, all receipts that have come in, we've agreed with the factoring counterparties as we did at the interim hearing, we're not spending that until this reconciliation effort happens, and people consent that we can spend it or Your Honor orders that we can spend it, you know, what was it factored.

So Your Honor with that background, that's the approach we took today on status quo.  I am pleased to report I can run through a couple of the settlements that we

**JOINT EXHIBIT NO. 61**

have with Your Honor.

THE COURT:  Okay.

MR. SINGH:  First, Your Honor, we have a settlement with Evolution.  Evolution is one of our SPV lenders, represented by Proskauer Rose.  We've entered into a stipulation with them, Your Honor, that is, you know, essentially the terms that we describe in our reply brief that we took with respect to all of these counterparties, the SPV counterparty.

So specifically, we're going to keep them flat at the inventory level at the petition date, right?   So and how are we going to do that?   We're either going to purchase and put more inventory at, you know, subject to their disputed liens under review or we'll cash collateralize, right?   And then we're going to have a true-up period.  So I think every seven days or so.  If it turns out that that value relative to the petition date value has fallen, fell down, we'll put cash in there.  If it's gone up, then excess cash can be swept back.  And we're making sure that we're leaving them at status quo pending the resolution of whose collateral is it, who's got senior liens right and figuring that all out?

Full reservation of rights of all parties as to that collateral dispute.  We're going to try to work with parties to see if we can come up with an answer.  If not,

they've filed an adversary proceeding.  You know, we'll figure out if that's the best way to go or what's -- what makes the most sense given that it's not just a one-on-one issue really, right?

It's kind of everybody is involved in this because if it's not their collateral, it could be ABL collateral. It could be one of the other SPV collaterals.  So it's not simply, you know, we can just kind of duke it out with Evolution or settle the issue with Evolution without involving other parties.  So that will be, you know, an issue for another day.

All parties are reserving rights with respect to surcharge, you know, with respect to these boxes.  They're reserving rights also to accrue interest and fees to the extent it turns out they're over secured.  And the stipulation period is 60 days.  We're going to try to do this over the next 60 days.  If we think it's making progress, the parties can agree to extend.  But, you know, that's generally the approach we're taking here.

And, Your Honor, Evolution you might have seen -- and I know we're going to have a scheduling conference with respect to some of the motions that were filed by the SPV counterparties regarding trustees, et cetera.  So this resolution does address that.  You know they've agreed to withdraw their objection to the DIP motion.  I am not going

to put on any evidence or cross.  You know they're good with their settlement.

They've agreed to withdraw their objection to Weil's retention application.  They've agreed to adjourn their motion for a Chapter 11 Trustee at their entities, you know, during this interim period, you know, with an obligation to give notice if they need to bring it back up.

So you know with that Your Honor, I think we're done.  We actually have a signed stipulation that we'll file with the court in connection with the final order that's continuing to move.  Parties are still working.

Your Honor, I will move to the next one, if -- you know and just kind of tick through.  I am actually going to -- sorry.

THE COURT:  Go ahead.

MR. SINGH:  I am actually going to ask my partner Cliff Carlson because he's been working on CarVal and Aequum.  And I think we have you know a similar type of resolution where we can adjourn some of these disputes.  Not exactly on the terms of Evolution, but I will let him come up and just describe those to Your Honor since he's had the most latest conversation if that's okay.

THE COURT:  Perfect.  Thank you.

MR. SINGH:  Thank you.

MR. CARLSON:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. CARLSON:  I will start with the CarVal settlement and that's we've been speaking with Mr. Brilliant.  We have an interim stipulation in place with CarVal that's at docket number 230.  And the agreement is to extend that that stipulation through December 8th.  I understand the court has availability for a hearing on that date.  That's available, and we would have our hearing on this on this on these issues, the adequate protection, or their client.  I will stop there just to make sure you're --

THE COURT:  Well, yes.  That's that Monday December 8th?

MR. CARLSON:  Yep.  And that hearing would be a continuation of the of these issues.  They've also filed a motion to dismiss --

THE COURT:  Right.

MR. CARLSON:  -- their SPV Debtors, and in the alternative, appoint a Trustee as well as --

THE COURT:  Or for adequate protection, too.

MR. CARLSON:  Right.  They have in a motion for lift-stay.  We would have, what I'd call, a scheduling conference on those notions at that hearing as well, and hopefully we're resolved on these issues when we come back to you on the 8th.

THE COURT:  Oh, got it.  Okay.

**JOINT EXHIBIT NO. 61**
**Page 464 of 540**

MR. CARLSON:  But to the extent we're not, though, then we would have -- and we would schedule a final hearing the first week of January, again, subject to Your Honors' availability.  A final hearing on a motion to --

THE COURT:  Yeah.  Let me get a --

MR. CARLSON:  -- to dismiss.

THE COURT:  So what would we be taking care of? What would happen on December 8th?

MR. BRILLIANT:  Your Honor, I don't know if it's we have disagreement or just that I think it's just nomenclature.  What we had agreed was as part of the DIP motion, they have a motion for use of our cash collateral. And you know, they want to provide us adequate protection. That's not going to be heard today.  That's going to be pushed to December to December 8th.

We would extend the interim stipulation as counsel said, also to December 8th, that requires just -- there's going to be just a few changes in the stipulation.  One, you know, it -- the termination date was originally, I believe, October 22.  We extended that to November 7th until today. We'll extend that again to December 8th.

And then there's a provision in there that limited their ability to use any of the cash collateral other than certain terms, which also would have expired on October 22, and was extended to November 7th.  I think that's in

Paragraph 3 and that'll be extended as well.

The last change in the interim stipulation is under the current stipulation, they're allowed to purchase inventory in only that stipulation three ways.  One, you know for you know cash on delivery.  The second was by providing raw materials, you know, at the time of delivery of the inventory.  And the third was there was a process where it could deliver it directly to the company and we would have retained a lien on their accounts receivable.

With respect to whatever we have, in terms of accounts receivable that were created, you know, prior to day, you know there's a 20-million-dollar cap, we'll still continue to have that.

With respect to, you know, after today, they won't be able to sell the receivables.  And they will only be able to, you know, sell for cash or for raw materials as provided in the stipulation.

THE COURT:  Okay.

MR. BRILLIANT:  So that's just going to come out. For the convenience of the parties, there's been issues with tracking the AR.  So no reason to create more administrative headaches and doing something that parties, you know, can't have a high confidence level in it.  So that'll be the change with the stipulation.

And then on December 8th, we would have this

continued hearing or on the on the motion, you know, to use our cash collateral, and you know, requests for adequate protection.  We would also have the interim hearing on our motion to lift stay for --

THE COURT:  Oh, got it.

MR. BRILLIANT:  That'll be on December 8th as well.  And then we agreed that for a date, we understand you have availability the first week of January, that we would have a hearing on a motion to dismiss adequate protection in the alternative.  Motion dismiss or alternatively for appointment of a trustee.

THE COURT:  On this week.

MR. BRILLIANT:  And the final hearing on the motion to lift stay the first week of January --

THE COURT:  As long as we mean the first week of January, being January 5th.  That would --

MR. BRILLIANT:  Yes.  Yeah.

THE COURT:  January 1st falls on a Thursday. That's why I was just saying don't get me in trouble with that -- yeah.  I think that week of -- let's just say December 8th would work conceptually for me.  We could -- I'd rather start just to give everyone a full day where I can just kind of start maybe 9:00 a.m., on December the 8th. If we could just block it out, and just the --

And then if we had to do something.  You know you

all can figure out in terms of witnesses and all that stuff.

January 7th or the 8th, that's like a Wednesday or a

Thursday.  Just get with your -- it's a little bit away.

Yeah.  I am looking at 2026 January 7th or the 8th.

Whatever time would work, just get with my case manager and

pick a date that would work --

MR. BRILLIANT:  Sure.

THE COURT:  -- for me.  Okay?

MR. BRILLIANT:  Thank you, Your Honor.

THE COURT:  All right.

MR. BRILLIANT:  So we would have that hearing on

the 8th.  In the meantime as you know, Mr. Singh and Mr.

Barr, you know, mentioned, there's just been an ongoing

investigation into the validity of the liens at the SPVs,

including there was a, you know, a supplemental declaration

from Mr. Moore

We, you know, obviously, you know, the hearing is

being put off.  Part of it is to investigate some of the

assertions in, you know, Mr. Moore's supplemental

declaration and for the Debtors to continue to do, you know,

their investigation on issues that potentially would be

relevant to the hearing.  They have agreed to give us, you

know, additional discovery, including another deposition of

Mr. Moore and, prior to that, to produce the documents that

he relied on and the relevant information in connection with

that matter.

And, then, you know, we're all going to be -- you know, given that it is going to be, you know, the hearing is going to be later, and we are going to have additional information, there may be additional witnesses, including appraisal witnesses, in connection with the hearing, in the interim hearing on the motion to lift-stay.

You know, we have agreed that none of the findings of fact that will occur in this hearing will be binding in connection with these other hearings.  With us leaving, we're going to, you know, continue our hearing and then, we're going to, you know, subject to other things I'm going to tell you, you know, withdraw our objections.

THE COURT:  Not binding with respect to your client?

MR. BRILLIANT:  Yes.  And, Your Honor, well, that's where I want to correct you.  If you want to go back or I can finish.

MAN 1:  Go ahead.

MR. BRILLIANT:  Now, Your Honor, we --

THE COURT:  Can you get close to the mic?   Yeah.

MR. BRILLIANT:  Thank you, Your Honor.  In addition to the -- you know, our objection to the use of our cash collateral and our other collateral, and request for adequate protection, as Your Honor probably knows, we filed

**JOINT EXHIBIT NO. 61**

an objection --

THE COURT:  Yes.

MR. BRILLIANT:  -- to the DIP.  You know, subject to an agreement, we have to make certain changes in the DIP order.  We would withdraw that objection as well.  The Debtors and the first-lien lenders have agreed to, you know, clarify language that the SPV Debtors, the special-purpose vehicle Debtors, and carve-out Debtors in particular, are not subject to the carve-out.  I think that has always been the intention, but there has been, you know, ambiguity.

All the parties, you know, reserve their rights in connection with future motions and proceedings to seek -- to surcharge collateral or to oppose that, or to seek, if they want, to try to do a carve-out later, they can do that, but it's not -- nothing in the order that is going to be entered or in the DIP financing agreements that will provide for that with respect to the, you know, CarVal entities, and the other SPV entities where -- that are our borrowers and, you know, guarantors.

There are going to be changes to the language to ensure that the springing guarantees, you know, do not apply to the special-purpose vehicles or the maquiladora entities. And then, you know, given that this investigation is going on into the liens, currently in the proposed DIP order individual, creditors would only have until the end of the

month to file claims asserting that other people's collateral is not appropriately treated.

That is going to be extended for us to be the same deadline that the Committee has.  And to the extent the Chapter 11 Trustee is appointed, it would -- that party would get, you know, 60 days after the appointment of the trustee rather than 30 days.

So, I think, Your Honor, that's -- and you know, with those changes, which have been agreed, we would withdraw our motion on the DIP.  And with respect to the cash collateral, that would be put off to the 8th.  And with respect to the other motions, they would be put off until the first week of January.

THE COURT:  Perfect.  Thank you very much.  Oh, Counsel, can you just -- I know it might be helpful.  Can we just have you, counsel, can you just -- I know your name, but just so we have a clean record?

MR. BRILLIANT:  Oh, yes.

THE COURT:  Just state your name just for the record??

MR. BRILLIANT:  Yes, for the record, Allen Brilliant on behalf of the CarVal secured lenders.

THE COURT:  Thank you very much, Mr. Brilliant.

MR. BRILLIANT:  Thank you, Your Honor.

MR. CARLSON:  Your Honor, we agree with all that.

I think just one clarification.  Is that this is just with respect to the SPV Debtor than it is with his client.  I just wanted to make that --

THE COURT:  Correct.

MR. CARLSON:  -- make sure that was clear.

THE COURT:  Yeah.  That is how I took it.

MR. CARLSON:  Yep.  And then, Your Honor, the other settlement is with Aequum, and it is very similar.  It's an extension of the interim stipulation for adequate protection that we had with Aequum.  That is docket number 215.  We would be extending that stipulation, and the consensual use of their collateral, through December 8th, the same date, and ask to have a hearing, you know, the hearing adjourned with respect to the use of their collateral to that date as well.

And the modifications to that stipulation are very similar.  One is, you know, we can transfer -- we can no longer transfer inventory from the SPV Debtor to the First Brands Group, FBG --

THE COURT:  The FBG.

MR. CARLSON:  -- what we call the FBG Debtor in exchange for granting accounts receivable.  So that option is no longer available.  In lieu of that, we can -- two options, either through cash or through replacing their inventory with new inventory as it cycles in.  So those are

the two options, and that --

THE COURT:  You're kind of keeping it at a certain level.

MR. CARLSON:  Exactly.

THE COURT:  All right.

MR. CARLSON:  The same structure that Mr. Singh walked through.  And so, and for -- with respect to the accounts receivable that was granted to them during the petition date to day, in lieu of that, that it will be the same.  It will be the inventory that's cycled through during that period of time.  We will have a replacement lien over that.

All of this is with a full reservation of rights as to the issues of whose collateral was it, as of the petition date and validity, extent, priority, et cetera.  So we are not stipulating to any of that.

THE COURT:  How far is this step going...  It is going to mirror --

MR. CARLSON:  It's going to mirror CarVal, so it will also to December 8th --

THE COURT:  Okay.

MR. CARLSON:  -- for that hearing.  I think that is it.  I will stop there in of if you have anything you wanted to --

THE COURT:  Yes.  If you can just state your name

for the record.

MR. OTTAVIANO:  Hi.  Yes.

THE COURT:  I'm getting good at this now.

MR. OTTAVIANO:  Yeah.  Kenneth Ottaviano, Blank Rome, on behalf of Aequum Capital Financial II LLC.  And I concur that our deal is essentially the same as CarVal's deal, and we are going to come back on the 8th and have it out if we do not have a final deal.

THE COURT:  Okay.

MR. OTTAVIANO:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. CARLSON:  And, Your Honor, that's all I have. I will turn it back over to Mr. Singh.

THE COURT:  Thank you.

MR. BLANK:  Your Honor, before Mr. Singh goes back, I'll quickly comment only because we are one of the parties who did not get a deal.  So I just wanted to say a few comments into the record.

THE COURT:  Just state your name for the record.

MR. CARLSON:  Sure.  Your Honor, Stephen Blank from Alston & Bird on behalf of UMB.

THE COURT:  Yes.

MR. BLANK:  Apologies, of course, when I came up here, my computer closed on me.  Give me one quick second.

THE COURT:  Are you giving me an intro, or you are

just kind of outlining kind of?   I have read your objection.  Is it --

MR. BLANK:  This is a little different.   There have been some new issues --

THE COURT:  Oh, okay.

MR. BLANK:  -- that have come to light, Your Honor.

THE COURT:  Okay.

MR. BLANK:  And, frankly, before I start, also congrats to your clerk.  That was really cool before.

THE COURT:  Yeah.

MR. BLANK:  So, Your Honor, for the record, Stephen Blank from Alston & Bird on behalf of UMB Bank, N.A., in its capacity as administrative agent for the lenders under a revolving credit facility to Debtors Global Assets LLC and Debtor Global Assets GmbH.

So the facility we are talking about, this was initially a $45 million facility, and my clients are currently owed in excess of 33 million, all of which is, or was at the outset of the case, secured, and our proof of claim is on file.

Our collateral generally consists of finished products and some raw materials which is held in three locations in Europe and one location in the U.S.  In all instances, this is segregated and readily identifiable

collateral, which has been subject to ongoing audits, one of which ended just a couple of days ago.  I mean, with respect to the European collateral, it is literally in a warehouse in a cordoned-off section to comply with the perfection requirements under local law.

So let me start with the punch line and then we can move backwards from there.  The Debtors are giving away property owned by a Debtor SPE to a non-debtor affiliate for zero value.  In concrete terms, our Debtor's SPV owns cordoned-off property sitting in a non-debtor warehouse, and the non-debtor entity, who is also represented by Weil, is taking that inventory out of that cordoned-off area and selling it.  Our understanding from Weil is that this collateral is needed to help facilitate an out-of-court financing for the non-debtor, which non-debtor is having liquidity issues.

So, in short, they are using Debtor collateral to shore up a non-debtor.  The Debtor SPV is getting nothing in exchange.  My client is getting nothing.  The gifting of our collateral needs to stop, and at a minimum, my client is entitled to adequate protection, and we have been offered none.

So as I am sure you remember, we previously negotiated an adequate protection stip.

THE COURT:  Yep.

MR. BLANK:  Among other things, in that stipulation, we agreed that the Debtors could access up to $20 million of our collateral, subject to various restrictions.  And frankly, the fact that the cap was 20 million, each in and of itself shows that the Debtors were putting a significant value on this stuff.

The Debtors breached that stipulation immediately. Standing here today, we have no idea how much of our collateral was used since the petition date, and, frankly, I do not think the Debtors have any idea how much of it was used.

THE COURT:  Are you arguing your emergency motion?

MR. BLANK:  Your Honor, I am arguing for adequate protection because, at the end of the day, we were told on Tuesday that the Debtors have come to the decision that they don't think our stuff is our stuff.  It is owned by a non-debtor.  They are refusing to assert the automatic stay. They're effectively doing an abandonment motion without giving due process to anyone.

THE COURT:  Okay.

MR. BLANK:  So, and this was on Tuesday, for the first time, relayed on a phone call that there may be a dispute between the Debtor SPV and the non-debtor entity over the ownership of that collateral.  The Debtors point to that dispute as a basis to not provide any adequate

protection to my client.

The most shocking part of all this is the Debtors doing nothing to maintain the status quo.  Mr. Singh said about four or five different times, "We want to maintain the status quo."  He apparently forgot the carve-out, that that does not include my client.

So let's be perfectly clear.  Weil represents both entities in this dispute, the SPV Debtor and the non-debtor, and yet the decision has been made to prioritize a non-debtor entity over the Debtor SPV and the estate and the creditors, giving away millions of dollars in collateral for nothing in return.

And frankly, this flies in the face of bankruptcy law, which is expressly designed to provide breathing room, and prevent this sort of dissipation of estate property.  So as of now, the Debtors have only flagged this as a dispute, nothing certain at this point.

Even if the Debtors were to take a more definitive position that this property does not belong to the Debtor SPV, they'd be doing so on admittedly less than all of the relevant information.  There is no evidence establishing definitively that these are not estate assets.  And, as of late last night, Debtors admitted in phone calls that they don't have and haven't reviewed all of the documents relevant to this dispute.

**JOINT EXHIBIT NO. 61**
**Page 478 of 540**

So it is pretty insane that, without reading the documents, the Debtors' fallback position is, "Let's just give it to the non-debtor," rather than take refuge in the automatic stay until the dispute can be resolved.  Weil is conflicted from representing this non-debtor in a dispute with the Debtor SPV.  The Debtor SPV deserves unconflicted counsel.

Now, the Debtors' fiduciary similarly must act in the best interest of the Debtor SPV.  It's obviously in the best interest of the Debtor SPV to vigorously assert the automatic stay and its turnover rights.  And that's what these provisions were designed for.

And instead, the Debtors have effectively abandoned this property without a 554 motion.  They haven't sought court permission to transfer the property outside the ordinary course of business, as required by section 363.  And because these transfers are not authorized by a court order, they're avoidable under 549.

The Debtors can't circumvent due process by omission, which is what is happening here.  There needs to be a process.  It needs to be fair.  We offered them an off-ramp.  We said, "Hey, put this on ice, maintain the status quo until we can all negotiate something."

We proposed they freeze any sale of the collateral for a short period of time, or instead, just trap the

proceeds in an account so that it's safe, and we can all hash it out in short order.  We wanted to maintain our status quo.  They've refused to do any of these things, and they're intent on letting a non-debtor continue to take and sell estate assets.

It's obvious that certain important parties will benefit from this, but it's clearly not my client here. There's no legal justification to give away the Debtor SPV's property to achieve this goal.

And so, as we sit here today, our collateral -- or stand here -- our collateral is continuing to be taken without any adequate protection.  The estate is being drained of an asset in direct violation of the law.  So we're asking for adequate protection to preserve our status quo.

THE COURT:  What is the difference between what you are arguing now and your emergency motion?

MR. BLANK:  The emergency motion was enforcement of the previous stipulation.

THE COURT:  But it also had a second component to it, right?

MR. BLANK:  It did.  It was enforcement of the stipulation they previously entered into, as well as an objection to the DIP, and it was a bring-down objection that was previously filed with respect to DIP.

THE COURT:  So what -- because I remember reading it.  So what is different?

MR. BLANK:  What is different now, is that before, we were talking about adequate protection for the use of estate assets.  And here, they're effectively saying, "We have decided these aren't estate assets, so there is no need to have any adequate protection."

THE COURT:  I see.

MR. BLANK:  There is no evidence that these are not estate assets.  They made the decision, and told us Tuesday night, and there is nothing in the record of it.  So, we -- until this can get hashed out, they have to offer us something to maintain the status quo.  And we have offered a bunch of suggestions and they have said, "Yeah, no, but let's try to get all the parties on the phone."

That's not going to do it.  We're not going to stand here naked hoping that people come to play.  Things need to be frozen.  Our status quo needs to be retained and then we can figure it out.  We're trying to be reasonable, but we were told on Tuesday, "By the way, we have decided, without any evidence, that maybe this is not your property, so you guys are different from everyone else, and we're going to carve you out."

And if that's really where they want to go, then this is something the Debtors should be protecting.  We

believe this is a Debtor estate asset.  No one is disputing this is worth tens of millions of dollars.  It should not be just given over to a non-debtor SPE.  The Debtor should be enforcing the automatic stay.

And if the Debtor doesn't want it, then I will orally move to lift the automatic stay so we can protect our rights.  But the Debtor, as a fiduciary to this SPV entity, is not doing that right now.  So our witness is here.  We're ready to go.  I don't think I'm being unreasonable.  We reserve all rights.

We're looking for adequate protection to preserve our status quo so that we can all keep talking and try to figure this out.  So thank you for indulging me, Your Honor.

THE COURT:  Thank you very much.  Hold on.  Are there are other deals before I hear an objection?

MR. SINGH:  Yeah.  Your Honor, I wasn't really finished with my remarks.

THE COURT:  That's okay.  No.  No.  I mean, everybody is going to speak.  I can tell everybody the way this is going because I know there may be some parties that want to speak.  I would rather -- looking at it, it's 11:00 central.  I think we ought to read into the record proposed agreements.  Let me hear from parties who wish to be heard, and we're probably going to get close to the noon hour at that point.  I'd rather -- I don't want to put a witness up.

**JOINT EXHIBIT NO. 61**
**Page 482 of 540**

Maybe we can move something, you know, talk about getting some evidence in too, some housekeeping, and then maybe we start officially around 1:00.

MR. SINGH:  Yeah.

THE COURT:  This is the way this is kind of just going.

MR. SINGH:  One second, Your Honor.

THE COURT:  Yeah.  Oh, okay.  Your Honor, one of our witnesses, is I think we filed a motion for Mr. Cowen to appear virtually.  He is actually overseas and running six hours ahead, Your Honor.  If we can, he has slotted out time to try to get this done.  If there is any chance that we could take his testimony and cross earlier that would be --

THE COURT:  How much direct do you have?

MR. SINGH:  Well, I think we're just submitting his direct through his declarations.

THE COURT:  Let me ask.  Does anyone have any cross for this witness?

MR. WINOGRAD:  Yes, Your Honor.  We do.

THE COURT:  How much cross do you have?

MAN 2:  I -- it's hard to say and I do not know what will happen with the technology, but I suspect it will probably be an hour or so, potentially, a little bit longer.

THE COURT:  yeah.

MR. KOTLIAR:  Your Honor, Brian Kotliar, Morrison

**JOINT EXHIBIT NO. 61**
**Page 483 of 540**

& Foerster on behalf of Onset Financial.  We probably have 15, 20 of cross for this account.

THE COURT:  Yeah.  I mean, I guess we could work for an hour, take a break, and then come back.  I don't --

MR. SINGH:  Let's see where we get, Your Honor, and we'll do the best we can with Mr. Cowen.

THE COURT:  Yeah.

MR. SINGH:  I just wanted to let you know he is seven hours ahead.  Okay.

MAN 3:  Excuse me.  I am sorry.  I didn't stand up quickly enough, Your Honor.  We're reserving for cross, Judge.  We're going to wait and see how the Debtors' case presents to their witness.

THE COURT:  Okay.  Yeah.

MAN 3:  We're still discussing some of those issues.  I just didn't want the lack of standing up to let you know there might be another party cross.

THE COURT:  Thank you.  So let's keep talking.

MR. SINGH:  Yeah.

THE COURT:  I do not think he is going to get on, but we will keep it going.

MR. SINGH:  Understood, Your Honor.  We will do the best we can.  I just wanted to put it out.

THE COURT:  No.  I appreciate it.

MR. SINGH:  So, Your Honor, going back to settlements, I think the other ones that I wanted to mention are the ABL lenders.  We're not quite done with the ABL lenders, but people are talking, and I think we will get it done, Your Honor, and they have to review the language. They're represented by Mr. McGuire at Winston, who is here.

And so, rather than, you know, lay out a settlement that's still being finalized, I think we'll just come back to it.  I am very confident we will get that done.

THE COURT:  Okay.

MR. SINGH:  So, Your Honor, that leaves, in terms of -- and the last one, I would says, is, you know, we put in some factoring language consistent with my remarks earlier.  I think we have gotten sign-off from some of the factoring counterparties.  I am not going to try to say which ones they're because it's moving.  I think it's -- the language is consistent with everything I have said earlier. I think people are still reviewing language, so if any of them end up getting up, I am not trying to say they can't, but I am hopeful that they will all agree that we're done, or, if it's just some language, we can clean it up.

So I think who that leaves, Your Honor, at this point, to my knowledge, is -- are the main objectors, and I am not trying to minimize anybody else, but I think we have either got language out to people or are resolved in

**JOINT EXHIBIT NO. 61**
**Page 485 of 540**

principle, you know, with landlords and things like that.

So, you know, to my knowledge, the main show for today right now is the UCC objection, as well as Onset, represented by Morrison & Foerster.  So those are the two main ones.  And again, I am not trying to prevent anybody from standing up, and I could have a little bit of that wrong, but I think that's the current state of play.

So, Your Honor, before we move to the evidence, I would like to make a few remarks with respect to those objections to set the stage from the Debtors' perspective, and I think others will have remarks as well for them, again.  So if that's okay, and again, you know, I will keep it quick.

Judge, you know, we couldn't get there.  You know, I am hopeful we can still get there, but we couldn't get there right now.  We're not at a final settlement.  But where we have gotten to, you know, thanks in many parts to the UCC's objections, and the work we have all been doing in the background, working with the DIP lenders and the UCC, is a number of material concessions that have been achieved, right?

So, if there is no UCC settlement, there are a bunch of things that I will review now that are in our reply papers that address the objections, or a lot of the objections, I should say, that the UCC has raised, and I

think all to the benefit of the estate.

Starting, most significantly, Your Honor, from our perspective, is the administrative expense claims basket. You know, there were some objections filed by the UCC and other parties that, hey, you know, there is a risk of administrative insolvency here, but we do not have any evidence of that, and you know, if we have to get to it, we'll get to it.

But notwithstanding, the concern was, and if you have a roll-up, you know, the amount of the roll-up here is going to swamp potentially other administrative expense claims.  It's a super priority claim, et cetera, et cetera.

And so what we have agreed to with our DIP lenders is to carve out a $200 million administrative expense claims basket that would only be subject to the new-money portion of the DIP.  So it would only be subordinate to that, and if we're administratively insolvent, then 200 million dollars' worth of admin expense claims, you know, properly allowed, have to go through the process, et cetera, go next, right, so before the roll-up amount is paid.

So we think that's a significant change, and gives people some good assurance in terms of the administrative, you know, sort of the downside scenario in this case, which we hope does not happen.

And besides that, you know, you (indiscernible)

Mr. Moore, and he's got some stuff in his declaration, and we working with the UCC's advisors.  We worked with the advisors to the ad hoc group and our DIP lenders to really size that based on spend that's happening in the case.  You know, what is going on with employees, how often we pay them, et cetera.

And so, it's not perfect, right?  We don't know what we don't know.  But we -- you know, we didn't just pick a number out of thin air.  We sat down and tried to size it and show it to people, and it's $200 million, we think is a massive win for the Debtors' estate.

THE COURT:  Mr. Ruff is going to stand up at some point and tell me that there is still not anything to show where an examiner is going to get paid.

MR. SINGH:  Yes.

THE COURT:  At some point, he is going to stand up and say it, so I will save him the time.

MR. RUFF:  Thank you, Your Honor.

THE COURT:  So what thoughts do parties have?  And again, it's not up for today.  I will tell everyone, I intentionally pushed that out.  A Committee had not been formed yet.  There were a lot of moving pieces and the motions got filed.  They obviously needed to be heard, but I wanted to make sure, in part, that a committee got up, that a committee got formed, that a committee was able to hire

professionals, that a committee was able to get up to speed, to then have conversations. So that when I took it up, everyone was a little bit smarter about what was going on and, you know, 30, 40 days would have passed in connection with this case.

So I wanted to put that out there. It's not for today. The scope of it is something completely different. I don't want to talk about that today. I just know that that objection is coming.

MR. SINGH: Yeah.

THE COURT: So that's one of the outstanding ones and I figured I would flag it.

MR. SINGH: Yeah. And, Your Honor, it's a good -- you know, first, Your Honor, we appreciate the way in which you schedule that motion. And I think it was very helpful because it's not up for today, but it -- as you said, it is somewhat connected.

What I would tell Your Honor, is if we have a settlement on -- you know, with the players, on this, I think we're going to have an agreed approach. I am not trying to bind Mr. Ruff or anybody that moved. But at least as between the UCC, the DIP lenders, and the Debtors. We're trying to come up with an agreed approach that makes sense and is efficient for these cases to go talk to people. We're not there yet, right?

THE COURT:  Got it.

MR. SINGH:  Assuming we don't get there, Your Honor, I don't think we have consent today from our DIP lenders to say, "Yeah.  They're going to foot the bill on an examiner.  This is where it's going to sit in the carve-out."  You know, frankly, they have made it clear that they're not consenting to that today.

But obviously, the motion's going to be heard by Your Honor.  You're going to either have a settlement before you with respect to that motion or you're going to make some determination.  And I think we'll have to address when we know the scope, the anticipated cost of a potential examiner, where it fits within the structure.  Does it fit within the carve-out?  Does it fit within the 200 million admin claim basket?

So we're not trying to prejudice that conversation.

THE COURT:  And let me just say --

MR. SINGH:  -- either way.

THE COURT:  I don't want to say too much, but I conceptually understand that if you create a carve-out someone will meet the carve-out, right?  And so you got to -- without knowing what the scope is, you got to have more information before you can do it.  I can give folks Like Mr. Ruff some comfort there.  The code says, there has to be one

so there's going to be one.  The scope of what it is, I think everyone should look closely at the text of -- and see exactly what examiners do.

And I am going to stick really close to what that is.  And so I know that in some instances, some cases have kind of examiners did some extra stuff.  They won't be doing it in this case.  We're going to stick right to the text in terms of what examiners are, are there to do.  And the text will guide us to what that is.

And I just -- everybody knows the cases in which they exist, I think.  You know I will share this thought and then we can move on to something else.  Because I don't want to talk about it more, but it may be helpful as parties think about the way I think about this in terms of what parties could present to me.

It seems, you know, someone getting appointed and disappearing for four months and showing up, but the report is not helpful.  I think four to five months out, six months out, it's just not beneficial.  I think at some point, there are some questions that the public there needs to be an answer to.  And someone can go -- and I know that others, there's a bunch of other professionals who are working on this.  And so, it's finding that balance.\

And I think, you know, you look at some other-- I don't, probably you all know the cases.  Some of them, folks

just -- and it was just the nature of the case.  You know, it took a year for an examiner to write a report.  And I think those are too long for purposes of this case.

I think you know, someone writing a report eight months later is probably just not going to -- that's the nature of the case.  It's just too long.  So I think as parties think about what it is, I think it ought to be tight, to the point, and relevant to what the parties would need to provide an answer to, to provide some clarity from an independent person that the statute requires.

So that's the most that I'll say.  But obviously, if -- you know, whoever that is, which I think is going to require some specialized expertise.  And then also someone who can write something in plain English, and I can kind of get it out there for the public.

I know it's really hard in a case like this, but someone, I think, you know, whoever that is, they will be paid, but I got -- but today's not the day to pick out a budget --

MR. SINGH:  Yeah.

THE COURT:  -- for it or scope.  It's just, you know, I don't want folks contemplating, which I think stick to the text.  Stick to what is relevant.  Stick to what someone could provide some public information on, and that is important.  And figure out a budget.  And I have no

insight into what that would be or what that would cost

But I do know that there are -- you know, someone who wants, you know an examiner to do 15 things, it's just -- I don't want that.  I want targeted.  I think but parties can present what they want.  I am just sharing my thoughts up front.  But let the text guide you.  All right.

MR. SINGH:  Okay.  Thank you.

THE COURT:  Where are we going next?

MR. SINGH:  Thank you, Your Honor.  That's helpful.  So, Your Honor, going through the other key changes, we do have -- you know, one of the other issues that the UCC has raised in its objection is by rolling up the -- oh, sorry honor.  Just one second.  Oh, sorry.

Your Honor, breaking news.  I am told that we have a settlement with the creditors Committee on its objection. So, Your Honor, what I would suggest is if we could maybe -- yeah.  Your Honor rather than proceed, it might make sense if we could take a quick 15-minute break to confirm or correct, and then I can or somebody can read the settlement into the record.

And we'll see if we can also finalize some of the other objections because they were contingent not necessarily done.

THE COURT:  No.

MR. SINGH:  But I think it would be --

Case 25-90399   Document 3345-15   Filed in TXSB on 07/23/26   Page 63 of 102

THE COURT:  I got it.

MR. SINGH:  -- helpful to clear this out.  So I defer to Your Honor how you want to proceed.

THE COURT:  No.  I am going to step off and let folks confirm with each other to make sure that you've got a deal.  You don't have one until you have one.

MR. SINGH:  Yeah.

THE COURT:  So I got it.  So I will -- I think you mentioned 15 minutes.  Do you think that would be adequate?

MR. SINGH:  No, Your Honor.  I am sorry.  I wish Your Honor, why don't we why don't we do 30 minutes if that's okay?

THE COURT:  So, yeah, let's do this.  Let's do --

MR. SINGH:  Or --

THE COURT:  Yeah.  Here's what I'd like to do because there's a number of parties on the line and just within 30 minutes, we'll come back on the record and at least announce kind of where we are.

MR. SINGH:  Yeah.

THE COURT:  And then maybe -- at some point, if there's no deal, at some point, someone's going to have to get on the stand get exhibits in and make rulings.

MR. SINGH:  Yeah.

THE COURT:  And I'll do it.  But maybe it makes more sense to -- if there's a deal that you read it into the

record.  And then parties can then start to talk about what the other ones look like.  And maybe for the last 15 minutes, for example, if Onset wished to tell me something or Mr. Ruff wished to tell me something, we can use that --

MR. SINGH:  Exactly.

THE COURT:  -- time.  And then everybody can break, and we can take an hour and then come back.

MR. SINGH:  Thank you, Your Honor.  That would be great.

THE COURT:  All right?  Thank you.

MR. SINGH:  Thank you.

CLERK:  All rise.

THE COURT:  We're back on the record in First Brands.  Parties are still speaking.

MAN 4:  I was going to filibuster, Your Honor.  Tell some jokes.

THE COURT:  I will give folks time to come in and at least tell me where we are.

MR. RUFF:  If you'd like to hear my opening anyway, you're all right.

THE COURT:  Mr. Ruff, maybe I can just ask and I will give you the option.  I mean, is there anything you wish to tell me at this time?  I think we do have representative from the Debtor here.  So everybody's here and they're walking in.

MR. RUFF:  But yeah, no, that's fair enough, Your Honor, I appreciate it.  So Jayson, for the record, Jayson Ruff, the United States Trustee's Office.  Your Honor, we did file our reservation of rights.  I think you saw that at Docket 427.  And I think your comments I was very appreciative of earlier.

We understand that, you know, whatever is in the budget or going to need to be in the budget is really going to be tied to the scope of an examiner, presuming that one is appointed.  And so we just need to see that at some point.  I was a little surprised to see that an examiner was specifically excluded from a carve-out.  But I understand and appreciated Debtors' comments on that, that maybe they're in the 200-million-dollar general admin fund or.

But I think they're -- like if there's professionals, and in the estate professionals, the United States Trustee's Office believes they belong in the carve-out.  So we just wanted to reserve those rights.

And then, just finally, Your Honor, as far as standing for -- excuse me, for a challenge period.  I understand the Committee has -- and I saw on the revised order they had extended a challenge period out.  Look, Your Honor is going to order not only the scope of the examiner, but you're also going to be telling the examiner how long he or she has to do their work and to get their report online.

**JOINT EXHIBIT NO. 61**
**Page 496 of 540**

I don't think what anybody wants to see is where a report is filed, and we learn all these things.  And the value of a report, obviously, and I will save most of this for when it -- but it's a report to the Court.  It's an uncolored report.  It doesn't worry about how does this look for my client, because Your Honor is essentially the client.  And so there's the value in that.

And so when that report comes out, whatever it tells us, if there's claims there, if there is a challenge or excuse me, a basis to challenge any of the releases, we think that those need to be preserved.  So that's just the, I think, the things that we wanted to mention for the record, I think that are relevant today.

THE COURT:  Thank you, Mr. Ruff.  Let me just ask counsel for Onset if there's anything you wish to tell me at this time or anyone else who would address the Court.

MR. BUTTERFIELD:  Good morning.  I guess it's still morning.

THE COURT:  Still morning.

MR. BUTTERFIELD:  We have 10 minutes.  Ben Butterfield, Morrison & Foerster LLP, for Onset Financial. Your Honor, you've read our objections.  I will try to keep this short.  Onset is the largest inventory and equipment lender to the Debtors.  Based on our calculations, their claim is 2.2 billion.  We just read a complaint that the

Debtors have filed against the sole shareholder of the company, which suggested that 200 million of our cash was siphoned out the door to the sole shareholder.

So in addition to being the largest individual creditor of the company, we may be the largest or one of the largest victims of the fraud that happened if it did happen. So we're looking at this DIP very closely.

We -- based on reps from Debtors' counsel and based on settlements that have happened to date, I think we're really down to one issue.  And that issue is Viceroy. I don't know if you recall that from our objection --

THE COURT:  I do.

MR. BUTTERFIELD:  But we have a $1 -- (indiscernible) billion-dollar guarantee claim against Viceroy.  We think we are the only creditor of Viceroy, and it's an SPV entity.  It sits -- if you look at that big org chart with 200 boxes on it, at the far-right upper corner of the org chart, above all of the SPV entities, and it owns 100 percent of their equity.  And as part of our SPV transaction, as part of our off-balance-sheet financing transaction, we obtained a guarantee from that box and the only guarantee offered by that box for our deals.

Look, the Debtors are proposing to have that box grant the DIP guarantee, and there's an issue.  Like maybe we actually don't care.  Because information flow here, and

Case 25-90399   Document 3345-15   Filed in TXSB on 07/23/26   Page 68 of 122

that's no fault of the Debtors, is not good.  No one knows what's in the box.  No one knows if it has assets.  We were offered it as a guarantee because we were told it had value, so we think it has value.

And I think the fact that we think it has value, although we have no real knowledge of that, or just -- this is just based on information that was told to us, which may be completely wrong, they want it, right?  So we want it.  Because we want it, they want it, and because they want it, we want it.  We're in one of these situations.

We are working on a settlement, and I think that the fact that the Committee has gotten their deal over the finish line apparently, is going to be helpful towards that.

But if we are not able to resolve the issue, the things that you should be thinking about today as you hear evidence are things like whether this guarantee makes sense for Viceroy.  Is the guarantee and entry into the DIP facility in the best interest of Viceroy?

And when you think what's in the best interest of Viceroy, well, you think about its estate and its creditors. The way that the guarantee is structured, it would be $1.1 or $1-point-something billion of new money.  There would be no marshaling away from the business assets.  Meaning if they go to repay the DIP, they can just start with the business assets of Viceroy until they're exhausted, and then

they can move on to the operational side.

No marshaling, dollar in, dollar out on the new DIP money, even though these boxes, this Viceroy box, is really non-operational.  It sits there, and it holds equity. It may -- we were told it has no actual assets.  All of the assets that it has are by virtue of its equity.  So it really shouldn't need that much money.

If there are professional fees that need to be covered, let us know what they are, and we'll cover them. But we are struggling with the idea that Viceroy, exercising its own business judgment, could look at this DIP guarantee and say, out of this DIP, I get what?  I get maybe a couple million dollars for my legal fees.

And what am I giving in exchange?  I am giving a $1.1 billion guarantee claim.  Like outside of bankruptcy, if they had done something like this right before bankruptcy, it would be a fraudulent transfer.  It would be gone.  But they didn't.  They're doing it in bankruptcy, and it's getting blessed by the Court.

So that's the issue.  I'll stop.  There are a few other, you know, collateral issues, things like we want notice of new DIP obligors, and we think the challenge period should be our challenge period, because we're the only creditor at a lot of boxes.  You should actually mirror the Committee's challenge period, stuff like that.  I don't

think that's going to hold up the deal.

The big issue right now is Viceroy.  And so that's where we are.  We're going to use the lunch hour to try to settle it, and we'll see if we can get there.  Maybe we'll get there.  Maybe we'll not.  But, you know, as you hear evidence this afternoon, if that ends up happening, that's what you should be thinking about.

THE COURT:  Thank you.

MR. BUTTERFIELD:  Okay.

THE COURT:  Before I turn to Mr. Singh, let me just see if there's anyone else who wishes to address the Court at this time.  Okay.  Mr. Singh.

MR. SINGH:  Thank you, Your Honor.  Your Honor, again, for the record, Sunny Singh, Weil, Gotshal, proposed counsel to the Debtors.  Your Honor, I am not going to respond on Onset.  We have a different view.  But I am just hopeful that we can settle this and then -- but, you know, later at some point, Your Honor, if I need to, I will address those issues.

Let me review for you, Your Honor, the proposed -- terms, not proposed, of the settlement.

THE COURT:  Hold on.

MR. SINGH:  Oh, I am sorry.

MR. SINGH:  Oh, that's disappointing, Your Honor.  I am concerned.  Hang on.  I need a minute, Your Honor.  I

am sorry.

THE COURT:  You got it.  It feels like an old school case, you know.

MR. KELLEY:  We have objections on file.  I think there was a misstatement earlier to suggest that our objections have been addressed as it relates to the DIP.  We've resolved our objections with the Debtor.  I believe conceptually we're waiting on language with the cash management order.  But ours -- and we understand.  The Debtors are turning their attention to the unsecured creditors Committee.  I've reserved my statements.  Probably before the hearing ends, we'll want to make some statements to the Court.

But we intend to use the lunch hour and see if the language we floated to them can be resolved.

THE COURT:  Okay.

MR. KELLEY:  There are a number of receivable counterparties who are talking about language we need in the order, and I understand the Debtors have not yet had a chance to turn their attention to that.

THE COURT:  It's still out there.

MR. KELLEY:  But I think the lunch hour may need to be a little bit longer than the lunch hour, but I think there's room to make things happen.  But I will leave that for Your Honor --

THE COURT:  Perfect.

MR. KELLEY:  -- to decide.

THE COURT:  Thank you.

MR. SINGH:  Excuse me.  This is the second time I've done this, Charles Kelley.

THE COURT:  Rather than having folks here waiting, Mr. Barr, maybe what makes sense is that we all come back at 1:30 and either start with something, someone starts putting on evidence at 1:30, and if there's a deal with all the language, and I'm -- and it sounds like that's -- I think, that's in everyone's best interest.  To just button up language and take a little bit of time, and get some food and hammer out language.

But if not, we just need to start just because logistics --

MR. SINGH:  Understood.

THE COURT:  -- and things of that nature, so.

MR. SINGH:  My only pushback, and I apologize for pushing back, is if we have the deal finalized, I would love to announce it.  Because an hour and a half will get people time to rethink things.

THE COURT:  No.  No.  No.  What I am saying is maybe -- I am just thinking in terms of buttoning everything up.  It may take some time for people to leave, a bunch of folks to leave.  Which I am thinking about logistics in

terms of leaving, a bunch of folks exiting, and then having to come back into the building.  I am really only giving you --

MR. SINGH:  An hour.

THE COURT:  Yeah.

MR. SINGH:  Okay.

THE COURT:  That's exactly right.  So I was thinking I am going -- yeah.  I am going to wait five minutes.  I am just going to turn my camera off, turn to some other matters --

MR. SINGH:  I appreciate that, Your Honor.

THE COURT:  - and then start.  But I was just thinking in terms of it's going to take a while to kind of just get through the security and all that stuff, and I want to give everyone a full hour to kind of go and do the deal and get to wherever they need to be.

So I think 1:30 would make the most sense from a logistics standpoint.  Okay.  But I will turn my camera off. Folks on the line, I am going to stay here.  I am just going to wait and see what happens.  I am just going to mute the line, but I'm -- actually, I will keep my camera on.  I will just mute the line.

Folks, I -- we are taking our break.  We're going to come back at 1:30 for those that are on the line.  We'll come back on at 1:30.  There were no updates other than we

need to take the break.  I apologize.  I had the phone line on mute.  I just wanted to let everybody know.  Thank you.

(Recess)

MR. BARR:  Your Honor, the Committee has asked for a ten-minute recess.  However, there is a procedural issue that we would like to bring in front of you with the Committee and the folks that are from the Committee can handle that better in the courtroom.  And that may take the ten minutes.  So, we will then roll right into it.

THE COURT:  Okay.

MR. BARR:  And the reason for the -- is we understand some of the Committee professionals are on the phone with their clients finalizing some conversations.

THE COURT:  Okay.

MR. BARR:  Thank you for the time.  It was hopefully helpful and we do believe that we should get there.  The issue that we have, and I'm sure Your Honor remembers, one of our witnesses, Mr. Cowan --

THE COURT:  Oh, yes.

MR. BARR:  -- is in Paris.  He said I can tell you this so I'm going to say it.  On his anniversary date, walking into a show and dinner.  He had -- we messed up, obviously, asking for the adjournments but they've all been helpful but missed a window.  We've asked the Committee -- because if we're not going to get to a deal, it is highly

likely we're going to be here tomorrow as well -- if we could hear that witness tomorrow morning.  And I believe they object, believing that it's unfair that the Debtors get to put their witness on potentially last, as opposed to putting on our burden and then having the ability to object.

My response to that, Your Honor, is we're not in front of a jury.  We are in front of Your Honor.  Your Honor could take the evidence in how you see fit, whether it's in order or out of order.  So, if we are going to go forward --

THE COURT:  What would he testify to?

MR. BARR:  He's testifying to the propriety of the DIP, the process of getting the DIP, the fees, the rollup, the economics of the DIP.

THE COURT:  Okay.

MR. BARR:  So, that's our request, Your Honor, and I'm sure the Committee would like to speak on it as well.

THE COURT:  No, I'm just going to shut this down and we'll start back up in the morning.  I'm going to do all this at one time.  If it's going to live or die on the merits, everybody's asked me for adjournments.  Everybody's been okay with them.  No one's objected to any of the adjournments.  I'll just shut this down and we'll start tomorrow morning but we won't leave, and we may go undecided.  It's just going to be one of those hearings, if that's what we end up doing.

So, I don't know if he's going to go first or last but he'll be doing it on Friday if that's what we end up doing.  But it'll be all done at one time.  I know that there's concerns with travel and stuff like that. Everybody's asked me for the time.  We're going to do this once, we're going to do it the right way.  You're going to get to put on your case in chief.  They'll be able to cross however they want, and we'll just go.

MR. BARR:  Okay.  I appreciate that, Your Honor. Obviously, we will move forward that way.

THE COURT:  Okay, what's going on?

MR. BARR:  We'll use the rest of the time --

THE COURT:  Hold on a second.

MAN 1:  The follow-up audio is not working.

THE COURT:  The audio is not working?  The line is open.  Hold on a second, let me just --

MAN 1:  (indiscernible)

THE COURT:  Well, it's not -- oh, hold on a second.  Rosario, can you hear me now?  Okay.  Okay, well, let me just tell folks -- you've missed nothing exciting. The question is, there is a witness who is essentially part of the Debtor's case in chief and he will be unable to testify today.  So, the question is can they go -- can the witness go last?  There's an objection by the Committee as to that procedure.  I've indicated that if that witness is

Case 25-90399   Document 3345-15   Filed in TXSB on 07/24/26   Page 78 of 109   Page 77

unable to testify today that we would then start tomorrow morning.

I will let folks know I've got a first day I think around two p.m., so we would have to take a break if that's what we did.  And then we'd keep working and we may go into Saturday if we have to, to kind of get it done.  But I think we need to just do it one time.  Maybe there's documents we can get in and things of that nature, housekeeping that we could figure it out.  If we're not there, we're just going. I'm prepared to go and we'll just see what we do.

MR. BARR:  Understood, Your Honor.

THE COURT:  Okay.

MR. BARR:  So, I guess then we would request the remainder of that ten-minute recess that the UCC asked for?

THE COURT:  No, no, I think where we are now is -- you know, we can stay here and you can continue to talk or we can continue to talk.  But at some point, if things don't go fine, we'll start in the morning at 9 a.m.  And just let me know from a timing standpoint what we do.  We'll just -- but I would like to use the time productively.  I'll give you all as much time as you want.

What I think makes the most sense -- someone tell me if it doesn't -- I'll just step off and then you all can -- if someone needs me, you can -- we can, whenever it makes the most sense, just call me back up and then we'll take --

I would say if there are other witnesses, that it doesn't matter the order in which they go, you all should think about that and maybe just try to use the time productively. Because we're here this afternoon, but I got it.

MR. BARR:  We'll try, Your Honor.

THE COURT:  Yeah, just to see where it goes.  I'll give you all as much time.  So, for the folks on the phone, I don't want to keep you hanging but I do want to do some periodic check-ins.  What makes the most sense?

MR. GEORGE:  Your Honor, for the record, Jason George, Weil Gotshal & Manges, on behalf of the Debtors.  We filed an emergency motion on Monday.  It was at Docket Number 502 for an order authorizing the Debtors to enter into an Assurity Credit facility with RLI.

THE COURT:  I did see that, yeah.

MR. GEORGE:  Yeah.  I understand that the Court has not yet docketed that motion.

THE COURT:  No, and I'll tell you why.  Because we were all coming today and I wanted to figure out if there were any objections to it.  It was -- I knew everybody who I needed to talk to would be here.  So, I just -- it was easier for me to just ask is there -- can you remind me of the docket number?

MR. GEORGE:  It's 502.

THE COURT:  Is there any objection to 502?  Okay,

I'll get it on the docket.

MR. GEORGE:  All right, thank you, Your Honor.

THE COURT:  Let me ask the Committee -- let me ask the Committee how much time do you think -- I do want to do periodic check-ins just because there's apparently 306 people on the phone and I don't want them just -- what makes the most sense?  How much time do you think you need?  I'm going to find this docket.  Remind me of the docket number again.  5 --

MR. GEORGE:  502, Your Honor.

THE COURT:  Five-zero-two.  I'm going to -- I'll get that signed right now.

MR. WINOGRAD:  Your Honor, Mike Winograd from Brown Rudnick for the Committee.  When you asked how much time we need, I'm not sure what you're referring to.

THE COURT:  Oh, I heard you needed ten minutes, or a request for ten minutes.

MR. WINOGRAD:  That was the first we heard as well, but I assume what counsel meant is that our client's talking to some of our other colleagues.  But I believe that -- I don't think we need more time for that adjournment, is that right?

MR. CARTY:  To talk to clients?

MR. WINOGRAD:  Yeah.

MR. CARTY:  No.  Good afternoon, Your Honor.

**JOINT EXHIBIT NO. 61**
**Page 510 of 540**

Andrew Carty from Brown Rudnick on behalf of the official creditors Committee.  I think at this point, maybe an hour to try to get folks on the phone and talk through what we hope will be sort of final issues.  I think that would be the request.

THE COURT:  Okay.  I'm going to give you all -- yeah, it's 1:42.  We'll come back at 2:42.  I really am encouraging the parties -- I don't know what the outstanding issues are so I can just say it.  And I think it's in everyone's best interest to just -- it's an expensive room -- just to get a deal done or let's figure out what we do and tee the issues up and go.  So, I -- but I do think it makes a lot of sense for parties to continue to talk if it's productive and parties want to continue to kind of see if they can get this done, then great.  You've got an hour. I'm going to sit here and sign 502 so I don't forget it.  I have to ask counsel one more time what the docket number is and I'll give everyone an hour.  We'll come back at 2:42. Thank you.

MR. BARR:  Thanks, Your Honor.

THE COURT:  Hold on.  Did you hang up the line?

entity.  And I do believe, Your Honor, that when we get to the end of this hearing, you will agree with us that the Debtors have carried their burden of proof.  And the fees and the associated provisions and economics are

warranted under the circumstances.

Your Honor, we've agreed to a bunch of bespoke provisions, some of which Mr. Singh took you through in the DIP order and the revised DIP order.  And despite what I would characterize as off-the-shelf accusations, that we were the only DIP lender and therefore, we had the proverbial gun to the Debtor's head and got whatever we wanted.  I think the changes to the order (indiscernible) between interim and final, we'd rebut that argument.  To put it bluntly, Your Honor, you can't have it both ways.  They expect our clients, everyone in this room, including the Debtors, to effectively lend into a black box which doesn't seem to have a bottom, but complain in the same breath that we haven't lent enough or we haven't funded enough professionals, while at the same time, stripping both the mechanical and the economic protections that we negotiated with the Debtor to underwrite this DIP at the outset.

Your Honor, I said I was going to do the Reader's Digest version, so I'll stick with it.  I think, to the extent we don't get to a deal with the Creditor's Committee, obviously, we'll reserve for closing or more details there.

THE COURT:  Thank you.

MR. GREENBERG:  Thank you, Your Honor.

MR. SINGH:  Your Honor, if I can come back up.  Your Honor, again, Sunny Singh on behalf of the Debtors.

I'm pleased to announce we have a deal.  I just really wanted Mr. Greenberg -- I really wanted Mr. Greenberg to get through that.  He's been dying all morning to just make his statements.  Your Honor, if it's okay with you -- and this deal is with the UCC, the Debtors and the DIP lenders that will resolve the UCC's objection.  If it's okay with you, the parties have agreed that I can read into the record the terms of the deal, in principle.  I'm not going to read the actual language of where we are, obviously answer any questions Your Honor may have with respect to this, and then, what we would do, at least with respect to the UCC, is work on the order language, which will probably take us the rest of the day and either submit it to Your Honor or overnight or we'll be back -- if we've got an agreed order, we'll be back before Your Honor tomorrow if you can hear us. There's still other parties that are, I think, getting closer, but at least we'll be done with the UCC, and we can take stock of where we are with everybody else and maybe finish that overnight, as well.

THE COURT:  Okay.

MR. SINGH:  So, if that's okay, Judge.  So, Your Honor --

THE COURT:  Let me just confirm that Mr. Singh -- y'all are okay with reading these terms on the record?

MR. CARTY:  Subject to hearing them.  Your Honor,

for the record, Andrew Carty, Brown Rudnick, on behalf of the Committee.  We're fine with Mr. Singh reading into the record his view of the deal, but to the extent we have comments, we'll make those comments and then we'll work --

THE COURT:  All right.  Why don't we get you a chair and you can hang close and just make sure we keep him honest.

MR. CARTY:  -- we'll work to document it.

MR. SINGH:  Your Honor, I'll live by that rule.  As my wife always says, "Just because I say it, doesn't make it right."  So, okay, yeah.  All right.  I'm going to start.

THE COURT:  Okay.

MR. SINGH:  Okay.  So, Your Honor, the settlement is all of the terms that I outlined for your Honor this morning and that are already in the proposed order, the administrative claims basket, the cram up, that stays.  So, this is just on top of that, the remaining terms --

THE COURT:  The extension of the milestones, as well.

MR. SINGH:  The extension of the milestones, the Committee budget.

THE COURT:  Got it.

MR. SINGH:  The extension of the challenge period.  Everything that was in the -- and by the way, we've agreed to make, on some of the smaller points, a couple more

additional modifications in favor of the Committee.  I'm not going to necessarily read through those today, but we've got a couple of additional things.  So, the settlement is that the roll up will be -- the Committee will drop its objection and should Your Honor approve it, the roll up would be approved on a 3 to 1 basis, as proposed, with all of the fees, subject to the following: that with respect to proceeds of avoidance actions or commercial tort claims that are not otherwise encumbered already, and I'm just going to come back to that.

THE COURT:  Okay.

MR. SINGH:  So, litigation proceed recovery, right.  In that category, the roll up would be approved on a 1 to 1 basis, right.  And so, and I'll explain this in a second.  Let me just get it all out, Your Honor.  And the way that would work is, it would be -- when you're thinking about just the avoidance proceeds, it's the new money DIP obligations, including interest.  Plus, only the principal amount of the roll up.  So, on a 1 to 1 basis.  So, $1.1 billion.  So, the way to think about it is, at that level, right, the -- excuse me, the DIP lenders will agree that they will marshal away from avoidance proceeds for those amounts and look just to their other assets, right, including the unencumbered assets.  So, the way I, sort of, think about it, Your Honor, is, basically that, assume that

interest is $300-400 million.  So, the first $2.5 billion, if you add up the principal amount, the $2.1 plus the new money DIP with interest, $1.4 -- sorry, I said the principal amount $2.1.  The principal amount $1.1 of the roll up obligations, plus you've got the new money DIP with interest, that's about $1.4, we're just estimating.  So, you've got $2.5 billion of what we call, what I'm talking about here.

So, what they're going to do, the DIP lenders, is, with respect to that $2.5 billion, they'll first look to enterprise value, right, so, non-litigation proceed recovery.  If they get cashed out from that, then the balance of the roll up does not attach to the avoidance proceeds.  But what happens with respect to that is, the DIP lenders retain their adequate protection liens, right.  So, we treat that as if it was pre-petition.  They have to prove, and they have the right to prove diminution in value, Creditor's Committee and others can object.  And if there's no diminution in value or if there is, whatever is left over, to the extent they have a deficiency claim, there's no waiver with respect to the deficiency claim, right, so they have an unsecured claim with respect to that.  And so, that's how we would, sort of, try to resolve this issue, Your Honor.  That's the proposed settlement.  The one other point, just going back to when I said, it includes not only

**JOINT EXHIBIT NO. 61**
**Page 516 of 540**

avoidance proceeds, but commercial tort claims to the extent they are not already encumbered.  That issue we're reserving rights on, right.  So, the DIP lenders can say, "Look, I already had pre-petition liens on this particular commercial tort claim", and the UCC or the Debtors could say, "Well, no you didn't", and we can, sort of, fight about that issue. It is what it is.  But they're not -- the DIP lenders are not waiving those rights, if you follow what I'm saying.

THE COURT:  Mm hmm.

MR. SINGH:  So, Your Honor, and then the rest of the order is basically they get the 3 to 1 roll up with respect to all other assets that we're talking about here. So, I know that's insanely complicated, but it's really -- if you think about the avoidance proceeds, what we focused on is, what is the hurdle that you have to clear with respect to --

THE COURT:  Where you can look to.

MR. SINGH:  -- other assets and you know, assuming my interest rates that I went through, it's basically $2.5 billion, right.  And then if you clear that with other assets, then the DIP liens, which includes the 1 to 1 roll up on a principal basis, don't get to collect from the avoidance proceeds or the litigation recovery proceeds.

THE COURT:  Yeah.  I get it.

MR. SINGH:  Okay.  A couple of other points to

this, Your Honor.  The idea here is, you know, timing should not affect the settlement.  So, you know, if avoidance proceeds come in first versus sales proceeds coming in second or vice versa, the idea is, we can do things that make sense and sort of, deal with timing and allocation at the end, right.  The idea is not supposed to -- the timing is not supposed to prejudice either side, right.  So, when proceeds come in, sort of, it doesn't matter under this settlement, this deal applies.

THE COURT:  It's the allocation.

MR. SINGH:  The allocation, exactly.  And then Your Honor, with respect to the examiner motion, I mentioned earlier that we were going to get together and -- we are still going to do that, right.  The idea is, look, we really want to have an efficient case.  You know, I think from the DIP lenders' perspective, they're buying not just peace on the settlement, they're trying to buy global peace on that issue and whatever else makes sense for us to, kind of, move forward in a more efficient way in these cases.  Obviously, we're not binding anybody to anything, but what we've agreed and thanks to Ray Stone, who has been helpful on this.  You know, they filed their motion, it's supposed to be heard, right now, on the 17th.  What we've agreed is to request that Your Honor, and of course, we want to consult with the U.S. Trustee's office if they're okay with all of this, I

didn't get a chance to talk to Mr. Ruff, is to just push that motion onto the December 8th hearing that Your Honor provided this morning for (indiscernible) and some of the other stuff we're adjourning.

In the meantime, we would also push discovery off for a week, come up with a schedule, but really use this week to see if we can agree on a scope and potentially a budget, in line with Your Honor's comments this morning and what we think makes sense.  So, hopefully this will lead to a path to a resolution of the examiner motion as well.  If it doesn't, we'll have to deal with it on the 8th, so we're not binding anybody to this.  But the idea is, let's see if we can wrap this up together, and so, that's how we would treat the examiner motion.

THE COURT:  What about the schedule, with respect to the examiner motion?  I know that there was a schedule. I think that extending the time to file a response in a Sunday reply.

MR. SINGH:  Yes.  We're going to -- I should have mentioned, we've agree to extend those.  We don't have the dates.

THE COURT:  No.

MR. SINGH:  But everybody's agreed that we're going to push all that out, including the discovery.

THE COURT:  Can I --

**JOINT EXHIBIT NO. 61**
**Page 519 of 540**

MR. SINGH:  So, we don't --

THE COURT:  Y'all can -- I will sign the order.  I was just telling everybody, I will sign a stipulation that pushes it out.  I'm not guaranteeing I'll read it if you file it on Sunday night.  But I promise you, I will sign the order if you want to file a reply on that time.  So, just use your time wisely.

MR. SINGH:  I appreciate your comments, Your Honor.  We'll come back to you and give you a better -- a more refined schedule consistent with this.

THE COURT:  Okay.

MR. SINGH:  So, Your Honor, I'm going to let --

THE COURT:  Yeah, obviously, I want you to consult with Mr. Ruff on that.  Mr. Ruff, I will --

MR. RUFF:  Yeah.

THE COURT:  -- my gut is, if everybody's rights are preserved with respect to the motion and parties want to engage in dialog, I'm open to it.  But obviously, I want folks to be able to talk to you.  I want you to be able to talk to your folks and I want to give you as much time as you need.  And we have time because that hearing isn't up till, what is it, the 17th?

MR. RUFF:  It's currently scheduled for the 17th.

THE COURT:  So, I think parties have time to talk, and if this agreement --

MR. RUFF:  We have time to talk, and I need to talk with my client.

THE COURT:  Yeah.  That's what I'm saying.

MR. RUFF:  I have no authority to do anything that --

THE COURT:  I don't want you to do anything today other than just be able to talk.

MR. RUFF:  This is the first I'm hearing of it, just as you are, Your Honor.  So --

THE COURT:  Yeah.  You got it.  Thank you, Mr. Ruff.  So, I think, let's not say anymore about that.

MR. SINGH:  Yeah, and Your Honor, I'll personally apologize to Mr. Ruff.  This is moving and he's been patiently waiting here all day, and I didn't get a chance to update him right before I jumped --

THE COURT:  He's watching folks walk in and out of here.  I think (indiscernible)

MR. SINGH:  Yeah.  So, Your Honor, that's the -- again, those are the key terms of the settlement that I've just outlined.  So, what we'd like to do is work on the order.  It'll probably take us a better part of today, probably into overnight.  And then we can figure out where we are with the other parties.  We are advancing the ball there, as well, and so, I'll let Mr. Carty or anybody stand up if they've got any clarifications or Mr. Greenberg.  But

that was all I wanted to say on the settlement.  Thank you.

MR. CARTY:  Good afternoon, Your Honor.  Andrew Carty from Brown Rudnick on behalf of the Official Creditors Committee.  First off, thank you, Your Honor for your accommodations today.  Very productive, very fruitful.  I think Mr. Singh's summation generally captures the deal.  We obviously need to document it and we're going to be working very hard to do that over the next couple of hours.  There are some other items.  Mr. Singh, I think alluded to some of them that kind of get into the weeds.  I don't think we need to get into that and I don't envision that it should be an issue finalizing language on that.  There is going to be some language around that cram up option that's in the order that we're going to have to clarify some things, especially how it's going to function.  And then there was also a discussion, to the extent that exclusivity is opened up, the Committee would also have that right.  I think right now it's limited to the Debtors, but the Committee would have that, to the extent exclusivity is opened.

With that, Your Honor, the only other thing, and this is, sort of, a funky one, but we -- and again, this is something that I discussed with Mr. Singh and I believe he discussed it with Mr. Greenberg, which is that, to the extent that the Debtors or the Committee, to the extent exclusivity is opened up, propose a cram up plan, there

**JOINT EXHIBIT NO. 61**
**Page 522 of 540**

can't be a provision in the RSA, for example, or some other

agreement with the lenders that would trigger a default of

the DIP.  That would essentially undo the spirit of that

deal.  And so, we'll have to work through that.  It's odd

because I think it's sort of a timing issue.  We have this

RSA milestone as an example, that's five months from now,

and so what we do here in the DIP, essentially it can't be

undone by requirements of an RSA acceptable plan that

prohibit what we've agreed to in the DIP and that would

result in a default under the DIP to the extent the Debtors

move forward with it.  That's the idea.  And again, I think

we can work through language on that.

THE COURT:  I understand the concept.

MR. CARTY:  But with that, Your Honor, thank you

very much.

THE COURT:  Thank you very much.  So, Mr.

Greenberg, yes?

MR. GREENBERG:  Thank you, Your Honor.  Scott

Greenberg, Gibson Dunn & Crutcher.  Just since this is, kind

of a tri-parte discussion that's been going on, I'm glad to

see my opening served a purpose (indiscernible) enough time.

I've burned enough time for the Committee to finally tell us

we're good to go.  But in all seriousness, obviously, we're

happy to try to get this resolved and behind us.  I know, as

Mr. Singh said, there's probably some ancillary parties we

still need to deal with.  As it relates to the, kind of, key economics that Mr. Singh outlined, it's our understanding, as well, we can obviously, as you know from all the adjournments working hard to try to get this done.  I think at this point, I wouldn't belabor the record.  I think we've just got to get it in the order and agree on it and put something in front of Your Honor.  But the key economic terms, I just wanted to confirm, were good as the DIP lenders, Your Honor.

THE COURT:  Thank you.  From a -- so, I had some things scheduled for 10 a.m. and I've moved them.  So, we've got the entire morning.  I've got a First Day at 1.  Does 9 a.m. make sense for tomorrow morning?

MR. SINGH:  Yes, Your Honor.

THE COURT:  So, what I would ask is, if it's possible, what I'd really like to do is, I don't know, sometime like 7:00 TO 8:00 a.m., just come in and just -- somebody can have something, even if it's the latest and greatest that everyone can read, something on the docket that someone can take an hour in the morning.  Like, sometime between -- in the morning, so myself, Mr. Ruff and (indiscernible) just can read whatever the latest version of the proposed order is, if you've got something there, so I can at least get my head wrapped around, kind of, what version it is.  If it gets filed late tonight, but at least,

that's fine.  What I would like to do is, kind of, walk in around 7:30 in the morning and just read for an hour-hour-and-a-half before I, kind of, just got in.  But also, at the same time, give everyone else an opportunity to, kind of, read to see to what extent.  And I got it, things can move by the time that paper gets here, but at least I know and the general public has something here.

Other than that, I'm going to end up taking an hour reading it on the spot and I don't want to do that or give people just as much notice as we can in terms of what the order would look like so that the parties -- and I know you're going to be talking with other parties.  Just, I got it, subject and you can put all the reservation rights language and all that good stuff in there on a one-pager.  But I would just -- I really just -- it would help me quite a bit to just take an hour and just read, kind of, where things are.  I understand it conceptually.  It all makes sense to me.  It would just -- I think the latest and greatest, just so we can give people notice.  There's plenty of people --

MR. SINGH:  Yeah.

THE COURT:  -- who have interest in this case, and I think it'd just be helpful to just give the public notice, as well.

MR. SINGH:  No problem, Your Honor.  We're

**JOINT EXHIBIT NO. 61**
**Page 525 of 540**

obviously happy to do that and we'll be sharing versions, not just with the UCC --

THE COURT:  Correct.

MR. SINGH:  -- and the DIP lenders, but we're talking the ABLs and other people (indiscernible), etc.

THE COURT:  Okay, so --

MR. SINGH:  So, we're happy to circulate it to as many people as we can.  So, that makes sense, Your Honor.  I think, to move forward, there's a couple of option.  I mean, I think -- I don't want to ask for another brief recess to take stock of where we are.  We could move --

THE COURT:  They're so much fun.

MR. SINGH:  We could -- I think we'd want to move our evidence in for the record since we are moving forward with that but I'm not hesitant to do that.  I just want to know if people are going to cross, etc. if we still have any open issues.  So, I'm trying to figure out if we're resolved or people are okay to defer or how others want to proceed. And I haven't had a chance to speak to people because now they're just learning of this news, so --

THE COURT:  Yeah.  No, let's just -- let's just break so that everybody's rights are going to be reserved. Let's just -- and then figure out what evidence you've got to move in tomorrow.  Just have the witness available, I guess, just in case.

MR. SINGH:  Okay.  That makes sense, Your Honor.

THE COURT:  And let's just -- let parties keep working and get it all buttoned up and let's just --

MR. SINGH:  That makes sense, Your Honor.

THE COURT:  -- let's just have a good morning.

MR. SINGH:  Okay.

THE COURT:  All right, folks.  Mr. Carlton?

MR. BLANK:  I'm sorry.  Mr. Blank.  We settled with -- we reached a short-term settlement with UMB.

THE COURT:  Oh, yeah.  Can you read that on the record, then?  That's great.

MR. BLANK:  I can read that into the record and (indiscernible) come back tomorrow.  So, Your Honor, it's a one-week --

THE COURT:  So, this is with UMB?

MR. BLANK:  This is with UMB.

THE COURT:  Thank you.

MR. BLANK:  It's a one-week settlement.  So, it's -- there's this dispute over ownership of the inventory and whether it's owned by the Debtors' entities or a non-Debtor entity called (indiscernible).  And that's obviously not going to be decided today and rights are reserved.  To keep the status quo over the next seven days, it's -- to the extent that UMB holds an interest in the inventory as of the petition date, a lien will attach to any interest of the

Debtors and the inventory to the extent that the inventory is replenished.  So, they'll have a replacement lien. Again, to the extent that they had it as of the petition date over the next seven days.  So, it'll be -- it'll cycle in.

THE COURT:  Got it.

MR. BLANK:  So, that's to keep them at those sites.  And then the second piece of the settlement for the next seven days is that the Debtors will undertake to have (indiscernible), the non-Debtor operating in the ordinary course over the next seven days, consistent with how it's been operating over the past few weeks.  It is a distressed company, but the way in which it buys and sells inventory at those facilities.  Did I get that right?

THE COURT:  So, and then -- so, I'll ask you before I -- what happens on November 13th?

MR. BLANK:  So, we were in discussion.  We're going to set up a call and try to resolve this, is the short answer.

THE COURT:  Okay.  The reason I'm saying is, I won't be in town on those days.  And so --

MR. BLANK:  Your Honor, Stephen --

THE COURT:  And I'm on a flight on the 12th.  What I'm saying is, I can -- if we do something, we may have to go -- if -- I'm not encouraging this --

MR. BLANK:  If UMB is fine with more time, I don't know.  If --

THE COURT:  Yeah.  No, no, let -- what I'm saying is, I'm going to give you two options.  Either just on the 13th, if we had to do something, it's going to have to be, like, old school, like on the phone, you know.

MR. BLANK:  Yeah.

THE COURT:  Dial in, no video kind of stuff. It'll just be an old school dial in hearing, and you can figure out if you want that.  If you want to stip it out just till Monday or something, I'd be fine with that, as well.  But, obviously, I'm just -- yeah, that's going to be --

MR. BLANK:  I think we should be fine to have it extended to Monday.  But for now, let's --

THE COURT:  No, no, no, no.  Keep it there.  I'm just giving you that so just --

MR. BLANK:  Your Honor?

THE COURT:  I'm just giving everyone timing.  But we may to have to go old school.

MR. BLANK:  Your Honor, I'm more than okay -- Steve Blank for the record, from Alston for UMB.  More than okay going old school.  The only thing I would point out is, if we don't get to a resolution, then we're going to be back in front of you asking for more adequate protection, which

also means it's going to be an evidentiary hearing.  So, clearly, reserving rights, whether it's Mr. Moore and to be able to cross-examine him, to bring my witness back.  I'm recognizing there's going to be limitations with doing that old school, on the phone.  So, to the --

THE COURT:  Yeah, that's why I'm saying, if it's just -- that's why I'm telling you.  But everybody's rights will be preserved on that.  Just wanted to give you a sense of my schedule here on the record as you think about this.  But that makes perfect sense, a one-week extension, got no issues.

MR. BLANK:  And then a few other clarifications, Your Honor.  And just to be clear, my understanding of the way the DIP order is working is that --

THE COURT:  (indiscernible)

MR. BLANK:  Well, no because just to make clear that any of the goodies that were in the DIP order, clarifying that the liens are not attaching to SPEs, that the SPE collateral is carved out.  All of that stuff is going to apply to us, as well.  There is no admin claims.  When it comes to 549, Chapter V, none of those types of causes of -- the DIP is not getting anything like that at our boxes right now, and we clearly reserve rights with all Chapter Vs and 549s.  And then, yeah, continuing to reserve rights and I appreciate the Debtors working with us to get

an extension.  And either we'll be back in front of you on the 13th or that Monday.

THE COURT:  All right.  Thank you.

MR. BLANK:  And Your Honor, to the extent that it ends up having to be for Monday, I assume the protections will just roll to Monday?

THE COURT:  Yeah, that's my understanding.  That's what I mean.  You just give that some thought.  What do I have on Monday?  Ooh, that Monday is -- yeah, you're already coming on Monday, that Monday, the 17th.  So, just give it some thought.

MR. BLANK:  That may move in light of the settlement, but yeah.

THE COURT:  Yeah.  So, just give that some thought.  We'll all be here.

MR. BLANK:  Appreciate it, Your Honor.

THE COURT:  Okay.  Thank you.

MR. SINGH:  And one other brief update.

THE COURT:  Yes, sir.

MR. SINGH:  We've also reached a deal in principle with the ABL lenders.  I told Mr. McGuire, counsel for the ABL lenders that just you wanted -- we're still working out stuff in the order, but we've got a deal in principle, and we can talk about what that settlement is at tomorrow's hearing.  But I just wanted to --

**JOINT EXHIBIT NO. 61**
**Page 531 of 540**

THE COURT:  Okay.  Thank you.  Mr. Kelley?

MR. KELLEY:  Good afternoon, Judge.  Charles Kelley for Mayer Brown on behalf of one of the more recently christened ancillary parties by Mr. Greenberg, on behalf of Katsumi Financing.  There are a number of -- excuse me, Katsumi Servicing, forgive me.  There are a number of receivables parties who may have similar or additional views on this, and they'll probably speak to this.  I have some things that I will want to address before the end of the hearing.  We have floated some ideas with the Debtors and I'm not going to announce what those ideas are, giving the Debtors a chance to process those.  But if we reach agreement, we'll be explaining those tomorrow.  If we do not, then we'll be arguing those tomorrow.  So, I appreciate the record won't be built until tomorrow because --

THE COURT:  That's correct.

MR. KELLEY:  -- we'll determine whether we're cross-examining witnesses or challenging the admission of exhibits.  But for now, I was heartened by the Court's comments recognizing the fundamental issue that we have been focused on, which is, we attempted pre-petition to purchase, and we do believe those transactions are defensible and structured as truth sales of receivables.  On First Day, we started with a declaration that informed us that there might have been some double charging or double billing of those

JOINT EXHIBIT NO. 61
Page 532 of 540

receivables to third parties where maybe proceeds weren't made there.  The protections we put in the interim order were constructed specifically to protect our rights.  Either we own outright separate property and therefore, it's not property of the estate, or we've got proceeds that are proceeds that we have to go track down, that is our proceeds.

We now were told, as of three or four days ago, there's a little bit of ground shifting going on of size and proportion we're going to get into.  And now there's maybe bigger issues than just double selling receivables is what we've heard.  We have been talking about process and procedure with Debtors, and we hope to have more flesh on the bones on that.  But the big thing from our perspective is, those are individual harms to these parties, not estate causes of action, they're individual harms.  So, we have been trying to be very judicious in the way we put our objections together and a lot of the remedies we seek which are all tied to those coins.  We don't really think the challenge period applies to us because these are individual causes of action or state causes of action.  We've been trying to draw clearly where we think that line is.  There may be some things that we have to look at as to how we deal with the two procedures we're talking about with the Debtors.  But those causes of action are ours.

**JOINT EXHIBIT NO. 61**
**Page 533 of 540**

The causes of action related to whether they're actual receivables, meaning there's money in the hands of the Debtors that we have to get, whether there's been defrauding and our proceeds were just stolen property from us, the money went somewhere else.  We have rights (indiscernible) recover those against third parties.  Obviously, the stay prevents us from going directly after the Debtor and we respect that.  We are concerned about those parameters and how we have to deal with (indiscernible).  We're the biggest, perhaps parties here who are trying to find information.  We've provided a lot of information to the Debtors.  The Debtors have assured us that they're going to reciprocate and provide us information.  We don't have it as we stand here today.  For that reason, there's a lot of protections we've been asking because on Day 1, we were looking at one sort of problem.  Now, here we are on Second Day, looking at a variety of different issues and we've put some language out there that we think protects us.  I heard the settlement with the Committee talked about commercial tort claims going to the Committee.  That's fine, but those are estate causes of action, not our causes of action.  And those are issues that we will be looking at the language on.  But we were heartened that the Court recognized those issues and we've been very crisp on staying focused on those because we still

**JOINT EXHIBIT NO. 61**
**Page 534 of 540**

don't know the full scope of what we're talking about.

We will be constructive.  We hope everything will be able to be addressed in language in the order.  We've had some very robust conversations with the Debtors.  But for now, we did not want to be a creditor of this estate.  We were thinking we were doing a transaction and buying separate property and would not be.  We have been told, obviously, by these actions, we may be involuntary creditors of the estate, to an order and magnitude we're going to learn about.

But for that reason, I wanted to say a few words while you -- before you got a chance to see the form of order, so you know what issues we're going to be attuned to. We are going to try to work within the parameters of what is in the state cause of action versus what may be our individual causes of action.  We are open to working very cooperatively with the estate on how we navigate those channels.  But we find ourselves with a landscape that has dramatically changed in the past 72 hours.  We're still learning and processing and are positioning ourselves, Judge.  Thank you for the opportunity.  I'm going to want to speak more after we figure out what we can work out with the Debtors and if not, we'll be making arguments on what we think should belong in that order.

THE COURT:  Thank you very much.

**JOINT EXHIBIT NO. 61**
**Page 535 of 540**

MR. KELLEY:  Thank you.

THE COURT:  Let me just see one thing.  I wanted to clarify on the record on the Mr. Carlton.  I know I said we'd be back on the 17th.  I know that, at the same time, you asked that potentially that hearing get moved.  What I intended to say, and I didn't want to prejudice, is that there's time already slotted out for First Brands on that day.  So, if we had to move to the 17th, that time slot works, in other words.  That's a better time slot.  I understand that there may be a hearing that day or not that day and I want to let y'all work that out.  But at least there was a slot available, and we could use that time slot as an available time slot.  That's what I meant.

MR. CARLTON:  Understood.

THE COURT:  Okay.  Thank you.

MR. BLANK:  Your Honor, since you brought us back up and just to clarify the second point that he said in terms of the ordinary course and what the non-Debtor entity would continue to do.  Conceptually, this is just to make sure that in the next week, all of our collateral is taken out of the box and nothing (indiscernible)

THE COURT:  I got it.  That makes sense to me.  Okay.  All right.  Thank you very much.  I very much appreciate everyone's time.  We'll see each other 9 a.m.  I'm going to sit here.  If -- how do I want to do this?  If

**JOINT EXHIBIT NO. 61**
**Page 536 of 540**

there are chairs, why don't you -- yeah, why don't we -- why don't we just put them back and just grab them in the morning because -- just because the people who are here will remember where they are and they may not be back tomorrow. So, if you took a chair, please put it back.  If not, it will be Nia, my law clerk, trying to figure out what you did.  But if not, I think everyone, we'll see each other tomorrow morning.  You're adjourned.  Thank you.

MR. BLANK:  Your Honor, may we leave boxes?

THE COURT:  Yes, absolutely.  Absolutely.  You can leave all your stuff.

MR. SINGH:  Thank you, Your Honor.

MR. BLANK:  Thank you.

(Proceedings adjourned at 3:35 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Sonya M. Ledanski Hyde

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  November 10, 2025

**JOINT EXHIBIT NO. 61**
**Page 538 of 540**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**ORDER GRANTING APPLICATION OF GLAS TRUST COMPANY LLC,**
**AS ADMINISTRATIVE AGENT, FOR ALLOWANCE AND**
<u>**PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**</u>
[Relates to ECF No. ___]

This matter comes before the Court on the Application of GLAS Trust Company LLC, as Administrative Agent, for Allowance and Payment of Administrative Expense Claim [ECF No. [•]] (the "<u>Application</u>")[2] filed by GLAS Trust Company LLC, as Administrative Agent (the "Administrative Agent") for the Carnaby II and III Secured Lenders; the Court having reviewed the Application; no objections having been filed, or any filed objections having been overruled; and the Court finding that (a) the Court has jurisdiction over the Application pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b), and (c) good cause exists for granting the relief requested in the Application; it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Application is GRANTED.

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

1

2.        The FBG Administrative Claim is an allowed administrative expense claim in favor of the Administrative Agent pursuant to sections 503(b)(1)(A) and section 507(a)(2) of the Bankruptcy Code against each of the FBG Debtors.

3.        The FBG Administrative Claim is allowed in the amount of $[●].

4.        The 507(b) Claim is an allowed administrative expense claim of the Administrative Agent pursuant to sections 503(b), 507(a), and 507(b).

5.        The 507(b) Claim is allowed in the amount of $[●].

6.        Nothing contained in this Order shall affect any other claims that the Administrative Agent holds or may hold against the Debtors in these chapter 11 cases.

7.        This Order shall be binding upon the Debtors, their bankruptcy estates, and any successors thereto, including any bankruptcy trustee appointed over such estates.

8.        This Court retains jurisdiction to interpret, implement, and enforce the provisions of this Order.

Dated: _____, 2026                _____

CHRISTOPHER M. LOPEZ

UNITED STATES BANKRUPTCY JUDGE