**Exhibit 2**

**Redline**

Bankruptcy Code.  Holders of Administrative Expense Claims that do not agree to participate in the Administrative Expense Claims Consent Program shall receive treatment under the Plan consistent with section 1129(a)(9) of the Bankruptcy Code.

34.     Notwithstanding anything in the Plan, in the event a Disputed Administrative Expense Claim ultimately becomes Allowed, the holder of such claim may, within 30 days of such Allowance, complete and submit an Administrative Expense Claims Consent Program Opt-In Form to share pro rata with any remaining unpaid Settled Administrative Expense Claims on a go-forward basis.

35.     For the avoidance of doubt, holders of Allowed Administrative Expense Claims and Allowed Priority Claims shall begin receiving distributions from the Litigation Trust in accordance with the terms of the Plan and the Litigation Trust Waterfall, prior to and regardless of the occurrence of the Effective Date.

## I.   Preference Settlement

36.     The terms of the Preference Settlement, including all other relevant and necessary documents related thereto, is hereby approved and shall be effective immediately and binding on all parties upon the entry of this Order.

37.     For the avoidance of doubt and notwithstanding anything to the contrary in the Preference Settlement Election Form attached as Exhibit 12 to the Disclosure Statement Order, any party that objects to the Plan, this Order, any related settlement, or any relief sought in furtherance thereof, will not be barred from participating in the Preference Settlement as a result of such party's objection.

38.     For the avoidance of doubt, notwithstanding anything to the contrary in Section 6.11(a)(i) of the Plan, a determination that a Trade Creditor, Supply Chain Financer, or

Factor meets the definition of Adverse Conduct and therefore is ineligible for the Preference

Settlement requires a Final Order.

### J.  Claim Allowance and Disallowance

39.    38. All Claims expressly Allowed or Disallowed pursuant to the Plan and/or this

Order shall be Allowed or Disallowed, respectively, and Kroll is authorized to update the claims

register maintained in the Chapter 11 Cases accordingly.

### K.  Distributions

40.    39. The FBG Debtors, the Trustees, and the Claims Ombudsman are authorized

and directed to make all distributions under the Plan pursuant to the terms of the Plan and the

Trust Agreements and to pay, as applicable, any fees and expenses approved by this Order or any

other order of this Court.

### L.  Executory Contracts and Unexpired Leases

41.    40. Entry of this Order shall constitute approval of the assumptions, assumptions

and assignments, or rejections, as applicable, provided for in the Plan pursuant to sections 365(a)

and 1123 of the Bankruptcy Code and a determination by this Court that the FBG Debtors or

applicable Estate representative, or the assignee of such executory contract or unexpired lease (as

applicable) have provided adequate assurance of future performance under such executory

contract or unexpired lease.  Each executory contract and unexpired lease assumed pursuant to

the Plan shall vest in and be fully enforceable in accordance with its terms, except as modified by

the provisions of the Plan, any Final Order of this Court authorizing and providing for its

assumption, or applicable law.

42.    41. Notwithstanding anything to the contrary in the Plan or this Order, any

unexpired lease subject to a stipulation and agreed order extending the time, pursuant to

Agreement, and shall not be applied to the DIP Obligations, the Wind Down Reserve, or any other obligation without the prior written consent of the ABL Agent.

**KK.     DIP Secured Party and Prepetition Secured Party Protections**

89.     ~~88.~~ Nothing in the Plan, this Order, or any Definitive Document, except as expressly set forth in the Plan, this Order, the DIP Order, the Litigation Trust Agreement, the DIP Collateral Trust Agreement, the DIP Forbearance Stipulation,[7] or the ABL Collateral Trust Agreement, as applicable, nothing shall modify, amend, waive, reject, or otherwise impair any of the rights, protections, or interests of the DIP Secured Parties or the Prepetition Secured Parties under the DIP Order or the Intercreditor Agreements (as defined in the DIP Order), except to the extent expressly agreed to in writing by the DIP Agent and Prepetition Agents (as defined in the DIP Order), as applicable; *provided* that, upon the Confirmation Date, the Debtors and any of their successors will be relieved of any and all covenants and reporting under the DIP Documents, and the Debtors' breach of any such covenants or reporting requirements will not trigger any default or Event of Default (as defined in the DIP Credit Agreement).

90.     ~~89.~~ Notwithstanding anything in the Plan to the contrary, no FBG Debtor shall dissolve, liquidate, wind up, file a certificate of dissolution or cancellation, or otherwise cease to exist as a legal entity until all of the following conditions have been satisfied or waived in writing by the Trustees: (i) all amended federal, state, and local tax returns that may give rise to tax refunds have been prepared, executed by an authorized officer or representative of the applicable FBG Debtor, and filed with the applicable taxing authorities; (ii) all applications, protests, or other filings necessary to obtain tariff refunds, duty refunds, or other governmental

---

[7]     "**DIP Forbearance Stipulation**" means the ~~[ ]~~*Stipulation and Agreed Order Regarding Forbearance From the Exercise of Remedies Arising From the Occurrence of the Maturity Date Under the DIP Credit Agreement* filed at Docket No. ~~[ ]~~3434.

national provider identifiers, (p) provider transaction access numbers, (q) licenses, (r) permits, (s) covenants, (t) inventory, (u) guarantees, (v) indemnifications, (w) data, (x) records, or (y) any other interests belonging to the United States (collectively, "**Federal Interests**") without compliance with all terms of the Federal Interests and with all applicable non-bankruptcy law or authorize the transfer or assignment of any governmental (i) lease, (ii) license, (iii) permit, (iv) registration, (v) authorization, or (vi) certification, without compliance with all applicable legal requirements under non-bankruptcy laws, regulations, and rules (including police or regulatory law or environmental law, or otherwise);

vii.  be interpreted to set cure amounts related to any Federal Interests or to require the United States to novate, approve or otherwise consent to the assumption, assignment, sale or other transfer of any Federal Interests;

viii.  constitute or be deemed an approval or consent by the United States;

ix.  waive, alter, or otherwise limit the United States' property rights;

x.  be construed as a compromise or settlement of any liability, Claim, Cause of Action or interest of the United States;

xi.  modify the scope of section 525 of the Bankruptcy Code;

xii.  cause Rejection Damage Claims to have to be filed before the governmental bar date or alter the priority and treatment of such Rejection Damage Claims under the Bankruptcy Code;

xiii.  preclude or alter the Internal Revenue Service's priority claims from receiving the Internal Revenue Code rate of interest, as set forth in 26 U.S.C. §§ 6621 and 6622 in accordance with section 511 of the Bankruptcy Code, for payments made under the Plan; or

xiv.  extend any Expedited Determination of Tax requests by the FBG Debtors and/or the Wind Down Administrator under Section 505(b) of the Bankruptcy Code in perpetuity.; *provided* that any Expedited Determination of Tax request by the FBG Debtors and/or the Wind Down Administrator under Section 505(b) of the Bankruptcy Code with respect to any given tax return must be filed no later than 270 days after the later of (i) the filing of such tax return (including any amended return) for the applicable tax period and (ii) the Effective Date;

xv.  preclude the normal course liquidation under non-bankruptcy law of any entry of merchandise made by the Debtors; or

xvi.  affect or impair any rights, claims, or causes of action that the U.S. Customs and Border Protection ("**CBP**") has or may have against any surety under any customs bond pursuant to applicable non-bankruptcy law, nor shall anything

in this Order, Plan or Disclosure Statement preclude or prohibit the ability of CBP to make demand on, be paid by, or otherwise pursue any surety that is jointly and severally liable for any debt owed to CBP.  For the avoidance of doubt, CBP reserves, and the entirety of this Order, the Plan, or the Disclosure Statement is without prejudice to, any and all rights or causes of action CBP has or may have against any surety under any bond, and nothing shall release, discharge, or exculpate any surety from its obligations or liabilities pursuant to non-bankruptcy law, including any obligation or liability of any surety of the Debtor(s) with respect to any bond.

Further, in the event of an inconsistency or conflict between any provision of the Definitive Documents and any provision of this Order, then, as to the United States, the provisions of this Order shall control.  For the avoidance of doubt, nothing in this Order shall expand or otherwise enlarge the police or regulatory powers, if any, of the United States with respect to the Debtors and/or their successors, and nothing in this Order or the Definitive Documents shall cause state law to preempt federal law, in the event of any conflict.  The United States shall not be deemed to have opted in to grant any of the releases set forth in Section 13.5(b) of the Plan.

2. *Berkley Surety*.  For purposes of this paragraph 2, the term "Surety" shall mean Berkley Insurance Company and/or Berkley Regional Insurance Company, and their successors, assigns, co-sureties, fronting companies, and/or reinsurers (collectively, "**Berkley**").  Berkley has executed that certain Surety Bond #0227210, made effective January 3, 2020 (the "**Existing Surety Bond**") on behalf of Trico Technologies Corporation (for purposes of this section, "**Trico**").

Nothing in the Plan Documents, and/or any document or agreement contemplated by or in connection therewith, shall: (i) limit or impair the rights of Berkley under the Existing Surety Bond, common law, statute, or otherwise, including without limitation the right to cancel or non-renew the Existing Surety Bond pursuant to its terms and applicable law; (ii) release, discharge, preclude, or enjoin any obligations of any non-Debtors (other than the post Effective Date Debtors, the successors and assigns of the Debtors, the Trusts, and the Trustees) to Berkley, whether related to, arising out of, or granted or created under any Existing Surety Bond, Agreement, contract, common law, and/or statute; and/or (iii) be deemed to provide Berkley's consent, whether express or implied, to the involuntary substitution of any principal under any Existing Surety Bond; provided, however, that nothing in the foregoing shall be deemed to expand any obligations of Trico and/or any non-Debtor under any Existing Surety Bond, contract common law, and/or statute.

For the avoidance of doubt: (i) without any further action by Berkley, including the execution or submission of a Ballot, Berkley shall be deemed to have not opted in to any Third Party Release set forth in Article XIII of the Plan; (ii) Berkley's right of subrogation, restitution or other common law rights against non-Debtors with respect to the Existing Surety Bond shall not be canceled, impaired or modified by the Plan Documents, and the Debtors' (and the Debtors' successors') defenses with respect thereto are expressly preserved; provided that nothing herein shall be construed to affect any General Unsecured Claims related to the Existing Surety Bond; (iii) with respect to any liability or claim that may be alleged or brought against

3

F&D's consent to the substitution of any principal under the F&D Surety Bond.  Nothing in this Order or the Plan shall be interpreted to alter, diminish or enlarge the rights or obligations of F&D in regard to state and federal agencies, third parties or otherwise under the F&D Surety Bond, the F&D Indemnity Agreement, or applicable law nor shall any of the foregoing be deemed to enjoin F&D from asserting any rights, claims or defenses, in regard to or against any state and federal agencies, third parties including, without limitation, any of F&D's non-Debtor indemnitors, insurers, or otherwise under the F&D Surety Bond, the F&D Indemnity Agreement, or applicable law.  Notwithstanding anything to the contrary herein, the Debtors, any successors in interest of the Debtors, the Litigation Trust, the Litigation Trustee, the DIP Collateral Trust, the DIP Collateral Trustee, or F&D, as applicable reserve all rights and defenses with respect to all rights, claims, interests, obligations, documents, and agreements related to the F&D Surety Bond and the F&D Indemnity Agreement.  F&D shall not be deemed to have opted in to granting of any release provided for under Section 13.5(b) of the Plan.

6.      *AutoZone.*  Nothing in this Order or the Plan will (i) be construed as an acceleration of the due date of any amounts owing from AutoZone, Inc. or AutoZone Parts, Inc. (collectively, "**AutoZone**") to any of the Debtors; (ii) alter or impair the rights or obligations of AutoZone under sections 542(b) or 553 of the Bankruptcy Code; or (iii) alter or impair the rights or obligations under any applicable contract or other applicable non-bankruptcy law regarding any Factored Receivables or Non-Factored Receivables (including for the avoidance of doubt accounts receivable relating to postpetition sales or related invoices) (each as defined in the *Motion of Debtors for Order (I) Establishing Third Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors' Estates and the Third Party Factors; (II) Authorizing Customers to Remit Receivables Without Liability; and (III) Granting Related Relief* (Docket No. 807)), including, without limitation, common law or other rights of recoupment or setoff, if any.  Notwithstanding anything to the contrary herein, the Debtors, any successors in interest of the Debtors, the Litigation Trust, or the Litigation Trustee, as applicable reserve all rights and defenses (provided that AutoZone's rights of recoupment or setoff, if any, are preserved) with respect to all rights, claims, interests, obligations, documents, and agreements related to any contract between the Debtors and AutoZone.

7.      *RLI.*  As to RLI Insurance Company ("**RLI**"), and notwithstanding any other contrary provision of this Order, the Plan, Definitive Documents, or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement), nothing shall

i.      alter, modify, limit, or impair the Court's November 6, 2025 *Order (I) Authorizing Debtors to (A) Enter into Surety Credit Facility with RLI Insurance Company and (B) Assume Prepetition Indemnity Agreement, and (II) Granting Related Relief* (Docket No. 584), ~~),~~ together with that related Collateral Security Agreement dated November 7, 2025 by and between First Brands Group, LLC and RLI;

ii.     alter, modify, limit, impair, release, enjoin, or discharge any rights, obligations, claims or defenses of RLI against any non-Debtor, including any surety bond claimant, with respect to surety bonds issued by RLI, whether

14.     *Horizon Purchase Agreement.*   In accordance with the Horizon Sale Order[2] and Section 6.17 of the Plan, to the extent the resolution, final judgment, or settlement of the James Complaint results in the avoidance of purported transfers of Business Registered IP covered by the Alester Agreements and to the recovery of such Business Registered IP by one or more of the FBG Debtors or the Litigation Trust, such FBG Debtors or the Litigation Trust, as applicable, shall execute the Second IPAA covering all additional Intellectual Property that such FBG Debtors or the Litigation Trust, as applicable, have the right or obligation to transfer in accordance with Section 7.02(g) of the Horizon Purchase Agreement. The provisions of this paragraph and any rights of Buyer related to the Business Registered IP Claims shall survive the Closing, the Wind-Up Date, and the closure of the Bankruptcy Cases, and shall be binding upon the Litigation Trust and its trustees in accordance with the Litigation Trust Agreement.

15.     *LBA.*  Notwithstanding anything to the contrary herein, nothing in the Plan or this Order shall modify the rights, if any, of LBA RV-Company XVII, LP ("**LBA**"), in its capacity as landlord under that certain Industrial Space Lease, dated September 9, 2010, as subsequently amended (the "**Patterson Lease**") to assert any valid right or defense of setoff or recoupment that LBA may have under applicable law, including, but not limited to, the (i) assertion of setoff or recoupment with respect to a security deposit held pursuant to the terms of the Patterson Lease, (ii) assertion of rights of setoff or recoupment, if any, in connection with claims reconciliation, or (iii) assertion of setoff or recoupment as a defense, if any, to any claim or action by the Debtors, or any successors in interest of the Debtors; *provided* that the Debtors, any successors in interest of the Debtors, the Trusts, or the Trustees, as applicable, reserve all rights and defenses with respect to all rights, claims, interests, obligations, documents, and agreements relating to LBA.

16.     *TCEQ.*  Nothing in this Order, the Plan, any amendments thereto, or related documents, discharges, releases, precludes, or enjoins: (i) any liability to the Texas Commission on Environmental Quality ("**TCEQ**") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("**Claim**"); (ii) any Claim of TCEQ arising on or after the Confirmation Date; (iii) any liability to a TCEQ under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the Confirmation Date; or (iv) any liability to TCEQ on the part of any Person other than the Debtors, their successors, or the Trusts. Nor shall anything in this Order enjoin or otherwise bar TCEQ from asserting or enforcing, outside this Court, any liability described in the preceding sentence.  All parties reserve all rights and defenses regarding any of the possible claims or liabilities described herein.

Further, nothing in this Order, the Plan, any amendments thereto, or related documents, authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration,

---

[2] Capitalized terms used in this paragraph but not defined herein or in the Plan shall have the meanings ascribed to them in (i) that certain *Stock and Asset Purchase Agreement*, dated as of May 19, 2026 (as amended, supplemented or otherwise modified, the "**Horizon Purchase Agreement**") or (ii) the *Order (A) Authorizing and Approving the Debtors' Entry Into Stock and Asset Purchase Agreement with Flex-N-Gate for Sale of Debtors' Horizon Business Assets and Transferred Equity Interests Free and Clear of Liens, Claims, Encumbrances, and Interest, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (Docket No. 2800) (the "**Horizon Sale Order**"), as applicable.

(d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order shall relieve any entity from any obligation to address or comply with information requests or inquiries from TCEQ. Nothing in this Order shall affect any setoff or recoupment rights of TCEQ. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

For the avoidance of doubt, the Texas Commission on Environmental Quality opts out of any and all third-party releases provided in the Plan.

17.     *Chubb*.  Notwithstanding anything to the contrary in the Plan (including, without limitation, and for the avoidance of doubt, Sections 6.2, 9.11, 11.1, 11.4 or 13.4 of the Plan, including any corresponding sections of this Order), any other of the Definitive Documents, and any other document related to any of the foregoing:

    i.     on the Confirmation Date, all of the insurance policies that have been issued at any time by ACE American Insurance Company and/or any of its U.S.-based affiliates or predecessors (collectively, "**Chubb**") to (or which provide coverage to) the FBG Debtors or any of their predecessors, and all agreements, documents, or instruments related thereto (collectively, the "**FBG Chubb Insurance Program**") shall neither be assumed nor rejected by the FBG Debtors, instead following the Confirmation Date: (i) all of the FBG Debtors' rights and obligations under any Insurance Policy that provides coverage for the Estate Claims, including the rights to the proceeds of any D&O Policies, shall vest in the Litigation Trust, (ii) all of the FBG Debtors' rights and obligations under any Insurance Policy that provides coverage for the DIP Collateral Trust Assets shall vest in the DIP Collateral Trust, (iii) all of the FBG Debtors' rights and obligations under any Insurance Policy that provides coverage for the ABL Collateral Trust Assets, shall vest in the ABL Collateral Trust, and (iv) any of the FBG Debtors' rights and obligations under any Insurance Policy that is part of the FBG Chubb Insurance Program that does not vest pursuant to (i) – (iii) hereof shall vest with the Wind Down Administrator; *provided*, that, to the extent any claim arises with respect to an asset that: (i) is assigned to a Trust, (ii) is not covered under the rights vested in the respective Trust; and (iii) may be covered by an Insurance Policy that the FBG Debtors' rights and obligations vested with the Wind Down Administrator pursuant to clause (iv) hereof, the Wind Down Administrator may pursue such claim in accordance with the terms of the FBG Chubb Insurance Program, and, if applicable, turn over to the applicable Trust any insurance proceeds (each, a "Proceed Turnover"), *provided, however*, that Chubb shall not have any duty to effectuate a Proceed Turnover or liability related to a Proceed Turnover; *provided, however,* the rights and obligations that vest hereby shall include all of the FBG Debtors' obligations regardless of when such arise or become due;

    ii.     on and after the Confirmation Date, the FBG Debtors, the Wind Down Administrator, and the Trusts, as applicable, shall become and remain liable in

full for all of their respective obligations under the FBG Chubb Insurance Program, as provided in subsection (a) hereof, without the need or requirement for Chubb to file or serve a request, motion, or application for payment of such obligations, including a Proof of Claim or Administrative Claim; *provided*, however, that all monetary obligations of the FBG Debtors, the Wind Down Administrator, or the Trusts, as applicable, shall be satisfied only by (i) *first*, by or through Chubb setting off (in full dollars) against, or applying, any collateral, security or credits (in full dollars) held by Chubb under the FBG Chubb Insurance Program in accordance with its terms and conditions, and (ii) *second*, to the extent such collateral, security or credits is insufficient to satisfy any such obligations or liabilities, Chubb shall have a Claim for such amounts and such Claim, to the extent Allowed, shall be treated as a General Unsecured Claim as provided for in the Plan; for the avoidance of doubt, the FBG Debtors', the Wind Down Administrator's, and the Trusts', monetary obligations, as applicable, under the FBG Chubb Insurance Program, shall be satisfied as provided for in this subparagraph (b) and not otherwise paid by such parties;

iii. except as expressly provided in this paragraph 17, nothing (i) alters, modifies, supplements, changes, expands, diminishes or otherwise amends (A) the terms and conditions of (or the coverage provided by) the FBG Chubb Insurance Program, or the rights, duties, obligations, and defenses, if any, of Chubb, any insured, the FBG Debtors, the Wind Down Administrator, the Trusts, or any other Person, as applicable under the FBG Chubb Insurance Program, (B) any valid setoff or recoupment rights of Chubb (or any corresponding rights and defenses of the FBG Debtors, the Wind Down Administrator, the Trusts, or any other Person with respect thereto, which are fully preserved) under the FBG Chubb Insurance Program; or (ii) alters or modifies the duty, if any, that Chubb has to pay claims covered by the FBG Chubb Insurance Program (subject to the terms and conditions of the FBG Chubb Insurance Program and applicable non-bankruptcy law) and its right to seek payment or reimbursement pursuant to the terms of the Plan, or draw on any collateral, security, or credits therefor; for the avoidance of doubt, Chubb, the insureds, the FBG Debtors, the Wind Down Administrator, and the Trusts, as applicable, shall each retain all rights and defenses under the FBG Chubb Insurance Program;

iv. except as specifically provided in this paragraph, nothing shall permit or otherwise effect a sale, assignment, or any other transfer of the FBG Chubb Insurance Program, and/or any rights, proceeds, benefits, claims, rights to payments, or recoveries under or relating thereto without the prior express written consent of Chubb or pursuant to further order of the Court after appropriate notice and opportunity for objections;

v. on the Confirmation Date, the automatic stay of Bankruptcy Code section 362(a), and the injunctions set forth in Section 13.4 of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims against Chubb under applicable non-bankruptcy law to proceed with

their claims; (II) Chubb to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against Chubb under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Section 13.4 of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing;  (III) subject to and in accordance with the terms and conditions of the FBG Chubb Insurance Program, Chubb to draw against any or all of the collateral or security provided by or on behalf of the FBG Debtors, and/or their successors, at any time and to hold the proceeds thereof as security for the obligations of the FBG Debtors, the Wind Down Administrator, and/or the Trusts, and/or apply such proceeds to the obligations of the FBG Debtors, the Wind Down Administrator, and/or the Trusts under the FBG Chubb Insurance Program, in such order as Chubb may determine, in each case to the extent permissible under applicable non-bankruptcy law and in accordance with the terms and conditions of the FBG Chubb Insurance Program; and (IV) following the Effective Date, Chubb to cancel any insurance policy that is part of the FBG Chubb Insurance Program, and take other actions relating to the FBG Chubb Insurance Program (including effectuating a setoff and/or any recoupment or subrogation rights or claims) pursuant to applicable non-bankruptcy law and in accordance with the terms and conditions of the FBG Chubb Insurance Program; provided that, for the avoidance of doubt, Chubb may not cancel any policy on account of the assignment of insurance rights and obligations in accordance with this paragraph; and

vi. nothing in Section 13.4(c) of the Plan (or any corresponding provision of this Order) requires, precludes, or prohibits Chubb from administering, handling, defending, settling, and/or paying claims covered by the FBG Chubb Insurance Program in accordance with and subject to the terms and conditions of the FBG Chubb Insurance Program and/or applicable non-bankruptcy law.

18. *Texas Comptroller*.  Notwithstanding anything in the Plan or Confirmation Order to the contrary, the following provisions shall govern the treatment of the claims of the Texas Comptroller of Public Accounts (the "**Texas Comptroller**"): (1) nothing in the Plan or Confirmation Order shall affect or impair the Texas Comptroller's existing statutory or common law setoff rights in accordance with 11 U.S.C. § 553; (2) nothing in the Plan or Confirmation Order shall affect or impair the Texas Comptroller's rights to pursue any non-debtor third parties (excluding the Trusts, the Trustees, the Wind Down Administrator, and the Claims Ombudsman, each as defined in the Plan) for any tax debts or claims; (3) nothing provided in the Plan or Confirmation Order shall be construed to preclude the payment of interest on the Texas Comptroller's administrative expense tax claims, if any, in each case solely to the extent such interest is payable under Section 9.1 of the Plan and applicable law; (4) to the extent that interest is payable on any administrative expense, priority, or secured tax claim of the Texas Comptroller, the Texas Comptroller has indicated it will assert that the applicable interest rate is the statutory rate under applicable non-bankruptcy law and, with respect to Allowed Priority Tax Claims, the rate determined under sections 511 and 1129(a)(9)(C) of the Bankruptcy Code; provided that all defenses, claims, counterclaims, affirmative defenses, and other rights thereto

that exist under applicable law in favor of the FBG Debtors, the Wind Down Administrator, the Claims Ombudsman, the Trusts, and the Trustees, as applicable, are expressly preserved; or (5) subject to filing a proof of claim in accordance with any applicable bar date, the Texas Comptroller is not required to file a motion or application for payment of administrative expense claims pursuant to section 503(b)(1)(D) of the Bankruptcy Code; provided that nothing herein shall be deemed to allow any such claim, and any Allowed Administrative Expense Claim of the Texas Comptroller shall be treated in accordance with Section 2.1 of the Plan and satisfied by the Litigation Trust and/or the DIP Collateral Trust in accordance with the applicable Trust Waterfall.  In connection with the foregoing, any defenses, claims, counterclaims, affirmative defenses, and other rights that exist under applicable law in favor of the FBG Debtors, the Wind Down Administrator, the Claims Ombudsman, the Trusts, or the Trustees, as applicable, are expressly preserved.

Allowed Priority Tax Claims of the Texas Comptroller shall be treated in accordance with Section 2.5 of the Plan.

If the Litigation Trustee or Wind Down Administrator or other distributing party, fails to make any payment required under the Plan or Confirmation Order, the Texas Comptroller shall provide written notice of the default via email or USPS First Class Mail to 1) the Litigation Trustee with copy to its counsel, 2) the Wind Down Administrator, and 3) counsel to the FBG Debtors for copy purposes only; and the written notice must allow fifteen (15) days to cure. If the default is not cured within those fifteen (15) days, the Comptroller may, without further order of the Court, pursue all of its rights and remedies available under applicable non-bankruptcy law to collect all taxes, penalties, and interest owed.

19.     *Texas Taxing Authorities*.  Notwithstanding anything to the contrary in the Plan or this Order,  any claim of the Texas Taxing Authorities[3] (the **"Tax Claims"**) that become Allowed Secured Claims shall be treated as Class 2 – Other Secured Claims in accordance with Section 4.2 of the Plan. Any Allowed Secured Claims of the Texas Taxing Authorities shall be entitled to interest to the extent provided under sections 506(b), 1129 and/or 511 of the Bankruptcy Code.  Any valid and perfected liens securing the Tax Claims (the "**Tax Liens**"), whether on real or business personal property, or on the proceeds of the sale of such property, shall be retained with the same force and effect and priority pursuant to state law until the Tax Claims are paid in full. To the extent any claims of the Texas Taxing Authorities for 2026 taxes are Allowed Administrative Expense Claims on the Effective Date, such Claims shall be paid on the Effective Date in accordance with 1129(a)(9)(A).  Nothing herein shall bar the Texas Taxing Authorities from bringing action in this Court to enforce their asserted rights under 28 U.S.C. Section 959 and 960 to payment of the 2026 taxes if not paid prior to state law delinquency.  Further, to the extent the 2026 taxes are paid after delinquency under state law, the Texas Taxing Authorities' rights to seek payment of penalty and interest under state and bankruptcy law are preserved.  The claims objection bar date as it relates to the claims of the Texas Taxing Authorities shall be no later than 90 days from the Plan's Effective Date.  In the event of a credit bid sale of any property subject to any valid and perfected Tax Liens pursuant to

---

[3]   "**Texas Taxing Authorities**" means, collectively, Cameron County, Tarrant County, Hidalgo County, City of McAllen, and Brownsville ISD.

the Plan, said property will be sold subject to the Tax Liens.  All defenses, claims, counterclaims, affirmative defenses, and other rights that exist under applicable law in favor of the FBG Debtors, the Wind Down Administrator, the Claims Ombudsman, the Trusts, and the Trustees, as applicable, with respect to any of the foregoing are expressly preserved.

20.     *United States Trustee*.  The Plan Injunction set forth in Section 13.4(b) of the Plan shall only apply until such time as the liquidation and disbursement actions contemplated in the Plan have been completed and the Trusts created pursuant to the Plan have been dissolved under applicable state law.

21.     *Non-Union Retiree Committee*.  The Non-Union Retiree Committee (as defined in Docket No. 3060) and each of its members shall be deemed to be a Released Party under the Plan.

22.     *SPV Debtors*.  For the avoidance of doubt, nothing in the Plan or this Order shall:

(i)      transfer any of the SPV Debtors' claims, rights, interests, or defenses to any of the Trusts;

(ii)     constitute a determination of the ownership of, or of any party's interest in, any Cause of Action, books and records, privileges, and insurance proceeds as between the FBG Debtors (or their Estates or any Trust), on the one hand, and the SPV Debtors (or their Estates), on the other hand;

(iii)    permit or authorize the FBG Debtors, the Wind Down Administrator, or any Trust or Trustee to commence, prosecute, settle, release, compromise, or otherwise exercise control over any Cause of Action owned by any SPV Debtor or its Estate, absent the consent of the applicable SPV Debtor (or any successor) or its estate fiduciary or further order of the Bankruptcy Court;

(iv)     enjoin any SPV Debtors or its creditors from asserting a right of setoff or defense of recoupment or setoff; *provided* that all parties' rights are preserved with respect to whether or not such rights exist under applicable law;

(v)      affect the enforceability of the *Agreed Order Granting Emergency Motion of Aequum Capital Financial II LLC for Entry of an Order Granting Related Relief From the Automatic Stay* (Docket No. 1820);

(vi)     enjoin or otherwise prevent any SPV Debtor or its creditors from asserting a claim under section 502(h) of the Bankruptcy Code in accordance with the Bankruptcy Code and applicable law; or

(vii)    impair or affect any privileges held by an SPV Debtor.

The FBG Debtors, Wind Down Administrator, ABL Collateral Trustee, and Litigation Trustee, or their respective agents, will cooperate in good faith in a commercially reasonable manner with the SPV Debtors with respect to books and records pertaining to any asset purported to be owned by any of the SPV Debtors (the "**SPV Assets**"), and will reasonably

preserve and provide access to such books and records to the applicable SPV Debtor upon reasonable request; *provided* that such reasonable cooperation shall not interfere with the normal responsibilities of the FBG Debtors, Wind Down Administrator, ABL Collateral Trustee, or Litigation Trustee or their respective agents and shall not impose any costs on such cooperating party not otherwise paid in advance by the SPV Debtors; *provided further*, that such cooperating parties may seek a determination from the Bankruptcy Court concerning any objection to a given request and the foregoing obligation to cooperate shall expire with respect to any SPV Asset that the Bankruptcy Court determines constitutes the sole property of any of the FBG Debtors.  The FBG Debtors, Wind Down Administrator, ABL Collateral Trustee, and Litigation Trustee, and their respective agents, reserve all rights to seek payment (including payment in advance) from the SPV Debtors on account of costs to store and provide access to any books and records pertaining to the SPV Assets.  Prior to abandoning or destroying any books and records pertaining to an SPV Asset, the FBG Debtors, Wind Down Administrator, or ABL Collateral Trustee, or their respective agents, as applicable, shall provide the applicable SPV Debtor five (5) business days' notice of its intent to abandon or destroy such books and records and offer to transfer such books and records to such SPV Debtor.  If the applicable SPV Debtor elects to receive such books and records, the SPV Debtor shall do so at its sole cost and expense (paid in advance), including the cost of any required continued storage until the transfer can be effectuated.  If the SPV Debtor does not pay such costs within five (5) business days of being notified of the cost to transfer such books and records, the FBG Debtors, Wind Down Administrator, ABL Collateral Trustee, or Litigation Trustee, or their respective agents, as applicable, may abandon or destroy such books and records without liability.

The provisions of Section 5.8 of the Plan shall not apply to Debtor Viceroy Private Capital, LLC ("**Viceroy**") and the current board of managers and Special Committee of Viceroy shall remain in place and shall continue to manage Viceroy in accordance with the applicable governing documents of such entity.

23.    *Garza Warn Plaintiffs.*  On February 10, 2026, an original complaint (as amended, the "**Garza WARN Complaint**") was filed initiating an Adversary Proceeding that is presently styled Francisco Garza, et al. v. First Brands Group, LLC, et al., Adv. No. 26-03038 (the "**Garza WARN Action**"). The Garza WARN Action is a putative class action asserting liability against the Debtor-Defendants named therein for workforce reductions in violation of the WARN Act. Notwithstanding any provision in the Plan or this Order to the contrary, (i) the adjudication of liability, the amount of any damages and the priority of any such damages (whether administrative, priority unsecured, or general unsecured) with respect to the claims asserted in the Garza WARN Action shall be adjudicated in the ordinary course by the Bankruptcy Court and confirmation of the Plan shall have no effect upon such claims, and(ii) entitlement to administrative or priority status for any damages awarded with respect to the claims asserted in the Garza WARN Action shall be determined by the Bankruptcy Court in accordance with the Bankruptcy Code. For the avoidance of doubt, each of the Garza WARN plaintiffs (including on behalf of any class ultimately represented by same (collectively, the "**Garza WARN Plaintiffs**")) and the Debtors reserve all rights, claims and defenses as to the Garza WARN Action and any claims asserted therein. The provisions of this paragraph shall apply to the benefit of the Garza WARN Plaintiffs irrespective of whether their claims proceed to adjudication in the Garza WARN Action, a pending alternative putative WARN Act Class

Action lawsuit currently pending as Adv. No. 26-03052, or a subsequently consolidated WARN Act class action lawsuit.