## Exhibit A

**PowerPoint Demonstrative**



# FBG Debtors' Closing Presentation in Support of Plan Confirmation

August 7, 2026



# Table of Contents



| Topic | Slide # |
|---|---|
| Overview | 3 |
| Plan Settlement Benefits | 6 |
| Voting Results | 12 |
| Estate Claims Credit Bid Transaction | 15 |
| Litigation Funding | 23 |
| Limited Consolidation | 26 |
| Classification | 29 |
| Administrative Expense Claims | 33 |
| Preference Settlement | 36 |
| Third-Party Releases, Plan Injunction and Exculpation | 41 |
| Plan Proposed In Good Faith | 46 |
| SPV Objections | 48 |
| Proposed Effective Date | 52 |
| Plan Is Commercially Viable | 58 |
| Estate Claims | 62 |

# History of these Chapter 11 Cases



| Date | Key Event |
|---|---|
| Sept. 2025 | DIP Lenders provide $1.1B new money DIP financing |
| Oct. 2025 - Jan. 2026 | Debtors learn extent of prepetition fraud through investigation |
| Jan. 2026 | • Nearly all DIP proceeds exhausted with no additional DIP financing available<br>• Debtors are at a crossroad: obtain new financing immediately or pivot to disorderly chapter 7 conversion<br>• Debtors immediately pivot to sale process |
| Jan. 26, 2026 | OEM customers step up and fund ongoing operations & DIP and ABL Lenders permit the continued use of cash collateral |
| Jan. 29 – Mar. 27, 2026 | Debtors, Ad Hoc Group, and UCC participate in mediation on case resolution |
| Mar. – May 2026 | Debtors successfully consummate 3 going concern sales for approx. $200 million and save approx. 2,000 jobs |
| April – June 2026 | Debtors, AHG, UCC and ABL Lenders engage in hard-fought negotiations and finalize a chapter 11 plan settlement to avoid value destructive conversion |
| May 4 – July 20, 2026 | Debtors run alternative sale process for estate claims to market test plan settlement / estate claims credit bid transaction |
| June 2026 | Debtors file and solicit the Plan |
| Late June 2026 | Following closing of going concern sales, OEM funding ceases |

# Key Themes



**1** Confirmation is the only value-maximizing solution

**2** Overwhelming support of stakeholders, excluding objectors / defendants / litigation targets

**3** Plan Confirmation locks in key settlement benefits

**4** Conversion would be devastating for *all*

# DIP Lenders' Rights and Remedies



## DIP Financing Quantum

- DIP Lenders put in **$1.1 billion** in new money DIP financing at the beginning of this case.

- With interest and fees and the roll up, there are approximately **$5 billion** in DIP claims.

## Maturity, Default and Remedies

- DIP matured on June 29, 2026, and the Debtors and DIP Lenders entered into a forbearance agreement approved by the Court (Docket No. 3506).

- Default interest is accruing at approx. **$250mm per year**.

- Absent Confirmation, the DIP Lenders are entitled to relief from the stay to allow them to exercise any and all remedies they are entitled to, including foreclosure of their collateral.

## Lien Priority Over Estate Claims

- DIP Lenders hold first-priority liens over Avoidance Action Proceeds up to **$2.4 billion** (i.e., the DIP Hurdle).

- For all other Estate Claims, junior creditors sit behind over **$7.6 billion** of senior liens ($5B DIP and $2.6B prepetition secured claims).

## Administrative Expense Basket

- The **$200 million** admin basket is not triggered until DIP A Claims are indefeasibility repaid in full in cash. The basket will never be triggered under either the Plan or in chapter 7.

5

# Plan Settlement: Benefits





**Litigation Trust Waterfall**

- Administrative and priority creditors of FBG Debtors begin to receive distributions from Litigation Trust following $350 million in distributable proceeds, well before repayment in full of DIP A Claims.

**Subordination of Roll-Up Claims**

- Holders of Roll-Up Claims share in Litigation Trust proceeds *pari passu* with the holders of First Lien Claims, Second Lien Claims, and General Unsecured Claims.

**DIP A Claim Interest Cap**

- DIP A Claims will not continue to accrue interest following Confirmation Date for purposes of Litigation Trust Waterfall.

**Litigation Trust Funding**

- Commitment by certain DIP Lenders to provide **at least $75mm** in Litigation Trust Funding.
- Additional $37.5mm in litigation funding also permitted (without changing $350mm attachment for junior creditors).

**Preference Settlement**

- Waiving or limiting the Litigation Trust's pursuit of preference claims that would otherwise be available to pay down the DIP Facility.

**Minimum Liquidity**

- Reducing $50mm minimum liquidity requirement to $25mm and consenting to continued use of cash collateral through confirmation process.

**Trust Governance**

- Minority representation on Litigation Trust Oversight Committee, including Creditors' Committee appointee who will have veto rights over certain decisions of the Litigation Trust (i.e., Sacred Rights).

# Admin & GUC Waterfall: DIP Order vs. Plan Settlement



## GUCs and administrative creditors move significantly up in the priority waterfall under the Plan Settlement

| Claim | DIP Order | Plan Settlement |
|---|---|---|
| DIP A Principal | $1.1 billion | $1.1 billion |
| DIP A Interest | $900 million through end of 2028* | **Capped at ~$250 million** |
| Roll-Up Claims | $1.1 billion (as to avoidance action proceeds)** | **Roll-Up is Unrolled** |
| Administrative Claims | $222 million | $222 million*** |
| Priority Claims | $78 million | $78 million |
| **Total Claims Senior to GUCs** | **$3.4 billion** | **$1.7 billion**** |
| General Unsecured Claims | $5.6 billion | $5.6 billion |

**Administrative Expense Basket**
1. <u>DIP Order</u>: assuming the admin basket is triggered (it would not be), $200mm in admin claims would be paid after $2B in DIP A Claims (principal plus interest).

2. <u>Plan Settlement</u>: all $222mm in admin claims will be paid at ~$1.9B in distributions.

* Represents ~$250 million accrued interest through June 29, 2026 *plus* ongoing accrual of interest at default rate (2%) (approx. $250mm/year)
** $3.3 billion roll-up claim (plus ~$300mm in accrued interest)
*** Subject to potential reductions based on participation in Administrative Expense Claims Consent Program
**** Includes $90 million of Litigation Funding

# Liquidation Analysis



## Chapter 7 results in $0 recovery for all junior creditors

| | Class | CH. 11 Operating Asset Recovery | CH. 11 Litigation Trust Recovery | CH. 11 Total Recovery | CH. 7 Operating Asset Recovery | Best Interests Test |
|---|---|---|---|---|---|---|
| 1 | Other Priority Claims | 100% | n/a | 100% | 100% | PASS |
| 2 | Other Secured Claims | 100% | n/a | 100% | 100% | PASS |
| 3 | Roll-Up Claims | – | LTI [1] | LTI [1] | – | PASS |
| 4 | First Lien Claims | – | LTI [1] | LTI [1] | – | PASS |
| 5 | Second Lien Claims | – | LTI [1] | LTI [1] | – | PASS |
| 6 | ABL Claims | 19% | n/a | 19% | 11% | PASS |
| 7 | General Unsecured Claims | – | LTI [1] | LTI [1] | – | PASS |
| 8 | Subordinated Claims | – | – | – | – | PASS |
| 9 | Intercompany Claims | – | – | – | – | PASS |
| 10 | FBG Debtor Interest | – | – | – | – | PASS |

Debtors' Ex. 9

(1) Beneficial interest in the Litigation Trust. These interests entitle holders to receive distributions from the Litigation Trust in accordance with the "Aggregate Distributions" table set forth in the Disclosure Statement.



# Liquidation Analysis (cont'd)

| Standard | A debtor's assumptions contained in a liquidation analysis must only be reasonable. *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 253-55 (Bankr. S.D.N.Y. 2007); *In re Charter Commc'ns*, 419 B.R. 221, 263 (Bankr. S.D.N.Y. 2009). |
| --- | --- |

## Mr. Moore' testimony establishes that his assumptions were reasonable



**Charles M. Moore**



Trial Transcript 7/28/26
Pg. 282:5–14, 20–25



I've made two very important assumptions. One relates to the estate claims. I have assumed that, as it relates to any claims that the DIP lenders have direct liens on, that they would foreclose on those claims. As it relates to the recovery actions where the DIP lenders have a lien on the proceeds, I expect that the DIP lenders would negotiate with a Chapter 7 trustee about, essentially, a bid or a purchase of those estate claims, given that any proceeds realized from the sale of those recovery actions would flow back to the DIP lenders and the Chapter 7 trustee.

What's important, though, is that at a baseline level, I've assumed that the DIP lenders would negotiate the purchase of those recovery -- the proceeds of the recovery actions, and there would be no sharing after that at all. They don't have any obligation to share any of those proceeds at all. Even the $200 million admin basket under

# Plan Confirmation Locks in Benefits and Does Not Prejudice Creditors



**Confirmation of the Plan secures all the benefits of the Plan & Plan Settlement without prejudicing any creditor's rights**

## Estate Benefits/Protections

- Locks in Litigation Trust Waterfall
- Ensures adequate funding for prosecution of Estate Claims
- Avoids value destruction caused by chapter 7 conversion

## No Prejudice

- No priority skipping distributions
- No increased liabilities for the estates
- No loss in assets for estates
  - Preserves estate's interest in Estate Claims
  - Unrebutted testimony that there are no valuable claims against Prepetition Secured Parties

# Who is (and is NOT) Objecting to the Plan?



Of the 28 formal objections to the Plan, the FBG Debtors have successfully resolved 11 formal objections and numerous informal objections*

The remaining objections were primarily filed by defendants and potential litigation targets of the FBG Debtors who want to see the Plan fail

Not a single objector argues that creditors will be better off if the FBG Debtors' cases convert to chapter 7

Over 55 thousand creditors (including administrative and priority creditors) were given notice of the Plan and an opportunity to object and/or vote; only 1 administrative creditor has an unresolved objection

* A list of resolved objections is attached hereto as **Exhibit A**.

# Voting Results



**The voting results demonstrate that there is substantial support for the Plan across all voting classes, including General Unsecured Creditors**

There is at least one impaired, accepting class at each of the 92 FBG Debtors and there is at least 4 impaired accepting classes at 81 FBG Debtors.  *See* Voting Decl., Ex. A.

| Class | Class Description | Number Accepting | Amount Accepting | Number Rejecting | Amount Rejecting | Voting Result |
|-------|------------------|------------------|------------------|------------------|------------------|---------------|
| 3 | Roll-Up Claims | 756 | $2,984,482,259 | 0 | $0.00 | Accept |
|   |                | *100%* | *100%* | *0%* | *0%* |  |
| 4 | First Lien Claims | 833 | $1,494,377,256 | 0 | $0.00 | Accept |
|   |                  | *100%* | *100%* | *0%* | *0%* |  |
| 5 | Second Lien Claims | 66 | $346,748,571 | 0 | $0.00 | Accept |
|   |                    | *100%* | *100%* | *0%* | *0%* |  |
| 6 | ABL Claims | 3 | $543,343,922.14 | 0 | $0.00 | Accept |
|   |            | *100%* | *100%* | *0%* | *0%* |  |
| 7 | General Unsecured Claims | 680 | $12,879,417,345 | 174 | $55,395,431,216 | Reject |
|   |                          | *79.63%* | *18.86%* | *20.37%* | *81.14%* |  |

# General Unsecured Creditor Voting Results



## Overwhelming Majority of General Unsecured Claimants *Accept*

- Out of 854 General Unsecured Claim holders that voted, *680* (**79.63%**) voted to accept.

- Full Support of the Creditors' Committee

## Excluding Litigation Targets, General Unsecured Claims *Accept*

- With the Litigation Targets' votes removed there is an accepting General Unsecured Class at all but 3 FBG Debtors, with 85.1% in amount voting to accept and 873 of 918 (95.1%) voting to accept by number.



# Estate Claims Credit Bid Transaction

# 363 Sale Structure: Rationale



- ✓ Necessary to lock in benefits from Plan Settlement, including Litigation Trust Waterfall and Litigation Trust Funding

- ✓ Allowed for "market check" of Estate Claims Credit Bid

- ✓ 363 sale structure required by DIP Secured Parties in exchange for Plan Settlement concessions

  - DIP Secured Parties required 363(m) and 364(e) protections as conditions to the Litigation Trust Funding, among other reasons

15

# FBG Debtors Ran a Thorough Sale Process



> **The Estate Claims Marketing Process was a full and fair process, and it confirmed that there were no viable or superior alternative transactions available to the FBG Debtors.**

Total Sale Process: *84 days*

Comprehensive sale process launched

Estate Claims Marketing Process launched

Original Bid Deadline

Agreement in Principle (Joint Plan)

First Extended Bid Deadline

Estate Claims Credit Bid selected as winning bid

| January | March | May | June | July |
|---|---|---|---|---|

Early Jan. — Mar. 27 — May 4 — May 22 — June 5 — June 12 — June 21 — July 6 — July 20 — July 27

Mediation expires without settlement on case resolution; negotiations continue

DS conditionally approved; A&M re-contacts bidders

Second Extended Bid Deadline

Final Extended Bid Deadline; **no** alternative bids submitted

16

# No Information Asymmetry Among Potential Bidders



**Every interested bidder was offered the same information the DIP Secured Parties were provided in connection with the marketing process—including the declarations, their supporting materials, and the terms of the credit bid itself.**

| Description | Overview |
|---|---|
| **Outreach to All 26 Parties** | • Targeted list of 26 potential bidders received same initial materials, including:<br>    • Marketing materials<br>    • Teaser<br>    • Timeline<br>    • Invitation to VDR & Advisors Meeting, Subject to NDA |
| **Diligence Materials** | **VDR combined a total of thousands of files, including:**<br>• Publicly filed James and Onset Complaints and related Pleadings, Examiner's Report, Indictments, Plea Allocutions, and certain Onset transaction documents.<br>• Later added Moore Declaration, Kirschner Declaration, supporting documents, which covered substantially the same findings as the April report. |
| **Diligence Capacity** | • Three bidders signed NDAs & received access to the same data room. Two proceeded with additional diligence and meetings with A&M and Weil. |

17



# Section 363(m) is Applicable and Satisfied



**Charles M. Moore**



Trial Transcripts 7/28/26
Pgs. 254:11–255:7

Q    Just a few questions about the sales.  To what extent did you observe evidence of or indications that bidders were controlling the price, colluding, in other words, multiple bidders, for any of the -- during any of these processes you've described?

A    I didn't witness any behaviors that would suggest collusion.

Q    And are you familiar with whether the insiders of the Debtors have any direct interest or indirect interest in the DIP-secured parties?

A    They don't.

Q    Or their affiliates?

A    Correct, they do not.

Q    There's been mention of 363(m) protections which are being sought in this plan process.  Just in terms of without going into negotiations, what is your understanding of the importance of obtaining those protections in order to consummate these credit bid transactions?

A    It certainly was a very important element for our DIP lenders.  I think that when you look at all of the consideration that's being provided, certainly this is one of the benefits that they're getting in return.

# Section 363(m) is Applicable and Satisfied (cont'd)



**Section 363 applies to sales effectuated through a chapter 11 plan, and the DIP Secured Parties constitute good faith purchasers under section 363(m) of the Bankruptcy Code.**

| Issue | Analysis |
|---|---|
| **Credit Bidder Can Be a Good Faith Purchaser** | • Credit bidders can be a good faith purchaser entitled to section 363(m) protections. *In re Palm Springs II, L.L.C.*, 65 F.4th 752 (5th Cir. 2023).<br><br>• A credit bidder is entitled to protection absent evidence of fraud, collusion or other improper actions by bidder. *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014). |
| **Good Faith Standard is Satisfied** | • No evidence of fraud, collusion or other improper actions by DIP Secured Parties.<br><br>• DIP Lenders provided a substantial package of consideration, including remarkable concessions as part of their bid.<br><br>• Each remaining bidder declined to submit bid. |

# Estate Claims Credit Bid is More Than $75m Credit Bid



The DIP Secured Parties are providing a package of consideration in exchange for the Estate Claims — the $75 million credit bid is only one component of such consideration.

| Consideration | Description |
|---|---|
| **$75 Million Credit Bid of DIP A Claims** | • $75 million credit bid of DIP A Claims for Estate Claims on assets that constitute DIP Collateral (i.e., all Estate Claims other than Avoidance Actions and Avoidance Action Proceeds) |
| **Package of Other Consideration** | |
| • **Litigation Trust Waterfall** | • DIP Secured Parties have agreed to (i) Litigation Trust Waterfall and (ii) subordination of Roll-Up Claims thereunder |
| • **Capping DIP A Claims and Minority Governance Rights** | • DIP A Claims capped for purposes of the Litigation Trust Waterfall at allowed amount outstanding as of Confirmation Date (approximately $1.335 billion)<br>• Plan provides minority governance rights in Litigation Trust to UCC Member |
| • **Settlement of DIP Lender Rights and Remedies for DIP Maturity and Events of Default** | • $5 billion in DIP obligations matured on June 29, 2026<br>• DIP Secured Parties have agreed to forbear from exercising remedies through the Effective Date (subject to certain termination events)<br>• Minimum liquidity covenant under DIP Documents also reduced from $50 million to $25 million<br>• DIP Secured Parties consented to continued use of cash collateral pursuant to agreed budget |
| • **Committed Litigation Trust Funding** | • Litigation Trust Funding of not less than $75 million |

# Estate Claims Credit Bid Provides Substantial Benefits/Consideration Beyond $75m Credit Bid



**Approval of the Estate Claims Credit Bid was contingent on all benefits provided by the DIP Secured Parties pursuant to the Plan Settlement**



**Charles M. Moore**



Trial Transcript 7/29/26
Pg. 267:18–25

settlement, my question to you is this. Would you, as CEO,

have approved the credit bid if the only benefit to the

estates was $75 million?

A   Excluding all other aspects.

Q    In other words, it was $75 million all of it, all of

the elements of the plan settlement are off the table.

Would you have approved that deal?

A   No.



# Litigation Funding

# Litigation Trust Funding is Required for Plan and Plan Settlement



**The Litigation Trust Funding is reasonable, appropriate and required for the Litigation Trust to prosecute Estate Claims and make distributions to junior creditors**

## Core Term of Plan Settlement

- The Litigation Trust Funding is a key term of the Plan Settlement and cannot be viewed in isolation

- Absent the broader Plan Settlement, the FBG Debtors will convert their chapter 11 cases to chapter 7 and junior creditors will receive no recovery

## No Alternative Financing Exists

- No other party has submitted an alternative financing proposal to the FBG Debtors



# Litigation Trust Funding is Permissible and Well Supported



**Charles M. Moore**



Trial Transcripts 7/28/26
Pgs. 227:25–228:9;
7/29/26 Pg. 196:1–8

Q    Okay.  Thank you.  How important is the -- to the overall settlement is the litigation funding component?

A    It's incredibly important.

Q    Why is that?

A    Having sufficient funds, to pursue litigation recoveries is key.  And this is in everyone's best interest.  As we can see through the waterfall, everyone is incentivized to maximize recoveries.  And so in order to do that, it's important that the litigation trust be properly funded.

Q    Mr. Moore, you believe that the litigation trust financing is the best litigation financing that was available to the Debtors.  Is that right?

A    I believe that it's the only litigation funding that was available to the Debtors.

Q    Do you believe that it is the best litigation financing available to the Debtors?

A    I do.



# Limited Consolidation

# Consolidation for Distribution Purposes Only



**FBG Debtors**

**Consolidation for Distribution Purposes Only** ✓

**Well-established, "middle ground" approach;** defendants' rights in future litigation preserved

**Patrick James & Aequum**

**LAM Parties, Katsumi, & First Citizens**

**No Substantive Consolidation** ✗

**Full Substantive Consolidation** ✗

**Costly and time-consuming exercise** to deconsolidate assets and liabilities, with no benefit to junior creditors

**Extraordinary and rare** remedy that frustrates Plan Settlement and junior creditor recoveries

26



# Consolidation for Distribution Purposes Only (cont'd)

**9019 standard applies. The court need only determine that the settlement does not "fall beneath the lowest point in the range of reasonableness."***

**FBG Debtors easily meet the burden for approval of proposed limited consolidation**

- Proposed limited form of consolidation was a key term of the Plan Settlement. *See July 28 Hr'g Tr.* 236:19-237:6

- Moore's testimony established that deconsolidating the FBG Debtors' assets and liabilities would be time consuming and costly. *July 28 Hr'g Tr.* 235:21-236:18

- Full substantive consolidation provides no benefit to junior creditors and is reserved for extraordinary circumstances

- "No consolidation" would frustrate the Litigation Trust Waterfall and junior creditor recoveries

- Plan fully reserves the rights of parties to raise substantive consolidation and other related arguments as defenses in any subsequent litigation (*see* Plan § 6.2(c))

- This Court and others have approved consolidation for distribution purposes only (*see, e.g.*, *Everstream, Steward, Luminar, TPI Composites*)

---

* *In re Age Refin., Inc.*, 801 F.3d 530, 540 (5th Cir. 2015); *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008).



# Classification

# Classification: Legal Standard and Evidence



> **"[A] plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."** 11 U.S.C. § 1122(a).

> **A plan proponent is afforded "_significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar_."***

> **"[T]hou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."** _In re Greystone III Joint Venture_, 995 F.2d 1274, 1279 (5th Cir. 1991).

**Class 3: Roll-Up Claims**

**Class 4: First Lien Claims**

**Class 5: Second Lien Claims**

**Class 6: ABL Claims**

**Class 7: General Unsecured Claims**

The classification structure under the Plan **complies with section 1122(a)** because there is a reasonable basis for the classification.

Mr. Moore testified that the classification closely tracks the Debtors' prepetition capital structure and divides classes based on the different:

➤ underlying debt instruments;
➤ interests;
➤ collateral packages; and
➤ priorities.

_July 28 Hr'g Tr. 261:2–262:14._

*_In re Idearc Inc._, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009), _aff'd sub nom. In re Idearc, Inc._, 662 F.3d 315 (5th Cir. 2011).

# Separate Classification of ABL Claims is Proper



## No Credible Argument Has Been Lodged Against ABL's Separate Classification and None Can Be Made.

- Class 6 (ABL Claims) is an impaired accepting class at all FBG Debtors except Viceroy Private Capital, LLC and First Brands Group Holdings, LLC, and no credible objection has been lodged to the separate classification of the ABL Lenders.

  - **Class 6 (ABL Claims) provides for different TREATMENT under the Plan from the other impaired classes and has different legal rights arising under different credit documents to different COLLATERAL.**
  *Plan §§ 4.3(b)–4.7(a), 6.5(d)(v)*

# Separate Classification of Roll-Up Claims is Proper



**Any argument that Roll-Up Claims cannot be a voting class is *directly contrary* to this Court's Final DIP Order**

- **Paragraph 25(e) of the Final DIP Order expressly permits Roll-Up Claims to be classified and vote on a chapter 11 Plan and to receive related treatment**

(e)     Notwithstanding anything herein to the contrary, the Roll-Up Obligations will not be required to be repaid in full in cash, subject to compliance with the terms and conditions of this paragraph. Notwithstanding that the Roll-Up Obligations are and remain superpriority administrative expense claims, any party with requisite authority to solicit a plan pursuant to Section 1121 of the Bankruptcy Code may classify the Roll-Up Obligations as one or more class(es) of claims entitled to vote, solely for the purposes outlined in this paragraph (any such plan, a "**Roll-Up Classification Plan**"). Under any Roll-Up Classification Plan, the holders of Roll-Up Obligations may be given non-cash treatment as long as the Roll-Up Classification Plan meets all applicable standards under the Bankruptcy Code, other than any Bankruptcy Code requirement to un-impair or pay the Roll-Up Obligations in full in cash. In the

**Final DIP Order ¶ 25(e)**

## FBG Debtors Are *Jointly and Severally Liable* for the Roll-Up Obligations

The DIP Order and Parent Guarantee Confirms Joint and Several Liability
- ***See e.g.,*** **Final DIP Order ¶ ¶ H(vi), 2(e); Interim Order Ex. 2 (Parent Guarantee).**



# Administrative Expense Claims

# Administrative Expense Claims: Legal Standard and Evidence



**LEGAL STANDARD**

*"Except to the extent that the holder of a particular claim has <u>agreed to a different treatment</u> of such claim, the plan provides that … with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim."* 11 U.S.C. § 1129(a)(9)(A).

## Evidence – Mr. Moore's Testimony

❑ Program gives claimants option to "decide if it is more beneficial to them to be at the front of the line for payment to this group or recognizing that they would be discounting their claim by half, or if they would prefer to wait their normal place and utilize 100 percent of their allowed claim." *July 28 Hr'g Tr. 239:7–11.*

❑ "The benefit to the estate if parties choose to enter into it is a reduction in the administrative expense claim amount." *July 28 Hr'g Tr. 239:4–6.*

❑ Program may benefit non-consenting administrative creditors because consenting creditors agree to **reduce their claims by 50%, thereby reducing the total amount of administrative claims** and potentially allowing non-consenting administrative creditors to begin receiving distributions at the same time as—or sooner than—they otherwise would. *July 29 Hr'g Tr. 254:13–255:19.*

**CONFIRMATION ORDER**

❑ **Disputed Administrative Expense Claims are not excluded from the Program**: a later-Allowed claim may opt in within 30 days to share pro rata. *Confirmation Order ¶ 34.*

33

# Objections to the Administrative Claims Consent Program Should be Overruled



| | |
|---|---|
| **Program Complies with 1129(a)(9)(A)** | Section 1129(a)(9)(A) expressly permits a holder of an administrative expense claim to **"agree[] to a different treatment"** of its claim. |
| **Courts Approve Similar Programs** | Courts have approved similar administrative expense claim consent programs in other large chapter 11 cases, including **Sears, Steward, and Toys "R" Us.** |
| **Benefits all Admin Claimants** | • Program benefits both participating and non-participating administrative claimants.<br>• Participating claimants reduce claim by 50% to get paid earlier, which decreases the aggregate administrative-claim pool, permitting non-participating claimants to recover sooner. |
| **1123(a)(4) Not Applicable** | Administrative expense claims are not classified under the Plan, per the Bankruptcy Code. Regardless, all administrative expense claimants are offered the same opportunity to participate on the same terms. |
| ***Jevic* Not Applicable** | • The Program does not violate *Jevic*.<br>• No class skipping. The Program operates only with the consent of the affected administrative claimant. |



34



# Preference Settlement

# Preference Settlement Does Not Violate Section 1123(a)(4)



## SECTION 1123(a)(4) OF THE BANKRUPTCY CODE

A chapter 11 plan must *"provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."*

## PREFERENCE SETTLEMENT DOES <u>NOT</u> CONSTITUTE UNEQUAL TREATMENT

- Preference Settlement does not offend section 1123(a)(4) because it does not constitute treatment of creditors on account of their claims

- *QVC* reaffirmed that release provisions do not qualify as plan "treatment" under section 1123(a)(4) because this provision is "focused on the payment of value" and there is no value paid when providing a release

  - *In re QVC Grp. Inc., Case No. 26-90447 (ARP), 2026 WL 2058528, at \*37 (Bankr. S.D. Tex. July 15, 2026); see also Reply Brief ¶¶ 161–62.*

36

# Preference Settlement Satisfies Rule 9019



## BANKRUPTCY RULE 9019 / APPLICABLE AUTHORITY

Settlement is permissible so long as the settlement does not *"fall beneath the lowest point in the range of reasonableness."*

*In re Idearc Inc., 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009), aff'd, 662 F.3d 315 (5th Cir. 2011)*

## PREFERENCE SETTLEMENT SATISFIES RULE 9019

- Preference Settlement (i) is supported by consideration on both sides and provides meaningful benefits to estate, (ii) was thoroughly evaluated by FBG Debtors, and (iii) is integral to larger Plan Settlement.

- Preference Settlement is consensual and parties that do not wish to participate are under no obligation to opt in.

- Adverse Conduct standard ensures no preference claims against bad actors are released.

## PREFERENCE SETTLEMENT WAS PROPERLY EVALUATED BY FBG DEBTORS – MOORE TESTIFIED:

- Debtors  "compar[ed] [ ] payments out in the 90 days preceding the petition date to an estimate of goods or services that would have been received during that time period to get a sense [of whether] there [was] a significant difference between transfers out, and goods and services received[.]" *July 28 Hr'g Tr. at 233:21–24*

- With respect to Trade Creditors, Debtors determined there was not a significant difference. *July 28 Hr'g Tr. at 233:16–234:4*

- However, with respect to Supply Chain Financers and Factors, "there is not visibility to all of the payments that supply chain financers [and factors] in particular may have made in terms of payments directly to vendors." *July 28 Hr'g Tr. at 233:21–234:12*

# Preference Settlement: Disclosure



## DISCLOSURE OF PREFERENCE SETTLEMENT RISKS AND BENEFITS

The Preference Settlement Election Form and the Disclosure Statement clearly set forth the risks and benefits of participating in the Preference Settlement.

## EXPRESS DISCLOSURES IN THE ELECTION FORM AND DISCLOSURE STATEMENT

- Election Form and Disclosure Statement clearly state that creditors will not regain ownership or control of their Direct Creditor Claims if it is determined that such party meets the definition of "Adverse Conduct," and further warn creditors that "[c]ontribution of your Direct Creditor Claims is irrevocable."

    *See Preference Settlement Opt-In Form (Exhibit 12 to the DS Order); DS § I(E)(2).*

## NOTICE AND OPPORTUNITY TO ELECT

- Preference Settlement Election Forms served on eligible creditors beginning on June 23, 2026
- Debtors served list of Specified Non-Released Parties as part of the Plan Supplement on June 23, 2026
- Trade Creditors, Supply Chain Financers, and Factors have until 45 days after the Confirmation Date to opt in to the Preference Settlement
- Eligible parties have been provided ample opportunity to evaluate the Preference Settlement and determine whether to opt in

38

# Preference Settlement is Supported by Evidence





**Charles M. Moore**



Trial Transcript 7/28/26
Pgs. 234:19–235:10,
230:13–18

Q   Are there benefits to the debtors of the preference settlement you've described?

A   There are.  As I indicated, the fact that, as part of this, if parties are opting into it, they are also in return for getting a release –– and I'm speaking about the trade creditors, they are providing releases and they're also contributing their direct claims.

Q   Do you –– have you assessed the benefits of the preference settlement with respect to the parties that opt into it against the concessions that are being granted by the FPG debtors?

A   Yes.  This is another area where essentially our DIP lenders are providing an accommodation to the extent that there are viable preference claims, and those are being waived in the instance of trade creditors, or a modified new value defense is being made available to supply chain funders and factors.  That is giving something up further.

Q   Okay.  All right, so going back to the question.  So without getting into communications, I'm just asking for –– from the debtors' perspective today, how important a component is this preference settlement to the overall plan support agreement?

A   It's very important.

39



# Third-Party Releases, Plan Injunction and Exculpation

# Debtor and Third-Party Releases



**Releases are narrowly tailored and only creditors that "opt in" will grant the Third-Party Releases**

## Released Parties

**Released Parties:**

1. DIP and Prepetition Secured Parties (in various capacities)*

2. ABL Parties*

3. Creditors' Committee

4. Special Committee Members

5. Four (4) A&M Executives

6. Retained Professionals

\* Plus Related Parties

- **Substantial contributions from Released Parties; <u>no</u> evidence of wrongdoing**
- DIP Lenders and Prepetition Lenders released under DIP Order
- Standard carve out for actual fraud, gross negligence, and willful misconduct
- **UCC evaluated potential claims against Prepetition Secured Parties; instead of pursuing any such claims, UCC agreed to let challenge period expire upon confirmation**
- **Unrebutted testimony that there no colorable claims against these parties for a chapter 7 trustee to pursue if cases convert**
- Third-Party Releases fully consensual with "opt-in" structure

41



# Debtor and Third-Party Releases (cont'd)

**The evidence established that the releases under the Plan comply with Fifth Circuit law and should be approved***



**Charles M. Moore**



Trial Transcript 7/28/26
Pgs. 269:18–273:17,
275:1–13

"I have seen no indication of any wrongdoing by [DIP Secured Parties or ABL Parties] during this time period, from the final DIP order through now"

"I have not observed any improper conduct by the specified officers or the advisors or professionals."

"I have not observed any improper conduct from the Ad Hoc Group."

A   They've all provided substantial support to the Debtors. Our DIP lenders have provided, as I indicated, over a billion dollars of new cash DIP funding. Our ABL lenders have provided significant benefits, including funding through the confirmation budget that we're operating under right now, along with the use of their cash collateral.

Q   How important was that use of cash collateral to get us from point A to, hopefully, Thursday?

A   It was absolutely critical. Without that, the entire business would have ground to a halt.

* See In re Jackson Brewing Co., 624 F.2d 599, 602 (5th Cir. 1980; In re Wool Growers Cent. Storage Co., 371 B.R. 768, 776 (Bankr. N.D. Tex. 2007); In re Bigler LP, 442 B.R. 537, 549 (Bankr. S.D. Tex. 2010).

# Exculpation and Injunction Provisions



**Following *Highland I* and *Highland II*, the Court has consistently approved plan exculpation provisions that applied to independent directors and gatekeeper provisions that apply to claims against exculpated parties.***

## Injunction

- Standard plan injunction that prevents parties from pursuing released claims or taking actions to frustrate Plan transactions

- "Gatekeeper" provision that prevents parties from pursuing claims against Exculpated Parties absent relief from Court

- Consistent with *Highland I* (holding exculpation appropriate for independent directors of plan proponents because they "are entitled to all rights and powers of a trustee" including immunity)

- Exculpated Parties acted in good faith on behalf of the FBG Debtors

- Standard carve out for actual fraud, gross negligence, and willful misconduct

## Exculpation

**Exculpated Parties are limited to:**

1. FBG Debtors

2. Special Committees Members

3. Creditors' Committee

- Injunction is consistent with Fifth Circuit precedent and Bankruptcy Code

- Critical to enforce Plan terms

- "Gatekeeper" only applies to Exculpated Parties and is consistent with *Highland II*

- Injunction ceases when the liquidation and disbursement actions contemplated in the Plan are completed and the Trusts are dissolved.

---

*\* See In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419  (5th Cir. 2022) ("**Highland I**");
*In re Highland Cap. Mgmt., L.P.*, 132 F.4th 353 (5th Cir. 2025) ("**Highland II**").

# Exculpation and Injunction Provisions (cont'd)



<div style="background-color:orange; text-align:center;">

**The evidence establishes that the exculpation and injunction provisions comply with Fifth Circuit law and should be approved**

</div>



**Charles M. Moore**



Trial Transcript 7/28/26
Pg. 277:8–11, 18–22

Q    Based on your experience as a chief restructuring officer in various Chapter 11 cases, to what extent is the exculpation that's contemplated under the plan customary?

A    This is very customary.  I would say this is more narrow than many other plans that I have been involved in, but this is certainly customary, especially in a situation like this, with how the parties have conducted themselves.

Q    So can you describe why the Debtors are proposing the plan injunction?

A    This is another element that's important for the overall implementation of the terms of the plan that we have.  So moving forward, we need to be able to have this injunction in order to be able to implement these provisions.

44



# Plan Proposed In Good Faith

# The Plan is Proposed in Good Faith



**The FBG Debtors have established that the plan is proposed in good faith and not forbidden by law**

## To meet their burden under section 1129(a)(3), the FBG Debtors may rely on:

**1** The Plan and the many substantial concessions and benefits embodied in the Plan is evidence of good faith

**2** History of these Chapter 11 Cases

**3** Months of court-ordered mediation occurred

**4** Good-faith plan settlement negotiations occurred *after* mediation expired where no privilege applied.  *See* Trial Transcript 7/28/26 Pgs. 216:22–217:14.

- ❖ This period comprises over **sixty days** of negotiations
(March 27 to May 20 and May 27 to June 5)

- ❖ Ample discovery has been provided for this non-privileged period

---

\* *See* Nov. 30, 2018 Hr'g Tr*., In re EXCO Resources, Inc*., No. 18-30155 (Bankr. S.D. Tex.) (Docket No. 1413) (holding that "he can say we went to mediation"); *see e.g.*, *In re Diocese of Camden, New Jersey*, 653 B.R. 309, 353 (Bankr. D.N.J. 2023) (finding "more than sufficient evidence of good faith" where witness "testified that he spent over 100 hours in mediation over seventeen sessions").



# SPV Objections

# SPV-Related Objections Should be Overruled



## Plan Does Not Constitute a Conflicts Matter

- Mr. Duster, in his capacity as independent manager of Viceroy Private Capital, LLC, only has exclusive authority over conflicts matters

- Plan is only for the FBG Debtors and not the SPV Debtors, and is **not** a conflicts matter

- FBG Debtors have negotiated with Mr. Duster (and his counsel) concerning SPV-related issues in connection with the Plan, but no agreements reached to date

- Other objections raised by the SPV Lenders are either unfounded or have been addressed with clarifying language in the proposed Confirmation Order

48

# SPV-Related Objections Should be Overruled (cont'd)



| Objection | Response |
|---|---|
| Exculpation is overly broad and captures SPV Debtor claims | • **Plan modified** to clarify that "Exculpated Parties" are only exculpated "in their capacities as officers, directors, or managers of one or more FBG Debtors, ***and not in their capacities as officers, directors or managers of any SPV Debtor***"  (Plan § 1.1 – definition of "Exculpated Parties") |
| Plan prevents SPV Debtors from pursuing claims sharing a common nucleus of facts with claims of FBG Debtors | • Only FBG Debtor claims will be transferred to the Litigation Trust (Plan § 1.1 – definition of "Estate Claims") |
| Plan does not preserve SPV Debtors' interests in D&O policies and does not provide a mechanism for sharing proceeds of D&O policies | • Plan only transfers FBG Debtors' rights in D&O Policies to Litigation Trust (Plan § 11.4(d))<br>• Plan expressly preserves rights of other parties to access D&O Policies (Plan § 11.4(d)) |
| Plan fails to preserve SPV Debtors' and creditors' defenses, setoff, and related rights | • Plan expressly preserves defenses, including setoff and recoupment (Plan § 6.2(c))<br>• **Added Confirmation Order language** expressly preserving setoff rights of SPV Debtors and their creditors (Confirmation Order, Schedule I) |

# SPV-Related Objections Should be Overruled (cont'd)



| Objection | Response |
|---|---|
| Plan fails to provide SPV Debtors with access to books and records | • Plan only provides for transfer of FBG Debtors' books and records (Plan § 1.1 – definition of Litigation Trust Assets)<br><br>• **Added Confirmation Order language** requiring FBG Debtors, Wind Down Administrators, Trustees, and successors to reasonably cooperate in a commercially reasonable manner with, and reasonably provide access to, SPV Debtors with respect to books and records (Confirmation Order, Schedule I) |
| Plan does not adequately protect SPV Debtors' privileges | • Plan only provides for the transfer of the FBG Debtors' privileges (Plan § 6.2(d))<br><br>• **Added Confirmation Order language** providing that nothing in the Plan or Confirmation Order impairs or affects any privilege held by a SPV Debtor  (Confirmation Order, Schedule I) |
| Plan lacks clarity on how SPV Debtors will be governed post-confirmation | • **Added Confirmation Order language** providing that the board of managers and Special Committee of Viceroy Private Capital, LLC will remain in place and will continue to govern the SPV Debtors (Confirmation Order, Schedule I) |



# Delayed Effective Date

# Delayed Effective Dates are Permissible



## Bankruptcy Code does not set the effective date of a chapter 11 plan

- "Section 1129(a)(9) does not require that confirmation of the plan be immediately followed by the effective date of the plan." Hr'g Tr. 177:22-24, *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 3, 2019).

- In determining whether and to what extent to approve a delayed effective date, courts look at three things:

  1. Will the extra time benefit the estate and creditors?

  2. Does delay prejudice creditors or unfairly shift risks to creditors.

  3. Is the Effective Date "no later than is reasonably necessary to accomplish a legitimate purpose."

# Courts Regularly Confirm Plans with Delayed Effective Dates



## Post-confirmation executory periods are regularly approved. Examples include:

### Monetize Litigation Assets to Fund Plan Distributions

1. **Steward Health Care** – Ongoing, estimated two (2) year executory period

- *In re Steward Health Care Sys.*, *LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex.)

2. **Sears** – Holders of administrative expense claims paid in full following over three (3) year executory period

- *In re Sears*, No. 18-23538 (RDD) (Bankr. S.D.N.Y.)

3. **PRM Family Holding Co.** – Holders of administrative and priority claims paid in full following over fourteen (14) month executory period

- *In re PRM Family Holding Co., LLC*, No. 13-09026 (BKM) (Bankr. D. Ariz.)

### Secure Financing

1. **W.R. Grace** – Financing and other conditions met following approximately three (3) year executory period

- *In re W.R. Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del.)

2. **Seadrill** – Financing obtained and other conditions met following approximately four (4) month executory period

- *In re Seadrill Ltd.*, No. 21-30427 (DRJ) (Bankr. S.D. Tex.)

3. **NY Racing Ass'n** – Financing obtained and parallel proceeding approved during four (4) month executory period

- *In re N.Y. Racing Ass'n, Inc.*, No. 06-12618 (JMP) (Bankr. S.D.N.Y.)

### Obtain Regulatory Approval

1. **American Airlines –** Approving plan where effective date was contingent on regulatory approval of merger

- *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y.)

2. **Talen Energy** – Approvals received and other conditions met during five (5) month executory period

- *In re Talen Energy Corp.*, No. 22-90054 (MI) (Bankr. S.D. Tex. 2022)

3. **Caesars Entm't** – Approvals received and other conditions met during nine (9) month executory period

- *In re Caesars Entm't Operating Co.*, No. 15-01145 (ABG) (Bankr. N.D. Ill. 2017)

# Proposed Effective Date No Longer than Reasonably Necessary



**The proposed Effective Date accomplishes a legitimate purpose – i.e., to provide Debtors with time to monetize assets to fund Plan distributions**



Mr. Moore's testified to the fact that:

- "[The Debtors] don't have cash in the estate right now to really vigorously pursue [the Estate Claims]."
*See July 28, 2026 Hr'g Tr. at 282:15–16*

- The Plan estimates that Administrative Expense and Priority Claims get repaid in full "at $1.9 billion and change [of proceeds]." *See July 29, 2026 Hr'g Tr. at 129:16*

**Confirmation Date** — **Executory Period** — **Effective Date**

| Confirmation Date | Executory Period | Effective Date |
|---|---|---|
| Necessary transactions will occur to lock in benefits for estates, including:<br><br>• Estate Claims Credit Bid Transaction<br>• Litigation Trust will receive $75 million in Litigation Funding<br>• Litigation Trust Agreement will be executed, and Litigation Trust Waterfall will become operable<br>• Administrative Expense Consent Program forms to be distributed<br>• DIP Collateral Transaction and ABL Foreclosure implemented<br>• Debtor Release and Exculpation effective | • The Litigation Trust will prosecute Estate Claims using the Litigation Funding<br><br>• As proceeds are recovered by the Litigation Trust, distributions will be made, with payments to junior creditors (i.e., administrative and priority) beginning after $350 million in aggregate distributions | • Administrative and Priority Claims will have received payment in full (Plan is effective upon satisfaction of this condition). Plan § 12.1(n)<br>• Distributions commence to holders of claims in Class 3-5 and 7. Plan § 6.5<br>• Third-Party Releases become effective. Plan § 13.5(b)<br>• Plan Injunction become effective. Plan § 13.4(b)<br>• Releases of Remaining First Lien Claims and Remaining Second Lien Claims. Plan § 5.2(h)<br>• Cancellation of security documents Plan § 5.9 |



# Proposed Effective Date Does Not Prejudice Creditors



**Charles M. Moore**



Trial Transcript 7/28/26
Pgs. 227:25–228:9,
243:4–12

- Consummating transactions on the Confirmation Date locks in benefits of the Plan Settlement for the Estates, including the Litigation Funding, the Litigation Trust Waterfall, and the capping of the DIP A Claims

- Creditors are not prejudiced by the Plan; rather, the Plan protects them, as evidenced by the "best interests" test

> efficiency.  If there is no plan settlement, I don't know if the Debtors have any other option but to convert all of the Chapter 7 cases.  That would have to be decided at that point.  But what I do know is that we would be faced with an extremely messy situation, a very disorganized situation, at best, perhaps chaotic, in terms of how assets would be monetized, how there would be funding to be able to pursue monetization of assets, what would happen to proceeds that would be recovered.

> Q    Okay.  Thank you.  How important is the -- to the overall settlement is the litigation funding component?
> A    It's incredibly important.
> Q    Why is that?
> A    Having sufficient funds, to pursue litigation recoveries is key.  And this is in everyone's best interest.  As we can see through the waterfall, everyone is incentivized to maximize recoveries.  And so in order to do that, it's important that the litigation trust be properly funded.

# Independent Authority to Consummate Confirmation Date Transactions



> **There is independent authority under the Bankruptcy Code for each of the Confirmation Date Transactions**

| Confirmation Date Transaction | Authority |
|---|---|
| Estate Claims Credit Bid Transaction, including Litigation Trust Waterfall | § 363(b) |
| Litigation Trust Funding | § 364 |
| DIP Collateral Credit Bid Transaction, including DIP Collateral Trust Waterfall | § 363(b) |
| DIP Collateral Trust Funding | § 364 |
| ABL Priority Collateral Foreclosure | § 363(b) |
| Administrative Expense Claims Consent Program | §§ 503(a), 105(a) |
| Debtor Releases | § 363(b) |
| Exculpation | § 1125(e),1103(c), 105(a) |

56



# Plan Is Commercially Viable

# Section 1129(a)(11) Standard



"Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11)

## Reasonable Assurance of Commercial Viability

- "In determining whether a debtor's Chapter 11 plan of reorganization is feasible . . . only a **reasonable assurance of commercial viability is required**.'" *In re T-H New Orleans L.P.*, 116 F.3d 790, 801 (5th Cir. 1997).

- "The court **need not require a guarantee of success**." *In re Northbelt, LLC*, 630 B.R. 228, 279 (Bankr. S.D. Tex. 2020).

- Plan simply needs to provide **"a realistic liquidation."** Hr'g Tr. 30:20, *In re Steward Health Care Sys, LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. July 16, 2024).

- "Where the projections are credible, based upon the balancing of all testimony, evidence, and documentation, **even if the projections are aggressive, the court may find the plan feasible**." *In re T-H New Orleans*, 116 F.3d at 802



# Evolution's Feasibility Argument Lacks Merit

## Evolution Has Not Demonstrated An Interest in the $25 Million Restricted DIP Lender Cash

### There Is No Bona Fide Dispute

**The DIP Lenders hold a first-priority perfected lien on all DIP proceeds.**
*Final DIP Order ¶¶ 11(a), 24(a).*

▼

**DIP proceeds remain DIP collateral even after transfer from the Escrow Account, notwithstanding any commingling.**
*Final DIP Order ¶ 19(a).*

▼

**To establish a bona fide dispute in the $25 million that will be transferred to the Litigation Trust, Evolution would need to assert an interest in those DIP proceeds themselves — which it has not done.**

**The evidence in the record plainly establishes that the $25 million Litigation Trust funding is DIP Proceeds.**



"The $25 million litigation trust funding consists of *DIP cash on the Debtors' balance sheet that is currently restricted*."
*— July 28, 2026 Hr'g Tr. 225:23–226:2.*

Since drawing on the DIP in early October 2025, the Debtors have consistently maintained at least a $25 million balance from DIP proceeds. *— July 28, 2026 Hr'g Tr. 226:17–25.*

*Evolution offered no evidence refuting Mr. Moore's uncontroverted testimony.*

**Bottom line: Evolution has not identified, and cannot identify, any interest in the $25 million of DIP cash funding the Litigation Trust.**

59

# Estimate of Administrative Expense Claims is Reasonable



**Objections raised regarding the Debtors' estimate of
outstanding Administrative Expense Claims should be overruled**

As Mr. Moore's testimony establishes, A&M has personal knowledge and Debtors' methodology has sufficient controls

- A&M team used reasonable methods and applied a cushion on top of a conservative figure
- There is no evidence to the contrary

Objections that the Debtors' estimates do not take future claims into account, including claims asserted by SPV Lenders, should be rejected, as the evidence and record reflect:

- SPV Lenders (including Carval) do not hold valid administrative claims against the FBG Debtors – the adequate protection stipulations explicitly limit administrative expense diminution claims as against the applicable SPV Debtor, not FBG Debtors
  *See* Stipulation between Debtors and Carnaby ¶¶ 4-5 (Docket No. 230)
- Even if any SPV Lender could prevail on an adequate protection claim against an FBG Debtor (notwithstanding express language in the orders to the contrary), such claims would be offset by **substantial section 506(c) surcharge claims** held by the FBG Debtors

- Objectors' position does not alter the result. Once DIP A Claims are repaid, 90% of further Litigation Trust proceeds go to Administrative and Priority Claims until paid in full. *See* Plan § 6.5(a)(iv)

60



# Estate Claims

# Estate Claims



|  | 90 Day | 1 Year | Full Period |
|---|---|---|---|
| **AR Factoring (ARF) Programs** | | | |
| Leucadia | $ 737,623,204 | | $ 9,400,235,200 |
| Katsumi | 321,413,837 | | 5,685,073,511 |
| **Total Payments to ARF Programs** | **$ 1,059,037,041** | | **$ 15,085,308,711** |
| **Supply Chain Finance (SCF) Programs** | | | |
| Raistone Financing Parties | 188,234,558 | | 1,939,805,707 |
| PrimeRevenue Financing Parties | 162,743,463 | | 1,418,480,533 |
| LiquidX Financing Parties | 76,981,691 | | 979,552,136 |
| YieldStreet Financing Parties | - | | 222,218,046 |
| Orbian Financing Parties | 39,997,124 | | 114,017,780 |
| Interface Financing Parties | - | | 380,708 |
| **Total Payments to SCF Programs** | **$ 467,956,836** | | **$ 4,674,454,910** |
| **Onset** | | | |
| Onset | 46,143,097 | 987,417,170 | 2,331,851,090 |
| **Total Payments to Onset** | **$ 46,143,097** | **$ 987,417,170** | **$ 2,331,851,090** |
| **Insiders** | | | |
| Patrick James | 65,056,679 | 514,700,466 | 965,659,044 |
| Insiders (Ed James, Andy Brumbergs, etc.) | 4,153,621 | 23,083,434 | 23,083,434 |
| **Total Payments to Insiders** | **$ 69,210,300** | **$ 537,783,900** | **$ 988,742,478** |
| **Other** | | | |
| Acquisitions Payments | - | | 1,646,000,000 |
| Helios | 3,920,000 | | 79,931,026 |
| BDO Fees (minimum) | 260,177 | | 4,268,797 |
| Trade Payables | 196,957,131 | | 196,957,131 |
| **Total Other** | **$ 201,137,308** | | **$ 1,927,156,954** |
| **TOTAL PAYMENTS** | **$ 1,843,484,582** | **$ 1,525,201,070** | **$ 25,007,514,143** |

DX 235



# The Debtors Are Reasonably Likely to Achieve the Effective Date

*The Debtors have provided sufficient evidence to establish that the Plan has a reasonable assurance of commercial viability*

- The Debtors hold approximately $25 billion in assertable claims and causes of action. *See* 7/29 Tr. 16:20-18:23 (calculating the various estate claims to total roughly $25 billion).

- Of those $25 billion in assertable claims, ***$1.965 billion – approximately 8% – is needed*** to satisfy the estimate of outstanding Administrative Expense Claims and Priority Claims



Estate Claims

Monetization of 8% of Assertable Claims Required to Satisfy Estimated Administrative and Priority Claims

- This Court has found that debtors may confirm a plan by providing evidence of the **reasonably expected recoveries** of litigation claims. *See* Hr'g Tr. 37:4–10, *In re Steward Health Care Sys. LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. July 16, 2025) (emphasis added) (finding plan was feasible where debtors had produced evidence of over $2 billion in potential claims, around **13%** of which were needed to satisfy outstanding administrative expense claims).

63

# What the Debtors' Must Show on Feasibility; Not a Mini-Trial



- The Fifth Circuit has said, in *In Re Briscoe*, that feasibility "need not be a guarantee of success, ***only a reasonable assurance of commercial viability is required*.**" *See* Hr'g Tr. 29:17–20, *In re Steward Health Care Sys. LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. July 16, 2025) (emphasis added) (quoting 994 F.2d 110, 1165-66 (5th Cir. 1993)).  **The Debtors have done just that.**

- There is no question a Plan confirmation hearing "is not the day to have a trial on the merits on the potential causes of action," *see* Hr'g Tr. 9:5-6, *In re Steward Health Care Sys. LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. July 16, 2025).

- The Court here made clear here that "this is a confirmation hearing.  ***It's not a trial of the estate claims***, and it's not a mini trial of any adversary proceeding," and that "***no finding [the Court] make[s] at this hearing is going to . . . have a preclusive effect*.**"  7/29 Tr. 105:17-19 (emphasis added); *id.*106:8–10 (emphasis added); *see also id.* 78:9-10 ("I'm not adjudicating merits of litigation, and none of this is going to be binding on any party.").

# The LAM Parties' assertion that "market indicia" are an indicator of feasibility is irrelevant



- The Debtors' have not and do not need to provide a "valuation" of Estate Claims.

- Consistent with the requirements of the Bankruptcy Code, they have provided an **estimate of "monies to be realized . . . over time" as a result of  prosecution of a highly motivated Litigation Trustee funded with a minimum of $75 million.**  *See Gold Star Constr., Inc. v. Cavu/Rock Props. Project I, L.L.C. (In re Cavu/Rock Props. Project I, L.L.C.)*, 637 F. App'x 123, 125–26 (5th Cir. 2016).

- Supposed market indicators cannot inform the aggregate value of the Estate Claims.
  - The secondary-market trading of the DIP A Claims are not indicative of the aggregate potentially collectible proceeds of the Estate Claims, which may reflect illiquidity discounts, duration risk, the buyer universe's inability to hold litigation exposure.

  - The Debtors' marketing process also would not provide a proxy for aggregate recoverable proceeds.



# Kirschner's Expert Testimony Supports Feasibility



The Debtors called Marc Kirschner—a bankruptcy practitioner and litigation trustee with **over 50 years' experience**—to assess the estate's claims.

- **Experience:** Kirschner has served as a litigation trustee, liquidation trustee, Chapter 11 trustee, and financial advisor in major fraud and restructuring cases, including Refco Capital Markets, Tribune Company, Nine West, Yellowstone Mountain Club, and Platinum Partners. *See* 7/30 Tr. 6:11–9:12; 11:9–16.

- **Relevance:** "Every one of the matters I mentioned" involved "assessing the validity and potential recovery of any claims or causes of action," including "fraudulent transfers, . . . common law fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, claims against officers and directors." *See* 7/30 Tr. 12:11–14; 14:12–17.

- **Same Approach**: Kirschner applied the same methodology he has used throughout his career—reviewing pleadings, facts, caselaw, and investigative reports—and concluded that the same principles support feasibility here. 7/30 Tr. 41:14–22; *see also id.* 18:6–19.

- **Depth of Review**: Kirschner worked "[t]en or more hours a day for that entire time" from June 20 through July 14, 2026. 7/30 Tr. 42:2–5.

# Kirschner Conducted a Thorough Review and Reached Strong Conclusions Regarding the Estate Claims



- **Materials Considered**: Kirschner reviewed the disclosure statement, the plan, the examiner's report, the criminal indictments, the guilty pleas, Moore's declarations, complaints and other pleadings from three already filed adversary proceedings, as well as internal correspondence among FBG and its counterparties. A litigation trustee would reasonably rely on all such materials. 7/30 Tr. 25:10–37:18; 37:19–23; 114:10–13; 115:8–22.

- **The basis for Kirschner's opinion is "the extensive analysis [he] did here of all of the pleadings and other materials . . . , [his] analysis of caselaw pertinent to the issues here, . . . and [his] experience for 50 years in the restructuring business."** 7/30 Tr. 69:2–12.

- **Conclusion**: Based on this, he concluded that it is reasonably probable that a litigation trustee could recover $2 billion by the end of 2028. 7/30 Tr. 43:12–18.

  - Kirschner even testified he would "be comfortable at $10 billion" as a starting point—well below the $25 billion in total assertable claims. 7/30 Tr. 70:2–5.

# Kirschner's Opinions Are Independently Held



- **Drafting Process**: "I provided the lawyers riders on substantive matters. We had discussions for several days before I received the first draft. . . . I commented extensively on the first draft. A day or two later I got a second draft. I made extensive further comments on the second draft." 7/30 Tr. 332:25–333:19.

- **Considered defenses**: "I assumed defenses would be asserted in opposition to the claims." 7/30 Tr. 337:4–12.  And he testified he factored such defenses (including net loser and single satisfaction) into his conclusions. *See* 7/30 Tr. 65:24–66:24; 7/30 Tr. 67:11–14;146:1-7 ("But in analyzing my work, I took into account that there would be defenses and, nevertheless, I reached the conclusions I did."); 7/30 Tr.146:21-147:2.

- **Independently Reached Conclusions**: Of course he received facts from the Debtors as well, but his opinions are his own.  When asked whether he separately and independently reached his conclusions, Kirschner testified: "**Yes, sir.**" 7/30 Tr. 336:10–16.

# A&M and the UCC's Investigations Uncovered Facts Sufficient to Draft Three Complaints



## Onset Adversary Proceeding (DX 176):

- "Carnaby FA ostensibly borrowed money from Onset to pay the FBG Debtors for PP&E and then became responsible for repaying the loan **even though it has no assets or liquidity**." ¶ 113.

- Onset "**obtained no appraisals; it did not seek or obtain legal opinions** as to the validity of the purported sales or lease transactions; and it did not engage external counsel to negotiate or draft documentation." ¶ 99.

- The effective interest rates under the agreements were "**as high as nearly 200%**" "in stark contrast" to typical ABL interest rates, which are "closer to 6%." ¶ 119.

## James Adversary Proceeding (DX 167):

- "James working with others, . . . deployed at least four discrete strategies to perpetuate [the] fraud and secure financing from third-party lenders." ¶ 4.

- "[T]he Company was nearing insolvency or rendered insolvent well before the Petition Date and, at Defendants' direction, engaged in a series of increasingly complex and intentionally deceptive off-balance sheet arrangements in part designed to conceal First Brands' true financial condition." ¶ 103.

- "[H]undreds of millions of dollars were transferred . . . to James and entities under his control, or to third parties for his personal benefit from 2018 to 2025." ¶ 71.

# A&M and the UCC's Investigations Uncovered Facts Sufficient to Draft Three Complaints, Two of Which are Pending (cont'd)



## UCC's Proposed Complaint (DX 183)

Has similar allegations referencing fraudulent and fabricated invoices and false and misleading financial statements to create the illusion of a healthy business to obtain additional financing

- "[T]he vast majority of the $2.3 billion was based upon fraudulent invoices submitted by First Brands." "$1.4 billion of purported customer invoices submitted for factoring did not exist in First Brands Group's books and records. Another $1.1 billion of purported accounts receivable were overstated." ¶ 100.

- "First Brands operated as a Ponzi scheme. . . . [T]he Company used false and misleading financial statements, fabricated invoices, and other falsified records to create the illusion of a healthy business and thereby obtain additional financing." ¶ 93.

- "Even where the invoice was accurate and did exist, it was still the product of fraud. First Brands would often double or triple-factor the same accounts receivable: e.g., it would pledge a receivable to both a Customer Factoring partner and a Third-Party Factoring partner under separate deals." ¶ 101.

# The Record Reflects Sufficient Facts to Support Fraud



- **Supply Chain Fraud**: Chuck Moore also testified that the investigation "uncovered that the company was actually utilizing supply chain financing, at least in some instances, based on **fabricated invoices**," and that "supply chain factors were providing funding . . . that they thought was going to outside vendors, **but it was actually being rerouted directly to First Brands**."  7/28 Tr. 151:21-152:4.

- **AR Factoring Fraud**:  Moore also explained that sometimes "the invoice information that was used with . . . factors was **actually based on fabricated invoices, including made-up invoices**, so invoices representing shipments that did not occur, as well as inflating invoices or changing the amount of the invoice."  7/28 Tr. 150:5-12.

- **Inventory Fraud:** "[T]ransactions that were purportedly to have occurred between First Brands and the Onset SPVs **didn't appear to be reported or recorded** accurately." 7/28 Tr.162:7-9.

  -  He further testified "the debt to service on the Onset transactions approached $200 million per month in 2025," and "[t]here were constant needs of cash . . . to service this debt, and the cash had to come from a variety of sources, whether it was First Brands or related parties" because "**there was no ability for the Onset SPV to possibly service the debt**." 7/28 Tr. 164:8-11; 7/28 Tr. 12-25.



# Kirschner Testified About Potential Red Flags

- Kirschner testified regarding an email that Katsumi wrote to Ed James in September 2023 because invoices did "not match the invoices that they were factoring against." 7/30 Tr. 83:9-11 (discussing DX207).

- He further testified that in an April 2024 deck, Apollo described issues with respect to First Brands, including that "while it's not uncommon for management teams to exaggerate their run rate and how it impacts their synergies, et cetera, but in the case of First Brands, underscored, it is not just pro forma numbers that don't make sense." 7/30 Tr. 96:21-25 (discussing DX189).
  - Kirschner characterized this as Apollo indicating "there's some serious problems with the financial picture of the First Brands situation." 7/30 Tr. 97:19-20.

- Similarly, Kirschner explained that Centerbridge reported—in its analysis of four diligence questions—that "the cash flows from receivables has been positive despite significantly growing revenues (which is counterintuitive)," and that this was "another indication that there were concerns, in this case [a] third party had, with the financial situation at First Brands, its cash flows." 7/30 Tr. 107:4-25 (discussing DX190).

# The Examiner's Report Independently Noted Both a Lack of Diligence by Third Parties and a Criminal Financial Enterprise



- We don't know if the facts will ultimately bear out that these entities knew or should have known, or should have done more diligence, but this testimony based on materials considered, together with the fact that both Katsumi and Leucadia received billions of dollars from FBG, support that there is a **reasonable basis** for concluding that there are substantial claims against these parties.

- And the examiner's report—based on over 75 witness interviews and terabytes of documents—also concluded that the third-party factoring entities, which included Katsumi and Leucadia, "**did not implement robust verification procedures.**" DX184 at 67-68.

- The examiner also concluded that "preliminary findings **strongly support** the **existence of a criminal financial enterprise** built on the maintenance of parallel books. DX184 at 97-98.

73

# Kirschner Concluded The Claims Are Valuable



- Kirschner testified repeatedly "that **there are very good claims**." 7/30 Tr. 43:8-16; 68:2-17 ("I analyzed what I felt were very good causes of action");

  - "[T]here are **very** *valuable claims against Patrick James*." 7/10 Tr. 113:18-25.

  - With respect to the supply chain financing, Kirschner testified that he "formed a judgment that those are **valuable claims**." 7/10 Tr. 76:1-9.

  - Kirschner found there were "**serious claims and theories against Onset**." 7/10 Tr. 228:22-25; *see also* 7/10:15-24 (testifying that the Onset claims are a valuable asset of the estate).

  - And he specifically testified that he found the third-party factoring claims against Katsumi and Leucadia valuable as well. 7/10 Tr. 77:9-10.

- Kirschner also testified that the fake, inflated, double-pledged invoices support a litigation trustee asserting a Ponzi Scheme Presumption here and that facts existed to support a number of badges of fraud, including Ed James being on both sides of transactions, a company that had financial difficulty, and fraudulent financial statements. 7/10 Tr. 50:9-51:4 (stating those facts "were material to [him]."); 7/10 Tr. 55:1-15**.**

# Kirschner Would Not Have Put His Credibility on the Line if he Disagreed With the Conclusions



- Kirschner testified that if he didn't believe the debtors could obtain $2 billion by the end of 2028 he "***certainly would have [said so]. And [he] would not be here***." 7/30 Tr. 48:16–20.

- Kirschner drew upon his extensive experience to explain how the Litigation Trustee could recoup the $2 billion within this timeframe.

  - His experience in Refco taught him to not to "reinvent the wheel," and leverage professionals in place. 7/30 Tr. 72:7-19. He also explained there are processes to limit depositions.  7/30 Tr. 73:3-9.

  - A "technique" that "he use[s] frequently is to draft a complaint, deliver it to the potential defendant" or "to attempt to meet with either particular defendants or groups of defendants and attempt to obtain a mediation."  7/30 Tr. 73:15-25.

  - Kirschner also suggested "group[ing] common issues in cases and attempt to have trials, mini-trials on the common issues."  7/30 Tr. 74:3-5.

# Kirschner Provided Support for Collectability



- **Patrick James**:   Kirschner testified "the allegation is Patrick took out from FBG between" $700 and $800 million, which to Kirschner, "indicated he had substantial assets."  7/30 Tr. 118:5-11; *see also* 7/30 Tr. 119:14-15.

- **Onset:**  Onset "admit[s] in their pleading that they're one of the major lenders in the auto parts businesses.  They've done billions of dollars over the years," and "that they tout how successful their business is[.]" 7/30 Tr. 118:12-22.

- **Katsumi**:   Kirschner stated, based on the "billions of dollars of factoring," "it does appear that that entity potentially has a lot of assets." 7/30 Tr. 118:25-119:3.

- **LAM/Jefferies**: Jefferies having an "excess of $10 billion of net worth" is also "an important factor in analysis of collectability."  7/30 Tr. 119:4-10.

- **"Wrong Entity Defense"**:  Kirschner explained that a subsequent transferee could be sued as well as an original transferee. 7/30 Tr. 334:3-8.

- The question is "[w]hether it's reasonable to expect that a portfolio of claims of this character prosecuted by a trustee would generate funds to satisfy the obligations that the plan seeks to do so," and the Court found Kirschner "looked at everything in the totality," and "assist[ed] the Court in assessing feasibility."  7/30 Tr. 344:24-345:7.

# This is Not a Mini-Trial — The Feasibility Standard is Satisfied



- **Not a Mini-Trial:** As this Court has stated, "this is a confirmation hearing. It's not a trial of the estate claims, and it's not a mini trial of any adversary proceeding." 7/28 Tr. 105:18–20.

- **Rights Reserved:**  Objectors have every opportunity to put on their case at the appropriate time—nothing decided here is binding on the merits. *See* 7/29 Tr. 78:9-10, 105:17–19, 106:8–10.

- **Court's Ruling Admits Kirschner Under All Prongs of Rule 702**: After hearing **over 10 hours** of direct and cross, this Court found Kirschner's testimony is "based on sufficient facts and data" (702(b)), is "the product of reliable principles and methods" (702(c)), and that he "reasonably applied . . . those principles and methods to the facts of this case" (702(d)). 7/30 Tr. 344–348.

- **The Feasibility Standard Is Met**: The only question is whether enough evidence has been presented that the estate claims are valuable and commercially reasonable, and that there is a reasonable assurance the Debtors will be able to achieve $2 billion in recoveries. The Debtors answered that question with a resounding **yes**.



# Exhibit A: Resolved Objections

# Resolved Objections



**The FBG Debtors have resolved the following objections to confirmation of the Plan:**

1. **Texas Taxing Authorities** (Cameron County, Tarrant County, Hidalgo County, City of McAllen, and Brownsville ISD) (Docket No. 3228)

2. **PrimeRevenue, Inc.** (Docket No. 3249)

3. **The Unions** (Docket No. 3250)

4. **Official Committee of Non-Union Retirees** (Docket No. 3258)

5. **LBA RV-Company XVII, LP** (Docket No. 3268)

6. **Texas Commission on Environmental Quality** (by and through the Office of the Texas Attorney General) (Docket No. 3285)

7. **Texas Comptroller of Public Accounts** (by and through the Office of the Texas Attorney General) (Docket No. 3313)

8. **BPP Cannonball Park A LP** (f/k/a BPP Shiraz Park A LP) (Docket No. 3317)

9. **The Chubb Companies** (Indemnity Insurance Company of North America, ACE American Insurance Company, Federal Insurance Company, and their affiliated insurers) (Docket No. 3384)

10. **Oracle America, Inc.** (Docket No. 3287)

11. **Garza WARN Plaintiffs** (Docket No. 3273)

