**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC,** *et al.*, | § | **Case No. 25-90399 (CML)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |

**LAM PARTIES' NOTICE OF FILING OF DEMONSTRATIVE**

PLEASE TAKE NOTICE that, on July 28 through July 30, a hearing (the "***Confirmation Hearing***") was held before the Honorable Christopher M. Lopez of the United States Bankruptcy Court for the Southern District of Texas (the "***Court***") to consider confirmation of the *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (Docket No. 3448) (the "***Plan***") and final approval of the *Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* (Docket No. 2982) (the "Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that the Court has scheduled closing argument regarding the Confirmation Hearing to be held before the Honorable Christopher M. Lopez on August 7, 2026 at 9:00 a.m. (Central Time) (the "***Closing Argument***").

**PLEASE TAKE FURTHER NOTICE** that the undersigned counsel intends to present a PowerPoint demonstrative during the Closing Argument, a copy of which is attached hereto as **Exhibit A**.

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands.  The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

2

Dated:  August 7, 2026
Houston, Texas

*/s/ Paul E. Heath*
**VINSON & ELKINS LLP**
Paul E. Heath (TX 09355050)
Matthew D. Struble (TX 24102544)
845 Texas Avenue, Suite 4700
Houston, TX  77002
Tel:  713.758.2222
Email: pheath@velaw.com
       mstruble@velaw.com

**WACHTELL, LIPTON, ROSEN & KATZ**
Emil A. Kleinhaus (admitted *pro hac vice*)
Angela K. Herring (admitted *pro hac vice*)
Michael H. Cassel (admitted *pro hac vice*)
51 West 52nd Street
New York, NY  10019
Tel:  212.403.1332
Email: eakleinhaus@wlrk.com
       akherring@wlrk.com
       mhcassel@wlrk.com

***COUNSEL TO THE LAM PARTIES***

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 7, 2026 I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Paul E. Heath*
One of Counsel

## EXHIBIT A

# In re First Brands LLC, et al. Case No. 25-90399 (CML)

## Confirmation Hearing – Closing Argument

Wachtell, Lipton, Rosen & Katz
*Counsel for LAM Parties*

August 7, 2026

# What Needs To Be True to Confirm

**The Plan can only be confirmed if the evidence supports every conclusion below.**

| Requirement for Confirmation | Bankruptcy Code provision |
| --- | --- |
| 1. Administrative expense claims will be paid on the statutory "effective date." | § 1129(a)(9)(a) |
| 2. The Plan has a reasonable probability of going effective by 2028, with the Debtors recovering ~$2B to pay administrative expense claims. | §§ 1129(a)(9)(a), 1129(a)(11) |
| 3. The $75M credit bid should be approved under § 363 and the DIP A lenders are good faith purchasers for value. | § 363 |
| 4. The Plan, including the Preference Settlement, treats unsecured creditors equally. | § 1123(a)(4) |
| 5. The Plan can substantively consolidate the estates for some purposes and not others. | § 105(a), § 1123(a)(4) |
| 6. At each Debtor, an impaired accepting class has voted to approve the Plan. | §§ 1122, 1129(a)(10) |

# Effective Date

# The Plan will be "effective" before the "Effective Date"

## Debtors' Supplemental Interrogatory Response No. 14

**RESPONSE**:

Subject to and without waiving any objections, the Debtors supplement their Response as follows: If the Effective Date does not occur, the Debtors contend that the Estate Claims Credit Bid Transaction, Litigation Trust Funding, Administrative Expense Claims Consent Program, DIP Collateral Credit Bid Transaction, DIP Collateral Trust Funding, and foreclosure by the ABL Secured Parties on the ABL Priority Collateral, on the terms and condition set forth in Articles VI, VII, and VIII, the applicable Plan Supplement documents, and any other terms of the Plan that implement the foregoing Articles, as well as Sections 13.5(a) (Debtor Releases), 13.6 (Exculpation), 13.7, and 13.8 of the Plan, will not be null and void and will be protected by Sections 363(m) and 364(e), as applicable, in accordance with the Confirmation Order approving such transactions. These transactions will preserve the benefits obtained under the Plan Settlement, including the agreement with respect to the Litigation Trust Waterfall, and will protect the interests of creditors, including administrative and priority creditors. The remaining provisions of the Plan will become null and void in accordance with Section 12.3 of the Plan.

3

# The contractual "Effective Date" is not the statutory "effective date"

**11 U.S.C. § 1129(a)(9)(A)**

**(a)** "The court shall confirm a plan only if all of the following requirements are met"

**(9)(A)** "[T]he plan provides that … on the ==effective date of the plan==, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim"

The "*contractual*" effective date "may coincide with the *statutory* effective date, or, as in this case, the contractual effective date may occur much later than the statutory effective date."

*In re Good*, 428 B.R. 235, 245 (Bankr. E.D. Tex. 2010)

4

# The plain meaning of "effective date" is the date on which the Plan becomes operative and effectual.

- "[E]ffective date" means "[t]he date on which a statute, contract, insurance policy, or other such instrument becomes enforceable or otherwise takes effect."

  Black's Law Dictionary (12th ed. 2024)

- "Effect" means "'a quality or state of being operative'" and "[e]ffective" means "'ready for service or action . . . .'"

  *In re Musil*, 99 B.R. 448, 450 (Bankr. D. Kan. 1988) (citing Webster's New Collegiate Dictionary (1975 ed.))

# Feasibility

# Mr. Moore:  "The market speaks"

Q     So how do you know what those claims are worth then?

A     Well, that gets back to the market speaks.  And so when you have a process where you have many parties that have access to information, all the same information, they can make a determination as to what they believe those claims may be worth.

June 12, 2026 Hearing, Testimony of Charles Moore, 52:21-53:1;
July 29, 2026 Hearing, Testimony of Charles Moore, 177-78

# The market has spoken

**The $1 billion DIP A is trading at approximately $0.18, implying ~$200M in value.**



Carnaby Ex. 71 (ECF 3526-1)

Q    And the estate claims credit bid is $75 million, right?

A    Correct.

July 29, 2026 Hearing, Testimony of Charles Moore, 159:22-23



we can now confirm that the **credit bid is $75 million**.

LAM Ex. 21 (ECF 3429)

8

# Credit bid is equivalent to cash

Title 11 U.S.C. § 363(k) . . . provides that credit bidders "may offset [their] claim against the purchase price" of the property that is the subject of the § 363(b) bankruptcy sale. **This provision explicitly contemplates mixed bids of cash and claims, implicitly presupposing an equivalence with cash of the value of the credit bid.**

*In re Spillman Dev. Grp., Ltd.*, 710 F.3d 299, 307–08 (5th Cir. 2013)

9

# The market has spoken



**Mr. Moore's Testimony on Returns to Litigation Trust Funders**

July 30, 2026 Hearing, Testimony of Charles Moore, 180-81

Debtors' Ex. 235 (ECF 3466)

10

# Mr. Kirschner considered a tiny, cherry-picked fragment of the record.

Q    And the documents in the other materials considered

section -- with the exception of the very last document,

those are documents that counsel provided to you, correct?

A    That's correct.

Q    So, all the emails on this list, those are documents

that counsel collected and provided to you, right?

A    That's correct.

*Not reviewed or considered:*
- Financial statements (Tr. 134)
- SEC filings (Tr. 134)
- Audit and ratings agency reports (Tr. 135)
- Hearing transcripts (Tr. 135-36)
- Depositions (Tr. 136)

July 30, 2026 Hearing
Testimony of Marc Kirschner, 134:5-11

# Mr. Kirschner considered a tiny, cherry-picked fragment of the record.



**Redacted**

M. Kirschner Handwritten Notes of July 3, 2026 meeting with Weil Gotshal, FBG_CH1_00220484

> "L asks for some diligence. . . . James said we do a lot of business with Jefferies."

July 30 Hearing, M. Kirschner, 174

> "Jefferies was told by Centerbridge they were . . . attempt to raise new money with Project Raven."

July 30 Hearing, M. Kirschner, 174

Q    Right.  Those were the two topics this morning you discussed relating to LAM emails, right?

A    I believe certainly those two.

July 30, 2026 Hearing, Testimony of Marc Kirschner, 177:18-20

12

# Mr. Kirschner highlighted a January 13, 2023 email relating to Leucadia.

## Mr. Dondl sends diligence questions

**From:** Keith Dondl <keith.dondl@jefferies.com>
**Sent:** Friday, January 13, 2023 9:51 PM
**To:** James, Edward <ed.james@firstbrandsgroup.com>
**Cc:** Kishore Bukkarayasamudram <kishore.bukkaraya@jefferies.com>; Ross Berger <ross.berger@jefferies.com>
**Subject:** First Brands Group - LAM Credit/Due Diligence Questions for Pre Existing Jefferies AR Facility

EXTERNAL SENDER - CAUTION: This email originated from outside of our organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Ed,

*Thank you for the call today.  As discussed, please see below a summary of the questions we are looking for answers to:*

1. What is the aggregate $ amount of all **Inventory** financing facilities in place and what are the due dates for each of these facilities?
2. What is the aggregate $ amount of all **Payables** facilities in place and what are the due dates for each of these facilities?
3. What is the aggregate $ amount of all **AR securitization** facilities in place and what are the due dates for each of these facilities?
4. Are there any other **AR facilities** in place in addition to the Jefferies A/R facility with our group?
5. What is your projection of the Cash Interest Expense for the full year 2023 assuming current interest rates remain constant?
6. What was FBG's actual annual AR Factoring costs for 2022?
7. How much of the $1B in cash is domiciled in the US?

## Ed James responds

**From:** James, Edward [ed.james@firstbrandsgroup.com] on behalf of James, Edward <ed.james@firstbrandsgroup.com>
**Sent:** Saturday, January 14, 2023 2:35 PM
**To:** keith.dondl@jefferies.com
**CC:** Kishore Bukkarayasamudram; Ross Berger
**Subject:** RE: First Brands Group - LAM Credit/Due Diligence Questions for Pre Existing Jefferies AR Facility

**Importance:** High

Ross
As discuss with Keith , the HZ Global transaction and incremental raise is the result of Jeffries making the recommendation to FBG to acquire it and our decision tree relies on any future acquisition being neutral to our existing cash position and ability to continue grow organically. For this logic, Jeffries as the administrative agent was rewarded handsomely for both the transaction and increasing the raise and I will need to keep any future recommendations in mind if there is going to be any concerns when I request additional capacity for my organic growth. I am available to discuss this weekend if needed as I am surprised by the length of the questions when I have grown this facility with no issues or default..  What is more important is that Jeffries has preview of the information given that they are our administrative agents and presents our information for any incremental raise or any quarterly review

Keith
Call me on Monday to go over these questions but note that the balance sheet and audited results covers the questions that credit needs ..Nothing not covered by our financials and my responses will duplicate our lender presentation questions. I will get Steve on the call to go any of these questions if this is needed as well.  As mentioned, we are going to be in NY next week if we need to meet

Debtors' Ex. 75 (ECF 3370-17); July 30, 2026 Hearing, Testimony of Marc Kirschner, 102:17-103:5

13

# But he was not aware of the response.

## Ed James provided detailed responses to the questions within a day.

**From:** James, Edward <ed.james@firstbrandsgroup.com>
**Sent:** Saturday, January 14, 2023 9:22 AM
**To:** Keith Dondl <keith.dondl@jefferies.com>
**Cc:** Kishore Bukkarayasamudram <kishore.bukkaraya@jefferies.com>; Ross Berger <ross.berger@jefferies.com>
**Subject:** RE: First Brands Group - LAM Credit/Due Diligence Questions for Pre Existing Jefferies AR Facility

[External Message]

Keith
See responses and we can discuss further if needed on Monday

**From:** Keith Dondl <keith.dondl@jefferies.com>
**Sent:** Friday, January 13, 2023 9:51 PM
**To:** James, Edward <ed.james@firstbrandsgroup.com>
**Cc:** Kishore Bukkarayasamudram <kishore.bukkaraya@jefferies.com>; Ross Berger <ross.berger@jefferies.com>
**Subject:** First Brands Group - LAM Credit/Due Diligence Questions for Pre Existing Jefferies AR Facility

EXTERNAL SENDER · CAUTION: This email originated from outside of our organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Ed,

Thank you for the call today.  As discussed, please see below a summary of the questions we are looking for answers to:

1. What is the aggregate $ amount of all **Inventory** financing facilities in place and what are the due dates for each of these facilities? Only ABL has the Inventory collateral in the US  – Facility size of the ABL - $250 M. No other facility otherwise

2. What is the aggregate $ amount of all **Payables** facilities in place and what are the due dates for each of these facilities?

   1. NONE.
   2. Suppliers provide the extension of terms and our ABL lenders on various platforms reviews our financial positions and provides any SCF facilities on these platforms for Suppliers to take advantage of discounting their invoices if they choose to do so. FBG is not a party to these facilities .
   3. Our PAYABLE on the Balance Sheet reflects all outstanding AP balances. We can discuss further on Monday if further clarification is needed

3. What is the aggregate $ amount of all **AR securitization** facilities in place and what are the due dates for each of these facilities? Securitization .. See Audit in 2021 for this facility size . Covers customers that is not participates on the Jefferies program

4. Are there any other **AR facilities** in place in addition to the Jefferies A/R facility with our group? See response above on customers covered.

5. What is your projection of the Cash Interest Expense for the full year 2023 assuming current interest rates remain constant? For now Q3 financials present this information and the cashflow impact . Also sharing 5 year plan.  We will share the 2023 Budget when this is ready

6. What was FBG's actual annual AR Factoring costs for 2022? See Q3 for EBITDA reconciliation for all interest and factoring costs. Jeffries is the highest interest as the Securitization has 2% interest. You should be able to derive what Jeffries is changing in this no

7. How much of the $1B in cash is domiciled in the US? As mentioned, the $1 Billion proforma in the lender deck relates to $425 plus reserved for the HZN acquisition. We highlight what cash is unrestricted whether domestic or foreign in our lender deck and you can rely on this for your response.. We can discuss further on Monday if there is something specific you are looking on the domestic question

LAM Ex. 7 (ECF 3425-7); July 30, 2026 Hearing, Testimony of Marc Kirschner, 164:4-12

14

# Nor did he know about the meeting that followed.

**Senior management met with LAM representatives in person one week later.**

From: James, Edward <ed.james@firstbrandsgroup.com>
Sent: Tuesday, January 17, 2023 1:52:12 PM
To: Ross Berger <ross.berger@jefferies.com>; Kishore Bukkarayasamudram <kishore.bukkaraya@jefferies.com>; Keith Dondl <keith.dondl@jefferies.com>; Graham, Stephen <Steve.Graham@FirstBrandsGroup.com>
Cc: Crichlow, Sean <sean.crichlow@firstbrandsgroup.com>
Subject: Meeting

[External Message]

Ross/Kishore

Steve and I are available to host the LAM team next week . I am copying Sean who will coordinate the guest passes for the visit to our offices

Sean

Kindly provide our address and coordinate anything that the LAM team needs
Edward James
Executive Vice President
127 Public Square Suite 5300, Cleveland, OH 44114
**Direct:** | **Email:** ed.james@firstbrandsgroup.com

From: James, Edward <ed.james@firstbrandsgroup.com>
Sent: Monday, January 23, 2023 10:39 AM
To: Keith Dondl <keith.dondl@jefferies.com>; Graham, Stephen <Steve.Graham@FirstBrandsGroup.com>
Cc: Kishore Bukkarayasamudram <kishore.bukkaraya@jefferies.com>; Ross Berger <ross.berger@jefferies.com>
Subject: RE: Meeting - FBG / LAM

Keith
Thanks. We will have lunch brought in ... Let Sean know if there is any dietary restrictions or special lunch requests . I have shared the last request of questions with Steve and he and I are  happy to address any other agenda questions . Best to highlight these for the discussions. We can make it a free flowing discussions otherwise

LAM Ex. 9 (ECF 3425-9); July 30, 2026 Hearing, Testimony of Marc Kirschner, 168:7-21

# Mr. Kirschner also ignored the follow-up diligence.

**After the meeting, LAM sent further diligence questions**

**Several days later, Mr. Brumbergs responds**

Hi Ed/Steve,

Thanks for your time last week.

in regards to the invoice verification we discussed, could you please assist with facilitating a call with your ops team to go through the following items via video zoom. The goal of the exercise is to walk through the invoice lifecycle and associated cash movements from step 1 through 4 below for each invoice.

For the following invoices listed in the attached file, we would like to see the following:
1) A copy of the unredacted invoice that is sold to LAM.
2) Within the AP portal(s) where FBG has access(These would be your large customers where FBG participates in the Supply Chain Financing program):
a. Validate the Supplier request  (example: FBG's upload to the portal) at the invoice level.
b. Validate the Buyer/Obligor acceptance of early pay (example: O'Reilly digitally approving the invoice).
c. Validate the funder acceptance (Example: Funder digitally approving the invoice within the portal).
3) Please provide proof of payment from AP Funder to FBG (example: MUFG paying to FBG on the same invoice).
a. We are looking for the amount that was wired, the date of the wire, where the funds came from, and where the funds went to.
.If the wire is an aggregate of multiple invoice payments, please provide a data file that shows the list of invoices that comprise the wire amount including the invoice #, invoice amount, payment date, obligor name, seller/supplier name for each invoice.
4) Please provide proof of payment(for that same invoice) from FBG to LAM. – LAM Can  take care of this step but will let you know if we have any questions.

This exercise will help us close out our file.

Best regards,

Keith Dondl

| | |
|---|---|
| From: | Brumbergs, Andy [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A48ACBF298164D6C912E61805B50A737-ANDY.BRUMBE] |
| Sent: | 2/3/2023 4:34:50 PM |
| To: | keith.dondl@jefferies.com |
| CC: | James, Edward [ed.james@firstbrandsgroup.com]; Graham, Stephen [Steve.Graham@FirstBrandsGroup.com] |
| Subject: | RE: FBG - Invoice Verification |
| Attachments: | Inv Verification Documentation.zip |

Hi Keith –

Attaching documentation for the 8 transactions selected for testing.

For each transaction, we have provided the invoice, payment and remittance detail.

LAM Ex. 11 (ECF 3428); July 30, 2026 Hearing, Testimony of Marc Kirschner, 171:19-172:4

16

Mr. Kirschner highlighted a diligence request from Centerbridge relating to a margin loan, and inferred that Centerbridge declined to go forward as a result.

**Centerbridge Diligence Requests (October 2023)**



LAM Ex. 14 (ECF 3428-3); July 30, 2026 Hearing, Testimony of Marc Kirschner, 103:13-108:1, 183:1-4

# But he had no answer to the email below, which shows that First Brands declined to go forward.

| | |
|---|---|
| **From:** | Steve.Graham@firstbrandsgroup.com[Steve.Graham@firstbrandsgroup.com] |
| **Sent:** | Tue 10/31/2023 9:52:58 PM (UTC) |
| **To:** | Baker, Michael[Michael.Baker@firstbrandsgroup.com] |
| **Cc:** | Brumbergs, Andy[andy.brumbergs@firstbrandsgroup.com] |
| **Subject:** | Re: Margin Loan |

Who has been told
Both Carey and Hoffmann have called me earlier today

Sent from my iPhone

On Oct 31, 2023, at 5:12 PM, Baker, Michael
<Michael.Baker@firstbrandsgroup.com> wrote:

I've told them pencils down per Patrick so we can ignore any more diligence requests.

LAM Ex. 15 (ECF 3428-4); July 30, 2026 Hearing, Testimony of Marc Kirschner, 183:5-185:13

18

# And he was unaware that Centerbridge actively tried to revive the margin loan, offering $100M.

**From:** Melwani, Vivek [vmelwani@centerbridge.com]
**Sent:** 3/6/2024 9:18:04 PM
**To:** James, Patrick [pjpb@firstbrandsgroup.com]
**Subject:** FW: FBG Margin Loan Term Sheet
**Attachments:** FBG Margin Loan - Term Sheet (3.6.24).pdf

EXTERNAL SENDER - CAUTION: This email originated from outside of our organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Patrick, good talking last week.  As we discussed here is a revised term sheet to see if you want to reengage on the margin loan – we tried to simply if it a bit.  Larger changes laid out below.  Saw that you upsized your incremental with pretty good execution and you are buying a good brake business – you have been busy!  Let us know if you want to discuss.

Also steve and I will send you dates next week for us to visit in April.

Viv

**From:** Schnepp, Thomas <tschnepp@centerbridge.com>
**Sent:** Wednesday, March 6, 2024 1:49 PM
**To:** Melwani, Vivek <vmelwani@centerbridge.com>
**Cc:** Mahony, Kevin <kmahony@centerbridge.com>; Maass, Evan <emaass@centerbridge.com>; Balkan, Adam <abalkan@centerbridge.com>
**Subject:** FBG Margin Loan Term Sheet

Viv –

Attached is a term sheet for the updated margin loan facility.  This is consistent with the prior deal, but is adjusted to reflect:

- Facility size reduced from $400mm to $100mm at close + $100mm DDTL
- Coupon reduced by 100bps
- Maturity increased from 30m to 36m
- Streamlined mechanics, including removing the equity basket margin trigger and consolidating the cliff margin concept into the EBITDA margin test

LAM Ex. 16 (ECF 3428-5); July 30, 2026 Hearing, Testimony of Marc Kirschner, 187:6-19

19

# Mr. Kirschner's opinion is hedged and qualified.

Q    Now, Mr. Kirschner, you testified earlier about your opinions and one of the opinions that you identified is that it is reasonably probable that at least approximately 2 billion could be recovered by a litigation trustee by the end of 2028.  Do you remember that testimony?

A    That's correct.

Q    So, to be clear, you're not offering an opinion that is reasonably probable that at least these amounts will be recovered, are you?

A    I am not.  Your statement is correct.

# Mr. Kirschner did not address critical points.

**Gross Transfer Amount**



~$25B
gross
transfers

**No analysis or adjustments**

*No adjustment for:*

❌ Good faith defense
❌ Single satisfaction
❌ Forfeiture
❌ Collectibility

21

# Mr. Kirschner did not address critical points.

## § 548(c) good faith defense

Q     Are you expressing any opinion whatsoever on whether a good faith defense would succeed as to my clients or any potential defender?

A     I'm not expressing such an opinion.

July 30, 2026 Hearing, Testimony of Marc Kirschner, 146:8-11

## Leucadia due diligence

Q     So, setting aside whatever Mr. Moore may or may not have said about due diligence by Leucadia, you were not expressing any view here today on whether Leucadia conducted a diligent investigation of First Brands, right?

A     I'm not.

July 30, 2026 Hearing, Testimony of Marc Kirschner, 145:12-16

22

# Mr. Kirschner did not address critical points.

## The single satisfaction rule...

"The bankruptcy trustee cannot 'recover' property that the transferee returned to the debtor before the bankruptcy filing. And we are particularly wary of disrupting such a consistent rule in bankruptcy law, where uniformity 'is sufficiently important that our Constitution authorizes Congress to establish "uniform laws on the subject of bankruptcies throughout the United States."

The purpose of Section 550 is to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.

*In re DeBerry*, 945 F.3d 943, 947-48 (5th Cir. 2019)

## ... no analysis or opinion

```
Q    My question is slightly different.  My question is, you
were not stating any opinion in this Court of any kind on
whether the Single Satisfaction Rule could affect a Trustee
in recovering on claims?  You're not stating an opinion on
that, are you?
A    I am not.
```

July 30, 2026 Hearing, Testimony of Marc Kirschner, 147:5-10

23

# Mr. Kirschner did not address critical points.

## Federal forfeiture law…

[T]he Government, by application of § 853(c)'s relation-back provision, became something like a **secured creditor with a lien on the defendant's tainted assets superior to that of most any other party**.  See 4 Collier on Bankruptcy ¶ 506.03[1] (16th ed. 2015).  For this reason, § 853(c) has operated in our cases as a significant limitation on criminal defendants' property rights in such assets—even before conviction.

*Luis* v. *United States*, 578 U.S. 5, 16-17 (2016) (plurality opinion)

## … no analysis or opinion

Mr. Kirschner, you're not expressing any opinion here on whether forfeiture principles would affect the trustee's recovery in this case, are you?

A      I am not doing that.

July 30, 2026 Hearing, Testimony of Marc Kirschner, 153:16-20

24

# The Debtors presented no evidence on collectibility.

**Mr. Moore offered no testimony on collectibility.**

Q    So, Mr. Moore, you are not expressing -- you have not expressed in your direct testimony any opinion of the collectability of any claims that the litigation trust might obtain, right?

A    Correct.

Tr. 175:10-14

Q    You're familiar that the party to the receivables purchase agreement with the Debtors was LAM Trade Finance Group LLC?

A    That's my recollection.

Q    You're not expressing -- you've not expressed any opinion on the collectability of claims against that entity, right?

A    Correct.

Tr. 176:8-11

July 29, 2026 Hearing, Testimony of Charles Moore

25

# Mr. Kirschner expressed no opinion on collectibility.

Q    You are not expressing an opinion that any specific dollar amount is collectible, are you?

A    I am not expressing such an opinion.

Q    You're not expressing an opinion that any particular defendant can meet a judgment, are you?

A    I am not.

July 30, 2026 Hearing, Testimony of Marc Kirschner, 193:17-22

# Mr. Kirschner did not know basic facts about the LAM entities.

Q      And you're not expressing any opinion on whether the particular LAM entity that received transfers has assets available to meet a judgment, are you?

A      I am not expressing an opinion on that.   I have not looked into that subject, as I testified.

Tr. 197:1-5

Q      You don't know which of the LAM entities purchased receivables from First Brands, do you?

A      I do not know which one.

Q      You don't know which of the LAM entities received transfers from one or more of the Debtors, right?

A      I don't know which specific one received the transfers.

Tr. 139:10-13

July 30, 2026 Hearing, Testimony of Marc Kirschner

27

# Mr. Kirschner also did not know basic facts about other potential defendants.

| Defendant | Question | Answer |
|---|---|---|
| **James Brothers** | Q    Do you know whether the James Brothers have dissipated assets since then? | A    No, I do not. |
| **Katsumi** | Q    As regards to Katsumi, do you know which particular Katsumi entity received transfers? | A    No, I have not looked at the corporate structure of entities, so I've only referred to Katsumi as part of the transfers outflows from the Debtor to Katsumi. |
| **Onset** | Q    Right, my question was just in this section of your expert disclosure, Paragraphs 144 to 146 on collectability, did you mention Onset? | A    No, I don't think so specifically. |

July 30, 2026 Hearing, Testimony of Marc Kirschner, 197-98

# Section 363 – The Sale

# The Marketing Process Timeline



# Third-party bidders received limited information.

From: Ferrier, Kyle [Kyle.Ferrier@weil.com]
Sent: 5/24/2026 7:03:06 PM
To: ██████████████████████████ Uhrin, Matt [muhrin@alvarezandmarsal.com]; Haughey, Nicholas [nhaughey@alvarezandmarsal.com]
CC: ████████████████████████████████████████; Moore, Chuck [cmoore@alvarezandmarsal.com]; Mennie, James [jmennie@alvarezandmarsal.com]; Carlson, Clifford [Clifford.Carlson@weil.com]; Overdrive Marketing [Overdrive.Marketing@weil.com]
Subject: RE: FBG Litigation Assets Teaser - ████████████████

The data room for the estate marketing is fairly limited to include the publicly filed examiner report, complaints, and related public pleadings, plus certain specific documents related to Onset's financing, all of which is either public or previously shared with the DIP A holders.

We intentionally did not include the product of discovery, work product, or privilege analysis.

## Not a level playing field

LAM Ex. 18 (ECF 3428-7); July 29, 2026 Hearing, Testimony of Charles Moore 163:14-164:25

31

# The Ad Hoc Group got much more.

## The Ad Hoc Group received an A&M/Weil presentation and other privileged information about potential estate claims from the Debtors.

**INTERROGATORY NO. 8**:

State whether any information has at any time been shared with or otherwise made available to the Ad Hoc Group (or any member thereof) or any participant in the Estate Claims Credit Bid Transaction that in any way relates to the Estate Claims or the value of such Estate Claims that was not made available to all bidders, all potential bidders, or all prospective bidders as part of the Estate Claims Marketing Process. If so, describe such information with particularity.

**RESPONSE**:

Subject to and without waiving any objections, the Debtors further supplement their Response as follows: The Debtors respond that to the best of their knowledge, the Debtors have not provided any facts to the Ad Hoc Group—in its capacity as a bidder—that were not made available to interested bidders. The Debtors have shared draft pleadings in the James and Onset adversary proceedings, in addition to the "Summary of Findings" deck that the Debtors have produced at Bates No. FBG_CH1_00206939, with counsel to the Ad Hoc Group and certain of its members, but not in their capacity as a bidder. The Debtors have also had meetings and conversations with counsel to the Ad Hoc Group and certain of its members regarding the assessment of Estate Claims, but not in their capacity as a bidder.

LAM Ex. 4 (ECF 3422-4)

---

Q    Was the April 2026 summary of findings presentation put in the data room on May 4th?

A    It was not.

Q    Was it put in the data room on July 15th?

A    No.

Q    And it never was uploaded to the data room, right?

A    Correct.

July 29, 2026 Hearing, Testimony of Charles Moore, 172:9-15

# The Ad Hoc Group got much more.

**The Ad Hoc Group received a separate presentation on April 22, 2026 about the UCC's investigation.**

> I'm just asking was any of the information orally presented or a presentation given to other constituents outside of the committee?
>
> A.    It is my understanding that there was a presentation of, related to at least some aspects of the investigation made in late April to Mr. Uzzi as an advisor of the ad hoc group, certain ad hoc group members, and I think certain Debtor professionals.

July 24, 2026 Deposition of R. Winning (UCC 30(b)(6) designee), 48-49

33

# The teaser provided minimal information.



**Estate Claims Sale Overview**

Case 25-90399   Document 3020   Filed in TXSB on 06/17/26   Page 286 of 307

**The Estate Claims include:**

- Patrick James Adversary – Claims related to the adversary proceeding among the Debtors, Patrick James (the "Founder"), and certain related entities titled *First Brands Group LLC v. James*, Adv. Pro. No. 25-3803 (CML) (Bankr. S.D. Tex. 2025) (as may be amended or supplemented, the "Patrick James Adversary Proceeding").

- Onset Adversary – Claims related to the adversary proceeding among the Debtors, Onset Financial Inc. ("Onset"), Edward James (the "Founder's Brother"), and certain related entities, titled *First Brands Group LLC v. Onset*, Adv. Pro. No. 26-03005 (CML) (Bankr. S.D. Tex. 2026) (as may be amended or supplemented, the "Onset Adversary Proceeding").

- Avoidance Actions – Any avoidance actions, including any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the FBG Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, or (ii) applicable non-bankruptcy law.

- Recovery Actions – The Recovery Actions, as defined in the DIP Order, including (i) any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement, or otherwise; (ii) commercial tort claims, other estate claims and causes of action, and the proceeds of the foregoing; (iii) the proceeds of property recovered, whether by judgment, settlement, or otherwise from all claims and causes of action under section 549 of the Bankruptcy Code (and section 550 of the Bankruptcy Code solely as to claims and causes of action under section 549) to recover any postpetition transfer of property; and (iv) all amounts recovered by the Debtors' estates under section 506(c) of the Bankruptcy Code.

- All Other Claims – Any and all other claims and/or remedies that are held or controlled by, or which were or could have been asserted by, the FBG Debtors or their Estates against any Person, seeking relief or recovery arising from harm to any FBG Debtor, any FBG Debtors' estates, or the FBG Debtors' creditors taken as a whole, based on any legal theory.

4

**DEBTORS' EXHIBIT NO. 5**
Page 286 of 307

Q    Before July 15th, was there any information in the data room showing the total amount of avoidable transfers the Debtors were claiming?

A    No.

Q    Does the teaser contain any specific discussion of who might be sued besides James and Onset?

A    No.

July 29, 2026 Hearing, Testimony of Charles Moore, 166:6-12

Debtors' Ex. 5 (ECF 3354-5)

34

# The Debtors added information after July 15, but then immediately ended the process.

From:      Ferrier, Kyle [Kyle.Ferrier@weil.com]
Sent:      7/19/2026 4:28:18 PM
To:        ███████████████████████████████████████ Uhrin, Matt
           [muhrin@alvarezandmarsal.com]
CC:        Haughey, Nicholas [nhaughey@alvarezandmarsal.com]; Carlson, Clifford [Clifford.Carlson@weil.com]; Overdrive
           Marketing [Overdrive.Marketing@weil.com];██████████████████████
           ████████████████████; Rhine, Fredrick [Fredrick.Rhine@weil.com]; Palisi, Thomas
           [Thomas.Palisi@weil.com]
Subject:   RE: FBG Litigation Assets Teaser - ████████████

Second, our team will be uploading additional documents to the VDR over the course of today. These are the underlying source documents for much of A&M's analysis, as described in Mr. Moore's declaration, which we discussed on Friday. If you have any follow-up questions on the declaration or the source documents, we would be happy to discuss tomorrow.

As a reminder, we have extended the marketing process for a limited number of parties and have asked all participants to submit their proposed bid structures by tomorrow. If you would like to be considered as a purchaser of the Estate Claims, we will need your proposed bid structure, including dollar amounts, by early tomorrow evening.

LAM Ex. 21 (ECF 3429)

35

# The Debtors added information after July 15, but then immediately ended the process.

## Screenshot of excerpt from data room

| Fileroom | Index | Title | Hyperlink | Type | File Type | Level | File size in MB | Status | Date Available | Publishing Status | Tags | Unique Id |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Staging Folder | | Staging Folder | Staging Fol | SANDBOX | | MANAGE | | Unread | 2025-08-05 18:21 | UNPUBLISHED | | 689283f616c9b5c5b2c16495 |
| First Brands Group Estate Claims Marl.4 | Expert Declaration Supporting Docs | Expert Decl: | FOLDER | | MANAGE | | Unread | 2026-07-16 12:22 | PUBLISHED | | 6a59055550d9282981f4638d |
| First Brands Group Estate Claims Marl.4.3 | Onset Pleadings | Onset Pleac | FOLDER | | MANAGE | | Unread | 2026-07-16 12:23 | PUBLISHED | | 6a590592a9ade372e1e5bd63 |
| First Brands Group Estate Claims Marl.4.4 | Main Case Filings | Main Case F | FOLDER | | MANAGE | | Unread | 2026-07-16 12:23 | PUBLISHED | | 6a59059a29f607876a4ab68f |
| First Brands Group Estate Claims Marl.4.5 | Emails and Assorted | Emails and | FOLDER | | MANAGE | | Unread | 2026-07-16 12:24 | PUBLISHED | | 6a5905a442ac173ea9947eb2 |
| First Brands Group Estate Claims Marl.4.5.8 | Katsumi & Leucadia Split Out | Katsumi & L | FOLDER | | MANAGE | | Unread | 2026-07-16 12:25 | PUBLISHED | | 6a5906026abab1d58441be6d |
| First Brands Group Estate Claims Marl.4.5.8.1 | Separated Expert Witness Materials | Separated E | FOLDER | | MANAGE | | Unread | 2026-07-16 12:25 | PUBLISHED | | 6a5906026abab1d58441be6e |
| First Brands Group Estate Claims Marl.4.5.12 | Ed James emails | Ed James e | FOLDER | | MANAGE | | Unread | 2026-07-16 12:25 | PUBLISHED | | 6a5906036dba192fb4fa2b4c |
| First Brands Group Estate Claims Marl.4.6 | Crim | Crim | FOLDER | | MANAGE | | Unread | 2026-07-16 12:24 | PUBLISHED | | 6a5905ab0158031b6e9f639e |
| First Brands Group Estate Claims Marl.4.7 | PJ Pleadings | PJ Pleading | FOLDER | | MANAGE | | Unread | 2026-07-16 12:24 | PUBLISHED | | 6a5905b450d9282981f46b03 |
| First Brands Group Estate Claims Marl.5 | C. Moore Supporting Docs | C. Moore St | FOLDER | | MANAGE | | Unread | 2026-07-20 00:25 | PUBLISHED | | 6a5da340f660f2ca70b29a96 |
| First Brands Group Estate Claims Marl.5.1 | C. Moore Supporting Docs | C. Moore St | FOLDER | | MANAGE | | Unread | 2026-07-20 00:30 | PUBLISHED | | 6a5da463810f170d748ea94b |
| First Brands Group Estate Claims Marl.5.1.1 | Analyses | Analyses | FOLDER | | MANAGE | | Unread | 2026-07-20 00:30 | PUBLISHED | | 6a5da463810f170d748ea95e |
| First Brands Group Estate Claims Marl.5.1.2 | Filings | Filings | FOLDER | | MANAGE | | Unread | 2026-07-20 00:30 | PUBLISHED | | 6a5da463810f170d748ea99f |
| First Brands Group Estate Claims Marl.5.2 | Additional Supporting Docs | Additional S | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f00 |
| First Brands Group Estate Claims Marl.5.2.1 | BDO | BDO | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f01 |
| First Brands Group Estate Claims Marl.5.2.1.1 | BDO | BDO | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f02 |
| First Brands Group Estate Claims Marl.5.2.2 | Bowery | Bowery | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f08 |
| First Brands Group Estate Claims Marl.5.2.2.1 | Bowery | Bowery | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f09 |
| First Brands Group Estate Claims Marl.5.2.3 | D&O Insurance Policies | D&O Insurar | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f0b |
| First Brands Group Estate Claims Marl.5.2.3.1 | D&O Insurance Policies | D&O Insurar | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f0c |
| First Brands Group Estate Claims Marl.5.2.4 | Edward James | Edward Jarr | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f23 |
| First Brands Group Estate Claims Marl.5.2.4.1 | Edward James | Edward Jarr | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f24 |
| First Brands Group Estate Claims Marl.5.2.4.1.3 | Helios | Helios | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f27 |
| First Brands Group Estate Claims Marl.5.2.5 | Financials | Financials | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f2e |
| First Brands Group Estate Claims Marl.5.2.5.1 | Financials | Financials | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f2f |
| First Brands Group Estate Claims Marl.5.2.5.1.1 | Adjustment Instructions | Adjustment | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f30 |
| First Brands Group Estate Claims Marl.5.2.5.1.2 | FBG Financials | FBG Financ | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f47 |
| First Brands Group Estate Claims Marl.5.2.5.1.3 | FBG General Ledgers | FBG Genera | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f5c |
| First Brands Group Estate Claims Marl.5.2.5.1.4 | Results Bridges | Results Brid | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f65 |
| First Brands Group Estate Claims Marl.5.2.6 | SCF | SCF | FOLDER | | MANAGE | | Unread | 2026-07-20 01:47 | PUBLISHED | | 6a5db66c01a51511f6f26f8d |

LAM Ex. 22 (ECF 3429-1)

36

# Unequal Treatment

# The Preference Settlement is precluded by *Serta* and *ConvergeOne.*

- **As in *Serta***, the Plan uses a settlement to provide unequal value to creditors within the same class.  It also reinstates claims that are required to be disallowed (in *Serta* under Section 502(e)(1)(B); here under Section 502(d)).

- **As in *ConvergeOne***, the Plan grants a valuable opportunity only to select creditors, increasing their net recoveries.

- **Even under *QVC***, the settlement is discriminatory: rather than just granting releases, the estate is "exchanging" higher net recoveries (via claim allowance, preference waivers, and enhanced defenses) for eligible creditors' direct claims against third parties.

- **The record demonstrates** that the giveaway to favored unsecured creditors is as much as $200 million in potentially avoidable transfers (July 29, 2026 Hearing, Testimony of Charles Moore, 192:16-24).

38

# The Debtors have conducted no analysis of the value of direct claims against third parties.

> Q     But the Debtors have done no analysis of the value of the direct claims of any preference settlement electing creditor, right?
>
> A     I'm not aware of any analysis that's taken place as it relates to the direct claims.

July 29, 2026 Hearing, Testimony of Charles Moore, 193:11-15

# Selective Substantive Consolidation

# *Owens Corning* on "deemed" consolidation

**\*216** But perhaps the flaw most fatal to the Plan Proponents' proposal is that the consolidation sought was "deemed" (*i.e.,* a pretend consolidation for all but the Banks). If Debtors' corporate and financial structure was such a sham before the filing of the motion to consolidate, then how is it that post the Plan's effective date this structure stays largely undisturbed, with the Debtors reaping all the liability-limiting, tax and regulatory benefits achieved by forming subsidiaries in the first place? In effect, the Plan Proponents seek to remake substantive consolidation not as a remedy, but rather a stratagem to "deem" separate resources reallocated to OCD to strip the Banks of rights under the Bankruptcy Code, favor other creditors, and yet trump possible Plan objections by the Banks. Such "deemed" schemes we deem not Hoyle.

*In re Owens Corning,* 419 F.3d 195, 216 (3d Cir. 2005)

# Voting

# The Debtors attempt to carry the vote with administrative expense claims at two entities.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| First Brands Group Holdings, LLC | 3 | Roll-Up Claims | 756 | 0 | $2,984,482,259.21 | $0.00 | Accept |
| | | | 100% | 0% | 100% | 0% | |
| | 4 | First Lien Claims | No creditors in this Class were entitled to vote on the Plan. As a result, per Article 3.4 of the Disclosure Statement, this Class is eliminated from the Plan for voting purposes. | | | | |
| | 5 | Second Lien Claims | No creditors in this Class were entitled to vote on the Plan. As a result, per Article 3.4 of the Disclosure Statement, this Class is eliminated from the Plan for voting purposes. | | | | |
| | 6 | ABL Claims | No creditors in this Class were entitled to vote on the Plan. As a result, per Article 3.4 of the Disclosure Statement, this Class is eliminated from the Plan for voting purposes. | | | | |
| | 7 | General Unsecured Claims | 2 | 9 | $6,585,075.96 | $321,434,376.66 | Reject |
| | | | 18.18% | 81.82% | 2.01% | 97.99% | |
| Viceroy Private Capital, LLC | 3 | Roll-Up Claims | 756 | 0 | $2,984,482,259.21 | $0.00 | Accept |
| | | | 100% | 0% | 100% | 0% | |
| | 4 | First Lien Claims | No creditors in this Class were entitled to vote on the Plan. As a result, per Article 3.4 of the Disclosure Statement, this Class is eliminated from the Plan for voting purposes. | | | | |
| | 5 | Second Lien Claims | No creditors in this Class were entitled to vote on the Plan. As a result, per Article 3.4 of the Disclosure Statement, this Class is eliminated from the Plan for voting purposes. | | | | |
| | 6 | ABL Claims | No creditors in this Class were entitled to vote on the Plan. As a result, per Article 3.4 of the Disclosure Statement, this Class is eliminated from the Plan for voting purposes. | | | | |
| | 7 | General Unsecured Claims | 1 | 2 | $6,516,000.00 | $2.00 | Reject |
| | | | 33.33% | 66.67% | 99.99997% | 0.00003% | |

Voting Declaration, Debtors' Ex. 3 (ECF 3351)

Notwithstanding anything herein to the contrary, the Roll-Up Obligations will not be required to be repaid in full in cash, subject to compliance with the terms and conditions of this paragraph. **Notwithstanding that the Roll-Up Obligations are and remain superpriority administrative expense claims**, any party with requisite authority to solicit a plan pursuant to Section 1121 of the Bankruptcy Code may classify the Roll-Up Obligations as one or more class(es) of claims entitled to vote, **solely for the purposes outlined in this paragraph** (any such plan, a "Roll-Up Classification Plan").

Final DIP Order ¶ 25(e)

43

# The Debtors do not have a valid impaired accepting class at 30 other entities.

There is "**one clear rule** that emerges from otherwise muddled caselaw on § 1122 claims classification: **thou shalt not classify similar claims differently** in order to gerrymander an affirmative vote on a reorganization plan."

| *Greystone III* debtors' arguments for separate classification | 5th Circuit response |
| --- | --- |
| There is a "legal difference" between secured deficiency claims and trade creditors' claims | "[S]tate law is irrelevant where, as here, the Code has eliminated the legal distinction between non-recourse deficiency claims and other unsecured claims." |

*Matter of Greystone III Joint Venture*, 995 F.2d 1274 (5th Cir. 1991)

# The Debtors Gerrymandered Unsecured Creditor Votes.

**INTERROGATORY NO. 11:**

Do You contend that creditors in Classes 4, 5, and 6 (as defined in the Plan) have Secured Claims, and not only Deficiency Claims, at each and every FBG Debtor entity? If not, state which of the FBG Debtors that Classes 4, 5, and 6 (as defined in the Plan) have Secured Claims against, and at which FBG Debtors they possess only Deficiency Claims against.

**RESPONSE:**

In addition to the foregoing Reservation of Rights, General Objections, Objections to Definitions, and Objections to Instructions, all of which are incorporated herein by reference, the Debtors object to this Interrogatory as a premature contention interrogatory. The Debtors further object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the attorney-work-product doctrine, the common interest privilege, the joint defense privilege, the mediation privilege, the *Supplemental Agreed Protective Order* between the Debtors and the Examiner (Dkt. 1364), or any other applicable privilege. The Debtors further object to this Interrogatory as overbroad, unduly burdensome, and not proportionate to the discovery needs of the Confirmation Hearing. The Debtors also object to this Interrogatory to the extent it calls for a legal conclusion.

Subject to and without waiving any objections, the Debtors respond as follows: the First Lien Claims in Class 4 are treated as unsecured under the Plan; the Second Lien Claims in Class 5 are treated as unsecured under the Plan; and the ABL Claims in Class 6 are treated as secured claims under the Plan. The collateral securing the ABL Claims is to be transferred to the ABL Collateral Trust, and the amount of any deficiency claims, if any, will depend on the proceeds generated by the ABL Collateral Trust.

**INTERROGATORY NO. 12:**

State Your basis for separate classification of the Deficiency Claims of Classes 4, 5, and 6 (as defined in the Plan) and the claims in Class 7 (as defined in the Plan).

**RESPONSE:**

In addition to the foregoing Reservation of Rights, General Objections, Objections to Definitions, and Objections to Instructions, all of which are incorporated herein by reference, the Debtors object to this Interrogatory as a premature contention interrogatory. The Debtors further object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the attorney-work-product doctrine, the common interest privilege, the joint defense privilege, the mediation privilege, the *Supplemental Agreed Protective Order* between the Debtors and the Examiner (Dkt. 1364), or any other applicable privilege. The Debtors further object to this Interrogatory as overbroad, unduly burdensome, and not proportionate to the discovery needs of the Confirmation Hearing. The Debtors also object to this Interrogatory to the extent it calls for a legal conclusion.

Subject to and without waiving any objections, the Debtors respond as follows: the Claims in Classes 4, 5, and 6 arise out of different credit agreements with the Debtors, whereas the Claims in Class 7 are general unsecured claims. The holders of such claims have different legal rights against the estates. Therefore, they are separately classified.

LAM Ex. 1 (ECF 3422-1)

It is undisputed that if all prepetition unsecured claims voted in the same class, the Plan would fail at an additional 30 Debtor entities.