*Execution Version*

---

**SECURITIES PURCHASE AGREEMENT**

among

**CARTER CARBURETOR HOLDINGS, LLC**

**AND**

**CARTER CARBURETOR, LLC,**

*as the Buyers*

**WALBRO CO. LTD.**

**AND**

**WEM NEWCO, LLC**

*as the Companies*

and

**THE SELLERS NAMED HEREIN**

*as the Sellers*

Dated as of September 29, 2023

---

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093807

**DEBTORS' EXHIBIT NO. 236**
**Page 1 of 216**

## TABLE OF CONTENTS

**Page**

**ARTICLE I   DEFINITIONS** ................................................................. **6**

    Section 1.1   Certain Defined Terms .......................................... 6

    Section 1.2   Table of Definitions ............................................. 16

**ARTICLE II   PURCHASE AND SALE; CLOSING** ..................................... **18**

    Section 2.1   Purchase and Sale ............................................... 18

    Section 2.2   Purchase Price .................................................... 18

    Section 2.3   Closing ............................................................. 18

    Section 2.4   Delivery of Closing Estimates .............................. 18

    Section 2.5   Seller Closing Deliverables .................................. 19

    Section 2.6   Buyer Closing Deliverables .................................. 20

    Section 2.7   Transactions at Closing ........................................ 20

    Section 2.8   Post-Closing Adjustment ...................................... 21

    Section 2.9   Earnout Consideration ......................................... 23

    Section 2.10   Withholding ..................................................... 26

**ARTICLE III   REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE SELLERS** ............................................. **26**

    Section 3.1   Authorization ..................................................... 26

    Section 3.2   No Violation ...................................................... 26

    Section 3.3   Consents and Approvals ....................................... 27

    Section 3.4   Title to Securities ............................................... 27

    Section 3.5   Litigation .......................................................... 27

    Section 3.6   No Brokers or Finders .......................................... 27

**ARTICLE IV   REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE ACQUIRED COMPANIES** ....................... **27**

    Section 4.1   Organization and Qualification; Authorization .......... 27

    Section 4.2   No Violation ...................................................... 28

    Section 4.3   Consents and Approvals ....................................... 28

    Section 4.4   Capitalization .................................................... 28

    Section 4.5   Financial Statements; Accounting and Internal Controls; Projections .... 29

    Section 4.6   Absence of Undisclosed Liabilities ........................ 30

    Section 4.7   Accounts and Notes Receivable; Accounts Payable .... 30

    Section 4.8   Inventory .......................................................... 30

i

CONFIDENTIAL

FBG_CH1_00093808

## TABLE OF CONTENTS

**Page**

Section 4.9    Absence of Changes or Events ............................................................. 30

Section 4.10    Assets ................................................................................................. 31

Section 4.11    Proprietary Rights ............................................................................. 31

Section 4.12    Contracts ........................................................................................... 33

Section 4.13    Litigation ........................................................................................... 34

Section 4.14    Compliance with Laws ...................................................................... 34

Section 4.15    Licenses and Permits ......................................................................... 35

Section 4.16    Health, Safety and Environment ....................................................... 35

Section 4.17    Taxes ................................................................................................. 36

Section 4.18    Employee Benefit Plans .................................................................... 38

Section 4.19    Employees; Labor Relations .............................................................. 40

Section 4.20    Related Party Transactions ................................................................ 42

Section 4.21    Real Property .................................................................................... 43

Section 4.22    Suppliers and Customers ................................................................... 43

Section 4.23    Insurance Policies ............................................................................. 44

Section 4.24    Bank Accounts .................................................................................. 44

Section 4.25    Trade Names; Business Locations ..................................................... 44

Section 4.26    Products ............................................................................................. 44

Section 4.27    Anti-Money Laundering .................................................................... 45

Section 4.28    Anticorruption; Improper Payments .................................................. 45

Section 4.29    International Trade Laws ................................................................... 45

Section 4.30    No Brokers or Finders ....................................................................... 46

**ARTICLE V    REPRESENTATIONS AND WARRANTIES OF THE BUYER ........... 46**

Section 5.1    Organization; Authorization ............................................................. 46

Section 5.2    No Violation ...................................................................................... 47

Section 5.3    Consents and Approvals .................................................................... 47

Section 5.4    Litigation ........................................................................................... 47

Section 5.5    Investment Intent .............................................................................. 47

Section 5.6    No Brokers or Finders ....................................................................... 47

**ARTICLE VI    RESERVED ................................................................................................ 47**

**ARTICLE VII    OTHER COVENANTS AND AGREEMENTS ....................................... 47**

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093809

**DEBTORS' EXHIBIT NO. 236**
**Page 3 of 216**

## TABLE OF CONTENTS

**Page**

Section 7.1    Restrictive Covenants ........................................................................... 47

Section 7.2    Agreements Regarding Tax Matters ..................................................... 49

Section 7.3    Employee Matters ................................................................................ 52

Section 7.4    Further Assurances............................................................................... 52

Section 7.5    Intercompany Arrangements................................................................ 52

Section 7.6    General Release .................................................................................... 52

Section 7.7    Public Announcements ........................................................................ 53

Section 7.8    D&O Insurance .................................................................................... 53

Section 7.9    Section 280G........................................................................................ 53

Section 7.10   No Outside Reliance; Acknowledgement by the Buyers....................... 54

Section 7.11   Directors and Officers.......................................................................... 54

Section 7.12   Contract Assignments .......................................................................... 55

**ARTICLE VIII   RESERVED.......................................................................................... 55**

**ARTICLE IX    RESERVED.......................................................................................... 55**

**ARTICLE X    RESERVED.......................................................................................... 55**

**ARTICLE XI    MISCELLANEOUS ............................................................................. 55**

Section 11.1   Non-survival ........................................................................................ 55

Section 11.2   Notices ................................................................................................. 56

Section 11.3   Expenses .............................................................................................. 56

Section 11.4   Entire Agreement ................................................................................ 56

Section 11.5   No Third-Party Beneficiaries................................................................ 57

Section 11.6   Assignments ........................................................................................ 57

Section 11.7   Amendment; Waiver............................................................................ 57

Section 11.8   Agreement Controls ............................................................................ 57

Section 11.9   Severability .......................................................................................... 57

Section 11.10  Governing Law ..................................................................................... 58

Section 11.11  Consent to Jurisdiction; Service of Process; Waiver of Jury Trial .......... 58

Section 11.12  Specific Performance............................................................................ 58

Section 11.13  Other Remedies.................................................................................... 59

Section 11.14  No Recourse Against Affiliates ............................................................ 59

Section 11.15  Rules of Construction .......................................................................... 59

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093810

**DEBTORS' EXHIBIT NO. 236**
**Page 4 of 216**

**TABLE OF CONTENTS**

**Page**

Section 11.16  Counterparts; Deliveries .............................................................................. 61

iv

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093811

**DEBTORS' EXHIBIT NO. 236**
**Page 5 of 216**

## SECURITIES PURCHASE AGREEMENT

This SECURITIES PURCHASE AGREEMENT (this "**Agreement**"), dated as of September 29, 2023, is among Carter Carburetor Holdings, LLC, a Delaware limited liability company (the "**Japan Buyer**"), Carter Carburetor, LLC, a Delaware limited liability company (the "**US Buyer**" and collectively with the Japan Buyer, the "**Buyers**"), Walbro Midco LLC, a Delaware limited liability company ("**Midco Seller**"), Walbro LLC, a Delaware limited liability company ("**US Seller**" and collectively with Midco Seller, the "**Sellers**"), WEM Newco, LLC, a Delaware limited liability company ("**US NewCo**") and Walbro Co. Ltd., Walbro Co., Ltd., a Japanese joint stock company (*kabushiki kaisha*) ("**Walbro Japan**" and collectively with US NewCo, the "**Companies**").

## RECITALS

A.      As of the date hereof, (i) Midco Seller owns, beneficially and of record, all of the issued and outstanding equity interests of Walbro Japan and (ii) US Seller owns, beneficially and of record, all of the issued and outstanding equity interests of US NewCo.

B.      Prior to the date hereof, US Seller contributed all of the assets and liabilities held by US Seller related to the Walbro Engine Management and Aftermarket divisions to US NewCo.

C.      Subject to the terms and conditions set forth herein, upon the execution and delivery of this Agreement, Japan Buyer will acquire one hundred percent (100%) of the issued and outstanding Equity Securities of Walbro Japan (the "**Walbro Japan Securities**") from Midco Seller, in exchange for the payment by Japan Buyer to Midco Seller of an amount equal to the Japan Purchase Price.

D.      Immediately thereafter, subject to the terms and conditions set forth herein, Japan Buyer will make an intercompany loan equal to the Japan Contribution Amount to Walbro Japan, and immediately thereafter, Walbro Japan will use such loan proceeds to pay the outstanding amounts due under that certain Intercompany Loan Agreement, dated as of October 26, 2021 (the "**Existing Walbro Japan Note**"), by and between Walbro Japan, Walbro US Holdings, Inc., a Delaware corporation and predecessor-in-interest to WEM US Co., a Delaware corporation and direct parent of US Seller ("**Walbro US Parent**"). To effectuate the intercompany loan and the payoff of the Existing Walbro Japan Note, the Japan Contribution Amount will be paid by Japan Buyer directly to Walbro US Parent (the transactions described in this recital, the "**Japan Contribution**").

E.      Simultaneously with the transactions described in the proceeding recitals, US Buyer will acquire one hundred percent (100%) of the issued and outstanding Equity Securities of US NewCo (the "**Walbro US Securities**," and collectively with the Walbro Japan Securities, the "**Securities**") from US Seller, in exchange for the payment by Japan Buyer to US Seller of an amount equal to the US Purchase Price.

F.      Concurrently with entering into this Agreement, as a condition and inducement to the willingness of the Buyers to enter into this Agreement, certain of the parties hereto and their respective Affiliates are entering into (i) the Transition Services Agreements set forth on Annex A, substantially in the form attached hereto as Exhibit A (the "**Transition Services Agreements**"), pursuant to which, among other things, the parties thereto shall provide certain transitional services to their respective counterparties following the Closing, and (ii) that certain Trademark License Agreement, substantially in the form attached hereto as Exhibit B (the "**Trademark License Agreement**"), pursuant to which, among other things, US Seller shall provide the Acquired Companies with a royalty-free license with respect to utilization of certain Trademarks as more fully set forth therein and (iii) that certain Supply Agreement, substantially in the form attached hereto as Exhibit C (the "**Supply Agreement**"), pursuant to which, among

5

US-DOCS\144371506.11

CONFIDENTIAL                                                                FBG_CH1_00093812

other things, the Acquired Companies shall agree to supply US Seller with certain inventory as more fully set forth therein.

## AGREEMENT

In consideration of the foregoing and the mutual representations, warranties, covenants and agreements contained herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1   **Certain Defined Terms**.  For purposes of this Agreement:

"**Acquired Companies**" means, collectively, the Companies and each of their direct and indirect Subsidiaries, and "**Acquired Company**" means each of such entities individually.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person.  As used herein, the term "control" means (a) the power to vote at least 10% of the voting power of a Person, or (b) the possession, directly or indirectly, of any other power to direct or cause the direction of the management and policies of such a Person, whether through ownership of voting securities, by contract or otherwise.

"**Affiliated Group**" means an affiliated group as defined in Section 1504 of the Code (or analogous combined, consolidated or unitary group defined under state, local or non-U.S. income Tax Law).

"**Affordable Care Act**" means the Patient Protection & Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, as amended and as interpreted in applicable administrative guidance and the rules and regulations issued thereunder.

"**Ancillary Agreements**" means the Escrow Agreement, the Transition Services Agreements, the Trademark License Agreement, the Supply Agreement, the Employee Secondment Agreement, and the Employee Transfer Agreement.

"**Balance Sheet Date**" means July 31, 2023.

"**Base Purchase Price**" means $65,000,000.

"**Business**" means the business of developing, manufacturing, trading and supplying engines, carburetors, ignition systems, fuel injection systems. For the avoidance of doubt, the "Business" shall not include the Retained Business.

"**Business Day**" means a day other than Saturday, Sunday or any other day on which banks in Ohio or Boston, Massachusetts are required or authorized to be closed.

"**Buyer Benefit Plan**" means, with respect to each Buyer, each Employee Pension Benefit Plan, Employee Welfare Benefit Plan, Multiemployer Plan, Multiple Employer Plan, Multiple Employer Welfare Arrangement, Title IV Plan, pension plan, plan of deferred compensation, medical plan, life insurance plan, long-term disability plan, dental plan, or other plan, program, arrangement or trust, personnel policy (including vacation time, holiday pay, sick leave, other forms of paid time off, bonus programs, moving or

6

US-DOCS\144371506.11

CONFIDENTIAL                                                                                 FBG_CH1_00093813

other expense reimbursement or payment programs), excess benefit plan, bonus or incentive plan (including stock options, restricted stock, stock bonus and deferred bonus plans), severance agreement, salary reduction agreement, change-if-control agreement, employment agreement, consulting agreement or any other benefit, program or Contract, whether or not written or pursuant to a Collective Bargaining Agreement.

"**Calculation Time**" means 11:59 p.m., Eastern time, on the day immediately prior to the Closing Date.

"**Cash**" means the aggregate amount of all cash and cash equivalents of the Acquired Companies (including marketable securities, short term investments, liquid instruments, petty cash, deposits in transit to the extent there has been a reduction of receivables on account therefor, the amount of any received and uncleared checks, wires or drafts, and reduced by the amount of any issued but uncleared checks, wires or drafts).

"**Closing Date Cash**" means the Cash other than (a) with respect to Cash held outside the U.S., any amounts that would be required to repatriate such cash into the U.S. in excess of $2,300,000 and (b) Cash restricted from use except for a contractually specified purpose or used as collateral for, or otherwise to provide credit support for, any liabilities of any Person under any letter of credit or other Contract, in each case of the Acquired Companies as of the Calculation Time and determined in accordance with GAAP using, to the extent in accordance with the Working Capital Schedule and GAAP, provided that where there is a conflict between the Working Capital Schedule and GAAP, the Working Capital Schedule shall control.

"**Closing Date Indebtedness**" means the Indebtedness of the Acquired Companies as of immediately prior to the Closing. For purposes of this Agreement and solely to avoid any double counting or duplication, any amounts to the extent actually taken into account in (i) the calculation of Closing Date Indebtedness will not be included in the calculation of Seller Transaction Expenses, (ii) the calculation of Seller Transaction Expenses will not be included in the calculation of the calculation of Closing Date Indebtedness; (ii) the calculation of Net Working Capital will not be included in the calculation of Closing Date Indebtedness.

"**Closing Date Seller Transaction Expenses**" means the Seller Transaction Expenses as of immediately prior to the Closing (but calculated assuming that the Closing has occurred such that any Seller Transaction Expenses triggered by the Closing are included in the Closing Date Seller Transaction Expenses).

"**COBRA**" means Section 4980B of the Code and Part 6 of Title I of ERISA (or any successor provisions thereto) and the rules and regulations promulgated thereunder.

"**COBRA Coverage**" means continuation of group health plan coverage required under COBRA.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreement**" means any Contract or other agreement with a labor union or labor organization or other employee representative.

"**Company Products**" means each product and service developed, marketed, licensed, sold, performed, produced, serviced, distributed or otherwise made available by any Acquired Company, including any product or service currently under development by the Acquired Companies.

7

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093814

"**Confidential Information**" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, of any Acquired Company, including all financial information, customer and supplier contact information, prices, internal practices, forecasts, business, marketing, development, sales and other commercial strategies, unpatented inventions, ideas, methods and discoveries, trade secrets, know-how, unpublished patent applications, designs, specifications, documentation, components, source code, object code, schematics, drawings, protocols and processes.  Notwithstanding the foregoing, "Confidential Information" shall not include (a) any information that is or becomes generally known to and available for use by the public other than as a result of any acts or omissions of any party hereto or any of its Affiliates; (b) is, was or becomes available to any party hereto on a nonconfidential basis from a source other than from another party to this Agreement, provided that such source is not, to the knowledge of such party, bound by a confidentiality agreement with such other party, or is under another contractual, legal or fiduciary obligation to, such other party; (c) has been or is independently developed by such party or its representatives without the use of Confidential Information or in violation of the terms of this Agreement; or (d) is related to the Retained Business and such information does not constitute a trade-secret or know-how or relate to the forecast or strategies of the Acquired Companies.

"**Contracts**" means all legally binding contracts, agreements, licenses, indentures, notes, bonds, instruments, leases, mortgages, sales orders, purchase orders, arrangements, commitments, obligations and other understandings or undertakings of any nature, in any case whether written or oral, and all amendments, restatements, supplements or other modifications thereto or waivers thereunder.

"**Employee Pension Benefit Plan**" means an "employee pension benefit plan" (as defined in Section 3(2) of ERISA whether or not subject to ERISA).

"**Employee Secondment Agreement**" means the Employee Secondment Agreement, by and among the US Buyer, US Seller and US NewCo, substantially in the form attached hereto as Exhibit D.

"**Employee Transfer Agreement**" means the Employee Transfer Agreement, by and among the US Buyer, US Seller and US NewCo, substantially in the form attached hereto as Exhibit E.

"**Employee Welfare Benefit Plan**" means an "employee welfare benefit plan" (as defined in Section 3(1) of ERISA whether or not subject to ERISA).

"**Environmental and Safety Requirements**" means any Law concerning pollution, protection of the environment, or human health and safety, including all those Laws relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, migration, control, or cleanup of any Hazardous Materials.

"**Equity Securities**" means, if a Person is a corporation, shares of capital stock of such corporation and, if a Person is a form of entity other than a corporation, ownership interests in such form of entity, whether membership interests, partnership interests or otherwise.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations issued thereunder.

"**ERISA Affiliate**" means any Acquired Company and any predecessor of any Acquired Company and any other Person who constitutes or has constituted all or part of a controlled group or had been or is under common control with, or whose employees were or are treated as employed by any Acquired

8

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093815

Company and/or any predecessor of an Acquired Company, under Section 414 of the Code or Section 3(40)(B)(ii) or 4001(b) of ERISA.

"**Escrow Agent**" means Western Alliance Bank, an Arizona corporation, d/b/a Bridge Bank.

"**Escrow Agreement**" means the Escrow Agreement, by and among the Buyers and the Sellers, substantially in the form attached hereto as Exhibit F.

"**Event**" means any event, change, development, effect, condition, circumstance, matter, occurrence or state of facts.

"**Fraud**" means a claim by a party hereto for an intentional misrepresentation or omission of a material fact which is (a) false and known by the party making such misrepresentation or omission to be false, (b) made for the purpose of inducing such party to rely on such misrepresentation or omission and (c) is actually relied upon by such party, in each case, solely with respect to the making by a party of any of the representations and warranties contained in Article III, Article IV or Article V; provided that, for the avoidance of doubt, "Fraud" shall not include any claim based on constructive knowledge, negligent misrepresentation, recklessness or similar theory.

"**GAAP**" means U.S. generally accepted accounting principles.

"**Governmental Authority**" means any court, tribunal, arbitrator, authority, agency, commission, bureau, board, department, official, body or other instrumentality of the United States, any foreign country, or any domestic or foreign state, province, county, city, other political subdivision or any other similar body or organization exercising governmental or quasi-governmental power or authority.

"**Government Official**" means, collectively, any officer or employee of a Governmental Authority, any Person acting for or on behalf of any Governmental Authority, any political party or official thereof and any candidate for political office.

"**Hazardous Material**" means (a) hazardous substances, as defined by the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (b) hazardous wastes, as defined by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., (c) petroleum, including crude oil or any fraction thereof which is liquid at standard conditions of temperature and pressure, (d) radioactive material, including any source, special nuclear, or by-product material as defined in 42 U.S.C. § 2011 et seq., (e) asbestos that is friable or could reasonably be likely to become friable, (f) polychlorinated biphenyls, (g) microbial matter, biological toxins, mycotoxins, mold or mold spores and (h) other material, substance or waste to which liability or standards of conduct may be imposed, or which requires or may require investigation, under any applicable Environmental and Safety Requirements.

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1986, as amended and the rules and regulations issued thereunder.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Improper Payment Laws**" means the United States Foreign Corrupt Practices Act of 1977, any legislation implementing the Organisation for Economic Cooperation and Development Convention on Combating Bribery of Foreign Official in International Business Transactions, and any other applicable Law regarding anti-bribery or illegal payments or gratuities.

9

US-DOCS\144371506.11

CONFIDENTIAL                                                      FBG_CH1_00093816

"**Income Tax Liability**" means, with respect to any jurisdiction, an amount (which amount shall not be less than zero for any taxpayer in any jurisdiction for any taxable period or portion thereof) equal to the sum of the liability for Income Taxes of the Acquired Companies for each Pre-Closing Tax Period, which Income Taxes are accrued but unpaid as of the Closing Date with respect to Tax Returns that are first due after the Closing Date, separately calculated for (a) each jurisdiction in which any Acquired Company filed an Income Tax Return for the last Tax year for which an Income Tax Return was due in such jurisdiction (taking into account any applicable extensions) and (b) each jurisdiction in which any Acquired Company commenced activities after the end of such Tax year, provided, however, that, such liability (i) shall be calculated (x) as of the end of the Closing Date but excluding any liability for Income Taxes of the Acquired Companies arising as a result of transactions after the Closing on the Closing Date that are outside the ordinary course of business not otherwise contemplated by this Agreement, (y) with respect to any Straddle Period in accordance with Section 7.2(b), and (z) taking into account any estimated Income Tax payments, net operating losses and overpayments that are available to be utilized in a Pre-Closing Tax Period to offset or reduce any such liability for Income Taxes of the Acquired Companies, and (ii) shall exclude, for the avoidance of doubt, (w) any such liabilities of Sellers and any of their Affiliates (other than any Acquired Company) which are not imposed under applicable Law on any of the Acquired Companies (including, for the avoidance of doubt, any such liabilities in respect of the sale of US NewCo that flow-through to or are included on any Tax Return of the Sellers), (x) any deferred Tax liabilities that reflect timing differences between book and Tax income, (y) any deferred Tax balances or any accruals or reserves established or required to be established under GAAP methodologies for contingent Income Taxes or with respect to uncertain Tax positions, and (z) any Taxes included in the calculation of Net Working Capital as finally determined pursuant to Section 2.8.

"**Income Tax Return**" means a Tax Return filed or required to be filed in connection with the determination, assessment or collection of any Income Tax of any party or the administration of any laws, regulations or administrative requirements relating to any Income Tax.

"**Income Taxes**" means any income, franchise or similar Tax measured by or imposed on net income.

"**Indebtedness**" means, without duplication, with respect to each Acquired Company, at any date, (a) all obligations for borrowed money or extensions of credit (other than obligations for borrowed money among the Acquired Companies), (b) all obligations evidenced by bonds, debentures, notes or other similar instruments, commercial paper or debt securities, (c) all obligations under swaps, hedges, caps, collars, options, futures or similar instruments, (d) all obligations for the deferred purchase price of any property or services (other than trade accounts payable and accrued expenses incurred in the ordinary course of business and reflected as accounts payable or accrued expenses in the Net Working Capital as finally determined pursuant to Section 2.8), including earnouts, payments under non-compete agreements and seller notes, (e) all obligations created or arising under any conditional sale or other title retention agreement, (f) all obligations secured by a Lien, (g) all obligations under leases which shall have been or should be, in accordance with GAAP, recorded as capital leases, (h) all obligations in respect of bankers' acceptances, surety bonds, performance bonds or letters of credit, (i) all obligations of any Person other than another Acquired Company which are directly or indirectly guaranteed by such Acquired Company or in respect of which such Acquired Company has otherwise assured an obligation against loss, (j) all interest, principal, prepayment penalties, premiums, fees or expenses due or owing in respect of any item listed in clauses (a) through (i) above, (k) all underfunded portions with respect to any Employee Benefit Plan that is required to satisfy certain funding levels but is not funded in accordance with ERISA, (l) all obligations with respect to any salary, bonus, deferred compensation or other compensation of any kind earned by any current or former employee for, or any contribution obligation to any Employee Benefit Plan with respect to, any period or portion of any period ending on or prior to the Closing Date and all Taxes that are payable by any Acquired Company in connection with or as a result of the payment of such obligations, (l) an

10

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093817

amount equal to all customer deposits and all obligations with respect to deferred revenue determined in accordance with GAAP, and (m) the Income Tax Liability.

"**Intellectual Property**" means, collectively, all intellectual property, intellectual property rights and related priority rights protected, created or arising under the Laws of the United States and all countries or jurisdictions foreign thereto or under any international convention, including: (a) all Patents and improvements thereto, (b) all Trademarks, and all applications, registrations, and renewals in connection therewith, (c) all moral rights, copyrights and other rights in any work of authorship or mask work and all registrations and renewals in connection therewith, (d) all trade secrets and Confidential Information, and (e) Software, together with (x) all goodwill associated therewith, (y) the exclusive right to display, perform, reproduce, make, use, sell, distribute, import, export and create derivative works or improvements based on any of the foregoing and (z) all income, royalties, damages and payments related to any of the foregoing (including damages and payments for past, present or future infringements, misappropriations or other conflicts with any intellectual property), and the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any intellectual property.

"**International Trade Laws**" means any applicable (a) Sanctions, (b) U.S. export control Laws (including the International Traffic in Arms Regulations (22 CFR §§ 120-130, as amended), the Export Administration Regulations (15 CFR §§ 730-774, as amended) and any regulation, order, or directive promulgated, issued or enforced pursuant to such laws, (c) laws pertaining to imports and customs, including those administered by the Bureau of Customs and Border Protection in the U.S. Department of Homeland Security (and any successor thereof) and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, (d) the anti-boycott laws administered by the U.S. Department of Commerce and the U.S. Department of the Treasury and (e) export, import and customs Laws of other countries in which the Acquired Companies have conducted and/or currently conduct business.

"**IT Assets**" means the computers, Software, hardware, and networks of the Acquired Companies.

"**Japan Contribution Amount**" means an amount equal to $1,188,379.67.

"**Japan Purchase Price**" means an amount equal to the sum of (x) the product of the Purchase Price, *multiplied by* the Midco Seller's Pro Rata Percentage, (y) *minus* the Japan Contribution Amount.

"**IRS**" means the U.S. Internal Revenue Service.

"**Knowledge**" means, when referring to the "knowledge" of the Companies or the Sellers, or any similar phrase or qualification based on knowledge of the Companies or any Seller the actual knowledge of Shane Griffin, Jerry Kibby and Tim Grifka after due inquiry of such individual's direct reports.

"**Law**" means the common law of any state or other jurisdiction, or any provision of any non-U.S., federal, state or local law, statute, code, rule, regulation, Order, certification standard, accreditation standard, Permit, regulatory code of practice, statutory guidance or other decision of any court or other tribunal or Governmental Authority.

"**Liabilities**" means any liabilities, demands, commitments or obligations of any nature whatsoever, whether accrued or unaccrued, absolute or contingent, direct or indirect, asserted or unasserted, fixed or unfixed, known or unknown, choate or inchoate, perfected or unperfected, liquidated or unliquidated, secured or unsecured, or otherwise, whether due or to become due, whether arising out of any Contract or tort based on negligence or strict liability and whether or not the same would be required by GAAP to be stated in financial statements or disclosed in the notes thereto, and however arising and including all fees, costs and expenses related thereto.

11

US-DOCS\144371506.11

FBG_CH1_00093818

**DEBTORS' EXHIBIT NO. 236**
**Page 12 of 216**

"**Liens**" means all liens, security interests, claims, mortgages, deeds of trust, preemptive rights, leases, charges, options, rights of first refusal, easements, proxies, voting trusts or agreements, transfer restrictions, pledges, assessments, covenants, burdens and other encumbrances of every kind, including restrictions on voting or use.

"**Losses**" means any and all Liabilities, losses, damages, judgments, awards, settlements, royalties, diminution in value, interest, penalties, fines, Taxes, demands, Proceedings, claims, deficiencies, costs and expenses of any kind (including reasonable fees and expenses of attorneys, accountants and other experts paid in connection with the investigation or defense of any of the foregoing or any Proceeding relating to any of the foregoing).

"**Material Adverse Effect**" means (a) any Event that, individually or in combination with any other Events, has had or could reasonably be expected to have a material adverse effect on the business, condition (financial or otherwise), assets, liabilities, results of operation or prospects of the Acquired Companies taken as a whole, whether or not foreseeable and whether or not durationally significant, provided that any effect resulting from any of the following shall not be considered when determining whether a Material Adverse Effect shall have occurred: (i) changes in general economic conditions, or (ii) acts of terrorism, armed hostilities or war, except, with respect to clauses (i) and (ii), to the extent that the Acquired Companies are disproportionately impacted by such Events in comparison to others in the industry in which they operate, (b) any Event that prevents or materially delays, or could be reasonably expected to prevent or materially delay, consummation of the transactions contemplated hereby or the performance by the Companies or the Sellers of any of their material obligations under this Agreement or any of the Ancillary Agreements, or (c) any Event that materially impairs, or could reasonably be expected to impair, the ability of the Acquired Companies to continue operating the Business after the Closing in substantially the same manner as it was operated immediately prior to the date of this Agreement.

"**Multiemployer Plan**" means a "multiemployer plan" within the meaning of Section 3(37) or 4001(a)(3) of ERISA whether or not subject to ERISA.

"**Multiple Employer Plan**" means a "multiple employer plan" within the meaning of ERISA Section 4063 or 4064 or Code Section 413(c) whether or not subject to ERISA

"**Multiple Employer Welfare Arrangement**" means a "multiple employer welfare arrangement" within the meaning of ERISA Section 3(40) whether or not subject to ERISA.

"**Net Working Capital**" means the difference, as of the Calculation Time, between (a) those assets that should be reflected as current assets on a consolidated balance sheet of the Companies and (b) those Liabilities that should be reflected as current liabilities on a consolidated balance sheet of the Companies, in each case, (i) prepared in accordance with GAAP using, to the extent in accordance with GAAP, the same accounting methods, principles, policies, practices and procedures, with consistent classifications, judgments and estimation methodology, as were used in the determination of the current assets or current liabilities, as applicable, in the preparation of the Balance Sheet, and in accordance with the methodology set forth on the Working Capital Schedule, and (ii) excluding any assets or liabilities with respect to Cash, Indebtedness, Seller Transaction Expenses or Income Taxes.

"**Net Working Capital Target**" means $13,323,000.

"**Open Source Software**" means any software that contains or is derived from any software, code or libraries that are distributed as free software or as open source software or under any licensing or distribution models similar to open source, including but not limited to any software licensed under or subject to terms that require source code to be provided or made available to subsequent licensees or

12

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093819

sublicensees (regardless of whether the license restricts source code from being distributed in modified form), including, without limitation, any software licensed under or subject to the GNU Affero GPL, the GNU GPL, the GNU LGPL, any other license that is defined as an Open Source License by the Open Source Initiative, and any similar license or distribution model.

"**Order**" means any order, judgment, ruling, injunction, award, stipulation, assessment, decree or writ, whether preliminary or final, of any Governmental Authority.

"**Party**" means any party to this Agreement.

"**Patents**" means all letters patent and pending patent applications and all reissues, reexaminations, divisionals, continuations, continuations-in-part, provisional applications, substitutes and extensions thereof.

"**Permits**" means permits, licenses, registrations, consents, certificates, grants, waivers, qualifications, approvals and all other authorizations by or of Governmental Authorities.

"**Permitted Lien**" means (a) Liens for Taxes not yet due and payable or that are being contested in good faith by appropriate proceedings as set forth on Schedule 1.1(b) and for which appropriate reserves have been accrued for in the Net Working Capital as of the Closing Date, (b) statutory Liens of landlords for amounts not yet due and payable, (c) Liens of carriers, warehousemen, mechanics and materialmen incurred in the ordinary course of business for amounts not yet due and payable, (d) [reserved], (e) with respect to real property, Liens and easements due to zoning and subdivision laws and regulations, (f) with respect to real property, reservations, restrictions, easements, limitations, conditions and other Liens of public record, (g) non-exclusive licenses to Intellectual Property granted in the ordinary course of business, and (h) in the case of the Securities, restrictions arising under applicable securities Laws, but in each such case excluding any Lien with respect to any Employee Benefit Plan.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated association, corporation, firm or other entity or any Governmental Authority.

"**Post-Closing Tax Period**" means any Tax period beginning after the Closing Date, and, with respect to a Straddle Period, the portion of such Tax period beginning on the day after the Closing Date.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period including and ending on the end of the Closing Date.

"**Pro Rata Percentage**" means, with respect to (a) the Midco Seller, an amount equal to the quotient of (i) $15,188,379.67, *divided by* (ii) the Purchase Price, and (b) the US Seller, an amount equal to the quotient of (i) the sum of (x) the Purchase Price, *minus* (y) $15,188,379.67, *divided by* (ii) the Purchase Price.

"**Proceeding**" means any suit, action, cause of action, litigation, hearing, inquiry, examination, demand, proceeding, controversy, complaint, appeal, notice of violation, citation, summons, subpoena, arbitration, mediation, dispute, claim, or audit of any nature whether civil, criminal, quasi criminal, indictment, administrative, regulatory or otherwise and whether at Law or in equity, by or before a Governmental Authority.

"**Purchase Price Adjustment**" means the amount obtained by subtracting (a) the amount of the Closing Payment as determined pursuant to Section 2.7, from (b) the amount that the Closing Payment would have been had it been calculated using the amounts of the Closing Date Cash, the Closing Date

13

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093820

Indebtedness, the Closing Date Seller Transaction Expenses and the Net Working Capital as finally determined pursuant Section 2.8.

"**Purchase Price Adjustment Escrow Amount**" means $500,000.

"**Purchase Price Adjustment Escrow Funds**" means the Purchase Price Adjustment Escrow Amount, *minus* any amounts released from the escrow account maintained by the Escrow Agent in accordance with the Escrow Agreement.

"**Related Party**" means each Seller, each officer or director of an Acquired Company, each family member of any Seller or any director or officer of an Acquired Company, each trust for the benefit of any of the foregoing, and each Affiliate of any of the foregoing (other than an Acquired Company).

"**Related Party Transaction**" means any Contract or transaction between an Acquired Company, on the one hand, and any Related Party, on the other hand.

"**Release**" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping into the indoor or outdoor environment.

"**Retained Business**" means the business as currently conducted by the Fuel Systems and Engineering Divisions of the Sellers and their controlled Affiliates, including (a) the business of developing, manufacturing, trading, and supplying end-to-end fuel systems, fuel tanks, fuel pump assemblies, vapor separator assemblies, and other fuel-related solutions and (b) "Engine Management Advanced Engineering," including the engineering and development of advanced engine management systems.

"**Sanctions**" means economic or financial sanctions, requirements or trade embargoes imposed, administered or enforced from time to time by U.S. Governmental Authorities (including the Office of Foreign Assets Control ("**OFAC**"), the U.S. Department of State and the U.S. Department of Commerce), the United Nations Security Council, the European Union, Her Majesty's Treasury or any other relevant Governmental Authority.

"**Sanctions Target**" means any Person: (a) that is the subject or target of any Sanctions; (b) named in any Sanctions-related list maintained by the U.S. Department of State; the U.S. Department of Commerce, including the Bureau of Industry and Security's Entity List and Denied Persons List; or the U.S. Department of the Treasury, including the OFAC Specially Designated Nationals and Blocked Persons List, the Sectoral Sanctions Identifications List, and the Foreign Sanctions Evaders List; or any similar list maintained by the United Nations Security Council, the European Union, Her Majesty's Treasury or any other relevant Governmental Authority; (c) located, organized or resident in a country, territory or geographical region which is itself the subject or target of any territory-wide Sanctions (including the Crimea region of Ukraine, Cuba, Iran, North Korea, Syria and, prior to January 17, 2017, Sudan); or (d) owned or controlled by any such Person or Persons described in the foregoing clauses (a)-(c).

"**Seller Certificate**" means a certificate in form and substance reasonably satisfactory to the Buyer, dated as of the Closing Date and duly executed and delivered by the Sellers, certifying that attached thereto are (a) true, complete and accurate copies of the organizational documents of each Acquired Company, (b) a true, complete and accurate copy of resolutions duly adopted by the board of directors (or comparable governing body) of such Seller and, if applicable, each Seller's requisite equityholders, which authorize and approve the execution, delivery and performance by such Seller of this Agreement and the Ancillary Agreements to which such Seller is a party and (c) a true, complete and accurate copy of resolutions duly

14

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093821

adopted by each board of directors (or comparable governing body) of the Companies of this Agreement and each Ancillary Agreement to which such Company is a party.

"**Seller and Company Required Consents**" means, collectively, all consents of any Persons listed on Schedule 1.1(c).

"**Seller Transaction Expenses**" means, without duplication, (a) all of the fees, costs and expenses incurred by any Seller or Acquired Company in connection with the transactions contemplated by this Agreement or any Ancillary Agreement or any transaction or series of transactions similar to such transactions, including all fees, costs and expenses payable to attorneys, financial advisors, accountants, consultants or other advisors, and all obligations under any engagement letter or other agreement or understanding with any investment banker or broker, including Angle Advisors, LLC, and (c) all obligations that arise in whole or in part as a result of the consummation of the transactions contemplated by this Agreement or any Ancillary Agreement, under any Contract or Employee Benefit Plan in effect on or before the Closing Date, including all change of control, severance, retention, stock appreciation, phantom stock or similar obligations or any other accelerations of or increases in rights or benefits. For purposes of this Agreement and solely to avoid any double counting or duplication, any amounts to the extent actually taken into account in (i) the calculation of Closing Date Indebtedness will not be included in the calculation of Seller Transaction Expenses and (ii) the calculation of Seller Transaction Expenses will not be included in the calculation of the calculation of Closing Date Indebtedness.

"**Service Provider**" means each director, officer, employee, manager or independent contractor, of the Acquired Companies.

"**Software**" means all computer programs and other software, whether in source code, object code or other form, along with all computerized databases, user interfaces and related documentation.

"**Straddle Period**" means any taxable period that begins on or before and ends after the Closing Date.

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association, or other business entity gains or losses, or shall have the right or sufficient voting interests to designate or elect either (i) a majority of the Persons serving as managers or (ii) the sole manager, managing director or general partner of such entity.

"**Tax**" means (a) any and all U.S. federal, state, local, or non-U.S. income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, entertainment, amusement, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, ad valorem, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, composite, healthcare, or other tax of any kind whatsoever, including any interest, penalties or additions to Tax, any penalties resulting

15

US-DOCS\144371506.11

FBG_CH1_00093822

from any failure to file or timely file a Tax Return, or additional amounts in respect of the foregoing; (b) liability for the payment of any amounts of the type described in clause (a) above of another Person arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto); and (c) liability for the payment of any amounts of the type described in clause (a) above of another Person as a result of any transferee or secondary liability or any liability assumed by Contract (other than by reason of any customary provisions in a commercial Contract the primary purpose of which is unrelated to Taxes) or applicable Law.

"**Tax Returns**" means returns, declarations, reports, notices, forms, claims for refund, information returns or other documents (including any related or supporting schedules, statements or information, and including for the avoidance of doubt all Forms 1099, FinCEN Form 114, Form TD F 90-22.1 and any predecessor or successor forms thereto) filed or required to be filed with any Governmental Authority, in connection with the determination, assessment or collection of any Tax of any party or the administration of any Laws, regulations or administrative requirements relating to any Tax.

"**Title IV Plan**" means an employee benefit plan subject to Section 302 or Title IV of ERISA or Code Sections 412, 413, or 430.

"**Trademarks**" means all trademarks, service marks, trade names, corporate names, trade dress, logos, slogans, Internet domain names, social media handles and other indicia of source, origin, endorsement, sponsorship or certification, together with any registrations, applications, renewals and extensions of any of the foregoing and all goodwill associated with any of the foregoing.

"**Treasury Regulations**" means the Treasury Regulations promulgated from time to time under the Code (including corresponding provisions and succeeding provisions) as in effect for the relevant taxable period.

"**U.S.**" or "**United States**" means the United States of America.

"**US Purchase Price**" means an amount equal to the product of the Purchase Price *multiplied by* the US Seller's Pro Rata Percentage.

"**VEBA**" means a "voluntary employees' beneficiary association" within the meaning of Code Section 501(c)(9).

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended and any similar Law.

**Section 1.2**    **Table of Definitions**.  The following terms have the meanings set forth in the locations in this Agreement referenced below:

| Term | Location |
|---|---|
| 2024 Earnout Amount | Section 2.9(b)(i) |
| 2025 Earnout Amount | Section 2.9(b)(ii) |
| 2026 Earnout Amount | Section 2.9(b)(iii) |
| Acceleration Event | Section 2.9(g) |
| Accountant | Section 2.8(c) |
| Adjusted EBITDA | Section 2.9(b)(iii), Section 2.9(b)(iii) |
| Agreement | Preamble |
| Assets | Section 4.10(a) |

16

US-DOCS\144371506.11

**DEBTORS' EXHIBIT NO. 236**
**Page 17 of 216**

Balance Sheet ................................................................................................... Section 4.5(a)(ii)
Buyer ....................................................................................................................... Preamble
Buyer Closing Deliverables ............................................................................... Section 2.6
Closing ................................................................................................................ Section 2.3
Closing Date ....................................................................................................... Section 2.3
Closing Statement ............................................................................................ Section 2.8(a)
Company Intellectual Property ....................................................................... Section 4.11(c)
D&O Policy ........................................................................................................ Section 6.6
Disclosure Schedules ......................................................................................... Article IV
Earnout Amounts ............................................................................................. Section 2.9(a)
Earnout Protest Deadline ............................................................................... Section 2.9(d)(ii)
Earnout Protest Notice ................................................................................... Section 2.9(d)(ii)
Earnout Statement ........................................................................................... Section 2.9(d)(i)
Estimated Closing Date Indebtedness ............................................................ Section 2.4
Estimated Closing Date Seller Transaction Expenses .................................... Section 2.4
Estimated Closing Statement ........................................................................... Section 2.4
Estimated Net Working Capital ....................................................................... Section 2.4
Export Approvals ............................................................................................. Section 4.29(a)
Financial Statements ....................................................................................... Section 4.5(a)
Insurance Policies ............................................................................................ Section 4.23
Leased Real Property ....................................................................................... Section 4.21(b)
Material Adverse Effect ................................................................................... Section 1.1
Nonqualified Deferred Compensation Plan ................................................... Section 4.17(r)
Owned Real Property ....................................................................................... Section 4.21(a)
Payoff Letters ................................................................................................... Section 2.5(d)
Pre-Closing Tax Period ................................................................................... Section 7.2(a)(i)
Privacy Requirements ...................................................................................... Section 4.11(g)
Protest Deadline ............................................................................................... Section 2.8(b)
Protest Notice ................................................................................................... Section 2.8(b)
Purchase Price ................................................................................................. Section 2.2
Purchase Price Adjustment Escrow Amount ................................................... Section 2.7(c)
Real Property ................................................................................................... Section 4.21(b)
Real Property Leases ....................................................................................... Section 4.12(c)
Releasees ........................................................................................................ Section 7.6(a)(i)
Releasing Parties ............................................................................................. Section 7.6(a)
Restricted Period ............................................................................................. Section 7.1(b)
Seller and Company Closing Deliverables ..................................................... Section 2.5
Straddle Tax Returns ....................................................................................... Section 7.2(a)(ii)
Top Customer ................................................................................................... Section 4.22(b)
Top Supplier ..................................................................................................... Section 4.22(a)
Transfer Taxes ................................................................................................. Section 7.2(e)
Transition Services Agreements ...................................................................... Recitals

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093824

## ARTICLE II
## PURCHASE AND SALE; CLOSING

Section 2.1    **Purchase and Sale**. On the terms and conditions set forth in this Agreement, at the Closing, (a) (i) the Midco Seller shall sell, assign, transfer, convey and deliver to the Japan Buyer all right, title and interest in the Walbro Japan Securities, free and clear of all Liens (other than Liens arising in connection with applicable securities Laws), (ii) the US Seller shall sell, assign, transfer, convey and deliver to the US Buyer all right, title and interest in the Walbro US Securities, free and clear of all Liens (other than Liens arising in connection with applicable securities Laws), and (iii) and each Buyer shall purchase, accept delivery of and acquire from the Sellers all right, title and interest in the applicable Securities, free and clear of all Liens (other than Liens arising in connection with applicable securities Laws) and (b) Japan Buyer, Walbro Japan and Walbro US Parent shall cause the Japan Contribution to be consummated.

Section 2.2    **Purchase Price**. The aggregate purchase price to be paid by the Buyers for the Securities (the "**Purchase Price**") shall consist of an amount of cash equal to the sum of the following:

(a)    the Base Purchase Price;

(b)    *plus* the Closing Date Cash;

(c)    *minus* the Closing Date Indebtedness;

(d)    *plus* the amount, if any, by which the Net Working Capital is greater than $250,000 in excess of the Net Working Capital Target;

(e)    *minus* the amount, if any, by which the Net Working Capital is less than $250,000 below the Net Working Capital Target;

(f)    *minus* the Closing Date Seller Transaction Expenses; and

(g)    *plus* the aggregate amount of any Earnout Amounts if and when payable pursuant to Section 2.9.

Section 2.3    **Closing**. The closing of the purchase and sale of the Securities and the other transactions contemplated by this Agreement (the "**Closing**") shall be effected simultaneously with the execution and delivery of this Agreement via electronic mail in either case at 10:00 a.m. Eastern Time on the date hereof, or at such other time and place as the parties hereto may agree in writing. The date on which the Closing occurs is referred to herein as the "**Closing Date**."

Section 2.4    **Delivery of Closing Estimates**. At least three Business Days before the Closing Date, the Sellers shall prepare and deliver to the Buyers a written statement (the "**Estimated Closing Statement**") setting forth good faith estimates of (a) the Net Working Capital (the "**Estimated Net Working Capital**"), (b) the Closing Date Cash, (c) the Closing Date Indebtedness (the "**Estimated Closing Date Indebtedness**") and (d) the Closing Date Seller Transaction Expenses (which shall include all amounts set forth in invoices from the respective payees) (the "**Estimated Closing Date Seller Transaction Expenses**"), together with a calculation of the Closing Payment, in each case, with reasonable supporting or underlying documentation used in the preparation thereof. The Acquired Companies shall make available such personnel as are reasonably necessary to assist the Buyers in their review of such estimates, and the Estimated Closing Statement shall be reasonably acceptable to the Buyer. The calculation of the Net Working Capital in the Estimated Closing Statement required under this Section 2.4

18

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093825

and the Closing Statement required under Section 2.8(a) shall include the line items included in the methodology set forth on Section 2.4 (the "**Working Capital Schedule**"). The Estimated Closing Statement also shall attach (i) the Partial Release Letter and (ii) invoices from the respective payees representing Closing Date Seller Transaction Expenses.

Section 2.5 **Seller Closing Deliverables**. In addition to the other requirements set forth in this Agreement, at or before the Closing, the Sellers shall deliver or cause to be delivered to the Buyers each of the following documents and instruments (collectively, the "**Seller Closing Deliverables**"):

(a) the Transition Services Agreements, duly executed by the various Sellers and Acquired Companies party thereto;

(b) the Escrow Agreement, duly executed by each Seller and the Escrow Agent;

(c) the Trademark License Agreement, duly executed by US Seller;

(d) the Supply Agreement, duly executed by Walbro Japan and Walbro Fuel Systems and Technology (Thailand) Co., Ltd.;

(e) original certificates representing the Securities to the extent they are certificated, stock powers or assignments evidencing the conveyance of the Securities duly executed in blank, and any other transfer instruments required to validly transfer title in and to the Securities from the Sellers to the Buyers (or to the Buyers' designee or designees, if so elected by the Buyers) in form and substance reasonably satisfactory to the Buyer;

(f) the Seller Certificate, duly executed by the Sellers;

(g) a counterpart of each Ancillary Agreement to which any Seller or a Company is a party, duly executed by each applicable Seller;

(h) an executed partial release letter for the repayment of the Indebtedness of the Acquired Companies set forth on Schedule 2.5(h), in form and substance reasonably acceptable to the Buyer, which will include a per diem interest amount and an authorization to file all UCC termination statements and releases necessary to enable, upon the occurrence of the Closing, the release of any Liens in favor of the holders of such Indebtedness, such that Seller's representation and warranty set forth in the second sentence of Section 3.4 will be true and accurate, along with wire transfer instructions and a duly executed IRS Form W-9 or applicable version of IRS Form W-8, as applicable, for each holder of such Indebtedness (collectively, the "**Payoff Letters**");

(i) an IRS Form W-9 or applicable version of IRS Form W-8, as applicable, for each of the Sellers and the Companies, duly executed by such Seller or Company, respectively;

(j) a certificate of good standing from the Secretary of State of the State of Delaware, dated no more than five days before the Closing Date and certifying as to the good standing of US Newco in Delaware;

(k) written resignations in form and substance reasonably acceptable to the Buyers effective as of the Closing from each officer and director of each of the Acquired Companies;

19

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093826

(l)      evidence of termination of all the agreements set forth on Schedule 2.5(l), in each case, solely with respect to the Acquired Companies, and in form and substance reasonably acceptable to the Buyer;

(m)      evidence that the Companies have obtained the D&O Policy;

(n)      a counterpart executed by Midco Seller to a request to amend the shareholder registry (*kabunushi meibo meigi kakikae seikyusho*) of Walbro Japan to reflect the transfer of Walbro Japan Securities from Midco Seller to Japan Buyer to the shareholder registry; and

(o)      a counterpart to the maquila assignment agreed to among the parties, duly executed by US Seller; provided that such counterpart shall be deemed delivered immediately following the Closing.

**Section 2.6      Buyer Closing Deliverables**.  In addition to the other requirements set forth in this Agreement, at or before the Closing, the Buyers shall deliver or cause to be delivered to the Sellers (or the Midco Seller on behalf of the Sellers) each of the following documents and instruments (collectively, the "**Buyer Closing Deliverables**"):

(a)      a counterpart of each Ancillary Agreement to which each Buyer is a party, duly executed by such Buyer; and

(b)      a counterpart of the Employee Secondment Agreement;

(c)      counterpart to the maquila assignment agreed to among the parties, duly executed by US Newco; provided that such counterpart shall be deemed delivered immediately following the Closing

(d)      a counterpart of the Employee Transfer Agreement.

**Section 2.7      Transactions at Closing**.  At the Closing, the parties hereto shall take the following actions and make the following the payments (collectively, the "**Closing Payments**"):

(a)      Japan Buyer shall pay or cause to be paid by wire transfer of immediately available funds:

(i)      to Midco Seller, the Japan Purchase Price, *minus* the product of (A) the Purchase Price Adjustment Escrow Amount, *multiplied by* (B) the Midco Seller's Pro Rata Percentage (such product, the "**Japan Escrow Payment Amount**");

(ii)      to Walbro US Parent, the Japan Contribution Amount in satisfaction of the Existing Walbro Japan Note;

(iii)      to the applicable recipients thereof as set forth on the Estimated Closing Statement, an amount equal to the product of (A) the Estimated Closing Date Seller Transaction Expenses, *multiplied by* (B) the Midco Seller's Pro Rata Percentage;

(iv)      to the applicable recipients thereof as set forth on the Estimated Closing Statement, an amount equal to the product of (A) the Estimated Closing Date Seller Indebtedness, *multiplied by* (B) the Midco Seller's Pro Rata Percentage; and

(v)      to the Escrow Agent, the Japan Escrow Payment Amount.

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093827

**DEBTORS' EXHIBIT NO. 236**
**Page 21 of 216**

(b)      US Buyer shall pay or cause to be paid by wire transfer of immediately available funds:

(i)      to US Seller, the US Purchase Price, *minus* the product of (A) the Purchase Price Adjustment Escrow Amount, *multiplied by* (B) the US Seller's Pro Rata Percentage (such product, the "**US Escrow Payment Amount**");

(ii)      to the applicable recipients thereof as set forth on the Estimated Closing Statement, an amount equal to the product of (A) the Estimated Closing Date Seller Transaction Expenses, *multiplied by* (B) the US Seller's Pro Rata Percentage;

(iii)      to the applicable recipients thereof as set forth on the Estimated Closing Statement, an amount equal to the product of (A) the Estimated Closing Date Seller Indebtedness, *multiplied by* (B) the US Seller's Pro Rata Percentage; and

(iv)      to the Escrow Agent, the US Escrow Payment Amount.

**Section 2.8      Post-Closing Adjustment**.

(a)      Closing Statement. No later than 90 days after the Closing Date, the Buyers or their representatives shall prepare and deliver to the Midco Seller a written statement (the "**Closing Statement**"), setting forth the Buyers' calculation of (i) the Net Working Capital, (ii) the Closing Date Cash, (iii) the Closing Date Indebtedness and (iv) the Closing Date Seller Transaction Expenses, together with a calculation of the resulting Purchase Price Adjustment, if any; provided, that (I) except as set forth in clause (II), the Closing Statement shall be prepared using the same accounting practices, policies, judgments and methodologies used in the preparation of the Working Capital Schedule and the Estimated Closing Statement and be based solely on facts and circumstances as they exist prior to the Closing, and shall exclude the effect of any fact, event, change, circumstance, act or decision occurring on or after the Closing Date (including any changes in applicable Law) and (II) (aa) the Closing Statement shall reflect no changes in reserves contained in the Working Capital Schedule except, by reason of payment, settlement, or due to events arising prior to Closing by the principles set forth in clause (I) and shall reflect no reserve line item other than those reflected in the Working Capital Schedule (whether or not GAAP would require the inclusion or creation of such reserve), (bb) the Closing Statement shall not give effect to the consummation of the transactions contemplated hereby, including any payments of cash in respect of the Purchase Price or any financing transactions in connection therewith or, after the Calculation Time, any other action or omission by any Buyer or any Company that is not in the ordinary course of business consistent with past practice, (cc) the treatment of leases as capital leases or operating leases shall be identical to their treatment in the Working Capital Schedule and (dd) the Closing Statement shall not reflect any expense or liability for which any Buyer is responsible under this Agreement. Upon receipt of the Closing Statement, the Midco Seller and its accountants will be given reasonable access upon reasonable notice to the Acquired Companies' relevant books, records, workpapers and personnel during business hours for the purpose of verifying the Net Working Capital, the Closing Date Cash, the Closing Date Indebtedness and the Closing Date Seller Transaction Expenses. Following the Closing, the Buyers shall provide Midco Seller and its representatives timely reasonable access to the records, properties, personnel and (subject to the execution of customary work paper access letters if requested) auditors of the Companies relating to the preparation of the Closing Statement and shall cause the personnel of the Companies to cooperate with the Midco Seller in connection with its review of the Closing Statement.

(b)      Protest Notice. Prior to the date which is 45 days after the Buyer's delivery of the Closing Statement (the "**Protest Deadline**"), Midco Seller may deliver written notice to the Buyers (the "**Protest Notice**") setting forth any objections which Midco Seller may have to the Closing Statement. The

21

US-DOCS\144371506.11

Protest Notice shall specify in reasonable detail any contested amounts and the basis therefor and shall include a schedule setting forth the Midco Seller's determination of the Net Working Capital, the Closing Date Cash, the Closing Date Indebtedness, the Closing Date Seller Transaction Expenses and the resulting Purchase Price Adjustment, if any. If a Protest Notice is not delivered prior to the Protest Deadline, the Net Working Capital, the Closing Date Cash, the Closing Date Indebtedness, the Closing Date Seller Transaction Expenses and the resulting Purchase Price Adjustment, if any, as set forth on the Closing Statement shall be final, binding and non-appealable by the Midco Seller or the Sellers. If a Protest Notice is delivered prior to the Protest Deadline, any such amounts not disputed therein shall be final, binding and non-appealable by the Midco Seller or the Sellers.

(c)     Resolution of the Protest.   The Buyers and Midco Seller shall confer and use reasonable best efforts to resolve any disagreement with respect to the Closing Statement within 30 days following the Buyer's receipt of the Protest Notice. If the Buyers and the Midco Seller are unable to resolve any such disagreement within such 30 day period, then any amounts that remain in dispute will be referred to one of (i) Deloitte LLP, (ii) PwC, LLC, (iii) EY LLP or (iv) KPMG LLP, as mutually agreed to by the parties (the "**Accountant**"), which will be instructed to determine the amounts in dispute within 45 days after such referral, including a report setting forth the Accountant's basis for its determination. In making such determination, the Accountant shall act as an expert and not an arbitrator, an shall rely on the Working Capital Schedule, applied consistently with GAAP. The Accountant will consider and opine only on the items disputed by the parties. The determination by the Accountant of the amounts in dispute shall be based solely on presentations by the Buyers and the Midco Seller, and shall not involve the Accountant's independent review. Any determination by the Accountant shall not be outside the range defined by the respective amounts in the Closing Statement proposed by the Buyers' and Midco Seller's proposed adjustments thereto set forth in the Protest Notice, and absent fraud or manifest error such determination shall be final, binding and non-appealable. Each of the Buyers and the Midco Seller shall execute and deliver a customary engagement letter as may be requested by the Accountant, and each of the Buyer, on the one hand, and the Sellers (jointly and severally) on the other hand, shall bear one-half of the fees and expenses of the Accountant. Other than the fees of the Accountant, the Buyers, on the one hand, and Midco Seller, shall each pay their own fees and expenses. The fees, costs and expenses of the Accountant shall be allocated to and borne by the Buyers (collectively) and Midco Seller, based on the inverse of the percentage that the Accountant determination (before such allocation) bears to the total amount of the amounts in dispute. For example, should the amounts in dispute total in amount to one thousand dollars ($1,000) and the Accountant awards six hundred dollars ($600) in favor of the Midco Seller's position, sixty percent (60%) of the costs of its review would be borne by the Buyers and forty percent (40%) of the costs would be borne by Midco Seller.

(d)     Purchase Price Adjustment.   Within five (5) Business Days following the final determination of the Net Working Capital, the Closing Date Cash, the Closing Date Indebtedness and the Closing Date Seller Transaction Expenses pursuant to this Section 2.8:

(i)     If the Purchase Price Adjustment is a negative number, then the Buyers and the Sellers shall deliver joint written instructions to the Escrow Agent, instructing the Escrow Agent to pay from the Purchase Price Adjustment Escrow Funds, (A) an amount equal to the Purchase Price Adjustment to the Buyers, and (B) any remaining Purchase Price Adjustment Escrow Funds to the Sellers in accordance with their respective Pro Rata Percentages, in each case, pursuant to the wire instructions set forth therein; or

(ii)     If the Purchase Price Adjustment is a positive number, (A) the Buyers and the Sellers shall deliver joint written instructions to the Escrow Agent, instructing the Escrow Agent pay to all of the Purchase Price Adjustment to the Sellers in accordance with their respective Pro Rata Percentages, pursuant to the wire instructions set forth therein, and (B) the Buyers shall pay or cause to be paid to the

22

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093829

Sellers an amount equal to the Purchase Price Adjustment, in accordance with their respective Pro Rata Percentages.

Notwithstanding anything herein to the contrary, if the Purchase Price Adjustment Escrow Funds are insufficient to cover the entire amount payable to the Buyers pursuant to clause (d)(i) above, the Buyers shall be permitted to reduce the amount of any required Earnout Amount (commencing with any required 2024 Earnout Amount) by an amount equal to the aggregate amount of such insufficiency; provided, that any such offset shall the Buyer's sole recourse and remedy with respect to any such insufficiency.

(e)        Any payments made pursuant to this Section 2.8 shall be deemed by all Parties as an adjustment to the Purchase Price for all Tax purposes unless otherwise required by applicable Law.

**Section 2.9        Earnout Consideration**.

(a)        Earnout Amounts.  In addition to the Closing Payment and the Purchase Price Adjustment, if any, and any Purchase Price Adjustment Escrow Funds released to the Sellers, each Seller shall be entitled to receive its Pro Rata Percentage of each of the 2024 Earnout Amount, 2025 Earnout Amount and 2026 Earnout Amount (collectively, the "**Earnout Amounts**") that become payable pursuant to this Section 2.9.

(b)        Earnout-Related Definitions.  For purposes of this Section 2.9:

(i)        "**2024 Earnout Amount**" shall be an amount (which shall not be less than zero) equal to the product of (A) 0.10, times (B) the difference between (x) the aggregate amount of the Net Acquired Companies Revenue for the fiscal year of the Buyers ending December 28, 2024 and (y) $100,000,000; provided that the 2024 Earnout Amount shall not, in any event, exceed the Maximum Earnout Amount.

(ii)        "**2025 Earnout Amount**" shall be an amount (which shall not be less than zero) equal to the product of (A) 0.10, times (B) the difference between (x) the aggregate amount of the Net Acquired Companies Revenue for the fiscal year of the Buyers ending January 3, 2026 and (y) $100,000,000; provided that the 2025 Earnout Amount shall not, in any event, exceed the Maximum Earnout Amount.

(iii)        "**2026 Earnout Amount**" shall be an amount (which shall not be less than zero) equal to the product of (A) 0.10, times (B) the difference between (x) the aggregate amount of the Net Acquired Companies Revenue for the fiscal year of the Buyers ending January 2, 2027 and (y) $100,000,000; provided that the 2026 Earnout Amount shall not, in any event, exceed the Maximum Earnout Amount.

(iv)        "**Maximum Earnout Amount**" means $2,500,000.

(v)        "**Net Acquired Companies Revenue**" means all revenue generated from Sales by the Acquired Companies, calculated using the Net Sales Price.

(vi)        "**Net Sales Price**" means the full invoiced price on a Sale to any final retail customer or retail distributed, less (to the extent such items are included in the price), (A) sales tax, value added tax or other taxes payable on such sale and (B) any actual returns and/or credits actually credited to a customer's account in respect of any such sale.

23

US-DOCS\144371506.11

CONFIDENTIAL                                                                                       FBG_CH1_00093830

(vii)    "**Sale**" means the earlier of the date upon which there is either a transfer of possession or title from the owner of the goods to any other person or the date upon which the owner of the goods invoices any person or the date upon which the owner receives full payment.

(c)    <u>Currency Conversion</u>.  In calculating Net Acquired Companies Revenue, all currencies other than United States dollars will be converted into United States dollars using the exchange rate utilized at the time of determination on such day as quoted by Bloomberg on www.bloomberg.com/markets/currencies/fxc.html (and applying the Currency Converter set forth on such webpage) "the **Exchange Rate**".  In the event that such rate is not displayed by Bloomberg on the webpage specified in the immediately preceding sentence, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as the Sellers and the Buyers shall mutually determine in good faith.

(d)    <u>Earnout Statement</u>.

(i)    Not later than 70 days following the last day of each applicable fiscal year the Buyers shall prepare and deliver to the Midco Seller a certificate, prepared in accordance with GAAP (each an "**Earnout Statement**") setting forth (A) the Buyers' reasonably detailed calculation (including reasonable supporting detail) of the Net Acquired Companies Revenue with respect to such fiscal year and (B) the resulting Earnout Amount for such period, if any.

(ii)    Without limitation to the other provisions set forth herein, following the Buyers' delivery of an Earnout Statement, if such Earnout Statement provides for an Earnout Amount that is less than the Maximum Earnout Amount, the Buyers shall provide Midco Seller with reasonable access during normal business hours to the books, records, supporting data and employees of the Acquired Companies, in each case, as is reasonably requested by Midco Seller for purposes of its review of the Buyer's calculation of Net Acquired Companies Revenue with respect to such fiscal year and the amount of the resulting Earnout Amount, if any, payable with respect to such calendar year.

(iii)    Prior to the date which is 30 days after the Buyer's delivery of an Earnout Statement (the "**Earnout Protest Deadline**"), the Midco Seller may deliver written notice to the Buyers (an "**Earnout Protest Notice**") setting forth any objections which the Midco Seller may have to such Earnout Statement.  The Earnout Protest Notice shall specify in reasonable detail any contested amounts and the basis therefor and shall include a schedule setting forth the Midco Seller's determination of Net Acquired Companies Revenue and the resulting Earnout Amount, if any.  If an Earnout Protest Notice is not delivered prior to the Earnout Protest Deadline, the Net Acquired Companies Revenue and the resulting Earnout Amount, if any, as set forth on such Earnout Statement shall be final, binding and non-appealable by the Midco Seller or the Sellers.  If an Earnout Protest Notice is delivered prior to the Earnout Protest Deadline, any such amounts not disputed therein shall be final, binding and non-appealable by the Midco Seller or the Sellers.

(iv)    The Buyers and the Midco Seller shall negotiate in good faith to resolve any disagreement with respect to an Earnout Statement within 30 days following the Buyer's receipt of the Earnout Protest Notice.  If the Buyers and the Midco Seller are unable to resolve any such disagreement within such 30 day period, then any matters that remain in dispute will be referred to the Accountant, which will be instructed to determine the amounts in dispute within 45 days after such referral. The terms set forth in <u>Section 2.8(c)</u> (including, for the avoidance of doubt, the provisions related to the fees of the Accountant and each party) shall apply to the Accountant's resolution of such dispute, *mutatis mutandis*.

(e)    <u>Payment of Earnout Amounts</u>.  No later than 10 days following the earlier of (i) the later of (x) the date on which an Earnout Statement becomes final and binding upon the parties and (y) the

US-DOCS\144371506.11

CONFIDENTIAL                                                          FBG_CH1_00093831

date that is 100 days after the end of the applicable fiscal year with respect to which such Earnout Statement applies, or (ii) the date of an Acceleration Event, the Buyers shall pay or cause the Companies to pay to each Seller its Pro Rata Share of the Earnout Amount(s) payable in respect thereof.

(f)     Artificial Actions.  From the Closing through the fiscal year of the Buyers ending January 2, 2027, none of the Buyers, the Acquired Companies or any of their Affiliates shall modify, change or alter any of its practices and policies regarding revenue collection or recognition, accounts receivable, discounting, rebates or other similar activities, or implement any new practices or policies that are outside of the ordinary course or are not customary for similarly situated businesses, in each case, in a manner that would be reasonably likely to reduce Net Acquired Companies Revenue for any particular year or make an Earnout Amount less likely to become payable for a given fiscal year.

(g)     Acceleration Events.  Notwithstanding other provisions of this Section 2.9, in the event that at any time prior to the fiscal year of the Buyers ending January 2, 2027, (i) there occurs a liquidation or dissolution of any of the Acquired Companies other than into an Affiliate of the Buyers, (ii) there occurs a sale, exclusive license or other transfer of all or substantially all of the assets of the Buyers or an Acquired Company to a Person that is not an Affiliate of the Buyers in one or a series of transactions, (iii) there occurs a merger, reorganization, consolidation or share exchange in which the outstanding shares of an Acquired Company's Equity Securities are cancelled, converted into or exchanged for a different kind of securities of the successor entity and the successor entity is not an Affiliate of the Buyer, (iv) there occurs an acquisition of all or substantially all of the outstanding Equity Securities of any Acquired Company by a Person that is not an Affiliate of the Buyers, (v) the Buyers elect, in their sole discretion, to accelerate the payment of the Maximum Earnout Amount, (vi) breaches any of its payment covenants or obligations set forth in this Section 2.9 or breaches any of its other covenants or obligations set forth in this Section 2.9 and does not remedy such breach within five Business Days of receiving notice thereof (each of clauses (i)–(vi), an "**Acceleration Event**"), an amount equal to the product of (x) the remaining number of Earnout Amounts that may be paid pursuant to this Section 2.9 times (y) the Maximum Earnout Amount, shall become due and payable immediately.

(h)     Buyer Control.  For the avoidance of doubt, nothing contained in this Section 2.9 shall restrict the Buyers' right to control the Acquired Companies in any respect, including the hiring or termination of Service Providers; the license of Intellectual Property; the offering or ceasing to offer particular products or services; the incurrence of expenses and requiring compliance with the Buyers' and their Affiliates' internal controls, corporate governance policies and procedures, legal and regulatory compliance standards and consumer data guidelines and privacy rules and regulations; provided, however, that the Parties understand that the Buyers' actions to control the Acquired Companies nonetheless may impact calculation of the Earnout Amount.  Notwithstanding anything in this Agreement to the contrary (but without limiting the effects of Section (f) above), none of the Buyer or any Acquired Company or any of their Affiliates (i) will owe any Seller any fiduciary or other similar duty in respect of this Section 2.9 or (ii) will have any obligation, and shall be bound by no agreement or covenant of any kind, in respect of this Section 2.9 other than an obligation to comply with (A) the covenants and agreements expressly set forth in this Section 2.9 and (B) the covenant of good faith and fair dealing implied in all contracts governed by Delaware law, it being the parties' intention that any other covenants, agreements and/or obligations are expressly waived and disclaimed.

(i)     Purchase Price Adjustment Set-Off Rights.  Notwithstanding anything herein to the contrary, the amount of any required Earnout Amount shall be subject to reduction by an amount equal to the excess of any Purchase Price Adjustment in the Buyer's favor over the Purchase Price Adjustment Escrow Amount as set forth in Section 2.8 above.

25

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093832

(j)      Non-Assignability. The interests, if any, of any Seller in such Seller's portion of the Earnout Amounts pursuant to this Section 2.9 shall not be assignable or transferable, except by operation of Law, provided that any Seller may assign its rights to (i) its Affiliates or (ii) its equity holders in proportion to their equity interests in such Seller (it being understood that any attempted assignment or transfer in violation of this Section 2.9(j) shall be null and void).

(k)      Any payments made pursuant to this Section 2.9 shall be deemed by all Parties as an adjustment to the Purchase Price for all Tax purposes unless otherwise required by applicable Law.

Section 2.10      **Withholding**. Notwithstanding anything to the contrary in this Agreement, the Buyer, the Acquired Companies, the Escrow Agent, Midco Seller, and their designees, as applicable, will be entitled to deduct and withhold from any amounts payable pursuant to this Agreement any amounts required to be deducted or withheld under applicable Law. In the event that any of the Buyer, the Acquired Companies, the Escrow Agent, Midco Seller, or any of their designees, as applicable, determines that deduction and withholding is required in connection with amounts payable pursuant to this Agreement, the Buyer, the Acquired Companies, the Escrow Agent, Midco Seller, or any of their designees, as applicable, will use reasonable best efforts to provide advance notice to such Person of such determination and the parties shall cooperate in good faith to reduce or eliminate any such deduction and withholding to the extent permitted under applicable Law. To the extent that any such amounts are so deducted and withheld, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made. Upon Closing (and thereafter as required by applicable Law), each person entitled to payment under this Agreement shall provide an IRS Form W-9 or applicable version of IRS Form W-8, as applicable. Any payments under this Agreement to employees or other current or former service providers that are treated as compensation or wages for Tax purposes shall be made through the applicable Acquired Company's payroll system.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE SELLERS

Each Seller hereby severally, and not jointly, represents and warrants to the Buyers as of the date hereof as follows:

Section 3.1      **Authorization**. Such Seller has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Ancillary Agreements to which such Seller is a party, the performance by such Seller of its obligations hereunder and thereunder and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly authorized. This Agreement and the Ancillary Agreements to which such Seller is a party have been duly executed and delivered by such Seller and constitute the legal, valid and binding obligation of such Seller, enforceable against it in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

Section 3.2      **No Violation**. The execution, delivery and performance by such Seller of this Agreement and the Ancillary Agreements to which such Seller is a party and the consummation of the transactions contemplated hereby and thereby will not:

(a)      violate, contravene or conflict with any provision of the charter documents, bylaws or similar organizational documents of such Seller;

US-DOCS\144371506.11

CONFIDENTIAL                    FBG_CH1_00093833

(b)      violate, contravene or conflict with any applicable Law or Order; or

(c)      contravene, conflict with, result in the violation or breach of any of the terms or conditions of, or constitute (with or without notice or lapse of time or both) a default under or an Event which would, or could reasonably be expected to give rise to, any right of notice, modification, acceleration, payment, withdrawal, suspension, cancellation or termination under, or in any manner release any party thereto from any obligation under, or otherwise affect any rights of any Seller under, any Contract or other instrument or obligation of any kind or nature, in any case whether written or oral, by which any Seller or any of its assets may be bound or affected.

**Section 3.3**      **Consents and Approvals**.  No consent, approval, Order or authorization of, or registration, declaration or filing with, or notice to, any Governmental Authority or other Person is required to be made or obtained by such Seller in connection with the authorization, execution, delivery and performance of this Agreement and the Ancillary Agreements, or the consummation of the transactions contemplated hereby and thereby.

**Section 3.4**      **Title to Securities**.  Such Seller has the sole voting power and sole power of disposition with respect to all of the Securities held by such Seller with no limitations, qualifications or restrictions on such rights and powers.  The Securities owned by such Seller will be transferred to each Buyer, as applicable, pursuant to this Agreement free and clear of any Liens.  Such Seller is not subject to any agreements, arrangements, options, warrants, calls, rights, commitments or other restrictions relating to the sale, transfer, purchase, redemption or voting of its Securities.

**Section 3.5**      **Litigation**.  There are no Proceedings pending or, to such Seller's knowledge, threatened against or affecting such Seller or any Acquired Company that seek to restrain or prohibit or to obtain damages or other relief in connection with the transactions contemplated hereby or under any Ancillary Agreement.

**Section 3.6**      **No Brokers or Finders**.  Except with respect to Angle Advisors, LLC, whose fees and expenses shall constitute a Seller Transaction Expense, neither such Seller nor any Affiliate thereof has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE ACQUIRED COMPANIES**

Except as set forth in the corresponding sections or subsections of the Disclosure Schedules attached hereto (collectively, the "**Disclosure Schedules**") (each of which shall qualify only the specifically identified sections or subsections hereof to which such Disclosure Schedule relates and shall not qualify any other provision of this Agreement or any Ancillary Agreement), the Sellers represent and warrant to the Buyers as of the date hereof and as of the Closing as follows:

**Section 4.1**      **Organization and Qualification; Authorization**.

(a)      Each Acquired Company is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation, which jurisdiction is listed on Schedule 4.1 of the Disclosure Schedules, and has all requisite power and authority to own, lease and operate its assets, properties and business and to carry on its business as now being conducted.  Complete and correct copies of the charter documents, bylaws or similar organizational documents of each Acquired Company and all

27

US-DOCS\144371506.11

CONFIDENTIAL      FBG_CH1_00093834

amendments thereto have been made available to the Buyer. None of the Acquired Companies is in violation of any of the provisions of its charter documents, bylaws or similar organizational documents. The minute books and resolutions of each Acquired Company previously made available to the Buyers contain true, complete and accurate records of all meetings and accurately reflect in all material respects all corporate action of the equity holders and board of directors (including committees thereof) of such Acquired Company. The stock certificate books and stock transfer ledgers of each Acquired Company previously made available to the Buyers are true, complete and accurate in all material respects.

(b)     Each Company has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Ancillary Agreements to which is party, the performance by such Company of its obligations hereunder and thereunder and the consummation by such Company of the transactions contemplated hereby and thereby have been duly authorized. This Agreement has been, and the Ancillary Agreements to which such Company is party will be, duly executed and delivered by such Company and constitute the legal, valid and binding obligation of such Company, enforceable against it in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

Section 4.2     **No Violation**. Except as set forth on Schedule 4.2 of the Disclosure Schedules, the execution, delivery and performance by the Sellers and the Companies of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby will not:

(a)     violate, contravene or conflict with any provision of the charter documents, bylaws or similar organizational documents of any Acquired Company;

(b)     violate, contravene or conflict with any resolution adopted by any Acquired Company's board of directors or stockholders;

(c)     violate, contravene or conflict with any Law or Order;

(d)     contravene, conflict with, result in the violation or breach of any of the terms or conditions of, or constitute (with or without notice or lapse of time or both) a default under or an event which would, or could reasonably be expected to give rise to, any right of notice, modification, acceleration, payment, suspension, withdrawal, cancellation or termination under, or in any manner release any party thereto from any obligation under, or otherwise affect any rights of any Acquired Company under, any Contract or Permit; or

(e)     result in the creation or imposition of any Lien upon any Securities or any Assets.

Section 4.3     **Consents and Approvals**. Except as set forth on Schedule 4.3 of the Disclosure Schedules, no consent, approval, Order or authorization of, or registration, declaration or filing with, or notice to, any Governmental Authority or other Person is required to be made or obtained by any Acquired Company in connection with the authorization, execution, delivery and performance by the Companies of this Agreement or any Ancillary Agreement, or the consummation of the transactions contemplated hereby and thereby.

Section 4.4     **Capitalization**. Schedule 4.4 of the Disclosure Schedules sets forth the entire authorized Equity Securities of each Acquired Company and a complete and correct list of the issued and outstanding Equity Securities of each Acquired Company, including the name of the record and beneficial

28

CONFIDENTIAL

FBG_CH1_00093835

owner thereof and the number of Equity Securities held thereby. All of the outstanding Equity Securities of each Acquired Company have been duly authorized, validly issued and are fully paid and non-assessable (as applicable). Except as set forth on Schedule 4.4 of the Disclosure Schedules, no Acquired Company has any outstanding Equity Securities or other securities directly or indirectly convertible into or exchangeable for its Equity Securities, no Acquired Company has any outstanding agreements, options, warrants or rights to directly or indirectly subscribe for or purchase, or that directly or indirectly require it to issue, transfer or sell, its Equity Securities or any securities directly or indirectly convertible into or exchangeable for its Equity Securities, and there are no agreements containing profit participation or phantom equity features with respect to any Acquired Company. Except for the direct and indirect Subsidiaries of each Acquired Company, no Acquired Company owns or otherwise holds, directly or indirectly, any stock, membership interest, partnership interest, joint venture interest or other equity interest in any Person. No Acquired Company is subject to any obligation (contingent or otherwise) to redeem, repurchase or otherwise acquire or retire any of its Equity Securities or any warrants, options or other rights to acquire its Equity Securities. Except as set forth on Schedule 4.4 of the Disclosure Schedules, there are no voting agreements, voting trusts or other agreements, commitments or understandings with respect to the voting or transfer of Equity Securities or other securities of any Acquired Company. All of the outstanding Equity Securities of each of the Subsidiaries are owned by a Company or another Subsidiary free and clear of all Liens (other than Liens arising in connection with applicable securities Laws). No Acquired Company has violated any applicable federal or state securities Laws in connection with the offer, sale or issuance of any of its Equity Securities or any warrants, options or other rights to acquire its Equity Securities. No Equity Securities of any Acquired Company are subject to, nor have been issued in violation of, preemptive or similar rights. There are no accrued but unpaid dividends payable by the Companies on any Equity Securities of the Acquired Companies.

**Section 4.5** **Financial Statements; Accounting and Internal Controls; Projections**.

(a)    Attached as Exhibit G are copies of the following financial statements of the Business (collectively, the "**Financial Statements**"):

(i)    The unaudited consolidated balance sheets of the Business as of December 31, 2022 and the related statements of operations for year then ended; and

(ii)    the unaudited consolidated balance sheet of the Business as of the Balance Sheet Date (the "**Balance Sheet**"), and the related unaudited statements of operations for the seven (7) month period then ended.

(b)    Except for the exceptions set forth on Schedule 4.5(b) of the Disclosure Schedules, the Financial Statements (including the notes thereto) (i) have been prepared in accordance with GAAP consistently applied throughout the periods covered thereby, except that the interim Financial Statements are subject to normal year-end adjustments (which will not be material individually or in the aggregate) and lack footnotes required by GAAP, (ii) present fairly the assets, liabilities and financial condition of the Business as of such dates and the results of operations of the Business for such periods, and (iii) are consistent with the books and records of the Acquired Companies (which books and records are correct and complete in all material respects). Since December 31, 2022, there has been no change in any accounting principles, policies, methods or practices, including any change with respect to reserves (whether for bad debt, contingent liabilities or otherwise) of the Business.

(c)    The Business has established and, for the past three years, has maintained in all material respects, a system of internal accounting controls sufficient to reasonably ensure (i) the reliability of financial reporting and the preparation of the financial statements of the Business and (ii) that (A) all transactions are executed in accordance with management's general or specific authorizations; (B) all

29

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093836

transactions are recorded when and as necessary to maintain asset accountability and to permit preparation of financial statements in conformity with GAAP applied using the same accounting practices, policies, principles and methodologies, with consistent classifications, judgments and valuation and estimation accrual methodologies, used in the preparation of the Financial Statements; and (C) all accounts, notes and other receivables are recorded accurately, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis.

(d)     The Business has established and maintained and, for the past three years, have maintained in all material respects, disclosure controls sufficient to reasonably ensure that material information relating to the Business (including any deficiencies or weaknesses in the design or operation of the Business's internal controls and any fraud that involves management or other Service Providers of any Acquired Company) is made known to the Business's management by others within the Business.

**Section 4.6     Absence of Undisclosed Liabilities**. No Acquired Company has any Liabilities, except (a) as and to the extent specifically accrued for or reserved against in the Balance Sheet, (b) Liabilities which have arisen after the date of the Balance Sheet in the ordinary course of business consistent with past practice (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement or violation of Law), (c) executory obligations under Contracts (other than Liabilities relating to any breach, or any fact or circumstance that, with notice, lapse of time or both, would result in a breach, thereof by any Acquired Company) and (d) Liabilities specifically set forth on Schedule 4.6 of the Disclosure Schedules.

**Section 4.7     Accounts and Notes Receivable; Accounts Payable**.  All accounts and notes, and other receivables of the Acquired Companies are reflected properly on their books and records, are valid receivables arising from bona fide transactions entered into by an Acquired Company involving the sale of goods or the rendering of services in the ordinary course of business subject to no setoffs or counterclaims, and are current and collectible subject to the reserve for bad debts set forth on the Balance Sheet as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of Acquired Companies.  Schedule 4.7 of the Disclosure Schedules sets forth the aging of accounts receivable of the Acquired Companies as of the Financials Date. The accounts payable and accruals of the Acquired Companies have arisen in bona fide arm's-length transactions in the ordinary course of business, and each Acquired Company has been paying its accounts payable as and when due.

**Section 4.8     Inventory**.  The inventory of the Acquired Companies is merchantable and fit for the purpose for which it was procured or manufactured, and is not slow-moving, obsolete, damaged, or defective, subject to the reserve for inventory write-down set forth on the Balance Sheet as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Acquired Companies, except, in each case, as would not be material to the Acquired Companies.  All such inventory is owned by the Acquired Companies free and clear of any Liens (other than Permitted Liens), and no material inventory is held on a consignment basis.

**Section 4.9     Absence of Changes or Events**.  Except as disclosed in the applicable subsection of Schedule 4.9 of the Disclosure Schedules, since December 31, 2022 (the "**Financials Date**"), (a) each of the Acquired Companies has conducted its business only in the ordinary course consistent with past practice, (b) no Event has occurred that, individually or in combination with any other Events, has had or could reasonably be expected to have Material Adverse Effect and (c) no Acquired Company has suffered any loss, damage, destruction or other casualty affecting any of its material properties or assets, whether or not covered by insurance.

30

US-DOCS\144371506.11

CONFIDENTIAL                                                                                    FBG_CH1_00093837

**Section 4.10**       <u>Assets</u>.

(a)       The Acquired Companies own, and immediately following the Closing will continue to own, good and marketable title to, or a valid right to use, all of the tangible assets and property used or held in connection with their businesses (the "**Assets**"), free and clear of any and all Liens (other than Permitted Liens).  The tangible assets and property to which the Acquired Companies have good and marketable title to, or a valid right to use, are all the assets and property that are necessary to enable the businesses of the Acquired Companies to be conducted immediately after the Closing in the same manner as the businesses of the Acquired Companies have been conducted since the Financials Date.

(b)       All material items of tangible personal property owned or leased by any Acquired Company are in good operating condition and repair, ordinary wear and tear excepted, and are suitable for the purposes for which they are presently being used.  None of the personal or movable property constituting Assets is located other than at the Real Property.

**Section 4.11**       <u>**Proprietary Rights**</u>.

(a)       Schedule 4.11(a) of the Disclosure Schedules contains a true, complete and accurate list of all (i) issued, registered, or applied-for Intellectual Property owned or purported to be owned by any Acquired Company, and (ii) any unregistered Trademark or copyright that is owned or purported to be owned by any Acquired Company and that, in the case of (i) and (ii), is material to the conduct of any Acquired Company's business as presently conducted.

(b)       Schedule 4.11(b) of the Disclosure Schedules contains a true, complete and accurate list of all Contracts to which any Acquired Company is a party pursuant to which Intellectual Property is licensed to any Acquired Company (excluding, Open Source Software licenses, confidentiality or non-disclosure agreements, agreements with employees or contractor, incidental or ancillary licenses to Intellectual Property that are necessary to be granted to provide services, generally commercially available, off the shelf software programs, software licensed to such Acquired Company pursuant to a shrink-wrap or "click to accept" agreements with a replacement cost and/or annual license fee of less than $100,000 or that are not otherwise material to the business of the Acquired Companies, taken as a whole) (the "**Intellectual Property Licenses**").The consummation of the transactions contemplated by this Agreement and the Ancillary Agreement will not (i) impair any rights of any Acquired Company under, or cause any Acquired Company to be in violation of or default under, any Intellectual Property License, (ii) give rise to any termination or modification of, or entitle any other party to terminate or modify, any such Intellectual Property License, or (iii) require the payment of (or increase the amount of) any royalties, fees, or other consideration with respect to the Acquired Company's use or exploitation of any Intellectual Property of any Person other than ongoing fees, royalties or payments which any Acquired Company would otherwise have been required to pay absent the transactions contemplated hereunder.

(c)       Each Acquired Company exclusively owns and possesses all right, title and interest in and to, or has the right under a valid and enforceable license to use and otherwise commercialize or exploit, all Intellectual Property necessary for or used in the operation of its businesses as presently conducted, free and clear of all Liens, except for Permitted Liens (collectively for all Acquired Companies, the "**Company Intellectual Property**").  All issued or registered Company Intellectual Property owned or purported to be owned by or exclusively licensed to any Acquired Company is valid, subsisting and, to the Knowledge of the Companies, enforceable.  The issued or registered Company Intellectual Property is currently in compliance with all formal legal requirements (including, as applicable, payment of filing, examination and maintenance fees, inventor declarations, proofs of working or use, timely post-registration filing of affidavits of use and incontestability, and renewal applications), and the Acquired Company has taken all actions reasonably necessary to obtain, perfect and maintain such Company Intellectual Property

31

US-DOCS\144371506.11

FBG_CH1_00093838

in full force and effect. Notwithstanding the foregoing, this (c) does not constitute a representation or warranty regarding the non-infringement any Acquired Company, the business of any Acquired Company or any Company Products of any Intellectual Property rights of any Person.

(d)     Except as set forth on Schedule 4.11(d) of the Disclosure Schedules, (i) there have been no claims made in writing or, to the Knowledge of the Companies, threatened against any Acquired Company asserting the invalidity, misuse or unenforceability of any Intellectual Property owned by the Acquired Companies ("**Owned Intellectual Property**") or challenging any Acquired Company's ownership of any Owned Intellectual Property or right to use, commercialize or exploit any other material Company Intellectual Property and to the Knowledge of the Companies there is no reasonable basis for any such claim, (ii) no Acquired Company has received any written notice of, and to the Knowledge of the Companies there are no facts which would constitute the basis for, a claim for any infringement, misappropriation, or other violation by an Acquired Company of any Intellectual Property (including any cease-and-desist letters or demands or unsolicited offers to license any Intellectual Property from any other Person), (iii) to the Knowledge of the Companies, the conduct of the Acquired Companies' respective businesses as previously conducted has not infringed, misappropriated or violated, and as presently conducted does not infringe, misappropriate or violate, any Intellectual Property of any other Person and (iv) to the Knowledge of the Companies, no Person is currently infringing, misappropriating, or otherwise violating any of the Owned Intellectual Property or any Acquired Company's rights therein or thereto.

(e)     The Acquired Companies are in material compliance with the terms and conditions of all licenses for the Open Source Software. Except as set forth on Schedule 4.11(e) of the Disclosure Schedules, no Acquired Company uses or distributes any Open Source Software in a manner that would require the disclosure of (or grant any person the right to receive) any source code or impose limitations on the right of such Acquired Company to require payment of license or other fees in connection with the distribution of such Software.

(f)     Assuming the provision of services under the Transition Services Agreements, IT Assets currently used by the Acquired Companies are sufficient for the current needs of the businesses of the Acquired Companies, including as to capacity and ability to process current peak volumes in a timely manner. In the past 12 months, there have been no bugs in, or failures, breakdowns, or continued substandard performance of, any IT Systems that has caused the substantial and material disruption of the business of any Acquired Company.

(g)     Each Person who is or was involved in the creation or development of any material Intellectual Property owned or purported to be owned by any Acquired Company has executed a valid and enforceable written agreement that assigns to such Acquired Company (or its predecessor in interest) all right, title and interest in and to such Intellectual Property.

(h)     Each of the Acquired Companies is in compliance with all applicable Laws, rules and regulations, in each case, pertaining to data privacy, data security, data breach notification requirements, and its own publicly published privacy policies, (collectively, the "**Privacy Requirements**"). No claims are currently pending or, to the Companies' Knowledge, are threatened against any Acquired Company by any Person alleging a violation of any Privacy Requirements. The execution and delivery of this Agreement and the Ancillary Agreements, the performance by the Sellers and the Companies of their respective obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby (i) will comply with all applicable Privacy Requirements, (ii) will not impair any rights of, or impose any obligations or restrictions on, any Acquired Company with respect to any use, disclosure, commercialization or exploitation of, or otherwise relating to, any personally identifiable information owned by the Acquired Companies. No Acquired Company nor anyone acting on behalf of any Acquired Company has knowingly used false log-on credentials with respect to any third-party website or other false

32

US-DOCS\144371506.11

FBG_CH1_00093839

**DEBTORS' EXHIBIT NO. 236**
**Page 33 of 216**

representation or statement to obtain any personally identifiable information. No Acquired Company has received a written complaint or been the subject of any Proceeding or, to the Companies' Knowledge, investigation regarding its collection, use or disclosure of personally identifiable or its privacy or data security policies, practices or activities. Each Acquired Company has commercially reasonable security measures in place to protect personally identifiable in its possession, custody or control, and, to the Companies' Knowledge, no Acquired Company has experienced any breach of security or unauthorized access by any third party to personally identifiable information in any Acquired Company's possession, custody or control, that has required notification to any Person under applicable Privacy Requirements. For purposes hereof, information in any Acquired Company's possession, custody or control includes information stored for such Acquired Company by any service provider or vendor.

**Section 4.12     Contracts.** Schedule 4.12 of the Disclosure Schedules contains a true, complete and accurate list (by reference to the applicable subsection hereof) as of the date of this Agreement of:

(a)     each Contract that requires an Acquired Company to pay, or entitles an Acquired Company to receive, or could result in obligations of an Acquired Company in the amount of, in the aggregate, $500,000 or more in any 12-month period;

(b)     each Contract that restricts any Acquired Company or any of its present or future Affiliates from competing with or engaging in any business activity anywhere in the world or soliciting for employment, hiring or employing any Person;

(c)     each Contract to acquire or dispose (by merger, purchase or sale of assets or stock or otherwise) of material assets, as to which an Acquired Company has continuing material obligations or material rights;

(d)     each Contract concerning a joint venture, strategic alliance, collaboration or partnership agreements, or the sharing of profits;

(e)     each Contract whereby any Acquired Company leases, subleases, licenses, or otherwise holds any rights to use or occupy any interest in real property (the "**Real Property Leases**");

(f)     each Contract with respect to Indebtedness;

(g)     each Contract with any Governmental Authority;

(h)     each Intellectual Property License;

(i)     each Contract that contains any fixed or indexed pricing, "most-favored nation" pricing or similar pricing terms or provisions regarding minimum volumes, volume discounts, or rebates;

(j)     each Collective Bargaining Agreement;

(k)     each Contract with current Service Providers respect to bonus or other incentive compensation, deferred compensation, equity purchase or award, salary continuation, pension, profit sharing or retirement plan;

(l)     each Contract with any firm or other organization providing commission or sales-based services to an Acquired Company has any Liability or other obligation;

(m)     each Contract with a Related Party;

33

US-DOCS\144371506.11

CONFIDENTIAL                                                                     FBG_CH1_00093840

(n)    each Contract that is not terminable by an Acquired Company with notice of 90 days or less without penalty;

(o)    each Contract that grants any Person other than an Acquired Company any rights of first refusal, rights of first negotiation or similar rights; and

(p)    each Contract not made in the ordinary course of business consistent with past practice or that is otherwise material.

True, complete and accurate copies of the Contracts listed or required to be listed on Schedule 4.12 of the Disclosure Schedules, together with all modifications and amendments thereto, have previously been delivered or made available to the Buyer, or, to the extent any of such Contracts are oral, Schedule 4.12 of the Disclosure Schedules contains a description of the material terms thereof.  Each such Contract is in full force and effect, is valid, binding and enforceable in accordance with its terms (except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies), and is not subject to any claims, charges, set-offs or valid affirmative defenses.  Except as set forth on Schedule 4.12 of the Disclosure Schedules, no Acquired Company is in material breach or material default, nor has any event occurred which with the giving of notice or the passage of time or both would constitute a material breach or material default by any Acquired Company of, or which would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by another party under, or in any manner release any party thereto from any obligation under, any such Contract and, to the Knowledge of the Companies, no other party is in breach or default, and no event has occurred which with the giving of notice or the passage of time or both would constitute a breach or default by any other party, or which would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by any Acquired Company under, or in any manner release any party thereto from any obligation under, any such Contract.  Since December 31, 2022, no Acquired Company has received any, written or, to the Knowledge of the Companies, oral notice or communication regarding any violation or breach of, or default under any such Contract.  Neither the Sellers nor any Acquired Company has been notified in writing, or to the Knowledge of the Companies, orally by any counterparty to any such Contract that such counterparty is terminating, modifying, repudiating or rescinding, or intends to terminate, modify, repudiate or rescind such Contract.

**Section 4.13**    **Litigation**.  Except as set forth on Schedule 4.13(a) of the Disclosure Schedules, there are no Proceedings pending or, to the Knowledge of the Companies, threatened against any Acquired Company or any of the current or former officers, directors or employees of any Acquired Company related to any Acquired Company or its operations or current managers, directors or officer.  Except as set forth on Schedule 4.13(b) of the Disclosure Schedules, there are no Proceedings pending or threatened by any Acquired Company.  For any Proceedings identified on Schedule 4.13(a) and 4.13(b) of the Disclosure Schedules that remain pending as of the date hereof, the Companies have provided or made available to the Buyers true, complete and accurate copies of all material information relating to each such Proceeding.  Schedule 4.13(c) of the Disclosure Schedules sets forth a complete and correct list and description of all Proceedings made, filed or otherwise initiated in connection with any Acquired Company or any of the current or former managers, directors of officers of any Acquired Company that has been resolved in the past three years.  Schedule 4.13(d) of the Disclosure Schedules sets forth any Order to which any Acquired Company is subject.

**Section 4.14**    **Compliance with Laws**.  Except as set forth on Schedule 4.14 of the Disclosure Schedules, each Acquired Company complies, and has at all times complied, in all material respects with all applicable Laws in connection with the conduct, ownership, use, occupancy or operation of its business and the Assets, and no Acquired Company has received during the past three years, nor is there any basis

34

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093841

for, any notice or other communication from any Governmental Authority or any other Person that any Acquired Company is not in compliance in any material respect with any Law.

Section 4.15    **Licenses and Permits**. Except as set forth on <u>Schedule 4.15</u> of the Disclosure Schedules, each Acquired Company holds, and has at all times held, and immediately following the Closing will hold, all Permits necessary for the conduct, ownership, use, occupancy or operation of its businesses or the Assets. Each Acquired Company complies, and has at all times complied, in all material respects with all such Permits, and no Acquired Company has received during the past three years any notice or other communication from any Governmental Authority or any other Person that any Acquired Company is not in compliance in any material respect with any such Permit or of any actual or possible revocation, withdrawal, suspension, cancellation, termination or material modification of any such Permit. All such Permits are, and immediately following the Closing will be, valid and in full force and effect on terms identical in all material respects to those under which, immediately before the Closing (and as of the date of this Agreement), the Acquired Companies hold such Permits.

Section 4.16    **Health, Safety and Environment**.

(a)    Each Acquired Company is and has been in compliance with all Environmental and Safety Requirements.

(b)    Each Acquired Company has obtained, maintains, and complies with all Permits required under Environmental and Safety Requirements to operate its business, and no Proceeding is pending, or to the Knowledge of the Companies, threatened, to revoke, modify, or terminate any Permit required under Environmental and Safety Requirements.

(c)    There are no Hazardous Materials present in, at, under, about or migrating to or from, any (i) Owned Real Property or Leased Real Property, (ii) real property formerly owned, leased, or used by any Acquired Company or any of its predecessors, or (iii) any property to which any Person has, at any time, transported, treated, stored or disposed of Hazardous Material on behalf of any Acquired Company or any of its predecessors that could reasonably be expected to give rise to, result in, or serve as a basis for Losses to the Acquired Companies under Environmental and Safety Requirements.

(d)    No Acquired Company has been subject to, nor has received any notice of, any Proceeding related to the Release of Hazardous Materials or noncompliance with or Liabilities under Environmental and Safety Requirements.

(e)    No Acquired Company has any contractual indemnity obligation to any third party with respect to Environmental and Safety Requirements.

(f)    No underground storage tanks or related piping are located on, under, or at any Owned Real Property or Leased Real Property, and no Acquired Company has removed or caused any such tank or piping to be removed, nor, to the Knowledge of the Companies, has there been any such removal from any Owned Real Property or Leased Real Property or any former operating location that could reasonably be expected to give rise to, result in, or serve as a basis for Losses to any Acquired Company under Environmental and Safety Requirements.

(g)    To the Knowledge of the Companies, no current facts, circumstances, or conditions exist with respect to any Acquired Company, their respective businesses, the Owned Real Property, the Leased Real Property, or any formerly owned, leased, or operated real property that would result, individually or in the aggregate, in any Acquired Company's incurring material Losses or material,

35

US-DOCS\144371506.11

unbudgeted capital expenditures to achieve or maintain compliance under Environmental and Safety Requirements, including Permits required under Environmental and Safety Requirements.

(h)     The Companies have provided the Buyers with true, complete and accurate copies of all material environmental assessment reports, health and safety audits, and reports of investigations with respect to the Acquired Companies, the Owned Real Property, or the Leased Real Property in the Companies' possession or control.

(i)     Prior to the Closing Date, the transactions contemplated by this Agreement do not require, under any Environmental and Safety Requirements, the consent of, or filings with, any Governmental Authority with jurisdiction over the Acquired Companies, the Owned Real Property, or Leased Real Property.

**Section 4.17     Taxes**.

(a)     Each Acquired Company has timely and properly filed all income and other material Tax Returns required to be filed by it, taking into account any valid extension of time to file. All such Tax Returns are accurate and complete. Each Acquired Company has timely and properly paid all income and other material Taxes required to be paid by it or with respect to its assets, whether or not shown on such Tax Returns.

(b)     All material Tax deficiencies that have been claimed, proposed, or asserted in writing by any Governmental Authority against any Acquired Company have been fully paid or finally settled.

(c)     No Tax audits or administrative or judicial Tax Proceedings are being conducted with respect to any Acquired Company. No Acquired Company has received from any Governmental Authority any (i) written notice indicating an intent to open an audit or other review with respect to Taxes, (ii) written request for information related to Tax matters, or (iii) written notice of deficiency or proposed adjustment for any amount of Tax. No Acquired Company has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that, in either case, remains in effect. No Acquired Company is currently the beneficiary of any extension of time within which to file any Tax Return or pay any Tax.

(d)     No claim has ever been made by an authority in writing in a jurisdiction where any Acquired Company does not file Tax Returns that such Acquired Company may be subject to taxation by that jurisdiction that would be covered by such Tax Returns.

(e)     There are no Liens on any of the assets of the Acquired Companies that arose in connection with any failure (or alleged failure) to pay any Tax other than Permitted Liens.

(f)     Each Acquired Company has timely withheld and paid all material Taxes required to have been withheld and paid in connection with any amounts paid or owing to any current or former Service Provider, equity interest holder, or other third party..

(g)     No Acquired Company is party to any Tax allocation, Tax sharing, or Tax distribution agreement or arrangement (other than by reason of customary provisions in commercial agreements entered into with third parties, the primary purpose of which does not relate to Taxes).

(h)     No Acquired Company (i) has ever been a member of an Affiliated Group filing a consolidated federal income Tax Return or any similar group for federal, state, local or non-U.S. Tax

36

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093843

purposes (other than a group the common parent of which was Walbro Japan), (ii) has any liability for the Taxes of any Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law), as a transferee or successor, or by any contract (other than by reason of customary provisions in commercial agreements entered into with third parties, the primary purpose of which does not relate to Taxes), or (iii) has ever been a party to any joint venture, partnership, or other arrangement that is treated as a partnership for Tax purposes.

(i)     Each Acquired Company has timely and properly collected all material sales, use, value-added, and similar Taxes required to be collected, and has remitted, or will remit on a timely basis, such amounts to the appropriate Governmental Authority.  Each Acquired Company has properly requested, received and retained all necessary exemption certificates and other documentation supporting any claimed exemption or waiver of material Taxes on sales or similar transaction as to which it would otherwise have been obligated to collect or withhold Taxes.

(j)     The aggregate unpaid Taxes of the Acquired Companies (a) did not, as of the Balance Sheet Date, materially exceed the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Balance Sheet and (b) do not materially exceed that reserve as adjusted for the passage of time through the end of the Closing Date in accordance with the past custom and practice of the Companies in preparing the Financial Statements.

(k)     No Acquired Company has ever participated in any "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code or Treasury Regulation Section 1.6011-4(b).

(l)     No Acquired Company has requested or received a ruling from any Governmental Authority or signed any binding agreement with any Governmental Authority that would impact the amount of Tax due from the Buyers or their Affiliates (including following the Closing, for the avoidance of doubt, the Acquired Companies) after the Closing Date.

(m)     Neither the Buyers nor any of their Affiliates (including following the Closing, for the avoidance of doubt, the Acquired Companies) will be required to include any material item of income in, or exclude any material deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting or use of a cash or improper method of accounting for a taxable period ending on or prior to the Closing Date with respect to any Acquired Company; (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. Income Tax Law) executed on or prior to the Closing Date; (iii) ; (iv) installment sale or open transaction disposition made on or prior to the Closing Date by any Acquired Company; (v) prepaid amount or deposit received on or prior to the Closing Date by any Acquired Company outside the ordinary course of business.

(n)     No Acquired Company has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that purported or intended to be governed in whole or in part by Section 355 or 361 of the Code.

(o)     All material transactions or arrangements made by any Acquired Company with any other Person have in all material respects been made on arm's length terms, and the processes by which prices and terms have been arrived at have, in each case, been documented in accordance with all applicable Laws, including Code Section 482 and any equivalent provision under any state, local, or non-U.S. Law.

37

US-DOCS\144371506.11

FBG_CH1_00093844

(p)    None of the Acquired Companies has any net operating losses or other tax attributes presently subject to limitation under Sections 382, 383, 384 or the federal consolidated return regulations (or any corresponding or similar provision of state, local or foreign income Tax Law).

(q)    Each Acquired Company has been resident in its jurisdiction of incorporation for Tax purposes and has not, at any time, been treated as a resident of or as having a permanent establishment or other fixed place of business in any other jurisdiction..

**Section 4.18**    **Employee Benefit Plans**.

(a)    Schedule 4.18 of the Disclosure Schedules sets forth each material Employee Benefit Plan (excluding at-will offer letters or agreements made in the ordinary course of business on the Acquired Companies' standard form, in each case that are cancellable without penalty to the Acquired Companies (other than any statutory severance obligations) and any Employee Benefit Plan that is governed by applicable Law). For purposes of this Agreement "**Employee Benefit Plan**" means each Employee Pension Benefit Plan, Employee Welfare Benefit Plan, Multiemployer Plan, Multiple Employer Plan, Multiple Employer Welfare Arrangement, Title IV Plan, pension plan, plan of deferred compensation, medical plan, life insurance plan, long-term disability plan, dental plan, or other plan, program, arrangement or trust, personnel policy (including vacation time, holiday pay, sick leave, other forms of paid time off, bonus programs, moving or other expense reimbursement or payment programs), excess benefit plan, bonus or incentive plan (including stock options, restricted stock, stock bonus and deferred bonus plans), severance agreement, salary reduction agreement, change-if-control agreement, employment agreement, consulting agreement or any other benefit, program or Contract, whether or not written or pursuant to a Collective Bargaining Agreement. No Employee Benefit Plan that provides severance benefits is subject to ERISA.

(b)    No Acquired Company has ever sponsored, maintained or contributed to, or has had any other Liability or potential Liability with respect to a plan which is or was (i) a Multiemployer Plan, (ii) a Multiple Employer Plan, (iii) a Multiple Employer Welfare Arrangement (or other plan, program, arrangement or trust providing for or funding the welfare of any of the employees or former employees or beneficiaries thereof of such Acquired Company), (iv) a Title IV Plan (including under Section 4204 of ERISA), (v) a VEBA, or (vi) any Employee Benefit Plan in which stock of the Acquired Companies or any ERISA Affiliate is or was held as a plan asset. There are, and have been, no ERISA Affiliates.

(c)    Each Employee Benefit Plan that is intended to be "qualified" under Section 401(a) of the Code has received a determination from the IRS that such Employee Benefit Plan is so qualified and to the Acquired Companies' Knowledge, there are no facts or circumstances that could reasonably be expected to adversely affect the qualified status of any such Employee Benefit Plan.

(d)    Each Employee Benefit Plan has been and is operated and funded in such a manner as to qualify, where appropriate, for both federal and state purposes, for Income Tax exclusions to its participants, Tax-exempt income for its funding vehicle, and the allowance of deductions and credits with respect to contributions thereto.

(e)    There are no Proceedings pending, or to the Acquired Companies' Knowledge, threatened against, by or with respect to any Employee Benefit Plan, or the assets, sponsor, plan administrator, or fiduciaries thereof (other than routine claims for benefits for which plan administrative review procedures have not been exhausted and for which any Liability is the sole responsibility of an insurance company), and there are no facts to the Acquired Companies' Knowledge which could give rise

38

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093845

to any material Liability or Proceeding against any Employee Benefit Plan, plan sponsor, fiduciary or plan administrator or other Person dealing with any Employee Benefit Plan or the assets thereof.

(f)     No Employee Benefit Plan is under audit or investigation by, or is the subject of a Proceeding with respect to, any Governmental Authority, including the IRS, the Department of Labor or the Pension Benefit Guaranty Corporation.

(g)     Each of the Employee Benefit Plans and all related trusts, insurance contracts and funds have been maintained, funded and administered in compliance with their terms and the terms of any applicable Collective Bargaining Agreement, and in compliance with the applicable provisions of ERISA, the Code, and any other applicable Law.  With respect to each Employee Benefit Plan, all required payments, premiums, contributions, distributions or reimbursements for all periods ending prior to or as of the date hereof have been timely made or properly accrued and all required payments, premiums, contributions, distributions or reimbursements for all periods between the date hereof and the Closing Date will have been timely made or properly accrued.

(h)     No Acquired Company, Seller nor any other "disqualified person" (within the meaning of Section 4975 of the Code) nor any "party in interest" (within the meaning of Section 3(14) of ERISA) has engaged in any nonexempt "prohibited transaction" (within the meaning of Section 4975 of the Code or Section 406 of ERISA) with respect to any of the Employee Benefit Plans which could subject any such Employee Benefit Plans, any Acquired Company or any current or former Service Provider of any Acquired Company to any liability or any penalty or tax under ERISA or the Code.  None of the Acquired Companies nor any other Person has engaged in any transaction with respect to any Employee Benefit Plan that could subject the Employee Benefit Plans, the Acquired Companies or any other Person to any Tax or penalty (civil or otherwise) imposed by ERISA, the Code or other applicable Law.

(i)     Each Employee Benefit Plan that is subject to COBRA and/or the requirements of HIPAA, and/or the requirements of the Affordable Care Act has been administered in compliance with such Laws, and none of the Employee Benefit Plans nor the Acquired Companies have any Liability under any such Law.  No Employee Benefit Plan provides post-retirement medical or life or other welfare benefits to any current or future retired or terminated employee (or any dependent thereof) of any Acquired Company other than as required pursuant to COBRA, the full cost of which is paid by the participant.  With respect to each Employee Benefit Plan that is an Employee Welfare Benefit Plan, all claims are (i) insured pursuant to a contract of insurance whereby the insurance company bears any risk of loss with respect to such claims, (ii) covered under a contract with a health maintenance organization, pursuant to which the health maintenance organization bears the liability for claims and there are no provisions for retroactive premium adjustments, or (iii) reflected as a liability or accrued for on the Financial Statements.  Schedule 4.18(i) of the Disclosure Schedules sets forth a true, correct, and complete list of all individuals who are receiving COBRA Coverage or who have incurred a "qualifying event" within the meaning of Section 4980B of the Code, but have not yet elected COBRA Coverage, the date and description of the qualifying event that triggered entitlement to COBRA Coverage, the name of the Employee Benefit Plans in which they participated that are subject to COBRA, and the expected date of termination of COBRA Coverage.

(j)     No Employee Benefit Plan has been acquired by the Acquired Companies as a result of any merger or acquisition.

(k)     With respect to each material Employee Benefit Plan, the Acquired Companies have provided the Buyer true, complete and correct copies of (to the extent applicable): (i) each material Employee Benefit Plan document (including the related trust documents, any amendments thereto, the summary plan descriptions, any summaries of material modifications and any insurance contracts or service provider agreements, custodial agreements, insurance policies, investment management agreements,

39

US-DOCS\144371506.11

FBG_CH1_00093846

administrative agreements and similar agreements and any amendments thereto); (ii) the three most recent annual reports, actuarial reports and/or financial reports; (iii) the three most recent annual reports (IRS Form 5500 series) filed with the United States Department of Labor (with all applicable attachments); (iv) the most recent determination or opinion letter, if any, received from the IRS relating to each Employee Benefit Plan intended to qualify under Section 401(a) of the Code; (v) non-routine communication to or from any Governmental Authority relating to the Employee Benefit Plan within the past three years; and (vi) any notes or minutes of any meeting of any fiduciary, administrator, or other committee.

(l)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will (either alone or in conjunction with any event) (i) increase any benefits otherwise payable under any Employee Benefit Plan, (ii) result in any acceleration of the time of funding, payment or vesting of any such benefits, (iii) result in any Liability to the Buyers or any Acquired Company under any Employee Benefit Plan or agreement with any current or former Service Provider, or (iv) require any notification or consultation with any union, works council, employee representative or other labor organization.

(m)     Each Acquired Company has, for purposes of each relevant Employee Benefit Plan, correctly classified its current and former Service Providers as common law employees, leased employees, independent contractors or agents of such Acquired Company and no Person has been an active participant in any Employee Benefit Plan subject to ERISA who was not a common law employee of an Acquired Company (or a beneficiary thereof) at the time of participation (other than with respect to continuation coverage mandated by COBRA).

(n)     No Employee Benefit Plan has been the subject of any correction procedure, including the Employee Plan Compliance Resolution System (EPCRS), the Delinquent Filer Voluntary Compliance Program or the Voluntary Fiduciary Correction Program.

(o)     Any notices required by ERISA or the Code or any other applicable Law with respect to the Employee Benefit Plans, including but not limited to any notices required by Section 204(h), Section 606 or Section 4043 of ERISA or Section 4980B of the Code, have been timely provided in the manner required under applicable Law.

(p)     There is no agreement, plan, arrangement or other contract (including this Agreement or the arrangements contemplated thereby) covering any employee or independent contractor or former employee or independent contractor of any of the Acquired Companies that, considered individually or considered collectively with any other such contracts, will, or could reasonably be expected to, give rise directly or indirectly to the payment of any amount that would not be deductible pursuant to Section 280G of the Code as a result of the transactions contemplated by this Agreement.  None of the Acquired Companies is a party to any contract, nor does it have any obligation (current or contingent), to compensate any individual for excise taxes paid pursuant to Section 4999 of the Code.

(q)     Each Employee Benefit Plan that is a "non-qualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code (a "**Nonqualified Deferred Compensation Plan**") and any award thereunder, in each case that is subject to Section 409A of the Code has been administered and drafted or amended in compliance with Section 409A of the Code.

**Section 4.19**     **Employees; Labor Relations**.

(a)     Schedule 4.19(a) of the Disclosure Schedules lists each Acquired Company's Service Provider as of the date of this Agreement, setting forth the (i) the name or identification number, job title and current annual salary and other compensation payable by such Acquired Company to such

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093847

Persons as of the date hereof, (ii) the profit sharing, bonus or other form of additional compensation paid or payable by such Acquired Company to or for the benefit of each such Person for the current fiscal year and any amounts owed in future fiscal years, (iii) any and all loans outstanding from such Acquired Company to any such Person, (iv) leave status (including type of leave), (v) whether such individual is exempt or non-exempt from overtime requirements and full-time or part-time status, (vi) date of hire, (vii) base compensation rate, and commission, bonus or other incentive-based compensation and whether such Person is retained on a salaried basis or on an hourly, piecework or other non-salaried basis, (viii) principal place of work, (ix) the type of security clearance held, if any, and the expiration date thereof, and (x) the amount of accrued and unused vacation and sick leave (as of the Closing Date in the ordinary course of business consistent with past practice).

(b)       Except as set forth on Schedule 4.19(b) of the Disclosure Schedules, since the Financials Date, no current officer of any Acquired Company has given notice of his or her intent to terminate such employment and no notice of termination has been given to any officer by any Acquired Company. There will not have been any "employment losses" or "layoffs" (as defined in the WARN Act) or similar event during the 90 days prior to the Closing Date that, when aggregated with enough similar other events, could result in any obligation on behalf of any of any of the Acquired Companies under the WARN Act.

(c)       Except as set forth on Schedule 4.19(c), (i) no Acquired Company is a party to or obligated with respect to any Collective Bargaining Agreement and (ii) no strike or union organizational activity or other similar occurrence (whether or not resolved) has occurred at any time during the past five years or is pending or materially threatened against any Acquired Company.  The Acquired Companies are not subject to any charge, demand, petition or representation proceeding seeking to compel, require or demand any of them to bargain with any labor union or labor organization. To the Knowledge of the Companies, no labor union has requested or is seeking to represent any Service Provider.  There is no pending or, to the Knowledge of the Companies, threatened labor dispute, strike or lockout involving any of the Acquired Companies. There is no pending, or to the Knowledge of the Companies, threatened unfair labor practice charge against any of the Acquired Companies before the National Labor Relations Board and, to the Knowledge of the Companies, no basis for any such charge exists.  No Acquired Company is or has been a party to or otherwise bound by any material Order relating to employees or employment practices, and there are no material Governmental Authority conciliation agreements, noncompliance findings or audits pending or in effect with respect to employees or employment practices of any Acquired Company.

(d)       Each current and former employee of the Acquired Companies that has been classified as exempt from overtime requirements was in fact exempt from overtime requirements at all times so classified, in all material respects.  Each current and former Service Provider who has not been classified as an employee of the Acquired Companies was in fact not an employee of the Acquired Companies at all times so classified, except as would not be material.  The Acquired Companies have no material financial obligation to any former Service Provider.  The Acquired Companies are not subject to any contractual obligation to rehire any former Service Provider or to refrain from disparaging any current or former Service Provider.  The Acquired Companies have complied, in all material respects, with all Laws relating to their current and former non-employee Service Providers.  The Acquired Companies have complied, in all material respects, with all Laws relating to their employees including all applicable Laws respecting employment and employment practices, terms and conditions of employment, and wages and hours, including (i) Title VII of the Civil Rights Act of 1964, as amended, (ii) the Equal Pay Act of 1967, as amended, (iii) the Age Discrimination in Employment Act of 1967, as amended, (iv) the Americans with Disabilities Act, as amended, (v) the Fair Labor Standards Act, as amended, and (vi) Laws relating to employment and employment practices, terms and conditions of employment, wages, hours, collective bargaining and the payment and withholding of Taxes or other sums as required by the appropriate

US-DOCS\144371506.11

CONFIDENTIAL                                                                                   FBG_CH1_00093848

Governmental Authority and has withheld and paid to the appropriate Governmental Authority or is holding for payment not yet due to such Governmental Authority all amounts required to be withheld from current and former employees, and there are no material arrearages or delinquencies in the payment of wages, salaries, commissions, bonuses or other direct compensation, in each such case, and the related rules and regulations adopted by those federal agencies responsible for the administration of such Laws.

(e)     There is no material Liability of, or pending or, to the Knowledge of the Companies, threatened claims against, or investigations involving, any of the Acquired Companies (including workers' compensation claims and claims or suits for contribution to, or indemnification of, third parties, occupational health and safety, environmental, consumer protection or equal employment matters) for injury, sickness, disease, discrimination, death or termination of employment services of any current or former Service Providers or other employment matter, other than as set forth on Schedule 4.19(e) of the Disclosure Schedules.

(f)     The Acquired Companies have no obligation to materially increase the compensation or benefits presently being paid or provided or hereafter payable or to be provided to current or former Service Providers, excluding any obligations under Collective Bargaining Agreements.

(g)     The Companies have provided to the Buyers true, correct and complete copies of all employee manuals and handbooks, disclosure materials, policy statements and other materials of the Acquired Companies in effect, as well as all affirmative action plans and material correspondence with any Governmental Authority during the last five years relating to affirmative action plans or other employment-related matters (e.g., OFCCP compliance evaluations, closure letters and conciliation agreements).

(h)     Except as set forth on Schedule 4.19(h) of the Disclosure Schedules, (a) the Acquired Companies do not utilize the services of any professional employer organization (PEO), staffing agency, or loan-out agency or any entity that provides temporary or long-term staffing services, and (b) each Person who provides employment-related services to the Acquired Companies is employed by an Acquired Company.

(i)     To the Knowledge of the Companies, none of the Service Providers of the Acquired Companies are subject to and in violation of any non-compete, non-solicitation, non-disclosure, confidentiality, employment, consulting or similar Contracts in conflict with the business and related activities of the Acquired Companies.  None of the Acquired Companies has received any notice alleging that any violation of any such Contracts has occurred.

**Section 4.20     Related Party Transactions**.  No Related Party (a) has any direct or indirect interest in any asset used in or otherwise relating to any Acquired Company or their businesses (other than the ownership by the Sellers and their equityholders of the Companies), (b) is indebted to any Acquired Company, (c) has entered into, or has had any direct or indirect financial interest in, any Contract, transaction or business dealing involving any Acquired Company (other than employment or service agreements), (d) is competing, directly or indirectly, with any Acquired Company, (e) is a member, manager, director, officer or employee of, or consultant to, or owns, directly or indirectly, any interest in, any vendor, supplier or customer of any Acquired Company, or is in any way associated with or involved in the business of the Acquired Companies (except in his or her capacity as a director, officer or employee of an Acquired Company, as the case may be), or (f) has any claim or right against any Acquired Company (other than rights to receive compensation for, or expense reimbursement in connection with, services performed as an employee or director).  Each Acquired Company does not share any facilities or equipment with any Related Party, and each Acquired Company does not purchase or provide assets or services for any business conducted by any Related Party.  For the past three years there has not been, and there is not

42

US-DOCS\144371506.11

currently, pending, or, to the Knowledge of the Companies, threatened, any Proceeding against any current or former Related Party with respect to which an Acquired Company has an indemnification obligation.

**Section 4.21   Real Property.**

(a)    Schedule 4.12(a) of the Disclosure Schedules sets forth a complete list, including an address and description, of all real property owned in fee by any Acquired Company (the "**Owned Real Property**"). With respect to Owned Real Property of any Acquired Company: (i) such Acquired Company has good and marketable indefeasible fee simple title, free and clear of all Liens except Permitted Liens; (ii) such Acquired Company has not leased, licensed or otherwise granted to any Person the right to use or occupy the Owned Real Property or any portion thereof; and (iii) there are no outstanding options, rights of first offer or rights of first refusal to purchase the Owned Real Property or any portion thereof or interest therein.

(b)    Schedule 4.21(b) of the Disclosure Schedules sets forth a complete list, including an address of each leasehold or subleasehold estate or other right to use or occupy any interest in real property held by any Acquired Company (the "**Leased Real Property**" and, together with Owned Real Property, the "**Real Property**") and the Real Property Leases (including all amendments, guaranties and other agreements with respect thereto) relating to each such Leased Real Property. With respect to each Leased Real Property: (i) the relevant Acquired Company's possession and quiet enjoyment under the applicable Real Property Lease has not been disturbed; (ii) no Acquired Company has subleased, licensed or otherwise granted any person the right to use or occupy any Leased Real Property or any portion thereof; and (iii) there are no special, general or other assessments pending against any Acquired Company or affecting any Leased Real Property that would be payable by the lessee thereof.

(c)    The Real Property comprises all of the real property that is used in or otherwise related to the businesses of the Acquired Companies. The Real Property is in good condition and repair and is sufficient for the operation of the businesses of the Acquired Companies as currently conducted and intended to be conducted. No Acquired Company has received any notice from any insurance company or board of fire underwriters of any defects or inadequacies that could adversely affect the insurability of any Real Property or requesting the performance of any material work or alteration with respect to any Real Property. There is no pending or threatened condemnation, expropriation or other governmental taking of any part or interest in any Owned Real Property or, to the Companies' Knowledge, Leased Real Property. The current and intended use and occupancy of the Real Property and the operation of the Acquired Companies' businesses as currently conducted and intended to be conducted thereon do not violate any applicable zoning Law, easement, covenant, condition, restriction or similar provision in any instrument of record affecting the Owned Real Property, or to the Companies' Knowledge, the Leased Real Property. No fact or condition exists that could result in the termination or impairment of presently available access from adjoining public or private streets or ways or in the discontinuation of presently available sewer, water, electric, gas, telephone or other utilities or services for any Owned Real Property, or to the Companies' Knowledge, Leased Real Property.

**Section 4.22   Suppliers and Customers.**

(a)    Schedule 4.22(a) of the Disclosure Schedules contains a true, complete and accurate list of (i) the 20 largest suppliers to the Acquired Companies, taken as a whole, (excluding utilities) by the aggregate dollar value of purchases by the Acquired Companies, taken as a whole, during the 12 month period ended July 31, 2023 (each a "**Top Supplier**") and (ii) with respect to each Top Supplier such aggregate dollar value of purchases. Since the Financials Date, no Top Supplier has terminated or adversely modified the amount, frequency or terms of the business such Top Supplier conducts with any Acquired Company. No Acquired Company has received any notice, nor do the Companies have any Knowledge,

43

US-DOCS\144371506.11

CONFIDENTIAL

that any Top Supplier intends to terminate or adversely modify the amount, frequency or terms of the business such Top Supplier conducts with any Acquired Company. None of the Acquired Companies has any outstanding material dispute with a Top Supplier, and the Companies have no Knowledge of any material dissatisfaction on the part of any Top Supplier.

(b)     Schedule 4.22(b) of the Disclosure Schedules contains a true, complete and accurate list of (i) the 20 largest customers of the Acquired Companies, taken as a whole, by the aggregate dollar value of sales by the Acquired Companies, taken as a whole, during the 12 month period ended July 31, 2023 (each a "**Top Customer**") and (ii) with respect to each Top Customer, the aggregate dollar value of such sales. No Top Customer has terminated or adversely modified the amount, frequency or terms of the business such Top Customer conducts with any Acquired Company. No Acquired Company has received any notice, nor do the Companies have any Knowledge, that any such Top Customer intends to terminate or adversely modify the amount, frequency or terms of the business such Top Customer conducts with any Acquired Company. None of the Acquired Companies has any outstanding material dispute with a Top Customer, and the Companies have no Knowledge of any material dissatisfaction on the part of any Top Customer.

Section 4.23     **Insurance Policies**. Schedule 4.23 of the Disclosure Schedules contains a true, complete and accurate list of all insurance policies to which any Acquired Company is a party or which provide coverage to or for the benefit of or with respect to any Acquired Company or any Service Provider in his or her capacity as such (the "**Insurance Policies**"), indicating in each case, the name of the insured, the insurer, the expiration date of each policy and the amount of coverage. True, complete and accurate copies of all such Insurance Policies have been provided or made available to the Buyer. Each Insurance Policy is in full force and effect and shall remain in full force and effect in accordance with its terms immediately following the Closing, is provided by a financially solvent carrier and has not been subject to any lapse in coverage. The Acquired Companies are current in all premiums or other payments due under the Insurance Policies and have otherwise complied in all material respects with all of their obligations under each Insurance Policy. During the past three years, no Acquired Company has been refused any insurance by, nor has coverage been limited by, any insurance carrier with which any Acquired Company has carried insurance or any other insurance carrier to which any Acquired Company has applied for insurance, and no insurer has issued a reservation of rights or denial of coverage for claims or incidents which could give rise to a claim under any Insurance Policy. No Insurance Policy provides for any retrospective premium adjustment or other experience based liability on the part of any Acquired Company.

Section 4.24     **Bank Accounts**. Schedule 4.24 of the Disclosure Schedules is a true, complete and accurate list of each bank or financial institution in which any Acquired Company has an account, safe deposit box or lockbox, or maintains a banking, custodial, trading or similar relationship, the number of each such account or box, and the names of all persons authorized to draw thereon or to having signatory power or access thereto.

Section 4.25     **Trade Names; Business Locations**. Schedule 4.25 of the Disclosure Schedules sets forth all fictitious or trade names that any Acquired Company has been known as or used and all offices or places of business each Acquired Company has used, in each case, in the past three years. No Acquired Company is the surviving corporation of a merger or consolidation.

Section 4.26     **Products**. All products manufactured, sold or delivered by any Acquired Company have been in conformity with all applicable warranties, and no Acquired Company has any Liability for replacement thereof or other damages in connection therewith in excess of any warranty reserve established with respect thereto on the Balance Sheet as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Acquired Companies. No products manufactured, sold or delivered by any Acquired Company are subject to any guaranty, warranty or other

44

CONFIDENTIAL                                                   FBG_CH1_00093851

indemnity beyond the applicable standard terms and conditions of sale with respect thereto which, in each case, have been made available to the Buyers. No Acquired Company received any notice of any claims for, and to the Companies' Knowledge there is no reasonable basis for, any extraordinary product recalls, returns, warranty obligations or service calls relating to any of its products or services. No Acquired Company has had or has any Liability arising out of any injury to individuals or property as a result of the ownership, possession or use of any products manufactured, sold or delivered by any Acquired Company or with respect to any services rendered by any Acquired Company.

Section 4.27    **Anti-Money Laundering**. The Acquired Companies have in place, adhere to and maintain (and for the past three years, have had in place, adhered to and maintained) policies and procedures designed to ensure at all times compliance in all material respects with all anti-money laundering Laws and guidelines applicable to the Acquired Companies, and no Proceeding by or before any Governmental Authority against or affecting any Acquired Company, any assets or properties of any Acquired Company with respect to any such Laws or guidelines is pending or, to the Knowledge of the Companies, threatened.

Section 4.28    **Anticorruption; Improper Payments**. None of the Acquired Companies, nor any Seller, nor any officer, director, agent, manager, employee, or, to the Knowledge of the Companies, any other Person authorized to act on behalf of any of the Acquired Companies or any Seller, has, directly or indirectly, taken any act in furtherance of an offer, payment, promise to pay, authorization, or ratification of payment, directly or indirectly, of any money or anything of value (including any gift, sample, rebate, travel, meal and lodging expense, entertainment, service, equipment, debt forgiveness, donation, grant or other thing of value, however characterized) to any Government Official or any Person to secure any improper advantage or to obtain or retain business that would cause any Acquired Company or Seller to be in violation of Improper Payment Laws. Each Acquired Company complies, and has at all times complied, with all Improper Payment Laws. Without limiting the generality of the foregoing, (a) none of the Acquired Companies nor any Seller has violated or is in violation in any material respect of the U.S. Anti-Kickback Statute (42 U.S.C. Section 1302a-7(b)), the Federal False Claims Act (31 U.S.C. Sections 3729, et seq.) or any related or similar Law and (b) there has been no use or authorization of money or anything of value relating to any unlawful payment or secret or unrecorded fund or any false or fictitious entries made in the books and records of any Acquired Company relating to the same. None of the Acquired Companies, nor any Seller, nor any of their respective Affiliates or Persons acting on their behalf have received any notice or communication from any Person that alleges, nor been involved in any internal investigation involving any allegations relating to potential violation of any Improper Payment Laws or other applicable Law, nor have received a request for information from any Governmental Authority regarding Improper Payment Laws. None of the Acquired Companies, nor any Seller nor, to the Knowledge of the Companies, any officer, director, manager, employee, attorney, accountant, consultant, financial advisor or other agent of either Company or any Seller, has employed or retained, directly or indirectly, a Government Official or a family member of a Government Official. No Government Official has, directly or indirectly, the right of control over, or any beneficial interest in any Acquired Company.

Section 4.29    **International Trade Laws**. The Acquired Companies have, at all times as to which the applicable statute of limitations has not yet expired, conducted their transactions in accordance with all applicable International Trade Laws. Without limiting the foregoing:

(a)    the Acquired Companies have obtained, and are in compliance with, all export licenses, license exceptions and other consents, notices, waivers, approvals, orders, authorizations, registrations, declarations, classifications and filings with any Governmental Authority required for (i) the export and re-export of products, services, Software and technologies and (ii) releases of technologies and Software to foreign nationals located in the United States and abroad ("**Export Approvals**");

45

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093852

(b)    there are no pending or, to the Knowledge of the Companies, threatened claims against any Acquired Company with respect to such Export Approvals;

(c)    to the Knowledge of the Companies, there are no actions, conditions or circumstances pertaining to the Acquired Companies' import or export transactions that may give rise to any future claims;

(d)    to the Knowledge of the Companies, no Export Approvals with respect to the transactions contemplated hereby are required;

(e)    none of the Acquired Companies, their Affiliates, their respective directors or officers, nor, to the Knowledge of the Companies, any employees or agents of the foregoing, is a Sanctions Target;

(f)    in the past three years, no Acquired Company has received written notice to the effect that a Governmental Authority claimed or alleged that any Acquired Company was not in compliance with International Trade Laws; and

(g)    neither the Acquired Companies nor any of their Affiliates has made any voluntary disclosures to, or has been subject to any fines, penalties or sanctions from, any Governmental Authority regarding any past violations of International Trade Laws.

**Section 4.30    No Brokers or Finders**.  Except with respect to Angle Advisors, LLC, whose fees and expenses shall constitute a Seller Transaction Expense, none of the Sellers, the Acquired Companies or any of their respective Affiliates has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement or any Ancillary Agreement.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF THE BUYERS**

Each Buyer hereby represent and warrant to the Sellers, severally and not jointly, as of the date hereof and as of the Closing as follows:

**Section 5.1    Organization; Authorization**.

(a)    Each Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite power and authority to own, lease and operate its assets, properties and business and to carry on its business as now being conducted. Each Buyer has full right, power, capacity and authority to execute and deliver this Agreement and each of the Ancillary Agreements to be executed and delivered thereby, to consummate the transactions contemplated hereby and thereby and to comply with the terms, conditions and provisions hereof and thereof.  The execution, delivery and performance by Each Buyer of this Agreement and each of the Ancillary Agreements to which such Buyer is a party have been duly and properly authorized by all requisite action in accordance with applicable Law and with the organizational documents of the Buyer.  This Agreement and each of the Ancillary Agreements to which each Buyer is a party have been duly executed and delivered by such Buyer and constitute the legal, valid and binding obligation of such Buyer, enforceable against such Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

46

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093853

**Section 5.2** **No Violation**. The execution, delivery and performance by each Buyer of this Agreement and the Ancillary Agreements to which it is a party and the consummation by such Buyer of the transactions contemplated hereby and thereby will not:

(a) violate, contravene or conflict with any Law; or

(b) violate, contravene or conflict with any provision of the charter documents, bylaws or similar organizational documents of the Buyer.

**Section 5.3** **Consents and Approvals**. No consent, approval, Order or authorization of, or registration, declaration or filing with, or notice to, any Governmental Authority or other Person is required to be made or obtained by each Buyer in connection with the authorization, execution, delivery and performance by such Buyer of this Agreement and the Ancillary Agreements to which such Buyer is a party, or the consummation by such Buyer of the transactions contemplated hereby and thereby.

**Section 5.4** **Litigation**. There are no Proceedings pending, or to the knowledge of the Buyer, threatened against the Buyer, or any properties or rights of each Buyer, that questions or challenges the validity of this Agreement or the Ancillary Agreements, nor any action taken or to be taken by such Buyer pursuant hereto or thereto or in connection with the transactions contemplated hereby or thereby, and such Buyer does not know of any such Proceeding that may be asserted.

**Section 5.5** **Investment Intent**. Each Buyer is acquiring the Securities for its own account for investment purposes only and not with a view to distribution with the meaning of Section 2(a)(11) of the Securities Act of 1933, as amended.

**Section 5.6** **No Brokers or Finders**. No Buyer nor any of its Affiliates has retained any broker or finder, made any statement or representation to any Person that would entitle such Person to, or agreed to pay, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement or any Ancillary Agreement.

**ARTICLE VI**
**[RESERVED]**

**ARTICLE VII**
**OTHER COVENANTS AND AGREEMENTS**

**Section 7.1** **Restrictive Covenants**.

(a) Confidentiality. For a period of five years following the Closing Date, each Seller shall not, and such Seller shall direct its Affiliates not to, use or disclose or convey to any third party, any Confidential Information; provided, however, that any Seller or its Affiliates may furnish such portion (and only such portion) of the Confidential Information: (i) as may be required by applicable Law, Order or rule (including, without limitation, the rules of securities exchange or any industry or self-regulatory body) (provided that such Seller or Affiliate promptly notifies the Buyers of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure (other than in connection with an audit or review by a Governmental Authority in the ordinary course or in connection with ordinary course filings)); (ii) to its representatives on a need to know basis, subject to confidentiality obligations substantially similar to, or greater than those contained herein; (iii) to any current or prospective Affiliate, partner, member, stockholder, limited partner, investor or wholly owned Subsidiary of such Seller or Affiliate in the ordinary course of business (provided that such Seller or Affiliate informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information).

47

US-DOCS\144371506.11

CONFIDENTIAL                                                                                      FBG_CH1_00093854

**DEBTORS' EXHIBIT NO. 236**
**Page 48 of 216**

(b)     Non-Competition.  Each Seller covenants and agrees that, during the period beginning on the Closing Date and ending on the fifth anniversary of the Closing Date, (the "**Restricted Period**") such Person and its Subsidiaries will not, directly or indirectly, engage or participate in any manner (as an owner, equity holder, director, manager, officer, employee, agent, representative, consultant, service provider or otherwise) in any business that is competitive with the Business, anywhere in Asia-Pacific, North America, Central America, South America or Europe.  For the avoidance of doubt, for all purposes hereunder, the Retained Business shall be deemed not to be competitive with the Business. Notwithstanding the foregoing, nothing contained in this Section 7.1(b) shall prohibit any Seller or its Affiliates from the passive ownership of less than 4% of any class of stock (or other securities) of any Person listed on a national securities exchange or traded in the over-the-counter market.

(c)     Non-Solicitation of Business Relationships.  Without limiting the generality of the provisions of Section 7.1(b) above, each Seller covenants and agrees that during the Restricted Period such Person and its Subsidiaries will not, directly or indirectly, solicit, induce or advise or participate in any manner (as an owner, equity holder, director, manager, officer, employee, agent, representative, consultant, service provider or otherwise) in any business that solicits, induces or advises, any Person that is or was a customer, supplier or other business relation of any Acquired Company at any time during the 24 month period prior to the Closing Date for purposes of diverting such Person's business from any Acquired Company.

(d)     Non-Solicitation of Employees and Contractors.  During the Restricted Period, each Seller agrees that such Seller and its Subsidiaries shall not, directly or indirectly, recruit, solicit for employment, hire or entice to leave the employment of or cease providing services to any Acquired Company any Person who was an employee of the Acquired Companies as of the Closing; provided, however, that nothing in this Section 7.1(d) shall prohibit such Seller from (x) conducting general solicitation, by advertisement, search firm or otherwise, not specifically targeted at such employees, or (y) recruiting, soliciting for employment after 6 months from the date of termination or cessation of employment, any employee whose employment with an Acquired Company has been voluntarily or involuntarily terminated.

(e)     Non-Disparagement.  Each Seller agrees that such Seller shall not, at any time hereafter, make any defamatory, derogatory, or disparaging statements or communications (whether written or oral) regarding the Buyers or any of the Acquired Companies, including any of their respective products or services, other than truthful statements made (i) in connection with any then pending or threatened Proceeding or as otherwise required by applicable Law; (ii) to enforce this Agreement or any other Contract; or (iii) to Governmental Authorities about possible violations of Law, in each case in good faith.

(f)     Acknowledgements; Remedies.  Each Seller acknowledges and agrees that (i) the covenants and agreements set forth in this Section 7.1 were a material inducement to the Buyers to enter into this Agreement and to perform their respective obligations hereunder, (ii) the Buyers and their stakeholders would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the Parties if such Seller breached any provisions of this Section 7.1, (iii) any breach of any provisions of this Section 7.1 by such Seller would result in a significant loss of goodwill by the Buyers and the Acquired Companies, (iv) the Purchase Price is sufficient consideration to make the covenants and agreements set forth herein enforceable, (v) the length of time, scope and geographic coverage of the covenants set forth in this Section 7.1 is reasonable given the benefits such Seller will directly or indirectly receive hereunder, (vii) such Seller is familiar with all the restrictive covenants contained in this Section 7.1 and is fully aware of its obligations hereunder, and (viii) such Seller will not challenge the reasonableness of the time, scope, geographic coverage or other provisions of this Section 7.1 in any Proceeding.  Each Seller further acknowledges and agrees that irreparable injury will result to each Buyer if such Seller or any of its Affiliates breaches any of the terms of this Section 7.1, and that in the event of

48

US-DOCS\144371506.11

FBG_CH1_00093855

an actual or threatened breach by such Seller or any of its Affiliates of any of the provisions contained in this Section 7.1, such Buyer may have no adequate remedy at Law. Each Seller accordingly agrees that in the event of any actual or threatened breach by such Seller or any of its Affiliates of any of the provisions contained in this Section 7.1, the Buyers shall be entitled to injunctive and other equitable relief without (A) posting any bond or other security, and (B) showing that monetary damages are an inadequate remedy. Nothing contained herein shall be construed as prohibiting the Buyers from pursuing any other remedies available to them for such breach or threatened breach, including the recovery of any damages that it is able to prove. In the event of a breach or violation by any Seller of this Section 7.1, the Restricted Period with respect to such Seller shall be extended by a period of time equal to the period of time during which such breach or violation is continuing.

(g)     Retained Business. Notwithstanding anything set forth herein to the contrary, nothing set forth in this Section 7.1 shall limit, or purport to limit, in any respect, the ability of the Sellers and their respective Affiliates, Subsidiaries, employees, directors, officers, managers, contractors, agents and representatives from operating the Retained Business to the fullest extent permitted by applicable Law. Any action, omission or activity that the Sellers or their Affiliates or Subsidiaries undertake in connection with the Retained Business (including conducting business with customers and suppliers who also have business relationships with the Acquired Companies related to the Business) shall be deemed not to violate any provision of this Section 7.1.

### Section 7.2     Agreements Regarding Tax Matters.

(a)     Preparation and Filing of Tax Returns.

(i)     The Sellers shall timely prepare or cause to be prepared and file or cause to be filed, at the Sellers' expense, all Income Tax Returns of the Acquired Companies for any Pre-Closing Tax Period (other than any Straddle Period) which are due (taking into account any applicable extensions) after the Closing Date, but excluding, for the avoidance of doubt, any Tax Returns of the Sellers whether in respect of any flow-through income or gains from the sale of US NewCo or otherwise (each, a "**Seller Return**"). All Seller Returns shall be prepared in accordance with applicable Law and such Acquired Company's past practice (provided that such past practice is consistent with applicable Law). Midco Seller shall provide each Seller Return to the Buyers for review and comment no later than 30 days before the due date of such Seller Return. If the Sellers and the Buyers are unable to resolve any dispute regarding any Seller Return within 15 days after the Sellers submit such Tax Return to the Buyer, the dispute shall be resolved by the Accountant in the same manner as disputes are intended to be resolved pursuant to Section 7.2(f).

(ii)     The Buyers shall prepare or cause to be prepared and file or cause to be filed all Tax Returns of the Acquired Companies required to be filed after the Closing Date (taking into account any applicable extensions) with respect to any Pre-Closing Tax Period which are not Seller Returns (each, a "**Buyer Return**"). All Buyer Returns shall be prepared in accordance with applicable Law and such Acquired Company's past practice (provided that such past practice is consistent with applicable Law). The Buyer shall provide each Buyer Return to the Sellers for review and comment no later than 30 days before the due date of such Buyer Return. If the Sellers and the Buyer are unable to resolve any dispute regarding any Buyer Return within 15 days after the Buyer submit such Tax Return to the Sellers, the dispute shall be resolved by the Accountant in the same manner as disputes are intended to be resolved pursuant to Section 2.8(c).

(b)     Allocation of Tax Liability. For all purposes under this Agreement (including the determination of Income Tax Liability and Net Working Capital), in the case of any Tax for a Straddle Period, the portion of such Tax attributable to the Pre-Closing Tax Period shall (i) in the case of any real

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093856

property, personal property, ad valorem or other similar Tax imposed on a periodic basis, be deemed to be the amount of such Tax for the entire Straddle Period *multiplied by* a fraction the numerator of which is the number of days in the portion of the Straddle Period ending on the end of the Closing Date and the denominator of which is the number of days in the entire Straddle Period and (ii) in the case of any Tax based upon or related to income, sales, payroll, or receipts, be deemed equal to the amount which would be payable if the relevant taxable period ended on the end of the Closing Date.

(c)     Cooperation on Tax Matters. The Buyer, the Acquired Companies, Midco Seller, and the Sellers shall cooperate reasonably and in good faith, as and to the extent reasonably requested by the other party (and at the requesting party's expense), in connection with the filing of Tax Returns of the Acquired Companies and any audit, litigation or other Proceeding with respect to Taxes of the Acquired Companies. Such cooperation shall include the retention and (upon the other party's reasonable request and at its expense) the provision of records and information which are reasonably relevant to any such audit, litigation or other Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Any information obtained under this Section 7.2(c) shall be kept confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund of Tax or in conducting an audit or other Proceeding relating to Tax.

(d)     Tax Sharing Agreements. The Sellers shall cause all Tax sharing, Tax indemnification, or Tax distribution agreements to which any Acquired Company, on the one hand, and any Seller or any of its Affiliates (other than an Acquired Company) on the other hand, are parties (excluding this Agreement) to be terminated as of 12:01 a.m. local time on the Closing Date and the Acquired Companies to not be bound thereby or have any Liability thereunder with respect to any taxable period.

(e)     Transfer Taxes, Etc. All transfer, documentary, sales, use, registration, stamp and other similar Taxes and fees (including any penalties and interest thereon), but excluding for the avoidance of doubt any Income Taxes, incurred in connection with the transactions contemplated by this Agreement (together, "**Transfer Taxes**") shall be paid by the Midco Seller (on behalf of the Sellers) when due, and the Midco Seller shall (on behalf of the Sellers and at their expense) file all necessary Tax Returns and other documentation with respect to such Transfer Taxes. If required by applicable Law, the Sellers shall, and shall cause their Affiliates (if applicable) to, join in the execution of any such Tax Returns and other documentation.

(f)     Intended Tax Treatment; Purchase Price Allocation. For U.S. federal income Tax purposes (and for state, local and non-U.S. Tax purposes, as applicable), the Sellers, the Companies and the Buyers shall treat the purchase of the Walbro US Securities as follows: US Buyer's purchase of the Walbro US Securities from US Seller is intended to be treated as the taxable purchase and sale of all of the ownership interests of an entity that is disregarded as an entity separate from its regarded owner, Walbro US Parent in accordance with Section 1001 of the Code and, therefore, as the taxable purchase and sale of an undivided interest in all of the assets of US NewCo in exchange for the portion of the Purchase Price to be allocated to the Walbro US Securities (the "**Intended Tax Treatment**"). The Parties agree to, first, allocate the Purchase Price (including any assumed liabilities and other items treated as taxable consideration for the Securities for U.S. federal income Tax purposes) (the "**Allocable Consideration**"), between the Securities of US NewCo and the Securities of Walbro Japan, and subsequently, allocate the portion of the Purchase Price allocable to the Walbro US Securities among the assets of US NewCo deemed to be acquired by purchase in a manner consistent with Section 1060 of the Code, the Treasury Regulations promulgated thereunder, and the methodology set forth on Schedule 7.2(f) (the "**Purchase Price Allocation Methodology**"). Within sixty 60 days after the final determination of the Closing Statement under Section 2.8, Sellers shall provide a draft allocation of the Allocable Consideration prepared in accordance with the

50

US-DOCS\144371506.11

FBG_CH1_00093857

**DEBTORS' EXHIBIT NO. 236**
**Page 51 of 216**

previous sentence (the "**Allocation Schedule**") to the Buyers for their review and comment. The Buyers shall review the Allocation Schedule prepared by Sellers and shall provide any comments to Sellers within 20 days of receipt thereof.  If the Buyers do not provide comments within such twenty 20 day period, the Buyers shall be deemed to have accepted such Allocation Schedule as prepared by Sellers. If the Buyers provide Sellers with timely comments, the parties shall work in good faith to resolve any disagreements regarding the Allocation Schedule.  If, after negotiating in good faith, the parties are unable to agree on such Allocation Schedule within 15 days after the Buyers provide their comments, the parties shall engage the Accountant to resolve the matter and the Accountant's determination shall be final and binding on the parties for the purposes of this Section 7.2(f).  The fees, costs, and expenses of the Accountant shall be allocated to and borne by the Sellers, on the one hand, and the Buyers, on the other hand, based on the inverse of the percentage that the Accountant's determination (before such allocation) bears to the total amount of the total items in dispute as originally submitted to the Accountant.  The parties agree to file their respective IRS Forms 8594 and all U.S. federal, state, and local income Tax Returns in accordance with the Allocation Schedule (as finally determined pursuant to this Section 7.2(f)) and the Intended Tax Treatment.  No party hereto shall take or permit others to take on its behalf, any position, whether in connection with a Tax audit, a Tax Return or otherwise, that is inconsistent with the Intended Tax Treatment or the Allocation Schedule (as finally determined pursuant to this Section 7.2(f)) unless required to do so pursuant to a final "determination" within the meaning of Section 1313(a) of the Code or other applicable Law, provided, however, that nothing contained herein shall prevent a Party (or any of its Affiliates) from settling any proposed Tax deficiency or adjustment by any Governmental Authority based upon or arising out of the Intended Tax Treatment, and no such Party shall be required to litigate before any court any proposed Tax deficiency or adjustment by any Governmental Authority challenging the Intended Tax Treatment.

(g)     Tax Deductions. For purposes of preparing and filing any Tax Returns for the Acquired Companies for any Pre-Closing Tax Period, the Sellers and the Buyers agree that, to the extent at least more-likely-than not permitted by applicable Law, any deductions attributable to (i) any Seller Transaction Expenses, (ii) any similar expenses of the Acquired Companies and any bonuses or other compensation paid or accrued by the Acquired Companies on or before the Closing Date, or promptly after the Closing Date in accordance with typical payroll practices, or paid by Buyers on behalf of the Acquired Companies that reduces the Purchase Price, as finally determined on or after the Closing Date, (iii) any payments with respect to the Indebtedness, (iv) any expenses of the Companies included as a current liability in Net Working Capital (as finally determined pursuant to Section 2.8), and (v) any such expenses described in the preceding clauses (i) through (iv) incurred on or before the close of business on the Closing Date, shall, to the extent, in all such cases, that any such expenses described in the preceding clauses (i) through (v) were funded directly or indirectly by the Sellers or the Acquired Companies effective (or deemed effective) on or prior to the Closing Date, be allocated, as applicable, to the Pre-Closing Tax Period, and each Buyer shall, and shall cause its Affiliates, including the Acquired Companies after the Closing, to not take any inconsistent position on any Tax Return.  If the Parties are unable to agree on whether such allocation of Tax deductions is permitted by applicable Law, they shall resolve any disagreement using procedures similar to those set forth in Section 7.2(f).  The Parties agree to adopt the 70% safe-harbor (and to include the applicable election statements) with respect to any Seller Transaction Expenses that are "success-based" fees under Section 4 of Revenue Procedure 2011-29 on any Tax Return that includes the Closing Date, unless otherwise required by applicable Law.

(h)     Post-Closing Actions. Following the Closing, without Sellers' consent, none of the Buyers, the Acquired Companies or any of their Affiliates shall: (i) amend any Tax Return or make any claim for refund to the extent that such Tax Return or claim for refund relates to any Pre-Closing Tax Period; (ii) make or change any Tax election or Tax accounting method or practice with respect to or that has retroactive effect to any Pre-Closing Tax Period; (iii) file any Tax Return that relates to any Pre-Closing Tax Period inconsistent with past practices; (iv) initiate or participate in any voluntary disclosure (or other

51

US-DOCS\144371506.11

FBG_CH1_00093858

communication reasonably expected to have a similar effect) with any Governmental Authority with respect to any Pre-Closing Tax Period; or (v) engage in any action not in the ordinary course of business occurring on the Closing Date after the Closing that would impact a Pre-Closing Tax Period and which is not otherwise contemplated hereby (including making any election pursuant to Sections 338 or 336(e) of the Code or any classification election on IRS Form 8832 which would change the tax status of such entity), in each case, to the extent any such action is reasonably expected to increase the Sellers' Tax liabilities pursuant to this Agreement or otherwise.

Section 7.3    **Employee Matters**.

Nothing in this Agreement will (a) create a Contract between any Buyer or, after the Closing, any Acquired Company, on the one hand and any Service Provider, on the other hand (b) be construed as a guarantee of continued employment or engagement of any Service Provider, (c) be construed so as to prohibit any Buyer or any Acquired Company from having the right to terminate the employment or engagement of any Service Provider, (d) require or be construed to require the Buyer, any Affiliate of the Buyer or any Acquired Company to provide any employee benefit play or non-cash compensation (including retirement benefits, health or welfare benefits, equity-based compensation or severance) to any Person, (e) prevent any Buyer or any Acquired Company from amending or terminating any Employee Benefit Plan or Buyer Benefit Plan in accordance with their terms or (f) be construed as an amendment to any Employee Benefit Plan or Buyer Benefit Plan. Notwithstanding anything in this Agreement to the contrary, (i) no Service Provider may rely on this Agreement as the basis for any breach of contract claim against any Buyer or any Acquired Company and (ii) the Buyers and their Affiliates will have the sole discretion and authority to interpret their respective employee benefit and compensation plans, Contracts, arrangements and programs in accordance with their terms and applicable Law.

Section 7.4    **Further Assurances**. Each of the Parties agrees that subsequent to the Closing, upon the reasonable request of any other Party from time to time, it shall execute and deliver, or cause to be executed and delivered, such further instruments and take such other actions as may be necessary or desirable to carry out the transactions contemplated by this Agreement and the Ancillary Agreements, or to vest, perfect or confirm ownership by the Buyers of the Securities.

Section 7.5    **Intercompany Arrangements**. Each of the intracompany accounts or Contracts between any of the Acquired Companies, on the one hand, and any Seller and its Affiliates (other than the Acquired Companies), on the other hand, as set forth on Schedule 7.5 shall be cancelled without any consideration or further liability to any party and without the need for any further documentation, immediately prior to the Closing.

Section 7.6    **General Release**.

(a)    Effective upon the Closing, each Seller, on such Seller's own behalf and on behalf of such Seller's successors, assigns and any other Person that may claim by, through or under such Seller (collectively, the "**Releasing Parties**"), hereby (i) irrevocably waives, releases, acquits and forever discharges each Acquired Company and each of their respective present and former officers, directors, managers, employees and other agents (collectively, the "**Releasees**") from, any and all Liabilities of any kind or nature whatsoever since the beginning of time relating to or arising out of such Seller's equity ownership of such Acquired Company and (ii) agrees that no Releasing Party will bring or voluntarily participate in or assist any Proceeding that relates to any matter released pursuant to this Section 7.6. Notwithstanding the foregoing, the Releasing Parties do not waive or release any rights based upon, arising out of or relating to this Agreement and the Ancillary Agreements.

52

US-DOCS\144371506.11

FBG_CH1_00093859

**DEBTORS' EXHIBIT NO. 236**
**Page 53 of 216**

**Section 7.7**     **Public Announcements**.

      (a)    No Party shall issue or cause the publication of any press release or other public announcement relating to this Agreement, any Ancillary Agreement or the transactions contemplated hereby or thereby (whether before or after the Closing) without the prior written consent of the Buyers and the Midco Seller, except as any Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by applicable rules of any stock exchange or quotation system on which such Party or its Affiliates lists or trades securities (in which case the disclosing Party will use its reasonable best efforts to advise the Buyers and the Midco Seller before making such disclosure).

      (b)    No Party shall make publicly available this Agreement or any Ancillary Agreement (or any portion of this Agreement or any Ancillary Agreement) (whether before or after the Closing) without the prior written consent of the Buyers and the Midco Seller, except as any Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by applicable rules of any stock exchange or quotation system on which such Party or its Affiliates lists or trades securities (in which case the disclosing Party will use its reasonable best efforts to advise the Buyers and the Midco Seller before making such disclosure and, upon the request of the Buyers or the Midco Seller, the Parties will work together in good faith to agree and pursue appropriate confidential treatment requests with respect to this Agreement or such Ancillary Agreements). This Section 7.7(b) shall not apply to disclosures by a party (i) to its officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors, and other agents for the purpose of obtaining advice in connection with the transactions contemplated hereunder, it being understood that such officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors, and other agents will be informed of the confidential nature of this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby and will be directed to treat such information as confidential in accordance with the terms of this Agreement (ii) to their direct or indirect members, holders of Equity Securities or limited partners and their respective Affiliates and (iii) in connection with any private equity fundraising activities by such party or their indirect members, holders of equity securities or limited partners or their respective Affiliates; provided that the identity of the Buyers is not disclosed under this clause (iii) in connection therewith.

      **Section 7.8**    **D&O Insurance**. Before the Closing, the Companies shall purchase a six-year prepaid "tail policy" for directors' and officers' liability insurance, on terms and subject to conditions reasonably acceptable to the Buyers, with respect to matters arising on or before the Closing Date (the "**D&O Policy**"). The full prepaid cost of such policy shall be included in the Seller Transaction Expenses. The Buyers shall use commercially reasonable efforts to cause the Companies to maintain such policy in full force and effect for the full term of such policy. For the avoidance of doubt, "commercially reasonable efforts" for purposes of the immediately preceding sentence shall in no event include the payment by the Buyers or the Companies of any premium or other amounts.

      **Section 7.9**    **Section 280G**. The Companies shall, prior to the Closing, (a) use reasonable best efforts to obtain waivers of any "excess parachute payment" (within the meaning of Section 280G) from each Person who has a right to any payments and/or benefits as a result of or in connection with the transactions contemplated by this Agreement and any Ancillary Agreement that would be deemed to constitute "excess parachute payments" (within the meaning of Code Section 280G excluding any payments to be made at the direction of the Buyer), and (b) solicit the approval of the stockholders of the Companies in a manner that complies with Code Sections 280G(b)(5)(A)(ii) and 280G(b)(5)(B) of all payments and/or benefits (including payments and benefits waived pursuant to the preceding clause) that would, as a result of, or in connection with, the transactions contemplated by this Agreement and any Ancillary Agreement, be deemed to constitute "excess parachute payments." To the extent required to comply with the provisions of the preceding sentence, the Companies shall deliver, among other items, to its stockholders a disclosure statement intended to satisfy the stockholder approval requirements of Section 280G(b)(5)(B) of the Code.

US-DOCS\144371506.11

CONFIDENTIAL

                                                   FBG_CH1_00093860

**DEBTORS' EXHIBIT NO. 236**
**Page 54 of 216**

The form of waiver, solicitation of approval, and disclosure materials shall be subject to the reasonable prior review of the Buyer, which shall not to be unreasonably conditioned or delayed.

### Section 7.10    No Outside Reliance; Acknowledgement by the Buyers.

(a)    Notwithstanding anything contained in this Article VII or any other provision hereof, Buyers and acknowledge and agree that none of the Acquired Companies, any Seller or any of their respective Affiliates, nor any of the respective directors, officers, employees, stockholders, partners, members, agents or representatives of the foregoing, has made, or is making, any representation or warranty whatsoever, oral or written, express or implied (and none of the Buyers nor any of its Affiliates or their respective directors, officers, employees, stockholders, partners, members, agents or representatives has relied on any representation, warranty or statement of any kind by any Acquired Company, any Seller or any of their respective Affiliates or any of the respective directors, officers, employees, stockholders, partners, members, agents or representatives of the foregoing), beyond those expressly given in Article III or Article IV including any implied warranty or representation as to condition, merchantability, suitability or fitness for a particular purpose or trade as to any of the assets of the Acquired Companies. Without limiting the generality of the foregoing, it is understood that any cost estimates, financial or other projections or other predictions or other materials (including any such materials contained in any "data room" or reviewed by the Buyers or any of their Affiliates, or any of their respective directors, officers, employees, stockholders, partners, members, agents or representatives) or management presentations or due diligence discussions that have been or shall hereafter be provided to or engaged in with the Buyers or any of their Affiliates or any of their respective directors, officers, employees, stockholders, partners, members, agents or representatives, are not and will not be deemed to be representations or warranties of the Acquired Companies, any Seller or any of their respective Affiliates or any of their respective directors, officers, employees, stockholders, partners, members, agents or representatives of the foregoing, and no representation or warranty is made as to the accuracy or completeness of any of the foregoing, except as may be expressly set forth in Article III or Article IV. Each Buyer understands and agrees that any inventory, equipment, vehicles, assets, properties and business of the Companies are furnished "as is", "where is" with all faults and without any other representation or warranty of any nature whatsoever, in each case subject only to the representations and warranties contained in Article III or Article IV.

(b)    EACH BUYER ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES MADE BY THE ACQUIRED COMPANIES AND THE SELLERS IN ARTICLE III AND ARTICLE IV CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE ACQUIRED COMPANIES AND THE SELLERS TO THE BUYERS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY. EACH BUYER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT, ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESSED OR IMPLIED (INCLUDING ANY RELATING TO THE FUTURE OR HISTORICAL FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS OR LIABILITIES OF THE ACQUIRED COMPANIES) ARE SPECIFICALLY AND EXPRESSLY DISCLAIMED BY THE ACQUIRED COMPANIES AND THE SELLERS. FOR THE AVOIDANCE OF DOUBT, AND NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NOTHING IN THIS SECTION 7.10 SHALL PREVENT ANY PARTY HERETO FROM BRINGING A CLAIM FOR FRAUD.

### Section 7.11    Directors and Officers.

(a)    Following the Closing, the Sellers will reasonably cooperate with Buyers and the Acquired Companies to make all necessary filings, and deliver all necessary notices, to effect the resignations of the directors and officers who executed and delivered a letter of resignation at Closing

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093861

pursuant to Section 2.5(k), and Buyers will use commercially reasonable efforts to effect their removal in a timely fashion following the Closing.

(b)        Without limiting the generality of the foregoing clause (a), promptly following the Closing, but in any event, within fourteen (14) days thereof, Japan Buyer shall provide evidence of the registration with the Japanese Legal Affairs Bureau of the resignation of each of the directors and the internal ombudsperson (*kansayaku*) of Walbro Japan who executed and delivered a letter of resignation at Closing pursuant to Section 2.5(k), and the election of their respective replacements.

Section 7.12        **Contract Assignments**. Following the Closing, the Buyers and the Sellers shall use commercially reasonable efforts to:

(a)        cause the counterparties (the "**Contractual Counterparties**") to each of the contracts set forth on Schedule 7.12(a) (the "**Existing Contracts**") to consent to the assignment of each such contract  to the entity set forth therein, under the heading "Assignee" (the "**Assigned Entities**") pursuant to an assignment and assumption agreement;

(b)        in the event that Buyers and the Sellers are unable to cause such counterparties to consent to such assignment, cause the Contractual Counterparties to enter into new contracts with the Assigned Entities on substantially the same or similar commercial, economic and legal terms as the Existing Contracts; and

(c)        with respect to the contracts set forth on Schedule 7.12(c), to amend, supplant, novate or assign such contracts such that the Acquired Companies may continue to utilize the services or other obligations supplied thereunder solely with respect to the Business.

Section 7.13        **Per Diem Payment**. In the event the Closing Payments are not received on the Closing Date, the Buyers shall pay an amount equal to the Per Diem Interest multiplied by the number of days follow the Closing Date that the Closing Payments are received.  The Per Diem Interest amount shall be paid in accordance with the Payoff Letters.

**ARTICLE VIII**
**[RESERVED]**

**ARTICLE IX**
**[RESERVED]**

**ARTICLE X**
**[RESERVED]**

**ARTICLE XI**
**MISCELLANEOUS**

Section 11.1        **Non-survival**. Except as set forth in the following sentence, the representations, warranties, covenants and agreements of the Buyers, Sellers and the Acquired Companies contained in this Agreement or in any certificate delivered in connection herewith will not survive beyond the Closing such that no claim for breach of any such representation or warranty may be brought after the Closing with respect thereto against the Buyers, the Acquired Companies or any Seller, and there will be no Liability in respect thereof. Notwithstanding the foregoing, the parties acknowledge and agree that the preceding sentence shall not apply to any claims arising out of or relating to (a) any breaches of any covenants or agreements set forth in this Agreement that are required, by their terms, to be performed or complied with

55

US-DOCS\144371506.11

FBG_CH1_00093862

**DEBTORS' EXHIBIT NO. 236**
**Page 56 of 216**

after the Closing or (b) Fraud. Each of the Buyers, the Sellers and the Acquired Companies acknowledge and agree that neither such party nor any other Person may avoid such limitation on liability by (x) seeking damages for breach of contract, tort or pursuant to any other theory of liability, all of which are hereby waived or (y) asserting or threatening any claim against any Person that is not a party hereto (or a successor to a party hereto) for breaches of the representations and warranties contained in this Agreement.

**Section 11.2**      **Notices**. All notices and other communications made pursuant to or under this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when transmitted by facsimile or electronic mail if such transmission occurs on a Business Day before 5:00 p.m. Eastern time, or the next succeeding Business Day if such transmission occurs at any other time, (c) one Business Day after deposit with a nationally recognized overnight courier service, or (d) three Business Days after the mailing if sent by registered or certified mail, postage prepaid, return receipt requested.  All notices and other communications under this Agreement shall be delivered to the addresses set forth below, or such other address as such Party may have given to the other Parties by notice pursuant to this Section 11.1 (or in the case of counsel, to such other readily ascertainable business address as such counsel may hereafter maintain).

|  |  |
|---|---|
| If to the Sellers: | Walbro Midco LLC<br>Walbro LLC<br>c/o Landon Capital Partners LLC<br>21 Custom House Street, Suite 700,<br>Boston, Massachusetts 02110<br>Attention:  Christopher P. Sullivan<br>Email:      csullivan@landoncapital.com |
| with a copy to (which<br>shall not constitute notice<br>but shall be required for notice): | Latham & Watkins LLP<br>200 Clarendon Street<br>Boston, Massachusetts 02116<br>Attention:  Ryan McCarthy; Elizabeth M. Slawsby<br>Email:      ryan.mccarthy@lw.com;<br>                elizabeth.slawsby@lw.com |
| If to the Buyers: | Carter Carburetor, LLC<br>127 Public Square, Suite 5300<br>Cleveland, Ohio 44114<br>Attention:  Legal Department<br>Email:      shekhar.kumar@firstbrandsgroup.com |

**Section 11.3**      **Expenses**.  Except as otherwise provided herein, all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated; provided that, if the Closing occurs, the Seller Transaction Expenses shall be borne and paid as provided in this Agreement.  In the event of termination of this Agreement, the obligation of each Party to pay its own expenses will be subject to any rights of such Party arising from a breach of this Agreement by the other.

**Section 11.4**      **Entire Agreement**.   All references in this Agreement or the Ancillary Agreements to this Agreement shall include all Exhibits and Schedules hereto.  This Agreement and the Ancillary Agreements constitute the entire agreement of the Parties relating to the subject matter hereof and thereof and supersede all prior agreements or understandings between the Parties with respect to such

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093863

subject matter. Notwithstanding any oral agreement or course of conduct of the Parties or their respective officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors and other agents to the contrary, no Party shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each of the Parties.

Section 11.5     **No Third-Party Beneficiaries**. This Agreement shall inure exclusively to the benefit of and be binding upon the Parties and any Releasee with respect to the provisions of Section 7.6, and their respective successors, permitted assigns, executors and legal representatives. Nothing in this Agreement, express or implied, is intended to confer on any Person (other than the Parties or their respective successors and permitted assigns and any Releasee with respect to the provisions of Section 7.6) any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 11.6     **Assignments**. This Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns, but will not be assignable or delegable by any Party, by operation of Law or otherwise, without the prior written consent of the other Parties; provided, however, that nothing in this Agreement shall or is intended to limit the ability of the Buyers to assign its rights or delegate its responsibilities, liabilities and obligations under this Agreement, in whole or in part, without the consent of any Seller to (a) any Affiliate of the Buyer, (b) any direct or indirect purchaser of all or substantially all of the assets of the Acquired Companies (subject to Section 2.9(g)), (c) any lender to any Buyer and/or any Acquired Company as security for borrowings, or (d) any Person to the extent any such assignment would reasonably be expected to have an adverse Tax impact on any Seller; provided, further, that any such assignment shall not relieve the Buyers from their obligations under Section 2.9. Any attempted assignment in violation of this Section 11.6 shall be void *ab initio*; provided, further, that nothing in this Agreement shall or is intended to limit the ability of any Seller to assign its rights or delegate its responsibilities, liabilities and obligations under this Agreement, in whole or in part, without the consent of the Buyer to (a) any Affiliate of such Seller, or (b) any lender to any such Seller (or any Affiliate of any such Seller) as security for borrowings.

Section 11.7     **Amendment; Waiver**. This Agreement shall not be amended, modified or waived in any manner except by an agreement in writing duly executed and delivered by each of the Buyers and the Midco Seller. No failure or delay of any Party to exercise any right or remedy given to such Party under this Agreement or otherwise available to such Party, or to insist upon strict compliance by any other Party with its or his obligations hereunder, no single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, and no custom or practice of the Parties in variance with the terms hereof, shall constitute a waiver of any Party's right to demand exact compliance with the terms hereof. Any written waiver shall be limited to those items specifically waived therein and shall not be deemed to waive any future breaches or violations or other non-specified breaches or violations unless, and to the extent, expressly set forth therein.

Section 11.8     **Agreement Controls**. In the event that a provision of any Ancillary Agreement is inconsistent with, conflicts with or contradicts any term of this Agreement, the terms of this Agreement shall prevail.

Section 11.9     **Severability**. If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired. If the final judgment of a court of competent jurisdiction or other Governmental Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or

57

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093864

provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

Section 11.10    **Governing Law**.    This Agreement shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation, inducement to enter and/or performance of this Agreement (whether related to breach of contract, tortious conduct or otherwise and whether now existing or hereafter arising) shall be governed by, the internal Laws of the State of Delaware, without giving effect to any Law that would cause the Laws of any jurisdiction other than the State of Delaware to be applied.

Section 11.11    **Consent to Jurisdiction; Service of Process; Waiver of Jury Trial**.

(a)    Each Party agrees that any Proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought exclusively in the Delaware Court of Chancery in New Castle County, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Proceeding, the United States District Court for the District of Delaware, and each of the Parties hereby submits to the exclusive jurisdiction of such courts for itself and with respect to its property, generally and unconditionally, for the purpose of any such Proceeding.  A final judgment in any such Proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Each Party agrees not to commence any Proceeding arising out of or relating to this Agreement or the transactions contemplated hereby except in the courts described above (other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in Delaware as described above), irrevocably and unconditionally waives any objection to the laying of venue of any Proceeding arising out of or relating to this Agreement or the transactions contemplated hereby in any such court, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such Proceeding brought in any such court has been brought in an inconvenient forum or does not have jurisdiction over any Party.

(b)    Each Party agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address (or in the case of Sellers, the Midco Seller's address) set forth herein shall be effective service of process for any such Proceeding.

(c)    EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, STATUTE OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.  EACH PARTY FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER PROCEEDING IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED OR WARRANTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.11.

Section 11.12    **Specific Performance**.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, each of the Parties shall be entitled to enforce

58

US-DOCS\144371506.11

FBG_CH1_00093865

specifically the provisions of this Agreement, including obtaining an injunction or injunctions to prevent breaches or threatened breaches of this Agreement, in any court designated to resolve disputes concerning this Agreement (or, if such court lacks subject matter jurisdiction, in any appropriate state or federal court), this being in addition to any other remedy to which such Party is entitled at Law or in equity. Each Party further agrees not to assert and waives (a) any defense in any action for specific performance that a remedy at Law would be adequate and (b) any requirement under any Law to post security or provide indemnity as a prerequisite to obtaining equitable relief.

Section 11.13    **Other Remedies**. Except to the extent set forth otherwise in this Agreement, all remedies under this Agreement expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or at Law or in equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

Section 11.14    **No Recourse Against Affiliates**. Notwithstanding any other provision of this Agreement, except to the extent otherwise agreed in writing, no claim (whether at law or in equity, whether in contract, tort, statute or otherwise) may be asserted by the Acquired Companies, the Sellers, the Buyers, any Affiliate of any of the foregoing (including, with respect to a Buyer, from and after the Closing, any Acquired Company) or any Person claiming by, through or for the benefit of any of them, against any Person who is not party to this Agreement, including any equityholders, partners, members, controlling persons, directors, managers, officers, employees, incorporators, managers, agents, representatives, or Affiliates of any Buyer or Acquired Company, or any Seller or the heirs, executors, administrators, successors or assigns of any of the foregoing (or any Affiliate of any of the foregoing) that is not a party to this Agreement (each a "**Non-Party Affiliate**") with respect to matters arising in whole or in part out of, related to, based on, or in connection with the Business and the Retained Business, the Acquired Companies, this Agreement, the Ancillary Agreements or their subject matter or the transactions contemplated hereby or thereby or with respect to any actual or alleged inaccuracies, misstatements or omissions with respect to information furnished by or on behalf of the Acquired Companies or any Non-Party Affiliate in any way concerning the Business, the Retained Business, the Acquired Companies, this Agreement or its subject matter or the transactions contemplated hereby.

Section 11.15    **Rules of Construction**. The following rules of construction shall govern the interpretation of this Agreement:

(a)    all references to Articles, Sections, Exhibits or Schedules are to Articles, Sections, Exhibits or Schedules in this Agreement;

(b)    each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with GAAP;

(c)    unless the context otherwise requires, words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, the feminine or neuter gender shall include the masculine, feminine and neuter;

(d)    whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "but not limited to";

(e)    the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not simply mean "if";

(f)    references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended,

59

US-DOCS\144371506.11

FBG_CH1_00093866

modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(g)     when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in beginning the calculation of such period will be excluded (for example, if an action is to be taken within two days after a triggering event and such event occurs on a Tuesday, then the action must be taken on or prior to Thursday); to the extent any such period is measured in Business Days, if the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(h)     time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement;

(i)     the subject headings of Articles and Sections of this Agreement are included for purposes of convenience of reference only and shall not affect the construction or interpretation of any of its provisions;

(j)     (i) the terms "hereof", "herein", "hereby", "hereto", and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto, (ii) the term "any" means "any and all", and (iii) the term "or" shall not be exclusive and shall mean "and/or";

(k)     (i) references to "days" means calendar days unless Business Days are expressly specified and (ii) references to "$" mean U.S. dollars;

(l)     the Parties intend that each representation, warranty, covenant and agreement contained herein shall have independent significance, and if any Party has breached any representation, warranty, covenant or agreement contained herein in any respect, the fact that there exists another representation, warranty, covenant or agreement relating to the same or similar subject matter that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, covenant or agreement;

(m)     all uses of "written" contained in Articles III, IV and V shall be deemed to include information transmitted via e-mail, facsimile or other electronic transmission;

(n)     for purposes of Article IV, information shall be deemed to have been "made available" to the Buyers only if such information was posted to the electronic data room maintained by Angle Advisors, LLC in a manner accessible and reviewable by the Buyers at least one Business Day prior to the date of this Agreement;

(o)     any drafts of this Agreement or any Ancillary Agreement circulated by or among the Parties prior to the final fully executed drafts shall not be used for purposes of interpreting any provision of this Agreement or any Ancillary Agreement, and each of the Parties agrees that no Party shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any dispute or Proceeding among any of the foregoing or for any other purpose; and

(p)     the Parties have participated jointly in the negotiation and drafting of this Agreement and the Ancillary Agreements; in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Ancillary Agreements shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the

US-DOCS\144371506.11

CONFIDENTIAL                                                                                                    FBG_CH1_00093867

authorship of any of the provisions of this Agreement or any Ancillary Agreement and the language used in it will be deemed to be the language chosen by the Parties to express their mutual intent.

   **Section 11.16  Counterparts; Deliveries**. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement, the Ancillary Agreements and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of electronic transmission of .pdf files or other image files via e-mail, cloud-based transfer or file transfer protocol, or use of a facsimile machine, shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No party to any such agreement or instrument shall raise the use of electronic transmission or a facsimile machine to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of electronic transmission or a facsimile machine as a defense to the formation or enforceability of a contract, and each such party forever waives any such defense.

*[The remainder of this page is intentionally left blank.]*

61

US-DOCS\144371506.11

CONFIDENTIAL

FBG_CH1_00093868

**DEBTORS' EXHIBIT NO. 236**
**Page 62 of 216**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**BUYERS:**

**CARTER CARBURETOR HOLDINGS, LLC**

By: _____

Name: Shekhar Kumar

Its: Senior Vice President - M&A


**CARTER CARBURETOR, LLC**

By: _____

Name: Shekhar Kumar

Its: Senior Vice President - M&A

(Signature Page to Securities Purchase Agreement)

CONFIDENTIAL                                    FBG_CH1_00093869

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

SELLER:

**WALBRO MIDCO LLC**

By: _____
Name:  Christopher P. Sullivan
Title:    President

*[Signature Page to Securities Purchase Agreement]*

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 236**
**Page 64 of 216**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**SELLERS:**

**WALBRO LLC**

DocuSigned by:

By: **Shane Griffin**
7400573FC306487...
Name: Shane Griffin
Title:   Chief Financial Officer

*[Signature Page to Securities Purchase Agreement]*

CONFIDENTIAL                                        FBG_CH1_00093871

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

COMPANY:

WEM NEWCO, LLC

By: **Shane Griffin**
Name: Shane Griffin
Title: Authorized Signatory

*[Signature Page to Securities Purchase Agreement]*

FBG_CH1_00093872

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

WALBRO JAPAN:

WALBRO CO., LTD.

By: _Teiji Kobayashi_
Name:   Teiji Kobayashi
Its:        Representative Director

[*Signature Page to Securities Purchase Agreement*]

CONFIDENTIAL

FBG_CH1_00093873

Schedule 1.1

Permitted Liens

None.

US-DOCS\145310411.1

CONFIDENTIAL                                                                     FBG_CH1_00093874

Schedule 1.1(c)

Seller and Company Required Consents

None.

US-DOCS\145310411.1

CONFIDENTIAL   FBG_CH1_00093875

Schedule 2.5(h)

Payoff Letters

Credit Agreement, dated as of October 27, 2021, by and among Midco Seller, Walbro US Parent, each of the lenders party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent.

US-DOCS\145310411.1

FBG_CH1_00093876

Schedule 2.5(l)

Termination of Agreements

None.

US-DOCS\145310411.1

CONFIDENTIAL                                                          FBG_CH1_00093877

Schedule 7.2(f)

Purchase Price Allocation Methodology

The "amount realized" on the deemed sale of the assets of US NewCo pursuant to this Agreement (as determined for federal and state income tax purposes) shall be determined and allocated for federal income tax purposes in accordance with IRC Section 1060.

The following table sets forth the agreed-upon fair market values of the assets deemed acquired in the sale of US NewCo for US federal and state income tax purposes. References to "Asset Classes" correspond to the asset classes set forth in Treasury Regulation Section 1.338-6(b)(2) (because IRC Section 1060 generally allocates the consideration paid for the assets in the same manner as amounts are allocated under IRC Section 338 when an IRC Section 338 election is made).

| Asset Class | Asset Description | Fair Market Value |
|---|---|---|
| I | Cash and deposits | The actual amount of cash acquired. |
| II | Marketable stock or securities, U.S. government securities, certificates of deposit and foreign currency, if any | The net book value recorded in the Balance Sheet of the Company as of the Closing Date. |
| III | Accounts receivable | The net book value recorded in the Balance Sheet of the Company as of the Closing Date. |
| IV | Inventory | The net book value recorded in the Balance Sheet of the Company as of the Closing Date. |
| V | All assets other than Class I, II, III, IV, VI and VII | The net book value recorded in the Balance Sheet of the Company as of the Closing Date. |
| VI | All IRC Section 197 intangible assets other than goodwill/going concern | The net book value recorded in the Balance Sheet of the Company as of the Closing Date. |
| VII | Goodwill/going concern | Remainder of not allocated to Classes I through VI. |

US-DOCS\145310411.1

CONFIDENTIAL

FBG_CH1_00093878

Schedule 7.5

Intercompany Agreements

None.

US-DOCS\145310411.1

CONFIDENTIAL                                                                                    FBG_CH1_00093879

Schedule 7.12(a)

Existing Contracts

[*see attached.*]

US-DOCS\145310411.1

CONFIDENTIAL

FBG_CH1_00093880

| COUNTERPARTY | TITLE | WALBRO ENTITY | EFFECTIVE DATE | STATUS | CLASSIFICATION |
|---|---|---|---|---|---|
| 32 Soft Inc. | License for the Software and provide such license to the Licensee, inclusive of ongoing annual maint | Walbro LLC | 11/20/2018 | Active | Consultant/Contractor/Visitor;#License |
| ACTIVE S.R.L. | Indemnification agreement for stratified scavenging engines | Walbro LLC | 7/3/2019 | Active | Indemnity |
| Andreas Stihl AG & Co. | Commercial agreement for sales between 01/01/2020 through 12/31/2022, including rebates | Walbro LLC | 2019/08/20 | Active | Sales Contract |
| Andreas Stihl AG & Co. KG | Sales and rebate agreement | Walbro LLC | 02/15/2017 | Active | Sales Contract |
| Andreas Stihl AG & Co. KG | Cross license of patents | Walbro LLC | 2/28/2017 | Active | License |
| Andreas Stihl AG & Co. KG | Long Term Supply Agreement | Walbro LLC | 2023.01.01 | Active | Sales Contract |
| Andreas Stihl AG & Co. KG | Non-exclusive cross license of patents between Stihl and Walbro | Walbro LLC | 3/12/2019 | Active | License |
| Andreas Stihl AG & Co. KG | Cross license of patents between Stihl (US 7814888) and Walbro (US 7000595) | Walbro LLC | 3/12/2019 | Active | License |
| Briggs & Stratton Corporation | Letter of intent related to evaluation of Walbro's low pressure EFI | Walbro LLC | 08/07/2017 | Active | Development |
| Briggs & Stratton Corporation | Master supply agreement for carburetors and related parts | Walbro LLC | 2018/06/26 | Active | Sales Contract |
| Briggs & Stratton Corporation | Tooling products agreement | Walbro LLC | 2019/01/17 | Active | Tooling Use |
| Briggs & Stratton Corporation | Amendment to tooling products agreement dated January 17, 2019 | Walbro LLC | 2019/02/18 | Active | Tooling Use |
| C-TPAT Security Services, Inc. | C-TPAT consultant and training services | Walbro LLC | 04/26/2017 | Active | Consultant/Contractor/Visitor |
| Cummins Incorporated | Assignment and Indemnity FSM-4 | Walbro Engine Management | 11/1/2011 | Active | Indemnity |
| Emak S.p.A. | Non-exclusive Supply Agreement | Walbro Engine Management | 2006/2/17 2006/4/4 | Active | Sales Contract |
| Firstronic, LLC | Supply of Engine Control Modules | Walbro LLC | 12/07/2016 | Active | Purchasing |
| Firstronic, LLC | Indemnity agreement related to offer letter Q8417 (4/8/2020) | Walbro LLC | 4/9/2020 | Active | Indemnity |
| Generac Power Systems, Inc. | Settlement and License Agreement | Walbro LLC | 04/29/2019 | Active | License |
| GGP Italy | Indemnity Agreement | Walbro Engine Management | 11/10/2008 | Active | Indemnity |
| Groupe ADEO SA | Limited trademark license for use of Walbro logo on certain ADEO Sterwins branded chainsaws that | Walbro LLC | 05/11/2017 | Active | License |
| Groupe ADEO SA | Limited trademark license for use of Walbro logo on certain ADEO Sterwins branded chainsaws that | Walbro LLC | 2017-05-11 | Active | License |
| Groupe ADEO SA | Limited trademark license for use of Walbro logo on certain ADEO Sterwins branded chainsaws that | Walbro LCC | 2017-05-11 | Active | License |
| Groupe ADEO SA | Second Amendment trademark license for use of Walbro logo on certain ADEO Sterwins branded ch | Walbro LCC | 2021-08-05 | Active | License |
| Groupe ADEO SA | Second Amendment trademark license for use of Walbro logo on certain ADEO Sterwins branded ch | Walbro LLC | 8/5/2021 | Active | License |
| HOP (Husqvarna AB and AB Electrolux) | Termination and Patent License Agreement (US Patent Nos. 6366189, 5611312); Release Agreement | Walbro Engine Management | 9/5/2002 | | License |
| HOP (Husqvarna AB) | Indemnification Agreement: HVA desires to purchase RWJ5 | Walbro Engine Management | 11/17/2009 | Active | Indemnity |
| HOP (Husqvarna AB) | Indemnification Agreement for  Split Carburetors for Husqvarna engines (UK Patent No. 107815 / US | Walbro Engine Management | 2/3/2006 | | Indemnity |
| HOP (Husqvarna AB) | Carburetors for Stratified Scavenging Engines | Walbro Engine Management | 9/29/2006 | | Indemnity |
| Husqvarna  (HOP) | Supply Agreement | Walbro Engine Management | 1/1/2006 | Active | Sales Contract |
| Husqvarna AB | Framework development agreement | Walbro LLC | 1/10/2018 | Active | Development |
| Husqvarna AB | Pricing for aftermarket parts | Walbro LLC | 12/1/2017 | Active | Sales Contract |
| Husqvarna AB | Sale of products into aftermarket | Walbro LLC | 2/25/2021 | Active | Sales Contract |
| Husqvarna AB | Modification of the long term agreement on Walbro products sold to Husqvarna | Walbro LLC | 3/23/2020 | Active | Sales Contract |
| Husqvarna Consumer Outdoor Products N.A. Inc. | Confidentiality and Development Agreement: tamper resistant carburetor mixture adjustments scre | Walbro LLC | 6/23/2016 | Active | CDA/NDA;#Development |
| Husqvarna Consumer Outdoor Products N.A. Inc. | Considering Co-operating with respect to Bluetooth Low Energy enabled ignition modules | Walbro LLC | 7/29/2016 | Active | CDA/NDA;#Development |
| Husqvarna Consumer Outdoor Products N.A., Inc. | Letter agreement re: PN 589364603, SAS II Ignition Module | Walbro LLC | 06/26/2017 | Active | Sales Contract |
| Husqvarna Professional Products | Visitor Confidentiality Agreement - Jerry LaMarr | Walbro Engine Management | 5/16/2011 | Active | Consultant/Contractor/Visitor |
| Husqvarna Professional Products | Visitor Confidentiality Agreement - Tony Kueffner | Walbro Engine Management | 5/18/2011 | Active | Consultant/Contractor/Visitor |
| Husqvarna Zenoah Co., Ltd. | Indemnification Agreement WT-935, WT-942 and WT/EX-3135 carbs | Walbro Engine Management | 5/15/2012 | Active | Indemnity |
| Intertek Carnot Emission Services | Proposal MOdel Year 2025 EPA Certification Support | Walbro LLC | 2023.05.15 | Active | Consultant/Contractor/Visitor |
| Kawasaki Motors Corp., U.S.A. | LTA for purchase of EFI engines from Kawasaki and sale of EFI components to Kawasaki for part of Te | Walbro LLC | 11/07/2018 | Active | Purchasing;#Sales Contract |
| Kawasaki Motors Corp., U.S.A. | Non-Binding Memorandum of Understanding re: Electronic Fuel Injection Engine to be Sold to Textr | Walbro LLC | 11/1/2016 | Active | Purchasing |
| Kawasaki Motors Corp., U.S.A. | First Amendment to Supply Agreement | Walbro LLC | 12/17/2021 | Active | Consultant/Contractor/Visitor |
| Kawasaki Motors Manufacturing Corp, U.S.A. | Long term agreement for EFI system being sold to Kawasaki for the Kawasaki Mule platform | Walbro LLC | 09/12/2018 | Active | Sales Contract |
| Kawasaki Motors Manufacturing Corp. U.S.A. | Supply Agreement | Walbro LLC | 2022.04.01 | Active | Sales Contract |
| Kawasaki Motors Manufacturing Corp., U.S.A. | Technical collaboration related to development of EFI system application on engines used in Kawasa | Walbro LLC | 09/29/2017 | Active | Development |
| Kawasaki Motors Manufacturing Corp., U.S.A. | Supply agreement related to carburetors sold by Walbro to Kawasaki | Walbro LLC | 6/1/2020 | Active | Sales Contract |
| Kingfisher International Products Limited | Trademark license agreement for use of Walbro logo on certain products that include genuine Walb | Walbro LLC | 10/22/2020 | Active | License |
| Kingfisher International Products Limited | Trademark license agreement for use of Walbro logo on certain products that include genuine Walbro | Walbro LLC | 2020-10-22 | Active | License |
| Kohler Co. | Supply and purchase agreement, with rebate commitments based on revenue and  share of product | Walbro LLC | 08/10/2017 | Active | Sales Contract |
| Kohler Co. | Supply and Purchase Agreement | Walbro LLC | 2023.03.31 | Active | Sales Contract |
| L.K. Technology (Tianjin) Co. Ltd. | Sales Contract | Walbro LLC | 3/29/2016 | Active | Sales Contract |
| Lacroix Electronics, MI LLC (formerly Firstronic) | First Amendment to the Supply Agreement dated December 7, 2016 | Walbro LLC | 2023.02.17 | Active | Purchasing |
| Robertshaw Controls Company | Consignment stock agreement for die cast products | Walbro LLC | 12/17/2019 | Active | Sales Contract |
| ROBERTSHAW Controls Company | Indemnity Directed change to use the mold transferred from Celaya to Walbro to increase productio | Walbro LLC and Walbro | 12/21/2020 | Active | Indemnity |
| SHI International Corp | Installment payments for software and the right to receive consulting, maintenance and other relate | Walbro LLC | 1/4/2021 | Active | Consultant/Contractor/Visitor;#License |
| Societe Cooperative Groupements d'Achats des Centres | Trademark license agreement for use of Walbro logo on certain products that include Walbro compo | Walbro LLC | 07/08/2020 | Active | License |
| Societe Cooperative Groupements d'Achats des Centres | Trademark license agreement for use of Walbro logo on certain products that include Walbro compo | Walbro LLC | 2020-07-08 | Active | License |
| Suzhou Sunray Power Mechanical Co., Ltd. | Trademark license agreement for use of Walbro logo on certain products that include genuine Walb | Walbro LLC | 10/22/2020 | Active | License |
| Suzhou Sunray Power Mechanical Co., Ltd. | Trademark license agreement for use of Walbro logo on certain products that include genuine Walb | Walbro LLC | 2020-10-22 | Active | License |
| Textron Specialized Vehicles Inc. | LTA for sale of EFI engines and service parts | Walbro LLC | 12/05/2018 | Active | Sales Contract |
| Textron Specialized Vehicles Inc. | Amendment to manufacturing and supply agreement for EFI engine to adjust price of the engine | Walbro LLC | 2019/05/06 | Active | Sales Contract |
| Textron Specialized Vehicles, Inc. | Second Amendment to Manufacturing and Supply Agreement | Walbro LLC | 12/01/2020 | Active | Sales Contract |
| Williams Holding Corporation | Purchase Order and General Terms and Conditions | Walbro LLC | 2022.08.09 | Active | Sales Contract |
| Zama Japan Kabushiki Kaisha | Non-exclusive cross license of patents between Zama and Walbro | Walbro LLC | 10/10/2018 | Active | License |
| Zama Japan Kabushiki Kaisha | Cross license of patents between Zama and Walbro | Walbro LLC | 10/10/2018 | Active | License |

| Zatkoff Seals and Packings, Inc. | Rebate agreement for purchases made between December 1, 2018 and November 30, 2019 | Walbro LLC | 12/01/2018 | Active | Purchasing |
|---|---|---|---|---|---|
| Zatkoff Seals and Packings, Inc. | Sales increase and annual volume rebate program for December 1, 2020 through November 30, 202 | Walbro LLC | 12/01/2020 | Active | Purchasing |
| Zatkoff Seals and Packings, Inc. | Sales increase annual volume rebate program | Walbro LLC | 12/1/2019 | Active | Purchasing |
| Zhejian Zhongjian Technology Co., Ltd. | Second Amendment trademark license for use of Walbro logo on certain ADEO Sterwins branded ch | Walbro LLC | 8/5/2021 | Active | License |
| Zhejiang Royal Garden Tools Manufacturing Co., Ltd. | Trademark license agreement for use of Walbro logo on certain products that include Walbro comp | Walbro LLC | 07/08/2020 | Active | License |
| Zhejiang Royal Garden Tools Manufacturing Co., Ltd. | Trademark license agreement for use of Walbro logo on certain products that include Walbro comp | Walbro LLC | 2020-07-08 | Active | License |
| Zhejiang Zhongjian Technology Co., Ltd. | Limited trademark license for use of Walbro logo on certain ADEO Sterwins branded chainsaws that | Walbro LLC | 05/11/2017 | Active | License |
| Zhejiang Zhongjian Technology Co., Ltd. | Limited trademark license for use of Walbro logo on certain ADEO Sterwins branded chainsaws that | Walbro LLC | 2017-05-11 | Active | License |
| Zhejiang Zhongjian Technology Co., Ltd. | Second Amendment trademark license for use of Walbro logo on certain ADEO Sterwins branded ch | Walbro LLC | 2021-08-05 | Active | License |

Schedule 7.12(c)

Additional Contracts

1. Settlement and License Agreement, dated as of January 23, 2019, by and between Walbro LLC and Tilloston, Clash Industrial Estate,Tralee, Co. Kerry, Ireland (Tillotson).

2. Supply Agreement, dated as of January 31, 2020, by and between Walbro LLC and Bombardier Recreational Products Inc.

US-DOCS\145310411.1

CONFIDENTIAL

FBG_CH1_00093883

**Exhibit A**
**Transition Services Agreement**

(*See attached.*)

CONFIDENTIAL                                                    FBG_CH1_00093884

*Execution Version*

---

**TRANSITION SERVICES AGREEMENT**

**by and among**

**WEM NEWCO, LLC**

**and**

**WALBRO CO. LTD.,**

**on the one hand,**

**AND**

**WALBRO, LLC,**

**on the other hand**

**Dated as of September 29, 2023**

---

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093885

**TABLE OF CONTENTS**

**Page**

Article I. Interpretation ................................................................................................................3

    1.1    Definitions................................................................................................................3
    1.2    Rules of Contruction ...............................................................................................4

Article II. SERVICES ...................................................................................................................4

    2.1    Provision of Services ..............................................................................................4
    2.2    Service Modifications and Additional Services......................................................6
    2.3    Service Standards....................................................................................................7

Article III. FEES AND PAYMENT .............................................................................................8

    3.1    Fees .........................................................................................................................8
    3.2    Payment Terms .......................................................................................................8
    3.3    Taxes ......................................................................................................................9

Article IV. TERM AND TERMINATION...................................................................................10

    4.1    Term......................................................................................................................10
    4.2    Early Termination .................................................................................................10
    4.3    Termination for Default ........................................................................................10
    4.4    Effect of Termination............................................................................................11

Article V. COOPERATION AND ACCESS................................................................................11

    5.1    Cooperation by Recipient .....................................................................................11
    5.2    Access to Premises and Systems...........................................................................11
    5.3    Compliance with Third Party Vendor Agreements ..............................................11

Article VI. INTELLECTUAL PROPERTY .................................................................................12

    6.1    Ownership of Intellectual Property.......................................................................12
    6.2    Limited Licenses; No Implied License .................................................................12

Article VII. NO WARRANTIES; LIMITATIONS OF LIABILITY ...........................................12

    7.1    No Warranties.......................................................................................................12
    7.2    Limitations of Liability.........................................................................................13
    7.3    Indemnification.....................................................................................................13

Article VIII. FORCE MAJEURE ................................................................................................13

    8.1    Force Majeure. ......................................................................................................13

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093886

**DEBTORS' EXHIBIT NO. 236**
**Page 80 of 216**

Article IX. CONFIDENTIALITY ..................................................................................................14

    9.1     Confidentiality ..................................................................................................14
    9.2     Government Order ............................................................................................14
    9.3     Data Protection.................................................................................................15

Article X. DISPUTE RESOLUTION ............................................................................................15

    10.1    Governing Law. ...............................................................................................15
    10.2    Escalation Process............................................................................................15
    10.3    Jurisdiction; Venue. .........................................................................................15
    10.4    WAIVER OF JURY TRIAL.............................................................................16

Article XI. Non-Solitication..........................................................................................................16

    11.1    Non-Solicitation of Employees and Contractors ...........................................16

Article XII. MISCELLANEOUS PROVISIONS...........................................................................16

    12.1    Amendments and Waivers ...............................................................................16
    12.2    Cumulative Remedies ......................................................................................16
    12.3    Captions; Counterparts.....................................................................................16
    12.4    Notices .............................................................................................................17
    12.5    Entire Agreement.............................................................................................17
    12.6    Assignment, Successors and Assigns; No Third-Party Beneficiaries...................18
    12.7    Severability. ....................................................................................................18
    12.8    Defined Terms .................................................................................................18
    12.9    Expenses .........................................................................................................18
    12.10  No Set-Off........................................................................................................18
    12.11  Conflict ...........................................................................................................18
    12.12  Relationship of the Parties ...............................................................................18
    12.13  Performance ....................................................................................................18
    12.14  Compliance with Laws ....................................................................................18
    12.15  Other Agreements ...........................................................................................18

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093887

**DEBTORS' EXHIBIT NO. 236**
**Page 81 of 216**

**TRANSITION SERVICES AGREEMENT**

This TRANSITION SERVICES AGREEMENT (this "<u>Agreement</u>"), dated as of September 29, 2023 ("<u>Effective Date</u>"), is made and entered into effective, by and between WEM Newco, LLC, a Delaware limited liability company, and Walbro Co. Ltd., a Japan corporation (collectively, "<u>Provider</u>") and Walbro, LLC, a Delaware limited liability company ( "<u>Recipient</u>"). Provider and Recipient are each a "<u>Party</u>" and are sometimes referred to herein collectively as the "<u>Parties</u>."

RECITALS

WHEREAS, Recipient and certain of its Subsidiaries were engaged in the Business, and pursuant to that certain Securities Purchase Agreement (the "<u>Purchase Agreement</u>") by and among Recipient, on the one hand, Provider and the other parties thereto on the other hand, pursuant to which Recipient agreed to sell the Business to Provider by selling the Transferred Assets and Assumed Liabilities to Provider, and Provider agreed to purchase the Transferred Assets and to assume the Assumed Liabilities;

WHEREAS, Provider and its Subsidiaries have agreed to provide, or cause to be provided, to Recipient and its Affiliates certain transitional services related to assets of the Business for the purpose of enabling the Parties to manage an orderly separation of and transition in Provider's operation of the Business, on the terms and conditions set forth in this Agreement; and

WHEREAS, as a condition to the Closing of the transactions contemplated by the Purchase Agreement, Provider agreed to enter into this Agreement, in order to provide to Recipient and its Affiliates certain services on a transitional basis to allow Recipient and its Affiliates the time to develop the capability to perform such services for itself or to outsource such services to a third-party service provider;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements, provisions and covenants contained in this Agreement, the Parties hereby agree as follows:

ARTICLE I.
INTERPRETATION

1.1     <u>Definitions</u>.  For the purposes of this Agreement, the following terms shall have the respective meanings set out below and grammatical variations of such terms shall have corresponding meanings.  Other terms that are capitalized but not specifically defined in this <u>Section 1.1</u> or in the body of this Agreement (including the preamble and the recitals hereto) shall have the meanings set forth in the Purchase Agreement.

(a)     "<u>Actual Cost</u>" means, with respect to a given Service, Provider's or its applicable Affiliate's actual cost to provide such Service, including a reasonable allocation of overhead and, with respect to third party providers, a reasonable allocation of the amounts paid to such providers that is proportionate to usage of Services by or on behalf of Recipient, in each case, calculated and allocated in a manner consistent with the cost calculation and allocation methodologies applied with respect to the Business during the one (1) year period prior to the Effective Date.

3

US-DOCS\144531851.8

CONFIDENTIAL     FBG_CH1_00093888

(b)    "Confidential Information" means all (i) non-public information and material of a Party or its Affiliates (and of companies with which such Party has entered into confidentiality agreements) that the other Party obtains knowledge of or access to; (ii) non-public Intellectual Property of the disclosing Party; and (iii) business and financial information of the disclosing Party, including pricing, business plans, forecasts, revenues, expenses, earnings projections, sales data and any and all other non-public financial information; provided, however, "Confidential Information" does not include information that: (i) is or becomes public knowledge without any action by, or involvement of, the receiving Party or its Affiliates or contractors; (ii) is independently developed by the receiving Party without reference or access to the Confidential Information of the disclosing Party and is so documented; or (iii) is obtained by the receiving Party without restrictions on use or disclosure from a third party who did not receive it, directly or indirectly, from the disclosing Party.

(c)    "Personal Data" and "Processing" shall have the meaning given to those terms under the applicable privacy Laws.

(d)    "Service" means each service provided to Recipient by or on behalf of Provider, as set forth on Annex I and in accordance with Section 2.1(a).

(e)    "Stranded Costs" means any costs or expenses that have been incurred or paid by Provider, or that Provider is or will be obligated to pay pursuant to any commitments, purchase orders, work orders or any agreements entered into with third parties in order to provide a Service, including employee retention commitments, minimum commitment fees payable to vendors, or termination penalties payable pursuant to such agreements, to the extent such costs will not be recovered as part of the Fees due to early termination of such Service.

1.2    Rules of Contruction. Section 11.4 of the Purchase Agreement is hereby incorporated by reference, mutatis mutandis.

ARTICLE II.
SERVICES

2.1    Provision of Services.

(a)    Scope of Services. Subject to the terms and conditions of this Agreement, Provider agrees to provide, or cause to be provided, to Recipient the Services described on Annex I, solely for purposes of the continued operation of the Business by Recipient in the ordinary course consistent in all material respects with how the Business was operated during the one (1) year period prior to the Effective Date (the "Reference Period"). For the avoidance of doubt, the Services expressly exclude, and under no circumstances shall Provider be required to provide or cause to be provided, the services set forth on Annex II (the "Excluded Services"). Notwithstanding any provision contained in this Agreement or in any Annex, neither Provider nor any Affiliate thereof shall be obligated to provide, or shall be deemed to be providing, any legal or tax advice to Recipient or any Affiliate thereof as part of or in connection with the Services or otherwise. Provider may, in its sole discretion, engage, or cause an Affiliate to engage, one or more third parties and/or Affiliates of Provider to provide some or all of the Services.

4

US-DOCS\144531851.8

CONFIDENTIAL                                                                       FBG_CH1_00093889

(b)       Omitted Services.  If, within ninety (90) days following the Effective Date, Recipient identifies any service(s) (other than an Excluded Service) that were provided to Recipient with the use of the assets or personnel of the Business during the Reference Period but that is not listed on Annex I as of the Closing Date, then Recipient may provide written notice thereof to Provider, setting out in reasonable detail such service (such service, an "Omitted Service").  As soon as reasonably practicable after receipt of such notice, Provider shall provide the Omitted Service on the same terms and conditions as the other Services provided hereunder, and shall establish a fee for such Omitted Service using substantially the same methodology as was used to determine the fees set forth in Annex I. The Parties shall discuss in good faith the duration of such Omitted Service; provided, that such duration shall not extend beyond the longest term for the other Services on Annex I as of the Closing Date.  Upon Provider's provision of a given Omitted Service, Annex I automatically shall be deemed updated to include the applicable Omitted Service, and such Omitted Service automatically shall become a "Service" hereunder.

(c)       Required Consents.  Provider shall use commercially reasonable efforts to obtain any third-party consents, approvals or amendments to Provider's existing third-party agreements that are necessary to allow Provider to provide the Services to Recipient (the "Consents").  Recipient shall pay, or, at Provider's request, reimburse Provider for, the cost of obtaining the Consents and any fees or charges associated with the Consents, including any additional license, sublicense, access or transfer fees.  Recipient acknowledges that there can be no assurance that Provider will be able to obtain the Consents.  In the event that any Consents are not obtained, upon Recipient's request, Provider will reasonably cooperate with Recipient to identify, and if commercially feasible, to implement, a work-around or other alternative arrangement for any affected Service(s); provided, that (i) Recipient shall be responsible for all fees and costs associated with any such work-around or alternative arrangement, and (ii) Recipient acknowledges that any such work-around or alternative arrangement may adversely impact the Service Standards, and Provider shall not be liable for any breach of the Service Standards that results from the adoption of any such work-around or alternative arrangement.  If no commercially feasible alternative for a Service is available or capable of being reasonably implemented, Provider shall be relieved of its obligations to provide such Service.

(d)       Compliance with Law.

(i)       Notwithstanding anything herein to the contrary, Provider (x) shall not be required to provide, or cause to be provided, any Service or perform or cause to be performed any other obligation in connection with this Agreement if and to the extent that Provider reasonably determines that the provision of such Service or the performance of such obligation would violate any applicable Laws or any generally applicable policy or procedure of Provider or any of its Affiliates and (y) shall have the right to perform any action that, in its reasonable opinion, is necessary to comply with applicable Law or any policy or procedure of Provider or any of its Affiliates.  If and to the extent permitted, Provider will reasonably cooperate with Recipient to identify, and if commercially feasible, to implement, a work-around or other alternative arrangement for the affected Service; provided, that (i) Recipient shall be responsible for all fees and costs associated with any such work-around or alternative arrangement, and (ii) Recipient acknowledges that any such work-around or alternative arrangement may adversely impact the Service Standards,

5

US-DOCS\144531851.8

FBG_CH1_00093890

and Provider shall not be liable for any breach of the Service Standards that results from the adoption of any such work-around or alternative arrangement.

(ii)     Provider assumes no responsibility for compliance by Recipient with any Laws applicable to Recipient, and Recipient shall be responsible for securing any necessary governmental or regulatory permits, consents, or approvals necessary to receive the Services.  Recipient shall be responsible for determining the compliance of the Services with Laws that are applicable to Recipient.  Any Service Modifications required as a result of non-compliance with, or changes to, Laws applicable to Recipient shall be agreed in accordance with Section 2.2 and any costs associated with such Service Modifications shall be borne by Recipient.

(iii)     Recipient shall not use or otherwise make available any Services in a manner that would result in a violation of any applicable Law, including by Provider or any of its Affiliates.

(e)     Service and Project Managers.  Each Party will appoint a manager for each Service (each a "Service Manager"), who shall be responsible for managing the provision of such Service and who shall be the primary contact for any issues relating to that Service.  The initial Service Manager for Provider is Jerry Kibby and the initial Service Manager for Recipient is Mike Coyle.  In addition, each Party will appoint a project manager, who shall oversee the Service Managers and ultimately be responsible for all day-to-day matters arising hereunder, and who shall be the primary contact for the other Party for any issues arising hereunder that are not covered or resolved by the Service Managers (each a "Project Manager").  The Project Managers shall meet (in person or by telephone) at the request of either Project Manager, in order to ensure the provision of the Services in accordance with the terms hereof, as well as the orderly transition of those Services at the end of the applicable Service Term.  Each Party may change its designated Project Manager or any of its Service Managers at any time by providing notice in accordance with Section 12.4.

2.2     Service Modifications and Additional Services.

(a)     Changes.  During the Term, the Parties may, in accordance with the procedures specified in this Section 2.2: (i) agree to modify the terms and conditions relating to the performance of a previously agreed-upon Service in order to reflect, among other things, new procedures or processes for providing such Service (a "Service Modification"), or (ii) agree upon terms and conditions related to the provision of services that are in addition to any of the previously agreed-upon Services and that were utilized in the conduct of the Business prior to Closing, other than any Excluded Services (an "Additional Service").

(b)     Change Requests.  In the event either of the Parties desires a Service Modification or an Additional Service (in each case, a "Change"), the Party requesting the Change will deliver a written description of the proposed Change (a "Change Request") to the other Party as follows: (i) in the case of a Change Request by Provider, to Recipient's Project Manager; and (ii) in the case of a Change Request by Recipient, to Provider's Project Manager.

6

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093891

**DEBTORS' EXHIBIT NO. 236**
**Page 85 of 216**

(c)     Meeting of the Parties.  Unless the Party receiving the Change Request agrees to implement the Change Request as proposed, the Project Managers will meet in person or by telephone to discuss the Change Request no later than ten (10) Business Days after delivery of the Change Request to the other Party.

(d)     Approval of Recipient Change Requests.  All Recipient Change Requests must be approved by Provider's Project Manager in writing before the Change may be implemented in accordance with Section 2.2(f) below, such approval not to be unreasonably withheld, conditioned, or delayed.  For the purposes of the preceding sentence, the Parties agree that it is not unreasonable to: (i) withhold such consent to the extent that such proposed Change would increase the resources required for Provider to provide the Services after giving effect to the Change Request, (ii) withhold such consent if Provider determines that it would have to hire any new resources in order to provide the Services following implementation of the Change, whether due to lack of available personnel, lack of expertise of existing available personnel, or otherwise, (iii) condition such consent on Recipient agreeing to bear any increases in Provider's cost of performance (including, if applicable, Actual Costs of personnel including, without duplication, any associated Expenses) resulting from such Change, or (iv) condition such consent on the Parties, acting in good faith, reaching an agreement on the pricing of the applicable Service following the Change.

(e)     Approval of Provider Change Requests.  All Provider Change Requests must be approved by Recipient's Project Manager in writing before the Change may be implemented in accordance with Section 2.2(f) below.  Such consent will not be unreasonably withheld, conditioned or delayed.  For the purposes of the preceding sentence, the Parties agree that it is not unreasonable to: (i) withhold such consent to the extent that such proposed Change would materially adversely affect Provider's performance of the Services after giving effect to the Change Request, (ii) condition such consent on Provider agreeing not to pass to Recipient any increases in Provider's cost of performance resulting from such Change, or (iii) condition such consent on Provider agreeing to reimburse Recipient for any costs incurred by Recipient to implement or accommodate such Change in order to continue to receive the Services.

(f)     Implementation of Approved Change.  If a Change Request is approved in accordance with this Section 2.2, then Annex I automatically will be deemed amended to reflect the implementation of the Change Request and any other agreed-upon terms or conditions relating to the Change.

2.3     Service Standards.

(a)     Service Quality.  Except to the extent otherwise expressly provided in Annex I, Provider shall provide, or cause to be provided, the Services in substantially the same manner and with substantially equivalent quality, care, and level of performance as (i) such similar Services were provided to Recipient or its Affiliates with the use of the assets or personnel of the Business during the Reference Period or (ii) Provider's current practice in performing or causing to be performed the Services for itself or its Affiliates (the "Service Standards").  For the avoidance of doubt, Provider shall be free to hire and terminate its personnel and its contractors in its sole and absolute discretion, and nothing herein shall be construed to require Provider (i) to maintain the employment of any particular individual(s), or any number of individual(s), (ii) acquire or

7

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093892

otherwise procure new, additional or different equipment or resources, (iii) acquire or establish any separate hardware or software platforms in order to perform the Services, or (iv) upgrade, update, improve, enhance, modify, add or delete any software, hardware, equipment, databases or interfaces, or provide any training, in connection with the Services.

(b)   Modifications and Upgrades.  Notwithstanding anything to the contrary herein (including Section 2.2 and Section 2.3(a)), Provider reserves the right to modify or upgrade the systems and processes used in support of the Services, as changes are made to respond to the needs of Provider's businesses or as a result of Provider's existing or future agreements with third parties or contractors.  Provider agrees to notify Recipient of such changes as notification is presented to Provider's other businesses.  To the extent such changes affect a Service: (i) Provider shall have no obligation to continue to supply such Service using its former technology, and (ii) Recipient may elect to discontinue the applicable Service upon the implementation of such changes by providing written notice thereof to Provider within ten (10) days of Provider's notification of such changes.  To the extent Recipient wishes to continue to receive such Service, it shall be obligated to conform its systems to Provider's upgraded technology.

(c)   Maintenance.  Notwithstanding anything to the contrary in this Agreement, Provider shall have the right to shut down its facilities and/or systems used in providing the Services in accordance with scheduled maintenance windows that have been set by Provider and communicated in advance to Recipient's Project Manager.  In the event that Provider determines in its reasonable business judgment that nonscheduled maintenance is necessary, Provider may perform the non-scheduled maintenance; provided that Provider shall notify Recipient's Project Manager of such maintenance as notification is presented to Provider's other businesses.  Provider shall have no obligation to supply the Services during any maintenance period described in this Section 2.3(c).

ARTICLE III.
FEES AND PAYMENT

3.1   Fees.  In consideration of the Services, Recipient shall pay to Provider the fees specified in Annex I (the "Fees"), which represent Provider's Actual Cost for providing the Services.  In addition, without duplication of any expenses included in the Fees and unless specified otherwise in Annex I, Recipient shall reimburse Provider for all out-of-pocket fees, costs and expenses incurred by Provider, its Affiliates or its or their third party providers in the provision of the Services ("Expenses").  Recipient acknowledges and agrees that all Fees (including those with respect to Services provided by third party providers) are subject to periodic increases to reflect increases to Provider's Actual Cost, and Recipient agrees that it shall bear any such increases.  For clarity, the actual charges for any volume-based Services will be determined based on Recipient's actual usage thereof, and therefore the actual Fees charged to Recipient will change monthly.

3.2   Payment Terms.

(a)   Invoices.  Except as otherwise provided in Annex I with respect to any Service, promptly following the end of each calendar month during the Term, Provider shall

8

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093893

deliver to Recipient or its nominated designee an invoice setting forth the Fees and Expenses for the Services provided during the prior month.

(b)     Payment.   Except as otherwise expressly provided to the contrary in this Agreement, any amount to be paid or reimbursed by a Party to the other Party under this Agreement shall be paid or reimbursed hereunder within thirty (30) days after presentation of an invoice or a written demand therefor in accordance with Section 3.2(a).  All payments under this Agreement shall be made by electronic funds transfer of immediately available funds to the bank account specified by the Party receiving the payment.

(c)     Disputed Amounts.   In the event that Recipient disputes in good faith the accuracy of any portion of an invoice, Recipient shall deliver to the Provider Project Manager notice of the dispute, along with a reasonably detailed explanation of the basis of the dispute, on or prior to the applicable due date, and shall pay all undisputed portions of the applicable invoice in a timely manner in accordance with Section 3.2(b).  All payment disputes shall be resolved in accordance with Section 12.2.

(d)     Late Payment Charge.   Except as expressly provided to the contrary in this Agreement, any amount not paid when due pursuant to this Agreement (and any amount billed or otherwise invoiced or demanded and properly payable that is not paid within thirty (30) days of such bill, invoice or other demand) shall bear interest at a rate per annum equal to the Prime Rate, from time to time in effect, plus one point seven five percent (1.75%), calculated for the actual number of days elapsed, accrued from the date on which such payment was due up to the date of the actual receipt of payment. Recipient shall reimburse Provider for all reasonable costs and expenses incident to the collection of overdue amounts hereunder, including but not limited to reasonable attorneys' fees.

(e)     Currency Conversion.   Without the prior written consent of Provider specifying otherwise, all payments to be made hereunder shall be made in U.S. dollars.  Except as expressly provided herein, any amount which is not expressed in U.S. dollars shall be converted into U.S. dollars by using the "composite" exchange rate published by Bloomberg at 5:00 pm, Eastern time, on the day before the relevant date, or in *The Wall Street Journal* on such date if not so published by Bloomberg.

3.3     Taxes.  All sums payable under this Agreement are exclusive of value added tax, sales tax, service tax and turnover tax that may be levied in any jurisdiction (collectively, "Service Taxes") which shall (if and to the extent applicable with respect to a Service) be payable by the Recipient of such Service in addition to the amount payable by the Recipient where applicable. Such Service Taxes shall be separately stated on the relevant invoice to the Recipient.  The amount of Expenses to be reimbured by the Recipient pursuant to Section 3.1 shall include all amounts of Services Taxes comprised in such Expenses, except to the extent the Provider (or a member of its group for the relevant Service Tax purposes) is entitled to recover such Service Tax (whether by repayment, credit or otherwise).  Each Party shall be liable for its own Taxes that are imposed on (or measured by) net income or net profits, however denominated, and any interest, penalties, additions to Tax or additional amounts in respect of the foregoing.  If any Taxes are required to be deducted or withheld from any payments made by one Party (the "Payor") to another Party (the "Payee") hereunder, then such Payor shall provide commercially reasonable notice to the Payee of

9

US-DOCS\144531851.8

**DEBTORS' EXHIBIT NO. 236**
**Page 88 of 216**

the intention to deduct or withhold an amount from any payment (and the amounts subject to such deduction or withholding). In the event such deduction or withholding is required, the amount payable by the Payor shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional amounts payable under this Section 3.3) the Payee receives an amount equal to the amount it would have received had no such deduction or withholding been made. The Payor shall provide the Payee with receipts from the appropriate taxing authority for all payments of Taxes withheld and paid by the Payor to such authorities on behalf of the Payee. Payor and Payee shall make commercially reasonable efforts to cooperate to the extent necessary to obtain any exemption relating to, or reduced rate of, deduction or withholding for or on account of Tax.

ARTICLE IV.
TERM AND TERMINATION

4.1     Term. This Agreement is effective as of the Effective Date, and unless earlier terminated in accordance with Section 4.2, shall expire twelve (12) months following the Effective Date (the "Term"). Each Service shall be provided for the entire Term, unless a shorter period is specified for a given Service on Annex I (with respect to each Service, the "Service Term"). Upon written noticeby Recipient to Provider at least sixty (60) days prior to the expiration of the Service Term (an "Extension Notice"), Recipient may upon mutal agreement and signed writing of both parties extend the Service Term for the applicable Service for the term agreed upon by both parties [1]; provided that (a) if an Extension Notice relates to a Service that is interdependent with other Services, Recipient must also extend such interdependent Services, to the extent necessary, and (b) during any extended Service Term, the Fees for the applicable Service shall be increased by twenty-five percent (25%). If an extension of a Service Term would cause such Service Term to continue after the end of the Term, the Term automatically shall be extended until the end of such Service Term (as extended).

4.2     Early Termination. Except as otherwise provided in Annex I, Recipient may terminate this Agreement in respect of any or all of the Services, in whole but not in part, by providing a minimum of forty-five (45) days prior written notice to Provider (an "Early Termination Notice"); provided, however, any such early termination must occur at month end, and Recipient may not terminate a particular Service if such Service is interdependent with other Services, unless all such interdependent Services are simultaneously terminated. Recipient shall reimburse Provider for Stranded Costs, if any, resulting from any such early termination.

4.3     Termination for Default.

(a)     Termination for Non-Payment. Provider may terminate this Agreement, with respect to all or any applicable Services it provides hereunder,upon the occurrence of a material breach by the Recipient party of any of the terms of this TSA, which is not waived in writing by the Provider, or if Recipient fails to pay undisputed amounts due in accordance with Article III, and Recipient fails to cure such payment default within thirty (30) days of receipt of notice of the payment default from Provider.

_____

[1] **Note to Draft:** Subject to further review.

US-DOCS\144531851.8

CONFIDENTIAL                                                                                           FBG_CH1_00093895

(b)      Termination for Material Breach.  Recipient may terminate this Agreement, with respect to all or any applicable Services it receives hereunder, if Provider is in material breach of this Agreement with respect to its provision of Services hereunder, and Provider fails to cure such material breach within thirty (30) days of receipt of notice of such material breach from Recipient.

4.4      Effect of Termination.

(a)      Upon the expiration or termination of this Agreement or the termination of the provision of any Services hereunder, the Recipient shall pay Provider all costs and other sums owed to Provider for the terminated Services provided in accordance with the payment terms set forth in Article III.  Unless Recipient is in default of its payment obligations hereunder, Provider will, at Recipient's reasonable expense, provide such cooperation as may reasonably be requested by Recipient, in order to transition the terminated Services to Recipient or a third party service provider (the "Termination Services").  Notwithstanding anything to the contrary, the Recipient will pay Provider its Actual Cost for providing the Termination Services (including, without duplication, reimbursement of all Expenses), which will be invoiced and payable in the same manner as set forth for Expenses in Article III above.

(b)      The provisions of Section 2.1(f), this Section 4.4, Article VI, Article VII, Article IX, Article X, and Article XI shall survive the expiration or the termination of this Agreement.  The remaining provisions shall survive to the extent such provisions are applicable to any amounts due for Services provided prior to termination or expiration, or are applicable to any Termination Services (including payment therefor).

ARTICLE V.
COOPERATION AND ACCESS

5.1      Cooperation by Recipient.  Recipient shall cooperate reasonably with Provider in all matters relating to the provision and receipt of the Services so as to minimize the expense, distraction, and disturbance in connection with such Services.  Recipient shall make available, as reasonably requested by Provider, sufficient resources and timely decisions, approvals and acceptances in order that Provider may accomplish its obligations under this Agreement in a timely and efficient manner.

5.2      Access to Premises and Systems.  Recipient agrees that it shall, without charge, provide such reasonable access to its premises, personnel and/or computer systems or information stores, and such reasonable assistance, as may be required to Provider for Provider to perform their obligations or receive the Services under this Agreement.  Unless otherwise agreed to in writing by the Parties, Provider will: (i) use the premises, computer systems and information stores of Recipient solely for the purpose of providing or receiving the Services; (ii) limit such access to those of its representatives with a bona fide need to have such access in connection with the Services, and (iii) comply, and cause its employees, subcontractors and third-party providers to comply, with all policies and procedures governing access to and use of such premises, computer systems and/or information stores made known to Provider in advance.

11

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093896

5.3     Compliance with Third Party Vendor Agreements.  Recipient acknowledges and agrees that the Services provided by Provider through third parties or using third party Intellectual Property Rights are subject to the terms and conditions of any applicable agreements between Provider or one of its Affiliates and such third parties.  Recipient shall comply with the terms of all third-party vendor agreements which are used by Provider in providing the Services to the extent that Provider makes Recipient aware of the applicable terms or such terms are otherwise known to Recipient or its personnel.  Provider shall be entitled to exclusively manage its relationships with such third parties.  Recipient shall not discuss with any third party the provision of the Services.

ARTICLE VI.
INTELLECTUAL PROPERTY

6.1     Ownership of Intellectual Property.  Except as otherwise expressly set forth herein, as between the Parties, each Party shall remain the exclusive owner of all right, title and interest throughout the world in and to its Intellectual Property Rights, whether provided to one another in the performance or receipt of the Services, or in any other context given the relationships of the Parties under this Agreement.  Without limiting the foregoing and for the avoidance of doubt, ownership of any Intellectual Property Rights that are developed or generated after the Effective Date in connection with any Service will vest, as between the Parties, in Provider, except for any Intellectual Property Rights (i) specifically developed for Receipient as a Service hereunder or (ii) generated by Recipient's use of a Service in the ordinary course of operating the Business (e.g., copyrights in reports, documents or data generated through Recipient's use of a Service).

6.2     Limited Licenses; No Implied License.

(a)     Provider hereby grants to Recipient and to its personnel, a non-exclusive, limited license and right, during the Term of this Agreement, under the Intellectual Property Rights (other than Trademarks) of Provider or its Affiliates, to use the embodiments of Intellectual Property Rights provided by Provider to Recipient hereunder solely to the extent necessary for the receipt, access and use of the Services.

(b)     Recipient hereby grants to Provider, its Affiliates and any third party providers, and each of their personnel, a non-exclusive, limited license and right, during the Term of this Agreement, under the Intellectual Property Rights (other than Trademarks) of Recipient and its Affiliates, to use the embodiments of Intellectual Property Rights provided by Recipient to Provider hereunder, solely to the extent necessary for the provision of the Services.

(c)     Each Party acknowledges that no license or conveyance of any rights to any Intellectual Property Rights is granted to the receiving Party by the disclosure of Confidential Information pursuant to this Agreement.  Recipient further acknowledges that it will acquire no right, title or interest (including any license rights or rights of use) in any firmware or software, or

12

US-DOCS\144531851.8

other Intellectual Property Rights owned or licensed by Provider by reason of Provider's provision of the Services provided hereunder, except for the limited license set forth in Section 6.2(a).

## ARTICLE VII.
## NO WARRANTIES; LIMITATIONS OF LIABILITY

7.1     No Warranties.  SUBJECT TO SECTION 2.3, ALL SERVICES ARE PROVIDED "AS IS," AND PROVIDER AND ITS AFFILIATES PROVIDE NO WARRANTIES OF ANY KIND (WRITTEN, ORAL, OR STATUTORY, EXPRESS OR IMPLIED) IN CONNECTION WITH THE SERVICES AND THIS AGREEMENT, AND HEREBY DISCLAIM ANY AND ALL WARRANTIES (WRITTEN, ORAL, OR STATUTORY, EXPRESS OR IMPLIED), INCLUDING ALL IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE.  To the extent that Provider and its Affiliates may not as a matter of applicable law disclaim any implied warranty, the scope and duration of such warranty will be the minimum permitted under such law.  Nothing in this Section 7.1 shall limit anything in the Purchase Agreement.

7.2     Limitations of Liability.

(a)     WITH THE EXCEPTION OF CLAIMS ARISING FROM PROVIDER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, PROVIDER AND ITS AFFILIATES' MAXIMUM, CUMULATIVE AND SOLE LIABILITY TO THE RECIPIENT FOR ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF THIS AGREEMENT, THE SERVICES, OR ITS, ITS AFFILIATES' AND ITS AND THEIR THIRD PARTY PROVIDERS' ACTS OR OMISSIONS IN CONNECTION WITH THIS AGREEMENT SHALL NOT EXCEED THE TOTAL AGGREGATE FEES PAID HEREUNDER IN THE PRECEEDING SIX (6) MONTHS. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, WITH THE EXCEPTION OF CLAIMS ARISING FROM A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, NEITHER PARTY, NOR ITS AFFILIATES, CONTRACTORS, SUPPLIERS OR AGENTS, SHALL HAVE ANY LIABILITY HEREUNDER FOR, AND DAMAGES SHALL NOT INCLUDE, ANY PUNITIVE, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES, OR DAMAGES CALCULATED BASED UPON LOST PROFITS, LOSS IN VALUE OR MULTIPLE OF EARNINGS. ANY CLAIM OR CAUSE OF ACTION REQUESTING OR CLAIMING SUCH DAMAGES IS SPECIFICALLY WAIVED AND BARRED, WHETHER OR NOT SUCH DAMAGES WERE FORESEEABLE OR A PARTY WAS NOTIFIED IN ADVANCE OF THE POSSIBILITY OF SUCH DAMAGES.

7.3     Indemnification.  Provider shall indemnify Recipient  and its directors, officers, employees and agents (the "Recipient Indemnified Parties") against and hold them harmless from and shall pay all costs, damages, liabilities, reasonable attorneys' fees and expenses, penalties, and judgments arising from or relating to (a) the performance by Recipient of the Services, except to the extent that any of the foregoing results from Recipient's gross negligence or willful misconduct, and (b) Provider's breach of this TSA or its negligence or willful misconduct.  This indemnity is separate from, and in addition to, the indemnification provisions of the Purchase Agreement.  Provider shall not enter into any settlement agreement on terms that would impact

US-DOCS\144531851.8

CONFIDENTIAL                                           FBG_CH1_00093898

any of the <u>Recipient</u> Indemnified Parties' rights or obligations, without the prior written consent of the applicable <u>Recipient</u> Indemnified Parties.

## ARTICLE VIII.
## FORCE MAJEURE

8.1     <u>Force Majeure</u>. Except for payment obligations, in case a Party shall be hindered, delayed or prevented from performing its obligations under this Agreement (other than its payment obligation), or if such performance is rendered impossible by reason of fire, explosion, earthquake, storm, flood, drought, embargo, pandemic, wars or other hostilities, strike, lockout or other labor disturbance, mechanical breakdown, cyber attack, governmental action, or any other cause that is beyond the reasonable control of a Party (a "<u>Force Majeure Event</u>"), then the Party so hindered, delayed or prevented shall not be liable to the other Party for the resulting delay or failure to carry out its obligations hereunder.  In any such event, such Party's affected obligations hereunder shall be postponed for such time as its performance is suspended or delayed on account thereof.  The affected Party will promptly notify the other Party, either orally or in writing, upon learning of the occurrence of such Force Majeure Event.  If the Force Majeure Event affects the provision of Services by Provider hereunder, Provider shall use commercially reasonable efforts to remove such Force Majeure Event as soon as and to the extent reasonably possible and, in any event, will treat the Recipient the same as any other internal or external service recipient of the affected Services, if any.  Upon the cessation of the Force Majeure Event, the affected Party will use commercially reasonable efforts to resume its performance with the least possible delay. Notwithstanding the foregoing, and notwithstanding anything to the contrary in this Agreement, Recipient shall not be required to pay for Services that are not provided during the pendency of a Force Majeure Event.  If any Services are interrupted or suspended for more than ten (10) consecutive days, Recipient may immediately terminate the affected Services upon written notice to Provider.

## ARTICLE IX.
## CONFIDENTIALITY

9.1     <u>Confidentiality</u>. Each of the Parties agrees that any Confidential Information of the other Party received in the course of performance under this Agreement shall be kept strictly confidential by the Parties, except that Provider may disclose Recipient's Confidential Information for the sole purpose of providing Services pursuant to this Agreement to any Affiliate or third-party subcontractor of Provider that provides such Services, in whole or in part, on behalf of Provider, provided that Provider shall ensure that any such Affiliate or third party is bound in writing by obligations of confidentiality at least as strict as those contained herein.  Provider shall be responsible for any such Affiliate or third party keeping confidential such Confidential Information of Recipient.  The Party receiving Confidential Information further agrees (a) not to use the disclosing Party's Confidential Information except as necessary to perform its obligations under this Agreement, and (b) to take the same care with the disclosing Party's Confidential Information as it does with its own, but in no event less than a reasonable degree of care.  Upon the termination of this Agreement, each Party shall return to the other Party or destroy all of such other Party's Confidential Information.  Each of the Parties shall treat the terms of this Agreement as if they were the Confidential Information of the other Party and shall not disclose the terms of this Agreement without the other Party's prior written consent, except as required by applicable

14

US-DOCS\144531851.8

FBG_CH1_00093899

Law, by the rules of any national stock exchange with respect to a Party's publicly-traded securities or as otherwise permitted under this Agreement

9.2     Government Order.   If the receiving Party is requested to disclose any of the disclosing Party's Confidential Information pursuant to any judicial or governmental order, the receiving Party will promptly notify the disclosing Party of such order so that the disclosing Party, in its sole discretion, may seek an appropriate protective order and/or take any other action to prevent or minimize the breadth of such disclosure.

9.3     Data Protection.   To the extent the provision of Services requires the Processing of Personal Data, the receiving Party of such Personal Data shall only Process such Personal Data as a service provider on the disclosing Party's behalf for one or more business purposes described in this Agreement, and the receiving Party shall not retain, use or disclosure any such Personal Data other than for the specific business purposes described in this Agreement.   Each Party will reasonably cooperate to allow the other Party to meet its compliance obligations under applicable privacy and data protection Laws, including but not limited to response to data subject requests, data incident or breach reporting timeframes and obligations, and appropriate application of technical and organizational measures designed to protect Confidential Information and Personal Data.   The Parties agree to put into place privacy and data protection agreements between them as may be required by the provision of the Services.

ARTICLE X.
DISPUTE RESOLUTION

10.1     Governing Law. This Agreement, and all issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement and the Annexes hereto, and all claims and disputes arising hereunder or in connection herewith, whether purporting to sound in contract or tort, or at law or in equity, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, including its statutes of limitation, without giving effect to any choice of Law or conflict of Law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

10.2     Escalation Process. In the event of any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or validity thereof, including the dispute of any amounts paid hereunder or any claim by any Party that any other Party has breached the material terms hereof (each, a "Dispute"), the Project Managers shall meet (by telephone or in person) no later than ten (10) Business Days after receipt of notice by any Party of a request for resolution of a Dispute.  The Project Managers shall enter into negotiations aimed at resolving any such Dispute.  If the Project Managers are unable to reach mutually satisfactory resolution of the Dispute within twenty (20) Business Days after receipt of notice of the Dispute, the Dispute shall be referred to one (1) member of senior management of Provider, on the one hand, and one (1) member of senior management of Recipient, on the other hand.  The executives will meet (by telephone or in person) during the next ten (10) Business Days and attempt to resolve the Dispute. If the executives are unable to resolve the Dispute, then the Parties shall follow the procedure provided in Section 10.3.

US-DOCS\144531851.8

CONFIDENTIAL                                             FBG_CH1_00093900

10.3     Jurisdiction; Venue. The Parties hereby agree and consent to, and shall cause their respective Affiliates to, be subject to the exclusive jurisdiction of the Court of Chancery of the State of Delaware or, to the extent such court declines jurisdiction, first to any federal court, or second, to any state court, each located in Wilmington, Delaware, and the Parties hereby waive the right to assert the lack of personal or subject matter jurisdiction or improper venue in connection with any such suit, action or other proceeding.  In furtherance of the foregoing, each of the Parties hereto (on behalf of itself and its Affiliates) (a) waives the defense of inconvenient forum, (b) agrees not to commence any suit, action or other proceeding arising out of this Agreement or any transactions contemplated hereby other than in any such court and (c) agrees that a final judgment in any such suit, action or other proceeding shall be conclusive and may be enforced in other jurisdictions by suit or judgment or in any other manner provided by Law.

10.4     WAIVER OF JURY TRIAL. EACH PARTY (ON BEHALF OF ITSELF AND ITS AFFILIATES) HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION BASED UPON, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH PARTY WOULD NOT, IN THE EVENT OF ANY SUCH ACTION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND EACH OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, BY, AMONG OTHER THINGS, THE MUTUAL WAIVER AND CERTIFICATIONS IN THIS SECTION 10.4.

ARTICLE XI.
NON-SOLITICATION

11.1     Non-Solicitation of Employees and Contractors.    During the Term of this Agreement and for a period of eighteen (18) months thereafter, each Party agrees that such Party and its Subsidiaries shall not, directly or indirectly, recruit, solicit for employment, hire or entice to leave the employment of or cease providing services to any Party any Person who was an employee of such Party as of the date hereof or who is engaged by either Party to provide the Services; provided, however, that nothing in this Section 11.1 shall prohibit either Party from (x) conducting general solicitation, by advertisement, search firm or otherwise, not specifically targeted at such employees, or (y) recruiting, soliciting for employment after 6 months from the date of termination or cessation of employment, any employee whose employment with the other Party has been voluntarily or involuntarily terminated.

ARTICLE XII.
MISCELLANEOUS PROVISIONS[2]

12.1     Amendments and Waivers.  Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by Provider and Recipient, or in the case of a waiver, by the Party against whom the waiver is to be effective.  No failure or delay by any Party in exercising any right, power or

---

[2] **Note to Draft:** To be conformed to Purchase Agreement, where applicable.

16

US-DOCS\144531851.8

CONFIDENTIAL                                                                                    FBG_CH1_00093901

privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

12.2    <u>Cumulative Remedies</u>.    The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

12.3    <u>Captions; Counterparts</u>.  The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.  This Agreement may be executed in two or more counterparts (including by means of facsimile or other electronic transmission, including.pdf, DocuSign or similar format), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any such other document, shall be disregarded in determining the party's intent or the effectiveness of such signature.

12.4    <u>Notices</u>.  With the exception of day-to-day matters relating to the performance of this Agreement, such as communications among the Project Managers, all notices, requests, claims, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) when delivered by FedEx or other nationally recognized overnight delivery service, or (c) when delivered by email (<u>provided</u> that the sending party does not receive an automatically generated message from the recipient's email server that such email could not be delivered to such recipient), addressed as follows:

if to Provider, to:

WEM Newco, LLC
c/o Carter Carburetor, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention: Legal Department
Email: legal@firstbrandsgroup.com

if to Recipient, to:

Walbro Midco LLC
Walbro LLC
c/o Landon Capital Partners LLC
21 Custom House Street, Suite 700,
Boston, Massachusetts 02110
Attention:     Christopher P. Sullivan
Email:                 csullivan@landoncapital.com

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093902

with a copy (which shall not constitute notice) to:

>Latham & Watkins LLP
>200 Clarendon Street
>Boston, MA 02116
>Attention:    Ryan McCarthy; Elizabeth M. Slawsby
>Email:         ryan.mccarthy@lw.com;
>              elizabeth.slawsby@lw.com

or to such other address or addresses as a Party may from time to time designate in writing.

12.5    Entire Agreement.  This Agreement, including the Annexes hereto, together with the Purchase Agreement and the other Transaction Documents constitutes the entire agreement among the Parties with respect to the matters covered hereby and supersedes all previous written, oral or implied understandings among them with respect to such matters.

12.6    Assignment, Successors and Assigns; No Third-Party Beneficiaries.  This Agreement may not, without the prior written consent of Provider, be assigned by Recipient, by operation of Law or otherwise, and any attempted assignment shall be null and void.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, and permitted assigns.  No provision of this Agreement is intended to confer any rights, benefits, remedies or Liabilities hereunder upon any Person other than the Parties and their respective successors and permitted assigns.

12.7    Severability. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.  The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties.

12.8    Defined Terms.  Capitalized terms used and not otherwise defined herein shall have the meanings specified in Section 1.1, or if not defined therein, in the Purchase Agreement.

12.9    Expenses.  Except as otherwise expressly provided herein, each Party shall pay its own expenses incident to this Agreement and the transactions contemplated herein.

12.10   No Set-Off.  The obligations under this Agreement shall not be subject to set-off for non-performance or any monetary or non-monetary claim by any Party or any of their respective Affiliates under any other agreement between the Parties or any of their respective Affiliates.

12.11   Conflict.  In case of conflict between the terms and conditions of this Agreement and any Annex hereto, the terms and conditions of this Agreement shall control and govern.

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093903

12.12   Relationship of the Parties.  The relationship of the Parties to each other is that of independent contractors and neither Party nor its agents or employees shall be considered employees or agents of the other Party.  This Agreement does not constitute and shall not be construed as constituting a partnership or joint venture or grant of a franchise between the Parties. Neither Party shall have the right to bind the other Party to any obligations to third parties.

12.13   Performance.  Each Party shall cause to be performed, and hereby guarantees the performance of, all actions, agreements and obligations set forth herein to be performed by any Subsidiary or Affiliate of such Party.

12.14   Compliance with Laws.  Each Party shall comply, at its own expense, with the provisions of all Laws applicable to the performance of its obligations under this Agreement.

12.15   Other Agreements.  Except as expressly set forth herein, this Agreement is not intended to address, and should not be interpreted to address, the matters specifically and expressly covered by the Purchase Agreement or the other Transaction Documents.

[Signature Page To Follow.]

19

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093904

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives.

WALBRO, LLC


By: _____
Name:
Title:

20

US-DOCS\144531851.8

CONFIDENTIAL                                          FBG_CH1_00093905

**DEBTORS' EXHIBIT NO. 236**
**Page 99 of 216**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives.

WALBRO CO. LTD.


By:         _____
Name:
Title:

21

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093906

**DEBTORS' EXHIBIT NO. 236**
**Page 100 of 216**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives.

WEM NEWCO, LLC

By:       _____
Name:
Title:

22

US-DOCS\144531851.8

FBG_CH1_00093907

## ANNEX I

## Services

*[Attached]*

US-DOCS\144531851.8

SCHEDULE I

| # | Function | Service to be provided | Description of Service Provided | Service Term | Service Fee |
|---|---|---|---|---|---|
| 1. | IT | Access and Licensing | Provider to provide those Recipient facilities identified on Appendix I with access to certain software programs and related assets set forth on Appendix I. | Set forth on Appendix I. | Set forth on Appendix I. |
| 2. | Knowledge Transfer | Reach/ROHs | Provider to train replacement individual to provide conflict resolution and declarations support, including knowledge transfer relating to use of the Tetra Tech software. | One (1) month. | $1,300 |
| 3. | Thai Matters | Separation Support | Provider to provide Recipient's Thailand facility with those accommodations set forth on Appendix II, for the durations set forth therein. | Set forth on Appendix II. | Set forth on Appendix II. |
| 4. | Finance Support | RSM Audit 2022 and Training/Handoff | Provider to provide RSM Audit support and train replacement individuals. | Set forth on Appendix II. | Set forth on Appendix II. |
| 5. | IT Support | Cybersecurity Support and Separation support | Provider to provide Cybersecurity support, stand up outsourced IT solution for Walbro FS Thailand | Set forth on Appendix II. | Set forth on Appendix II. |

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093909

| | | | | |
|---|---|---|---|---|
| | | and support and train replacement individuals. | | |
| 6. | Japan FS Support | Payroll and Customer Communication Support | Provider to process payroll for 7 Walbro FS employees remaining in Japan.  Provider also to provide customer communications support for Walbro FS customers. | Set forth on <u>Appendix II</u>. | Set forth on <u>Appendix II</u>. |

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093910

**APPENDIX I**

| # | Software | Function/Purpose | Term | Facility | Billing Frequency | Service Fee |
|---|---|---|---|---|---|---|
| 1. | Exchange 2016 – JPN (19 FS Users) | Mail application | Six (6) months | Japan, Thailand | Per user cost (monthly) | $190 |
| 2. | EAC CAD (License for 2 FS Engineers) | Engineering drawing and modeling software | One Year | Japan (FS Engineers) | Monthly | $1,907 |

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093911

## APPENDIX II

| Item | Department | Description | Duration | Service Fee |
|------|-----------|-------------|----------|-------------|
| 1 | Thailand EM HR | Support HR's tasks to makes sure the transition is smooth, such as recruitment, payroll, employee contacts, security, janitorial services, and government relations. | Two (2) months | Set forth on Figures I-IV (as applicable). |
| 2 | Thailand EM Purchasing | Coordinate with suppliers regarding new company. Complete suppliers add in WTL. Support PR, PO process. | Three (3) months | Set forth on Figures I-IV (as applicable). |
| 3 | Thailand EM Customer Service | Coordinate with suppliers regarding new company. Complete suppliers add in WTL. Support PR, PO process. | Three (3) months | Set forth on Figures I-IV (as applicable). |
| 4 | Thailand EM BOI | Completed BOI transfer process. Existing first & second BOI transfer from WTH to WTL. Support BOI – IBC (ITC) certificate process. | Six (6) months | Set forth on Figures I-IV (as applicable). |
| 5 | Thailand EM Finance | Support finance transition on an as-needed basis. | Six (6) months | Set forth on Figures I-IV (as applicable). |
| 6 | EM Quality Control | Support quality control as needed, including Japanese customer quality issue support (especially TSM). | Two (2) months Quality<br><br>One (1) year Customer Quality | Set forth on Figures I-IV (as applicable). |
| 7 | Finance | Support RSM Audit 2022 | Seven (7) months | Set forth on Figures I-IV (as applicable). |
| 8 | Finance | Training, on-boarding, and transitional support for the new Finance Controller and Sr. Fin. Analyst<br>Training for Finance/Accounting/Treasury - 35 hours in Oct-Dec 2023; | Six (6) months | Set forth on Figures I-IV (as applicable). |

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093912

| | | Training/support on costing - 35 hours in Oct-Dec 2023;<br>   Support for the new Controller -<br>   7 hours per week x 13 weeks in Oct-Dec 2023 = 91 hours;<br>   4 hours per week x 13 weeks in Jan-Mar 2024 = 52 hours. | | |
|---|---|---|---|---|
| 9 | IT | Cybersecurity support and monitoring | Four (4) months | Set forth on Figures I-IV (as applicable). |
| 10 | IT | Standing up outsourced IT solution for Walbro FS Thailand and some global ERP support/handoff | Three (3) months | Set forth on Figures I-IV (as applicable). |
| 11 | HR | Labor cost to process payroll for 7 FS Employees | One (1) year | Set forth on Figures I-IV (as applicable). |
| 12 | Sales | Sales communication support for FS Japanese customers | Three (3) months | Set forth on Figures I-IV (as applicable). |
| 13 | Japan FS Office Space | Physical space for FS employees in Japan | One (1) year | One-time payment of $17,000 |

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093913

FIGURE I

| | HR | Purchasing | Customer Service | BOI/Logistics | Finance | Quality | Customer Quality | Total | Cost | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Support for Walbro FS Thailand | | | | | | | | | |
| Month | Aphinya Thaksina wan | Pornpen Pongsathitsiri | Valeerat Variphan | Duangrat Duangrat Limpisawads | Seni Sudsawad | Thawat Thikawa, Thawat | Watanabe Masatoshi (JPN) | Total Hours | Total USD$ | |
| Oct-23 | 16 | 24 | 24 | 32 | 32 | 16 | 10 | 154 | $ | 4,620.00 |
| Nov-23 | 8 | 24 | 24 | 32 | 24 | 16 | 10 | 138 | $ | 4,140.00 |
| Dec-23 | | 16 | 16 | 32 | 24 | | 10 | 98 | $ | 2,940.00 |
| Jan-24 | | | | 24 | 16 | | 10 | 50 | $ | 1,500.00 |
| Feb-24 | | | | 16 | 16 | | 10 | 42 | $ | 1,260.00 |
| Mar-24 | | | | 16 | 16 | | 10 | 42 | $ | 1,260.00 |
| Apr-24 | | | | | | | 10 | 10 | $ | 300.00 |
| May-24 | | | | | | | 10 | 10 | $ | 300.00 |
| Jun-24 | | | | | | | 10 | 10 | $ | 300.00 |
| Jul-24 | | | | | | | 10 | 10 | $ | 300.00 |
| Aug-24 | | | | | | | 10 | 10 | $ | 300.00 |
| Sep-24 | | | | | | | 10 | 10 | $ | 300.00 |
| | | | | | | | Totals | 584 | $ | 17,520.00 |

US-DOCS\144531851.8

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 236**
**Page 108 of 216**

FBG_CH1_00093914

**FIGURE II**

| Month | Cindy Dang | Ema Garcia | Vera Jones | Mexico Finance | Thailand Finance | China Finance | Japan Finance | Training Thailand Finance | Total Hours | Cost USD $ |
|---|---|---|---|---|---|---|---|---|---|---|
| | EM Global Finance/Accounting Support for Walbro FS | | | | | | | | | |
| | RSM Audit 2022 | | | | | | | | | |
| Oct-23 | 20 | 30 | | | | | | 68 | 118 | $ 7,670.00 |
| Nov-23 | 80 | 80 | 15 | 40 | 40 | 40 | 40 | 58 | 393 | $ 25,545.00 |
| Dec-23 | 30 | 40 | 8 | 40 | 40 | 40 | 40 | 35 | 273 | $ 17,745.00 |
| Jan-24 | 60 | 60 | 8 | | | | | 20 | 148 | $ 9,620.00 |
| Feb-24 | 60 | 60 | 10 | | | | | 16 | 146 | $ 9,490.00 |
| Mar-24 | 60 | 60 | 20 | | | | | 16 | 156 | $ 10,140.00 |
| Apr-24 | 60 | 60 | 10 | | | | | | 130 | $ 8,450.00 |
| May-24 | | | | | | | | | 0 | |
| Jun-24 | | | | | | | | | 0 | |
| Jul-24 | | | | | | | | | 0 | |
| Aug-24 | | | | | | | | | 0 | |
| Sep-24 | | | | | | | | | 0 | |
| Oct-24 | | | | | | | | | 0 | |
| | | | | | | | | Totals | 1364 | $ 88,660.00 |

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093915

**FIGURE III**

| | IT Support | | | Cost |
|---|---|---|---|---|
| | Cybersecurity | Thai FS support and ERP handoff | Total | . |
| Month | Carlos Cardenas | Chinkrit Asunee Na Ayuthaya | Hours | USD $ |
| Oct-23 | 40 | 16 | 56 | $ 3,640.00 |
| Nov-23 | 40 | 16 | 56 | $ 3,640.00 |
| Dec-23 | 40 | 16 | 56 | $ 3,640.00 |
| Jan-24 | 20 | | 20 | $ 1,300.00 |
| Feb-24 | | | 0 | $    - |
| Mar-24 | | | 0 | $    - |
| Apr-24 | | | 0 | $    - |
| May-24 | | | 0 | |
| Jun-24 | | | 0 | |
| Jul-24 | | | 0 | |
| Aug-24 | | | 0 | |
| Sep-24 | | | 0 | |
| | | Totals | 188 | $ 12,220.00 |

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093916

**FIGURE IV**

| | Japan Support | | |
| | Process FS Payroll (7 employees) | Sales Communication Support | Total |
|---|---|---|---|
| **Month** | Japan HR | JPN Sales | **USD$** |
| Oct-23 | $ 100.00 | $ 1,000.00 | $1,100.00 |
| Nov-23 | $ 150.00 | $ 1,000.00 | $1,150.00 |
| Dec-23 | $ 150.00 | $ 1,000.00 | $1,150.00 |
| Jan-24 | $ 100.00 | | $ 100.00 |
| Feb-24 | $ 100.00 | | $ 100.00 |
| Mar-24 | $ 100.00 | | $ 100.00 |
| Apr-24 | $ 100.00 | | $ 100.00 |
| May-24 | $ 100.00 | | $ 100.00 |
| Jun-24 | $ 150.00 | | $ 150.00 |
| Jul-24 | $ 150.00 | | $ 150.00 |
| Aug-24 | $ 100.00 | | $ 100.00 |
| Sep-24 | $ 100.00 | | $ 100.00 |
| | | Totals | $4,400.00 |

US-DOCS\144531851.8

CONFIDENTIAL

FBG_CH1_00093917

**ANNEX II**

**Excluded Services**

*[Reserved]*

US-DOCS\144531851.8

FBG_CH1_00093918

**DEBTORS' EXHIBIT NO. 236**
**Page 112 of 216**

**Exhibit B**
**Trademark License Agreement**

*(See attached.)*

CONFIDENTIAL                                                    FBG_CH1_00093919

*Execution Version*

# TRADEMARK AND DOMAIN NAME LICENSE AGREEMENT

This TRADEMARK AND DOMAIN NAME LICENSE AGREEMENT (this "Agreement") by and between Walbro, LLC, a Delaware limited liability company ("Licensor"), and WEM Newco, LLC, a Delaware limited liability company ("Licensee") (each a "Party" and both, the "Parties"), is entered into effective as of September 29, 2023 (the "Effective Date").

WHEREAS, Licensor ("Seller") is party to that certain Securities Purchase Agreement dated [as of the date hereof] (the "Purchase Agreement") by and among Seller, Licensee, Carter Carburetor, LLC, a Delaware limited liability company (collectively, "Buyer"), and the other parties thereto, pursuant to which Seller agreed to sell to Buyer, and Buyer agreed to purchase, all of the issued and outstanding Equity Securities (as defined in the Purchase Agreement) of Licensee;

WHEREAS, in connection with the consummation of the transactions contemplated by the Purchase Agreement, Licensor agreed to grant a license to Licensee to use the marks set forth on Exhibit A of this Agreement (the "Licensed Marks") on the terms and conditions set forth herein;

WHEREAS, in connection with the consummation of the transactions contemplated by the Purchase Agreement, Licensor agreed to grant a license to Licensee to use the Domain Name (as defined below) on the terms and conditions set forth herein; and

WHEREAS, the Parties have agreed to enter this Agreement concurrently with the consummation of the transactions contemplated by the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and promises contained herein, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.

## DEFINITIONS; INTERPRETATION

Section 1.01   Definitions.  For the purposes of this Agreement, the following terms shall have the respective meanings set out below and grammatical variations of such terms shall have corresponding meanings.  Other terms that are capitalized but not specifically defined in this Section 1.01 or in the body of this Agreement (including the preamble and the recitals hereto) shall have the meanings set forth in the Purchase Agreement.

(a)     "Competitor" means any of the Persons set forth on Exhibit B attached hereto, and their respective Affiliates and successors.

(b)     "Domain Name" means the *walbro.com* domain name.

(c)     "Products" means those products produced by Licensor and sold under, or contemplated to be produced and sold under, the Licensed Marks as of the Effective Date as set forth on Exhibit C attached hereto.

1

US-DOCS\144821876.17

CONFIDENTIAL

FBG_CH1_00093920

**DEBTORS' EXHIBIT NO. 236**
**Page 114 of 216**

(d)    "Unauthorized Use" means any infringement, dilution, counterfeiting, or other unauthorized use of the Licensed Marks, or of any use of marks confusingly or substantially similar to the Licensed Marks.

## ARTICLE II.

## LICENSE

Section 2.01    Grant of License.  Subject to the terms and conditions of this Agreement, Licensor, on behalf of itself and its Affiliates, hereby grants to Licensee a nonexclusive, worldwide, royalty-free, non-transferable (except in connection with a permitted assignment under Section 9.02), non-sublicensable right and license to use the Licensed Marks in connection with the promotion and sale of the Products.

Section 2.02    Sublicensing.  Subject to the terms and conditions of this Agreement, Licensor, on behalf of itself and its Affiliates, hereby grants to Licensee the right to sublicense Licensee's rights under Section 2.01 to its Affiliates and third-party resellers and distributors of the Products to the extent reasonably required to provide such services on behalf of Licensee, but not for any such third party's own benefit; *provided*, that, in each case, any such sublicensee is bound in writing to all applicable terms and conditions of this Agreement; and *further provided*, that, for any sublicense granted under this Section 2.02 to any third-party reseller and/or distributor, Licensee shall provide Licensor with written notice of the name and address of such sublicensee and the applicable Licensed Marks which are the subject of the granted sublicense.  Licensee shall ensure that any such sublicensee shall comply with the terms and conditions of this Agreement, and Licensee shall be responsible and liable for such sublicensees' compliance with this Agreement in connection with any such sublicensed activities.

Section 2.03    Reservation of Rights.  The Parties hereby acknowledge and agree that any and all rights not expressly granted to Licensee hereunder are reserved to Licensor.

Section 2.04    Restrictions on Use.  Licensee shall not change or modify the Licensed Marks, or use any colorable imitations of the Licensed Marks.  Licensee agrees that, during the Term, it will not use, or cause or permit to be used, the Licensed Marks for any purpose other than the permitted uses of the Licensed Marks consistent with Licensee's obligations under and in furtherance of this Agreement.

Section 2.05    Domain Name.

(a)    Subject to the terms of this Agreement, Licensor, on behalf of itself and its Affiliates, hereby grants to Licensee an exclusive, non-transferable (except in connection with a permitted assignment under Section 9.02), non-sublicensable right and license to use and display the Domain Name as the address of Licensee's website through which Licensee promotes and sells the Products.

(b)    During the Term, Licensor shall, at Licensee's cost and expense, use commercially reasonable efforts to maintain, and if required, renew the Domain Name.

US-DOCS\144821876.17

CONFIDENTIAL

FBG_CH1_00093921

**DEBTORS' EXHIBIT NO. 236**
**Page 115 of 216**

(c)      Within ten (10) days after the Effective Date Licensee shall post, and at all times thereafter shall include, a prominent disclaimer on the webpage associated with the Domain Name which (i) discloses that Licensee is not affiliated with, endorsed by, or under shared ownership or control with Licensor and that Licensor does not produce any of the products or provide any of the services made available via the website associated with the Domain Name, including without limitation, the Products for or in connection with Licensee, (ii) links to Licensor's main website, and (iii) discloses that Licensee is granted a license to the Licensed Marks by Licensor solely with respect to the Products.

(d)      Nothing in this Section 2.05 shall be deemed to permit Licensee to publish at a webpage affiliated with the Domain Name any content that offers, sells or otherwise provides any goods, services, materials or business activities of Licensee other than the sale of the Products in a manner consistent with Licensor's historical sale of such Products prior to the date hereof.

ARTICLE III.

OWNERSHIP

Section 3.01      Ownership.  As between the Parties, Licensor is the sole and exclusive owner of all right, title and interest in and to the Licensed Marks and the Domain Name.  Licensee agrees that all goodwill arising from its use of the Licensed Marks and the Domain Name will inure solely to the benefit of Licensor and that its use of the Licensed Marks and the Domain Name will not create any right, title or interest for Licensee in the Licensed Marks or the Domain Name, except for the licenses granted pursuant to Article II above.  To the extent a Licensed Mark or Domain Name would as a result of applicable law otherwise vest in Licensee, Licensee hereby assigns to Licensor all right, title and interest in and to such Licensed Mark or the Domain Name.

Section 3.02      No Contest.  Licensee agrees (and will require each of its sublicensees to agree) that it will not contest, oppose, seek cancellation of or otherwise challenge the validity of any of the Licensed Marks or the Domain Name, or Licensor's registration or application for registration or ownership of any of the Licensed Marks or the Domain Name.  Licensee agrees (and will require each of its sublicensees to agree) that it will not seek to register any Licensed Mark, any variation, derivation, abbreviation or combination thereof, or any mark or domain name confusingly or substantially similar to any Licensed Mark or the Domain Name in any jurisdiction.  Licensee agrees (and will require each of its sublicensees to agree) not to use any other mark in combination with any Licensed Mark or the Domain Name in a manner that would create a combination or composite mark.

Section 3.03      Quality Standards and Assurance.  Licensee shall use (and will require each of its sublicensees to use) the Licensed Marks in a manner consistent with such reasonable brand guidelines and quality control standards as may be provided by Licensor from time to time, provided that Licensee shall be given a reasonable period of time to comply with any changes thereto.  Licensee shall not use (and will not permit of its sublicensees to use) the Licensed Marks or the Domain Name in a manner that tarnishes, degrades or disparages the Licensed Marks or the Domain Name or Licensor or its business or reputation, and shall not at

US-DOCS\144821876.17

FBG_CH1_00093922

any time do or suffer to be done any act which would impair Licensor's proprietary rights in or to the Licensed Marks or the Domain Name or the goodwill associated therewith. Licensee shall ensure that the quality of the Products shall be of equal or better quality than the products offered under the Licensed Marks by Licensor as of the Effective Date. No more than once per calendar quarter, at Licensor's request, Licensee shall provide samples of the Products reasonably sufficient to demonstrate to Licensor the manner of the use of the Licensed Marks by Licensee, in order to confirm that the uses of the Licensed Marks by Licensee are in accordance with this Agreement.

Section 3.04        Notices and Legends. Upon Licensor's request or if so provided in Licensor's brand guidelines, Licensee shall, and shall require its sublicensees to, mark, in a manner that is visible to the public, the use of the Licensed Marks (or in the case of multiple uses of any Licensed Mark in any particular materials, the first prominent use of such Licensed Mark) with (a) the superscript "R" symbol (®) or superscript "TM" symbol (™), as applicable; and (b) such legend as to provide notice to third Persons that the Licensed Marks are owned by Licensor. No partial version of any Licensed Mark, or any fragments thereof, nor any modified or derivative versions of any Licensed Mark (including any representation of any Licensed Mark in combination with any other marks), may be used at any time for any purpose without the prior written approval of Licensor on a case-by-case basis. Licensee's distribution or sale of Products for which Licensee's use of the Licensed Marks has not been approved by Licensor shall be a material breach of this Agreement giving rise to a termination right by Licensor in accordance with the terms and conditions of Section 8.02 of this Agreement. Notwithstanding anything to the contrary contained herein, nothing in this Section 3.04 shall require Licensor to modify any products or packing in existence or already in production as of the Effective Date.

Section 3.05        Renewal and Maintenance. Licensor shall at its sole cost and expense use commercially reasonable efforts to maintain all existing registrations of the Licensed Marks in the jurisdictions in which they are used by Licensee in full force and effect and prosecute all pending applications for registration of the Licensed Marks (unless it is not possible to maintain or continue to prosecute such registrations or applications, as applicable, as a matter of law or in the event of rejection of such Licensed Mark by the applicable authority), for so long as Licensee is marketing or selling Products under such Licensed Marks; provided, however, that Licensor may discontinue and abandon any Licensed Marks that it determines to change or replace in its own business and may require Licensee to implement any such change or replacement with respect to the Products and all materials containing such marks within a reasonable period of time following notice thereof. Upon Licensor's request, Licensee shall provide reasonable cooperation and assistance to Licensor in furtherance of Licensor's obligations under this Section 3.05.

ARTICLE IV.

ENFORCEMENT

Section 4.01        Unauthorized Use. In the event that either Party (or any of its Affiliates) becomes aware of any Unauthorized Use, such Party shall promptly provide the other Party with written notice thereof.

US-DOCS\144821876.17

CONFIDENTIAL                                                                    FBG_CH1_00093923

Section 4.02     Enforcement by Licensor.  Licensor shall have the sole right, and shall use commercially reasonable efforts, to bring an enforcement action or otherwise challenge and attempt to eliminate each Unauthorized Use.  Licensee shall reasonably cooperate (and shall require Licensee's sublicensees to reasonably cooperate) with Licensor in investigating, prosecuting and settling any enforcement action instituted by Licensor against any Person engaging in an Unauthorized Use.  All proceeds recovered in such enforcement action shall first be remitted to each of the Parties to reimburse them, on a pro rata basis, for their respective reasonable out-of-pocket costs and expenses incurred in connection with such action, and any remaining proceeds shall be shared equally by the Parties.

ARTICLE V.

INDEMNIFICATION

Licensee shall indemnify Licensor and its Affiliates and its and their respective officers, directors, equityholders, employees and agents (collectively, "Licensor Indemnitees") from and against any and all actions, deficiencies, demands, interests, penalties, charges, liabilities, obligations, losses, damages, judgments, settlements, awards, fees, costs and expenses (including reasonable attorneys' fees and all amounts paid in investigation, defense or settlement of any of the foregoing) incurred or suffered by any Licensor Indemnitee in connection with any claim by any third Person against Licensor or any of the other Licensor Indemnitees resulting from, arising out of or related to: (a) use of the Licensed Marks in breach of this Agreement by Licensee or any of its sublicensees, and (b) Licensee's and/or its sublicensees' advertising, marketing, promotion, distribution and sale of the Products under the Licensed Marks, including but not limited to any product liability claim or intellectual property rights infringement claim relating to the Products that bear the Licensed Marks; provided, however, that Licensee shall not be obligated to indemnify the Licensor Indemnitees for any claim to the extent alleging that use of the Licensed Marks as permitted in this Agreement infringes, dilutes or otherwise violates the trademark rights of any third Person.

ARTICLE VI.

REPRESENTATIONS; DISCLAIMER

Section 6.01    Representations and Warranties.

(a)     Each Party represents and warrants to the other Party that: (i) it has the right and power to enter into this Agreement and that the entry into this Agreement is the duly authorized, valid, and binding act of such Party; (ii) this Agreement has been duly authorized by all necessary corporate action on the part of such Party and has been duly executed and delivered by a duly authorized officer of such Party; and (iii) the entry into this Agreement, as well as the performance of its obligations under this Agreement, is not inconsistent with and will not violate any other agreement between such Party and any other person or entity that is not a party to this Agreement.

US-DOCS\144821876.17

CONFIDENTIAL

FBG_CH1_00093924

(b)     Licensee further represents and warrants that it and its sublicensees shall not: (i) use the Licensed Marks or Domain Name in violation of any applicable law; or (ii) use the Licensed Marks or Domain Name in any way that could disparage Licensor.

Section 6.02   THE LICENSED MARKS AND DOMAIN NAME ARE PROVIDED AS-IS. TO THE MAXIMUM EXTENT PERMITTED BY LAW, LICENSOR EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES OF ANY KIND IN CONNECTION WITH THIS AGREEMENT, WHETHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THE LICENSED MARKS AND DOMAIN NAME AND OTHERWISE IN CONNECTION WITH THIS AGREEMENT.

ARTICLE VII.

LIMITATION OF LIABILITY

WITH THE EXCEPTION OF LIABILITY FOR A PARTY'S FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR LICENSEE'S BREACH OF ITS OBLIGATIONS UNDER Article II AND Article III OF THIS AGREEMENT, TO THE MAXIMUM EXTENT PERMITTED BY LAW, NO PARTY TO THIS AGREEMENT SHALL HAVE ANY LIABILITY UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, RELIANCE OR PUNITIVE DAMAGES OR LOST PROFITS, WHETHER LIABILITY IS ASSERTED IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT PRODUCT LIABILITY), INDEMNITY OR CONTRIBUTION, AND IRRESPECTIVE OF WHETHER IT OR ANY OF ITS AFFILIATES HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE. IN ADDITION AND WITHOUT LIMITING THE FOREGOING, LICENSEE SHALL HAVE NO LIABILITY TO LICENSOR HEREUNDER FOR PUNITIVE DAMAGES ARISING OUT OF LICENSEE'S BREACH OF ITS OBLIGATIONS UNDER Article II AND Article III OF THIS AGREEMENT.

ARTICLE VIII.

TERM AND TERMINATION

Section 8.01          Term.   The term of this Agreement shall commence on the Effective Date and shall continue until terminated as set forth in this Article VIII (the "Term").

Section 8.02          Termination for Cause.

(a)     Licensor may terminate the license granted in Section 2.01 of this Agreement by written notice if Licensee breaches this Agreement and fails to cure such breach, if curable, within sixty (60) days of Licensee's receipt of written notice thereof.

Section 8.03          Termination by Mutual Agreement.   This Agreement may be terminated at any time by mutual consent in writing executed by both Parties.

US-DOCS\144821876.17

CONFIDENTIAL                                                                    FBG_CH1_00093925

**DEBTORS' EXHIBIT NO. 236**
**Page 119 of 216**

Section 8.04          Effect of Termination.  Upon termination or expiration of this Agreement, the license granted to Licensee by this Agreement shall immediately and automatically terminate, and Licensee shall cease and desist from all use of the Licensed Marks and Domain Name, provided that, Licensee shall have a period of one hundred eighty (180) days following the effective date of termination to sell off all then-existing Products bearing the Licensed Marks from its existing inventory and continue to operate its website under the Domain Name for such purpose (the "Phase-Out"), subject to Licensee's continued compliance with this Agreement as if this Agreement has not terminated or expired.  Upon the expiration or termination of this Agreement, subject to the Phase-Out, all sublicense agreements for use of the Licensed Marks between Licensee and its sublicensees shall simultaneously terminate and Licensee shall deliver to Licensor, or at Licensor's option, destroy, all materials in Licensee's possession or control bearing the Licensed Marks or the Domain Name.

Section 8.05          Survival.  Section 3.01 and Section 8.05 Section 8.04 and Article V, Article VI, Article VII and Article IX shall survive any expiration or termination of this Agreement.

ARTICLE IX.

MISCELLANEOUS

Section 9.01          Notices.  All notices, requests, claims, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) when delivered by FedEx or other nationally recognized overnight delivery service, or (c) when delivered by email (provided that the sending party does not receive an automatically generated message from the recipient's email server that such email could not be delivered to such recipient), addressed as follows:

If to Licensor:

> Walbro Midco LLC
> Walbro LLC
> c/o Landon Capital Partners LLC
> 21 Custom House Street, Suite 700,
> Boston, Massachusetts 02110
> Attention: Christopher P. Sullivan
> Email:          csullivan@landoncapital.com

with a copy (which shall not constitute notice) to:

> Latham & Watkins LLP
> 200 Clarendon Street
> Boston, MA 02116
> Attention:     Ryan McCarthy; Elizabeth M. Slawsby
> Email:          ryan.mccarthy@lw.com;
>                     elizabeth.slawsby@lw.com

US-DOCS\144821876.17

CONFIDENTIAL                                                                FBG_CH1_00093926

If to Licensee:

> WEM Newco, LLC
> c/o Carter Carburetor, LLC
> 127 Public Square, Suite 5300
> Cleveland, Ohio 44114
> Attention: Legal Department
> Email: Legal@firstbrandsgroup.com

or to such other address or addresses as a Party may from time to time designate in writing.

Section 9.02          Assignment.  Neither Party may assign this Agreement or any of its rights or obligations hereunder without the express prior written consent of the other Party, such consent not to be unreasonably withheld; provided, however, that without the prior consent of the other Party, (i) Licensee may assign this Agreement only in connection with the sale or transfer of all or substantially all of the Business (as defined in the Purchase Agreement), whether by merger, consolidation, acquisition, restructuring, stock or asset sale or similar transaction or series of related transactions, in each case, other than to a Competitor, and (ii) Licensor may assign this Agreement, in whole or in part, in connection with the sale or transfer of all or substantially of its assets or stock, whether by merger, consolidation, acquisition, restructuring, stock or asset sale or similar transaction or series of related transactions or in connection with its assignment or other transfer of any of the Licensed Marks or Domain Name, in each case of (i) and (ii), provided that such assignee acknowledges and agrees in writing to assume all of the rights and obligations of the assigning Party under this Agreement.  Any purported assignment in violation of this Section 9.02 shall be null and void. Subject to this Section 9.02, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.

Section 9.03          Entire Agreement.  This Agreement, together with the Purchase Agreement, constitutes the entire agreement among the Parties with respect to the matters covered hereby and supersedes all previous written, oral or implied understandings among them with respect to such matters.

Section 9.04          Severability.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.  The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties.

Section 9.05          Amendment; Waivers.  Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the

US-DOCS\144821876.17

CONFIDENTIAL                    FBG_CH1_00093927

case of an amendment, by Licensor and Licensee, or in the case of a waiver, by the Party against whom the waiver is to be effective.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 9.06        Captions and Counterparts.  The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.  This Agreement may be executed in two or more counterparts (including by means of facsimile or other electronic transmission, including.pdf, DocuSign or similar format), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any such other document, shall be disregarded in determining the party's intent or the effectiveness of such signature.

Section 9.07        Governing Law.  This Agreement, and all issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement and the Exhibits hereto, and all claims and disputes arising hereunder or in connection herewith, whether purporting to sound in contract or tort, or at law or in equity, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, including its statutes of limitation, without giving effect to any choice of Law or conflict of Law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

Section 9.08        Rules of Construction.  Section 11.15 of the Purchase Agreement is incorporated into this Section 9.08 *mutatis mutandis* as if fully set forth herein.

Section 9.09        Specific Performance.  The Parties agree that irreparable damage would occur in the event that any of the covenants or obligations contained in this Agreement are not performed in accordance with their specific terms or were otherwise breached or threatened to be breached and that remedies at law, including monetary damages, are inadequate compensation for any loss that the other Party would suffer in such event.  Accordingly, each of the Parties shall be entitled to seek injunctive or other equitable relief to prevent or cure any breach by the other Party of its covenants or obligations contained in this Agreement and to specifically enforce such covenants and obligations in any court referenced in Section 9.07 having jurisdiction, such remedy being in addition to any other remedy to which any Party may be entitled at law or in equity.  The Parties acknowledge and agree that, in the event that the other Party seeks an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the terms and provisions of this Agreement, the Party seeking an injunction will not be required to provide any bond or other security in connection with any such order or injunction.

Section 9.10        Remedies Cumulative.  Any specific right or remedy provided in this Agreement shall not be exclusive but shall be cumulative upon all other rights and remedies set forth in this Agreement and allowed under applicable Law.

US-DOCS\144821876.17

FBG_CH1_00093928

Section 9.11        No Agency.   Nothing contained herein shall be construed as creating any agency, employment relationship, partnership, principal-agent or other form of joint enterprise between the Parties.

**[Signature Page Follows]**

US-DOCS\144821876.17

CONFIDENTIAL                                                                        FBG_CH1_00093929

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

**WALBRO, LLC**

By: _____
      Name:
      Title:

US-DOCS\144821876.17

CONFIDENTIAL

FBG_CH1_00093930

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

**WEM NEWCO, LLC**

By: _____
       Name:
       Title:

US-DOCS\144821876.17

CONFIDENTIAL

FBG_CH1_00093931

EXHIBIT A

LICENSED MARKS

| Trademark | Class | Country | Register Number | Status | Serial Number | Owner |
|---|---|---|---|---|---|---|
| "W WALBRO" (Slanted Design) | 12 Int., 7 Int. | United States of America | 3287832 | Registered | 78/661094 | Walbro, LLC |
| "W WALBRO" (Slanted Design) | 7 Int. | Argentina | 2134097 & 2893990 | Registered | 2595188 | Walbro, LLC |
| "W WALBRO" (Slanted Design) | 12 Int. | Argentina | 2134098 & 2893989 | Registered | 2595189 | Walbro, LLC |
| "W WALBRO" (Slanted Design) | 7 Int. | China (Peoples Republic) | 4820685 | Registered | 4820685 | Walbro, LLC |
| "W WALBRO" (Slanted Design) | 12 Int. | China (Peoples Republic) | 4820684 | Registered | 4820684 | Walbro, LLC |
| "W WALBRO" (Slanted Design) | 12 Int., 7 Int. | European Community | 004541264 | Registered | 4541264 | Walbro, LLC |
| "W WALBRO" (Slanted Design) | 12 Int., 7 Int. | Japan | 4958216 | Registered | 2005-063122 | Walbro, LLC |
| "W WALBRO" (Slanted Design) | 7 Int. | Thailand | Kor256664 | Registered | 611455 | Walbro, LLC |
| "W WALBRO" (Slanted Design) | 12 Int. | Thailand | Kor260516 | Registered | 611456 | Walbro, LLC |
| "W WALBRO" (Vertical Design) | 7 Int. | Argentina | 2391527 & 1755847 | Registered | 2088361 | Walbro, LLC |
| "W WALBRO" (Vertical Design) | 12 Int. | Argentina | 2401808 & 1764413 | Registered | 2088362 | Walbro, LLC |
| "W WALBRO" (Vertical Design) | 7 Int. | China (Peoples Republic) | 689523 | Registered | 93/010772 | Walbro, LLC |

US-DOCS\144821876.17

**DEBTORS' EXHIBIT NO. 236**
**Page 126 of 216**

FBG_CH1_00093932

| Mark | Class | Country | Application No. | Status | Registration No. | Owner |
|------|-------|---------|-----------------|--------|------------------|-------|
| "W WALBRO" (Vertical Design) | 7 Int. | China (Peoples Republic) | 5017684 | Registered | 5017684 | Walbro, LLC |
| "W WALBRO" (Vertical Design) | 12 Int. | China (Peoples Republic) | 5017698 | Registered | 5017698 | Walbro, LLC |
| "W WALBRO" (Vertical Design) | 12 Int., 7 Int. | European Community | 004756532 | Registered | 4756532 | Walbro, LLC |
| "W WALBRO" (Vertical Design) | 7 Int. | India | 593863 | Registered | 593863 | Walbro, LLC |
| "W WALBRO" (Vertical Design) | 7 Int. | Japan | 3318031 | Registered | 6-113285 | Walbro, LLC |
| "W WALBRO" (Vertical Design) | 7 Int. | Korea, Republic of | 40-0341989 | Registered | 94-44270 | Walbro, LLC |
| "W WALBRO" (Vertical Design) | 82 Int. | Taiwan | 631106 | Registered | 82-011458 | Walbro, LLC |
| "W WALBRO" (Vertical Design) | 84 Int. | Taiwan | 642817 | Registered | 82-011460 | Walbro, LLC |
| WALBRO (Word Mark) | 23 NA, 7 Int. | United States of America | 938745 | Registered | 72/388448 | Walbro LLC |
| WALBRO (Word Mark) | 7 Int. | Argentina | 2401812 & 1764414 | Registered | 2088364 | Walbro, LLC |
| WALBRO (Word Mark) | 12 Int. | Argentina | 2401809 & 1764415 | Registered | 2088365 | Walbro, LLC |
| WALBRO (Word Mark) | No classification system used. | Canada | 193353 | Registered | 356434 | Walbro, LLC |
| WALBRO (Word Mark) | 7 Int. | China (Peoples Republic) | 689525 | Registered | 93/010773 | Walbro, LLC |
| WALBRO (Word Mark) | 7 Int. | China (Peoples Republic) | 5017687 | Registered | 5017687 | Walbro, LLC |
| WALBRO (Word Mark) | 12 Int. | China (Peoples Republic) | 5017681 | Registered | 5017681 | Walbro, LLC |

A-2

US-DOCS\144821876.17

CONFIDENTIAL

FBG_CH1_00093933

| WALBRO (Word Mark) | 12 Int., 7 Int. | European Community | 004613725 | Registered | 4613725 | Walbro, LLC |
|---|---|---|---|---|---|---|
| WALBRO (Word Mark) | 6 Int., 7 Int., 11 Int., 12 Int., 17 Int. and 20 Int. | Japan | 1091978 | Registered | 95150/71 | Walbro, LLC |
| WALBRO (Word Mark) | 82 Int. | Taiwan | 631077 | Registered | 82-011457 | Walbro, LLC |
| WALBRO (Word Mark) | 84 Int. | Taiwan | 642807 | Registered | 82-011459 | Walbro, LLC |
| WALBRO (Word Mark) | 12 Int. | Thailand | Kor256663 | Registered | 611454 | Walbro, LLC |
| WALBRO (Word Mark) | 7 Int. | Thailand | Kor256662 | Registered | 611453 | Walbro, LLC |
| WALBRO (Word Mark) | 7 Int. | United Kingdom | 997579 | Registered | 997579 | Walbro, LLC |
| WALBRO (Word Mark) | 20 Int., 7 Int., 9 Int. | United Kingdom | 2050381 | Registered | 2050381 | Walbro, LLC |
| WALBRO (Word Mark) | 7 Int. | Benelux | 312519 | Registered | 593082 | Walbro, LLC |
| WALBRO (Word Mark) | 7 Int. | Australia | A250144 | Registered | 250144 | Walbro, LLC |
| WALBRO (Word Mark) | 7 Int. | Brazil | 819007650 | Registered | 819007650 | Walbro, LLC |
| WALBRO | 12 Int., 7 Int. | France | 1663197 | Registered | 286893 | Walbro, LLC |
| WALBRO (Word Mark) | 7 Int. | Germany | 894019 | Registered | 23218/7Wz | Walbro, LLC |
| WALBRO (Word Mark) | 7 Int. | India | 593861 | Registered | 593861 | Walbro, LLC |
| WALBRO (Word Mark) | 12 Int. | Italy | 993923 & 1505097 | Registered | RM92C003954 | Walbro, LLC |

A-3

US-DOCS\144821876.17

| | | | | | | |
|---|---|---|---|---|---|---|
| WALBRO (Word Mark) | 9 Int. | Korea, Republic of | 179329 | Registered | 88-16072 | Walbro, LLC |
| WALBRO (Word Mark) | 12 Int. | Korea, Republic of | 40-161889 | Registered | 87-6891 | Walbro, LLC |
| WALBRO (Word Mark) | 7 Int, 12 | Korea, Republic of | 0164576 | Registered | 87-6890 | Walbro, LLC |
| WALBRO (Word Mark) | 7 Int. | New Zealand | 97669 | Registered | 97669 | Walbro, LLC |
| WALBRO (Word Mark) | 7 Int., 9 Int., 12 Int., 17 Int. | United States of America | 3542323 | Registered | 76/668119 | Walbro LLC |
| "W WALBRO" (Vertical Design) | 12 | China (Peoples Republic) | 886593 | Registered | 886593 | Walbro, LLC |
| "W WALBRO" (Slanted Design) | 7 Int., 12 Int. | India | 2169299 | Registered | 2169299 | Walbro LLC |
| WALBRO (Word Mark) | 7 | Indonesia | | Pending | D-002015014624 & 55005/2017 | Walbro, LLC |
| "W WALBRO" (Slanted Design) | 7 | Indonesia | | Pending | D-002015014626 & 55006/2017 | Walbro, LLC |
| WALBRO | 1, 3, 7, 9, 12 | Russia | | Published | 2021756283 | Walbro LLC |
| "WALBRO" | No classification system used. | Ukraine | | Published | m202121237 | Walbro LLC |
| W Walbro; 2015 Logo Design slanted design | 1, 3, 7, 9, 12 | Russia | | Published | 2021756286 | Walbro LLC |
| W Walbro; 2015 Logo Design "slanted design" | No classification system used. | Ukraine | | Published | m202121247 | Walbro LLC |
| WALBRO (Word Mark) | 7 | Mexico | 2205947 | Published | 2100943 | Walbro LLC |
| "W Walbro" 2015 Logo Design | 7 | Mexico | 2205948 | Published | 2100944 | Walbro LLC |
| WALBRO | No classification system used. | Canada | | Published | 2111916 | Walbro, LLC |

A-4

US-DOCS\144821876.17

CONFIDENTIAL

FBG_CH1_00093935

| | | | | | | |
|---|---|---|---|---|---|---|
| "W Walbro" 2015 Logo Design | No classification system used. | Canada | | Published | 2111912 | Walbro, LLC |
| "Walbro" | No classification system used. | Ukraine | | Published | m202121237 | Walbro, LLC |
| WALBRO (Word Mark) | 7 Int. | Turkey | 2022057575 | Pending | | Walbro Co., Ltd. |
| WALBRO (Word Mark) | 7 | United Arab Emirates | | Published | 382481 | Walbro, LLC |
| WALBRO (Word Mark) | 7 | Saudi Arabia | | Pending | 368504 | Walbro, LLC |
| WALBRO (Word Mark) | 7 | Qatar | | Pending | | Walbro, LLC |
| WALBRO (Wordmark) | 7 | Indonesia | D002015014624 | Registered | | Walbro, LLC |

A-5

US-DOCS\144821876.17

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 236**
**Page 130 of 216**

FBG_CH1_00093936

EXHIBIT B

COMPETITORS

1. Kautex Textron GmbH & Co.

2. Yapp Automotive Systems Co., Ltd.

3. Plastic Omniun S.A.

4. Agri Industrial Supply, Inc.

5. Flambeau, Inc.

6. TI Fluid Systems plc

7. Yachiyo Industry Co., Ltd.

8. Ningbo Rocket Automobile Parts Co., Ltd.

9. Airtex Products, S.A.U.

10. Carter Fuel Systems, LLC

11. Robert Bosch GmbH

12. Delphi Automotive, PLC

13. DENSO Products and Services Americas, Inc.

14. Vitesco Technologies GmbH

15. Aisan Industry Co., Ltd.

-B-1-

US-DOCS\144821876.17

CONFIDENTIAL

FBG_CH1_00093937

EXHIBIT C

PRODUCTS

1.   Diaphragm carburetors

2.   Float carburetors

3.   Ignition modules

4.   Electronic fuel injection systems comprised of throttle bodies, engine control units, and ignition systems

5.   Die-cast aluminum contract manufactured products

-C-1-

US-DOCS\144821876.17

CONFIDENTIAL

FBG_CH1_00093938

**DEBTORS' EXHIBIT NO. 236**
**Page 132 of 216**

**Exhibit C**
**Supply Agreement**

(*See attached.*)

CONFIDENTIAL                                                                FBG_CH1_00093939

*Execution Version*

TRANSITIONAL MANUFACTURING AND SALE AGREEMENT

This **TRANSITIONAL MANUFACTURING AND SALE AGREEMENT** (this "**Agreement**") is entered into as of [ ● ], 2023 (the "**Effective Date**"), by and between

**WALBRO CO., LTD. ("CC Japan")**

a Japan corporation, with its principal place of business at:

Otemachi Building
1-6-1 Otemachi, Chiyoda
Tokyo 100-8133
Japan

and

**WALBRO FUEL SYSTEMS AND TECHNOLOGY (THAILAND) CO., LTD. ("Thai FS")**

a Thai company with its registered office at:

No. 700/531 Amata City Industrial Estate
Moo 7
Don Hua Lor Sub-District
Muang Chonburi District
Chonburi Province
Thailand

## 1. DEFINITIONS

Capitalized terms that are used in this Agreement shall have the meanings ascribed to them below in this Section 1 or elsewhere in the body of this Agreement.

1.1 "**Business Day**" means any day other than a Saturday, a Sunday or a day on which banking institutions located in the jurisdiction in which the party to whom notice is to be provided is located are authorized or obligated by law or executive order to close.

1.2 "**Confidential Information**" means any and all technical and non-technical information either party provides to the other hereunder that is marked or otherwise identified at the time of disclosure as confidential or proprietary or, due to its nature or the circumstances of its disclosure, would reasonably be regarded as being confidential or proprietary, including trade secrets, know-how, firmware, mask works, designs, schematics, techniques, software code, technical documentation, specifications, plans or any other information relating to any research project, work-in-process, future development, scientific, engineering, manufacturing, marketing or business plan or financial or personnel matter relating to either party or its present or future products, sales, suppliers, customers, employees, investors or business, whether in written, oral, graphic or electronic form. Notwithstanding the foregoing, any technical information regarding the Thai FS Process Technology and the Products and any unique technical information regarding

1

US-DOCS\145222534.6

CONFIDENTIAL

FBG_CH1_00093940

**DEBTORS' EXHIBIT NO. 236**
**Page 134 of 216**

their manufacture (versus other general manufacturing know-how), shall constitute the Confidential Information of Thai FS.

1.3     "**Customers**" means entities that purchase the Products manufactured by CC Japan and sold by CC Japan as of the Effective Date.

1.4     "**Intellectual Property Right**" means any patent, copyright, trade name, trademark, trade secret, know-how or any other intellectual property right or proprietary right, whether registered or unregistered, and whether now known or hereafter recognized, in any jurisdiction.

1.5     "**Mandatory Engineering Change**" shall mean an Engineering Change required to satisfy governmental regulations, including safety and environmental regulations.

1.6     "**Products**" means the proprietary products designed and developed by Thai FS set forth on Exhibit A that will be manufactured by CC Japan to meet the Specifications .

1.7     "**Specifications**" means the parts, materials, manufacturing procedures, functional and performance criteria, test methods and other specifications for Products set forth on Exhibit B, as may be updated by Thai FS from time to time in its sole discretion following consultation with CC Japan.

1.8     "**Thai FS Process Technology**" means any process technology (including any proprietary Product manufacturing process of Thai FS), if any, provided by Thai FS to CC Japan to configure and manufacture Products on Thai FS's behalf.

2.      **MANUFACTURING AND SALE**

2.1     **Manufacturing and Sale**. CC Japan shall manufacture, test and sell the Products to Customers, subject to applicable laws and the terms and conditions of the Agreement. CC Japan will maintain and implement the quality assurance and testing policies in existence as of the Effective Date at CC Japan's facility in a manner sufficient to meet its obligations hereunder and to comply with Thai FS's quality assurance policies as such exist as of the Effective Date or as may be updated by Thai FS from time to time upon reasonable advance written notice. CC Japan may not subcontract the manufacturing or sale of the Products or any of its other obligations hereunder to any third party or any of its affiliates without Thai FS's prior written consent on a case-by-case basis.   No permitted subcontracting shall relieve CC Japan of its obligations contained herein and CC Japan shall be liable for any breach hereof by any permitted subcontractors as if such breach were committed by CC Japan.  The goal of the parties is that this arrangement is a temporary arrangement until such time as the Customer relationships for the Products and the full manufacturing of the Products can be transitioned from CC Japan fully to Thai FS.

2.2     **Consigned Materials and Equipment**. Thai FS shall procure the supply of the raw materials, parts, components  and any other materials that it supplies to CC Japan as of the Effective Date (excluding, for avoidance of doubt, materials that CC Japan directly procures from local suppliers at its expense), or that the parties may hereafter agree that Thai FS will supply to CC Japan, for the production of Products (collectively, "**Consigned Materials**"), at Thai FS's

2

US-DOCS\145222534.6

expense, to be delivered to CC Japan's facility and held by CC Japan on consignment as set forth in Section 5.1. Without limiting the foregoing, any such Consigned Materials currently being held at CC Japan for the production of Products shall also be deemed Consigned Materials and subject to the provisions of this Agreement. Any failure to provide Consigned Materials in sufficient quantities on a timely basis shall not constitute a material breach by Thai FS, but shall be deemed an excuse from performance for CC Japan; provided, however, that Thai FS shall be responsible for any claims from Customers arising out of the delay in Product shipments to the extent due to a delay or failure in the delivery of Consigned Materials to CC Japan, including any expedited freight costs. CC Japan shall provide all machinery, equipment, labor and utilities necessary to manufacture the Products, and shall continue to locally source, at its expense, raw materials, parts and components that it procures from local suppliers as needed to manufacture Products.

2.3     **Sales.** During the term hereof, CC Japan will continue to sell the Products it manufactures to the Customers in accordance with the purchase orders submitted by the Customers to CC Japan. All such sales activities and sales shall be made in accordance with the processes, terms and conditions that CC Japan currently uses to sell the Products to Customers in effect as of the Effective Date. Any material changes to such processes or terms will be subject to the prior written agreement of Thai FS, such agreement not to be unreasonably conditioned, delayed or withheld.

2.4     **Customer Migration Plan.** The parties will also work on and adopt a Customer migration plan and CC Japan agrees to work with Thai FS to make Customer introductions and assist Thai FS to establish any necessary purchase order processing and fulfillment terms with the Customers so that the Customers will be able to purchase the Products from Thai FS once Thai FS manufactures the Products.

3.     **ENGINEERING CHANGES**

3.1     **CC Japan Changes.** No change to the Specifications, manufacturing or testing process, materials, equipment, technology, manufacturing location, Product design, parts or components, or other alterations affecting the performance (whether specified or not), the mechanical form, fit or function, the compatibility or characteristics, quality, or the reliability of any Product (each, an "**Engineering Change**"), will be incorporated in a Product or otherwise implemented without Thai FS's prior written approval on a case-by-case basis. CC Japan will provide written notice of any proposed Engineering Change at least 90 days prior to the proposed date of implementation of the Engineering Change. CC Japan will provide to Thai FS information describing the proposed Engineering Change in sufficient detail so as to allow Thai FS to properly evaluate the impact of the proposed Engineering Change, including any impact on pricing and lead times.

3.2     **Thai FS Changes.** Thai FS may also propose Engineering Changes for its Products. CC Japan shall provide Thai FS a proposal to implement any such requested Engineering Change, including any impacts on lead times and prices changes to implement the requested Engineering Change.

3.3     **Generally.** The parties will promptly discuss any proposed Engineering Changes proposed by either party based on the impacts report issues by CC Japan in either instance. Only

3

US-DOCS\145222534.6

CONFIDENTIAL                                          FBG_CH1_00093942

if the parties agree in writing will any Engineering Change be implemented, and if not agreed the pre-existing Specifications, processes, pricing, lead times, etc. shall continue unchanged.

3.4    **Mandatory Engineering Changes**.  Notwithstanding the foregoing, either party shall have the right to make Mandatory Engineering Changes, and the other party cannot withhold acceptance of such Mandatory Engineering Changes, subject to the parties reaching mutual agreement regarding the implementation and impact (including pricing changes), such agreement not to be unreasonably conditioned, delayed or withheld, but agrees to give the other party immediate written notice of any such Mandatory Engineering Change.

4.    **[RESERVED]**

5.    **CONSIGNED MATERIALS DELIVERY AND STORAGE**

5.1    **Storage and Use of Consigned Materials.**  The parties will continue to work together using the same processes in place as of the Effective Date to assess the need for further supply of Consigned Materials so that CC Japan can fulfill obligations to manufacture and sell Products to the Customers. CC Japan shall provide sufficient and suitable warehouse space for the Product and reasonable volumes of incoming Consigned Materials as agreed and required under this Agreement. Until such time as the Consigned Materials owned by Thai FS are consumed, CC Japan shall ensure that the Consigned Materials are stored and handled according to Thai FS's storage instructions and in any event with reasonable care. CC Japan shall be responsible for any damage to or loss of Consigned Materials while in CC Japan's or its affiliates' or agents' possession or control. CC Japan shall store the Consigned Materials separately only in its storage facilities agreed to in writing by Thai FS, and shall provide Thai FS reasonable access to its facility for purposes of inspecting the Consigned Materials. For clarity, all Consigned Materials are consigned, not sold, to CC Japan and CC Japan shall obtain no title to the Consigned Materials until such time as they are used to manufacture Products. CC Japan agrees not to change any marking indicating ownership or origin of the Consigned Materials or to add any additional marking to the Consigned Materials that would indicate ownership thereof by any entity or person other than Thai FS until such time as they are consumed in the ordinary course of manufacturing Products.  CC Japan shall not use the Consigned Materials for any purpose other than the manufacture of Products and shall promptly return any unused Consigned Materials to Thai FS upon Thai FS' request or upon termination or expiration of this Agreement (and in no event later than 30 days from such request) at Thai FS's reasonable expense. CC Japan agrees to keep an accurate count, to the nearest unit of measurement reasonably requested by Thai FS, of the Consigned Materials for use in the manufacture of the Products.  The parties will work together in good faith to ensure that CC Japan maintains a sufficient quantity of Consigned Materials to manufacture Products.  CC Japan will manufacture Products using the Consigned Materials on a "First In - First Out" (FIFO) basis.  On the first day of each calendar quarter during the term of this Agreement, CC Japan will provide an inventory report that shows inventory activity by material part number, showing the beginning balance, receipts, issues and ending inventory balance of Consigned Materials and finished Products. The parties shall use good faith efforts to resolve any discrepancies within ten business days.

5.2    **Insurance**. CC Japan shall maintain insurance with financially sound and reputable insurance companies or associations that protect the Consigned Materials while in CC Japan's

4

US-DOCS\145222534.6

CONFIDENTIAL                                                         FBG_CH1_00093943

*Execution Version*

possession or control against loss or damage from environmental, fire and such other hazards and such other risks as are customarily insured against and in such amounts as are usually carried by companies engaged in the same or a similar business.

5.3     **Packaging.**  CC Japan will package the Products for shipment in accordance with the applicable Specifications.  If packaging is not specified in the applicable Specifications, then the following terms shall apply: all Products shipped by CC Japan pursuant to this Agreement shall be packaged, marked, and otherwise prepared for shipment in a manner that is (a) in accordance with good commercial practice; (b) adequate to ensure safe arrival of the Products; and (c) consistent with historical processes for shipment of the Products.

5.4     **Return of Consigned Materials.**   In the event that CC Japan reasonably determines that Consigned Materials do not meet the applicable specifications for such Consigned Materials and cannot be used to manufacture Products, or if a Product does not comply with the limited warranty set forth in Section 8.1 and CC Japan has identified that the reason for such non-conformance is a failure by the Consigned Materials as delivered by Thai FS to meet the applicable specifications, CC Japan will notify Thai FS of the nonconformance and deliver the non-conforming Consigned Materials or Products to Thai FS at CC Japan's expense.  If Thai FS confirms in its reasonable, good faith judgment that the non-conformance is due to the Consigned Materials as delivered by Thai FS, Thai FS will reimburse CC Japan for the cost of shipping and will replace the applicable Consigned Materials at no expense to CC Japan.  If no trouble is found by Thai FS that is attributable to the Consigned Materials in the form and condition originally delivered to CC Japan, Thai FS will return the applicable Consigned Materials the applicable Product to CC Japan at CC Japan's expense.

## 6.     PRICING, COST ALLOCATION AND PAYMENT

6.1     **Pricing.**  CC Japan will pay Thai FS for the Consigned Materials at such time as CC Japan uses the Consigned Materials to manufacture Products.  The prices for the Consigned Materials will be as set forth in Exhibit A, unless otherwise agreed by the parties from time to time.   The parties acknowledge and agree that there may be cost fluctuations regarding the procurement of the Consigned Materials and the parties agree that if the costs for Thai FS to procure and deliver the Consigned Materials increases by greater than 5%, as evidenced by reasonable documentation provided by Thai FS, the price to CC Japan to consume such Consigned Materials shall ratably increase automatically following the corresponding increase in the price for the relevant Product to the Customer. All prices will be calculated in Japanese yen.  Without limiting the foregoing, every three months during the term hereof, the parties will meet to assess the accuracy of, and may adjust, pricing.

6.2     **Reports; Payment.**  CC Japan will provide Thai FS written reports on a weekly basis for all Products manufactured by CC Japan in the preceding week, specifying Consigned Materials used by CC Japan to manufacture such Products.  Payment shall be made consistent with the payment terms in effect as between CC Japan and the applicable Customer.

6.3     **Taxes.**  Unless otherwise explicitly stated, the prices specified in this Agreement are exclusive of any sales, use, excise, consumption or similar taxes, and of any export and import duties, which may be levied upon or collectible by Thai FS as a result of the sale of the Consigned

5

US-DOCS\145222534.6

CONFIDENTIAL

FBG_CH1_00093944

**DEBTORS' EXHIBIT NO. 236**
**Page 138 of 216**

*Execution Version*

Materials to CC Japan, but not any taxes based on the net income of Thai FS. CC Japan agrees to pay and otherwise be fully responsible for any such taxes and duties, unless in lieu thereof CC Japan provides Thai FS with an exemption certificate acceptable to the relevant governmental authorities.

**7.      AUDIT AND INSPECTION**

7.1      **Site Visits.**  Thai FS may send its employees or customers to visit CC Japan's production facilities upon at least two Business Days' prior written notice to inspect the manufacture of Products and conduct other activities contemplated by this Agreement. Such visits shall be conducted during CC Japan's normal working hours. While visiting CC Japan's facilities, each visitor shall at all times fully comply with CC Japan's plant rules and regulations as well as all reasonable instructions that may be issued by CC Japan employees and personnel accompanying any such visitor.

7.2      **Financial Audit Rights.**  CC Japan shall keep records in sufficient detail to enable Thai FS to determine that the Consigned Materials usage reports are accurate 6. CC Japan shall permit said records to be inspected, at Thai FS's expense, upon at least 24 hours' notice, during regular business hours by Thai FS or an independent auditor selected by Thai FS and approved by CC Japan, which approval shall not be unreasonably withheld.   Inspections conducted under this Section 7.2 shall be at Thai FS's expense, unless a variation or error in CC Japan's calculations have produced an overcharge of 3% or more for the applicable audited period, in which case CC Japan shall bear the reasonable expenses of such audit.

7.3      **Inspection**.  Thai FS or its independent auditors shall at all reasonable times (upon at least 24 hours' notice), and during regular business hours, have the right, but not the obligation, to visit and inspect CC Japan's production facilities, at Thai FS's expense, so as to ensure CC Japan's compliance with the terms and conditions of this Agreement, including manufacturing according to the applicable Specifications and quality requirements. CC Japan will cooperate in the inspection, will make the information reasonably required to conduct the inspection available on a timely basis and will assist the designated employees of Thai FS or its auditors as reasonably necessary. While visiting CC Japan's facilities, each visitor shall at all times fully comply with CC Japan's plant rules and regulations as well as all reasonable instructions that may be issued by CC Japan employees and personnel accompanying any such visitor.

**8.      LIMITED WARRANTY; WARRANTY DISCLAIMER**

8.1      **Limited Warranty.**  CC Japan represents and warrants that (a) all Products shall be free and clear of any liens, claims or encumbrances, (b) all Products shall be manufactured in accordance with applicable laws, and (c) for a period of 12 months after a Product is accepted by the applicable Customer, such Product shall meet the applicable Specifications and shall be free from defects in material and workmanship under normal use, excluding any defects which are caused by a flaw or defect in Product design provided to CC Japan by Thai FS, a defect in the Consigned Materials or other raw materials, parts, components locally procured by CC Japan  (in each case, the form delivered to CC Japan), accident, abuse, misuse, neglect, improper handling, repair or alteration by Thai FS or improper testing or usage contrary to any instructions issued by CC Japan.

6

US-DOCS\145222534.6

FBG_CH1_00093945

8.2     **Additional CC Japan Representations and Warranties.**  In performing its duties under this Agreement, CC Japan represents and warrants that it shall at all times comply with all applicable laws and shall not engage in any illegal or unethical practices.  CC Japan agrees that any sums paid to CC Japan under this Agreement are for CC Japan's own account, and that except as appropriate to carry out CC Japan's duties set forth herein in a legal manner, CC Japan has not, has no obligation to and shall not, directly or indirectly, give, offer, pay, promise to pay, or authorize the payment of money or anything of value to any other person in connection with the transactions for which amounts hereunder are to be paid.  Without limiting the foregoing, CC Japan agrees not to take any actions that would cause it or Thai FS to violate the U.S. Foreign Corrupt Practices Act of 1977, as amended.  CC Japan further agrees that no officer, director, employee, or agent of CC Japan is an "official" of any government, as that term is defined in such Act, nor shall CC Japan employ any such "official."  In addition, CC Japan agrees that CC Japan shall not download, export, or re-export any software or technical data received hereunder, regardless of the manner in which received, (x) into, or to a national or resident of, any country to which the United States has embargoed goods, or (y) to anyone in the United States Treasury Department's list of Specially Designated Nationals or the U.S. Commerce Department's Table of Denial Orders.

8.3     **Disclaimer.**  EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HEREBY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES IN CONNECTION WITH THIS AGREEMENT, WHETHER IMPLIED OR STATUTORY, INCLUDING ALL WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT OF THIRD-PARTY RIGHTS.

## 9.     INDEMNIFICATION

9.1     **Thai FS Indemnity.**  Thai FS shall, at its own expense, indemnify, defend and hold CC Japan harmless from and against any liabilities, losses, damages, costs or expenses, including reasonable attorneys' fees and costs, arising from any third party action, claim, suit or proceeding alleging infringement or misappropriation of such third party's Intellectual Property Rights to the extent arising from CC Japan making Products in compliance with any Thai FS Product designs that have not been modified by CC Japan and otherwise in accordance with the terms of this Agreement and the claim is based on the Thai FS Product designs; provided that CC Japan (a) gives Thai FS prompt written notice of any such claim, (b) gives Thai FS through counsel of its choice, sole control of the defense or settlement of such claim and (c) gives Thai FS all necessary information, assistance and authority to defend such claim, at Thai FS's request and reasonable expense.

9.2     **CC Japan Indemnity**.  CC Japan shall, at its own expense, indemnify, defend and hold Thai FS harmless from and against any liabilities, losses, damages, costs or expenses, including reasonable attorneys' fees and costs, arising from any third party action, claim, suit or proceeding to the extent it is based upon any actual or alleged infringement or other violation of any third party's Intellectual Property Rights arising from CC Japan's manufacture and sale of Products hereunder, except to the extent Thai FS is required to indemnify CC Japan for such claim pursuant to Section 9.1; provided that Thai FS (x) gives CC Japan prompt written notice of any such claim, (y) gives CC Japan through counsel of its choice, sole control of the defense or

7

US-DOCS\145222534.6

**DEBTORS' EXHIBIT NO. 236**
**Page 140 of 216**

settlement of such claim and (z) gives CC Japan all necessary information, assistance and authority to defend such claim, at CC Japan's request and reasonable expense.

9.3    **Notification**. To the extent that any delay by a party in notifying the other party of a claim required to be indemnified hereunder results in any cost, expense or liability to the indemnifying party which would otherwise have been avoided, the indemnifying party shall be relieved of its obligation to indemnify and shall be entitled to deduct such amount from sums paid or collect such amount from the indemnified party.

## 10.    INTELLECTUAL PROPERTY RIGHTS

10.1    **Background Intellectual Property.** Except as otherwise provided in <u>Section 10.3</u>, each party shall retain all right, title and interest in and to all materials, formulae, documentation, processes, technical ideas, concepts, know-how, inventions, discoveries, improvements, works of authorship, techniques and other Intellectual Property Rights, created, conceived or developed by or for, or licensed to, that party prior to the Effective Date ("**Background IP**") whether or not used in connection with the Agreement.

**10.2    License Grant**. Subject to the terms and conditions of this Agreement, Thai FS hereby grants CC Japan, during the term of this Agreement, a limited, revocable, royalty-free, nontransferable (except in connection with a permitted assignment under <u>Section 14.2</u>), non-sublicensable license under Thai FS's applicable Intellectual Property Rights solely to the extent necessary for CC Japan to manufacture the Products and sell the Products to Customers. Any use of the trademarks of Thai FS in the branding, packaging and sale of Products to Customers shall be in accordance with the Trademark License Agreement between the parties of even date herewith.

10.3    **Ownership.** As between the parties, any improvements or modifications to the Thai FS Process Technology, the Products or any other proprietary technologies or product designs provided by Thai FS hereunder shall be owned by Thai FS, regardless of creator. Without limiting the foregoing, in the event CC Japan provides services to Thai FS hereunder that result in the conception, creation or reduction to practice by CC Japan, solely or in collaboration with others, of writings, software, drawings, designs, copyrightable material, mask works, inventions, improvements, developments or discoveries which are derived from or relate in any manner to the Products, the Thai FS Process Technology or any Thai FS Intellectual Property Rights ("**Enhancements**"), such Enhancements and all Intellectual Property Rights therein shall, as between the parties, be the sole property of Thai FS, regardless of creator. CC Japan shall provide Thai FS with prompt written notice of any Enhancements conceived, developed or reduced to practice by or on behalf of CC Japan. Thereafter, upon Thai FS's request, CC Japan shall make available to Thai FS appropriate personnel with suitable knowledge and understanding of such Enhancements to describe and explain such Enhancements to designated Thai FS personnel and to otherwise provide such Thai FS personnel with sufficient information and materials to enable Thai FS to implement and practice such Enhancements. CC Japan hereby assigns to Thai FS any and all right, title and interest, including all Intellectual Property Rights, CC Japan has in, to and under all Enhancements.

10.4    **Reservation of Rights**. All rights not expressly granted herein are reserved.

8

US-DOCS\145222534.6

CONFIDENTIAL

FBG_CH1_00093947

## 11.    TERM AND TERMINATION

11.1    **Term.**  Unless terminated earlier as provided in this Agreement, this Agreement shall commence on the Effective Date and remain in force for six months.  The term of this Agreement may be extended by mutual written agreement of the parties prior to expiration of the then-current term.

11.2    **Termination for Cause.**  Either party may terminate this Agreement in the event of a material breach of this Agreement by the other party that is not cured within 60 days of the breaching party's receipt of written notice of such breach.

11.3    **Termination for Convenience.**  Thai FS may terminate this Agreement for convenience upon three months' prior written notice to CC Japan.

11.4    **Effect of Termination.**  Upon expiration or termination of the term of this Agreement, (a) CC Japan shall deliver to or make available for pick-up by Thai FS all Consigned Materials remaining in its possession or control at Thai FS's expense, (b) Thai FS shall purchase from CC Japan all raw materials, parts, components  remaining in CC Japan's inventory that were procured for the manufacture of Products under this Agreement and (c) CC Japan shall have no further delivery obligations other than continuing to manufacture and deliver all confirmed purchase orders accepted prior to termination or expiration.

11.5    **Survival.**  The provisions of Sections 1, 5.4, 6, 8.3, 9, 10.1, 10.3, 10.4, 11.4, 11.5, 12, 13 and 14 shall survive any expiration or termination of this Agreement.

## 12.    CONFIDENTIALITY

12.1    **Nondisclosure.**  No Confidential Information provided pursuant to this Agreement shall be distributed, disclosed or disseminated in any way or form by the receiving party except to its own employees, officers, directors and agents who have a reasonable need to know such Confidential Information and who have been advised of the confidential nature and required to observe the terms and conditions hereof; nor shall Confidential Information be used by the receiving party, except for the purposes of exercising its rights or fulfilling its obligations under this Agreement.  Each party shall take all actions as are reasonably necessary and appropriate to preserve and protect the Confidential Information of the other party and such other party's respective rights therein, at all times exercising at least the same degree of care that it uses to protect its own Confidential Information of a similar nature, but in no event less than a reasonable degree of care.  A disclosure of Confidential Information that is legally compelled to be disclosed pursuant to a subpoena, summons, order or other judicial or governmental process shall not be considered a breach of this Agreement; provided that the receiving party provides the disclosing party with prompt notice of any such subpoena or other order so that the disclosing party will have the opportunity to obtain a protective order or otherwise oppose the disclosure.

12.2    **Exclusions.**  The obligations of Section 12.1 shall not apply to any information which:

US-DOCS\145222534.6

CONFIDENTIAL                                                                FBG_CH1_00093948

(a)     is already in the public domain at the time of disclosure to the receiving party, or becomes generally available to the public after its disclosure to the receiving party, through no breach of this Agreement or other confidentiality obligation by the receiving party;

(b)     was in the receiving party's possession prior to disclosure by the disclosing party through no breach of this Agreement or other confidentiality obligation by the receiving party, as proven by the receiving party's written records;

(c)     is received independently on a non-confidential basis from a third party free to disclose such information to the receiving party; or

(d)     is independently developed by the receiving party without any use of or reference to the disclosing party's Confidential Information.

12.3    **Return of Confidential Information.**  Upon request of the disclosing party, copies and embodiments of the disclosing party's Confidential Information shall be promptly returned to the disclosing party by the receiving party.  Upon expiration or termination of this Agreement for any reason, each party shall promptly return to the other party all Confidential Information of the other party in its possession, including all copies thereof, unless such copies are required to support existing customers under the terms of this Agreement.

12.4    **Press Releases**.  All press and media releases, public announcements and public disclosures by either party relating to this Agreement shall be coordinated with and approved by both parties prior to the release thereof.

13.     **LIMITATION OF LIABILITY**

EXCEPT FOR LIABILITY ARISING FROM A PARTY'S BREACH OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS OR A PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS HEREUNDER, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, AND EXCEPT TO FULFILL A PARTY'S INDEMNIFICATION OBLIGATIONS HEREUNDER, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER, OR TO ANY THIRD PARTY CLAIMING THROUGH OR UNDER SUCH PARTY, FOR ANY LOST PROFITS, LOSS OF DATA, EQUIPMENT DOWNTIME OR FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES, REGARDLESS OF (A) WHETHER SUCH DAMAGES WERE FORESEEABLE, (B) WHETHER OR NOT A PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (C) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED.  EXCEPT FOR A BREACH OF A PARTY'S CONFIDENTIALITY OBLIGATIONS OR A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN NO EVENT WILL EITHER PARTY'S TOTAL CUMULATIVE LIABILITY TO THE OTHER PARTY HEREUNDER IN CONNECTION WITH THIS AGREEMENT FROM ALL CAUSES OF ACTION OF ANY KIND, INCLUDING TORT, CONTRACT, NEGLIGENCE, STRICT LIABILITY AND BREACH OF WARRANTY, EXCEED THE TOTAL AMOUNT PAID OR PAYABLE BY THAI FS TO CC JAPAN UNDER THIS AGREEMENT DURING THE 12 MONTH PERIOD IMMEDIATELY PRECEDING THE CLAIM(S) GIVING RISE TO LIABILITY.  Each party acknowledges that the foregoing

US-DOCS\145222534.6

CONFIDENTIAL                                                      FBG_CH1_00093949

limitations are an essential element of this Agreement between the parties and that, in the absence of such limitations, the pricing and other terms set forth in this Agreement would be substantially different.

## 14.    MISCELLANEOUS

14.1    **Rights in Bankruptcy.**  All rights and licenses granted to either party under or pursuant to this Agreement are, and will otherwise be deemed to be, for purposes of the Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 of the Bankruptcy Code. The parties agree that each party, as licensee of such rights under this Agreement, will retain and may fully exercise all of its rights and elections as a licensee of intellectual property under the Bankruptcy Code. The parties further agree and acknowledge that enforcement by licensee of any rights under Section 365(n) of the Bankruptcy Code in connection with this Agreement shall not violate the automatic stay of Section 362 of the Bankruptcy Code and waive any right to object on such basis.

14.2    **Assignment.**  Neither party may assign any of its rights or delegate any of its responsibilities under this Agreement without the prior written consent of the other party, not to be unreasonably withheld, conditioned or delayed; provided that either party may assign or transfer this Agreement, or any of its rights or obligations under this Agreement, to a successor-in-interest in connection with a merger, acquisition, change of control, reorganization or consolidation of such party or a sale of all or substantially all of its assets.  Any assignment in violation of this Section 14.2 shall be null and void from the beginning.  Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and permitted assigns.

14.3    **Force Majeure.**  Neither party shall be liable to the other in any way whatsoever for any failure or delay in performance of any of the obligations under this Agreement (other than obligations to make payment) arising out of any event or circumstance beyond the reasonable control of such party (including, without limitation, war, rebellion, civil commotion, strikes, lock-outs or industrial disputes; fire, explosion, earthquake, acts of God, flood, drought or bad weather; acts of terror; epidemics, pandemics or quarantine restrictions; or the requisitioning or other act or order by any government department, council or other constituted body).

14.4    **Notices**. All notices, requests, claims, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) when delivered by FedEx or other nationally recognized overnight delivery service, or (c) when delivered by email (provided that the sending party does not receive an automatically generated message from the recipient's email server that such email could not be delivered to such recipient), addressed as follows:

If to CC Japan:

**WALBRO CO., LTD.**
Address: 1-6-1 Otemachi, Chiyoda-ku, Tokyo 100-0004
         Otemachi Building 2F
Attention: Shane Griffin
Email: sgriffin@walbro.com

11

US-DOCS\145222534.6

If to Thai FS:

**WALBRO FUEL SYSTEMS AND TECHNOLOGY (THAILAND) CO., LTD.**
Address: 700/531 Amata City Industrial Estate, Moo 7,
            Don Hua Lor Sub-District, Muang Chonburi District,
            Chonburi Province, Thailand
Attention: Shane Griffin; Seni Sudsawad
Email: sgriffin@walbro.com; seni@walbro.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
200 Clarendon Street, 27th Floor,
Boston, MA 02116, USA
Attention: Ryan McCarthy; Elizabeth Slawsby

or to such other address or addresses as a party may from time to time designate in writing.

14.5    **Severability**.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.  The parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the parties.

14.6    **Amendment; Waivers**.  Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, CC Japan and Thai FS, or in the case of a waiver, by the party against whom the waiver is to be effective.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

14.7    **Captions and Counterparts**.  The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.  This Agreement may be executed in two or more counterparts (including by means of facsimile or other electronic transmission, including.pdf, DocuSign or similar format), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any such other document, shall be disregarded in determining the party's intent or the effectiveness of such signature.

14.8    **Governing Law**.  This Agreement, and all issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement and the Exhibits hereto, and all claims and disputes arising hereunder or in connection herewith, whether purporting to

12

US-DOCS\145222534.6

CONFIDENTIAL

FBG_CH1_00093951

sound in contract or tort, or at law or in equity, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, including its statutes of limitation, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

14.9   **Rules of Construction**.   The following rules of construction shall govern the interpretation of this Agreement:

(a)   all references to Articles, Sections or Schedules are to Articles, Sections or Schedules in this Agreement;

(b)   unless the context otherwise requires, words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, the feminine or neuter gender shall include the masculine, feminine and neuter;

(c)   whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "but not limited to";

(d)   the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not simply mean "if";

(e)   references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(f)   (i) the terms "hereof", "herein", "hereby", "hereto", and derivative or similar words refer to this entire Agreement, including the Schedules hereto, (ii) the term "any" means "any and all", and (iii) the term "or" shall not be exclusive and shall mean "and/or"; and

(g)   the parties have participated jointly in the negotiation and drafting of this Agreement; in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement and the language used in it will be deemed to be the language chosen by the parties to express their mutual intent.

14.10   **Remedies Cumulative**.   Any specific right or remedy provided in this Agreement shall not be exclusive but shall be cumulative upon all other rights and remedies set forth in this Agreement and allowed under applicable law.

14.11   **No Agency**.   Nothing contained herein shall be construed as creating any agency, employment relationship, partnership, principal-agent or other form of joint enterprise between the parties.

13

US-DOCS\145222534.6

CONFIDENTIAL

FBG_CH1_00093952

14.12   **Entire Agreement**.  This Agreement constitutes the entire agreement among the parties with respect to the matters covered hereby and supersedes all previous written, oral or implied understandings among them with respect to such matters.

*[Remainder of page intentionally left blank.  Signature page to follow.]*

14

US-DOCS\145222534.6

CONFIDENTIAL

FBG_CH1_00093953

*Execution Version*

IN WITNESS WHEREOF, the parties have signed this Agreement as of the Effective Date.

**CC Japan**                                          **Thai FS**

By:    _____            By:    _____

Name:    _____          Name:    _____

Title:    _____         Title:    _____

15

US-DOCS\145222534.6

CONFIDENTIAL

FBG_CH1_00093954

EXHIBIT A

CONSIGNED MATERIALS AND PRODUCTS

| Part for Manufactured Products | Part Name | Price per 1 Pcs, JPY |
|---|---|---|
| FGA-15 | FUEL PUMP ASSEMBLY | 11,225.16 |
| FGA-11 | FUEL PUMP ASSEMBLY | 9,834.59 |
| FGA-13 | FUEL PUMP ASSEMBLY | 6,458.13 |
| 122-3528-AF | TUBE-SLEEVE | 43.22 |
| 94-921-AF | WIRE-BULK(RED) | 58.10 |
| 94-919-AF | WIRE-BULK(BLACK) | 58.10 |
| 187-194-AF | TERMINAL | 14.46 |
| 141-538-AF | BOOT | 34.52 |
| 122-3489-AF | TUBE-SLEEVE | 10.30 |
| 25-180 | Cap Inactive | 17.09 |
| 134-509-AF | NUT-HEX #6-32 | 2.51 |
| 55-9077 | PAPER/CORROSION | 5.23 |
| 136-509-AF | WASHER- #6 LOOK | 1.36 |
| 122-3628-AF | TUBE-SLEEVE | 5.23 |
| 32-607-AF | CONNECTOR | 104.53 |
| 187-555-AF | TERMINAL | 4.09 |
| 122-3502-AF | TUBE-SLEEVE | 4.50 |

1

US-DOCS\145222534.6

CONFIDENTIAL

FBG_CH1_00093955

EXHIBIT B

SPECIFICATIONS

FPE-14A

| FUEL PUMP SPECIFICATION | | | | |
|---|---|---|---|---|
| PRODUCT VALIDATION | DESCRIPTION | TEST PARAMETERS | TEST PARAMETERS | TEST VALUE |
| (D.V.) | - - - - - - - - - - - - - - - | VOLTAGE (VOLTS) | PRESSURE (kPa) | REQUIREMENT |
|  | MINIMUM FLOW RATE IN STODDARD SOLVENT(LPH): (0 HOURS) | 14.0 | 105 | 227 |
| X | MINIMUM FLOW RATE IN EEE UNLEADED GASOLINE, @ -12 kPa INLET DEPRESSION (LPH): (24 HOURS) | 14.0 | 52.5 | 227 |
|  | MAXIMUM CURRENT DRAW IN STODDARD SOLVENT (AMPS): (0 HOURS) | 14.0 | 105 | 4.3 |
| X | MAXIMUM CURRENT DRAW IN EEE UNLEADED GASOLINE, @ -12 kPa INLET DEPRESSION (AMPS): (24 HOURS) | 14.0 | 52.5 | 4.3 |
|  | MAXIMUM PRESSURE IN STODDARD SOLVENT (kPa): (0 HOURS) | 15.0 | DEAD HEAD | 587-1100 |
| X | MAXIMUM PRESSURE IN EEE UNLEADED GASOLINE (kPa): (24 HOURS) | 15.0 | DEAD HEAD | 587-1100 |

ASSEMBLY NOTES:
◇ 1. LEAK TEST: USE A PRESSURE DECAY TYPE TESTER PER S-437
     MUST NOT EXCEED 3.0cc/MIN @ 207kPa MINIMUM
2. TERMINAL PULL OFF SPEC: MINIMUM PULL FORCE AFTER CRIMPING IS 22LBS. (98N) PULL
   FORCE TO BE MEASURED BY PULLING ON TERMINAL AND WIRE AT A RATE OF I INCH PER MINUTE

FPE-13A

1

US-DOCS\145222534.6

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 236**
**Page 150 of 216**

FBG_CH1_00093956

| FUEL PUMP SPECIFICATION | | | | |
|---|---|---|---|---|
| PRODUCT VALIDATION | DESCRIPTION | TEST PARAMETERS | TEST PARAMETERS | TEST VALUE |
| (D.V.) | - - - - - - - - - - - - - - | VOLTAGE (VOLTS) | PRESSURE (kPa) | REQUIREMENT |
| | MINIMUM FLOW RATE IN STODDARD SOLVENT(LPH): (0 HOURS) | 14.0 | 105 | 227 |
| X | MINIMUM FLOW RATE IN EEE UNLEADED GASOLINE, @ -12 kPa INLET DEPRESSION (LPH): (24 HOURS) | 14.0 | 52.5 | 227 |
| | MAXIMUM CURRENT DRAW IN STODDARD SOLVENT (AMPS): (0 HOURS) | 14.0 | 105 | 4.3 |
| X | MAXIMUM CURRENT DRAW IN EEE UNLEADED GASOLINE, @ -12 kPa INLET DEPRESSION (AMPS): (24 HOURS) | 14.0 | 52.5 | 4.3 |
| | MAXIMUM PRESSURE IN STODDARD SOLVENT (kPa): (0 HOURS) | 15.0 | DEAD HEAD | 587-1100 |
| X | MAXIMUM PRESSURE IN EEE UNLEADED GASOLINE (kPa): (24 HOURS) | 15.0 | DEAD HEAD | 587-1100 |

ASSEMBLY NOTES:
◇ 1. LEAK TEST: USE A PRESSURE DECAY TYPE TESTER PER S-437
     MUST NOT EXCEED 3.0cc/MIN @ 207kPa ±7 kPa
   2. TERMINAL PULL OFF SPEC: MINIMUM PULL FORCE AFTER CRIMPING IS 20 lbs, PULL FORCE TO
     BE MEASURED BY PULLING ON TERMINAL AND WIRE AT A RATE OF 1 INCH PER MINUTE

2

US-DOCS\145222534.6

DEBTORS' EXHIBIT NO. 236
Page 151 of 216

**FPE-15A**

| FUEL PUMP SPECIFICATION | | | | |
|---|---|---|---|---|
| PRODUCT VALIDATION | DESCRIPTION | TEST PARAMETERS | TEST PARAMETERS | TEST VALUE |
| (D.V.) | ---------------- | VOLTAGE (VOLTS) | PRESSURE (kPa) | REQUIREMENT |
|  | MINIMUM FLOW RATE IN STODDARD SOLVENT(LPH): (0 HOURS) | 14.0 | 105 | 227 |
| X | MINIMUM FLOW RATE IN EEE UNLEADED GASOLINE, @ -12 kPa INLET DEPRESSION (LPH): (24 HOURS) | 14.0 | 52.5 | 227 |
|  | MAXIMUM CURRENT DRAW IN STODDARD SOLVENT (AMPS): (0 HOURS) | 14.0 | 105 | 4.3 |
| X | MAXIMUM CURRENT DRAW IN EEE UNLEADED GASOLINE, @ -12 kPa INLET DEPRESSION (AMPS): (24 HOURS) | 14.0 | 52.5 | 4.3 |
|  | MAXIMUM PRESSURE IN STODDARD SOLVENT (kPa): (0 HOURS) | 15.0 | DEAD HEAD | 587-1100 |
| X | MAXIMUM PRESSURE IN EEE UNLEADED GASOLINE (kPa): (24 HOURS) | 15.0 | DEAD HEAD | 587-1100 |

ASSEMBLY NOTES:
◇ 1. LEAK TEST: USE A PRESSURE DECAY TYPE TESTER PER S-437 MUST NOT EXCEED 3.0cc/MIN @ 207kPa MINIMUM
2. TERMINAL PULL OFF SPEC: MINIMUM PULL FORCE AFTER CRIMPING IS 22LBS. (98N) PULL FORCE TO BE MEASURED BY PULLING ON TERMINAL AND WIRE AT A RATE OF 1 INCH PER MINUTE

3

US-DOCS\145222534.6

FPE-10A

| FUEL PUMP SPECIFICATION | | | | |
|---|---|---|---|---|
| PRODUCT VALIDATION | DESCRIPTION | TEST PARAMETERS | TEST PARAMETERS | TEST VALUE |
| (D.V.) | - - - - - - - - - - - - - - | VOLTAGE (VOLTS) | PRESSURE (kPa) | REQUIREMENT |
|  | MINIMUM FLOW RATE IN STODDARD SOLVENT(LPH): (0 HOURS) | 14.0 | 105 | 227 |
| X | MINIMUM FLOW RATE IN EEE UNLEADED GASOLINE, @ -12 kPa INLET DEPRESSION (LPH): (24 HOURS) | 14.0 | 52.5 | 227 |
|  | MAXIMUM CURRENT DRAW IN STODDARD SOLVENT (AMPS): (0 HOURS) | 14.0 | 105 | 4.3 |
| X | MAXIMUM CURRENT DRAW IN EEE UNLEADED GASOLINE, @ -12 kPa INLET DEPRESSION (AMPS): (24 HOURS) | 14.0 | 52.5 | 4.3 |
|  | MAXIMUM PRESSURE IN STODDARD SOLVENT (kPa): (0 HOURS) | 15.0 | DEAD HEAD | 587-1100 |
| X | MAXIMUM PRESSURE IN EEE UNLEADED GASOLINE (kPa): (24 HOURS) | 15.0 | DEAD HEAD | 587-1100 |

ASSEMBLY NOTES:
◇ 1. LEAK TEST: USE A PRESSURE DECAY TYPE TESTER PER S-437
     MUST NOT EXCEED 3.0cc/MIN @ 207kPa MINIMUM
2. TERMINAL PULL OFF SPEC: MINIMUM PULL FORCE AFTER CRIMPING IS 22LBS. (98N) PULL
     FORCE TO BE MEASURED BY PULLING ON TERMINAL AND WIRE AT A RATE OF 1 INCH PER MINUTE

4

US-DOCS\145222534.6

CONFIDENTIAL

FBG_CH1_00093959

FPE-12

| Test Type | | | | 1. Performance | |
|---|---|---|---|---|---|
| DV | EOL | Item | Description | Requirement | Test Condition |
| | X | 1 | Voltage | DC 14V | |
| | X | 2 | Pressure | 105kPa | |
| | X | 3 | Flow Rate | 227 L/m MIN | AS PER JIS D 3606 |
| | X | 4 | Current | 4.3A MAX | |
| | X | 5 | Shut-Off Pressure | 1100kPa(11.2kgf/cm2) MAX | |
| | X | 6 | Low Voltage | DC 8V 110 L/h MIN (at 105kPa) 4.0 amps MAX | |
| X | | 7 | Dry Vacuum Generation | -56 kPa (-5.7 kgf/cm2) | |

| Test Type | | | | 2. Operating Conditions | |
|---|---|---|---|---|---|
| DV | EOL | Item | Description | Description | |
| X | | 1 | Usable Fuel | UNLEADED GASOLINE<br>UNLEADED GASOLINE+INDUSTRIAL EtOH (WATER FREE) 10%<br>UNLEADED GASOLINE+INDUSTRIAL MeOH (WATER FREE) 5% | |
| X | | 2 | Fuel Temp Range | -30 TO +50 °C | |
| X | | 3 | Ambient Temp Range | -30 TO +70 °C | |
| X | | 4 | Voltage Range | DC8V-14V | |

| Test Type | | | | 3. Environmental Testing | |
|---|---|---|---|---|---|
| DV | EOL | Item | Description | Test Condition & Method | Requirement |
| X | | 1 | Salt Spray | a) ACCORDING TO ASTM B 117<br>b) DURATION: 500h<br>c) INLET & OUTLET TO BE SEALED | THE PUMP SHALL NOT CAUSE ANY TROUBLE AS TO ITS PERFORMANCE |
| X | | 2 | Temp Cycling Test | a) 20 CYCLES IN THE FOLLOWING MODE<br>80°C / -20°C (1h 1h 1h 1h) 1 CYCLE | THE PUMP SHALL SATISFY 1.3, 1.6 (90% MIN) 1.4, 1.5 (+10% MAX) THE INITIAL PERFORMANCE |
| X | | 3 | Vibration Test | a) ACCELERATION: 88.2 m/s2 (9.0G)<br>b) FREQUENCY BAND: 10-500HZ<br>c) SWEEP: 10 MIN<br>d) DURATION: 1h, EACH FOR 3 AXES | THE PUMP SHALL SATISFY 1.3, 1.6 (90% MIN) 1.4, 1.5 (+10% MAX) THE INITIAL PERFORMANCE SHOULD HAVE NO BREAKAGE AND CRACK WHICH AFFECT FUNCTION |
| X | | 4 | Wire Pull Test | a) PULL LOAD: 98N<br>b) TIME: 1 MINUTE | NO BREAK |

| Test Type | | | | 4. Endurance Testing | |
|---|---|---|---|---|---|
| DV | EOL | Item | Description | Test Condition & Method | Requirement |
| X | | 1 | Continuous Operating | a) TEST OIL: UNLEADED GASOLINE (ACCORDING TO JIS K 2202)<br>b) THE TEMP OF OIL: AMBIENT TEMP<br>c) DURATION: 2000h<br>d) VOLTAGE: 14V<br>e) PRESSURE: 105 kPa | |
| X | | 2 | On-Off Endurance | a) TEST OIL: UNLEADED GASOLINE (ACCORDING TO JIS K 2202)<br>b) MODE: 10S ON -10S OFF<br>c) DURATION: 1.8 x 10$^5$ CYCLES<br>d) THE TEMP OF TEST OIL: AMBIENT TEMP<br>e) VOLTAGE: 15±0.5V<br>f) PRESSURE: 105 kPa | THE PUMP SHALL SATISFY 1.3, 1.6 (90% MIN) 1.4, 1.5 (+10% MAX) THE INITIAL PERFORMANCE |
| X | | 3 | High Temp Endurance | a) TEST OIL: (1) UNLEADED GASOLINE (ACCORDING TO JIS K 2202)<br>(2) EtOH 30% CONTAINING UNLEADED GASOLINE<br>(3) MeOH 15% CONTAINING UNLEADED GASOLINE<br>b) THE TEMP OF OIL: 65±1°C<br>c) DURATION: 150h<br>d) VOLTAGE: 14V<br>e) PRESSURE: 83-105 kPa | |
| X | | 4 | Low Temp Endurance | a) TEST OIL: UNLEADED GASOLINE<br>b) THE TEMP OF OIL: -20±1°C<br>c) DURATION: 150h<br>d) VOLTAGE: 14±0.5V<br>e) PRESSURE: 83-105 kPa | |
| X | | 5 | Gasoline Resistance | a) 3 CYCLES IN THE FOLLOWING MODE<br>SOAK IN GASOLINE 8h + DRY IN AMBIENT TEMP 16h<br>b) TEST FUEL TEMP: 65-68°C<br>c) TEST FUEL (1): FUEL C (TOLUENE 50% + ISOOCTANE 50%)<br>(2): SOUR GASOLINE (LPO 10g PER FUEL C 1L)<br>(3): EtOH 15% UNLEADED GASOLINE | |

TEST TYPE DEFINITION;
DV: DESIGN VALIDATION TEST
EOL: END OF LINE PRODUCTION TEST

US-DOCS\145

**Exhibit D**
**Employee Secondment Agreement**

*(See attached.)*

CONFIDENTIAL                                                                 FBG_CH1_00093961

*Execution Version*

**EMPLOYEE SECONDMENT AGREEMENT**

**BY AND AMONG**

**WEM NEWCO, LLC,**

**AND**

**WALBRO LLC**

US-DOCS\144697499.8

CONFIDENTIAL

FBG_CH1_00093962

**TABLE OF CONTENTS**

ARTICLE I.
SECONDMENT

Section 1.1    Seconded Employees ................................................................................................1
Section 1.2    Period of Secondment................................................................................................2
Section 1.3    Withdrawal or Resignation ........................................................................................2
Section 1.4    Termination of Secondment.......................................................................................2
Section 1.5    Supervision ................................................................................................................3
Section 1.6    Seconded Employee Qualifications ...........................................................................3
Section 1.7    Benefit Plan Participation .........................................................................................3

ARTICLE II.
COMPANY EMPLOYEE SERVICES

Section 2.1    Company Employee Services .....................................................................................4
Section 2.2    Cancellation of Company Employee Services............................................................4
Section 2.3    Workers' Compensation ............................................................................................4

ARTICLE III.
SERVICES REIMBURSEMENT

Section 3.1    Operational, Management, Reporting and Routine Maintenance Expenses............4
Section 3.2    Seconded Employees .................................................................................................5
Section 3.3    Reserved....................................................................................................................6
Section 3.4    Termination Costs.....................................................................................................6

ARTICLE IV.
ALLOCATION; RECORDS; PAYMENT

Section 4.1    Allocation; Records ..................................................................................................7
Section 4.2    Payment.....................................................................................................................8

ARTICLE V.
TERM

Section 5.1    Term..........................................................................................................................8

ARTICLE VI.
GENERAL PROVISIONS

Section 6.1    Accuracy of Recitals.................................................................................................8
Section 6.2    Choice of Law; Submission to Jurisdiction ..............................................................9
Section 6.3    Notices ......................................................................................................................9
Section 6.4    Further Assurances...................................................................................................9
Section 6.5    Entire Agreement ....................................................................................................10
Section 6.6    No Recourse.............................................................................................................10

i

US-DOCS\144697499.8

CONFIDENTIAL                                                    FBG_CH1_00093963

**DEBTORS' EXHIBIT NO. 236**
**Page 157 of 216**

Section 6.7      Effect of Waiver or Consent ....................................................................10
Section 6.8      Amendment or Modification......................................................................11
Section 6.9      Counterparts ..............................................................................................11
Section 6.10    Severability ...............................................................................................11
Section 6.11    Force Majeure ...........................................................................................11
Section 6.12    Interpretation.............................................................................................12
Section 6.13    Titles and Headings...................................................................................12
Section 6.14    Binding Effect...........................................................................................12
Section 6.15    Time of the Essence ..................................................................................12
Section 6.16    Delay or Partial Exercise Not Waiver.......................................................12
Section 6.17    Withholding or Granting of Consent .........................................................13
Section 6.18    Laws and Regulations ...............................................................................13
Section 6.19    Relationship of the Parties ........................................................................13
Section 6.20    No Third Party Beneficiaries ....................................................................13
Section 6.21    No Recourse Against Officers or Directors ...............................................13
Section 6.22    Signatories Duly Authorized.....................................................................13
Section 6.23    Dispute Resolution....................................................................................14

ii

US-DOCS\144697499.8

CONFIDENTIAL

FBG_CH1_00093964

## EMPLOYEE SECONDMENT AGREEMENT

This Employee Secondment Agreement (the "**Agreement**"), dated as of September 29 (the "**Execution Date**"), is entered into by and among Walbro LLC, a Delaware limited liability company (the "**Employer**") and WEM Newco, LLC, a Delaware limited liability company (the "**Company**"). Each of the foregoing is referred to herein as a "**Party**" and collectively as the "**Parties**." Capitalized terms used herein but not defined shall have the meanings given to them in that certain Asset Contribution Agreement (the "**Contribution Agreement**") dated September 29, by and among the Parties.

### RECITALS:

**WHEREAS**, the Employer has agreed to second certain of its employees to the Company and its Affiliates, and the Company agrees to accept such secondment, for the purpose of performing job functions related to the Company's business (the "**Secondment**"); and

**WHEREAS**, the Parties desire to enter into this Agreement to set forth the terms and conditions under which such employees will provide the services to the Company during the Secondment.

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### ARTICLE I.
### SECONDMENT

Section 1.1     Seconded Employees.

Exhibit A to this Agreement (the "**Seconded Employee Schedule**") sets forth a true, complete and accurate list of each employee who is seconded to the Company in accordance with this Agreement (a "**Seconded Employee**" and collectively, the "**Seconded Employees**"). It is intended that each Seconded Employee will devote 100% of their working time to the Company.

The Seconded Employees will remain at all times employees of the Employer and they will also be joint employees of the Company or its Affiliates during the Period of Secondment (as defined below) and shall, subject to Section 1.5, during the Period of Secondment, work under the direction, supervision and control of the Company. The Employer will retain the right to hire or discharge the Seconded Employees with respect to their employment with the Employer; *provided*, *however*, that the Employer shall consult with the Company prior to hiring an individual who will become a Seconded Employee, and will in good faith consider (i) hiring each individual as a Seconded Employee whom the Company so requests and (ii) refraining from hiring an individual as a Seconded Employee whom the Company desires not to hire. Subject to the provisions in Sections 1.2 and 1.5, the Employer will not otherwise exercise direction, supervision or control over the Seconded Employees.  For each Seconded Employee, the "**Period of Secondment**" shall be that period of time as set forth in Section 1.2.  Seconded

1

US-DOCS\144697499.8

FBG_CH1_00093965

Employees shall have no authority or apparent authority to act on behalf of the Employer during the Period of Secondment.

The Seconded Employee Schedule sets forth the names of the Seconded Employees, the job functions of the Seconded Employees, if other than the closing of the transactions contemplated by the Contribution Agreement, and the starting date for the Period of Secondment for each Seconded Employee.  Subject to the above proviso, individuals may be added or removed from the Seconded Employee Schedule from time to time by the execution by the Parties of a completed "Addition/Removal/Change of Responsibility of Seconded Employee" form, the form of which is attached to this Agreement as Exhibit B, which will be fully binding on the Parties for all purposes under this Agreement.

Section 1.2     Period of Secondment.

The Employer will second to the Company or its Affiliates each Seconded Employee during a period commencing on the closing of the transactions contemplated by the Contribution Agreement and until the earliest of:

(a)     the end of the term of this Agreement under Section 5.1;

(b)     a withdrawal from the Secondment or resignation or termination of employment with respect to such Seconded Employee; or

(c)     a termination of Secondment for such Seconded Employee by the Company under Section 1.4.

At the end of the Period of Secondment for any Seconded Employee, such Seconded Employee will no longer be subject to the direction of the Company with regard to the Seconded Employee's day-to-day activities unless such individual thereafter otherwise becomes employed by the Company.

Section 1.3     Withdrawal or Resignation.

The Employer will use commercially reasonable efforts to not cause any early withdrawal from the Secondment or resignation from employment by its Seconded Employees prior to the end of such Seconded Employee's Period of Secondment as set forth in Section 1.2.  If any Seconded Employee tenders his or her resignation of employment to the Employer, the Employer will promptly notify the Company.  If any Seconded Employee tenders a withdrawal from his or her Secondment, the Company will promptly notify the Employer.

Section 1.4     Termination of Secondment.

The Company will have the right to terminate the Secondment to it of any Seconded Employee for any reason at any time (such terminated Seconded Employees referred to as "**Removed Employees**").  Except as contemplated in Section 1.2, the Employer will not have the right to terminate the Secondment to the Company of any Seconded Employee who is employed by the Employer without the prior written consent of the Company (which may be through the execution of a completed Addition/Removal/Change of Responsibility of Seconded Employee

2

US-DOCS\144697499.8

FBG_CH1_00093966

form).  Upon the termination of any Seconded Employee's Period of Secondment by the Employer without the prior written consent of the Company, the Employer will be solely liable for any costs or expenses associated with the termination of the Secondment, except as otherwise provided in this Agreement.  Upon the termination of a Secondment, the Seconded Employee will cease performing services for the Company or its Affiliates. At no time will the Company have the right to terminate the Seconded Employees' employment with the Employer.  The Employer shall in its sole discretion determine whether the employment of any Removed Employee shall be terminated following the termination of such Removed Employee's Secondment or whether such Removed Employee shall be redeployed by the Employer.

Section 1.5    Supervision.

During the Period of Secondment, the Company shall:

(a)    have responsibility for the daily work assignments of the Seconded Employees, including supervision of their day-to-day work activities and performance consistent with the purposes stated in Section 1.1 and the job functions set forth in the Seconded Employee Schedule; and

(b)    set and maintain the hours of work and the holidays and vacation schedules that are consistent with the hours of work and the holidays and vacation schedules of the Employer and determine the training to be provided to the Seconded Employees.

In the course and scope of performing any Seconded Employee's job functions for the Company, the Seconded Employee will report into the Company's management structure, and will be under the direct management and supervision of the Company for all services to be performed for the Company or its Affiliates.

Section 1.6    Seconded Employee Qualifications.

The Employer does not warrant that the Secondment of the Seconded Employees will permit the Company to achieve any specific results.

Section 1.7    Benefit Plan Participation.

The Company shall not be a participating employer in any of the Employer's Employee Benefit Plans (as defined in the Purchase Agreement) during the Period of Secondment.  Subject to the Company's reimbursement obligations hereunder, the Employer will remain solely responsible for all obligations and liabilities arising under the express terms of the Employer's Employee Benefit Plans, and during the Period of Secondment, the Company shall not assume any Employer's Employee Benefit Plans and shall have no obligations or liabilities arising under the express terms of the Employer's Employee Benefit Plans, in each case except for cost reimbursement pursuant to this Agreement.

US-DOCS\144697499.8

CONFIDENTIAL
                                                                    FBG_CH1_00093967

**DEBTORS' EXHIBIT NO. 236**
**Page 161 of 216**

## ARTICLE II.
## COMPANY EMPLOYEE SERVICES

Section 2.1    Company Employee Services.

Those services provided by the Seconded Employees to the Company or its Affiliates hereunder shall be referred to herein as the "**Company Employee Services**."

Section 2.2    Cancellation of Company Employee Services.

The Company may terminate any of the Company Employee Services on thirty (30) days' prior written notice, or such longer period as may be required by applicable Law, to the Employer.  In the event the Company terminates the Company Employee Services, the Company shall pay the Employer the monthly installment for the last month (or portion thereof) in which it received such terminated services.  Upon payment thereof, the Company shall have no further Services Reimbursement obligations to the Employer pursuant to this Agreement.

Section 2.3    Workers' Compensation.

During the Period of Secondment, the Employer will maintain workers' compensation insurance (either through an insurance company or qualified self-insured program) which shall include and afford coverage to the Seconded Employees.  The Employer will name the Company as an additional named insured under such insurance policy or qualified self-insured program.  Prior to being assigned any duties by the Company, each Seconded Employee must sign an acknowledgement that the Seconded Employee is an employee during the Period of Secondment of both the Employer and the Company and that for any workplace injury, the Seconded Employee's sole remedy will be under the Employer's workers' compensation insurance policy or qualified self-insured program.  Notwithstanding the foregoing, nothing herein shall preclude a Seconded Employee from participating in benefit programs generally available to employees of the Employer.

## ARTICLE III.
## SERVICES REIMBURSEMENT

Section 3.1    Operational, Management, Reporting and Routine Maintenance Expenses.

On or before the thirtieth (30th) day after the end of each month during the Period of Secondment, the Employer shall send an itemized invoice (in a form mutually agreed upon by the Company and the Employer) to the Company detailing all reimbursable expenses incurred by the Employer with respect to the Seconded Employees in connection with the performance of the Company Employee Services during the preceding month (the "**Services Reimbursement**").  The Company shall, within thirty (30) days of receipt, pay such invoice to the extent that the amounts therein are not disputed by the Company pursuant to the dispute resolution procedures provided for in Section 6.23 below (the "**Dispute Mechanism**").  With respect to any disputed amounts that are determined to be owing to the Employer through the Dispute Mechanism, such amounts will be paid within ten (10) days of such determination or at such earlier or later time as provided in the Dispute Mechanism.

4

US-DOCS\144697499.8

CONFIDENTIAL                                                                FBG_CH1_00093968

Section 3.2     Seconded Employees.

Subject to Sections 3.3 and 3.4 below, the Services Reimbursement for each month during the Period of Secondment shall include all costs and expenses incurred for such month by the Employer for the Seconded Employees, including the costs and expenses set forth below:

(a)     salary, wages, sales commissions and cash bonuses (including employee and employer payroll and withholding taxes and social insurance contributions associated therewith);

(b)     401(k) plan and any cash expense for matching 401(k) contributions made by the Employer;

(c)     cash or premiums paid, or expenses incurred, with respect to vacation, sick leave, paid time off, gratuity payments, long-term or short-term disability benefits, family leave, parental leave, disability or other medical leave, accommodations, military leave, or other personal leave;

(d)     medical, dental, vision and prescription drug coverage ("**Medical Coverage**");

(e)     flexible benefits plan, including medical care and dependent care expense reimbursement programs;

(f)     disability insurance;

(g)     workers' compensation benefits;

(h)     life insurance and accidental death and dismemberment insurance;

(i)     Reimbursable Severance Payments (as defined below), if any;

(j)     Termination Costs, to the extent provided in Section 3.4 below;

(k)     business travel expenses and other business expenses reimbursed in the normal course by the Employer such as subscriptions to business related periodicals and dues to professional business organizations;

(l)     any other employee benefit customarily provided to all employees by the Employer for which the Employer incurs costs; and

(m)     any sales taxes imposed upon the provision of any taxable Company Employee Services under this Agreement, *provided* that the Company and the Employer contemplate that the Company Employee Services provided pursuant to this Agreement are not taxable services for sales and use tax purposes.

The costs and expenses described in (a) through (m) above are referred to as "**Seconded Employee Expenses.**"  The costs and expenses described in (b), (d), (e), (f), (g) and (h) above shall be determined based on the ratio of the number of Seconded Employees covered by such plans over the sum of all employees covered by such plans plus the Seconded Employees

5

US-DOCS\144697499.8

CONFIDENTIAL                                                                                           FBG_CH1_00093969

covered by such plans, and including, for the avoidance of doubt, any the pro-rata portion of the employee benefits insurance costs and premiums (which costs and premiums, for the avoidance of doubt, shall consist of any and all costs incurred by the Employer in connection with coverage of the Seconded Employee and their eligible dependents under any such self-insured plan), as well as the pro-rata costs related to the administration of such benefit plans.  Where it is not reasonably practicable to determine the amount of such a cost or expense, the Company and the Employer shall mutually agree on the method of determining or estimating such cost or expense.

For purposes of this Agreement, "**Severance Payments**" shall mean the severance payments and benefits paid to a Seconded Employee or Removed Employee in return for a release of claims which includes the Employer, the Company and their respective Affiliates as named releasees, in an amount equal to the greater of (i) the severance payments and benefits due to such Seconded Employee or Removed Employee under an employment agreement between the Employer and such Seconded Employee or Removed Employee or the existing severance plan or policy of the Employer or (ii) the severance payments and benefits due to such Seconded Employee or Removed Employee under a severance policy, practice or program of the Employer, *provided*, that the term "Severance Payments" shall also include any amounts payable in connection with a termination of employment of a Seconded Employee or Removed Employee by the Employer including termination, pay in lieu of notice, gratuity payments, paid time-off, redundancy and similar payments.

For the purposes of this Agreement, "**Reimbursable Severance Payments**" shall mean all Severance Payments made (i) to Removed Employees whom the Company terminates from Secondment, (ii) to Seconded Employees as of the Offer Date (as defined in the Employee Transfer Agreement) to whom the Company does not provide an offer of employment on or prior to the Offer Date in accordance with the Employee Transfer Agreement and (iii) to Seconded Employees who has not received an offer employment from the Company that is on substantially similar terms to those that the Seconded Employee enjoyed as of the date hereof.

Except to the extent expressly provided in this <u>Section 3.2</u>, the Company shall have no obligation to reimburse the Employer for any Severance Payment or any other separation payment or severance benefit provided by the Employer or any Affiliate thereof to any Seconded Employee.

Section 3.3    <u>Reserved</u>.

Section 3.4    <u>Termination Costs</u>.

(a)    Except as otherwise expressly provided in this Agreement, the Company shall reimburse the Employer for any and all Termination Costs (as defined below) arising out of or in any way connected with or related to claims by a Seconded Employee concerning the termination of employment of such Seconded Employee to the extent such Termination Costs are attributable to actions, omissions or events that occur during such Seconded Employee's Period of Secondment (and, in the case of a Removed Employee who is terminated by the Employer within ninety (90) days after the date on which the Employer is notified by the Company that the employee has become a Removed Employee, such Termination Costs attributable to actions, omissions or events that occur during such ninety (90) day period).

6

US-DOCS\144697499.8

FBG_CH1_00093970

(b)      As to all employees of the Employer who do not become Seconded Employees, the Employer shall be solely responsible for any and all Termination Costs, Severance Payments and other severance costs and benefits relating to the employment of such employees for all periods ending on or before the Transfer Date.

(c)      The Employer will indemnify, defend and hold harmless the Company and its directors, officers and employees against any and all costs, expenses (including reasonable attorneys' fees), claims, demands, losses, liabilities, obligations, actions, lawsuits and other proceedings, judgments and awards (each, a "**Loss**" and collectively, the "**Losses**") arising out of or in any way connected with or related to claims by a Seconded Employee concerning the termination of employment of such Seconded Employee by the Employer in the event such termination of employment is effected without the prior written consent of the Company, even though such Losses may be caused in part by the negligence of the Company, except to the extent that (i) such Losses arise out of or result from the gross negligence or willful misconduct of the Company or (ii) the Employer terminates such Seconded Employee's employment as the result of the Seconded Employee's (X) willful commission of an act of theft, fraud or dishonesty in connection with the Seconded Employee's Secondment or employment with the Employer; (Y) willful disclosure of the Employer's confidential or proprietary information; or (Z) continued failure or refusal to adhere to the Employer's employment policies, including policies prohibiting employment discrimination and harassment, after receiving written notice of any such failure or refusal.  This indemnity does not apply to any Removed Employee.

(d)      The Company will indemnify, defend and hold harmless the Employer and its directors, officers and employees against any and all Losses arising out of or in any way connected with or related to claims by or on behalf of any Seconded Employee arising during or out of the Period of Secondment, including without limitation claims relating to any term or condition of employment, or the termination thereof, of any Removed Employees.

(e)      For purposes of this Agreement, "**Termination Costs**" shall mean all liabilities incurred in connection with or arising out of the termination of employment (whether actual or constructive) with the Employer, including liabilities relating to or arising out of any claim of discrimination or other illegality in connection with such termination, including cost of defense of such claims, but excluding Severance Payments, *provided*, that "Termination Costs" shall not include any amount to the extent that such amount arises out of or results from the gross negligence or willful misconduct of the Employer or any Affiliate of Employer (other than the Company).

## ARTICLE IV.
## ALLOCATION; RECORDS; PAYMENT

Section 4.1      Allocation; Records.

The Employer will maintain auditable records that reflect the direct and indirect costs of the Seconded Employee Expenses based on the Company Employee Services.  The Company and its representatives will have the right from time to time, during regular business hours and on reasonable prior notice, to audit such records and such other records as the Company may reasonably require in connection with its verification of the Seconded Employee Expenses and

7

US-DOCS\144697499.8

Services Reimbursement during regular business hours and on reasonable prior notice.  Based on these records, the Company may request adjustments under Section 3.2 above.  The Company will provide to the Employer such information which is within the Company's control as is necessary to allow the Employer to keep and maintain books/records reflecting hours worked and costs and expenses incurred in connection with each of the Seconded Employees.  The Employer will have the right from time to time upon its reasonable request to audit such information and books/records maintained by the Company during regular business hours and on reasonable prior notice.

   Section 4.2  Payment.

   The Company and the Employer acknowledge and agree that the Employer shall be responsible for paying the Seconded Employee Expenses (or providing the employee benefits with respect thereto, as applicable) to the Seconded Employees but that the Company shall be responsible for reimbursing the Employer for the Seconded Employee Expenses to the extent provided under Section 3.2 of this Agreement.  Subject to the Company's responsibility to so reimburse the Employer, the Employer agrees to indemnify and hold the Company harmless from any and all Losses incurred by the Company related to such Employer's failure to carry out its duties for the payment of the Seconded Employee Expenses for Seconded Employees or the provision of the employee benefits related thereto, as set forth above, except to the extent that such Losses arise solely out of or result solely from the gross negligence or willful misconduct of the Company.

## ARTICLE V.
## TERM

   Section 5.1  Term.

   The term of this Agreement will commence on the closing of the transactions contemplated by the Contribution Agreement and will continue through December 31, 2023, on which date this Agreement will expire and only those provisions that, by their terms, expressly survive this Agreement shall so survive.  Notwithstanding the foregoing, the Company may terminate this Agreement at any time, upon ninety (90) days' prior written notice to the Employer, and only those provisions that, by their terms, expressly survive this Agreement shall so survive.

## ARTICLE VI.
## GENERAL PROVISIONS

   Section 6.1  Accuracy of Recitals.

   The paragraphs contained in the recitals to this Agreement are incorporated in this Agreement by this reference, and the Parties to this Agreement acknowledge the accuracy thereof.

8

US-DOCS\144697499.8

CONFIDENTIAL                  FBG_CH1_00093972

Section 6.2    Choice of Law; Submission to Jurisdiction.

This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware except that the Parties recognize that to the extent that any term of this Agreement must be interpreted in light of the law of the state or country in which a Seconded Employee is employed, those terms shall be interpreted accordingly.

Section 6.3    Notices.

Any notice, demand or communication required or permitted under this Agreement shall be in writing and delivered personally, by reputable courier or by telecopier, and shall be deemed to have been duly given as of the date and time reflected on the delivery receipt, if delivered personally or sent by reputable courier service, or on the automatic telecopier receipt, if sent by telecopier, addressed as follows:

> Walbro LLC
> c/o Landon Capital Partners LLC
> 21 Custom House Street, Suite 700,
> Boston, Massachusetts 02110
> Attention: Christopher P. Sullivan
> Email: csullivan@landoncapital.com

with a copy to (which shall not constitute notice):

> Latham & Watkins LLP
> 200 Clarendon Street
> Boston, Massachusetts 02116
> Attention: Ryan McCarthy; Elizabeth M. Slawsby
> Email: ryan.mccarthy@lw.com;
>          elizabeth.slawsby@lw.com

> WEM Newco, LLC

> Attention:  Shane Griffin
> Facsimile:
> Email:      sgriffin@walbro.com

A Party may change its address for the purposes of notices hereunder by giving notice to the other Parties specifying such changed address in the manner specified in this Section 6.3.

Section 6.4    Further Assurances.

The Parties agree to execute such additional instruments, agreements and documents, and to take such other actions, as may be necessary to affect the purposes of this Agreement.

9

US-DOCS\144697499.8

CONFIDENTIAL

FBG_CH1_00093973

Section 6.5    Entire Agreement.

This Agreement, together with the Transaction Documents, constitute the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior contracts or agreements with respect to the subject matter hereof and the matters addressed or governed hereby or in the Transaction Documents, whether oral or written.  Without limiting the foregoing, each of the Parties acknowledges and agrees that (i) this Agreement is being executed and delivered in connection with each of the other Transaction Documents and the transactions contemplated hereby and thereby, (ii) the performance of this Agreement and the other Transaction Documents and expected benefits herefrom and therefrom are a material inducement to the willingness of the Parties to enter into and perform this Agreement and the Transaction Documents and the transactions described herein and therein, (iii) the Parties would not have been willing to enter into this Agreement in the absence of the entrance into, performance of, and the economic interdependence of, the Transaction Documents, (iv) the execution and delivery of this Agreement and the Transaction Documents and the rights and obligations of the Parties hereto and thereto are interrelated and part of an integrated transaction being effected pursuant to the terms of this Agreement and the Transaction Documents, (v) the transactions contemplated by this Agreement and the Transaction Documents are necessary elements of the same and integrated transaction, (vi) the transactions contemplated by this Agreement and by the Transaction Documents are economically interdependent and (vii) such Party will cause any of its successors or permitted assigns to expressly acknowledge and agree to this Section 6.5.

Section 6.6    No Recourse.

No Party hereto nor any Affiliate of a Party hereto shall assert or threaten, and each Party hereto hereby waives, and shall cause such Affiliates to waive, any claim or other method of recovery, in contract, in tort or under applicable Law, against any Person that is not a Party hereto (or a successor to a Party hereto) relating to this Agreement.  Without limiting the foregoing, and notwithstanding any other provision of this Agreement to the contrary, this Agreement may be enforced only against the named parties hereto.  All claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement, may be made only against the entities that are expressly identified as parties hereto; and no past, present or future Affiliate of any party hereto, or any director, manager, officer, employee, incorporator, member, partner, shareholder, Affiliate, agent, attorney or representative of any such party or Affiliate (including any Person negotiating or executing this Agreement on behalf of a party hereto), unless party to this Agreement, shall have any Liability or obligation with respect to this Agreement or with respect to any claim or cause of action (whether in contract or tort) that may arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including a representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement).

Section 6.7    Effect of Waiver or Consent.

No waiver or consent, express or implied, by any Party to or of any breach or default by any Person in the performance by such Person of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by

10

US-DOCS\144697499.8

CONFIDENTIAL

FBG_CH1_00093974

such Person of the same or any other obligations of such Person hereunder. Failure on the part of a Party to complain of any act of any Person or to declare any other Party in default, irrespective of how long such failure continues, shall not constitute a waiver by such Party of its rights hereunder until the applicable statute of limitations period has run.

Section 6.8    Amendment or Modification.

This Agreement may be amended or modified from time to time only by the written agreement of all the Parties. Each such instrument shall be reduced to writing and shall be designated on its face an "Amendment" or an "Addendum" to this Agreement.

Section 6.9    Counterparts.

This Agreement may be executed in any number of counterparts with the same effect as if all signatory Parties had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument.

Section 6.10    Severability.

If any provision of this Agreement or the application thereof to any Person or circumstance shall be held invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

Section 6.11    Force Majeure.

To the extent any Party is prevented by Force Majeure (as defined below) from performing its obligations, in whole or in part, under this Agreement, and if such Party ("**Affected Party**") gives notice and details of the Force Majeure to the other Parties as soon as reasonably practicable, then the Affected Party shall be excused from the performance with respect to any such obligations (other than the obligation to make payments). Each notice of Force Majeure sent by an Affected Party to the other Parties shall specify the event or circumstance of Force Majeure, the extent to which the Affected Party is unable to perform its obligations under this Agreement, and the steps being taken by the Affected Party to mitigate and to overcome the effects of such event or circumstances. The non-Affected Parties shall not be required to perform their obligations to the Affected Party corresponding to the obligations of the Affected Party excused by Force Majeure (including, for the avoidance of doubt, the payment of fees or other amounts with respect to any affected Seconded Employees). A Party prevented from performing its obligations due to Force Majeure shall use commercially reasonable efforts to mitigate and to overcome the effects of such event or circumstances and shall resume performance of its obligations as soon as practicable. In its efforts to mitigate and overcome the effects of the Force Majeure, and in its efforts to resume performance, the Employer shall treat the Company the same as any other internal or external service recipient of the affected Seconded Employee services, if any. "**Force Majeure**" means any act of God, fire, flood, storm, explosion, terrorist act, rebellion or insurrection loss of electrical power, computer system failures, finding of illegality, strikes and labor disputes or any similar event or circumstance that prevents a Party from performing its obligations under this Agreement, but only if the event or circumstance: (a) is not within the reasonable control of the Affected Party; (b) is not the result

11

US-DOCS\144697499.8

CONFIDENTIAL

FBG_CH1_00093975

of the fault or negligence of the Affected Party; and (c) could not, by the exercise of due diligence, have been overcome or avoided.

Section 6.12    Interpretation.

In this Agreement, unless a clear contrary intention appears: (a) the singular includes the plural and vice versa; (b) reference to any Person includes such Person's successors and assigns but, in the case of a Party, only if such successors and assigns are permitted by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity; (c) reference to any gender includes each other gender; (d) reference to any agreement (including this Agreement), document or instrument means such agreement, document, or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms of this Agreement; (e) reference to any Section means such Section of this Agreement, and references in any Section or definition to any clause means such clause of such Section or definition; (f) "hereunder," "hereof," "hereto" and words of similar import will be deemed references to this Agreement as a whole and not to any particular Section or other provision hereof or thereof; (g) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; and (h) relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding" and "through" means "through and including."

Section 6.13    Titles and Headings.

Section titles and headings in this Agreement are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

Section 6.14    Binding Effect.

This Agreement will be binding upon, and will inure to the benefit of, the Parties and their respective successors, permitted assigns and legal representatives.

Section 6.15    Time of the Essence.

Time is of the essence in the performance of this Agreement.

Section 6.16    Delay or Partial Exercise Not Waiver.

No failure or delay on the part of any Party to exercise any right or remedy under this Agreement will operate as a waiver thereof; nor shall any single or partial exercise of any right or remedy under this Agreement preclude any other or further exercise thereof or the exercise of any other right or remedy granted hereby or any related document.  The waiver by either Party of a breach of any provisions of this Agreement will not constitute a waiver of a similar breach in the future or of any other breach or nullify the effectiveness of such provision.

12

US-DOCS\144697499.8

CONFIDENTIAL

FBG_CH1_00093976

Section 6.17    Withholding or Granting of Consent.

Unless otherwise provided in this Agreement, each Party may, with respect to any consent or approval that it is entitled to grant pursuant to this Agreement, grant or withhold such consent or approval in its sole and uncontrolled discretion, with or without cause, and subject to such conditions as it shall deem appropriate.

Section 6.18    Laws and Regulations.

Notwithstanding any provision of this Agreement to the contrary, no Party shall be required to take any act, or fail to take any act, under this Agreement if the effect thereof would be to cause such Party to be in violation of any applicable law, statute, rule or regulation.

Section 6.19    Relationship of the Parties.

This Agreement does not form a partnership or joint venture between the Parties.  This Agreement does not make either Party an agent or a legal representative of the other Party.  The Parties shall not assume or create any obligation, liability, or responsibility, expressed or implied, on behalf of or in the name of the other Party.

Section 6.20    No Third Party Beneficiaries.

No Party shall have the right to assign its rights or obligations under this Agreement without the prior written consent of the other Parties.  Each of the Parties hereto specifically intends that each entity comprising the Employer and the Company and its Affiliates, as applicable, whether or not a Party to this Agreement, shall be entitled to assert rights and remedies hereunder as third-party beneficiaries hereto with respect to those provisions of this Agreement affording a right, benefit or privilege to any such entity.  Except as set forth in this Section 6.20, the provisions of this Agreement are enforceable solely by the Parties, and no limited partner, member, or assignee of the Employer, the Company, its Affiliates or other Person (including any Seconded Employee or other employee or service provider of any Party or any Affiliate thereof) shall have the right, separate and apart from the Employer and the Company or its Affiliates, to enforce any provision of this Agreement or to compel any Party to comply with the terms of this Agreement.

Section 6.21    No Recourse Against Officers or Directors.

For the avoidance of doubt, the provisions of this Agreement shall not give rise to any right of recourse against any officer or director of any Party.

Section 6.22    Signatories Duly Authorized.

Each of the signatories to this Agreement represents that the signatory is duly authorized to execute this Agreement on behalf of the Party for which the signatory is signing, and that such signature is sufficient to bind the Party purportedly represented.

13

US-DOCS\144697499.8

FBG_CH1_00093977

**DEBTORS' EXHIBIT NO. 236**
**Page 171 of 216**

Section 6.23    Dispute Resolution.

Any dispute, controversy or claim arising out of or relating to this Agreement shall be submitted to binding arbitration.  By agreeing to arbitrate, the Parties hereby agree to waive their respective rights to a jury trial.  The arbitration shall be conducted before a panel of three neutral arbitrators selected in accordance with the rules of Commercial Arbitration of the AAA and conducted in accordance with the AAA's rules of Commercial Arbitration utilizing the AAA's expedited procedures and applying the laws of the state of Delaware.  The arbitration shall be commenced and held in the state of Delaware.  Any issue concerning the location of the arbitration, the extent to which any dispute is subject to arbitration or the applicability, interpretation, or enforceability of this Agreement shall be resolved by all of the arbitrators.  Each Party will be entitled to depose a maximum of six witnesses, plus all experts designated to be witnesses at the arbitration.  The depositions shall be limited to a maximum of six hours per deposition.  All aspects of the arbitration shall be treated as confidential and none of the Parties nor the arbitrators may disclose the content or results of the arbitration, except as necessary to comply with legal or regulatory requirements.  The results of the arbitration shall be binding on the Parties and judgment on the arbitrators' award may be entered in any court having jurisdiction.

*[Signature page follows]*

14

US-DOCS\144697499.8

CONFIDENTIAL

FBG_CH1_00093978

AS WITNESS HEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives on the date herein above mentioned.

WEM NEWCO, LLC

By:     _____
Name:
Title:


WALBRO LLC

By:     _____
Name:
Title:

Signature Page to Employee Secondment Agreement

CONFIDENTIAL

FBG_CH1_00093979

**EXHIBIT A TO THE**
**EMPLOYEE SECONDMENT AGREEMENT**

**SECONDED EMPLOYEE SCHEDULE**

[*Attached*]

US-DOCS\144697499.8

FBG_CH1_00093980

**EXHIBIT B TO THE**
**EMPLOYEE SECONDMENT AGREEMENT**

**ADDITION/REMOVAL/CHANGE OF RESPONSIBILITY**
**OF SECONDED EMPLOYEE FORM**

In accordance with Section 1.1 of the Agreement, the Parties hereto wish to add, remove, or change the responsibilities of the following Seconded Employees. All defined terms used herein shall have the same meaning as set forth in the Agreement. All information must be filled in for this form to be valid.

| Name of Seconded Employee | Title and Job Function | Start Date | Status (Add, Remove or Change) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

WEM NEWCO, LLC
By:
Name:  [                    ]
Title:  [                    ]

WALBRO LLC

By:
Name:  [                    ]
Title:  [                    ]

US-DOCS\144697499.8

CONFIDENTIAL                                                                     FBG_CH1_00093981

**Exhibit E**
**Employee Transfer Agreement**

*(See attached.)*

CONFIDENTIAL                                          FBG_CH1_00093982

*Execution Version*

**EMPLOYEE TRANSFER AGREEMENT**

**BY AND AMONG**

**WEM NEWCO, LLC,**

**AND**

**WALBRO LLC**

US-DOCS\144709933.7

CONFIDENTIAL

FBG_CH1_00093983

*Execution Version*

## TABLE OF CONTENTS

WEM NEWCO, LLC,

ARTICLE I.
DEFINITIONS

Section 1.1    Definitions.................................................................................................................3

ARTICLE II.
TRANSFER OF EMPLOYEES TO VENTURE

Section 2.1    Selection of Employees and Offer of Employment .................................................4

ARTICLE III.
COMPENSATION

Section 3.1    Compensation Generally...............................................................................................5

ARTICLE IV.
EMPLOYEE BENEFITS

Section 4.1    Employee Benefits Generally .....................................................................................5
Section 4.2    Savings Plans ...............................................................................................................5
Section 4.3    Reserved........................................................................................................................6
Section 4.4    Welfare Benefits ..........................................................................................................6

ARTICLE V.
TERMINATION

Section 5.1    Termination....................................................................................................................7
Section 5.2    Effect of Termination....................................................................................................7

ARTICLE VI.
MISCELLANEOUS

Section 6.1    Accuracy of Recitals.....................................................................................................7
Section 6.2    Choice of Law...............................................................................................................7
Section 6.3    Notices ...........................................................................................................................7
Section 6.4    Further Assurances........................................................................................................8
Section 6.5    Entire Agreement ..........................................................................................................8
Section 6.6    No Recourse ..................................................................................................................9
Section 6.7    Effect of Waiver or Consent ........................................................................................9
Section 6.8    Amendment or Modification.........................................................................................9
Section 6.9    Counterparts ..................................................................................................................9
Section 6.10   Severability ...................................................................................................................9
Section 6.11   Force Majeure ...............................................................................................................9
Section 6.12   Interpretation.................................................................................................................10

i

US-DOCS\144709933.7

CONFIDENTIAL

FBG_CH1_00093984

Section 6.13   Titles and Headings................................................................................................10
Section 6.14   Binding Effect......................................................................................................10
Section 6.15   Time of the Essence ............................................................................................11
Section 6.16   Delay or Partial Exercise Not Waiver..................................................................11
Section 6.17   Withholding or Granting of Consent ...................................................................11
Section 6.18   Laws and Regulations..........................................................................................11
Section 6.19   Third Party Beneficiaries .....................................................................................11
Section 6.20   No Recourse Against Officers or Directors..........................................................11
Section 6.21   Signatories Duly Authorized................................................................................11

ii

US-DOCS\144709933.7

CONFIDENTIAL

FBG_CH1_00093985

**DEBTORS' EXHIBIT NO. 236**
**Page 179 of 216**

*Execution Version*

## EMPLOYEE TRANSFER AGREEMENT

This Employee Transfer Agreement (the "**Agreement**"), dated as of [   ], is entered into by and among Walbro LLC, a Delaware limited liability company ("**Walbro**") and WEM Newco, LLC, a Delaware limited liability company (the "**Company**").  Each of the foregoing is referred to herein as a "**Party**" and collectively as the "**Parties**."  Capitalized terms used herein but not defined shall have the meanings given to them in that certain Asset Contribution Agreement (the "**Contribution Agreement**") dated [   ], by and among the Parties, and that certain Employee Secondment Agreement (as defined below).

### RECITALS:

**WHEREAS**, Walbro will transfer to the Company (or its Affiliates) certain employees necessary to operate, manage and maintain the Company's assets.

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

Section 1.1     Definitions.

As used in this Agreement, the following terms shall have the respective meanings set forth below:

"**COBRA Coverage**" shall mean continuation of group health coverage required pursuant to Section 4980B of the Code and Part 6 of Title I of ERISA, as defined in the Purchase Agreement, (or any successor provisions thereto) and the rules and regulations promulgated thereunder.

"**Walbro Savings Plan**" shall mean the Walbro LLC Employees' Savings Plan.

"**Employee Secondment Agreement**" means the Employee Secondment Agreement between Walbro and the Company attached hereto as Exhibit A.

"**Geographic Relocation**" shall mean that the location of an alternative employment position offered to a Seconded Employee by the Company would require, if the alternative position were accepted, an increase in travel of fifty (50) miles or more (or such other limit as required by applicable Law) each way from the Seconded Employee's then current place of residence to the location of the new job compared to the distance the Seconded Employee travels from his or her then current residence to the location of his or her then current job with Walbro.

"**Multiemployer Plan**" means a "multiemployer plan" within the meaning of Section 3(37) or 4001(a)(3) of ERISA whether or not subject to ERISA.

3

US-DOCS\144709933.6

FBG_CH1_00093986

"**Seconded Employee**" shall have the meaning set forth in the Employee Secondment Agreement.  Notwithstanding the foregoing, the term "**Seconded Employee**" shall not include any individual who is on an inactive employee status leave or on long-term disability leave, unless such individual's absence is designated as covered by the Family and Medical Leave Act of 1993 or the Uniformed Services Employment and Reemployment Rights Act of 1994.

"**Transfer Date**" shall mean the date on which a Seconded Employee's employment with Walbro ends and the Seconded Employee becomes solely an employee of the Company, which date shall be January 1, 2024.  No provision of this Agreement shall be construed as precluding or prohibiting different Transfer Dates with respect to Seconded Employees' commencement of employment with the Company.

"**Transferred Employee**" shall mean each Seconded Employee who accepts the Company's offer of employment and commences services with the Company or its Affiliates following the Transfer Date.

"**Employee Welfare Benefit Plans**" shall mean an "employee welfare benefit plan" as defined in Section 3(1) of ERISA whether or not subject to ERISA.

## ARTICLE II.
## TRANSFER OF EMPLOYEES TO VENTURE

Section 2.1     Selection of Employees and Offer of Employment.

(a)     No later than thirty (30) days prior to the Transfer Date, or such other date as shall be mutually agreed by Walbro and the Company (the "**Offer Date**"), the Company shall provide an offer of employment to all Seconded Employees (other than Removed Employees), such offer to become effective on the applicable Transfer Date.  Each such offer shall include a description of: (i) base salary or an hourly wage rate, as applicable, to be provided to such Seconded Employee, and (ii) other employee benefits (including, without limitation, health, welfare, and retirement benefits) to be provided to such Seconded Employee (collectively, the "**Employment Terms**").

(b)     Walbro shall, immediately prior to the Transfer Date, terminate the employment of all Transferred Employees and shall cooperate with and use its commercially reasonable efforts to assist the Company in its efforts to secure satisfactory employment arrangements with such Seconded Employees to whom the Company makes an offer.  Effective as of immediately prior to the Transfer Date, Walbro shall take such actions as are necessary to cause the active participation of each Transferred Employee under Walbro's Employee Benefit Plans (as defined in the Purchase Agreement) to cease.

(c)     If any Transferred Employee requires a work visa or permit or other approval for his or her employment to continue with the Company or one of its Affiliates as of the Transfer Date, the Company shall, or shall cause one of its Affiliates to, use commercially reasonable efforts to secure prior to the Transfer Date the necessary visa, permit, pass or other approval in a timely manner consistent with the terms of this Article II and shall be solely responsible for any expenses related thereto.

4

US-DOCS\144709933.6

CONFIDENTIAL                                                                                      FBG_CH1_00093987

## ARTICLE III.
## COMPENSATION

Section 3.1    Compensation Generally.  Subject to the Company's services reimbursement obligations under the Secondment Agreement and Section 4.2(b), Walbro shall retain all obligations and liability for wages, salary, overtime pay, bonuses, incentive pay, other cash compensation and employee benefits of the Seconded Employees attributable to periods before the Transfer Date.  Effective as of the Transfer Date, to the extent permitted by applicable Law, the Company and its Subsidiaries shall be solely responsible for the Employment Terms beginning on the Transfer Date.

## ARTICLE IV.
## EMPLOYEE BENEFITS

Section 4.1    Employee Benefits Generally.

(a)    Neither the employment transfers of Transferred Employees nor any of the other actions contemplated by this Agreement shall cause the Company to become a participating employer in Walbro's Employee Benefit Plans.  Subject to the Company's services reimbursement obligations under the Employee Secondment Agreement, Walbro and its Affiliates shall remain solely responsible for all obligations and liabilities arising under the express terms of Walbro's Employee Benefit Plans, and the Company shall not assume Walbro's Employee Benefit Plans and shall have no obligations or liabilities arising under the express terms of Walbro's Employee Benefit Plans, in each case except for cost reimbursement pursuant to the Employee Secondment Agreement and as specifically provided in Section 4.3 below.

(b)    Walbro or its Affiliates, as the case may be, shall take any necessary actions to cause, effective as of the Transfer Date, any Transferred Employee who is participating in Walbro's Employee Benefit Plans to cease participation in such Employee Benefit Plan.

(c)    From and after the Transfer Date, the Company shall adopt and maintain such compensation arrangements and employee benefit plans, programs, policies and arrangements as shall be determined by the Company or its Affiliates from time to time in the Company's sole discretion (the "**Company Plans**"), subject to the Company's compliance with Section 3.1 above.

(d)    For purposes of determining eligibility and vesting under the Company Plans, each Transferred Employee shall be credited with his or her years of service with Walbro and its Affiliates prior to the Closing Date to the same extent as such Transferred Employee was (or would have been) entitled, before the Closing Date, credit for such service under Walbro's Employee Benefit Plans, except to the extent providing such credit would result in any duplication of benefits.

Section 4.2    Savings Plans.  The Company and Walbro shall take all reasonable steps necessary and appropriate so that Transferred Employees who participated in the Walbro Savings Plan and who have loans outstanding from such plan as of the Transfer Date may continue to repay such loans using voluntary payroll deductions from their paychecks from the Company, and Walbro agrees to take those actions as are necessary to cause such loans not to go into

5

US-DOCS\144709933.6

FBG_CH1_00093988

**DEBTORS' EXHIBIT NO. 236**
**Page 182 of 216**

default under the Walbro Savings Plan as a result of the employment transfers of Transferred Employees pursuant to Section 2.1(a) to the extent permitted by applicable Law.

Section 4.3    Reserved.

Section 4.4    Welfare Benefits.  Without limiting the generality of the above provisions, this Section 4.4 contains certain specific provisions regarding the provision of benefits under Employee Welfare Benefit Plans, unemployment compensation benefits and workers compensation benefits.

(a)    Except as specifically provided in this Section 4.4, and subject to the Company's services reimbursement obligations under the Employee Secondment Agreement: (i) Walbro shall be solely responsible for (A) claims of Transferred Employees who, immediately prior to the Transfer Date, were Seconded Employees and their eligible beneficiaries and dependents for workers compensation, unemployment compensation benefits and claims under Walbro's Employee Welfare Benefit Plans that are incurred before the Transfer Date, and (B) claims relating to COBRA Coverage attributable to "qualifying events" occurring on or before the Transfer Date with respect to any Transferred Employees who, immediately prior to the Transfer Date, were Seconded Employees and their eligible beneficiaries and dependents; and (ii) the Company and its Affiliates shall be solely responsible for (A) claims of Transferred Employees and their eligible beneficiaries and dependents for workers compensation, unemployment compensation benefits and claims under the Company's Employee Welfare Benefit Plans that are incurred on or after the Transfer Date, and (B) claims relating to COBRA Coverage attributable to "qualifying events" occurring after the Transfer Date with respect to Transferred Employees and their beneficiaries and dependents.  A medical/dental claim shall be considered incurred on the date when the medical services are rendered or medical supplies are provided, and not when the condition arose or when the course of treatment began.  An unemployment compensation or workers compensation claim shall be considered incurred before the Transfer Date if the occurrence leading up to the claim occurs before the Transfer Date.

(b)    Subject to applicable law and the provisions of Section 2.1(a) and Articles III and IV of this Agreement, the Company shall use commercially reasonable efforts to cause (i) each Transferred Employee to be immediately eligible to participate, without any waiting time, in any and all Company Plans (including the Company's Employee Welfare Benefit Plans); (ii) each Company Plan (including the Company's Employee Welfare Benefit Plans) providing medical, dental, hospital, pharmaceutical or vision benefits, all pre-existing condition exclusions and actively-at-work requirements of such Company Plan to be waived for such Transferred Employee and his or her covered dependents (except to the extent that such exclusions or requirements applied to the Transferred Employee under comparable Walbro Employee Benefit Plans); and (iii) any co-payments, deductibles and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year during which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Company Plan (to the extent such credit would have been given under comparable Walbro Employee Benefit Plans prior to the Closing Date).

6

US-DOCS\144709933.6

CONFIDENTIAL

FBG_CH1_00093989

(c)     The Parties acknowledge and agree that all provisions contained in Section 2.1(a), Article III and this Article IV with respect to employees are included for the sole benefit of the respective Parties and shall not create any right in any other Person, including, without limitation, any employees, former employees, any participant in any Walbro Employee Benefit Plan or Company Plan or any beneficiary thereof or any right to continued employment with any of the Parties or any Affiliate of any of the Parties, nor shall such provisions require any Party to continue or amend any particular benefit plan after the consummation of the transactions contemplated by the Contribution Agreement or this Agreement for any employee or former employee of any Party, and subject only to the obligations of the Parties to each other hereunder, any such plan may be amended or terminated in accordance with its terms and applicable Laws.

## ARTICLE V.
## TERMINATION

Section 5.1     Termination.  Notwithstanding the foregoing, either the Company or Walbro may terminate this Agreement upon notice to the other in the event that: (i) the Parties mutually agree to do so; (ii) such other Party materially breaches the Agreement and its failure to cure such material breach within ninety (90) days following receipt of written notice of such material breach; or (iii) the occurrence of a liquidation, dissolution or winding up of the Company.

Section 5.2     Effect of Termination.  Upon termination of this Agreement, all rights and obligations of the Parties under this Agreement will terminate; *provided*, *however*, that termination will not affect or excuse the performance of either Party under any provision of this Agreement that by its terms survives termination (including, without limitation, obligations to make payment for services provided or liabilities incurred prior to the effective date of such termination).  Notwithstanding anything to the contrary herein, the following provisions of this Agreement will survive the termination of this Agreement indefinitely: Articles III, IV and VI.

## ARTICLE VI.
## MISCELLANEOUS

Section 6.1     Accuracy of Recitals.  The paragraphs contained in the recitals to this Agreement are incorporated in this Agreement by this reference, and the Parties to this Agreement acknowledge the accuracy thereof.

Section 6.2     Choice of Law.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware without regard to principles of conflicts of laws except the Parties recognize that to the extent that any term of this Agreement must be interpreted in light of the law of the state or country in which a Seconded Employee or Transferred Employee is employed, such term shall be interpreted accordingly.

Section 6.3     Notices.  Any notice, demand or communication required or permitted under this Agreement shall be in writing and delivered personally, by reputable courier or by telecopier, and shall be deemed to have been duly given as of the date and time reflected on the delivery receipt, if delivered personally or sent by reputable courier service, or on the automatic telecopier receipt, if sent by telecopier, addressed as follows:

7

US-DOCS\144709933.6

CONFIDENTIAL                                                                                   FBG_CH1_00093990

Walbro LLC
c/o Landon Capital Partners LLC
21 Custom House Street, Suite 700,
Boston, Massachusetts 02110
Attention: Christopher P. Sullivan
Email: csullivan@landoncapital.com

with a copy to (which shall not constitute notice):

Latham & Watkins LLP
200 Clarendon Street
Boston, Massachusetts 02116
Attention: Ryan McCarthy; Elizabeth M. Slawsby
Email: ryan.mccarthy@lw.com;
       elizabeth.slawsby@lw.com

WEM Newco, LLC
c/o Carter Carburetor, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention: Legal Department
Email: Legal@firstbrandsgroup.com

A Party may change its address for the purposes of notices hereunder by giving notice to the other Parties specifying such changed address in the manner specified in this Section 6.3.

Section 6.4    Further Assurances.  The Parties agree to execute such additional instruments, agreements and documents, and to take such other actions, as may be necessary to affect the purposes of this Agreement.

Section 6.5    Entire Agreement.  This Agreement, together with the Transaction Documents, constitute the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior contracts or agreements with respect to the subject matter hereof and the matters addressed or governed hereby or in the Transaction Documents, whether oral or written.  Without limiting the foregoing, each of the Parties acknowledges and agrees that (i) this Agreement is being executed and delivered in connection with each of the other Transaction Documents and the transactions contemplated hereby and thereby, (ii) the performance of this Agreement and the other Transaction Documents and expected benefits herefrom and therefrom are a material inducement to the willingness of the Parties to enter into and perform this Agreement and the Transaction Documents and the transactions described herein and therein, (iii) the Parties would not have been willing to enter into this Agreement in the absence of the entrance into, performance of, and the economic interdependence of, the Transaction Documents, (iv) the execution and delivery of this Agreement and the Transaction Documents and the rights and obligations of the Parties hereto and thereto are interrelated and part of an integrated transaction being effected pursuant to the terms of this Agreement and the Transaction Documents, (v) the transactions contemplated by this Agreement and the Transaction Documents are necessary elements of the same and integrated transaction, (vi) the transactions contemplated

8

US-DOCS\144709933.6

CONFIDENTIAL

FBG_CH1_00093991

by this Agreement and by the Transaction Documents are economically interdependent and (vii) such Party will cause any of its successors or permitted assigns to expressly acknowledge and agree to this Section 6.5.

Section 6.6    No Recourse.  No Party hereto nor any Affiliate of a Party hereto shall assert or threaten, and each Party hereto hereby waives, and shall cause such Affiliates to waive, any claim or other method of recovery, in contract, in tort or under applicable Law, against any Person that is not a Party hereto (or a successor to a Party hereto) relating to this Agreement. Without limiting the foregoing, and notwithstanding any other provision of this Agreement to the contrary, this Agreement may be enforced only against the named parties hereto.  All claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement, may be made only against the entities that are expressly identified as parties hereto; and no past, present or future Affiliate of any party hereto, or any director, manager, officer, employee, incorporator, member, partner, shareholder, Affiliate, agent, attorney or representative of any such party or Affiliate (including any Person negotiating or executing this Agreement on behalf of a party hereto) shall have any Liability or obligation with respect to this Agreement or with respect to any claim or cause of action (whether in contract or tort) that may arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including a representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement).

Section 6.7    Effect of Waiver or Consent.  No waiver or consent, express or implied, by any Party to or of any breach or default by any Person in the performance by such Person of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such Person of the same or any other obligations of such Person hereunder.  Failure on the part of a Party to complain of any act of any Person or to declare any other Party in default, irrespective of how long such failure continues, shall not constitute a waiver by such Party of its rights hereunder until the applicable statute of limitations period has run.

Section 6.8    Amendment or Modification.  This Agreement may be amended or modified from time to time only by the written agreement of all the Parties.  Each such instrument shall be reduced to writing and shall be designated on its face an "Amendment" or an "Addendum" to this Agreement.

Section 6.9    Counterparts.  This Agreement may be executed in any number of counterparts with the same effect as if all signatory Parties had signed the same document.  All counterparts shall be construed together and shall constitute one and the same instrument.

Section 6.10    Severability.  If any provision of this Agreement or the application thereof to any Person or circumstance shall be held invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

Section 6.11    Force Majeure.  To the extent any Party is prevented by Force Majeure (as defined below) from performing its obligations, in whole or in part, under this Agreement, and if

9

US-DOCS\144709933.6

FBG_CH1_00093992

such Party ("**Affected Party**") gives notice and details of the Force Majeure to the other Parties as soon as reasonably practicable, then the Affected Party shall be excused from the performance with respect to any such obligations (other than the obligation to make payments). Each notice of Force Majeure sent by an Affected Party to the other Parties shall specify the event or circumstance of Force Majeure, the extent to which the Affected Party is unable to perform its obligations under this Agreement, and the steps being taken by the Affected Party to mitigate and to overcome the effects of such event or circumstances. The non-Affected Parties shall not be required to perform their obligations to the Affected Party corresponding to the obligations of the Affected Party excused by Force Majeure (including, for the avoidance of doubt, the payment of fees or other amounts with respect to any affected Seconded Employees). A Party prevented from performing its obligations due to Force Majeure shall use commercially reasonable efforts to mitigate and to overcome the effects of such event or circumstances and shall resume performance of its obligations as soon as practicable. In its efforts to mitigate and overcome the effects of the Force Majeure, and in its efforts to resume performance, Walbro shall treat the Company the same as any other internal or external service recipient of the affected Seconded Employee services, if any. "**Force Majeure**" means any act of God, fire, flood, storm, explosion, terrorist act, rebellion or insurrection, loss of electrical power, computer system failures, illegality, strikes and labor disputes or any similar event or circumstance that prevents a Party from performing its obligations under this Agreement, but only if the event or circumstance: (a) is not within, the reasonable control of the Affected Party; (b) is not the result of the fault or negligence of the Affected Party; and (c) could not, by the exercise of due diligence, have been overcome or avoided.

Section 6.12   Interpretation. In this Agreement, unless a clear contrary intention appears: (a) the singular includes the plural and vice versa; (b) reference to any Person includes such Person's successors and assigns but, in the case of a Party, only if such successors and assigns are permitted by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity; (c) reference to any gender includes each other gender; (d) reference to any agreement (including this Agreement), document or instrument means such agreement, document, or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms of this Agreement; (e) reference to any Section means such Section of this Agreement, and references in any Section or definition to any clause means such clause of such Section or definition; (f) "hereunder," "hereof," "hereto" and words of similar import will be deemed references to this Agreement as a whole and not to any particular Section or other provision hereof or thereof; (g) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; and (h) relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding" and "through" means "through and including."

Section 6.13   Titles and Headings. Section titles and headings in this Agreement are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

Section 6.14   Binding Effect. This Agreement will be binding upon, and will inure to the benefit of, the Parties and their respective successors, permitted assigns and legal representatives.

US-DOCS\144709933.6

CONFIDENTIAL                                                    FBG_CH1_00093993

Section 6.15    Time of the Essence.  Time is of the essence in the performance of this Agreement.

Section 6.16    Delay or Partial Exercise Not Waiver.  No failure or delay on the part of any Party to exercise any right or remedy under this Agreement will operate as a waiver thereof; nor shall any single or partial exercise of any right or remedy under this Agreement preclude any other or further exercise thereof or the exercise of any other right or remedy granted hereby or any related document.  The waiver by either Party of a breach of any provisions of this Agreement will not constitute a waiver of a similar breach in the future or of any other breach or nullify the effectiveness of such provision.

Section 6.17    Withholding or Granting of Consent.  Unless otherwise provided in this Agreement, each Party may, with respect to any consent or approval that it is entitled to grant pursuant to this Agreement, grant or withhold such consent or approval in its sole and uncontrolled discretion, with or without cause, and subject to such conditions as it shall deem appropriate.

Section 6.18    Laws and Regulations.  Notwithstanding any provision of this Agreement to the contrary, no Party shall be required to take any act, or fail to take any act, under this Agreement if the effect thereof would be to cause such Party to be in violation of any applicable law, statute, rule or regulation.

Section 6.19    Third Party Beneficiaries.  No Party shall have the right to assign its rights or obligations under this Agreement without the prior written consent of the other Parties.  Each of the Parties hereto specifically intends that each entity comprising Walbro and the Company or its Affiliates, as applicable, whether or not a Party to this Agreement, shall be entitled to assert rights and remedies hereunder as third-party beneficiaries hereto with respect to those provisions of this Agreement affording a right, benefit or privilege to any such entity.  Except as set forth in this Section 6.19, the provisions of this Agreement are enforceable solely by the Parties, and no limited partner, member, or assignee of Walbro or the Company and its Affiliates or other Person (including any Transferred Employee or other employee or service provider of any Party or any Affiliate thereof) shall have the right, separate and apart from Walbro and the Company and its Affiliates, to enforce any provision of this Agreement or to compel any Party to comply with the terms of this Agreement.

Section 6.20    No Recourse Against Officers or Directors.  For the avoidance of doubt, the provisions of this Agreement shall not give rise to any right of recourse against any officer or director of any Party.

Section 6.21    Signatories Duly Authorized.  Each of the signatories to this Agreement represents that the signatory is duly authorized to execute this Agreement on behalf of the Party for which the signatory is signing, and that such signature is sufficient to bind the Party purportedly represented.

*[Signature page follows]*

11

US-DOCS\144709933.6

*Execution Version*

AS WITNESS HEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives on the date herein above mentioned.

WEM NEWCO, LLC

By:  _____
Name:
Title:

WALBRO LLC

By:  _____
Name:
Title:

Signature Page
Employee Transfer Agreement

CONFIDENTIAL                                                                                  FBG_CH1_00093995

**DEBTORS' EXHIBIT NO. 236**
**Page 189 of 216**

*Execution Version*

**EXHIBIT A TO THE**
**EMPLOYEE TRANSFER AGREEMENT**

**EMPLOYEE SECONDMENT AGREEMENT**

[*Attached*]

US-DOCS\144709933.6

CONFIDENTIAL

FBG_CH1_00093996

**Exhibit F**
**Escrow Agreement**

*(See attached.)*

CONFIDENTIAL

FBG_CH1_00093997

*Execution Version*

### ESCROW AGREEMENT

THIS ESCROW AGREEMENT (the "Escrow Agreement") is entered into and effective as of this 29th day of September, 2023, by and among Western Alliance Bank, an Arizona corporation (the "Escrow Agent"), Carter Carburetor Holdings, LLC, a Delaware limited liability company (the "Japan Buyer"), Carter Carburetor, LLC, a Delaware limited liability company (the "US Buyer" and collectively with the Japan Buyer, the "Buyers"), Walbro Midco LLC, a Delaware limited liability company ("Midco Seller"), Walbro LLC, a Delaware limited liability company ("US Seller" and collectively with Midco Seller, the "Sellers"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Purchase Agreement (as defined below).

WHEREAS, the Buyers, the Sellers and WEM Newco, LLC, a Delaware limited liability company ("US NewCo") and Walbro Co. Ltd., a Japanese joint stock company (*kabushiki kaisha*) ("Walbro Japan") are party to that certain Securities Purchase Agreement, dated as of the date hereof (the "Purchase Agreement");

WHEREAS, Western Alliance Bank does business as: Bridge Bank, Alliance Association Bank, Alliance Bank of Arizona, Bank of Nevada, First Independent and Torrey Pines Bank;

WHEREAS, the Purchase Agreement contemplates the execution and delivery of this Escrow Agreement and requires that the Buyers collectively deposit into a separate and distinct escrow account established by the Escrow Agent (the "Escrow Account") a cash amount equal to $500,000 (the "Escrow Amount") to be held in accordance with the terms of this Escrow Agreement and the Purchase Agreement, and to serve as a source for payment of any adjustment to the Purchase Price in accordance with Section 2.8(d) of the Purchase Agreement; and

WHEREAS, the parties hereto desire to set forth their understandings with regard to the Escrow Account in connection with such funds deposited by the Buyers with the Escrow Agent.

NOW, THEREFORE, in consideration of the premises herein, and intending to be legally bound, the parties hereto agree as follows:

**1.      Terms and Conditions**

1.1      Appointment of and Acceptance by Escrow Agent. The Buyers and the Sellers hereby appoint the Escrow Agent to serve as escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to perform its duties as provided herein.

1.2      Establishment of Escrow. Pursuant to the terms of the Purchase Agreement, at the Closing the Buyers will deposit (or cause to be deposited) with the Escrow Agent the Escrow Amount (taking into account any disbursements hereunder, the "Escrow Funds"), pursuant to the wire instructions set forth on Schedule A hereto, in immediately available funds.

1.3      Application of the Escrow Funds.

US-DOCS\144542714.4

CONFIDENTIAL                                   FBG_CH1_00093998

**DEBTORS' EXHIBIT NO. 236**
**Page 192 of 216**

(a)     Subject to the terms, conditions and limitations contained herein and in the Purchase Agreement, the Escrow Funds shall be used for the purposes set forth in the Purchase Agreement and then released to either the Buyers or the Sellers (or their designee(s)) pursuant to the terms of the Purchase Agreement and this Escrow Agreement.

(b)     For the avoidance of doubt, all Escrow Earnings (as defined in Section 3.1(b) hereto) if any, shall be retained by the Escrow Agent and reinvested in the Escrow Funds and shall become part of the Escrow Funds; and shall be disbursed or distributed as part of the Escrow Funds in accordance with the terms and conditions of this Escrow Agreement.

1.4     Disbursements of the Escrow Funds. The Escrow Agent shall only disburse amounts from the Escrow Funds as follows:

(a)     If the Escrow Agent receives a joint written instruction in the form of Exhibit B hereto ("Joint Written Instructions") signed by an authorized representative of each of the Buyers and the Sellers (as set forth on Exhibit A-1 and Exhibit A-2, respectively, as such Exhibits may be amended from time to time by notice given pursuant to Section 4.5 by the Buyers and the Sellers, respectively) (each, an "Authorized Representative") directing the Escrow Agent as to payment of all or any part of the Escrow Funds, the Escrow Agent shall, as soon as practicable, but in all events within two (2) Business Days, after receipt of such Joint Written Instructions, pay such amount from the applicable Escrow Funds in the applicable Escrow Account as directed in such Joint Written Instructions.

(b)     If the Escrow Agent receives a final, non-appealable decision of any court of competent jurisdiction (a "Final Determination") directing the Escrow Agent to release the Escrow Funds in accordance with such decision, the Escrow Agent shall, as soon as practicable, but in all events within five (5) Business Days, after receipt of such Final Determination, pay such amount from the applicable Escrow Funds in the applicable Escrow Account as directed in such Final Determination.

(c)     All payments of any part of the Escrow Funds shall be made by wire transfer of immediately available funds or check as set forth in the Joint Written Instructions or Final Determination, as applicable.

(d)     With respect to any release of the Escrow Funds or any portion thereof from any Escrow Account (other than pursuant to a decision of a court in accordance with Section 1.4(b)), the Escrow Agent shall (i) send a confirmatory notice to an Authorized Representative of each of the Buyers and the Sellers of the pending disbursement of the Escrow Funds showing the amount(s) and the account(s) from which it is to be distributed, (ii) obtain, from an Authorized Representative of each of the Buyers and the Sellers, final confirmation (which the Parties shall not unreasonably withhold) of the amount(s) of pending disbursement of Escrow Funds and the account(s) from which the disbursement is to be made, as applicable, and (iii) thereafter, disburse such confirmed amount(s) as set forth in such confirmatory notice.

(e)     The Escrow Agent shall, in its sole discretion, comply with a Final Determination with respect to the Escrow Funds, including without limitation any attachment, levy or garnishment, without any obligation to determine such court's jurisdiction in the matter and in

US-DOCS\144542714.4

CONFIDENTIAL

accordance with its normal business practices. If the Escrow Agent complies with any such Final Determination, then it shall not be liable to any Party or any other person by reason of such compliance, regardless of the final disposition of any such judgment, order or process.

(f)     In the event that a Party gives funds transfer instructions (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by electronic mail or otherwise, the Escrow Agent shall seek confirmation of such instructions by telephone callback to an Authorized Representative of such Party, and the Escrow Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated. The persons and telephone numbers for such callbacks may be changed only in a writing executed by the applicable Party and actually received and acknowledged by the Escrow Agent. The Sellers and the Buyers agree that such security procedure is commercially reasonable. Buyers and the Sellers understand that the Escrow Agent's inability to receive or confirm funds transfer instructions pursuant to the above security procedure may result in a delay in accomplishing such funds transfer, and agree that the Escrow Agent shall not be liable for any loss caused by any such delay.

(g)     The Escrow Agent will furnish monthly statements to the Sellers and the Buyers setting forth the activity in the Escrow Accounts, or provide access to the authorized individuals to obtain the account statements through the Escrow Agent's online portal ("GATEWAY") in accordance with the GATEWAY access exhibits ("GATEWAY Access") as set forth on Exhibit A-3 and Exhibit A-4. The parties acknowledge changes to GATEWAY Access should be made in writing to the Escrow Agent.

1.5     Written Instructions to Release of Escrow Funds.

(a)     Escrow Funds. The Sellers and the Buyers shall deliver Joint Written Instructions with respect to the Escrow Funds in accordance with Section 2.3 of the Purchase Agreement.

## 2.     Provisions as to the Escrow Agent

2.1     Limited Duties of Escrow Agent. The Escrow Agent undertakes to perform only such duties as are expressly set forth in this Escrow Agreement that shall be deemed purely ministerial in nature. Under no circumstance will the Escrow Agent be deemed to be a fiduciary to any party or any other person under this Escrow Agreement. This Escrow Agreement expressly and exclusively sets forth the duties of the Escrow Agent with respect to any and all matters pertinent hereto and no implied duties or obligations shall be read into this Escrow Agreement against the Escrow Agent. The Escrow Agent shall not be bound by, deemed to have knowledge of, or have any obligation to determine, make inquiry into or consider, any term or provision of any agreement among the Sellers, the Buyers or any other third party or as to which the escrow relationship created by this Escrow Agreement relates, including without limitation the Purchase Agreement or any other documents referenced in this Escrow Agreement.

2.2     Limitations on Liability of Escrow Agent.

(a)     In performing its duties under this Escrow Agreement, or upon the claimed failure to perform its duties, the Escrow Agent shall have no liability except for the Escrow Agent's willful misconduct, bad faith, gross negligence or fraud. In no event shall the Escrow Agent be

US-DOCS\144542714.4

CONFIDENTIAL                                                                    FBG_CH1_00094000

liable for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(b)     Except in cases of the Escrow Agent's willful misconduct, bad faith, gross negligence or fraud the Escrow Agent shall be fully protected (i) in acting in reliance upon any certificate, statement, request, notice, advice, instruction, direction, other agreement or instrument or signature reasonably and in good faith provided by the Sellers or the Buyers with respect to such party's information and believed by the Escrow Agent to be genuine, (ii) in assuming that any person purporting to give the Escrow Agent any of the foregoing in connection with either this Escrow Agreement or the Escrow Agent's duties has been duly authorized to do so and (iii) in acting or failing to act in good faith in accordance with the terms of this Escrow Agreement on the advice of outside counsel retained by the Escrow Agent.

(c)     The Escrow Agent shall have no liability with respect to the transfer or distribution of any funds effected by the Escrow Agent pursuant to wiring or transfer instructions provided to the Escrow Agent in accordance with the provisions of this Escrow Agreement. The Escrow Agent shall be entitled to rely upon all bank and account information provided to the Escrow Agent by the applicable Authorized Representative of each of the Buyers and the Sellers set forth on Exhibit A-1 and Exhibit A-2. The Escrow Agent shall have no duty to verify or otherwise confirm any written wire transfer instructions except as set forth in Section 2.3, but it may do so in its discretion on any occasion without incurring any liability to any party for failing to do so on any other occasion. The Escrow Agent shall process all wire transfers based on bank identification and account numbers rather than the names of the intended recipient of the funds, even if such numbers pertain to a recipient other than the recipient identified in the payment instructions. The Escrow Agent shall have no duty to detect any such inconsistencies and shall resolve any such inconsistencies by using the account number. In connection with any payments that the Escrow Agent is instructed to make by wire transfer, the Escrow Agent shall not be liable for the acts or omissions of (i) the Sellers, the Buyers or other person providing such instructions, including without limitation errors as to the amount, bank information or bank account number; or (ii) any other person or entity, including without limitation any Federal Reserve Bank, any transmission or communications facility, any funds transfer system, any receiver or receiving depository financial institution, and no such person or entity shall be deemed to be an agent of the Escrow Agent. Any wire transfers of funds made by the Escrow Agent pursuant to this Escrow Agreement will be made subject to and in accordance with the Escrow Agent's usual and ordinary wire transfer procedures in effect from time to time.

(d)     No provision of this Escrow Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement. The Escrow Agent shall not be obligated to take any legal action or to commence any proceedings in connection with this Escrow Agreement or any property held hereunder or to appear in, prosecute or defend in any such legal action or proceedings.

2.3     Security Procedure For Funds Transfers. The Escrow Agent shall confirm each funds transfer instruction received in the name of a party by telephone call-back to a person specified on Exhibit A-1 (in the case of a funds transfer to the Buyers) or Exhibit A-2 (in the case

US-DOCS\144542714.4

FBG_CH1_00094001

of a funds transfer to the Sellers) at the telephone number specified for such authorized person on Exhibit A-1 or Exhibit A-2, as applicable. The person confirming the funds transfer instruction shall be a person other than the person from whom the funds transfer instruction was received, unless only one person is designated on Exhibit A-1 or Exhibit A-2, as applicable. Once delivered to the Escrow Agent, Exhibit A-1 or Exhibit A-2 may be revised or rescinded only by a writing signed by an authorized representative of the applicable party. Such revisions or rescissions shall be effective only after actual receipt and following such period of time as may be necessary to afford the Escrow Agent a reasonable opportunity to act on it. If a revised Exhibit A-1 or Exhibit A-2 or a rescission of an existing Exhibit A-1 or Exhibit A-2 is delivered to the Escrow Agent by an entity that is a successor-in-interest to such party, such document shall be accompanied by additional documentation satisfactory to the Escrow Agent showing that such entity has succeeded to the rights and responsibilities of the applicable Authorized Representative of each of the Buyers and the Sellers under this Escrow Agreement. The Buyers and the Sellers understand that the Escrow Agent's inability to receive or confirm funds transfer instructions pursuant to the above security procedure may result in a delay in accomplishing such funds transfer, and agree that the Escrow Agent shall not be liable for any loss caused by any such delay.

2.4     Depository Role. The Escrow Agent acts hereunder as a depository only, and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of the subject matter of this Escrow Agreement or any part thereof, or of any person executing or depositing such subject matter.

2.5     No Duty to Notify. The Escrow Agent shall in no way be responsible for nor shall it be its duty to notify any party hereto or any other party interested in this Escrow Agreement of any payment required or maturity occurring under this Escrow Agreement or under the terms of any instrument deposited therewith unless such notice is explicitly provided for in this Escrow Agreement.

2.6     Other Relationships. The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents. The Escrow Agent and its affiliates, and any of their respective directors, officers or employees may become pecuniarily interested in any transaction in which any of the other parties hereto may be interested and may contract and lend money to any such party and otherwise act as fully and freely as though it were not Escrow Agent under this Escrow Agreement. Nothing herein shall preclude the Escrow Agent or its affiliates from acting in any other capacity for any such party.

2.7     Disputes.

(a)     In the event of any disagreement between the Buyers and the Sellers, or between either of them and any other party, resulting in adverse claims or demands being made in connection with the matters covered by this Escrow Agreement, or in the event that the Escrow Agent, in good faith, in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not be or become liable in any way or to any party for its failure or refusal to act, and the Escrow Agent shall be entitled to continue to refrain from acting until directed by (i) an order of a court of competent jurisdiction, or (ii) Joint Written Instructions.

US-DOCS\144542714.4

(b)     In the event of any disagreement or doubt, as described in <u>Section 2.7(a)</u>, the Escrow Agent shall have the right, in addition to the rights described in <u>Section 2.7(a)</u> and at the election of the Escrow Agent, to tender into the registry or custody of any court having jurisdiction, all funds, equity and property held under this Escrow Agreement, and the Escrow Agent shall have the right to take such other legal action as may be appropriate or necessary, in the sole discretion of the Escrow Agent. Upon such tender, the Buyers and the Sellers agree that the Escrow Agent shall be discharged from all further duties under this Escrow Agreement.

2.8     <u>Indemnification</u>. The Buyers and the Sellers agree to jointly and severally defend, indemnify and hold harmless the Escrow Agent and each of the Escrow Agent's officers, directors, agents and employees (each an "<u>Escrow Indemnified Party</u>", and together the "<u>Escrow Indemnified Parties</u>") from and against any and all losses, liabilities, claims, damages, expenses and costs (including, without limitation, reasonable attorneys' fees and expenses) of every nature whatsoever (other than taxes, which are governed exclusively by <u>Section 3.1(e)</u>)) (collectively, "<u>Escrow Agent Losses</u>") which any such Escrow Indemnified Party may incur and which arise directly or indirectly from this Escrow Agreement or which arise by virtue of the Escrow Agent's undertaking to serve as the Escrow Agent hereunder; <u>provided</u>, <u>however</u>, that no Escrow Indemnified Party shall be entitled to indemnity with respect to Escrow Agent Losses that have been finally adjudicated by a court of competent jurisdiction to have been caused by (a) such Escrow Indemnified Party's gross negligence, bad faith, willful misconduct or fraud, or (b) the Escrow Agent's following, accepting or acting upon any instructions or directions from the parties received in accordance with this Escrow Agreement. The Buyers and the Sellers agree solely between themselves, and without affecting any Escrow Indemnified Party's right to indemnification hereunder, that the Buyers and the Sellers shall each be responsible for fifty percent (50%) of such indemnification obligations and shall have a right of contribution against the other to the extent that they pay more than their fifty percent (50%) share of such indemnification obligations; <u>provided</u>, <u>however</u>, that to the extent Escrow Agent Losses result from a failure of either party hereto to comply with the provisions of <u>Section 3.1(a)</u>, then such party shall be responsible for one hundred percent (100%) of the indemnification obligations with respect to such Escrow Agent Losses in accordance with <u>Section 3.1(e)</u>. The provisions of this section shall survive the termination of this Escrow Agreement and any resignation or removal of the Escrow Agent.

2.9     <u>Mergers, Consolidations, Etc.</u> Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business of the Escrow Agent may be transferred, shall be the successor Escrow Agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, in each case without the execution or filing of any instrument or paper or the performance of any further act (other than due notice to the Buyers and the Sellers).

2.10    <u>Resignation; Removal</u>.

(a)     The Escrow Agent may resign and be discharged from its duties and obligations at any time under this Escrow Agreement by providing written notice to the Buyers and the Sellers. Such resignation shall be effective on the date set forth in such written notice, which shall be no earlier than thirty (30) days after such written notice has been furnished.

US-DOCS\144542714.4

FBG_CH1_00094003

Thereafter, the Escrow Agent shall have no further obligation except to hold the Escrow Funds as depository and cooperate reasonably in the transfer of the Escrow Funds to a successor escrow agent. The Buyers and the Sellers shall promptly appoint a successor escrow agent. The Escrow Agent shall refrain from taking any action until it shall receive a Joint Written Instruction designating the successor escrow agent. However, in the event no successor escrow agent has been appointed on or prior to the date such resignation is to become effective, the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction all funds, equity and other property then held by the Escrow Agent hereunder and the Escrow Agent shall thereupon be relieved of all further duties and obligations under this Escrow Agreement.

(b)     The Buyers and the Sellers acting together shall have the right to terminate the appointment of the Escrow Agent upon thirty (30) days' joint written notice to the Escrow Agent specifying the date upon which such termination shall take effect. Thereafter, the Escrow Agent shall have no further obligation except to hold the Escrow Funds as depository and cooperate reasonably in the transfer of the Escrow Funds to a successor escrow agent. The Escrow Agent shall refrain from taking any action until it shall receive a Joint Written Instruction designating the successor escrow agent. However, in the event no successor escrow agent has been appointed on or prior to the date such termination is to become effective, the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction all funds, equity and other property then held by the Escrow Agent hereunder and the Escrow Agent shall thereupon be relieved of all further duties and obligations under this Escrow Agreement.

(c)     In the case of a resignation or removal of the Escrow Agent, the Escrow Agent shall have no responsibility for the appointment of a successor escrow agent hereunder. The successor escrow agent appointed by the Buyers and the Sellers shall execute, acknowledge and deliver to the Escrow Agent and the other parties an instrument in writing accepting its appointment hereunder, and thereafter, the Escrow Agent shall deliver all of the then-remaining balance of the Escrow Funds, less any fees and expenses then incurred by and unpaid to the Escrow Agent, to such successor escrow agent in accordance with the Joint Written Instruction of the Buyers and the Sellers and upon receipt of the Escrow Funds, the successor escrow agent shall be bound by all of the provisions of this Escrow Agreement.

2.11   Compensation of the Escrow Agent. The parties agree that upon the execution of this Escrow Agreement, the Buyers, on the one hand, and the Sellers, on the other hand, will each pay fifty percent (50%) of the Escrow Agent the entire amount stated in the fee schedule attached hereto as Schedule B.

**3.     Tax Matters.**

3.1   Tax Matters.

(a)     On or before the execution and delivery of this Escrow Agreement, the Buyers and the Sellers shall each provide to the Escrow Agent a properly completed and executed Internal Revenue Service ("IRS") Form W-9 or appropriate version of IRS Form W-8 (or, in each case, any successor form), as applicable, and shall promptly update any such form to the extent such form becomes obsolete or inaccurate in any respect. The Escrow Agent shall have the right to request from any party to this Escrow Agreement, or any other person or entity entitled to

US-DOCS\144542714.4

FBG_CH1_00094004

payment hereunder, any additional forms, documentation or other information as may be reasonably necessary for the Escrow Agent to satisfy its reporting and withholding obligations under the Internal Revenue Code of 1986, as amended (the "Code") and applicable state, local, or non-U.S. income tax law. To the extent any such forms to be delivered under this Section 3.1 are not provided prior to the date hereof or by the time the related payment is required to be made or are determined by the Escrow Agent to be incomplete or inaccurate in any respect, the Escrow Agent shall be entitled to withhold on any payments hereunder to the extent withholding is required by applicable law, and shall have no obligation to gross up any such payment; provided, however, that such amounts withheld shall be timely and properly paid over by the Escrow Agent to the proper taxing authority.

(b)     Notwithstanding anything to the contrary herein provided, the Escrow Agent shall have no duty to prepare or file any federal or state tax report or return with respect to any funds or equity held pursuant to this Escrow Agreement other than such reports or returns as the Escrow Agent is required to prepare and file as required by the Code or other applicable law.

(c)     The Buyers and the Sellers, jointly and severally, shall indemnify, defend and hold the Escrow Agent harmless from and against any tax, interest, penalty or other cost or expense that may be assessed by a taxing authority against the Escrow Agent on or with respect to the Escrow Funds, unless such tax, interest, penalty or other cost or expense assessed by such taxing authority (i) was attributable to the negligence, bad faith, misconduct or fraud of the Escrow Agent, (ii) are imposed on or measured by income, receipts or gains of the Escrow Agent, or (iii) was imposed with respect to the fees that the Escrow Agent earns for performing services under this Escrow Agreement. Notwithstanding the foregoing, to the extent any such tax, interest, penalty or other cost or expense assessed by a taxing authority results from a failure of either party hereto to comply with the provisions of Section 3.1(a) or otherwise provide any forms or certifications required under this Escrow Agreement, then such party shall be responsible for one hundred percent (100%) of the indemnification obligations with respect to such tax, interest, penalty or other cost or expense so assessed. The indemnification provided for in this Section 3.1(c) is in addition to the indemnification provided in Section 2.8 and shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

4.     **Miscellaneous**

4.1     Covenant of Escrow Agent. The Escrow Agent hereby agrees and covenants with the Buyers and Sellers that it shall perform all of its obligations under this Escrow Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except pursuant to the express terms of this Escrow Agreement or as otherwise required by law.

4.2     Disbursements. The Escrow Agent shall make no disbursement, investment or other use of funds until and unless it has collected funds. The Escrow Agent shall not be liable for collection items until such proceeds have been received or the Federal Reserve has given the Escrow Agent credit for the funds.

4.3     Permitted Investments. The Escrow Agent shall invest the Escrow Funds in a Bridge Bank Non-Interest Bearing Deposit Account. The Escrow Agent shall not be liable or responsible for any loss resulting from any deposits or investments made pursuant to this

US-DOCS\144542714.4

FBG_CH1_00094005

<u>Section 4.3</u>, other than as a result of the gross negligence, bad faith, willful misconduct or fraud of the Escrow Agent.

      4.4    <u>Accounting</u>. The Escrow Agent shall provide monthly reports of transactions and holdings to the Buyers and the Sellers as of the end of each month at the address provided by the Buyers and the Sellers or provide access to GATEWAY Access in accordance with Exhibit A-3 and Exhibit A-4.

      4.5    <u>Notices</u>. Any notice, request for consent, report, or any other communication required or permitted in this Escrow Agreement shall be in writing and shall be deemed to have been given (i) when delivered personally to any individual party, (ii) when delivered by electronic mail to the e-mail address given below, provided that written confirmation of receipt is obtained promptly from the recipient after completion of the electronic mail transmission or (iii) on the first (1st) Business Day after the date of deposit with an overnight courier with a reputable national overnight delivery service for next day delivery, postage paid, or on the third (3rd) Business Day after deposit in the U.S. mail, certified or registered, return receipt requested, postage prepaid, addressed in all cases to the party at her, his or its respective address set forth below, or to such other address as such party may designate, provided that notices will be deemed to have been given to the Escrow Agent on the actual date received, provided further that with respect to notices deliverable to the Sellers, such notices shall be delivered solely via email or facsimile:

If to the Escrow Agent:

      Bridge Bank, a division of Western Alliance Bank
      Attn: Laura Cawley
      3601 Minnesota Drive, Suite 800
      Edina, Minnesota 55435
      Email: laura.cawley@bridgebank.com;
      heather.kelly@bridgebank.com
      Phone: 612-615-1637 or 617-797-5539
      **For claims: claims@bridgebank.com**

If to the Buyers:

      Carter Carburetor, LLC
      127 Public Square, Suite 5300
      Cleveland, Ohio 44114
      Email:  shekhar.kumar@firstbrandsgroup.com
      Attention:  Legal Department

if to the Sellers:

      Walbro Midco LLC
      Walbro LLC
      c/o Landon Capital Partners LLC
      21 Custom House Street, Suite 700,
      Boston, Massachusetts 02110

US-DOCS\144542714.4

CONFIDENTIAL

FBG_CH1_00094006

Attention:    Christopher P. Sullivan
Email:        csullivan@landoncapital.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
200 Clarendon Street
Boston, Massachusetts 02116
Attention:    Ryan McCarthy; Elizabeth M. Slawsby
Email:        ryan.mccarthy@lw.com;
              elizabeth.slawsby@lw.com

Any party may unilaterally designate a different address by giving notice of each change in the manner specified above to each other party. In all cases, the Escrow Agent shall be entitled to rely on a copy or electronic transmission of any document with the same legal effect as if it were the original of such document. "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which banking institutions located in New York, New York are authorized or obligated by law or executive order to close.

4.6     Governing Law. This Escrow Agreement shall be governed by and construed according to the laws of the State of Delaware, without regard to principles or rules of conflicts of law that would cause the application of the laws of any other jurisdiction. The parties hereto consent to the exclusive jurisdiction of the state and federal courts sitting in the State of Delaware and consent to personal jurisdiction of and venue in such courts with respect to any and all matters or disputes arising out of this Escrow Agreement.

4.7     Waiver of Jury Trial. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS ESCROW AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 4.7 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

4.8     Assignment; Binding Effect. Except as permitted in Section 2.9, neither this Escrow Agreement nor any rights or obligations hereunder may be assigned by any party hereto without the express written consent of each of the other parties hereto. This Escrow Agreement shall inure to and be binding upon the parties hereto and their respective successors, heirs and permitted assigns.

4.9     Amendment and Waiver. The terms of this Escrow Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by all the parties hereto. No course of conduct shall constitute a waiver of any terms or conditions of this Escrow

US-DOCS\144542714.4

CONFIDENTIAL                                        FBG_CH1_00094007

Agreement, unless such waiver is specified in writing, and then only to the extent so specified. A waiver of any of the terms and conditions of this Escrow Agreement on one occasion shall not constitute a waiver of the other terms of this Escrow Agreement, or of such terms and conditions on any other occasion.

4.10   Severability. If any provision of this Escrow Agreement shall be held or deemed to be or shall in fact, be illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative or unenforceable to any extent whatsoever.

4.11   Further Assurances. If at any time the Escrow Agent shall determine or be advised that any further agreements, assurances or other documents are reasonably necessary or desirable to carry out the provisions of this Escrow Agreement and the transactions contemplated by this Escrow Agreement, the parties shall execute and deliver any and all such agreements or other documents and do all things reasonably necessary or appropriate to carry out fully the provisions of this Escrow Agreement.

4.12   No Third Party Beneficiaries. This Escrow Agreement is for the sole benefit of the parties hereto, and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Escrow Agreement. Additionally, any permitted assignee must also satisfy the Escrow Agent's requirements set forth in Section 2.9.

4.13   Force Majeure. No party to this Escrow Agreement shall be liable to any other party hereto for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, interruption or malfunctions of communications or power supplies, labor difficulties, actions of public authorities or other similar causes reasonably beyond its control.

4.14   Termination. This Escrow Agreement shall terminate upon the distribution by the Escrow Agent in accordance with this Escrow Agreement of all funds, equity and property held under this Escrow Agreement or upon the earlier Joint Written Instruction.

4.15   Titles and Headings. All titles and headings in this Escrow Agreement are intended solely for convenience of reference and shall in no way limit or otherwise affect the interpretation of any of the provisions hereof.

4.16   Counterparts; E-mail Execution. This Escrow Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

4.17   Entire Agreement; Effect of Purchase Agreement. This Escrow Agreement constitutes the entire agreement between the Escrow Agent and the Buyers and the Sellers in

US-DOCS\144542714.4

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 236**
**Page 202 of 216**

connection with the subject matter of this Escrow Agreement, and no other agreement entered into between the Buyers and the Sellers, or either of them, including, without limitation, the Purchase Agreement, shall be considered as adopted or binding, in whole or in part, upon the Escrow Agent notwithstanding that any such other agreement may be deposited with the Escrow Agent or the Escrow Agent may have knowledge thereof. The parties hereto acknowledge and agree that the Escrow Agent is not a party to, is not bound by, and has no duties or obligations under the Purchase Agreement, that all references in this Escrow Agreement to the Purchase Agreement are for convenience, and that the Escrow Agent shall have no implied duties beyond the express duties set forth in this Escrow Agreement.

4.18    Procedures for Opening a New Account. IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT: in accordance with Section 326 of the USA Patriot Act, to help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. When a party opens an account, the Escrow Agent must obtain each party's name, address, date of birth (as applicable), taxpayer or other government identification number or other appropriate information that will allow the Escrow Agent to identify such party. The Escrow Agent may also ask to see each party's driver's license, passport or other identifying documents. For parties that are business or other legal entities, the Escrow Agent may require such documents as it deems necessary to confirm the legal existence of the entity.

4.19    PATRIOT Act. The parties to this Escrow Agreement agree to provide all such information as Escrow Agent may reasonably request in order to satisfy the requirements of the USA Patriot Act or any other regulatory requirements, and any policy or procedure implemented by the Escrow Agent to comply therewith.

4.20    Compliance with Laws. Buyers hereby represent that (i) it is not a person that is the target of any sanctions program administered by the U.S. Department of the Treasury Office of Foreign Assets Control ("Sanctioned Person"); (ii) it is not directly or indirectly controlled by, or acting hereunder for or on behalf of, any Sanctioned Person; and (iii) none of the funds used to make any payments contemplated under this Escrow Agreement are derived from any illegal activity.

4.21    Compliance with Court Orders. In the event that a legal garnishment, attachment, levy, restraining notice or court order is served with respect to any of the Escrow Funds, or the delivery thereof shall be stayed or enjoined by an order of a court of competent jurisdiction, Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all such orders so entered or issued, whether with or without jurisdiction, and in the event that Escrow Agent obeys or complies with any such order it shall not be liable to any of the Parties or to any other person by reason of such compliance notwithstanding such order be subsequently reversed, modified, annulled, set aside or vacated.

*[Signature Page Follows]*

US-DOCS\144542714.4

CONFIDENTIAL                                                      FBG_CH1_00094009

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed as of the date first above written.

**ESCROW AGENT:**

**WESTERN ALLIANCE BANK**, as the Escrow Agent

By:_____
Name:
Title:

**JAPAN BUYER:**

[ ● ]
a [ ● ]

By:_____
Name:
Title:

**US BUYER:**

[ ● ]
a [ ● ]

By:_____
Name:
Title:

**MIDCO SELLER:**

[ ● ],
a [ ● ]

By:_____
Name:
Title:

*Signature Page to Escrow Agreement*

CONFIDENTIAL

FBG_CH1_00094010

**DEBTORS' EXHIBIT NO. 236**
**Page 204 of 216**

**US SELLER:**

**[ ● ],**
a [ ● ]


By:_____
Name:
Title:

US-DOCS\144542714.4

CONFIDENTIAL

FBG_CH1_00094011

**SCHEDULE A**

**Escrow Agent**
**Wire Instructions**

US-DOCS\144542714.4

CONFIDENTIAL

FBG_CH1_00094012

## SCHEDULE B

### Escrow Agent Fee

FEES OF ESCROW AGENT

| Description of Fee | Amount |
|---|---|
| Administrative Fee | Waived |

**Out-of Pocket Expenses:**                                                      **Billed at Cost**

This includes fees billed by any outside contractors that are engaged including but not limited to attorneys, accountants, managers, or appraisers and also includes charges incurred for printing, publishing, postage, and special delivery expenses.

US-DOCS\144542714.4

CONFIDENTIAL                                                      FBG_CH1_00094013

**Exhibit A-1**

**Certificate of Incumbency**
**(List of Authorized Representatives of the Buyers)**

Client Names: [ ● ]; [ ● ]

As an Authorized Officer of the above referenced entities, I hereby certify that each person listed below is an authorized signor for each entity and is authorized to provide direction and initiate or confirm transactions, including funds transfer instructions, on behalf of the above referenced entities, and that the title, signature and contact number appearing beside each name is true and correct.

| **Name Title** | **Email Address** | **Signature** | **Contact Number** |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer on:

_____
                                    Date

By:_____
Its: Authorized Officer

US-DOCS\144542714.4

CONFIDENTIAL                                                                    FBG_CH1_00094014

**Exhibit A-2**

**Certificate of Incumbency**
**(List of Authorized Representatives of Sellers)**

Client Names: Walbro Midco LLC; Walbro LLC,

     As an Authorized Officer of the above referenced entities, I hereby certify that each person listed below is an authorized signor for entity and is authorized to provide direction and initiate or confirm transactions, including funds transfer instructions, on behalf of the above referenced entities, and that the title, signature and contact number appearing beside each name is true and correct.

| Name Title | Email Address | Signature | Contact Number |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer on:

_____
                Date

By:_____
Its: Authorized Officer

US-DOCS\144542714.4

CONFIDENTIAL

FBG_CH1_00094015

**Exhibit A-3**

**GATEWAY ACCESS**

Buyers instruct the Escrow Agent to grant certain authorized individuals access to information regarding the Escrow Fund through GATEWAY as further detailed below. Each authorized individual must agree to comply with the GATEWAY terms and conditions and any other provisions required by the Escrow Agent to access GATEWAY. Buyers must provide written notice to Escrow Agent to change or remove any access previously authorized or granted.

List of authorized individuals:

| Name | Title | Email Address | Contact Number |
|------|-------|---------------|----------------|
|      |       |               |                |
|      |       |               |                |

US-DOCS\144542714.4

CONFIDENTIAL                                                              FBG_CH1_00094016

**Exhibit A-4**

**GATEWAY ACCESS**

Sellers instruct the Escrow Agent to grant certain authorized individuals access to information regarding the Escrow Fund through GATEWAY as further detailed below. Each authorized individual must agree to comply with the GATEWAY terms and conditions and any other provisions required by the Escrow Agent to access GATEWAY. The Sellers must provide written notice to Escrow Agent to change or remove any access previously authorized or granted.

List of authorized individuals:

| Name | Title | Email Address | Contact Number |
|------|-------|---------------|----------------|
|      |       |               |                |
|      |       |               |                |

US-DOCS\144542714.4

CONFIDENTIAL

FBG_CH1_00094017

**EXHIBIT B**

**Joint Written Instruction**

[INSERT DATE]

   Pursuant to that certain Escrow Agreement (the "Escrow Agreement") dated as of [ ● ], 2023, by and among [ ● ], a [ ● ] (the "[Japan] Buyer"), [ ● ], a [ ● ] (the "[US] Buyer" and collectively with the Japan Buyer, the "Buyers"), Western Alliance Bank, an Arizona corporation (the "Escrow Agent"), and Walbro Midco LLC, a Delaware limited liability company ("Midco Seller"), Walbro LLC, a Delaware limited liability company ("US Seller" and collectively with Midco Seller, the "Sellers"), the Buyers and the Sellers hereby instruct the Escrow Agent to release Escrow Funds from the Escrow Account in accordance with the following instructions:

| $ [_____] to Buyers: | $ [_____] to Sellers: |
|---|---|
| Wire Instructions: | Wire Instructions: |
| Account Name: _____ | Account Name: _____ |
| Account Number: _____ | Account Number: _____ |
| Bank Name: _____ | Bank Name: _____ |
| Bank ABA Number: _____ | Bank ABA Number: _____ |
| Bank Address: | Bank Address: |
| _____ | _____ |
| For credit to: | For credit to: |
| _____ | _____ |
| Special Instructions: | Special Instructions: |
| _____ | _____ |
| Bank Check: | Bank Check: |
| Payee Name: | Payee Name: |
| _____ | _____ |
| Mailing Address: | Mailing Address: |
| _____ | _____ |

US-DOCS\144542714.4

CONFIDENTIAL

FBG_CH1_00094018

**DEBTORS' EXHIBIT NO. 236**

IN WITNESS WHEREOF, the parties hereto have caused this Joint Written Instruction to be executed as of the date first above written.

| [JAPAN BUYER]<br><br>By: _____<br>Name:<br>Title: | [MIDCO SELLER].<br><br>By:_____<br>Name:<br>Title: |
|---|---|
| [US BUYER]<br><br>By: _____<br>Name:<br>Title: | WALLBRO LLC.<br><br>By:_____<br>Name:<br>Title: |

US-DOCS\144542714.4

CONFIDENTIAL

FBG_CH1_00094019

**Exhibit G**
**Financial Statements**

(*See attached.*)

CONFIDENTIAL                                                                FBG_CH1_00094020

| ($000) | EM Actual 2023-07 YTD (Actual FX) | R1 2023 2023-07 YTD (R1 2023 FX) | B/(W) Budget | APG Actual 2023-07 YTD (Actual FX) | R1 2023 2023-07 YTD (R1 2023 FX) | B/(W) Budget | EM+APG Actual 2023-07 YTD (Actual FX) | R1 2023 2023-07 YTD (R1 2023 FX) | B/(W) Budget |
|---|---|---|---|---|---|---|---|---|---|
| Pro-forma Sales (constant FX) | 56,191 | 65,877 | (9,685) | 4,266 | 4,844 | (578) | 60,457 | 70,721 | (10,264) |
| FX impact (at Budget rates) | (511) | 0 | (511) | (10) | 0 | (10) | (522) | 0 | (522) |
| Net Sales | 55,680 | 65,877 | (10,197) | 4,256 | 4,844 | (589) | 59,936 | 70,721 | (10,785) |
| Std Matl & Inv Effect | 24,473 | 26,627 | 2,154 | 1,642 | 2,102 | 460 | 26,115 | 28,729 | 2,614 |
| % of Sales | 44.0% | 40.4% | -3.5% | 38.6% | 43.4% | 4.8% | 43.6% | 40.6% | -2.9% |
| Matl Var excl. Freight / 4122 | (1,625) | (1,707) | (82) | 703 | 642 | (60) | (922) | (1,064) | (142) |
| Freight | 2,273 | 2,969 | 696 | 8 | 87 | 79 | 2,281 | 3,056 | 775 |
| % of Sales | 4.1% | 4.5% | 0.4% | 0.2% | 1.8% | 1.6% | 3.8% | 4.3% | 0.5% |
| Direct Labor | 7,384 | 8,469 | 1,085 | 85 | 83 | (2) | 7,469 | 8,552 | 1,084 |
| % of Sales | 13.3% | 12.9% | -0.4% | 2.0% | 1.7% | -0.3% | 12.5% | 12.1% | -0.4% |
| Variable excl. Scrap/Freight | 5,472 | 6,092 | 620 | 12 | 0 | (12) | 5,483 | 6,092 | 608 |
| % of Sales | 9.8% | 9.2% | -0.6% | 0.3% | 0.0% | -0.3% | 9.1% | 8.6% | -0.5% |
| Realized FX (Gain)/Loss | (125) | 191 | 316 | 0 | 0 | 0 | (125) | 191 | 316 |
| Contribution | 17,828 | 23,235 | (5,407) | 1,806 | 1,929 | (123) | 19,634 | 25,165 | (5,530) |
| Contribution Margin | 32.0% | 35.3% | -3.3% | 42.4% | 39.8% | 2.6% | 32.8% | 35.6% | -2.8% |
| Fixed Exp | 5,663 | 6,406 | 743 | 99 | 110 | 12 | 5,762 | 6,516 | 754 |
| Gross Profit | 12,165 | 16,830 | (4,665) | 1,707 | 1,819 | (111) | 13,873 | 18,649 | (4,776) |
| Gross Margin | 21.8% | 25.5% | -3.7% | 40.1% | 37.5% | 2.6% | 23.1% | 26.4% | -3.2% |
| Engineering Costs | 1,115 | 1,341 | 226 | 0 | 0 | 0 | 1,115 | 1,341 | 226 |
| SG&A Costs | 5,495 | 5,833 | 338 | 466 | 512 | 45 | 5,961 | 6,345 | 383 |
| MIP | 298 | 369 | 71 | 15 | 15 | 0 | 313 | 384 | 71 |
| SGA excl. Corporate | 6,909 | 7,543 | 634 | 481 | 526 | 45 | 7,390 | 8,069 | 680 |
| Amort & Deprec | 2,428 | 2,999 | (572) | 45 | 21 | 24 | 2,473 | 3,021 | (548) |
| EBITDA before Corporate | 7,684 | 12,286 | (4,602) | 1,271 | 1,314 | (42) | 8,956 | 13,600 | (4,644) |
| EBITDA Margin | 13.8% | 18.7% | -4.8% | 29.9% | 27.1% | 2.8% | 14.9% | 19.2% | -4.3% |

CONFIDENTIAL

FBG_CH1_00094021

**DEBTORS' EXHIBIT NO. 236**

| | EM/APG 2022-12 | EM/APG 2023-01 | EM/APG 2023-02 | EM/APG 2023-03 | EM/APG 2023-04 | EM/APG 2023-05 | EM/APG 2023-06 | EM/APG 2023-07 |
|---|---|---|---|---|---|---|---|---|
| Cash | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Trade Receivables, Net | 18,043 | 18,263 | 16,936 | 17,525 | 15,157 | 15,667 | 17,910 | 18,536 |
| Inventories | 21,774 | 19,767 | 19,050 | 19,593 | 18,401 | 17,473 | 17,917 | 16,455 |
| Other Current Assets | 2,791 | 1,721 | 1,885 | 1,650 | 1,903 | 2,199 | 2,644 | 2,763 |
| **Total Current Assets** | **42,608** | **39,751** | **37,871** | **38,769** | **35,460** | **35,339** | **38,470** | **37,754** |
| | | | | | | | | |
| Fixed Assets, NBV | 23,731 | 24,275 | 23,720 | 23,996 | 23,900 | 23,213 | 23,562 | 23,147 |
| LT Deferred Tax Asset | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Intangible Assets | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Goodwill & Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Assets** | **70,113** | **67,908** | **65,509** | **66,683** | **63,341** | **62,557** | **66,213** | **65,113** |
| | | | | | | | | |
| Accounts Payable | 18,062 | 17,349 | 15,682 | 15,600 | 13,653 | 14,498 | 15,427 | 14,994 |
| Accrued Warranty | 88 | 89 | 85 | 85 | 74 | 84 | 84 | 79 |
| Accrued Salaries & Wages | 3,205 | 3,639 | 3,723 | 3,935 | 4,068 | 4,072 | 4,011 | 4,394 |
| Accrued Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ico Related Parties | 334 | 1,068 | 1,269 | 1,943 | 2,080 | 2,059 | 1,951 | 581 |
| ST Loan Payable | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ST Borrowings | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ST Operating Lease Obligation | 525 | 537 | 536 | 539 | 542 | 540 | 557 | 557 |
| ST Capital Lease Obligation | 184 | 195 | 184 | 187 | 187 | 184 | 184 | 187 |
| Other Expenses | 4,958 | 4,514 | 4,894 | 5,561 | 3,625 | 3,663 | 3,762 | 4,074 |
| **Current Liabilities** | **27,357** | **27,390** | **26,373** | **27,850** | **24,229** | **25,099** | **25,975** | **24,866** |
| | | | | | | | | |
| Long-Term Notes Payable | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LT ROU Finance Lease Obligations | 1,876 | 1,974 | 1,850 | 1,860 | 1,846 | 1,799 | 1,789 | 1,800 |
| Pension Obligation | 1,347 | 1,438 | 1,381 | 1,408 | 1,411 | 1,353 | 1,364 | 1,455 |
| Other LT Liabilites | 3,364 | 3,465 | 3,486 | 3,490 | 3,537 | 3,550 | 3,692 | 3,717 |
| **Total Liabilities** | **33,944** | **34,268** | **33,091** | **34,609** | **31,023** | **31,802** | **32,819** | **31,839** |
| | | | | | | | | |
| **Total Equity & Interco Accts** | **36,169** | **33,641** | **32,418** | **32,074** | **32,318** | **30,755** | **33,393** | **33,273** |
| | | | | | | | | |
| **Total Liabs & Equity** | **70,113** | **67,908** | **65,509** | **66,683** | **63,341** | **62,557** | **66,213** | **65,113** |

| | | Actual | Total Product Lines | |
|---|---|---|---|---|
| MEX | - Trade Receivables, Net | | 8,627 | |
| MEX | 0192 - A/R-REVENUE RECOGNITION | | 1,586 | |
| MEX | - Trade Receivables, Gross | | 7,068 | Aging Report |
| MEX | 0112 - A/R-ACCRUAL | | {94} | |
| MEX | 0111 - A/R-TRADE | | 7,162 | |
| MEX | - Allowance for Doubtful Accounts | | {23} | |
| | | | | |
| WTH | - Trade Receivables, Net | | 1,589 | |
| WTH | 0192 - A/R-REVENUE RECOGNITION | | 0 | |
| WTH | - Trade Receivables, Gross | | 1,589 | Aging Report |
| WTH | 0112 - A/R-ACCRUAL | | 0 | |
| WTH | 0111 - A/R-TRADE | | 1,589 | |
| WTH | - Allowance for Doubtful Accounts | | 0 | |
| | | | | |
| JPN | - Trade Receivables, Net | | 7,627 | |
| JPN | 0192 - A/R-REVENUE RECOGNITION | | {188} | |
| JPN | - Trade Receivables, Gross | | 7,817 | Aging Report incl. FS |
| JPN | 0112 - A/R-ACCRUAL | | 102 | |
| JPN | 0111 - A/R-TRADE | | 7,714 | |
| JPN | - Allowance for Doubtful Accounts | | {1} | |
| | | | | |
| CHN | - Trade Receivables, Net | | 631 | |
| CHN | 0192 - A/R-REVENUE RECOGNITION | | 244 | |
| CHN | - Trade Receivables, Gross | | 387 | Aging Report |
| CHN | 0112 - A/R-ACCRUAL | | {13} | |
| CHN | 0111 - A/R-TRADE | | 399 | |
| CHN | - Allowance for Doubtful Accounts | | 0 | |
| | | | | |
| AFM | - Trade Receivables, Net | | 1,048 | |
| AFM | 0192 - A/R-REVENUE RECOGNITION | | 0 | |
| AFM | - Trade Receivables, Gross | | 1,048 | Aging Report |
| AFM | 0112 - A/R-ACCRUAL | | 0 | |
| AFM | 0111 - A/R-TRADE | | 1,048 | |
| AFM | - Allowance for Doubtful Accounts | | 0 | |
| | | | | |
| | Adjustment | | {986} | FS exclusion from the JPN balances |

CONFIDENTIAL

FBG_CH1_00094022

**DEBTORS' EXHIBIT NO. 236**
**Page 216 of 216**